| | |
|---|---|
| **From:** | Peters, Joe |
| **To:** | Bodisch, Robert |
| **Sent:** | 8/7/2013 4:19:16 PM |
| **Subject:** | RE: About Those Free Voter ID Cards — Few Sign Up |

Thanks for the heads up. I read the Trib article earlier today. Just FYI, we met with DSHS officials last Thursday regarding the possibilities of them providing free birth certificates for EIC applicants. They are receptive to doing that if DPS could somehow verify that the birth certificate is being requested in connection with an EIC application. We proposed some near term email solutions at low or no cost to us and a longer term, less time consuming process that would involve our CSRs being able to directly query the HHSC database for confirmation. Still working on requesting a blessing from OGC and working out potential security issues. I am scheduled to talk via phone with them again at 4:30 pm to get an update from their end.

Joe

Joe Peters
Assistant Director
Texas Department of Public Safety
Driver License Division
P.O. Box 4087
Austin, TX 78773
Office: 512-424-5899
joe.peters@dps.texas.gov



---

**From:** Bodisch, Robert
**Sent:** Wednesday, August 07, 2013 4:01 PM
**To:** Peters, Joe
**Subject:** FW: About Those Free Voter ID Cards — Few Sign Up

FYI

**Robert J. Bodisch**
**Assistant Director/Chief of Staff**
**Texas Homeland Security**
**Texas Department of Public Safety**
**P. O. Box 4087**
**Austin, Texas 78773**
**512-424-2368**
**robert.bodisch@dps.texas.gov**
**robert.bodisch.sle@dhs.sgov.gov**

Exhibit _119_
Date _5/9/14_
Melody Campbell, CSR



**From:** Bodisch, Robert
**Sent:** Wednesday, August 07, 2013 3:49 PM
**To:** Bodisch, Robert
**Subject:** About Those Free Voter ID Cards — Few Sign Up

# About Those Free Voter ID Cards — Few Sign Up



Texas Tribune

08/07 11:40 AM
08/07 11:43 AM



Texans aren't exactly lining up to get the free voter ID certificates the Texas Department of Public Safety is required to distribute under the terms of the state's controversial voter ID law. Both sides say that's proof they were right.

Opponents of Texas' voter ID law were supposed to be somewhat placated by a component of that 2011 measure that requires that the Texas Department of Public Safety to issue free IDs to non-drivers interested in casting a ballot.

That would solve the problem of the hundreds of thousands of Texans without the money to pay for IDs, conservative supporters of the bill argued.

But a month after a U.S. Supreme Court ruling gutted a key component of the Voting Rights Act and paved the way for the state's implementation of the voter ID bill, Texans aren't exactly camping out at DPS offices to get their voting credentials. As of July 26, the department had issued six of the documents, an average of about one a week, across the state. Texas DPS spokesman Tom Vinger said the documents were issued in Lampasas, Austin, Snyder, Skidmore, Jacksonville and Dallas.

When asked what the dismal figure means, friends and foes of voter ID rehashed their old arguments.

"It proves what we all suspected to be the case — that it's highly unlikely that anyone wouldn't be able to meet the ID standard laid out in the bill," said Beth Cubriel, the executive director of the Texas Republican Party.

Cubriel conceded there would be another "surge" — a term she used loosely — as election dates near. She lightheartedly added that it would likely resemble the first rush — the half-dozen issued so far.

Vinger said there had been about 50 inquiries about the EICs, but many found they already had the necessary documents. Alternatives include a Texas driver's license or ID, a passport, a concealed handgun license, a passport or passcard, or a military ID or naturalization certificate.

The American Civil Liberties Union of Texas said the numbers are so low because the required documents are nearly as difficult to obtain as a driver's license or ID.

"We know, from evidence in our photo voter ID case, that this law adversely affects poor, black and Latino Texans. So we're not at all surprised to hear that few Texans have been able to take advantage of this supposedly free ID," said Rebecca Robertson, legal and policy director for the ACLU of Texas. "It costs money to get the underlying documents, such as a certified copy of your birth certificate, which you need to prove to DPS your eligibility for the free ID."

The Texas Democratic Party is keeping with that same message. Tanene Allison, the party's communications director, said the time spent getting the free card equals money thrown away.

"Anybody who has ever struggled knows that time is money," she said. Like the GOP's Cubriel, she said the numbers may rise as elections, and interest in them, grows. But the TDP spokeswoman said the free IDs won't make a dent in the overall problem.

"The bottom line is that voter ID disenfranchises Texans," Allison said. "I imagine those numbers will rise but they won't match the numbers of Texans who need them."

As far as the U.S. Department of Justice's latest efforts to once again subject Texas to federal review of voting laws — that's happening through last month's legal filing from U.S. Attorney General Eric Holder — Republicans aren't too worried about that. At least not yet.

"We're confident in the [Texas] attorney general's ability to defend our state's rights in Texas," Cubriel said.

**Page: 1**
Copyright 2013 Nexstar Broadcasting, Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

**Robert J. Bodisch**
**Assistant Director/Chief of Staff**
**Texas Homeland Security**
**Texas Department of Public Safety**
**P. O. Box 4087**
**Austin, Texas 78773**
**512-424-2368**
**robert.bodisch@dps.texas.gov**
**robert.bodisch.sle@dhs.sgov.gov**



TEX0491000



**U.S. Census Bureau**

**P228**
**9/2/2014**
**2:13-cv-00193**

B05002 | PLACE OF BIRTH BY NATIVITY AND CITIZENSHIP STATUS

Universe: Total population
2008-2012 American Community Survey 5-Year Estimates

Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Data and Documentation section.

Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section.

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

| | Texas | |
|---|---|---|
| | **Estimate** | **Margin of Error** |
| Total: | 25,208,897 | ***** |
| Native: | 21,109,883 | +/-17,115 |
| Born in state of residence | 15,248,259 | +/-26,408 |
| Born in other state in the United States: | 5,553,655 | +/-19,140 |
| Northeast | 694,750 | +/-7,146 |
| Midwest | 1,511,610 | +/-10,273 |
| South | 2,054,740 | +/-13,591 |
| West | 1,292,555 | +/-10,628 |
| Born outside the United States: | 307,969 | +/-5,067 |
| Puerto Rico | 55,383 | +/-2,625 |
| U.S. Island Areas | 12,664 | +/-963 |
| Born abroad of American parent(s) | 239,922 | +/-3,782 |
| Foreign born: | 4,099,014 | +/-17,115 |
| Naturalized U.S. citizen | 1,343,456 | +/-8,558 |
| Not a U.S. citizen | 2,755,558 | +/-19,310 |

Exhibit 120
fairiola
Date 5/9/14
Melody Campbell, CSR

Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see Accuracy of the Data). The effect of nonsampling error is not represented in these tables.

While the 2008-2012 American Community Survey (ACS) data generally reflect the December 2009 Office of Management and Budget (OMB) definitions of metropolitan and micropolitan statistical areas; in certain instances the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB definitions due to differences in the effective dates of the geographic entities.

Estimates of urban and rural population, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2000 data. Boundaries for urban areas have not been updated since Census 2000. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization.

Source: U.S. Census Bureau, 2008-2012 American Community Survey

Explanation of Symbols:

1. An '*****' entry in the margin of error column indicates that either no sample observations or too few sample observations were

04/20/2014

available to compute a standard error and thus the margin of error. A statistical test is not appropriate.

2. An '-' entry in the estimate column indicates that either no sample observations or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest interval or upper interval of an open-ended distribution.

3. An '-' following a median estimate means the median falls in the lowest interval of an open-ended distribution.

4. An '+' following a median estimate means the median falls in the upper interval of an open-ended distribution.

5. An '**' entry in the margin of error column indicates that the median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.

6. An '*****' entry in the margin of error column indicates that the estimate is controlled. A statistical test for sampling variability is not appropriate.

7. An 'N' entry in the estimate and margin of error columns indicates that data for this geographic area cannot be displayed because the number of sample cases is too small.

8. An '(X)' means that the estimate is not applicable or not available.

Senator Troy Fraser                                              May 17, 2012

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
        Plaintiff,                 )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR. in his         )
official capacity as Attorney      )
General of the United States,      )
                                   )
        Defendant,                 )
                                   )
ERIC KENNIE, et al,                )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS STATE CONFERENCE OF          )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    )  (RMC-DST-RLW)
                                   )  Three-Judge Court
        Defendant-Intervenors,     )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al,             )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al,                     )
                                   )
        Defendant-Intervenors,     )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
        Defendant-Intervenors.     )

************************************************
ORAL DEPOSITION OF
SENATOR TROY FRASER
MAY 17, 2012
************************************************

## 2

1       ORAL DEPOSITION OF SENATOR TROY FRASER, produced as
2   a witness at the instance of the Defendant, was duly
3   sworn, was taken in the above-styled and numbered cause
4   on the MAY 17, 2012, from 9:43 a.m. to 6:29 p.m., before
5   Chris Carpenter, CSR, in and for the State of Texas,
6   reported by machine shorthand, at the offices of The
7   United States Attorney's Office, 816 Congress Avenue,
8   Suite 1000, Austin, Texas 78701, pursuant to the Federal
9   Rules of Civil Procedure and the provisions stated on
10  the record or attached hereto.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 3

1
2
3                A P P E A R A N C E S
4   FOR THE PLAINTIFF, STATE OF TEXAS:
5       Patrick K. Sweeten
        Matthew Frederick
6   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
        P.O. Box 12548
7       Austin, TX 78711-2548
8       209 West 14th Street
        8th Floor
9       Austin, TX 78701
        (512) 936-1307
10      patrick.sweeten@texasattorneygeneral.gov
        matthew.frederick@texasattorneygeneral.gov
11
    FOR THE DEFENDANT, HOLDER, ET AL:
12
13      Elizabeth S. Westfall
        Bruce Gear
14  U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue, NW
15      NWB - Room 7202
        Washington, DC 20530
16      (202) 305-7766
        elizabeth.westfall@usdoj.gov
17  FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
    NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
18  CAUCUS:
19      Ezra D. Rosenberg
    DECHERT, LLP
20      Suite 500
        902 Carnegie Center
21      Princeton, NJ 08540-6531
        (609) 955-3200
22      ezra.rosenberg@dechert.com
23
24
25

## 4

1   FOR THE KENNIE INTERVENORS:
2       Chad W. Dunn
    BRAZIL & DUNN, LLP
3       4201 Cypress Creek Parkway
        Suite 530
4       Houston, TX  77068
        (281) 580-6310
5       chad@brazilanddunn.com
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25





EXHIBIT
2

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                           May 17, 2012

## 5

INDEX

Appearances...........................................2
SENATOR TROY FRASER
   Examination by Ms. Westfall....................6
   Examination by Mr. Rosenberg..............295

Signature and Changes..........................318

Reporter's Certificate............................320

EXHIBITS

NO.  DESCRIPTION                          PAGE MARKED

43   Deposition Notice                         16

44   HB No. 1706                               62

45   Declaration of Carlos Uresti             117

46   Excerpt of proceedings of the Committee of  207
     the Whole Senate on Tuesday, March 10
     2009

47   Senate Journal of the fifth day,          283
     Wednesday, January the 26th
48   Texas Tribune article                    289
49   Excerpt of Senate Record                 311

## 7

1       If you would like to take a break for any
2   reason, just let me know, and we can take a break.  We
3   will take breaks probably several times today and also
4   break for lunch.  But if I have a question pending and
5   you would like to take a break, if you could go ahead
6   and answer that question first before we take a break,
7   I'd appreciate it.  Is that clear?
8       A.  Yes.
9       Q.  You understand that you've been sworn in and
10  you're under oath and you may be subject to penalty of
11  perjury for giving false or misleading testimony just
12  like a trial, okay?
13      A.  Yes.
14      Q.  Do you understand these instructions?
15      A.  Yes, I do.
16      Q.  Do you have any questions about these
17  instructions?
18      A.  No.
19      Q.  Are you on any medication today that would have
20  any impact on your ability to testify truthfully at this
21  deposition?
22      A.  No.  I should qualify:  I've had knee surgery a
23  month ago, and at some point, about every five minutes,
24  I will stand up and stretch my leg.  So if I stand up,
25  I'm not leaving.

## 6

1              SENATOR TROY FRASER,
2   having been first duly sworn to testify the truth, the
3   whole truth, and nothing but the truth, testified as
4   follows:
5                  EXAMINATION
6   BY MS. WESTFALL:
7       Q.  Good morning, Senator Fraser.  Could you state
8   and spell your name for the record, please?
9       A.  Troy Fraser, F-r-a-s-e-r.
10      Q.  Have you had your deposition taken before?
11      A.  Not to my knowledge.
12      Q.  Okay.  I'm going to tell you some ground rules
13  so you can understand what will be happening
14  today.  You're here to testify truthfully, accurately
15  and completely.
16          The court reporter here will be preparing
17  a transcript of that everything is said today, so it is
18  important to wait for me to ask my question before you
19  answer.  And also to make verbal responses to my
20  questions.  In other words, please do not shake your
21  head or say "uh-huh" or "nuh-uh," because you can't see
22  that in the transcript.
23          Please wait for me to finish my question.
24  If you have any questions about my question or don't
25  understand my question, please feel free to ask.

## 8

1       Q.  Very good.  I will not take offense.  Thank you
2   for letting me know, and I hope you're recovering
3   swiftly.
4           I may use the terms "voter ID" and "photo
5   ID" interchangeably throughout this deposition, and I
6   want you to interpret those terms as broadly as you can
7   to mean a requirement that a voter present a form of
8   identification, whether it has a photo or otherwise,
9   when voting in person, before being permitted to vote
10  with a regular ballot.  Do you understand?
11      A.  Yes.
12      Q.  If I refer to "you," I'm asking you a question
13  about you in your capacity as a member of the Texas
14  State Senate, and not in any other capacity.  Do you
15  understand?
16      A.  Yes.
17      Q.  And if I refer to "you," I also mean to include
18  anyone in your office or acting on your behalf, okay?
19      A.  Could I address my attorney?
20      Q.  Certainly.
21          THE WITNESS:  Why, my staff?
22          MR. SWEETEN:  Yeah.  I think, you know,
23  with respect to that instruction, I think that that
24  could be very difficult for him, if you're asking
25  Senator Fraser something, I mean, it depends on the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

9

1   context. But if you're asking him, "Did you do this,"
2   he could be answering that he personally did something
3   or -- under your definition, you would be requiring him
4   to say that, you know, to speak for, you know, a group
5   of people.
6          I think we would have -- we would ask that
7   when you -- we can't agree to that instruction the way
8   it's phrased, because I think that that could be
9   problematic for him. And certainly, he's raised that
10  that would be potentially an issue.
11         So we would ask that we -- that "you" be
12  giving its normal meaning. If there's a circumstance
13  you're asking for "you" to mean his office, then I think
14  that if you would just specify that, we'd appreciate
15  that.
16         MS. WESTFALL: Thank you, Mr. Sweeten. I
17  will do my best to make sure that my questions are
18  accurate. And when I intend to refer to "you" and "your
19  office," I'll try to make sure the question encompasses
20  both of those terms.
21  Q. (By Ms. Westfall) Finally, I would like to
22  instruct you that when I state the term "minority
23  voters," I mean voters who are not white or not Anglo.
24  Do you understand that definition?
25         MR. SWEETEN: So she's saying for purposes

10

1   of this deposition, as she's asking you the questions,
2   when she using the term "minority voters," that she
3   means people that are not white or nonAnglo. Okay.
4   Just as she says it in the deposition, that that's what
5   that term will mean.
6          THE WITNESS: Is that a term of art used?
7          MR. SWEETEN: Well.
8   Q. (By Ms. Westfall) Sir, I'm using the term for
9   purpose of this definition -- deposition, and I want to
10  make sure that we have a mutually agreed upon
11  understanding of terms so that when I ask you a
12  question, you can know the question that I'm asking.
13         Otherwise, I could ask -- I could ask you
14  many, many questions about persons of different races,
15  but I don't want to burden you with those number of
16  questions today at this deposition. So I'm hoping we
17  can agree that you will understand what I mean when I
18  say "minority voter."
19         Do you have any questions about that, sir?
20  A. No.
21  Q. Thank you. Are you represented by counsel
22  today?
23  A. Yes.
24  Q. Who is your lawyer?
25  A. Patrick.

11

1   Q. And Patrick is Patrick Sweeten?
2   A. Yes.
3   Q. And I think I asked you whether you've been
4   deposed before, and you said no?
5   A. No.
6   Q. That's correct?
7   A. I'm sorry. I do not remember being deposed
8   before.
9   Q. Thank you. Have you testified in court before?
10  A. No. Again, not to my -- I don't remember
11  testifying in court.
12  Q. Have you ever been personally a party to a
13  lawsuit, either as a plaintiff or a defendant?
14  A. Not to my knowledge that I -- not that I
15  remember.
16  Q. Thank you. What did you do to prepare for
17  today's deposition?
18  A. Read the -- all the -- you know, the '09 and
19  '011 hearings data. Reread the bill that was passed and
20  met with Counsel prior to.
21  Q. And by "Counsel," you mean Mr. Sweeten?
22  A. Yes.
23  Q. Did you read anything else in advance of this
24  deposition other than the things you just testified
25  about today?

12

1   A. That's a very broad question.
2   Q. Did you read anything other than the 2009, 2011
3   hearings and the bill to prepare for the deposition?
4   A. Yes.
5   Q. What else did you read?
6   A. Anything that I had in my file that had been
7   delivered to you that, you know, we had released, I read
8   that data.
9   Q. Okay. Very good. And did that include
10  information about Senate Bill 14?
11  A. Yes.
12  Q. Did that include information and documents
13  related to previous photo ID bills that had been enacted
14  or considered by the Texas legislature?
15  A. Yes.
16  Q. Are there any other categories of documents
17  that I did not mention in that list that you read from
18  your file?
19  A. No.
20  Q. When you met with your attorney, Mr. Sweeten,
21  was anyone else present?
22  A. Yes.
23  Q. Who else was present?
24  A. Other counsel that would be working with
25  Mr. Sweeten.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

13

1    Q. Anyone else besides other attorneys in the
2  room?
3    A. No.
4    Q. Other than your attorneys, did you speak with
5  anyone in advance of this deposition about your
6  deposition?
7    A. No.
8    Q. Did you speak to Janice McCoy about her
9  deposition?
10   A. No.
11   Q. Did you bring any notes or documents with you
12 today?
13   A. No.
14   Q. Is it your understanding that as a -- that you
15 as a state legislator may invoke legislative privilege?
16   A. Yes.
17   Q. Are you invoking that privilege today?
18   A. Yes.
19   Q. Are there any other privileges that you are
20 asserting today other than attorney-client privilege
21 with your attorneys and legislative privilege?
22      MR. SWEETEN: Those are the two categories
23 that we intend to assert. Obviously, if something were
24 to come up that we're not expecting in the examination,
25 if you asked about his physician discussions or

14

1  something like that, that could be implicated, but I
2  think those are the two, I think, coming in that we
3  expect to assert.
4    Q. (By Ms. Westfall) Do you agree with what your
5  attorney just said, Senator?
6    A. Yes.
7    Q. Have you asserted legislative privilege over
8  documents and other materials within your possession or
9  in the possession of your staff members that relate to
10 Senate Bill 14?
11   A. I would like to address Counsel. I believe we
12 have.
13      MR. SWEETEN: That's correct. Correct.
14   A. The answer is yes.
15   Q. (By Ms. Westfall) Do you understand that as a
16 result of asserting this privilege, the office of the
17 Attorney General for the State of Texas has withheld
18 certain documents in your position that relate to Senate
19 Bill 14?
20   A. Yes.
21   Q. And do you further understand that the offices
22 of the Attorney General has not produced those documents
23 to counsel for the US Attorney General in this
24 litigation; is that right?
25   A. Yes.

15

1    Q. Do you continue today to assert legislative
2  privilege over documents related to Senate Bill 14?
3    A. Yes.
4    Q. Will you be invoking today legislative
5  privilege over your deposition testimony that you
6  provide today in this litigation?
7    A. Yes.
8    Q. Will you be invoking legislative privilege with
9  regard to your deposition testimony today that relates
10 to other photo ID bills that have been considered by the
11 Texas legislature in past sessions?
12   A. Yes.
13   Q. Why are you asserting a legislative privilege?
14      MR. SWEETEN: You don't have to answer why
15 you're asserting that.
16      We revealed communications that I've had
17 with him, discussions about legal matters, he doesn't
18 have to provide you with why, as to why he's asserting
19 the privilege.
20   A. I think that's protected.
21   Q. (By Ms. Westfall) Are you adhering to your
22 attorney's instruction?
23   A. Yes.
24   Q. If you would -- and you realize that you
25 yourself personally hold this privilege; is that right?

16

1    A. Yes.
2    Q. And you may decide if you want to assert it or
3  not; is that correct?
4    A. Yes.
5    Q. If you would like to waive the privilege in
6  response to any particular question that I ask today
7  during the deposition, will you let me know?
8    A. Yes.
9    Q. Thank you.
10      MS. WESTFALL: Court Reporter, can you
11 mark this, please?
12      (Exhibit 43 marked for identification.)
13   Q. (By Ms. Westfall) Senator, I don't think this
14 is in very small font, but I want you to have your
15 proper glasses because I want to ask you about this
16 stuff.
17      You've been handed by the court reporter
18 what's been marked as US Exhibit 43. Do you recognize
19 this document?
20   A. No, I do not.
21   Q. Okay. Could you look at the second page, sir?
22 Does taking a look at the second page of Exhibit 43
23 refresh your recollection about what this document is?
24   A. No.
25      MS. WESTFALL: I'll note for the record



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Troy Fraser                                    May 17, 2012

17

1   that Counsel is assisting the witness in reviewing the
2   document.
3       Q.  (By Ms. Westfall)  Does it remain your
4   testimony that you've never seen this document before?
5       A.  (Looking through other pages.)  I have not seen
6   this document.
7       Q.  Thank you.  You need not refer to it right now,
8   but I'm going to ask you some questions about documents
9   that were collected pursuant to US Exhibit 43.
10          Did anyone to your knowledge search in
11  your office for documents and communications related to
12  calculations, reports, audits, estimates, projections,
13  assessments and other analyses of the effect of Senate
14  Bill 14 on minority voters?
15          MR. SWEETEN:  Can you direct him to where
16  you're reading?
17          MS. WESTFALL:  I certainly can.  It's
18  Number 5 in the list of documents.  It's not a paginated
19  document, but Mr. Sweeten could you assist him in
20  looking at Number 5 on this?
21          MR. SWEETEN:  So counsel is asking me to
22  assist him reviewing the document.  Sure.  I can do
23  that.
24          MS. WESTFALL:  Well, if you want me to
25  refer to it, otherwise, I can read, Mr. Sweeten.

18

1       Q.  (By Ms. Westfall)  And Number 5 on the next
2   page, sir.
3       A.  Clarify.  You want all through 1 through 5?
4       Q.  No.  Just -- I'm directing your attention to
5   Number 5 in the document.  If you could look at that
6   Number 5, and let me know when you've had a chance to
7   review that.
8       A.  (Witness complies.)
9       Q.  Do you know whether -- you've had a chance to
10  look at Number 5; is that correct, sir?
11      A.  Uh-huh.
12      Q.  Do you know -- is that a "yes"?
13      A.  Yes.
14      Q.  Thank you.  Just so the court reporter can hear
15  you.  Thank you.
16          Do you know whether anyone in your office
17  has searched for documents in response to the documents
18  requested in Number 5 of Exhibit 43?
19          MR. SWEETEN:  She's asking you, do you
20  know if anybody in your office has done a search for
21  these documents?
22      A.  It's my understanding that Janice McCoy did the
23  search for the documents.
24      Q.  (By Ms. Westfall)  Okay.  And did Ms. McCoy, to
25  the best of your recollection, handle all document

19

1   searches in response to the documents listed here --
2       A.  Yes.
3       Q.  -- in Exhibit 43?
4           So you don't have any further information
5   about looking for those records, is that your testimony?
6       A.  Yes.
7           MR. SWEETEN:  Were you asking just as to
8   5, when you said "as to this document" --
9           MS. WESTFALL:  No.  I meant --
10          MR. SWEETEN:  -- or are you asking as to
11  any on the list?
12          MS. WESTFALL:  Thank you for the
13  clarification, Mr. Sweeten.
14      Q.  (By Ms. Westfall)  You've testified you've
15  never seen Exhibit 43?
16      A.  No.
17      Q.  Is that correct?
18      A.  Yes.
19      Q.  It -- Exhibit 43 has a list of documents
20  numbered 1 through 12, does it not?
21      A.  Yes.
22      Q.  And to the best of your knowledge, did
23  Ms. McCoy in response to this request for documents
24  search for documents?
25      A.  I have no knowledge that she did.  I think it

20

1   was requested of her, but no, I have no knowledge.
2       Q.  Thank you.  And are there any documents related
3   to Senate Bill 14 or previous voter ID bills that you
4   keep in your possession that Ms. McCoy would not have
5   had access to?
6       A.  No.
7       Q.  Can you describe your educational background,
8   please, starting with college?
9       A.  College, three total years of college.  One
10  year of junior college.  And then I attended three other
11  colleges.
12      Q.  Did you eventually get a degree?
13      A.  No.
14      Q.  Did you do any studies after that?
15      A.  In at least one, maybe two occasions, took a
16  course through a university.
17      Q.  Did any of those courses involve election law?
18      A.  No.
19      Q.  Did any of them involve voter ID?
20      A.  No.
21      Q.  How long have you served in the Senate, sir?
22      A.  I was elected in 1996, sworn in January '97.
23      Q.  Before that time, were you a member of the
24  Texas House of Representatives?
25      A.  Yes, I was.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

---

**21**

1     Q.   And when did you start that service?
2     A.   I was elected in 1988, and served until '93.
3     Q.   Could you describe the areas within your Senate
4   district currently?
5     A.   Could you clarify?
6     Q.   Certainly.  Just could you describe where your
7   Senate district is?
8     A.   The Senate district is the geographic center of
9   the State of Texas encompassing 21 counties.
10    Q.   And is it Senate District 24?
11    A.   Yes, it is.
12    Q.   What is the total population of your district?
13    A.   The last census, we subdivided the state, and
14  it's approximately 820,000 people.
15    Q.   Could you describe the racial demographics of
16  your district?
17    A.   Racial demographics are in keeping with the
18  rest of the state, probably -- no, probably a pretty
19  good reflection of the percentages within the rest of
20  the state.
21    Q.   Could you tell me approximately how that breaks
22  down, to the best of your knowledge?
23    A.   I'm sorry.  I cannot.
24    Q.   Do you currently serve on any committees in the
25  Senate?

---

**23**

1     Q.   And putting aside for a moment the photo ID
2   bills that you have sponsored and had involvement in,
3   how many election-related bills have you sponsored, or
4   voter-related bills?
5     A.   Again, I don't have a clear recollection.  I
6   think I probably carried two very minor bills six or
7   eight years ago, but I don't -- I don't have
8   recollection of those.
9     Q.   Do you know generally what they were about?
10    A.   No.
11    Q.   Did they relate to voter registration?
12    A.   No.
13    Q.   Did they relate to voting?
14    A.   If they were a voter bill, they related to
15  voting.
16    Q.   I just wanted to know if they related to
17  campaign finance or some other election-related matter.
18  But to the best of your recollection, they related to
19  voting; is that correct?
20    A.   I don't have a clear recollection, so no, I
21  can't answer that affirmatively.
22    Q.   Do you know whether those bills were enacted?
23    A.   A.  No.
24    Q.   You don't know?
25    A.   No.  I do not know.

---

**22**

1     A.   Yes.
2     Q.   What are those committees?
3     A.   The chair of Natural Resources.  I serve on the
4   State Affairs.  I serve on International Relations and
5   something.  I'm sorry.  I'm missing one.
6     Q.   Do you also serve on Nominations?
7     A.   No.
8     Q.   No?
9     A.   No.
10    Q.   My apologies.
11    A.   Well, hold on a second.  I'm sorry, I can't
12  answer that question.  I don't.
13    Q.   That's okay.
14         Is State Affairs committee the sole
15  committee that has considered voter ID bills since
16  you've served in the Senate?
17    A.   Again, I'm not sure I can answer that.  The
18  answer is it has not been the sole committee.
19    Q.   Has the other committee been the Committee of
20  the Whole?
21    A.   Yes.
22    Q.   Are there any other committees you're aware of
23  that have considered voter ID in the Senate since you've
24  served in the Senate?
25    A.   No.

---

**24**

1     Q.   Have you cosponsored any voting bills other
2   than the photo ID bills?
3     A.   I believe the answer is no, not to my
4   knowledge.
5     Q.   What has your primary focus in the legislature
6   been in the Senate?
7     A.   I have chaired, prior to Natural Resources,
8   chaired Business and Commerce and worked on business-
9   related issues.
10    Q.   Could you describe those issues?
11    A.   I heard about 2,000 bills per year for 15
12  years, so it would be a long list of description.
13    Q.   Okay.  Did you have any signature initiatives
14  in that committee?
15    A.   Qualify "signature."
16    Q.   Did you have any area of focus?
17    A.   I focused on the entire committee.
18    Q.   Have you served in any leadership roles in the
19  Senate?
20    A.   We are not divided to leadership positions.
21  There are no leadership positions.
22    Q.   Have you ever served as president pro tem?
23    A.   Yes, I have.
24    Q.   When was that?
25    A.   The -- starting in June of '09 through January

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

25

1    of '11.
2        Q.   What did that role entail as president pro tem?
3        A.   It is an honorary position that is rotated by
4    seniority. It's not mandated, but it is custom that we
5    transfer it by seniority. And it becomes your term and
6    you serve. The responsibilities would be entailed that
7    if the Governor and the Lieutenant Governor are out of
8    the state, then you would be the acting governor in
9    their absence.
10       Q.   I see. What is the role of the Lieutenant
11   Governor in the Senate?
12       A.   The Lieutenant Governor is a state-wide elected
13   official. He presides over the Senate at the will of
14   the Senate. He has no constitutional right to serve.
15   He's given his power by rule from the senators.
16       Q.   Is that in the Senate rules?
17       A.   Yes.
18       Q.   Does the Lieutenant Governor vote as a member
19   of the Senate?
20       A.   He is allowed to be a tiebreaker. He – yes,
21   he is allowed to vote.
22       Q.   Is that the sole circumstance under which he
23   may vote?
24       A.   No. He can vote any time he chooses.
25       Q.   Does the Lieutenant Governor set the agenda for

26

1    what the Senate hears on the Floor?
2        A.   Yes.
3        Q.   Does the Lieutenant Governor --
4        A.   I'm sorry. I need to reanswer that
5    question. The – the Senate sets the order of their
6    agenda based on an order of business by rule that is
7    established by the senators themselves. In the absence
8    of a -- following the order of business, the Lieutenant
9    Governor will establish what bills are eligible to be
10   heard that day.
11       Q.   Was – was it true that the Lieutenant Governor
12   played a role in insuring that Senate Bill 14 would be
13   heard by the Senate when it was?
14       A.   Yes.
15       Q.   And describe the role he played.
16            MR. SWEETEN: At this point, I'm going to
17   instruct you with respect to the legislative privilege,
18   and I want you to not reveal the thoughts, mental
19   impressions, opinions about legislation, including
20   Senate Bill 14. Don't reveal the communications that
21   you've had with legislators, with legislative staff,
22   with any state agency, including the Lieutenant
23   Governor's Office, the Governor's Office, or the Texas
24   Legislative Council or constituents.
25       A.   I will assert privilege on that question.

27

1        Q.   (By Ms. Westfall) And outside of any
2    conversations for which your counsel is asserting
3    privilege, as a matter of procedure, did the Lieutenant
4    Governor – could you describe the role that the
5    Lieutenant Governor played with regard to Senate Bill 14
6    and its placement on the Senate calendar or agenda?
7        A.   I would again assert privilege.
8        Q.   Thank you, sir. Is the Lieutenant Governor in
9    effect the leader of the Senate?
10       A.   No.
11       Q.   Who is?
12       A.   The senators.
13       Q.   Collectively?
14       A.   Yes.
15       Q.   Are you familiar with an organization called
16   the American Legislative Exchange Council, otherwise
17   known as ALEC?
18       A.   Yes.
19       Q.   Where is that organization based physically, do
20   you know?
21       A.   No.
22       Q.   Is it based in Washington, D.C.?
23       A.   I just answered. I don't know where it's
24   located.
25       Q.   Thank you. Do you have any affiliation with

28

1    ALEC?
2        A.   Clarify "affiliation."
3        Q.   Are you a member of ALEC?
4        A.   My understanding of ALEC is that there's not a
5    constant membership, that if you choose to attend a
6    conference, part of the registration fee includes your
7    dues for that year.
8        Q.   What is ALEC? Could you describe it, please?
9        A.   It's an American legislative something
10   exchange.
11       Q.   We'll call it ALEC for the purposes of this
12   deposition to make things easier, sir.
13       A.   Oh.
14       Q.   Could you describe the type of services it
15   provides or what it does generally?
16       A.   They have a conference once a year and enables
17   legislators to get together to intermingle.
18       Q.   Is it for state legislators solely?
19       A.   I believe it is.
20       Q.   How long have you had any dealings – for how
21   many years have you had membership or attended the
22   conferences or otherwise participated in ALEC events?
23       A.   In 1991, my first dealing with them in 1991, I
24   was chosen as one of their legislators of the year.
25       Q.   How did you get that honor?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                           May 17, 2012

---

29

1     A. I have no idea.
2     Q. Do you know if there are other members of the
3  Texas legislature who are members of ALEC?
4     A. Again, to my knowledge, there is no membership
5  to ALEC. There's a competing group that is a -- you
6  know, the state pays the membership to a competing
7  group. To ALEC, the only membership is if someone goes
8  to a conference, part of their conference dues includes,
9  I'm assuming, a membership for that year. So I don't
10  know who's a member.
11     Q. Have you attended meetings of ALEC with other
12  members of the Texas legislature?
13     A. Yes.
14     Q. Who are those members?
15     A. I would not -- wouldn't recall who they were.
16     Q. Was it -- did you attend -- have you attended
17  ALEC meetings with 10 other senators from the Texas
18  Senate?
19     A. Again, I don't remember who was there.
20     Q. Are there agendas for the meetings of ALEC?
21     A. You have general meetings, where you have
22  speakers, and you have breakout meetings that address
23  topics.
24     Q. And I believe you testified you attend, you
25  have attended ALEC conferences once a year; is that

---

30

1  correct?
2     A. I didn't say that.
3     Q. Please tell me how often you attend meetings?
4     A. Whenever there's a meeting that I want to
5  attend.
6     Q. So could be once a year, could be less than
7  once a year, could be more than once a year; is that
8  correct?
9     A. Oh, you're asking how many times a year?
10     Q. Yes, sir.
11     A. To my knowledge, I've never attended more than
12  one per year.
13     Q. Do you generally take notes when you go to
14  those meetings?
15     A. No.
16     Q. Do you serve on any task forces or other
17  subcommittees that have been convened by ALEC?
18     A. To my knowledge, none through ALEC.
19     Q. Have you ever received any documents, materials
20  or communications from ALEC related to voter ID?
21     A. No.
22     Q. Has ALEC ever offered any technical assistance
23  on voter ID?
24     A. No --
25        MR. SWEETEN: Hold on a minute. I just

---

31

1  want to make sure that we're -- with respect to
2  legislative privilege, when she's asking you these
3  questions, I don't want you to reveal thoughts, mental
4  impressions, opinions about legislation, including
5  Senate Bill 14. And don't reveal communications that
6  you've had with other legislators, legislative staff,
7  state agencies and Texas Legislative Council or
8  constituents. Okay?
9        THE WITNESS: All right.
10        MR. SWEETEN: All right.
11     Q. (By Ms. Westfall) Have you ever asked ALEC for
12  assistance with any legislation you've been drafting?
13        MR. SWEETEN: Any legislation at all?
14        MS. WESTFALL: Yes.
15        MR. SWEETEN: I think that would still ask
16  him to reveal thoughts, mental impressions, opinions
17  about legislation, so I don't think you should answer,
18  and I instruct you not to answer that.
19     Q. (By Ms. Westfall) Are you following your
20  counsel's advice?
21     A. Yes.
22     Q. Have you ever attended -- strike that.
23        Are you a member of the National
24  Conference of State Legislators?
25     A. To my knowledge, yes.

---

32

1     Q. Do you attend their meetings?
2     A. Yes.
3     Q. Where are their meetings held?
4     A. Always different cities.
5     Q. How often do you attend those meetings?
6     A. Never more than once a year and not every year.
7     Q. Have you attended any of those -- any meetings
8  other than the National Conference of State Legislators
9  where voter ID has been discussed?
10     A. How do I answer that?
11        MR. SWEETEN: I'm going to let you answer
12  to the extent you've attended. She can ask you about
13  whether you've attended a conference. And just the
14  subject matter of voter ID, I'm going to let you answer
15  as to just yes or no.
16     A. The answer is no.
17     Q. (By Ms. Westfall) Could you identify your
18  staff members by name and title who work for you?
19     A. Probably not.
20     Q. Could you name one of them?
21     A. Janice McCoy is my chief of staff.
22     Q. Could you name each and every person on your
23  staff who worked on Senate Bill 14?
24     A. Janice McCoy.
25     Q. Was she the sole person?

---



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                     May 17, 2012

---

### 33

1    A.  (Witness nods head yes.)
2    Q.  Do you have a schedule in your -- scheduler in
3    your office?
4    A.  Yes.
5    Q.  And what's the name of that scheduler?
6    A.  Terri Mathis.
7    Q.  Did Terri play any role in scheduling any
8    witnesses for hearings related to SB 14?
9    A.  Not to my knowledge.
10   Q.  Did she schedule any meetings with any
11   constituents, groups or other legislators regarding SB
12   14?
13   A.  That's not privileged, is it?
14        MR. SWEETEN:  She's just asking if someone
15   scheduled anything related to you.  You can answer that.
16   A.  The answer would be yes.
17   Q.  (By Ms. Westfall)  And I'm sorry, Terri's last
18   name is?
19   A.  Mathis.
20   Q.  Is she still employed with you today?
21   A.  Yes, she is.
22   Q.  How long has she been employed with you?
23   A.  15 years.
24   Q.  How did she generally schedule meetings with
25   constituents for you?

### 34

1    A.  I feel sure they called and asked for a
2    meeting, and she asked if I wanted to take the meeting,
3    and then they arrange it.
4    Q.  Does she maintain a calendar for you?
5    A.  Yes, she does.
6    Q.  Is that calendar maintained on a computer
7    system or is it a paper calendar?
8    A.  It's a computer.
9    Q.  How often do you communicate with your staff
10   when you're in session?
11   A.  When I'm in session?  Constantly.
12   Q.  Do you use e-mail?
13   A.  No.
14   Q.  No e-mail, personal or business?
15   A.  I have a personal e-mail account that -- and I
16   estimate that I've probably have sent less than 10
17   e-mails in my lifetime.  I don't know how to
18   e-mail.  The answer is I don't know how to e-mail, and
19   when I send one, I have to ask staff how to do it.
20   Q.  Thank you.
21   A.  So I don't e-mail.
22   Q.  Do you have a BlackBerry?
23   A.  No.
24   Q.  How do you communicate with your staff?
25   A.  Yell into the other office.

### 35

1    Q.  How do you communicate with your staff on
2    nonlegislative matters?
3    A.  Clarify, please.
4    Q.  I guess scheduling issues, personnel issues, is
5    there a distinction between how you communicate
6    regarding legislation with your staff and other matters?
7    A.  My staff are generally not involved in
8    nonlegislative.  If I have something that I'm going to
9    do, I will just -- I'll say "Don't arrange something on
10   this day.  Block this day."
11   Q.  How often in session do you communicate with
12   other members of the legislature?
13   A.  In session, constantly.
14   Q.  How do you communicate with other legislators?
15   A.  Open my mouth and words come out.
16   Q.  Face-to-face meetings?
17   A.  Yes.
18   Q.  Chiefly?
19   A.  Well, the answer is a combination of face-to-
20   face, and obviously, there are some phone communication
21   that we touch on.  But we generally more face-to-face
22   because we're around each other constantly.
23   Q.  And do you communicate with the Lieutenant
24   Governor's Office and the Lieutenant Governor?
25   A.  You know, limited.  Once in a while.

### 36

1    Q.  Do you communicate with the Governor's Office?
2    A.  Very limited.
3    Q.  How do you communicate with the Governor's
4    Office?
5    A.  If it's involving a staffer question, probably
6    would be a phone call.  If it's the Governor, you'd have
7    to ask to get on his calendar to see him.
8    Q.  But are these chiefly in-person meetings that
9    you have with the Governor's Office?
10   A.  90 percent of the time.  Occasionally, it will
11   be a phone call.
12   Q.  And does the same hold true for the Lieutenant
13   Governor's Office?
14   A.  Yes.
15   Q.  Turning back to ALEC, can you describe the
16   issues that ALEC has highlighted in the last five years
17   in terms of issue priorities for ALEC?
18   A.  They've highlighted a lot of issues.
19   Q.  Could you name some of them?
20   A.  No.
21   Q.  Could you describe ALEC's key issues and goals?
22   A.  No.
23   Q.  Has ALEC highlighted or provided technical
24   advice on immigration-related issues?
25        MR. SWEETEN:  Don't reveal any sort of

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                      May 17, 2012

<table>
<tr><td>

37

1  thoughts, mental impressions or opinions about
2  legislation or your process in considering legislation.
3  And then I think that that would include, you know, any
4  sort of discussions she's asking you for, so I'm
5  going to ask --
6       MS. WESTFALL: Mr. Sweeten, I have not
7  posed any question about any legislation. I'm asking
8  about a policy organization and its issues. I'm going
9  to ask you to withdraw that objection.
10      MR. SWEETEN: Well, I heard your question
11  to ask technical assistance, which I believe in the way
12  I'm understanding your question would reveal, and you
13  said as to any legislation, so it would potentially
14  reveal any sort of process that he had in formulating
15  legislation. So I think that that potentially is
16  legislatively privileged what you've asked him.
17    Q.  (By Ms. Westfall)  Let me try another way.
18      Has ALEC highlighted in its work as a
19  policy organization any immigration-related issues?
20    A.  Not to my knowledge.
21    Q.  Has ALEC highlighted any election-related
22  issues?
23    A.  Again, not to my knowledge.
24    Q.  Have you had any communications with ALEC
25  related to the subject matter of photo ID?

</td><td>

39

1    A.  I'm sorry. I renewed my driver's license in
2  Austin, Texas.
3    Q.  Where was that office?
4    A.  North end of town.
5    Q.  How far was that from your office?
6    A.  Probably 25 minutes.
7    Q.  How far was that from your home, to the extent
8  you have a home in Austin?
9    A.  It's an hour and a half from my home.
10    Q.  When did you go there?
11    A.  I'm sorry. I don't know.
12    Q.  Do you know approximately how many years ago?
13    A.  Three years.
14    Q.  Do you know the hours of operations of that
15  office?
16    A.  No.
17    Q.  What time of day did you go, do you recall?
18    A.  No.
19    Q.  Did you go during business hours, to the best
20  of your recollection?
21    A.  Yes.
22    Q.  How did you get to the driver's license office?
23    A.  I drove myself.
24    Q.  Do you remember waiting in line?
25    A.  Yes.

</td></tr>
<tr><td>

38

1    A.  No.
2    Q.  Never, not one?
3    A.  Not to my knowledge. You're clarifying here
4  that is me as an individual Senator. I have not had
5  communication that I know of.
6    Q.  Have you had any communications with ALEC in
7  any other capacity, other than being a Texas senator?
8    A.  The answer is no. I'm just saying that --
9      MR. SWEETEN: We've defined you as --
10    A.  I want to clarify it's me. I have -- I have
11  not had communication.
12    Q.  (By Ms. Westfall)  Are you aware of whether
13  Ms. McCoy has any communications?
14    A.  I'm not aware.
15    Q.  Are you employed in the capacity other than
16  serving in the Texas State Senate?
17      MR. SWEETEN: Is he employed?  I'm sorry.
18    Q.  (By Ms. Westfall)  In another capacity other
19  than being in the Texas Senate?
20    A.  I have no job other than my $600 a month I'm
21  making as a legislator.
22    Q.  When you last renewed your driver's license,
23  where did you have to go to do that?
24    A.  Marble Falls, Texas.
25    Q.  How far was that from your home --

</td><td>

40

1    Q.  How long did you wait?
2    A.  I don't remember.
3    Q.  How would you have gotten to that office if you
4  hadn't had a car?
5    A.  Public transportation in Austin.
6    Q.  Could you remind me again, what office was this
7  that you went to, the driver's license office?
8    A.  I'm sorry. I don't know the name of the
9  office.
10    Q.  Do you know approximately where it's located or
11  what street it's on?
12    A.  Approximately Burnet Road.
13    Q.  Is it your testimony that there's public
14  transportation to that office?
15    A.  No. I can't testify that there is public. You
16  asked me what if, and I don't know for sure that there
17  is.
18    Q.  Thank you for your testimony. Do you have a
19  copy of your birth certificate?
20    A.  Yes.
21    Q.  If you lost it, do you know how you'd get
22  another one?
23    A.  Yes.
24    Q.  How?
25    A.  To request the town that I was born.

</td></tr>
</table>



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

---

41

1    Q.  Were you born in Texas?
2    A.  Yes.
3    Q.  Do you know how much it would cost?
4    A.  No.
5    Q.  And how would you go about getting a
6  replacement of your birth certificate?
7    A.  Place a phone call to the -- I'm assuming its
8  county clerk and ask for a replacement.
9    Q.  Do you think you could do that by phone, or
10  would you have to go in person?
11   A.  I believe you can do it by phone.
12   Q.  Would there be some cost associated with
13  obtaining that document?
14   A.  I'm not advised.  I don't know.
15   Q.  When -- do you generally vote in elections?
16   A.  Yes.
17   Q.  Do you vote in person or by mail?
18   A.  In person.
19   Q.  When was the last time you voted?
20   A.  Three days ago.
21   Q.  How far is your polling place from your house?
22   A.  15 minutes.
23   Q.  Is that by car?
24   A.  Uh-huh.
25   Q.  Do you ever vote early, early vote, or do you

---

43

1  you that.  That's -- I'm not asserting privileges to
2  that issue.
3    A.  Ask it again, please.
4       MS. WESTFALL:  Could you read back the
5  question, sir?
6       (Requested portion read back by the court
7  reporter.)
8    A.  Again, I would ask you to narrow that question
9  down.  "Problems" is a very broad word.  Could be
10  parking.
11   Q.  (By Ms. Westfall)  I'm directing attention to
12  within a polling place, have you seen any voters having
13  problems in voting?
14   A.  Yes.
15   Q.  Could you describe the first problem that you
16  saw in a polling place?
17   A.  Someone showing up at the wrong location to
18  vote.
19   Q.  What happened to that individual?
20   A.  They were instructed where to go to -- to vote.
21   Q.  Have you ever witnessed anyone who was not
22  supposed to be in the polling location appearing to
23  vote?
24   A.  Yes.
25   Q.  Tell me about the first time you saw that.

---

42

1  vote on election day?
2    A.  More often, early.
3    Q.  Do you have any experience outside of your work
4  in the Texas State Senate on any election law-related
5  matters?
6    A.  Please clarify.
7    Q.  Do you have any -- strike that.
8       Do you have any experience related to
9  election administration?
10   A.  Clarify.
11   Q.  Have you ever volunteered as or worked as a
12  poll worker?
13   A.  No.
14   Q.  Have you ever worked as a poll watcher?
15   A.  No.
16   Q.  Have you ever participated in any other
17  capacity in serving any polling location on election day
18  or during early voting?
19   A.  No.
20   Q.  As a voter, have you witnessed any problems in
21  the polls firsthand?
22   A.  Would that not be privileged?
23       MR. SWEETEN:  I think she can ask you if
24  in your personal, in your life, if you've witnessed any
25  what was the problem with the -- with the -- she can ask

---

44

1    A.  The question I just answered before.  They were
2  in the wrong location, and they were sent to another
3  location.
4    Q.  Have you ever witnessed anyone who was trying
5  to impersonate another voter in a polling place?
6    A.  No.
7    Q.  Have you ever seen -- have you ever witnessed a
8  person who was not a US citizen attempting to vote?
9    A.  No.
10   Q.  Have you ever seen anyone challenging someone's
11  voter eligibility in a polling place?
12   A.  Clarification, again.  First answer I gave, the
13  answer is yes, because they were in the wrong location.
14   Q.  Are you aware that -- that voters may be
15  challenged at the polls as not properly registered to
16  vote or otherwise eligible?
17   A.  Please clarify.
18   Q.  I'll strike that question.
19       Have you ever, when you've been in a
20  polling location, challenged a voter's eligibility to
21  vote?
22   A.  No.
23   Q.  Are you familiar with Section 5 of the Voting
24  Rights Act?
25   A.  Yes.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

---

45

1    Q.  What is your understanding of Section 5
2  requirements as a general matter?
3    A.  As per the 1965 Voter Rights Act, there were
4  certain states, mostly in the south, that were placed
5  under Section 5.  And placed -- given different
6  requirements than everyone else in the nation.
7    Q.  And I understand that you've testified that
8  you're not a lawyer, but can you tell me, to the best of
9  your ability, what the requirements are of Section 5,
10 sir?
11   A.  Currently, are you asking for currently or in
12 1965?
13   Q.  Currently today.
14   A.  Any election activity that happens in a Section
15 5 state, of which Texas is one, that all data pertaining
16 to that has to be cleared by the Justice Department
17 prior to the election, and there's obviously a cost,
18 administrative cost associated with that.
19   Q.  Is there anything else that you want to testify
20 about your understanding of Section 5 requirements, or
21 that is the sum total?
22   A.  That's it.
23   Q.  Do you believe that compliance with the Voting
24 Rights Act is important?
25     MR. SWEETEN:  Objection.  Relevance.  Go

---

46

1  ahead and answer.
2    Q.  (By Ms. Westfall)  You may answer.
3    A.  I believe when the Act was passed in '65, it
4  was important.  I believe today the Voting Rights Act
5  has outlived its useful life.
6    Q.  When do you believe -- first of all, what do
7  you mean by that, "outlived its useful life"?
8    A.  Should I?  Privilege on that?
9      MR. SWEETEN:  Well, here's how we'll --
10 let me instruct you as to that.  I don't want you to
11 reveal any sort of thoughts or mental impressions or
12 opinions about legislation or matters in furtherance of
13 the legislative process as it relates to bills.  And I
14 don't want you to reveal communications between you and
15 legislators or legislative staff, state agencies, Texas
16 Legislative Council or constituents.  If you can answer
17 that question without revealing those, then you can go
18 ahead and do so.  And you can at all times --
19   A.  I believe it's outlived its useful life.
20     MR. SWEETEN:  Okay.  Let me also just
21 finish.  You can at all times include matters of the
22 public record.  You can discuss matters on the public
23 record, including committee hearings, proceedings,
24 debates, that sort of thing.
25     MS. WESTFALL:  Mr. Sweeten, I'm not asking

---

47

1  about any legislative act right now.  So I think your
2  instruction is inappropriate.  I would ask you to
3  withdraw it with regard to the question I asked.
4      MR. SWEETEN:  Well, I think he's answered
5  the question.  I think it's important that he not reveal
6  matters that would be legislatively privileged in
7  answering the question.  If he can answer it without
8  doing so, which I think he may have just done, then I'm
9  letting him do so.  So it's just as to matters that
10 could be legislatively privileged.  That's my
11 instruction.
12   Q.  (By Ms. Westfall)  Could you explain what you
13 mean by Section 5 having outlived its useful life?
14   A.  I believe it's outlived its useful life.
15   Q.  Could you explain what you mean by that?
16     MR. SWEETEN:  Same instruction.  Go ahead.
17   A.  I believe it's outlived its useful life.
18   Q.  (By Ms. Westfall)  And that's the sum total of
19 your response to my question?
20   A.  Yes.
21   Q.  When did that occur that it became -- that
22 Section 5 became no longer useful?
23   A.  I wouldn't attach a date to that time.
24   Q.  And what is the basis for your opinion?
25     MR. SWEETEN:  Same instruction.  Go ahead.

---

48

1    A.  I believe it has outlived its useful life.
2    Q.  (By Ms. Westfall)  Do you have any facts to
3  support that statement that you want to testify about
4  today?
5      MR. SWEETEN:  Same instruction.
6    A.  I believe it has outlived its useful life.
7    Q.  (By Ms. Westfall)  Do you receive any legal
8  advice on election-related legislation to ensure
9  compliance with Section 5?  And I'm just asking about
10 the fact of legal advice.  I'm not asking you to testify
11 about any conversations you've had with your attorneys
12 about Section 5.
13     MR. SWEETEN:  Okay.  And so -- so it's
14 clear.  She's not asking you about the substance of
15 communications.  She's simply asking, you do you receive
16 legal advice on that issue?
17   A.  I would claim privilege on that because any
18 advice I'm getting would be involving legislation.
19   Q.  (By Ms. Westfall)  Sir, your counsel has
20 instructed you not to reveal any -- the substance of
21 those conversations, but I'm sure your counsel would not
22 disagree with my assertion that I'm allowed to ask
23 whether you have received advice on compliance with
24 Section 5 of the Voting Rights Act.
25   A.  The answer is yes.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

49

1    Q.  Thank you.  And from whom?
2    A.  Counsel.
3    Q.  Mr. Sweeten?
4    A.  Not like -- well, Mr. Sweeten, obviously, we
5    have had conversations recently.
6    Q.  Do you have counsel for the -- that you -- that
7    you rely upon within your capacity as a Texas State
8    Senator for advice about Section 5?
9    A.  I do not have specific counsel that I rely on,
10   on Section 5.
11   Q.  Are there any attorneys at all that you relied
12   upon in drafting Senate Bill 14 pertaining to compliance
13   with Section 5?
14       MR. SWEETEN:  Okay.  If you're asking has
15   he communicated and did he have communications with
16   individuals?
17       MS. WESTFALL:  That's not my question,
18   Mr. Sweeten.
19       Court Reporter, would you read back the
20   question?
21       MR. SWEETEN:  Yeah.  Read back the
22   question.
23       (Requested portion read back by the court
24   reporter.)
25   A.  In the drafting of Senate Bill 14.

50

1    Q.  (By Ms. Westfall)  Consideration or anything
2    involving Senate Bill 14, did you -- I'm just asking
3    whether you relied upon the advice of counsel.
4    A.  Yes.
5    Q.  Who was that person?
6    A.  I couldn't give you specific counsel.
7    Q.  Was there an office that person was employed
8    with?  What entity housed the lawyer that you relied
9    upon for advice for Section 5?
10   A.  The counsel for the State of Texas generally is
11   the Attorney General's office.  We do have in-house
12   counsel that drafts legislation, the lawyers there that
13   obviously are involved in the drafting.
14   Q.  Who -- what office is that within --
15   A.  There's two groups in Texas.  One is the Texas
16   Legislative Council.  The second group, I'm sorry, I
17   can't pull up the name of it, but there is a second
18   group that does -- does secondary work.
19   Q.  Is that Engrossing and Enrolling, is it that
20   group?
21   A.  Yes, but that's not what it's called.
22   Q.  If you remember later today, will you tell me?
23   A.  Sure.  Yeah.
24   Q.  Doing my best to figure out the various
25   entities of the Texas State Senate, but I'll have to

51

1    rely upon your help.
2        So it is your testimony that you solely
3    relied upon advice from the Texas Legislative Council
4    for advice pertaining to compliance with Section 5 in
5    regards to Senate Bill 14; is that right?
6    A.  Yes.
7    Q.  Did you rely upon advice from the office of the
8    Attorney General as well in that regard?
9    A.  Yes.
10   Q.  What is Texas's current system for determining
11   how to verify the identity of a voter before section --
12   before SB 14 was enacted?
13   A.  The only requirement Texas has that if you show
14   your -- your voter registration card that is sent by --
15   in the mail to people, and whoever has that card in
16   their possession can walk up and vote.
17   Q.  Has this system failed to prevent voter fraud
18   in your view?
19   A.  No.
20   Q.  Are there any problems you can identify today
21   with the current system in identifying voter fraud?
22       MR. SWEETEN:  When you're answering this
23   question, I don't want you to reveal thoughts, mental
24   impressions or opinions about legislation or in
25   furtherance of the legislative process, or

52

1    communications that you've had among the entities that
2    we've talked about.
3    A.  It has been testified in the hearings on the
4    bill that there's been numerous occasions where a card
5    was either stolen out of a mailbox or given to someone
6    else and that person voted with that card.
7    Q.  (By Ms. Westfall)  Could you tell me when that
8    testimony occurred?
9    A.  When the bill was heard in 2009 and when the
10   bill was heard in 2011.
11   Q.  How many voters did that occur with, to the
12   best of your recollection?
13   A.  I don't recall that number.
14   Q.  Was it more than 10?
15   A.  Yes.
16   Q.  Was it 20?
17   A.  I don't have a number.
18   Q.  Do you know the witness who testified about
19   that activity that you just described?
20   A.  The one witness that comes to mind is Senator
21   Williams' father -- he was deceased and had been voting
22   for multiple elections.  Someone had his card and was
23   taking the card and voting.
24   Q.  Did that result in a conviction of that
25   individual?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                              May 17, 2012

53

1    A.  To my knowledge, no.
2    Q.  Are you aware of any convictions on the basis
3  of -- related to the activity that you described?
4        MR. SWEETEN:  Can you reread the question
5  back?
6        MS. WESTFALL:  Mr. Sweeten, it's a matter
7  of public record, convictions.
8        MR. SWEETEN:  Okay.  I'm -- I didn't ask
9  that.  I'm asking for him to read the question back, if
10  he would, please.
11        MS. WESTFALL:  You may do so, sir.
12        (Requested portion read back by the court
13  reporter.)
14        MR. SWEETEN:  And when you say activity
15  described, he's talking about Williams's testimony on
16  the Senate.  So do you know?  You can answer that
17  question.
18    A.  I'm sorry.  I do not remember.  There has been
19  testimony on that, but I do not remember specific
20  convictions.
21    Q.  (By Ms. Westfall)  So sitting here today,
22  you're unaware, just to -- so I understand your
23  testimony, you're unaware of any convictions related to
24  the fraud that you described, which is stealing
25  someone's voter registration card.  Is that -- am I

54

1  correctly stating your testimony?
2    A.  You asked me to list specific ones, and I
3  cannot list specific ones.
4    Q.  Thank you, sir.  Other than that issue that you
5  just flagged as a potential problem under the current
6  law, are you aware of any other problems with the
7  current system for verifying a voter's identity under
8  Texas law?
9        MR. SWEETEN:  Again, don't reveal your
10  thoughts, mental impressions or opinions in furtherance
11  or about legislation.  Don't reveal communications that
12  you've had between legislators, legislative staff, state
13  agencies, Texas Legislative Council or constituents in
14  answering this question.  You can refer to matters in
15  the public record.
16    A.  Texas law is insufficient for making a person
17  identify who they are.
18    Q.  (By Ms. Westfall)  And thank you for your
19  testimony.  And what is the basis for that opinion,
20  other than what you've just testified about, which is
21  testimony regarding stolen voter registration cards?
22        MR. SWEETEN:  Okay.  In answering this
23  question, don't reveal mental impressions, thoughts or
24  opinions about legislation, okay, including Senate Bill
25  14.  And don't reveal communications that you've had

55

1  with any of the individuals or entities that we've
2  talked about in answering this question.  You can refer
3  to matters of the public record.
4    A.  In Texas, if someone has in their possession a
5  voter registration card and they go to the proper voting
6  location, they are allowed to vote.
7    Q.  (By Ms. Westfall)  And --
8    A.  Without identifying they are who they say they
9  are.
10    Q.  And it's -- it's your opinion that that creates
11  problems or are there any -- what I'm trying to ask you
12  is whether there are any facts that you haven't already
13  testified to that support your opinion.
14        MR. SWEETEN:  In answering this question,
15  do not reveal thoughts, mental impressions or opinions
16  about legislation or in furtherance of the legislative
17  process.  Okay?  Don't reveal the communications that
18  we've talked about with individuals or entities that are
19  protected under the privilege.
20    A.  It's been testified in testimony that it is
21  possible in Texas for someone to go to and present a
22  voter registration card that is not theirs, and if they
23  are on the list, they're allowed to vote and not asked
24  for identification.
25    Q.  (By Ms. Westfall)  So is it your testimony that

56

1  the problem with the current system is the potential for
2  in-person voter fraud, as you just described, is that
3  your testimony?
4        MR. SWEETEN:  In answering this question,
5  do not reveal thoughts, mental impressions, opinions
6  about legislation, including Senate Bill 14, and do not
7  reveal communications that you've had with legislators,
8  legislative staff, Texas Ledge Council, constituents or
9  state agencies.
10    A.  I claim the privilege on this question.
11        MS. WESTFALL:  Mr. Sweeten, it will be
12  possible that you could you shorten, shorthand your
13  objections so we don't have to spend much of the day
14  listening to the same objection over and over, and you
15  could have a shorthand understanding.  Is that something
16  I could ask for you to work out with your client?
17        MR. SWEETEN:  We can do that.  Why don't
18  we -- we can discuss that at a break.
19        MS. WESTFALL:  Okay.
20        MR. SWEETEN:  I know you don't want to
21  hear me sit here and go through this exercise.  At the
22  same time, I think it's important that I will
23  occasionally, you know, interject that.  But let's
24  continue as we are.  We will discuss sort of something
25  we can work out at the break.  Okay?  But I'll work with



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

57

1    you.
2              MS. WESTFALL: I would like --
3              MR. SWEETEN: I know you don't want to
4    hear me all day.
5              MS. WESTFALL: I would like to remind you,
6    Senator, that -- and it's going to be very difficult
7    within a complicated deposition with your counsel
8    asserting privilege on your behalf and a lot of
9    interruptions, and we found in the last few days that
10   it's sometimes difficult to remember the question that
11   was posed. But the way we're going to get through this
12   deposition in as quick a process as possible is if you
13   listen carefully to my question and answer it to the
14   best of your ability, if you decide to listen to the
15   advice of your counsel, taking that into account. But
16   I'm now going to go back and ask that question again so
17   I can get an answer on the record.
18             Could you read the question back, Court
19   Reporter?
20             (Requested portion read back by the court
21   reporter.)
22        A.   I'll claim privilege.
23        Q.   (By Ms. Westfall) When was Senate Bill 14
24   signed into law? To refresh your recollection, was it
25   approximately May 2011?

58

1        A.   That sounds correct.
2        Q.   Had there been elections held in Texas since
3    that time?
4        A.   Yes.
5        Q.   Approximately how many?
6        A.   I'm sorry. I don't have that number.
7        Q.   To your knowledge, has the Secretary of State
8    or any county officials enforced Senate Bill 14 since it
9    was signed into law?
10       A.   No.
11       Q.   Have there been any -- and so you've been
12   operating under the current system before Senate Bill 14
13   is enforced; is that correct?
14       A.   Yes.
15       Q.   And have there been any problems related to
16   in-person voter impersonation, fraud, other problems
17   that you're aware of that occurred between May 2011 and
18   the present?
19       A.   I don't have that information.
20       Q.   So is the answer you're not aware of any
21   problems, sitting here today?
22       A.   My answer is I don't have that information.
23       Q.   When did you first hear any support for
24   enacting photo voter identification requirements in
25   Texas?

59

1              MR. SWEETEN: In answering this question,
2    don't reveal your thoughts, mental impressions, opinions
3    about legislation or in furtherance of the legislative
4    process. Don't reveal communications between the
5    entities or individuals that we've named.
6        A.   Ask the question again, please.
7              MS. WESTFALL: Court Reporter, could you
8    read it back?
9              (Requested portion read back by the court
10   reporter.)
11       A.   2007. No, late 2006.
12       Q.   (By Ms. Westfall) Could you describe the
13   circumstances under which you heard about interest in
14   them -- in that issue?
15             MR. SWEETEN: Same instruction.
16       A.   Privilege.
17       Q.   (By Ms. Westfall) Could you tell me the --
18   could you identify the persons who expressed support for
19   such a law?
20       A.   No.
21       Q.   No, you don't know?
22       A.   Privilege.
23       Q.   I'm sure your counsel will agree that the
24   privilege doesn't extend to identifying the persons who
25   expressed support.

60

1        A.   Okay. The answer is no, I don't have a
2    specific person.
3        Q.   So you don't recall at this time, or you do
4    recall?
5        A.   You're asking for the name of a specific
6    person. The answer is no, I don't have a specific
7    person.
8        Q.   Was there a group of people who were supporting
9    it?
10       A.   No.
11       Q.   Not that you recall?
12       A.   There was not a group that brought the
13   legislation to me.
14       Q.   So you first heard the support in late 2006.
15   It's your testimony you can't remember individuals.
16   It's your testimony you can't remember any groups. How
17   did you come to learn about the interest in photo ID?
18       A.   I believe my first contact of looking at it was
19   the Baker-Carter commission report that came out in '05,
20   and I believe I read documentation of that and the
21   recommendation of that group.
22             MR. SWEETEN: Okay. She can ask you, and
23   the court will allow her to ask you if you had
24   conversations with someone, who was present in the
25   conversations. She can ask you the approximate date of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

**61**

1  that. Do not, though, go beyond that and reveal the
2  substance of the communication or -- when she's asking
3  these questions. I'm just going to instruct you.
4      Q.  (By Ms. Westfall)  Do you know why there was
5  support for photo ID in 2005?
6          MR. SWEETEN:  Don't answer.  Legislative
7  privilege.
8      A.  Privilege.
9      Q.  (By Ms. Westfall)  Are you not asking on the
10  basis of your counsel's advice?
11     A.  Yes.
12     Q.  Was there a time when photo -- voter ID law was
13  first introduced in the Texas legislature?
14     A.  Clarify.
15     Q.  In 2005, was there a bill?
16     A.  To my knowledge, I do not remember a bill in
17  2005.
18     Q.  Was there a bill in the House?
19     A.  Again, I don't remember.
20         MS. WESTFALL:  Could you mark this as
21  US --
22         MS. MARANZANO:  Has it been marked before?
23         MS. WESTFALL:  It hasn't been.  So what's
24  the next number?
25         MS. MARANZANO:  44.

---

**62**

1          MS. WESTFALL:  Could you mark this as U.S.
2  44, please?
3      Q.  (By Ms. Westfall)  You've been handed what's
4  been marked US 44.  Do you recognize this?
5      A.  I recognize it as a bill, but I don't -- has
6  this got a date on it?
7      Q.  I'll give you a moment to take a look.  I don't
8  believe it does have a date.  Oh, it does.
9      A.  The bill is set to have made -- to take effect
10  on September 1, 2009, so it would imply --
11     Q.  Of 2005?
12     A.  It's Senate Bill 362.
13     Q.  Oh, my apologies.
14         MR. SWEETEN:  You've got 362.  She's was
15  trying to get you 1706 here.  So let's change that out.
16         MS. WESTFALL:  Yeah.  Sorry.  So would you
17  mark this Exhibit 44.
18         (Exhibit 44 remarked for identification.)
19     Q.  (By Ms. Westfall)  You've been handed the
20  corrected copy of US 44.  Do you recognize this?
21  Have you had a chance to look at US 44?
22     A.  Yes.
23     Q.  Do you recognize this?
24     A.  Yes.
25     Q.  What is it?

---

**63**

1      A.  It appears to be legislation that was filed,
2  and again, it doesn't have a date on it for the
3  enactment.
4      Q.  Directing your attention to Page 10, which is
5  the last page of US 44.  Do you see a date on that, sir?
6      A.  Okay.  Okay.  Yes.
7      Q.  Does that refresh your recollection as to when
8  this bill was introduced?
9      A.  No.
10     Q.  Did you have any involvement -- and just for
11  the record's purposes, this is House Bill 1706, correct?
12     A.  Yes.
13     Q.  And does it appear that it was introduced in
14  2005?
15     A.  Yes.
16     Q.  Did you have any involvement whatsoever in this
17  bill?
18     A.  No.
19     Q.  Can you hand the witness what's been previously
20  marked as Exhibit 28?
21         MR. SWEETEN:  You can put that other one
22  aside, Senator Fraser.  And let's start with the stack
23  here so we don't lose any of these.
24     Q.  (By Ms. Westfall)  You've been handed what's
25  been previously marked as US 28.  Do you recognize this

---

**64**

1  document?
2          MR. SWEETEN:  Caution the witness to take
3  your time in reviewing the document before you answer
4  any questions on it.
5      Q.  (By Ms. Westfall)  Sir, have you had a chance
6  to look at this Exhibit 28, or do you need some more
7  time?
8      A.  No.  I've looked at it.
9      Q.  Do you recognize it?
10     A.  Yes.
11     Q.  What is it?
12     A.  It was a bill filed in the Texas House of
13  Representatives in 2007.
14     Q.  Do you recall who authored it?
15     A.  I recall because I can read the author's name
16  on the top of the -- the coauthors.
17     Q.  And who authored it?
18     A.  Brown of Kaufman, Berman, Bohac, Riddle, et al.
19     Q.  Did you or your staff play any role in
20  development of House Bill 218?
21     A.  Not to my knowledge.
22     Q.  Are you familiar with the provisions of House
23  Bill 218?
24     A.  Yes.
25     Q.  Could you tell me -- could you describe it,

---



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                                  May 17, 2012

65

1   House Bill 218 for me?
2        MR. SWEETEN:  In answering this, don't
3   reveal thoughts, mental impressions or opinions about
4   legislation or in furtherance of the legislative
5   process, or any conversations that we've talked about.
6        MS. WESTFALL:  I would ask you to withdraw
7   that objection.  I'm asking him questions about the
8   bill, which couldn't be more public.  Do you agree,
9   Mr. Sweeten?
10       MR. SWEETEN:  I think -- I'm not sure that
11  the way you just phrased it is what the question asked,
12  but go ahead and you can -- we'll ask the court reporter
13  to read it back.
14       (Requested portion read back by the court
15  reporter.)
16       MR. SWEETEN:  Okay.  He can describe the
17  bill that's in front of him.
18       MS. WESTFALL:  Would you withdraw your
19  objection, Mr. Sweeten?
20       MR. SWEETEN:  If you're asking him to
21  describe the document in front of him, yeah, I'll
22  withdraw the objection.  Go ahead.
23       MS. WESTFALL:  Thank you.
24  Q.  (By Ms. Westfall)  Could you answer the
25  question?

66

1   A.  Could you repeat the question?
2   Q.  Certainly.  Could you describe House Bill 218
3   for me?
4   A.  No.
5   Q.  I believe you just testified you were familiar
6   with this bill, did you not?
7   A.  You asked me if I recognized the bill.
8   Q.  Are you unable to describe House Bill 218 for
9   me, sir?
10  A.  This is with a House Bill filed in part of the
11  House.
12  Q.  Can I turn your attention to the part of the
13  bill that may refresh your recollection?  Could you turn
14  your attention to Page 9 of Exhibit 28, House Bill 218?
15  Do you see on Page 9 it lists forms of acceptable
16  documentary proof of ID?
17  A.  What's that number?  I'm sorry.
18  Q.  Certainly.
19       MR. SWEETEN:  She's asking about Page 9,
20  Senator Fraser, I think.
21  A.  I know.  I'm thinking about something else.
22       MR. SWEETEN:  Okay.
23  A.  I'm trying to recall.  It's been a long time
24  ago.
25       What was your question?

67

1   Q.  (By Ms. Westfall)  I was directing you to the
2   list of IDs on Page 9.  Are you there?
3   A.  9?
4   Q.  On Page 9, Section 63.
5   A.  Yes.
6   Q.  So just to clarify, you testified earlier that
7   you were unfamiliar with House Bill 1706, is that right,
8   that was introduced in 2005?
9   A.  I didn't say that I was unfamiliar.
10  Q.  Could you clarify your testimony?
11  A.  You asked if I could describe.
12  Q.  Okay.  Are you able to describe any differences
13  between House Bill 1706 enacted in -- or introduced in
14  2005 and the bill that you have before you, Exhibit 28,
15  House Bill 218?  I just want to know if you're able to
16  do so.
17  A.  I am not able to do so.
18  Q.  Thank you.  Were you present at any meetings
19  during the development of House Bill 218?
20  A.  No.
21  Q.  Was any of your staff?
22  A.  I don't know.
23  Q.  Are you aware of any concerns that were raised
24  during the development of House Bill 218 about the
25  impact of House Bill 218 on Hispanic voters?

68

1   A.  Privilege.
2        MR. SWEETEN:  Don't -- yeah, that's
3   privileged.
4   Q.  (By Ms. Westfall)  Are you aware of purposes,
5   the purpose or purposes for House Bill 218?  And I'm
6   just looking for a "yes" or "no" answer.  Are you aware
7   of the purposes, and then we'll talk about what they
8   are?
9   A.  When the bill was filed?
10  Q.  Yes.
11  A.  No.
12  Q.  Are you aware of whether part of the purpose of
13  218 was to prevent noncitizens from voting?
14       MR. SWEETEN:  Objection, legislative
15  privilege.
16  A.  Privilege.
17       MS. WESTFALL:  I hand you what's been --
18  well, could you remark this as -- it's previously
19  marked.  Can you just remark this as 3?
20  Q.  (By Ms. Westfall)  I'm handing you what's been
21  previously marked as Exhibit 3.  Have you seen this
22  document before?
23  A.  As the date of this publication -- it says 4-12
24  on the printing.  Is that the date?
25  Q.  I would turn your attention to the top line of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 69

1  Exhibit 3, where it says Volume 23, Issue 46. Does that
2  tell you, give you any indication about the date of this
3  document?
4     A. No.
5     Q. Have you ever seen this document before?
6     A. I don't know whether I have or not.
7     Q. Do you want to take a moment to take a look at
8  it and see if it rings a bell?
9     A. Sure. (Witness reading.)
10    Q. Have you had a chance review Exhibit 3?
11    A. I have.
12    Q. Do you remember seeing the letter referenced in
13 Exhibit 3 from -- that was drafted from Lieutenant
14 Governor Dewhurst on voter ID?
15    A. The answer is no, I don't remember seeing it.
16    Q. And does it appear from this article that it
17 was -- that letter was written around the time of
18 consideration of House Bill 218?
19    A. The attempt to consider?
20    Q. Yes. Does it appear that the letter was
21 written in conjunction with that --
22    A. Yes.
23    Q. -- particular piece of legislation?
24    A. Yes.
25    Q. Thank you, sir.

## 70

1        And do you see that this article refers to
2  two versions of a letter from Lieutenant Governor
3  Dewhurst; is that correct?
4     A. No. I don't see there's two letters.
5     Q. All right. Well, turning your attention to
6  Exhibit 3, does it -- does it appear that -- strike
7  that.
8        Do you know who would have written this
9  letter for Mr. Dewhurst and his staff?
10       MR. SWEETEN: Objection, calls for
11 speculation.
12    Q. (By Ms. Westfall) Would it have been
13 Mr. Hebert?
14    A. Privilege.
15    Q. I don't believe that that's a proper response,
16 and your counsel will not -- will advise you.
17       MR. SWEETEN: I'll instruct you. On that,
18 I think her question is: Do you know who wrote this?
19    A. No.
20       MR. SWEETEN: Okay.
21    Q. (By Ms. Westfall) Do you see in that letter
22 that is referred to in the Texas Weekly article,
23 Exhibit 3, that it urges support for House Bill 218 in
24 order to stop voting by people who are not US citizens?
25 At Paragraph 2 of the Texas Weekly article?

## 71

1     A. Would you rephrase your question?
2     Q. Yes.
3     A. Or re-ask your question?
4     Q. Yes. Turning your attention to the second
5  paragraph of the Texas Weekly article, Exhibit 3, does
6  it indicate that Mr. Dewhurst's support for 218 because
7  it will prevent noncitizens, people who are not US
8  citizens, from voting at the polls? Do you see that?
9     A. No.
10    Q. You don't? Does it indicate in the letter that
11 you, Senator Fraser, brought up in the Senate for
12 consideration, and I'm reading from Paragraph 2, "House
13 Bill 218 by Representative Betty Brown, which simply
14 requires voters to present a driver's license or some
15 other common form of identification at the election
16 polls to prove who they say they are, US citizens." Do
17 you see that paragraph?
18    A. I do see that paragraph.
19    Q. And do you see down at Paragraph 4, that it
20 refers to testimony from Mr. Paul Bettencourt regarding
21 foreign nationals both applying for and receiving voter
22 registration cards?
23    A. Would you show me where you're referencing?
24    Q. Certainly. The first sentence at Paragraph 4
25 of the Texas Weekly article starting with, "On June 22,

## 72

1  2006, Harris County Tax Assessor-Collector and Voter
2  Registrar Paul Bettencourt testified before the US House
3  Administration Committee that both foreign nationals are
4  both applying for and receiving voter registration
5  cards." Do you see that sentence?
6     A. I do.
7     Q. Was that -- was preventing noncitizens from
8  voting part of the purpose of House Bill 218?
9     A. Privilege.
10       MR. SWEETEN: Yeah.
11       MS. WESTFALL: You may answer.
12       MR. SWEETEN: You can -- she's asking you
13 -- hold on a minute. She's asking you about this
14 document. Okay? You can answer questions about, you
15 know, any public statements that you've made regarding
16 it. But you don't have to reveal information, opinions,
17 mental impressions or thoughts about legislation.
18    A. I didn't write this article. I didn't make
19 that statement. And I -- whoever Paul Bettencourt is,
20 obviously, he testified before the US House
21 Committee. He didn't testify before my Senate
22 committee.
23    Q. And Mr. -- this article refers to a letter
24 written by Lieutenant Governor Dewhurst in which he
25 expressed the views that I just read into the record,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

73

1   did he not?
2       A.  You're representing that this is a letter from
3   him.  I couldn't -- I can't validate that.
4       Q.  Let me ask you directly:  Was part of the
5   purpose of House Bill 218 to prevent noncitizens from
6   voting?
7           MR. SWEETEN:  I'm going to object to
8   legislative privilege.
9       Q.  (By Ms. Westfall)  Mr. Dewhurst -- well, strike
10  that.
11          Who would be the best -- strike that.
12          Would Mr. Dewhurst know about this letter?
13          MR. SWEETEN:  Objection, calls for
14  speculation.
15      Q.  (By Ms. Westfall)  You may answer.
16      A.  Privilege.  I don't know.  I'm not, you know, I
17  don't know.  I -- I don't know about this letter.
18      Q.  Do you think that if the Texas Weekly published
19  an open letter from Lieutenant Governor Dewhurst, and
20  sitting here today, you are unable to answer questions
21  about this, that Mr. Dewhurst would be the best person
22  that we could ask about this letter and the contents
23  thereof?
24      A.  Speculation.
25      Q.  Is there anybody --

74

1       A.  I do not -- you're asking me do I know.  I do
2   not know.
3       Q.  Who would know about this letter and about the
4   purposes expressed about House Bill 218?
5       A.  You'll have to ask them.  I do not know.
6       Q.  And by "them," you mean Mr. Dewhurst?
7       A.  Anyone you want to ask would be appropriate.  I
8   don't -- I don't know.
9       Q.  And I believe when I asked you whether
10  preventing US -- non-US citizens from voting was the
11  purpose of House Bill 218 you asserted privilege.  If
12  that is with regard to any private conversations over
13  which your counsel is asserting privilege, could you
14  identify the person with whom you had a conversation
15  about noncitizens voting and House Bill 218?
16      A.  Is that privilege?
17          MR. SWEETEN:  She's asking you and the
18  court will allow them to ask you questions that reveal
19  the name or legislator or staff involved in a
20  communication, the name of a constituent involved in a
21  communication, whether any individuals were privy to the
22  communication, the date on which the communication
23  occurred, or the form or medium of the communication or
24  the nature of general subject matter.
25          So you can identify those sort of

75

1   particulars about a contact or conversation.  Do not
2   reveal the specific content of contacts?
3       A.  Ask the question again.
4       Q.  Certainly.  Let me strike the question and ask
5   another one.
6           Did you ever have any conversations with
7   anyone about House Bill 218 and its purpose as it
8   pertained to preventing non-US citizens from voting?
9       A.  No.
10      Q.  Was part of the purpose of House Bill 218 to
11  prevent foreign nationals from applying for and
12  receiving voter registration cards?
13      A.  Privilege.  Privilege.
14      Q.  Did you ever have any conversations about the
15  purpose of House Bill 218 as it pertained to stopping
16  foreign nationals from applying for and receiving voter
17  registration cards?
18          MR. SWEETEN:  Same objection, legislative
19  privilege.
20      A.  Privilege.
21      Q.  (By Ms. Westfall)  Did you have any
22  conversations?  I'm sure your counsel will instruct you
23  that you can answer that question.
24      A.  Privilege.
25          MS. WESTFALL:  Mr. Sweeten.

76

1           MR. SWEETEN:  You can identify whether or
2   not you had a conversation with anyone and you can -- if
3   she's asking you the general subject matter, you can
4   answer about the date or time or who was involved in the
5   conversation.  Don't reveal the substance of the
6   conversation or communication.
7       A.  Ask the question again, please.
8       Q.  (By Ms. Westfall)  Senator Fraser, did you ever
9   have any conversations with anyone about House Bill 218
10  and part of its purpose being to prevent foreign
11  nationals from applying for or receiving voter
12  registration cards?
13          MR. SWEETEN:  I'm going --
14      A.  Not to my knowledge.
15          MR. SWEETEN:  And I'm also going to
16  interpose an objection, assumes facts not in
17  evidence.  But go ahead.  You've answered it, so we're
18  on to the next question.
19      Q.  (By Ms. Westfall)  Would, in your view, House
20  Bill 218 stop noncitizens from voting?
21          MR. SWEETEN:  I'm going to object --
22      A.  Privilege.
23          MR. SWEETEN:  -- yeah, as to legislative
24  privilege on that issue.
25      Q.  (By Ms. Westfall)  Would it stop foreign



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                     May 17, 2012



77

1   nationals from receiving voter registration cards?
2        MR. SWEETEN: Same objection. Same
3   instruction. Legislative privilege.
4        A. Privilege.
5        Q. (By Ms. Westfall) Don't people indicate their
6   citizenship when they register to vote?
7        MR. SWEETEN: Time frame, are you asking
8   currently now? Are you asking in 2007?
9        MS. WESTFALL: I'm asking currently now.
10       MR. SWEETEN: Okay.
11       MS. WESTFALL: And then.
12       MR. SWEETEN: Do you understand the
13   question?
14       A. To my knowledge, no.
15       Q. (By Ms. Westfall) Do people affirm or indicate
16   their citizenship on voter registration applications in
17   Texas?
18       A. Clarify "affirm." Is there a question
19   "asked"? Is that what you're asking?
20       Q. I'm asking whether when you apply to register
21   to vote and submit a voter registration form in the
22   state of Texas today, do you swear or affirm or indicate
23   under penalty of perjury that you are a US citizen?
24       A. To my knowledge, yes, you do.
25       Q. Thank you for your testimony.

79

1        MR. SWEETEN: Okay. We're going to take a
2   break.
3        MS. WESTFALL: Thank you. Why don't we
4   take a break for a few minutes and we can get some
5   coffee and come back in a few minutes.
6        (Lunch recess from 11:24 a.m. to
7   12:39 p.m.)
8        Q. (By Ms. Westfall) Okay.
9        A. Could I possibly go back and readdress an issue
10   that we had talked about earlier?
11       Q. Certainly.
12       A. The -- on Exhibit 28 that you handed me, which
13   is House Bill 218.
14       Q. Yes.
15       A. I answered that I was not familiar and had not
16   seen it because I thought this was the filed version
17   that had been filed in the House, and was not the
18   amended -- it was amended on the Floor, engrossed in the
19   House, sent to the Senate, and I picked the bill up. I
20   had not been following 218 as filed, which I assume it
21   is. I've since looked at the language and there's an
22   amendment that I recognize in this that was placed, I
23   believe, in the bill that came over. So I believe my
24   answer to your question you asked, is it 218 as you
25   handed it to me, yes, I am familiar with it because it

78

1        As you sit here today, do you believe that
2   part of the purpose of House Bill 218 was to prevent
3   noncitizens from voting?
4        MR. SWEETEN: Objection, legislative
5   privilege.
6        A. Privilege.
7        MS. WESTFALL: I'm asking him as he sits
8   here today --
9        A. Privilege.
10       MS. WESTFALL: -- his opinion, not based
11   upon a legislative act. Mr. Sweeten, will you
12   reconsider your objection?
13       MR. SWEETEN: Well, I think he wants a
14   break, and so let's -- we'll discuss it at the break.
15       MS. WESTFALL: No. Can we finish the
16   question?
17       MR. SWEETEN: Okay. Can you read the
18   question back, please?
19       (Requested portion read back by the court
20   reporter.)
21       MR. SWEETEN: Objection, asked and
22   answered.
23       Q. (By Ms. Westfall) You may answer.
24       A. The purpose of the bill was to protect the
25   integrity of the voting box.

80

1   was the version that was sent to the House and I picked
2   up as to carry.
3        Q. Thank you for that.
4        A. So this -- this -- and I want to correct that.
5        Q. Thank you for that clarification. Just to be
6   clear: Exhibit 28, House Bill Number 218, is that the
7   -- do you believe it is the version that was received in
8   the Senate and engrossed in the House? Is that your
9   testimony?
10       A. I do believe this is the engrossed version as
11   amended in the House that came to the Senate and was the
12   bill that I picked up and took to the Floor.
13       Q. Thank you for that clarification. I appreciate
14   that.
15       MS. WESTFALL: Before we proceed,
16   Mr. Sweeten, will you, as we discussed during the break,
17   agree -- that we can have an agreement, that you can
18   assert legislative privilege and that will be an
19   objection that reflects objections that you've made more
20   fully previously during this deposition?
21       MR. SWEETEN: Right. And Counsel will
22   allow me to, in asserting the legislative privilege,
23   that that preserves the full objection that I had been
24   making throughout this deposition. Okay. That's fine.
25       MS. WESTFALL: Thank you.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

81

1    Q.  (By Ms. Westfall) Senator, we had been
2    discussing House Bill 218 before the break. I'd like to
3    refer you to that bill again and ask you whether this
4    bill, House Bill 218, would prevent non-citizens from
5    voting?
6    A.  The --
7         MR. SWEETEN: I'm going to object based on
8    legislative privilege. I think that goes to effect.
9         THE WITNESS: Do you think that's
10   privileged?
11        MR. SWEETEN: Yeah. I think it --
12        MS. WESTFALL: Mr. Sweeten, I'm asking
13   about the effect of the bill, so outside of
14   conversations that you've -- that are -- I'm not asking
15   you to testify about anything -- personal conversations,
16   private things that you're alleging to be privileged, in
17   terms of conversations with other legislators, but to
18   the extent you can just testify about whether you
19   believe the bill on its face.
20   A.  And, again, if you get into belief, what I
21   believed, I would've claim privilege.
22   Q.  (By Ms. Westfall) Okay. So you -- your
23   testimony is you cannot answer the question about
24   whether HB 218 --
25   A.  I'm saying it is privileged the way you asked

82

1    the question.
2    Q.  Okay. And I'm going to counsel you, just
3    because we're having a back and forth, not to talk over
4    each other because the record will be very difficult to
5    read. So I will try to wait for you answer, and if you
6    wait for me to interpose my question, I'd be grateful.
7         Let me ask it a different way: Was HB 218
8    enacted, to the best of your recollection?
9    A.  I'm sorry?
10   Q.  Was it enacted and signed by the Governor in to
11   law?
12   A.  218?
13   Q.  Yes?
14   A.  No.
15   Q.  And if it had been and was precleared by the
16   Justice Department or otherwise approved under Section 5
17   through the courts and was enforced in Texas, is it --
18   do you believe that it would prevent non-citizens from
19   voting?
20        MR. SWEETEN: I'm going to object to the
21   question as legislatively privileged. It goes into his
22   beliefs. I think, to help us, if you want to ask if a
23   specific provision as written in the text that you're
24   seeing would prohibit something, I think that would be
25   fine, but I think you're asking his overall believe, his

83

1    mental impressions, about the legislation. So that's my
2    direction.
3    Q.  (By Ms. Westfall) Directing your attention to
4    Page 9 of Exhibit 28, Section 63.0101, on Page 9; do you
5    see that?
6         MS. WESTFALL: Let the record reflect
7    witness is reviewing Exhibit 28.
8    Q.  (By Ms. Westfall) Do you see where it lists
9    documentation of proof of identification?
10   A.  Yes.
11   Q.  Would this section of the bill have the effect
12   of preventing non-citizens from voting?
13   A.  No.
14   Q.  Is it true as you understand it, sitting here
15   today, that non-citizens in Texas may obtain a Texas
16   driver's license?
17   A.  Yes.
18   Q.  Are you aware that in 2007, Royal Masset --
19   actually, strike that.
20        Who is Royal Masset?
21        MR. SWEETEN: You can answer who he is.
22   A.  Royal Masset had been affiliated through party
23   politics off and on through the last ten years.
24   Q.  (By Ms. Westfall) And by party politics, do you
25   mean the Republican party of Texas?

84

1    A.  Yes.
2    Q.  Was he the former political director?
3    A.  I don't know.
4    Q.  Are you aware that he said something to the
5    effect of -- in -- that he said in 2007, "They're just
6    basically using sheer racism to pump up their own
7    political points; they're just trying to exploit public
8    fear of illegal aliens." Are you familiar with that
9    quote?
10   A.  No.
11   Q.  Are you familiar with that sentiment?
12   A.  No.
13   Q.  You never heard Royal Masset make any
14   indication of that in the public or in the press?
15   A.  No.
16   Q.  What's your reaction to that quote?
17   A.  Privileged.
18   Q.  Could you identify -- did you have a
19   communication that you're referring to in asserting
20   privilege over?
21        MR. SWEETEN: I think what she's asking
22   you is are you basing the privilege claim on -- on a
23   communication or on the fact that it would reveal
24   thoughts, mental impressions, opinions about
25   legislation?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                   May 17, 2012

---

85

1     A.  I think I have to answer this in that the only
2  knowledge I have of this was an assertion made during
3  testimony in 2009.  That's the only time I've ever heard
4  of this issue and had any other knowledge other than it
5  was asserted by a member during testimony.
6     Q.  (By Ms. Westfall) In 2009, your -- could you
7  tell me about the testimony, on the record, that you're
8  referring to?
9     A.  I don't remember the member, but a member of
10  the legislature, and it was a Democrat member, made the
11  assertion that Royal Masset had made this quote.
12     Q.  And what is your reaction to the quote?
13        MR. SWEETEN:  Reaction would be asking for
14  -- objection, legislative privilege.
15     Q.  (By Ms. Westfall) Are you following the advice
16  of counsel?
17     A.  Yes, privilege.
18     Q.  Were there any other bills introduced in the
19  2007 legislative session that you recall related to
20  combatting issues pertaining to undocumented aliens?
21     A.  There was a legislation that was -- I'm sorry,
22  2007?
23     Q.  2007.
24     A.  I have no knowledge that I remember.
25     Q.  And yesterday, your chief of staff, Janice

---

86

1  McCoy, testified in deposition that you advised the
2  Lieutenant Governor's Office that you wanted to sponsor
3  House Bill 218 in the Senate; is that correct?
4     A.  That is correct.
5     Q.  Why did you want to sponsor House Bill 218?
6        MR. SWEETEN:  Objection, calls for
7  legislative privilege.
8     Q.  (By Ms. Westfall) Are you following the advice
9  of counsel?
10     A.  I am.  Privilege.
11     Q.  Is there any conversation that you had with
12  anyone in the Governor's Office concerning your desire
13  to sponsor H Bill -- HB 218?
14        MR. SWEETEN:  Objection.  I think you're
15  -- you're asking the specifics of the conversation.  He
16  can definitely identify whether a conversation occurred
17  with the Governor, but the subject matter is assumed in
18  your question.
19        MR. ROSENBERG:  But the subject, if I may
20  point to the order, we're allowed to get on the record
21  what the subject matter of the conversation was.
22        MS. WESTFALL:  Further, Mr. Sweeten, the
23  witness just confirmed that the testimony of Ms. McCoy,
24  that he indeed made that request to sponsor that
25  legislation.

---

87

1     A.  And did you --
2        MR. SWEETEN:  Hold on.  No, no, no.  No,
3  no, no.  Let me talk.
4        Would -- the subject matter, it was a
5  general subject matter, is what the court's order says.
6  The subject matter does not relate to -- he's not going
7  to identify the specific subject matter.  He can answer
8  the question as to whether or not he had conversations
9  with the Governor's Office.  You can ask about the
10  time.  You can ask about the subject, the general
11  subject matter, but the specifics, I think, are assumed
12  in the question is sort of the issue we're having.
13        MS. WESTFALL:  I'm not going to withdraw
14  my question.  I'm going to try another way.
15     Q.  (By ms. Westfall) Did you have any
16  conversations with anyone in the Lieutenant Governor's
17  Office about sponsoring HB 218 in the Senate?
18        MR. SWEETEN:  I'm going to let you answer
19  that question as phrased.  Do not reveal any additional
20  substance of any conversations other than yes or no.
21     A.  I would first ask for clarification.  You have
22  used Governor in one question and Lieutenant Governor in
23  the other question.  What is the question you're asking?
24     Q.  (By Ms. Westfall) Let's start with the
25  Lieutenant Governor.  Did you have any conversations --

---

88

1  did you or your staff have any conversations with
2  Lieutenant Governor or anyone in his office concerning
3  your sponsorship of HB 218?
4        MR. SWEETEN:  You can answer as phrased,
5  yes or no.
6     A.  Yes.
7     Q.  (By Ms. Westfall) Did you personally
8  participate in that meeting?
9     A.  You're inferring it was a meeting.
10     Q.  Did you personally participate in that
11  communication with the Lieutenant Governor's Office?
12     A.  No.
13     Q.  Did Ms. McCoy?
14     A.  My assumption --
15        MR. SWEETEN:  Answer if you know.
16     A.  My assumption is yes, that she would be the one
17  to do it.
18     Q.  (By Ms. Westfall) Do you know who else was in
19  that part of that communication?  And I'm sure your
20  counsel --
21     A.  No.
22     Q.  Okay.  How many conversations were there about
23  your sponsorship of HB 218 with the Lieutenant
24  Governor's Office?
25     A.  I -- I don't know that because I didn't have

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                                    May 17, 2012

89

1    one, so.
2        Q.  Do you know approximately when --
3        A.  Zero.  I had zero conversations.
4        Q.  Do you know approximately when this
5    conversation between Ms. McCoy and the Lieutenant
6    Governor's Office occurred?
7        A.  No.
8        Q.  Why did you want to sponsor HB 218?
9        A.  Privilege.
10           MR. SWEETEN:  Objection privilege.
11       Q.  (By Ms. Westfall) Did you have communications
12   with any election officials, either county or state,
13   concerning your sponsorship of HB 218?
14           MR. SWEETEN:  Objection, that's
15   legislatively privileged.
16       A.  Privilege.
17       Q.  (By Ms. Westfall) Yes or no answer for
18   establishing a privilege log.
19           MR. SWEETEN:  Okay.  You can answer if you
20   had a specific conversation with any election official?
21       A.  No.
22       Q.  (By Ms. Westfall) Are you familiar with
23   Secretary of State Roger Williams?
24       A.  Clarify "familiar."
25       Q.  Do you know him?

90

1        A.  Yes.
2        Q.  Do you know who he is?
3        A.  Yes.
4        Q.  Are you aware that Secretary of State Roger
5    Williams said something to the effect of he wasn't sure
6    a photo ID would improve turnout?
7        A.  Is the question am I aware that he said that?
8    No.
9        Q.  Are you aware of Secretary of State Roger
10   Williams having that sentiment and believing that in
11   2007?
12           MR. SWEETEN:  Don't reveal any
13   conversations that you had on this issue.
14       A.  No.
15           MR. SWEETEN:  Legislative privilege.
16           MS. WESTFALL:  He just testified he hasn't
17   had any conversations with Secretary of State Williams.
18   I'm not sure what -- this is about whether he's aware.
19           MR. SWEETEN:  Okay.  But if he's aware
20   because he heard from a staffer, because he heard from a
21   legislator or someone else, then that would be
22   privilege.  If he heard from public media sources,
23   public statements, that sort of thing, I think that that
24   would be not be.  So that -- it wasn't clear to me the
25   line you were drawing there.  But if it invaded the

91

1    conversations, that needed to be -- we needed to make an
2    objection.
3        Q.  (By Ms. Westfall) Do you think it's important,
4    when you're drafting election-related legislation, to
5    consult with the Secretary of State to obtain the
6    Secretary of State's view on potential legislation?
7            MR. SWEETEN:  Objection, privilege.
8        A.  Privilege.
9        Q.  (By Ms. Westfall) As a general matter?  Not as
10   regarding any particular legislation.  My question
11   stands.  Are you going to claim privilege again?
12       A.  Restate the question, please.
13       Q.  Do you think as a -- as a general matter, it is
14   advisable to consult with the Secretary of State of
15   Texas in crafting election-related legislation?
16           MR. SWEETEN:  I'm going to assert
17   privilege.  Objection, privilege.
18       Q.  (By Ms. Westfall) Are you following his advice?
19       A.  Privilege.
20       Q.  (By Ms. Westfall) Could you -- do you know the
21   party affiliation of Secretary of State Roger Williams?
22           MR. SWEETEN:  You can answer.
23       A.  Today or when he was Secretary of State?
24       Q.  (By Ms. Westfall) In 2007.
25       A.  No.

92

1        Q.  Do you know what his party affiliation is
2    today?
3        A.  Yes.
4        Q.  What is it?
5        A.  Republican.
6        Q.  Did you or your office conduct any analyses
7    prior to carrying House Bill 218 in the Senate?
8            MR. SWEETEN:  Objection.
9        A.  Privilege.
10           MR. SWEETEN:  Privilege.
11       Q.  (By Ms. Westfall) Did you have any
12   conversations about conducting any analyses prior to
13   carrying House Bill 218 in the Senate?
14       A.  Privilege.
15       Q.  (By Ms. Westfall) It's a yes or no answer.
16           MS. WESTFALL:  Mr. Sweeten?
17           MR. SWEETEN:  Well, in the question,
18   you're asking about conversations about analyses.  So
19   first, I think I'm going to object to the question as
20   vague and unclear as to what that would mean.  Secondly,
21   I think the question assumes -- I think that the
22   question does invade privilege to some degree.  He can
23   reveal conversations he's had if you want to ask him
24   about what specific state agencies, with legislators,
25   we're going to give the facts of the actual



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

93

1    communication. But when you're asking him, "What
2    conversations you've had in the course of your
3    analysis," I think that is overly broad, I think it's
4    vague, and I think it invades the legislative privilege.
5         MS. WESTFALL: Could you reread the
6    question, Court Reporter.
7         (The requested portion was read by the
8    court reporter.)
9         MR SWEETEN: Same objection.
10   Q. (By Ms. Westfall) Are you following his
11   instruction?
12   A. Yes.
13   Q. Yesterday, Ms. McCoy testified that your office
14   did not conduct any analysis of House Bill 218; is that
15   correct?
16        MR. SWEETEN: I'm sorry, can you reread
17   the question, please?
18        (The requested portion was read by the
19   court reporter.)
20        MR. SWEETEN: First of all, I'm going to
21   object based upon legislative privilege.
22        You do not have to reveal any analysis
23   that -- that was conducted by or not conducted by your
24   office. So you don't have to answer that question.
25   Privilege.

---

94

1         MS. WESTFALL: Mr. Sweeten, Ms. McCoy has
2    waived the privilege as -- as pertaining to that
3    question and I would ask you reconsider that objection.
4         MR. SWEETEN: It's Senators Fraser's
5    privilege to assert. He is asserting the privilege and
6    we are so asserting it.
7         MS. WESTFALL: She testified about it
8    yesterday.
9         MR. SWEETEN: Okay.
10        MS. WESTFALL: And you did not make any
11   effort to claim that that was privilege or otherwise
12   prohibit that examination on that topic today. It's
13   been waived.
14        MR. SWEETEN: Well, I'm currently
15   objecting to it based upon legislative privilege. So I
16   am making an effort today for him not to disclose that
17   matter which would be privileged. Analysis, it relates
18   to his mental impressions, thoughts, or opinions about
19   legislation. I'm going to instruct him accordingly.
20   Q. (By Ms. Westfall) Ms. McCoy is a long-term
21   staff person of yours, isn't she?
22   A. Yes.
23   Q. She's been working for you since 1992; isn't
24   that correct?
25   A. No.

---

95

1    Q. How long has she been working for you?
2    A. I wasn't elected until '97.
3    Q. My apologies. How long has she been working
4    for you?
5    A. I think since 1999. I think she started two
6    years after I got in the Senate, I believe.
7    Q. Would you describe her as a trusted advisor?
8         MR. SWEETEN: You can answer.
9    A. Yes.
10   Q. (By Ms. Westfall) She wouldn't tell you
11   anything that was untruthful, would she?
12        MR. SWEETEN: Objection, argumentative,
13   calls for --
14   Q. (By Ms. Westfall) You may answer.
15   A. Is it privilege? That's a judgment.
16        MR. SWEETEN: Objection, argumentative.
17   Objection, calls for speculation. Objection, vague.
18        With that you can answer the question to
19   the extent --
20   A. I trust her judgment.
21   Q. (By Ms. Westfall) Thank you. Ms. McCoy also
22   testified yesterday that you and your office did not
23   conduct an analysis of the impact of HB 218 on minority
24   voters; is that correct?
25        MR. SWEETEN: Do not discuss the analysis

---

96

1    that was performed or not performed.
2         So I'm going to object as to legislative
3    privilege?
4    A. Privilege.
5    Q. (By Ms. Westfall) Did you conduct any analysis
6    of the impact of HB 218 on minority voters?
7         MR. SWEETEN: Objection, privilege.
8    Q. (By Ms. Westfall) Are you following the
9    instruction?
10   A. Privilege.
11   Q. Thanks. And we'll have to be careful because
12   we're going to make a mess of the transcript. But I
13   realize --
14   A. All right. Okay.
15   Q. (By Ms. Westfall) Okay. We need to make our
16   records, both of us.
17        Why didn't you -- strike that.
18        Could you describe the procedural history
19   of House Bill 218 after it was introduced in the House?
20        MR. SWEETEN: By procedural history, you
21   mean how -- how it went through the different committees
22   and legislative process, the public record, it's --
23   Q. (By Ms. Westfall) Do you -- do you understand
24   the question, Senator Fraser?
25   A. I do.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

97

1    Q.  Thank you.  Could you answer?
2    A.  I don't have that information.
3    Q.  Do you know whether it was passed in the House?
4    A.  Yes.
5    Q.  And then what happened after that?
6    A.  In the legislative process, when a bill leaves
7    the House, it is delivered to the Senate, and the bill
8    is referred to a committee, and a member can request
9    picking the bill up, or it -- or it is assigned to
10   someone.
11   Q.  And I believe you testified earlier that you
12   had -- there were conversations about your interest in
13   carrying the bill; is that correct?
14   A.  No.  There -- that wasn't the conversation at
15   all.
16   Q.  Go ahead and clarify your testimony.
17   A.  Did you ask me a question?
18   Q.  Do you have an answer to that?  Is the answer
19   no?
20         MR. SWEETEN:  Is -- is -- I think he's
21   asking.
22   A.  There is no question.  You didn't ask a
23   question.
24   Q.  I said, I believe you testified earlier that
25   you had indicated interest in carrying HB 218 in the

98

1    Senate; is that correct?
2          MR. SWEETEN:  I'm going to object to the
3    extent it misstates any prior testimony.
4    Q.  (By Ms. Westfall)  You may answer.
5    A.  It's -- if you want -- if you want to pull up
6    -- I'll -- testament of what I've said, you can, but the
7    way you're stating the question, no, it is not correct.
8    Q.  How did HB 218 come to be carried by you in
9    the Senate?
10   A.  The conversations --
11         THE WITNESS:  Is that spec -- is
12   conversation within the office?
13         MR. SWEETEN:  If it -- if this relates to
14   conversations you've had with legislators --
15         THE WITNESS:  And/or staff?
16         MR. SWEETEN:  Staff, et cetera, then
17   that's legislatively privileged.
18   A.  Privilege.
19         MR. SWEETEN:  You can reveal basic
20   information about the conversations, date, time, but not
21   the substance of the conversation.
22   Q.  (By Ms. Westfall)  Let's move on.  Did you
23   monitor consideration of HB 218 in the House?
24   A.  No.
25   Q.  Did you learn of any concerns raised about HB

99

1    218 when it was being considered in the House?
2          MR. SWEETEN:  Objection, privilege.
3    Privilege.
4    Q.  (By Ms. Westfall)  Are you aware of any
5    conversations that were had with anybody involving you
6    or your staff concerning concerns raised about HB 218 in
7    the House?
8          MR. SWEETEN:  You can answer to the extent
9    that you can reveal conversations or people involved in
10   those conversations.  Do not reveal the substance of
11   those conversations.
12   A.  Reread the question, please.
13         (Requested portion was read back by the
14   court reporter.)
15   Q.  Are you -- can you answer the question?
16   A.  No.
17   Q.  I believe you just testified that you carried
18   HB 218 in the Senate, correct?
19   A.  Yes.
20   Q.  Was there a reason for your interest in voter
21   ID?
22         MR. SWEETEN:  Objection, privilege.
23   Q.  (By Ms. Westfall)  Did you have a conversation
24   with anyone about your interest in voter ID in 2007?
25         MR. SWEETEN:  You can answer whether or

100

1    not you had a conversation.  Don't reveal the contents
2    of the conversation.
3    A.  Ask the question again, please.
4    Q.  (By Ms. Westfall)  Did you have any
5    conversations in 2007 related to your interest in voter
6    ID?
7    A.  I believe that's privileged because of nature
8    of the conversation.
9          MR. SWEETEN:  She can -- she can get a
10   general subject matter.  I do think interest in the bill
11   is getting a little towards general.  But I'm going to
12   let you answer the question as phrased.  So you can
13   answer whether conversations were held.
14   A.  What was the question again?
15   Q.  Were there conversations -- were you involved
16   in conversations regarding your interest in voter ID in
17   2007?
18   A.  Yes.
19   Q.  Who were the other parties to that
20   conversation?
21   A.  Privileged.
22         MR. SWEETEN:  You can testify as to who
23   you had conversations with regarding the issue,
24   regarding the subject matter that she's raised.
25   A.  Janice McCoy.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

---

101

1    Q.  (By Ms. Westfall) Anyone else?
2    A.  No.
3    Q.  Did you have more than one conversation?
4    A.  Yes.
5    Q.  With -- with Janice McCoy?
6    A.  Yes.
7    Q.  Were these conversations in writing at all?
8    A.  No.
9    Q.  Did an interest in preventing voter
10   impersonation prompt your interest in sponsoring --
11           MR. SWEETEN: Objection. Sorry.
12           MS. WESTFALL: Let me finish my question.
13           MR. SWEETEN: I'm going to.
14   Q.  (By Ms. Westfall) -- HB 218?
15           MR. SWEETEN: Objection, privilege.
16   Q.  (By Ms. Westfall) And was HB 218 referred to
17   the State Affairs Committee?
18           MR. SWEETEN: You can answer.
19   A.  I believe it was. That, you know, to my
20   knowledge that's where it went.
21   Q.  (By Ms. Westfall) Did the committee hold a
22   hearing on HB 218?
23   A.  Again, to my knowledge, yes, that's normal
24   procedure.
25   Q.  What was your role in the committee in 2007?

---

102

1    Were you a member or were you the chair?
2    A.  A member.
3    Q.  Do you recall the hearing that was held on HB
4    218?
5    A.  I'm sorry, no, not in detail.
6    Q.  And Ms. McCoy testified yesterday that there
7    was a hearing on HB 218. And it's correct, it's your
8    testimony, that there was one hearing?
9    A.  Again, I just testified, I don't -- I don't
10   remember the hearing, but I'm assuming there was.
11   Q.  Do you recall that -- do you recall the
12   identity of any witnesses at that hearing?
13   A.  No.
14   Q.  Janice McCoy testified yesterday that the
15   Republican party testified at the committee hearing on
16   HB 218; do you believe that to be correct?      .
17   A.  I -- I can't verify or not verify.
18   Q.  And Ms. McCoy testified yesterday that she made
19   Skipper Wallace aware that the committee was having a
20   hearing on HB 218; do you think that's correct?
21   A.  You're subjective. You're asking what I think.
22   Q.  I'm asking whether --
23   A.  Privilege.
24   Q.  -- Ms. McCoy's statement is correct about
25   something that happened on the public record, and I'm

---

103

1    sure your counsel will instruct you that it's acceptable
2    as to the identity of witnesses at a hearing.
3            MR. SWEETEN: Well, I'm -- you -- you can
4    answer this question as phrased.
5    A.  Ask the question again.
6            MS. WESTFALL: Okay. Could you repeat
7    that question, Court Reporter?
8            COURT REPORTER: I'm going to have to go
9    back about two questions.
10           MS. WESTFALL: You know what, why don't I
11   just save you the trouble.
12   Q.  (By Ms. Westfall) Ms. McCoy testified that she
13   made Skipper Wallace aware that the committee was having
14   a hearing about HB 218, and that Mr. Wallace testified;
15   is that correct?
16           MR. SWEETEN: Objection, compound.
17           Go ahead.
18   A.  There's no reason for me to assume that she
19   didn't.
20   Q.  (By Ms. Westfall) Who is Skipper Wallace?
21   A.  He was a county Republican chair from a county
22   in my district.
23   Q.  And what county was that?
24   A.  Lampasas.
25   Q.  Is he still in that position?

---

104

1    A.  Yes.
2    Q.  How long has he held that position?
3    A.  I'm sorry, I don't know.
4    Q.  Do you know why Mr. Wallace has an interest in
5    voter ID?
6            MR. SWEETEN: Objection, calls for
7    speculation.
8    Q.  (By Ms. Westfall) You may answer.
9    A.  Privilege.
10           MS. WESTFALL: I'm not sure that is
11   privilege, Mr. Sweeten. Could you think about directing
12   your witness to answer the question?
13           MR. SWEETEN: Well, I mean, the question
14   very clearly calls for speculation. You're asking why
15   Skipper Wallace believes -- or has an interest in, and
16   so it assumes facts not in evidence, it calls for
17   speculation.
18           With that, you can answer if you're able.
19   A.  I have no idea.
20   Q.  (By Ms. Westfall) Have you ever had
21   conversations about Mr. Wallace with photo ID in 2007?
22           MR. SWEETEN: Did he have conversation
23   with Mr. Wallace?
24           MS. WESTFALL: Yes.
25           MR. SWEETEN: Okay. You can testify as to

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                              May 17, 2012

105

1    the facts of the conversation, whether they occurred.
2    But don't reveal the substance.
3        A.  I don't remember conversations with Skipper
4    Wallace.
5        Q.  (By Ms. Westfall) Do you know whether Ms. McCoy
6    had conversations with Mr. Wallace about voter ID?
7        A.  I have no way of knowing.
8        Q.  Do you generally know whether Ms. McCoy has
9    conversations with groups or individuals?
10           MR. SWEETEN:  Objection, vague.
11       Q.  (By Ms. Westfall) You may answer.
12       A.  I don't always know who she's talking to.
13       Q.  Do you predominantly know who she's talking to?
14       A.  I don't always know --
15           MR. SWEETEN:  Objection, calls for
16   speculation.
17       Q.  (By Ms. Westfall) But listening very carefully
18   to my question, does she mostly let you know when she's
19   meeting with individuals or groups?
20           MR. SWEETEN:  Objection, calls for
21   speculation.
22       Q.  (By Ms. Westfall) You may answer.
23           MR. SWEETEN:  If you -- if you can, answer
24   the question, please.
25       A.  The answer is still the same.  She, you know,

106

1    she doesn't always tell me who she meets with, and I
2    don't always ask.
3        Q.  (By Ms. Westfall) And you're her direct
4    supervisor; is that right.
5        A.  Yes.
6        Q.  Do you recall, at the hearing on HB 218 before
7    the State Affairs Committee, whether there was any
8    concerns raised about the impact of HB 218 on minority
9    voters?
10           MR. SWEETEN:  At the hearing, you said?
11           MS. WESTFALL:  Right.
12           MR. SWEETEN:  Okay.  No -- no objection.
13           Go ahead.  You can answer.
14       A.  I'm sorry, I do not remember the hearing in
15   2007.
16       Q.  (By Ms. Westfall) Was the bill amended in the
17   State Affairs Committee?
18       A.  I don't remember whether it was or not.
19       Q.  After committee consideration, was it voted out
20   of committee?
21       A.  It had to be voted out of the committee to get
22   to the Floor.
23       Q.  Thank you.  Was it voted out of committee on
24   party lines?
25       A.  Again, I don't -- I don't remember the vote.

107

1        Q.  Do you remember any member of the Republican
2    party who voted against the bill?
3        A.  No.  I don't remember the vote.
4        Q.  Did you, after Committee voted it out, did you
5    bring it to the Senate Floor?
6        A.  You're -- the answer is no.  I did not bring
7    the bill to the Senate Floor.
8        Q.  Was HB 218 brought to the Senate Floor?
9        A.  It was recognized to be brought forward.
10       Q.  And who recognized it to be brought forward?
11       A.  I don't remember who was in the chair at the
12   time.
13       Q.  Was it Lieutenant Governor Dewhurst?
14       A.  I don't remember who was in the chair at the
15   time.
16       Q.  As a general matter, is the Chair of the Senate
17   would bring a bill, or how would it move from committee
18   to Floor?
19       A.  Whoever is sitting in the chair acting as
20   presiding officer would recognize the member.
21       Q.  Is there a way that it got on to the list of
22   bills to be considered for Floor consideration?
23       A.  When a bill comes out of committee, it is sent
24   to the Floor, and is put in the regular order of
25   business.

108

1        Q.  Did HB 218 jump the line, so to speak, from the
2    regular order of business, to be heard before other
3    bills that would ordinarily have come before it?
4        A.  I'm going to need to give an explanation.
5            MR. SWEETEN:  Okay.  You --
6            MS. WESTFALL:  I'm sure it would be
7    helpful to me.
8            MR. SWEETEN:  Well, I mean, you can
9    testify about matters of public record.  Okay?  You can
10   you do that.  Don't reveal conversations that you've had
11   surrounding the bill, the substance of those
12   conversations.
13       A.  In 2007, there was a bill put in place that
14   acted as a blocker bill and it was the number one bill
15   on the agenda.  All bills, after that, in order to be
16   brought up, had to jump over that bill in order to be
17   heard.  So every bill heard was heard -- held -- heard
18   out of order.
19       Q.  (By Ms. Westfall) I see.  And was the blocker
20   bill a procedural requirement that required two-thirds
21   of senators to vote in favor of bringing a bill to the
22   Floor?
23       A.  It wasn't a procedural requirement.  It was a
24   Senate rule, an agreement, that that bill was placed
25   there.  And in order to bring up a bill, you had to jump



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

### 109

1  over the blocker bill.
2      Q.  I see.  And is it an ordinary practice for a
3  blocker bill to be put into place at the beginning of
4  session, in the Texas Senate in your experience?
5      A.  Not ordinary.
6      Q.  How did that arise in 2007?
7          MR. SWEETEN:  You can answer to the extent
8  that this doesn't invade privilege.  You can talk about
9  matters of the public record.
10     A.  In the 2007, the chairman of Administration
11 filed a bill, and that bill remained in place.
12     Q.  (By Ms. Westfall) What was the substance of the
13 bill?  What was the blocker bill?
14     A.  I'm sorry --
15     Q.  Can you describe it?
16     A.  It's usually something having to do with the
17 gardening of the state lawn.  It's...
18     Q.  I see.
19     A.  It was a -- administrative bill.
20     Q.  Did HB 218 require the support of two-thirds
21 Senators to be brought to the Floor for a vote?
22     A.  Yes.
23     Q.  Could you describe the two-thirds procedure,
24 for the record; how does it work?
25         MR. SWEETEN:  As a general matter?

### 110

1          MS. WESTFALL:  As a general matter.
2      A.  As a general matter, if I had a bill that I
3  wanted to get in front of the blocker bill, the Floor
4  would recognize me, let's say you're recognized for a
5  motion on House Bill 218.  I would say, "I now move to
6  suspend all necessary rules to take up and consider
7  Senate Bill 218.
8      Q.  I see --
9      A.  Or House Bill 218.
10     Q.  Sir, how many other sessions are you aware of
11 and served in, in which there has been a blocker bill
12 introduced?
13     A.  Well, I've only been in the Senate since '95 --
14 '97.
15     Q.  That's seems like a long time to me.  Could you
16 tell me how many times a blocker bill has been
17 interposed?
18     A.  During those sessions, at some point in every
19 session, there was a blocker bill that was put in place.
20     Q.  And so the blocker bill requires a two-thirds
21 vote to overcome?
22     A.  Yes.
23     Q.  Were you involved in bringing HB 218 to the
24 Senate Floor for a vote?
25         MR. SWEETEN:  You can reveal matters of

### 111

1  public record.  Don't reveal matters that are
2  legislatively privileged.  Involved could include
3  either.
4      A.  Clarify "involved."
5      Q.  (By Ms. Westfall) Were you're involved,
6  procedurally, in bringing HB 218 to the Senate for a
7  vote in terms of what you just testified to overcoming a
8  blocker bill.
9          MR. SWEETEN:  Same instruction, go ahead.
10     Q.  (By Ms. Westfall) You may answer.
11     A.  My involvement was that it was announced that
12 "Senator Fraser, you are recognized for a motion on
13 House Bill 218."
14     Q.  And I believe you testified earlier you didn't
15 know who was chairing the Senate at that time; is that
16 right?
17     A.  No.
18     Q.  Please proceed and describe the rest of the
19 procedure.
20         MR. SWEETEN:  Again, legislatively
21 privilege.
22         Information, don't provide.  Anything
23 public record, you're free to talk about.
24     A.  When I was recognized, I said, "I now move to
25 suspend all necessary rules to take up and consider

### 112

1  House Bill 218.
2      Q.  (By Ms. Westfall) When that exchange occurred
3  on the Senate Floor, how many Senators were present?
4      A.  Again, I don't know.
5      Q.  Do you recall if anyone was not present?
6      A.  No, I do not recall.
7      Q.  Was Senator Uresti not on the Floor at that
8  time?
9      A.  Again, I don't -- I don't recall.
10     Q.  Are you aware of Senator Uresti's vote on HB
11 218?
12     A.  I believe the record will reflect that Senator
13 Uresti voted not to suspend -- not to suspend.
14     Q.  Does that mean, in lay persons terms and
15 outside of Senate procedure, does that mean he was for
16 or against the bill?
17     A.  It is not a vote for or against.
18     Q.  It is a procedural prerequisite to voting on
19 the bill; is it not?
20     A.  I think your question is not correct.  It's
21 neither one.
22     Q.  Well, could you clarify your testimony or
23 explain to us?
24     A.  If you ask the correct question, I'll be glad
25 to.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

113

1     Q.  Is it a vote against considering the bill?
2     A.  It would be a vote against consideration of the
3   bill.
4     Q.  Thank you.  Was there a conversation, that
5   you're aware of, involving the timing of when HB 218 was
6   brought to the Floor?  It's a yes or no.  Was there --
7   was there a conversation?
8     A.  Between me?
9     Q.  I'm going to ask you about your knowledge of
10  the existence of a conversation.
11    A.  Privilege.
12    Q.  The existence.
13        MR. SWEETEN:  It's okay.
14        What she's saying is:  Was there a
15  conversation about that issue?  You can identify if a
16  conversation occurred, with whom it occurred, the date
17  it occurred, if you know.  But don't reveal the
18  substance of it otherwise.
19    A.  I have no knowledge of the conversation.
20    Q.  (By Ms. Westfall) So is it your testimony that
21  you just appeared on the Senate one day and you were
22  recognized?
23        MR. SWEETEN:  Objection.  I think that
24  misstates his testimony.
25        MS. WESTFALL:  You may answer.

114

1         MR. SWEETEN:  Argumentative.
2     A.  My testimony is that I was on the Senate Floor
3   and the chair said, "Senator Fraser, you are now
4   recognized for a motion on House Bill 218.
5     Q.  (By Ms. Westfall) How did you react to that;
6   were you surprised?
7         MR. SWEETEN:  Objection.  I think that
8   definitely asks for him to reveal thoughts, mental
9   impressions, opinions about legislation, in furtherance
10  of the legislative process, and therefore is
11  legislatively privileged.
12        MS. WESTFALL:  His human emotion and
13  reaction is part of the legislative process?
14        MR. SWEETEN:  It would be his mental
15  impressions or opinions about legislation.
16    Q.  (By Ms. Westfall) Are you not answering the
17  question?
18    A.  Privilege.
19    Q.  Was a vote held when Senator Uresti was not on
20  the Floor?
21    A.  I'm sorry?
22    Q.  Was this -- was a vote held on HB 218 when
23  Senator Uresti was not on -- on the Floor?
24    A.  The final vote --
25    Q.  I'm not asking you about the first vote.  Was

115

1   there a vote when he was not on the Floor?
2     A.  On a bill, there's only one vote.  The vote is
3   the vote that is in the record.  And my only
4   recollection is looking at the vote.  The vote failed to
5   suspend, there wasn't sufficient votes, so I'm assuming
6   that he was on the Floor and voted.
7     Q.  Was there a time in Floor consideration on HB
8   218 when Mr. Uresti did not -- was not on the Floor?
9     A.  I'm sorry, I don't -- I don't know the answer
10  to that.
11    Q.  Was Mr. Uresti sick that day?
12    A.  That would be subjective on my part.  I would
13  say privilege.
14        MR. SWEETEN:  Well --
15    A.  I --
16        MR. SWEETEN:  You -- if you don't know the
17  answer, then that's the answer.  She's asking the fact
18  of whether or not he was sick or not, or whether you
19  knew he was sick or not.  So you can just answer that
20  question.  That's -- that's -- we're not claiming
21  privilege as to that question.
22    A.  I don't -- I don't know whether he was sick or
23  not.
24        MR. SWEETEN:  Okay.
25    Q.  (By Ms. Westfall) Was there a verification of

116

1   the vote on HB 218 on the Floor?
2     A.  Every vote is a verification.
3     Q.  Were there, in essence, two votes on HB 218;
4   one when Mr. Uresti was not on the Floor, and one when
5   he was on the Floor to verify the vote?
6     A.  I -- I'm sorry, I don't remember.
7     Q.  And just so that we can have a -- in order to
8   facilitate our conversation, as you're an expert in the
9   Texas Senate rules and I'm not, if you could testify
10  about procedure, and grant me some latitude in my
11  questioning, it would make things go along faster.
12  Because I'm -- I -- there's a lot more, many more
13  sessions to cover in today's examination and --
14        MR. SWEETEN:  I'm not sure what you're
15  asking him to do --
16        MS. WESTFALL:  -- I don't want to delay
17  you --
18        MR. SWEETEN:  -- but my instruction to him
19  will be to just answer the question that's posed to him.
20  So that's what --
21        MS. WESTFALL:  Sure.
22        MR. SWEETEN:  -- he's going to do.
23        MS. WESTFALL:  And if we want to play
24  these games, we'll be here for a long, long time,
25  Mr. Sweeten.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

### 117

1   MR. SWEETEN: It is not -- Counsel --
2   MS. WESTFALL: And I'm going to have that
3   on the record.
4   MR. SWEETEN: It is not a game, I assure
5   you. I mean, I'm not sure if you're asking him to make
6   a speech on issues. He's certainly not going to do
7   that.
8   MS. WESTFALL: No, I --
9   MR. SWEETEN: The way it works is, you ask
10  a question, he gets to answer. He trying to do that.
11  MS. WESTFALL: And I'm asking for
12  assistance as he is an expert in the procedures of Texas
13  State Senate and I am not. To make sure that --
14  MR. SWEETEN: I'm not even sure what the
15  -- what you're even asking him. I mean, he -- he will
16  answer the question that's posed to him. He will do the
17  best he can to answer that, to the extent it's not
18  privileged. He's trying to do that, will continue to do
19  that.
20  MS. WESTFALL: Thank you, Mr. Sweeten.
21  Could you mark this as Exhibit 45.
22  (Exhibit 45 marked for identification.)
23  Q. (By Ms. Westfall) You've been handed what's
24  been marked as Exhibit 45. If you can take a look at
25  this document and let me know when you've had a chance

---

### 118

1   to review.
2   A. (Reading.)
3   Q. You know what, for the time being, Senator,
4   unless you have interest, I'm going to direct your
5   attention to the first page of the numbered paragraphs
6   so you need not read this entire declaration, which is
7   lengthy.
8   Senator, have you seen this declaration
9   before?
10  A. No.
11  Q. Turning your attention to Paragraph 6 and 7,
12  concerning the 2007 legislative session, do you have any
13  different view of the facts that Senator Uresti has set
14  forth in Paragraph 6 and 7?
15  MR. SWEETEN: Okay. To some degree, what
16  is contained in Paragraph 6 or 7 reveals conversations
17  that could have occurred within the Senate. When you're
18  answering her question, make sure that -- that you're
19  not doing -- doing so. And so I'm going to assert a
20  legislative privilege as to that.
21  To the extent you can answer her question
22  without revealing legislative privilege, because I think
23  some of this does not implicate it, that you can feel
24  free to do so.
25  A. Privilege.

---

### 119

1   Q. (By Ms. Westfall) This declaration pertains to
2   matters that some of which occurred on the Senate Floor,
3   does it not?
4   A. Show me what happened on the Senate Floor.
5   Q. Mr. Uresti appeared on the Senate Floor, on
6   Paragraph 7.
7   A. And I will agree that that happened.
8   Q. And also turning your attention to Paragraph 9,
9   do you have any different recollections than what
10  Senator Uresti has put forth in Paragraph 9?
11  A. The -- no, that is not correct.
12  Q. Could you -- could you indicate what you
13  disagree with in Paragraph 9?
14  A. If a bill passes and the bill is suspended,
15  then you would move to the next step, which would be to
16  hear the bill. There was never a final resolution of
17  the vote to vote to suspend.
18  Q. Was that --
19  A. And the vote was kept open. So what -- the way
20  he's describing it here is -- is partially correct, but
21  not in its entirety.
22  Q. Were you involved in any conversations
23  concerning keeping the vote open on HB 218?
24  A. No.
25  Q. What is Senator Uresti race or ethnicity?

---

### 120

1   A. I don't know that I've ever asked him. I have
2   an opinion, is that --
3   MR. SWEETEN: You can answer to the extent
4   you know.
5   A. I -- I believe that Senator Uresti is Hispanic.
6   Q. Do you know what part of the state he
7   represents?
8   A. San Antonio.
9   Q. Does he represent a large area of the state
10  bordering the U.S. Mexico border, in part?
11  A. He -- his district touches the Mexico boarder.
12  Q. Did you have any concerns about holding a vote
13  on HB 218 given Senator Uresti illness?
14  MR. SWEETEN: Objection, privilege.
15  Q. (By Ms. Westfall) Are you following your --
16  A. Privilege.
17  Q. Did you have any concerns about holding a vote
18  on HB 218 given the constituency that Senator Uresti
19  represents?
20  MR. SWEETEN: Same objection.
21  A. Privilege.
22  Q. (By Ms. Westfall) Was a request made to verify
23  the vote on 218?
24  MR. SWEETEN: Are you asking on the Floor?
25  If it's public record, you can testify to

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

121

1   it. If she's asking if there was a request made and it
2   involved internal communications, then that would be
3   privileged.
4       A. The answer is no. There was not a verification
5   of the vote.
6       Q. (By Ms. Westfall) Did House Bill 218, was there
7   a failure to suspend regular order of business with
8   two-thirds of the vote?
9       A. Yes.
10      Q. What -- and could you tell me the purpose of
11  the two-thirds rule that you testified about earlier, as
12  a general matter, and, of course, procedurally?
13      A. Well, that's privilege. There's, you know,
14  everyone has a different opinion.
15          MR. SWEETEN: Privilege.
16      Q. (By Ms. Westfall) Well, I'm -- Mr. Sweeten, I
17  don't think it -- I'm not asking about a particular
18  legislative act, I'm asking about Senator Fraser's deep
19  knowledge of Senate procedures given his long history in
20  the Senate.
21          MR. SWEETEN: Okay.
22          I -- we're going to let you answer as to
23  the general purpose of the rule.
24      A. There is no purpose for the two-thirds rule.
25      Q. (By Ms. Westfall) It's just a rule that's in

122

1   place for absolutely no reason?
2       A. You're asking me. And my response is there is
3   no...
4       Q. And Ms. McCoy testified yesterday in her
5   deposition the purpose of the rule is to reach general
6   consensus on the bills. Do you agree with her view of
7   the purpose of the two-thirds rule?
8       A. No.
9       Q. How do you -- why do you disagree?
10      A. Privilege.
11      Q. Ms. McCoy also testified that most bills are
12  brought under the two-thirds rule. Do you agree with
13  that testimony?
14          MR. SWEETEN: You can answer.
15      A. I would not agree with the word "most."
16      Q. How would you characterize it?
17      A. Meaning?
18          MS. WESTFALL: Mr. Sweeten, Senator Fraser
19  just refused to answer my question about the purpose,
20  whether the purpose of the two-thirds rule was general
21  consensus on bills. And I believe that was an improper
22  refusal to answer my question. Will you advice your
23  client to answer the question?
24          MR. SWEETEN: I thought he answered.
25          MS. WESTFALL: I said, "Ms. McCoy

123

1   testified the purpose of the rule is general consensus
2   on the bills." and he said, "privilege" and didn't
3   answer. Would you --
4           MR. SWEETEN: Okay. Well, I mean, the
5   preceeding question was, you asked him, well, is there a
6   purpose. And he said there's no purpose. So he's
7   answered what he thinks the purpose is. And now you're
8   coming back with "she says this, is she -- is she
9   right?" I mean, by its own --
10          MS. WESTFALL: It's a different question.
11          MR. SWEETEN: Okay.
12          MS. WESTFALL: About the purpose.
13          MR. SWEETEN: So is the question, "Is
14  Ms. McCoy right about that"? I think he's already
15  answered it, but if you --
16          MS. WESTFALL: He said, "privileged." We
17  can read back the record, Mr. Sweeten.
18          MR. SWEETEN: You can answer that he
19  question.
20      A. Privilege to waive the question when asked.
21          MR. SWEETEN: Okay.
22      Q. (By Ms. Westfall) I'll reask it: Ms. McCoy
23  testified yesterday that the purpose of the two-thirds
24  rule is general consensus on bills. Do you agree with
25  that?

124

1       A. No.
2       Q. Did the Senate take any further action on House
3   Bill 218?
4           MR. SWEETEN: Don't reveal privilege. You
5   can reveal matters of public record.
6       A. To my knowledge, there was no other action
7   taken on 218 in that session.
8       Q. Were there any conversations about 218 after it
9   failed to pass the Senate?
10      A. Privilege.
11      Q. And that's a yes-no question about whether
12  conversations --
13          MR. SWEETEN: She -- just say if a
14  conversation existed. Don't say what the conversation
15  entailed. So, were there conversations, is her
16  question.
17      A. Yes.
18      Q. (By Ms. Westfall) How many?
19      A. One that I can remember.
20      Q. Were you directly involved or did you hear
21  about the conversation?
22      A. I was directly involved.
23      Q. And who else was in the conversation?
24          MR. SWEETEN: You can identify who was a
25  party to the conversation.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                           May 17, 2012

---

125

1   A.  I don't remember the specific person.
2   Q.  (By Ms. Westfall) You were in a conversation
3   and you don't know who else was -- I mean, do you have a
4   general sense of whether it was a staff person or was it
5   a legislator?
6   A.  Yes.  I have a general sense.
7   Q.  Was it legislator?
8   A.  No.
9   Q.  Was it a staff person?
10  A.  I believe it was.
11  Q.  Was it a staff person in the Senate?
12      THE WITNESS:  How do I answer this?
13      MR. SWEETEN:  You can answer if -- who --
14  the identity of person to the best of your knowledge.
15  A.  I believe the conversation was with the
16  Lieutenant Governor's Office and I believe it was a
17  staffer.
18  Q.  (By Ms. Westfall) Was it Mr. Hebert?
19  A.  Not likely.
20  Q.  Was it Ms. Rathgeber?
21  A.  Possibly.
22  Q.  Was this in person or by phone?
23      MR. SWEETEN:  You can answer.
24  A.  In person.
25  Q.  (By Ms. Westfall) How soon after the vote on HB

---

126

1   218 did this occur?
2   A.  Not immediately.
3   Q.  A few weeks?
4   A.  A week.
5   Q.  Were there any other conversations, you recall,
6   about HB 218 after it didn't pass in the Senate?
7   A.  No.
8   Q.  Thank you.  Did you talk to -- actually do you
9   recall any conversations with anyone in the Governor's
10  Office after HB 218 failed?
11  A.  You're -- you're -- Governor Governor?
12  Q.  Governor Governor.
13  A.  No.
14  Q.  Do you recall any conversations about HB 218
15  after it failed in the Senate with anyone in the
16  Secretary of State's Office?
17  A.  No.
18  Q.  Or in -- with the Department of Public Safety?
19  A.  No.
20  Q.  Or with anyone, staff person or legislator, in
21  the House?
22  A.  No.
23  Q.  Did you file a photo ID bill in 2009 in the
24  Texas State Senate?
25  A.  Yes.

---

127

1   Q.  Do you remember the bill number?
2   A.  362, SB 362.
3       MS. WESTFALL:  Could you hand the witness
4   29, please.
5   Q.  (By Ms. Westfall) You've been handed what's
6   been previously marked as U.S. 29.  Do you recognize
7   this document?
8       MR. SWEETEN:  I'll tidy this up a little
9   bit here.  Which one do you need?  Are you done with
10  this?
11      Okay, you're asking about 29 right now, is
12  that right?
13      THE WITNESS:  362.
14      MR. SWEETEN:  Exhibit 29 though?
15      MS. WESTFALL:  Yes, yes.
16      MR. SWEETEN:  Okay.  Gotcha.
17      MS. WESTFALL:  They all look alike.
18      MR. SWEETEN:  Yes, they do.
19  Q.  (By Ms. Westfall) And do you recognize this
20  bill?
21  A.  Yes.
22  Q.  And what is it?
23  A.  Senate Bill 362.
24  Q.  This is as filed in the Senate or did this --
25  A.  I believe this is the bill that was -- we

---

128

1   filed.
2   Q.  Did you also file a bill SB 363?
3   A.  Yes.
4   Q.  And could you tell us about that bill and what
5   did it do?
6   A.  My only knowledge of that bill is seeing -- I
7   read in a press release last night of that bill, the
8   bill was filed of what we call a "shell," and to my
9   knowledge, the bill never moved and never had a hearing.
10  Q.  What does "shell" mean?
11  A.  It was a caption for a bill, if needed, to --
12  for a bill to, you know, to address an issue, but it
13  never -- it was never -- to my -- I don't remember
14  having a hearing on the bill.
15  Q.  Was it a placeholder in effect?
16  A.  Yes.
17  Q.  And did SB 362 and SB 363 kind of go hand-in-
18  hand with one another?
19  A.  No.
20  Q.  And why not?
21      MR. SWEETEN:  I'm going object to the
22  extent that calls for matters of his mental impressions,
23  opinions about legislation, and furtherance of the
24  legislative process.
25  Q.  (By Ms. Westfall) SB 363 pertained to voter

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

129

1   registration, did it not?
2       A.  I don't remember 363.
3           MS. WESTFALL: Court Reporter, would you
4   hand him what's been previously marked as Exhibit 36.
5   Thank you, sir.
6       Q.  (By Ms. Westfall) I'm going to hand you what's
7   been previously marked as Exhibit 36.  Do you recognize
8   this document?
9       A.  What was the question?
10      Q.  Do you recognize this document?
11      A.  I recognize it is represented this is Senate
12  Bill 363.
13      Q.  Yes.  And do you see your name is at the top
14  left --
15      A.  I do.
16      Q.  -- as the person who introduced it; is that
17  right?
18          Is this -- does this bill require persons
19  to present documentary proof of citizenship when
20  registering?
21      A.  The bill, if passed, had a provision in it as
22  filed that would provide for proof of citizenship.
23      Q.  And these -- these bills were filed around the
24  same time, SB 362 and SB 363; is that right?
25      A.  It's implied if it's this next number, it

130

1   was --
2       Q.  That's what I was thinking too.  Thank you.
3           And turning your attention to Exhibit 29.
4   Can you identify the forms of identification that were
5   allowable in this bill?  And I would like to turn your
6   attention to Page 5, if that will help.
7       A.  And what would you like to know?
8       Q.  Could you just provide a general overview of
9   the -- not each and every one maybe, but just an
10  overview.
11      A.  An expired driver's license, a military ID card
12  that contains a photograph, a United States citizenship
13  certificate that contains a photograph, a license to
14  carry concealed handgun, an identification card that has
15  a persons photograph issued by a federal government
16  agency or a political subdivision of the state, and,
17  looks like, a typical proof of identification as a
18  voter's registration card.
19      Q.  And some other items that do not require a
20  photo; is that correct?
21      A.  That's true.
22      Q.  And the balance of Section 10; is that correct?
23      A.  You said the balance of section?
24      Q.  Well, you were at -- you were at Subsection B
25  -- I'm sorry, of -- Section 63.0101.

131

1       A.  The balance from B down.
2       Q.  Right.
3       A.  It lists 11 other pieces of identification.
4       Q.  Thank you.  Were you involved in the
5   development of Senate Bill 362?
6       A.  No.
7       Q.  You filed 362, didn't you?
8       A.  Yes.
9       Q.  Who developed it if you didn't?
10      A.  This is the bill that was passed -- this was
11  the bill that -- 218 that was passed by the House.  We
12  started with the House version that had passed the House
13  the year before.
14      Q.  So you just simply --
15      A.  Picked up.
16      Q.  -- refiled the --
17      A.  Refiled the Bill 218 that came over.  And I
18  want to clarify, that was my understanding.  It might
19  not be exactly word-for-word, but the intention was to
20  file --
21          MR. SWEETEN: Don't talk about intention,
22  okay?  You're not talking about -- we're not here to
23  talk about our mental impression, opinions about
24  legislation.
25          THE WITNESS: Okay.

132

1       Q.  (By Ms. Westfall) Are you following your
2   counsel's advice --
3       A.  Yes.
4       Q.  -- as to not further testify on the development
5   of the bill?
6       A.  Yes.
7       Q.  Okay.  When did you start developing Senate
8   Bill -- what became Senate Bill 362?
9       A.  I didn't develope 362.
10      Q.  Is your testimony you simply took House Bill
11  218 and filed it the following session?  In essence?
12      A.  In essence.
13      Q.  Did you, just to confirm, is that -- strike
14  that.
15          Did you look at legislation in any other
16  states.
17          MR. SWEETEN: Don't reveal your thoughts,
18  mental impressions, opinions about legislation or
19  furtherance of the legislative process.  Answer that
20  question if you can reference matters of public record
21  or -- you can discuss public matters.
22          So objection, privilege.
23      A.  Privilege.
24      Q.  (By Ms. Westfall) Just -- did you look at
25  any models of bills from any interest groups in drafting



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

<table>
<tr><td>

133

1   Senate Bill 362?
2           MR. SWEETEN: Same objection. Objection,
3   privilege.
4           Don't -- don't reveal thoughts, mental
5   impressions, opinions about legislation or in
6   furtherance of the legislative process.
7       A. Privilege.
8       Q. (By Ms. Westfall) Did you look to any other
9   sources other than HB 218 in developing and drafting and
10  filing Senate Bill 362?
11      A. No.
12          MR. SWEETEN: Same objection.
13      Q. (By Ms. Westfall) Did you have any
14  communications about Senate Bill 362 with other current
15  or former legislators who'd offered past photo ID bills,
16  before filing the bill?
17      A. Privilege.
18          MR. SWEETEN: You can answer as to the
19  fact of a communication, okay? So you can say if -- if
20  you -- if conversations occurred, but you do not reveal
21  the substance of those.
22      A. And this is the 362 in '09? Ask the question
23  again.
24      Q. (By Ms. Westfall) Did you have any
25  communications about Senate Bill 362 with other current

</td><td>

135

1   of you?
2       A. I don't know for sure, but I believe it was
3   likely Ms. McCoy.
4       Q. Was that -- was there one conversation with the
5   Lieutenant Governor's Office about the filing of 362?
6       A. Yes. It's all it would be.
7       Q. Did you have any communications with officials
8   or legislators from other states including but not
9   limited to Georgia and Indiana concerning the drafting
10  of HB 362 before it was filed?
11      A. No.
12      Q. Did you have any conversation about Senate Bill
13  362 with any interest groups before it was filed?
14          MR. SWEETEN: You can answer as to whether
15  or not a conversation occurred. Do not discuss the
16  substance of the conversation.
17      A. No.
18      Q. (By Ms. Westfall) Did you have any
19  communications about Senate Bill 362 with any
20  individuals including constituents in Texas before you
21  filed it?
22      A. Yes.
23      Q. And who was the -- who was the person with whom
24  you had the conversation?
25          MR. SWEETEN: You can reveal who the

</td></tr>
<tr><td>

134

1   or former legislators who had offered past photo ID
2   bills, or their staff?
3       A. No.
4       Q. Did you have any communications with the
5   Lieutenant Governor's Office staff, Governor's Office
6   staff, or anyone in an executive agency about Senate
7   Bill 362 before filing it?
8           MR. SWEETEN: You can answer.
9       A. Yes.
10      Q. (By Ms. Westfall) Could you identify the staff
11  person with whom you had the conversation -- or the
12  person, the individual, with whom you had the
13  conversation?
14          MR. SWEETEN: You can identify the person.
15      A. I can't identify the person. We just gave
16  notice that we were filing the bill to the Lieutenant
17  Governor's Office and --
18      Q. (By Ms. Westfall) Was there a person in the
19  office to whom you gave that notice?
20          MR. SWEETEN: You can answer as to the
21  identity of the person.
22      A. I don't know for sure. I assume it was Julia
23  Rathgeber.
24      Q. (By Ms. Westfall) Did you personally make that
25  communication, or did Ms. McCoy on your behalf, or both

</td><td>

136

1   conversation was with. Do not reveal the substance of
2   the conversation.
3       A. Skipper Wallace.
4       Q. (By Ms. Westfall) Did you have one conversation
5   with Skipper Wallace?
6       A. Yes.
7       Q. Was it you personally, Ms. McCoy, both of you?
8       A. Me personally.
9       Q. And how far in advance did you advise
10  Mr. Wallace -- or had this conversation, pardon me,
11  about 326?
12          MR. SWEETEN: I'm sorry, how far in
13  advance of what?
14          MS. WESTFALL: Of the filing of the bill.
15          MR. SWEETEN: Of the filing.
16          You can answer if you know.
17      A. Fall of '08.
18      Q. (By Ms. Westfall) Did he come into your office,
19  or where did this conversation take place?
20      A. I don't remember the specifics.
21      Q. Was it a phone call?
22      A. Likely a phone call. It was not in my office.
23      Q. Do you regularly have communications with
24  Mr. Wallace?
25      A. Yes.

</td></tr>
</table>



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

137

1   Q.  About once a week, once a month?
2   A.  Once a month.
3   Q.  Did you have one conversation with Mr. Wallace
4   about 362 before it was filed?
5   A.  Yes.
6   Q.  Did you have more than one?
7   A.  Not to my knowledge.
8   Q.  Did you have any communications with any other
9   constituents or individuals besides Mr. Wallace about
10  362 before it was filed?
11  A.  No.
12  Q.  I believe you testified earlier about the forms
13  of ID that are listed that are allowable in Senate Bill
14  362.  I want to turn your attention to those.
15      Why did you include the forms of allowable
16  photo ID that you included in 362 that you did?
17      MR. SWEETEN:  Why did you include those,
18  that's legislatively privileged.  Do not provide an
19  answer to that question.
20  A.  That's privileged.
21      MR. SWEETEN:  That's privileged.  Do not
22  answer that question.
23  A.  Yes, privileged.
24  Q.  (By Ms. Westfall)  Let me ask you a question
25  about one of the forms of ID.

138

1       Do you need a minute?
2   A.  No.  I'm good.
3       MS. WESTFALL:  Okay.
4   Q.  (By Ms. Westfall)  Turning your attention to
5   Senate Bill 362, do you see where it lists United States
6   military identification cards?
7       MR. SWEETEN:  What page?  I'll help him.
8       MS. WESTFALL:  It's page -- top of Page 6.
9       MR. SWEETEN:  Here.
10  Q.  (By Ms. Westfall)  Could you -- do you see that?
11  A.  Uh-huh.
12  Q.  Could you describe what types of cards would
13  fall under this category?
14  A.  A United States military identification card
15  that contains the person's photograph.
16  Q.  Do you have any other information about the
17  types of cards that this would specify?
18  A.  It would cover United States military
19  identification cards that contains the person's
20  photograph.
21  Q.  Is it -- is it your testimony that -- that the
22  definition of military identification card is -- is
23  clear from the face of the statute?
24  A.  It is my testimony that this bill recognizes
25  that a United States military identification card that

139

1   contains the person's photograph is acceptable.
2   Q.  Do you know what federal agency would issue
3   such a card or agencies?
4   A.  I do not know that.
5   Q.  Was that discussed at all in -- in the drafting
6   or filing process for Senate Bill 362?
7       MR. SWEETEN:  Objection, privilege.
8   A.  Privilege.
9   Q.  (By Ms. Westfall)  Turning your attention to a
10  little lower down on the page where it indicates it
11  would include valid ID cards containing a person's
12  photograph from an agency or institution of federal
13  government or agency or institution or political
14  subdivision of the state, do you see that?
15  A.  Uh-huh.
16  Q.  Would that include student IDs from state
17  colleges and universities to the best of your knowledge?
18  A.  I don't know the answer.
19  Q.  Did you have any communications with anyone
20  about the forms of ID to included in Senate Bill 362?
21      MR. SWEETEN:  You can reveal whether or
22  not a communication occurred.  Do not reveal the
23  substance of any such communication?
24  A.  No communication.
25  Q.  (By Ms. Westfall)  You had no communications?

140

1   I'm sorry, I didn't hear you?
2   A.  No communication.
3   Q.  Thank you.  Do you know who would know the
4   answer to my previous question about whether student IDs
5   would be included in the passage of 362 we just
6   described?
7       MR. SWEETEN:  I mean, you're asking who
8   might know?
9   A.  Anyone that could clarify that if a university
10  -- state university is a political subdivision.
11  Q.  Right.  Who would -- who -- or for purposes of
12  this statute, is there any -- any person who would --
13  who you can -- sitting here today, who would know the
14  answer to that question?
15  A.  There's lot of people.
16  Q.  Pardon?
17  A.  Almost anyone but me.
18  Q.  So can you specify anyone?
19  A.  Sure.  Someone working for state government
20  could -- could verify that.  I could verify that with
21  time, but I can't answer -- answer it right now.
22  Q.  Did you analyze or direct anyone to analyze
23  which registered voters did not possess one of the photo
24  IDs identified in Senate Bill 362?
25      MR. SWEETEN:  Don't answer.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Troy Fraser                                        May 17, 2012

### 141

1    Legislative privilege.
2    A.   Privilege.
3    Q.   (By Ms. Westfall) Did you read any research
4    about voter ID to assist you in drafting Senate Bill
5    362?
6    A.   Privilege.
7         MR. SWEETEN:   Same objection, legislative
8    privilege.
9    Q.   (By Ms. Westfall) Did you conduct or instruct
10   anyone to conduct an analysis of the impact of Senate
11   Bill 362 on minority voters?
12        MR. SWEETEN:   Same objection, privilege.
13   A.   Privilege.
14   Q.   (By Ms. Westfall) If 362 had been passed, would
15   it have been subject to the requirements of Section 5 of
16   the Voting Rights Act?
17   A.   Ask the question again.
18   Q.   If Senate Bill 362 had been passed, would it
19   have been subject to the requirements of Section 5 of
20   the Voting Rights Act?
21   A.   All voting legislation in a Section 5 state is
22   subject to the Voting Rights Act.
23   Q.   So is your answer that yes, it would have been?
24   A.   Yes.
25   Q.   Turning your attention back to Senate Bill 362,

### 142

1    I believe you testified earlier that it would allow a
2    voter to present forms of nonphoto ID; is that correct?
3    A long list on Page – starting on Page 6 and continuing
4    into 7?
5    A.   Yes.
6    Q.   Why did you -- why did you include that
7    provision in the bill?
8         MR. SWEETEN:   Objection, legislative
9    privilege.
10        Do not reveal thoughts, mental
11   impressions, opinions about legislation.
12   A.   Privilege.
13   Q.   What was the purpose -- what is the purpose of
14   the nonphoto ID allowable in Senate Bill 362?
15   A.   Privilege.
16        MS. WESTFALL:   Mr. Sweeten?
17        MR. SWEETEN:   As the court has said, he
18   can provide -- let's read from the Court's Order:
19   "Privilege does not protect testimony with respect to
20   the general purpose or the purpose of a legislature as a
21   whole in enacting Senate Bill 14 as opposed to the
22   subjective intent of the legislator." So, I think he
23   could testify as to the purpose of the bill, and I will
24   allow him testify as to the purpose of the overall bill.
25        MS. WESTFALL:   The purpose of this

### 143

1    provision is what I'm asking about, Mr. Sweeten. I'm
2    going to restate my question. You can decide how you
3    want to respond to this order.
4    Q.   (By Ms. Westfall) Could you read back -- well,
5    you know what, it's probably way back. I'll -- just let
6    me redo the question.
7         As to Senate Bill 362, what was the
8    purpose of the provision allowing voters to use nonphoto
9    ID at the polls on election day?
10   A.   To protect the integrity of the ballot box.
11        MR. ROSENBERG:   Could you repeat that
12   back? I didn't hear it.
13        MR. SWEETEN:   "To protect the integrity of
14   the ballot box."
15   Q.   (By Ms. Westfall) Okay. And how would
16   including and allowing those forms of photo ID further
17   that purpose?
18   A.   To protect the integrity of the ballot box.
19   Q.   So is it your testimony that a voter -- it
20   would be acceptable under this bill and would further
21   that purpose to allow voters to present either photo or
22   nonphoto ID; is that correct?
23   A.   I would assert privilege on that.
24        MS. WESTFALL:   I will allow your counsel
25   to confer and then.... Let the record reflect there is a

### 144

1    colloquy between the state's counsel right now about the
2    privilege issues.
3         MR. SWEETEN:   Yeah. We're all -- of
4    course there is. We're considering the Court's Order
5    and its application to the facts of the case --
6         MS. WESTFALL:   Very good.
7         MR. SWEETEN:   -- which is not at all
8    times --
9         MS. WESTFALL:   I'm grateful. I'm
10   grateful.
11        MR. SWEETEN:   Good. I'm glad you are.
12   We're certainly going to follow the Court's Order.
13        I'm going to go on ahead and go on the
14   record.
15        The Court has, with respect to this
16   matter, the Court has -- has ordered that Texas will --
17   that the witness can testify as to the general purpose
18   or the purpose of a legislature as a whole, and in this
19   case it says enacting Senate Bill 14.
20        So he can testify about the general
21   purpose. But for you to parse and to take specific
22   provisions out and then ask him each purpose is -- is
23   not, I think, in accordance with what the Court's Order
24   is. We are going to, as he's sitting here, he can
25   testify as to the general purpose of the bill. So we'll



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

145

1  allow that testimony.
2          MS. WESTFALL: In other words, you're
3  directing him not to answer the last question on the on
4  the basis of privilege?
5          MR. SWEETEN: Well, can we hear the last
6  question again?
7          MS. WESTFALL: Can you search for my last
8  question, sir.
9          (Requested portion was read back by the
10  court reporter.)
11          MR. SWEETEN: You're -- you're asking if
12  it would be acceptable under the bill. I think you've
13  gone beyond what is the purpose of the bill. He can
14  testify about the purpose of the bill. I -- I think
15  you're going beyond what -- what he has to do. He
16  obviously, you know, the Court has said that he doesn't
17  have to provide his subjective intent of the legislator
18  or other legislators. He can testify about the purpose
19  of the bill. He's done so.
20          So I think that's -- we're going instruct
21  as to privilege as to that issue.
22          MS. WESTFALL: Okay.
23  Q.  (By Ms. Westfall) Did you have any
24  conversations with anyone about allowing nonphoto ID in
25  HB -- SB 362?

146

1          MR. SWEETEN: You can testify as to
2  whether or not you had conversations on that issue. You
3  can identify with whom the conversation was.
4  A.  Repeat the question.
5  Q.  Did you have conversations with anyone about
6  allowing nonphoto ID in Senate Bill 362?
7  A.  Yes.
8  Q.  Did you personally have a conversation or was
9  it Ms. McCoy on your behalf?
10  A.  I personally had a conversation.
11  Q.  And with whom did you have that conversation?
12  A.  Ms. McCoy.
13  Q.  Did you have that conversation with anyone else
14  other than Ms. McCoy?
15  A.  Yes.
16  Q.  Who else was in the meeting?
17          MR. SWEETEN: Who was in the meeting is
18  all she's asking, just who was there?
19  A.  Senator Williams.
20  Q.  Was his staff or was he himself in the meeting?
21  A.  Only him.
22  Q.  When did that meeting take place?
23  A.  Prior to the bill coming to the Floor.
24  Q.  Did you have any other meetings you can recall
25  concerning the inclusion of nonphoto ID forms in Senate

147

1  Bill 362?
2  A.  Yes.
3  Q.  Who was that conversation with?
4  A.  Lieutenant Governor Dewhurst.
5  Q.  And when did that conversation occur?
6  A.  Prior to the bill coming to the Floor.
7  Q.  And was anyone else in that meeting beside you
8  and Mr. Dewhurst?
9  A.  I don't remember.
10  Q.  Was that in-person conversation?
11  A.  Yes.
12  Q.  Was that in his office or yours?
13  A.  His.
14  Q.  Do you recall any other conversations about
15  including nonphoto ID in Senate Bill 362?
16  A.  No.
17  Q.  Thank you.
18          Were there any -- are you aware of any
19  e-mails or other written communications concerning any
20  of the meetings you just testified about including
21  nonphoto ID in Senate Bill 362?
22  A.  No knowledge of any.
23  Q.  Are you familiar with the concept of Spanish
24  surnamed voter registration?
25  A.  No.

148

1  Q.  What was the purpose or purposes of Senate Bill
2  362?
3  A.  To protect the integrity of the ballot box.
4  Q.  Could you describe -- you just testified about
5  conversations between you and Lieutenant Governor
6  Dewhurst concerning nonphoto ID in Senate Bill
7  362. Could you describe that conversation?
8  A.  Privileged.
9          MR. SWEETEN: Yeah, don't reveal the
10  substance of the conversation.
11  Q.  (By Ms. Westfall) You just testified that you
12  had conversation with Senator Williams and Ms. McCoy
13  about including nonphoto ID in Senate Bill 362; is that
14  correct? Could you describe that conversation?
15  A.  Privileged.
16          MR. SWEETEN: Objection, privilege.
17  Q.  (By Ms. Westfall) So I believe you were
18  testifying about the purposes of Senate Bill 362; is
19  that correct?
20          MR. SWEETEN: He did answer that question.
21  Q.  (By Ms. Westfall) And I -- and you said it was
22  -- I'm sorry, I -- I was talking about the
23  conversations. Could you testify about -- strike that.
24          What were the purposes of Senate Bill 362?
25  A.  To preserve the -- the integrity of the ballot



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

149

1   box.
2       Q.   Anything else?
3       A.   No.
4       Q.   Is that the sole purpose of 362?
5       A.   Yes.
6       Q.   Is that why you introduced 362?
7           MR. SWEETEN:   Now, wait a minute.  Now
8   you're asking for his subjective intent of the -- as
9   opposed to the subjective intent of the legislator.  So
10  he's testifying as to purpose, and the Court has very
11  specifically said that this is not his subjective
12  intent.
13          I'm going to instruct you not to answer in
14  accordance with the Court's Order.
15      A.   Privilege.
16          MR. SWEETEN:   Which I hope you recognize
17  as well.
18          MS. WESTFALL:   I certainly do.  I have it
19  right in front of me, Mr. Sweeten.
20          MR. SWEETEN:   Right.  So do I.
21      Q.   (By Ms. Westfall) Did anyone ask you to
22  introduce Senate Bill 362?
23      A.   No.
24      Q.   Did you promise anyone that you would introduce
25  Senate Bill 362.

---

150

1           MR. SWEETEN:   I'm going to object.  I
2   think that you're asking for a specific content of a
3   communication and asking was he -- did he promise
4   someone.  If you want to ask if he had constituent
5   communications --
6           MS. WESTFALL:   We take the position that
7   falls outside the privilege.  That's outside the scope.
8           MR. FREDERICK:   Can we have just a moment
9   to confer.
10          MS. WESTFALL:   Certainly.
11          MR. SWEETEN:   Yeah, I'm going to go ahead
12  and assert privilege on -- on did he promise anyone to
13  -- with respect to the bill.  So I'm going to go ahead
14  and assert privilege as to that issue.
15      Q.   (By Ms. Westfall) Senator, did anything occur
16  between 2007 when HB 218 was introduced in 2009 when
17  Senate Bill 362 was introduced that caused you to
18  conclude there was a continued need for voter ID?
19          MR. SWEETEN:   I'm going to object.  That
20  calls for legislative privilege.
21      A.   Privilege.
22          MS. WESTFALL:   Thanks.  If you can make
23  sure the court reporter can hear you.
24      Q.   (By Ms. Westfall) Are you aware of any
25  in-person voter impersonation that caused you to believe

---

151

1   a voter ID bill was still needed in Texas.
2           MR. SWEETEN:   Objection, privilege.
3       A.   Privilege.
4       Q.   (By Ms. Westfall) You just testified that the
5   purpose of 362 was to preserve the integrity of the
6   ballot box.  What does that mean?
7       A.   To preserve the integrity of the ballot box.
8       Q.   Correct.  Could you explain a bit -- elaborate
9   a bit on that purpose?
10      A.   To preserve the integrity of the ballot box.
11      Q.   Does that mean that -- why does it need
12  preserving?
13      A.   We need to preserve the integrity the ballot
14  box.
15          MR. SWEETEN:   Yeah, I'm going to assert
16  privilege.  He said what he thought the purpose is.  And
17  he's answered the question.
18      O.   (By Ms. Westfall) Was a there a lack of
19  integrity in the ballot box in 2009?
20          MR. SWEETEN:   I think that's privileged.
21      A.   Privilege.
22      Q.   (By Ms. Westfall) Had you had any conversations
23  with election officials about the integrity the ballot
24  box in 2009?
25          MR. SWEETEN:   You're asking him if he had

---

152

1   conversations about the integrity of the ballot box.  I
2   think we're getting a little more in a subjective -- I
3   mean, we're getting a fairly substantive description in
4   the preface of your question.  I think if you would
5   re-ask it and just ask about whether he's had contact
6   with the election officials, we won't have any objection
7   whatsoever as to that.
8           MS. WESTFALL:   Okay.  I'm going to keep my
9   question on the record and not withdraw it.
10      Q.   (By ms. Westfall) But did you have any
11  conversations with election officials in advance of
12  filing Senate Bill 362?
13      A.   Yes.
14      Q.   Which election officials?
15      A.   Those that testified on the bill in 2007.
16      Q.   And who were those?
17      A.   I don't remember the names.
18      Q.   Were they county officials?
19      A.   Yes.
20      Q.   Did they include any state officials?
21      A.   No.
22      Q.   Did it include Mr. Paul Bettencourt?
23      A.   I can't verify it was Mr. Bettencourt.
24      Q.   Do you recall which counties?
25      A.   I believe it was Houston.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

153

1    Q.   Did you have any conversations with any other
2    election officials outside of those public proceedings
3    in 2007 prior to filing SB 362?
4    A.   No.
5    Q.   What was -- are there any bases or facts that
6    you can identify related to the purpose of SB 362, which
7    you just testified was to preserve the integrity of the
8    ballot box?
9    A.   Privilege.
10        MR. SWEETEN:  Objection, privilege.
11   Q.   (By Ms. Westfall) Can you tell me how 362
12   preserves the integrity of the ballot box?
13        MR. SWEETEN:  Objection, privilege.
14   A.   Privilege.
15   Q.   (By Ms. Westfall) Did you become aware of any
16   convictions on -- for in-person voter impersonation
17   between 2007 and 2009?
18   A.   Rephrase the question.
19   Q.   I'm here to ask you --
20   A.   Not rephrase -- repeat the question, not
21   rephrase.  Repeat.
22   Q.   Okay.  Good.  I liked my question.
23        MR. SWEETEN:  I'm going to object on
24   privilege anyway so go ahead and ask it.
25        MS. WESTFALL:  Well, let's let it be.

---

154

1    A.   Privilege.
2    Q.   (By Ms. Westfall) Very good.
3         How does Senate Bill 362 -- how is it more
4    effective in preventing in-person voter impersonation
5    than -- than current law?
6         MR. SWEETEN:  Objection, privilege.
7    Q.   (By Ms. Westfall) Under current law, voters
8    must verify their identity by bringing their voter
9    registration certificate, correct?
10   A.   Repeat the question, please.
11   Q.   Under current law voters must verify their
12   identity by bringing their voter registration
13   certificate to the polls on election day; is that
14   correct?
15   A.   No.
16   Q.   Tell me how I'm not correct?
17        MR. SWEETEN:  She's asking you under
18   current law, the requirement.
19   A.   There are multiple options of which one of
20   those is to show your voter identification card.
21   Q.   (By Ms. Westfall) So how is Senate Bill 362
22   more effective than current law under which one -- a
23   voter may show a voter registration certificate or other
24   forms of ID --
25        MR. SWEETEN:  Objection --

---

155

1    Q.   (By Ms. Westfall) -- to be verified at the
2    poll.
3         MR. SWEETEN:  Objection, privilege.
4    A.   Privilege.
5    Q.   (By Ms. Westfall) Does Senate Bill 362 address
6    issues of non-citizens voting?
7         MR. SWEETEN:  Objection, privilege.
8    A.   Privilege.
9    Q.   (By Ms. Westfall) Can you identify any
10   non-citizen who has voted in any election in Texas?
11        MR. SWEETEN:  Objection to the extent that
12   this would require you to reveal thoughts, mental
13   impressions, opinions about legislation in furtherance
14   of the legislative process.  However, if it's not under
15   that category or relates to communications you've had,
16   you can answer outside of those.
17   A.   Privilege.
18   Q.   (By Ms. Westfall) Have you ever had any
19   conversations with anyone concerning the identity of any
20   non-citizen who has voted in any election in Texas?
21        MR. SWEETEN:  Don't reveal legislatively
22   privileged information.
23   A.   Privilege.
24   Q.   (By Ms. Westfall) It was concerning
25   conversations, the existence thereof.

---

156

1         MR. SWEETEN:  Okay.  Can you say it again?
2         MS. WESTFALL:  Certainly.
3    Q.   (By Ms. Westfall) Have you ever had a
4    conversation with anyone concerning the identity of any
5    non-citizen who has voted in any Texas election?
6         MR. SWEETEN:  There's a lot of substance
7    in that question as to what the conversation was
8    about.  If you want to narrow that down, I'll let him
9    answer whether conversations occurred and facts about
10   the conversation.
11        MS. WESTFALL:  I don't.  I want that on
12   the record.
13        MR. SWEETEN:  Okay.  On that we'll object.
14        MS. WESTFALL:  On the basis --
15   A.   The question is?  Repeat the question, please.
16   Q.   (By Ms. Westfall) Have you -- can you -- have
17   you had any conversations concerning the identity of any
18   non-citizen who has voted in any election in Texas?
19        MR. SWEETEN:  I've got to object on
20   privilege.
21   Q.   (By Ms. Westfall) Are you following your
22   counsel's advice?
23   A.   Privilege.
24        MR. SWEETEN:  Elizabeth, let me offer that
25   if -- if we've objected to that question, if you're

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

157

1   trying to seek similar information that is not as
2   descriptive as his conversation, we're more than happy
3   to work with you to try to have an answer to the
4   question you're seeking.
5       Q.   (By Ms. Westfall) Have you -- are you aware of
6   any conversations related to non-citizen voting in
7   Texas?
8           MR. SWEETEN:  Yeah, yeah.  I'm going to
9   let you answer that whether or not you had any
10  conversations.
11      A.   I'm not aware of conversations.
12      Q.   (By Ms. Westfall) I'm going to hand you what's
13  been previously marked as or I'm going to have the court
14  reporter hand you what's been previously marked as
15  Exhibit 31.
16          MS. WESTFALL:  Or maybe I can.  Here you
17  go, sir.
18          MR. ROSENBERG:  31?
19          MS. WESTFALL:  Yes.
20      Q.   (By Ms. Westfall) Do you recognize this
21  document?
22      A.   Yes.
23      Q.   And what is it?
24      A.   Press release from my office December 15, 2008.
25      Q.   And do you see it concerns the Senate Bill 362

159

1   a ballot, does it not?
2       A.   Repeat the question.
3       Q.   Senate Bill 363, well, this press release
4   Exhibit 31, indicates that the purpose of 363 is to
5   ensure that only legal citizens cast a ballot, does it
6   not?
7       A.   Our current laws state that only legal citizens
8   can cast a ballot.
9       Q.   Do you agree with that, that that statement is
10  included and you're quoted in your press release; is
11  that right?
12      A.   The statements is -- our current laws state
13  that only legal citizens can cast a ballot.
14      Q.   And Senate Bill 363, as explained in this press
15  release, would require voter applicants to prove that he
16  or she is a United States citizen by furnishing a birth
17  certificate or a naturalization oath; is that right?
18          MR. SWEETEN:  Are you reading from this?
19          MS. WESTFALL:  I am.  I'm asking him to
20  just confirm that what's in the document is in the
21  document.
22      A.   It's require a voter to prove he or she is a
23  United States citizen by furnishing a birth certificate
24  or, if it's a naturalized citizen, the city, state and
25  year of taking the naturalized oath.

158

1   and 363 about which you just testified today?
2       A.   Yes.
3       Q.   Have you ever heard of any registered voter
4   indicating that the voter was not going to vote because
5   he or she was concerned their vote would be diluted by
6   illegitimate votes?
7       A.   Privilege.
8           MR. SWEETEN:  To the extent, I mean,
9   here's the distinction here:  You don't have to reveal
10  thoughts, mental impressions, or opinions about
11  legislation in furtherance of the legislative process or
12  communications that we've outlined before.  She can ask
13  you about public statements that are made and matters of
14  public record.  And so if it is -- falls in one of the
15  areas of privilege, you don't have to reveal that, if
16  there is.  She can ask you about the public statement
17  though.
18      A.   Privilege.
19      Q.   (By Ms. Westfall) And this press release, when
20  was it dated?
21      A.   December 15, 2008.
22      Q.   Did Ms. McCoy draft it?
23      A.   Yes.
24      Q.   And it, as to Senate Bill 363, it expresses
25  concern about ensuring that only legal citizens can cast

160

1       Q.   (By Ms. Westfall) Did you have any concern that
2   Senate Bill 363 would be burdensome to people trying to
3   register to vote?
4       A.   Privilege.
5           MR. SWEETEN:  Don't reveal privileged
6   information.
7       Q.   (By Ms. Westfall) Do you know of any other
8   states that are -- require producing a birth certificate
9   or naturalization oath to register to vote?
10          MR. SWEETEN:  Don't reveal privileged
11  information.
12      A.   Privilege.
13      Q.   (By Ms. Westfall) Are you aware that the state
14  of Arizona requires documents of proof of citizenship to
15  vote?
16          MR. SWEETEN:  Objection, privilege.
17      A.   Privileged.
18      Q.   (By Ms. Westfall) And are you aware that
19  Arizona has been involved in fiercely fought voter
20  rights litigation over that issue for years?
21          MR. SWEETEN:  Objection to the extent it
22  calls for privilege.
23      A.   Privileged.
24      Q.   (By Ms. Westfall) And what did you mean,
25  Senator Fraser, when you said in Paragraph 4, voting is



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                      May 17, 2012

161

1   one of our most important rights as Americans but it's
2   also a responsibility.
3        A.   I meant that voting is one of our most
4   important rights as Americans but it is also a
5   responsibility.
6        Q.   (By Ms. Westfall) What did you mean by the word
7   "responsibility?"
8        A.   I meant that voting is a one of our most
9   important rights as Americans but it also is a
10  responsibility.
11       Q.   Do you think -- you have to be responsible to
12  vote, is that what mean?
13       A.   I meant that voting is one of our most
14  important rights as Americans but it also is a
15  responsibility.
16       Q.   I -- it sounds to me I've asked the question
17  three times and is it -- is it your testimony today that
18  you do not have further explanation of the words on the
19  face of this press release and you're not going to
20  answer my question?
21       A.   I believe that voting is one our most important
22  rights as Americans, but it's also a responsibility.
23       Q.   Did you have communications -- are you aware of
24  any communications with legislators or staff who opposed
25  Senate Bill 362?

162

1        A.   Privilege.
2        Q.   Did you have any communications with
3   legislators who opposed Senate Bill 362 regarding the
4   purpose of Senate Bill 362?
5             MR. SWEETEN: Objection, privilege.
6        A.   Privilege.
7        Q.   (By Ms. Westfall) Who, besides you, were the
8   main proponents of Senate Bill 362?
9             MR. SWEETEN: To the extent you can refer
10  the matters of public record?
11       A.   Its co-sponsors.
12            MR. SWEETEN: Matters that are privilege,
13  you can --
14       A.   Co-sponsors of the bill were Senator Estes,
15  Senator Nelson, Senator Nichols.
16       Q.   (By Ms. Westfall) Was this legislation a
17  priority for other people in the Texas government
18  besides the sponsors of the bill?
19            MR. SWEETEN: Don't reveal privileged
20  information.
21       A.   Privilege.
22       Q.   (By Ms. Westfall) Was this legislation a
23  priority for Lieutenant Governor?
24       A.   Privilege.
25            MR. SWEETEN: Objection, privilege.

163

1        Q.   (By Ms. Westfall) Was this legislation a
2   priority for the Governor?
3             MR. SWEETEN: Same objection.
4        A.   Privilege.
5        Q.   (By Ms. Westfall) Was Senate Bill 362 a
6   priority for anyone outside the Texas government, such
7   as interest groups, other states, people outside of the
8   state?
9             MR. SWEETEN: To the extent this would
10  require you to reveal thoughts, mental impressions,
11  opinions about legislation in furtherance of the
12  legislative process, don't answer that. Or
13  communications with any of the individuals or entities
14  named, then don't answer it answer it. To the extent it
15  does not do so, you're free to answer.
16       A.   Privilege.
17       Q.   (By Ms. Westfall) Did any groups representing
18  minority voters support Senate Bill 362?
19            MR. SWEETEN: Same objection, same
20  instruction.
21       A.   Privilege.
22       Q.   (By Ms. Westfall) Did you have any
23  communications with anyone supporting Senate Bill 362?
24            MR. SWEETEN: You can answer whether or
25  not you've had communications and facts about those

164

1   communications. Other than -- but don't reveal the
2   substance.
3        A.   Ask the question again.
4        Q.   (By Ms. Westfall) Did you have any
5   communications with any individuals or groups supporting
6   Senate Bill 362?
7        A.   Yes.
8        Q.   Could you name each and every one of those
9   individuals or groups?
10       A.   Skipper Wallace.
11       Q.   Who else?
12       A.   The only one, Skipper Wallace.
13       Q.   That's the sum total of the supporters you
14  talked to other than legislators and their staff who
15  were supporting the bill; is that correct?
16       A.   Yes. That was a nod -- that was nod-head yes.
17       Q.   You're getting in the swing of things here in
18  terms of the transcript. Thank you.
19            Who were the main opponents of Senate Bill
20  362?
21            MR. SWEETEN: Objection, calls for
22  legislative privilege.
23       A.   Privilege.
24       Q.   Do you know you why -- do you know why
25  opponents oppose Senate Bill 362?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

### 165

1           MR. SWEETEN: Objection, privilege.
2       A. Privilege.
3       Q. (By Ms. Westfall) Did you have any
4   conversations with any bill opponents?
5       A. Privilege.
6       Q. Conversations?
7           MR. SWEETEN: You can testify about the
8   facts of conversations. Who you talked to, what day,
9   how long, the duration of them, but don't reveal the
10  substance of the conversation.
11          THE WITNESS: You said I --
12          MR. SWEETEN: You can testify as to
13  whether you had conversations with -- with opponents as
14  long as they're not privileged. I mean, for example, if
15  you talked to a legislator about it, it would be a
16  privilege. You can talk to -- you can say whether or
17  not you had a conversation with an opponent. You can
18  list the name of the person on the --
19          THE WITNESS: But if it's a legislator,
20  would it be privileged?
21          MR. SWEETEN: You can identify whether or
22  not you had a conversation. Don't reveal any of the
23  substance whatsoever.
24      A. I had a -- had a conversation with an -- an
25  opponent.

### 166

1       Q. (By Ms. Westfall) And what -- who was that
2   opponent?
3       A. John Whitmire.
4       Q. When was that conversation?
5       A. I don't remember.
6       Q. Did you have conversations -- was that the only
7   bill opponent you had a conversation with about SB 362?
8       A. Likely that I had more. I believe I had a
9   conversation with Rodney Ellis, Senator Ellis.
10      Q. Was Ms. McCoy at either one of those meetings?
11      A. No.
12      Q. Was this a one-on-one meeting with the member?
13      A. Yes.
14      Q. Did you have any other conversations with any
15  other bill opponents, legislators or staff?
16      A. I don't remember having a conversation.
17      Q. Do you recall when you had a conversation with
18  Mr. Whitmire?
19      A. Whitmire probably was in the fall before Ellis,
20  would probably have been during the session.
21      Q. Can -- can you describe the general issue, I
22  mean, the general purpose, or the general discussion
23  that you had with Mr. Whitmire?
24      A. Privilege.
25          MR. SWEETEN: No, don't -- don't reveal --

### 167

1       A. Privilege.
2           MR. SWEETEN: I mean, well, general. I
3   think you've already done so when you said has he had --
4   has he had conversations with opponents of the bill. I
5   think he's testified as to the fact of the conversation
6   and he's revealed that he's had discussions with the
7   opponents.
8       Q. (By Ms. Westfall) And you had one conversation
9   with Senator Whitmire?
10      A. Likely more than one.
11      Q. Did, after that, just temporally -- actually,
12  that was before you filed Senate Bill 362; is that
13  right?
14      A. Yes.
15      Q. And you also had a conversation with Senator
16  Ellis; is that correct?
17      A. Yes.
18      Q. Could you tell me the general nature of that
19  conversation?
20      A. Privileged.
21      Q. When was -- did that conversation occur?
22      A. Likely, after session started.
23      Q. Was it after you filed the bill?
24      A. Yes.
25      Q. Was there any change made to the bill

### 168

1   temporally after that time?
2       A. No.
3       Q. I'm -- I'm -- we're going break in one
4   second. Let me just finish.
5           Did you take any steps with regard to the
6   Senate Bill 362, to try to address any concerns raised
7   by bill opponents?
8       A. Privilege.
9           MR. SWEETEN: Objection, privileged.
10          MS. WESTFALL: Okay. Why don't we take
11  ten minute break.
12          MR. SWEETEN: Okay.
13          (Recess from 2:31 to 2:47 p.m.)
14          MS. WESTFALL: Back on the record.
15      Q. (By Ms. Westfall) Senator, what was your role in
16  trying to get Senate Bill 362 passed in the Senate?
17          MR. SWEETEN: Objection, legislative
18  privilege.
19      A. Privilege.
20      Q. (By Ms. Westfall) What procedures did you use
21  to try to ensure that SB 362 would pass the Senate?
22          MR. SWEETEN: Objection, privilege.
23      A. Privilege.
24          MS. WESTFALL: Will you allow him to
25  testify about publicly known procedures?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

---

169

1       MR. SWEETEN: I will let him testify --
2   well, I'm not going to let him reveal his thoughts,
3   mental impressions or opinions about legislation or in
4   furtherance of the legislative process. That's covered.
5   So I'm -- I think the way it's phrased, I can't allow
6   him to answer that, so no, I'm going to object on
7   privilege grounds.
8       Q. (By Ms. Westfall) Are there any publicly known
9   and publicly available procedures that you used to get
10  Senate Bill 362 passed through the Senate?
11      MR. SWEETEN: I think it still -- I think
12  that's implying a purpose, and therefore, is
13  legislatively privileged. I mean, I think you could ask
14  the general what procedures occurred on a factual basis
15  with respect to the bill. I don't think that that would
16  -- I would have an objection to that.
17      Q. (By Ms. Westfall) Okay. What procedures were
18  employed to -- in conjunction with consideration of
19  Senate Bill 362 in the Senate?
20      MR. SWEETEN: I think that's still -- it's
21  still infirm. I object, privilege.
22      Q. (By Ms. Westfall) What was your strategy for
23  getting Senate Bill 362 passed?
24      MR. SWEETEN: Same objection, privilege.
25      A. Privilege.

---

170

1       Q. (By Ms. Westfall) When you introduced Senate
2   Bill 362, did you know how many senators would support
3   it?
4       MR. SWEETEN: Objection, privilege.
5       A. Privilege.
6       Q. (By Ms. Westfall) Did you try to make any
7   determination about the number of senators who would
8   support Senate Bill 362 prior to bringing it to the
9   Floor?
10      MR. SWEETEN: Objection, privilege.
11      Q. (By Ms. Westfall) Sir, are you relying upon
12  advice of counsel?
13      A. Privilege.
14      Q. Thank you. Did you know how many senators
15  would support 362 prior to your bringing it to the
16  Floor.
17      MR. SWEETEN: Objection, privilege.
18      A. Privilege.
19      Q. (By Ms. Westfall) Did you have any
20  conversations about how much support 362 had prior to
21  bringing it to the Floor?
22      MR. SWEETEN: Objection, privilege.
23      MS. WESTFALL: The existence of
24  conversations?
25      MR. SWEETEN: He can talk about -- well,

---

171

1   let me think, about the privilege of your questioning
2   again.
3       Court reporter, can you reread that
4   question, please?
5       (Requested portion read back by the court
6   reporter.)
7       MR. SWEETEN: That reveals his thoughts,
8   I'm afraid. I'm going to object on privilege.
9       If you want to rephrase the preface of the
10  question. You know, general subject matter is one
11  thing. That is more than general subject matter. So if
12  you want to change the question, we may allow him to
13  answer.
14      Q. (By Ms. Westfall) Did you have any
15  conversations prior to bringing 362 to the Floor
16  concerning counting votes?
17      MR. SWEETEN: Okay. I'm going to let you
18  answer as to if you had conversations about counting
19  votes.
20      A. Yes.
21      Q. (By Ms. Westfall) And who did you have a
22  conversation with?
23      A. Likely had a conversation with all 31 senators,
24  all 30 other senators.
25      Q. All 30 senators in the Republican caucus?

---

172

1       A. There's not 30 Republican senators.
2       Q. Who were those 30 senators?
3       A. There are 31 members of the Texas Senate; not
4   counting me, there are 30.
5       Q. So you had a conversation with all the senators
6   about counting votes on 362?
7       A. I would believe that I had a conversation with
8   every senator.
9       Q. Do you mean individual conversations?
10      MR. SWEETEN: You can answer that.
11      A. Yes.
12      MR. SWEETEN: Okay. Let me just make sure
13  that we're clear, though, other than just revealing the
14  fact that the conversation happened, you are not to
15  reveal the substance of those conversations.
16      Q. (By Ms. Westfall) Did you have a conversation
17  with each and every individual senator prior to bringing
18  362 to the Floor?
19      A. To my knowledge, yes, I talked to everyone.
20      Q. Were these one-on-one conversations?
21      A. For the most part.
22      Q. Did Ms. McCoy have any conversations on your
23  behalf with any staff members for senators?
24      MR. SWEETEN: You can answer if you know
25  about the existence of the conversations. Don't reveal

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

173

1  the substance.
2      A. I don't know.
3      Q. (By Ms. Westfall) Did you learn as a result of
4  these conversations that you did not have the support of
5  two-thirds of senators for 362?
6          MR. SWEETEN: Objection. Calls for
7  matters that are subject to the legislative privilege.
8      A. Privilege.
9      Q. (By Ms. Westfall) During these conversations,
10 did you solicit the view of the members as to whether he
11 or she supported 362?
12         MR. SWEETEN: I'm going to object. You're
13 asking for the substance of the conversations. Don't
14 answer based on legislative privilege.
15     Q. (By Ms. Westfall) During these individual
16 conversations, did you discuss support or opposition
17 against 362?
18         MR. SWEETEN: Same objection.
19     A. Privilege.
20     Q. (By Ms. Westfall) Did you try to persuade any
21 member who was opposed to Senate Bill 362 to vote for
22 it?
23         MR. SWEETEN: Same objection.
24     A. Privilege.
25     Q. (By Ms. Westfall) I hand you what's been

174

1  previously marked as Exhibit 32. Do you recognize this
2  document?
3      A. Would you like me to read it back to you?
4      Q. Not the whole entire thing. I won't do that to
5  you today. But could you tell me, do you recognize this
6  document?
7      A. I do recognize this document.
8      Q. And what is it?
9      A. I think it is --
10         MR. SWEETEN: If you don't mind me
11 scooting in here. I need to be able to see this. Do
12 you have a copy?
13         MS. WESTFALL: No, I don't. We --
14         MR. SWEETEN: I don't have one either.
15         MS. WESTFALL: -- lost our others.
16     Q. (By Ms. Westfall) Do you recognize what this
17 document is?
18     A. I do.
19     Q. What is it?
20     A. I believe it is the hearing that was held
21 January 14, 2009.
22     Q. Directing your attention to the first page,
23 does it say "Senate Rules," sir?
24         MR. SWEETEN: She said the first page.
25     A. Senate Rules.

175

1      Q. (By Ms. Westfall) And what year were these
2  rules adopted?
3      A. Just a second. I'm sorry. I need to retract
4  the last or -- okay. I'm sorry. The answer I gave you
5  was incorrect. It was not the hearing. This is the
6  Senate rules that were adopted.
7      Q. Thank you.
8      A. January 14th.
9      Q. Thank you.
10         And was this in 2009?
11     A. Yes.
12     Q. Were these rules operable during consideration
13 of Senate Bill 362?
14     A. Yes.
15     Q. And turning your attention to Rule 5.11 on Page
16 24 of this document, Exhibit 32, could you direct your
17 attention to that?
18     A. Page 24?
19     Q. 24, yes. Could you take a look at Rule 5.11?
20     A. Uh-huh.
21     Q. Could you describe this rule?
22     A. I'm sorry?
23     Q. Could you describe this rule?
24     A. Could you be more specific?
25     Q. Could you describe what this rule provides for

176

1  based on your knowledge of serving in the Senate for
2  many years?
3      A. Senate Rule 5.11 refers to special orders.
4      Q. Could you describe the provision in Section A
5  of Rule 11, 5.11?
6      A. It says "Any bill, resolution, or other measure
7  may be on any day be made a special order for future
8  time of the session by affirmative vote of two-thirds of
9  the members present."
10     Q. Turning your attention to Subsection D of Rule
11 5.11, what does that subsection provide for?
12     A. "Notwithstanding Subsection A of this bill, a
13 bill or resolution relating to voter identification
14 requirements reported favorably from the Committee of
15 the Whole may be set as a special order for a time at
16 least 24 hours after the motion is adopted by a majority
17 of the members of the Senate."
18     Q. Could you explain the effect of Rule 5.11D?
19     A. I think it's self-explanatory as I just read
20 it.
21     Q. So you have no further testimony in answer to
22 my question about the effect?
23     A. The effect is as it reads, that would be the
24 effect.
25     Q. What is the purpose of Rule 5.11D as it



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Troy Fraser                                           May 17, 2012

---

177

1    pertains to voter ID requirements?
2        A.  The purpose is to not --
3            MR. SWEETEN:  Hold on.  Hold on.  I think
4    as it pertains to voter ID requirements, I'm going to
5    object.  I think that that calls for him to reveal
6    matters of legislative privilege.  He's also already
7    answered in previous questioning questions about this
8    rule.
9            MS. WESTFALL:  Are you preventing me from
10   examining the witness about this exhibit, the rules in
11   2009 pertaining to voter ID?
12           MR. SWEETEN:  I'm not prohibiting you from
13   examining the exhibit.  You can do that.  And you
14   have done that.
15           MS. WESTFALL:  I would direct you also to
16   the Court's Order of today concerning purpose.  And the
17   purpose of a rule governing consideration of voter ID in
18   2009, are you prohibiting me from examining the witness?
19           MR. SWEETEN:  Counsel, you've already
20   asked him very specifically earlier about this rule and
21   what he felt the purpose of it was and what Janice McCoy
22   thought the purpose of it was.  You've already asked
23   this question.
24           MS. WESTFALL:  I can ask a different
25   question.  But I'm going to keep my question on the

---

178

1    record.  I'm not withdrawing it.
2        Q.  (By Ms. Westfall)  What was purpose in Rule
3    5.11D of specifying voter ID requirements?
4            MR. SWEETEN:  Okay.  I'm going to let him
5    answer as to your previous question, what is the purpose
6    of that rule.  He can answer that.
7        A.  The purpose of number -- of Subsection C (sic)
8    is to establish a special order, that notwithstanding
9    the section's rule, a bill or resolution relating to the
10   voter identification requirements reported favorably by
11   the committee can be set as a special order.
12       Q.  (By Ms. Westfall)  And are you reading from
13   Subsection D of Rule 5.11?
14       A.  D, yes, I am.
15       Q.  What -- I'm going to ask the question I asked
16   previously, which is what was the purpose of specifying
17   voter ID requirements by name in Rule 5.11D and setting
18   specific procedures for those requirements?
19       A.  It was to specify a special order relating to
20   what is mentioned in Subsection D.
21       Q.  And what was the purpose of that special order?
22       A.  To establish a special order.
23       Q.  Okay.  So what I'm hearing is roundy, roundy
24   circle.  Do you have any further testimony on the
25   subject --

---

179

1            MR. SWEETEN:  Objection to the sidebar.
2    Objection to the sidebar.
3        A.  No.
4        Q.  (By Ms. Westfall)  Were there any conversations
5    about establishing Rule 5.11D that you're aware of?
6        A.  Yes.
7        Q.  When did that conversation occur?
8        A.  In the Committee of the Whole meeting with all
9    31 senators.
10       Q.  When was that meeting?
11       A.  Prior to the passage of this.  It was likely
12   the first week of the session.
13       Q.  Is there a Senate rules committee that adopts
14   rules at the beginning of every session?
15       A.  Not a specified rules committee, no.
16       Q.  Does the Committee of the Whole Senate
17   establish its own rules?
18       A.  Yes.
19       Q.  Who is the chair of that committee in 2009?
20       A.  It would have to be John Whitmire, because he's
21   the Dean of the Senate, and he runs the meeting that
22   establishes -- that calls for the vote on the rules.
23       Q.  Did you have any conversations with Senator
24   Williams concerning Rule 5.11D or the concept embodied
25   therein?

---

180

1            MR. SWEETEN:  You can answer as to whether
2    a conversation occurred, otherwise it's legislatively
3    privileged.
4        A.  Yes.  There was a conversation.
5        Q.  When did that conversation occur?
6        A.  Immediately prior to this meeting.
7        Q.  I believe you testified this meeting would have
8    been the first week of session in January; is that
9    correct, of 2009?
10       A.  It looks like it was January 14, and the
11   session I think probably started on the 10th, so the
12   first week of the session.
13       Q.  What was your conversation with Senator
14   Williams about?
15           MR. SWEETEN:  Do not reveal, based on
16   legislative privilege.
17       A.  Privilege.
18       Q.  (By Ms. Westfall)  Was anyone else at that
19   meeting?
20       A.  No.
21       Q.  Who requested that meeting, you or Senator
22   Williams?
23           MR. SWEETEN:  Objection.
24       A.  Privileged.
25           MR. SWEETEN:  Yeah, it's privileged.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                      May 17, 2012

181

1      Q.  (By Ms. Westfall)  What was your strategy for
2  gaining two-thirds support of all senators in 2009 to
3  support SB 362?
4           MR. SWEETEN:  Objection, legislative
5  privilege.
6      Q.  (By Ms. Westfall)  Did you request that the
7  two-thirds rule be suspended for Senate Bill 362?
8           MR. SWEETEN:  Objection, legislative
9  privilege.
10     Q.  (By Ms. Westfall)  Do you know of anyone in the
11 Senate or otherwise who requested the two-thirds rule be
12 suspended for consideration of Senate Bill 362?
13          MR. SWEETEN:  Objection, calls for
14 legislative privilege.
15     Q.  (By Ms. Westfall)  Are you aware of any other
16 conversations, other than the one that you just
17 described with Senator Williams, for the meeting of the
18 Committee of the Whole, concerning suspending the
19 two-thirds rule for consideration of Senate Bill 362?
20          MR. SWEETEN:  Is he aware of any
21 conversations about the two-thirds rule?
22          MS. WESTFALL:  Correct.
23          MR. SWEETEN:  Okay.  You can answer as to
24 whether or not there were conversations.  Do not reveal
25 any substance other than that.

182

1      A.  This is -- you know, these two are not
2  connected.  This is not a conversation about the
3  two-thirds rule.
4           MR. SWEETEN:  Okay.  Then if you don't --
5  if you're not aware of conversations --
6      A.  There is no conversation about the two-thirds
7  rules.
8      Q.  (By Ms. Westfall)  Was there a conversation
9  about Rule 5.11A, B, C, D or any combination therein
10 that you're aware of?
11     A.  I'm sorry?
12     Q.  Was there a conversation about Rule 5.11 in
13 Exhibit 32 that you're aware of, other than the one that
14 you described between you and Senator Williams?
15     A.  No.
16     Q.  Did you speak to Mr. Dewhurst about Rule 5.11?
17     A.  No.
18     Q.  Or his staff?
19     A.  No.
20     Q.  Do you know whether Janice McCoy spoke to
21 Mr. Dewhurst or his staff about Rule 5.11?
22     A.  I have no idea.
23     Q.  You served in the Senate since 1996; is that
24 right?
25     A.  '97.

183

1      Q.  I mean, '97, you started your service.  To the
2  best of your knowledge, have you seen any other rule
3  that was similar to Rule 5.11D during your service in
4  the Texas Senate?
5      A.  You're asking -- ask the question again,
6  please.
7      Q.  Certainly.  During your time in the Senate,
8  since 1997, have you ever seen a rule in the rules that
9  was similar to Rule 5.11D?
10     A.  Yes.
11     Q.  Tell me about each and every time you've seen a
12 rule like that.
13     A.  It would be impossible for me to tell you
14 because every session, there are multiple rule changes
15 in a revision of the rules.  The rules are set by the
16 senators prior to the session, and we change the rules
17 often.
18     Q.  Have you ever seen a subject matter like voter
19 ID requirements listed in Rule 5.11?
20     A.  As a special order?
21     Q.  Yes.
22     A.  Yes.
23     Q.  Tell me each and every time that's happened.
24     A.  I can't, you know, tell you the exact
25 amount.  You asked, had it been done, and I've answered

184

1  yes.  I can't give you specifics.
2      Q.  Prior to 2009 when Rule 5.11 was changed to
3  include this carve-out -- to include this provision
4  concerning voter ID requirements in Subsection D, had
5  there been an area of legislation categorically carved
6  out of Rule 5.11 that you're aware of?
7      A.  The answer to your first question is yes, but
8  adding the word "that I'm aware of" would make it a no.
9      Q.  Are you -- do you familiarize yourself with the
10 rules every time a Senate session starts?
11     A.  Ask that again, please.
12     Q.  Do you familiarize yourself with the Senate
13 rules at the beginning of Senate session?
14     A.  Yes.
15     Q.  Could you clarify your testimony that you --
16 that you just gave concerning whether you're aware of
17 any particular time that a subject matter area has been
18 specified in Rule 5.11 during your service in the
19 Senate?
20          MR. SWEETEN:  Objection to the question as
21 vague.
22          Could you ask him, I mean, in another
23 way?  I'm not sure what you're asking to clarify.  I
24 think he's tried to answer your questions.
25     Q.  (By Ms. Westfall)  Could you identify a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

185

1   particular year or session in which Rule 5.11 referenced
2   a particular subject matter area as being set for
3   special order for a time at least 24 hours after the
4   motion, et cetera?
5        A.   I would believe most years.
6        Q.   Most years. Okay. Are you familiar with the
7   two-thirds rule? You testified about that earlier
8   today, did you not?
9        A.   There's no such thing as a two-thirds rule.
10       Q.   Is there a two-thirds tradition?
11       A.   No.
12       Q.   Is there a two-thirds procedure?
13       A.   Yes.
14       Q.   Do most measures and bills require the support
15  of two-thirds of senators in the Texas Senate?
16       A.   I would not say most.
17       Q.   Ms. McCoy testified yesterday that she was
18  unaware --
19       A.   I'm sorry. I need to back up.
20       Q.   Certainly.
21       A.   No bills require a two-thirds majority.
22       Q.   Is that because it is two-thirds of senators to
23  bring the bill to the Floor for a vote on the substance
24  of the bill, generally speaking?
25       A.   That's because of the regular order of

186

1   business. You follow the regular order of business.
2        Q.   Okay.
3        A.   Everything is a majority vote.
4        Q.   But to, ordinarily, to get a bill to be brought
5   out of the calendar and onto the Floor for consideration
6   on the merits of the bill, you need to have a two-thirds
7   vote --
8        A.   No..
9        Q.   As a procedural matter?
10       A.   No.
11       Q.   And there's a tradition, is there not?
12       A.   No.
13       Q.   How would you describe it?
14       A.   Incorrect that you -- you're describing it
15  incorrectly.
16       Q.   Could you describe what -- what is the
17  procedure that ordinarily requires two-thirds votes of
18  senators? What is that vote?
19       A.   A bill that is filed in the legislature to be
20  brought up in the regular order of business requires
21  majority vote.
22       Q.   What are the circumstances under which it
23  requires two-thirds?
24       A.   Clarify.
25       Q.   I believe you testified earlier that there is

187

1   ordinarily a blocker bill put in place and you need
2   two-thirds of a vote to get around the blocker bill; is
3   that right?
4        A.   To bring up the blocker bill is a majority. If
5   you follow the regular order of business, it is a
6   majority vote.
7        Q.   Once a blocker bill is in place, you need
8   two-thirds to overcome that; is that correct? And to go
9   out of order; is that correct?
10            MR. SWEETEN:   Objection, compound.
11       A.   You asked two questions.
12       Q.   (By Ms. Westfall) Why don't you take the first
13  one first, and then we'll do the second one?
14            Does it require two-thirds vote to
15  overcome a blocker bill and go out of order?
16       A.   There's no such thing as overcoming the blocker
17  bill.
18       Q.   I'm using the wrong terms, because I am not
19  familiar with the Texas Senate rules, but I would like
20  you to interpret my terms as broadly as you are able to
21  understand them to answer the question.
22       A.   If you ask that question correctly, I'll be
23  glad to answer it.
24       Q.   Okay. Well, Ms. McCoy testified yesterday she
25  was unaware of any other bills, except voter ID, that

188

1   have been accepted under Rule 5.11D. Are you surprised
2   by her testimony?
3            MR. SWEETEN:   Objection, assumes facts not
4   in evidence. You can go ahead and answer.
5        A.   Am I surprised by her answer?
6        Q.   (By Ms. Westfall) Correct. Yes.
7        A.   That's her recollection. I'm a member. She's
8   a staffer.
9        Q.   I see. Okay. So did you have any concerns
10  about rule -- all right. What is the vote for a special
11  order?
12       A.   I'm sorry?
13       Q.   What is the vote required for a special order?
14       A.   Majority.
15       Q.   Majority. Okay. And that's indeed what Rule
16  5.11D indicates that it is a special -- that voter ID
17  requirements may be set as a special order; is that
18  right? And that they will be considered 24 hours after
19  that motion for -- is adopted by a majority; is that
20  correct?
21       A.   (Witness nods head yes.)
22       Q.   OKay. Did you have any concerns about Rule
23  5.11D?
24            MR. FREDERICK:   Objection, privileged.
25            MR. SWEETEN:   Yeah, objection, calls for



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                      May 17, 2012

189

1   legislative privilege.
2           MS. WESTFALL: Mr. Frederick, Mr. Sweeten
3   is the one defending this deposition. You may counsel
4   him but not object on the record.
5           MR. FREDERICK: I thought I had to counsel
6   him a little louder that time. I apologize.
7           MS. WESTFALL: He wasn't awake? He wasn't
8   listening to you? That's between the two of you.
9           MR. SWEETEN: Thanks for all this on the
10  record. (Laughing.)
11      Q.  (By Ms. Westfall) Were you concerned that Rule
12  5.11D --
13      A.  I believe Mr. Sweeten was talking to me and
14  counseling the witness, and the other lawyer heard the
15  response, and I believe -- I don't believe he was
16  asleep, for the record.
17      Q.  It's very good that you're defending his honor
18  in this deposition.
19          Senator, did you have any concern that
20  Rule 5.11D would make Senate Bill 362 appear very
21  partisan?
22          MR. SWEETEN: Objection.
23      A.  Privilege.
24          MR. SWEETEN: Privilege.
25      Q.  (by Ms. Westfall) Was there -- was 362 in any

191

1       Q.  (By Ms. Westfall) Was the purpose of 362 in
2   part for partisan reasons?
3       A.  The purpose of the bill was as I just answered
4   the prior question.
5       Q.  Therefore, is your answer no?
6       A.  The purpose of the bill is what I answered
7   previously.
8           MS. WESTFALL: If I don't get responses
9   from your witness, I'm going to move to compel responses
10  based on nonresponsive, Mr. Sweeney. You may want to
11  step outside and have a counsel, have a conference with
12  him.
13          MR. SWEETEN: Okay. He's answered what he
14  thinks is the purpose of the bill is.
15          MS. WESTFALL: He hasn't answered my
16  question.
17          MR. SWEETEN: I think he's attempting to
18  do so, and he's tried to tell you what the purpose is.
19  That's what he's done.
20          MS. WESTFALL: We can take it up. We can
21  take it up.
22          MR. SWEETEN: Okay. Well, I'll tell you
23  what, we'll talk about it at a break, and --
24          MS. WESTFALL: Okay.
25          MR. SWEETEN: How many more questions are

190

1   part designed for partisan purposes?
2           MR. SWEETEN: Objection, privilege.
3       A.  Privilege.
4           MS. WESTFALL: Purpose?
5       A.  Privileged.
6           MR. SWEETEN: You said was it designed for
7   partisan purposes.
8       Q.  (By Ms. Westfall) Well, did it have any
9   partisan purpose? Did Senate Bill 362 have any partisan
10  purpose?
11          MR. SWEETEN: He's already answered what
12  he felt the purpose was. You've asked him repeatedly.
13          MS. WESTFALL: Are you instructing him not
14  to answer?
15          MR. SWEETEN: You're now asking him, did
16  it have a partisan purpose?
17          MS. WESTFALL: Correct. That's my
18  question.
19          MR. SWEETEN: I think he's already
20  testified to what he thought the purpose was -- all
21  right.
22          If you want to answer her question, you
23  can go ahead and do so.
24      A.  The purpose of Senate Bill 362 was to protect
25  the integrity of the ballot box.

192

1   you going to have about the purpose of? Because we keep
2   going over the same thing on 362. I assume we've got
3   2011 to go to. Go ahead.
4       Q.  (By Ms. Westfall) Would Senate Bill 362 have
5   passed the Senate if it had not -- if it were not for
6   Rule 5.11D?
7           MR. SWEETEN: I'm going to object.
8   Legislative privilege.
9       Q.  (By Ms. Westfall) You following counsel's
10  advice?
11      A.  Privilege.
12      Q.  Did Senate Bill 362 have the support of
13  two-thirds of the Senate?
14          MR. SWEETEN: Same objection.
15      Q.  (By Ms. Westfall) Just for the court reporter,
16  could you --
17      A.  Privilege.
18      Q.  What was your -- what was the reaction from
19  other senators to the resolution to suspend -- strike
20  that.
21          What was the reaction from other senators
22  to Rule 5.11D?
23      A.  Privilege.
24          MR. SWEETEN: Objection, privilege.
25      Q.  (By Ms. Westfall) Was there opposition?



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

193

1      A.  Privilege.
2            MR. SWEETEN:  Don't reveal privileged
3      information.
4      Q.  (By Ms. Westfall)  Was there any consideration
5      of modifications of any other Senate rules in 2009 in
6      addition to Rule 5.11D associated with consideration of
7      Senate Bill 362 or voter identification requirements
8      generally?
9            MR. SWEETEN:  Objection, calls for
10     legislative privilege.
11     A.  Privilege.
12     Q.  (By Ms. Westfall)  Was Senate Bill 362
13     considered by any Senate committees?
14           MR. SWEETEN:  I think that's a matter of
15     public record, so you can --
16     A.  The Committee of the Whole is a Senate
17     committee.
18     Q.  (By Ms. Westfall)  When a bill comes from the
19     house, is it usually referred to a Senate committee
20     other than the Committee of the Whole?
21           MR. SWEETEN:  You can answer about the
22     general procedures.
23     A.  You have the option of doing either.
24     Q.  (By Ms. Westfall)  And what -- how does that
25     break down in terms of percentage in your experience in

194

1      the Senate?  In other words, how many go to the
2      Committee of the Whole, and how many go to a committee
3      that's not the Committee of the Whole?
4      A.  I don't have that percentage.
5      Q.  You can't recall sitting here today?
6      A.  No.  I don't have that percentage.
7      Q.  Okay.  How about in 2009 session, how many
8      bills came from the House, originated in the Senate, and
9      went directly to the Committee of the Whole other than
10     362?
11     A.  Well, you've asked an incorrect question.
12     Q.  How many bills that were filed with the Senate
13     in 2009 went -- were assigned directly to the Committee
14     of the Whole that you're aware of?
15     A.  I don't remember.
16     Q.  How many were assigned to other committees in
17     2009?
18     A.  I don't have access to that information,
19     because not every bill is referred.
20     Q.  How many bills were filed in 2009 in the
21     Senate?
22     A.  I don't know the answer to that.
23     Q.  Do you have a ballpark figure?
24     A.  Several thousand.
25     Q.  Of those several thousand, how many went to --

195

1      were assigned directly to the Committee of the Whole?
2      A.  I don't have that information.
3      Q.  Janice McCoy yesterday testified it was unusual
4      for a bill to go straight to the Committee of the
5      Whole.  Do you agree with that?
6            MR. SWEETEN:  Assumes facts not in
7      evidence.  You can go ahead and answer to the extent --
8      A.  Unusual is not the correct word.
9      Q.  (By Ms. Westfall)  What words would you use
10     instead of unusual?
11     A.  It is, you know, they are referred to the
12     Committee of the Whole when there's an interest in all
13     senators hearing the activity on the bill.
14     Q.  What was your role during consideration of the
15     Senate Bill 362 before the Committee of the Whole?  What
16     was your role?  Were you presiding?  Were you in the
17     chair?  Were you managing?  What's the correct verb?
18           MR. SWEETEN:  Hold on one second.  To the
19     extent that that asks matters that are subjective to the
20     legislative privilege, do not answer the question.  To
21     the extent that her question calls for information
22     that's a matter of public record, you can answer.
23           MS. WESTFALL:  This was in the Committee
24     of the Whole.  How much more public could it be?
25     A.  I was standing -- sitting at my desk

196

1      initially.  I was recognized to lay out the bill, and I
2      stood and stood for 27 hours.  I'm sorry.  Not 27 hours
3      straight, but I -- I answered questions about the bill,
4      and the hearing took 27 hours.
5      Q.  (By Ms. Westfall)  Is it ordinarily the rule of
6      the bill author to be the one to answer questions about
7      the bill when it is considered by the Committee of the
8      Whole?
9      A.  The -- generally, the author of the bill lays
10     out the bill and as a courtesy to other members will
11     answer their questions that they can answer.  But if
12     there's questions asked that someone better could answer
13     it, they say if you will hold that question until the
14     expert witness comes, they will answer your question.
15     Q.  So you answered questions for 27 hours; is that
16     correct?
17     A.  I didn't answer questions for 27 hours, but I
18     was -- the bill was before the committee, and I had to
19     be in the neighborhood.
20     Q.  Why did you -- why was the decision to consider
21     the bill for 27 hours?
22           MR. SWEETEN:  Objection, calls for
23     legislative privilege.
24     A.  Privilege.
25     Q.  (By Ms. Westfall)  Was there an urgency in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

197

1    considering Senate Bill 362?
2              MR. SWEETEN: Same objection, privilege.
3         Q.   (By Ms. Westfall) In your -- I believe you
4    testified earlier that to prepare for this deposition
5    you reviewed the transcripts from 2009 and 2011
6    regarding voter ID; is that right?
7         A.   Uh-huh. Yes.
8         Q.   Do you remember that you, in 2009, in the
9    Committee of the Whole, made numerous references to the
10   purpose of the bill relating to voter fraud; is that
11   right?
12        A.   No. I do not agree with that, and if you'd
13   like to reference something, I'd be glad to.
14        Q.   Okay. We will do that in one moment. Do you
15   remember also during 2009 hearing, that you mentioned
16   that Indiana's voter ID law had withstood legal
17   challenge and had been upheld by the Supreme Court; is
18   that correct?
19             MR. SWEETEN: She's asking you matters of
20   public record. You can answer as to that.
21        A.   Yes.
22        Q.   (By Ms. Westfall) And do you recall that you
23   were pointing to the Indiana voter ID law as support for
24   Senate Bill 362; is that correct?
25        A.   I was supporting a fact that the Indiana law

198

1    had been approved by the US Supreme Court in a 6-3 vote.
2         Q.   And do you also recall that on the Senate floor
3    in the Committee of the Whole proceedings of 362, that
4    you advocated for Senate Bill 362 based in part on the
5    fact that it offered alternatives of two nonphoto IDs;
6    is that right?
7              MR. SWEETEN: You can testify about
8    matters of the public record.
9         A.   Advocate is not correct. I explained that the
10   bill, as filed, had those parameters.
11        Q.   (By Ms. Westfall) And also on the Senate floor
12   during consideration of Senate Bill 362, did you mention
13   that 1.5 percent of registered voters appeared not to
14   have driver's licenses and that you perceived this as a
15   small segment of the voting registered voters; is that
16   correct?
17        A.   I referenced data that had been released, I
18   believe, through the Baker-Carter court that referenced
19   in the states that had passed packed the bill, that 98.5
20   percent of people in those states had a driver's
21   license.
22        Q.   During the Floor debate on the Senate Bill 362,
23   did anyone raise concerns about the impact of the bill
24   on minority voters?
25             MR. SWEETEN: Since this is a matter of

199

1    public record, you can discuss the vote record.
2         A.   Questions were asked and concerns were raised.
3         Q.   (By Ms. Westfall) And did legislators raise
4    concerns on that topic --
5              MR. SWEETEN: You're asking in hearings?
6              MS. WESTFALL: Yes. I'm confining my
7    questions to the public hearing.
8         A.   Yes.
9         Q.   (By Ms. Westfall) Who were those legislators?
10        A.   I can't give you specific names, but they were
11   people that were opposed to the bill.
12        Q.   Was there public testimony, members of the
13   public came during the committee consideration of SB
14   362?
15        A.   Yes.
16        Q.   And did some members of the public express
17   concerns about the impact of the bill on minority
18   voters?
19        A.   Yes.
20        Q.   And on the Floor during the committee
21   consideration, what was your response to these concerns?
22             MR. SWEETEN: Confine your answer to the
23   matters of the public record.
24        A.   I would have to have more of a specific
25   question from a specific member, and they would have to

200

1    reference the, you know, the records. I can't remember
2    that far back.
3         Q.   (By Ms. Westfall) Do you recall any changes
4    that were made to Senate Bill 362 in response to
5    concerns from any of these concerns that you just
6    testified about, about the bill's impact on minority
7    voters?
8              MR. SWEETEN: Objection, legislative
9    privilege.
10        A.   Privilege.
11             MS. WESTFALL: To the extent that the
12   changes were in iterations of the bill, are you still
13   maintaining that objection?
14             MR. SWEETEN: Yes. That is a matter of
15   legislative privilege. You just asked ask him what
16   changes were made in response to statements made by
17   other legislators, so you don't have to answer that.
18             MS. WESTFALL: Let me put it this way.
19   I'm going to keep my question for purposes of subsequent
20   motions to compel. But after these concerns were raised
21   on the -- in the Committee of the Whole in 2009, were
22   any changes made to 362?
23             MR. SWEETEN: Same objection. Think that
24   calls for his mental impressions process.
25        Q.   (By Ms. Westfall) Do you recall that there was



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

201

1    a letter signed by all of the racial or ethnic minority
2    members of the Senate expressing opposition to Senate
3    Bill 362?
4        A.  I don't remember.
5        Q.  You don't.  Okay.  I hand you what's been
6    previously marked as Exhibit 33.
7        A.  It's a lot of paper.
8            MR. SWEETEN:  Yes.  And if you need any of
9    these to refer to, let me know, and I'll get them back
10   for you.
11       Q.  (By Ms. Westfall)  Have you had a chance to
12   look at Exhibit 33?
13       A.  Yes.  What are you referencing?
14       Q.  Could you first off tell me what you're looking
15   at?  Could you identify it?
16       A.  It's Senate Journal for the 23rd day of the
17   session, Wednesday, March 18.
18       Q.  And does this -- is this journal pertaining to
19   the Committee of the Whole consideration of Senate Bill
20   362?
21       A.  This is the journal of the regular session.
22       Q.  Okay.  You mean the Floor consideration of the
23   bill?  What do you mean by "regular session"?
24       A.  We go into session every day, and we're gabled
25   into regular session.  And then if -- you know, you have

203

1        Q.  I see.  Looking at the letter today, in your
2    deposition, does it refresh your recollection as to when
3    you first saw this?
4        A.  It refreshes my -- my recollection that
5    something was submitted, but it doesn't, no.
6        Q.  Could you indicate to me your interpretation of
7    what this statement says?
8        A.  Privilege.
9            MR. SWEETEN:  Legislative privilege.
10           MS. WESTFALL:  This is a matter of public
11   record.
12           MR. SWEETEN:  You're asking him to
13   interpret for you.  He can refer to matters of the
14   public record, but you're asking him matters that relate
15   to his thoughts, mental impressions or opinions about
16   legislation or in furtherance of legislation, in this
17   case, Senate Bill 362.
18       A.  Yeah.  362.
19           MR. SWEETEN:  Yes.
20           MS. WESTFALL:  So therefore --
21           MR. SWEETEN:  You can answer to the extent
22   you can -- if you want to discuss matters of public
23   record, but otherwise --
24       A.  I recognize that a statement was submitted.
25       Q.  (By Ms. Westfall)  What does the statement say?

202

1    different sections of the session.  This is the journal
2    of the regular session.  You will see the part about
3    81st legislature regular session, and this was the
4    proceedings on the regular session on the 23rd day.
5        Q.  I see.  Thank you for your testimony on that
6    point,
7            So this was not the Committee of the
8    Whole, in other words?
9        A.  No.
10       Q.  Thank you.
11           Directing your attention to Page 591 of
12   the Senate Journal of the Exhibit 33, could you take a
13   look at that?
14       A.  Yes.
15       Q.  And do you see that in the middle of the page
16   there is a statement regarding votes cast on Senate Bill
17   362 submitted by Senator West?
18       A.  I see a statement submitted by Senator West.
19       Q.  Do you recall seeing this statement before
20   today?
21       A.  No.
22       Q.  You never looked at it until this deposition
23   today; is that right?
24       A.  That wasn't what I said.  I said I don't
25   recall.

204

1        A.  Would you like for me to read the statement to
2    you?
3        Q.  I would not.  I'll represent to you, this is a
4    letter from senators noting that all ethnic and racial
5    minorities voted against Senate Bill 362 and have
6    consistently opposed the voter ID bills.  Am I
7    misrepresenting the statement?
8        A.  You're representing that these people -- the
9    answer is no, your -- your statement is incorrect.
10       Q.  How is it incorrect?
11       A.  Can you restate the statement -- you know, the
12   question?  It's incorrect.
13       Q.  Could you -- do you have anything further to
14   say about why my -- why the summary that I just provided
15   you of this statement is incorrect, or is that the sum
16   total of your testimony on that point?  Do you have
17   further testimony or no?
18           MR. SWEETEN:  I think her question is how
19   was she incorrect?
20           THE WITNESS:  You want me to answer that?
21           MR. SWEETEN:  Well, to the extent it's a
22   matter of the public record, you can say that.  You
23   can't reveal thoughts and impressions.
24       A.  These people are not -- they're not minorities.
25           MR. SWEETEN:  Okay.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Troy Fraser                                    May 17, 2012

205

1    Q. (By Ms. Westfall) Okay. Do you have any
2   further corrections to my summary of the statement? Or
3   is that -- is that your testimony?
4    A. You asked me the question, if they were all the
5   -- you know, all these listed were racial minorities,
6   and they're not.
7    Q. I believe what I said, and which is why I
8   originally asked you if you would like to summarize your
9   read of the letter so we could move things along, was
10  that the letter was from senators noting that all ethnic
11  and racial minorities had voted against this Senate Bill
12  362 and have consistently opposed voter ID bills, not
13  that the signatories were, but the fact that voter ID
14  bills have been consistently opposed by members of
15  racial and ethnic minorities. That was the summary that
16  I provided. Do you agree with that summary?
17   A. In the Senate.
18   Q. I'm talking about this statement, not the --
19  whether you agree with the merits. I'm asking you
20  whether you agree with my summary of the statement,
21  which is why we're at loggerheads.
22   A. I don't disagree that this was filed and it was
23  their statement.
24   Q. Thank you.
25       Why do you think these senators felt the

206

1   need to submit for the record this statement about
2   racial and ethnic minorities voting against voter ID
3   legislation?
4        MR. SWEETEN: Objection, legislative
5   privilege.
6    Q. (By Ms. Westfall) Are you following the advice
7   of counsel?
8    A. Privilege.
9    Q. Did you place any significance on the unified
10  opposition of all minority members of the Senate? And
11  by "minority," I mean racial and ethnic minorities.
12       MR. SWEETEN: Objection.
13   A. Privilege.
14       MR. SWEETEN: It calls for matters covered
15  by the legislative privilege.
16   Q. (By Ms. Westfall) Did you believe that their
17  concerns about the impact of the bill on minority voters
18  were genuine?
19   A. Privilege.
20       MR. SWEETEN: Objection, calls for matters
21  that are subject to the legislative privilege.
22   Q. (By Ms. Westfall) Do you believe that senators
23  who are opposing the bill and had concerns about the
24  impact of the bill on minority voters were acting in
25  good faith in raising those concerns?

207

1    A. Privilege.
2        MR. SWEETEN: Objection, privilege.
3    Q. (By Ms. Westfall) Was it true that some
4   legislators and members of the public stayed up all
5   night during consideration of Senate Bill 362?
6    A. Yes.
7    Q. Why do you think there was such strong
8   opposition to the bill?
9        MR. SWEETEN: Objection, privilege.
10   A. Privilege.
11   Q. (By Ms. Westfall) During consideration of 362,
12  did you indicate that you had done more research and
13  reading on the bill than you've ever done on any other
14  legislation?
15       MR. SWEETEN: You're asking on the public
16  record?
17       MS. WESTFALL: Correct.
18       MR. SWEETEN: You can answer.
19   Q. (By Ms. Westfall) Do you recall saying that?
20   A. No, I do not recall it.
21   Q. Okay.
22       MS. WESTFALL: Could you mark this as 46?
23       (Exhibit 46 marked for identification.)
24   Q. (By Ms. Westfall) You've been handed --
25       MS. WESTFALL: Patrick, we have one for

208

1   you.
2        MR. SWEETEN: Ah, that's great.
3    Q. (By Ms. Westfall) You've been handed what's
4   been marked as Exhibit 46. Have you seen this before?
5    A. Looks awful small. This looks like a subset of
6   the transcript.
7    Q. Yes. I'll represent to you, and I'm sure your
8   counsel will not disagree, this is an excerpt of
9   proceedings of the Committee of the Whole Senate on
10  Tuesday, March 10, 2009.
11       I'm going to turn your attention to -- I'm
12  going to ask you to turn your attention to what's been
13  marked -- there's various paginations on this exhibit,
14  but 72 in the upper right-hand corner of the page of the
15  transcript, it's Bates Number TX3939. Do you see that
16  page?
17   A. Yes.
18   Q. It's an exchange between you and Senator
19  Watson.
20   A. Yes.
21   Q. And do you see that you reference 12 percent of
22  persons in other states without proper photo ID?
23   A. Show me where I reference that.
24   Q. Actually, you know what, let's look at the
25  beginning of this exchange on Page 70. That's the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

---

209

1   beginning of your statement, Senator Fraser, on Page 70,
2   where you talk about records of numbers of people in the
3   voter registration records who do not have appropriate
4   ID, and you indicate that it's around 800,000 or 12
5   percent. Do you see that?
6       A.  No.
7           MR. SWEETEN:  I caution the witness to
8   make sure that you're taking the time you need to read.
9       A.  I do not see that. Show me.
10      Q.  (By Ms. Westfall)  I'm sorry. Page 70, 71 and
11  72. You discuss the numbers.
12      A.  What is your question?
13      Q.  So here you're discussing the numbers of people
14  who appear not to have a photo ID, and you're discussing
15  that with Senator Watson; is that correct?
16      A.  Yes.
17      Q.  And you indicate the number roughly 809,000
18  people; is that correct?
19      A.  What about the 809?
20      Q.  I'm just asking whether the record reflects
21  that you refer to about 809,000 people who did not have
22  photo ID in your exchange with Senator Watson.
23      A.  No.
24      Q.  What was it?
25      A.  I didn't say that.

---

210

1       Q.  You -- oh, you said no, you don't see it?
2       A.  I said I did not say that.
3       Q.  Tell me what you said.
4       A.  You want me to read you the transcript?
5       Q.  Certainly. Tell me what you're talking about
6   so we can be on the same page for the questions. What
7   did you say?
8       A.  The ones that neither number show up, either a
9   Social Security number or voter ID, 809,000. That --
10      Q.  Okay.
11      A.  There's 5 million that gave their driver's
12  license. The others did not use their driver's license.
13      Q.  Correct. So these are -- these are voter
14  applicants who did not indicate a Social Security number
15  or driver's license?
16      A.  They didn't use their driver's license.
17      Q.  When they -- when they registered to vote; is
18  that correct?
19      A.  Yes. Because there are other options.
20      Q.  Thank you for clarifying your testimony.
21          But you had an exchange with Senator
22  Watson concerning this number of 800,000 people; is that
23  correct?
24      A.  Yes.
25      Q.  How was that analysis conducted?

---

211

1           MR. SWEETEN:  I'm going to object. Don't
2   reveal thoughts, mental impressions, opinions about
3   legislation or in furtherance of the legislative
4   process. If you want to, you can reference matters of
5   the public record in answer to that question, but don't
6   reveal the other based on the legislative privilege
7   objection.
8       Q.  (By Ms. Westfall)  Did you have any
9   conversations, are you aware of any communications with
10  the Secretary of State during consideration of Senate
11  Bill 362, concerning the number of registered voters
12  without a driver's license or Social Security number?
13          MR. SWEETEN:  Objection, compound.
14  Objection, I think you're seeking the substance of
15  conversations. If you want to ask about whether he's
16  had conversations with the Secretary of State, I think
17  that would be fine. Under the court's order, I think a
18  general subject matter description would also be fine.
19  But I think the way it's asked, it's compound, multiple;
20  it also has the substance of the conversation in it. We
21  object.
22          MS. WESTFALL:  Specifically, you're not
23  instructing the witness to not answer because it's a
24  compound question; is that right?
25          MR. SWEETEN:  I think my objection has

---

212

1   been clear, but let me just say that I think I will let
2   him answer questions about whether he's had
3   conversations with the Secretary of State. I'll let him
4   answer about the date, time and a general subject matter
5   description as provided in the court's order.
6       Q.  (By Ms. Westfall)  Senator Fraser, are you
7   aware of any conversations during or before the
8   Committee of the Whole consideration of Senate Bill 362
9   with the Secretary of State's Office?
10          MR. SWEETEN:  You can answer.
11      A.  No.
12      Q.  (By Ms. Westfall)  Did you try to do any
13  analysis of the racial composition or ethnic composition
14  of persons, these 809-approximately-thousand people who
15  did not register to vote with either a Social Security
16  number or driver's license number?
17          MR. SWEETEN:  Objection, legislative
18  privilege.
19      A.  Privilege.
20      Q.  (By Ms. Westfall)  Did Senator Watson raise
21  this as a concern as to the racial composition of these
22  800,000 persons?
23          MR. SWEETEN:  Don't reveal private
24  conversations, but you certainly can bring up matters of
25  public record.

---



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                      May 17, 2012

213

1      Q.   (By Ms. Westfall) I'll direct you to Page 72,
2   at the bottom of the page, at Line 21.  Did Senator
3   Watson ask about the racial composition of the 800,000
4   persons?
5      A.   I think my answer speaks for itself.
6      Q.   And your answer was that you were not advised
7   and you hadn't done that analysis?
8      A.   I didn't say that.  I said I don't remember if
9   the driver's license had that information, the racial
10  breakdown of the license.
11     Q.   And in response to Senator Watson's questions
12  to whether any statistical analysis had been done
13  regarding potential impact of SB 362 on African-
14  Americans, which is on Page 73, your response was it had
15  been implemented in Indiana and Georgia; is that right?
16     A.   I made reference to the fact that we're going
17  to have someone from Indiana and Georgia, two states
18  that had implemented it, where they would give their
19  testimony and they can give reaction to what happened in
20  their states.
21     Q.   Was there any analysis on the racial
22  composition or ethnic composition of those 800,000
23  voters that was conducted with regard to Texas voters?
24           MR. SWEETEN:  Do not reveal based upon --
25  objection, legislative privilege.  Go ahead.

214

1      A.   Privilege.
2      Q.   (By Ms. Westfall)  Is there any -- are there
3   any conversations about analysis of the racial
4   composition or ethnic composition of those 800,000
5   voters, that you're aware of?
6           MR. SWEETEN:  Objection, privilege.
7      A.   Privilege.
8           MS. WESTFALL:  The existence of
9   conversations?
10           MR. SWEETEN:  Were there conversations
11  about --
12           MS. WESTFALL:  -- the racial composition
13  or ethnic composition of the 800,000 voter registration
14  applicants referenced in this testimony.
15           MR. SWEETEN:  Okay.  That is way more than
16  a general subject matter description that would be on a
17  privilege log, and so I think that's beyond what we --
18  what I'll let him answer.  I'll work with you, though,
19  if you want to talk about conversations, he will do
20  that.  He'll identify the specifics of the conversation,
21  even a general subject matter description, but that is
22  not a general subject matter description.
23     Q.   (By Ms. Westfall)  Are you aware of any
24  analysis, conversation -- strike that.
25           Are you aware of any conversations of any

215

1   analysis of the racial or ethnic composition of voters
2   who did not have the forms of allowable ID under Senate
3   Bill 362?
4           MR. SWEETEN:  I think you're -- I think
5   there's subject matter within that question is beyond a
6   general description of subject matter that he would have
7   to provide under a privilege log.  So I'm going to
8   object to the question.
9      Q.   (By Ms. Westfall)  Do you think 800,000 is a
10  small number?
11           MR. SWEETEN:  Don't reveal your thoughts,
12  mental impressions about the legislation.  Objection,
13  legislative privilege.
14     A.   Privilege.
15     Q.   (By Ms. Westfall)  Did these numbers concern
16  you at all?
17           MR. SWEETEN:  Same objection.
18     A.   Privilege.
19     Q.   (By Ms. Westfall)  Do you agree that the key to
20  effective implementation of Senate Bill 362 is adequate
21  poll worker training?
22           MR. SWEETEN:  Same objection, legislative
23  privilege.
24     Q.   (By Ms. Westfall)  Do you recall that in 2009,
25  during the Committee of the Whole consideration of

216

1   Senate Bill 362, when you were asked about training for
2   poll workers to determine whether an ID was proper, you
3   deferred to the Secretary of State at that time on the
4   public record?
5           MR. SWEETEN:  You can answer to matters of
6   the public record.
7      A.   Yes.  I did refer, yes.
8      Q.   (By Ms. Westfall)  Why didn't Senate Bill 362
9   address more clearly and have more guidance for the
10  Secretary of State concerning poll worker training?
11           MR. SWEETEN:  Same objection, legislative
12  privilege.
13     A.   Privilege.
14     Q.   (By Ms. Westfall)  You're asserting the
15  privilege with regard to that question?
16     A.   (Witness nods head yes.)
17     Q.   You agree that poll worker training is very
18  important, isn't it, in implementing photo ID law?
19           MR. SWEETEN:  Objection, privilege.
20     Q.   (By Ms. Westfall)  As a general policy matter,
21  not with regard to legislation?
22           THE WITNESS:  Isn't that privilege?
23           MR. SWEETEN:  Well, she's now saying -- so
24  logically divorcing this from any pending legislation, I
25  think is what you're doing.  If there were any



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

|  | 217 |
|---|---|
| 1 | consideration of specific legislation, you're asking as |
| 2 | a general matter, whether he thinks considerations of |
| 3 | poll worker training are important; is that what you're |
| 4 | saying? |
| 5 | MS. WESTFALL: My question stands. |
| 6 | A. That's privileged information because I would |
| 7 | give my opinion about any legislation. |
| 8 | MR. SWEETEN: Yeah, I think that's -- |
| 9 | we're going to object to privilege on that. |
| 10 | MS. WESTFALL: Your opinion just -- |
| 11 | opinions about the necessity of poll worker training is |
| 12 | off limits? |
| 13 | MR. SWEETEN: If you're asking him to |
| 14 | reveal thoughts, mental impressions or opinions about |
| 15 | legislation or in furtherance of the legislative process |
| 16 | in doing that, then that is subject to the well- |
| 17 | recognized legislative privilege. |
| 18 | Q. (By Ms. Westfall) I believe you testified |
| 19 | earlier that the purpose of 362 was to ensure integrity |
| 20 | of the ballot box; is that right? |
| 21 | A. Yes. |
| 22 | Q. Isn't that connected and furthered by how |
| 23 | effectively a poll worker can verify a voter's |
| 24 | identity? |
| 25 | MR. SWEETEN: Objection, that's |

|  | 219 |
|---|---|
| 1 | A. Yes, there were conversations. |
| 2 | Q. (By Ms. Westfall) Was it with members of the |
| 3 | House or their staff? |
| 4 | A. Members of the House. |
| 5 | Q. And who are those members? |
| 6 | A. I can't give you specifics. |
| 7 | Q. Who was carrying the bill in the house? |
| 8 | A. Todd Smith. |
| 9 | Q. Did you have conversations with Mr. Smith? |
| 10 | A. Yes. |
| 11 | Q. Did you have more than one? |
| 12 | A. Yes. |
| 13 | Q. Did you have conversations with his staff? |
| 14 | A. No. |
| 15 | Q. Just the two of you? |
| 16 | A. Yes. |
| 17 | Q. How many conversations? |
| 18 | A. More than five. |
| 19 | Q. When did 362 pass in the Senate approximately? |
| 20 | A. January the 20th -- I'm sorry, I don't know. |
| 21 | Q. 362, was that March? |
| 22 | A. 362? |
| 23 | Q. Yes. |
| 24 | A. Oh, I don't know. I'm sorry. I don't know. |
| 25 | Q. Do you know when you had these conversations |

|  | 218 |
|---|---|
| 1 | legislative privilege. |
| 2 | A. Privilege. |
| 3 | Q. (By Ms. Westfall) Why didn't you include a |
| 4 | provision on poll worker training in Senate Bill 362? |
| 5 | MR. SWEETEN: Same objection, privilege. |
| 6 | Q. (By Ms. Westfall) Why did you leave it to the |
| 7 | Secretary of State? |
| 8 | MR. SWEETEN: Same objection, privilege. |
| 9 | Q. (By Ms. Westfall) So did 362 pass in the |
| 10 | Senate? |
| 11 | MR. SWEETEN: You can answer. |
| 12 | A. Yes. |
| 13 | Q. (By Ms. Westfall) And was it referred to the |
| 14 | House? |
| 15 | A. Yes. |
| 16 | MR. SWEETEN: You can answer. |
| 17 | Q. (By Ms. Westfall) Did you have any role in |
| 18 | furthering the advancement of Senate Bill 362 once it |
| 19 | was referred to the House? |
| 20 | A. No. |
| 21 | Q. Did you talk to any members of the House about |
| 22 | 362 after passage in the Senate? |
| 23 | MR. SWEETEN: You can reveal |
| 24 | conversations -- I mean, don't reveal substance of them, |
| 25 | but you can reveal whether conversations occurred. |

|  | 220 |
|---|---|
| 1 | with Representative Smith about 362? |
| 2 | A. After the bill was sent to the House. |
| 3 | Q. What was the general nature of the |
| 4 | conversations with Mr. Smith? |
| 5 | MR. SWEETEN: You can provide a very |
| 6 | general subject matter description. |
| 7 | A. Status of the bill. |
| 8 | Q. (By Ms. Westfall) Did you have any |
| 9 | conversations with any other members of the House about |
| 10 | 362? |
| 11 | MR. SWEETEN: You can reveal |
| 12 | the conversation -- whether a conversation occurred. |
| 13 | A. Yes, there were other members. |
| 14 | Q. (By Ms. Westfall) Where you had individual |
| 15 | one-on-one conversations with other members about 362? |
| 16 | MR. SWEETEN: Of the House. |
| 17 | Q. (By Ms. Westfall) Of the House? |
| 18 | A. Yes. |
| 19 | Q. Who were those members? |
| 20 | A. I can't tell you specifically who they were. |
| 21 | Q. What happened to Senate Bill 362 in the House? |
| 22 | A. It was never voted out. |
| 23 | Q. Did it get assigned to a committee? |
| 24 | A. Yes. |
| 25 | Q. What was the committee? |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                      May 17, 2012

---

221

1    A. I don't know.
2    Q. Was it the House Elections Committee?
3    A. I'm -- I don't know. I'm not a House member.
4    Q. Was Mr. Smith the chair of the Elections
5    Committee in 2009?
6    A. I believe he was.
7    Q. Have you spoken in any public settings,
8    meetings, or groups about the subject of voter ID ever?
9    A. Yes.
10   Q. Besides the Floor of the Senate?
11   A. Yes.
12   Q. When was the first time you talked about voter
13   ID in a public setting?
14   A. I don't remember. I don't remember exactly
15   when it was.
16   Q. Can you remember any time you've spoken in
17   public about voter ID, not on the Senate Floor?
18   A. One -- yes. The answer is yes.
19   Q. Tell me when that was.
20   A. In Brownwood recently.
21   Q. What group were you addressing?
22   A. Chamber of Commerce.
23   Q. What did you tell the Chamber of Commerce?
24   A. That the Justice Department had failed to
25   preclear the bill.

---

222

1    Q. How long were your remarks about voter ID?
2    A. Ten minutes.
3    Q. Was it in the answer to a question about the
4    status of the bill?
5    A. No.
6    Q. Or were you there with prepared remarks about
7    voter ID?
8    A. I was prepared -- it was prepared remarks about
9    the status of the, you know, things in the state.
10   Q. Who prepared those remarks?
11   A. I did.
12   Q. Where are those remarks retained?
13   A. I need to back up. My staff always give me
14   guidelines of things that I've either talked about or I
15   generally talk about in an outline or a sketch form. I
16   never use that. I always wing it.
17   Q. So did Ms. McCoy prepare remarks for you?
18   A. Yes.
19   Q. Did you retain those remarks?
20   A. Retain the remarks?
21   Q. Did you keep a copy --
22   A. No.
23   Q. -- of the hard copy of the remarks?
24   A. No.
25   Q. Have you been asked by your lawyers to retain

---

223

1    all documents concerning Senate Bill 14 as a result of
2    this litigation?
3        MR. SWEETEN: Don't reveal communications
4    between you and your attorneys.
5        Q. (By Ms. Westfall) Let me rephrase. Let me
6    rephrase.
7        Was there a time when you started
8    retaining documents related to Senate Bill 14?
9        A. You're using the word "you," and the answer
10   would be no.
11       Q. Was there a time that your office took any
12   steps, that you can identify sitting here today, to
13   retain documents?
14       A. Yes.
15       Q. When did that occur?
16       A. I don't know.
17       Q. Who would know?
18       A. When we were asked.
19       Q. I see. Would Ms. McCoy know?
20       A. Yes.
21       Q. Are you familiar with a federal law called the
22   "Help America Vote Act"?
23       A. I'm assuming that's HAVA. Yes.
24       Q. What does HAVA do generally? Could you tell
25   me?

---

224

1    A. No.
2    Q. You testified earlier that you had introduced
3    Senate Bill 363 in 2009. Remember we talked about that
4    earlier today?
5    A. Yes.
6    Q. And that would require documentary proof of
7    citizenship upon registration of voting; is that
8    correct?
9        MR. SWEETEN: You can refer to matters of
10   the public record.
11       Q. (By Ms. Westfall) This is within your bill.
12   I'm summarizing it.
13       A. We discussed whatever we read on the bill.
14       Q. Yes.
15       A. Yes.
16       Q. Does HAVA implement identification requirements
17   for certain voter registration applicants --
18       A. Sorry.
19       Q. -- to your knowledge?
20       A. I don't know.
21       Q. Do you know what ethnic group makes up the
22   largest the percentage of the noncitizen population in
23   the state of Texas?
24       A. I'm sorry. I -- you know. Is that --
25       MR. SWEETEN: She's just asking you

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

225

1  whether you know a fact or whether you know. So you can
2  answer just as to --
3      A.  No, I do not know.
4      Q.  (By Ms. Westfall)  Is it Hispanics?
5          MR. SWEETEN:  Objection.
6      A.  I just said I didn't know.
7      Q.  (By Ms. Westfall)  I'm trying to refresh your
8  recollection.
9          Was there a time that you introduced a
10 voter ID bill in the 2011 session?  I guess it would be
11 the 82nd session.
12     A.  Yes.
13     Q.  And was that bill called Senate Bill 14?
14     A.  Yes.
15     Q.  Did anyone ask you to introduce this bill?
16         MR. SWEETEN:  Objection, legislative privilege, so don't
17 reveal matters of legislative privilege, so don't
18 answer.
19     Q.  (By Ms. Westfall)  When did you decide to
20 introduce Senate Bill 14?
21     A.  As soon as 362 didn't pass.
22     Q.  So that was 2009 sometime, you started working
23 on it right away?
24     A.  May 31st, 2009.
25     Q.  But when did you file Senate Bill 14?

226

1      A.  By law, you cannot file -- you can file one
2  month before.  So in the one month filing period, I
3  filed it prior to session start.
4      Q.  Did you start -- did you start drafting it
5  immediately following the defeat of Senate Bill 362?
6      A.  No.
7      Q.  When did you start drafting or working on
8  concepts for the bill?
9      A.  I did not start drafting.
10     Q.  I understand you didn't draft, but when did you
11 start thinking about what you wanted the bill to look
12 like?
13         MR. SWEETEN:  You're asking him to reveal
14 thoughts, mental impressions, opinions in furtherance of
15 legislation, including Senate Bill 14, so that would be
16 privileged.
17     A.  Privileged.
18     Q.  (By Ms. Westfall)  Did anyone ask you to file
19 Senate Bill 14?
20         MR. SWEETEN:  Same -- I think he's already
21 answered that, but objection, legislative privilege.
22     A.  Privilege.
23     Q.  (By Ms. Westfall)  Did you make any promises to
24 anyone to file Senate Bill 14?
25         MR. SWEETEN:  Same objection, legislative

227

1  privilege.
2          MS. WESTFALL:  Did you -- I mean, for the
3  record, I think what you're instructing him not to
4  answer falls outside any conceivably assertible
5  privilege.  I want to just make that known for the
6  record.  We'll brief that later.
7          MR. SWEETEN:  Okay.  Why don't you go
8  ahead and read the question back, and I will consider it
9  again.  If you think I'm way off base, let's hear it
10 again.
11         MS. WESTFALL:  You've made the same
12 objection earlier today, but my question was whether the
13 Senator promised anyone to file Senate Bill 14.
14         MR. SWEETEN:  Okay.  That is a matter --
15 you're asking about a specific communication whether
16 he's promised someone regarding Senate Bill 14.  I think
17 that is privileged.
18     Q.  (By Ms. Westfall)  Did you promise Mr. Skipper
19 Wallace that you would file Senate Bill 14?
20         MR. SWEETEN:  Objection.  I think this has
21 been asked and answered, questions about Skipper
22 Wallace.  If you want to ask him --
23         MS. WESTFALL:  It's Skipper Wallace but
24 we're in a new year.
25         MR. SWEETEN:  And I've heard that name a

228

1  lot today, Counsel.  What I want to say is, I -- he can-
2  reveal whether or not there's a communication that
3  existed.  He's not going to reveal the substance of the
4  communication.  So you're free to ask him that.
5      Q.  (By Ms. Westfall)  Did you have any
6  conversations with anyone -- strike that.
7          Was Senate Bill 14 given a designation by
8  the Governor or in his office -- Governor -- let me
9  strike that again.
10         Was Senate Bill 14 designated by the
11 Governor to be emergency legislation?
12     A.  Yes.
13     Q.  What are the -- what happens?  Describe what
14 happens when the Governor designates a bill as emergency
15 legislation.
16     A.  The Governor declares it an emergency
17 legislation.
18     Q.  What's the consequences for its consideration
19 in the Texas State Senate?
20     A.  No consequences.
21     Q.  Is it automatically considered within the first
22 60 days of session?
23     A.  No.
24     Q.  There are no consequences to this designation?
25 Is it purposeless; is that your testimony?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                      May 17, 2012

---

229

1    A.  No.
2    Q.  What is the purpose of designation by the
3  Governor of emergency legislation?
4    A.  You would have to ask the Governor that.
5    Q.  I'm asking as a general -- I'm asking as a
6  general matter, when -- strike that.
7        As a result of the designation of SB 14 as
8  emergency legislation, was it considered within the
9  first 60 days of the Senate session in 2011?
10   A.  She asked me two questions.
11   Q.  Well, you know what --
12       MR. SWEETEN:  Hold on.
13   Q.  -- I'm asking the questions.  If you don't like
14  the questions and you need clarification, you can ask
15  me, as I instructed you at the beginning of this
16  deposition.
17       MR. SWEETEN:  Okay.  Okay.  Let's -- let
18  me -- I want to hear the question read back, please.
19       (Question read back.)
20       MR. SWEETEN:  Objection, legislative
21  privilege.
22       MS. WESTFALL:  Can you further explain
23  your assertion of privilege?  This is a procedural
24  matter and a timing matter and a matter of public
25  record.

---

230

1        MR. SWEETEN:  He can answer -- the
2  legislative privilege objection relates to matters of
3  nonpublic record.  He is free to answer based upon the
4  public record, if it is as you claim it is.  So he can
5  answer if there are matters of the public record that
6  addresses this, but -- I mean, I'm asserting privilege
7  as to matters not of the public record.
8    Q.  (By Ms. Westfall)  Can you answer the question?
9    A.  Privilege.
10   Q.  When a governor designates legislation as
11  emergency legislation, is it always considered within
12  the first 60 days of the session?
13       MR. SWEETEN:  You can answer as a general
14  matter.
15   A.  No.
16   Q.  (By Ms. Westfall)  Is it sometimes considered
17  within the first 60 days of a session?
18   A.  Yes.
19   Q.  And this designation is done by the Governor;
20  is that right?
21   A.  Yes.
22   Q.  How did Senate Bill 14 come to receive this
23  emergency designation?
24       MR. SWEETEN:  Objection, calls
25  for legislative privilege.  Also calls for speculation.

---

231

1    Q.  (By Ms. Westfall)  Were there any conversations
2  about the designation of Senate Bill 14 as emergency
3  legislation, that you're aware of?
4        MR. SWEETEN:  The question --
5    A.  No.
6        MR. SWEETEN:  -- is were there any
7  conversations?
8    A.  No.
9        MR. SWEETEN:  Okay.  You answered it.
10  Okay.
11   Q.  (By Ms. Westfall)  There were no conversations
12  you're aware of?
13   A.  No.
14   Q.  Did you request this designation of the
15  Governor's Office?
16   A.  No.
17   Q.  When did you first learn that Senate Bill 14
18  had been designated as emergency legislation?
19       MR. SWEETEN:  You can answer.
20   A.  Read about it in the paper.
21   Q.  (By Ms. Westfall)  Do you know why Senate Bill
22  14 had to be considered within the first 60 days of the
23  legislature in 2011?
24   A.  Privilege.
25       MR. SWEETEN:  Yeah, objection, privilege.

---

232

1    Q.  (By Ms. Westfall)  Are you aware of any
2  conversations regarding the timing of consideration of
3  Senate Bill 14 in the Senate?
4        MR. SWEETEN:  Objection, that requires him
5  to reveal his mental impressions, opinions about the
6  legislation.
7    A.  Privilege.
8        MR. SWEETEN:  It's legislative privilege.
9    Q.  (By Ms. Westfall)  Do you know what other bills
10  were designated emergency legislation by the Governor in
11  2011?
12       MR. SWEETEN:  You can answer.
13   A.  He had multiple bills that he declared
14  emergency.
15   Q.  (By Ms. Westfall)  Do you recall any of them
16  sitting here today?
17   A.  The sonogram bill.
18   Q.  Any others?
19   A.  No, I'm sorry, I don't.
20   Q.  Was there any urgency, in your mind, about
21  getting this Senate Bill 14 passed quickly, promptly,
22  and expeditiously, in 2011?
23       MR. SWEETEN:  Objection, it requires him
24  to reveal thoughts, mental impressions, opinions about
25  legislation.  It's legislatively privileged.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

233

1     A. Privilege.
2     Q.  (By Ms. Westfall)  Was there any -- were there
3   immediate elections that were going to be held for which
4   there was a need for the legislation?
5           MR. SWEETEN:  Same objection.  If you want
6   to ask if there were elections, you know, that's      ,
7   different.
8           MS. WESTFALL:  This was previously marked
9   as 5.  Here's a copy.  We have many.
10          (Discussion off the record.)
11    Q.  (By Ms. Westfall)  You've been handed what's
12  been previously marked as Exhibit 5.  Senator, do you
13  recognize this document?
14    A.  I believe this is probably Senate Bill 14, I'm
15  assuming as filed.  The answer is:  No, I do not
16  recognize it, because I'd have to go through it and
17  verify if this is the bill as filed or the engrossed
18  voted version that was --
19    Q.  Sir, if I could refer you to Page 17 of the
20  exhibit, maybe that will clarify for you what version of
21  the bill it is.
22    A.  This is the version that was signed by the
23  Governor.
24    Q.  Thank you.  Is this a copy of the legislation
25  as signed by the Governor that you introduced in 2011

234

1   related to voter ID?
2     A.  Yes.  Appears to be.
3     Q.  And turning your attention to Page 9, Section
4   63.0101, do you see it lists Proof of ID?  And could you
5   describe the forms of identification permitted under
6   Senate Bill 14?
7     A.  A driver's license, a US military
8   identification card that contains a person's photograph,
9   a US citizenship certificate that contains a photograph,
10  a passport that's not expired, a concealed-carry handgun
11  license.
12    Q.  Thank you.
13         And does it also provide, on Page 11 at
14  Section 16, for increasing the criminal penalties for
15  persons who impersonate a voter in an attempt to vote as
16  that voter?  Is that right?  At Section 16 of the bill?
17    A.  Yes.
18    Q.  Thank you.
19         Were you involved in the development of
20  Senate Bill 14?
21    A.  Yes.
22    Q.  What was your involvement?
23         MR. SWEETEN:  Don't reveal --
24    A.  Legislative privilege.
25         MR. SWEETEN:  Yeah.  Objection,

235

1   legislative privilege.
2     Q.  (By Ms. Westfall)  Can you describe the process
3   by which Senate Bill 14 was developed?
4     A.  Privilege.
5           MR. SWEETEN:  Objection, legislative
6   privilege.
7     Q   (By Ms. Westfall)  When was Senate Bill 14 --
8   when was it -- when did the development of Senate Bill
9   14 start?
10    A.  May 31st of 2009.
11    Q.  Were you aware of any communications concerning
12  the drafting of the bill?
13    A.  Say it again.  Repeat.
14    Q.  Are you aware of any communications concerning
15  the drafting of the bill?
16          MR. SWEETEN:  I think that's been asked
17  and answered.  Also, I think objection, vague, as far as
18  considerations of drafting the bill.  Or did you say
19  conversations drafting the bill?
20          MS. WESTFALL:  Conversations.
21    Q.  (By Ms. Westfall)  You may answer.
22    A.  Were there conversations?
23    Q.  Yes.
24    A.  Yes.
25    Q.  And was it -- I believe you testified you had a

236

1   conversation with Mr. Wallace.  Were there other
2   conversations you were aware of concerning the drafting
3   of Senate Bill 14?
4     A.  With Ms. McCoy.
5     Q.  With Ms. McCoy.  How many conversations did you
6   have with Ms. McCoy?
7     A.  Hundreds.
8     Q.  Hundreds.  Did you have conversations with
9   anyone outside of conversations with your chief of
10  staff, Ms. McCoy?
11    A.  Only in terms of advising people that I was
12  filing the bill.
13    Q.  And who were those people?
14    A.  Skipper Wallace.
15    Q.  Any legislators in the Senate?
16    A.  I don't know specifics.
17    Q.  You don't recall?  Or you can't identify the
18  people?  Or --
19    A.  I can't give you a specific instance, but the
20  bill was talked about in the interim.
21    Q.  I see.  Did you have any conversations with the
22  Lieutenant Governor or his office concerning your
23  intention to file Senate Bill 14?
24    A.  Not that I can recall.
25    Q.  Did you look at past legislation on voter ID in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Troy Fraser                                              May 17, 2012

237

1   developing Senate Bill 14?
2              MR. SWEETEN:  Do not reveal your thoughts,
3   mental impressions, opinions about legislation, or
4   matters of furtherance of the legislative process.
5   Objection, legislative privilege.
6       A.  Privilege.
7       Q.  (By Ms. Westfall)  Did you look to other
8   states' photo ID in drafting Senate Bill 14?
9       A.  Privilege.
10             MR. SWEETEN:  Same objection.
11      Q.  (By Ms. Westfall)  Did you look to any models
12  from any interest groups in developing Senate Bill 14?
13             MR. SWEETEN:  Same objection.
14      A.  Privilege.
15      Q.  (By Ms. Westfall)  Did you have any
16  communications about Senate Bill 14 with other current
17  or former legislators who had offered past photo ID
18  bills?
19             MR. SWEETEN:  You can answer as to whether
20  a conversation occurred.
21      A.  No -- I'm sorry, ask that question again.
22      Q.  (By Ms. Westfall)  Did you have any
23  communications about Senate Bill 14 with other current
24  or former legislators who had offered past photo ID
25  bills?

239

1       Q.  Where was that meeting?
2       A.  I don't recall.
3       Q.  Could you describe the general nature of that
4   meeting?
5       A.  The senate presidents get together to discuss
6   state issues.
7       Q.  And was there at that meeting a general
8   discussion of interest amongst many states in enacting
9   photo ID laws?
10      A.  Status of legislation involving voter ID in
11  Texas, specific questions.
12      Q.  Was there -- oh, it was a meeting held on that
13  topic solo?
14      A.  No.
15      Q.  I'm sorry.  Could you verify your testimony?
16      A.  There was a question asked about the status of
17  legislation.
18      Q.  And this convening of presidents of state
19  senates, is there an umbrella organization that
20  organized that meeting?
21      A.  Called the Senate Presidents Forum.
22      Q.  I see.  And did -- at that forum, were there
23  discussed other bills pending in other states concerning
24  photo ID?
25      A.  No.

238

1       A.  Define "legislators".
2       Q.  People who sit in the legislature past or
3   current.
4       A.  Texas legislators?
5       Q.  Correct.
6       A.  No.
7       Q.  How about outside of Texas?
8       A.  Yes.
9       Q.  And could you identify that person or persons?
10      A.  President of the Senate of Illinois -- I mean,
11  Indiana.  The president of the Senate in
12  Georgia.  President of the Senate in Illinois.
13      Q.  Illinois?
14      A.  Actually, the list is probably 40 of the 50
15  state senate presidents.
16      Q.  Was there a conference call, or did you have
17  individual conversations with these folks?
18      A.  I meet four times a year with the senate
19  presidents.
20      Q.  I see.  So there was a meeting with senate
21  presidents.  When was that meeting?
22      A.  We meet four times a year every year.
23      Q.  When was the meeting that you referred to
24  concerning your development of Senate Bill 14?
25      A.  I don't recall.

240

1       Q.  After that meeting, did you make any changes in
2   the draft of Senate Bill 14?
3       A.  Privilege.
4              MR. SWEETEN:  Objection, legislative
5   privilege.
6       Q.  (By Ms. Westfall)  Did you have communications
7   with legislators in Georgia about photo ID as you were
8   drafting Senate Bill 14 or developing it?
9       A.  Yes.
10      Q.  What officials in Georgia?
11      A.  I'm sorry, I need to backtrack on that.  You're
12  asking in the drafting of the bill?
13      Q.  Yes.
14      A.  No.
15      Q.  In the development of the concepts for Senate
16  Bill 14, which I believe you just testified started
17  around May 31st, 2009?
18      A.  Privilege.
19             MR. SWEETEN:  You can identify if you have
20  conversations from May 2009 --
21             MS. WESTFALL:  31st, 2009.
22             MR. SWEETEN:  May 31st, 2009, until the
23  bill was --
24      A.  With --
25             MR. SWEETEN:  With anyone from Georgia,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

---

241

1     you can testify about that.
2         A.   No.
3         Q.   (By Ms. Westfall)  Did you have communications
4     with any officials or legislators in Indiana concerning
5     about their photo ID law after May 31st, 2009?
6         A.   Yes.
7         Q.   When did you have that conversation?
8         A.   Four times a year.
9         Q.   Are you referring to the same convening of the
10    senate presidents?
11        A.   Yes.
12        Q.   Were there -- was there any agenda for that
13    meeting that was circulated?
14        A.   Every meeting has an agenda.
15        Q.   Was there an agenda for the meeting you just
16    testified about at which you answered the question about
17    the status of Texas photo ID?
18        A.   Yes.
19        Q.   Who has that agenda?
20        A.   Senate Presidents Forum.
21        Q.   Where is that headquartered?
22        A.   Washington, D.C.
23        Q.   Who's the staff person who you usually deal
24    with at the forum?
25        A.   That I -- I don't deal with anyone.

---

242

1         Q.   Is there any administrative person who
2     maintains records and organizes the meetings for the
3     forum?
4         A.   Yes.
5         Q.   And who is that person?
6         A.   I don't have that name.
7         Q.   And this meeting that you're testifying about
8     where you talked about Texas photo ID, was this -- did
9     this occur in the year of 2009 or 2010?
10        A.   I don't know.
11        Q.   Did you keep any notes from that meeting --
12        A.   No.
13        Q.   -- yourself?
14        A.   (Witness shakes head no.)
15        Q.   You testified earlier about Exhibit 5, Senate
16    Bill 14, and a number of forms of ID; is that correct?
17    You testified about the particular types of ID that are
18    allowable under Senate Bill 14; is that right?
19        A.   I testified?
20        Q.   You testified in this deposition just minutes
21    ago, don't you remember doing that?
22        A.   I don't --
23        Q.   I just -- I asked you a question about the
24    forms of --
25        A.   And I read the forms that are in the bill.

---

243

1         Q.   Correct.  That's what I'm referring to when I
2     said you testified.
3              Have you reviewed the photo ID laws in
4     both Indiana and Georgia?
5         A.   Yes.
6              MR. SWEETEN:  Don't reveal your thoughts
7     or mental impressions or opinions about legislation or
8     matters in furtherance of the legislative process when
9     you're answering these questions here.
10        Q.   (By Ms. Westfall)  Do you know whether under
11    Senate Bill 14 there are fewer forms of allowable ID
12    than under Georgia photo ID law?
13        A.   I don't know that.
14        Q.   Do you know whether there are fewer forms of
15    allowable ID in Senate Bill 14 than in the Indiana voter
16    ID law?
17        A.   Don't know that.
18        Q.   Have you reviewed -- I know you testified
19    earlier that you're not an attorney, but have you
20    reviewed those laws or a summary of those laws?
21              MR. SWEETEN:  Objection, that's been asked
22    and answered.  It's legislative privilege.  It goes to
23    his process, thoughts, mental impressions, opinions
24    about legislature or furtherance of legislation.
25              But you are free to refer to matters of

---

244

1     the public record.
2         Q.   (By Ms. Westfall)  Do you have any answer --
3         A.   Privilege.
4         Q.   Thank you.
5              Have you had any -- did you have any
6     communications in developing or conceptualizing Senate
7     Bill 14 with any groups representing minority voters?
8              MR. SWEETEN:  Objection, legislative
9     privilege.
10        A.   Privilege.
11        Q.   (By Ms. Westfall)  Did you have any
12    communications with any groups representing minority
13    voters in 2009?
14              MR. SWEETEN:  Communications you're
15    asking?
16              MS. WESTFALL:  Correct.
17              MR. SWEETEN:  Okay.  You can ask -- you
18    can answer as to whether a communication occurred or did
19    not occur.
20        A.   Not to my knowledge.
21        Q.   (By Ms. Westfall)  Did you have any such
22    communications with any such groups in 2010?
23        A.   Not to my knowledge.
24        Q.   Did you have any communications about Senate
25    Bill 14 with any officials in the executive branch in

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                              May 17, 2012

---

245

1   Texas?
2       A.  No.
3       Q.  Did you have any communications about Senate
4   Bill 14 with any member of the Lieutenant Governor's
5   Office or the Lieutenant Governor?
6           MR. SWEETEN:  I think that's been asked
7   and answered, but you may answer.
8       Q.  (By Ms. Westfall)  You may answer.  You may
9   answer.
10          MR. SWEETEN:  I'll instruct him as to
11  whether or not he can answer.  I said, "You can answer."
12      A.  And give me the time frame.
13      Q.  (By Ms. Westfall)  2009 or 2010.
14      A.  I don't remember.  Could I add that, if there
15  was a communication, it was advising them that I was
16  filing the bill again?  That would be the extent.
17          MR. SWEETEN:  Okay.
18          MS. WESTFALL:  Thank you.
19          MR. SWEETEN:  And that's fine.  Just don't
20  reveal the specifics of communications you've had.  Her
21  question was:  Was there a communication?  So just limit
22  it to that, but that's general.
23      Q.  (By Ms. Westfall)  Did you or your office or
24  Ms. McCoy exchange drafts of Senate Bill 14 with
25  anybody?

---

246

1       A.  No.
2       Q.  Did Senate Bill 14 change during the drafting
3   profess before it was filed?
4       A.  Privilege.
5           MR. SWEETEN:  I'm going to object based on
6   legislative privilege.  I think we're getting into the
7   thoughts, mental processes, impressions in furtherance
8   of legislation.
9       Q.  (By Ms. Westfall)  In drafting Senate Bill 14,
10  did you, Ms. McCoy, or anyone associated with the
11  drafting review any reports or studies?
12      A.  Privilege.
13          MR. SWEETEN:  That's -- that's subject to
14  the legislative privilege.  Objection.
15      Q.  (By Ms. Westfall)  When drafting Senate Bill 14
16  or developing the concepts for Senate Bill 14, did you
17  or Ms. McCoy conduct any analysis of how it impacted
18  voters?
19          MR. SWEETEN:  Same objection, privilege.
20      A.  Privilege.
21      Q.  (By Ms. Westfall)  Did you consider including
22  any additional forms of ID in the version of Senate Bill
23  14 that you filed?
24          MR. SWEETEN:  Objection, calls for him to
25  reveal thoughts, mental impressions, opinions about

---

247

1   legislation.  Legislative privilege.
2       Q.  (By Ms. Westfall)  Are you following the advice
3   of counsel on that?
4       A.  Why don't you ask that again?
5       Q.  Sure.  Did you consider including any
6   additional forms of ID in Senate Bill 14?
7           MR. SWEETEN:  Objection, privilege.
8       A.  Privilege.
9       Q.  (By Ms. Westfall)  In -- was this the least
10  restrictive set of forms of ID that you could include in
11  Senate Bill 14 that would achieve your objective?
12          MR. SWEETEN:  Objection, privilege.
13      A.  Privilege.
14      Q.  (By Ms. Westfall)  Did you consider allowing
15  expired forms of ID as allowable ID?
16          MR. SWEETEN:  Objection, privilege.
17  You're asking about his mental impressions and
18  considerations.
19      A.  Privilege.
20      Q.  (By Ms. Westfall)  Did you consider allowing
21  forms of ID that have expired two years prior to the
22  election rather than 60 days?
23          MR. SWEETEN:  Objection, privilege.
24      A.  Privilege.
25      Q.  (By Ms. Westfall)  If a photo ID is expired but

---

248

1   was validly issued, doesn't that prove the person is the
2   same person on the ID?
3       A.  Privilege.
4           MR. SWEETEN:  Objection, you're asking
5   about his considerations of the Senate Bill 14.  That
6   would be legislatively privileged.
7       Q.  (By Ms. Westfall)  I'm asking, as a general
8   matter, if a photo ID is expired but was validly issued,
9   doesn't that prove the person is the same person on the
10  ID, notwithstanding that it's expired?
11          MR. SWEETEN:  Objection, argumentative.
12  You can answer.  She's asking not in relation to
13  legislation, she's just asking you as a general matter.
14      A.  Why don't you ask the question again slowly?
15      Q.  (By Ms. Westfall)  Sure.  If a photo ID is
16  expired but was validly issued, why doesn't that prove
17  the person was the same person on the ID?
18      A.  The logic that is that if it's expired, it is
19  not a valid form of identification.
20      Q.  But nevertheless, when you see the person's
21  picture and you see the person next to the picture,
22  notwithstanding that it's expired, you can make a visual
23  -- a poll worker could make a visual check to affirm an
24  individual's identity; isn't that true?
25      A.  I've given my answer to the question.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

249

1    Q.  You have no further testimony on that issue?
2    A.  I've given my answer to the question.
3    Q.  How often in Texas do you have to go appear to
4  get your picture retaken for a driver's license?  Do you
5  know?
6    A.  Ask the question again.  How often --
7    Q.  -- do you have to have your picture taken for
8  your driver's license?
9    A.  I'm sorry, I don't know that.
10   Q.  Can you renew your driver's license by mail in
11 Texas in certain circumstances?
12   A.  I don't believe so.  I don't know the answer.
13   Q.  How long are driver's licenses in Texas valid
14 for?
15   A.  I don't know the answer to that.
16   Q.  Did you conduct any analysis as to how many
17 registered voters possess the required forms of ID under
18 Senate Bill 14?
19       MR. SWEETEN:  Objection, legislative
20 privilege.
21   Q.  (By Ms. Westfall)  Did you conduct any analysis
22 to determine if minority voters would be
23 disproportionately less likely to possess the forms of
24 ID required by Senate Bill 14?
25       MR. SWEETEN:  Objection, legislative

250

1  privilege.
2    A.  Privilege.
3    Q.  (By Ms. Westfall)  And Janice McCoy yesterday
4  testified that there were no studies at all with any
5  analysis of who has an ID for purposes of Senate Bill
6  14, either public or private.  Do you agree with that
7  testimony?
8        MR. SWEETEN:  Objection, calls for matters
9  that are legislatively privileged.
10   A.  Privilege.
11       MS. WESTFALL:  Ms. McCoy has testified
12 about this matter and waived the privilege.  Are you
13 going to let the witness testify on this?
14       MR. SWEETEN:  He is asserting legislative
15 privilege as to any considerations, analysis related to
16 the bill.
17   Q.  (By Ms. Westfall)  Are you surprised Ms. McCoy
18 had that testimony yesterday?
19       MR. SWEETEN:  Objection.  You're asking
20 the same question in another form.  It calls for matters
21 of legislative privilege.  It's also relevant whether
22 he's surprised.  Don't answer.
23   Q.  (By Ms. Westfall)  Are you following the advice
24 of counsel?
25   A.  Privilege.

251

1    Q.  What is a military ID?
2        MR. SWEETEN:  Asked and answered --
3    Q.  (By Ms. Westfall)  Do you know how many --
4        MR. SWEETEN:  -- objection.
5    Q.  (By Ms. Westfall)  Do you know how many --
6        THE WITNESS:  Did you --
7    Q.  (By Ms. Westfall)  -- different forms of
8  military ID --
9        MR. SWEETEN:  Yes.
10   Q.  (By Ms. Westfall)  -- are accepted --
11       (Reporter cautions everyone not to talk at
12 the same time.)
13       MS. WESTFALL:  Let's break.
14       (Recess 4:29 to 4:46 p.m.)
15   Q.  (By Ms. Westfall)  Okay.  Senator, do you know
16 what a citizenship certificate is?
17   A.  No.
18   Q.  Is it a form of ID in Senate Bill 14?
19   A.  Yes.
20   Q.  Do you have any idea how much it costs to
21 obtain a citizenship certificate?
22   A.  No.
23   Q.  Do you know how much it costs to obtain a U.S.
24 passport?
25   A.  No.

252

1    Q.  Do you know what documents you would have to
2  provide to get a U.S. passport?
3    A.  I believe a birth certificate.
4    Q.  And anything else besides a birth certificate?
5    A.  Not to my knowledge.
6    Q.  Do you know how long it takes to obtain a
7  passport?
8    A.  No.
9    Q.  Can you tell me what the purpose was of --
10 well, strike that.
11       I believe you testified earlier that
12 Senate Bill 362 allows for nonphoto ID; is that right?
13   A.  Rephrase -- re-read the question, please.
14   Q.  I believe I -- that you testified earlier that
15 Senate Bill 362 allows for the use of nonphoto ID; is
16 that right?
17   A.  The -- the legislation, as filed, had that
18 provision.
19   Q.  And Senate Bill 14 does not; is that right?
20   A.  That is correct.
21   Q.  And what was the purpose of not including in
22 Senate Bill 14 the option for a voter to show nonphoto
23 ID?
24       MR. SWEETEN:  Objection, you're asking him
25 to reveal thoughts, mental impressions, opinions about



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                              May 17, 2012

253

1   legislation, including Senate Bill 14.
2       A.  Privilege.
3           MS. WESTFALL:  Are you instructing him not
4   to answer?
5           MR. SWEETEN:  I'm instructing him not to
6   answer that specific question as to the differences
7   between the two bills and the why's and wherefore's.  He
8   can answer if you're going to ask him as to what is the
9   purpose of Senate Bill 14.  I will allow him to answer
10  that question.
11      Q.  (By Ms. Westfall) Are you aware of any
12  conversations regarding the non-inclusion of photo ID in
13  Senate Bill 14?
14          MR. SWEETEN:  You're asking about the
15  substance of conversations, and so I think that that
16  would be -- that would be privileged.  He can discuss
17  specifics of whether he had a conversation or general
18  subject matter, but I think that the way you're asking
19  it, I think you're asking for the specific subject
20  matter.
21      A.  Privilege.
22      Q.  (By Ms. Westfall) Who made the decision not to
23  include non-photo forms of ID in Senate Bill 14?
24          MR. SWEETEN:  Objection, legislative
25  privilege.

254

1       A.  Privilege.
2       Q.  (By Ms. Westfall) What changed between 2009 and
3   2011 that made two forms the non-photo ID an acceptable
4   option in 2009 but not in 2011?
5           MR. SWEETEN:  Objection, legislative
6   privilege.
7       Q.  (By Ms. Westfall) In response to a similar
8   question posed to Ms. McCoy yesterday in her deposition,
9   she testified that what happened between 2009 and 2011
10  was that things have worked out well in Indiana and
11  Georgia.  Do you agree with that statement?
12          MR. SWEETEN:  Don't reveal your thoughts,
13  mental impressions or opinions about legislation or
14  between the difference in the 2009 and 2011.  That is
15  legislatively privileged.  Do not answer.
16      A.  Privilege.
17      Q.  (By Ms. Westfall) We talked about this earlier
18  with regard to Senate Bill 362, but under Senate Bill
19  14, who is responsible for verifying the identity of the
20  voter?  Who checks the ID of the voter in Senate Bill
21  14?
22      A.  When they're voting?
23      Q.  Yes.
24      A.  That is determined by the training that is done
25  by the Secretary of State, and I think it would be

255

1   improper for me to speculate what that is.
2       Q.  What are the standards governing how a poll
3   worker administers the -- the photo ID requirement under
4   Senate Bill 14?
5       A.  Those standards are set by the Secretary of
6   State.
7       Q.  And would you agree that those standards are
8   very important for the success and fulfillment of the
9   purpose of Senate Bill 14 you earlier testified about?
10          MR. SWEETEN:  I'm going to object to the
11  extent you're asking for him to reveal thoughts, mental
12  impressions, or opinions about legislation or
13  furtherance of the legislative process.
14      A.  Privilege.
15      Q.  (By Ms. Westfall) There are no standards
16  governing how the ID requirement is administered in
17  Senate Bill 14; isn't that right?
18          MR. SWEETEN:  Objection, privilege.  Are
19  you asking about the text of the bill, Counsel?
20          MS. WESTFALL:  I'm asking about the face
21  of the statute.
22          MR. SWEETEN:  Okay, if you're asking about
23  the face of the statute, he can answer the question.
24      A.  We gave that authority to set that to the
25  Secretary of State.

256

1       Q.  (By Ms. Westfall) So, in other words, it's not
2   -- it's not in the face of the statute; is that correct?
3   Would you agree with that?
4       A.  We -- we did not set to micro-manage.  We said
5   to ask the Secretary of State to determine that.
6       Q.  I want to answer.  I know it's late in the day,
7   but I want you to listen carefully to my question.  Is
8   there anything in Senate Bill 14 that -- that sets the
9   standards for how poll workers are to administer the
10  photo ID requirement in the this -- in this law?
11      A.  No.
12      Q.  Thank you.
13          What was the purpose of removing, and not
14  including from Senate Bill 14, the option for a voter to
15  show a state or federal issued photo ID, as you did
16  include in Senate Bill 362?
17          MR. SWEETEN:  You're asking him to compare
18  and contrast bills from 2009 and 2011 which would
19  necessarily reveal his thoughts, mental impressions, and
20  opinions about legislation or furtherance of the
21  legislative process and is therefore privileged.
22  Objection.
23      A.  Privilege.
24      Q.  (By Ms. Westfall) Are there any circumstances
25  in election administration, problems with the election



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                                May 17, 2012

257

1  administration, et cetera, between 2009 and 2011, that
2  caused to you make this change?
3          MR. SWEETEN: I'm going to object, you're
4  asking for his thoughts and mental impressions,
5  privilege.
6      A.  Privilege.
7      Q.  (By Ms. Westfall) How would allowing the use of
8  state or federal issued photo ID prevent the goal in
9  Senate Bill 14 of ensuring election integrity?
10         MR. SWEETEN: Objection, legislative
11 privilege.
12     A.  Privilege.
13     Q.  (By Ms. Westfall) Are you aware that the
14 Indiana photo ID law allowed for the use of state issued
15 photo ID?
16         MR. SWEETEN: Objection, you're asking him
17 to reveal his thoughts, mental impressions, opinions
18 about legislation and furtherance of the process;
19 therefore, it would be privilege.
20     Q.  (By Ms. Westfall) What was the purpose of not
21 including in Senate Bill 14 the option for a voter to
22 show a valid employee ID as was included in the Senate
23 Bill 362?
24         MR. SWEETEN: Objection, you're asking him
25 to compare 2009 to 2011. He will answer the question of

259

1  identification certificate?
2      A.  Not to my knowledge.
3      Q.  Not on the Floor?
4      A.  Again, I -- not to my recollection.
5      Q.  Did you conduct any analysis of the process for
6  obtaining election identification certificate?
7          MR. SWEETEN: Do not reveal your thoughts,
8  mental impressions, or opinions or -- about legislation
9  or furtherance of the legislation process --
10     A.  Privilege.
11         MR. SWEETEN: -- legislative privilege.
12     Q.  (By Ms. Westfall) What were the circumstances
13 under which a license to carry a concealed handgun were
14 included in Senate Bill 14?
15         MR. SWEETEN: Do not answer, it's asking a
16 legislative privilege.
17     A.  Privilege.
18     Q.  (By Ms. Westfall) Do you know the racial
19 composition of license to carry license holders?
20         MR. SWEETEN: Objection, you're asking for
21 matters covered by the legislative privilege.
22         MS. WESTFALL: I'm asking him as a matter
23 of general knowledge, not -- not related to a
24 legislative act.
25         MR. SWEETEN: Okay. So this is not in

258

1  what is the purpose of Senate Bill 14, but to ask him to
2  compare and contrast provisions that were or were not in
3  those two statutes is asking him to reveal the thoughts,
4  mental impressions, and opinions about the legislation.
5      Q.  (By Ms. Westfall) Is there a provision included
6  in Senate Bill 14 related to an election identification
7  certificate?
8          MR. SWEETEN: You can answer.
9      A.  Would you restate the question?
10     Q.  (By Ms. Westfall) Certainly. Is there a
11 provision in Senate Bill 14 that would allow for the use
12 of an election identification certificate for persons
13 who do not have allowable forms of ID under Senate Bill
14 14?
15     A.  SB 14 provides that an elections identification
16 certificate may not be used or accepted as a personal
17 identification certificate.
18     Q.  Did any legislators -- strike that.
19         Did you -- are you aware of any
20 conversations with anyone about concerns about the
21 ability to obtain an election identification
22 certificate?
23     A.  No.
24     Q.  Did anyone express concern about their
25 constituents having difficulty obtaining an election

260

1  relation to his analysis or review of legislation.
2  You're asking him, now as he sits here, is he aware of
3  this -- of this piece of information.
4          You can answer that question.
5      A.  I'm not aware.
6      Q.  (By Ms. Westfall) Is it -- is the racial
7  composition of license to carry license holders
8  disproportionately white relative to Texas registered
9  voters?
10     A.  I'm not -- I'm not aware of the percentage.
11     Q.  Are you aware of any conversations about the
12 racial composition of licensed to carry holders?
13     A.  No.
14     Q.  How did the exception for individuals with
15 disabilities come to be included in Senate Bill 14?
16         MR. SWEETEN: Objection, legislative
17 privilege.
18     A.  Privilege.
19     Q.  (By Ms. Westfall) How did the exception for
20 individuals with religious objections to being
21 photographed come in -- come to be included in Senate
22 Bill 14?
23         MR. SWEETEN: Objection, legislative
24 privilege.
25     Q.  (By Ms. Westfall) Why is it that some changes



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

261

1   in response to some concerns were taken into account and
2   others were not?
3           MR. SWEETEN: Objection, legislative
4   privilege.
5       Q.  (By Ms. Westfall) The legislature made
6   modifications to Senate Bill 14 for persons with
7   disabilities, is that right, on the face of the bill?
8           MR. SWEETEN: You can answer.
9       A.  Reread.
10      Q.  (By Ms. Westfall) The legislation made
11  modifications to Senate Bill 14 to accommodate the
12  interests of persons with disabilities; isn't that
13  right?
14          MR. SWEETEN: Well, now you threw in
15  "accommodate people with disabilities." I think if you
16  want to ask him a question about the text of the bill,
17  you can you ask him whether it's there or not, but not
18  -- you're starting to get into thoughts, mental
19  impressions, opinions with that question.
20          MS. WESTFALL: Are you invoking privilege?
21          MR. SWEETEN: I don't think I objected to
22  the first question, but then the second, the way you
23  worded it, I think you --
24      Q.  (By Ms. Westfall) Why didn't you answer the
25  first question then, since your counsel is --

262

1       A.  Would you repeat the first question?
2       Q.  The legislature made modifications to Senate
3   Bill 14 for persons with disabilities, did they not?
4       A.  Would you reference the part of the bill that
5   does that?
6       Q.  Certainly.
7           MR. SWEETEN: Okay. You're saying "for
8   individuals." If you're asking him does the text say
9   this, I'm fine with him answering that question, but if
10  you're asking him why was it made, I think that's
11  objectionable, legislative privilege.
12      Q.  (By Ms. Westfall) I refer you to Exhibit 5 at
13  Section 1, Senator.
14          MR. SWEETEN: This is 5. -- yeah, that's
15  5.
16      Q.  (By Ms. Westfall) Where it indicates --
17      A.  5, Section 1?
18      Q.  Exhibit 5, Senate Bill 14, at -- at Section 1
19  on Page 1. There is, is there not, an exemption for
20  persons with disabilities that provide certain written
21  documentation from federal agencies; is that correct?
22      A.  Yes.
23      Q.  And this is a provision, wouldn't you agree,
24  that is helpful for certain persons that have
25  disabilities in having an exemption from the bill, isn't

263

1   that correct, on the face of the statute?
2       A.  Yes.
3       Q.  Likewise, turning to your attention to the
4   provisional ballot section of Senate Bill 14 which is on
5   Page 11 at Section 17 of the bill, do you see that?
6   There is a provision related to persons who have
7   religious objections to being photographed; isn't that
8   correct?
9       A.  On Page 11?
10      Q.  On Page 12, sorry. It starts on Page 11. Do
11  you see that?
12      A.  Yes.
13      Q.  And -- and this provision indicates that if a
14  person casts a provisional ballot and is eligible to
15  vote in the election but doesn't have ID because a
16  person -- and consequently casts a provisional ballot,
17  that the ballot will be counted if the voter signs an
18  affidavit indicating a religious objection to being
19  photographed, isn't that correct, on the face of the
20  statute?
21          MR. SWEETEN: You can answer.
22      A.  Yes.
23      Q.  (By Ms. Westfall) And this is a helpful
24  provision for people who have religious beliefs and
25  objections to being photographed; isn't that right?

264

1           THE WITNESS: She's asking my opinion?
2           MR. SWEETEN: Yeah.
3       Q.  (By Ms. Westfall) On the face of the statute.
4       A.  The statute states very clearly what it -- it
5   does.
6       Q.  Did the legislature make any modifications to
7   Senate Bill 14 based on concerns pertaining to racial
8   and ethnic minorities?
9           MR. SWEETEN: Objection, legislative
10  privilege.
11      A.  Privilege.
12      Q.  Could you -- strike that.
13          During the drafting or legislature's
14  consideration of Senate Bill 14, was there any analysis
15  of the costs or steps that a voter would need to take to
16  obtain an election identification certificate?
17          MR. SWEETEN: I'm going to object based
18  upon privilege. You're free to refer to matters of the
19  public record.
20      A.  Privilege.
21      Q.  (By Ms. Westfall) Do you know -- do you know
22  what documents are needed under Senate Bill 14 on the
23  face of the statute to obtain an election identification
24  certificate? Directing your attention to Section 20 on
25  Page 13.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                              May 17, 2012

265

1     A.  That they -- they must state that they're --
2   the person must sign a certificate for the purpose of
3   satisfying Section 63.001(b) of the election code and
4   does not have another form of identification.
5     Q.  Is it -- is it your recollection that, and
6   based on public record, based on the code, based on the
7   regulations, that the Secretary of State was responsible
8   for identifying the documents needed to obtain an
9   election identification certificate?
10    A.  It says the department may develop -- may
11  cooperate with Secretary of State in developing the form
12  and appearance of an election identification
13  certificate.
14    Q.  So you agree that it's a responsibility of the
15  Secretary of State; is that what the statute says?
16    A.  No.  It says the department may cooperate with
17  the Secretary of State in developing the form and
18  appearance of an election certificate.
19    Q.  Okay.  Thank you.
20        Do you know how much it costs to obtain
21  the documents necessary to get an election
22  identification certificate under Senate Bill 14 and
23  associated regulations?
24    A.  No.
25    Q.  And if the documents needed to get the election

266

1   identification certificate are not themselves free, is
2   there a cost associated with obtaining election
3   identification certificates?
4     A.  I don't know.
5     Q.  Where does one obtain an election
6   identification certificate?
7     A.  I don't know.
8     Q.  And when are those offices open?
9     A.  I don't know.
10    Q.  Does one obtain them at the driver's license
11  office in Texas?
12        MR. SWEETEN:  Objection.  He's indicated
13  that he doesn't know the answer, so asked and answered.
14    Q.  (By Ms. Westfall)  What was the -- I know we've
15  -- you've testified about the purpose of previous voter
16  ID bills that you've introduced, but what was the
17  purpose, each and every purpose, of Senate Bill 14?
18    A.  The purpose of Senate Bill 14 was to ensure the
19  integrity of the ballot box.
20    Q.  Anything else?
21    A.  No.
22    Q.  Pardon?
23    A.  (Witness shakes head no.)
24    Q.  What is the basis for your assertion that the
25  purpose was to ensure integrity of the ballot box?

267

1     A.  Privilege.
2         MR. SWEETEN:  That's -- that's -- now
3   you're asking him, beyond what the purpose is, you're
4   asking him to reveal his thoughts, mental impressions or
5   opinions and his subjective intent in that question.  So
6   he's answered what the purpose is.  I think that you're
7   now going in to matters that are matters protected by
8   the legislative privilege.
9     Q.  (By Ms. Westfall)  How would Senate Bill 14
10  ensure integrity of the ballot box?
11        MR. SWEETEN:  Same objection.
12    Q.  For the record, are you asserting privilege?
13    A.  Privilege.
14        MR. SWEETEN:  Objection, privilege.
15    Q.  (By Ms. Westfall)  Is there a need in Texas to
16  take measures legislatively to ensure integrity at the
17  ballot box?
18        MR. SWEETEN:  Same objection.
19    A.  Privilege.
20    Q.  Are there any facts, that you're aware of
21  sitting here today, that -- that there's a lack of
22  integrity at the ballot box in Texas?
23        MR. SWEETEN:  Same objection, calls for
24  matters that are covered by the legislative privilege.
25    A.  Privilege.

268

1     Q.  (By Ms. Westfall)  Yesterday your chief of
2   staff, when asked this question, testified that the
3   purpose of Senate Bill 14 was both election integrity
4   and to prevent in-person voter fraud.  Today, when I
5   asked you the similar question, you did not mention
6   in-person voter fraud.  Is it your testimony that
7   preventing in-person voter fraud is not a purpose of
8   Senate Bill 14, as you sit here today?
9         MR. SWEETEN:  This has been asked, this
10  has been answered.  He has -- he has answered the
11  question, but -- and also objection, assumes facts not
12  in evidence.  Nevertheless, if you want to go ahead and
13  answer, you can.
14    A.  Ask the question again.
15    Q.  (By Ms. Westfall)  Is the purpose of Senate Bill
16  14 also to prevent in-person voter fraud and
17  impersonation?
18    A.  The purpose of the bill is to protect the
19  integrity of the ballot box.
20    Q.  (By Mr. Westfall)  So is your answer no?
21    A.  The purpose of the bill is to protect the
22  integrity of the ballot box.
23        MS. WESTFALL:  Mr. Sweeten, did you have
24  chance during the break to counsel your client about
25  answering the question?  Otherwise, unless it is a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

269

1 privileged question, that for which you are asserting
2 privilege, instructing your client not to answer, your
3 client could be -- if we prevail in a motion to compel,
4 could be brought back and asked the same question again.
5 Did you do that, sir?
6        MR. SWEETEN: Well, I mean, number one,
7 I'm not going tell you what I told my client. So I'm
8 not going to reveal that.
9        MS. WESTFALL: Okay, fair point.
10       MR. SWEETEN: No, no. But nevertheless,
11 if you can answer that question, just, I mean -- or we
12 can talk about for it second. But as to what is the
13 purpose of the legislation, I think you've answered what
14 it is, but if you can just answer that second question.
15    Q. (By Ms. Westfall) Is -- Ms. McCoy testified
16 yesterday that part of the purpose of Senate Bill 14 was
17 to prevent in-person voter fraud. Is that -- are you --
18 is preventing in-person voter fraud part of the purpose
19 of Senate Bill 14, in your mind?
20    A. Yes.
21    Q. Is any part the purpose of Senate Bill 14,
22 private or public, to decrease the number of Hispanic
23 voters?
24       THE WITNESS: Answer that?
25       MR. SWEETEN: You can answer what the

270

1 purpose of the bill is.
2    A. No.
3    Q. (By Ms. Westfall) Are you aware of any
4 conversations about the purpose of Senate Bill 14 being
5 to decrease the number of Hispanic voters?
6        MR. SWEETEN: Okay, he's not going to
7 answer that question. You're asking for matters that
8 are covered by the legislative privilege.
9        I'm instructing you not to answer that
10 question.
11       MS. WESTFALL: Mr. Sweeten, I believe I'm
12 allowed to ask foundational questions about any
13 conversations related to that purpose, pursuant to
14 Paragraph 2 of the order entered today by the Court. Do
15 you disagree?
16       MR. SWEETEN: Do you want to cite for me
17 where you -- where you think that that would allow that
18 question?
19       MS. WESTFALL: The final -- the final
20 sentence of the Order.
21       MR. SWEETEN: Okay. Let's go to -- I need
22 Paragraph 1.
23       Actually, Counsel, your -- your question,
24 as I have said on several occasions, and I think we've
25 on most occasions you've been able to move beyond that,

271

1 your questions suggests more than a general subject
2 matter of a communication. You're talking about very
3 specific information in a conversation, which would
4 require him to reveal legislative privilege. If you
5 want to ask it in another way, you know, that -- that
6 adheres to the Court's Order, which is the nature or
7 general subject matter of the communication, I won't
8 have any objection. And all day -- let me also say for
9 the record, that all day I have allowed you to ask all
10 of this information about communications. I think would
11 you agree with that. And I -- and I -- so I will allow
12 you to do that, but I think the way you phrased that
13 question, it's too specific, it's too -- it's too much
14 into the substance of a potential conversation for him
15 to be able to answer that question.
16       MS. WESTFALL: Okay. Well, as to my
17 original question as to whether any part the purpose of
18 Senate Bill 14 was to decrease the number of Hispanic
19 voters, this Order indicates that I'm allowed to examine
20 witnesses as to the purpose, as the witness understands
21 it today, including public information and private
22 information. So could you make sure that -- or
23 information outside of the public record. So could --
24 could you make sure that -- that your client is fully
25 answering the question about whether -- and I'll pose it

272

1 again, was there any part of the purpose of Senate Bill
2 14 that was to decrease the number the Hispanic voters.
3        MR. SWEETEN: Okay. You can -- you can
4 answer that based upon, as she said, based on the public
5 -- or public record or based upon your view of the
6 purpose of the bill, you can tell her what the purpose
7 of Senate Bill 14 was.
8    A. The purpose of the bill was to preserve the
9 integrity of the ballot box.
10   Q. (By Ms. Westfall) So in answer to my question,
11 are you answering no, that no part of the purpose of
12 Senate Bill 14 was to decrease the number of Hispanic
13 voters? Is that your testimony today?
14       MR. SWEETEN: You can answer that.
15   A. I'm answering that the purpose of the bill was
16 to preserve the integrity of the ballot box.
17       MS. WESTFALL: Okay, Mr. Sweeten --
18       MR. SWEETEN: You can ask -- you can
19 answer the converse of that, as she's asking it. Was --
20   A. Ask the question again.
21   Q. (By Ms. Westfall) Was any part of the purpose
22 of Senate Bill 14 to decrease the number of Hispanic
23 voters?
24   A. No.
25   Q. Was any part of the purpose of Senate Bill 14



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

273

1   to decrease the number of any other group of minority
2   voters?
3      A.  No.
4      Q.  Was any part of the purpose of Senate Bill 14
5   to discriminate in any way against any group or groups
6   of minority voters?
7      A.  No.
8      Q.  And I want to -- do you understand that the
9   last three questions that I've asked pertained to the
10  purpose, as you understand it, both from the public
11  record of the consideration of Senate Bill 14 and
12  outside of the public record?  Do you understand that?
13     A.  No.
14     Q.  You don't understand that?
15         MR. SWEETEN:  I -- I think, when you
16  prefaced the question, I told him both.
17         And so I think that -- I mean, she's --
18  she's just asking what is the purpose of the bill based
19  on matters of -- based on your understanding of the bill
20  and based on matters of the public record, both, what is
21  the purpose of the bill.  So in answering --
22         THE WITNESS:  I responded to --
23         MR. SWEETEN:  She's -- she's now answering
24  -- she's now asking you, in those three questions where
25  you said, "no," on all three of those, was that part of

274

1   the -- are you using both your understanding of the bill
2   as well as the matters of the public record in answering
3   the question?
4      A.  Yes.
5      Q.  (By Ms. Westfall) That is correct?
6      A.  Yes.
7      Q.  Thank you.  Was any part of the purpose of
8   Senate Bill 14, either on the public record or outside
9   the public record, for partisan purposes?
10     A.  No.
11     Q.  Was any part of the purpose of Senate Bill 14
12  to depress the participation of registered Democrats in
13  elections?
14     A.  No.
15     Q.  How do you know that?
16         MR. SWEETEN:  Objection, that asks for him
17  to go in to his -- or reveal his thoughts, mental
18  impressions, opinions as well as communications that
19  he's had regarding the issue.
20     Q.  (By Ms. Westfall) Did the purposes of photo ID
21  in Texas from 2005 to 2007 to 2009 to 2011, evolve over
22  time and between legislative sessions?
23         MR. SWEETEN:  I'm going to object.  I
24  think that calls for matters -- you're asking the
25  differences between bills.  I think that calls for

275

1   matters that would reveal his thoughts, mental
2   impressions, opinions about the legislation.  We have,
3   for the record, let you ask as to the purpose of each of
4   those bills and the answer has been consistent on that
5   issue, so --
6          MS. WESTFALL:  I appreciate --
7          MR. SWEETEN:  -- we're not going to let
8   him --
9          MS. WESTFALL:  I appreciate your
10  testimony, but we're here to --
11         MR. SWEETEN:  Elizabeth, I'm trying to
12  make sure the record is clear.  We've got complicated
13  privilege issues, we've got court orders that we're --
14  we're both trying to give the utmost consideration to,
15  and I have at all times done so today.  And I'm trying
16  to make sure that the record here is clear about what
17  we're discussing.
18     A.  Privilege.
19     Q.  (By Ms. Westfall) Was one of the purposes of
20  Senate Bill 14 -- strike that.
21         Was one of the purposes of previous photo
22  bill -- ID bills before Senate Bill 14 to prevent
23  non-citizens from voting?
24         MR. SWEETEN:  I think these questions have
25  been asked and answered all throughout the day.  I think

276

1   he has told you on each singular bill what the purpose
2   of it was.  So if you're now asking him as a whole, as a
3   group, I think the very same question, I'm going allow
4   you to answer it, but we're not going to keep -- we're
5   not going to keep, you know, there's no point in
6   continuing to go back and do this.  You're starting --
7   this is starting to be harassing of this witness.
8          So I'm going let you go ahead and answer
9   her question.  I'm going ask the court reporter could
10  read it back.
11     A.  And I'm going to claim privilege on that
12  question.
13         MR. SWEETEN:  Well, let -- I'm going to
14  have a discussion with -- with him regarding the issue
15  of privilege and we'll --
16         Can you read the question back?
17         (The requested portion was read by the
18  reporter.)
19         MR. SWEETEN:  Okay.  Now, I -- I think I
20  see what the problem is.  You're asking about bills that
21  other people filed.  You're asking about bills that --
22  that were never passed.  You're asking all of these in
23  one loaded question.  And some of this would reveal his
24  mental impressions and thoughts about the bills.  I will
25  let him, as to the legislation that you've already



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                                  May 17, 2012

---

277

1  asked, I will let him answer the -- what the purpose of
2  those bills was.  He -- which he's -- which he's done.
3  And if you want to go through those bills and ask that
4  specific question, I think that -- that we would let him
5  do that.
6          He's also indicated he'd like to discuss,
7  so I think there may be some matters of privilege that
8  he's concerned about and wants to discuss with me, so
9  would ask for a short --
10         MS. WESTFALL:  Would you like a recess?
11         MR. SWEETEN:  Yeah, I'd like a recess.
12         MS. WESTFALL:  Before we go off the
13  record, I do want to take objection with your accusation
14  that I'm harassing your witness.  I am trying to get
15  through the outline as rapidly as possible.  All the
16  questions are relevant under Arlington Heights,
17  Mr. Sweeten.  And I'm going through the bills, some of
18  the questions repeat from bill to bill, but this is all
19  within the scope of relevance.  And I don't think you
20  have taken objection to any of the relevance of the
21  questions that I have asked.
22         MR. SWEETEN:  Well, I've tried to make it
23  clear that I think we've -- I've -- we've had all day to
24  let you -- let him answer the question of purpose.  And
25  I think for you to continue to go back to the same issue

---

278

1  I think is causing difficulty here.
2          MS. WESTFALL:  Mr. Sweeten, I'm asking
3  about purposes for different bills.  We cannot assume
4  that purpose for each bill is different from year-to-
5  year, and I have a right to examine on different bills
6  and different -- and the purposes.  And now we're on
7  Senate Bill 14, which is the subject of this litigation.
8          MR. SWEETEN:  And he has completely
9  answered what the purpose is of Senate Bill 14.  I mean,
10 ad nauseam he's answered that question.
11         MS. WESTFALL:  Why don't you just take a
12 recess.
13         (Recess from 5:20 to 5:33 p.m.)
14 Q.  (By Ms. Westfall)  So I believe you testified
15 that the purpose of Senate Bill 14 was to restore
16 confidence or electoral integrity or something along
17 those lines; is that right?
18 A.  Restore the integrity of the ballot box or
19 protect the integrity of the ballot box.
20 Q.  Has Texas ever had a photo ID requirement prior
21 to the enactment of Senate Bill 14?
22 A.  No.
23 Q.  What do you mean by "restoring confidence" in
24 the system?
25 A.  Our goal --

---

279

1          MR. SWEETEN:  I'm going to object to the
2  extent you're now going into having him reveal thoughts,
3  mental impressions or opinions about legislation, and
4  that would be subject to legislative privilege.
5  A.  Privilege.
6          MR. SWEETEN:  It also misstates his
7  testimony.
8  Q.  (By Ms. Westfall)  Has anyone ever told you
9  they wouldn't vote because they were concerned that
10 voter fraud would cancel out their vote?
11         MR. SWEETEN:  Don't reveal matters of
12 legislative privilege.
13 A.  Privilege.
14 Q.  (By Ms. Westfall)  Are you aware of any
15 conversations regarding anyone saying they wouldn't vote
16 because they were concerned that voter fraud would
17 cancel out their vote?
18 A.  No.
19 Q.  Would a registered voter, who has voted in
20 previous elections who was refused a regular ballot
21 because of this law, still have confidence in the voting
22 system in Texas?
23         MR. SWEETEN:  Objection, you're asking him
24 to reveal his thoughts, mental impressions or opinions
25 about legislation.  Privilege.

---

280

1  A.  Privilege.
2  Q.  (By Ms. Westfall)  How about a student who has
3  an ID from the University of Texas, and that's the sole
4  ID that he or she has, would that person have a level of
5  confidence in Texas's voting system under this law?
6          MR. SWEETEN:  Objection, legislative
7  privilege.
8  A.  Privilege.
9  Q.  (By Ms. Westfall)  What about the person who
10 has to take time off from work and go to a DPS office,
11 Department of Public Safety office or driver's license
12 office, to get an election identification certificate,
13 would that person have confidence in the system?
14         MR. SWEETEN:  Same objection.
15 A.  Privilege.
16 Q.  (By Ms. Westfall)  What about a person who has
17 to wait to get a copy of a birth certificate or a copy
18 of a court order in order to get ID to vote under Senate
19 Bill 14, would that person have confidence in the
20 system?
21         MR. SWEETEN:  Again, you're asking him to
22 reveal his thoughts or mental impressions about
23 legislation.  Objection, privilege.
24 A.  Privilege.
25 Q.  (By Ms. Westfall)  Did you in any part intend

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

281

1   that SB 14 would be designed to increase voter turnout
2   in the state of Texas?
3           MR. SWEETEN:  The question was, did he
4   what?
5   Q.   (By Ms. Westfall)  Is SB 14 designed or does it
6   have any purpose to increase voter turnout in the state
7   of Texas?
8   A.   The purpose of the bill was to protect the
9   integrity of the ballot box.
10  Q.   So I take it the answer is no?
11  A.   The answer is that we designed the bill to
12  protect the integrity of the ballot box.
13  Q.   And that's the sole reason you testified about
14  today; is that correct?
15  A.   That was our -- yes, that's the reason, yes.
16  Q.   Thank you.
17          During -- do you remember Floor
18  consideration of Senate Bill 14?
19  A.   Floor consideration?
20  Q.   Yes.
21  A.   Do I remember?
22  Q.   Yes.
23  A.   Some month.
24  Q.   Yes.  Did you answer many, many, many questions
25  about the bill by saying you were not advised?  Is that

282

1   right?  Do you remember that?
2           MR. SWEETEN:  Objection,
3   argumentative.  Objection, vague.  Go ahead.
4   Q.   (By Ms. Westfall)  You may answer.
5           MR. SWEETEN:  You can answer.  It's about
6   the public record.
7   A.   No, I did not answer many, many, many
8   questions.
9   Q.   How about dozens of questions?
10  A.   Probably dozens of questions.
11  Q.   And what did you mean by "I am not advised"?
12          MR. SWEETEN:  I'm going to object.  You're
13  asking what he meant by "I'm not advised," that he said
14  dozens of times.  So how would he possibly -- given the
15  context of that, there's no way he can answer that
16  question.
17  Q.   (By Ms. Westfall)  Do you understand the
18  question?
19  A.   Yes.
20  Q.   What did you mean by "I am not advised"?
21  A.   I'll be glad, if you've give me specific
22  examples of a question, and then I'll tell you, if it
23  applies, why I answered that way.
24  Q.   Okay.  Well, we can go through that maybe at a
25  later time.

283

1           Janice McCoy testified yesterday that it
2   was her view that "I'm not advised" means "I don't
3   know."  Do you agree with that testimony by Ms. McCoy?
4           MR. SWEETEN:  Same objection to the
5   question.  You can answer to the extent you can.
6   A.   Privilege.
7           (Exhibit 47 marked for identification.)
8   Q.   (By Ms. Westfall)  You've just been handed
9   Exhibit 47.  Do you recognize this document?
10  A.   Appears to be the Senate Journal of the fifth
11  day, Wednesday, January the 26th.
12  Q.   Thank you.  And on this day, did the Senate
13  consider floor amendments to Senate Bill 14?
14  A.   I believe we did the second reading, which
15  would include the amendments.
16  Q.   Thank you.
17          And could I direct your attention to Page
18  119 of this document?
19  A.   Okay.
20  Q.   Turning your attention to Amendment 13, do you
21  recall that Senator Davis introduced an amendment to
22  include a provision in Senate Bill 14 that would allow
23  individuals to use an ID that is unexpired or has
24  expired at some time since the last general election?
25  Do you recall that amendment?

284

1   A.   Yes.
2   Q.   Are you aware of whether the Indiana photo ID
3   law includes such a provision in its photo ID law?
4   A.   I don't know.
5   Q.   And did you move to table this amendment?
6   A.   Yes.
7   Q.   And why did you move to table this amendment?
8           MR. SWEETEN:  Objection, legislative
9   privilege.
10  Q.   (By Ms. Westfall)  Bear with me.  Could you
11  turn your attention to Page 130 at Floor Amendment
12  Number 30.
13  A.   I don't believe I have 130.
14  Q.   130.
15          MR. SWEETEN:  Page 130, it's up here on
16  the left of the page numbers here.
17          MS. WESTFALL:  Yeah.  You may want to take
18  off the clip.
19          MR. SWEETEN:  Yeah.  There's 130 right
20  there.
21          MS. WESTFALL:  Thank you, Mr. Sweeten.
22  Q.   (By Ms. Westfall)  Directing your attention to
23  Floor Amendment Number 30, do you recall that Senator
24  Ellis introduced an amendment or offered an amendment to
25  Senate Bill 14 that would have required the Secretary of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                   May 17, 2012

285

1  State to conduct a study that would have included
2  information about the number of eligible voters who are
3  prevented from voting or had to vote provisionally
4  because of a lack of identification and an analysis of
5  this group by race?
6      A.  Is there a question there?
7      Q.  Yes.  Do you recall this amendment?
8      A.  Yes.
9      Q.  Did you vote to table this amendment introduced
10 by Senator Ellis?
11     A.  Yes.
12     Q.  Why would conducting a study have interfered
13 with the purpose that you have described in enacting
14 Senate Bill 14?
15         MR. SWEETEN:  Objection, legislative
16 privilege.
17     A.  Privilege.
18     Q.  (By Ms. Westfall)  Were you concerned that such
19 a study would show that minorities are
20 disproportionately impacted by Senate Bill 14?
21         MR. SWEETEN:  Objection, legislative
22 privilege.
23     A.  Privilege.
24     Q.  (By Ms. Westfall)  Turning your attention to
25 Page 118, turning your attention to Floor Amendment

286

1  Number 12 listed on Page 118, do you see that?
2      A.  Okay.
3      Q.  Do you recall that Senator Davis introduced an
4  amendment to prohibit state agencies from charging fees
5  for the issuance of any acceptable form of photo ID
6  under Senate Bill 14 or for the underlying documents
7  that may be required to obtain an acceptable form of ID?
8      A.  Yes.
9      Q.  Did you move to table this amendment?
10     A.  Yes.
11     Q.  How would this amendment have interfered with
12 the stated purpose of enacting Senate Bill 14, which was
13 to ensure integrity of the ballot box?
14         MR. SWEETEN:  Objection, legislative
15 privilege.
16     A.  Privilege.
17     Q.  (By Ms. Westfall)  Why did you vote to table
18 this amendment?
19         MR. SWEETEN:  Objection, legislative
20 privilege.
21     A.  Privilege.
22     Q.  (By Ms. Westfall)  Turning your attention to
23 Page 137.  Are you on Page 137, sir?
24     A.  Uh-huh.
25     Q.  Do you see Floor Amendment Number 40?

287

1      A.  Uh-huh.
2      Q.  Did this amendment allow for the counting of
3  provisional ballots of voters who are indigent and
4  unable to obtain ID because of cost?  Do you recall this
5  amendment?
6      A.  I don't believe it is as you described it, no.
7      Q.  How would you describe it?
8      A.  It is as it's laid out.
9      Q.  Are you aware of whether the Indiana photo ID
10 requirement allows for the counting of provisional
11 ballots of someone who is indigent and unable to obtain
12 photo ID because of the cost of that ID?
13     A.  No.
14     Q.  Did you vote to table this amendment?  Sir, is
15 your vote on this amendment recorded in the Senate
16 Journal or no?
17     A.  You're a step ahead of yourself.
18     Q.  Oh?
19     A.  She offered an amendment to the deal, so the
20 motion was to table the amended motion.
21     Q.  And how did you vote on that motion?
22     A.  Voted to table.
23     Q.  Why did you do that?
24         MR. SWEETEN:  Oh.  Objection, legislative
25 privilege.

288

1      A.  Privilege.
2      Q.  (By Ms. Westfall)  How would including this
3  provision in Senate Bill 14 have interfered with the
4  accomplishment of the goals of your legislation?
5          MR. SWEETEN:  Same objection, legislative
6  privilege.
7      A.  Privilege.
8      Q.  (By Ms. Westfall)  Turning your attention now
9  to Page 129, turning your attention to Floor Amendment
10 29, do you see that.
11     A.  Uh-huh.
12     Q.  Yes?
13     A.  Yes.
14     Q.  Did Senator Gallegos offer an amendment that
15 would have required driver license offices to be open
16 until 7 p.m. one week day and during four or more hours
17 on at least two Saturdays per month?
18     A.  Yes.
19     Q.  Did you move to table this amendment?
20     A.  Yes.
21     Q.  How would this amendment have harmed the
22 ability of Texas to deter and -- deter and detect a -- a
23 voter fraud?
24         MR. SWEETEN:  Objection, legislative
25 privilege.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                      May 17, 2012

289

1    A. Privilege.
2    Q. (By Ms. Westfall) Do you have any concern that
3    individuals who work an hourly wage may have a difficult
4    time in getting to a driver's license office during
5    business hours?
6         MR. SWEETEN: Objection, legislative
7    privilege.
8    A. Privilege.
9         MS. WESTFALL: Can we go off the record
10   for one moment?
11        MR. SWEETEN: No objection.
12        (Discussion off the record.)
13        (Exhibit 48 marked for identification.)
14        MS. WESTFALL: Back on the record.
15   Q. (By Ms. Westfall) I'm handing you what's been
16   — oh, go ahead.
17        MR. SWEETEN: I'm sorry.
18   Q. (By Ms. Westfall) I'm handing you what's been
19   marked as US Exhibit 48. Do you recognize This
20   document?
21   A. Appears to be from the Texas Tribune.
22   Q. Have you seen this article before?
23   A. I read it last night.
24   Q. Wonderful. Could you turn your attention to
25   the second page of the document?

290

1    A. Okay.
2    Q. And do you see at the top of the page that
3    there are some quotations from you, attributed to you,
4    concerning the Justice Department's rejection of Texas
5    voter ID law, as you phrase it? Do you see that?
6    A. Yes.
7    Q. And do you see that you cite a Lighthouse
8    opinion, polling and research poll, in the middle of the
9    page?
10   A. Yes.
11   Q. In your view, does public support for Senate
12   Bill 14 have anything to do with its purpose, as you
13   stated and testified today?
14        MR. SWEETEN: Don't reveal matters of
15   legislative privilege. You can refer to matters of
16   public records and public statements.
17        MS. WESTFALL: Mr. Sweeten, this is in the
18   public record.
19        MR. SWEETEN: What are you specifically
20   asking him?
21        MS. WESTFALL: Well, my question stands.
22        MR. SWEETEN: Can you read the question
23   back, please?
24        (Record read back.)
25   Q. (By Ms. Westfall) Do you have a question about

291

1    the question, sir?
2         MS. WESTFALL: Or you, Mr. Sweeten?
3         MR. SWEETEN: Objection, calls for
4    speculation. You can answer to the extent you know.
5    Q. (By Ms. Westfall) Do you know?
6    A. The question — repeat the question again.
7         MS. WESTFALL: Could you repeat the
8    question, court reporter.
9         (Record read back again.)
10        MR. SWEETEN: Objection, vague. Go ahead.
11   A. The purpose of the bill still is to protect the
12   integrity of voting, and public support is certainly —
13   it's good that we have that.
14   Q. (By Ms. Westfall) If it was unpopular, would
15   you still have moved forward with Senate Bill 14?
16        MR. SWEETEN: Objection. You're now
17   asking about his thoughts, mental impressions or
18   opinions about legislation. It's legislatively
19   privileged.
20   A. Privilege.
21   Q. (By Ms. Westfall) Are you invoking the
22   privilege?
23   A. (Witness nods head yes.) Privilege.
24   Q. Do you see also in this article that you're
25   quoted as saying, "Polls show that people are less

292

1    likely to vote if they believe their ballot will not be
2    fairly counted"?
3    A. Yes.
4    Q. Do you think that's a fair representation of
5    something that you've said?
6    A. It's printed and I also said it on the record.
7    Q. Can you identify any people who have indicated
8    to you that they were less likely to vote because they
9    believe their ballot will not be fairly counted?
10        MR. SWEETEN: Don't reveal matters that
11   are privileged in answering the question.
12   A. Privilege.
13   Q. (By Ms. Westfall) What polls were you
14   referring to in that statement, sir? It's at the — the
15   sentence that indicates, "Polls show that people are
16   less likely to vote if they believe their ballot will
17   not be fairly counted." Do you see that?
18   A. Uh-huh.
19   Q. Could you tell me what polls you're referring
20   to?
21   A. That is a quote that was taken from my opening
22   comments in 2009, and so, I don't have the poll, but
23   it was a poll that I, you know, had at that time.
24   Q. So sitting here today, you don't recall the
25   particular poll; is that your testimony?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

### 293

1    A.  No, I do not.
2    Q.  Do you have a legislative ID as a member of the
3  Texas Senate?
4    A.  Yes, I do.
5    Q.  Does it have a photograph on it?
6    A.  Yes, it does.
7    Q.  Does it prove your identity?
8    A.  Yes.
9    Q.  Do other forms of photo ID, in addition to
10  legislative ID that have a picture on it, prove one's
11  identity in addition to the forms of ID listed in Senate
12  Bill 14?
13          MR. SWEETEN:  Objection, vague.
14    A.  If you want to narrow it down, I'll answer the
15  question.
16    Q.  (By Ms. Westfall)  Otherwise, are you refusing
17  to answer my question, sir?
18    A.  No.  I'm asking you to clarify your question.
19    Q.  Are any other photo IDs that we have referred
20  to today, including student IDs, employee IDs, expired
21  state licenses, out-of-state state licenses that have a
22  photograph, do those prove a person's identity?
23    A.  I'll be glad to address those one at a time if
24  you'd like.
25    Q.  We may have time to do that another day.

### 294

1          MR. SWEETEN:  Okay.  And also, while
2  you're answering those, I want to caution you that when
3  you're answering a question, don't reveal thoughts,
4  impressions, matters about legislation when you're
5  answering that question.  It's legislatively privileged
6  if you do that.
7    Q.  (By Ms. Westfall)  At any time since --
8          MS. WESTFALL:  I'm sorry.  Are you done
9  with your instruction?
10          MR. SWEETEN:  I am.
11          MS. WESTFALL:  I was looking down at my
12  paper.
13          MR. SWEETEN:  That's okay.
14          MS. WESTFALL:  Thank you.
15    Q.  (By Ms. Westfall)  At any time since the
16  passage of Senate Bill 14, which -- strike that.
17          When was Senate Bill 14 signed into law
18  approximately?  Was it May 2011?
19    A.  May 2011.
20    Q.  At any time since the passage and signing into
21  law Senate Bill 14, have you come to believe that it was
22  passed with a discriminatory intent?
23    A.  No.
24    Q.  At any time since the passage of Senate Bill
25  14, have you come to believe that Senate Bill 14 will

### 295

1  have a harmful and retrogressive effect on minority
2  voters?
3    A.  No.
4    Q.  If you are called to trial in this action, will
5  you testify that Senate Bill 14 has no discriminatory
6  purpose?
7    A.  Yes.
8    Q.  If called to trial on this action, will you
9  testify that Senate Bill 14 does not have a
10  discriminatory effect upon minority voters?
11    A.  Does not.
12          MS. WESTFALL:  I would like to at this
13  time conclude the questioning of the witness.
14  Obviously we're leaving the deposition open pending
15  resolution of the motion to compel to be filed shortly.
16          I will turn over the questioning to
17  counsel for Defendant Interveners.
18              EXAMINATION
19  BY MR. ROSENBERG:
20    Q.  I will ask your indulgence.  I will try not to
21  go too far over, although we're reserving our right to
22  ask, as is the DOJ, to continue this deposition, if
23  necessary, to bring back the Senator.  I'm Ezra
24  Rosenberg.  I'm going to ask you a few questions right
25  now.

### 296

1          Let me start very briefly with the 5.11,
2  which is in US 32.  Just very quickly, and I don't know
3  if you even have to look at it:  When is a special order
4  needed?
5    A.  I'm having a lot of trouble understanding you.
6    Q.  Okay.  I'm from New Jersey.  I'm going to slow
7  down.  Okay?
8    A.  You need to speak Texan if you're going to
9  talk.
10    Q.  I'll try, y'all.
11          When is a special order needed?  Under
12  what circumstances is a special order needed?
13    A.  There is not a definition of when a special
14  order is needed.
15    Q.  Is one of the times a special order is needed
16  when there's a blockage bill, to get around the blockage
17  bill?
18    A.  No.
19    Q.  Give me one example of when a special order is
20  needed.
21    A.  I don't -- I just said that there's not a --
22  circumstance where a special order.  There are special
23  orders that are put into the rules.
24    Q.  Give me an example of when a special order is
25  put into the rules.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                                May 17, 2012

297

1    A. A good example would be the bill we're looking
2    at.
3    Q. Which says, "Any bill, resolution, or other
4    measure, may on any day be made a special order for a
5    future time of the session by an affirmative vote of
6    two-thirds of the members present," right?
7    A. Yes.
8    Q. Did I read that correctly?
9    A. (Witness nods head yes.)
10   Q. So that's not an example of a special order
11   being put in the rules, that's -- they talk about a bill
12   being made a special order, correct?
13   A. Who is "they"?
14   Q. The Senate, in this rule, talks about any bill
15   may on any day be made a special order, correct?
16   A. Yes.
17   Q. All right. So there are certain times when
18   bills are made special orders, correct?
19   A. That's what this reads, yes.
20   Q. And when are those times that bills are made
21   special orders?
22   A. I couldn't project that without knowing the
23   specific bill and the request of the bill.
24   Q. Is one of the times that a bill is made a
25   special order when there is a blockage bill?

298

1    A. No.
2    Q. Okay. Is -- does a blockage bill have anything
3    to do with special orders?
4    A. No.
5    Q. Okay. The exception in 5.119(d) which carved
6    out from the two-thirds rule voter ID identification
7    requirements bills, right?
8    A. No.
9    Q. It did not?
10   A. No.
11   Q. Doesn't it say, "Notwithstanding Subsection A
12   of this rule, a bill or resolution relating to voter ID
13   indication requirements reported favorably from the
14   Committee of the Whole Senate may be set as a special
15   order for a time at least 24 hours after the motion is
16   adopted by a majority of the members of the Senate"? Is
17   that what it says?
18   A. Yes.
19   Q. It says, "Notwithstanding the two-thirds rule,"
20   correct?
21   A. No.
22   Q. Well, can you tell me --
23   A. You're making a reference that the two-thirds
24   rule and the blocker bill.
25   Q. I didn't use "blocker bill." I said -- I'm

299

1    using -- I'm looking right at 5.11D, that says
2    "Notwithstanding Subsection A of this rule," and
3    Subsection A of this rule is the two-thirds rule,
4    right? So notwithstanding the two-thirds rule, a bill
5    relating to voter identification requirements may be
6    reported on the basis of a majority rule, a majority
7    vote, correct? That's what that means?
8    A. No.
9    Q. Then tell me what that means.
10   A. You're asking the questions.
11   Q. That's right. I'm asking the questions. I
12   asked you to tell me what that means.
13   A. What?
14   Q. 5.11D, what does that mean?
15   A. It says "Notwithstanding Subsection A of this
16   rule, a bill or resolution relating to the voter
17   identification requirements reported favorably from the
18   Committee of the Whole, shall be set as a special order
19   at a time at least 24 hours after the motion is adopted
20   by the majority of the members of the Senate."
21   Q. What relationship does 5.11D have to 5.11A?
22   A. "Notwithstanding A." It is not subject to A.
23   Q. Okay, fine. So voter identification
24   requirements are not subject to 5.11A, correct?
25   A. Yes.

300

1    Q. Okay. Can you think of any -- can you identify
2    any other category of legislation that is currently not
3    subject to 5.11A?
4    A. I'm sorry. I can't -- I don't know the answer
5    to that.
6    Q. So sitting here today, you cannot identify any
7    other category of legislation, other than voter
8    identification requirements, that are not subject to
9    5.11A; is that right?
10   A. I can't give you specific answers to a specific
11   bill.
12   Q. You cannot give me a category of such
13   legislation, correct?
14   A. You don't go into categories of legislation.
15   Q. Well, can you name any other types of
16   legislation that are exempt from the requirements of
17   5.11A?
18   A. It would only be exempt if it was put into the
19   legislation that session, and it would be in that -- in
20   that order until it was taken out the next session.
21   Q. Can you identify any such examples such as
22   that, other than the voter identification bill?
23   A. I cannot give you specific examples.
24   Q. Do you recall -- by the way, the Shoe Horn, is
25   that is a newspaper?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                                    May 17, 2012

---

301

1    A. I have no idea.
2    Q. Have you ever heard of anything -- anything in
3    the media called the "Shoe Horn"?
4    A. No.
5    Q. Do you recall making a public statement in
6    January 2011, where you said that the number of Texas
7    citizens who would not have photo identification would
8    be very, very small?
9    A. Made the statement to who?
10   Q. To the public.
11   A. No.
12   Q. Do you believe that the number of Texas
13   citizens who would have photo identification would be
14   very, very -- who would not have photo identification
15   would be very, very small?
16       MR. SWEETEN: Objection, legislative
17   privilege.
18   Q. (By Mr. Rosenberg) Sitting here today, do you
19   believe that the number of Texas citizens who do not
20   have photo identification is very, very small?
21       MR. SWEETEN: Don't reveal thoughts,
22   mental impressions or opinions about legislation,
23   including Senate Bill 34.
24   A. Privilege.
25   Q. (By Mr. Rosenberg) And I'm not asking you --

---

302

1    I'm asking your present knowledge today, not related to
2    legislation that's pending. I'm asking you for your
3    present knowledge today as to whether or not you believe
4    that the number of Texas citizens who do not have photo
5    identification is very, very small?
6        MR. SWEETEN: If you can provide that
7    information without revealing thoughts, mental
8    impressions, opinions about legislation or in
9    furtherance to the legislative process, or not revealing
10   conversations you've had with the multiple agencies or
11   categories of individuals or entities that we've
12   discussed earlier, then you can answer the question.
13   A. Privilege.
14   Q. (By Mr. Rosenberg) Did you have discussions
15   with anyone concerning the differences between SB 14 and
16   SB 362?
17       MR. SWEETEN: You can answer whether you
18   had discussions with anyone. You can answer that
19   factual question. Don't reveal the substance of any
20   conversation.
21   A. I need more clarification about when you're
22   talking about.
23   Q. (By Mr. Rosenberg) At any time -- any time.
24   It would have to be, obviously, at a time when SB 14 was
25   either being formulated or drafted.

---

303

1    A. Yes.
2    Q. Okay. With whom did you have such
3    conversations?
4    A. Members of the Texas Senate.
5    Q. With which members of the Texas Senate?
6    A. Many.
7    Q. Can you identify -- were these -- and I'd like
8    to focus on conversations that were off the floor and
9    not on the record.
10   A. Okay. Then there -- ask the question again.
11   Q. Sure. Did you have any discussions that were
12   not on the public record with any Texas legislators
13   concerning differences between SB 14 and SB 362?
14   A. Yes.
15   Q. With whom?
16   A. I had conversations with Senator Van de Putte.
17   I had conversations with Senator Whitmire.
18   Q. Anyone else?
19   A. That would probably be it.
20   Q. Did you have conversations with any
21   constituents concerning differences between SB 362 and
22   SB 14?
23   A. No.
24   Q. Did you have conversations with anyone in any
25   executive agency as to differences between SB 362 and SB

---

304

1    14?
2    A. No.
3    Q. And when did you have the conversations with
4    Senator Van de Putte?
5    A. As we were starting, it was after the bill was
6    filed and we were starting session and we were probably
7    within a day or so it being heard.
8    Q. And what was the substance of that
9    conversation?
10       MR. SWEETEN: Objection, privilege.
11   Q. (By Mr. Rosenberg) And when did you have the
12   conversation with Senator Whitmire?
13       MR. SWEETEN: You can answer.
14   A. More than one conversation. A conversation in
15   the last quarter of the year, and then another -- at
16   least one other conversation in about the time we
17   started session.
18   Q. (By Mr. Rosenberg) And what was the substance
19   of that conversation?
20       MR. SWEETEN: Objection, privilege.
21   Q. (By Mr. Rosenberg) Did you have discussions
22   with anyone off the public record concerning the effect
23   of SB 14 on minorities?
24       MR. SWEETEN: I think the question is
25   you're asking about specific -- the substance of

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                                    May 17, 2012

305

1    specific conversations that he's had.  I think -- I
2    don't think he has to reveal that.  That's beyond just a
3    general subject matter description.
4            MR. ROSENBERG:  I really disagree.
5        Q.  (By Mr. Rosenberg)  I'll change it to the
6    effect of, if any, of SB 14 on minorities?
7        A.  Ask the question again, please.
8        Q.  Sure.  Did you have any discussions, not on the
9    public record, as to the effect --
10       A.  I'm sorry.  I don't understand "not in the
11   public record."
12       Q.  Well, meaning, as I think your counsel has
13   advised, that they're taking the position that
14   legislative privilege applies to anything that's not on
15   the public record.  And I think that has been stated
16   over and over again.  So I'm using your counsel's
17   terminology.
18           And my question is:  At any time, did you
19   have discussions with anyone, that was not on the public
20   record, concerning the effect, if any, of SB 14 on
21   minorities?
22       A.  And you're including legislators in session?
23       Q.  No, no.  Off the public record.  During the
24   session, yes, so long as it's not on what your counsel
25   considers the public record.

306

1            MR. SWEETEN:  As phrased, I'm going to let
2    you answer whether or not you had such conversations
3    with anyone, whether or not you did.  Don't reveal any
4    substance --
5        A.  I did not have conversations that were not
6    privileged.
7            MR. SWEETEN:  Okay.  And you're not going
8    to reveal any of the substance of any such conversations
9    but you can reveal whether or not you've had a
10   conversation with someone --
11       A.  I just --
12           MR. SWEETEN:  -- on the issue of that.
13       A.  The question before this, I disclosed
14   conversations I had with Van de Putte and --
15           MR. SWEETEN:  Whitmire.
16       A.  -- Whitmire, and I've also said earlier that I
17   had a conversation with Ellis.
18       Q.  (By Mr. Rosenberg)  Right.
19       A.  That sits next to me.  And so I've already
20   testified to those conversations.
21       Q.  Well, this is a different question.  My
22   question is specifically:  Conversations not on the
23   public record with anyone concerning the effect, if any,
24   of SB 14 on minorities?
25       A.  And I can't answer that because I'm saying I

307

1    have already answered that question of the three that
2    would be included.  So if you're going to qualify your
3    question, anyone other than the three that I have
4    mentioned.
5        Q.  Well, I -- when I first asked you the question
6    which resulted in you giving me the names of Senator Van
7    de Putte and Whitmire, I didn't specify the effect, if
8    any, on minorities.  So now you're telling me that the
9    conversations that you had with Senator Van de Putte,
10   Senator Whitmire, and Senator Ellis had to do with the
11   effect, if any, of SB 14 on minorities; is that correct?
12       A.  I'm saying that it was part of the total
13   conversation.
14       Q.  Other than those conversations, did you have
15   discussions with any other legislators concerning the
16   effect, if any, of SB 14 on minorities?
17       A.  No.
18       Q.  Did you have discussions off the public record
19   with anyone from executive agencies as to the effect, if
20   any, of SB 14 on minorities?
21       A.  No.
22       Q.  Did you have discussions with any constituents
23   or lobbyists or public interest groups as to the effect,
24   if any, of SB 14 on minorities?
25       A.  No.

308

1        Q.  Did you have discussions with anyone concerning
2    the effect, if anything, if any, on election results of
3    SB 14?
4        A.  Not to my knowledge.
5        Q.  And that includes discussions with legislators,
6    with anyone from the executive agencies, Governor,
7    Lieutenant Governor, and constituents?
8        A.  Not to my knowledge.
9        Q.  I'd like you to take a look at United States
10   Exhibit -- Department of Justice Exhibit 46.
11       A.  Which is 46?
12       Q.  Should be in your batch there.  And turn to
13   Page 74, please.  And if you see, there's a quote from
14   you, and I'm going to focus your attention on the last
15   sentence where it says, last two sentences, you're
16   asking, "Have I done that?"  Oh, actually, we should
17   have to give context to this.
18           And I want you to turn a page back to
19   where Senator Watson says, "Well, and I'm looking
20   forward to that.  I'm saying to you, though, with regard
21   to your bill, Senate Bill 362, are you familiar with any
22   data or study that's been done with regard to some sort
23   of statistical analysis concerning the effect of the new
24   requirements of Senate Bill 362 on African-American
25   population, Hispanic, people making less than $35,000 a



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

323

---

**A**

**ability**
7:20 45:9
  57:14
  258:21
  288:22
**able**
67:12,15,17
  104:18
  174:11
  187:20
  270:25
  271:15
**above-styled**
2:3
**absence**
25:9 26:7
**absolutely**
122:1
**academics**
310:18
**acceptable**
66:15 103:1
  139:1
  143:20
  145:12
  254:3 286:5
  286:7
**accepted**
188:1 251:10
  258:16
**access**
20:5 194:18
  314:21
  315:10,17
  316:15
**accommodate**
261:11,15
**accomplis...**
288:4
**account**
34:15 57:15
  261:1
**accurate**
9:18
**accurately**
6:14

**accusation**
277:13
**achieve**
247:11
**acknowledged**
320:9
**act**
44:24 45:3
  45:24 46:3
  46:4 47:1
  48:24 78:11
  121:18
  141:16,20
  141:22
  223:22
  259:24
**acted**
108:14
**acting**
8:18 25:8
  107:19
  206:24
**action**
124:2,6
  295:4,8
  322:17,19
**activity**
45:14 52:19
  53:3,14
  195:13
**actual**
92:25
**ad**
278:10
**add**
245:14
**adding**
184:8
**addition**
193:6 293:9
  293:11
**additional**
87:19 246:22
  247:6
**address**
8:19 14:11
  29:22
  128:12

155:5 168:6
  216:9
  293:23
**addresses**
230:6
**addressing**
221:21
**adequate**
215:20
**adheres**
271:6
**adhering**
15:21
**administer**
256:9
**administered**
255:16
**administers**
255:3
**administr...**
42:9 72:3
  109:10
  256:25
  257:1
**administr...**
45:18 109:19
  242:1
**adopted**
175:2,6
  176:16
  188:19
  298:16
  299:19
**adopts**
179:13
**advance**
11:23 13:5
  136:9,13
  152:11
**advancement**
218:18
**advice**
31:20 36:24
  48:8,10,16
  48:18,23
  49:8 50:3,9
  51:3,4,7
  57:15 61:10

85:15 86:8
  91:18
  122:22
  132:2
  156:22
  170:12
  192:10
  206:6 247:2
  250:23
**advisable**
91:14
**advise**
70:16 136:9
**advised**
41:14 86:1
  213:6
  281:25
  282:11,13
  282:20
  283:2
  305:13
**advising**
236:11
  245:15
**advisor**
95:7
**Advocate**
198:9
**advocated**
198:4
**Affairs**
22:4,14
  101:17
  106:7,17
**affidavit**
263:18
**affiliated**
83:22
**affiliation**
27:25 28:2
  91:21 92:1
**affirm**
77:15,18,22
  248:23
**affirmative**
176:8 297:5
**affirmati...**
23:21

**affix**
319:21
**afraid**
171:8
**African**
213:13
**African-A...**
308:24
**agencies**
31:7 46:15
  54:13 56:9
  92:24 139:3
  262:21
  286:4
  302:10
  307:19
  308:6 314:2
  317:15
**agency**
26:22 130:16
  134:6 139:2
  139:12,13
  303:25
**agenda**
25:25 26:6
  27:6 108:15
  241:12,14
  241:15,19
**agendas**
29:20
**ago**
7:23 23:7
  39:12 41:20
  66:24
  242:21
**agree**
9:7 10:17
  14:4 59:23
  65:8 80:17
  119:7 122:6
  122:12,15
  123:24
  159:9 195:5
  197:12
  205:16,19
  205:20
  215:19
  216:17

---



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

324

```
250:6              30:17,18,20        145:24             94:17 95:23        83:21 85:1
254:11             30:22 31:11        146:6              95:25 96:5         87:7,18
255:7 256:3        36:15,16,17        247:14,20          141:10             88:4,15
262:23             36:23 37:18        257:7              210:25             89:17,19
265:14             37:21,24        allows                212:13             91:22 92:15
271:11             38:6               252:12,15          213:7,12,21        93:24 95:8
283:3           ALEC's                287:10             214:3,24           95:14,18
311:25             36:21           alternatives          215:1             97:1,18,18
316:13          aliens                198:5              246:17             98:4 99:8
agreed             84:8 85:20      amended               249:16,21          99:15,25
10:10 312:3     alike                 79:18,18           250:5,15           100:12,13
agreement          127:17             80:11              259:5 260:1        101:18
80:17 108:24    alleging              106:16             264:14             103:4 104:8
Ah                 81:16              287:20             285:4              104:12,18
208:2           allow              amendment            308:23             105:11,22
ahead              60:23 74:18        79:22 283:20    analyze               105:23,25
7:5 46:1,18        80:22 142:1        283:21,25       140:22,22             106:13
47:16,25           142:24             284:5,7,11     310:11                 107:6 109:7
65:12,22           143:21,24          284:23,24     And/or                  111:10
76:17 97:16        145:1              284:24           98:15                113:25
103:17             168:24             285:7,9,25    Anglo                    115:9,17,17
106:13             169:5              286:4,9,11     9:23                    115:19
111:9              171:12             286:18,25    announced                116:19
144:13             253:9              287:2,5,14     111:11                  117:10,16
150:11,13          258:11             287:15,19    answer                   117:17
153:24             270:17             288:9,14,19    6:19 7:6               118:21
188:4              271:11             288:21           14:14 15:14          120:3 121:4
190:23             276:3           amendments           22:12,17,18        121:22
192:3 195:7        283:22             283:13,15         23:21 24:3         122:14,19
213:25             287:2           America              31:17,18           122:22,23
227:8           allowable             223:22             32:10,11,14       123:3,18
268:12             130:5 137:13    American              32:16 33:15       125:12,13
276:8 282:3        137:15             3:17 27:16         33:16 34:18       125:23
287:17             142:14             28:9               35:19 38:8        132:19
289:16             215:2           Americans            44:12,13          133:18
291:10             242:18             161:1,4,9,14      46:1,2,16         134:8,20
al                 243:11,15          161:22             47:7 48:25        135:14
1:8,13,16,18       247:15             213:14             53:16 57:13       136:16
3:11 64:18         258:13          amount               57:17 58:20       137:19,22
319:2 321:8     allowed               183:25             58:22 60:1        139:18
321:13,16          25:20,21           311:22             60:6 61:6         140:4,14,21
321:18             48:22 55:6         322:11             64:3 65:24        140:21,25
ALEC               55:23 86:20    analyses              68:6 69:15        141:23
27:17 28:1,3       257:14             17:13 92:6         72:11,14         145:3
28:4,8,11          270:12             92:12,18          73:15,20         148:20
28:22 29:3         271:9,19           309:18             75:23 76:4       149:13
29:5,7,11       allowing           analysis             78:23 79:24      155:16
29:17,20,25        143:8,16           93:3,14,22        81:23 82:5       156:9 157:3
                                                                          157:9
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

161:20
163:12,14
163:14,15
163:24
169:6
171:13,18
172:10,24
173:14
175:4
176:21
178:5,6
180:1
181:23
184:7,24
187:21,23
188:4,5
190:14,22
191:5
193:21
194:22
195:7,20,22
196:6,11,11
196:12,14
196:17
197:20
199:22
200:17
203:21
204:9,20
207:18
211:5,23
212:2,4,10
213:5,6
214:18
216:5
218:11,16
221:18
222:3 223:9
225:2,18
227:4 230:1
230:3,5,8
230:13
231:19
232:12
233:15
235:21
237:19
244:2,18
245:7,8,9

245:11,11
248:12,25
249:2,12,15
250:22
253:4,6,8,9
254:15
255:23
256:6
257:25
258:8
259:15
260:4 261:8
261:24
263:21
266:13
268:13,20
269:2,11,14
269:24,25
270:7,9
271:15
272:4,10,14
272:19
275:4 276:4
276:8 277:1
277:24
281:10,11
281:24
282:4,5,7
282:15
283:5 291:4
293:14,17
300:4
302:12,17
302:18
304:13
306:2,25
309:16,17
309:25
310:2,23
315:5
316:11
317:2,3
answered
27:23 44:1
47:4 76:17
78:22 79:15
122:24
123:7,15

151:17
177:7
183:25
190:11
191:3,6,13
191:15
196:3,15
226:21
227:21
231:9
235:17
241:16
243:22
245:7 251:2
266:13
267:6
268:10,10
269:13
275:25
278:9,10
282:23
307:1 315:7
answering
9:2 47:7
51:22 54:14
54:22 55:2
55:14 56:4
59:1 65:2
114:16
118:18
243:9 262:9
268:25
271:25
272:11,15
273:21,23
274:2
292:11
294:2,3,5
315:2
316:10,23
317:10,17
answers
300:10 310:9
Antonio
120:8
anybody
18:20 73:25
99:5 245:25

anyway
153:24
apologies
22:10 62:13
95:3
apologize
189:6
appear
63:13 69:16
69:20 70:6
189:20
209:14
249:3
appearance
265:12,18
Appearances
5:2
appeared
113:21 119:5
198:13
320:5
appearing
43:22
appears
63:1 234:2
283:10
289:21
appended
317:24
applicants
159:15
210:14
214:14
224:17
application
144:5
applications
77:16
applies
282:23
305:14
apply
77:20
applying
71:21 72:4
75:11,16
76:11

appreciate
7:7 9:14
80:13 275:6
275:9
appropriate
74:7 209:3
approved
82:16 198:1
approximate
60:25 313:13
approxima...
21:14,21
39:12 40:10
40:12 57:25
58:5 89:2,4
219:19
294:18
area
24:16 120:9
184:5,17
185:2
areas
21:3 158:15
argumenta...
95:12,16
114:1
248:11
282:3
Arizona
160:14,19
Arlington
277:16
arrange
34:3 35:9
art
10:6
article
5:16 69:16
70:1,22,25
71:5,25
72:18,23
289:22
291:24
aside
23:1 63:22
asked
11:3 13:25
31:11 34:1



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

326

| | | | | |
|---|---|---|---|---|
| 34:2 37:16 | 48:15 49:14 | 247:17 | 150:12,14 | assisting |
| 40:16 47:3 | 50:2 53:9 | 248:4,7,12 | 151:15 | 17:1 |
| 54:2 55:23 | 60:5 61:2,9 | 248:13 | asserted | associated |
| 65:11 66:7 | 65:7,20 | 250:19 | 14:7 74:11 | 41:12 45:18 |
| 67:11 74:9 | 66:19 72:12 | 252:24 | 85:5 314:16 | 193:6 |
| 77:19 78:21 | 72:13 74:1 | 253:14,18 | assertible | 246:10 |
| 79:24 81:25 | 74:17 76:3 | 253:19 | 227:4 | 265:23 |
| 120:1 123:5 | 77:7,8,9,19 | 255:11,19 | asserting | 266:2 |
| 123:20 | 77:20 78:7 | 255:20,22 | 13:20 14:16 | assume |
| 161:16 | 81:12,14 | 256:17 | 15:13,15,18 | 79:20 103:18 |
| 177:20,22 | 82:25 84:21 | 257:4,16,24 | 27:2 43:1 | 134:22 |
| 178:15 | 85:13 86:15 | 258:3 | 57:8 74:13 | 192:2 278:3 |
| 183:25 | 87:23 92:18 | 259:15,20 | 80:22 84:19 | assumed |
| 187:11 | 93:1 97:21 | 259:22 | 94:5,6 | 86:17 87:11 |
| 190:12 | 102:21,22 | 260:2 262:8 | 216:14 | assumes |
| 194:11 | 104:14 | 262:10 | 230:6 | 76:16 92:21 |
| 196:12  , | 114:25 | 264:1 267:3 | 250:14 | 104:16 |
| 199:2 | 115:17 · | 267:4 270:7 | 267:12 | 188:3 195:6 |
| 200:15 | 116:15 | 272:19 | 269:1 | 268:11 |
| 205:4,8 | 117:5,11,15 | 273:18,24 | assertion | assuming |
| 211:19 | 120:24 | 274:24 | 48:22 85:2 | 29:9 41:7 |
| 216:1 | 121:1,17,18 | 276:2,20,21 | 85:11 | 102:10 |
| 222:25 | 122:2 | 276:22 | 229:23 | 115:5 |
| 223:18 | 127:11 | 278:2 | 266:24 | 223:23 |
| 227:21 | 140:7 143:1 | 279:23 | 314:17 | 233:15 |
| 229:10 | 145:11 | 280:21 | 315:10,17 | assumption |
| 235:16 | 146:18 | 282:13 | 316:5,8 | 88:14,16 |
| 239:16 | 149:8 150:2 | 290:20 | assertions | assure |
| 242:23 | 150:3 | 291:17 | 314:9,13,19 | 117:4 |
| 243:21 | 151:25 | 293:18 | 314:23,24 | attach |
| 245:6 251:2 | 154:17 | 299:10,11 | 314:25 | 47:23 |
| 266:13 | 159:19 | 301:25 | 315:25 | attached |
| 268:2,5,9 | 173:13 | 302:1,2 | assessments | 2:10 |
| 269:4 273:9 | 183:5 | 304:25 | 17:13 | attempt |
| 275:25 | 184:23 | 308:16 | Assessor-... | 69:19 234:15 |
| 277:1,21 | 190:15 | 309:16 | 72:1 | 317:3 |
| 299:12 | 197:19 | asks | assigned | attempting |
| 307:5 | 199:5 | 114:8 195:19 | 97:9 194:13 | 44:8 191:17 |
| asking | 203:12,14 | 274:16 | 194:16 | attend |
| 8:12,24 9:1 | 205:19 | asleep | 195:1 | 28:5 29:16 |
| 9:13 10:1 | 207:15 | 189:16 | 220:23 | 29:24 30:3 |
| 10:12 17:21 | 209:20 | assert | assist | 30:5 32:1,5 |
| 18:19 19:7 | 217:1,13 | 13:23 14:3 | 17:19,22 | attended |
| 19:10 30:9 | 224:25 | 15:1 16:2 | 141:4 | 20:10 28:21 |
| 31:2 33:14 | 226:13 | 26:25 27:7 | assistance | 29:11,16,25 |
| 37:4,7 | 227:15 | 80:18 91:16 | 30:22 31:12 | 30:11 31:22 |
| 45:11 46:25 | 229:5,5,13 | 94:5 118:19 | 37:11 | 32:7,12,13 |
| 48:9,10,14 | 240:12 | 143:23 | 117:12 | attention |
| | 244:15 | | | |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

327

| | | | | |
|---|---|---|---|---|
| 18:4 43:11 | **Austin** | 214:5,23,25 | 229:18,19 | **ballots** |
| 63:4 66:12 | 2:8 3:7,9 | 231:3,12 | 269:4 276:6 | 287:3,11 |
| 66:14 68:25 | 39:2,8 40:5 | 232:1 | 276:10,16 | **ballpark** |
| 70:5 71:4 | 322:24 | 235:11,14 | 277:25 | 194:23 |
| 83:3 118:5 | **author** | 236:2 | 289:14 | **base** |
| 118:11 | 196:6,9 | 253:11 | 290:23,24 | 227:9 |
| 119:8 130:3 | **authored** | 257:13 | 291:9 | **based** |
| 130:6 | 64:14,17 | 258:19 | 295:23 | 26:6 27:19 |
| 137:14 | **authority** | 260:2,5,10 | 308:18 | 27:22 78:10 |
| 138:4 139:9 | 255:24 | 260:11 | 309:5,6 | 81:7 93:21 |
| 141:25 | **author's** | 267:20 | 310:19 | 94:15 |
| 174:22 | 64:15 | 270:3 | **background** | 173:14 |
| 175:15,17 | **automatic...** | 279:14 | 20:7 | 176:1 |
| 176:10 | 228:21 | 284:2 287:9 | **backtrack** | 180:15 |
| 202:11 | **available** | 313:9,21,22 | 240:11 | 191:10 |
| 208:11,12 | 169:9 | 314:9,13,16 | **Baker** | 198:4 211:6 |
| 234:3 263:3 | **Avenue** | 314:19,23 | 312:2 | 213:24 |
| 264:24 | 2:7 3:14 | 315:25 | **Baker-Carter** | 230:3 246:5 |
| 283:17,20 | 322:23 | 316:5 | 60:19 198:18 | 264:7,17 |
| 284:11,22 | **awake** | **awful** | 311:15 | 265:6,6,6 |
| 285:24,25 | 189:7 | 208:5 | **balance** | 272:4,4,5 |
| 286:22 | **aware** | **a.m** | 130:22,23 | 273:18,19 |
| 288:8,9 | 22:22 38:12 | 2:4 79:6 | 131:1 | 273:20 |
| 289:24 | 38:14 44:14 | | **ballot** | **bases** |
| 308:14 | 53:2 54:6 | **B** | 8:10 143:10 | 153:5 |
| 311:9 | 58:17,20 | **B** | 143:14,18 | **basic** |
| **attorney** | 67:23 68:4 | 130:24 131:1 | 148:3,25 | 98:19 |
| 1:6 3:6 8:19 | 68:6,12 | 182:9 | 151:6,7,10 | **basically** |
| 12:20 14:5 | 83:18 84:4 | **back** | 151:13,19 | 84:6 |
| 14:17,22,23 | 90:4,7,9,18 | 36:15 43:4,6 | 151:23 | **basing** |
| 50:11 51:8 | 90:19 99:4 | 49:19,21,23 | 152:1 153:8 | 84:22 |
| 243:19 | 102:19 | 53:5,9,12 | 153:12 | **basis** |
| 315:15 | 103:13 | 57:16,18,20 | 159:1,5,8 | 47:24 53:2 |
| 321:6 322:6 | 110:10 | 59:8,9 | 159:13 | 54:19 61:10 |
| 322:10 | 112:10 | 65:13,14 | 190:25 | 145:4 |
| **attorneys** | 113:5 | 78:18,19 | 217:20 | 156:14 |
| 13:1,4,21 | 147:18 | 79:5,9 82:3 | 263:4,14,16 | 169:14 |
| 48:11 49:11 | 150:24 | 99:13 103:9 | 263:17 | 266:24 |
| 223:4 | 153:15 | 123:8,17 | 266:19,25 | 299:6 |
| 322:17 | 157:5,11 | 141:25 | 267:10,17 | 314:18 |
| **attorney's** | 160:13,18 | 143:4,5,12 | 267:22 | 317:7 |
| 2:7 15:22 | 161:23 | 145:9 | 268:19,22 | **batch** |
| **attorney-...** | 179:5 | 168:14 | 272:9,16 | 308:12 |
| 13:20 | 181:15,20 | 171:5 174:3 | 278:18,19 | **Bates** |
| **attributed** | 182:5,10,13 | 185:19 | 279:20 | 208:15 |
| 290:3 | 184:6,8,16 | 200:2 201:9 | 281:9,12 | **Bear** |
| **audits** | 194:14 | 222:13 | 286:13 | 284:10 |
| 17:12 | 211:9 212:7 | 227:8 | 292:1,9,16 | **beginning** |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

328

| | | | | |
|---|---|---|---|---|
| 109:3 | 161:21 | 139:17 | 79:13,19,23 | 137:13 |
| 179:14 | 166:8 172:7 | 183:2 | 80:6,12 | 138:5,24 |
| 184:13 | 174:20 | **Bettencourt** | 81:2,3,4,4 | 139:6,20 |
| 208:25 | 180:7 185:5 | 71:20 72:2 | 81:13,19 | 140:24 |
| 209:1 | 186:25 | 72:19 | 83:11 86:3 | 141:4,11,18 |
| 229:15 | 189:13,15 | 152:22,23 | 86:5,13 | 141:25 |
| **behalf** | 189:15 | **better** | 92:7,13 | 142:7,14,21 |
| 8:18 57:8 | 197:3 | 196:12 | 93:14 96:19 | 142:23,24 |
| 134:25 | 198:18 | **Betty** | 97:6,7,9,13 | 143:7,20 |
| 146:9 | 205:7 | 71:13 | 100:10 | 144:19,25 |
| 172:23 | 206:16,22 | **beyond** | 106:16 | 145:12,13 |
| **belief** | 217:18 | 61:1 145:13 | 107:2,7,17 | 145:14,19 |
| 81:20 | 221:6 | 145:15 | 107:23 | 146:6,23 |
| **beliefs** | 233:14 | 214:17 | 108:11,13 | 147:1,6,15 |
| 82:22 263:24 | 235:25 | 215:5 267:3 | 108:14,14 | 147:21 |
| **believe** | 240:16 | 270:25 | 108:16,17 | 148:1,6,13 |
| 14:11 24:3 | 249:12 | 305:2 | 108:20,21 | 148:18,24 |
| 28:19 29:24 | 252:3,11,14 | **bill** | 108:24,25 | 149:22,25 |
| 37:11 41:11 | 270:11 | 11:19 12:3 | 109:1,3,11 | 150:13,17 |
| 45:23 46:3 | 278:14 | 12:10 14:10 | 109:11,13 | 151:1 |
| 46:4,6,19 | 283:14 | 14:19 15:2 | 109:13,19 | 152:12,15 |
| 47:14,17 | 284:13 | 17:14 20:3 | 110:2,3,5,7 | 154:3,21 |
| 48:1,6 | 287:6 292:1 | 23:14 26:12 | 110:9,11,16 | 155:5 |
| 60:18,20 | 292:9,16 | 26:20 27:5 | 110:19,20 | 157:25 |
| 62:8 66:5 | 294:21,25 | 31:5 32:23 | 111:8,13 | 158:24 |
| 70:15 74:9 | 301:12,19 | 49:12,25 | 112:1,16,19 | 159:3,14 |
| 78:1 79:23 | 302:3 | 50:2 51:5 | 113:1,3 | 160:2 |
| 79:23 80:7 | 311:19 | 52:4,9,10 | 114:4 115:2 | 161:25 |
| 80:10 81:19 | 312:17 | 54:24 56:6 | 119:14,14 | 162:3,4,8 |
| 82:18,25 | **believed** | 57:23 58:8 | 119:16 | 162:14,18 |
| 95:6 97:11 | 81:21 | 58:12 61:15 | 121:6 124:3 | 163:5,18,23 |
| 97:24 99:17 | **believes** | 61:16,18 | 126:23 | 164:6,15,19 |
| 100:7 | 104:15 | 62:5,9,12 | 127:1,20,23 | 164:25 |
| 101:19 | **believing** | 63:8,11,17 | 127:25 | 165:4 166:7 |
| 102:16 | 90:10 | 64:12,20,23 | 128:2,4,6,7 | 166:15 |
| 111:14 | **bell** | 65:1,8,17 | 128:8,9,11 | 167:4,12,23 |
| 112:12 | 69:8 | 66:2,6,7,8 | 128:12,14 | 167:25 |
| 120:5 | **Berman** | 66:10,13,14 | 129:12,18 | 168:6,7,16 |
| 122:21 | 64:18 | 67:7,13,14 | 129:21 | 169:10,15 |
| 125:10,15 | **best** | 67:15,19,24 | 130:5 131:5 | 169:19,23 |
| 125:16 | 9:17 18:25 | 67:25 68:5 | 131:10,11 | 170:2,8 |
| 127:25 | 19:22 21:22 | 68:9 69:18 | 131:17 | 173:21 |
| 135:2 | 23:18 39:19 | 70:23 71:13 | 132:5,8,8 | 175:13 |
| 137:12 | 45:8 50:24 | 72:8 73:5 | 132:10 | 176:6,12,13 |
| 142:1 | 52:12 57:14 | 74:4,11,15 | 133:1,10,14 | 178:9 181:7 |
| 148:17 | 73:11,21 | 75:7,10,15 | 133:16,25 | 181:12,19 |
| 150:25 | 82:8 117:17 | 76:9,20 | 134:7,16 | 185:23,24 |
| 152:25 | 125:14 | 78:2,24 | 135:12,19 | 186:4,6,19 |
| | | | 136:14 | 187:1,2,4,7 |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

329

189:20
190:9,24
191:3,6,14
192:4,12
193:7,12,18
194:19
195:4,13,15
196:1,3,6,7
196:9,10,18
196:21
197:1,10,24
198:4,10,12
198:19,22
198:23
199:11,17
200:4,12
201:3,19,23
202:16
203:17
204:5
205:11
206:17,23
206:24
207:5,8,13
211:11
212:8 215:3
215:20
216:1,8
218:4,18
219:7 220:2
220:7,21
221:25
222:4 223:1
223:8 224:3
224:11,13
225:10,13
225:13,15
225:20,25
226:5,8,11
226:15,19
226:24
227:13,16
227:19
228:7,10,14
230:22
231:2,17,21
232:3,17,21
233:14,17
233:21

234:6,16,20
235:3,7,8
235:12,15
235:18,19
236:3,12,20
236:23
237:1,8,12
237:16,23
238:24
240:2,8,12
240:16,23
242:16,18
242:25
243:11,15
244:7,25
245:4,16,24
246:2,9,15
246:16,22
247:6,11
248:5
249:18,24
250:5,16
251:18
252:12,15
252:19,22
253:1,9,13
253:23
254:18,18
254:20
255:4,9,17
255:19
256:8,14,16
257:9,21,23
258:1,6,11
258:13
259:14
260:15,22
261:6,7,11
261:16
262:3,4,18
262:25
263:4,5
264:7,14,22
265:22
266:17,18
267:9 268:3
268:8,15,18
268:21
269:16,19

269:21
270:1,4
271:18
272:1,6,7,8
272:12,15
272:22,25
273:4,11,18
273:19,21
274:1,8,11
275:20,22
275:22
276:1
277:18,18
278:4,7,9
278:15,21
280:19
281:8,11,18
281:25
283:13,22
284:25
285:14,20
286:6,12
288:3
290:12
291:11,15
293:12
294:16,17
294:21,24
294:25
295:5,9
296:16,17
297:1,3,11
297:14,23
297:23,24
297:25
298:2,12,24
298:25
299:4,16
300:11,22
301:23
304:5
308:21,21
308:24
313:5,15,25
316:25
**bills**
12:13 15:10
20:3 22:15

23:2,3,4,6
23:22 24:1
24:2,11
26:9 46:13
85:18
107:22
108:3,15
122:6,11,21
123:2,24
129:23
132:25
133:15
134:2
185:14,21
187:25
194:8,12,20
204:6
205:12,14
232:9,13
237:18,25
239:23
253:7
256:18
266:16
274:25
275:4,22
276:20,21
276:24
277:2,3,17
278:3,5
297:18,20
298:7
**bill's**
200:6
**birth**
40:19 41:6
159:16,23
160:8 252:3
252:4
280:17
**bit**
127:9 151:8
151:9
**BLACK**
1:15 321:15
**BlackBerry**
34:22
**Block**

35:10
**blockage**
296:16,16
297:25
298:2
**blocker**
108:14,19
109:1,3,13
110:3,11,16
110:19,20
111:8 187:1
187:2,4,7
187:15,16
298:24,25
**boarder**
120:11
**Bohac**
64:18
**border**
120:10
**bordering**
120:10
**born**
40:25 41:1
**bottom**
213:2
**box**
3:6 78:25
143:10,14
143:18
148:3 149:1
151:6,7,10
151:14,19
151:24
152:1 153:8
153:12
190:25
217:20
266:19,25
267:10,17
267:22
268:19,22
272:9,16
278:18,19
281:9,12
286:13
**branch**
244:25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

330

**BRANCHES**
1:11 3:17
321:11
**BRAZIL**
4:2
**break**
7:1,2,4,5,6
56:18,25
78:14,14
79:2,4
80:16 81:2
168:3,11
191:23
193:25
251:13
268:24
**breakdown**
213:10
**breakout**
29:22
**breaks**
7:3 21:21
**brief**
227:6
**briefly**
296:1
**bring**
13:11 107:5
107:6,17
108:25
185:23
187:4
212:24
295:23
**bringing**
108:21
110:23
111:6 154:8
154:12
170:8,15,21
171:15
172:17
**broad**
12:1 43:9
93:3
**broadly**
8:6 187:20
**brought**

60:12 71:11
107:8,9,10
108:16
109:21
113:6
122:12
186:4,20
269:4
**Brown**
64:18 71:13
**Brownwood**
221:20
**Bruce**
3:13
**burden**
10:15
**burdensome**
160:2
**Burnet**
40:12
**business**
24:8,8 26:6
26:8 34:14
39:19
107:25
108:2 121:7
186:1,1,20
187:5 289:5

---
**C**
---

**C**
3:3 178:7
182:9
**calculations**
17:12
**calendar**
27:6 34:4,6
34:7 36:7
186:5
**call**
28:11 36:6
36:11 41:7
128:8
136:21,22
238:16
**called**
27:15 34:1
50:21

223:21
225:13
239:21
295:4,8
301:3
**calls**
70:10 73:13
86:6 95:13
95:17 104:6
104:14,16
105:15,20
128:22
150:20
160:22
164:21
173:6 177:5
179:22
181:13
188:25
193:9
195:21
196:22
200:24
206:14,20
230:24,25
246:24
250:8,20
267:23
274:24,25
291:3
313:24
316:22
**campaign**
23:17
**cancel**
279:10,17
**capacity**
1:6 8:13,14
38:7,15,18
42:17 49:7
321:6
**caption**
128:11
**car**
40:4 41:23
**card**
51:14,15
52:4,6,22

52:23 53:25
55:5,22
130:11,14
130:18
138:14,22
138:25
139:3
154:20
234:8 320:7
**cards**
54:21 71:22
72:5 75:12
75:17 76:12
77:1 138:6
138:12,17
138:19
139:11
**careful**
96:11
**carefully**
57:13 105:17
256:7
**Carlos**
5:11
**Carnegie**
3:20
**Carpenter**
2:5 321:22
322:22
**carried**
23:6 98:8
99:17
**carry**
80:2 130:14
259:13,19
260:7,12
**carrying**
92:7,13
97:13,25
219:7
**cars**
314:22
**Carter**
312:2
**carved**
184:5 298:5
**carve-out**
184:3

**case**
1:10 144:5
144:19
203:17
321:10
**cast**
158:25 159:5
159:8,13
202:16
**casts**
263:14,16
**categoric...**
184:5
**categories**
12:16 13:22
300:14
302:11
**category**
138:13
155:15
300:2,7,12
**caucus**
1:16 3:18
171:25
321:16
**cause**
2:3
**caused**
150:17,25
257:2
**causing**
278:1
**caution**
64:2 209:7
294:2
**cautions**
251:11
**census**
21:13
**center**
3:20 21:8
**certain**
14:18 45:4
224:17
249:11
262:20,24
297:17
**certainly**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

331

| | | | | |
|---|---|---|---|---|
| 8:20 9:9 | 4:5 | charging | 302:4 | 138:23 |
| 17:17 21:6 | chair | 286:4 | citizenship | 172:13 |
| 66:2,18 | 22:3 102:1 | check | 77:6,16 | 212:1 |
| 71:24 75:4 | 103:21 | 248:23 | 129:19,22 | 275:12,16 |
| 79:11 117:6 | 107:11,14 | checks | 130:12 | 277:23 |
| 144:12 | 107:16,19 | 254:20 | 160:14 | 310:14 |
| 149:18 | 114:3 | chief | 224:7 234:9 | cleared |
| 150:10 | 179:19 | 32:21 85:25 | 251:16,21 | 45:16 |
| 156:2 183:7 | 195:17 | 236:9 268:1 | city | clearly |
| 185:20 | 221:4 | chiefly | 159:24 | 104:14 216:9 |
| 210:5 | chaired | 35:18 36:8 | Civil | 264:4 |
| 212:24 | 24:7,8 | choose | 2:9 | clerk |
| 258:10 | chairing | 28:5 | claim | 41:8 |
| 262:6 | 111:15 | chooses | 48:17 56:10 | client |
| 291:12 | chairman | 25:24 | 57:22 81:21 | 56:16 122:23 |
| certificate | 109:10 | chosen | 84:22 91:11 | 268:24 |
| 5:6 40:19 | challenge | 28:24 | 94:11 230:4 | 269:2,3,7 |
| 41:6 130:13 | 197:17 | Chris | 276:11 | 271:24 |
| 154:9,13,23 | challenged | 2:5 321:22 | claiming | clip |
| 159:17,23 | 44:15,20 | 322:22 | 115:20 | 284:18 |
| 160:8 234:9 | challenging | circle | clarifica... | close |
| 251:16,21 | 44:10 | 178:24 | 19:13 44:12 | 311:22 |
| 252:3,4 | Chamber | circulated | 80:5,13 | coauthors |
| 258:7,12,16 | 221:22,23 | 241:13 | 87:21 | 64:16 |
| 258:17,22 | chance | circumstance | 229:14 | code |
| 259:1,6 | 18:6,9 62:21 | 9:12 25:22 | 302:21 | 265:3,6 |
| 264:16,24 | 64:5 69:10 | 296:22 | clarify | coffee |
| 265:2,9,13 | 117:25 | circumsta... | 18:3 21:5 | 79:5 |
| 265:18,22 | 201:11 | 59:13 186:22 | 28:2 35:3 | collected |
| 266:1,6 | 268:24 | 249:11 | 38:10 42:6 | 17:9 311:2 |
| 280:12,17 | 309:12 | 256:24 | 42:10 44:17 | Collectively |
| certificates | change | 259:12 | 61:14 67:6 | 27:13 |
| 266:3 | 62:15 167:25 | 296:12 | 67:10 77:18 | college |
| CERTIFICA... | 171:12 | cite | 89:24 97:16 | 20:8,9,9,10 |
| 321:20 | 183:16 | 270:16 290:7 | 111:4 | colleges |
| Certified | 246:2 257:2 | cities | 112:22 | 20:11 139:17 |
| 321:22 | 305:5 319:3 | 32:4 | 131:18 | colloquy |
| 322:20 | changed | citizen | 140:9 | 144:1 |
| certify | 184:2 254:2 | 44:8 77:23 | 184:15,23 | COLUMBIA |
| 321:23 | changes | 159:16,23 | 186:24 | 1:1 321:1 |
| 322:15 | 5:5 183:14 | 159:24 | 233:20 | combatting |
| cetera | 200:3,12,16 | citizens | 293:18 | 85:20 |
| 98:16 185:4 | 200:22 | 70:24 71:8 | clarifying | combination |
| 257:1 309:1 | 240:1 | 71:16 74:10 | 38:3 210:20 | 35:19 182:9 |
| 317:21 | 260:25 | 75:8 158:25 | clear | come |
| Chad | 319:1 | 159:5,7,13 | 7:7 23:5,20 | 13:24 35:15 |
| 4:2 | characterize | 301:7,13,19 | 48:14 80:6 | 60:17 79:5 |
| chad@braz... | 122:16 | | 90:24 | |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                                  May 17, 2012

| | | | | |
|---|---|---|---|---|
| 98:8 108:3 | 197:9 198:3 | 46:14 48:15 | 57:7 275:12 | 89:13 99:6 |
| 136:18 | 199:13,20 | 49:15 52:1 | **complies** | 118:12 |
| 230:22 | 200:21 | 54:11,25 | 18:8 | 119:23 |
| 260:15,21 | 201:19 | 55:17 56:7 | **composition** | 135:9 |
| 260:21 | 202:7 208:9 | 59:4 89:11 | 212:13,13,21 | 146:25 |
| 294:21,25 | 212:8 | 121:2 | 213:3,22,22 | 147:19 |
| **comes** | 215:25 | 133:14,25 | 214:4,4,12 | 148:6 |
| 52:20 107:23 | 220:23,25 | 134:4 135:7 | 214:13 | 155:19,24 |
| 193:18 | 221:2,5 | 135:19 | 215:1 | 156:4,17 |
| 196:14 | 298:14 | 136:23 | 259:19 | 171:16 |
| **coming** | 299:18 | 137:8 | 260:7,12 | 177:16 |
| 14:2 123:8 | **committees** | 139:19,25 | **compound** | 179:24 |
| 146:23 | 21:24 22:2 | 147:19 | 103:16 | 181:18 |
| 147:6 | 22:22 96:21 | 150:5 | 187:10 | 184:4,16 |
| **comments** | 193:13 | 155:15 | 211:13,19 | 210:22 |
| 292:22 | 194:16 | 158:12 | 211:24 | 211:11 |
| **Commerce** | **common** | 161:23,24 | 316:21 | 216:10 |
| 24:8 221:22 | 71:15 | 162:2 | **computer** | 223:1 |
| 221:23 | **communicate** | 163:13,23 | 34:6,8 | 235:11,14 |
| **commission** | 34:9,24 35:1 | 163:25 | **concealed** | 236:2,22 |
| 60:19 311:16 | 35:5,11,14 | 164:1,5 | 130:14 | 238:24 |
| 312:2 | 35:23 36:1 | 211:9 223:3 | 259:13 | 239:23 |
| **committee** | 36:3 | 235:11,14 | **concealed...** | 241:4 290:4 |
| 5:12 22:14 | **communicated** | 237:16,23 | 234:10 | 302:15 |
| 22:15,18,19 | 49:15 316:25 | 240:6 241:3 | **conceivably** | 303:13,21 |
| 22:19 24:14 | **communica...** | 244:6,12,14 | 227:4 | 304:22 |
| 24:17 46:23 | 35:20 38:5 | 244:22,24 | **concept** | 305:20 |
| 72:3,21,22 | 38:11 61:2 | 245:3,20 | 147:23 | 306:23 |
| 97:8 101:17 | 74:20,21,22 | 271:10 | 179:24 | 307:15 |
| 101:21,25 | 74:22,23 | 274:18 | **concepts** | 308:1,23 |
| 102:15,19 | 76:6 84:19 | **compare** | 226:8 240:15 | **concerns** |
| 103:13 | 84:23 88:11 | 256:17 | 246:16 | 67:23 98:25 |
| 106:7,17,19 | 88:19 93:1 | 257:25 | **conceptua...** | 99:6 106:8 |
| 106:20,21 | 133:19 | 258:2 | 244:6 | 120:12,17 |
| 106:23 | 134:25 | **compel** | **concern** | 157:25 |
| 107:4,17,23 | 139:22,23 | 191:9 200:20 | 158:25 160:1 | 168:6 188:9 |
| 176:14 | 139:24 | 269:3 | 189:19 | 188:22 |
| 178:11 | 140:2 150:3 | 295:15 | 212:21 | 198:23 |
| 179:8,13,15 | 227:15 | 317:20 | 215:15 | 199:2,4,17 |
| 179:16,19 | 228:2,4 | **competing** | 258:24 | 199:21 |
| 181:18 | 244:18 | 29:5,6 | 289:2 | 200:5,5,20 |
| 193:16,17 | 245:15,21 | **completely** | **concerned** | 206:17,23 |
| 193:19,20 | 271:2,7 | 6:15 278:8 | 158:5 189:11 | 206:25 |
| 194:2,2,3,9 | **communica...** | **compliance** | 277:8 279:9 | 258:20 |
| 194:13 | 15:16 17:11 | 45:23 48:9 | 279:16 | 261:1 264:7 |
| 195:1,4,12 | 26:20 30:20 | 48:23 49:12 | 285:18 | **conclude** |
| 195:15,23 | 31:5 37:24 | 51:4 | **concerning** | 150:18 |
| 196:7,18 | 38:6,13 | **complicated** | 86:12 88:2 | 295:13 |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| | | | | |
|---|---|---|---|---|
| concluded | 182:2 217:22 | 250:15 | 152:5 | 113:16,19 |
| 318:2 | consensus | considered | contacts | 116:8 |
| conduct | 122:6,21 | 12:14 15:10 | 75:2 | 124:14,14 |
| 92:6 93:14 | 123:1,24 | 22:15,23 | contained | 124:21,23 |
| 95:23 96:5 | consequences | 99:1 107:22 | 118:16 | 124:25 |
| 141:9,10 | 228:18,20,24 | 188:18 | containing | 125:2,15 |
| 246:17 | consequently | 193:13 | 139:11 | 134:11,13 |
| 249:16,21 | 263:16 | 196:7 | contains | 135:4,12,15 |
| 259:5 285:1 | consider | 228:21 | 130:12,13 | 135:16,24 |
| conducted | 69:19 110:6 | 229:8 | 138:15,19 | 136:1,2,4 |
| 93:23,23 | 111:25 | 230:11,16 | 139:1 234:8 | 136:10,19 |
| 210:25 | 196:20 | 231:22 | 234:9 | 137:3 146:3 |
| 213:23 | 227:8 | considering | content | 146:8,10,11 |
| conducting | 246:21 | 37:2 113:1 | 75:2 150:2 | 146:13 |
| 92:12 285:12 | 247:5,14,20 | 144:4 197:1 | contents | 147:3,5,10 |
| confer | 283:13 | considers | 73:22 100:1 | 148:7,10,12 |
| 143:25 150:9 | considera... | 305:25 | context | 148:14 |
| conference | 50:1 69:18 | consistent | 9:1 282:15 | 156:4,7,10 |
| 1:10 3:17 | 71:12 98:23 | 275:4 | 308:17 | 157:2 |
| 28:6,16 | 106:19 | consistently | 309:9 | 165:10,17 |
| 29:8,8 | 107:22 | 204:6 205:12 | continue | 165:22,24 |
| 31:24 32:8 | 113:2 115:7 | 205:14 | 15:1 56:24 | 166:4,7,9 |
| 32:13 | 169:18 | constant | 117:18 | 166:16,17 |
| 191:11 | 175:12 | 28:5 | 277:25 | 167:5,8,15 |
| 238:16 | 177:17 | constantly | 295:22 | 167:19,21 |
| 321:10 | 181:12,19 | 34:11 35:13 | continued | 171:22,23 |
| conferences | 186:5 193:4 | 35:22 | 150:18 | 172:5,7,14 |
| 28:22 29:25 | 193:6 | constituency | continuing | 172:16 |
| Conferring | 195:14 | 120:18 | 142:3 276:6 | 179:7 180:2 |
| 310:3 | 198:12 | constituent | contrast | 180:4,5,13 |
| confidence | 199:13,21 | 74:20 150:4 | 256:18 258:2 | 182:2,6,8 |
| 278:16,23 | 201:19,22 | constituents | convened | 182:12 |
| 279:21 | 207:5,11 | 26:24 31:8 | 30:17 | 211:20 |
| 280:5,13,19 | 211:10 | 33:11,25 | convening | 214:20,24 |
| Confine | 212:8 | 46:16 54:13 | 239:18 241:9 | 220:12,12 |
| 199:22 | 215:25 | 56:8 135:20 | conversation | 236:1 |
| confining | 217:1 | 137:9 | 74:14 75:1 | 237:20 |
| 199:6 | 228:18 | 258:25 | 76:2,5,6 | 241:7 |
| confirm | 232:2 | 303:21 | 86:11,15,16 | 253:17 |
| 132:13 | 264:14 | 307:22 | 86:21 89:5 | 271:3,14 |
| 159:20 | 273:11 | 308:7 | 89:20 97:14 | 302:20 |
| confirmed | 275:14 | 317:16 | 98:12,21 | 304:9,12,14 |
| 86:23 | 281:18,19 | constitut... | 99:23 100:1 | 304:14,16 |
| Congress | 320:10 | 25:14 | 100:2,8,20 | 304:19 |
| 2:7 322:23 | considera... | consult | 101:3 | 306:10,17 |
| conjunction | 217:2 235:18 | 91:5,14 | 104:22 | 307:13 |
| 69:21 169:18 | 247:18 | contact | 105:1 113:4 | conversat... |
| connected | 248:5 | 60:18 75:1 | 113:7,10,15 | 27:2 48:11 |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

334

| | | | | |
|---|---|---|---|---|
| 48:21 49:5 | 181:24 | 233:9,24 | 256:2 | 74:13 75:22 |
| 60:24,25 | 182:5 211:9 | 280:17,17 | 262:21 | 80:21 82:2 |
| 65:5 74:12 | 211:15,16 | **corner** | 263:1,8,19 | 85:16 86:9 |
| 75:6,14,22 | 212:3,7,24 | 208:14 | 274:5 | 88:20 103:1 |
| 76:9 81:14 | 214:3,9,10 | **correct** | 281:14 | 117:1 |
| 81:15,17 | 214:19,25 | 11:6 14:13 | 297:12,15 | 143:24 |
| 87:8,16,20 | 218:24,25 | 14:13 16:3 | 297:18 | 144:1 |
| 87:25 88:1 | 219:1,9,13 | 18:10 19:17 | 298:20 | 170:12 |
| 88:22 89:3 | 219:17,25 | 23:19 30:1 | 299:7,24 | 177:19 |
| 90:13,17 | 220:4,9,15 | 30:8 58:1 | 300:13 | 189:3,5 |
| 91:1 92:12 | 228:6 231:1 | 58:13 63:11 | 307:11 | 191:11 |
| 92:18,23 | 231:7,11 | 70:3 80:4 | 319:22 | 206:7 208:8 |
| 93:2 97:12 | 232:2 | 86:3,4 | **corrected** | 228:1 247:3 |
| 98:10,14,20 | 235:19,20 | 93:15 94:24 | 62:20 | 250:24 |
| 99:5,9,10 | 235:22 | 95:24 97:13 | **corrections** | 255:19 |
| 99:11 100:5 | 236:2,5,8,9 | 98:1,7 | 205:2 | 261:25 |
| 100:13,15 | 236:21 | 99:18 102:7 | **correctly** | 268:24 |
| 100:16,23 | 238:17 | 102:16,20 | 54:1 187:22 | 270:23 |
| 101:7 | 240:20 | 102:24 | 297:8 | 295:17 |
| 104:21 | 253:12,15 | 103:15 | 310:19 | 305:12,24 |
| 105:3,6,9 | 258:20 | 112:20,24 | **cosponsored** | 315:15 |
| 108:10,12 | 260:11 | 119:11,20 | 24:1 | 322:15 |
| 118:16 | 270:4,13 | 130:20,22 | **cost** | **counseling** |
| 119:22 | 279:15 | 142:2 | 41:3,12 | 189:14 |
| 124:8,12,15 | 302:10 | 143:22 | 45:17,18 | **counsel's** |
| 126:5,9,14 | 303:3,8,16 | 148:14,19 | 266:2 287:4 | 31:20 61:10 |
| 133:20 | 303:17,20 | 151:8 154:9 | 287:12 | 132:2 |
| 145:24 | 303:24 | 154:14,16 | **costs** | 156:22 |
| 146:2,5 | 304:3 305:1 | 164:15 | 251:20,23 | 192:9 |
| 147:14 | 306:2,5,8 | 167:16 | 264:15 | 305:16 |
| 148:5,23 | 306:14,20 | 180:9 | 265:20 | **counted** |
| 151:22 | 306:22 | 181:22 | **Council** | 263:17 292:2 |
| 152:1,11 | 307:9,14 | 187:8,9 | 26:24 27:16 | 292:9,17 |
| 153:1 | 313:6 314:1 | 188:6,20 | 31:7 46:16 | **counties** |
| 155:19,25 | 315:22 | 190:17 | 50:16 51:3 | 21:9 152:24 |
| 156:9,17 | **converse** | 195:8,17 | 54:13 56:8 | **counting** |
| 157:6,10,11 | 272:19 | 196:16 | 317:15 | 171:16,18 |
| 165:4,6,8 | **conviction** | 197:18,24 | **counsel** | 172:4,6 |
| 165:13 | 52:24 | 198:9,16 | 10:21 11:20 | 287:2,10 |
| 166:6,14 | **convictions** | 207:17 | 11:21 12:24 | **county** |
| 167:4 | 53:2,7,20,23 | 209:15,18 | 14:11,23 | 41:8 58:8 |
| 170:20,24 | 153:16 | 210:13,18 | 17:1,21 | 72:1 89:12 |
| 171:15,18 | **cooperate** | 210:23 | 27:2 48:19 | 103:21,21 |
| 172:9,15,20 | 265:11,16 | 224:8 238:5 | 48:21 49:2 | 103:23 |
| 172:22,25 | **copy** | 242:16 | 49:6,9 50:3 | 152:18 |
| 173:4,9,13 | 40:19 62:20 | 243:1 | 50:6,10,12 | 320:2 |
| 173:16 | 174:12 | 244:16 | 57:7,15 | **course** |
| 179:4,23 | 222:21,23 | 252:20 | 59:23 70:16 | 20:16 93:2 |
| 181:16,21 | | | | |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

335

121:12
144:4
**courses**
20:17
**court**
1:1,11 6:16
11:9,11
16:10,17
18:14 43:6
49:19,23
53:12 57:18
57:20 59:7
59:9 60:23
65:12,14
74:18 78:19
93:6,8,19
99:14 103:7
103:8 129:3
142:17
144:15,16
145:10,16
149:10
150:23
157:13
171:3,5
192:15
197:17
198:1,18
270:14
275:13
276:9
280:18
291:8 321:1
321:11
**courtesy**
196:10
**courts**
82:17
**court's**
87:5 142:18
144:4,12,23
149:14
177:16
211:17
212:5 271:6
**cover**
116:13
138:18

**covered**
169:4 206:14
259:21
267:24
270:8
**co-sponsors**
162:11,14
**crafting**
91:15
**create**
312:25
**creates**
55:10
**Creek**
4:3
**criminal**
234:14
**CSR**
2:5 322:22
**current**
51:10,21
54:5,7 56:1
58:12
133:14,25
154:5,7,11
154:18,22
159:7,12
237:16,23
238:3
**currently**
21:4,24
45:11,11,13
77:8,9
94:14 300:2
**custodial**
322:10
**custom**
25:4
**Cypress**
4:3

———————
**D**
———————
**D**
3:19 176:10
178:13,14
178:20
182:9 184:4
**data**

11:19 12:8
45:15
198:17
308:22
310:17,21
311:2
313:14
**date**
47:23 60:25
62:6,8 63:2
63:5 68:23
68:24 69:2
74:22 76:4
98:20
113:16
212:4
322:23
**dated**
158:20
**Davis**
283:21 286:3
**day**
5:14 26:10
35:10,10
39:17 42:1
42:17 56:13
57:4 113:21
115:11
143:9
154:13
165:8 176:7
201:16,24
202:4 256:6
271:8,9
275:25
277:23
283:11,12
288:16
293:25
297:4,15
304:7
317:22
320:4,13
322:5,20
**days**
41:20 57:9
228:22
229:9

230:12,17
231:22
247:22
**DC**
3:15
**de**
303:16 304:4
306:14
307:7,9
**deal**
241:23,25
287:19
**dealing**
28:23
**dealings**
28:20
**Dean**
179:21
**debate**
198:22
**debates**
46:24
**deceased**
52:21
**December**
157:24
158:21
**DECHERT**
3:19
**decide**
16:2 57:14
143:2
225:19
**decision**
196:20
253:22
**declaration**
5:11 118:6,8
119:1
**declared**
232:13
**declares**
228:16
**decrease**
269:22 270:5
271:18
272:2,12,22

273:1
**deep**
121:18
**defeat**
226:5
**defendant**
1:7 2:2 3:11
11:13
295:17
321:7
**DEFENDANT...**
3:17
**Defendant...**
1:9,12,14,17
1:19 321:9
321:12,14
321:17,19
**defending**
189:3,17
**deferred**
216:3
**Define**
238:1
**defined**
38:9
**definitely**
86:16 114:8
**definition**
9:3,24 10:9
138:22
296:13
**degree**
20:12 92:22
118:15
**delay**
116:16
**delivered**
12:7 97:7
310:18,25
311:3
**Democrat**
85:10
**Democrats**
274:12
**demographics**
21:15,17
**deny**



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

315:10,13
315:16
316:8
**department**
3:13 45:16
82:16
126:18
221:24
265:10,16
280:11
308:10
**Department's**
290:4
**depends**
8:25
**deposed**
11:4,7
**deposition**
1:22 2:1 5:9
6:10 7:21
8:5 10:1,4
10:9,16
11:17,24
12:3 13:5,6
13:9 15:5,9
16:7 28:12
57:7,12
80:20,24
86:1 122:5
189:3,18
197:4
202:22
203:2
229:16
242:20
254:8
295:14,22
317:25
318:2
319:21
321:20
322:2,4,12
**depress**
274:12
**describe**
20:7 21:3,6
21:15 24:10
26:15 27:4

28:8,14
36:15,21
43:15 59:12
64:25 65:16
65:21 66:2
66:8 67:11
67:12 95:7
96:18
109:15,23
111:18
138:12
148:4,7,14
166:21
175:21,23
175:25
176:4
186:13,16
228:13
234:5 235:2
239:3 287:7
**described**
52:19 53:3
53:15,24
56:2 140:6
181:17
182:14
285:13
287:6
**describing**
119:20
186:14
**description**
5:8 24:12
152:3
211:18
212:5
214:16,21
214:22
215:6 220:6
305:3 320:7
**descriptive**
157:2
**designated**
228:10
231:18
232:10
**designates**
228:14

230:10
**designation**
228:7,24
229:2,7
230:19,23
231:2,14
**designed**
190:1,6
281:1,5,11
**desire**
86:12
**desk**
195:25
**detail**
102:5
**detect**
288:22
**deter**
288:22,22
**determina...**
170:7
**determine**
216:2 249:22
256:5
**determined**
254:24
**determining**
51:10
**develop**
265:10
**develope**
132:9
**developed**
131:9 235:3
**developing**
132:7 133:9
237:1,12
240:8 244:6
246:16
265:11,17
**development**
64:20 67:19
67:24 131:5
132:4
234:19
235:8
238:24
240:15

**Dewhurst**
69:14 70:3,9
72:24 73:9
73:12,19,21
74:6 107:13
147:4,8
148:6
182:16,21
**Dewhurst's**
71:6
**difference**
254:14
311:23
312:7,11,12
312:15,19
**differences**
67:12 253:6
274:25
302:15
303:13,21
303:25
**different**
10:14 32:4
45:5 82:7
96:21
118:13
119:9
121:14
123:10
177:24
202:1 233:7
251:7 278:3
278:4,5,6
306:21
315:13
**difficult**
8:24 57:6,10
82:4 289:3
**difficulty**
258:25 278:1
316:2
**diluted**
158:5
**direct**
17:15 106:3
118:4
140:22
175:16

177:15
213:1
283:17
**directing**
18:4 43:11
63:4 67:1
83:3 104:11
145:3
174:22
202:11
264:24
284:22
**direction**
83:2
**directly**
73:4 124:20
124:22
194:9,13
195:1
**director**
84:2
**disabilities**
260:15 261:7
261:12,15
262:3,20,25
**disagree**
48:22 119:13
122:9
205:22
208:8
270:15
305:4
314:17
317:7
**disclose**
94:16
**disclosed**
306:13
**discriminate**
273:5
**discrimin...**
294:22 295:5
295:10
**discuss**
46:22 56:18
56:24 78:14
95:25
132:21



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

337

135:15
173:16
199:1
203:22
209:11
239:5
253:16
277:6,8
**discussed**
32:9 80:16
139:5
224:13
239:23
302:12
314:3
**discussing**
81:2 209:13
209:14
275:17
**discussion**
166:22
233:10
239:8
276:14
289:12
311:10
**discussions**
13:25 15:17
37:4 167:6
302:14,18
303:11
304:21
305:8,19
307:15,18
307:22
308:1,5
315:3
317:14
**dispropor...**
249:23 260:8
285:20
317:8
**dispute**
311:20
**distinction**
35:5 158:9
**district**
1:1,1 21:4,7

21:8,10,12
21:16
103:22
120:11
321:1,1
**divided**
24:20
**divorcing**
216:24
**document**
16:19,23
17:2,4,6,19
17:22 18:5
18:25 19:8
41:13 64:1
64:3 65:21
68:22 69:3
69:5 72:14
117:25
127:7 129:8
129:10
157:21
159:20,21
174:2,6,7
174:17
175:16
233:13
283:9,18
289:20,25
320:7
**documentary**
66:16 129:19
224:6
**documenta...**
60:20 83:9
262:21
**documents**
12:12,16
13:11 14:8
14:18,22
15:2 17:8
17:11,18
18:17,17,21
18:23 19:1
19:19,23,24
20:2 30:19
160:14
223:1,8,13

252:1
264:22
265:8,21,25
286:6 316:3
316:18
317:21
**doing**
47:8 50:24
118:19,19
193:23
216:25
217:16
242:21
309:17
316:11
317:3
**DOJ**
295:22
**doubt**
314:24 315:9
315:13
**dozens**
282:9,10,14
**DPS**
280:10
**draft**
158:22
226:10
240:2
**drafted**
69:13 302:25
**drafting**
31:12 49:12
49:25 50:13
91:4 132:25
133:9 135:9
139:5 141:4
226:4,7,9
235:12,15
235:18,19
236:2 237:8
240:8,12
246:2,9,11
246:15
264:13
**drafts**
50:12 245:24
**drawing**

90:25
**driver**
288:15
**driver's**
38:22 39:1
39:22 40:7
71:14 83:16
130:11
198:14,20
210:11,12
210:15,16
211:12
212:16
213:9 234:7
249:4,8,10
249:13
266:10
280:11
289:4
314:21
315:11,17
316:15,16
**drove**
39:23
**dues**
28:7 29:8
**duly**
2:2 6:2
321:25
**Dunn**
4:2,2
**duration**
165:9
**D.C**
27:22 241:22

_____
       **E**
_____
**E**
3:3,3
**earlier**
67:6 79:10
97:11,24
111:14
121:11
137:12
142:1
177:20
185:7

186:25
197:4
217:19
224:2,4
227:12
242:15
243:19
252:11,14
254:17
255:9
302:12
306:16
**early**
41:25,25
42:2,18
**easier**
28:12 310:9
**easy**
316:14
**EDUCATION**
1:13 321:13
**educational**
20:7
**effect**
17:13 27:9
62:9 81:8
81:13 83:11
84:5 90:5
128:15
176:18,22
176:23,24
295:1,10
304:22
305:6,9,20
306:23
307:7,11,16
307:19,23
308:2,23
311:21
**effective**
154:4,22
215:20
**effectively**
217:23
**effort**
94:11,16
**eight**
23:7



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

338

| | | | | |
|---|---|---|---|---|
| **either** | **elections** | 50:7 169:18 | 270:14 | 201:1 204:4 |
| 11:13 52:5 | 41:15 52:22 | 322:16 | **entire** | 205:10,15 |
| 89:12 111:3 | 58:2 221:2 | **employee** | 24:17 118:6 | 206:2,11 |
| 143:21 | 221:4 233:3 | 257:22 | 174:4 | 212:13 |
| 166:10 | 233:6 | 293:20 | **entirety** | 213:22 |
| 174:14 | 258:15 | **enables** | 119:21 | 214:4,13 |
| 193:23 | 274:13 | 28:16 | **entities** | 215:1 |
| 210:8 | 279:20 | **enacted** | 50:25 52:1 | 224:21 |
| 212:15 | **election-...** | 12:13 23:22 | 55:1,18 | 264:8 |
| 222:14 | 23:3,17 | 51:12 67:13 | 59:5 163:13 | **ethnicity** |
| 250:6 274:8 | 37:21 48:8 | 82:8,10 | 302:11 | 119:25 |
| 302:25 | 91:4,15 | **enacting** | 317:2 | **events** |
| 314:18 | **electoral** | 58:24 142:21 | **entity** | 28:22 |
| **elaborate** | 278:16 | 144:19 | 50:8 | **eventually** |
| 151:8 | **eligibility** | 239:8 | **enumerated** | 20:12 |
| **elected** | 44:11,20 | 285:13 | 314:2 317:2 | **evidence** |
| 20:22 21:2 | **eligible** | 286:12 | **ERIC** | 76:17 104:16 |
| 25:12 95:2 | 26:9 44:16 | **enactment** | 1:5,8 321:5 | 188:4 195:7 |
| **election** | 263:14 | 63:3 278:21 | 321:8 | 268:12 |
| 20:17 42:1,4 | 285:2 | **encompasses** | **essence** | **evolve** |
| 42:9,17 | 312:17 | 9:19 | 116:3 132:11 | 274:21 |
| 45:14,17 | 313:1 | **encompassing** | 132:12 | **exact** |
| 71:15 89:12 | **Elizabeth** | 21:9 | **establish** | 183:24 |
| 89:20 143:9 | 3:12 156:24 | **enforced** | 26:9 178:8 | 313:12 |
| 151:23 | 275:11 | 58:8,13 | 178:22 | **exactly** |
| 152:6,11,14 | 322:9 | 82:17 | 179:17 | 131:19 |
| 153:2 | **elizabeth...** | **engrossed** | **established** | 221:14 |
| 154:13 | 3:16 | 79:18 80:8 | 26:7 | **examination** |
| 155:10,20 | **Ellis** | 80:10 | **establishes** | 5:4,4 6:5 |
| 156:5,18 | 166:9,9,19 | 233:17 | 179:22 | 13:24 94:12 |
| 247:22 | 167:16 | **Engrossing** | **establishing** | 116:13 |
| 256:25,25 | 284:24 | 50:19 | 89:18 179:5 | 295:18 |
| 257:9 258:6 | 285:10 | **Enrolling** | **Estes** | 322:6 |
| 258:12,21 | 306:17 | 50:19 | 162:14 | **examine** |
| 258:25 | 307:10 | **ensure** | **estimate** | 271:19 278:5 |
| 259:6 | **embodied** | 48:8 159:5 | 34:16 | **examining** |
| 263:15 | 179:24 | 168:21 | **estimates** | 177:10,13,18 |
| 264:16,23 | **emergency** | 217:19 | 17:12 | **example** |
| 265:3,9,12 | 228:11,14,16 | 266:18,25 | **et** | 165:14 |
| 265:18,21 | 229:3,8 | 267:10,16 | 1:8,13,16,18 | 296:19,24 |
| 265:25 | 230:11,23 | 286:13 | 3:11 64:18 | 297:1,10 |
| 266:2,5 | 231:2,18 | **ensuring** | 98:16 185:4 | **examples** |
| 268:3 | 232:10,14 | 158:25 257:9 | 257:1 309:1 | 282:22 |
| 280:12 | **emotion** | **entail** | 317:21 | 300:21,23 |
| 283:24 | 114:12 | 25:2 | 319:2 321:8 | **exception** |
| 308:2 | **employed** | **entailed** | 321:13,16 | 260:14,19 |
| 311:22 | 33:20,22 | 25:6 124:15 | 321:18 | 298:5 |
| 312:15,19 | 38:15,17 | **entered** | **ethnic** | **excerpt** |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

| | | | | |
|---|---|---|---|---|
| 5:12,17 | 208:4,13 | 159:14 198:9 | 34:12,14,15 | 268:11 |
| 208:8 | 233:12,20 | **explanation** | 34:18,18,21 | **factual** |
| 311:12 | 242:15 | 108:4 161:18 | **e-mails** | 169:14 |
| **exchange** | 262:12,18 | **exploit** | 34:17 147:19 | 302:19 |
| 27:16 28:10 | 283:7,9 | 84:7 | ———————— | **failed** |
| 112:2 | 289:13,19 | **express** | **F** | 51:17 115:4 |
| 208:18,25 | 308:10,10 | 199:16 | **face** | 124:9 |
| 209:22 | 311:5,6,8 | 258:24 | 35:20 81:19 | 126:10,15 |
| 210:21 | **EXHIBITS** | **expressed** | 138:23 | 221:24 |
| 245:24 | 5:7 | 59:18,25 | 161:19 | **failure** |
| **executed** | **existed** | 72:25 74:4 | 255:20,23 | 121:7 |
| 320:9 | 124:14 228:3 | 320:11 | 256:2 261:7 | **fair** |
| **executive** | **existence** | **expresses** | 263:1,19 | 269:9 292:4 |
| 134:6 244:25 | 113:10,12 | 158:24 | 264:3,23 | **fairly** |
| 303:25 | 155:25 | **expressing** | 312:16 | 152:3 292:2 |
| 307:19 | 170:23 | 201:2 | **face-to** | 292:9,17 |
| 308:6 | 172:25 | **extend** | 35:19 | **faith** |
| **exempt** | 214:8 | 59:24 | **face-to-face** | 206:25 |
| 300:16,18 | **expect** | **extent** | 35:16,21 | **fall** |
| **exemption** | 14:3 | 32:12 39:7 | **facilitate** | 136:17 |
| 262:19,25 | **expecting** | 81:18 95:19 | 116:8 | 138:13 |
| **exercise** | 13:24 | 98:3 99:8 | **facilities** | 166:19 |
| 56:21 | **expeditio...** | 109:7 | 314:21 | **falls** |
| **exhibit** | 232:22 | 117:17 | 315:11,18 | 38:24 150:7 |
| 16:12,18,22 | **experience** | 118:21 | 316:15,17 | 158:14 |
| 17:9 18:18 | 42:3,8 109:4 | 120:3 | **fact** | 227:4 |
| 19:3,15,19 | 193:25 | 128:22 | 48:10 84:23 | **false** |
| 62:17,18 | **expert** | 155:11 | 115:17 | 7:11 |
| 63:20 64:6 | 116:8 117:12 | 158:8 | 133:19 | **familiar** |
| 66:14 67:14 | 196:14 | 160:21 | 167:5 | 27:15 44:23 |
| 68:21 69:1 | **Expiration** | 162:9 163:9 | 172:14 | 64:22 66:5 |
| 69:10,13 | 322:23 | 163:14 | 197:25 | 79:15,25 |
| 70:6,23 | **expired** | 195:7,19,21 | 198:5 | 84:8,11 |
| 71:5 79:12 | 130:11 | 200:11 | 205:13 | 89:22,24 |
| 80:6 83:4,7 | 234:10 | 203:21 | 213:16 | 147:23 |
| 117:21,22 | 247:15,21 | 204:21 | 225:1 | 185:6 |
| 117:24 | 247:25 | 245:16 | **facts** | 187:19 |
| 127:14 | 248:8,10,16 | 255:11 | 48:2 55:12 | 223:21 |
| 129:4,7 | 248:18,22 | 279:2 283:5 | 76:16 92:25 | 308:21 |
| 130:3 | 283:24 | 291:4 | 104:16 | **familiarize** |
| 157:15 | 293:20 | 313:24 | 105:1 | 184:9,12 |
| 159:4 174:1 | **explain** | 314:1,4 | 118:13 | **far** |
| 175:16 | 47:12,15 | **Ezra** | 144:5 153:5 | 38:25 39:5,7 |
| 177:10,13 | 112:23 | 3:19 295:23 | 156:9 | 41:21 136:9 |
| 182:13 | 151:8 | 309:2 310:7 | 163:25 | 136:12 |
| 201:6,12 | 176:18 | **ezra.rose...** | 165:8 188:3 | 200:2 |
| 202:12 | 229:22 | 3:22 | 195:6 | 235:17 |
| 207:23 | **explained** | **e-mail** | 267:20 | 295:21 |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

340

| | | | | |
|---|---|---|---|---|
| **faster** | 236:23 | 211:17,18 | 106:22 | 120:15 |
| 116:11 | **filed** | 245:19 | 107:5,7,8 | 132:1,11 |
| **father** | 63:1 64:12 | 262:9 | 107:18,22 | 156:21 |
| 52:21 | 66:10 68:9 | 299:23 | 107:24 | 192:9 206:6 |
| **favor** | 79:16,17,20 | 310:4 | 108:22 | 226:5 247:2 |
| 108:21 | 109:11 | **finish** | 109:21 | 250:23 |
| **favorably** | 127:24 | 6:23 46:21 | 110:3,24 | 321:24 |
| 176:14 | 128:1,8 | 78:15 | 112:3,7 | **follows** |
| 178:10 | 129:22,23 | 101:12 | 113:6 114:2 | 6:4 322:12 |
| 298:13 | 131:7 | 168:4 | 114:20,23 | **font** |
| 299:17 | 132:11 | **Firm** | 115:1,6,7,8 | 16:14 |
| **fear** | 135:10,13 | 322:25 | 116:1,4,5 | **forces** |
| 84:8 | 135:21 | **first** | 119:2,4,5 | 30:16 |
| **federal** | 137:4,10 | 6:2 7:6 | 120:24 | **foregoing** |
| 2:8 130:15 | 167:12,23 | 28:23 43:15 | 146:23 | 319:20 320:8 |
| 139:2,12 | 186:19 | 43:25 44:12 | 147:6 170:9 | **foreign** |
| 223:21 | 194:12,20 | 46:6 58:23 | 170:16,21 | 71:21 72:3 |
| 256:15 | 198:10 | 60:14,18 | 171:15 | 75:11,16 |
| 257:8 | 205:22 | 61:13 71:24 | 172:18 | 76:10,25 |
| 262:21 | 226:3 | 87:21 92:19 | 185:23 | **form** |
| **fee** | 233:15,17 | 93:20 | 186:5 198:2 | 8:7 71:15 |
| 28:6 | 246:3,23 | 114:25 | 198:11,22 | 74:23 77:21 |
| **feel** | 252:17 | 118:5 | 199:20 | 222:15 |
| 6:25 34:1 | 276:21 | 174:22,24 | 201:22 | 248:19 |
| 118:23 | 295:15 | 179:12 | 221:10,17 | 250:20 |
| **fees** | 304:6 | 180:8,12 | 259:3 | 251:18 |
| 286:4 | **filing** | 184:7 | 281:17,19 | 265:4,11,17 |
| **felt** | 133:10,16 | 187:12,13 | 283:13 | 286:5,7 |
| 177:21 | 134:7,16 | 201:14 | 284:11,23 | **former** |
| 190:12 | 135:5 | 203:3 | 285:25 | 84:2 133:15 |
| 205:25 | 136:14,15 | 221:12 | 286:25 | 134:1 |
| **fewer** | 139:6 | 228:21 | 288:9 303:8 | 237:17,24 |
| 243:11,14 | 152:12 | 229:9 | **focus** | **forms** |
| **fiercely** | 153:3 226:2 | 230:12,17 | 24:5,16 | 66:15 130:4 |
| 160:19 | 236:12 | 231:17,22 | 303:8 | 137:12,15 |
| **fifth** | 245:16 | 261:22,25 | 308:14 | 137:25 |
| 5:14 283:10 | **final** | 262:1 307:5 | **focused** | 139:20 |
| **figure** | 114:24 | 311:9,10 | 24:17 | 142:2 |
| 50:24 194:23 | 119:16 | **firsthand** | **folks** | 143:16 |
| **file** | 270:19,19 | 42:21 | 238:17 | 146:25 |
| 12:6,18 | **Finally** | **five** | **follow** | 154:24 |
| 126:23 | 9:21 | 7:23 36:16 | 144:12 186:1 | 215:2 234:5 |
| 128:2 | **finance** | 219:18 | 187:5 | 242:16,24 |
| 131:20 | 23:17 | **flagged** | **following** | 242:25 |
| 225:25 | **financially** | 54:5 | 26:8 31:19 | 243:11,14 |
| 226:1,1,18 | 322:18 | **floor** | 79:20 85:15 | 246:22 |
| 226:24 | **fine** | 3:8 26:1 | 86:8 91:18 | 247:6,10,15 |
| 227:13,19 | 80:24 82:25 | 79:18 80:12 | 93:10 96:8 | 247:21 |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

341

249:17,23
251:7
253:23
254:3
258:13
293:9,11
formulated
302:25
formulating
37:14
forth
82:3 118:14
119:10
forum
239:21,22
241:20,24
242:3
forward
107:9,10
291:15
308:20
forwarded
322:9
fought
160:19
found
57:9
foundational
270:12
four
238:18,22
241:8
288:16
frame
77:7 245:12
Fraser
1:23 2:1 5:3
6:1,7,9
8:25 63:22
66:20 71:11
76:8 96:24
111:12
114:3
122:18
160:25
209:1 212:6
318:1
319:20,25

320:5
321:20,25
Fraser's
94:4 121:18
fraud
51:17,21
53:24 56:2
58:16
197:10
268:4,6,7
268:16
269:17,18
279:10,16
288:23
311:22
Frederick
3:5 150:8
188:24
189:2,5
free
6:25 111:23
118:24
163:15
228:4 230:3
243:25
264:18
266:1
front
65:17,21
110:3
149:19
fulfillment
255:8
full
80:23
fully
80:20 271:24
FUND
1:13 321:13
furnishing
159:16,23
further
14:21 19:4
86:22 124:2
132:4
143:16,20
161:18
176:21

178:24
204:13,17
205:2
229:22
249:1
322:15,18
furtherance
46:12 51:25
54:10 55:16
59:3 65:4
114:9
128:23
132:19
133:6
155:13
158:11
163:11
169:4
203:16
211:3
217:15
226:14
237:4 243:8
243:24
246:7
255:13
256:20
257:18
259:9 302:9
317:13
furthered
217:22
furthering
218:18
future
176:7 297:5
F-r-a-s-e-r
6:9

_____ G _____
gabled
201:24
gaining
181:2
Gallegos
288:14
game
117:4

games
116:24
gardening
109:17
Gear
3:13
general
1:6 3:6
14:17,22,23
29:21 45:2
51:8 74:24
76:3 87:5
87:10 91:9
91:13
100:10,11
107:16
109:25
110:1,2
121:12,23
122:5,20
123:1,24
125:4,6
130:8
142:20
144:17,20
144:25
166:21,22
166:22
167:2,18
169:14
171:10,11
193:22
211:18
212:4
214:16,21
214:22
215:6
216:20
217:2 220:3
220:6 229:5
229:6
230:13
239:3,7
245:22
248:7,13
253:17
259:23
271:1,7

283:24
305:3
312:25
321:6
generally
23:9 28:15
30:13 33:24
35:7,21
41:15 50:10
105:8
185:24
193:18 196:9
222:15
223:24
312:24
General's
50:11
genuine
206:18
geographic
21:8
Georgia
135:9 213:15
213:17
238:12
240:7,10,25
243:4,12
254:11
311:1
getting
41:5 48:18
100:11
152:2,3
164:17
169:23
232:21
246:6 289:4
310:9
give
50:6 62:7
69:2 92:25
108:4 184:1
199:10
213:18,19
217:7 219:6
222:13
236:19
245:12



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

342

275:14
282:21
296:19,24
300:10,12
300:23
308:17
309:9
310:12
**given**
25:15 45:5
52:5 120:13
120:18
121:19
228:7
248:25
249:2
282:14
320:12
322:2
**giving**
7:11 9:12
307:6
**glad**
112:24
144:11
187:23
197:13
282:21
293:23
**glasses**
16:15
**go**
7:5 30:13
38:23 39:10
39:17,19
41:5,10
43:20 45:25
46:17 47:16
47:25 55:5
55:21 56:21
57:16 61:1
65:12,22
76:17 79:9
97:16 103:8
103:17
106:13
111:9
116:11

128:17
144:13,13
150:11,13
153:24
157:17
187:8,15
188:4
190:23
192:3,3
194:1,2
195:4,7
201:24
213:25
227:7
233:16
249:3
268:12
270:21
274:17
276:6,8
277:3,12,25
280:10
282:3,24
289:9,16
291:10
295:21
300:14
309:3,5
316:16
**goal**
257:8 278:25
**goals**
36:21 288:4
**goes**
29:7 81:8
82:21
243:22
**going**
6:12 17:8
26:16 32:11
32:14 35:8
37:5,8 57:6
57:11,16
61:3 73:7
76:13,15,21
79:1 81:7
82:2,20
87:6,13,14

87:18 91:11
91:16 92:19
92:25 93:20
94:19 96:2
96:12 98:2
100:11
101:13
103:8 108:4
113:9
116:22
117:2,6
118:4,19
121:22
128:21
129:6 143:2
144:12,13
144:24
145:15,20
149:13
150:1,11,13
150:19
151:15
152:8
153:23
157:8,12,13
158:4
161:19
168:3 169:2
169:6 171:8
171:17
173:12
177:4,25
178:4,15
191:9 192:1
192:2,7
200:19
208:11,12
211:1
213:16
215:7 217:9
228:3 233:3
246:5
250:13
253:8
255:10
257:3
264:17
267:7 269:7
269:8 270:6

274:23
275:7 276:3
276:4,5,8,9
276:11,13
277:17
279:1,2
282:12
295:24
296:6,8
306:1,7
307:2
308:14
309:6,7
313:23
315:14
**good**
6:7 8:1 12:9
21:19 138:2
144:6,11
153:22
154:2
189:17
206:25
291:13
297:1
**Gotcha**
127:16
**gotten**
40:3
**governing**
177:17 255:2
255:16
**government**
130:15
139:13
140:19
162:17
163:6
**governor**
25:7,7,8,11
25:12,18,25
26:3,9,11
27:4,5,8
35:24 36:6
69:14 70:2
72:24 73:19
82:10 86:17
87:22,22,25

88:2 107:13
126:11,11
126:12,12
147:4 148:5
162:23
163:2 228:8
228:8,11,14
228:16
229:3,4
230:10,19
232:10
233:23,25
236:22
245:5 308:6
308:7
**Governor's**
26:23,23
35:24 36:1
36:3,9,13
86:2,12
87:9,16
88:11,24
89:6 125:16
126:9 134:5
134:5,17
135:5
231:15
245:4
**grant**
116:10
**grateful**
82:6 144:9
144:10
**great**
208:2
**ground**
6:12
**grounds**
169:7
**group**
9:4 29:5,7
50:16,18,20
60:8,12,21
221:21
224:21
273:1,5
276:3 285:5
**groups**



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

343

33:11 50:15
60:16 105:9
105:19
132:25
135:13
163:7,17
164:5,9
221:8
237:12
244:7,12,22
273:5
307:23
**guess**
35:4 225:10
**guidance**
216:9
**guidelines**
222:14

**H**

**H**
1:5 86:13
321:5
**half**
39:9
**hand**
63:19 68:17
127:3
128:18
129:4,6
157:12,14
173:25
201:5
320:12
**handed**
16:17 62:3
62:19 63:24
79:12,25
117:23
127:5
207:24
208:3
233:11
283:8
**handgun**
130:14
234:10
259:13

**handing**
68:20 289:15
289:18
**handle**
18:25
**hand-in**
128:17
**happened**
43:19 97:5
102:25
119:4,7
172:14
183:23
213:19
220:21
254:9
**happening**
6:13
**happens**
45:14 228:13
228:14
**happy**
157:2
**harassing**
276:7 277:14
**hard**
222:23
**harmed**
288:21
**harmful**
295:1
**Harris**
72:1
**HAVA**
223:23,24
224:16
**HB**
5:10 81:24
82:7 86:13
87:17 88:3
88:23 89:8
89:13 95:23
96:6 97:25
98:8,23,25
99:6,18
101:14,16
101:22
102:3,7,16

102:20
103:14
106:6,8
107:8 108:1
109:20
110:23
111:6
112:10
113:5
114:22
115:7 116:1
116:3
119:23
120:13,18
125:25
126:6,10,14
133:9
135:10
145:25
150:16
**head**
6:21 33:1
188:21
216:16
242:14
266:23
291:23
297:9
**headquart...**
241:21
**hear**
18:14 56:21
57:4 58:23
119:16
124:20
140:1
143:12
145:5
150:23
227:9
229:18
**heard**
24:11 26:10
26:13 37:10
52:9,10
59:13 60:14
84:13 85:3
90:20,20,22

108:2,17,17
108:17,17
158:3
189:14
227:25
301:2 304:7
**hearing**
101:22 102:3
102:7,8,10
102:12,15
102:20
103:2,14
106:6,10,14
128:9,14
174:20
175:5
178:23
195:13
196:4
197:15
199:7
**hearings**
11:19 12:3
33:8 46:23
52:3 199:5
**hears**
26:1
**Hebert**
70:13 125:18
**Heights**
277:16
**held**
32:3 58:2
100:13
102:3 104:2
108:17
114:19,22
174:20
233:3
239:12
**help**
51:1 82:22
130:6 138:7
223:22
**helpful**
108:7 262:24
263:23
**hereto**

2:10
**He'll**
214:20
**highlighted**
36:16,18,23
37:18,21
**Hispanic**
67:25 120:5
269:22
270:5
271:18
272:2,12,22
308:25
**Hispanics**
225:4
**history**
96:18,20
121:19
**hold**
15:25 22:11
30:25 36:12
72:13 87:2
101:21
177:3,3
195:18
196:13
229:12
**HOLDER**
1:5 3:11
319:2 321:5
**holders**
259:19 260:7
260:12
**holding**
120:12,17
**home**
38:25 39:7,8
39:9
**honor**
28:25 189:17
**honorary**
25:3
**hope**
8:2 149:16
**hoping**
10:16
**Horn**
300:24 301:3



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

344

| | | | | |
|---|---|---|---|---|
| **hour** | 131:12 | 148:6,13 | 263:15 | 298:6 299:5 |
| 39:9 | 132:10 | 150:18 | 266:16 | 299:17,23 |
| **hourly** | 193:19 | 151:1 | 274:20 | 300:8,22 |
| 289:3 | 194:8 | 154:24 | 275:22 | 301:7,13,14 |
| **hours** | 218:14,19 | 177:1,4,11 | 278:20 | 301:20 |
| 39:14,19 | 218:21 | 177:17 | 280:3,4,18 | 302:5 311:6 |
| 176:16 | 219:3,4,7 | 178:3,17 | 283:23 | 314:11,11 |
| 185:3 | 220:2,9,16 | 183:19 | 284:2,3 | 314:15 |
| 188:18 | 220:17,21 | 184:4 | 286:5,7 | 316:14,18 |
| 196:2,2,4 | 221:2,3 | 187:25 | 287:4,9,12 | **identific...** |
| 196:15,17 | **housed** | 188:16 | 287:12 | 316:4 |
| 196:21 | 50:8 | 197:6,16,23 | 290:5 293:2 | **identified** |
| 288:16 | **Houston** | 204:6 | 293:9,10,11 | 140:24 |
| 289:5 | 4:4 152:25 | 205:12,13 | 298:6,12 | **identify** |
| 298:15 | **human** | 206:2 | 312:18 | 32:17 51:20 |
| 299:19 | 114:12 | 208:22 | 313:11 | 54:17 59:18 |
| 322:13 | **Hundreds** | 209:4,14,22 | **idea** | 74:14,25 |
| **house** | 236:7,8 | 210:9 215:2 | 29:1 104:19 | 76:1 84:18 |
| 20:24 41:21 | | 216:2,18 | 182:22 | 86:16 87:7 |
| 61:18 63:11 | **I** | 221:8,13,17 | 251:20 | 113:15 |
| 64:12,20,22 | | 222:1,7 | 301:1 | 124:24 |
| 65:1 66:2,8 | **ID** | 225:10 | **identific...** | 130:4 |
| 66:10,11,14 | 8:4,5 12:13 | 234:1,4 | 8:8 16:12 | 134:10,14 |
| 67:7,13,15 | 15:10 20:3 | 236:25 | 55:24 58:24 | 134:15 |
| 67:19,24,25 | 20:19 22:15 | 237:8,17,24 | 62:18 71:15 | 146:3 153:6 |
| 68:5 69:18 | 22:23 23:1 | 239:9,10,24 | 83:9 117:22 | 155:9 |
| 70:23 71:12 | 24:2 30:20 | 240:7 241:5 | 130:4,14,17 | 165:21 |
| 72:2,8,20 | 30:23 32:9 | 241:17 | 131:3 138:6 | 184:25 |
| 73:5 74:4 | 32:14 37:25 | 242:8,16,17 | 138:14,19 | 201:15 |
| 74:11,15 | 60:17 61:5 | 243:3,11,12 | 138:22,25 | 214:20 |
| 75:7,10,15 | 61:12 66:16 | 243:15,16 | 154:20 | 223:12 |
| 76:9,19 | 69:14 90:6 | 246:22 | 176:13 | 236:17 |
| 78:2 79:13 | 99:21,24 | 247:6,10,15 | 178:10 | 238:9 |
| 79:17,19 | 100:6,16 | 247:15,21 | 193:7 | 240:19 |
| 80:1,6,8,11 | 104:5,21 | 247:25 | 207:23 | 292:7 300:1 |
| 81:2,4 86:3 | 105:6 | 248:2,8,10 | 224:16 | 300:6,21 |
| 86:5 92:7 | 126:23 | 248:15,17 | 234:5,8 | 303:7 |
| 92:13 93:14 | 130:11 | 249:17,24 | 248:19 | **identifying** |
| 96:19,19 | 133:15 | 250:5 251:1 | 258:6,12,15 | 51:21 55:8 |
| 97:3,7 | 134:1 | 251:8,18 | 258:17,21 | 59:24 265:8 |
| 98:23 99:1 | 137:13,16 | 252:12,15 | 259:1,6 | **identity** |
| 99:7 110:5 | 137:25 | 252:23 | 264:16,23 | 51:11 54:7 |
| 110:9 | 139:11,20 | 253:12,23 | 265:4,9,12 | 102:12 |
| 111:13 | 141:4 142:2 | 254:3,20 | 265:22 | 103:2 |
| 112:1 114:4 | 142:14 | 255:3,16 | 266:1,3,6 | 125:14 |
| 121:6 124:2 | 143:9,16,22 | 256:10,15 | 280:12 | 134:21 |
| 126:21 | 145:24 | 257:8,14,15 | 283:7 285:4 | 154:8,12 |
| 131:11,12 | 146:6,25 | 257:22 | 289:13 | 155:19 |
| | 147:15,21 | 258:13 | | |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

156:4,17
217:24
248:24
254:19
293:7,11,22
320:7
IDs
67:2 139:16
140:4,24
198:5
293:19,20
293:20
illegal
84:8
illegitimate
158:6
Illinois
238:10,12,13
illness
120:13
immediate
233:3
immediately
126:2 180:6
226:5
immigrati...
36:24 37:19
impact
7:20 67:25
95:23 96:6
106:8
141:10
198:23
199:17
200:6
206:17,24
213:13
impacted
246:17
285:20
impersonate
44:5 234:15
impersona...
58:16 101:10
150:25
153:16
154:4
268:17

311:19
impersona...
313:21
implement
224:16
implement...
215:20
implemented
213:15,18
implementing
216:18
implicate
118:23
implicated
14:1
implied
129:25
imply
62:10
implying
169:12
important
6:18 45:24
46:4 47:5
56:22 91:3
161:1,4,9
161:14,21
216:18
217:3 255:8
impossible
183:13
impression
131:23
impressions
26:19 31:4
31:16 37:1
46:11 51:24
54:10,23
55:15 56:5
59:2 65:3
72:17 83:1
84:24 94:18
114:9,15
128:22
132:18
133:5
142:11
155:13

158:10
163:10
169:3
200:24
203:15
204:23
211:2
215:12
217:14
226:14
232:5,24
237:3 243:7
243:23
246:7,25
247:17
252:25
254:13
255:12
256:19
257:4,17
258:4 259:8
261:19
267:4
274:18
275:2
276:24
279:3,24
280:22
291:17
294:4
301:22
302:8
309:20
313:4,24
315:21
316:24
317:12
improper
122:21 255:1
improve
90:6
inappropr...
47:2
include
8:17 12:9,12
37:3 46:21
111:2
137:15,17

139:11,16
142:6
152:20,22
184:3,3
218:3
247:10
253:23
256:16
283:15,22
included
137:16
139:20
140:5
159:10
257:22
258:5
259:14
260:15,21
285:1 307:2
includes
28:6 29:8
284:3 308:5
including
26:19,22
31:4 46:23
54:24 56:6
135:8,20
143:16
147:15,20
148:13
226:15
246:21
247:5
252:21
253:1
256:14
257:21
271:21
288:2
293:20
301:23
305:22
313:5,25
316:24
317:12
inclusion
146:25
incorrect

175:5 186:14
194:11
204:9,10,12
204:15,19
incorrectly
186:15
increase
281:1,6
increasing
234:14
INDEX
5:1
Indiana
135:9 197:23
197:25
213:15,17
238:11
241:4 243:4
243:15
254:10
257:14
284:2 287:9
311:1
Indiana's
197:16
indicate
71:6,10 77:5
77:15,22
119:12
203:6
207:12
209:4,17
210:14
indicated
97:25 266:12
277:6 292:7
indicates
139:10 159:4
188:16
262:16
263:13
271:19
292:15
indicating
158:4 263:18
indication
69:2 84:14
298:13



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

346

indigent
287:3,11
individual
38:4 43:19
52:25
134:12
172:9,17
173:15
220:14
238:17
individuals
49:16 55:1
55:18 59:5
60:15 74:21
105:9,19
135:20
137:9
163:13
164:5,9
260:14,20
262:8
283:23
289:3
302:11
314:2 317:2
individual's
248:24
indulgence
295:20
ineligible
313:2
inferring
88:9
infirm
169:21
information
12:10,12
19:4 58:19
58:22 72:16
97:2 98:20
111:22
138:16
155:22
157:1 160:6
160:11
162:20
193:3
194:18

195:2,21
213:9 217:6
260:3 271:3
271:10,21
271:22,23
285:2 302:7
initially
196:1
initiatives
24:13
instance
2:2 236:19
institution
139:12,13
instruct
9:22 26:17
31:18 46:10
61:3 70:17
75:22 94:19
103:1 141:9
145:20
149:13
245:10
instructed
43:20 48:20
229:15
instructing
190:13
211:23
227:3 253:3
253:5 269:2
270:9
instruction
8:23 9:7
15:22 47:2
47:11,16,25
48:5 59:15
77:3 93:11
96:9 111:9
116:18
163:20
294:9
instructions
7:14,17
instrument
320:9
insufficient
54:16

insuring
26:12
integrity
78:25 143:10
143:13,18
148:3,25
151:5,7,10
151:13,19
151:23
152:1 153:7
153:12
190:25
217:19
257:9
266:19,25
267:10,16
267:22
268:3,19,22
272:9,16
278:16,18
278:19
281:9,12
286:13
291:12
intend
9:18 13:23
280:25
intent
142:22
145:17
149:8,9,12
267:5
294:22
intention
131:19,21
236:23
interchan...
8:5
interest
59:13 60:17
97:12,25
99:20,24
100:5,10,16
101:9,10
104:4,15
118:4
132:25
135:13

163:7
195:12
237:12
239:8
307:23
interested
322:19
interests
261:12
interfered
285:12
286:11
288:3
interim
236:20
interject
56:23
intermingle
28:17
internal
121:2
Internati...
22:4
interpose
76:16 82:6
interposed
110:17
interpret
8:6 187:20
203:13
interpret...
203:6
interrupt...
57:9
Interveners
295:17
INTERVENORS
4:1
introduce
149:22,24
225:15,20
introduced
61:13 63:8
63:13 67:8
67:13 85:18
96:19
110:12

129:16
149:6
150:16,17
170:1 224:2
225:9
233:25
266:16
283:21
284:24
285:9 286:3
invade
92:22 109:8
invaded
90:25
invades
93:4 310:12
invoke
13:15
invoking
13:17 15:4,8
261:20
291:21
involve
20:17,19
involved
35:7 50:13
74:19,20
76:4 99:9
100:15
110:23
111:2,4,5
119:22
121:2
124:20,22
131:4
160:19
234:19
involvement
23:2 63:10
63:16
111:11
234:22
involving
36:5 48:18
50:2 99:5
113:5
239:10
in-house



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

347

50:11
in-person
36:8 56:2
58:16
147:10
150:25
153:16
154:4 268:4
268:6,7,16
269:17,18
issuance
286:5
issue
9:10 36:17
43:2 48:16
54:4 59:14
69:1 76:24
79:9 85:4
87:12 90:13
100:23
113:15
128:12
139:2
145:21
146:2
150:14
160:20
166:21
249:1
274:19
275:5
276:14
277:25
306:12
issued
130:15 248:1
248:8,16
256:15
257:8,14
issues
24:9,10 35:4
35:4 36:16
36:18,21,24
37:8,19,22
85:20 117:6
144:2 155:6
239:6
275:13

317:21
items
130:19
iterations
200:12

---

**J**

Janice
13:8 18:22
32:21,24
85:25
100:25
101:5
102:14
177:21
182:20
195:3 250:3
283:1
January
5:15 20:22
24:25
174:21
175:8 180:8
180:10
219:20
283:11
301:6
Jersey
296:6
job
38:20
John
166:3 179:20
journal
5:14 201:16
201:18,21
202:1,12
283:10
287:16
JR
1:5 321:5
judgment
95:15,20
Julia
134:22
jump
108:1,16,25
June

24:25 71:25
junior
20:10
Justice
3:13 45:16
82:16
221:24
290:4
308:10

---

**K**

K
3:5
Kaufman
64:18
keep
20:4 152:8
177:25
192:1
200:19
222:21
242:11
276:4,5
keeping
21:17 119:23
KENNIE
1:8 4:1
321:8
kept
119:19
key
36:21 215:19
kind
128:17
knee
7:22
knew
115:19
know
7:2 8:2,22
9:4,4 10:12
11:18 12:7
16:7 18:6,9
18:12,16,20
23:9,16,22
23:24,25
27:20,23
29:2,6,10

34:17,18
35:25 37:3
38:5 39:11
39:12,14
40:8,10,16
40:21 41:3
41:14 52:18
53:16 56:20
56:23 57:3
59:21 61:4
66:21 67:15
67:22 69:6
70:8,18
72:15 73:12
73:16,16,17
73:17 74:1
74:2,3,5,8
84:3 88:15
88:18,25
89:2,4,25
90:2 91:20
92:1 97:3
101:19
103:10
104:3,4
105:5,8,12
105:13,14
105:18,25
111:15
112:4
113:17
115:9,16,22
117:25
118:3 120:1
120:4,6
121:13
125:3
128:12
130:7
134:22
135:2
136:16
139:2,4,18
140:3,3,8
140:13
143:5
145:16
160:7
164:24,24

170:2,14
171:10
172:24
173:2
181:10
182:1,20
183:24
194:22
195:11
200:1 201:9
201:25
204:11
205:5
208:24
219:20,24
219:24,25
221:1,3
222:9
223:16,17
223:19
224:20,21
224:24
225:1,1,3,6
229:11
231:21
232:9 233:6
236:16
242:10
243:10,13
243:14,17
243:18
249:5,9,12
249:15
251:3,5,15
251:23
252:1,6
256:6
259:18
264:21,21
265:20
266:4,7,9
266:13,14
271:5
274:15
276:5 283:3
284:4 291:4
291:5
292:23
296:2 300:4



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

313:19
314:18
knowing
105:7 297:22
knowledge
6:11 11:14
17:10 19:22
19:25 20:1
21:22 24:4
29:4 30:11
30:18 31:25
33:9 37:20
37:23 38:3
53:1 58:7
61:16 64:21
76:14 77:14
77:24 85:2
85:4,24
101:20,23
113:9,19
121:19
124:6
125:14
128:6,9
137:7
139:17
147:22
172:19
176:1 183:2
224:19
244:20,23
252:5 259:2
259:23
302:1,3
308:4,8
314:5
known
27:17 168:25
169:8 227:5
320:5

____ L ____

lack
151:18
267:21
285:4
laid
287:8

Lampasas
103:24
language
79:21
large
120:9
largest
224:22
late
59:11 60:14
256:6
latitude
116:10
Laughing
189:10
law
20:17 54:6,8
54:16 57:24
58:9 59:19
61:12 82:11
154:5,7,11
154:18,22
197:16,23
197:25
216:18
223:21
226:1 241:5
243:12,16
256:10
257:14
279:21
280:5 284:3
284:3 290:5
294:17,21
lawn
109:17
laws
159:7,12
239:9 243:3
243:20,20
lawsuit
11:13
lawyer
10:24 45:8
50:8 189:14
lawyers
50:12 222:25
law-related

42:4
lay
112:14 196:1
lays
196:9
leader
27:9
leadership
24:18,20,21
LEAGUE
1:13 321:13
learn
60:17 98:25
173:3
231:17
leave
218:6
leaves
97:6
leaving
7:25 295:14
317:20
Ledge
56:8
left
129:14
284:16
leg
7:24
legal
15:17 48:7
48:10,16
158:25
159:5,7,13
197:16
legislation
26:19 31:4
31:12,13,17
35:6 37:2,2
37:7,13,15
46:12 48:8
48:18 50:12
51:24 54:11
54:24 55:16
56:6 59:3
60:13 63:1
65:4 69:23
72:17 83:1

84:25 85:21
86:25 91:4
91:6,10,15
94:19 114:9
114:15
128:23
131:24
132:15,18
133:5
141:21
142:11
155:13
158:11
162:16,22
163:1,11
169:3 184:5
203:16,16
206:3
207:14
211:3
215:12
216:21,24
217:1,7,15
226:15
228:11,15
228:17
229:3,8
230:10,11
231:3,18
232:6,10,25
233:4,24
236:25
237:3
239:10,17
243:7,24
246:8 247:1
248:13
252:17
253:1
254:13
255:12
256:20
257:18
258:4 259:8
259:9 260:1
261:10
269:13
275:2
276:25

279:3,25
280:23
288:4
291:18
294:4 300:2
300:7,13,14
300:16,19
301:22
302:2,8
309:21
312:21
313:4,25
315:4,21
316:24
317:13
legislative
1:15 3:17
13:15,21
14:7 15:1,4
15:8,13
26:17,21,24
27:16 28:9
31:2,6,7
46:13,15,16
47:1 50:16
51:3,25
54:12,13
55:16 56:8
59:3 61:6
65:4 68:14
73:8 75:18
76:23 77:3
78:4,11
80:18,22
81:8 85:14
85:19 86:7
90:15 93:4
93:21 94:15
96:2,22
97:6 114:10
114:13
118:12,20
118:22
121:18
128:24
132:19
133:6 141:1
141:7 142:8



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

349

| | | | | |
|---|---|---|---|---|
| 150:20 | 262:11 | 165:15,19 | **letter** | 314:21 |
| 155:14 | 264:9 267:8 | **legislators** | 69:12,17,20 | 315:11,18 |
| 158:11 | 267:24 | 26:21 28:17 | 70:2,9,21 | 316:15,17 |
| 163:12 | 270:8 271:4 | 28:18,24 | 71:10 72:23 | **licensed** |
| 164:22 | 274:22 | 31:6,24 | 73:2,12,17 | 260:12 |
| 168:17 | 279:4,12 | 32:8 33:11 | 73:19,22 | **licenses** |
| 169:4 173:7 | 280:6 284:8 | 35:14 46:15 | 74:3 201:1 | 198:14 |
| 173:14 | 285:15,21 | 54:12 56:7 | 203:1 204:4 | 249:13 |
| 177:6 | 286:14,19 | 81:17 92:24 | 205:9,10 | 293:21,21 |
| 180:16 | 287:24 | 98:14 | **letters** | **Lieutenant** |
| 181:4,8,14 | 288:5,24 | 133:15 | 70:4 | 25:7,10,12 |
| 189:1 192:8 | 289:6 | 134:1 135:8 | **letting** | 25:18,25 |
| 193:10 | 290:15 | 145:18 | 8:2 47:9 | 26:3,8,11 |
| 195:20 | 293:2,10 | 161:24 | **let's** | 26:22 27:3 |
| 196:23 | 301:16 | 162:3 | 56:23 62:15 | 27:5,8 |
| 200:8,15 | 302:9 | 164:14 | 63:22 78:14 | 35:23,24 |
| 203:9 206:4 | 305:14 | 166:15 | 87:24 98:22 | 36:12 69:13 |
| 206:15,21 | 316:10 | 199:3,9 | 110:4 | 70:2 72:24 |
| 211:3,6 | 317:1,11,13 | 200:17 | 142:18 | 73:19 86:2 |
| 212:17 | 317:14,15 | 207:4 | 153:25 | 87:16,22,25 |
| 213:25 | 321:15 | 236:15 | 208:24 | 88:2,11,23 |
| 215:13,22 | **legislati...** | 237:17,24 | 227:9 | 89:5 107:13 |
| 216:11 | 37:16 47:6 | 238:1,4 | 229:17 | 125:16 |
| 217:15,17 | 47:10 82:21 | 240:7 241:4 | 251:13 | 134:5,16 |
| 218:1 | 89:15 98:17 | 258:18 | 270:21 | 135:5 147:4 |
| 225:17 | 111:2,20 | 303:12 | 310:4,16 | 148:5 |
| 226:21,25 | 114:11 | 305:22 | **level** | 162:23 |
| 229:20 | 137:18 | 307:15 | 280:4 | 236:22 |
| 230:2,25 | 155:21 | 308:5 317:1 | **license** | 245:4,5 |
| 232:8 | 169:13 | 317:14 | 38:22 39:1 | 308:7 |
| 234:24 | 180:2 | **legislature** | 39:22 40:7 | **life** |
| 235:1,5 | 232:25 | 12:14 15:11 | 71:14 83:16 | 42:24 46:5,7 |
| 237:4,5 | 248:6 250:9 | 24:5 29:3 | 130:11,13 | 46:19 47:13 |
| 240:4 243:8 | 254:15 | 29:12 35:12 | 198:21 | 47:14,17 |
| 243:22 | 267:16 | 61:13 85:10 | 210:12,12 | 48:1,6 |
| 244:8 246:6 | 291:18 | 142:20 | 210:15,16 | **lifetime** |
| 246:14 | 294:5 | 144:18 | 211:12 | 34:17 |
| 247:1 | 312:21 | 186:19 | 212:16 | **Lighthouse** |
| 249:19,25 | 313:5,6 | 202:3 | 213:9,10 | 290:7 |
| 250:14,21 | 315:5,23 | 231:23 | 234:7,11 | **liked** |
| 253:24 | **legislator** | 238:2 | 249:4,8,10 | 153:22 |
| 254:5 | 13:15 38:21 | 243:24 | 259:13,19 | **Likewise** |
| 255:13 | 74:19 90:21 | 261:5 262:2 | 259:19 | 263:3 |
| 256:21 | 125:5,7 | 264:6 | 260:7,7 | **limit** |
| 257:10 | 126:20 | **legislatu...** | 266:10 | 245:21 |
| 259:11,16 | 142:22 | 264:13 | 280:11 | **limited** |
| 259:21,24 | 145:17 | **lengthy** | 288:15 | 35:25 36:2 |
| 260:16,23 | 149:9 | 118:7 | 289:4 | 135:9 |
| 261:3 | | | | |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

limits
217:12
line
39:24 68:25
  90:25 108:1
  213:2 316:2
  319:3
lines
106:24
  278:17
list
12:17 17:18
  19:11,19
  24:12 54:2
  54:3 55:23
  67:2 107:21
  142:3
  165:18
  238:14
listed
19:1 137:13
  183:19
  205:5 286:1
  293:11
listen
57:13,14
  256:7
listening
56:14 105:17
  189:8
lists
66:15 83:8
  131:3 138:5
  234:4
litigation
14:24 15:6
  160:20
  223:2 278:7
little
100:11 127:8
  139:10
  152:2 189:6
LLP
3:19 4:2
loaded
276:23
lobbyists
307:23

located
27:24 40:10
location
42:17 43:17
  43:22 44:2
  44:3,13,20
  55:6
log
89:18 214:11
  215:7
loggerheads
205:21
logic
248:18
logically
216:24
long
20:21 24:12
  28:20 33:22
  40:1 66:23
  95:1,3
  104:2
  110:15
  116:24,24
  121:19
  142:3 165:9
  165:14
  222:1
  249:13
  252:6
  305:24
longer
47:22
long-term
94:20
look
16:21,22
  18:5,10
  62:7,21
  64:6 69:7
  117:24
  127:17
  132:15,24
  133:8
  175:19
  201:12
  202:13
  208:24

226:11
  236:25
  237:7,11
  296:3 308:9
  310:5
looked
64:8 79:21
  202:22
looking
17:5,20 19:5
  60:18 68:6
  115:4
  201:14
  203:1
  294:11
  297:1 299:1
  308:19
looks
130:17
  180:10
  208:5,5
lose
63:23
lost
40:21 174:15
  309:2
lot
36:18 57:8
  116:12
  140:15
  156:6 201:7
  228:1 296:5
  310:9
louder
189:6
lower
139:10
lunch
7:4 79:6

———— M ————
machine
2:6
mail
41:17 51:15
  249:10
mailbox
52:5

main
162:8 164:19
maintain
34:4
maintained
34:6
maintaining
200:13
maintains
242:2
majority
176:16
  185:21
  186:3,21
  187:4,6
  188:14,15
  188:19
  298:16
  299:6,6,20
making
38:21 54:16
  80:24 94:16
  298:23
  301:5
  308:25
managing
195:17
mandated
25:4
MARANZANO
61:22,25
Marble
38:24
March
5:13 201:17
  208:10
  219:21
margin
311:23
mark
16:11 61:20
  62:1,17
  117:21
  207:22
  311:5
marked
5:8 16:12,18
  61:22 62:4

63:20,25
68:19,21
117:22,24
127:6 129:4
129:7
157:13,14
174:1 201:6
207:23
208:4,13
233:8,12
283:7
289:13,19
311:6,8
Masset
83:18,20,22
  84:13'85:11
materials
14:8 30:19
Mathis
33:6,19
matter
23:17 27:3
  32:14 37:25
  45:2 53:6
  74:24 76:3
  86:17,21
  87:4,5,6,7
  87:11 91:9
  91:13 94:17
  100:10,24
  107:16
  109:25
  110:1,2
  121:12
  144:16
  171:10,11
  183:18
  184:17
  185:2 186:9
  193:14
  195:22
  198:25
  200:14
  203:10
  204:22
  211:18
  212:4
  214:16,21



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

214:22
215:5,6
216:20
217:2 220:6
227:14
229:6,24,24
229:24
230:14
248:8,13
250:12
253:18,20
259:22
271:2,7
305:3
312:25
**matters**
15:17 35:2,6
42:5 46:12
46:21,22
47:6,9
54:14 55:3
108:9 109:9
110:25
111:1 119:2
124:5
128:22
132:20,21
158:13
162:10,12
173:7 177:6
195:19
197:19
198:8
199:23
203:13,14
203:22
206:14,20
211:4
212:24
216:5 224:9
225:17
230:2,5,7
237:4 243:8
243:25
250:8,20
259:21
264:18
267:7,7,24

270:7
273:19,20
274:2,24
275:1 277:7
279:11
290:14,15
292:10
294:4 316:9
316:23,25
317:11,16
**Matthew**
3:5
**matthew.f...**
3:10
**McCoy**
13:8 18:22
18:24 19:23
20:4 32:21
32:24 38:13
86:1,23
88:13 89:5
93:13 94:1
94:20 95:21
100:25
101:5 102:6
102:14,18
103:12
105:5,8
122:4,11,25
123:14,22
134:25
135:3 136:7
146:9,12,14
148:12
158:22
166:10
172:22
177:21
182:20
185:17
187:24
195:3
222:17
223:19
236:4,5,6
236:10
245:24
246:10,17

250:3,11,17
254:8
269:15
283:1,3
**McCoy's**
102:24
**mean**
8:7,17,25
9:13,23
10:5,17
11:21 46:7
47:13,15
74:6 83:25
92:20 96:21
104:13
108:8
112:14,15
117:5,15
123:4,9
125:3
128:10
140:7 151:6
151:11
152:3 158:8
160:24
161:6,12
165:14
166:22
167:2
169:13
172:9 183:1
184:22
201:22,23
206:11
218:24
227:2 230:6
238:10
269:6,11
273:17
278:9,23
282:11,20
299:14
309:23
310:10
312:6,11
**meaning**
9:12 122:17
305:12

**means**
10:3 283:2
299:7,9,12
**meant**
19:9 161:3,8
161:13
282:13
**measure**
176:6 297:4
**measures**
185:14
267:16
**media**
90:22 301:3
**medication**
7:19
**medium**
74:23
**meet**
238:18,22
**meeting**
30:4 34:2,2
88:8,9
105:19
146:16,17
146:20,22
147:7
166:12
179:8,10,21
180:6,7,19
180:21
181:17
238:20,21
238:23
239:1,4,7
239:12,20
240:1
241:13,14
241:15
242:7,11
**meetings**
29:11,17,20
29:21,22
30:3,14
32:1,3,5,7
33:10,24
35:16 36:8
67:18

146:24
147:20
166:10
221:8 242:2
**meets**
106:1
**member**
8:13 20:23
25:18 28:3
29:10 31:23
85:5,9,9,10
97:8 102:1
102:2 107:1
107:20
166:12
173:21
188:7
199:25
221:3 245:4
293:2
**members**
14:9 29:2,3
29:12,14
32:18 35:12
172:3,23
173:10
176:9,17
196:10
199:12,16
201:2
205:14
206:10
207:4
218:21
219:2,4,5
220:9,13,15
220:19
297:6
298:16
299:20
303:4,5
**membership**
28:5,21 29:4
29:6,7,9
**memory**
311:13
**mental**
26:18 31:3



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

31:16 37:1
46:11 51:23
54:10,23
55:15 56:5
59:2 65:3
72:17 83:1
84:24 94:18
114:8,14
128:22
131:23
132:18
133:4
142:10
155:12
158:10
163:10
169:3
200:24
203:15
211:2
215:12
217:14
226:14
232:5,24
237:3 243:7
243:23
246:7,25
247:17
252:25
254:13
255:11
256:19
257:4,17
258:4 259:8
261:18
267:4
274:17
275:1
276:24
279:3,24
280:22
291:17
301:22
302:7
309:20
312:20
313:4,24
315:21
316:23

317:12
**mention**
12:17 198:12
268:5
**mentioned**
178:20
197:15
307:4
**merits**
186:6 205:19
**mess**
96:12
**met**
11:20 12:20
**MEXICAN**
3:17
**Mexico**
120:10,11
**micro-manage**
256:4
**middle**
202:15 290:8
**military**
130:11 138:6
138:14,18
138:22,25
234:7 251:1
251:8
**million**
210:11
**mind**
52:20 174:10
232:20
269:19
**minor**
23:6
**minorities**
204:5,24
205:5,11,15
206:2,11
264:8
285:19
304:23
305:6,21
306:24
307:8,11,16
307:20,24
314:10,14

314:20
315:10,17
316:1 317:8
**minority**
9:22 10:2,18
17:14 95:23
96:6 106:8
141:11
163:18
198:24
199:17
200:6 201:1
206:10,11
206:17,24
244:7,12
249:22
273:1,6
295:1,10
**minute**
30:25 72:13
138:1 149:7
168:11
**minutes**
7:23 39:6
41:22 79:4
79:5 222:2
242:20
322:13,14
**misleading**
7:11
**misrepres...**
204:7
**missing**
22:5
**misstates**
98:3 113:24
279:6
**models**
132:25
237:11
**modificat...**
193:5 261:6
261:11
262:2 264:6
**moment**
23:1 62:7
69:7 150:8
197:14

289:10
**monitor**
98:23
**month**
7:23 38:20
137:1,2
226:2,2
281:23
288:17
**morning**
6:7
**motion**
110:5 111:12
114:4
176:16
185:4
188:19
269:3
287:20,20
287:21
295:15
298:15
299:19
**motions**
200:20
**motor**
315:11,18
**mouth**
35:15
**move**
98:22 107:17
110:5
111:24
119:15
191:9 205:9
270:25
284:5,7
286:9
288:19
310:4,16
**moved**
128:9 291:15
**moving**
317:19
**multiple**
52:22 154:19
183:14
211:19

232:13
302:10
**mutually**
10:10

_____
**N**
_____
**N**
3:3
**NAACP**
1:11 3:17
321:11
**name**
6:8 32:18,20
32:22 33:5
33:18 36:19
40:8 50:17
60:5 64:15
74:19,20
129:13
164:8
165:18
178:17
227:25
242:6
300:15
320:8
**named**
59:5 163:14
**names**
152:17
199:10
307:6
**narrow**
43:8 156:8
293:14
**nation**
45:6
**National**
31:23 32:8
**nationals**
71:21 72:3
75:11,16
76:11 77:1
**Natural**
22:3 24:7
**naturaliz...**
159:17 160:9
**naturalized**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

159:24,25
nature
74:24 100:7
167:18
220:3 239:3
271:6
nauseam
278:10
necessarily
256:19
necessary
110:6 111:25
265:21
295:23
316:3
necessity
217:11
need
17:7 26:4
64:6 96:15
108:4 118:6
127:9 138:1
150:18
151:11,13
174:11
175:3
185:19
186:6 187:1
187:7 201:8
206:1 209:8
222:13
229:14
233:4
240:11
264:15
267:15
270:21
296:8
302:21
needed
91:1,1
128:11
151:1
264:22
265:8,25
296:4,11,12
296:14,15
296:20

neighborhood
196:19
neither
112:21 210:8
322:15
Nelson
162:15
never
17:4 19:15
30:11 32:6
38:2 84:13
119:16
128:9,9,13
128:13
202:22
220:22
222:16
276:22
nevertheless
248:20
268:12
269:10
new
227:24 296:6
308:23
newspaper
300:25
Nichols
162:15
night
128:7 207:5
289:23
310:5
NJ
3:21
nod
164:16
nods
33:1 188:21
216:16
291:23
297:9
nod-head
164:16
Nominations
22:6
nonAnglo
10:3

noncitizen
224:22
noncitizens
68:13 71:7
72:7 73:5
74:15 76:20
78:3
nonlegisl...
35:2,8
nonminori...
316:4
nonphoto
142:2,14
143:8,22
145:24
146:6,25
147:15,21
148:6,13
198:5
252:12,15
252:22
nonpublic
230:3
nonrespon...
191:10
non-citizen
155:10,20
156:5,18
157:6
non-citizens
81:4 82:18
83:12,15
155:6
275:23
non-inclu...
253:12
non-photo
253:23 254:3
non-US
74:10 75:8
normal
9:12 101:23
North
39:4
NOTARY
320:16
note
16:25

noted
319:22
notes
13:11 30:13
242:11
notice
5:9 134:16
134:19
noting
204:4 205:10
notwithst...
176:12 178:8
248:10,22
298:11,19
299:2,4,15
299:22
nuh-uh
6:21
number
10:15 17:18
17:20 18:1
18:5,6,10
18:18 52:13
52:17 58:6
61:24 66:17
80:6 108:14
127:1
129:25
170:7 178:7
208:15
209:17
210:8,9,14
210:22
211:11,12
212:16,16
215:10
242:16
269:6,22
270:5
271:18
272:2,12,22
273:1
284:12,23
285:2 286:1
286:25
301:6,12,19
302:4 311:9
313:12,13

313:16,17
313:20
numbered
2:3 19:20
118:5
numbers
209:2,11,13
215:15
284:16
numerous
52:4 197:9
NW
3:14
NWB
3:14

_____

O

oath
7:10 159:17
159:25
160:9 320:6
object
73:7 76:21
81:7 82:20
92:19 93:21
96:2 98:2
128:21
150:1,19
153:23
156:13,19
169:6,21
171:8
173:12
177:5 189:4
192:7 211:1
211:21
215:8 217:9
246:5
255:10
257:3
264:17
274:23
279:1
282:12
313:23
315:15
objected
156:25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                          May 17, 2012

354

| | | | | |
|---|---|---|---|---|
| 261:21 | 170:22 | 252:24 | 264:16,23 | **offense** |
| **objecting** | 173:6,18,23 | 253:24 | 265:8,20 | 8:1 |
| 94:15 | 179:1,2 | 254:5 | 266:5,10 | **offer** |
| **objection** | 180:23 | 255:18 | 286:7 287:4 | 156:24 |
| 37:9 45:25 | 181:4,8,13 | 256:22 | 287:11 | 288:14 |
| 56:14 65:7 | 184:20 | 257:10,16 | **obtaining** | **offered** |
| 65:19,22 | 187:10 | 257:24 | 41:13 258:25 | 30:22 133:15 |
| 68:14 70:10 | 188:3,24,25 | 259:20 | 259:6 266:2 | 134:1 198:5 |
| 73:13 75:18 | 189:22 | 260:16,23 | **obviously** | 237:17,24 |
| 76:16 77:2 | 190:2 | 261:3 | 13:23 35:20 | 284:24 |
| 78:4,12,21 | 192:14,24 | 263:18 | 45:17 49:4 | 287:19 |
| 80:19,23 | 193:9 | 264:9 | 50:13 72:20 | **office** |
| 85:14 86:6 | 196:22 | 266:12 | 145:16 | 2:7 3:6 8:18 |
| 86:14 89:10 | 197:2 200:8 | 267:11,14 | 295:14 | 9:13,19 |
| 89:14 91:2 | 200:13,23 | 267:18,23 | 302:24 | 14:16 17:11 |
| 91:7,17 | 206:4,12,20 | 268:11 | **occasionally** | 18:16,20 |
| 92:8 93:9 | 207:2,9 | 271:8 | 36:10 56:23 | 26:23,23 |
| 94:3 95:12 | 211:7,13,14 | 274:16 | **occasions** | 33:3 34:25 |
| 95:16,17,17 | 211:25 | 277:13,20 | 20:15 52:4 | 35:24 36:1 |
| 96:7 99:2 | 212:17 | 279:23 | 270:24,25 | 36:4,9,13 |
| 99:22 | 213:25 | 280:6,14,23 | **occur** | 39:3,5,15 |
| 101:11,15 | 214:6 | 282:2,3 | 47:21 52:11 | 39:22 40:3 |
| 103:16 | 215:12,17 | 283:4 284:8 | 126:1 147:5 | 40:6,7,9,14 |
| 104:6 | 215:22 | 285:15,21 | 150:15 | 50:7,11,14 |
| 105:10,15 | 216:11,19 | 286:14,19 | 167:21 | 51:7 86:2 |
| 105:20 | 217:25 | 287:24 | 179:7 180:5 | 86:12 87:9 |
| 106:12 | 218:5,8 | 288:5,24 | 223:15 | 87:17 88:2 |
| 113:23 | 225:5,16 | 289:6,11 | 242:9 | 88:11,24 |
| 114:7 | 226:21,25 | 291:3,10,16 | 244:19 | 89:6 92:6 |
| 120:14,20 | 227:12,20 | 293:13 | **occurred** | 93:13,24 |
| 132:22 | 229:20 | 301:16 | 52:8 58:17 | 95:22 98:12 |
| 133:2,2,12 | 230:2,24 | 304:10,20 | 74:23 86:16 | 125:16 |
| 139:7 141:7 | 231:25 | 313:7 | 89:6 105:1 | 126:10,16 |
| 141:12 | 232:4,23 | 316:21,22 | 112:2 | 134:5,5,17 |
| 142:8 | 233:5 | 316:22 | 113:16,16 | 134:19 |
| 148:16 | 234:25 | **objection...** | 113:17 | 135:5 |
| 151:2 152:6 | 235:5,17 | 262:11 | 118:17 | 136:18,22 |
| 153:10,13 | 237:5,10,13 | **objections** | 119:2 | 147:12 |
| 154:6,25 | 240:4 | 56:13 80:19 | 133:20 | 157:24 |
| 155:3,7,11 | 243:21 | 260:20 | 135:15 | 212:9 |
| 160:16,21 | 244:8 | 263:7,25 | 139:22 | 223:11 |
| 162:5,25 | 246:14,19 | **objective** | 156:9 | 228:8 |
| 163:3,19 | 246:24 | 247:11 | 169:14 | 231:15 |
| 164:21 | 247:7,12,16 | **obtain** | 180:2 | 236:22 |
| 165:1 168:9 | 247:23 | 83:15 91:5 | 218:25 | 245:5,23 |
| 168:17,22 | 248:4,11 | 251:21,23 | 220:12 | 266:11 |
| 169:16,24 | 249:19,25 | 252:6 | 237:20 | 280:10,11 |
| 170:4,10,17 | 250:8,19 | 258:21 | 244:18 | 280:12 |
| | 251:4 | | | |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

355

```
 289:4              82:2  88:22      255:22           175:12             275:2  279:3
 320:12             89:19 90:19      259:25           operating          279:24
officer             94:9  96:14      262:7            58:12              291:18
107:20 322:1        96:15 103:6      265:19           operations         301:22
offices             104:25           269:9 270:6      39:14              302:8
2:6  14:21          106:12           270:21           opinion            309:20
 266:8              108:5,9          271:16           47:24  54:19       313:4,24
 288:15             113:13           272:3,17          55:10,13          315:21
official            115:24           276:19            78:10 120:2       316:24
1:6  25:13          118:15           282:24            121:14           opponent
 89:20 321:6        121:21           283:19            217:7,10         165:17,25
officials           123:4,11,21      286:2 290:1       264:1 290:8       166:2,7
58:8  89:12         127:11,16        294:1,13         opinions          opponents
 135:7              131:22,25        296:6,7          26:19  31:4        164:19,25
 151:23             132:7            298:2,5           31:16  37:1        165:4,13
 152:6,11,14        133:19           299:23            46:12  51:24       166:15
 152:18,20          138:3            300:1 303:2       54:10,24           167:4,7
 153:2              143:15           303:10            55:15  56:5        168:7
 240:10             145:22           306:7 309:7       59:2  65:3        oppose
 241:4              152:8            310:16            72:16 84:24       164:25
 244:25             153:22           311:4,15          94:18 114:9      opposed
oh                  156:1,13         314:19            114:15            142:21 149:9
28:13 30:9          168:10,12        317:23            128:23            161:24
 62:8,13            169:17          once              131:23            162:3
 210:1              171:17          28:16 29:25        132:18            173:21
 219:24             172:12           30:6,7,7          133:5             199:11
 239:12             175:4 178:4      32:6 35:25        142:11            204:6
 287:18,24          178:23           137:1,1,2        155:13            205:12,14
 289:16             181:23           187:7            158:10           opposing
 308:16             182:4 185:6      218:18            163:11           206:23
okay                186:2           ones              169:3            opposition
6:12  7:12          187:24          54:2,3 210:8       203:15           173:16
 8:18  10:3         188:9,15,22     one's              211:2             192:25
 12:9  16:21        191:13,22       293:10             217:11,14        201:2
 18:24 22:13        191:24          one-on-one         226:14           206:10
 24:13 31:8         194:7           166:12             232:5,24         207:8
 46:20 48:13        197:14           172:20            237:3 243:7     option
 49:14 53:8         201:5,22         220:15            243:23           193:23
 54:22,24           204:25          open               246:25           252:22
 55:17 56:19        205:1           35:15 73:19        252:25           254:4
 56:25 60:1         207:21           119:19,23         254:13           256:14
 60:22 63:6         210:10           266:8             255:12           257:21
 63:6  65:16        214:15           288:15            256:20          options
 66:22 67:12        227:7,14         295:14            257:17           154:19
 70:20 72:14        229:17,17        317:20            258:4 259:8       210:19
 77:10 78:17        231:9,10        opening            261:19          oral
 79:1,8             244:17          292:21             267:5            1:22  2:1
 80:24 81:22        245:17          operable           274:18           322:1
                    251:15
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

order
26:5,6,8
  70:24 86:20
  87:5 107:24
  108:2,15,16
  108:18,25
  116:7 121:7
  142:18
  143:3 144:4
  144:12,23
  149:14
  176:7,15
  177:16
  178:8,11,19
  178:21,22
  183:20
  185:3,25
  186:1,20
  187:5,9,15
  188:11,13
  188:17
  211:17
  212:5
  270:14,20
  271:6,19
  280:18,18
  296:3,11,12
  296:14,15
  296:19,22
  296:24
  297:4,10,12
  297:15,25
  298:15
  299:18
  300:20
  316:16
ordered
144:16
orders
176:3 275:13
  296:23
  297:18,21
  298:3
ordinarily
108:3 186:4
  186:17
  187:1 196:5
ordinary

109:2,5
organization
27:15,19
  37:8,19
  239:19
organized
239:20
organizes
242:2
original
271:17 322:8
originally
205:8
originated
194:8
outcome
322:19
outline
222:15
  277:15
outlined
158:12
outlived
46:5,7,19
  47:13,14,17
  48:1,6
outside
27:1 42:3
  81:13
  112:15
  150:7,7
  153:2
  155:16
  163:6,7
  191:11
  227:4 236:9
  238:7
  271:23
  273:12
  274:8
out-of-state
293:21
overall
82:25 142:24
overcome
110:21 187:8
  187:15
overcoming

111:7 187:16
overly
93:3
overview
130:8,10

---
**P**

P
3:3,3
packed
198:19
page
5:8 16:21,22
  18:2 63:4,5
  66:14,15,19
  67:2,4 83:4
  83:4 118:5
  130:6 138:7
  138:8,8
  139:10
  142:3,3
  174:22,24
  175:15,18
  202:11,15
  208:14,16
  208:25
  209:1,10
  210:6 213:1
  213:2,14
  233:19
  234:3,13
  262:19
  263:5,9,10
  263:10
  264:25
  283:17
  284:11,15
  284:16
  285:25
  286:1,23,23
  288:9
  289:25
  290:2,9
  308:13,18
  309:3,5,6
  309:15
  311:9,9
  319:3

pages
17:5
paginated
17:18
paginations
208:13
paper
34:7 201:7
  231:20
  294:12
paragraph
70:25 71:5
  71:12,17,18
  71:19,24
  118:11,14
  118:16
  119:6,8,10
  119:13
  160:25
  270:14,22
  311:11
paragraphs
118:5
parameters
198:10
pardon
136:10
  140:16
  266:22
parking
43:10
Parkway
4:3
parse
144:21
part
28:6 29:8
  66:10,12
  68:12 72:8
  73:4 75:10
  76:10 78:2
  88:19
  114:13
  115:12
  120:6,10
  172:21
  190:1 191:2
  198:4 202:2

262:4
269:16,18
269:21
271:17
272:1,11,21
272:25
273:4,25
274:7,11
280:25
307:12
partially
119:20
participate
88:8,10
participated
28:22 42:16
participa...
274:12
particular
16:6 69:23
  91:10
  121:17
  184:17
  185:1,2
  242:17
  292:25
particulars
75:1
parties
100:19
  322:16
partisan
189:21 190:1
  190:7,9,9
  190:16
  191:2 274:9
party
11:12 83:22
  83:24,25
  91:21 92:1
  102:15
  106:24
  107:2
  124:25
  322:11
pass
124:9 126:6
  168:21



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

| | | | | |
|---|---|---|---|---|
| 218:9 | 7:10 77:23 | 21:19 | 88:10 | 125:22 |
| 219:19 | **pending** | **performed** | 134:24 | 136:21,22 |
| 225:21 | 7:4 216:24 | 96:1,1 | 136:7,8 | **photo** |
| **passage** | 239:23 | **period** | 146:8,10 | 8:4,8 12:13 |
| 140:5 179:11 | 295:14 | 226:2 | 320:5 | 15:10 23:1 |
| 218:22 | 302:2 | **perjury** | **personnel** | 24:2 37:25 |
| 294:16,20 | **Pennsylvania** | 7:11 77:23 | 35:4 | 58:24 60:17 |
| 294:24 | 3:14 | **permitted** | **persons** | 61:5,12 |
| **passed** | **people** | 8:9 234:5 | 10:14 59:18 | 90:6 104:21 |
| 11:19 46:3 | 9:5 10:3 | **person** | 59:24 | 126:23 |
| 97:3 129:21 | 21:14 51:15 | 8:9 32:22,25 | 112:14 | 130:20 |
| 131:10,11 | 60:8 70:24 | 41:10,17,18 | 129:18 | 133:15 |
| 131:12 | 71:7 77:5 | 44:8 50:5,7 | 130:15 | 134:1 |
| 141:14,18 | 77:15 99:9 | 52:6 54:16 | 208:22 | 137:16 |
| 168:16 | 140:15 | 60:2,6,7 | 212:14,22 | 140:23 |
| 169:10,23 | 160:2 | 73:21 74:14 | 213:4 | 143:16,21 |
| 192:5 | 162:17 | 94:21 125:1 | 234:15 | 208:22 |
| 198:19 | 163:7 | 125:4,9,11 | 238:9 | 209:14,22 |
| 232:21 | 198:20 | 125:14,22 | 258:12 | 216:18 |
| 276:22 | 199:11 | 125:24 | 261:6,12 | 237:8,17,24 |
| 294:22 | 204:8,24 | 126:20 | 262:3,20,24 | 239:9,24 |
| **passes** | 209:2,13,18 | 129:16 | 263:6 313:1 | 240:7 241:5 |
| 119:14 | 209:21 | 134:11,12 | 313:2 | 241:17 |
| **passing** | 210:22 | 134:14,15 | **person's** | 242:8 243:3 |
| 312:21 | 212:14 | 134:18,21 | 138:15,19 | 243:12 |
| **passport** | 236:11,13 | 135:23 | 139:1,11 | 247:25 |
| 234:10 | 236:18 | 140:12 | 234:8 | 248:8,15 |
| 251:24 | 238:2 | 165:18 | 248:20 | 253:12 |
| 252:2,7 | 261:15 | 238:9 | 293:22 | 255:3 |
| **Patrick** | 263:24 | 241:23 | **persuade** | 256:10,15 |
| 3:5 10:25 | 276:21 | 242:1,5 | 173:20 | 257:8,14,15 |
| 11:1,1 | 291:25 | 248:1,2,9,9 | **pertained** | 274:20 |
| 207:25 | 292:7,15 | 248:17,17 | 75:8,15 | 275:21 |
| **patrick.s...** | 308:25 | 248:21 | 128:25 | 278:20 |
| 3:10 | 316:19 | 263:14,16 | 273:9 | 284:2,3 |
| **Paul** | **perceived** | 265:2 280:4 | **pertaining** | 286:5 287:9 |
| 71:20 72:2 | 198:14 | 280:9,13,16 | 45:15 49:12 | 287:12 |
| 72:19 | **percent** | 280:19 | 51:4 85:20 | 293:9,19 |
| 152:22 | 36:10 198:13 | 312:14,17 | 94:2 177:11 | 301:7,13,14 |
| **pay** | 198:20 | 316:13 | 201:18 | 301:20 |
| 316:17 | 208:21 | 320:8 | 264:7 | 302:4 |
| **paying** | 209:5 | **personal** | **pertains** | 312:18 |
| 316:2 | **percentage** | 34:14,15 | 119:1 177:1 | 313:10 |
| **pays** | 193:25 194:4 | 42:24 81:15 | 177:4 | 314:11,15 |
| 29:6 | 194:6 | 258:16 | **phone** | 316:3,14,18 |
| **penalties** | 224:22 | **personally** | 35:20 36:6 | **photograph** |
| 234:14 | 260:10 | 9:2 11:12 | 36:11 41:7 | 130:12,13,15 |
| **penalty** | **percentages** | 15:25 88:7 | 41:9,11 | 138:15,20 |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

139:1,12
234:8,9
293:5,22
**photographed**
260:21 263:7
263:19,25
**phrase**
290:5 309:17
310:17
312:10
**phrased**
9:8 65:11
87:19 88:4
100:12
103:4 169:5
271:12
306:1
**physically**
27:19
**physician**
13:25
**picked**
79:19 80:1
80:12
131:15
**picking**
97:9
**picture**
248:21,21
249:4,7
293:10
**piece**
69:23 260:3
**pieces**
131:3
**place**
41:7,21
43:12,16
44:5,11
108:13
109:3,11
110:19
122:1
136:19
146:22
187:1,7
206:9
**placed**

45:4,5 79:22
108:24
**placeholder**
128:15
**placement**
27:6
**plaintiff**
1:3 3:4
11:13 321:3
**play**
33:7 64:19
116:23
**played**
26:12,15
27:5
**please**
6:8,20,23,25
16:11 20:8
28:8 30:3
35:3 42:6
43:3 44:17
53:10 59:6
62:2 76:7
78:18 91:12
93:17 99:12
100:3
105:24
111:18
127:4
154:10
156:15
171:4 183:6
184:11
229:18
252:13
290:23
305:7
308:13
314:7,12
**point**
7:23 26:16
86:20
110:18
202:6
204:16
269:9 276:5
**pointing**
197:23

**points**
84:7
**policy**
37:8,19
216:20
**political**
84:2,7
130:16
139:13
140:10
**politics**
83:23,24
**poll**
42:12,14
155:2
215:21
216:2,10,17
217:3,11,23
218:4
248:23
255:2 256:9
290:8
292:22,23
292:25
**polling**
41:21 42:17
43:12,16,22
44:5,11,20
290:8
**polls**
42:21 44:15
71:8,16
143:9
154:13
291:25
292:13,15
292:19
**population**
21:12 224:22
308:25
**portion**
43:6 49:23
53:12 57:20
59:9 65:14
78:19 93:7
93:18 99:13
145:9 171:5
276:17

**pose**
271:25
**posed**
37:7 57:11
116:19
117:16
254:8
**position**
14:18 25:3
103:25
104:2 150:6
305:13
310:5
**positions**
24:20,21
**possess**
140:23
249:17,23
**possession**
14:8,9 20:4
51:16 55:4
**possible**
55:21 56:12
57:12
277:15
**possibly**
79:9 125:21
282:14
**potential**
54:5 56:1
91:6 213:13
271:14
**potentially**
9:10 37:13
37:15
**poverty**
316:1
**power**
25:15
**practice**
109:2 312:25
**preceeding**
123:5
**preclear**
221:25
**precleared**
82:15

**predomina...**
105:13
**preface**
152:4 171:9
**prefaced**
273:16
**prepare**
11:16 12:3
197:4
222:17
**prepared**
222:6,8,8,10
**preparing**
6:16
**prerequisite**
112:18
**present**
8:7 12:21,23
55:21 58:18
60:24 67:18
71:14 112:3
112:5
129:19
142:2
143:21
176:9 297:6
302:1,3
**preserve**
148:25 151:5
151:7,10,13
153:7 272:8
272:16
**preserves**
80:23 153:12
**preserving**
151:12
**president**
24:22 25:2
238:10,11
238:12
**presidents**
238:15,19,21
239:5,18,21
241:10,20
**presides**
25:13
**presiding**
107:20



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                      May 17, 2012

359

195:16
**press**
84:14 128:7
157:24
158:19
159:3,10,14
161:19
**pretty**
21:18
**prevail**
269:3
**prevent**
51:17 68:13
71:7 73:5
75:11 76:10
78:2 81:4
82:18 257:8
268:4,16
269:17
275:22
**prevented**
285:3
**preventing**
72:7 74:10
75:8 83:12
101:9 154:4
177:9 268:7
269:18
**previous**
12:13 20:3
140:4 177:7
178:5
266:15
275:21
279:20
**previously**
63:19,25
68:18,21
80:20 127:6
129:4,7
157:13,14
174:1
178:16
191:7 201:6
233:8,12
**primary**
24:5
**Princeton**

3:21
**printed**
292:6
**printing**
68:24
**prior**
11:20 24:7
45:17 92:7
92:12 98:3
146:23
147:6 153:3
170:8,15,20
171:15
172:17
179:11
180:6
183:16
184:2 191:4
226:3
247:21
278:20
**priorities**
36:17
**priority**
162:17,23
163:2,6
**private**
74:12 81:16
212:23
250:6
269:22
271:21
**privilege**
13:15,17,20
13:21 14:7
14:16 15:2
15:5,8,13
15:19,25
16:5 26:17
26:25 27:3
27:7 31:2
46:8 48:17
55:19 56:10
57:8,22
59:16,22,24
61:7,8 68:1
68:15,16
70:14 72:9

73:8,16
74:11,13,16
75:13,13,19
75:20,24
76:22,24
77:3,4 78:5
78:6,9
80:18,22
81:8,21
84:20,22
85:14,17
86:7,10
89:9,10,16
89:18 90:15
90:22 91:7
91:8,11,17
91:17,19
92:9,10,14
92:22 93:4
93:21,25
94:2,5,5,11
94:15 95:15
96:3,4,7,10
98:18 99:2
99:3,22
101:15
102:23
104:9,11
109:8
111:21
113:11
114:18
115:13,21
118:20,22
118:25
120:14,16
120:21
121:13,15
122:10
123:2,20
124:4,10
132:22,23
133:3,7,17
139:7,8
141:1,2,6,8
141:12,13
142:9,12,15
142:19
143:23

144:2 145:4
145:21
148:16
149:15
150:7,12,14
150:20,21
151:2,3,16
151:21
153:9,10,13
153:14,24
154:1,6
155:3,4,7,8
155:17,23
156:20,23
158:7,15,18
160:4,12,16
160:22
162:1,5,6
162:12,21
162:24,25
163:4,16,21
164:22,23
165:1,2,5
165:16
166:24
167:1 168:8
168:18,19
168:22,23
169:7,21,24
169:25
170:4,5,10
170:13,17
170:18,22
171:1,8
173:7,8,14
173:19,24
177:6
180:16,17
181:5,9,14
189:1,23,24
190:2,3
192:8,11,17
192:23,24
193:1,10,11
195:20
196:23,24
197:2 200:9
200:10,15
203:8,9

206:5,8,13
206:15,19
206:21
207:1,2,9
207:10
211:6
212:18,19
213:25
214:1,6,7
214:17
215:7,13,14
215:18,23
216:12,13
216:15,19
216:22
217:9,17
218:1,2,5,8
225:17
226:21,22
227:1,5
229:21,23
230:2,6,9
230:25
231:24,25
232:7,8
233:1
234:24
235:1,4,6
237:5,6,9
237:14
240:3,5,18
243:22
244:3,9,10
246:4,6,12
246:14,19
246:20
247:1,7,8
247:12,13
247:16,19
247:23,24
248:3
249:20
250:1,2,10
250:12,15
250:21,25
253:2,21,25
254:1,6,16
255:14,18
256:23



**Toll Free:** 800.211.DEPO
**Facsimile:** 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

360

| | | | | |
|---|---|---|---|---|
| 257:5,6,11 | 317:20 | 74:21 | 169:9,14,17 | 286:4 |
| 257:12,19 | **privileged** | **pro** | 178:18 | **prohibiting** |
| 259:10,11 | 33:13 37:16 | 24:22 25:2 | 193:22 | 177:12,18 |
| 259:16,17 | 42:22 47:6 | **probably** | **proceed** | **project** |
| 259:21 | 47:10 68:3 | 7:3 21:18,18 | 80:15 111:18 | 297:22 |
| 260:17,18 | 81:10,16,25 | 23:6 32:19 | **proceeding** | **projections** |
| 260:24 | 82:21 84:17 | 34:16 36:5 | 322:17 | 17:12 |
| 261:4,20 | 89:15 94:17 | 39:6 143:5 | **proceedings** | **promise** |
| 262:11 | 98:17 100:7 | 166:19,20 | 5:12 46:23 | 149:24 150:3 |
| 264:10,11 | 100:21 | 180:11 | 153:2 198:3 | 150:12 |
| 264:18,20 | 111:2 | 233:14 | 202:4 208:9 | 227:18 |
| 267:1,8,12 | 114:11 | 238:14 | **process** | **promised** |
| 267:13,14 | 117:18 | 282:10 | 37:2,14 | 227:13,16 |
| 267:19,24 | 121:3 | 303:19 | 46:13 51:25 | **promises** |
| 267:25 | 123:16 | 304:6 | 55:17 57:12 | 226:23 |
| 269:2 270:8 | 137:18,20 | **problem** | 59:4 65:5 | **prompt** |
| 271:4 | 137:21,23 | 42:25 43:15 | 96:22 97:6 | 101:10 |
| 275:13,18 | 148:8,15 | 54:5 56:1 | 114:10,13 | **promptly** |
| 276:11,15 | 151:20 | 276:20 | 128:24 | 232:21 |
| 277:7 279:4 | 155:22 | **problematic** | 132:19 | **proof** |
| 279:5,12,13 | 160:5,10,17 | 9:9 | 133:6 139:6 | 66:16 83:9 |
| 279:25 | 160:23 | **problems** | 155:14 | 129:19,22 |
| 280:1,7,8 | 162:19 | 42:20 43:9 | 158:11 | 130:17 |
| 280:15,23 | 165:14,20 | 43:13 51:20 | 163:12 | 160:14 |
| 280:24 | 167:20 | 54:6 55:11 | 169:4 | 224:6 234:4 |
| 283:6 284:9 | 168:9 | 58:15,16,21 | 200:24 | **proper** |
| 285:16,17 | 169:13 | 256:25 | 211:4 | 16:15 55:5 |
| 285:22,23 | 180:3,24,25 | **procedural** | 217:15 | 70:15 |
| 286:15,16 | 188:24 | 96:18,20 | 235:2 237:4 | 208:22 |
| 286:20,21 | 190:5 193:2 | 108:20,23 | 243:8,23 | 216:2 |
| 287:25 | 217:6 | 112:18 | 255:13 | **properly** |
| 288:1,6,7 | 226:16,17 | 186:9 | 256:21 | 44:15 |
| 288:25 | 227:17 | 229:23 | 257:18 | **proponents** |
| 289:1,7,8 | 232:25 | **procedurally** | 259:5,9 | 162:8 |
| 290:15 | 248:6 250:9 | 111:6 121:12 | 302:9 | **protect** |
| 291:20,22 | 253:16 | **procedure** | 317:13 | 78:24 142:19 |
| 291:23 | 254:15 | 2:9 27:3 | **processes** | 143:10,13 |
| 292:12 | 256:21 | 101:24 | 246:7 312:21 | 143:18 |
| 301:17,24 | 269:1 | 109:23 | 315:3 | 148:3 |
| 302:13 | 291:19 | 111:19 | **produced** | 190:24 |
| 304:10,20 | 292:11 | 112:15 | 2:1 14:22 | 268:18,21 |
| 305:14 | 294:5 306:6 | 116:10 | 317:21 | 278:19 |
| 309:24 | 312:22 | 185:12 | **producing** | 281:8,12 |
| 310:1,12 | 313:5,7 | 186:17 | 160:8 | 291:11 |
| 312:23 | 315:5,23 | **procedures** | **profess** | **protected** |
| 313:8 | **privileges** | 117:12 | 246:3 | 15:20 55:19 |
| 315:24 | 13:19 43:1 | 121:19 | **prohibit** | 267:7 |
| 316:10,12 | **privy** | 168:20,25 | 82:24 94:12 | **prove** |
| 317:5,11,18 | | | | |



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

71:16
159:15,22
248:1,9,16
293:7,10,22
**proved**
320:6
**provide**
15:6,18
111:22
129:22
130:8
137:18
142:18
145:17
176:11
215:7 220:5
234:13
252:2
262:20
302:6
**provided**
36:23 204:14
205:16
212:5
**provides**
28:15 175:25
258:15
**provision**
82:23 129:21
142:7 143:1
143:8 176:4
184:3 218:4
252:18
258:5,11
262:23
263:6,13,24
283:22
284:3 288:3
**provisional**
263:4,14,16
287:3,10
**provision...**
285:3
**provisions**
2:9 64:22
144:22
258:2
**public**

40:5,13,15
46:22,22
53:7 54:15
55:3 65:8
72:15 84:7
84:14 90:22
90:23 96:22
102:25
108:9 109:9
111:1,23
120:25
124:5
126:18
132:20,21
153:2
158:13,14
158:16
162:10
193:15
195:22,24
197:20
198:8 199:1
199:7,12,13
199:16,23
203:10,14
203:22
204:22
207:4,15
211:5
212:25
216:4,6
221:7,13,17
224:10
229:24
230:4,5,7
244:1 250:6
264:19
265:6
269:22
271:21,23
272:4,5
273:10,12
273:20
274:2,8,9
280:11
282:6
290:11,16
290:16,18
291:12

301:5,10
303:12
304:22
305:9,11,15
305:19,23
305:25
306:23
307:18,23
309:21
310:1 314:5
314:7,10,11
314:14,20
314:22
315:18
317:16
320:16
**publication**
68:23
**publicly**
168:25 169:8
169:9
**published**
73:18
**pull**
50:17 98:5
**pulled**
312:1
**pulling**
310:17
**pump**
84:6
**purpose**
10:9 68:5,12
72:8 73:5
74:11 75:7
75:10,15
76:10 78:2
78:24
121:10,23
121:24
122:5,7,19
122:20
123:1,6,6,7
123:12,23
142:13,13
142:20,20
142:23,24
142:25

143:8,17,21
144:17,18
144:21,22
144:25
145:13,14
145:18
148:1 149:4
149:10
151:5,9,16
153:6 159:4
162:4
166:22
169:12
176:25
177:2,16,17
177:21,22
178:2,5,7
178:16,21
190:4,9,10
190:12,16
190:20,24
191:1,3,6
191:14,18
192:1
197:10
217:19
229:2 252:9
252:21
253:9 255:9
256:13
257:20
258:1 265:2
266:15,17
266:17,18
266:25
267:3,6
268:3,7,15
268:18,21
269:13,16
269:18,21
270:1,4,13
271:17,20
272:1,6,6,8
272:11,15
272:21,25
273:4,10,18
273:21
274:7,11
275:3 276:1

277:1,24
278:4,9,15
281:6,8
285:13
286:12
290:12
291:11
295:6
**purposeless**
228:25
**purposes**
9:25 28:11
63:11 68:4
68:5,7 74:4
140:11
148:1,18,24
190:1,7
200:19
250:5 274:9
274:20
275:19,21
278:3,6
320:10
**pursuant**
2:8 17:9
270:13
**put**
63:21 107:24
108:13
109:3
110:19
119:10
187:1
200:18
296:23,25
297:11
300:18
**Putte**
303:16 304:4
306:14
307:7,9
**putting**
23:1
**p.m**
2:4 79:7
168:13
251:14
278:13



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

362

| | | | | |
|---|---|---|---|---|
| 288:16 | 94:3 95:18 | 187:21,22 | 276:23 | 213:11 |
| 318:2 | 96:24 97:17 | 190:18,22 | 277:4,24 | 227:21 |
| **P.O** | 97:22,23 | 191:4,16 | 278:10 | 229:10,13 |
| 3:6 | 98:7 99:12 | 194:11 | 281:3 | 229:14 |
| | 99:15 100:3 | 195:20,21 | 282:16,18 | 239:11 |
| ———— | 100:12,14 | 196:13,14 | 282:22 | 243:9 |
| **Q** | 101:12 | 199:25 | 283:5 285:6 | 270:12 |
| **qualify** | 103:4,5,7 | 200:19 | 290:21,22 | 271:1 273:9 |
| 7:22 24:15 | 104:12,13 | 204:12,18 | 290:25 | 273:24 |
| 307:2 | 105:18,24 | 205:4 | 291:1,6,6,8 | 275:24 |
| **quarter** | 112:20,24 | 209:12 | 292:11 | 277:16,18 |
| 304:15 | 114:17 | 211:5,24 | 293:15,17 | 277:21 |
| **question** | 115:20,21 | 215:5,8 | 293:18 | 281:24 |
| 6:18,23,24 | 116:19 | 216:15 | 294:3,5 | 282:8,9,10 |
| 6:25 7:4,6 | 117:10,16 | 217:5 222:3 | 302:12,19 | 295:24 |
| 8:12 9:19 | 118:18,21 | 227:8,12 | 303:10 | 299:10,11 |
| 10:12,12 | 122:19,22 | 229:18,19 | 304:24 | 317:25 |
| 12:1 16:6 | 122:23 | 230:8 231:4 | 305:7,18 | **quick** |
| 22:12 26:5 | 123:5,10,13 | 237:21 | 306:13,21 | 57:12 |
| 26:25 36:5 | 123:19,20 | 239:16 | 306:22 | **quickly** |
| 37:7,10,12 | 124:11,16 | 241:16 | 307:1,3,5 | 232:21 296:2 |
| 43:5,8 44:1 | 129:9 | 242:23 | 310:11 | **quotations** |
| 44:18 46:17 | 132:20 | 245:21 | 314:12,24 | 290:3 |
| 47:3,5,7,19 | 133:22 | 248:14,25 | 315:2,8,14 | **quote** |
| 49:17,20,22 | 137:19,22 | 249:2,6 | 316:10,11 | 84:9,16 |
| 51:23 53:4 | 137:24 | 250:20 | 317:4,6,10 | 85:11,12 |
| 53:9,17 | 140:4,14 | 252:13 | 317:17 | 292:21 |
| 54:14,23 | 141:17 | 253:6,10 | **questioning** | 308:13 |
| 55:2,14 | 143:2,6 | 254:8 | 116:11 171:1 | 310:2,2 |
| 56:4,10 | 145:3,6,8 | 255:23 | 177:7 | 312:3,9,11 |
| 57:10,13,16 | 146:4 | 256:7 | 295:13,16 | **quoted** |
| 57:18 59:1 | 148:20 | 257:25 | **questions** | 159:10 |
| 59:6 65:11 | 151:17 | 258:9 260:4 | 6:20,24 7:16 | 291:25 |
| 65:25 66:1 | 152:4,9 | 261:16,19 | 9:17 10:1 | 312:8 |
| 66:25 70:18 | 153:18,20 | 261:22,25 | 10:14,16,19 | **quoting** |
| 71:1,3 75:3 | 153:22 | 262:1,9 | 17:8 31:3 | 311:15 |
| 75:4,23 | 154:10 | 267:5 268:2 | 61:3 64:4 | |
| 76:7,18 | 156:7,15,15 | 268:5,11,14 | 65:7 72:14 | |
| 77:13,18 | 156:25 | 268:25 | 73:20 74:18 | **R** |
| 78:16,18 | 157:4 159:2 | 269:1,4,11 | 103:9 177:7 | **R** |
| 79:24 81:23 | 161:16,20 | 269:14 | 184:24 | 3:3 |
| 82:1,6,21 | 164:3 171:4 | 270:7,10,18 | 187:11 | **race** |
| 86:18 87:8 | 171:10,12 | 270:23 | 191:25 | 119:25 285:5 |
| 87:12,14,19 | 176:22 | 271:13,15 | 196:3,6,11 | **races** |
| 87:22,23,23 | 177:23,25 | 271:17,25 | 196:12,15 | 10:14 |
| 90:7 91:10 | 177:25 | 272:10,20 | 196:17 | **racial** |
| 91:12 92:17 | 178:5,15 | 273:16 | 199:2,7 | 21:15,17 |
| 92:19,21,22 | 183:5 184:7 | 274:3 276:3 | 210:6 212:2 | 201:1 204:4 |
| 93:6,17,24 | 184:20 | 276:9,12,16 | | 205:5,11,15 |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Troy Fraser                                      May 17, 2012

363

```
206:2,11        60:20 64:15    reask          receiving       recommend...
212:13,21       65:13,14       123:22         71:21 72:4      60:21
213:3,9,21      72:25 78:17    reason         75:12,16        reconsider
214:3,12        78:19 82:5     7:2 99:20      76:11 77:1      78:12 94:3
215:1           93:7,18          103:18       recess          record
259:18          99:13 118:6      122:1        79:6 168:13     2:10 5:17
260:6,12        123:17           281:13,15      251:14          6:8 16:25
264:7           128:7 141:3      319:3          277:10,11       46:22,23
racism          142:18         reasons          278:12,13       53:7 54:15
84:6            143:4 145:9    191:2          recognize        55:3 57:17
raise           171:5 174:3    recall         16:18 62:4,5     72:25 82:4
198:23 199:3    176:19         29:15,39:17      62:20,23        83:6 85:7
  212:20        204:1 205:9      52:13 60:3     63:25 64:9      86:20 96:22
raised          209:8 210:4      60:4,11        79:22           102:25
9:9 67:23       224:13           64:14,15       107:20          108:9 109:9
  98:25 99:6    227:8            66:23 85:19    110:4 127:6     109:24
  100:24        229:18,19        102:3,11,11    127:19          111:1,23
  106:8 168:6   231:20           106:6 112:5    129:7,10,11     112:12
  199:2         242:25           112:6,9        149:16          115:3 117:3
  200:20        276:10,16        126:5,9,14     157:20          120:25
raising         276:17           146:24         174:1,5,7       123:17
206:25          289:23           147:14         174:16          124:5
rapidly         290:22,24        152:24         203:24          132:20
277:15          291:9 297:8      166:17         233:13,16       143:25
rare            309:11,11        194:5          283:9           144:14
311:20          309:13           197:22         289:19          152:9
Rathgeber       310:19           198:2 200:3  recognized        156:12
125:20          319:20           200:25        66:7 107:9       158:14
  134:23        readdress        202:19,25       107:10          162:10
reach           79:9             207:19,20       110:4           168:14
122:5           reading          215:24         111:12,24       178:1 189:4
react           17:16 69:9       232:15         113:22          189:10,16
114:5             71:12 118:2    236:17,24      114:4 196:1      193:15
reaction          159:18         238:25        217:17          195:22
84:16 85:12       178:12         239:2        recognizes        197:20
  85:13           207:13         283:21,25     138:24           198:8 199:1
  114:13          283:14         284:23      recollection        199:1,23
  192:18,21     reads            285:7 286:3   16:23 18:25       203:11,14
  213:19        176:23           287:4          23:5,8,18        203:23
read              297:19         292:24         23:20 39:20      204:22
11:18,23        real             300:24         52:12 57:24      206:1
  12:2,5,7,17   311:21           301:5          63:7 66:13       207:16
  17:25 43:4    realize        receive         82:8 115:4       209:20
  43:6 49:19    15:24 96:13    48:7,15          188:7 203:2      211:5
  49:21,23      really           230:22         203:4 225:8      212:25
  53:9,12       305:4          received         259:4 265:5      216:4,6
  57:18,20      reanswer        30:19 48:23    recollect...      224:10
  59:8,9        26:4             80:7 313:14    119:9           227:3,6
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

364

229:25
230:3,4,5,7
233:10
244:1
264:19
265:6
267:12
271:9,23
272:5
273:11,12
273:20
274:2,8,9
275:3,12,16
277:13
282:6 289:9
289:12,14
290:18,24
291:9 292:6
303:9,12
304:22
305:9,11,15
305:20,23
305:25
306:23
307:18
309:21
314:5,7,10
314:14,20
317:17
322:2
**recorded**
287:15
**records**
19:5 96:16
200:1 209:2
209:3 242:2
290:16
**record's**
63:11
**recovering**
8:2
**redo**
143:6
**refer**
8:12,17 9:18
17:7,25
54:14 55:2
81:3 162:9

201:9
203:13
209:21
216:7 224:9
233:19
243:25
262:12
264:18
290:15
309:17
317:16
**reference**
132:20
197:13
200:1
208:21,23
211:4
213:16
262:4
298:23
309:21
**referenced**
69:12 185:1
198:17,18
214:14
**references**
197:9
**referencing**
71:23 201:13
**referred**
70:22 97:8
101:16
193:19
194:19
195:11
218:13,19
238:23
293:19
**referring**
84:19 85:8
241:9 243:1
292:14,19
310:21
**refers**
70:1 71:20
72:23 176:3
**refiled**
131:16,17

**reflect**
83:6 112:12
143:25
**reflection**
21:19
**reflects**
80:19 209:20
**refresh**
16:23 57:24
63:7 66:13
203:2 225:7
**refreshes**
203:4
**refusal**
122:22
**refused**
122:19
279:20
**refusing**
293:16
**regard**
15:9 27:5
47:3 51:8
74:12 168:5
213:23
216:15,21
254:18
308:20,22
**regarding**
33:11 35:6
54:21 71:20
72:15 91:10
100:16,23
100:24
162:3 197:6
202:16
213:13
227:16
232:2
253:12
274:19
276:14
279:15
**regardless**
311:18
**regards**
51:5
**register**

77:6,20
160:3,9
212:15
**registered**
44:15 140:23
158:3
198:13,15
210:17
211:11
249:17
260:8
274:12
279:19
**registering**
129:20
**Registrar**
72:2
**registration**
23:11 28:6
51:14 53:25
54:21 55:5
55:22 71:22
72:4 75:12
75:17 76:12
77:1,16,21
129:1
130:18
147:24
154:9,12,23
209:3
214:13
224:7,17
322:25
**regular**
8:10 107:24
108:2 121:7
185:25
186:1,20
187:5
201:21,23
201:25
202:2,3,4
279:20
**regularly**
136:23
**regulations**
265:7,23
**rejection**

290:4
**relate**
14:9,18
23:11,13
87:6 203:14
**related**
12:13 15:2
17:11 20:2
23:14,16,18
24:9 30:20
33:8,15
37:25 42:8
53:3,23
58:15 85:19
100:5 153:6
157:6 223:8
234:1
250:15
258:6
259:23
263:6
270:13
302:1
322:16
**relates**
15:9 46:13
94:17 98:13
155:15
230:2
**relating**
176:13 178:9
178:19
197:10
298:12
299:5,16
**relation**
248:12 260:1
**Relations**
22:4
**relationship**
299:21
**relative**
260:8
**relatively**
311:20
**release**
128:7 157:24
158:19



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

**ESQUIRE**
DEPOSITION SOLUTIONS

Senator Troy Fraser                                        May 17, 2012

| | | | | |
|---|---|---|---|---|
| 159:3,10,15 | 107:1,3,11 | 153:20,21 | 20:24 64:13 | 249:17,24 |
| 161:19 | 107:14 | 171:9 223:5 | **represented** | 284:25 |
| **released** | 116:6 | 223:6 | 10:21 129:11 | 286:7 |
| 12:7 198:17 | 124:19 | 252:13 | **representing** | 288:15 |
| **relevance** | 125:1 127:1 | 315:14 | 73:2 163:17 | **requirement** |
| 45:25 277:19 | 128:13 | **replacement** | 204:8 244:7 | 8:7 51:13 |
| 277:20 | 129:2 | 41:6,8 | 244:12 | 108:20,23 |
| **relevant** | 136:20 | **report** | **represents** | 154:18 |
| 250:21 | 147:9 | 60:19 | 120:7,19 | 255:3,16 |
| 277:16 | 152:17 | **reported** | **Republican** | 256:10 |
| **relied** | 166:5,16 | 2:6 176:14 | 83:25 92:5 | 278:20 |
| 49:11 50:3,8 | 194:15 | 178:10 | 102:15 | 287:10 |
| 51:3 | 197:8,15 | 298:13 | 103:21 | **requirements** |
| **religious** | 200:1 201:4 | 299:6,17 | 107:1 | 45:2,6,9,20 |
| 260:20 263:7 | 213:8 | **reporter** | 171:25 | 58:24 |
| 263:18,24 | 221:14,14 | 6:16 16:10 | 172:1 | 141:15,19 |
| **rely** | 221:16 | 16:17 18:14 | **request** | 176:14 |
| 49:7,9 51:1 | 224:3 | 43:7 49:19 | 19:23 40:25 | 177:1,4 |
| 51:7 | 242:21 | 49:24 53:13 | 86:24 97:8 | 178:3,10,17 |
| **relying** | 245:14 | 57:19,21 | 120:22 | 178:18 |
| 170:11 | 281:17,21 | 59:7,10 | 121:1 181:6 | 183:19 |
| **remain** | 282:1 | 65:12,15 | 231:14 | 184:4 |
| 17:3 | **remind** | 78:20 93:6 | 297:23 | 188:17 |
| **remained** | 40:6 57:5 | 93:8,19 | **requested** | 193:7 |
| 109:11 | **removing** | 99:14 103:7 | 18:18 20:1 | 224:16 |
| **remark** | 256:13 | 103:8 129:3 | 43:6 49:23 | 298:7,13 |
| 68:18,19 | **renew** | 145:10 | 53:12 57:20 | 299:5,17,24 |
| **remarked** | 249:10 | 150:23 | 59:9 65:14 | 300:8,16 |
| 62:18 | **renewed** | 157:14 | 78:19 93:7 | 308:24 |
| **remarks** | 38:22 39:1 | 171:3,6 | 93:18 99:13 | **requires** |
| 222:1,6,8,10 | **repeat** | 192:15 | 145:9 171:5 | 71:14 110:20 |
| 222:12,17 | 66:1 103:6 | 251:11 | 180:21 | 160:14 |
| 222:19,20 | 143:11 | 276:9,18 | 181:11 | 186:17,20 |
| 222:23 | 146:4 | 291:8 | 276:17 | 186:23 |
| **remember** | 153:20,21 | 321:22 | **require** | 225:16 |
| 11:7,10,15 | 154:10 | **Reporter's** | 109:20 | 232:4,23 |
| 29:19 39:24 | 156:15 | 5:6 321:20 | 129:18 | **requiring** |
| 40:2 50:22 | 159:2 | **reports** | 130:19 | 9:3 |
| 53:18,19 | 235:13 | 17:12 246:11 | 155:12 | **reread** |
| 57:10 60:15 | 262:1 | **represent** | 159:15,22 | 11:19 53:4 |
| 60:16 61:16 | 277:18 | 120:9 204:3 | 160:8 | 93:5,16 |
| 61:19 69:12 | 291:6,7 | 208:7 | 163:10 | 99:12 171:3 |
| 69:15 85:9 | **repeated** | 311:11 | 185:14,21 | 261:9 |
| 85:24 | 312:8 | **represent...** | 187:14 | **research** |
| 102:10 | **repeatedly** | 292:4 | 224:6 271:4 | 141:3 207:12 |
| 105:3 | 190:12 | **Represent...** | **required** | 290:8 |
| 106:14,18 | **rephrase** | 71:13 220:1 | 108:20 | **reserve** |
| 106:25 | 71:1 153:18 | **Represent...** | 188:13 | 317:25 |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

366

reserving
295:21
resolution
119:16 176:6
  176:13
  178:9
  192:19
  295:15
  297:3
  298:12
  299:16
Resources
22:3 24:7
respect
8:23 26:17
  31:1 142:19
  144:15
  150:13
  169:15
  315:4,4
respond
143:3
responded
273:22
response
16:6 18:17
  19:1,23
  47:19 70:15
  122:2
  189:15
  199:21
  200:4,16
  213:11,14
  254:7 261:1
responses
6:19 191:8,9
responsibile
161:11
responsib...
25:6
responsib...
161:2,5,7,10
  161:15,22
  265:14
responsible
254:19 265:7
rest
21:18,19

111:18
restate
91:12 143:2
  204:11
  258:9
restore
278:15,18
restoring
278:23
restrictive
247:10
result
14:16 52:24
  173:3 223:1
  229:7
resulted
307:6
results
308:2 311:1
retain
222:19,20,25
  223:13
retained
222:12
retaining
223:8
retaken
249:4
retract
175:3
retrogres...
295:1
return
322:7
returned
322:8
reveal
26:18,20
  31:3,5,16
  36:25 37:12
  37:14 46:11
  46:14 47:5
  48:20 51:23
  54:9,11,23
  54:25 55:15
  55:17 56:5
  56:7 59:2,4
  61:1 65:3

72:16 74:18
75:2 76:5
84:23 87:19
90:12 92:23
93:22 98:19
99:9,10
100:1 105:2
108:10
110:25
111:1
113:17
114:8 124:4
124:5
132:17
133:4,20
135:25
136:1
139:21,22
142:10
148:9
155:12,21
158:9,15
160:5,10
162:19
163:10
164:1 165:9
165:22
166:25
169:2
172:15,25
177:5
180:15
181:24
193:2
204:23
211:2,6
212:23
213:24
215:11
217:14
218:23,24
218:25
220:11
223:3
225:17
226:13
228:2,3
232:5,24
234:23

237:2 243:6
245:20
246:25
252:25
254:12
255:11
256:19
257:17
258:3 259:7
267:4 269:8
271:4
274:17
275:1
276:23
279:2,11,24
280:22
290:14
292:10
294:3
301:21
302:19
305:2 306:3
306:8,9
309:19
312:20
313:3 315:3
315:20
316:9,23
317:11
revealed
15:16 167:6
revealing
46:17 118:22
  172:13
  302:7,9
reveals
118:16 171:7
  314:1
review
18:7 69:10
  118:1
  246:11
  260:1
reviewed
197:5 243:3
  243:18,20
reviewing
17:1,22 64:3

83:7
revision
183:15
re-ask
71:3 152:5
re-read
252:13
Riddle
64:18
right
14:24 15:25
  17:7 25:14
  31:9,10
  47:1 51:5
  67:7 70:5
  80:21 96:14
  106:4,11
  111:16
  123:9,14
  127:11,12
  129:17,24
  131:2
  140:11,21
  144:1
  149:19,20
  159:11,17
  167:13
  182:24
  187:3
  188:10,18
  190:21
  197:6,11
  198:6
  202:23
  211:24
  213:15
  217:20
  225:23
  230:20
  234:16
  242:18
  252:12,16
  252:19
  255:17
  261:7,13
  263:25
  278:5,17
  282:1



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

284:19
295:21,24
297:6,17
298:7 299:1
299:4,11
300:9
306:18
309:8
310:23
**rights**
44:24 45:3
45:24 46:4
48:24
141:16,20
141:22
160:20
161:1,4,9
161:14,22
**right-hand**
208:14
**rings**
69:8
**RMC-DST-RLW**
1:11 321:11
**Road**
40:12
**Rodney**
166:9
**RODRIGUEZ**
1:18 321:18
**Roger**
89:23 90:4,9
91:21
**role**
25:2,10
26:12,15
27:4 33:7
64:19
101:25
168:15
195:14,16
218:17
**roles**
24:18
**room**
3:14 13:2
**Rosenberg**
3:19 5:4

86:19
143:11
157:18
295:19,24
301:18,25
302:14,23
304:11,18
304:21
305:4,5
306:18
309:5,8,12
309:23
310:4,8,16
311:4,7
312:24
313:9 314:4
314:9 315:7
315:25
316:13
317:6,19
322:14
**rotated**
25:3
**roughly**
209:17
**roundy**
178:23,23
**Royal**
83:18,20,22
84:13 85:11
**rule**
25:15 26:6
108:24
121:11,23
121:24,25
122:5,7,12
122:20
123:1,24
175:15,19
175:21,23
175:25
176:3,5,10
176:18,25
177:8,17,20
178:2,6,9
178:13,17
179:5,24
181:7,11,19

181:21
182:3,9,12
182:16,21
183:2,3,8,9
183:12,14
183:19
184:2,6,18
185:1,7,9
188:1,10,15
188:22
189:11,20
192:6,22
193:6 196:5
297:14
298:6,12,19
298:24
299:2,3,3,4
299:6,16
**rules**
2:9 6:12
25:16 110:6
111:25
116:9
174:23,25
175:2,6,12
177:10
179:13,14
179:15,17
179:22
182:7 183:8
183:15,15
183:16
184:10,13
187:19
193:5
296:23,25
297:11
**runs**
179:21

——————————
           **S**
——————————
**S**
3:3,12
**Safety**
126:18
280:11
**San**
120:8

**satisfying**
265:3
**Saturdays**
288:17
**save**
103:11
**saw**
43:16,25
203:3
**saying**
9:25 38:8
81:25
113:14
207:19
216:23
217:4 262:7
279:15
281:25
291:25
306:25
307:12
308:20
309:15
310:14
**says**
10:4 68:23
69:1 87:5
123:8
144:19
176:6 203:7
265:10,15
265:16
297:3
298:17,19
299:1,15
308:15,19
312:16
**SB**
33:8,11
51:12 127:2
128:2,17,17
128:25
129:24,24
145:25
153:3,6
166:7
168:21
181:3

199:13
213:13
229:7
258:15
281:1,5
302:15,16
302:24
303:13,13
303:21,22
303:25,25
304:23
305:6,20
306:24
307:11,16
307:20,24
308:3
316:19
317:8
**schedule**
33:2,10,24
**scheduled**
33:15
**scheduler**
33:2,5
**scheduling**
33:7 35:4
**scooting**
174:11
**scope**
150:7 277:19
**seal**
320:12
**search**
17:10 18:20
18:23 19:24
145:7
**searched**
18:17
**searches**
19:1
**second**
16:21,22
22:11 50:16
50:17 71:4
168:4 175:3
187:13
195:18
261:22



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                              May 17, 2012

368

```
269:12,14          178:9              157:1              108:24             168:6,16,16
283:14             Security           seeking            109:4 110:7        168:21
289:25             210:9,14           157:4 211:14       110:13,24          169:10,10
310:13             211:12             seen               111:6,15           169:19,19
secondary          212:15             17:4,5 19:15       112:3,15           169:23
50:18              see                43:12 44:7         113:21             170:1,8
Secondly           6:21 25:10         44:10 68:21        114:2 116:9        172:3
92:20              36:7 63:5          69:5 79:16         117:13             173:21
Secretary          66:15 69:8         118:8 183:2        118:17             174:23,25
58:7 89:23         70:1,4,21          183:8,11,18        119:2,4,5          175:6,13
90:4,9,17          71:8,17,18         208:4              121:19,20          176:1,3,17
91:5,6,14          71:19 72:5         289:22             124:2,9            179:13,16
91:21,23           83:5,8             segment            125:11             179:21
126:16             108:19             198:15             126:6,15,24        181:7,11,12
211:10,16          109:2,18          self-expl...        127:23,24          181:19
212:3,9            110:8              176:19             129:11             182:23
216:3,10           129:13             senate             131:5 132:7        183:4,7
218:7              138:5,10           5:13,14,17         132:8 133:1        184:10,12
254:25             139:14             8:14 12:10         133:10,14          184:13,19
255:5,25           157:25             14:10,18          133:25             185:15
256:5 265:7        174:11             15:2 17:13         134:6              187:19
265:11,15          188:9 202:2        20:3,21            135:12,19          189:20
265:17             202:5,15,18        21:3,7,8,10        137:13             190:9,24
284:25             203:1              21:25 22:16        138:5 139:6        192:4,5,12
section            208:15,21          22:23,24           139:20             192:13
44:23 45:1,5       209:5,9            24:6,19            140:24             193:5,7,12
45:9,14,20         210:1              25:11,13,14        141:4,10,18        193:13,16
47:13,22           223:19             25:16,19           141:25             193:19
48:9,12,24         234:4              26:1,5,12          142:14,21          194:1,8,12
49:8,10,13         236:21             26:13,20           143:7              194:21
50:9 51:4          238:20             27:5,6,9           144:19             195:15
51:11 67:4         239:22             29:18 31:5         146:6,25           197:1,24
82:16 83:4         248:20,21          32:23 38:16        147:15,21          198:2,4,11
83:11              263:5,11           38:19 42:4         148:1,6,13         198:12,22
130:22,23          276:20             49:12,25           148:18,24          200:4 201:2
130:25             286:1,25          50:2,25             149:22,25          201:2,16,19
141:15,19          288:10             51:5 53:16         150:17             202:12,16
141:21             290:2,5,7          54:24 56:6         152:12             203:17
176:4 234:3        291:24             57:23 58:8         154:3,21           204:5
234:14,16          292:17             58:12 62:12        155:5              205:11,17
262:13,17          308:13             71:11 72:21        157:25             206:10
262:18             309:15             79:19 80:8         158:24             207:5 208:9
263:4,5            311:23             80:11 86:3         159:3,14           211:10
264:24             seeing             87:17 92:7         160:2              212:8 215:2
265:3              69:12,15           92:13 95:6         161:25             215:20
sections           82:24 128:6        97:7 98:1,9       162:3,4,8          216:1,8
202:1              202:19             99:18 107:5        163:5,18,23        218:4,10,18
section's          seek              107:7,8,16         164:6,19,25        218:22
                                                         167:12            219:19
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

369

| | | | | |
|---|---|---|---|---|
| 220:21 | 258:13 | **senator** | 303:16,17 | **sentences** |
| 221:10,17 | 259:14 | 1:23 2:1 5:3 | 304:4,12 | 308:15 |
| 223:1,8 | 260:15,21 | 6:1,7 8:25 | 307:6,9,10 | **sentiment** |
| 224:3 | 261:6,11 | 14:5 16:13 | 307:10 | 84:11 90:10 |
| 225:13,20 | 262:2,18 | 38:4,7 49:8 | 308:19 | **September** |
| 225:25 | 263:4 264:7 | 52:20 57:6 | 309:13 | 62:10 |
| 226:5,15,19 | 264:14,22 | 63:22 66:20 | 311:7 | **serious** |
| 226:24 | 265:22 | 71:11 76:8 | 317:25 | 311:20 |
| 227:13,16 | 266:17,18 | 81:1 96:24 | 319:20,25 | **serve** |
| 227:19 | 267:9 268:3 | 111:12 | 320:5 | 21:24 22:3,4 |
| 228:7,10,19 | 268:8,15 | 112:7,10,12 | 321:20,25 | 22:6 25:6 |
| 229:9 | 269:16,19 | 114:3,19,23 | **senators** | 25:14 30:16 |
| 230:22 | 269:21 | 118:3,8,13 | 25:15 26:7 | **served** |
| 231:2,17,21 | 270:4 | 119:10,25 | 27:12 29:17 | 20:21 21:2 |
| 232:3,3,21 | 271:18 | 120:5,13,18 | 94:4 108:21 | 22:16,24 |
| 233:14 | 272:1,7,12 | 121:18 | 109:21 | 24:18,22 |
| 234:6,20 | 272:22,25 | 122:18 | 112:3 170:2 | 110:11 |
| 235:3,7,8 | 273:4,11 | 146:19 | 170:7,14 | 182:23 |
| 236:3,15,23 | 274:8,11 | 148:12 | 171:23,24 | **service** |
| 237:1,8,12 | 275:20,22 | 150:15 | 171:25 | 21:1 183:1,3 |
| 237:16,23 | 278:7,9,15 | 160:25 | 172:1,2,5 | 184:18 |
| 238:10,11 | 278:21 | 162:14,15 | 172:23 | **services** |
| 238:12,15 | 280:18 | 162:15 | 173:5 179:9 | 28:14 |
| 238:18,20 | 281:18 | 166:9 167:9 | 181:2 | **serving** |
| 238:24 | 283:10,12 | 167:15 | 183:16 | 38:16 42:17 |
| 239:5,21 | 283:13,22 | 168:15 | 185:15,22 | 176:1 |
| 240:2,8,15 | 284:25 | 172:8,17 | 186:18 | **session** |
| 241:10,20 | 285:14,20 | 179:23 | 192:19,21 | 34:10,11 |
| 242:15,18 | 286:6,12 | 180:13,21 | 195:13 | 35:11,13 |
| 243:11,15 | 287:15 | 181:17 | 204:4 | 85:19 109:4 |
| 244:6,24 | 288:3 | 182:14 | 205:10,25 | 110:19 |
| 245:3,24 | 290:11 | 189:19 | 206:22 | 118:12 |
| 246:2,9,15 | 291:15 | 202:17,18 | **send** | 124:7 |
| 246:16,22 | 293:3,11 | 208:18 | 34:19 | 132:11 |
| 247:6,11 | 294:16,17 | 209:1,15,22 | **seniority** | 166:20 |
| 248:5 | 294:21,24 | 210:21 | 25:4,5 | 167:22 |
| 249:18,24 | 294:25 | 212:6,20 | **sense** | 176:8 |
| 250:5 | 295:5,9 | 213:2,11 | 125:4,6 | 179:12,14 |
| 251:18 | 297:14 | 227:13 | **sent** | 180:8,11,12 |
| 252:12,15 | 298:14,16 | 233:12 | 34:16 44:2 | 183:14,16 |
| 252:19,22 | 299:20 | 251:15 | 51:14 79:19 | 184:10,13 |
| 253:1,9,13 | 301:23 | 262:13 | 80:1 107:23 | 185:1 194:7 |
| 253:23 | 303:4,5 | 283:21 | 220:2 | 201:17,21 |
| 254:18,18 | 308:21,24 | 284:23 | **sentence** | 201:23,24 |
| 254:20 | 313:5,25 | 285:10 | 71:24 72:5 | 201:25 |
| 255:4,9,17 | 316:25 | 286:3 | 270:20 | 202:1,2,3,4 |
| 256:8,14,16 | **senates** | 288:14 | 292:15 | 225:10,11 |
| 257:9,21,22 | 239:19 | 295:23 | 308:15 | 226:3 |
| 258:1,6,11 | | | | |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

228:22
229:9
230:12,17
297:5
300:19,20
304:6,17
305:22,24
**sessions**
15:11 110:10
110:18
116:13
274:22
**set**
25:25 62:9
118:13
176:15
178:11
183:15
185:2
188:17
247:10
255:5,24
256:4
298:14
299:18
**sets**
26:5 256:8
**setting**
178:17
221:13
**settings**
221:7
**shake**
6:20
**shakes**
242:14
266:23
**sheer**
84:6
**shell**
128:8,10
**Shoe**
300:24 301:3
**short**
277:9
**shorten**
56:12
**shorthand**

2:6 56:12,15
321:22
**shortly**
295:15
**show**
51:13 71:23
119:4
154:20,23
208:23
209:9 210:8
252:22
256:15
257:22
285:19
291:25
292:15
314:7
**showing**
43:17 311:7
**sic**
178:7
**sick**
115:11,18,19
115:22
**sidebar**
179:1,2
**sign**
265:2
**signatories**
205:13
**signature**
5:5 24:13,15
319:1,21
322:6
**signed**
57:24 58:9
82:10 201:1
233:22,25
294:17
**significance**
206:9
**signing**
294:20
**signs**
263:17
**similar**
157:1 183:3
183:9 254:7

268:5
**simply**
48:15 71:13
131:14
132:10
**singular**
276:1
**sir**
10:8,19
16:21 18:2
18:10 20:21
27:8 28:12
30:10 43:5
45:10 48:19
53:11 54:4
63:5 64:5
66:9 69:25
110:10
129:5 145:8
157:17
170:11
174:23
233:19
269:5
286:23
287:14
291:1
292:14
293:17
**sit**
56:21 78:1
238:2 268:8
**sits**
78:7 260:2
306:19
**sitting**
53:21 58:21
73:20 83:14
107:19
140:13
144:24
194:5
195:25
223:12
232:16
267:21
292:24
300:6

301:18
310:11
313:9 317:7
**six**
23:6
**sketch**
222:15
**Skipper**
102:19
103:13,20
104:15
105:3 136:3
136:5
164:10,12
227:18,21
227:23
236:14
**slow**
296:6
**slowly**
248:14
**small**
16:14 198:15
208:5
215:10
301:8,15,20
302:5
311:22
**Smith**
219:8,9
220:1,4
221:4
**Social**
210:9,14
211:12
212:15
**sole**
22:14,18
25:22 32:25
149:4 280:3
281:13
**solely**
28:18 51:2
**solicit**
173:10
**solo**
239:13
**someone's**

44:10 53:25
**sonogram**
232:17
**soon**
125:25
225:21
**sorry**
11:7 21:23
22:5,11
26:4 33:17
38:17 39:1
39:11 40:8
50:16 53:18
58:6 62:16
66:17 82:9
85:21 93:16
101:11
102:5 104:3
106:14
109:14
114:21
115:9 116:6
130:25
136:12
140:1
148:22
175:3,4,22
182:11
185:19
188:12
196:2
209:10
219:20,24
224:18,24
232:19
237:21
239:15
240:11
249:9
263:10
289:17
294:8 300:4
305:10
309:6
**sort**
36:25 37:4
37:14 46:11
46:24 56:24



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

371

74:25 87:12
90:23
308:22
**sounds**
58:1 161:16
**sources**
90:22 133:9
**south**
45:4
**Spanish**
147:23
**spare**
316:17
**speak**
9:4 13:4,8
108:1
182:16
296:8
**speakers**
29:22
**speaking**
185:24
312:24
**speaks**
213:5 309:22
**spec**
98:11
**special**
176:3,7,15
178:8,11,19
178:21,22
183:20
185:3
188:10,13
188:16,17
296:3,11,12
296:13,15
296:19,22
296:22,24
297:4,10,12
297:15,18
297:21,25
298:3,14
299:18
**specific**
49:9 50:6
53:19 54:2
54:3 60:2,5

60:6 75:2
82:23 87:7
89:20 92:24
125:1
144:21
150:2
175:24
178:18
199:10,24
199:25
217:1
227:15
236:19
239:11
253:6,19
271:3,13
277:4
282:21
297:23
300:10,10
300:23
304:25
305:1
**specifically**
149:11
177:20
211:22
220:20
290:19
306:22
**specifics**
86:15 87:11
136:20
184:1
214:20
219:6
236:16
245:20
253:17
**specified**
179:15
184:18
**specify**
9:14 138:17
140:18
178:19
307:7
**specifying**

178:3,16
**speculate**
255:1
**speculation**
70:11 73:14
73:24 95:17
104:7,14,17
105:16,21
230:25
291:4
316:22
**speech**
117:6
**spell**
6:8
**spend**
56:13
**spoke**
182:20
**spoken**
221:7,16
**sponsor**
86:2,5,13,24
89:8
**sponsored**
23:2,3
**sponsoring**
87:17 101:10
**sponsors**
162:18
**sponsorship**
88:3,23
89:13
**stack**
63:22
**staff**
8:21 14:9
26:21 31:6
32:18,21,23
34:9,19,24
35:1,6,7
46:15 54:12
56:8 64:19
67:21 70:9
74:19 85:25
88:1 94:21
98:15,16
99:6 125:4

125:9,11
126:20
134:2,5,6
134:10
146:20
161:24
164:14
166:15
172:23
182:18,21
219:3,13
222:13
236:10
241:23
268:2 317:1
**staffer**
36:5 90:20
125:17
188:8
**staffs**
317:15
**stand**
7:24,24
310:14
**standards**
255:2,5,7,15
256:9
**standing**
195:25
**stands**
91:11 217:5
290:21
**start**
21:1 63:22
87:24 132:7
226:3,4,4,7
226:9,11
235:9 296:1
**started**
95:5 131:12
167:22
180:11
183:1 223:7
225:22
240:16
304:17
**starting**
20:8 24:25

71:25 142:3
261:18
276:6,7
304:5,6
**starts**
184:10
263:10
**state**
1:2,10 2:5
3:4,17 6:7
8:14 9:22
13:15 14:17
21:9,13,18
21:20 22:4
22:14 25:8
26:22 28:18
29:6 31:7
31:24 32:8
38:16 42:4
45:15 46:15
49:7 50:10
50:25 54:12
56:9 58:7
77:22 89:12
89:23 90:4
90:9,17
91:5,14,21
91:23 92:24
101:17
106:7,17
109:17
117:13
120:6,9
126:24
130:16
139:14,16
140:10,19
141:21
152:20
159:7,12,24
160:13
163:8
211:10,16
212:3 216:3
216:10
218:7 222:9
224:23
228:19



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                          May 17, 2012

| | | | | |
|---|---|---|---|---|
| 238:15 | 135:8 138:5 | 264:15 | 308:22 | 149:8,9,11 |
| 239:6,18 | 138:14,18 | **stolen** | **stuff** | 152:2 |
| 254:25 | 138:25 | 52:5 54:21 | 16:16 | 195:19 |
| 255:6,25 | 159:16,23 | **stood** | **subcommit...** | 267:5 |
| 256:5,15 | 160:8 163:7 | 196:2,2 | 30:17 | **submit** |
| 257:8,14 | 198:19,20 | **stop** | **subdivided** | 77:21 206:1 |
| 265:1,7,11 | 208:22 | 70:24 76:20 | 21:13 | **submitted** |
| 265:15,17 | 213:17,20 | 76:25 | **subdivision** | 202:17,18 |
| 281:2,6 | 237:8 239:8 | **stopped** | 130:16 | 203:5,24 |
| 285:1 286:4 | 239:23 | 313:1,2 | 139:14 | 322:4 |
| 293:21,21 | 264:4 308:9 | **stopping** | 140:10 | **subscribed** |
| 317:15 | 321:1,6 | 75:15 | **subject** | 320:8 |
| 320:1,17 | **state's** | **straight** | 7:10 32:14 | **subsection** |
| 321:2,10,23 | 91:6 126:16 | 195:4 196:3 | 37:25 74:24 | 130:24 |
| **stated** | 144:1 212:9 | **strategy** | 76:3 86:17 | 176:10,11 |
| 2:9 286:12 | **state-wide** | 169:22 181:1 | 86:19,21 | 176:12 |
| 290:13 | 25:12 | **street** | 87:4,5,6,7 | 178:7,13,20 |
| 305:15 | **stating** | 3:8 40:11 | 87:10,11 | 184:4 |
| **statement** | 54:1 98:7 | **stretch** | 100:10,24 | 298:11 |
| 48:3 72:19 | **statistical** | 7:24 | 141:15,19 | 299:2,3,15 |
| 102:24 | 213:12 | **strike** | 141:22 | **subsequent** |
| 158:16 | 308:23 | 31:22 42:7 | 171:10,11 | 200:19 |
| 159:9 | 309:18 | 44:18 70:6 | 173:7 | **subset** |
| 202:16,18 | **status** | 73:9,11 | 178:25 | 208:5 |
| 202:19 | 220:7 222:4 | 75:4 83:19 | 183:18 | **substance** |
| 203:7,24,25 | 222:9 | 96:17 | 184:17 | 48:14,20 |
| 204:1,7,9 | 239:10,16 | 132:13 | 185:2 | 61:2 76:5 |
| 204:11,15 | 241:17 | 148:23 | 206:21 | 87:20 98:21 |
| 205:2,18,20 | **statute** | 192:19 | 211:18 | 99:10 105:2 |
| 205:23 | 138:23 | 214:24 | 212:4 | 108:11 |
| 206:1 209:1 | 140:12 | 228:6,9 | 214:16,21 | 109:12 |
| 254:11 | 255:21,23 | 229:6 | 214:22 | 113:18 |
| 292:14 | 256:2 263:1 | 252:10 | 215:5,6 | 133:21 |
| 301:5,9 | 263:20 | 258:18 | 217:16 | 135:16 |
| 309:22 | 264:3,4,23 | 264:12 | 220:6 221:8 | 136:1 |
| 310:1 | 265:15 | 275:20 | 246:13 | 139:23 |
| 311:12,25 | **statutes** | 294:16 | 253:18,19 | 148:10 |
| 312:1 | 258:3 | **strong** | 271:1,7 | 156:6 164:2 |
| **statements** | **stayed** | 207:7 | 278:7 279:4 | 165:10,23 |
| 72:15 90:23 | 207:4 | **student** | 299:22,24 | 172:15 |
| 158:13 | **stealing** | 139:16 140:4 | 300:3,8 | 173:1,13 |
| 159:12 | 53:24 | 280:2 | 305:3 316:9 | 181:25 |
| 200:16 | **step** | 293:20 | 317:19 | 185:23 |
| 290:16 | 119:15 | **studies** | **subjective** | 211:14,20 |
| **states** | 191:11 | 20:14 246:11 | 102:21 | 218:24 |
| 1:1,6 2:7 | 287:17 | 250:4 | 115:12 | 228:3 |
| 45:4 130:12 | **steps** | **study** | 142:22 | 253:15 |
| 132:16 | 168:5 223:12 | 285:1,12,19 | 145:17 | 271:14 |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

302:19
304:8,18,25
306:4,8
**substantial**
311:21
**substantive**
152:3
**success**
255:8
**sufficient**
115:5
**suggests**
271:1
**Suite**
2:8 3:20 4:3
322:23
**sum**
45:21 47:18
164:13
204:15
**summarize**
205:8
**summarizing**
224:12
**summary**
204:14 205:2
205:15,16
205:20
243:20
**supervisor**
106:4
**support**
48:3 55:13
58:23 59:18
59:25 60:14
61:5 70:23
71:6 109:20
163:18
170:2,8,15
170:20
173:4,16
181:2,3
185:14
192:12
197:23
290:11
291:12
**supported**

173:11
**supporters**
164:13
**supporting**
60:8 163:23
164:5,15
197:25
**supposed**
43:22 312:14
**Supreme**
197:17 198:1
**sure**
9:17,19
10:10 17:22
22:17 31:1
34:1 40:16
48:21 50:23
59:23 65:10
69:9 75:22
88:19 90:5
90:18 103:1
104:10
108:6
116:14,21
117:5,13,14
118:18
134:22
135:2
140:19
150:23
172:12
184:23
208:7 209:8
247:5
248:15
271:22,24
275:12,16
303:11
305:8
314:13
315:9
**surgery**
7:22
**surnamed**
147:24
**surprised**
114:6 188:1
188:5

250:17,22
**surrounding**
108:11
**suspend**
110:6 111:25
112:13,13
115:5
119:17
121:7
192:19
**suspended**
119:14 181:7
181:12
**suspending**
181:18
**swear**
77:22
**Sweeney**
191:10
**Sweeten**
3:5 8:22
9:16,25
10:7 11:1
11:21 12:20
12:25 13:22
14:13 15:14
17:15,19,21
17:25 18:19
19:7,10,13
26:16 30:25
31:10,13,15
32:11 33:14
36:25 37:6
37:10 38:9
38:17 42:23
45:25 46:9
46:20,25
47:4,16,25
48:5,13
49:3,4,14
49:18,21
51:22 53:4
53:6,8,14
54:9,22
55:14 56:4
56:11,17,20
57:3 59:1
59:15 60:22

61:6 62:14
63:21 64:2
65:2,9,10
65:16,19,20
66:19,22
68:2,14
70:10,17,20
72:10,12
73:7,13
74:17 75:18
75:25 76:1
76:13,15,21
76:23 77:2
77:7,10,12
78:4,11,13
78:17,21
79:1 80:16
80:21 81:7
81:11,12
82:20 83:21
84:21 85:13
86:6,14,22
87:2,18
88:4,15
89:10,14,19
90:12,15,19
91:7,16,22
92:8,10,16
92:17 93:9
93:16,20
94:1,4,9,14
95:8,12,16
95:25 96:7
96:20 97:20
98:2,13,16
98:19 99:2
99:8,22,25
100:9,22
101:11,13
101:15,18
103:3,16
104:6,11,13
104:22,25
105:10,15
105:20,23
106:10,12
108:5,8
109:7,25
110:25

111:9,20
113:13,23
114:1,7,14
115:14,16
115:24
116:14,18
116:22,25
117:1,4,9
117:14,20
118:15
120:3,14,20
120:24
121:15,16
121:21
122:14,18
122:24
123:4,11,13
123:17,18
123:21
124:4,13,24
125:13,23
127:8,14,16
127:18
128:21
131:21
132:17
133:2,12,18
134:8,14,20
135:14,25
136:12,15
137:17,21
138:7,9
139:7,21
140:7,25
141:7,12
142:8,16,17
143:1,13
144:3,7,11
145:5,11
146:1,17
148:9,16,20
149:7,16,19
149:20
150:1,11,19
151:2,15,20
151:25
153:10,13
153:23
154:6,17,25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| | | | | |
|---|---|---|---|---|
| 155:3,7,11 | 195:6,18 | 240:25 | 281:3 282:2 | **T** |
| 155:21 | 196:22 | 243:6,21 | 282:5,12 | **table** |
| 156:1,6,13 | 197:2,19 | 244:8,14,17 | 283:4 284:8 | 284:5,7 |
| 156:19,24 | 198:7,25 | 245:6,10,17 | 284:15,19 | 285:9 286:9 |
| 157:8 158:8 | 199:5,22 | 245:19 | 284:21 | 286:17 |
| 159:18 | 200:8,14,23 | 246:5,13,19 | 285:15,21 | 287:14,20 |
| 160:5,10,16 | 201:8 203:9 | 246:24 | 286:14,19 | 287:22 |
| 160:21 | 203:12,19 | 247:7,12,16 | 287:24 | 288:19 |
| 162:5,9,12 | 203:21 | 247:23 | 288:5,24 | **take** |
| 162:19,25 | 204:18,21 | 248:4,11 | 289:6,11,17 | 7:1,2,3,5,6 |
| 163:3,9,19 | 204:25 | 249:19,25 | 290:14,17 | 8:1 30:13 |
| 163:24 | 206:4,12,14 | 250:8,14,19 | 290:19,22 | 34:2 62:7,9 |
| 164:21 | 206:20 | 251:2,4,9 | 291:2,3,10 | 64:2 69:7,7 |
| 165:1,7,12 | 207:2,9,15 | 252:24 | 291:16 | 79:1,4 |
| 165:21 | 207:18 | 253:5,14,24 | 292:10 | 110:6 |
| 166:25 | 208:2 209:7 | 254:5,12 | 293:13 | 111:25 |
| 167:2 168:9 | 211:1,13,25 | 255:10,18 | 294:1,10,13 | 117:24 |
| 168:12,17 | 212:10,17 | 255:22 | 301:16,21 | 124:2 |
| 168:22 | 212:23 | 256:17 | 302:6,17 | 136:19 |
| 169:1,11,20 | 213:24 | 257:3,10,16 | 304:10,13 | 144:21 |
| 169:24 | 214:6,10,15 | 257:24 | 304:20,24 | 146:22 |
| 170:4,10,17 | 215:4,11,17 | 258:8 259:7 | 306:1,7,12 | 150:6 168:5 |
| 170:22,25 | 215:22 | 259:11,15 | 306:15 | 168:10 |
| 171:7,17 | 216:5,11,19 | 259:20,25 | 309:2,7,10 | 175:19 |
| 172:10,12 | 216:23 | 260:16,23 | 309:19 | 187:12 |
| 172:24 | 217:8,13,25 | 261:3,8,14 | 310:7,10,24 | 191:20,21 |
| 173:6,12,18 | 218:5,8,11 | 261:21 | 312:20 | 202:12 |
| 173:23 | 218:16,23 | 262:7,14 | 313:3,23 | 264:15 |
| 174:10,14 | 220:5,11,16 | 263:21 | 315:2,20 | 267:16 |
| 174:24 | 223:3 224:9 | 264:2,9,17 | 316:9,21 | 277:13 |
| 177:3,12,19 | 224:25 | 266:12 | 317:10,23 | 278:11 |
| 178:4 179:1 | 225:5,16 | 267:2,11,14 | **swiftly** | 280:10 |
| 180:1,15,23 | 226:13,20 | 267:18,23 | 8:3 | 281:10 |
| 180:25 | 226:25 | 268:9,23 | **swing** | 284:17 |
| 181:4,8,13 | 227:7,14,20 | 269:6,10,25 | 164:17 | 308:9 |
| 181:20,23 | 227:25 | 270:6,11,16 | **sworn** | 312:16 |
| 182:4 | 229:12,17 | 270:21 | 2:3 6:2 7:9 | 316:15 |
| 184:20 | 229:20 | 272:3,14,17 | 20:22 322:1 | **taken** |
| 187:10 | 230:1,13,24 | 272:18 | **system** | 2:3 6:10 |
| 188:3,25 | 231:4,6,9 | 273:15,23 | 34:7 51:10 | 124:7 249:7 |
| 189:2,9,13 | 231:19,25 | 274:16,23 | 51:17,21 | 261:1 |
| 189:22,24 | 232:4,8,12 | 275:7,11,24 | 54:7 56:1 | 277:20 |
| 190:2,6,11 | 232:23 | 276:13,19 | 58:12 | 292:21 |
| 190:15,19 | 233:5 | 277:11,17 | 278:24 | 300:20 |
| 191:13,17 | 234:23,25 | 277:22 | 279:22 | 322:18 |
| 191:22,25 | 235:5,16 | 278:2,8 | 280:5,13,20 | **takes** |
| 192:7,14,24 | 237:2,10,13 | 279:1,6,11 | 313:1 | 252:6 |
| 193:2,9,14 | 237:19 | 279:23 | | **talk** |
| 193:21 | 240:4,19,22 | 280:6,14,21 | | |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| | | | | |
|---|---|---|---|---|
| 68:7 82:3 | 6:12 21:21 | 187:18,20 | 241:16 | 53:15,19,23 |
| 87:3 109:8 | 30:3 43:25 | 193:25 | 242:15,17 | 54:1,19,21 |
| 111:23 | 45:8 50:22 | 236:11 | 242:19,20 | 55:20,25 |
| 126:8 | 52:7 59:17 | 314:21 | 243:2,18 | 56:3 60:15 |
| 131:21,23 | 64:25 69:2 | 315:11,18 | 250:4,11 | 60:16 67:10 |
| 165:16 | 85:7 95:10 | **Terri** | 252:11,14 | 71:20 77:25 |
| 170:25 | 106:1 | 33:6,7 | 254:9 255:9 | 80:9 81:23 |
| 191:23 | 110:16 | **Terri's** | 266:15 | 85:3,5,7 |
| 209:2 | 121:10 | 33:17 | 268:2 | 86:23 97:16 |
| 214:19 | 128:4 | **testament** | 269:15 | 98:3 102:8 |
| 218:21 | 153:11 | 98:6 | 278:14 | 112:22 |
| 222:15 | 154:16 | **testified** | 281:13 | 113:20,24 |
| 251:11 | 167:18 | 6:3 11:9,24 | 283:1 | 114:2 |
| 269:12 | 174:5 | 19:14 29:24 | 290:13 | 122:13 |
| 296:9 | 183:11,13 | 45:7 52:3 | 306:20 | 132:10 |
| 297:11 | 183:23,24 | 52:18 54:20 | **testify** | 138:21,24 |
| **talked** | 191:18,22 | 55:13,20 | 6:2,14 7:20 | 142:19 |
| 52:2 55:2,18 | 201:14 | 66:5 67:6 | 40:15 45:19 | 143:19 |
| 65:5 79:10 | 210:3,5 | 72:2,20 | 48:3,10 | 145:1 |
| 164:14 | 220:20 | 86:1 90:16 | 72:21 81:15 | 161:17 |
| 165:8,15 | 221:19,23 | 93:13 94:7 | 81:18 | 176:21 |
| 172:19 | 223:24 | 95:22 97:11 | 100:22 | 178:24 |
| 221:12 | 252:9 269:7 | 97:24 99:17 | 104:25 | 184:15 |
| 222:14 | 272:6 | 102:6,9,14 | 108:9 116:9 | 188:2 |
| 224:3 | 282:22 | 102:15,18 | 120:25 | 199:12 |
| 236:20 | 292:19 | 103:12,14 | 132:4 | 202:5 |
| 242:8 | 298:22 | 111:7,14 | 142:23,24 | 204:16,17 |
| 254:17 | 299:9,12 | 121:11 | 144:17,20 | 205:3 |
| 311:16 | **telling** | 122:4,11 | 144:25 | 210:20 |
| **talking** | 307:8 309:25 | 123:1,23 | 145:14,18 | 213:19 |
| 53:15 105:12 | **tem** | 137:12 | 146:1 | 214:14 |
| 105:13 | 24:22 25:2 | 142:1 | 148:23 | 228:25 |
| 131:22 | **temporally** | 147:20 | 165:7,12 | 239:15 |
| 148:22 | 167:11 168:1 | 148:4,11 | 168:25 | 249:1 250:7 |
| 189:13 | **ten** | 151:4 | 169:1 198:7 | 250:18 |
| 205:18 | 83:23 168:11 | 152:15 | 241:1 | 268:6 |
| 210:5 271:2 | 222:2 | 153:7 158:1 | 250:13 | 272:13 |
| 302:22 | **term** | 167:5 180:7 | 295:5,9 | 275:10 |
| **talks** | 9:22 10:2,5 | 185:7,17 | 314:6 | 279:7 283:3 |
| 297:14 | 10:6,8 25:5 | 186:25 | **testifying** | 292:25 |
| **task** | **terminology** | 187:24 | 11:11 148:18 | 310:22,24 |
| 30:16 | 305:17 | 190:20 | 149:10 | 310:25 |
| **Tax** | **terms** | 195:3 197:4 | 242:7 | 311:10 |
| 72:1 | 8:4,6 9:20 | 200:6 | **testimony** | 313:15 |
| **technical** | 10:11 36:17 | 217:18 | 7:11 15:5,9 | 322:2 |
| 30:22 36:23 | 81:17 111:7 | 224:2 | 17:4 19:5 | **Texan** |
| 37:11 | 112:14 | 235:25 | 40:13,18 | 296:8 |
| **tell** | 164:18 | 240:16 | 51:2 52:8 | **Texans** |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

376

| | | | | |
|---|---|---|---|---|
| **Texans** | 239:11 | 130:2 131:4 | 15:20 16:13 | 204:18 |
| 313:10 | 241:17 | 140:3 | 19:25 23:6 | 205:25 |
| **Texas** | 242:8 245:1 | 147:17 | 31:15,17 | 207:7 |
| 1:2,10,13,15 | 249:3,11,13 | 164:18 | 37:3,15 | 211:14,16 |
| 2:5,8 3:4,6 | 260:8 | 170:14 | 41:9 42:23 | 211:17,19 |
| 3:17 5:16 | 266:11 | 175:7,9 | 47:1,4,5,8 | 211:25 |
| 8:13 12:14 | 267:15,22 | 202:5,10 | 56:22 65:10 | 212:1 213:5 |
| 14:17 15:11 | 274:21 | 205:24 | 66:20 70:18 | 214:17 |
| 20:24 21:9 | 278:20 | 210:20 | 73:18 78:13 | 215:4,4,9 |
| 26:23 29:3 | 279:22 | 233:24 | 81:8,9,11 | 216:25 |
| 29:12,17 | 280:3 281:2 | 234:12,18 | 82:22,24,25 | 217:8 |
| 31:7 38:7 | 281:7 | 244:4 | 84:21 85:1 | 226:20 |
| 38:16,19,24 | 288:22 | 245:18 | 86:14 87:11 | 227:3,9,16 |
| 39:2 41:1 | 289:21 | 256:12 | 90:23 91:3 | 227:20 |
| 42:4 45:15 | 290:4 293:3 | 265:19 | 91:13 92:19 | 235:16,17 |
| 46:15 49:7 | 301:6,12,19 | 274:7 | 92:21,21 | 245:6 246:6 |
| 50:10,15,15 | 302:4 303:4 | 281:16 | 93:3,3,4 | 253:15,18 |
| 50:25 51:3 | 303:5,12 | 283:12,16 | 95:5,5 | 253:19 |
| 51:13 54:8 | 317:15 | 284:21 | 97:20 | 254:25 |
| 54:13,16 | 319:2 321:2 | 294:14 | 100:10 | 261:15,21 |
| 55:4,21 | 321:10,13 | **Thanks** | 102:20,21 | 261:23 |
| 56:8 58:2 | 321:15,23 | 96:11 150:22 | 104:11 | 262:10 |
| 58:25 61:13 | 322:22 | 189:9 | 112:20 | 267:6 |
| 64:12 70:22 | **Texas's** | **theirs** | 113:23 | 269:13 |
| 70:25 71:5 | 51:10 280:5 | 55:22 | 114:7 | 270:17,24 |
| 71:25 73:18 | **text** | **theories** | 118:22 | 271:10,12 |
| 77:17,22 | 82:23 255:19 | 314:6 | 121:17 | 273:15,17 |
| 82:17 83:15 | 261:16 | **thereof** | 123:14 | 274:24,25 |
| 83:15,25 | 262:8 | 73:23 155:25 | 142:22 | 275:24,25 |
| 91:15 109:4 | **thank** | **thing** | 144:23 | 276:3,19 |
| 116:9 | 8:1 9:16 | 46:24 90:23 | 145:12,14 | 277:4,7,19 |
| 117:12 | 10:21 11:9 | 171:11 | 145:20 | 277:23,25 |
| 126:24 | 11:16 16:9 | 174:4 185:9 | 150:2 | 278:1 292:4 |
| 135:20 | 17:7 18:14 | 187:16 | 151:20 | 300:1 |
| 144:16 | 18:15 19:12 | 192:2 | 152:2,4 | 304:24 |
| 151:1 | 20:2 27:8 | **things** | 161:11 | 305:1,2,12 |
| 155:10,20 | 27:25 34:20 | 11:24 28:12 | 167:3,5 | 305:15 |
| 156:5,18 | 40:18 49:1 | 81:16 | 169:5,11,11 | 310:12,14 |
| 157:7 | 54:4,18 | 116:11 | 169:13,15 | 311:12,16 |
| 162:17 | 65:23 67:18 | 164:17 | 169:20 | 317:21 |
| 163:6 172:3 | 69:25 77:25 | 205:9 222:9 | 171:1 174:9 | **thinking** |
| 183:4 | 79:3 80:3,5 | 222:14 | 176:19 | 66:21 130:2 |
| 185:15 | 80:13,25 | 254:10 | 177:3,5 | 226:11 |
| 187:19 | 95:21 97:1 | 316:20 | 180:11 | **thinks** |
| 213:23 | 106:23 | **think** | 184:24 | 123:7 191:14 |
| 224:23 | 113:4 | 8:22,23 9:6 | 190:19 | 217:2 |
| 228:19 | 117:20 | 9:8,13 11:3 | 191:17 | **thought** |
| 238:4,7 | 126:8 129:5 | 14:2,2 | 193:14 | 79:16 122:24 |
| | | | 200:23 | |



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

377

| | | | | |
|---|---|---|---|---|
| 151:16 | 309:20 | 223:7,11 | 15:1,4,6,9 | 138:8 290:2 |
| 177:22 | 313:3 | 225:9 | 16:6 33:20 | **topic** |
| 189:5 | 315:20 | 245:12 | 45:13 46:4 | 94:12 199:4 |
| 190:20 | 316:23 | 251:12 | 48:4 50:22 | 239:13 |
| 315:3 | 317:12 | 274:22 | 51:20 53:21 | **topics** |
| **thoughts** | **thousand** | 280:10 | 58:21 73:20 | 29:23 |
| 26:18 31:3 | 194:24,25 | 282:25 | 77:22 78:1 | **total** |
| 31:16 37:1 | **three** | 283:24 | 78:8 83:15 | 20:9 21:12 |
| 46:11 51:23 | 20:9,10 | 289:4 | 91:23 92:2 | 45:21 47:18 |
| 54:10,23 | 39:13 41:20 | 292:23 | 94:12,16 | 164:13 |
| 55:15 56:5 | 161:17 | 293:23,25 | 140:13 | 204:16 |
| 59:2 65:3 | 273:9,24,25 | 294:7,15,20 | 158:1 | 307:12 |
| 72:17 84:24 | 307:1,3 | 294:24 | 161:17 | 317:24,24 |
| 94:18 114:8 | **Three-Judge** | 295:13 | 174:5 | **touch** |
| 132:17 | 1:11 321:11 | 297:5 | 177:16 | 35:21 |
| 133:4 | **threw** | 298:15 | 185:8 194:5 | **touches** |
| 142:10 | 261:14 | 299:19 | 202:20,23 | 120:11 |
| 155:12 | **tidy** | 302:23,23 | 203:1 | **town** |
| 158:10 | 127:8 | 302:24 | 223:12 | 39:4 40:25 |
| 163:10 | **tiebreaker** | 304:16 | 224:4 | **tradition** |
| 169:2 171:7 | 25:20 | 305:18 | 227:12 | 185:10 |
| 203:15 | **time** | 316:16 | 228:1 | 186:11 |
| 204:23 | 20:23 25:24 | 317:23,24 | 232:16 | **training** |
| 211:2 | 36:10 39:17 | 318:1 | 267:21 | 215:21 216:1 |
| 215:11 | 41:19 43:25 | 322:11 | 268:4,8 | 216:10,17 |
| 217:14 | 47:23 56:22 | **times** | 270:14 | 217:3,11 |
| 226:14 | 58:3 60:3 | 7:3 30:9 | 271:21 | 218:4 |
| 232:24 | 61:12 64:3 | 46:18,21 | 272:13 | 254:24 |
| 237:2 243:6 | 64:7 66:23 | 110:16 | 275:15 | **transcript** |
| 243:23 | 69:17 76:4 | 144:8 | 281:14 | 6:17,22 |
| 246:7,25 | 77:7 85:3 | 161:17 | 290:13 | 96:12 |
| 252:25 | 87:10 98:20 | 238:18,22 | 292:24 | 164:18 |
| 254:12 | 107:12,15 | 241:8 | 293:20 | 208:6,15 |
| 255:11 | 110:15 | 275:15 | 300:6 | 210:4 322:1 |
| 256:19 | 111:15 | 282:14 | 301:18 | 322:4,9 |
| 257:4,17 | 112:8 115:7 | 296:15 | 302:1,3 | **transcripts** |
| 258:3 259:7 | 116:24 | 297:17,20 | 313:10,10 | 197:5 |
| 261:18 | 118:3 | 297:24 | 317:7 | **transfer** |
| 267:4 | 129:24 | **timing** | **today's** | 25:5 |
| 274:17 | 140:21 | 113:5 229:24 | 11:17 116:13 | **transport...** |
| 275:1 | 168:1 176:8 | 232:2 | **Todd** | 40:5,14 |
| 276:24 | 176:15 | **title** | 219:8 | 314:22 |
| 279:2,24 | 183:7,11,23 | 32:18 | **told** | 315:19 |
| 280:22 | 184:10,17 | **today** | 269:7 273:16 | **trial** |
| 291:17 | 185:3 189:6 | 6:14,17 7:3 | 276:1 279:8 | 7:12 295:4,8 |
| 294:3 | 209:8 212:4 | 7:19 10:16 | **top** | 318:1 |
| 301:21 | 216:3 | 10:22 11:25 | 64:16 68:25 | **Tribune** |
| 302:7 | 221:12,16 | 13:12,17,20 | 129:13 | 5:16 289:21 |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

378

tried
184:24
    191:18
    277:22
trouble
103:11 296:5
Troy
1:23 2:1 5:3
    6:1,9
    319:20,25
    320:5
    321:20,25
true
26:11 36:12
    83:14
    130:21
    207:3
    248:24
    319:22
    322:2
trust
95:20
trusted
95:7
truth
6:2,3,3
truthfully
6:14 7:20
try
9:19 37:17
    82:5 87:14
    157:3 168:6
    168:21
    170:6
    173:20
    212:12
    295:20
    296:10
trying
44:4 55:11
    62:15 66:23
    84:7 117:10
    117:18
    157:1 160:2
    168:16
    225:7
    275:11,14
    275:15

277:14
309:8
310:11
Tuesday
5:13 208:10
turn
66:12,13
    68:25 130:5
    137:14
    208:11,12
    284:11
    289:24
    295:16
    308:12,18
turning
36:15 70:5
    71:4 118:11
    119:8 130:3
    138:4 139:9
    141:25
    175:15
    176:10
    234:3 263:3
    283:20
    285:24,25
    286:22
    288:8,9
    311:8
turnout
90:6 281:1,6
two
13:22 14:2
    20:15 23:6
    50:15 70:2
    70:4 95:5
    103:9 116:3
    182:1
    187:11
    189:8 198:5
    213:17
    219:15
    229:10
    247:21
    253:7 254:3
    258:3
    288:17
    308:15
two-thirds

108:20
109:20,23
110:20
121:8,11,24
122:7,12,20
123:23
173:5 176:8
181:2,7,11
181:19,21
182:3,6
185:7,9,10
185:12,15
185:21,22
186:6,17,23
187:2,8,14
192:13
297:6 298:6
298:19,23
299:3,4
TX
3:7,9 4:4
    322:24
TX3939
208:15
type
28:14
types
138:12,17
    242:17
    300:15
typical
130:17

_____U_____
uh-huh
6:21 18:11
    41:24
    138:11
    139:15
    175:20
    197:7
    286:24
    287:1
    288:11
    292:18
umbrella
239:19
unable

66:8 73:20
    287:4,11
unaware
53:22,23
    185:18
    187:25
unclear
92:20
underlying
286:6 316:3
    316:18
understand
6:13,25 7:9
    7:14 8:10
    8:15 9:24
    10:17 14:15
    14:21 45:7
    53:22 77:12
    83:14 96:23
    187:21
    226:10
    273:8,10,12
    273:14
    282:17
    305:10
    310:8,10
    312:10,14
understan...
10:11 13:14
    18:22 28:4
    37:12 45:1
    45:20 56:15
    131:18
    273:19
    274:1 296:5
understands
271:20
understood
312:12
undocumented
85:20
unexpired
283:23
unfamiliar
67:7,9
unified
206:9
United

1:1,6 2:7
    130:12
    138:5,14,18
    138:25
    159:16,23
    308:9 321:1
    321:6
universities
139:17
university
20:16 140:9
    140:10
    280:3
unpopular
291:14
untruthful
95:11
unusual
195:3,8,10
upheld
197:17
upper
208:14
Uresti
5:11 112:7
    112:13
    114:19,23
    115:8,11
    116:4
    118:13
    119:5,10,25
    120:5,13,18
Uresti's
112:10
urgency
196:25
    232:20
urges
70:23
use
8:4 34:12
    143:8
    168:20
    195:9
    210:12,16
    222:16
    252:15
    257:7,14



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

258:11
283:23
298:25
**useful**
46:5,7,19
47:13,14,17
47:22 48:1
48:6
**usually**
109:16
193:19
241:23
**utmost**
275:14
**U.S**
3:13 62:1
120:10
127:6
251:23
252:2

**V**

**vague**
92:20 93:4
95:17
105:10
184:21
235:17
282:3
291:10
293:13
316:22
**valid**
139:11
248:19
249:13
257:22
**validate**
73:3
**validly**
248:1,8,16
**Van**
303:16 304:4
306:14
307:6,9
**various**
50:24 208:13
**vehicles**

315:12,18
**verb**
195:17
**verbal**
6:19
**verification**
115:25 116:2
121:4
**verified**
155:1
**verify**
51:11 102:17
102:17
116:5
120:22
140:20,20
152:23
154:8,11
217:23
233:17
239:15
311:13
**verifying**
54:7 254:19
**version**
79:16 80:1,7
80:10
131:12
233:18,20
233:22
246:22
**versions**
70:2
**VICTORIA**
1:18 321:18
**view**
51:18 76:19
91:6 118:13
122:6
173:10
272:5 283:2
290:11
**views**
72:25
**visual**
248:22,23
**Volume**
69:1

**volunteered**
42:11
**vote**
8:9 25:18,21
25:23,24
41:15,17,25
41:25 42:1
43:18,20,23
44:8,16,21
51:16 55:6
55:23 77:6
77:21
106:25
107:3
108:21
109:21
110:21,24
111:7
112:10,17
113:1,2
114:19,22
114:24,25
115:1,2,2,3
115:4,4
116:1,2,5
119:17,17
119:19,23
120:12,17
120:23
121:5,8
125:25
158:4,5
160:3,9,15
161:12
173:21
176:8
179:22
185:23
186:3,7,18
186:21
187:2,6,14
188:10,13
198:1 199:1
210:17
212:15
223:22
234:15
263:15

279:9,10,15
279:17
280:18
285:3,9
286:17
287:14,15
287:21
292:1,8,16
297:5 299:7
312:14,18
316:19
**voted**
41:19 52:6
106:19,21
106:23
107:2,4
112:13
115:6
155:10,20
156:5,18
204:5
205:11
220:22
233:18
279:19
287:22
**voter**
8:4,7 10:18
20:3,19
22:15,23
23:11,14
30:20,23
32:9,14
42:20 44:5
44:11 45:3
51:11,14,17
51:21 53:25
54:21 55:5
55:22 56:2
58:16,24
61:12 69:14
71:21 72:1
72:4 75:12
75:16 76:11
77:1,16,21
99:20,24
100:5,16
101:9 104:5

105:6
128:25
141:4 142:2
143:19
147:24
150:18,25
151:1
153:16
154:4,8,12
154:20,23
154:23
158:3,4
159:15,22
160:19
176:13
177:1,4,11
177:17
178:3,10,17
183:18
184:4
187:25
188:16
193:7 197:6
197:10,16
197:23
204:6
205:12,13
206:2 209:3
210:9,13
214:13
221:8,12,17
222:1,7
224:17
225:10
234:1,15,16
236:25
239:10
243:15
252:22
254:20,20
256:14
257:21
263:17
264:15
266:15
268:4,6,7
268:16
269:17,18
279:10,16



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

380

279:19
281:1,6
288:23
290:5 298:6
298:12
299:5,16,23
300:7,22
311:19
313:20
**voters**
1:13 9:23,23
10:2 17:14
43:12 44:14
52:11 67:25
71:14 95:24
96:6 106:9
140:23
141:11
143:8,21
154:7,11
163:18
198:13,15
198:24
199:18
200:7
206:17,24
211:11
213:23,23
214:5 215:1
244:7,13
246:18
249:17,22
260:9
269:23
270:5
271:19
272:2,13,23
273:2,6
285:2 287:3
295:2,10
321:13
**voter's**
44:20 54:7
130:18
217:23
**voter-rel...**
23:4
**votes**

115:5 116:3
158:6
171:16,19
172:6
186:17
202:16
312:15
**voting**
8:9 23:13,15
23:19 24:1
42:18 43:13
44:23 45:23
46:4 48:24
52:21,23
55:5 68:13
70:24 71:8
72:8 73:6
74:10,15
75:8 76:20
78:3,25
81:5 82:19
83:12
112:18
141:16,20
141:21,22
155:6 157:6
160:25
161:3,8,13
161:21
198:15
206:2 224:7
254:22
275:23
279:21
280:5 285:3
291:12
311:1 313:1
313:2
**VS**
1:4 319:2
321:4

─────── W ───────

**W**
4:2
**wage**
289:3
**wait**

6:18,23 40:1
82:5,6
149:7
280:17
**waiting**
39:24
**waive**
16:5 123:20
**waived**
94:2,13
250:12
**walk**
51:16
**Wallace**
102:19
103:13,14
103:20
104:4,15,21
104:23
105:4,6
136:3,5,10
136:24
137:3,9
164:10,12
227:19,22
227:23
236:1,14
**want**
8:6 10:9,15
16:2,14,15
17:24 18:3
26:18 30:4
31:1,3
38:10 45:19
46:10,14
48:3 51:23
56:20 57:3
67:15 69:7
74:7 80:4
82:22 86:5
89:8 92:23
98:5,5
116:16,23
131:18
137:14
143:3 150:4
156:8,11
171:9,12

190:22
191:10
203:22
204:20
210:4 211:4
211:15
214:19
227:5,22
228:1
229:18
233:5 256:6
256:7
261:16
268:12
270:16
271:5 273:8
277:3,13
284:17
293:14
294:2
308:18
312:25
**wanted**
23:16 34:2
86:2 110:3
226:11
**wants**
78:13 277:8
**Washington**
3:15 27:22
241:22
**wasn't**
90:5,24 95:2
97:14
108:23
115:5 189:7
189:7
202:24
**watcher**
42:14
**Watson**
208:19
209:15,22
210:22
212:20
213:3
308:19
**Watson's**

213:11
**way**
9:7 37:11,17
57:11 65:11
81:25 82:7
87:14 98:7
105:7
107:21
117:9
119:19
143:5 169:5
184:23
200:18
211:19
214:15
227:9
253:18
261:22
271:5,12
273:5
282:15,23
300:24
311:11
313:19
314:18
**Wednesday**
5:15 201:17
283:11
**week**
126:4 137:1
179:12
180:8,12
288:16
**Weekly**
70:22,25
71:5,25
73:18
**weeks**
126:3
**went**
40:7 96:21
101:20
194:9,13,25
**West**
3:8 202:17
202:18
**Westfall**
3:12 5:4 6:6



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

381

| | | | | |
|---|---|---|---|---|
| 9:16,21 | 91:9,18,20 | 136:4,14,18 | 174:16 | 220:14,17 |
| 10:8 14:4 | 91:24 92:11 | 137:24 | 175:1 177:9 | 223:5 |
| 14:15 15:21 | 92:15,16 | 138:3,4,8 | 177:15,24 | 224:11 |
| 16:10,13,25 | 93:5,10 | 138:10 | 178:2,12 | 225:4,7,19 |
| 17:3,17,24 | 94:1,7,10 | 139:9,25 | 179:4 | 226:18,23 |
| 18:1,24 | 94:20 95:10 | 141:3,9,14 | 180:18 | 227:2,11,18 |
| 19:9,12,14 | 95:14,21 | 142:16,25 | 181:1,6,10 | 227:23 |
| 27:1 31:11 | 96:5,8,15 | 143:4,15,24 | 181:15,22 | 228:5 |
| 31:14,19 | 96:23 98:4 | 144:6,9 | 182:8 | 229:22 |
| 32:17 33:17 | 98:22 99:4 | 145:2,7,22 | 184:25 | 230:8,16 |
| 37:6,17 | 99:23 100:4 | 145:23 | 187:12 | 231:1,11,21 |
| 38:12,18 | 101:1,12,14 | 148:11,17 | 188:6 189:2 | 232:1,9,15 |
| 43:4,11 | 101:16,21 | 148:21 | 189:7,11,25 | 233:2,8,11 |
| 46:2,25 | 103:6,10,12 | 149:18,21 | 190:4,8,13 | 235:2,7,20 |
| 47:12,18 | 103:20 | 150:6,10,15 | 190:17 | 235:21 |
| 48:2,7,19 | 104:8,10,20 | 150:22,24 | 191:1,8,15 | 237:7,11,15 |
| 49:17 50:1 | 104:24 | 151:4,18,22 | 191:20,24 | 237:22 |
| 52:7 53:6 | 105:5,11,17 | 152:8,10 | 192:4,9,15 | 240:6,21 |
| 53:11,21 | 105:22 | 153:11,15 | 192:25 | 241:3 |
| 54:18 55:7 | 106:3,11,16 | 153:25 | 193:4,12,18 | 243:10 |
| 55:25 56:11 | 108:6,19 | 154:2,7,21 | 193:24 | 244:2,11,16 |
| 56:19 57:2 | 109:12 | 155:1,5,9 | 195:9,23 | 244:21 |
| 57:5,23 | 110:1 111:5 | 155:18,24 | 196:5,25 | 245:8,13,18 |
| 59:7,12,17 | 111:10 | 156:2,3,11 | 197:3,22 | 245:23 |
| 61:4,9,20 | 112:2 | 156:14,16 | 198:11 | 246:9,15,21 |
| 61:23 62:1 | 113:20,25 | 156:21 | 199:3,6,9 | 247:2,9,14 |
| 62:3,16,19 | 114:5,12,16 | 157:5,12,16 | 200:3,11,18 | 247:20,25 |
| 63:24 64:5 | 115:25 | 157:19,20 | 200:25 | 248:7,15 |
| 65:6,18,23 | 116:16,21 | 158:19 | 201:11 | 249:21 |
| 65:24 67:1 | 116:23 | 159:19 | 203:10,20 | 250:3,11,17 |
| 68:4,17,20 | 117:2,8,11 | 160:1,7,13 | 203:25 | 250:23 |
| 70:12,21 | 117:20,23 | 160:18,24 | 205:1 206:6 | 251:3,5,7 |
| 72:11 73:9 | 119:1 | 161:6 162:7 | 206:16,22 | 251:10,13 |
| 73:15 75:21 | 120:15,22 | 162:16,22 | 207:3,11,17 | 251:15 |
| 75:25 76:8 | 121:6,16,25 | 163:1,5,17 | 207:19,22 | 253:3,11,22 |
| 76:19,25 | 122:18,25 | 163:22 | 207:24,25 | 254:2,7,17 |
| 77:5,9,11 | 123:10,12 | 164:4 165:3 | 208:3 | 255:15,20 |
| 77:15 78:7 | 123:16,22 | 166:1 167:8 | 209:10 | 256:1,24 |
| 78:10,15,23 | 124:18 | 168:10,14 | 211:8,22 | 257:7,13,20 |
| 79:3,8 | 125:2,18,25 | 168:15,20 | 212:6,12,20 | 258:5,10 |
| 80:15,25 | 127:3,5,15 | 168:24 | 213:1 214:2 | 259:12,18 |
| 81:1,12,22 | 127:17,19 | 169:8,17,22 | 214:8,12,23 | 259:22 |
| 83:3,6,8,24 | 128:25 | 170:1,6,11 | 215:9,15,19 | 260:6,19,25 |
| 85:6,15 | 129:3,6 | 170:19,23 | 215:24 | 261:5,10,20 |
| 86:8,22 | 132:1,24 | 171:14,21 | 216:8,14,20 | 261:24 |
| 87:13,15,24 | 133:8,13,24 | 172:16 | 217:5,10,18 | 262:12,16 |
| 88:7,18 | 134:10,18 | 173:3,9,15 | 218:3,6,9 | 263:23 |
| 89:11,17,22 | 134:24 | 173:20,25 | 218:13,17 | 264:3,21 |
| 90:16 91:3 | 135:18 | 174:13,15 | 219:2 220:8 | 266:14 |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

382

267:9,15
268:1,15,20
268:23
269:9,15
270:3,11,19
271:16
272:10,17
272:21
274:5,20
275:6,9,19
277:10,12
278:2,11,14
279:8,14
280:2,9,16
280:25
281:5 282:4
282:17
283:8
284:10,17
284:21,22
285:18,24
286:17,22
288:2,8
289:2,9,14
289:15,18
290:17,21
290:25
291:2,5,7
291:14,21
292:13
293:16
294:7,8,11
294:14,15
295:12
322:9,13
**we'll**
28:11 46:9
65:12 68:7
78:14 96:11
116:24
144:25
156:13
187:13
191:23
227:6
276:15
**we're**
13:24 31:1

35:22 57:11
76:17 79:1
82:3 86:20
87:12 92:25
96:12
115:20
121:22
131:22
144:3,4,12
145:20
152:2,3
157:2 168:3
172:13
201:24
205:21
213:16
217:9
227:24
246:6 275:7
275:10,13
275:14,17
276:4,4
278:6
295:14,21
297:1
310:11
317:22
**we've**
38:9 52:2
55:1,18
59:5 65:5
156:25
158:12
192:2
266:14
270:24
275:12,13
277:23,23
302:11
309:2 314:2
**whatsoever**
63:16 152:7
165:23
**wherefore's**
253:7
**white**
9:23 10:3
260:8

**Whitmire**
166:3,18,19
166:23
167:9
179:20
303:17
304:12
306:15,16
307:7,10
**why's**
253:7
**widespread**
311:19
**Williams**
52:21 89:23
90:5,10,17
91:21
146:19
148:12
179:24
180:14,22
181:17
182:14
**Williams's**
53:15
**wing**
222:16
**withdraw**
37:9 47:3
65:6,18,22
87:13 152:9
**withdrawing**
178:1
**withheld**
14:17
**withstood**
197:16
**witness**
2:2 8:21
10:6 17:1
18:8 31:9
33:1 52:18
52:20 63:19
64:2 69:9
81:9 83:7
86:23 98:11
98:15
104:12

125:12
127:3,13
131:25
144:17
165:11,19
177:10,18
188:21
189:14
191:9
196:14
204:20
209:7
211:23
216:16,22
242:14
250:13
251:6 264:1
266:23
269:24
271:20
273:22
276:7
277:14
291:23
295:13
297:9
321:25
322:3,5,6
**witnessed**
42:20,24
43:21 44:4
44:7
**witnesses**
33:8 102:12
103:2
271:20
**Wonderful**
289:24
**word**
43:9 122:15
161:6 184:8
195:8 223:9
**worded**
261:23
**words**
6:20 35:15
145:2
161:18

194:1 195:9
202:8 256:1
312:6
315:13
**word-for-...**
131:19
**work**
32:18 37:18
42:3 50:18
56:16,25,25
109:24
157:3
214:18
280:10
289:3
316:16
**worked**
24:8 32:23
42:11,14
254:10
**worker**
42:12 215:21
216:10,17
217:3,11,23
218:4
248:23
255:3
**workers**
216:2 256:9
**working**
12:24 94:23
95:1,3
140:19
225:22
226:7
**works**
117:9
**wouldn't**
29:15 47:23
95:10
262:23
279:9,15
**would've**
81:21
**write**
72:18
**writing**
101:7



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

383

**written**
69:17,21
70:8  72:24
82:23
147:19
262:20
**wrong**
43:17  44:2
44:13
187:18
**wrote**
70:18

**Y**

**yeah**
8:22  49:21
50:23  62:16
65:21  68:2
72:10  76:23
81:11  144:3
148:9
150:11
151:15
157:8,8
180:25
188:25
203:18
217:8
231:25
234:25
262:14
264:2
277:11
284:17,19
310:24
**year**
20:10  24:11
28:7,16,24
29:9,25
30:6,7,7,9
30:12  32:6
32:6  131:13
159:25
175:1  185:1
227:24
238:18,22
238:22
241:8  242:9

278:5
304:15
309:1
**years**
20:9  23:7
24:12  28:21
33:23  36:16
39:12,13
83:23  95:6
160:20
176:2  185:5
185:6
247:21
**year-to**
278:4
**Yell**
34:25
**yesterday**
85:25  93:13
94:8  95:22
102:6,14,18
122:4
123:23
185:17
187:24
195:3  250:3
250:18
254:8  268:1
269:16
283:1
**yes-no**
124:11
**YOUNG**
1:13  321:13
**y'all**
296:10

**Z**

**zero**
89:3,3

**$**

**$22**
316:17
**$35,000**
308:25
**$600**
38:20

**0**

**011**
11:19
**05**
60:19
**08**
136:17
**08540-6531**
3:21
**09**
11:18  24:25
133:22

**1**

**1**
18:3  19:20
62:10
262:13,17
262:18,19
270:22
**1.5**
198:13
**1:12-CV-0...**
1:10  321:10
**10**
5:13  29:17
34:16  52:14
63:4  130:22
208:10
**10th**
180:11
**100**
322:23
**1000**
2:8
**11**
25:1  131:3
176:5
234:13
263:5,9,10
**11:24**
79:6
**1151**
322:22
**117**
5:11
**118**

285:25  286:1
**119**
283:18
**12**
19:20  208:21
209:4
263:10
286:1
**12/31/2012**
322:23
**12:39**
79:7
**12548**
3:6
**129**
288:9
**13**
264:25
283:20
**130**
284:11,13,14
284:15,19
**137**
286:23,23
**14**
12:10  14:10
14:19  15:2
17:14  20:3
26:12,20
27:5  31:5
32:23  33:8
33:12  49:12
49:25  50:2
51:5,12
54:25  56:6
57:23  58:8
58:12
142:21
144:19
174:21
180:10
223:1,8
225:13,20
225:25
226:15,19
226:24
227:13,16
227:19

228:7,10
229:7
230:22
231:2,17,22
232:3,21
233:14
234:6,20
235:3,7,9
236:3,23
237:1,8,12
237:16,23
238:24
240:2,8,16
242:16,18
243:11,15
244:7,25
245:4,24
246:2,9,15
246:16,23
247:6,11
248:5
249:18,24
250:6
251:18
252:19,22
253:1,9,13
253:23
254:19,21
255:4,9,17
256:8,14
257:9,21
258:1,6,11
258:14,15
259:14
260:15,22
261:6,11
262:3,18
263:4  264:7
264:14,22
265:22
266:17,18
267:9  268:3
268:8,16
269:16,19
269:21
270:4
271:18
272:2,7,12
272:22,25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

384

| | | | | |
|---|---|---|---|---|
| 273:4,11 | 67:13 | 77:8 83:18 | 254:14 | 72:8 73:5 |
| 274:8,11 | **18** | 84:5 85:19 | 256:18 | 74:4,11,15 |
| 275:20,22 | 201:17 | 85:22,23 | 257:1,25 | 75:7,10,15 |
| 278:7,9,15 | **19th** | 90:11 91:24 | 274:21 | 76:9,20 |
| 278:21 | 322:20 | 99:24 100:5 | 292:22 | 78:2 79:13 |
| 280:19 | **1965** | 100:17 | **2010** | 79:20,24 |
| 281:1,5,18 | 45:3,12 | 101:25 | 242:9 244:22 | 80:6 81:2,4 |
| 283:13,22 | **1988** | 104:21 | 245:13 | 81:24 82:7 |
| 284:25 | 21:2 | 106:15 | **2011** | 82:12 86:3 |
| 285:14,20 | **1991** | 108:13 | 12:2 52:10 | 86:5,13 |
| 286:6,12 | 28:23,23 | 109:6,10 | 57:25 58:17 | 87:17 88:3 |
| 288:3 | **1992** | 118:12 | 192:3 197:5 | 88:23 89:8 |
| 290:12 | 94:23 | 150:16 | 225:10 | 89:13 92:7 |
| 291:15 | **1996** | 152:15 | 229:9 | 92:13 93:14 |
| 293:12 | 20:22 182:23 | 153:3,17 | 231:23 | 95:23 96:6 |
| 294:16,17 | **1997** | 274:21 | 232:11,22 | 96:19 97:25 |
| 294:21,25 | 183:8 | **2008** | 233:25 | 98:8,23 |
| 294:25 | **1999** | 157:24 | 254:3,4,9 | 99:1,6,18 |
| 295:5,9 | 95:5 | 158:21 | 254:14 | 101:14,16 |
| 302:15,24 | | **2009** | 256:18 | 101:22 |
| 303:13,22 | **2** | 5:13 12:2 | 257:1,25 | 102:4,7,16 |
| 304:1,23 | **2** | 52:9 62:10 | 274:21 | 102:20 |
| 305:6,20 | 5:2 70:25 | 85:3,6 | 294:18,19 | 103:14 |
| 306:24 | 71:12 | 126:23 | 301:6 | 106:6,8 |
| 307:11,16 | 270:14 | 150:16 | **20112** | 107:8 108:1 |
| 307:20,24 | **2,000** | 151:19,24 | 321:21 | 109:20 |
| 308:3 313:5 | 24:11 | 153:17 | **2012** | 110:5,7,9 |
| 313:25 | **2:31** | 174:21 | 1:24 2:4 | 110:23 |
| 316:19,25 | 168:13 | 175:10 | 320:13 | 111:6,13 |
| 317:9 | **2:47** | 177:11,18 | 322:5,8,20 | 112:1,11 |
| **14th** | 168:13 | 179:19 | **202** | 113:5 114:4 |
| 3:8 175:8 | **20** | 180:9 181:2 | 3:15 | 114:22 |
| **15** | 52:16 264:24 | 184:2 193:5 | **20530** | 115:8 116:1 |
| 24:11 33:23 | **20th** | 194:7,13,17 | 3:15 | 116:3 |
| 41:22 | 219:20 | 194:20 | **207** | 119:23 |
| 157:24 | **2000** | 197:5,8,15 | 5:12 | 120:13,18 |
| 158:21 | 322:23 | 200:21 | **209** | 120:23 |
| **16** | **2005** | 208:10 | 3:8 | 121:6 124:3 |
| 5:9 234:14 | 61:5,15,17 | 215:24 | **21** | 124:7,8 |
| 234:16 | 62:11 63:14 | 221:5 224:3 | 21:9 213:2 | 126:1,6,10 |
| **17** | 67:8,14 | 225:22,24 | **218** | 126:14 |
| 1:24 2:4 | 274:21 | 235:10 | 64:20,23 | 131:11,17 |
| 233:19 | **2006** | 240:17,20 | 65:1 66:2,8 | 132:11 |
| 263:5 | 59:11 60:14 | 240:21,22 | 66:14 67:15 | 133:9 |
| 321:21 | 72:1 | 241:5 242:9 | 67:19,24,25 | 150:16 |
| **1706** | **2007** | 244:13 | 68:5,13 | **22** |
| 5:10 62:15 | 59:11 64:13 | 245:13 | 69:18 70:23 | 71:25 |
| 63:11 67:7 | | 254:2,4,9 | 71:6,13 | **23** |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

385

| | | | | |
|---|---|---|---|---|
| 69:1 | **305-7766** | 139:20 | 200:4,22 | 286:25 |
| **23rd** | 3:15 | 140:5,24 | 201:3,20 | **4201** |
| 201:16 202:4 | **31** | 141:5,11,14 | 202:17 | 4:3 |
| **24** | 157:15,18 | 141:18,25 | 203:17,18 | **43** |
| 21:10 175:16 | 159:4 | 142:14 | 204:5 | 5:9 16:12,18 |
| 175:18,19 | 171:23 | 143:7 | 205:12 | 16:22 17:9 |
| 176:16 | 172:3 179:9 | 145:25 | 207:5,11 | 18:18 19:3 |
| 185:3 | **31st** | 146:6 147:1 | 211:11 | 19:15,19 |
| 188:18 | 225:24 | 147:15,21 | 212:8 | **44** |
| 298:15 | 235:10 | 148:2,7,13 | 213:13 | 5:10 61:25 |
| 299:19 | 240:17,21 | 148:18,24 | 215:3,20 | 62:2,4,17 |
| **25** | 240:22 | 149:4,6,22 | 216:1,8 | 62:18,20,21 |
| 39:6 | 241:5 | 149:25 | 217:19 | 63:5 |
| **26th** | **311** | 150:17 | 218:4,9,18 | **45** |
| 5:15 283:11 | 5:17 | 151:5 | 218:22 | 5:11 117:21 |
| **27** | **318** | 152:12 | 219:19,21 | 117:22,24 |
| 196:2,2,4,15 | 5:5 | 153:3,6,11 | 219:22 | **46** |
| 196:17,21 | **32** | 154:3,21 | 220:1,10,15 | 5:12 69:1 |
| **28** | 174:1 175:16 | 155:5 | 220:21 | 207:22,23 |
| 63:20,25 | 182:13 | 157:25 | 225:21 | 208:4 |
| 64:6 66:14 | 296:2 | 161:25 | 226:5 | 308:10,11 |
| 67:14 79:12 | **320** | 162:3,4,8 | 252:12,15 | **47** |
| 80:6 83:4,7 | 5:6 | 163:5,18,23 | 254:18 | 5:14 283:7,9 |
| **281** | **326** | 164:6,20,25 | 256:16 | **48** |
| 4:4 | 136:11 | 166:7 | 257:23 | 5:16 289:13 |
| **283** | **33** | 167:12 | 302:16 | 289:19 |
| 5:14 322:25 | 201:6,12 | 168:6,16,21 | 303:13,21 | 311:9 |
| **289** | 202:12 | 169:10,19 | 303:25 | **49** |
| 5:16 | **34** | 169:23 | 308:21,24 | 5:17 311:6,8 |
| **29** | 301:23 | 170:2,8,15 | **363** | **5** |
| 127:4,6,11 | **36** | 170:20 | 128:2,17,25 | **5** |
| 127:14 | 129:4,7 | 171:15 | 129:2,12,24 | 17:18,20 |
| 130:3 | **362** | 172:6,18 | 158:1,24 | 18:1,3,5,6 |
| 288:10· | 62:12,14 | 173:5,11,17 | 159:3,4,14 | 18:10,18 |
| **295** | 127:2,2,13 | 173:21 | 160:2 224:3 | 19:8 44:23 |
| 5:4 | 127:23 | 175:13 | **4** | 45:1,5,9,15 |
| **3** | 128:17 | 181:3,7,12 | **4** | 45:20 47:13 |
| **3** | 129:24 | 181:19 | 71:19,24 | 47:22 48:9 |
| 68:19,21 | 131:5,7 | 189:20,25 | 160:25 | 48:12,24 |
| 69:1,10,13 | 132:8,9 | 190:9,24 | **4-12** | 49:8,10,13 |
| 70:6,23 | 133:1,10,14 | 191:1 192:2 | 68:23 | 50:9 51:4 |
| 71:5 | 133:22,25 | 192:4,12 | **4:29** | 82:16 130:6 |
| **30** | 134:7 135:5 | 193:7,12 | 251:14 | 141:15,19 |
| 171:24,25 | 135:10,13 | 194:10 | **4:46** | 141:21 |
| 172:1,2,4 | 135:19 | 195:15 | 251:14 | 210:11 |
| 284:12,23 | 137:4,10,14 | 197:1,24 | **40** | 233:9,12 |
| 322:13,14 | 137:16 | 198:3,4,12 | 238:14 | 242:15 |
| | 138:5 139:6 | 198:22 | | |
| | | 199:14 | | |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser

May 17, 2012

386

| | | | |
|---|---|---|---|
| 242:15 | 202:11 | **7202** | 119:8,10,13 |
| 262:12,14 | | 3:14 | 234:3 |
| 262:15,17 | **——— 6 ———** | **73** | **9:43** |
| 262:18 | **6** | 213:14 309:6 | 2:4 |
| **5.11** | 5:4 118:11 | **74** | **90** |
| 175:15,19 | 118:14,16 | 308:13 309:3 | 36:10 |
| 176:3,5,11 | 138:8 142:3 | 309:15 | **902** |
| 178:13 | 322:13 | **77068** | 3:20 |
| 182:12,16 | **6-3** | 4:4 | **93** |
| 182:21 | 198:1 | **78701** | 21:2 |
| 183:19 | **6:29** | 2:8 3:9 | **936-1307** |
| 184:2,6,18 | 2:4 | 322:24 | 3:9 |
| 185:1 296:1 | **6:30** | **78711-2548** | **95** |
| **5.11A** | 318:2 | 3:7 | 110:13 |
| 182:9 299:21 | **60** | | **950** |
| 299:24 | 228:22 229:9 | **——— 8 ———** | 3:14 |
| 300:3,9,17 | 230:12,17 | **8th** | **955-3200** |
| **5.11D** | 231:22 | 3:8 | 3:21 |
| 176:18,25 | 247:22 | **800,000** | **97** |
| 178:3,17 | **609** | 209:4 210:22 | 20:22 95:2 |
| 179:5,24 | 3:21 | 212:22 | 110:14 |
| 183:3,9 | **62** | 213:3,22 | 182:25 |
| 188:1,16,23 | 5:10 | 214:4,13 | 183:1 |
| 189:12,20 | **63** | 215:9 | **98.5** |
| 192:6,22 | 67:4 | **809** | 198:19 |
| 193:6 299:1 | **63.001(b)** | 209:19 | |
| 299:14,21 | 265:3 | **809,000** | |
| **5.119(d)** | **63.0101** | 209:17,21 | |
| 298:5 | 83:4 130:25 | 210:9 | |
| **5:20** | 234:4 | **809-appro...** | |
| 278:13 | **65** | 212:14 | |
| **5:33** | 46:3 | **81st** | |
| 278:13 | | 202:3 | |
| **50** | **——— 7 ———** | **816** | |
| 238:14 | **7** | 2:7 | |
| **500** | 118:11,14,16 | **82nd** | |
| 3:20 | 119:6 142:4 | 225:11 | |
| **500,000** | 288:16 | **820,000** | |
| 313:18 | **70** | 21:14 | |
| **512** | 208:25 209:1 | **89** | |
| 3:9 | 209:10 | 309:3 | |
| **512)328-5557** | **71** | | |
| 322:24 | 209:10 | **——— 9 ———** | |
| **530** | **72** | **9** | |
| 4:3 | 208:14 | 66:14,15,19 | |
| **580-6310** | 209:11 | 67:2,3,4 | |
| 4:4 | 213:1 | 83:4,4 | |
| **591** | | | |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                                    May 17, 2012

---

309

1  year," et cetera.
2         MR. SWEETEN:  We -- Ezra, we've lost -- we
3  go from Page 74 to 89.
4      A.  We don't --
5         MR. ROSENBERG:  No, no.  Go back to Page
6  73.  I'm sorry.  I was going back a page.
7         MR. SWEETEN:  Okay.  He's going here.
8         MR. ROSENBERG:  Right.  I was trying to
9  give context to this.
10        MR. SWEETEN:  Here, that's what he
11 read.  You can read that.
12     Q.  (By Mr. Rosenberg)  Have you had a chance to
13 read that, Senator?
14     A.  I have.
15     Q.  You see where on Page 74, where you're saying,
16 you're asking, "Have I done that?  The answer is no."
17 The phrase, "The answer is no," does that refer to doing
18 statistical analyses?
19        MR. SWEETEN:  You can -- don't reveal your
20 thoughts, mental impressions, opinions about
21 legislation.  You can reference the public record.
22     A.  The -- the statement speaks for itself.
23     Q.  (By Mr. Rosenberg)  Well, what does it mean?
24     A.  Privilege.
25     Q.  So you're telling me that you won't answer

---

310

1  under privilege the public statement that you made that,
2  quote, "The answer is no," end quote?
3      A.  (Conferring.)
4         MR. ROSENBERG:  Fine.  Let's move on.
5  Look, we don't have all night.  If that's your position,
6  that's --
7         MR. SWEETEN:  Ezra, you're already over.
8         MR. ROSENBERG:  I understand, but it would
9  be a lot easier if I was getting answers.
10        MR. SWEETEN:  I understand.  But I mean,
11 we're sitting here trying to analyze your question as to
12 whether or not we think it invades privilege.  Just give
13 us a second.
14     A.  I think it's clear what I'm saying, and I stand
15 by what I say.
16     Q.  (By Mr. Rosenberg)  Okay.  Let's just move on.
17 Next phrase, "But I am pulling data from
18 the academics that have done that and have delivered
19 back."  Did I read that correctly?
20     A.  Yes.
21     Q.  What data were you referring to?
22     A.  The testimony --
23         Is it all right for me to answer that?
24         MR. SWEETEN:  As to the testimony, yeah.
25     A.  The testimony was about to be delivered from

---

311

1  Indiana and Georgia on their voting results, and it came
2  from data that they had collected and that was about to
3  be delivered.
4      Q.  (By Mr. Rosenberg)  Okay.  And this will be the
5  one and only exhibit that I will mark.
6         (Exhibit 49 marked for identification.)
7      Q.  (By Mr. Rosenberg)  Senator, I'm showing you
8  what's been marked as Exhibit 49, and turning your
9  attention to the page number 48, which is the first page
10 with testimony on it, with discussion.  And the first
11 paragraph -- and I will represent, by the way, that this
12 is an excerpt from a statement by you and I think -- can
13 you verify that from your own memory?
14     A.  Yes.
15     Q.  Okay.  And you're quoting from the Baker-Carter
16 Commission that I think you talked about before.
17     A.  Yes.
18     Q.  And you say, "And regardless of whether one
19 believe that voter impersonation is widespread or
20 relatively rare, it can be no serious dispute that it is
21 a real effect that can be substantial, because in a
22 close election, even a small amount of fraud can make
23 the margin of difference."  Do you see that?
24     A.  Yes.
25     Q.  And is that a statement with which you agree?

---

312

1      A.  That is a statement that I pulled from the
2  Baker and Carter commission.
3      Q.  And did you quote it because you agreed with
4  it?
5      A.  Yes.
6      Q.  And what did you mean then by using the words
7  "can make a difference"?
8      A.  I repeated what they had quoted from their
9  quote.
10     Q.  And what did you understand the phrase "can
11 make a difference" to mean from their quote?
12     A.  I understood it can make a difference.
13     Q.  Do you -- are you -- were you taking it to
14 understand that a person who's not supposed to vote and
15 votes can make a difference in an election?
16     A.  I take it on its face for what it says.
17     Q.  Do you believe that a person who is eligible to
18 vote but can't because he doesn't have a photo ID can
19 make a difference in an election?
20        MR. SWEETEN:  Don't reveal your mental
21 processes in passing a legislation.  It's legislatively
22 privileged.
23     A.  Privilege.
24     Q.  (By Mr. Rosenberg)  Generally speaking, as a
25 matter of general practice, would you want to create a

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                                  May 17, 2012

313

1   system that stopped more eligible persons from voting
2   than stopped ineligible persons from voting?
3            MR. SWEETEN: Do not reveal your thoughts,
4   mental impressions, opinions about legislation,
5   including Senate Bill 14. Legislatively privileged. Or
6   any conversations because it's legislatively
7   privileged. Objection.
8        A.   Privilege.
9        Q.   (By Mr. Rosenberg) Are you aware, sitting
10  today, here today, of how many Texans don't have photo
11  ID?
12       A.   I do not have the exact number.
13       Q.   Do you have an approximate number?
14       A.   I have only the data that we received during
15  the testimony of the bill.
16       Q.   And what number is that?
17       A.   I don't have a number.
18       Q.   Is it more than 500,000?
19       A.   There's no way to know that.
20       Q.   Is it more than the number of voter
21  impersonations with which you're aware -- of which
22  you're aware?
23            MR. SWEETEN: I'm going to object to the
24  extent it calls for his mental impressions, opinions
25  about legislation, including Senate Bill 14, or to the

314

1   extent that it reveals any conversations he's had with
2   any of the enumerated individuals or agencies we've
3   discussed.
4            MR. ROSENBERG: But to the extent that
5   it's in the public record and he has knowledge, he can
6   testify, even according to your theories.
7        A.   Please show me in the public record what's been
8   said.
9        Q.   (By Mr. Rosenberg) Are you aware of assertions
10  on the public record that minorities are less likely to
11  have public identification -- photo identification?
12       A.   Ask the question again, please.
13       Q.   Sure. Are you aware of assertions on the
14  public record that minorities are less likely to have
15  photo identification?
16       A.   I'm aware that it has been asserted.
17       Q.   Do you disagree with the assertion?
18       A.   I have no basis to know either way.
19       Q.   Okay. Are you aware of assertions on the
20  public record that minorities are less likely to have
21  access to driver's license facilities in terms of having
22  cars or public transportation?
23       A.   I'm aware that assertions have been made.
24       Q.   Do you doubt the assertions? Do you question
25  the assertions?

315

1        A.   Yes, I do.
2            MR. SWEETEN: In answering that question,
3   don't reveal your thought processes or discussions with
4   respect to this -- with respect to this legislation;
5   it's legislatively privileged. You can answer
6   otherwise.
7        Q.   (By Mr. Rosenberg) Have you answered?
8        A.   Ask the question again.
9        Q.   Sure. Are you -- do you doubt the -- do you
10  deny the assertion that minorities have less access to
11  driver's license facilities, in terms of having motor
12  vehicles --
13       A.   "Deny" and "doubt" are different words.
14       Q.   Well, I'm going to rephrase the question, and
15  your attorney can object or counsel you.
16            Let me just say again. Do you deny the
17  assertion that minorities have less access to driver's
18  license facilities in terms of motor vehicles or public
19  transportation?
20            MR. SWEETEN: Don't reveal your thoughts,
21  your mental impressions, your opinions about legislation
22  or conversations that you've had. Those are
23  legislatively privileged.
24       A.   Privilege.
25       Q.   (By Mr. Rosenberg) Are you aware of assertions

316

1   that minorities are more likely to be below the poverty
2   line and therefore would more difficulty for paying for
3   the underlying documents necessary to get photo
4   identifications than nonminorities?
5        A.   Am I aware of the assertion?
6        Q.   Yes.
7        A.   Yes.
8        Q.   Do you deny the assertion?
9            MR. SWEETEN: Don't reveal matters subject
10  to legislative privilege in answering the question. If
11  you can answer the question without doing so, you can.
12       A.   Privilege.
13       Q.   (By Mr. Rosenberg) Do you agree that a person
14  who doesn't have photo identification, doesn't have easy
15  access to driver's license facilities, may have to take
16  time off from work in order to go to the driver's
17  license facilities and doesn't have a spare $22 to pay
18  for underlying documents to get photo identification,
19  may be less likely to vote under SB 14 than people who
20  do have those things?
21            MR. SWEETEN: Objection, compound.
22  Objection, calls for speculation. Objection, vague. In
23  answering that, don't reveal matters, thoughts, mental
24  impressions or opinions about legislation, including
25  Senate Bill 14 or matters communicated to you within --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

### 317

1    by any legislators, legislative staff, or other
2    enumerated individuals or entities.  If you can answer
3    without doing so, you can attempt to answer his
4    question.
5        A.   Privilege.
6        Q.   (By Mr. Rosenberg)  And my last question:  Just
7    sitting here today, do you have a basis to disagree that
8    minorities will be disproportionately affected by SB
9    14?
10           MR. SWEETEN:  In answering this question,
11   do not reveal matters of legislative privilege,
12   including your thoughts, mental impressions about the
13   legislation, in furtherance of the legislative process,
14   or discussions you've had with legislators, legislative
15   staffs, state agencies, Texas Legislative Council, or
16   constituents.  You can refer to matters of the public
17   record in answering the question.
18       A.   Privilege.
19           MR. ROSENBERG:  Subject to our moving to
20   compel, I'm leaving this open after all the privilege
21   issues and documents are produced, et cetera, I think
22   we're through for the day.
23           MR. SWEETEN:  Okay.  I would like the time
24   total.  I would like the time total appended to the
25   deposition.  And we will reserve questions of Senator

### 318

1            Fraser to the time of trial.
2              (Deposition concluded at 6:30 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### 319

1    CHANGES AND SIGNATURE
2    RE: TEXAS VS. HOLDER, ET AL
3    PAGE LINE CHANGE        REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   I, SENATOR TROY FRASER, have read the foregoing
21   deposition and hereby affix my signature that same is
22   true and correct, except as noted above.
23
24   _____
25         SENATOR TROY FRASER

### 320

1    THE STATE OF _____)
2    COUNTY OF_____)
3
4        Before me,_____, on this day
5    personally appeared SENATOR TROY FRASER, known to me (or
6    proved to me under oath or through_____
7    (description of identity card or other document) to be
8    the person whose name is subscribed to the foregoing
9    instrument and acknowledged to me that they executed the
10   same for the purposes and consideration therein
11   expressed.
12       Given under my hand and seal of office
13   this_____day of _____, 2012.
14
15
16
            _____
16   NOTARY PUBLIC IN AND FOR
17   THE STATE OF _____
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                      May 17, 2012

321

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
     STATE OF TEXAS,               )
 3                                 )
            Plaintiff,             )
 4                                 )
     VS.                           )
 5                                 )
     ERIC H. HOLDER, JR, in his    )
 6   official capacity as Attorney )
     General of the United States, )
 7                                 )
            Defendant,             )
 8                                 )
     ERIC KENNIE, et al,           )
 9                                 )
            Defendant-Intervenors, )
10                                 )
     TEXAS STATE CONFERENCE OF     )  CASE NO. 1:12-CV-00128
11   NAACP BRANCHES,               )  (RMC-DST-RLW)
                                   )  Three-Judge Court
12          Defendant-Intervenors, )
                                   )
13   TEXAS LEAGUE OF YOUNG VOTERS  )
     EDUCATION FUND, et al,        )
14                                 )
            Defendant-Intervenors, )
15                                 )
     TEXAS LEGISLATIVE BLACK       )
16   CAUCUS, et al,                )
                                   )
17          Defendant-Intervenors, )
                                   )
18   VICTORIA RODRIGUEZ, et al.,   )
                                   )
19          Defendant-Intervenors, )
20              REPORTER'S CERTIFICATION
               DEPOSITION OF SENATOR TROY FRASER
21                   MAY 17, 20112
22          I, Chris Carpenter, Certified Shorthand Reporter in
23   and for the State of Texas, hereby certify to the
24   following:
25          That the witness, SENATOR TROY FRASER, was duly
```

322

```
 1   sworn by the officer and that the transcript of the oral
 2   deposition is a true record of the testimony given by
 3   the witness;
 4          That the deposition transcript was submitted on the
 5   _____ day of _____, 2012, to the witness or to the
 6   attorney for the witness for examination, signature and
 7   return to _____, by
 8   _____, 2012; and if returned, the original
 9   transcript will forwarded to Elizabeth Westfall, the
10   custodial attorney;
11          That the amount of time used by each party at the
12   deposition is as follows:
13          Ms. Westfall: 6 hours, 30 minutes
14          Mr. Rosenberg: 30 minutes
15          I further certify that I am neither counsel for,
16   related to, nor employed by any of the parties or
17   attorneys in the action in which this proceeding was
18   taken, and further that I am not financially or
19   otherwise interested in the outcome of the action.
20          Certified to by me this 19th day of May, 2012.
21
22
             Chris Carpenter, Texas CSR 115
23           Expiration Date: 12/31/2012
             100 Congress Avenue, Suite 2000
24           Austin, TX 78701
             (512)328-5557
25           Firm Registration No. 283
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Troy Fraser                                                                                     June 13, 2012

---

**Page 1**

346212 eb

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                        *
        Plaintiff,                     *
VS.                                    *
ERIC H. HOLDER, JR., in his            *
official capacity as Attorney          *
General of the United States,          *
        Defendant,                     *
ERIC KENNIE, et al,                    *
        Defendant-Intervenors,         *
TEXAS STATE CONFERENCE OF NAACP        * CASE NO.
BRANCHES, et al,                       * 1:12-CV-00128
        Defendant-Intervenors,         * (RMC-DST-RLW)
TEXAS LEAGUE OF YOUNG VOTERS           * THREE-JUDGE COURT
EDUCATION FUND, et al,                 *
        Defendant-Intervenors,         *
TEXAS LEGISLATIVE BLACK CAUCUS,        *
et al,                                 *
        Defendant-Intervenors,         *
VICTORIA RODRIGUEZ, et al              *
        Defendant-Intervenors.         *

DEPOSITION OF SENATOR TROY FRASER
VOLUME 2

UPON RECEIPT OF SIGNATURE, THE ORIGINAL OF THIS
DEPOSITION WILL BE IN THE CUSTODY OF:
Elizabeth Westfall, Esquire
U.S. Department of Justice
950 Pennsylvania Avenue, NW
NWB - Room 7202
Washington, DC 20530

Date              Edith A. Boggs, CSR

6-13-12           HOUSTON, TEXAS

---

**Page 2**

DEPOSITION OF SENATOR TROY FRASER

DEPOSITION AND ANSWERS of SENATOR TROY FRASER, taken
before Edith A. Boggs, a certified shorthand reporter in
Harris County for the State of Texas, taken at the
offices of Dechert, LLP, 300 6th Street, Suite 2010,
Austin, Texas, on the 13th day of June, 2012, between
the hours of 1:17 p.m. and 3:49 p.m.

---

**Page 3**

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFF, STATE OF TEXAS:

Office of the Attorney General of Texas
P.O. Box 12548 (78711-2548)
209 West 8th Street, 8th Floor
Austin, Texas 78701
By: Patrick K. Sweeten, Esquire
and Stacey Napier, Esquire

(512) 936-1307
patrick.sweeten@aog.state.tx.us

ATTORNEY FOR DEFENDANT, HOLDER, ET AL:

U.S. Department of Justice
950 Pennsylvania Avenue, NW
NWB - Room 7202
Washington, DC 20530
By: Elizabeth S. Westfall, Esquire
(202) 305-7766
elizabeth.westfall@usdoj.gov

---

**Page 4**

A P P E A R A N C E S (Continued)

ATTORNEY FOR DEFENDANT-INTERVENOR TEXAS STATE
CONFERENCE OF NAACP BRANCHES AND THE MEXICAN AMERICAN
LEGISLATIVE CAUCUS:

Dechert, LLP
300 6th Street, Suite 2010
Austin, Texas 78701

By: Lindsey Stelcen, Esquire

(512) 394-3000
lindsey.stelcen@dechert.com

ATTORNEY FOR THE KENNIE INTERVENORS:
Brazil & Dunn, LLP
4201 Cypress Creek Parkway, Suite 530
Houston, Texas 77068
By: Chad Dunn, Esquire
(281) 580-8310
chad@braziianddunn.com

REPORTED BY:

Ms. Edith A. Boggs





EXHIBIT
3

ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                    June 13, 2012

**5**

1  EXAMINATION INDEX
2
3  QUESTIONS BY                    PAGE
4
5  Ms. Westfall                    6
6
7  INDEX OF EXHIBITS
8
   NO.   MARKED      DESCRIPTION
9
   550   12          Notice of Deposition
10
   551   16          Senate Rules adopted by 82nd
11 Legislature January 19, 2011, Senate Resolution No. 36
12 552   48          Senate Rules adopted by 81st
   Legislature January 14, 2009, Senate Resolution No. 14
13
   553   65          Senate Journal, Fourth Day, Monday,
14 January 24, 2011
15 554   85          E-mail dated 1-27-11 from Brenda
   Payne
16
   555   91          E-mail dated 1-28-11 from R. L.
17 Kucera
18 556   99          E-mail dated 1-21-11 from Mickey
   Mathis
19
   557   102         E-mail dated 1-25-11 from Catherine
20 Engelbrecht
21 558   107         E-mail dated 1-26-11 from Sonia
   Santana
22
23
24
25

**6**

1              SENATOR TROY FRASER
2  was called as a witness and, being first duly sworn by
3  the notary, testified as follows:
4              EXAMINATION
5      Q. (BY MS. WESTFALL)  Good afternoon, Senator
6  Fraser.  How are you?
7      A. Very good.
8      Q. Good.  Could you state and spell your name again
9  for the record.
10     A. Senator Troy Fraser.  Last name is F R A S E R.
11     Q. And you were previously deposed in this matter,
12 right?
13     A. I was.
14     Q. Do you remember the ground rules I gave you last
15 time?
16     A. I do.
17     Q. And you are appearing to resit for your
18 deposition, as ordered by the Court in this matter on
19 June 5th; is that correct?
20     A. That's my understanding, yes.
21         MR. SWEETEN:  Just for the record, let me
22 just state that we are here pursuant to the Court's
23 order of June 5th, 2012.
24         In that order, the Court required Senator
25 Fraser to resit for a deposition, to provide nonevasive

**7**

1  answers to questions regarding the substance and purpose
2  of the two-thirds rule, the effect of a Governor
3  designating a bill as emergency legislation and whether
4  he was aware of any conversations regarding the timing
5  of consideration of Senate Bill 14.
6          He is going to answer questions based upon
7  those issues, as set forth in the Court's order.  He is
8  continuing to assert his legislative privilege as to any
9  matters that would be covered by that.
10         And with that, I'll let you proceed with the
11 examination, Counsel.
12         MS. WESTFALL:  Thank you, Mr. Sweeten.
13     Q. (BY MS. WESTFALL)  And just to be clear, Senator,
14 are you also aware that the Court ruled that other
15 subjects, such as communications between legislators and
16 constituents, lobbyists and interest groups, public
17 statements and press releases and statements made after
18 Senate Bill 14 was signed into law are not subject to
19 legislative privilege?
20     A. I would like to be shown that, please.
21         MR. SWEETEN:  Well, I mean, to the extent
22 that the Court's order is limiting as to these three
23 issues, we don't intend -- I mean, our intention is to
24 have him sit for the issues that the Court has ordered
25 him to sit for.  He will answer the questions that the

**8**

1  Court has provided for, and the Court has not reopened
2  the examination with respect to constituent
3  communication.
4          MS. WESTFALL:  Mr. Sweeten, I provided you
5  with correspondence indicating that we would be
6  examining the Senator on areas related to the order on
7  motions to spell, ECF 167, June 5th, 2012, that related
8  to constituent communications, public statements and
9  press releases and statements made after the signing.
10         This deposition has been ordered by the
11 Court to be reopened.  The Court has ruled that certain
12 issues and areas of examination are not subject to
13 legislative privilege, and I'm going to examine the
14 Senator on those areas, as permitted to do so by the
15 Court's order.
16         MR. SWEETEN:  Okay.  And what I'm telling
17 you is that my interpretation of the Court's order is he
18 is sitting for these three topics and these topics only.
19         If you can show me the support for why you
20 believe that you could extend into the other area, which
21 I understand you to say is constituent communications,
22 then we can have a discussion on that issue.
23         MS. WESTFALL:  Mr. Sweeten, the whole entire
24 order is about areas that are in the Court's ruling
25 subject to legislative privilege and outside of that



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                      June 13, 2012

9

1   privilege.
2          They have identified certain areas that are
3   outside of the legislative privilege and, therefore, now
4   that we are -- Mr. Fraser is here for his deposition and
5   to resit, I'm going to examine him on those areas that
6   the Court has deemed not privileged.
7          If you are disagreeing with this ruling, we
8   can take a break and I can -- we can take a break and
9   discuss it further.
10         MR. SWEETEN:  I'm not disagreeing on the
11  Court's ruling, of course.  I'm disagreeing on our
12  interpretation of what the Court's ruling is.
13         So, I'm just saying if you've got support
14  for that, show me that and we'll have a discussion on
15  it.
16         I mean, he's certainly here to testify as to
17  the matters the Court has provided that he will testify
18  to.
19         MS. WESTFALL:  I would add that the Court
20  just recently ruled -- and I don't have the ECF number
21  in front of me -- that Representative Harless, who was
22  deposed today, was subject to examination of some of the
23  areas that the Court ruled did not fall within the
24  legislative privilege, and the State lost on that issue,
25  and she was directed to answer questions in that regard

10

1   in that capacity following the issuance of the order on
2   motions to compel, ECF 167.
3          So, I think that reasoning applies with
4   equal force here.  I would ask that you reconsider your
5   position on this issue.
6          MR. SWEETEN:  Okay.  Well, let me discuss it
7   with the Senator.  And I think what I hear you saying
8   is:  We were able to do it -- we asked the Court for
9   permission to do it with respect to Patricia Harless
10  and, therefore, we think that the Court would probably
11  do the same thing here.
12         I don't here you saying that we're directly
13  ordered to that.  Is that a fair --
14         MS. WESTFALL:  You're not ordered but I
15  think it is ill advised, not that I would ever give you
16  legal advice, Mr. Sweeten.
17         MR. SWEETEN:  Okay.  I understand your
18  position.
19         THE WITNESS:  Before we leave, I'd like for
20  her to again go over the areas that she intends to ask
21  about so I can be clear in my mind.
22         MS. WESTFALL:  Certainly.  Well, you know
23  what, instead of advising you what is in this document,
24  since I'm not your attorney, I would have your attorney
25  tell you about the scope of the order and the rulings in

11

1   the order in a private setting outside of this
2   deposition.
3          We can go off the record if you would like
4   to now or we can do the first part of the examination
5   and then break, whatever your preference is.
6          MR. SWEETEN:  Okay.  If we can put that
7   issue aside, we could just get going on this and then we can
8   revisit it at a break, and then we can discuss the
9   specific areas.
10         So, let's proceed with the ordered
11  examination, and then we'll discuss the other issue.
12         MS. WESTFALL:  Very good.  Thank you.
13         Q.  (BY MS. WESTFALL)  Senator, what did you do to
14  prepare for today's deposition?
15         A.  I met with counsel that's sitting beside me,
16  Mr. Sweeten, and I read my last deposition.
17         Q.  Did you review any other documents?
18         A.  No.
19         Q.  When you met with Mr. Sweeten, was anyone else
20  present?
21         A.  Yes, both counsel that are with me today.
22         Q.  Other than your attorneys, did you speak to
23  anyone else about your deposition today?
24         A.  Only commenting that I was being deposed, but no,
25  not a discussion about the deposition.

12

1   Q.  Did you bring any notes with you here today?
2   A.  I did not.
3          (Exhibit 550 marked.)
4   Q.  (BY MS. WESTFALL)  You've been handed what's been
5   marked US 550.  Do you recognize this document?
6   A.  Do I recognize it?  No.
7   Q.  If you could take one minute to take a look --
8          MR. SWEETEN:  Let me take a look at this, if
9   you would.
10  Q.  (BY MS. WESTFALL)  Senator, if you could take a
11  look at this document and let me know whether you --
12  after you've had a chance to review it, whether you've
13  ever seen it before?
14  A.  Actually, I'm not sure.  I don't know whether I
15  have or not.
16  Q.  I'd turn your attention to the second page of
17  this document.  And it's a double-sided document.  So,
18  if you could see on the second page where it indicates
19  that the State has been directed to have you appear
20  today at 1:00 p.m.  Do you see that?
21  A.  Yes.
22  Q.  Does that refresh your recollection in any way
23  about what this document is?
24  A.  That -- I'm aware that I was required to be here.
25  Q.  Thank you.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                      June 13, 2012

13

1        And turning in a couple of pages after the
2    numbered paragraphs defining terms, do you see that it
3    lists Documents on the next page?
4        A.  What number?
5        Q.  On the following page.  Unfortunately, these
6    pages are not paginated but after --
7        A.  What number is the sub number?
8        Q.  After paragraph 11 on the following page, sir,
9    where it says Documents, do you see it lists a number of
10   documents, 1, 2, 3?
11       A.  Yes.
12       Q.  Did you under -- did you or your staff undertake
13   a search for these documents?
14       A.  I believe my staff did.  I did not.
15       Q.  Do you know whether it was Ms. McCoy?
16       A.  Ms. McCoy would have been the one.
17       Q.  Do you know where she searched for the documents?
18       A.  In our file in our office.
19       Q.  Do you know what she found in terms of documents?
20   And I'm not asking you for the specific documents but
21   the types of documents she found?
22       A.  I believe every document that had been requested
23   had been released to the Attorney General's Office, and
24   I believe they had some that they felt like were
25   privileged but we have no other documents in our

14

1    possession that have not been previously either asked
2    for or released to the Attorney General's Office.
3        Q.  I see.  So, is it your understanding that there
4    were no documents recently produced from your office?
5    Is that right?
6        A.  That is my understanding.
7        Q.  Sir, are you familiar with the Senate procedure
8    which you previously referred to in your prior
9    deposition as the two-thirds procedure?
10       A.  No.
11       Q.  Sir, when a bill in the Senate is favorably
12   reported by a committee, what happens to the bill next?
13           MR. SWEETEN:  And you can answer as a
14   general matter.  I think many of these questions today
15   will be general parliamentary matters, and so, you can
16   answer those questions.
17           Just don't -- if it comes to your thoughts
18   or mental impressions about a specific bill today, then
19   we're going to assert legislative privilege on that but
20   go ahead.
21       A.  I'm sorry.  I'm going to stop you here.  I would
22   like to go back to the previous question and have it
23   read back to me again.
24       Q.  (BY MS. WESTFALL)  Certainly.
25           MS. WESTFALL:  Could you read back the

15

1    previous question.
2           (Whereupon, the requested testimony was read back
3    as follows:
4           QUESTION:  Sir, are you familiar with the Senate
5           procedure which you previously referred to in
6           your prior deposition as the two-thirds
7           procedure?)
8        A.  I would like for you to show me where I referred
9    to something as the two-thirds rule -- vote rule.
10       Q.  (BY MS. WESTFALL)  Okay.  Well, I'm going to
11   strike that question for the time being.  We'll go on to
12   the next question.
13       A.  And I am prepared to expand and discuss, because
14   I understand the Court would like that, but the question
15   as you asked it, implying that I had referred to that, I
16   don't remember implying, and I am prepared to expand.
17       Q.  Okay.  And I will ask you many questions
18   generally about what has been referred to in the press
19   and elsewhere as the two-thirds rule or procedure or
20   whatnot.
21           I will ask you the question I just asked earlier,
22   which is, when a bill is favorably reported from a
23   committee, what happens to the bill next?
24       A.  The bill, after it's reported -- first,
25   obviously, you have to have the paperwork that would be

16

1    correctly delivered, and that is delivered to the
2    Lieutenant Governor's Office.
3           The Lieutenant Governor, they -- my understanding
4    is they generally preview the bill, and then they will
5    post that on a calendar.
6        Q.  Sir, does that go on the calendar of the regular
7    order of business?
8        A.  We have multiple calendars that -- there are
9    special orders, there are regular orders for second
10   reading, there are regular orders for third reading, and
11   then any other that would be considered served.  There
12   are multiple calendars.
13       Q.  I think instead of talking about this in the
14   abstract, we'll mark this 551.
15           (Exhibit 551 marked.)
16       Q.  (BY MS. WESTFALL)  Sir, you've been hand what's
17   been marked US 551.  Do you recognize this document?
18       A.  I have not examined in detail in full but on
19   the surface, on the face, it says Senate Rules adopted
20   by the 82nd legislature, and I'm assuming you're
21   representing that this is that document.
22       Q.  Yes, sir, I will represent to you -- and I'm sure
23   your counsel won't disagree -- that this is a copy of
24   the Senate 2011 Rules in its entirety.
25       A.  Yes.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                                    June 13, 2012

17

1    Q. Does the Senate consider bills in a particular
2    order?
3    A. Yes.
4    Q. What is that order?
5    A. There are multiple orders that could be created,
6    that if a bill is designated for a special order, it
7    would be designated what special order it would be, and
8    if a bill is designated a special order, it would become
9    the first bill that would be considered on that
10   legislative day.
11       If there's not a special order and you have bills
12   to be considered for a second reading that are eligible,
13   they would be required to be brought up in the order of
14   business in which, you know, they came out of committee.
15   Q. I'd like to turn your attention to Rule 5.09 on
16   Page 21?
17   A. 21?
18   Q. On Page 21, Rule 5.09.
19   A. Okay.
20   Q. Do you see what that rule is?
21   A. Order of considering bills and resolutions.
22   Q. Could you describe your understanding of Rule
23   5.09?
24   A. 5.09 says, "At the conclusion of the morning
25   call, the Senate shall proceed to consider business on

18

1    the President's table, which shall be disposed of in the
2    following order." One would be special orders. Two
3    would be unfinished business. Three would be Senate
4    Joint Resolutions. Four would be Senate Resolutions.
5    Five, Senate Concurrent Resolutions. Six, Senate bills
6    on third reading. Seven, Senate bills on second
7    reading. Eight, House Joint Resolutions. Nine, House
8    bills on third reading. Ten, House bills on second
9    reading. And Eleven, House Concurrent Resolutions.
10   Q. Is it your understanding that under Rule 5.09
11   that special orders are considered first in terms of
12   order?
13   A. The rule says it will be disposed of in the
14   following order.
15   Q. And turning your attention to the end of that
16   rule on the notes of rulings, does it indicate that the
17   order of business may be changed by a two-thirds vote of
18   the Senate? Do you see that?
19   A. I do see that.
20   Q. And what does that mean?
21   A. The — a 21 vote rule or a vote of two-thirds of
22   the members of the Senate are used any time that you do
23   a suspension of an existing rule.
24       The example would be if there is a printing rule
25   and there's a 48-hour layout, we could suspend the

19

1    printing rule with a 21 vote, two-thirds vote.
2        If a bill is coming up — had been passed on
3    second reading and there's a 24 or 48-hour layout for
4    third reading, the Senate would be allowed -- if the
5    other members would do it, they could suspend that rule
6    with a 21 vote or a two-thirds majority of those present
7    in order to suspend that rule.
8        So, any rule in the Senate where there's an
9    existing rule, you are allowed to suspend that rule.
10   There are literally thousands of suspensions that are
11   done on probably as many as 15 different categories of a
12   suspension.
13       So, when you refer to something as a two-thirds
14   rule, the two-thirds could apply to the posting rule, it
15   could be the printing rule, it could be the layout rule,
16   it could be third reading or it could apply to the
17   regular order of business.
18       And that is my reason for saying there is no such
19   thing as a two-thirds rule. You have to have a
20   two-thirds majority in Robert's Rules of Order,
21   according to parliamentary procedure, in order to
22   suspend any rule that is established by the Senate,
23   which this is a rule that's been established. If you
24   want to change the order of that, then you have to
25   suspend the regular order of business in order to take

20

1    up and consider a bill.
2    Q. What is the regular order of business?
3    A. The regular order of business is the order that
4    it came out of the committee.
5    Q. Could you refer to a particular rule in the
6    Exhibit 551 that refers to what the regular order of
7    business is?
8    A. Well, it's -- if you look at the rules, if you
9    have a special order as number one, the first special
10   order that comes out would be number 1, and it would
11   have priority.
12       If there was unfinished business, which means
13   that if you had been carrying a bill and for some reason
14   you suspended that bill and you decided you were going
15   to have a time certain of 11:00 o'clock tomorrow
16   morning, well, at 11:00 o'clock tomorrow morning, it
17   would be -- if there were no special orders, it would
18   be — would have number 1 preference.
19       So, your order of business is established by
20   Senate Rule 5.09. If you're not going to go in that
21   order and you're asking members to change that -- and
22   the example I'll give you is that if I had a House
23   resolution that I felt very strongly about but it was a
24   hundred bills down in the order and I was going to have
25   to wait and there were some constituents here that we



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                June 13, 2012

21

1  wanted to honor, I could ask the other members to allow
2  me to suspend the regular order of business to take up
3  and consider House Concurrent Resolution such and such,
4  and that is a common thing that happens often if a
5  member chooses to suspend the regular order of business
6  but the regular order of business, it would allow that
7  it is a majority vote as long as you go in the regular
8  order of business.
9      Q. I see. And turning your attention to Rule 5.12
10  on Page 25 --
11     A. I'm sorry.
12     Q. Page 25, Rule 5.12. Do you see at the bottom
13  that describes regular order of business?
14     A. Uh-huh.
15     Q. Is this -- could you describe Rule 5.12?
16     A. I'd be glad to read it to you. It says, "Bills
17  and resolutions shall be considered on second reading
18  and shall be listed on the daily calendar of bills and
19  resolutions on the President's table for second reading
20  in the order in which the committee reports on them are
21  received by the Senate."
22         They're received, stamped with the time stamp as
23  being received by the Senate coming out of --
24     Q. Just so I understand that clearly, the committees
25  report favorably bills and whatever order they come in

22

1  and they're time stamped on, that is the regular order
2  of business; is that right?
3      A. That is the regular order of business. It is my
4  understanding that that's the way they do it. I'm not
5  there when they come in but they do establish a regular
6  order of business, and my understanding is that if I
7  chair Natural Resources and if I complete a bill and
8  we've got, you know, Senate Bill 300 and we send it over
9  favorably from the committee, they review it, as soon as
10  the paperwork is in order, they time stamp it, and if I
11  am 5th in the regular order of business, it is my right
12  to bring that bill up 5th.
13     Q. And then you would only need a majority of the
14  Senates to vote in favor of that pursuant to the regular
15  order of business?
16     A. That is correct. If I chose to try to jump over
17  everybody and I wanted to come up first, I would have to
18  ask the other members to allow me to get two-thirds
19  majority to do that.
20     Q. So, I think you just said this but when a bill is
21  considered in the regular order of business, it only
22  requires a majority vote?
23     A. That's correct.
24     Q. Are most bills considered in the regular order of
25  business?

23

1         MR. SWEETEN: You can answer as a general
2  matter.
3      A. There are some bills that are considered in the
4  regular order of business, and there are some bills that
5  are considered out of the regular order of business.
6      Q. (BY MS. WESTFALL) Is it fair to say that most
7  are considered out of the regular order of business?
8      A. It's fair to say that there are more considered
9  out of the regular order of business, not most.
10     Q. What type of bills or resolutions are considered
11  in the regular order of business?
12     A. Bills that came in in the regular order. If they
13  come in the regular order of business and there's not
14  some pressing reason why I or someone else needs to
15  bring our bill up, we operate in the regular order of
16  business, not unlike what the House does. The House
17  does the same procedure.
18     Q. If you do that and you proceed on the regular
19  order of business, there is a risk, is there not, that
20  the session may end without the Senate having considered
21  your bill; isn't that right?
22     A. No.
23     Q. Why not?
24     A. Well, there's no limit on the length of time that
25  you can have the session. I have -- in 2009 on the

24

1  photo voter ID bill --
2         MR. SWEETEN: Don't discuss specific
3  legislation.
4      A. Okay. There are bills that have gone -- there's
5  not a time limit on the length of the time that you can
6  go. So, the answer is no. Generally, there's
7  sufficient time.
8         The Senate operates on -- you know, we -- I don't
9  know whether you would call it pacing yourself but we
10  take care of business to stay up with the order of -- to
11  take care of sufficient business but --
12     Q. (BY MS. WESTFALL) Sir, isn't it true that some
13  bills are reported favorably out of committee and they
14  do not reach the Senate floor for a vote before the
15  session ends?
16     A. Yes.
17     Q. When bills are reported favorably from committee,
18  I believe you said they go to the Lieutenant Governor's
19  Office and get stamped; is that correct?
20     A. I'm telling you what I believe is the policy.
21  I've never physically seen that and it has never been
22  explained to me but my understanding is there is a
23  procedure for establishing the regular order of
24  business.
25     Q. Is that a committee or is it your understanding



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Troy Fraser                                                    June 13, 2012

25

1  that that is the Lieutenant Governor in his capacity as
2  the President of the Senate doing that?
3      A. He and his staff but that also is a power given
4  to that office by the Senate members per the Senate
5  Rules.
6      We allow the --
7      THE WITNESS:  You can tell me if you don't
8  want me to head there.
9      A. But the House has a Calendars Committee that does
10  this. The Senate has chosen not to have a Calendars
11  Committee. We allow the Lieutenant Governor to
12  establish that but if we disagree, through the rules, we
13  have the ability to override.
14      Q. (BY MS. WESTFALL)  I see. So, the Lieutenant
15  Governor's Office is in charge of calendaring bills that
16  come out of committee before they go to the floor; is
17  that right?
18      A. That would be a correct representation.
19      Q. I believe you testified earlier about bill
20  blockers. Do you remember that testimony?
21      A. A blocker bill.
22      Q. Blocker bills. I stand corrected. Can you
23  remind what a blocker bill is?
24      A. A blocker bill would be if my bill is number 10
25  and somebody has a bill that is number 9, that bill is

26

1  blocking my bill from being brought up, and until number
2  9 is brought up, I can't bring up number 10.
3      Q. My understanding -- and correct me if I'm
4  wrong -- do blocker bills require that even if you're in
5  the regular order of business and your bill is coming up
6  for a vote that you would have to get two-thirds of the
7  Senate to support a suspension of the rules to have your
8  bill considered?
9      A. Please repeat that question.
10      MS. WESTFALL:  Could you read that back.
11      (Whereupon, the requested testimony was read back
12  as follows:
13      QUESTION:  My understanding -- and correct me if
14      I'm wrong -- do blocker bills require that even
15      if you're in the regular order of business and
16      your bill is coming up for a vote that you would
17      have to get two-thirds of the Senate to support a
18      suspension of the rules to have your bill
19      considered?)
20      A. No, that is not correct. If you are following
21  the regular order of business and your bill is scheduled
22  to come up next, it requires a majority vote.
23      Q. (BY MS. WESTFALL)  I believe you testified
24  earlier that blocker bills are often filed at the
25  beginning of a session. Do you remember that testimony?

27

1      A. Yes.
2      Q. And that they are administrative in nature, do
3  you remember that testimony?
4      A. Yes.
5      Q. Does the filing of that blocker bill require that
6  all bills must receive support of two-thirds of Senators
7  to suspend -- or to overcome that blocker bill to be
8  heard?
9      A. What you're actually saying is that you have to
10  come to a resolution of the first bill on the calendar,
11  and if that bill is a bill -- something that the author
12  of the bill does not choose to resolve that and it is
13  sitting and if there's a bill behind it that you choose
14  to break up, you would have to make a motion that I
15  would like to suspend, you know, the regular order of
16  business to take up and consider bill number 2 to jump
17  over bill number 1.
18      Q. Since you have been serving in the Senate
19  since -- you've served in the Senate since 1997, right?
20      A. Uh-huh.
21      Q. Has there always been a blocker bill filed at the
22  beginning of the session in your experience?
23      MR. SWEETEN:  I don't think that's correct.
24      You've served in the Senate since '97?
25      THE WITNESS:  Uh-huh.

28

1      MR. DUNN:  Is that a yes?
2      THE WITNESS:  That is a yes.
3      MR. DUNN:  Just for our court reporter.
4      MS. WESTFALL:  Thank you, Mr. Dunn.
5      THE WITNESS:  Are you shocked?
6      MR. SWEETEN:  Go ahead.
7      Q. (BY MS. WESTFALL)  Since you have served in the
8  Senate, every session has there been a blocker bill
9  filed at the beginning of the session?
10      A. To my knowledge, there has been a bill filed that
11  would -- that you -- if your bill was behind that bill,
12  you would have to suspend the necessary rules.
13      Q. So, you can't recall, sitting here today, any
14  legislature that you've served in since you've been in
15  the Senate when there hasn't been such a blocker bill
16  filed?
17      A. No.
18      MR. SWEETEN:  Was your question regular
19  session or --
20      A. Again, I'm -- the term blocker bill is a term of
21  art, and there's nothing in the Senate Rules that refers
22  to it, and there's nothing in the Texas Constitution.
23  So, it implies that there is no such thing as a blocker
24  bill.
25      A blocker bill would be something, in my mind,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

29

1  that that bill is blocking me bringing up my bill. So,
2  there is really no such thing as a blocker bill. It's
3  just if there's a bill in front of mine, it would be
4  blocking me bringing my bill up.
5      Q. (BY MS. WESTFALL) Thank you.
6      Is the blocker bill -- what you refer to as the
7  blocker bill, is that what others in the public may
8  refer to as the two-thirds procedure or rule?
9      A. No. Now, I probably should -- you know, there is
10 a term of art that people refer to that we're going to
11 suspend the two-thirds rule but there is no such thing
12 as a two-thirds rule.
13     There is a two-thirds majority required to
14 suspend any existing Senate rule. There's an existing
15 Senate rule that says you have to go in the regular
16 order of business.
17     So, implying that there is a two-thirds rule
18 would imply that that two-thirds rule is the same rule
19 that has to do with a -- the printing rule because you
20 have to have a two-thirds majority, and it's the exact
21 same vote that you have to have to suspend the regular
22 order of business.
23     Q. Thank you.
24     And is there a particular rule in the Senate
25 Rules that embodies some of what you just testified

30

1  about in terms of the two-thirds required to suspend
2  rules or is it throughout the rules, it refers to
3  two-thirds?
4      A. And I'm -- I probably should ask you -- it is my
5  belief -- and I'm sorry, I cannot point to it but I
6  believe in the Senate Rules, there is a rule that says
7  that if you want to suspend an existing Senate rule, it
8  would take a two-thirds majority of the Senate to
9  suspend that existing rule.
10     Q. I'm glad you've turned to that because I'm going
11 to direct your attention now to Rule 5.13 on Page 26,
12 suspension of the regular order of business.
13     A. Okay.
14     Q. Do you recognize this rule?
15     A. Yes.
16     Q. What does this rule do?
17     A. This rule says exactly what it says. "No bill,
18 joint resolution or resolution affecting state policy
19 may be considered out of its regular calendar order
20 unless the regular order is suspended by a vote of
21 two-thirds of the members present."
22     Q. Is this your understanding of what people refer
23 to as the two-thirds rule, Rule 5.13?
24     MR. SWEETEN: Objection. Calls for
25 speculation. Compound.

31

1      You can answer.
2      A. This rule says exactly what it is. It is that if
3  you're going to take something out of the regular order
4  of business, it requires a two-thirds vote, but a
5  two-thirds vote is required on a printing if you're
6  going suspend, on a -- I don't know whether there's 15
7  but there's multiple rules that require a two-thirds
8  vote.
9      So, implying that this particular one is the
10 two-thirds vote, I would say no, that's not the case.
11 This is -- there is a two-thirds vote required to
12 suspend the regular order of business but it would be
13 improper to imply that it only applies to this.
14     Q. (BY MS. WESTFALL) I see. So, is it your
15 testimony that, generally speaking, the Senate requires
16 two-thirds of the Senators to vote in favor of anything,
17 many rules throughout the rules?
18     A. No. Every rule, if you do it in the order that
19 you're supposed to, is a majority vote. If you want to
20 change or get away from the regular rules and not do it
21 in the rules of the Senate, you have to have a vote of
22 two-thirds of the members to suspend that existing
23 Senate rule.
24     Q. Do you recall in the 2011 session which bills or
25 resolutions were considered under the regular order of

32

1  business?
2      MR. SWEETEN: You can testify as to matters
3  of the public record.
4      A. All business in the 2011 session was considered
5  according to the regular order of business. That is our
6  rule.
7      Q. (BY MS. WESTFALL) Which bills or resolutions did
8  not -- only required a majority vote to pass on the
9  merits?
10     A. Special orders did not require a two-thirds vote.
11 House bill days that we -- generally it's usually
12 allocated -- I believe it's Wednesday and Thursday. On
13 that day when you bring up House bills, a two-thirds
14 vote is not required on those bills as long as they're
15 done in the regular order of business. That would be
16 the regular order of business and we bring those up and
17 it would not require a two-thirds vote to suspend the
18 regular order of business because you're doing them in
19 that order.
20     Q. Sitting here today concerning the 2011 session,
21 can you remember or describe or list all of the bills
22 that were considered in the regular order of business?
23     A. I'm sorry, I could not list all the bills.
24     Q. Do you know how many were?
25     A. I do not know how many.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                    June 13, 2012

33

1    Q. Was it fewer than 10?
2    A. I'm sorry?
3    Q. Was it fewer than 10?
4    A. I'm sorry, I've said I don't remember the bills
5    or the number of bills.
6    Q. Was it -- my question stands.  Was it fewer than
7    10, to the best of your recollection?
8        MR. SWEETEN:  Objection.  Asked and
9    answered.  Objection.  Foundation.
10       THE WITNESS:  Did you tell me to answer?
11       MR. SWEETEN:  You can answer if you can
12   answer the question.  I'm not prohibiting you from
13   answering.
14   A. There were -- on the House bills coming over,
15   approximately half of the bills considered in the
16   legislative session come from the House, and if the
17   House bills are considered in regular order, there is
18   not a suspension vote necessary.
19       So, I'm sorry, I can't answer that question.  I
20   don't know the number.
21   Q. (BY MS. WESTFALL)  Okay.  So, your testimony is
22   you do not recall the number of bills in the 2011
23   session that were considered by regular order of
24   business?
25   A. I do not.

34

1    Q. And what is a special order?
2    A. A special order, as you've seen in 5.01 -- was
3    that the number?
4    Q. I'll turn your attention to Page 24 at Rule 5.11.
5    A. I'm looking at 5.09.  A special order is at the
6    top of the regular order of business.  So, if something
7    is specified as a special order, it moves to the top of
8    the list.
9    Q. Turning your attention to Rule 5.11 on Page 24.
10   A. Yes.
11   Q. Do you see that section about special orders?
12   A. Yes.
13   Q. What is a special order?
14   A. 5.11 says, "Any bill, resolution or other measure
15   may on any day be made a special order for a future time
16   of the session by an affirmative vote of two-thirds of
17   the members present."
18   Q. Under what circumstances are bills designated as
19   special orders?
20       MR. SWEETEN:  Don't answer that question if
21   it would reveal matters of legislative privilege, your
22   thoughts, mental impressions, motivations regarding any
23   specific legislation.
24       MS. WESTFALL:  Mr. Sweeten, this is not
25   about a particular piece of legislation.  This is about

35

1    the Senator's knowledge of the rules.
2        MR. SWEETEN:  You're asking then general
3    information?
4    A. And I'll answer general.  What you're referring
5    to here is if a special order had not been designated
6    specifically in the Senate Rules.  If the Senate Rules
7    are established and in the Senate Rules themselves, you
8    designate items that would be a special order, that is a
9    majority vote of the Senate to establish that.
10       Once they are in the Senate Rules and the Senate
11   Rules are established and it's been designated that it
12   would only require a majority vote, that would refer
13   back to Rule 5.09, which would put the special order as
14   the number 1 bill on the order of business and would
15   only require a majority vote.
16       If someone wanted to change all other order and
17   make it a special order, they would be suspending the
18   existing rules, the Senate Rules, and it would take a
19   two-thirds vote.
20       But this has no -- this is no different than if
21   someone was in the regular order of business, their bill
22   was number 100 and they wanted to suspend the regular
23   order of business, it would have the same weight.
24   Q. (BY MS. WESTFALL)  When do special orders usually
25   arise in the session?

36

1    A. Since I've been in the Senate, any time that
2    there was an issue that was a -- either a very large
3    specific issue, difficult issue, it could be and often
4    was given the status of special order.
5    Q. Was that usually --
6    A. I'll add that almost every session since I've
7    been in the Senate, there has been something specified
8    as a special order.  And my understanding is, looking at
9    the history of the Senate prior to me getting there when
10   there was Democratic control, they used the special
11   order virtually every session.
12   Q. Would the special orders that you just testified
13   to, would they be set during the session if a Senator
14   made a motion to create a special order or were they
15   usually embodied in the Senate Rules themselves?
16   A. The more logical way to do it would be to embody
17   it in the Senate Rules.  And the Senate Rules could
18   either be established at the start of the session or
19   they could be amended at any time during the session.
20       This is a method -- this is a method to do that
21   but if you did that, you had to have a two-thirds -- so,
22   this is a way to establish a special order.  I would say
23   it's more likely that it would happen in the Senate
24   Rules themselves as a special order.
25   Q. Do you recall -- other than the special order



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                    June 13, 2012

37

1  regarding voter ID requirements in the 2011 and 2009
2  Rules, do you recall any other special orders that were
3  created in the Senate Rules themselves, to your
4  knowledge?
5      A.  In what year?
6      Q.  Any year in which you've served in the Senate.
7      A.  I'm going to answer you, you know, what I -- I
8  cannot give you specifics but these are issues that I
9  do -- I believe were special orders.
10     Through time, there have been multiple budgets
11 that were put into special order and we voted on.  There
12 have been redistricting plans not only in the current
13 time when the Republicans control but also prior to me
14 getting in the Senate, when the Democrats controlled,
15 that they did special orders for redistricting because
16 they listed that.
17     Prior to me getting to the Senate, when I was in
18 the House, there was a workers' compensation bill that I
19 believe -- my understanding was that it was placed as
20 special order.
21     At that time, there were over two-thirds of the
22 members in the House that were Democrat and about
23 four-fifths of the members in the Senate that were
24 Democrat, with a Democrat speaker and a Democrat
25 Lieutenant Governor, and they placed that as a -- it's

38

1  my understanding that they placed that as a special
2  order in the Senate Rules.
3      Q.  And it's your testimony that with regard to
4  budgets, redistricting and worker's comp that there were
5  special specific -- that they were specified as special
6  orders in the Senate Rules themselves; is that right?
7      A.  That's my understanding.
8      Q.  And was it your testimony that any bill could be
9  made a special order with a two-thirds vote of the
10 Senate during session?
11     A.  It is my testimony that there's two different
12 methods to become a special order.  One is that if you
13 amend -- if you either establish it in the Senate Rules
14 that are voted at the start of the session or you do an
15 amendment to the Senate Rules, you can do it that way;
16 or if you want to establish something as a special
17 order, I could move to do a suspension of Rule 5.11 to
18 establish a special order of Senate Bill 6 and if the
19 members chose to establish a special order, they could
20 do that.
21     Q.  How many special orders were there in the 2011
22 session?
23     A.  I don't know.
24     Q.  Were there more than 10?
25     A.  I'm sorry, I don't know.

39

1      Q.  To your knowledge, were the Senate Rules in 2011
2  amended at all?
3      A.  Well, yes.  Every session, at the start of the
4  session, the membership goes into caucus, and there will
5  be usually a review of the rules by members of the
6  Senate.
7      They will come back and recommend changes to the
8  Senate Rules.  Those Senate Rules come before the
9  Senate, and there is a -- they're added to the Senate
10 Rules, and then we go to the floor, and we take a vote
11 on the floor.
12     Q.  Does the Lieutenant Governor's Office recommend
13 changes to the rules?  Is he in charge of that?
14     A.  The changes are from the Senators.
15     Q.  But is that done by the whole Senate or by a
16 committee of the Senate or a sub group of the Senate?
17     A.  There is a general sub group that does the review
18 and comes back with recommendations but the vote is by
19 the Senate as a whole.
20     Q.  Who is in that sub group?
21     A.  It would be generally someone who would be
22 appointed by the Dean of the Senate, which is a
23 Democrat.
24     Q.  Is that Mr. Whitmire?
25     A.  Whitmire.

40

1      Q.  Who else besides Mr. Whitmire recommends changes
2  to the rules?
3      A.  It's my understanding that any time that
4  happens -- Senate Whitmire is the Dean of the Senate, he
5  runs the meetings, he makes the recommendations.  So,
6  any appointments to people to do a review would come
7  from him.
8      Any member that -- if I had something I wanted to
9  change, I could bring it forward but whoever is doing
10 the review -- I could bring it forward and I could offer
11 an amendment.  If I disagreed with the rules as they're
12 coming out, I could offer to have an amendment when it
13 comes at the floor, and the amendment would be a
14 majority vote.
15     Q.  Who was on the committee in 2011 who recommended
16 the Senate Rules for that session besides Mr. Whitmire?
17         MR. SWEETEN:  You can answer as to matters
18 of public record.
19         THE WITNESS:  Okay.
20         MR. SWEETEN:  And if you don't know --
21     A.  I'm not aware of whether there was a public
22 record on it but I also don't know who they are.  So,
23 the answer is the same.  I don't know whether it was a
24 public record but I also don't remember who they were.
25     Q.  (BY MS. WESTFALL)  What is the general purpose of



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Troy Fraser                                                      June 13, 2012

41

1   having a requirement that two-thirds of the Senators
2   vote in favor of suspending the rules or any of the
3   other things you testified about requiring two-thirds?
4           MR. SWEETEN:  He's not --
5           MS. WESTFALL:  Mr. Sweeten, that's a
6   general --
7           MR. SWEETEN:  He's not answering the
8   question as phrased, period.  So, you can rephrase it if
9   you want to ask a general purpose of a rule.  He's not
10  answering a question, "As to everything you just said,
11  what's the purpose of it?"  Absolutely not.
12      Q.  (BY MS. WESTFALL)  I'm going to withdraw my
13  question and try again.
14          What is the general purpose of the two-thirds
15  rule?
16      A.  You'll have to be more specific because there's
17  no such thing as a two-thirds rule.  There is a
18  two-thirds vote required on specific items, and if you'd
19  like to address a specific item, I'll attempt to answer
20  that.
21          MS. WESTFALL:  Mr. Sweeten, as you know, the
22  Court has directed that Senator Fraser sit and answer
23  questions about the general purpose of the two-thirds
24  rule.
25          The Senator has testified that two-thirds

42

1   applies to a variety of rules, and I am asking him to
2   testify as to the purpose of two-thirds vote being
3   required in a variety of settings, and I ask your
4   indulgence of being permitted to ask this question in
5   order to resolve any conflicts that there may be between
6   your witness and the Court.
7           THE WITNESS:  I'd like to answer.
8           MR. SWEETEN:  Okay.  Let me just -- let me
9   explain my objection, which is when you ask the question
10  as phrased, you basically referenced every bit of
11  testimony that he had just testified about the Senate
12  Rules.  There's no possible he could have answered the
13  question that you phrased.
14          If you're asking about why the two-thirds
15  rule applies in certain circumstances, he can give a
16  general purpose answer as to the reason for that since
17  he's indicated he thinks he can answer your question.
18      Q.  (BY MS. WESTFALL)  Can you answer my question?
19      A.  Okay.  I would respectfully address the question
20  that I think the Court has ordered, and I would clarify
21  again that the requirement to have a two-thirds vote is
22  a -- we operate under Robert's Rules of Order.
23          If you look in Robert's Rules of Order, if
24  there's an established rule and you want to suspend that
25  rule, generally, it requires a two-thirds vote of those

43

1   present.  That's per Robert's Rules of Order.
2           Now, there are exceptions to that.  There are
3   times where it requires a four-fifths vote.  We have
4   multiple four-fifths votes in the legislature, some of
5   them referring to what you're talking about, which is a
6   regular order of business.
7           So, when you refer to the two-thirds rule, I
8   still say there's not something that is clearly the
9   two-thirds rule.
10          We do have a rule that if you want to take
11  something out of the regular order of business,
12  according to Robert's Rules of Order -- which you said
13  what is the purpose, the purpose is to follow
14  parliamentary procedure as defined by Robert's Rules of
15  Order, which we follow, and those are the rules of the
16  parliamentary procedure that we follow.
17      Q.  Why is it necessary to have that rule for the
18  Senate?  What is the purpose of the rule?
19          MR. SWEETEN:  You can answer as to the
20  general purpose of the rule.  I think you have.  You
21  don't have to give more than what is the general
22  purpose.  That's what the Court has provided.
23          So, if you have additional general purpose
24  information, you can answer but you don't have to give
25  additional.

44

1       A.  Robert's Rules of Order have been established
2   through -- I'm not -- I don't have how long they've been
3   in existence but a long time, and it was set up in order
4   that you have something where you have to determine the
5   parliamentary procedure of the order of things as they
6   should proceed.
7           I think it is the accepted method of
8   parliamentary procedure and is -- I was taught that at
9   an early age and have known parliamentary procedure for
10  a long time.
11          But under Robert's Rules of Order, unless it's
12  specifically specified, everything is a majority vote,
13  and if there's going to be an exception to that where
14  you're either suspending or you're having a special
15  request, it is elevated to a higher vote.
16          In Congress, they have to have a 60 -- a
17  three-fifths vote in order to proceed.
18          And our Senate Rules, the Robert's Rules of
19  Order, I believe, recommend a two-thirds vote but we
20  also have if a bill is in the regular order of business
21  during the first 60 days of the session, it takes a
22  four-fifths vote.
23      Q.  (BY MS. WESTFALL)  Turn your attention to Page
24  22, the notes of rulings under Rule 5.09.
25      A.  I'm sorry?

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                    June 13, 2012

45

1     Q.  Under the order of considering bills and
2   resolutions, Rule 5.09, there are notes on Page 22.  And
3   do you see the first note is, "The order of business as
4   set forth above may be changed by a two-thirds vote of
5   the Senate," and it refers to the Senate Journal and
6   1931?
7     A.  Uh-huh.
8     Q.  Does that at all relate to the Robert's Rules
9   you've just testified to or do you not know?
10     A.  I'm sorry, I can't answer that because I wasn't
11   in the Senate in 1931.  I would have loved to have been
12   but I wasn't.
13     Q.  Where do Robert's Rules come from?
14     A.  I'm sorry, I don't know that either.  I know that
15   I was taught Robert's Rules of Order as a 13 year old in
16   school.  So, they've been around at least 50ish years.
17   Past that, I don't know.
18     Q.  So, I understand your testimony is that the
19   Senate follows this two-thirds procedure in many context
20   throughout the rules based on adherence to the Robert's
21   Rules; is that right?
22        MR. SWEETEN:  Objection.  Vague.
23        You can answer.  You can answer as to the
24   general purpose of the rules.
25     A.  It is my belief that we always follow the

46

1   Robert's Rules of Order if we can but they're also
2   guided by the Senate Rules.
3        And the Senate Rules are if there's a rule of the
4   Senate and it has been established, it will be the
5   presiding rule of the Senate.
6     Q.  (BY MS. WESTFALL)  Why does the Senate generally
7   require the support of two-thirds Senators?  What is the
8   purpose of that rule?
9        MR. SWEETEN:  I think you've asked and
10   answered the question.  If you have more on the general
11   purpose, you can answer.  Otherwise, you don't have to
12   give more than what the general purpose is.
13     A.  The -- any time that a two-thirds vote is
14   required, it's because you are doing a deviation from an
15   established Senate rule.  If you're going to deviate
16   from that, you have to suspend the existing Senate rule
17   in order to move to the rule that you're talking about
18   but it could be on a multiple of issues, and it is not
19   just specific to one particular area.  The two-thirds
20   suspension vote could apply to many, many topics.
21     Q.  (BY MS. WESTFALL)  Thank you for your testimony.
22        Getting back to what is the purpose of the
23   two-thirds rule -- strike that.
24        Your Chief of Staff, Janice McCoy, testified in
25   her deposition that the purpose of this two-thirds vote

47

1   in a variety of settings, in a variety of reasons, is to
2   get general consensus in the Senate.  That was her
3   believe of the purpose of this rule.  Do you agree with
4   the testimony of Ms. McCoy?
5        MR. SWEETEN:  Objection.  Assumes facts not
6   in evidence.
7        You can answer.
8        I think he's answered as to general purpose.
9   So, I really don't think this is an appropriate question
10   but --
11     A.  I am a Senator.  I'm responsible for my vote.  I
12   vote in accordance to Senate Rules.  Senate Rules
13   require that you have to follow regular order of
14   business.  If you don't do that, then it's required a
15   two-thirds vote to either suspend that rule or suspend
16   others.
17     Q.  (BY MS. WESTFALL)  So, is it your testimony that
18   two-thirds vote is required for various reasons
19   throughout the Senate Rules because you're adhering to
20   that rule?  Is that your testimony?
21        MR. SWEETEN:  Objection.  Asked and
22   answered.  I think he's already provided an answer as to
23   the general purpose.  This has been now asked probably
24   five times.  So, I think he's answered the question.
25     A.  The two-thirds rule applies any time that you are

48

1   going to have to deviate from an existing rule of the
2   Senate.  There are multiple times and reasons you do
3   that but any time you deviate from the Senate Rules, it
4   would require at least a two-thirds vote to suspend
5   that, and occasionally a four-fifths vote.
6     Q.  (BY MS. WESTFALL)  What is the purpose of
7   requiring two-thirds vote when you are deviating from
8   the regular Senate Rules?
9     A.  The two-thirds vote rule is -- you know, I
10   believe, is according to Robert's Rules of Order that
11   says that if you have an existing Senate rule that
12   requires a majority vote, if you're going to deviate
13   from that and not stay within that, if you're not going
14   to observe the 48-hour printing rule, if you're not
15   going to observe the 24-hour layout rule and you want to
16   suspend that, it takes a minimum of a two-thirds vote to
17   do that.
18        So, the purpose would be that if you're going to
19   deviate, you have to use that rule to deviate.
20        MS. WESTFALL:  Would you mark this 552.
21        (Exhibit 552 marked.)
22     Q.  (BY MS. WESTFALL)  You've been handed what's been
23   marked US Exhibit 552.  Do you recognize this document?
24     A.  I believe you've handed me something that says on
25   the face Senate Rules adopted 2009, January 14th.  I'm



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                          June 13, 2012

49

1   assuming that everything inside are those rules. I have
2   not read the document but I'm assuming by you handing it
3   to me that that's what you're representing.
4       Q. I will represent to you that it is a full,
5   complete, nonexcerpted copy of the 2009 Senate Rules.
6       A. Okay.
7       Q. I would like you to turn your attention to Rule
8   5.11 in the 2009 rules and Rule 5.11 in the 2011 rules.
9   And tell me when you have a chance --
10      A. Both of them?
11      Q. Yes.
12      A. Okay. 5.11?
13      Q. Yes.
14      A. Okay.
15      Q. I think it's Page 24 for both sets of rules, if
16  that helps. Are you there, sir?
17      A. I'm there.
18      Q. I believe you testified earlier that Rule 5.11 A
19  means that any bill, resolution, et cetera, may be made
20  a special order for a future time by an affirmative vote
21  of two-thirds members present; is that right?
22      MR. SWEETEN: Do you mean in his first
23  deposition or do you mean in this one?
24      MS. WESTFALL: I mean today.
25      MR. SWEETEN: Objection. Misstates

50

1   testimony.
2       You can answer the question.
3       A. 5.11, as we discussed earlier, says that if
4   you're going to establish a special order after -- that
5   was not established initially in the Senate Rules, that
6   would be a deviation from the Senate Rules and would
7   require a two-thirds vote, as many, many other votes do.
8       Q. (BY MS. WESTFALL) And are you referring to Rule
9   5.11 A?
10      A. Yes.
11      Q. Is that true for both the 2009 and the 2011
12  rules?
13      A. Unless I'm missing something, it appears that
14  both of those are exactly the same.
15      Q. So, your testimony is yes, it applies to both
16  rules?
17      A. I'm testifying that what I read as what you
18  represent as the rules, that both of those say exactly
19  the same thing.
20      Q. Turning your attention to Rule 5.11 D for both
21  the 2009 and 2011 rules, could you compare those
22  sections?
23      A. I'm sorry?
24      Q. Could you compare 5.11 D in the 2009 rules and
25  2011 rules and tell me if there are any differences?

51

1       A. I do believe it's the same.
2       Q. What does Rule 5.11 D do?
3       A. It says, "Notwithstanding Subsection A of this
4   rule, a bill or resolution relating to voter
5   identification requirements reported favorably from the
6   Committee of the Whole Senate may be set as a special
7   order for a time at least 24 hours after the motion is
8   adopted by a majority of the members of the Senate."
9       Q. Why does it refer to a 24-hour period after being
10  reported from the Committee of the Whole?
11      MR. SWEETEN: Don't answer the question.
12  You can answer the general purpose of the rule but you
13  don't have to explain the why something was done a
14  certain way or your mental impressions regarding that.
15  Okay?
16      A. And my answer is going to be that I don't know
17  for sure other than potentially there is a 24-hour
18  layout rule of things moving forward, and I'm assuming
19  that would allow for that 24 hours.
20      Q. (BY MS. WESTFALL) What is the 24-hour layout
21  rule?
22      MR. SWEETEN: You can answer as a general
23  matter of Senate procedure.
24      A. And I'm sorry, you're getting into an area that
25  I'm -- I will tell you what I believe it to be, that

52

1   when a bill is reported from committee, that you have to
2   wait 24 hours layout before that bill could be
3   considered by the Senate.
4       Q. (BY MS. WESTFALL) What is the usual rule for how
5   long it takes to go from committee to the floor, the
6   minimum amount of time?
7       A. I believe the -- the rule that I just stated to
8   you that I believe is the rule applies to all bills.
9       Q. So, it's a minimum of 24 hours for all bills; is
10  that correct?
11      A. Yes.
12      Q. If that's the case for all bills, do you know why
13  it would have had to be included in Rule 5.11 D, that it
14  would have to specify 24 hours?
15      A. I do not know.
16      Q. Are there any different rules to --
17      MR. SWEETEN: Let me -- when you -- pause
18  when you answer and let me make my objection, if it's
19  necessary.
20      THE WITNESS: Okay.
21      MR. SWEETEN: Okay. Go ahead.
22      Q. (BY MS. WESTFALL) Do you know whether there's
23  any difference between bills reported out of the
24  Committee of the Whole Senate and other committees as to
25  the minimum amount of time that is required for the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Troy Fraser                                                                                                          June 13, 2012

53

1    layout of the bill?
2          MR. SWEETEN:  You can answer as a general
3    matter.
4      A.  My answer will have to be I am not for sure but
5    it is my belief that the same rules apply.
6      Q.  (BY MS. WESTFALL)  So, it would be 24 hours for
7    any committee, regardless of whether it's the Committee
8    of the Whole or others?
9      A.  That would be my belief.
10     Q.  Is it your understanding that under some --
11     A.  Excuse me.  I've got to move that.  Sorry.
12     Q.  Do you want to go off the record?  Are you okay?
13     A.  I'm fine.
14     Q.  Is it your understanding that bills considered in
15   the Committee of the Whole could, under some
16   circumstances, be considered immediately by the full
17   Senate?
18         MR. SWEETEN:  You can answer as a general
19   matter.
20     A.  I don't know the answer to that.
21     Q.  (BY MS. WESTFALL)  Is it your understanding that
22   Rule 5.11 D was put into place in the Senate Rules
23   before the Senate went into session in January, 2011?
24         MR. SWEETEN:  You can answer.
25     A.  Would you repeat that?

54

1      Q.  (BY MS. WESTFALL)  Let me strike that question.
2    Let me try a more artful question.
3          Is it your understanding that Rule 5.11 D was
4    drafted before the Senate went into session in January,
5    2011?
6      A.  No.
7      Q.  How do you know that?
8          MR. SWEETEN:  Don't reveal matters of
9    privilege in answering the question.  Do you want me to
10   go over what those areas would be?
11         THE WITNESS:  I think I'm fine in answering
12   this one.
13         MR. SWEETEN:  Okay.  Well, don't reveal
14   communications you've had with other Senators, don't
15   reveal communications you've had with leg staff,
16   agencies, TLC, and don't reveal your thoughts and mental
17   impressions when answering the question.  Those would be
18   subject to the legislative privilege.  Go ahead.
19     A.  This bill was an existing Senate rule brought
20   forward.
21     Q.  (BY MS. WESTFALL)  I'm talking about the -- I'm
22   referring you to Rule 5.11 D.
23     A.  Uh-huh.
24     Q.  Is it your testimony that because it was in the
25   2009 rules, it was in place in 2009, so, it carried

55

1    forward to 2011; is that right?
2      A.  That is my testimony.
3      Q.  In 2009 or 2008, when was the first time you
4    heard about the possibility of including a provision
5    like Rule 5.11 D in the 2009 rules, without revealing
6    any communications you've had with any other legislator?
7      A.  I'd like to go off the record and have a
8    discussion with counsel.
9          MR. SWEETEN:  We can discuss privilege, yes.
10         THE WITNESS:  I don't think there's a
11   problem with answering it.
12         MR. SWEETEN:  Are you going to have an issue
13   with this?  Because I'm allowed to talk to him about
14   matters relating to privilege.  The rules allow for it.
15         MS. WESTFALL:  Can you direct him on the
16   record whatever your instruction is, Mr. Sweeten.
17         THE WITNESS:  I think I'm okay to answer it.
18         MS. WESTFALL:  I have a question pending,
19   so, I'm reluctant to --
20         MR. SWEETEN:  That's fine but here's what
21   we're going to do:  If she's asking you about
22   communications that occurred that would be subjective to
23   the legislative privilege, do not reveal the substance
24   of the communications.
25         You can reveal whether you had a

56

1    conversation or a -- privilege log stuff, like when it
2    happened, who with, but do not reveal the substance of
3    any sort of communication about Rule 5.11.
4      A.  Would you repeat the question?
5          MS. WESTFALL:  Would you read back the
6    question, please.
7          (Whereupon, the requested testimony was read back
8    as follows:
9          QUESTION:  In 2009 or 2008, when was the first
10         time you heard about the possibility of including
11         a provision like Rule 5.11 D in the 2009 rules,
12         without revealing any communications you've had
13         with any other legislator?)
14     A.  The first I knew of this rule is when it was
15   brought forward and voted on by the Senators.
16     Q.  (BY MS. WESTFALL)  Was that in January, 2009?
17     A.  Yes.
18     Q.  You had never heard of any communication about
19   the concept of Rule 5.11 D prior to that time?
20     A.  No.
21     Q.  Was redistricting in 2003 designated as a special
22   order in the rules?
23     A.  I'm sorry, I don't know.  I believe it was but I
24   do not know.
25     Q.  Was redistricting -- was any redistricting bill



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

57

1  that you've ever been involved in, was it considered by
2  the Committee of the Whole?
3      A. Again, I don't have a recollection. I don't
4  remember.
5      Q. Are you aware of any other bill besides voter ID
6  that has been both subject to being set forth as a
7  special order in the rules and considered in the
8  Committee of the Whole?
9      A. You've asked a very broad question, and I
10  can't -- I can't give you a yes answer on that because I
11  can't say that I know of issues that were both special
12  orders and Committee of the Whole because we have had
13  some of each but I don't know that they were connected.
14  I can't say.
15     Q. (BY MS. WESTFALL) Was there any time in the
16  2000 -- prior to the 2009 legislature that you became
17  aware of any discussions whatsoever about amending the
18  Senate Rules for voter ID?
19         MR. SWEETEN: Objection. Asked and
20  answered.
21         THE WITNESS: What did you just say?
22         MR. SWEETEN: I just said objection. Asked
23  and answered.
24         THE WITNESS: That means I've already
25  answered it?

58

1         MR. SWEETEN: That's my objection but you
2  can answer if you can. I'm objecting to her question as
3  already having been asked and answered.
4      A. My answer is the same as I just gave, that I have
5  not -- I was not made aware or hadn't discussed it prior
6  to it coming forward in the rules recommendation for a
7  vote. It was laid out and explained prior to a vote of
8  the Senate, and that's the first I saw of it.
9      Q. (BY MS. WESTFALL) In 2007 -- strike that.
10     Was there a time in 2008 when you heard anything
11  about any procedures related to how voter ID would be
12  handled in the Senate in 2009?
13         MR. SWEETEN: Objection. Vague. Objection.
14  Asked and answered.
15         You can answer.
16     A. No. The answer is no.
17     Q. (BY MS. WESTFALL) You sponsored the voter ID
18  bill in the Senate in 2009; isn't that right?
19     A. Yes.
20     Q. That was Senate Bill 362; is that correct?
21     A. Yes.
22     Q. Is it your testimony that you were not aware of
23  any conversations prior to the filing of that bill
24  related to how it would be considered procedurally in
25  the Senate in 2009?

59

1      A. No. You're saying were there -- was I aware of
2  it? I was not aware of any conversations about how it
3  would be considered, no.
4         MR. SWEETEN: Same objection to the
5  question.
6      Q. (BY MS. WESTFALL) Did you hear of any
7  conversations in 2009 or 2010 about how voter ID bills
8  would be handled procedurally in the 2011 legislature?
9         MR. SWEETEN: Objection. Vague. Objection.
10  Compound.
11     A. I was aware that the rule would be carried -- or
12  would be recommended to be carried forward, not to be
13  removed. I knew that the rule was in the Senate Rules.
14  And I need to clarify my answer.
15         MR. SWEETEN: Don't reveal the substance of
16  any communications you've had with anyone.
17     A. I need to clarify that I was aware that the rule
18  was existing in 2009. And when the rules were laid out
19  in 2011, I read the rules, and I saw that the rule was
20  still there. So, that was when I was aware that it
21  would be carried forward, but no, that was the only
22  communication.
23     Q. (BY MS. WESTFALL) So, prior to seeing the rules
24  in 2011, you were not aware of any -- not a single
25  conversation prior to that time about carrying forward

60

1  the rule from 2009 to 2011?
2         THE WITNESS: Privileged communication?
3      Q. (BY MS. WESTFALL) Without revealing the
4  substance of the communication.
5         MR. SWEETEN: She's asking did a
6  communication occur but don't answer as to the substance
7  of any communication, just if there was a communication.
8      A. Yes. Yes.
9      Q. (BY MS. WESTFALL) I'm sorry, we had the --
10     A. You asked was there a communication, and the
11  answer is yes.
12     Q. When was the first communication that you had
13  about the procedures for voter ID in 2011?
14     A. Probably a month from session.
15     Q. Would that be sometime in December, 2010?
16     A. Yes.
17     Q. Were you, yourself a party to that communication?
18     A. Yes.
19     Q. Who else was in the conversation?
20         THE WITNESS: Can I answer that question?
21         MR. SWEETEN: You can answer as to who was
22  another party to the conversation.  Do not reveal the
23  specifics.
24     A. Senator Williams.
25     Q. (BY MS. WESTFALL) Was anyone else involved in



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                      June 13, 2012

61

1    that conversation?
2    A. No.
3    Q. It was only the two of you?
4    A. Yes.
5    Q. Was that an in-person discussion?
6    A. Yes.
7    Q. Were your staff people there?
8    A. I'm sorry. Just a second. I need to retract the
9    question about the date. I will say it was an in-person
10   but it would have been at the start of the session
11   because I don't believe I saw him in December. So, it
12   would have been in and around the first -- either the
13   day before or a day after the start of session would be
14   that conversation.
15   Q. And that was the first conversation that you had
16   about procedures --
17   A. Yes.
18   Q. -- in regards to Senate Bill 14?
19   A. Yes.
20   Q. Did you have any other conversations besides that
21   one with Senator Williams about the procedures for
22   Senate Bill 14?
23   A. No.
24   Q. Did you have any conversations with anyone in
25   Mr. Dewhurst's office?

62

1        MR. SWEETEN: And when you say
2    conversations, just general conversations, are you
3    asking about the timing of the --
4        MS. WESTFALL: The procedures to be employed
5    for Senate Bill 14.
6        MR. SWEETEN: Okay.
7    Q. (BY MS. WESTFALL) Did you have any conversations
8    with anyone in Mr. Dewhurst's office?
9    A. And I'm going to qualify your question. We
10   advised Governor Dewhurst's office --
11       MR. SWEETEN: Do not tell her what you
12   advised or discussed or the substance of the
13   conversation. You can tell whether you had a
14   conversation, the existence of the communication only.
15   A. There was a one-way conversation.
16   Q. (BY MS. WESTFALL) Was that conversation between
17   you or your office and Mr. Dewhurst's office about
18   Senate Bill 14 --
19   A. Yes.
20   Q. -- prior to the session?
21   A. Yes.
22   Q. Was there more than one communication?
23   A. No.
24   Q. I believe you testified earlier that you advised
25   the Lieutenant Governor's Office that you were filing;

63

1    is that correct?
2    A. Yes, that is what I'm referring to.
3    Q. Was that in November or December, 2010?
4    A. It was likely the first of December because you
5    can't file a bill until 30 days prior to, and in order
6    to establish that I was going to refile, I'm sure --
7        MR. SWEETEN: Hold on a minute. Do not
8    start expressing reasons for why you communicated with
9    him or the substance of that communication. She's just
10   asking you did a communication occur.
11   A. Approximately December the 8th of 2008 would have
12   been in that range when it would have happened.
13   Q. (BY MS. WESTFALL) Are you talking about 2008 or
14   2010, about 362 or --
15   A. 362 was 2008. 2010 for Senate Bill 14.
16   Q. Did you advise the Lieutenant Governor's Office
17   approximately the same time in December --
18   A. I'm sorry, your -- I need to retract that. You
19   led me down a path I didn't mean to go.
20       I don't remember a communication with them on
21   362. I do remember a communication on Senate Bill 14.
22   Q. And that was approximately December 8, 2010; is
23   that right?
24   A. Yes. Yes.
25   Q. And that was the communication between you or

64

1    your office and Mr. Dewhurst's office?
2    A. Yes.
3    Q. Related to the filing of Senate Bill 14; is that
4    correct?
5    A. Yes.
6    Q. Other than the communication with Senator
7    Williams about procedures for Senate Bill 14 in January
8    and this communication with Mr. Dewhurst, do you recall
9    any other communications with any of the members of
10   Senate, House, Governor's Office, Lieutenant Governor's
11   Office about the Senate Bill 14?
12   A. You've asked a very broad question. Not with the
13   Governor, not with House members but after we started
14   session, there were communication with other Senators
15   that they were aware that I had filed it.
16   Q. Okay. But prior to the session starting, there
17   were no other communications besides with Mr. Dewhurst's
18   office and Mr. Williams' office?
19       MR. SWEETEN: We're talking about the '11
20   session, right?
21       MS. WESTFALL: Correct.
22   A. No.
23   Q. (BY MS. WESTFALL) May the Governor designate
24   legislation as emergency legislation?
25   A. May as in does he have the ability?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

65

1  Q. Yes.
2  A. Yes.
3  Q. What allows the Governor to designate legislation
4  as emergency legislation?
5  A. The Governor can -- you know, he can declare
6  anything an emergency legislation.
7      MS. WESTFALL: Could you mark this as 553.
8      (Exhibit 553 marked.)
9  Q. (BY MS. WESTFALL) You've been handed what's been
10  marked US Exhibit 553.
11  A. Could we go off the record?
12  Q. Certainly.
13      (Short recess.)
14      MS. WESTFALL: Let's go back on the record.
15  Q. (BY MS. WESTFALL) Before the break, you had been
16  handed what's been marked as US 553. Do you recognize
17  this document?
18  A. Appears to be the Senate journal for Monday,
19  January 24th, began the session of 1:38 p.m.
20  Q. This was 2011; is that correct?
21  A. 2011.
22  Q. Turning your attention to the second page of the
23  document, which is the 54th page of the Senate Journal,
24  do you see down toward the bottom of the page it has a
25  message from the Governor?

66

1  A. Yes.
2  Q. What does that message indicate?
3  A. Would you like me to read the message to you?
4  Q. Or you could summarize it, whatever you'd like.
5  And I'd like to direct your attention to the first such
6  message.
7      MR. SWEETEN: You can answer based on the
8  text of the document.
9  A. Would you like me to describe it?
10  Q. (BY MS. WESTFALL) Yes, please.
11  A. It appears that a message from the Governor was
12  read, the following message on January 20th, 2011, "I,
13  Rick Perry, Governor of the State of Texas, do hereby
14  submit the following emergency matter for immediate
15  consideration to the Senate and House of Representatives
16  of the 82nd Legislature, now convened. Legislation that
17  requires a voter to present proof of identification when
18  voting. Respectfully submitted, Rick Perry, Governor
19  over the State of Texas, January 20th, 2011."
20  Q. Thank you.
21      And does that refresh your recollection as to the
22  source of the Governor's power for making emergency
23  designations of bills?
24      MR. SWEETEN: Objection. Foundation. Go
25  ahead.

67

1  A. It doesn't refresh my memory of the power of the
2  Governor. I'm very aware of the power of the Governor.
3  No, it does not refresh my memory.
4  Q. (BY MS. WESTFALL) What is the power of the
5  Governor to designate certain areas of legislation as
6  emergency legislation?
7  A. I'm going to clarify your question. You're
8  asking me what power does the Governor have to specify a
9  piece of legislation?
10      The Governor has the -- he takes the authority
11  that he can declare any issue an emergency. Generally,
12  he does not specify a specific bill, which is what you
13  referred to.
14      So, as you stated the question, that would be
15  incorrect because he generally does not mention or state
16  a specific piece of legislation. He will specify an
17  issue.
18  Q. Where does he get that power from?
19      MR. SWEETEN: You can answer as a general
20  matter.
21  A. You're asking where does the Governor get that
22  power from?
23  Q. (BY MS. WESTFALL) Yes.
24  A. You're implying that he has a power. There is no
25  power associated with it because his designation has no

68

1  force of power or affect. So, I would not use the word
2  power.
3      The Governor can declare or submit -- which his
4  wording is very clear here. He submits the following
5  emergency matter. He submits it to the Legislature but
6  it has no force of power.
7  Q. And referring back to his message that you just
8  testified to, do you see that it indicates that he is
9  designating voter ID as an emergency legislation under
10  his powers under the Texas Constitution?
11  A. Your representation is not correct. He is not
12  designating. It very clearly says that, "Pursuant to
13  Section 5 of the Texas Constitution, by this special
14  message, I do submit the following emergency matter for
15  immediate" -- he is submitting it for consideration.
16  There is no power that goes with that that is in any way
17  implied by the Texas Constitution.
18      The Constitution allows him to declare something
19  an emergency but it has no force past that.
20  Q. Can you explain when he designates an area of
21  legislation as emergency legislation, how does he do it?
22      MR. SWEETEN: Do you mean -- I'm sorry --
23  Q. (BY MS. WESTFALL) As a general matter.
24      MR. SWEETEN: He's not going to talk about
25  the times or the Governor's motivation in doing that.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652



Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                          June 13, 2012

69

1   That would be subject to privilege and would call for
2   speculation.
3           Are you asking in what means it's done?
4           MS. WESTFALL: Yes.
5   Q. (BY MS. WESTFALL) I'm asking procedurally, how
6   does the Governor --
7   A. You need to rephrase your question because your
8   question didn't ask that.
9   Q. I'm going to withdraw my question and ask you,
10  procedurally, how does the Governor submit an area of
11  legislation as an emergency matter?
12  A. I do not know the procedure that the Governor
13  does. You know, I know when I read about it but I don't
14  know the procedure of how it's done.
15  Q. Thank you.
16      When the Governor submits something as an
17  emergency matter to the legislature, what affect does
18  that have?
19          MR. SWEETEN: You can answer as a general
20  procedural matter.
21  A. None.
22  Q. (BY MS. WESTFALL) You can totally disregard it,
23  as a Senator?
24  A. When you say "totally disregard," obviously, if
25  the Governor issued it, I noted that it was important to

70

1   him but in this case, if he would have really thought it
2   was important, I think they would have picked up the
3   phone and called me. I read about it in the newspaper.
4   Q. Are there any procedural consequences of the
5   Governor's designation of a particular area as emergency
6   legislation?
7           MR. SWEETEN: You can answer as a general
8   matter.
9   A. There's no consequences of this and, in fact,
10  there are numerous issues that are declared as emergency
11  items that never come before the Legislature.
12  Q. (BY MS. WESTFALL) Is it your testimony that it's
13  totally within the Senate's discretion as to how to
14  respond to an emergency designation from the Governor?
15  A. I would agree with that observation.
16  Q. So, you would -- strike that.
17      Emergency legislation, as designated by the
18  Governor, is not always considered within the first
19  60 days of session, is that your understanding?
20  A. No, it is not always considered.
21  Q. Is it usually considered within the first 60 days
22  of session?
23          MR. SWEETEN: You can answer as a general
24  matter.
25  A. It is not always considered, and there's --

71

1   occasionally, it is considered but also occasionally, it
2   is not considered in the 60 days. So, there's not a set
3   pattern of when an issue would be considered.
4   Q. (BY MS. WESTFALL) Based on the public record,
5   was there any consequence to the Governor's designation
6   of proof of identification when voting as an emergency
7   legislative matter in 2011?
8           MR. SWEETEN: Don't --
9           MS. WESTFALL: As a matter of public record,
10  Mr. Sweeten.
11          MR. SWEETEN: Still you're asking for his
12  thoughts, mental impressions as to what the consequence
13  of the Governor declaring this an emergency item was.
14      So, if you want to ask him if something was
15  expressed regarding that that he recalls in the public
16  record, that's one thing but you're asking him whether
17  or not -- what the procedural consequences were, and
18  that reveals legislative privilege.
19      I'm going to instruct you, on that basis,
20  not to answer the question.
21  Q. (BY MS. WESTFALL) Are you following advice of
22  counsel?
23  A. I would like the question reasked again.
24          MS. WESTFALL: Would you reread it, please,
25  Ms. Court Reporter?

72

1   (Whereupon, the requested testimony was read back
2   as follows:
3   QUESTION: Based on the public record, was there
4   any consequence to the Governor's designation of
5   proof of identification when voting as an
6   emergency legislative matter in 2011?)
7           MR. SWEETEN: If you answer the question, it
8   would reveal legislative privilege unless a specific --
9   something was uttered on the public record.
10  A. If you'd like to ask me about the first half of
11  the question and not specify about Senate Bill 14, I
12  would be glad to answer, if you would like to repeat the
13  question up to the point that you address Senate Bill
14  14.
15  Q. (BY MS. WESTFALL) I'll ask a different question.
16  A. Are you withdrawing that question?
17  Q. I'm going to let it be. I'm going to ask you
18  another question because I think you've asserted
19  privilege or your counsel has directed you to assert
20  privilege.
21  A. No, I have not done that at all. The question is
22  still before us. I'm telling you that the question that
23  you're asking, the majority of the question I'm willing
24  to answer but as you asked it in reference to a specific
25  piece of legislation, which was Senate Bill 14, that



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Troy Fraser                                                    June 13, 2012

73

1   would you force me to assert privilege.
2        So, if you will ask me the question on the
3   general matter without it being specific to that issue,
4   I'll be glad to answer your question.
5   Q. Thank you, sir.
6        Were there any -- strike that.
7   A. Did you withdraw your last question?
8   Q. No, it's pending but you've answered it, so,
9   we're on to another --
10       When the Governor designated legislation
11  requiring a voter to present proof of ID when voting in
12  January of 2011, were there any consequences or effects
13  in the Senate on the public record?
14       MR. SWEETEN: Don't answer.
15       Objection. Legislative privilege.
16  Q. (BY MS. WESTFALL) Senator, are you following the
17  advice of counsel?
18  A. Privileged. And I would ask you to reask the
19  question.
20  Q. Were there any procedural consequences on the
21  record as a result of the Governor's designation of
22  voter ID as an emergency legislative matter --
23       MR. SWEETEN: Same objection.
24  Q. (BY MS. WESTFALL) -- in 2011?
25       MR. SWEETEN: Same objection on legislative

74

1   privilege.
2   A. If you will ask the first part of the question as
3   a general sense about any emergency legislation and not
4   specify to Senate Bill 14, I'll be glad to answer the
5   question.
6   Q. (BY MS. WESTFALL) Are there any procedural
7   consequences when the Governor generally designates
8   legislation as an emergency?
9        MR. SWEETEN: You can answer the question.
10  A. No.
11  Q. (BY MS. WESTFALL) I believe you testified the
12  Senate can take it or leave it; is that right?
13  A. Did I say that?
14  Q. No, but I'm summarizing.
15  A. I believe you're putting words in my mouth, and I
16  don't believe I said that. I said there were no
17  consequences.
18  Q. The Senate may or may not take into consideration
19  the Governor's wishes?
20  A. The Senate will do their wishes.
21  Q. As a general matter, when the Governor designates
22  an issue area as emergency legislation, does the Senate
23  consider such legislation within the first 60 days?
24  A. There is no general rule. Every issue is
25  considered on its own merit.

75

1   Q. When did you first hear about the Governor
2   designating proof of voter ID in 2011 as emergency
3   legislation?
4   A. I read about it in the paper.
5   Q. Are you aware of any communications about the
6   Governor's designation of voter ID as emergency
7   legislation prior to it appearing in the Senate Journal?
8   A. With who?
9   Q. With anyone.
10  A. I'm not aware of any communications.
11  Q. Are you aware of any conversations or other
12  communications regarding the timing of consideration of
13  Senate Bill 14 by the Senate?
14  A. No.
15  Q. Are you aware of any conversations regarding
16  consideration of the Senate Bill 14 by the Committee of
17  the Whole prior to the session starting?
18  A. Prior to the session starting?
19  Q. Yes.
20  A. No.
21  Q. When did you first learn that the Committee of
22  the Whole would be considering Senate Bill 14?
23  A. And I believe you asked me that question in the
24  last deposition, and the answer remains the same, is
25  that my recollection is that I was advised by the

76

1   Lieutenant Governor's office that I would be recognized
2   on Senate Bill 14 on X date. It was about two days
3   before that happened.
4   Q. Is it your testimony that you filed Senate Bill
5   14 before the session started and that you were not
6   aware or party to any communications about how the
7   Senate would consider Senate Bill 14 until you had that
8   conversation or communication with Mr. Dewhurst's
9   office?
10  A. I'd like the question back. You've got -- I've
11  got a clarification I've got to make. I need to hear
12  the question again.
13       MS. WESTFALL: Could you read it back?
14       (Whereupon, the requested testimony was read back
15  as follows:
16       QUESTION: Is it your testimony that you filed
17  Senate Bill 14 before the session started and
18  that you were not aware or party to any
19  communications about how the Senate would
20  consider Senate Bill 14 until you had that
21  conversation or communication with Mr. Dewhurst's
22  office?)
23       MR. SWEETEN: Objection. Compound.
24       THE WITNESS: Am I free to answer?
25       MR. SWEETEN: Yeah, to the extent -- just

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                    June 13, 2012

77

1   don't reveal legislatively privileged matter or the
2   substance of any communication.
3       A.  I can't answer your question, and the reason I
4   can't answer your question is the bill that was filed
5   before session started, the one before, was given
6   another number.  I don't recall what that number was but
7   after we got into session -- or about the time we
8   started session, we refiled the exact same bill but they
9   designated a new number on the bill administratively.  I
10  don't know why that happened but we refiled the bill.
11      So, the question, as you asked it, is not
12  correct.  If you'd like to rephrase it and say the bill
13  that I filed, I'll be glad to answer your question.
14      Q.  (BY MS. WESTFALL)  Thank you for your testimony.
15      Did you have any communications with anyone about
16  that previous bill prior to the session starting?
17      A.  With anyone?
18      Q.  With anyone.
19      A.  Yes.
20      Q.  When was the first conversation that you had in
21  that regard?
22      A.  Probably in the summer of 2010.
23      Q.  Were you a party to that communication?
24      A.  Yes.
25      Q.  Who else was a party to that communication?

78

1       A.  Myself and the person that I was talking to.
2       Q.  And who was that individual?
3       A.  Skipper Wallace.
4       Q.  That was in the summer of 2010?
5       A.  It's my recollection it was sometime prior to the
6   start of the session in a three-month period.  I don't
7   remember when it was but it's my recollection that we
8   had a conversation some time prior to the session.
9       Q.  Did you only have one conversation with
10  Mr. Wallace?
11      A.  I can't answer that because I don't remember.
12      Q.  Was anyone else a party it that conversation?
13      A.  No.
14      Q.  Was that a phone conversation or in-person?
15      A.  In-person.
16      Q.  Was that in your office?
17      A.  No.  It would have likely been at a political
18  event that we were both attending, and it was a passing
19  conversation.
20      Q.  Did you have any other conversations with anyone
21  besides Mr. Wallace about the previously numbered voter
22  ID bill that you were going to file in 2010 -- prefile
23  in 2010 for the 2011 session?  Sorry.
24      A.  Yes.
25      Q.  Who else — strike that.

79

1       When was that conversation?
2       A.  Summer of 2010.
3       Q.  Were you a party to that conversation?
4       A.  Yes.
5       Q.  Who else was involved in that conversation?
6       A.  Myself.
7       Q.  Who was the other party?
8       A.  The President of the Senate of Indiana.
9       Q.  What is the name of that individual?
10      A.  Senator David Long.
11      Q.  Was that at the meeting of Senate Presidents --
12      A.  Yes.
13      Q.  -- that you had testified to earlier?
14      A.  Yes.
15      Q.  Did you have any other conversations with anyone
16  else about the voter ID bill that you were filing?
17      A.  I believe I had a conversation with the Senate
18  President from Georgia.
19      Q.  Was that at that same meeting?
20      A.  Same meeting.
21      Q.  Are there any other conversations that you had
22  about the bill -- the voter ID bill that you were filing
23  in 2010 for the 2011 session?
24      A.  Yes.
25      Q.  Who was that with?

80

1       A.  With the Senate President of Illinois, John
2   Culbertson, a Democrat.
3       Q.  Were there any other conversations about the bill
4   that you were filing related to voter ID not related to
5   that meeting that you had with the Senate Presidents?
6       A.  No.
7       Q.  Do you receive constituent mail in your Senate
8   office?
9       A.  I don't personally but I'm sure there is mail
10  that comes in to the Senate office.
11      Q.  How is that mail received?  Do you receive it by
12  E-mail?  Do you receive hard copies of letters?
13      A.  I don't know.  I believe that we receive, for
14  sure, postage, and I'm assuming we receive some E-mail
15  communication.  I'm not privy to that because, as I told
16  you, I don't do E-mails.
17      Q.  Is there a staff person in your office who
18  handled constituent communication in 2011 for you?
19      A.  Janice McCoy.
20      Q.  Is she the sole person in your office who handled
21  constituent communication in 2011?
22      A.  I don't know the answer to that.
23      MR. SWEETEN:  Okay.  We're going to get into
24  constituent communication, so, let's have a discussion
25  on that.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                    June 13, 2012

81

1       When we began the deposition, you indicated
2   that you wanted to discuss those issues with Senator
3   Fraser, and I indicated that I didn't believe that that
4   was what the Court has ordered us to do. It's not part
5   of the Court's order.
6       Nevertheless, you pointed out that we did go
7   with Representative Harless and they made a motion with
8   the Court to allow additional questioning on that issue.
9       I've spoken with Senator Fraser regarding
10  the issue, and we've determined that in view of the fact
11  that the Court has ordered that with respect to
12  Representative Harless, that we're going to allow you to
13  ask questions about constituent communications as you've
14  asked to do.
15      At the same time we would ask that just as
16  the Court limited Representative Harless' questioning on
17  that issue to an hour, I think that is a very reasonable
18  request, so, we would assert that if we're getting into
19  that area, that we limit the questioning of that, if
20  that's agreeable to you, Counsel.
21      MS. WESTFALL: I appreciate the
22  accommodation. I don't think it will be a lengthy
23  examination on constituent correspondence. We have not
24  received a great deal of correspondence produced from
25  Senator Fraser's office.

82

1       So, I believe as things stand currently,
2   that it will not take more than one hour to
3   examine Senator Fraser on constituent communication.
4       MR. SWEETEN: You didn't answer my question.
5       MS. WESTFALL: I sure didn't. As things
6   stand right now -- and it's my general practice not to
7   promise to limit my examination to a certain period of
8   time but I do not foresee as of currently, unless we get
9   into extensive communications about communications, that
10  it will go longer than an hour. I can make that
11  representation to you right now, Counsel.
12      MR. SWEETEN: And I assume we're finished
13  with the other issues, because I want to make a clean --
14  I want to have an idea of where we are. Is that
15  correct?
16      MS. WESTFALL: Yes, unless -- I'm going to
17  hand the podium to counsel for defendant-intervenors,
18  who may have additional questions in that regard.
19      MR. SWEETEN: Mr. Dunn, do you have any idea
20  of what sort of time your examination will be?
21      MR. DUNN: At the moment, five minutes or
22  less.
23      MR. SWEETEN: I accept. Okay. So, we'll
24  go -- we'll march forward in the spirit of accommodation
25  and allow these questions to proceed.

83

1       MS. WESTFALL: I'm grateful, Mr. Sweeten.
2       Q. (BY MS. WESTFALL) Senator, is there someone in
3   your office who responds to constituent correspondence?
4       A. I don't know the answer to that.
5       Q. Do you know whether you generally do respond to
6   constituent correspondence or do you just receive the
7   communications?
8       A. We are not very big on response. So, I feel sure
9   that there are people that we might respond to but we
10  don't communicate a lot in my office.
11      Q. Does Ms. McCoy ever share any constituent
12  communication with you that she has reviewed?
13      A. She occasionally will come in my office and say,
14  "We heard from Skipper and I told him X."
15      MR. SWEETEN: Now, as you're answering these
16  questions, I want to remind you of the legislative
17  privilege.
18      THE WITNESS: Okay.
19      MR. SWEETEN: She can ask you questions
20  about constituent communications. She can ask about the
21  substance of those communications but in answering those
22  questions, I don't want you to reveal your mental
23  impressions or thoughts about any specific legislation.
24      THE WITNESS: Okay.
25      MR. SWEETEN: They are still subject to the

84

1   legislative privilege.
2       MS. WESTFALL: And, Mr. Sweeten, just to be
3   clear before we exam on some exhibits related to
4   constituent communications, it is the Court's order that
5   communications between legislators and constituents,
6   lobbyists and interest groups are not within the
7   legislative privilege. So, those communications both
8   ways must be produced.
9       The Court also indicated, as you have
10  directed your witness, that questioning a Legislator
11  about -- to the extent it would require the Legislator
12  to reveal subjective motivations is covered within the
13  privilege. So, I just want to make sure we're in
14  agreement with the scope of the privilege before I
15  examine the witness.
16      MR. SWEETEN: I think what you said is what
17  I said --
18      MS. WESTFALL: Right.
19      MR. SWEETEN: -- which is he's not going to
20  reveal his mental impressions about -- for example, if
21  constituent X wrote something, he's not going to say why
22  he said something to them or he's not going to say what
23  he did as a result of something that was told to him.
24      He will reveal, to the extent he can recall,
25  the substance of the communication, the approximate



**ESQUIRE**
DEPOSITION SOLUTIONS

**Toll Free:** 800.211.DEPO
**Facsimile:** 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

85

1    date, means of communication.
2            MS. WESTFALL: In both directions, right?
3            MR. SWEETEN: That's correct, if we're
4    talking about a constituent. I think that's the Court's
5    order.
6            MS. WESTFALL: Okay. Could you mark this US
7    554.
8            (Exhibit 554 marked.)
9        Q. (BY MS. WESTFALL) You've been handed what's been
10   marked US 554. Do you recognize this document?
11       A. No.
12       Q. Do you see that it was from Janice McCoy's
13   E-mail?
14       A. Yes.
15       Q. Do you have any reason to believe that Janice
16   McCoy did not receive this E-mail?
17       A. Well, you're assuming that I understand how
18   E-mail works.
19       Q. Do you not know whether this was received by
20   Ms. McCoy, is that your testimony?
21       A. I don't know the answer. No, I do not know. I
22   have not seen it, and no, I don't know.
23       Q. Do you know Brenda Payne?
24       A. No.
25       Q. Is Abilene, Texas within your district?

86

1        A. Uh-huh.
2            MR. DUNN: Is that a yes?
3        A. Yes, it is.
4        Q. (BY MS. WESTFALL) Could you describe what
5    Ms. Payne is indicating in her E-mail message?
6        A. Again, I'm not real good at -- I don't do E-mails
7    but it appears that after her name, she has put in, "Yes
8    to voter ID. No to a school, university or college ID
9    as proper identification to vote. Too many illegals
10   have acquired these and it would defeat the purpose.
11   Thank you."
12       Q. Do you see that this communication was sent on
13   Thursday, January 27th, 2011, at the top of the page?
14           MR. SWEETEN: Objection. Form. Objection.
15   Foundation.
16           Go ahead. You can answer.
17       A. It appears that it was sent on January 27th.
18       Q. (BY MS. WESTFALL) You just described Ms. Payne's
19   E-mail. Do you know whether others shared Ms. Payne's
20   views that undocumented persons have college IDs?
21           MR. SWEETEN: Objection to the question as
22   vague. Objection to the question to the extent it asks
23   you to reveal your thoughts, your mental impressions,
24   your analysis of any given legislation. So, don't
25   answer it if it would require you to do so.

87

1        A. I have no way of knowing. I didn't see this
2    E-mail or others, so, I have no way of knowing.
3        Q. (BY MS. WESTFALL) Do you know whether others
4    among your constituents or interest groups or advocacy
5    groups expressed the view that there are a lot of
6    undocumented people who have student IDs?
7            MR. SWEETEN: You can answer based on the
8    public record or based upon communications from
9    constituents.
10       A. I have no communications that I can fall back on
11   that stated that view that I saw.
12       Q. (BY MS. WESTFALL) Sitting here today, is that
13   the first time you've heard that argument that a lot of
14   undocumented people have student IDs in Texas?
15           MR. SWEETEN: Don't reveal matters of
16   privilege in answering the question.
17       A. There was debate --
18           THE WITNESS: If it's a matter of public
19   debate, there's no problem?
20           MR. SWEETEN: There's no problem with that
21   but if there's a communication --
22       A. There was a debate in 2009 and 2011 discussing
23   about the type of identification and if the
24   identification was proper and could be -- if someone
25   could get an ID that was illegal, and that's not -- it's

88

1    not targeted at someone -- to me, this says anyone that
2    is not entitled to that identification and they get one,
3    they illegally got that. So, I would say that
4    discussion was one that I heard on the floor several
5    times.
6        Q. (BY MS. WESTFALL) Senator, had you ever heard
7    concerns that undocumented people could have access to
8    student IDs in particular, based on communications in
9    the public record or constituent or advocacy group
10   communications?
11       A. It is a matter of public record of newspaper
12   stories and/or magazine articles that discussed that or
13   things that had been written prior to in other reports
14   or studies. So, yes, I have read that.
15       Q. So, before appearing for this deposition today,
16   you had heard, either through news articles, public
17   debate or constituent communications, that there was a
18   concern about undocumented people having access to
19   student IDs, is that your testimony?
20       A. I'm testifying that in reading prior to this of
21   accounts of things that were written, there had been
22   people that had been written prior of multiple concerns, of which
23   this was one.
24       Q. And "this," you mean student IDs in particular?
25       A. I believe the discussion on student IDs probably

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Troy Fraser                                                    June 13, 2012

89

1   was restricted to discussion on the floor of the Senate.
2       Q.  Did it relate to or concern people without
3   documentation in this country obtaining student IDs?
4       A.  No.
5       Q.  Had you ever --
6       A.  I'm sorry, I need to clarify.  To my knowledge, I
7   do not remember a discussion of that type.
8       Q.  When did you first hear that there was a concern
9   about undocumented people having student IDs?
10          MR. SWEETEN:  Objection to the extent it
11  calls for privilege.
12      A.  To my knowledge, I don't remember that issue
13  being brought up other than you showing me this, that
14  someone, it appears, sent in.
15      Q.  (BY MS. WESTFALL)  Had Ms. McCoy ever raised the
16  issue of undocumented people having student IDs with
17  you?
18          MR. SWEETEN:  Don't answer the question.
19      A.  Privilege.
20      Q.  (BY MS. WESTFALL)  Are you following the advice
21  of counsel?
22          MR. SWEETEN:  Objection.  That calls for
23  privilege.
24          Don't answer the question is my instruction.
25      A.  Privilege.

90

1       Q.  (BY MS. WESTFALL)  Had Ms. McCoy ever told you
2   about constituent communication or advocacy groups
3   concerned that undocumented people had student IDs?
4           MR. SWEETEN:  Same objection.
5           Don't answer the question.  Privileged.
6       A.  Privilege.
7       Q.  (BY MS. WESTFALL)  Do you know whether your
8   office responded to this E-mail from Ms. Payne?
9           MR. SWEETEN:  You can answer.
10      A.  I do not know.
11      Q.  (BY MS. WESTFALL)  If Ms. McCoy had received a
12  lot of complaints and a lot of E-mails about the
13  possibility of undocumented people getting student IDs,
14  do you think she would have raised that with you?
15          MR. SWEETEN:  Don't answer the question.
16  Legislative privilege.
17      Q.  (BY MS. WESTFALL)  Can you answer that question?
18          MR. SWEETEN:  No.  My instruction is do not
19  answer the question.
20      A.  Privilege.
21      Q.  (BY MS. WESTFALL)  Do you know whether E-mails
22  sent from constituents to you are automatically routed
23  to Ms. McCoy's E-mail?
24          MR. SWEETEN:  You can answer as a general
25  matter.

91

1       A.  Yes.
2       Q.  (BY MS. WESTFALL)  They are, they are sent to her
3   for her response?
4       A.  I think my answer is I don't know.  My assumption
5   is that it is because there are no E-mails sent directly
6   to me.  There are things sent to my Senate office, which
7   in the Senate office, she is the -- she runs the Senate
8   office.  So, it wasn't sent directly to me.  I have -- I
9   don't have things sent to me personally.
10      Q.  Is it your understanding that Ms. McCoy reviews
11  all E-mails that gets sent to your E-mail address?  Is
12  that right?
13      A.  I didn't say that.  I said I believe that they
14  are routed to her, and my assumption is that she does
15  review those.
16          MS. WESTFALL:  Could you mark this as 555.
17          (Exhibit 555 marked.)
18      Q.  (BY MS. WESTFALL)  You've been handed what's been
19  marked as US 555.  Have you seen this document before?
20      A.  Have I seen this?  No.
21      Q.  Could you describe the E-mail message that is
22  contained in US 555?
23      A.  It appears to come from someone outside of my
24  district that -- I don't even know where Needville,
25  Texas is, and I don't recognize the name of the person.

92

1   And he appears to have sent a message to my office.
2       Q.  Could you describe the message?
3       A.  He says -- he's congratulating me on a wonderful
4   voter ID bill for all legal citizens of Texas.
5       Q.  Do you know whether you responded to this E-mail?
6       A.  No, I do not.
7       Q.  Do you know why this constituent was saying it
8   was helpful for legal citizens of Texas?
9           MR. SWEETEN:  Objection.  Calls for
10  speculation.  Objection.  Privileged.
11          Don't reveal your thoughts, mental
12  impressions about why someone would have done something
13  to the extent it would relate to any motivation about --
14          MS. WESTFALL:  Mr. Sweeten, I'm asking him
15  about his understanding of why this constituent was
16  writing this E-mail.  It's not about anything that's in
17  the Senator's head.
18          MR. SWEETEN:  Well, he said he's never seen
19  this before in his life, he doesn't know this guy,
20  doesn't know where he's from, and now you're asking him
21  to interpret why he said something.  So, that's first is
22  it's an inappropriate question, but secondly --
23          MS. WESTFALL:  But that's not a basis for
24  instructing the witness not to answer.
25          MR. SWEETEN:  Well, let's get to that.  The



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Troy Fraser                                           June 13, 2012

93

1   basis for instructing him not to answer is legislative
2   privilege to the extent that it would require him to
3   reveal any mental thoughts, impressions about why
4   someone would do that.
5        If in answering the question, it would
6   require him to reveal his impressions or thoughts or
7   motivations about the bill, then he can't answer the
8   question as phrased.
9        Q. (BY MS. WESTFALL) Do you have any understanding
10  about why this constituent would link voter ID and other
11  immigration bills in his E-mail?
12       MR. SWEETEN: Same objection. Same
13  instruction.
14       A. Privilege.
15       Q. (BY MS. WESTFALL) Can you answer it outside of
16  any privileged information or testimony that you might
17  have?
18       A. I don't know this person.
19       Q. So, is your answer you don't know why he linked
20  voter ID with illegal immigration?
21       MR. SWEETEN: Same objection. Same
22  instruction.
23       Q. (BY MS. WESTFALL) Do you not know?
24       A. Privilege.
25       Q. Do you know whether other constituents, advocacy

94

1   groups or interest groups also saw that there was a
2   connection between the voter ID bill and immigration
3   bills?
4        MR. SWEETEN: Same objection. Instruct you
5   not to answer the question on the basis of legislative
6   privilege.
7        A. Privilege.
8        Q. (BY MS. WESTFALL) Do you have any idea why a
9   constituent like Mr. Kucera would have connected the two
10  issues?
11       MR. SWEETEN: Same instruction. Don't
12  answer on the basis of privilege. Same objection.
13       MS. WESTFALL: Based on their motivations
14  and intents, not based on the Senator's, Mr. Sweeten.
15       MR. SWEETEN: Same -- you're asking his
16  opinion as to why someone would do something, which
17  could invade his -- his thoughts and mental impressions
18  about a bill. It is subject to privilege. Same
19  instruction. Same objection.
20       MS. WESTFALL: Mr. Sweeten, the question is
21  about the motivation of the constituent writing the
22  letter. It's not about the motivation of the Senator.
23       Will you withdraw your objection?
24       MR. SWEETEN: No, absolutely not. I'm -- my
25  objection is appropriate based upon the questions that

95

1   you're asking the Senator.
2        MS. WESTFALL: I am not asking him to reveal
3   any of his subjective motivations in his advancement of
4   Senate Bill 14.
5        I'm asking about his opinion of why a
6   constituent would put something in an E-mail.
7        Mr. Sweeten, would you reconsider your
8   objection?
9        MR. SWEETEN: It's the same objection.
10  First, we can go back over the reason that -- you're
11  asking for speculation. You're also asking for him to
12  reveal his thoughts, mental impressions about why
13  someone would vote for a specific piece of legislation,
14  which implicates the legislative privilege.
15       I will not reconsider it -- I mean, I have
16  considered it again but my objection is appropriate and
17  I'm going to maintain the same objection and
18  instructions.
19       Q. (BY MS. WESTFALL) Without -- Senator, without
20  talking about your own motivations in advancing Senate
21  Bill 14, why do you think a constituent would praise
22  your work on voter ID based on behalf of legal citizens
23  of Texas, as opposed to illegal citizens of Texas? Do
24  you know why he would do that?
25       MR. SWEETEN: Same objection. Same

96

1   instruction. Legislative privilege and vague. Calls
2   for speculation.
3        A. Privilege.
4        Q. (BY MS. WESTFALL) Can you answer that question
5   about why the constituent would write that?
6        A. Privilege.
7        Q. Is your answer you don't know why the constituent
8   would link those two issues?
9        MR. SWEETEN: Objection. Asked and
10  answered. Objection to the question as vague and calls
11  for speculation. Objection based on the legislative
12  privilege. Instruct not to answer the question.
13       A. Privilege.
14       Q. (BY MS. WESTFALL) Are you following his counsel?
15       A. Yes, I am.
16       Q. Did you receive any other constituent
17  communications that similarly praised you for your work
18  on Senate Bill 14 on behalf of legal citizens of Texas?
19       A. I don't see communications coming in.
20       Q. I'm not asking about -- I guess I don't
21  understand your answer.
22       Are you aware of any other constituents who were
23  supportive of your work on voter ID because it was
24  helpful to legal citizens of Texas?
25       A. Are you asking if people communicated to me?

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Troy Fraser                                                    June 13, 2012

97

1    Q. Yes.
2    A. By print?
3    Q. Are you aware of any communications at all coming
4    into your office -- and I'm sure your counsel will
5    advise you that those are not privileged -- that were
6    supportive of your work on voter ID because it helped
7    legal citizens of Texas?
8    A. Every time I go to the grocery store, someone
9    still will say something, say, "Good job on Senate Bill
10   14 or the photo ID bill."
11   Q. Are you aware of many constituents who say this
12   is helpful on the issue of illegal immigration that you
13   passed and worked very hard on Senate Bill 14?
14   A. People say, you know, it's a good piece of
15   legislation. They don't go into specifics.
16   Q. Are you aware of ever having heard any
17   constituent say to you, "Thanks for your work on voter
18   ID. It helped. It helps on illegal immigration"?
19   A. I cannot give you a specific example of where
20   someone said that.
21   Q. And looking at US 555, is this the first time
22   today sitting here in this deposition that you have
23   received a communication from a constituent -- or, I
24   guess, a resident of Texas, not a constituent, thanking
25   you for your work on voter ID because it helped on

98

1    immigration issues?
2    A. What is US 55?
3    Q. This exhibit that you're looking at now.
4    MR. SWEETEN: 555.
5    A. Okay. What was your question?
6    Q. (BY MS. WESTFALL) Is this the first time that
7    you're hearing support for your work on voter ID because
8    it helps on immigration issues, sitting here today?
9    MR. SWEETEN: From constituents.
10   Q. (BY MS. WESTFALL) From constituents.
11   A. Yes.
12   Q. You never heard any constituents say this is
13   good, from the standpoint of immigration, until you saw
14   this letter here?
15   A. My testimony is that I do not recall anyone
16   specifically saying that this was good for immigration
17   issues.
18   Q. Do you recall whether Mr. Wallace saw there being
19   a connection between Senate Bill 14 and voter ID and
20   fighting illegal immigration?
21   MR. SWEETEN: Objection. Calls for
22   speculation but you can testify as to what Mr. Wallace
23   told you.
24   A. No. No communication.
25   Q. (BY MS. WESTFALL) Do you know whether your

99

1    office responded to Mr. Kucera's E-mail?
2    A. I do not know but suspect we did not.
3    Q. Do you know whether Ms. McCoy searched for
4    responses to constituent E-mail on voter ID and produced
5    them to your attorneys in this action?
6    A. Yes.
7    Q. Did she produce any such responses, to your
8    knowledge?
9    A. I don't know. I know that she was attempting --
10   she checked our office. She told me she was going
11   through it and was going to return everything we had,
12   per the instructions of the Attorney General.
13   Q. I'm sorry, also the Lieutenant Governor?
14   A. No. Attorney General and, I guess, the Justice
15   Department. The request from the Court had a request,
16   and we complied with the request.
17   Q. Thank you.
18   MS. WESTFALL: Would you mark this US 556.
19   (Exhibit 556 marked.)
20   Q. (BY MS. WESTFALL) You've been handed what's been
21   marked as US 556. Do you recognize this document?
22   A. No.
23   Q. Do you know a Mickey Mathis?
24   A. No.
25   Q. Does this appear to be an E-mail message from

100

1    Mickey Mathis to your office on January 21st, 2011?
2    A. It appears that is. I believe that's what it
3    says.
4    Q. Is Brownwood, Texas in your district?
5    A. Yes, it is.
6    Q. Could you describe the message that Mr. Mathis
7    conveyed -- pardon me -- Ms. Mathis conveyed?
8    MR. SWEETEN: You can testify based on the
9    text of the E-mail.
10   A. "Voter ID, E verify and other anti illegal
11   immigration bills are crucial to this State. 24 percent
12   of the population is on some kind of social program.
13   Schools, communities and our state government are all
14   overdrawn at the bank. Stop the invasion. Clean out
15   the welfare rolls. Verify who is in this state.
16   Washington has stopped deporting. Texas has to tighten
17   up and toughen up now."
18   Q. Do you recall whether Ms. McCoy ever showed this
19   E-mail to you?
20   A. I've never seen this E-mail.
21   Q. Do you recall whether Ms. McCoy ever described
22   the sentiments expressed in this E-mail to you?
23   MR. SWEETEN: Objection. Privilege.
24   Don't answer. Instruct you not to answer.
25   Q. (BY MS. WESTFALL) Are you following the advice



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                    June 13, 2012

101

1    of counsel?
2        A. Privilege. Privilege.
3        Q. Do you know whether you responded to this E-mail?
4        A. I do not know.
5        Q. Do you know why Ms. Mathis saw that voter ID, E
6    verify and other illegal immigration bills, as she puts
7    it, were all connected topically?
8            MR. SWEETEN: Objection. Calls for
9    speculation. Objection. Vague. Objection. Calls for
10   matters of legislative privilege. Instruct not to
11   answer on that basis.
12       Q. (BY MS. WESTFALL) To the extent that you can
13   answer without revealing your mental impressions, could
14   you answer the question?
15           MR. SWEETEN: Same obstruction.
16       A. If you will reword the question, and it's not
17   privileged, I'll be glad to.
18       Q. (BY MS. WESTFALL) Senator, without testifying as
19   to your mental impressions of this E-mail, could you
20   explain why Ms. Mathis is connecting voter ID, E verify
21   and illegal immigration bills topically in her E-mail?
22           MR. SWEETEN: Objection. Vague. Objection.
23   Calls for speculation. Objection. Subject to the
24   legislative privilege.
25           Don't reveal your thoughts, mental

102

1    impressions, motivations, analysis recording any sort of
2    legislation, including Senate Bill 14.
3            MS. WESTFALL: Mr. Sweeten, the question
4    itself excludes any mental impressions that the Senator
5    may have in the response.
6            MR. SWEETEN: To the extent that you would
7    not reveal privilege —
8        A. I can't answer the question without a -- giving a
9    privilege. I'm sorry, I cannot answer that question.
10           MS. WESTFALL: Would you mark this as 557.
11           (Exhibit 557 marked.)
12       Q. (BY MS. WESTFALL) You've been handed what's been
13   marked US 557. Do you recognize this document?
14       A. I'm sorry?
15       Q. Do you recognize this document?
16       A. I've never seen it.
17       Q. Do you know Catherine Engelbrecht?
18       A. I do not.
19       Q. You've never heard of her?
20       A. No.
21       Q. Do you know who the King Street Patriots are?
22       A. No.
23       Q. Do you know who True the Vote is?
24       A. What?
25       Q. True the Vote, the organization.

103

1        A. No.
2        Q. Never heard of it?
3        A. No.
4        Q. Did Ms. McCoy tell you anything about the
5    existence of this communication, without revealing any
6    private conversations you've had with Ms. McCoy?
7        A. No communications with Ms. McCoy on this.
8        Q. Do you see that it indicates in the second
9    paragraph if you ever have any need of incident reports,
10   Catherine Engelbrecht of King Street Patriots would be
11   willing to provide you with empirical evidence? Do you
12   see in that E-mail it does, sir?
13       A. I read that she said that, yes.
14       Q. Pardon?
15       A. I read that she said that, yes.
16       Q. Could you describe the E-mail that she sent to
17   you?
18       A. I can read you what it says. "If you ever have
19   need of any of our incident reports to provide the
20   empirical evidence I heard requested so often today,
21   please let me know. We would be happy to provide you
22   with any of our documentation."
23       Q. And could you tell me what date on which this
24   E-mail appears to have been sent?
25       A. Looks like January the 25th.

104

1        Q. Do you know whether there was any response from
2    your office to this E-mail?
3        A. I do not know.
4        Q. Do you know whether Ms. Engelbrecht ever sent to
5    you any incident reports she had related to Senate Bill
6    14?
7        A. I do not. No, I do not know, and I have no
8    indication that she sent anything.
9        Q. Are you familiar with an organization called
10   Empower Texans?
11       A. I have heard of Empower Texans but I'm not
12   familiar with them.
13       Q. Have you ever had any communications with anyone
14   at Empower Texans?
15       A. Since I don't know who the group is, I don't know
16   the individuals involved, so, my answer would have to be
17   no.
18       Q. To the extent you know, do you know what Empower
19   Texans is?
20       A. No.
21       Q. Do you know Michael Quinn Sullivan?
22       A. I know the name.
23       Q. Who is he?
24       A. He is a person named Michael Quinn Sullivan.
25       Q. Do you know whether he represents a group or



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Troy Fraser                                                      June 13, 2012

105

1    represents a particular --
2    A. He is a political activist.
3    Q. Where is he based?
4    A. I don't know.
5    Q. What are his issues on which he advocates?
6    A. I don't know.
7    Q. Have you ever spoken to Mr. Sullivan?
8    A. I believe that I have met him, but a conversation
9    other than hello is probably the extent. I don't know
10   Michael Quinn Sullivan.
11   Q. Is it your testimony you've never discussed voter
12   ID with Mr. Sullivan?
13   A. No. No.
14   Q. What is the Immigration Reform Coalition of
15   Texas?
16   A. I don't know.
17   Q. Do you know Rebecca Forrest?
18   A. Forrest?
19   Q. Yes.
20   A. No.
21   Q. What is the San Antonio Tea Party?
22   A. I would suspect it is the San Antonio Tea Party.
23   Q. And do you know what their central areas of
24   advocacy are?
25   A. The geographic area or issues?

106

1    Q. No. Advocacy. What are their issues?
2    A. I have no idea.
3    Q. Is San Antonio in your district?
4    A. No.
5    Q. Do you know who George Rodriguez is?
6    A. No.
7    Q. Do you know whether George Rodriguez is the
8    president of the San Antonio Tea Party?
9    A. I have no idea.
10   Q. Do you know a Raymond Wilkinson?
11   A. No.
12   Q. Are you familiar with a Tenth Amendment Center?
13   A. No.
14   Q. Do you know Steve Basinger?
15   A. Basinger?
16   Q. Yes.
17   A. No.
18   Q. I believe you testified you're not familiar with
19   the King Street Patriots?
20   A. No.
21   Q. Are you familiar with True the Vote?
22   A. No.
23   Q. And you've never had any contact with
24   Ms. Catherine Engelbrecht?
25   A. No.

107

1            MR. SWEETEN: Asked and answered.
2    Q. (BY MS. WESTFALL) Do you know Paul Bettencourt?
3            MR. SWEETEN: Asked and answered.
4    Objection.
5    A. I don't know Paul Bettencourt but he testified in
6    2009. When we were hearing the bill, he signed up as
7    someone to testify, and I listened to his testimony
8    then.
9    Q. (BY MS. WESTFALL) Is that the only interaction
10   or communication you have had with Mr. Bettencourt?
11   A. Only communication.
12   Q. Have you had any communications with MALDEF,
13   Mexican-American Legal Defense and Education Fund?
14   A. That's a very broad question.
15   Q. About voter ID.
16   A. Not to my knowledge that I've ever talked to
17   MALDEF about voter ID.
18   Q. Have you ever talked to Luis Figueroa?
19   A. No.
20   Q. Have you ever spoken to LULAC about voter ID?
21   A. No.
22            MS. WESTFALL: Would you mark this as 558?
23            (Exhibit 558 marked.)
24   Q. (BY MS. WESTFALL) You've been handed what's been
25   marked US 558. Do you recognize this?

108

1    A. No.
2    Q. You've never seen this article before?
3    A. Not to my recollection because I don't know what
4    it is.
5    Q. Does it appear to be an article from the
6    STATESMAN dated January 28, 2011, called Texas Senators
7    split on whether voter ID bill is constitutional?
8    A. It appears to be connected with the STATESMAN. I
9    don't know that it was an article.
10   Q. Do you see about two-thirds of the way down the
11   page --
12   A. Uh-huh.
13   Q. -- it references you by name? Do you see that
14   paragraph?
15   A. "After the vote, the bill's author"?
16   Q. Yes.
17   A. Yes.
18   Q. Do you see that?
19   A. Yes.
20   Q. Could you just read that paragraph and let me
21   know when you've had a chance to review it?
22   A. "After" --
23   Q. Oh, you can --
24   A. "After the vote, the bill's author, State Senator
25   Troy Fraser, Republican Horseshoe Bay, said he expects



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                    June 13, 2012

<div style="columns:2">

109

1  some of the amendments will be added to the bill to
2  address issues that critics said would unfairly affect
3  minorities, people with disabilities and the elderly.
4  Those changes, Fraser said, will ensure it passes muster
5  with the Justice Department, although both he and
6  Dewhurst said they believe the bill as passed Tuesday
7  would be approved under the Voting Rights Act."
8      Q.  Thank you.
9          Did you say something to that effect, do you
10  recall?
11     A.  No.  I don't -- there -- I do not remember making
12  this quote to the AUSTIN AMERICAN STATESMAN.
13     Q.  Do you remember saying anything to that effect?
14     A.  I do remember that we were looking at issues,
15  making sure that we had looked at these issues.
16     Q.  Were any amendments passed that would help
17  address what critics said would unfairly affect
18  minorities?
19         MR. SWEETEN:  Objection.  Don't answer on
20  the basis of legislative privilege.
21     Q.  (BY MS. WESTFALL)  Can you answer without --
22     A.  Privilege.  If you want to restate the
23  question --
24     Q.  Without revealing any mental impressions,
25  conversations with other Legislators and based on the

110

1  public record, are there any amendments that were
2  incorporated into Senate Bill 14 that addressed critics
3  that the bill would hurt minorities voters?
4          MR. SWEETEN:  Objection.  Calls for matters
5  of privilege.  You're still asking for his mental
6  impressions and his assessment.  Even though I realize
7  the preface of the question intends not to do so, it
8  still does so.  Therefore, objection.  Privilege.
9  Instruct not to the answer.
10     A.  Privilege.
11         MS. WESTFALL:  Okay.  No further questions
12  at this time.
13         I'm going to turn it over to Mr. Dunn.
14         Mr. Dunn, would you like to sit here?
15         MR. DUNN:  I'm not going to ask any
16  questions.
17         MR. SWEETEN:  We will reserve questions
18  until the time of trial.
19         (Whereupon at 3:49 p.m. the
20         deposition was concluded.)
21
22
23
24
25

111

1        E R R A T A   S H E E T
2
3  Correction              Page    Line
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25

112

1      I, SENATOR TROY FRASER, have read the foregoing
2  deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
3         _____
          SENATOR TROY FRASER
4
   THE STATE OF _____
5  COUNTY OF _____
6  Before me, _____, on this day personally
   appeared SENATOR TROY FRASER, known to me (or proved to
7  me under oath or through _____) (description of
   identity card or other document) to be the person whose
8  name is subscribed to the foregoing instrument and
   acknowledged to me that they executed the same for the
9  purposes and consideration therein expressed.
10  Given under my hand and seal of office this _____ day
   of _____, _____.
11
12  NOTARY PUBLIC IN AND FOR
   THE STATE OF _____
13
14
15
16
17
18
19
20
21
22
23
24
25

</div>



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

113

1   STATE OF TEXAS        *
    COUNTY OF HARRIS      *
2

        I, the undersigned certified shorthand reporter
3   and notary public in and for the State of Texas, certify
    that the facts stated in the foregoing pages are true
4   and correct.
5       I further certify that I am neither attorney or
    counsel for, nor related to or employed by, any of the
6   parties to the action in which this deposition is taken
    and, further, that I am not a relative or employee of
7   any counsel employed by the parties hereto, or
    financially interested in the action.
8
        SUBSCRIBED AND SWORN TO under my hand and seal of
9   office on this the 13th day of June, 2012.
10
11
        EDITH A. BOGGS, CSR
12      Certified Shorthand Reporter and
        Notary Public in and for
13      the State of Texas
14  Notary Expires: 5-10-2016
    Certificate No. 3022
15  Expiration date: 12-31-2013
    Esquire Deposition Solutions, LLC
16  Registration No. 3
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

**A**

Abilene
85:25

ability
25:13 64:25

able
10:8

Absolutely
41:11 94:24

abstract
16:14

accept
82:23

accepted
44:7

access
88:7,18

accommodation
81:22 82:24

accordance
47:12

accounts
88:21

acknowledged
112:8

acquired
86:10

Act
109:7

action
99:5 113:6,7

activist
105:2

add
9:19 36:6

added
39:9 109:1

additional
43:23,25 81:8
82:18

address
41:19 42:19
72:13 91:11
109:2,17

addressed
110:2

adherence
45:20

adhering
47:19

administrativ
e
27:2

administrativ
ely
77:9

adopted
5:10,12 16:19
48:25 51:8

advancement
95:3

advancing
95:20

advice
10:16 71:21
73:17 89:20
100:25

advise
63:16 97:5

advised
10:15 62:10,
12,24 75:25

advising
10:23

advocacy
87:4 88:9
90:2 93:25
105:24 106:1

advocates
105:5

affect

address
68:1 69:17
109:2,17

affirmative
34:16 49:20

affix
112:1

afternoon
6:5

age
44:9

agencies
54:16

agree
47:3 70:15

agreeable
81:20

agreement
84:14

ahead
14:20 28:6
52:21 54:18
66:25 86:16

a1
1:8,10,11,13,
14 3:12

allocated
32:12

allow
21:1,6 22:18
25:6,11 51:19
55:14 81:8,12
82:25

allowed
19:4,9 55:13

allows
65:3 68:18

already
47:22 57:24
58:3

also
7:14 25:3

37:13 40:22,
24 44:20 46:1
71:1 84:9
94:1 95:11
99:13

although
109:5

always
27:21 45:25
70:18,20,25

amend
38:13

amended
36:19 39:2

amending
57:17

amendment
38:15 40:11,
12,13 106:12

amendments
109:1,16
110:1

AMERICAN
4:4 109:12

among
87:4

amount
52:6,25

analysis
86:24 102:1

and/or
88:12

another
60:22 72:18
73:9 77:6

answer
7:6,25 9:25
14:13,16 23:1
24:6 31:1
33:10,11,12,
19 34:20 35:4
37:7 40:17,23

41:19,22
42:7,16,17,
18 43:19,24
45:10,23
46:11 47:7,22
50:2 51:11,
12,16,22
52:18 53:2,4,
18,20,24
55:17 57:10
58:2,4,15,16
59:14 60:6,
11,20,21 66:7
67:19 69:19
70:7,23 71:20
72:7,12,24
73:4,14 74:4,
9 75:24 76:24
77:3,4,13
78:11 80:22
82:4 83:4
85:21 86:16,
25 87:7
89:18,24
90:5,9,15,
17,19,24 91:4
92:24 93:1,7,
15,19 94:5,12
96:4,7,12,21
100:24
101:11,13,14
102:8,9
104:16
109:19,21
110:9

answered
33:9 42:12
46:10 47:8,
22,24 57:20,
23,25 58:3,14
73:8 96:10
107:1,3

answering
33:13 41:7,10
54:9,11,17



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

55:11 83:15,
21 87:16 93:5

ANSWERS
2:11 7:1

anti
100:10

Antonio
105:21,22
106:3,8

appear
12:19 99:25
108:5

appeared
112:6

appearing
6:17 75:7
88:15

appears
50:13 65:18
66:11 86:7,17
89:14 91:23
92:1 100:2
103:24 108:8

applies
10:3 31:13
42:1,15 47:25
50:15 52:8

apply
19:14,16
46:20 53:5

appointed
39:22

appointments
40:6

appreciate
81:21

appropriate
47:9 94:25
95:16

approved
109:7

approximate

84:25

approximately
33:15 63:11,
17,22

area
8:20 46:19
51:24 68:20
69:10 70:5
74:22 81:19
105:25

areas
8:6,12,14,24
9:2,5,23
10:20 11:9
54:10 67:5
105:23

argument
87:13

arise
35:25

around
45:16 61:12

art
28:21 29:10

artful
54:2

article
108:2,5,9

articles
88:12,16

aside
11:7

asked
10:8 14:1
15:15,21 33:8
46:9 47:21,23
57:9,19,22
58:3,14 60:10
64:12 72:24
75:23 77:11
81:14 96:9
107:1,3

asking
13:20 20:21
35:2 42:1,14
55:21 60:5
62:3 63:10
67:8,21 69:3,
5 71:11,16
72:23 92:14,
20 94:15
95:1,2,5,11
96:20,25
110:5

asks
86:22

assert
7:8 14:19
72:19 73:1
81:18

asserted
72:18

assessment
110:6

associated
67:25

assume
82:12

Assumes
47:5

assuming
16:20 49:1,2
51:18 80:14
85:17

assumption
91:4,14

attempt
41:19

attempting
99:9

attending
78:18

attention
12:16 17:15

18:15 21:9
30:11 34:4,9
44:23 49:7
50:20 65:22
66:5

Attorney
1:7 3:5,12
4:3,11 10:24
13:23 14:2
99:12,14
113:5

ATTORNEYS
3:4 11:22
99:5

Austin
2:15 3:7 4:6
109:12

author
27:11 108:15,
24

authority
67:10

automaticall
y
90:22

Avenue
1:20 3:14

aware
7:4,14 12:24
40:21 57:5,17
58:5,22 59:1,
2,11,17,20,
24 64:15 67:2
75:5,10,11,
15 76:6,18
96:22 97:3,
11,16

———— B ————

back
14:22,23,25
15:2 26:10,11
35:13 39:7,18

46:22 56:5,7
65:14 68:7
72:1 76:10,
13,14 87:10
95:10

bank
100:14

based
7:6 45:20
66:7 71:4
72:3 87:7,8
88:8 94:13,
14,25 95:22
96:11 100:8
105:3 109:25

basically
42:10

Basinger
106:14,15

basis
71:19 92:23
93:1 94:5,12
101:11 109:20

Bay
108:25

began
65:19 81:1

beginning
26:25 27:22
28:9

behalf
95:22 96:18

being
6:2 11:24
15:11 21:23
26:1 42:2,4
51:9 57:6
73:3 89:13
98:18

belief
30:5 45:25
53:5,9



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser

June 13, 2012

116

**believe**
8:20 13:14,
22,24 24:18,
20 25:19
26:23 30:6
32:12 37:9,19
44:19 47:3
48:10,24
49:18 51:1,25
52:7,8 56:23
61:11 62:24
74:11,15,16
75:23 79:17
80:13 81:3
82:1 85:15
88:25 91:13
100:2 105:8
106:18 109:6
**beside**
11:15
**besides**
40:1,16 57:5
61:20 64:17
78:21
**best**
33:7
**Bettencourt**
107:2,5,10
**between**
2:15 7:15
42:5 52:23
62:16 63:25
84:5 94:2
98:19
**big**
83:8
**bill**
7:3,5,18
14:11,12,18
15:22,23,24
16:4 17:6,8,9
19:2 20:1,13,
14 22:7,8,12,

20 23:15,21
24:1 25:19,
21,23,24,25
26:1,5,8,16,
18,21 27:5,7,
10,11,12,13,
16,17,21
28:8,10,11,
15,20,24,25
29:1,2,3,4,6,
7 30:17 32:11
34:14 35:14,
21 37:18
38:8,18 44:20
49:19 51:4
52:1,2 53:1
54:19 56:25
57:5 58:18,
20,23 61:18,
22 62:5,18
63:5,15,21
64:3,7,11
67:12 72:11,
13,25 74:4
75:13,16,22
76:2,4,7,17,
20 77:4,8,9,
10,12,16
78:22 79:16,
22 80:3 92:4
93:7 94:2,18
95:4,21 96:18
97:9,10,13
98:19 102:2
104:5 107:6
108:7 109:1,6
110:2,3
**bills**
17:1,11,21
18:5,6,8
20:24 21:16,
18,25 22:24
23:3,4,10,12
24:4,13,17
25:15,22

26:4,14,24
27:6 31:24
32:7,13,14,
21,23 33:4,5,
14,15,17,22
34:18 45:1
52:8,9,12,23
53:14 59:7
66:23 93:11
94:3 100:11
101:6,21
**bill's**
108:15,24
**bit**
42:10
**BLACK**
1:12
**blocker**
25:21,22,23,
24 26:4,14,24
27:5,7,21
28:8,15,20,
23,25 29:2,6,
7
**blockers**
25:20
**blocking**
26:1 29:1,4
**Boggs**
1:23 2:12
4:18 113:11
**both**
11:21 49:10,
15 50:11,14,
15,18,20
57:6,11 78:18
84:7 85:2
109:5
**bottom**
21:12 65:24
**Box**
3:6
**BRANCHES**

1:10 4:4
**Brazil**
4:12
**break**
9:8 11:5,8
27:14 65:15
**Brenda**
5:15 85:23
**bring**
12:1 22:12
23:15 26:2
32:13,16
40:9,10
**bringing**
29:1,4
**broad**
57:9 64:12
107:14
**brought**
17:13 26:1,2
54:19 56:15
89:13
**Brownwood**
100:4
**budgets**
37:10 38:4
**business**
16:7 17:14,25
18:3,17
19:17,25
20:2,3,7,12,
19 21:2,5,6,
8,13 22:2,3,
6,11,15,21,
25 23:4,5,7,
9,11,13,16,
19 24:10,11,
24 26:5,15,21
27:16 29:16,
22 30:12
31:4,12 32:1,
4,5,15,16,
18,22 33:24

34:6 35:14,
21,23 43:6,11
44:20 45:3
47:14
_____ C _____

**c**
3:1 4:1
**calendar**
16:5,6 21:18
27:10 30:19
**calendaring**
25:15
**calendars**
16:8,12 25:9,
10
**call**
17:25 24:9
69:1
**called**
6:2 70:3
104:9 108:6
**Calls**
30:24 89:11,
22 92:9 96:1,
10 98:21
101:8,9,23
110:4
**came**
17:14 20:4
23:12
**cannot**
30:5 37:8
97:19 102:9
**capacity**
1:7 10:1 25:1
**card**
112:7
**care**
24:10,11
**carried**
54:25 59:11,
12,21



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser

June 13, 2012

117

carrying
20:13 59:25
CASE
1:9 31:10
52:12 70:1
categories
19:11
Catherine
5:19 102:17
103:10 106:24
CAUCUS
1:12 4:4 39:4
Center
106:12
central
105:23
certain
8:11 9:2
20:15 42:15
51:14 67:5
82:7
certainly
9:16 10:22
14:24 65:12
Certificate
113:14
certified
2:12 113:2,12
certify
113:3,5
cetera
49:19
Chad
4:14
chad@brazilan
ddunn.com
4:15
chair
22:7
chance
12:12 49:9

108:21
change
19:24 20:21
31:20 35:16
40:9
changed
18:17 45:4
changes
39:7,13,14
40:1 109:4
charge
25:15 39:13
checked
99:10
Chief
46:24
choose
27:12,13
chooses
21:5
chose
22:16 38:19
chosen
25:10
circumstances
34:18 42:15
53:16
citizens
92:4,8 95:22,
23 96:18,24
97:7
clarification
76:11
clarify
42:20 59:14,
17 67:7 89:6
clean
82:13 100:14
clear
7:13 10:21
68:4 84:3

clearly
21:24 43:8
68:12
Coalition
105:14
college
86:8,20
COLUMBIA
1:3
come
21:25 22:5,17
23:13 25:16
26:22 27:10
33:16 39:7,8
40:6 45:13
70:11 83:13
91:23
comes
14:17 20:10
39:18 40:13
80:10
coming
19:2 21:23
26:5,16 33:14
40:12 58:6
96:19 97:3
commenting
11:24
committee
14:12 15:23
17:14 20:4
21:20 22:9
24:13,17,25
25:9,11,16
39:16 40:15
51:6,10 52:1,
5,24 53:7,15
57:2,8,12
75:16,21
committees
21:24 52:24
common
21:4

communicate
83:10
communicated
63:8 96:25
communicatio
n
8:3 56:3,18
59:22 60:2,4,
6,7,10,12,17
62:14,22
63:9,10,20,
21,25 64:6,8,
14 76:8,21
77:2,23,25
80:15,18,21,
24 82:3 83:12
84:25 85:1
86:12 87:21
90:2 97:23
98:24 103:5
107:10,11
communicatio
ns
7:15 8:8,21
54:14,15
55:6,22,24
56:12 59:16
64:9,17 75:5,
10,12 76:6,19
77:15 81:13
82:9 83:7,20,
21 84:4,5,7
87:8,10 88:8,
10,17 96:17,
19 97:3 103:7
104:13 107:12
communities
100:13
comp
38:4
compare
50:21,24
compel

10:2
compensation
37:18
complaints
90:12
complete
22:7 49:5
complied
99:16
Compound
30:25 59:10
76:23
concept
56:19
concern
88:18 89:2,8
concerned
90:3
concerning
32:20
concerns
88:7,22
concluded
110:20
conclusion
17:24
Concurrent
18:5,9 21:3
CONFERENCE
1:9 4:4
conflicts
42:5
congratulati
ng
92:3
Congress
44:16
connected
57:13 94:9
101:7 108:8



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Troy Fraser

June 13, 2012

118

connecting
101:20
connection
94:2 98:19
consensus
47:2
consequence
71:5,12 72:4
consequences
70:4,9 71:17
73:12,20
74:7,17
consider
17:1,25 20:1
21:3 27:16
74:23 76:7,20
consideration
7:5 66:15
68:15 74:18
75:12,16
112:9
considered
16:11 17:9,12
18:11 21:17
22:21,24
23:3,5,7,8,
10,20 26:8,19
30:19 31:25
32:4,22
33:15,17,23
52:3 53:14,16
57:1,7 58:24
59:3 70:18,
20,21,25
71:1,2,3
74:25 95:16
considering
17:21 45:1
75:22
constituent
8:2,8,21
80:7,18,21,24
81:13,23 82:3

83:3,6,11,20
84:4,21 85:4
88:9,17 90:2
92:7,15 93:10
94:9,21 95:6,
21 96:5,7,16
97:17,23,24
99:4
constituents
7:16 20:25
84:5 87:4,9
90:22 93:25
96:22 97:11
98:9,10,12
Constitution
28:22 68:10,
13,17,18
constitutiona
l
108:7
contact
106:23
contained
91:22
context
45:19
Continued
4:1
continuing
7:8
control
36:10 37:13
controlled
37:14
convened
66:16
conversation
56:1 59:25
60:19,22
61:1,14,15
62:13,14,15,
16 76:8,21

77:20 78:8,9,
12,14,19
79:1,3,5,17
105:8
conversations
7:4 58:23
59:2,7 61:20,
24 62:2,7
75:11,15
78:20 79:15,
21 80:3 103:6
109:25
conveyed
100:7
copies
80:12
copy
16:23 49:5
correct
6:19 22:16,23
24:19 25:18
26:3,13,20
27:23 52:10
58:20 63:1
64:4,21 65:20
68:11 77:12
82:15 85:3
112:2 113:4
corrected
25:22
Correction
111:3
correctly
16:1
correspondenc
e
8:5 81:23,24
83:3,6
Counsel
7:11 11:15,21
16:23 55:8
71:22 72:19
73:17 81:20

82:11,17
89:21 96:14
97:4 101:1
113:5,7
country
89:3
County
2:13 112:5
113:1
couple
13:1
course
9:11
COURT
1:3,11 6:18,
24 7:14,24
8:1,11 9:6,
17,19,23
10:8,10 15:14
28:3 41:22
42:6,20 43:22
71:25 81:4,8,
11,16 84:9
99:15
Court's
6:22 7:7,22
8:15,17,24
9:11,12 81:5
84:4 85:4
covered
7:9 84:12
create
36:14
created
17:5 37:3
Creek
4:12
critics
109:2,17
110:2
crucial
100:11

CSR
1:23 113:11
Culbertson
80:2
current
37:12
currently
82:1,8
CUSTODY
1:18
Cypress
4:12

— D —

D
50:20,24 51:2
52:13 53:22
54:3,22 55:5
56:11,19
daily
21:18
Date
1:23 61:9
76:2 85:1
103:23 113:15
dated
5:15,16,18,
19,21 108:6
David
79:10
day
2:15 5:13
17:10 32:13
34:15 61:13
112:6,10
113:9
days
32:11 44:21
63:5 70:19,21
71:2 74:23
76:2
DC



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser
June 13, 2012
119

1:21 3:15
deal
81:24
Dean
39:22 40:4
debate
87:17,19,22
88:17
December
60:15 61:11
63:3,4,11,17,
22
Dechert
2:14 4:5
decided
20:14
declare
65:5 67:11
68:3,18
declared
70:10
declaring
71:13
deemed
9:6
defeat
86:10
Defendant
1:8 3:12
DEFENDANT-
INTERVENOR
4:3
Defendant-
Intervenors
1:9,10,12,13,
14 82:17
Defense
107:13
defined
43:14

defining
13:2
delivered
16:1
Democrat
37:22,24
39:23 80:2
Democratic
36:10
Democrats
37:14
Department
1:19 3:13
99:15 109:5
deporting
100:16
deposed
6:11 9:22
11:24
DEPOSITION
1:16,18 2:8,
11 5:9 6:18,
25 8:10 9:4
11:2,14,16,
23,25 14:9
15:6 46:25
49:23 75:24
81:1 88:15
97:22 110:20
112:1 113:6,
15
describe
17:22 21:15
32:21 66:9
86:4 91:21
92:2 100:6
103:16
described
86:18 100:21
describes
21:13
DESCRIPTION

5:8 112:7
designate
35:8 64:23
65:3 67:5
designated
17:6,7,8
34:18 35:5,11
56:21 70:17
73:10 77:9
designates
68:20 74:7,21
designating
7:3 68:9,12
75:2
designation
67:25 70:5,14
71:5 72:4
73:21 75:6
designations
66:23
determine
44:4
determined
81:10
deviate
46:15 48:1,3,
12,19
deviating
48:7
deviation
46:14 50:6
Dewhurst
64:8 109:6
Dewhurst's
61:25 62:8,
10,17 64:1,17
76:8,21
didn't
63:19 69:8
81:3 82:4,5
87:1 91:13
difference

52:23
differences
50:25
different
19:11 35:20
38:11 52:16
72:15
difficult
36:3
direct
30:11 55:15
66:5
directed
9:25 12:19
41:22 72:19
84:10
directions
85:2
directly
10:12 91:5,8
disabilities
109:3
disagree
16:23 25:12
disagreed
40:11
disagreeing
9:7,10,11
discretion
70:13
discuss
9:9 10:6
11:8,11 15:13
24:2 55:9
81:2
discussed
50:3 58:5
62:12 88:12
105:11
discussing
87:22

discussion
8:22 9:14
11:25 55:8
61:5 80:24
88:4,25 89:1,
7
discussions
57:17
disposed
18:1,13
disregard
69:22,24
DISTRICT
1:3 85:25
91:24 100:4
106:3
document
12:5,11,17,
23 13:22
16:17,18,21
48:23 49:2
65:17,23 66:8
85:10 91:19
99:21 102:13,
15 112:7
documentatio
n
89:3 103:22
documents
11:17 13:3,9,
10,13,17,19,
20,21,25 14:4
doesn't
67:1 92:19,20
doing
25:2 32:18
40:9 46:14
68:25
double-sided
12:17
down
20:24 63:19



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser

June 13, 2012

120

| | | | | |
|---|---|---|---|---|
| 65:24 108:10 | 18:7 | 29:25 | Esquire | examined |
| drafted | either | embody | 1:19 3:8,16 | 16:18 |
| 54:4 | 14:1 36:2,18 | 36:16 | 4:7,14 113:15 | examining |
| duly | 38:13 44:14 | emergency | establish | 8:6 |
| 6:2 | 45:14 47:15 | 7:3 64:24 | 22:5 25:12 | example |
| Dunn | 61:12 88:16 | 65:4,6 66:14, | 35:9 36:22 | 18:24 20:22 |
| 4:12,14 28:1, | elderly | 22 67:6,11 | 38:13,16,18, | 84:20 97:19 |
| 3,4 82:19,21 | 109:3 | 68:5,9,14,19, | 19 50:4 63:6 | exception |
| 86:2 110:13, | elevated | 21 69:11,17 | established | 44:13 |
| 14,15 | 44:15 | 70:5,10,14,17 | 19:22,23 | exceptions |
| during | Eleven | 71:6,13 72:6 | 20:19 35:7,11 | 43:2 |
| 36:13,19 | 18:9 | 73:22 74:3,8, | 36:18 42:24 | excludes |
| 38:10 44:21 | eligible | 22 75:2,6 | 44:1 46:4,15 | 102:4 |
| E | 17:12 | empirical | 50:5 | Excuse |
| E | Elizabeth | 103:11,20 | establishing | 53:11 |
| 3:1 4:1 6:10 | 1:19 3:16 | employed | 24:23 | executed |
| 100:10 101:5, | elizabeth.wes | 62:4 113:5,7 | et | 112:8 |
| 20 111:1 | tfall@usdoj.g | employee | 1:8,10,11, | Exhibit |
| each | ov | 113:6 | 13,14 3:12 | 12:3 16:15 |
| 57:13 | 3:17 | Empower | 49:19 | 20:6 48:21,23 |
| earlier | elsewhere | 104:10,11,14, | event | 65:8,10 85:8 |
| 15:21 25:19 | 15:19 | 18 | 78:18 | 91:17 98:3 |
| 26:24 49:18 | E-mail | end | everybody | 99:19 102:11 |
| 50:3 62:24 | 5:15,16,18, | 18:15 23:20 | 22:17 | 107:23 |
| 79:13 | 19,21 80:12, | ends | evidence | EXHIBITS |
| early | 14 85:13,16, | 24:15 | 47:6 103:11, | 5:7 84:3 |
| 44:9 | 18 86:5,19 | Engelbrecht | 20 | existence |
| eb | 87:2 90:8,23 | 5:20 102:17 | exact | 44:3 62:14 |
| 1:1 | 91:11,21 | 103:10 104:4 | 29:20 77:8 | 103:5 |
| ECF | 92:5,16 93:11 | 106:24 | exactly | existing |
| 8:7 9:20 10:2 | 95:6 99:1,4, | ensure | 30:17 31:2 | 18:23 19:9 |
| Edith | 25 100:9,19, | 109:4 | 50:14,18 | 29:14 30:7,9 |
| 1:23 2:12 | 20,22 101:3, | entire | exam | 31:22 35:18 |
| 4:18 113:11 | 19,21 103:12, | 8:23 | 84:3 | 46:16 48:1,11 |
| EDUCATION | 16,24 104:2 | entirety | EXAMINATION | 54:19 59:18 |
| 1:11 107:13 | E-mails | 16:24 | 5:1 6:4 7:11 | expand |
| effect | 80:16 86:6 | entitled | 8:2,12 9:22 | 15:13,16 |
| 7:2 109:9,13 | 90:12,21 | 88:2 | 11:4,11 81:23 | expects |
| effects | 91:5,11 | equal | 82:7,20 | 108:25 |
| 73:12 | embodied | 10:4 | examine | experience |
| Eight | 36:15 | ERIC | 8:13 9:5 82:3 | 27:22 |
| | embodies | 1:6,8 | 84:15 | |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser

June 13, 2012

121

| | | | | |
|---|---|---|---|---|
| Expiration 113:15 | 106:12,18,21 | 44:21 45:3 49:22 55:3 | Forrest 105:17,18 | 113:5,6 |
| Expires 113:14 | favor 22:14 31:16 41:2 | 56:9,14 58:8 60:12 61:12, 15 63:4 66:5 | forth 7:7 45:4 57:6 | future 34:15 49:20 |
| explain 42:9 51:13 68:20 101:20 | favorably 14:11 15:22 21:25 22:9 24:13,17 51:5 | 70:18,21 72:10 74:2,23 75:1,21 77:20 | forward 40:9,10 51:18 54:20 55:1 | **G** |
| explained 24:22 58:7 | feel 83:8 | 87:13 89:8 92:21 95:10 97:21 98:6 | 56:15 58:6 59:12,21,25 82:24 | gave 6:14 58:4 |
| expressed 71:15 87:5 100:22 112:9 | felt 13:24 20:23 | Five 18:5 47:24 82:21 | found 13:19,21 | General 1:7 3:5 14:14,15 23:1 35:2,4 39:17 |
| expressing 63:8 | fewer 33:1,3,6 | Floor 3:6 24:14 25:16 39:10, | Foundation 33:9 66:24 86:15 | 40:25 41:6,9, 14,23 42:16 43:20,21,23 |
| extend 8:20 | fighting 98:20 | 11 40:13 52:5 88:4 89:1 | Four 18:4 | 45:24 46:10; 12 47:2,8,23 51:12,22 |
| extensive 82:9 | Figueroa 107:18 | follow 43:13,15,16 45:25 47:13 | four-fifths 37:23 43:3,4 44:22 48:5 | 53:2,18 62:2 67:19 68:23 69:19 70:7,23 |
| extent 7:21 76:25 84:11,24 86:22 89:10 | file 13:18 63:5 78:22 | following 10:1 13:5,8 18:2,14 26:20 | Fourth 5:13 | 73:3 74:3,21, 24 82:6 90:24 99:12,14 |
| 92:13 93:2 101:12 102:6 104:18 105:9 | filed 26:24 27:21 28:9,10,16 64:15 76:4,16 77:4,13 | 66:12,14 68:4,14 71:21 73:16 89:20 96:14 100:25 | FRASER 1:16 2:8,11 6:1,6,10,25 9:4 41:22 81:3,9 82:3 | generally 15:18 16:4 24:6 31:15 32:11 39:21 42:25 46:6 |
| **F** | filing 27:5 58:23 62:25 64:3,11 79:16,22 80:4 | follows 6:3 15:3 26:12 45:19 | 108:25 109:4 112:1,3,6 | 67:11,15 74:7 83:5 |
| F 6:10 | financially 113:7 | 56:8 72:2 76:15 | Fraser's 81:25 | General's 13:23 14:2 |
| face 16:19 48:25 | fine 53:13 54:11 55:20 | force 10:4 68:1,6, 19 73:1 | free 76:24 | geographic 105:25 |
| fact 70:9 81:10 | finished 82:12 | foregoing 112:1,8 113:3 | front 9:21 29:3 | George 106:5,7 |
| facts 47:5 113:3 | first 6:2 11:4 | foresee 82:8 | full 16:18 49:4 53:16 | Georgia 79:18 |
| fair 10:13 23:6,8 | 15:24 17:9 18:11 20:9 | Form 86:14 | FUND 1:11 107:13 | getting 36:9 37:14,17 46:22 51:24 |
| fall 9:23 87:10 | 22:17 27:10 | | further 9:9 110:11 | 81:18 90:13 |
| familiar 14:7 15:4 104:9,12 | | | | give |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                          June 13, 2012
                                                              122

| | | | | |
|---|---|---|---|---|
| 10:15 20:22 37:8 42:15 43:21,24 46:12 57:10 97:19 | 21 62:9 63:6 67:7 68:24 69:9 71:19 72:17 78:22 80:23 81:12 82:16 84:19, 21,22 95:17 99:10,11 110:13,15 | grocery 97:8 ground 6:14 group 39:16,17,20 88:9 104:15, 25 | happened 56:2 63:12 76:3 77:10 happens 14:12 15:23 21:4 40:4 happy 103:21 | helpful 92:8 96:24 97:12 helps 49:16 97:18 98:8 her 10:20 46:25 |
| given 25:3 36:4 77:5 86:24 112:10 | gone 24:4 | groups 7:16 84:6 87:4,5 90:2 94:1 | hard 80:12 97:13 Harless 9:21 10:9 81:7,12 | 47:2 58:2 62:11 86:5,7 91:2,3,14 101:21 102:19 |
| giving 102:8 | Good 6:5,7,8 11:12 86:6 97:9,14 98:13,16 | guess 96:20 97:24 99:14 | Harless' 81:16 | hereby 66:13 112:1 hereto 113:7 |
| glad 21:16 30:10 72:12 73:4 74:4 77:13 101:17 | government 100:13 | guided 46:2 guy 92:19 | Harris 2:13 113:1 hasn't 28:15 | higher 44:15 history 36:9 |
| go 10:20 11:3 14:20,22 15:11 16:6 20:20 21:7 24:6,18 25:16 28:6 29:15 39:10 52:5,21 53:12 54:10, 18 55:7 63:19 65:11,14 66:24 81:6 82:10,24 86:16 95:10 97:8,15 | Governor 7:2 16:3 25:1,11 37:25 62:10 64:13, 23 65:3,5,25 66:11,13,18 67:2,5,8,10, 21 68:3 69:6, 10,12,16,25 70:14,18 71:13 73:10 74:7,21 75:1 99:13 | H H 1:6 111:1 hadn't 58:5 half 33:15 72:10 hand 16:16 82:17 112:10 113:8 handed 12:4 48:22,24 | head 25:8 92:17 hear 10:7 59:6 75:1 76:11 89:8 heard 27:8 55:4 56:10,18 58:10 83:14 87:13 88:4,6, 16 97:16 98:12 102:19 | Hold 63:7 HOLDER 1:6 3:12 honor 21:1 Horseshoe 108:25 hour 81:17 82:2,10 hours 2:16 51:7,19 52:2,9,14 53:6 |
| goes 39:4 68:16 | Governor's 16:2 24:18 25:15 39:12 62:25 63:16 64:10 66:22 68:25 70:5 71:5 72:4 73:21 74:19 75:6 76:1 | 65:9,16 85:9 91:18 99:20 102:12 107:24 | 103:2,20 104:11 | House 18:7,8,9 |
| going 7:6 8:13 9:5 11:7 14:19,21 15:10 20:14, 20,24 29:10 30:10 31:3,6 37:7 41:12 44:13 46:15 48:1,12,13, 15,18 50:4 51:16 55:12, | | handing 49:2 handled 58:12 59:8 80:18,20 happen 36:23 | hearing 98:7 107:6 hello 105:9 help 109:16 helped 97:6,18,25 | 20:22 21:3 23:16 25:9 32:11,13 33:14,16,17 37:18,22 64:10,13 |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                    June 13, 2012
                                                        123

66:15
**HOUSTON**
1:25 4:13
**hundred**
20:24
**hurt**
110:3
_____
          I
_____
**ID**
24:1 37:1
57:5,18
58:11,17 59:7
60:13 68:9
73:11,22
75:2,6 78:22
79:16,22 80:4
86:8 87:25
92:4 93:10,20
94:2 95:22
96:23 97:6,
10,18,25
98:7,19 99:4
100:10 101:5,
20 105:12
107:15,17,20
108:7
**idea**
82:14,19 94:8
106:2,9
**identificatio
n**
51:5 66:17
71:6 72:5
86:9 87:23,24
88:2
**identified**
9:2
**identity**
112:7
**IDs**
86:20 87:6,14
88:8,19,24,25

89:3,9,16
90:3,13
**ill**
10:15
**illegal**
87:25 93:20
95:23 97:12,
18 98:20
100:10 101:6,
21
**illegally**
88:3
**illegals**
86:9
**Illinois**
80:1
**immediate**
66:14 68:15
**immediately**
53:16
**immigration**
93:11,20 94:2
97:12,18
98:1,8,13,16,
20 100:11
101:6,21
105:14
**implicates**
95:14
**implied**
68:17
**implies**
28:23
**imply**
29:18 31:13
**implying**
15:15,16
29:17 31:9
67:24
**important**
69:25 70:2
**impressions**

14:18 34:22
51:14 54:17
71:12 83:23
84:20 86:23
92:12 93:3,6
94:17 95:12
101:13,19
102:1,4
109:24 110:6
**improper**
31:13
**inappropriate**
92:22
**incident**
103:9,19
104:5
**included**
52:13
**including**
55:4 56:10
102:2
**incorporated**
110:2
**incorrect**
67:15
**INDEX**
5:1,7
Indiana
79:8
**indicate**
18:16 66:2
**indicated**
42:17 81:1,3
84:9
**indicates**
12:18 68:8
103:8
**indicating**
8:5 86:5
**indication**
104:8
**individual**

78:2 79:9
**individuals**
104:16
**indulgence**
42:4
**information**
35:3 43:24
93:16
**initially**
50:5
**in-person**
61:5,9 78:14,
15
**inside**
49:1
**instead**
10:23 16:13
**instruct**
71:19 94:4
96:12 100:24
101:10 110:9
**instructing**
92:24 93:1
**instruction**
55:16 89:24
90:18 93:13,
22 94:11,19
96:1
**instructions**
95:18 99:12
**instrument**
112:8
**intend**
7:23
**intends**
10:20 110:7
**intention**
7:23
**intents**
94:14
**interaction**

107:9
**interest**
7:16 84:6
87:4 94:1
**interested**
113:7
**interpret**
92:21
**interpretati
on**
8:17 9:12
**INTERVENORS**
4:11
**invade**
94:17
**invasion**
100:14
**involved**
57:1 60:25
79:5 104:16
**issuance**
10:1
**issue**
8:22 9:24
10:5 11:7,11
36:2,3 55:12
67:11,17 71:3
73:3 74:22,24
81:8,10,17
89:12,16
97:12
**issued**
69:25
**issues**
7:7,23,24
8:12 37:8
46:18 57:11
70:10 81:2
82:13 94:10
96:8 98:1,8,
17 105:5,25
106:1 109:2,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser

June 13, 2012

124

14,15
**item**
41:19 71:13
**items**
35:8 41:18
70:11

_____ **J** _____

**Janice**
46:24 80:19
85:12,15
**January**
5:11,12,14
48:25 53:23
54:4 56:16
64:7 65:19
66:12,19
73:12 86:13,
17 100:1
103:25 108:6
**job**
97:9
**John**
80:1
**Joint**
18:4,7 30:18
**Journal**
5:13 45:5
65:18,23 75:7
**JR**
1:6
**jump**
22:16 27:16
**June**
2:15 6:19,23
8:7 113:9
**Just**
6:21,22 7:13
9:13,20 14:17
15:21 21:24
22:20 28:3
29:3,25 36:12
41:10 42:8,11

45:9 46:19
52:7 57:21,22
58:4 60:7
61:8 62:2
63:9 68:7
76:25 81:15
83:6 84:2,13
86:18 108:20

**Justice**
1:19 3:13
99:14 109:5

_____ **K** _____

**K**
3:8
**KENNIE**
1:8 4:11
**kind**
100:12
**King**
102:21 103:10
106:19
**knew**
56:14 59:13
**know**
10:22 12:11,
14 13:15,17,
19 17:14 22:8
24:8,9 27:15
29:9 31:6
32:24,25
33:20 37:7
38:23,25
40:20,22,23
41:21 45:9,
14,17 48:9
51:16 52:12,
15,22 53:20
54:7 56:23,24
57:11,13 65:5
69:12,13,14
77:10 80:13,
22 83:4,5
85:19,21,22,

23 86:19 87:3
90:7,10,21
91:4,24 92:5,
7,19,20
93:18,19,23,
25 95:24 96:7
97:14 98:25
99:2,3,9,23
101:3,4,5
102:17,21,23
103:21 104:1,
3,4,7,15,18,
21,22,25
105:4,6,9,16,
17,23 106:5,
7,10,14
107:2,5
108:3,9,21
**knowing**
87:1,2
**knowledge**
28:10 35:1
37:4 39:1
89:6,12 99:8
107:16
**known**
44:9 112:6
**Kucera**
5:17 94:9
**Kucera's**
99:1

_____ **L** _____

**L**
5:16
**laid**
58:7 59:18
**large**
36:2
**Last**
6:10,14 11:16
73:7 75:24
**law**

7:18
**layout**
18:25 19:3,15
48:15 51:18,
20 52:2 53:1
**LEAGUE**
1:11
**learn**
75:21
**least**
45:16 48:4
51:7
**leave**
10:19 74:12
**led**
63:19
**leg**
54:15
**legal**
10:16 92:4,8
95:22 96:18,
24 97:7
107:13
**legislation**
7:3 24:3
34:23,25
64:24 65:3,4,
6 66:16 67:5,
6,9,16 68:9,
21 69:11
70:6,17 72:25
73:10 74:3,8,
22,23 75:3,7
83:23 86:24
95:13 97:15
102:2
**LEGISLATIVE**
1:12 4:4 7:8,
19 8:13,25
9:3,24 14:19
17:10 33:16
34:21 54:18
55:23 71:7,18

72:6,8 73:15,
22,25 83:16
84:1,7 90:16
93:1 94:5
95:14 96:1,11
101:10,24
109:20
**legislativel
y**
77:1
**legislator**
55:6 56:13
84:10,11
**legislators**
7:15 84:5
109:25
**Legislature**
5:11,12 16:20
28:14 43:4
57:16 59:8
66:16 68:5
69:17 70:11
**length**
23:24 24:5
**lengthy**
81:22
**less**
82:22
**let's**
11:10 65:14
80:24 92:25
**letter**
94:22 98:14
**letters**
80:12
**Lieutenant**
16:2,3 24:18
25:1,11,14
37:25 39:12
62:25 63:16
64:10 76:1
99:13



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser

June 13, 2012

125

life
92:19
likely
36:23 63:4
78:17
limit
23:24 24:5
81:19 82:7
limited
81:16
limiting
7:22
Lindsey
4:7
lindsey.stelc
en@dechert.co
m
4:9
Line
111:3
link
93:10 96:8
linked
93:19
list
32:21,23 34:8
listed
21:18 37:16
listened
107:7
lists
13:3,9
literally
19:10
LLC
113:15
LLP
2:14 4:5,12
lobbyists
7:16 84:6

log
56:1
logical
36:16
long
21:7 32:14
44:2,3,10
52:5 79:10
longer
82:10
look
12:7,8,11
20:8 42:23
looked
109:15
looking
34:5 36:8
97:21 98:3
109:14
Looks
103:25
lost
9:24
lot
83:10 87:5,13
90:12
loved
45:11
Luis
107:18
LULAC
107:20

**M**

magazine
88:12
mail
80:7,9,11
maintain
95:17
majority
19:6,20 21:7

22:13,19,22
26:22 29:13,
20 30:8 31:19
32:8 35:9,12,
15 40:14
44:12 48:12
51:8 72:23
making
66:22 109:11,
15
MALDEF
107:12,17
march
82:24
mark
16:14 48:20
65:7 85:6
91:16 99:18
102:10 107:22
MARKED
5:8 12:3,5
16:15,17
48:21,23
65:8,10,16
85:8,10
91:17,19
99:19,21
102:11,13
107:23,25
Mathis
5:18 99:23
100:1,6,7
101:5,20
matter
6:11,18 14:14
23:2 51:23
53:3,19 66:14
67:20 68:5,
14,23 69:11,
17,20 70:8,24
71:7,9 72:6
73:3,22 74:21
77:1 87:18
88:11 90:25

matters
7:9 9:17
14:15 32:2
34:21 40:17
54:8 55:14
87:15 101:10
110:4
McCoy
13:15,16
46:24 47:4
80:19 83:11
85:16,20
89:15 90:1,11
91:10 99:3
100:18,21
103:4,6,7
McCoy's
85:12 90:23
mean
7:21,23 9:16
18:20 49:22,
23,24 63:19
68:22 88:24
95:15
means
20:12 49:19
57:24 69:3
85:1
measure
34:14
meeting
79:11,19,20
80:5
meetings
40:5
member
21:5 40:8
members
18:22 19:5
20:21 21:1
22:18 25:4
30:21 31:22
34:17 37:22,

23 38:19 39:5
49:21 51:8
64:9,13
membership
39:4
memory
67:1,3
mental
14:18 34:22
51:14 54:16
71:12 83:22
84:20 86:23
92:11 93:3
94:17 95:12
101:13,19,25
102:4 109:24
110:5
mention
67:15
merit
74:25
merits
32:9
message
65:25 66:2,3,
6,11,12 68:7,
14 86:5 91:21
92:1,2 99:25
100:6
met
11:15,19
105:8
method
36:20 44:7
methods
38:12
MEXICAN
4:4
Mexican-
American
107:13
Michael



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser
June 13, 2012
126

104:21,24 105:10
**Mickey** 5:18 99:23 100:1
**mind** 10:21 28:25
**mine** 29:3
**minimum** 48:16 52:6,9, 25
**minorities** 109:3,18 110:3
**minute** 12:7 63:7
**minutes** 82:21
**missing** 50:13
**Misstates** 49:25
**moment** 82:21
**Monday** 5:13 65:18
**month** 60:14
**morning** 17:24 20:16
**most** 22:24 23:6,9
**motion** 27:14 36:14 51:7 81:7
**motions** 8:7 10:2
**motivation** 68:25 92:13 94:21,22

**motivations** 34:22 84:12 93:7 94:13 95:3,20 102:1
**mouth** 74:15
**move** 38:17 46:17 53:11
**moves** 34:7
**moving** 51:18
**multiple** 16:8,12 17:5 31:7 37:10 43:4 46:18 48:2 88:22
**must** 27:6 84:8
**muster** 109:4
**Myself** 78:1 79:6

**N**

**N** 3:1 4:1
**NAACP** 1:9 4:4
**name** 6:8,10 79:9 86:7 91:25 104:22 108:13 112:8
**named** 104:24
**Napier** 3:8
**Natural** 22:7
**nature**

27:2
**necessary** 28:12 33:18 43:17 52:19
**need** 22:13 59:14, 17 61:8 63:18 69:7 76:11 89:6 103:9,19
**needs** 23:14
**Needville** 91:24
**neither** 113:5
**never** 24:21 56:18 70:11 92:18 98:12 100:20 102:16,19 103:2 105:11 106:23 108:2
**Nevertheless** 81:6
**new** 77:9
**news** 88:16
**newspaper** 70:3 88:11
**Nine** 18:7
**nonevasive** 6:25
**nonexcerpted** 49:5
**notary** 6:3 112:12 113:3,12,14
**note** 45:3

**noted** 69:25 112:2
**notes** 12:1 18:16 44:24 45:2
**nothing** 28:21,22
**Notice** 5:9
**Notwithstand ing** 51:3
**November** 63:3
**number** 9:20 13:4,7,9 20:9,10,18 25:24,25 26:1,2 27:16, 17 33:5,20,22 34:3 35:14,22 77:6,9
**numbered** 13:2 78:21
**numerous** 70:10
**NW** 1:20 3:14
**NWB** 1:20 3:14

**O**

**oath** 112:7
**objecting** 58:2
**Objection** 30:24 33:8,9 42:9 45:22 47:5,21 49:25 52:18 57:19, 22 58:1,13

59:4,9 66:24 73:15,23,25 76:23 86:14, 21,22 89:10, 22 90:4 92:9, 10 93:12,21 94:4,12,19, 23,25 95:8,9, 16,17,25 96:9,10,11 98:21 100:23 101:8,9,22, 23 107:4 109:19 110:4, 8
**observation** 70:15
**observe** 48:14,15
**obstruction** 101:15
**obtaining** 89:3
**obviously** 15:25 69:24
**occasionally** 48:5 71:1 83:13
**occur** 60:6 63:10
**occurred** 55:22
**o'clock** 20:15,16
**offer** 40:10,12
**Office** 3:5 13:18,23 14:2,4 16:2 24:19 25:4,15 39:12 61:25 62:8,10,17, 25 63:16



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser

June 13, 2012

127

| | | | | |
|---|---|---|---|---|
| 64:1,10,11,18 76:1,9,22 78:16 80:8, 10,17,20 81:25 83:3, 10,13 90:8 91:6,7,8 92:1 97:4 99:1,10 100:1 104:2 112:10 113:9 **offices** 2:14 **official** 1:7 **Oh** 108:23 **Okay** 8:16 10:6,17 11:6 15:10,17 17:19 24:4 30:13 33:21 40:19 42:8,19 49:6,12,14 51:15 52:20, 21 53:12 54:13 55:17 62:6 64:16 80:23 82:23 83:18,24 85:6 98:5 110:11 **old** 45:15 **Once** 35:10 **one-way** 62:15 **operate** 23:15 42:22 **operates** 24:8 **opinion** 94:16 95:5 **opposed** | 95:23 **order** 6:23,24 7:7, 22 8:6,15,17, 24 10:1,23,25 11:1 16:7 17:2,4,6,7,8, 11,13,21 18:2,12,14,17 19:7,17,20, 21,24,25 20:2,3,6,9, 10,19,21,24 21:2,5,6,8, 13,20,25 22:1,3,6,10, 11,15,21,24 23:4,5,7,9, 11,12,13,15, 19 24:10,23 26:5,15,21 27:15 29:16, 22 30:12,19, 20 31:3,12, 18,25 32:5, 15,16,18,19, 22 33:17,23 34:1,2,5,6,7, 13,15 35:5,8, 13,14,16,17, 21,23 36:4,8, 11,14,22,24, 25 37:11,20 38:2,9,12,17, 18,19 42:5, 22,23 43:1,6, 11,12,13 44:1,3,5,11, 17,19,20 45:1,3,15 46:1,17 47:13 48:10 49:20 50:4 51:7 56:22 57:7 63:5 81:5 | 84:4 85:5 **ordered** 6:18 7:24 8:10 10:13,14 11:10 42:20 81:4,11 **orders** 16:9,10 17:5 18:2,11 20:17 32:10 34:11, 19 35:24 36:12 37:2,9, 15 38:6,21 57:12 **organization** 102:25 104:9 **ORIGINAL** 1:17 **outside** 8:25 9:3 11:1 91:23 93:15 **over** 10:20 22:8,16 27:17 33:14 37:21 54:10 66:19 95:10 110:13 **overcome** 27:7 **overdrawn** 100:14 **override** 25:13 ___P___ **P** 3:1 4:1 **P.O** 3:6 **pacing** 24:9 **PAGE** 5:3 12:16,18 | 13:3,5,8 17:16,18 21:10,12 30:11 34:4,9 44:23 45:2 49:15 65:22, 23,24 86:13 108:11 111:3 **pages** 13:1,6 113:3 **paginated** 13:6 **paper** 75:4 **paperwork** 15:25 22:10 **paragraph** 13:8 103:9 108:14,20 **paragraphs** 13:2 **pardon** 100:7 103:14 **Parkway** 4:12 **parliamentary** 14:15 19:21 43:14,16 44:5,8,9 **part** 11:4 74:2 81:4 **particular** 17:1 20:5 29:24 31:9 34:25 46:19 70:5 88:8,24 105:1 **parties** 113:6,7 **party** | 60:17,22 76:6,18 77:23,25 78:12 79:3,7 105:21,22 106:8 **pass** 32:8 **passed** 19:2 97:13 109:6,16 **passes** 109:4 **passing** 78:18 **path** 63:19 **Patricia** 10:9 **Patrick** 3:8 **patrick.sweeten@aog.state.tx.us** 3:10 **Patriots** 102:21 103:10 106:19 **pattern** 71:3 **Paul** 107:2,5 **pause** 52:17 **Payne** 5:15 85:23 86:5 90:8 **Payne's** 86:18,19 **pending** 55:18 73:8 |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                                June 13, 2012
                                                                    128

Pennsylvania
1:20 3:14
people
29:10 30:22
40:6 61:7
83:9 87:6,14
88:7,18,22
89:2,9,16
90:3,13 96:25
97:14 109:3
percent
100:11
period
41:8 51:9
78:6 82:7
permission
10:9
permitted
8:14 42:4
Perry
66:13,18
person
78:1 80:17,20
91:25 93:18
104:24 112:7
personally
80:9 91:9
112:6
persons
86:20
phone
70:3 78:14
photo
24:1 97:10
phrased
41:8 42:10,13
93:8
physically
24:21
picked
70:2

piece
34:25 67:9,16
72:25 95:13
97:14
place
53:22 54:25
placed
37:19,25 38:1
Plaintiff
1:5 3:4
plans
37:12
please
7:20 26:9
56:6 66:10
71:24 103:21
podium
82:17
point
30:5 72:13
pointed
81:6
policy
24:20 30:18
political
78:17 105:2
population
100:12
position
10:5,18
possession
14:1
possibility
55:4 56:10
90:13
possible
42:12
post
16:5
postage
80:14

posting
19:14
potentially
51:17
power
25:3 66:22
67:1,2,4,8,
18,22,24,25
68:1,2,6,16
powers
68:10
practice
82:6
praise
95:21
praised
96:17
preface
110:7
preference
11:5 20:18
prefile
78:22
prepare
11:14
prepared
15:13,16
present
11:20 19:6
30:21 34:17
43:1 49:21
66:17 73:11
President
25:2 79:8,18
80:1 106:8
Presidents
79:11 80:5
President's
18:1 21:19
presiding
46:5

press
7:17 8:9
15:18
pressing
23:14
preview
16:4
previous
14:22 15:1
77:16
previously
6:11 14:1,8
15:5 78:21
print
97:2
printing
18:24 19:1,15
29:19 31:5
48:14
prior
14:8 15:6
36:9 37:13,17
56:19 57:16
58:5,7,23
59:23,25
62:20 63:5
64:16 75:7,
17,18 77:16
78:5,8 88:13,
20
priority
20:11
private
11:1 103:6
privilege
7:8,19 8:13,
25 9:1,3,24
14:19 34:21
54:9,18 55:9,
14,23 56:1
69:1 71:18
72:8,19,20
73:1,15 74:1

83:17 84:1,7,
13,14 87:16
89:11,19,23,
25 90:6,16,20
93:2,14,24
94:6,7,12,18
95:14 96:1,3,
6,12,13
100:23 101:2,
10,24 102:7,9
109:20,22
110:5,8,10
privileged
9:6 13:25
60:2 73:18
77:1 90:5
92:10 93:16
97:5 101:17
privy
80:15
probably
10:10 19:11
29:3 30:4
47:23 60:14
77:22 88:25
105:9
problem
55:11 87:19,
20
procedural
69:20 70:4
71:17 73:20
74:6
procedurally
58:24 59:8
69:5,10
procedure
14:7,9 15:5,
7,19 19:21
23:17 24:23
29:8 43:14,16
44:5,8,9
45:19 51:23
69:12,14



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

procedures
58:11 60:13
61:16,21 62:4
64:7
proceed
7:10 11:10
17:25 23:18
44:6,17 82:25
produce
99:7
produced
14:4 81:24
84:8 99:4
program
100:12
prohibiting
33:12
promise
82:7
proof
66:17 71:6
72:5 73:11
75:2
proper
86:9 87:24
proved
112:6
provide
6:25 103:11,
19,21
provided
8:1,4 9:17
43:22 47:22
provision
55:4 56:11
public
7:16 8:8 29:7
32:3 40:18,
21,24 71:4,9,
15 72:3,9
73:13 87:8,18
88:9,11,16

110:1 112:12
113:3,12
purpose
7:1 40:25
41:9,11,14,23
42:2,16
43:13,18,20,
22,23 45:24
46:8,11,12,
22,25 47:3,8,
23 48:6,18
51:12 86:10
purposes
112:9
pursuant
6:22 22:14
68:12
put
11:6 35:13
37:11 53:22
86:7 95:6
puts
101:6
putting
74:15

—— Q ——

qualify
62:9
question
14:22 15:1,4,
11,12,14,21
26:9,13 28:18
33:6,12,19
34:20 41:8,
10,13 42:4,9,
13,17,18,19
46:10 47:9,24
50:2 51:11
54:1,2,9,17
55:18 56:4,6,
9 57:9 58:2
59:5 60:20
61:9 62:9

64:12 67:7,14
69:7,8,9
71:20,23
72:3,7,11,13,
15,16,18,21,
22,23 73:2,4,
7,19 74:2,5,9
75:23 76:10,
12,16 77:3,4,
11,13 82:4
86:21,22
87:16 89:18,
24 90:5,15,
17,19 92:22
93:5,8 94:5,
20 96:4,10,12
98:5 101:14,
16 102:3,8,9
107:14 109:23
110:7
questioning
81:8,16,19
84:10
QUESTIONS
5:3 7:1,6,25
9:25 14:14,16
15:17 41:23
81:13 82:18,
25 83:16,19,
22 94:25
110:11,16,17
Quinn
104:21,24
105:10
quote
109:12

—— R ——

R
3:1 4:1 5:16
6:10 111:1
raised
89:15 90:14
range

63:12
Raymond
106:10
reach
24:14
read
11:16 14:23,
25 15:2 21:16
26:10,11 49:2
50:17 56:5,7
59:19 66:3,12
69:13 70:3
72:1 75:4
76:13,14
88:14 103:13,
15,18 108:20
112:1
reading
16:10 17:12
18:6,7,8,9
19:3,4,16
21:17,19
88:20
real
86:6
realize
110:6
really
29:2 47:9
70:1
reask
73:18
reasked
71:23
reason
19:18 20:13
23:14 42:16
77:3 85:15
95:10
reasonable
81:17
reasoning

10:3
reasons
47:1,18 48:2
63:8
Rebecca
105:17
recall
28:13 31:24
33:22 36:25
37:2 64:8
77:6 84:24
98:15,18
100:18,21
109:10
recalls
71:15
RECEIPT
1:17
receive
27:6 80:7,11,
12,13,14 83:6
85:16 96:16
received
21:21,22,23
80:11 81:24
85:19 90:11
97:23
recess
65:13
recognize
12:5,6 16:17
30:14 48:23
65:16 85:10
91:25 99:21
102:13,15
107:25
recognized
76:1
recollection
12:22 33:7
57:3 66:21
75:25 78:5,7
108:3



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser

June 13, 2012

130

recommend
39:7,12 44:19

recommendatio
n
58:6

recommendatio
ns
39:18 40:5

recommended
40:15 59:12

recommends
40:1

reconsider
10:4 95:7,15

record
6:9,21 11:3
32:3 40:18,
22,24 53:12
55:7,16
65:11,14
71:4,9,16
72:3,9 73:13,
21 87:8 88:9,
11 110:1

recording
102:1

redistricting
37:12,15 38:4
56:21,25

refer
19:13 20:5
29:6,8,10
30:22 35:12
43:7 51:9

reference
72:24

referenced
42:10

references
108:13

referred

14:8 15:5,8,
15,18 67:13

referring
35:4 43:5
50:8 54:22
63:2 68:7

refers
20:6 28:21
30:2 45:5

refile
63:6

refiled
77:8,10

Reform
105:14

refresh
12:22 66:21
67:1,3

regard
9:25 38:3
77:21 82:18

regarding
7:1,4 34:22
37:1 51:14
71:15 75:12,
15 81:9

regardless
53:7

regards
61:18

Registration
113:16

regular
16:6,9,10
19:17,25
20:2,3,6
21:2,5,6,7,13
22:1,3,5,11,
14,21,24
23:4,5,7,9,
11,12,13,15,
18 24:23

26:5,15,21
27:15 28:18
29:15,21
30:12,19,20
31:3,12,20,25
32:5,15,16,
18,22 33:17,
23 34:6
35:21,22
43:6,11 44:20
47:13 48:8

relate
45:8 89:2
92:13

related
8:6,7 58:11,
24 64:3 80:4
84:3 104:5
113:5

relating
51:4 55:14

relative
113:6

released
13:23 14:2

releases
7:17 8:9

reluctant
55:19

remains
75:24

remember
6:14 15:16
25:20 26:25
27:3 32:21
33:4 40:24
57:4 63:20,21
78:7,11 89:7,
12 109:11,13,
14

remind
25:23 83:16

removed

59:13

reopened
8:1,11

repeat
26:9 53:25
56:4 72:12

rephrase
41:8 69:7
77:12

report
21:25

REPORTED
4:17 14:12
15:22,24
24:13,17
51:5,10 52:1,
23

reporter
2:12 28:3
71:25 113:2,
12

reports
21:20 88:13
103:9,19
104:5

represent
16:22 49:4
50:18

representati
on
25:18 68:11
82:11

Representati
ve
9:21 81:7,12,
16

Representati
ves
66:15

representing
16:21 49:3

represents
104:25 105:1

Republican
108:25

Republicans
37:13

request
44:15 81:18
99:15,16

requested
13:22 15:2
26:11 56:7
72:1 76:14
103:20

require
26:4,14 27:5
31:7 32:10,17
35:12,15 46:7
47:13 48:4
50:7 84:11
86:25 93:2,6

required
6:24 12:24
17:13 29:13
30:1 31:5,11
32:8,14 41:18
42:3 46:14
47:14,18
52:25

requirement
41:1 42:21

requirements
37:1 51:5

requires
22:22 26:22
31:4,15 42:25
43:3 48:12
66:17

requiring
41:3 48:7
73:11

reread



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

71:24

**reserve**
110:17

**resident**
97:24

**resit**
6:17,25 9:5

**Resolution**
5:11,12 20:23
21:3 27:10
30:18 34:14
49:19 51:4

**resolutions**
17:21 18:4,5,
7,9 21:17,19
23:10 31:25
32:7 45:2

**resolve**
27:12 42:5

**Resources**
22:7

**respect**
8:2 10:9
81:11

**respectfully**
42:19 66:18

**respond**
70:14 83:5,9

**responded**
90:8 92:5
99:1 101:3

**responds**
83:3

**response**
83:8 91:3
102:5 104:1

**responses**
99:4,7

**responsible**
47:11

**restate**

109:22

**restricted**
89:1

**result**
73:21 84:23

**retract**
61:8 63:18

**return**
99:11

**reveal**
34:21 54:8,
13,15,16
55:23,25 56:2
59:15 60:22
72:8 77:1
83:22 84:12,
20,24 86:23
87:15 92:11
93:3,6 95:2,
12 101:25
102:7

**revealing**
55:5 56:5
60:3 101:13
103:5 109:24

**reveals**
71:18

**review**
11:17 12:12
22:9 39:5,17
40:6,10 91:15
108:21

**reviewed**
83:12

**reviews**
91:10

**revisit**
11:8

**reword**
101:16

**Rick**
66:13,18

**right**
6:12 14:5
22:2,11 23:21
25:17 27:19
38:6 45:21
49:21 55:1
58:18 63:23
64:20 74:12
82:6,11 84:18
85:2 91:12

**Rights**
109:7

**risk**
23:19

**RMC-DST-RLW**
1:10

**Robert's**
19:20 42:22,
23 43:1,12,14
44:1,11,18
45:8,13,15,20
46:1 48:10

**RODRIGUEZ**
1:14 106:5,7

**rolls**
100:15

**Room**
1:20 3:14

**routed**
90:22 91:14

**rule**
7:2 15:9,19
17:15,18,20,
22 18:10,13,
16,21,23,24
19:1,5,7,8,9,
14,15,19,22,
23 20:5,20
21:9,12,15
29:8,11,12,
14,15,17,18,
19,24 30:6,7,
9,11,14,16,

17,23 31:2,
18,23 32:6
34:4,9 35:13
38:17 41:9,
15,17,24
42:15,24,25
43:7,9,10,
17,18,20
44:24 45:2
46:3,5,8,15,
16,17,23
47:3,15,20,
25 48:1,9,11,
14,15,19
49:7,8,18
50:8,20 51:2,
4,12,18,21
52:4,7,8,13
53:22 54:3,
19,22 55:5
56:3,11,14,
19 59:11,13,
17,19 60:1
74:24

**ruled**
7:14 8:11
9:20,23

**Rules**
5:10,12 6:14
16:19,24
19:20 20:8
25:5,12 26:7,
18 28:12,21
29:25 30:2,6
31:7,17,20,
21 35:1,6,7,
10,11,18
36:15,17,24
37:2,3 38:2,
6,13,15 39:1,
5,8,10,13
40:2,11,16
41:2 42:1,12,
22,23 43:1,
12,14,15

44:1,11,18
45:8,13,15,
20,21,24
46:1,2,3
47:12,19
48:3,8,10,25
49:1,5,8,15
50:5,6,12,
16,18,21,24,
25 52:16
53:5,22 54:25
55:5,14
56:11,22
57:7,18 58:6
59:13,18,19,
23

**ruling**
8:24 9:7,11,
12

**rulings**
10:25 18:16
44:24

**runs**
40:5 91:7

**S**
3:1,16 4:1
6:10 111:1

**San**
105:21,22
106:3,8

**Santana**
5:21

**saw**
58:8 59:19
61:11 87:11
94:1 98:13,18
101:5

**saying**
9:13 10:7,12
19:18 27:9
59:1 92:7
98:16 109:13



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser

June 13, 2012

132

| | | | | |
|---|---|---|---|---|
| **says** 13:9 16:19 17:24 18:13 21:16 29:15 30:6,17 31:2 34:14 48:11, 24 50:3 51:3 68:12 88:1 92:3 100:3 103:18 | 34:11 45:3 65:24 68:8 85:12 86:12 87:1 96:19 103:8,12 108:10,13,18 | 8,11,25 49:5 50:5,6 51:6, 8,23 52:3,24 53:17,22,23 54:4,19 57:18 58:8,12,18, 20,25 59:13 61:18,22 | 108:24 112:1, 3,6 **Senators** 27:6 31:16 39:14 41:1 46:7 54:14 56:15 64:14 108:6 | 60:14 61:10, 13 62:20 64:14,16,20 65:19 70:19, 22 75:17,18 76:5,17 77:5, 7,8,16 78:6, 8,23 79:23 |
| | **seeing** 59:23 | 62:5,18 63:15,21 | **Senator's** 35:1 92:17 94:14 | **set** 7:7 36:13 44:3 45:4 51:6 57:6 71:2 |
| **scheduled** 26:21 | **seen** 12:13 24:21 34:2 85:22 91:19,20 92:18 100:20 102:16 108:2 | 64:3,7,10,11 65:18,23 66:15 72:11, 13,25 73:13 74:4,12,18, 20,22 75:7, 13,16,22 76:2,4,7,17, 19,20 79:8, 11,17 80:1,5, 7,10 89:1 91:6,7 95:4, 20 96:18 97:9,13 98:19 102:2 104:5 110:2 | **send** 22:8 | **sets** 49:15 |
| **school** 45:16 86:8 | | | **sense** 74:3 | **setting** 11:1 |
| **Schools** 100:13 | | | **sent** 86:12,17 89:14 90:22 91:2,5,6,8, 9,11 92:1 103:16,24 104:4,8 | **settings** 42:3 47:1 |
| **scope** 10:25 84:14 | **Senate** 5:10,11,12,13 7:5,18 14:7, 11 15:4 16:19,24 17:1,25 18:3, 4,5,6,18,22 19:4,8,22 20:20 21:21, 23 22:8 23:20 24:8,14 25:2, 4,10 26:7,17 27:18,19,24 28:8,15,21 29:14,15,24 30:6,7,8 31:15,21,23 35:6,7,9,10, 18 36:1,7,9, 15,17,23 37:3,6,14,17, 23 38:2,6,10, 13,15,18 39:1,6,8,9, 15,16,19,22 40:4,16 42:11 43:18 44:18 45:5,11,19 46:2,3,4,5,6, 15,16 47:2, 12,19 48:2,3, | | | **Seven** 18:6 |
| **seal** 112:10 113:8 | | | | **shall** 17:25 18:1 21:17,18 |
| **search** 13:13 | | | **sentiments** 100:22 | **share** 83:11 |
| **searched** 13:17 99:3 | | | **served** 16:11 27:19, 24 28:7,14 37:6 | **shared** 86:19 |
| **second** 12:16,18 16:9 17:12 18:6,8 19:3 21:17,19 61:8 65:22 103:8 | | **Senates** 22:14 | **serving** 27:18 | **shocked** 28:5 |
| | | **Senate's** 70:13 | **session** 23:20,25 24:15 26:25 27:22 28:8,9, 19 31:24 32:4,20 33:16,23 34:16 35:25 36:6,11,13, 18,19 38:10, 14,22 39:3,4 40:16 44:21 53:23 54:4 | **Short** 65:13 |
| **secondly** 92:22 | | **SENATOR** 1:16 2:8,11 6:1,5,10,24 7:13 8:6,14 10:7 11:13 12:10 36:13 41:22,25 47:11 60:24 61:21 64:6 69:23 73:16 79:10 81:2,9, 25 82:3 83:2 88:6 94:22 95:1,19 101:18 102:4 | | **shorthand** 2:12 113:2,12 |
| **section** 34:11 68:13 | | | | **show** 8:19 9:14 15:8 |
| **sections** 50:22 | | | | **showed** 100:18 |
| **see** 12:18,20 13:2,9 14:3 17:20 18:18, 19 21:9,12 25:14 31:14 | | | | **showing** 89:13 |
| | | | | **shown** |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser

June 13, 2012

133

7:20
SIGNATURE
1:17 112:1
signed
7:18 107:6
signing
8:9
similarly
96:17
single
59:24
sir
13:8 14:7,11
15:4 16:6,16,
22 24:12
49:16 73:5
103:12
sit
7:24,25 41:22
110:14
sitting
8:18 11:15
27:13 28:13
32:20 87:12
97:22 98:8
Six
18:5
Skipper
78:3 83:14
social
100:12
sole
80:20
Solutions
113:15
somebody
25:25
Sonia
5:21
soon
22:9

sorry
14:21 21:11
30:5 32:23
33:2,4,19
38:25 44:25
45:10,14
50:23 51:24
53:11 56:23
60:9 61:8
63:18 68:22
78:23 89:6
99:13 102:9,
14
sort
56:3 82:20
102:1
source
66:22
speak
11:22
speaker
37:24
speaking
31:15
special
16:9 17:6,7,
8,11 18:2,11
20:9,17 32:10
34:1,2,5,7,
11,13,15,19
35:5,8,13,17,
24 36:4,8,10,
12,14,22,24,
25 37:2,9,11,
15,20 38:1,5,
9,12,16,18,
19,21 44:14
49:20 50:4
51:6 56:21
57:7,11 68:13
specific
11:9 13:20
14:18 24:2

34:23 36:3
38:5 41:16,
18,19 46:19
67:12,16
72:8,24 73:3
83:23 95:13
97:19
specifically
35:6 44:12
98:16
specifics
37:8 60:23
97:15
specified
34:7 36:7
38:5 44:12
specify
52:14 67:8,
12,16 72:11
74:4
speculation
30:25 69:2
92:10 95:11
96:2,11 98:22
101:9,23
spell
6:8 8:7
spirit
82:24
split
108:7
spoken
81:9 105:7
107:20
sponsored
58:17
Stacey
3:8
staff
13:12,14 25:3
46:24 54:15
61:7 80:17

stamp
21:22 22:10
stamped
21:22 22:1
24:19
stand
25:22 82:1,6
standpoint
98:13
stands
33:6
start
36:18 38:14
39:3 61:10,13
63:8 78:6
started
64:13 76:5,17
77:5,8
starting
64:16 75:17,
18 77:16
STATE
1:5,9 2:13
3:4 4:3 6:8,
22 9:24 12:19
30:18 66:13,
19 67:15
100:11,13,15
108:24 112:4,
12 113:1,3,13
stated
52:7 67:14
87:11 113:3
statements
7:17 8:8,9
STATES
1:3,7
STATESMAN
108:6,8
109:12
status
36:4

stay
24:10 48:13
Stelcen
4:7
Steve
106:14
stop
14:21 100:14
stopped
100:14
store
97:8
stories
88:12
Street
2:14 3:6 4:6
102:21 103:10
106:19
strike
15:11 46:23
54:1 58:9
70:16 73:6
78:25
strongly
20:23
student
87:6,14 88:8,
19,24,25
89:3,9,16
90:3,13
studies
88:14
stuff
56:1
sub
13:7 39:16,
17,20
subject
7:18 8:12,25
9:22 54:18
57:6 69:1
83:25 94:18



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser                                              June 13, 2012
                                                                    134

101:23
**subjective**
55:22 84:12
95:3
**subjects**
7:15
**submit**
66:14 68:3,14
69:10
**submits**
68:4,5 69:16
**submitted**
66:18
**submitting**
68:15
**subscribed**
112:8 113:8
**Subsection**
51:3
**substance**
7:1 55:23
56:2 59:15
60:4,6 62:12
63:9 77:2
83:21 84:25
**sufficient**
24:7,11
**Suite**
2:14 4:6,12
**Sullivan**
104:21,24
105:7,10,12
**summarize**
66:4
**summarizing**
74:14
**summer**
77:22 78:4
79:2
**support**
8:19 9:13

26:7,17 27:6
46:7 98:7
**supportive**
96:23 97:6
**supposed**
31:19
**sure**
12:14 16:22
51:17 53:4
63:6 80:9,14
82:5 83:8
84:13 97:4
109:15
**surface**
16:19
**suspect**
99:2 105:22
**suspend**
18:25 19:5,7,
9,22,25 21:2,
5 27:7,15
28:12 29:11,
14,21 30:1,7,
9 31:6,12,22
32:17 35:22
42:24 46:16
47:15 48:4,16
**suspended**
20:14 30:20
**suspending**
35:17 41:2
44:14
**suspension**
18:23 19:12
26:7,18 30:12
33:18 38:17
46:20
**suspensions**
19:10
**Sweeten**
3:8 6:21
7:12,21 8:4,
16,23 9:10

10:6,16,17
11:6,16,19
12:8 14:13
23:1 24:2
27:23 28:6,18
30:24 32:2
33:8,11
34:20,24 35:2
40:17,20
41:4,5,7,21
42:8 43:19
45:22 46:9
47:5,21
49:22,25
51:11,22
52:17,21
53:2,18,24
54:8,13 55:9,
12,16,20
57:19,22
58:1,13 59:4,
9,15 60:5,21
62:1,6,11
63:7 64:19
66:7,24 67:19
68:22,24
69:19 70:7,23
71:8,10,11
72:7 73:14,
23,25 74:9
76:23,25
80:23 82:4,
12,19,23
83:1,15,19,25
84:2,16,19
85:3 86:14,21
87:7,15,20
89:10,18,22
90:4,9,15,18,
24 92:9,14,
18,25 93:12,
21 94:4,11,
14,15,20,24
95:7,9,25
96:9 98:4,9,
21 100:8,23

101:8,15,22
102:3,6
107:1,3
109:19 110:4,
17
**sworn**
6:2 113:8
            **T**
            _____
**T**
111:1
**table**
18:1 21:19
**take**
9:8 12:7,8,10
19:25 21:2
24:10,11
27:16 30:8
31:3 35:18
39:10 43:10
74:12,18 82:2
**taken**
2:11,13 113:6
**takes**
44:21 48:16
52:5 67:10
**talk**
55:13 68:24
**talked**
107:16,18
**talking**
16:13 43:5
46:17 54:21
63:13 64:19
78:1 85:4
95:20
**targeted**
88:1
**taught**
44:8 45:15
**Tea**
105:21,22
106:8

**tell**
10:25 25:7
33:10 49:9
50:25 51:25
62:11,13
103:4,23
**telling**
8:16 24:20
72:22
**Ten**
18:8
**Tenth**
106:12
**term**
28:20 29:10
**terms**
13:2,19 18:11
30:1
**testified**
6:3 25:19
26:23 29:25
36:12 41:3,25
42:11 45:9
46:24 49:18
62:24 68:8
74:11 79:13
106:18 107:5
**testify**
9:16,17 32:2
42:2 98:22
100:8 107:7
**testifying**
50:17 88:20
101:18
**testimony**
15:2 25:20
26:11,25 27:3
31:15 33:21
38:3,8,11
42:11 45:18
46:21 47:4,
17,20 50:1,15
54:24 55:2


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Troy Fraser

June 13, 2012

135

56:7 58:22
70:12 72:1
76:4,14,16
77:14 85:20
88:19 93:16
98:15 105:11
107:7
**Texans**
104:10,11,14,
19
**TEXAS**
1:5,9,11,12,
25 2:13,15
3:4,5,7 4:3,
6,13 28:22
66:13,19
68:10,13,17
85:25 87:14
91:25 92:4,8
95:23 96:18,
24 97:7,24
100:4,16
105:15 108:6
113:1,3,13
**text**
66:8 100:9
**Thank**
7:12 11:12
12:25 28:4
29:5,23 46:21
66:20 69:15
73:5 77:14
86:11 99:17
109:8
**thanking**
97:24
**Thanks**
97:17
**themselves**
35:7 36:15,24
37:3 38:6
**therefore**
9:3 10:10

110:8
**thing**
10:11 19:19
21:4 28:23
29:2,11 41:17
50:19 71:16
**things**
41:3 44:5
51:18 82:1,5
88:13,21
91:6,9
**think**
10:3,7,10,15
14:14 16:13
22:20 27:23
42:20 43:20
44:7 46:9
47:8,9,22,24
49:15 54:11
55:10,17 70:2
72:18 81:17,
22 84:16 85:4
90:14 91:4
95:21
**thinks**
42:17
**third**
16:10 18:6,8
19:4,16
**thought**
70:1
**thoughts**
14:17 34:22
54:16 71:12
83:23 86:23
92:11 93:3,6
94:17 95:12
101:25
**thousands**
19:10
**three**
7:22 8:18
18:3

**three-fifths**
44:17
**THREE-JUDGE**
1:11
**three-month**
78:6
**throughout**
30:2 31:17
45:20 47:19
**Thursday**
32:12 86:13
**tighten**
100:16
**time**
6:15 15:11
18:22 20:15
21:22 22:1,10
23:24 24:5,7
34:15 36:1,19
37:10,13,21
40:3 44:3,10
46:13 47:25
48:3 49:20
51:7 52:6,25
55:3 56:10,19
57:15 58:10
59:25 63:17
77:7 78:8
81:15 82:8,20
87:13 97:8,21
98:6 110:12,
18
**times**
43:3 47:24
48:2 68:25
88:5
**timing**
7:4 62:3
75:12
**TLC**
54:16
**today**
9:22 11:21,23

12:1,20
14:14,18
28:13 32:20
49:24 87:12
88:15 97:22
98:8 103:20
**today's**
11:14
**told**
80:15 83:14
84:23 90:1
98:23 99:10
**tomorrow**
20:15,16
**top**
34:6,7 86:13
**topically**
101:7,21
**topics**
8:18 46:20
**totally**
69:22,24
70:13
**toughen**
100:17
**toward**
65:24
**trial**
110:18
**TROY**
1:16 2:8,11
6:1,10 108:25
112:1,3,6
**true**
24:12 50:11
102:23,25
106:21 112:2
113:3
**try**
22:16 41:13
54:2
**Tuesday**

109:6
**turn**
12:16 17:15
34:4 44:23
49:7 110:13
**turned**
30:10
**turning**
13:1 18:15
21:9 34:9
50:20 65:22
**Two**
18:2 38:11
61:3 76:2
94:9 96:8
**two-thirds**
7:2 14:9
15:6,9,19
18:17,21
19:1,6,13,
14,19,20
22:18 26:6,17
27:6 29:8,11,
12,13,17,18,
20 30:1,3,8,
21,23 31:4,5,
7,10,11,16,
22 32:10,13,
17 34:16
35:19 36:21
37:21 38:9
41:1,3,14,
17,18,23,25
42:2,14,21,
25 43:7,9
44:19 45:4,19
46:7,13,19,
23,25 47:15,
18,25 48:4,7,
9,16 49:21
50:7 108:10
**type**
23:10 87:23
89:7



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Troy Fraser                                            June 13, 2012
                                                                136

types
13:21

**U**

U.S
1:19 3:13
Uh-huh
21:14 27:20,
25 45:7 54:23
86:1 108:12
under
13:12 18:10
31:25 34:18
42:22 44:11,
24 45:1
53:10,15
68:9,10 109:7
112:7,10
113:8
undersigned
113:2
understand
8:21 10:17
15:14 21:24
45:18 85:17
96:21
understanding
6:20 14:3,6
16:3 17:22
18:10 22:4,6
24:22,25
26:3,13 30:22
36:8 37:19
38:1,7 40:3
53:10,14,21
54:3 70:19
91:10 92:15
93:9
undertake
13:12
undocumented
86:20 87:6,14
88:7,18 89:9,
16 90:3,13

unfairly
109:2,17
unfinished
18:3 20:12
Unfortunately
13:5
UNITED
1:3,7
university
86:8
unless
30:20 44:11
50:13 72:8
82:8,16
unlike
23:16
use
48:19 68:1
usual
52:4
usually
32:11 35:24
36:5,15 39:5
70:21
uttered
72:9

**V**

Vague
45:22 58:13
59:9 86:22
96:1,10
101:9,22
variety
42:1,3 47:1
various
47:18
verify
100:10,15
101:6,20
VICTORIA
1:14

view
81:10 87:5,11
views
86:20
virtually
36:11
VOLUME
1:16
vote
15:9 18:17,21
19:1,6 21:7
22:14,22
24:14 26:6,
16,22 29:21
30:20 31:4,5,
8,10,11,16,
19,21 32:8,
10,14,17
33:18 34:16
35:9,12,15,19
38:9 39:10,18
40:14 41:2,18
42:2,21,25
43:3 44:12,
15,17,19,22
45:4 46:13,
20,25 47:11,
12,15,18
48:4,5,7,9,
12,16 49:20
50:7 58:7
86:9 95:13
102:23,25
106:21
108:15,24
voted
37:11 38:14
56:15
voter
24:1 37:1
51:4 57:5,18
58:11,17 59:7
60:13 66:17
68:9 73:11,22

75:2,6 78:21
79:16,22 80:4
86:8 92:4
93:10,20 94:2
95:22 96:23
97:6,17,25
98:7,19 99:4
100:10 101:5,
20 105:11
107:15,17,20
108:7
VOTERS
1:11 110:3
votes
43:4 50:7
voting
66:18 71:6
72:5 73:11
109:7
VS
1:6

**W**

wait
20:25 52:2
Wallace
78:3,10,21
98:18,22
want
19:24 25:8
30:7 31:19
38:16 41:9
42:24 43:10
48:15 53:12
54:9 71:14
82:13,14
83:16,22
84:13 109:22
wanted
21:1 22:17
35:16,22 40:8
81:2
Washington
1:21 3:15

100:16
wasn't
45:10,12 91:8
way
12:22 22:4
36:16,22
38:15 51:14
68:16 87:1,2
108:10
ways
84:8
Wednesday
32:12
weight
35:23
welfare
100:15
we'll
9:14 11:11
15:11 16:14
82:23,24
went
53:23 54:4
we're
10:12 14:19
29:10 55:21
64:19 73:9
80:23 81:12,
18 82:12
84:13 85:3
West
3:6
Westfall
1:19 3:16 5:4
6:5 7:12,13
8:4,23 9:19
10:14,22
11:12,13
12:4,10
14:24,25
15:10 16:16
23:6 24:12
25:14 26:10,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

23 28:4,7
29:5 31:14
32:7 33:21
34:24 35:24
40:25 41:5,
12,21 42:18
44:23 46:6,21
47:17 48:6,
20,22 49:24
50:8 51:20
52:4,22 53:6,
21 54:1,21
55:15,18
56:5,16 57:15
58:9,17 59:6,
23 60:3,9,25
62:4,7,16
63:13 64:21,
23 65:7,9,14,
15 66:10
67:4,23 68:23
69:4,5,22
70:12 71:4,9,
21,24 72:15
73:16,24
74:6,11 76:13
77:14 81:21
82:5,16 83:1,
2 84:2,18
85:2,6,9
86:4,18 87:3,
12 88:6
89:15,20
90:1,7,11,17,
21 91:2,16,18
92:14,23
93:9,15,23
94:8,13,20
95:2,19 96:4,
14 98:6,10,25
99:18,20
100:25
101:12,18
102:3,10,12
107:2,9,22,24
109:21 110:11

we've
22:8 81:10
whatever
11:5 21:25
55:16 66:4
whatnot
15:20
whatsoever
57:17
Whereupon
15:2 26:11
56:7 72:1
76:14 110:19
whether
7:3 12:11,12,
14 13:15 24:9
31:6 40:21,23
52:22 53:7
55:25 62:13
71:16 83:5
85:19 86:19
87:3 90:7,21
92:5 93:25
98:18,25 99:3
100:18,21
101:3 104:1,
4,25 106:7
108:7
Whitmire
39:24,25
40:1,4,16
whoever
40:9
whole
8:23 39:15,19
51:6,10 52:24
53:8,15 57:2,
8,12 75:17,22
Wilkinson
106:10
Williams
60:24 61:21
64:7

Williams'
64:18
willing
72:23 103:11
wishes
74:19,20
withdraw
41:12 69:9
73:7 94:23
withdrawing
72:16
within
9:23 48:13
70:13,18,21
74:23 84:6,12
85:25
witness
6:2 10:19
25:7 27:25
28:2,5 33:10
40:19 42:6,7
52:20 54:11
55:10,17
57:21,24
60:2,20 76:24
83:18,24
84:10,15
87:18 92:24
wonderful
92:3
word
68:1
wording
68:4
words
74:15
work
95:22 96:17,
23 97:6,17,25
98:7
worked
97:13

worker's
38:4
workers'
37:18
works
85:18
write
96:5
writing
92:16 94:21
written
88:13,21,22
wrong
26:4,14
wrote
84:21

———— X ————

X
76:2 83:14
84:21

———— Y ————

Yeah
76:25
year
37:5,6 45:15
years
45:16
YOUNG
1:11
yourself
24:9 60:17

———— 1 ————

1
13:10 20:10,
18 27:17
35:14
10
25:24 26:2
33:1,3,7
38:24

100
12:20 35:22
102
5:19
107
5:21
11
13:8

'11
64:19

———— 1 ————

1100
20:15,16
112-CV-00128
1:10
117
2:16
12
5:9
1-21-11
5:18
12-31-2013
113:15
1-25-11
5:19
12548
3:6
1-26-11
5:21
1-27-11
5:15
1-28-11
5:16
13
45:15
138
65:19
13th
2:15 113:9



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Troy Fraser

June 13, 2012

138

| | | | | |
|---|---|---|---|---|
| **14**<br>5:12 7:5,18<br>61:18,22<br>62:5,18<br>63:15,21<br>64:3,7,11<br>72:11,14,25<br>74:4 75:13,<br>16,22 76:2,5,<br>7,17,20 95:4,<br>21 96:18<br>97:10,13<br>98:19 102:2<br>104:6 110:2<br>**14th**<br>48:25<br>**15**<br>19:11 31:6<br>**16**<br>5:10<br>**167**<br>8:7 10:2<br>**19**<br>5:11<br>**1931**<br>45:6,11<br>**1997**<br>27:19<br>——— **2** ———<br>**2**<br>1:16 13:10<br>27:16<br>**2000**<br>57:16<br>**2003**<br>56:21<br>**2007**<br>58:9<br>**2008**<br>55:3 56:9<br>58:10 63:11,<br>13,15 | **2009**<br>5:12 23:25<br>37:1 48:25<br>49:5,8 50:11,<br>21,24 54:25<br>55:3,5 56:9,<br>11,16 57:16<br>58:12,18,25<br>59:7,18 60:1<br>87:22 107:6<br>**2010**<br>2:14 4:6 59:7<br>60:15 63:3,<br>14,15,22<br>77:22 78:4,<br>22,23 79:2,23<br>**2011**<br>5:11,14 16:24<br>31:24 32:4,20<br>33:22 37:1<br>38:21 39:1<br>40:15 49:8<br>50:11,21,25<br>53:23 54:5<br>55:1 59:8,19,<br>24 60:1,13<br>65:20,21<br>66:12,19 71:7<br>72:6 73:12,24<br>75:2 78:23<br>79:23 80:18,<br>21 86:13<br>87:22 100:1<br>108:6<br>**2012**<br>2:15 6:23 8:7<br>113:9<br>**202**<br>3:17<br>**20530**<br>1:21 3:15<br>**209**<br>3:6 | **20th**<br>66:12,19<br>**21**<br>17:16,17,18<br>18:21 19:1,6<br>**21st**<br>100:1<br>**22**<br>44:24 45:2<br>**24**<br>5:14 19:3<br>34:4,9 49:15<br>51:7,19 52:2,<br>9,14 53:6<br>100:11<br>**24-hour**<br>48:15 51:9,<br>17,20<br>**24th**<br>65:19<br>**25**<br>21:10,12<br>**25th**<br>103:25<br>**26**<br>30:11 108:6<br>**27th**<br>86:13,17<br>**281**<br>4:15<br>——— **3** ———<br>**3**<br>13:10 113:16<br>**30**<br>63:5<br>**300**<br>2:14 4:6 22:8<br>**3022**<br>113:14<br>**305-7766**<br>3:17 | **346212**<br>1:1<br>**349**<br>2:16 110:19<br>**36**<br>5:11<br>**362**<br>58:20 63:14,<br>15,21<br>**394-3000**<br>4:8<br>——— **4** ———<br>**4201**<br>4:12<br>**48**<br>5:12<br>**48-hour**<br>18:25 19:3<br>48:14<br>——— **5** ———<br>**5**<br>68:13<br>**5.01**<br>34:2<br>**5.09**<br>17:15,18,23,<br>24 18:10<br>20:20 34:5<br>35:13 44:24<br>45:2<br>**5.11**<br>34:4,9,14<br>38:17 49:8,<br>12,18 50:3,9,<br>20,24 51:2<br>52:13 53:22<br>54:3,22 55:5<br>56:3,11,19<br>**5.12**<br>21:9,12,15<br>**5.13** | **30:11,23**<br>**50ish**<br>45:16<br>**5-10-2016**<br>113:14<br>**512**<br>3:9 4:8<br>**530**<br>4:12<br>**54th**<br>65:23<br>**55**<br>98:2<br>**550**<br>5:9 12:3,5<br>**551**<br>5:10 16:14,<br>15,17 20:6<br>**552**<br>5:12 48:20,<br>21,23<br>**553**<br>5:13 65:7,8,<br>10,16<br>**554**<br>5:15 85:7,8,<br>10<br>**555**<br>5:16 91:16,<br>17,19,22<br>97:21 98:4<br>**556**<br>5:18 99:18,<br>19,21<br>**557**<br>5:19 102:10,<br>11,13<br>**558**<br>5:21 107:22,<br>23,25<br>**580-6310** |



Toll Free: 800.211.DEPO<br>Facsimile: 202.296.8652

Suite 350<br>1425 K Street NW<br>Washington, DC 20005<br>www.esquiresolutions.com

Troy Fraser
June 13, 2012
139

| | |
|---|---|
| 4:15 | 9 |
| **5th** | 25:25 26:2 |
| 6:19,23 8:7 | **91** |
| 22:11,12 | 5:16 |
| **6** | **936-1307** |
| **6** | 3:9 |
| 5:4 38:18 | **950** |
| **60** | 1:20 3:14 |
| 44:16,21 | |
| 70:19,21 71:2 | |
| 74:23 | **'97** |
| **6-13-12** | 27:24 |
| 1:25 | **9** |
| **65** | **99** |
| 5:13 | 5:18 |
| **6th** | |
| 2:14 4:6 | |
| **7** | |
| **7202** | |
| 1:20 3:14 | |
| **77068** | |
| 4:13 | |
| **78701** | |
| 3:7 4:6 | |
| **78711-2548** | |
| 3:6 | |
| **8** | |
| **8** | |
| 63:22 | |
| **81st** | |
| 5:12 | |
| **82nd** | |
| 5:10 16:20 | |
| 66:16 | |
| **85** | |
| 5:15 | |
| **8th** | |
| 3:6 63:11 | |
| **9** | |



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

# OFFICE OF STATE SENATOR TROY FRASER
## STATE CAPITOL BUILDING, ROOM 1E.15
512-463-0124
512-475-3732 (FAX)

### Voter ID is Good for Texas
### by Senator Troy Fraser

Voting is one of the most fundamental rights guaranteed by the U.S. Constitution. And as Justice William Brennan put it, "one man, one vote" is the very basis of our democratic system of government.

But unfortunately some would undermine our fundamental rights. Consider, for example, the Beeville woman who was convicted of voting for her dead mother. And the Corpus Christi suspect who was charged with a felony for stepping in front of an elderly couple--who she claimed to be helping at the polls--and illegally casting their ballots. Or the former city councilwoman who was sentenced to five years in prison after illegally registering non-citizens to vote.

These are a few examples of election fraud that authorities managed to catch. But under the current system, our democracy remains vulnerable because citizens are not required to adequately verify their identities at the polls. Now is the time to change our laws to prevent political operatives and others from undermining legitimate votes on Election Day.

Though Texans must show a photo ID in order to get on an airplane, obtain a hunting license, enter many government buildings or even make purchase at a Sam's Club, the law does not require that voters produce a photo ID before they enter the ballot box.

All voters have to do is show a voter registration card. Is it possible for John to vote using Bill's registration card? Absolutely. Could he cast that very same ballot if he had to show identification? Absolutely not.

My Democrat colleagues who oppose the so-called 'voter ID' law argue that the requirements will suppress turnout among minorities, the poor and the elderly.

I disagree. But don't take it from me--here are the facts:

In Georgia, which has a voter ID law, the 2008 presidential election marked a 5% increase in African-American voter turnout. And in Indiana, which has the nation's most stringent photo identification law, Democrat voter turnout increased by nearly 8.5%.

Equally important, despite numerous legal challenges, opponents have failed to persuade the courts that requiring a photo ID leads to voter suppression. As the liberal Justice John Paul Stevens noted in his opinion upholding Indiana's voter ID law, the challengers failed to find a



HIGHLY CONFIDENTIAL

TX_00009749

single Indiana resident who would be unable to vote because of the photo identification requirement. Importantly, the U.S. Supreme Court rejected the challenge to the Indiana law and found that it was entirely constitutional.

Unfortunately, when it comes to protecting the integrity of the ballot box, Texas is behind the curve. According to the National Conference of State Legislatures, the following states already have photo identification requirements: Florida, Georgia, Hawaii, Indiana, Louisiana, Michigan, and South Dakota. And in Mexico, voters must present a valid identification card with a photograph and embedded security codes.

So I am offering Texas voters new protections that will prevent fraud at the ballot box. But importantly, the legislation I filed will not send anyone away from the polling place without being able to cast their ballot.

Senate Bill 362 will require voters to show either one form of photo identification or two other forms of non-photo identification. The non-photo identification can be a utility bill, mail from a government entity or even a library card. And voters who cannot produce acceptable forms of identification will still be allowed to cast a provisional ballot.

So despite all the rhetoric some might hear from the opposition, let me be clear: No eligible voter will walk away from a polling location without being able to cast their ballot.

The Texas Senate Committee of the Whole will be debating this legislation on Tuesday March 10th. I encourage all Texans to contact their elected officials and express their opinion on this very important issue.

But concerned Texans should keep recent history in mind. In 2000, the presidential election was decided by just 537 votes in Florida. At this very moment, the critical 60th vote in the United States Senate is being fought in the courts because the election outcome depends upon just a couple hundred votes in Minnesota. And right here in Texas, control of the House of Representatives hung on a legislative election that was won by just 19 votes.

Those small margins show that every single vote counts. And every fraudulent vote effectively steals a legitimate vote. Election fraud not only undermines the voters' intent--it strikes at the heart of our democratic system of government. Elections are too important to leave unprotected when the Legislature could take proactive steps to prevent fraud and protect our democracy.

Senate Bill 362 legislation is not a radical concept--it just asks that all Texans verify that "you are who you say you are" before casting your ballot.

#

*Senator Troy Fraser (R - Horseshoe Bay) represents 21 counties in the geographic center of Texas. He serves as Chairman of the Senate Committee on Business and Commerce and sits on the Senate Committees on Finance, State Affairs, and International Relations and Trade.*

HIGHLY CONFIDENTIAL

TX_00009750

# OFFICE OF STATE SENATOR TROY FRASER
## STATE CAPITOL BUILDING, ROOM 1E.15
512-463-0124
512-475-3732 (FAX)

### Voter ID is Good for Texas
### by Senator Troy Fraser

Voting is one of the most fundamental rights guaranteed under the U.S. Constitution. I believe it is my responsibility as an elected official to ensure that legitimate votes cast by Texans are not diluted by those voting fraudulently.

Voters are losing confidence in the integrity of our election system because there appears to be multiple ways for people to commit voter fraud. Polls show that people are less likely to vote if they believe their ballot will not be fairly counted.

In Beeville, a woman was convicted of voting for her deceased mother. A former Port Lavaca city councilwoman was convicted for registering noncitizens to vote and tampering with government documents. Four people in Starr County were indicted for falsifying voter registration cards with fake addresses and the names of nonexistent voters.

These are a few examples we caught. Now it is time to change our laws to prevent other types of voter fraud.

Under current law, we do not have the tools to determine if someone is attempting to commit in-person voter fraud. Is it possible for John to vote using Bill's registration card? Absolutely. Could he cast that ballot if he had to show identification? Absolutely not.

It is not possible for every election judge to personally know every voter on the registration lists - especially in large, urban counties. We must give them the ability to know that the person voting is who they say they are when they show up at the polls.

A voter identification law is just one step in restoring voter confidence by eliminating one type of voter fraud.

In a nationwide poll conducted last October, three out of four Americans believe that voters should be required to show photo identification before being allowed to vote. Despite the overwhelming public support for voter identification laws, some try to argue that these laws are intended to suppress turnout among minorities, the poor and the elderly.

I disagree.

And the results of the November elections support my position. In Indiana, a state with a strict photo identification requirement, the turnout of Democrat voters in the November election

TX_00009751

increased by over 8 percent - the largest of any state in the country. In contrast, the Democrat turnout in Illinois - a state with no voter identification turnout - only increased by four percent.

Everyone wants to make sure that all eligible, legal citizens are able to exercise their right to vote. Even the US Supreme Court has said that voter identification requirements are constitutional. Under the legislation I filed, no person will walk away from a polling place being able to cast a ballot.

Senate Bill 362 will require a voter to show either one form of photo identification or two other forms of non-photo identification. The non-photo identification can be a utility bill, mail from a government entity or even a library card. Even if a voter cannot show any of the acceptable forms of identification, he or she may still cast a provisional ballot upon the completion of an affidavit.

Again, I want to make it very clear, no person will walk away from a polling location without being able to cast a ballot.

The Texas Senate Committee of the Whole will be debating this legislation on Tuesday March 10th. I encourage you to let your elected officials know your thoughts on this very important issue.

Voting is one of our most important rights as Americans, but it is also a responsibility. This legislation is not a radical concept. I am just asking that every voter verify that "you are who you say you are" before casting your vote.

#

*Senator Troy Fraser (R - Horseshoe Bay) represents 21 counties in the geographic center of Texas. He serves as Chairman of the Senate Committee on Business and Commerce and sits on the Senate Committees on Finance, State Affairs, and International Relations and Trade.*

HIGHLY CONFIDENTIAL

TX_00009752



PL232
9/2/2014
2:13-cv-00193

# SENATE JOURNAL

### EIGHTY-FIRST LEGISLATURE — REGULAR SESSION

### AUSTIN, TEXAS

### PROCEEDINGS

### TWENTY-THIRD DAY
(Wednesday, March 18, 2009)

The Senate met at 11:10 a.m. pursuant to adjournment and was called to order by the President.

The roll was called and the following Senators were present: Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hegar, Hinojosa, Huffman, Jackson, Lucio, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Williams, Zaffirini.

The President announced that a quorum of the Senate was present.

The Reverend Dr. Bruce Webb, First Baptist Church of The Woodlands, offered the invocation as follows:

Our Father, thank You for these men and women who serve our state in the Texas Senate. I ask You to bless their families and their businesses. Bless the time and effort they give to help the people of our state live better lives. Aid them in doing what is right. Rescue them from pettiness and selfishness. Help them reject the temptation to use dishonorable methods to try to bring about honorable results. Give them solutions to our many problems that are good for all. I pray for these men and women of the Senate the rare and special courage to do what is best for our state even if it is not always in their own personal best interest. Empower them to be their very best for our state and for others. And now, with respect toward all people of faith and also to those who do not have faith, I pray this prayer in the name of the risen lord and my savior, Jesus Christ. Amen.

Senator Whitmire moved that the reading of the Journal of the proceedings of yesterday be dispensed with and the Journal be approved as printed.

The motion prevailed without objection.

### CO-AUTHORS OF SENATE BILL 19

On motion of Senator Patrick, Senators Averitt, Davis, Deuell, Fraser, Gallegos, Harris, Lucio, Seliger, Shapiro, Shapleigh, Uresti, Watson, Wentworth, and Zaffirini will be shown as Co-authors of SB 19.

US_00005599

### CO-AUTHOR OF SENATE BILL 52

On motion of Senator Zaffirini, Senator Uresti will be shown as Co-author of SB 52.

### CO-AUTHOR OF SENATE BILL 112

On motion of Senator Ellis, Senator Van de Putte will be shown as Co-author of SB 112.

### CO-AUTHORS OF SENATE BILL 175

On motion of Senator Shapiro, Senators Nelson, Seliger, and Wentworth will be shown as Co-authors of SB 175.

### CO-AUTHOR OF SENATE BILL 188

On motion of Senator Deuell, Senator Wentworth will be shown as Co-author of SB 188.

### CO-AUTHOR OF SENATE BILL 575

On motion of Senator Davis, Senator Nelson will be shown as Co-author of SB 575.

### CO-AUTHOR OF SENATE BILL 607

On motion of Senator Uresti, Senator Wentworth will be shown as Co-author of SB 607.

### CO-AUTHOR OF SENATE BILL 631

On motion of Senator Davis, Senator Ellis will be shown as Co-author of SB 631.

### CO-AUTHOR OF SENATE BILL 686

On motion of Senator Davis, Senator Nelson will be shown as Co-author of SB 686.

### CO-AUTHOR OF SENATE BILL 687

On motion of Senator Hegar, Senator Uresti will be shown as Co-author of SB 687.

### CO-AUTHOR OF SENATE BILL 841

On motion of Senator Averitt, Senator Williams will be shown as Co-author of SB 841.

### CO-AUTHORS OF SENATE BILL 843

On motion of Senator Uresti, Senators Davis and Huffman will be shown as Co-authors of SB 843.

### CO-AUTHOR OF SENATE BILL 915

On motion of Senator Ellis, Senator Hinojosa will be shown as Co-author of SB 915.

### CO-AUTHOR OF SENATE BILL 972

On motion of Senator Averitt, Senator Nelson will be shown as Co-author of SB 972.

US_00005600

### CO-AUTHOR OF SENATE BILL 985

On motion of Senator Davis, Senator Gallegos will be shown as Co-author of SB 985.

### CO-AUTHOR OF SENATE BILL 1052

On motion of Senator Uresti, Senator Van de Putte will be shown as Co-author of SB 1052.

### CO-AUTHOR OF SENATE BILL 1084

On motion of Senator Ellis, Senator Gallegos will be shown as Co-author of SB 1084.

### CO-AUTHOR OF SENATE BILL 1155

On motion of Senator Davis, Senator Ellis will be shown as Co-author of SB 1155.

### CO-AUTHOR OF SENATE BILL 1157

On motion of Senator Davis, Senator Ellis will be shown as Co-author of SB 1157.

### CO-AUTHOR OF SENATE BILL 1345

On motion of Senator Watson, Senator Deuell will be shown as Co-author of SB 1345.

### CO-AUTHOR OF SENATE BILL 1589

On motion of Senator Ogden, Senator Wentworth will be shown as Co-author of SB 1589.

### CO-SPONSOR OF HOUSE CONCURRENT RESOLUTION 36

On motion of Senator Nelson, Senator Estes will be shown as Co-sponsor of HCR 36.

### RESOLUTION SIGNED

The President announced the signing of the following enrolled resolution in the presence of the Senate:  HCR 87.

### MESSAGES FROM THE GOVERNOR

The following Messages from the Governor were read and were referred to the Committee on Nominations:

Austin, Texas
March 17, 2009

TO THE SENATE OF THE EIGHTY-FIRST LEGISLATURE, REGULAR SESSION:

I ask the advice, consent and confirmation of the Senate with respect to the following appointments:

US_00005601

| 586 | 81st Legislature — Regular Session | 23rd Day |

To be a member of the Texas Public Finance Authority for a term to expire February 1, 2015:

    Rodney Keith Moore
    Lufkin, Texas

(Mr. Moore is replacing H. L. Bert Mijares, Jr., of El Paso whose term expired)

To be members of the State Committee of Examiners in the Fitting and Dispensing of Hearing Instruments for terms to expire as indicated:

    To Expire December 31, 2009:
    Cindy Steinbart
    Round Rock, Texas

(replacing Sara Ann Garza of Mission who resigned)

    To Expire December 31, 2011:
    Robert J. Gebhard, Jr.
    Pearland, Texas

(replacing Audrey McDonald of Georgetown who resigned)

To be members of the Trinity River Authority Board of Directors for terms to expire March 15, 2015:

    Ronald J. Goldman
    Fort Worth, Texas

(Mr. Goldman is being reappointed)

    John W. Jenkins
    Hankamer, Texas

(Mr. Jenkins is being reappointed)

    Keith W. Kidd
    Dallas, Texas

(replacing Katrina Keyes of Dallas whose term expired)

    Emmanuel "Manny" Rachal
    Livingston, Texas

(Mr. Rachal is being reappointed)

    Ronald Kevin Maxwell
    Crockett, Texas

(Mr. Maxwell is being reappointed)

    Barbara Nash
    Arlington, Texas

(Ms. Nash is being reappointed)

    Shirley K. Seale
    Anahuac, Texas

(Ms. Seale is being reappointed)

    Kimberly Chris "K. C." Wyatt
    Corsicana, Texas

(Mr. Wyatt is being reappointed)

To be members of the Credit Union Commission for terms to expire February 15, 2015:

David Cibrian
San Antonio, Texas
(replacing Mary Ann Grant of Houston whose term expired)

Gary L. Janacek
Belton, Texas
(Mr. Janacek is being reappointed)

A. John Yoggerst II
San Antonio, Texas
(replacing Rusty Ballard of Forreston whose term expired)

Respectfully submitted,

/s/Rick Perry
Governor

### PHYSICIAN OF THE DAY

Senator Wentworth was recognized and presented Dr. Eugene David Pampe of Austin as the Physician of the Day.

The Senate welcomed Dr. Pampe and thanked him for his participation in the Physician of the Day program sponsored by the Texas Academy of Family Physicians.

### GUESTS PRESENTED

Senator Zaffirini was recognized and introduced to the Senate Brittany Fisk, Abigail Gorham, and Joseph Miller of the Gifted and Talented Program at Oak Crest Intermediate School in San Antonio, serving today as Honorary Senate Pages, accompanied by their teacher, Beverly Weatherington.

The Senate welcomed its guests.

### GUEST PRESENTED

Senator Huffman was recognized and introduced to the Senate her son, Luke Lawyer.

The Senate welcomed its guest.

### GUESTS PRESENTED

Senator West was recognized and introduced to the Senate a delegation of students representing the Student Advisory Council from Senatorial District 23, accompanied by their teachers, parents, and sponsors.

The Senate welcomed its guests.

### SENATE RESOLUTION 438

Senator Hinojosa offered the following resolution:

WHEREAS, The Senate of the State of Texas is pleased to recognize the Lipan Apache Tribe of Texas; and

WHEREAS, The Lipan Apache Tribe of Texas is the present-day incarnation of the clans, bands, and divisions historically known as the Lipan Apaches, who have lived in Texas and northern Mexico for 300 years; and

WHEREAS, The Lipan Apaches have a culture rich in tradition and a heritage that has been handed down from one generation to the next; they have maintained their sense of community from the days of treaties until the present day despite social, economic, and military instabilities; and

WHEREAS, The Lipan Apaches have enjoyed government to government relations with Spain, Mexico, the Republic of Texas, the United States of America, and the State of Texas; these relations have taken the form of treaties, alliances, and pledges of friendship; and

WHEREAS, The Lipan Apaches have faithfully served when called upon to bear arms in protection of their fellow Texans and Americans; the tribe honors many veterans who served as scouts in World War I, World War II, Korea, Vietnam, and Iraq; the Tribal Shield of the Lipan Apache proudly flies beside the American flag in Afghanistan, where one of the Lipan Apache Tribe of Texas warriors is serving on his second tour; and

WHEREAS, The Lipan Apaches of today continue to serve their communities as police officers, ministers, nurses, and school teachers and in many other occupations that speak to integrity and fidelity of service to others; and

WHEREAS, The treaty closest to the heart of the Lipan Apache is the Live Oak Treaty of 1838; the promises of "Peace and Perpetual Friendship" live today as they did when President Sam Houston and the Lipan Apache pledged this commitment to one another; now, therefore, be it

RESOLVED, That the Senate of the State of Texas hereby recognize the Lipan Apache Tribe of Texas and commend it on its many valuable contributions to this state; and, be it further

RESOLVED, That a copy of this Resolution be prepared for the tribe as an expression of highest esteem from the Texas Senate.

SR 438 was read and was adopted without objection.

### GUESTS PRESENTED

Senator Hinojosa was recognized and introduced to the Senate representatives of the Lipan Apache Tribe of Texas: Bernard F. Barceno, Jr., Chair; Robert Soto, Vice-chair; Juan Z. Soliz, Treasurer; Alma Cruz, Clerk of the Nation and Clan Mother; and William Larers, Tribal Administrator; accompanied by other representatives.

The Senate welcomed its guests.

### GUEST PRESENTED

Senator Nelson was recognized and introduced to the Senate Michelle Aguilar of Saginaw, winner on *The Biggest Loser* television show.

The Senate welcomed its guest.

## INTRODUCTION OF
## BILLS AND RESOLUTIONS POSTPONED

The President announced that the introduction of bills and resolutions on first reading would be postponed until the end of today's session.

There was no objection.

### BIRTHDAY GREETINGS EXTENDED

Senator Williams was recognized and, on behalf of the Senate, extended birthday greetings to Senator Watson.

### CONCLUSION OF MORNING CALL

The President at 11:39 a.m. announced the conclusion of morning call.

### PERSONAL PRIVILEGE STATEMENT

Senator Lucio was recognized to speak on a matter of personal privilege.

### AT EASE

The President at 11:44 a.m. announced the Senate would stand At Ease subject to the call of the Chair.

### IN LEGISLATIVE SESSION

The President at 12:13 p.m. called the Senate to order as In Legislative Session.

### SENATE BILL 362 ON THIRD READING

The President laid before the Senate SB 362 by Senator Fraser at this time on its third reading and final passage (Set as special order):

SB 362, Relating to requiring a voter to present proof of identification.

The bill was read third time and was passed by the following vote: Yeas 19, Nays 12.

Yeas: Averitt, Carona, Deuell, Duncan, Eltife, Estes, Fraser, Harris, Hegar, Huffman, Jackson, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Wentworth, Williams.

Nays: Davis, Ellis, Gallegos, Hinojosa, Lucio, Shapleigh, Uresti, Van de Putte, Watson, West, Whitmire, Zaffirini.

### LETTER FROM DEPUTY SECRETARY OF STATE

Senator Van de Putte submitted the following letter relating to SB 362 from the Deputy Secretary of State:

Colby Shorter, III
Deputy Secretary of State
State of Texas

March 11, 2009

The Honorable Leticia Van de Putte
Texas Senate
P.O. Box 12068 – Capitol Station

Austin, Texas 78711

Dear Senator Van de Putte:

Thank you for the opportunity to serve as a resource witness on Senate Bill 362. During my testimony you asked several questions which I needed to research. Below, please find your questions and my responses.

Question: Explain the difference between a Citizenship Certificate and Citizenship Papers.

Please know the Office of the Secretary of State does not have jurisdiction over U.S. citizenship issues; thus, our response is based on information from the U.S. Citizenship and Immigration Services. Based on preliminary research, we have determined that a Certificate of U.S. Citizenship is a document issued by the United States government as proof of U.S. citizenship. Individuals who are eligible to apply for the certificate include those who obtained U.S. citizenship while residing in the United States or individuals who were born outside the United States to U.S. citizens. Specifically, children born of U.S. citizens who were born abroad are eligible. In addition, a child whose parent or parents became naturalized while the child was under 18 years of age is also eligible for this document. The Certificate of U.S. Citizenship contains a photograph and qualifies as proof of identity under the proposed amendment to Section 63.0101(a) of the Texas Election Code (the "Code").

"United States Citizenship Papers" are one of the authorized forms of identification in the proposed amendment to Section 63.0101(b) of the Code. According to the U.S. Citizenship and Immigration Services, the following documents generally constitute proof of U.S. citizenship: birth certificate, U.S. Passport, Certificate of Citizenship, and Naturalization Certificate. These four documents would appear to qualify as "United States Citizenship Papers" under the proposed amendment to Section 63.0101. A U.S. Passport and a Certificate of Citizenship are specifically listed as forms of photo identification authorized under the proposed Section 63.0101(a), so it appears that these documents qualify under both 63.0101(a) and (b). A Certificate of Naturalization is a document issued by the United States government (or before October 1, 1991 by a federal or state court) as proof of a person having obtained U.S. citizenship through naturalization. A Certificate of Naturalization contains the person's photograph. A birth certificate does not contain a photograph.

Question: How will inconsistencies between a temporary address appearing on an authorized identification document and a permanent address appearing on the voter registration list of military and student voters be treated if SB 362 were to become law?

Senate Bill 362 requires a voter to provide proof of his or her identity and does not require a voter to provide proof of residence. If there was an inconsistency between an address that appeared on an authorized form of identification and the voter registration roll, that would not be grounds to disqualify the voter. As long as the voter still claimed the address that appeared on the voter registration list as his or her permanent residence address, the voter would be accepted for voting. Accordingly, if

Case 2:13-cv-00193 Document 665-11 Filed on 11/11/14 in TXSD Page 219 of 255

a voter presented a valid form of identification as proposed under Senate Bill 362, which contained an address different from the address on the list of registered voters, that voter wold be allowed to vote.

Question: Does the Secretary of State track the racial status of registered voters? If not, how will the state prove that Senate Bill 362 does not have an adverse impact on minority voters when the state submits the bill for preclearance?

Because racial status is not considered in a person's eligibility to register to voter, the state prescribed voter registration application does not request this information from voters. As a result, the state does not have statistics regarding the race or ethnicity of registered voters in Texas. We do have data on the number of registered voters with Hispanic surnames, but this data is inconclusive as it simply matches the surname of registered voters against a list of identified Hispanic surnames provided by the U.S. Census Bureau.

Every submission to the U.S. Department of Justice is different based on the unique aspects of the legislation. For instance, the Texas Legislative Council assisted with the compilation of data on race and ethnicity for redistricting bills. A similar effort to obtain such demographics may be required for a voter identification bill. Historically, we have also worked with legislators to ensure the best data available is included in submissions.

Thank you for the opportunity to research these issues. If I have inadvertently omitted or misunderstood your questions, please let me know.

Sincerely,

/s/ Colby Shorter, III
Deputy Secretary of State

### STATEMENT REGARDING VOTES CAST ON
### SENATE BILL 362
### (Senate Rule 17.01)

Senator West submitted the following statement:

We offer the following statements with respect to our votes on Senate Bill 362 and ask that they be spread upon the journal of the Senate:

1. The Senate is comprised of 31 members, 8 of whom are ethnic minorities: Ellis, West, Gallegos, Hinojosa, Lucio, Uresti, Van de Putte, and Zaffirini.

2. On January 14, 2009, a motion was made to amend the previous rules of the Senate to allow for legislation relating to voter identification requirements, after being reported favorably from a Committee of the Whole Senate, to be set as a special order, therefore bypassing the need for a two-thirds vote of the Senate at any point during Senate deliberations, for legislation addressing only this subject. The motion prevailed by a vote of 18-13. All 8 Senators who are ethnic minorities voted against this motion.

3. On March 10-11, 2009, the Senate convened as a Committee of the Whole Senate, and took up and passed Senate Bill 362, which relates to voter identification requirements, by a vote of 20 to 12. All Senators who are ethnic minorities voted against passage of the bill from the Committee of the Whole Senate.

4. On March 11, 2009, the Senate voted to set Senate Bill 362, and no other bill, for special order. The vote on this special order was 19-12. All 8 ethnic minority Senators voted against this motion.

5. On March 17th, the Senate took up Senate Bill 362 on second reading, as a special order. The vote on this legislation was 19-12. All 8 ethnic minority Senators voted against this motion.

6. On March 18th, the Senate took up Senate Bill 362 on third reading. The vote on this legislation was 19-12. All 8 ethnic minority Senators voted against this legislation.

7. To date, there have been no other opportunities during the 81st Regular Legislative Session in which members of the Senate had the opportunity to vote on legislation relating to voter identification, other than the ones listed above; and

8. Of all the opportunities members of the Senate have had to vote on voter identification legislation, or Senate process regarding voter identification legislation, no Senator who is an ethnic minority has voted in favor of such legislation or the process related to such legislation.

| | |
|---|---|
| WEST | URESTI |
| ELLIS | VAN DE PUTTE |
| GALLEGOS | WATSON |
| LUCIO | WHITMIRE |
| SHAPLEIGH | ZAFFIRINI |

### SENATE BILL 52 ON SECOND READING

On motion of Senator Zaffirini and by unanimous consent, the regular order of business was suspended to take up for consideration SB 52 at this time on its second reading:

SB 52, Relating to the penalties for the illegal use of a parking space or area designated specifically for persons with disabilities.

The bill was read second time and was passed to engrossment by a viva voce vote.

All Members are deemed to have voted "Yea" on the passage to engrossment.

### SENATE BILL 52 ON THIRD READING

Senator Zaffirini moved that Senate Rule 7.18 and the Constitutional Rule requiring bills to be read on three several days be suspended and that SB 52 be placed on its third reading and final passage.

The motion prevailed by the following vote: Yeas 29, Nays 2.

Yeas: Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hegar, Hinojosa, Huffman, Jackson, Lucio, Nelson, Nichols, Ogden, Patrick, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, West, Whitmire, Williams, Zaffirini.

Nays: Seliger, Wentworth.

US_00005608

### COMMITTEE SUBSTITUTE
### SENATE BILL 434 ON SECOND READING

Senator Wentworth moved to suspend the regular order of business to take up for consideration CSSB 434 at this time on its second reading:

**CSSB 434,** Relating to the establishment and operation of a motor-bus-only lane pilot program in certain counties.

The motion prevailed by the following vote: Yeas 30, Nays 1.

Nays: Ogden.

The bill was read second time.

Senator Ogden offered the following amendment to the bill:

**Floor Amendment No. 1**

Amend CSSB 434, on page 1, line 20 as follows:
(1) Strike ", and Williamson"; and
(2) Insert "and" between "El Paso," and "Travis".

The amendment to CSSB 434 was read and was adopted by a viva voce vote.

All Members are deemed to have voted "Yea" on the adoption of Floor Amendment No. 1.

On motion of Senator Wentworth and by unanimous consent, the caption was amended to conform to the body of the bill as amended.

CSSB 434 as amended was passed to engrossment by a viva voce vote.

All Members are deemed to have voted "Yea" on the passage to engrossment.

### SENATE BILL 987 ON SECOND READING

On motion of Senator Shapiro and by unanimous consent, the regular order of business was suspended to take up for consideration SB 987 at this time on its second reading:

**SB 987,** Relating to the age at which transition planning begins for a public school student receiving special education services.

The bill was read second time and was passed to engrossment by a viva voce vote.

All Members are deemed to have voted "Yea" on the passage to engrossment.

### SENATE BILL 987 ON THIRD READING

Senator Shapiro moved that Senate Rule 7.18 and the Constitutional Rule requiring bills to be read on three several days be suspended and that SB 987 be placed on its third reading and final passage.

The motion prevailed by the following vote: Yeas 30, Nays 1.

Nays: Wentworth.

### Reason for Vote

Senator Wentworth submitted the following reason for vote on suspension of the Constitutional Three-day Rule:

I cast a "No" vote on the procedural motion to suspend the Constitutional Rule requiring that bills be read on three several days in order to take up and consider SB 987, because in my judgment no circumstance exists in this case to justify the extraordinary act of suspending a requirement of the Texas Constitution. The suspension of this Constitutional Rule has the direct and immediate effect of denying the people of Texas knowledge and notice of the passage of this measure until it has already been finally passed on third reading. Were we to have followed the requirement of the Texas Constitution, third reading and a vote on SB 987 would have occurred on the next legislative day, allowing for Texans to have learned through news reports of our second reading vote exactly what we had tentatively passed. Third reading and a vote on the next legislative day would also have allowed our professional staff an opportunity overnight to make sure any amendments passed on second reading are technically correct.

/s/Jeff Wentworth
Senator, District 25

The bill was read third time and was passed by the following vote: Yeas 31, Nays 0.

### COMMITTEE SUBSTITUTE
### SENATE BILL 555 ON SECOND READING

Senator Duncan moved to suspend the regular order of business to take up for consideration CSSB 555 at this time on its second reading:

CSSB 555, Relating to indemnification provisions in construction contracts.

The motion prevailed by the following vote: Yeas 30, Nays 1.

Nays: Nichols.

The bill was read second time and was passed to engrossment by the following vote: Yeas 30, Nays 1. (Same as previous roll call)

### COMMITTEE SUBSTITUTE
### SENATE BILL 555 ON THIRD READING

Senator Duncan moved that Senate Rule 7.18 and the Constitutional Rule requiring bills to be read on three several days be suspended and that CSSB 555 be placed on its third reading and final passage.

The motion prevailed by the following vote: Yeas 29, Nays 2.

Yeas: Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hegar, Hinojosa, Huffman, Jackson, Lucio, Nelson, Ogden, Patrick, Seliger, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, West, Whitmire, Williams, Zaffirini.

Nays: Nichols, Wentworth.

US_00005611

**Reason for Vote**

Senator Wentworth submitted the following reason for vote on suspension of the Constitutional Three-day Rule:

I cast a "No" vote on the procedural motion to suspend the Constitutional Rule requiring that bills be read on three several days in order to take up and consider CSSB 555, because in my judgment no circumstance exists in this case to justify the extraordinary act of suspending a requirement of the Texas Constitution. The suspension of this Constitutional Rule has the direct and immediate effect of denying the people of Texas knowledge and notice of the passage of this measure until it has already been finally passed on third reading. Were we to have followed the requirement of the Texas Constitution, third reading and a vote on CSSB 555 would have occurred on the next legislative day, allowing for Texans to have learned through news reports of our second reading vote exactly what we had tentatively passed. Third reading and a vote on the next legislative day would also have allowed our professional staff an opportunity overnight to make sure any amendments passed on second reading are technically correct.

/s/Jeff Wentworth
Senator, District 25

The bill was read third time and was passed by the following vote: Yeas 30, Nays 1.

Nays: Nichols.

**COMMITTEE SUBSTITUTE**
**SENATE BILL 188 ON SECOND READING**

Senator Deuell moved to suspend the regular order of business to take up for consideration CSSB 188 at this time on its second reading:

CSSB 188, Relating to disease control programs to reduce the risk of certain communicable diseases.

The motion prevailed by the following vote: Yeas 23, Nays 7.

Yeas: Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Gallegos, Harris, Hegar, Hinojosa, Lucio, Nelson, Nichols, Seliger, Shapleigh, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Zaffirini.

Nays: Estes, Fraser, Huffman, Ogden, Patrick, Shapiro, Williams.

Absent: Jackson.

The bill was read second time and was passed to engrossment by the following vote: Yeas 23, Nays 7. (Same as previous roll call)

**SENATE BILLS ON FIRST READING**

The following bills, filed on or before Friday, March 13, 2009, were introduced, read first time, and referred to the committees indicated:

**SB 6** by Duncan, Nelson
Relating to the creation of the Healthy Texas Program.
To Committee on State Affairs.

**SB 7** by Nelson
Relating to strategies for and improvements in quality of health care and care management provided through health care facilities and through the child health plan and medical assistance programs designed to improve health outcomes.
To Committee on Health and Human Services.

**SB 14** by Fraser
Relating to the operation of the Texas Windstorm Insurance Association and the Texas FAIR Plan Association.
To Committee on Business and Commerce.

**SB 19** by Patrick
Relating to the computation of the franchise tax.
To Committee on Finance.

**SB 20** by Williams
Relating to ad valorem taxation.
To Committee on Finance.

<div align="center">

**NOTICE GIVEN FOR**
**LOCAL AND UNCONTESTED CALENDAR**

</div>

Senator Williams announced that a Local and Uncontested Calendar had been furnished to each Member of the Senate. He then gave notice that the Local and Uncontested Calendar Session would be held at 8:00 a.m. tomorrow and that all bills and resolutions would be considered on second and third reading in the order in which they were listed.

<div align="center">

**SENATE RULE 11.10(a) SUSPENDED**
**(Public Notice of Committee Meetings)**

</div>

On motion of Senator Whitmire and by unanimous consent, Senate Rule 11.10(a) was suspended in order that the Committee on Criminal Justice might meet today.

<div align="center">

**SENATE RULE 11.10(a) SUSPENDED**
**(Public Notice of Committee Meetings)**

</div>

On motion of Senator Fraser and by unanimous consent, Senate Rule 11.10(a) was suspended in order that the Committee on Business and Commerce might meet today.

<div align="center">

**SENATE BILL 1165 REREFERRED**

</div>

Senator Carona submitted a Motion In Writing requesting that **SB 1165** be withdrawn from the Committee on Criminal Justice and rereferred to the Committee on Transportation and Homeland Security.

The Motion In Writing prevailed without objection.

US_00005613

## MOTION TO ADJOURN

On motion of Senator Whitmire and by unanimous consent, the Senate at 1:34 p.m. agreed to adjourn, in memory of Ana Maria Bujanos of Brownsville and Rebecca Pemelton and Roger G. Burns of Harlingen, upon conclusion of the Local and Uncontested Calendar Session, until 10:00 a.m. tomorrow.

## RESOLUTIONS OF RECOGNITION

The following resolutions were adopted by the Senate:

### Memorial Resolutions

**SR 448** by Davis, Extending condolences to the staff of the Fort Worth Zoo on the occasion of the death of Kambula the gorilla.

**SR 449** by Davis, In memory of George Allen Crowley.

**SR 450** by Davis, In memory of David John Barker of Fort Worth.

**SR 451** by Davis, In memory of Jack Quarles Whitley of Burleson.

**SR 452** by Davis, In memory of James "Buck" Hubbard of Granbury.

**SR 456** by Lucio, In memory of Simon Salinas of Willacy County.

**SR 461** by Huffman, In memory of Douley Ray Graham of Gardendale.

**SR 464** by Deuell, In memory of Johnny Freelen of Grand Saline.

### Congratulatory Resolutions

**SR 378** by Ogden and Deuell, Congratulating Rebecca Robinson for being named Miss Texas 2008.

**SR 453** by Davis, Recognizing the Chess Club of Lake Country Christian School in Fort Worth for its success in the Region II tournament.

**SR 455** by Lucio, Commending Joe Kenney for his contributions to the Brownsville community.

**SR 457** by Nelson and Deuell, Congratulating Sydney Capello for being named Miss Teen Texas 2008.

**SR 458** by Hinojosa, Recognizing the mariachi program developed in the La Joya schools.

**SR 459** by Hinojosa, Congratulating Ishan Kamat for winning a state academic decathlon competition.

**SR 462** by Huffman, Recognizing Jack E. Thompson on the occasion of his retirement from the Harris County district courts.

**HCR 36** (Nelson), Commending all those in Denton County who participated in the emergency response to Hurricane Ike.

**HCR 98** (Watson), Commending Michael William Heskett for his 26 years of service to the Texas State Library and Archives Commission.

### Official Designation Resolutions

**SR 454** by Seliger, Recognizing March 25, 2009, as Big Spring Area Day at the State Capitol.

**SR 460** by West, Recognizing June 11, 2009, as Texas Health Steps Provider Appreciation Day in Grand Prairie.

**SR 463** by Hegar, Recognizing March 24, 2009, as Jackson County Day at the State Capitol.

### RECESS

On motion of Senator Whitmire, the Senate at 1:35 p.m. recessed until 8:00 a.m. tomorrow for the Local and Uncontested Calendar Session.

---

## APPENDIX

---

### COMMITTEE REPORTS

The following committee reports were received by the Secretary of the Senate in the order listed:

March 18, 2009

GOVERNMENT ORGANIZATION — **SB 745, SB 833, SB 1001, SB 1003, SB 1004**

ECONOMIC DEVELOPMENT — **CSSB 500**

BUSINESS AND COMMERCE — **SB 529, SB 711**

### BILLS ENGROSSED

March 17, 2009

**SB 33, SB 93, SB 189**

### RESOLUTIONS ENROLLED

March 17, 2009

**SR 324, SR 394, SR 442, SR 443, SR 444**

**Mardi Alexander**

From:        Janice McCoy
Sent:        Tuesday, November 09, 2010 8:59 AM
To:          Mardi Alexander
Subject:     RE: Voter ID - SB 178

You are welcome.

One more request. The Lt. Governor wants us to potentially re-file the bill and give it one the low-number reserved spots.
Can your office review/prepare the bill to re-file? Let me know what you think.

Janice

**From:** Mardi Alexander
**Sent:** Monday, November 08, 2010 4:56 PM
**To:** Janice McCoy
**Subject:** RE: Voter ID - SB 178

Janice—

Bill text is now available on TLIS.  Thanks for heads-up and sending text quickly.

Mardi

**From:** Janice McCoy
**Sent:** Monday, November 08, 2010 3:46 PM
**To:** Mardi Alexander
**Subject:** Voter ID - SB 178

Mardi –

Attached is the just filed voter ID bill.

Let me know if you have any questions.

Thanks,

Janice

*11/10/10*

*Janice —*
*There are*
*a few formatting*
*edits and*
*— Statute underlining*
*error, p. 6*
*— subject agreement*
*edit, p. 9, l. 8*
*Mardi*

EXHIBIT
11
_____

1

HIGHLY CONFIDENTIAL

By: _____                                                    S.B. No. 178

A BILL TO BE ENTITLED

1                                    AN ACT

2    relating to requirements to vote, including presenting proof of

3    identification; providing criminal penalties.

4        BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

5        SECTION 1.   Subchapter A, Chapter 15, Election Code, is

6    amended by adding Section 15.005 to read as follows:

7        Sec. 15.005.  NOTICE OF IDENTIFICATION REQUIREMENTS.  (a) The

8    voter  registrar  of  each  county  shall  provide  notice  of  the

9    identification requirements for voting prescribed by Chapter 63 and

10   a  detailed  description  of  those  requirements  with  each  voter

11   registration  certificate  issued  under  Section  13.142  or  renewal

12   registration certificate issued under Section 14.001.

13       (b) The secretary of state shall prescribe the wording of the

14   notice to be included on the certificate under this section.

15       SECTION 2.   Subsection (a), Section 15.022, Election Code, is

16   amended to read as follows:

17       (a)   The registrar shall make the appropriate corrections in

18   the  registration  records,  including,  if  necessary,  deleting  a

19   voter's name from the suspense list:

20            (1) after receipt of a notice of a change in registration

21   information under Section 15.021;

22            (2)  after  receipt  of  a  voter's  reply  to  a  notice  of

23   investigation given under Section 16.033;

24            (3)  after  receipt  of  a  registration  omissions  list  and

25   any affidavits executed under Section 63.006 [63.007], following

26   an election;

1

HIGHLY CONFIDENTIAL

TX_00009652

1          (4) after receipt of a voter's statement of residence

2 executed under Section 63.0011;

3          (5) before the effective date of the abolishment of a

4 county election precinct or a change in its boundary;

5          (6) after receipt of United States Postal Service

6 information indicating an address reclassification;

7          (7) after receipt of a voter's response under Section

8 15.053; or

9          (8) after receipt of a registration application or change

10 of address under Chapter 20.

11    SECTION 3.  Subchapter A, Chapter 31, Election Code, is amended

12 by adding Section 31.012 to read as follows:

13    Sec. 31.012.  VOTER IDENTIFICATION EDUCATION.  (a)  The

14 secretary of state and the voter registrar of each county that

15 maintains a website shall provide notice of the identification

16 requirements for voting prescribed by Chapter 63 on each entity's

17 respective website.  The secretary of state shall prescribe the

18 wording of the notice to be included on the websites.

19    (b) The secretary of state shall conduct a statewide effort to

20 educate voters regarding the identification requirements for voting

21 prescribed by Chapter 63.

22    SECTION 4.   Section 32.111, Election Code, is amended by

23 adding Subsection (c) to read as follows:

24    (c) The training standards adopted under Subsection (a) must

25 include provisions on the acceptance and handling of the $/_{u/3}$

26 identification presented by a voter to an election officer under

27 Section 63.001.

28    SECTION 5. Subsection (a), Section 32.114, Election Code, is

2

TX_00009653

1   amended to read as follows:

2      (a) The county clerk shall provide one or more sessions of

3   training using the standardized training program and materials

4   developed and provided by the secretary of state under Section

5   32.111 for the election judges and clerks appointed to serve in

6   elections ordered by the governor or a county authority. Each

7   election judge shall complete the training program. <u>Each election</u>

8   <u>clerk shall complete the part of the training program relating to</u>

9   <u>the acceptance and handling of the identification presented by a</u>

10  <u>voter to an election officer under Section 63.001.</u>

11     SECTION 6. Chapter 62, Election Code, is amended by adding

12  Section 62.016 to read as follows:

13     <u>Sec. 62.016. NOTICE OF ACCEPTABLE IDENTIFICATION OUTSIDE</u>

14  <u>POLLING PLACES. The presiding judge shall post in a prominent place</u>

15  <u>on the outside of each polling location a list of the acceptable</u>

16  <u>forms of identification. The notice and list must be printed using</u>

17  <u>a font that is at least 24-point.</u>

18     SECTION 7. Section 63.001, Election Code, is amended by

19  amending Subsections (b), (c), (d), and (f) and adding Subsection

20  (g) to read as follows:

21     (b) On offering to vote, a voter must present <u>to an election</u>

22  <u>officer at the polling place</u> one form of identification listed in

23  <u>Section 63.0101</u> [the voter's voter registration certificate to an

24  election officer at the polling place].

25     (c) On presentation of <u>the documentation required by</u>

26  Subsection (b) [a registration certificate], an election officer

27  shall determine whether the voter's name on the <u>documentation</u>

28  [registration certificate] is on the list of registered voters for

3

HIGHLY CONFIDENTIAL

TX_00009654

1   the precinct.

2       (d) If the voter's name is on the precinct list of registered

3   voters  and  the  voter's  identity  can  be  verified  from  the

4   documentation presented under Subsection (b), the voter shall be

5   accepted for voting.

6       (f) After determining whether to accept a voter, an election

7   officer   shall   return   the   voter's   documentation   [registration

8   certificate] to the voter.

9       (g)  If  the  requirements  for  identification  prescribed  by

10  Subsection  (b)  are  not  met,  the  voter  may  be  accepted  for

11  provisional voting only under Section 63.011. For a voter who is

12  not  accepted  for  voting  under  this  section,  an  election  officer

13  shall:

14          (1)  inform  the  voter  of  the  voter's  right  to  cast  a

15  provisional ballot under Section 63.011; and

16          (2) provide the voter with written information, in a form

17  prescribed by the secretary of state, that:

18              (A) lists the requirements for identification;

19              (B)    states    the    procedure    for    presenting

20  identification under Section 65.0541;

21              (C)  includes  a  map  showing  the  location  where

22  identification must be presented; and

23              (D) includes notice that even if all procedures are

24  followed,  there  is  no  guarantee  a  provisional  ballot  will  be   4|5

25  accepted.

26      SECTION 8. Subsection (a), Section 63.0011, Election Code, is

27  amended to read as follows:

28      (a) Before a voter may be accepted for voting, an election

4

HIGHLY CONFIDENTIAL

TX_00009655

1    officer shall ask the voter if the voter's residence address on the

2    precinct list of registered voters is current and whether the voter

3    has changed residency within the county. If the voter's address is

4    omitted, for the precinct list under Section 18.005(c), the officer

5    shall ask the voter if the voter's residence, if [as] listed, on

6    identification presented by the voter under Section 63.001(b) [the

7    voter's voter registration certificate] is current and whether the

8    voter has changed residence within the county.

9        SECTION 9. Chapter 63, Election Code, is amended by adding

10   Section 63.0012 to read as follows:

11       Sec. 63.0012. NOTICE OF IDENTIFICATION REQUIREMENTS TO CERTAIN

12   VOTERS. (a) An election officer shall distribute written notice of

13   the identification that will be required to vote in elections held

14   after January 1, 2012, and information on obtaining identification

15   without a fee under Section 521.422, Transportation Code, to each

16   voter who, when offering to vote, presents a form of identification

17   that will not be sufficient for acceptance as a voter under this

18   chapter beginning with those elections.

19       (b) The secretary of state shall prescribe the wording of the

20   notice and establish guidelines for distributing the notice.

21       (c) This section expires September 1, 2013.

22       SECTION 10. Section 63.006, Election Code, is amended to read

23   as follows:

24       Sec. 63.006.  VOTER  WITH  REQUIRED  DOCUMENTATION  [CORRECT

25   CERTIFICATE] WHO IS NOT ON LIST. (a) A voter who, when offering to

26   vote,  presents  the  documentation  required  under  Subsection

27   63.001(b) [a voter registration certificate indicating that the

28   voter is currently registered in the precinct in which the voter is

5

HIGHLY CONFIDENTIAL

TX_00009656

1  ~~offering to vote~~], but whose name is not on the precinct list of

2  registered voters, shall be accepted for voting <u>if the voter also</u>

3  <u>presents a voter registration certificate indicating that the voter</u>

4  <u>is currently registered:</u>

5  <u>(1) in the precinct in which the voter is offering to</u>

6  <u>vote; or</u>

7  <u>(2) in a different precinct from the one in which the</u>

8  <u>voter is offering to vote and the voter executes an affidavit</u>

9  <u>stating that the voter:</u>

10  <u>(A) (i) is a resident of the precinct in which the</u>

11  <u>voter is offering to vote or is otherwise entitled by law to vote</u>

12  <u>in that precinct; or</u>

13  <u>(ii) was a resident of the precinct in which the</u>

14  <u>voter is offering to vote at the time the information on the</u>

15  <u>voter's residence address was last provided to the voter registrar;</u>

16  <u>(B)  did not deliberately provide false information</u>

17  <u>to secure registration in a precinct in which the voter does not</u>

18  <u>reside; and</u>

19  <u>(C)  is voting only once in the election.</u>

20  <u>(b) After the voter is accepted, an election officer shall:</u>

21  <u>(1)  indicate beside the voter's name on the poll list</u>

22  <u>that the voter was accepted under this section; and</u>

23  <u>(2)  if applicable, enter on the registration omissions</u>

24  <u>list the precinct of the voter's registration as indicated by the</u>

25  <u>voter's registration certificate.</u>

26  SECTION 11. Subsection (a), Section 63.009, Election Code, is

27  amended to read as follows:

28  (a) <u>A</u> [~~Except as provided by Subsection (b), a~~] voter who does

6

HIGHLY CONFIDENTIAL

TX_00009657

1   not present a voter registration certificate when offering to vote,

2   and whose name is not on the list of registered voters for the

3   precinct in which the voter is offering to vote, shall be accepted

4   for provisional voting if the voter executes an affidavit in

5   accordance with Section 63.011.

6       SECTION 12. Section 63.0101, Election Code, is amended to read

7   as follows:

8       Sec. 63.0101. DOCUMENTATION OF PROOF OF IDENTIFICATION. The

9   following documentation is <u>an</u> acceptable <u>form</u> [~~as proof~~] of <u>photo</u>

10  identification under this chapter:

11          (1) a driver's license or personal identification card

12  issued to the person by the Department of Public Safety <u>that has</u>

13  <u>not expired</u> [~~or a similar document issued to the person by an~~

14  ~~agency of another state, regardless of whether the license or card~~

15  ~~has expired~~];

16          (2) a <u>United States military identification card that</u>

17  <u>contains the person's photograph that has not expired</u> [~~form of~~

18  ~~identification containing the person's photograph that establishes~~

19  ~~the person's identity~~];

20          (3) a [~~birth certificate or other document confirming~~

21  ~~birth that is admissible in a court of law and establishes the~~

22  ~~person's identity~~;

23          [(4)] United States citizenship <u>certificate</u> [~~papers~~]

24  issued to the person <u>that contains the person's photograph</u>; <u>or</u>

25          <u>(4)</u> [~~(5)~~] a United States passport issued to the person

26  <u>that has not expired</u> [~~;~~

27          [~~(6) official mail addressed to the person by name from a~~

28  ~~governmental entity~~.

7

HIGHLY CONFIDENTIAL

TX_00009658

1   [(7) a copy of a current utility bill, bank statement,

2   government check, paycheck, or other government document that shows

3   the name and address of the voter; or

4   [(8) any other form of identification prescribed by the

5   secretary of state].

6   SECTION 13. ∧Section 63.011, Election Code, ~~is~~ *are* amended ~~by~~

7   ~~amending~~ (Subsections (a) and (b)) to read as follows:

8   (a)  A  person  to  whom  Section  63.001(g)  [63.008(b)]  or

9   63.009(a)  applies  may  cast  a  provisional  ballot  if  the  person

10  executes  an  affidavit  stating  that  the  person:

11           (1)  is  a  registered  voter  in  the  precinct  in  which  the

12  ←――――――person seeks to vote; and

13           (2)  is  eligible  to  vote  in  the  election.

14  (b)  A  form  for  an  affidavit  required  by  this  section  shall  be

15  printed  on  an  envelope  in  which  the  provisional  ballot  voted  by  the

16  person  may  be  placed  and  must  include  a  space  for  entering  the

17  identification  number  of  the  provisional  ballot  voted  by  the  person

18  ~~(,)~~ and a space for an election officer to indicate whether the

19  person presented a form of identification described by Section

20  63.0101.   The  affidavit  form  may  include  space  for  disclosure  of

21  any  necessary  information  to  enable  the  person  to  register  to  vote  / 8/2

22  under  Chapter  13.   The  secretary  of  state  shall  prescribe  the  form

23  of  the  affidavit  under  this  section.

24  SECTION 14. Subsection (b), Section 64.012, Election Code, is

25  amended  to  read  as  follows:

26  (b)  An  offense  under  this  section  is  a  felony  of  the  second

27  [third]  degree  unless  the  person  is  convicted  of  an  attempt.   In

28  that  case,  the  offense  is  a  state jail felony  [Class  A

8

HIGHLY CONFIDENTIAL

TX_00009659

1   ~~misdemeanor~~].

2       SECTION 15. Subsection (b), Section 65.054, Election Code, is

3   amended to read as follows:

4       (b) A provisional ballot <u>shall</u> [~~may~~] be accepted [~~only~~] if the

5   board determines that, from the information in the affidavit or

6   contained in public records, the person is eligible to vote in the

7   election and has not previously voted in that election <u>and the</u>

8   <u>~~voter~~ person meets the identification requirements of Section 63.001(b) in</u>

9   <u>the period prescribed under Section 65.0541.</u>

10      SECTION 16. Subchapter B, Chapter 65, Election Code, is

11  amended by adding Section 65.0541 to read as follows:

12      <u>Sec. 65.0541. PRESENTATION OF IDENTIFICATION FOR CERTAIN</u>

13  <u>PROVISIONAL BALLOTS. (a) A voter who is accepted for provisional</u>

14  <u>voting under Section 63.011 because the voter does not meet the</u>

15  <u>identification requirements of Section 63.001(b) may, not later</u>

16  <u>than the sixth day after the date of the election, present proof of</u>

17  <u>identification to the voter registrar for examination by the early</u>

18  <u>voting ballot board.</u>

19      <u>(b) The secretary of state shall prescribe procedures as</u>

20  <u>necessary to implement this section.</u>

21      SECTION 17. Section 66.0241, Election Code, is amended to read

22  as follows:

23      Sec. 66.0241. CONTENTS OF ENVELOPE NO. 4. Envelope No. 4 must

24  contain:

25          (1) the precinct list of registered voters;

26          (2) the registration correction list;

27          (3) the registration omission list;

28          (4) any statements of residence executed under Section

9

HIGHLY CONFIDENTIAL

TX_00009660

1  63.0011; and

2      (5) any affidavits executed under Section   63.006

3  [63.007] or 63.011.

4     SECTION 18. Section 521.422, Transportation Code, is amended

5  by amending Subsection (a) and adding Subsection (d) to read as

6  follows:

7     (a) Except as provided by Subsection (d), the [The] fee for a

8  personal identification certificate is:

9        (1) $15 for a person under 60 years of age;

10       (2) $5 for a person 60 years of age or older; and

11       (3) $20 for a person subject to the registration

12  requirements under Chapter 62, Code of Criminal Procedure.

13    (d) The department may not collect a fee for a personal

14  identification certificate issued to a person who states that the

15  person is obtaining the personal identification certificate for the

16  purpose of satisfying Section 63.001(b)(2), Election Code, and:

17       (1) who is a registered voter in this state and presents

18  a valid voter registration certificate; or

19       (2) who is eligible for registration under Section

20  13.001, Election Code, and submits a registration application to

21  the department.

22    SECTION 19. Effective January 1, 2012, Sections 63.007,

23  63.008, and 63.009(b), Election Code, are repealed.

24    SECTION 20. As soon as practicable after the effective date of

25  this Act:

26       (1) the secretary of state shall adopt the training

27  standards and develop the training materials required to implement

28  the change in law made by this Act to Section 32.111, Election

10

HIGHLY CONFIDENTIAL

1   Code; and

2           (2) the county clerk of each county shall provide a

3   session of training under Section 32.114, Election Code, using the

4   standards adopted and materials developed to implement the change

5   in law made by this Act to Section 32.111, Election Code.

6       SECTION 21. (a) The change in law made by this Act applies

7   only to an offense committed on or after January 1, 2012. For

8   purposes of this section, an offense is committed before January 1,

9   2012, if any element of the offense occurs before that date.

10      (b) An offense committed before January 1, 2012, is covered by

11  the law in effect when the offense was committed, and the former

12  law is continued in effect for that purpose.

13      SECTION 22. State funds disbursed under Chapter 19, Election

14  Code, for the purpose of defraying expenses of the voter

15  registrar's office in connection with voter registration may also

16  be used for additional expenses related to coordinating voter

17  registration drives or other activities designed to expand voter

18  registration.  This section expires January 1, 2013./          4/12

19      SECTION 23. Except as provided by Subsection (b) of this

20  section, this Act takes effect January 1, 2012.

21      (b) The changes in law made by Sections 1, 3, 4, 5, 9, 20, and 22

22  of this Act take effect September 1, 2011.

HIGHLY CONFIDENTIAL

TX_00009662

**Frank Battle**

| From: | Bryan Hebert |
|---|---|
| Sent: | Thursday, January 27, 2011 11:33 AM |
| To: | Jonathan Stinson; Janice McCoy; Amanda Montagne; Jennifer Fagan; Ryan LaRue_SC; Wroe Jackson |
| Subject: | SB14 bill summary |
| Attachments: | VOTE - SB14 - engrossed- summary.docx |

Attached is a summary of SB14 as passed by the senate.

Bryan Hebert
Deputy General Counsel
Office of the Lieutenant Governor
512-463-0001



TX_00034469

552.111 - entire document

# VOTER ID BILL SUMMARY
## SB14 (82R engrossed)

## SUMMARY

SB14 would give Texas arguably the strictest photo ID law in the country. A review of the US Supreme Court's approval of Indiana's photo ID law and the DOJ's approval of Georgia's photo ID law indicate that SB14 is likely to be upheld under both constitutional review and Section 5 Voting Rights Act review.

SB14 requires a voter to provide one of six acceptable photo IDs on election day (TX DL, DPS ID card, military ID, passport, citizenship certificate, or CHL), except that there is an opportunity to opt out of the photo ID requirement for people who are over age 70 when the law takes effect or who provide a signature affirming that they are disabled, indigent, or have a religious objection to being photographed and therefore cannot get a photo ID.

If a person does not have acceptable ID on election day, they may cast a provisional ballot and return to the voter registrar within six days with acceptable ID and have their ballot counted.

The criminal penalties for attempting to vote fraudulently are increased.

There are several provisions requiring training of poll workers and notice and education for the public in multiple languages and formats. The education and training efforts begin now, but the new ID requirements will not apply until the 2012 primary election. The Secretary of State has federal HAVA funds available to pay for the education and training efforts.

## SUBSTANTIVE PROVISIONS

- A voter must present an acceptable photo ID on election day:
    (1) TX DL (current or expired no more than 60 days)
    (2) ID card issued by DPS (current or expired no more than 60 days) - *provided free if requested by a voter*
    (3) military ID (current or expired no more than 60 days)
    (4) US passport (current or expired no more than 60 days)
    (5) US citizenship certificate
    (6) CHL (current or expired no more than 60 days)

- *Exception #1*: a voter who is 70 or older on 01/01/12 need only present a voter registration card on election day
- *Exception #2*: a voter who is disabled and has provided a physician certification of the disability to the registrar and received a registration card marked "Photo ID not required" need only present the registration card on election day
- *Exception #3*: indigent people and people with religious objection to being photographed may cast a provisional ballot on election day and return to the registrar within 6 days to sign an affidavit confirming their exempt status

HIGHLY CONFIDENTIAL

- The name on the ID must be "substantially similar" to the name on the voter list. If a person does not have acceptable ID on election day, they may cast a provisional ballot and return to the voter registrar within six days with acceptable ID and have their ballot counted.

- All election workers must be trained in the new ID requirements. The SOS and counties must provide education and notice in multiple languages to voters, including signs at polling places, written notice included with registration cards, written notice to voters attempting to use unacceptable ID, educational materials on the SOS website, and a statewide education campaign organized by the SOS.

- The criminal penalty for voting fraudulently is increased from a third degree felony to a second degree felony, and the penalty for attempting to fraudulently vote is increased from a Class A misdemeanor to a state jail felony.

HIGHLY CONFIDENTIAL

PL235
9/2/2014
2:13-cv-00193

## SB 14/Voter Identification

Thank you Mr. Chairman and Members.

### Voter Fraud Exists in Texas

- The dangers of voter fraud has threatened the integrity of the electoral process for the entire history of the United States. And that threat continues to this day.

- Over the last couple of sessions, witnesses have testified that voter impersonation, in which people's IDs or voter-registration cards have been stolen and false votes had been cast in those persons' names, is not uncommon.

- Voter fraud has a substantial effect on elections because even a small amount of fraud could make the margin of difference in a close election.

### Texas has a Legitimate Interest in Protecting Elections

- It is imperative that we PROTECT THE PUBLIC'S CONFIDENCE IN ELECTIONS BY DETERRING  AND DETECTING VOTER FRAUD

- In upholding Indiana's photo-ID law, the US Supreme Court stated "confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of

1

HIGHLY CONFIDENTIAL

our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones, will feel disenfranchised."

- An October 2010 Lighthouse Opinion Polling survey found that 86 percent of Texas voters - both Republicans & Democrats - favor voter-ID laws.

## Compliance with US Supreme Court

- This bill is in compliance with the US Supreme Court decision which upheld the Indiana Voter ID legislation because it:
  - o It deters and detects fraud
  - o It protects public confidence in elections
  - o It counts only eligible voters' votes
- It complies with the Supreme Court decision because it offsets burdens on voters by:
  - o Providing access to free photo ID cards
  - o Allowing for provisional ballots and absentee ballots
  - o Ensuring that obtaining photo ID is no more inconvenient or burdensome than usual act of voting
  - o Providing an exception for elderly voters

## Current Law

- Current law provides that when a voter shows up to vote, he or she must show a valid voter registration card. If unable to do so, the voter may show a photo-id or other official mail from a governmental entity

2

utility bill, bank statement, government check, paycheck or other government document with name and address and sign an affidavit.

## SB 14 - What it does

- SB 14 would require a voter to show a photo-ID except that people 70 or older on January 1, 2012, may continue to vote with just their voter registration card.

- Acceptable ID includes an unexpired card issued by DPS (for most this will be Texas Drivers License), a military ID, a passport, or a citizenship certificate with photo.

- Voters who cannot produce an acceptable form of photo identification will be allowed to cast a provisional ballot. That ballot will be counted if the voter returns within 6 days to show a photo id.

- It would provide statewide training and notification of the changes in required ID to vote.

- It would provide a free DPS issued ID to any registered voter who requests an ID card.

## Conclusion

- Every fraudulent vote effectively steals a legitimate vote. Elections are too important to leave unprotected when the Legislature could take proactive steps to prevent fraud and protect our democracy.

- This legislation is not a radical concept. I am just asking that every

3

voter verify that "you are who you say you are" before casting a vote."

4

HIGHLY CONFIDENTIAL

TX_00009461

FILED- SB14

**What are you trying to accomplish with this bill?**
This bill will protect the public's confidence in elections by deterring and detecting in-person voter fraud.

**Why is this bill different from the bill you filed last session?**
We have had two additional years to see Photo ID working in other states and two additional years to see that voter fraud is still a problem. Only a true photo ID bill can deter and detect fraud at the polls and can protect the public's confidence in elections. Plus, I believe that Photo ID is simpler and less confusing for the voters.

**Why only four forms of ID?**
It is less confusing and simpler for both voters and election workers. Everyone knows what these forms of ID look like.

**Why doesn't this bill phase-in over two election cycles?**
The bill would not take effect until January 2012, and the bill requires education efforts by the counties and the Secretary of State. Also, 86 percent of voters support this change in law. That tells me that voters do not need a phase-in in order to be compliant with the law. Plus, we do allow for a provisional ballot to be cast and counted so voters have two opportunities to get their ballot cast.

**Why is there an exemption for the elderly?**
This provision was added as a compromise to several of my Democrat colleagues who asked that the elderly be exempt from the law.

**Does the elderly exemption provide for two classes of voters?**
I believe that there is a legitimate state interest in exempting certain elderly voters from the requirements of Photo ID just like we allow certain classes of voters to vote by mail.

**How do you know there is fraud occurring?**
Under current law, we do not have the tools necessary to stop fraudulent in-person voter fraud. In fact, in-person voter fraud may not even be

HIGHLY CONFIDENTIAL

TX_00009462

evident until AFTER the election has occurred.  Also, we have heard
from many witnesses over the last couple of sessions who have testified
that voter impersonation, in which people's IDs or voter-registration
cards have been stolen and false votes had been cast in those persons'
names, is not uncommon.

**Does this bill provide for free ID?**
Yes. . . . let me turn over to *Senator Williams* to address ID issues.

**Does this bill reduce minority turnout?**
I think the bill will increase turnout among all voters. In fact in Georgia
and Indiana, turnout was up in the election immediately following the
implementation of Photo ID. I think *Senator Wentworth* has some
information on those statistics and voter turnout studies.

**Do we know the number of people on the voter registration roll that
do not have a DL or SSN?**
I will defer to the SOS and DPS representative to answer that question,
but I am convinced that voters will have access to proper ID.

**What is the impact on Voter ID on Hispanic/Black/poor?**
I am convinced that voters will have access to proper ID. I can tell you
that in Indiana - which has had voter ID for 3 election cycles - no
individual voter has alleged that the Voter ID Law has prevented them
from voting or inhibited their ability to vote in any way.

A survey of 2000 registered voters in Indiana, Maryland and Mississippi
found that only 1.2 percent of total respondents lack government-issued
photo identification (DL, passport, military ID). Fewer than three
percent of the overall respondents could not produce documentation to
prove their citizenship. Fewer than half a percent of those surveyed had
neither photo ID nor citizenship documentation.

I think we will find similar results in Texas.

HIGHLY CONFIDENTIAL

TX_00009463

\*\*\*   NO ID - 156,280 registered voters
NO ID/citizenship papers - 78,140 voters

**How will the training/education program work?**
Those decisions will be made by the SOS office. I think they are here as
a resource witness.

HIGHLY CONFIDENTIAL

TX_00009464

## SB 14 by Fraser (FILED)

### Highlights

- Requires voters to show a photo ID, except that people 70 or older as of January 1, 2012, may continue to vote with just their voter registration card
- Acceptable photo ID includes an unexpired card issued by DPS (for most this will be driver's license), a military ID, a passport, or a citizenship certificate with photo
- Requires DPS to provide a free photo ID to any registered voter who requests an ID
- Allows a voter to cast a provisional ballot if he/she does not have a Photo ID and return within 6 days with Photo ID to have the ballot counted
- Requires S●S and voter registrars to educate the public and train election workers on the new requirements, including mailing notice to each voter and posting notice outside all polling places
- Increases criminal penalties for illegal voting (mandatory jail time)

### Why I made the law stronger:

"When I filed SB 178 in November (and re-filed SB 14 this month), I decided that a true photo identification bill was a better solution than the bill I proposed last session.

"We've had two additional years to see Photo ID laws working in other states and two additional years to see that voter fraud is still a problem.

"Only a true photo id bill, can deter and detect fraud and can protect the public's confidence in elections. Plus, I believe it simpler and less confusing for the voters."

HIGHLY CONFIDENTIAL

**TALKING POINTS (82R)**

I.     <u>THE THREAT OF FRAUD IS REAL</u>
- Deceased voters, felons, duplicate registrations, and non-residents remain on voter rolls (*2007 State Auditor report found over 49,000 of these possible ineligible voters*)
- Fraudulent registration applications are rampant (*over 6,000 applications by non-citizens rejected in Harris County from 2004-2007, 2008 ACORN and 2010 Houston Votes registration scandals made national news*)
- Texas Election Administration Management (TEAM) system is improving, but continues to have accuracy problems
- Current election system is inadequate to catch in-person voting fraud

II.    <u>THIS BILL PROTECTS TEXAS VOTERS</u>
- Deters and detects fraud
- Improves and modernizes election procedures
- Protects against fraud enabled by inaccurate registration rolls
- Counts only eligible voters' votes
- Protects public confidence in elections

*(These points are taken directly from Supreme Court opinion describing Indiana's "legitimate state interests" in adopting photo ID)*

III.    <u>THIS BILL REPRESENTS AN ATTEMPT TO ENSURE THAT EVERY ELIGIBLE VOTER CAN VOTE AND THAT ONLY LEGITIMATE VOTES ARE COUNTED</u>

- Simplified bill requires photo ID
- includes exemption for voters over 70 and a procedure for counting provisional ballots
- Similar to Indiana and Georgia laws (which were both upheld by the federal authorities)
- Requires months of statewide voter education efforts before law takes effect

HIGHLY CONFIDENTIAL

TX_00009466

## ENSURING COMPLIANCE WITH SUPREME COURT

I.     <u>LEGITIMATE STATE INTERESTS</u>
- Deterring and detecting fraud
- Improving and modernizing election procedures
- Protecting against fraud enabled by inaccurate registration rolls
- Counting only eligible voters' votes
- Protecting public confidence in elections

II.     <u>MEASURES *REQUIRED* TO OFFSET BURDENS ON VOTERS</u>
- Access to free photo ID cards
- Availability of provisional ballots and absentee ballots
- Ensure that obtaining ID is no more inconvenient or burdensome than usual act of voting

III.     <u>MEASURES *RECOMMENDED* TO OFFSET BURDENS ON VOTERS</u>
- Phase-in over two election cycles (as prescribed by Carter-Baker Report)
- Exception for certain elderly voters (to decrease size of class of voters adversely impacted by law)

HIGHLY CONFIDENTIAL

TX_00009467

| | INDIANA LAW | GEORGIA LAW | TEXAS - SB 14 | TEXAS - CURRENT LAW |
|---|---|---|---|---|
| **REQUIRED I.D.** | **One photo ID:**<br>• state or federal ID that includes name, photo, and expiration date (specific forms of ID not provided) | **One photo ID:**<br>• driver's license (even if expired)<br>• state or federal photo ID<br>• local, state, or federal govt employee photo ID<br>• U.S. passport<br>• military photo ID<br>• tribal photo ID | **One photo ID:**<br>• DPS-issued ID that has not expired<br>• military photo ID<br>• citizenship certificate with photo<br>• U.S. passport | voter registration card<br>**- OR -**<br>sign affidavit at polls **AND**<br>• DPS-issued ID (even if expired)<br>• any photo ID with name<br>• birth certificate<br>• citizenship papers<br>• U.S. passport<br>• govt-issued mail or document<br>• other ID prescribed by Sec of State |
| **EXCEPTIONS TO PHOTO REQUIREMENT** | • indigent<br>• religious objection<br>• voters in state-licensed care facility | none | none | (photo ID not required) |
| **PROVISIONAL BALLOT** | If no ID, voter may cast provisional ballot and may return within 10 days with ID for ballot to be counted. | If no ID, voter may cast provisional ballot and may return within 2 days with ID for ballot to be counted. | If no ID, voter may cast provisional ballot, and may return within 6 days with ID for ballot to be counted. | If no ID, voter may cast provisional ballot, and registrar must confirm eligibility within 7 days |
| **REQUIRED VOTER EDUCATION** | secretary of state conducts statewide education campaign for voters and poll workers | none | secretary of state conducts statewide education campaign for voters and poll workers | N/A |

*(The Indiana law was upheld by the Supreme Court and the Georgia law was upheld by the DOJ)*

HIGHLY CONFIDENTIAL

TX_00009468

## VOTER ID BILL SUMMARY
### SB14 (82R engrossed)

### SUMMARY

SB14 would give Texas arguably the strictest photo ID law in the country. A review of the US Supreme Court's approval of Indiana's photo ID law and the DOJ's approval of Georgia's photo ID law indicate that SB14 is likely to be upheld under both constitutional review and Section 5 Voting Rights Act review.

SB14 requires a voter to provide one of six acceptable photo IDs on election day (TX DL, DPS ID card, military ID, passport, citizenship certificate, or CHL), except that there is an opportunity to opt out of the photo ID requirement for people who are over age 70 when the law takes effect or who provide a signature affirming that they are disabled, indigent, or have a religious objection to being photographed and therefore cannot get a photo ID.

If a person does not have acceptable ID on election day, they may cast a provisional ballot and return to the voter registrar within six days with acceptable ID and have their ballot counted.

The criminal penalties for attempting to vote fraudulently are increased.

There are several provisions requiring training of poll workers and notice and education for the public in multiple languages and formats. The education and training efforts begin now, but the new ID requirements will not apply until the 2012 primary election. The Secretary of State has federal HAVA funds available to pay for the education and training efforts.

### SUBSTANTIVE PROVISIONS

- A voter must present an acceptable photo ID on election day:
    - (1) TX DL (current or expired no more than 60 days)
    - (2) ID card issued by DPS (current or expired no more than 60 days) - *provided free if requested by a voter*
    - (3) military ID (current or expired no more than 60 days)
    - (4) US passport (current or expired no more than 60 days)
    - (5) US citizenship certificate
    - (6) CHL (current or expired no more than 60 days)

- *Exception #1*: a voter who is 70 or older on 01/01/12 need only present a voter registration card on election day
- *Exception #2*: a voter who is disabled and has provided a physician certification of the disability to the registrar and received a registration card marked "Photo ID not required" need only present the registration card on election day
- *Exception #3*: indigent people and people with religious objection to being photographed may cast a provisional ballot on election day and return to the registrar within 6 days to sign an affidavit confirming their exempt status

HIGHLY CONFIDENTIAL

- The name on the ID must be "substantially similar" to the name on the voter list. If a person does not have acceptable ID on election day, they may cast a provisional ballot and return to the voter registrar within six days with acceptable ID and have their ballot counted.

- All election workers must be trained in the new ID requirements. The SOS and counties must provide education and notice in multiple languages to voters, including signs at polling places, written notice included with registration cards, written notice to voters attempting to use unacceptable ID, educational materials on the SOS website, and a statewide education campaign organized by the SOS.

- The criminal penalty for voting fraudulently is increased from a third degree felony to a second degree felony, and the penalty for attempting to fraudulently vote is increased from a Class A misdemeanor to a state jail felony.

HIGHLY CONFIDENTIAL