JANICE MCCOY                                        MAY 16, 2012

### 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,
    Plaintiff,
VS.
ERIC H. HOLDER, JR. in his official capacity as Attorney General of the United States,
    Defendant,
ERIC KENNIE, et al,
    Defendant-Intervenors,
TEXAS STATE CONFERENCE OF NAACP BRANCHES,
    Defendant-Intervenors,
TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, et al,
    Defendant-Intervenors,
TEXAS LEGISLATIVE BLACK CAUCUS, et al,
    Defendant-Intervenors,
VICTORIA RODRIGUEZ, et al.,
    Defendant-Intervenors.

CASE NO. 1:12-CV-00128 (RMC-DST-RLW) Three-Judge Court

ORAL DEPOSITION OF
JANICE McCOY
MAY 16, 2012

### 2

ORAL DEPOSITION OF JANICE McCOY, produced as a witness at the instance of the Defendant, was duly sworn, was taken in the above-styled and numbered cause on the MAY 16, 2012, from 9:39 a.m. to 6:24 p.m., before Chris Carpenter, CSR, in and for the State of Texas, reported by machine shorthand, at the offices of The United States Attorney's Office, 816 Congress Avenue, Suite 1000, Austin, Texas 78701, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

### 3

APPEARANCES

FOR THE PLAINTIFF, STATE OF TEXAS
  Matthew Frederick
  Patrick K. Sweeten
  OFFICE OF THE ATTORNEY GENERAL OF TEXAS
  P.O. Box 12548
  Austin, TX 78711-2548
  209 West 14th Street
  8th Floor
  Austin, TX 78701
  (512) 936-1307
  matthew.frederick@texasattorneygeneral.gov

FOR THE DEFENDANT, HOLDER, ET AL:
  Jennifer Maranzano
  Elizabeth S. Westfall
  U.S. DEPARTMENT OF JUSTICE
  950 Pennsylvania Avenue, NW
  NWB - Room 7202
  Washington, DC 20530
  (202) 305-7766
  jennifer.maranzano@usdoj.gov
  elizabeth.westfall@usdoj.gov

FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE CAUCUS:
  Ezra D. Rosenberg
  DECHERT, LLP
  Suite 500
  902 Carnegie Center
  Princeton, NJ 08540-6531
  (609) 955-3200
  ezra.rosenberg@dechert.com

### 4

FOR THE KENNIE INTERVENORS:
  Chad W. Dunn
  BRAZIL & DUNN, LLP
  4201 Cypress Creek Parkway
  Suite 530
  Houston, TX 77068
  (281) 580-6310
  chad@brazilanddunn.com

EXHIBIT 2
McCoy 7-9-14

JANICE MCCOY                                                                    MAY 16, 2012

---

**Page 5**

```
                    INDEX
 1  Appearances..........................2
 2  JANICE McCOY
 3     Examination by Ms. Maranzano...............7
 4     Examination by Mr. Dunn..................227
 5  Signature and Changes..........................286
 6  Reporter's Certificate..........................288
 7
                   EXHIBITS
 8
    NO. DESCRIPTION                     PAGE MARKED
 9
    28  HB No. 218, Filed 2007              41
10
    29  SB No. 362                          79
11
    30  Notice of Deposition                14
12
    31  Press Release From the Office of State    97
13      Senator Troy Fraser
14  32  Senate Rules Adopted by the 81st          119
        Legislature, Jan. 14, 2009
15
    33  Senate Journal, March 18, 2009           132
16
    34  Transcript, March 10, 2009, Committee of  134
17      the Whole Senate
18  36  SB No. 363                               139
19  37  Declaration of Janice McCoy, March 30,   161
        2012
20
    38  Senate Rules Adopted by 82nd Legislature  196
21
    39  Transcript, Jan. 25, 2011, Committee of   204
22      the Whole Senate
23  40  Transcript, Jan. 26, 2011, Committee of   206
        the Whole Senate
24
    41  Transcript Excerpt: Senate Bill 14, Jan.  208
25      26, 2011
```

---

**Page 6**

```
 1  42  Transcript Excerpt: Senate Bill 14, Jan.  213
        26, 2011, CD 1, Section II
```

---

**Page 7**

```
 1                JANICE McCOY,
 2  having been first duly sworn to testify the truth, the
 3  whole truth, and nothing but the truth, testified as
 4  follows:
 5                 EXAMINATION
 6  BY MS. MARANZANO:
 7     Q. Good morning.
 8     A. Good morning.
 9     Q. My name is Jennifer Maranzano. I'm
10  representing the Defendant, Eric Holder, in this matter.
11         Can you please state your full name for
12  the record?
13     A. Janice Steffes McCoy.
14         MS. MARANZANO: And can we have everybody
15  go around and identify themselves, please?
16         MR. ROSENBERG: Ezra Rosenberg from
17  Dechert LLP on behalf of the Texas State Conference of
18  NAACP Branches and MALC.
19         MR. DUNN: Chad Dunn on behalf of the
20  Kennie Intervenors.
21         MR. ROSENBERG: And let me see if we're
22  having a telephone guest today.
23         MR. FREDERICK: Matthew Frederick for the
24  State of Texas.
25         MS. MARANZANO: Let's just continue while
```

