### 45

1  Q. And did you have a role in that?
2  A. I did.
3  Q. Do you know what the purpose of including two
4  forms of nonphoto ID in HB 218 was?
5     MR. FREDERICK: I'll make the same
6  objection.
7     But I think she's just asking just a
8  yes-or-no question, so you may answer whether or not you
9  know.
10  A. I was not part of how House Bill developed in
11  the House. My personal belief is that they included two
12  forms of voter ID in order to get the necessary votes to
13  move it out of the House.
14  Q. Okay.
15     MS. MARANZANO: And just to clarify the
16  record, it's my understanding that Mr. Sweeten has
17  actually alerted the court that you all are going to
18  allow witnesses to answer questions about legislative
19  purpose. I missed the e-mail, but that's my
20  understanding of what has happened, so...
21     MR. FREDERICK: No. Consistent, I think,
22  with what we have tried to convey yesterday and today,
23  we will permit testimony about legislative purpose to
24  the extent that is available from nonprivileged sources.
25     MS. MARANZANO: Okay. This might be

### 46

1  something that we discuss with the court later.
2  Q. (By Ms. Maranzano) Did Senator Fraser have any
3  role in the development of HB 218?
4  A. No.
5  Q. Did the Senator take a public position on HB
6  218?
7  A. Yes.
8  Q. What position was that?
9  A. In favor.
10  Q. Did you play any role with regard to advising
11  the Senator on that position?
12  A. Yes.
13  Q. Did you recommend that he support the bill?
14  A. Yes.
15  Q. And what was that recommendation based upon?
16     MR. FREDERICK: Object to the extent the
17  question calls for thoughts and mental impressions about
18  pending legislation or asks for the substance of
19  communications of legislators' staff, state agencies,
20  TLC and constituents, I will instruct you not to
21  answer. If you can answer without relying on that
22  material, you may do so.
23  A. I cannot answer.
24  Q. (By Ms. Maranzano) Okay. And just so we have a
25  clear record, you cannot answer because of the privilege

### 47

1  being asserted?
2  A. Yes.
3  Q. Did you have any conversations with
4  constituents about HB 218?
5  A. Yes.
6  Q. How many?
7  A. How many conversations or how many
8  constituents? Sorry.
9  Q. That's an important distinction. Let's start
10  with how many constituents.
11  A. Verbally, I probably spoke to five to ten
12  constituents.
13  Q. Did you speak to any of these constituents on
14  multiple occasions?
15  A. Yes.
16  Q. About how many did you speak to on multiple
17  occasions?
18  A. How many constituents?
19  Q. Uh-huh.
20  A. One.
21  Q. And was this a conversation on the phone? In
22  person? In another means?
23  A. Most of the time, the conversations with this
24  one constituent were in person.
25  Q. Have -- I'm sorry.

### 48

1  A. Otherwise, I might have spoken to him once or
2  twice on the phone.
3  Q. Was anybody else party to the conversations
4  that occurred in person?
5  A. The Senator may or may not have been part of
6  the conversations. I don't remember 2007 very well.
7  Q. Does the Senator meet with any constituent who
8  comes to his office if he's in the office?
9  A. If the Senator is in the office, in a meeting
10  or on the phone, he will visit with constituents.
11  Q. Do you recall if he met with anybody, any
12  constituent about HB 218?
13  A. The same constituents that I met with on
14  several occasions, I think the Senator met with.
15  Q. Who was this constituent?
16  A. Skipper Wallace.
17  Q. Why was he particularly interested in HB 218?
18     MR. FREDERICK: Object to the extent that
19  calls for the substance of communications with a
20  constituent or a legislator or staff for the thoughts
21  and mental impressions about pending legislation; I
22  instruct you not to answer.
23  A. I can't answer because of privilege.
24  Q. (By Ms. Maranzano) Did these conversations all
25  take place in the Senator's office?

JANICE MCCOY                                                           MAY 16, 2012

## 49

1  A. I don't remember, but probably, yes. By
2  "office," you mean our general office because I have a
3  -- so there's three rooms, so in that space?
4  Q. In Senator Fraser's office complex --
5  A. Yes. Okay. Right.
6  Q. -- in the Capitol.
7  A. Okay.
8  Q. Okay. Thank you for clarifying that.
9     Did either you or the Senator ask
10 Mr. Wallace to comment, to speak about HB 218?
11 A. No. Are we still talking about 2007?
12 Q. We're still talking about 2007 right now.
13 A. Thank you. No.
14 Q. We'll get to the other bills at some point.
15    What was the nature of your conversation
16 with Mr. Wallace?
17    MR. FREDERICK: I'll object and instruct
18 you not to answer to the extent that you would reveal
19 the substance of the conversation. You may testify as
20 to the general subject matter only, and to the extent
21 you can do that, you may answer. Otherwise, I instruct
22 you not to answer the question.
23 Q. (By Ms. Maranzano) And are you going to --
24 A. I'm going to assert privilege.
25 Q. All right.

