JANICE MCCOY                                             MAY 16, 2012

**89**

1   for the Lieutenant Governor?
2        A.  No, ma'am.
3        Q.  He was not the Lieutenant Governor's staff
4   person on voter ID issues in 2007?
5        A.  I don't remember.  He might have been.
6        Q.  Was he the Lieutenant Governor's staff person
7   on voter ID issues in 2011?
8        A.  Yes, ma'am.
9        Q.  Did you have communications with officials from
10  other states about SB 362?
11       A.  Yes, ma'am.
12       Q.  And who was that?
13       A.  When I was looking to get witnesses to testify,
14  I spoke to somebody in Indiana.  I don't recall who.  I
15  think from the Secretary of State's Office.  And they
16  were not able to come.  And then I spoke with someone in
17  Georgia.  And I don't remember his name, although it's
18  in the record, because he did come testify.
19       Q.  Did anyone ask you to contact these
20  individuals?
21           MR. FREDERICK:  Object that the question
22  asks you to reveal the substance of communications with
23  legislators, staff or agencies or constituents.  To the
24  extent that you can answer without revealing those
25  privileged conversations, you may do so.

**90**

1        A.  Senator Fraser.
2        Q.  (By Ms. Maranzano)  Why did you think, or why
3   did the Senator think that individuals from Georgia or
4   Indiana would be helpful in terms of the testimony about
5   SB 362?
6            MR. FREDERICK:  I object, based that that
7   seeks thoughts or mental impressions of Senator Fraser
8   and communications between Senator Fraser and his
9   staff.  I instruct you not to answer on the basis of
10  privilege.
11       A.  I'll assert privilege.
12       Q.  (By Ms. Maranzano)  Do you remember either of
13  these individuals' names who you talked to in Indiana
14  and Georgia?
15       A.  No.
16       Q.  Did anyone from Indiana come and testify during
17  the hearings on SB 362?
18       A.  No.
19       Q.  Did anyone from Georgia come testify?
20       A.  Yes, ma'am.  He was very nice.  I just can't
21  remember his name.
22       Q.  Did you have communications about SB 362 with
23  any interest groups?
24       A.  I don't remember.
25       Q.  Did you have communications about SB 362 with

**91**

1   any groups representing minority voters?
2        A.  I don't remember.
3        Q.  Is there anything that would help you remember
4   whether you had any communications about SB 362 with any
5   interest groups?
6        A.  No.
7        Q.  Did you consider adding any additional forms of
8   identification to SB 362?
9            MR. FREDERICK:  Object.  That question
10  seeks thoughts or mental impressions about pending
11  legislation.  I instruct you not to answer on the basis
12  of legislative privilege.
13       A.  I'll assert privilege.
14       Q.  (By Ms. Maranzano)  Can you look at Exhibit 29
15  and Exhibit 28, I believe, HB 218 and SB 362, and look
16  at forms of ID that are allowed in each bill.
17       A.  (Viewing documents.)
18       Q.  What was the purpose of excluding from 362 the
19  student ID as a form of allowable identification even
20  though it was allowed in HB 218?
21           MR. FREDERICK:  I object to the extent
22  this question seeks your thoughts or mental impressions
23  about pending legislation or thoughts of any other
24  legislator, including Senator Fraser or their staff or
25  to the extent it requires communications with

**92**

1   legislators, staff, agencies, TLC, and constituents, I
2   instruct you not to answer on the basis of legislative
3   privilege.  To the extent you are able to identify the
4   purpose of any part of the bill without relying on those
5   privileged matters, you may do so.
6        A.  Again, this version of House Bill 218 is not
7   the version that came to the Senate.  I think that the
8   student ID was pulled out by the House, not by the
9   Senate.
10       Q.  (By Ms. Maranzano)  I believe that the bill that
11  I have introduced as evidence was actually the bill that
12  was engrossed.  Does that seem correct to you?
13       A.  It does not.
14       Q.  Okay.
15       A.  I'd have --
16       Q.  And you think that the student ID was pulled
17  out of SB 362 in the House?
18           MR. FREDERICK:  I just object to the
19  extent it mischaracterizes the testimony, but you can
20  answer.
21       Q.  (By Ms. Maranzano)  Okay.  Can you describe to
22  me what you --
23       A.  My understanding --
24       Q.  Uh-huh.
25       A.  My recollection, Senate Bill 362 should be the

JANICE MCCOY                                                           MAY 16, 2012

**93**

1  engrossed version of House Bill 218. So I what I see in
2  front of me with House Bill 218 is not the bill that the
3  Senate debated. So I don't know what this version is
4  without -- it's saying that it's the engrossed version.
5  I think it's the filed version.
6      Q.  Okay. Well. Let me ask you this: Did SB 362
7  allow, as a form of acceptable identification, student
8  identifications?
9      A.  No, ma'am.
10     Q.  What was the purpose of excluding that from the
11 bill?
12         MR. FREDERICK: I object to the extent
13 this seeks thoughts or mental impressions from you,
14 Senator Fraser, or other legislators or staff or to the
15 extent it requires you to reveal the substance of
16 communications with legislators, staff, state agencies,
17 TLC, and constituents, I instruct you not to answer on
18 the basis of privilege. However, to the extent that you
19 are able to identify the purpose of that portion of the
20 bill without relying on those privileged matters, you
21 can do so.
22     A.  I'll assert privilege.
23     Q.  (By Ms. Maranzano) Did you ever look or do any
24 research into who among registered voters would be most
25 likely to have a student identification card?

