JANICE MCCOY                                                                          MAY 16, 2012

### 133

1. Do you recognize this, sort of, the
2. overall document?
3. A. Yes, ma'am.
4. Q. Is it the Senate Journal from March 18th, 2009?
5. A. Yes, ma'am.
6. Q. And do you see on the pages I've directed you
7. to, there's a letter that was submitted by Senator West?
8. A. The letter was submitted by Senator Van de
9. Putte. Senator West had comments further down the page.
10. Q. Gotcha.
11. A. Is that the letter you're referring to?
12. Q. Yes, the letter that -- well, I'm referring to
13. the letter the starts out by saying, "Senator West
14. submitted the following statement."
15. A. Oh, that's not a letter. That's his statement.
16. Q. Okay.
17. A. Uh-huh.
18. Q. And then on the next page, if you see, it was
19. signed off by Senators West, Ellis, Gallegos, Lucio,
20. Shapleigh, Uresti, Van de Putte, Watson, Whitmire and
21. Zaffirini?
22. A. Yes, ma'am.
23. Q. And can you look at Paragraph Number 8, and
24. there's a sentence in there that says, "No Senator who
25. is an ethnic minority has voted in favor of such

### 134

1. legislation," and it's talking about voter ID
2. legislation. Why do you think these senators felt the
3. need to put in the record the fact that no ethnic
4. minority had voted in favor of voter ID legislation?
5. MR. FREDERICK: Objection, legislative
6. privilege to the extent it calls for the thought process
7. of these senators. If you can answer on a nonprivileged
8. basis, you can.
9. A. I cannot.
10. Q. (By Ms. Maranzano) Did Senator Fraser place any
11. significance on the fact that there was such unified
12. opposition from the minority members of the Senate?
13. MR. FREDERICK: Objection, legislative
14. privilege. Instruct you not to answer.
15. A. I'll assert privilege.
16. Q. (By Ms. Maranzano) Why do you think there was
17. such strong opposition to SB 362?
18. MR. FREDERICK: Objection, legislative
19. privilege. Objection, calls for speculation. I
20. instruct you not to answer.
21. A. I'll assert privilege.
22. (Exhibit 34 marked for identification.)
23. Q. (By Ms. Maranzano) Okay. I'm showing you what
24. we're marking as Deposition Exhibit 34.
25. For the record, it's labeled Texas, Bates

### 135

1. range Texas, underscore, 00003857 through 00003920.
2. And I'd like to direct your attention to
3. Page 3911. It's the second page of this.
4. Do you recognize -- first of all, do you
5. recognize this document?
6. A. I don't think I've seen the whole document, but
7. I recognize it what it is.
8. Q. Is it a transcript -- does it appear to be a
9. copy of a transcript from the Committee of the Whole on
10. March 10th, 2009?
11. A. Yes, ma'am.
12. Q. Is that when you considered SB -- when the
13. Senate considered SB 362?
14. A. Yes.
15. Q. Can you look at the bottom of 3911. It's a
16. statement from Senator Fraser. And if you see at the
17. bottom of the page, the statement says, "And I actually
18. came back, and sat down, and I've got probably,
19. interestingly, more research and more reading and debate
20. on this bill maybe than one that I've ever done."
21. Can you tell me what reading and research
22. the Senator is referring to in that?
23. MR. FREDERICK: Objection, legislative
24. privilege. Instruct you not to answer.
25. A. Again, I mean, the same reports and polls that

### 136

1. I referenced earlier would be what he was referencing
2. there.
3. Q. (By Ms. Maranzano) Nothing in addition to what
4. you've already testified about?
5. A. No, ma'am.
6. (Exhibit 35 marked for identification.)
7. Q. (By Ms. Maranzano) Okay. We marked this as
8. Deposition Exhibit 35. It's TX underscore 00 --
9. A. It's the same one you just gave us.
10. Q. Oh, okay. Well, we have two copies. I'm going
11. to -- all right. Let's just use the same exhibit, then.
12. I'm going to direct your attention
13. Page 3940.
14. A. Uh-huh.
15. Q. And do you see there is a comment from Senator
16. Watson?
17. A. Oh, maybe it is different. Uh-huh. Yes.
18. Q. Yes. Okay. And do you see that he asks a
19. question: "Are you familiar with any data or study
20. that's been done with regard to some sort of statistical
21. analysis concerning the effect of the new requirements
22. of Senate Bill 362?" And then on the next page, you see
23. Senator Fraser has an answer, and at the end of that,
24. that paragraph, he says, "I think you're asking a
25. subjective question that we have objective data that is

137

1  available that the witnesses are going to lay out.
2  You're asking have I done that? The answer is no." Do
3  you see all that?
4    A. Uh-huh.
5    Q. Do you recall this testimony?
6    A. Not specifically, but...
7    Q. Did Senator Fraser ever do any research on how
8  SB 362 would impact minority voters?
9        MR. FREDERICK: Objection, legislative
10 privilege. Instruct you not to answer.
11   Q. (By Ms. Maranzano) Was there any testimony
12 presented during the debate of SB 362 by Senator Fraser
13 about any analysis related to the impact that the bill
14 would have on minority voters?
15   A. I think the only testimony that Senator Fraser
16 might have talked about, in terms of voter turnout,
17 minority or not, was the election results from Indiana
18 and Georgia.
19   Q. Did SB 362 pass the Senate?
20   A. Yes.
21   Q. Did Senator Fraser have any role with regard to
22 SB 362 once it was referred to the House?
23   A. No.
24   Q. Did you have any role?
25   A. I met with Representative Todd Smith once.

