JANICE MCCOY											MAY 16, 2012

### 177

1  A. After the bill was filed, but prior to it being
2  heard in committee.
3  Q. Were those conversations in writing or verbal?
4  A. Verbal.
5  Q. Was anybody else a party to those
6  conversations?
7  A. Yes.
8  Q. And who was that?
9  A. Bryan Hebert.
10 Q. Anyone else?
11 A. I'm trying to think. It all runs together.
12 Ryan Larue, I think, was in on one of those meetings.
13 Amanda Montague, I think, was in on one of those
14 meetings.
15 Q. Anyone else?
16 A. I don't think so.
17 Q. And were those meetings about how SB 14 would
18 be implemented?
19     MR. FREDERICK: I want to just caution the
20 witness, the question asked, you may answer, but please
21 don't reveal the substance of any communication.
22     THE WITNESS: Right.
23 A. Yes.
24 Q. (By Ms. Maranzano) And what were the nature of
25 those conversations?

### 178

1      MR. FREDERICK: Object on the basis of
2  legislative privilege. Instruct you not to answer.
3  A. I'll assert privilege.
4  Q. (By Ms. Maranzano) Ms. McCoy, wouldn't it be
5  fair to say that the standards by which a poll worker is
6  going to verifying the identity of a voter is pretty
7  central to the purpose of SB 14?
8      MR. FREDERICK: Objection. Objection,
9  calls for speculation. Objection to the extent it calls
10 for thoughts and mental impressions about SB 14. I
11 object on the basis of legislative privilege and
12 instruct you not to answer.
13 A. I'll assert privilege.
14     MS. MARANZANO: Let's take a break.
15     (Recess from 3:46 p.m. to 3:56 p.m.)
16     MS. MARANZANO: Back on the record.
17 Q. (By Ms. Maranzano) Ms. McCoy, you testified
18 earlier that under SB 362, a voter could show a state or
19 a federal-issued photo ID; is that correct?
20 A. Yes, ma'am.
21 Q. What was the purpose of removing that form of
22 photo identification from the required forms of ID
23 allowed under SB 14?
24     MR. FREDERICK: Objection, legislative
25 privilege. Instruct you not to answer.

### 179

1  Q. (By Ms. Maranzano) What was the purpose of
2  removing from SB 14 the option for voters to show a
3  valid employee ID?
4      MR. FREDERICK: Objection, legislative
5  privilege. Instruct you not to answer.
6  Q. (By Ms. Maranzano) Did any legislators express
7  concern to Senator Fraser that the election
8  identification certificate pursuant to SB 14 would be
9  difficult for their constituents to obtain?
10     MR. FREDERICK: I'll object on legislative
11 privilege. However, to the extent any concerns were
12 raised on the Floor in committee, you may testify about
13 that.
14 A. I don't recall. Yeah. That was added by the
15 conference committee, and so I -- the debate on the bill
16 at that point, I don't think anybody raised it on the
17 Floor.
18 Q. (By Ms. Maranzano) Prior to the addition of
19 the election identification certificate, was there a
20 provision that allowed for a different sort of
21 pre-identification in SB 14?
22 A. Yes.
23 Q. And was that a form of identification that
24 needed to be obtained at driver's license offices?
25 A. Yes, ma'am.

### 180

1  Q. And does the election identification
2  certificate also need to be obtained at driver's license
3  offices?
4  A. Yes, ma'am.
5  Q. Did anybody testify on the Floor about the
6  distance their constituents would need to travel to get
7  to a driver's license office?
8  A. Yes, ma'am.
9  Q. Did anybody testify on the Floor about the lack
10 of public transportation options available to driver's
11 license offices?
12 A. I don't specifically remember that point being
13 raised, but I'm sure it was.
14 Q. Did anybody testify on the Floor about the wait
15 times at driver's license offices?
16 A. Yes.
17 Q. Did anybody testify on the Floor about the cost
18 of obtaining the required underlying documentation to
19 obtain the identification that needed to be issued free
20 of charge under SB 14?
21 A. I don't specifically recall, but I assume yes.
22 Q. What was the Senator's response to these
23 concerns that were raised on the Floor?
24     MR. FREDERICK: I'll just object,
25 legislative privilege, only to the extent the question

### 181

1. could be construed to ask for confidential privileged
2. communications, but anything on the Floor, you may
3. testify about.
4.    A. I don't remember how he responded to those
5. particular complaints on the Floor specifically.
6.    Q. (By Ms. Maranzano) Did he conduct any
7. analyses, or did you conduct any analysis at his request
8. on any of these issues?
9.       MR. FREDERICK: Objection, legislative
10. privilege. Instruct you not to answer.
11.    A. I'll assert.
12.    Q. (By Ms. Maranzano) You'll assert the
13. privilege?
14.    A. Yes, ma'am.
15.    Q. What were the circumstances by which the
16. license to carry a concealed handgun were included in SB
17. 14?
18.       MR. FREDERICK: Object on the grounds of
19. legislative privilege, to the extent it seeks thoughts,
20. mental impressions or confidential communications among
21. legislators or staff or agencies. To the extent you can
22. answer without revealing any of that, you may.
23.    A. It was added as an amendment by Senator
24. Hinojosa.
25.    Q. Do you know the racial composition of license

### 182

1. to carry license holders?
2.    A. No.
3.    Q. Is it disproportionately white relative to
4. Texas registered voters?
5.    A. I do not know.
6.    Q. Are you aware of whether any staff or
7. legislator investigated the racial composition of
8. license to carry holders?
9.       MR. FREDERICK: I'll object only to the
10. extent that it seeks the substance or nature of the
11. investigations, whether or not you were aware, you may
12. answer.
13.    A. I am not aware.
14.    Q. (By Ms. Maranzano) Was there any discussion
15. expressing concern that this form of identification
16. might disproportionately favor white voters?
17.       MR. FREDERICK: Object on the grounds of
18. legislative privilege, to the extent there was
19. discussion on the Floor and committee on the record, you
20. may answer.
21.    Q. (By Ms. Maranzano) Are you asserting
22. privilege?
23.    A. Well, Senator Hinojosa offered the amendment,
24. so I think -- I don't -- I can't speak to his research
25. on the bill or on his amendment.

