221

1    Q. What newspaper was that in?
2    A. I do not recall.
3    Q. What was the general subject of the statement?
4    A. I don't recall. Generally, I remember hearing
5    that somebody said something in a committee hearing on
6    public record, but that's the extent of what I know.
7    Q. Somebody said something in a committee meeting,
8    that somebody being one of the legislators?
9    A. Yes. I'm sorry.
10   Q. Okay. Thank you. Have you ever heard any
11   Texas state legislator who voted in favor of SB 14 say
12   that it would prevent a legitimately registered voter
13   from voting in Texas?
14        MR. FREDERICK: I object on privilege, to
15   the extent it calls for confidential privileged
16   communications, but other than that, you may answer.
17   A. That specific statement, no. That general
18   idea, yes.
19   Q. (By Ms. Maranzano) Who said that?
20   A. The general thought that a legitimate voter
21   might not be able to vote was generally said by the
22   Democrat senators who testified against the bill.
23   Q. Okay. I'm sorry. My question was any
24   legislator who voted in favor of SB 14 saying that?
25   A. Then the answer is no. I'm sorry.

222

1    Q. Have you ever heard any Texas state legislator
2    who voted in favor of SB 14 say that it would prevent
3    racial or ethnic minorities from voting in Texas?
4    A. No.
5    Q. Are you familiar with a public letter from the
6    Lieutenant Governor in 2007 about photo ID requirements?
7    A. No.
8    Q. This has been previously marked as -- as
9    Exhibit 3. This has been previously marked as
10   Deposition Exhibit 3. Have you seen this before,
11   Ms. McCoy? I'm sorry. I'm showing you what has been
12   marked as Deposition Exhibit 3, previously marked. And
13   if you can tell me if you've seen it before.
14   A. I don't specifically remember reading this, but
15   I'm sure I did.
16   Q. Do you see that there's a sentence that 8 to 12
17   million illegal aliens currently living in the U.S. --
18   wait, I'm sorry. Let me find the exact sentence.
19        Can you look at the second paragraph? Do
20   you see that -- do you see that that sentence says that
21   "Yesterday, Senator Troy Fraser brought up in the Senate
22   consideration of House Bill 218 by Representative Betty
23   Brown, which simply requires voters to present a
24   driver's license or some other common form of
25   identification at the election polls to prove they are

223

1    who they say they are, U.S. citizens"?
2    A. Yes.
3    Q. Was that part of the purpose of House Bill 218?
4    A. No.
5    Q. Any reason that the Lieutenant Governor would
6    assert that that is the purpose of House Bill 218?
7         MR. FREDERICK: Objection, calls for
8    speculation. You can answer.
9    A. I can't speak to what Lieutenant Governor wrote
10   in 2007.
11   Q. (By Ms. Maranzano) Ms. McCoy, at any time
12   since the passage of Senate Bill 14, have you come to
13   believe that it was passed with any discriminatory
14   purpose?
15        MR. FREDERICK: I'll object on the basis
16   of legislative privilege. I mean, to the extent -- and
17   I'll object to the extent that the question seeks your
18   thought processes, based on information gathered during
19   consideration of SB 14. And otherwise, you can answer
20   if you won't reveal that.
21        MS. MARANZANO: My question is, post
22   enactment, did she come to believe it was passed with
23   discriminatory purpose?
24   A. No.
25   Q. (By Ms. Maranzano) At any time since the

224

1    passage of SB 14, have you come to believe that SB 14
2    will have a discriminatory effect on minority voters?
3         MR. FREDERICK: Same objection, but you
4    can answer.
5    A. No.
6    Q. (By Ms. Maranzano) Ms. McCoy, can you give me
7    about two minutes? I'm just about done.
8    A. Sure.
9    Q. We'll go off the record for about two minutes.
10   A. Yeah. Uh-huh.
11        (Recess from 5:03 to 5:11 p.m.)
12   Q. (By Ms. Maranzano) Ms. McCoy, do you know what
13   percentage of Senator Fraser's district was made up of
14   Latinos?
15   A. No.
16   Q. You testified earlier that minority legislators
17   made statement on the Floor to -- statements on the
18   Floor for the benefit of I believe you said, "of you."
19   Did you mean the Department of Justice?
20   A. I meant -- yes, yes.
21   Q. What's the basis of that statement?
22   A. Personal opinion.
23   Q. What's your personal opinion based on?
24   A. Their opposition to the bill and the fact that
25   they thought maybe y'all could help kill it.

225

1   Q. Did any of them say anything like that to you?
2        MR. FREDERICK: Object, based on
3   legislative privilege, to the extent there was any
4   confidential communication between a specific legislator
5   and you or Senator Fraser, I'll instruct you not to
6   answer. Otherwise, to the extent you can answer, you
7   may.
8   Q. (By Ms. Maranzano) Can you answer this
9   question?
10  A. I cannot.
11  Q. Ms. McCoy, if you're called to testify at
12  trial, will you testify that SB 14 has no discriminatory
13  purpose?
14  A. Yes.
15  Q. If you're called to testify at trial, will you
16  testify that SB 14 has no discriminatory effect?
17  A. Yes.
18       MS. MARANZANO: Well, to be clear for
19  Mr. Frederick, it's our position that if she's taking
20  that position, we have a right to explore the basis of
21  that under our motion to compel.
22       MR. FREDERICK: I'm sorry. Just so I'm
23  clear, to explore what?
24       MS. MARANZANO: To explore the -- I mean,
25  there's a number of questions that are related to that,

