JANICE MCCOY                                      MAY 16, 2012

265

1   A. Yes, sir.
2   Q. All right. And the hope then is to get the
3   bill passed and get two-thirds while this other senator
4   is out of the room?
5   A. Yes, sir.
6   Q. And sometimes it might take a couple of
7   senators out of the room; is that true?
8   A. Yes.
9   Q. There's a tradition in the Senate, though, on
10  big and large and hot button measures that senators ask
11  the chair that a bill not come up when they have to be
12  away from the Senate; is that true?
13      MR. FREDERICK: Objection, vague. You may
14  answer.
15  A. It has been done, to my knowledge, yes.
16  Q. (By Mr. Dunn) And now here's where I'll get
17  his objection. All right.
18      Do you know if Senator Uresti asked
19  whoever was in the Lieutenant Governor's chair, don't
20  bring up this bill while I'm out of the chamber?
21      MR. FREDERICK: I'll object on legislative
22  privilege, to the extent it calls for a confidential
23  communication from a legislator or staff, or -- yeah,
24  but to the extent it's in the public record or the
25  Senate, you may answer.

266

1   A. I don't know Senator Uresti's discussions with
2   Governor Dewhurst's office.
3   Q. (By Mr. Dunn) Now, senators who have it in
4   their intent when they pass a bill, to try to get the
5   bill passed without another member present, that senator
6   could also have the intent to conduct elections in Texas
7   where certain members can't participate?
8       MR. FREDERICK: Objection, calls for
9   speculation.
10  A. I disagree.
11  Q. (By Mr. Dunn) Have you ever done any research
12  or been presented any data as to whether or not there's
13  racially polarized voting in Texas?
14      MR. FREDERICK: I'll object, legislative
15  privilege, to the extent that you have performed any
16  such research in connection with pending legislation.
17  I'm instructing you not to answer on the basis of
18  legislative privilege.
19  A. I'll assert privilege.
20      MR. DUNN: So even sitting -- not talking
21  about Senate Bill 14, just in general, are you familiar
22  with whether or not there's racially polarized voting in
23  Texas, you're instructing her not to answer on that?
24      MR. FREDERICK: No.
25      MR. DUNN: Okay.

267

1       MR. FREDERICK: If you're asking her, in
2   general, is she aware of whether or not there's racially
3   polarized voting, that's different. If you're asking
4   her whether she's performed research in her role as the
5   senate staffer, that I would object to.
6       MR. DUNN: I see.
7   Q. (By Mr. Dunn) Are you aware of whether or not
8   there's racially polarized voting in Texas?
9   A. I am not aware.
10  Q. Do you know what racially polarized voting is?
11  A. Not necessarily.
12  Q. Have you ever worked on campaign staff?
13  A. No. I'm sorry. When I first got out of
14  college, I worked for a political consultant, but we had
15  several campaigns, and I never actually staffed a
16  campaign.
17  Q. Do you play any role in Senator Fraser's
18  reelection campaign?
19  A. I do Senator Fraser's campaign books. Senator
20  Fraser hasn't had a campaign for several years. So I
21  have helped him develop press releases saying he's
22  running for reelection, but that's the extent of it.
23  Q. All right. When you say his books, are you
24  talking about the Ethics Commission reports?
25  A. Yes, sir.

268

1   Q. All right. But you don't actually direct
2   political strategy for him?
3   A. No, sir.
4   Q. Do you do that for any other candidate?
5   A. No, sir.
6   Q. Did you have any involvement in redistricting
7   this last election cycle?
8   A. No, sir.
9   Q. Did you make any recommendations to
10  redistricting members or their staff as it related to
11  the makeup or the shape of Senator Fraser's district?
12      MR. FREDERICK: I'll object on privilege,
13  only to the extent that your answer would reveal
14  confidential communications or thought processes, the
15  fact of whether or not you did. You may answer.
16  A. Yes.
17  Q. (By Mr. Dunn) Who was it that you spoke with
18  about Senator Fraser's district?
19  A. Senator Seliger.
20  Q. He was the chairman of the redistricting effort
21  in the Senate; is that true?
22  A. Yes, sir.
23  Q. Anyone else?
24  A. His asides, probably other staff, legislative
25  staff, other senators, members, staffs.

