Recently, the Harris County Voter Registration Department has discovered non-citizens on the voter rolls thanks to cooperation from the Harris County District Clerk. The District Clerk, Charles Bacarisse, was receiving returned jury summons with a unique excuse: people were admitting that they were not citizens to avoid serving on a jury. The list of potential jurors, however, is culled from the list of registered voters pursuant to Government Code §62.001.

**The Right to Vote**

The gravity of the right to vote is highlighted by the U.S. Citizenship and Immigration Services (USCIS) in flash cards[†] available to immigrants undergoing the naturalization process. One of the cards asks, "What is the most important right granted to United States *citizens*?" The answer: "The right to vote." The hard fought battles for universal suffrage and equal rights over the past two centuries are undermined by the disregard for preserving the integrity of elections.

Following the ratification of the 13th, 14th and 15th Amendments to the United States Constitution, Africans Americans were legally recognized as citizens and guaranteed the right to vote. The woman's suffrage movement, led by Elizabeth Cady Stanton and Susan B. Anthony, began prior to the Civil War. In 1920 the 19th Amendment to the United States Constitution was ratified, declaring that "[t]he right of the citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex."

Despite ratification of the 15th Amendment, African Americans remained disenfranchised by the efforts of some states. Once literacy tests[19] and all-white primaries[20] were ruled unconstitutional, some states relied on a poll tax to disenfranchise African Americans. In 1964, however, the 24th Amendment to the U.S. Constitution was ratified, making poll taxes unconstitutional. The Supreme Court later ruled that poll taxes are unconstitutional in the 1966 case, *Harper v. Virginia Board of Elections*[21].

Furthermore, two U.S. Supreme Court rulings in the 1960s, *Baker v. Carr* and *Reynolds v. Sims*, both aimed to ensure that equal protection of the right to vote is achieved in our national and state governments; "one man, one vote" became the rule in apportionment. For example, in *Reynolds v. Sims*, Chief Justice Warren, writing for the majority, pointed out that

> ... if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or ten times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted[22].

Later that decade, the Voting Rights Act of 1965 required Texas and other states to pre-clear changes to their electoral systems with the Department of Justice to ensure that

---

[†] The USCIS flash card on the most important right granted to U.S. citizens is reproduced as an Appendix.

HIGHLY CONFIDENTIAL

TX_00005501

minority votes had equal weight to all others cast[23]. More than forty years later, the Supreme Court and federal government still take an active role in guarding the "one man, one vote rule", as evidenced by the June 28, 2006 ruling *League of United Latin American Citizens v. Perry*[24]. Therein, the Supreme Court ruled that the Texas Legislature's 2003 redistricting map diluted the votes of some Latinos.

The League of United Latin American Citizens (LULAC) issued a statement touting the Supreme Court's decision in *LULAC v. Perry*, illustrating its unbalanced concern regarding voting rights. Their statement reads: "the old [District] lines are the only sure way of ensuring that every citizen's vote will be given its true equal weight[25]." The group is conspicuously silent, however, on national and state proposals to end fraud by requiring voters to show identification at the polls. The group's platform is additionally silent regarding election fraud that negatively impacts not only Latinos, but all voters. The platform reads:

> LULAC aims to assure that voters' rights are safeguarded on election-day by preventing potential voting rights violations, such as intimidation at the polls, unworkable voting equipment, and other civil rights violations.

LULAC ignores the fact that legal Latino votes are as diluted by non-citizens' votes as they are by racially-motivated gerrymandering. From the 1960's rulings to the 2006 ruling in *LULAC v. Perry*, the Supreme Court, Department of Justice, and state legislatures have taken painstaking measures to ensure that our system results in "one man, one vote".

The assiduous attention given to apportionment of representation is completely absent in verifying that the citizenship qualification for voting is strictly enforced. Nevertheless, fraudulently cast votes by illegal aliens or other non-citizens have the same, deleterious effect of diluting citizens' legitimately cast votes. The Supreme Court's case history on "one man, one vote" is primarily concerned with preserving the voting rights of minority and urban voters. The dilution that occurs when non-citizens vote, however, impacts *all* voters.

