# Part I

# Voting, Citizenship, and Identity

## Background

The animated and well-publicized debates over illegal immigration have been dominated by talk of amnesty, guest-worker programs, and border walls. The sheer number of illegal aliens in our nation warrants the attention of lawmakers. A March 2006 report by the Pew Hispanic Center estimates the "unauthorized migrant" population at 11.5 to 12 million[9].

However, enforcing existing immigration laws and securing our borders have drowned out another, equally important aspect of the immigration debate – the need to secure our elections against voting by non-citizens.

The most paramount of our democratic rights, the right to vote, is guarded indifferently. Federal and state laws are clear in their intent: only citizens may vote. In practice, however, our polling places are just as porous as are our borders.

**In fact, the U.S. Department of State will not accept a voter registration as proof of citizenship when applying for a passport[10]. That healthy skepticism is justified because of significant gaps in Texas election law and enforcement procedures.**

## Laws without Meaning

The United States Constitution does not provide an affirmative voting right. However, the 15th, 19th, 24th, and 26th Amendments to the Constitution, ratified over the course of more than 100 years, all contain the same phraseology: "the right of citizens of the United State to vote..." The intent of these amendments to the U.S. Constitution is crystal clear and substantiates a view since the founding: only citizens have the right to vote. Similarly, Article 6, Section 2 of the Texas Constitution grants the right to vote only to U.S. citizens who are residents of Texas:

> "Every person subject to none of the disqualifications provided by Section 1 of this article [under age 18, mentally incompetent, persons convicted of felonies] or by a law enacted under that section who is a <u>citizen of the United States</u> and who is a resident of this State shall be deemed a qualified voter." [emphasis added]

Voting is a right reserved only for U.S. citizens. However, the lack of any explicit statutory mandate and procedural requirement to verify the qualification of voters leaves voting

---

9 Jeffrey S. Passel, Pew Hispanic Center, "The Size and Characteristics of the Unauthorized Migrant Population in the U.S." http://pewhispanic.org/files/reports/61.pdf
10 U.S. Department of State, "How to Apply in Person for a Passport"; http://travel.state.gov/passport/get/first/first_830.html

12

booths wide open to illegal aliens and other non-citizens [and other forms of fraud], stripping constitutional protections of any real value.

Sections 11.002(1) and (2) of the Texas Election Code list the top two qualifications for voting: age (18 or over) and citizenship (United States). The application to register to vote, available online through the Secretary of State website, begins with the following questions:

| | | |
|---|---|---|
| Are you a United States Citizen? | ☐ Yes | ☐ No |
| Will you be 18 years of age on or before election day? | ☐ Yes | ☐ No |
| If you checked 'no' in response to either of the above, do not complete this form. | | |
| Are you interested in serving as an election worker? | ☐ Yes | ☐ No |

*[Please see Appendix A for the full application]*

Applicants who check "yes" to the citizenship question are taken at their word; there is no verification of citizenship by state, local, or federal authorities.

The Office of the Secretary of State, which oversees the administration of elections confirms that citizenship verification goes no further than the honor system. In a June 15, 2006 letter, the Secretary of State's office states:

> "[U]nder current Texas voter registration guidelines, there is no formal verification of an applicant's citizenship status... Texas relies on the applicant to provide accurate/truthful information on his or her voter registration application. To the extent that an applicant must sign the application verifying that he or she has met the qualifications to register (one of which is U.S. citizenship) and that he or she has provided accurate/truthful information, the application is processed on those merits."[11]

That admission alone is sufficient basis for legislative action. However, the gaps in election law are significant.

Pursuant to the Help America Vote Act (HAVA), the Texas Secretary of State checks voter registration applications against Driver's License and Social Security databases[12]. While such a measure may serve to verify the name and address of an applicant, it does not prevent foreign nationals from registering to vote since both Social Security Numbers (SSN) and Driver's Licenses are available to non-citizens. In fact, the Transportation Code contains an entire section (§521.0305) dedicated to agreements with foreign countries under which the Department of Public Safety (DPS) may issue Driver's Licenses to foreign nationals.

