most paramount right of our representative democracy, and must be reserved strictly for citizens of the United States.

Requests for identity are increasingly common: to buy alcohol or purchase tobacco; to board an airplane; to buy Sudafed; to buy certain paints or glues; to rent a movie or a library book. Requesting identification of voters is a simple measure that will greatly abate illegally cast votes by non-citizens. Additionally, the Texas Department of Public Safety will have to amend the Driver's License pursuant to the federal REAL ID Act. This gives the state a unique opportunity to verify the citizenship status of individuals at polling places, giving real meaning to the litany of laws mandating that only U.S. citizens may vote.

Whatever efforts are made to prevent illegal aliens from penetrating our borders, the state should amend its election law and practices so that illegal aliens are prevented from entering the voting booth.

# Part II

# Denying Benefits to Illegal Immigrants

### Background

The Federal Deficit Reduction Act of 2005 purportedly imposes a requirement that Medicaid applicants must prove that they are U.S. citizens in order to enroll in the program. The goal of the legislation is to ensure that any Medicaid coverage which should only be provided to US citizens, and other qualifying legal residents, is not received by undocumented immigrants or those who are unable to prove their citizenship. The proof-of-citizenship requirement in the Federal Deficit Act does not apply to other government programs such as Temporary Assistance for Needy Families (TANF), Food Stamps, the Children's Health Insurance Program (CHIP), or the Housing Choice Voucher Program (known commonly as Section 8 Housing). Enrollment in most of these programs is typically restricted to citizens and certain eligible non-citizens, although the processes by which citizenship is verified are often deficient.

The new Medicaid requirement comes as concerns about the costs of illegal immigration continue to increase. It is hard to accurately determine the cost of illegal immigration in terms of how much state and federal money is spent on illegal aliens who unlawfully enroll in government programs. In Texas, the only figure which is a reliable indication of a portion of what the state spends on illegal immigrants relates to the cost of incarceration. In its 2006-07 legislative appropriations request, the Texas Department of Criminal Justice sought over $31 million to fund the incarceration of illegal aliens.[65] At the national level, the Center for Immigration Studies estimated in 2004 that illegal aliens enrolled in Medicaid cost the federal government $2.5 billion, and that illegal aliens enrolled in Food Stamps and other food-assistance programs cost the federal government $1.9 billion.[66]

Denying benefits to illegal immigrants remains controversial, not least because many illegal immigrants contribute to state and federal programs through taxes paid on their earnings, sales taxes, and other consumption taxes. Those who argue against denying benefits to illegal immigrants hold that undocumented workers pay into the system through their taxes, and that they therefore cannot rightfully be denied access to the government programs that their tax dollars have helped to fund. This social-justice argument is extended, notably, by prominent Catholic bishops, who argue that the U.S. government should deal "compassionately with the millions of undocumented aliens in the United States."[67]

---

[65] Texas Department of Criminal Justice, Fiscal Year 2005 Operating Budget and Fiscal Years 2006-2007 Legislative Appropriations Request, August 23, 2004; http://www.tdcj.state.tx.us/publications/finance/lar-fy2006-7-short.pdf
[66] *The High Cost of Cheap Labor: Illegal Immigration and the Federal Budget,* Center for Immigration Studies, August 2004; http://www.cis.org/articles/2004/fiscal.html
[67] *Cardinals Visit White House, Hill on Immigration Reform,* United States Conference of Catholic Bishops, April 2006; http://www.usccb.org/mrs/cardinalsvisit.shtml

29

Philosophical arguments have also been made that access to government benefits and programs is an intrinsic right for anyone who lives in that country. Ruling on whether children who enter the country illegally with their parents have the right to public education, in *Plyler vs. Doe*, the U.S. Supreme Court held that:

> "[L]ike all persons who have entered the United States illegally, these children are subject to deportation. But there is no assurance that a child subject to deportation will ever be deported...a State cannot realistically determine that any particular undocumented child will in fact be deported until after deportation proceedings have been completed. It would be most difficult for the State to justify denial of education to a child enjoying an inchoate federal permission to remain." [68]

