information."[88] Unlike Medicaid applicants, TANF and Food Stamp applicants are required to obtain an affidavit from only one person, and the person need not be a blood relative. When these facts are coupled with the more general deficiencies of HHSC's suggested affidavit (as outlined above), severe doubts about the ability of HHSC to accurately verify the citizenship of its TANF and Food Stamp applicants arise.

## CHIP

A similarly slipshod citizenship verification process exists for the Children's Health Insurance Program (CHIP), which is also administered by HHSC. Any child enrolled in CHIP must be a citizen or legal permanent resident[89], but the parent or guardian who files the application on a child's behalf is not required to provide his own immigration status. Even if parents do provide this information, they are informed that it "cannot be used to deny you admission to the US, to harm your permanent residency status or to deport you."[90] This provision is derived from federal guidelines governing "public charge", that were announced in May 1999. The Center on Budget and Policy Priorities points out that the guidance:

> "Narrowly limits the situations in which receipt of public benefits is relevant to a "public charge finding"...the receipt of any non-cash benefit, with the sole exception of institutionalization for long term care at government expense is never a factor in public charge determination... Thus, immigrants can accept Medicaid, food stamps, WIC, housing benefits, child care subsidies or other non-cash benefits without endangering their immigration status."[91]

The CHIP application form[92] requests information about the citizenship status of each child for whom coverage is being sought:

| g. Is the child a U.S. citizen? | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |
|---|---|---|---|---|
| If "No," is the child a legal permanent resident? | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |
| Children who are legal permanent residents may qualify for these health insurance programs. You must provide a copy of the front and back of the child's Resident Alien Card (I-551) or Arrival/Departure Form (I-94) with this application. This information is for OUR records only. It will not affect the immigration status of you or your children and will not be shared with the Bureau of Citizenship and Immigration Services (BCIS). | | | | |
| h. Child's Social Security # | | | | |

Space on the form is also provided for the Social Security Number (SSN) of each child, although the HHSC Texas Works Handbook notes that "undocumented aliens are not required to apply for an SSN."[93]

---

[88] HHSC Texas Works Handbook, Section 350, Item 351.2; http://www.dads.state.tx.us/handbooks/TexasWorks/A/300/351.2.htm
[89] Texas Health & Human Services Commission, CHIP/Children's Medicaid eligibility; http://www.chipmedicaid.com/english/qualify.htm
[90] Application Information for Children's Medicaid and the Children's Health Insurance Program, HHSC; http://www.chipmedicaid.com/files/CHIP_TexCare_Application_Eng.pdf
[91] *The INS Public Charge Guidance: What Does it Mean For Immigrants Who Need Public Assistance?*, Center on Budget and Policy Priorities, January 7, 2000; http://www.cbpp.org/1-7-00imm.htm
[92] http://www.chipmedicaid.com/files/CHIP_TexCare_Application_Eng.pdf

36

The HHSC also confirms that there is no process by which the citizenship of CHIP applicants is verified, meaning that the system must rely solely on the honesty of those completing application forms, since applicants are not asked to prove the citizenship of the children for whom they are applying.

Furthermore, the CHIP Prenatal Care Program specifically extends prenatal care benefits to illegal immigrants. HHSC's draft program description describes the Prenatal Care Programs's purpose as the following:

> "To extend CHIP services to unborn children of non-Medicaid eligible women below 200% FPL who are ineligible due to income or <u>immigration</u> status." [94] [Emphasis added.]

The Prenatal Care Program provides 12 months of continuous coverage for children. Therefore, if an unborn child was enrolled in the third month of a pregnancy, the child would receive 6 months of prenatal care and a further 6 months of CHIP enrollment after birth. HHSC makes clear that "the unborn child, not the mother, is being enrolled for benefits." [95]

## Section 8 Housing Choice Voucher Program

Section 8 Housing provides rental assistance to low-income families and individuals and is administered locally by public housing agencies under the supervision of the Texas Department of Housing and Community Affairs (TDHCA). Illegal immigrants are permitted to live in Section 8 Housing - the only requirement is that one member of the household must be a legal resident. Rental payments are then pro-rated in accordance with the number of eligible immigrants in the household.[96] The US Department of Housing and Urban Development reports that:

> "Eligibility for a housing voucher is determined by the PHA [Public Housing Agency] based on the total annual gross income and family size and is limited to US citizens and specified categories of non-citizens who have eligible immigration status."[97]

