# Part III

# Employer Sanctions

## Background

In March 2005, the Pew Hispanic Center calculated that there were 7.2 million undocumented workers in the U.S. economy. In its study, the Center estimated that undocumented workers account for 24% of all agricultural employment in the U.S., 14% of all construction employment, and 12% of all food preparation employment[112]. The demand for jobs and the willingness of American employers to supply them to undocumented immigrants in such large numbers is the cause of much of the illegal immigration that takes place across America's southern border every day.

Two core problems must be addressed if the tide of illegal immigration is to be stemmed. These problems are: (a) the economic conditions in Mexico that lead to mass migration; and, (b) the willingness of employers to illegally hire migrant labor. Though it is beyond the scope of this report to suggest remedies for the economic and social problems plaguing Mexico, this paper will attempt to show that employer sanctions and enforcement of labor law should be the focus of congressional action, rather than border enforcement or amnesty.

## The Dynamics of Illegal Immigration

Much like the flow of illicit drugs into the United States, the demand side appears to be the chief culprit of the present crisis. The willingness of some employers to violate immigration and labor laws has negative ramifications for the body politic even if the American economy benefits from illegal immigration. So rather than rewarding "lawbreakers" through blanket amnesty and encouraging American isolation through wall-building and deportation, workplace enforcement should be the primary focus of lawmakers. That would appear to be the most appropriate means to depress demand for illegal immigration and the apparent rise of cultural separatism.

A report by the Center for Immigration Studies highlights the dynamics of the process that sees so many people enter the United States illegally from Mexico each year:

> "The typical Mexican worker earns one-tenth his American counterpart, and numerous American businesses are willing to hire cheap, compliant labor from abroad; such businesses are seldom punished because our country lacks a viable system to verify new hires' work eligibility."[113]

---

[112] *The Size and Characteristics of the Unauthorized Migrant Population in the US*, Pew Hispanic Center Research Report, March 7, 2006; http://pewhispanic.org/files/reports/61.pdf
[113] "Illegal Immigration," Center for Immigration Studies, http://www.cis.org/topics/illegalimmigration.html

As to the matter of why Mexicans come to the United States, the World Bank reports that although Mexico's economic situation has greatly improved over the last decade, the statistics remain numbing:

> "According to the most recent poverty report prepared by the World Bank, approximately 50% of the population was living in poverty in 2004, an improvement over the 64% of the total population living in poverty following the 1995 crisis."[114]

The crushing weight of Mexico's poor economic health is horribly clear when the situation is considered "improved" because just 50% of its population lives in poverty. The root of American unease with perceived job losses due to illegal immigration begins with the poverty faced by Mexicans who are now part of the US workforce. The costs to that nation, through drain of its human capital, probably cannot be calculated but it is of great benefit to the U.S. economy in general and American corporations specifically.

However, the backlash over the increasing presence of illegal aliens in the U.S. economy has not lead to increased employer sanctions. Instead, it has lead to greater calls for more border security – or a closed border – which is ancillary to the central problem of the willingness of corporations to flout federal law. Without access to jobs, illegal immigration would not have reached the magnitude it is today. The vast network of migrants now living and working in the United States clearly signals to others that crossing the border in search of a job is an acceptable risk because the likelihood of securing employment is high.

Rather than focus on the workplace enforcement, policymakers, particularly on the political right, have instead searched for new ways to secure the border. As noted by the Center for Immigration Studies, "the standard response to illegal immigration has been increased border enforcement. And, in fact, such tightening of the border was long overdue. But there has been almost no attention paid to enforcement at worksites within the United States."[115] The fact that there is little or no workplace enforcement, and that Mexicans are perceived to violate American immigration laws at will in search of jobs, helps explain why the tide of public opinion runs so strongly on the issue.

