> "Throughout the country's past, the notion of bilingual education was essentially at odds with the prevailing U.S. "melting-pot" culture. Assimilation, not separation, has historically been the key to America's nation-building success, and a common, standardized language has been, many argue, indispensable. This ideology has played a key role in America's domestic policies toward immigrants, particularly in the area of education."[125]

The most obvious test of assimilation is language, and perpetuating a situation in which students are educated entirely or partially in languages other than English will only harm the extent to which those students can assimilate with English-speaking students.

Indeed, when Congress passed the Bilingual Education Act in 1968, its sponsor, Senator Ralph Yarborough (D-TX) stressed that the purpose of the bill was "not to try to make the mother tongue the dominant language, but just to try to make those children fully literate in English."[126] Yet as Professor Rossell's research demonstrates (below), the English language performance of California's students improved after the passage of Proposition 227. In other words, bilingual education holds back the English language skills of limited English proficiency students.

### The Benefits of Ending Bilingual Programs

Despite residual enrollment in bilingual programs, the passage of Proposition 227 has been beneficial for the California public school system. The American Institutes for Research (AIR) reported in February 2006 that "[s]ince the passage of Proposition 227, students across all language classifications in all grades have experienced performance gains on state achievement tests."[127] AIR's researchers also recommended that to improve the educational achievement of English learners further, California's schools should "ensure that the students' English learner status does not impede full access to the core curriculum," and that "[s]chools should limit prolonged separation of English learners from English-speaking students to cases of demonstrated efficacy."[128]

Rossell's research also indicates that following the passage of Proposition 227:

> "[S]chools that eliminated their bilingual education programs had a 10-point gain in reading and a 13-point gain in math, but those that maintained some form of bilingual education program had only a 6-point gain in reading and a 14-point gain in math."[129]

---

[125] "Bye-Bye to Bilingual Ed?" Jorge Amselle, March 2000; http://www.onenation.org/0003/030100.html
[126] Ibid.
[127] "Five Year Study of Proposition 227 Finds No Conclusive Evidence Favoring One Instruction Approach for English Learners," American Institutes for Research, February 21, 2006; http://www.air.org/news/documents/Release200602prop227.htm
[128] Ibid.
[129] "The Near End of Bilingual Education," Prof. Christine Rossell, published in the Journal *Education Next* by the Hoover Institution, April 2003; http://www.educationnext.org/20034/44.html

52

The results in California demonstrate that the Texas Education Code's assertion that "[e]xperience has shown that public school classes in which instruction is given only in English are often inadequate for the education of those students," is at best a questionable basis from which to develop education policy for students with limited English proficiency. The California experience casts considerable doubt on the value of the bilingual and ESL programs being operated by schools in Texas, particularly when the growing cost of these programs is taken into account.

## Bilingual Education in Texas

The Texas Education Code provides that any school district with 20 or more enrolled students with limited English proficiency (as determined by language proficiency assessments undertaken during the first four weeks of the school year), must offer bilingual education or a special language program to its limited English proficiency students[130]. The programs that must be offered under §29.053 of the Education Code are as follows:

- Kindergarten through elementary grades: Bilingual education
- Post-elementary grades through grade 8: Bilingual education or ESL
- Grades 9 through 12: ESL

§29.055 of the Education Code draws a distinction between bilingual education and ESL, with the former being defined as "a full-time program of dual-language instruction that provides for learning basic skills in the primary language of the students enrolled in the program." ESL is defined as "a program of intensive instruction in English from teachers trained in recognizing and dealing with language differences." It is clear from the definition of bilingual education that students can be taught the main parts of the curriculum in their primary language. Indeed, the Education Code also makes it clear that "elective courses included in the curriculum may be taught in a language other than English,"[131] with the only exception to this being that "in subjects such as art, music, and physical education, students of limited English proficiency shall participate fully with English-speaking students in regular classes."[132]

## The Cost of Bilingual Education

A report published by the Comptroller in December 2004 found that the Texas school population grew by 18% between the 1993-94 and 2002-03 school years. During the same period, the Comptroller found that the number of students in bilingual or ESL programs grew by 54%[133].

