PL426
9/2/2014
2:13-cv-00193



# TOMMY WILLIAMS
Texas State Senator
District 4

Committees:
Administration, Chair
Finance
Education
International Relations & Trade

# NEWS RELEASE

**FOR IMMEDIATE RELEASE**
June 8, 2009
Contact: 281-364-9426

## State Senator Williams Proposes "Smile & Vote" Legislation

*Williams calls for voter approval of statewide "Smile & Vote constitutional amendment*

Texas State Senator Tommy Williams (R-The Woodlands) today proposed an alternative legislative solution to the hotly debated issue of photo voter ID. The **"Smile & Vote"** proposal would require election officials to photograph individuals who show up to vote without their voter registration card or a photo ID.

"I believe the **"Smile & Vote"** proposal addresses both the serious concerns of voter fraud and the US Department of Justice's concerns of not denying voter access," said Williams.

Williams' proposal would be put forward as a state constitutional amendment - thus requiring statewide voter approval on the matter.

"This proposal would have minimal cost," added Williams. "Texans strongly support ensuring the integrity of the ballot box, and they deserve the right to vote on it."

Under Williams' **"Smile & Vote"** proposal, all voters would be required to show either their voter registration card or photo proof of ID. Those without a voter registration card or photo ID would be photographed at the polling location. Voters not willing to be photographed would not be allowed to vote. All polling locations would be equipped with either digital cameras and/or laptop computers with cameras. Digital photos would be held by the respective county voter registration clerk for 6 years.

*Senator Williams represents Senate District 4 covering all or portions of Jefferson, Orange, Chambers, Liberty, Harris and Montgomery Counties. Williams serves as Chairman of the Senate Administration Committee and as a member of the Finance, Education, International Relations & Trade and State Preservation Board.*

Beaumont Office:
P.O. Box 5819
Beaumont, Texas 77726-5819
(409) 896-2350
Fax: (409) 896-2454

Capitol Office:
Room GE.7
P.O. Box 12068
Austin, Texas 78711
(512) 463-0104
(888) 668-1227
Fax: (512) 463-6373
Dial 711 for Relay Calls

The Woodlands Office
P.O. Box 8069
The Woodlands, Texas 77387-8069
(281) 364-9426
Fax: (281) 364-9473

CONFIDENTIAL



Δ π EXHIBIT
Deponent
Date       Rptr
WWW.DEPOBOOK.COM

LEG00000794

TRANSPORTATION CODE

TITLE 7. VEHICLES AND TRAFFIC

SUBTITLE B. DRIVER'S LICENSES AND PERSONAL IDENTIFICATION CARDS

CHAPTER 521. DRIVER'S LICENSES AND CERTIFICATES


SUBCHAPTER A. GENERAL PROVISIONS


Sec. 521.001.  DEFINITIONS.  (a)  In this chapter:

(1)  "Correctional facility" means:

(A)  a place described by Section 1.07(a)(14),
Penal Code; or

(B)  a secure correctional facility or secure
detention facility, as defined by Section 51.02, Family Code.

(1-a)  "Department" means the Department of Public
Safety.

(2)  "Director" means the public safety director.

(3)  "Driver's license" means an authorization issued
by the department for the operation of a motor vehicle.  The term
includes:

(A)  a temporary license or instruction permit;
and

(B)  an occupational license.

(3-a)  "Federal judge" means:

(A)  a judge of a United States court of appeals;

(B)  a judge of a United States district court;

(C)  a judge of a United States bankruptcy court;
or

(D)  a magistrate judge of a United States
district court.

(4)  "Gross combination weight rating" has the meaning
assigned by Section 522.003.

(5)  "Gross vehicle weight rating" has the meaning
assigned by Section 522.003.

(6)  "License" means an authorization to operate a
motor vehicle that is issued under or granted by the laws of this
state.  The term includes:

(A)  a driver's license;

1



to inmates of the Texas Department of Criminal Justice.

(b) Under the pilot program, the department may:

(1) enter into a contract with the Texas Department of Criminal Justice and the Department of State Health Services to establish an identification verification process for inmates of the Texas Department of Criminal Justice; and

(2) issue a driver's license or a personal identification certificate to an inmate whose identity has been confirmed through the verification process and who otherwise meets the requirements for the issuance of the driver's license or personal identification certificate.

(c) At the conclusion of the pilot program the governing bodies of the participating agencies may agree to continue the pilot program on a permanent basis.

(d) Not later than December 1, 2010, the department and the Texas Department of Criminal Justice shall jointly issue a report to the standing committees of the legislature with jurisdiction over issues related to criminal justice and homeland security addressing:

(1) the status of the pilot program;

(2) the effectiveness of the pilot program; and

(3) an analysis of the feasibility of implementing a statewide program based on the pilot program.

Added by Acts 2009, 81st Leg., R.S., Ch. 1146 (H.B. 2730), Sec. 14.02, eff. September 1, 2009.


Sec. 521.1425. INFORMATION REQUIRED TO BE FURNISHED TO DEPARTMENT. (a) Except as provided by Subsections (b) and (c), the department may require each applicant for an original, renewal, or duplicate driver's license to furnish to the department the information required by Section 521.142.

(b) The department shall require each applicant for an original, renewal, or duplicate driver's license to furnish to the department the information required by Sections 521.142(c)(7) and (8).

(c) Unless the information has been previously provided to the department, the department shall require each applicant for an

56

original, renewal, or duplicate driver's license to furnish to the department:

(1) proof of the applicant's United States citizenship; or

(2) documentation described by Section 521.142(a).

(d) The department may not deny a driver's license to an applicant who provides documentation described by Section 521.142(a) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Section 521.142(a).

Added by Acts 1997, 75th Leg., ch. 165, Sec. 30.76(a), eff. Sept. 1, 1997. Amended by Acts 1999, 76th Leg., ch. 640, Sec. 4, eff. Sept. 1, 1999.

Amended by:

Acts 2011, 82nd Leg., 1st C.S., Ch. 4 (S.B. 1), Sec. 72.07, eff. September 28, 2011.


Sec. 521.1426. DOMICILE REQUIREMENT; VERIFICATION. (a) The department may not issue a driver's license or a personal identification certificate to a person who has not established a domicile in this state.

(b) The department shall adopt rules for determining whether a domicile has been established, including rules prescribing the types of documentation the department may require from the applicant to verify the validity of the claimed domicile.

(c) The department may contract with a third-party personal data verification service to assist the department in verifying a claim of domicile, including whether the physical address provided by the applicant is the applicant's actual residence.

Added by Acts 2009, 81st Leg., R.S., Ch. 1146 (H.B. 2730), Sec. 13.04, eff. June 19, 2009.


Sec. 521.1427. POST OFFICE BOX NOT VALID AS ADDRESS. (a) In this section, "post office box address" means a United States Postal Service post office box address or a private mailbox address.

(b) Unless an exception exists under state or federal law,

57

S.B. No. 14

_____          _____
President of the Senate                Speaker of the House

I hereby certify that S.B. No. 14 passed the Senate on January 26, 2011, by the following vote: Yeas 19, Nays 11; April 5, 2011, Senate refused to concur in House amendments and requested appointment of Conference Committee; April 11, 2011, House granted request of the Senate; May 9, 2011, Senate adopted Conference Committee Report by the following vote: Yeas 19, Nays 12._____

_____
Secretary of the Senate

I hereby certify that S.B. No. 14 passed the House, with amendments, on March 24, 2011, by the following vote: Yeas 101, Nays 48, one present not voting; April 11, 2011, House granted request of the Senate for appointment of Conference Committee; May 16, 2011, House adopted Conference Committee Report by the following vote: Yeas 98, Nays 46, one present not voting._____

_____
Chief Clerk of the House

Approved:

27 MAY '11
_____
Date

Rick Perry
_____
Governor

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
7:00PM   O'CLOCK

MAY 27 2011
_____
Secretary of State




BRENNAN
CENTER
FOR JUSTICE

LAWYERS' COMMITTEE FOR
CIVIL RIGHTS
U N D E R    L A W

September 14, 2011

Mr. T. Christian Herren
Chief, Voting Section
Civil Rights Division
Room 7254-NWB
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

　　　　RE:　　Comment under Section 5, Submission No. 2011-2775

Dear Mr. Herren:

　　　　The Brennan Center for Justice and the Lawyers' Committee for Civil Rights Under Law, on behalf of the Texas State Conference of the NAACP, submit this comment letter opposing preclearance of a recently enacted set of changes to the State of Texas's Election Code. We respectfully request that the Department deny Section 5 preclearance to this legislation because these changes, which are set forth in Senate Bill 14, will disproportionately impact African-American and Latino citizens and have a retrogressive effect on minority voting strength across the State of Texas.

　　　　This comment letter summarizes the new voter identification requirements contained in Senate Bill 14 and outlines the special burdens—both financial and logistical—that these provisions will impose upon African-American and Latino voters in Texas. The letter also reviews some of the legislative history behind Senate Bill 14, which demonstrates that the new voter ID provisions may have been enacted with discriminatory intent. In light of this evidence of Senate Bill 14's discriminatory effects and potentially discriminatory purpose, and the State of Texas's failure to provide adequate information disproving both discriminatory effects and intent, Texas has failed to meet its burden under Section 5 of the Voting Rights Act. Accordingly, the Department should deny preclearance for Senate Bill 14.

## I. Overview of Senate Bill 14

　　　　Senate Bill 14,[1] which was signed by Texas Governor Rick Perry on May 27, 2011, and submitted for preclearance on July 25, 2011, requires that voters show photo identification at the polls in order to cast a ballot. Although Texas law already requires voters to produce identification at the polls, Senate Bill 14 would limit the acceptable forms of voter identification to one of the following types of photo identification:

---

[1] Act of May 27, 2011, Senate Bill 14, Chapter 123, 82nd Legislature (2011) ("Senate Bill 14").

1



NAACP-00005248

- A Texas driver's license;
- A personal identification card issued by the Texas Department of Public Safety and featuring the voter's photograph;
- An election identification certificate (this is a new form of state photo identification created by the legislation);
- A U.S. military identification card featuring the voter's photograph;
- A U.S. citizenship certificate featuring the voter's photograph;
- A U.S. passport; or
- A concealed handgun permit issued by the Texas Department of Public Safety.[2]

The new law would remove several types of documents from the list of valid forms of voter identification. The documents no longer accepted include birth certificates, bank statements, and utility bills.[3]

Notably, Senate Bill 14 does not permit voters to use state or federal government employee identification cards as an acceptable form of photo identification. This distinguishes Texas's voter identification requirements from those in other states such as Alabama,[4] Georgia,[5] Kansas,[6] and Tennessee.[7] Texas is also the only one of these states other than Tennessee that refuses to recognize any valid student ID card issued by a state university as an acceptable form of voter identification. In sum, Senate Bill 14's narrow list of acceptable forms of voter identification makes it one of the most restrictive pieces of voter ID legislation in the country.

Senate Bill 14's plan for educating voters about the new voter identification requirements is also severely limited. While Senate Bill 14 includes some provisions requiring that county clerks, voter registrars, and the Secretary of State engage in voter education and outreach, these requirements are primarily web-based.[8] The bill's voter education provisions delegate primary responsibility for education to the Secretary of State's office for implementing a program but provide minimal details about what the program will ultimately entail. Beyond the web-based component of the campaign and the requirement that county clerks post written notices about the new identification requirements in their offices and at the polls, the legislation provides no guidance as to how voters will be informed of the new requirements.

---

[2] Senate Bill 14, at § 14 (amending TEX. ELEC. CODE § 63.0101).

[3] Id.

[4] See ALA. CODE § 17-9-30(a)(4) (permitting voters to use "valid employee identification card containing the photograph of the [voter] and issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state").

[5] See GA. CODE ANN. § 21-2-417(a)(4) (permitting voters to use a "valid employee identification card containing a photograph of the elector and issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state").

[6] See KAN. STAT. ANN. § 25-2908(h)(1)(E) (permitting voters to use "an employee badge or identification document issued by a municipal, county, state, or federal government office or agency").

[7] See TENN. CODE ANN. § 2-7-112(c)(5) (effective Jan. 1, 2012) (permitting voters to use "valid employee identification card issued by a branch, department, agency or entity of the State of Tennessee, any other state, or the United States authorized by law to issue employee identification, provided that such identification card contains a photograph of the voter").

[8] Id. at § 5 (amending TEX. ELEC. CODE § 31.012).

2

NAACP-00005249

**II. Senate Bill 14's photo identification requirements for in-person voting will have a retrogressive effect on African-American and Latino citizens' ability to vote.**

Under Section 5 of the Voting Rights Act, any jurisdiction that seeks preclearance for a change in its voting laws must demonstrate that the proposed change is not motivated by a discriminatory purpose and will not have a "retrogressive effect" on the voting rights of racial and language minority groups. 42 U.S.C. § 1973c; 28 C.F.R. § 51.55. The Supreme Court has made clear that the covered jurisdiction "bears the burden of providing the Attorney General information sufficient to make that proof." *Branch v. Smith*, 538 U.S. 254, 263 (2003). Although we believe the Department has sufficient information to interpose an objection to Senate Bill 14, the Department may initially issue a request to the jurisdiction for "any omitted information necessary for evaluation of the submission." 28 C.F.R. §§ 51.37. However, the jurisdiction ultimately bears the burden of proof. 28 C.F.R. § 51.52.

Racial and language minority citizens in Texas have historically been subject to discrimination at the polls, which is one of the reasons why Section 5 coverage was expanded to include Texas in 1975.[9] The effects of this discrimination remain visible today. According to the November 2008 Current Population Survey, 54.3% of voting-eligible Latinos in Texas said that they were registered to vote, compared to 73.6% of voting-eligible whites and 73.7% of voting-eligible African Americans. This data suggest that voting-eligible Latinos in Texas are significantly less likely to be registered than whites.[10] Moreover, documented instances of discriminatory voter intimidation and vote suppression continue to be recorded during Texas elections in the twenty-first century.[11]

The ongoing discrimination against African-American and Latino voters in the state heightens concerns over the new obstacles to voting created by Senate Bill 14. Since Texas has failed to prove that Senate Bill 14 will not have a retrogressive effect on minority voting rights and was not motivated by a discriminatory intent, the Justice Department should deny its request for preclearance.

---

[9] *See Section 5 of the Voting Rights Act, Introduction to Section 5*, U.S. DEP'T OF JUSTICE (last visited Sept. 2, 2011), http://www.justice.gov/crt/about/vot/sec_5/about.php; *see also* NINA PERALES, LUIS FIGUEROA, AND CRISELDA G. RIVAS, MALDEF, VOTING RIGHTS IN TEXAS, 1982-2006, at 8-30 (2006) (documenting the history of discrimination against minority voters in Texas after the 1982 amendments to the Voting Rights Act).

[10] The difference in self-reported Latino and white registration rates is significant at the 5% level, using a Fisher's exact test for differences in sample proportions. U.S. CENSUS BUREAU, *November 2008 Current Population Survey* (last visited Sept. 13, 2011), available *at* http://www.census.gov/hhes/www/socdemo/voting/publications/p20/2008/tables.html. We use data from the *2008 Current Population Survey* because the *2010 Current Population Survey* provides anomalous data on voter registration rates in Texas: the 2010 data suggest that just 35% of eligible Texas voters were registered. This is dramatically different from the *2008 Current Population Survey* estimates for Texas and from the Election Assistance Commission's state-level estimates for voter registration rates in the rest of the country. *See id.*; ELECTION ASSISTANCE COMMISSION, THE IMPACT OF THE NATIONAL VOTER REGISTRATION ACT OF 1993 ON THE ADMINISTRATION OF ELECTIONS FOR FEDERAL OFFICE 2009-2010, at 34-35 (2011), *available at* http://www.eac.gov/assets/1/Documents/2010%20NVRA%20FINAL%20REPORT.pdf.

[11] *See* PERALES ET AL., *supra* note 9, at 30-31 (recounting various examples of discriminatory vote suppression in Texas during the 2004 election cycle).

