

July 15, 2011

# Capitol View -
# 82nd Legislative Session Review

### Senator Dan Patrick
### Your Voice from Senate District 7

Hi Friend,

Because this is my legislative summary of a very long session and special session, this e-blast is longer than usual. I wanted it to be thorough, and I hope you will take a few minutes to read it at your leisure. If you have any questions concerning any of these issues please feel free to contact our Senate office by e-mail, letter, or phone.

After nearly six full months' work, the 82nd Session and Special Session finally came to an end on June 29th. As a member of the Senate Finance, Education, Healthcare Committees, as well as five other major committees and sub-committees, it was non-stop work for me. Because of my assignments and the legislation our office carried, I was involved in virtually all of the major decisions made this session. As always, I view my job as being your voice in these decisions. Together we had a major seat at the table to fight for our conservative principles.

*Empower Texas*, one of the leading conservative legislative watchdog groups, rated me as an A+ for my voting record. Only two others, Senator Birdwell and Senator Huffman, received an A+ conservative rating of the 31 senate members.

Click to see the ratings of the Senate and House.

## The Challenge

We began the session with the challenge of a $20 billion+ shortfall due to the national economy's impact on Texas. Our goal was to balance the budget without raising taxes while still meeting the needs of our most important programs. I believe we accomplished those goals.

## The Budget

We balanced the budget without raising taxes. I was the only

TX_00013523

**Defendant's Exhibit #**
062                                    DE-000438

USA_00008232



**Budget Facts:**

- **Final budget 2012-13 $172.5 billion total**

- **Education, healthcare, and public safety equal 85% of all state spending**

Republican of ten on the Finance Committee who voted against using the Rainy Day Fund (RDF) in the 2012-13 budget. I believed we should preserve most of the RDF for the future. I expect we will face another major shortfall in 2013 as property values continue to be flat and the economy sluggishly improves. I was able to find other Republican senators, not on Finance, to join with me to hold the line on our reserve fund. The final budget did not use the RDF for 2012-13. Instead we required further spending cuts if the budget falls short of projected revenues. Once that goal was achieved, I supported the final budget that cut $15 billion in spending, didn't raise taxes, met our obligations, while saving our RDF for the future.

There has been a lot of misinformation distributed by those who never want to cut any dollars for any program. The headlines predicting 100,000 teachers being fired and nursing homes being closed never materialized. Cuts to local school districts were restrained to an average of five percent. We funded our nursing homes at almost 100% of current levels. We also fully funded public safety and even added over $100 million to border security.

While healthcare, the fastest growing segment of our budget, is still a major challenge, we passed legislation with the intention of saving billions moving forward. Depending on the future of the Patient Protection and Affordable Care Act, commonly known as Obamacare, we will have to revisit Medicaid again in 2013. That was another important reason to save the RDF from depletion.

In the end, we cut $15 billion from the budget and we focused our money where it is needed most.

Our budget, even with the $15 billion in cuts, is still a whopping $172.5 billion over two years. Education, healthcare, and public safety make up over 85% of all state spending.

---

**Prioritizing Classroom Funding**

As a member of the Senate Finance Committee, as well as the Education Finance Sub-Committee, I spent a lot of time ensuring that classroom funding was prioritized. Education, almost half of our entire budget, was funded at levels insisted on by the Senate. The final budget added almost $6 billion back to education from the original proposed budget. The total cut will see district budgets decreased somewhere between 3% and 8%. Superintendents from across the state supported the Senate plan over the House plan because, while they realized that some cuts were inevitable, the Senate plan placed a priority on the classroom and teachers.

TX_00013524

**Defendant's Exhibit #** 062
DE-000439

USA_00008233

The districts by and large have done a good job of focusing their cuts on non-classroom areas where possible. One of my key goals was to protect teacher jobs and the classrooms even while cutting 5% from the education budget. The vast majority of teachers that were terminated in the spring will return. Class sizes have not changed and textbooks have been fully funded. We also passed major legislation supported overwhelmingly by school districts that provides them needed flexibility in controlling their budgets.

**Transportation**

Transportation funding continues to be a challenge. Our gas tax revenues are nearly flat despite having millions of additional cars on the road. Cars today on average get much better gas mileage than a decade ago. Even with higher gas prices, the state tax is flat at $.20 per gallon. Though we've added cars, it is because of better gas mileage that our total collections have been kept at a relatively flat level for a decade. In spite of this budgetary challenge, working with Representative Fletcher and Senator Williams, we were able to push TxDOT to place a priority on building out the Grand Parkway, finishing 249, and continuing the planning to expand 290. These projects will all be a combination of toll lanes and free lanes and take many years to complete, but work is to begin in the next year.

**Other Major Legislation**

As stated previously, I was proud to be heavily involved in virtually every major piece of legislation passed this session. I was a co-author of the **Photo Voter I.D.** bill that finally passed. I co-authored and authored major healthcare reform including the **Healthcare Compact** which will give Texas the option to join other states in opting out of federal healthcare.

I authored the **Sonogram Bill** that finally passed after I first introduced it in 2007. It requires a sonogram 24 hours before an abortion. We have 80,000 abortions each year in Texas. This bill will improve informed consent and could save 15,000 lives a year if just 20% of women see the sonogram and choose not to have the abortion.

I also passed legislation to protect our **100% disabled veterans' property tax exemption** so it can be passed on to their spouse upon their death. This legislation was the number one priority for many veterans' groups across the state, and I was happy to join Representative Fletcher in delivering this to them.

I passed nearly a dozen "local" bills that will have a positive impact on our senate district. I joined with Representative Bohac

TX_00013525

**Defendant's Exhibit #**                    DE-000440
062

USA_00008234

to pass the bill that says HOAs cannot prevent homeowners from flying a U.S., Texas or military flag.

Click to visit my senate website for a more comprehensive review of the bills that I passed.

### Criminal Justice

On Criminal Justice, I passed legislation to increase penalties for drunk drivers who are twice the legal limit. I also passed legislation increasing penalties for smuggling illegal aliens into Texas and co-authored legislation to address human trafficking.

### Unfinished Work

There were several disappointments. Every Republican senator signed onto the **Sanctuary City** bill in the special session. The Senate passed it to the House with two weeks remaining in the special session. Unexplainably, it was stuck in a House committee and never was voted out. It did not pass in the special session.

Also, after I passed the "anti-groping" **TSA Bill** out of the Senate, it failed to pass the House on the last day of session. However, the TSA has begun to change their invasive pat-down policies. I believe that change was in part due to the focus the Texas legislature put on this issue.

### The Future

As mentioned, 2013 promises to offer significant financial challenges once again. We are a fast growing state. Senate District 7 was the fastest growing district in the last decade and will continue to grow at a rapid rate. We are going to have to begin finding long-term solutions to funding education, transportation, and healthcare. We have to lower property taxes and resolve the business tax issue. I will be sending out my plan for the future in upcoming e-blasts.

It is truly an honor to serve you in the Texas Senate. I hope you can see from my volume of work that I did my very best to represent you this session, speak on your behalf, and fight for the issues important to all Conservatives.

TX_00013526

**Defendant's Exhibit #**
062

DE-000441

USA_00008235



See our press releases on legislation.

Visit my Senate website.

Visit my campaign website.

