**PL673**
**9/2/2014**
**2:13-cv-00193**

# Local Redistricting Objection Letters

Defendant's Exhibit #                         DE-005555

USA_00012622

7 JUL 1976

Mr. Lucius D. Bunton
Shafer, Gilliland, Davis,
  Bunton & McCollum
Attorneys at Law
P. O. Drawer 1552
Odessa, Texas   79760

Dear Mr. Bunton:

This is in reference to the reapportionment of
Commissioners' Court precincts in Crockett County,
Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as
amended. Your submission was completed on May 8, 1976.

We have considered the submitted changes and
supporting materials as well as information and comments
received from other interested parties. The reapportion-
ment in question was based on voter registration data.
To determine whether this reapportionment would have
the effect of abridging the vote of Mexican Americans
in Crockett County this Department needs to know the
population by race and ethnic group of the Commissioners'
precincts established by the new plan. This information
has not been provided to us, although we requested it.

Our experience indicates that Mexican Americans
generally have a lower rate of voter registration than
do Anglos. Thus an apportionment based on registration
data is likely to have a dilutive effect on the vote of
Mexican Americans. See Ely v. Klahr, 403 U.S. 108, 113-19
(1971) (Douglas, J., concurring). Because of the uncertainty
extant in this redistricting plan due to the absence of
reliable population statistics, we cannot conclude, as
we must under the Voting Rights Act, that this reapportion-
ment does not have the purpose of the effect of abridging
the right to vote of Mexican Americans in Crockett
County.

cc:  Public File
     X1687

Defendant's Exhibit #

DE-005556

USA_00012623

-2-

Therefore, I must, on behalf of the Attorney General, interpose an objection to the 1975 reapportionment of Crockett County.

Please be advised that the Attorney General will reconsider this determination if relevant statistical information is provided, or on the basis of other information showing that the apportionment does not have the proscribed discriminatory effect. However, until and unless the objection is withdrawn, the 1975 reapportionment plan is legally unenforceable.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-0055

USA_00012624

D.J. 166-012-3
X1687

NOV 9 1977

Mr. Lucius D. Bunton
Shafer, Gilliland, Davis,
    Bunton & McCollum
Attorneys at Law
P. O. Box Drawer 1552
Odessa, Texas 79760

Dear Mr. Bunton:

  This is in reference to your request for
reconsideration of the objection interposed by the
Attorney General on July 7, 1976, to the 1975
redistricting plan for Crockett County, Texas.
Additional information which you furnished in
support of that request was received on August 16
and September 2 and 22, 1977.

  As the July 7, 1976, letter indicated, the
Attorney General's objection was based on the absence
of reliable population statistics that would facili-
tate an appropriate evaluation of the redistricting
plan. You now have supplied data from the results
of a 1977 special census survey undertaken for
Crockett County which has enabled us to make an
analysis of the redistricting plan in accordance
with the requirements of Section 5 of the Voting
Rights Act.

  In our reconsideration of this submission we
have given careful consideration to the 1977 census
data provided, the information furnished in connec-
tion with the initial submission, and comments and
information provided by other interested parties.
Population statistics from the special census show
that Crockett County has a population which is 41.5%

USA_00012625

- 2 -

Mexican American.  Our analysis shows that under the
old apportionment plan the concentration of Mexican
American population was divided between adjoining
commissioner precincts 1 and 4, each of which had more
than enough population for an ideal district and each
of which was slightly over 68% Mexican American.
During the 1974 elections in precincts 2 and 4 of this
plan a Mexican American was elected in precinct 4.

Our analysis further shows that, according to
the 1977 census data, under the plan adopted in 1975
the Mexican American majority in precinct 4, where a
Mexican American candidate had already been successful
in 1974, was increased to 84% while the Mexican American
majority in precinct 1 was reduced to 58%.  In a subse-
quent election in precinct 1 in 1976 a Mexican American
candidate was defeated by an Anglo candidate in a
runoff.  The county has provided no compelling reason,
and we have not been able otherwise to discover one,
for the seeming overloading of Mexican Americans into
precinct 4, with the inevitable and concommitant reduc-
tion of the Mexican American percentage in precinct 1,
especially when one effect of that configuration is to
increase to 4.2% the deviation in precinct 1 which
previously had been 2.9%.

Under these circumstances, therefore, we are
unable to conclude that the redistricting before us
does not discriminate against Mexican Americans.
Accordingly, in view of our analysis and recent court
decisions to which we feel obligated to give great
weight, e.g., White v. Regester, 412 U.S. 755 (1973);
Robinson v. Commissioners Court, Anderson County,
505 F.2d 674 (1974); Moore v. LeFlore County Board of
Election Commissioners, 502 F.2d 621 (1974), the
Attorney General must decline to withdraw the objection
interposed to the 1975 redistricting in Crockett
County.

Defendant's Exhibit #

DE-005559

USA_00012626

- 3 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the alternative of instituting an action in the United States District Court for the District of Columbia seeking a declaratory judgment that the redistricting does not have the prohibited purpose or effect. However, until and unless such a judgment is obtained, the 1975 Crockett County redistricting plan is legally unenforceable.

With regard to the polling place changes undertaken in conjunction with the 1975 reapportionment plan, the Attorney General does not interpose any objection. However, we feel a responsibility to point out that Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent judicial action to enjoin the enforcement of such changes and our determination in no way seeks to address the question of the validity of the change in polling places under state law, in view of the legal unenforceability of the new districting.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005560

USA_00012627

DJ 166-012-3
X1245

MAR 1 2 1976

Mr. Easton Wall
Superintendent, Dumas Independent
   School District
Box 852
Dumas, Texas  79029

Dear Mr. Wall:

        This is in reference to the imposition of Numbered Post and Majority Vote requirements in the election of the School Board of the Dumas Independent School District, which changes were submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965.  Your submission was received on January 13, 1976.

        After a careful examination of the submitted changes, including consideration of demographic and geographic data, and comments from interested parties, we can not conclude as we must under the Voting Rights Act, that the use of a numbered post and majority vote requirement to elect members of the Dumas School Board, in the context of an at-large election system, will not have a discriminatory effect on the minority community in the Dumas Independent School District. Recent Supreme Court decisions, to which we feel obligated to give great weight, indicate that the combination of the above features may have the effect of abridging minority voting rights in the Dumas Independent School District.  E.g., White v. Regester, 412 U.S. 755 (1973); Whitcomb v. Chavis, 403 U.S. 124 (1971).

Defendant's Exhibit #                                      DE-005561

For the foregoing reasons, I must on behalf of
the Attorney General interpose an objection to the com-
bination of the numbered post and majority vote re-
quirements in the context of at-large elections.  Of
course, Section 5 permits seeking approval of all
changes affecting voting by the United States District
Court for the District of Columbia irrespective of
whether the changes have been previously been submitted
to the Attorney General.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005562



APR 16 1976

Mr. James W. Smith, Jr.
County Attorney
Frio County
P. O. Drawer V
Pearsall, Texas   78061

Dear Mr. Smith:

This is in response to your letter of January 19,
1976, in which you submitted to the Attorney General
resolutions of the Frio County Commissioners' Court of
July 13 and August 13, 1973, which redistricted the
four commissioner precincts and established new voting
precincts, respectively, pursuant to Section 5 of the
Voting Rights Act of 1965. Your letter and the
attached materials were received by this Department
on February 23, 1976.

We have considered the submitted changes and
supporting materials as well as information and comments
received from other interested parties. Our review and
analysis show that the commissioner precinct lines as
drawn unnecessarily dilute Mexican-American voting
strength in the county. According to the 1970 Census,
Frio County is 69.1% Mexican-American, 29.8% Anglo and
1.1% black. According to information available to us,
proposed Commissioner Precinct 3 is approximately 97%
Mexican-American and deviates from the norm of an ideal
(population) district of 2,790 by 499, thereby exceeding
the norm by 17.9%. Meanwhile, Commissioner Precinct 2,
approximately 63% Anglo, is 674 (-24%) people under the
norm. Thus, it would appear that the precinct with the
highest percentage of Mexican-Americans is the most under-
represented while the precinct with the highest percentage
of Anglos is the most overrepresented.

Defendant's Exhibit #



DE-005563

USA_00012630

- 2 -

Our analysis further reveals that there is a
history of ethnic bloc voting in Frio County.  There
is substantial evidence, including the absence of any
Mexican-American representation on the 8-member
reapportionment committee responsible for the plan
under review, that Mexican-Americans are not afforded
access to the political process in Frio County.  When
all of these considerations are noted, together with
the configuration of the plan, particularly the
elongated shape of Precinct 1 which emerges with only
a 48% Mexican-American population, we cannot conclude,
as we must under the Voting Rights Act, that this
reapportionment does not have the purpose or effect
of abridging the right to vote of the Mexican-American
citizenry.

Accordingly, in view of our analysis and recent
court decisions to which we feel obligated to give
great weight, e.g., White v. Regester, 412 U.S. 755
(1973); Robinson v. Commissioners' Court, Anderson
County, 505 F.2d 674 (1974), I must, on behalf of the
Attorney General, interpose an objection to the 1973
redistricting of Frio County.  In addition, since it
is our understanding that state law requires that
voting precinct lines conform with commissioner
precinct lines, this objection also renders unenforce-
able any resulting changes in voting precincts.

Of course, as provided by Section 5 of the
Voting Rights Act, you have the alternative of institut-
ing an action in the United States District Court for
the District of Columbia seeking a declaratory judgment
that the present submission does not have the purpose
and will not have the effect of denying or abridging
the right to vote to members of a language minority
group in the county.  However, until and unless such a
judgment is obtained, the 1973 Frio County redistricting
plan is legally unenforceable.  Therefore, since it is our



Defendant's Exhibit #

DE-005564

USA_00012631

- 3 -

understanding that primary elections are scheduled for
two commissioner precincts on May 1, 1976, I would
appreciate your advising me by April 23, 1976, of the
steps you intend to take with respect to that election.

                    Sincerely,


                    J. Stanley Pottinger
                    Assistant Attorney General
                    Civil Rights Division

JUL 9, 1976

Honorable Mark White
Secretary of State of Texas
Capitol Station
Austin, Texas   78711

Dear Mr. Secretary:

This is in reference to our letter of
January 23, 1976, and in further reply to your
submission of the subdistrictings of 9 multi-
member Texas House of Representatives districts
in House Bill 1097 of the 1975 Session of the
Texas Legislature, to the Attorney General
pursuant to Section 5 of the Voting Rights Act
of 1965.  Your submission was received on
November 20, 1975.

We responded to your submission prior to
January 26, 1976, the last day of the 60-day period
As set out in Section 51.22 of our procedural guide-
lines for the administration of Section 5, 28 C.F.R.
§51.22:

> When a decision not to object is
> made within the 60-day period
> following receipt of a submission
> which satisfies the requirements
> of §51.10(a), the Attorney General
> may reexamine the submission if
> additional information comes to
> his attention during the remainder
> of the 60-day period which would
> require objection in accordance
> with §51.19.

cc:   Public File (Rm. 920)
      X0614

DE-005566

USA_00012633

- 2 -

Such additional information has come to
our attention and we have reexamined the submission
of House Bill 1097 with regard to the effect of
new single-member districts defined in House Bill
1097 for Nueces County, Districts 48A through 48C.

The additional information in this regard
concerned the minority population within the single-
member districting plans for Nueces County presented
to the Court prior to its order of January 28, 1975,
in Graves v. Barnes. During our initial examination
of the districts set out in House Bill 1097 for
Nueces County we erroneously considered the population
statistics of the plan submitted to the Court by the
State as statistics relative to the plan which the Court
adopted.  On that erroneous basis we had determined
that the plan set out in House Bill 1097 would not
dilute minority voting strength given the results
that would flow from fairly drawn alternative
districting plans.

Our evaluation of the new single-member districts
in House Bill 1097 for Nueces County indicated that the
district lines are drawn through a cognizable minority
residential area known as "the corridor" in Corpus
Christi resulting in an apportionment or fragmenting
of that area into each of the 3 districts, only in
one of which minorities represent a majority of the
population.  It was our understanding that in
approaching the question of how to draw new single-
member districts for Nueces County, the legislature
utilized the theory that a fair districting of the
county, given the county's population, should be
designed to result in one "safe" Mexican-American
district, one safe Anglo district, and one "swing"
district with close to 50% Anglo and Mexican-
American population.

Defendant's Exhibit #                              DE-005567

USA_00012634

- 3 -

We had no objection to this districting approach as long as it did not result in a dilution of minority voting strength and, as I explained above, given our erroneous understanding of available districting alternative we found no such dilution would result. However, we now realize that the districting plan for Nueces County adopted by the Court in _Graves_ v. _Barnes_, which apportions the corridor into only 2 districts, results in 2 districts in which minorities represent a significant majority of the population. Thus, on the basis of our previous evaluation and in the light of population statistics of the districting plan ordered by the Court in _Graves_ v. _Barnes_, it appears that fairly drawn alternative districting plans which avoid fragmenting the corridor into as many as 3 districts also would make a significant difference in the ability of minority residents of Nueces County to elect representatives of their choice. In addition, we have determined, as we had determined previously, that the result in House Bill 1097 for Nueces County does not appear to be necessary on the basis of natural boundaries or overriding considerations of district compactness.

Therefore, the remaining question is whether the legislative approach for the districting of Nueces County constitutes a compelling governmental justification for the results that it achieved in Nueces County. I believe it does not. Although the theory used in House Bill 1097 for apportioning the population of Nueces County could, under other circumstances, be considered to reflect a legitimate interest of the state, under the standards for our Section 5 review as enunciated in my letter of January 23, 1976, and given the facts as described above, I view the apportionment approach used in House Bill 1097 for

Defendant's Exhibit #

DE-005568

USA_00012635

- 4 -

Nueces County as a minimization and thus a dilution of minority voting strength since it unnecessarily and unfairly limits minorities to only one district in which they would represent a majority of the population.

