- 3 -

We have carefully analyzed population and registered voter data for each of the proposals, as well as citizenship data, election returns, and statistical analyses by the city's experts and others. We note that the city has acknowledged that there was virtually no minority input in the development and selection of any of the redistricting proposals submitted for our review. Furthermore, with regard to the quadrant component, the information available to us suggests that these regional districts are, in many respects, the functional equivalent of the at-large council positions that have been found to be racially discriminatory, and we are not persuaded that the quadrant districts, as submitted, remedy the dilution occasioned by at-large elections in Dallas.

With regard to the opportunities for both black and Hispanic voters under the ten-district components, it appears that neither of the proposals is designed to afford equal opportunity to minority voters. For example, in both the 10F(3) and the 10I(1) plans, it appears that neither of the two districts that the city offers as providing an opportunity for Hispanic voters actually would accomplish that goal. In both plans, it appears that Hispanics are less than 45 percent of the citizen voting-age population in each of the two districts. Furthermore, those districts are drawn in a way that unnecessarily merges concentrations of Hispanic and white voters, particularly in 10F(3) District A and 10I(1) District B, where the white voter group is one with particularly high registration and turnout rates. The proposed ten-district plans also merge concentrations of black and white voters in some areas where the white voter group historically has been antipathetic to black persons. In addition, the unnecessary fragmentation of black neighborhoods in 10F(3) between Districts B, C, and F, and in 10I(1) between Districts E and F would appear to minimize black voting strength.

We further note the city's recognition that under both of the two adopted ten-district proposals as well as under the quadrant component, the opportunities for Hispanic voters are not expected to be fully realized until the mid-1990s at the earliest, notwithstanding the concerns of the Hispanic community and the conclusion by the Williams court that Hispanic voters be able to elect candidates of their choice to the council as soon as possible.

In sum, the city maintains that the proposed electoral system will provide seven districts that allow minority voters to participate equally in the electoral process and to elect candidates of their choice to office. In our view, however, the city has not demonstrated that the proposal now before us provides black and Hispanic voters with a realistic opportunity to elect candidates of their choice to the city council in any of

USA_00012718

- 4 -

the quadrant districts as proposed to be drawn or in any more than three of the ten local districts.

With regard to the proposal to amend candidate qualifications so that a term of 366 days, rather than two full years, will be counted in determining the limitation on consecutive terms for a non-mayoral councilmember, the information available to us demonstrates that only the two incumbent black councilmembers would be directly affected by this proposal, such that they would be ineligible to seek re-election in 1991.  Further, the information available to us indicates that the change was proposed for this purpose and that the city rejected an alternative that would have applied this change prospectively, rather than retroactively.

In light of the information presently available to us, therefore, and under the circumstances discussed above, I cannot conclude, as I must under the Voting Rights Act, that the city's burden has been sustained in this instance with regard to either of the 10-4-1 proposals now before us or the proposed changes in the manner of counting consecutive terms to determine non-mayoral candidate eligibility.  In addition, it does not appear that either of the current proposals assures to the affected minority group members the equality of opportunity necessary to remedy the Section 2 violation found to exist in the current system. Accordingly, on behalf of the Attorney General, I must object to the proposed redistricting plans and, therefore, to the proposed charter amendments establishing the 10-4-1 method of election and changing the definition of terms under the consecutive terms provisions for non-mayoral candidate eligibility.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the objected-to changes continue to be legally unenforceable.  See the Procedures for the Administration of Section 5 (28 C.F.R. 51.10 and 51.45).

The Attorney General does not interpose any objection to the increase in the size of the city council from eleven to fifteen members, the change in the effective date of term of office for mayor and council, and the changes in the powers and duties of the mayor and council pursuant to Chapter III, Section 2; Chapter XVI, Section 1; and Chapter XVII, Section 2.  However, we note that Section 5 expressly provides that the failure of the

USA_00012719

- 5 -

Attorney General to object does not bar subsequent litigation to
enjoin the enforcement of these changes.  28 C.F.R. 51.41.

The remaining changes under the proposed charter amendments
are directly related to or dependent on the change to the
proposed 10-4-1 method of election.  Accordingly, the Attorney
General is unable to make any determination under Section 5 at
this time regarding concurrent terms by majority vote for mayor
and council; a change from a two-year to a four-year term for
mayor; a decrease in the number of consecutive terms for the
mayor; the changes in the definition of term in order to
determine the number of consecutive terms served for mayor; the
changes in candidate qualification (Chapter IV, Section 6); the
alteration in ballot language to implement the proposed 10-4-1
method of election (Chapter IV, Section 8); and the changes in
the powers and duties of the mayor and council pursuant to
Chapter XXIV, Section 13.  See also 28 C.F.R. 51.22(b) and 51.35.

To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the City of
Dallas plans to take concerning these matters.  If you have any
questions, you should call Lora L. Tredway (202-307-2290), an
attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

**Civil Rights Division**

*Office of the Assistant Attorney General*               *Washington, D.C. 20530*

OCT   4 1991

Honorable John Hannah, Jr.
Secretary of State
P. O. Box 12060
Austin, Texas 78711-2060

Clarence A. West, Esq.
City Attorney
P. O. Box 1562
Houston, Texas  77251-1562

Dear Messrs. Hannah and West:

This refers to Chapter 666 (1991), which amends the
procedures for filling vacancies; and the 1991 redistricting plan
for the City of Houston in Harris, Montgomery, and Fort Bend
Counties, Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  We received your initial response to our request for
additional information on August 29, 1991, and received further
responses on several dates thereafter.

We have carefully considered the extensive information
provided by the city and the arguments ably presented by its
representatives, as well as the comments and information provided
by other individuals, including members of the city's black and
Hispanic communities.  At the outset, we note that in making the
necessary Section 5 determinations, we apply the legal rules and
precedents established by the federal courts and our published
administrative guidelines.  See, e.g., Procedures for the
Administration of Section 5 (28 C.F.R. 51.52 (a), 51.55, 51.56).
For example, we cannot preclear those portions of a plan where
the jurisdiction has deferred to the interests of incumbents
while refusing to accommodate the community of interest shared by
insular minorities.  See, e.g., <u>Garza</u> v. <u>Los Angeles County</u>, 918
F.2d 763, 771 (9th Cir. 1990), <u>cert. denied</u>, 111 S. Ct. 681
(1991); <u>Ketchum</u> v. <u>Byrne</u>, 740 F.2d 1398, 1408-09 (7th Cir. 1984),
<u>cert. denied</u>, 471 U.S. 1135 (1985).  Such concerns are frequently
related to the unnecessary fragmentation of minority communities
or the needless packing of minority constituents into a minimal
number of districts in which they can expect to elect candidates
of their choice.  See 28 C.F.R. 51.59.  We endeavor to evaluate
these issues in the context of the demographic changes which
compelled the particular jurisdiction's need to redistrict (<u>id</u>.).
Finally, our entire review is guided by the principle that the
Act insures fair election opportunities and does not require that
any jurisdiction attempt to guarantee racial or ethnic
proportional results.

USA_00012721

2

Turning to the instant submission, we note that perhaps the most striking demographic change experienced by the City of Houston in the past decade has been the dramatic increase in the Hispanic population. From 1980 to 1990, the Hispanic population grew by 60 percent, rising from 17.6 percent to 27.6 percent of the total city population. The black population percentage remained essentially unchanged while the white population percentage dropped from 52.3 to 40.6 percent.

This demographic shift, however, does not appear to have been reflected in any significant increase in the past decade in the opportunity of Hispanic voters to elect candidates of their choice to the city council. Following the city's adoption in 1979 of the current system of nine councilmembers elected from single-member districts, five elected at-large, and the mayor elected at large (the "9-5-1" system), each districting plan has included one district with an Hispanic majority and the sole Hispanic elected to the council has represented that district. As described by the city, there are a number of factors relevant to understanding this disparity between potential Hispanic voting strength and what has been realized, but, in large part, it appears to be the product of an ongoing pattern of polarized voting operating in the context of an electoral system in which only one district has an Hispanic majority.

Recently, in response to concerns voiced by the Hispanic community for greater representation on the city council, the city undertook an intensive review of its electoral system. Numerous hearings and meetings were conducted, from February through April of this year, and minority leaders testified about the underrepresentation issue. After much debate, it was agreed to propose an enlarged city council elected pursuant to a 16-6-1 system. However, the change was conditioned on approval in a referendum, and the proposal was subsequently defeated in the August 1991 citywide vote.

It was in this context that, in May and June of this year, the city council considered and adopted the proposed redistricting plan for the existing 9-5-1 structure. The city informs us that here, as well, it sought to recognize the growing Hispanic population. However, the plan continues to provide only one district in which Hispanic voters will have the opportunity to elect a candidate of their choice and fragments the remainder of the community into a number of adjoining districts.

3

In this regard, we note that several alternative plans were developed which would more fairly represent Hispanic voting strength in the city.  In particular, it was shown that by avoiding fragmentation a plan would contain two districts in which Hispanics constitute a majority of the voting age population.  While we understand that these illustrative districts were developed in the context of an alternative plan that had an unrelated deficiency, we have received no explanation for the city's decision not to present these districts for public review in a plan that properly could be implemented.

We have carefully considered the city's contentions concerning the redistricting process, the redistricting issues with which it was confronted, and the reasons stated for the choices it ultimately made.  This review indicates that, by the end of the process, it was generally recognized that a nine-district plan with two districts with Hispanic voting age population majorities would provide Hispanic voters with a substantially greater electoral opportunity than contained in the proposed plan.

We also take note that in the plan adopted to implement the 16-6-1 proposal, the city appears to have been willing to recognize the Hispanic population growth.  However, in the nine district proposal this latter goal appears to have been subordinated to a concern for protecting white incumbent councilmembers.  As noted above, while incumbency is not in and of itself an inappropriate consideration, it may not be accomplished at the expense of minority voting potential.  See, e.g., Garza, 918 F.2d at 771.

Finally, we note that another factor which seemingly limited the city's ability to fairly reflect Hispanic voting strength was the decision not to split existing county precincts.  We are aware that the plan ultimately must be implemented without such precinct splits, but it is our understanding that if such splits are necessary in order to adopt a proper plan, the county may then adjust its precincts to follow the new city district lines.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52.  In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the 1991 redistricting plan.

4

With regard to the change in the procedures for filling vacancies, the Attorney General does not interpose any objection. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the change. In addition, as authorized by Section 5, we reserve the right to reexamine this change if additional information that would otherwise require an objection comes to our attention during the remainder of the 60-day period. See 28 C.F.R. 51.41 and 51.43.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the redistricting plan continues to be legally unenforceable. Clark v. Roemer, 59 U.S.L.W. 4583 (U.S. June 3, 1991); 28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the Voting Rights Act, and in light of the impending municipal election, please inform us of the action the city plans to take concerning this matter. In this regard, we stand ready to immediately review any remedial redistricting plan adopted by the city. If you have any questions, you should call Mark A. Posner (202) 307-1388, an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

USA_00012724



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                     _Washington, D.C. 20530_

April 6, 1992

Honorable Marilyn Cox
Bailey County Judge
300 South 1st Street
Muleshoe, Texas  79347

Dear Judge Cox:

This refers to the 1991 redistricting plans for
commissioners court and justice of the peace/constable districts,
the realignment of voting precincts, and a polling place change
in Bailey County, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c.  We received your response to our
January 30, 1992, letter on February 6, 1992.

We have carefully considered the information you have
provided, as well as 1990 Census data and information from other
interested parties.  We note that between 1980 and 1990 the
Hispanic share of Bailey County's population increased from 33.9
to 38.8 percent.  Nevertheless, the Hispanic share of the
population in District 4, the only district with a Hispanic
population majority, decreases from 69.3 percent under the
existing plan to 64.2 percent under the proposed plans.

We recognize that the 1990 Census revealed that District 4
was underpopulated.  Our review of the county's demography
reveals, however, that a five percentage point reduction in the
Hispanic share of the population in District 4 was not necessary
to comply with the one person, one vote requirement of the United
States Constitution.  Moreover, in light of the existing Hispanic
registration levels in the county and District 4 in particular
and our analysis of the results of the 1990 primary election
involving an unsuccessful Hispanic candidate, the proposed plans'
reduction in the Hispanic share of the population in District 4
would appear to lessen the opportunity for Hispanics to elect
representatives of their choice.  See <u>Beer</u> v. <u>United States</u>, 425
U.S. 130 (1976).

Defendant's Exhibit #

DE-005658

- 2 -

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); Procedures for the Administration of Section 5, 28 C.F.R. 51.52. In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the 1991 redistricting plans for county commissioner and justice of the peace/constable districts.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither a discriminatory purpose nor effect. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the redistricting plans continue to be legally unenforceable. See <u>Clark</u> v. <u>Roemer</u>, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10.

Because the voting precinct realignment and polling place change are dependent upon the objected-to redistricting plans, the Attorney General will make no determination with regard to them. See 28 C.F.R. 51.22.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Bailey County plans to take concerning this matter. If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005659

USA_00012726



**U.S. Department of Justice**

**Civil Rights Division**

_____

*Office of the Assistant Attorney General*          *Washington, D.C. 20530*

Michael D. Morrison, Esq.                    **MAR 1 7 1992**
Guinn & Morrison
Baylor Law School
P.O. Box 97288
Waco, Texas 76798-7288

Dear Mr. Morrison:

     This refers to the 1991 redistricting plans for
commissioners court districts, and justice of the peace and
constable districts; a realignment of precincts; the elimination
of six voting precincts; and the establishment of three new
polling places and the elimination of nine polling places for
Calhoun County, Texas, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended, 42
U.S.C. 1973c.  We received your responses to our request for
additional information on December 23, 1991, and January 17,
1992.

     We have considered carefully the information you have
provided, as well as comments from other interested persons.  At
the outset, we noted that according to the 1990 Census, Hispanics
constitute 36 percent of the county's population and are
principally concentrated in the City of Port Lavaca, where about
three-quarters of the county's Hispanic population resides.  In
the proposed redistricting of the commissioners court districts,
as well as in the plan for justices of the peace and constables,
the Hispanic community in the city is fragmented among four
districts (we note that the two plans are identical except that
Anglo-majority District 4 in the commissioners court plan is
split into two districts in the justice/constable plan).  The
resulting plan includes one district (District 2) that is
majority Hispanic in population and voting age population (59%
and 56%, respectively), but the county's registration data
indicate that Hispanics would be a minority of the district's
registered voters.  In light of the apparent pattern of polarized
voting in county elections, there is substantial doubt that this
district will afford Hispanic voters the opportunity to elect
their preferred candidate.

