5

plan for the State House of Representatives continues to be
legally unenforceable.  Clark v. Roemer, 59 U.S.L.W. 4583 (U.S.
June 3, 1991); 28 C.F.R. 51.10 and 51.45.  In this regard, you
should be aware that the opening of candidate qualifying pursuant
to the 1991 plan would constitute a prohibited implementation of
this plan.  South Carolina v. United States, 585 F. Supp. 418
(D.D.C. 1984); Busbee v. Smith, 549 F. Supp. 494, 497 n.1 (D.D.C.
1982).  As we recently informed the court in the pending District
of Columbia litigation, we will seek an order enjoining any such
illegal implementation of the plan.  In addition, in view of that
pending litigation, the state may not seek authorization from a
state or federal court in Texas or acquiesce in an order from
such a court for use of this plan absent preclearance.  South
Carolina v. United States, 589 F. Supp. 757 (D.D.C. 1984).

    We understand that the current schedule calls for candidate
qualifying to begin on December 3, 1991, for a primary election
on March 10, 1992, and a general election on November 3, 1992.
We believe that sufficient time remains for the state to make
the necessary adjustments to the submitted plan and to obtain
Section 5 preclearance for the plan so that the election may
proceed on schedule under a plan that meets the requirements of
federal law.  Should the state decide to seek to adopt a new
plan, our staff remains available to discuss further the nature
of our concerns with the submitted plan; if a new plan is adopted
and administrative review is sought, we are prepared to respond
on an expedited basis.

    To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the State of
Texas plans to take concerning this matter.  If you have any
questions, you should call Steven H. Rosenbaum, Deputy Chief of
the Voting Section at (202) 307-3143.

                              Sincerely,

                              John R. Dunne
                         Assistant Attorney General
                            Civil Rights Division

USA_00012810

JRD:GAS:GAS:lrj
DJ 166-012-3
90-0003

August 23, 1991

Tom Harrison, Esq.
Special Assistant for Elections
Elections Division
P.O. Box 12060
Austin, Texas  78711-2060

Dear Mr. Harrison:

This refers to Chapter 206, S.B. No. 907 (1989), which
mandates procedures for creating hospital districts; provides for
special elections therefor; establishes petition, notice, and
ballot requirements for elections to create hospital districts;
restricts the frequency of creation elections under specified
circumstances; provides for interim appointed and permanent
elected boards of directors; mandates an odd number of directors,
with no fewer than five; permits three methods of election for a
board of directors; mandates two-year, staggered terms and a
plurality vote requirement; provides implementation plans;
mandates the first Saturday in May as the regular election date;
mandates regular election petition and notice requirements;
specifies candidate qualifications; provides procedures for
filling vacancies; establishes compensation provisions and
powers, duties, and responsibilities for elected directors;
provides procedures for annexation; provides for dissolution of a
hospital district created pursuant to the statute, subject to
special elections therefor; and permits special bond and tax
elections, for the State of Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended, 42 U.S.C. 1973c.  We received the information
necessary to complete your submission on June 25, 1991.

Chapter 206 requires as a first step in creating a hospital
district the circulation for signature of petitions which
describe the method to be used to elect hospital directors.  The
act limits the permissible methods of election to three: (1) at
large; (2) at large by place (numbered posts); or (3) a

USA_00012811

- 2 -

combination of district and at-large seats.  The third method
requires the use of county commissioner districts.  It appears
that this last method would normally be unavailable to hospital
districts that are not composed of whole counties, since it is
likely that the resulting election districts would not satisfy
the constitutional requirement of population equality.

Prior to the adoption of Chapter 206 the only means of
creating a hospital district with direct control over financing
was by a special act of the legislature which was tailored to the
individual needs of the proposed district.  Under this procedure
there existed no express limitation on the method of selecting
the board of directors of such a district.

Our understanding is that Chapter 206 was adopted to provide
a general mechanism for hospital districts to be created without
the need for individual legislation.  The legislative history of
the act indicates that no special consideration was given to the
methods of selecting the hospital boards.  It appears that the
act's limitation on methods of election resulted from adapting
language in a model bill previously used to create individual
hospital districts.  Although the three methods listed are said
to be the methods most commonly specified in previous acts
creating individual districts, the instant act apparently
reflects no strong state policy that election methods for
hospital districts should be so limited.  Indeed, the legislature
has on many previous occasions specified other methods of
selecting hospital directors, and this Department has reviewed
and precleared numerous such instances under Section 5.  Such
alternative methods, such as those using single-member districts
exclusively or incorporating districts that do not correspond to
commissioner districts would not be permitted under Chapter 206.

Our experience with hospital districts under Section 5 has
shown that the method of selecting hospital district directors is
often of significant interest and concern to voters, and raises
important questions under the Voting Rights Act.  We have twice
interposed objections under Section 5 to the initial methods
chosen by the legislature to elect individual hospital district
boards.  Our experience has led us to conclude that, as applied
in particular cases, none of the methods of election specified in
Chapter 206 would meet the requirements for preclearance under
Section 5.  The dilutive effect which at-large methods of
election can have by submerging racial and ethnic minorities is
well recognized in the case law and in our experience under
Section 5.  This effect is exacerbated by the limitation on
single-shot voting resulting from the use of numbered posts or
staggered terms.  Nor are these concerns allayed by the inclusion
in the act of the method employing commissioner districts.  In
the case of hospital districts formed of portions of counties,

Defendant's Exhibit #

DE-005745

USA_00012812

- 3 -

this method would not appear to be available.  Even when available, its limitation to four districts may well be insufficient to produce an electoral system in which minority voters would have an equal opportunity to participate in the electoral process and elect candidates of their choice and the requirement that there be at least one at-large seat could further reduce the likelihood that the electoral system would satisfy the Voting Rights Act.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the voting changes occasioned by Chapter 206 (1989).

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  See 28 C.F.R. 51.44.  In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, Chapter 206 (1989) continues to be legally unenforceable.  See 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the State of Texas plans to take concerning this matter.  If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

**Civil Rights Division**

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

Honorable John Hannah, Jr.
Secretary of State
Elections Division                    **AUG 04 1992**
P.O. Box 12060
Austin, Texas  78711-2060

Dear Mr. Secretary:

This refers to your request that the Attorney General recon-
sider the August 23, 1991, objection under Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c, to
Chapter 206 (1989), which mandates procedures for creating
hospital districts; provides for special elections therefor;
est_blishes petition, notice, and ballot requirements for
elections to create hospital districts; restricts the frequency
of creation elections under specified circumstances; provides for
interim appointed and permanent elected boards of directors;
mandates an odd number of directors, with no fewer than five;
permits three methods of election for a board of directors;
mandates two-year, staggered terms and a plurality vote
requirement; provides implementation plans; mandates the first
Saturday in May as the regular election date; mandates regular
election petition and notice requirements; specifies candidate
qualifications; provides procedures for filling vacancies;
establishes compensation provisions and powers, duties, and
responsibilities for elected directors; provides procedures for
annexation; provides for dissolution of a hospital district
created pursuant to the statute, subject to special elections
therefor; and permits special bond and tax elections, for the
State of Texas.  We received your letter on June 5, 1992.

We have reconsidered our earlier determination in this
matter based on the information and arguments you have advanced
in support of your request, along with the other information in
our files.  Our objection to the voting changes occasioned by
Chapter 206 centered on the limitation imposed by that act on the
permissible methods of electing a hospital district board of
directors.  Our understanding of the act, which was confirmed by

- 2 -

your office, was that it allowed hospital boards to be elected
under only the following three methods:  at large, at large with
numbered posts, or a combination of single-member districts
corresponding to the commissioner districts and at-large seats.
Among alternatives not permitted by the act, for example, was a
system consisting purely of single-member districts.  Our concern
was that, as applied in particular cases, none of the methods of
election permitted under Chapter 206 would meet the requirements
for preclearance under Section 5.

     Your request for reconsideration is based on Opinion
No. DM-122 (June 1, 1992) of the Texas Attorney General regarding
methods of electing hospital district directors under chapter 286
of the Health and Safety Code (the current codification of laws
originally enacted by Chapter 206 (1989)).  Your submission notes
that your office accepts this new interpretation and that the
Texas courts are bound to give great weight to Opinions of the
Attorney General.  In the formal opinion of the Texas Attorney
General, the language of Chapter 206 permits the board of
directors of hospital districts created under the authority of
that act to be elected under a method of election consisting
purely of single-member districts without any at-large seats, and
that such districts need not correspond to those used to elect
the commissioners court.  Such an interpretation is sufficient to
allay the concerns noted in our objection letter regarding the
limitations on the method of electing hospital district boards.

     Accordingly, pursuant to Section 51.48(c) of the Procedures
for the Administration of Section 5 (28 C.F.R.), the objection
interposed to the voting changes occasioned by Chapter 206 (1989)
is hereby withdrawn.  However, we note that the failure of the
Attorney General to object does not bar subsequent litigation to
enjoin the enforcement of the changes.  See 28 C.F.R. 51.41.

     The provisions of this Act are viewed as enabling
legislation.  Therefore, local jurisdictions are not relieved of
their responsibility to seek Section 5 preclearance of any
changes affecting voting (e.g., establishment of hospital
district, adoption of election method) adopted pursuant to this
Act.  See 28 C.F.R. 51.15.

Defendant's Exhibit #

DE-005748

- 3 -

If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.  Refer to File No. 90-0003 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                            DE-005749



**U.S. Department · Justice**

**Civil Rights Division**

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

March 10, 1992

Honorable John Hannah, Jr.
Secretary of State
P.O. Box 12060
Austin, Texas 78711-2060

Dear Mr. Secretary:

This refers to House Bill No. 2 (1992), which concerns the
1992 primary and general elections and provides for the
consolidation of election precincts, nomination of candidates by
political party executive committees in the event that a
different redistricting plan for either house of the legislature
is used for the general election than was used for the primary
election, an alternative date for the state and presidential
primary election, a candidate filing period for state Senate for
such primary, and the rescheduling of deadlines and modification
of procedures consistent with the alternative primary date,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We
received your submission on January 10, 1992.

We have carefully considered the information you have
provided, as well as information and comments from other
interested persons. With regard to the provision authorizing the
consolidation of election precincts for the 1992 primary and
general elections only (H.B. 2, § 3), the Attorney General does
not interpose any objection to the specified change. However, we
note that the failure of the Attorney General to object does not
bar subsequent litigation to enjoin the enforcement of the
change. See the Procedures for the Administration of Section 5
(28 C.F.R. 51.41). We also note that the provision for the
consolidation of election precincts is viewed as enabling
legislation. Therefore, any changes affecting voting, such as
the actual consolidation of specific election precincts, which
you or others may seek to implement pursuant to this Act would be
subject to Section 5 review. See 28 C.F.R. 51.15.

Defendant's Exhibit #

DE-005750

USA_00012817

- 2 -

Another provision of H.B. 2, Section 8, addresses the
possibility that the 1992 general election for "either house of
the legislature" may be held under a redistricting plan different
than the plan used for the 1992 primary election. If that
circumstance were to occur, Section 8 provides: "if a political
party has no nominee for a particular office under the new plan,
the political party's appropriate executive committee may
nominate a candidate to appear on the general election ballot for
that office." Because neither your submission nor the text of
this provision explains fully the operation of this provision, we
have sought informally to obtain such clarification from the
state but have obtained no official, written clarification in
response to our inquiries.

It appears that the legislation contemplates that there
would not be a new primary election if the state obtained
authorization for holding the 1992 general election under a
redistricting plan other than the state House and state Senate
plans used for today's primary election pursuant to the orders of
the three-judge federal court in Terrazas v. Slagle, Nos. 91-CA-
425 and 426 (W.D. Tex. Dec. 24, 1991). Instead of a new primary,
it appears that the political party nominee for the general
election would be either the person chosen in the primary from
the comparable district under the court's plan or the person
chosen by the party executive committee.

The state has not explained adequately why it would seek to
deprive voters of the opportunity to select political party
nominees in a new primary if a new redistricting plan for the
state House or state Senate is authorized for use in the general
election. The effect of such a decision on minority voting
strength could be analyzed thoroughly in the context of a
specific redistricting plan. The state, however, has chosen to
seek Section 5 preclearance for Section 8 now, despite the
contingent nature of the provision and regardless of the specific
plan that may be involved.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R 51.52).
In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that your burden
has been sustained with regard to Section 8 of H.B. 2.
Therefore, on behalf of the Attorney General, I must object to
the voting changes effected by Section 8.

Of course, as provided by Section 5, the state has the right
to seek a declaratory judgment granting preclearance for the
submitted change effected by Section 8 from the United States
District Court for the District of Columbia. The state also may

USA_00012818

- 3 -

request that the Attorney General reconsider the objection. Until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the provisions of Section 8 of H.B. 2 continue to be legally unenforceable. Clark v. Roemer, 111 S.Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.46.

Finally, the provisions of Sections 2, 5, 6 and 7 of H.B. 2 are, by their terms, contingent on the authorization for the state to use the legislatively enacted state Senate redistricting plan (i.e., Senate Bill No. 1 (1992)) for the primary election. The state, however, has been ordered to hold primary elections on March 10, 1992, under the state Senate redistricting plan drawn by the court in Terrazas v. Slagle, No. 91-CA-426 (W.D. Tex.) and has been unsuccessful in its attempts to stay those orders or to obtain authorization to use the S.B. 1 redistricting plan. Nor has the state obtained the requisite preclearance under Section 5 for the S.B. 1 plan. Accordingly, no determination by the Attorney General is required or appropriate concerning these matters. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.25 and 51.35).

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the State of Texas plans to take concerning this matter. If you have any questions, you should call Steven H. Rosenbaum, Deputy Chief of the Voting Section at (202) 307-3143.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005752

USA_00012819



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

Honorable John Hannah, Jr.
Secretary of State
Elections Division                    **AUG 04 1992**
P.O. Box 12060
Austin, Texas  78711-2060

Dear Mr. Secretary:

This refers to your request that the Attorney General recon-
sider the August 23, 1991, objection under Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c, to
Chapter 206 (1989), which mandates procedures for creating
hospital districts; provides for special elections therefor;
est\blishes petition, notice, and ballot requirements for
elections to create hospital districts; restricts the frequency
of creation elections under specified circumstances; provides for
interim appointed and permanent elected boards of directors;
mandates an odd number of directors, with no fewer than five;
permits three methods of election for a board of directors;
mandates two-year, staggered terms and a plurality vote
requirement; provides implementation plans; mandates the first
Saturday in May as the regular election date; mandates regular
election petition and notice requirements; specifies candidate
qualifications; provides procedures for filling vacancies;
establishes compensation provisions and powers, duties, and
responsibilities for elected directors; provides procedures for
annexation; provides for dissolution of a hospital district
created pursuant to the statute, subject to special elections
therefor; and permits special bond and tax elections, for the
State of Texas.  We received your letter on June 5, 1992.

