

**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*

*Washington, D.C. 20530*

November 9, 1984

Sam Sparks, Esq.
Grambling & Mounce
P. O. Drawer 1977
El Paso, Texas  79950

Dear Mr. Sparks:

This refers to the implementation schedule for the new method of electing members of the board of trustees for the El Paso Independent School District in El Paso County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received the information to complete your submission on September 10, 1984.

The proposal before us is to delay implementation of the single-member district plan for the school board, which plan the Attorney General precleared on August 6, 1984; the single-member district plan was drawn following a decision of the federal district court that the at-large method of electing the school board violates Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973. <u>Sierra v. El Paso Independent School District</u>, Civ. Action No. EP-83-CA-203 (W.D. Tex.). The submission now before us proposes that the new plan would not immediately be implemented fully but, rather, that elections would be conducted in two districts in 1984 (or as soon thereafter as an election can be scheduled), elections would be conducted in three other districts in 1986, and elections would be conducted in the remaining two districts in 1988.

We have considered carefully the factual information and legal arguments you have submitted on behalf of the proposal, as well as that provided by other interested parties. It appears to us, however, that delaying full implementation of the single-member district plan until 1988 will perpetuate until that time the discriminatory results which the court found to exist in the at-large election system under which current members of the school board were elected. Moreover, there are strong indications that this delay was calculated to deny the minority community, for as long as possible, of the opportunity for equal participation in the electoral process.

Defendant's Exhibit #                                    DE-005837

USA_00012904

-2-

In this regard, we cannot help but note that, although the initial election would involve two districts in which Mexican Americans constitute a significant majority of the population, elections in the two other districts in which Mexican Americans constitute a majority of the electorate would be delayed for several years. The school district has not presented any compelling nonracial justification for such a delay in the full enjoyment of rights protected by the Voting Rights Act.

Under Section 5 of the Voting Rights Act, the submitting jurisdiction bears the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures of the Administration of Section 5 (28 C.F.R. 51.39(e)). In view of the above discussion, I am unable to conclude that that burden has been sustained in this instance. Accordingly, on behalf of the Attorney General, I must interpose an objection to the implementation schedule for the election of board members of the El Paso Independent School District.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the implementation schedule for the election of board members for the El Paso Independent School District legally unenforceable. See also 28 C.F.R. 51.9.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the El Paso Independent School District plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call Poli A. Marmolejos (202-724-6718), Attorney Supervisor in our Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

USA_00012905

**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

JAN 18 1985

Mr. Tony E. Murray
Superintendent, Rusk
   Independent School District
204 East Third Street
Rusk, Texas   75785

Dear Mr. Murray:

This refers to the adoption of numbered positions for
the Rusk Independent School District in Cherokee County, Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.   We
received information to complete your submission on November 19,
1984.

We have considered carefully the materials furnished by
you, information and comments provided by other interested
parties, and information in our files relating to similar
changes submitted previously by other jurisdictions in Cherokee
County.   Blacks constitute an estimated 14.8 percent of the
general population and 17.1 percent of the student population
of the school district, and voting appears to exist along
racial lines.   Under the existing system, the district's board
of trustees is elected at large with staggered terms and a
plurality vote requirement; one black has been elected under
this system through the technique of single-shot voting.

Our analysis shows that the addition of the numbered
positions requirement will, in effect, nullify the ability of
blacks to single-shot vote and, thus, significantly reduce,
if not extinguish, their potential for electing a candidate of
their choice to the school board.   In such circumstances, the
proposed change would lead to an impermissible retrogression
in the position of minority voters contrary to the Voting
Rights Act.   See Beer v. United States, 425 U.S. 130 (1976).

Defendant's Exhibit #                                              DE-005839

-2-

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change
has no discriminatory purpose or effect. See Georgia v.
United States, 411 U.S. 526 (1973); see also the Procedures
for the Administration of Section 5 (28 C.F.R. 51.39(e)).
Under Beer v. United States, supra, the absence of such an
effect is shown only when it is demonstrated that there has
been no retrogression in the political strength already attained
by the affected minority group.  In light of the considerations
discussed above, I cannot conclude, as I must under the Voting
Rights Act, that the school district's burden has been sustained
in this instance.  Therefore, on behalf of the Attorney General,
I must object to the utilization of numbered positions for the
election of school board members in the Rusk Independent School
District.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the United States District Court for the
District of Columbia that this change has neither the purpose
nor will have the effect of denying or abridging the
right to vote on account of race, color, or membership in
a language minority group.  In addition, Section 51.44 of
the guidelines permits you to request that the Attorney
General reconsider the objection.  However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the effect of the objection by
the Attorney General is to make the imposition of numbered
positions legally unenforceable.  28 C.F.R. 51.9.

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of the
course of action the Rusk Independent School District
plans to take with respect to this matter.  If you have any
questions, feel free to call Poli A. Marmolejos (202-724-8388),
Attorney-Supervisor of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

USA_00012907

U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

February 26, 1985

Mr. E. Max Harris
Superintendent, Liberty-Eylau
  Independent School District
2901 FCI Road
Texarkana, Texas  75501

Dear Mr. Harris:

     This refers to the December 20, 1972, special election;
the January 15, 1973, creation of the Liberty-Eylau Independent
School District; and the adoption of numbered positions in 1973
and a majority vote requirement in 1984 for the Liberty-Eylau
Independent School District in Bowie County, Texas, submitted
to the Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received
information to complete your submission on December 28, 1984.

     We have considered carefully the materials furnished
by you, relevant 1980 Census data, statistics from the
Texas Education Agency, along with information and comments
provided by other interested parties.  With respect to the
December 20, 1972, special election, the January 15, 1973,
creation of the Liberty-Eylau Independent School District,
and the adoption of numbered positions, the Attorney General
does not interpose any objections to these changes.  However,
we feel a responsibility to point out that Section 5 of the
Voting Rights Act expressly provides that the failure of the
Attorney General to object does not bar any subsequent judicial
action to enjoin the enforcement of such changes.  See the
Procedures for the Administration of Section 5 (28 C.F.R.
51.48).

     With respect to the adoption of the majority vote
requirement, however, we are unable to reach a similar conclu-
sion.  Our analysis of the information before us indicates
that blacks constitute more than 46 percent of the school

USA_00012908

-2-

district's student population.  Our analysis also reveals
that blacks constitute at least 37 percent of the total
population in the school district and that voting along
racial lines appears to exist.

The addition in 1984 of a majority vote requirement
occurred immediately after blacks for the first time were
successful in seating two members on the school board.
Our experience has been that such a requirement serves to
increase the likelihood of head-to-head contests between
black and white candidates--contests which, in the context
of the racial bloc voting which seems to exist in the
Liberty-Eylau School District, blacks are unlikely to win.
Thus, the addition of the majority vote requirement would
appear to lessen the chances of blacks electing candidates
of their choice to the Liberty-Eylau School Board.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change
has neither a discriminatory purpose or effect.  See Georgia v.
United States, 411 U.S. 526 (1973); see also the Procedures
for the Administration of Section 5 (28 C.F.R. 51.39(e)).  In
light of the considerations discussed above, I cannot conclude,
as I must under the Voting Rights Act, that the school district's
burden has been sustained in this instance.  Therefore, on
behalf of the Attorney General, I must object to the utilization
of the majority vote requirement for the election of members
to the Liberty-Eylau Independent School District.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
this change has neither the purpose nor the effect of denying or
abridging the right to vote on account of race or color.  In
addition, Section 51.44 of the guidelines permits you to request
that the Attorney General reconsider the objection.  However,
until the objection is withdrawn or a judgment from the District
of Columbia Court is obtained, the effect of the objection by
the Attorney General is to make the imposition of the majority
vote requirement legally unenforceable.  28 C.F.R. 51.9.

Defendant's Exhibit #

DE-005842

USA_00012909

-3-

        To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of the
course of action the Liberty-Eylau Independent School District
plans to take with respect to this matter.  If you have
any questions, feel free to call Poli A. Marmolejos
(202-724-8388), Attorney-Supervisor of the Section 5 Unit
of the Voting Section.

                          Sincerely,

                          Wm. Bradford Reynolds
                          Assistant Attorney General
                          Civil Rights Division

Defendant's Exhibit #

DE-005843

USA_00012910

August 6, 1985

Mr. Eldon G. Moody
Chairperson, Dawson County
   Democratic Party
P. O. Box 56
Lamesa, Texas  79331

Dear Mr. Moody:

        This refers to the bilingual election procedures
used by the Democratic Party of Dawson County, Texas,
submitted to the Attorney General pursuant to Section 5 of
the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.
We received the information to complete your submission on
June 7, 1985.

        We have given careful consideration to the materials
you have submitted, as well as to information and comments
from other sources.  Members of the local Hispanic community
have advised us, and 1980 Census data have confirmed, that
a significant proportion of the population of Dawson County
communicate effectively only in the Spanish language and, thus,
must rely on that language for information respecting elections.
In addition, for a large number of those voters it is necessary
that such information be given orally.

        Our review of the materials you have provided, however,
discloses that the Dawson County Democratic Party has made no
provision for bilingual election materials or announcements
beyond the ballot itself, and that the party failed to make
bilingual assistance available at the polls at such times and
sites as that assistance was necessary.  Furthermore, it
appears that the party has placed restrictions upon the
voters' choice of persons who may assist them at the polls.
For example, we have been advised that at recent elections
only poll officials were allowed to enter the polling booth
with voters requiring assistance, and you have advised that
you personally acted to discourage a private citizen from
assisting voters prior to the 1984 election.

        In this connection, we call your attention to Section
208 of the Voting Rights Act which expressly provides that a
voter who requires assistance in casting a ballot is entitled

cc:  Public File

Defendant's Exhibit #

DE-005844

USA_00012911

- 2 -

to receive such assistance from any person of the voter's choice, except for the voter's employer, union official or an agent of either. The right to assistance pertains to all phases of the election process, including the actual casting of the ballot. Absent significant evidence to the contrary, it would appear that limitations on this right to assistance may have had the effect in Dawson County of further restricting the already limited opportunities for Spanish-language voters to cast a free and effective ballot.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.39(e)). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the bilingual election procedures of the Dawson County Democratic Party.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the bilingual election procedures of the Dawson County Democratic Party legally unenforceable. 28 C.F.R. 51.9.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the Dawson County Democratic Party plans to take with respect to this matter. If you have any questions, feel free to call Mr. John K. Tanner, Attorney/Reviewer (202-724-6718) in the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #          DE-005845



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*          *Washington, D.C. 20530*

November 8, 1985

Ms. Brenda Adams
City Secretary
P. O. Box 829
El Campo, Texas   77437

Dear Ms. Adams:

This refers to the 1975 imposition of numbered positions
and a majority vote requirement, and the 1985 change to the
election of four councilmembers by single-member districts
and three at large with a new staggering method for the City
of El Campo in Wharton County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of
1965, as amended, 42 U.S.C. 1973c. We received the information
to complete your submission on September 9, 1985. Although
we noted your request for expedited consideration, we have
been unable to respond until this time.

We have considered carefully the information you have
provided along with that provided by other interested parties.
At the outset, we note that until 1975, the City of El Campo
elected its seven councilmembers at large with a plurality
vote under a staggered term system which required four members
to be elected at one election and three at the next.  Our
analysis shows that, with approximately 39 percent of the
population, the minority community in El Campo would have a
realistic opportunity to elect candidates of their choice to
office in each of the staggered elections.  Consequently, this
would provide minorities the opportunity to elect at least
two of the seven councilmembers by virtue of their ability to
single-shot vote under that system.  However, the system
instituted in 1975, with its majority vote and designated
posts requirements, offers no opportunity comparable to that
of the pre-1975 system.

USA_00012913

- 2 -

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change
has no discriminatory purpose or effect. See Georgia v.
United States, 411 U.S. 526 (1973); see also the Procedures
for the Administration of Section 5 (28 C.F.R. 51.39(e)).
Under Beer v. United States, 425 U.S. 130 (1976), the absence
of such an effect is shown only when it is demonstrated that
there has been no retrogression in the political strength that
the minority group has already attained.  In the context of
the circumstances extant in the City of El Campo, where
Hispanics have been unable to elect a representative of their
choice to office, I cannot conclude, as I must under the
Voting Rights Act, that the city has sustained its burden of
showing that the 1975 change is void of the proscribed purpose
and effect.  Therefore, on behalf of the Attorney General,
I must object to the election system instituted in 1975 whereby
councilmembers are elected at large with numbered positions
and the majority vote requirement.

With regard to the 1985 proposal for a mixed plan of
elections under which four councilmembers would be elected by
districts and three would be elected at large to staggered
terms, we are unable, in the absence of the districting plan
itself, to determine the effect of that system on the voting
rights of affected minority group members.  For that reason,
and in view of the sixty-day period in which the Attorney
General has to act, I must interpose an objection to the
proposed 4-3 system of election pending the city's completion
of its districting plan.  Once that process has been completed
and a final plan for implementing the 4-3 concept has been
adopted and submitted for review, we will undertake a review
of the completed 1985 revision to the city's electoral system
under Section 5 of the Voting Rights Act.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the United States District Court for the
District of Columbia that these changes have neither the
purpose nor will have the effect of denying or abridging
the right to vote on account of race, color, or membership
in a language minority group.  In addition, Section 51.44
of the guidelines permits you to request that the Attorney
General reconsider the objections.  However, until the
objections are withdrawn or a judgment from the District of
Columbia Court is obtained, the effect of the objections by
the Attorney General is to make the changes legally unenforce-
able.  28 C.F.R. 51.9.

Defendant's Exhibit #

DE-005847

USA_00012914

- 3 -

　　　　To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of El Campo plans to take with respect to this matter.  If you have any questions, feel free to call John K. Tanner (202-724-8388), Attorney/Reviewer of the Section 5 Unit of the Voting Section.

　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　James P. Turner
　　　　　　　Acting Assistant Attorney General
　　　　　　　　　Civil Rights Division

January 13, 1986

Honorable Charles Stavley
Terrell County Judge
P. O. Box 674
Sanderson, Texas  79848

Dear Judge Stavley:

     This refers to the reduction in the number of justices of
the peace and constables from four to one and the resulting
consolidation of the existing four single-member districts into
a single county-wide unit for electing those offices in Terrell
County, Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended,
42 U.S.C. 1973c. We received the information to complete
your submission on December 26, 1985.

     Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change
has no discriminatory purpose or effect.  See Georgia v.
United States, 411 U.S. 526 (1973); see also the Procedures
for the Administration of Section 5 (28 C.F.R. 51.39(e)).
While we have considered carefully all of the materials and
information you have provided in connection with this submission,
we cannot conclude that the county has met its burden with
respect to the change here under consideration.

     According to the information presently available to us,
the county, in pursuing its objective to reduce the number of
its justices of the peace, had before it two proposals, one of
which would have reduced the number from four districts to two
and the other of which would reduce the number from four
districts to one.  In spite of support for the former and
opposition to the latter in the minority community, the county
nevertheless adopted the latter.  We have received comments
from local citizens to the effect that this option was
selected, at least in part, to assure the removal from office

cc:  Public File

Defendant's Exhibit #

DE-005849

- 2 -

of the lone Mexican-American incumbent in existing Precinct 2.
Although by our letter of October 8, 1985, we sought additional
information to help resolve these issues, the county's response
essentially was a denial that the Precinct 2 incumbency was a
motivating factor and a denial that a two district alternative
was considered.  The commissioner court's order of September 10,
1984, which you furnished, indicates consideration was given
to both plans.  Had the county provided a persuasive explana-
tion of the governmental purpose served in preferring the
single district plan, negating the contention that it was
based on elimination of a minority incumbent, it is likely
that the change would have merited preclearance.  Should you
so desire, such information may still be submitted in support
of an application for reconsideration (see 28 C.F.R. §51.44).

Under these circumstances, and as indicated above, I
cannot conclude, as I must under the Voting Rights Act, that
the county has sustained its burden in this instance.  There-
fore, on behalf of the Attorney General, I must object to the
change to a single justice of the peace elected, of necessity,
from the county at large.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory judgment
from the United States District Court for the District of
Columbia that these changes have neither the purpose nor will
have the effect of denying or abridging the right to vote on
account of race, color, or membership in a language minority
group.  In addition, Section 51.44 of the guidelines permits
you to request that the Attorney General reconsider the
objection and we stand ready and willing to reconsider this
matter should the county adequately justify the need for
reducing its number of justices of the peace to one rather
than two.  However, until the objection is withdrawn or a
judgment from the District of Columbia Court is obtained, the
effect of the objection by the Attorney General is to make
the reduction in the number of justices of the peace and
constables from four to one and their concomitant election at
large legally unenforceable.  28 C.F.R. 51.9.

- 3 -

        To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of the
course of action Terrell County plans to take with respect
to this matter.  If you have any questions, feel free to call
John K. Tanner (202-724-8388), Attorney/Reviewer of the
Section 5 Unit of the Voting Section.

                        Sincerely,


                        Wm. Bradford Reynolds
                        Assistant Attorney General
                        Civil Rights Division

Defendant's Exhibit #                              DE-005851

USA_00012918



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

APR 1 0 1986

Paul Lyle, Esq.
Day, Owen, Lyle, Voss & Owen
P. O. Box 328
Plainview, Texas   79073-0328

Dear Mr. Lyle:

     This refers to the change in the method of election
from at large with numbered positions to five single-member
districts with two at-large positions; the districting plan;
the establishment of five voting precincts and the polling
places therefor; and the runoff election procedures for the
Plainview Independent School District in Hale County, Texas,
submitted to the Attorney pursuant to Section 5 of the Voting
Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received
the information to complete your submissions on March 27, 1986.

     We have considered carefully the information you
have provided, information and comments from other interested
parties, as well as relevant Bureau of the Census data.  Con-
cerning the change in the method of election and the districting
plan, the information we have received and our independent
analysis reveal strong indications that the plan adopted by the
school district was designed to minimize the opportunity for
effective political participation by minority citizens.  First,
we note that rather than adopt a plan of districts coordinated
with the districting plan for the City of Plainview, the school
board chose a plan of five districts and two at-large seats.
The districts of the school board's plan show little relationship
to the districts of the city's election plan.  As a result of
this decision, many voters will be required to visit two polling
places on the same day in order to cast ballots for city and
school district offices.  The information submitted reveals
that a primary motivation underlying the submitted plan was to

USA_00012919

- 2 -

assure that minority citizens would constitute a voting
majority in only one district. This result was achieved by
needlessly fragmenting the concentrated minority population
among four of the five districts, creating arbitrary divisions
among cohesive minority neighborhoods, and linking segments
of the minority community with the largely Anglo rural compo-
nents of the school district. Finally, our analysis reveals
that despite requests from the minority community for involve-
ment in the development of a new election system, the school
district chose to exclude minority citizens from any effective
role in the decision-making process. No adequate nonracial
explanation has been furnished by the school board as to any
of these choices.

Under Section 5 of the Voting Rights Act, the sub-
mitting authority has the burden of showing that a submitted
change has no discriminatory purpose or effect. See Georgia v.
United States, 411 U.S. 526 (1973); see also the Procedures
for the Administration of Section 5 (28 C.F.R. 51.39(e)).
In light of the considerations discussed above, I am unable
to conclude that the school district has satisfied its burden
of demonstrating that the submitted election plan was enacted
without a purpose of denying or abridging the right to vote
of minority citizens. See Busbee v. Smith, 549 F. Supp. 494
(D. D.C. 1982). As a consequence, I must, on behalf of the
Attorney General, interpose an objection to the change in the
method of election and the districting plan.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory judgment
from the United States District Court for the District of
Columbia that these changes have neither the purpose nor will
have the effect of denying or abridging the right to vote on
account of race, color, or membership in a language minority
group. In addition, Section 51.44 of the guidelines permits
you to request that the Attorney General reconsider the
objection. However, until the objection is withdrawn or a
judgment from the District of Columbia Court is obtained, the
effect of the objection by the Attorney General is to make
the change in the method of election and districting plan
legally unenforceable. 28 C.F.R. 51.9.

Defendant's Exhibit #

DE-005853

USA_00012920

- 3 -

In light of the Section 5 objection to the above-described changes, we are unable to make a determination concerning the voting precinct, polling place, and runoff procedure changes now.  See 28 C.F.R. 51.20(b).

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the Plainview ISD plans to take with respect to these matters.  If you have any questions, feel free to call Poli Marmolejos (202-724-8388), Attorney-Reviewer of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

July 18, 1986

Richard B. Collin, Esq.
City Attorney
P. O. Box 829
El Campo, Texas  77437

Dear Mr. Collin:

     This refers to the two alternative districting proposals
for implementing the city's proposed 4-3 election system, the
four proposed polling places for those districts, and your request
for reconsideration to the Attorney General's November 8, 1985,
objection to the city's proposed election of councilmembers from
four single-member districts and three at large, with a majority
vote requirement and staggered terms for the City of El Campo in
Wharton County, Texas, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  We received the information to complete your submission on
May 19, 1986.

     We have considered carefully the information you have
provided, relevant 1980 Census data, information in our files as
well as comments and information from other interested parties.
Under Section 5 of the Voting Rights Act, the submitting authority
has the burden of showing that a submitted change has no discrimi-
natory purpose or effect.  See <u>Georgia</u> v. <u>United States</u>, 411 U.S.
526 (1973); see also the Procedures for the Administration of
Section 5 (28 C.F.R. 51.39(e)).  As noted in our previous letter,
under <u>Beer</u> v. <u>United States</u>, 425 U.S. 130 (1976), the absence of
such an effect is shown only when it is demonstrated that there
has been no retrogression in the political strength already
attained by minorities in the electoral system.

     We note that during the April 5, 1986, elections under the
existing system which allows for the at-large election of council-
members with a plurality of the vote, the city's first minority
councilmember was elected by being one of the three top vote-
getters for the three council seats that were up for election
during this year's contest.  From all that presently appears,
minorities in the city will have an equal or greater opportunity
for similarly electing a candidate of their choice to at least
one of the four seats up for election during the city's next
election, thus giving them the potential for having at least two
members on the council should the present system continue.

Defendant's Exhibit #                    DE-005855

- 2 -

In comparison to the existing plan the proposed 4-3 election plans with a majority vote requirement and the staggering of the three at-large positions (one at-large position to be filled each year) appear to offer less opportunity for effective political participation by minority citizens. The staggering of the at-large seats and the majority vote requirement will make it more difficult for minority citizens to elect candidates of their choice to these positions and the alternate districting plans, by themselves, fail to offer minority citizens an opportunity for effective political participation comparable to that offered by the current election plan. For these reasons, I am unable to conclude that the city has carried the burden imposed by Section 5. Accordingly, on behalf of the Attorney General, I must object to the proposed districting plans and continue the Attorney General's November 8, 1985, objection to the 4-3 method of election with a majority vote requirement and staggered terms.

Of course, as noted in our prior objection letter, under Section 5 of the Voting Rights Act you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the changes legally unenforceable. 28 C.F.R. 51.9.

Although the submitted election plan requires us to interpose this Section 5 objection, our action should not be interpreted as indicating that an electoral option including at-large positions, filled concurrently and without majority vote requirements, would fail the Section 5 test. In light of the objection to the proposed districting plans, however, we need not make a determination at this time concerning the four polling places under Section 5. 28 C.F.R. 51.20.

Defendant's Exhibit #

DE-005856

USA_00012923

- 3 -

　　　To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action the City of El Campo plans to take with respect to these
matters.  If you have any questions, feel free to call Poli A.
Marmolejos (202-724-8388), Attorney/Reviewer in our Section 5
Unit of the Voting Section.

　　　　　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　　　　　Wm. Bradford Reynolds
　　　　　　　　　　　　　　　Assistant Attorney General
　　　　　　　　　　　　　　　　Civil Rights Division

Defendant's Exhibit #

DE-005857

USA_00012924

U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_ _Washington, D.C. 20530_

December 15, 1986

Richard B. Collins, Esq.
City Attorney
P. O. Box 829
El Campo, Texas   77437

Dear Mr. Collins:

This refers to your request that the Attorney General reconsider the November 8, 1985, and July 18, 1986, objections under Section 5 of the Voting Rights Act of 1965, as amended, to changes in the method of electing councilmembers, and districting plans for implementing those changes, in the City of El Campo in Wharton County, Texas.  We received your initial letter on August 18, 1986; supplemental information was received on October 17, 1986.

You request that we withdraw the objections to the proposed system of election which requires the election of four members from single-member districts and three members at large with a majority vote requirement for staggered (1-1-1) terms.  However, because you provide no new factual or legal grounds for a change in the conclusions previously reached, we find no basis for withdrawing the Attorney General's objections.  While we do note that under the existing at-large system the terms of office are staggered on a 3-2-2 basis as opposed to the 4-3 staggering which we had earlier understood to exist, it would still appear to us that the proposed system, with its majority vote requirement and 1-1-1 staggering for the at-large seats, is retrogressive for minorities who have an opportunity to win with a plurality vote in multiple seat contests under the existing system.  Accordingly, on behalf of the Attorney General, I must decline to withdraw the objections.

We iterate, however, that our continuation of the objection to the 4-3 system of election should not be interpreted as indicating that the 4-3 system of election would fail the Section 5 test if, in conjunction with fairly drawn single-member districts (Alternate Plan 4 or 5), the three at-large positions were elected concurrently every two years with a plurality vote requirement.

Defendant's Exhibit # DE-005858

- 2 -

Again we point out that Section 5 permits you to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, irrespective of whether the changes previously have been submitted to the Attorney General.  However, as also previously noted, until such a judgment is rendered by that court, the legal effect of the objection by the Attorney General is to render the changes in question unenforceable.  See the Procedures for the Administration of Section 5 (28 C.F.R. 51.9).

If you have any further questions regarding these matters, feel free to contact Sandra S. Coleman (202-724-6718), Director of the Section 5 Unit of the Voting Section.

                    Sincerely,

                    Wm. Bradford Reynolds
                    Assistant Attorney General
                    Civil Rights Division

Defendant's Exhibit #

DE-005859

USA_00012926

JBR:MAP:GS:gmh
DJ 166-012-3
N4446

Kelly Frels, Esq.
Bracewell & Patterson
2900 South Tower Pennzoil Place
Houston, Texas  77002

DEC 29 1986

Dear Mr. Frels:

     This refers to the adoption of a majority vote requirement
for the Wharton Independent School District in Wharton County,
Texas, submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.
We received the information to complete your submission on
October 28, 1986.

     We have considered carefully the information you have
provided, as well as the information provided by other interested
parties.  Under the school district's election system, the seven
members of the board of trustees are elected at large to numbered
posts and serve staggered terms.  According to information available
to us, voting in Wharton Independent School District elections
appears to be polarized along racial and ethnic lines and this
voting pattern has hampered the ability of minority voters to
elect candidates of their choice.  The school district has not
provided us with sufficient information to reach a different
conclusion.

     In this context, the incorporation of a majority vote
requirement, which increases the probability of "head-to-
head" contests between minority candidates and white candidates,
serves to enhance the ability of the majority group to control
the election of all board members and thereby exacerbates the
election difficulties faced by minority voters.  See City of
Port Arthur v. United States, 459 U.S. 159 (1982); Rogers v.
Lodge, 458 U.S. 613, 627 (1982).


cc:  Public File

Defendant's Exhibit #

DE-005860

USA_00012927

- 2 -

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.39(e)). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the majority vote requirement.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the use of the majority vote requirement legally unenforceable.  28 C.F.R. 51.9.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the Wharton Independent School District plans to take with respect to this matter.  If you have any questions, feel free to call Mark A. Posner (202-724-8388), Attorney/Reviewer in the Section 5 Unit of the Voting Section.

Sincerely,


Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

**U.S. Department of Justice**

Civil Rights Division

Office of the Assistant Attorney General                    Washington, D.C. 20530

JUN 22 1987

Michael D. Morrison, Esq.
Guinn & Morrison
South Fifth Street
Waco, Texas  76798

Dear Mr. Morrison:

This refers to the change in the method of election from
at large to five members elected from single-member districts
and two elected at large by numbered position to staggered
terms, the districting plan, the implementation schedule, the
establishment of four polling places, and the voting precinct
realignment for Marlin Independent School District in Falls
County, Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  We received the information to complete your submission
on April 28, 1987.

