**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

**February 19, 1993**


Dr. Ronald G. Claunch
Dr. Leon C. Hallman
Box 13045 SFA Station
Stephen F. Austin State University
Nacogdoches, Texas   75962

Dear Drs. Claunch and Hallman:

This refers to the change in the method of electing trustees
from seven at large to five single-member districts and two
elected at large; the districting plan; the provision that the
two at-large seats will be elected on a staggered basis; the
implementation schedule; the realignment, renumbering, and
elimination of voting precincts; the designation of three new
polling places and two polling place changes; and the new
location for absentee voting for the Atlanta Independent School
District in Cass County, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c.  We received your responses to
our request for additional information on November 12 and
December 21, 1992; supplemental information was received on
December 9 and 14, 1992.

We have carefully considered the information you have
provided, as well as information provided by other interested
persons.  According to 1990 Census data, the Atlanta Independent
School District has a total population of 10,651 of whom 23.3
percent are black.  The school board is comprised of seven
members elected at large by plurality vote to three-year,
staggered terms.

The school board began its consideration of changing its
at-large system after concerns were raised by the black community
that at-large elections unfairly limited opportunities for black
voters to elect candidates of choice to the school board.  From
the outset of the process, the board only considered alternative
election plans that retained the at-large seats, despite the fact
that black candidates had been unable in the past to gain

- 2 -

election to the board under the at-large system and the representations of minorities that this pattern of electoral results would likely continue in the future. Ultimately, black voters filed a lawsuit under Section 2 of the Voting Rights Act challenging the at-large method of election.

We have reviewed the school board's contention that black voters will be able to elect candidates of their choice to the at-large seats in light of the history of racial discrimination in the county, disparities that exist in the socio-economic conditions of black and white citizens, and election results over the past decade. Our analysis of election contests involving voters within the school district suggests the existence of a pattern of racially polarized voting within the school district, with black-sponsored candidates facing consistent defeat other than in election districts with substantial black majorities. Indeed, despite the apparent support of black voters, no black candidate has ever been elected to the school board under the at-large election system. There is little reason to believe that black voters will have any greater opportunity to elect their candidates of choice to the at-large seats under the proposed plan than is available to them under the present plan.

The board also contends that it did not consider other electoral schemes that contain fewer at-large seats because the demographers retained by the board believed that it was not possible to draw more than one majority black district under any such options available, i.e., under a 5-2, 6-1 or a 7-0 election scheme. But the information provided to us indicates that the board favored retaining two at-large seats prior to the time that the demographers were actually retained. The board never appears to have deviated from its preference for the two at-large seats, except when it voted in December 1991 in favor of retaining the at-large election scheme for all seven trustee seats. Prior to the adoption of the instant plan in May 1992, the board did not request and the demographers did not devise a districting plan for more than five single-member districts. Our analysis of the demographics of the school district, and the data you provided for Census blocks split by school district boundaries, suggests that the feasibility of drawing two majority black single-member districts under a 7-0 plan was readily discernible.

Finally, it appears that the protection of the interests of incumbents played a significant role in the school district's decision. Our review of the information you provided suggests

Defendant's Exhibit #                                          DE-005930

- 3 -

that at-large seats were retained and their election schedule
staggered in order to permit incumbents to run for re-election
without requiring that they compete against one another.  While
we recognize that the desire to protect incumbents may not in and
of itself be an inappropriate consideration, it may not be
accomplished at the expense of minority voting potential.  See
Garza v. Los Angeles County, 918 F.2d 763, 771 (9th Cir. 1990),
cert. denied, 111 S.Ct. 681 (1991); Ketchum v. Byrne, 740 F.2d
1398, 1408-09 (7th Cir. 1984), cert. denied, 471 U.S. 1135
(1985).  Where, as here, the protection afforded incumbents
appears to have been provided at the expense of black voters, the
school board bears a heavy burden of demonstrating that its
choices are not tainted, at least in part, by an invidious racial
purpose.

     Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that your burden
has been sustained in this instance.  Therefore, on behalf of the
Attorney General, I must object to the proposed change in the
method of election for the school district.

     We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed changes have neither
the purpose nor will have the effect of denying or abridging the
right to vote on account of race, color, or membership in a
language minority group.  In addition, you may request that the
Attorney General reconsider the objection.  However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the county council and school board
redistricting plan continues to be legally unenforceable.
Clark v. Roemer,  111 S.Ct. 2096 (1991); 28 C.F.R. 51.10 and
51.45.

     With respect to the remaining changes, we understand that
those changes are dependent on the method of election change.  In
view of the objection interposed herein to the change in method
of election, the Attorney General will make no determination with
regard to those matters.  See 28 C.F.R. 51.22(b).

- 4 -

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the Atlanta Independent School District plans to take concerning this matter. If you have any questions, you should call Ms. Zita Johnson-Betts (202-514-8690), an attorney in the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-005932

USA_00012999



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*              *Washington, D.C. 20530*

## MAR 22 1993

Mr. Mac Wheat
Superintendent
Carthage Independent School District
#1 Bulldog Drive
Carthage, Texas  75633

Dear Mr. Wheat:

This refers to the change in method of election from seven members elected at large by numbered places and majority vote to five members elected from single-member districts and two at-large seats by numbered places with a majority vote requirement, the districting plan, the implementation schedule, and the establishment of a new polling place for the Carthage Independent School District in Panola County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received supplemental information necessary to review these matters on January 21 and March 16, 1993.

The Attorney General does not interpose any objection to the submitted establishment of a new polling place.  However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of this change.  See the Procedures for the Administration of Section 5 (28 C.F.R. 51.41).

With respect to the other submitted changes, however, we cannot reach a similar conclusion.  We have carefully considered the information you have provided, as well as 1990 Census data and information and comments from other interested parties. According to the 1990 Census, black residents constitute 18.9 percent of the school district's total population and 17.7 percent of its voting age population.  Information available to us indicates an apparent pattern of racially polarized voting among the school district's voters and that under the existing at-large system, black voters have been unable to elect candidates of their choice to the school board.

Defendant's Exhibit #                                        DE-005933

USA_00013000

- 2 -

In 1989, the school board established a biracial study committee to consider alternative methods of election. Among the plans considered were plans with seven single-member districts (7-0 plan), six single-member districts and one at-large seat (6-1 plan) and five single-member districts and two at-large seats (5-2 plan). While all of the black members of the committee preferred a seven single-member district plan, all of the white members preferred a 5-2 plan. The committee reached unanimity on a compromise by agreeing to recommend a 5-2 plan, provided that there be a plurality vote requirement for the at-large seats. The committee's work was completed in 1992 when a districting plan was developed and its final recommendation was sent to the school board.

While the school board decided to accept the study committee's recommendation to change to a 5-2 plan, as well as to adopt the proposed districting plan, the board rejected the plurality vote recommendation and decided to impose a majority vote requirement instead. The board made this latter decision apparently without seeking to obtain input from the minority community. Moreover, the timing of the decision raises concerns, as it came just four months after a recent contest for school board trustees in which a black candidate received a 40-percent plurality of the votes cast in the primary election, but was defeated in the runoff election by a white candidate.

The school board now contends, apparently based upon information it first received months after the decision was made, that state law may proscribe the use of a plurality vote requirement for some trustee positions and a majority vote requirement for others. Of course, such post hoc information could not have formed the basis of the board's decision. In addition, the state law on this point is not clear and we have been directed to no definitive interpretation on this issue. Moreover, the board has not suggested that state law prevented it from choosing to have all seats in the new election system subject to a plurality vote requirement.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the school district's burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the submitted change in method of election.

Defendant's Exhibit #

DE-005934

- 3 -

        We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed changes have neither
the purpose nor will have the effect of denying or abridging the
right to vote on account of race, color, or membership in a
language minority group.   In addition, you may request that the
Attorney General reconsider the objection.   However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the change in method of election
continues to be legally unenforceable.   Clark v. Roemer, 111 S.
Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

        Because the submitted districting plan and implementation
schedule are dependent upon the method of election change to
which an objection is being interposed, the Attorney General is
unable to make a final determination with respect to those
changes at this time.   28 C.F.R. 51.22(b).

        To enable us to meet our responsibility to enforce both
Section 2 and Section 5 of the Voting Rights Act, please inform
us of the action the Carthage Independent School District plans
to take concerning this matter.   If you have any questions or
want to discuss this matter, please call Donna M. Murphy (202-
514-6153), an attorney in the Voting Section.

                                    Sincerely,

                                    James P. Turner
                            Acting Assistant Attorney General
                                 Civil Rights Division



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

MAR 22 1993

Mr. Earl Scarborough
Business Manager
Corsicana Independent School District
601 North 13th Street
Corsicana, Texas  75110

Dear Mr. Scarborough:

This refers to the change from a plurality to a majority
vote requirement for election to the board of trustees for the
Corsicana Independent School District in Navarro County, Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We
received responses to our request for additional information on
December 2, 1992, January 22, 1993, and March 3, 1993.

We have carefully considered the information you have
provided, as well as Census data and information and comments
from other interested parties.  According to 1980 Census data,
blacks comprised 22.5 percent and Hispanics comprised 4.5 percent
of the school district's population.  While 1990 Census data have
not been provided for the school district as a whole, the 1990
data for the City of Corsicana, which contains almost all of the
school district's population, reflect an increase in the minority
population percentages since 1980.

Prior to 1978, the school district's seven-member board of
trustees was elected at large with a plurality vote requirement.
As you are aware, on April 28, 1978, we interposed a Section 5
objection to the school district's proposal to add majority vote
and numbered place requirements to its at-large system.  We noted
in our objection letter that the proposed changes might "have the
effect of diluting black voting strength in elections for school
trustees."  Shortly thereafter, the school district repealed the
resolution that provided for a majority vote requirement and
obtained Section 5 preclearance for the imposition of numbered
places.  Thus, the change to a majority vote requirement now
before us would impose the same electoral system,

Defendant's Exhibit #                                            DE-005936

- 2 -

at-large elections with numbered place and majority vote
requirements, to which we had objected in 1978.

Our analysis of elections involving voters within the school
district suggests that they remain characterized by racially
polarized voting patterns. We are aware, however, that since
1978, only black candidates have run for Place 3, and that the
school board has been comprised of six white members and one
black member. But it appears that under the current system
minority voters have not had a realistic opportunity to elect
candidates of choice to the school board other than from Place 3,
and that as a result minority candidates may have been
discouraged from running for the board other than from Place 3.

In this context, the imposition of a majority vote
requirement may further limit the opportunity of minority voters
to elect candidates of their choice by increasing the probability
of "head-to-head" contests between minority and white candidates.
See, e.g., Rogers v. Lodge, 458 U.S. 613, 627 (1992); City of
Port Arthur v. United States, 459 U.S. 156 (1982). Under these
circumstances, we cannot say that the school district has
demonstrated that the adoption of a majority vote requirement
will not "lead to a retrogression in the position of . . .
minorities with respect to their effective exercise of the
electoral franchise." Beer v. United States, 425 U.S. 130, 141
(1976).

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot con-
clude, as I must under the Voting Rights Act, that the school
district's burden has been sustained in this instance.
Therefore, on behalf of the Attorney General, I must object to
the use of a majority vote requirement for election of school
board trustees.

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the use of a majority vote
requirement in elections for school board trustees has neither
the purpose nor will have the effect of denying or abridging the
right to vote on account of race, color or membership in a
language minority group. In addition, you may request that the
Attorney General reconsider the objection. However, until the

- 3 -

objection is withdrawn or a judgment from the District of
Columbia Court is obtained, use of a majority vote requirement in
elections for school board trustees continues to be legally
unenforceable.  Clark v. Roemer, 111 S. Ct. 2096 (1991); 28
C.F.R. 51.10 and 51.45.

   To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the Corsicana
Independent School District plans to take concerning this matter.
If you have any questions, you should call Ms. Zita Johnson-Betts
(202-514-8690), an attorney in the Voting Section.

                              Sincerely,

                              James P. Turner
                    Acting Assistant Attorney General
                         Civil Rights Division

USA_00013005



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

**APR 6 1993**

Ms. Rose Kendrick
City Secretary
128 North Dallas Avenue
Wilmer, Texas 75172

Dear Ms. Kendrick:

This refers to your request that the Attorney General reconsider the July 20, 1992, objection under Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c, to the adoption of numbered positions for the election of councilmembers in the City of Wilmer, Dallas County, Texas. We received your request on February 12, 1993.

We have considered carefully the information you have provided. We note, however, that it does not contain any factual information that addresses or rebuts the conclusions we previously reached regarding the pattern of racially polarized voting in city elections and the potential adverse effect of this pattern on the opportunity for minority voters to elect their candidates of choice to the city council. Rather, you suggest that we are merely erroneous in our conclusions, without providing any supporting documentation or any information demonstrating that there has been "a substantial change in operative fact or relevant law." See the Procedures for the Administration of Section 5 (28 C.F.R. 51.46).

In your letter, you indicate that numbered positions may serve as the functional equivalent of single-member districts or at least permit a cohesive minority group to nominate a candidate from its area. As we previously explained, however, it is well recognized that the addition of numbered positions to an at-large election system with a majority vote requirement may further limit the opportunity of minority citizens to elect candidates of their choice to office. See, e.g., <u>City of Rome</u> v. <u>United</u>

Defendant's Exhibit #                                     DE-005939

- 2 -

<u>States</u>, 446 U.S. 156, 183-185 (1980).  Numbered positions do not serve as the functional equivalent of single-member election districts.  Rather, the use of numbered positions serves to generate head-to-head election contests and to preclude minority voters from utilizing the election device of single-shot voting.

You have not provided any basis for us to alter our view that the use of numbered positions will make it less likely that minority voters will be able to elect candidates of their choice to the city council.  Under these circumstances, we still are unable to say that the city has met its burden of demonstrating that the use of numbered positions will not "lead to a retrogression in the position of . . . minorities with respect to their effective exercise of the electoral franchise."  <u>Beer</u> v. <u>United States</u>, 425 U.S. 130, 141 (1976).

In light of the considerations discussed above, I remain unable to conclude that the City of Wilmer has carried its burden of showing that the submitted change has neither a discriminatory purpose nor a discriminatory effect.  See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); 28 C.F.R. 51.52.  Therefore, on behalf of the Attorney General, I must decline to withdraw the objection to the use of numbered positions for city council elections.

As we previously advised, you may seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  We remind you that until such a judgment is rendered by that court, the objection by the Attorney General remains in effect and the proposed change continues to be legally unenforceable.  See <u>Clark</u> v. <u>Roemer</u>, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10, 51.11, and 51.48(c) and (d).