---

**Page 8**

```
 1  they are doing that.
 2     Q. (By Ms. Maranzano) Ms. McCoy, have you ever
 3  been known by any other names?
 4     A. My maiden name is Janice Steffes.
 5     Q. Have you ever been deposed before?
 6     A. No.
 7     Q. Let me go over some ground rules with you. You
 8  have been placed under oath today, so it's important to
 9  testify truthfully, accurately, and completely.
10         The court reporter is taking down a
11  transcript of everything that we say, and so it's
12  important to answer my questions verbally, not with
13  shaking your head or nodding. It's important for you to
14  wait until I finish a question before you answer. We
15  shouldn't talk over each other, and that way, the record
16  will be clear. If you wish to stop and take a break at
17  any point, go ahead and let me know, and I will do my
18  best to accommodate you.
19         From time to time, your attorney may make
20  an objection to a question that I ask. He is doing this
21  for the record, and unless he instructs you not to
22  answer, you can go ahead and answer my question. If he
23  counsels you to answer only to the extent that
24  information is not privileged, I'd ask you to clarify
25  whether you're not answering based on that ground, so
```

Page 9

1  that we have a clear record.
2      Do you have any questions based on these
3  instructions?
4      A. I do not.
5      Q. Are you on any medication today that would
6  affect your ability to testify?
7      A. No.
8      Q. Is there any other reason why you can't testify
9  truthfully, accurately, and completely today?
10     A. No.
11     Q. I may use some shorthand today. If I say "the
12 Senator," I'm referring to Senator Fraser or anyone who
13 is acting on his behalf. Do you understand that?
14     A. Yes.
15     Q. I may use the terms "voter ID" and "photo ID"
16 interchangeably during this deposition. I'd like you to
17 interpret those words broadly to include any photo
18 identification -- I'm sorry -- any voter identification
19 requirement, whether it had a photo or not, that a voter
20 needs to present in order to vote in person.
21     A. Okay.
22     Q. If I use the term "minority voters," I'm
23 referring to voters who are not white, nonAnglo.
24     A. Okay.
25     Q. Do you understand all those terms?

Page 10

1      A. Yes.
2      Q. If I ask any questions today that you do not
3  understand, please let me know.
4      A. I will.
5      Q. Are you represented by counsel today?
6      A. I am.
7      Q. And who is that?
8      A. Matthew Frederick.
9      Q. And when did that representation begin?
10     A. I think when I started working for the
11 state. I mean, in terms of this case?
12     Q. In terms of -- you're being represented by
13 Mr. Frederick today in this deposition?
14     A. Yes.
15     Q. And when did that representation start, to the
16 best of your knowledge?
17     A. When the case was brought before the court.
18     Q. How did you come to be informed that you were
19 being represented by Mr. Frederick?
20     A. The Attorney General's Office called me.
21     Q. Have you ever been a party in litigation?
22     A. No.
23     Q. Have you ever been involved in a case in which
24 Texas was the -- was a party?
25     A. No.

Page 11

1      Q. What did you do to prepare for today's
2  deposition?
3      A. I reviewed the bill, and I looked at some
4  minutes of the Committee of the Whole and the Floor
5  debate.
6      Q. And when you say "the bill," can you tell me
7  what bill you're referring to?
8      A. The enrolled version of Senate Bill 14.
9      Q. And minutes of the Committee of the Whole
10 debate was for Senate Bill 14?
11     A. Senate Bill 14, yes, ma'am.
12     Q. Okay. Did you review anything else?
13     A. No, ma'am.
14     Q. Did you meet with your attorneys prior to this
15 deposition?
16     A. Yes, ma'am.
17     Q. And who did you meet with?
18     A. I met with Matt Frederick and Stacey Napier.
19     Q. And when was that?
20     A. I met with Matt and Stacey three or four weeks
21 ago. I don't know the exact date. And I talked with
22 Matt on the phone last evening.
23     Q. How long did you meet with Mr. Frederick and
24 Ms. Napier three to four weeks ago?
25     A. Hour, hour and a half.

Page 12

1      Q. And was anybody else present?
2      A. No, ma'am.
3      Q. And how long did you talk to Mr. Frederick last
4  night?
5      A. About an hour.
6      Q. Did you bring any documents with you today?
7      A. No, ma'am.
8      Q. Other than your attorneys, did you speak to
9  anybody about today's deposition?
10     A. I talked to Colby on Tuesday afternoon about
11 the length of his deposition.
12     Q. Did you talk to -- and I'm sorry, you're
13 referring to Colby Beuck?
14     A. Is that how you say his last name? Yes. From
15 Representative Harless's Office, yes.
16     Q. Did you talk to about him anything else from
17 his deposition?
18     A. No, ma'am. Just the length.
19     Q. Did you talk to Senator Fraser about your
20 deposition?
21         MR. FREDERICK: Let me interject here and
22 say, as I think will not come as a surprise to anybody,
23 the State of Texas will be asserting legislative
24 privilege throughout the deposition. I will be
25 instructing Ms. McCoy not to answer questions that seek

JANICE MCCOY                                          MAY 16, 2012

### 13

1  to discover thoughts or mental impressions of herself or
2  Senator Fraser about pending legislation, or
3  communications about pending legislation with
4  legislators, staffs, state agencies, the Texas
5  Legislative Council, and constituents.
6      So I will instruct you, I think you can
7  answer the question to the extent it asks for whether a
8  conversation occurred, who was party to the conversation
9  and how long it took, when it occurred, but I want to
10 instruct you not to reveal the substance of any
11 conversation that you had with the Senator. But you may
12 answer her question.
13     A.  The Senator and I did speak about the
14 depositions.
15     Q.  (By Ms. Maranzano) And when was that?
16     A.  We have talked about the deposition when they
17 were trying to get scheduled, and we talked about
18 scheduling and the timing of those depositions. And
19 then this week, we talked several times Tuesday. Is
20 today Wednesday? We talked several times on Tuesday
21 strictly about the length of the depositions that have
22 occurred so far this week, and about the fact that I'm
23 probably going to be out of the office all day today.
24     Q.  Anything else that you discussed with the
25 Senator?