## 50

1     MS. MARANZANO: So that I'm clear,
2  Mr. Frederick, is your position that unsolicited
3  conversations with constituents are also covered by
4  privilege?
5     MR. FREDERICK: Yes.
6  Q. (By Ms. Maranzano) Did you or Senator Fraser
7  communicate with any members of the Executive Branch
8  about HB 218?
9  A. I don't remember. I'm sorry. I'm probably
10 sure that I talked to Ann McGeehan in the Secretary of
11 State's Office. Other than that, I don't remember.
12 Q. What did you talk to Ann McGeehan about?
13    MR. FREDERICK: I'll object again, and
14 instruct you not to answer to the extent it requires you
15 to disclose the substance of your conversation with
16 Ms. McGeehan about pending or proposed legislation. To
17 the extent you can answer by giving the general subject
18 matter, you may do so.
19 A. Generally, I'm sure you've heard Ann. Ann was
20 responsible for the Elections Division. Generally, we
21 spoke of how they would implement the bill.
22 Q. (By Ms. Maranzano) About how many times did you
23 speak with Ms. McGeehan?
24 A. I don't remember.
25 Q. Do you remember whether those were

## 51

1  conversations or e-mails or other written
2  communications?
3  A. I would assume in 2007, most of our
4  conversations were verbal, either on the phone or in
5  person.
6  Q. Did Senator Fraser have any communications with
7  the Executive Branch about HB 218?
8  A. I don't know.
9  Q. Did you communicate with any interest groups or
10 lobbyists about HB 218?
11 A. I don't remember.
12 Q. Did you communicate with any election officials
13 about HB 218?
14 A. Election officials outside of the Secretary of
15 State's Office?
16 Q. Yes, that's right. NonExecutive Branch
17 election officials.
18 A. Yes.
19 Q. Who did you communicate with?
20 A. Well, Skipper as County Chair. I think that I
21 also spoke with the Republican Party of Texas.
22 Q. How many times did you speak with the
23 Republican Party of Texas?
24 A. Probably once.
25 Q. Who from the Republican Party of Texas did you

## 52

1  speak with?
2  A. I don't know.
3  Q. Was that an in-person conversation or a
4  conversation by phone, e-mail?
5  A. Most likely, it was by phone.
6  Q. And when was that?
7  A. It was sometime in May, April May of 2009.
8  2007. I'm sorry.
9  Q. Anyone else a party to that conversation?
10 A. No.
11 Q. Did the Republican Party of Texas also speak to
12 Senator Fraser about HB 218?
13 A. No.
14 Q. And how do you know that?
15 A. Because the Senator doesn't speak to the
16 Republican Party of Texas. I do.
17 Q. What was the nature of your conversation with
18 the Republican Party of Texas?
19 A. I might have been asking about witnesses and
20 testifying and just generally about the bill.
21 Q. When you say witnesses and testifying, are you
22 talking about for --
23 A. For the State Affairs Committee.
24 Q. Did you talk to the Republican Party of Texas
25 about the substance of HB 218?

JANICE MCCOY                                                                      MAY 16, 2012

### 53

1  A. I don't remember. I don't think so, but I
2  don't remember.
3  Q. Did you have any communications or -- well, let
4  me: Are there any other election officials that you
5  spoke with about HB 218?
6  A. Not that I know of.
7  Q. Did you have any conversations with any groups
8  representing minority voters about HB 218?
9  A. I don't remember.
10 Q. Did you have any conversations with the
11 Lieutenant Governor's Office about HB 218?
12 A. Yes.
13 Q. How many?
14 A. I don't remember. A dozen, two dozen.
15 Q. Who did you have those conversations with?
16 A. His executive staff, Julia Rathgeber. I'm
17 trying to remember if Blaine Brunson was chief of staff
18 then or not. I can't remember if Blaine was or not.
19 And then whoever staffed State Affairs for Lieutenant
20 Governor, and I don't know who was at the time, either.
21 Q. Did you say his executive staff? Is that what
22 you said initially?
23 A. Yeah.
24 Q. Does he have --
25 A. Well -- go ahead.

### 54

1  Q. I was going to ask: Does he have an executive
2  staff that's distinguishable from legislative staff?
3  A. No. I said executive staff because there's
4  like three or four people that sit upstairs with him. I
5  just classified them that way.
6  Q. Okay. So you believe that you spoke with Julia
7  Rathgeber potentially?
8  A. It's Rathgeber.
9  Q. And you said Blain Brunson possibly?
10 A. If he was chief of staff in 2007, then, yes.
11 Q. And potentially whoever was staffing his State
12 Affairs issues?
13 A. Uh-huh.
14 Q. And when were these conversations?
15 A. I would have to look at the record of when the
16 bill made it to the Senate. April, May time frame of
17 2007.
18 Q. Were these conversations in person, over the
19 phone, e-mail? How did you communicate with the
20 Lieutenant Governor's Office?
21 A. Primarily in person.
22 Q. Were they in the Capitol offices?
23 A. Yes.
24 Q. What was the nature of your conversations with
25 Lieutenant Governor's staff?

### 55

1  MR. FREDERICK: I'll give you the same
2  instruction. I instruct you not to answer to the extent
3  that it would reveal thoughts and mental impressions
4  about pending legislation or the substance of
5  conversations between you and Senator Fraser or members
6  of the Lieutenant Governor's staff or the Lieutenant
7  Governor. But to the extent you can identify the
8  subject matter without revealing the substance of the
9  conversations, you may answer the question.
10 Q. (By Ms. Maranzano) Can you answer?
11 A. I'm trying to decide if I can.
12 Q. Okay.
13 A. We generally spoke about the process of moving
14 the bill in the Senate.
15 Q. Did you have any discussions with anyone in the
16 Lieutenant Governor's Office about the impact of HB 218
17 on minority voters?
18 A. No.
19 Q. Did you have conversations with anybody about
20 the impact of HB 218 on minority voters?
21 A. I don't remember.
22 Q. Do you keep any record of meetings that you
23 have?
24 A. No.
25 Q. None?

### 56

1  A. Not from 2007.
2  Q. How about from 2009?
3  A. No.
4  Q. How about from 2011?
5  A. There might be some stuff on my calendar from
6  2011.
7  Q. Do you keep any record of meetings or
8  conversations the Senator has?
9  A. No.
10 Q. Does the Senator keep such a record?
11 A. Of meetings that he's had in the past, only to
12 the extent that his calendar is stored electronically,
13 and if that meeting made it to the calendar.
14 Q. Who keeps that calendar in your office? Does
15 the Senator keep his own calendar?
16 A. The scheduler.
17 Q. Did you turn that calendar over to counsel?
18 A. No, I didn't. I'm sorry.
19 Q. Do you believe that's responsive to the
20 requests that were propounded on your office?
21 A. I suppose not.
22 Q. You don't believe that was?
23 A. Well, I mean, I guess if -- I didn't search the
24 calendar. So then the answer is no, it was not
25 responsive.