**94**

1         MR. FREDERICK: Object. The question
2  calls for your thoughts, mental impressions about
3  pending legislation. I instruct you not to reveal --
4  not to reveal the substance of your efforts. However,
5  to the extent that you can answer whether you did or
6  not, you may answer.
7      A.  Ask the question again.
8         MS. MARANZANO: Can you read back the
9  question.
10        (The requested portion read back by the
11 court reporter.)
12     A.  No.
13     Q.  (By Ms. Maranzano) Why not?
14        MR. FREDERICK: I'll object on the ground
15 that that calls for your subjective mental impressions
16 and thoughts about pending legislation and instruct you
17 not to answer on the basis of privilege.
18     A.  I'll assert privilege.
19     Q.  (By Ms. Maranzano) Did you have any
20 communications with anyone about the forms of
21 identification, what forms of identification to include
22 in SB 362?
23     A.  No, ma'am.
24     Q.  Did you do any analysis to determine who among
25 registered voters possessed the forms of identification

**95**

1  included in SB 362?
2         MR. FREDERICK: I'll object to the
3  question on the ground that it seeks thoughts and mental
4  impressions and investigative efforts related to pending
5  legislation, and instruct you not to answer to the
6  extent that it would disclose the substance or -- the
7  substance or nature of the process you engaged in.
8  However, you may answer to the extent that you can do so
9  without revealing those matters.
10     A.  I'm sorry. I'm having some brain fatigue. You
11 have to read the question again.
12        MS. MARANZANO: Can you read the question?
13        (The requested portion was read back by
14 the court reporter.)
15     A.  No.
16     Q.  (By Ms. Maranzano) Were you ever instructed not
17 to look at who among registered voters possessed one of
18 the forms of identification included in SB 362?
19        MR. FREDERICK: I object on the grounds
20 that that seeks communications between legislators,
21 staff, and state agencies. I instruct you not to answer
22 on the basis of privilege.
23     A.  I'll assert privilege.
24     Q.  (By Ms. Maranzano) If SB 362 had passed the
25 Texas Legislature, would it have been subject to the

**96**

1  requirements of Section 5?
2      A.  Yes.
3      Q.  Are you familiar with the concept of a Spanish
4  surname voter registration match?
5      A.  No.
6      Q.  Have you ever heard of a Spanish surname
7  analysis being conducted on a voter registration list?
8      A.  No.
9      Q.  Have you ever heard of a Spanish surname list
10 that's put together by the U.S. Census?
11     A.  No.
12     Q.  What's the purpose of SB 362?
13        MR. FREDERICK: I'll object to the extent
14 that the question calls for thoughts or mental
15 impressions about pending legislation, or to the extent
16 it seeks the substance of communications from
17 legislators, staff, state agencies, TLC, and
18 constituents. To the extent, however, that you can
19 identify the purpose of the bill without relying on
20 privileged matters, you may do so.
21     A.  Senator Fraser's stated purpose on the record
22 about Senate Bill 362 is to prevent in-person voter
23 fraud.
24     Q.  (By Ms. Maranzano) Any other purposes?
25     A.  No, ma'am.

### 97

1  Q. Did he state on the record any evidence that
2  in-person voter fraud exists?
3  A. No.
4  Q. Why was SB 362 a better way to deter in-person
5  voter fraud than through the current system?
6  MR. FREDERICK: Object to the extent this
7  question seeks thoughts and mental impressions or
8  communications that are privileged about pending
9  legislation. To the extent that you can answer without
10 relying on those matters, you can do so.
11 A. I'll assert privilege.
12 Q. (By Ms. Maranzano) Did anyone ask Senator
13 Fraser to introduce SB 362?
14 A. No.
15 Q. And how do you know that?
16 MR. FREDERICK: I object to the extent it
17 calls for the substance of any privileged
18 communications, and I instruct you not to answer on the
19 basis of privilege.
20 A. I'll assert privilege.
21 MS. MARANZANO: Can I have this marked as
22 Exhibit 31?
23 (Exhibit 31 marked for identification.)
24 Q. (By Ms. Maranzano) Ms. McCoy, I'm showing you
25 what we are marking as Deposition Exhibit 30. Do you

### 98

1  recognize -- I'm sorry, 31. Do you recognize this
2  document?
3  A. Yes, ma'am.
4  Q. What is this?
5  A. This is a press release that Senator Fraser
6  issued when he filed Senate Bill 362.
7  Q. And can I direct your attention to the second
8  to last paragraph there. Do you see that there is a
9  quote that says -- it's a quote by Fraser, by Senator
10 Fraser. It says, "In no way am I trying to prevent any
11 legal citizen from voting. Instead, I want to ensure
12 that illegal aliens, noncitizens, and people otherwise
13 not qualified do not dilute the legitimate votes cast by
14 citizens." Do you know see which paragraph I'm talking
15 about?
16 A. You have a different one.
17 MR. FREDERICK: Okay. I'm sorry. Can I
18 stop you real quick? I think I may have the wrong
19 one. Oh, okay. That one is right, December 15th.
20 Thanks. She wrote -- do you want to mark a different
21 one for the record?
22 (Brief discussion held off the record.)
23 MR. RODRIGUEZ: That's 30, not 31.
24 (Brief discussion held off the record.)
25 MS. MARANZANO: We accidentally took this

### 99

1  the other day. That's an original exhibit.
2  MR. FREDERICK: Just so the record
3  reflects that we have marked a nonmarked copy of the
4  exhibit.
5  MS. MARANZANO: Are we -- we're on the
6  record?
7  THE REPORTER: Yes.
8  MS. MARANZANO: Okay.
9  Q. (By Ms. Maranzano) Do you see that paragraph
10 that I just read?
11 A. Yes, ma'am.
12 Q. And can you tell me what the Senator meant by,
13 "I want to ensure that illegal aliens, noncitizens, and
14 people otherwise not qualified do not dilute the
15 legitimate votes cast by citizens." What does that
16 mean?
17 MR. FREDERICK: I'll object to the
18 question to the extent it seeks mental impressions of
19 the thought process regarding pending legislation. But
20 to the extent that -- and I'll also object to the extent
21 it calls for speculation. To the extent that you think
22 you can answer without relying on privileged matters,
23 you may do so.
24 A. I'll assert privilege.
25 Q. (By Ms. Maranzano) Ms. McCoy, did you write

### 100

1  this press release?
2  A. Yes, ma'am.
3  Q. And are you the contact person for any
4  inquiries from --
5  A. Yes, ma'am.
6  Q. -- the press release?
7  A. Yes, ma'am.
8  Q. And it's your position that you can't testify
9  as to what he meant because it's privileged? Is that --
10 MS. MARANZANO: I mean, Mr. Frederick,
11 this is public document.
12 MR. FREDERICK: Yeah. Yeah. Sure. And
13 let me clarify. I think we need to be clear on my
14 instruction. I'm objecting to the extent that it seeks
15 thoughts or mental impressions of Senator Fraser. To
16 the extent that Ms. McCoy sitting here can -- to the
17 extent that she can tell you in her personal knowledge
18 what she thinks this means sitting here today, then that
19 would not be privileged. And communications with Fraser
20 would be privileged. But I mean, the words are on the
21 page, and to the extent that she can tell you what she
22 thinks they mean today, I think that that's fine.
23 MS. MARANZANO: And just to be clear, she
24 did just testify that she wrote the words, so...
25 MR. FREDERICK: Right.