138

1    Q. Anybody else?
2    A. No.
3    Q. What was your meeting with Representative Smith
4  about?
5        MR. FREDERICK: Object, legislative
6  privilege to the extent it seeks the substance of the
7  communications, but you are free to describe general
8  subject matter of the meeting, if you can.
9    A. Senate Bill 14. I mean, specifically the
10 provisions in Senate Bill 14.
11   Q. (By Ms. Maranzano) And did Representative Smith
12 carry Senate Bill -- oh, wait. Did you say Senate Bill
13 14?
14   A. Oh, I'm sorry. Senate Bill 362. I'm sorry.
15   Q. Did Representative Smith carry Senate Bill 362
16 in the House?
17   A. Yes.
18   Q. And did the bill pass the House?
19   A. No.
20   Q. Why not?
21   A. It ran out of time.
22   Q. Was it essentially filibustered in the House?
23   A. I don't really remember how that worked, but I
24 think it -- yes. No. That's the wrong term. The
25 calendar was filibustered.

139

1    Q. Okay. All right. Thank you for the
2  distinction.
3    A. Yeah. I don't -- yeah.
4    Q. You testified earlier about Senate Bill 363.
5  Do you recall that --
6    A. Yes, ma'am.
7    Q. -- when we read the news article?
8        Can we have this marked as Exhibit 36?
9        (Exhibit 36 marked for identification.)
10   Q. (By Ms. Maranzano) Does this appear to be a
11 copy of Senate Bill 363 that you referred to earlier?
12   A. Yes, ma'am.
13   Q. What are the general requirements of this
14 legislation in regard to voter registration applicants?
15   A. Honestly, without reading it again, I can't
16 tell you.
17   Q. Would it sound correct to you if I said that
18 this requires voter registration applicants to prove
19 citizenship?
20       MR. FREDERICK: And take your time to read
21 it, if you need to.
22   A. (Viewing documents.) Yes.
23   Q. (By Ms. Maranzano) What was the purpose of
24 Senate Bill 363?
25       MR. FREDERICK: I object to legislative

140

1  privilege to the extent that it seeks mental
2  impressions, thought process, or confidential
3  communications, but to the extent that the question just
4  seeks the purpose of the bill, then you may answer, if
5  you know.
6    A. I don't remember.
7    Q. (By Ms. Maranzano) Was this filed at the same
8  time as Senate Bill 362?
9    A. Yes, ma'am.
10   Q. Were they filed -- would you say these bills
11 were filed in conjunction with each other?
12   A. Yes, ma'am.
13   Q. Why would it be necessary for a voter
14 registration applicant to prove their citizenship?
15       MR. FREDERICK: Objection, calls for
16 speculation.
17   A. I don't remember this bill.
18   Q. (By Ms. Maranzano) Did you work on this bill,
19 Ms. McCoy?
20   A. Not since it was filed in November of 2008.
21   Q. Do you recall that press release that we looked
22 at earlier today?
23   A. Yes, ma'am.
24   Q. And did it mention Senate Bill 363?
25   A. Yes, ma'am.

JANICE MCCOY									MAY 16, 2012

141

1   Q.  And didn't you testify that you had written
2   that press release?
3   A.  Yes, ma'am.
4   Q.  Are you aware of any evidence that noncitizens
5   register to vote?
6       MR. FREDERICK: I'll object, legislative
7   privilege, to the extent this seeks your thought
8   process, mental impressions or those of Senator Fraser
9   related to this pending legislation. To the extent you
10  can answer just based on general knowledge, if you can,
11  you're free to do so.
12  A.  I don't know.
13  Q.  (By Ms. Maranzano) You don't know of any
14  evidence?
15  A.  I do not.
16  Q.  Did you look into any such evidence when you
17  were working on Senate Bill 363?
18      MR. FREDERICK: Objection, legislative
19  privilege. Instruct you not to answer.
20  A.  I don't recall.
21  Q.  (By Ms. Maranzano) Are you familiar with a
22  federal law called the Help America Vote Act?
23  A.  Yes.
24  Q.  Does HAVA, the Help America Vote Act, implement
25  certain identification requirements for voter

142

1   registration applicants?
2   A.  Yes.
3   Q.  Is there any reason to think that those forms
4   of identification wouldn't be sufficient?
5       MR. FREDERICK: Objection, calls for
6   speculation. You can answer if you can.
7   A.  Well, my understanding is, HAVA requires your
8   driver's license or your social security card number.
9   Those are the photo -- those are the IDs.
10  Q.  And if a person does not list those forms of
11  identification on their voter registration application,
12  are you familiar with any additional requirements?
13  A.  When they go to vote the first time, they're
14  supposed to show some form of ID.
15  Q.  And do you know what forms of ID are acceptable
16  HAVA?
17  A.  I do not.
18  Q.  Do you know if it's only photo identification?
19  A.  I think it's more than that, but I don't know
20  specifically.
21  Q.  Did you look into the requirements of HAVA when
22  you were working on any voter identification bills?
23      MR. FREDERICK: Object, legislative
24  privilege. Instruct you not to answer.
25  A.  I'll assert privilege.

143

1   Q.  (By Ms. Maranzano) Do you know what ethnic
2   group makes up the largest percentage of the noncitizen
3   population in Texas?
4   A.  The noncitizen --
5   Q.  Uh-huh.
6   A.  -- population in Texas? No.
7   Q.  How long have you lived in Texas?
8   A.  My whole life.
9   Q.  And you have no idea what ethic group makes up
10  the largest -- percentage of the noncitizen population?
11  A.  Do you want me to guess?
12      MR. FREDERICK: Objection, argumentative.
13  Q.  (By Ms. Maranzano) You can make an educated
14  guess.
15  A.  Hispanic.
16  Q.  And what's your educated guess based on? Your
17  time in Texas?
18  A.  We're close to Mexico.
19  Q.  Okay. Let's talk about Senate Bill 14. When
20  did Senator Fraser introduce Senate Bill 14?
21  A.  In November of 2010, Senator Fraser filed a
22  piece of legislation -- and I don't recall the bill
23  number -- that was essentially Senate Bill 14. When
24  session started, we refiled that legislation as Senate
25  Bill 14, so it was right January of 2011.