### 183

1.    Q. Was there any discussion expressing concern
2. that this form of ID might disproportionately favor
3. white voters?
4.       MR. FREDERICK: Same objection,
5. legislative privilege, only to the extent it seeks
6. confidential communications, but to the extent that
7. there were.
8.    A. Not that I know of.
9.    Q. (By Ms. Maranzano) How did the exception for
10. individuals with disabilities come to be included in SB
11. 14?
12.       MR. FREDERICK: Object on legislative
13. privilege, only to the extent it seeks confidential
14. communications and thought processing and mental
15. impressions. To the extent it seeks information about
16. the legislative process or testimony, you may answer.
17.    A. Senator Patrick offered an amendment, and
18. Senator Fraser accepted it.
19.    Q. (By Ms. Maranzano) What was the purpose of
20. this provision?
21.       MR. FREDERICK: Object to the legislative
22. privilege. I instruct you not to answer.
23.    A. I think that the record -- Senator Patrick
24. probably on the record said why he wanted to include
25. it. I don't recall what he said.

### 184

1.    Q. (By Ms. Maranzano) Was this amendment in
2. response to concerns by any particular groups or
3. constituencies?
4.       MR. FREDERICK: Object on the basis of
5. legislative privilege. To the extent there's -- you
6. have any nonprivileged basis to answer, you may.
7.    A. I think that -- well, again, I don't want to
8. speak for Senator Patrick because I -- I don't want to
9. speak for Senator Patrick. But there was an individual
10. that testified on the Floor during the Senate committee
11. debate that was fairly moving, and I think Senator
12. Patrick wanted to do something to help him.
13.    Q. (By Ms. Maranzano) What was the general nature
14. of that testimony?
15.    A. I don't know. I didn't listen to it.
16.    Q. Was there any testimony on the Floor related to
17. difficulties other individuals might have obtaining
18. identification?
19.    A. I don't know. I didn't listen to the
20. testimony.
21.    Q. What -- what was your -- your role during the
22. Floor consideration of SB 14?
23.       MR. FREDERICK: I would just caution you
24. not to reveal any confidential communications or mental
25. impressions or thought process, but as to your -- the

JANICE MCCOY                                                              MAY 16, 2012

### 185

1. process, you may answer.
2. A. It was the same as what we had testified
3. earlier, I think, on the Senate bill 362, and I sat next
4. to the Senator and helped him with his debate and
5. providing him information that he asked me to provide
6. him during the debate.
7. Q. (By Ms. Maranzano) So you were on the Floor
8. with him during the debate?
9. A. During the Committee of the Whole, yes, ma'am.
10. Q. And when you say this individual testified with
11. moving testimony that potentially led Senator Patrick to
12. include this exemption, was that during the Committee of
13. the Whole?
14. A. Yes, ma'am.
15. Q. How did the exception for individuals with
16. religious objections to being photographed come to be
17. included in SB 14?
18.     MR. FREDERICK: I'll object only to the
19. extent that it seeks confidential communications,
20. thought processes or mental impressions. But to the
21. extent it seeks the process or public discussion, you
22. may answer.
23. A. I'll assert privilege. I don't -- yeah.
24.     MR. FREDERICK: I mean, just -- I want to
25. be clear with you. I'm not instructing her not to

### 186

1. answer about when it was introduced or how it became
2. part of the bill. And so I think if you want to probe
3. that further, I'm not objecting to that part.
4.     MS. MARANZANO: Okay.
5. Q. (By Ms. Maranzano) Was that provision added in
6. response to any particular concern, Ms. McCoy?
7.     MR. FREDERICK: I'll just -- only to the
8. extent it seeks mental impressions, communications, but
9. if there's testimony, Floor testimony, and if you know,
10. you may answer.
11. A. There was not Floor testimony on that issue.
12. Q. (By Ms. Maranzano) During the drafting of the
13. legislator's consideration of SB 14, was there analysis
14. of the cost that a voter would need to take -- the cost
15. or the steps the voter would need to take to obtain an
16. election identification certificate?
17.     MR. FREDERICK: Objection, legislative
18. privilege. Instruct you not to answer.
19. A. I'll assert privilege.
20. Q. (By Ms. Maranzano) What documents are needed
21. to obtain an election identification certificate?
22. A. I don't know.
23. Q. Was that something that you -- I'm sorry. You
24. can finish your answer.
25. A. I used to know, but I don't know now.

### 187

1. Q. Was that something that you looked into while
2. developing SB 14?
3. A. Yes, ma'am.
4. Q. And were the costs, in particular, something
5. that you looked into while developing SB 14?
6.     MR. FREDERICK: Object on the grounds of
7. legislative privilege. Instruct you not to answer.
8. A. I'll assert privilege.
9. Q. (By Ms. Maranzano) If there are costs to
10. obtaining underlying documentation for the election
11. identification certificate, is it fair to say the
12. election identification certificate is not actually
13. free?
14.     MR. FREDERICK: Object to the form of the
15. question. Object, it calls for speculation. And object
16. to relevance. If you -- if you have an opinion, you may
17. answer.
18. Q. (By Ms. Maranzano) Do you have an opinion?
19. A. I do not.
20. Q. You have no opinion on that?
21. A. I don't know which documents are required to
22. get an ID at this point. I don't remember. And so I
23. don't recall why people wouldn't or would not have
24. them. So my opinion, I mean, I'd have to go back and
25. kind of look.