226

1   that y'all have not permitted her to answer. So we
2   would reserve our right -- we're going to leave this
3   deposition open. I'd like to say that for the record.
4   And you know, we believe that we have a right to ask her
5   and get answers on a number of questions that you've
6   instructed her not to answer, if she's taking the
7   position that she will offer these opinions if she's
8   called to testify at trial.
9        MR. DUNN: Intervenors join.
10       MR. FREDERICK: Okay. I understand.
11  Q. (By Ms. Maranzano) Ms. McCoy, are there any
12  answers that you've provided today that you now wish to
13  change?
14  A. Yes.
15  Q. What's that?
16  A. When we took our break.
17  Q. Uh-huh.
18  A. I went back and tried to look at the record of
19  when things passed or didn't pass.
20  Q. Uh-huh.
21  A. And I didn't have a lot of time, because there
22  was someone in my office on an unrelated issue for most
23  of the hour. But you -- the Senate did remove the
24  provision on student ID's, not the House. I think I had
25  testified that the House removed it, but we ended up

227

1   taking it out at some point. I don't recall really when
2   that came out just because I was kind of hurriedly
3   looking through the versions. And I think the House did
4   send it to us with it in and we had taken out.
5   Q. Thank you for that clarification.
6   A. You're welcome.
7   Q. Anything else?
8   A. That's -- that's it.
9   Q. Any -- I'm sorry.
10  A. So that was the only thing that I wasn't sure
11  about when I answered earlier.
12  Q. Is there any information that you didn't recall
13  earlier that you now recall?
14  A. No.
15       MS. MARANZANO: Well, as I said, we're
16  leaving this deposition open, and I will now hand it
17  over to Chad.
18            EXAMINATION
19  BY MR. DUNN:
20  Q. Good afternoon.
21  A. Hi.
22  Q. Hi. My name is Chad Dunn. I don't think we've
23  ever met before, have we?
24  A. I don't think so.
25  Q. All right. Well, I know you've been here for

228

1   quite a while today, so I'm not going to, you know, try
2   to waste your time. I've got a few issues that I want
3   to ask you about. And I'm going to jump around a little
4   bit, all right? I'm going to do my best to not ask you
5   anything that's already been asked.
6   A. Okay.
7   Q. But in order to get done with you as soon as I
8   can, I may end up having to overlap just a little bit,
9   and for that I apologize. All right.
10       I'm going to start a little bit with some
11  of your earlier testimony. As I understand it, you used
12  to be an election judge; is that true?
13  A. One election I served as election judge.
14  Q. Which election was that?
15  A. Maybe 2000. I don't really recall. It's been
16  a while.
17  Q. Was that in Travis County?
18  A. Yes, sir.
19  Q. And were you appointed as the actual election
20  judge, or you served as a volunteer?
21  A. I was not precinct chair.
22  Q. Okay.
23  A. I -- they called and asked me, it was a
24  November election, the local party called and said we
25  need a Republican, because they had -- they wanted a

JANICE MCCOY                                                    MAY 16, 2012

229

1    Democrat and a Republican. And I lived in the precinct,
2    and they asked me to do it, and I said yes. I don't
3    know if they had to actually turn my name in or not.
4        Q. Okay. And I'm not trying to quarrel with you,
5    but it sounds more like you were an election observer or
6    a poll watcher than an election judge.
7        A. No, sir. I was an election -- or the assistant
8    election -- I don't think I was the election judge. I
9    was the assistant election judge. I mean, I actually
10   had the title.
11       Q. Okay. And what were you responsibilities there
12   at the polling location?
13       A. I was -- what was it? I was -- I -- served as
14   the election judge, assistant election judge. So I
15   monitored the election. If there were any issues that
16   came up, I was there to resolve them. There were not.
17   And then at the end of the night, I do remember taking
18   the box. They used -- they used to take the boxes to --
19       Q. Central tabulation?
20       A. Yeah. Well, you know where Palmer Event
21   Center -- there used to be a building next to Palmer
22   Event Center, but they tore it down. Whatever that
23   building was, I took the box there and had to turn it in
24   official. And then by election code, you have to keep
25   the documents for two years. And so I was the custodian

230

1    of the documents for that precinct for two years.
2        Q. All right. Were you actually assigned the
3    responsibility of enrolling voters as they came in?
4        A. I did not sit there and check the voters.
5    That, the election workers did that.
6        Q. And did you do that during early vote or
7    election day or both?
8        A. It was only on election day.
9        Q. Do you remember the precinct?
10       A. No. The precinct number, no, sir.
11       Q. Do you remember the actual location?
12       A. There was a church just at 45th and Medical
13   Parkway.
14       Q. While there, did you observe any activity that
15   you were concerned might be election fraud?
16       A. No.
17       Q. Have you served in an election judge or
18   election official capacity any other time than we just
19   spoke about?
20       A. No.
21       Q. Now, you said somebody called you and asked you
22   to do this. Do you remember who that was?
23       A. No, sir.
24       Q. Was it a party official or a county official?
25       A. I think it was a party official. Travis County

231

1    Republican party official.
2        Q. Was it the chairman?
3        A. I don't recall.
4        Q. I assume that you vote in most elections?
5        A. Yes, sir.
6        Q. Do you vote in both nonpartisan and partisan
7    elections?
8        A. Yes, sir.
9        Q. And you're going to hate me for asking this,
10   but it's important for several questions, what year were
11   you born?
12       A. 1969.
13       Q. All right. I tried to do it as gingerly as I
14   could.
15       A. I'm not embarrassed.
16       Q. So I assume since you turned 18 and since then,
17   you have more or less consistently voted?
18       A. Yes, sir.
19       Q. Whenever you have voted in Texas, have you ever
20   observed activity that made you concerned it would be
21   voter fraud?
22       A. No, sir.
23       Q. Have you ever voted in an election and observed
24   discriminatory behavior by an election clerk?
25       A. No, sir.