JANICE MCCOY											MAY 16, 2012

### 269

1  Q. What was the characteristic of the changes
2  Senator Fraser wanted to his district?
3  		MR. FREDERICK: Objection, legislative
4  privilege. I'm instructing you not to answer.
5  	A. I'll assert privilege.
6  	Q. (By Mr. Dunn) All right. Earlier we asked, I
7  asked you about discrimination in Texas. Are you aware
8  of any courts in Texas finding that legislative acts
9  have a discriminatory effect or purpose?
10  	A. Not specifically, no.
11  	Q. Are you aware that in this most recent
12  redistricting cycle, a panel of judges in San Antonio
13  unanimously found that parts of the redistricting plan
14  in Texas either had a discriminatory effect or purpose?
15  		MR. FREDERICK: Object to the extent it
16  assumes facts not in evidence.
17  	A. I didn't follow.
18  	Q. (By Mr. Dunn) You didn't follow?
19  	A. No, sir.
20  	Q. Did you follow the United States Supreme Court
21  opinion in 2003 where a majority of that court found
22  that Texas legislature had been racially discriminatory
23  in redistricting?
24  	A. No, sir.
25  	Q. At least with respect to the legislators that

### 270

1  passed Senate Bill 14, the vast majority of them were
2  the same ones that passed the legislative redistricting
3  in both 2003 and the most recent set; is that true?
4  	A. I'm sorry. I don't know the votes of
5  redistricting in 2003. The votes of the redistricting
6  bill in 2011, I think only two senators voted against
7  it, and those two senators also voted against voter ID.
8  		MR. DUNN: All right. So I object to the
9  responsiveness.
10  	Q. (By Mr. Dunn) I guess all I'm asking, though,
11  is that the senators that voted in support of
12  redistricting in 2011 were the same body of senators
13  that voted on Senate Bill 14?
14  		MR. FREDERICK: Object to the extent it
15  assumes facts not evidence, but you can answer if you
16  know.
17  	A. Yes.
18  	Q. Is it also true that the champions, so to
19  speak, the people who were pushing the redistricting
20  effort in the Senate, were also the same senators that
21  were pushing Senate Bill 14?
22  		MR. FREDERICK: Objection, assumes facts
23  not in evidence. Object, vague. You can answer if you
24  can.
25  	A. I really honestly didn't work on redistricting.

### 271

1  	Q. (By Mr. Dunn) All right. I'm going to move to
2  a new topic. You spoke with Ann McGeehan about Senate
3  Bill 14, if I recall?
4  	A. Yes, sir.
5  	Q. And she was -- she left the Secretary of
6  State's office, what, in January of this year; is that
7  true?
8  	A. She left sometime this -- in the last couple of
9  months. I don't know exactly when.
10  	Q. Have you had -- and the person that replaced
11  her is a gentleman named Ingram; is that right?
12  	A. Keith Ingram. Yes, sir.
13  	Q. Keith Ingram. Have you spoken with him at all
14  about Senate Bill 14's implementation?
15  	A. About Senate Bill 14's implementation. I
16  talked -- I don't recall. I know I think I've talked to
17  him. I don't know if it's specifically about Senate
18  Bill 14.
19  	Q. Turning back to Ms. McGeehan, did she testify
20  in either the House or the Senate committee as a whole
21  on Senate Bill 14?
22  	A. She testified on Senate Bill 14, yes, in the
23  Senate. Yes, sir.
24  	Q. Did she testify in favor or opposition to it?
25  	A. She testified on as a resource witness.

### 272

1  	Q. In other words, she didn't express an opinion
2  on behalf of the Secretary of State as to whether or not
3  Senate Bill 14 was a good idea?
4  	A. Not that I recall.
5  	Q. Was there any effort by you to encourage
6  Ms. McGeehan to get behind the bill in her testimony?
7  		MR. FREDERICK: Objection, legislative
8  privilege. I would instruct you not to answer.
9  	A. I'll assert privilege.
10  	Q. (By Mr. Dunn) In your -- I'm going to do
11  several questions. He's going to object, and you're
12  going to answer, but I just want to get these out here.
13  		In your conversations with Ms. McGeehan,
14  did you ask her to provide you data on election returns
15  and how they might be impacted by the photo ID
16  requirement?
17  		MR. FREDERICK: Objection, legislative
18  privilege. I'll instruct you not to answer.
19  	A. I'll assert.
20  	Q. (By Mr. Dunn) Did you provide Ms. McGeehan any
21  data or research that you had performed on the effect of
22  the photo ID requirement on turnout?
23  		MR. FREDERICK: Objection, legislative
24  privilege. I'll instruct you not to answer.
25  	A. I'll assert.