### Proposals to Verify Citizenship

The potential for non-citizens voting has not gone completely ignored. Several proposals to verify the vote have been made at the state and national level.

During the May 2006 U.S. Senate debates on legislation to address illegal immigration, Senator Mitch McConnell (R-KY) proposed amending the REAL ID Act of 2005[26] to require that all state Driver's Licenses and Texas Identification Cards note whether the licensed driver is a United States citizen. The McConnell amendment to the Senate immigration bill[27] would have required that each state require individuals voting in federal elections in person show valid photo identification that proves their citizenship. As the Senator put it,

6

HIGHLY CONFIDENTIAL

TX_00005502

...consider whether the protection of each and every American's franchise – a right at the core of our democracy – is important enough to accord it equal treatment to getting a library card or joining Sam's Club. Last I checked, the constitutional right to rent a movie or buy motor oil in bulk was conspicuously absent. However, the Constitution is replete, as is the U.S. Code, with protections of the franchise of all Americans[28].

Senator McConnell's proposal mirrored one made by the bi-partisan Commission on Federal Election Reform, chaired by former president Jimmy Carter and former Secretary of State James Baker. In its final report, the Carter-Baker Commission notes that "[p]hoto IDs currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important[29]."

Despite the proposal's recommendation by the bi-partisan Carter-Baker Commission, opponents in the Senate were vocal. Senator Barak Obama (D-IL), in stark contrast to evidence on the record, labeled Senator McConnell's amendment "a solution without a problem." Senator McConnell's amendment ultimately failed.

A bill by Representative Henry Hyde (R-IL) takes a similar approach to securing elections against fraud. The Federal Election Integrity Act of 2006[30] would amend the National Voter Registration Act of 1993 (also known as the Motor Voter Law) so that applicants who register or re-register to vote must prove their citizenship. Under Rep. Hyde's proposal, applicants to register to vote must provide a photocopy of a document that proves the applicant is a U.S. citizen. The bill also requires voters to provide current and valid photo identification. Harris County Tax Assessor-Collector and Voter Registrar Paul Bettencourt testified before the Committee on House Administration that Rep. Hyde's bill "...would help my office ensure that only U.S. citizens are allowed to vote in federal, state and local elections[31]."

In November of 2004, Arizona voters approved a statewide ballot initiative, Proposition 200, requiring all applicants to register to prove their citizenship and requiring that voters present identification at polling places. Importantly, the United States District Court for the District of Arizona upheld Proposition 200 in a June 2006 ruling[32], reading in part:

> determining whether an individual is a United States citizen is of paramount importance when determining his or her eligibility to vote[33].

Lastly, the State of Georgia has made two recent attempts to verify the citizenship of its voters. First proposed in March of 2005, Georgia passed a law requiring voters to present digital identification cards in order to vote[34]. In order to obtain a card, only available at Department of Motor Vehicles offices, a voter would have to present an original birth certificate and pay $20 (the fee would have been waived for those who attested to being indigent). In October of 2005, the U.S. District Court, Northern District of Georgia, struck down the Georgia law, in part on the grounds that the fee for the digital ID cards amounted to an unconstitutional poll tax[35]. On July 12, 2006, Georgia's revised version

7

HIGHLY CONFIDENTIAL

TX_00005503

of the same law[36] was also overturned in federal court[37], despite the fact that the Legislature tailored the new law to address the concerns of the same federal judge.

### Recommendations

Where courts have struck down the Georgia General Assembly's attempts to verify the identity of voters, the Texas Legislature could succeed just as the Arizona Legislature did. Efforts to increase voter turnout such as the Motor Voter law and HAVA are exercises in futility if the primary qualification to vote, citizenship, is not guarded. Following are policy recommendations to be considered by the 80th Legislature.