Importantly, the DPS does not record the citizenship status of the Driver's License applicant, meaning that even if an applicant for a Driver's License provides a permanent resident card (green card) or visa as proof of identity, DPS does not record that the

---

[11] Ann McGeehan, Director of Elections, Secretary of State; letter dated June 15, 2006
[12] Help America Vote Act of 2002, Section 303(a)(5)(A)(i), Page 116 STAT. 1711
http://www.fec.gov/hava/law_ext.txt

13

applicant is a non-citizen[13]. Therefore, when the Secretary of State cross-checks a voter registration application against DPS Driver's License records, the agency cannot determine the citizenship status of the applicant.

A non-citizen, however, need not have a SSN or Driver's License in order to vote. The Voter Registration Application continues:

| TX Driver's License No. or Personal I.D. No. |
| --- |
| (Issued by the Department of Public Safety) |
| ☐ Check if you do not have a TX Driver's License, or Personal Identification Number |
| If no TX Driver's License or Personal Identification, give last 4 digits of your Social Security Number |
| ☐ Check if you do not have a Social Security Number     X |

Note the two boxes labeled "Check if you do not have a..."; even without a Driver's License, Texas Identification Card number, or SSN, an applicant may still be registered to vote. HAVA and the Texas Election Code make special provisions for persons without either a Driver's License or SSN so that applicants without either of those forms of identification remain eligible to vote[14]. Driver's Licenses, Texas Identification Cards, and SSN's are all available to non-citizens. However, an illegal alien need not go so far as to obtain one of those identifying documents since federal and state laws make them completely unnecessary for voting.

The list of identification acceptable in lieu of a Driver's License or SSN includes utility bills, bank statements, and pay checks. However, delivery of electricity and gas service for an apartment or home are not predicated on citizenship. Indeed, any person with the financial wherewithal, including an illegal alien, can obtain utility service. Similarly, a foreign national with or without a permanent resident card or visa can work and earn a pay check. The items acceptable as ID in lieu of a Driver's License or SSN have nothing to do with the citizenship status of the applicant.

Opening the Door to Fraud

While the citizenship status of registered voters goes unchecked, fraud is taking place. The long history of vote fraud in Texas, most notably the theft of the 1948 race for U.S. Senate, should give any high-minded public servant cause enough to act. But vote fraud in Texas and other states is not relegated to near ancient history. Fraud continues to this day.

---

[13] Claire McGuinness, Senior Staff Attorney, Drivers License Division, Texas Department of Public Safety; Submitted Friday, June 2, 2006; response received Tuesday, June 13, 2006.
[14] Help America Vote Act of 2002, Section 303(a)(5)(A)(ii); See also: Texas Election Code §13.002(c)(8)

14

Investigations into the 1996 election contest in California's 46th Congressional District between then-incumbent Congressman Bob Dornan and challenger Loretta Sanchez showed that illegal immigrants were registered and fraudulently voted. The investigation centered on *Hermandad Mexicana Nacional (Mexican National Brotherhood)*. The California-based organization noted in its Articles of Incorporation that its primary purpose is "to provide non-profit, low-cost legal services to undocumented immigrant workers and their families and other low-income families[15]." However, investigations by the U.S. House of Representatives Committee on House Oversight[16] and *The Los Angeles Times*[17] found that the group illegally registered non-citizens, including illegal aliens, to vote in the 1996 Congressional election.

While no indictments were brought, it is possible that illegal aliens swayed the election. Former Representative Dornan lost the election by 979 votes to the challenger, now-Representative Sanchez. The U.S. House Resolution issued at the conclusion of the Congressional investigation of the election notes that the "investigation was repeatedly hindered and delayed by the lack of cooperation by the Department of Justice, the Immigration and Naturalization Service, and key witnesses[18]."

More recently, the problem of illegal immigrants voting in elections was illustrated by June 1, 2006 comments made by Francine Busby, the Democratic candidate for California's 50th Congressional Seat in San Diego. In response to a question from a Spanish-speaking member of an audience about how he might help her campaign, Busby was taped saying, "Everybody can help, yeah, absolutely, you can all help. You don't need papers for voting, you don't need to be a registered voter to help[19]." Unfortunately, Ms. Busby is correct. Given the lack of verification in the current election system, "papers" are optional. At best, Ms. Busby was encouraging illegal aliens to participate in her campaign; at worst, the Congressional candidate was relying on the failure of our election system to verify citizenship in the hope that illegal aliens might vote for her.