Holding the same view, Owen Fiss, Sterling Professor at Yale Law School argues that barring illegal immigrants from enrolling in any basic welfare program represents an act of subjugation, which places illegal aliens at a disadvantage in society:

> "[E]xcluding illegal aliens...severely disadvantages them economically and socially...we can well understand why the antisubjugation principle should reach beyond education and guard against exclusion from all manner of state programs, food stamps, public housing, or medical treatment. Illiteracy is a severe disability in modern society, but perhaps no more so than being malnourished or homeless or sick and in need of medical attention. The state routinely responds to these needs of its citizens, and against this background, the exclusion of immigrants has a severely subordinating effect upon them." [69]

In addition to the philosophical arguments in favor of granting benefits to illegal aliens, the case is also made that illegal aliens should have access to benefits on the basis of the various benefits, tangible and intangible, that they bring to America. Pia Orrenius, a senior economist at the Federal Reserve Bank of Dallas, recently pointed out some of the economic benefits, suggesting that:

> "[A] large influx of immigrants into an area tends to encourage an inflow of capital to put them to use...[a]t the same time, the native labor supply is changing. We have fewer and fewer low-skilled workers, largely because older workers, who are more likely to lack a high school degree, are retiring and leaving the labor force. In that way, low-skilled immigrants are filling a disappearing niche in our native labor force." [70]

It should be pointed out, however, that Orrenius' argument applies at least as well to legal immigrants as it does to illegal immigrants. The economic benefits that immigrants bring, in terms of filling a niche in the labor market, in no way derive from immigrants being

---

[68] Justice Brennan delivering the Opinion of the Court, *Plyler vs. Doe*, 457 U.S. 202 (1982), §IV; http://caselaw.lp.findlaw.com/scripts/getcase.pl?court=US&vol=457&invol=202
[69] *The Immigrant as Pariah*, Owen Fiss, The Boston Review, October/November 1998; http://bostonreview.net/BR23.5/Fiss.html
[70] *A Conversation with Pia Orrenius: The Economics of Immigration*, Southwest Economy, March/April 2006; http://www.dallasfed.org/research/swe/2006/swe0602e.html

30

Case 2:13-cv-00193   Document 668-11   Filed on 11/11/14 in TXSD   Page 4 of 8

illegal. There is no intrinsic benefit that comes from an immigrant worker being illegal *per se*. It may be true that illegal immigrants' willingness to work for lower than average wages is a benefit to employers, but it is the minimum wage law, rather than the illegal status of the workers, that creates this situation. All of the economic benefits that illegal immigrants bring would exist just as well if they were legal.

## The Philosophy of Denying Benefits

Despite the arguments which are sympathetic towards offering government benefits to illegal aliens, the case against offering benefits to illegal immigrants is far more compelling. The first part of the argument is based on the acknowledgement that illegal immigrants have come here *illegally* and that their very presence here is a violation of federal law. This argument was articulated succinctly by U.S. Senator Jim DeMint (R-South Carolina) in May 2006, when he asked "Why in the world would we endorse this criminal activity with federal benefits?"[71] In part, there is a supply-and-demand equation at work. As long as federal and state governments continue to supply generous benefits to those who have entered the U.S. illegally, people will continue to come (even if access to benefits isn't the chief reason they come). Just as many people enter the U.S. illegally to find work that is offered to them by unscrupulous employers, many others, including the families of those who come to find work, will come in order to take advantage of the welfare system. Evidence of this has been well documented for many years; as far back as 1995, the General Accounting Office recorded 24,594 Medicaid-funded births to undocumented aliens in Texas[72]. Similarly, according to *The Houston Chronicle* (September 24, 2006), in 2005, administrators at Houston's Ben Taub General Hospital and Lyndon B. Johnson General Hospital, reported that as many as 80% of the two hospitals' 10,587 births were to "undocumented immigrant" parents.[73]

Denying benefits to illegal immigrants is as much about helping stop illegal immigration as it is about doing what is right and just. The Legal Action Center reports that "federal law imposes a lifetime ban on anyone convicted of a drug-related felony from receiving federally-funded food stamps or cash assistance,"[74] which demonstrates that simply being a resident of the U.S. does not confer upon an individual permanent eligibility for enrollment in all public programs. Those who engage in criminal activity, whether it be drug-related offenses or entering the country illegally, should be denied access to government programs on the basis of that activity.