In a May 2004 report, the Audit Committee of TDHCA reported that Section 8 applicants are required to attest to their citizenship and to provide *"at least a signed declaration of*

---

[93] HHSC Texas Works Handbook, Section 410;
http://www.dads.state.tx.us/handbooks/Archives/texasworks/tw05-4/PartA/A400/tw-a410.asp
[94] HHSC Program Bullets for the CHIP Prenatal Care Program;
www.dshs.state.tx.us/mch/pdf/CHIP_Prenatal%20Care_Program_bullets.pdf
[95] HHSC Handout "CHIP Perinatal and Prenatal Care Program."
[96] *Section 8 Waiting List Sparks Lots of Questions and Comments,* Austin-American Statesman, July 16, 2006; http://www.statesman.com/news/content/news/stories/local/07/16philanthropy.html
[97] U.S. Department of Housing and Urban Development, Housing Choice Vouchers Fact Sheet;
http://www.hud.gov/offices/pih/programs/hcv/about/fact_sheet.cfm

37

*their US citizenship or US nationality.*"[98] The report pointed out that TDHCA's policy is to require that additional information, such as a US passport, also be provided. However, the Audit Committee found that:

> "For one of thirty tenants selected for test work, documentation was not available to determine if the tenant met the requirements of citizenship or eligible immigration status. The tenant noted, was admitted to the program on February 1, 2000 without the proper citizenship documentation. During the renewal process...DHCA noted in the tenant's file that the required citizenship information was not provided and requested the information from the tenant. However, the documentation was not obtained and benefits of $1,262 were paid during the 2003 fiscal year."[99]

As a result of the Audit Committee report, TDHCA began using the Immigration and Naturalization Service's (INS) automated system, Systematic Alien Verification for Entitlement (SAVE), to verify the immigration status of applicants who claim to have eligible immigration status. SAVE is a database established by the INS to help employers and state agencies to ascertain the immigration status of any non-citizens.

Employers may use the SAVE system to verify that a potential employee is permitted to work in the US, while state agencies can use it to establish a non-citizen's precise immigration status, and therefore the benefits or state programs for which the individual is entitled. The primary problem with using the SAVE system to verify citizenship however, is that the system only contains information pertaining to non-citizens[100], so if an individual applies for Section 8 Housing claiming to be a US citizen, the SAVE cannot substantiate the veracity of the applicant's claim.

## Recommendations

### *Restrict Birthright Citizenship by Supporting H.J.R. 46*

In 2005, the Pew Hispanic Center estimated that 3.1 million children of illegal immigrants currently reside in the U.S., having obtained citizenship by birth.[101] The citizenship that is automatically conferred upon anyone born on United States' soil clearly motivates families to illegally cross our borders. H.J.R. 46, by Congressman Ron Paul (R-TX), proposes an amendment to the Constitution that declares:

> "Any person born after the date of the ratification of this article to a mother and father, neither of whom is a citizen of the United States nor a person who owes

---

[98] TDHCA Audit Committee Report, May 12, 2004; http://www.tdhca.state.tx.us//pdf/agendas/040512-auditbook-040505.pdf
[99] Ibid.
[100] Systematic Alien Verification for Entitlement (SAVE) Program User Manual, U.S. Immigration and Naturalization Service; http://dhfs.wisconsin.gov/EM/pdf/SAVEManual.pdf
[101] *Unauthorized Migrants: Numbers and Characteristics,* Jeffrey S. Passel, Pew Hispanic Center, June 15, 2005; http://pewhispanic.org/files/reports/46.pdf

permanent allegiance to the United States, shall not be a citizen of the United States or of any State solely by reason of birth in the United States."[102]

Amending the United States Constitution to deny citizenship to individuals born in the United States to parents who are not themselves citizens is an important step to removing an important incentive behind illegal immigration. To this end, a resolution should be passed in support of the passage of H.J.R. 46 through the United States Congress.

### Base Eligibility for the CHIP Prenatal Care Program on the Residency or Citizenship Status of At Least One of the Child's Parents

The 2006-2007 General Appropriations Act (Article II, Rider 70) utilized a provision made by the Centers for Medicare and Medicaid Services, allowing states to provide CHIP benefits to unborn children.