## An Economic Benefit to America?

An extensive analysis of the impact of illegal immigrant labor by *BusinessWeek* magazine underscores why the U.S. Chamber of Commerce and other business organizations generally oppose efforts to increase border and workplace enforcement. The U.S. Chamber puts the blame for the problem of illegal immigration clearly on the shoulders of the federal government:

> "Experts estimate there may be as many as 10 million undocumented workers throughout the country who are working hard and performing tasks that most

---

[114] http://devdata.worldbank.org/idg/IDGProfile.asp?CCODE=MEX&CNAME=Mexico&SelectedCountry=MEX
[115] "Illegal Immigration," Center for Immigration Studies, ttp://www.cis.org/topics/illegalimmigration.html

45

Americans take for granted but won't do themselves, in such industries as construction, landscaping, health care, restaurants and hotels and others. The combination of a need for workers and an inadequate immigration system has caused an unacceptable status quo. By not creating adequate legal avenues for hiring foreign workers and not addressing the status of workers already here, Congress and this administration are not fully safeguarding the economy for the future."[116]

The Chamber's claim that business bears no culpability is hollow. Procedures already exist for hiring of foreign labor (even if those procedures are bureaucratic), and the "status of workers" is affected most by those who knowingly hire individuals who have not legally entered the United States.

Economists differ as to the magnitude of the impact of illegal aliens on the wages of low-skilled workers. George Borjas of the Kennedy School of Government argues that immigration has reduced the earnings of a "typical" high school drop out by $1,200 annually, or about 5%. Others such as Pia Orrenius of the Federal Reserve Bank of Dallas believes "immigration had a small negative impact on manual laborers' wages -- about 1% -- but did not adversely affect the wages of professionals or service workers."[117] Put another way, depressed wages for low-skilled workers generally benefits employers and the economy as a whole. In response to a *Wall Street Journal* survey:

"Nearly all of the economists – 44 of the 46 who answered the question – believe that illegal immigration has been beneficial to the economy. Most believe the benefits to business of being able to fill jobs at wages many American workers won't accept outweigh the costs."[118]

Explaining that "farms, hotels restaurants, small manufacturers, and other employers have continued to hire the undocumented with little regard to the federal laws intended to stop them," the authors of the *Business Week* analysis emphasized why the illegal workforce is so attractive to U.S. businesses:

"The fast-growing undocumented population is coming to be seen as an untapped engine of growth. In the past several years, big U.S. consumer companies – banks, insurers, mortgage lenders, credit-card outfits, phone carriers, and others – have decided that a market of 11 million or so potential customers is simply too big to ignore. It may be against the law for the Valenzuelas [a family profiled in the *Business Week* analysis] to be in the U.S. or for an employer to hire them, but there's nothing illegal about selling to them."[119]

In truth these economic debates matter little. It makes no difference whether there are positive or negative economic consequences of illegal immigration. The point is that the

---

[116] U.S. Chamber of Commerce
[117] Orrenius, Pia. "The Impact of Immigration." The Wall Street Journal. April 25, 2006. Page A18.
[118] Annett, Tim. "Illegal Immigration and the Economy." The Wall Street Journal, April 13, 2006.
[119] Grow, Brian, et.al, "Embracing Illegals," BusinessWeek online. July 16, 2005

immigration is *illegal*. Just as we do not condone theft or fraud because they can yield an economic benefit to certain parties, illegal immigration should not be condoned simply because some individuals, businesses, or consumers may benefit from it. It is a violation of federal law (8 U.S.C. 1325a) to enter the U.S. without approval by an immigration official, and it is similarly a violation of federal law (8 U.S.C. 1324a) to employ undocumented workers. Businesses and other employers have not only a legal responsibility, but also an ethical one, to ensure that they are not willfully employing illegal immigrants.

## Exploring Employer Sanctions

It is no great leap of logic to deduce that if the employment incentive for illegal immigrants can be removed, the rate of illegal immigration will fall. It is a simple supply and demand equation, which can be likened to the problem of illegal drugs in American society. No matter how many poppy fields or drug cartels are destroyed by law enforcement officials, as long as the demand for illegal drugs remains high, so the supply of these drugs will continue (the problems faced by NATO forces in Afghanistan is a strong rejoinder to skeptics of the demand-side of the drug problem). Similarly, no matter how many illegal immigrants are caught crossing the border, or detained and deported once they get here, as long as the supply of jobs and taxpayer funded benefits exists, people will continue to attempt (and probably succeed) to enter the U.S. illegally in search of work, especially since economic conditions in Mexico are so deplorable compared to that in the United States.

It is hardly revolutionary to conclude that reducing the demand for illegal immigrants in the U.S. will reduce the rate of illegal immigration. Among the most effective ways to cut the supply of jobs would be to impose strict sanctions on American employers who are found to be employing undocumented workers. A provision for sanctioning employers in this way was introduced at the federal level with the Immigration Reform and Control Act of 1986. However, enforcement of this legislation has been generally weak.