In the 2005-06 biennium, the Texas Education Agency (TEA) spent $22.1 billion on educational programs. The vast majority, $14.5 billion, of this was spent on "regular" programs, $3.2 billion was spent on programs for students with disabilities, while $1 billion

---

[130] Texas Education Code, Chapter 29, §29.053.
[131] Texas Education Code §29.055(d)
[132] Texas Education Code §29.055(c)
[133] "The Cost of Underpaying Texas Teachers," Texas Comptroller of Public Accounts, December 2004; http://www.window.state.tx.us/specialrpt/teachersalary04/

was spent on bilingual education programs[134]. These figures reveal that bilingual and ESL programs are the third largest area of TEA's budget, and that they receive more funding than programs for gifted or talented students, athletics programs, and career and technology programs. In short, TEA spends 5% of its budget on teaching students in languages other than English, and teaching English as a foreign language to students who have a limited English proficiency. The Education Code declares that English is the language of the state; yet, flying in the face of that declaration, $1 billion dollars of education funding is spent each year teaching students in languages other than English.

The vast majority of students enrolled in bilingual education or ESL in Texas are Hispanics. Research compiled by the Southern Methodist University indicates that 90% of students in Texas Public Schools who have "limited English proficiency", are Spanish speakers[135]. The growth rate of Texas' Hispanic population suggests that the cost of providing bilingual education programs will continue to rise. Since FY2000-01, the budgeted cost of bilingual education programs has grown by more than 40%, echoing the increase in the State's Hispanic population, which grew 54% during the 1990s[136]. Conservative estimates suggest that Texas' Hispanic population will more than double over the next 25 years[137], which indicates that the share of the education budget required by existing ESL and bilingual education programs will increase significantly.

The growth of Texas' Hispanic population only goes part of the way towards explaining the increasing cost of bilingual education programs. Another factor is the lack of qualified bilingual education teachers. The Commissioner of Education has designated bilingual education as a "critical shortage area," which allows school districts to offer stipends on top of annual salaries in order to attract qualified bilingual education teachers. In March 2006, the Comptroller reported that:

> "Bilingual education was the area most commonly reported as receiving stipends, with 56 percent (208 districts) offering teachers stipends in this area. It was also the area receiving the largest stipends, averaging $2,253 annually."[138]

This additional cost associated with providing bilingual programs only strengthens the arguments for bringing these programs to an end in Texas.

<u>Enrollment of English-Speaking Students</u>

§29.058 of the Texas Education Code declares that "[w]ith the approval of the school district and a student's parents, a student who does not have limited English proficiency

---

134 "2005-06 Budgeted Financial Data," Texas Education Agency; http://www.tea.state.tx.us/cgi/sas/broker
135 "Texas Bilingual Education Facts," Southern Methodist University; http://www.smu.edu/smunews/education/esl.asp
136 "In a State of Change: The Rapidly Growing and Increasingly Diverse Population of Texas," University of Texas at Austin, June 2005; http://utopia.utexas.edu/articles/tbr/state_change.html
137 Texas Population Projections 2000-2040, Texas State Data Center and Office of the State Demographer, June 2004; http://txsdc.utsa.edu/tpepp/2004projections/2004_txpopprj_txtotnum.php
138 "The Cost of Underpaying Texas Teachers," State Comptroller of Public Accounts, March 2006; http://www.window.state.tx.us/specialrpt/teachersalary06/

may also participate in a bilingual education program." Given the cost of bilingual programs and the assertion of English as the basic language of the state, there can be no logical argument justifying the enrollment of English-speaking students in bilingual programs. English-speaking students should be taught in English in mainstream classes, rather than being given the option to enroll in a more costly program. This section of the Education Code should be amended, since it acts only as a loophole though which students whose primary language is not English may remain in bilingual education even when they have become proficient in English.