NAACP-00005250

**A. Available data show that African-American and Latino citizens are less likely than white citizens to possess a form of identification required by Senate Bill 14.**

At the outset, it is our understanding that no reliable data are available which indicate the number of citizens or registered voters in Texas, by race, who possess the existing types of photo identification which will be valid under Senate Bill 14 for identification at the polls, except for data regarding concealed handgun permits, discussed below. Certainly, Texas does not include any such data in its Section 5 submission, and the Department would be well-justified in requesting it. Nonetheless, there is a variety of evidence which uniformly indicates that minority citizens in Texas likely possess the forms of identification that are valid under the new legislation at far lower rates than whites. Moreover, it is also important to note that certain minority groups have higher in-person voting rates than white voters in Texas and will therefore be disproportionately burdened by Senate Bill 14's new in-person voting requirements.[12]

**1. National data demonstrate the disproportionate impact of photo ID requirements.**

Substantial empirical evidence demonstrates that minority voters are less likely than whites to possess a government-issued photo ID.[13] According to one recent national survey of registered voters conducted following the 2008 election cycle, 10.6% of registered African-American voters, 5.8% of Asian-American voters, and 5.5% of Latino voters did not own any form of government-issued photo identification.[14] In contrast, only 5.2% of white voters lacked a valid form of photo ID.[15] Another national survey of voting-age citizens conducted after the 2006 election cycle found that 25% of voting-age African Americans do not have a current government-issued photo ID, compared to just 8% of voting-age whites.[16]

The data from national voter surveys creates a reasonable presumption that black and Latino voters in Texas will be disproportionately affected by Senate Bill 14's new photo ID requirements. Applying national rates to the Texas registered voter data, we estimate that roughly 152,000 African-American registered voters and 129,000 Latino registered voters in the state do not own a government-issued photo ID. Applying these rates to Texas's voting-eligible population, we

---

[12] A 2008 survey of voters revealed that 66.01% of Latino voters cast their ballots in person at the polls, compared to 62.98% of white voters. LORRIE FRASURE ET AL., 2008 COLLABORATIVE MULTI-RACIAL POST-ELECTION STUDY (2009), *available at* http://cmpstudy.com/index.html. While this difference is not statistically significant, it nevertheless demonstrates the risk of discriminatory impact that Senate Bill 14 creates.
[13] *See, e.g.,* FRASURE ET AL., *supra* note 12 (concluding that African-Americans were half as likely as whites to possess state-issued photo ID); MATT A. BARRETO, STEPHEN A. NUÑO, & GABRIEL R. SANCHEZ, VOTER ID REQUIREMENTS AND THE DISENFRANCHISEMENTS OF LATINO, BLACK, AND ASIAN VOTERS 10 (2007) ("For five out of six types of voter identification, Latinos, Asians, Blacks and immigrants were statistically less likely to have access to ID, as compared to Whites and the native born."), *available at* http://brennan.3cdn.net/63836cceca55aa81c4f_hlm6bhkse.pdf.
[14] *See* FRASURE ET AL., *supra* note 12.
[15] *Id.* The difference between photo ID ownership rates among registered white voters and registered black voters is statistically significant.
[16] BRENNAN CTR. FOR JUSTICE, CITIZENS WITHOUT PROOF: A SURVEY OF AMERICANS' POSSESSION OF DOCUMENTARY PROOF OF CITIZENSHIP AND PHOTO IDENTIFICATION 2 (2006), *available at* http://www.brennancenter.org/page/-/d/download_file_39242.pdf (noting that "[m]inority citizens are less likely to possess government-issued photo identification"). The same survey found that 16% of Latino voting-age citizens do not have a current government-issued photo ID but this result was not statistically significant due to the relatively small sample size of the survey. *Id.*

4

estimate that roughly 207,000 African-American voting-age citizens, 33,000 Asian-American voting-age citizens, and 237,000 Latino voting-age citizens do not have government-issued photo ID.[17] Since the state has failed to provide any information about photo ID ownership rates among minority voters in Texas, the state has failed to meet its burden under Section 5.

### 2. Senate Bill 14's limited list of acceptable forms of photo ID disadvantages African-American voters by excluding student IDs but including concealed handgun licenses.

Senate Bill 14 permits voters to use a concealed handgun license (CHL) as proof of identity but precludes voters from using a student ID, even if the student ID was issued by a state university. This will most likely have a retrogressive effect on African-American voting strength in Texas and exacerbate existing disparities in voter ID ownership rates between blacks and whites.

As the Texas Department of Public Safety (DPS) has recently noted, African Americans are significantly underrepresented among the state's CHL holders. According to DPS, of the more than 100,000 concealed handgun licenses issued in Texas last year, only 7.69% were issued to African Americans.[18] Since African Americans constitute 12.1% of Texas's voting age population, the DPS figures suggest that blacks are significantly underrepresented among the state's CHL holders. These data, alone, raise concerns about the inclusion of the CHL as a valid means of voter identification at the polls and counsel against preclearance of this provision in the absence of additional information.

Furthermore and in contrast, African Americans are more likely to be attending a public university in Texas than are whites, but student IDs were not included as an acceptable form of identification in Senate Bill 14. According to the 2009 American Community Survey, 8.0% of voting-age African Americans in Texas were attending a public university compared with only 5.8% of voting-age whites.[19] These data also reveal that African Americans constitute 17.2% of Texas's total university student population and 16.9% of the state's public university students despite representing a smaller share of Texas's overall voting age population.[20] By denying these students the opportunity to use their student ID cards to satisfy the new voter identification law—as several

---

[17] U.S. CENSUS BUREAU, *2010 Current Population Survey* (last visited Sept. 7, 2011), *available at* http://dataferrett.census.gov (data obtained by creating custom table from Current Population Survey's *Internet and Computer Use Supplement* with the U.S. Census Bureau's *Data Ferrett*). These figures are conservative estimates that may even underestimate the total number of voting-age citizens in Texas who do not have a government-issued photo ID. Since these numbers were obtained by applying the ID ownership rates observed for registered voters, *see* FRASURE ET AL., *supra* note 12, rather than ID ownership rates for all eligible voters, they likely overstate the number of people who actually own a government-issued photo ID among the population of all eligible voters.
[18] TEX. DEP'T OF PUBLIC SAFETY, CONCEALED HANDGUN LICENSING BUREAU, *Demographic Information by Race/Sex*, http://www.txdps.state.tx.us/administration/crime_records/chl/PDF/2010Calendar/ByRaceSex LicAppIssued.pdf (last visited Sept. 6, 2011). Although DPS does not keep data on how many CHLs are issued to Latinos, the available data nevertheless make clear that African-Americans are significantly less likely to obtain a CHL than are other groups. In 2010, only 0.26% of African-Americans received CHLs compared to 0.49% of whites. *See id.*
[19] U.S. CENSUS BUREAU, *2009 American Community Survey* (last visited Sept. 7, 2011), *available at* http://dataferrett.census (demonstrating significance at the 5% level, using a Z test for a single sample proportion) (data obtained by creating a custom table from the *2009 American Community Survey* one-year estimates in the U.S. Census Bureau's *Data Ferrett*).
[20] *Id.*

5

other states with photo ID laws permit[21]—Senate Bill 14 exacerbates the racial disparities in voting opportunities created by the new photo ID requirements.[22]

### B. Texas's African-American and Latino citizens face greater financial and logistical barriers than white citizens in obtaining a form of photo identification required by Senate Bill 14.

#### 1. The cost of obtaining the necessary identification will disproportionately limit minorities' ability to obtain such identification.

With over four million people living below the poverty line, Texas has one of the highest poverty rates in the nation[23]—one that has continued to rise in recent years.[24] This poor population is disproportionately made up of African Americans and Latinos, who constitute roughly three-quarters of all poor people in Texas.[25] While only 11% of white Texans live below the poverty line, roughly 30% of African Americans and 34% of Latinos in Texas live in poverty.[26]

As a result, the various costs associated with obtaining a form of photo identification required by Senate Bill 14 will most likely burden African-American and Latino voters disproportionately. Of the various forms of acceptable photo identification listed in Senate Bill 14, only the newly-created "election identification certificate" is issued to voters free of charge.[27]

---

[21] ALA. CODE § 17-9-30(a); GA. CODE ANN. § 21-2-417(a); KAN. STAT. ANN. § 25-2908(h)(1).

[22] As the Department is fully aware, students of color have long been affected by discriminatory voting laws in Texas. *See United States v. State of Texas*, 445 F. Supp. 1245, 1248-53 (S.D. Tex. 1978) (documenting the long history of discrimination against African-American student voters at Prairie View A&M University). These student voters continue to face barriers to voting today. Indeed, as recently as 2008, the Department filed a complaint against Waller County, TX, for impermissible registration practices that hindered student voting at Prairie View A&M University, one of Texas's nine historically black colleges and universities. That suit ultimately led to a consent decree issued just two weeks before the 2008 election. *See United States v. State of Texas*, 445 F. Supp. 1245, 1248-53 (S.D. Tex. 1978) (documenting the long history of discrimination against student voters at Prairie View A&M). *United States v. Waller Cnty.*, No. CV 4:08-cv-03022 (S.D. Tex. Oct. 17, 2008), *available at* http://www.justice.gov/crt/about/vot/sec_5/waller_cd.pdf.

[23] *See* STATE HEALTH FACTS, *Texas: Poverty Rate by Race/Ethnicity, States* (2008-09), http://www.statehealthfacts.org/profileind.jsp?ind=14&cat=1&rgn=45 (last visited Sept. 1, 2011).

[24] Robert T. Garnett & Kim Horner, *Texas Seeks Answers to Rising Poverty Rate*, DALLAS MORNING NEWS (Sept. 17, 2010, 7:38am ), http://www.dallasnews.com/news/nation-world/nation/20100916-Texas-seeks-answers-to-rising-poverty-4755.ece ("The government announced Thursday[, September 16, 2010,] that nearly 4.3 million Texans lived in poverty last year, a whopping 11 percent increase.").

[25] *See* STATE HEALTH FACTS, *supra* note 23.

[26] *See id.*

[27] The State of Texas charges its citizens $25 for a driver's license ($9 for people over age 85), $16 for a personal ID card ($6 for people over age 60), $140 for a concealed handgun license, and $22 for a birth certificate, which is required documentation for many of the forms of identification listed in Senate Bill 14. TEX. DEP'T OF PUB. SAFETY, *Driver License Division Fees* (last visited Sept. 1, 2011), http://www.txdps.state.tx.us/DriverLicense/dlfees.htm; TEX. DEP'T OF STATE HEALTH SERVICES, *Certified Copy of a Birth Certificate* (last visited Sept. 1, 2011), http://www.dshs.state.tx.us/vs/reqproc/certified_copy.shtm. The U.S. State Department charges a $55 fee for a passport card and $135 for a passport book. U.S. DEP'T OF STATE, *Passport Fees* (last visited Sept. 1, 2011), http://travel.state.gov/passport/fees/fees_837.html. The citizenship documents accepted under Senate Bill 14 cost even more—typically, between $325 and $365. U.S. CITIZENSHIP & IMMIGRATION SERVICES, *Check Filing Fees* (last visited Sept. 1, 2011), http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=b1ae408b1c4b3210VgnVCM100000b92ca60aRCRD&vgnextchannel=b1ae408b1c4b3210VgnVCM100000b92ca60aRCRD.

6

NAACP-00005253

Moreover, even this "free" certificate has the potential to impose burdensome costs on the State's poor voters. These costs would not only include the expense of traveling to and from the regional Driver's License Offices (DLOs) where the certificates will presumably be issued,[28] but also the expense of furnishing any information and documents necessary to obtain the certificate itself. Since Senate Bill 14 permits DPS to ask certificate applicants to furnish the same information required on a driver's license application,[29] applicants for an election identification certificate could potentially be required to produce a wide array of identification documents that are not freely available, such as birth certificates, which cost $22 in Texas.[30]

Thus, despite Senate Bill 14's command that DPS "may not collect a fee for an election identification certificate," the bill does not eliminate the various costs that its photo identification requirement would impose upon Texas's poor voters—the large majority of whom are African-American or Latino.

### 2. African-American and Latino citizens have less access to both public transportation and private vehicles than whites and therefore face greater obstacles in obtaining photo identification from DPS's Driver's License Offices.

Individuals who need to obtain an election identification certificate, personal identification card, or driver's license in order to vote under Senate Bill 14 must travel to a Driver's License Office in order to obtain one.[31] This requirement imposes disproportionate costs on Texas's minority citizens who not only have less access to private vehicles than whites but also have limited access to the regional transit systems that they would need in order to reach their nearest DLO office.

The latest census data reveals that African-American and Latino citizens in Texas are less likely than whites to own a car. Among voting-age citizens, 9.8% of African Americans and 4.3% of Latinos do not have access to a personal vehicle.[32] This totals over 300,000 minority citizens who

---

[28] The Department of Public Safety issues driver's licenses at its Driver's License Offices. Since Senate Bill 14 does not specify where voters might obtain the newly-created "election identification certificate," see § 14, we have assumed that DPS will issue these certificates at Driver's License Offices.

[29] Senate Bill 14, § 20, permits the department to "require each applicant for an original or renewal election identification certificate to furnish to the department the information required by Section 521.142" of the Transportation Code. Section 521.142 of the Transportation Code includes a provision that gives the department broad discretion to impose additional requirements on applicants ("The application must include any other information the department requires to determine the applicant's identity, competency, and eligibility."). TEX. TRANSP. CODE ANN. § 521.142(c).

[30] See TEX. DEP'T OF STATE HEALTH SERVICES, Certified Copy of a Birth Certificate (last visited Sept. 1, 2011), http://www.dshs.state.tx.us/vs/reqproc/certified_copy.shtm. Voters born outside of Texas may face additional hurdles to obtaining a birth certificate. For instance, voters who were born in Arkansas—a neighboring state of Texas—must not only pay $12 for a birth certificate but, in addition, must produce government-issued photo ID with their application. ARKANSAS DEP'T OF HEALTH, Birth Records (last visited Sept. 13, 2011), http://www.healthy.arkansas.gov/programsServices/certificatesVitalRecords/Pages/BirthRecords.aspx.

[31] Senate Bill 14, § 20.

[32] U.S. CENSUS BUREAU, 2000 Census (last visited Sept. 7, 2011), available at http://factfinder.census.gov/servlet/CustomTableServlet?_ts=333464746305. It is important to note that these figures are based on U.S. Census data that document vehicle access at the household—rather than individual—level. As a result, this Census data will include an individual who does not own a driver's license within the population of people who have access to a private vehicle if anyone in that individual's household has access to a private vehicle. Thus, the U.S. Census data, which indicate that 90.2% of African Americans in Texas have access to a private

NAACP-00005254

would need to access a public or regional transit system in order to obtain an election identification certificate or other acceptable identification issued by DPS. Since Texas's white citizens have greater access to private transportation options—nearly 98% have access to a personal vehicle—Senate Bill 14's requisite process for obtaining an election identification certificate places a disproportionate burden on the state's minority voters.[33]

Texas citizens without access to a private vehicle do not always have access to public transit alternatives. In fact, public and regional transportation quality varies widely across the state and features many geographic gaps in access. At least twelve of the state's 38 regional public rural transit providers do not offer weekend service.[34] Twenty-three of these rural transit providers require individuals to call ahead in order to schedule transport, often a full 24 hours in advance.[35] The other 15 transit providers employ fixed routes, which would likely be difficult to access for individuals who do not live along those routes and lack access to private vehicles.[36]

Newton County provides a stark example of the shortcomings in Texas's public transit system. The county, which has the highest rate of Latino households in Texas without access to a private vehicle,[37] has no public or regional transit system whatsoever.[38] Many African Americans in the county are similarly placed at a disadvantage since 22% of black households there have no access to a private vehicle.[39] These figures offer a telling contrast to the more than 93% of white households in Newton County that enjoy access to a private vehicle.[40] This discrepancy illustrates the unequal burdens that traveling to obtain photo identification will place on African-American and Latino voters in Texas.

In sum, the limited public transit options in Texas may pose a significant obstacle for voters who must travel to obtain photo identification—particularly African Americans and Latinos.

### 3. Minority citizens must travel farther distances than whites to obtain photo identification.

Not only do Texas's minority citizens have less access to transportation than whites but they must also travel farther distances in order to reach a Driver's License Office operated by DPS. An analysis of census block populations from the 2010 U.S. Census reveals that nearly one million

---

vehicle, remains consistent with studies that find that only about 75% of African Americans own a driver's license, *see* CITIZENS WITHOUT PROOF *supra* note 15 and accompanying text,
[33] *Id.*
[34] *See* TEX. DEP'T OF TRANSP., *Rural Transit Systems Contacts* (last visited Sept. 12, 2011),
http://www.dot.state.tx.us/drivers_vehicles/public_transit/contacts.htm?type=rural (listing contact information for rural public transit systems in Texas).
[35] *Id.*
[36] *Id.*
[37] U.S. CENSUS BUREAU, *2000 Census* (last visited Sept. 7, 2011), *available at*
http://factfinder.census.gov/servlet/CustomTableServlet?_ts=333464746305.
[38] TEX. DEP'T OF TRANSP., *Rural Public Transportation Systems Map* (last visited September 7, 2011), *available at*
http://ftp.dot.state.tx.us/pub/txdot-info/ptn/rural_map.pdf.
[39] U.S. CENSUS BUREAU, *2000 Census* (last visited Sept. 7, 2011), *available at*
http://factfinder.census.gov/servlet/CustomTableServlet?_ts=333464746305.
[40] *Id.*

8

NAACP-00005255

African-American and Latino voting-age citizens would have to travel more than 10 miles in order to reach the closest DLO location to their home.[41]

In particular, relative to other ethnic groups in Texas, Latino citizens are more likely to have to travel this distance in order to reach their nearest DLO location.[42] This disparity is even greater when assessing the population of Texas citizens who must travel 20 miles or more to reach their nearest DLO location. The relative concentration of Latino voting-age citizens in these areas is 85.6% greater than it is in the rest of Texas.[43] In contrast, the relative concentration of white voting-age citizens is 34.3% less than in the rest of Texas.[44] These figures demonstrate that the obstacles to obtaining an election identification certificate fall disproportionately on Texas's Latino citizens, thus seriously undermining the accessibility and effectiveness of this "free" identification option. Since Latinos in Texas have less access to reliable transportation than whites, the added burden of traveling farther than others to obtain an election identification certificate makes it particularly likely that Senate Bill 14 will have a retrogressive effect on Latino voting strength.