**P.O. Box 79544 ♦ Houston, TX  77279 ♦ Tel: (832) 390-0107 ♦ Fax: (281) 936-0274**

**pd pol ad Texans for Dan Patrick**            **Website: www.danpatrick.org**
**Click to send comments or questions.**

Click here to forward this email to a friend



http://hosted-p0.vresp.com/251553/b8e7b1f599/ARCHIVE                    4/4/2012

TX_00013527

Defendant's Exhibit #        DE-000442
062

USA_00008236

PL577
9/2/2014
2:13-cv-00193

<< TX_00015825 >>

Election Integrity:
TCC Analysis and Talking Points
Texas Conservative Coalition
January 24, 2011
Background: Elections Open to Fraud
Article 6, Section 2 of the Texas Constitution grants the right to vote only to U.S. citizens who are residents of Texas:
Every person subject to none of the disqualifications provided by Section 1 of this article [under age 18, mentally incompetent, persons convicted of felonies] or by a law enacted under that section who is a citizen of the United States and who is a resident of this State shall be deemed a qualified voter. [Emphasis added]
It is clear that voting is a right reserved only for U.S. citizens. However, the lack of any explicit statutory mandate and procedural requirement to verify the qualification of voters leaves voting booths wide open fraud, stripping constitutional protections of any real value.
Sections 11.002(1) and (2) of the Texas Election Code list the top two qualifications for voting: age (18 or over) and citizenship (United States). The application to register to vote, available online through the Secretary of State website, begins with the following questions:
Air you a United States Citizen?
.................................................................................................... ^ Yes ^ No
v ill you be 18 years of age on or before election day?
.................................................................... ^ yes ^ No
If you checked 'no' in response to either of the above, do not complete this form.
Are you interested in ser N ing as an election worker?
.................................................................... ^ Yes ^ No
Applicants who check "yes" to the citizenship question are taken at their word; there is no verification of citizenship by the state or local authorities. The Office of the Secretary of State, which oversees elections in Texas, confirms what statute and practice allude to: that citizenship verification goes no further than the honor system:
...under current Texas voter registration guidelines, there is no formal verification of an applicant's citizenship status... Texas relies on the applicant to provide accurate/truthful information on his or her voter registration application'.
That admission alone is sufficient basis for legislative action: The system by which voters are registered must be improved so that citizenship and other eligibility requirements are verified before an applicant is placed on the voter rolls.
However, the problems with election integrity in Texas go beyond the admission by the Secretary of State that applicants' eligibility is not verified. Non-citizens are registered to vote and are voting in Texas elections. Simple open records requests to five of Texas' most populous counties reveal the following:
Since 1992, Harris County has cancelled the registration of 3,742 non-citizens who had registered to vote.
303 non-citizens were removed from voter rolls in Bexar County between 2003 and 2005; 41 of these non-citizens voted at least once.
1,889 non-citizens were removed from voters rolls in Dallas County between 1999 and 2007; 356 of these non-citizens voted at least once.
584 non-citizens have been removed from voter rolls in Tarrant County since 1999.
213 non-citizens were removed from voter rolls in El Paso County between January and October of 2006."
Page 1
~,~.. -. i L.. ,r__. .~1...1, .i.,f:a " +_ li.+.,'
11

**Defendant's Exhibit #**
065

DE-000446

USA_00008240

<< TX_00015826 >>

It is worth noting that these non-citizens were discovered on the voter rolls in just five counties without a comprehensive audit. Based on these initial results, it is likely that a statewide audit would yield many more ineligible voters on the rolls across the state.
Photo Identification TEMPORARY VISITOR CARD lInit, the new driver's lice+tse being issued to non-citizens TEXAS in Texas differs from fX~
To address these election integrity issues, the Legislature should standard drivers licenses: TEMPORARY J VISITOR
create a secure system of voter registration, voter identification, and Temporary i~RR RLICENSEcs ~ citizenship verification that require driver's license as both voter visitor status indicated DE LURE.MARY
registration card and voter identification. The drivers license is a 2 CUSTOMER WAY HOMETOWN TX 00000-0000 widely accepted form of identification that can be presented to law vertical CLASS: D DL 12345677 -15-7:_ ev II ES 09
enforcement officials, and is widely used by private sector R format EST. A10I 1 CDEPSTJr organizations as proof of identification for employment applications END: PTX and certain over-the-counter medications. Using the Red box purchasing g around Hoto Hi7 driver's license as a basis for voter identification is a sensible reform EX: F
to secure the integrity of elections. Temporary TEMP visitor status STAT expiration date EXP'R 06-01
In October 2008, the Texas Public Safety Commission enacted an
administrative rule (37 T.A.C. § 15.171) that made several changes "P"restriction
to the driver's licenses that are issued to legal immigrants. Those on back of card ~yt~ tom. N I I L' iI ~'
changes are reflected in the graphic [see right]. Most importantly, Source: TNxas Dp;trnent nt PUhIic Safety I immigrant driver's licenses must clearly indicate that the holder is a temporary visitor, and they include the date on which the immigrant's visa expires. Therefore, requiring a driver's license (or Texas ID card) to be presented before voting would enable poll workers to ascertain the identification of the person presenting themselves to vote. Legal resident non-citizens would be immediately evident to poll workers, and illegal aliens would be barred from voting since they are unable to legally obtain a driver's license in Texas.
A secure driver's license should function as the primary form of identification with which individuals are able to vote, although other forms of state-issued photo ID-such as a Texas identification card-should also be acceptable. The experience of states like Georgia and Indiana - both of which have recently enacted voter photo ID - demonstrates that identification requirements work well and do not suppress turnout.
Between Georgia's 2004 general election (the last without photo ID requirements) and the state's 2008 general election (the first with photo ID requirements), turnout increased 6.7 percent statewide, compared to just a 2.4 percent increase in nearby Mississippi which is demographically similar, but has no photo ID requirement. The black share of the vote in Georgia increased from 25 percent to 30 percent between the two elections."' Indiana's experience was similar.
Democratic turnout in the 2008 general election increased by 8.3 percent under voter identification laws, compared to the 2004 general election when the laws were not in effect. The increase in neighboring Illinois was just 4.4 percent
despite that state being the home of Democratic Presidential candidate Barack Obama." These facts underscore the point that meaningful voter ID requirements certainly do not suppress turnout but may in fact increase turnout by strengthening voters' confidence in the electoral process. In addition, it is important to note that
photo identification requirements have been approved by the nation's highest court. In April 2008 the U.S. Supreme Court upheld Indiana's photo identification law six-to-three in Crawford v. Marion." The judgment of the Court issued by Justice Kennedy undermines volumes of spurious claims made by opponents of photo identification requirements, forever memorializing their constitutional weightlessness.
Justice Scalia's concurring opinion stated that "the universally applicable requirements of Indiana's voter-identification law are eminently reasonable" and that the burdens of photo identification were "minimal and justified." While an ID requirement may place a burden on voters, Justice Steven's opinion concluded that "burdens... arising from life's
Page 2
J

**Defendant's Exhibit #**
065

DE-000447

USA_00008241

```
<< TX_00015827 >>
```

vagaries, however, are neither so serious nor so frequent as to raise any question about the constitutionality of [photo ID
requirements]."
Justice Steven's opinion also noted that for the few voters without identification, the burden of obtaining one (for free
under Indiana's law), "does not qualify as a substantial burden on the right to vote."
In addition, it is worth noting that the U.S. Department of Justice recently dropped its objections to Georgia's citizenship
verification law"', underscoring that verifying the citizenship of voter registration applicants is constitutional and can be
pursued by other states. Under Georgia's process, more than 4,000 non-citizens were discovered on the state's voter
rolls.
With photo identification as the centerpiece, there are a number of other election integrity measures that must be taken
to help restrict opportunities for vote fraud:
1. Absentee Ballots: Mailed ballots present unique opportunities for fraud because the voter is not required to present
themselves to a poll worker on election day. A warning to absentee voters on the Secretary of State's website underlines
these risks:
A stranger might "show up" on your doorstep offering to help you with your ballot soon after you've received it in
the mail. We recommend you decline this kind of help for several reasons. If you allow your ballot to be mailed by
someone you don't know, it might not be mailed at all. Your ballot will be rejected if a common or contract carrier
attempts to deliver it to the elections office from the address of a candidate or a campaign's headquarters. The
safety of your vote is best assured by asking someone you know and trust to help you read, mark or mail your
ballot.""
The security of mail-in ballots should be improved by requiring that only close family members or persons who reside at
the same address are legally permitted to assist an absentee voter in submitting their mail-in ballot. In addition, the
process of absentee voting could be made more secure by requiring voters to include a state-issued "voter registration
number" on their application for an absentee ballot. This would deter fraud and would interject transparency and
accountability into the absentee voting process.
2. Signage at Polling Place: Require signs to be posted at all polling places that clearly state the statutory definition of
"qualified voter" (over eighteen years of age, U.S. citizen, registered).
3. Prosecution of Vote Fraud: Create an independent office within the Office of the Attorney General that is charged
solely with the investigation and prosecution of voter fraud.
4. Voter Rolls: More-frequently purge voter registration lists of non-citizens, felons, and those who are deceased; and,
forward the names of any non-citizen removed from voting rolls to the appropriate investigative agency for potential
prosecution.
Summary: The Legislature must secure the integrity of elections by verifying the citizenship of those registering to
vote, requiring a photo ID to vote, removing non-qualified voters from voter registration lists, and improving absentee
ballot security.
Page 3
iox