Accordingly, we are unable to conclude as we must under Section 5 that implementation of the districts 43A - 43C set out in House Bill 1097 for Nueces County will not have a discriminatory effect. Under these circumstances I must, on behalf of the Attorney General, interpose an objection to the implementation of the specified districts set out in House Bill 1097 for Nueces County. So that there be no misunderstanding, I should point out that the objection interposed herein is in addition to the objections interposed in my letter of January 23, 1976, to the implementation of the districts 7A - 7C and 32A - 32I set out in House Bill 1097 for Jefferson and Tarrant Counties.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these districts neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race or color or in contravention of the guarantees set forth in Section 4(f) of the Act. However, until and unless such a judgment is obtained, the provisions objected to are unenforceable.

USA_00012636

- 5 -

I apologize for any inconvenience that may
have been caused to you by our error in this matter.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Department of Justice
Washington, D.C.   20530

JAN 2 8 1976

Honorable Mark White
Secretary of State of Texas
Capitol Station
Austin, Texas   78711

Dear Mr. Secretary:

This is in reply to your submission of the
subdistrictings of 9 multimember Texas House of
Representatives districts in House Bill 1097 of
the 1975 Session of the Texas Legislature, to the
Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965.  Your submission was received
on November 26, 1975.

We have considered carefully the submitted
changes and supporting materials as well as infor-
mation and comments received from other interested
parties and information derived from the proceedings
in the cases consolidated sub nom, Graves v. Barnes,
Civil Action No. A-71-CA-142 (W.D. Tex.).  On the
basis of our review and analysis, the Attorney General
does not interpose an objection with regard to changes
that may be effected by House Bill 1097 in Districts
1 through 6, 8 through 31, and 33 through 101.  How-
ever, we feel a responsibility to point out that
Section 5 of the Voting Rights Act expressly provides
that the failure of the Attorney General to object
does not bar any subsequent judicial action to enjoin
the enforcement of such changes.

In conducting our Section 5 review of legis-
lative districtings, such as those contained in
House Bill 1097, we evaluate the effect of the

Defendant's Exhibit #

DE-005571

- 2 -

resulting districts on racial and language minority groups in the light of fairly drawn available districting alternatives and the legislature's affirmative duty as represented by White v. Regester, 412 U.S. 755 (1973), and related cases (see, e.g., City of Petersburg (Va.) v. United States, 354 F. Supp. 1021 (D. D.C. 1972), aff'd, 410 U.S. 962 (1973)) to assure that the voting rights of cognizable racial minorities are not minimized or diluted.

With respect to the effect of the new single-member districts defined in House Bill 1097 for Jefferson County, Districts 7A-7C, our analysis shows that the subdistricting may be affected to a substantial degree by the extent to which the boundaries of previously existing multimember district 7 are changed and the manner in which it is done. While alteration of the multimember district boundaries to accommodate the subdistricting would appear to be a legitimate consideration by the state, it also appears that, from available alternatives, the subdistricting lines adopted in House Bill 1097 have an unnecessary dilutive effect. The location of single-member district lines almost evenly divides the county's minority population among the county's three new single-member districts, none of the three districts has a significant minority population, such a division appears to be unnecessary on the basis of natural boundaries or overriding considerations of district compactness or on the basis of any compelling governmental justification, and at least one single-member district with a significant minority population would result under fairly drawn alternative districting plans.

Defendant's Exhibit #

DE-005572

- 3 -

Regarding Districts 32A-32I in Tarrant County it appears that portions of the new single-member district lines are drawn through cognizable minority residential concentrations resulting in an apportionment or fragmenting of those areas into 4 districts, only one of which has a significant minority population, while fairly drawn alternative districting plans would avoid placing portions of the minority residential concentrations in as many districts and would result in two districts with significant minority populations. We note that at least two of the districting alternatives presented to the Court prior to its order of January 28, 1975, in Graves v. Barnes, avoided the fragmenting of cognizable minority residential areas in Tarrant County that results from House Bill 1097.  As we found with regard to the submitted districting in Jefferson County, the result in House Bill 1097 for Tarrant County does not appear to be necessary on the basis of natural boundaries or overriding considerations of district compactness or on the basis of any compelling governmental justification.

Thus, our evaluation indicates that the fragmenting of cognizable minority residential concentrations in Jefferson and Tarrant Counties will have a dilutive effect on minority voting strength, and accordingly, we are unable to conclude as we must under Section 5 that implementation of the districts 7A-7C and 32A-32I set out in House Bill 1097 for Jefferson and Tarrant Counties will not have a discriminatory effect.  Under these circumstances I must, on behalf of the Attorney General, interpose an objection to the implementation of the specified districts set out in House Bill 1097 for Jefferson and Tarrant Counties.

Defendant's Exhibit #

DE-005573

USA_00012640

- 4 -

Of course, as provided by Section 5 of the
Voting Rights Act, you have the right to seek a
declaratory judgment from the United States District
Court for the District of Columbia that these districts
neither have the purpose nor will have the effect of
denying or abridging the right to vote on account of
race or color or in contravention of the guarantees
set forth in Section 4(f) of the Act.  However, until
and unless such a judgment is obtained, the provisions
objected to are unenforceable.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Honorable Mark White
Secretary of State of Texas
Capitol Station
Austin, Texas  78711

Dear Mr. Secretary:

    This is in reference to our letter of
January 23, 1976, and in further reply to your
submission of the subdistrictings of 9 multi-
member Texas House of Representatives districts
in House Bill 1097 of the 1975 Session of the
Texas Legislature, to the Attorney General
pursuant to Section 5 of the Voting Rights Act
of 1965.  Your submission was received on
November 26, 1975.

    We responded to your submission prior to
January 26, 1976, the last day of the 60-day period
As set out in Section 51.22 of our procedural guide-
lines for the administration of Section 5, 28 C.F.R.
§51.22:

        When a decision not to object is
        made within the 60-day period
        following receipt of a submission
        which satisfies the requirements
        of §51.10(a), the Attorney General
        may reexamine the submission if
        additional information comes to
        his attention during the remainder
        of the 60-day period which would
        require objection in accordance
        with §51.19.

cc:  Public File (Rm. 920)
     X0614

Defendant's Exhibit #

DE-005575

USA_00012642

- 2 -

Such additional information has come to
our attention and we have reexamined the submission
of House Bill 1097 with regard to the effect of
new single-member districts defined in House Bill
1097 for Nueces County, Districts 48A through 48C.

The additional information in this regard
concerned the minority population within the single-
member districting plans for Nueces County presented
to the Court prior to its order of January 28, 1975,
in Graves v. Barnes.  During our initial examination
of the districts set out in House Bill 1097 for
Nueces County we erroneously considered the population
statistics of the plan submitted to the Court by the
State as statistics relative to the plan which the Court
adopted.  On that erroneous basis we had determined
that the plan set out in House Bill 1097 would not
dilute minority voting strength given the results
that would flow from fairly drawn alternative
districting plans.

Our evaluation of the new single-member districts
in House Bill 1097 for Nueces County indicated that the
district lines are drawn through a cognizable minority
residential area known as "the corridor" in Corpus
Christi resulting in an apportionment or fragmenting
of that area into each of the 3 districts, only in
one of which minorities represent a majority of the
population.  It was our understanding that in
approaching the question of how to draw new single-
member districts for Nueces County, the legislature
utilized the theory that a fair districting of the
county, given the county's population, should be
designed to result in one "safe" Mexican-American
district, one safe Anglo district, and one "swing"
district with close to 50% Anglo and Mexican-
American population.

Defendant's Exhibit #                                           DE-005576

- 3 -

We had no objection to this districting
approach as long as it did not result in a dilution
of minority voting strength and, as I explained
above, given our erroneous understanding of available
districting alternative we found no such dilution
would result.  However, we now realize that the
districting plan for Nueces County adopted by the
Court in Graves v. Barnes, which apportions the
corridor into only 2 districts, results in 2 districts
in which minorities represent a significant majority
of the population.  Thus, on the basis of our previous
evaluation and in the light of population statistics
of the districting plan ordered by the Court in Graves
v. Barnes, it appears that fairly drawn alternative
districting plans which avoid fragmenting the corridor
into as many as 3 districts also would make a
significant difference in the ability of minority
residents of Nueces County to elect representatives
of their choice.  In addition, we have determined,
as we had determined previously, that the result in
House Bill 1097 for Nueces County does not appear to
be necessary on the basis of natural boundaries or
overriding considerations of district compactness.

Therefore, the remaining question is whether
the legislative approach for the districting of Nueces
County constitutes a compelling governmental justi-
fication for the results that it achieved in Nueces
County.  I believe it does not.  Although the theory
used in House Bill 1097 for apportioning the popu-
lation of Nueces County could, under other circumstances,
be considered to reflect a legitimate interest of the
state, under the standards for our Section 5 review
as enunciated in my letter of January 23, 1976, and
given the facts as described above, I view the
apportionment approach used in House Bill 1097 for

- 4 -

Nueces County as a minimization and thus a dilution
of minority voting strength since it unnecessarily
and unfairly limits minorities to only one district
in which they would represent a majority of the
population.

Accordingly, we are unable to conclude as we
must under Section 5 that implementation of the
districts 48A - 48C set out in House Bill 1097 for
Nueces County will not have a discriminatory effect.
Under these circumstances I must, on behalf of the
Attorney General, interpose an objection to the
implementation of the specified districts set out
in House Bill 1097 for Nueces County. So that
there be no misunderstanding, I should point out
that the objection interposed herein is in addition
to the objections interposed in my letter of
January 23, 1976, to the implementation of the
districts 7A - 7C and 32A - 32I set out in House
Bill 1097 for Jefferson and Tarrant Counties.

Of course, as provided by Section 5 of the
Voting Rights Act, you have the right to seek a
declaratory judgment from the United States District
Court for the District of Columbia that these districts
neither have the purpose nor will have the effect of
denying or abridging the right to vote on account of
race or color or in contravention of the guarantees
set forth in Section 4(f) of the Act. However, until
and unless such a judgment is obtained, the provisions
objected to are unenforceable.

Defendant's Exhibit #                                        DE-005578

USA_00012645

- 5 -

I apologize for any inconvenience that may
have been caused to you by our error in this matter.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

X5572
[FACSIMILE]

October 13, 1976

Honorable Leo Darley
County Judge
County Courthouse
Uvalde, Texas  78801

Dear Judge Darley:

This is in reference to the reapportionment of Commissioner's
Court Precincts in Uvalde County, Texas submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965, as
amended.  Your submission was completed on August 14, 1976.

We have considered the submitted changes and supporting
materials as well as information and comments received from other
interested parties.  Our review and analysis shows that, according
to the 1970 Census, Uvalde County is 50.7% Mexican-Americans, 47.5%
Anglo and 1.8% Black.  Information available to us indicates that
Commissioner Precinct 2 under the redistricting plan has an over-
whelming concentration of Mexican-Americans, and in addition exceeds
the norm of an ideal (population) district by a percentage of at
least 11%.  The other precincts, two of which are substantially
underrepresented, apparently have deviations of similar scope result-
ing in a total deviation range in excess of 20%.  Thus, it would
appear that the precinct with the highest percentage of Mexican-
Americans is the most underrepresented while at least two of the
remaining precincts, each with evident Anglo population majorities,
show deviations indicating overrepresentation.

We note that the reapportionment is based on registered voter
statistics.  Our experience indicates that Mexican-Americans generally
have a lower rate of voter registration than do Anglos.  Thus an
apportionment based on registration data is likely to have a dilutive
effect on the vote of Mexican-Americans.  See Ely v Klahr, 403 U.S.
108, 113-15 (1971) (Douglas, J., concurring).  Our analysis further
shows that there is evidence that Mexican-Americans have not been
afforded access to the political process in Uvalde County.  When
these considerations are noted, together with the configuration of
the plan, particularly with the elongated hour-glass shape of
precinct 1 which is developed with the Mexican-American population
in the minority, we cannot conclude, as we must under the Voting
Rights Act, that this reapportionment does not have the purpose or
effect of abridging the right to vote of the Mexican-American
citizens of Uvalde County.

USA_00012647

- 2 -

Accordingly, in view of our analysis and recent court deci-
sions to which we feel obligated to give great weight, e.g., White
v. Regester, 412 U.S. 755 (1975); Robinson v. Commissioner's Court,
Anderson County, 505 F.2d 674 (1974), I must, on behalf of the
Attorney General, interpose an objection to the 1973 redistricting
of Uvalde County.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the alternative of instituting an action in the
United States District Court for the District of Columbia seeking
a declaratory judgment that the redistricting plan does not have
the purpose and will not have the effect of denying or abridging
the right to vote to members of a language minority group in the
County. However, until and unless such a judgment is obtained,
the 1973 Uvalde redistricting plan is legally unenforceable.

                        Sincerely,


                        J. STANLEY POTTINGER
                            Assistant Attorney General
                            Civil Rights Division

Defendant's Exhibit #                                    DE-005581

Mr. Hayden Burns
Butler, Binion, Rice, Cook
   & Knapp
Attorneys at Law
1100 Esperson Building
Houston, Texas  77002

JUL 27 1976

Dear Mr. Burns:

      This is in reference to the redistricting of
County Commissioner and Justice Precincts and change
in election precincts of Waller County, Texas, submitted
to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended.  Your submission
was completed on May 28, 1976.

      We have considered the submitted changes and
supporting materials as well as information and comments
received from other interested parties.  According to the
1970 Census, Waller County is 52.5% black, 43.3% white and
3.5% Mexican-American.

      Racial breakdowns, by race, for the old and new
commissioner precincts were not supplied by the County.
A breakdown of registered voter figures, by race, for the
old and new commissioner precincts is not a sufficient
means by which to evaluate the redistricting plan.  Our
experience indicates that blacks have a lower rate of
voter registration than do whites.  Thus an apportionment
based on registration data is likely to have a dilutive
effect on the vote of blacks.  See Ely v. Klahr, 403 U.S.
108, 118-119 (1971) (Douglas, Jr., concurring).  Further,
this approach to reapportionment has been upheld by the
Supreme Court only when it produces a distribution of
legislators not substantially different from that which
would have resulted from the use of a permissible popula-
tion base (Burns v. Richardson, 384 U.S. 73, 93(1966)).

cc:  Public File
     X2128-2130

USA_00012649

— 2 —

In this regard, we take particular note of the
fact that in drawing this reapportionment plan approxi-
mately 2,000 resident students at predominantly black
Prairie View A & M University were excluded.  You state
in your May 26, 1976 letter that those Prairie View A & M
University students who do not meet the residence require-
ments for voting outlined in Article 5.08 of the Texas
Election Code were not considered to be residents of
Commissioner Precinct 2.  However, the statutory presump-
tion against student residency outlined in Article 5.08(k)
of the Code was found to violate the Fourteenth Amendment's
equal protection clause (Whatley v. Clark, 482 F.2d 1230
(5th Cir. 1973)) and the county has presented no compelling
reason for treating students different from other potential
voters.