- 2 -

Our review further reveals that during the redistricting process Hispanic leaders indicated that Hispanic voting strength would be more fairly represented by providing that District 1, rather than District 2, be drawn as the Hispanic majority district.   Support for this position is found in the fact that during the 1980s there was substantial Anglo growth in District 2 while the Hispanic population declined slightly, and we understand that this demographic change is continuing.   In District 1, however, the Hispanic population increased while the Anglo population decreased.   During the redistricting process, Hispanic leaders drew the county's attention to these demographic trends and the need for a somewhat larger Hispanic majority than proposed in order to provide Hispanic voters a realistic opportunity to elect their preferred candidate.   It appears that the county understood that there were readily available alternatives that would address these concerns, yet the county has not provided any nonracial explanation for their rejection.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the county's burden has been sustained in this instance with respect to the commissioners court and justice of the peace/constable redistricting plans.   Therefore, on behalf of the Attorney General, I must object to these changes.

With respect to the precinct and polling place changes, the Attorney General will make no determination since these changes are directly related to the redistricting plans.   28 C.F.R. 51.35.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the objected-to changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.   In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the objected-to changes continue to be legally unenforceable.  Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

USA_00012728

- 3 -

In this regard, we understand that contrary to the express proscription of the Voting Rights Act, the county implemented the unprecleared redistricting plans in the March 10, 1992, primary election.   Accordingly, to enable us to meet our responsibility to enforce the Act, please inform us within ten days of the action Calhoun County plans to take concerning these matters. Please contact Mark A. Posner, an attorney in the Voting Section, at (202) 307-1388.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

USA_00012729



**U.S. Department of Justice**

**Civil Rights Division**

---

*Office of the Assistant Attorney General*　　　　　Washington, D.C. 20530

March 30, 1992

Bob Bass, Esq.
Allison & Associates
208 West 14th Street
Austin, Texas  78701

Dear Mr. Bass:

This refers to the 1991 redistricting plan for commissioners court districts, the renumbering of voting precincts, realignment of voting precincts, the elimination of a voting precinct and the polling place therefor, and two polling place changes for Castro County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973C.  We received your responses to our request for additional information on January 30 and March 5 and 13, 1992.

We have considered carefully the information you have provided, as well as comments from other interested persons.  At the outset, we note that according to the 1990 Census, Hispanics constitute 46% of the county's population and are principally concentrated in the City of Dimmitt and the Town of Hart.  We also note that a significant number of Hispanic residents in the county are noncitizens and not eligible to vote.  We have identified two specific areas of migrant farmworker housing, Azteca Apartments and the Coronado Acres subdivision, where we understand there are concentrations of Hispanic persons who are not eligible to vote.

In the proposed redistricting of the commissioners court districts, the county has proposed a plan with two majority-minority districts.  District 1 is 58% Hispanic and includes the entire town of Hart and the southeast quadrant of the county, but no part of Dimmitt.  District 3 is 65% Hispanic, and includes part of Dimmitt and the two migrant housing developments noted above.  While these two districts are majority Hispanic in population and voting age population (51% and 56% respectively), further information indicates that Hispanics who are eligible to vote would be in the minority in both districts.  In light of the

- 2-

apparent pattern of polarized voting in county elections, it
would not appear that either of these districts will afford
Hispanic voters the opportunity to elect their preferred
candidates.

We understand that during the redistricting process several
alternatives were presented and rejected and that, in the course
of the redistricting debate, representatives for the minority
community urged the county to create one or two districts with
populations greater than 70% Hispanic so that Hispanic voters
would have a realistic opportunity to elect their candidates of
choice.  While we recognize that it may not be possible to draw
two districts which would afford minority voters such an
opportunity, given the large noncitizen population in the county,
the county has not provided any nonracial explanation for its
failure to adopt a plan which includes at least one viable
Hispanic district.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
Georgia v. United States, 411 U.S. 526 (1973); Procedures for the
Administration of Section 5, 28 C.F.R. 51.52.  In light of the
considerations discussed above, I cannot conclude, as I must
under the Voting Rights Act, that your burden has been sustained
in this instance.  Therefore, on behalf of the Attorney General,
I must object to the 1991 redistricting plan for county
commissioner districts.

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed changes have neither a
discriminatory purpose nor a discriminatory effect.  28 C.F.R.
51.44.  In addition, you may request that the Attorney General
reconsider the objection.  See 28 C.F.R. 51.45.  However, until
the objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the redistricting plan continues to
be legally unenforceable.  See Clark v. Roemer, 111 S. Ct. 2096
(1991); 28 C.F.R. 51.10.

Because the voting precinct and polling place changes are
dependent upon the objected-to redistricting, the Attorney
General will make no determination with regard to them.  See 28
C.F.R. 51.22.

Defendant's Exhibit #

DE-005664

USA_00012731

- 3 -

    To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Castro County plans to take concerning this matter.  If you have any questions, you should call Richard Jerome (202-514-8696), an attorney in the Voting Section.

                                 Sincerely,

                                 John R. Dunne
                      Assistant Attorney General
                        Civil Rights Division

Defendant's Exhibit #

DE-005665

USA_00012732



**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*


Robert Bass, Esq.                         OCT  6 1992
The Wahrenberger House
208 West 14th Street
Austin, Texas  78701

Dear Mr. Bass:

     This refers to the 1992 redistricting plan for the
commissioners court of Castro County, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c.  We received your
submission on September 4, 1992; supplemental information was
received on September 28 and 30, and October 1, 1992.

     We have carefully considered the information you have
provided, as well as information provided by other interested
persons.  According to the 1990 Census, Hispanics constitute 46
percent of the population, 39 percent of the voting age
population, and 34 percent of the citizen voting age population.
No Hispanic person has been elected to the commissioners court.
As you are aware, on March 30, 1992, the Attorney General
interposed an objection under Section 5 to the initial
redistricting plan adopted by the commissioners court following
the 1990 Census.  In the objection letter, we concluded that the
county had not "provided any nonracial explanation for its
failure to adopt a plan which includes at least one viable
Hispanic majority district."  We noted in that regard that county
elections appear to be characterized by a pattern of polarized
voting, and that while two districts in the 1991 plan were
majority Hispanic in population and voting age population
(Districts 1 and 3), it appeared that Hispanics did not
constitute a majority of the eligible voting age population in
either district because of the presence of a noncitizen Hispanic
population in the county.  We also noted our understanding that
noncitizens are particularly concentrated in two areas of migrant
farmworker housing, Azteca apartments and Coronado Acres.

     Despite the absence of Section 5 preclearance, the county
used the 1991 plan for the March 10, 1992 primary for
commissioner Districts 1 and 3.  We understand that it is
preparing to hold the November general election pursuant to this
plan as well.  Section 5 expressly provides that covered
jurisdictions, such as Castro County, Texas, may not implement

USA_00012733

- 2 -

any change in a voting practice or procedure until preclearance
is obtained, either from the Attorney General or the United
States District Court for the District of Columbia.  The Supreme
Court has repeatedly held that Section 5 means what it says.
E.g., Clark v. Roemer, 111 S.Ct. 2096 (1991); Hathorn v. Lovorn,
457 U.S. 255 (1982); United States v. Board of Supervisors of
Warren County, 429 U.S. 642 (1977)(per curiam); Allen v. State
Board of Elections, 393 U.S. 544 (1969).  See also Procedures for
the Administration of Section 5 (28 C.F.R. 51.10).  "A voting
change in a covered jurisdiction 'will not be effective as la[w]
until and unless cleared' pursuant to one of these two methods."
Clark v. Roemer, supra, 111 S.Ct. at 2101, quoting Conner v.
Waller, 421 U.S. 656 (1975)(per curiam).  Although as of the
March 10, 1992 primary date, the Attorney General had not yet
ruled on the county's preclearance request, preclearance -- and
not the absence of a Section 5 determination -- is the necessary
prerequisite for the implementation of a covered voting change,
and in our December 6, 1991 request for additional information we
specifically advised the county that the plan was unenforceable
until preclearance was received.  Furthermore, the illegal
implementation of the redistricting plan in the primary election
does not validate continued implementation in the general
election.  Clark v. Roemer, supra, and 111 S.Ct. 399 (1990).

     Against this backdrop, the county adopted and now seeks
Section 5 preclearance for a revised redistricting plan.  The
proposed plan, like its predecessor, includes two districts with
Hispanic population majorities.  Both include a district that is
65 percent Hispanic in population (District 2 in the 1992 plan;
District 3 in the objected-to plan) and a district (District 1 in
both plans) that is between 55 and 60 percent Hispanic (the new
plan drops the Hispanic population percentage in this district by
two percentage points from the objected-to plan).

     The county's decision to shift the location of the district
with the highest Hispanic population percentage from District 3
in the objected-to plan to District 2 was not required in order
to remedy the concerns that led us to interpose an objection to
the 1991 plan.  This shift is significant since, pursuant to the
county's system of staggered terms, District 3 is to elect its
commissioner this year while the District 2 position will not be
up for election until 1994.  Our review indicates that the county
specifically adopted this change in an attempt to validate the
implementation of the uncleared plan in this year's elections.
The shift would have the necessary effect of delaying for two
years the opportunity afforded Hispanics to elect a candidate of
their choice while enabling the county to argue that no real harm
would flow from the continued implementation of the objected-to
plan in this year's elections since no election would be
scheduled in the district with the highest Hispanic population

- 3 -

percentage.  In this regard, our analysis indicates that reasonable redistricting alternatives are available in which District 3 would offer Hispanic voters a realistic electoral opportunity.  Furthermore, there is no claim that the proposed delay is being undertaken to benefit the Hispanic community (e.g., to permit Hispanics to conduct additional voter registration drives).

In adopting Section 5 of the Voting Rights Act of 1965, Congress took the extraordinary step of reversing the usual presumption that laws validly adopted by state and local governments are effective unless judicially enjoined so as to "shift the advantage of time and inertia from the perpetrators of the evil [of discrimination] to its victims."  South Carolina v. Katzenbach, 383 U.S. 301, 328 (1966).  Castro County's attempt to validate its illegal implementation of the 1991 plan and delay the provision of an electoral opportunity to its Hispanic residents does not comport with this central Section 5 principle.

Under Section 5, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52.  In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the county's burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the 1992 redistricting plan for the commissioners court.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the redistricting plan has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the 1992 redistricting plan for the commissioners court continues to be legally unenforceable.  Clark v. Roemer, supra; 28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Castro County plans to take concerning this matter.  If you have any questions, you should call Mark A. Posner (202-307-1388), Special Section 5 Counsel in the Voting Section.  Because the implementation of the objected-to plan is being addressed in the consolidated cases of Valdez v. Castro County, Texas, C.A. No. 2-92-CV-168

Defendant's Exhibit #

DE-005668

USA_00012735

- 4 -

(N.D. Tex.), and Crespin v. Castro County, Texas, C.A. No. 2-92-CV-202 (N.D. Tex.), we are providing a copy of this letter by telefaxsimile transmission to the members of the three-judge court and plaintiffs' counsel in these cases.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

cc:   Honorable William L. Garwood
      Honorable Mary Lou Robinson
      Honorable Eldon B. Mahon

      Rolando Rios, Esq.
      William L. Garrett, Esq.
      Judith Sanders-Castro, Esq.
      Jose Garza, Esq.

Defendant's Exhibit #                                    DE-005669

USA_00012736



**U.S. Department of Justice**

**Civil Rights Division**

_Office of the Assistant Attorney General_          _Washington, D.C. 20530_

April 6, 1992

Robert T. Bass, Esq.
Allison & Associates
208 West 14th Street
Austin, Texas  78701

Dear Mr. Bass:

     This refers to the 1991 redistricting plan for commissioners
court districts and the realignment of voting precincts in
Cochran County, Texas, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act cf 1965, as amended, 42
U.S.C. 1973c.  We received your responses to our request for
additional information on February 6 and March 19, 1992.

     We have considered carefully the information you have
provided, as well as 1990 Census data and information from other
interested persons.  According to the 1990 Census, Hispanics
constitute 42.4 percent of the county's total population and 36.1
percent of its voting age population.  The existing commissioner
districts were drawn based upon 1970 Census data, which showed
that 28.4 percent of the total population in Cochran County was
Hispanic.  Thus, there has been a substantial increase in Cochran
County's Hispanic population since the Census upon which the
existing plan was based.

     Approximately three-quarters of the county's Hispanic
residents are concentrated in the town of Morton.  Under the
existing district boundaries this concentration of Hispanic
population in Morton is divided among several districts so that
in District 4, the only district with a Hispanic population
majority, Hispanics make up 58.6 percent of the total population
and 51.2 percent of the voting age population according to the
1990 Census.  Your submission included a report prepared by
Allison and Associates, which stated that "[t]here does appear to

Defendant's Exhibit #                    DE-005670

- 2 -

be some fragmentation of minority population in the Town [of]
Morton which should be addressed when bringing the population
balance of [District] No. 4 into compliance."

Notwithstanding this advice, the proposed redistricting plan
continues significantly to divide the Hispanic community in
Morton, resulting in a reduction in the Hispanic share of the
population in District 4 of nearly two percentage points (to
56.7%).  The county has failed adequately to explain this
reduction in the Hispanic population percentage of the proposed
plan's most heavily Hispanic district.  Indeed, our analysis of
the county's demography indicates that such a reduction was
unnecessary to satisfy legitimate redistricting criteria.

In this regard, we note that the county commissioners
considered and rejected two alternative plans prepared by its
consultant.  Both of these plans, in addition to the proposed
redistricting plan, appear to have imposed a 65 percent ceiling
on total minority population within each district.  In light of
the county's demography, the lower rates of political
participation among Hispanics acknowledged in your submission and
the apparent polarization in voting in the county, we do not
believe such an approach to redistricting has been justified.

Finally, concerns have been raised about the nature and
extent of minority participation in the county's redistricting
process.  In particular, it does not appear that the county's
initial redistricting discussions were publicized or that the
county made any direct effort to notify and involve the minority
community in the redistricting process until a proposed plan was
already prepared.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that the
county's burden has been sustained in this instance with respect
to the commissioners court redistricting plan.  Therefore, on
behalf of the Attorney General, I must object to these changes.

Because the realignment of the voting precincts is directly
related to the objected-to redistricting plan, the Attorney
General will make no determination at this time with regard to
that matter.  28 C.F.R. 51.22(b).