We have reconsidered our earlier determination in this
matter based on the information and arguments you have advanced
in support of your request, along with the other information in
our files.  Our objection to the voting changes occasioned by
Chapter 206 centered on the limitation imposed by that act on the
permissible methods of electing a hospital district board of
directors.  Our understanding of the act, which was confirmed by

- 2 -

your office, was that it allowed hospital boards to be elected
under only the following three methods:  at large, at large with
numbered posts, or a combination of single-member districts
corresponding to the commissioner districts and at-large seats.
Among alternatives not permitted by the act, for example, was a
system consisting purely of single-member districts.  Our concern
was that, as applied in particular cases, none of the methods of
election permitted under Chapter 206 would meet the requirements
for preclearance under Section 5.

Your request for reconsideration is based on Opinion
No. DM-122 (June 1, 1992) of the Texas Attorney General regarding
methods of electing hospital district directors under chapter 286
of the Health and Safety Code (the current codification of laws
originally enacted by Chapter 206 (1989)).  Your submission notes
that your office accepts this new interpretation and that the
Texas courts are bound to give great weight to Opinions of the
Attorney General.  In the formal opinion of the Texas Attorney
General, the language of Chapter 206 permits the board of
directors of hospital districts created under the authority of
that act to be elected under a method of election consisting
purely of single-member districts without any at-large seats, and
that such districts need not correspond to those used to elect
the commissioners court.  Such an interpretation is sufficient to
allay the concerns noted in our objection letter regarding the
limitations on the method of electing hospital district boards.

Accordingly, pursuant to Section 51.48(c) of the Procedures
for the Administration of Section 5 (28 C.F.R.), the objection
interposed to the voting changes occasioned by Chapter 206 (1989)
is hereby withdrawn.  However, we note that the failure of the
Attorney General to object does not bar subsequent litigation to
enjoin the enforcement of the changes.  See 28 C.F.R. 51.41.

The provisions of this Act are viewed as enabling
legislation.  Therefore, local jurisdictions are not relieved of
their responsibility to seek Section 5 preclearance of any
changes affecting voting (e.g., establishment of hospital
district, adoption of election method) adopted pursuant to this
Act.  See 28 C.F.R. 51.15.

Defendant's Exhibit #

DE-005754

- 3 -

If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.  Refer to File No. 90-0003 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                    DE-005755



**U.S. Department of Justice**

**Civil Rights Division**

_____

_Office of the Assistant Attorney General_        _Washington, D.C. 20530_

March 9, 1992

Honorable John Hannah, Jr.
Secretary of State
P.O. Box 12060
Austin, Texas  78711-2060

Dear Mr. Secretary:

This refers to Senate Bill No. 1 (1992), which provides the
redistricting plan for the Senate of the State of Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We
received your initial submission on January 9, 1992; supplemental
information was received on January 10, 1992.

We note that the submitted redistricting plan is
substantively identical to the plan resulting from the settlement
of state court litigation in October 1991.  Quiroz v. Richards,
No. C-4395-91F (332nd Jud. Dist. Ct., Hidalgo County, Tex.); Mena
v. Richards, No. C-454-91-F (332nd Jud. Dist. Ct., Hidalgo
County, Tex.).  As you know, that plan received Section 5
preclearance on November 18, 1991.  Since then, there have been
significant new developments and submission of new information
regarding that redistricting plan.

In December 1991, the Texas Supreme Court invalidated the
settlement, thereby precluding its further implementation.
Terrazas v. Ramirez, No. D-1817, 1991 WL 269035 (Tex. Dec. 17,
1991).  One week later, the three-judge federal court in Terrazas
v. Slagle, No. 91-CA-426 (W.D. Tex. Dec. 24, 1991) ("Terrazas"),
adopted its own interim plan for Senate elections in 1992.

In January 1992, the legislature enacted the submitted
Senate redistricting plan, and the state sought to supplant the
Terrazas court plan with the enacted plan.  The Terrazas court
denied the request to stay implementation of the court's plan for
the 1992 elections and, in its January 10, 1992 opinion ruled
that the enacted plan could not be implemented, even if it were
precleared under Section 5, because it "fails to satisfy the
Sec. 2 requirements of the Voting Rights Act," op. at 12-13.

Defendant's Exhibit #

DE-005756

USA_00012823

- 2 -

We know that the state has appealed the relevant rulings in
the Terrazas action, and that the appeal is pending in the United
States Supreme Court.  On several occasions, however, the Supreme
Court has declined to stay the use of the Terrazas court's Senate
redistricting plan for the 1992 election.  Thus, at this time the
extant orders in the Terrazas action preclude the implementation
of the submitted redistricting plan for the 1992 election.
Moreover, the finding that the submitted plan violates Section 2
would appear to preclude its use thereafter.

Under these circumstances, it is not clear that the state is
entitled to invoke Section 5 to obtain either an administrative
or judicial determination on the merits of the submitted plan.
We recognize that the Supreme Court's decision on the state's
appeal in Terrazas may determine whether the submitted plan is
capable of implementation.  But in view of the statutory time
constraints, an administrative determination under Section 5 may
not be deferred pending that ruling.

The Voting Rights Act requires that the submitting authority
demonstrate that the proposed change has neither a discriminatory
purpose nor a discriminatory effect.  Georgia v. United States,
411 U.S. 520 (1973); see also Procedures for the Administration
of Section 5 (28 C.F.R. 51.52).  In addition, preclearance may
not be obtained for a voting change that clearly violates Section
2 of the Voting Rights Act, as amended, 42 U.S.C. 1973; 28 C.F.R.
51.55 and 51.56.

In this situation, a federal district court has ruled that
the submitted redistricting plan may not be used, in part,
because the plan violates Section 2.  That ruling, although
challenged by the state, has not been vacated or reversed.
Accordingly, I cannot conclude, as I must under the Voting Rights
Act, that the plan meets the Act's preclearance requirements.
Therefore, on behalf of the Attorney General, I must object to
the redistricting plan contained in Senate Bill No. 1 (1992).

Of course, as provided by Section 5, the state has the right
to seek a declaratory judgment granting preclearance for the
submitted redistricting plan from the United States District
Court for the District of Columbia.  As you are aware, the state
has indicated it may do so in the context of the pending
preclearance litigation concerning statewide redistricting.
Texas v. United States, No. 91-2383 (D.D.C.).

The state also may request that the Attorney General
reconsider the objection.  In addition, reconsideration at the
instance of the Attorney General may be appropriate "[w]here
there appears to have been a substantial change in operative fact
or relevant law." 28 C.F.R. 51.46(a).  However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the submitted redistricting plan for

USA_00012824

- 3 -

the Texas Senate continues to be legally unenforceable under
Section 5.  Clark v. Roemer, 111 S.Ct. 2096 (1991); 28 C.F.R.
51.10 and 51.46.

    To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the State of
Texas plans to take concerning this matter.  If you have any
questions, you should call Steven H. Rosenbaum, Deputy Chief of
the Voting Section at (202) 307-3143.

                          Sincerely,


                          John R. Dunne
                    Assistant Attorney General
                       Civil Rights Division

Defendant's Exhibit #                                    DE-005758

U.S. Department * Justice

Civil Rights Division

Office of the Assistant Attorney General

Washington, D.C. 20035

NOV 16 2001

The Honorable Geoffrey Connor
Acting Secretary of State
P.O. Box 12060
Austin, Texas 78711-2060

Dear Secretary Connor:

This refers to the 2001 redistricting plan for the Texas House of Representatives, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your submission on August 17, 2001; supplemental information was received through October 12, 2001.

We have considered carefully the information you have provided, as well as census data, comments and information from other interested parties, and other information. As discussed further below, I cannot conclude that the State's burden under Section 5 has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the 2001 redistricting plan for the Texas House of Representatives.

The 2000 Census indicates that the State has a total population of 20,851,820, of whom 11.5 percent are African American and 31.9 percent are Hispanic. The State's voting age population (VAP) is 14,965,061, of whom 10.9 percent are African American and 28.6 percent are Hispanic. One of the most significant changes to the State's demography has been the increase in the Hispanic population. Between 1990 and 2000, the Hispanic share of the State's population increased from 26 to 31.9 percent. Statewide, African American population remained stable.

Under the Voting Rights Act, a jurisdiction seeking to implement a proposed change affecting voting, such as a redistricting plan, must establish that, in comparison with the status quo, the change does not "lead to a retrogression" in the position of minority voters with respect to the "effective exercise of the electoral franchise." See Beer v. United States, 425 U.S. 130, 141 (1976). In addition, the jurisdiction must establish that the change was not adopted with an intent to retrogress. Reno v. Bossier Parish School Board, 528 U.S. 320, 340 (2000). Finally, the submitting authority has the burden of demonstrating that the proposed change has neither the prohibited

-2-

purpose nor effect.  Id. at 328; see also Procedures for the
Administration of Section 5 (28 C.F.R. 51.52).

The constitutional requirement of one-person, one-vote
mandated that the State reapportion the house districts in light
of the population growth since the last decennial census.  We
note that the redistricting plan submitted by the State was
passed by the Legislative Redistricting Board (LRB), which had
assumed reapportionment responsibility under Article III of the
Texas Constitution after the State legislature was unable to
enact a redistricting plan.

The LRB held a series of meetings and hearings, culminating
with a meeting on July 24, 2001, at which it considered new plans
submitted by LRB members.  The LRB adopted three amendments
making substantive changes to the plan then under consideration.
These amendments consisted of approximately 14 discrete changes.

The Texas House of Representatives consists of 150 members
elected from single-member districts to two-year terms.  Under
the existing plan, there are 57 districts that are combined
majority minority in total population, and 53 are combined
majority minority in voting age population.  With regard to those
with a majority minority voting age population, 31 districts have
a majority Hispanic voting age population, seven have a majority
black voting age population, and the remaining 15 districts have
a combined minority majority voting age population.  There are 27
districts where a majority of the registered voters have a
Spanish surname.

An initial issue arises as to the appropriate standard for
determining whether a district is one in which Hispanic voters
can elect a candidate of choice.  The State of Texas has
provided, and accepted as a relevant consideration, Spanish-
surnamed registered voter data as well as election return
information and voting age population data from the census.  We
agree with the State's assessment, although we also consider
comments from local individuals familiar with the area,
historical election analysis, analysis of local housing trends,
and other information intended to create an accurate picture of
citizenship concerns.  Campos v. Houston, 113 F.3d 544, 548 (5th
Cir. 1997).

Our examination of the State's plan indicates that it will
lead to a prohibited retrogression in the position of minorities
with respect to their effective exercise of the electoral
franchise by causing a net loss of three districts in which the
minority community would have had the opportunity to elect its

Defendant's Exhibit #                                        DE-005760

-3-

candidate of choice. Although there is an increase in the number
of districts in which Hispanics are a majority of the voting age
population, the number of districts in which the level of Spanish
surnamed registration (SSRV) is more than 50 percent decreases by
two as compared to the benchmark plan. Moreover, we note that in
two additional districts SSRV has been reduced to the extent that
the minority population in those districts can no longer elect a
candidate of choice. In the State's plan these four reductions
are only offset by the addition of a single new majority minority
district - District 80 - leaving a net loss of three.

As described more fully below, when coupled with an analysis
of election returns and other factors, we conclude that minority
voting strength has been unnecessarily reduced in Bexar County,
South Texas, and West Texas. Because retrogression is assessed
on a state-wide basis, the State may remedy this impermissible
retrogression either by restoring three districts from among
these problem areas, by creating three viable new majority
minority districts elsewhere in the State, or by some combination
of these methods.

With regard to the problem areas we have identified, in
Bexar County the 2000 Census data indicated that the county
population constituted 10.4 ideal districts. As a result of the
State's constitutional requirement of assigning a whole number of
districts to the more populous counties, known as the "county
line rule," the State reduced the number of districts in the
county from 11 in the existing plan to 10. Although the State
has admitted that the reduction to 10 would not have precluded it
from maintaining the number of majority Hispanic districts at
seven, it in fact chose to reduce that number to six. Initially,
the State asserted that it had created an additional majority
Hispanic district in Harris County so as to offset the loss of
the Bexar County district and identified District 137 as a
compensating district. Because the State's obligation under
Section 5 is to ensure that the redistricting plan, as a whole,
is not retrogressive, such a course of action is not
impermissible. However, in the supplemental materials that were
provided on October 10, 2001, the State notified us that if any
district should be considered as the replacement, District 80 in
South Texas - not District 137 - should be the one which offsets
the loss of the majority Hispanic district in Bexar County.

When the State is considered as a whole, however, this
argument is ultimately unpersuasive. While District 80 indeed
adds an additional district in which Hispanic voters in South
Texas will have the opportunity to elect a candidate of their
choice, in two other districts, as discussed below, they lose

DE-005761

-4-

this opportunity, resulting in the net loss for Hispanic voters
of one district in South Texas.

In South Texas Hispanic voters will lose the opportunity to
elect their candidate of choice in District 35. The new district
is created from existing Districts 31 and 44 and pairs an
nonminority and a Hispanic incumbent. The Hispanic incumbent
currently represents a district which has a Spanish surname
registration level of 55.6 percent; that level drops to 50.2
percent in the proposed plan while the Hispanic voting age
population decreases from 57.8 to 52.1 percent. Over half (58%)
of the new district's configuration is from the nonminority
incumbent's former district. Our analysis indicates that
District 35 as drawn will preclude Hispanic voters from electing
their candidates of choice.

In addition, in Cameron County District 38 reverts to a
configuration that previously precluded Hispanic residents from
electing a candidate of their choice. The Spanish surnamed
registration level is reduced from 70.8 to 60.7 percent, and the
Hispanic voting age population decreases from 78.7 percent to
69.6 percent. The State removed over 40 percent of the core of
existing District 38, 90 percent of whom are Hispanic persons,
and replaced it with population that is 45 percent nonminority.
While the Hispanic voters in District 38 still remain a majority
of voters in the district, because the area is subject to
polarized voting along racial lines and under the particular
circumstances present in this district, it is doubtful that
Hispanics will be able to elect their candidate of choice.