We have considered carefully the information you have
provided, as well as information provided by other interested
parties.  Our review of this information shows that, even though
one minority group member has served on the school board since
1978 without electoral opposition, the six minority candidates who
have been in contested elections were unsuccessful, largely
because of what appears to be a pattern of racially polarized
voting in school district elections.  Under the proposed districting
plan, the ability of minority voters to participate in the
electoral process would seem to be significantly enhanced since
they would have the opportunity to elect candidates of their
choice in two of the plan's five districts.

However, it also appears that the manner in which the
at-large seats are to be elected is calculated to deny to
minority voters the opportunity to participate equally in the
election of members to fill these two positions on the school
board.  By designating these positions by number and staggering
the terms so that only one at-large position is elected at a time,

USA_00012929

- 2 -

the board seems effectively to have precluded minority voters from the opportunity for enhancing their voting potential through use of the election technique of single-shot voting. Were these seats filled on a concurrent basis with the plurality-win feature used in school district elections (and without numbered positions or any other anti-single-shot provision), minority voters would have a realistic opportunity to elect an additional candidate to the board. We have been afforded no nonracial justification for this seemingly unnecessary limitation on minority participation in the electoral process for school board members.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect. See Georgia v. United States, 411 U.S. 526 (1973); see also Section 51.52 of the Procedures for the Administration of Section 5 (52 Fed Reg. 497-498 (1987)). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the changes here under submission insofar as they incorporate the use of numbered positions and staggered terms for the at-large seats.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, Section 51.45 of the guidelines (52 Fed. Reg. 496 (1987)) permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the proposed new method of election legally unenforceable so long as it seeks to have the at-large positions elected by numbered posts to staggered terms. See Section 51.10 (52 Fed. Reg. 492 (1987)).

With regard to the establishment of four polling places and the voting precinct realignment, the Attorney General will make no determination on these changes at this time since they are directly related to the new method of election to which an objection is being interposed. Section 51.22(b) (52 Fed. Reg. 493 (1987)).

Defendant's Exhibit #

DE-005863

USA_00012930

-3-

     To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of
the course of action Marlin Independent School District
plans to take with respect to this matter.  If you have any
questions, feel free to call Sandra S. Coleman (202-724-6718),
Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds<br>Assistant Attorney General<br>Civil Rights Division

Defendant's Exhibit #

DE-005864

USA_00012931



**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

October 2, 1987

Honorable Jack M. Rains
Secretary of State of Texas
P. O. Box 12697
Austin, Texas  78711

Dear Mr. Secretary:

    This refers to Chapter 2, S.B. No. 88 (1987), which
provides for the creation of the Crockett County Hospital
District, a referendum requirement, the at-large election of
seven directors to two-year, staggered terms by numbered
positions and plurality vote, and the method of filling
vacancies for the district in Crockett County, Texas, submitted
to the Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received
the information to complete your submission on August 3, 1987.

    We have considered carefully the information furnished by
you as well as information and comments from other interested
parties.  At the outset, we note that presently Crockett County
operates a hospital through a board of directors consisting of
six members who are appointed by the county commissioners.
The county commissioners are elected from four single-member
districts, two of which have Hispanic majorities and are
represented by Hispanic commissioners.  Two of the members
appointed to the present board of hospital directors are
Hispanic.  Under the proposed system the new hospital district
would be governed by a board of seven directors elected at large
by numbered positions to staggered terms.

    The 1980 Census reveals that Hispanics constitute a
substantial proportion of the population in Crockett County and,
based on information available to us, bloc voting along racial
lines appears to exist.  In this context, the at-large system
with numbered positions would appear to be the most restrictive
on minority voting strength of all the systems available to
choose from since numbered positions serve to prevent the use by
Hispanic voters of the device known as single-shot voting.
These circumstances would seem to preclude any opportunity for
Hispanics to elect candidates of their choice to the new
hospital governing board and no legitimate nonracial reason has
been provided for selecting this method of election.

- 2 -

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also Section 51.52(a) of the Procedures for the Administration of Section 5 (52 Fed. Reg. 497-498 (1987)).  In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to Chapter 2, S.B. No. 88 (1987), to the extent that it proposes to use the at-large system with numbered positions for electing the board of directors for the newly created Crockett County Hospital District.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, Section 51.45 of the guidelines (52 Fed. Reg. 496 (1987)) permits you to request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the at-large system with numbered positions legally unenforceable. See also Section 51.10 (52 Fed. Reg. 492 (1987)).

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the State of Texas plans to take with respect to this matter.  If you have any questions, feel free to call Sandra S. Coleman (202-724-6718), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*          *Washington, D.C. 20530*

JAN 4 1988

Mr. John R. Saul
Superintendent, Columbus
  Independent School District
P. O. Box 578
Columbus, Texas   78934

Dear Mr. Saul:

This refers to the adoption of numbered positions and a
majority vote requirement for the election of the Board of
Trustees for the Columbus Independent School District in Colorado
and Austin Counties, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c. We received the information to complete
your submission on November 4, 1987.

We have given careful consideration to the information
furnished by you as well as information and comments by interested
parties. At the outset, we note that minorities constitute 23.9
percent of the 1980 Census population and that a pattern of
racially polarized voting appears to exist in the Columbus ISD.
Under the present method of election school trustees are elected
at large by a plurality vote to staggered terms, a system which
provides to minority voters a realistic opportunity, through the
technique of single-shot voting, to elect a candidate of their
choice to the board of education. In this context, the proposed
numbered positions would operate to remove the benefits enjoyed by
minority voters from the use of single-shot voting and, thus,
restrict their ability to participate meaningfully in school board
elections. The incorporation of a majority vote requirement,
which is likely to promote "head-to-head" contests between
minority candidates and white candidates, would serve only to
enhance the ability of the majority group to control the election
of all board members and thereby exacerbate the election
difficulties faced by minority voters. No nonracial justification
has been presented to refute the strong inferences that the
proposed changes were designed to hinder minority voting
opportunities.

USA_00012934

-2-

    Section 5 of the Voting Rights Act places upon the
submitting authority the burden of showing that submitted changes
in voting practices and procedures do not have a racially
discriminatory purpose or effect.  See, e.g., Georgia v. United
States, 411 U.S. 526 (1973); see also the Procedures for the
Administration of Section 5 (28 C.F.R. 51.52(a)).  In view of the
circumstances discussed above, we are unable to conclude that the
burden of proof has been sustained in this instance.  Accordingly,
on behalf of the Attorney General, I must interpose an objection
to the implementation of the numbered position and majority vote
requirements for the election of members of the Board of Trustees
of the Columbus ISD.

    Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
these changes have neither the purpose nor will have the effect of
denying or abridging the right to vote on account of race, color,
or membership in a language minority group.  In addition, Section
51.45 of the guidelines permits you to request that the Attorney
General reconsider the objection.  However, until the objection is
withdrawn or a judgment from the District of Columbia Court is
obtained, the effect of the objection by the Attorney General is
to make the use of numbered positions and a majority vote
requirement legally unenforceable.  28 C.F.R. 51.10.

    To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action the Columbus ISD plans to take with respect to this matter.
If you have any questions, feel free to call Rebecca J. Wertz
(202-724-8290), Attorney/Reviewer of the Section 5 Unit of the
Voting Section.

                              Sincerely,

                              Wm. Bradford Reynolds
                              Assistant Attorney General
                              Civil Rights Division

USA_00012935



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_       _Washington, D.C. 20530_

January 22, 1988

William T. Armstrong III, Esq.
Foster, Lewis, Langley, Gardner & Banack
Frost Bank Tower
16th Floor
San Antonio, Texas  78205

Dear Mr. Armstrong:

      This refers to the change in the method of electing the
seven school trustees from at large with numbered positions to
five single-member districts and two at-large seats elected by
position with staggered terms, the districting plan, the
realignment of voting precincts, the creation of five voting
precincts and polling places therefor, and the implementation
schedule for the Hondo Independent School District in Frio and
Medina Counties, Texas, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended,
42 U.S.C. 1973c.  We received the information to complete your
submission on November 23, 1987.

      At the outset, we note that the existing at-large method of
election with numbered positions historically has not provided
Hispanic voters with an effective opportunity to elect candidates
of their choice.  By providing for two majority Hispanic
districts, however, the proposed change in the method of election
and districting plan for the school board increase the possibility
for the Hispanic voting population to elect candidates of their
choice.  Thus, the changes before us would seem to meet the
nonretrogressive effects test imposed by Section 5.

      Under Section 5 of the Voting Rights Act, however, the
submitting authority has the burden of showing that a submitted
change has no discriminatory purpose as well as no discriminatory
effect.  See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see
also the Procedures for the Administration of Section 5 (28 C.F.R.
51.52).  In this regard, we note that the new method of election
would not only include five single-member districts but two at-
large positions which would be elected by place on a staggered
basis, thereby effectively continuing for those two positions the
same features which have characterized the existing system under
which Hispanics have not been able to elect representatives of their

Defendant's Exhibit #

DE-005869

USA_00012936

- 2 -

choice to office.  Although the use of some at-large seats in such a plan is not unusual, the requirement in this proposal that the two at-large seats shall be elected on a staggered and designated place basis, inhibits the potential for effective minority participation and, thus far, has not been justified by any non-racial considerations.  Thus, it would appear that the plan as a whole may have been calculated to limit the voting potential of Hispanic voters in the school district, and while this plan cannot be said to be retrogressive in effect, we are unable to draw the same conclusion with regard to the issue of racial purpose.

In light of these considerations, therefore, I cannot conclude, as I must under the Voting Rights Act, that the school district has sustained its burden with regard to purpose.  Accordingly, on behalf of the Attorney General, I must object to the school district's change in the method of election and the districting plan insofar as they incorporate the use of desig- nated positions and staggered terms for the two at-large seats.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the proposed districting plan legally unenforceable.  28 C.F.R. 51.10.

With regard to the realignment of voting precincts, the creation of five voting precincts and polling places therefor, and the implementation schedule, it is apparent that these changes were made to accommodate the districting plan.  Since they are dependent upon the districting plan to which an objec- tion is being interposed, the Attorney General is unable to make a final determination with respect to them at this time.  · 28 C.F.R. 51.22(b).

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the Hondo Independent School District plans to take with respect to this matter.  If you have any questions, feel free to call Sandra S. Coleman (202-724-6718), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**Civil Rights Division**

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*



Honorable Frank H. Lindsey, Jr.
Mayor                                    **AUG 12 1988**
P. O. Box 1170
Jasper, Texas  75951

Dear Mayor Lindsey:

This refers to the annexation, reflected in Ordinance No. 3-
88-1, to the City of Jasper in Jasper County, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act of
1965, as amended, 42 U.S.C. 1973c. We received the information to
complete your submission on June 13, 1988.

We have considered carefully the information you have
provided, information obtained from Census data, and information
from other informed sources. At the outset, we note that the city
elects its mayor and council at large by numbered posts. Analysis of
election returns establishes that candidates who appear to have the
support of black voters essentially have been unsuccessful in city
elections and this result appears to be due, at least in part, to the
existence of a pattern of racial bloc voting in the local electoral
process. In this context, the proposed annexation, which will have
the immediate effect of reducing the black population of the city by
2.3 percentage points (from 42.4 percent to 40.1 percent) is
retrogressive and, if precleared, would dilute the position of black
voters.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has no
discriminatory purpose or effect. See Georgia v. United States, 411
U.S. 526 (1973); see also the Procedures for the Administration of
Section 5 (28 C.F.R. 51.52). In light of the considerations
discussed above, I cannot conclude, as I must under the Voting Rights
Act, that that burden has been sustained in this instance. See City
of Rome v. United States, 446 U.S. 156, 184 & n.19 (1980); City of
Richmond v. United States, 422 U.S. 358, 370 (1975). Therefore, on
behalf of the Attorney General, I must object to the proposed
annexation.

USA_00012938

- 2 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection and, in this regard, it should be noted that normally annexations of this nature may be found to meet Section 5 standards if the city's election system is modified in a way which fairly reflects minority voting strength in the expanded city.  See, e.g., City of Richmond v. United States, supra, 422 U.S. at 370. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the voting changes occasioned by the proposed annexation legally unenforceable. 28 C.F.R. 51.10.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of Jasper plans to take with respect to this matter. If you have any questions, feel free to call Ms. Lora L. Tredway (202-724-8290), Attorney Reviewer in the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

USA_00012939



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                     *Washington, D.C. 20530*

FEB 3 1989

Richard Collins, Esq.
Duckett, Bouligny, Collins, Clapp
  & Collins
P. O. Box 829
El Campo, Texas  77437

Dear Mr. Collins:

This refers to the proposed imposition of numbered
positions and a majority-vote requirement for the three
at-large city council positions for the City of El Campo in
Wharton County, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c.  We received your initial submission
on December 5, 1988; supplemental information was received on
December 19, 1988.

We have carefully considered the information you have
submitted, as well as comments and information from other
interested parties.  Under Section 5 of the Voting Rights Act,
the submitting authority has the burden of showing that a
submitted change has no discriminatory purpose or effect.  See
Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R.
51.52).  As noted in our previous letter to the city, under
Beer v. United States, 425 U.S. 130 (1976), the absence of such
an effect is shown only when it is demonstrated that there has
been no retrogression in the political strength already
attained by minorities in the electoral system.

We note that, during the April 1988 city council
election under the existing system with three at-large
positions, but without numbered positions or a majority-vote
requirement, minorities were able to elect candidates of their
choice to two of the seven positions on the city council.  One
of those positions was in a predominantly minority district
(District No. 2) where the minority candidate was unopposed,
and the other was an at-large position where the minority
candidate placed second in a field of five for the three at-
large positions.