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Wilmer plans to take concerning this matter.  If you have any questions, you should call Lora L. Tredway (202-307-2290), an attorney in the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

April 26, 1993

Mr. Robert Gorsline
City Secretary
310 South Main
Lamesa, Texas  79331

Dear Mr. Gorsline:

     This refers to the change from a plurality to a majority
vote requirement for the election of the mayor for the City of
Lamesa in Dawson County, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c.  We received responses to our April 27,
1992, request for additional information on February 23, and
April 7 and 9, 1993.

     We have carefully considered the information you have
provided, as well as Census data and information and comments
from other interested parties.  According to the 1990 Census,
Hispanics comprise 46 percent of the city's total population and
39 percent of its voting age population.  Review of Census data
reveals that these figures represent an increase of six
percentage points in the Hispanic proportion of the city's total
population since 1980.

     Prior to 1992, the mayor of Lamesa was selected from among
the city's seven elected councilmembers, three of whom were
elected from single-member districts by majority vote, and four
of whom were elected at large by plurality vote.  Under this
method of selection, no Hispanic was ever appointed mayor.  On
April 27, 1992, the Attorney General precleared a change to six
councilmembers elected from single-member districts and the mayor
elected at large.  We did not preclear the city's proposed
majority vote requirement for the election of the mayor because
the information sent was insufficient to enable us to determine
that the change satisfied the requirements of Section 5.  As a
result, we requested additional information about the majority
vote requirement for mayoral elections.

- 2 -

After reviewing the city's response to that request and other information available to us, we see an apparent pattern of racially polarized voting in city elections that has hampered the ability of Hispanic voters to elect candidates of their choice to at-large positions on the city council.  In this context, the imposition of a majority vote requirement may further limit the opportunity of Hispanic voters to elect candidates of their choice by increasing the probability of "head-to-head" contests between minority and white candidates.  See, e.g., Rogers v. Lodge, 458 U.S. 613, 627 (1982); City of Port Arthur v. United States, 459 U.S. 156 (1982).

We have considered the city's explanation that the use of a majority vote requirement for election of the mayor does not represent a change in the city's past electoral procedures because the mayor was previously selected by a majority of city councilmembers.  In addition, the city suggests that it has used a majority vote requirement in its single-member districts since 1984 and that these elections are similar procedurally to the election of a single council position, such as mayor.

We do not find either of these arguments persuasive.  Until 1992, all of the city's at-large councilmanic positions were elected by a plurality vote requirement.  The city now proposes to elect the remaining at-large position on the council by a majority vote requirement, a change from the manner in which at-large seats on the council have previously been elected.  Nor is the selection of a mayor, by a majority of the votes cast by councilmembers, equivalent to the direct election of a mayor by a majority of the votes cast.  While a multiplicity of candidates and a plurality vote winner are possible in a direct election, that scenario is unlikely in the appointment system.  Under these circumstances, we cannot conclude that the city has demonstrated that the adoption of a majority vote requirement for mayoral elections will not "lead to a retrogression in the position of . . . minorities with respect to their effective exercise of the electoral franchise."  Beer v. United States, 425 U.S. 130, 141 (1976).

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52).  In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the city's burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the use of a majority vote requirement for election of mayor.

Defendant's Exhibit #

DE-005942

USA_00013009

- 3 -

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the use of a majority vote requirement in elections for mayor has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, use of a majority vote requirement in elections for mayor continues to be legally unenforceable.  Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Lamesa plans to take concerning this matter.  If you have any questions, you should call Ms. Zita Johnson-Betts (202-514-8690), an attorney in the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

USA_00013010



**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

May 4, 1993

Robert T. Bass, Esq.
Allison and Associates
Wahrenberger House
208 West 14th Street
Austin, Texas  78701

Dear Mr. Bass:

This refers to the procedures for conducting the January 5,
1993, special local option election in Bailey County, Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We
received your initial submission on March 5, 1993; supplemental
information was received on March 15, 1993.

We have carefully considered the information you have
provided as well as information contained in previous Section 5
submissions concerning Bailey County's justice of the peace
districts.  As you are aware, on April 6, 1992, the Attorney
General interposed an objection to the county's submission of
a 1991 redistricting plan to be used to elect members of the
commissioners court, as well as justices of the peace and
constables.  On two occasions, July 6 and September 28, 1992,
the Attorney General denied requests of the county to withdraw
the objection.

We understand that under state law, special local option
elections like the one under review may be held upon the petition
of county residents either county-wide, within the boundaries
of an incorporated city or town, or within the boundaries of a
"justice precinct," i.e., an election district for justice of
the peace.  According to information provided in your submission,
county officials permitted local residents to circulate their
petitions within the boundaries of Justice Precinct No. 4 as
drawn in the 1991 redistricting plan to which the Attorney
General had interposed an objection.

Defendant's Exhibit #

DE-005944

- 2 -

Subsequently, the county confirmed that the number of signatures obtained were sufficient to trigger an election in this district, and the county held this election on January 5, 1993, using the objected-to district boundaries.   Changes in procedure which affect voting are unenforceable without Section 5 preclearance.   Clark v. Roemer, 111 S. Ct. 2996 (1991); Procedures for the Administration of Section 5 (28 C.F.R. 51.10). We note that the county's use of unprecleared district boundaries for Justice Precinct No. 4 occurred well after Bailey County received notice of our initial objection to those boundary lines and the subsequent maintaining of that objection on two separate occasions.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52.   In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance.   Therefore, on behalf of the Attorney General, I must object to the procedures for conducting the January 5, 1993, special local option election.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.   See 28 C.F.R. 51.44.   In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45.   However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the special election procedures continue to be legally unenforceable.

If you have any questions regarding this matter, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                        DE-005945

USA_00013012

 U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*    *Washington, D.C. 20035*

November 19, 1993

Honorable John Hannah, Jr.
Secretary of State of Texas
Elections Division
P. O. Box 12060
Austin, Texas 78711

Dear Mr. Secretary:

This refers to Chapter 626 (1993) which provides for the elected board of directors of the Edwards Underground Water District to be replaced by an appointed board of directors of the Edwards Aquifer Authority in the State of Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received your responses to our request for additional information on September 20, November 12, and November 15, 1993.

We have carefully considered the information you have provided, as well as information and comments from other interested persons. The state has explained that Chapter 626 was adopted as its response to the violations of the Endangered Species Act, 16 U.S.C. 1536 and 1538, found by the federal court in <u>Sierra Club</u> v. <u>Lujan</u>, 91-CA-069, (W.D. Texas, order dated February 1, 1993). Our review of this legislation under Section 5, however, is limited solely to those aspects that relate to voting. Specifically, the proposed dissolution of the elected twelve-member board that manages a portion of the Edwards Aquifer and its replacement by an appointed board is a change affecting voting within the meaning of Section 5. <u>Presley</u> v. <u>Etowah County Commission</u>, 112 S.Ct. 820 (1992); <u>Allen</u> v. <u>State Board of Elections</u>, 393 U.S. 544 (1969); Procedures for the Administration of Section 5, 28 C.F.R. 51.13. Under Section 5, the Attorney General is required to determine whether the state has sustained its burden of showing that this change is free of the proscribed discriminatory purpose or effect. See, e.g., 28 C.F.R. 51.52(a), 51.55, 51.56. It is with these standards in mind that we have reviewed and analyzed the submitted voting change.

Defendant's Exhibit #        DE-005946

USA_00013013

- 2 -

The Edwards Underground Water District includes Bexar, Comal
and Hays Counties.  According to the 1990 Census, it has a total
population of 1,261,098 persons, of whom 48.7 percent are
Hispanic.  The Hispanic share of the voting age population of
the water district is 44.5 percent.  Almost 94 percent of the
total population in the water district is located in Bexar
County.  The water district is governed by a twelve-member board
of directors with six members elected from Bexar County (four
from single-member districts and two at-large) and three members
elected at large in Comal County and three members elected at
large in Hays County.  Two of the single-member districts in
Bexar County have Hispanic majorities in voting age population.

The single-member district component of the system in Bexar
County is a recent development, having been first implemented in
1989.  It appears to have been adopted as a direct response to
successful litigation under Section 2 of the Voting Rights Act,
42 U.S.C. 1973, relating to the use of a purely at-large system
for the election of the San Antonio River Authority.  Leal v. San
Antonio River Authority, et al., C.A. No. SA85-CA2988 (1987).
Prior to the use of single-member districts, no Hispanic person
had ever served on the board of directors of the water district.
As a result of the change to the existing method of election,
Hispanic voters consistently have been able to elect
representatives of their choice to the two single-member
districts with Hispanic majorities.  It remains the case,
however, that Hispanic voters have been unable to elect
representatives of their choice to any of the six seats outside
of Bexar County.  In this regard, we are aware that there is a
pending federal court challenge to the existing water district
election system on one-person, one-vote grounds under the
Fourteenth Amendment and Hispanic vote dilution grounds under
Section 2.  Williams v. Edwards Underground Water District, C.A.
No. SA92- CA0144, (W.D. Texas).

The state proposes to replace the Edwards Underground Water
District and its elected board with a nine-member appointed board
that would regulate and administer the Edwards Aquifer.  The
appointed body would have authority over a larger geographic
area than the existing water district, as it includes Medina and
Uvalde Counties and portions of other counties not in the water
district.  However, this expansion does not significantly alter
the population since nearly 87 percent of the population in this
larger geographic area still is in Bexar County.

Under the proposed system of appointment, three appointees
would be selected from the areas west of Bexar County, three
appointees would be selected from the areas east of Bexar County,
and three appointees would be selected from Bexar County.  A
variety of different elected or appointed bodies would make the

- 3 -

respective appointments.  At this time, none of the bodies
responsible for making the appointments have a Hispanic majority
among the selecting officials, and only the appointing bodies
within Bexar County have any substantial Hispanic representation.
Thus, it appears that Hispanic voters will have considerably less
influence over the selection of members of the governing body of
the Edwards Aquifer through the choices of the appointing
authorities than they currently have under the direct-election
system for the water district.

We recognize that the state, faced with the environmental
concerns underscored by the federal court's determinations in
Sierra Club litigation, had to ensure that a governmental body
would have the appropriate powers and the mandate to manage the
use of the Edwards Aquifer.  The state, however, has not
suggested that it was directed by the court ruling in the Sierra
Club litigation to dissolve the existing elected governing board
for the water district or to change the method of selecting the
governing body.  Indeed, during the legislative process,
consideration was given to alternatives, including utilizing an
elected body or a combination of an elected and appointed body to
address the environmental concerns.  Hispanic legislators in both
the House and the Senate proffered proposals that would have
continued the state's current practice of using an elected body
in the water management system for the Edwards Aquifer.  Instead,
the state chose to eliminate the elected body for the water
district entirely and replace it with an appointed one.  While
we recognize that, in creating the appointive system, the state
sought to assure some minority representation on the Bexar County
appointed delegation, under federal law this is not an adequate
substitute for existing electoral rights.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
Georgia v. United States, 411 U.S. 526 (1973); Procedures for
the Administration of Section 5, 28 C.F.R. 51.52.  The existence
of some legitimate, nondiscriminatory reasons for the voting
change does not satisfy this burden.  See Village of Arlington
Heights v. Metropolitan Housing Development Corp., 429 U.S. 252,
265-66 (1977); City of Rome v. United States, 446 U.S. 156, 172
(1980); Busbee v. Smith, 549 F. Supp. 494, 516-17 (D.D.C. 1982),
aff'd, 459 U.S. 1166 (1983).  Our review leads us to conclude
that the state has not shown that its interest in managing the
Edwards Aquifer, including the allocation of water among the
various kinds of users, required eliminating the election of
members to the governing body.  Nor can we say that the state
has met its burden of showing that, in these circumstances, the
change from an elected to an appointed board will not "lead to a
retrogression in the position of . . . minorities with respect
to their effective exercise of the electoral franchise."  Beer v.
United States, 425 U.S. 130, 141 (1976).

USA_00013015

- 4 -

In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the change insofar as it replaces the previously elected governing body with an appointed board.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither a discriminatory purpose nor effect. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the dissolution of the Edwards Underground Water District with an elected governing body and its replacement by the Edwards Aquifer Authority with an appointed board continues to be legally unenforceable. See Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10.

We believe that the state can develop a system for managing the Edwards Aquifer in an environmentally-sound manner that would satisfy the requirements of the Voting Rights Act. Should the state decide to seek to adopt a new system, our staff stands ready to discuss further the nature of our concerns with the electoral impact of the submitted change. If a new system is adopted and administrative review under Section 5 is sought, we are prepared to respond on an expedited basis.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action that the State of Texas plans to take concerning this matter. If you have any questions, you should call Delora L. Kennebrew, a Deputy Chief in the Voting Section (202-307-3718).

Since the Section 5 status of the dissolution of the Edwards Underground Water District and the creation of the Edwards Aquifer Authority has been placed at issue in the Sierra Club v. Lujan case, we are providing a copy of this case letter to the court and counsel of record in that case.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

cc: Honorable Lucius D. Bunton, III
Senior United States District Judge

Counsel of Record

U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

April 18, 1994

James P. Finstrom, Esq.
Marion County District Attorney
P. O. Box 276
Jefferson, Texas  75657

Dear Mr. Finstrom:

This refers to the polling place change for Voting Box 12 from the Jefferson Community Center to the Jefferson Volunteer Fire Department Building in Marion County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received your response to our request for additional information on February 17, 1994.

We have carefully considered the information you have provided, as well as information and comments from other interested persons. According to the 1990 Census, black persons represent 31 percent of Marion County's total population and 28 percent of its voting age population. The county is governed by a five-member county commission, four of whom are elected from single-member districts. District 3, with a black population of 62 percent, is the only black-majority district of the four. Voting Box 12 is one of two black-majority precincts located in District 3.

The location of the polling place for Voting Box 12 has been an issue that has divided the county along racial lines for some years, with black voters generally supporting the location of a polling place in the western portion of the precinct. In 1988, the first black county commissioner was elected to District 3. Under his leadership, the change in the location of the existing polling place for Voting Box 12 from a temporary building to the Jefferson Community Center occurred in 1991. After his defeat by a white candidate in 1992, in an election that appears to have been characterized by racially polarized voting, the proposed polling place change was initiated.

USA_00013017

- 2 -

Information made available to us indicates that in late 1993, the Marion County Commission made the decision to change the polling place location for Voting Box 12 without any meaningful input from the black community regarding the possible effects of the proposed change. Our examination of your submission shows that the Jefferson Community Center is located in a heavily black portion of the precinct, and the proposed site for the new polling place, the Jefferson Volunteer Fire Department Building, is one to two miles away in a heavily white portion of the precinct. In a county with limited public transportation, this proposed location would appear to make it more difficult for black voters to exercise their right to vote.