### 14

1      A.  I would probably assert legislative privilege
2  at this point.
3      Q.  Was anybody else present during these
4  conversations?
5      A.  No.
6      Q.  Did these conversations take place in person?
7      A.  No.
8      Q.  On the phone?
9      A.  Yes.
10     Q.  Okay.
11     A.  I'm sorry. Jennifer, we -- the Senator and I
12 also spoke this morning as I was coming over here, so
13 yesterday and this morning.
14     Q.  And did you speak on the phone this morning?
15     A.  Yes, ma'am.
16     Q.  For about how long?
17     A.  Five, ten minutes.
18     Q.  Was that also about the length of time of the
19 deposition?
20     A.  Yes.
21         (Exhibit 30 marked for identification.)
22     Q.  (By Ms. Maranzano) I'm showing you what we've
23 marked as Deposition Exhibit 30. Can you take a look at
24 it and tell me if you recognize this document?
25     A.  I do.

### 15

1      Q.  And what is it?
2      A.  It's the Notice of Deposition for -- for me to
3  appear.
4      Q.  And can I direct your attention to the third
5  page of this document. Do you see that there's a list
6  of documents there?
7      A.  Yes, ma'am.
8      Q.  Did you undertake a search for these documents?
9      A.  Yes, ma'am.
10     Q.  Can you describe that search to me?
11     A.  I searched -- well, it wasn't very hard,
12 because I had a box marked Voter ID, and everything that
13 I had ever produced was in that box. And then I did the
14 -- I did a search of my e-mail, and I did a search of my
15 computer files, which also, I had specific files marked
16 as Voter ID in folders, and went through there.
17     Q.  The box that was marked Voter ID, did you
18 say --
19     A.  Uh-huh.
20     Q.  -- can you tell me: When did you compile
21 documents and put them in that box?
22     A.  I started compiling the box in 2009, when we
23 were debating the legislation then.
24     Q.  Uh-huh.
25     A.  And just continued it through 2011.

### 16

1      Q.  And what documents would go in that box?
2      A.  Studies, polls, information from agencies,
3  constituent letters, documents related to the
4  legislative process.
5      Q.  Does that box contain all of your documents
6  about voter ID?
7      A.  That box contains all of my documents about
8  voter ID from 2009 forward.
9      Q.  Did you collect documents prior to 2009?
10     A.  In 2007, Senator Fraser was the Senate sponsor
11 of a House bill related to voter ID, and that particular
12 bill folder has been archived, and those documents were
13 provided to the Attorney General electronically, not in
14 written form.
15     Q.  And when you say that you -- well, let me ask
16 you this: About how many documents are in that box?
17     A.  Hundreds.
18         (Mr. Patrick Sweeten joins the
19 deposition.)
20     Q.  (By Ms. Maranzano) And then you said you
21 searched your e-mail and computer files?
22     A.  Yes, ma'am.
23     Q.  How did you search your e-mail?
24     A.  The Legislative Council provided a list of
25 terms to search on, and so I searched on those terms.

JANICE MCCOY                                            MAY 16, 2012

17

1  Q. And how did you search your computer files?
2  A. Again, all of my voter ID stuff was in the same
3  folders. I created specific folders for voter ID. And
4  so other than looking in, potentially, the media folder,
5  I just -- actually just went and grabbed those files and
6  provided them to the Attorney General.
7  Q. So all the documents you found, you provided to
8  the Office of the Attorney General?
9  A. Yes, ma'am.
10 Q. Can I direct your attention particularly to
11 Number 5, Request Number 5? Can you read that for me
12 please.
13 A. "All documents and communications, including
14 but not limited to those among and between staff,
15 members of the Texas Legislature, the Texas Legislative
16 Council, and other Texas State executive offices and
17 agencies relating to any calculations, reports, audits,
18 estimates, projections, assessments, or other analysis
19 of the effect that SB 14 will impose upon minority
20 voters."
21 Q. Did you search for documents responsive to
22 Request Number 5?
23 A. I searched for all documents related to voter
24 ID.
25 Q. Did you have any documents responsive to

18

1  Request Number 5?
2  A. No.
3  Q. Can I direct your attention to Request
4  Number 8? Did you search for documents responsive to
5  Request Number 8?
6  A. Yes.
7  Q. Did you find any responsive documents?
8  A. Yes.
9  Q. Can you tell me how many?
10 A. No.
11 Q. Because you don't know?
12 A. Because I didn't count them.
13 Q. Can you approximate how many?
14       MR. FREDERICK: For the record, I'll
15 object to the extent it calls for speculation. But if
16 you can approximate, you may answer the question.
17 A. I mean, I'm just trying -- the guess that I
18 would make, if you're talking about things the Senator
19 said publicly that I actually wrote and did a public --
20 a press release on, was probably four or five a session
21 that we would write a public statement.
22 Q. (By Ms. Maranzano) Okay. And you mentioned the
23 Senator's involvement in the 2007 legislation. Was he
24 also involved in the 2005 legislation?
25 A. No, ma'am.