JANICE MCCOY                                                                              MAY 16, 2012

---

**57**

1  Q. Am I understanding that you didn't turn -- you
2  didn't search it because it was --
3  A. I forgot to search it. And so now that you've
4  brought it up, it's not responsive, and I can search for
5  it.
6  Q. Okay. Yeah. I think we're going to ask you to
7  make that search and turn it over to counsel.
8      MR. FREDERICK: And just for the record,
9  I'll object to the request.
10     MS. MARANZANO: On what grounds?
11     MR. FREDERICK: On the grounds that it's
12 privileged and not relevant and not reasonably
13 calculated to lead to discovery of relevant evidence.
14     MS. MARANZANO: Okay. But I'm asking her
15 to turn it over to you. I mean, you can still do a
16 privilege review.
17     MR. FREDERICK: Fair enough. Fair enough.
18 That's fine. I understand.
19     MS. MARANZANO: Okay. For the record, our
20 position is who the Senator met with on the dates is not
21 actually privileged. The substance, we understand
22 you're asserting privilege over. But we would ask that,
23 at the very least, she'd turn that information over to
24 you.
25     MR. FREDERICK: And we understand.

**58**

1      MS. MARANZANO: Yeah.
2  Q. (By Ms. Maranzano) Did Senator -- yes.
3  A. Just so we can be clear, the Senator meets with
4  people unexpectedly, and it doesn't make to it his
5  calendar.
6  Q. Okay.
7  A. So there may have been meetings that have took
8  place that will not reflected on his calendar.
9  Q. Okay. And are there any documents that reflect
10 those meetings?
11 A. Again, the meetings that just took place
12 unexpectedly, no, ma'am.
13 Q. Okay. Did you review any studies that would be
14 related to HB 218?
15 A. No.
16 Q. Did anyone in your office?
17 A. No.
18 Q. Did the Senator -- did you or the Senator make
19 any attempt to determine who among registered voters did
20 not possess one of the forms of identification listed in
21 HB 218?
22 A. No.
23 Q. Why not?
24     MR. FREDERICK: Object to the extent it
25 calls for thoughts, mental impressions, or

**59**

1  communications between you and the Senator or you and
2  the Senator and the legislative staff, state agencies,
3  TLC, and constituents. If you can answer without
4  revealing privileged matters, you may do so.
5  A. Generally, when you pick up a bill from the
6  other chamber, you assume most of the work was done in
7  the other chamber.
8  Q. (By Ms. Maranzano) Did you feel you had any
9  obligation to analyze the bill prior to recommending to
10 your boss that he take a position on it?
11     MR. FREDERICK: I think I'll make the same
12 instruction: Don't reveal thoughts, mental impressions,
13 or communications that are privileged. But if you can
14 answer without doing, so you may answer the question.
15 A. I did review the bill prior to making a
16 recommendation.
17 Q. (By Ms. Maranzano) And did you feel that you
18 needed to do anything in addition to reviewing the bill
19 prior to making a recommendation to the Senator?
20 A. No.
21 Q. Were you aware that if this bill had been
22 passed, it would have been subject to Section 5 of the
23 Voting Rights Act?
24 A. Yes.
25 Q. And did you believe that includes any

**60**

1  obligation to take any additional steps before
2  recommending a position to Senator Fraser?
3  A. No.
4  Q. Are you aware of whether the House analyzed the
5  impact of HB 218?
6  A. I'm not aware.
7  Q. Do you know whether there was any attempt in
8  the House to analyze whether HB 218 would have a
9  disproportionate impact on minority voters?
10 A. I'm not aware.
11 Q. Who would know that information?
12 A. The House author.
13 Q. And that was?
14 A. Representative Betty Brown.
15 Q. What was the purpose of HB 218?
16     MR. FREDERICK: Object on grounds of
17 privilege. To the extent the question calls for
18 thoughts or mental impressions of you, Senator Fraser,
19 or communications that you or the Senator have had with
20 other legislators, staff, agencies, TLC, or
21 constituents, I instruct you not to answer. But to the
22 extent that you are able to identify the purpose of the
23 bill without relying on privileged matters, you are free
24 to answer the question.
25 A. I think the record from the State Affairs

JANICE MCCOY                                                                          MAY 16, 2012

61

1   Committee hearing on House Bill 218 will show that the
2   Senator said the intent was to stop in-person voter
3   fraud.
4       Q.  (By Ms. Maranzano) And how does this bill stop
5   in-person voter fraud?
6           MR. FREDERICK:  Object to the extent it
7   calls for speculation and object to the extent it calls
8   for thoughts, mental impressions, or privileged
9   communications.  But to the extent you can answer
10  without relying on privileged matters, you may do so.
11      A.  What was the question?
12      Q.  (By Ms. Maranzano) How does HB 218 solve
13  in-person -- or help with in-person voter fraud?  Is
14  that what -- what did you say the purpose of the bill
15  is?  Why don't you repeat that?
16      A.  If you look at the record from the State
17  Affairs Committee hearing, the Senator said that the
18  intent of a voter ID bill was to stop in-person voter
19  fraud.
20      Q.  And so my question is:  How does this bill do
21  that?
22          MR. FREDERICK:  Same instruction.
23      A.  I'll assert privilege.
24      Q.  (By Ms. Maranzano) Is that the only purpose of
25  HB 218?