JANICE MCCOY							MAY 16, 2012

**101**

1    Q.  (By Ms. Maranzano) Okay.  So to the extent that
2  you --
3    A.  Would you like to ask the question again?
4    Q.  Yes. I'm interested in what -- the sentence
5  that starts with, "Instead, I want to ensure that
6  illegal aliens, noncitizens, and people otherwise not
7  qualified, do not dilute the legitimate votes cast by
8  citizens, said Fraser."  What does that mean?
9    A.  I think it means that he wants to ensure that
10  the person who shows up at the polls is the person who
11  is supposed to be voting under that name.
12    Q.  Was a part of the purpose of SB 262 related to
13  illegal aliens voting?
14       MR. FREDERICK:  Let me just interpose a
15  objection to the extent that seeks thoughts, mental
16  process, or privileged communications that would be
17  privileged, and I would instruct you not to answer.  But
18  to the extent that you can identify the purpose or
19  whether that's a purpose, you may answer.
20    A.  The purpose of Senate Bill 362 was to stop
21  in-person voter fraud, and that would entail anybody not
22  voting legally, including illegal aliens who are not
23  allowed to vote.
24    Q.  (By Ms. Maranzano) So if a noncitizen votes,
25  you define in-person voter fraud to include a noncitizen

**102**

1  voting as themselves?  Am I understanding you correctly?
2    A.  Because they're committing fraud, yes, ma'am.
3    Q.  Okay.  So when you said the purpose of SB 362
4  was to deter in-person voter fraud, you also are
5  including in that category deterring noncitizens from
6  voting in elections; is that correct?
7       MR. FREDERICK:  I'll just object to the
8  extent it mischaracterized the testimony.  But to the
9  extent we're talking about the purpose of the bill, you
10  may answer the question.
11    A.  The purpose of the bill was to ensure that
12  citizens, registered -- were voting -- were not
13  committing fraud.  There was no in-person voter fraud.
14  So whatever that constitutes, this bill was trying to
15  prevent.
16    Q.  (By Ms. Maranzano) Okay.  So what I'm asking
17  you now is:  What do you believe that that constitutes?
18  As somebody who was the chief of staff for the author of
19  the bill, what do you think that constitutes?
20       MR. FREDERICK:  I will object, based on
21  privilege, the extent that this seeks a subjective
22  motivation, a subjective thought or a mental impression
23  somehow incorporated in the text of the bill.  And I
24  would instruct you not to answer on the basis of
25  privilege.  To the extent that sitting here today, you

**103**

1  can explain your understanding of the terms at issue
2  that would not be privileged, then you may answer.
3    A.  I don't know that I understand your question.
4    Q.  (By Ms. Maranzano) Okay.  What I'm trying to do
5  is, you have testified earlier today that the purpose of
6  both SB 362 and HB 218 was to detect in-person voter
7  impersonation.  And I want to be clear for the record as
8  to how you define that term, the term in-person voter
9  impersonation.
10    A.  Someone who is not authorized to vote by our
11  constitution who is voting in person.  Someone who is
12  cheating the system by voting under a different name.
13  Someone who is cheating the system by voting more than
14  once in an election.
15    Q.  So is part of the purpose of SB 362 to prevent
16  noncitizens from voting?
17       MR. FREDERICK:  Same objection.  But you
18  can answer subject to my previous instruction.
19    A.  Okay.  Can we back up?  Because I just reread
20  this press release.
21    Q.  (By Ms. Maranzano) Uh-huh.
22    A.  Senator Fraser filed two bills in 2008 -- 2008,
23  Senate Bill 362 and Senate Bill 363?
24    Q.  Uh-huh.
25    A.  Senate Bill 363 was talking about -- more about

**104**

1  the illegal immigrant issue.  Senate Bill 362 was about
2  in-person voter fraud.  This quote probably relates more
3  to Senate Bill 363 than it does to Senate Bill 362.  So,
4  I mean, we have to read the whole press release in
5  context.
6    Q.  Uh-huh.
7    A.  I mean, but in-person voter fraud is someone
8  showing up who's not supposed to be there, who is not a
9  citizen of our country, who has someone else's ID, who
10  has falsified voter records and is voting fraudulently,
11  and that's what Senate Bill 362 was trying to do.
12    Q.  Okay.  So how does Senate Bill 362 deter
13  noncitizens from voting?
14       MR. FREDERICK:  I object to the extent it
15  calls for speculation.  You may answer if you can.
16    A.  By requiring someone to show ID, if they're not
17  a legal citizen, they wouldn't have that ID,
18  necessarily, and then they wouldn't be able to vote.
19    Q.  (By Ms. Maranzano) Do you know how many forms
20  of ID listed in SB 362 a noncitizen is able to obtain?
21    A.  I do not.
22    Q.  Did you look into that when you were working on
23  SB 362?
24       MR. FREDERICK:  I object to the extent it
25  calls for mental impressions, thought process,