144

1   Q.  Would it sound correct to you if I say: Did he
2   introduce a bill that's called Senate Bill 178?
3   A.  That's it. Yes, ma'am.
4   Q.  And that was the one that was introduced prior
5   to the session beginning?
6   A.  Yes, ma'am.
7   Q.  Was that the same as Senate Bill 14 as it was
8   introduced?
9   A.  No, ma'am.
10  Q.  What were the changes?
11  A.  There was a provision added to Senate Bill 14
12  to exempt certain elderly people from the provisions of
13  voter ID.
14  Q.  And how did that get added?
15      MR. FREDERICK: Object, legislative
16  privilege. If you can answer without revealing
17  confidential communications or thought processes, you
18  may.
19  A.  I'll assert privilege.
20  Q.  (By Ms. Maranzano) Did anyone ask Senator
21  Fraser to introduce Senate Bill 14?
22      MR. FREDERICK: Object, legislative
23  privilege. Instruct you not to answer.
24  A.  I'll assert privilege.
25  Q.  (By Ms. Maranzano) Did Senator Fraser ever make

JANICE MCCOY                                                                                    MAY 16, 2012

### 145

1  any public commitments to introduce Senate Bill 14 after
2  Senate Bill 362 did not get enacted?
3      A.  Probably, but I can't definitively say.
4      Q.  Was Senate Bill 14 given a designation by
5  Governor Perry as emergency legislation?
6      A.  Governor Perry designated photo ID as an
7  emergency.  I don't think that order specifically said
8  that bill number.
9      Q.  What does it mean to be designated emergency
10 legislation?
11     A.  According to the constitution, the Legislature
12 can't do anything substantive for 60 days unless the
13 Governor says it's an emergency.
14     Q.  How did photo ID come to be included in the
15 Governor's designation?
16     A.  I don't know.  I'll just tell you.  I mean...
17     Q.  Did you have any conversations with anyone in
18 the Governor's Office about the emergency designation?
19     A.  No.
20     Q.  Did the Senator?
21     A.  I don't know.
22     Q.  Why would photo ID requirements need to be
23 considered within the first 60 days of the legislative
24 session?
25         MR. FREDERICK:  Objection, calls for

### 146

1  speculation.  You can answer if you know.
2      A.  I don't know.
3      Q.  (By Ms. Maranzano) Were there any elections
4  scheduled within the first 60 days of 2011, of the 2011
5  legislative session?
6      A.  I don't think so, but I can't speak to every
7  election that local governments or...
8      Q.  What other categories of -- what other topics
9  were given emergency designation in 2011?
10     A.  I don't remember.
11     Q.  Does legislation automatically get considered
12 within the first 60 days if it's designated as emergency
13 legislation?
14     A.  No.
15     Q.  Who makes the decision whether or not the
16 legislation will be heard within the first 60 days?
17     A.  My guess is leadership, Lieutenant Governor or
18 the Speaker.  They set the calendars.
19     Q.  Did you have any conversations with anybody in
20 the Lieutenant Governor's Office about SB 14 getting
21 heard within the first 60 days of the 2011 legislative
22 session?
23         MR. FREDERICK:  Object, legislative
24 privilege.
25     A.  Yes.

### 147

1          MR. FREDERICK:  I think that's calls
2  for --
3          THE WITNESS:  Sorry.
4          MR. FREDERICK:  Just let me finish my
5  objection, please.
6          THE WITNESS:  Okay.
7      Q.  (By Ms. Maranzano) Who in the Lieutenant
8  Governor's Office did you have a conversation with?
9      A.  Julia Rathgeber and Blaine Brunson.
10     Q.  How many conversations did you have with them?
11     A.  Probably two on that issue.
12     Q.  How many conversations did you have with the
13 Lieutenant Governor's Office about SB 14?
14     A.  I probably spoke to them once or twice a day
15 during the whole process until voter ID left the Senate.
16     Q.  And is there anybody, other than the people
17 that you've already testified to from the Lieutenant
18 Governor's Office, who you were communicating with?
19     A.  In the Lieutenant Governor's Office?
20     Q.  Uh-huh.
21     A.  No.
22     Q.  So am I correct that it was Julia Rathgeber,
23 Blaine Brunson and Bryan Hebert?
24     A.  Uh-huh.
25         (Brief discussion held off the record.)

### 148

1      Q.  (By Ms. Maranzano) Okay.  Ms. McCoy, I'm
2  showing you what we've marked as Deposition Exhibit 5
3  for the record.  Do you recognize what this is?
4      A.  It's the enrolled version of Senate Bill 14.
5      Q.  And can you look at Section 14 of the bill and
6  tell me what forms of identification are permitted under
7  Senate Bill 14?
8      A.  A driver's license, an election ID certificate,
9  an ID card by DPS, a military ID card, a citizens
10 certificate, a passport, and a license to carry a
11 concealed handgun.
12     Q.  What is a military identification card?
13     A.  My understanding is it's a card issued by the
14 Department of Defense.
15     Q.  Is it your understanding that only the
16 Department of Defense issues military IDs that would be
17 acceptable under SB 14?
18     A.  Yes.
19     Q.  And what's that understanding based on?
20         MR. FREDERICK:  We'll object on
21 legislative privilege, only to the extent it would
22 require you to disclose confidential communications or
23 thought process.  If it's based on something outside of
24 that, then you're free to answer.
25     A.  I'll assert privilege.