### 188

1. Q. If -- if you were to determine that there were
2. costs to obtaining those underlying documentations for
3. an individual who did not have them --
4. A. Right.
5. Q. -- would you say it would be fair to
6. characterize the election identification certificate as
7. free?
8.     MR. FREDERICK: Objection to the form of
9. the question. You can answer if you can.
10. A. I suppose not.
11. Q. (By Ms. Maranzano) Do you know when driver's
12. license offices are open in Texas?
13. A. I do not.
14. Q. Does SB 14 require employers to provide paid
15. leave to obtain an ID?
16. A. No.
17. Q. Do some individuals in Texas live at least 50
18. miles from a driver's license office?
19. A. I think there was testimony to that effect,
20. yes.
21. Q. How much does gas cost in Texas?
22. A. Texas is a big state. It varies. I think in
23. Austin right now it's 3.55 a gallon.
24. Q. So how much would it cost for somebody to drive
25. a hundred miles round trip?

JANICE MCCOY                                                              MAY 16, 2012

### 189

1    MR. FREDERICK: Objection, calls for
2    speculation.
3    A. Depends on their car, how they drive.
4    Q. (By Ms. Maranzano) Do you know whether any
5    racial or ethnic group is more likely than not have the
6    necessary ID to obtain the election identification
7    certificate?
8    MR. FREDERICK: I'll object only to the
9    time extent that this can be construed to seek
10   information related to the development of SB
11   14. Insofar as you can answer based on your knowledge,
12   sitting here today, you may answer.
13   A. Can you repeat the question?
14   Q. (By Ms. Maranzano) Is there any racial or
15   ethnic group that is more likely to not possess the
16   underlying documentation needed to obtain election
17   identification certificate?
18   A. I do not know.
19   Q. Is that something that you ever looked into
20   during the development of SB 14?
21   MR. FREDERICK: Objection, legislative
22   privilege. I instruct you not to answer.
23   A. I'll assert privilege.
24   Q. (By Ms. Maranzano) Did you ever look into or
25   analyze who among registered voters would be -- might

### 190

1    not have the forms of identification included in SB 14?
2    MR. FREDERICK: Objection, legislative
3    privilege. I instruct you not to answer, except to the
4    extent you can do so based on nonconfidential matters or
5    nonprivileged matters.
6    A. The specific question again was?
7    Q. (By Ms. Maranzano) Did you ever research or
8    analyze who among registered voters in Texas would be
9    more likely or less likely to have the required forms of
10   identification under SB 14?
11   A. No.
12   Q. No, you never looked into that?
13   A. That is correct.
14   Q. Why not?
15   MR. FREDERICK: Objection, legislative
16   privilege. Instruct you not to answer.
17   A. I'll assert privilege.
18   Q. (By Ms. Maranzano) Would you agree that that
19   might be a relevant inquiry pursuant to Section 5?
20   MR. FREDERICK: Objection, calls for
21   speculation. Objection, calls for a legal opinion. You
22   can answer if you can.
23   A. As I testified earlier, I didn't really
24   consider Section 5 when I was helping the Senator
25   develop this bill.

### 191

1    Q. (By Ms. Maranzano) Did the Senator seek legal
2    advice from anybody about to ensure that Senate Bill 14
3    would comply with Section 5?
4    MR. FREDERICK: I'm going to object on the
5    grounds that it seeks information within the attorney-
6    client privilege. I think the fact that he might have
7    sought some legal would not itself be privileged, but
8    the question -- the question entails the substance of
9    the advice that he may or may not have sought, so I
10   object on that ground.
11   MS. MARANZANO: And you're instructing
12   Ms. McCoy not to answer?
13   MR. FREDERICK: Yes. Yes.
14   Q. (By Ms. Maranzano) Are you going to follow
15   your counsel's advice?
16   A. Yes, ma'am.
17   Q. Was the passage of SB 14 a priority for Senator
18   Fraser?
19   MR. FREDERICK: I'll object on legislative
20   privilege and instruct you not to answer as to the
21   extent it calls for confidential communications, but to
22   the extent it's in a public statement or testimony, you
23   can answer.
24   A. I think the answer is he consistently told his
25   constituents that he thought voter ID needed to be

### 192

1    passed.
2    Q. (By Ms. Maranzano) Did his constituents ask
3    for him to pass some sort of voter ID law?
4    MR. FREDERICK: We'll object to the extent
5    that seeks -- to the extent it seeks the substance of
6    any particular constituent communication. If you can
7    answer based on nonconfidential communications from
8    constituents, you may answer.
9    A. I assert the privilege.
10   Q. (By Ms. Maranzano) Was passage of SB 14 a
11   priority for Governor Perry?
12   A. He declared it an emergency. I can't speak
13   further than that.
14   Q. Was passage of the SB 14 a priority for any
15   interest groups that you're aware of?
16   A. Not that I'm aware of, no.
17   Q. What was the purpose of SB 14?
18   MR. FREDERICK: I'm just going to give a
19   cautionary instruction. You may testify about the
20   purpose of SB 14 to the extent you know. I would only
21   caution you not to reveal the substance of the
22   confidential communications between yourself and the
23   legislature or any legislative thought process or mental
24   impressions. But as to the purpose of the bill, you may
25   testify.

JANICE MCCOY                                                              MAY 16, 2012

### 193

1   A. Senator Fraser consistently said on the record
2   that his purpose was to stop in-person voter fraud.
3   Q. (By Ms. Maranzano) Were there any additional
4   purposes to SB 14?
5   A. Election integrity.
6   Q. What does that mean?
7   A. It means -- it means that elections are valid
8   and true and there isn't fraud.
9   Q. Any other purposes?
10  A. (Witness shakes head no.) No. I'm sorry.
11  Q. Thank you. Were there any purposes of SB 14
12  that were not stated on the public record?
13  MR. FREDERICK: Object, legislative
14  privilege. Instruct you not to answer.
15  Q. (By Ms. Maranzano) Are you following your
16  counsel's advice?
17  A. I am.
18  Q. Was any part of the purpose of SB 14 to
19  decrease the number of Hispanic voters?
20  MR. FREDERICK: Object, legislative
21  privilege. Instruct you not to answer.
22  A. I'll assert privilege.
23  Q. (By Ms. Maranzano) Was any part of the purpose
24  of SB 14 to decrease the number of any group of minority
25  voters?