232

1        Q. I think you also testified that you've lived in
2    Texas your whole life; is that true?
3        A. Yes, sir.
4        Q. Have you, during that time, ever witnessed an
5    act of discrimination against a minority citizen in
6    Texas?
7            MR. FREDERICK: Object as vague. Object
8    to relevance. But you can answer.
9        A. Yeah. I don't -- I don't know that I can
10   answer that question because it's vague. I mean --
11       Q. (By Mr. Dunn) Well, I'll do -- I'll see if I
12   can do better. All right?
13       A. Okay.
14       Q. Have you ever seen a government official deny a
15   benefit or service to a minority citizen?
16       A. No, sir.
17       Q. Have you ever seen another citizen in Texas
18   treat a minority citizen with some degree of disrespect?
19       A. Another citizen?
20       Q. Yes, ma'am.
21       A. So one citizen treating somebody else with
22   disrespect? Yes, sir.
23       Q. And was that an Anglo to an African-American or
24   an Anglo to a Latino or something different?
25       A. I think in all instances I have seen people

233

1   treat people poorly, whether it's minority on minority
2   or Anglo on minority or minority on Anglo, I've seen it
3   all. And I've lived 43 years, you see a lot of
4   disrespect.
5       Q. So, in your opinion, there's not a higher
6   degree of discrimination amongst the citizenry between
7   Anglos and minority population in Texas anyway?
8       A. In my opinion, that's correct.
9       Q. Have you always lived in Austin?
10      A. No, sir.
11      Q. Where else have you lived in the state?
12      A. Houston, in College Station, Bryan/College
13  Station when I was at A&M.
14      Q. You went to school at A&M?
15      A. Yes, sir.
16      Q. Where did you grow up?
17      A. Houston.
18      Q. So is it fair to say that you've more or less
19  split your life in-between Houston and Travis County?
20      A. Yes, sir.
21      Q. Now, I'm going to move to a different topic, so
22  I'm trying not to lose you here. But you were asked a
23  number of questions about the various photo voter ID
24  bills over the last several sessions about documents
25  prepared as part of the legislative process. Okay.

234

1   That's where I'm going now.
2       A. Yes, sir.
3       Q. And you were asked some questions about bill
4   analysis that were prepared. And I want to focus on SB
5   14 for a minute. The bill analysis prepared for SB 14
6   was created by whom?
7       A. The bill analysis that was created by Senate
8   Bill 14 as it came out of Senate, as it was filed, as it
9   came out of Senate committee as it was grossed,
10  engrossed, was prepared by Senate Research Center,
11  essentially, via the Senate administrative process.
12          The House, when it made it over there,
13  their processes developed their own bill analysis for
14  use. I don't really recall -- I don't know who does
15  theirs.
16      Q. All right.
17      A. They probably base it on ours, but they do
18  their own.
19      Q. And I want to focus on the Senate report
20  first. The Senate report was prepared by Senate
21  Research, if I understood your answer right.
22      A. That's -- yes.
23      Q. Okay. And I want to make sure we're being very
24  specific about that.
25      A. Right.

235

1       Q. Was it completely created by and put out by
2   Senate Research, or did it include language provided by
3   you or somebody in your office?
4       A. Senator Fraser, through me, provides language
5   to the committee chair and their staff, and in this
6   case, Senator Duncan chaired Senate State Affairs. They
7   then take that information and submit it to Senate
8   Research Center. I don't know for sure if they used my
9   language verbatim. Sometimes they do. Sometimes they
10  don't. And on this instance, I do not recall if they
11  used any of my language verbatim.
12      Q. And so just to be clear in our record, do you
13  recall whether or not the language your office submitted
14  to Senator Duncan's staff was changed at all when it was
15  submitted by Senator Duncan's staff to Senate research?
16      A. I do not recall.
17      Q. Who was it with Senator Duncan's staff you
18  would have coordinated on the research analysis?
19      A. Jennifer Fagan.
20      Q. Was any convincing or cajoling necessary to
21  convince Senator Duncan's staff to support this bill?
22          MR. FREDERICK: Object, legislative
23  privilege. Instruct you not to answer.
24      A. I'll assert privilege.
25      Q. (By Mr. Dunn) With respect to the -- in

236

1   addition to the bill analysis, a fiscal note was also
2   prepared; is that true?
3       A. Yes, sir.
4       Q. And was that prepared by the Legislative Budget
5   Board?
6       A. Yes, sir.
7       Q. Can you recall if, and I'm not asking for the
8   numbers, but from the various sessions you've been asked
9   about photo ID bills today, can you recall if there were
10  any changes to the fiscal note of the bill in its
11  various iterations?
12      A. I don't recall what the fiscal note was in
13  2007. I think in 2009 the number stayed somewhere in
14  the 2 to 4 million dollar range.
15      Q. Do you remember who the analyst at LBB was on
16  these bills?
17      A. I did not know the analyst at LBB.
18      Q. Did you ever communicate with the analyst at
19  LBB?
20      A. No, sir.
21      Q. Did you ever provide LBB any estimates as to
22  your belief as to the fiscal impact of the bill?
23      A. No, sir.
24      Q. Did you ever do or conduct any research as to
25  what the fiscal impact of the bill would be?

JANICE MCCOY                                              MAY 16, 2012

237

1          MR. FREDERICK:  Object, based on
2    legislative privilege.  Instruct you not to answer to
3    the extent it reveals the substance of any research.  I
4    instruct you not to answer.
5          A.  I'll assert privilege.
6          Q.  (By Mr. Dunn)  Stepping way from this bill for
7    a minute, is it generally important that a bill in the
8    legislature not have a fiscal impact or have a minimal
9    fiscal impact in order to pass?
10         MR. FREDERICK:  Object, vagueness, but you
11   can answer.
12         MR. DUNN:  I'll strike the question and
13   rephrase.  How about that?
14         Q.  (By Mr. Dunn)  Is it -- bills with a large
15   fiscal impact, do they typically get defeated or fail?
16         A.  They take longer to pass.
17         Q.  And they -- and because the bill involves a
18   larger fiscal impact, that means the state has to divert
19   financial resources to the bill's tenants; is that true,
20   if it were to pass?
21         A.  No.
22         Q.  Well, I assume that in all these years that
23   you've worked for Senator Fraser and perhaps others, you
24   have prepared a lot of bills and received a lot of
25   fiscal impacts on bills; is that true?