JANICE MCCOY								MAY 16, 2012

### 273

1  Q. (By Mr. Dunn) Did you request at any time that
2  the Secretary of State's office prepare research or
3  analysis on whether or not the photo ID requirement
4  would have a disparate impact on minority citizens?
5  MR. FREDERICK: Objection, legislative
6  privilege. Instruct you not to answer.
7  A. I'll assert.
8  Q. (By Mr. Dunn) Are you aware -- this one ought
9  to get past the bully here.
10  Are you aware that the Secretary of
11  State's office has data and computer staff that might be
12  capable of performing an analysis about the impact of a
13  particular legislation on minority citizens?
14  A. I've seen the data that they prepared for the
15  Department of Justice, so yes, I know that now.
16  Q. You know that they are capable of doing that?
17  A. Yes, sir.
18  Q. The data, though, that's been prepared for the
19  Department of Justice, all that came about after Senate
20  Bill 14 had been passed by legislature and signed by the
21  Governor, true?
22  A. True.
23  Q. Other than the resource of the Secretary of
24  State's office, are you familiar with any other
25  organization that you had sort of access to that could

### 274

1  have performed an analysis, what I would call an
2  analytical analysis of whether or not Senate Bill 14
3  would have disparate impact on minorities?
4  MR. FREDERICK: I'll object on the basis
5  of legislative privilege, only to the extent that it
6  seeks thought process or mental impressions during the
7  development and passage of SB 14, to the extent it --
8  he's asking you as you sit here today, are you aware.
9  Q. Let me fix the question.
10  What resources other than Secretary of
11  State did you have to consult about doing data type
12  analysis on the effect of SB 14 on minorities?
13  MR. FREDERICK: I'm sorry. Could you
14  read -- read the question back, sir?
15  (Requested portion read back by the court
16  reporter.)
17  MR. FREDERICK: I'm going to object on
18  legislative privilege. I think that gets into thoughts
19  and mental impressions. I'll instruct you not to
20  answer.
21  A. I'll assert.
22  MR. DUNN: All right. And I just want to
23  make sure. So she's not allowed to tell me what
24  agencies or groups could have performed this analysis
25  that she's aware of?

### 275

1  MR. FREDERICK: To the extent you're
2  asking her during -- during the development and passage
3  of SB 14, what she thought at the time was available to
4  her to perform specific subject matter, subject matter
5  specific analysis, yes, I believe that's a thought,
6  mental impression, that's protected by legislative
7  privilege.
8  Q. (By Mr. Dunn) Is it your opinion that this
9  bill will not have the effect of discouraging even one
10  voter?
11  MR. FREDERICK: That's -- cautionary
12  instruction, I mean, I think as phrased, to the extent
13  the question seeks your opinion, as you sit here, you
14  may answer.
15  A. My opinion is that it will not impact one voter
16  negatively.
17  Q. (By Mr. Dunn) All right. If you could go with
18  me to US-31. Right here on the top.
19  A. Oh, yes.
20  Q. I'd like to go with you to the last paragraph,
21  and if I remember your testimony from earlier, you at
22  least prepared the initial draft of 31; is that true?
23  A. Yes, sir.
24  Q. All right. The first sentence of --
25  A. The first phrase.

### 276

1  Q. And I told you the last paragraph. I really
2  meant the next to the last one that begins with "voting
3  is"?
4  A. Okay.
5  Q. The sentence reads: "Voting is one of our most
6  important rights as Americans, but it is also a
7  responsibility." Do you see that?
8  A. Yes, sir.
9  Q. In my reading, I don't understand, and I don't
10  think it's defined in the writing here what it was meant
11  be responsibility. Is there a sentence that informs
12  what that phrase, "but it is also a responsibility," in
13  this document?
14  A. No, sir.
15  Q. All right. So what is it that you meant, at
16  least when you drafted this, about voting is a
17  responsibility? I mean, why was that in here?
18  MR. FREDERICK: I object on the basis of
19  legislative privilege, to the extent that it seeks a
20  thought or mental impression about pending legislation
21  that goes -- that -- underlying a public statement. So
22  I -- as phrased, I would instruct you not to answer the
23  question.
24  A. I'll assert.
25  Q. (By Mr. Dunn) Do you believe that members who