#### *Place Citizenship Status on Driver's Licenses and Texas Identification Cards*

Pursuant to the REAL ID Act of 2005 and the rules drafted by the Department of Homeland Security, the Texas Driver's License application process will change. As of 2008, the Department of Public Safety will be required to verify the citizenship or legal residency status of all applicants for a Driver's License or Texas Identification Card. While the REAL ID Act lists certain fields that must appear on the new identity cards, the Act does not require the cards to list citizenship status. Senator McConnell's amendment to the Senate immigration bill would have done this. The Senate immigration bill was passed without Senator McConnell's amendment, meaning that the onus is on the Texas Legislature to require that DPS list on all Driver's Licenses and Texas Identification Cards whether or not the holder of the card is a United States citizen just as it does with the height, weight and eye color of each person. Non-citizens who can prove they are in Texas legally will still be able to obtain a Driver's License or Texas Identification Card, but it will label them as non-citizens in order to prevent them from voting.

An applicant for a U.S. Passport must provide a birth certificate, naturalization papers, or other limited documents that *prove* citizenship. The standard for receiving a Driver's License or Texas Identification card should be no less.

> This objective could be achieved by DPS rulemaking authority. Whether or not this objective is achieved by DPS rules, the Legislature should amend Transportation Code §521.121(3) by adding "citizenship status" as a feature that a Driver's License must include.

> Transportation Code, Chapter 521, Subchapter R should be amended to provide Driver's License and Texas Identification Card fee waivers for the indigent.

*[handwritten note:] Seperate Bill; Call DPS re: cost to implement.*

#### *Require Voters to Present a Driver's License or Texas Identification Card at their Polling Place*

In order to vote, the Legislature should immediately require each voter to present a photo ID at their polling place. Once all Driver's Licenses and Texas Identification Cards list citizenship status illegal aliens and non-citizens will not be able to vote.

HIGHLY CONFIDENTIAL

TX_00005504

As Senator McConnell, Mr. Bettencourt, and others have argued, Americans are frequently asked to show identification for even the most mundane daily activities:

- ✓ to rent a DVD,
- ✓ to check out a library book,
- ✓ to board an airplane,
- ✓ to buy alcohol or tobacco
- ✓ to belong to bulk retail clubs such as Sam's Club.

With the passage of House Bill 164, the 79th Legislature required that products containing ephedrine or pseudoephedrine (most commonly known as Sudafed) be sold from behind the counter only. Furthermore, in order to purchase the cold medicines, the person making the purchase must show a Driver's License or other photo ID indicating the person is over sixteen years of age.

In each of those instances, an individual must present ID. The right to vote trumps all in importance. A worker at a polling place should be able to verify the identity of a voter just like a clerk at Blockbuster Video should be able to discern the identity of a person renting a movie. Additionally, workers at polling places must be sufficiently armed with the tools necessary to turn away non-citizens. A photo ID which lists citizenship status is the best means to achieve that end.

> Amend Election Code §63.001(b) so that, on offering to vote, a voter must present the voter's voter registration certificate *and* a valid, unexpired Texas Driver's License or a valid, unexpired Texas Identification Card that proves the voter is a United States citizen.

## Increase Funding to the Attorney General to Investigate Election Fraud

The Special Investigations Unit (SIU) in the Office of the Attorney General currently assists local officials in investigating and prosecuting election fraud. The Legislature should appropriate funds to the SIU for the investigation and prosecution of illegal votes cast by non-citizens. The sheer number of non-citizens removed from the voter rolls in Harris County warrants an investigation of the voter rolls in other counties. Such an investigation can and should be undertaken by the SIU.

## Secure Applications for Early Voting Ballots-by-Mail

Requests for early voting ballots are handled much the same way as are voter registration applications: the veracity of the applicant is assumed and the request is processed on those merits. Requiring absentee voters to put a phone number on their absentee ballot request will give local officials a necessary tool to verify the request for an absentee ballot is actually being made by the person in question. Additionally, with voters providing either a Driver's License or Texas ID number, local officials will be able to verify the citizenship of *all* voters, as opposed to just those who vote in person.