Furthermore, the book *Stealing Elections* offers a shocking example of non-citizens taking advantage of the honor system: eight of the nineteen September 11th hijackers registered to vote in either Virginia or Florida[20].

The integrity of voter rolls in Texas is highly questionable. On June 22, 2006, Harris County Tax Assessor-Collector and Voter Registrar Paul Bettencourt testified before the U.S. House Administration Committee that in 2005, he identified at least 35 foreign

---

[15] Ira Mehlman, National Review, "Funding Fraud – Hermandad Mexicana Nacional", March 24, 1997; http://www.findarticles.com/p/articles/mi_m1282/is_n6_v49/ai_19254701
[16] 105th Congress, 2d Session, Committee on House Oversight, House Report 105-416, "Dismissing The Election Contest Against Loretta Sanchez"; http://thomas.loc.gov/cgi-bin/cpquery/z?cp105:hr416
[17] Peter M. Warren, Los Angeles Times, "Noncitizens Say They Voted in Key O.C. District", December 27, 1996;
[18] 105th Congress, 2d Session, H. RES. 355 [Report No. 105-416]; February 12, 1998; http://thomas.loc.gov/cgi-bin/query/D?c105:1:./temp/~c105UzSDNg::
[19] Dani Dodge, San Diego Union-Tribune, "Busby on Defense, Says She Misspoke", June 3, 2006
[20] John Fund, "Stealing Elections: How Voter Fraud Threatens Our Democracy"

15

nationals who either applied for or *received* voter registration cards[21]. Mr. Bettencourt told the Committee that a Brazilian woman registered, had her registration cancelled, re-registered claiming to be a citizen, and had her registration cancelled again. While registered, *she voted at least four times* in general and primary elections. Since 1992, Mr. Bettencourt's office has cancelled 3,742 registered voters for non-citizenship; 683 of those non-citizenship cancellations have occurred from the year 2000 to present[22]. Following the 2004 election, from December 2004 to June 2006, thirty-four non-citizens were removed from the Harris County voter rolls[23].

Recently, the Harris and Bexar County have discovered non-citizens on the voter rolls because of the cooperation from their respective district clerks. The Harris County District Clerk, Charles Bacarisse, was receiving returned jury summons with a unique excuse: people were admitting that they were not citizens to avoid serving on a jury. The list of potential jurors, however, is culled from the list of registered voters pursuant to Government Code §62.001.

In a public information request, the Texas Conservative Coalition Research Institute learned that between 2003 and 2005, 303 people were removed from the voter rolls in Bexar County because they were not citizens. The majority of these people were removed because they had rejected jury summons on the grounds that they were not citizens.[24] These figures, together with those described above in Harris County, indicate that the problem of non-citizens being registered to vote must be addressed.

The illegal alien population in Texas is estimated to be over 1.6 million[25], second in size only to the illegal alien population of California. That estimated illegal alien population accounts for over 7% of the total state population of 22,859,968[26]. With such sizeable numbers of illegal aliens residing in the state, their potential impact on election outcomes is too serious to ignore.

## The Right to Vote

The gravity of the right to vote is highlighted by the U.S. Citizenship and Immigration Services (USCIS) in flash cards [see Appendix B] available to immigrants undergoing the naturalization process. One of the cards asks, "What is the most important right granted to United States *citizens*?" The answer: "The right to vote." The hard fought battles for

---

[21] Testimony of Paul Bettencourt Before Committee on House Administration, June 22, 2006; http://www.hctax.net/forms/testimonyofPaul.pdf

[22] Voter registration records provided by the Harris County Voter Registration Department

[23] Voter registration records provided by the Harris County Voter Registration Department

[24] Public information requests were also filed with Tarrant County, Travis County, Dallas County, Jim Wells County and Collin County. Tarrant County refused to provide the information. Dallas and Jim Wells counties failed to respond. Collin and Travis counties responded, but to date, the requested information has not been received.