The second part of the argument in favor of denying benefits to illegal immigrants becomes apparent through the following question: to whom does the U.S. government owe its primary responsibility? The U.S. government is primarily responsible, of course, for U.S. citizens. Any welfare benefits that the U.S. government offers are created to help U.S.

---

[71] *Illegals Granted Social Security,* The Washington Times, May 19, 2006; http://www.washtimes.com/national/20060518-114132-2456r.htm

[72] *Undocumented Aliens: Medicaid-Funded Births in California and Texas,* General Accounting Office, May 1997; http://archive.gao.gov/paprpdf1/158747.pdf

[73] "'Border Baby' Boom Strains South Texas," *The Houston Chronicle*, September 24, 2006.

[74] *Opting Out of Federal Ban on Food Stamps and TANF;* Legal Action Center; http://www.lac.org/toolkits/TANF/TANF.htm

citizens. It is absolutely clear that the U.S. government is not responsible for helping people who come here illegally. Anyone who enters the country illegally shows a blatant disregard for our laws. They enter the country *without the government's knowledge or permission,* and to expect that the government should then offer the same benefits as it does to citizens either shows our own disregard for our laws or our irrationality.

Those who argue that welfare programs should be expanded to include many or all of the illegal immigrants who live in the U.S. must know that such an expansion will dilute the scarce resources with which welfare programs operate. Stretching these resources to accommodate illegal immigrants can only ensure that everyone enrolled in these programs will receive less assistance. Those who advocate the expansion of government welfare programs, such as the Center for Public Policy Priorities (CPPP), are usually critical when rising costs cause welfare programs to be cut back. In February 2006, CPPP opposed federal Medicaid funding reductions because "65,000 individuals would lose Medicaid coverage entirely."[75] Yet research by the Center for Immigration Studies (CIS) conducted in 2005 revealed that nationwide, Medicaid enrollment among legal and illegal immigrant households is almost 40% higher than enrollment among "native" households.[76] According to the analysis by CIS, 24.2% of the 35 million legal and illegal immigrants residing in the U.S. are enrolled in Medicaid – almost 8.5 million people. If just one percent of these Medicaid enrollees are illegal immigrants, then 85,000 people are enrolled illegally; which is higher than the 65,000 people CPPP complained would lose coverage in Texas when federal cuts were made. Allowing illegal immigrants to enroll in government programs because of lax citizenship-verification procedures undermines the extent to which the programs can deliver services to eligible enrollees. If the government has the authority to deport people, it has a right to deny them benefits.

Additionally, certain welfare programs, such as TANF, require enrollees to participate in "work activities" such as voluntary work, job training, or even simply searching for a job, in order to wean them off welfare programs. Illegal immigrants cannot fully participate in these work programs because any employer that hires them, even on a voluntary basis, is breaking the law.

Essential to the process of ensuring that illegal immigrants do not receive benefits to which they are not entitled is the method by which the citizenship of welfare applicants is verified. It is clear that, in Texas, citizenship-verification procedures for a variety of programs, ranging from Medicaid to Section 8 Housing, often lack the appropriate level of scrutiny. The following sections highlight some of the most obvious flaws in how the citizenship of applicants for Medicaid, TANF, Food Stamps, CHIP, and Section 8 Housing in Texas is verified.