Eligibility for the subsequently-created Texas CHIP Prenatal Care Program should be restricted to the children of U.S. citizens or legal residents.

### Require Disclosure of Citizenship When a Child Enrolls at a Public School

Amend the Texas Education Code (Section 25.002) so that disclosure of a child's residency status is required at the time of enrollment in a public school. Each school district should then be required to submit statistics to the Texas Education Agency that indicate:

(a) How many students it has enrolled who do not have documentation confirming either their citizenship or legal resident status; and,
(b) What percentage of total school district enrollment students comprises students described in (a).

The amended version of the Texas Education Code (Section 25.002), as described above, should make clear that disclosure of a child's residency status is required for statistical reasons only, and that while such disclosure is a precondition of enrollment in a public school, it cannot be used prevent a child from enrolling.

### Revise the "Emergency Medical Care" Provision in EMTALA

While birthright citizenship is the incentive behind much of the illegal immigration, the problem is exacerbated by federal law. The Emergency Medical Treatment and Active Labor Act of 1978 (EMTALA), requires Emergency Rooms to treat anyone who has an "emergency medical condition", regardless of their citizenship or ability to pay for the treatment. It is this provision that paves the way for illegal immigrants to receive free health care in American hospitals. As mentioned above, 80% of births in two Houston hospitals in 2005 were to "undocumented immigrant" parents.

---

[102] Library of Congress, 109th Congress, 1st Session, H.J.Res. 46.

39

The definition of emergency care in the Emergency Medical Treatment and Labor Act of 1986 (EMTALA) should be amended so that only the rarest births which genuinely pose a threat to the life of the mother or child should be handled in emergency rooms. It is clear that the birth of most children can hardly be called an "emergency medical condition", since the term "emergency" is defined as something *unexpected*. Childbirth is preceded by nine months of pregnancy and is generally a predictable and safe medical procedure.

EMTALA mandates that:

> "If any individual (whether or not eligible for benefits under this title) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
> (B) for transfer of the individual to another medical facility in accordance with subsection (c)."[103]

With regard to the definition of an "emergency medical condition," EMTALA provides that:

> "(1) The term "emergency medical condition" means—
> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
>> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>> (ii) serious impairment to bodily functions, or
>> (iii) serious dysfunction of any bodily organ or part; or
>
> (B) with respect to a pregnant woman who is having contractions—
>> (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
>> (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child."[104]

### Reform the Performance Measures for HHSC and other Agencies that Administer Welfare Programs

Introduce targets that measure the performance of state agencies partly on the basis of the number or percentage of applications that are turned down on the basis of an applicant's citizenship or immigration status. This will create a positive incentive for administrators to enforce eligibility criteria.

---

[103] 42 U.S.C. 1395dd(b)
[104] 42 U.S.C. 1395dd(e)

## Deny Illegal Immigrants Access to Punitive Damages

Amend Texas Civil Practices and Remedies Code (Chapter 41) so that illegal immigrants cannot receive punitive damage in civil lawsuits.

Understanding that the legal system should never reward those who break the law, an individual who breaks federal law by entering and remaining in the country illegally should not be permitted to benefit from a civil proceeding. Making it generally understood that courts in Texas will not ignore a person's illegal status will discourage illegal immigration.

## Impose a Fee on Remittances Sent to Mexico or Central or South America

Recent research carried out by the Inter-American Development Bank shows that in 2005, remittances from the United States to Mexico and Central and South American countries totaled more than $40 billion.[105] Mexico receives the largest amount of remittances – more than $20 from all countries in 2005 – 75% of which is estimated to come from the United States.[106] The Mexican government already collects a fee on remittances received by its citizens.[107] Yet in the United States neither federal nor state governments levy such a fee – despite the cost of illegal immigration to American taxpayers, particularly with respect to uncompensated health care.

It is appropriate, therefore, to add Chapter 279 to the Finance Code so that:

> "A money transmission business shall charge a fee on a money transmission that originates in this state and is transmitted to a destination in Mexico or in Central or South America. The amount of the fee is eight percent of the total amount sent by the money transmission."