*The Washington Post* reported (June 19, 2006) that work-site enforcement operations by the Immigration and Naturalization Service (INS) were scaled back by 95% between 1999 and 2003. In 1999 there were 182 prosecutions of employers who had employed illegal immigrants; in 2003 there were just four. Total fines imposed declined from $3.6 million to just $212,000 over the same period. The INS was succeeded by U.S. Immigration and Customs Enforcement in 2004, which lead to a slight increase in convictions – 46 in 2004, and 127 in 2005.

In order to ensure that this increase in convictions continues, the most sensible and needed measure to be introduced in Congress is the "Comprehensive Enforcement and Immigration Reform Act" (S 1438) by Texas' junior senator John Cornyn. Among its primary recommendations is to authorize 10,000 additional agents over 5 years to investigate employers who hire illegal aliens. Workplace enforcement is crucial because it places the burden where it most justifiably belongs. Furthermore, workplace enforcement recognizes the sufficiency of federal law in matters relating to immigration and labor: as mentioned above, it is already illegal to come to the United States without having secured a work visa or having achieved "resident alien" status and it is already illegal to hire an

undocumented worker. New federals laws are not necessary; it is simply the enforcement of existing laws that must be improved.

Despite the recent up tick in convictions, and putting to one side the enforcement of employer sanctions by the federal government, there is still a role that states must play by drafting legislation and enforcing sanctions themselves. According to the National Conference of State Legislators, over the past year as many as 30 states have considered a total of 75 bills targeting employers of undocumented workers. States have considered almost 500 bills on immigration in 2006 alone. As far as imposing and enforcing stricter employer sanctions is concerned, the ball is clearly in the states' court.

Recommendations

In Texas, House Bill 3 (79S3), which created the gross margins tax, excludes "any compensation paid to an undocumented worker" from the amount that an employer may deduct from its tax liability (§171.1012). There are other ways in which the employment of illegal immigrants could be further penalized:

- A chapter could be created in the Labor Code, which would detail a monetary penalty (perhaps equal to the amount that was paid by the employer to illegal immigrants during the financial year) to be paid to the state by any business found to be employing one or more illegal immigrants. The revenue resulting from such fines could be credited to further enforcement efforts in order to increase their scope and effectiveness.
- Chapter 62 of the Labor Code could be amended so that the act of paying wages or any other compensation constitutes an admission by the employer that they have confirmed that the employee is authorized to work in the U.S. Any employer found to be paying wages or compensation to an unauthorized employee will have committed an offence under §37.02 Penal Code.
- Certificates of formation for all businesses filing with the Secretary of State should be accompanied by an affidavit stating that the company will not hire "unauthorized aliens." Employer actions contrary to this affidavit will constitute an offence under §37.02 Penal Code.
- The gross margins tax created by House Bill 3(79S3) could be amended so that each taxable entity is required to declare that it employed no "unauthorized aliens" when submitting its reports to the Comptroller for each tax year. Employer actions contrary to this declaration will constitute an offence under §37.02 Penal Code.
- Similarly, the gross margins tax could be amended to include an additional tax penalty equal to ten percent of their tax liability for each undocumented employee a company is found to be employing.
- Property tax exemptions could be ended for any business or individual found to be employing "unauthorized aliens."
- To further penalize repeat offenders, any business that is found to have employed "unauthorized aliens" for three out of any five years could be prohibited from conducting business in the state for a period of sixth months.

48

Legislation such as the above could be enforced by the Corporate Integrity Unit of the Office of the Attorney General, the Enforcement Division of the Office of the Comptroller of Public Accounts, and the Alien Labor Certification Program of the Texas Workforce Commission.

## Conclusion

Millions of people are compelled to leave Mexico because they live in abject poverty. The chronic problems of poverty and unemployment there, as well as the availability of jobs here, are the proximate, if not ultimate, causes of the mass migration from Mexico (even Central America) to the United States. Unless and until employers believe that they cannot escape sanction for their illegal activity, the problem of illegal immigration will remain unabated and the illegal immigration debate will oscillate between the two extremes of deportation and wall-building on the one hand, and blanket amnesty and complete access to social services on the other. Neither extreme is tenable, but neither is any policy on illegal immigration that does not address the employment incentives that are part of the root cause of this long-simmering crisis.