### Recommendations

#### *Remove the Bilingual Education Mandate in the Education Code:*

> ➤ Amend §29.053 of the Education Code so that school districts are no longer mandated to offer bilingual education or a special language program to their limited English proficiency students.

#### *Exclude English-Speaking Students from Bilingual Programs*

> ➤ Remove §29.058 of the Education Code so that students who do not have "limited English proficiency" are no longer permitted to participate in bilingual education programs.

### Conclusion

Despite the provision in the Texas Education Code that "English is the basic language of this state," approximately 700,000 students with limited English proficiency are considered eligible for bilingual education, which accounts for 5% of all education spending in Texas. Educational attainment results from California suggest that scaling back bilingual education programs can have a positive impact on student achievement. This, coupled with the growing cost of bilingual programs, and the shortage of qualified bilingual teachers in Texas leads to the conclusion that bilingual education programs in Texas public schools should be ended.

While public schools may have a role to play providing students with basic English language skills – perhaps following the California model of a one-year immersion course - it is not the role of public schools to teach "limited English proficiency" students in any language other than English. This is costly and will become increasingly more costly as Texas' Hispanic population continues to grow rapidly. Bilingual programs are demonstrably no more beneficial academically than teaching students entirely in English, and they reduce the incentive for students to learn English. If English is truly the basic language of the state, it is the language in which all instruction in public schools should be carried out.

# Part V

# Border Security and Local Law Enforcement

## Recommendations

### Enable Local Law Enforcement to Detain Illegal Immigrants

In *United States vs. Vasquez*-Alvarez, the Tenth Circuit of the U.S. Court of Appeals concluded that there is "a preexisting general authority of state or local police officers to investigate and make arrests for violations of federal law, including immigration laws."[139] Additionally, in *United States vs. Santana-Garcia*, the Tenth Circuit held that federal law "evinces a clear invitation from Congress for state and local agencies to participate in the process of enforcing federal immigration laws."[140]

Allowing state-level law enforcement officials to detain illegal immigrants on the basis of their illegal residency status or illegal entry alone is a vital tool for combating illegal immigration.

A resolution supporting the passage of House Resolution 6095 through the United States Congress should be passed. H.R. 6095 affirms that:

> "[L]aw enforcement personnel of a State or a political subdivision of a State have the inherent authority of a sovereign entity to investigate, identify, apprehend, arrest, detain, or transfer to Federal custody aliens in the United States (including the transportation of such aliens across State lines to detention centers), for the purposes of assisting in the enforcement of the immigration laws of the United States in the course of carrying out routine duties."[141]

### Increase Funding for Border Security

Border sheriffs should be provided with increased funding and resources. State-led initiatives such as Operation Laredo have decreased border crime by at least 65% in border counties. Increasing funding for border security will further reduce drug trafficking, people smuggling, and other types of crime.

### Discourage Sanctuary Cities

House Amendment 1139 (by Congressman John Culberson [TX-7]) to House Resolution 5672 blocks federal law enforcement funding for cities and counties that have adopted

---

[139] *United States vs. Vasquez-Alvarez*, United States Court of Appeals, Tenth Circuit. 176 F.3d 1294, 1295 (10th Cir. 1999).
[140] *Unites States vs. Santana-Garcia*, United States Court of Appeals, Tenth Circuit. 264 F.3d 1188, 1193 (10th Cir. 2001)
[141] Library of Congress, 109th Congress, 2nd Session, H.R. 6095.

"sanctuary policies." Sanctuary policies generally prevent local law enforcement officers from asking individuals they arrest, detain, or stop whether they are in the country legally.

To reflect the harmful impact that sanctuary policies have on efforts to restrict illegal immigration, a resolution in support of House Amendment 1139 is recommended.