### C. Senate Bill 14 grants broad discretion to polling place officials and thereby creates new opportunities for discrimination against minority voters.

The Department should take note of the potential for discriminatory application of the provision that allows polling place officials to determine whether the name on the identification document provided by the voter matches the voter's name on the registration rolls.[45] Under this provision, if the two name entries do not "match exactly," the individual will be allowed to vote only if the name that appears on the identification document is "substantially similar" to the name that appears on the registration list and "the voter submits an affidavit stating that the voter is the person on the list of registered voters."[46] But the legislation is silent as to what happens when a person presents identification that an election official refuses to accept as "substantially similar." This suggests that the person would either be precluded from casting a ballot or would be subject to the provisional balloting requirements requiring presentation of identification after the election, which could be futile given that the person's proof of identification was already rejected.[47]

Empowering election officials with this level of discretion creates a substantial risk that Senate Bill 14 will be enforced in a racially discriminatory manner. In particular, this discretion may

---

[41] Statistics were obtained by using ArcMap10 software to tabulate the total population living in Census block groups that were in their entirety at least ten miles from the nearest DLO location. DLO locations were obtained from the Texas Department of Public Safety's *Texas Driver's License Office Map*, available at http://www.txdps.state.tx.us/administration/driver_licensing_control/rolodex/search.asp; 2010 Census block group population data were obtained from the Texas Legislative Council, available at ftp://ftpgis1.tlc.state.tx.us/2011_Redistricting_Data/2010Census/Population/. For a more detailed explanation of this analysis with accompanying graphics, see Sundeep Iyer, *Voter ID in Texas: The Accessibility of DLO Location*, BRENNAN CTR. FOR JUSTICE, (last visited Sept. 13, 2011), http://www.brennancenter.org/blog/archives/the_accessibility_of_texas_dlo_locations.

[42] Iyer, *supra* note 41.

[43] *Id.* (using ArcMap10 software to tabulate the total population living in Census block groups that were in their entirety at least twenty miles from the nearest DLO location).

[44] *Id.*

[45] Senate Bill 14, § 9 (amending TEX. ELEC. CODE § 63.001).

[46] *Id.*

[47] In this regard, if more persons need to vote challenged ballots, the NAACP has identified concerns with the manner in which officials decide whether to count challenged ballots after an election.

NAACP-00005256

make it more difficult for Latino and Asian-American voters to satisfy the bill's requirement that the name entries be identical or "substantially similar."

First, it is more likely that Latino and Asian-American voters will have name entries that do not "match exactly," and thus will be subject to a determination by polling officials as to whether the names are "substantially similar." For Latino voters, name discrepancies may result from the occasional use of anglicized nicknames or different notations of maternal and paternal surnames.[48] Asian-American voters often have common English names on some forms of identification that differ from their legal transliterated names on other forms of identification.[49] The Texas House of Representatives heard testimony on this very point with regard to Asian-American voters during a 2009 hearing on an earlier version of the photo ID bill.[50] Special problems will also likely arise for other voters whose names differ from the names on their IDs, such as women who have changed their names after marriage. There is evidence that indicates that minority women are more likely to change their names after marriage than white women,[51] further raising the possibility that Senate Bill 14 will have a greater impact on minority voters.

Second, there is a valid concern that polling place officials will use the discretion delegated to them to conclude that names that do not "match exactly" are also not "substantially similar," which, as indicated would likely result in voters being precluded from casting ballots that will be counted. For example, studies have documented the inconsistent application of voter ID laws in recent election cycles. One 2009 study, for instance, documented the "persistence of differential treatment of racial groups at polling places."[52] The study found that, nationally, 71% of African-American voters and 65% of Latino voters were asked to show photo ID at the polls compared to only 51% of white voters during the 2008 election cycle.[53] The researchers who conducted this analysis ultimately concluded that "there were large differences across racial groups in whether poll workers' requested voter identification."[54] Another recent study confirmed that these disparities in application remain even when controlling for differences in voter ID requirements across states. In

---

[48] Latino voters' high rates of in-person voting, *see supra* note 12, also demonstrates how Senate Bill 14's "substantially similar" provision creates new opportunities for polling place discrimination.

[49] R.G. Ratcliffe, *Texas Lawmaker Suggests Asians Adopt Easier Names*, HOUS. CHRON. (Apr. 8, 2009, 5:30am), http://www.chron.com/news/houston-texas/article/Texas-lawmaker-suggests-Asians-adopt-easier-names-1550512.php (summarizing the testimony of Ramey Ko, a representative of the Organization of Chinese Americans, before the House Elections Committee).

[50] *Id.*

[51] There is no one study that establishes this specific conclusion; however, there is good reason to believe this is true. *See* Richard E. Kopelman et al., *The Bride Is Keeping Her Name: A 35-Year Retrospective Analysis of Trends and Correlates*, 37 SOC. BEHAV. & PERSONALITY 687, 694 (2009) (concluding that 22% of women with graduate degrees kept their name when they got married; just 14% of women without graduate degrees kept their name) and U.S. CENSUS BUREAU, *March 2010 Current Population Survey* (last visited Sept. 7, 2011), *available at* http://dataferrett.census.gov (data were obtained by creating a custom table from *Current Population Survey* microdata in U.S. Census Bureau's *Data Ferrett*) (revealing that 3.3% of voting-eligible Latino women in Texas who have been or are currently married have a graduate degree, compared to 8.0% of similarly situated black women and 10.4% of similarly situated white women).

[52] R. MICHAEL ALVAREZ ET AL., 2008 SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS: FINAL REPORT 40-42 (2009), *available at* http://www.pewcenteronthestates.org/uploadedFiles/Final%20report20090218.pdf.

[53] *Id.*

[54] *Id.* at 42.

10

states whose laws mention photo identification, 96% of African-Americans and 91% of Latinos are asked to produce an ID at the polls.[55] Only 85% of whites in these states are asked for ID.[56]

Since Texas's submission to the Department fails to address—or even acknowledge—any of the new risks that Senate Bill 14 creates with respect to polling place discrimination against both Latino and Asian-American voters, the Department should deny its request for preclearance.

### D. Senate Bill 14's voter education and outreach program is less likely to reach Texas's African-American and Latino citizens since they have lower literacy rates and less internet access than whites.

Senate Bill 14's inadequate plan for educating voters about the new photo identification requirement will only exacerbate its retrogressive effect on minority voting strength. Courts have recognized that whenever a state creates new requirements for voting, potential voters must be notified and informed about those new voting requirements so that they have a reasonable opportunity to satisfy them.[57] Local election officials play a critical role in this process. While Senate Bill 14 includes a provision for voter education and outreach, the only specific mandates that this provision places on voter registrars in each county is to update their existing websites with information about the new requirement. Senate Bill 14 does not even require voter registrars in counties without informational websites to create such websites. Rather, the bill limits its educational mandate to "the voter registrar of each county that maintains a website."[58]

This limitation will severely undermine the voter education plan set forth in Senate Bill 14. Although some county clerks in Texas provide hyperlinks on their webpages to the Secretary of State's website, many of these counties do not maintain separate webpages for their registrars of voters. For instance, none of the voter registrars in the eight Texas counties with the highest percentages of voting-age Latinos currently maintains its own website (in each of these counties, Latinos constitute 90% or more of the voting-age population). Furthermore, only three of the voter registrars in the eight Texas counties with the highest percentages of voting-age African Americans currently maintain their own websites. Of these sixteen counties, only three currently have functioning links to a relevant county website on the Texas Secretary of State's "Links of Interest" webpage, where individual counties' voting websites are listed.[59] Thus, Senate Bill 14's limited online notice requirements are poorly suited to educate voters in black and Latino communities across the state.

This plan is also unlikely to benefit the large number of Texans who do not have access to the internet. According to the 2010 Current Population Survey, white voting-age citizens in Texas are much more likely to have internet access than African-American and Latino voting-age citizens,

---

[55] Charles Stewart, III, *Racial Differences in Election Administration* 25 (CalTech/MIT Voting Technology Project, Working Paper No. 82, 2009), *available at* http://www.vote.caltech.edu/drupal/files/working_paper/WP_82.pdf.
[56] *Id.*
[57] *See, e.g.*, *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1348 (11th Cir. 2009) (describing the lower court's "concern," following the enactment of a new voter ID law, "about the lack of knowledge among voters that photo identification was needed for in-person voting").
[58] Senate Bill 14, § 5.
[59] The webpage displays links to websites for Houston County and Bowie County but the links provided to these websites are currently dead. *See* TEXAS SECRETARY OF STATE, LINKS OF INTEREST, *County Sources* (last visited Sept. 12, 2011), http://www.sos.state.tx.us/elections/voter/links.shtml#County.

11

NAACP-00005258

whose respective rates of internet access both fall below the national average.[60] Only 58.7% of Texas's Latino voting-age citizens and an even smaller percentage of the state's African-American voting-age citizens—just 55.1%—have internet access. In raw population numbers, this amounts to over two and a half million minority voters who would not benefit from Senate Bill 14's web-based voter education program. Since 78.3% of Texas's white voting-age citizens have internet access—a rate just above the national average—the online component of Senate Bill 14's voter education plan is much more likely to reach white voters than minority voters.

The other components of Senate Bill 14's voter education plan—such as the mandate that county clerks post notices of the new photo identification requirements in their offices and at the polls[61]—will similarly have a diminished effect in minority communities relative to white communities. The best available data on literacy rates across Texas reveal that the counties with the highest rates of Level 1 literacy also have the highest minority voting-age populations.[62] Since individuals with a Level 1 literacy level cannot identify or enter background information on a social security card, they would not benefit from written notices describing the various forms of photo identification now required for voting under Senate Bill 14. In any event, it seems very unlikely that posting notices about the new photo identification requirements in clerks' office will reach many people at all and, of course, providing information at the polls is too late to help citizens vote who are without the requisite identification.

Although Senate Bill 14 delegates primary responsibility to the Secretary of State for designing the other components of the voter education and outreach campaign, neither the legislation nor the State's submission for administrative preclearance provides any additional guidance as to what that program might entail. In the absence of this information, and in light of the stark racial disparities in both internet access and adult literacy rates across the state, Texas has failed to demonstrate that its voter education plan will avoid a retrogressive effect on minority voting strength. Accordingly, DOJ should deny the state's request for preclearance with regards to Senate Bill 14.

---

[60] U.S. CENSUS BUREAU, *2010 Current Population Survey* (last visited Sept. 7, 2011), *available at* http://dataferrett.census.gov (data obtained by creating custom table from Current Population Survey's *Internet and Computer Use Supplement* with the U.S. Census Bureau's *Data Ferrett*).

[61] Senate Bill 14, § 5.

[62] *See* NATIONAL INSTITUTE FOR LITERACY, THE STATE OF LITERACY IN AMERICA: ESTIMATES AT THE STATE, LOCAL, AND NATIONAL LEVELS 243-53 (1998), *available at* http://www.eric.ed.gov/PDFS/ED416407.pdf. The report states that Dimmit, Duval, Cameron, Brooks, and El Paso Counties have the highest rates of Level 1 literacy in Texas. According to the 2010 U.S. Census, the voting-age population in all of these counties is greater than 84% non-white. U.S. CENSUS BUREAU, *2010 Census* (last visited Sept. 7, 2011), *available at* http://factfinder.census.gov/servlet/CustomTableServlet?_ts=333464942224.

12

NAACP-00005259

III. **The Legislature's failure to take precautions against minority disenfranchisement in Senate Bill 14, despite its knowledge that the new photo identification requirements would disproportionately burden minority voters, suggests that the law may have been enacted for a discriminatory purpose.**

   A. **The Texas Legislature was presented with ample evidence of the discriminatory effects that Senate Bill 14 would have on minority voters prior to passed the bill.**

During the hearings and floor debates on Senate Bill 14, several witnesses and legislators testified about the likely discriminatory impact that the new photo identification requirement would have on Texas voters. Some also openly voiced their opinions about the discriminatory purpose behind Senate Bill 14.

- At a hearing before the Senate Committee of the Whole on January 25, 2011 Gary Bledsoe, President of the Texas State Conference of the NAACP, testified against Senate Bill 14. He recounted the long history of discrimination against African-American voters in Texas and compared Senate Bill 14 to less restrictive voter ID laws around the country, concluding, "[i]t's very clear that the Texas law will impair and have a clearly disparate disadvantage on people of color."[63] Responding to questions from the committee after his testimony, Bledsoe stated that he knew of no black elected officials in the entire State of Texas who supported Senate Bill 14.

- At the same Senate hearing, two past national presidents of the League of United Latin American Citizens (LULAC), Hector Flores and Rosa Rosales, testified that Senate Bill 14 would have a discriminatory impact on Latino voters. They cited the recent history of discrimination against Latino voters in Texas and argued that the new photo ID requirement would create yet another "obstacle . . . for minorities, who may not have ID to begin with."[64] Another LULAC representative testified that the legislation would "continue the tradition . . . . of keeping Mexican[-Americans] from voting."[65]

- In 2009, during a hearing in the Texas House of Representatives on an earlier piece of voter identification legislation, Representative Betty Brown told one witness that

---

[63] *Act Relating to Requirements To Vote, Including Presenting Proof of Identification; Providing Criminal Penalties: Hearing on S.B. 14 Before the S. Comm. of the Whole,* 2011 Leg., 82nd Sess. (Tex. 2011) (testimony of Gary L. Bledsoe, Texas State Conference of the NAACP).

[64] *Act Relating to Requirements To Vote, Including Presenting Proof of Identification; Providing Criminal Penalties: Hearing on S.B. 14 Before the S. Comm. of the Whole,* 2011 Leg., 82nd Sess. (Tex. 2011) (testimony of Hector Flores, LULAC of San Antonio, TX). Since a full transcript of the January 25th hearing is not available, the quotes set forth in this section were transcribed by the Brennan Center after watching videos of the hearing on the Texas State Senate's website, available at http://www.senate.state.tx.us/avarchive/?yr=2011.

[65] *Act Relating to Requirements To Vote, Including Presenting Proof of Identification; Providing Criminal Penalties: Hearing on S.B. 14 Before the S. Comm. of the Whole,* 2011 Leg., 82nd Sess. (Tex. 2011) (testimony of Fidel Acevedo, LULAC of Austin, TX).

13

NAACP-00005260

Asian Americans should adopt names that are "easier for Americans to deal with."[66]
Her comment was in response to a witness's testimony about the difficulties that
Asian-American voters would face if forced to show identification at the polls.

- At another 2009 hearing in the House on the same piece of legislation, Justin Levitt
  of the Brennan Center testified about the numerous research studies that have
  documented racial disparities in the rates of photo ID ownership.[67] This
  testimony—along with all of the expert testimony offered on the proposed 2009
  voter ID legislation—was entered into the record during the Senate debates on
  Senate Bill 14 earlier this year.

- During a House floor debate on March 23, 2011, the House of Representatives
  rejected an amendment that would have added at least some precautions to Senate
  Bill 14. Representative Marc Veasey, an African-American legislator who sits on the
  House Elections Committee, offered an amendment that would have required the
  Secretary of State to determine at the next statewide election whether racial and
  language minority voters had been disproportionately burdened by the new photo
  ID requirement.[68] If the Secretary concluded that the new photo identification
  requirement had led to minority disenfranchisement, the amendment would have
  required that the list of acceptable forms of voter ID be expanded for future
  elections. The House voted down the amendment 99-48.[69]

- During the same floor debate, Representative Richard Peña Raymond proposed an
  amendment to Senate Bill 14 to address his specific concerns about the bill's
  discriminatory impact on minority voters.[70] His amendment would have provided
  travel reimbursements to people who live below the federal poverty line and incur
  travel expenses while travelling to obtain photo identification for voting.
  Representative Raymond explained that the amendment would help poor voters who
  have to travel vast distances—upwards of more than thirty miles, in some cases—to
  reach a DPS office, where they can obtain a photo identification. The lack of such a
  provision in Senate Bill 14, he noted, supported his view that Senate Bill 14 was
  motivated by discrimination. He explained that "of the four million poor people in
  the State of Texas . . . nearly three-fourths [] are minority. And that's why I believe
  this aimed at minorities."[71] The amendment was voted down 100-46.

---

[66] Ratcliffe, *supra* note 48.

[67] *Act Relating to Relating to Requiring a Voter To Present Proof of Identification: Hearing on S.B. 362 Before the
H. Comm. on Elections*, 2009 Leg., 81st Sess. (Tex. 2009) (testimony of Justin Levitt of the Brennan Center for
Justice), *available at* http://brennan.3cdn.net/6672fa437920 18edac_jpm6bxr6c.pdf.

[68] *Id.* at 1016-19, *available at* http://www.journals.house.state.tx.us/hjrnl/82r/pdf/82RDAY40FINAL.PDF#page=74.

[69] *Id.*

[70] *Id.* at 1009-12, *available at* http://www.journals.house.state.tx.us/hjrnl/82r/pdf/82RDAY40FINAL.PDF#page=67.