**Defendant's Exhibit #**
065

DE-000448

USA_00008242

<< TX_00015828 >>

Talking Points
• Requiring voter ID is constitutional, practical and effective.
The Supreme Court has ruled the voter ID constitutional.
The voter ID is practical: tie voter registration to a secure driver's license system that is already in practice in
Texas.
Voter ID is effective as proven by the experience of Georgia and Indiana, which experienced increases in black
voter participation after the ID was required.
• The Texas Driver's License can be used as a secure voter identification card to combat vote fraud
The Driver's License is a widely-accepted photo identification document that is readily identifiable by law
enforcement agents, poll worker, and the general public.
Requiring voters to present a Texas Driver's License before voting would limit opportunities for in-person vote
fraud.
Recent changes to the format of Driver's Licenses for non-citizens will assist poll workers in identifying those
who are not eligible to vote in elections in Texas.
Photo identification requirements for voting have been affirmed by the U.S. Supreme Court.
• Photo identification requirement to vote may in fact increase voter turnout:
- Claims that voter ID requirements suppress the vote have been proven false.
- Both Indiana and Georgia experienced significant increases in voter turnout during their first general elections
with photo ID requirements.
- The increased turnout in the 2008 general election in these states exceeded that of other neighboring states, a
trend that was mirrored among black voters and Democratic voters.
- Photo ID improves voters' confidence in the electoral system, which can spur increased turnout.
• A secure voter ID is necessary because current procedures for registering voters and accepting voters at polling
places create opportunities for election fraud.
- The State of Texas does not verify the citizenship or other eligibility of persons applying to register to vote.
- There is no meaningful identification requirement for persons presenting to vote at a polling place. Combined
with the lack of eligibility verification, this leaves Texas elections wide open to fraud.
• It is well-established that non-citizens are registering to vote and are voting in elections in Texas.
Since 1992, Harris County has cancelled the registration of 3,742 non-citizens who had registered to vote.
1,889 non-citizens were removed from voter rolls in Dallas County between 1999 and 2007; 356 of these non-
citizens voted at least once.
303 non-citizens were removed from voter rolls in Bexar County between 2003 and 2005; 41 of these non-
citizens voted at least once.
These non-citizens were discovered through simple open records requests: no comprehensive audit of the
state's voter rolls has been performed.
Page 4
11 o 'g, I
iox

**Defendant's Exhibit #**
065

DE-000449

USA_00008243

<< TX_00015829 >>

ENDNOTES
Ann McGeehan, Director of Elections, Secretary of State; letter dated June 15, 2006
"State Approaches to Illegal Immigration," Texas Conservative Coalition Research Institute, October 2006.
Hans Von Spakovsky, "Requiring Identification by Voters," Testimony Before the Texas Senate (Heritage Foundation
Online), March 23, 2009.
Hans Von Spakovsky, "Requiring Identification by Voters," Testimony Before the Texas Senate (Heritage Foundation
Online), March 23, 2009.
Crawford v. Marion County Election Board, 553 U.S. 181 (2008).
John Fund, "DOJ Reversal on Georgia Election Law," Wall Street Journal, August 28, 2010.
Early Voting in Texas, Office of the Secretary of State;
http://www.sos.state.tx.us/elections/pamphlets/earlyvote.shtml
Page 5

**Defendant's Exhibit #**
065

DE-000450

USA_00008244

PL578
9/2/2014
2:13-cv-00193

<< TX_00015839 >>

Texas Transportation Commission
125 E. 11TH STREET • AUSTIN, TEXAS 78701-2483
May 6, 2011
The Honorable Rafael Anchia
Texas House of Representatives
P.O. Box 2910
Austin, Texas 78768-2910
Dear Representative Anchia:
Thank you for your letter regarding SB 14 and its potential impact on the Texas Mobility Fund
(TMF). As you noted in your letter, your requests related to the version of SB 14 that the Texas
House passed on third reading on March 24, 2011. As you may know, on May 4 the Legislature
issued a Conference Committee Report (CCR) that makes revisions to SB 14 that we believe
are significant to your inquiries. Most notably, Sections 14 and 20 of the CCR version of SB 14
provide for the issuance of a new "election identification certificate," to be used (in addition to a
drivers license or a personal identification card) for voting purposes (but only for voting
purposes). Because this version continues to require fees for personal identification cards and
provides for the issuance of free election identification certificates that did not previously exist
and that can only be used for voting purposes, it does not reduce the dedication of this source
of TMF funding. If the earlier version of SB 14 created the constitutional issue to which your
letter alluded, we believe that the CCR eliminates any such concerns.
Nevertheless, most of the requests in your letter relate to the Department's "ability to issue
bonds" under the TMF, rather than to any potential constitutional issues. In light of that, we are
happy to provide the following general responses, based on a review by the Department's legal
advisors of the resolutions authorizing the TMF bond issues as well as Art. III, Sec. 49-k of the
Constitution and relevant provisions of the Transportation Code:
1. The simple reduction or decline in a specific amount of fee revenue would not cause an
impairment to the TMF, but a legislative act or acts that cause such a reduction
impermissibly could certainly result in an impairment, depending on all relevant facts and
circumstances. We believe the CCR eliminates or, at least, significantly alters the
"estimated annual reduction of '$9 million'" to which you have referred. Nevertheless, the
previously-estimated $9 million reduction in ID Fee annual revenues, if correctly
estimated, would not keep the TMF from being able to pay debt service on outstanding,
currently issued TMF bonds.
2. The Department is engaging in various ongoing analyses regarding the state's ability to
issue additional TMF bonds over the next 10 years. Based on the most recent biennial
revenue estimate, estimated revenues coming into the TMF during FY 2011, 2012, and
THE TEXAS PLAN
REDUCE CONGESTION • ENHANCE SAFETY • EXPAND ECONOMIC OPPORTUNITY • IMPROVE AIR QUALITY
PRESERVE THE VALUE OF TRANSPORTATION ASSETS
An Equal Opportunity Employer

**Defendant's Exhibit #**
066

DE-000451

USA_00008245

<< TX_00015840 >>

The Honorable Rafael Anchia -2- May 6, 2011
2013 will not exceed debt service requirements during those years by an amount
sufficient to meet the required 110 percent debt service coverage test for issuance of
additional bonds under Sec. 201.943 of the Transportation Code. The Department
continues to monitor evolving facts and circumstances and estimated revenues pertinent
to satisfaction of the statutory test. At this point, it is premature to reach a conclusion as
to whether a loss of revenue from ID Fees would make a difference in the state's
eligibility to issue additional TMF bonds, including refunding bonds that could generate a
savings in TMF debt service costs.
3. The Department takes seriously any proposed legislation that might have a potential
impact on the constitutional requirements of paragraph (f) of the Art. III, Sec. 49-k or on
the covenants of the Transportation Commission in the bond resolutions authorizing the
TMF bonds. Based on our analysis, the amount of revenue that would be lost from any
reduction in ID Fee revenue, even the estimated reduction from the earlier version of
SB 14, is not material or significant in light of the size of the TMF. Under the
CCR version of SB 14, any reduction in revenue is significantly minimized and may be
eliminated.
4. If the Department is obligated to notify the Municipal Securities Rulemaking Board
regarding the TMF bonds after the end of the legislative session, a copy of the notice will
be provided to you.
I hope the above responses are helpful. Please let me know if I can be of further assistance
once the full facts and circumstances affecting these issues are known.
Sincerely,
4- zA&-
Deirdre Delisi
Chair
Texas Transportation Commission
cc: The Honorable Rick Perry, Governor
The Honorable David Dewhurst, Lt. Governor
The Honorable Joe Straus, Texas House of Representatives
The Honorable Tommy Williams, Texas Senate
The Honorable Larry Phillips, Texas House of Representatives
Texas Transportation Commission