Because the submitted plan excludes a significant
portion of the potential black voters of Waller County,
the commissioner precincts do not appear to accurately
reflect black voting strength in the County.  Further,
since the population of the only black majority district
is an estimated 2,000 more than the other districts with
the inclusion of these students, the black residents of
Commissioner Precinct 2 are underrepresented in relation
to the other county residents.  Therefore, we cannot con-
clude, as we must under the Voting Rights Act, that this
reapportionment does not have the purpose or effect of
abridging the right to vote of the black citizenry.

Accordingly, in view of our analysis and recent
court decisions to which we feel obligated to give great
weight, I must, on behalf of the Attorney General, inter-
pose an objection to the 1975 redistricting of Waller
County.

Defendant's Exhibit #                                    DE-005583

USA_00012650

- 2 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the alternative of instituting an action in the United States District Court for the District of Columbia seeking a declaratory judgment that the present submission does not have the purpose and will not have the effect of denying or abridging the right to vote of blacks in the county.  However, until and unless such a judgment is obtained, the 1975 Waller County redistricting plan is legally unenforceable.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005584

USA_00012651

AUG   1 1977

Honorable L. W. Scott
County Judge
Caldwell County
Post Office Box 1050
Lockhart, Texas   78644

Dear Judge Scott:

This is in reference to the redistricting of
commissioner precincts in Caldwell County, Texas, submitted
to the Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended.   Your original submission
was received on April 3, 1976.   Additional information was
received on September 7, 1976, and June 3, 1977.

We have given careful consideration to the informa-
tion furnished by you as well as Bureau of the Census data
and information and comments from interested parties.   On
the basis of our analysis, we are unable to conclude, as
we must under the Voting Rights Act, that the 1973
redistricting of commissioner precincts in Caldwell County
will not have a discriminatory effect on minority groups
in the county.

Our analysis reveals that Mexican Americans constitute
over 30 percent of the population of Caldwell County and
that blacks constitute between 13 and 21 percent of the
county population.   To make a determination under Section 5
with respect to the commissioner precincts we need to know
the racial composition of these precincts.   The statistical
information that you have provided does not enable us to
determine this racial composition.   Although our independent
research suggests preliminarily that the precincts do not
have a discriminatory effect, we have no basis for being
confident in this conclusion.

Defendant's Exhibit #                              DE-005585

USA_00012652

-- 2 --

The Attorney General's Procedures for the Adminis-
tration of Section 5 of the Voting Rights Act provide that:

>   If the evidence as to the . . . effect of
>   the change is conflicting, and the Attorney
>   General is unable to resolve the conflict
>   within the 60-day period, he shall, consistent
>   with the above-described burden of proof
>   applicable in the District Court, enter an
>   objection and so notify the submitting authority.

(28 C.F.R. 51.19).

Accordingly, I must, at this time, on behalf of the
Attorney General, interpose an objection to the redistricting
of commissioner precincts in Caldwell County. However, we
have requested the Census Bureau to provide us with enumera-
tion district statistics on the location of Mexican Americans
in the county. Should this information indicate that the
redistricting plan does not fragment the minority population
of Caldwell County or should the county be able to provide
new information showing that the redistricting does not
adversely effect the potential of minority groups in the
county to elect a candidate of their choice, we will be
willing to reconsider the objection.

                                   Sincerely,



                              Drew S. Days III
                              Assistant Attorney General
                              Civil Rights Division

USA_00012653

APR 2 8 1978

Mr. James L. Anderson, Jr.
County Attorney
Aransas County Courthouse
Rockport, Texas 78382

Dear Mr. Anderson:

This is in reference to the redistricting of commissioner
precincts of Aransas County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended.

Your initial letter was received on December 21,
1977. On February 17 and March 31, 1978, we requested
additional information with respect to this submission
to enable us to analyze whether the redistricting has
the purpose or will have the effect of abridging the
right to vote on account of race, color, or membership
in a language minority group. Your responding letters,
received by us on February 26, and April 12, 1978,
provided some, but not all, of the information requested.
Although the submission of the redistricting cannot be
considered complete, you have requested that we make a
determination as soon as possible on the basis of the
information available to us.

Under Section 5 the burden is on the jurisdiction
proposing a voting change to show that the new practice or
procedure is not discriminatory in purpose or effect. The
burden of proof is the same when a submission is made to
the Attorney General as it would be in a suit for a declara-
tory judgment under Section 5 brought in the United States
District Court for the District of Columbia. See Georgia v.
United States, 411 U.S. 526 (1973). The Procedures for the
Administration of Section 5 of the Voting Rights Act of 1965,
C.F.R. 51.19, state:

Defendant's Exhibit #                                    DE-005587

USA_00012654

- 2 -

If the evidence as to the purpose or effect of the change is conflicting, and the Attorney General is unable to resolve the conflict within the 60-day period, he shall, consistent with the above-described burden of proof applicable in the district court, enter an objection . . .

We have analyzed the information contained in your submission and data obtained from the Bureau of the Census in the light of relevant judicial decisions. See, e.g., Kirksey v. Hinds County Board of Supervisors, 554 F.2d 139 (5th Cir. 1977), cert. denied, 46 U.S.L.W. 3357 (Nov. 18 1977); Robinson v. Commissioners Court, 505 F.2d 674 (5th Cir. 1974). Our analysis reveals that the 1970 population of Aransas County was 8,902, of which 2,372 or 27 percent were of Spanish heritage. The 1975 population of the county has been estimated to have been 10,507; the Spanish heritage proportion of this number is not known. In 1970 the black population of the county was 411, or about 5 percent of the total. The 1975 black population is not known. We have not been provided the total population of the four commissioner precincts, either under the old plan or the new plan. Thus we do not know the extent to which the old plan deviated from the requirements of the one person, one vote principle, the extent to which any such deviation has been remedied by the new plan, nor the effect, if any, of that remedying upon the minority voting strength. We also have not been provided with the racial composition of the old or new districts.

On the basis of voter registration statistics and Fifth Count data from the 1970 census, however, it appears that a concentration of Mexican American population in the City of Rockport was divided, under the old plan, between commissioner precincts 1 and 2, and that this division is maintained under the new plan. We note further that these commissioner precincts with the greatest concentration of Mexican American registered voters, numbers 1 and 2, also have significantly more registered voters than the remaining two precincts. If, as is frequently the case, the Mexican American registration rate is lower than the Anglo registration rate, this leads to the distinct possibility that the districting plan fails to satisfy the one person, one vote principle, and that the underrepresented precincts are those with the greatest Mexican American concentration. See Ely v. Klahr, 403 U.S. 108 (1971).

USA_00012655

- 3 -

In addition, it is our understanding that minorities were not consulted with respect to the creation or adoption of the new plan, and that no minorities have been elected to the Commissioners Court. An analysis of election returns and voter registration data by voter precinct leads to an inference that support for Mexican American candidates comes largely from Mexican American voters and, thus, that racial bloc voting exists.

Under these circumstances, we are unable to conclude that the county has carried its burden of proving that the submitted redistricting plan for Aransas County will not have the effect of diluting the vote of Mexican Americans in Aransas County. Accordingly, on behalf of the Attorney General, I must interpose an objection to this plan.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.2(b), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the redistricting plan legally unenforceable.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division


cc:   Honorable John D. Wendell
      County Judge

      Ms. Lola Bonner, Chairman
      Aransas County Democratic Party

      Mr. Harold Shirey, Chairman
      Aransas County Republican Party

APPENDIX

Honorable Allan Stovall
County Judge
Edwards County
Post Office Box 348
Rocksprings, Texas 78880

Dear Judge Stovall:

This is in reference to the redistricting of commissioner precincts in Edwards County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended. Your submission was completed on February 27, 1978.

We have given careful consideration to the information furnished by you as well as Bureau of the Census data and information and comments from interested parties. Our analysis reveals that, according to the 1970 Census, Mexican Americans constitute approximately 44% of the population of Edwards County and are concentrated in the City of Rocksprings. No Mexican Americans have been elected to the Commissioners Court under the prior districting plan. Under the submitted redistricting plan, the Mexican American population in the county has been almost evenly distributed among the four commissioner precincts. The result of this division of a highly concentrated minority group is to minimize and thus dilute minority voting strength since it assures that Mexican Americans will not represent a majority of the population in any one commissioner precinct. See Kirksey v. Board of Supervisors of Hinds County, 554 F.2d 139 (5th Cir. 1977), cert. denied, 98 S.Ct. 512 (1977), and Robinson v. Commissioners Court, 505 F.2d 674 (5th Cir. 1974). Our analysis further reveals that rational and compact alternative districting could achieve population equality among the four commissioner precincts while at the same time achieving a precinct system that would more accurately reflect Mexican American voting strength in Edwards County.

Defendant's Exhibit #

DE-005590

USA_00012657

- 2 -

Therefore, on the basis of our analysis, we are unable to conclude, as we must under the Voting Rights Act, that the submitted redistricting of commissioner precincts in Edwards County does not have the purpose and will not have the effect of discriminating on account of membership in a language minority group. Accordingly, on behalf of the Attorney General, I must interpose an objection to the redistricting plan for Edwards County.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.2(b), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the redistricting plan for Edwards County legally unenforceable.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

USA_00012658

AUG  8 1978

Honorable Ernest F. Smith
County Judge
Harrison County
Post Office Drawer A
Marshall, Texas  75670

Dear Judge Smith:

This is in reference to the 1975 redistricting of
commissioner precincts in Harrison County, Texas, submitted
to the Attorney General pursuant to Section 5 of the Voting
Rights Act, as amended.  Your original submission was received
on March 25, 1976.  Additional information was requested on
May 24, 1976 but to date has not been received.

Under Section 5 the burden is on the jurisdiction
proposing a voting change to show that the new practice or
procedure is not discriminatory in purpose or effect.  The
burden of proof is the same when a submission is made to
the Attorney General as it would be in a suit for a declara-
tory judgment under Section 5 brought in the United States
District Court for the District of Columbia.  See Georgia v.
United States, 411 U.S. 526 (1973).  The Procedures for the
Administration of Section 5 of the Voting Rights Act of 1965,
28 C.F.R. 51.19, state:

> If the evidence as to the purpose or effect of the
> change is conflicting, and the Attorney General is
> unable to resolve the conflict within the 60-day
> period, he shall, consistent with the above-described
> burden of proof applicable in the district court,
> enter an objection . . .

cc:  Public File

Defendant's Exhibit #                                    DE-005592

USA_00012659

- 2 -

We have given careful consideration to the information originally furnished by you as well as Bureau of the Census data and information and comments from interested parties. In our analysis we are guided by relevant judicial decisions. See, for example, Kirksey v. Board of Supervisors of Hinds County, 554 F.2d 139 (5th Cir.) cert. denied, 6 W.S.L.W. 3357 Nov. 18 (1977); Robinson v. Commissioners Court, 505 F.2d 674 (5th Cir. 1974).

Our analysis reveals that blacks constitute 36 percent of the population of Harrison County. The statistical information that you have provided does not enable us to compare the racial composition of the new commissioner precincts with that of the old. Our research indicates that the county's black population is fairly evenly distributed among the four precincts and, in addition, we understand that the blacks were not consulted concerning the creation of this plan. We note also that blacks have not been elected to the county commission or to other county offices.

Under these circumstances we are unable to conclude, as we must under the Voting Rights Act, that the new redistricting plan for commissioner precincts does not have the purpose and will not have the effect of diluting minority voting strength in Harrison County. Accordingly, on behalf of the Attorney General, I must interpose an objection to the redistricting of commissioner precincts in Harrison County.

Under the Procedures for the Administration of Section 5 of the Voting Rights Act (42 C.F.R. 51.21(b) and (c), 51.23, and 51.24) you may request the Attorney General to reconsider this objection. In addition, Section 5 permits you to seek a declaratory judgment from the United States District Court for the District of Columbia that this change does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color. However, until the objection is withdrawn or such a judgment is rendered by that Court, the legal effect of the objection by the Attorney General is to render the change unenforceable.

Defendant's Exhibit #                          DE-005593

- 3 -

As this matter is the subject of litigation in the District Court for the Eastern District of Texas, Marshall Division (Watson v. Harrison County, C.A. No. M-75-45-CA), I am taking the liberty of sending a copy of this letter to United States District Judge William M. Steger and to counsel in that case.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division

cc:
United States District Judge William M. Steger
Larry R. Daves, Esquire
Phillip Brin, Esquire

USA_00012661

APR 1 4 1978

Mr. William T. Armstrong
Foster, Lewis, Langley, Gardner
& Banack
Attorneys at Law
1655 Frost Bank Tower
San Antonio, Texas  78205

Dear Mr. Armstrong:

This is in reference to the reapportionment of commissioner precincts in Medina County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended. Your submission was received on March 13, 1978. In accordance with your request expedited consideration has been given this submission pursuant to the procedural guidelines for the administration of Section 5 (28 C.F.R. 51.22).

We have given careful consideration to the information furnished by you as well as Bureau of the Census data and information and comments from other interested parties. On the basis of our analysis, we are unable to conclude, as we must under the Voting Rights Act, that the submitted reapportionment of commissioner precincts in Medina County will not have a discriminatory effect on the minority community of the county.