USA_00012738

- 3 -

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the objected-to change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the objected-to changes continue to be legally unenforceable. Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the Act, please inform us of the action Cochran County plans to take concerning this matter. If you have any questions, you should call Robert A. Kengle, an attorney in the Voting Section, at (202) 514-6196.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

USA_00012739



U.S. Department of Justice

Civil Rights Division

Office of the Assistant Attorney General       Washington, D.C. 20530

July 6, 1992

Robert T. Bass, Esq.
Allison & Associates
208 West 14th Street
Austin, Texas 78701

Dear Mr. Bass:

This refers to your May 1, 1992, requests that the Attorney
General reconsider the objections interposed under Section 5 of
t.e Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c, to
the 1991 redistricting plans for the commissioners courts in
Castro, Cochran, Deaf Smith, Hale, and Terrell Counties, Texas
and the redistricting plan for the commissioners court and for
justices of the peace and constables in Bailey County, Texas. We
received your requests on May 4, 1992.

As you are aware, the redistricting plans for these Texas
counties were separately submitted for Section 5 review and were
the subject of separate Section 5 determination letters. The
instant reconsideration requests, however, are identical and
accordingly we are responding to all the requests by this letter.
The requests allege that the Attorney General applied an improper
standard in interposing these Section 5 objections and indicate
that supporting information will be provided after the Department
responds to the Freedom of Information Act requests that have
been filed with regard to the Department records associated with
the objections. In this regard, we note that we currently are
processing the FOIA requests and should respond to all the
requests shortly. The reconsideration requests otherwise do not
offer any specific reasons why the objection analyses may have
been flawed or present any data or other information to support
withdrawal of the objections.

USA_00012740

- 2 -

Section 51.48 of the Procedures for the Administration of Section 5 specifies that "[t]he objection shall be withdrawn if the Attorney General is satisfied that the change does not have the purpose or effect of discriminating on account of race, color, or membership in a language minority group." See also Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R. 51.52. The instant requests do not establish any basis for concluding that the counties have met their burden in this regard, and our review of the objections indicates that we applied the statutory standards contained in Section 5 in interposing the objections. Accordingly, on behalf on the Attorney General, I decline to withdraw the objections to the commissioners court redistricting plans for Castro, Cochran, Deaf Smith, Hale, and Terrell Counties, Texas, and the objection to the redistricting plan for the commissioners court and for justices of the peace and constables for Bailey County, Texas.

As previously noted in the objection letters, Section 5 provides that the counties may seek a declaratory judgment from the United States District Court for the District of Columbia that the objected-to changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, the counties may at any time renew their requests that the Attorney General reconsider the objections. 28 C.F.R. 51.45.

We wish to emphasize, however, that unless and until the objections are withdrawn or a judgment from the District of Columbia Court is obtained, the redistricting plans to which objections have been interposed are legally unenforceable. Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45. We note that each of the counties requesting reconsideration implemented its unprecleared 1991 plan in the 1992 primary election, contrary to the express requirement of Section 5 that no voting change may be implemented without first obtaining Section 5 preclearance either from the Attorney General or the District Court for the District of Columbia.

Accordingly, to enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action that Bailey, Castro, Cochran, Deaf Smith, Hale, and Terrell Counties plan to take to place themselves in compliance

USA_00012741

- 3 -

with the Act.  If you have any questions, you should call
Mark A. Posner, Section 5 Special Counsel in the Voting Section,
at (202) 307-1388.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

**Civil Rights Division**

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

April 10, 1992

Robert T. Bass, Esq.
Allison & Associates
208 West 14th Street
Austin, Texas  78701

Dear Mr. Bass:

This refers to the 1991 redistricting plan for the commissioners court and the realignment of voting precincts for Deaf Smith County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received your responses to our request for additional information on February 10, March 23, and March 26, 1992.

We have considered carefully the information you have provided, as well as information from other interested persons. According to the 1990 Census, Hispanics constitute 49 percent of the county's population and are principally concentrated in the City of Hereford.  In the proposed redistricting plan, the county divides the Hispanic population in Hereford among three districts.  In light of the apparent polarization in voting, Hispanic voters appear to have an opportunity to elect a candidate of their choice only in one district.  That district, District 2, is 69.0 percent Hispanic in population in the existing plan and is increased to 69.8 percent Hispanic in the proposed plan.  In 1990, the district elected the first Hispanic commissioner in modern times, after unsuccessful Hispanic candidacies in 1982 and 1986 in the district.

The remainder of Hereford's Hispanic population is divided between proposed Districts 1 and 4 which are 60.5 percent and 49.0 percent Hispanic, respectively.  The county's registration data suggest that Hispanics will not have a registration majority

USA_00012743

- 2 -

in either district, although they would approach that level in
District 1. We note that Hispanic candidates have run
unsuccessfully in that district in the past three elections,
including most recently the 1992 Democratic primary where the
county implemented the proposed plan contrary to the requirements
of Section 5. Clark v. Roemer, 111 S.Ct. 2096 (1991).

It appears that the Hispanic population percentage in
District 1 could have been increased (by several percentage
points) to allow Hispanic voters the opportunity to elect a
candidate of their choice in this district by reducing the
fragmentation of the Hispanic population in north Hereford
between Districts 1, 2, and 4. In this regard, we note that the
county's submission indicates that it was fully aware of the
fragmentation occasioned by the proposed plan. Nevertheless, the
county has failed adequately to justify its districting decisions
in this regard.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that the
county's burden has been sustained in this instance with respect
to the commissioners court redistricting plan. Therefore, on
behalf of the Attorney General, I must object to this change.

Because the precinct realignment is directly related to the
objected-to redistricting plan, the Attorney General will make no
determination at this time with regard to this matter. 28 C.F.R.
51.22(b).

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the objected-to change has neither
the purpose nor will have the effect of denying or abridging the
right to vote on account of race, color, or membership in a
language minority group. In addition, you may request that the
Attorney General reconsider the objection. However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the proposed redistricting plan
continues to be legally unenforceable. Clark v. Roemer, supra;
28 C.F.R. 51.10 and 51.45.

USA_00012744

- 3 -

To enable us to meet our responsibility to enforce the Act, please inform us of the action Deaf Smith County plans to take concerning this matter.  If you have any questions, you should call Mark A. Posner, an attorney in the Voting Section, at (202) 307-1388.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

USA_00012745



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                                          *Washington, D.C. 20530*

John T. Fleming, Esq.                    July 31, 1992
Henslee, Ryan & Groce
9600 Great Hills Trail
Suite 300 West
Austin, Texas  78759

Dear Mr. Fleming:

     This refers to the interim change in method of election from
seven members elected at large by numbered positions to six
elected from single-member districts and one elected at large,
the districting plan, implementation schedule, polling place
changes, a majority vote requirement, a precinct realignment,
creation of a voting precinct, and a change in the method of
selecting the president of the board of trustees for the Del
Valle Independent School District in Travis County, Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We
received your response to our request for additional information
on June 1, and July 28, 1992.

     On June 1, 1992, we received your May 28, 1992, letter,
which enclosed a new map of district boundaries for the six
single-member districting plan and demographic data, including a
new Census tract and block list, prepared by plaintiffs in Lopez
v. Del Valle Independent School District, No. 475,874 (D. Travis
County, Tx.).  The new district map is different than the map
submitted on February 25, 1992.  We understand that at least some
of these changes reflect revisions to the plan made by the court
in Lopez, and that the map submitted on June 1, 1992, represents
the districting plan implemented in the May 2, 1992, election.
Your correspondence indicates that the school district no longer
wishes to implement the districting plan initially submitted.
Accordingly, no determination by the Attorney General is required
concerning that districting plan submitted on February 25, 1992.
See the Procedures for the Administration of Section 5 (28 C.F.R.
51.25 and 51.35).  Instead, we have reviewed the districting plan
submitted on June 1, 1992.

---

Defendant's Exhibit #                                          DE-005679

USA_00012746

- 2 -

We have carefully analyzed the proposed changes and the information you have provided, as well as Census data and information and comments from other interested persons. According to the 1990 Census, black and Hispanic residents constitute 44.3 percent of the school district's population. We also note that the map of the districting plan submitted on June 1, 1992, and the demographic data provided on the same date do not correspond. Our estimates of the population data for the submitted districting plan reveal a total population deviation among the districts of approximately 38 percent.

We are mindful that the voting changes you have submitted for Section 5 review are intended to remedy the concerns expressed in our December 24, 1991, objection to a method of election with five single-member districts and two at-large seats and a districting plan proposed by the school district. Our objection letter noted that, in the context of the racial bloc voting apparent in the school district, the plan provided blacks and Hispanics a realistic opportunity to elect only one school board trustee out of seven, even though available alternative plans afforded minorities an opportunity to elect at least two trustees. The decision to maintain two at-large positions also raised concerns that the proposed changes were intended to minimize minority voting strength.

Analysis of the plan now under review reveals that it, too, contains only one district in which blacks and Hispanics have a realistic opportunity to elect their chosen representatives. The submitted plan also maintains an at-large position that would appear to be out of reach for minority voters. While the lack of accurate demographic data for the submitted plan makes our review more difficult, our analysis indicates that only District 1 has a majority of blacks and Hispanics of voting age. Serious concerns have been raised as to whether minority voters in any of the other districts will have an opportunity to elect their preferred candidates. Moreover, it appears that after our earlier objection, the board refused to consider alternative plans providing for two viable minority districts.

With respect to the majority vote requirement for the at-large position on the board of trustees, it is generally well established that a majority vote requirement in an at-large context enhances the opportunity for discrimination against minority voters. See, e.g. <u>City of Port Arthur</u> v. <u>United States</u>, 459 U.S. 159 (1982); Senate Report No. 417, 97th Congress, 2nd Session 6 (1982). It appears that imposition of a majority vote requirement in Del Valle Independent School District would make it more difficult for minority voters to elect candidates of their choice to the at-large position and the school district has presented us with nothing to show that this would not be the case.

Defendant's Exhibit #                    DE-005680

- 3 -

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of demonstrating that proposed changes do not have a racially discriminatory purpose or effect. Georgia v. United States, 411 U.S. 526 (1973). In light of the information available to us, and given the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the school district's burden has been sustained in this instance. Accordingly, on behalf of the Attorney General, I must object to the proposed method of election, the districting plan, and the majority vote requirement as it applies to the at-large position on the board of trustees for the Del Valle Independent School District.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the method of election, districting plan and the majority vote requirement as applied to the at-large position on the board of trustees continue to be legally unenforceable. Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

The remaining changes are directly related to the change in the method of election and the districting plan. Accordingly, the Attorney General is also unable to make any determination regarding these changes under Section 5 at this time. See also 28 C.F.R. 51.22(b) and 51.35.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the Del Valle Independent School District plans to take concerning these matters. If you have any questions, you should call Richard Jerome (202-514-8696), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

USA_00012748



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

MAR 30 1992

Michael Morrison, Esq.
Guinn & Morrison
Baylor Law School
P.O. Box 97288
Waco, Texas 76798-7288

Dear Mr. Morrison:

This refers to the 1991 redistricting plan for commissioner court districts, the reduction in the number of justices of the peace and constables from five to four and the districting plan, the realignment of voting precincts, the establishment of fourteen new voting precincts and seven polling places, four consolidations of voting precincts and the designation of polling places therefor, and seven polling place changes, in Ellis County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received your response to our request for additional information on January 29 and February 4, 1992; supplemental information was received on February 19 and March 5 and 6, 1992.

We have carefully considered the information you have provided as well as 1990 Census data and information from other interested parties. According to our information, the proposed commissioners court plan was one of many that was considered during the redistricting process. Although the proposed plan is not retrogressive of minority voting strength, most of the alternative plans that were considered provided for significantly greater increases in the minority percentage in one district. Some alternatives provided for a district with a majority of Hispanic and black population. We are unable to conclude that the county has provided sufficient nonracial reasons for its failure to adopt one of these alternatives.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); Procedures for the Administration of Section 5, 28 C.F.R. 51.52. In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the commissioners court redistricting plan.

Defendant's Exhibit #                                          DE-005682

-2-

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither a discriminatory purpose nor effect. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the commissioners redistricting plan continues to be legally unenforceable. See Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10.

The Attorney General does not interpose any objection to the remaining specified changes. However, we note that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes. In addition, as authorized by Section 5, we reserve the right to reexamine this submission if additional information that would otherwise require an objection comes to our attention during the remainder of the sixty-day review period. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.41 and 51.43).

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Ellis County plans to take concerning this matter. If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

Since the Section 5 status of these changes has been placed at issue in Gant v. Ellis County Commissioners' Court, No. 3-92CV0395-D (N.D. Tex.), we are providing a copy of this letter to the court in that case.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

USA_00012750



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_       _Washington, D.C. 20530_

July 14, 1992

Robert T. Bass, Esq.
Allison & Associates
208 West 14th Street
Austin, Texas  78701

Dear Mr. Bass:

This refers to the 1991 redistricting plan for commissioners
court districts and the realignment of voting precincts in Gaines
County, Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  We received your further response to our December 23,
1991, request for additional information on May 15, 1992.

We have considered carefully the information you have
provided, as well as data from the 1990 Census and information
from other interested parties.  The commissioners court is
composed of five members, four of whom are elected from single-
member districts and the fifth member, the county judge, is
elected at large.

Although Gaines County is nearly 29 percent Hispanic in
voting age population, in each district in the proposed plan
white residents constitute a majority of the voting age
population.  This result has been achieved by fragmenting
Hispanic population concentrations in the cities of Seagraves and
Seminole.  At the time of redistricting the county was aware that
it was possible to draw a district with a Hispanic voting age
population majority but rejected the one alternative its
demographer drew and failed to develop other such options that
did not have the asserted defects of that plan.  The reasons for
rejecting a redistricting approach that would produce one
Hispanic voting age population majority district do not withstand
scrutiny.  Moreover, the fact that a Hispanic challenger forced a
runoff in the 1990 election in the most-heavily Hispanic district

Defendant's Exhibit #

DE-005684

USA_00012751

- 2 -

(40% Hispanic in population) suggests that the real concern may well have been the fact that providing a majority Hispanic voting age population district would produce a real opportunity for Hispanics to elect a candidate of their choice.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the commissioners court redistricting plan.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the redistricting plan continues to be legally unenforceable.  Clark v. Roemer, 111 S.Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

Because the realignment of voting precincts is dependent upon the objected-to redistricting, the Attorney General will make no determination at this time with regard to this matter. 28 C.F.R. 51.22(b).

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Gaines County plans to take concerning this matter.  If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005685

USA_00012752



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

MAR 17 1992

Honorable Ray Holbrook
County Judge
Courthouse
Galveston, Texas 77550

Dear Judge Holbrook:

This refers to the 1991 redistricting plan for justice of
the peace/constable districts in Galveston County, Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We
received your response to our request for additional information
on January 17, 1992; supplemental information was received on
February 24 and March 5, 1992.