Finally, the districts adjacent to Districts 35 and 38 have
levels of Spanish surnamed registered voters exceeding 80
percent, and Hispanic voting age population exceeding 90 percent,
both of which are far beyond what is necessary for compliance
with the Voting Rights Act. Thus the reductions in Districts 35
and 38 were avoidable had the State avoided packing Hispanic
voters into the districts adjacent to them. Moreover, overall
the State fragments the core of majority Hispanic districts in
this area, thus affecting member-constituent relations and
existing communities of interest in these districts at a
disproportionately higher rate than it does other districts in
this part of the State. This fragmentation is unnecessary and
disadvantages Hispanic voters by requiring them to establish new
relations with their elected representatives. It also deviates
from the State's traditional redistricting principles in a manner
that exacerbates the retrogression in South Texas.

USA_00012829

-5-

As for West Texas, Hispanic voters lose the opportunity to elect their candidate of choice in proposed District 74. The Spanish surname registration level decreases from 64.5 to 48.7 percent, and the Hispanic voting age population decreases from 73.4 to 57.3 percent. Significantly, the State did not need to reconfigure existing District 74 because the existing configuration under the 2000 Census was underpopulated by only 894 persons, a deviation of 0.64 percent. Such unnecessary population movement supplements our finding in our election analysis that Hispanic voters in District 74 will suffer a retrogression in the effective exercise of the electoral franchise. See Guidance Concerning Redistricting and Retrogression under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, 66 Fed. Reg. 5411, 5413 (Jan. 18, 2001).

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); see also Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude that your burden has been sustained in this instance. On behalf of the Attorney General, I must object to the 2001 redistricting plan for the Texas House of Representatives. Beyond the specific discussion above, however, in all other respects we find that the State has satisfied the burden of proof required by Section 5.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the redistricting plan continues to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

Defendant's Exhibit #                                    DE-005763

-6-

 To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the State of
Texas plans to take concerning this matter.  If you have any
questions, you should call Mr. Robert Berman (202-307-3718),
Deputy Chief of the Voting Section.

                     Sincerely,

                     Ralph F. Boyd, Jr.
                     Assistant Attorney General
                     Civil Rights Division

Defendant's Exhibit #                                   DE-005764

# Other Objection Letters

Defendant's Exhibit #                                        DE-005765

USA_00012832

DSD:JHC:JV:rjs
DJ 166-012-3
C8242; C7763

George Wikoff, Esq.
City Attorney
City of Port Arthur
Post Office Box 1089
Port Arthur, Texas 77640

15 JAN 1980

Dear Mr. Wikoff:

This is in reference to Ordinance No. 79-119, which calls for a referendum election on collective bargaining scheduled for January 19, 1980, in the City of Port Arthur, Jefferson County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended. Your submission was received on December 27, 1979.

According to your letter of submission, Ordinance No. 79-119 was enacted to repeal and supersede Ordinance No. 79-108 which, like Ordinance No. 79-119, provided for the referendum election on collective bargaining scheduled for January 19, 1980. However, on December 21, 1979, prior to our receipt of your present submission, an objection was interposed to the January 19, 1980, referendum election provided for in Ordinance No. 79-108. The purpose of this letter is to advise you that, for the reasons set forth in our letter of December 21, 1979, relating to Ordinance No. 79-108 the Attorney General also objects to the referendum election set forth in Ordinance No. 79-119.

Of course, as provided by Section 5 of the Voting Rights Act you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider

Defendant's Exhibit #     DE-005766

USA_00012833

George Wikoff, Esq.
City Attorney
City of Port Arthur
Post Office Box 1089
Port Arthur, Texas  77640

15 JAN 1980

Dear Mr. Wikoff:

This is in reference to Ordinance No. 79-113, which
calls for a referendum election on collective bargaining
scheduled for January 19, 1980, in the City of Port Arthur,
Jefferson County, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended.  Your submission was received on December 27, 1979.

According to your letter of submission, Ordinance
No. 79-113 was enacted to repeal and supersede Ordinance
No. 79-108 which, like Ordinance No. 79-119, provided
for the referendum election on collective bargaining
scheduled for January 19, 1980.  However, on December 31,
1979, prior to our receipt of your present submission, an
objection was interposed to the January 19, 1980, referendum
election provided for in Ordinance No. 79-108.  The purpose
of this letter is to advise you that, for the reasons set
forth in our letter of December 31, 1979, relating to
Ordinance No. 79-108 the Attorney General also objects to
the referendum election set forth in Ordinance No. 79-119.

Of course, as provided by Section 5 of the Voting
Rights Act you have the right to seek a declaratory judg-
ment from the United States District Court for the District
of Columbia that these changes have neither the purpose nor
will have the effect of denying or abridging the right to
vote on account of race, color, or membership in a language
minority group.  In addition, the Procedures for the Adminis-
tration of Section 5 (28 C.F.R. 51.21(b) and (e), 51.23, and
51.24) permit you to request the Attorney General to reconsider

- 2 -

the objection. However, until the objection is withdrawn or
the judgment from the District of Columbia Court obtained, the
effect of the objection by the Attorney General is to make the
referendum election legally unenforceable.

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us immediately
upon receipt of this letter as to what course of action the
City of Port Arthur plans to take with respect to this matter.
If you have any questions concerning this letter, please feel
free to call Mr. Jess Vigil (202-726-6676) of our staff, who
has been assigned to handle this submission. Please refer to
File Nos. C6242 and C7763 in any written response to this
letter so that your correspondence will be properly channeled.

Sincerely,

JAMES P. TURNER
Acting Assistant Attorney General
Civil Rights Division

DE-005768

USA_00012835

Defendant's Exhibit #

JAN 1 7 1980

Richard C. Sedgeley, Esq.
609 Fannin Building, Suite 1301
Fannin & Texas
Houston, Texas   77002

Dear Mr. Sedgeley:

This is in reference to the procedures to be followed
in the January 19, 1980, election of the County School Trustees
of Harris County, Texas, submitted to the Attorney General pur-
suant to Section 5 of the Voting Rights Act of 1965, as amended,
and to compliance with Section 5 by the county school trustees
with respect to the date of school trustee elections.  Your
submission was received on December 20, 1979.

The seven members of the board of trustees serve six-
year terms, with two or three positions filled every two
years.  As of November 1, 1972, school trustee elections
were held on the first Saturday in October of odd-numbered
years.  The legal effect of House Bill 275 (1975), was to
shift the election date to the first Tuesday after the first
Monday in November of odd-numbered years.  Before the school
trustees had an occasion for holding an election on the new
election date, the legislature enacted House Bill 443 (1977),
which gave the school trustees discretion to choose from
among four possible election dates, including the November
date specified by House Bill 275.  Pursuant to House Bill 443,
the school trustees chose the third Saturday in January of
even-numbered years as the election date.

A change of election date is subject to the preclearance
requirement of Section 5 of the Voting Rights Act.  The school
trustees' submission of the choice of the January date was
received by the Attorney General on November 25, 1977.  More

cc:  Public File

Defendant's Exhibit #                                    DE-005769

USA_00012836

- 2 -

information with respect to that submission was requested on
January 20 and received on February 28, 1978, and an objection
with respect to the choice of the January date was interposed
on May 1, 1978. Following a request for reconsideration
received on July 3, 1978, I declined, on September 1, 1978,
to withdraw the objection.

In brief, the basis for the objection was that black
and Mexican-American voters in Harris County would have a
lesser opportunity to participate in school trustee elec-
tions if those elections were held in January, when there
would generally be fewer opportunities for joint elections
in areas where most black and Mexican-American voters reside
than if those elections were held in November, when they
could be held jointly with elections of the City of Houston
and of the Houston Independent School District and with
constitutional amendment elections. Although the required
federal preclearance had not been obtained, the school
trustee election was conducted on January 21, 1978.

Your submission with respect to the proposed
January 19, 1980, election indicates no changes in circum-
stances that could provide a basis for the withdrawal of
the objection to the choice of the January election date.
We note that, according to your submission, in the area
that comprises the Houston Independent School District,
only 25 polling places are scheduled to be used on January 19,
1980, although this area contains 275 Harris County voting
precincts. Since the same adverse effect on minority voters
that led to our previous objection would be expected to again
peculiarly disadvantage minority voters, were the election
held on January 19, 1980, on behalf of the Attorney General
I must again object to the county school trustees' choice of
election date.

The combined effect of House Bill 275 (1975) and the
objections under Section 5 of the Voting Rights Act is that
the legal election date for the election held on January 21,
1978, was November 8, 1977, and that the legal election date
for the election scheduled to be held on January 19, 1980,
was November 6, 1979. Because the two legal election dates
are no longer available for use, we believe that the most
adequate remedy for the school trustees' failure to comply
with Section 5 is for new elections to be held in conjunc-
tion with the primary elections of May, 1980, at which time

- 3 -

all seats filled in January, 1978 and those that were to
be filled in January, 1980 would be open for election to
fill the seats for the remainder of their terms.  Any
conflict with state law may be resolved through a consent
decree filed in a Section 5 enforcement action in federal
district court.  All future elections would be held in
November, unless and until an alternative date is precleared
pursuant to Section 5.

To enable us to carry out our responsibility to
enforce the Voting Rights Act, please let us know imme-
diately whether the county school trustees accept this
proposed schedule of elections.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory judg-
ment from the United States District Court for the District
of Columbia that the county school trustees' choice of
election date has neither the purpose nor the effect of
denying or abridging the right to vote on account of race,
color, or membership in a language minority group.

If you have any questions concerning the matters
discussed in this letter, please do not hesitate to
telephone Voting Section Attorney David Hunter, at 202--
724-7189.

Sincerely,


DREW S. DAYS III
Assistant Attorney General
Civil Rights Division

1 FEB 1980

Honorable W. L. Harville
Jim Wells County Judge
Post Office Drawer 2080
Alice, Texas 78332

Dear Judge Harville:

This is in reference to the proposed redistricting plan
for Jim Wells County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of
1965, as amended.  Your submission was received on December 12,
1979 and additional information was received on January 2, 1980.
Although we were unable to complete our evaluation by
January 15, 1980 as you requested, we have expedited our
consideration of your submission to the extent possible
pursuant to the procedural guidelines for the administration
of Section 5 (28 C.F.R. Section 51.22).

We have analyzed carefully the material contained in
your submission, data obtained from the Bureau of the Census,
and comments from other interested persons.  As explained to
Mrs. Villareal on January 15, 1980, and to you on January
16, 1980, we found discrepancies in the data furnished on
your summary charts and on the maps for the City of Alice
with repect to the Census Enumeration Districts contained
within proposed Commissioner Precinct One.  During her tele-
phone conversation with Elda Gordon of my staff, Mrs.
Villareal confirmed that, despite the incongruity reflected
in the summary charts, the County Commission is submitting
the plan as depicted on the maps provided in the submission
to the Attorney General.  We have, therefore, reviewed your
submission with this understanding.

-- 3

In light of the inference of racial polarization among voters that emerged from our review of the election returns you provided, we find that the proposed plan has the potential of diluting the minority voting strength that has only recently begun to be realized in several largely Mexican-American voting precincts, which have been distributed among all four Commissioner Precincts.   Although the information you have submitted is in large measure ambiguous and confusing, it appears that the proposed plan realistically yields only one district from which a Mexican-American may be elected and distinguishes that district as one that is over-populated and of little practical significance in view of the paucity of road mileage and budget funds allocated to it.   Also, several members of the minority community have expressed concern about the conspicuous lack of input from interested members of the minority community, including the current Mexican-American commissioner, in the development of the plan and that Mexican-Americans in Jim Wells County, and especially those who reside in the area known as Rancho Alegre, may be denied effective and responsive representation on the Commissioners Court through the implementation of a plan that places that area within Commissioner Precinct Three.   Thus the implementation of this proposed plan would appear to be retrogressive under the standard of Beer v. United States, 425 U.S. 130, 141 (1976).

Under Section 5 of the Voting Rights Act the submitting authority has the burden of proving that a submitted change has no discriminatory purpose or effect.   See, e.g., Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R. 51.19.   In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance.   Accordingly, on behalf of the Attorney General, I must object to the proposed plan.

Of course, as provided by Section 5 of the Voting Rights Act you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

- 3 -

In addition, the Procedures for the Administration of Section 5
(28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to
request the Attorney General to reconsider the objection.
However, until the objection is withdrawn or the judgment from
the District of Columbia Court obtained, the effect of the
objection by the Attorney General is to make the implementation
of the proposed redistricting plan for Jim Wells County
legally unenforceable.

To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us within twenty
days of your receipt of this letter of the course of action
the Jim Wells County Commissioners Court plans to take with
respect to this matter.  If you have any questions concerning
this letter, please feel free to call Elda Gordon (202-724-
6675), of my staff, who has been assigned to handle this
submission.

                    Sincerely,


                    Drew S. Days III
                    Assistant Attorney General
                    Civil Rights Division

Defendant's Exhibit #

DE-005774

USA_00012841



U.S. Department of Justice
Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

MAR 5  1980

George Wikoff, Esq.
City Attorney
City of Port Arthur
Post Office Box 1089
Port Arthur, Texas  77640

Dear Mr. Wikoff:

     This is in reference to the consolidation of
Lakeview, Pear Ridge and Port Arthur, the annexations
of the Sabine Pass area (Ordinance Nos. 78-43, 78-44,
78-47, 79-33, 79-34 and 79-67) and Gulf of Mexico tracts
(Ordinance Nos. 79-79, 79-103 and 79-116), and the revised
council district plan (Ordinance No. 80-02), submitted to
the Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended.  Your submission was
received on February 5, 1980.  In accordance with your
request expedited consideration has been given this submission
pursuant to the Procedural Guidelines for the Administration
of Section 5 (28 C.F.R. 51.22).  I am also writing to discuss
more fully the overall compliance by the City of Port Arthur,
the City of Pear Ridge and the Town of Lakeview with Section
5 of the Voting Rights Act, 42 U.S.C. 1973c.

     As you know, on March 24, 1978, a Section 5 objection
was interposed to the consolidation of Pear Ridge and Lakeview
into Port Arthur.  The letter of objection notified the City
that "the Attorney General will reconsider his objection to
the consolidation should the City of Port Arthur undertake to
elect members of its city council from fairly-drawn single-
member districts."  Since that time our staff has met with
representatives of the City on several occasions in an effort
to resolve this matter.  Your latest proposal to obtain
compliance with Section 5 was received on February 5, 1980,
as indicated above.  We have determined, after analysis, that
the expansion of the Port Arthur City Council to eight members
elected on an at-large basis from residency districts, instead
of the seven previously provided for, does not meet the con-
cerns that led to the objection.  Therefore, on behalf of the
Attorney General and for the reasons previously stated I must
decline to withdraw the objection of March 24, 1978.