Defendant's Exhibit #                                    DE-005873

USA_00012940

- 2 -

In comparison to the existing plan, the proposed changes, with the three at-large positions being elected from numbered positions and with a majority-vote requirement, appear to offer less opportunity for effective political participation by minority citizens.  As was the case when we earlier objected to the incorporation of those features into the city's election system, in our view the use of numbered positions and a majority-vote requirement for the at-large positions would make it more difficult for minority citizens to elect candidates of their choice to these positions because it would eliminate the possibility of single-shot voting, a device which traditionally has been used by minorities to realize their voting potential in at-large election systems.  Since the city has presented nothing to show that this is an unwarranted assessment, I am unable to conclude that the city has carried the burden imposed by Section 5.  Accordingly, on behalf of the Attorney General, I must object to the use of numbered positions and a majority-vote requirement for the at-large positions.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, Section 51.45 of the Section 5 guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the use of numbered positions and a majority-vote requirement for the at-large positions legally unenforceable.  28 C.F.R. 51.10.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of El Campo plans to take with respect to this matter.  If you have any questions, feel free to call Sandra S. Coleman (202-724-6718), Deputy Chief of the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                    DE-005874



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

February 27, 1989

Mary Milford, Esq.
Law Offices of Earl Luna, P.C.
4411 Central Building
4411 N. Central Expressway
Dallas, Texas 75205

Dear Ms. Milford:

This refers to six branch absentee voting location changes,
three additional absentee voting locations, and the implementation
schedule for the November 8, 1988, general election for Dallas
County, Texas, submitted to the Attorney General pursuant to Section
5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We
received the information to complete your submission on December 28,
1988, and February 8, 16, and 22, 1989.

We have reviewed carefully the information you have provided,
as well as Census and other available statistical data and comments
from other interested parties. At the outset, we note the very
abbreviated schedule allowed by the county for our review under
Section 5 of the changes presently before us. We initially received
eight of the changes on September 9, 1988, just 60 days prior to the
November 8, 1988, general election. Those changes were scheduled to
be and, in fact, were implemented beginning October 14, which, in
turn, was only 11 days after final adoption of the changes. The
period for absentee voting by personal appearance ended November 4,
1988. The remaining two changes at issue were not adopted until
October 31, and we received that submission on November 3, 1988, two
days after the county implemented the additional changes and the day
before such absentee voting was to end.

During the course of our review, our staff orally informed
county officials that the proposed changes were legally unenforceable
absent the requisite Section 5 preclearance and that there was
substantial concern that the proposed changes would discriminate
against minority voters. Thus, it appears that although the county
was well aware of the Section 5 preclearance requirements, it took no
steps to ensure that its decisions could be adequately reviewed prior
to implementation. The county apparently intended to, and, in fact,
did proceed with these changes without obtaining the requisite
Section 5 preclearance.

Defendant's Exhibit #                                    DE-005875

USA_00012942

- 2 -

The November 1988 election was the first general and Presidential election conducted under the Texas law that eliminates most restrictions on absentee voting by personal appearance. Thus, any person who was eligible to vote on November 8, 1988, was also eligible to vote by personal appearance during the absentee voting period from October 19 through November 4, 1988. Under precleared state law, there is no limit on either the number or the location of branch absentee voting sites that the county may establish for absentee voting by personal appearance. We note, as well, that Anglo and minority (both black and Hispanic) residents of Dallas County are not similarly situated socio-economically, since blacks and Hispanics lag significantly behind Anglos in income, education, occupational status and electoral participation.

These factors are of particular relevance here, in that when the county evaluated its absentee voting locations for the November 8, 1988, general election, the five then existing branch absentee voting locations which were retained were all in predominantly Anglo areas. Furthermore, in moving the remaining branch absentee voting locations, the county relocated each site to a predominantly Anglo area, including the Lancaster Library site, which is relocated from the Cummings Recreational Center location in a predominantly minority area. The county commissioners court also approved two additional absentee voting locations, each in a predominantly Anglo area. These actions occurred subsequent to requests by persons representing the minority communities for absentee voting locations in areas with highly concentrated black and Hispanic populations.

Only after what appears to have been significant pressure from the black community did Dallas County agree to place an absentee voting site in a location convenient to some blacks. Even so, the establishment of that site, the Martin Luther King Jr. Recreational Center, as an absentee voting polling place (a choice that has received Section 5 preclearance) appears to have been contingent on the establishment of yet another absentee voting location in another predominantly Anglo area (Lake Highlands). Moreover, notwithstanding that there were fewer than five days remaining in the absentee voting period and that the county elections department was prepared to open the Martin Luther King Jr. Center site immediately upon its approval

USA_00012943

as an absentee polling place, the county nevertheless delayed opening that absentee voting site until after the occurrence of an event which, as the county was fully aware, would have provided many black voters with a convenient opportunity to vote absentee by personal appearance at the Martin Luther King Jr. Center site.

Based on the information you have provided, it appears that the county also relied on past absentee voter turnout, which it avers has been low in minority communities, and current registration strength in adopting the proposed changes in its absentee voting program. Past absentee turnout at these locations is an unreliable measure for the general election since only non-countywide and special elections had been conducted under the state's unrestricted absentee eligibility law prior to November 8, 1988. Furthermore, it appears that past low levels of absentee voting by minority citizens may be attributable in part at least to the lack of convenient absentee polling places and stricter eligibility requirements at earlier elections. With regard to the criterion of registration strength, the available information indicates that within five geographical areas of the 24th Congressional District, the predominantly minority area of East Oak Cliff/West Dallas had 76,349 registered voters, but was not served by any convenient absentee voting location, while each of the other four areas, which is predominantly Anglo, had significantly fewer registered voters, but was served by an absentee voting location.

Finally, it should be pointed out that we had previously expressed concern about the legal propriety of these criteria. When the county used very similar criteria to establish its ballot allocation formula for the November 1982 general election, our investigation of complaints led us to advise the county that operation of the formula had had a disparate effect on minority voters by precluding many minority citizens from voting. We advised the county that continued use of the formula would, in our view, clearly violate Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973.

While we recognize that the state's revised absentee voting law greatly expands the opportunity for registered voters to exercise their franchise, county officials have the responsibility of ensuring that this expanded opportunity is provided equally to all electors in Dallas County. The county's timetable for and delay in addressing the implementation of the new state law for the 1988 general election necessarily precluded an adequate preimplementation opportunity for the Attorney General to review the voting changes that the county

- 4 -

proposed under the new law.  However, information we have received
on the absentee voting results from the proposed voting locations for
the 1988 election lend significant support to the concerns that have
been raised about the failure of the absentee voting program to
provide black and Hispanic voters an opportunity equal to that of
Anglo voters to cast absentee ballots under the new expansive Texas
procedure.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that the submitted changes have
no discriminatory purpose or effect.  See Georgia v. United States,
411 U.S. 526 (1973); see also the Procedures for the Administration
of Section 5 (28 C.F.R. 51.52(c)).  In light of the circumstances
discussed above, I cannot conclude, as I must under the Voting Rights
Act, that that burden has been sustained in this instance.
The program for absentee voting by personal appearance operated by
Dallas County for the 1988 general election cannot be precleared
under Section 5 at this time nor, in view of the circumstances
involved here, could it have been even had it been timely submitted
prior to its implementation on October 14 and November 1, 1988.
Therefore, on behalf of the Attorney General, I must object to the
six branch absentee voting location changes, the three additional
branch absentee voting locations, and the implementation schedule
therefor, to the extent that it delayed absentee voting at the Martin
Luther King Jr. Recreational Center until November 1, 1988.

In addition to interposing an objection to the use in the 1988
election or in any future election of the proposed system, we feel a
responsibility to advise the county of its duty in the future to
obtain Section 5 preclearance prior to implementation of changes of
this nature and that, in light of this experience, we will feel
constrained to interpose an objection to, and seek court enforcement
as needed to prevent, future implementation of any untimely submitted
changes in the absentee voting program.  In that regard, we are
studying the circumstances to determine if it will be necessary or
appropriate to seek a court-ordered remedy as to the 1988 actions.

Of course, as provided by Section 5 of the Voting Rights Act,
you have the right to seek a declaratory judgment from the United
States District Court for the District of Columbia that these changes
have neither the purpose nor will have the effect of denying or
abridging the right to vote on account of race, color, or membership
in a language minority group.  In addition, Section 51.45 of the

Defendant's Exhibit #

DE-005878

- 5 -

guidelines permits you to request that the Attorney General
reconsider the objection.  However, until the objection is withdrawn
or a judgment from the District of Columbia Court is obtained, the
effect of the objection by the Attorney General is to make the
changes legally unenforceable.  28 C.F.R. 51.10.

    To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action Dallas County plans to take with respect to these matters.
If you have any questions, feel free to call Ms. Lora L. Tredway
(202-724-8290), Attorney-Reviewer in the Voting Section.

                Sincerely,

                James P. Turner
        Acting Assistant Attorney General
           Civil Rights Division

cc:  Mr. Bruce R. Sherbet
     Dallas County Elections Administrator

USA_00012946



**U.S. Department of Justice**

**Civil Rights Division**

---

*Office of the Assistant Attorney General*           *Washington, D.C. 20530*

**March 20, 1989**

Randall Strong, Esq.
City Attorney
P.O. Box 424
Baytown, Texas 77522

Dear Mr. Strong:

    This refers to the change in the method of electing the city
council from voting at large (with residency districts) to election
of five members from single-member districts and four (including the
mayor) at large, the districting plan, the increase in the number of
councilmembers from seven to nine, the provision that the three at-
large members other than the mayor will be elected from numbered
positions to staggered terms, the implementation schedule, the
elimination of eleven polling places, and the realignment of voting
precincts for the City of Baytown in Chambers and Harris Counties,
Texas, submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received
the information to complete your submission on March 3, 1989.

    We have considered carefully the information you have
provided, comments and information received from other interested
parties, and the opinions of the district court and the court of
appeals in <u>Campos</u> v. <u>City of Baytown, Texas</u>, C.A. No. H-85-1021 (S.D.
Tex. Jan. 5 and March 25, 1987), <u>vacated and remanded</u>, 840 F.2d 1240,
<u>reh'g denied</u>, 849 F.2d 943 (5th Cir. 1988).

    The district court ruled, and the court of appeals affirmed,
that the city's at-large method of election violates Section 2 of the
Voting Rights Act.  In response to these rulings, the city now
proposes the mixed method of election outlined above for an expanded
nine-member city council.  Our analysis of the opportunity that this
plan provides minority citizens to participate in the political
process and elect candidates of their choice is guided by the
district court's findings of fact (also affirmed by the appellate

USA_00012947

-2-

court), including the determination that black and Hispanic city
residents are politically cohesive and that white persons vote
sufficiently as a bloc to defeat the minorities' preferred
candidates.

It appears that the proposed plan will permit minority
citizens, who constitute one-fourth of the city's population, the
opportunity to elect only one of nine city councilmembers, the
representative from the majority-minority single-member district.
This result flows primarily from the manner in which at-large
positions were included in the proposed plan: they offer minority
voters no more realistic opportunity to elect a candidate of their
choice than do the at-large positions in the existing system.

Although the city was required to develop a new method of
electing city councilmembers to remedy the violation that adheres to
the existing at-large election system, the system proposed by the
city would continue to elect nearly half of the city council by the
at-large method which has been found by the courts to discriminate
against minority persons. We particularly note that the city chose
to impose anti-single-shot provisions on the proposed at-large seats,
thus eliminating the electoral opportunity minorities otherwise would
have to elect a person of their choice to these seats through the
technique of single-shot voting. In addition, we note that a
majority vote requirement was retained for these seats though opposed
by minority residents.

During the process leading to the adoption and submission of
this plan for Section 5 review, the city developed several
alternative plans and minority representatives also put forth several
alternatives, including alternatives for single-member district plans
and combinations of single-member districts with one or more at-large
seats. It appears that from among these alternatives the city chose
the election plan that offers minority voters the least opportunity
to participate in city council elections and elect candidates of
their choice.

Moreover, we have not been provided any nonracial reasons for
the city's inflexible adherence to the proposed plan. We understand
that the city may wish to retain some at-large representation on the
city council, but this does not explain the restrictions that have
been placed on voting for the at-large seats in the proposed plan.
For example, the numbered positions are not now used, and a system of
staggered terms for all councilmembers could be retained while
providing that the terms of the councilmembers occupying the at-large
seats run concurrently.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect. See

USA_00012948

-3-

Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).  In
light of the considerations discussed above, I cannot conclude, as I
must under the Voting Rights Act, that the burden has been sustained
in this instance.  Therefore, on behalf of the Attorney General, I
must object to the proposed method of election and the districting
plan.  Because the precinct and polling place changes are directly
related to the election method change, we will make no determination
on these matters at this time.

Of course, as provided by Section 5 of the Voting Rights Act,
you have the right to seek a declaratory judgment from the United
States District Court for the District of Columbia that these changes
will have neither the purpose nor will have the effect of denying or
abridging the right to vote on account of race, color, or membership
in a language minority group.  In addition, Section 51.45 of the
guidelines permits you to request that the Attorney General
reconsider the objection.  However, until the objection is withdrawn
or a judgment from the District of Columbia court is obtained, the
effect of the objection by the Attorney General is to make the
proposed method of election legally unenforceable.

Since this matter is pending before the United States District
Court for the Southern District of Texas in Campos v. City of
Baytown, Texas, we are providing a copy of this letter to the Court.

To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action the City of Baytown plans to take with respect to this matter.
If you have any questions, feel free to call Mark A. Posner (202-724-
8388), an attorney in the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

USA_00012949



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                 _Washington, D.C. 20530_

Jerry W. Corbin, Esq.                              FEB 5  1990
City Attorney
P. O. Drawer 1388
Denver City, Texas   79323

Dear Mr. Corbin:

     This refers to the adoption of numbered positions and a
majority vote requirement for the city council of Denver City in
Yoakum County, Texas, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended, 42
U.S.C. 1973c.  We received the information to complete your
submission on December 8, 1989.

     We have considered carefully the information you have
provided as well as comments from other interested parties.
Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In this regard, we note that it is well recognized that where a
jurisdiction has a significant minority population and a pattern
of polarized voting exists, the addition of numbered positions
and a majority vote requirement to an at-large election system
may limit the opportunity of minority citizens to elect
candidates of their choice to office.  See, e.g., City of Rome v.
United States, 446 U.S. 156, 183-185 (1980).  Both numbered
positions and the majority vote requirement serve to generate
head-to-head election contests and, thus, where elections are
characterized by voting along racial or ethnic lines, they act,
especially in combination, to preclude minority voters from
utilizing the election device of single-shot voting.