The county suggests that the polling place change was motivated by concerns of voter safety at the community center. We understand, however, that there have been no incidents identified warranting this concern while the community center was being used as a voting location and that citizens in the county, both black and white, regularly use the community center for activities not related to voting apparently without similar safety concerns. In addition, other options to ensure voter safety would appear to be available short of moving the polling place. Under these circumstances, the county's proffered explanation for the polling place change appears to be pretextual, as the change appears to be designed, in part, to thwart recent black political participation.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General I must object to the polling place change for Voting Box 12 from the Jefferson Community Center to the Jefferson Volunteer Fire Department Building.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the polling place change for Voting Box 12 from the Jefferson Community Center to the Jefferson Volunteer Fire Department Building continues to be legally unenforceable. Clark v. Roemer, 111 S.Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

Defendant's Exhibit #

DE-005951

USA_00013018

- 3 -

To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action Marion County
plans to take concerning this matter.  If you have any questions,
you should call Ms. Colleen Kane (202-514-6336), an attorney in
the Voting Section.

Sincerely,

Deval L. Patrick
Assistant Attorney General
Civil Rights Division

USA_00013019



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20035_

May 9, 1994

The Honorable John Hannah, Jr.
Secretary of State
Elections Division
P. O. Box 12060
Austin, Texas 78711-2060

Dear Mr. Secretary:

This refers to Chapter 1032 (1993), which creates a fourth
district court judgeship in Midland County, the 385th Judicial
District Court, to be elected at large by designated position
with a majority vote requirement for the State of Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We
received your response to our September 24, 1993, request for
additional information on March 10, 1994.

We have given careful consideration to the information you
have provided, as well as 1990 Census data, comments received
from interested persons, and information contained in the state's
earlier submission of the creation of additional judicial
district courts in other Texas counties and the record in
relevant judicial decisions. In Midland County, Hispanic persons
constitute 21 percent of the total population and 18 percent of
the voting age population. Black persons comprise eight percent
of the county's total population and seven percent of the voting
age population. Our review of the county's electoral history
indicates that black and Hispanic voters are politically cohesive
and that county elections are characterized by racially polarized
voting patterns.

The election of district court judges by numbered judicial
districts functions as a numbered post requirement and has the
effect of eliminating the ability of minority voters to utilize
single-shot voting. We further note that nomination for this new
judicial post is subject to the general requirement in Texas law
that a successful candidate must obtain a majority of the votes
cast in a party primary. Numerous federal court decisions have
chronicled instances where at-large elections, numbered post

Defendant's Exhibit #                                DE-005953

- 2 -

requirements, and the runoff system have been adopted in Texas with clearly discriminatory motives, and where their use has produced the intended discriminatory results.

We have analyzed the state's decision to expand the at-large election system in Midland County against this backdrop. We recognize that the state has asserted that it has an interest in adding a fourth judgeship to the circuit in order to relieve an overcrowded court docket. However, the state has not shown that serving that interest need be tied to expanding the existing at-large method of electing district court judges.

Prior to the state's adoption of the change at issue in this submission, the Attorney General had interposed an objection to the expansion of the at-large system in the creation of nine other district court judgeships in the state. In our November 5, 1990, objection letter, we noted that a review of legislative discussions in 1989 revealed that it was commonly understood among Texas legislators that the election of district court judges at large and by numbered post, subject to a runoff requirement, has a racially discriminatory impact. Legislative hearings in March and April of 1993 confirm the widespread view among Texas legislators that the method of electing district court judges in Texas dilutes minority voting strength. Thus, it appears that in creating the 385th Judicial District in Midland County in 1993, the state understood that the method of electing the proposed judgeship would have a racially discriminatory impact but decided to use this election scheme rather than an alternative method of selecting judges that would be fair to racial and ethnic minorities.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the creation of the 385th Judicial District Court in Midland County.

In reaching our decision, we are not unmindful of the recent decision of the United States Court of Appeals for the Fifth Circuit in League of United Latin American Citizens v. Clements, 999 F.2d 831 (5th Cir. 1993) (en banc), cert. denied, 114 S. Ct. 878 (1994), which held that the method of electing district court judges in Midland and other counties in Texas does not violate Section 2 of the Voting Rights Act. We note, however, that the court did not make findings on the issue of whether racial

- 3 -

purpose underlies the adoption or maintenance of the method of electing district court judges in Midland or other Texas counties.  Moreover, the LULAC decision does not affect the legal standards to be applied when jurisdictions seek preclearance of voting changes under Section 5.  See, e.g., City of Richmond v. United States, 422 U.S. 358, 373-374 n.6. (1975).  Thus, in light of our conclusion that the state has failed to meet its burden of showing that the change under submission is not designed to dilute minority voting strength, it is unnecessary to reach the question of whether use of the at-large election system with numbered posts and a majority vote requirement would violate Section 2 of the Voting Rights Act.  See 28 C.F.R. 51.55.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  See 28 C.F.R. 51.44.  In addition, you may request that the Attorney General reconsider the objection.  See 28 C.F.R. 51.45.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the creation of the 385th Judicial District Court in Midland County continues to be legally unenforceable.  See Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the State of Texas intends to take concerning this matter.  If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

Sincerely,

Deval L. Patrick
Assistant Attorney General
Civil Rights Division

USA_00013022



U.S. Department of Justice

Civil Rights Division

Office of the Assistant Attorney General                          Washington, D.C. 20035

May 31, 1994

The Honorable Ronald Kirk
Secretary of State
Elections Division
P. O. Box 12060
Austin, Texas 78711-2060

Dear Mr. Secretary:

    This refers to the following acts of the State of Texas,
which create judgeships to be elected at large by designated
position with a majority vote requirement and which were
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c:

    Chapter 318 (1993), which creates a fifteenth county
criminal court at law judgeship in Harris County, and

    Chapter 653 (1993), which creates a third county court at
law judgeship in Fort Bend County.

As to Chapter 318, we received your partial responses to our
September 14, 1993, request for additional information on March
31, April 1, and May 11, 12, and 19, 1994. As to Chapter 653, we
received your partial responses to our September 14, 1993,
request for additional information on March 29, and May 2, 5, 10
and 19, 1994.

    We have given careful consideration to the information you
have provided, as well as 1990 Census data, comments received
from interested persons, and information contained in the state's
earlier submission of the creation of additional judicial
district courts in other Texas counties and the record in
relevant judicial decisions.

Defendant's Exhibit #                                            DE-005956

- 2 -

In Harris County, Hispanic persons constitute 22.9 percent of the total population and 20.2 percent of the voting age population. Black persons comprise 18.7 percent of the county's total population and 17.8 percent of the voting age population. Our review of Harris County's electoral history indicates that each of those minority groups is politically cohesive and that county elections are characterized by racially and ethnically polarized voting patterns.

In Fort Bend County, black persons constitute 20.3 percent of the total population and 19.2 percent of the voting age population. Hispanic persons constitute 19.5 percent of the county's total population and 17.9 percent of the voting age population. Our review of Fort Bend County's electoral history indicates that, at least in general elections, black and Hispanic voters are politically cohesive and that county elections are characterized by racially and ethnically polarized voting patterns.

The use of separate courts for election of judges of the courts at issue functions as a numbered post requirement and has the effect of eliminating the ability of minority voters to utilize single-shot voting. We further note that nomination for such judgeships is subject to the general requirement in Texas law that a successful candidate must obtain a majority of the votes cast in a party primary. Numerous federal court decisions have chronicled instances where at-large elections, numbered post requirements, and the runoff system have been adopted in Texas with clearly discriminatory motives, and where their use has produced the intended discriminatory results.

We have analyzed the state's decisions to expand the at-large election systems in Harris County and in Fort Bend County against this backdrop. We recognize that the state has asserted that it has an interest in adding the proposed judgeships in order to relieve overcrowded court dockets. However, the state has not shown that serving that interest need be tied to expanding the existing at-large method of electing the judges.

Prior to the state's adoption of the changes at issue in these submissions, the Attorney General had interposed an objection to the expansion of the at-large system in the creation of nine district court judgeships in the state. In our November 5, 1990, objection letter, we noted that a review of legislative discussions in 1989 revealed that it was commonly understood among Texas legislators that the election of district court

- 3 -

judges at large and by numbered post, subject to a runoff
requirement, has a racially discriminatory impact.  Legislative
hearings in March and April of 1993 confirm the widespread view
among Texas legislators that the method of electing district
court judges in Texas dilutes minority voting strength.

The method of electing county criminal court and county
court at law judges is virtually the same as the method of
electing district court judges.  Thus, it appears that in
creating the courts at issue here, the state was aware that the
method of electing the proposed judgeships would have a racially
discriminatory impact.  Nonetheless, in each case, the state
decided to use this election scheme rather than an alternative
method of selecting judges that would be fair to racial and
ethnic minorities.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that your burden
has been sustained in this instance.  Therefore, on behalf of the
Attorney General, I must object to the creation of Harris County
Criminal Court at Law No. 15 and the creation of Fort Bend County
Court at Law No. 3.

In reaching our decision, we are not unmindful of the recent
decision of the United States Court of Appeals for the Fifth
Circuit in League of United Latin American Citizens v. Clements,
999 F.2d 831 (5th Cir. 1993) (en banc), cert. denied, 114 S. Ct.
878 (1994), which held that the method of electing district court
judges in Harris and eight other Texas counties does not violate
Section 2 of the Voting Rights Act.  It appears, however, that
the LULAC plaintiffs litigated only a narrow issue of intent; and
they did not raise that issue in the court of appeals (LULAC, 999
F.2d at 838 and n. 3).  In any event, the trial in LULAC took
place in 1989, several years prior to enactment of the submitted
voting changes.  Thus, the circumstances leading to adoption of
these changes, entailing maintenance and expansion of at-large
systems for electing county criminal court and court at law
judges, were not addressed at that trial.

Moreover, the LULAC decisions do not affect the legal
standards to be applied when jurisdictions seek preclearance of
voting changes under Section 5.  See, e.g., City of Richmond v.
United States, 422 U.S. 358, 373-374 n.6. (1975).  Thus, in light

Defendant's Exhibit #                                    DE-005958

- 4 -

of our conclusion that the state has failed to meet its burden of
showing that the changes under submission are not designed to
dilute minority voting strength, it is unnecessary to reach the
question of whether use of the at-large election system with
numbered posts and a majority vote requirement would violate
Section 2 of the Voting Rights Act.  See 28 C.F.R. 51.55.

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed changes have neither
the purpose nor will have the effect of denying or abridging the
right to vote on account of race, color, or membership in a
language minority group.  See 28 C.F.R. 51.44.  In addition, you
may request that the Attorney General reconsider the objections.
See 28 C.F.R. 51.45.  However, as to each of these changes, until
the objection is withdrawn or a judgment from the District of
Columbia Court is obtained, creation of the court in question
continues to be legally unenforceable.  See Clark v. Roemer, 500
U.S. 646 (1991); 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the State of
Texas intends to take concerning these matters.  If you have any
questions, you should call George Schneider (202-307-3153), an
attorney in the Voting Section.

                              Sincerely,


                              Deval L. Patrick
                        Assistant Attorney General
                           Civil Rights Division

Defendant's Exhibit #

USA_00013026



U.S. Department of Justice

Civil Rights Division

Office of the Assistant Attorney General                    Washington, D.C. 20035

June 13, 1994

David M. Guinn, Esq.
Guinn and Morrison
P. O. Box 97288
Waco, Texas  76798-7288

Dear Mr. Guinn:

This refers to the change in the method of electing school
trustees from seven at large to five from single-member districts
and two at large, the districting plan, the elimination of
numbered posts for the two at-large seats, the implementation
schedule, and the establishment of additional voting precincts
and polling places for the Mexia Independent School District in
Limestone County, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c.  We received your response to our
February 7, 1994, request for additional information on April 12,
1994; supplemental information was received on May 10 and 16, and
June 7, 1994.

We have carefully considered the information that you have
provided, as well as information provided by other interested
persons.  According to the 1990 Census, the Mexia Independent
School District has a total population of 11,656 persons, of whom
25 percent are black and 6.6 percent are Hispanic.  Black and
Hispanic persons constitute, respectively, 22.9 and 5.1 percent
of the voting age population in the school district.  While you
have not supplied us with voter registration data, by race, you
have advised us that there are only 48 registrants in the school
district with Spanish surnames.  Currently, the school board
consists of seven members elected at large by plurality vote to
three-year, staggered terms.  There are two black members on the
school board, one of whom was first elected in May 1994.

Defendant's Exhibit #                                    DE-005960

- 2 -

The school board began its consideration of changing its at-large method of election after the black community raised concerns that the continued use of at-large elections for school board trustees unnecessarily limited the opportunity for black voters to elect their candidates of choice to the school board. After black leaders threatened to seek a change in the at-large system through voting rights litigation, the school district established a tri-racial study committee to consider alternative methods of election.

Among the plans considered by the tri-racial committee were plans with seven single-member districts (7-0 plan), six single-member districts and one at-large seat (6-1 plan) and five single-member districts and two at-large seats (5-2) plan. The fifteen member tri-racial committee voted unanimously to recommend a 7-0 method of election and districting plan with two districts having substantial black voting age population majorities. The school board, however, rejected that recommendation and decided to adopt a 5-2 method of election instead.

We have reviewed the school board's contention that minority voters will be able to elect their candidates of choice in the two districts in which they constitute a majority of the voting age population. Our analysis of election contests shows an apparent pattern of racially polarized voting in school district elections, which has limited the success of candidates of choice of minority voters. We have weighed the impact that the significantly low level of Hispanic voter registration may have upon the opportunity of minority voters to elect their chosen candidates. In these circumstances, the two districts with bare black voting age population majorities would appear to afford black voters an unnecessarily limited opportunity to elect candidates of their choice.

We also have considered the school district's proffered reasons for selection of the 5-2 method of election, including a desire to maintain continuity on the school board by maintaining the staggered election cycle. However, this criterion was not identified when the tri-racial committee was charged and apparently did not surface until after a 7-0 plan, preferred by the minority community, was recommended. In addition, the school board's reliance on continuity to explain its rejection of the 7-0 alternative appears to be pretextual since the electoral history of the board suggests that it is improbable that every board member would be replaced if all were up for election simultaneously.

Finally, it is apparent that the protection of the interests of incumbents played a significant role in the school district's decision to select a 5-2 method of election. The information

Defendant's Exhibit #

DE-005961

- 3 -

that you have provided suggests that the chosen method of election preserves the existing staggered election cycle as much as possible in order to permit incumbents to run for re-election without competing against each other.  While protecting incumbency is not in and of itself an inappropriate consideration, it may not be accomplished at the expense of minority voting potential.  See, e.g., Garza v. County of Los Angles, 918 F.2d 763, 771 (9th Cir. 1990), cert. denied, 111 S. Ct. 681 (1991); Ketchum v. Byrne, 740 F.2d 1398, 1408-09 (7th Cir. 1984), cert. denied, 471 U.S. 1135 (1985).  Where, as here, the protection afforded incumbents by selecting a method of election specifically designed to maintain incumbents is provided at the expense of minority voters, the school district bears a heavy burden of demonstrating that its choices are based on neutral nonracial considerations and are not tainted, even in part, by an invidious racial purpose.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the proposed change in method of election for the school district.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the change in the method of election continues to be legally unenforceable.  Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

With regard to the remaining voting changes, we understand that those changes are dependent on the now objected-to method of election change.  Accordingly, no determination is appropriate with respect to those voting changes.  See 28 C.F.R. 51.22(b)

- 4 -

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the Mexia Independent School District plans to take concerning this matter. If you have any questions, you should call Ms. Colleen Kane (202-514-6336), an attorney in the Voting Section.