19

1  Q. Can I direct your attention to -- let me ask
2  you this about Request Number 8: Where were those
3  documents?
4  A. The public statements that I wrote for the
5  Senator on voter ID were stored on my computer.
6  Q. Now, when you say the public statements that
7  you wrote, are there public statements that you did not
8  write that the Senator made?
9  A. Potentially, yes.
10 Q. And is there a reason you didn't search for
11 those, too?
12       MR. FREDERICK: Objection to the extent it
13 misstates the testimony.
14 Q. (By Ms. Maranzano) Did you search for -- I
15 understood you to say that --
16 A. I did not search newspaper articles for
17 comments that the Senator made.
18 Q. And -- okay. Just so I'm understanding you, do
19 you keep newspaper articles --
20 A. No.
21 Q. -- in which the Senator makes comments?
22 A. No.
23       MR. FREDERICK: Let her finish the
24 question.
25       THE WITNESS: Oh, okay.

20

1  Q. (By Ms. Maranzano) Can I direct your attention
2  to Request Number 11. Can you take a look at that? Did
3  you search for documents that were responsive to Request
4  Number 11?
5  A. Yes.
6  Q. Did you have any documents that were responsive
7  to Request Number 11?
8  A. No.
9  Q. Ms. McCoy, can you tell me a little bit about
10 your educational background?
11 A. I graduated from a Texas public high school out
12 of Houston and went to Texas A&M University and got a
13 bachelor of science degree awarded in 1991 in political
14 science.
15 Q. Any other schooling?
16 A. No, ma'am.
17 Q. What's your -- what's your job title?
18 A. Chief of staff.
19 Q. For?
20 A. I'm sorry.
21 Q. For who?
22 A. Senator Troy Fraser.
23 Q. What was your job prior to working for Senator
24 Fraser?
25 A. I worked for the Republican Party of Texas.



JANICE MCCOY                                                                    MAY 16, 2012

### 21

1  Q. How long did you work for the Republican Party
2  of Texas?
3  A. Twelve and a half, 13 months.
4  Q. And what was your title with them?
5  A. Coalitions Director.
6  Q. And when did you start working for them and
7  when did you complete your time there?
8  A. I started working for the Republican Party in
9  August of 1997, and it ended in September of 1998.
10 Q. When did you start working for Senator Fraser?
11 A. September of 1998.
12 Q. What does it mean to be a coalitions director?
13 A. The chairwoman who hired me wanted to try and
14 be more inclusive and bring different types of
15 coalitions to the Republican Party.
16 Q. What coalitions did she want to bring to the
17 Republican Party?
18 A. We tried to create a Hispanic Business
19 Council. Now you're testing my memory. I don't know if
20 that's the exact title or not. But there was a couple
21 -- there was another group, but I can't remember. I'm
22 sorry.
23 Q. There was another -- another group that you
24 formed with the Republican --
25 A. Yes.

### 22

1  Q. The Republican Party of Texas?
2  A. Yes.
3  Q. How did you get your job with Senator Fraser?
4  A. The current chief of staff and I had met, and
5  he interviewed me and offered me a position.
6  Q. Did you start working for Senator Fraser as
7  chief of staff or as something else?
8  A. Something else.
9  Q. And what was that position?
10 A. Legislative assistant.
11 Q. And what did you do as a legislative assistant?
12 A. I did policy work, reviewed bills, answered
13 constituent inquiries.
14 Q. Any areas of legislative specialty as a
15 legislative assistant?
16 A. No.
17 Q. And just so I'm clear, I meant, did you have
18 any areas of --
19 A. Right. I -- I was assigned to the State
20 Affairs Committee. Senator Fraser sat on that
21 committee, and I worked that committee.
22 Q. And what --
23 A. I think. I'm sorry. I don't remember.
24 Q. Okay. What issues does the State Affairs
25 Committee deal with?

### 23

1  A. In 1999, they did transportation. They did
2  elections. They did tort reform.
3  Q. Anything else that you can remember?
4  A. I can't remember.
5  Q. Are those the same issues that they do now?
6  A. They do -- State Affairs no longer does
7  transportation.
8  Q. Okay. How long were you a legislative
9  assistant for Senator Fraser?
10 A. I think in 2000, I became legislative
11 director. In or around the year 2000, I became
12 legislative director, and then I became chief of staff
13 in December of 2004.
14 Q. What did you do as Senator Fraser's legislative
15 director?
16 A. Similar things; legislative assistant, policy
17 work, constituent work, bill analysis. But I also
18 directed the other legislative staff in their work.
19 Q. Did you have the same legislative areas that
20 you worked on when you were the legislative director as
21 when you were a legislative assistant, or did you change
22 your area of focus?
23 A. I think in the 2001 session, I worked on
24 business and commerce issues and in the 2003 session.
25 No, that's not right. It all runs together. I'm