62

1           MR. FREDERICK:  Same objection and
2   instruction.  Don't reveal thoughts, mental impressions
3   or communications with legislative staff, agencies, TLC
4   or constituents.  If you are able to answer without
5   doing so, you may.
6       A.  Again, according to the record, if you look at
7   what Senator Fraser said in the State Affairs Committee
8   hearing, his only intent is to stop in-person voter
9   fraud.
10      Q.  (By Ms. Maranzano) Can you describe to me the
11  procedural history of after HB 218 was introduced, what
12  happened?
13          MR. FREDERICK:  I'll object on grounds of
14  vagueness, but you can answer if you can.
15      A.  I cannot --
16      Q.  (By Ms. Maranzano) I'm looking for a general
17  summary of what happened with the bill.
18      A.  I mean, the House process is the House
19  process.  The bill gets filed, gets sent to committee,
20  gets voted out of committee, it goes to calendars, goes
21  the Floor, gets passed.  In the Senate, it gets -- comes
22  to over to the Senate, then just like every bill,
23  Lieutenant Governor reviews it, refers it to a
24  committee, committee chairman decides to give it a
25  hearing or not, and the bill has a hearing in committee,

63

1   and the bill gets voted out of committee, and Senator
2   places the bill on the intent calendar.
3       Q.  Can I stop for a second.
4       A.  Uh-huh.
5       Q.  I'm asking you particularly about HB 218, not
6   about a general description.
7       A.  House Bill 218 was voted out of the House, and
8   I can't speak to how it got out of the House.  You need
9   to go back and talk to Betty Brown about that.  House
10  Bill 218 showed up in the Senate, was read, Lieutenant
11  Governor referred it to the Senate State Affairs
12  Committee.  The Senate State Affairs Committee had the
13  bill.  Senator Fraser notified the Senate State Affairs
14  Committee that he wanted to sponsor HB 218 and requested
15  a hearing.  The bill was set for a hearing by the
16  Chairman of Senate State Affairs.  The bill had a
17  hearing.  I don't remember if this bill sat in State
18  Affairs or if it was voted out the same day it was
19  heard.  You'd have to look at the record.  But the bill
20  was voted out of committee.
21          And Senator Fraser decided to move forward
22  with the bill, and so he notified, via the intent
23  calendar notification process, the other senators that
24  he wanted to hear the bill, and we had the bill in
25  Intent for quite a while.

64

1           This particular bill, we tried to move one
2   day, when we thought we had the necessary votes, and we
3   were not successful, and the bill died.
4       Q.  Okay.  So I'm going to ask you a couple of
5   questions about that process as you've described it.
6           I believe that you testified that the
7   Lieutenant Governor reviews a bill, after it gets voted
8   out of the House, and than refers it to committee?
9       A.  Yes, ma'am.
10      Q.  Does every bill that gets voted out of the
11  House get referred to some Senate committee?
12      A.  Yes, ma'am.
13      Q.  And does the Lieutenant Governor solely -- is
14  that decision of which committee to refer it to solely
15  that of the Lieutenant Governor's?
16      A.  Based on the current Senate rules, yes.
17      Q.  And you mean the 2011 rules?
18      A.  2007, but even now in 2011, yes, ma'am.
19      Q.  Okay.  And you said that the Senator, Senator
20  Fraser notified the committee on State Affairs that he
21  wanted to sponsor this bill?
22      A.  Yes, ma'am.
23      Q.  Why did he do that?
24          MR. FREDERICK:  Well, object to the extent
25  it calls for the Senator's thoughts, mental impressions,

**65**

1  or any communications that you had with him, and I will
2  instruct you not to answer.
3       A.  I'll assert privilege.
4            MR. FREDERICK:  Okay.
5            Jennifer, sometime soon, if we could take
6  a quick break.
7            MS. MARANZANO:  Yeah, just give me a
8  couple of minutes.
9            MR. FREDERICK:  Sure.  Sure.
10      Q.  (By Ms. Maranzano) And you said the committee
11 held hearings on HB 218?  The Committee on State Affairs
12 held hearings on HB 218?
13      A.  Held a hearing.  I don't think they had
14 multiple.  I think they had one.
15      Q.  Who invited the witnesses to testify at that
16 committee hearing?
17           MR. FREDERICK:  I'm going to object to
18 that, and to the extent it calls for communications that
19 any legislator had or that you or Senator Fraser had
20 with legislators, staff, agencies, TLC, constituents, or
21 potential witnesses, I'll instruct you not to answer.
22 To the extent you can answer without revealing the
23 substance of conversations, you can do so.
24      A.  I don't remember that there was an invited
25 panel.  It was just the process of laying out a bill by

**66**

1  the Senator and then the public testifying.
2            I earlier said that I think I talked to
3  the Republican Party of Texas about coming and
4  testifying, so I may have called a few people that I
5  thought would be helpful to the passage of the bill
6  besides the Republican Party of Texas.  I'm not sure.
7  And then the one constituent that we talked to quite a
8  bit about this bill.  Other than that, I don't think
9  there was invited to testimony.
10      Q.  (By Ms. Maranzano) So the one constituent was
11 Skipper Wallace?
12      A.  Yes.
13      Q.  And are you saying that you may have invited
14 him to testify as well?
15      A.  I think I didn't invite him to testify.  I
16 think I was more making sure he knew that the bill had
17 been scheduled for hearing.
18      Q.  Do you remember about how many members of the
19 public testified at that hearing?
20      A.  I do not.
21      Q.  Can you approximate?
22      A.  I cannot.  It's in the record, however.
23      Q.  Okay.  Did anybody raise any concerns about 218
24 during this committee hearing?
25      A.  My recollection is yes.