### 105

1  privileged communications. But subject to that
2  instruction, if you can answer without revealing that,
3  you may answer.
4     A.  No.
5     Q.  (By Ms. Maranzano) No, you didn't look into it?
6     A.  I did not.
7     Q.  Do you think that would be an important issue
8  to look into, if part of the goal of the bill is to
9  prevent noncitizens from voting?
10    A.  The goal of the bill was to prevent in-person
11 voter fraud.
12    Q.  Okay. I thought you testified earlier that
13 that included anyone who was not legally permitted to
14 vote. Is that not correct?
15    A.  The goal of Senate Bill 362 was to prevent
16 in-person voter fraud. Whether it was by legal citizens
17 or illegal citizens, we were trying to create a tool to
18 prevent in-person voter fraud.
19    Q.  Okay. And to be clear, you did not look into
20 whether noncitizens could obtain the forms of
21 identification required by SB 362?
22    A.  I did not.
23        MR. FREDERICK:  If we can take a break
24 soon.
25        MS. MARANZANO:  Do you want to go like

### 106

1  another 15 minutes and break for lunch? That's fine.
2        MR. FREDERICK:  Sure.
3        MR. DUNN:  But then we'll have to do the
4  hearing.
5        MR. ROSENBERG:  Yeah, that would fit in
6  with the hearing.
7        MS. MARANZANO:  Okay.
8     Q.  (By Ms. Maranzano) Did the Senator consider any
9  alternative legislative measures that would have
10 accomplished the goal of deterring in-person voter
11 impersonation.
12        MR. FREDERICK:  Object on the ground that
13 it seeks thoughts, mental impressions, and privileged
14 communications, and I instruct you not to answer the
15 question based on privilege.
16    A.  I'll assert privilege.
17    Q.  (By Ms. Maranzano) Did the Senator make any
18 promises to anyone concerning alternative legislative
19 measures that would have accomplished the goal of
20 deterring in-person voter impersonation?
21        MR. FREDERICK:  I'll object to the extent
22 that calls for thoughts, mental impressions, or
23 communications with other legislators or legislative
24 staff members, other privileged communications. To the
25 extent you can answer without revealing privileged

### 107

1  communications, you may do so.
2     A.  I'll assert privilege.
3     Q.  (By Ms. Maranzano) Ms. McCoy, is it your
4  position that promises that the Senator makes about
5  legislation are covered by the privilege, the
6  legislative privilege?
7        MR. FREDERICK:  Yes, to the extent -- I
8  mean, I guess promises, I'm not entirely clear on what a
9  promise would entail, but I think to the extent that it
10 would include a discussion with another legislator or
11 discussions between legislative staff members about
12 pending legislation. I mean, I think promise could be
13 construed to include ordinary legislative discussions
14 and, you know, policy discussions and compromises. I
15 think that kind of thing is an integral part of the
16 legislative process in determining votes to get
17 legislation passed.
18        MS. MARANZANO:  Is it also your position
19 that promises to constituents or groups would be covered
20 by the privilege?
21        MR. FREDERICK:  It's my understanding that
22 a promise to somebody outside the Legislature, I think,
23 would not fall under the privilege.
24        MS. MARANZANO:  That's my understanding,
25 too.

### 108

1        MR. FREDERICK:  Yeah. Yeah. And I think
2  to the extent it's not an -- to the extent it's a
3  nonconfidential or an external communication, I think
4  that's not what I intend to object to.
5        MS. MARANZANO:  Okay.
6     Q.  (By Ms. Maranzano) Ms. McCoy let me rephrase
7  that question. Did the Senator make any promises to
8  constituents or outside groups related to SB 362?
9     A.  In what way?
10    Q.  Did the Senator make any promises to bring a
11 bill to the Senate Floor that would require photo
12 identification in 2009?
13    A.  The Senator committed, after the legislation
14 failed in 2007, to constituents that he would try again.
15    Q.  Which constituents did he commit to?
16    A.  Skipper Wallace.
17    Q.  Can you tell me who Skipper Wallace is?
18    A.  He's a constituent from Lampasas.
19    Q.  Why is he so interested in photo identification
20 bills?
21        MR. FREDERICK:  I'll object to the extent
22 that calls for privileged communications between Senator
23 Fraser, Ms. McCoy, and privileged communications between
24 either and Mr. Wallace, and as well as to the extent it
25 calls for thought process, mental impressions. If you

### 109

1 can answer without revealing thoughts or privileged
2 communications, you can do so. Otherwise, I instruct
3 you not to answer on the basis of privilege.
4     A.  I mean, Skipper has been a long-time election
5 worker and judge, and I think he just advocates for
6 election law change.
7     Q.  (By Ms. Maranzano) He's an election worker and
8 judge.  What is his profession, if you know?
9     A.  He's a businessman.
10     Q.  So he is a volunteer election judge, and what
11 was the first thing you said?
12     A.  Election worker, election judge.
13     Q.  Does he have any role in the government
14 structure of the county?
15     A.  Skipper, I think, used to be city manager in
16 Lampasas, I think.
17     Q.  Does he have any role with a political party?
18 Any political party?
19     A.  Yes.
20     Q.  Which one?
21     A.  Republican.
22     Q.  And what's his role?
23     A.  He's Chair of the Lampasas Republican Party.
24     Q.  Ms. McCoy, you testified earlier that there was
25 no partisan purpose to SB 362.  So now that you've

### 110

1 testified that the Senator made a promise to a person
2 who was affiliated with a political party, the Chair of
3 a political party, do you wish to change your testimony
4 from earlier today?
5     A.  No, ma'am.
6     Q.  Did your office have any communications about
7 the purpose of SB 362?
8         MR. FREDERICK:  Object as vague, also
9 object on grounds of privilege to the extent it calls
10 for the substance of confidential communications, and
11 instruct you not to answer.  To the extent you can
12 answer without revealing confidential communications,
13 you may.
14     A.  I'm going to assert privilege.
15     Q.  (By Ms. Maranzano) Did your office have any
16 communications in response to a -- did you -- did your
17 office ever get a Texas public records request regarding
18 SB 362?
19     A.  We have received public information requests
20 about voter ID.  I do not recall if they were in post
21 2009 session or post 2011.  Probably both.
22     Q.  Has Senator Fraser had any meetings with
23 constituents where the purpose of 362 was discussed?
24         MR. FREDERICK:  I'll object to the extent
25 it calls for the content of communications, privileged