### 149

1. Q. (By Ms. Maranzano) Have you ever seen a
2. military ID card?
3. A. No.
4. Q. Do you know if veterans ID -- a veterans
5. identification is an acceptable form of military
6. identification under SB 14?
7. A. I don't believe that it is.
8. Q. And what is that based on?
9. A. The Department of Veterans Affairs is not a
10. military. It's an executive branch agency.
11. Q. Do you know if any Department of Homeland
12. Security identifications would be considered acceptable
13. under SB 14?
14. A. Again, I would say no.
15. Q. And what is that based on?
16. A. That they're not also not military. They're
17. not under the Department of Defense.
18. Q. What is a citizenship certificate?
19. A. My understanding is when someone becomes a
20. citizen of the United States, they are issued a
21. certificate showing that they are now a citizen.
22. Q. Do you know how much it costs to get a
23. citizenship certificate?
24. A. No.
25. Q. Do you know how much is costs to get a United

### 150

1. States passport?
2. A. No.
3. Q. Did you look into the cost of obtaining these
4. IDs when you were working on SB 14?
5. A. No.
6. Q. Can you look at Page 11, Section 16 of the
7. bill? Does SB 14 increase criminal penalties for a
8. person who impersonates a voter?
9. A. Yes.
10. Q. Were you involved in the drafting of SB 14?
11. A. Yes.
12. Q. What involvement did you have?
13. A. I presented options to Senator Fraser, and when
14. he determined what he wanted included in the bill, I had
15. it drafted by Senate Engrossing and Enrolling.
16. Q. Who is Senate Engrossing and Enrolling?
17. A. It's an administrative arm of the Senate that
18. works on -- it's a group of lawyers that help us with
19. bill drafts and amendments.
20. Q. What options did you present to Senator Fraser?
21. MR. FREDERICK: Objection, legislative
22. privilege. Instruct you not to answer.
23. A. I'll assert privilege.
24. Q. (By Ms. Maranzano) Does Senate Engrossing and
25. Enrolling -- did you say that was a committee?

### 151

1. A. No, ma'am. It's an administrative arm of the
2. Senate.
3. Q. Do they provide legal advice about whether a
4. law complies with federal law?
5. A. No.
6. Q. Are they connected at all to the Texas
7. Legislative Council?
8. A. No.
9. Q. How are those two bodies different?
10. A. The Texas Legislative Council -- well, Senate
11. Engrossing and Enrolling is strictly a body that's
12. designed to assist the senators, but they do the same
13. essential work. They work just for the Senate.
14. MS. MARANZANO: Mr. Frederick, have you
15. produced any documents from the Engrossing and Enrolling
16. branch that Ms. McCoy is testifying about?
17. MR. FREDERICK: I am not aware at this
18. time whether or not we have.
19. MS. MARANZANO: Have you reached out to
20. them in terms of the document requests that were
21. propounded on the State of Texas?
22. MR. FREDERICK: I'm not aware that we
23. have.
24. MS. MARANZANO: It sounds to me like they
25. might have relevant documents, so I'd request that you

### 152

1. all do that.
2. Q. (By Ms. Maranzano) Did you also work with the
3. TLC, Ms. McCoy, in developing SB 14?
4. A. Yes.
5. Q. And what was the TLC's role?
6. A. I'm trying to remember if we did substitutes or
7. amendments. But they assisted me with either a
8. substitute or potential amendments. And then at the
9. end, they also assisted me with the conference committee
10. reports.
11. Q. When you say -- all right. So the substitute,
12. can you tell me what the substitute was?
13. A. I don't remember how we moved this bill through
14. the process. I don't remember if we had a substitute.
15. I don't remember if we had amendments. So once we filed
16. the bill with the E & E draft, I used the Legislative
17. Council, as we moved forward, with whatever drafting
18. needs I had. But I don't remember what those drafting
19. needs are -- were.
20. Q. So just so I'm clear, what -- how do you
21. distinguish between the drafting E & E does versus the
22. drafting that Texas Legislative Council does? Is it the
23. process that the bill is in, or is there another
24. distinction?
25. A. Senate Engrossing and Enrolling moves a lot

### 153

1  faster, so when we need quick drafts, we tend to use
2  them. Legislative Council is a little bit slower, but
3  they review all of the sections of the code to make sure
4  that we're -- if something needs to get changed for
5  compliance -- not -- compliance is not the right word,
6  but settle up reasons, they'll say, "Hey, if you're
7  amending this section of code, you need to address this
8  section, too." And so sometimes we go through Leg
9  Council, even though we know it's going slower, to make
10 sure that we've hit every part of the code or statute
11 that we need to.
12     Q. And does Leg Council also look at how
13 legislation interacts with federal law?
14     A. I don't know.
15     Q. So did you go through the Engrossing and
16 Enrolling with the initial draft of SB 14 because you
17 were on an expedited -- because you were -- it was
18 because the bill was given emergency designation?
19     A. No. We used Engrossing and Enrolling in
20 November because we wanted to get the bill filed as
21 close to the first day of filing as we could.
22     Q. And why was that?
23     A. The Senator just wanted to.
24     Q. Were there multiple drafts of SB 14 prior to it
25 being introduced?

### 154

1      A. Yes.
2      Q. And would E & E, Engrossing and Enrolling, be
3  the -- would they be the holders of those drafts?
4      A. No.
5      Q. Who would?
6      A. Me.
7      Q. And did you keep them?
8      A. Yes.
9      Q. And did you turn them over to your counsel?
10     A. Yes.
11     Q. Did Senate Engrossing and Enrolling draft
12 SB 362 as well?
13     A. Yes.
14     Q. Did they draft HB 218 as well?
15     A. Oh, I'm sorry. No, no, no. I'm sorry. I got
16 confused. Senate Bill 362 in 2009 was drafted by
17 Legislative Council.
18     Q. And why was that one drafted by Legislative
19 Council?
20     A. Because it was -- I think what I filed as
21 Senate Bill 362 was the Senate Committee report of House
22 Bill 218. So that's all I asked them to do, was, like
23 would you just make this document ready to file, and
24 they did.
25     Q. Who from -- if I say E & E, can we agree that