### 194

1   MR. FREDERICK: Objection, legislative
2   privilege. I'll instruct you not to answer.
3   A. I'll assert.
4   Q. (By Ms. Maranzano) Was any part of the purpose
5   of SB 14 to discriminate in any way against any group of
6   minority voters?
7   MR. FREDERICK: Objection, legislative
8   privilege. Instruct you not to answer.
9   A. Assert the privilege.
10  Q. (By Ms. Maranzano) Was any part of the purpose
11  of SB 14 for partisan purposes?
12  MR. FREDERICK: Objection, legislative
13  privilege. I'll instruct you not to answer.
14  A. Assert the privilege.
15  Q. (By Ms. Maranzano) Did the purpose of photo ID
16  in Texas evolve over time in legislative sessions?
17  MR. FREDERICK: Object on the basis of
18  legislative privilege. Instruct you not to answer
19  unless you can do so based on public statements or
20  testimony.
21  A. Senator Fraser's stated purpose has always been
22  to be prevent in-person voter fraud across the sessions.
23  Q. (By Ms. Maranzano) Have you ever heard of a
24  voter who decides not to vote on election day because
25  they're worried their vote will be diluted by a

### 195

1   nonlegitimate voter?
2   A. No.
3   Q. Who are the main opponents of SB 14?
4   A. I think the Senate Democrats, Democrat
5   members. I think the Texas Democratic party.
6   Q. Did any minority members of the Senate support
7   SB 14?
8   MR. FREDERICK: Object on legislative
9   privilege, only to the extent that support or opposition
10  was expressed confidentially by a legislator or staff
11  member to you.
12  A. No minority senator voted for the bill.
13  Q. (By Ms. Maranzano) Did any groups representing
14  minority voters support SB 14?
15  MR. FREDERICK: Same cautionary
16  instruction. You may answer to the extent that you know
17  from public statements or the legislative record, but
18  caution you not to reveal any privileged matter
19  communicated to you by a constituent.
20  A. I don't know.
21  Q. (By Ms. Maranzano) Did the Senator consider
22  any alternative legislative measures that would have
23  deterred voter fraud?
24  MR. FREDERICK: Objection, legislative
25  privilege, and instruct you not to answer.

### 196

1   A. I'll assert.
2   Q. (By Ms. Maranzano) What was the Senator's
3   strategy to ensure that Senate Bill 14 was passed?
4   MR. FREDERICK: Objection, legislative
5   privilege. Instruct you not to answer.
6   A. I'll assert.
7   (Exhibit 38 marked for identification.)
8   Q. (By Ms. Maranzano) Ms. McCoy, I'm showing you
9   what we marked as Deposition Exhibit 38. Do you
10  recognize what this -- what this is?
11  A. Yes.
12  Q. What is it?
13  A. It's the Senate Rules Adopted by the 82nd
14  Legislature.
15  Q. And this, what I've given you is actually the
16  table of contents and some portion of the rules. It's
17  not the entire set of Senate rules. Can you look at the
18  table of contents and tell me what procedural rules are
19  implicated by the consideration of SB 14, what
20  procedural rules were applied to SB 14's consideration?
21  MR. FREDERICK: Objection, vague. You can
22  answer if you can.
23  A. I'm not sure.
24  Q. (By Ms. Maranzano) Oh, you know what, that
25  looks like it's highlighted.

JANICE MCCOY                                                                    MAY 16, 2012

**197**

1  A. It is highlighted. Is that the one you want?
2     MS. MARANZANO: Why don't we mark a clean
3  one for the record.
4     MR. FREDERICK: Here, that one's got a
5  mark on it. I've got a clean one right here.
6     MS. MARANZANO: Thank you.
7     MR. FREDERICK: Here's your highlighted
8  one.
9     (Clean copy Exhibit 38 exchanged for
10 highlighted copy originally marked.)
11 A. I don't --
12 Q. (By Ms. Maranzano) If you look -- let's look
13 at Rule 5.11.
14 A. Yes, ma'am.
15 Q. Subsection D of 5.11. Is that the same
16 provision that we talked about earlier that was included
17 in the 2009 rules that carves out voter identification
18 requirements from the two-thirds rule?
19 A. Yes, ma'am.
20 Q. And can you look at Rule 16 for me?
21    You can scratch looking at Rule 16.
22    THE REPORTER: I'm sorry. I didn't get
23 that.
24    MS. MARANZANO: I said she could scratch
25 reviewing Rule 16.

**198**

1  Q. (By Ms. Maranzano) Can you look at Rule 12.03
2  about conference committees?
3  A. Yes, ma'am.
4  Q. And do you see that Section 4 states -- well,
5  can you read Section 4 for me and tell me what your
6  understanding of that subsection of the rule is?
7  A. "Add text on any matter which is not included
8  in either the House or Senate version of the bill or
9  resolution."
10 Q. What's your understanding of what this rule
11 does?
12 A. That rule says that when a bill is in
13 conference committee, they -- the conference committee
14 should not consider including provisions that weren't in
15 either of the House or Senate passed versions.
16 Q. How many times have you seen that section of
17 the rule disregarded while you've worked for Senator
18 Fraser?
19 A. Probably happens 20 to 30 times a session.
20 Q. What type of bills does that happen on?
21 A. All types.
22 Q. Was SB 14 considered by any -- you know what,
23 scratch that. I think we've talked about that already.
24    What did you do to ensure that Senator
25 Fraser was prepared for Floor consideration of SB 14?