238

1          A.  Yes, sir.
2          Q.  Is it not typically bad news when you received
3    a fiscal impact statement from LBB that puts money on
4    the cost of a bill?
5          MR. FREDERICK:  Object to vagueness.  You
6    can answer.
7          A.  Well, I think I need you to ask the question
8    better.  I don't -- can you ask the question again?
9          Q.  (By Mr. Dunn)  Uh-huh.  Is it more difficult to
10   pass a piece of legislation when it has a fiscal impact
11   statement from LBB that it costs a considerable amount
12   of money?
13         A.  Not always, but the majority of the time, yes,
14   you'd rather have a zero fiscal note than not.  Or have
15   a low fiscal note than not.
16         Q.  And just so our court, which may not understand
17   the process here in Texas, our budget here in the state
18   is prepared either by the House Appropriations Committee
19   or the Senate Finance Committee in alternating sessions;
20   is that true?
21         A.  That's true.
22         Q.  And so if a member wants to pass a bill that
23   has a fiscal impact, they typically have to go to either
24   the Appropriations or Finance Committee and work out an
25   arrangement to pay for the bill; is that also true?

239

1          A.  Yes.
2          Q.  All right.  What efforts were made -- is it
3    true that Senate Bill 14 had a fiscal impact
4    according to the LBB?
5          A.  Yes.
6          Q.  What steps were taken to make sure the funding
7    would be available for the bill?
8          A.  In 2007, no, I'm sorry.  I get my years -- in
9    2009 -- well, let's back up.
10         So when a bill has a fiscal impact, you
11   need a Finance Committee member to propose an amendment
12   to the budget or a rider or some sort of mechanism to
13   get that included, a contingency rider, sometimes.  In
14   2007, I want to say that -- I can't remember if I did
15   one of those or not.  In 2009, I'm sorry.  Sorry.
16   2009.  In 2007, I don't -- I didn't do anything with the
17   budget of the bill.  I don't remember that.
18         In 2009, I think we prepared a contingency
19   rider, and I think we asked another senator who was on
20   the committee to move that forward, who was a supporter
21   of the bill.
22         In 2011, I don't recall that I did any
23   work on trying to -- on behalf of Senator Fraser in
24   trying to get money in the budget.
25         Q.  Is the short answer with respect to Senate Bill

240

1    14, in 2011, you can't recall what, if anything, you did
2    to get the bill funded?
3          A.  I don't recall that I did anything to get the
4    bill funded --
5          Q.  All right.
6          A.  -- on behalf of Senator Fraser.
7          Q.  Senator Fraser has served on the Finance
8    Committee before, has he not?
9          A.  Yes, he has.
10         Q.  When did that service stop?
11         A.  I don't recall.  2005 or 2007.
12         Q.  Do you recall the senator you approached in
13   2009 to hold the contingency rider on the committee?
14         A.  I do not.
15         Q.  Do you know who carried it in 2011?
16         A.  I do not.
17         Q.  Just for our record, which -- was the
18   appropriation bill in '11 out of the house or out of the
19   Senate?  Or do you remember?
20         A.  I don't remember.
21         Q.  I don't either so I was hoping you did.
22         A.  I try to forget.
23         Q.  All right.  As part of the fiscal analysis for
24   the bill, did you participate in trying to determine
25   what it would cost to fully fund antifraud technologies

241

1  in voting locations?
2        MR. FREDERICK: I'm going to object on the
3  basis of privilege, to the extent it calls for the
4  substance of any communications or your thought process,
5  mental impressions, but the question as phrased, you may
6  answer it as long as you don't reveal those matters.
7        A. Senator Fraser and I didn't do any work on
8  developing what the fiscal note looked like or what the
9  agency said it would cost them or not cost them. So we
10  did nothing on the fiscal impact.
11        Q. (By Mr. Dunn) All right. Fair enough. So
12  I'll ask this question: Did you, though, in working on
13  the bill, in any session, come to learn of various
14  technologies that have been developed or being developed
15  that can be used in polling locations to stop voter
16  fraud?
17        MR. FREDERICK: Object to legislative
18  privilege. Instruct you not to answer.
19        A. I'll assert privilege.
20        Q. (By Mr. Dunn) With respect to Senate Bill 14,
21  do you know which legislator or which legislator's staff
22  was the point person for the fiscal impact of the bill,
23  if it wasn't you?
24        A. I mean --
25        MR. FREDERICK: If you know.

242

1        A. When a bill moves to the legislative process,
2  the committee staff in the committee is responsible for
3  asking LBB for a fiscal note. LBB then asks the
4  different agencies that are impacted how much it will
5  cost. That comes back, gets attached to the bill, and
6  we move forward.
7        I mean, I don't -- I mean, I think -- I
8  mean, I don't know that I can be responsive to your
9  question, because I don't know that any legislative
10  staff directed anybody to provide that type -- those
11  numbers. It's just that's what happened. That's what
12  we got back from legislative budget board.
13        Q. (By Mr. Dunn) Let me try a different way of
14  phrasing the question. Do you know and can you name for
15  us any staffer that was involved in formulating the
16  fiscal impact of this bill or coordinating with LBB?
17        A. No.
18        Q. Okay. As I understand your description earlier
19  of your job responsibilities, you principally handle the
20  Capitol office for Senator Fraser and his legislative
21  priorities; is that true?
22        A. Yes.
23        Q. Do you have any district office
24  responsibilities?
25        A. Only insomuch as I oversee the same