---

**277**

1  don't have a significant population of minority citizens
2  in their district still have to take care to make sure
3  the minority citizens elsewhere in the state are
4  protected under the law?
5      A.  Yes.
6      Q.  In other words, if there's a member that -- and
7  I know this doesn't happen, but if there's a member that
8  just represented 100 percent African-Americans, would it
9  be fair for that member to just ignore the needs of
10 Anglos and Latinos?
11     A.  No.
12     Q.  So when you prepare legislation or help Senator
13 Fraser with legislation, do you consider it one of your
14 responsibilities to make certain that that legislation
15 doesn't have a disparate impact on minority citizens or
16 majority citizens?
17         MR. FREDERICK:  Objection, legislative
18 process.  Instruct you not to answer.
19     A.  I'll assert.
20     Q.  (By Mr. Dunn)  Is there any -- have there ever
21 been situations where you've been working on bills where
22 you believe there was a conflict in your duties under
23 the state constitution and the federal constitution?
24         MR. FREDERICK:  Objection, legislative
25 process privilege.  Legislative privilege.  Instruct you

**278**

1  not to answer.
2      A.  I'll assert.
3      Q.  (By Mr. Dunn)  Do you believe that federal law
4  is supreme to state law?
5          MR. FREDERICK:  Objection, relevance.
6  Objection, vague.  I would also object on the basis of
7  legislative privilege, to the extent it's asking for
8  what she believes in her role as a role in the Senate.
9  If he's asking for your opinion or belief as you sit
10 here today, not based on confidential matters, you can
11 answer if you can.
12     A.  I do -- I believe that the state -- that the
13 federal government is not superior to the states.
14     Q.  (By Mr. Dunn)  All right.  And that's not what
15 I thought my question was.
16     A.  Okay.
17     Q.  So, but I may have done a bad job of wording
18 it.
19         Really what I'm asking is, to the degree
20 there's conflict between federal law and state law,
21 which one controls, if one does?
22         MR. FREDERICK:  Objection, asks for legal
23 opinion.
24     A.  I don't think I can answer that question.
25     Q.  (By Mr. Dunn)  Well, as you helped Senator

**279**

1  Fraser prepare legislation, do you have to consider how
2  that legislation will interact with federal law?
3      A.  In some cases, yes.
4      Q.  And do you think the state is authorized to
5  pass statutes that conflict with the federal law?
6          MR. FREDERICK:  Objection, relevance.
7  Objection, legislative privilege, to the extent it seeks
8  her opinion with respect to specific legislation.  To
9  the extent it just asks for your opinion, you can answer
10 if you can.
11     A.  I don't think I have an opinion.
12     Q.  (By Mr. Dunn)  All right.  I'm going to switch
13 gears on you now and go to the ID requirements
14 themselves.  You were asked some questions about
15 nonphoto IDs?
16     A.  Yes, sir.
17     Q.  And as I understand your testimony, without
18 going through it all, but under current state law, a
19 voter can arrive at the polling location without a photo
20 ID and rely on some nonphoto IDs; is that right?
21     A.  That's my understanding, yes.
22     Q.  And some of those things are like utility
23 bills, for example?
24     A.  Yes.
25     Q.  Do you have an opinion as to whether or not a

**280**

1  nonphoto ID is as effective as a photo ID in
2  discouraging voter fraud?
3          MR. FREDERICK:  Just caution to the extent
4  it asks for your opinion as you sit here today, based on
5  nonprivileged matters, you can answer if you have an
6  opinion.
7      A.  My opinion is the photo ID is a better
8  mechanism to prevent fraud.
9      Q.  (By Mr. Dunn)  Now, do you believe that photo
10 identification can be sort of manufactured?
11         MR. FREDERICK:  Objection, vague.  I'll
12 caution you to the extent you can answer based on
13 personal opinion, not based on privileged information,
14 you may answer if you have an opinion.
15     Q.  (By Mr. Dunn)  Have you ever heard of a fake
16 ID?
17     A.  When I was in college, yes, sir.
18     Q.  All right.  People had fake driver's license?
19     A.  A lot of people had fake driver's licenses,
20 yes, sir.
21     Q.  And they would use them to go into bars and
22 convince the bartender they were 21 and get an alcoholic
23 beverage; is that right?
24     A.  Yes, sir.  Back when we are younger, yes, sir.
25     Q.  You don't think people fake IDs any longer?