9

HIGHLY CONFIDENTIAL

TX_00005505

> Amend Election Code §84.002 by adding the requirement that an application for an early voting ballot include the applicant's telephone number and either a Driver's License number or Texas Identification Card number.

### Cross-Check Voter Rolls against Death Records:

Vote fraud in the name of the deceased can be better combated. The Department of State Health Services maintains a computer database of all birth and death records. Similarly, the Office of the Secretary of State maintains the master list of registered voters. Texas Election Code, Section 16.001 requires "local registrars of deaths" to share death records with voter registrars monthly. However the statute does not command the voter rolls be expunged. The two should be cross-checked twice a year, and all deceased persons should be immediately removed from the voter rolls.

> Amend Election Code §18.061 by adding subsection (f) to require the Secretary of State to conduct a semi-annual cross-check of the statewide computerized voter registration list against death records maintained by the Department of State Health Services.

### Allow Responses to Jury Summons to Immediately Disqualify Voters

The Harris County voter registration officials discovered non-citizens on their voter rolls based on responses to jury summons. The Legislature should make a jury summons a voter registration document so that if a person indicates that he is not a citizen in response to a jury summons, he is automatically stricken from the voter rolls.

> Amend Election Code §16.0332 so that the registrar shall immediately cancel a voter's registration upon receipt of a returned jury summons that lists non-citizenship as an excuse.

### Answering Anticipated Objections

The Texas House of Representatives have already debated the essence of this proposal on May 2, 2005. House Bill 1706 would have required voters to identify themselves at polling places with either one form of photo ID or two forms of other identifying documents, including a utility bill or library card.

HB 1706 would not, however, have given officials the means to verify the citizenship of voters since most of the identifying documents are available to non-citizens. Nevertheless, the bill passed the House by a vote[38] of 78-67. Legislators preparing for the 80th Regular Session should take note of the arguments made against HB 1706, as many of them will likely be repeated. For example, State Representative Paul Moreno (D-El Paso) argued that asking people to have identification with them on election is an inconvenience. Rep. Moreno, according to his floor arguments, doesn't always his Driver's License with him. That argument is fatuous at best since it defies common sense that people would remove his or her Driver's License from a wallet or purse for an

10

HIGHLY CONFIDENTIAL

TX_00005506

extended period. It is deceitful at worst because it is meant to deflect attention from the core argument that non citizens must be prevented from voting.

Texas legislators can further benefit by examining arguments made against similar proposals made in other states. For example, one major objection is likely to be the cost of obtaining proof of citizenship (i.e. the cost of a registered birth certificate). Driver's License fees are $24 and the fee for a Texas ID Card is $15. Opponents will likely label the law an unconstitutional poll tax. For example, the American Civil Liberties Union (ACLU) argues that asking voters to identify themselves at a polling place has them "jump through unnecessary hoops to exercise their constitutionally-guaranteed right to vote[39]." The ACLU arguments against the Georgia voter ID law reads in part:

> The racially disparate impact of the economic obstacles to obtain photo identification stemming from the cost of certain documentation, including certified copies of birth certificates, as well as the cost of taking time off work and traveling to obtain photo ID[40].

The response to the ACLU argument: without minimal "hoops", such as an ID requirement, the constitutionally-guaranteed right to vote is no longer guaranteed if a citizen's vote is cancelled by a fraudulent vote. When fraudulent votes are cast, the legitimate votes of citizens are diluted.

First, Driver's License fees are currently waived for disabled veterans[41], meaning that at least one narrow class of citizens should face absolutely no economic impact in obtaining a Driver's License. That waiver could be expanded to the indigent. Furthermore, to fully counter the ACLU argument, counties could waive fees for certified copies of birth certificates.