[25] Federation for American Immigration Reform, "Extended Immigration Data for Texas", 2005 FAIR estimate; http://www.fairus.org/site/PageServer?pagename=research_research2891

[26] U.S. Census Bureau, "State & County QuickFacts; Texas"; http://quickfacts.census.gov/qfd/states/48000.html

universal suffrage and equal rights over the past two centuries are undermined by a disregard for the integrity of elections.

Following the ratification of the 13th, 14th and 15th Amendments to the United States Constitution, African-Americans were legally recognized as citizens and guaranteed the right to vote. The woman's suffrage movement, led by Elizabeth Cady Stanton and Susan B. Anthony, began prior to the Civil War. In 1920, the 19th Amendment to the United States Constitution was ratified, declaring that "[t]he right of the citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex."

Despite ratification of the 15th Amendment, African Americans remained disenfranchised by the efforts of some states. Once literacy tests[27] and all-white primaries[28] were ruled unconstitutional, some states relied on a poll tax to disenfranchise African Americans. In 1964, however, the 24th Amendment to the U.S. Constitution was ratified, making poll taxes unconstitutional. The Supreme Court later ruled that poll taxes are unconstitutional in the 1966 case, *Harper v. Virginia Board of Elections*[29].

Furthermore, two U.S. Supreme Court rulings in the 1960s, *Baker v. Carr* and *Reynolds v. Sims*, both aimed to ensure that equal protection of the right to vote is achieved in our national and state governments; "one man, one vote" became the rule in apportionment. For example, in *Reynolds v. Sims*, Chief Justice Warren, writing for the majority, pointed out that:

> "[I]f a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or ten times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted."[30]

Later that decade, the Voting Rights Act of 1965 required Texas and other states to pre-clear changes to their electoral systems with the Department of Justice to ensure that minority votes had equal weight to all others cast[31]. More than forty years later, the Supreme Court and federal government still take an active role in guarding the "one man, one vote" rule, as evidenced by the June 28, 2006 ruling *League of United Latin American Citizens v. Perry*[32]. Therein, the Supreme Court ruled that the Texas Legislature's 2003 redistricting map diluted the votes of some Latinos.

The League of United Latin American Citizens (LULAC) issued a statement touting the Supreme Court's decision in *LULAC v. Perry*, illustrating its unbalanced concern regarding voting rights. Their statement reads: "the old [District] lines are the only sure way of

---

[27] Guinn v. United States, 238 U.S. 347 (1915)
[28] Smith v. Allright, 321 U.S. 649 (1944)
[29] Harper v. Virginia Board of Elections, 383 U.S. 663 (1966)
[30] Chief Justice Earl Warren, Reynolds v. Sims, 377 U.S. 533 (1964), Part III
[31] Voting Rights Act of 1965, Section 5; http://www.usdoj.gov/crt/voting/sec_5/about.htm
[32] League of United Latin American Citizens, et al. v. Rick Perry, Governor of Texas et al., Part III, Section C, Page 33

17

ensuring that every citizen's vote will be given its true equal weight[33]." The group is conspicuously silent, however, on national and state proposals to end fraud by requiring voters to show identification at the polls. The group's platform is additionally silent regarding election fraud that negatively impacts not only Latinos, but all voters. The platform reads:

> "LULAC aims to assure that voters' rights are safeguarded on election-day by preventing potential voting rights violations, such as intimidation at the polls, unworkable voting equipment, and other civil rights violations."

LULAC ignores the fact that legal Latino votes are as diluted by non-citizens' votes as they are by racially-motivated gerrymandering. From the 1960's rulings to the 2006 ruling in *LULAC v. Perry*, the Supreme Court, the Department of Justice, and state legislatures have taken painstaking measures to ensure that our system results in "one man, one vote".

The assiduous attention given to apportionment of representation is completely absent in verifying that the citizenship qualification for voting is strictly enforced. Nevertheless, fraudulently cast votes by illegal aliens or other non-citizens have the same, deleterious effect of diluting citizens' legitimately cast votes. The Supreme Court's case history on "one man, one vote" is primarily concerned with preserving the voting rights of minority and urban voters. The dilution that occurs when non-citizens vote, however, impacts *all* voters.

## Proposals to Verify Citizenship

The potential for non-citizens voting has not been completely ignored. Several proposals to verify the vote have been made at the state and national level.