---

[75] *Last Chance to Oppose Federal Medicaid Cuts,* CPPP, February 2006; http://www.cppp.org/files/3/Last%20Chance%20to%20Oppose%20Federal%20Medicaid%20Cuts.pdf

[76] *Immigrants at Mid-Decade: A Snapshot of America's Foreign Born Population in 2005;* CIS, December 2005; http://www.cis.org/articles/2005/back1405.html

32

## Medicaid

Despite the clear need for close inspection of applicants' citizenship status, scrutiny of the Texas Health and Human Services Commission's guidance on how Medicaid applicants must prove their citizenship reveals that the documentary requirements are not nearly as stringent as they should be. Documents that the Health and Human Services Commission (HHSC) indicates can be used to prove citizenship are[77]:

- U.S. birth certificate,
- U.S. citizen identification card,
- Report of birth abroad of a U.S. citizen,
- Religious record of birth recorded in the U.S. or its territories,
- Hospital record of birth in one of the 50 states or affiliated territories,
- Northern Mariana or American Indian identification card,
- Affidavit from 2 blood-related individuals of the applicant, who have personal knowledge of the events establishing the applicant's claim of U.S. citizenship.

This guidance means that Medicaid applicants who cannot provide appropriate documentary evidence of their citizenship, such as a birth certificate, can have their application approved if two family members simply attest to their citizenship. There is no indication of how or if HHSC officials are expected to verify the relationship between the applicants and their sponsors, or that the sponsors must themselves be U.S. citizens and if so, how this is verified.

---

**AFFIDAVIT OF FACTS CONCERNING CITIZENSHIP AND IDENTITY OF**

_____

Before me, the undersigned authority, on this day personally appeared _____ ("Affiant") who, being first duly sworn, upon his/her oath states:

1. My name is _____, and I live at _____. I am more than eighteen years of age and I have personal knowledge of the facts stated in this affidavit.

2. I have known Applicant for _____. I am personally familiar with the circumstances of the Applicant, who resides at _____. I have personal knowledge of the circumstances that establish the Applicant's United States Citizenship. The facts known to me are as follows (for example, date and place of birth in the United States):

_____
_____
_____

3. Applicant is unable to produce documentary evidence of citizenship because _____

---

[77] Health & Human Services Commission, Texas Works Bulletin 06-13; http://www.dads.state.tx.us/handbooks/TexasWorks/res/Bulletins/06-09-06.htm

33

Above is an excerpt from the sample affidavit[78] that HHSC suggests can be used by Medicaid applicants who are otherwise unable to prove their citizenship. In addition to the information shown above, the affidavit must be signed by the affiant and must be notarized by a public official. A letter sent by HHSC to all Medicaid clients to advise them of the new citizenship requirement informs the clients that:

> "If you want to provide an affidavit to prove citizenship and identity, you can get a form at your local HHSC benefits office or online at www.hhsc.state.tx.us. An affidavit must be notarized. Free notary services are available to you at your local HHSC benefits office."[79]

Despite federal guidelines issued by the Centers for Medicare and Medicaid Services, which specify that affidavits must only be used in rare circumstances "when the state is unable to secure evidence of citizenship from another listing,"[80] HHSC fails to clearly indicate to clients that the affidavit can only be submitted as a last resort, and only if there is no other way for the client to prove their citizenship. Instead, the affidavit is promoted as a way for clients who do not have the appropriate documentation, such as a birth certificate or passport, to prove their citizenship. This is despite the obvious deficiencies of using a document that requires the affiant to provide only their name, where they live, and their signature, in order to "verify" the citizenship of the applicant. Again, although federal guidelines indicate that "for the affidavit to be acceptable the persons making them must be able to provide proof of their own citizenship and identity,"[81] HHSC fails to explain that the affiant must be a citizen, and much less how this can be verified if the affiant is only instructed to provide their name, address, and signature.

HHSC's performance measures as set out in its Strategic Plan 2003-07 are revealing and perhaps suggest why citizenship verification procedures are poorly enforced. One of HHSC's "output measures" is "average number of aliens receiving emergency medical services."[82] The strategic plan indicates that this measurement should only include patients who meet all Medicaid eligibility criteria, but notes that due to data limitations "these persons are non-immigrants, undocumented aliens, and certain legal permanent resident (LPR) aliens."[83] Having performance measures that specifically include "undocumented aliens" among those who are counted towards output targets creates perverse incentives for HHSC administrators. Introducing a performance measure that counts the number of Medicaid applicants who are turned down on the grounds of citizenship or immigration status would reverse these incentives and prompt administrators to forcefully uphold eligibility criteria.