To reflect the burden that illegal immigrants who do not have health insurance place on Texas' hospitals and health care providers, the revenue raised from this fee should be credited to the indigent health care support account under Section 64.002 of the Health and Safety Code. The State Comptroller concluded in November 2005 that:

> "No one doubts that undocumented immigrant workers account for a significant portion of the nation's uninsured. The Spring 2005 *Journal of American Physicians and Surgeons* estimated that illegal aliens might make up a quarter or more of the national total. [Harris County Commissioner Sylvia] Garcia noted that Harris County has spent about $50 million on health care for immigrant workers in the last five to 10 years."[108]

Using fees from remittances is clearly an appropriate response to this additional burden that illegal immigrants place on health care providers in Texas. To distinguish between

---

[105] "Remittances 2005," Inter-American Development Bank, March 2006.
[106] Ibid.
[107] "Dollars Cross Border", State Comptroller Fiscal Notes, November 2005.
[108] "Dollars Cross Border", State Comptroller Fiscal Notes, November 2005.

41

legal and illegal immigrants, a refund of the fee levied on remittances may be received by any person who can prove their United States citizenship, or that they are lawfully present in the United States.

### Repeal In-State Tuition for Illegal Immigrants

House Bill 1403 (77R) made it possible for illegal immigrants to be eligible for in-state tuition rates at public universities in Texas. Specifically, an illegal immigrant who graduates from a Texas high school after having lived in the state for least three years can qualify for in-state tuition[109].

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 declares that:

> "[a]n alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a state (or political subdivision) for any post-secondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident." [110]

It is clear that by allowing illegal immigrants the "education benefit" of eligibility for in-state tuition, Texas law currently treats illegal immigrants more favorably than it does U.S. citizens or legal residents who happen not to meet state residency requirements. This is contrary to the section of U.S Code outlined above. The question that this situation raises is why should legal U.S. residents have to pay higher tuition rates than illegal immigrants?

Furthermore, the state is effectively subsidizing the college education of students who are here illegally. When illegal immigrants graduate from Texas universities they will not be able to work legally in the state. The American Association of State Colleges and Universities reported in June 2005 that "several hundred undocumented immigrants graduated from Texas institutions this month and found themselves unemployable without work visas or legal status." [111]

To reflect the fact that granting in-state tuition to illegal immigrants places legal U.S. residents at a financial disadvantage in terms of college tuition, and that it derives little benefit to the state since illegal immigrants cannot work lawfully in Texas, in-state tuition for illegal immigrants should be repealed. Education Code (Section 54.052) should be amended so that in order to qualify for in-state tuition, an individual must be either a U.S. citizen, or a legal resident, who meets the other existing criteria under Chapter 54 of the Education Code.

---

[109] "States Weigh Tuition Breaks for Illegal Immigrants," Stateline.org, June 2003.
[110] U.S. Code, Title 8, Chapter 14, Section 1623.
[111] "Should Undocumented Immigrants Have Access to In-State Tuition?" American Association of State Colleges and Universities, June 2005.

## Conclusion

Illegal immigrants should be denied all state and federal benefits except emergency medical care. Just as the supply of jobs attracts immigrants illegally to America, so the supply of welfare programs with lax citizenship verification procedures serves as an incentive for immigrants to come and stay illegally.

The method by which state and federal agencies verify the citizenship of applicants to welfare programs is the most important part of the process of ensuring that illegal immigrants do not receive benefits to which they are not entitled. Allowing stringent documentary requirements to be circumvented by permitting applicants to attest to their own citizenship, or have a family member or other person attest on their behalf, represents a major flaw in the application process for many welfare programs in Texas.

A signed affidavit does not prove the citizenship of those applying for, or receiving, welfare. Allowing the signatures of three persons to "verify" citizenship blurs the line between clear verification of citizenship and an honor system, under which the state and federal government must trust the information provided by those applying to government programs. In reality, the only documents that absolutely prove citizenship are a birth record, naturalization certificate, or a U.S. passport. Allowing an affidavit as proof of citizenship undermines the entire system. The affidavit loophole should be eliminated from the new federal Medicaid rules, if citizenship verification is to have any meaning or force.

Those who cannot provide appropriate documentary evidence of their citizenship should be denied enrollment in a program *until such time as they can provide appropriate evidence of their eligibility.* Similarly, those already enrolled in programs who are unable to satisfactorily prove their citizenship, should be dis-enrolled until their citizenship can be verified.

The state should also be required to keep a record of the number of illegal immigrants who are enrolled in welfare programs. This count should be used to ask for a federal reimbursement for the cost of the services and financial support that the state provides to those who are here illegally.