Despite employer sanctions being central to the Immigration Reform and Control Act of 1986, enforcement of sanctions has been woefully poor at the federal level. For conservatives, the knowledge that we live in a world governed by the incentives of demand and supply leads us to a firm conclusion in the quest to halt illegal immigration. Removing the demand for illegal labor by creating significant disincentives for employers to break the law will cause a decline in the supply of jobs and employment potential for illegal immigrants. With no guarantee of finding a job, the incentive to come to the U.S. illegally will be dramatically reduced, and a decline in illegal immigration is likely to follow.

# Part IV

# Ending Bilingual Education Programs

## Background

Chapter 29 of the Texas Education Code declares that "English is the basic language of this state." However, this declaration is undermined by the subsequent qualification that:

> "[L]arge numbers of students in the state come from environments in which the primary language is other than English. Experience has shown that public school classes in which instruction is given only in English are often inadequate for the education of those students...Bilingual education and special language programs can meet the needs of those students and facilitate their integration into the regular school curriculum."[120]

The assertion that bilingual programs are imperative for students whose first language is not English is the basis for Texas' bilingual and ESL programs. The logic employed in the Education Code is unclear, since it suggests that despite English being the basic language of the state, those students whose first language is not English must be taught in their own language. This premise is based on the notion that students' academic achievement will be compromised if they are taught in English despite either not being fluent in English, or coming from a home in which English is not the primary language.

However, experience from other states, and most notably California, suggests that students whose primary language is not English perform *better* academically when they are taken out of bilingual or English as a Second Language (ESL) programs. Academic achievement improved across the board in California after bilingual programs were significantly cut back in 1998, casting doubt on the assertion in the Texas Education Code that students with poor English proficiency need to be taught in bilingual programs.

## The Californian Experience: Proposition 227

On June 2, 1998, California voters passed Proposition 227, which fundamentally revised the basis upon which bilingual education was made available to students in California's public schools. Proposition 227 required that:

> "[A]ll children in California public schools shall be taught English by being taught in English. In particular, this shall require that all children be placed in English language classrooms. Children who are English learners shall be educated through

---

[120] Texas Education Code, Chapter 29, Subchapter B, §29.051.

sheltered English immersion during a temporary transition period not normally intended to exceed one year." [121]

As a result of the passing of Proposition 227, the number of schoolchildren enrolled in bilingual education programs in California fell from 409,879 in school year 1997-98, to 169,440 in 1998-99[122]. Bilingual education went from being widely available to all students at all grade levels, to being available only to students whose parents signed a waiver allowing them to be educated in bilingual programs, but only after they had spent the first 30 days of the school year being schooled completely in English. The only exception to this was a provision permitting one year immersion courses during which students would learn English before being assimilated into mainstream programs.

Professor Christine Rossell, author of a number of detailed studies on bilingual education and the impact of Proposition 227, has pointed out that both the one year immersion courses and the parental waiver have been abused by parents, teachers, administrators, and school districts. Rossell's research indicated that the one year immersion period was deemed to be "renewable" by the California State Board of Education if a student had not "achieved a reasonable level of English proficiency,"[123] and that:

> "Teachers in schools with enough Spanish speaking English learners to run a bilingual education program explained...that they "worked very hard" telephoning and holding meetings during the 30 day all-English trial period to convince parents that their child would be better off in the bilingual education program." [124]

These exemptions to the eradication of bilingual education explain the residual number of students still considered to be enrolled in bilingual programs even since the passing of Proposition 227. Rossell's research indicates that the number of students remaining in bilingual programs remained constant in the years immediately after the Proposition was passed, with roughly 11% of high school students and 15% of elementary school students remaining in bilingual programs. This compares to enrollments rates of 29% and 39% for high school and elementary school participants respectively, before the passage of Proposition 227.

<u>Assimilation</u>

In addition to the educational benefits of ending bilingual programs, it is also likely that such reform would improve the assimilation of immigrants into American society and culture. As Jorge Amselle, then director of the READ (Research in English Acquisition and Development) Institute, wrote in March 2000:

---

[121] "Dismantling Bilingual Education Implementing English Immersion: The California Initiative," Prof. Christine Rossell, University of Boston, August 20, 2002;
http://www.bu.edu/polisci/CROSSELL/Dismantling%20Bilingual%20Education,%20July%202002.pdf
[122] Ibid.
[123] Ibid.
[124] Ibid.

51