# Appendix A:
# Texas Voter Registration Application

**Texas Voter Registration Application**

Prescribed by the Office of the Secretary of State   VR17web.06E.p65

*For Official Use Only*  [ Print ]  [ Reset ]

## Complete These Questions Before Proceeding

Check one ☐ New ☐ Change ☐ Replacement

Are you a United States Citizen? .................................................................................. ☐ Yes ☐ No

Will you be 18 years of age on or before election day? ............................................... ☐ Yes ☐ No

*If you checked 'no' in response to either of the above, do not complete this form.*

Are you interested in serving as an election worker? ................................................... ☐ Yes ☐ No

*Continue below to complete application.*

| Last Name | First Name | Middle Name (If any) | Former Name |
|---|---|---|---|
| | | | |

**Residence Address:** Street Address and Apartment Number, City, State, and ZIP Code. If none, describe where you live. (Do not include P.O. Box or Rural Rt.)

**Mailing Address:** Street Address and Apartment Number or P.O. Box, City, State and ZIP Code: If mail cannot be delivered to your residence address.

| Date of Birth: month, day, year | Gender (Optional) ☐ Male ☐ Female | I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to 180 days, a fine up to $2,000, or both. |
|---|---|---|
| TX Driver's License No. or Personal I.D. No. (Issued by the Department of Public Safety) | | I affirm that I<br>• am a resident of this county; |
| ☐ Check if you do not have a TX Driver's License, or Personal Identification Number | | • have not been finally convicted of a felony or if a felon I have completed all of my punishment including any |
| If no TX Driver's License or Personal Identification, give last 4 digits of your Social Security Number | | term of incarceration, parole, supervision, period of probation, or I have been pardoned; and<br>• have not been declared mentally incompetent by final judgment of a court of law. |
| ☐ Check if you do not have a Social Security Number | X | ___/___/___ Date |
| Telephone Number, Include Area Code (Optional) | Signature of Applicant or Agent and Relationship to Applicant or Printed Name of Applicant if Signed by Witness and Date. | |

## Qualifications

- You must register to vote in the county in which you reside.
- You must be a citizen of the United States.
- You must be at least 17 years and 10 months old to register, and you must be 18 years of age by election day.
- You must not be finally convicted of a felony, or if you are a felon, you must have completed all of your punishment, including any term of incarceration, parole, supervision, period of probation, or you must have received a pardon.

## General Information

- Your voter registration will become effective 30 days after it is received or on your 18th birthday, whichever is later.
- If you move to another county, you must re-register in the county of your new residence.
- If you decline to register to vote, the fact that you have declined to register will remain confidential and will be used only for registration purposes. If you do register to vote, the identity of the office (if applicable) at which you submitted a voter registration application will remain confidential and will be used only for voter registration purposes.
- You must provide your Texas driver's license or personal identification number. If you do not have a driver's license or personal identification number, then give the last four digits of your social security number or if you do not have any of these identification numbers, then you must indicate by checking the appropriate box on the application side.

## Identification Requirement

If you do not have a Texas driver's license or a social security number, you will be required to present identification when you vote in person or enclose a copy of such identification with your ballot if you vote by mail. Instead, you may enclose a copy of one of the following with this voter registration application. Identification includes: a current and valid ID; a copy of a current utility bill; bank statement; government check; paycheck; or other government document that shows your name and address.

Please complete sections by printing legibly. If you have any questions about how to fill out this application, please call your local voter registrar or the Secretary of State's Office toll free at 1-800-252-VOTE(8683).
TDD 1-800-735-2989, www.sos.state.tx.us.

Este formulario está disponible en Español. Favor de llamar sin cargo a la oficina del Secretario de Estado al 1-800-252-8683 para conseguir una versión en Español.

Appendix B:
United States Citizenship and Immigration Services (USCIS) Civic Flash Card