[71] *Id.*

14

- Later that day, after recounting the history of voting discrimination in Texas and describing Senate Bill 14's likely impact on minority voters, Representative Lon Burnam said that "this [legislative] session was shaping up to be the most overtly racist session that I have witnessed in 25 or 30 years." Another legislator, Representative Armando Martinez agreed that Senate Bill would undermine minority voting rights and stated that he viewed the bill as "a personal attack on minorities."[72]

Despite this evidence and testimony, the Legislature nevertheless voted in favor of Senate Bill 14 without taking any precautions against minority disenfranchisement.

## B. The Legislature's proffered justification for Senate Bill 14, namely to prevent voter fraud, is pretextual and lacks substantive support in the legislative record.

Proponents of Senate Bill 14 repeatedly identified the elimination of voter fraud as their primary justification for enacting the new photo identification requirement. However, the Bill's lengthy legislative record contains no concrete evidence of in-person voter fraud—the only kind of voter fraud that the new photo ID requirement would prevent[73]—occurring anywhere in Texas. The committee reports from both houses of the Legislature make no reference to any officially-documented cases of in-person voter fraud and neither does the House Research Organization's analysis of the final bill. Likewise, the written documents included in the legislative record are wholly devoid of any specific evidence of such voter fraud occurring in Texas.

The dearth of evidence supporting the allegations of Senate Bill 14's proponents is not surprising. Several recent analyses of voter fraud have concluded that in-person voter fraud is extremely rare in the United States.[74] As a 2006 study conducted by the Election Assistance Commission explained, "impersonation of voters is probably the least frequent type of fraud because it is the most likely type of fraud to be discovered, there are stiff penalties associated with this type of fraud, and it is an inefficient method of influencing an election."[75] Indeed, some of the most highly publicized allegations of polling place fraud in recent Texas elections were later proven unfounded.[76]

The scant evidence of in-person voter fraud, both in Texas and around the country, indicates that the Legislature's proffered justifications for Senate Bill 14 are merely pretextual. The legislative

---

[72] TEX. HOUSE OF REPRESENTATIVES, *Texas House Journal*, 82nd Leg., 2011 Reg. Sess. No. 40, at 1031-32 (Tex. 2011), *available at* http://www.journals.house.state.tx.us/hjrnl/82r/pdf/82RDAY40FINAL.PDF#page=90.
[73] *See* JUSTIN LEVITT, BRENNAN CTR. FOR JUSTICE, THE TRUTH ABOUT VOTER FRAUD 6 (2007), *available at* http://www.truthaboutfraud.org/pdf/TruthAboutVoterFraud.pdf.
[74] *See* ELECTION ASSISTANCE COMMISSION, ELECTION CRIMES: AN INITIAL REVIEW AND RECOMMENDATIONS FOR FUTURE STUDY 9 (2006) ("ELECTION CRIMES"), *available at* http://www.eac.gov/assets/1/workflow_staging/Page/57.PDF; LEVITT, *supra* note 72, at 4-6.
[75] *See* ELECTION CRIMES, *supra* note 73, at 9.
[76] *See* Kristen Mack, *In Trying To Win, Has Dewhurst Lost a Friend?*, HOUS. CHRON., May 18, 2007, http://www.chron.com/news/article/In-trying-to-win-has-Dewhurst-lost-a-friend-1815569.php ("Remember that in the 2005 election contest between Hubert Vo and Talmadge Heflin, Heflin questioned more than 250 votes cast in the state House race. But a Republican lawmaker who investigated the contest concluded that Heflin produced "no evidence of any intentional voter fraud" that would have affected the outcome.").

15

history provides further evidence that Senate Bill 14's proponents were not motivated by a legitimate desire to eliminate voter fraud. During the March 23rd floor debate on Senate Bill 14 in the House, Representative Martinez cited the lack of evidentiary support for other legislators' voter fraud allegations, asserting that the bill was "written and fortified on pure speculation" and that it would "undermine[] every civil rights movement, the work of every civil rights leader and, most of all, undermine[] every minority in this State."[77]

Several other legislators shared this sentiment. Fifteen members of the House—all but two of whom were members of either the Black Legislative Caucus or the Mexican-American Legislative Caucus—highlighted the Legislature's weak justifications for Senate Bill 14. In a joint statement articulating their reasons for voting against the bill, they wrote that "[i]n the absence of evidence of voter fraud of a type that would be prevented by the provisions in this bill, it is clear that this bill would do more harm than good to the integrity of elections."[78]

## IV. Conclusion

The State of Texas has failed to demonstrate that Senate Bill 14 will not have a retrogressive effect on African-American and Latino voting rights and has failed to show that the bill was not motivated by a discriminatory purpose. The State has, therefore, has not met its burden under Section 5 of the Voting Rights Act. Accordingly, we urge the Justice Department to deny preclearance of the voting changes occasioned by Senate Bill 14.

Respectfully submitted,

Gary Bledsoe, President
Robert Notzon, Legal Redress Chair
Howard Jefferson, Political Action Chair
Texas State Conference of the NAACP

Wendy Weiser
Nic Riley
Brennan Center for Justice
161 Avenue of the Americas, 12th Floor
New York, NY 10013

Mark Posner
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005

---

[77] TEX. HOUSE OF REPRESENTATIVES, *Texas House Journal*, 82nd Leg., 2011 Reg. Sess. No. 40, at 1032-33 (Tex. 2011), *available at* http://www.journals.house.state.tx.us/hjrnl/82r/pdf/82RDAY40FINAL.PDF#page=91.
[78] *Id.* at 1040-41, *available at* http://www.journals.house.state.tx.us/hjrnl/82r/pdf/82RDAY40FINAL.PDF#page=98.

16



# State Auditor's Office

**John Keel, CPA**
**State Auditor**

An Audit Report on

# The Voter Registration System at the Texas Secretary of State's Office

November 2007
Report No. 08-012



Δ π EXHIBIT 13
Deponent
Date 1/25/14   Rptr.
WWW.DEPOBOOK.COM

TX_00202892



**State Auditor's Office**

John Keel, CPA
State Auditor

*An Audit Report on*

# The Voter Registration System at the Texas Secretary of State's Office

SAO Report No. 08-012
November 2007

## Overall Conclusion

The Texas Secretary of State's Office should improve its processes and controls to ensure that records in the Texas Election Administration Management (TEAM) system are accurate in accordance with the Help America Vote Act of 2002 (HAVA). Voter registration is an important element of the electoral process that presents many challenges. Ensuring that only eligible persons are registered to vote is an ongoing challenge that involves the Secretary of State's Office, 254 county voter registration offices, the Department of Public Safety, and the Bureau of Vital Statistics. Although the Secretary of State's Office has processes to identify many ineligible voters and remove them from the State's voter registration list, improvements can be made.

Auditors compared data in the TEAM system to data obtained from the Department of Criminal Justice and the Bureau of Vital Statistics using criteria developed by the Secretary of State's Office. As a result, auditors identified 49,049 (0.4 percent) of 12,374,114 registered voters for the May 12, 2007, special election who may have been ineligible to vote. These included the following:

> ➢ Voter records for 23,114 possible felons.

> ➢ Records for 23,576 voters who may be deceased.

> ➢ Duplicate records for 2,359 voters.

> **Background Information**
>
> The Help America Vote Act (HAVA) was passed by the U.S. Congress in 2002 in response to issues stemming from the 2000 presidential election. HAVA requires states to establish and maintain a uniform, centralized, interactive, and computerized statewide voter registration list.
>
> To comply with HAVA, the Texas Secretary of State's Office contracted with IBM on October 22, 2004, to develop the Texas Election Administration Management (TEAM) system. The TEAM system includes multiple components. Specifically:
>
> - Voter registration.
> - Election management (ongoing).
> - Jury duty (ongoing).
>
> The TEAM system includes a voter registration database that serves as the official statewide voter registration list required by HAVA. The TEAM system also serves as an interface for county voter registration offices for entering, updating, and deleting voter information. The TEAM system uses Hart InterCivic's eRegistry application, as well as IBM's WebSphere and Tivoli eBusiness products.
>
> The Secretary of State's Office expects to spend $15.5 million on the implementation of the TEAM system; it reported spending $12.6 million on the TEAM system project as of August 31, 2007. Ninety-five percent of the funding for the project was provided by the U.S. Election Assistance Commission and 5 percent was provided by state funds.

---

*This audit was conducted in accordance with Texas Government Code, Section 321.0132.*

*For more information regarding this report, please contact Michael Apperley, Assistant State Auditor, or John Keel, State Auditor, at (512) 936-9500.*

TX_00202893

Auditors did not identify any instances in which potentially ineligible voters actually voted during the May 12, 2007, special election, although voting history data in the TEAM system was incomplete.

The Secretary of State's Office does not retain a complete history of death and felon records that were reported during previous periods. This limits its ability to identify ineligible voters who may not have been previously removed, convicted felons who try to register multiple times, or applicants who use a deceased person's information to register to vote. In addition, the Secretary of State's Office does not require counties to investigate and remove voter registration records that match felon or deceased records on a periodic basis. As a result, voter registration records identified by the Secretary of State's Office as potentially ineligible may remain active indefinitely.

The Secretary of State's Office has implemented certain access and security controls over the TEAM system; however, the Secretary of State's Office needs to implement additional controls to ensure that it adequately protects voter registration information and the TEAM system from unauthorized access. Auditors did not identify any breaches of security or disclosures of confidential voter registration data, but they did identify weaknesses that the Secretary of State's Office should address to ensure that the TEAM system is adequately protected. Specifically:

> The Secretary of State's Office does not have a process to ensure that user accounts are authorized by appropriate personnel, including administrative accounts that allow access to and control of confidential information within the TEAM system. The Secretary of State's Office also does not have the appropriate tools necessary to adequately monitor TEAM user activity.

> The Secretary of State's Office has not reviewed existing accounts for validity, nor does it have a process to do so in the future. As a result, it could not confirm whether county or contractor users were actual employees. This increases the risk of unauthorized access.

> Weaknesses within data backup and change management procedures increase the risk that the Secretary of State's Office would be unable to promptly and fully recover from a disaster. In addition, specific weaknesses within application and database security increase the risk that TEAM data is not adequately protected.

Tests performed by a contractor (IBM) on behalf of the Secretary of State's Office, as well as statements by county voter registration officials, indicate that although the TEAM system is available to users, its stability and response time can be improved. In addition, 106 (52 percent) of 204 county voter registration offices said that the TEAM system does not allow them to perform their jobs effectively.

For 6 (60 percent) of 10 benchmarks required by the Secretary of State's Office's contract for the development of the TEAM system, the TEAM system was slower

TX_00202894

than the system used previously by the Secretary of State's Office—the Texas Voter
Registration System (TVRS). However, the Secretary of State's Office has made
numerous changes to the TEAM system to enhance its performance. Foremost
among these changes is an ongoing performance test that the Secretary of State's
Office conducted during the week of August 6, 2007. According to the Secretary of
State's Office, this test used an automated tool to simulate the voter registration
activity that the TEAM system is likely to experience during the 2008 presidential
election. (The TEAM system is expected to see the highest volume of activity
during presidential elections.) According to the Secretary of State's Office, it
plans to use the results of this test to make further improvements to the TEAM
system's performance. Auditors did not verify the results of this performance test.

Auditors also identified less significant issues that were communicated separately
to the Secretary of State's Office.

## Summary of Management's Response

The Secretary of State's Office generally agrees with each of the three
recommendations offered in this report.

First, the Secretary of State's Office agrees that current processes within TEAM
should be re-assessed to determine if there are better ways to identify potentially
ineligible voters. However, while it is important to purge the system of ineligible
voters, it is equally important to ensure that valid and eligible voters are not
removed. Accordingly, any changes that the Secretary of State's Office pursues
with respect to removing names from the TEAM system will and must be
implemented after a careful consideration of these important factors. Also, any
changes that are made in how Texas conducts its electoral process will be subject
to the U.S. Department of Justice's pre-clearance requirements, and therefore any
new policies that are adopted must take this process into consideration.

Second, the Secretary of State's Office agrees that the performance of the TEAM
system can be improved, and that significant steps have been taken by the
Secretary of State's Office to make sure that improvements have been made.
Indeed, the marked differences that the Secretary of State's Office and the
counties experienced between the May 2007 and November 2007 elections is
significant evidence of the progress that has been made in this regard.

Finally, the Secretary of State's Office agrees that it should strengthen its
procedures to ensure that TEAM is further protected from either an external or an
internal threat. The Secretary of State's Office believes that TEAM's current risk
of exposure is relatively low. However, when the security of this information is at
issue, improvements such as the ones suggested can and will be made.

TX_00202895

## *Summary of Objectives, Scope, and Methodology*

The objectives of this audit were to:

> Determine whether the records in the statewide voter registration database are accurate in accordance with HAVA.

> Assess whether the statewide voter registration system will be available when needed.

> Determine whether the Web-based statewide voter registration system is protected from unauthorized access.

The scope of this audit included the voter registration component of the TEAM system and the processes and controls at the Secretary of State's office and county voter registration offices, which coordinated with each other to generate a list of voters who were eligible to vote during the May 12, 2007, special election.

The audit methodology included interviewing Secretary of State's Office personnel; interviewing staff at 11 selected county voter registration offices; reviewing Secretary of State's Office documentation; analyzing TEAM system data and configurations; testing voter registration records; reviewing processes, policies, and procedures for determining voter eligibility; conducting security scans of the Secretary of State's Office network; and surveying 254 county voter registration offices regarding the use of the TEAM system as of August 3, 2007.

TX_00202896

# *Contents*

## *Detailed Results*

Chapter 1
The TEAM System Includes Potentially Inaccurate Voter
Information .................................................................. 1

Chapter 2
The Secretary of State's Office Can Improve the
Performance of the TEAM System ................................. 10

Chapter 3
The Secretary of State's Office Should Improve Controls
Over Access to the TEAM System................................... 17

## *Appendices*

Appendix 1
Objectives, Scope, and Methodology............................. 24

Appendix 2
The U.S. Social Security Administration's Response to
the State Auditor's Office's Request for Citizenship Data..... 27

Appendix 3
Texas Voter Registration Application ............................ 28

Appendix 4
County Voter Registration Offices That Maintain Their
Own Voter Registration Databases.................................. 29

Appendix 5
Survey Instruments and Results ................................... 31

Appendix 6
Secretary of State's Office's Attachment to Management
Responses ................................................................. 35

TX_00202897

# *Detailed Results*

**Chapter 1**
## *The TEAM System Includes Potentially Inaccurate Voter Information*

The Secretary of State's Office should improve its processes and controls to ensure that records in the Texas Election Administration Management (TEAM) system are accurate and that only eligible voters are able to vote in state and federal elections. The Secretary of State's Office has implemented processes to identify and remove records that are duplicate or belong to ineligible voters, but these processes do not identify all duplicate or ineligible voter records. Specifically, of 12,374,114 records in the TEAM system of registered voters who were able to vote in the May 12, 2007, special election, auditors identified 49,049 (0.4 percent) records as potential duplicates or belonging to potentially ineligible voters.

In Texas, constituents are not allowed to vote if they do not meet certain requirements. The Texas Election Code provides a detailed description of eligible voters (see text box for voter eligibility requirements). In addition, Section 303.4 of the Help America Vote Act of 2002 (HAVA) requires each state to maintain an accurate and regularly updated voter registration system, as well as make a reasonable effort to remove registrants who are ineligible to vote from this system.

The actual number of inaccurate voter records may be more than the 49,049 identified by auditors because complete information was not available in the TEAM system to verify the eligibility of all registered voters. Specifically, the following information was not available that would have allowed auditors to complete additional eligibility analysis in accordance with state and federal statute:

- United States citizenship status.

- Persons convicted of federal felonies.

- Voter identification information for records that lack a Social Security number, a Texas driver's license number, or both.

Auditors did not identify any instances in which potentially ineligible voters cast a ballot during the May 12, 2007, special election; although voting history data maintained in the TEAM system was incomplete, and the relatively low 7 percent voter turnout for this election reported by the Secretary of State's Office may limit the applicability of auditors' testing to other elections. The

> **Texas Voter Registration Eligibility Requirements**
>
> Texas Election Code, Section 13.001, states:
>
> (a) To be eligible for registration as a voter in this state, a person must:
>
>   (1) Be 18 years of age or older;
>
>   (2) Be a U.S. citizen;
>
>   (3) Not have been determined mentally incompetent by a final judgment of a court;
>
>   (4) Not have been finally convicted of a felony or, if so convicted, must have been:
>
>     (i) Fully discharged of his or her sentence, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court; or
>
>     (ii) Been pardoned or otherwise released from the resulting disability to vote; and
>
>   (5) Be a resident of the county in which application for registration is made.
>
> (b) To be eligible to apply for registration, a person must, on the date that the registration application is submitted to the county voter registration office, be at least 17 years and 10 months of age and satisfy the requirements of Subsection (a), except for age.

TX_00202898

State Auditor's Office provided copies of all records of potentially ineligible voters and duplicate voter information identified in this audit to the Secretary of State's Office for investigation and resolution.

Chapter 1-A
## The Secretary of State's Office Could Identify and Remove More Ineligible Voters from TEAM

The TEAM system included the following voter registration records for the May 12, 2007, special election that auditors identified as belonging to people who were potentially ineligible to vote:

- Records for 23,114 voters identified as possible felons using data provided by the Department of Criminal Justice. The data identified felons on community supervision as of April 30, 2007, and felons who were incarcerated or on parole as of May 31, 2007. The Secretary of State's Office identified 1,124 (4.9 percent) of these possible felons prior to the election, but it was not able to complete its investigations to verify the registrants' felon status and remove them from the TEAM system before the election.