**Defendant's Exhibit #**
066

DE-000452

USA_00008246

<< TX_00015892 >>

CQSE OF
TOMMY WILLIAMS
TEXAS STATE SENATOR COMMITTEES:
DISTRICT 4 FINANCE
EDUCATION
SUBCOMMITTEE ON HIGHER EDUCATION
TRANSPORTATION AND HOMELAND SECURITY
STATE AFFAIRS, VICE CHAIR
For Immediate Release
Wednesday, January 14, 2009
Contact: Jason Baxter 512-463-0104
Public Statement from Tommy Williams State Senator,
District 4
Re: Comment on allowing a majority vote for State Senate floor debate on legislation
requiring valid photo ID to vote.
On behalf of the citizens of State Senate District 4, I strongly support requiring valid
photo ID to vote.
Voter fraud is a bipartisan concern. Do Texans favor or oppose requiring voters to
provide a valid photo ID to vote? The answer is "Yes" just as Texans want protection
from other types of identity fraud. The Texas Senate feels it is imperative to address this
concern with a "majority vote" special order allowing for State Senate consideration and
floor debate during this regular session.
Concerns for allowing an orderly phase-in of the voter photo ID, especially with regard to
addressing needs of seniors, will be addressed. Combating voter fraud by requiring voters
to have valid photo IDs has been upheld as constitutional and a matter of state's rights
per
recent federal court rulings. Currently, seven states have voter photo ID requirements,
including Florida, Michigan, Indiana, Louisiana, Georgia, and Hawaii. (Source: National
Conference of State Legislatures)
Historical precedent for allowing majority vote issues that do not require 2/3rds support
for debate have deep historical roots in the Texas State Senate. In recent times, majority
vote rules have been invoked in regular and special sessions under Democrat State Senate
majorities in 1971, 1972, 1973, 1975, 1977, 1978, 1981, 1984, 1985, 1986, 1987, 1989,
1990, 1992. And a majority vote requirement was invoked under Republican majority in
the 2003 third called special session.
BEAUMONT OFFICE: CAPITOL OFFICE: THE WOODLANDS OFFICE:
P.O. BOX 5819 ROOM GE.7 P.O. Box 8069
BEAUMONT, TEXAS 777 26-58 1 9 P.O. Box 12068 THE WOODLANDS, TEXAS 77387-8069
(409) 896-2350 AUSTIN, TEXAS 7871 1 (281) 364-9426
FAX: (409) 896-2454 (512) 463-0104 FAX: (281) 364-9473
(888)668-1227
FAX: (512)463-6373
DIAL 71 1 FOR RELAY CALLS

**Defendant's Exhibit #**
068

DE-000455

USA_00008249



# The State of Texas

Hope Andrade
Secretary of State

Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
www.sos.state.tx.us

Phone: 512-463-5650
Fax: 512-475-2811
Dial 7-1-1 For Relay Services
(800) 252-VOTE (8683)

**TO:**    Chairman Smith, Vice-Chairman Pena, and Members of the House Committee on Elections

**FROM:**    Secretary of State Hope Andrade

**DATE:**    March 6, 2009

**RE:**    Follow-up to the Organizational Meeting on March 2, 2009

Thank you very much for allowing the Secretary of State's office to present testimony at the House Elections' Committee's March 2, 2009 hearing. Below please find the results of research into questions posed by committee members that agency staff could not definitively answer at the hearing. If the agency has misunderstood or omitted any question, please let me or my General Counsel, John Sepehri, know.

1. <u>Super Precincts.</u>

You asked the agency to follow-up with the Democratic Party County Chair of Erath County regarding his concerns with the super precinct pilot conducted in Erath County in November 2008. Agency staff did speak to Mr. Tillman Chaplin, the chair, and he informed the staff that he would be submitting a written report explaining his concerns by the end of this week. Once the agency has received his report, the agency will forward copies to all committee members.

2. <u>Obtaining Photographs from the Department of Public Safety.</u>

Committee members asked the agency to check on the legality and feasibility of obtaining photographs from the drivers license file maintained by the Texas Department of Public Safety ("DPS") and applying those photographs to the voter registration certificates issued by the county voter registrars. According to DPS, Chapter 730 of the Transportation Code restricts DPS from releasing the photographs to anyone other than a law enforcement or criminal justice agency or a state agency investigating an alleged violation of a state or federal law relating to obtaining public assistance. DPS advises that legislation would be required to allow for them to share photographs with the Office of the Secretary of State.

As for incorporating photos into the voter registration certificate, it is feasible with added costs. DPS estimates a fiscal impact of about $273,000 to create a daily file with photos and our agency would bear a similar cost to modify our statewide system to accept this file and then be able to send it on to the counties. The counties would then be required to download the photo and apply it to the voter registration certificate, and then place it in an envelope to

- 1 -

**Defendant's Exhibit #**
**076**

DE-000483

TX_00018562

USA_00008277

mail to the voter. This would be a significant fiscal impact to the counties. Lastly, for those voters who do not have a DPS-issued driver's license or personal identification card, a separate process will be necessary to capture their photographs.

3. Provisional Ballot Data.

Committee members asked if the agency could provide the reasons why provisional ballots were rejected in the last general election and whether the agency maintains demographic data regarding the voters whose provisional ballots were not counted. Based on county responses to a federal survey compiled on the November 2008 election, agency records reflect that statewide provisional ballots were rejected in the following amounts for the following reasons:

- 20,140 ☐ Not Registered in State
- 4,751 ☐ Wrong Jurisdiction
- 4,100 ☐ Wrong Precinct
- 371 ☐ No ID
- 628 ☐ Envelope Incomplete
- 75 ☐ Ballot Missing from Provisional Envelope
- 58 ☐ No Signature
- 172 ☐ Already Voted
- 340 ☐ Other

Enclosed is a spreadsheet of the county-by-county breakdown on the reasons why provisional ballots were not counted. The agency does not collect or maintain demographic data on the voters who cast provisional ballots.

4. Complaints received concerning election-related crimes (vote fraud).

Committee members asked the agency to provide the number of complaints the agency has received that allege criminal wrong-doing, including a breakdown of how many of those complaints allege voter impersonation.

We have made an effort to quantify the complaints, which have come to the agency's attention. However, we cannot represent that the numbers reported in this letter are indicative of the number of criminal acts actually occurring in Texas. Criminal complaints are often made directly to local law enforcement or other law enforcement agencies, not with the Secretary of State's office. As Ann McGeehan, the director of the agency's Elections Division, testified in the hearing, the agency's records do not reflect complaints made directly to other authorities. Moreover, the number of complaints recorded in the agency's records may or may not reflect difficulty in detecting criminal activity, the punishment level Texas law assigns to such activity or other factors.

Agency staff researched the number of complaints since September 1, 2007. During the period researched, the agency received approximately fifty written complaints alleging criminal activity in an election, copies of which are attached. Roughly a handful of these complaints alleged voter impersonation including multiple instances of voter impersonation. The agency has also received potential impersonation complaints through its toll free complaint hotline. A summary of criminal allegations received via the toll-free number is also attached. Although the agency strives to track all complaints, it is possible other unwritten complaints have been received through various other means.

TX_00018563

**Defendant's Exhibit #**
076

DE-000484

USA_00008278

Based on the foregoing, interested parties may obtain a more complete picture of the extent of criminal and impersonation activity in Texas by referring to local law enforcement, election workers, local elections officials, and other authorities.

5.   Number of voters who have registered since 2006 without a driver's license number.

Committee members asked for the number of voters who registered since January 1, 2006 without a driver's license.  The agency queried its statewide file, which reflects the following data:

| | |
|---|---|
| Number of voters who registered with a TDL: | 2,419,188 |
| Number of voters who registered with a SSN: | 253,282 |
| Number of voters who registered with both: | 872,425 |
| Number of voters who registered without either: | 37,490 |

In addition, agency staff queried the entire statewide file, which reflects the following breakdowns concerning identification numbers for all voters:

| | |
|---|---|
| Number of voters with a TDL: | 5,601,219 |
| Number of voters with a SSN: | 2,352,829 |
| Number of voters with both: | 4,102,204 |
| Number of voters with neither number: | 809,041 |

Attached are spreadsheets of the county-by-county breakdown of this data.

6.   How much would it cost to re-register the entire state with a photograph on the voter registration certificate?

As discussed in the response to Question Number 2, state law would need to be changed to require a photo ID on a voter registration certificate.  The cost of a complete re-registration effort is dependant on how the photos are obtained (from DPS or some other source), and what level of voter education and communication is required.  Unfortunately, the agency cannot provide an estimate without some more direction on how the re-registration effort would work.

We hope you find this information helpful, and please let us know if we can answer any further questions or provide additional data.

Sincerely,


Hope Andrade

Attachments

TX_00018564

**Defendant's Exhibit #**
076                          DE-000485


USA_00008279

PL581
9/2/2014
2:13-cv-00193

**Talking Points for Secretary Hope Andrade**
**Subject: Proof of U.S. Citizenship**

Our office has worked over the years to enforce the U. S. citizenship requirement, but in a manner that will not intimidate persons who are eligible to vote. The Texas and federal system, in general, is designed to make registration easy for a voter, and that goal is served both by mail-in and agency registration procedures.