Our analysis reveals that, according to the 1970 Census, Mexican Americans constitute approximately 47% of the population of Medina County. Under the present plan, the county's population is disproportionately distributed among the four precincts, violating the one person-one vote principle. Mexican Americans constitute 56.69% of the population in Precinct 1 and 49.68% of Precinct 3. While we recognize that the proposed plan substantially remedies the one person-one vote problems in the existing plan, in our view the effect of the new plan is to perpetuate denial of access by Mexican Americans to the political process in Medina County.

cc: Public File
    A4881

Defendant's Exhibit #                                    DE-005595

USA_00012662

- 2 -

In spite of the Mexican American 56.69% population majority in Precinct 1 that group has been unable to achieve representation on the County Commission. We are, therefore, unable to conclude that the new plan's precincts having 55.66% and 50.89% Mexican-American majorities would serve to remove the political disadvantage currently suffered by the minority community in Medina County. See, e.g., Kirksey v. Board of Supervisors of Hinds County, 554 F.2d 139 (1977).

Under these circumstances, therefore, I must, on behalf of the Attorney General, interpose an objection to the reapportionment plan for Medina County here under submission.

We have noted that widespread publicity was given and public input was invited in connection with the adoption of this plan. We further note that at least two other plans were considered, one of which was offered by the Mexican American Legal Defense and Educational Fund (MALDEF). The MALDEF plan, while noncontiguous due to the inclusion in Precinct 1 of all of several separate segments of Census enumeration district (ED) 7, contains a precinct with a significant Mexican-American majority of 74% and could easily be modified to remove the contiguity problems while only slightly increasing the deviation.

Sections 51.23 to 51.25 of the Attorney General's Section 5 guidelines (28 C.F.R. 51.23-51.25) permit reconsideration of the objection should you have new information bearing on the matter or should the County Commission alter its plan so as to alleviate the dilutive effects discussed above. We are aware of the upcoming elections scheduled for May 6, 1978, and in view of that the Attorney General will be happy to expedite any such request for reconsideration. In any event please notify us immediately, by telephoning Voting Section Attorney David H. Hunter at 202/739-3849, of the action the Commissioners Court plans to take.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the District Court for the District of Columbia that this change has neither the purpose nor the effect of abridging the right to vote on account of race, color or membership in a language minority group. However, until such time as the objection may be withdrawn or a judgment from the District of Columbia Court is obtained, the legal effect of the objection by the Attorney General is to render the change in question unenforceable.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

USA_00012663

MAR 24 1978

Mr. Mike Westergren
Nueces County Attorney
Nueces County Courthouse
Corpus Christi, Texas  78401

Dear Mr. Westergren:

This is in reference to the reapportionment of
commissioner precincts in Nueces County, Texas, submitted
to the Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended.  Your submission was completed
upon our receipt on February 13, 1978, of the supplemental
material you provided.  In accordance with your request we
have expedited our consideration of this matter pursuant to
the procedural guidelines for the administration of Section 5
(28 C.F.R. 51.22).

We have given careful consideration to the information
furnished by you as well as Bureau of the Census data, informa-
tion and comments from other interested parties, and materials
in our files from previous Nueces County submissions.  On the
basis of our analysis, we are unable to conclude, as we must
under the Voting Rights Act, that the submitted reapportionment
of commissioner precincts in Nueces County will not have a
discriminatory effect on minority groups in the county.

Our analysis reveals that, according to the 1970
Census, Mexican Americans constitute approximately 44% of
the population of Nueces County.  Under the submitted
reapportionment plan, Mexican Americans would constitute
52% of the population of Commissioner Precinct 2 and 81.6%
of the population of Commissioner Precinct 3.  Under the
present plan, Mexican Americans constitute 44% of the
population of Commissioner Precinct 2 and 82.5% of the
population of Commissioner Precinct 3.  While we recognize
that the proposed plan might be considered ameliorative, in
our view there also are substantial indications that the
plan sufficiently perpetuates denial of access by Mexican
Americans to the political process in Nueces County as to
make it constitutionally impermissible within the meaning
of Beer v. United States, 425 U.S. 130 (1976).

Defendant's Exhibit #                          DE-005597

USA_00012664

- 2 -

Factors indicative of denial of access to the political process were considered by the Court when reviewing the Texas state at-large elective legislative districts for Nueces County (Graves v. Barnes, 378 F. Supp.640, 658-661 (1974)).  The court there found that under the at-large system the Mexican American minority population in Nueces County had less opportunity than other residents to participate in the political processes and to elect legislators of their choice.  We have been provided with no basis for concluding that the proposed reapportionment plan for the Nueces County Commissioners' Court will not perpetuate this denial.  By overly concentrating the Mexican American population in one precinct (Commissioner Precinct 3) the plan has the effect of minimizing the impact of the Mexican American vote in other precincts, notably Precinct 2.  It appears that fairly drawn alternative reapportionment plans could easily avoid this result.

Under these circumstances, therefore, we are unable to conclude, as we must under the Voting Rights Act, that the plan does not discriminate against Mexican American voters.  Accordingly, on behalf of the Attorney General, I must interpose an objection to the reapportionment plan here under submission.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the District Court for the District of Columbia that this change has neither the purpose nor the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group.  In addition, Sections 51.23 to 51.25 of the Attorney General's Section 5 guidelines (28 C.F.R. 51.23-51.25) permit reconsideration of the objection should you have new information bearing on the matter.  However, until such time as the objection may be withdrawn or a judgment from the District of Columbia Court is obtained, the legal effect of the objection by the Attorney General is to make the change in question unenforceable.

Sincerely,

JOHN E. HUERTA
Acting Assistant Attorney General
Civil Rights Division

A1097' A4610;
A3970-71

MAR 24 1978

Mr. George Wikoff
City Attorney
City of Port Arthur
P. O. Box 1089
Port Arthur, Texas  77640

Dear Mr. Wikoff:

    This is in reference to the consolidation of the
Cities of Port Arthur, Lakeview, and Pear Ridge, Texas,
and to the increase in size and redistricting of resi-
dency districts for the consolidated city submitted to
the Attorney General for review under Section 5 of the
Voting Rights Act of 1965, as amended.  Your submission
was completed by our receipt of supplemental informa-
tion on February 21, 1978.  In accordance with your
request, we have given expedited consideration to this
submission pursuant to the Procedures for the Admini-
stration of Section 5, 28 C.F.R. 51.22.

    Section 5 requires the Attorney General to
examine submitted changes affecting the electoral
process to determine whether they have the purpose or
will have the effect of denying or abridging the right
to vote on account of race, color, or membership in a
language minority group.  In making this determination
on behalf of the Attorney General, we are guided by the
legal principles developed by the courts in the same or
analogous situation.  The principal cases dealing with
the evaluation of a change in the composition of a
municipal electorate under Section 5 are City of
Richmond v. United States, 422 U.S. 358 (1975) and
City of Petersburg v. United States, 354 F. Supp. 1021
(D.D.C. 1972), affirmed, 410 U.S. 962 (1973).  Following

USA_00012666

- 2 -

these cases, we have considered the effect of the
consolidation on the voting strength of the minority
population in the affected area, racial voting
patterns, and the method of election to the city
council of the City of Port Arthur.  Our analysis is
based on the materials and information you have
provided as well as on information provided by and
views of other interested persons.

    Our analysis has revealed that, according to
1970 Census figures, prior to the consolidation blacks
constituted 41.0 percent of the population of Port Arthur
and virtually none of the population of Lakeview and
Pear Ridge.  Blacks will constitute 35.5 percent of the
population of the consolidated city.  Thus, the consoli-
dation results in a significant dilution of black voting
strength in Port Arthur.

    Our analysis of election returns for Port Arthur
elections also reveals an apparent unwillingness on the
part of the white electorate to support candidates
favored by black voters in the city.  This conclusion
is corroborated by the findings of Graves v. Barnes,
378 F. Supp. 640, 648-50 (W.D. Texas, 1974) vacated on
other grounds sub nom. White v. Regester, 412 U.S. 755
(1973) where the district court found that minorities
had been excluded from effective and meaningful partici-
pation in Jefferson County, where Port Arthur is located.
Because the city council of Port Arthur is elected at-
large, the necessary effect of the consolidation would
appear to be an enhancement of the power of the white
majority to exclude blacks from effective participation
in the political process.  See City of Richmond, supra,
422 U.S. at 370.

    We have considered whether the addition of a
seventh council member and the redrawing of residency
district lines to create a second district the popula-
tion of which is more than 90 percent black sufficiently
minimizes the dilution of black voting strength to enable
the consolidation to satisfy the judicial standards under

USA_00012667

- 3 -

Section 5.  See City of Petersburg v. United States,
354 F. Supp. at 1031.  However, these changes do not
change the electorate that selects members of the city
council and, thus, do nothing to counteract the increase
in the control of the white electorate brought about by
the consolidation.

Under these circumstances we are unable to conclude,
as we must under the Voting Rights Act, that the consoli-
dation and redrawing of residency district lines will not
have the effect of abridging the right to vote on account
of race or color.  Accordingly, on behalf of the Attorney
General, I must interpose an objection to the consolida-
tion and the redistricting.  We do not object to the
increase in size of the council.

Consistent with the decisions in Petersburg and
Richmond cited above, the Attorney General will reconsider
his objection to the consolidation should the City of
Port Arthur undertake to elect members of its city council
from fairly-drawn single-member districts.  In addition,
you have the right under the Procedures for the Admini-
stration of Section 5, 28 C.F.R. 51.21(b), 51.23, and
51.24, to request the Attorney General to reconsider
this objection, and you have the right provided by
Section 5 to seek a declaratory judgment from the United
States District Court for the District of Columbia that
the consolidation has neither the purpose nor the effect
of denying or abridging the right to vote on account of
race, color, or membership in a language minority group.
However, until the objection has been withdrawn by the
Attorney General or such a judgment rendered by the
District Court, the legal effect of the objection by the
Attorney General is to render the consolidation legally
unenforceable insofar as it affects voting in the City
of Port Arthur.

USA_00012668

- 4 -

Because of the pending litigation involving this matter, <u>Mosely</u> v. <u>Sadler</u>, C.A. No. B-78-69-CA (E.D. Tex.), I am taking the liberty of sending copies of this letter to the Court and to counsel for the plaintiff.

Sincerely,


John E. Huerta
Acting Assistant Attorney General
Civil Rights Division


cc:  Hon. William M. Steger
     Judge, U.S. District Court for the
        Eastern District of Texas
     Beaumont Division

     David R. Richards, Esq.

Defendant's Exhibit #

DE-005602

USA_00012669

United States Department of Justice

Washington, D.C. 20530

ASSISTANT ATTORNEY GENERAL

*FEB 1, 1979*

Mr. Dennis D. Clark
City Manager.
City of Beeville
100 West Corpus Christi Street
Beeville, Texas  78102

Dear Mr. Clark:

This is in reference to the adoption of the
single-member district method of electing the City
Council of the City of Beeville, the designation of
five single-member districts for that purpose, and
other electoral changes occasioned by the adoption
of the new electoral method, effected by Ordinance
No. 1106 (1973) and by the approval of Proposition
One by the electorate of the City of Beeville in the
election of April 3, 1973, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights
Act, as amended.  Your submission was completed on
December 4, 1978.

Under Section 5 the submitting jurisdiction
has the burden of proving  both that the change in
question was not adopted with a discriminatory
purpose and that its effect will not be discrimina-
tory.  See Beer v. United States, 425 U.S. 130 (1976);
Wilkes County v. United States, 450 F. Supp. 1171
(D.D.C. 1978), affirmed, 47 U.S.L.W. 3391 (Dec. 4,
1978)(No. 78-70); Procedures for the Administration
of Section 5 of the Voting Rights Act of 1965,
28 C.F.R. 51.19.

Mexican Americans constitute approximately
55 percent of the population of Beeville.  The City
Council of Beeville has five members, who are elected
to staggered two-year terms.  Prior to the adoption

Defendant's Exhibit #

DE-005603

USA_00012670

- 2 -

of the changes in question, members of the council
were elected at-large, and candidates favored by the
Mexican American electorate had frequently been
elected.  The charter amendment providing for the
single-member district system of electing council
members was adopted in what appears to have been a
referendum polarized between Mexican American and
Anglo voters, with predominantly Mexican American
precinct one voting against the proposition by a
significant margin and predominantly Anglo precinct
two voting in favor by an equally significant margin.
Our analysis of the demographic data and maps you
have provided indicates that the effect of the adoption
of the single-member district plan may be to restrict
the influence of the Mexican American electorate in
Beeville to districts one and two, although under the
prior at-large system or under alternative single-
member district plans Mexican Americans could potentially
have greater influence.

According to the statistics you have provided,
there are significant differences in population among
the five districts.  The population of district one,
the district with the smallest population, is only
equal to 53.3 percent of the population of district
five, the district with the greatest population.  We
cannot determine that districts more equal in population
would not have enhanced the electoral strength of
Mexican Americans.  Reservations with respect to the
reliability of the statistics you have provided also
prevent us from determining that the submitted plan
does not have a discriminatory effect.  According to
the registered voter and voting age population statistics
for the five wards that you have provided, 126.0 percent
of the voting age population of district one are regis-
tered to vote, while only 57.8 percent of the voting
age population of district five are registered.  These
statistics suggest that either the population or the
registration statistics you have provided are inaccurate.

Under these circumstances I am unable to conclude
as I must under the Voting Rights Act, that the single-
member district method of election established by
Ordinance No. 1106 neither has a discriminatory purpose

Defendant's Exhibit #                                DE-005604

- 3 -

nor will have a discriminatory effect.  Accordingly, on behalf of the Attorney General, I must interpose an objection pursuant to Section 5 to the submitted method of election and other related electoral changes.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the single-member district method of election established by Ordinance No. 1106 does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request reconsideration of this objection by the Attorney General.  However, until the judgment from the District Court is obtained or the objection withdrawn, the effect of the objection by the Attorney General is to make the method of election established by Ordinance No. 1106 legally unenforceable.  As a result, the at-large system previously in effect remains the legal electoral system for the City of Beeville.

If you choose to ask the Attorney General to reconsider this objection, the following information would be helpful:

1.  An explanation of the voter registration rates that appear to exist for the five districts of the City of Beeville.

2.  Elections returns by precinct or other information that would show whether Mexican Americans and Anglos constitute separate voting blocs in Beeville.