We have carefully considered the information you have
provided as well as 1990 Census data, and information from other
interested parties.  The county is divided into eight justice of
the peace/constable districts, one of which elects two justices
of the peace but only one constable.  Although blacks and
Hispanics comprise 31.4  percent of the county's population, none
of the existing districts contains a majority of black and
Hispanic residents.

Our analysis of the process which resulted in the submitted
plan shows that minority residents repeatedly pressed for a
redistricting that would produce districts in which minorities
would have an equal opportunity to elect candidates of their
choice.  Included in these proposals were plans presented in late
August and mid-September, 1991, that would have given District 3
a majority black and Hispanic population.  The county rebuffed
these efforts with general claims that the existing districts had
served the county well and an apparent reluctance to make any
significant changes in the districts.  However, two weeks later,
at the request of an Anglo justice of the peace and constable,
the county changed course and adopted a major transfer of
territory and population between Districts 3 and 4.  The effect
of this transfer was to fragment a significant minority community
in the City of Hitchcock from nearby minority communities in the
cities of La Marque and Texas City.  At the same time the county
refused to reopen consideration of the changes proposed for
District 3 by the minority community.

USA_00012753

- 2 -

The reasons asserted by the county for its redistricting choices in this area do not withstand Section 5 scrutiny. Although convenience to the public is asserted to have been the principal reason for the change, it appears that persons in the area transferred will have further to travel to the justice court than before. Also, the county's statement that the redistricting will reduce a population disparity between the districts appears to be a post hoc justification, as the county was well aware of population disparities that existed (and will continue to exist under the proposed plan), but exhibited no interest in making any such adjustments in any other areas.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); Procedures for the Administration of Section 5, 28 C.F.R. 51.52. In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the justice of the peace/constable redistricting plan.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither a discriminatory purpose nor effect. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the justice of the peace/constable redistricting plan continues to be legally unenforceable. See Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Galveston County plans to take concerning this matter. If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

USA_00012754



**U.S. Department of Justice**

**Civil Rights Division**

_____

*Office of the Assistant Attorney General*          *Washington, D.C. 20035*

March 17, 1992

J. Elliott Beck, Esq.
Clark, Thomas, Winters, & Newton
P.O. Box 1148
Austin, Texas  78767

Dear Mr. Beck:

This refers to the 1991 redistricting plan for commissioners
court districts and the realignment of voting precincts in Gregg
County, Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  We received your response to our request for additional
information on January 17, 1992; supplemental information was
received on February 12, 1992.

We note at the outset that on February 24, 1992, Gregg
County filed an action under Section 5 seeking a declaratory
judgment from the United States District Court for the District
of Columbia that the proposed change has neither the purpose nor
will have the effect of denying or abridging the right to vote on
account of race, color, or membership in a language minority
group.  Kenneth J. Walker, et al. v. United States, C.A. No. 92-
0480 (D.D.C.) (three-judge court).  Pursuant to the direction of
Judge Richey at the status conference of March 6, 1992, we are
today filing a notice and copy of this determination with the
court and providing courtesy copies to the members of the three-
judge panel.

We have considered carefully the information you have
provided as well as Census data and comments and information from
other interested parties.  According to the 1990 Census, 18.9
percent of the population of Gregg County is black, and
approximately 69 percent of the black population in Gregg County
lives in the City of Longview.  Under both the existing and
proposed redistricting plans for Gregg County, District 4 is the
most heavily black commissioner district, with black persons

Defendant's Exhibit #          DE-005688

- 2 -

making up 35.6 percent of the total population in District 4 under the existing plan compared to 37.5 percent of the total population under the proposed plan. It appears that elections have been marked by racially polarized voting and, with the exception of Commissioner James Johnson who was elected in 1990, black voters have not been able to elect candidates of their choice in District 4 or elsewhere in the county.

In addition, the information in your submission does not establish that black voters will have an equal opportunity to elect candidates of their choice in District 4 of your proposed plan. In that regard, we note the longstanding objections by members of the black community in Gregg County to the division of the black population concentrations in the southern portion of the City of Longview between commissioner Districts 1 and 4 and their unsuccessful efforts to persuade the commissioners court to adopt a redistricting plan in 1991 that would unite the majority-black areas in south Longview into one commissioner district which would provide black voters with a significantly more meaningful electoral opportunity. Nothing provided in your submission establishes that the division of the black community in south Longview was justified by any nondiscriminatory redistricting criteria.

Finally, we are not satisfied that the process of formulating the proposed redistricting plan was open to fair participation by members of the minority community. Although the commissioners court held public hearings, the hearings seem to have been a formality to which the commissioners court did not give serious consideration.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the redistricting plan presently under submission.

You may request that the Attorney General reconsider this objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the proposed redistricting plan continues to be legally unenforceable. Clark v. Roemer, 111 S.Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

Defendant's Exhibit #                              DE-005689

- 3 -

The realignment of the voting precincts is directly related to the proposed redistricting; therefore, the Attorney General will make no determination at this time with regard to that change.   28 C.F.R. 51.22(b) and 51.35.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Gregg County plans to take concerning this matter.  If you have any questions, please contact Robert A. Kengle (202-514-6196), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

cc:  Honorable Charles R. Richey
     Honorable Laurence H. Silberman
     Honorable Gerhard A. Gesell



**U.S. Department of Justice**

**Civil Rights Division**

_Office of the Assistant Attorney General_                 _Washington, D.C. 20530_

APR 10 1992

Robert T. Bass, Esq.
Allison & Associates
208 West 14th Street
Austin, Texas  78701

Dear Mr. Bass:

This refers to the 1991 redistricting plan for the
commissioners court, and the realignment and renumbering of
voting precincts for Hale County, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c.  We received your responses
to our request for additional information on February 10 and
March 25, 1992; other supplemental information was received on
March 6 and 30, 1992.

We have considered carefully the information you have
provided, as well as information from other interested persons.
As documented by the 1980 and 1990 Censuses, the Hispanic share
of the county population rose substantially in the past decade,
from 34 percent in 1980 to 42 percent in 1990.  This increase
similarly was reflected in the existing commissioners court
districts.  In particular, the Hispanic proportion in District 2
increased from a bare Hispanic majority of 54 percent to 67
percent, giving Hispanic voters a significant opportunity to
elect a candidate of their choice to the commissioners court.

The proposed plan reduces the Hispanic population percentage
in District 2 by nine percentage points (to 58%) while it
increases the Hispanic share of the population in District 1 from
42 to 57 percent.  The registration data compiled by the State of
Texas reveal that Hispanics would not constitute a majority of
the registered voters in either district in the new plan.  On the
other hand, the data show that Hispanics are nearly a majority of
the registered voters in existing District 2.

- 2 -

Our analysis indicates that the malapportionment in the
existing commissioners court districts may be remedied with
little or no reduction in the Hispanic percentage in District 2
and with no meaningful alteration to the districting
configuration selected by the county.  This may be accomplished
principally by minimizing the proposed plan's fragmentation of
the Hispanic population in Plainview between Districts 1 and 2.
It also appears that such a plan would continue to provide
Hispanic voters the opportunity to exert a substantial influence
in District 1 elections.  In light of the apparent pattern of
polarized voting in local elections, the proposed plan would
appear to "lead to a retrogression in the position of ...
minorities with respect to their effective exercise of the
electoral franchise." Beer v. United States, 425 U.S. 130, 141
(1976).  In addition, the county has failed to provide an
adequate nonracial explanation for its redistricting decisions.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that the
county's burden has been sustained in this instance with respect
to the commissioners court redistricting plan.  Therefore, on
behalf of the Attorney General, I must object to this change.

Because the realignment and renumbering of the voting
precincts are directly related to the objected-to redistricting
plan, the Attorney General will make no determination at this
time with regard to these matters.  28 C.F.R. 51.22(b).

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the objected-to change has neither
the purpose nor will have the effect of denying or abridging the
right to vote on account of race, color, or membership in a
language minority group.  In addition, you may request that the
Attorney General reconsider the objection.  However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the proposed redistricting plan
continues to be legally unenforceable.  Clark v. Roemer, 111 S.
Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

- 3 -

    To enable us to meet our responsibility to enforce the
Act, please inform us of the action Hale County plans to take
concerning this matter.  If you have any questions, you should
call Mark A. Posner, an attorney in the Voting Section, at
(202) 307-1388.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005693

```
T. 3/30/92
JRD:MAP:JVJ:gmh
DJ 166-012-3
91-3910
```

March 30, 1992

Brian P. Quinn, Esq.
McWhorter, Cobb and Johnson
P.O. Box 2547
Lubbock, Texas 79408

Dear Mr. Quinn:

This refers to the 1991 redistricting plan for the Lubbock
Independent School District in Lubbock County, Texas, submitted
to the Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received the
information to complete your submission on January 28 and 29,
1992.

We have given careful consideration to the information you
have provided, as well as the comments and information from other
interested persons.  At the outset, we note that minorities
constitute 31.4 percent of the school district population (22.9%
Hispanic and 8.5% black), and that pursuant to the five district,
two at-large method of election, there presently are two minority
trustees, both elected from single-member districts in which
Hispanics and blacks constitute a majority of the population.
Our analysis indicates that Hispanic and black voters generally
form a cohesive electoral coalition, and that Anglos provide
little support for candidates of the minority community's choice.

While the proposed redistricting maintains the minority
percentages in majority-minority District 1, it effects a
substantial decrease in majority-minority District 2, from 75 to
63 percent of the population (the Hispanic and black populations
each decrease by six percentage points).  This results from the
school district's decision to correct the underpopulation of
existing District 2 by adding two precincts that are

cc:  Public File

Defendant's Exhibit #                                    DE-005694

- 2 -

overwhelmingly Anglo in population. The school district advises
that this will safeguard the opportunity of black voters to elect
a candidate of their choice in the district since they are more
likely to coalesce with Anglo than Hispanic voters in school
district elections. However, we find little or no support for
this view in the recent election history of the county, and it
appears that there are a number of alternative plans available
that would minimize the reduction of minority voting strength in
this district. We also note that while the minority percentage
in proposed District 2 still exceeds the percentage in proposed
District 1, the Hispanic proportion of the electorate is
significantly greater in District 1 since we understand that it
includes a substantial number of Anglo university students who
generally do not participate in school district elections.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that the school
district's burden has been sustained in this instance.
Therefore, on behalf of the Attorney General, I must object to
the proposed redistricting plan.

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the redistricting plan has neither
the purpose nor will have the effect of denying or abridging the
right to vote on account of race, color, or membership in a
language minority group. In addition, you may request that the
Attorney General reconsider the objection. However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the redistricting plan continues to
be legally unenforceable. Clark v. Roemer, 111 S. Ct. 2096
(1991); 28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibilities under the Voting
Rights Act, please inform us of the action the Lubbock
Independent School District plans to take concerning this matter.
If you have any questions, you should call Mark A. Posner
(202-307-1388), an attorney in the Voting Section.

Sincerely,


John R. Dunne
Assistant Attorney General
Civil Rights Division


Defendant's Exhibit #                                    DE-005695



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_          _Washington, D.C. 20530_

March 30, 1992

James E. Nelson, Esq.
Schafer, Davis, McCollum,
  Ashley, O'Leary & Stoker
P. O. Drawer 1552
Odessa, Texas 79760-1552

Dear Mr. Nelson:

    This refers to the 1991 redistricting plan for trustee
districts and a polling place change for the Monahans-Wickett-
Pyote Independent School District in Ward County, Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We
received your response to our request for additional information
on January 28, 1992.

    We have carefully considered the information you have
provided as well as 1980 and 1990 Census data and information
from other interested parties.  According to our information, the
board of trustees is composed of seven members; two are elected
at large and five are elected from single-member districts.
Hispanics comprise 34.5 percent of the school district
population, and the school district has conceded that racial bloc
voting characterizes school district elections.

    The proposed plan appears to be virtually the equivalent of
the existing plan in the extent to which it affords minorities in
the district an equal opportunity to elect candidates of their
choice.  Thus, even though 1990 Census data reflect a significant
increase over 1980 Census data in the Hispanic population, in
both the existing plan, which was drawn on the basis of 1980
data, and the proposed plan, there is only one district,
District 3, in which Hispanics constitute a majority of the total
population.

- 2 -

Indeed, it appears that no attempt was made to acknowledge the increased Hispanic voting strength and, from the onset of the redistricting process, the school district identified retention of the one Hispanic district as part of its redistricting criteria.  In accomplishing this result, the proposed plan appears unnecessarily to have fragmented Hispanic population in the City of Monahans.  Our examination of minority concentrations in Monahans shows that elimination of such fragmentation could result in a second majority Hispanic district, despite the school district's demographer's statement to the contrary.

In addition, the school district appears to have avoided public participation in the redistricting effort as much as possible.  The demographer developed the plan without even visiting the community, the school district neither invited nor arranged for any citizen participation, and decisions relating to the plan were made at school board meetings the notices for which were published only in English.  Although the Voting Rights Act litigation that produced the existing method of election and districting plan had only recently been concluded, the school district's redistricting procedures seem to have been calculated to avoid participation in the process by the minority plaintiffs or their attorney.  As a result, the school district succeeded in freezing in place a plan that does not appear fairly to reflect minority voting strength in the school district.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect.  Georgia v. United States, 411 U.S. 526 (1973); Procedures for the Administration of Section 5, 28 C.F.R. 51.52.  In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the redistricting plan.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither a discriminatory purpose nor effect.  28 C.F.R. 51.44.  In addition, you may request that the Attorney General reconsider the objection.  See 28 C.F.R. 51.45.  However, until the objection is withdrawn or a judgment from the District of

USA_00012764

- 3 -

Columbia Court is obtained, the redistricting plan continues to be legally unenforceable.  See <u>Clark</u> v. <u>Roemer</u>, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10.

Because the polling place change is dependent upon the objected-to redistricting, the Attorney General will make no determination with regard to this change.  See 28 C.F.R. 51.22.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the Monahans-Wickett-Pyote Independent School District plans to take concerning this matter.  If you have any questions, you should call Nancy Sardeson (202-307-3153), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                    DE-005698



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

April 6, 1992

Robert T. Bass, Esq.
Allison & Associates
208 West 14th Street
Austin, Texas 78701

Dear Mr. Bass:

This refers to the 1991 redistricting plan for the
commissioners court, the redistricting plan for the justice of
the peace/constable districts, the elimination of three polling
places, and the realignment of voting precincts for Terrell
County, Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c. We received your response to our December 30, 1991,
request for additional information on February 5, 1992.

We have carefully considered the information you have
provided, as well as 1990 Census data and information from other
interested parties. With regard to the redistricting plan for
the justice of the peace/constable districts, the Attorney
General does not interpose any objection to the specified change.
However, we note that Section 5 expressly provides that the
failure of the Attorney General to object does not bar subsequent
litigation to enjoin the enforcement of the change. See the
Procedures for the Administration of Section 5 (28 C.F.R. 51.41).