Defendant's Exhibit #                                    DE-005775

USA_00012842

- 2 -

We have also examined the voting changes occasioned
by the City's annexation of the area known as Sabine Pass.
Our analysis shows that these voting changes serve to
further exacerbate the dilution of minority voting strength
caused by the earlier consolidation of Pear Ridge and
Lakeview into the City of Port Arthur.  For that reason,
therefore, I must, on behalf of the Attorney General, interpose
an objection to the annexation.  Of course, as with our
previous objection, the Attorney General will reconsider this
objection should the City of Port Arthur undertake to elect
members of its city council from fairly-drawn single-member
districts.  Also you have the right, as provided by Section 5,
to seek a declaratory judgment from the United States District
Court for the District of Columbia that these changes have
neither the purpose nor the effect of denying or abridging the
right to vote on account of race, color or membership in a
language minority group.

Absent a declaratory judgment from the District Court
for the District of Columbia, of course, the legal effect of
the objections is to render the voting changes legally
unenforceable.  See, e.g., Allen v. State Board of Elections,
393 U.S. 544 (1969); Heggins v. City of Dallas, 469 F. Supp.
739 (N.D. Tex. 1979); Leroy and United States v. City of Houston,
C.A. H78-2174 and C.A. H78-2407 (S.D. Tex., July 19, 1979).
Notwithstanding the objection of March 24, 1978, the City's
failure to obtain a withdrawal of that objection and the
objection interposed today, we are aware that most of the
voting changes occasioned by the consolidation and annexation
have been implemented.  Although city-wide councilmanic
elections in the expanded Port Arthur have not been conducted,
regularly scheduled elections in "old" Port Arthur have been
cancelled as have elections in Pear Ridge and Lakeview.  The
Port Arthur City Council's responsibilities now include
governing the former areas of Pear Ridge, Lakeview and Sabine
Pass.  The City of Port Arthur has provided representation
for the Pear Ridge and Lakeview areas by appointing the mayors
and councils of the respective municipalities to advisory
councils and by establishing procedures for electing successors
to these councils.  Our staff has requested that the City
submit the ordinances establishing these advisory councils
for Section 5 review but the City has refused to make the
necessary submission.

- 3 -

Under these circumstances, we believe that prompt
action must be taken by the City to obtain a withdrawal
of the March 24, 1978 objection, the objection interposed
today and preclearance of the voting changes occasioned
by provisions for the advisory councils, or Port Arthur,
Pear Ridge, Lakeview and Sabine Pass must revert to the
method of governance and election which existed prior to
the consolidation and annexation. Almost two years have
passed since the date of the initial objection and we
perceive no basis for continued delay. Our experience
in enforcing Section 5 in other Texas municipalities,
such as Houston, Dallas, and San Antonio, demonstrates
that these matters are capable of resolution without the
delay that has resulted in the Port Arthur matter.

Thus, I request that you notify us within seven days
of receipt of this letter as to what steps the City is
willing to take either to obtain a withdrawal of the March
24, 1978 objection and the objection interposed today and to
obtain preclearance of the ordinances establishing advisory
councils or to revert back to the prior method of governance
and election. Our staff remains willing to work with you
and the appropriate officials during this time to resolve
the matter. However, if we do not receive a firm commitment
for a prompt resolution we will institute legal proceedings
and request the court to order the necessary relief.

You have also submitted for preclearance, pursuant to
Section 5, three ordinances which annexed tracts in the
Gulf of Mexico. Since these annexations do not have a dilutive
effect on the electorate of Port Arthur, the Attorney General
interposes no objection to the annexations contained in
Ordinances No. 79-79, 79-103 and 79-116.

If you have any questions regarding these matters
please feel free to contact Mr. Robert S. Berman of our
Voting Section at 202/724-6680. Mr. Berman is the attorney
who is responsible for this matter and he will be available
during the next seven days to work with you and the city
officials to resolve this matter.

Defendant's Exhibit #

DE-005777

USA_00012844

- 4 -

We appreciate your cooperation and it is our hope
that this matter can be resolved without the necessity
of litigation.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division


cc:  George W. Strake, Jr.
Texas Secretary of State

Bernis W. Sadler,
Mayor, City of Port Arthur

George Dibrell,
City Manager of Port Arthur

Robert Q. Keith, Esq.

Defendant's Exhibit #

DE-005778

USA_00012845

Jane Macon, Esq.                                    24 MAR 1980
City Attorney
Post Office Box 9066
San Antonio, Texas  78285

Dear Ms. Macon:

        This is in reference to your request for reconsideration
of the objection interposed on August 17, 1979, to the change
in polling place location of Precinct 205 for the April 7,
1979, municipal election in San Antonio, Texas.  The final
supplement of your request was received on February 29, 1980.

        In our letter of objection of August 17, 1979, we noted
that our analysis at that time revealed that the location of
the polling place for Precinct 205 at Our Lady of the Lake
University was objectionable because of an apparent lack of
notice of the location of the polling place in this predominantly
Mexican-American precinct, and because of the inaccessibility
of the polling place caused by construction work on 24th Street.
These conclusions were based in part upon information provided
by the former city clerk, Mr. G.V. Jackson, Jr., that the
city did not provide notice of the exact location of the
polling place on the campus of Our Lady of the Lake University,
nor of the alternate routes of entry to the polling place
other than the partially closed 24th Street entrance.

        Subsequent to our August 17, 1979, objection you
have adduced new and substantial evidence that the informa-
tion previously supplied to us by the city clerk and others
was erroneous.  You have demonstrated that notice of the
exact location of the polling place for Precinct 205 was
published bilingually in two newspapers serving San Antonio,
and that signs indicating alternate routes of access to the
polling place were situated at several locations on election
day.  Furthermore, your random survey of voters in Precinct 205
has demonstrated that voters were generally familiar with the
campus of Our Lady of the Lake University and the alternate
routes of access to the polling place other than those blocked
by construction on 24th Street.  You have also presented
information which shows that the voter turnout in Precinct 205
was not significantly different from that in comparable precincts
during the April 7, 1979, municipal elections.

USA_00012846

- 2 -

      After a careful analysis of the newly submitted infor-
mation and comments from other interested parties, I conclude
that an objection is no longer warranted.  Therefore, on
behalf of the Attorney General, I withdraw the objection
previously interposed to the polling place change for
Precinct 205 during the April 7, 1979, municipal election
in San Antonio.

                    Sincerely,


                    Drew S. Days III
             Assistant Attorney General
               Civil Rights Division

Defendant's Exhibit #

DE-005780

1

USA_00012847

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

Edmund F. Benchoff, Esq.                    **APR 3** 1980
Benchoff & Guidry
316 University Drive
Nacogdoches, Texas  75961

Dear Mr. Benchoff:

This is in reference to the 5:2 single-member district
election plan for the Nacogdoches Independent School District in
Nacogdoches County, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965,
as amended.  Your submission was completed on February 5, 1980.

Under Section 5, the district has the burden of
proving that the submitted 5:2 plan does not represent a
retrogression in the position of black voters in the district
and that it does not transgress constitutional limits with
respect to black voters.  See Beer v. United States, 425
U.S. 130 (1976).  See also 28 C.F.R. 51.19.  Under White
v. Regester, 412 U.S. 755 (1973), and its progeny, to prove
the constitutionality of its system, the city must prove
that the electoral system is equally open to black and white
voters, and that each group has a fair opportunity to elect
candidates of its choice.

We have given careful consideration to the information
you have provided as well as to comments and information
provided by other interested parties.  In addition to evidence
of a general pattern of racially polarized voting in Nacogdoches
County, the City of Nacogdoches and the Nacogdoches Independent
School District, we have noted that no black has ever won
election to the Nacogdoches Independent School District
Board of Trustees.  We have also been presented with and

Defendant's Exhibit #                                DE-005781

USA_00012848

have considered evidence of considerable residential racial
segregation in Nacogdoches County.

On the basis of our review, it does not appear that
the 5:2 plan submitted by the district, which provides for
slim minority population majorities in Election Districts
I and II, would offer black voters a fair opportunity to
elect candidates of their choice.  At the same time, the
school district has rejected alternative electoral systems that
would offer such an opportunity.  For example, our analysis shows
that it is possible to devise a plan that would provide
for at least one district with a substantial minority popu-
lation and voting age population majority.  The adoption
by the Nacogdoches Independent School District of an electoral
scheme that would maintain minority voting strength at a
minimum level, where alternative options would provide a
fair chance for minority participation, is relevant to the
question of an impermissible racial purpose in its adoption.
See Wilkes County v. United States, 450 F. Supp. 1171
(D. D. C. 1978).

Under the circumstances we are unable to conclude,
as we must under Section 5, that the submitted change does
not have a racially discriminatory purpose or effect.
Accordingly, I must,  on behalf of the Attorney General,
interpose an objection to the 5:2 single-member district
plan now under submission.

Of course, as provided by, Section 5 of the Voting
Rights Act, you have the right to seek a declaratory judg-
ment from the United States District Court for the
District of Columbia that this change has neither the
purpose nor will have the effect of denying or abridging
the right to vote on account of race, color, or mem-
bership in a language minority group.  In addition, the
Procedures for the Administration of Section 5 (28 C.F.R.
51.21(b) and (c), 51.23, and 51.24) permit you to request
the Attorney General to reconsider the objection.  However,
until the objection is withdrawn or the judgment from the
District of Columbia Court obtained, the effect of the
objection by the Attorney General is to make the 5:2 plan
legally unenforceable.

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us within
twenty days of your receipt of this letter of the course
of action the Nacogdoches Independent School District plans

Defendant's Exhibit #                                    DE-005782

to take with respect to this matter. If you have any
questions concerning this letter, please feel free to call
Andrew Karron (202-724-7403), of our staff, who has been
assigned to handle this submission.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005783

USA_00012850

2 3 JUL 1980

George Wikoff, Esq.
City Attorney
Post Office Box 1089
Port Arthur, Texas   77640

Dear Mr. Wikoff:

This is in reference to Ordinances Nos. 80-57,
80-59, and 80-60 (1980), which provide for a special
August 9, 1980, referendum election and changes relating
to that election, including five polling place changes
and an extension of hours for absentee voting, for the
City of Port Arthur in Jefferson County, Texas, sub-
mitted to the Attorney General pursuant to Section 5 of
the Voting Rights Act of 1965, as amended.  The sub-
mitted ordinances indicate that the referendum will be
conducted in the consolidated city, including the areas
of Lakeview, Pear Ridge and Sabine Pass.  Your submission
was received on July 18, 1980.  In accordance with your
request expedited consideration has been given this
submission pursuant to the Procedural Guidelines for the
Administration of Section 5 (28 C.F.R. 51.22), in order
to reach a determination by July 24, 1980.

We have given careful consideration to your
proposal to conduct the referendum in the expanded city,
notwithstanding the Section 5 objection to the consoli-
dation and annexation.  As you know, it is our position
that Section 5 of the Voting Rights Act requires that no
elections which implement the voting changes occasioned
by the consolidation with Lakeview, Pear Ridge, and
Sabine Pass may be conducted by the City of Port Arthur
until the objection under Section 5 is removed, except
elections that are likely to provide a basis for
withdrawal of the Section 5 objection to the consolidations,

Defendant's Exhibit #                                   DE-005784

USA_00012851

- 2 -

i.e., elections that are calculated to lead to the adoption
of a plan for electing the city governing body which
shows promise of "[affording black residents] represen-
tation reasonably equivalent to their political strength
in the enlarged community."  City of Richmond v. United
States, 422 U.S. 358, 370 (1975); see also City of
Petersburg v. United States, 354 F. Supp. 1021 (D.D.C.
1972), aff'd, 410 U.S. 962 (1973).  This is the same
principle we enunciated in the similar Houston annexation
matter last summer, and in our letters of objection
of December 21, 1979, and January 15, 1980, to a special
referendum election in the expanded City of Port Arthur.

     Pursuant to your request, we have not conducted
a Section 5 review of the election plans themselves.
However, we must, to some extent, consider the plans
to be presented to the expanded city in order to
determine whether the plans offer any promise of affording
black residents representation reasonably equivalent to
their political strength in the expanded city.  On the
basis of our past experience, it is our view that the
6-3 plan, if enacted, satisfies this test since it offers
some promise of remedying the concerns which led to
the objection.  Thus, if this were the only election plan
being presented we would interpose no objection to the
conduct of the referendum in the expanded city.  However,
the proposed referendum also presents to the voters a 4-5
election plan.  That plan, if enacted, will not "afford
[black residents] representation reasonably equivalent to
their political strength in the enlarged community."
City of Richmond v. United States, supra.  Accordingly,
I can perceive no basis for granting Section 5 pre-
clearance to your proposal for submitting that plan to
the expanded city.  Thus, on behalf of the Attorney
General I object to the referendum as proposed.

Defendant's Exhibit #                                        DE-005785

- 3 -

In interposing this objection, however, I stress
that the Attorney General will grant Section 5 preclearance
to any proposal for the conduct of a referendum in the
expanded city so long as the election plan(s) to be
presented meet the remedial test defined herein.  Thus,
the 6-3 plan and/or any other plan which shows promise of ',
providing a basis for removing the objection to the
consolidation, could be presented to the voters of the
entire city.  Should such a referendum be conducted the
election plan adopted by the voters would be subject to
the Voting Right Act's preclearance requirements, and
would be reviewed on its merits with respect to the purpose
and effect standards of Section 5.

I should reiterate that the city is not precluded
from presenting the 4-5 plan or any other referendum issue
to the voters of "old" Port Arthur, i.e., those persons
residing within the boundaries of the city as they existed
prior to the consolidations and annexation in question.
The conduct of such a referendum would be subject to
Section 5 preclearance only with regard to any procedural
changes that are made in election practices or procedures.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the United States District Court for the
District of Columbia that the proposed referendum has
neither the purpose nor the effect of denying or abridging
the right to vote on account of race, color, or membership
in a language minority group.  In addition, the Procedures
for the Administration of Section 5 (28 C.F.R. 51.21(b)
and (c), 51.23, and 51.24) permit you to request the
Attorney General to reconsider the objection.  However,
until the instant objection is withdrawn or the judgment
from the District of Columbia Court obtained, the effect
of the objection by the Attorney General is to make the
August 9, 1980, special referendum election legally
unenforceable.