     Here, the city proposes to add numbered positions and a
majority vote requirement to an at-large method of election under
which no Hispanic ever has been elected to city office through
the use of single-shot voting or otherwise.  While we recognize
that Hispanics appear not to have actively participated to any

Defendant's Exhibit #                                              DE-005883

- 2 -

significant extent in the political process in the past, we also
find in the information available to us significant indications
that these changes will make it unlikely that Hispanics will
succeed in future elections even though they may become more
active politically.  This serves to deprive Hispanics of a
potential they presently possess.


    Under these circumstances, then, we cannot say that the city
has sustained its burden of showing that the changes will not
"lead to a retrogression in the position of ... minorities with
respect to their effective exercise of the electoral franchise"
(Beer v. United States, 425 U.S. 130, 141 (1976)) and, thus, have
no discriminatory effect.  Accordingly, on behalf of the Attorney
General, I must object to the adoption of numbered positions and
a majority vote requirement for councilmanic elections in Denver
City.

    Of course, as provided by Section 5 of the Voting Rights Act,
you have the right to seek a declaratory judgment from the United
States District Court for the District of Columbia that these
changes have neither the purpose nor will have the effect of
denying or abridging the right to vote on account of race, color,
or membership in a language minority group.  In addition, Section
51.45 of the guidelines permits you to request that the Attorney
General reconsider the objection.  However, until the objection
is withdrawn or a judgment from the District of Columbia Court
is obtained, the submitted changes continue to be legally
unenforceable.  28 C.F.R. 51.10.

    To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action Denver City plans to take with respect to this matter.  If
you have any questions, feel free to call Mark A. Posner
(202-724-8388), an attorney in the Voting Section.


                              Sincerely,

                              James P. Turner
                    Acting Assistant Attorney General
                         Civil Rights Division



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

Ms. Pam Rhodes                                    **FEB 12 1990**
Chairperson, Board of Directors
Nolan County Hospital District
200 Arizona Street
Sweetwater, Texas  79556

Dear Ms. Rhodes:

This refers to Senate Bill No. 315 (1989), which provides
for the creation of the Nolan County Hospital District with a
seven-member board of directors with four elected from single-
member districts and three elected at large; numbered positions
for the at-large members; a districting plan; two-year, staggered
terms; a plurality vote requirement; the election date; the
implementation schedule; the candidacy requirements; and the
procedures for filling vacancies for the district in Nolan
County, Texas, submitted to the Attorney General on April 25,
1989, pursuant to Section 5 of the Voting Rights Act of 1965,
as amended, 42 U.S.C. 1973c.  We received the information to
complete your submission on December 12, 1989.

We have considered carefully all of the information and
materials you have supplied, along with information from other
interested parties and the Bureau of the Census.  As a result,
the Attorney General does not interpose any objection to Senate
Bill No. 315 insofar as it creates the Nolan County Hospital
District.  However, we feel a responsibility to point out that
Section 5 of the Voting Rights Act expressly provides that the
failure of the Attorney General to object does not bar any
subsequent judicial action to enjoin the enforcement of such
change.  See the Procedures for the Administration of Section 5
(28 C.F.R. 51.41).

Defendant's Exhibit #

DE-005885

USA_00012952

- 2 -

With regard to the remaining changes effected by Senate Bill No. 315, we cannot reach a similar conclusion. At the outset, we note that no minority candidate within Nolan County has won a contested election for office under an at-large system featuring numbered positions, a circumstance that appears to be due largely to the combination of the at-large electoral structures with a pattern of racially polarized voting in Nolan County elections. Indeed, it appears that even though minority candidates historically have had the support of minority voters, they have not achieved electoral success in any of the local governing bodies in Nolan County until after a change from an at-large method of election to an election system featuring single-member districts and a districting plan that provides for a significant majority of minority voters in a particular district.

Moreover, it appears that minority population in the hospital district is concentrated in such a manner that easily discernible districting alternatives would result in a plan that provides minority voters with a realistic opportunity to elect a candidate of their choice to the hospital board, an opportunity that the election system contained in Senate Bill No. 315 does not provide. In this regard, it is of particular note that the system contained in Senate Bill No. 315 not only incorporates the county commissioner election precincts, which themselves have been ineffective in affording minority voters a fair opportunity to elect candidates of their choice, but also superimposes upon its at-large positions features, such as numbered posts and staggered terms, which have been recognized as detrimental to minority voting strength where, as in Nolan County, a pattern of racial bloc voting exists.

Furthermore, the proposed method of election for the hospital board appears to have been adopted with virtually no input from the minority community. The question of what method should be used to elect the seven members of the hospital board arose subsequent to protests by minority citizens which led to the abandonment of the at-large election systems by the City of Sweetwater and the Sweetwater Independent School District, both of which are entities containing a major part of the hospital district's constituency. In addition, the proposed method of election was adopted at a time when persons active in the political process in Nolan County were aware that the at-large method of election, with numbered posts and staggered terms, was opposed by minority citizens because, in the context of Nolan County, it operated as a device to minimize or cancel out minority voting strength.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect. See Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52(c). In

USA_00012953

- 3 -

satisfying its burden, the submitting authority must demonstrate
that the proposed change is not tainted, even in part, by an
invidious racial purpose; it is insufficient simply to establish
that there are some legitimate, nondiscriminatory reasons for the
voting changes.  See <u>Village of Arlington Heights</u> v. <u>Metropolitan
Housing Development Corp.</u>, 429 U.S. 252, 265-66 (1977); <u>City of
Rome</u> v. <u>United States</u>, 422 U.S. 156, 172 (1980); <u>Busbee</u> v. <u>Smith</u>,
549 F. Supp. 494, 516-17 (D.D.C. 1982), <u>aff'd</u>, 459 U.S. 1166
(1983).  In addition, a submitted change may not be precleared if
its implementation would lead to a violation of Section 2 of the
Voting Rights Act, 42 U.S.C. 1973, because minority voters have
less opportunity than do white voters to elect candidates of
their choice.  See 28 C.F.R. 51.55(b).  In light of these
considerations, I cannot conclude, as I must under the Voting
Rights Act, that the county has sustained its burden in this
instance.  Therefore, on behalf of the Attorney General, I must
object to the proposed method of election and districting plan
for the hospital district's board of directors contained in
Senate Bill No. 315.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
these changes have neither the purpose nor will have the effect
of denying or abridging the right to vote on account of race,
color, or language minority.  In addition, Section 51.45 of the
guidelines permits you to request that the Attorney General
reconsider the objection.  However, until the objection is
withdrawn or a judgment from the District of Columbia Court is
obtained, the proposed new method of election changes and
districting plan continue to be legally unenforceable.  28 C.F.R.
51.10.

Finally, the election date, the implementation schedule, the
candidacy requirements, and the procedures for filling vacancies
can be implemented only in the context of the method of election
changes and districting plan to which an objection is interposed
herein.  Accordingly, the Attorney General is unable to make a
determination regarding these directly related changes at this
time.  See also 28 C.F.R. 51.22(b).

To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action that the Nolan County Hospital District plans to take with

Defendant's Exhibit #

DE-005887

USA_00012954

- 4 -

respect to these matters.  If you have any questions, feel free
to call Ms. Lora Tredway (202-724-8290), an attorney in the
Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005888

USA_00012955



**U.S. Department of Justice**

**Civil Rights Division**

_____

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

April 30, 1990


Richard C. Hile, Esq.
Tonahill, Hile, Leister
   & Jacobellis
P. O. Box 670
Jasper, Texas  75951

Dear Mr. Hile:

        This refers to your request that the Attorney General
reconsider the August 12, 1988, objection under Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c, to the
annexation (Ordinance No. 3-88-1) to the City of Jasper in Jasper
County, Texas.  We received your letter on January 24, 1990;
supplemental information was received on February 27, 1990.

        In our August 12, 1988, objection letter we identified the
considerations underlying our objection to the proposed
annexation.  We noted our concerns about the immediate reduction
of 2.3 percentage points in the city's black population and the
resulting dilution of the position of black voters in the context
of the city's at-large election method and evidence of racial
bloc voting.

        We have considered carefully the information in your
letters and your submittal of a report of the Deep East Texas
Council of Governments (DETCOG) special population survey of
Jasper.  Your request for reconsideration claims that these new
data show that the proposed annexation will result in no
diminution in minority voting strength.

        According to the special DETCOG survey, the city's 1988
base population (not including the annexed area) is 7,296, of
whom 3,079 (42.2%) are black.  The annexed area has a population
of 865, of whom 191 are black.  Inclusion of the annexed area
into the 1988 survey count results in a total population of
8,161, of whom 3,270 (40.1%) are black.  Thus, on the basis of


cc:  Public File

USA_00012956

- 2 -

the city's new figures, the proposed annexation results in a black population reduction of 2.1 percentage points (from 42.2% to 40.1%).  Therefore, it appears that the new statistical data submitted for reconsideration support our initial conclusions, and, on behalf of the Attorney General, I must decline to withdraw the objection to the annexation.

Of course, Section 5 permits you to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, irrespective of whether the change previously has been submitted to the Attorney General.  As previously noted, until such a judgment is rendered by that court, the legal effect of the objection by the Attorney General is that the change in question remains legally unenforceable.  See the Procedures for the Administration of Section 5 (28 C.F.R. 51.10).

Furthermore, as mentioned in our August 12, 1988, letter, the Attorney General would consider withdrawing his objection if the city's election method is modified in a way which fairly reflects minority voting strength in the expanded city.  See <u>City of Richmond</u> v. <u>United States</u>, 422 U.S. 358, 370 (1975); see also 28 C.F.R. 51.61(c)(3).

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of Jasper plans to take with respect to this matter.  If you have any questions, feel free to call Lora L. Tredway (202-724-8290), an attorney in the Voting Section.  Refer to File No. T7878 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

**MAY 7 1990**

Stan Reid, Esq.
Allison & Associates
208 W. 14th Street
Austin, Texas   78701

Dear Mr. Reid:

This refers to the June 26, 1980, transfer of registration
duties from the county tax assessor/collector to the county
clerk, and the September 26, 1987, transfer of registration
duties from the county clerk to the county tax assessor/collector
for San Patricio County, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c. We received the information to
complete your submission on March 6, 1990.

The Attorney General does not interpose any objection to
the 1980 transfer of registration duties from the county tax
assessor/collector to the county clerk. However, we feel a
responsibility to point out that Section 5 of the Voting Rights
Act expressly provides that the failure of the Attorney General
to object does not bar any subsequent judicial action to enjoin
the enforcement of such change. See the Procedures for the
Administration of Section 5 (28 C.F.R. 51.41).

With regard to the 1987 action returning registration duties
to the county tax assessor/collector, we have given careful
consideration to the reasons advanced in support of the transfer,
as well as the sequence of events leading to the commissioners
court's decision to adopt the 1987 transfer of registration
duties. The purposes of the transfer were said to be to correct
the failure to submit the prior change for Section 5 review, to
save the county money and to place the responsibility in more
capable hands. The information available to us does not confirm
such purposes. Rather, the record seems to establish that this
transfer was directly in response to actions taken by the
incumbent county clerk to assist this Department in carrying
out its responsibilities under Section 5 in the review of the
proposed consolidation of justice of the peace precincts, to
which an objection was interposed on June 14, 1988.

Defendant's Exhibit #                    DE-005891

USA_00012958

- 2 -

Under the Procedures for the Administration of Section 5, 28 C.F.R. 51.55, the Attorney General is to consider submissions in light of "constitutional and statutory provisions designed to safeguard the right to vote from denial or abridgement on account of race, color or membership in a language minority group." If, as seems to be the case, the responsibility for voter registration was removed from the county clerk in reprisal for that person's assistance to this office in its statutory responsibility to enforce the Voting Rights Act, it is not entitled to receive Section 5 preclearance.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52. In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the 1987 transfer of registration duties from the county clerk to the county tax assessor/collector meets these preclearance standards. Therefore, on behalf of the Attorney General, I must object to the 1987 transfer of registration duties from the county clerk to the county tax assessor/collector.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the unprecleared change continues to be legally unenforceable. 28 C.F.R. 51.10.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action San Patricio County plans to take with respect to this matter. If you have any questions, feel free to call Sandra S. Coleman (202) 724-6718, Deputy Chief of our Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

_____

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

November 13, 1990


Robert C. Story, Esq.
City Attorney
128 East 4th Street
Freeport, Texas 77541

Dear Mr. Story:

    This refers to the imposition of a majority vote requirement
for the election of mayor and councilmember for the City of
Freeport in Brazoria County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended, 42 U.S.C. 1973c. We received the information
necessary to complete your submission on September 11, 1990.

    We have given careful consideration to the information in
your submission as well as information from the Census and other
sources. We note that the City of Freeport has a population,
according to the 1980 Census, that is 13.1 percent black and 27.2
percent Hispanic. In combination, these minority groups comprise
40 percent of the city's population, yet it appears that only one
black and only one Hispanic have ever been elected to city
office.

    The current method of electing the city council is at large
with numbered posts. Where voting is racially polarized, this
election method is commonly understood to place a significant
limitation on the ability of racial and ethnic minorities to
participate equally in the political process and elect candidates
of their choice. From our review of election returns in
Freeport, it appears that racial bloc voting does occur in the
city to a significant degree. In this context, the imposition of
a majority-vote requirement clearly will operate as an added
obstacle to the potential for minority voters to elect candidates
of their choice to city government in Freeport. Indeed, earlier
this year an Hispanic candidate became the first Hispanic to be
elected to the Freeport City Council by receiving a slim
plurality of the vote in a contest against several Anglo
candidates. The ability of minority voters to elect their
preferred candidate under such circumstances would be

Defendant's Exhibit #                                                DE-005893

- 2 -

significantly diminished if a majority vote is required for election.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the majority vote requirement for city offices.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the majority vote requirement continues to be legally unenforceable. See 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Freeport plans to take concerning this matter. If you have any questions, you should call George Schneider (202-514-8696), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005894

USA_00012961



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                  *Washington, D.C. 20530*

Cindy Maria Garner, Esq.                    **DEC 21 1990**
City Attorney
P.O. Box 1076
Crockett, Texas  75835

Dear Ms. Garner:

   This refers to the five annexations (one adopted July 13,
1973, and four adopted March 27, 1990) to the City of Grapeland
in Houston County, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c.  We received the information to
complete your submission on October 24, 1990.