Sincerely,

Deval L. Patrick
Assistant Attorney General
Civil Rights Division

USA_00013030



U.S. Department of Justice

Civil Rights Division

_____

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

AUG 15 1994

The Honorable Ronald Kirk
Secretary of State
221 E. 11th Street
Third Floor
Austin, Texas 78701

Dear Mr. Secretary:

     This refers to Chapter 38 (1987), which creates, and
provides an implementation schedule for, four criminal court
judgeships (Nos. 7-10); and Chapter 354 (1993), which abolishes
Criminal Court No. 5, creates a new Criminal Court of Appeals,
and establishes candidate qualifications and compensation for
that court in Tarrant County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended, 42 U.S.C. 1973c. We received your submissions on
July 14, 1994.

     We have given careful consideration to the information you
have provided, as well as data from the 1990 Census, comments
received from interested persons, and information in our files,
as well as the record in relevant judicial decisions. The
Attorney General does not interpose any objection to the
specified changes in Chapter 354 (1993). However, we note that
Section 5 expressly provides that the failure of the Attorney
General to object does not bar subsequent litigation to enjoin
the enforcement of the changes. See the Procedures for the
Administration of Section 5 (28 C.F.R. 51.41).

     With respect to the voting changes in Chapter 38 (1987), I
cannot come to the same conclusion. In Tarrant County, black
persons constitute 12 percent of the total population as do
Hispanic persons. Our review of the county's electoral history,
beginning in 1982, indicates that no black person and only one
Hispanic has ever served as a county criminal court judge.

Defendant's Exhibit #                                    DE-005964

USA_00013031

- 2 -

The four additional county criminal court judgeships established by Chapter 38 are to be elected at large by numbered place.  The election of judges by such numbered judicial districts has the effect of eliminating the ability of minority voters to utilize single-shot voting.  Nomination for these judicial posts is subject as well to the general requirement in Texas law that a successful candidate must obtain a majority of the votes cast in a party primary.

Numerous federal court decisions prior to 1987 chronicled instances where at-large elections, numbered place requirements, and the runoff system were adopted in Texas for clearly discriminatory motives, and where their use has produced the intended discriminatory results.  Tarrant County is among those jurisdictions where the federal courts have found that these electoral factors have resulted in discrimination in violation of Section 2 of the Voting Rights Act, 42 U.S.C. 1973.  In addition, review of our records shows that prior to 1987 the Attorney General had interposed objections under Section 5 on 38 occasions to the adoption of numbered posts and on 24 occasions to adoption of a majority vote requirement by various Texas jurisdictions.

We have analyzed the state's decision to expand the at-large system for electing Tarrant County criminal court judges in 1987 against this background.  It appears that in creating Tarrant County Criminal Court Nos. 7 through 10 in 1987 the state understood that the method of electing the proposed judgeships would have a racially discriminatory impact but decided to use this election scheme rather than an alternative method of selecting judges that would be fair to racial and ethnic minorities.  We recognize that the state asserts that it had an interest in adding these four courts in order to relieve an overcrowded docket.  However, the state has not shown that serving that interest need be tied to expanding the existing at-large system of electing these judges or the additional requirement that judicial candidates qualify for particular numbered judicial posts.

In reaching our decision, we are not unmindful of the recent decision of the United States Court of Appeals for the Fifth Circuit in League of United Latin American Citizens v. Clements, 999 F.2d 831 (5th Cir. 1993) (en banc), cert. denied, 114 S. Ct. 878 (1994), which held that the method of electing district court judges in Tarrant and other counties does not violate Section 2 of the Voting Rights Act.  We note, however that criminal court judgeships in Tarrant County were not among the offices at issue in that litigation.  Nor does the record in that case include evidence concerning the legislation at issue in this submission or recent judicial election contests.

- 3 -

Moreover, the LULAC decisions do not affect the legal standards to be applied when jurisdictions seek preclearance of voting changes under Section 5.  See, e.g., City of Richmond v. United States, 422 U.S. 358, 373-374 n.6. (1975).  Thus, in light of our conclusion that the state has failed to meet its burden of showing that the changes under submission are not designed to dilute minority voting strength, it is unnecessary to reach the question of whether use of the at-large election system with numbered posts and a majority vote requirement would violate Section 2 of the Voting Rights Act.  See 28 C.F.R. 51.55.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the creation of, and implementation schedule for, Tarrant County Criminal Court Nos. 7 through 10 as provided in Chapter 38 (1987).

Since the Section 5 status of Chapter 38 (1987) and Chapter 354 (1993) is a matter before the court in Texas v. United States, No. 1:94CV01529 (D.D.C.), we are providing copies of this letter to the court and counsel of record in that case.

Sincerely,

Deval L. Patrick
Assistant Attorney General
Civil Rights Division

cc:  Honorable Thomas Penfield Jackson
     Honorable John Garrett Penn
     United States District Judges

     Honorable Harry T. Edwards
     United States Circuit Judge

     Renea Hicks, Esq.

**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

August 22, 1994

Arturo G. Michel, Esq.
Bracewell & Patterson
South Tower Pennzoil Place
711 Louisiana Street
Suite 2900
Houston, Texas 77002-2781

Dear Mr. Michel:

This refers to the change in the method of electing school trustees from seven at large to five from single-member districts and two at large, the districting plan, the implementation schedule and a polling place change for the Edna Independent School District in Jackson County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received your response to our May 2, 1994 request for additional information on July 6, 1994; supplemental information was received on August 12, 1994.

The Attorney General does not interpose any objection to the polling place change. However, we note that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the change. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.41).

With regard to the method of election change, we have carefully considered the information that you have provided, as well as information provided by other interested persons. According to the 1990 Census, the Edna Independent School District has a total population of 7,531 persons, of whom 22 percent are Hispanic and 13 percent are black. Hispanic and black persons constitute, respectively 19.2 and 12.8 percent of the voting age population in the school district. Currently, the school board consists of seven members elected at large by plurality vote to three year, staggered terms. There is one Hispanic member of the school board and one black member of the school board. They were elected May 7, 1994, using the unprecleared method of election. Prior to this election, no minorities ever have served on the school board.

USA_00013034

- 2 -

The school board began its consideration of changing its at-large method of election after the minority community raised concerns that the continued use of at-large elections for school board trustees unnecessarily limited the opportunity for minority voters to elect their candidates of choice to the school board. After minority leaders expressed their concern, the school district appointed a tri-racial committee to consider alternative methods of election.

Among the plans considered by the tri-racial committee were plans with seven single-member districts (7-0 plan), six single-member districts and one at-large seat (6-1 plan), five single-member districts and two super districts (5-2 super) and five single-member districts and two at-large seats (5-2 plan). The fourteen member tri-racial committee voted nine to five in favor of the 7-0 plan. The 7-0 alternative provided for one district with a black majority voting age population (64.7 percent) and one district with an Hispanic majority voting age population (52.7 percent). The school board, however, rejected the recommendation by the tri-racial committee and adopted the 5-2 method of election instead. The 5-2 plan provides for one district with a black majority voting age population (52.3 percent) and a district with an Hispanic voting age population of 46.0 percent.

We have reviewed the board's contention that minority voters will be able to elect their candidates of choice in the two districts in which they constitute a majority of the voting age population. The board has not provided sufficient election data to suggest that election contests for school board are not characterized by a pattern of racially polarized voting or that minority voters are cohesive. The board concedes that the three elections upon which it relies to support its contention that the minority majority districts provide minority voters with an "equal chance" to elect candidates of choice are insufficient to predict future minority electoral success. Our analysis of school board election contests shows an apparent pattern of racially polarized voting and mixed results with regard to cohesion among black and Hispanic voters. Under these circumstances, the method of election adopted by the school board appears to afford minority voters an unnecessarily limited opportunity to elect candidates of their choice.

We also have considered the school district's proffered reasons for selecting the 5-2 method of election, including a desire to provide minority voters with an "equal opportunity" to elect candidates of choice but not a guarantee. While there is no requirement to guarantee minority voters can elect candidates of choice, there is a requirement to provide minority voters with a reasonable opportunity to do so. The board defined a district

- 3 -

that provides an "equal opportunity" as one that has 50 percent
or more minority population. However, in applying this
criterion, the board appears to have chosen the method of
election that provides for majority minority districts in which
the dominant minority group is as near to 50 percent as possible.
No consideration appears to have been given to the apparent
pattern of racially polarized voting or inconsistent cohesion
between black and Hispanic voters. Based on our investigation,
it does not appear that districts, in which the dominant minority
group is as near to 50 percent as possible, provide minority
voters with a reasonable opportunity to elect candidates of
choice.

Finally, it is apparent that the protection of the interests
of incumbents played a significant role in the school district's
decision to select a 5-2 method of election. The information you
have provided suggests that placing multiple incumbents in the
same districts was unavoidable due to the location of their
residences. The proposed plan provides as many as four
incumbents with the opportunity to be re-elected. By contrast,
the 7-0 plan would have limited the number of incumbents who
could be re-elected to two. While protecting incumbency is not
in and of itself an inappropriate consideration, it may not be
accomplished at the expense of minority voting potential. See,
e.g., Garza v. County of Los Angeles, 918 F.2d 763, 771 (9th Cir.
1990), cert. denied, 111 S.Ct. 681 (1991); Ketchem v. Byrne, 740
F.2d 1398, 1408-9 (7th Cir. 1984), cert. denied, 471 U.S. 1135
(1985). Where, as here, the protection afforded incumbents by
selecting a method of election specifically designed to maintain
incumbents is provided at the expense of minority voters, the
school district bears a heavy burden of demonstrating that its
choices are based on neutral, nonracial considerations and are
not tainted, even in part, by an invidious racial purpose.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot
conclude, as I must under Section 5 of the Voting Rights Act,
that your burden has been sustained in this instance. Therefore,
on behalf of the Attorney General, I must object to the proposed
change in the method of election for the school district.

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed change has neither the
purpose nor will have the effect of denying or abridging the
right to vote on account of race, color or membership in a
language minority group. In addition, you may request that the
Attorney General reconsider the objection. However, until the

- 4 -

objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the change in the method of election
continues to be legally unenforceable. Clark v. Roemer, 111
S.Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

With regard to the remaining changes, we understand that
those changes are dependent on the now objected-to method of
election change. Accordingly, no determination is appropriate
with respect to those voting changes. See 28 C.F.R. 51.22(b).

To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the action the
Edna Independent School District plans to take concerning this
matter. In that regard, I have asked the Voting Section to
consider whether the at-large system violates Section 2 of the
Voting Rights Act, should the school district determine to take
no further action toward changing that system. If you have any
questions, you should call Ms. Colleen Kane (202-514-6336), an
attorney in the Voting Section.

Sincerely,

Stuart J. Ishimaru
Acting Assistant Attorney General
Civil Rights Division

U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20035_

September 12, 1994

Paul Lyle, Esq.
Owen, Lyle, Voss & Owen
P.O. Box 328
Plainview, Texas  79073-0328

Dear Mr. Lyle:

This refers to the change in the method of electing the five councilmembers from at large to a cumulative voting system for the City of Morton in Cochran County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received your response to our May 20, 1994, request for additional information on July 14, 1994.

We have carefully considered the information that you have provided, as well as information provided by other interested persons.  According to the 1990 Census, the City of Morton has a total population of 2,597 persons, of whom 51.7 percent are Hispanic and 7.4 percent are black.  The city's minority population suffers from a history of discrimination which appears to have resulted in depressed education and registration levels. For example, over 13 percent of Hispanic citizens in the county do not speak English well enough to participate in the political process without Spanish language materials.  In addition, based on the registration rates for the county, minority voters are approximately 34 percent of the city's registered voters.  The electoral history of the city suggests that voting is polarized along racial and ethnic lines to such a degree that no minority person has ever served as a councilmember.

The city council began its consideration of changing its at-large method of election after private voting rights litigation was filed by statewide LULAC.  Two possible alternatives emerged -- a single-member districting plan, including two majority minority districts, and a cumulative voting system.

Defendant's Exhibit #                                        DE-005971

USA_00013038

- 2 -

The city council then considered both plans.  It adopted
cumulative voting despite the fact that the minority population
is geographically concentrated in such a way that it is
relatively simple to draw two single-member districts with
Hispanic voting age populations at or above 65 percent.  A single
public hearing to explain the use of the cumulative voting system
was held.  The hearing was advertised only in English and it was
not attended by any minority residents.  There was no effort to
solicit specifically the views of the local minority community
contemporaneously with the council's consideration of these
plans.  No investigation was made into whether or not the
minority community had a complete understanding of the cumulative
voting system.

After this system was adopted, the city did not engage in
any type of bi-lingual voter education program to ensure that
minority voters would understand it.  There has been no Spanish-
language outreach to the minority community in the form of public
service announcements, advertisements, mailers, demonstrations,
etc., to provide the minority community with the information it
needs to use effectively the cumulative voting system.

These facts bear heavily on our consideration of the ability
of minority voters to elect candidates of their choice under the
proposed system, and also on the reasons for the city's adoption
of this system, as opposed to available alternatives.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
The existence of some legitimate, nondiscriminatory reasons for
the voting change does not satisfy this burden.  See Village of
Arlington Heights v. Metropolitan Housing Development Corp., 429
U.S. 252, 265-66 (1977); City of Rome v. United States, 446 U.S.
156, 172 (1980); Busbee v. Smith, 549 F. Supp. 494, 516-17
(D.D.C. 1982), aff'd, 459 U.S. 1166 (1983).  In light of the
considerations discussed above, I cannot conclude as I must under
the Voting Rights Act, that your burden has been sustained in
this instance.  Therefore, on behalf of the Attorney General, I
must object to the proposed change in the method of election for
the city council.

USA_00013039

- 3 -

We note under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the change in the method of election continues to be legally unenforceable.  Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10 and 51.45.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the action the City of Morton plans to take concerning this matter.  In that regard, I have asked the Voting Section to consider whether the at-large system violates Section 2 of the Voting Rights Act, should the city determine to take no further action toward changing that system.  If you have any questions, you should call Ms. Colleen Kane (202-514-6336), an attorney in the Voting Section.