### 24

1  sorry. It seems like it should have been yesterday, and
2  it wasn't. At some point, State Affairs was my focus,
3  and at some point, State Affairs, workers' comp -- no
4  business and commerce became my focus, and I started
5  doing workers' comp issues. And then in 2003, Senator
6  Fraser became Chair of Business and Commerce. So in
7  2001, I did Business and Commerce. 2003, I think I went
8  back to State Affairs.
9  Q. Can you describe for me all of your experience
10 that relates to election law?
11 A. My experience related to election law is
12 related to when I staffed State Affairs and monitoring
13 and analyzing the legislation that impacted the election
14 code.
15 Q. And you staffed State Affairs as a legislative
16 assistant, correct?
17 A. Yes, ma'am. And then again in 2003, as
18 legislative director. In 2005 as well, I think.
19 Q. And do you staff State Affairs as the chief of
20 staff?
21 A. No, ma'am.
22 Q. Do you have any experience related to election
23 administration?
24 A. Yes, ma'am.
25 Q. What's that experience?

**25**

1  A. In 1998, when I worked for the Republican Party
2  of Texas, I was also, in addition to being coalitions
3  director, they asked me to help their primary
4  administrator with some of her job.
5  Q. And what was that job?
6  A. To help coordinate the county chairs and get
7  them the information they needed to run their election,
8  the primary election, and then get that information back
9  so it could get certified by the chairman of the
10 Republican Party.
11 Q. Have you ever worked at a polling place on
12 election day?
13 A. Yes, ma'am.
14 Q. In what capacity?
15 A. Election judge.
16 Q. And can you describe for me what an election
17 judge does?
18 A. The election judge helps run the primary in
19 terms of getting the ballots in the ballot box to the
20 polling location, ensuring that the voters are voting in
21 the correct location and that they're eligible to vote
22 at that location, and then when the polls close, getting
23 the ballots back to the county.
24 Q. Have you ever witnessed any problems at a
25 polling place while you were serving as election judge?

**26**

1  A. No, ma'am.
2      MR. FREDERICK: Objection, vague.
3      THE WITNESS: Sorry?
4      MR. FREDERICK: It's okay. You can
5  answer.
6  A. No.
7  Q. (By Ms. Maranzano) Did you ever witness anyone
8  trying to impersonate another voter while you were
9  serving as election judge at a polling place?
10 A. No.
11 Q. Can you describe all of your current
12 responsibilities as chief of staff for Senator Fraser to
13 me, please.
14 A. I'm responsible for managing the office in
15 terms of just Senate paperwork, time sheets, travel
16 vouchers, general day-to-day business of making sure the
17 Senate office runs. I'm responsible for overseeing and
18 directing six staff people, in terms of giving them
19 advice about issues that they see or are dealing with in
20 their roles working for the Senator. I handle the
21 Senator's media relations, and I continue to work policy
22 and legislative issues for the Senator.
23 Q. Do you assist with drafting legislation?
24 A. Yes, ma'am.
25 Q. In what capacity? What role do you play in

**27**

1  drafting legislation?
2  A. There's several ways you can draft
3  legislation. Once an idea is -- once it's determined
4  that the Senator wants to carry legislation, we
5  typically make a request to either the Texas Legislative
6  Council or Senate Engrossing and Enrolling and we just
7  send them -- or the Texas Legislative Council with just,
8  you know, general two, three lines, this is what we'd
9  like to see the law do, and then they draft it. And
10 during session, occasionally we will draft -- I will
11 draft amendments to various legislation, if they're in
12 order to facilitate movement.
13 Q. If a Senator -- if the Senator has proposed
14 legislation, do you work on trying to ensure that
15 legislation gets passed?
16 A. Yes.
17 Q. Can you describe that process for me?
18     MR. FREDERICK: I'll object, and to the
19 extent that it calls for communications that you might
20 have had with legislators, staff, state agencies, the
21 TLC, or constituents about pending legislation, I'll
22 instruct you not to answer on the basis of privilege.
23 But to the extent you can answer without relying on
24 that, you're free to answer the question.
25 Q. (By Ms. Maranzano) And I'm asking you right now

**28**

1  in a general sense what your role is in that capacity.
2  A. In a general sense, once a piece of legislation
3  has been drafted by whomever drafted it, as staff, we
4  get the bill filed with the calendar clerk, and then it
5  goes through a general process that every bill goes
6  through, and once it gets referred to a committee, we
7  make the bill hearing request. Along with the bill
8  hearing request, we will do a bill analysis, or provide
9  information to the committee so that they can have a
10 bill analysis prepared. Once the bill is set for a
11 hearing, we will help the Senator with talking points.
12     If the bill makes it out of committee, we
13 will -- in the Senate, we have what's called an intent
14 calendar, so it's my job to -- once when we're ready to
15 move something on the Floor, we will notify the intent
16 calendar, essentially, and we will do talk -- and once
17 we're going to be recognized on the Floor, we'll do
18 talking points for the Floor. And then if it passes the
19 Senate, we will provide that information to -- the same
20 sort of talking points and data that we have to whoever
21 will pick up the bill in the House.
22 Q. What is a bill analysis? I think you mentioned
23 that in regards to the committee portion of the bill.
24 A. The Senate rules require that every bill have
25 an analysis attached to it. The committees are