**67**

1       Q.  What were those concerns?
2       A.  I cannot -- I cannot speak to what they
3  actually said.
4       Q.  Did anybody raise any concerns about the impact
5  HB 218 might have on minority voters?
6            MR. FREDERICK:  Well, object and instruct
7  you not answer to the extent that the question calls for
8  communications that you had or Senator Fraser had with
9  legislators or legislative staff, agencies, TLC, or
10 constituents.  But to the extent you can answer without
11 revealing.
12      A.  I mean, the record is there.  The hearing was
13 videotaped.  I think that you could watch it.  I don't
14 remember specifically.
15      Q.  (By Ms. Maranzano) Okay.  Did the bill change
16 at all in committee?
17      A.  I don't think so, but -- yeah, I don't think
18 so.  I don't remember.  I mean, we might have made minor
19 tweaks, but I don't think so.
20      Q.  Okay.
21           MS. MARANZANO:  Let's take a five-minute
22 break.
23           (Recess from 11:11 a.m. to 11:32 a.m.)
24      Q.  (By Ms. Maranzano) Ms. McCoy, before the break,
25 we were talking about HB 218.  Who brought HB 218 to the

**68**

1  Floor of the Senate?
2       A.  Senator Fraser.
3       Q.  Did anyone ask the Senator to bring it to the
4  Floor?
5            MR. FREDERICK:  Object to the extent that
6  calls for communications with other legislative staff in
7  this case the legislators or staff members that's not on
8  the public record, I will instruct you not to answer.
9  If you can answer without revealing that, you may
10 answer.
11      A.  I'll assert privilege.
12      Q.  (By Ms. Maranzano) Why was Senator Fraser
13 playing a leadership role in HB 218?
14           MR. FREDERICK:  I'll object to the extent
15 that calls for thoughts or mental impressions of Senator
16 Fraser about HB 218 or communications with other
17 legislators, staff, or state agencies.  If you can
18 answer without revealing subjective mental impressions
19 or you may do so.
20      A.  I'll assert privilege.
21      Q.  (By Ms. Maranzano) When HB 218 was brought at
22 the time Floor of the Senate, what was your role?
23      A.  My role with House Bill 218 at that point was
24 to help the Senator with his talking points, and that's
25 it.

## 69

1   Q. Did you draft his talking points?
2   A. Yes.
3   Q. Did you save those talking points?
4   A. Yes.
5   Q. Do you still have them?
6   A. Yes.
7   Q. Were those turned over to your counsel?
8   A. Yes.
9   Q. Did you do any research prior to drafting those
10  talking points?
11  A. I read the bill book that Representative Brown
12  provided to us.
13  Q. And what does the bill book include?
14  A. I don't remember what the bill book included
15  specifically. Typically, a bill book has copies of the
16  legislation, copies of the bill analysis, copies of the
17  fiscal note, and occasionally, supporting documents.
18  This bill book had all of those things. I do not
19  remember what those supporting documents were.
20  Q. Did you do any additional research other than
21  read the bill book?
22  A. No.
23  Q. Why not?
24      MR. FREDERICK: I'll object. I believe
25  that question calls for your mental impressions about

## 70

1   pending legislation. I'll instruct not to answer.
2   Q. (By Ms. Maranzano) Are you going to follow your
3   counsel's instruction not to answer the question?
4   A. Yes, ma'am.
5   Q. Okay. When HB 218 was brought to the Floor of
6   the Senate, did -- or did HB 218 require the support of
7   two-thirds of the senators to bring bill to the Floor
8   for a vote?
9   A. Yes.
10  Q. When Senator Fraser brought HB 218 to the
11  Floor, how many senators were present at that time?
12  A. I don't recall exactly. Either 29 or 30.
13  Q. I believe you testified earlier that the
14  Senator brought the bill to the Floor when he -- he
15  tried to move this bill on a day when you thought it
16  would pass?
17  A. Yes, ma'am.
18  Q. What did you mean by that?
19  A. We knew that a particular Senator was absent.
20  Q. Which Senator was absent?
21  A. Senator Uresti.
22  Q. Why was Senator Uresti absent?
23  A. If you look at the record from that day, I
24  think he was excused because he was sick.
25  Q. Did you know Senator Uresti's position on HB

## 71

1   218?
2       MR. FREDERICK: I'll object to the extent
3   it calls for thoughts or mental impressions of any
4   legislators or staff of pending legislation or
5   communications with other legislators of Senator Fraser
6   or staff. But if you can answer without revealing
7   privileged matters, you may do so.
8   A. After the bill moved, Senator Uresti voted no.
9   Q. Can you --
10  A. So I did not know how he was going to vote
11  prior to the bill moving. After he voted, he voted
12  no. After we voted, he voted no.
13  Q. Well, why did you bring the bill to the Floor
14  when he was absent?
15      MR. FREDERICK: Object to the extent the
16  question calls for thoughts and mental impressions about
17  pending legislation or communications indications that
18  are privileged. I instruct you not to answer. If you
19  can answer without revealing privileged matters, you may
20  do so.
21  A. I'll assert privilege.
22  Q. (By Ms. Maranzano) Do you think it's important
23  to give every Senator a chance to weigh in on a bill
24  like HB 218?
25      MR. FREDERICK: I'll object as

## 72

1   argumentative, but you may answer if you can.
2   Q. (By Ms. Maranzano) Are you able to answer that,
3   Ms. McCoy?
4   A. No.
5   Q. No, you're not able to answer or --
6   A. I'm sorry.
7   Q. -- no, you don't think it's important to --
8   A. No, I don't think it's important that every
9   Senator vote on every specific piece of legislation,
10  including House Bill 218.
11  Q. Do you know Senator's Uresti's ethnicity?
12  A. Yes.
13  Q. What ethnicity is he?
14  A. He's Hispanic.
15  Q. Do you know anything about the district that he
16  represents?
17  A. Not specifically.
18  Q. Do you know if he made any comments about
19  HB 218 and the impact it would have on his constituents?
20  A. I do not know.
21  Q. Would that impact your thoughts on whether it
22  was important to give him an opportunity to vote on
23  HB 218?
24      MR. FREDERICK: Objection, calls for
25  speculation.