### 111

1 communications between Senator Fraser and
2 constituents.  To the extent you can answer without
3 revealing the substance of those conversations, you may
4 do so.
5     A.  The Senator has met with constituents about
6 voter ID.
7     Q.  (By Ms. Maranzano) How many times?
8     A.  The Senator mentions voter ID when he speaks
9 and when he gets invited to go speak to different
10 chambers and groups.  Pretty much every time he speaks
11 to a group like that, he'll mention it.  And in office,
12 half dozen.
13     Q.  Would you say that voter ID was one of the
14 Senator's key legislative accomplishments?
15         MR. FREDERICK:  I'll object to the extent
16 to calls for mental impressions or thoughts.  However,
17 to the extent you can answer, based on -- to the extent
18 you can answer without relying on privileged
19 information, you can do so.
20     A.  Yes.
21     Q.  (By Ms. Maranzano) Who besides Senator Fraser
22 were the main proponents of SB 362?
23     A.  Other members?
24     Q.  Well, presumably.  Well, why don't we start
25 with:  Were there any members who voted for the bill who

### 112

1 were strong proponents of it?
2         MR. FREDERICK:  I'll just interpose, I
3 don't think that this question is asking for the
4 substance of communications, so I would admonish you not
5 to reveal the substance of any privileged communications
6 in answering, but I think that you can do that.
7     A.  I mean, I think that all the members that
8 signed on as co-authors would consider themselves strong
9 proponents of the bill.
10     Q.  (By Ms. Maranzano) Were there others in the
11 Texas government who were strong proponents of SB 362?
12         MR. FREDERICK:  Same instruction.
13     A.  I don't think so.  I don't know.
14     Q.  (By Ms. Maranzano) Was 362 a priority for the
15 Governor?
16         MR. FREDERICK:  I'll object on the same
17 grounds.  To the extent it seeks thoughts, mental
18 impressions of the Governor or communications between
19 Senator Fraser's office and the Governor, I will
20 instruct you not to answer.  I mean, if you know.
21     A.  I don't know the Governor's priorities from
22 2009.
23     Q.  (By Ms. Maranzano) Was SB 362 a priority for
24 the Lieutenant Governor?
25         MR. FREDERICK:  The same instruction.  To

JANICE MCCOY                                                        MAY 16, 2012

### 113

1. the extent it seeks thoughts or mental impressions of
2. the Lieutenant Governor or confidential communications
3. between Senator Fraser's office and the Lieutenant
4. Governor's Office, I would instruct you not to answer.
5. If you're able to answer, you may do so.
6.     A. I don't know -- I don't know the Lieutenant
7. Governor's priorities from 2009.
8.     Q. (By Ms. Maranzano) Was SB 36 a priority for
9. anyone outside of the Texas government?
10.     MR. FREDERICK: I'll object as vague, but
11. you can answer if you know.
12.     A. I don't. I don't know.
13.     Q. (By Ms. Maranzano) How often did you say that
14. you talked to Lieutenant Governor's Office during the
15. consideration of SB 362?
16.     A. I probably talked to them every day while we
17. were scheduling the bill and during the hearing.
18.     Q. And you have no idea whether it was priority
19. for their office?
20.     MR. FREDERICK: Object, argumentative.
21.     Q. (By Ms. Maranzano) You can answer.
22.     A. That process was about six days long, so to
23. talk to them for six days. But again, I don't speak for
24. the Lieutenant Governor, so I don't know his priorities.
25.     Q. Were there any groups that represented minority

### 114

1. voters who supported SB 362?
2.     MR. FREDERICK: I'll just object to the
3. extent this calls for the substance of confidential
4. communications between any constituents and Senator
5. Fraser's office, I would instruct you not to answer.
6. But to the extent that you can answer without revealing
7. the substance of any conversation, you can do so.
8.     A. I don't know.
9.     Q. (By Ms. Maranzano) Ms. McCoy, who would know
10. the Lieutenant Governor's priorities?
11.     MR. FREDERICK: Object as vague and calls
12. for speculation. You can answer if you know.
13.     A. The Lieutenant Governor and his staff.
14.     Q. (By Ms. Maranzano) Who on his staff?
15.     MR. FREDERICK: Same objection.
16.     A. His chief of staff, Blaine Brunson.
17.     Q. (By Ms. Maranzano) Who were the main opponents
18. to SB 362?
19.     A. I don't recall.
20.     Q. Do you recall having communications with
21. constituents who opposed SB 362?
22.     A. No.
23.     Q. Do you recall having -- do you recall having
24. communications with outside groups that opposed SB 362?
25.     MR. FREDERICK: I'll object to the extent

### 115

1. it seeks the substance of any privileged communication
2. between a constituent and Senator Fraser's office, but
3. to the extent it doesn't require you to reveal the
4. substance, you may answer the question.
5.     A. I don't recall.
6.     Q. (By Ms. Maranzano) Do you recall that there was
7. opposition to SB 362?
8.     A. Yes, ma'am.
9.     Q. What was the basis of that opposition?
10.     MR. FREDERICK: I'll object to the extent
11. it calls for speculation. Also object to the extent it
12. seeks the substance of any privileged communications
13. between other legislators and staff or constituents and
14. Senator Fraser and Ms. McCoy. To the extent that you
15. know independent of privileged sources or you don't have
16. to reveal any, you may answer.
17.     A. I think if you look at the record, that the
18. people that testified against Senate Bill 362 believed
19. that it would disenfranchise voters.
20.     Q. (By Ms. Maranzano) What do you think about that
21. testimony?
22.     MR. FREDERICK: I'll object to the extent
23. it calls for thoughts or mental impressions about
24. pending legislation. I also object to relevance.
25.     A. I'll assert privilege.