### 155

1  that's this Engrossing and Enrolling?
2      A. Yes, ma'am. That's how we call them.
3      Q. Okay. Who from E & E did you work with on
4  Senate Bill 14?
5      A. Mardi, M-a-r-d-i, Alexander was my contact.
6      Q. Anybody else?
7      A. She was head of E & E. I think she assigned it
8  to a lawyer, but she's who I dealt with.
9      Q. How did you communicate with Ms. Alexander?
10     A. E-mail.
11     Q. Did you save those e-mails?
12     A. If I printed out the e-mail, I saved it. If it
13 was not printed out, then it was not saved.
14     Q. And would those be in your files if you printed
15 out the e-mails?
16     A. Yes, ma'am.
17     Q. And that's the files that we talked about
18 earlier that you kept of SB 362 and SB 14?
19     A. Yes, ma'am.
20     Q. Do you know about how many e-mails you
21 exchanged Ms. Alexander?
22     A. Three or four.
23     Q. For the whole process of drafting SB 14?
24     A. Yes, ma'am.
25     Q. Was there anything you looked at, when you were

### 156

1  developing SB 14, that you haven't already testified to,
2  when we were talking about other bills?
3          MR. FREDERICK: Object, legislative
4  privilege. Instruct you not to answer.
5      A. I'll assert privilege.
6      Q. (By Ms. Maranzano) Did you have any
7  communications about SB 14 with other legislators?
8      A. Yes.
9      Q. Which legislators?
10     A. Throughout the process?
11     Q. Uh-huh.
12     A. I would say probably 90 percent of the
13 senators. Representative Harless.
14     Q. Anyone else?
15     A. I'm trying to think. That's -- I mean, those
16 are the ones I can remember. House members. Other
17 House members potentially, but it was probably more of
18 size than substantive.
19     Q. Did you have communications with any
20 individuals from the Governor's Office about SB 14?
21     A. Yes.
22     Q. And who was that?
23     A. Michael Scofield.
24     Q. When was that?
25     A. Throughout the legislative session.

JANICE MCCOY                                                                       MAY 16, 2012

157

1   Q. Were those communications verbal or written?
2   A. Verbal.
3   Q. By phone or in person?
4   A. Both.
5   Q. Was Senator Fraser involved in those
6   communications?
7   A. Yes.
8   Q. In none of them?
9   A. No.
10  Q. What was the nature of those communications?
11       MR. FREDERICK: I'll object, legislative
12  privilege. Instruct you not to answer.
13  A. I'll assert.
14  Q. (By Ms. Maranzano) Did you have communications
15  about SB 14 with any interest groups or lobbyists?
16  A. Yes.
17  Q. What groups?
18  A. I talked to AARP a couple of times. I'm pretty
19  sure the Disability Coalition, although I'm not sure
20  that's how they're known, came in a time or two, and
21  that group out of Houston, the Patriots or the -- I
22  can't think of what their name is.
23  Q. Does the King Street Patriots sound correct?
24  A. Yes, ma'am. The King Street Patriots. I think
25  they came in once. Other than that, I can't think of

158

1   any particular interest group that came in.
2   Q. Did you have any communications with a group by
3   the name of American Legislative Exchange Council, or
4   ALEC, about SB 14?
5   A. I did not.
6   Q. Did the Senator?
7   A. Not to my recollection.
8   Q. Did you have any communications with an
9   individual by the name of Catherine Engelbrecht about SB
10  14?
11  A. I did not, but I think she testified. Did she
12  testify in the Senate? I can't remember. I'm sorry.
13  Q. Did you have any communications with an
14  individual by the name of Paul Bettencourt about SB 14?
15  A. Yes.
16  Q. How many?
17  A. Maybe two.
18  Q. And do you remember when -- when were those
19  communications?
20  A. I do not recall.
21  Q. Were they in person or by phone?
22  A. By phone.
23  Q. Were you and he the only parties to those
24  conversations?
25  A. As far as I know, yes.

159

1   Q. What was the nature of those conversations?
2       MR. FREDERICK: Object on legislative
3   privilege and instruct you not to answer.
4   A. I'll assert.
5   Q. (By Ms. Maranzano) Can you tell me the general
6   nature of your conversation with Mr. Bettencourt in
7   terms of a --
8   A. I generally am having a hard -- I think -- I
9   know I talked to him.
10  Q. Uh-huh.
11  A. And generally, I'm -- I honestly don't recall
12  that he was helpful to me. I don't really remember. We
13  generally talked about Senate Bill 14.
14  Q. How about the general nature of your
15  conversation with the King Street Patriots?
16      MR. FREDERICK: To the extent it's a
17  general subject matter, I'll permit you to answer.
18      THE WITNESS: Right. Okay.
19  A. I think generally, they came in to talk about
20  their history of monitoring elections in Harris County.
21  Q. (By Ms. Maranzano) Did they bring up any
22  in-person voter impersonation?
23      MR. FREDERICK: Object, legislative
24  privilege and instruct you not to answer.
25  A. I'll assert.

160

1   Q. (By Ms. Maranzano) Did you say there was a
2   disability group that came in, disability advocate?
3   A. I don't -- I think that the disability
4   lobbyists, interest group came in as we were in
5   conference committee to talk to me about the language
6   that was added -- that was amended by the House.
7   Q. And what was that amendment?
8   A. It was the Section 1 of the bill.
9   Q. And were they concerned about that?
10      MR. FREDERICK: Objection, legislative
11  privilege. Instruct you not to answer.
12  Q. (By Ms. Maranzano) Did you have any
13  communications about SB 14 with an individual by the
14  name of Hans von Spakovsky?
15  A. No.
16  Q. Did you have any communications with any local
17  election officials about SB 14?
18  A. I don't recall.
19  Q. Did you have any communications with the Texas
20  Republican Party about SB 14?
21  A. I don't think so, but I don't recall.
22  Q. Did Senator Fraser exchange drafts of SB 14
23  with anyone other than Engrossing and Enrolling or TLC?
24      MR. FREDERICK: We'll object on
25  legislative privilege to the extent that it seeks the