**199**

1     MR. FREDERICK: Object based on
2  legislative privilege, to the extent it calls for
3  substance of any communication or your thought process
4  or Senator Fraser's thought process. However, to the
5  extent you can answer without revealing that, you may
6  describe your preparation.
7  A. Typically, when we do floor prep for Senate
8  Bill 14 or any bill, we put together a bill book, which
9  includes the bill, the bill analysis, the fiscal notes,
10 any supporting documentation and talking points. And
11 that's what I did for Senate Bill 14.
12 Q. (By Ms. Maranzano) And do you write the
13 talking points?
14 A. Yes. Or -- not for every bill. I did for
15 Senate Bill 14.
16 Q. And is the bill analysis what we've previously
17 discussed, a section-by-section analysis of the bill?
18 A. Yes, ma'am.
19 Q. And do you write that?
20 A. No, ma'am.
21 Q. Who does?
22 A. Those are prepared through the committee
23 process, and I think the Senate Research Center prepares
24 those.
25 Q. Are you familiar with this Floor testimony on

**200**

1  SB 14?
2  A. Generally.
3  Q. And I believe you testified earlier you were
4  with the Senator, correct?
5  A. For some of it. I don't -- I think I got up
6  and left for part of it. Actually, I know I got up and
7  left for part of it.
8  Q. During the Floor consideration of SB 14, did
9  Senator Fraser answer any questions about SB 14 by
10 saying he was not advised?
11 A. Can we be clear when we're talking about Floor
12 consideration, Committee of the Whole consideration
13 or Floor? Specifically when we talk about the Floor,
14 it's when they're actually in session on the Floor. The
15 Committee of the Whole meets on the senate Floor, just
16 because there's no other place for them to meet.
17    So during the Committee of the Whole
18 debate, there were times that Senator Fraser said "I'm
19 not advised."
20 Q. What does that mean, "I'm not advised"?
21    MR. FREDERICK: Object, based on
22 legislative privilege, only to the extent it asks for
23 Senator Fraser's thought process or mental impressions.
24 To the extent you can answer from your own personal
25 knowledge of what "I'm not advised" means, you may.

JANICE MCCOY							MAY 16, 2012

## 201

1  A. Typically, when a senator says that, it means
2  they don't know.
3  Q. (By Ms. Maranzano) About how many questions
4  did he answer by saying "I'm not advised"?
5  A. I don't know.
6  Q. Can you approximate?
7  A. No.
8  Q. Would you say it was hundreds?
9  A. I don't remember.
10 Q. Isn't it part of the Senator's role as author
11 of the bill to answer questions about the bill?
12     MR. FREDERICK: Objection, argumentative.
13 You may answer.
14 A. The Senator offered his colleagues that he
15 didn't know the answer to some questions and that
16 resource and expert witnesses were going to testify
17 later during the committee, and those questions would be
18 better addressed to those resource expert witnesses.
19 Q. (By Ms. Maranzano) Did anyone instruct Senator
20 Fraser not to answer substantive questions about SB 14
21 during the Committee of the Whole?
22     MR. FREDERICK: Objection, legislative
23 privilege. Instruct you not to answer.
24 A. I'll assert privilege.
25 Q. (By Ms. Maranzano) During -- during the

## 202

1  Committee of the Whole's consideration of SB 14, did
2  anyone raise concerns about the impact of SB 14 on
3  minority voters?
4  A. Yes.
5  Q. What was the Senator's response?
6  A. I don't remember.
7  Q. You don't recall how he responded?
8  A. (Witness shakes head no.)
9  Q. Did numerous senators raise concerns about the
10 impact of SB 14 on minority voters?
11     MR. FREDERICK: Objection, legislative
12 privilege, only to the extent it calls for confidential
13 communications. Anything on the committee or on the
14 Floor, you may testify about.
15 A. I think that 10 of the 12 Democrat senators
16 testified against the bill during the Committee of the
17 Whole. May have been 9. May have been 11. It wasn't
18 all 12.
19 Q. (By Ms. Maranzano) But my question was about
20 testimony related to concerns about the impact of SB 14
21 on minority voters. It not about --
22 A. I don't recall what they said. I know that
23 many senators testified against the bill, but I can't
24 recall what each of them said. So I cannot answer that
25 question.

## 203

1  Q. Was that testimony that you would consider to
2  be important?
3     MR. FREDERICK: Objection, vague. You may
4  answer.
5  A. To some people, yes.
6  Q. (By Ms. Maranzano) How about to you?
7  A. No.
8  Q. Why not?
9  A. I just work for the Senator. I don't --
10 Q. Well, part of your job in working for the
11 Senator is giving him advice on this bill, is it not?
12 A. Yes.
13 Q. And so the impact of this bill on minority
14 voters is a relevant consideration, is it not?
15 A. Yes.
16 Q. So I'm just wondering why that wasn't an
17 important testimony to you.
18     MR. FREDERICK: Object to the extent it
19 mischaracterizes the testimony, but you may answer if
20 you can.
21 A. I think that the position that the Senator had
22 relative to this bill wasn't going to change because of
23 testimony we heard in January of 2011, because we heard
24 the same testimony in January of 2009, and we heard the
25 same testimony in May of '07.

## 204

1  So the testimony is important to the
2  people that were giving it, mainly, I think, because
3  they were trying to put it on the record for you guys,
4  but it wasn't going to change my recommendations to the
5  Senator on how to proceed with this legislation.
6  Q. (By Ms. Maranzano) Did you take any actions
7  with regard to Senate Bill 14 in response to those
8  concerns?
9     MR. FREDERICK: Objection, legislative
10 privilege. Instruct you not to answer.
11 A. I'll assert privilege.
12     (Exhibit 39 marked for identification.)
13 Q. (By Ms. Maranzano) I'm showing you what we've
14 marked for the record as Deposition Exhibit 39. Can you
15 turn to the label at the bottom, Texas 00000098, and
16 look at the portion of the print?
17     Well, let me ask you first, do you
18 recognize this document, or can you tell me what this
19 document is?
20 A. I've never seen this document, but it is a
21 transcript of the Committee of the Whole from Tuesday,
22 January 25, 2011.
23 Q. Can you look at the transcript Page 168. And
24 do you see that there's a question posed by Senator West
25 as to whether the forms of identification that are