243

1  administrative functions for those three employees, and
2  they call me and bounce things off me about meetings or
3  issues or case work that they're working on.
4        Q. Do you go out into the district?
5        A. I have. I haven't done it in the last couple
6  of years.
7        Q. Senator Fraser's district is, gross
8  generalization, but more or less northwest of the Austin
9  area; is that true?
10        A. He would categorize it as the Hill Country from
11  Kerr County to Abilene, from Belton to Menard.
12        Q. All right.
13        A. Junction.
14        Q. Where are his district offices?
15        A. Abilene, Belton and Marble Falls.
16        Q. Is there an area in the district that has a
17  high degree of African-American, Latino or Asian
18  population?
19        A. I would assume Bell County probably has our
20  largest minority population because it's our largest
21  county.
22        Q. How would you describe that minority? I mean,
23  is it Latino, African-American mixed?
24        A. African-American.
25        Q. I think we were asked earlier if you knew the

244

1  percentage of Latinos you have in your district. I
2  think you said you didn't know; is that true?
3        A. That's true.
4        Q. Do you have an estimate?
5        A. No, sir.
6        Q. Do you have an estimate for the number of
7  African-Americans in your district?
8        A. No, sir.
9        Q. Do you have an estimate for the number of
10  Asians in your district?
11        A. No, sir.
12        Q. You've been with Senator Fraser for 10 years.
13  Did I hear that right?
14        A. Since 1998.
15        Q. '98. All right. So about 14 years?
16        A. Yes, sir.
17        Q. In the 14 years, what activities have you taken
18  or Senator Fraser taken to support the minority
19  community in his district? Any bills, business,
20  meetings, or legislative business undertaken for those
21  groups?
22        MR. FREDERICK: I'll object on legislative
23  privilege, only to the extent that your answer would
24  require you to reveal thought process, mental
25  impressions or confidential communications related to

JANICE MCCOY                                                    MAY 16, 2012

245

1   pending legislation. To the extent you can answer
2   without revealing that, you may answer.
3       A. Senator Fraser votes and promotes and works
4   with every constituent equally.
5       Q. (By Mr. Dunn) And I appreciate that. I'm just
6   trying to find out, can you name for us some bills or
7   meetings or sort of administrative lobbying he's done on
8   of behalf of the minority constituents in his district?
9       A. No.
10      Q. Now, with regard to your district
11  responsibilities, do you ever go out and take the place
12  of the Senator at an event or speak to group because
13  he's unavailable?
14      A. I have in the past. I have not done it in
15  about three years.
16      Q. What sort of events would you go speak to?
17      A. They weren't necessarily speaking events where
18  it was a public forum. They typically would just be
19  meetings with various constituency groups that wanted to
20  express concerns or opinions to our office.
21      Q. Are there -- if I understand the testimony
22  earlier, there's sort of a schedule kept by your office
23  of where the Senator goes and does. It doesn't have
24  everything, but it has some things; is that right?
25      A. Yes, sir.

246

1       Q. Would it also include the events that you
2   attended or another staff attended on his behalf?
3       A. No, sir.
4       Q. Those would be kept on the staffer's private
5   calendar?
6       A. That's correct.
7       Q. Can you recall ever have gone to an event in
8   place of Senator Fraser and speaking with a group of
9   African-Americans or Latinos?
10      A. I've gone to events where African-Americans and
11  Latinos were present but nothing specific to those
12  groups.
13      Q. Not a group or event where they made up the
14  predominant population in the attendees?
15      A. That's correct. I have not.
16      Q. Have you attended any public meetings in
17  Senator Fraser's district as it relates to photo ID?
18      A. I've attended meetings with the Senator where
19  he has -- speaking to a group where he brings up the
20  topic of photo ID in terms of the legislation that he
21  passed or didn't pass, given whatever year it was, but
22  nothing specific for the meeting specifically about
23  voter ID.
24      Q. In other words, you didn't go to any rallies or
25  events put together by certain political groups who were

247

1   pushing photo ID?
2       A. No, sir.
3       Q. It would just come up as a part of more general
4   political discussion?
5       A. Yes, sir.
6       Q. My question earlier was limited to events in
7   the district. Now I'm going to ask you about anywhere.
8   Have you been to such events?
9       A. No, sir.
10      Q. When is it that photo ID became something you
11  started working on in your office?
12      A. The spring of 2007.
13      Q. What caused that project to develop?
14          MR. FREDERICK: Object, based on
15  legislative privilege. To the extent you can answer
16  without revealing communications with the Senator,
17  legislators, constituents, or thoughts or mental
18  impression, you can answer.
19      A. When the Senator agreed to be the House sponsor
20  to House Bill 218.
21      Q. (By Mr. Dunn) Prior to agreeing to be the
22  sponsor of House Bill 218, you hadn't researched,
23  drafted bill language or otherwise worked on the photo
24  ID issue?
25          MR. FREDERICK: Objection, legislative

248

1   privilege. Instruct you not to answer.
2       A. I'll assert privilege.
3       Q. (By Mr. Dunn) The impetus to your office
4   beginning to deal with photo ID, did it have anything to
5   do with a specific event or events actually involving
6   voter impersonation?
7           MR. FREDERICK: Object on the basis of
8   legislative privilege. Instruct you not to answer.
9       A. I'll assert privilege.
10      Q. (By Mr. Dunn) Why is it that Senator Fraser,
11  after having been asked in 2007 to carry House Bill 218,
12  why is it that he continued to hold the issue and push
13  it in future sessions?
14          MR. FREDERICK: Object on the basis of
15  legislative privilege. To the extent that it -- that
16  the question calls for subjective mental impressions,
17  thought process or confidential communications, I
18  instruct you not to answer. If you can answer based on
19  nonprivileged matters including public statements or
20  core testimony, you can do so.
21      A. I think I can say that Senator Fraser has said
22  consistently, public record or public meetings, that he
23  believes that the issue of in-person voter fraud and
24  protecting the integrity of our elections was important,
25  and he wanted to continue to fight.