### 281

1   A.  I think it's a lot harder to fake IDs these
2   days.
3   Q.  What do you think makes it harder about faking
4   IDs today?
5   A.  I think that the provisions of real ID -- the
6   federal provisions of real IDs that Texas has enacted to
7   make driver's licenses harder to fake make it harder.
8   Q.  Like, for example, a driver's license now have
9   like a black light insignia; is that right?
10  A.  Yes, sir.
11  Q.  And there's other things that when you put the
12  ID in a certain type of viewing device, you can see
13  whether it's genuine; is that true?
14  A.  That's my understanding.  Yes, sir.
15  Q.  And you see these devices at the airport, you
16  know, occasionally at the bank; is that right?
17  A.  I haven't seen them at a bank but --
18  Q.  You've seen them at the airport?
19  A.  I don't know that I've seen them at an
20  airport.  I haven't flown in over three years.
21  Q.  With twins?
22  A.  Yes, sir.
23  Q.  All right.  Well, was there ever any discussion
24  about funding technology of polling locations that would
25  allow the staff to determine whether or not a particular

### 282

1   photo ID was genuine?
2           MR. FREDERICK:  Objection, legislative
3   privilege.  To the extent you can answer based on
4   discussions on the Floor or any public statements or
5   testimony, you may do so.
6   A.  I don't recall any public discussions about
7   that --
8   Q.  (By Mr. Dunn) Was there any --
9   A.  -- issue.
10  Q.  Do you recall any private discussions without
11  giving me the details?
12          MR. FREDERICK:  Objection, legislative
13  privilege.  Instruct you not to answer that.
14          MR. DUNN:  She doesn't even have to admit
15  whether the discussion happened.
16          MR. FREDERICK:  I think with the lead up,
17  I believe that the question implies the substance of a
18  conversation.  I'm not trying to prevent you from asking
19  if a conversation ever took place, generally, but I
20  think the subject matter was drawn too specifically to
21  lead up.
22  Q.  (By Mr. Dunn) Are you aware of any
23  conversations in the consideration of Senate Bill 14
24  relating to technology at the polling location to
25  determine the genuineness of a photo ID?

### 283

1   A.  No.
2   Q.  Do you know why not?
3   A.  Why people didn't have discussions about that
4   issue?  No, sir.
5   Q.  Now, would you agree that nonphoto ID, if you
6   required a number of them, might be accurate to confirm
7   the identity of a voter?
8           MR. FREDERICK:  Objection, calls for
9   speculation.  Objection, vague.  But you may answer.
10  A.  Nonphoto ID, a number of nonphoto ID could
11  confirm the identity of someone, yes.
12  Q.  (By Mr. Dunn) Do you know why that wasn't
13  included in the bill?
14          MR. FREDERICK:  Objection, legislative
15  privilege.  Instruct you not to answer.
16  A.  I'll assert privilege.
17  Q.  (By Mr. Dunn) Did you have any senators come
18  to you and tell you or in your presence that they were
19  voting against this bill but they really supported it?
20          MR. FREDERICK:  Objection, legislative
21  privilege.  To the extent that calls for communication
22  between a senator and you, that would be privileged, and
23  I instruct you not to reveal it.
24  A.  I'll assert.
25  Q.  (By Mr. Dunn) When was the last time you

### 284

1   renewed your driver's license?  Ballpark.  You don't
2   need to look it up.
3   A.  I don't know.
4   Q.  Oh, okay.  Has it been a while?
5   A.  It's been -- yeah.  I think I'm due next year.
6   Q.  All right.
7   A.  So five or six years.
8   Q.  Do you use the private DPS office here
9   available to Capitol staff members?
10  A.  I think I do it online.
11  Q.  Okay.  Each time you do it, you do it online?
12  A.  The last time I renewed online.  I think I
13  renewed when I got married in 2006, or I went in 2006,
14  because I had to actually show my marriage -- my new
15  Social Security card.  And since then, I've done it
16  online if I had to do it.  I guess, probably, I haven't
17  had to do it since 2006.
18  Q.  Are you aware of there being a DPS office
19  available for Capitol employees and state employees?
20  A.  If you're speaking of the office at 15th and
21  Congress, I thought that was open to the public.
22  Q.  All right.  Are you aware of an office that is
23  open to the public but is not advertised to the public
24  for DPS driver's license?
25  A.  I didn't know that it wasn't advertised.