Recall that the 2005 Georgia voter ID law carried a provision under which the indigent would be given a free identification card. However the Georgia law did not define "indigent." Instead, the law allowed applicants for the ID to attest to their indigence. Despite the exemption for indigent voters, U.S. District Judge Harold L. Murphy struck down the law as an unconstitutional poll tax.

In Texas, several public social programs are designed to assist the indigent. Temporary Assistance for Needy Families (TANF), for example, gives aid to families earning 14% of the Federal Poverty Line (FPL)[42]. The Lone Star Card, used by the state to deliver food stamps and TANF assistance, is available to a family of four which nets no more than $1,613 in monthly income[43], or nearly 100% FPL. The Legislature need not create a new determination of indigence by which the Driver's License fee may be waived. Instead, the fee waiver can and should be linked to one of those government programs, which provide for a generally-accepted measure of the indigence of the applicant for an identity card. By basing the ID fee waiver on an existing program, the indigence of those receiving the waiver would not be based on the honor system, but would be verifiable.

11

HIGHLY CONFIDENTIAL

TX_00005507

Even without a waiver, however, the fee does not constitute an unjust barrier to the right to vote. For example, people of all income levels drive despite the fact that each county in Texas charges between $60 and $70 annual vehicle registration. The indigent marry and form families, despite the fact that counties charge between $30 and $40 for marriage licenses. Importantly, as of July 1, 2006, the federal government requires all applicants and recipients of Medicaid to prove their citizenship with a birth certificate, passport, or limited other documents. Furthermore, many citizens retain copies of their birth certificates, meaning that in those cases the cost to prove citizenship would be zero. For a citizen who has already obtained a passport, the cost to prove citizenship for voting purposes would be zero. Insuring our elections against fraud will not come without some minimal cost, but the return on the investment is confidence that citizens' votes are not diluted by those of non-citizens.

Additionally, the following table compares the number of registered voters against the number of Driver's Licenses and Texas ID Cards:

| Registered Voters (Nov, 2005)[44] | 12,577,545 |
|---|---|
| Age 18+ Driver's Licenses (fy2005)[45] | 14,429,377 |
| Texas ID Cards (2006)[46] | 3,960,249 |

In fiscal year 2005, there were 14.4 million valid unexpired Driver's Licenses issued to Texans of voting age. In November of 2005, however, there were only 12.5 million registered voters. With 1.8 million more Driver's Licenses held by the voting age population than there are registered voters, the argument that the voter ID proposal will be a barrier to voting is a fallacy. Add in another 3,960,249 unexpired Texas Identification Cards in the state as of April, 2006[47] and 87% of the *total* state population (all ages) has some form of government identification card. The March 2006 estimate of the voting age population was 16,636,742, leaving a miniscule proportion of voting age citizens who are without identification[48]. The number of voting age citizens *without* one of those forms of government identification is insignificant and therefore not a valid argument against voter ID law.

Another objection is based on the inconvenience of having to acquire a voter identification card. This objection is best illustrated by the Southwest Voter Registration Education Project (SVREP). On November 2, 2004, Arizona voters passed Proposition 200 which requires that persons registering to vote prove their citizenship. SVREP openly opposed the Arizona effort to verify citizenship of voters. In a release on its website, the group lists those who will be disenfranchised by the Arizona law. Non-drivers, people who have changed addresses, senior citizens, and disabled persons will all face "obstacles to registration", according to the SVREP[49]. The SVREP specifically argues that "[m]any senior citizens no longer drive cars and may have an expired driver's license[50]." That argument is based on the assumption that all elderly people are decrepit and all disabled people are completely dependent. The Attorney General of Texas and a long-serving State Representative are both disabled (Greg Abbott and Paul Moreno are wheel-chair bound) and one of the state's leading corporate executives is aged (T. Boone Pickens is now 78 years old and going strong as head of BP Capital Management).

12

HIGHLY CONFIDENTIAL

TX_00005508