During the May 2006 U.S. Senate debates on legislation to address illegal immigration, Senator Mitch McConnell (R-KY) proposed amending the REAL ID Act of 2005[34] to require that all state Driver's Licenses and Texas Identification Cards note whether the licensed driver is a United States citizen. The McConnell amendment to the Senate immigration bill[35] would have mandated that each state require individuals voting in federal elections in person show valid photo identification that proves their citizenship. As the Senator put it:

> "[C]onsider whether the protection of each and every American's franchise – a right at the core of our democracy – is important enough to accord it equal treatment to getting a library card or joining Sam's Club. Last I checked, the constitutional right to rent a movie or buy motor oil in bulk was conspicuously absent. However, the

---

[33] League of United Latin American Citizens, Press Release, "Hispanic Voters Vindicated in LULAC vs Perry Texas Redistricting Case.", June 28, 2006; http://www.lulac.org/advocacy/press/2006/perry1.html
[34] Public Law 109-13, Division B, Title II (109th Congress, H.R. 1268); http://thomas.loc.gov/cgi-bin/bdquery/z?d109:HR01268:@@@D&summ2=m&
[35] 109th Congress, 2d Session, S.2611 ES, "Comprehensive Immigration Reform Act of 2006", passed in the Senate on May 25, 2006;

Constitution is replete, as is the U.S. Code, with protections of the franchise of all Americans."[36]

Senator McConnell's proposal mirrored one made by the bi-partisan Commission on Federal Election Reform, chaired by former president Jimmy Carter and former Secretary of State James Baker. In its final report, the Carter-Baker Commission notes that "[p]hoto IDs currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important."[37]

Despite the fact that the proposal came from a bi-partisan commission, Senator Barak Obama (D-IL) labeled Senator McConnell's amendment "a solution without a problem." Senator McConnell's amendment ultimately failed.

A bill by Representative Henry Hyde (R-IL) takes a similar approach to securing elections against fraud. The Federal Election Integrity Act of 2006[38] would amend the National Voter Registration Act of 1993 (also known as the Motor Voter Law) so that applicants who register or re-register to vote must prove their citizenship. Under Rep. Hyde's proposal, applicants to register to vote must provide a photocopy of a document that proves the applicant is a U.S. citizen. The bill also requires voters to provide current and valid photo identification. Harris County Tax Assessor-Collector and Voter Registrar Paul Bettencourt testified before the Committee on House Administration that Rep. Hyde's bill "...would help my office ensure that only U.S. citizens are allowed to vote in federal, state and local elections."[39]

In November of 2004, Arizona voters approved a statewide ballot initiative, Proposition 200, requiring all applicants to register to prove their citizenship and requiring that voters present identification at polling places. Importantly, the United States District Court for the District of Arizona upheld Proposition 200 in a June 2006 ruling[40], reading in part:

> "[D]etermining whether an individual is a United States citizen is of paramount importance when determining his or her eligibility to vote."[41]

Lastly, the State of Georgia has made two recent attempts to verify the citizenship of its voters. First proposed in March of 2005, Georgia passed a law requiring voters to present digital identification cards in order to vote[42]. In order to obtain a card, only available at Department of Motor Vehicles offices, a voter would have to present an original birth certificate and pay $20 (the fee would have been waived for those who attested to being

---

[36] Senator Mitch McConnell, "Statement Of U.S. Senator McConnell On His Amendment To Require A Photo ID To Vote", May 24, 2006; http://mcconnell.senate.gov/record.cfm?id=256023&start=21
[37] Report of the Commission on Federal Election Reform, "Building Confidence in U.S. Elections", September 2005; http://www.american.edu/ia/cfer/report/full_report.pdf
[38] 109th Congress, 2d Session, H.R. 4844, "Federal Election Integrity Act of 2006"
[39] Testimony of Paul Bettencourt Before Committee on House Administration, June 22, 2006; http://www.hctax.net/forms/testimonyofPaul.pdf
[40] Maria M. Gonzalez, et al. v. State of Arizona, No. CV 06-1268-PHX-ROS
[41] Ibid., Page 9
[42] Georgia General Assembly, H.B. 244, http://www.legis.state.ga.us/legis/2005_06/pdf/hb244.pdf

19