In short, the process of verifying a Medicaid applicant's citizenship is severely compromised by the potential for fraud that is presented by the use of affidavits such as the

---

[78] Full affidavit is available on HHSC's website: http://www.hhs.state.tx.us/medicaid/Affidavit_Adult.pdf
[79] HHSC letter to clients, June 2006; http://www.hhs.state.tx.us/medicaid/engApp.shtml
[80] Medicaid Fact Sheet issued by US Department of Health and Human Services, Centers for Medicare and Medicaid Services, July 6, 2006;
http://www.cms.hhs.gov/MedicaidEligibility/Downloads/Citizenshipfactsheet.pdf
[81] Ibid.
[82] HHSC Strategic Plan, 2003-07; www.hhsc.state.tx.us/StrategicPlans/SP03-07/SP03-07_AppD.pdf
[83] Ibid.

one that is suggested for use by HHSC. The verification process is compromised both because the affidavit itself requires that only the bare minimum amount of information be provided by the affiant, and because the affidavit is promoted by HHSC as a way to prove citizenship.

If an affidavit is to be used at all, it must primarily be used as a last resort, and as such, it should not be advertised to clients when they are first asked to prove their citizenship. Since Federal rules require that HHSC must accept an affidavit when other forms of identification are unavailable, it is clear that the document must be more detailed than the one currently suggested by HHSC, so that information about the applicant *and the affiant* can be verified against existing state and federal records. The applicant and affiants should also be required to attend a face-to-face meeting with HHSC administrators in the appropriate field office, so that all the relevant documentation can be presented, and HHSC can verify the identity and citizenship status of all three parties.

### TANF and Food Stamps

HHSC guidance on how administrators should verify the citizenship of TANF and Food Stamp applicants is even more deficient than the new processes to be followed for Medicaid applicants. HHSC's *Texas Works Handbook* permits citizenship to be verified by documents ranging from a U.S. birth certificate or passport, to a hospital birth record or certificate of citizenship. A voter registration card is acceptable as proof of citizenship for the Food Stamp program only, which is notable because the card can be obtained without the applicant having to do anything other than indicate that he is a citizen; *no supporting evidence is required*[84]. Furthermore, the US Department of State specifically indicates that a voter registration card is *not* an acceptable proof of citizenship when applying for a passport[85]. Yet providing a voter registration card is sufficient evidence of citizenship for the HHSC to enroll an individual in the Food Stamp program.[86] This is a clear loophole, which must be addressed. Other evidence that can be submitted by TANF or Food Stamp applicants to prove citizenship includes: baptismal records, Indian census papers, and local, state, or federal records showing a US place of birth.[87]

If the applicant cannot provide documentation to prove his citizenship, HHSC administrators are instructed to "obtain an affidavit signed by someone who knows the applicant's history...the affidavit must state that the signer: is a US citizen; knows that the applicant is a U.S. citizen; and may be fined, imprisoned, or both if he gives false

---

[84] In a June 15, 2006 letter, Ann McGeehan, Director of Elections, Secretary of State's Office states: "...under current Texas voter registration guidelines, there is no formal verification of an applicant's citizenship status... Texas relies on the applicant to provide accurate/truthful information on his or her voter registration application. To the extent that an applicant must sign the application verifying that he or she has met the qualifications to register (one of which is U.S. citizenship) and that he or she has provided accurate/truthful information, the application is processed on those merits."

[85] How to Apply in Person for a Passport, US Department of State guidance; http://travel.state.gov/passport/get/first/first_830.html

[86] HHSC Texas Works Handbook, Section 350, Item 358; http://www.dads.state.tx.us/handbooks/TexasWorks/A/300/358.htm

[87] HHSC Texas Works Handbook, Section 350, Item 358; http://www.dads.state.tx.us/handbooks/TexasWorks/A/300/358.htm

35