- Records for 23,576 voters believed to be deceased because these records matched death records through November 30, 2006, obtained from the Bureau of Vital Statistics. The Secretary of State's Office identified three of these records prior to the election, but it was not able to complete its investigations to verify that these voters were deceased and remove them from the TEAM system before the election. It should be noted that the number of potentially deceased voters auditors identified may be understated because the data obtained from the Bureau of Vital Statistics did not include death notices for the six months prior to the May 12, 2007, special election.

The Secretary of State's Office could not identify all the potentially ineligible voters in the TEAM system that auditors found because the Secretary of State's Office does not receive the most complete death records or felon data available. The Secretary of State's Office receives daily felony data updates from the Department of Public Safety; however, this data does not include felons who were listed on earlier reports and are still serving a sentence. Similarly, the Secretary of State's Office receives weekly updates of death records from the Bureau of Vital Statistics, but this data does not include deaths from earlier reporting periods.

The Secretary of State's Office does not retain a comprehensive history of either the felon data or death records it receives. As a result, once the Secretary of State's Office processes the felon and death records in the TEAM system, it cannot ensure that ineligible voters remain off the voter registration list. For example, a convicted felon could try to register to vote at a later date, and the TEAM system would not flag the record as potentially ineligible.

TX_00202899

Alternately, if the Secretary of State's Office mistakenly does not process one of the felon data or death record files it receives, there would be no additional opportunities for it to identify the resulting ineligible voter.

The TEAM system identifies ineligible voters by processing the daily or weekly updates of felon and deceased data. Felon records that match voter records according to the Secretary of State's Office's criteria are flagged for further investigation by county voter registration offices (see text box for criteria). However, each update of felon data or death records is processed only once in the TEAM system immediately after the data is received. As a result, the TEAM system is not able to identify potentially ineligible voters who register after the Secretary of State's Office has processed the felon or deceased data containing their names or who attempt to register multiple times. For example, after the Secretary of State's Office has processed its felon data, a felon on probation who is deemed ineligible to vote could register to vote again without being flagged as a felon in the TEAM system.

County voter registration offices are ultimately responsible for determining voter eligibility, which limits the Secretary of State's Office's ability to ensure that voter registration records are accurate and that ineligible voters are removed, as required by HAVA.

**The Secretary of State's Office does not monitor county voter registration offices that investigate potentially ineligible voters.**

Once potentially ineligible voters are identified by the TEAM system, the Secretary of State's Office does not have processes to ensure that county voter registration offices investigate these voters and cancel registrations for ineligible voters in a timely manner. The Secretary of State's Office's policies and Texas Election Code require county voter registration offices to investigate each voter and to cancel the registrations of voters who are deemed ineligible. However, the Secretary of State's Office does not monitor the county voter registration offices to ensure that the registrations of potentially ineligible voters are consistently investigated and resolved. The Secretary of State's Office's management stated that some county voter registration offices cause delays because they do not promptly investigate and resolve the registrations of potentially ineligible voters. As a result, a risk exists that voters flagged by the TEAM system as potentially ineligible could retain the ability to vote if county voter registration offices do not verify their eligibility.

However, the TEAM system does not always provide county voter registration offices with details of ineligible voter records that are flagged for

---

**Secretary of State's Office's Matching Criteria**

The Secretary of State's Office has defined the data that must be similar to identify voters as potentially ineligible or duplicate. The strongest of these criteria are:

- First name, last name (or former last name), and Social Security number.
- First name, last name (or former last name), and Texas driver's license number.
- First name, last name (or former last name), date of birth, and last four digits of Social Security number.

The TEAM system will cancel a record that matches death records or that is identified as a duplicate record using one of these methods. If the TEAM system matches felon data using one of these criteria, the voter record is flagged for further investigation by county voter registration offices.

The Secretary of State's Office also uses other criteria to identify voters who are potentially ineligible and flags these records for further investigation by county voter registration offices.

---

TX_00202900

review. For example, one county voter registration office auditors visited received a summary report from the Secretary of State's Office stating that there were 21 outstanding flagged voter records. However, the accompanying detailed report listed information for only three of the flagged records.

Auditors visited 11 county voter registration offices and identified weaknesses within several critical processes and controls that could limit the Secretary of State's Office's ability to ensure that all registered voters are eligible to vote. Specifically:

- One county voter registration office employee, when duplicate records are found, deletes the most recent record. This does not follow the Secretary of State's Office's procedures, which require counties to delete the oldest duplicate record. Deleting the most recent record deletes a voter's most recent address, which is more likely to be accurate.

- Employees at the same county voter registration office discussed above do not cancel the registration of voters who are convicted of felonies and receive a sentence of 90 days or less for violating state laws.

- Another county voter registration office initially entered the same erroneous date of registration (January 1, 2006) for 84 percent of its voter records in the TEAM system. This limits the Secretary of State's Office's ability to track voter activity prior to this date.

- Auditors also noted many instances in which inaccurate data was entered into the TEAM system by other county voter registration offices, including invalid Social Security numbers and dates of birth.

**Recommendations**

The Secretary of State's Office should:

- Periodically review the entire list of registered voters in the TEAM system to identify potentially ineligible voters for further investigation.

- Coordinate with the Department of Public Safety and the Bureau of Vital Statistics to obtain more complete data records, and it should retain a comprehensive history of all the data used to verify voter eligibility.

- Continuously look for additional sources of information that the TEAM system could use to identify inaccurate voter information and potentially ineligible voters. The Secretary of State's Office should determine whether the benefits outweigh the costs in its decision to utilize new information.

TX_00202901

## Management's Response

*Management agrees with these recommendations, and the Secretary of State's Office (the "Office" or the "SOS") will continue to review the TEAM system periodically for potentially ineligible voters. The Office recognizes that it may not be receiving the most up-to-date or complete set of information that either the Texas Department of Public Safety or the Texas Bureau of Vital Statistics could provide. Accordingly, the Secretary of State's Office will work with these two agencies and explore whether more recent, more comprehensive or more useful information is or could be made available to the Office so that it might be better able to identify voters who may be deceased, convicted of a felony or otherwise ineligible to vote. The Office will also determine whether there are other state or federal agencies from which it could solicit information to further assist the Office in these efforts.*

*However, despite the fact that management agrees with these recommendations, there are three caveats to these recommendations that are worth discussing. First, under current law the Office is almost entirely dependent upon the Texas Department of Public Safety and the Texas Bureau of Vital Statistics for much of the data it receives on felons and deceased voters. Similarly, because state law provides that the counties are ultimately responsible for determining voter eligibility, the Office is also almost entirely dependent upon them for the content entered into and removed from TEAM. Therefore, it is possible that legislation may be necessary for the Office to accomplish these important goals. If this proves to be the case, then the Office will work with the Legislature if the Legislature elects to address these issues through legislation.*

*The second caveat is that while it is important to make sure that ineligible voters are promptly removed from the TEAM system, it is also equally important to make sure that eligible voters are not. Any changes that are implemented by the Office will necessarily then take both of these important factors into consideration.*

*Lastly, issues related to voting and the election process in the State of Texas are subject to Section 5 of the federal Voting Rights Act of 1965. Accordingly, any changes to the current process of identifying, investigating or canceling ineligible voters must be submitted for, and will be subject to, "pre-clearance" by the U.S. Department of Justice. This "pre-clearance" must be obtained before any such changes can take effect or be implemented in this State.*

TX_00202902

Chapter 1-B
## The Secretary of State's Office Does Not Have Adequate Processes to Ensure All Duplicate Voter Records in the TEAM System Are Identified and Removed

Auditors identified 2,359 registered voters (less than 0.1 percent of the 12,374,114 total registered voters in the state) with more than one voter record in the TEAM system who may have been able to cast multiple ballots during the May 12, 2007, special election. These duplications were a result of an error in the TEAM system's software during implementation, which prevented the program from removing some duplicates.

HAVA requires state and local election officials to perform maintenance on the voter registration list on a regular basis, including the removal of duplicate records from the list.

The Secretary of State's Office's process for identifying and deleting duplicate voter records is integrated into the voter application process in the TEAM system. This automated process compares voter records to identify those with similar data, and it automatically deactivates duplicate voter records that match according to the strongest criteria. Specifically, TEAM will deactivate voter records that have the same:

- First name, last name (or former last name), and Social Security number.

- First name, last name (or former last name), and Texas driver's license number.

- First name, last name (or former last name), date of birth, and last four digits of Social Security number.

Auditors tested records for 30 voters having duplicate records in the TEAM system, none of whom cast more than a single vote during the May 12, 2007, special election. But auditors could not conclude with certainty that voters with duplicate records did not cast multiple ballots in this election because the voting history maintained in the TEAM system is incomplete. Also, the relatively low 7 percent voter turnout for this election may limit the applicability of auditors' testing to other elections.

The Secretary of State's Office is not able to identify duplicate registrations if an individual registers to vote using a Social Security number, and then registers to vote at a later date using a driver's license number. A risk exists that voters who advertently or inadvertently registered twice could illegally vote more than once in the same election. However, auditors did not identify any instances of a voter casting more than one ballot in the May 12, 2007, special election.

TX_00202903

**Recommendation**

The Secretary of State's Office should periodically review the entire list of registered voters in the TEAM system to identify and cancel duplicate records.

**Management's Response**

*Management agrees with these recommendations. The existence of 2,359 voters with more than one record within TEAM was caused by a defect that was found within the TEAM system. The defect has been identified and fixed. The duplications created by the defect have been identified and a process is being developed to resolve them. In addition, the Office will review its existing matching criteria and seek to improve its existing processes to prevent duplicate registration by individuals who may (either advertently or inadvertently) seek to register at different times and with different pieces of identifying information (e.g. with a Texas driver's license at one point and then a social security number later).*

Chapter 1-C
## Certain Eligibility Information Is Not Available

Auditors were not able to obtain certain information needed to verify voter eligibility in accordance with state and federal statutes. Specifically, the following information could not be obtained:

<div style="border:1px solid">

**Citizenship Requirements in State and Federal Voting Statutes**

Texas Election Code, Section 11.002 (2), states that a "qualified voter" means, among multiple requirements, a person who is a U.S. citizen.

The National Voter Registration Act (Title 42, United States Code, Section 1973gg (a)) states that the right of U.S. citizens to vote is a fundamental right. Additionally, the National Voter Registration Act requires voter registration agencies to distribute each voter registration application with a statement that lists each voter eligibility requirement, including U.S. citizenship.

</div>

■ **Citizenship status.** Auditors could not find an authoritative source of information to verify the citizenship status of registered voters. Auditors contacted the U.S. Social Security Administration to obtain the citizenship status of registered voters in Texas; however, the U.S. Social Security Administration replied that it could not disclose personally identifiable information and that it may not have current data on citizenship in all cases (see Appendix 2 for a copy of the U.S. Social Security Administration's response). Auditors were also not able to obtain the citizenship information of registered voters from other sources. State and federal statutes require that voters be U.S. citizens to vote in state and federal elections (see textbox for additional information on citizenship requirements).

· ■ **Federal felony conviction data.** The Secretary of State's Office receives some federal felony conviction data, but it does not receive this data in an electronic format. As a result, it cannot consistently identify people who are ineligible to vote because they have been convicted of a federal felony.

TX_00202904

The National Voter Registration Act[1] requires United States Attorneys to provide state election officials with federal felony conviction data. According to General Accountability Office reports,[2] however, United States Attorneys have not been consistent in providing states with information on felony convictions.

Because data on citizenship and federal felonies is not available, a risk exists that some ineligible voters who cannot be identified may retain the ability to vote. However, two controls exist to help deter voters from submitting false information on citizenship status and identify those who do:

* Applicants must provide a signed acknowledgement of eligibility requirements on the voter registration application (see Appendix 3 for a copy of the Texas Voter Registration Application). Among the eligibility requirements listed on this form is confirmation that the applicant is a U.S. citizen and is not currently serving punishment for a felony. This application also requires the voter to acknowledge that perjury is a crime under state and federal law and is punishable by imprisonment of up to 180 days and a fine of up to $2,000.

* Texas Election Code, Section 16.0332, requires county voter registration offices to review the documentation received from courts listing the individuals who were excused or disqualified from jury duty because they are not U.S. citizens. County voter registration offices are instructed to request proof of citizenship from individuals on the list and cancel any voter registration records for any individuals who do not respond to the requests for proof of citizenship within 30 days. However, the Secretary of State's Office does not monitor the county voter registration offices to ensure that they are consistently canceling voter registration records when ineligible individuals are identified.

These measures help the Secretary of State's Office (1) deter voter registration applicants from knowingly submitting false information and (2) identify some ineligible voters who were selected for jury duty. But neither of these controls is adequate to ensure that citizenship status is accurately reported by voter applicants. It is important to note that neither a Texas driver's license number nor a Social Security number can be relied upon to determine citizenship status because both forms of identification are issued to non-U.S. citizens. In addition, the Texas Election Code[3] allows individuals who affirm on their voter registration application that they do not have either a Social Security

---

[1] Title 42, United States Code, Section 1973gg-6 (g).

[2] See *Elections: Additional Data Could Help State and Local Elections Officials Maintain Accurate Voter Registration Lists*, General Accountability Office Report No. 05-478, June 2005; and *Elections: The Nation's Evolving Election System as Reflected in the November 2004 General Election*, General Accountability Office Report No. 06-450, June 2006.

[3] Texas Election Code, Sections 13.002(e) and 63.0101.

TX_00202905

number or Texas driver's license number to register to vote using documents such as a current utility bill, bank statement, government check, paycheck, or other government document containing the name and address of the applicant.

## Recommendations

The Secretary of State's Office should:

- Pursue additional information that can help verify the eligibility of voter applicants.

- Pursue additional information and implement processes that can help identify and eliminate duplicate voter records.

- Coordinate directly with the United States Attorneys (as opposed to the Department of Public Safety) to obtain data for federal felony convictions to use for verification of voter eligibility.

## Management's Response

*Management agrees with these recommendations. As discussed in more detail above (see Management's Response to Recommendations in Chapters 1-A and 1-B), the Secretary of State's Office will review and evaluate whether other state or federal agencies may have information that is accessible and that would further assist the Office in identifying voters who may not be eligible to vote in Texas. The Office will also further refine its processes and procedures to help identify and eliminate duplicate voter records.*

*Furthermore, the Office will investigate ways to improve its relationship and avenues of communication with the U.S. Attorneys so that it might have better access to federal felony conviction information.*

*Finally, as the State Auditor's Report points out, information pertaining to the citizenship status of registered voters or applicants for voter registration is currently unavailable. However, this information may become more available over time as the federal REAL ID Act is implemented, and the Office will work to incorporate any information that becomes available as a result of this federal legislation into TEAM.*

TX_00202906

*Chapter 2*
## The Secretary of State's Office Can Improve the Performance of the TEAM System

The TEAM system provides the Secretary of State's Office and county voter registration offices electronic access to voter records and was available during the May 12, 2007, special election. However, TEAM system users indicate that they are not satisfied with the system's performance. In addition, benchmark tests performed by a subcontractor on behalf of the Secretary of State's Office, as well as statements made by county election officials and observations by auditors, indicate that the TEAM system's performance can be improved.

> **Availability Requirements in the Help America Vote Act (HAVA)**
>
> The Help America Vote Act requires each state to implement a computerized voter registration list capable of allowing any election official, including local election officials, to obtain immediate electronic access to the information contained in the computerized list. The chief state election official in any state must also provide local election officials with the support necessary to allow the local election officials to electronically enter, on an expedited basis, all voter registration information into the computerized list at the time the registration information is provided to the local election officials.

The Secretary of State's Office is aware of the risk of inadequate performance, and it has undertaken multiple initiatives to improve the TEAM system's performance. Most recently, the Secretary of State's Office performed a performance test during the week of August 6, 2007. The test, in which county voter registration offices participated, included a simulation of the heavy workload that county voter registration offices are expected to experience prior to the 2008 presidential election. Auditors were unable to verify the results of the performance test because the Secretary of State's Office had not completed its analysis prior to the end of audit fieldwork. Secretary of State's Office management said the performance test results will be used to prioritize the issues that need to be addressed to improve the TEAM system's performance in the future.

The TEAM system is designed to allow county and state election officials to maintain voter registration records, administer elections in all jurisdictions, and execute and report election results. The Secretary of State's Office plans to add an election management component and a public voter inquiry Web site by January 2009. All 254 Texas counties are using the TEAM system. Of these, the Secretary of State's Office reports that 224 counties (88 percent) used the TEAM system as their primary voter registration system as of May 2007. When residents in one of these 224 counties register to vote, their information is entered and stored directly in the TEAM system. The other 30 counties maintain their own voter registration databases and upload new registration records and changes to the TEAM system every 24 hours for verification. Among these 30 counties are Harris, Dallas, Bexar, Travis, Collin, and El Paso. (See Appendix 4 for a complete list of counties that maintain their own voter registration databases.) After the Secretary of State's Office verifies the records from these 30 counties, it downloads an updated list of registered voters from the TEAM system to each county. HAVA requires that each state have a single, official list of registered voters.