**Current verification system:**

- Voter swears under oath that they are a U.S. citizen
- Application designed with yes or no box, which limits number of applicants who missed the citizenship requirement on the face of the application.
- Identification numbers (TDL, SS#) supplied by voter must be authenticated. If not authenticated (after request to voter for supplementation), the voter is marked as an ID voter, requiring proof of ID when voting. However, this process verifies the identification number only and does not validate citizenship status.
- Acceptable forms of ID (TEC, Section 63.0101):
    - a driver's license or personal identification card issued to the person by the Department of Public Safety or a similar document issued to the person by an agency of another state, regardless of whether the license or card has expired;
    - a form of identification containing the person's photograph that establishes the person's identity;
    - a birth certificate or other document confirming birth that is admissible in a court of law and establishes the person's identity;
    - United States citizenship papers issued to the person;
    - a United States passport issued to the person;
    - official mail addressed to the person by name from a governmental entity;
    - a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or
    - any other form of identification prescribed by the secretary of state.

- Process for challenging voter's registration
    - Any registered voting via a sworn statement
    - Evidence of lack of citizenship on jury documents provided by court clerks
    - Evidence of non U.S. citizen voting or registering will be referred to the OAG for criminal prosecution.

TX_00018598

**Defendant's Exhibit #**
**077**

DE-000486

USA_00008280

- Disqualification of persons excused from Jury Service due to citizenship

  o Each month, the district clerk complies a list of persons called for jury service who were excused or disqualified because they are not a US citizen.
  o The list is sent to the voter registrar who then must challenge the voter registration of any voter who has claimed such an exemption.
  o The voter has 30 days to provide proof of citizenship, and if he does not, then the voter is canceled from the roles.

**Challenges to verifying citizenship**

- Burden falls either to the voter to provide proof or to government to validate citizenship
- Requiring voters to provide proof of citizenship would significantly slow down the registration process and it is questionable whether such a change would be precleared by the US Department of Justice. Many people do not have proof of their citizenship.
- Requiring state or local government to verify citizenship status is difficult because there is not a federal database that can be accessed.
- Last year this office checked with the Social Security Bureau, Homeland Security and other federal agencies and we were not able to obtain citizenship data. The most we could do is to verify the citizenship status of people who were born in Texas by working with the Texas Bureau of Vital Statistics.

**Other States with Proof of Citizenship Requirements:**

Arizona is the only state that currently requires proof of citizenship in order to register to vote, and like Texas, Arizona is subject to section 5 of the federal Voting Rights Act. Arizona requires proof of US Citizenship when obtaining a driver's license.

Arizona's list of acceptable documents to establish citizenship:
• A legible photocopy of a birth certificate that verifies citizenship and supporting legal documentation (i.e. marriage certificate) if the name on the birth certificate is not the same as your current legal name.
• A legible photocopy of the pertinent pages of your passport
• Presentation to the County Recorder of U.S. naturalization documents or fill in your Alien Registration Number in box 19.
• Your Indian Census Number, Bureau of Indian Affairs Card Number, Tribal Treaty Card Number, or Tribal Enrollment Number in box 15.
• A legible photocopy of your Tribal Certificate of Indian Blood or Tribal or Bureau of Indian Affairs Affidavit of Birth.

*State Approaches to Illegal Immigration
- Voter ID & Citizenship Verification*

# Voter Identification and Citizenship Verification

In the fervent and well-publicized debates over illegal immigration, a major concern has been mainly overlooked—the need to secure our elections against voting by non-citizens.

Our paramount democratic right, the right to vote, is guarded indifferently. Federal and state laws are clear in their intent: Only citizens may vote. In practice, however, polling places are just as porous as are our borders.

In fact, the U.S. Department of State will not accept a voter registration document as proof of citizenship for a passport application.[1] That healthy skepticism is justified because of significant gaps in election law and enforcement procedures.

Just one person denied the right to vote on the basis of race is enough to launch federal action under the Voting Rights Act. But even though vote fraud cancels the legitimately cast votes of minorities, the elderly, and the poor, fraud is treated almost casually, if not indifferently.

## Laws Without Meaning

The United States Constitution does not provide an affirmative voting right. However, the Fifteenth, Nineteenth, Twenty-fourth, and Twenty-sixth Amendments to the Constitution, ratified over the course of more than 100 years, all contain the same phraseology: "the right of citizens of the United States to vote…." The intent of these amendments is clear and substantiates a view held since the founding: Only citizens have the right to vote. Similarly, Article 6, Section 2 of the Texas Constitution grants the right to vote only to U.S. citizens who are residents of Texas:

> "Every person subject to none of the disqualifications provided by Section 1 of this article [under age 18, mentally incompetent, persons convicted of felonies] or by a law enacted under that section who is a citizen of the United States and who is a resident of this State shall be deemed a qualified voter."

Voting is a right reserved for U.S. citizens. However, the lack of any explicit statutory mandate or procedural requirement to verify the qualification of voters leaves voting booths wide open to illegal immigrants and other non-citizens (as well as other forms of fraud), stripping constitutional rights of any real value.

---

[1] "How to Apply in Person for a Passport,", U.S. Department of State, at *http://travel.state.gov/passport/get/first/first_830.html*.

TCCRI ★ P.O. Box 2659, Austin TX 78768 ★ 512-474-6042 ★ www.txccri.org    1

**Defendant's Exhibit #**
080

DE-000535

TX_00021365

USA_00008329

Sections 11.002(1) and (2) of the Texas Election Code list the top two qualifications for voting: age (18 or over) and citizenship (United States). The application to register to vote, available online through the Texas Secretary of State Web site, begins with the following questions:

| | | |
|---|---|---|
| Are you a United States Citizen? ........................................................... | ☐ Yes | ☐ No |
| Will you be 18 years of age on or before election day? ................................. | ☐ Yes | ☐ No |
| If you checked "no" in response to either of the above, do not complete this form. | | |
| Are you interested in serving as an election worker? ................................... | ☐ Yes | ☐ No |

Applicants who check "yes" to the citizenship question are taken at their word; there is no verification of citizenship by state, local, or federal authorities. The Office of the Secretary of State, which oversees the administration of elections in Texas, confirms that citizenship verification goes no farther than the honor system. In a June 15, 2006, letter, the Secretary of State's office states:

> "[U]nder current Texas voter registration guidelines, there is no formal verification of an applicant's citizenship status.... Texas relies on the applicant to provide accurate/truthful information on his or her voter registration application. To the extent that an applicant must sign the application verifying that he or she has met the qualifications to register (one of which is U.S. citizenship) and that he or she has provided accurate/truthful information, the application is processed on those merits."[2]

That admission alone is sufficient basis for legislative action. However, the gaps in Texas election law are significant.

Pursuant to the Help America Vote Act of 2002 (HAVA), state election administrators check voter registration applications against driver's license and Social Security databases[3]. While such a measure may serve to verify the name and address of an applicant, it does not prevent foreign nationals from registering to vote since both Social Security numbers (SSN) and driver's licenses are available to non-citizens. In fact, the Texas Transportation Code contains an entire section dedicated to agreements with foreign countries under which the Texas Department of Public Safety (DPS) may issue driver's licenses to foreign nationals.

It is important to note that the DPS does not record the citizenship status of the driver's license applicant. Even if an applicant for a driver's license provides a permanent resident card (green card) or visa as proof of identity, the DPS does not record that the applicant is

---

[2]Ann McGeehan, Director of Elections, Secretary of State, Texas, form letter dated June 15, 2006.
[3]Help America Vote Act of 2002, Section 303(a)(5)(A)(i), Page 116 STAT. 1711, at *www.fec.gov/hava/law_ext.txt.*

TCCRI ★ P.O. Box 2659, Austin TX 78768 ★ 512-474-6042 ★ www.txccri.org          2

TX_00021366

**Defendant's Exhibit #**          DE-000536
080

USA_00008330

a non-citizen.[4] Therefore, when the Secretary of State cross-checks a voter registration application against DPS driver's license records, the agency cannot determine the citizenship status of the applicant.