3.  Information that will show why Beeville adopted the single-member district method of election over the at-large system or other alternatives and why the particular plan contained in Ordinance No. 1106 was adopted instead of alternatives.  In particular,

USA_00012672

- 4 -

we find in the materials you have provided references
to meetings of Subcommittee No. 2 of the Charter
Revision Commission on December 14 and 26, 1972, and
to a meeting of the Commission on February 8, 1973,
but minutes of these meetings were not provided. In
addition, the minutes of the February 9, 1973, City
Council meeting indicate that Ordinance No. 1106 was
adopted unanimously, although we have been informed
that Messrs. Martinez and Munoz voted against the
adoption of the ordinance. A clarification of these
matters would assist our reconsideration.

To enable this Department to meet its responsi-
bility to enforce the Voting Rights Act, please inform
us within twenty days of your receipt of this letter
of the course of action the City of Beeville plans to
take with respect to this matter. If you have any
questions concerning this letter, please feel free
to call Voting Section Attorney David Hunter at
202/633-3849.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division



**United States Department of Justice**

WASHINGTON, D.C. 20530

ASSISTANT ATTORNEY GENERAL

William T. Armstrong, Esq.
Foster, Lewis, Langley,
    Gardner & Banack
1655 Frost Bank Tower
San Antonio, Texas   78205

11 DEC 1979

Dear Mr. Armstrong:

        This is in reference to the redistricting of county
commissioner precincts, justice of the peace precincts and
voting precincts in Medina County, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended.  Your submission was received on
October 12, 1979.

        We have given careful consideration to the information
you have provided as well as to that available from Bureau
of the Census data and from other interested parties.  Our
analysis reveals that the proposed change in the line
dividing Commissioner Precincts 1 and 3 does little to change
the situation to which the Attorney General interposed an
objection on April 14, 1978.  A comparison of the 1979 plan
with the 1978 plan reveals an increase in the minority popu-
lation of 1.47 percent in proposed Precinct 3.  When compared
with the only legally enforceable plan (pre-1978), an increase
of 7.20 percent (49.68 to 56.88) is noted in Precinct 3,
while Precinct 1 has been reduced by 12.26 percent from
56.69 percent to 44.43 percent in minority population.

        As we indicated in our letter of April 14, 1978,
Mexican Americans have been unable to achieve representa-
tion on the County Commission with a population majority
of 56.69 percent in existing Commissioner Precinct 1.
An increase of .19 percent as represented by the 56.88
percent total minority population in Precinct 3 would
hardly seem to change this situation.  Although Mexican
Americans will have a population majority in Precinct 3,
they likely will be unable to elect a candidate of their
choice because of the fall-off in that percentage due to
a smaller voting age population and a lower registration
rate among Mexican Americans, and because of the racially
polarized voting pattern that seems to exist in Medina
County.

Defendant's Exhibit #                                     DE-005607

USA_00012674

- 2 -

In addition, as indicated in our letter of April 14, 1978, it has been demonstrated that the minority population of Medina County is concentrated in such a way as to make it possible to develop a plan that would include a district which would include a minority percentage of the population at a level that would assure minority voters meaningful access to the political process.  See, e.g., Mississippi v. United States, C.A. No. 78-1425 (D. D.C. June 1, 1979) and United Jewish Organizations v. Carey, 430 U.S. 144 (1977).  Furthermore, we have been presented with no justification for the continued substantial fragmentation of the Mexican American community in the City of Hondo.

Under Section 5 the submitting authority has the burden of proving that the change in question is neither retrogressive nor unconstitutional with respect to protected minorities.  Beer v. United States, 425 U.S. 130, 141-142 (1976).  Under the circumstances I must conclude that, for the same reasons described in my letter of objection of April 14, 1978, Medina County has again failed to sustain its burden of proof.  Therefore, on behalf of the Attorney General, I must object to the submitted reapportionment plan.

With regard to the changes in the justice of the peace precincts and the voting precincts, no determination will be made at this time pending resolution of the redistricting issue since the realignments of the justice of the peace and voting precincts are dependent upon the change in Commissioner precinct lines.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection.  However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the redistricting of the commissioner precincts legally unenforceable.

Defendant's Exhibit #                                    DE-005608

USA_00012675

- 3 -

    To enable this Department to meet  its responsibility
to enforce the Voting Rights Act, please inform us within
twenty days of your receipt of this letter what course of
action the County plans to take with respect to this matter.
If you have any questions concerning this letter, please
feel free to call Ms. Donna Clarke (202--724-7440) of our
staff, who has been assigned to handle this submission.

                        Sincerely,

                        DREW S. DAYS III
                    Assistant Attorney General
                       Civil Rights Division

Defendant's Exhibit #                              DE-005609

25 FEB 1980

Mr. George H. Spencer
Clemens, Spencer, Welmaker &
   Finck
1805 National Bank of Commerce
   Building
San Antonio, Texas   78205

Dear Mr. Spencer:

       This is in response to your letter dated January 16,
1980, in which you requested that the Attorney General recon-
sider his December 7, 1979, objection to the redistricting of
Commissioner, Justice of the Peace and Constable Precincts by
Atascosa County, Texas, in light of the decision in Garcia v.
Uvalde County, 455 F. Supp. 101 (W.D. Tex. 1978), aff'd sub
nom. United States v. Uvalde, 439 U.S. 1059 (1979).  Your
letter was received on January 22, 1980.

       In Garcia, the court found (p. 106) that the Attorney
General had repeated his request for information which the
submitting authority had already stated to be unavailable
and concluded that "[t]he submission was, therefore, according
to the regulations, complete."  The circumstances surrounding
the submission from Atascosa County are distinguishable from
those present in Uvalde County.

       Our initial request for information of January 26, 1977,
asked for the number or percent of black or Spanish-heritage
residents and voters of each of the precincts, for the results,
by voting precinct, of all county elections held since January 1,
1972, in which minority candidates have participated, and for
the names and business-hour telephone numbers of Spanish-
heritage residents who were consulted regarding the redistricting
plan.  No response was made to this request nor have we
been advised that the requested information is unavailable.

USA_00012677

-- 2 --

To the contrary, the information requested does appear to be
available to the submitting authority since voter lists and
county election results are maintained at county offices.
Also the undated narrative, "Atascosa County--A Redistricting
Proposal," submitted by the county, contains a chart breaking
down the 1970 Census population figure for the county into the
four proposed commissioner precincts and the narrative of the
methodology employed to arrive at those figures suggests that
this process could have been followed to determine the pre-
redistricting composition of each commissioner precinct.

In addition to these items, an explanation was
requested in our letter dated August 11, 1977, of a discre-
pancy in the data initially submitted from that provided in
response to our request for additional information concerning
the population figures given for Precinct No. 2.  This explana-
tion was never received.

In light of the circumstances noted above, we do not
believe this submission can be considered to have been completed
as was the one in Uvalde County.  Accordingly, the Attorney
General is unable to withdraw his objection based on the
decision in the cited case.  However, as stated in our letter
of objection, should the county elect to provide the requested
information the Attorney General will evaluate the matter on
its merits and determine whether there is a basis for with-
drawing the objection.

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us within
twenty days of your receipt of this letter of the course
of action Atascosa County plans to take with respect to this
matter.  If you have any questions concerning this letter,
please feel free to call Ms. Elda Gordon (202--724-6675) of
our staff, who has been assigned to handle this submission.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                   DE-005611

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

Felix J. Stalls, III, Esq.                 25 FEB 1980
County Attorney
Cochran County Courthouse
Room B-2
Morton, Texas   79346

Dear Mr. Stalls·

    This is in reference to the redistricting of
the commissioners' precincts and the creation of
additional voting precincts and polling places in
Cochran County, Texas.   Preliminary materials relating
to these changes were received by us initially on
April 16, 1976.

    On June 7, 1976, we wrote to the then-County
Attorney requesting the information with respect to
these voting changes which we believed to be necessary
to enable us to determine, as required by Section 5
of the Voting Rights Act, whether the redistricting
had the purpose or the effect of abridging the right to
vote on account of race, color, or membership in a
language minority group.   Having received no response
and having learned that the addressee of our previous
request was no longer in office, on August 21, 1977,
we repeated that request to you.   (Copies of our letters
are attached.)   Your responding letter, received by us
on December 21, 1977, provided some, but not all, of the
information requested and we renewed our request for the
unprovided information in our letter of February 21, 1978.
(Copy attached).   To date we have not received the
remainder of the requested information, specifically,
answers to our inquiries concerning the number of registered
voters, by race, in each commissioner and voting precinct
before and after the change.

Defendant's Exhibit #                                    DE-005612

USA_00012679

- 2 -

This information is especially important in reviewing this submission because you have indicated that total population statistics, by race, for the commissioner and voting precincts before and after the change are not available and you were able to provide only percentage estimates. On the other hand, we are aware from experience that the county, in order to conduct its elections, must maintain some record of registered voters and the precincts in which they reside and it would not appear to be a difficult task to identify the Spanish surnamed voters on the lists.

Under Section 5 of the Voting Rights Act the submitting authority has the burden of proving that a submitted change has no discriminatory purpose or effect. See, e.g., Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R. 51.19. In failing to provide the Attorney General with the information necessary for the proper evaluation of your submission, you have failed to sustain your burden of proof. Therefore, on behalf of the Attorney General, I must object to the submitted changes.

Of course, as provided by Section 5 of the Voting Rights Act you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b), and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection. Such a request would be particularly appropriate were the county to provide the information which was requested by the Attorney General but never provided. However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the redistricting of commissioner precincts and the creation of additional voting precincts and polling places legally unenforceable.

USA_00012680

- 3 -

     To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter what course of action Cochran County plans to take with respect to this matter.  If you have any questions concerning this letter, please feel free to call Ms. Hallue E. Wright (202--724-7170) of our staff, who has been assigned to handle this submission.

                    Sincerely,


                    Drew S. Days III
                Assistant Attorney General
                 Civil Rights Division

Defendant's Exhibit #

DE-005614

USA_00012681

J. C. Reagan, Esq.                                      **1** FEB 1980
Bartram, Reagan,
   Burrus & Dierksen
Post Office Box 69
205 North Seguin Avenue
New Braunfels, Texas  78130

Dear Mr. Reagan:

        This is in reference to the redistricting of commissioner
precincts and the change in the boundaries of Voting Precincts
10 and 14 in Comal County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended.  Your submission was received on May 7, 1979.  On
July 6, 1979, we sent a letter requesting additional information
necessary to complete our review of this submission.  A copy of
that letter is attached.

        Our records indicate that, to date, we have received no
response to our request.  We have obtained answers to some of
our questions from other sources; however, we still need the
following previously requested information to evaluate properly
the changes in question:

        1.  Maps of the county and of the City of New Braunfels`
showing the existing boundaries and boundaries after the change
with areas of minority population concentrations so indicated;
it would be most helpful to have these areas of concentration
shown as portions of census enumeration districts if possible.

        2.  Reasons for selecting the plan that was adopted.
(We understand that the Mexican American Legal Defense and
Education Fund (MALDEF) submitted two other plans for your
consideration.)

USA_00012682

- 2 -

3.   A description of any verification of the accuracy
of the methodology of determining the population and racial
composition of split enumeration districts.

4.   Any estimates that have been made of the change in
the total population or racial or language minority group
composition of the county since the 1970 Census.

5.   The number of registered voters by race or language
minority group for each voting precinct in the county.   If
exact statistics are not available, please provide your best
estimates and the basis for those estimates.

6.   Primary and general election results, by precinct,
of all contests in which a Mexican American has competed for
the position of County Commissioner, Justice of the Peace,
Constable, Sheriff, Tax Assessor/Collector, or School Trustee
or for any other county office since November 1, 1972.   We
understand that there was a Mexican American candidate for
constable in 1976 and that there is some discrepancy in
the election results.   Therefore, please provide both unofficial
newspaper tallies and official results, by precinct, for this
election.

Under Section 5 of the Voting Rights Act the submitting
authority has the burden of proving that a submitted change
has no discriminatory purpose or effect.   See, e.g. Georgia v.
United States, 411 U.S. 526 (1973); 28 C.F.R. 51.19.   In
failing to provide the Attorney General with the information
necessary for the proper evaluation of your submission, you
have failed to sustain your burden of proof.   Therefore, on
behalf of the Attorney General, I must object to the submitted
changes.

Of course, as provided by Section 5 of the Voting Rights
Act you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
those changes have neither the purpose nor will have the effect
of denying or abridging the right to vote on account of race,
color or membership in a language minority group.   In addition,
the Procedures for the Administration of Section 5 (28 C.F.R.
51.21(b) and (c), 51.23, and 51.24) permit you to request the
Attorney General to reconsider the objection and, in this
instance, we will reconsider the matter upon receipt of the
additional information we previously requested.   However,

Defendant's Exhibit #

DE-005616

USA_00012683

- 3 -

until the objection is withdrawn or the judgment from the
District of Columbia Court obtained, the effect of the
objection by the Attorney General is to make the redistricting
of commissioner precincts and the changes in Voting Precincts
10 and 14 of Comal County, Texas, legally unenforceable.

To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us within twenty
days of your receipt of this letter what course of action
Comal County plans to take with respect to this matter.  If
you have any questions concerning this letter, please feel
free to call Ms. Donna Clarke (202--724-7440) of our staff,
who has been assigned to handle this submission.

                    Sincerely,



                    DREW S. DAYS III
                    Assistant Attorney General
                    Civil Rights Division

USA_00012684

Civil Rights Division

Office of the Assistant Attorney General                    Washington, D.C. 20530

J. W. Gary, Esq.
Gary, Thomasson, Hall & Marks                    APR 16 1980
817 N. Carancahua
Post Office Box 371
Corpus Christi, Texas   78403

Dear Mr. Gary:

        This is in reference to the nine polling place changes
and apportionment plan providing for election of four members
from single-member districts and three members at-large from
residency districts, with staggered terms, for the Corpus
Christi Independent School District in Nueces County, Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended.  Your submission was
completed on February 25, 1980.