We are unable to reach the same conclusion regarding the
redistricting plan for the commissioners court. We note that
between 1980 and 1990 the Hispanic share of Terrell County's
population increased by ten percentage points, from 43.3 percent
to 53.3 percent. Under the existing districting plan, Hispanics
constitute a significant majority of the population in two
districts, District 1 (71.8%) and District 2 (79.8%). The

Defendant's Exhibit #                                         DE-005699

- 2 -

proposed redistricting plan, however, reduces the Hispanic
population proportion in District 1 nearly nine percentage points
(to 63%), while increasing the Hispanic population proportion
four percentage points in District 2 (to 83.9%). In doing so,
the plan fragments the county's Hispanic population among
Districts 1, 2 and 4, and shifts politically active Hispanics
from District 1 to District 2 and from District 2 into
District 4.

Although the 1990 Census reveals that District 1 in the
existing plan is overpopulated and that Districts 2 and 4 are
underpopulated, our examination of county demography indicates
that one-person, one-vote requirements could have been satisfied
without reducing the Hispanic share of the population in
District 1. Moreover, our analysis of recent elections indicates
that the proposed plan's reduction in the Hispanic share of the
population in District 1 would appear to lessen the opportunity
for Hispanics to elect representatives of their choice. Beer v.
United States, 425 U.S. 130 (1976). The county has failed to
provide an adequate nonracial explanation for its redistricting
decisions concerning the redistricting plan for the commissioners
court.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change
has neither a discriminatory purpose nor a discriminatory
effect. See Georgia v. United States, 411 U.S. 526 (1973);
see also the Procedures for the Administration of Section 5
(28 C.F.R. 51.52). In view of the concerns noted above, however,
I am unable to conclude, as I must under the Act, that the county
has carried its burden with regard to the submitted change.
Accordingly I must, on behalf of the Attorney General, interpose
an objection to the proposed redistricting plan for the
commissioners court in Terrell County.

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed change has neither the
purpose nor will have the effect of denying or abridging the
right to vote on account of race, color or membership in a
language minority group. In addition, you may request that the
Attorney General reconsider the objection. However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the redistricting plan for the
commissioners districts continues to be legally unenforceable.
Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and
51.45.

Defendant's Exhibit #

DE-005700

- 3 -

Because the elimination of the three polling places and the realignment of voting precincts are dependent upon the objected-to redistricting plan, the Attorney General will make no determination with regard to them.  28 C.F.R. 51.22(b) and 51.35.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Terrell County plans to take concerning this matter.  If you have any questions, you should call Richard B. Jerome (202-514-8696), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

July 19, 1993

Robert T. Bass, Esq.
Allison & Associates
Wahrenberger House
208 West 14th Street
Austin, Texas  78701

Dear Mr. Bass:

This refers to the reduction in the number of justice of the
peace and constable districts from four to one and the
implementation schedule in Bailey County, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c.  We received your response
to our March 16, 1993, request for additional information on
May 19, 1993.

We have carefully considered the information that you have
provided as well as 1990 Census data, comments from other
interested persons and information contained in previous Section
5 submissions concerning Bailey County's justice of the peace and
constable districts.  According to the 1990 Census, Hispanic
residents constitute 38.8 percent of the county's total
population and 32.6 percent of the voting age population.  Under
the county's existing electoral system, there are four justice of
the peace/constable districts, which coincide with the county's
commissioner's court districts as they existed before we
precleared the 1992 commissioner's court redistricting.

In 1992, we interposed a Section 5 objection to the county's
1991 redistricting plan, noting concerns about how District 4 was
drawn in light of the apparent pattern of polarized voting in
county elections and the recent, narrow defeat of a candidate
preferred by Hispanic voters.  The county subsequently revised
its plan by increasing the Hispanic share of the population in
District 4 to 70 percent (63 percent voting age population).  We
precleared the revised plan earlier this year.

Defendant's Exhibit #                                        DE-005702

USA_00012769

- 2 -

Under the precleared plan, Hispanic voters would appear to have a good opportunity to elect their chosen candidates in District 4. But for the proposed reduction in the number of justices of the peace and constables, that opportunity would extend to the offices of justice of the peace and constable as there is no indication that the county would have departed from its historic pattern of matching its justice of the peace and constable districts with those used to elect county commissioners.

Concerns have been raised about the timing of the decision and the nature and extent of minority participation in the county's decision-making process that led to the proposed change. The decision to reduce the number of justices of the peace and constables followed our 1992 objection and came on the heels of a settlement in a lawsuit which produced a new commissioners court plan that enhances Hispanic voting potential.

In support of the proposed reduction the county notes that it has a long-standing practice of allowing the justice of the peace elected from District 1 to perform essentially all justice of the peace duties throughout the county. The county contends that the proposed reduction has been undertaken to consolidate justice of the peace and constable duties because the existing four positions are not necessary to fulfill the county's needs. While it may be true that having one justice of the peace instead of four might result in some economies, it is not clear how much money would be saved, since the projected cost savings, as we understand them, refer to potential costs if the existing system were successfully challenged in litigation. Nor did the county appear to consider the possibility of having two or three justices of the peace/constables instead of four as a means of saving costs while recognizing existing electoral opportunities for Hispanic voters. Under these circumstances, we cannot conclude that the county's proffered explanations for the proposed reduction have been justified.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the submitted reduction in the number of justice of the peace and constable districts from four to one.

Defendant's Exhibit #

DE-005703

USA_00012770

- 3 -

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, you may request that the Attorney General reconsider the objection.  See 28 C.F.R. 51.11 and 51.45.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the proposed reduction in justice of the peace and constable districts continues to be legally unenforceable.  Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

Because the submitted implementation schedule is directly related to the objected-to change, no determination by the Attorney General regarding the schedule is appropriate at this time.  28 C.F.R. 51.22(b).

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Bailey County plans to take concerning this matter.  If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005704

USA_00012771

U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

May 10, 1993

Virginia Daugherty, Esq.
Daugherty & Associates
P.O. Box 15507
Amarillo, Texas   79105

Dear Ms. Daugherty:

This refers to the 1993 redistricting plan for commissioner
court districts, the renumbering of voting precincts, realignment
of voting precincts, the creation of a voting precinct and the
polling place therefor, and a polling place change for Castro
County, Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  We received your submission on March 9, 1993; additional
information was received on April 27 and 28, and May 3, 1993.

We have considered carefully the information provided in
this submission and in the county's submissions of its 1991 and
1992 redistricting plans, as well as Census data and information
and comments received from other interested persons.  As you
know, we interposed Section 5 objections to both the 1991 and
1992 redistricting plans.

When we objected to the 1991 redistricting plan, we
explained that the county had not demonstrated any nonracial
explanation for its failure to provide for even one Hispanic
district in which Hispanic voters would have a realistic
opportunity to elect candidates of their choice.  We noted that
under the 1991 plan two districts (Districts 1 and 3) were
majority Hispanic in total population and voting age population
but that our analysis indicated that Hispanics did not constitute
a majority of the eligible voting age population in either
district because of the presence of a noncitizen Hispanic
population in the county.  We further noted that this noncitizen
population is particularly concentrated in two areas of migrant
farmworker housing, Azteca apartments and Coronado Acres.
Despite the lack of Section 5 preclearance, the county
implemented the 1991 redistricting plan in the 1992 primary
elections for commissioners court.

USA_00012772

- 2 -

In 1992, following our objection, the county adopted a
redistricting plan that shifted the district with the highest
Hispanic population percentage from District 3 in the objected-to
plan to District 2 in the proposed plan in an attempt to validate
its implementation of the unprecleared plan in the county's 1992
primary elections.  We noted that the effect of this shift,
because of the county's system of staggering terms, was
unnecessarily to delay for two years the opportunity afforded
Hispanic voters to elect their candidates of choice.
Accordingly, the Attorney General interposed an objection to the
county's 1992 plan.

The 1993 redistricting plan now under review has two
districts (Districts 1 and 3) with Hispanic total population
percentages of 62.9 and 69.6 percent, respectively.  District 1
includes the town of Hart, the southeast quadrant of the county
and southern portions of the town of Dimmitt.  District 3 extends
through the northwest quadrant of the county and includes the
Coronado Acres development and part of the town of Dimmitt.  A
third district which is 29 percent Hispanic in total population,
District 4, cuts through a majority-Hispanic community in the
southern half of the City of Dimmitt, thereby fragmenting this
Hispanic population among Districts 1, 3 and 4.

Our analysis of voter registration and voter turnout
estimates indicates that this fragmentation in south Dimmitt
would unnecessarily limit the ability of Hispanic voters to elect
their candidates of choice in proposed District 3.  The turnout
data you have supplied indicates a significant disparity between
the rates of Hispanic and non-Hispanic turnout in the county,
as a whole as well as in the precincts that comprise most of
proposed District 3.  Thus, the fragmentation of the Hispanic
population concentration in South Dimmitt between three of the
proposed districts is significant in light of the turnout
disparities.

We have considered and found unpersuasive the county's
contention that this fragmentation of the Hispanic population
concentration in south Dimmitt is unavoidable.  We note that
the county considered and rejected at least one redistricting
alternative that would have gone far toward remedying that
fragmentation by unifying most of the Hispanic core population
in Dimmitt into District 3 while at the same time resulting in
a 73 percent Hispanic share of total population in that district.
Other alternative approaches would appear to have been readily
discernible, as well.  While the county is not required by
Section 5 to adopt any particular redistricting plan, it is not
free to adopt plans that unnecessarily dilute minority voting
strength.

USA_00012773

- 3 -

In addition, it appears that the county's redistricting decisions have been made to foster the interests of incumbents on the commissioners court. We recognize that the protection of incumbents may not in and of itself be an inappropriate consideration, but it may not be accomplished at the expense of minority voting potential. See Garza v. County of Los Angeles, 918 F.2d 763, 771 (9th Cir. 1990), cert. denied, 111 S. Ct. 681 (1991).

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the 1993 redistricting plan for the commissioners court.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the 1993 redistricting plan for the commissioners court continues to be legally unenforceable. Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

Because the voting precinct and polling place changes are dependent upon the objected-to redistricting, the Attorney General will make no determination with regard to them. See 28 C.F.R. 51.22.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Castro County plans to take concerning this matter. If you have any questions, you should call Robert Kengle (202-514-6196), an attorney in the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

USA_00012774



U.S. Department of Justice

Civil Rights Division

*Office of the Assistant Attorney General*                  *Washington, D.C. 20035*

June 4, 1993

Virginia Daugherty, Esq.
Daugherty and Associates
P. O. Box 15507
Amarillo, Texas 79105

Dear Ms. Daugherty:

This refers to the 1991 redistricting plan for the county
commission, the additional polling place and the renumbering and
realignment of voting precincts for McCulloch County, Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We
received your response to our March 12, 1993, request for
additional information on April 5, 1993.

We have considered carefully the information you have
provided as well as comments from other interested parties.
The Hispanic share of the county's total population increased
from 19.1 percent in 1980 to 26.4 percent in 1990; approximately
80 percent of the county's Hispanic population resides in the
City of Brady. The commissioners court consists of four members
elected from single-member districts and one member elected at
large. The existing redistricting plan, which has been in use
since 1968, divides the City of Brady and the Hispanic population
in the city among the districts such that Hispanics comprise no
more than 41 percent of the total population and 36 percent of
the voting age population in any district, according to the 1990
Census.

Despite the significant increase in the percentage of
Hispanic residents in the county since 1980 and despite the
concentration of Hispanic residents in the City of Brady, the
proposed plan maintains the division of Brady among the four
districts, effectively dispersing most of the county's Hispanic
residents among the districts. The result is that Hispanic
residents comprise 42 percent of the total population and 36
percent of the voting age population in the most-heavily Hispanic
district under the proposed plan.

Defendant's Exhibit #                                           DE-005708

USA_00012775

- 2 -

The information available to us suggests that the commissioners court gave only perfunctory consideration to an alternative redistricting proposal that eliminated the fragmentation of the Hispanic community within Brady and provided for one district in which approximately 60 percent of the total population and 54 percent of the voting age population was Hispanic. While the county is not required by Section 5 to adopt any particular plan, it is not free to adopt a plan that perpetuates the unnecessary fragmentation of Hispanic population concentrations. In the context of an apparent pattern of racially polarized voting that has defeated candidates preferred by Hispanic voters or discouraged such candidacies under the existing redistricting plan, it appears that the proposed plan will continue to deny Hispanic voters an opportunity to elect candidates of their choice to the commissioners court.

The explanations provided in your submission for the continued division of the Hispanic community in Brady appear largely to be post hoc justifications for maintaining the status quo and thereby protecting the interests of the incumbent commissioners. We recognize that the protection of incumbents may not in and of itself be an inappropriate consideration, but it may not be accomplished at the expense of minority voting potential. See Garza v. County of Los Angeles, 918 F.2d 763, 771 (9th Cir. 1990), cert. denied, 111 S. Ct. 681 (1991).

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the 1991 commissioner court redistricting plan.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the 1991 redistricting plan continues to be legally unenforceable. Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

- 3 -

With respect to the proposed additional polling place and renumbering and realignment of precincts, the Attorney General will make no determination at this time since these changes are directly related to the objected-to change. 28 C.F.R. 51.22.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action McCulloch County plans to take concerning this matter. If you have any questions, you should call Robert A. Kengle (202-514-6196), an attorney in the Voting Section.

Since the Section 5 status of the proposed redistricting plan has been placed at issue in Mireles v. McCulloch County, No. A-92 CA-577 SS (W.D. Tex.), we are providing a copy of this letter to the court and counsel of record in that case.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division


cc:  Honorable Sam Sparks
     United States District Judge

     Counsel of Record

Defendant's Exhibit #

DE-005710

USA_00012777



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_ .                    _Washington, D.C. 20035_


Irene E. Foxhall, Esq.                        **AUG 30 1993**
Mayor, Day, Caldwell & Keeton
700 Louisiana, Suite 1900
Houston, Texas 77002-2778

Dear Ms. Foxhall:

     This refers to the 1992 redistricting plans for the
commissioners court and justices of the peace/constables for
Wharton County, Texas, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended, 42
U.S.C. 1973c.  We received your further response to our request
for additional information on June 30, 1993; supplemental
information was received on August 20, 1993.

     We have carefully considered the information you have
provided, data from the 1990 Census, and information from other
interested persons.  According to the 1990 Census, Hispanic and
black residents constitute, respectively, 25.3 percent and 15.4
percent of the county's total population.  The commissioners
court consists of four members elected from single-member
districts and the county judge, elected at large.  We note that
Wharton County currently uses the same districting plan to elect
members of the commissioners court, justices of the peace and
constables and that the proposed plan continues this practice.
Apparently, no Hispanic or black person has been elected to
county office in Wharton County in this century.