- 4 -

Since a hearing has been scheduled for July 24,
1980 in United States v. City of Port Arthur, we will
notify the office of the Honorable Robert A. Parker,
by telephone, of the entry of this objection and will
hand-deliver a copy of this letter to the Court prior
to the hearing.

We continue to look forward to a prompt resolution
of the long-standing Section 5 objection to the consoli-
dation and annexation and it is our hope that the City
will promptly propose for presentation to the voters
an election plan meeting the remedial standard described
herein.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                          DE-005787

USA_00012854

8 AUG 1980

Richard G. Sedgeley, Esq.
1301-509 Fannin Building
Houston, Texas  77002

Dear Mr. Sedgeley:

This is in reference to the adoption of numbered
posts by the Cleveland Independent School District in Liberty
County, Texas, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended.
Your submission was completed on June 13, 1980.

Under Section 5, the District has the burden of
proving that the submitted change to numbered posts will
not result in a retrogression in the position of black voters
in the district and that it will not transgress constitutional
limits with respect to black voters.  See Beer v. United States,
425 U.S. 130 (1976).  See also 28 C.F.R. 51.19.

We have given careful consideration to the information
you have provided as well as to comments and information
provided by other interested parties.  In particular, we
have noted that there is evidence of a general pattern of
racially polarized voting in the Cleveland Independent School
District.  On the basis of our review, it does not appear
that the adoption of numbered posts, given the racially
polarized voting patterns mentioned above, will continue
to afford blacks a fair opportunity to elect representatives
of their choice.

Under the circumstances we are unable to conclude,
as we must under Section 5, that the submitted change does
not have a racially discriminatory purpose or effect.  Accordingly
I must, on behalf of the Attorney General, interpose an
objection to the adoption of the change to numbered posts
now under submission.

Defendant's Exhibit #

DE-005788

USA_00012855

- 2 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.   In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection.   However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the adoption of the numbered post scheme legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter what course of action the Cleveland Independent School District plans to take with respect to this matter.   If you have any questions concerning this letter, please feel free to call Andrew Karron (202-724-7403), of our staff, who has been assigned to handle this submission.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division


Defendant's Exhibit #                                    DE-005789

USA_00012856

DJ 166-012-3
D1992-1995


Roland Carlson, Esq.                    SEP  3 1980
City Attorney
Post Office Box 1758
Victoria, Texas  77901

Dear Mr. Carlson:

        This is in reference to the annexations (Ordinances
No. 79-32a (1979), No. 79-34a (1979), No. 80-9a (1980),
and No. 80-10a (1980)), to the City of Victoria in Victoria
County, Texas, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended.
Your submission was completed on July 10, 1980.

        To determine that a change in the composition of
a city's population resulting from annexations does not
have the effect of abridging the right to vote on account
of race, color, or membership in a language minority group, the
Attorney General must be satisfied either that the percentage
of members of a racial or language minority group has not
been appreciably reduced and that voting is not polarized
between racial or language groups, or that, nevertheless,
the city's electoral system will afford minority groups
representation reasonably equivalent to their political
strength in the enlarged community.  See City of Richmond
v. United States, 422 U.S. 358 (1975).  See also 28 C.F.R.
51.19.

        We have given careful consideration to the information
you have provided as well as to comments and information
provided by other interested parties.  In addition to evidence
of a general pattern of racially polarized voting in
City of Victoria elections, we have noted that no black
or Mexican American has ever won election to the Victoria
City Council under the at-large, majority vote, and designated
place features of its electoral system.  We have been presented
with and have considered demographic information indicating

USA_00012857

- 2 -

that it is most likely that the proportion of minority residents
of the submitted annexations like their recent predecessors will be
significantly smaller than that for the existing City of
Victoria, and that the annexations will therefore dilute
minority voting strength.  The most reliable data before us
indicates that the submitted annexations would decrease the
combined minority percentage population by at least one percent
and that, taken cumulatively with all annexations since 1973,
they would decrease the population percentage by over three
percent.  In the context of Victoria's at-large election
system, with its majority vote and designated post requirements,
this dilution will not be counterbalanced by an ability
on the part of the minority community to elect representation
reasonably equivalent to its strength in the enlarged community.
See City of Richmond, supra.

        Under the circumstances we are, therefore, unable to
conclude, as we must under Section 5, that the submitted
annexation will not have the proscribed discriminatory purpose
or effect.  Accordingly, I must, on behalf of the Attorney
General, interpose an objection to the submitted annexations.

        Should the City of Victoria adopt an electoral system
that would afford minority voters an opportunity to elect
candidates of their choice, the Attorney General will consider
withdrawing this objection.  Our analysis has indicated
that a plan incorporating single-member districts could
offer such a fair opportunity.

        Of course, as provided by Section 5 of the Voting
Rights Act you have the right to seek a declaratory judgment
from the United States District Court for the District of
Columbia that these changes neither have the purpose nor
will have the effect of denying or abridging the right
to vote on account of race, color, or membership in a language
minority group.  In addition, the Procedures for the Ad-
ministration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23,
and 51.24) permit you to request the Attorney General
to reconsider the objection.  However, until the objection
is withdrawn or the judgment from the District of Columbia
Court obtained, the effect of the objection by the Attorney
General is to make the annexations legally unenforceable.

Defendant's Exhibit #

DE-005791

USA_00012858

- 3 -

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us within
twenty days of your receipt of this letter what course
of action the City of Victoria plans to take with respect to
this matter. If you have any questions concerning this
letter, please feel free to call Andrew Karron (202-724-7403),
of our staff, who has been assigned to handle this submission.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005792

SEP 2 2 1980

J. C. Reagan, Esq.
Bartram, Reagan, Burrus & Dierkson
P. O. Box 69
New Braunfels, Texas  78130

Dear Mr. Reagan:

This is in reference to your request that the Attorney
General reconsider his February 1, 1980, objection under Section
5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c, to the
redistricting of commissioner precincts and the change in
boundaries of Voting Precincts No. 10 and No. 14 in Comal
County, Texas.  Your request was completed on February 27,
1980.

The Attorney General objected to these changes because
the county had failed to provide sufficient information to enable us
to make a determination on the merits of the changes involved
and, thereby, had not sustained its burden of proving that
these voting changes had neither the purpose nor the effect
of discriminating on the basis of race, color, or mem-
bership in a language minority group.  The information sub-
sequently received from you and from other interested parties
leads us to conclude at this time that the county has met
that burden and that no objection to those changes is warranted.
Therefore, pursuant to the reconsideration guidelines pro-
mulgated for the administration of Section 5, 28 C.F.R.
51.23 through 51.25, the objection interposed to the redistricting
of Comal County commissioner precincts and the changes in
Voting Precincts No. 10 and No. 14 is hereby withdrawn.
However, we feel a responsibility to point out that Section
5 of the Voting Rights Act expressly provides that the failure
of the Attorney General to object does not bar any subsequent
judicial action to enjoin the enforcement of such changes.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division


Defendant's Exhibit #                              DE-005793

USA_00012860

NOV 4 1980

Mr. Richard Bolf
Wilson County Clerk
P.O. Box 27
Floresville, Texas  78114

Dear Mr. Bolf:

This is in reference to the three polling place
changes for Wilson County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of
1965, as amended.  Your submission was received on September 29,
1980.

With regard to the changes for Voting Box No. 14
in Floresville City, within Commissioner's Precinct No. 4
and Voting Box No. 10 in La Vernia City within Commissioner's
Precinct No. 3, the Attorney General does not interpose
any objections to the changes in question.  However, we
feel a responsibility to point out that Section 5 of the
Voting Rights Act expressly provides that the failure of
the Attorney General to object does not bar any subsequent
judicial action to enjoin the enforcement of such changes.
In addition, as authorized by Section 5, the Attorney General
reserves the right to reexamine this submission if additional
information that would otherwise require an objection comes
to his attention during the remainder of the sixty-day period.

With respect to the proposed new polling place selected
for Voting Box No. 1, Commissioner's Precinct No. 3, however,
we cannot reach a like conclusion.  In that regard, we have
analyzed carefully the information contained in your
submission and comments from other interested persons.
Our analysis reveals that the new polling place would be
approximately one and one-half miles from the present
polling place, that there is no public transportation to the
proposed polling place, and that the present site is located
in close proximity to a heavily minority populated area and
is within walking distance to a great majority of the minority
registered voters in that precinct.  Under the proposed change
access to the polling place would be significantly reduced,
particularly for minority persons, many of whom we understand
are without the use of an automobile.  We have, in addition,
been presented with no compelling reason why the change
is necessary.

Defendant's Exhibit #                              DE-005794

- 2 -

Under Section 5 of the Voting Rights Act the submitting authority has the burden of proving that a submitted change has no discriminatory purpose or effect.  See, e.g., Georgia v. United States, 411 U.S. 526 (1973), 28 C.F.R. 51.19. In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance.  Under these circumstances, therefore, on behalf of the Attorney General, I must interpose an objection to the polling place change for Voting Box No. 1, Commissioner's Precinct No. 3, in Wilson County, Texas.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group.  In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection.  However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the polling place change for Voting Box No. 1, Commissioner's Precinct No. 3, legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter what course of action Wilson County plans to take with respect to this matter.  If you have any questions concerning this letter, please feel free to call Mr. Max Salazar (202-724-7169) of our staff, who has been assigned to handle this submission.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005795

FEB 9   1981

Joe D. Alford, Esq.
West Orange-Cove Consolidated
  Independent School District
113 South Border
Orange, Texas   77630

Dear Mr. Alford:

This is in reference to the numbered position and major-
ity vote requirements for the election of the Board of Trustees
of the West Orange-Cove Consolidated Independent School
District in Orange County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of
1965, as amended.  Your submission was completed on
December 9, 1980.

We have given careful consideration to the informa-
tion furnished by you as well as information and comments by
interested parties.  Under the present method of election,
school trustees are elected at-large by a plurality vote.
Under these circumstances, court decisions, to which we
feel obligated to give great weight, indicate that a numbered
position system and a majority vote requirement can have the
potential for abridging minority voting rights.  See Dunston v.
Scott, 336 F. Supp 206, 213 (E.D. N.C. 1972); White v.
Register, 412 U.S. 755, 766-767 (1973); Zimmer v. McKeithen,
485 F. 2d 1297, 1305 (5th Cir. 1973), aff'd sub nom.  East
Carroll Parish School Board v. Marshall, 424 U.S. 636 (1976);
and Blacks United for Lasting Leadership v. City of Shreveport,
71 F.R.D. 623, 628, 632, 636 (W.D. La. 1976).

We have not been provided information sufficient to
demonstrate that the position system and majority vote
requirement will not dilute the potential of the minority

Defendant's Exhibit #

DE-005796

— 2 —

voting were held in the West Orange-Cove Consolidated Independent School District. Although black candidates have been elected to the board of trustees, this was under the at-large, plurality method of election and it has not been shown that the addition of the position system and majority vote requirements will not make it more difficult for black candidates to be elected and will not inhibit the full and equal participation of blacks in the school district's political process.

Section 5 of the Voting Rights Act places upon the submitting authority the burden of proving that submitted changes in voting practices and procedures do not have a racially discriminatory purpose or effect. See, e.g., Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R. 51.19. Because of the potential for diluting black voting strength inherent in the use of a place system and majority vote requirement in the West Orange-Cove Consolidated Independent School District and because the school district has not advanced any compelling reason for their use, we are unable to conclude that the burden of proof has been sustained and that the imposition of the position system and majority vote requirement, in the context of an at-large election system, does not have a racially discriminatory purpose and will not have a racially discriminatory effect in the West Orange-Cove Consolidated Independent School District. Accordingly, on behalf of the Attorney General, I must interpose an objection to the implementation of the place system and majority vote requirement for the election of members of the Board of Trustees of the West Orange-Cove Consolidated Independent School District.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the use of the place system and majority vote requirement legally unenforceable.

Defendant's Exhibit #

DE-005797

USA_00012864

- 2 -

To enable this Department to meet its responsibi-
lity to enforce the Voting Rights Act, please inform us
within seven days of your receipt of this letter what
course of action the West Oranne-Cove Consolidated Independ-
ent School District plans to take with respect to this matter.
If you have any questions concerning this letter, please feel
to contact Carl W. Gabel (202--724-7439) of our staff, who
is available to discuss this matter with you.

                              Sincerely,


                              James P. Turner
                    Acting Assistant Attorney General
                         Civil Rights Division

Defendant's Exhibit #

DE-005798

USA_00012865

FEB 9 1981

Joe D. Alford, Esq.
West Orange-Cove Consolidated
   Independent School District
118 South Border
Orange, Texas  77630

Dear Mr. Alford:

    This is in reference to the numbered position and major-
ity vote requirements for the election of the Board of Trustees
of the West Orange-Cove Consolidated Independent School
District in Orange County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of
1965, as amended.  Your submission was completed on
December 9, 1980.

    We have given careful consideration to the informa-
tion furnished by you as well as information and comments by
interested parties.  Under the present method of election,
school trustees are elected at-large by a plurality vote.
Under these circumstances, court decisions, to which we
feel obligated to give great weight, indicate that a numbered
position system and a majority vote requirement can have the
potential for abridging minority voting rights.  See Dunston v.
Scott, 336 F. Supp 206, 213 (N.D. N.C. 1972); White v.
Register, 412 U.S. 755, 766-767 (1973); Zimmer v. McKeithen,
485 F. 2d 1297, 1305 (5th Cir. 1973), aff'd sub nom. East
Carrell Parish School Board v. Marshall, 424 U.S. 636 (1976);
and Blacks United for Lasting Leadership v. City of Shreveport,
71 F.R.D. 623, 628, 632, 636 (W.D. La. 1976).

    We have not been provided information sufficient to
demonstrate that the position system and majority vote
requirement will not dilute the potential of the minority

Defendant's Exhibit #

DE-005799

USA_00012866

- 2 -

voting strength in the West Orange-Cove Consolidated Independ-
ent School District.  Although black candidates have been
elected to the board of trustees, this was under the at-large,
plurality method of election and it has not been shown that the
addition of the position system and majority vote requirements
will not make it more difficult for black candidates to be
elected and will not inhibit the full and equal participation
of blacks in the school district's political process.