   The Attorney General does not interpose any objection to
the 1973 annexation.  However, we note that Section 5 expressly
provides that the failure of the Attorney General to object does
not bar subsequent litigation to enjoin the enforcement of the
change.

   With regard to the four 1990 annexations, however, we are
unable to reach a similar conclusion.  We have considered
carefully the information you have provided, as well as Census
data and information from other interested parties.  At the
outset, we note that the city elects a mayor and five
councilmembers under an at-large system with staggered terms.
While two of the four areas annexed in this package appear to be
virtually all-black in population, the overall effect of the
proposed annexations is to reduce the proportion of the city's
black population by about 3.0 percentage points.  In addition,
the information available to us suggests that municipal elections
in Grapeland are characterized by racially polarized voting.  In
that context, then, the increase in the white majority, as a
result of the annexations, serves only to enhance the ability of
white citizens to preclude black voters from electing candidates
of their choice to the city council under the existing election
system.

cc:  Public File

---

USA_00012962

- 2 -

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.39(e)). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the city's burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the four proposed 1990 annexations.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection and, in this regard, annexations of this nature usually may meet Section 5 standards if the city's election system is modified in a way that fairly reflects minority voting strength in the expanded city. See City of Richmond, 422 U.S. 358, 370 (1979); see also City of Port Arthur v. United States, 459 U.S. 159 (1982). Also, in that connection, it should be noted that such modifications need not necessarily involve adoption of a districting plan, since acceptable adjustments might include the use of such corrective measures as limited or cumulative voting. See, e.g., Dillard v. Chilton County Board of Education, 699 F. Supp. 870 (M.D. Ala. 1988); see also Dillard v. Crenshaw County, No. 85-T-1332-N (M.D. Ala.). However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is that the voting changes occasioned by the proposed 1990 annexations continue to be legally unenforceable. 28 C.F.R. 51.10.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of Grapeland plans to take with respect to these matters. If you have any questions, feel free to call Ms. Lora L. Tredway (202-307-2290), Attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

USA_00012963



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*          *Washington, D.C. 20530*

MAR 13 1991

Analeslie Muncy, Esq.
City Attorney
City of Dallas
1500 Marilla, 7-B North
Dallas, Texas  75201

Dear Ms. Muncy:

This refers to charter amendments to Chapter XXIV, Section
21 (1-5) of the municipal charter, which delay the regular
May 1991 municipal election until November 1991 or January 1992,
based on certain conditions, and provide an implementation
schedule therefor, for the City of Dallas in Collin, Dallas,
Denton, Kaufman, and Rockwall Counties, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c.  We received the informa-
tion to complete your submission on January 15 and February 26
and 28, 1991.

We have carefully reviewed the information you have
provided, along with the information available to us from
related Section 5 submissions by the city, the Bureau of the
Census, and other interested parties.  At the outset, we note
that the instant submission is related to litigation by minority
plaintiffs, in which the court has found that the existing 8-3
election method for the city council violates Section 2 of the
Voting Rights Act and specifically has ordered that the regularly
scheduled May 4, 1991, municipal election shall go forward under
an interim remedial 14-1 election system.  <u>Williams</u> v. <u>City of
Dallas</u>, No. 3-88-1152-R (N.D. Tex.) (Mar. 28, 1990, liability)
(Feb. 1, 4, 5 and 27, 1991, remedy).  We further note that the
district court's remedial orders are based, in part, on its
observation of nearly one year ago, that "an interim City Council
election must be held as soon as possible in order to remedy the
adverse effects of the 8-3 system -- the denial of equal access
to the City's political process -- which African and Mexican-
Americans have suffered in Dallas, for some 10-15 years."  <u>Id.</u>
slip op. at 239 (Mar. 28, 1990) (emphasis in original).

The instant submission was designed as an adjunct to the
proposal to change to a 10-4-1 method of election and its
original purpose was to delay the May 4, 1991, election to
allow the city to use 1990 Census data to prepare and submit

Defendant's Exhibit #                                    DE-005897

- 2 -

for preclearance a specific districting proposal.  As you are
aware, we are presently providing expedited consideration to
such a proposal.  Because of procedural reasons, however, the
proposal to postpone the election date must be considered now,
before we have had the opportunity to complete our consideration
of the underlying plan it was designed to facilitate and on which
it is wholly dependent.  Given the state of the ongoing litiga-
tion, approval of a delay in the May 4, 1991, election would
interfere with and perhaps frustrate the careful remedial plan
ordered by the district court.

We are, of course, aware that the Williams defendants are
seeking immediate appellate relief regarding the district court's
remedial orders.  We intend to monitor that litigation closely
and consider whether any future orders by the appellate court
might suggest revisions or modifications to our disposition of
this matter.  We also will review further this proposal to
postpone the election should we conclude, upon completion of
our analysis, that the 10-4-1 plan satisfies the requirements
of  Section 5.

In the meantime, and for the reasons stated above, it would
be premature and disruptive to preclear the election date change
under Section 5.  Accordingly, I cannot conclude, as I must under
the Voting Rights Act, that the city's burden of demonstrating
that this proposed change has neither the purpose nor the effect
of discriminating on the basis of race has been sustained in this
instance.  Therefore, on behalf of the Attorney General, I must
object to the proposed charter amendments under Chapter XXIV,
Section 21 (1-5), which provide for a delay of the regularly
scheduled May 4, 1991, election and an implementation schedule
therefor.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
these changes have neither the purpose nor will have the effect
of denying or abridging the right to vote on account of race,
color, or membership in a language minority group.  In addition,
you may request that the Attorney General reconsider this
objection.  However, until the objection is withdrawn or a
judgment from the District of Columbia Court is obtained, a
delay in the regularly scheduled May 4, 1991, municipal election
continues to be legally unenforceable.  28 C.F.R. 51.10 and
51.45.

Defendant's Exhibit #

DE-005898

USA_00012965

- 3 -

To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the City of
Dallas plans to take concerning these matters. If you have any
questions, you should call Lora L. Tredway (202/307-2290), an
attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*      *Washington, D.C. 20035*

March 19, 1991

Don Graf, Esq.
McCleskey, Harriger, Brazill & Graf
P. O. Drawer 6170
Lubbock, Texas 79493-6170

Dear Mr. Graf:

This refers to the following changes submitted under
Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c, by
the Lubbock County Water Control and Improvement District No. 1
in Lubbock County, Texas:

1. the adoption of a precinct system of voting which
includes the establishment of four voting precincts;

2. the selection of polling places for each precinct,
including the assignment of four current polling places (at
Idalou, Buffalo Springs Lake, Slaton, and Haynes Elementary
School) to the precincts, the elimination of three polling places
(at the county courthouse, Wolfforth, and Shallowater), and the
establishment of a new polling place (at Rush Elementary School);
and

3. the implementation schedule for the change in method of
election (to four single-member districts and one at large) which
provided for Districts 2 and 3 and the at-large director to be
elected at the January 1991 regular election, and the Districts 1
and 2 directors to be elected at the January 1993 election.

We received the information to complete your submission on
January 18, 1991.

We have carefully reviewed the information you have
provided, as well as Census and other available statistical data
and comments from other interested parties. We note that the

USA_00012967

- 2 -

instant changes stem from a suit filed under Section 2 of the Voting Rights Act, 42 U.S.C. 1973, in which minority residents of the Water District challenged the at-large method of election for the members of the District board of directors.  Aguero v. Lubbock County Water Control and Improvement District No. 1, No. CA5-89-0077C (N.D. Tex.).  Pursuant to a settlement of that action, a new method of election was adopted and precleared under Section 5 which allows minority residents an equal opportunity to elect candidates of their choice to the board.  In particular, minority residents constitute a majority of the population in District 3 and a substantial minority of the population in District 2.  The other two districts have relatively insignificant levels of minority population.

In implementing the new plan, the Water District determined that it would abandon the practice whereby a voter could cast a ballot on election day at any District polling place and, instead, decided to designate voting precincts which are coterminous with the single-member districts.  Each precinct has been assigned its own discrete polling place or places.

In this regard, we note, at the outset, that the vast majority of the Water District's population resides in the City of Lubbock, located in the center of the county, and that the districting and precinct scheme divides the city into four nearly equal parts, so that at least three-quarters of the registered voters of each district or precinct are located in the city.  For overwhelmingly white Precincts 1 and 4 the Water District, logically, has selected locations inside the city and has eliminated rural locations which historically have served few voters.  However, for Precincts 2 and 3, where the minority population is concentrated, the District has chosen the opposite course.  It proposes to eliminate the county courthouse site in the city, which in recent District elections has been the location with the second highest number of voters, and proposes to require city voters, who include the bulk of the Water District's minority voters, to travel to the more remote and inaccessible rural communities to vote on election day.  Past voting experience in the county shows that the now eliminated county courthouse voting site has been the most convenient polling location for most minority voters.

The District has not offered any persuasive nonracial explanation for applying such a divergent standard in the selection of polling places.  While we note, with respect to

USA_00012968

- 3 -

District 3, the Water District's claim that it placed the poll in
a town where the Hispanic county commissioner has an office, we
have been presented with nothing which shows the relationship
between that fact and the determination of what would constitute
a convenient polling location for the precinct's electorate.  The
Water District also notes that minority voters in District 3 may
choose to vote absentee at the courthouse.  However, since this
would appear to be equally true for voters in Districts 1 and 4,
this observation serves but to suggest further the application of
a different standard for Districts 2 and 3.  With more specific
reference to District 2, the Water District offers no explanation
for its polling site selections.  Thus, from all that is
apparent, the polling site selections for Districts 2 and 3 would
seem calculated to discourage turnout among minority voters and,
accordingly, to undermine the electoral opportunities created by
the new election system.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that your burden
has been sustained in this instance.  Therefore, on behalf of the
Attorney General, I must object to the selection of polling
places for Precincts 2 and 3.

With respect to the establishment the precinct system of
voting, the polling places selected for Precincts 1 and 4, and
the implementation schedule insofar as it does not affect the
changes to which an objection has been interposed, the Attorney
General does not interpose any objection under Section 5.
However, we feel a responsibility to point out that Section 5
expressly provides that the failure of the Attorney General to
object does not bar any subsequent judicial action to enjoin the
enforcement of such changes.  See 28 C.F.R. 51.41.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
the changes to which an objection has been interposed have
neither the purpose nor will have the effect of denying or
abridging the right to vote on account of race, color, or
membership in a language minority group.  In addition, Section
51.45 of the guidelines permits you to request that the Attorney

Defendant's Exhibit #

DE-005902

- 4 -

General reconsider the objection.  However, until the objection
is withdrawn or a judgment from the District of Columbia Court is
obtained, the selection of polling places for Precincts 2 and 3,
including the elimination of the courthouse polling location,
continue to be legally unenforceable.  See 28 C.F.R. 51.10.

     To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action Lubbock County Water Control and Improvement District
No. 1 plans to take with regard to these matters.  If you have
any questions, feel free to call Mark A. Posner (202-307-1388),
an attorney in the Voting Section.

                         Sincerely,

                         John R. Dunne
                  Assistant Attorney General
                     Civil Rights Division

JRD:MAP:TCR:gmh
DJ 166-012-3
90-1268

April 22, 1991

Judy Underwood, Esq.
Walsh, Judge, Anderson,
  Underwood & Schulze
P.O. Box 2156
Austin, Texas  78768

Dear Ms. Underwood:

    This refers to the change in the method of electing the
school board from at large to five single-member districts and
two at large, the concurrent election of the at-large seats by
numbered position, the districting plan, the implementation
schedule, and the polling place change for the Refugio
Independent School District in Refugio County, Texas, submitted
to the Attorney General under Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c.  We received your last
submittal of information regarding these matters on February 20,
1991.

    The Attorney General does not interpose any objection to the
submitted polling place change.  However, we note that Section 5
expressly provides that the failure of the Attorney General to
object does not bar subsequent litigation to enjoin the
enforcement of the change.  See the Procedures for the
Administration of Section 5 (28 C.F.R. 51.41).

    With respect to the other submitted changes, however,
we cannot reach a similar conclusion.  As you are aware, on
May 8, 1989, the Attorney General interposed an objection under
Section 5 to an earlier five district, two at large plan adopted
by the school district.  In that regard, we found that in light
of the electoral circumstances present in the school district (in
particular, the apparent pattern of polarized voting), the
proposed plan unnecessarily minimized the opportunity of
minorities to elect candidates of their choice to office.  We
noted that our information tended to support a concern that the
5-2 system had been selected over a system of seven single-member
districts "to avoid the potential for fair minority
representation in three majority-minority districts."  We also
noted that the use of staggered terms for the at-large seats
would further limit minority electoral opportunity by foreclosing
the use of the election device of single-shot voting.

cc:  Public File

Defendant's Exhibit #

DE-005904

USA_00012971

- 2 -

In response to the objection, the school district proposes a redesigned 5-2 system, eliminating the use of staggered terms for the two at-large seats which characterized the earlier plan. While two of the five districts in the new proposal seem to provide minority voters with a realistic opportunity to elect candidates of their choice to the school board, like the previous proposal the present one continues to limit the opportunity of minorities to no more than those two seats by precluding the use of single-shot voting for the at-large positions, through the use of numbered posts.

We recognize that the school district has concluded that state law requires the use of numbered positions for the at-large seats in a 5-2 plan such as this, but we are also aware that other independent school districts in Texas have adopted 5-2 plans without numbered posts. In any event, the school district has not adequately explained, in nonracial terms, why other alternative election systems, such as a seven single-member district plan, which concededly are sanctioned by state law could not be adopted by the Refugio Independent School District.