Sincerely,

Kerry Scanlon
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                     DE-005973

USA_00013040



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

Lloyd Garza, Esq.                    **OCT 21 1994**
City Attorney
Ms. Norma Rodriguez
City Clerk
P. O. Box 839966
San Antonio, Texas  78283-3966

Dear Mr. Garza and Ms. Rodriguez:

    This refers to the procedures for conducting the August 13, 1994, special referendum election, and 39 voting precinct consolidations and the selection of polling places therefor, two early voting location changes, extended hours for early voting, 16 polling place changes, and a name change for the 12000 Perrin Oaks Center for the August 13th special election in the City of San Antonio, Bexar County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received your response to our August 5, 1994, request for additional information on August 22, 1994. On August 9, 1994, we received your related submission of additional precinct and polling place changes for the special election.

    We carefully have considered the information that you have provided, as well as information provided by other interested persons. According to the 1990 Census, the City of San Antonio has a total population of 935,933 persons, of whom 55.6 percent are Hispanic and 6.8 percent are black. Three-quarters of San Antonio's population speaks Spanish at home, and nearly four out of every ten (37.1 percent) of these Spanish speakers require Spanish-language assistance to participate effectively in elections.

    In considering whether the implementation of bilingual procedures satisfy Section 5 of the Voting Rights Act, the Attorney General will pay "particular attention . . . to the requirements of . . . Sections 4(f)(4) and 203(c) . . . of the Act . . . ." 28 C.F.R. 51.55 (a); See also Apache County High

Defendant's Exhibit #                    DE-005974

USA_00013041

- 2 -

<u>School District No. 90</u> v. <u>United States</u>, Civil Action No. 77-1845
(D.D.C. 1980). The guidelines for the implementation of Sections
4(f)(4) and 203 of the Voting Rights Act state that the test for
compliance with regard to bilingual procedures is whether or not
the materials and assistance are provided in a way that allows
members of the language minority group to be effectively informed
of and participate effectively in voting-concerned activities, 28
C.F.R. 55.2(b)(1). We note that the city's bilingual procedures
provide that "all election materials will be prepared
bilingually."

While the city provided assistance and many materials
bilingually for the August 13, 1994, special referendum election,
it provided the principal substantive document concerning the
referendum, the 2050 Plan, in English only.

The availability of the 2050 Plan in Spanish was critical to
the ability of Hispanic voters to participate effectively in the
election. Given that the ballot question, as well as the election
literature, advertisements, and other information provided to the
voters by the city specifically and repeatedly referred to the
2050 Plan, the Applewhite issue was voted upon in the context of
the 2050 Plan. In addition, the new Applewhite project could
easily have been confused with the 1991 Applewhite project,
although the two projects were substantially different. The 2050
Plan contained the only substantive explanation of these
differences.

You advise that the city distributed the 2050 Plan in
English because it was "important for voters to know the
components of the plan of which the project is a part." Because
of the importance of the plan, the city took special steps to
make it available in English, and distributed hundreds of copies.
The city sponsored announcements over local television which
specifically referred to the 2050 Plan. These announcements were
in English only. Once the city provided the 2050 Plan to the
public, it had an obligation to provide it so that all voters
would benefit from its distribution, not only those who are
proficient in English. The city's failure to do so constituted a
violation of the Voting Rights Act.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
The existence of some legitimate, nondiscriminatory reasons for
the voting change does not satisfy this burden. See <u>Village of
Arlington Heights</u> v. <u>Metropolitan Housing Development Corp.</u>, 429
U.S. 252, 265-66 (1977); <u>City of Rome</u> v. <u>United States</u>, 446 U.S.
156, 172 (1980); <u>Busbee</u> v. <u>Smith</u>, 549 F. Supp. 494, 516-17
(D.D.C. 1982), <u>aff'd</u>, 459 U.S. 1166 (1983). In light of the

- 3 -

considerations discussed above, I cannot conclude as I must under the Voting Rights Act, that your burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the procedures for conducting the August 13th special election.

We note under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the procedures for conducting the August 13, 1994, special referendum election continue to be legally unenforceable.  <u>Clark</u> v. <u>Roemer</u>, 500 U.S. 646 (1991); 28 C.F.R. 51.10 and 51.45.

The Attorney General will make no determination at this time with regard to the voting precinct, early voting and polling place changes as they are directly related to the August 13, 1994, special election procedures.  See 28 C.F.R. 51.22(b).

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the action the City of San Antonio plans to take concerning this matter.  If you have any questions, you should call Ms. Colleen Kane (202-514-6336), an attorney in the Voting Section.

Sincerely,

Deval L. Patrick
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

October 31, 1994

The Honorable Don Tymrac
Mayor, City of Karnes City
Post Office Box 399
Karnes City, Texas  78118

Dear Mayor Tymrac:

    This refers to the increase in the number of officials on
the municipal governing body from two to five, the procedures for
conducting the August 13, 1994, special election for the three
additional officials, the adoption of staggered terms and the
implementation schedule for the City of Karnes City in Karnes
County, Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  We received your responses to our July 22, 1994, request
for additional information on September 1 and October 14, 17, 20
and 25, 1994; supplemental information was received on
October 27, 1994.

    We have carefully considered the information you have
provided, as well as Census data and information and comments
from other interested persons.  At the outset, we note that the
expansion of the city's governing body occasioned by the
establishment of the three additional positions must be analyzed
in the context of the method used to elect the governing body.
City of Lockhart v. United States, 460 U.S. 125, 131-132 (1983).
See also McCain v. Lybrand, 465 U.S. 236, 255 n.27 (1984).  Under
the existing electoral system in Karnes, two city commissioners
and the mayor are elected at large to concurrent, two-year terms
by plurality vote.  Elections in Karnes exhibit a pattern of
polarized voting, and significant disparities appear to exist in
the rates at which Hispanic and Anglo residents register and
vote.  Moreover, the depressed political participation rates
among Hispanics appear attributable largely to a history of
discrimination, which continues to be reflected in the
disparities in socio-economic conditions that exist between the
city's Hispanic and Anglo residents.  Thus, in the totality of
circumstances, it appears that Hispanic residents in the city do
not participate equally in the political process and have a
limited opportunity to elect candidates of their choice to the
city's governing body.

USA_00013044

- 2 -

The city determined to eliminate the existing system and expand the size of the city's governing body. Rather than do so in a manner fair to all of the city's citizens, however, the city added positions to the at-large electoral system. Indeed, the expanded governing body will be elected with staggered terms of office (2-3), which, under the at-large system, would have the effect of limiting the effective use of single-shot voting. The city has not advanced any persuasive non-racial reasons for the use of at-large elections for the expanded governing body and there clearly were alternative methods for electing an expanded body that would not similarly submerge Hispanic voting strength. It appears, furthermore, that little or no effort was made by the city to solicit the views of the Hispanic community regarding alternative methods of electing the enlarged governing body.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In addition, a submitted change may not be precleared if its implementation would lead to a clear violation of Section 2. See 28 C.F.R. 51.55(b). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance, and that the proposed expansion of the city's governing body satisfies the preclearance requirements of the Act. Therefore, on behalf of the Attorney General, I must object to the increase in the number of officials insofar as the city proposes to elect the three additional positions under an at-large election scheme with staggered terms.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the increase in the number of officials from two to five continues to be legally unenforceable. See Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10.

Defendant's Exhibit #

DE-005978

USA_00013045

- 3 -

    With regard to the procedures for conducting the August 13,
1994, special election and the implementation schedule, the
Attorney General will make no determination because these matters
are directly related to the objected-to increase in the number of
officials on the city's governing body.  See 28 C.F.R. 51.22(b).

    To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the City of
Karnes City plans to take concerning these matters.  If you have
any questions, you should call Ms. Zita Johnson-Betts
(202-514-8690), an attorney in the Voting Section.

                                        Sincerely,

                                   Deval L. Patrick
                              Assistant Attorney General
                                 Civil Rights Division

Defendant's Exhibit #                                    DE-005979



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*


Galen R. Elolf, Ed.D.
Superintendent of Schools
Judson Independent School District          **NOV 18 1994**
P.O. Box 249
Converse, Texas 78109

Dear Dr. Elolf:

   This refers to the procedures for conducting the
November 19, 1994, special bond election and two early voting
locations for the Judson Independent School District in Bexar
County, Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  We received your submission on October 20, 1994;
supplemental information was received on November 15, 1994.

   We have carefully considered the information you have
provided, as well as information from other interested persons.
According to the 1990 Census, the school district has a total
population of 58,190, of whom 24 percent are Hispanic and 13
percent are black.  According to the 1990 Census, countywide
approximately 85 percent of Hispanic citizens of voting age speak
Spanish at home and, in the Judson School District, approximately
one-third of those persons of voting age who speak Spanish at
home require Spanish-language assistance to participate
effectively in elections.

   Under Sections 4(f)(4) and 203 of the Voting Rights Act, 42
U.S.C. 1973b(f)(4) and 1973aa-1a, whenever the Judson School
District provides any "materials or information relating to the
electoral process ... it shall provide them in the language of
the applicable language minority group as well as in the English
language."  Under Section 5, when a jurisdiction subject to these
sections submits a request for preclearance of a special
election, one factor the Attorney General considers is whether
the election materials and information for that election will be
provided bilingually.  In that regard, we are guided by the
Attorney General's guidelines for implementation of Sections

Defendant's Exhibit #

DE-005980

USA_00013047

- 2 -

4(f)(4) and 203, which state that covered jurisdictions must take all reasonable steps to provide bilingual materials in such a way as to allow minority group members "to be effectively informed of and participate effectively in voting-connected activities." 28 C.F.R. 55.2(b)(1).

Our review indicates that an important part of the election process for the November 19, 1994, special bond election has been the distribution of various materials by the school district, as well as by a committee organized by the school district, that sought to educate voters on the proposed bond issue.  These materials included several newsletters, a one-page summary sheet, "door-hanger" advertisements, and posters.  However, with the exception of the summary sheet, none of these materials were provided in Spanish.  In addition, numerous informational meetings were conducted, but apparently only one included Spanish translation.  While the school district published the official election notice in both English and Spanish, and the ballot is bilingual, Sections 4(f)(4) and 203 are not narrowly limited to requiring the translation of materials specifically concerned with the calling of an election and polling place procedures.  28 C.F.R. 55.15.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the holding of the November 19, 1994, special bond election.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the special election continues to be legally unenforceable.  Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10 and 51.45.

In this regard, we note that we were not able to make the requisite Section 5 decision regarding this bond election until now because the school district did not make the necessary submission to the Attorney General until about a month ago, thus not allowing the Attorney General the full 60-day review period

- 3 -

granted by Section 5.   Nevertheless, we wish to emphasize that because the school district has not received preclearance for this election, federal law does not permit it to be conducted.

Finally, with regard to the submitted early voting locations, no determination under Section 5 is necessary since they are directly related to the objected-to change. 28 C.F.R. 51.22(b).

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the Judson Independent School District plans to take concerning this matter. If you have any questions, you should call Mark A. Posner, Special Section 5 Counsel, at (202) 307-1388.

Sincerely,

Deval L. Patrick
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

## DEC 8 1994

Galen R. Elolf, Ed.D.
Superintendent of Schools
Judson Independent School District
P.O. Box 249
Converse, Texas 78109

Dear Dr. Elolf:

This refers to your request that the Attorney General
reconsider and withdraw the November 18, 1994, objection under
Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, to the
procedures for conducting the November 19, 1994, special bond
election for the Judson Independent School District in Bexar
County, Texas.  We received your reconsideration request on
November 29, 1994, and, as you further requested, we have
undertaken to make an expeditious decision on whether to continue
or withdraw the objection.

As set forth in our November 18 determination letter, the
objection was interposed because the school district, in
preparing to conduct the bond election, provided materials and
information relating to the election process predominantly in the
English language but not in Spanish, contrary to the bilingual
requirements of Sections 4(f)(4) and 203 of the Voting Rights
Act, 42 U.S.C. 1973b(f)(4) and 1973aa-1a.  In reviewing a special
election submitted for Section 5 preclearance, an important
consideration is whether a jurisdiction covered by the Act's
bilingual provisions will conduct the election in compliance with
those provisions.

In the reconsideration request, the school district contends
that the English-only publicity was prepared and distributed in
part by a campaign committee composed of private individuals
acting independently of the school district.  Our further review
of this issue pursuant to the reconsideration request, however,
confirms that the committee was closely aligned with, and not
independent of, the school district.  The committee was formed at
the instigation of the school district, the school district

Defendant's Exhibit #                                              DE-005983

- 2 -

played a major role in selecting the committee's members, and district officials then provided important advice and assistance to the committee regarding the committee's activities.   Written materials prepared by the committee included articles written by you in your role as school superintendent.   The committee newsletter identified the school district as the return addressee, and the newsletter was mailed using the school district's post office nonprofit mailing permit.

The school district points out that the English-only newsletter it published regarding the election also included articles unrelated to the election, and other newsletters published by the district do not relate to any election. However, this does not alter the fact that the newsletter in question directly addressed the bond election process.

Finally, the school district contends that there only is a very slight need for bilingual materials among the Hispanic electorate of the district, thus apparently suggesting that the district need not provide any election materials bilingually. Our review of the Census data does not support that proposition. Well over 2,000 voting age citizens of the school district require bilingual assistance.   While it may be that these persons comprise only a minority of the district's entire Hispanic population, that provides no basis under the law for concluding that important election materials may be provided in English but not in Spanish.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance.   Therefore, on behalf of the Attorney General, I must decline to withdraw the objection to the holding of the November 19, 1994, special bond election.

As we previously have advised, under Section 5 the school district has the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the special election continues to be legally unenforceable.   <u>Clark</u> v. <u>Roemer</u>, 500 U.S. 646 (1991); 28 C.F.R. 51.10 and 51.45.

Defendant's Exhibit #

DE-005984

USA_00013051

- 3 -

Finally, we understand that the school district has selected a new date (January 28, 1995) for conducting a special referendum election on the proposed bond should the objection not be withdrawn.  If the school district intends to proceed with that election, it should seek Section 5 preclearance immediately and we will make every effort to expedite our review of that submission.  In this regard, we note that in order to obtain Section 5 preclearance for the new election, the district will need to remedy the absence of bilingual information with regard to the November election.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the Judson Independent School District plans to take concerning this matter. If you have any questions, you should call Mark A. Posner, Special Section 5 Counsel, at (202) 307-1388.

Sincerely,

Loretta King
Acting Assistant Attorney General
Civil Rights Division

U.S. Department of Justice

Civil Rights Division

Office of the Assistant Attorney General　　　　　　　　Washington, DC 20035

February 13, 1995

David M. Guinn, Esq.
Guinn and Morrison
P. O. Box 97288
Waco, Texas 76798-7288

Dear Mr. Guinn:

This refers to your request that the Attorney General
reconsider the June 13, 1994, objection under Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c, to the
change in method of electing school trustees from seven at large
to five from single-member districts and two at large for the
Mexia Independent School District in Limestone County, Texas. We
received your request on December 13, 1994.