JANICE MCCOY                                                          MAY 16, 2012

### 29

1  responsible for -- in the Senate, the committees are
2  responsible for putting that bill analysis together.
3  The Senate Research Center helps with that; it's an arm
4  of the Senate, and it basically provides a general
5  description of the bill, and then it will provide a
6  section-by-section analysis.
7     Q. Do you have -- do you personally have
8  communications with other legislators?
9     A. Yes.
10    Q. Regularly about legislation?
11    A. I mean, regularly is an interesting term.
12 During session?
13    Q. Uh-huh.
14    A. Yes. During the interim, no.
15    Q. Are your communications with other legislators
16 usually related to bills that Senator Fraser is
17 sponsoring or authoring?
18    A. Yes.
19    Q. What else would communications with other
20 legislators be about?
21    A. Potentially, it could be about that
22 legislator's legislation, if I have a question about it.
23    Q. Okay.
24    A. I don't --
25    Q. About how many times -- during the legislative

### 30

1  session, about how many times in a given week would you
2  talk to another legislator? Not Senator Fraser, a
3  different legislator.
4     A. I talk to other legislators pretty much every
5  day during session.
6     Q. Do you communicate with the Executive Branch
7  about legislation?
8     A. Yes.
9     Q. About how frequently during a legislative
10 session do you communicate with the Executive Branch?
11    A. Infrequently. It depends on the bill. I mean,
12 if it's something that is changing the way an agency
13 does business, it could be every day. If it's a bill
14 that doesn't do that, then maybe never. I mean...
15    Q. About how frequently do you communicate with
16 the Governor's Office about legislation?
17    A. Two, three times a session.
18    Q. About how frequently do you communicate with
19 the Lieutenant Governor's Office about legislation?
20    A. Every day. During session. I'm sorry.
21    Q. Yeah. When we were talking about your
22 responsibilities as chief of staff, did you say
23 communicating with constituents was one of your
24 responsibilities?
25    A. I might not have said it, but it would be, yes.

### 31

1     Q. Is communicating with interest groups or
2  advocacy groups one of your responsibilities?
3     A. Yes.
4     Q. And you said that you had a role in drafting
5  legislation. Do you have a role in researching issues
6  that might be related to legislation?
7     A. Yes.
8     Q. When Senator Fraser is taking a vote on a bill,
9  what's your role in regards to that legislation? Do you
10 make a recommendation to him?
11    A. Yes, ma'am. We do.
12    Q. You do. Does that role change if the Senator
13 is the sponsor of a bill?
14    A. No.
15    Q. Can you tell me, I think you said the Senator
16 has six staff people?
17    A. Well, I'm seven. Yeah.
18    Q. Can you tell me their names and their titles?
19    A. We have three people working in the district.
20 They're all called district coordinators. Mel Ferguson,
21 Blake Woodall, Ralph Gauer, G-a-u-e-r. And then
22 currently in Austin, in addition to myself, we have
23 three people, and Terri Mathis is scheduler. Will
24 McAdams, policy analyst. I think that's his title,
25 legislative analyst, policy analyst, something like

### 32

1  that. And then Whitney Smith-Nelson, administrative
2  assistant.
3     Q. Do the staff people in the district office have
4  any role in legislative efforts the Senator makes?
5     A. No.
6     Q. Does your office have a records retention
7  policy?
8     A. No.
9     Q. None?
10    A. Our specific office does not have a records
11 retention policy.
12    Q. When you say "our specific office," you mean
13 Senator Fraser's office?
14    A. Yes, ma'am.
15    Q. Do you retain records?
16    A. No, not --
17    Q. What prompted you to save certain files from
18 2009 voter ID?
19    A. I knew that the Senator would want to try again
20 in 2011.
21    Q. How often do you communicate with Senator
22 Fraser?
23    A. During the interim? Two or three times a week.
24    Q. I'm sorry. During the interim, can you
25 describe what you mean by that?

JANICE MCCOY                                                        MAY 16, 2012

### 33

1  A. The Texas legislature is in regular session for
2  140 days in odd-numbered years. The rest of the time,
3  it's called the interim. And that's the period we're in
4  right now, and I speak with him two or three times a
5  week during the interim.
6  Q. And by what means do you communicate with him,
7  usually, during the interim?
8  A. Phone.
9  Q. Just phone?
10 A. (Witness nods head yes.)
11 Q. And do you speak on the phone, or do you text
12 message each other?
13 A. Both.
14 Q. Is that on the Senator's personal phone or an
15 official government phone?
16 A. Personal phone.
17 Q. Is that on your personal phone or an official
18 government phone?
19 A. Both, depending on what time of day it is.
20 Q. Do you save those messages on your phone?
21 A. No.
22 Q. Not at all, or not for any length of time at
23 all?
24 A. I don't save anything.
25 Q. Do you delete them, meaning, if they're not on

### 34

1  your phone now, is that because they weren't archived in
2  some manner or --
3  A. Right. I delete them.
4  Q. Okay. So other than the phone during the
5  interim, do you communicate with the Senator in any
6  other ways?
7  A. I will, if I'm writing a speech or if he needs
8  some information, I fax things to his home. But other
9  than that, I do not communicate with him in any other
10 way.
11 Q. When you're in the legislative session --
12 A. Yes, ma'am.
13 Q. -- how often do you communicate with the
14 Senator?
15 A. Every day.
16 Q. And how do you usually communicate with him?
17 A. Verbally.
18 Q. Do you and the Senator ever exchange e-mails?
19 A. I have sent him e-mail. He does not respond.
20 Q. Do you send e-mail to his personal account or
21 to a government account?
22 A. Personal.
23 Q. During the time that you worked for Senator
24 Fraser, how many election-related bills has the Senator
25 authored?