JANICE MCCOY											MAY 16, 2012

**73**

1  Q. (By Ms. Maranzano) You can ahead and answer.
2  A. I'm sorry. You need to ask the question
3  again. I don't know what you're asking me.
4  Q. I'm asking if you thought that Senator Uresti
5  believed that HB 218 would impact his constituents,
6  would you think it was important that he be given an
7  opportunity to take a vote on that bill?
8       MR. FREDERICK: Same objection. You can
9  answer.
10  A. I think, again, generally, every bill impacts
11  every Senators' constituents. And generally, Senators
12  should on the Floor to vote, but not -- we don't have a
13  31 -- we don't always 31 Senators on the Floor to vote.
14  And so with Senator Uresti, I can't speak to Senator
15  Uresti's constituents what they think is important or
16  not important for him to vote on.
17  Q. (By Ms. Maranzano) But am I understanding you
18  correctly that your position is, you don't think every
19  Senator needs to vote on every bill, including HB 218?
20  A. That's correct.
21  Q. And did you say that the bill -- well, after
22  the first vote was taken on HB 218, was there
23  verification of the vote that was taken?
24  A. I think that's what it's called, yes. I think
25  of we -- they voted again. I don't know if it was a

**74**

1  verification or if they just chose to vote again. I'm
2  not really sure how that worked. But there was a second
3  vote.
4  Q. And did you say Senator Uresti arrived for that
5  vote?
6  A. He did.
7  Q. And what happened to HB 218?
8  A. It failed to suspend the regular order of
9  business rule.
10  Q. Was that because it did not have a two-thirds
11  majority --
12  A. That's correct.
13  Q. Two-thirds majority support?
14  A. That's correct.
15  Q. What is the purpose of the two-thirds rule?
16  A. There is not a rule that's the two-thirds
17  rule. The rule is the regular order of business rule,
18  and that rule says that as a bill comes out of the
19  calendar, it's placed on the regular order of business,
20  and you're supposed to vote in that order. So there is
21  no two-thirds rule.
22  Q. So to vote on a bill out of order, does that
23  require two-thirds majority support?
24  A. You have to suspend the regular order of
25  business rule, and that requires a two-thirds vote of

**75**

1  the members present.
2  Q. What do you think the purpose of that
3  requirement is?
4  A. I can't speak to the purpose. It's just the
5  way the Senate has done business.
6  Q. But as somebody who has worked there since
7  1992, do you have any thoughts on what you think the
8  purpose of that is?
9  A. General consensus on bills.
10  Q. Are most bills brought to the Floor by getting
11  two-thirds majority support?
12  A. Yes.
13  Q. After HB 218 failed to get two-thirds majority
14  support, did anything further happen to that bill?
15  A. No.
16  Q. Who were the main supporters of HB 218?
17       MR. FREDERICK: I'll object to the extent
18  that it calls for communications that you or Senator
19  Fraser might have had with legislators, staff, agencies,
20  or constituents or thoughts and mental impressions. But
21  if you can answer without that, I think you're free to
22  answer.
23  A. Well, I think the record will show, if you look
24  at the vote in the Senate, you're talking about who the
25  supporters were in the Senate; Republican Senators

**76**

1  supported it, Democrat Senators did not.
2  Q. (By Ms. Maranzano) How about, were there any --
3  would you consider anybody from the Executive Branch to
4  be a main supporter of HB 218?
5       MR. FREDERICK: Same objection. To the
6  extent it calls for communications between you or
7  Senator Fraser and a member the Executive Branch or
8  their thoughts or mental impressions, I instruct you not
9  to answer. If you can answer without revealing that,
10  you can answer.
11  A. I'll assert purchase.
12  Q. (By Ms. Maranzano) Was there any outside groups
13  or advocacy groups that you would consider to be in the
14  group of the main supporters of HB 218?
15       MR. FREDERICK: Again, I'll instruct you
16  not to answer and object on privilege, to the extent
17  that it would require you to reveal the substance of any
18  conversation. But to the extent it's just seeking
19  identity, then you may identify.
20  A. I honestly don't remember who testified for and
21  against the bill. Republican Party, I think, was for
22  it.
23  Q. (By Ms. Maranzano) And did you say -- you said
24  most of the legislators who supported the bill were in
25  the Republican Party?

## 77

1. A. Yes, ma'am..
2. Q. Do you believe any part of the purpose of
3. HB 218 was partisan?
4.    MR. FREDERICK: I'll object and assert
5. privilege to the extent that the question seeks thoughts
6. or mental impressions about pending legislation or the
7. substance of communications with legislators, staff,
8. agencies, TLC, or constituents. But, I mean, to the
9. extent that you can identify -- to the extent you're
10. able to identify a purpose without relying on those
11. matters, you're free to answer the question.
12. A. I think the purpose of the bill, from Senator
13. Fraser and our office's perspective, was to stop
14. in-person voter fraud. It wasn't partisan.
15. Q. (By Ms. Maranzano) Who were the main opponents
16. to HB 218?
17. A. I don't remember.
18. Q. You don't remember any of them?
19. A. I don't.
20. Q. Do you believe that HB 218 would have had a
21. discriminatory impact on minority voters?
22.    MR. FREDERICK: I'll object to the extent
23. it calls for your thoughts and mental impressions about
24. pending legislation and communications, and based on
25. that, I will instruct you not to answer the question.