### 116

1. Can I do that?
2.     MR. FREDERICK: Yeah.
3.     Q. (By Ms. Maranzano) Did the Senator take any
4. steps with regard to SB 362 to address any of these
5. concerns that were raised by opponents to SB 362?
6.     MR. FREDERICK: Objection, vague.
7. Objection, seeks thoughts and mental impressions of the
8. Senator. It also seeks the substance of confidential
9. communications and privileged communications with the
10. Senator. To the extent that you can answer without
11. revealing the substance of confidential communications
12. or the Senator's thought process or the thought
13. processes of you or any other legislator, you may do so.
14.     A. I don't think we amended the bill, so the
15. answer would be no.
16.     Q. (By Ms. Maranzano) Just to be clear, you don't
17. think you amended the bill at all throughout the entire
18. Senate process?
19.     A. I don't think we did. Maybe on the margins,
20. but -- so, we did not take any action to make changes
21. either direction.
22.     Q. Is there a reason you didn't take any action to
23. respond to the concern of opponents?
24.     MR. FREDERICK: Objection, it seeks
25. thoughts and mental impressions. I instruct you not to

### 117

1. answer on the basis of privilege.
2.    A.  I'll assert privilege.
3.    Q.  (By Ms. Maranzano) Did anybody raise any
4. concerns that SB 362 would disenfranchise minority
5. voters?
6.        MR. FREDERICK: I'll object to the extent
7. it calls for privileged communications between
8. constituents, legislators, staff, and you or Senator
9. Fraser. To the extent you can answer without relying on
10. privileged communications, you may do so.
11.    A.  And on the record, during the debate, several
12. members testified that way, and then we had witnesses
13. that testified in the same manner.
14.    Q.  (By Ms. Maranzano) And do you recall what the
15. basis of their testimony was?
16.    A.  No, ma'am.
17.    Q.  Did you take any steps to determine whether
18. SB 362 would disenfranchise minority voters?
19.        MR. FREDERICK: Object to the extent it
20. seeks thought process -- thought processes and mental
21. impressions and confidential communications with
22. legislators and legislative staff. I would instruct you
23. not to answer that question on the basis of privilege.
24.    A.  I'll assert privilege.
25.        MS. MARANZANO: I think that I'm a point

### 118

1. where it might make sense to stop for lunch. And maybe
2. we can start back up after the call to the court? Does
3. that make sense?
4.        MR. SWEETEN: That's fine.
5.        With respect to letting Janice go, I'm
6. going to let her go for a while. Let's probably have
7. you come back at two o'clock. I mean, I don't think she
8. needs to be here before 2:00 for any reason.
9.        MS. MARANZANO: Yeah, I think that's
10. right.
11.        MR. DUNN: That's fine. The only thing
12. I'll add is that I invoked the rule, and under the
13. Federal Rules of Procedure you're not to talk to anybody
14. about your testimony other than your lawyers.
15.        THE WITNESS: That's fine.
16.        (Lunch recess from 12:46 p.m. to
17. 2:15 p.m.)
18.        MS. MARANZANO: Let's go back on the
19. record.
20.    Q.  (By Ms. Maranzano) Before the break, we were
21. talking about SB 362, and I'd like to continue talking
22. about SB 362.
23.        Ms. McCoy, what was your role in trying to
24. get SB 362 passed?
25.    A.  My role in trying to get 362 passed was to

### 119

1. navigate the legislative process for the Senator in
2. terms of the behind-the-scenes staff work that takes
3. place.
4.    Q.  And can you describe that to me?
5.    A.  Filing the bill. Filing the bill and
6. requesting hearings, prepping talking points.
7.    Q.  Did you have any role in determining how
8. different senators would vote on SB 362?
9.    A.  No.
10.    Q.  Did Senator Fraser have any idea of how many
11. senators would support SB 362 when he introduced it?
12.        MR. FREDERICK: Object. The question
13. calls for thought process and mental impressions of
14. Senator Fraser. It may also call for communications
15. with legislators and staff that are privileged. I would
16. instruct you not to answer on the basis of privilege.
17.    A.  I'll assert privilege.
18.        (Exhibit 32 marked for identification.)
19.    Q.  (By Ms. Maranzano) Okay. Can you take a look
20. at what we've marked as Deposition Exhibit 32? In
21. particular, can you look at Rule 5.11, which is on Page
22. 24. Do you see Provision D under 5.11?
23.    A.  Yes.
24.    Q.  When was that provision added to the rules?
25.    A.  January 14th, 2009.

### 120

1.    Q.  And how was -- was there a resolution to
2. specifically add Subsection D to Rule 5.11?
3.    A.  Yes.
4.    Q.  Who introduced that resolution?
5.    A.  Senator Williams.
6.    Q.  Did Senator Fraser ask Senator Williams to
7. exempt voter ID requirements from the two-thirds Rule?
8.        MR. FREDERICK: I object on the grounds
9. that it seeks confidential communications related to
10. pending legislation, and I'm going to instruct you not
11. to answer on the basis of privilege.
12.    A.  I'll assert privilege.
13.    Q.  (By Ms. Maranzano) How was the resolution
14. brought up in the Senate to add Subsection D to 5.11?
15.    A.  I don't remember.
16.    Q.  During the time that you have worked for
17. Senator Fraser, have you ever seen another category of
18. legislation exempted from the two-thirds rule?
19.        MR. FREDERICK: I'll object just on -- to
20. the extent that it mischaracterizes the testimony in the
21. record, but you can answer.
22.    A.  I don't recall the Committee of the Whole
23. meeting, except for 2009 and 2011, since I've worked for
24. Senator Fraser.
25.    Q.  (By Ms. Maranzano) So am I understanding you

JANICE MCCOY                                                                 MAY 16, 2012

### 121

1  correctly that there has not been, to the best of your
2  recollection, another category of legislation that's
3  been written into the rules as exempted from the
4  two-thirds vote requirement under Rule 5.11?
5       MR. FREDERICK: The same objection, but
6  you can answer.
7       A. Can you repeat the question?
8       Q. (By Ms. Maranzano) I just want to make sure I
9  understood the answer that you gave, because you
10 mentioned the Committee of the Whole. But am I
11 understanding you correctly that it's your recollection,
12 as you sit here, that during the time you worked for
13 Senator Fraser, there has not been another category of
14 legislation carved out of Rule 5.11 as voter
15 identification requirements are carved out in
16 Subsection D in the 2009 rules?
17      A. Yes.
18      Q. Okay. What was the purpose of carving out the
19 voter ID identification requirement from the two-thirds
20 rule?
21      A. I don't know.
22      Q. Did the Senator have any concerns about
23 exempting SB 362 from the requirement that legislation
24 get two-thirds support in the Senate?
25      MR. FREDERICK: Object on the grounds that