JANICE MCCOY                                                                         MAY 16, 2012

161

1   substance of those drafts, but the fact that drafts were
2   exchanged, you can testify if you remember.
3       A.  No.
4       Q.  (By Ms. Maranzano) Did he discuss drafts of the
5   bill with anybody other than E & E or the Legislative
6   Council?
7           MR. FREDERICK: Same objection and
8   instruction. The fact of the communications you can
9   identify.
10      A.  I don't think so.
11          (Discussion held off the record.)
12          (Exhibit 37 marked for identification.)
13      Q.  (By Ms. Maranzano) Can you take a look at --
14  and what exhibit number is -- 23? Okay. So I'm showing
15  what we're marking as Deposition Exhibit 37, along with
16  what's been previously marked as Deposition Exhibit 23.
17          And can you look at 37 for a moment and
18  tell me if you recognize that document?
19      A.  I do.
20      Q.  What is that?
21      A.  That's a declaration.
22      Q.  And is that your declaration?
23      A.  Yes, ma'am.
24      Q.  Did you sign that in response to providing
25  information that's contained in Interrogatory Response

162

1   Number 1 in Deposition Exhibit 23?
2       A.  Yes, ma'am.
3       Q.  What did you do to compile the list of names
4   that's included in Response Number 1?
5           MR. FREDERICK: I'm going to object to
6   that on grounds of work product.
7           MS. MARANZANO: But she's verifying the
8   names. I'm just asking her what she did to compile the
9   information. Is that --
10          MR. ROSENBERG: Whose work product?
11          MR. FREDERICK: Well, she compiled the
12  information at the direction of an attorney, namely
13  me. I mean...
14          MS. MARANZANO: I mean, I'm interested in
15  what she did to come up with the information of who
16  participated in the process of putting SB 14 together.
17  Did she talk to people? Did she go through records? Is
18  that, in your mind, work product?
19          MR. FREDERICK: Hmm. I mean, if she can
20  answer without waiving the objection.
21          MS. MARANZANO: What about this: What did
22  you do to make sure this was a complete list of
23  individuals responsive to Interrogatory Number 1? Does
24  that alleviate your concerns, Mr. Frederick? I mean,
25  she did verify in a sworn declaration that she was

163

1   supplying this information.
2           MR. FREDERICK: Okay. Yeah. You can
3   answer.
4       A.  Okay. Well, I worked with the Attorney
5   General's Office and Colby in Representative Harless's
6   office to try and remember who helped in developing and
7   analyzing Senate Bill 14, and amongst three offices,
8   this is the list we produced.
9       Q.  (By Ms. Maranzano) Did you review any documents
10  when you were compiling this list?
11      A.  No.
12      Q.  Did you review any e-mails when you were
13  compiling this list?
14      A.  No.
15      Q.  Did you review anything, or is this solely from
16  your memory and Mr. Beuck's memory?
17      A.  I can't speak for Mr. Beuck in terms of how he
18  developed.
19      Q.  Okay. Good point. The names that you provided
20  here, are they solely from your memory?
21      A.  Yes, ma'am.
22      Q.  With regard to Page 3 and 4, do you see there's
23  a list of several legislators: Representative Pena,
24  Representative Gonzalez, Representative Aliseda, and
25  they are described as co-sponsors and joint sponsors?

164

1       A.  Uh-huh.
2       Q.  Are there additional joint sponsors and
3   co-sponsors of SB 14?
4       A.  There's additional co-authors. All of the 18
5   Senate Republicans signed on as co-authors. I do not
6   know if there were additional co-sponsors in the House.
7       Q.  You know, I'm going to show you what we've
8   marked -- what was this -- this has been previously
9   marked as Deposition Exhibit 8.
10      A.  Uh-huh.
11      Q.  Can you look at that and tell me if it
12  refreshes your recollection as to are there other
13  co-sponsors of SB 14?
14      A.  Like I said, all the other 18 Republicans and
15  apparently, quite a few House members also were
16  co-sponsors.
17      Q.  So why are only these three of the co-sponsors,
18  these three legislators who co-sponsored or joint
19  sponsored the bill, listed in response to Interrogatory
20  Number 1?
21          MR. FREDERICK: You know, I let you ask
22  her a little bit. I'm very uncomfortable with this line
23  of questioning, because I think it invades attorney work
24  product that goes to the process of answering discovery,
25  and I object to the question on grounds of work product

JANICE MCCOY                                                                                    MAY 16, 2012

165

1  privilege, the work product immunity.
2       MS. MARANZANO: Okay. I mean, our
3  position is she signed a sworn declaration that this is
4  complete and accurate information.
5       MR. FREDERICK: I would disagree.
6       MS. MARANZANO: True and correct.
7       MR. FREDERICK: Yes, that I would agree
8  to.
9       MS. MARANZANO: And so our position is
10 that we should be able to question her about what she
11 did to make sure it was true and correct and what she
12 meant, you know, by listing these as the individuals who
13 are responsive to the request. It's about the three.
14      The question remains about the three
15 co-sponsors and joint -- and the -- about Representative
16 Aliseda, Representative Gonzalez, Representative Pena,
17 and why those three individuals are listed in response
18 to Interrogatory Number 1 and why the other co-sponsors
19 are not listed. So let's just, you know, be clear. Are
20 you going to instruct her not to answer that question?
21      MR. FREDERICK: No. I'll permit her to
22 respond subject to my objection.
23      Q. (By Ms. Maranzano) So the question is about why
24 Representative Pena, Gonzalez and Aliseda are listed
25 here, and the description provided for them is that they