### 205

1  listed in the bill are the least restrictive options in
2  order to achieve the goal of avoiding what you have said
3  is voter identification fraud?
4     A.  Uh-huh.  Yes.
5     Q.  And can you look at Senator Fraser's answer to
6  that?
7     A.  (Witness complies.)
8     Q.  Is that a topic that you looked into prior to
9  introducing Senate Bill 14 of whether this was the least
10 restrictive way to achieve the Senator's goal?
11       MR. FREDERICK:  Objection, legislative
12 privilege.  Instruct you not to answer.
13    A.  I'll assert privilege.
14    Q.  (By Ms. Maranzano)  Can you tell me anything
15 about that topic based on the comments that were made in
16 public during the Committee of the Whole, Ms. McCoy?
17       MR. FREDERICK:  Object to the form, but
18 you may answer.
19    A.  Well, I can speak to what Senator Fraser said.
20 The Secretary of State had provided us information,
21 which he referenced here, showing that people -- 91
22 percent of voters registered with their driver's license
23 under HAVA.
24    Q.  (By Ms. Maranzano)  90 percent of the -- of
25 voter registration applicants registered with their

### 206

1  driver's license number?
2     A.  Under the HAVA requirement.
3     Q.  And do you know when HAVA started requiring
4  people to write down their driver's license number?
5     A.  Texas passed its version of HAVA in 2005, so I
6  would assume it took a while to make sure -- it started
7  probably that fall of 2005 or 2006.  Sometimes we start
8  things in January of the next year.
9     Q.  And did anybody ever -- or did you or the
10 Senator ever conduct any analysis of who those 10
11 percent, approximately 10 percent of registered voters
12 without driver's license numbers might be and whether or
13 not they might have any other forms of identification?
14       MR. FREDERICK:  Objection, legislative
15 privilege, and instruct you not to answer.
16    A.  I'll assert privilege.
17    Q.  (By Ms. Maranzano)  Okay.  I'm going to have
18 this marked.
19       (Exhibit 40 marked for identification.)
20    Q.  (By Ms. Maranzano)  I'm showing you what we are
21 marking as Deposition Exhibit 40, which is a transcript
22 of another transcript of the Committee of the Whole from
23 Tuesday, January 26, 2011.
24       Can you look at the second page of this
25 document that's labeled on the transcript as Page 189 at

### 207

1  the top?  Actually, the quote starts -- I'm sorry.  The
2  quote starts on Page 188 from Senator Fraser.  If you
3  can just take a look at that.
4        Does that appear to be saying that there
5  are very small differences between Texas's bill and
6  Indiana and Georgia's bill?
7     A.  That does what it seems to be saying.
8     Q.  Are you familiar with the Indiana and Georgia
9  photo identification requirement?
10    A.  No.
11    Q.  Didn't you testify earlier that you had looked
12 at those two states when you were developing SB 14 362?
13    A.  We looked at voter turnout from those two
14 states.  I never looked at the legislation.
15    Q.  So, Ms. McCoy, you've never looked at either
16 Indiana or Georgia's photo identification requirements?
17    A.  I might have printed out a copy of Indiana's,
18 and I might have seen a table that included the
19 different IDs that allowed under every state's photo ID
20 law, but I've never looked at Indiana or Georgia's
21 legislation in depth, no.
22    Q.  So do you have any position on whether the
23 Indiana and Georgia identification requirements are
24 similar to SB 14?
25    A.  I do not have a position, no.

### 208

1        (Exhibit 41 marked for identification.)
2     Q.  (By Ms. Maranzano)  Okay.  I'm showing you what
3  we've marked as Deposition Exhibit --
4        MR. FREDERICK:  Do you have one for me?
5        MS. MARANZANO:  Sorry.  I only have one
6  copy.
7        MS. WESTFALL:  Can you look on with the
8  witness?
9        MR. FREDERICK:  Oh, yeah, yeah, I'll look
10 at this one.
11    Q.  (By Ms. Maranzano)  Ms. McCoy, this is a
12 transcript from July 26, 2011.  The Committee of the
13 Whole's consideration of SB 14.  I'm going to direct you
14 to certain pages, but I want to say at the beginning,
15 this transcript has two sets of pagination.  On the
16 left-hand side, it says "CD Number" and "Section
17 Number," and then it also has a page.  So I will give
18 you both of those, because it has -- the pagination
19 restarts with every CD and section number.
20    A.  Okay.  But I want to clarify this isn't from
21 the Committee of the Whole.  This is from when the
22 Senate was actually in session as the Senate.
23    Q.  Okay.  Thank you for that clarification.
24    A.  You're welcome.
25    Q.  Can you turn to Page 34 on CD 1, Section 1?

JANICE MCCOY                                                      MAY 16, 2012

### 209

1.    A. Hold on. Okay.
2.    Q. Were you on the Floor with the Senator during
3. -- during the Floor consideration on January 26th of SB
4. 14?
5.    A. Yes, but --
6.    Q. Yes, but?
7.    A. Can I just clarify?
8.    Q. Yes, please.
9.    A. During the Committee of the Whole, I could
10. actually be inside the rail right next to the Senator.
11. When the Senate was in full session, I had to be outside
12. the rail away from the Senator's desk.
13.    Q. Okay. Did you communicate with the Senator
14. during that time?
15.    A. As much as you can if they turn around and look
16. at you.
17.    Q. You didn't -- you didn't communicate by a
18. Blackberry or cell phone?
19.    A. No, ma'am.
20.    Q. Okay. Can you take a look at on Page 34, where
21. it starts with the testimonies by Davis? Can you just
22. take a look at that?
23.    A. I think I'm on the wrong page.
24.       MR. FREDERICK: I think you're on Section
25. 2. Got Section 1.