JANICE MCCOY                                                    MAY 16, 2012

249

1    Q.  (By Mr. Dunn)  And he came to that conclusion
2  sometime in or around the spring of 2007 when he was
3  asked to support House Bill 218?
4        MR. FREDERICK:  Objection to the extent it
5  mischaracterizes the prior testimony.  Also object on
6  legislative privilege.  I instruct you not to answer.
7    A.  I'll assert privilege.
8    Q.  (By Mr. Dunn)  Is it true that Senator Fraser's
9  issue in the photo ID matter -- strike that.
10       Senator Fraser's interest in the photo ID
11  matter did not develop until he was approached by a
12  member of the House?
13       MR. FREDERICK:  Objection, legislative
14  privilege.  Instruct you not to answer.
15    A.  I'll assert privilege.
16    Q.  (By Mr. Dunn)  You were asked some testimony
17  about Section 5 of the Voting Rights Act.  I'm just
18  telling you that to sort of get you to where I'm going
19  now.
20    A.  Yes, sir.
21    Q.  All right.  And you mentioned something that
22  nine states and some territories are subject to Section
23  5.  Did I hear you correctly?
24    A.  That was my comment.  Yes, sir.
25    Q.  Do you know how it is that those nine states

250

1  and territories were made subject to Section 5?
2    A.  My understanding is that it was part of -- back
3  when LBJ was president, but that's as much I could speak
4  to.
5    Q.  In other words, you don't know if there was a
6  formula or some kind of basis used to select the areas
7  subject to Section 5, you're not familiar with it?
8    A.  That's correct.
9    Q.  Are you aware that Section 5 was applied to
10  certain areas because of the history of discrimination?
11    A.  It's my understanding that that was the
12  intent.  Yes, sir.
13    Q.  And do you deny that there's a history of
14  discrimination in Texas?
15    A.  No, sir.
16    Q.  When is it that you think, if you do, that the
17  discrimination in Texas stopped?
18    A.  I don't recall that there being discrimination
19  in my life -- well, in my adult lifetime.
20    Q.  So sometime in your adolescence is when that
21  problem was solved in your view?
22       MR. FREDERICK:  Objection, to the extent
23  misstates the testimony.  You can answer.
24       MR. DUNN:  I'll rephrase.
25    Q.  (By Mr. Dunn)  When in your view was racial

251

1  discrimination in Texas resolved?
2    A.  I don't know.
3    Q.  Okay.  But in any event, in your opinion, we're
4  at the point now where federal laws are not required to
5  protect minority citizens in Texas?
6        MR. FREDERICK:  You may answer to the
7  extent that --
8    A.  My personal opinion is federal law is not
9  necessary to protect minority voters in Texas.
10    Q.  (By Mr. Dunn)  But you believe that minority
11  citizens have an equal opportunity to vote as Anglos or
12  anyone else?
13    A.  That they do?
14    Q.  Yes, ma'am.
15    A.  Yes, sir.
16    Q.  Okay.  That is -- that sort of belief, the
17  belief that everybody that's an American citizen has an
18  equal vote is also part of the law in the constitution,
19  the federal constitution; is that true?
20    A.  Yes, sir.
21    Q.  All right.  So when you draft legislation,
22  whether it's on elections or anything else for the
23  Senator, do you keep that concern in mind to make sure
24  you're complying with that provision of the
25  constitution?

252

1    A.  I --
2        MR. FREDERICK:  Object on the basis of
3  legislative privilege, and instruct you not to answer.
4    A.  I'll assert privilege.
5    Q.  (By Mr. Dunn)  Do you believe that -- this
6  is -- I'm going to make sure I'm clear about this.  If
7  you're confused, ask me.  But do you believe that
8  government, whether it's state or federal, is capable of
9  disenfranchising a citizen?  I beg your pardon?
10    A.  I'm sorry.  I'm just thinking in my head.
11    Q.  Oh.
12    A.  What do you mean by "disenfranchising"?
13    Q.  Well, let's say the federal government passed a
14  law that said that people with blue eyes can't vote any
15  longer.
16    A.  So we're specifically talking about elections?
17    Q.  Yes.  Uh-huh.  Such a law would disenfranchise
18  voters.  Would you agree?
19    A.  If you had blue eyes, yes, sir.
20    Q.  All right.  You and I share that trait.  That's
21  why I picked that one.
22    A.  Maybe we shouldn't be voting.
23    Q.  Well, we probably -- well, I won't even say.
24       All right.  With respect to -- there have
25  been laws over the years that have caused voters to be

JANICE MCCOY                                                        MAY 16, 2012



253

1   disenfranchised; would you agree?
2      A.  Previous, yes.
3      Q.  For example, requiring a voter to pay a poll
4   tax.  Would you agree that resulted in disenfranchise?
5      A.  Yes.
6      Q.  Laws that require voters to take a literacy
7   test.  Would you agree that was disenfranchising?
8      A.  Yes.
9      Q.  Do you believe that government can make voting
10  so onerous that it becomes a disenfranchisement?
11         MR. FREDERICK:  Object as vague, but if
12  you have an opinion, you can answer it.
13     A.  I don't believe the government would do that.
14     Q.  Fine.  But if it did, it could become
15  disenfranchising?
16     A.  I think the government could do a lot of things
17  that are bad and does.
18     Q.  So is it your opinion that Senate Bill 14 as
19  passed has no effect on the difficulty in voting in
20  Texas?
21         MR. FREDERICK:  I'll object only to the
22  extent that the question seeks your mental impressions,
23  thought processes related to the development of SB 14
24  and any confidential communications.  As you sit here
25  today, you may answer based on personal knowledge or