285

1  Q. Did you ever go to a DPS office for a driver's
2  license in the Clement's building?
3  A. No.
4  Q. So if there's an office that is available to
5  the public but isn't otherwise made known to the public
6  for obtaining a driver's license, you wouldn't know
7  about it?
8  A. That's correct.
9  (Recess from 6:20 to 6:23 p.m.)
10  MR. DUNN: I'm going to say the thing
11  today that you're going be the most happy to hear:
12  There are no more questions for you.
13  THE WITNESS: Woo-hoo.
14  MR. DUNN: However -- there's my however
15  -- however, we join in the United States' position we're
16  leaving the deposition open, after the court rules on
17  some issues, and we may have to ask you more questions
18  later on.
19  THE WITNESS: Yes, sir.
20  MR. DUNN: Thank you for your time.
21  (Deposition concludes at 6:24 p.m.)
22
23
24
25

286

1  CHANGES AND SIGNATURE
2  RE: TEXAS VS. HOLDER, ET AL
3  PAGE  LINE  CHANGE       REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  I, JANICE McCOY, have read the foregoing deposition
21  and hereby affix my signature that same is true and
22  correct, except as noted above.
23
24  _____
25  JANICE McCOY

287

1  THE STATE OF _____)
2  COUNTY OF _____)
3
4  Before me, _____, on this day
5  personally appeared JANICE McCOY, known to me (or proved
6  to me under oath or through _____
7  (description of identity card or other document) to be
8  the person whose name is subscribed to the foregoing
9  instrument and acknowledged to me that they executed the
10  same for the purposes and consideration therein
11  expressed.
12  Given under my hand and seal of office
13  this _____ day of _____, 2012.
14
15
16
                        _____
                        NOTARY PUBLIC IN AND FOR
17                      THE STATE OF _____
18
19
20
21
22
23
24
25

288

1  IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLUMBIA
2
   STATE OF TEXAS,          )
3                           )
       Plaintiff,            )
4                           )
   VS.                      )
5                           )
   ERIC H. HOLDER, JR. in his )
6  official capacity as Attorney )
   General of the United States, )
7                           )
       Defendant,            )
8                           )
   ERIC KENNIE, et al,      )
9                           )
   Defendant-Intervenors,   )
10                          )
   TEXAS STATE CONFERENCE OF ) CASE NO. 1:12-CV-00128
11  NAACP BRANCHES,          ) (RMC-DST-RLW)
                            ) Three-Judge Court
12  Defendant-Intervenors,  )
                            )
13  TEXAS LEAGUE OF YOUNG VOTERS )
   EDUCATION FUND, et al,   )
14                          )
   Defendant-Intervenors,   )
15                          )
   TEXAS LEGISLATIVE BLACK  )
16  CAUCUS, et al,           )
                            )
17  Defendant-Intervenors,  )
                            )
18  VICTORIA RODRIGUEZ, et al., )
                            )
19  Defendant-Intervenors.  )
20          REPORTER'S CERTIFICATION
            DEPOSITION OF JANICE McCOY
21               MAY 16, 2012
22      I, Chris Carpenter, Certified Shorthand Reporter in
23  and for the State of Texas, hereby certify to the
24  following:
25      That the witness, JANICE McCOY, was duly sworn by

289

1      the officer and that the transcript of the oral
2      deposition is a true record of the testimony given by
3      the witness;
4         That the deposition transcript was submitted on the
5      _____day of _____, 2012, to the witness or to the
6      attorney for the witness for examination, signature and
7      return to_____, by
8      _____, 2012; and if returned, the original
9      transcript will forwarded to Jennifer Maranzano, the
10     custodial attorney;
11        That the amount of time used by each party at the
12     deposition is as follows:
13        Ms. Maranzano: 5 hours, 28 minutes
14        Mr. Rosenberg: 1 hour, 6 minutes
15        I further certify that I am neither counsel for,
16     related to, nor employed by any of the parties or
17     attorneys in the action in which this proceeding was
18     taken, and further that I am not financially or
19     otherwise interested in the outcome of the action.
20        Certified to by me this 18th day of May, 2012.
21
22        _____
          Chris Carpenter, Texas CSR 1151
23        Expiration Date: 12/31/2012
          100 Congress Avenue, Suite 2000
24        Austin, TX 78701
          (512)328-5557
25        Firm Registration No. 283