TX_00202907

Therefore, the list downloaded from the TEAM system is the official list of voters and is the only list that counties can use in federal elections.

Chapter 2-A

## The TEAM System Is Not Meeting Contract Performance Benchmarks

Tests that a Secretary of State's Office contractor conducted on December 6, 2006, and December 7, 2006, revealed that the TEAM system did not meet contract performance benchmarks on 6 (60 percent) of 10 tests conducted. The contract between the Secretary of State's Office and TEAM application developers—IBM and Hart InterCivic—requires the TEAM system to perform at least as quickly and provide substantially similar functionality as the system it replaced–the Texas Voter Registration System (TVRS).

IBM conducted tests of both the TEAM system and TVRS. These 10 tests measured the amount of time it took each system to perform each of 7 activities (multiple search methods were tested). The activities selected for the tests were included in the contract and were among the functions most frequently used by county voter registration offices. The TEAM system did not perform as quickly as TVRS on 4 (50 percent) of 8 tests of performing transactions and on 2 (100 percent) of 2 tests of producing reports (see Table 1). Since the tests were completed, the Secretary of State's Office has initiated various initiatives to improve the TEAM system's performance (see Chapter 2-C for details).

Table 1

| TEAM and TVRS Performance in Benchmark Tests (Time in seconds) | | | | |
|---|---|---|---|---|
| Benchmark Tested | Average Time Taken to Complete Test | | Difference in Time to Complete Test | Percentage Change in Time to Complete Test | Type of Test |
| | TEAM | TVRS | | | |
| Edit a voter | 5.17 | 7.45 | 1.72 | 43.09% | Transaction |
| Cancel a voter | 4.79 | 0.87 | 3.92 | 450.57% | Transaction |
| Change a voter | 4.17 | 5.07 | 0.90 | 17.75% | Transaction |
| Search by name only | 47.73 | 48.21 | -0.48 | -1.00% | Transaction |
| Search by voter ID | 2.39 | 0.50 | 1.89 | 378.00% | Transaction |
| Search on voter name and date of birth | 2.56 | 4.44 | -1.88 | -42.34% | Transaction |
| Search by address only | 2.94 | 7.56 | 4.62 | 61.11% | Transaction |
| Search by driver's license number | 2.16 | 0.20 | 1.96 | 980.00% | Transaction |
| Produce an official voting list | 6,686.00 | 312.00 | 6,374.00 | 2,042.95% | Report |
| Produce a list of registered voters | 4,284.00 | 169.00 | 4,115.00 | 2,434.91% | Report |

Source: *TEAM Performance Benchmark Results*, IBM, December 19, 2006.

TX_00202908

However, the Secretary of State's Office told auditors that these benchmarks are not the most relevant measures of the TEAM system's performance because TEAM differs from TVRS in architecture, technology, and features. For example, the TEAM system provides real-time access to information on registered voters. It performs real-time comparisons (live checks) between registration data submitted by a county voter registration office and data from the Department of Public Safety, the Bureau of Vital Statistics, and the U.S. Social Security Administration. In contrast, TVRS used batches to periodically update voter information. As a result, voter information in TVRS was not always current.

**Auditors identified county equipment issues that may contribute to poor TEAM system performance.**

The Secretary of State's Office has not determined the types of equipment used by counties to connect to the TEAM system as of May 2007 and, therefore, cannot determine whether performance problems are related to inadequate county equipment, such as slow dial-up modems.

These equipment issues could negatively affect county users' ability to access the TEAM system and limit the system's ability to meet contract benchmarks.

**The Secretary of State's Office did not maintain historical data on the TEAM system's performance.**

The Secretary of State's Office used multiple tools to monitor the TEAM system's performance. However, these tools tracked and maintained only average system performance data and did not maintain detailed historical monitoring data. The Secretary of State's Office implemented a tool to track and collect historical data prior to the performance test conducted during the week of August 6, 2007. Because the Secretary of State's Office did not implement this tool earlier, it did not have sufficient performance data to determine the specific causes for poor TEAM system performance and whether the system was complying with both the availability requirements in HAVA and the performance requirements in the system's development contract.

### Recommendations

The Secretary of State's Office should:

- Ensure that the TEAM system meets or exceeds contractual benchmarks.

- Identify the equipment used by counties to access the TEAM system and help counties make any improvements necessary to improve the system's performance.

TX_00202909

- Maintain and use historical data on the TEAM system's performance to help determine causes of poor performance.

**Management's Response**

*Management agrees with these recommendations, and has already implemented each of these suggestions. The Office of the Secretary of State readily acknowledges that TEAM's performance was unacceptable during the first six months of deployment. As a result of this dissatisfaction, the Office and its vendors worked aggressively over the summer of 2007 to improve and stabilize the performance of the TEAM system. Changes were made to TEAM and these changes were tested in a structured, high-load validation/performance test that was conducted in early August. During this validation/performance test, the contractual benchmarks were also retested and each retested benchmark actually exceeded the contractual standards. (See Attachment A, which is affixed to this Audit Report as Appendix 6). This high-load performance/validation test also identified additional areas that have since been improved as well as areas that still need improvement. Action is currently underway to implement these findings and further improve the functionality and performance of TEAM.*

*With respect to the equipment used by the counties, in July 2007 Secretary of State Phil Wilson personally requested that each county in Texas be contacted to ensure that it was using equipment that met or exceeded the minimum required specifications for TEAM. The results of these contacts were compiled and analyzed by the Office, and federal money was made available to each county in Texas that needed it to replace or upgrade equipment that was below TEAM's minimum requirements. For example, the Office identified several counties that were using dial-up (and therefore slower) Internet connections and paid for them to upgrade to DSL, cable or similar (and faster) Internet providers so that they could see faster response times when interacting with TEAM.*

*Finally, the Office has obtained and implemented tracking tools that are better than the ones used earlier in the TEAM project so that the Office can more precisely identify where and when slow downs are occurring within TEAM. These tools were not in place during the first six months of deployment.*

Chapter 2-B
## Survey Results Indicate Users Are Not Satisfied with the TEAM System's Performance

Auditors conducted a survey of all 254 county voter registration offices in Texas and received responses from 209 offices (see Appendix 5 for a

TX_00202910

complete list of survey results).  Of these, 142 (68 percent) of the 208 counties that responded to the question, "How often is the TEAM system available when you need to access the system?" indicated that the TEAM system was not always available when needed.  Also, 106 (52 percent) of the 204 offices that responded to the question, "In general, does the TEAM system allow you to do your job effectively?" answered "No."  Survey responses also confirmed the results of the IBM benchmark tests that were discussed in Chapter 2-A. For example:

- 102 (56 percent) of 183 offices that responded to the question, "How quickly can you download a registered voter roll from the TEAM system?" said it took an hour or more to download a registered voter roll from the TEAM system; 37 (20 percent) offices said it took more than a day to download a registered voter roll.

- 103 (57 percent) of 182 offices that responded to the question, "How quickly, on average, can the TEAM system generate a report?" said it took the TEAM system an hour or more to generate a report; 27 (15 percent) offices said it took the TEAM system more than a day to generate a report.

- 139 (76 percent) of 183  offices that responded to the question, "How quickly, on average, can the TEAM system process an online voter registration?" said it took a minute or more, on average, for the TEAM system to process an online voter registration; 11 (6 percent) offices said it took more than 10 minutes for the TEAM system to process an online voter registration.

- 120 (62 percent) of 194 offices that responded to the question, "How quickly, on average, can the TEAM system process a search for a voter?" said it took the TEAM system a minute or more to process a search for a voter's record.

In addition to conducting the survey, auditors visited 11 county voter registration offices.  During these visits, users of the TEAM system expressed concerns about the system's performance that were similar to concerns identified in survey responses.

### Recommendations

The Secretary of State's Office should continue to improve the TEAM system's performance and follow up with county voter registration offices to ensure that the system allows users to do their jobs effectively.

TX_00202911

**Management's Response**

*Management agrees with these recommendations and with the counties that TEAM's performance during the first six month's of its deployment was simply unacceptable. As indicated above (see Management's Response to Recommendations from Chapter 2-A), the Office's dissatisfaction and frustration with TEAM led to the dedication of significant time and attention by agency personnel, which in turn led to significant changes in and to the TEAM system. The Office believes that the dedication of these staff resources and the changes that resulted from them have led to a system that is now stable and one that is performing at levels that are much closer to what was initially expected. The Office believes that the absence of widespread issues or complaints during and in the months leading up to the November 2007 election, especially when compared to those received by the Office in the months preceding the May 2007 election, speak directly to this issue and the progress that has been made in this regard.*

### Chapter 2-C
## The Secretary of State's Office Has Multiple Performance Improvement Initiatives Underway for the TEAM System

The Secretary of State's Office's management recognizes that the TEAM system should be improved, and it is in the process of implementing changes to enhance the TEAM system's performance. For example, the Secretary of State's Office has completed the following initiatives since the TEAM system was implemented in January 2007:

- Upgraded hardware on servers running the TEAM system, including adding memory.

- Installed updates to the eRegistry software application, which is the foundation of the TEAM system.

- Modified settings in the TEAM system database that stores voter registration data.

In addition to these initiatives, one of the contractors developing the TEAM system (Hart InterCivic) hired a consultant to review the design and architecture of the eRegistry application. This consultant identified a number of problems with the TEAM system's configuration that the Secretary of State's Office and Hart InterCivic are working to address. For example, the consultant determined that the TEAM system's reporting application (Cognos) is incompatible with Adobe Systems Portable Document Format (PDF) report formatting requirements, hindering the production of reports in the TEAM system.

TX_00202912

Among the Secretary of State's Office's largest ongoing initiatives is the use of the results of the August 2007 performance test as a guide for making further improvements to the TEAM system. The Secretary of State's Office and IBM conducted the test from August 6, 2007, to August 12, 2007 (after auditors finished reviewing the system's performance). According to the Secretary of State's Office, this test used an automated tool to simulate the voter registration activity that the TEAM system is likely to experience prior to the November 2008 presidential election. (The TEAM system is expected to experience the highest usage volume prior to presidential elections.) According to the Secretary of State's Office, it plans to use the results of this performance test to make further improvements to the TEAM system's performance. Auditors did not verify the results of this performance test.

Also, the Secretary of State's Office said it had set aside about $2.1 million to help Texas counties acquire equipment, software, supplies, and contractual services (such as Internet connection services) to improve the counties' integration with the TEAM system. The Secretary of State's Office had awarded $550,840 to 150 Texas counties for these purposes as of August 27, 2007; 104 counties had not yet requested any funding, according to the Secretary of State's Office.

### Management's Response

*As evidenced by the differences observed in TEAM's performance between the November 2007 and the May 2007 elections, the Office believes that the performance improvements initiated by the Office over the last several months have created a dramatic improvement in TEAM. Although the Office has been pleased to see this improvement, the Office continues to work with the vendors and analyze the system to identify processes that can be and should be improved. The Office is actively analyzing performance data to ensure that, under the heavy load that can be expected during a presidential election cycle, TEAM will be ready to do the job it was designed to do.*

TX_00202913

*Chapter 3*
## The Secretary of State's Office Should Improve Controls Over Access to the TEAM System

Auditors identified weaknesses associated with controls over the TEAM system that increase the risk of unauthorized access to voter data. However, auditors did not identify any instances in which data was inappropriately accessed or modified.

### Chapter 3-A
### The Secretary of State's Office Does Not Have Adequate Controls Over User Access to the TEAM Application and Database

Specific control weaknesses over user access to the TEAM system increase the risk of unauthorized access to voter data. Specifically:

- The Secretary of State's Office delegated the responsibility for setting up county user access accounts to county administrators without properly training the administrators. In addition, the Secretary of State's Office also gave county administrators the ability to delegate their access rights to other users. As a result, some county administrators had granted administrative access rights to the TEAM system to most, if not all, the TEAM system user accounts in their counties. Auditors determined that county administrators granted administrative access to 111 (54 percent) of the 204 county user accounts tested. In 8 (24 percent) of the 33 counties represented in the test sample, county administrators gave administrative access to all TEAM system user accounts in their counties. Administrative access gives users extensive access to the TEAM system and allows users to make widespread changes to a county's voter registration data.

- The Secretary of State's Office could not confirm whether any of the TEAM system user accounts in the county voter registration offices and one other user account had been assigned to actual employees. In addition, 9 (4.4 percent) of 204 county user accounts tested appeared to be group accounts and did not have an individual's name attached to them. Auditors also determined that 13 percent of state administrative access accounts were test accounts, and the Secretary of State's Office could not determine whether these accounts were being used. As a result, the Secretary of State's Office would not be able to identify the specific individual who used one of these accounts to make inappropriate changes to TEAM system data. The Secretary of State's Office's account management policy requires that all accounts be uniquely identifiable and use an assigned user name.

- The Secretary of State's Office did not have a formal process for reviewing the validity of existing users' accounts or for closing terminated

TX_00202914

users' accounts.  As a result, auditors determined that four users in two
county voter registration offices that auditors visited were not current
county employees.  Because auditors visited only 11 counties, additional
examples of this weakness may exist at the other 243 counties not visited.
The Secretary of State's Office's account management policy requires that
system administrators or other designated staff have a documented process
for periodically reviewing existing accounts for validity.

- Although the Secretary of State's Office collected TEAM access logs, it
  had not implemented automated tools to allow it to regularly analyze the
  voluminous data collected.  Title 1, Texas Administration Code, Section
  202.25, requires that all information resource systems provide the means
  by which management can audit information system records and establish
  individual accountability for any action that can potentially allow access
  to, generation of, modification of, or allow the release of confidential
  information.  Without automated tools to analyze the voluminous audit log
  data collected and to assist in identifying trends that may indicate security
  breaches, the Secretary of State's Office may not detect and prevent
  unauthorized user access or unauthorized changes to TEAM system data.

- The Secretary of State's Office had appropriate controls in place to
  prevent access to the TEAM database by unauthorized users without direct
  access to the database.  For example, all security-critical default accounts
  had been disabled.  However, auditors determined that certain direct
  database access and security controls can be improved.  To minimize the
  risk of a security breach, auditors communicated in writing details about
  these control weaknesses directly to the Secretary of State's Office.

Responses to the survey auditors sent to county voter registration offices
underscored these findings.  Specifically:

- 26 (13 percent) of the 207 offices that answered the question, "Do
  multiple users share the same log-in account(s) in the TEAM system?"
  answered "Yes."

- 35 (17 percent) of the 203 offices that answered the question, "Did
  everyone who had access to the TEAM system sign an Information
  Security Acknowledgement and Non-disclosure Agreement (ISANA)
  form?" answered "No."  Another 27 (13 percent) offices stated they did
  not know of the ISANA form.  The Secretary of State's Office's account
  management policy requires that all users must sign the ISANA form
  before access is given to the TEAM system.  There is a risk that users who
  do not sign the ISANA form may disclose private, confidential, or high-
  risk information to unauthorized parties.

TX_00202915

## Recommendations

The Secretary of State's Office should:

- Require formal access request forms be submitted to the TEAM security administrator for all TEAM users, including county users and contractors.

- Limit the ability of county administrators to delegate TEAM administrator roles to other county users.

- Ensure all users have read and signed the ISANA form.

- Review all existing county, Secretary of State's Office employee, and contractor accounts and remove or modify those accounts that are not appropriately assigned.

- Establish and implement procedures for periodically reviewing existing accounts for validity.

- Remove test user access accounts with administrative access to the TEAM system.

- Develop an automated process for monitoring and analyzing audit log data and develop standards and procedures for regular review of access logs.

## Management's Response

*Management agrees with these recommendations. The Office's Information Security Officer will work closely with the Office's Elections division to address these recommendations. Specifically, the Office will review its current request forms, make any necessary modifications to these forms and ensure that the proper forms are submitted to the Secretary of State's Office by the counties. The Office will also meet with the vendor and explore the feasibility of installing additional security controls within TEAM, and then associating those controls with the primary role of the end-user. Similarly, the Office will develop processes to monitor county compliance with SOS security policies, including and especially the Information Security Acknowledgment and Non-Disclosure Agreement.*

*Additionally, the Office will work with the counties and implement procedures so that county accounts can be reviewed for validity and proper authority levels can be ascertained. The Office will also investigate the use of log analysis tools to aid in reviewing access logs.*

*Finally, the Office of the Secretary of State has developed a process whereby the Office can ascertain what accounts exist, and to whom these accounts have been assigned within the Office and each particular county. The process that has been developed is currently a manual one, and the Office is working*

TX_00202916

*to make this process an automated one. Test user accounts have been eliminated from the TEAM system.*

### Chapter 3-B
### The Secretary of State's Office Has Inadequate Change Management Procedures for the TEAM System

The Secretary of State's Office does not follow a consistent change management process for the TEAM system. Some change requests were made directly by the development staff using e-mails. If no one on the Technical Infrastructure Committee (the members of which are on the change request's e-mail distribution list) questioned the change, then programmers made the change themselves and sometimes communicated completion of the change to the committee using e-mail. These e-mails did not show whether requests were approved or whether changes were tested.