A non-citizen, however, need not have an SSN or driver's license in order to vote. The Voter Registration Application continues:

| TX Driver's License No. or Personal I.D. No. |
|---|
| (Issued by the Department of Public Safety) |
| ☐ Check if you do not have a TX Driver's License, or Personal Identification Number |
| If no TX Driver's License or Personal Identification, give last 4 digits of your Social Security Number |
| ☐ Check if you do not have a Social Security Number                                      X |

Note the two boxes labeled "Check if you do not have a…"; even without a driver's license, personal identification card number, or SSN, an applicant may still be registered to vote. HAVA and the Texas Election Code make special provisions for persons without either a driver's license or SSN so that applicants without those forms of identification remain eligible to vote.[5] Driver's licenses, personal identification cards, and SSNs are all available to non-citizens. However, an illegal immigrant need not go so far as to obtain one of those identifying documents since federal and state laws make them completely unnecessary for voting.

Identification acceptable in lieu of a driver's license or SSN includes utility bills, bank statements, and pay checks. However, delivery of electricity and gas service for an apartment or home are not predicated on citizenship. Indeed, any person with the financial wherewithal, including an illegal immigrant, can obtain utility service. Similarly, a foreign national with or without a permanent resident card or visa can work and earn a pay check. The items acceptable as ID in lieu of a driver's license or SSN have nothing to do with the citizenship status of the applicant.

**The Lack of Citizenship Verification Has Bred Proven Vote Fraud in Texas**

On June 22, 2006, Harris County (Houston) Tax Assessor-Collector and Voter Registrar Paul Bettencourt testified before the U.S. Congress Committee on House Administration that in 2005 he identified at least 35 foreign nationals who either had applied for or

---

[4]Claire McGuinness, Senior Staff Attorney, Drivers License Division, Texas Department of Public Safety; TCCRI public information request submitted June 2, 2006; response received June 13, 2006.
[5]Help America Vote Act of 2002, Section 303(a)(5)(A)(ii). See also: Texas Election Code §13.002(c)(8).

TX_00021367

**Defendant's Exhibit #**        DE-000537
080

USA_00008331

*State Approaches to Illegal Immigration*
*- Voter ID & Citizenship Verification*

received voter registration cards.[6] Since 1992, Mr. Bettencourt's office has cancelled 3,742 registered voters for non-citizenship; 683 of those non-citizenship cancellations have occurred from the year 2000 to present.[7]

Furthermore, as a result of public information requests, the Texas Conservative Coalition Research Institute (TCCRI) learned that:

- Between 2003 and 2005, 303 people were removed from the voter rolls in Bexar County (San Antonio) because they were not citizens. Forty-one of these non-citizens voted in local, state, and federal elections.

- From September 1999 to March 21, 2007, Dallas County cancelled the voter registration of 1,889 individuals because of non-citizenship. Before being deleted from the voter rolls, 356 of those individuals had voted in Dallas County.

- In El Paso County, 213 non-citizens were removed from the voter rolls between January and October of 2006.

- In Tarrant County (Ft. Worth), 584 non-citizens have been removed from the voter rolls since 1999.

It is demonstrable that non-citizens have illegally registered to vote, and, in some cases, have cast ballots illegally. The results from public information requests are very likely to be only a small sampling of the non-citizens who are on the voter rolls. The non-citizens whose registration was cancelled in each county were not discovered through an exhaustive review by state or county authorities. Instead, voter registrars confirm that there are two primary, incidental means for discovering that a non-citizen is registered to vote:

- A non-citizen will contact the voter registrar because he or she is applying for citizenship and has been instructed to cancel his or her voter registration, or
- A non-citizen will claim "non-citizenship" as an excuse on a jury summons. Per Texas Government Code §62.113(b), the county clerk forwards the names of those individuals to voter registrars.

The irony is palpable. In Texas, non-citizens are stealing for themselves the right to vote, but shirking the civic responsibility, jury service, that is statutorily linked to the right to vote.

---

[6] Testimony of Paul Bettencourt Before Committee on House Administration, June 22, 2006, at *www.hctax.net/forms/testimonyofPaul.pdf.*
[7] Voter registration records provided by the Harris County Voter Registration Department.

TX_00021368

**Defendant's Exhibit #**          DE-000538
080

USA_00008332

*State Approaches to Illegal Immigration*
*- Voter ID & Citizenship Verification*

**Recommendations:**

*Place citizenship status on driver's licenses and personal identification cards.*

Pursuant to the REAL ID Act of 2005[8] and the rules drafted by the U.S. Department of Homeland Security, the states' driver's license application and issuance processes will change. By 2008 (or 2009, with a waiver), states motor vehicle departments will be required to verify the citizenship or legal residency status of all applicants for a driver's license or personal identification card. While the REAL ID Act lists certain fields that must appear on the new identification cards, the Act does not require that the cards list citizenship status.

During the May 2006 U.S. Senate debates on legislation to address illegal immigration, Senator Mitch McConnell (R–KY) proposed amending the REAL ID Act of 2005 to require that all state driver's licenses and personal identification cards note whether the licensed driver is a United States citizen. The McConnell amendment to the 2006 Senate immigration bill[9] would have mandated each state to require that individuals voting in federal elections in person show valid photo identification that proves their citizenship.

The Senate immigration bill was passed without Senator McConnell's amendment, meaning that the onus is on state legislatures to require all driver's licenses and personal identification cards to indicate whether or not the holder of the card is a United States citizen. Non-citizens who can prove they are in the United States legally will still be able to obtain a driver's license or personal identification card, but it will label them as non-citizens in order to prevent them from voting.

An applicant for a U.S. passport must provide a birth certificate, naturalization papers, or other limited documents that prove citizenship. The standard for receiving a driver's license or personal identification card should be no less.

*Require voters to present a driver's license or personal identification card at their polling place.*

States should require each voter to present a photo ID that verifies U.S. citizenship at their polling place. Americans are frequently asked to show identification; some examples of identification requirements from statutes include:

- to drive a car [§ 521.021, Texas Transportation Code, states that a person "may not operate a motor vehicle on a highway in this state unless the person holds a driver's license" that has a photo ID];
- to board an airplane [Transportation Security Adminsitration, "What you Need: government-issued photo ID"];

---

[8] Public Law 109-13, Division B, Title II (109th Congress, H.R. 1268), at *http://thomas.loc.gov/cgi-bin/bdquery/z?d109:HR01268:@@@D&summ2=m&*.
[9] Comprehensive Immigration Reform Act of 2006, S. 2611 ES, passed in the U.S. Senate on May 25, 2006.

TX_00021369

**Defendant's Exhibit #**          DE-000539
080

USA_00008333

*State Approaches to Illegal Immigration*
*- Voter ID & Citizenship Verification*

- to buy alcohol or tobacco [see §109.61 and Chapter 106, Texas Alcoholic Beverages Code];
- to obtain a marriage license [§2.005, Texas Family Code requires proof of identity and age for the issuance of marriage license];
- to be a licensed doctor [§ 155.0031, Texas Occupations Code requires identifying documents, including photographs, for the licensure of doctors];
- to check out a library book [the City of Dallas, for example, requires name and address verification for a library card];
- to purchase products containing ephedrine or pseudoephedrine (most commonly known as Sudafed). Furthermore, in order to purchase the cold medicines, the person making the purchase must show a driver's license or other photo ID indicating the person is over sixteen years of age. [Chapter 486, Texas Health & Safety Code]

Other, more mundane activities such as renting a DVD or applying for membership in bulk retail clubs like Costco or Sam's Club also require identification.

In each of those instances, an individual must present ID. The right to vote trumps all of them in importance. A worker at a polling place should be able to verify the identity of a voter just like a clerk at Blockbuster Video should be able to discern the identity of a person renting a movie. Additionally, workers at polling places must be sufficiently armed with the tools necessary to turn away non-citizens. A photo ID that lists citizenship status is the best means to achieve that end.

*Require that all vote fraud allegations be sent to a county or district attorney, or a state attorney general, for investigation.*

*NOTE: Model legislation follows in Appendix 1.*

## Anticipating and Answering Objections

Opposition to voter identification and citizenship verification will be fierce. The points below provide facts that answer some of the arguments advanced by opponents in the 80th Texas Legislature.

1. Objection: States lack the authority enact to voter identification and citizenship verification.

Response: The U.S. Constitution, Article I, Section 4, reads:

"The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof;"

TX_00021370

**Defendant's Exhibit #**
080

DE-000540

USA_00008334

*State Approaches to Illegal Immigration*
*- Voter ID & Citizenship Verification*

The Texas Constitution, Article 6, Section 2(c), reads:

> "(c) The privilege of free suffrage shall be protected by laws regulating elections and prohibiting under adequate penalties all undue influence in elections from power, bribery, tumult, or other improper practice."