        The Attorney General does not interpose any objections
to the nine polling place changes.  However, we feel a respon-
sibility to point out that Section 5 of the Voting Rights Act
expressly provides that the failure of the Attorney General to
object does not bar any subsequent judicial action to enjoin the
enforcement of such changes.

        With respect to the apportionment plan, we have given
careful consideration to the materials you have submitted,
as well as information and comments from other interested
parties.  We have noted particularly the history of purpose-
ful racial discrimination by and within the district, an
apparent pattern of racial bloc-voting in district elections,
and the use of racial campaign tactics in some district elec-
tions.  We note that the submitted plan provides for only one
district in which Mexican-American voters will have a realistic
opportunity to elect a representative of their choice, in a
school district which is over forty percent Mexican American
in population.  We note also that Mexican American voters likely
would have a viable majority in a second district but for the
over-population of proposed District 1.  We note further that
the provision for residency districts has the same effect of
preventing single-shot voting for the at-large seats as the
numbered post provision struck down in LULAC v. Williams,
C.A. No. 74-C-95 (S.D. Tex., Oct. 2, 1979).

Defendant's Exhibit #                                        DE-005618

USA_00012685

- 2 -

Under Section 5 of the Voting Rights Act the submitting authority has the burden of proving that a submitted change has no discriminatory purpose or effect.  See, e.g., Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R. 51.19.  In the particular context of the Corpus Christi Independent School District, the standard of review is governed by the standard expressed in Kirksey v. Board of Supervisors of Hinds County, Mississippi, 554 F.2d 139, 143 (5th Cir. 1977) (en banc):

> The court must then look to the matter of whether the redistricting plan, whether adopted by legislative processes or proposed to be adopted and ordered by the court, will continue in effect an existent denial of access to the minority.  Both the Supreme Court and this circuit have firmly held that where a reapportionment plan is formulated in the context of an existent intentional denial of access by minority group members to the political process, and would perpetuate that denial, the plan is constitutionally unacceptable because it is a denial of rights guaranteed under the Fourteenth and Fifteenth Amendments.

In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden of proof has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the submitted apportionment plan.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection.  However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the submitted electoral system legally unenforceable.

Defendant's Exhibit #

DE-005619

USA_00012686

- 3 -

The objection here interposed may be readily remedied, as the foregoing discussion of our rationale suggests.  If the residency districts for the at-large seats and the over-population of District 1 were eliminated in a fairly drawn 4:3 plan, or if an alternative plan were devised which provided for fair political access for both black and Hispanic minorities, our concerns would be alleviated.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter of the course of action the Corpus Christi Independent School District plans to take with respect to this matter.  If you have any questions concerning this letter, please feel free to call Ms. Zaida Friedman (202--724-7187) of our staff, who has been assigned to handle this submission.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

USA_00012687

12 AUG 1980

Honorable T. L. Harville
Jim Wells County Judge
200 North Almond Street
Alice, Texas  78332

Dear Judge Harville:

This is in reference to the February, 1980, redis-
tricting plan for Jim Wells County, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended.  Your submission was completed on
June 13, 1980.

We have analyzed carefully the materials contained in
your submission, data obtained from the Bureau of the Census
and comments from other interested persons.  Our analysis
reveals that while the proposed plan adequately deals with
some of the concerns we had in the previously submitted plan,
the plan continues to dilute the voting strength of the
minority concentration that exists in the southern portion
of the City of Alice by distributing those voters among all
four commissioner precincts.  On the other hand, it appears
that a number of plans were available to the Commissioners
Court that would not have had that effect.  The adoption of
a plan that would maintain Mexican-American voting strength
at a minimum level, where alternative options would provide
a fairer chance for minority representation, is relevant to
the question of an impermissible racial purpose in its
adoption (see Wilkes County v. United States, 450 F. Supp.
1171 (D.D.C. 1978), aff'd 439 U.S. 999; see also, 28 C.F.R.
51.19)), particularly where, as here, the plan was drawn
with no significant input from the affected minority group.

USA_00012688

- 2 -

Under Section 5 of the Voting Rights Act the submitting authority has the burden of proving that a submitted change has no discriminatory purpose or effect. See, e.g., Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R. 51.19. In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the submitted change.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the redistricting plan for Jim Wells County, Texas, legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter of the course of action the Jim Wells County Commissioners Court plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call Ms. Elda Gordon (202--724-7403) of our staff, who has been assigned to handle this submission.

Sincerely,


JAMES P. TURNER
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                    DE-005622

USA_00012689

**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*              *Washington, D.C. 20530*

**22 JAN 1982**

Jeffrey A. Davis, Esq.
Reynolds, Allen, Cook,
  Pannill & Hooper
1100 Milam Building, 16th Floor
Houston, Texas  77002

Dear Mr. Davis:

        This is in reference to the redistricting of the
commissioners precincts of Uvalde County, Texas, submitted
to the Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended, 42 U.S.C. 1973c.  Your
submission was received initially on October 29, 1981, and was
completed by a corrective supplement on November 23, 1981.

        We have made a careful analysis of the information
that you have provided, the events surrounding the enactment
of the change, the information in our files with respect to
prior plans and elections in Uvalde County, and comments and
information provided by other interested parties.  On the
basis of that analysis, we are unable to conclude that the
new plan for the redistricting of commissaisoners precincts
does not have a discriminatory purpose or effect.

        Our review of this matter shows that Uvalde County,
like other Texas counties, is divided into four commissioners
precincts, which are required, under the Fourteenth Amendment,
to be equalized in population following decennial censuses.
According to the 1980 census, the population of Uvalde County
is 22,441, of whom Mexican-Americans constitute 55.5 percent.
Because the plan previously in use had been held in violation
of the one-person, one-vote requirement of the Fourteenth
Amendment (Mata v. White, C.A. No. DR-79-CA-27 (W.D. Tex.
Feb. 7, 1980)) the county, in 1981, adopted a new plan,
which provides districts of relatively equal population.

---

Defendant's Exhibit #                                          DE-005623

USA_00012690

- 2 -

Our analysis of the submitted plan indicates that
its likely effect will be to dilute the voting strength of
Mexican-American residents of Uvalde County.  Our research
indicates that polarized voting between Anglos and Mexican-
Americans exists.  Under the proposed plan Mexican-American
voters will be able to elect a candidate of their choice
to the commissioners' court in only one district, although
Mexican-Americans now constitute a majority of the county's
population.  It would appear, also, that the plan unnecessarily
fragments the Mexican-American community by placing an overly
large number of Hispanics into Precinct 2 and dividing the
remainder between Precincts 1 and 4, with the result that
Mexican-American voters will not have a substantial influence
on the election of commissioners in but one precinct.  More-
over, our research further indicates that a plan which
creates districts as equal in population as the adopted
plan, and creates two districts in which Mexican-Americans
would have a reasonable opportunity to elect candidates
of their choice, could have been drawn without difficulty.

Under these circumstances we are unable to conclude,
as we must under the Voting Rights Act, that the submitted plan
does not have the purpose and will not have the effect of
abridging the right to vote on account of membership in a
language minority group.  See Beer v. United States, 425
U.S. 130, 141 (1976); Wilkes County v. United States, 450
F. Supp. 1168, 1177-78 (D.D.C. 1978), affirmed 439 U.S. 999
(1978); Georgia v. United States, 411 U.S. 538 (1973).
Accordingly, on behalf of the Attorney General, I must inter-
pose an objection to the redistricting plan.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory judg-
ment from the United States District Court for the District
of Columbia that this change neither has the purpose nor
will have the effect of denying or abridging the right to
vote on account of race, color, or membership in a language
minority group.  In addition, the Procedures for the Adminis-
tration of Section 5 (Section 51.44, 46 Fed. Reg. 878)
permit you to request the Attorney General to reconsider
the objection.  However, until the objection is withdrawn
or the judgment from the District of Columbia court is
obtained, the effect of the objection of the Attorney
General is to make the 1981 plan legally unenforceable.

USA_00012691

- 3 -

Because of the pending litigation concerning the districting of the commissioners precincts of Uvalde County, <u>Mata</u> v. <u>White</u>, <u>supra</u>, I am taking the liberty of providing a copy of this letter to the court and to counsel for the plaintiffs.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

cc:  Dorwin W. Suttle
     United States District Judge

     Jose Garza, Esq.

     Jerry White
     Uvalde County Judge

Defendant's Exhibit #                                      DE-005625

USA_00012692



U.S. Department ⸱ Justice

Civil Rights Division

*Office of the Assistant Attorney General*                     *Washington, D.C. 20530*

18 FEB 1982

Jeffrey A. Davis, Esq.
Reynolds, Allen, Cook,
  Pannill & Hooper
1100 Milam Building, 16th Floor
Houston, Texas  77002

Dear Mr. Davis:

        This is in reference to the redistricting of the
commissioners precincts of Uvalde County, Texas, sub-
mitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  Your submission was received on February 4, 1982.
As pointed out in your submission, the fact that there is
pending litigation, a hold over of incumbent commissioners
and the need to prepare for the May 1, 1982 election, all
require an expedited review of this submission.  The
analysis which follows is therefore based on the facts
presently available to us.  We are prepared, of course,
to consider any supplemental information you may wish to
provide.

        We have made a careful analysis of the information
that you have provided, the events surrounding the
enactment of the change, the information in our files
with respect to prior plans and elections in Uvalde County,
and comments and information provided by other interested
parties.  On the basis of that analysis, we are unable to
conclude that the new plan for the redistricting of
commissioners precincts does not have a discriminatory
purpose or effect.

        Our review of this matter shows that Uvalde County,
like other Texas counties, is divided into four commissioners
precincts which are required, under the Fourteenth Amendment,
to be equalized in population following decennial censuses.
According to the 1980 census, the population of Uvalde County
is 22,441, of whom Mexican-Americans constitute 55.5 percent.
Because the plan previously in use had been held in violation
of the one-person, one-vote requirement of the Fourteenth
Amendment (Mata v. White, C.A. No. DR-79-CA-27 (W.D. Tex.
Feb. 7, 1980)) the county, in 1981, adopted a new plan, which
provided for districts of relatively equal population.  The
1981 plan was submitted for preclearance pursuant to Section 5
of the Voting Rights Act and on January 22, 1982, a timely
objection was interposed.

Defendant's Exhibit #                                    DE-005626

- 2 -

As with the previous plans, our analysis of the current plan under submission indicates that its inevitable effect will be to dilute the voting strength of Mexican-American residents of Uvalde County. For instance, our review shows that this plan, as did the 1981 plan, unnecessarily fragments the Mexican-American community by placing a large number of Mexican-Americans in Precinct 2, while dividing the remaining Mexican-American concentration in the City of Uvalde between Precincts 1 and 4. The plan accomplishes this result through the use of a strange hour-glass configuration for which the county has presented no explanation reflecting a legitimate state interest.

This fragmentation has the effect of minimizing the potential voting strength of the Mexican-American citizens of Uvalde County. Under the proposed plan Mexican-Americans stand a clear chance of electing a candidate of their choice to the commissioners court in only one precinct, although they constitute a majority of the county's population. In this regard, while we note the county's representation that proposed Precinct 4 is 65% Mexican-American, our analysis of the census data indicates that the percentage is well below that figure. We are particularly concerned about this discrepancy because applying the stated percentages accompanying your latest submission to the percent populations provided result in between 500 to 600 more Mexican-Americans in the county than established by the census count. Without a clarification of these inconsistencies, we are unable to preclear the current submission. As stated in the January 22, 1982, letter of objection, our research indicates that a logically formulated plan, including districts which meet one-person, one-vote standards, and two districts in which Mexican-Americans would have a reasonable opportunity to elect candidates of their choice, can be drawn without difficulty.

Under these circumstances we are unable to conclude as we must under the Voting Rights Act, that the submitted plan does not have the purpose and will not have the effect of abridging the right to vote on account of membership in a language minority group. See Beer v. United States, 425 U.S. 130, 141 (1976); Wilkes County v. United States, 450 F. Supp. 1168, 1177-78 (D. D.C. 1978), affirmed 439 U.S. 999 (1978); Georgia v. United States, 411 U.S. 538 (1973). Accordingly, on behalf of the Attorney General, I must interpose an objection to the redistricting plan.

USA_00012694

- 3 -

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the United States District Court for the
District of Columbia that this change neither has the
purpose nor will have the effect of denying or abridging
the right to vote on account of race, color, or membership
in a language minority group.  In addition, the Procedures
for the Administration of Section 5 (Section 51.44, 46
Fed. Reg. 878) permit you to request the Attorney General
to reconsider the objection.  However, until the objection
is withdrawn or the judgment from the District of Columbia
court is obtained, the effect of the objection of the
Attorney General is to make the 1981 plan legally unenforce-
able.

Because of the pending litigation concerning the
districting of the commissioners precincts of Uvalde County,
Mata v. White, supra, I am taking the liberty of providing
a copy of this letter to the court and to counsel for the
plaintiffs.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

cc:   Fred Shannon
      United States District Judge

      Jose Garza, Esq.

      Jerry White
      Uvalde County Judge



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*    *Washington, D.C. 20530*

November 18, 1985

Honorable J. F. Brandon
Lynn County Judge
P. O. Box 1256
Tahoka, Texas  79373

Dear Judge Brandon:

This refers to the redistricting of justice of the peace and constable precincts and the reduction in the number of justices of the peace and constables from five to two in Lynn County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received your response to our request for additional information on September 18, 1985.

We have considered carefully the materials you have provided, as well as information and comments from other interested parties. At the outset, we note that the current plan provides for one district in which minority group members comprise a 57 percent majority, and that the minority population of Lynn County is situated in such a way that a variety of fairly drawn plans would allow the retention or enhancement of that majority. However, when the proposed plan is analyzed with 1980 Census data, the highest combined minority percentage in any district is 51 percent, and both districts have clear white voting age majorities. These facts indicate at least initially that the proposed districting plan would have a retrogressive effect on minority voting strength.