     Our analysis of the county's demographic patterns shows that
it is not possible to create a commissioners court district in
which either Hispanic persons or black persons constitute a
majority of the population.  The information available to us
suggests that the county's redistricting approach rested upon its
assumption that Hispanic and black voters are not politically
cohesive in Wharton County.

     The absence of any voting precincts in Wharton County that
have a Hispanic population majority precludes any definitive
statistical assessment of Hispanic-black cohesion.  However,
anecdotal information that we obtained during our review supports

Defendant's Exhibit #                                          DE-005711

USA_00012778

- 2 -

the conclusion that Hispanic and black voters are politically
cohesive in Wharton County.  The county has proffered no
justification for its apparent failure to explore nonstatistical
information relevant to the issue of minority cohesion.

Under the county's proposed plan, Hispanics and blacks
combined would be a majority of the population in two districts,
Districts 2 (centered around the City of Wharton) and 4 (centered
around El Campo).  However, in view of the apparent pattern of
racially polarized voting in county elections and other factors,
it would appear that neither of those districts will afford
minority voters a real opportunity to elect candidates of their
choice.  One aspect of the proposed plan is the division of a
predominantly minority area of the City of Wharton between
Districts 2 and 4.  We understand that, during the redistricting
process, the plaintiffs in the pending one-person, one-vote
lawsuit, Jackson v. Wharton County, No. H-92-2294 (S.D. Tex.),
offered alternative plans that avoided such fragmentation, but
that the county rejected those plans for a number of reasons,
including their effect on commissioner services in rural areas.
While the county is not required by Section 5 to adopt any
particular plan, it is not free to adopt a plan that results in
unnecessary fragmentation of minority population concentrations.

It appears that the Jackson plaintiffs made it clear from
the start of the litigation that they were interested in reaching
a compromise that included an increase in the minority percentage
of District 2.  The plaintiffs' view recognized that the black
population of Wharton County, especially in the City of Wharton
area, has a higher level of political participation than does the
Hispanic population.  On November 5, 1992, the plaintiffs'
attorneys met with the county's attorneys and expert and made
specific suggestions for modifying the county's proposed plan in
order to increase the minority percentage in District 2.
Although the plaintiff did not draw up plans embodying the
suggestions made at the meeting, nothing prevented the county
from pursuing the suggested alternatives.  Our analysis reveals
that there were easily discernible alternative districting
options, consistent with the county's stated redistricting
criteria, that would avoid the limiting of minority voting
strength occasioned by the fragmentation evident in the proposed
plan.  The county has not provided a sufficient explanation for
its failure to explore such alternatives.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot

- 3 -

conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the 1992 redistricting plans.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the redistricting plans continue to be legally unenforceable. See Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Wharton County plans to take concerning this matter. If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

Because the Section 5 status of the proposed commissioners court plan is a matter before the court in Jackson v. Wharton County, we are providing a copy of this letter to the court and counsel of record in that case.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division


cc: Honorable Melinda Harmon
United States District Judge

Rex VanMiddlesworth, Esq.
Jose Garza, Esq.
Judith Sanders-Castro, Esq.

USA_00012780

JPT:GS:DBM:lrj
DJ 166-012-3
92-5239

November 22, 1993

Irene E. Foxhall, Esq.
Mayor, Day, Caldwell & Keeton
700 Louisiana, Suite 1900
Houston, Texas  77002-2778

Dear Ms. Foxhall:

     This refers to your request that the Attorney General
reconsider the August 30, 1993, objection under Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c, to the
1992 redistricting plan for the commissioners court and justices
of the peace/constables for Wharton County, Texas.  We received
your letter on September 23, 1993.

     Your November 12, 1993, letter withdraws your request from
Section 5 review.  Accordingly, no determination by the Attorney
General is required concerning this matter.  See the Procedures
for the Administration of Section 5 (28 C.F.R. 51.25(a)).
We will proceed with our review of your 1993 redistricting plan
for the commissioners court and justices of the peace/constables,
submitted under Section 5 on November 15, 1993 (File
No. 93-4359).

     Because the Section 5 status of the proposed commissioner
districts is a matter before the court in Jackson v. Wharton
County, No. H-92-2294 (S.D. Tex.), we are providing a copy of
this letter to the court and counsel of record in that case.

                              Sincerely,

                              James P. Turner
                         Acting Assistant Attorney General
                              Civil Rights Division

              By:

                         Steven H. Rosenbaum
                         Chief, Voting Section

cc:  Honorable Melinda Harmon
     United States District Judge

     Rex VanMiddlesworth, Esq.
     Jose Garza, Esq.
     Judith A. Sanders-Castro, Esq.

cc:  Public File



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20035_

October 31, 1994

Ms. Mary Anne Wyatt
Golden Crescent Regional
   Planning Commission
P. O. Box 2028
Victoria, Texas 77902

Dear Ms. Wyatt:

This refers to the creation of the Gonzales County
Underground Water Conservation District; the districting plan;
the establishment of polling places; the procedures for
conducting the May 7, 1994, special election for the confirmation
of the creation of the district, the approval to assess an ad
valorem tax, and the election of directors; and the arrangement
that Gonzales County conduct the May 7, 1994, special election
for the district in Gonzales County, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c. We received your response
to our request for additional information on August 30, 1994;
supplemental information was received on October 18, 19 and 27,
1994.

The Attorney General does not interpose any objection to the
creation of the Gonzales County Underground Water Conservation
District; the procedures for conducting the May 7, 1994, special
election for the confirmation of the creation of the district and
the approval to assess an ad valorem tax; and the arrangement
that Gonzales County conduct the May 7, 1994, special election
for the district. However, we note that the failure of the
Attorney General to object does not bar subsequent litigation to
enjoin the enforcement of the changes. See the Procedures for
the Administration of Section 5 (28 C.F.R. 51.41).

With regard to the districting plan, we carefully have
considered the information that you have provided, as well as
information provided by other interested persons. According to
your submission, the Gonzales County Underground Water
Conservation District has a total population of 16,587, of whom
36.5 percent are Hispanic and 9.4 percent are black.

Defendant's Exhibit #                                    DE-005715

USA_00012782

- 2 -

The water district's directors will be elected from five single-member districts.  The proposed districting plan provides for districts which are grossly malapportioned.  The City of Gonzales comprises a single district that is two and a half times the size of any of the other districts (6,547 versus 2,611). That district contains nearly half of the minority population in the entire water district, but still has an Anglo voting age majority.  Indeed, despite the large minority population, the proposed districting plan creates only one district with a majority combined voting age population, and even that majority (51.4 percent) appears too narrow to provide minority voters with an equal opportunity to elect candidates of their choice.  The consequence of the proposed districting plan is that minority voting strength is diluted.

Those involved in drawing these districts were aware, if only from extensive media coverage on the subject, of the need to protect minority voting rights specifically where water districts are involved.  Nevertheless, the minority community appears effectively to have been frozen out of the process which produced the proposed districting plan.  None of the public hearing or meeting notices were posted in Spanish.  There was no attempt to involve the minority community in the process or solicit their views with regard to particular boundary line choices.  Nor was any attempt made to explore possible alternative districting plans that would have allowed minority voters an equal opportunity to participate in the electoral process and to elect candidates of their choice.  For example, it appears that under a fairly drawn plan of single-member districts, minority voters would constitute effective majorities in two of the five districts.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). The existence of some legitimate, nondiscriminatory reasons for the voting change does not satisfy this burden.  See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-66 (1977); City of Rome v. United States, 446 U.S. 156, 172 (1980); Busbee v. Smith, 549 F. Supp. 494, 516-17 (D.D.C. 1982), aff'd, 459 U.S. 1166 (1983).  In addition, the Section 5 Procedures (28 C.F.R. 51.55(b)(2)) require that preclearance be withheld where a change presents a clear violation of the results standard incorporated in Section 2 of the Voting Rights Act, 42 U.S.C. 1973.  In light of the

- 3 -

considerations discussed above, I cannot conclude as I must under the Voting Rights Act, that your burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the proposed districting plan for the Gonzales County Underground Water Conservation District.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the districting plan continues to be legally unenforceable.  Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10 and 51.45.

The Attorney General will make no determination at this time with regard to the establishment of polling places for the districts or the May 7, 1994, election of directors as they are directly related to the districting plan.  See 28 C.F.R. 51.22(b).

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the action the Gonzales County Underground Water Conservation District plans to take concerning this matter.  If you have any questions, you should call Ms. Colleen Kane (202-514-6336), an attorney in the Voting Section.

Sincerely,

Deval L. Patrick
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005717

USA_00012784



**U. S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

June 21, 2002

Denise Nance Pierce, Esq.
Bickerstaff, Heath, Smiley,
   Pollan, Kever & McDaniel
816 Congress Avenue, Suite 1700
Austin, Texas  78701-2443

Dear Ms. Pierce:

     This letter is in reference to the 2001 redistricting plans
for the commissioners court, justice of the peace, and constable
districts; the renumbering and realignment of voting precincts;
two polling place changes; the elimination and renaming of
polling places; and the temporary additional early voting
locations and their hours for Waller County, Texas, submitted to
the Attorney General pursuant to Section 5 of the Voting Rights
Act, 42 U.S.C. 1973c.  We received your responses to our
February 6, 2002, request for additional information through
June 10, 2002.

     We have considered carefully the information you have
provided, as well as census data, comments from interested
parties, and other information, including the county's previous
submissions.  As discussed further below, I cannot conclude that
the county's burden under Section 5 has been sustained in this
instance.  Therefore, on behalf of the Attorney General, I must
object to the 2001 redistricting plans for the commissioners
court, justice of the peace, and constable districts.

     The 2000 Census indicates that Waller County has a total
population of 32,663 persons, of whom 9,565 (29.3%) are black and
of whom 6,344 (19.4%) are Hispanic.  The county's voting age
population is 24,277, of whom 7,601 (31.3%) are black and 3,871
(15.9%) are Hispanic.

- 2 -

The county is governed by a five-member commissioners court.
Voters elect four commissioners to four-year, staggered terms
from single-member districts, called precincts.  The justice of
the peace and constable districts are coterminous with the
commissioners court districts.  Under the census data above,
there are two districts under the benchmark plan, Precinct 1 and
Precinct 3, in which minority persons are a majority of the
voting age population:  Precinct 1 has a total minority voting
age population of 52.5 percent, while Precinct 3 has a total
minority voting age population of 71.9 percent.

In contrast, the proposed 2001 redistricting plans contain
only one district in which minority persons are a majority of the
voting age population.  According to the information that you
provided, the black percentage of the voting age population in
proposed Precinct 1 voting age population drops to 29.7 percent.
Within the context of electoral behavior in Waller County, the
county has not established that implementation of this plan will
not result in a retrogression in the ability of minority voters
to effectively exercise their electoral franchise.  Moreover, the
viability of alternative plans demonstrates that the potential
retrogression of the proposed plan is avoidable.

Our analysis of county elections shows that minority voters
in Precinct 1 have been electing candidates of choice since 1996,
and that those candidates are elected on the basis of strong,
cohesive black and Hispanic support.  Our statistical analysis
also shows that white voters do not provide significant support
to candidates sponsored by the minority community, and that
interracial elections are closely contested.  For example, the
black candidate for commissioner in Precinct 1 prevailed in the
last election by two votes.  As a result, the proposed reduction
in the minority voting age percentage in Precinct 1 casts
substantial doubt on whether minority voters would retain the
reasonable opportunity to elect their candidate of choice under
the proposed plan, particularly if the current incumbent in
Precinct 1 declines to run for office again.

Our review of the county's benchmark and proposed plans as
well as the alternative plans presented to the county, suggests
that the significant reduction in minority voting age population
percentage in Precinct 1 in the proposed plan, and the likely
resulting retrogressive effect on the ability of minority voters
to elect candidates of choice, was neither inevitable nor
required by any constitutional or legal imperative.  Illustrative
plans demonstrate that it is possible to avoid any retrogression
in Precinct 1, maintain the minority voting strength in Precinct
3, and meet the county's redistricting criteria.  Accordingly, we


- 3 -

are not persuaded by the county's contention that a reduction in minority voting strength in Precinct 1 was necessary to preserve the minority voting strength in Precinct 3 if one is to honor the redistricting criteria used by the county.

Under the Voting Rights Act, a jurisdiction seeking to implement a proposed change affecting voting, such as a redistricting plan, must establish that, in comparison with the status quo, the change does not "lead to a retrogression" in the position of minority voters with respect to the "effective exercise of the electoral franchise." See Beer v. United States, 425 U.S. 130, 141 (1976). If the proposed plan materially reduces the ability of minority voters to elect candidates of their choice to a level less than what they enjoyed under the benchmark plan, preclearance must be denied. State of Georgia v. Ashcroft, C.A. No. 2001-2111 (D.D.C. Apr. 5, 2002), slip op. at 117-18. In addition, the jurisdiction must establish that the change was not adopted with an intent to retrogress. Reno v. Bossier Parish School Board, 528 U.S. 320, 340 (2000). Finally, the submitting authority has the burden of demonstrating that the proposed change has neither the prohibited purpose nor effect. Id. at 328; see also Procedures for the Administration of Section 5 (28 C.F.R. 51.52).

In light of the consideration discussed above, I cannot conclude that your burden of showing that a submitted change does not have a discriminatory effect has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the submitted redistricting plans.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the changes continue to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

Please note that the Attorney General will make no determination regarding the submitted realignment and renumbering of voting precincts, the polling place changes, the elimination and renaming of polling places, and the temporary additional early voting locations and their hours because those changes are dependent upon the redistricting plan.

- 4 -

Further, in our letter of February 2, 2002, we informed you that, under the Voting Rights Act, changes, such as the county's proposed redistricting plans, are not legally enforceable until the jurisdiction has obtained Section 5 preclearance for those changes.  Clark v. Roemer, 500 U.S. 646 (1991).  However, it is our understanding that on March 12, 2002, Waller County conducted an election, which implemented the proposed plan, without such preclearance.  Please inform us of the action Waller County plans to take  regarding both the objection interposed by this letter as well as the conduct of the March 12 primary election without the requisite preclearance.