     Section 5 of the Voting Rights Act places upon the
submitting authority the burden of proving that submitted
changes in voting practices and procedures do not have a racially
discriminatory purpose or effect.  See, e.g., Georgia v. United
States, 411 U.S. 526 (1973); 28 C.F.R. 51.19.  Because of the
potential for diluting black voting strength inherent in the
use of a place system and majority vote requirement in the
West Orange-Cove Consolidated Independent School District and
because the school district has not advanced any compelling
reason for their use, we are unable to conclude that the burden
of proof has been sustained and that the imposition of the
position system and majority vote requirement, in the context
of an at-large election system, does not have a racially discri-
minatory purpose and will not have a racially discriminatory
effect in the West Orange-Cove Consolidated Independent School
District.  Accordingly, on behalf of the Attorney General, I
must interpose an objection to the implementation of the place
system and majority vote requirement for the election of members
of the Board of Trustees of the West Orange-Cove Consolidated
Independent School District.

     Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory judg-
ment from the United States District Court for the District
of Columbia that these changes neither have the purpose nor
will have the effect of denying or abridging the right to
vote on account of race, color or membership in a language
minority group.  In addition, the Procedures for the
Administration of Section 5 (28 C.F.R. 51.21(b) and (c),
51.23, and 51.24) permit you to request the Attorney
General to reconsider the objection.  However, until the
objection is withdrawn or the judgment from the District
of Columbia Court obtained, the effect of the objection
by the Attorney General is to make the use of the place
system and majority vote requirement legally unenforceable.

Defendant's Exhibit #

- 3 -

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter what course of action the West Orange-Cove Consolidated Independent School District plans to take with respect to this matter. If you have any questions concerning this letter, please feel to contact Carl W. Gabel (202--724-7439) of our staff, who is available to discuss this matter with you.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                    DE-005801

USA_00012868

DJ 166-012-3
D1992-1995; D5041,
D5027-5830, D5367; D5395

MAR 19 81

Charles Bluntzer, Esq.
City Attorney
Post Office Box 1758
Victoria, Texas  77901

Dear Mr. Bluntzer:

This is in reference to your request that the
Attorney General reconsider his September 5, 1980, objection
under Section 5 of the Voting Rights Act of 1965, 42 U.S.C.
1973c, to four annexations (Ordinance Nos. 79-32a, 79-34a,
80-9a, and 80-10a), and also in reference to your submission
of five charter amendments and a three district and four
at-large apportionment plan for the City of Victoria in
Victoria County, Texas.  Because our reconsideration of the
outstanding objection is inextricably linked with, and directly
affected by, the subsequently submitted charter changes, we
have followed our usual practice, described in Section 51.37
of the Procedures for the Administration of Section 5 (46
Fed. Reg. 878) and undertaken our reconsideration of the
outstanding objection in conjunction with our review of the
charter changes.  Accordingly, both the submission and the
request for reconsideration were considered completed on
January 22, 1981, the date on which the submission of the
charter changes and the reapportionment plan was completed.

The submitted charter changes include: an extension of
councilmembers' terms from two to three years; the expansion
of the city council from five to seven members; the adoption
of a 3:4 mixed single-member district-at-large election
method; the 2:2:3 staggering of terms so that an election
will be held each year for one single-member district
representative and one at-large representative; and a change
in the runoff primary date.  The Attorney General does not
interpose any objections to any of these charter amendments
or to the three district and four at-large plan.  However,

Defendant's Exhibit #

DE-005802

USA_00012869

we feel a responsibility to point out that Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent judicial action to enjoin the enforcement of such changes.

With regard to your request that the Attorney General reconsider his objection to the four annexations, in our view the dilution occasioned by these annexations is adequately remedied by the 3:4 method of election adopted by the City and to which we interpose no objection as indicated above. Accordingly, on behalf of the Attorney General, I am withdrawing the objection to the four annexations.

Sincerely,


James P. Turner
Acting Assistant Attorney General
Civil Rights Division

USA_00012870

JPT:CWG:CEI:spk
DJ 166-012-3
D5627


16 MAR 1981


Mr. J. Gene Cramon
Superintendent, Liberty
 Public Schools
P.O. Box 871
Liberty, Texas 77575

Dear Mr. Cramon:

        This is in reference to the adoption of the numbered positions system by the Liberty Independent School District in Liberty County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  Your submission was completed on February 12, 1981.

        We have given careful consideration to the information furnished by you as well as information and comments by interested parties.  Our analysis reveals that blacks constitute a substantial proportion of the population of the Liberty Independent School District and that bloc voting along racial lines appears to exist.  It would seem that the adoption of the numbered positions system in the District, when the number of voters, by race and voting pattern in the past are considered, will make it more difficult for black voters to elect candidates of their choice and will inhibit their full and equal participation in the District's political process.

        Under Section 5 of the Voting Rights Act the submitting authority has the burden of proving that a submitted change has no discriminatory purpose or effect.  See, e.g., Georgia v. United States, 411 U.S. 526 (1973); see also Section 51.39(e) of the Procedures for the Administration of Section 5 (46 Fed. Reg. 878).  For the foregoing reasons, I must on behalf of the Attorney General interpose an objection to the adoption of the numbered positions system in the context of at-large elections.

Defendant's Exhibit #                    DE-005804

USA_00012871

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group.  In addition, the Procedures for the Administration of Section 5 (Section 51.44, 46 Fed. Reg. 878) permit you to request the Attorney General to reconsider the objection.  However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the use of the numbered positions system legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter of the course of action the Liberty Independent School District plans to take with respect to this matter.  If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-7439), Director of the Section 5 Unit of the Voting Section.

                              Sincerely,


                              JAMES P. TURNER
                    Acting Assistant Attorney General
                        Civil Rights Division

Defendant's Exhibit #                                    DE-005805

JUN 5  1981

Frank B. McCreBary, Esq.
Vinson & Elkins
First City National Bank Building
Houston, Texas  77002

Dear Mr. McCreary:

This is in reference to the reduction in polling places, from thirteen to one, for the Burleson County Hospital District in Burleson County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended.  Your submission was received on April 7, 1981.

In our consideration of your submission, we have considered carefully the information furnished by you, along with information and comments provided by other interested parties.  Our review and analysis of this matter reveals the following facts:  The Burleson County Hospital District has boundaries coterminous with Burleson County which has a population of 12,313, of whom twenty-two percent are black and ten percent are Mexican American.  The number of polling places in the District was reduced from thirteen throughout the county to a single location in the City of Caldwell. One effect of this reduction in the number of polling places was a drop in voter participation from approximately 2,100 voters participating in the 1977 election to approximately 500 voters participating in 1979 and 1980 elections.

The bulk of the black population is concentrated in an area known as Clay Station, which is over thirty miles from the District's single polling place in the City of Caldwell.  A large percentage of the county's Mexican-American population is found within the City of Somerville which is about nineteen miles from the City of Caldwell.  Both of these areas had polling places that were eliminated by the change to a single polling location.

Defendant's Exhibit #

DE-005806

USA_00012873

- 2 -

We understand that for the April 4, 1981, election, minorities from the Clay Station and Somerville areas were able to meet the burden placed on them by the use of a single polling place in Caldwell only through a concerted effort with other county voters with similar interests whereby they themselves successfully provided publicity for the election and transportation to the single poll. However, this additional burden imposed upon the minority voters to obtain access to the single poll was caused by the elimination of polling places in areas which are centers of minority population. Thus, the removal of polling places in the minority areas had a disparate impact on minority voters.

Under Section 5, the Burleson County Hospital District has the burden of proving that the reduction in the number of polling places from thirteen to one does not represent a retrogression in the position of minority voters in the district (see Beer v. United States, 425 U.S. 130 (1976)), and that the submitted change has no discriminatory purpose or effect. See, e.g., Georgia v. United States, 411 U.S. 526 (1973); see also Section 51.39(e) of the Procedures for the Administration of Section 5 (46 Fed. Reg. 878). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance. Thus, on behalf of the Attorney General I must interpose an objection to the continued use of a single polling place in future elections held by the Burleson County Hospital District.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (Section 51.44, 46 Fed. Reg. 878) permit you to request the Attorney General to reconsider the objection and in that connection we have noted your request for a conference "in the event clearance is not anticipated". Because insufficient time remains to grant such a conference during the 60-day period allowed by statute to object we are sending this notification without affording such a conference. However, we would be pleased to hold a conference under the reconsideration procedures referred to above, if you desire and request it. In

Defendant's Exhibit #

DE-005807

USA_00012874

- 3 -

any event, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the use of a single polling place for elections held by the Burleson County Hospital District legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter the course of action the Burleson County Hospital District plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-7439), Director of Section 5 Unit of the Voting Section.

Sincerely,


James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                          DE-005808

JUN 5  1981

Frank ?. McCreary, Esq.
Vinson ? ?lkins
First City National Bank Building
Houston, Texas  77002

Dear Mr. McCreary:

    This is in reference to the reduction in polling
places, from thirteen to one, for the Burleson County
Hospital District in Burleson County, Texas, submitted to
the Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended.  Your submission was received
on April 7, 1981.

    In our consideration of your submission, we have
considered carefully the information furnished by you, along
with information and comments provided by other interested
parties.  Our review and analysis of this matter reveals the
following facts:  The Burleson County Hospital District has
boundaries coterminous with Burleson County which has a
population of 12,313, of whom twenty-two percent are black
and ten percent are Mexican American.  The number of polling
places in the District was reduced from thirteen throughout
the county to a single location in the City of Caldwell.
The effect of this reduction in the number of polling
places was a drop in voter participation from approximately
2,300 voters participating in the 1977 election to approximately
300 voters participating in 1979 and 1980 elections.

    The bulk of the black population is concentrated in
an area known as Clay Station, which is over thirty miles
from the District's single polling place in the City of
Caldwell.  A large percentage of the county's Mexican-American
population is found within the City of Somerville which is
about nineteen miles from the City of Caldwell.  Both of
these areas had polling places that were eliminated by the
change to a single polling location.

Defendant's Exhibit #

DE-005809

USA_00012876

- 2 -

We understand that for the April 4, 1981, election, minorities from the Clay Station and Somerville areas were able to meet the burden placed on them by the use of a single polling place in Caldwell only through a concerted effort with other county voters with similar interests whereby they themselves successfully provided publicity for the election and transportation to the single poll. However, this additional burden imposed upon the minority voters to obtain access to the single poll was caused by the elimination of polling places in areas which are centers of minority population. Thus, the removal of polling places in the minority areas had a disparate impact on minority voters.

Under Section 5, the Burleson County Hospital District has the burden of proving that the reduction in the number of polling places from thirteen to one does not represent a retrogression in the position of minority voters in the district (see Beer v. United States, 425 U.S. 130 (1976)), and that the submitted change has no discriminatory purpose or effect. See, e.g., Georgia v. United States, 411 U.S. 526 (1973); see also Section 51.39(e) of the Procedures for the Administration of Section 5 (46 Fed. Reg. 878). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance. Thus, on behalf of the Attorney General I must interpose an objection to the continued use of a single polling place in future elections held by the Burleson County Hospital District.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (Section 51.44, 46 Fed. Reg. 878) permit you to request the Attorney General to reconsider the objection and in that connection we have noted your request for a conference "in the event clearance is not anticipated". Because insufficient time remains to grant such a conference during the 60-day period allowed by statute to object we are sending this notification without affording such a conference. However, we would be pleased to hold a conference under the reconsideration procedures referred to above, if you desire and request it. In

USA_00012877

- 3 -

any event, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the use of a single polling place for elections held by the Burleson County Hospital District legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter the course of action the Burleson County Hospital District plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-7439), Director of Section 5 Unit of the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                    DE-005811

WBR:GWJ:FPR:DSC:bhq
DJ 166-012-3
E0840
    81 -0298

                                                    23 FEB 1982

Honorable Mark White
Attorney General of Texas
Supreme Court Building
P. O. Box 12548
Austin, Texas  78711

Dear Mr. Attorney General:

        This is in response to your letters dated February 8,
1982 and February 9, 1982 requesting reconsideration of the
Section 5 objections interposed on January 25 and 29, 1982.
As you know, this Department has recognized the Secretary
of State as the official of the State of Texas responsible
for submitting the congressional and legislative redistricting
plans.  Thus we cannot treat your letters of February 8 and 9
as requests for reconsideration of the objections at issue.

        However, by letter dated February 9, 1982, the Secretary
of State has requested that we reconsider the objections and
that review process is currently underway.  Your letters and
supporting information will be considered in the course of
our review and we invite you to submit whatever additional
information you deem relevant.

        I am enclosing for your information a copy of a letter
which we have sent to the Secretary of State regarding the
objections of January 25 and 29, 1982.

                            Sincerely,


                            Wm. Bradford Reynolds
                        Assistant Attorney General
                            Civil Rights Division


cc:  William P. Hobby
     Lieutenant Governor

Defendant's Exhibit #                                    DE-005812

                                                    USA_00012879



**U.S. Department of Justice**

**Civil Rights Division**

Office of the Assistant Attorney General                    Washington, D.C. 20530

1 2 MAR 1982

Mr. George Wikoff
City Attorney
P. O. Box 1089
Port Arthur, Texas  77640

Dear Mr. Wikoff:

This is in reference to the City of Port Arthur's
submission of the proposed consolidation of Port Arthur and
Griffing Park, and the submission of a proposed election plan
for the enlarged area.  Your submission, pursuant to Section 5
of the Voting Rights Act of 1965, was received on February 24,
1982.  As you requested, we have given expedited consideration
to your submission.

The City's proposed consolidation with Griffing Park is
tied to its proposed 4-2-2-1 election plan for the enlarged
city.  As you know, that plan has already been scrutinized by
the three-judge court for the District of Columbia, and that court
rejected the majority-vote feature for the at-large seats.  In
the conduct of our preclearance functions under Section 5 of the
Voting Rights Act, we traditionally have considered ourselves to
be a surrogate of the district court, seeking to make the kind
of decision we believe the court would make if the matter were
before it.  In that role, therefore, as well as in our role as
a party to that lawsuit, we are bound by the district court's
decision.

Your request that we preclear the 4-2-2-1 plan essentially
asks us to overturn the district court's decision.  This we have
no authority to do.  However, even if we had the authority to make
such a determination, we would not be justified in doing so since,
by proposing to expand Port Arthur by including overwhelmingly
white Griffing Park, Port Arthur has exacerbated the factual
context in which the at-large features of the 4-2-2-1 plan
would operate.

In light of these circumstances, and on the basis of other
information available to us, including the evidence of record
and the decision of the court in Port Arthur, Texas v.
United States, 517 F. Supp. 987 (D.D.C. 1981), prob. juris.
noted, 50 U.S.L.W. 3586 (January 25, 1982), we are unable to
conclude that the proposed voting changes are free of a
racially discriminatory purpose or effect.  Accordingly, on

Defendant's Exhibit #

DE-005813

- 2 -

behalf of the Attorney General, I must interpose an objection under
Section 5 to Port Arthur's proposed consolidation with Griffing Park
and the proposed election plan (4-2-2-1 plan) for the enlarged area,
because of the fact that the proposed election plan incorporates the
majority-vote requirement for the two non-mayoral at-large seats.