In that regard, we note that, even though our May 8, 1989, letter expressed concern over the lack of opportunity for minority citizens to participate in that decision making process, it appears that in developing the instant plan the school district perpetuated this problem. Thus, while the district did establish a committee of minority citizens to examine the election method issue, the committee appears to have been excluded from any participation in the process once it made known its preference for a seven single-member district plan.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52. In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the submitted changes, with the exception of the polling place change noted above.

Defendant's Exhibit #

DE-005905

- 3 -

Of course, under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or  membership in a language minority group.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the objected-to changes continue to be legally unenforceable.  28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the Refugio Independent School District plans to take concerning this matter. If you have any questions, you should call Mark A. Posner (202-307-1388), an attorney in the Voting Section.

Sincerely,


John R. Dunne
Assistant Attorney General
Civil Rights Division

USA_00012973

JRD:GAS:GAS:lrj
DJ 166-012-3
90-0003

August 23, 1991

Tom Harrison, Esq.
Special Assistant for Elections
Elections Division
P.O. Box 12060
Austin, Texas  78711-2060

Dear Mr. Harrison:

     This refers to Chapter 206, S.B. No. 907 (1989), which
mandates procedures for creating hospital districts; provides for
special elections therefor; establishes petition, notice, and
ballot requirements for elections to create hospital districts;
restricts the frequency of creation elections under specified
circumstances; provides for interim appointed and permanent
elected boards of directors; mandates an odd number of directors,
with no fewer than five; permits three methods of election for a
board of directors; mandates two-year, staggered terms and a
plurality vote requirement; provides implementation plans;
mandates the first Saturday in May as the regular election date;
mandates regular election petition and notice requirements;
specifies candidate qualifications; provides procedures for
filling vacancies; establishes compensation provisions and
powers, duties, and responsibilities for elected directors;
provides procedures for annexation; provides for dissolution of a
hospital district created pursuant to the statute, subject to
special elections therefor; and permits special bond and tax
elections, for the State of Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended, 42 U.S.C. 1973c.  We received the information
necessary to complete your submission on June 25, 1991.

     Chapter 206 requires as a first step in creating a hospital
district the circulation for signature of petitions which
describe the method to be used to elect hospital directors.  The
act limits the permissible methods of election to three: (1) at
large; (2) at large by place (numbered posts); or (3) a

USA_00012974

- 2 -

combination of district and at-large seats.  The third method requires the use of county commissioner districts.  It appears that this last method would normally be unavailable to hospital districts that are not composed of whole counties, since it is likely that the resulting election districts would not satisfy the constitutional requirement of population equality.

Prior to the adoption of Chapter 206 the only means of creating a hospital district with direct control over financing was by a special act of the legislature which was tailored to the individual needs of the proposed district.  Under this procedure there existed no express limitation on the method of selecting the board of directors of such a district.

Our understanding is that Chapter 206 was adopted to provide a general mechanism for hospital districts to be created without the need for individual legislation.  The legislative history of the act indicates that no special consideration was given to the methods of selecting the hospital boards.  It appears that the act's limitation on methods of election resulted from adapting language in a model bill previously used to create individual hospital districts.  Although the three methods listed are said to be the methods most commonly specified in previous acts creating individual districts, the instant act apparently reflects no strong state policy that election methods for hospital districts should be so limited.  Indeed, the legislature has on many previous occasions specified other methods of selecting hospital directors, and this Department has reviewed and precleared numerous such instances under Section 5.  Such alternative methods, such as those using single-member districts exclusively or incorporating districts that do not correspond to commissioner districts would not be permitted under Chapter 206.

Our experience with hospital districts under Section 5 has shown that the method of selecting hospital district directors is often of significant interest and concern to voters, and raises important questions under the Voting Rights Act.  We have twice interposed objections under Section 5 to the initial methods chosen by the legislature to elect individual hospital district boards.  Our experience has led us to conclude that, as applied in particular cases, none of the methods of election specified in Chapter 206 would meet the requirements for preclearance under Section 5.  The dilutive effect which at-large methods of election can have by submerging racial and ethnic minorities is well recognized in the case law and in our experience under Section 5.  This effect is exacerbated by the limitation on single-shot voting resulting from the use of numbered posts or staggered terms.  Nor are these concerns allayed by the inclusion in the act of the method employing commissioner districts.  In the case of hospital districts formed of portions of counties,

- 3 -

this method would not appear to be available.  Even when available, its limitation to four districts may well be insufficient to produce an electoral system in which minority voters would have an equal opportunity to participate in the electoral process and elect candidates of their choice and the requirement that there be at least one at-large seat could further reduce the likelihood that the electoral system would satisfy the Voting Rights Act.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the voting changes occasioned by Chapter 206 (1989).

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  See 28 C.F.R. 51.44.  In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, Chapter 206 (1989) continues to be legally unenforceable.  See 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the State of Texas plans to take concerning this matter.  If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

Sincerely,


John R. Dunne
Assistant Attorney General
Civil Rights Division

USA_00012976



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

## DEC 24 1991

Richard C. Hile, Esq.
Tonahill, Hile, Leister
    & Jacobellis
P.O. Box 670
Jasper, Texas  75951

Dear Mr. Hile:

This refers to your request that the Attorney General
reconsider the August 12, 1988, objection under Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c, to the
annexation (Ordinance No. 3-88-1) to the City of Jasper in Jasper
County, Texas.  We received your letter on October 30, 1991;
supplemental information was received on November 5, 1991.

This also refers to the change in method of election for the
city council from five members and a mayor elected at large to
four members elected from single-member districts and the mayor
and one member elected at large; the implementation schedule; the
districting plan; the limit on number of consecutive terms for
mayor and council; changes in candidate qualifications; the
realignment of voting precincts; the establishment of three
additional voting precincts and polling places; and the
procedures for conducting the August 10, 1991, special election
for the city, submitted to the Attorney General pursuant to
Section 5.  We received your initial submission on October 30,
1991; supplemental information was received on November 5, 1991.

The Attorney General does not interpose any objection to
the specified changes in the city's electoral system, including
the term limits, candidate qualifications, and implementation
schedule; the districting plan; the precinct and polling place
changes; and the special election.  With regard to the 1988
annexation, we note that the new electoral system appears fairly
to reflect minority voting strength in the city as it is expanded
by the annexation.  Accordingly, pursuant to Section 51.48(b) of
the Procedures for the Administration of Section 5 (28 C.F.R.),

USA_00012977

- 2 -

the objection interposed to the annexation by Ordinance
No. 3-88-1 is hereby withdrawn.  We note that the failure of the
Attorney General to object does not bar subsequent litigation to
enjoin the enforcement of these changes.  See also 28 C.F.R.
51.41.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

USA_00012978



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*　　　　　　　*Washington, D.C. 20530*

John T. Fleming, Esq.　　　　　　**DEC 24 1991**
Henslee, Ryan & Groce, P.C.
Great Hill Plaza
9600 Great Hills Trail
Suite 300 West
Austin, Texas 78759

Dear Mr. Fleming:

This refers to the change in method of election from seven
trustees elected at large by numbered positions to five trustees
elected from single-member districts and two elected at large,
the districting plan, implementation schedule, precinct
realignment and changes in polling places for the Del Valle
Independent School District in Travis County, Texas, submitted to
the Attorney General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended, 42 U.S.C. 1973c.  We received your
response to our request for additional information on October 31,
1991.

We have carefully reviewed the information you have
provided, as well as Census data and information and comments
from other interested persons.  At the outset, we note that
according to the 1990 Census data, black and Hispanic residents
consitute 44 percent of the school district's total population.
We also note that the court in Lopez v. Del Valle ISD, No.
475,874, slip. op. (D. Travis County, TX May 21, 1991), has found
that the existing at-large method of election discriminates
against blacks and Hispanics in violation of the Texas Equal
Rights Amendment and the state's Equal Protection Clause.

As the school district has acknowledged, the proposed plan
includes only one majority minority district.  At the same time,
the plan maintains two at-large seats, a feature which the court
has found to be racially discriminatory in the context of the
racial bloc voting that exists in school district elections.
Several alternative plans were available for consideration by the
school board in which minority voters would have an opportunity
to elect candidates of their choice to at least two trustee
positions.  We understand that these alternative plans generally
are favored by the minority community and would appear more
fairly to reflect minority voting strength in the school
district.

cc:  Public File

Defendant's Exhibit #　　　　　　　　DE-005912

- 2 -

With respect to the changes in polling place locations, serious concerns have been raised that the polling place change for District 4, now located in the rural area of the county several miles distant from the minority community in the Montopolis area of the district, will make it more difficult for minority voters to get to the polls and vote. While we are aware that because of precinct boundary changes the Montopolis Recreation Center, which had previously served as the polling place for this area, is no longer in the minority district, other sites close by could have been chosen. The school district has failed to offer any persuasive nonracial reasons for its decisions in this regard.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of demonstrating that proposed changes do not have a racially discriminatory purpose or effect. <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the school district's burden has been sustained in this instance. Accordingly, on behalf of the Attorney General, I must object to the proposed method of election as well as the districting plan and the polling place change for District 4 for the Del Valle Independent School District.

We note that under Section 5 you have the right to seek declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the method of election, the districting plan and polling place change continue to be legally unenforceable. <u>Clark</u> v. <u>Roemer</u>, 59 U.S.L.W. 4583 (U.S. June 3, 1991); 28 C.F.R. 51.10 and 51.45.

With regard to the realignment of voting precincts, the remaining polling place changes and the implementation schedule, it is apparent that these changes are directly related to the change in the method of election and the districting plan. Since these changes are dependent upon the objected-to changes, the Attorney General is unable to make a final determination with respect to them at this time. 28 C.F.R. 51.22(b).

- 3 -

    To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the Del Valle Independent School District plans to take concerning these matters.  If you have any questions, you should call Richard Jerome (202-514-8696), an attorney in the Voting Section.

                    Sincerely,

                    John R. Dunne
            Assistant Attorney General
              Civil Rights Division

Defendant's Exhibit #

DE-005914

USA_00012981



**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

**JAN 07 1992**

Ronald B. Collins, Esq.
Duckett, Bouligny, Collins,
   Clapp & Collins
P.O. Box 1567
El Campo, Texas 77437

Dear Mr. Collins:

This refers to the proposed change in the method of
concurrently electing the three at-large members of the city
council from three elected by plurality vote without numbered
positions to two elected by plurality vote without numbered
positions, and one elected by majority vote to a separate
position designated as the mayor; and the change in the method of
electing the mayor from selection among the council to direct
election for the City of El Campo in Wharton County, Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We
received your response to the written request for additional
information on November 8, 1991; further supplemental information
was received on December 13, 1991.

We have considered carefully the information you have
provided, as well as information provided by other interested
persons. At the outset, we note that in the context of the
ongoing pattern of racially polarized voting which appears to
exist in city elections, the current election system permits
minority voters two avenues by which they may elect candidates of
their choice to the seven-member city council--in the single-
member district in which minorities constitute a substantial
majority of the population, and as a result of the opportunity
afforded minorities to elect one of the at-large councilmembers.
This latter opportunity arises in major part from the use of a
plurality-win provision and the fact that minority voters may

USA_00012982

- 2 -

utilize the device of single-shot voting in a situation where
three positions are being filled concurrently.  Indeed, as
appears to be generally recognized in the city, the ability to
single-shot has played an important role in the success enjoyed
by minority voters in recent at-large elections.

The city now proposes to reduce the number of at-large seats
elected as a group from three to two by separately designating
one seat on the ballot as that of the mayor.  In this regard, we
note that of the four elections in which a minority candidate has
been elected at large, in one the minority candidate finished
third (and only barely ahead of the fourth-place finisher) and in
two others the minority candidate finished second, but only a few
votes ahead of the third-place finisher.  In these circumstances,
it appears that the proposed shrinking of the at-large pool from
three to two would diminish the opportunity of minority voters to
effectively single-shot and thus would "lead to a retrogression
in the position of ... minorities with respect to their effective
exercise of the electoral franchise."  <u>Beer</u> v. <u>United States</u>, 425
U.S. 130, 141 (1976).  Likewise, the change to a majority-vote
requirement for the separately designated at-large position would
appear to contribute further to such a retrogression in minority
electoral opportunity.

As you are aware, the Attorney General has found it
necessary to interpose Section 5 objections on three other
occasions in recent years (1985, 1986, and 1989) to efforts by
the city to foreclose the use of single-shot voting (through the
adoption of numbered positions or staggered terms).  It has been
alleged that the instant changes were adopted as yet another
attempt to undercut the use of the single-shot device.  The city
avers that it has a justifiable interest in directly electing its
mayor.  While such an interest certainly is cognizable under the
Voting Rights Act, here it appears that reasonable alternatives
were available to accomplish this goal without limiting minority
voting strength, and we have been provided no convincing
nonracial explanation for the city's choice of the instant
alternatives.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that your burden
has been sustained in this instance.  Therefore, on behalf of the
Attorney General, I must object to the change in the method of
electing the at-large councilmembers involving the separate

Defendant's Exhibit #

DE-005916

USA_00012983

- 3 -

designation of one seat and the adoption of a majority vote requirement. With respect to the proposed change to a directly elected mayor, no determination will be made since this is directly related to the objectionable changes.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the submitted changes continue to be legally unenforceable. Clark v. Roemer, 59 U.S.L.W. 4583 (U.S. June 3, 1991); 28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of El Campo plans to take concerning this matter. If you have any questions, you should call Mark A. Posner (202-307-1388), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_     _Washington, D.C. 20530_

MAR 2 3 1992

John T. Fleming, Esq.
Henslee, Ryan & Groce
9600 Great Hills Trail
Suite 300 West
Austin, Texas 78759

Dear Mr. Fleming:

This refers to your request that the Attorney General
reconsider the December 24, 1991, objection under Section 5 of
the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c, to
the change in method of election from seven trustees elected at
large by numbered positions to five trustees elected from single-
member districts and two elected at large, the districting plan,
and a change in polling places in District 4 for the Del Valle
Independent School District in Travis County, Texas. We received
your letter on January 21, 1992.

We have reconsidered our earlier determination in this
matter based on the arguments you have advanced in support of
your request, along with the other information in our files.