We have reconsidered our earlier determination regarding
this matter based on the information and arguments that you have
advanced in support of your request, along with other information
in our files and comments from other interested persons. Our
review indicates that there has been no "substantial change in
operative fact or relevant law" since the time we interposed the
objection. See the Procedures for the Administration of Section
5 (28 C.F.R. 51.46). Your request does not contain any factual
information that addresses or rebuts the conclusions we
previously reached regarding the unnecessarily limited
opportunity afforded to black voters under the objected-to plan.
For example, your request provides no information that suggests
the apparent pattern of racially polarized voting in school board
elections and the significantly low level of Hispanic voter
registration will not have an adverse impact on the ability of
black voters to elect candidates of their choice in the majority
minority districts.

Without providing any new or additional facts to suggest
that the majority minority districts will provide black voters
with a reasonable opportunity to elect candidates of their

- 2 -

choice, the school district opines that by her objection, the Attorney General has adopted a policy that requires the school district to "maximize minority percentages without regard to any other legislative value." Under Section 5, a jurisdiction is not required to adopt a plan that maximizes minority voting strength; however, by the same token, a jurisdiction also is not free to reject a particular plan that enhances minority voting strength without a legitimate, non-racial justification for doing so.

Although the school district does not provide the specifics in its request, it implies that there was some "legislative value" in rejecting the 7-0 alternative unanimously recommended by the fifteen member tri-racial committee and adopting the objected-to plan in its place. During the course of our previous investigation of the objected-to plan, the school district argued that maintaining continuity on the board and protecting incumbents were among those values. Our analysis, however, revealed that serving these particular "legislative values" would be at the expense of black voting strength in the majority minority districts. We concluded that the school district's "legislative values" were pre-textual and that the objected-to plan was adopted, at least in part, to minimize black voting strength.

Absent entirely from the school district's request for reconsideration is any supporting documentation or any information that would enable us to conclude that black voters residing in the majority minority districts have a reasonable opportunity to elect candidates of their choice. Under these circumstances, the school district has not met its burden of demonstrating that the choices underlying the adoption of the objected-to plan over a plan that would have provided black voters with a reasonable opportunity to elect two of the seven school board members were not tainted, even in part, by an invidious discriminatory purpose. See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-66 (1977); City of Rome v. United States, 446 U.S. 156, 172 (1980); Busbee v. Smith, 549 F. Supp. 494, 516-17 (D.D.C. 1982), aff'd, 459 U.S. 1166 (1983).

In light of the considerations discussed above, I remain unable to conclude that the Mexia Independent School District has carried its burden of showing that the submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R. 51.52. Therefore, on behalf of the Attorney General, I must decline to withdraw the objection to the change in method of election for the Mexia Independent School District.

- 3 -

As we previously advised, you may seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  We remind you that until such a judgment is rendered by that court, the objection by the Attorney General remains in effect and the proposed change continues to be legally unenforceable.  See <u>Clark</u> v. <u>Roemer</u>, 500 U.S. 646 (1991); 28 C.F.R. 51.10, 51.11, and 51.48(c) and (d).

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the Mexia Independent School District plans to take concerning this matter. In that regard, I have asked the Voting Section to consider whether the at-large system violates Section 2 of the Voting Rights Act, should the school district determine to take no further action toward changing that system.  If you have any questions, you should call Colleen M. Kane (202) 514-6336, an attorney in the Voting Section.

Sincerely,

Loretta King
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                    DE-005988



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*　　　　*Washington, D.C. 20530*

February 17, 1995

The Honorable Ronald Kirk
Secretary of State
State of Texas
Elections Division
P.O. Box 12060
Austin, Texas 78711-2060

Dear Mr. Secretary:

This refers to the bilingual procedures to be used in the implementation of the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. 1973gg, for the State of Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. Other changes with respect to the NVRA implementation of the State of Texas, provided for by Administrative Rule 1 T.A.C. §81.401, were precleared by our letters of December 12, 1994, and February 2, 1995. Additional information with respect to your submission was received on December 19, 1994.

We have carefully considered the information that you have provided, as well as information provided by other interested persons. According to the 1990 Census, the state's 2,054,103 Hispanic voting age citizens constitute 18 percent of the state's total citizen voting age population. Of Hispanic voting age citizens, 86 percent speak Spanish at home and 33 percent require Spanish-language assistance to participate effectively in elections.

Defendant's Exhibit #                                         DE-005989

USA_00013056

- 2 -

In considering whether the implementation of bilingual procedures satisfies Section 5 of the Voting Rights Act, the Attorney General will pay "particular attention . . . to the requirements of . . . Sections 4(f)(4) and 203(c) . . . of the Act . . . ."  28 C.F.R. 51.55(a).  The Attorney General's guidelines for the implementation of Sections 4(f)(4) and 203(c) of the Voting Rights Act state that the test for compliance with regard to bilingual procedures is whether the jurisdiction has taken "all reasonable steps" to ensure that materials are provided in a way that allows members of the language minority group to be effectively informed of and participate effectively in voting-concerned activities, 28 C.F.R. 55.2(b)(1) and (2).

One step in ensuring that language minority members are able to participate effectively in voting-concerned activities is consultation with members of the applicable language minority group with respect to the translation of materials, 28 C.F.R. 55.19(b).  In this regard, we note that although members of the language minority group were included in some of the meetings of Texas' National Voter Registration Task Force, they were consulted only minimally as to the actual translations of registration materials.

Another step in ensuring that language minority members are able to participate effectively in voting-concerned activities is providing materials in the language of the affected language minority group that are "clear, complete and accurate," 28 C.F.R. 55.19(b).  Where even portions of the translations are unclear, misleading, incorrect, or incomplete, those who are relying on the translations will not be able to participate effectively in the process.  Our examination of the proposed Spanish language materials reveals that some portions of the Spanish language translations are inconsistent with the English version, that there are numerous instances of misspelled Spanish words, and that there are instances of poor or incorrect Spanish word choice.

Because of these errors, those relying on the translations are at higher risk for misunderstanding the instructions and/or the forms than are those relying on the English versions.  As a result, persons relying on the proposed Spanish language translations have an increased likelihood of having their registration forms rejected.  In an effort to aid the Secretary of State's Office in identifying some of the more problematic aspects of the Spanish language translations, we have compiled the following list of problem areas.  It should be noted, however, that this list is not inclusive of all of the problems we have identified:

- 3 -

With regard to the use of an agent, the English version
specifically limits eligible agents to six specific
family members, while the Spanish translation indicates
that these six specific family members are examples of
persons who are eligible to serve as agents;

Although both the English and Spanish instructions
specify that the agent's relationship to the applicant
is to be noted next to the agent's signature, only the
English version repeats this instruction on the actual
registration card;

On the registration card, the English asks for the city
and county of the former residence, while the Spanish
asks for the street address and county of the former
residence;

Persons relying on the English version are asked to
either print in ink or type, while those relying on the
Spanish version are asked to write in ink or type; and

The instructions in English direct persons who have
changed names to provide the former name. In Spanish
they are instructed to use the former name.

Our investigation reveals that rejection of registration
applications is particularly likely with regard to the
translations pertaining to registration by agent. Because the
Spanish language translation is misleading with regard to the
identification of appropriate agents, those relying on it may
select an ineligible agent. Because the Spanish version of the
registration card provides no specific instruction below the
space in which an agent is to designate his/her relationship to
the applicant, those relying on it may omit the designation of
the relationship of the agent from the form. Applications filled
out by an ineligible agent or that do not designate the agent's
relationship to the applicant will be rejected. Moreover,
because there is a criminal penalty for false registration
through an agent, applicants and/or agents relying on the Spanish
language translations potentially could find themselves defending
their attempt to register in a criminal action.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that your burden
has been sustained in this instance. Therefore, on behalf of the
Attorney General, I must object to the bilingual procedures

USA_00013058

- 4 -

to be used as part of the state's NVRA implementation.

We note under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the bilingual procedures for the implementation of the National Voter Registration Act of 1993 continue to be legally unenforceable.  <u>Clark</u> v. <u>Roemer</u>, 500 U.S. 646 (1991); 28 C.F.R. 51.10 and 51.45.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the action the State of Texas plans to take concerning this matter.  If you have any questions, you should call Ms. Colleen Kane (202-514-6336), an attorney in the Voting Section.

Sincerely,

Deval L. Patrick
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                        DE-005992

USA_00013059

U.S. Department of Justice

Civil Rights Division

Office of the Assistant Attorney General                     *Washington, D.C. 20035*

MAR 0 2 1995

Ms. Sally Tamez-Salas
Assistant Secretary
Board of Directors
P.O. Box 15830
San Antonio, Texas  78212-9030

Dear Ms. Tamez-Salas:

    This refers to the temporary use of punch card ballots and
the procedures relating thereto, and the joint agreement between
the Edwards Underground Water District and Bexar County for the
conduct of the November 8, 1994, election of the board of
directors of the Edwards Underground Water District in Bexar,
Hays and Comal Counties, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c.  On February 15, 1995, we received your
response to our November 22, 1994, letter in which we precleared
the November 8, 1994, election procedures for Hays and Comal
Counties and requested additional information on the November 8,
1994, election procedures for Bexar County.

    We have carefully considered the information you have
provided, as well as information and comments from other
interested persons.  According to the 1990 Census, the Edwards
Underground Water District has a total population of 1,261,098
persons, of whom 48.7 percent are Hispanic.  The Hispanic share
of the voting age population of the water district is 44.5
percent.  Almost 94 percent of the population in the water
district is located in Bexar County.  Hispanic persons represent
49.7 percent of the total and 45.6 percent of the voting age
population in Bexar County.  Black persons represent 6.9 percent
of the total and 6.8 percent of the voting age population in
Bexar County.

    Single-member districts recently were adopted by consent
decree to settle a federal court challenge to the existing water
district election system on one-person, one-vote grounds under
the Fourteenth Amendment and minority vote dilution grounds under
Section 2.  <u>Williams</u> v. <u>Edwards Underground Water District</u>, C.A.
No. SA92- CA0144, (W.D. Texas).  Under the settlement plan, the
water district will be governed by a twelve-member board of
directors elected from single-member districts.  Six of the
members will be elected from Bexar County, four of whom will be
elected from districts that are majority minority in voting age
population.  The parties also agreed to change the date of the

Defendant's Exhibit #                                      DE-005993

USA_00013060

- 2 -

water district's elections from the third Saturday in January of
odd-numbered years to the second Tuesday in November of even-
numbered years.  Finally, the parties agreed to an implementation
schedule that, in part, required 1994 elections in two of Bexar
County's majority minority districts (Districts 3 and 5).

About two months after the <u>Williams</u> suit was settled, the
Edwards board entered into negotiations to have Bexar County
conduct the November elections in Edwards Districts 3 and 5.
Our investigation has revealed that during these negotiations,
representatives of the Edwards board impressed upon the county
the need to have the Edwards election on the same ballot as the
general election in order to comply with the consent decree's
intent to increase voter turnout.  Despite the availability of a
variety of alternative approaches for placing the Edwards
election on the general election ballot, the county chose to hold
the Edwards election on a separate ballot and the Edwards board
contracted for the county to do so.

To allay concerns about the adverse impact the dual ballots
would have on voter turnout in the Edwards election, the county
represented that it would implement an extensive training program
to ensure that poll officials were prepared to handle both
elections and that it would provide publicity, signs, and
assistance to ensure that voters would be aware of the Edwards
election.  However, our investigation reveals that the county
does not appear to have taken even the most basic steps to
prevent confusion among the poll officials and ensure voter
participation in the Edwards election.  For example, we have
received numerous reports that the county provided little
publicity regarding the Edwards election prior to the election,
provided virtually no signs or assistance in the polling places
to direct voters to the Edwards election, and apparently provided
information at training sessions concerning the procedures for
the Edwards election that led some poll officials to understand
that they were to offer voters Edwards ballots only if voters
specifically asked for these ballots.

Neither the Edwards board, nor the county, has shown that
the decision to place the Edwards election on the general
election ballot and/or the county's apparent failure to fully and
clearly implement an extensive training program for poll
officials and provide publicity, signs, and assistance for voters
did not contribute to the significant difference between the
voter participation levels in the Edwards and general elections
and the apparent inability of voters to participate in the
political process in two districts (Districts 3 and 5) that were
created specifically to provide minority voters with an equal
opportunity to elect candidates of choice.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has

- 3 -

neither a discriminatory purpose nor a discriminatory effect.
Georgia v. United States, 411 U.S. 526 (1973); Procedures for the
Administration of Section 5, 28 C.F.R. 51.52.  The existence of
some legitimate, nondiscriminatory reasons for the voting change
does not satisfy this burden.  See Village of Arlington Heights
v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-66
(1977); City of Rome v. United States, 446 U.S. 156, 172 (1980);
Busbee v. Smith, 549 F. Supp. 494, 516-17 (D.D.C. 1982), aff'd,
459 U.S. 1166 (1983).  Our review leads us to conclude that
holding a timely general election did not necessarily require
severing the Edwards election from the general ballot, and that
once the decision to do so was made, that the failure to fully
and clearly train poll officials and educate and assist voters
further exacerbated the adverse impact of holding the Edwards
election on a separate ballot.  Nor can we say that the Edwards
board or the county has met their burden of showing that, in
these circumstances, temporary use of punch card ballots and the
procedures relating thereto will not "lead to a retrogression in
the position of . . . minorities with respect to their effective
exercise of the electoral franchise."  Beer v. United States, 425
U.S. 130, 141 (1976).

     In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that your burden
has been sustained in this instance.  Therefore, on behalf of the
Attorney General, I must object to the temporary use of punch
card ballots and the procedures relating thereto.

     We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed change has neither a
discriminatory purpose nor effect.  28 C.F.R. 51.44.  In
addition, you may request that the Attorney General reconsider

- 4 -

the objection.  See 28 C.F.R. 51.45.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the temporary use of punch card ballots and the procedures relating thereto continue to be legally unenforceable.  See Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10.

The joint agreement between the Edwards Underground Water District and Bexar County for the conduct of the November 8, 1994, election is directly related to the temporary use of punch card ballots and the procedures related thereto.  Accordingly, the Attorney General will make no final determination at this time with regard to this related change.  28 C.F.R. 51.22(b).

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action that the Edwards board plans to take concerning this matter.  If you have any questions, you should call Colleen M. Kane, an attorney in the Voting Section (202-514-6336).