### 35

1  A. I don't know.
2  Q. Can you give me an estimate?
3  A. The Senator typically does not author election-
4  related legislation. He sponsors it. So typically, I
5  would say, because of his seat on State Affairs, House
6  members will ask him to pick up their election bills,
7  and it could be 10 or 15 a session. That's not to say
8  that he hasn't authored election related, other than,
9  obviously, voter ID, I just -- I don't -- I don't know.
10 Q. So as you sit here, you can't think of other
11 election-related bills that Senator Fraser has authored
12 other than voter ID bills?
13 A. That's correct.
14 Q. And he has sponsored about 10 to 15 election-
15 related bills in those legislative sessions that you
16 worked in?
17 A. That's a good guess.
18 Q. During the time that you've worked for Senator
19 Fraser, how many immigration-related bills has Senator
20 Fraser authored?
21 A. I don't know.
22 Q. Can you give me an approximation?
23 A. My guess would be none.
24 Q. How about how many immigration-related bills
25 has Senator Fraser sponsored or co-sponsored?

### 36

1  A. Again, my guess would be none, but I don't
2  know.
3  Q. Are you familiar with Section 5 of the Voting
4  Rights Act?
5  A. I know what it is.
6  Q. What's your understanding of the requirements
7  of Section 5?
8  A. My understanding is that Section 5 of the
9  Voting Rights Act requires the Department of Justice to
10 review election-related legislation for nine specific
11 states and a few other entities, and to ensure that
12 those election changes don't discriminate against
13 minorities.
14 Q. Did you think it was important to save your
15 voter ID files because of Section 5 of the Voting Rights
16 Act?
17 A. No.
18 Q. How does the Legislature ensure that an
19 election-related change complies with Section 5 of the
20 Voting Rights Act?
21    MR. FREDERICK: Let me interpose an
22 objection. To the extent that the question seeks
23 information that reflects thoughts or mental impressions
24 about pending legislation or privileged communications,
25 I'll instruct you not to answer. I think that the

## 37

1   question is more general. And to the extent it doesn't
2   call for privileged information or communications, you
3   may answer the question.
4       A. Can you ask the question again?
5       Q. (By Ms. Maranzano) Yes. How does the Texas
6   Legislature ensure that an election-related change to
7   the law complies with Section 5 of the Voting Rights
8   Act?
9       A. I don't know.
10      Q. Do you believe that compliance with the Voting
11  Rights Act is important?
12          MR. FREDERICK: Object to relevance.
13      Q. (By Ms. Maranzano) You can answer.
14      A. No.
15      Q. Why not?
16      A. I don't believe it's fair that nine states --
17  personally don't believe it's fair that nine states are
18  singled out in 2012.
19      Q. To your knowledge, does Senator Fraser believe
20  that compliance with the Voting Rights Act is important?
21      A. I don't speak to the Senator's beliefs.
22      Q. In regards to your files on voter ID, did
23  anybody instruct you not to save those files?
24      A. No.
25      Q. Did anybody instruct you to delete your text

## 38

1   messages?
2       A. No.
3       Q. Can you tell me, describe for me, the current
4   system in Texas by which a voter's identity is verified
5   at the polls?
6       A. Under current law, the voter who does not show
7   up with a voter registration card -- well, under current
8   law, if a voter shows up with a voter registration card
9   and they're on the rolls, gets to vote. That's all they
10  need is the card. If you don't have a card, under
11  current law, you can show several different forms of
12  ID: Photo, one photo, with several options, or two
13  nonphoto.
14      Q. Are you aware of any problems with the system?
15          MR. FREDERICK: Objection, vague, but you
16  may answer.
17      A. I think that the system works mostly, but it's
18  open to fraud.
19      Q. (By Ms. Maranzano) Why do you say that?
20      A. Because the voter registration card doesn't
21  necessarily have to be the person who is standing there
22  with it.
23      Q. Are you aware of instances of voter fraud?
24      A. No, ma'am.
25      Q. Are you aware of any instances of voter fraud?

## 39

1       A. I think in -- are we talking about in-person
2   voter fraud or voter fraud?
3       Q. Well, let's talk generally first.
4       A. I mean, I think, yes, there are instances of
5   voter fraud in that we know that there is some being
6   prosecuted. Particularly, mail-in ballots are probably
7   the worst offenders, where we actually have the tools to
8   catch fraud. In-person voter fraud, I'm not personally
9   aware of any.
10      Q. When you said earlier that this -- the current
11  system, I think you said, it left -- it left open the
12  possibility of in-person voter fraud? Is that a correct
13  summary of your testimony?
14      A. Yes, ma'am.
15      Q. What would somebody need to do to commit
16  in-person voter fraud under the current system?
17          MR. FREDERICK: Objection to the extent it
18  calls for speculation, but you may answer, if you can.
19      Q. (By Ms. Maranzano) What did you mean by it
20  leaves open the possibility?
21      A. You could register yourself five times, five
22  different names, go vote five times. You could steal
23  someone's voter registration card and go vote. You
24  could, you know, borrow. Like, I don't have time to
25  vote, you go vote for me. Someone could go vote twice.