## 78

1. A. I'll assert privilege.
2. Q. (By Ms. Maranzano) Are you familiar with
3. Section 2 of the Voting Rights Act?
4. A. No.
5. Q. Not at all?
6. A. Not at all.
7. Q. Would it surprise you if I told you that
8. Section 2 includes an antidiscrimination provision that
9. applies to all 50 states?
10. A. I don't know anything about Section 2, so...
11. Q. So you've never made any effort to ensure that
12. legislation you worked on complied with Section 2 of the
13. Voting Rights Act?
14.    MR. FREDERICK: Objection, argumentative.
15. Objection, assumes facts not in evidence.
16. A. I don't know anything about Section 2.
17. Q. (By Ms. Maranzano) Do you think a federal law
18. is required to make sure a piece of legislation doesn't
19. discriminate against minorities?
20. A. No.
21. Q. Do you make any attempts to make sure that
22. legislation you work on doesn't discriminate against
23. minorities?
24.    MR. FREDERICK: I object, to the extent it
25. calls for you to reveal thoughts, mental impressions, or

## 79

1. communications relating to specific legislation. To the
2. extent you can answer without relying on privileged
3. matters, you may do so.
4. A. I assert privilege.
5. Q. (By Ms. Maranzano) Was Senator Fraser involved
6. in a photo identification bill in 2009?
7. A. Yes, ma'am.
8.    (Exhibit 29 marked for identification.)
9. Q. (By Ms. Maranzano) Ms. McCoy, I'm showing you
10. what has been marked as Deposition Exhibit 29. Do you
11. recognize this?
12. A. Yes, ma'am.
13. Q. And what is this?
14. A. I think it's the filed version of Senate Bill
15. 362.
16. Q. Can you take a look at it and tell me what
17. forms of identification would be allowed in this bill?
18. A. Section 10 of the bill shows six different
19. forms of photo ID that would be acceptable, including a
20. driver's license or ID card, a military card, a citizen
21. certificate that has a photograph, a passport, a
22. concealed handgun license, and a valid ID card from a
23. federal or local government, or two forms of nonphoto
24. ID, including registration cards, utility bills,
25. official mail, birth certificates, marriage license or

## 80

1. divorce decrees, court records.
2. Q. Is -- I think I didn't ask you this question.
3. Is this the bill that Senator Fraser introduced in 2009?
4. A. I think I said it was the filed version, yes,
5. ma'am.
6. Q. Okay.
7. A. I don't know that to be exact, but based on the
8. title of the bill, it looks like it's the filed version.
9. Q. Okay. And this bill would allow for a voter to
10. show one form of photo identification or two forms of
11. nonphoto identification?
12. A. That's correct.
13. Q. I believe you testified earlier that two forms
14. of nonphoto identification would verify a voter's
15. identity in both instances?
16. A. Uh-huh.
17. Q. What are the instances --
18.    MR. DUNN: Was that a yes?
19.    THE WITNESS: Yes.
20. Q. (By Ms. Maranzano) What are the instances that
21. a nonphoto ID would not verify a voter's identity?
22.    MR. FREDERICK: Objection to the extent it
23. calls for speculation, but you can answer.
24. A. Again, if someone is trying to cheat the
25. system, they can -- nonphoto IDs can be reproduced and

### Page 81

1. manipulated.
2. Q. (By Ms. Maranzano) Can photo IDs be reproduced
3. and manipulated?
4. MR. FREDERICK: Objection to the extent it
5. calls for speculation, but you can answer if you know
6. A. Some can.
7. Q. (By Ms. Maranzano) Can you tell me what your
8. involvement was in the development of SB 362?
9. A. Senate Bill 362 as filed was the legislation
10. that the House sent to us from House Bill 218. So
11. Exhibit 28 is not the bill the Senate was debating,
12. because this is the filed version. So after the House
13. manipulated it a while, this is the language they sent
14. us. So we refiled the bill that had passed the House
15. from 2007. We refiled it in 2009.
16. Q. Why did Senator Fraser decide to file the bill
17. in the Senate in 2009?
18. MR. FREDERICK: Object. That question
19. seeks thoughts or mental impressions of Senator Fraser.
20. I'll instruct you not to answer on the basis of
21. privilege.
22. A. I'll assert privilege.
23. Q. (By Ms. Maranzano) So you filed -- I'm sorry.
24. Senator Fraser filed a bill that was -- that had been
25. previously filed in the House; is that correct? And SB

### Page 82

1. 362 was a version of a previously-filed bill in the
2. House?
3. A. Senate Bill 362 was the version of House Bill
4. 218 that the House sent us, the engrossed version of
5. House Bill 218 from 2007.
6. Q. Okay. And you did not make any changes to the
7. bill prior to filing SB 362?
8. A. I think Senate Bill 362, as filed, was exactly
9. the language that was House Bill 218 as it came out of
10. the Senate committee on State Affairs.
11. Q. Did you do any -- we've talked a little bit
12. about what you did in relation to House Bill 218. Did
13. you take any additional steps, in terms of developing or
14. working on SB 362, with regards to any research you did
15. any studies you looked at?
16. A. Yes, ma'am.
17. Q. And what did you do?
18. MR. FREDERICK: I'll object to the extent
19. this calls for you to reveal thoughts or mental
20. impressions, any communications with legislators, staff,
21. agencies, TLC, or constituents, I instruct you not to
22. reveal the substance of those communications or your
23. thoughts or mental impressions. If you can answer
24. without revealing those matters, you may do so.
25. A. I gathered more poll data. I gathered more

### Page 83

1. research reports, and compiled that information for the
2. Senator.
3. Q. (By Ms. Maranzano) What poll data did you
4. gather?
5. MR. FREDERICK: Object. That calls for
6. you to reveal your thoughts or mental impressions. I
7. will instruct you not to answer on the basis of
8. privilege.
9. Q. (By Ms. Maranzano) Are you following your
10. counsel's instruction not to answer that question?
11. A. Yes, ma'am.
12. Q. What research reports did you gather?
13. MR. FREDERICK: Object on the basis that
14. calls for thoughts or mental impressions. I'm going to
15. instruct you not to answer on the basis of privilege.
16. A. I'll assert privilege, yes, ma'am.
17. Q. (By Ms. Maranzano) All right. Why did you
18. decide to look at poll data when you were doing research
19. on this question?
20. MR. FREDERICK: I object. That answer
21. calls for your thoughts or mental impression on pending
22. legislation. I instruct you not to answer on the basis
23. of privilege.
24. A. I'll assert privilege.
25. Q. (By Ms. Maranzano) Did the Senator cite any of