### 122

1  it seeks the thought process and mental impressions of
2  Senator Fraser about pending legislation, and I instruct
3  you not to answer on the basis of privilege.
4       A. I'm going to assert privilege.
5       Q. (By Ms. Maranzano) Did the Senator have any
6  concerns that by exempting legislation from the
7  two-thirds rule requirement, it would appear to be a
8  very partisan-supported piece of legislation?
9       MR. FREDERICK: I object on the grounds
10 that it seeks the mental impressions and thought
11 processes of Senator Fraser on pending legislation. I
12 instruct you not to answer on grounds of privilege.
13      A. I'll assert privilege.
14      Q. (By Ms. Maranzano) If SB 362 had not been
15 exempt from the two-thirds rule requirement, would it
16 have passed the Senate?
17      MR. FREDERICK: Object to the extent it
18 calls for speculation.
19      A. I don't know.
20      Q. (By Ms. Maranzano) Well, SB 362 was voted on,
21 did two-thirds of the members support it?
22      A. No.
23      Q. Did you have any communications with Senator
24 Williams about the resolution that led to Subsection D
25 of Rule 5.11 in the 2009 rules?

### 123

1       MR. FREDERICK: I object to the question
2  to the extent it calls for the substance of confidential
3  communications between Ms. McCoy and Senator Williams,
4  so it's subject to legislative privilege. I'm going to
5  instruct you not to answer on that basis.
6       Q. (By Ms. Maranzano) Are you following your
7  counsel's instruction not to answer that question?
8       A. I never spoke to Senator Williams about this
9  resolution.
10      Q. Did you speak to anybody at Senator Williams's
11 office about this resolution?
12      A. No.
13      Q. Did you speak to anybody in the Lieutenant
14 Governor's Office about the resolution that led to the
15 suspension of the two-thirds rule?
16      A. No.
17      Q. Did you speak to anybody in the Governor's
18 Office?
19      A. No.
20      Q. What was the reaction from senators on the --
21 well, let me ask you this first: Are you familiar with
22 the testimony that occurred when Senator Williams
23 introduced the resolution to suspend the two-thirds
24 rule?
25      A. No.

### 124

1       Q. Can you also take a look at Rule 16.07? It's
2  on Page 106 and 107.
3       A. Which rule did you want me to look at?
4       Q. 16 -- hold on.
5       A. 07?
6       Q. 16.07.
7       A. Okay.
8       Q. Actually, you know what; let's do 16.06 and 07,
9  which relate to matters regarding -- 16.06 is matters
10 requiring a vote of two-thirds of the members present,
11 and 16.07 is Matters of Requiring Vote of Majority
12 Members of the Senate. Were these rules also impacted
13 by Senator Williams's resolution?
14      A. I don't know.
15      Q. Can you look at Section 7, Subsection 7 of Rule
16 16.07, matters -- and 16.07, again, is Matters Requiring
17 Vote of Majority of Members of the Senate. And
18 Subsection 7 says, "Set voter identification requirement
19 bills for special order." Does that refresh your
20 recollection as to whether that was something that was
21 impacted by Senator Williams's resolution?
22      A. I never read Senator Williams's resolution, so
23 I would assume yes, it was in there.
24      Q. So these changes in the rules directly impacted
25 SB 362, did they not?

JANICE MCCOY                                                                MAY 16, 2012

### 125

1     A. Yes.
2     Q. So you never read Senator Williams's
3  resolution, but are you familiar with the impact that
4  his resolution on the rules?
5     A. Yes.
6     Q. Did Senator Fraser have any concerns about
7  suspending the two-thirds rule for SB 362?
8        MR. FREDERICK: I object on the grounds
9  that it seeks the mental impressions and thought
10 processes of Senator Fraser as well as privileged
11 communications of the staff, and I instruct you not to
12 answer on the basis of privilege.
13    A. I'll assert privilege.
14    Q. (By Ms. Maranzano) Were there any other changes
15 in the rules in 2009 from previous Senate rules that --
16    A. I don't recall. I'm sorry. I thought you were
17 done. I'm sorry.
18    Q. No, it was just a pause.
19       That were related only to voter
20 identification requirements?
21    A. I don't recall.
22    Q. Was there any consideration of changing any
23 other Senate rules in 2009 to ensure that SB 362 would
24 get passed in the Senate?
25       MR. FREDERICK: I object to the extent the

### 126

1  question calls for thought process, mental impressions
2  of legislators and for confidential communications,
3  privileged communications among legislators and
4  staff. I would instruct you not to answer on the basis
5  of privilege, except to the extent there is something
6  nonprivileged you can point to answer.
7     A. I don't know.
8     Q. (By Ms. Maranzano) Was SB 362 considered by any
9  Senate committees?
10    A. Senate committee on the whole.
11    Q. Is that the only one?
12    A. Yes, ma'am.
13    Q. Is it unusual for a bill to go straight to
14 Senate Committee of the Whole?
15    A. Yes.
16    Q. Have you seen that happen with other
17 legislation during the time you have worked for Senator
18 Fraser?
19    A. I don't recall it happening since I've worked
20 for Senator Fraser.
21    Q. What was your role during the Floor
22 consideration of SB 362?
23    A. I sat with Senator Fraser as he laid out the
24 bill, and when he asked me to produce documentation, I
25 would give it to him.