166

1  were co-sponsors and joint sponsors. But my
2  understanding is that there a number of other co-
3  sponsors and joint sponsors who are not listed here.
4       A. And those names were provided by Representative
5  Harless's Office as people that were instrumental in
6  specifically drafting, proposing, and developing Senate
7  Bill 14. My assumption, when I signed this, was that
8  the other members that supported the legislation didn't
9  draft, propose, develop, or analyze the bill. They
10 supported it, but they didn't do those fours things.
11 And so that's, I think, probably how these members got
12 on the list and not every member.
13      Q. And was the person who provided these names to
14 you, Mr. Beuck?
15      A. Yes.
16      Q. And do you see that on Page 5, Mr. Beuck is,
17 is also listed?
18      A. Yes, ma'am.
19      Q. Would it surprise you to learn that
20 Representative Harless testified yesterday that
21 Mr. Beuck was not instrumental in drafting, developing,
22 and passing SB 14?
23      MR. FREDERICK: Object, mischaracterizes
24 the testimony and assumes facts not in evidence.
25      Q. (By Ms. Maranzano) Would you like to me to read

167

1  you testimony from yesterday?
2       A. Sure.
3       Q. The question was: "And the State of Texas has
4  indicated that Mr. Beuck assisted with the drafting,
5  development, and passage of SB 14 in the Texas House of
6  Representatives. Are you aware of any assistance that
7  Mr. Beuck provided concerning the drafting of SB 14?"
8       Representative Harless said, "I have no
9  idea."
10      "Were you aware of any assistance he
11 provided in the development of SB 14?"
12      Representative Harless said, "I have no
13 idea."
14      MR. FREDERICK: Can I get page and line
15 cite for that?
16      MS. MARANZANO: Yes. That is, of the
17 dirty transcript, at Page 201, Line -- I think I started
18 reading -- I read Line 12 through Line 20. And that's
19 of the transcript that we were sent last night, not the
20 final.
21      MR. FREDERICK: Thank you.
22      Q. (By Ms. Maranzano) Would that surprise you
23 Ms. McCoy?
24      A. That she didn't remember?
25      Q. That she has no idea if Mr. Beuck was involved

168

1  in the development, drafting, and passing of SB 14?
2       A. Yes.
3       Q. Can you look at -- below Mr. Beuck's name on
4  the interrogatories, Bryan Hebert and Julia Rathgeber?
5       A. Uh-huh.
6       Q. Can you tell me what Mr. Hebert's role was in
7  the drafting of SB 14?
8       MR. FREDERICK: Object on the grounds of
9  legislative privilege. To the extent you can answer
10 without revealing -- no, I'm going to object. I'm going
11 to object to that on legislative privilege and instruct
12 you not to answer.
13      A. I'll assert privilege.
14      Q. (By Ms. Maranzano) Can you tell me what
15 Mr. Hebert's role was in analyzing SB 14?
16      MR. FREDERICK: Object, legislative
17 privilege. Instruct you not to answer.
18      A. I'll assert privilege.
19      Q. (By Ms. Maranzano) Can you tell me what
20 Ms. Rathgeber's role was in assisting with the
21 development of SB 14?
22      MR. FREDERICK: Objection, legislative
23 privilege. Instruct you not to answer.
24      A. I'll assert privilege.
25      Q. (By Ms. Maranzano) And at the bottom of Page 5,

### 169

1. the top of Page 6, do you see Mr. Battle is listed as
2. somebody who assisted with the analysis of legal
3. questions relating to SB 14. Can you tell me what legal
4. questions Mr. Battle analyzed?
5.     MR. FREDERICK: Objection, legislative
6. privilege. Instruct you not to answer.
7.     A. I'll assert privilege.
8.     MS. MARANZANO: And is that even on what
9. issues he was looking at Mr. Frederick, what legal
10. issues he --
11.     MR. FREDERICK: Yeah, that reflects the
12. thought process in mental impressions.
13.     Q. (By Ms. Maranzano) And below Mr. Battle,
14. Mr. Brunson is listed as involved in the development of
15. SB 14. Can you tell me what his role was in the
16. development of SB 14?
17.     MR. FREDERICK: Objection, legislative
18. privilege. Instruct you not to answer.
19.     A. I'll assert privilege.
20.     Q. (By Ms. Maranzano) Can you turn to Page 7, and
21. there's two individuals who are listed as staff members
22. for Senator Tommy Williams, both Amanda Montague and
23. Ryan Larue. Can you tell me why these two staffers are
24. listed here, but Senator Williams is not?
25.     MR. FREDERICK: Again, this whole line of

### 170

1. questioning I object to. I object to that question on
2. the grounds of work product immunity.
3.     Q. (By Ms. Maranzano) Why don't we do this,
4. Ms. McCoy. Can you just look through the list and tell
5. me, as you sit here today, if this looks like a true and
6. correct list of individuals involved in the drafting,
7. development -- drafting, proposing, development or
8. analysis of SB 14?
9.     MR. FREDERICK: May I also note for the
10. record that the State -- I mean, as reflected in the
11. exhibit, the State made numerous objections to the
12. request, including overbreadth, undue burden.
13.     But you may answer to the extent you can.
14.     A. I think that potentially you could have listed
15. every elected official and every legislator in this
16. document. But I think this list is pretty complete,
17. given that Senate Bill 14 and how it was developed.
18.     Q. (By Ms. Maranzano) Every -- every legislator in
19. the Texas Senate could be listed as being involved in
20. the drafting, development --
21.     A. Or analysis.
22.     Q. -- or analysis?
23.     A. They all had a thought. They all had talked
24. about it. And if you wanted to just...
25.     Q. Did you consider listing every legislator in