### 210

1.    A. Okay.
2.       MR. FREDERICK: Yeah.
3.    A. Okay.
4.    Q. (By Ms. Maranzano) Can you just take look at
5. that amendment which starts with Davis? And then the
6. action that's taken on that amendment is lower on the
7. page. Do you recall this amendment being offered?
8.       MR. FREDERICK: Just to clarify, is
9. this -- is it Floor Amendment 12 we're talking about?
10.       MS. MARANZANO: Yes. I think that's
11. right.
12.    A. I don't recall, because I'm not seeing the text
13. of the amendment.
14.    Q. (By Ms. Maranzano) Uh-huh.
15.    A. So I don't -- I don't recall.
16.    Q. Do you recall that Senator Davis introduced an
17. amendment to prohibit state agencies from charging fees
18. for the issuance of any acceptable ID under SB 14?
19.    A. Not really, no.
20.    Q. Do you recall that Senator Fraser moved to
21. table that amendment?
22.    A. I mean, I can see that he did. I don't recall
23. this particular part of the debate.
24.    Q. Did you have any role in recommending to him
25. how to handle amendments to SB 14?

### 211

1.       MR. FREDERICK: Well, you may answer the
2. question whether or not you had a role.
3.    A. Yes.
4.    Q. (By Ms. Maranzano) What was your role?
5.       MR. FREDERICK: I'll object to legislative
6. privilege, to the extent it seeks confidential
7. communications, thought processes or mental
8. impressions. But to the extent you can describe your
9. role without going into that, then you may answer the
10. question.
11.    A. I provided the Senator with some thoughts on
12. what he could say if certain amendments that we thought
13. were going to be introduced were introduced.
14.    Q. (By Ms. Maranzano) And did you provide him
15. with a recommendation on how to vote on certain
16. amendments?
17.       MR. FREDERICK: Just caution you, I mean,
18. you can answer the question as phrased, whether or not
19. you offered a recommendation.
20.    A. I did not.
21.    Q. (By Ms. Maranzano) Why -- well, how would this
22. amendment introduced by Senator Davis have interfered
23. with the Senator's goals of deterring voter fraud?
24.       MR. FREDERICK: Object on legislative
25. privilege.

### 212

1.    Q. (By Ms. Maranzano) Ms. McCoy, as you're
2. sitting here today, are you aware of any ways in which
3. not charging for the acceptable forms of identification
4. under SB 14 would interfere with the goal of deterring
5. in-person voter impersonation?
6.    A. No.
7.    Q. Can you turn to what's labeled as CD-1, Section
8. 2, Page 28 through 30?
9.    A. (Witness complies.)
10.    Q. You see that this testimony is related to an
11. amendment proposed by Senator Ellis that would have
12. required the Secretary of State to conduct a study
13. including information about the number of eligible
14. voters who are prevented from voting or have to vote
15. provisionally because they lacked an ID?
16.    A. Yes.
17.    Q. And do you recall that amendment being offered?
18.    A. Yes, ma'am.
19.    Q. Did you provide a recommendation to Senator
20. Fraser as to how to handle that amendment?
21.       MR. FREDERICK: I'll caution. You can
22. answer the question as phrased, as long as you don't
23. reveal the substance of any confidential communication.
24.    A. No.
25.    Q. (By Ms. Maranzano) Did Senator Fraser move to

JANICE MCCOY                                                                           MAY 16, 2012

### 213

1   table that amendment?
2   A. Yes.
3   Q. And how would conducting a study about who was
4   impacted by SB 14 have interfered with the Senator's
5   goals of deterring in-person voter impersonation?
6       MR. FREDERICK: Objection, legislative
7   privilege. Instruct you not to answer.
8   A. I'll assert privilege.
9   Q. (By Ms. Maranzano) Was Senator Fraser
10  concerned that such a study would show that minorities
11  are disproportionately impacted by Senate Bill 14?
12      MR. FREDERICK: Objection, legislative
13  privilege. Instruct you not to answer.
14  A. I'll assert privilege.
15  Q. (By Ms. Maranzano) Can I have you turn to --
16  I'm going to actually get out another exhibit.
17      (Exhibit 42 marked for identification.)
18  Q. (By Ms. Maranzano) I'm showing you what we're
19  marking as Deposition Exhibit 42. If you could look at
20  the side of the page that has 28 at the top. Actually,
21  I'm sorry. It starts on the bottom of 27. There's an
22  amendment presented by Senator Gallegos that goes to the
23  top.
24      Do you see that Senator Gallegos offered
25  an amendment that would have required driver's license

### 214

1   offices to be open until 7 p.m. on one weekend and
2   during four or more hours on at least two Saturdays per
3   month?
4   A. Yes.
5   Q. Did you provide a recommendation to Senator
6   Fraser as to how to vote on this bill -- on this
7   amendment?
8       MR. FREDERICK: I just caution. You may
9   answer the question as phrased. I advise you not to
10  reveal the substance of any communication.
11  A. No.
12  Q. (By Ms. Maranzano) Did Senator Fraser move to
13  table this amendment?
14  A. Yes.
15  Q. How would keeping driver's license offices open
16  longer interfere with deterring in-person voter
17  impersonation?
18      MR. FREDERICK: Objection, legislative
19  privilege. I instruct you not to answer.
20  A. I'll assert privilege.
21  Q. (By Ms. Maranzano) Did Senator Fraser have any
22  concern that any individuals who work at hourly wage may
23  have a difficult time making it to a driver's license
24  office while it's open?
25      MR. FREDERICK: Objection, legislative

### 215

1   privilege. I'll instruct you not to answer.
2   A. I'll assert privilege.
3   Q. (By Ms. Maranzano) Did Senator Fraser
4   acknowledge on the Floor that a person needed to work to
5   make sure that a driver's license office was open?
6   A. Can you repeat that question?
7   Q. Do you recall the Senator acknowledging on
8   the -- during the consideration of SB 14, that people
9   needed to work to make sure that a driver's license
10  office was open?
11  A. I do not recall.
12  Q. Were there any other amendments that you
13  haven't testified about that were offered that would
14  have mitigated the impact of SB 14 on minority voters?
15      MR. FREDERICK: Objection, assumes facts
16  not in evidence. Also object on legislative
17  privilege. Instruct you not to answer.
18  A. I'll assert privilege.
19  Q. (By Ms. Maranzano) Based on the public record,
20  are there any amendments that we haven't discussed that
21  you believe would have mitigated the impact of SB 14 on
22  minority voters?
23      MR. FREDERICK: Objection, assumes facts
24  not in evidence. You -- otherwise, you may answer if
25  you can.