254

1   opinion.
2      A.  I do not believe Senate Bill 14 disenfranchises
3   voters.
4      Q.  (By Mr. Dunn)  All right.  And that's fair
5   enough, but that's a slightly different answer to a
6   different question.
7         I'm asking:  Do you believe that Senate
8   Bill 14 puts some burden on voting that wasn't there
9   before?
10         MR. FREDERICK:  Same objection and
11  instruction.
12     A.  I'll assert privilege.
13         THE WITNESS:  Can I?  Is that what --
14         MR. FREDERICK:  No.  Let me repeat it just
15  so I'm clear to you.
16         THE WITNESS:  Okay.
17         MR. FREDERICK:  I object based on
18  legislative privilege, only to the extent the question
19  seeks your thoughts or Senator Fraser's thoughts or
20  mental impressions about SB 14 during the process of
21  development and passage or any confidential
22  communications --
23     A.  Okay.
24         MR. FREDERICK:  -- related to it.  To the
25  extent that you have a personal opinion or personal

255

1   knowledge, as you sit here today, not based on that, you
2   may answer.
3      Q.  So the question is?
4      Q.  (By Mr. Dunn)  The question is, what is your
5   opinion as to whether or not Senate Bill 14 places some
6   burden on voting?
7      A.  I don't believe it imposes an additional burden
8   on voting that makes it hard for anybody to vote.
9      Q.  And so I just want to make sure I understand.
10  You don't think that there's any burden, or you think
11  that the burden is insignificant?
12     A.  I think the burden is insignificant.
13     Q.  All right.  And so whereas a burden that would
14  come from a poll tax or a literacy test is some degree
15  higher -- well, let me just strike that.
16         Where do you draw the line between the
17  burden of a poll tax, for example, and the burden
18  created by the photo ID requirement?
19         MR. FREDERICK:  Object as vague.
20     A.  I don't know that I personally believe that the
21  burden of having a photo ID is a burden or having a
22  photo ID is a burden.
23     Q.  (By Mr. Dunn)  I see.  All right.  Well, have
24  you worked on -- you staffed State Affairs for some
25  period of time I think you said, right?

256

1      A.  Yes, sir.
2      Q.  And State Affairs in the Senate is where most
3   election bills go through unless --
4      A.  Yes.
5      Q.  -- there's a special rule set up?
6      A.  Yes, sir.
7      Q.  All right.  In this case, Senate Bill 14 didn't
8   go through State Affairs because the Committee of the
9   Whole was created; is that true?
10     A.  That's true.
11     Q.  But typically, the committee with senators who
12  have the background and knowledge about election matters
13  are in State Affairs?
14     A.  Yes, sir.
15     Q.  There have been a number of bills that have
16  been passed by the state legislature in the last several
17  sessions that relate to election laws; is that true?
18     A.  Yes, sir.
19     Q.  There have also been a number that relate to
20  voter registration; is that true?
21     A.  Yes, sir.
22     Q.  Are you familiar with bills that have created
23  new requirements for deputy voter registrars in Texas?
24     A.  Not specifically, no.
25     Q.  All right.  Are you familiar with any bills

JANICE MCCOY                                                          MAY 16, 2012

257

1    that create additional burdens in order to become
2    registered to vote in Texas?
3         A.  I don't recall that we passed anything about
4    registering to vote since HAVA or that doesn't comply
5    with HAVA.
6         Q.  So if things have been passed since then, you
7    just don't recall it?
8         A.  That's correct.
9         Q.  Now, could you see a scenario where the -- and
10   I'm using your language, the insignificant burden of SB
11   14 added on to a burden of voter registration, added on
12   to a burden of deputy registrars, could add up to
13   disenfranchisement in time?
14              MR. FREDERICK:  Objection, calls for
15   speculation.  You can answer if you can.
16        A.  I don't know what the changes were to voter
17   registration and deputies, so I cannot answer the
18   question.
19        Q.  (By Mr. Dunn)  But you would agree that if we
20   take stacks of hairs and we continue to stack the hairs,
21   sooner or later we'll get to the thickness of a quarter?
22              MR. FREDERICK:  Objection, vague.  You can
23   answer if you can.
24        A.  I don't believe that Senate Bill 14 was passed
25   in a vacuum, and I think we recognized what the rest of

258

1    the election code did when we passed it.
2         Q.  (By Mr. Dunn)  So it's your testimony then that
3    whatever burden, if there is one on Senate Bill 14, does
4    not add into other burdens if there are in state law to
5    the right to vote?
6               MR. FREDERICK:  Object to the extent it
7    mischaracterizes prior testimony, but you can answer.
8         A.  I don't know that I said there were other
9    burdens.  So, I mean.
10        Q.  All right.  What burdens are there, if any, to
11   the voting in Texas?
12        A.  I don't believe there are any burdens currently
13   to voting in Texas.
14        Q.  Are you familiar with new regulations adopted
15   by the Department of Public Safety relating to documents
16   required to be presented in order to get an ID or
17   driver's license?
18        A.  I have recently read news clips saying they did
19   that.  Yes, sir.
20        Q.  These are new regulations that came out May the
21   1st; is that true?
22        A.  I don't know the date, but recent, yes, sir.
23        Q.  Very recently?
24        A.  Yes, sir.
25        Q.  DPS also adopted some new regulations shortly

259

1    in advance of the last legislative session, did they
2    not, with respect to information that had to be provided
3    to get a driver's license or ID?
4         A.  I think that's correct.  Yes.
5         Q.  So is it your opinion that as DPS continues to
6    add requirements to getting a driver's license or an ID,
7    that doesn't create a burden, even so slight, to
8    voting?
9         A.  Well, Senate Bill 14 provides with other forms
10   of ID, so you could use one of those forms, those five
11   other forms, four other forms, to vote if you didn't
12   want to get a driver's license.
13        Q.  So if the state, whether it be through the
14   legislature, the agency makes it extremely difficult to
15   get a driver's license, that's not a burden, in your
16   view, because there are other IDs that can be obtained.
17   Do I have that right?
18              MR. FREDERICK:  Object to the extent it
19   misstates prior testimony.  You can answer.
20        A.  I don't -- can you say that, can you repeat
21   your question?
22              MR. DUNN:  Sure.  Would you mind reading
23   that one?
24              (Requested portion read back by the court
25   reporter.)