In addition, these changes were not recorded on a change request log as required by Secretary of State's Office policy. Only changes questioned by a member of the Technical Infrastructure Committee are submitted to the Secretary of State's Office's Change Control Board, which is responsible for changes to the TEAM system. The Secretary of State's Office could provide auditors only one change request that had been submitted to its Change Control Board. The Secretary of State's Office could not provide documentation to auditors showing change request approvals, back-out plans, test results, and system documentation updates for any changes, including emergency changes. The Secretary of State's Office's change management policy requires that such documentation be maintained.

System programmers and others applying changes directly to the production environment without testing these changes could cause data corruption, system crashes, and related problems. In addition, the lack of a formal, standardized process for managing changes to the TEAM system increases the risk that unauthorized changes could be made to applications and data without detection.

### Recommendations

The Secretary of State's Office should establish and implement formal procedures to ensure that:

- Adequate documentation of decisions related to all change requests, such as prioritization and assignment of responsibilities, is maintained.

- All change requests are submitted using formal change request forms and that all users and approvers provide sign-offs on the forms.

TX_00202917

- All emergency changes are logged, reviewed, and approved by management.

- All changes are tested and reviewed before implementation and all test and review documentation is maintained.

- Formal, detailed back-out instructions are drawn up for each change.

- System documentation is updated after every system change.

**Management's Response**

*Management agrees with these recommendations. The SOS Information Technology Director will develop the necessary methodologies, documentation, forms and instructions to ensure that change management procedures are enhanced and that each of these recommendations are satisfied.*

Chapter 3-C
## Vulnerabilities Exist within the Secretary of State's Office Network

The Secretary of State's Office had secured the TEAM server and Web application from unauthorized access from outside the network. However, the Office had not secured other parts of its network from inappropriate access by individuals inside the Secretary of State's Office.

**The TEAM server and Web application were secure.**

Auditors reviewed the results of security scans performed by the Department of Information Resources that included the following:

- A penetration test conducted on October 30, 2006, of the servers on which the TEAM system runs. During this test, Department of Information Resources employees attempted to gain access to protected files in the Secretary of State Office's network.

- An application scan conducted on July 19, 2007, of the software on which the TEAM system runs. During this scan, the Department of Information Resources used an automated tool to search for vulnerabilities in the software.

The penetration test and the application scan did not identify any high-severity vulnerabilities that would negatively affect the security of the TEAM system. This means that TEAM servers and software did not have any weaknesses that could be used to easily access the system or take it off-line. However these test results do not provide a guarantee that the TEAM system will remain secure from unauthorized access attempts in the future.

TX_00202918

**The Secretary of State's Office has not corrected all vulnerabilities identified in a network scan performed by auditors.**

As of September 10, 2007, the Secretary of State's Office had addressed only 6 (24 percent) of 25 high-severity vulnerabilities that were identified by a scan of the Secretary of State's Office's network that auditors performed on July 19, 2007. During the scan, auditors used an automated tool to identify the vulnerabilities of the Secretary of State's Office's network that present security risks of unauthorized access from inside the Secretary of State's Office.

**The Secretary of State's Office did not have an active intrusion detection system.**

The Secretary of State's Office did not have an intrusion detection system at the start of this audit. However, the Secretary of State's Office implemented an intrusion detection system during the scope of this audit. As a result, the Secretary of State's Office can now review access attempt logs, including firewall logs, and identify and address anomalies that could pose security threats to the TEAM system.

### Recommendation

The Secretary of State's Office should address all high-severity vulnerabilities identified by the auditors' scan of the Secretary of State's Office's network.

### Management's Response

*Management agrees with this recommendation and has taken corrective action with respect to the 19 vulnerabilities that were identified as of September 10, 2007, but not corrected as of that date. The corrective action that was taken on these 19 vulnerabilities means that each of the 25 vulnerabilities that were identified by a scan of the Secretary of State's network by the State Auditor's Office on July 19, 2007 has been addressed and remediated.*

Chapter 3-D
### The Secretary of State's Office Does Not Have a Process in Place to Routinely Verify Data Backups

The Secretary of State's Office has a well established data backup schedule and stores backup media containing critical TEAM system data off site in a secure, environmentally safe, locked facility. However, the Secretary of State's Office does not have a process to routinely verify data backups; such a process is required by the Secretary of State's Office's backup/disaster recovery policy. Without a process to verify data backups, the Secretary of

TX_00202919

State's Office may not be aware that an unsuccessful or unreadable backup has been made and would be unable to maintain or quickly resume mission-critical functions in a disaster.

### Recommendation

The Secretary of State's Office should establish a process to routinely verify data backups.

### Management's Response

*Management agrees with this recommendation. The service provider for operational support of the SOS data center environment is the Texas Department of Information Resources (DIR) as per the statewide data consolidation project currently underway. The SOS has been working with DIR to make sure that DIR and its partner in the data consolidation endeavor, the "Team for Texas" (which is a team of vendors headed up by IBM), are performing routine verification of data backups.*

TX_00202920

# *Appendices*

## *Objectives, Scope, and Methodology*

### Objectives

The objectives of this audit were to:

- Determine whether the records in the statewide voter registration database are accurate in accordance with the Help America Vote Act of 2002.

- Assess whether the statewide voter registration system will be available when needed.

- Determine whether the Web-based statewide voter registration system is protected from unauthorized access.

### Scope

The scope of this audit included the voter registration component of the Texas Election Administration Management (TEAM) system and the processes and controls at the Secretary of State's Office and county voter registration offices, which coordinated with each other to generate a list of voters who were eligible to vote during the May 12, 2007, special election.

### Methodology

The audit methodology included interviewing Secretary of State's Office personnel; interviewing election staff and information technology staff at 11 selected county voter registration offices; reviewing Secretary of State's Office documentation; analyzing TEAM system data and configurations; testing voter registration records for eligibility; reviewing processes, policies, and procedures for determining voter eligibility; and conducting security scans of the Secretary of State's Office network. Auditors also surveyed 254 county voter registration offices regarding the use of the TEAM system as of August 3, 2007.

Information collected and reviewed included the following:

- Secretary of State's Office policies and procedures.

- TEAM voter registration data.

- TEAM user account information, configuration documents, and implementation documents.

- Bureau of Vital Statistics death records through November 30, 2007.

TX_00202921

- Department of Criminal Justice report of persons serving felony sentences in May 2007, including those who were incarcerated, serving parole, or on probation.

- Department of Information Resources penetration test summaries and application scan reports.

- Computer systems and networks at selected county voter registration offices.

Procedures and tests conducted included the following:

- Conducted interviews with key staff from the Secretary of State's Office and county voter registration offices regarding the TEAM system.

- Analyzed voter registration data from the TEAM system.

- Tested voting history of registrants who may not have been eligible for the May 12, 2007, special election.

- Analyzed TEAM system data and controls.

- Tested user accounts in the TEAM system for appropriateness.

- Physically inspected the data center and servers that run the TEAM system.

- Scanned the Secretary of State's Office's computer network for security weaknesses.

- Surveyed county voter registration offices.

Criteria used included the following:

- Title 42, United States Code, Section 15301 (Help America Vote Act of 2002).

- Title 1, Texas Election Code, Chapters 11 through 18.

- Title 42, United States Code, Section 1973 (National Voter Registration Act of 1993).

- Title 1, Texas Administrative Code, Chapter 81.

- Title 1, Texas Administrative Code, Chapter 202.

- Secretary of State's Office's contract with IBM for the development of the TEAM system.

- Secretary of State's Office's policies and procedures.

TX_00202922

- Department of Information Resources guidelines.

## Project Information

Audit fieldwork was conducted from May 2007 through September 2007. This audit was conducted in accordance with generally accepted government auditing standards.

The following members of the State Auditor's staff performed the audit:

- Kels Farmer, CISA (Project Manager)

- Joseph Mungai, CIA, CISA (Assistant Project Manager)

- Hillary Hornberger, CIA

- Alexis Markham

- Robert Pagenkopf

- Stacy Snoe

- Cody Tubbs

- Wei Wang, MSAS, CPA, CIA, CISA

- Rachelle Wood, MBA

- Marlen Kraemer, MBA, CISA (Information System Audit Team)

- Serra Tamur, MPAff, CIA, CISA (Information System Audit Team)

- J. Scott Killingsworth, CIA, CGFM (Quality Control Reviewer)

- Michael C. Apperley, CPA (Assistant State Auditor)

TX_00202923

*Appendix 2 ·*
## The U.S. Social Security Administration's Response to the State Auditor's Office's Request for Citizenship Data

Auditors contacted the U.S. Social Security Administration to obtain the United States citizenship status of registered voters in Texas; the U.S. Social Security Administration denied the request. Below is the text of the response that a program analyst in the Center for Program Support at the U.S. Social Security Administration e-mailed to Mr. Kels Farmer (the project manager overseeing this audit) on July 19, 2007:

*Mr. Farmer,*

*The Social Security Administration (SSA) can only disclose personally identifiable information (PII) from its records without the individual's consent to various entities (including state and federal agencies) when there is legal authority via the Privacy Act and SSA disclosure regulates to do so. Your request does not meet the criteria so consent would be required. Additionally, SSA may not have current data on citizenship in all cases since individuals are not required to report back to SSA when citizenship status changes.*

*I hope this information is helpful.*

*Center for Program Support*

*U.S. Social Security Administration*

TX_00202924

Appendix 3
## Texas Voter Registration Application

Figure 1

TX_00202925

Appendix 4
## County Voter Registration Offices That Maintain Their Own Voter Registration Databases

Table 2 lists the 30 counties that maintain their own voter registration databases and upload new registration records and changes to the Texas Election Administration Management (TEAM) system every 24 hours for verification.

Table 2

| County Voter Registration Offices That Have Their Own Voter Registration Databases | |
|---|---|
| County Voter Registration Office | Number of Registered Voters |
| Harris County | 1,797,512 |
| Dallas County | 1,099,797 |
| Bexar County | 891,965 |
| Travis County | 524,689 |
| Collin County | 366,750 |
| El Paso County | 363,483 |
| Denton County | 316,501 |
| Fort Bend County | 258,408 |
| Montgomery County | 218,414 |
| Williamson County | 198,109 |
| Cameron County | 162,671 |
| Jefferson County | 145,191 |
| Bell County | 140,618 |
| McLennan County | 125,972 |
| Smith County | 119,777 |
| Webb County | 97,577 |
| Wichita County | 79,700 |
| Ector County | 65,488 |
| Guadalupe County | 65,178 |
| Tom Green County | 65,108 |
| Kaufman County | 53,581 |
| Rockwall County | 39,046 |
| Bastrop County | 37,455 |
| Kerr County | 32,444 |
| Val Verde County | 26,883 |
| Fayette County | 14,952 |
| Grimes County | 13,518 |
| Morris County | 8,936 |

TX_00202926

| County Voter Registration Offices That Have Their Own Voter Registration Databases | |
| --- | --- |
| County Voter Registration Office | Number of Registered Voters [a] |
| Terry County | 7,086 |
| Motley County | 905 |

[a] Reflects status of county voter registration offices and number of voters per county as of May 2007.

TX_00202927

Appendix 5
## Survey Instruments and Results

The State Auditor's Office sent surveys to each of the 254 county voter registration offices in Texas asking about their experiences using the Texas Election Administration Management (TEAM) system. Auditors received 209 survey responses on or before August 3, 2007. Some offices elected not to answer all questions. Table 3 summarizes the responses.

Table 3

| | Survey Responses | | |
|---|---|---|---|
| Question | Response | Number of Respondents | Percentage of Respondents |
| Do you have procedures to identify ineligible voter applicants, such as felons, non-citizens, or voters who submitted duplicate registrations? | Yes | 87 | 43% |
| | No | 96 | 46% |
| | Did not answer | 24 | 11% |
| | Totals | 209 | 100% |
| How often, if at all, do you find errors in the registered voter roll obtained from the Secretary of State's Office? | All the time | 10 | 5% |
| | Often | 30 | 14% |
| | Sometimes | 73 | 35% |
| | Rarely | 57 | 27% |
| | Never | 16 | 8% |
| | Did not answer | 23 | 11% |
| | Totals | 209 | 100% |
| Do multiple users share the same login account(s) in the TEAM system? | Yes | 26 | 12% |
| | No | 181 | 87% |
| | Did not answer | 2 | 1% |
| | Totals | 209 | 100% |
| Did everyone who had to access the TEAM system sign an Information Security Acknowledgement and Non-disclosure Agreement (ISANA) form? | Yes | 133 | 64% |
| | No | 35 | 17% |
| | Other | 35 | 17% |
| | Did not answer | 6 | 3% |
| | Totals | 209 | 100% |
| What kind of Internet connection do you use to access the TEAM system? | T1/T3 (Typical Speed: 100mbps) | 47 | 22% |
| | Cable/DSL (Typical Speed: 10mbps) | 118 | 56% |
| | Dial-Up (Typical Speed: 56kbps) | 4 | 2% |
| | Other | 26 | 12% |
| | Did not answer | 14 | 7% |
| | Totals | 209 | 100% |

TX_00202928

| | Survey Responses | | |
|---|---|---|---|
| Question | Response | Number of Respondents | Percentage of Respondents |
| How often is TEAM available when you need to access the system? | Always | 62 | 30% |
| | 75% of the time or more | 102 | 49% |
| | 50% of the time or more | 21 | 10% |
| | Less than 50% of the time | 4 | 2% |
| | Less than 25% of the time | 1 | 0% |
| | Other | 18 | 9% |
| | Did not answer | 1 | 0% |
| | Totals | 209 | 100% |
| Is your county an online or offline county? | Online | 183 | 88% |
| | Offline | 25 | 12% |
| | Did not answer | 1 | 0% |
| | Totals | 209 | 100% |
| How quickly, on average, can the TEAM system process an online voter registration? | Less than 1 minute | 19 | 9% |
| | 1-2 minutes | 55 | 26% |
| | 3-5 minutes | 45 | 22% |
| | 6-10 minutes | 28 | 13% |
| | More than 10 minutes | 11 | 5% |
| | Other | 25 | 12% |
| | Did not answer | 26 | 12% |
| | Totals | 209 | 100% |
| How quickly, on average, can the TEAM system generate a report? | Less than 1 hour | 55 | 26% |
| | Less than 6 hours | 6 | 29% |
| | Less than 24 hours | 15 | 7% |
| | 1-2 days | 21 | 10% |
| | 3-5 days | 6 | 3% |
| | Other | 24 | 11% |
| | Did not answer | 27 | 13% |
| | Totals | 209 | 100% |
| How satisfied are you with the TEAM system's ability to generate customized reports? | Very satisfied | 6 | 3% |
| | Somewhat satisfied | 37 | 18% |
| | Neutral | 41 | 20% |
| | Not very satisfied | 61 | 29% |
| | Very unsatisfied | 33 | 16% |
| | Did not answer | 31 | 15% |
| | Total | 209 | 100% |
| Does the TEAM system process offline batch transactions in a timely manner? | Always | 0 | 0% |
| | Often | 12 | 6% |
| | Sometimes | 4 | 2% |

TX_00202929

| Survey Responses | | | |
|---|---|---|---|
| Question | Response | Number of Respondents | Percentage of Respondents |
| | Rarely | 2 | 1% |
| | Never | | 1% |
| | Did not answer | 181 | 87% |
| | Totals | 209 | 100% |
| How quickly, on average, does the TEAM system process "send/receive" batched voter registration files? | Less than 1 minute | 3 | 1% |
| | 1-2 minutes | 10 | 5% |
| | 3-5 minutes | 7 | 3% |
| | 6-10 minutes | 2 | 1% |
| | More than 10 minutes | 0 | 0% |
| | Other | 5 | 2% |
| | Did not answer | 182 | 87% |
| | **Totals** | 209 | 100% |
| How quickly, on average, can the TEAM system process a search for a voter? | Less than a minute | 48 | 23% |
| | 1-2 minutes | 74 | 35% |
| | 3-5 minutes | 36 | 17% |
| | 6-10 minutes | 9 | 4% |
| | More than 10 minutes | 2 | 1% |
| | Other | 25 | 12% |
| | Did not answer | 15 | 7% |
| | Totals | 209 | 100% |
| How satisfied are you with the TEAM Help Desk Support? | Very satisfied | 81 | 40% |
| | Somewhat satisfied | 61 | 30% |
| | Neutral | 27 | 13% |
| | Not very satisfied | 19 | 9% |
| | Very unsatisfied | 6 | 3% |
| | Do not use Help Desk Support | 10 | 5% |
| | Did not answer | 5 | 2% |
| | **Totals** | 204 | 100% |
| Did you receive training from the Secretary of State's Office on the TEAM system? | Yes | 194 | 93% |
| | No | 15 | 7% |
| | Did not answer | 0 | 0% |
| | Totals | 209 | 100% |
| (If received training) To what extent did you find the training helpful? | To a great extent | 23 | 12% |
| | To a good extent | 68 | 35% |
| | To some extent | 73 | 38% |
| | To a small extent | 30 | 15% |
| | Not helpful at all | 0 | 0% |

TX_00202930

| | Survey Responses | | |
|---|---|---|---|
| Question | Response | Number of Respondents | Percentage of Respondents |
| | Did not answer | 15 | 8% |
| | **Totals** | **194** | **100%** |
| In general, does the TEAM system allow you to do your job effectively? | Yes | 96 | 47% |
| | No | 106 | 51% |
| | Did not answer | 4 | 2% |
| | **Totals** | **209** | **100%** |

a Percentages calculated in this table include offices that did not answer each question.