The Texas Constitution is unambiguous in allowing for regulations of voting in order to protect the integrity of elections.

Requiring identification at the polls is a minimum standard to protect against "improper practice" that contributes to fraudulent votes and stolen elections. Arizona, Florida, Hawaii, Indiana, Louisiana, Ohio, and South Dakota require photo identification for voting. Arizona's voter identification law includes a provision that requires citizenship verification.

2. Objection: Voter identification and citizenship verification will not pass Department of Justice pre-clearance.

Response: Opponents argue that voter identification and citizenship verification would not pass Department of Justice pre-clearance under Section 5 of the Voting Rights Act. Of the seven states that have enacted a photo identification requirement, however, Arizona and Louisiana are required to pre-clear election law changes. Some jurisdictions within Florida and South Dakota also must pre-clear election law changes. Photo identification laws have passed pre-clearance in those states. The citizenship verification requirement in Arizona also passed Department of Justice pre-clearance.

3. Objection: Voter identification and citizenship verification will not pass muster in the courts.

Response: In removing an injunction against Arizona's photo identification law (the only such law in the nation to require citizenship verification), the U.S. Supreme Court's per curiam opinion reads:

> "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised."[10]

Also, Indiana's photo ID law was upheld by U.S. Court of Appeals for the Seventh Circuit on January 4, 2007. In upholding Indiana's photo ID law, the U.S. Court of Appeals notes that voters who do not comply with the law by obtaining photo identification disenfranchise *themselves*.[11]

---

[10] *Purcell v. Gonzalez*, U.S. Supreme Court per curiam opinion, October 20, 2006.
[11] Circuit Judge Richard A. Posner, *Indiana Democratic Party v. Rokita*, U.S. Court of Appeals, 7th Circuit Case Nos. 06-2218, 06-2317, January 4, 2007

TX_00021371

**Defendant's Exhibit #**
080

DE-000541

USA_00008335

*State Approaches to Illegal Immigration*
*- Voter ID & Citizenship Verification*

4. Objection: Voter identification and citizenship verification proposals amount to a poll tax.

Texas State Senator Mario Gallegos (D–Houston) argued in an opinion-editorial that "the cost of obtaining the ID and necessary documents amounts to a 21st century poll tax."[12]

Response: Courts have held that voter identification laws are *not* an unconstitutional poll tax.

In ruling on Indiana's and Georgia's voter identification laws, federal district courts have held that the photo ID laws at issue did not create a poll tax. Noting that voters could obtain a photo ID free of charge or vote absentee, both courts determined that the plaintiffs failed to prove the additional costs associated with procuring documents to obtain a voting photo ID were sufficiently tied to voting as to constitute a poll tax. Relying on the Supreme Court's decision in *Burdick v. Takushi*[13], both courts noted "[t]he imposition of tangential burdens does not transform a regulation into a poll tax."[14]

5. Objection: Many individuals without identification, especially minorities and the elderly, will be disenfranchised.

In a May 17, 2007, editorial, the *Houston Chronicle* argued that: "the elderly and minorities… are less likely to have the required identification than more affluent, working-age citizens."

Response: There are more Texas driver's licenses held by the voting-age population than there are registered voters. The following table compares the number of registered voters against the number of driver's licenses and personal ID cards:

| | |
|---|---|
| Registered Voters (November 2005)[15] | 12,577,545 |
| Age 18+ Driver's Licenses (FY 2005)[16] | 14,429,377 |
| Personal ID Cards (2006)[17] | 3,960,249 |

In fiscal year 2005, there were 14.4 million valid driver's licenses held by Texans of voting age. In November of 2005, however, there were only 12.5 million registered voters. With 1.8 million more drivers' licenses held by the voting-age population than

---

[12]Mario Gallegos, "Why Right to Vote, Without an ID, Is Worth Fighting For," *Houston Chronicle*, May 22, 2007.

[13] Justice Byron R. White for the majority, *Burdick v. Takushi, Director Of Elections Of Hawaii*, 504 U.S. 428 (1992)

[14]*Rokita* at 90; *Common Cause/Georgia v. Billups*, No. 4:05-CV-00201-HLM (N. D. Ga. July 14, 2006) at 177.

[15]Office of the Secretary of State, "Turnout and Voter Registration Figures (1970–Current)," at *www.sos.state.tx.us/elections/historical/70-92.shtml.*

[16]Department of Public Safety, Driver's License Division, review of Federal Highway Administration reports

[17]Department of Public Safety, Driver's License Division

**Defendant's Exhibit #**
080

DE-000542

TX_00021372

USA_00008336

*State Approaches to Illegal Immigration*
*- Voter ID & Citizenship Verification*

there are registered voters, the argument that the voter ID proposal will be a barrier to voting is a fallacy. Add in another 3,960,249 unexpired personal identification cards in Texas as of April 2006, and 87 percent of the *total* Texas population (all ages) has some form of government identification card.

Similarly, statistics show that elderly currently hold valid Texas driver's licenses in large numbers. Nevertheless, in an opinion-editorial piece, Texas State Senator Mario Gallegos stated:

> "My grandmother came from Mexico, played by the rules, became a citizen and earned her right to vote. She didn't have a driver's license, but she had her voter registration card, went to the polls where the workers knew her, and voted. If the voter ID law were in effect, I'm not sure she or others like her could have voted."[18]

Senator Gallegos neglects to consider that a family member or friend could assist his grandmother in securing sufficient identification for voting. Senator Gallegos's grandmother, if unable to procure identification, would likely qualify to vote by absentee ballot, which remains unaffected by the Texas proposals. Furthermore, a driver's license was not the only acceptable identification under the Texas bill. Other acceptable forms of identification included a utility bill, employer identification card, a library card, or government mail.

The Department of Public Safety reports that 73 percent of the population aged 79 and older holds a valid driver's license.[19]

In sampling state election returns in Harris County (Houston) for the November 2006 General Election, 125,221 individuals who are 65 or older voted in that election. Of those, 84.7 percent voted in person, and 92.6 percent already held a driver's license,[20] rebutting the presumption that the elderly would be unfairly burdened by a voter identification and citizenship verification requirement.

An overwhelming majority of Texans who are 65 and older already have photo identification, vote in person, and have the option of voting by mail.

6. Objection: Requiring citizenship verification and voter identification is a Republican effort to disenfranchise traditionally Democratic voters.

A liberal Texas publication argued that the "GOP's efforts to clamp down on voter participation won't save them from electoral defeat."[21]

---

[18] Gallegos, "Why Right to Vote, Without an ID, Is Worth Fighting For."
[19] Department of Public Safety, Driver's License Division; and Texas State Data Center.
[20] Harris County Voter Registrar
[21] "The GOP's Darker Motives", *The Texas Observer*, Editorial, May 4, 2007; online at http://www.texasobserver.org/article.php?aid=2485

Defendant's Exhibit #
080

DE-000543

TX_00021373

USA_00008337

Response: The implied statement, that voter identification and citizenship verification are partisan issues, is far from the truth. The bipartisan Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James Baker III issued 87 recommendations for ensuring both equal access to elections and election integrity. Among the 87 recommendations, the Commission recommended that states verify citizenship before registering voters by employing the REAL ID Act.

The Commission's final report recommends:

> "The right to vote is a vital component of U.S. citizenship and all states should use their best efforts to obtain proof of citizenship before registering voters."[22]

The report also states:

> "The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. Photo IDs currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important."[23]

This recommendation, and former President Carter's support for it, clearly refutes claims that voter identification and citizenship verification are ploys by the Republican Party to disenfranchise select individuals. The recommendation of the Commission is simple, clear, and unequivocal: proof of citizenship should be a prerequisite for anyone registering to vote. In the 80th Texas Legislature, voter identification and citizenship verification proposals were filed in separate bills, neither of which relied on the REAL ID Act. Opponents, therefore, painted the use of the Commission on Federal Election Reform report as a mischaracterization of the Commission's recommendation. States should tailor their voter identification and citizenship verification proposals around the REAL ID Act.

## Conclusion

With an estimated 500,000 illegal immigrants entering the United States each year,[24] and with over one million illegal immigrants in Texas, states cannot afford to leave their election systems susceptible to votes cast fraudulently by non-citizens. Voting is the paramount right of our representative democracy and must be reserved strictly for citizens of the United States.