In order to examine further the purpose and effect of the proposed changes, we requested specific additional information, including election returns for all contests within the county which have involved minority candidates, current

Defendant's Exhibit #                                    DE-005629

- 2 -

voter registration data, and maps showing the location of the county's minority population concentrations so that we could judge their treatment by the proposed districting.  To date, much of this information which would enable us to reach a reasoned decision has not been furnished and some of that which has been supplied is not consistent with other information available to us.  For example, the population statistics you have provided for the existing districts are, without explanation, significantly different from the statistics provided in connection with our earlier review of those districts when they were adopted in 1982.  Thus, while the data used in the plan submitted show whites as constituting only 40 percent of the county's population, the earlier submitted statistics, as well as Census data, show that whites constitute over 58 percent of the county's population, a difference that is not satisfactorily accounted for or explained in the submitted plan.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.39(e)).  Based on the circumstances discussed above, and in light of evidence of racial bloc voting in local elections and the absence of evidence of an effective opportunity for minority participation in designing the districting plan, we are unable to conclude that the county's burden has been met in this instance.  Accordingly, I must, on behalf of the Attorney General, interpose an objection to the proposed districting plan.

With regard to the reduction in the number of justices of the peace and constables, this change does not appear on its face to be objectionable.  However, it would be inappropriate to preclear such a change in the absence of a nondiscriminatory districting system for its implementation and, for that reason, an objection also is being interposed to that change pending the county's adoption of a districting plan that meets Section 5 requirements.

- 3 -

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the United States District Court for the
District of Columbia that these changes have neither the
purpose nor will have the effect of denying or abridging
the right to vote on account of race, color, or membership
in a language minority group.  In addition, Section 51.44
of the guidelines permits you to request that the Attorney
General reconsider the objections.  However, until the
objections are withdrawn or a judgment from the District of
Columbia Court is obtained, the effect of the objections by
the Attorney General is to make the redistricting and reduc-
tion legally unenforceable.  28 C.F.R. 51.9.

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of
the course of action Lynn County plans to take with respect
to this matter.  If you have any questions, feel free to call
John K. Tanner (202-724-8388), Attorney/Reviewer of the
Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

September 26, 1988

Ann Clarke Snell, Esq.
Bickerstaff, Heath & Smiley
San Jacinto Center, Suite 1800
98 San Jacinto Boulevard
Austin, Texas  78701-4039

Dear Ms. Snell:

This refers to the reduction in the number of justice of the peace and constable precincts from five to one in Lynn County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received the information to complete your submission on July 26, 1988.

We have considered carefully the information you have provided, as well as information from other interested parties and from the Section 5 submissions of prior redistricting plans in 1982 and 1985 for justice of the peace ("JP") precincts in Lynn County. As you know, on November 18, 1985, the Attorney General interposed an objection to the county's proposal to reduce the number of JP precincts from five to two and the associated redistricting plan. In that letter, we noted what appeared to be a pattern of racially polarized voting in local elections and, in that context, the changes appeared to have a retrogressive effect on the opportunity of minority citizens to participate in the political process.  We also noted that much of the information we had requested to enable us to reach a more informed decision had not been furnished and that some of that which had been provided was inconsistent with other information available to us.  Finally, we shared with you our observation that the reduction in the number of JP precincts did not appear on its face to be objectionable, but that an objection was necessary in the context of the implementing districting plan which was retrogressive to minority voting strength in the county.

Defendant's Exhibit #                                      DE-005632

USA_00012699

- 2 -

        The county now proposes to adopt a single, countywide JP
precinct.  In so doing, the county has not sought to provide any of
the information which we explained was lacking in the prior
submission nor has the county clarified any of the inconsistencies
which handicapped our prior review.  However, on the basis of the
information available to us it appears that the new plan will not
only continue but increase the retrogression which led to the 1985
objection.  Also, we find particularly relevant the fact that, as
with the 1985 plan, minority citizens were not allowed the
opportunity to participate in the process leading to the adoption of
the present proposal.

        Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has no
discriminatory purpose or effect.  See <u>Georgia</u> v. <u>United States</u>, 411
U.S. 526 (1973); see also the Procedures for the Administration of
Section 5 (28 C.F.R. 51.52).  In light of the considerations
discussed above, I cannot conclude, as I must under the Voting
Rights Act, that that burden has been sustained in this instance.
Therefore, on behalf of the Attorney General, I must object to the
proposed reduction in the number of justice of the peace and
constable precincts from five to one.

        In interposing this objection we wish to reiterate that a
reduction in the number of JP precincts, if implemented by a fairly
drawn, nondiscriminatory districting plan, should encounter no
difficulty satisfying Section 5 preclearance standards.  In that
regard, we note that the state constitution (art. 5, sec. 18)
continues to provide Lynn County the authority "from time to time,
for the convenience of the people, . . . [to] divide[ the county]
into not more than four precincts."

        Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that the
instant changes have neither the purpose nor will have the effect of
denying or abridging the right to vote on account of race, color, or
membership in a language minority group.  In addition, Section 51.45
of the guidelines permits you to request that the Attorney General
reconsider the objection.  However, until the objection is withdrawn
or a judgment from the District of Columbia Court is obtained, the
effect of the objection by the Attorney General is to make the
proposed reduction legally unenforceable.  28 C.F.R. 51.10.

- 3 -

          To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action the county plans to take with respect to this matter.  If you
have any questions, feel free to call Mark A. Posner (202-724-8388),
an attorney in the Voting Section.

                         Sincerely,

                         James P. Turner
                    Acting Assistant Attorney General
                         Civil Rights Division

Defendant's Exhibit #                           DE-005634

U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C 20530*

OCT 1 4 1986

Dr. William J. Campion
President, Trinity Valley Community
  College District
500 South Prairieville Street
Athens, Texas  75751

Dear Dr. Campion:

       This refers to the February 3, 1986, redistricting
plan, the appointment of a board member to fill a vacancy in
District 4, and a decrease in the length of the terms of two
board members for the Trinity Valley Community College District
(formerly known as the Henderson County Junior College District)
in Anderson, Henderson, Hunt, Kaufman, and Van Zandt Counties,
Texas, submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.
We received the information to complete your submission on
August 12, 1986.

       We have considered carefully the information you have
provided as well as information received from other interested
parties.  At the outset, we note that according to the 1980
Census the proposed redistricting plan is significantly malap-
portioned, with a top-to-bottom deviation of approximately
49 percent.  The district with the largest minority population
(District 6, 43% black) is overpopulated by approximately 31
percent.  We understand that this malapportionment resulted
from using registration (rather than population) data as the
basis for the apportionment; however, it is now well established
that registration data may validly be used only where it
produces a plan "not substantially different from that which
would have resulted from the use of a permissible population
basis." Burns v. Richardson, 384 U.S. 73, 93 (1966).  Of
particular relevance to our review is the observation that,
had the college district prepared a properly apportioned plan
otherwise using its stated criteria, District 6 would have
been majority black rather than minority black as consti-
tuted in the proposed plan.  This consequence is highly
significant given the racially polarized voting which exists
in the Terrell area, where District 6 is located.

Defendant's Exhibit #                                    DE-005635

-2-

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.39(e)).  In light of the considerations discussed above and other relevant circumstances, including those surrounding the process that led to the adoption of the plan, I cannot conclude, as I must under the Voting Rights Act, that the college district has carried its burden in this instance of showing the absence of a discriminatory purpose.  Therefore, on behalf of the Attorney General, I must object to the redistricting plan submitted by the Trinity Valley Community College District.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the redistricting plan legally unenforceable.  28 C.F.R. 51.9.

In view of the foregoing objection, it would not be appropriate to reach a determination on the two related changes submitted with the redistricting plan.  28 C.F.R. 51.20(b).

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the Trinity Valley Community College District plans to take with respect to this matter.  If you have any questions, feel free to call Mark A. Posner (202-724-8388), Attorney/Reviewer in the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                    DE-005636



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*　　　　*Washington, D.C. 20530*

April 18, 1988

David Ryan, Esq.
Henslee, Ryan & Grace
3432 Greystone Drive
Suite 200
Austin, Texas  78731

Dear Mr. Ryan:

This refers to the change in method of election from at
large to four single-member districts and three at-large
positions (without numbered positions), the districting plan, a
majority vote requirement for trustees elected from districts,
the implementation schedule, candidate qualifications, and the
consolidation of seven polling places for the Marshall
Independent School District in Harrison County, Texas, submitted
to the Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received the
information to complete your submission on March 29, 1988.

We have considered carefully the information you provided,
as well as information from other interested parties and from the
1980 Census.  Our analysis of the 1980 Census data indicates that
the minority population figures for the proposed districts
provided in your submission mistakenly include a double-count of
Hispanic residents.  In addition, the figures furnished for each
of the districts show that the black population totals include
Hispanics and others, even though there is no indication that
these other minority residents ally themselves with blacks in
school board elections.  Thus, it would appear that, from the
standpoint of the black non-Hispanic population, the proposed
plan contains but a single majority black district, and that one
at only 54.9 percent black.  This contrasts significantly with
the 57 percent and 55.7 percent "minority" populations for two
districts as set forth in the information provided with the
submission.

In this regard, we find it particularly noteworthy that the
black community apparently has been seeking for many years to
have the school district adopt single-member districts.  It
appears that the school district resisted these efforts while, at
the same time, blacks consistently were defeated in contested
school board elections.  In fact, during the course of these
events the Attorney General found it necessary in 1976 to
interpose an objection to the school board's effort to impose a

USA_00012704

- 2 -

majority vote requirement which had the potential for making it
even more difficult for blacks to elect candidates of their
choice.  Racially polarized voting appears to characterize school
board elections in the Marshall Independent School District and
the school district so stipulated during the course of this
submission.  Under such circumstances, then, a serious question
is raised as to whether the submitted plan affords the black
constituency an equal opportunity to participate in the electoral
process and to elect candidates of their choice to office.

With respect to the consolidation of polling places, a
similar concern is raised since it appears that such a
consolidation would make it more difficult for many black voters
to participate in school board elections.  While we recognize
that there is a valid interest in eliminating election day
problems engendered by the school district and the city holding
elections on the same day at different polling locations, it
appears that the school district had available to it alternatives
which would have been not nearly so restrictive on polling place
accessibility as the one adopted.  That choice is particularly
troubling when it is noted that the consolidation does not
resolve the problem of voters having to vote at more than one
polling place on election day and that no input on this important
matter was sought from the minority community.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
no discriminatory purpose or effect.  See Georgia v. United
States, 411 U.S. 526 (1973); see also the Procedures for the
Administration of Section 5 (28 C.F.R. 51.39(e)).  In light of
the considerations discussed above, I cannot conclude, as I must
under the Voting Rights Act, that that burden has been sustained
in this instance.  Therefore, on behalf of the Attorney General,
I must object to the change in the method of election as
implemented by the instant districting plan, and to the polling
place consolidation.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
these changes have neither the purpose nor will have the effect
of denying or abridging the right to vote on account of race,
color, or membership in a language minority group.  In addition,
Section 51.45 of the guidelines permits you to request that the
Attorney General reconsider the objection.  However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the effect of the objection by the
Attorney General is to make the change in method of election as
implemented by the submitted districting plan and the consoli-
dation of polling places legally unenforceable.  28 C.F.R. 51.10.

- 3 -

With regard to the candidate qualifications and the
implementation schedule, we are unable to make a determination at
this time since these changes are dependent upon the changes to
which an objection is being interposed.  See 28 C.F.R. 51.22(b).

To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action Marshall Independent School District plans to take with
respect to this matter.  If you have any questions, feel free to
call Mark A. Posner (202-724-8388), Deputy Director of the
Section 5 Unit of the Voting Section.

Sincerely,


Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

James P. Allison, Esq.
Allison & Associates                    **JUN 1 4 1988**
815 Brazos, Suite 204
Austin, Texas 78701

Dear Mr. Allison:

        This refers to the reduction in the number of justice of
the peace and constable precincts, and the redistricting of such
precincts in San Patricio County, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C.1973c.  We received the information
to complete your submission on April 15, 1988.  Although we noted
your request for expedited consideration, we have been unable to
respond until this time.

        We have considered carefully the information you have
provided, as well as comments and information received from other
interested parties.  At the outset, we note that almost half the
county's population is Hispanic, and that the western and north-
central portions of the county are predominantly Hispanic.  Under
the existing justice of the peace election system, four justice
of the peace ("J.P.") districts are located in these
predominantly Hispanic areas of the county while two such
districts are located in the eastern portion of the county which
is predominantly Anglo.  Under the proposed system, the existing
six districts would be reduced to four in that the four
districts now existing in the predominantly Hispanic areas of the
county would be consolidated into two districts.  Thus, two
justice of the peace positions (and two constable positions)
would be eliminated and, given the pattern of polarized voting
which appears to exist in the county, the opportunity presently
enjoyed by Hispanics for electing candidates of their choice to
the office of justice of the peace (and constable) would be
significantly diminished, leading to a retrogression in their

Defendant's Exhibit #                    DE-005640

- 2 -

ability to elect candidates of their choice to these offices. See _Beer_ v. _United States_, 425 U.S. 130 (1976).  We find this conclusion inescapable even though we recognize that the plan proposed for implementing this new districting concept is identical to the plan for the commissioners court which previously was granted Section 5 preclearance in a different context.

We have duly noted the county's explanation that these changes were adopted to equalize the workloads of the justices of the peace and to reduce the cost of operating the county's J.P. system.  While these generally would appear to be appropriate concerns for the county to consider in evaluating the need for judicial-type offices of this nature, our information is that the commissioners made no comparative study of the workloads or the economic status of the J.P. offices before adopting the changes. As we understand it, they did not consult the J.P. reports (although such reports apparently were readily available) which would have informed them of the workload actually being handled by each justice and the revenue being returned to the county by each J.P. office.  As a consequence, it appears that the proposed changes would in fact assign a substantial amount of additional work to the two J.P. offices (both located in the predominantly Hispanic area of the county) which already are the busiest while making no change with respect to the J.P. office (located in an Anglo majority district) which appears to have the least amount of work (and produces the smallest amount of revenue).