If you have any questions on either of these matters, you should call Mr. Timothy Mellett (202-307-6262), an attorney in the Voting Section.  Refer to File Nos. 2001-3951 and 2002-2142 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

J. Michael Wiggins
Acting Assistant Attorney
General

# Statewide Redistricting Objection Letters

Defendant's Exhibit #                                                    DE-005722

USA_00012789



**U.S. Department of Justice**

**Civil Rights Division**

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

WBR:GWJ:CWJ:PFH:ELG:bhq
DJ 166-012-3
E0840

Honorable David Dean                    **2 9 JAN 1982**
Secretary of State
Elections Division
P. O. Box 12887
Austin, Texas  78711

Dear Mr. Secretary:

This is in reference to Senate Bill No. 1 (1981)
which provides for the Congressional Districts for the
State of Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965,
as amended, 42 U.S.C. 1973c.  Your submission was completed
on December 7, 1981.

We have given careful consideration to the infor-
mation provided by you, data available from the Bureau
of the Census, and comments and information from interested
third parties.  We also have considered information relating
to the issues raised in Seamon v. Upham, Civil Action No.
P-81-49-CA (E.D. Tex.), a lawsuit involving the Congressional
reapportionment.

As you are aware, under Section 5 the submitting
authority has the burden of proving that a submitted plan
does not have a discriminatory purpose or effect.  See, e.g.,
Georgia v. United States, 411 U.S. 526 (1973); see also
Section 51.39(e) of the Procedures for the Administration of
Section 5 (46 Fed. Reg. 878).  Our analysis has revealed that,
for the most part, the state has satisfied its burden of demons-
trating that the submitted plan is nondiscriminatory in purpose
and effect.  Concerns remain, however, over the manner in which
the congressional district lines were drawn in a portion of
south Texas.  For that reason I must, on behalf of the Attorney
General, interpose a Section 5 objection to the plan because of
the manner in which it affects the districts described below.

Defendant's Exhibit #                                    DE-005723

USA_00012790

- 2 -

The area of concern is the area comprising proposed Districts 15 and 27. This portion of South Texas experienced substantial growth during the past decade and the 1980 Census reveals that 67 percent of the persons residing in this area are Mexican Americans. Under the plan as drawn, however, this very significant Mexican-American concentration and growth area seems to be proportioned inequitably between these two districts so that while proposed District 15 is 80.4 percent Mexican American, proposed District 27 is only 52.9 percent Mexican American. We have received allegations that this method of dividing the area dilutes the voting strength of the Mexican-American community as it exists in this area; we are also aware that numerous alternate plans were presented which would not have this effect and that such alternatives were rejected. We are particularly troubled by information indicating that the future population growth in this area (a heavy majority of which likely will continue to be Mexican-American) is projected primarily in Hidalgo and Cameron counties. Thus the inclusion of both of these counties into District 15 may exacerbate the alleged "packing" of Mexican Americans into this district and effectively preclude Mexican-Americans from realizing their potential voting strength in District 27.

For these reasons, therefore, I am persuaded that Section 5 requires an objection. However, we will reconsider the objection if the state can present information demonstrating that our concerns are not well-founded. Likewise, we are available to give prompt attention to the matter if the State alters the plan to remedy the concerns described.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the described changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. However, until the objection is withdrawn or a judgment from the District of Columbia court is obtained, the effect of this objection is to render the implementation of the provisions of Senate Bill No. 1 (1981) legally unenforceable, because of the manner in which the Bill affects Districts 15 and 27.

Defendant's Exhibit #

DE-005724

USA_00012791

- 3 -

        If you have any questions concerning this letter, please
call Carl Gabel (202-724-8388), Director of the Section 5 Unit
of the Voting Section.

                        Sincerely,


                        Wm. Bradford Reynolds
                   Assistant Attorney General
                        Civil Rights Division

Defendant's Exhibit #                                    DE-005725



U.S. Department of Justice

Civil Rights Division

Office of the Assistant Attorney General                    Washington, D C 20530

25 JAN 1982

Honorable David Dean
Secretary of State
Elections Division
P. O. Box 12887
Austin, Texas  78711

Dear Mr. Secretary:

This is in reference to the Legislative Redistricting
Board Plan Number 3 which provides for the redistricting
of the House of Representatives for the State of Texas
submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  Your submission was received on December 1,
1981.

We have given careful consideration to the informa-
tion that you have supplied.  In addition, we have examined
comments and information provided by other interested persons.
As you know, under Section 5 of the Voting Rights Act, the
submitting authority has the burden of proving that a sub-
mitted change has no discriminatory purpose or effect.
See, e.g., Georgia v. United States, 411 U.S. 526 (1973);
see also, Procedures for the Administration of Section
5, 28 C.F.R. 51.39(e) (46 Fed. Reg. 878).

In this instance we have received a number of allega-
tions that the plan discriminates against black and Mexican-
American voters in certain parts of the state.  In fact, your
submission itself states:

It has come to my attention that the submitted
Plan may not comply with the Voting Rights Act in all
respects.  There are claims that under the Plan there
is a retrogression in opportunities for minority
representation.  In my opinion several of these
claims are meritorious.

- 2 -

Because of the number of questions which thus have
been raised about the plan and because you have
requested that we make a decision on this submission
on the basis of the information now before us, we are
unable to conclude that the state has satisfied its
burden of demonstrating that the plan "does not have the
purpose and will not have the effect of denying or abridging
the right to vote on account of race, color or [membership
in a language minority group]." 42 U.S.C. 1973c.  Accordingly,
on behalf of the Attorney General, I hereby interpose
an objection to the plan.

At the outset, we note that in the ten-year
period since the 1970 Census the state's population has
increased by 27.1 percent.  A significant portion of that
increase was experienced in the minority community.  This
is especially true for the Mexican-American population
which increased 44.96 percent since 1970.

The house districting plan, however, does not ac-
curately reflect this increase in the voting strength of
the minority community. The net result seems to be a plan
in which minorities enjoy no significant gains even though
their percentage of the population has increased and the
demography of the state presents opportunities in several
areas for recognizing the increased potential of the
minority community. While we recognize there is no
obligation to maximize the political impact of a minority
group it has been alleged that the state's plan, as it
affects several areas within the state, fragments min-
ority concentrations in such a manner as to dilute the
voting strength of the minority communities.

For example, we have received allegations that in
Dallas County the state's plan fragments the Mexican-
American community on the west side of the City of Dallas
in such a manner as to prevent the creation of a district
where Mexican Americans could elect a candidate of
their choice.  In addition, the sweep of proposed District
100 through the center of the City of Dallas is alleged to
dilute the voting strength of Dallas' black community; the
contention is that the use of more compactly drawn districts
would result in the creation of an additional district in

Defendant's Exhibit #                    DE-005727

USA_00012794

- 3 -

which black voters would be able to elect a candidate of
their choice.  It is also alleged that the odd shapes of
proposed Districts 142 in Harris County and proposed Dis-
trict 117 in Bexar County serve to dilute the voting
strength of the minority communities in these counties.

Another allegation that seems to have some merit
concerns the creation of proposed District 68 which
consists of Webb, Maverick, Kinney, Val Verde, Terrell,
Pecos, Brewster and Presidio Counties. The existing district
includes Zavala and Crockett Counties and the state's
decision not to include Zavala and Crockett Counties in
the proposed district significantly reduced the minority
population percentage in the resulting new district.  The
state has not presented any evidence upon which we can
reject the contention that the removal of the two counties
was not done for the purpose of diluting minority voting
strength.

Finally, it has been alleged that the house plan
also adversely affects the minority populations in Lub-
bock and El Paso Counties.  Proposed District 83 in Lub-
bock County (existing District 75B) has suffered a sig-
nificant reduction in the minority population percentage.
It is alleged that this reduction is detrimental to the
continued viability of the district as one in which the
minority community could elect candidates of their choice
to office.  Regarding El Paso County, we have received
allegations that the proposed plan does not fairly reflect
the voting strength of the Mexican-American community,
which has increased significantly over the past ten
years.

Defendant's Exhibit #                                    DE-005728

Since the state has failed to demonstrate that the plan is nondiscriminatory it is necessary to interpose an objection. We note, however, that the concerns that lead to this decision are based, in large part, on our not being able to reach the conclusion that the allegations of racial and ethnic discrimination have been sufficently refuted on the basis of the information presently before us. Thus, if the state can present evidence which satisfactorily addresses the issues that have been raised by the complaints referred to above, we would be willing to reconsider this objection pursuant to the applicable provisions of the Procedures for the Administration of Section 5. See, 28 C.F.R. §51.44. If you desire, our staff is also available to meet with you and other state officials to discuss these concerns.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. However, until the objection is withdrawn or a judgment from the District of Columbia court is obtained, the effect of this objection is to render the redistricting of the Texas House of Representatives as authorized by the Legislative Redistricting Board's Plan Number 3 legally unenforceable.

If you have any questions concerning this letter, please feel free to call Carl Gabel (202-724-8388), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division


cc:  Hon. Mark White
     Attorney General
     State of Texas



U. S. Department of Justice

Office of Legislative Affairs

Office of the Assistant Attorney General

Washington, D.C. 20530

WBR:GWJ:PFH:RSB:bhq
166-012-3
D2634

25 JAN 1982

Honorable David Dean
Secretary of State
Elections Division
P. O. Box 12887
Austin, Texas  78711

Dear Mr. Secretary:

This is in reference to the Legislative Redistricting
Board Plan Number 1 which provides for the redistricting
of the Senate for the State of Texas submitted to the
Attorney General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended, 42 U.S.C. 1973c.  Your submission
was received on December 1, 1981.

We have given careful consideration to the informa-
tion that you have supplied.  In addition, we have examined
comments and information provided by other interested persons.
As you know, under Section 5 of the Voting Rights Act, the
submitting authority has the burden of proving that a sub-
mitted change has no discriminatory purpose or effect.
See, e.g., Georgia v. United States, 411 U.S. 526 (1973);
see also, Procedures for the Administration of Section
5, 28 C.F.R. 51.39(e) (46 Fed. Reg. 878).

In this instance we have received a number of allega-
tions that the plan discriminates against black and Mexican-
American voters in certain parts of the state.  In fact, your
submission itself states:

It has come to my attention that the submitted
Plan may not comply with the Voting Rights Act in all
respects.  There are claims that under the Plan there
is a retrogression in opportunities for minority
representation.  In my opinion several of these
claims are meritorious.

Defendant's Exhibit #

DE-005730

USA_00012797

- 2 -

Because of the number of questions which thus have
been raised about the plan and because you have
requested that we make a decision on this submission
on the basis of the information now before us, we are
unable to conclude that the state has satisfied its
burden of demonstrating that the plan "does not have the
purpose and will not have the effect of denying or abridging
the right to vote on account of race, color or [membership
in a language minority group]." 42 U.S.C. 1973c.  Accordingly,
on behalf of the Attorney General, I must interpose an
objection to the plan.

At the outset, we note that in the ten-year period
since the 1970 Census the state's population has increased
by 27.1 percent.  A significant portion of that increase
was experienced in the minority community.  This is
especially true for the Mexican-American population
which increased 44.96 percent since 1970.

The senate districting plan, however, does not
appear to reflect this increase in the voting strength
of the minority community. The net result seems to be a
plan in which minorities enjoy no significant gains even
though their percentage of the population has increased
and the demography of the state presents several areas
for recognizing the increased potential of the minority
community. While we recognize there is no obligation to
maximize the political impact of a minority group, it
has been alleged, and not adequately refuted, that the
state's plan, as it affects Bexar and Harris Counties,
unnecessarily fragments minority concentrations in such
a manner as to dilute the voting strength of the minority
communities.

For example, in Bexar County, existing District
19 is underpopulated according to the 1980 Census and
thus requires additional persons to meet one person-one
vote standards.  The proposed plan for this area, however,
removes a substantial number of Mexican Americans from
this district and adds a larger number of Anglos.  The
effect of this method of drawing the boundaries for

USA_00012798

- 3 -

proposed District 19 appears to be a dilution of Mexican-American voting strength. Regarding Harris County, we have received allegations that the senate districts unnecessarily fragment the minority community and the odd configurations of proposed Districts 6 and 13 lend support to that claim and raise substantial question as to whether the plan, as it affects Harris County, satisfies the requirements of Section 5.

Additionally, we have received allegations that the state used criteria for drawing senate districts in Harris County which differ from the criteria used in drawing senate districts in Dallas County. The claim is that in Harris County the state divided the minority communities among several districts so as to create districts in which minorities could have an "impact" even if they could not elect candidates of their choice. In Dallas County, the minority community apparently was treated as a "community of interest" and the plan seems to recognize the potential of that community to elect candidates of their choice to the senate. The state has presented no information to demonstrate why such divergent criteria were employed or to establish that the use of the seemingly inconsistent criteria does not have a discriminatory effect.

Since the state has failed to demonstrate that the plan is nondiscriminatory it is necessary to interpose an objection. We note, however, that the concerns that lead to this decision are based, in large part, on our being unable to reach the conclusion that the allegations of racial and ethnic discrimination have been sufficently refuted on the basis of the information presently before us. Thus, if the state can present evidence which satisfactorily addresses the issues that have been raised by the complaints referred to above, we would be willing to reconsider this objection pursuant to the applicable provisions of the Procedures for the Administration of Section 5. See, 28 C.F.R. §51.44. If you desire, our staff is also available to meet with you and other state officials to discuss these concerns.

Defendant's Exhibit #                                    DE-005732

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group.  However, until the objection is withdrawn or a judgment from the District of Columbia court is obtained, the effect of this objection is to render the redistricting of the Texas Senate as authorized by the Legislative Redistricting Board's Plan Number 1 legally unenforceable.

If you have any questions concerning this letter, please feel free to call Carl Gabel (202-724-8388), Director of the Section 5 Unit of the Voting Section.

Sincerely

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

cc:  Hon. Mark White
     Attorney General
     State of Texas

USA_00012800



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

NOV 5 1990

Mr. Tom Harrison
Special Assistant for Elections
Elections Division
P. O. Box 12060
Austin, Texas  12060

Dear Mr. Harrison:

   This refers to Chapter 632, S.B. No. 1379 (1989), which
provides for the creation of fifteen additional judicial
districts and the implementation schedule for the State of Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We
received your submission on October 2, 1990.

   We have given careful consideration to the information in
your submission, including all information contained in your
earlier submission of Chapter 632, which was withdrawn by the
state pending a decision by the court <u>en banc</u> in <u>League of United
Latin American Citizens</u> v. <u>Clements</u>, No. 90-8014 (5th Cir.
Sept. 28, 1990) and we have considered the information in that
opinion, as well as prior court opinions in that case.  In
addition, we have considered information from the Census, along
with comments and information from other sources.