The City, through its counsel Mr. Welch, has also proposed
that, in any event, the Attorney General might preclear the consolida-
tion and 4-2-2-1 plan on the condition that the City is successful
before the Supreme Court in overturning the decision of the three-
judge court.  We know of no authority for the granting of such a
"conditional" preclearance, and it would appear to us that, by
operation of Section 5 itself, preclearance would be final absent
an objection within 60 days of the submission.  See, e.g., Morris
v. Gressette, 432 U.S. 491 (1977).  Accordingly, such action on our
part would be neither appropriate nor effective.  We do note, how-
ever, that the Supreme Court's decision in the pending litigation
presumably will decide whether the majority-vote feature of
the at-large posts is entitled to Section 5 preclearance.  Once
that decision is rendered by the Court, the City will be free
to resubmit the proposed consolidation with Griffing Park along
with such proposed election plan for the enlarged area as may
appear appropriate in the context of that decision.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment regarding
this matter from the United States District Court for the
District of Columbia that these changes neither have the
purpose nor will have the effect of denying or abridging the
right to vote on account of race, color or membership in a
language minority group.  However, until such a judgment from the
District of Columbia Court is obtained, the effect of the objec-
tion by the Attorney General here is to make the proposed consol-
idation of Port Arthur and Griffing Park, as well as the proposed
election plan for the enlarged city (the 4-2-2-1 plan), legally
unenforceable.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

USA_00012881



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*　　　　　　*Washington, D.C. 20530*

## 15 MAR 1982

Mr. Leroy Bieri
President, Board of Trustees
Angleton Independent School District
1900 North Downing Road
Angleton, Texas 77515

Dear Mr. Bieri:

This is in reference to the use of numbered positions
for the election of members of the board of trustees for the
Angleton Independent School District in Brazoria County,
Texas, submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended. Your submission
was initially received on October 26, 1981, and supplemental
information was received on January 12, 1982.

We note that in a telephone conversation on March 2,
1981, with Ms. Natalie Govan of our staff, Superintendent
Wall stated his understanding that state law would require
trustees to be elected by a majority vote after the adoption
of numbered positions. Based on information which we received
from the Office of the Texas Secretary of State, and from
our review of Section 23.11 of the Texas Education Code, it
appears that school districts are not required to follow a
majority-vote rule when numbered positions are adopted but,
rather, retain the option of imposing such a requirement.
Since it appears, however, that the school district may have
intended a change from a plurality-vote to a majority-vote
as a part of its submission, we have addressed this change
as well as the change to numbered positions in our consideration
of your submission under Section 5.

Our analysis reveals that blacks and Mexican Americans
constitute approximately twenty-five percent of the population
of the Angleton Independent School District and that there
are indications that bloc voting along racial and ethnic
lines may exist. On the basis of the limited information

Defendant's Exhibit #　　　　　　　　　　　　　DE-005815

- 2 -

that is available, it appears that the addition of the numbered
position, with or without the majority-vote requirement,
will make it more difficult for minority candidates to be
elected, and is likely to inhibit the full and equal partici-
pation of minorities in the school district's political
process.  In this connection, we note the observation in
your letter of October 21, 1981, that under the present
at-large, plurality-vote system "one particular candidate
may be elected by a small group of voters by their voting
for only one and refusing to vote for any others," and
that under the present method of election "a person may be
elected to a position on the board with less than a majority
of the vote."  This particular method of voting, however,
has been recognized by the courts as a means peculiarly
helpful to minorities seeking to win representation in an
at-large system.  Court decisions, to which we feel obligated
to give great weight, indicate that a numbered position
and majority-vote requirement in the context of the at-large
election system for the school board can have the potential
for abridging minority voting rights.  See White v. Regester,
412 U.S. 755, 766-767 (1973); Zimmer v. McKeithen, 485 F.
2d 1297, 1305 (5th Cir. 1973), aff'd sub nom. East Carroll
Parish School Board v. Marshall, 424 U.S. 636 (1976).

     Section 5 of the Voting Rights Act places upon the
submitting authority the burden of proving that submitted
changes in voting practices and procedures do not have a
racially discriminatory purpose or effect.  See, e.g.,
Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R.
51.19.  Because of the potential for diluting black voting
strength inherent in the use of numbered positions and a
majority-vote requirement in the Angleton Independent School
District and because the school district has not advanced
any compelling reason for these changes, we are unable to
conclude that the burden of proof has been sustained and
that the imposition of the numbered position and majority-
vote requirements, in the context of an at-large election
system, does not have a racially discriminatory purpose and
will not have a racially discriminatory effect in the
Angleton Independent School District.  To the extent that
the information we have obtained is conflicting with respect
to some of the issues involved, the Attorney General is
unable to determine that the submitted changes do not have
the prohibited purpose or effect of discriminating.  See
Section 51.39 of the Procedures for the Administration of
Section 5 (46 Fed. Reg. 875).  Accordingly, on behalf of
the Attorney General, I must interpose an objection to the
implementation of the numbered position and majority-vote
requirements for the election of members of the Board of
Trustees of the Angleton Independent School District.

Defendant's Exhibit #                                    DE-005816

- 3 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (Section 51.44, 46 Fed. Reg. 878) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the use of numbered positions and a majority-vote requirement legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter of the course of action the Angleton Independent School District plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-8388), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division


cc: Mr. Easton Wall
    Superintendent



U.S. Department   Justice

Civil Rights Division

Office of the Assistant Attorney General                    Washington, D.C. 20530

MAY 12 1982

Mr. Leroy Bieri
President, Board of Trustees
Angleton Independent School District
1900 North Downing Road
Angleton, Texas  77515

Dear Mr. Bieri:

        This is in reference to your request that the
Attorney General reconsider his March 15, 1982, objection
under Section 5 of the Voting Rights Act of 1965, as
amended, to numbered positions and a majority-vote requirement
for the Angleton Independent School District in Brazoria
County, Texas.  Your request was received on March 31, 1982.

        We have carefully reviewed the information that you
have provided to us, as well as comments and information
provided by other interested parties.  However, we have not
found a basis for the withdrawal of the Attorney General's
objection.  Therefore, on behalf of the Attorney General, I
must decline to withdraw the objection.

        Of course, Section 5 permits you to seek a declaratory
judgment from the United States District Court for the District
of Columbia that these changes have neither the purpose nor
will have the effect of denying or abridging the right to vote
on account of race, color or membership in a language minority
group, irrespective of whether the changes have previously
been submitted to the Attorney General.  As previously noted,
until such a judgment is rendered by that court, the legal
effect of the objection by the Attorney General is to render
the changes in question unenforceable.

                        Sincerely,


                        Wm. Bradford Reynolds
                        Assistant Attorney General
                        Civil Rights Division



**U.S. Department of Jus** 

**Civil Rights Division**

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

**4 OCT 1982**

Richard G. Sedgeley, Esq.
609 Fannin Building
Suite 1301
Houston, Texas  77002

Dear Mr. Sedgeley:

        This is in reference to the election date change
from the first Tuesday after the first Monday in November
in even-numbered years to the third Saturday in January
in odd-numbered years for the election of members to the
board of trustees for the Department of Education in Harris
County, Texas, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended,
42 U.S.C. 1973c.  Your submission was received on August 4,
1982.  Although we noted your request for expedited con-
sideration, we have been unable to respond until this
time.

        We have considered carefully the information you
have provided, as well as comments from other interested
parties and information previously provided by the Harris
County Department of Education.  At the outset, we note
that this change to January elections is not significantly
different from and raises the same concerns as those
which were noted in the previous submissions of November 25,
1977, and December 20, 1979.

        Our analysis shows that the submitted change to January
would result in holding elections on a date when a significant
portion of the county's non-minority population will be
voting for local school board members.  On the other hand, in
the Houston Independent School District (HISD) portion of the
county, which contains the predominant proportion of the
county's black and Hispanic population, no voting for HISD

Defendant's Exhibit #                                    DE-005819

USA_00012886

- 2 -

school board members will occur nor are there any other
significant elections on the proposed January date as there
are in November.  Thus, our analysis reveals that, even with
an increase in the number of polling places as compared to
elections previously scheduled for January, the bifurcation of
the election from other significant elections in the area
encompassed by the HISD will have a significant negative
impact on minority voting rights.

    Under these circumstances, therefore, I am unable to
conclude that the Harris County Department of Education has
met its burden of showing that the submitted change does not
have the purpose or effect of discriminating against minority
voters.  Accordingly, I must, on behalf of the Attorney
General interpose an objection to the election date change.
In this connection, we note that the Attorney General interposed
Section 5 objections to similar changes on two previous
occasions--May 1, 1978, and January 17, 1980.

    Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory judgment
from the United States District Court for the District of
Columbia that this change has neither the purpose nor will
have the effect of denying or abridging the right to vote on
account of race, color or membership in a language minority
group.  In addition, the Procedures for the Administration
of Section 5 (28 C.F.R. 51.44) permit you to request the
Attorney General to reconsider the objection.  However,
until the objection is withdrawn or the judgment from the
District of Columbia Court is obtained, the effect of the
objection by the Attorney General is to make the requested
election date change legally unenforceable.  See also 28
C.F.R. 51.9.

    To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of the
course of action Harris County plans to take with respect
to this matter.  If you have any questions concerning this
letter, please feel free to call Carl W. Gabel (202-724-8388),
Director of the Section 5 Unit of the Voting Section.

                    Sincerely,

                    Wm. Bradford Reynolds
                Assistant Attorney General
                   Civil Rights Division

Defendant's Exhibit #                              DE-005820

USA_00012887

Mr. Don Savage
City Manager                                    14 OCT 1982
P. O. Box 209
Pleasanton, Texas    78064

Dear Mr. Savage:

    This is in reference to the August 14, 1982, referen-
dum election; the majority vote requirement for the mayor;
the implementation of numbered positions for councilmembers;
the August 9, 1980, charter commission and charter commission
member election; and the adoption of bilingual election proce-
dures for the City of Pleasanton in Atascosa County, Texas,
submitted to the Attorney General pursuant to Section 5 of
the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.
Your submission was completed on August 16, 1982.

    The Attorney General does not interpose any objections
to the August 14, 1982, and August 9, 1980, referendum elections,
the adoption of bilingual election procedures, and the majority
vote requirement for the election of the mayor.  However, we feel
a responsibility to point out that Section 5 of the Voting
Rights Act expressly provides that the failure of the Attorney
General to object does not bar any subsequent judicial action
to enjoin the enforcement of such changes.  See the Procedures
for the Administration of Section 5 (28 C.F.R. 51.48).

    With respect to the implementation of numbered positions
for councilmembers, we have considered carefully the information
you have provided, as well as comments from other interested
parties.  Although Hispanics have been elected to the city
council under the present method of election (i.e., at-large
with plurality vote requirement), our analysis of the available
information indicates that the addition of the numbered posi-

cc:  Public File

USA_00012888

- 2 -

tion requirement will have the effect of making it more
difficult for Hispanic candidates to be elected, when compared
to the present system.  Such a situation would lead to a
retrogression in the position of minority voters and thus would
have an impermissible effect under the Act.  See Beer v.
United States, 425 U.S. 130 (1976).

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of proving that a submitted change
has no discriminatory purpose or effect.  See also, e.g.,
Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R. 51.19.
Because of the potential for dilution of the Hispanic voting
strength inherent in the use of numbered positions and because
the city has not advanced any compelling reason for its use,
I am unable to conclude that the burden of proof has been
sustained and that this change, in the context of an at-large
system, does not have a racially discriminatory purpose and
will not have a racially discriminatory effect.  Accordingly,
on behalf of the Attorney General, I must interpose an objection
to the implementation of numbered positions for the election
of councilmembers.

Of course, as provided by Section 5 of the Voting
Rights Act you have the right to seek a declaratory judgment
from the United States District Court for the District of
Columbia that this change has neither the purpose nor will
have the effect of denying or abridging the right to vote on
account of race, color or membership in a language minority
group.  In addition, the Procedures for the Administration
of Section 5 (28 C.F.R. 51.44) permit you to request the
Attorney General to reconsider the objection.  However, until
the objection is withdrawn or the judgment from the District
of Columbia Court is obtained, the effect of the objection by
the Attorney General is to make the implementation of numbered
positions legally unenforceable.  See also 28 C.F.R. 51.9.

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of

Defendant's Exhibit #

DE-005822

USA_00012889

— 3 —

the course of action the City of Pleasanton plans to take
with respect to this matter. If you have any questions
concerning this letter, please feel free to call Carl W.
Gabel (202-724-8388), Director of the Section 5 Unit of the
Voting Section.

Sincerely,


James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                        DE-005823



U.S. Department of Justice

Civil Rights Division

Office of the Assistant Attorney General                    Washington, D.C. 20530

**15 DEC 1982**

Richard G. Sedgeley, Esq.
Suite 1301
601 Fannin Building
Fannin & Texas
Houston, Texas  77002

Dear Mr. Sedgeley:

This is in reference to your request that the Attorney
General reconsider his October 4, 1982, objection under
Section 5 of the Voting Rights Act of 1965, as amended, to the
change in election date from the first Tuesday after the first
Monday in November in even-numbered years to the third Saturday
in January in odd-numbered years for the election of members
of the Harris County Board of School Trustees, Harris County,
Texas.  Your request was received at your meeting with members
of our staff on October 13, 1982.

We have reviewed carefully the information that you
have provided to us in support of your request, as well as
that already in our files concerning this matter.  In this
connection, we note the indication in your letter of request
that "substantial new information" was available which would
be furnished to us but, to date, we have not received that
information.  However, the information which has been provided
is not sufficient to allay the concerns set forth in our
October 4, 1982, letter which led to our being unable to con-
clude that the holding of the elections in January, rather
than November, will not have a prohibited disparate impact on
minority participation in the electoral process.  Therefore,
on behalf of the Attorney General, I must decline to withdraw
the objection.

Of course, Section 5 permits you to seek a declaratory
judgment from the United States District Court for the District
of Columbia that this change has neither the purpose nor will
have the effect of denying or abridging the right to vote on
account of race, color or membership in a language minority
group, irrespective of whether the change previously has been

Defendant's Exhibit #                                    DE-005824

- 2 -

submitted to the Attorney General. However, until such a
judgment is rendered by that court, the legal effect of the
objection by the Attorney General is to render the change in
question unenforceable. See the Procedures for the Admini-
stration of Section 5 (28 C.F.R. 51.9).