Your request for reconsideration emphasizes our reliance on
the trial court's findings in _Lopez_ v. _Del Valle Independent_
_School District_, No. 475,874, slip op. (D. Travis County, TX May
29, 1991), in which the court found that the existing at-large
method of election discriminates against blacks and Hispanics in
violation of the Texas Equal Rights Amendment and the state's
Equal Protection Clause. Our objection, however, was interposed
only after an extensive review of the proposed 5-2 method of
election and districting plan, which included not only an
analysis of the overall impact of the proposed changes on
minority voters, but also an examination of the reasons for and
the impact of the legislative choices that were made in arriving
at the proposed changes.

Defendant's Exhibit #     DE-005918

- 2 -

As we noted in our letter of December 24, 1991, the proposed plan included only one majority minority district, while several available alternative plans afforded minority voters an opportunity to elect candidates of their choice to at least two trustee positions.  These alternative plans were generally favored by the minority community and appeared to more fairly reflect minority voting strength in the school district.  While we are mindful that the Voting Rights Act ensures fair election opportunities and does not require that any jurisdiction attempt to guarantee racial or ethnic proportional results, the rejection of these plans has still not satisfactorily been explained in terms of any racially neutral criteria.

With respect to the change in polling place in District 4, you state that the school district was not afforded the opportunity to explain the "reasons for its decision."  In this regard, we would direct your attention to our letter of October 21, 1991, where we requested that the school district respond to concerns that "the polling place changes proposed [would] make it more difficult for minority voters, especially those in District 4, to participate in school district elections."  Your response to that request was considered fully in reaching our determination.

Because you have not provided any new or additional information relating to the purpose or effect of the submitted changes, I remain unable to conclude that Del Valle Independent School District has carried its burden of showing that the submitted changes have neither a discriminatory purpose nor a discriminatory effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52.  Therefore, on behalf of the Attorney General, I must decline to withdraw the objection to the proposed method of election as well as the districting plan, and the polling place change for District 4 for the Del Valle Independent School District.

As we previously noted, you may seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  We remind you, however, that unless and until such a judgment is rendered by that court, the objection by the Attorney General remains in effect and the proposed change is legally unenforceable.  Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10, 51.11, and 51.48(c) and (d).

Defendant's Exhibit #

DE-005919

USA_00012986

- 3 -

With regard to the realignment of voting precincts, the remaining polling place changes and the implementation schedule, it is apparent that these changes are directly related to the change in the method of election and the districting plan. Since these changes are dependent upon the objected-to changes, the Attorney General is unable to make a final determination with the respect to them at this time. 28 C.F.R. 51.22 (b).

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action Del Valle Independent School District plans to take with respect to this matter. If you have any questions, feel free to call Richard Jerome (202-514-8696), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

USA_00012987

U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_      _Washington, D.C. 20530_

July 20, 1992

Honorable Preston Parks
Mayor
128 North Dallas Avenue
Wilmer, Texas  75172

Dear Mayor Parks:

This refers to the adoption of numbered positions for the
election of councilmembers in the City of Wilmer, Dallas County,
Texas, submitted to the Attorney General pursuant to Section 5 of
the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We
received your response to our request for additional information
on May 19 and 20, 1992.

We have considered carefully the information you have
provided as well as comments from other interested parties.  The
1990 Census reports that Hispanics constitute 30.3 percent while
blacks constitute 20.9 percent of the city's population.  Review
of Census data demonstrates that these figures represent
significant increases in the population of each minority group in
the city since 1980.  The information available to us indicates
that no minority person has ever served on the city council and
that minority candidates who have sought city office have been
unsuccessful, in large part as a result of racially polarized
voting.

It is well recognized that where a jurisdiction has a
significant minority population and a pattern of polarized
voting exists, the addition of numbered positions to an at-large
election system with a majority vote requirement may further
limit the opportunity of minority citizens to elect candidates
of their choice to office.  See, e.g., City of Rome v. United
States, 446 U.S. 156, 183-185 (1980).  Numbered positions serve
to generate head-to-head election contests, and, thus, where
elections are characterized by voting along racial or ethnic
lines, they act to preclude minority voters from utilizing the
election device of single-shot voting.

Defendant's Exhibit #

DE-005921

USA_00012988

- 2 -

We understand that the city adopted numbered positions primarily in response to requests by some minority residents to create an opportunity for minority voters, but, based on the information available to us, it appears that the use of numbered positions will make it less likely that minority voters will be able to elect candidates of their choice to the city council. Under these circumstances, then, we cannot say that the city has demonstrated that the use of numbered positions will not "lead to a retrogression in the position of . . . minorities with respect to their effective exercise of the electoral franchise." **Beer** v. **United States**, 425 U.S. 130, 141 (1976).

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See **Georgia** v. **United States**, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the city's burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the use of numbered positions for city council elections.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the use of numbered positions has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the use of numbered positions continues to be legally unenforceable. **Clark** v. **Roemer**, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Wilmer plans to take concerning this matter. If you have any questions, you should call Lora L. Tredway (202-307-2290), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division



U.S. Department of

Civil Rights Division

JRD:GS:CGM:gmh
DJ 166-012-3
91-4250

*Voting Section*
*P.O. Box 66128*
*Washington, D.C. 20035-6128*

July 29, 1992

Michael Morrison, Esq.
Guinn & Morrison
Baylor Law School
P. O. Box 97288
Waco, Texas  76798-7288

Dear Mr. Morrison:

    This refers to your request that the Attorney General
reconsider the March 30, 1992, objection interposed under
Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c, to the redistricting plan for the commissioners court in
Ellis County, Texas.  We received your request on May 30, 1992.

    In your subsequent June 3, 1992, letter, Ellis County
withdrew its request for reconsideration.  Accordingly, as we
previously have informed you, the Attorney General will not take
any action on the reconsideration request and the Section 5
objection remains in force.

                              Sincerely,

                              John R. Dunne
                        Assistant Attorney General
                           Civil Rights Division

                    By: *[signature]*

                    *[initials]*  Steven H. Rosenbaum
                              Chief, Voting Section

Defendant's Exhibit #                                    DE-005923



U.S. Department   Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

August 17, 1992

Ms. Frances Vesley
City Secretary
P. O. Box 264
Ganado, Texas  77962

Dear Ms. Vesley:

This refers to the procedures for conducting the
January 18, 1992, special election; the change in form of
government from a Type C (commission) to Type A (aldermanic)
city; the increase in the number of the governing body from
three (mayor and two commissioners) to six (mayor and five
councilmembers); the adoption of numbered positions and
staggered terms; and the implementation schedule therefor,
for the City of Ganado in Jackson County, Texas, submitted to
the Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received
your response to our April 27, 1992, request for additional
information on June 18, 1992.

With respect to the procedures for conducting the
January 18, 1992, special election, the change in form of
government from a Type C (commission) to Type A (aldermanic)
city, and the increase in the number of officials from three
(mayor and two commissioners) to six (mayor and five
councilmembers), with election at large, the Attorney General
does not interpose any objection.  However, we note that the
failure of the Attorney General to object does not bar
subsequent litigation to enjoin the enforcement of the
changes.  28 C.F.R. 51.41.

We cannot reach the same conclusion concerning the
change to staggered terms and numbered posts, however.  We
have carefully considered the information you have provided,
as well as information provided by other interested persons.
The use of staggered terms and numbered posts in at-large
elections limits minority electoral opportunity by
foreclosing the use of single-shot voting.  In light of the
racially polarized voting that usually occurs in city
elections, the proposed changes unnecessarily minimize the
opportunity of minorities to elect candidates of their choice
to office.  (See <u>City of Rome</u> v. <u>United States</u>, 446 U.S. 156,

Defendant's Exhibit #                                        DE-005924

- 2 -

183-185 (1980).)  The city has not adequately explained why
other alternative election systems, such as five seats
elected concurrently, could not be adopted by the city of
Ganado.  Finally, it appears that the minority community was
not offered an opportunity to participate in the process of
adopting these changes.

    Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change
has neither a discriminatory purpose nor a discriminatory
effect.  See Georgia v. United States, 411 U.S. 526 (1973);
see also the Procedures for the Administration of Section 5
(28 C.F.R. 51.52).

    In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that the
city's burden has been sustained in this instance with
respect to the use of numbered posts, staggered terms, and
the implementation schedule therefor.  Therefore, on behalf
of the Attorney General, I must object to these changes.

    We note that under Section 5 you have the right to seek
a declaratory judgment from the United States District Court
for the District of Columbia that the objected-to changes
have neither the purpose nor will have the effect of denying
or abridging the right to vote on account of race, color, or
membership in a language minority group.  In addition, you
may request that the Attorney General reconsider the
objection.  However, until the objection is withdrawn or a
judgment from the District of Columbia Court is obtained, the
proposed use of numbered posts, staggered terms and the
implementation schedule therefor, continue to be legally
unenforceable.  Clark v. Roemer, 111 S.Ct. 2096 (1991); 28
C.F.R. 51.10 and 51.45.

    To enable us to meet our responsibility to enforce the
Act, please inform us of the action the City of Ganado plans
to take concerning this matter.  If you have any questions,
you should call Richard B. Jerome, an attorney in the Voting
Section, at (202) 514-8696.

                          Sincerely,

                          James P. Turner
                Acting Assistant Attorney General
                      Civil Rights Division

cc:  Gary Olson, Esq.
     City Attorney

Defendant's Exhibit #                                    DE-005925



**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

December 14, 1992

Gary W. Smith, Esq.
City Attorney
P. O. Box 779
Galveston, Texas  77553-0779

Dear Mr. Smith:

    This refers to the change in the method of electing the city
council from at large to four from single-member districts and
two at large by numbered posts for concurrent terms; the
districting plan; the elimination of the majority vote
requirement for city council and mayoral elections; the
shortening of mayoral and council terms from three years to two
years; the change in maximum number of consecutive terms from two
to three; and the implementation schedule for the City of
Galveston in Galveston County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended, 42 U.S.C. 1973c.  We received your further responses
to our request for additional information on October 15 and
November 10, 12 and 23, 1992; supplemental information was
received on November 24, 1992.

    With regard to the change to concurrent, two-year terms, the
change in the limit on consecutive terms, and the elimination of
the majority vote requirement, the Attorney General does not
interpose any objection.  However, we note that the failure of
the Attorney General to object does not bar subsequent litigation
to enjoin the enforcement of the changes.  In addition, as
authorized by Section 5, we reserve the right to reexamine this
submission if additional information that would otherwise require
an objection to these changes comes to our attention during the
remainder of the sixty-day review period.  See the Procedures for
the Administration of Section 5 (28 C.F.R. 51.41 and 51.43).

    We cannot reach the same conclusion, however, concerning the
change in method of election and the adoption of numbered posts
for at-large positions.  We have carefully considered the
information you provided as well as information from other

USA_00012993

- 2 -

interested parties and Census data.  According to the 1990
Census, blacks constitute 28 percent and Hispanics constitute 21
percent of the total population of the City of Galveston.  Under
the existing at-large system, over the last twelve years, there
have been a number of black or Hispanic candidates in city
council and mayoral contests.  Although many of these candidates
were supported by their respective minority group, almost all
were unsuccessful.  This appears to have been the result of their
failure, in general, to receive support outside their racial or
ethnic group.

The city began the process that led to the proposed method
of election after black plaintiffs filed suit to challenge the
existing system under Section 2 of the Voting Rights Act.
Arceneaux v. City of Galveston, No. G-90-221 (S.D. Tex.).  The
city's proposed system would have four council members elected
from single-member districts, with two council members and the
mayor elected at large.  In choosing this system, the city
rejected arguments in favor of a system preferred by the
Arceneaux plaintiffs and others in the black and Hispanic
communities that would have six single-member districts and a
mayor elected at large.

The city has argued for preclearance of its proposed system
on the ground that black voters and Hispanic voters are
politically cohesive with each other and that as a result its
system and the subsequently adopted districting plan would
provide two districts in which minority voters would be able to
elect candidates of their choice.  The information provided by
the city, however, does not support the claim that such political
cohesion between black and Hispanic voters occurs in city
elections.  Under these circumstances, the city has not
established that the proposed changes likely would produce the
results it claims.  Moreover, the city has not provided
legitimate reasons for maintaining two at-large council positions
(in addition to the mayor) in the face of the prevailing patterns
of polarized voting.

Those same voting patterns also would appear to make it
more difficult for minority voters to elect representatives of
their choice to at-large council positions with the proposed
adoption of numbered posts.  As the city's charter review
committee, itself, recognized when it considered this matter,
the use of numbered posts would rule out the possibility of
single-shot voting, a technique which often may be beneficial to
minority voters to overcome the effects of racial bloc voting.

Under Section 5, the City of Galveston has the burden of
showing that the proposed changes do not have the purpose and
will not have the effect of denying or abridging the right to
vote on account of race or membership in a language minority

- 3 -

group.  See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see
also 28 C.F.R. 51.52.  Accordingly, on behalf of the Attorney
General, I must object to the proposed method of election with
four single-member districts, two at-large seats and a mayor
elected at large, as well as the adoption of numbered posts.

The Attorney General will make no determination regarding
the districting plan because it is dependent upon the objected-to
change to the 4-2-1 method of election.  See 28 C.F.R. 51.22(b)
and 51.35.

Effectuation of the proposed implementation schedule, which
was to begin in May 1992, is no longer possible.  Accordingly,
the Attorney General will make no determination as to that
schedule.

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed changes have neither
the purpose nor will have the effect of denying or abridging the
right to vote on account of race, color, or membership in a
language minority group.  In addition, you may request that the
Attorney General reconsider the objection.  However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the proposed 4-2-1 system and the use
of numbered posts continue to be legally unenforceable.  <u>Clark</u> v.
<u>Roemer</u>, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the City of
Galveston plans to take concerning these matters.  If you have
any questions, you should call George Schneider (202-307-3153),
an attorney in the Voting Section.

Because the current method of electing the city council is
at issue in the <u>Arceneaux</u> litigation, we are providing a copy of
this letter to the court in that case.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

cc: Honorable Hugh Gibson
United States District Judge