Sincerely,

Deval L. Patrick
Assistant Attorney General
Civil Rights Division

USA_00013063



U.S. Department of Justice

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

June 26, 1995

J. Gerald Hebert, Esq.
800 Parkway Terrace
Alexandria, Virginia  22302

Dear Mr. Hebert:

     This refers to the change in method of election from at-
large by majority vote with numbered posts, staggered terms, and
a 2-2-1 method of staggering to cumulative voting by plurality
vote with numbered posts, staggered terms, and a 3-2 method of
staggering, a change in procedures for filling vacancies on the
city council, a change in terms of office for the mayor and
councilmembers from three-year terms to two-year terms, and the
implementation schedule for the City of Andrews in Andrews
County, Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  We received your partial response to our request for
additional information on April 27, 1995.

     Over the past decade, the city's Hispanic population
percentage has increased by about ten percentage points.
According to the 1990 Census, Hispanic persons represent 34
percent of the city's total and 28 percent of the city's voting
age populations.  Under the proposed system, every two years
either two or three posts for the city council will be up for
election.  Candidates must designate the specific post for which
they seek election.  Voters will be able to cast as many ballots
as there are positions, and they may apportion their votes across
the posts.  Thus, when three posts are up for election, a voter
has three votes to apportion.  The voter may cast all three votes
in a particular post, two votes in one post and one vote in
another, or one vote in each post.  Because the city eliminated
the majority vote requirement, whichever candidate obtains the
most votes in a particular post wins.  The city does not provide
for any kind of voter education or outreach program to help the
minority community understand how to use the proposed system
effectively.

Defendants Exhibit #                    DE-005997

USA_00013064

- 2 -

We have considered carefully the information you have provided. Your initial submission contained virtually none of the information required and explicitly described in our published administrative guidelines for submissions of districting plans and changes in electoral systems. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.52 through 51.60). As a result, we made a timely written request for additional information with regard to this submission on August 5, 1994. 28 C.F.R. 51.37. After our initial request for additional information, we met with the city's attorneys on two separate occasions to discuss the reasons for our request and our concerns about the proposed system.

We explained that the use of staggered terms and numbered posts and the absence of a voter education program appear to unnecessarily dilute the ability of minority voters to elect a candidate of choice. Staggered terms limit the number of positions that are up for election at any one time, and therefore, minority voters must register and turn out to vote in higher proportions to elect their candidate of choice than they would when more positions are up for election. Likewise, without numbered posts, the top two or three candidates overall would be elected. With numbered posts, if the minority community's candidate of choice were to place second or third overall but lose in the particular post, that candidate would not be elected.

On February 9, 1995, we reiterated our original request for additional information. Finally, on April 27, 1995, in a meeting with the mayor and the city's attorneys, we received the city's response to the request made the previous August and were informed by the city's attorney that no other information would be provided. In neither the meeting nor in its written response, did the city provide any more than a cursory explanation of the reasons the proposed system was adopted. The city also has failed to provide any explanation for its rejection of a single-member districting plan containing a majority Hispanic district which was available to the city during its deliberative process.

Nor has the city provided any detailed explanation of the reasons why staggered terms and numbered posts were included as part of the proposed system. In fact, the city's brief justifications for staggered terms and numbered posts appear pretextual. The city claims that staggered terms are necessary to maintain continuity on the council, but the likelihood of all of the council's incumbents being defeated if concurrent terms were used appears to be very small considering that on average each incumbent is re-elected at least once. Nor is the city's claim that numbered posts are required by law credible. State law does not require cities to use numbered posts, and as a home rule city, Andrews apparently has the authority to alter its election system by its own action. Thus, just as it eliminated

- 3 -

the majority vote requirement for councilmembers, the council
could have eliminated numbered posts and staggered terms.

The city's rationale for omitting this information from its
response is that it is subject to the attorney-client privilege
because the deliberations concerning the method of election were
part of executive sessions called to discuss the settlement of
the voting rights lawsuit that had been brought against the city,
League of United Latin American Citizens, District 5 v. City of
Andrews, et al., No. MO 93 CA 075 (W.D. Tex. 1993).  Because
there are no public records or members of the community who were
involved in the process, the city and its attorney are the only
persons who have access to such information.  However, under
Section 5 of the Voting Rights Act, the submitting authority has
the burden of showing that a submitted change has neither a
discriminatory purpose nor a discriminatory effect.  See Georgia
v. United States, 411 U.S. 526 (1973); see also the Procedures
for the Administration of Section 5 (28 C.F.R. 51.27, 51.40, and
51.52).

In the absence of any other explanation by the city, a
reasonable inference that can be drawn from the information
presented to us is that the proposed system was adopted to
protect incumbents or otherwise to minimize minority voting
strength.  For example, the single-member district plan presented
to the council during the process paired several incumbents in
the same district.  Conversely, the proposed system does not
require any of the incumbents to run against another; each
incumbent may run for an individual post without any competition
from a fellow incumbent.

Thus, based on the information available to us, the proposed
system not only unnecessarily dilutes the ability of minority
voters to elect a candidate of choice, but it also appears to be
designed to protect incumbents.  While incumbency is not in and
of itself an inappropriate consideration, it may not be
accomplished at the expense of minority voting potential.  See,
e.g., Garza v. County of Los Angeles, 918 F.2d 763, 771 (9th Cir.
1990), cert. denied, 111 S.Ct. 681 (1991); Ketchem v. Byrne, 740
F.2d 1398, 1408-9 (7th Cir. 1984), cert. denied, 471 U.S. 1135
(1985).  Where, as here, the protection afforded incumbents is
provided at the expense of minority voters, the city bears a

Defendant's Exhibit #

- 4 -

heavy burden of demonstrating that its choices are based on
legitimate, non-racial considerations that are not tainted, even
in part, by an invidious racial purpose. See <u>Village of
Arlington Heights</u> v. <u>Metropolitan Housing Development Corp.</u>, 429
U.S. 252, 265-66 (1977); <u>City of Rome</u> v. <u>United States</u>, 446 U.S.
156, 172 (1980); <u>Busbee</u> v. <u>Smith</u>, 549 F. Supp. 494, 516-17
(D.D.C. 1982), <u>aff'd</u>, 459 U.S. 1166 (1983); <u>Washington</u> v. <u>Davis</u>,
426 U.S. 229, 242 (1976).

Moreover, we note that the proposed method of election also
clearly violates Section 2 of the Voting Rights Act.  The city's
minority population suffers from a history of discrimination
which appears to have resulted in depressed income, education,
and registration levels.  The electoral history of the city and
within the county suggests that voting is polarized along racial
and ethnic lines to such a degree that no person of Hispanic
heritage has ever served as a councilmember.  Moreover, the only
Hispanic member of the school board ever to win election was
recently defeated in an election in which cumulative voting with
staggered terms was employed.

In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that your burden
has been sustained in this instance.  Therefore, on behalf of the
Attorney General, I must object to the proposed change in the
method of election from at-large by majority vote with numbered
posts, staggered terms, and a 2-2-1 method of staggering to
cumulative voting by plurality vote with numbered posts,
staggered terms, and a 3-2 method of staggering.

We note under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed system has neither the
purpose nor will have the effect of denying or abridging the
right to vote on account of race or color.  In addition, you may
request that the Attorney General reconsider the objection.
However, until the objection is withdrawn or a judgment from the
District of Columbia Court is obtained, the change in the method
of election continues to be legally unenforceable.  <u>Clark</u> v.
<u>Roemer</u>, 500 U.S. 646 (1991); 28 C.F.R. 51.10 and 51.45.

The Attorney General will make no determination at this time
with regard to the change in the terms of office as they are
directly related to the proposed change in the method of election
for the city council.  See 28 C.F.R. 51.22 (b).

The Attorney General does not interpose any objection to the
change in the method of filling vacancies.  However, we note that
Section 5 expressly provides that the failure of the Attorney
General to object does not bar subsequent litigation to enjoin

- 5 -

the enforcement of the this change.  See the Procedures for the
Administration of Section 5 (28 C.F.R. 51.41).

     Your April 27, 1995, letter withdraws the implementation
schedule from Section 5 review.  Accordingly, no determination by
the Attorney General is required concerning this matter.  See the
Procedures for the Administration of Section 5 (28 C.F.R. 51.25
(a)).

     To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the action the
City of Andrews plans to take concerning this matter.  If you
have any questions, you should call Ms. Colleen Kane
(202-514-6336), an attorney in the Voting Section.  Refer to File
No. 94-2271 in any response to this letter so that your
correspondence will be channeled properly.

     Since the Section 5 status of the method of election has
been placed at issue in League of United Latin American Citizens,
District 5 v. City of Andrews, et al., No. MO 93 CA 075 (W.D.
Tex. 1993), we are providing a copy of this letter to the court
and counsel of record in that case.

                              Sincerely,

                              Loretta King
                    Acting Assistant Attorney General
                         Civil Rights Division




cc:  The Honorable Lucius D. Bunton III
     United States District Court

     Rolando L. Rios, Esq.
     Kevin B. Jackson, Esq.



U.S. Department of Justice

Civil Rights Division

Office of the Assistant Attorney General          Washington, D.C. 20035

January 16, 1996

The Honorable Antonio Garza
Secretary of State
State of Texas
Elections Division
P.O. Box 12060
Austin, Texas 78711-2060

Dear Mr. Secretary:

This refers to Chapter 797 (1995), insofar as it authorizes
agency employees to make determinations of an individual's
eligibility to register based on citizenship information
contained in the agency's file; eliminates the requirement that
agency employees must request the completion of a declination
form each and every time an individual is offered registration
and refuses; authorizes cancellation of registration immediately
upon a voter's written indication of residence outside the
county; authorizes cancellation of registration on the November
30th following the second general election for state and county
officers rather than on the November 30th following the second
general election for federal officers; and relocates voter
registration assistance requirements as part of the
implementation of the National Voter Registration Act of 1993
("NVRA"), 42 U.S.C. 1973gg to 1973gg-10, for the State of Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We
received your response to our request for additional information
on November 14, 1995.

With regard to the authorization to cancel registration
immediately upon a voter's written indication of residence
outside the county; the authorization to cancel registration on
the November 30th following the second general election for state
and county officers rather than on the November 30th following
the second general election for federal officers; and the
relocation of voter registration assistance requirements, the
Attorney General does not interpose any objection.  However, we
note that Section 5 expressly provides that the failure of the
Attorney General to object does not bar subsequent litigation to
enjoin the enforcement of the these changes.  See Procedures for
the Administration of Section 5 (28 C.F.R. 51.41).

Defendant's Exhibit #          DE-006002

USA_00013069

2

With regard to the provision which allows agency employees to make determinations of an individual's eligibility to register based on citizenship information contained in the agency's file, we have reviewed the information provided by the State, as well as information from the 1990 Census and other sources, including the Immigration and Naturalization Service. According to the 1990 Census, minority persons represent 34 percent of the State's total population (14,229,191) and 30 percent of its voting age population (9,923,085). Hispanic persons comprise the largest minority group (21 percent of the total population). Data from the INS indicate that nearly 70,000 applications for citizenship are currently pending in Texas and that between fiscal years 1993 and 1994, over 51,000 Texas residents became citizens. Two-thirds of those who became citizens in 1993 and 1994 were of Hispanic or Asian ancestry.

We do not take the position that persons who are clearly not citizens should be registered to vote or even encouraged to register. However, with the rapid rate at which minority persons are becoming citizens, there is a strong likelihood that some of the citizenship information contained in agency files may be outdated or incorrect. We are concerned that persons who have become citizens since they last filled out forms at a particular agency will not be offered registration. There are no provisions or safeguards in the legislation to deal with situations in which the citizenship information in the file is outdated or wrong. Because the law makes no provisions for informing potential registrants that the reason they were not offered registration is that their file indicates non-citizen status, there is no opportunity for potential registrants to provide any relevant or updated information. Moreover, there are no mechanisms to explain to potential registrants who ask to register and are refused that the reason for the refusal is because of information in the file indicating non-citizen status.

Because minority persons represent the majority of persons attaining citizenship in Texas and the information contained in agency files is unlikely to keep pace with their citizenship rate, allowing agency employees to make eligibility determinations based on citizenship information contained in those files is likely to have a retrogressive effect on minority persons. _Beer_ v. _United States_, 425 U.S. 130, 141 (1976); 28 C.F.R. 51.54. As a result, I cannot conclude, as I must under the Voting Rights Act, that your burden under Section 5 has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to Chapter 797 insofar as it authorizes agency employees to make determinations of an individual's eligibility to register based on citizenship information contained in the agency's file.

We note under Section 5 you have the right to seek a declaratory judgment from the United States District Court for

3

the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the change in the method of election continues to be legally unenforceable.  Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10 and 51.45.

With regard to the elimination of the requirement that agency employees must request the completion of a declination form each and every time an individual is offered registration and refuses, we have been informed that the Secretary of State's Office will promulgate rules to implement the procedures that will be used to document offers of registration and record declinations and will provide a training program, including a detailed memorandum and a video tape, pertaining to these procedures.  When these procedures and training program are finalized, they should be submitted to the United States District Court for the District of Columbia for judicial review or to the Attorney General for administrative review as required by Section 5 of the Voting Rights Act.  It is necessary that these changes either be brought before the District Court for the District of Columbia or submitted to the Attorney General for a determination that they do not have the purpose and will not have the effect of discriminating on account of race, color, or membership in a language minority group.  Changes which affect voting are legally unenforceable unless Section 5 preclearance has been obtained.  Clark v. Roemer, 500 U.S. 646 (1991); Procedures for the Administration of Section 5 (28 C.F.R. 51.10).

Because the elimination of the requirement that agency employees must request the completion of a declination form each and every time an individual is offered registration and refuses and the implementation procedures to be utilized by the Secretary of State are directly related, they must be reviewed simultaneously.  Accordingly, it would be inappropriate for the Attorney General to make a preclearance determination on the instant change until the related changes have been submitted for Section 5 review.  See 28 C.F.R. 51.22(b) and 51.35.

Should you elect to make a submission to the Attorney General for administrative review rather than seek a declaratory judgment from the District Court for the District of Columbia, it should be made in accordance with Subparts B and C of the procedural guidelines.  At that time we will review all changes simultaneously; however, any documentation previously provided need not be resubmitted.

Defendant's Exhibit #

DE-006004

USA_00013071

4

To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the State of
Texas plans to take concerning these matters.  If you have any
questions, you should call Colleen M. Kane (202-514-6336) of our
staff.  Refer to File Nos. 95-2017 and 96-0054 in any response to
this letter so that your correspondence will be channeled
properly.

Sincerely,

Deval L. Patrick
Assistant Attorney General
Civil Rights Division

DE-006005

USA_00013072



U.S. Department of Justice

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

                                        February 18, 1997

The Honorable Antonio O. Garza, Jr.
Secretary of State
State of Texas
Elections Division
P.O. Box 12060
Austin, Texas 78711-2060

Dear Mr. Secretary:

    This refers to your request that the Attorney General
reconsider and withdraw the January 16, 1996, objection
interposed under Section 5 of the Voting Rights Act, 42 U.S.C.
1973c, to Chapter 797 (1995), insofar as it authorizes agency
employees to make determinations of an individual's eligibility
to register based on citizenship information contained in agency
files as part of the implementation of the National Voter
Registration Act of 1993 ("NVRA"), 42 U.S.C. 1973gg to 1973gg-10,
for the State of Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c.  We received your request on December
19, 1996; supplemental information was received on January 22,
1997.