## 40

1       Q. Are you familiar with the voter registration
2   application in Texas?
3       A. Generally.
4       Q. Does somebody have to make certain attestations
5   on that voter registration application?
6       A. Yes, ma'am.
7       Q. And what are those?
8       A. I think that you are who you say you are, and
9   you live where you say you live, but I don't know for
10  sure.
11      Q. Does somebody have to swear that they are a
12  citizen on the voter registration application?
13      A. I think so.
14      Q. When was SB 14 signed into law?
15      A. Around the end of May 2011.
16      Q. Have there been elections since the time that
17  SB 14 was signed into law?
18      A. Yes, ma'am.
19      Q. Was SB 14 enforced in those elections?
20      A. No, ma'am.
21      Q. Are you aware of any in-person voter fraud that
22  occurred in any of those elections?
23      A. No, ma'am.
24      Q. I believe you testified earlier that there was
25  a photo ID bill introduced in 2007; is that correct?

Case 2:13-cv-00193   Document 666-17   Filed on 11/11/14 in TXSD   Page 11 of 11

JANICE MCCOY                                                    MAY 16, 2012

### 41

1   A. Yes, ma'am.
2       MS. MARANZANO: Can I get that marked?
3   We can do 28.
4       (Exhibit 28 marked for identification.)
5   Q. (By Ms. Maranzano) Can you take a look at that
6   exhibit that has been marked for the record as
7   Deposition Exhibit 28?
8   A. (Viewing document.)
9   Q. Do you recognize this?
10  A. Yes, ma'am.
11  Q. What is it?
12  A. It looks like the filed version of House Bill
13  218 from 2007.
14  Q. Can you tell me what forms of identification
15  were permitted under House Bill -- is this House Bill
16  218?
17  A. Yes, ma'am.
18  Q. Can you tell me what forms of identification
19  this bill would have permitted?
20      MR. FREDERICK: And take your time. If
21  you need a minute to review.
22  A. Oh, no, I just to find it. Under Section 11 of
23  the bill --
24  Q. (By Ms. Maranzano) Uh-huh.
25  A. -- it shows eight different forms of photo ID

### 42

1   that were acceptable: Driver's license, ID card,
2   military card, employee ID card, citizen's certificate
3   that has a photo, passport, student ID card, concealed
4   handgun license, or a valid ID card issued by a
5   government institution, federal or local.
6       And then if you didn't have photo ID, the
7   bill would allow two forms. Well, I thought it was two,
8   but I don't see that in here. The bill would allow for
9   some forms of nonphoto ID, which is also in Section 11:
10  Utility bills, bank statements, official mail, birth
11  certificate, citizenship papers, marriage license,
12  divorce decree, court records.
13  Q. So under HB 218, am I correct that a voter
14  could show either a form of photo identification or
15  forms of nonphoto identification?
16  A. Yes, ma'am.
17  Q. Does nonphoto verification verify a voter's
18  identity?
19  A. Most of the time, yes.
20  Q. Is there something about the forms of nonphoto
21  identification in HB 218 that you think verifies an
22  identity in a more secure fashion than a voter
23  registration card?
24      MR. FREDERICK: Object to the extent that
25  this seeks information of thoughts or mental impressions

### 43

1   about pending legislation or requires information that
2   would reflect communications with legislators, staff,
3   state agencies, the Texas Legislative Council,
4   constituents, I'll instruct you not to answer on the
5   basis of privilege. If you are able to answer without
6   relying on privileged matters, you may do so.
7   A. Can you ask the question again?
8   Q. (By Ms. Maranzano) Yeah. My question is: Do
9   you think HB 218 would have made an improvement on the
10  current system that you described to me, where a voter
11  shows their voter registration card or other forms of ID
12  when they show up to vote?
13      MR. FREDERICK: Same objection and
14  objection. But you may answer if you can.
15  Q. (By Ms. Maranzano) Do you have an answer to
16  that, ma'am? Thinking?
17  A. Yeah. My personal opinion is no.
18  Q. What's Senator Fraser's opinion on that?
19      MR. FREDERICK: Object to the extent it
20  calls for a legislator's thoughts and mental impressions
21  about pending legislation, and I'll instruct you not to
22  answer that question.
23  A. I choose not to answer.
24  Q. (By Ms. Maranzano) Would HB 218 prevent a voter
25  from voting multiple times?

### 44

1       MR. FREDERICK: I'll make the same
2   objection. To the extent it calls for privileged
3   information, thoughts or mental impressions or
4   privileged communications. But to the extent you can
5   answer without relying on privileged matters, you may do
6   so.
7   A. I have no answer.
8   Q. (By Ms. Maranzano) Have you no answer because
9   of the instruction?
10  A. Yes, ma'am.
11  Q. Okay. What was the purpose of including two
12  forms of photo identification at HB 1218?
13      MR. FREDERICK: Objection to the extent it
14  seeks thoughts or mental impressions you or Senator
15  Fraser may have had about pending legislation or
16  communications that are privileged. To the extent that
17  you can answer without relying on privileged matters,
18  you may answer the question.
19  Q. (By Ms. Maranzano) And for the record, this is
20  about the legitimate purpose of part of this bill.
21  A. I think you are better off asking
22  Representative Betty Brown.
23  Q. Betty Brown. Did the Senator bring HB 218 to
24  the Senate Floor?
25  A. He did.