### Page 84

1. the poll data or reports that you had gathered on the
2. public record?
3. A. Yes.
4. Q. Which polls or reports did he cite?
5. A. In 2009, he cited Rasmussen Poll on the
6. record. He cited the Carter-Baker Commission report on
7. the record. And I don't know that I can recall more
8. than those two on the record.
9. Q. Were there any polls that you had found in
10. doing your research that the Senator did not cite on the
11. public record?
12. MR. FREDERICK: I object on the basis that
13. that calls for your thoughts or mental impression,
14. communications. I instruct you not to answer on the
15. basis of privilege, except to the extent that you can
16. answer yes or no if there are such reports.
17. A. No.
18. Q. (By Ms. Maranzano) Were there any studies that
19. you had found or other research you had found that the
20. Senator did not cite on the public record?
21. MR. FREDERICK: Same objection, same
22. instruction. You may answer yes or no.
23. A. Yes.
24. Q. (By Ms. Maranzano) And what were those?
25. MR. FREDERICK: I object on the basis that

JANICE MCCOY                                                                                          MAY 16, 2012

### 85

1  seeks thoughts or mental impressions and communications
2  that are privileged. I instruct you not to answer on
3  the basis of privilege.
4     A. But I can answer because I don't remember the
5  names of those reports.
6     Q. (By Ms. Maranzano) Do you remember how many
7  there were?
8     A. Four or five. Three, four, five, something
9  like that.
10    Q. Do you remember what they were about?
11    A. Voter identification.
12    Q. Anything more specific than voter
13 identification?
14       MR. FREDERICK: I'll object. That seeks
15 thoughts and mental impressions, communications. I
16 object and instruct you not to answer on the basis of
17 privilege.
18    A. I'll assert privilege.
19    Q. (By Ms. Maranzano) When you were working on SB
20 362, did you study any other state's identification
21 requirements?
22       MR. FREDERICK: I'll object to the extent
23 that calls for your thoughts or mental impressions or
24 communications with legislators, staff, agencies, TLC,
25 or constituents, instruct you not to answer on the basis

### 86

1  of privilege. However, if you can answer without
2  revealing privileged matters, you may do so.
3     A. On the record, Senator Fraser said that he had
4  looked at how Indiana was working.
5     Q. (By Ms. Maranzano) Did you look at any
6  information or study information from any interest
7  groups in relation to SB 362?
8        MR. FREDERICK: I'll make the same
9  objection that this question calls for thoughts or
10 mental impressions about pending legislation and your
11 investigative process. I instruct you not to answer on
12 the basis of privilege, except to the extent you can
13 answer without revealing privileged matters, you may do
14 so.
15    A. I don't remember.
16    Q. (By Ms. Maranzano) Did you have any
17 communications about SB 362 with other legislators?
18    A. Yes.
19    Q. Which ones?
20       MR. FREDERICK: I'll just issue a
21 cautionary instruction. I don't think that this
22 question is seeking the content of those communications,
23 so I would instruct you not to reveal the content, but
24 you may identify people with whom you spoke.
25    A. Can we just on the record say that I was four

### 87

1  months pregnant with twins when we were debating Senate
2  Bill 362, so I don't remember a lot.
3        I probably spoke to a dozen Senators about
4  Senate Bill 362. And as the bill moved through the
5  Senate, Senator Williams, Senator Ellis, Senator West,
6  Senator Duncan, Senator Van de Putte, Senator Whitmire.
7  2009, Senator Huffman, was she in the Senate? Senator
8  Harris. Generally, I mean, a lot of senators I --
9     Q. (By Ms. Maranzano) Uh-huh. So is it fair to
10 say that you spoke to senators who -- those senators who
11 voted for and against SB 362?
12    A. Yes, ma'am.
13    Q. Did you speak to the Lieutenant Governor's
14 Office about SB 362?
15    A. Yes, ma'am.
16    Q. How many times?
17    A. I mean, I probably spoke to them every day as
18 the bill was being scheduled for hearing and being
19 heard, and then probably not at all until the House was
20 done with it, and it was moving back over, and then
21 again every day until we voted on it again.
22    Q. Can you tell me, generally, what those
23 conversations, the nature of those conversations?
24       MR. FREDERICK: I'll object to the extent
25 it asks you to reveal the substance or content of those

### 88

1  conversations, which are subject to privilege. However,
2  to the extent you're able to identify a general subject
3  matter, you may answer.
4     A. We generally spoke about the legislative
5  process and we generally spoke about the bill itself.
6     Q. (By Ms. Maranzano) The legislative process, do
7  you mean how the bill would get passed?
8        MR. FREDERICK: I'll object to the extent
9  that seeks the content of privileged communications and
10 instruct you not to answer.
11    A. I'll assert privilege.
12    Q. (By Ms. Maranzano) Were those conversations by
13 phone or in person?
14    A. I spoke to Lieutenant Governor's Office. I
15 generally spoke to them in person.
16    Q. Is there anybody from the Lieutenant Governor's
17 Office who you spoke to who you haven't already
18 testified about?
19    A. In 2009?
20    Q. Uh-huh.
21    A. I would add Bryan Hebert to the list.
22    Q. And who is Bryan Hebert?
23    A. He was Lieutenant Governor's primary staff
24 person for State Affairs in 2009.
25    Q. Do you know when Bryan Hebert started working