### 127

1     Q. What kind of documentation did you have with
2  you?
3        MR. FREDERICK: I object on the ground
4  that it seeks thought process and mental impressions
5  that may reflect confidential communications. I would
6  instruct you not to answer on the basis of privilege.
7     A. I will answer, because I will tell you the same
8  things that we've talked about earlier: The poll data,
9  the studies, the Carter-Baker Commission report. Just
10 those two.
11       MS. MARANZANO: I'm going to ask, if it's
12 possible, Mr. Frederick, can you shorten your objections
13 just so that we can --
14       MR. FREDERICK: Yeah.
15       MS. MARANZANO: I mean, you know, since
16 it's the same objection, that will maybe save us some
17 time.
18       MR. FREDERICK: Absolutely.
19       MS. MARANZANO: Thank you.
20       MR. FREDERICK: If y'all are willing to --
21 you know, to stipulate that when I make a shorter
22 objection, it covers all the matters, I am happy to
23 shorten it.
24       MS. MARANZANO: Great. Thank you.
25       MR. FREDERICK: Can I propose "Objection,

### 128

1  legislative privilege"?
2        MS. MARANZANO: That's sounds --
3        MR. FREDERICK: Is that good enough?
4        MS. MARANZANO: That's great. And you
5  will understand what he means overall.
6        THE WITNESS: And then I may not forget
7  your question.
8        MR. FREDERICK: Yeah. Thanks.
9        MS. MARANZANO: Okay. Terrific.
10    Q. (By Ms. Maranzano) During the Floor debate on
11 SB 362, did anyone raise concerns about the impact that
12 the bill might have on minority voters?
13    A. Yes.
14    Q. What concerns were those?
15    A. I can't speak to specific concerns.
16    Q. Who raised those concerns?
17    A. Democrats and the senators.
18    Q. Were they minority senators?
19    A. Some of them were.
20    Q. Do you know if they were senators who
21 represented minority voters?
22    A. Yes.
23    Q. What was the Senator's response to these
24 concerns?
25    A. His response was that he disagreed.

### 129

1  Q. What was that disagreement based upon?
2     MR. FREDERICK: Object on legislative
3  privilege, but matters in the public record you may
4  address.
5     A. He referenced election data in both Georgia and
6  Indiana that showed that their voter ID laws did not
7  impact minority voters on the record.
8     Q. (By Ms. Maranzano) What was that election data?
9     A. Data from Indiana and Georgia's elections that
10 were held after they voted -- after they had a voter ID
11 law, that showed that the turnout increased.
12    Q. So the data you referenced was about turnout?
13    A. Yes, ma'am.
14    Q. Was it solely about turnout?
15    A. Yes, ma'am.
16    Q. And was it about turnout of minority voters in
17 particular?
18    A. All voters.
19    Q. All voters?
20    A. By I think the data he showed did have
21 minority -- I think the data he referenced in his
22 testimony did show that minority voters increased as
23 well.
24    Q. And what years were those studies run?
25    A. I don't remember.

### 130

1  Q. Do you know if he looked into whether other
2  issues might have had any impact on that turnout?
3     MR. FREDERICK: Objection, legislative
4  privilege. To the extent there's material on the
5  record, you may answer.
6     A. I'll assert privilege.
7     Q. (By Ms. Maranzano) Did any of those studies
8  record any information about voter registration rates in
9  Indiana and Georgia?
10    A. The data -- I'm sorry. The data that I
11 mentioned was not a study. It's actual voter turnout
12 from those states' Secretaries of State. So I want to
13 be real clear that they're not studies. We're talking
14 about actual turnout.
15    Q. Okay. I got you. So did the Senator do any
16 research to determine whether voter registration rates
17 changed in those states during the years in which there
18 was an increase in voter turnout?
19    MR. FREDERICK: Objection, legislative
20 privilege. Instruct you not to answer.
21    A. I'll assert privilege.
22    Q. (By Ms. Maranzano) Did the Senator do any
23 research to determine whether there were any close
24 elections during those years?
25    MR. FREDERICK: Objection, legislative

### 131

1  privilege. Instruct you not to answer.
2     A. Assert privilege.
3     Q. (By Ms. Maranzano) Did the Senator do any
4  research to determine whether there were any high
5  profile elections during those years?
6     MR. FREDERICK: Objection, legislative
7  privilege. Instruct you not to answer.
8     A. I assert privilege.
9     Q. (By Ms. Maranzano) Did the Senator do any
10 additional research about turnout and Georgia and
11 Indiana?
12    MR. FREDERICK: Objection, legislative
13 privilege. Instruct you not to answer.
14    A. Assert privilege.
15    Q. (By Ms. Maranzano) Did SB 362 change at all in
16 response to the concerns that were raised on the Senate
17 Floor?
18    MR. FREDERICK: Objection, legislative
19 privilege, to the extent it calls for actual thought
20 process, but I think to the extent there's anything on
21 the record, you're free to testify about that.
22    A. So I went and looked over at the break, while
23 y'all were doing your conference, about the process,
24 because I don't recall, didn't recall, and Senate Bill
25 362, there was a committee substitute in committee. But

### 132

1  I don't think it changed on the Floor after the Floor
2  debate.
3     Q. (By Ms. Maranzano) What were the changes that
4  occurred in committee?
5     A. I didn't -- I don't recall, and I didn't have
6  time to review it.
7     Q. I just want to go back to finish what you were
8  talking about earlier, and just make sure. You said the
9  Senator disagreed with the opposition that was brought
10 up on the Floor, and then we talked about turnout.
11    A. Uh-huh.
12    Q. Were there any other bases from the Senator's
13 disagreement with the concerns that were raised on the
14 Floor?
15    MR. FREDERICK: Object on the legislative
16 privilege only to the extent those bases were not
17 disclosed. But if there's anything else on the record,
18 you're free to address it.
19    A. I don't remember if he had any other arguments.
20    (Exhibit 33 marked for identification.)
21    Q. (By Ms. Maranzano) Okay. Ms. McCoy, I'm
22 showing you what we're marking for the record as
23 Deposition Exhibit 33, and it's Bates labeled U.S.
24 00005599 through U.S. 00005615. And I'd like to turn
25 your attention to Page 5607 at the bottom and 5608.