### 171

1. response to Interrogatory Number 1?
2.     A. No.
3.     Q. Why not?
4.     MR. FREDERICK: I object. It's attorney
5. work product. I instruct you not to answer that
6. question.
7.     Q. (By Ms. Maranzano) Are you following your
8. counsel's advice not to answer?
9.     A. Yes.
10.     Q. In drafting SB 14, did you or the Senator
11. review any studies or reports or analysis that you
12. haven't already testified about today?
13.     MR. FREDERICK: You may testify to the
14. fact of yes or no whether you did.
15.     A. Yes.
16.     Q. (By Ms. Maranzano) What were those?
17.     MR. FREDERICK: Objection, legislative
18. privilege. Instruct you not to answer.
19.     Q. (By Ms. Maranzano) How many --
20.     A. Well, except that in the record, we referenced
21. more recent polls, more recent public opinion polls.
22. Those types of things weren't -- and they're in the
23. record, so I'll tell you that they were there.
24.     Q. Were there any polls or reports or studies or
25. analysis that you reviewed that are not in the public

### 172

1. record?
2.     MR. FREDERICK: Again, I'll instruct you
3. that you may answer to the question posed, which is a
4. yes-or-no question.
5.     A. Yes.
6.     Q. (By Ms. Maranzano) And for the record, what
7. were those?
8.     MR. FREDERICK: Objection, legislative
9. privilege. Instruct you not to answer.
10.     A. I'll assert privilege.
11.     Q. (By Ms. Maranzano) How many were there?
12.     MR. FREDERICK: You know what; I'm going
13. to object to that on legislative privilege and instruct
14. you not to answer as well. That goes to thought
15. processes and mental impressions.
16.     A. I'll assert privilege.
17.     Q. (By Ms. Maranzano) Who were the authors or who
18. conducted these reports or studies?
19.     MR. FREDERICK: Objection, legislative
20. privilege. Instruct you not to answer except to the
21. extent that the question includes matters that are on
22. the public record.
23.     A. The one in particular that's on the record is
24. the one led by Lighthouse.
25.     Q. (By Ms. Maranzano) Ms. McCoy, did you consider

JANICE MCCOY							MAY 16, 2012

### 173

1  including any additional forms of identification in
2  SB 14?
3      MR. FREDERICK: Objection, legislative
4  privilege. Instruct you not to answer the question.
5      A. I'll assert privilege.
6      Q. (By Ms. Maranzano) Did you consider including
7  identification forms that had expired?
8      MR. FREDERICK: Objection, legislative
9  privilege. Instruct you not to answer.
10     A. Except that -- the answer is yes, and there's
11 an amendment where we -- the original bill required it
12 to be valid and the amendment allowed expired photo IDs
13 to be used.
14     Q. (By Ms. Maranzano) And under SB 14, are you
15 allowed to use identification that has expired for a
16 length of time that is greater than 60 days?
17     A. No.
18     Q. So you're referring to the amendment that
19 allowed for identification, certain forms of
20 identification in SB 14 to be expired for 60 days --
21     A. Yes, ma'am.
22     Q. -- prior to the presentation? Thank you.
23        What was the purpose of excluding from
24 SB 14 the option that a voter could present two forms of
25 nonphoto ID?

### 174

1      MR. FREDERICK: Objection, legislative
2  privilege. Instruct you not to answer.
3      Q. (By Ms. Maranzano) What changed between 2009
4  and 2011 that would impact what forms of voter -- what
5  forms of identification would verify a voter's identity?
6      MR. FREDERICK: I object on legislative
7  privilege. To the extent there are matters in the
8  record that you can identify, you're free to do so, but
9  don't go beyond that.
10     A. On the record, Senator Fraser said he thought
11 the additional two years from 2009 to 2011 provided us
12 the opportunity to see that the states that had voter ID
13 were not -- that it was working.
14     Q. (By Ms. Maranzano) What do you mean by that?
15     A. That people were still voting, that turnout was
16 still fine, that there hadn't been any voter had come
17 forward that had been unable to vote.
18     Q. And are you referring to anything other than
19 what we already talked about with the Senator having
20 presented the actual turnout rates from Georgia and
21 Indiana?
22     A. No.
23     Q. And so I believe we discussed that the Senator
24 didn't do any -- whether the Senator did any additional
25 research other than looking at the turnout rates?

### 175

1      A. That's correct.
2      Q. Okay. Ms. McCoy, how often does a driver's
3  license photo need to be renewed?
4      A. I don't know.
5      Q. Do you know how often a driver's license needs
6  to be renewed?
7      A. Six years.
8      Q. Did you think it was an important consideration
9  to look into whether -- how recent a photo would be on
10 one of the forms of identification that you were
11 requiring under SB 14?
12     MR. FREDERICK: Objection, legislative
13 privilege. Instruct you not to answer.
14     A. I'll assert.
15     Q. (By Ms. Maranzano) Pursuant to SB 14, who will
16 be verifying the voter's identity when they -- well, who
17 looks at the --
18     A. The election worker.
19     Q. And how would they do that?
20     MR. FREDERICK: Objection to the extent it
21 calls for speculation. If you know, you can answer.
22     A. I think the legislation is designed for the
23 Secretary of State to write rules to implement that
24 provision.
25     Q. (By Ms. Maranzano) Do you know if there's going

### 176

1  to be additional training given to poll workers on that
2  topic?
3      A. I think under Senate Bill 14, the Secretary of
4  State is instructed to provide additional training.
5      Q. Did you discuss any of these regulations with
6  the Secretary of State's Office?
7      MR. FREDERICK: I'll object on legislative
8  privilege. To the extent it calls for communications
9  between you, Senator Fraser, and the Secretary of
10 State's Office about SB 14 or any other pending
11 legislation.
12     A. I'll assert privilege.
13     MS. MARANZANO: And just for the record to
14 be clear, are you asserting privilege over the fact of
15 whether or not she had a conversation with the Secretary
16 of State's Office?
17     MR. FREDERICK: I did not intend to, so if
18 you want to reask the question, I'm not intending to
19 prevent you from discovering that.
20     Q. (By Ms. Maranzano) Did you have conversations
21 with the Secretary of State's Office about SB 14?
22     A. Yes.
23     Q. How many?
24     A. Five or six.
25     Q. And when were those?