### 216

1   A. I don't recall every amendment offered.
2   Q. (By Ms. Maranzano) Do you recall any amendment
3   that you believe would have mitigated the impact of SB
4   14 on minority voters?
5       MR. FREDERICK: Again, object, assumes
6   facts not in evidence. You may answer.
7   A. I don't know how to answer, because I don't
8   know that Senator Fraser or I think the bill impacted
9   minority voters negatively. So the amendment -- I don't
10  know that the -- the answer then is no, because I don't
11  know that they would have added to what we already
12  believe the bill did.
13  Q. (By Ms. Maranzano) When did the Senate pass SB
14  14 and refer it to the House?
15  A. It was either January 26th or 27th when we
16  passed it to engrossment. I don't recall exactly which
17  day that occurred.
18  Q. Is it unusual for the Senate to pass
19  legislation within the first two weeks of a session?
20  A. Yes.
21  Q. Has that ever happened before during the time
22  that you've worked for Senator Fraser?
23  A. I don't recall.
24  Q. Did the Senator have any role with regard to SB
25  14 once it was referred to the House?

JANICE MCCOY													MAY 16, 2012

### 217

1  MR. FREDERICK: Object only to the extent
2  it seeks privileged matters as to the fact, whether or
3  not he had a role. You may answer.
4  A. Yes.
5  Q. (By Ms. Maranzano) What role was that?
6  MR. FREDERICK: And I'll object on the
7  basis of legislative privilege and instruct you not to
8  answer to the extent that your answer would reveal
9  his -- the Senator's or your thought process, mental
10 impressions or disclose the substance of any privileged
11 conversation. But to the extent you can describe his
12 role without divulging that, you may answer.
13 A. It was limited in that once Representative
14 Harless was determined to be the House sponsor, we
15 provided her the information that we had that she could
16 move forward.
17 Q. (By Ms. Maranzano) Was the Senator concerned
18 about any of the changes to SB 14 that occurred in the
19 House?
20 MR. FREDERICK: Objection, legislative
21 privilege. Instruct you not to answer.
22 A. I'll assert privilege.
23 Q. (By Ms. Maranzano) Was the Senator on the
24 conference committee?
25 A. Yes.

### 218

1  Q. Did the conference committee change the
2  structure of the identification card that was required
3  to be issued free of charge?
4  A. Yes.
5  Q. Did they insert a new provision into the bill
6  on that topic?
7  A. Yes.
8  Q. Is that unusual?
9  MR. FREDERICK: Objection, vague. You may
10 answer.
11 A. As I testified earlier, the conference
12 committees, 20, 30 times during a session, we'd go
13 outside the bounds.
14 Q. (By Ms. Maranzano) What was the purpose of the
15 conference committee removing the provision of SB 14
16 that would have allowed a tribal identification to be
17 used by a voter?
18 MR. FREDERICK: Objection, legislative
19 privilege. Instruct you not to answer.
20 A. I'll assert privilege.
21 Q. (By Ms. Maranzano) What was the purpose of the
22 conference committee removing a provision that would
23 require the voter education that was required in SB 14
24 be targeted at low income and minority voters?
25 MR. FREDERICK: Objection, legislative

### 219

1  privilege. Instruct you not to answer.
2  A. I'll assert privilege.
3  Q. (By Ms. Maranzano) What was the purpose of the
4  conference committee removing the provision of SB 14
5  that would have exempted from the photo ID requirement
6  individuals whose ID had been stolen and who certified
7  that in an affidavit?
8  MR. FREDERICK: Objection, legislative
9  privilege. Instruct you not to answer.
10 A. I'll assert privilege.
11 Q. (By Ms. Maranzano) Did the Senator ever
12 discuss whether SB 14 might disproportionately impact
13 minority voters?
14 MR. FREDERICK: I'm sorry, Jennifer. You
15 said did the Senate ever discuss --
16 MS. MARANZANO: Senator. I'm sorry.
17 Q. (By Ms. Maranzano) Did Senator Fraser ever
18 discuss whether SB 14 might disproportionately impact
19 minorities voters?
20 MR. FREDERICK: Objection, legislative
21 privilege, and instruct you not to answer, except to the
22 extent that you recall public statements or statements
23 on the Floor in the committee.
24 A. He had discussions in the Committee of the
25 Whole and on the Floor with other members about their

### 220

1  impressions of the bill that it would impact minority
2  voters.
3  Q. Did he have discussions about this topic that
4  are not included in the public record?
5  MR. FREDERICK: I'll object, vague, object
6  to form, and object on the legislative privilege, to the
7  extent that it seeks the substance of any nonpublic
8  conversation. To the extent you were aware of it, the
9  fact of the conversation, you may testify to.
10 A. I can't speak to the Senator's private
11 conversations. I wasn't privy to them.
12 Q. (By Ms. Maranzano) Are you aware of any
13 legislators making any statements about illegal alien
14 voting?
15 A. Yes.
16 Q. Who was that?
17 A. I just know it happened. I don't remember who
18 said it.
19 Q. What was the statement?
20 A. I don't know the specifics of it. I remember
21 reading about it in the newspaper, but I don't remember
22 who said it.
23 Q. When -- when did you read about the statement?
24 A. I want to say there was something in 2009, but
25 I'm not -- I don't recall.