260

1               MR. FREDERICK:  Object, again, as
2    vague.  Object to the extent it mischaracterizes the
3    prior testimony.  And object, it calls for speculation.
4    But you can answer.
5               (Cell phone buzzes.)
6         Q.  (By Mr. Dunn)  Do you need to deal with that?
7         A.  I need to just turn it off.
8         Q.  I know you have twins.  If you need to get it.
9         A.  No.  My husband has them.
10              I don't know that what we -- what DPS has
11   done is created a burden in terms of getting a driver's
12   license.  And I believe that Senate Bill 14 provided
13   with other mechanisms if you didn't want to use a
14   driver's license as a photo ID to vote.
15        Q.  All right.  Well, did you or anybody in your
16   office have any coordination with DPS and its adoption
17   of regulations relating to obtaining a driver's license
18   or ID?
19        A.  No.
20        Q.  Are you aware of any impediments to DPS through
21   its rule-making authority to create other requirements
22   for folks to bring in order to obtain one of these state
23   IDs?
24        A.  No.
25        Q.  So then it would be true that even under the

261

1  current sort of situation and regulation in which we're
2  judging Senate Bill 14, that could easily change should
3  DPS decide to alter its regulations?
4      MR. FREDERICK: Objection, calls for
5  speculation, but you can answer.
6      A. I don't think I can answer the question. I
7  can't speculate what DPS will or won't do.
8      Q. (By Mr. Dunn) I don't think I was asking you
9  to speculate.
10     A. Okay.
11     Q. I guess all I was asking is since DPS
12 regulations are as fluid as DPS wants to create rules,
13 you would agree with me the effect of Senate Bill 14
14 will change as those requirements change?
15     A. I disagree because DPS has to operate within
16 statute, and if statute is clear, then DPS rules can't
17 go beyond that.
18     Q. Was there anything in Senate Bill 14 that
19 authorized DPS to require documentation of 30-day
20 residency in order to get a voter ID or a driver's
21 license?
22     A. No, sir.
23     Q. So do you know what their statutory authority
24 was for doing that?
25     A. No, sir.

262

1      Q. If there was statutory authority, it would have
2  had to come from someplace other than Senate Bill 14?
3      A. That's correct.
4      Q. All right. Now, I'd like to ask you a little
5  bit about the 21-vote rule. And I understand that you
6  say it's not a rule, so I'm not trying to put the word
7  "rule." How do you want to refer to it, the 21-vote
8  tradition?
9      A. We can call it a rule if you'd prefer, if that
10 makes it easier for you.
11     Q. All right. A bill or measure in the Senate in
12 order to pass out of the body under typical rules and
13 traditions requires 21 votes, if all 31 senators are
14 present?
15     A. It requires -- yes, sir, if all 31 senators are
16 present. Yes, sir.
17     Q. All right. And if there's some number below 31
18 senators, then two-thirds of the number who are present
19 is required, so long as there's a quorum; is that true?
20     A. Yes, sir.
21     Q. What measures can you recall in your 14 or so
22 years of experience have been passed out of the Senate
23 without complying with the two-thirds tradition?
24     A. Besides photo ID, I don't know of any.
25     Q. Now, you gave some testimony earlier -- well,

263

1  strike that.
2      The 31 senators who are in the Senate are
3  the only people eligible to vote in the Senate. Seems
4  like a silly question, but that's true; is that right?
5      A. That's true.
6      Q. All right. So you either have to convince the
7  requisite number of those senators to support your
8  measure or you have to somehow change the electorate; is
9  that true?
10     A. Change the electorate. I don't understand.
11     Q. These 31 senators. You either got to convince
12 --
13     A. Right.
14     Q. -- two-thirds or a majority, whatever you
15 need --
16     A. Right.
17     Q. -- or you got to beat a senator or two in an
18 election?
19     A. That's correct.
20     Q. As I understand earlier forms of photo ID,
21 because there wasn't the two-thirds vote in the Senate,
22 the maneuver then was to have the vote when one senator
23 who opposed the bill was missing; is that true?
24     A. Yes.
25     Q. And that happened on at least one occasion when

264

1  Senator Uresti was not around?
2      A. In terms of voter ID, yes.
3      Q. And it was senators, I'm not asking you to
4  identify whom, but it was senators who came up with this
5  maneuver of trying to get a bill through when there
6  wasn't two-thirds of the -- when you didn't have a
7  senator present.
8      MR. FREDERICK: I'll object on legislative
9  privilege. Instruct you not to answer it.
10     MR. DUNN: Okay. And I'm not talking
11 about Senate Bill 14. I'm talking about process in
12 general in the Senate. So is it your -- is it your
13 instruction to her, she can't talk about the two-thirds
14 rule in general?
15     MR. FREDERICK: No. That's not my
16 instruction to her.
17     MR. DUNN: Oh, okay. All right. I just
18 didn't want to keep asking the same question.
19     MR. FREDERICK: No, no, I hear you.
20     Q. (By Mr. Dunn) All right. So -- let me just
21 start over.
22     Your experience there in the Senate is
23 that senators occasionally will wait for an opponent
24 senator to not be in the chamber in order to push a
25 bill?