In addition, auditors asked county voter registration offices to list the most common problems they have encountered using the TEAM system, if any. Respondents could state up to five problems in response to this question. Auditors grouped similar responses, and the ten most common responses are listed in Table 4.

Table 4

| Most Common Problems with the TEAM System Cited by County Voter Registration Offices | |
|---|---|
| Problem | Number of Respondents Citing Problem |
| The TEAM system is slow when processing new applications, setting up elections, generating reports, and generating voter rolls. | 84 |
| The TEAM system requires too many steps to do one task. | 73 |
| County voter registration staff have experienced difficulty running reports. | 58 |
| The street index—a feature of the TEAM system that assigns voting districts based on a voter's address—is complex, confusing, difficult, and time-consuming to edit. | 56 |
| The TEAM system times out often and will log users out. | 41 |
| The TEAM system is too difficult to use and not user-friendly. The previous voter registration system—Texas Voter Registration System (TVRS)—performed better and quicker. | 41 |
| County voter registration staff have experienced printing problems, such as the printer alignment not being correct and the system being unable to print three voter cards on the page (which the TEAM system was designed to do). | 35 |
| County voter registration staff could not get voter lists when needed (and did not want to set up an election to get them). | 32 |
| County voter registration staff want more training on the TEAM system; the manual provided by the Secretary of State's Office should be updated with more detailed, step-by-step instructions. | 22 |
| County voter registration staff experienced difficulty batching; the "create batch" button did not work. | 20 |

TX_00202931

Appendix 6
## Secretary of State's Office's Attachment to Management Responses

The Secretary of State's Office provided this information as an attachment to its responses, which has not been subjected to any audit procedures.

Attachment A

### The State of Texas



Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
www.sos.state.tx.us

Phone: 512-463-5651
Fax: 512-475-2811
Dial 7-1-1 For Relay Services
(800) 252-VOTE (8683)

Phil Wilson
Secretary of State

As part of the Validation Activity, the TEAM Benchmark from December 2006 was rerun in order to document and compare the impact of the 6 months of tuning efforts. The follow summary shows the results for the original TEAM November 2006 benchmark (TEAM A and TEAM B), and the August 2007 (TEAM07) benchmark. In all cases, performance has significantly improved from the November 2006 Benchmark:

| Test ID | Statistic | TEAM A | TEAM B | TEAM07 | Faster by x |
|---|---|---|---|---|---|
| 3.1.3 ADD | count | 20 | 20 | 20 | |
| | average | 11.30 | 9.17 | 1.97 | 4.7 |
| | stdev | 7.59 | 6.20 | 0.84 | |
| | confidence | 3.33 | 2.72 | 0.37 | |
| | maximum | 26.39 | 18.35 | 3.86 | 4.7 |
| | minimum | 1.96 | 1.60 | 1.39 | 1.2 |
| | correl | | | | |
| | rec / sec | | | | |
| 3.2.2 CANCEL | count | 13 | 12 | 14 | |
| | average | 5.63 | 4.79 | 1.83 | 2.6 |
| | stdev | 0.32 | 0.35 | 0.15 | |
| | confidence | 0.17 | 0.20 | 0.08 | |
| | maximum | 6.33 | 5.35 | 2.29 | 2.3 |
| | minimum | 5.08 | 4.28 | 1.66 | 2.6 |
| | correl | | | | |
| | rec / sec | | | | |
| 3.3.1 EDIT | count | 14 | 13 | 14 | |
| | average | 7.93 | 4.17 | 1.91 | 2.2 |
| | stdev | 4.88 | 1.26 | 0.38 | |
| | confidence | 2.56 | 0.64 | 0.20 | |
| | maximum | 19.53 | 6.64 | 2.67 | 2.6 |
| | minimum | 4.09 | 2.19 | 1.50 | 1.5 |
| | correl | | | | |
| | rec / sec | | | | |
| 3.4.1 NAME | count | 18 | 19 | 10 | |
| | average | 47.73 | 8.66 | 1.37 | 6.3 |
| | stdev | 130.66 | 12.77 | 0.20 | |
| | confidence | 60.30 | 7.92 | 0.12 | |

TX_00202932

| Test ID | Statistic | TEAM A | TEAM B | | |
|---|---|---|---|---|---|
| | maximum | 541.74 | 43.99 | 1.86 | 23.6 |
| | minimum | 1.54 | 1.81 | 1.21 | 1.5 |
| | correl | 0.26 | 0.91 | 0.95 | |
| | rec / sec | 1.43 | 2.61 | 15.94 | |
| 3.4.2 VUID | count | 22 | 10 | 10 | |
| | average | 2.76 | 2.39 | 1.26 | 1.9 |
| | stdev | 0.71 | 0.20 | 0.12 | |
| | confidence | 0.30 | 0.12 | 0.07 | |
| | maximum | 4.99 | 2.69 | 1.86 | 1.7 |
| | minimum | 1.45 | 2.08 | 1.14 | 1.8 |
| | correl | | | | |
| | rec / sec | | | | |
| 3.4.3 DOB | count | 19 | 13 | 13 | |
| | average | 2.56 | 76.57 | 1.47 | 52.0 |
| | stdev | 1.15 | 187.07 | 0.17 | |
| | confidence | 0.52 | 101.69 | 0.09 | |
| | maximum | 5.01 | 692.87 | 1.80 | 385.4 |
| | minimum | 1.33 | 2.13 | 1.27 | 1.7 |
| | correl | | | | |
| | rec / sec | | | | |

| Test ID | Statistic | TEAM A | TEAM B | | |
|---|---|---|---|---|---|
| 3.4.4 ADDR | count | 10 | 10 | 10 | |
| | average | 2.94 | 12.85 | 1.54 | 8.4 |
| | stdev | 2.00 | 16.67 | 0.34 | |
| | confidence | 1.24 | 10.33 | 0.21 | |
| | maximum | 7.18 | 58.06 | 2.20 | 26.4 |
| | minimum | 1.38 | 0.74 | 1.13 | 0.7 |
| | correl | 0.96 | 0.59 | 0.95 | |
| | rec / sec | 8.00 | 4.38 | 33.52 | |
| 3.4.6 TDL | count | 10 | 9 | 9 | |
| | average | 2.16 | 2.25 | 1.31 | 1.7 |
| | stdev | 0.61 | 0.24 | 0.04 | |
| | confidence | 0.38 | 0.16 | 0.03 | |
| | maximum | 2.94 | 2.61 | 1.37 | 2.1 |
| | minimum | 1.38 | 2.04 | 1.26 | 1.6 |
| | correl | | | | |
| | rec / sec | | | | |

2

TX_00202933

Copies of this report have been distributed to the following:

## Legislative Audit Committee

The Honorable David Dewhurst, Lieutenant Governor, Joint Chair
The Honorable Tom Craddick, Speaker of the House, Joint Chair
The Honorable Steve Ogden, Senate Finance Committee
The Honorable Thomas "Tommy" Williams, Member, Texas Senate
The Honorable Warren Chisum, House Appropriations Committee
The Honorable Jim Keffer, House Ways and Means Committee

## Office of the Governor

The Honorable Rick Perry, Governor

## Secretary of State

The Honorable Phil Wilson

TX_00202934



This document is not copyrighted. Readers may make additional copies of this report as needed. In addition, most State Auditor's Office reports may be downloaded from our Web site: www.sao.state.tx.us.

In compliance with the Americans with Disabilities Act, this document may also be requested in alternative formats. To do so, contact our report request line at (512) 936-9880 (Voice), (512) 936-9400 (FAX), 1-800-RELAY-TX (TDD), or visit the Robert E. Johnson Building, 1501 North Congress Avenue, Suite 4.224, Austin, Texas 78701.

The State Auditor's Office is an equal opportunity employer and does not discriminate on the basis of race, color, religion, sex, national origin, age, or disability in employment or in the provision of services, programs, or activities.

To report waste, fraud, or abuse in state government call the SAO Hotline: 1-800-TX-AUDIT.

TX_00202935

PL430
9/2/2014
2:13-cv-00193

The resolution was read and was adopted.

## SENATE RESOLUTION 5

Senator Mauzy offered the following resolution:

BE IT RESOLVED by the Senate of the State of Texas, That the Rules of the Senate of the 67th Legislature are adopted as the Temporary Rules of the Senate of the 68th Legislature with the following modifications:

Subsections (a), (b), and (c) of Senate Rule 94 are revised to read as follows:

(a)  At the beginning of each regular session, the President shall appoint the following standing committees and subcommittees with the number of Members indicated:

(1)  Committee on Administration (7 members)
(2)  Committee on Economic Development (9 members)
(3)  Committee on Intergovernmental Relations (9 members)
(4)  Committee on Education (11 members)
(5)  Committee on Finance (13 members)
(6)  Committee on Jurisprudence (11 members)
      Subcommittee on Civil Matters (5 members)
      Subcommittee on Criminal Matters (5 members)
(7)  Committee on Human Resources (9 members)
      Subcommittee on Consumer Affairs (4 members)
      Subcommittee on Public Health (4 members)
(8)  Committee on State Affairs (13 members)
      Subcommittee on Nominations (7 members)
(9)  Committee on Natural Resources (11 members)
      Subcommittee on Agriculture (3 members)
      Subcommittee on Energy (3 members)
      Subcommittee on Water (3 members)



(b) The President shall designate the chair and vice-chair of each committee and subcommittee. For each committee with more than 10 members the President must appoint at least four Senators who served on the committee during the previous legislative session. A Senator may not serve on more than three standing committees and may chair only one committee. A Senator may serve on only one standing subcommittee within a standing committee.

(c) The President may appoint special committees and subcommittees in addition to those listed in Subsection (a) of this section with the consent of two-thirds of the Members of the Senate.

The resolution was read and was adopted by the following vote:    Yeas 31, Nays 0.

**From:** Libby Nezda_SC
**Sent:** Monday, January 24, 2011 6:27 PM
**To:** Amanda Montagne; Jason Baxter; Ryan LaRue_SC
**Subject:** Voter Registration Information

Here is a link for voter registration for each county from Nov. 2010. Might be useful to cross reference it with the counties that don't have driver's license offices, as far determining what areas are actually under served.

http://www.sos.state.tx.us/elections/historical/nov2010.shtml

Secretary of State's website has all kinds of useful voter registration information as well but I'm not quickly coming across information broken down by age groups. I'll keep looking.

**Libby Nezda**
Senate Committee on Transportation and Homeland Security
Tommy Williams, Chair
Telephone: (512) 463-0067
Fax: (512) 463-0097
libby.nezda_sc@senate.state.tx.us



1

HIGHLY CONFIDENTIAL

| | |
|---|---|
| From: | Ann McGeehan |
| Sent: | Tuesday, February 01, 2011 10:00 AM |
| To: | Ann McGeehan; Karen Richards |
| Cc: | Lee Guyette; John Mendoza |
| Subject: | RE: Query to identify voters with no TDL/ID - compare to DPS records |
| Attachments: | Voters without TDL-ID.doc |

Talked with John, and he confirmed that the voters with SSN records only were included in the group of voters that had no TDL/ID. Attached is a draft summary that I will send to Coby and John so that they can distribute to legislative folk. Can you please review before I send it out? Thanks.

Ann McGeehan
Director of Elections
Office of the Texas Secretary of State
amcgeehan@sos.state.tx.us
512-463-9871

---

**From:** Ann McGeehan
**Sent:** Tuesday, February 01, 2011 9:18 AM
**To:** Karen Richards
**Cc:** Lee Guyette; John Mendoza
**Subject:** RE: Query to identify voters with no TDL/ID - compare to DPS records

I am typing up a summary of this comparison to provide to legislative staff. Did the group of voters with no TDL/ID issued by DPS also include those voters who provided an SSN only?

Ann McGeehan
Director of Elections
Office of the Texas Secretary of State
amcgeehan@sos.state.tx.us
512-463-9871

---

**From:** Karen Richards
**Sent:** Thursday, January 27, 2011 2:35 PM
**To:** Ann McGeehan
**Cc:** Lee Guyette; John Mendoza
**Subject:** Query to identify voters with no TDL/ID - compare to DPS records

The following statistics represent those voters identified on the state database of registered voters who do not have a Texas driver's license or ID number issued by the Department of Public Safety (DPS). The voter set was compared against the database of driver/ID records supplied to the Secretary of State's Office by DPS in October of 2010.

The queries performed used different matching criterion to compare the voter data to the DPS data in an attempt to identify the most effective search and obtain the most optimum results. The results demonstrate what fields matched between the two data sets. It should be anticipated that a margin of matches could be false; resulting in different persons with the same data elements.

1





TX_00107733

Δ π EXHIBIT 26
Deponent 4/1/14 ams
Date 29/14 Rptr D
WWW.DEPOBOOK.COM

Total Voters in the State: 12,657,884

## Query 1
__Matching Criterion:__ Last Name, First Name, Date of Birth and Same County

|  |  | % to State # | % to no TDL/ID |
|---|---|---|---|
| # of Voters with no TDL/ID Number: | 2,814,965 | 22% | |
| # of Voters that Matched a DPS Record: | 1,970,252 | 16% | 70% |
| # of Voters that did not match a DPS Record | 844,713 | 7% | 30% |

## Query 2
__Matching Criterion:__ Last Name, First Name, Date of Birth, Same County; Exempt 70+

|  |  | % to State # | % to no TDL/ID |
|---|---|---|---|
| # of Voters with no TDL/ID Number: | 2,096,699 | 17% | |
| # of Voters that Matched a DPS Record: | 1,577,185 | 12% | 75% |
| # of Voters that did not match a DPS Record | 519,514 | 4% | 25% |

## Query 3
__Matching Criterion:__ Last Name, Date of Birth and Same County

|  |  | % to State # | % to no TDL/ID |
|---|---|---|---|
| # of Voters with no TDL/ID Number: | 2,814,216 | 22% | |
| # of Voters that Matched a DPS Record: | 2,135,656 | 17% | 76% |
| # of Voters that did not match a DPS Record | 678,560 | 5% | 24% |

## Query 4
__Matching Criterion:__ Last Name, Date of Birth, Same County; Exempt 70+

|  |  | % to State # | % to no TDL/ID |
|---|---|---|---|
| # of Voters with no TDL/ID Number: | 2,096,705 | 17% | |
| # of Voters that Matched a DPS Record: | 1,592,334 | 13% | 76% |
| # of Voters that did not match a DPS Record | 504371 | 4% | 24% |

## Query 5
__Matching Criterion:__ Last Name, First Name and Date of Birth

|  |  | % to State # | % to no TDL/ID |
|---|---|---|---|
| # of Voters with no TDL/ID Number: | 2,814,210 | 22% | |
| # of Voters that Matched a DPS Record: | 2,083,730 | 16% | 74% |
| # of Voters that did not match a DPS Record | 730,480 | 6% | 26% |

## Query 6
__Matching Criterion:__ Last Name, First Name, Date of Birth; Exempt 70+

|  |  | % to State # | % to no TDL/ID |
|---|---|---|---|
| # of Voters with no TDL/ID Number: | 2,096,789 | 17% | |
| # of Voters that Matched a DPS Record: | 1,475,889 | 12% | 70% |
| # of Voters that did not match a DPS Record | 650,900 | 5% | 30% |

TX_00107734

Question:

How many registered voters have not been issued a driver's license or personal identification card by the Texas Department of Public Safety?

Discussion:

The Office of the Secretary of State cannot answer this question precisely, but we can provide an estimated range of the number of voters who appear not to have been issued TDL/personal identification card by the DPS. Prior to 2006, providing a TDL/ID number was optional on the application to register to vote. Beginning January 2006, a TDL/ID number was required on the application to register to vote, if the applicant had been issued such a number. We can provide an estimate of the number of voters without TDL/ID cards by comparing the group of voters in the official state file without a TDL/ID card against the copy of the DPS driver/personal identification card database maintained by our office. The number of voters in the official state file of voters without a TDL/ID is 2,814,965. Our copy of the DPS database contains only those data fields relevant for voter registration: TDL number; Last Name; First Name; Middle Name; Name Suffix; Date of Birth; Date Created; Last Modified; and Transaction Type.

We performed two queries to obtain the estimated range of voters that have not been issued a TDL/ID number. First, we queried based on the matching criteria of Last Name, First Name, Date of Birth and Same County. This query resulted in a total of 844,713 voter records that did not have a match in the TDL/ID file. Currently there are 12,657,884 registered voters in the state so based on this query, roughly 6.7% of the registered voters have not been issued a TDL/ID card by DPS.

The second query matched on Last Name, Date of Birth, and Same County. The matching criteria for this query is not quite as tight as the first query, but it will catch matches when the first name field is slightly different between the DPS file and the SOS file. For example, under the first query, a voter named Bob Smith in the SOS data base would not match against a Robert Smith in the DPS database even thought date of birth and county fields may match. The second query generated a total of 678,560 voters that did not have a match in the DPS file. Based on the current number of registered voters in the state, the second query shows that roughly 5.3% of voters have not been issued a TDL or ID card.

Conclusion:

Based on the information available to the Office of the Secretary of State, we can estimate that between 844,713 to 678,560 of the 12,657,884 registered voters may not have been issued a TDL/ID by the DPS.

TX_00107735