Requests for identification are increasingly common: to buy alcohol or purchase tobacco; to board an airplane; to buy certain paints or glues (in many states); to rent a movie or a

---

[22] Commission on Federal Election Reform ,*Building Confidence in U.S. Elections*, Final Report, September 2005, Recommendation 2.5.2, page 21, http://www.american.edu/ia/cfer/report/CFER_section2.pdf
[23] *Ibid.* Section 2.5, page 18.
[24] Jeffrey S. Passel, "The Size and Characteristics of the Unauthorized Migrant Population in the U.S.," Pew Hispanic Center, March 7, 2006, at *http://pewhispanic.org/files/reports/61.pdf.*

TX_00021374

**Defendant's Exhibit #**
080

DE-000544

USA_00008338

*State Approaches to Illegal Immigration*
*- Voter ID & Citizenship Verification*

library book. Requesting identification of voters is a simple measure that will abate illegally cast votes by non-citizens. Additionally, state departments of motor vehicles will have to amend their driver's licenses pursuant to the federal REAL ID Act. This gives states the unique opportunity to verify the citizenship status of individuals at polling places, giving real meaning to the litany of laws mandating that only U.S. citizens may vote.

Whatever efforts are made to prevent illegal immigrants from penetrating our borders, states should amend their election laws and practices so that non-citizens are prevented from entering the voting booth.

TX_00021375

**Defendant's Exhibit #**
080

DE-000545

USA_00008339

PL583
9/2/2014
2:13-cv-00193



### OFFICE OF THE GOVERNOR

RICK PERRY
GOVERNOR

March 23, 2011

Charles C. Butt
Chairman & CEO
HEB
646 S. Main
P.O. Box 839999
San Antonio, Texas 78283-3999

Dear Mr Butt: *CHARLES*

First let me apologize for the delayed response to your letter about Voter ID.  I believe requiring an official photo identification to vote is a simple and effective way to improve the integrity of Texas elections.

All Texans, regardless of background or ethnicity, agree that ensuring the identity of voters will only enhance the reliability of our electoral system.  I respectfully disagree with the premises that there is no voter fraud perpetrated by undocumented immigrants or that Voter ID will drive wedges in Texas.  Public and legislative support for requiring a photo ID to vote has proven to be strong among all regions and ethnicities in Texas.

I view our state's ethnic and cultural diversity as a great source of pride.  I am committed, as are leaders of both parties, to holding up Texas' cultural diversity as a source of great strength and opportunity.  Mexico is our state's number one trading partner, and our history, culture and families are positively intertwined.  That's why I have spoken out against those who rail against Mexico or Hispanics in general, and I have stated that Arizona-style immigration-related legislation would not be right for Texas.

To remain strong and competitive, America must do more to secure our borders and enforce our criminal justice laws.  Enhancing the security of the ballot box will help increase confidence in our democracy and help push back against those who seek to divide us along ethnic or geographic lines.

Thank you for your service to our state and for the economic opportunity HEB provides to many thousands of Texas families.

Sincerely,

*Rick*

Rick Perry

POST OFFICE BOX 12428 AUSTIN, TEXAS 78711 (512) 463-2000 (VOICE)/DIAL 7-1-1 FOR RELAY SERVICES

TX_0002431⁹

**Defendant's Exhibit #**
085

DE-000553

USA_00008347

**PL584**
**9/2/2014**
**2:13-cv-00193**

| | |
|---|---|
| **From:** | Batheja, Aman [abatheja@star-telegram.com] |
| **Sent:** | Friday, October 14, 2011 11:20 AM |
| **To:** | Allison Castle |
| **Subject:** | Re: Special session? |

Thanks!

Aman

On Fri, Oct 14, 2011 at 10:51 AM, Allison Castle <allison.castle@governor.state.tx.us> wrote:

Morning! You didn't miss any statement, they were probably referring to a comment I made yesterday in response to a media question.

Here's what I said:

Gov. Perry believes sanctuary city policies should be outlawed. He made ending sanctuary city policies an emergency item in the 2011 legislative session and added it to the special session agenda. Unfortunately, the Legislature did not pass the sanctuary city ban in the regular or special session, despite the fact that both chambers separately passed it.

Gov. Perry trusts local law enforcement to use their training and judgment to inquire about immigration status during a lawful detention or arrest in Texas. We welcome support for efforts to outlaw sanctuary city policies and continues to urge those interested to communicate their concerns to members of the Texas Legislature. Gov. Perry already agrees that sanctuary policies must end. At this time there are no plans to call a special session of the Legislature.

Governor Perry is a vocal critic of the federal government's failure to secure the border. He has called for thousands more National Guard and Border Patrol troops, strategic fencing and aerie surveillance by Predator drones to detect illegal activity along the border. Governor Perry has also championed $400 million in state funds for border law enforcement, dispatched the Texas Rangers to fight border crime, outlawed driver licenses for illegal immigrants and passed Voter ID.

---

**From:** Batheja, Aman [mailto:abatheja@star-telegram.com]
**Sent:** Friday, October 14, 2011 10:19 AM
**To:** Allison Castle
**Subject:** Special session?

TX_00024527

**Defendant's Exhibit #**
**089**

DE-000680

USA_00008474

Morning Allison, My editor told me he heard a radio report this morning that said Gov. Perry issued a statement saying he wouldn't call a special session for sanctuary cities legislation. I can't find any report of this online. Did he make such a statement recently? If so, can you please send it to me?


Thanks,

Aman



--
Aman Batheja

Reporter, Fort Worth Star-Telegram

817-390-7695

abatheja@star-telegram.com

Twitter: @amanbatheja




--
Aman Batheja
Reporter, Fort Worth Star-Telegram
817-390-7695
abatheja@star-telegram.com
Twitter: @amanbatheja

2

TX_00024528

**Defendant's Exhibit #**
089

DE-000681

USA_00008475

| | |
|---|---|
| **From:** | Montgomery, Dave [dmontgomery@star-telegram.com] |
| **Sent:** | Monday, October 17, 2011 1:27 PM |
| **To:** | Allison Castle |
| **Subject:** | Re: Thanks forhelp on border story |

this is great, Allison.  Just what i needed.  thanks, dave

On Mon, Oct 17, 2011 at 12:07 PM, Allison Castle <allison.castle@governor.state.tx.us> wrote:
Hey Dave -
Gov. Perry has been consistent on how we can secure our southern border and he is a vocal critic of the federal government's failure to do so. He has called for strategic fencing in urban and high traffic areas, thousands more National Guard and Border Patrol troops, and aerial surveillance by Predator drones to detect illegal activity along the border. Governor Perry has also championed $400 million in state funds for border law enforcement, dispatched the Texas Rangers to fight border crime, outlawed driver licenses for illegal immigrants and passed Voter ID.
The most effective tool to protect our border is additional boots on the ground as well as technology and coordination among local, state, federal authorities. Gov. Perry supports fencing in strategic areas such as those with high population density, but for the hundreds of miles of remote land in between, the most effective border security strategy is to increase the patrol presence on the ground, in the air, and in the water with personnel and advanced technology.

Thanks -
Allison

_____
From: Montgomery, Dave [dmontgomery@star-telegram.com]
Sent: Monday, October 17, 2011 8:57 AM
To: Allison Castle
Subject: Re: Thanks forhelp on border story

Hey, Allison, I'm doing a story on the border fence that I have to write today.  I'm trying to get the governor's exact position on the border fence, and what he's said.  In a couple ofthedebates, he  seemed to oppose a fence extending across the United States border.

On Sun, Oct 16, 2011 at 9:17 PM, Allison Castle <allison.castle@governor.state.tx.us<mailto:allison.castle@governor.state.tx.us>> wrote:

Great, thanks Dave

_____
From: Montgomery, Dave
To: Allison Castle
Sent: Sun Oct 16 19:24:16 2011
Subject: Thanks forhelp on border story

Hey, Allison,
  Sure appreciateyour helping me set up the border story.  Tom Vinger was excellent, as was the DPS crew I spent time with in Edinburg.  Steve McCraw also called and gave me a good phone interview.  Ran today.
 Going to do another story tmorrow on the border fence.  Thanks, Dave

1

TX_00024533

**Defendant's Exhibit #**
090                    DE-000682

USA_00008476