We also are not unmindful of the procedural concerns that attach to these changes.  Thus, we understand that the commissioners at first sought to adopt these changes (at the July 13, 1987, meeting) without notifying or seeking any input from the affected justices of the peace or the affected communities.  Indeed, the agenda notice for the July 13th meeting indicated only that minor changes were slated for adoption to realign the J.P. districts with election precinct boundaries (though no such change was proposed or needed for the J.P. districts located in the predominantly Hispanic portions of the county), and we understand that the county attorney subsequently advised that the agenda notice violated the Texas Open Meetings Act.  One reason advanced at the meeting for approaching this issue in this manner was that the changes should be adopted promptly to avoid having members of the affected communities

Defendant's Exhibit #

DE-005641

USA_00012708

- 3 -

present to oppose them.  When, after the July 13th meeting,
Hispanic residents of the county did express strong opposition to
the changes, this led simply to a pro forma reconsideration of
the prior action with no change in result.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
no discriminatory purpose or effect.  See Georgia v. United
States, 411 U.S. 526 (1973); see also the Procedures for the
Administration of Section 5 (28 C.F.R. 51.52(c)).  In light of the
considerations discussed above, I cannot conclude, as I must
under the Voting Rights Act, that that burden has been sustained
in this instance.  Therefore, on behalf of the Attorney General,
I must object to the reduction in the number of justice of the
peace and constable precincts and the districting plan adopted
for its implementation.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
these changes have neither the purpose nor will have the effect
of denying or abridging the right to vote on account of race,
color, or membership in a language minority group.  In addition,
Section 51.45 of the guidelines permits you to request that the
Attorney General reconsider the objection.  However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the effect of the objection by the
Attorney General is to make the submitted changes legally
unenforceable.  28 C.F.R. 51.10.

To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action San Patricio County plans to take with respect to this
matter.  If you have any questions, feel free to call Mark A.
Posner (202-724-8388), Deputy Director of the Section 5 Unit of
the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                        DE-005642



**U.S. Department of Justice**

**Civil Rights Division**

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

May 8, 1989

Dr. Ben Colwell
Superintendent, Refugio Independent
· School District
P. O. Drawer 190
Refugio, Texas  78377

Dear Dr. Colwell:

This refers to the change in method of election from seven
trustees elected at large (with numbered posts and plurality win)
to five single-member districts and two at-large positions
(plurality win), the districting plan, an implementation schedule
which includes staggered terms for the two at-large seats, an
annexation, and the selection of two polling places for the
Refugio Independent School District in Refugio County, Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We
received the information to complete your submissions on March 7,
1989.

The Attorney General does not interpose any objection to
the annexation.  However, we feel a responsibility to point out
that Section 5 of the Voting Rights Act expressly provides that
the failure of the Attorney General to object does not bar any
subsequent judicial action to enjoin the enforcement of such
change.  See the Procedures for the Administration of Section 5
(28 C.F.R. 51.41).

With regard to the remaining changes, we have given
careful consideration to the materials you have provided, as well
as information and comments from other interested parties.  At
the outset, we note that while the change in the method of
electing the city council will provide minority voters with a
greater opportunity to participate in the political process than
under the current method, some of the information you have
provided has been conflicting, and important elements of this

- 2 -

information remain incomplete.  For example, your submission includes population by race and ethnicity on a block-by-block basis for some areas of the city, while for other areas the figures are essentially estimates, the reliability of which is open to serious question.  It has been alleged, and the information available to us tends to confirm, that the proposed districting plan overconcentrates or "packs" minority voters into District 1, while a significant proportion of the remaining minority population is divided between Districts 3 and 4.  In view of the apparent pattern of polarized voting in school district elections, it appears that this packing and fragmentation of the minority community denies Hispanic and black voters an equal opportunity to participate in the political process and elect candidates of their choice to office.

Our review also has revealed information to support the allegation that the mixed "5-2" system of district and at-large seats was selected over the seven single-member district system preferred by minority citizens so as to avoid the potential for fair minority representation in three majority-minority districts.  In addition, the selection of staggered terms for the at-large seats would preclude minority voters from using the election device of single-shot voting and thus further limits the opportunity of minority voters to participate in the political process.  Finally, we note that the polling places appear to have been chosen to benefit the white community and disadvantage minority voters, many of whom live a great distance from the proposed polling sites.  We have received no adequate nonracial explanation for these decisions which appear to be the product of a decisionmaking process in which minority citizens did not have the opportunity to effectively participate.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52. In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the burden of showing the absence of a proscribed purpose has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the submitted changes, with the exception of the annexation, as noted above.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect

- 3 -

of denying or abridging the right to vote on account of race,
color, or membership in a language minority group.  In addition,
Section 51.45 of the guidelines permits you to request that the
Attorney General reconsider the objection.  However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the effect of the objection by the
Attorney General is to make the submitted changes legally
unenforceable.  28 C.F.R. 51.10.

        Lastly, we note that the school district has yet to seek
review under Section 5 of its bilingual procedures though we
requested that the district seek Section 5 clearance over five
months ago, in our November 28, 1988, letter to you.  We
understand that the district is in the process of gathering the
information necessary to make a Section 5 submission and, in view
of the time that has passed, we would expect that such a
submission should be forthcoming immediately.  We would be happy
to provide whatever assistance would be appropriate in this
regard.

        To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action the Refugio Independent School District plans to take with
respect to this matter.  If you have any questions, feel free to
call Sandra S. Coleman (202-724-6718), Deputy Chief of the Voting
Section.

                        Sincerely,

                        James P. Turner
                Acting Assistant Attorney General
                        Civil Rights Division

Defendant's Exhibit #                                    DE-005645

USA_00012712



U.S. Department of Justice

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

October 27, 1989

Richard D. Cullen, Esq.
Cullen, Carsner, Seerden & Cullen
P. O. Box 2938
Victoria, Texas  77902

Dear Mr. Cullen:

    This refers to the 1977 charter revisions, which provide for
an increase in compensation for the mayor and councilmembers; the
change in the method of election from five at large, with
numbered posts and majority vote, to four single-member districts
and three at large, all by plurality vote for regular two-year
terms; the districting plan; the increase in the number of
councilmembers from five to seven; the provision that the two
nonmayoral at-large members will be elected for concurrent terms;
the implementation schedule, including the temporary increase in
the term of mayor and a change in staggering of terms from 3-2
to 4-3; the elimination of numbered posts and the related change
in ballot format; a polling place change; a precinct realignment
and the establishment of an additional precinct and the polling
place therefor; the candidate qualification residency
requirement; and the repeal of the candidate qualification
requirement in Article III, Section 3.02(a)(3) of the charter,
for the City of Cuero in DeWitt County, Texas, submitted to the
Attorney General on January 30, 1989, pursuant to Section 5 of
the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.
We received the information to complete your submission on
August 28, 1989.

    The Attorney General does not interpose any objections to
the 1977 charter amendments, the polling place change, the
precinct realignment, the establishment of an additional precinct
and a polling place therefor, and the repeal of the candidate
qualification requirement in Article III, Section 3.02(a)(3) of
the city charter.  However, we feel a responsibility to point out
that Section 5 of the Voting Rights Act expressly provides that
the failure of the Attorney General to object does not bar any
subsequent judicial action to enjoin the enforcement of such
changes.  See the Procedures for the Administration of Section 5
(28 C.F.R. 51.41).

  cc:  Public File

Defendant's Exhibit #                                    DE-005646

- 2 -

With regard to the remaining changes, we have considered carefully the information and materials you have supplied, along with information from other interested parties and the Bureau of the Census.  At the outset, we note that even though minority residents constitute 47 percent of the city's total population, no minority member presently is among those elected to the council and at no time in the past has the city council included more than one minority member, circumstances that appear to be due largely to the combination of the existing at-large structure with a pattern of racially polarized voting in municipal elections.  We further note that the process leading to adoption of the proposed changes was the result of litigation by minority citizens challenging the city's existing at-large election system under Section 2 of the Voting Rights Act and that those plaintiffs are strongly opposed to the manner in which the new council is to be elected, including the use of any at-large positions other than the mayor.

We see no basis for interposing an objection to the proposed use of two at-large seats in the new council.  The features most often associated with minimizing minority representation -- numbered posts and majority vote -- have been eliminated. However, we cannot reach a similar conclusion with respect to the districts selected for the new plan.  According to our information, a last minute change was made to modify the districts to place a white incumbent in one of the predominately minority districts.  This change reduced the minority proportion in this district from 65.2 to 60.7 percent.  The modification of districts solely to protect the interests of a white incumbent raises serious questions under the Act.  See Ketchum v. Byrne, 740 F.2d 1398, 1408 (7th Cir. 1984).

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52(c)).  In satisfying its burden, the submitting authority must demonstrate that the proposed changes are not tainted, even in part, by an invidious racial purpose; it is insufficient simply to establish that there are some legitimate, nondiscriminatory reasons for the voting changes.  See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-66 (1977); City of Rome v. United States, 422 U.S. 156, 172 (1980); Busbee v. Smith, 549 F. Supp. 494, 516-17 (D.D.C. 1982), aff'd 459 U.S. 1166 (1983).  In light of the circumstances discussed above, I cannot conclude, as I must under the Voting Rights Act, that the city has sustained its burden in this instance.  Therefore, on behalf of the Attorney General, I must object to the districting plan proposed by the City of Cuero for implementing its proposed 4-2-1 election method.

Defendant's Exhibit #

DE-005647

USA_00012714

- 3 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.  In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgement from the District of Columbia Court is obtained, the method of election changes and districting plan remain legally unenforceable.  28 C.F.R. 51.10.

Because the proposed implementation schedule has been established to implement the objected-to changes, the Attorney General is unable to make a determination with regard to it.  See 28 C.F.R. 51.35.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of Cuero plans to take with respect to these matters.  If you have any questions, feel free to call Ms. Lora Tredway (202-724-8290), an attorney in the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

**MAY  6 1991**

Analeslie Muncy, Esq.
City Attorney
1500 Marilla, 7-B North
Dallas, Texas  75201

Dear Ms. Muncy:

This refers to proposed amendments to the municipal charter
of the City of Dallas which provide for an increase in the size
of the city council from eleven to fifteen members; a change in
the method of election for council members and mayor from
election from eight single-member districts and three at-large
seats, including the mayor, for concurrent terms by majority
vote, to a 10-4-1 election system, which includes ten single-
member local districts, four single-member regional quadrant
districts, and the mayor at large for concurrent terms by
majority vote; a change from a two-year to a four-year term for
mayor; a decrease in the number of consecutive terms for the
mayor; the changes in the definition of term in order to
determine the number of consecutive terms served for mayor; the
changes in the definition of term to determine the number of
consecutive terms for non-mayoral councilmembers; the change in
the effective date for new terms of office for mayor and council;
the changes in candidate qualification (Chapter IV, Section 6);
the alteration in ballot language to implement the proposed
10-4-1 method of election (Chapter IV, Section 8); the changes in
the powers and duties of the mayor and council pursuant to
Chapter III, Section 2; Chapter XVI, Section 1; Chapter XVII,
Section 2; and Chapter XXIV, Section 13; and the 1991
redistricting plan for the 10-4-1 election system for the City of
Dallas in Collin, Dallas, Denton, Kaufman, and Rockwall Counties,
Texas, submitted to the Attorney General pursuant to Section 5 of
the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We
received your last submittal of information necessary to review
these matters on May 3, 1991.

We have carefully reviewed the information you have
provided, along with information available to us from related
Section 5 submissions, the Bureau of the Census, and other
interested parties.  At the outset, we note that 1990 Census data
reflect a significant increase in the city's Hispanic proportion

Defendant's Exhibit #                                        DE-005649

- 2 -

of total population and that black and Hispanic residents now
constitute 50 percent of the city's total population.  We also
note that the federal district court has found that the existing
8-3 election method for the city council violates Section 2 of
the Voting Rights Act and has ordered new elections as soon as
possible under a plan that will "remedy the adverse effects of
the 8-3 system -- the denial of equal access to the City's
political process -- which African[-Americans] and Mexican-
Americans have suffered in Dallas, for some 10-15 years."
Williams v. City of Dallas, 734 F. Supp. 1317, 1412 (N.D. Tex.
1990) (liability); No. 3-88-1152-R (N.D. Tex.) (Feb. 1, 4, 5, and
27, 1991) (remedy); 59 U.S.L.W. 3672 (U.S. Apr. 2, 1991) (No.
A-716), denying application to vacate stay from No. 91-1178 (5th
Cir. Mar. 15, 1991) (order staying remedial orders).  In its most
recent order the court of appeals deferred a review of the merits
of the appeal in order to provide a "reasonable time" for the
Justice Department to review a submission of a change in the
method of election and a redistricting plan proposed by the city.

     Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of demonstrating that a proposed change
does not have a racially discriminatory purpose or effect.
Georgia v. United States, 411 U.S. 526 (1973).  In addition,
where, as here, an existing election system has been held by the
court to be in violation of the Voting Rights Act, the affected
jurisdiction not only bears the burden of demonstrating that the
proposed plan is free of the proscribed purpose and effect, but
also the plan must remedy the dilution found by the court to
exist.  See S. Rep. No. 417, 97th Cong., 2d Sess. 31 (1982).  See
also Dillard v. Crenshaw County, 831 F.2d 246, 249 (11th Cir.
1987); Edge v. Sumter County Sch. Dist., 775 F.2d 1509, 1510
(11th Cir. 1985).  The proposed 10-4-1 election method now before
us for review under Section 5 is the city's proposal to remedy
the violation found by the Williams court.

     In addressing these matters, the city has presented to us
alternative proposals consisting of one component of four
quadrant districts [4C] and two alternative components for the
ten local districts [10F(3) and 10I(1)].  You have explained that
the city council has formally adopted both ten-district
components and that while 10F(3) initially was the city's
preferred plan, the city now considers 10I(1) to be its preferred
ten-district plan.  The city maintains that its proposed
electoral system and the redistricting plan have no racially
discriminatory purpose or effect and provide minority voters with
an equal opportunity to participate and elect their chosen
candidates.  Concerns have been raised, however, that under the
proposed "10-4-1" system it is not possible to devise a plan in
which minority voters will be afforded the same opportunity as
white voters to elect their preferred candidates to the city
council.  Our review of the alternatives currently under
submission to us lends some credence to those concerns.

Defendant's Exhibit #                                    DE-005650

USA_00012717