   The changes consist of the establishment of fifteen
additional district court judgeships, denominated as separate
Judicial Districts.  Each judgeship is elected at large in the
area of the court's jurisdiction, which consists of one or more
counties.  Each judgeship is subject to the general requirement
in Texas law that nomination for such position requires the
obtaining of a majority of the vote in a political primary.
Thirteen of these judgeships will have the same geographic
jurisdiction as previously existing judgeships.  In these cases,
the election of judgeships by Judicial District operates as a
numbered post requirement, eliminating any possibility of
effective single-shot voting.

Defendant's Exhibit #                    DE-005734

USA_00012801

- 2 -

Our review of the history of the numbered post feature in Texas elections indicates that its adoption and continued maintenance over the years appears calculated to place an additional limitation on the ability of minority voters to participate equally in the political process and elect candidates of their choice.  In that regard, we note that it is commonly understood that numbered posts along with other features such as the use of a majority-vote requirement in the context of an at-large election system, have had a discriminatory impact on racial and ethnic minorities in those areas where minorities are a significant percentage of the population.  Numerous federal court decisions have chronicled instances where these features have been adopted in Texas for clearly discriminatory motives, and where their use has produced the intended discriminatory effects.  In addition, review of our records shows that the Attorney General has had to interpose objection under Section 5 on forty-one occasions to the adoption of numbered posts and on twenty-six occasions to the adoption of a majority-vote requirement by various Texas jurisdictions.

A review of more recent materials shows that it is commonly understood among Texas legislators that the discriminatory impact of these features is present in the election of judges.  Indeed, the legislative session which produced Chapter 632 (1989) included an address by the Chief Justice of the Texas Supreme Court and legislative committee discussions in which the discriminatory impact of these features was acknowledged.  It appears that the proposed method of electing the judicial positions presently before us, which incorporates the very features understood to be discriminatory, took the form it did primarily because of the inability of legislators to reach a consensus regarding an alternative method of selecting judges that would be fair to racial and ethnic minorities.

Accordingly, with regard to the additional judgeships in Dallas, Lubbock, and Tarrant Counties in particular, the evidence clearly indicates that the at-large method of election, even considered in isolation from the numbered post and majority-vote features, produces a discriminatory result proscribed under Section 2 of the Voting Rights Act, 42 U.S.C. 1973c.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52).  In addition, our guidelines provide that a submitted change may not be precleared if its implementation would lead to a clear violation of Section 2 of the Act.  See 28 C.F.R. 51.55.  Because we cannot conclude, as we must under the Voting Rights Act, that your burden has been sustained in this instance, and because our view is that use of the at-large election sytem with numbered

Defendant's Exhibit #

DE-005735

USA_00012802

- 3 -

posts and majority vote results in a clear violation of
Section 2, I must, on behalf of the Attorney General, interpose
an objection to the voting changes occasioned by Chapter 632,
S.B. No. 1379 (1989) and the implementation schedule for those
districts.

In reaching this decision, we are not unmindful of the
recent decision of the Fifth Circuit Court of Appeals in League
of United Latin American Citizens v. Clements, No. 90-8014
(Sept. 28, 1990) ("LULAC") (en banc) which held that the
Section 2 results standard is not applicable to judicial
elections.  The LULAC court, however, expressly recognized that
"Section 5 of the Act applies to state judicial elections" (Slip.
op. at 20) and until this matter is clarified further by the
courts we see no basis for altering our Section 5 procedural
requirements insofar as they relate to Section 2.

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed changes have neither
the purpose nor will have the effect of denying or abridging the
right to vote on account of race, color, or membership in a
language minority group.  In addition, you may request that the
Attorney General reconsider the objection.  However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the changes to which we have objected
continue to be legally unenforceable and should not be
implemented in the November 6, 1990, election.  Clark v. Roemer,
No. A-327 (U.S. Nov. 2, 1990) (copy attached).  See also
28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the State of
Texas plans to take concerning this matter.  If you have any
questions, you should call George Schneider (202-514-8696),
Attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005736

USA_00012803

U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_          _Washington, D.C. 20530_

NOV 20 1990

Mr. Tom Harrison
Special Assistant for Elections
Elections Division
P. O. Box 12060
Austin, Texas  78711-2060

Dear Mr. Harrison:

   This refers to our letter of November 5, 1990, in which the
Attorney General interposed an objection under Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c, to
Chapter 632, S.B. No. 1379 (1989), which provides for the
creation of fifteen additional elected judgeships and the
implementation schedule for the State of Texas.  Since that time
it has come to our attention that our determination in that
regard may need clarification so that state authorities will have
a clearer basis upon which to conform their actions to the
requirements of Section 5.

   As you know, Chapter 632 created or authorized the creation
of fifteen judgeships in ten of the distinct geographical
districts used for the election of judges in Texas.  The Attorney
General's determination was made with respect to the statute as a
whole but focused on certain elements of the electoral scheme
which raised the concerns which led to our interposing the
objection.  Of course, our findings with respect to the purpose
and effect of a particular voting feature well may vary depending
on the demographic and historical context in which the features's
implementation relative to given positions must be viewed.  Thus,
our consideration of each of the new judgeships contained in
Chapter 632 in the light of these factors and in the context of
existing racially polarized voting, along with the use of
designated post and majority vote features, led us to conclude
that the state had not met its burden under Section 5 of showing
the absence of a discriminatory purpose with regard to a number
of the new judgeships involved, namely, those in Dallas, Lubbock,
Tarrant, and Victoria counties (i.e., Judicial Districts 363-364,
and 371-377).  In addition, we concluded that, even aside from

Defendant's Exhibit #                                    DE-005737

USA_00012804

- 2 -

the designated post and majority-vote features, the at-large election method for the additional judgeships in Dallas, Lubbock, and Tarrant Counties, produced discriminatory results proscribed by Section 2 of the Voting Rights Act, 42 U.S.C. 1973c, and our earlier letter expressly noted that these judgeships were not entitled to preclearance for this additional reason.

Consequently, while our letter does say, in broad terms, that the Attorney General's objection was interposed to "the voting changes occasioned by Chapter 632," the concerns that led to our objection involved only the additional judgeships noted above.  Of course, it is within the province of state authorities to decide whether, under state law, the other provisions of Chapter 632 may be enforced in view of the Attorney General's decision, but we wish to make clear our view that there is no Section 5 bar to enforcement of the additional judgeships in Dimmit, Maverick, Zavala, Collin, Denton, Williamson, Anderson, Cherokee, and Hidalgo Counties (i.e., Judicial Districts 365-370).

If you have any questions regarding this matter, please call George Schneider (202-514-8696), Attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20035_

November 12, 1991

Honorable John Hannah, Jr.
Secretary of State
P.O. Box 12060
Austin, Texas 78711-2060

Dear Mr. Secretary:

This refers to Chapter No. 899 (1991), which provides the
1991 redistricting plan for the House of Representatives of the
State of Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  We received your initial submission on September 12,
1991; supplemental information was received on September 17
and 23, October 29, and November 1, 4, and 8, 1991.

We have carefully considered the information you have
provided, as well as Census data and information and comments
from other interested persons.  At the outset, we note that the
state waited nearly three months before seeking the requisite
preclearance under Section 5 for the House redistricting plan.
Although we have found that your initial submission was not
complete, in an effort to expedite our review, as you requested,
we have sought additional information informally and we are
providing a determination within the 60-day period following your
initial submission.

The Voting Rights Act requires that the submitting authority
demonstrate that the proposed change neither has a discriminatory
purpose nor a discriminatory effect.  <u>Georgia</u> v. <u>United States</u>,
411 U.S. 526 (1973); see also the Procedures for the
Administration of Section 5 (28 C.F.R. 51.52).  In addition,
preclearance may not be obtained if implementation of the change
would clearly violate Section 2 of the Act.  28 C.F.R. 51.55.  In
the case of a statewide redistricting, Section 5 requires us not
only to review the overall impact of the plan on minority voters,
but also to understand the reasons for and the impact of each of
the legislative choices that were made in adopting the particular
plan.

In making these judgments, we apply the legal rules and
precedents established by the federal courts and our published
administrative guidelines.  See, e.g., 28 C.F.R. 51.52(a), 51.55,
51.56.  For example, we cannot preclear those portions of a plan
where the legislature has deferred to the interests of incumbents

USA_00012806

2

while refusing to accommodate the community of interest shared by insular minorities.  See, e.g., Garza v. Los Angeles County, 918 F.2d 763, 771 (9th Cir. 1990), cert. denied, 111 S. Ct. 681 (1991); Ketchum v. Byrne, 740 F.2d 1398, 1408-09 (7th Cir. 1984), cert. denied, 471 U.S. 1135 (1985).  Such concerns are frequently related to the unnecessary fragmentation of minority communities or the needless packing of minority constituents into a minimal number of districts in which they can expect to elect candidates of their choice.  See 28 C.F.R. 51.59.  We endeavor to evaluate these issues in the context of the demographic changes which compelled the particular jurisdiction's need to redistrict (id.).  Finally, our entire review is guided by the principle that the Act insures fair election opportunities and does not require that any jurisdiction attempt to guarantee racially or ethnically proportional results.

Turning now to the instant submission, the state House is composed of 150 members elected from single-member districts.  Accordingly, the House plan required redistricting decisions at a substantially different scale than in Texas' other statewide plans currently undergoing Section 5 review, which contain far fewer districts.  In addition, the House plan was adopted several months earlier than those other statewide redistricting plans.

In terms of the state's demography, one of the most significant changes in the past decade has been the increase in the Hispanic population.  From 1980 to 1990, the Hispanic share of the state's population increased from about 21 percent to 26 percent while the black share of the population remained at about 12 percent.  For statewide redistricting purposes, significant Hispanic population concentrations are located in south and southwest Texas and in the urban areas of San Antonio (Bexar County), Houston (Harris County), Dallas (Dallas County) and Fort Worth (Tarrant County).  There are significant black population concentrations in Houston, Dallas and Fort Worth.

There are 20 Hispanic and 13 black state representatives at this time.  Most have been elected from districts in which potential minority voters predominate.  Nineteen of the 20 Hispanic representatives serve districts that are over 50 percent Hispanic in voting age population and over 40 percent Hispanic in voter registration.  Of the 13 black representatives, eight serve districts that are over 50 percent black in voting age population; the remainder serve districts in which the combined black plus Hispanic voting age populations comprise at least 46 percent of the district.  This election history, court findings in voting rights cases, and other information in your submission have led us to examine the 1991 redistricting plan in light of the pattern of racially polarized voting that appears generally to characterize legislative elections in the state.

USA_00012807

3

In addition, your submission notes that both the current and the proposed House plans are drawn (in part) by assigning a whole number of districts to the larger urban counties. Thus, the plans essentially include severable "sub-districting plans" within the overall plan.

With this background in mind, our analysis shows that the proposed Texas House redistricting plan exhibits a pattern of districting decisions that appears to minimize Hispanic voting strength through packing or fragmenting Hispanic population concentrations unnecessarily.

El Paso County, one of the most populous and heavily Hispanic counties in the state, was apportioned five districts. Two of the districts are well over 80 percent Hispanic in voting age population and Hispanics have chosen to be represented by Hispanic legislators. Because of demographic changes in the past decade, it appears that an effective Hispanic registration majority was emerging in the district located between those two districts, which currently has a white incumbent. The plan, however, reduces that district's Hispanic registration by about four percentage points. The state has offered no adequate explanation for this approach as alternatives were available that would not reduce the Hispanic population in this district.

In south Texas (the area south and southwest of Bexar County, and north of Cameron and Hidalgo Counties), the state chose to draw the district lines generally in an east-west manner. This has the effect of overconcentrating Hispanics in the southernmost districts. At the same time, the two districts (31 and 44) in the northern portion of this area have white voting age population and registration majorities. We understand that it is generally recognized that a north-south configuration would produce an additional district with a significant electoral opportunity for minority voters, and it appears that this option was rejected in large part to protect white incumbent legislators. Similarly, while five districts in Cameron and Hidalgo Counties have substantial Hispanic populations, the Hispanic share of the voting age population and registration in the one district with a white incumbent was reduced. It appears that the asserted interest in keeping the City of Harlingen entirely within this district could have been satisfied without the proposed reduction in the Hispanic share of the population in the district.

In Bexar County, the state decided to increase the number of districts from ten to eleven. While the Hispanic share of the county's population has increased from about 47 percent to almost 50 percent, the plan appears to reduce Hispanic voting strength by packing Hispanics in District 118, which is over 77 percent Hispanic in voting age population, while reducing unnecessarily

USA_00012808

4

the Hispanic share of the voting age population in adjoining
District 117 (from 54.8% to 50.9%).  Particularly given the fact
that last decade one of the state's House redistricting plans for
Bexar County suffered from the same defect of packing districts
with Hispanic population, <u>Terrazas</u> v. <u>Clements</u>, 537 F. Supp. 514,
541-542 (N.D. Tex. 1982), the state has not adequately explained
this proposed configuration.

In Dallas County, the decision apparently was made late in
the legislative process to reduce from 17 to 16 the number of
districts apportioned to the county.  The proposed plan includes
five districts in which blacks and Hispanics combined comprise
over 60 percent of the voting age population.  In four of those
districts blacks comprise between 46 and 55 percent of the voting
age population and in the fifth district Hispanics comprise 57
percent of the voting age population.  The plan appears fairly to
reflect black voting strength in the county.  For Hispanics,
however, we are unable to reach the same conclusion.  Our
analysis indicates that the plan fragments the growing Hispanic
population concentrations in the City of Dallas resulting in a
significant reduction in the electoral opportunities for
Hispanics in the existing district in that area.  This
fragmentation does not appear to have been necessary to create
other districts in which Hispanics or blacks would have the
potential to elect their chosen representatives.  Indeed, it
appears that the legislature was aware that relatively compact
districts may be centered on the Hispanic concentrations, thus,
more fairly recognizing the fast growing Hispanic population in
Dallas County without adversely affecting the four districts with
substantial black populations.

In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that the state's
burden has been sustained with regard to the redistricting here
under review.  Therefore, on behalf of the Attorney General, I
must object to the 1991 redistricting plan for the State House of
Representatives because of the concerns relating to the proposed
configurations for the areas discussed above.

Of course, as provided by Section 5, you have the right to
seek a declaratory judgment from the United States District Court
for the District of Columbia that the proposed 1991 House
redistricting plan has neither the purpose nor will have the
effect of denying or abridging the right to vote on account of
race, color, or membership in a language minority group and, as
you are aware, the State of Texas has filed a lawsuit in which it
appears to seek such relief.  <u>Texas</u> v. <u>United States</u>, No. 91-2383
(PMW U.S.C.A., SS, MB) (D.D.C.).  In addition, the state may
request that the Attorney General reconsider the objection.

Until the objection is withdrawn or a judgment from the
District of Columbia Court is obtained, the 1991 redistricting

USA_00012809