In addition, we have noted the request in your letter for
permission to conduct an election for Board of Trustee members
on the first Saturday in April or the second Saturday in August
1983 if our objection is not withdrawn. The Attorney General
can make no determination with regard to that request, since a
change which is not finally enacted or capable of administration
is not ripe for review by the Attorney General. See 28 C.F.R.
51.20(a). Accordingly, we cannot properly evaluate your submis-
sion of an alternate election date unless and until such change
is formally adopted. We do observe, however, that the holding
of the Harris County Board of School Trustees elections on any
date when other elections are not scheduled in the Houston
Independent School District area likely would raise the same
concerns which led to our October 4, 1982, and prior objections
relative to this matter.

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of the
course of action the Harris County Board of School Trustees
plans to take. If you have any questions concerning this
letter, please feel free to call Carl W. Gabel (202-724-8388),
Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

T. 8/15/83  Ret. 8/17/83
WBR:SSC:ELG:dyw
DJ 166-012-3
G9277

August 19, 1983

Mr. Bennie Wolff
Superintendent, Stockdale
   Independent School District
P. O. Box 7
Stockdale, Texas  78160

Dear Mr. Wolff:

        This is in reference to the use of numbered positions
for the election of board members of the Stockdale Independent
School District in Wilson County, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended, 42 U.S.C. 1973c. Your submission
was completed on June 20, 1983.

        We have given careful consideration to the information
you have submitted, as well as that provided by other interested
parties.  Our analysis reveals evidence of racially polarized
voting in the Stockdale area.  Our analysis further reveals
that the imposition of numbered positions will make it more
difficult for Hispanic voters to elect candidates of their
choice than under the present system because the change elimi-
nates the benefits that accrue to minority voters from being
able to vote single-shot.  Since designated positions often
cause head-to-head contests, this would, in effect, amount to
a majority vote requirement to win elections, a success the
minority would have little likelihood of attaining in the
context of the racial bloc voting that seems to exist.

        Under Section 5 of the Voting Rights Act, the submitting
jurisdiction bears the burden of showing that a submitted
change has neither a discriminatory purpose nor a discrimina-
tory effect.  See Georgia v. United States, 411 U.S. 526 (1973);
see also the Procedures of the Administration of Section 5

-2-

(28 C.F.R. 51.39(e)).  In order to show the absence of a
racially discriminatory effect, the jurisdiction must demon-
strate that the proposed change will not lead to "a retrogres-
sion in the position of racial minorities with respect to
their effective exercise of the electoral franchise."  Beer v.
United States, 425 U.S. 130, 141 (1976).

　　　In view of the above discussion, it would appear to us
that the use of a designated post system of elections for the
Stockdale Independent School District will lead to a retrogres-
sion in the ability of minority voters to elect candidates of
their choice.  For that reason, and because the school district
has not advanced any compelling reason for the use of numbered
positions, I am unable to conclude that the burden of proof
has been sustained and that this change, in the context of an
at-large system and the racially polarized voting that seems
to exist in the Stockdale area, does not have a racially dis-
criminatory effect.  Accordingly, on behalf of the Attorney
General, I must interpose an objection to the implementation
of numbered positions for the election of board members of the
Stockdale Independent School District.

　　　Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
the change has neither the purpose nor will have the effect of
denying or abridging the right to vote on account of race,
color, or membership in a language minority group.  In addition,
Section 51.44 of the guidelines permits you to request that
the Attorney General reconsider the objection.  However, until
the objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the effect of the objection by the
Attorney General is to make the use of numbered positions for
the election of board members of the Stockdale Independent
School District legally unenforceable.  See also 28 C.F.R. 51.9.

　　　To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of the
course of action the Stockdale Independent School District

Defendant's Exhibit #

DE-005827

USA_00012894

-3-

plans to take with respect to this matter.  If you have any
questions concerning this letter, please feel free to call
Sandra S. Coleman (202-724-6718), Deputy Director of the
Section 5 Unit of the Voting Section.

Sincerely,


Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005828

USA_00012895



**U.S. Department of Justice**

**Civil Rights Division**

_Office of the Assistant Attorney General_           -     _Washington, D.C. 20530_

**2 0 OCT 1983**

Lavon L. Jones, Esq.
Assistant Criminal District
  Attorney
P. O. Box 2553
Beaumont, Texas  77704

Dear Mr. Jones:

     This is in reference to the dissolution of the Beaumont
Independent School District; the creation of a common school
district; and its attachment to the South Park Independent School
District in Jefferson County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of
1965, as amended, 42 U.S.C. 1973c.  We received your submission
on August 22, 1983.  Although we noted your request for expedited
consideration, we have been unable to respond until this time.

     We have given careful consideration to the information
you have provided, as well as comments and information provided
by other interested parties.  We also have considered the
evidence of record concerning the litigation pending in <u>United
States</u> v. <u>Texas Education Agency</u>, 699 F.2d 1291 (5th Cir.),
cert. denied, 52 U.S.L.W. 3228 (U.S. Oct. 3, 1983).

     Our analysis of all available information shows that, at
present, the City of Beaumont is divided into two school
districts--the Beaumont Independent School District and the
South Park Independent School District.  Both districts elect a
seven-member school board at-large.  In the Beaumont Independent
School District, which is 40-percent black, blacks have been
able to elect three of the seven school board members; in the
South Park Independent School District, which is 30-percent
black, blacks have been unable to elect any of the seven members
to the school board.

     The change now under review proposes to create a single
school district by abolishing the Beaumont Independent School
District, and its integrated school board, and annexing that
area to the South Park Independent School District.  The
enlarged school district would be 36-percent black and would
elect its school board on an at-large basis.

USA_00012896

-2-

Our information is that voting along racial lines exists in these elections and that blacks have been able to elect candidates of their choice in the 40-percent Beaumont Independent School District only by utilizing the technique of single-shot voting. Our analysis also has revealed a widespread concern among minorities and others that the decrease in the black percentage of the population resulting from the annexation to South Park of the Beaumont constituency will have a significant adverse impact on the ability of blacks to elect representatives of their choice to the surviving school board under an at-large election system.

Under Section 5 the county is required to demonstrate that the proposed change affecting voting "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. 1973c. See Georgia v. United States, 411 U.S. 526 (1973). See also the Procedures for the Administration of Section 5 (28 C.F.R. 51.39(e)). While the submitting jurisdiction's burden usually is to show that the change will not "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise" (Beer v. United States, 425 U.S. 130, 141 (1975)), in the case of an annexation such as that now before us, the proposed change would not have the prohibited effect "as long as the post-annexation electoral system fairly recognizes the minority's political potential" (City of Richmond v. United States, 422 U.S. 358, 378 (1975)). In other words, the system of elections after the change should be one that would afford minorities "representation reasonably equivalent to their political strength in the enlarged community." Id. at 370.

On the basis of our analysis of this submission, we are unable to conclude either that the changes in question will be nonretrogressive for black voters or that the election system will afford blacks "representation reasonably equivalent" to their political strength in the post-annexation school district. Accordingly, on behalf of the Attorney General, I must interpose an objection to the proposed dissolution of the Beaumont Independent School District, the creation of a common school district, and its attachment to the South Park Independent School District.

Defendant's Exhibit #                    DE-005830

USA_00012897

-3-

In this regard, courts consistently have recognized that the Voting Rights Act does not prohibit the territorial expansion of jurisdictions but that such expansions may "be approved only on the condition that modifications calculated to neutralize to the extent possible any adverse effect upon the political participation of black voters are adopted, i. e., that the [jurisdiction] shift from an at-large to a ward system of electing its [officials]." City of Petersburg v. United States, 354 F. Supp 1021, 1031 (D. D.C. 1972), aff'd, 410 U.S. 962 (1973). See also, City of Port Arthur v. United States, 51 U.S.L.W. 4033 (U.S. Dec. 13, 1982); City of Rome v. United States, 446 U.S. 156 (1980); City of Richmond v. United States, supra. Therefore, should the Board of Trustees of the South Park Independent School District undertake to adopt an appropriate election plan for its expanded jurisdiction (see Tex. Educ. Code Ann. §23.024 (Vernon 1983), as amended by Senate Bill No. 1304 (1983)), such action would provide grounds for reconsideration and withdrawal of the objection.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the dissolution of the Beaumont Independent School District, the creation of a common school district, and its attachment to the South Park Independent School District legally unenforceable. 28 C.F.R. 51.9.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action Jefferson County plans to take with respect to this matter. If you have any questions, feel free to call Carl W. Gabel (202-724-8388), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

USA_00012898



**U.S. Department of Justice**

**Civil Rights Division**

_Office of the Assistant Attorney General_          _Washington, D.C. 20530_

December 27, 1983

Mr. Jack R. Trammell
Superintendent, Pewitt Consolidated
  Independent School District
P. O. Box 1106
Omaha, Texas  75571-1106

Dear Mr. Trammell:

This is in reference to the adoption of numbered
positions by the Pewitt Consolidated Independent School
District in Cass, Morris, and Titus Counties, Texas, submitted
to the Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received
the information to complete your submission on October 28,
1983.

We have given careful consideration to the informa-
tion furnished by you as well as information and comments
by interested parties.  Our analysis reveals that blacks
constitute a substantial proportion of the population of
the Pewitt Consolidated Independent School District and
that bloc voting along racial lines appears to exist.  Even
though blacks do not appear ever to have elected a candidate
of their choice to office, under the existing system they
do have a potential for doing so through the technique of
single-shot voting.  However, the addition of the numbered
positions system by the district will in effect nullify the
advantage of single-shot voting, thus making it more difficult
for black voters to elect candidates of their choice.  In
such circumstances, the proposed change would lead to an
impermissible retrogression in the position of minority
voters contrary to the Voting Rights Act.  See Beer v.
United States, 425 U.S. 130 (1976).

Defendant's Exhibit #

DE-005832

USA_00012899

- 2 -

Under Section 5 of the Voting Rights Act the submitting
authority has the burden of showing that a submitted change
has neither a discriminatory purpose or a discriminatory
effect.  See Georgia v. United States, 411 U.S. 526 (1973);
see also the Procedures for the Administration of Section 5
(28 C.F.R. 51.39(e)).  In light of the considerations
discussed above, I cannot conclude, as I must under the
Voting Rights Act, that that burden has been sustained in
this instance.  Therefore, on behalf of the Attorney General,
I must object to the imposition of numbered positions by
the Pewitt Consolidated Independent School District.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the United States District Court for the
District of Columbia that this change has neither the purpose
nor will have the effect of denying or abridging the
right to vote on account of race, color, or membership in
a language minority group.  In addition, Section 51.44 of
the guidelines permits you to request that the Attorney
General reconsider the objection.  However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the effect of the objection by
the Attorney General is to make the imposition of numbered
positions legally unenforceable.  28 C.F.R. 51.9.

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of the
course of action the Pewitt Consolidated Independent School
District plans to take with respect to this matter.  If you
have any questions, feel free to call Carl W. Gabel (202-724-
8388), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005833

USA_00012900



Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

Glenn R. Snyder, Esq.                    **2** APR 1984
Snyder & Rugaard
P. O. Box 248
DeSoto, Texas 75115

Dear Mr. Snyder:

This refers to the four polling place and the absentee
voting location changes for the Wilmer-Hutchins Independent
School District in Dallas County, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended, 42 U.S.C. 1973c. We received your
submission on March 15, 1984. Although we were unable to
complete our evaluation by March 22, 1984, as you requested,
we have expedited our consideration of your submission to the
extent possible pursuant to the Procedures for the Adminis-
tration of Section 5 (28 C.F.R. 51.32).

We have considered carefully the information you have
provided, as well as comments and information provided by
other interested parties. At the outset, we note that the
greater portion of the school district's population resides
in the northern part of the district which is a part of the
City of Dallas and is predominantly black. Under the existing
arrangement, there are two school district polling places in
this area (along with the absentee polling place) and one in
the less populated southern portion of the district which
contains the Cities of Wilmer, Hutchins, and Lancaster and
is predominantly white.

The proposed changes would establish new polling
places in the Cities of Wilmer, Hutchins, and Lancaster (in
the southern portion of the district) while abolishing one of
the two polling places now existing in Dallas in the northern
portion of the district and the absentee voting location
would be moved from the northern to the southern portion of
the district. In addition, the school district has arranged
to have its proposed polling places in Wilmer and Hutchins
combined with polling places being used for city elections

Defendant's Exhibit #                                              DE-005834

- 2 -

which are being held on the same day but the district has
declined to pursue similar arrangements for City of Dallas
residents of the school district where city elections also are
being held on the same day.  Thus, our information indicates
that not only would the school district be moving polling
places out of the black community (where the greater proportion
of the district's population resides) and into the less
populated white areas (Wilmer, Hutchins, and Lancaster), it
would also be conferring on white voters the additional
advantage of consolidated voting locations for city elections
and denying the black voters a similar opportunity.

    The school district has not provided any credible
reasons, unrelated to race, for its decrease in the facilities
that will be available to the predominantly black and more
heavily populated northern portion of the district nor for its
failure to seek the use of Dallas city polling places for its
election.  This especially concerns us because we understand
that recent efforts by blacks in the district to resolve this
situation have been rejected by the school board despite the
expressed willingness of the City of Dallas to coordinate
polling place locations with the Wilmer-Hutchins School
District.  No satisfactory explanation has been provided as
to why the school board refuses to accommodate the black
community's desire to vote in the same location for both city
and school elections in the same manner that it accommodated
the largely white electorate in the Cities of Wilmer and
Hutchins.

    Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change
does not have the purpose and will not have the effect of
denying or abridging the right to vote on account of race or
color.  See Georgia v. United States, 411 U.S. 526 (1973); see
also 28 C.F.R. 51.39(e)).  In light of the circumstances dis-
cussed above, I cannot conclude, as I must under the Voting
Rights Act, that that burden has been sustained in this instance.
Therefore, on behalf of the Attorney General, I must object to
the proposed polling place and absentee voting location changes.

Defendant's Exhibit #

DE-005835

USA_00012902

- 3 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the proposed polling place and absentee voting location changes legally unenforceable. 28 C.F.R. 51.9.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the Wilmer-Hutchins Independent School District plans to take with respect to this matter. If you have any questions, feel free to call Carl W. Gabel (202-724-8388), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division