    This also refers to the administrative rule promulgated by
the Texas Secretary of State at 1 Tex. Admin. Code, Section
81.402, which authorizes employees of agencies where clients are
required to update citizenship status at each renewal of service,
change of address, or other contact with the agency to make
determinations of an individual's eligibility to register, as
part of the implementation of the National Voter Registration Act
of 1993 ("NVRA"), 42 U.S.C. 1973gg to 1973gg-10, for the State of
Texas, submitted to the Attorney General pursuant to Section 5 of
the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We
received your submission on December 19, 1996; supplemental
information was received on January 22, 1997.

Defendant's Exhibit #                                    DE-006006

USA_00013073

- 2 -

With regard to the proposed administrative rule, we understand based on the supplemental information your office provided on January 22, 1997, which was confirmed in a telephone conversation on February 14, 1997, between Ms. Colleen Kane-Dabu of our staff and Mr. Clark Kent Ervin of your office, that the administrative rule has not been finally adopted and that the earliest date that it can become final is February 21, 1997.  A proposed change which is not finally enacted or capable of administration is not ripe for review by the Attorney General (with certain limited exceptions not applicable here).  Accordingly, it would be inappropriate for the Attorney General to make a determination concerning your submission now.  See the Procedures for the Administration of Section 5 (28 C.F.R. 51.22(a) and 51.35).  When this change is formally adopted, preclearance under Section 5 should be sought.

With regard to your request that the Attorney General reconsider the January 16, 1996, objection, the state has provided no new relevant information or legal argument in support of its request; as noted above, the proposed administrative rule, which appears to form the basis for the state's request, is not final and cannot be considered under Section 5 at this time.  See 28 C.F.R. 51.45.  Therefore, I remain unable to conclude, as I must under the Voting Rights Act, that the State of Texas has carried its burden of showing that the submitted change will not have a discriminatory effect.  See Beer v. United States, 425 U.S. 130, 141 (1976); Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.48 and 51.52.  Accordingly, on behalf of the Attorney General, I must decline to withdraw the objection to Chapter 797 (1995), insofar as it authorizes agency employees to make determinations of an individual's eligibility to register based on citizenship information contained in agency files.

As we previously advised, you may seek a declaratory judgment from the United States District Court for the District of Columbia that Chapter 797, insofar as it authorizes agency employees to make determinations of an individual's eligibility to register based on citizenship information contained in the agency's file, has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  We remind you that until such a judgment is rendered by that court, the objection by the Attorney General remains in effect and the proposed change continues to be legally unenforceable.  See Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

- 3 -

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the State of Texas plans to take concerning these matters.  If you have any questions, you should call Colleen Kane-Dabu (213-894-2931) of our staff.  Refer to File Nos. 95-2017 and 96-4548 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

Isabelle Katz Pinzler
Acting Assistant Attorney General
Civil Rights Division

U.S. Department of Justice

Civil Rights Division

---

Office of the Assistant Attorney General

Washington, D.C. 20035

March 17, 1997

Randall B. Strong, Esq.
503 Ward Road
Baytown, Texas 77520

Dear Mr. Strong:

     This refers to two annexations (Ordinance Nos. 95-13 and
95-33) to the City of Webster in Harris County, Texas, submitted
to the Attorney General pursuant to Section 5 of the Voting
Rights Act, 42 U.S.C. 1973c.  We received your response to our
May 3, 1996, request for additional information on January 15 and
March 11, 1997; supplemental information was received on March 5,
1997.

     The Attorney General does not interpose any objection to the
commercial annexation that was the subject of Ordinance No.
95-13.  However, we note that the failure of the Attorney General
to object does not bar subsequent litigation to enjoin the
enforcement of the change.  See the Procedures for the
Administration of Section 5 (28 C.F.R. 51.41).

     With respect to the annexation contained in Ordinance No.
95-33, however, we cannot reach the same conclusion.  We have
considered carefully the information you have provided, as well
as Census data, and comments and information from other
interested parties.  According to the 1990 Census, Hispanic
residents constitute 19 percent and black residents constitute 5
percent of the city's total population, and 17 and 4 percent,
respectively, of the voting age population.  The annexation in
Ordinance No. 95-33 adds approximately 1,162 persons to the
city's total population, all of whom appear to be white.  Thus,
the proposed annexation will reduce the city's Hispanic
proportion to 15.0 percent and the black proportion to 4.2
percent of the total population.

Defendant's Exhibit #

DE-006009

- 2 -

Our analysis indicates that there is a residential area
adjacent to the city limits that if annexed, would have lessened
the impact of annexing the all-white area included in Ordinance
No. 95-33.  This area is to the northeast of the city and is
located within Census Block 101B of Tract 037304.  This block has
a significant minority population percentage:  Hispanic persons
constitute 39 percent and black residents constitute 7 percent of
the total population.  According to information provided by the
city, the annexation of Block 101B alone would have increased the
city's Hispanic population to 20.2 percent and the black
population to 5.3 percent of the total.

The city has offered several reasons for its refusal to
annex Block 101B.  First, it alleges that it was unaware that
Block 101B had a significant minority population at the time it
was considering its 1995 annexations and that its racial/ethnic
composition did not play a role in the city's annexation
decisions.  Our analysis, however, revealed that during the
annexation process, the Hispanic councilmember and another leader
of the Hispanic community opposed the annexation contained in
Ordinance No. 95-33 indicating that if the city was going to
annex the all-white residential property in Ordinance No. 95-33,
it should also annex the residential property contained in Block
101B.  They requested city officials at a planning and zoning
meeting and at council meetings to consider annexing Block 101B,
but their requests were refused.

Although there is some dispute regarding whether the city
manager, who is central in deciding which areas will be
considered for annexation into the city, actually stated that the
reason Block 101B would not be annexed was because of its ethnic
composition, conversations between the city manager and at least
two city councilmembers tend to corroborate that this was indeed
the city manager's view.  Given the role of the city manager in
the city's annexation process, and the concerns expressed to city
officials by representatives of the minority community regarding
the city's failure to include Block 101B in the annexation, the
city's assertions that it was unaware of the racial/ethnic make-
up of Block 101B at the time of the 1995 annexation is at best
disingenuous.

Second, the city argues that Block 101B could not be annexed
because it is in a track of land that straddles the
extraterritorial jurisdiction ("ETJ") of the city.  Our analysis
revealed that Block 101B is clearly within the city's ETJ line
and that the city's failure to annex the area could not be
explained satisfactorily on this basis.

Defendant's Exhibit #

DE-006010

USA_00013077

- 3 -

Third, the city claims that the population from Block 101B would place a strain on city services that would be too great for the city to absorb, and that unlike the area annexed by Ordinance No. 95-33, Block 101B would not generate enough revenue to cover the cost of extending services thereto.  The city maintains that an important consideration in determining whether to annex a particular parcel of land is the city's assessment that the revenues generated from the area will offset the cost of providing municipal services to it.  With regard to Ordinance No. 95-33 and Block 101B, however, no specific data or precise information regarding anticipated revenues or costs for municipal services was provided by the city in support of its position. Information we obtained from city officials and municipal records indicates that the cost of providing services to Block 101B would not be any more, and might even be less, than the cost of providing services to the area annexed by Ordinance No. 95-33.

Fourth, the city also alleges that annexing the area included in Ordinance No. 95-33 would serve to clarify the city's northern boundaries between it and the City of Houston by creating an easily distinguishable boundary.  Information contained in city documents and provided by city officials clearly indicates that annexing Block 101B would have enabled the city to use a major thoroughfare, El Camino Real, as a continuous, and easily distinguishable boundary line for the northeastern part of the city.  The failure to include Block 101B leaves the city with an irregular boundary in the north.

Finally, the city suggests that the area contained in Ordinance Nos. 95-13 and 95-33 were more desirable than Block 101B because of their profitability.  Although our investigation indicates that it is likely that the area annexed by Ordinance No. 95-33 will generate more revenue than Block 101B, no information has been presented by the city to suggest that annexing Block 101B would create a deficit in the city's budget because Block 101B has an insufficient tax base to cover the cost of the additional services it will need.  Moreover, even though it appears that the area annexed by Ordinance No. 95-33 has the ability and/or the potential to provide the city with greater revenues than Block 101B, the fact that the other area the city annexed in 1995 is vacant and will generate no revenue unless and until it is developed suggests that generating revenue could not have been the city's only motivation in deciding not to annex Block 101B.  In fact, as stated above, with regard to the annexation of areas other than Block 101B, the city seems most concerned that the revenues generated by the property simply offset the cost of providing municipal services to it.

USA_00013078

- 4 -

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). To demonstrate the absence of a discriminatory purpose with respect to an annexation, a jurisdiction must demonstrate that the revision of municipal boundary lines to "includ[e] certain voters within the city [while] leaving others outside," was not based, even in part, on race. Perkins v. Matthews, 400 U.S. 379, 388 (1971). See also City of Pleasant Grove v. United States, 479 U.S. 462 (1987).

The following facts weigh heavily here in our assessment regarding whether the city's burden has been met: (1) the city failed to annex an area with a significant minority population, while it was simultaneously annexing an all-white area that when added to the city's population will reduce the minority proportion; (2) the city deviated from what appears to be its primary annexation consideration in deciding not to annex Block 101B (i.e., that the cost of providing municipal services not be outweighed by the revenues anticipated from the annexation); (3) the city failed to achieve its purported objective of establishing an easily distinguishable boundary in the north in undertaking the annexation in Ordinance No. 95-33. This objective would have been more fully realized, however, had Block 101B been annexed; and (4) the city in the decision-making process appears to have been apprised by representatives of the minority community of their concerns about excluding from the city the population that resides in Block 101B, but, contrary to these concerns, voted in favor of annexing only the all-white area included in Ordinance No. 95-33.

Additionally, the information available to us suggests that the city's agent in determining which areas were eligible for annexation consideration refused to consider Block 101B for annexation because of the racial/ethnic background of the persons who reside in the area. Thus, significant questions persist regarding a lack of even-handedness in the city's application of its annexation policy and the city's annexation choices appear to have been tainted, if only in part, by an invidious racial purpose. See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-66 (1977); Busbee v. Smith, 549 F. Supp. 494, 516-17 (D.D.C. 1982), aff'd, 459 U.S. 1166 (1983); City of Rome v. United States, 446 U.S. 156, 172 (1980). An annexation or any other voting change adopted for racial reasons, however, can have no legal effect under Section 5. City of Richmond v. United States, 422 U.S. at 378.

USA_00013079

- 5 -

    In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden under Section 5 has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the annexation contained in Ordinance No. 95-33. We note under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the objection by the Attorney General remains in effect and the annexation continues to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10, 51.11, 51.45, and 51.48(c) and (d).

    To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Webster plans to take concerning these matters. If you have any questions, you should call Colleen Kane-Dabu (213-894-2931) of our staff. Refer to File No. 96-1006 in any response to this letter so that your correspondence will be channeled properly.

                    Sincerely,

                    Isabelle Katz Pinzler
             Acting Assistant Attorney General
                  Civil Rights Division

USA_00013080



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20035_

APR   7 1998

Randall B. Strong, Esq.
City Attorney
503 Ward Road
Baytown, Texas  77520

Dear Mr. Strong:

This refers to a 1997 annexation (Ordinance No. 97-15) to
the City of Webster in Harris County, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act,
42 U.S.C. 1973c.  We received your submission of this annexation
on February 6, 1998.

This also refers to your request that the Attorney General
reconsider and withdraw the March 17, 1997, objection interposed
under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, to a
1995 annexation (Ordinance No. 95-33) to the City of Webster.  We
received your request on February 6, 1998.

With regard to the annexation adopted pursuant to Ordinance
No. 97-15, the Attorney General does not interpose any objection.
However, we note that Section 5 expressly provides that the
failure of the Attorney General to object does not bar subsequent
litigation to enjoin the enforcement of the change.  See the
Procedures for the Administration of Section 5 (28 C.F.R. 51.41).

We understand that the annexation precleared above is
located within Census Block 101B of Tract 037304.  We note that
the city's failure to annex this area formed the basis for our
conclusion during our review of the annexation adopted pursuant
to Ordinance 95-33 that the city had failed to establish that its
annexation policy was racially nondiscriminatory.  The annexation
of the area within Census Block 101B now resolves our prior
concerns.

USA_00013081

- 2 -

Accordingly, pursuant to Section 51.48(b) of the Procedures for the Administration of Section 5 (28 C.F.R.), the objection interposed to the 1995 annexation (Ordinance 95-33) is hereby withdrawn.  However, we note that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the change.  See 28 C.F.R. 51.41.

Sincerely,

Bill Lann Lee
Acting Assistant Attorney General
Civil Rights Division

U. S. Department of Justice

Civil Rights Division

---

Office of the Assistant Attorney General                    Washington, D.C. 20530

September 29, 1998


The Honorable Alberto R. Gonzales
Secretary of State
Elections Division
P.O. Box 12060
Austin, Texas 78711-2060

Dear Mr. Secretary:

    This refers to the change in the procedures for filling
certain vacancies in judicial offices from election to
appointment in the State of Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C.
1973c.  We received your response to our June 1, 1998, request
for additional information on July 31, 1998. Supplemental
information was received on August 3 and 27, 1998.

    We have carefully considered the information you have
provided, as well as Census data, and information and comments
from other interested persons.  The state has explained that the
change in filling prospective judicial vacancies occurs as
a result of the state supreme court's interpretation of Texas'
constitution in State of Texas ex rel. Angelini v. Hardberger,
932 S.W.2d 489 (Texas 1996).  The state has indicated that it
interprets the Hardberger decision to apply only to vacancies in
judicial offices.  Our review of the Hardberger decision under
Section 5 is limited solely to that aspect of the opinion that
relates to voting.  See Allen v. State Board of Elections, 393
U.S. 544 (1969); Procedures for the Administration of Section 5,
28 C.F.R. 51.13.  Specifically, we reviewed the proposed change
from election to appointment in the procedure for filling
vacancies that results from the prospective resignation of a
judge.  As we understand it, rather than directly electing a
judge to fill a vacancy at the election that occurs between the
time the resigning judge tenders his/her resignation but before
he/she actually steps down, under the new procedure an interim
appointment will be made by the governor, and the appointed judge
will serve until the next succeeding general election.

    According to the 1990 Census, the State of Texas has a total
population of 16,986,510 persons, of whom 25.6 percent are
Hispanic and 11.6 percent are black.  The Hispanic share of the