voting age population is 22.4 percent and the black share of the
voting age population is 11.0 percent. The state has fourteen
court of appeals districts, three (4th, 8th, and 13th) of which
have majority Hispanic population percentages (55, 56, and 63
percent Hispanic, respectively). There are no majority black
court of appeals districts. Sixty eight of the state's 396
district courts are majority minority districts; of these,
thirty-seven district courts have majority Hispanic voting age
population percentages, but none have majority black voting age
population percentages.

Our analysis indicates that under the proposed change, it is
unlikely that judicial vacancies in districts with significant
Hispanic voting age and/or registered voter populations will be
filled in a manner that reflects the preferences of Hispanic
voters commensurate with the opportunity available to those
voters if the vacancy was filled by election. The governor is
elected at large, by a statewide electorate in which Hispanic
voters are a minority. Because the governor's constituency is
substantially different than that in districts with significant
Hispanic population percentages and because voting in Texas often
is polarized along racial lines, voters in these districts will
not have an opportunity to participate in the selection of judges
under the new system similar to the opportunity they have under
the current system. Moreover, there does not appear to be any
mechanism or safeguard built into the judicial appointment
process to allow for input from Hispanic voters, or a consistent
procedure for soliciting the minority community's views with
regard to potential judicial candidates.

The judicial appointment made to the fourth court of appeals
district pursuant to the Hardberger decision fully demonstrates
the impact of the proposed procedure on Hispanic participation
opportunities. Instead of seeking input from Hispanic voters
with regard to potential judicial appointees, the governor
selected an Anglo appointee who had been rejected by the majority
of the voters in that district in an earlier election in favor of
a Hispanic candidate. Had the vacancy been filled by election,
rather than by gubernatorial appointment, Hispanic voters in the
fourth court of appeals district would have had an opportunity to
elect a candidate of choice rather than having a judge for the
past two years appointed to that seat who was not their choice.
Thus, the Angelini appointment is illustrative of the effect the
proposed change may have on the participation opportunities of
Hispanic voters.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
Georgia v. United States, 411 U.S. 526 (1973); Procedures for the

Defendant's Exhibit #

DE-006017

USA_00013084

Administration of Section 5, 28 C.F.R. 51.52.  We recognize that
the state supreme court, faced with the constitutional issues
raised in the Hardberger litigation, was required to render a
decision regarding the proper interpretation of state law.  The
state, however, has not suggested that it was prevented by the
court ruling in the Hardberger litigation from providing Hispanic
voters in the fourth court of appeals district meaningful input
into the appointment process, which might well offset the
diminution in electoral opportunity resulting from the change in
vacancy filling procedure.  Thus, while the state has met its
burden with regard to purpose, we cannot say that the state has
met its burden of showing that, in these circumstances, the
change in vacancy filling procedure from election to appointment
will not "lead to a retrogression in the position of . . .
minorities with respect to their effective exercise of the
electoral franchise."  Beer v. United States, 425 U.S. 130, 141
(1976).

     In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that your burden
has been sustained in this instance.  Therefore, on behalf of the
Attorney General, I must object to the change in the procedure
for filling prospective judicial vacancies.

     We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed change has neither a
discriminatory purpose not effect.  28 C.F.R. 51.44.  In
addition, you may request that the Attorney General reconsider
the objection.  See 28 C.F.R. 51.45.  However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the procedure for filling prospective
judicial vacancies by gubernatorial appointment continues to be
legally unenforceable.  See Clark v. Roemer, 500 U.S. 646 (1991);
28 C.F.R. 51.10.

     Finally, we note that the state may well be able to develop
a procedure for filling prospective judicial vacancies that would
satisfy the requirements of both the state constitution and the
Voting Rights Act.  In this regard, the objection we interpose
today does not mean that the Voting Rights Act precludes the
state from adopting a procedure for filling prospective judicial
vacancies by gubernatorial appointment; our decision does mean,
however, that in order to satisfy the Section 5 non-retrogression
principle, any appointment procedure that is used must provide
minority participation opportunities.  Should the state decide to
adopt a new procedure and to seek administrative review under
Section 5, our staff stands ready to respond on an expedited
basis.

Defendant's Exhibit #

DE-006018

USA_00013085

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action that the State of Texas plans to take concerning this matter.  If you have any questions, you should call Zita Johnson-Betts, a Deputy Chief in the Voting Section (202-514-8690).

Sincerely,

Bill Lann Lee
Acting Assistant
   Attorney General
Civil Rights Division

- 4 -

Defendant's Exhibit #                                    DE-006019

USA_00013086



U.S. Department of Justice

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

December 14, 1998

Barbara E. Roberts, Esq.
City Attorney
P.O. Box 779
Galveston, Texas 77553-0779

Dear Ms. Roberts:

This refers to amendments to the city charter that provide
for a change in the method of election for the city council from
six single-member districts to four single-member districts and
two at large with numbered posts, a change from a plurality to a
majority vote requirement, redistricting criteria and revised
recall procedures for the City of Galveston in Galveston County,
Texas, submitted to the Attorney General pursuant to Section 5 of
the Voting Rights Act, 42 U.S.C. 1973c. We received your
response to our August 17, 1998, request for additional
information on October 15, 1998.

The Attorney General does not interpose any objection to the
specified recall procedures. However, we note that Section 5
expressly provides that the failure of the Attorney General to
object does not bar subsequent litigation to enjoin the
enforcement of the change. See the Procedures for the
Administration of Section 5 (28 C.F.R. 51.41).

With regard to the remaining specified changes, we cannot
come to the same conclusion. We have carefully considered the
information you provided, as well as Census data, and information
in our files and from other interested parties. According to
1990 Census data, the city's total population is 28 percent black
and 21 percent Hispanic. Under the existing system, six
councilmembers are elected from single-member districts and the
mayor is elected at large. Two of the single-member districts
have black population majorities and have elected black
representatives to the city council. This method of election and
districting plan were adopted in settlement of a vote dilution

Defendant's Exhibit #                                        DE-006020

USA_00013087

- 2 -

lawsuit filed by minority residents against the city in Arceneaux
v. City of Galveston, No. G-90-221 (S.D. Tex.), and received
preclearance under Section 5 for use on an interim basis on
April 29, 1993, and for use on a permanent basis on January 27,
1994.

     Prior to the adoption of a single-member district method of
election, the city sought preclearance for a method of election
similar to the plan currently under review.  It provided for the
election of four councilmembers from single-member districts, two
councilmembers elected at large by numbered position and the
mayor elected at large with a plurality vote requirement.  This
4-2-1 method of election was proposed as a replacement for the
at-large method of election that was the subject of the vote
dilution lawsuit.  On December 14, 1992, the Attorney General
precleared the use of a plurality vote requirement, but
interposed an objection under Section 5 to the proposed 4-2-1
method of election and to the use of numbered posts for the at-
large seats because the city had not met its burden under Section
5 of demonstrating the absence of a discriminatory purpose and
effect.  Our conclusion in this regard was premised upon a number
of factors.

     First, our analysis of the at-large system indicated that
voting in municipal elections was racially polarized and that
minority-supported candidates had very limited success under the
at-large system.  Second, the districting plan that accompanied
the 4-2-1 method of election did not include a single district in
which black or Hispanic voters constituted a majority of the
population; instead, the plan included two districts in which
black and Hispanic voters combined constituted a majority.  The
city failed, however, to provide evidence of cohesion between
black and Hispanic voters in municipal elections, rendering it
doubtful that either minority group under this plan would elect a
candidate of choice to a council seat.  Third, the city
maintained its preference for the 4-2-1 plan over the opposition
of the minority community and the Arceneaux plaintiffs, who
favored the adoption of a six single-member district plan with
two districts in which black voters would constitute a majority
of the population.  Fourth, the city chose to maintain two at-
large positions on the city council, in addition to the mayoral
seat, and to add numbered posts.  Given the existence of racially
polarized voting in municipal elections, we concluded that these
features of the proposed electoral system would limit the ability
of minority voters to elect their candidates of choice to the
city council.  Finally, given all of the circumstances described
above, we determined that the city had not provided legitimate,
nonracial justifications for its choices regarding the 4-2-1
method of election and its adoption of numbered posts.  It is
against this backdrop that we must view the city's current

USA_00013088

- 3 -

request for preclearance of the 4-2-1 plan, with numbered posts, as well as the proposed return to the use of a majority vote requirement.

In light of the Attorney General's prior objection to virtually identical voting changes, and the requirement of Section 5 that the submitting authority carries the burden of demonstrating that proposed voting changes are free of discriminatory purpose and effect -- see 28 C.F.R. 51.52(a) -- we have examined the information provided to determine whether new factual or legal circumstances exist which would lead to the conclusion that voting changes that did not satisfy the nondiscrimination requirement of Section 5 in 1992 will satisfy the same requirement under Section 5 today. Central to our consideration of this issue is the presence today in the City of Galveston of a method of election which fairly reflects minority voting strength, a circumstance which did not exist when the 1992 objection was interposed.

Our examination of city election returns since 1991 indicates that racial bloc voting continues to play a significant role in city elections. This year's mayoral election in which the Hispanic candidate was successful appears to have been an instance where Hispanic and black voters did vote together, along with a number of Anglo crossover voters. However, this cohesion between minority voters appears to have been a departure from the norm, as evidenced by the results in other recent elections. Of particular note is the fact that the proposed majority vote requirement, had it been in effect in this year's election, could well have changed the outcome of the mayoral race since the majority of the votes cast were for candidates favored by the Anglo voting majority. We find it significant that the city has provided no information or analysis in support of the proposed changes regarding racial bloc voting or cohesiveness between black and Hispanic voters, factors which were critical in our 1992 examination of the 4-2-1 method of election and which are no less important today.

While the city council has not yet adopted a redistricting plan for the proposed method of election, we understand that three alternative plans were developed by an appointed redistricting committee and they are currently before the council. We understand that all three plans are based on 1990 Census data and that this data continues to be the most accurate available information on the city's demographics. As was the case in 1992, we are informed that none of these plans provide for a single-member district in which Hispanic persons constitute a majority of the population or more than one district in which black persons constitute a majority. If this information is correct, it would appear to confirm that the proposed method of election, under current circumstances, cannot produce an electoral system that recognizes minority voting strength as

USA_00013089

- 4 -

fairly as does the current system.   Therefore, the proposed 4-2-1
method of election with numbered posts for the two at-large seats
and a majority vote requirement would lead to a retrogression in
minority voting strength prohibited by Section 5.   See Beer v.
United States, 425 U.S. 130, 141 (1976)("the purpose of § 5 has
always been to insure that no voting-procedure changes would be
made that would lead to a retrogression in the position of racial
minorities with respect to their effective exercise of the
electoral franchise"); 28 C.F.R. 51.54.

     We have considered the impact of the proposed redistricting
criteria on the city's ability in the future to draw districts
that fairly recognize minority voting strength.   Our analysis has
been hampered by the lack of information from the city regarding
these criteria and how they are to be interpreted and applied.
For reasons that the city does not explain, these criteria place
what appear to be significant restrictions on the ability of the
city to draw racially fair redistricting plans.   The criteria
specify that city districts be drawn from north to south and that
districts "be as equal as possible with only minor variations
depending upon the streets selected for district boundaries."
The latter criterion appears to be significantly more exacting
than the plus or minus 10 percent deviation standard approved by
the federal courts for local jurisdictions to satisfy the one
person, one vote requirement of the Constitution.   If we
understand these criteria correctly, had they been in effect in
1993 they would not have permitted the existing districts to be
drawn, and their future application could hamper the ability of
the city to draw nonretrogressive redistricting plans in
compliance with Section 5.

     Although city officials and members of the charter review
committee established in 1997 presumably were aware of the prior
history of litigation under the Voting Rights Act and the
Attorney General's 1992 objection, the information provided by
the city in support of its application for preclearance of the
instant changes contains remarkably little acknowledgment of
these past events or their relevance to our review under Section
5 of the city's preclearance request.   For example, the city
council, which appointed the charter review committee, apparently
provided little direction to the committee regarding factors that
should be considered in proposing changes that would affect
voting, such as whether its proposals complied with Section 2 of
the Voting Rights Act, 42 U.S.C. 1973, and satisfied the
nonretrogression standard of Section 5.   In response to a
specific inquiry on this subject, you informed us simply that
"the Charter Review Committee did not discuss in depth the
Attorney General's 1992 objection."   These facts, viewed in light
of the position adopted by the council before the committee began

Defendant's Exhibit #

DE-006023

USA_00013090

- 5 -

its work that it would put before the voters any proposed charter change approved by a majority of the committee, support an inference that the council gave very little independent consideration to the serious voting rights issues implicated by the charter committee's work and the potential impact of its efforts on the political participation opportunities of minority voters.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52. In light of the considerations discussed above, I cannot conclude that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the change in the method of election to four single-member districts and two at-large seats, the adoption of numbered posts for the at-large seats, the adoption of a majority vote requirement for the election of city officers, and the proposed redistricting criteria.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the objected-to changes continue to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Galveston plans to take concerning this matter. If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

Sincerely,

Bill Lann Lee
Acting Assistant
Attorney General
Civil Rights Division

USA_00013091



U.S. Department of Justice

Civil Rights Division

_____

Office of the Assistant Attorney General                    *Washington, D.C. 20035*

July 16, 1999

Mr. Robert Gorsline
City Secretary
601 South First Street
Lamesa, Texas 79331

Dear Mr. Gorsline:

   This refers to the deannexation by referendum of property
previously annexed under Ordinance No. O-06-98, and an annexation
(Ordinance No. O-05-99) for the City of Lamesa in Dawson County,
Texas, submitted to the Attorney General pursuant to Section 5 of
the Voting Rights Act, 42 U.S.C. 1973c.  We received your
response to our April 5, 1999, request for additional information
regarding the deannexation on April 27, 1999, and your submission
of the 1999 annexation on May 20, 1999.

   We have considered carefully the information you have
provided, as well as information from the 1990 Census,
information from previous submissions from the city, and
information and comments from other persons.

   The Attorney General does not interpose any objection to the
1999 annexation.  However, we note that Section 5 expressly
provides that the failure of the Attorney General to object does
not bar subsequent litigation to enjoin the enforcement of the
change.  See the Procedures for the Administration of Section 5
(28 C.F.R. 51.41).

   We are unable to reach a similar conclusion with regard to
the deannexation.  The property that is the subject of the
deannexation was annexed in 1998 and received Section 5
preclearance on December 8, 1998.  The owner of the property

- 2 -

specifically sought annexation to obtain the necessary city
services and rezoning which would permit the construction of a
72-unit apartment complex for occupancy by moderate to low income
families.  Other assisted housing for the elderly, including
housing built by the same developer, already existed in this
area, and had apparently been proposed and built with little
accompanying controversy.  We understand that this housing
contains few, if any, minority residents.

According to 1990 Census data, Hispanics and blacks
constituted 51 percent of the city's population.  Had it not been
for the deannexation by referendum, the area annexed by Ordinance
No. O-06-98 and its future residents would have become part of
City Council District 6, which, according to the 1990 Census, has
by far the lowest percentage of minority residents
(7 percent) in the city.  While it is difficult to predict with
certainty the racial and ethnic makeup of the future residents of
the proposed housing project, the income limits for occupancy of
this housing, considered in light of existing socioeconomic
characteristics of the population in Lamesa and Dawson County,
indicate that the future residents would more likely reflect the
minority percentage of the city as a whole than the minority
percentage of District 6.

It appears that elected city officials originally welcomed
the request for annexation and the proposed development because
of a generally recognized need for additional housing in the
city.

Almost immediately, however, the annexation and the proposed
development became the subject of intense opposition, led
principally by residents of District 6.  Opponents of the project
appeared at public hearings regarding the annexation and the
proposed rezoning of the property to voice their objections.

Following the city council's approval of the annexation and
rezoning ordinances, the opponents presented sufficient petitions
under the city's referendum procedure to force the council to
repeal the ordinances or put them to a citywide vote.  At the
subsequent referendum election, the voters repealed the
ordinances.

The minutes of public meetings and hearings and
contemporaneous newspaper articles report on various statements
made by the opponents of the project.  We have closely examined
this public record of statements made by opponents of the
development for legitimate non-racial arguments why the
annexation and the rezoning ordinances should not be approved.
We note that a significant number of opponents' statements were
based on who the proposed occupants would be, and included such

Defendant's Exhibit #                                    DE-006026

- 3 -

terms as "undesirables," "HUD people," "Section 8 people," and
"criminal activity that could come from this project."  Other
opponents stated that they would not oppose the annexation if the
development was for elderly housing instead of low to moderate
income housing.  To be sure, there were other asserted grounds
for opposition which were not directed at the prospective tenants
(e.g., concerns over flooding or reduced water pressure), but no
information has been provided which indicates that these
potential problems could not have been dealt with effectively by
the city or the developer.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R.
51.52.  Our examination of the circumstances regarding the
deannexation indicates that the city has not met its burden of
showing that a discriminatory purpose to exclude minority voters
from taking up residence in District 6 was not a significant
factor in the decision to adopt the change.  Accordingly, on
behalf of the Attorney General, I must object to the proposed
deannexation by referendum of the property annexed under
Ordinance No. O-06-98.

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed deannexation neither
has the purpose nor will have the effect of denying or abridging
the right to vote on account of race, color, or membership in a
language minority group.  See 28 C.F.R. 51.44.  In addition, you
may request that the Attorney General reconsider the objection.
See 28 C.F.R. 51.45.  However, until the objection is withdrawn
or a judgment from the District of Columbia Court is obtained,
the deannexation continues to be legally unenforceable insofar as
it affects voting.  Clark v. Roemer, 500 U.S. 646 (1991); 28
C.F.R. 51.10.

To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the City of
Lamesa plans to take concerning this matter.  If you have any
questions, you should call George Schneider (202-307-3153),
Special Section 5 Counsel in the Voting Section.

Sincerely,

Bill Lann Lee
Acting Assistant
Attorney General
Civil Rights Division

Defendant's Exhibit #                                          DE-006027



**U.S. Department of Justice**

Civil Rights Division

---

Office of the Assistant Attorney General                    *Washington, D.C. 20035*

June 5, 2000

David Méndez, Esq.
Bickerstaff, Heath, Smiley,
   Pollan, Kever & McDaniel
1700 Frost Bank Plaza
816 Congress Avenue
Austin, Texas  78701-2443

Dear Mr. Méndez:

    This refers to the adoption of numbered posts for the Sealy Independent School District in Austin County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.  We received your response to our February 14, 2000, request for additional information on April 6 and June 1, 2000; supplemental information from the state was received on June 2, 2000.

    We have carefully considered the information you have provided, as well as Census data, information in our files, and information and comments from other interested parties. According to the 1990 Census, 12.7 percent of the school district's total population is black and 15.9 percent is Hispanic.  Since 1990, it appears that the school district has experienced growth in its overall population and in the minority share of its population.  Minority students within the school district at present constitute a significant percentage of the school district's overall student enrollment (28 percent Hispanic/16 percent black).

    Under the existing system, the school district elects its seven-member board of trustees on an at-large basis to three-year staggered terms of office (3-2-2).  Only one minority representative, an African American, has been elected to the

- 2 -

school board in recent times. After two unsuccessful efforts, this individual succeeded in gaining election when she ran for office in an election year when three trustee seats were up for election. In that contest in 1992 she placed last among the three winning candidates, which was also true of her reelection in 1995. In her two unsuccessful bids for the school board, she, like other minority candidates, appears to have failed to garner sufficient white voter support to get elected under the at-large system.

In our view, the available information concerning voting patterns within the school district is not inconsistent with a pattern of racially polarized voting, although it does appear that some minority candidates in the school district and other local elections have received a level of support from white voters, as well as from minority voters, sufficient to gain election. By and large, however, this level of white voter support appears to have been reserved for a very small number of minority candidates. Most minority candidates have been unsuccessful in election contests for at-large seats on the school board, as well as for other local offices when they face white opposition. Electoral patterns such as these are typically observed in instances where voting is racially polarized.

The school district now seeks to add to its at-large electoral system a numbered post requirement that, in effect, will convert each election for a seat on the board into a separate election contest. In these separate contests for school board seats, minority-supported candidates are more likely to be pitted against white incumbents or challengers in "head-to-head" contests. Where voting is racially polarized, our experience suggests that minority-supported candidates are more likely to lose because they are unlikely to garner a majority of the votes in the bid for a single seat. Indeed, it appears that the school district's sole minority trustee may not have fared well under the proposed system, given her third place showing in the two successful bids for the board in which she faced white opposition.

The school district maintains, however, that the proposed numbered post requirement will not have a negative impact on minority electoral opportunity for at least three reasons. First, the district asserts that voting within the district is not racially polarized and numbered posts cannot adversely impact minority voters under these circumstances. Second, the district claims that minority voters will not be harmed by the implementation of numbered posts because they do not make use of the technique of "single-shot" voting under the existing system and are too small a share of the voting population to elect on their own a candidate of choice. Hence, the change to numbered posts could not worsen their political participation opportunities. Third, the district posits that the addition of

USA_00013096

- 3 -

numbered posts will not harm minority voters because under the proposed system, unlike the existing system, white voters will not be able to utilize the technique of "single-shot" voting, which denies minority candidates the white votes needed to gain election under the at-large system.

With regard to the district's first assertion concerning the existence of polarized voting, we have noted above that based on the information available to us there is evidence of such a pattern of voting. We have been unable, however, to conduct a more particularized analysis of the school district's claim in this regard, given, among other things, several deficiencies in the information that has been provided. For example, election returns by voting precinct for school district contests in which minority candidates participated were not provided to us, except for the May 2000 election returns forwarded to us on June 1, 2000. And, the consolidated returns that were provided did not include in several instances the total number of voters who voted in a particular school district election, all of which is important information in the analysis of voting behavior. Finally, no information was provided for elections in which minority candidates participated for municipal offices other than for the City of Sealy.

In support of its argument regarding the absence of polarized voting, the school district relies in large part on the following elections involving minority candidates: 1) the election without opposition of a minority candidate who was first appointed to fill a vacant constable position in Precinct 4 (this candidate also happens to be the husband of the minority school board trustee); 2) the third place election and reelection of the incumbent African-American trustee, who is the only minority to ever serve on the school board; and 3) the election of a single minority candidate to the five-member city council for the City of Sealy, despite numerous unsuccessful candidacies of minority candidates in a city with a combined 1990 minority population share of 38 percent. We are not persuaded that these limited instances of minority electoral success under the circumstances noted above demonstrate the absence of polarized voting within the school district, given the lack of success generally experienced by minority candidates.

The school district's second claim is that the proposed change will not harm minority-supported candidates because minority voters do not single-shot vote and, by themselves, are too small a share of the voting population to control the outcome of an at-large election. This reasoning, however, does not fully embrace the level of minority electoral success, albeit limited, that has been achieved to date within the school district. While it does appear that under the existing at-large, staggered term election system there are limited opportunities for the effective use of single-shot voting, a candidate apparently preferred by

Defendant's Exhibit #                                DE-006030

USA_00013097

- 4 -

the minority community has gained election to the school board
with significant crossover from white voters.  This minority
candidate ran successfully only in years in which there were
three seats up for election and, even then, placed last among the
winning candidates when there was white opposition.  As noted
earlier, it is questionable whether this minority candidate, the
incumbent African-American trustee, could continue under the
proposed system to be elected to the school board because she
would have to place first in contests in which there was white
opposition.

Finally, as we understand it, the school district's third
claim is that the proposed change may actually benefit minority
voters by ensuring that white voters will not be able to "single-
shot" vote for a white candidate and thereby deny minority
candidates the white votes they need in order to win election.
Our experience analysing the impact of electoral devices such as
the proposed numbered posts requirement does not support this
conclusion.  It is true that the implementation of numbered posts
will prevent any use of the technique of "single-shot" voting.
In our experience, however, "single-shot" voting is generally
utilized by minority voters to boost the effect of their support
for a preferred candidate in multi-seat, at-large election
contests where voting is racially polarized, rather than by white
voters who are a majority of the electorate; no information
provided to us during our review of the instant submission would
require a different conclusion.  Implicit in this claim by the
school district, however, is the view that when white voters
limit their vote to a single candidate, they are more likely to
choose a white rather than a minority candidate.  This
observation is consistent with our experience and adds to the
evidence indicating that in single-seat contests for the school
board, minority-supported candidates are unlikely to place first
ahead of white candidates, and, indeed, are in a worse position
than under the existing at-large system to elect candidates of
their choice.

Under these circumstances, I am unable to conclude as I must
under Section 5 that the school district has met its burden of
demonstrating that the submitted change has neither a
discriminatory purpose nor a discriminatory effect.  <u>Georgia</u> v.
<u>United States</u>, 411 U.S. 526 (1973); see also the Procedures for
the Administration of Section 5 (28 C.F.R. 51.52).  Therefore, on
behalf of the Attorney General, I must object to the addition of
numbered posts for the Sealy Independent School District.

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed change neither has the
purpose nor will have the effect of denying or abridging the
right to vote on account of race, color, or membership in a
language minority group.  See 28 C.F.R. 51.44.  In addition, you

USA_00013098

- 5 -

may request that the Attorney General reconsider the objection.
See 28 C.F.R. 51.45.  However, until the objection is withdrawn
or a judgment from the District of Columbia Court is obtained,
the use of numbered posts by the school district continues to be
legally unenforceable.  Clark v. Roemer, 500 U.S. 646 (1991); 28
C.F.R. 51.10.

    To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the Sealy
Independent School District plans to take concerning this matter.
If you have any questions, you should call Deanne B. Ross
(202-514-6331), an attorney in the Voting Section.

                              Sincerely,

                              Bill Lann Lee
                              Acting Assistant
                                Attorney General
                              Civil Rights Division

USA_00013099



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*

*P.O. Box 65808*
*Washington, D.C. 20035-5808*

*Telephone (202) 514-2151*

September 24, 2001

Cheryl T. Mehl, Esq.
Schwartz & Eichelbaum
800 Brazos Street
Suite 870
Austin, Texas  78701

Dear Ms. Mehl:

This refers to the change in the method of election from single-member districts to an at-large system employing cumulative voting, its implementation schedule, and the subsequent revision of the implementation schedule as subsequently revised for the Haskell Consolidated Independent School District in Haskell, Knox, and Throckmorton Counties, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your responses to our February 5, 2001, request for additional information on July 25, and September 5, 6, 7, and 12, 2001.

We have considered carefully the information you have provided, as well as Census data, and comments and information from other interested parties. According to the 2000 Census, the Haskell Consolidated Independent School District [the district] has a population of 3,845, of whom 19.7 percent are Hispanic and 3.2 percent are black persons.

Our analysis of the district's electoral history indicates that under the current method of election, which utilizes seven single-member districts, Hispanic voters have been able to elect candidates of their choice to office in at least one district. We note that this election method resulted from the settlement of federal litigation claiming that the previous method, an at-large

-2-

system with staggered terms, violated Section 2 of the Voting
Rights Act.  League of United Latin American Citizens, District 5
LULAC v. Haskell Consolidated Independent School Districts, No.
193-CV-0178(C) (N.D. Tex.  Oct. 21, 1994).  The school district
implemented the single-member district system, which contained
one district with a Hispanic population majority, in 1995.

Under a cumulative voting system, voters are allocated a
number of votes equal to the number of offices that are being
contested at that particular election and can assign all of their
votes to one candidate.  Thus, a candidate supported by voters
who are a minority of the electorate can win with support from
fewer voters than in a traditional at-large election.  A
statistical measure, known as the "threshold of exclusion," can
determine the lowest percentage of support from a single group
that ensures their candidate will win no matter what other voters
do.  This level of support is 33 percent in a two-seat race and
25 percent in a three-seat race.  Thus, for Hispanic voters to
elect a candidate of their choice in a three-seat contest, they
must either constitute 25 percent of the electorate or be able to
count on enough non-Hispanic votes to reach that threshold.  The
school district has conceded that it will be virtually impossible
for minority voters to elect at least one candidate of their
choice under the board's proposed method of election without non-
Hispanic cross-over voting.  Accordingly, we have examined the
ability of candidates supported by the Hispanic community to
attract non-Hispanic votes in past elections.

Only one Hispanic candidate had been elected to the board of
trustees prior to the implementation of single-member districts
in 1995.  From 1981 to 1994, there were five attempts by four
Hispanic candidates to win a seat on the school board.  Based on
the information provided by the district, in only one instance
has a Hispanic candidate's vote total exceeded the threshold of
exclusion.  In the 1993 contest for Place 1, a Hispanic
candidate's vote total exceeded the threshold by only 0.8
percentage points.  Accordingly, based on the information
available, it appears that candidates favored by the Hispanic
community have not consistently received significant non-Hispanic
cross-over voting, much less at the levels claimed by the
district.

Given the demographics of the school district and apparent
voting patterns within it, the jurisdiction has not carried its
burden that the proposed change will not significantly reduce the
ability of minority voters to elect candidates of their choice to
the school board.

Defendant's Exhibit #                                    DE-006034

-3-

We have also examined the reasons proffered by the district in support of the change, such as allegedly low voter turnout during the time that it utilized single-member districts as compared to purportedly higher turnout under the at-large system. An analysis of past voter turnout information does not support the board's position.  For example, in May 2001, the board claims that less than one percent of the registered voters in District 1 cast a ballot.  A closer examination indicates that the candidate for that position was unopposed and the election would have been cancelled, with the candidate being sworn into office, had there not been another office on the ballot being contested.

Moreover, in both the Section 5 submission and at the February 10, 2000, public hearing, school board officials claimed that voter turnout was higher in at-large elections.  The district cited the 1993 election, calculating that 1,465 persons voted, a 64.5 percent turnout rate, and, the 1994 election in which 1,863 persons, or 73 percent of the registered voters voted, as evidence of the need to return to at-large elections. This assertion does not withstand close scrutiny.  In both of these elections, two numbered posts were up for election and a voter could vote for both posts.  According to the 1993 election returns, there were 730 votes for Place I candidates and 735 votes for Place II candidates for a total of 1,465.  The 1994 figure of 1,863 is the result of similar calculation.  The only way to arrive at the district's numbers is to assume that every voter who cast a ballot for one post chose not to vote for the second office.  We do not believe that such an assumption is warranted here.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5, 28 C.F.R. 51.52. In light of the considerations discussed above, I cannot conclude that your burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the change to cumulative voting with staggered terms.

In its request for preclearance, the district notes that if, in fact, the change is retrogressive, individuals in the minority community would be free either to petition the board to change the method of election or to institute further litigation.  This suggestion ignores the essential purpose of Section 5, which is to ensure that gains achieved by minority voters not be subverted by retrogressive changes.  Accordingly, we can not accede to the

Defendant's Exhibit #                                    DE-006035

district's request.

-4-

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28·C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the changes continue to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

The Attorney General will make no determination regarding the submitted implementation schedule because it is dependant upon the objected to change in the method of election.

We understand that the school district employs Spanish language election procedures. "Spanish language election procedures" refers to such matters as the procedures for translating election-related information and materials (e.g., notices, advertisements, informational pamphlets, ballots) into Spanish (include examples of such documents), procedures for confirming the accuracy of the translations, and the procedures used to provide oral assistance or information in Spanish at polling places, early voting locations, as well as publicity in Spanish regarding the availability of Spanish language assistance. See Interpretive Guidelines: Implementation of the Provisions of the Voting Rights Act Regarding Language Minority Groups, 28 C.F.R., Part 55 (copy enclosed).

Our records fail to show that this change affecting voting has been submitted to the United States District Court for the District of Columbia for judicial review or to the Attorney General for administrative review as required by Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. If our information is correct, it is necessary that this change either be brought before the District Court for the District of Columbia or submitted to the Attorney General for a determination that it does not have the purpose and will not have the effect of discriminating on account of race, color, or membership in a language minority group. Changes which affect voting are legally unenforceable without Section 5 preclearance. Clark v. Roemer, 500 U.S. 646 (1991); Procedures for the Administration of Section 5 (28 C.F.R. 51.10).

Defendant's Exhibit # _____    DE-006036

-5-

To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action Haskell
Consolidated Independent School District plans to take concerning
this matter.  If you have any questions, you should call Ms.
Judybeth Greene (202-616-2350), an attorney in the Voting
Section.  Refer to File No. 2001-2924 in any response to this
letter so that your correspondence will be channeled properly.

                         Sincerely,

                         Ralph F. Boyd, Jr.
                         Assistant Attorney General
                         Civil Rights Division


Enclosure



**U. S. Departme.  .f Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*


Wallace Shaw, Esquire
P.O. Box 3073
Freeport, Texas  77542-1273              AUG 1 2 2002

Dear Mr. Shaw:

     This refers to the procedures for conducting the May 4,
2002, special city charter amendment election and the change in
the method of electing city council members from districts to at
large for the City of Freeport in Brazoria County, Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act, 42 U.S.C. 1973c.  We received your responses
to our May 14, 2002, request for additional information through
July 31, 2002.

     With regard to the special election, the Attorney General
does not interpose any objection to the specified change.
However, we note that Section 5 expressly provides that the
failure of the Attorney General to object does not bar subsequent
litigation to enjoin the enforcement of the change.  See the
Procedures for the Administration of Section 5 (28 C.F.R. 51.41).

     As to the change to at-large elections with numbered
positions, we have carefully considered the information you have
provided, as well as census data, comments and information from
other interested parties, and other information, including the
city's previous submission of the adoption of the current
districting system for the election of council members.  Based on
our analysis of the information you have provided, on behalf of
the Attorney General, I am compelled to object to the submitted
change in the method of election.

     According to the 2000 Census, the city has a total
population of 12,708, of whom 6,614 (52.0 percent) are Hispanic
and 1,696 (13.3 percent) are black persons.  Hispanic residents
comprise 47.3 percent, and black residents 12.3 percent, of the
city's voting age population.  Approximately 29 percent of the
city's registered voters are Spanish-surnamed individuals.

Defendant's Exhibit #                                    DE-006038

USA_00013105

- 2 -

Until 1992, the city elected its four-member council on an
at-large basis.  In that year it began to use the single-member
district system, which it had adopted as part of a settlement of
voting rights litigation challenging the at-large system.  Under
the subsequent single-member district method of election,
minority voters have demonstrated the ability to elect candidates
of choice in at least two districts, Wards A and D.  The city now
proposes to reinstitute the at-large method of election.  Our
analysis shows that the change will have a retrogressive effect
on the ability of minority voters to elect a candidate of their
choice.

Elections in the city are marked by a pattern of racially
polarized voting.  Under the city's previous use of at-large
elections, no Hispanic-preferred candidates were successful until
1990.  In that election, one such candidate narrowly won office
when several Anglo-supported candidates split the vote.  In
contrast, a Hispanic-preferred candidate won over significant
Anglo opposition in 1992 in the first election held under the
single-member district system.  Since then, three other minority-
preferred candidates have been successful in their wards.
However, minority voters remain unable to elect their candidates
of choice in municipal at-large elections.  Thus, a return to an
electoral system where all council offices are elected on an at-
large basis will result in a retrogression in their ability to
exercise the electoral franchise that they enjoy currently.  A
voting change has a discriminatory effect if it will lead to a
retrogression in the position of members of a racial or language
minority group (i.e., will make members of such a group worse off
than they had been before the change) with respect to their
opportunity to exercise the electoral franchise effectively.
Reno v. Bossier Parish School Board, 528 U.S. 320, 328 (2000);
Beer v. United States, 425 U.S. 130, 140-42 (1976).

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot conclude
that your burden has been sustained in this instance.  Therefore,
on behalf of the Attorney General, I must object to the change in
the method of election.

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed change neither has the
purpose nor will have the effect of denying or abridging the

Defendant's Exhibit #

DE-006039

- 3 -

right to vote on account of race, color, or membership in a
language minority group.  See 28 C.F.R. 51.44.  In addition, you
may request that the Attorney General reconsider the objection.
See 28 C.F.R. 51.45.  However, until the objection is withdrawn
or a judgment from the District of Columbia Court is obtained,
the submitted change continues to be legally unenforceable.
Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

     To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the City of
Freeport plans to take concerning this matter.  If you have any
questions, you should call Mr. Robert Lowell (202-514-3539), an
attorney in the Voting Section.

                              Sincerely,


                              J. Michael Wiggins
                              Acting Assistant Attorney
                                General

Defendant's Exhibit #                                      DE-006040

USA_00013107

Honorable Mark White
Secretary of State
State of Texas
Capitol Station
Austin, Texas  78711

Dear Mr. Secretary:

        This is in reference to S.B. 300 of 1975, voter
registration procedures in the State of Texas, which
was submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended
in 1975.  Your submission was received on October 31,
1975.  Pursuant to your request we have given expedited
consideration to this submission in accordance with
Section 51.22 of our Section 5 guidelines (28 C.F.R.
51.22).

        We have reviewed carefully the information,
statistical data and other material submitted by you
as well as information, comments and views provided
by other interested persons.  Except insofar as
S.B. 300 requires a purge of all currently registered
voters in Texas, the Attorney General does not interpose
an objection to the changes involved.  We feel a
responsibility to point out, however, that Section 5
of the Voting Rights Act expressly provides that our
failure to object does not bar any subsequent judicial
action to enjoin the enforcement of these changes should
such action become necessary.

- 2 -

Section 2 of S.B. 300 provides, among other things, that registrants who fail to reregister shall have their registration terminated on March 1, 1976. We recognize the State's interest in enacting legislation which promotes registration and, also, which utilizes a reasonable means of maintaining accurate registration records. However, our review of recent registration laws in Texas, e.g., the poll tax, annual registration, reregistration (S.B. 51 of 1971), in conjunction with our evaluation of S.B. 300, illustrates that the citizens of Texas have experienced several registration procedures within a ten-year period.

Under Section 5 of the Voting Rights Act the burden falls upon the submitting authority to demonstrate that voting changes, such as those here under submission, not only do not have a prohibited discriminatory purpose but will not have such an effect. Thus, as set forth in his Procedures For the Administration of Section 5 of the Voting Rights Act of 1965, Section 51.19 (28 C.F.R. 51.19), the Attorney General will refrain from objecting only if he is satisfied that the proposed change does not have the prohibited purpose or effect. If he is persuaded to the contrary or if he cannot satisfy himself that the change is without discriminatory purpose or effect, the guidelines state that the Attorney General will object.

Our analysis has revealed nothing to suggest a discriminatory purpose to the purge involved here. In addition, the State's proposals for minimizing the adverse effect of the reregistration are commendable. However, we cannot conclude that the effect of the total purge to initiate the reregistration program will not be discriminatory in a prohibited way.

Defendant's Exhibit #                                                    DE-006042

USA_00013109

- 3 -

With regard to cognizable minority groups in
Texas, namely, blacks and Mexican-Americans, a study
of their historical voting problems and a review of
statistical data, including that relating to literacy,
disclose that a total voter registration purge under
existing circumstances may have a discriminatory effect
on their voting rights.  Comments from interested parties,
as well as our own investigation, indicate that a
substantial number of minority registrants may be
confused, unable to comply with the statutory regis-
tration requirements of Section 2, or only able to
comply with substantial difficulty.  Moreover, repre-
sentations have been made to this office that a
requirement that everyone register anew, on the heels
of registration difficulties experienced in the past,
could cause significant frustration and result in
creating voter apathy among minority citizens, thus,
erasing the gains already accomplished in registering
minority voters.

We have reviewed carefully the justifications
submitted by the State in an effort to satisfy the
State's burden of proof that the purge in question
does not have the purpose or effect of denying or
abridging voting rights on the basis of race or language
minority status.  We also have closely scrutinized the
nature of the State's interest in implementing a state-
wide purge to determine whether it is compelling and
whether alternative means of accomplishing its purpose
are available.  Dunn v. Blumstein, 405 U.S. 330 (1972).
Under all the circumstances involved, we are unable to
conclude that a total purge is necessary to achieve the
State's purpose.  Likewise, we are unable to conclude,
as we must under the Voting Rights Act, that implementation

USA_00013110

- 4 -

of such a purge in Texas will not have the effect of
discriminating on account of race or color and language
minority status.  For that reason, I must, on behalf
of the Attorney General, interpose an objection to the
implementation of the purge requirement of Section 2
of S.B. 300.

Should you decide, however, to implement the
reregistration without the purge requirement and can
at a later date demonstrate that it did not have an
adverse effect on minority voting rights, we would
welcome a request for reconsideration with appropriate
supporting materials (see 28 C.F.R. 51.23).

Of course, as provided for by Section 5, you
have the alternative of instituting an action in the
United States District Court for the District of
Columbia for a declaratory judgment that the change
does not have the purpose and will not have the effect
of denying or abridging the right to vote on account
of race or color.  Should you decide to pursue such
a course of action my staff and I will cooperate to
expedite the matter in any way possible.

I am aware that there is now pending a lawsuit
in the United States District Court for the Eastern
District of Texas with respect to the subject matter
of this submission.  I am, therefore, taking the liberty
of forwarding a copy of this letter to the Court.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

DJ 166-012-3
X0612

Honorable Mark White
Secretary of State of Texas
Capitol Station
Austin, Texas  78711

Dear Mr. Secretary:

        This is in reference to Senate Bill 11
(1975), which was submitted to the Attorney
General pursuant to Section 5 of the Voting
Rights Act.  Your submission was received on
November 26, 1975.  While we have noted your
request for expedited consideration, we have
been unable to give you an earlier response
to this matter.

        The Attorney General does not interpose
an objection to the changes contained in Senate
Bill 11 except as noted below.  However, we feel
a responsibility to point out that Section 5 of
the Voting Rights Act expressly provides that
the failure of the Attorney General to object
does not bar any subsequent judicial action to
enjoin the enforcement of such changes.

        Section 6 of Senate Bill 11 restricts the
ability of political parties in Texas to hold
primary elections after 1974 by requiring that
a political party nominate its candidates only
by convention if the party's candidate for governor
in the last preceding general election received at
least 2% but less than 20% of the total votes cast

USA_00013112

- 2 -

for that office.  Immediately prior to Senate Bill 11
no such restriction was imposed upon any political
party whose candidate for governor in the last preced-
ing election received at least 2% of the vote for that
office.  In fact, Section 6 of Senate Bill 11 itself
allowed such a political party to conduct primaries in
1974.

Under present state law the costs to political
parties of primary elections are reimbursed by the State,
but the State does not reimburse political parties for
the costs of conducting party conventions.  The reason
advanced by the state for its limitation on the primary
as a vehicle for nomination by political parties in
Texas is a lessening of the burdensome expense of
state-financed primary elections.

According to our information, in the 1974 guber-
natorial election in Texas the Democratic Party's
candidate received approximately 62% of the vote, the
Republican Party's candidate received approximately
31%, and approximately 6% of the vote was received by
the candidate of the Raza Unida Party, a party composed
predominantly of Mexican-Americans and devoted to the
protection of Mexican-American interests.  The Raza
Unida Party accounted for under $60,000 or less than
3% of the state's total expenditure for primary elec-
tions in 1974 and, therefore, under Senate Bill 11
the only parties able to conduct primary elections in
1976 will be the two parties which combined to account
for over 97% of the cost to the state of primary
elections in 1974.  Thus, based on these results the
effect of the Section 6's restriction in 1976 and
thereafter necessarily would fall on only one party,
the Raza Unida, and significantly limit the opportunity
for Mexican-Americans to nominate, on an equal basis
with others, a candidate of their choice.

USA_00013113

- 3 -

Under these circumstances we are unable to
conclude that the stated purpose for the primary elec-
tion restriction in Senate Bill 11 outweighs the effect
of the restriction on the racially identifiable La Raza
Unida, and that beginning in 1976 the provisions of
Section 6 of Senate Bill 11 will not have a prohibited
discriminatory effect within the meaning of Section 5
of the Voting Rights Act. Accordingly, on behalf of
the Attorney General, I must object to the implemen-
tation of those provisions of Section 6 of Senate Bill
11.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the United States District Court for the
District of Columbia that these provisions neither have
the purpose nor will have the effect of denying or
abridging the right to vote on account of race, color,
or membership in a language minority group. However,
until and unless such a judgment is obtained, the
provisions objected to are unenforceable.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                        DE-006047

USA_00013114

FEB 25 1976

Mr. Jack Skeen, Jr.
City Attorney
City of Tyler
Post Office Box 2039
Tyler, Texas  75701

Dear Mr. Skeen:

     This is in response to your letter dated
December 24, 1975, in which you submit annexations,
a referendum to decide inter alia, the form of
government in Tyler, Texas, and a reapportionment
plan for the City of Tyler, Texas, to the Attorney
General pursuant to Section 5 of the Voting Rights
Act of 1965.  Your submission was received on
December 27, 1975.

     The Attorney General does not interpose any
objection to the annexations and the aforementioned
referendum.  However, we feel a responsibility to
point out that Section 5 of the Voting Rights Act
expressly provides that the failure of the Attorney
General to object does not bar any subsequent judicial
action to enjoin the enforcement of such changes.

     With regard to the submitted reapportionment,
we have completed our analysis and review of the
change.  Our analysis shows that blacks comprise
23.5% of the total population of Tyler, Texas and
that Mexican-Americans comprise about 5% of the total

Defendant's Exhibit #                DE-006048

USA_00013115

- 2 -

population, that no minority candidates have been
elected to city office in Tyler, and that reasonable
alternate plans could be drawn (including a seven
single-member district plan), that would be more
reflective of minority voting strength in Tyler.

Not insignificant to our consideration of
this change is our recognition of the fact that in
establishing the plan under submission the city
increased the size of its governing body from five
to seven members. Thus, while the determination
here well might have been different had this single-
member districting involved the 20% representation
that the minority groups could have elected to a
continued five-member council, we find it not only
appropriate but necessary that we consider several
factors in the context of the enlarged seven-member
council. First, we are mindful that under the
enlarged seven-member council the representation
which the affected minorities are given a realistic
chance of electing is reduced to 14%. Second, we
find it logical to presume that, in the absence of
evidence to the contrary, racial bloc voting exists
since no minority candidate (of whom there have
been several) has ever been elected to the council
under the at-large system. Third, we cannot ignore
the fact that the five-member system is presently
under challenge in the United States District Court
for the Eastern District of Texas (Square v. Halbert,
C.A. No. T.Y75-54). Fourth, the city has presented
no evidence of a compelling need to incorporate in
its proposal an at-large feature.

- 3 -

Under these circumstances, therefore, the Attorney General cannot conclude, as he must under the Voting Rights Act, that the proposed reapportionment plan does not have the effect of impermissibly diluting the voting strength of protected minorities in the City of Tyler. Accordingly, I must, on behalf of the Attorney General, interpose an objection to the implementation of this plan.

Of course, you are permitted under Section 5 of the Voting Rights Act to seek a declaratory judgment in the District Court for the District of Columbia that the proposed reapportionment plan does not have the purpose, and will not have the effect of denying or abridging the right to vote on account of race or color. Until such judgment is obtained, however, the legal effect of the Attorney General's objection is to render unenforceable the legislation authorizing the proposed reapportionment.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Department of Justice
Washington, D.C. 20530

MAR 5  1976

Mr. Joe Resweber
County Attorney
Office of the County Attorney
Harris County Courthouse
Houston, Texas  77002

Dear Mr. Resweber:

This is in reference to the 1973, 1974 and 1975
changes in the method of selecting precinct election
judges in Harris County, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended.  Your submission was received on
January 5, 1976.

The Attorney General does not interpose any
objection to the 1973 and 1974 changes.  However, we
feel a responsibility to point out that Section 5 of
the Voting Rights Act expressly provides that the failure
of the Attorney General to object does not bar any
subsequent judicial action to enjoin the enforcement of
such changes.

After careful consideration of the submitted
changes, of supporting information and of comments
from interested parties, we are unable to conclude, as
we must under the Voting Rights Act, that the December 8,
1975 Commissioners' Court Order, as amended by the
December 29, 1975 Order has not had and will not have a
racially discriminatory purpose or effect.  In the
absence of information indicating that minorities are
fairly represented among the precinct polling staff we
are unable to conclude that the qualification that "the
racial make-up of the precinct polling staff will not
be affected" will not discriminatorily limit the opportun-
ities of minorities to serve as precinct polling staff.
I must, therefore, on behalf of the Attorney General,
interpose an objection to this Order.

Defendant's Exhibit #                    DE-006051

- 2 -

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the District Court for the District of
Columbia that these changes neither have the purpose
nor the effect of denying or abridging the right to vote
on account of race or color.  However, until and unless
such a judgment is obtained, the provisions objected to
are unenforceable.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

USA_00013119

MAR 9 1976

Mr. Johnnie Henderson
Superintendent
Forney Independent School District
P. O. Box 939
Forney, Texas 75126

Dear Mr. Henderson:

This is in reference to the imposition of
majority vote and numbered post voting requirements
in Board of Trustees' elections, submitted to the
Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended. Your submission
was received on January 9, 1976.

We have given careful consideration to the
submitted changes and the supporting information as
well as the data compiled by the Bureau of the Census
and information and comments from interested parties.
After a careful examination of these factors as well
as an analysis of recent court decisions, we are
unable to conclude, as we must under the Voting
Rights Act, that the imposition of the majority vote
and numbered post voting requirements in the context
of the at-large and staggered elections for the
Board of Trustees will not have a racially discrimi-
natory effect. Recent Supreme Court decisions, to
which we feel obligated to give great weight, indicate
that the combination of the above features would
have the effect of abridging minority voting rights.
The reasoning of these recent cases is illustrated
by the Supreme Court's decision in June of 1973 which
held that the multi-member election system, numerical

cc: Public File (Room 920),
    X1205

Defendant's Exhibit #                                      DE-006053

USA_00013120

- 2 -

post and majority vote requirement of Dallas and
Bexar Counties, Texas, tended to abridge minority
voting power and therefore violated the Fourteenth
Amendment.  White v. Regester, 412 U.S. 755 (1973).
See also, Whitcomb v. Chavis, 403 U.S. 124 (1971).

For the foregoing reasons, I must on behalf
of the Attorney General interpose an objection to the
numbered post and majority vote features mentioned
above.  We have reached this conclusion reluctantly
because we fully understand the complexities involved
in devising a plan of this nature so as to satisfy
the needs of the school district and its citizens
and simultaneously, to comply with the mandates of
the Federal Constitution and laws.  We are persuaded,
however, that the Voting Rights Act compels this
result.

Of course, Section 5 permits seeking approval
of all changes affecting voting by the United States
District Court for the District of Columbia irrespec-
tive of whether the changes have previously been sub-
mitted to the Attorney General.  However, until such
a judgment is rendered by that court, the legal effect
of the objection by the Attorney General is to render
the changes in question legally unenforceable.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

USA_00013121

DE-006055

USA_00013122

Defendant's Exhibit #

MAR 10 1976

Mr. Holmen Lilienstern
City Attorney
City of Texas City
P. O. Drawer 2608
Texas City, Texas  77590

Dear Mr. Lilienstern:

This is in reference to the numbered post pro-
vision governing the election of City Commissioners
in Texas City, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of
1965.  Your submission was completed on February 2,
1976.  In accordance with your request expedited
consideration has been given to this submission pur-
suant to the procedural guidelines for the admini-
stration of Section 5 (28 C.F.R. 51.22).

After a careful examination of all the avail-
able facts and circumstances and an analysis of the
relevant decisions of the federal courts, we are
unable to conclude as we must under the Voting
Rights Act that the numbered post provision will not
have a racially discriminatory effect.  In our
analysis we have given great weight to the factors
enunciated in White v. Regester, 412 U.S. 755 (1973),
and the numerous cases to which it has given rise,
including the history of governmental discrimination
in the area, the electoral history of the minority
groups involved, the presence of racial bloc-voting,
the degree of responsiveness of the elected repre-
sentatives to the needs of the minority groups, the
history of the policy regarding the change in

cc:  Public File (Room 920).
     X0554

- 2 -

question, and the presence of aggravating factors,
such as an at-large electoral scheme. See also
Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973)
and Graves v. Barnes, 378 F. Supp. 640 (W.D.Tex. 1974).

Under the totality of the circumstances I
must on behalf of the Attorney General interpose an
objection to the numbered post provision of the
Texas City Charter.

Of course, the Voting Rights Act permits a
jurisdiction to seek approval of changes subject to
Section 5 by the United States District Court for
the District of Columbia irrespective of whether the
changes have been submitted to the Attorney General.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

USA_00013123

MAR 11 1976

Mr. L. Holt Magee
Attorney at Law
P. O. Box 1826
Monahans, Texas   79756

Dear Mr. Magee:

This is in reply to your letter of January 8,
1976, in which you submitted to the Attorney General
the April 9, 1974 order of the Monahans City Council
authorizing the use of numbered posts in city council
elections pursuant to Section 5 of the Voting Rights
Act of 1965.  Your letter and the attached materials
were received on January 12, 1976.

After a careful examination of all the avail-
able facts and circumstances and information received
from interested citizens, we are unable to conclude,
as we must under the Voting Rights Act, that the
numbered post provision of Ordinance No. 667 (1974),
in the context of at-large elections for the Monahans
City Council, will not have a discriminatory effect
on blacks and Mexican-Americans.  Our information
indicates that there are adjoining concentrations of
blacks and Mexican-Americans in and around the "old
town" of Monahans, and that there is a history of
racial-ethnic bloc voting.  Where these circumstances
prevail, the combination of features such as the
numbered post requirement with at-large elections
tend to be dilutive and thus violative of the voting
rights of minorities.  <u>White</u> v. <u>Regester</u>, 412 U.S.
755 (1973).



Defendant's Exhibit #                              DE-006057

USA_00013124

- 2 -

Therefore, for the foregoing reasons, on behalf of the Attorney General I must interpose an objection to the numbered post provision of Ordinance No. 667 (1974). Of course as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this provision neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race. However, until and unless such a judgment is obtained, the provision objected to is unenforceable.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

USA_00013125

MAR 1 1 1976

Honorable Jon Lindsay
County Judge
Harris County
Family Law Center
Houston, Texas 77002

Dear Judge Lindsay:

This is in reference to your letter of March 9,
1976, in which you requested reconsideration by the
Attorney General of his March 5, 1976, objection to
the change in the method of selecting precinct
election judges in Harris County, as prescribed in
the Commissioners' Court Orders of December 8, 1975,
and December 29, 1975.  Your request for reconsidera-
tion was presented to us on March 10, 1976.

Pursuant to 28 C.F.R. Section 51.23, and in
light of information provided by you in your March 9,
1976, letter and during a telephone conversation on
that same date with Ms. Polly A. Dammann, a member of
my staff, we have made a reevaluation of the 1975 Orders
relating to the selection of precinct election judges.
Based upon your March 9, 1976, letter, we understand
that the 1975 Orders prescribe the method of selecting
precinct election judges for only one term, and that
for the term in question they have, in actuality, only
affected the selection procedure in Commissioner Precinct
No. 3.  Given your written assurance that the phrase
included in the December 29, 1975, Order, which reads
". . . the racial make-up of the precinct polling staff

USA_00013126

- 2 -

will not be affected," was intended to reflect that
no discrimination would occur by the adoption of the
new policy, given your additional information that
the 1975 procedure did not, in fact, adversely affect
the selection of any of the three incumbent black
precinct election judges in Commissioner Precinct No. 3,
and given our finding that minorities are fairly
represented among precinct polling staff in Commissioner
Precinct No. 3, the Attorney General will not impose
any further objection to your submission of January 5,
1976.  The objection to your submission in my letter
of March 5, 1976, is hereby withdrawn.  We note, however,
that should the Commissioners' Court pass an order in
any subsequent years establishing the procedure for
selecting precinct election judges, such order must
have Section 5 preclearance prior to implementation; at
the time of such a submission we must examine the
purpose and the effect of the change in all commissioner's
precincts.

Finally, we feel a responsibility to point out
that Section 5 of the Voting Rights Act expressly provides
that the failure of the Attorney General to object does
not bar any subsequent judicial action to enjoin the
enforcement of such change.  We should further point out
that the Attorney General has no authority to waive the
60-day period for considering a submission and, as our
guidelines indicate (see 28 C.F.R. Section 51.22), we
may reexamine our position on your submission should we
receive additional information concerning the change in
voting procedure prior to expiration of the 60-day period.
Should such information warrant a change in the Attorney
General's determination, you will be so advised.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

USA_00013127

MAR 19 1976

Mr. John R. Slater
Superintendent, Orange Grove
   Independent School District
Drawer L
Orange Grove, Texas   78372

Dear Mr. Slater:

        This is in reference to the imposition of a
numbered post requirement in the election of the
School Board, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of
1965, as amended.  Your submission was received on
January 19, 1976.

        We have given careful consideration to the
submitted change and the supporting information as
well as the data compiled by the Bureau of the
Census and information and comments from interested
parties.  On the basis of our analysis, we are unable
to conclude, as we must under the Voting Rights Act,
that the imposition of the numbered post voting
requirement in the context of at large elections for
members of the Board of Trustees with staggered
terms will not have a racially discriminatory effect.
Recent Supreme Court decisions, to which we feel
obligated to give great weight, indicate that the
combination of the above features may have the effect
of abridging minority voting rights in the Orange
Grove Independent School District.  E.g., White v.
Regester, 412 U.S. 755 (1973); Whitcomb v. Chavis,
403 U.S. 124 (1971).



USA_00013128

- 2 -

For the foregoing reasons, I must on behalf of the Attorney General interpose an objection to the numbered post requirement in the context of at-large elections. Of course, Section 5 permits your seeking a declaratory judgment from the United States District Court for the District of Columbia that the change does not have the proscribed purpose or effect.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

DE-006062

USA_00013129

MAR 3 9 1976

Mr. W. F. Leigh
Attorney at Law
Western Insurance Building
Pecos, Texas  79772

Dear Mr. Leigh:

This is in reference to the imposition of
a numbered posts requirement in the election of
aldermen for the Town of Pecos City, Texas, sub-
mitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended.  Your
submission was received November 17, 1975 and
completed on January 23, 1976.

We have given careful consideration to the
submitted change and the supporting information as
well as data compiled by the Bureau of the Census
and information and comments from interested parties.
On the basis of our analysis we are unable to con-
clude, as we must under the Voting Rights Act, that
the imposition of the numbered posts voting require-
ment in the context of at large elections for aldermen
with staggered terms will not have the proscribed
discriminatory effect.  Our analysis, moreover,
indicates a strong possibility that racial bloc
voting exists in Pecos City.  Recent Supreme Court
decisions, to which we feel obligated to give great
weight, indicate that the combination of the above
features may have the effect of abridging minority
voting rights under circumstances such as exist in
Pecos City.  See White v. Regester, 412 U.S. 755 (1973);
Whitcomb v. Chavis, 403 U.S. 124 (1971).

USA_00013130

- 2 -

      For the foregoing reasons, I must on behalf of
the Attorney General interpose an objection to the
imposition of the numbered post requirement in Pecos
City.  Of course, Section 5 permits your seeking a
declaratory judgment from the United States District
Court for the District of Columbia that the change does
not have the proscribed purpose or effect.  However,
until such a judgment is rendered by that court, the
legal effect of the objection by the Attorney General
is to render the changes in question legally unenforce-
able.

                              Sincerely,


                              J. Stanley Pottinger
                          Assistant Attorney General
                              Civil Rights Division

Defendant's Exhibit #                    DE-006064

MAR 24 1976

Mr. Charles G. Harris
Superintendent, Chapel Hill
    Independent School District
Route 7
Tyler, Texas  75701

Dear Mr. Harris:

        This is in reference to the majority vote
requirement for the Chapel Hill Independent School
District submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965.  Your
submission was received on January 24, 1976.  While
we have noted your request for expedited consideration,
we have been unable to give you an earlier response
to this matter.

        We have considered carefully the submitted
change to majority vote requirement and the support-
ing information, along with Census Bureau data and
information and comments from other interested parties.
Our analysis reveals that the at-large election scheme
for Chapel Hill Independent School District includes
the use of staggered terms and designated posts and
there are significant indications that racial bloc
voting may exist.

        Recent court decisions suggest that an at-large
voting system which incorporates features such as
numbered posts, staggered terms and the majority vote
requirement may operate to minimize or dilute the
voting strength of minority groups and thus have an

/

Defendant's Exhibit #                                          DE-006065

USA_00013132

- 2 -

invidious discriminatory effect.  See White v. Regester,
412 U.S. 755 (1973); Whitcomb v. Chavis, 403 U.S. 124
(1971); Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.
1973); Beer v. United States, 374 F. Supp. 363 (D.D.C.
1974).  In view of these court decisions, and on the
basis of all the available facts and circumstances,
the Attorney General is unable to conclude, as he must
under the Voting Rights Act, that the implementation
of a majority vote requirement will not have a
discriminatory racial effect on voting rights in the
Chapel Hill Independent School District.  On behalf
of the Attorney General, I must interpose an objection
to the submitted majority vote requirement.

     Of course, Section 5 permits you to seek a
declaratory judgment from the District Court for the
District of Columbia that the majority vote require-
ment neither has the purpose nor will have the effect
of denying or abridging the right to vote on account
of race.  Until such a judgment is rendered by that
court, however, the legal effect of the objection of
the Attorney General is to render unenforceable this
change in the method of electing members of the
Board of Trustees, Chapel Hill Independent School
District, Tyler, Texas.

                    Sincerely,



                    J. Stanley Pottinger
                    Assistant Attorney General
                    Civil Rights Division

USA_00013133

D.J. 166-012-3
X1899-1901                         MAR 29 1976

Mr. John L. Love
City Secretary
City of Luling
P. O. Box 630
Luling, Texas  78648

Dear Mr. Love:

   This is in response to your letter of January 23,
1976, in which you submitted to the Attorney General
three changes in voting procedures in Luling, Texas,
pursuant to Section 5 of the Voting Rights Act of 1965.
Your letter and the attached materials were received on
January 28, 1976.

   The Attorney General does not interpose any
objection to the following changes:

    Change from commission to aldermanic form
    of government adopted November 13, 1973;

    Change of polling place from fire station
    to Luling Senior High School Library
    adopted February 11, 1975.

However, we feel a responsibility to point out that
Section 5 of the Voting Rights Act expressly provides
that the failure of the Attorney General to object
does not bar any subsequent judicial action to enjoin
the enforcement of such changes.

Defendant's Exhibit #                                    DE-006067

USA_00013134

- 2 -

With respect to the numbered post provision adopted November 12, 1974, we have considered carefully all of the information presented by you along with pertinent Census data and information and comments received from other interested parties. On the basis of our analysis we are unable to conclude, as we must under the Voting Rights Act, that the use of numbered posts, in the context of at-large elections for the Luling City Council, will not have a discriminatory effect on blacks and Mexican-Americans.

Our analysis reveals that minority groups constitute approximately 41% of the population of Luling (25% Mexican-American; 16% black). While our information is that one black has been elected to the city council under both the prior system and the numbered post system since its inception, our analysis also has revealed significant evidence that bloc voting along racial and ethnic lines exists in Luling. Under these circumstances, recent court decisions, to which we feel obligated to give great weight, suggest that the combination of such features as designated posts and at-large elections may have the effect of abridging minority voting rights. See White v. Regester, 412 U.S. 755 (1973); Whitcomb v. Chavis, 403 U.S. 124 (1971).

Accordingly, on behalf of the Attorney General I must interpose an objection to the numbered post feature of electing city councilpersons adopted on November 12, 1974. Of course, as provided by Section 5

Defendant's Exhibit #                    DE-006068

USA_00013135

- 3 -

of the Voting Rights Act, you have the right to seek
a declaratory judgment from the United States District
Court for the District of Columbia that this provision
neither has the purpose nor will have the effect of
denying or abridging the right to vote on account of
race. However, until and unless such a judgment is
obtained, the provision objected to is legally
unenforceable.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

USA_00013136

MAR 30 1976

Mr. Paul Lyle
Day, Owen, Lyle & Voss
Attorneys & Counselors
215 Skaggs Building
Plainview, Texas  79072

Dear Mr. Lyle:

This is in reference to the imposition of a
majority vote and numbered post voting requirements
in Board of Trustee elections for the Lockney
Independent School District, submitted to the
Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended.  Your sub-
mission of the numbered post provision was received
on January 30, 1976, and your submission of the
majority vote feature was received on March 12, 1976.

We have given careful consideration to the
submitted changes and the supporting information as
well as to information and comments from interested
parties.  On the basis of our analysis, which reveals
substantial indication of racial bloc voting in the
Lockney Independent School District, we are unable
to conclude, as we must under the Voting Rights Act,
that the imposition of the majority vote and numbered
post voting requirements in the context of the at-
large and staggered elections for the Board of
Trustees will not have a racially discriminatory
effect.  Recent Supreme Court decisions, to which
we feel obligated to give great weight, indicate
that the combination of the above features may
have the effect of abridging minority voting rights
in this instance.  The reasoning of these cases is
illustrated by the Supreme Court's decision in

Defendant's Exhibit #                    DE-006070

USA_00013137

- 2 -

June of 1973 which held that the multi-member
election system, numerical post and majority vote
requirement of Dallas and Bexar Counties, Texas,
tended to abridge minority voting power and there-
fore violated the Fourteenth Amendment.  White v.
Regester, 412 U.S. 755 (1973).  See also, Whitcomb v.
Chavis, 403 U.S. 124 (1971).

    For the foregoing reasons, therefore, I must
on behalf of the Attorney General interpose an
objection to the numbered post and majority vote
features mentioned above.  Of course, Section 5
permits your seeking a declaratory judgment from
the United States District Court for the District
of Columbia that the changes do not have the
proscribed purpose or effect.  However, until such
a judgment is rendered by that court, the legal
effect of the objection by the Attorney General
is to render the changes in question legally
unenforceable.

                    Sincerely,


                    J. Stanley Pottinger
                    Assistant Attorney General
                    Civil Rights Division

Defendant's Exhibit #                                    DE-006071

APR 2   1976

Mr. James M. Parker
City Attorney
City of San Antonio
Post Office Box 9066
San Antonio, Texas   78285

Dear Mr. Parker:

This is in reference to the November, 1974, City
Charter Amendments, changes in City designated polling
places, and 23 annexations to the City of San Antonio,
Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended.
Your submission was completed on February 2, 1976.

The Attorney General does not interpose any
objections to the polling place changes or the City
Charter Amendments.   However, we feel a responsibility
to point out that Section 5 of the Voting Rights Act
expressly provides that the failure of the Attorney
General to object does not bar any subsequent judicial
action to enjoin the enforcement of these changes.

In examining the annexations submitted under
Section 5 of the Voting Rights Act, it is incumbent
for the Attorney General to determine whether the
annexations, either in purpose or effect, result in
voting discrimination against racial or language
minorities.   Our proper concern is not with the
validity of the annexations as such but with the
changes in voting which proceed from them.

Defendant's Exhibit #                                    DE-006072

USA_00013139

- 2 -

With respect to San Antonio specifically, we note that the population of the City prior to the annexations here under submission, in November, 1972, was 53.1% Mexican-American, 38% white-Anglo, and 8.6% black and other races. The City's nine-member governing council is elected at-large, with numbered posts and a majority requirement. In November of 1974, a proposition to amend the City Charter to provide for a system of ward representation was defeated by the City electorate. However, our examination of election results by precincts indicates the proposition was favored overwhelmingly in predominantly Mexican-American and black precincts.

Facts available to us show that the annexations under submission expanded the City by 65 square miles (a 25% increase) and 51,417 persons, approximately three-fourths of whom were white-Anglo. The enlarged City is 51.1% Mexican-American, 40.4% white-Anglo, and 8.5% black and other races. Thus, after the addition of the substantial and predominantly white-Anglo population involved in several of these 23 annexations the proportional strength of Mexican-Americans necessarily has been reduced, even though Mexican-Americans still are a bare majority of the population. It is our understanding that the present City Council is composed of two Mexican-American members, one black, and six white-Anglos.

We have considered carefully all the information submitted, along with pertinent Census data and information and comments from other interested parties. On the basis of our review, the Attorney General will not object to 10 of the annexations submitted. 1/ As to

1/Annexations nos. 224, 225, 233, 234, 235, 236, 238, 239, 240 and 242.

Defendant's Exhibit #                    DE-006073

- 3 -

those our analysis shows that they involve uninhabited
areas or populations the effect of which would be
de minmus or not adverse to minority voting strength.
However, with regard to the other 13 annexations 2/ we
cannot conclude, as we must under the Voting Rights Act,
that they, when coupled with an at-large, majority vote,
numbered post system of City elections, in which racial-
ethnic bloc voting exists, do not have the effect of
abridging the right to vote of affected minorities in
San Antonio.  Cf. City of Richmond v. United States,
376 F. Supp. 1344 (D. D.C. 1974), 422 U.S. 358 (1975).
City of Petersburg v. United States, 354 F. Supp. 1021
(D.D.C. 1972), aff'd 410 U.S. 962 (1973).  Accordingly,
I must, on behalf of the Attorney General, interpose an
objection to those 13 annexations.

    I would emphasize that this objection relates only
to the voting changes occasioned by the annexations.  As
the Court in the Richmond and Petersburg cases, supra,
have indicated, one way to remedy this situation would
be to adopt a system of fairly drawn single-member wards.
Should that occur the Attorney General will reconsider
the matter upon receipt of that information.

    Of course, as provided by Section 5, you have an
alternative of instituting an action in the United States
District Court for the District of Columbia for a declara-
tory judgment that the annexations do not have the
purpose and will not have the effect of denying or
abridging the right to vote on account of race or color
or in contravention of the guarantees set forth in
Section 4(f)(2) of the Voting Rights Act.

                    Sincerely,


                    J. Stanley Pottinger
                    Assistant Attorney General
                    Civil Rights Division


———————————
2/ Annexations nos. 220, 221, 222, 223, 226, 227, 228,
229, 230, 231, 232, 237, and 241.

Defendant's Exhibit #                                        DE-006074

USA_00013141

APR 2  1976

Honorable Joseph B. Bumgardner
County Judge
County of Victoria
Victoria County Courthouse Building
Victoria, Texas  77901

Dear Judge Bumgardner:

This is in reference to the pending election
pertaining to a proposed consolidation between the
Victoria Independent School District and the Mission
Valley Independent School District in Victoria
County, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of
1965, as amended.  Your submission was received on
February 2, 1976.

In examining the proposed consolidation,
under Section 5 of the Voting Rights Act, it is
incumbent on the Attorney General to determine whether
the proposed change, either in purpose or effect, may
result in racial or language minority group discrimi-
nation in voting.  In making this evaluation we apply
the legal principles which the courts have developed
in the same or analogous situations.  Moreover, it is
also significant that Section 5 only prohibits
implementation of changes affecting voting and provides
that such changes may not be enforced without receiving
prior approval by the Attorney General or by the District
Court for the District of Columbia.  Our proper concern

Defendant's Exhibit #                                    DE-006075

USA_00013142

- 2 -

then is not with the validity of the proposed con-
solidation but with the changes in voting which
proceed from it.

After a careful examination of the submitted
change, including consideration of demographic and
geographic data, and comments from interested parties,
we cannot conclude, as we must under the Voting Rights
Act, that the proposed consolidation will not have a
discriminatory effect on either the Mexican-American
or black communities in the Victoria Independent
School District. According to the data we examined
the Mission Valley Independent School District is
predominantly white (Anglo) in population with a
7% Mexican-American population and a 4% black population.
The Victoria Independent School District, by contrast,
contains a 36% Mexican-American population and a 9%
black population. Our information regarding elections
in the Victoria Independent School District demonstrates
that the school district elects its board of trustees
at-large to seven numbered posts, and that there is a
likelihood of racial ethnic bloc voting. Moreover,
the information we examined indicates that the major
portion of the black and Mexican-American population
is located within the City of Victoria in cognizable
residential areas.

Under the procedural guidelines for the
administration of Section 5 the burden of proving
that changes affecting voting have not had or will
not have the purpose or effect of discriminating
against racial or language minority groups lies with
the submitting authority. 28 C.F.R. 51.19; Georgia v.
United States, 411 U.S. 526 (1973). Under the
circumstances described above, commensurate with our
guidelines we cannot conclude that the proposed

Defendant's Exhibit #                                    DE-006076

USA_00013143

- 3 -

consolidation, in the context of an at-large, numbered post election system, will not have a dilutive effect on the voting strength of blacks and Mexican-Americans in the Victoria Independent School District. Therefore, on behalf of the Attorney General, I must interpose an objection to the consolidation of the Victoria and Mission Independent School Districts.

While we are not aware of any court decision dealing specifically with a consolidation of this type, cases dealing with annexations are particularly pertinent since the change in voting effected is both cases is the same, i.e., an alteration of a particular electorate. Supreme Court decisions which have considered the racially dilutive effect of annexations under Section 5 of the Voting Rights Act have held that such annexations can be approved only on the condition that modifications calculated to neutralize to the extent possible any adverse effect upon the minority voters are adopted, such as a shift from an at-large election system to a single member district election system. City of Richmond v. United States, 422 U.S. 358 (1975); City of Petersburg v. United States, 410 U.S. 962 (1973). In this connection, should the Victoria School District undertake to elect its board of trustees from single member districts the Attorney General will reconsider his determination in this matter. We note that it is our understanding that the establishment of single member districts in the Victoria Independent School District has been a topic of discussion in the past.

Defendant's Exhibit #                                    DE-006077

- 4 -

As set out in the Section 5 guidelines, 28 C.F.R. 51.23 and 51.24, we will examine any information not previously available to you in support of a request to reconsider the objection interposed above, including such information as the results of any studies or other documentation regarding the feasibility of creating single member districts in the Victoria Independent School District.

Of course, as provided by Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed consolidation has neither the purpose nor effect of denying or abridging the right to vote on account of race or color.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                          DE-006078

USA_00013145

APR 19 1976

Mr. Howard Guy
Business Manager
Liberty Independent
  School District
P.O. Box 312
Liberty, Texas  77575

Dear Mr. Guy:

      This is in reference to the imposition of a
numbered post system with a majority requirement, the
change and addition of polling places, and bilingual
procedures for the April 3, 1976 election for Liberty
Independent School District, Liberty County, Texas,
submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended.  Your
submission was received on February 19, 1976.  Although
we noted your request for expedited consideration,
we were unable to comply.

      The Attorney General does not interpose any
objections to the change and addition of polling
places, and bilingual procedures for the April 3,
1976 election.  However, we feel a responsibility
to point out that Section 5 of the Voting Rights
Act expressly provides that the failure of the
Attorney General to object does not bar any sub-
sequent judicial action to enjoin the enforcement
of such changes.

      It was noted during our evaluation of this
matter that there are few, if any, persons in Liberty
Independent School District whose participation in
the electoral process would be made more effective
by the provision of bilingual materials.  Please be
advised that under Section 55.13(d) of our Interim

USA_00013146

- 2 -

Guidelines Regarding Language Minority Groups, a copy of which is enclosed, Liberty Independent School District may comply with the minority language requirements of the Act by providing less than a complete distribution of bilingual materials as long as such materials are provided to language minority group members who would benefit from receiving them.

In regard to the addition of the majority vote and numbered post voting requirements to the at large election of School Board members, after carefully examining this change with supporting information and comments from interested parties, as well as analysis of recent court decisions, we are unable to conclude, as we must under the Voting Rights Act, that this change will not have a racially discriminatory effect. Our analysis reveals that Blacks constitute a substantial proportion of the population of the Liberty Independent School District and that bloc voting along racial lines may exist. Under such circumstances, recent Supreme Court decisions, to which we feel obligated to give great weight, indicate that the combination of the above features would have the effect of abridging minority voting rights. The reasoning of these recent cases is illustrated by the Supreme Court's decision in June of 1973 which held that the multi-member election system, numerical post and majority vote requirement of Dallas and Bexar Counties, Texas, tended to abridge minority voting power and therefore violated the Fourteenth Amendment. White v. Regester, 412 U.S. 755 (1973). See also, Whitcomb v. Chavis, 403 U.S. 124 (1971).

For the foregoing reasons, I must on behalf of the Attorney General interpose an objection to the numbered post and majority vote features in the context of at large elections. Of course, Section 5 permits seeking approval of all changes affecting voting by the United States District Court for the District

USA_00013147

of Columbia irrespective of whether the changes have
previously been submitted to the Attorney General.
However, until such a judgment is rendered by that
court, the legal effect of the objection by the
Attorney General is to render the changes in question
legally unenforceable.

Please advise us within 10 days of the steps
that you intend to take to comply with this decision.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                          DE-006081

MAY 5  1976

Mr. Jack Schulze
Superintendent, Pettus
  Independent School District
Post Office Box 16
Pettus, Texas  78146

Dear Mr. Schulze:

This is in reference to the imposition of a numbered post provision and the bilingual election procedures for the Pettus Independent School District, Bee County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended.  Your submission was received on March 6, 1976.

The Attorney General does not interpose any objection to the bilingual election procedures for the Pettus Independent School District.  However, we feel a responsibility to point out that Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent judicial action to enjoin the enforcement of such change.

In regard to the addition of the numbered post voting requirement to the at-large election of school board members, after carefully examining this change with supporting information and comments from interested parties, as well as analysis of recent court decisions, we are unable to conclude, as we must under the Voting

USA_00013149

- 2 -

Rights Act, that the imposition of the numbered post
requirement in the context of the at-large election
system for the school board will not have a racially
discriminatory effect. Our analysis reveals that
Mexican-Americans constitute a substantial proportion
of the population of the Pettus Independent School
District and that there are significant indications
that bloc voting along ethnic lines exist. Under
such circumstances, recent Supreme Court decisions,
to which we feel obligated to give great weight,
indicate that the combination of the above features
would have the effect of abridging minority voting
rights. In our analysis we have given careful scru-
tiny to the factors enunciated in <u>White</u> v. <u>Regester</u>,
412 U.S. 755 (1973) and its progeny. See, also,
<u>Zimmer</u> v. <u>McKeithen</u>, 485 F.2d 1297 (5th Cir. 1973)
and <u>Graves</u> v. <u>Barnes</u>, 378 F. Supp. 640 (W.D. Tex.
1974).

For the foregoing reasons, I must on behalf
of the Attorney General interpose an objection to
the imposition of the numbered post feature for
electing school board members in the Pettus Inde-
pendent School District. Of course, Section 5
permits seeking approval of all changes affecting
voting by the United States District Court for the
District of Columbia irrespective of whether the
changes have previously been submitted to the Attorney
General. However, until such a judgment is rendered
by that court, the legal effect of the objection by
the Attorney General is to render the change in
question legally unenforceable.

Please advise us within 20 days of the steps
that you intend to take to comply with this decision.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                    DE-006083

USA_00013150

Washington, D.C.  20530

1 1 MAY 1976

Mr. Alan C. Fielder
City Attorney
119 South Main
Lockhart, Texas  78644

Dear Mr. Fielder:

This is in reference to the bilingual procedures,
deletion of the property requirement for voting, change
in election date, and majority vote requirement for
election to the city council in the City of Lockhart,
Caldwell County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended.  Your submission was received on
March 12, 1976.

The Attorney General does not interpose any
objection to the bilingual procedures, deletion of
property requirement, and the change in election date.
However, we feel a responsibility to point out that
Section 5 of the Voting Rights Act expressly provides
that the failure of the Attorney General to object does
not bar any subsequent judicial action to enjoin the
enforcement of such changes.

We have considered carefully the submitted change
to majority vote requirement and the supporting information,
along with Census Bureau data and information and comments
from other interested parties.  Our analysis reveals that
the at-large election scheme for the City of Lockhart
includes the use of staggered terms and designated posts
and there are indications that racial bloc voting may
exist.

Defendant's Exhibit #                                     DE-006084

USA_00013151

Recent court decisions suggest that an at-large voting system which incorporates features such as numbered posts, staggered terms and the majority vote requirement may operate to minimize or dilute the voting strength of minority groups and thus have an invidious discriminatory effect. See White v. Regester, 412 U.S. 755 (1973); Whitcomb v. Chavis, 403 U.S. 124 (1971). In view of these court decisions, and on the basis of all the available facts and circumstances, the Attorney General is unable to conclude, as he must under the Voting Rights Act, that the implementation of a majority vote requirement will not have a discriminatory racial effect on voting rights in the City of Lockhart. On behalf of the Attorney General, I must interpose an objection to the submitted majority vote requirement.

Of course, Section 5 permits you to seek a declaratory judgment from the District Court for the District of Columbia that the majority vote requirement neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race. Until such a judgment is rendered by that court, however, the legal effect of the objection of the Attorney General is to render unenforceable this change in the method of electing members of the City Council of Lockhart.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

USA_00013152

May 17, 1976

Honorable Morris Hassell
Mayor, City of Rusk
Rusk, Texas  75785

Dear Mayor Hassell:

This is in reference to the adoption of the
place system for Aldermanic elections of the City
of Rusk, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of
1965, as amended.  Your submission was received on
March 19, 1976.

After a careful examination of all of the
available facts and circumstances and an analysis of the
relevant decisions of the federal courts, we are unable
to conclude, as we must under the Voting Rights Act,
that the place system will not have a racially discrim-
inatory effect.  In our analysis we have considered the
factors enunciated in White v. Regester, 412 U.S. 755
(1973), and other cases to which it has given rise,
including the history of governmental discrimination
in the area, the presence of racial bloc voting, the
degree of responsiveness of the elected representatives
to the needs of the minority community, and the existence
of an at-large electoral scheme.  See also Graves v.
Barnes, 378 F. Supp. 640 (W.D. Tex. 1974).

Under the totality of the circumstances I must
on behalf of the Attorney General interpose an objection
to the place system for Aldermanic elections of the
City of Rusk.

cc:  Public File
     X5255

USA_00013153

- 2 -

Of course, the Voting Rights Act permits a juris-
diction to seek the approval of changes subject to
Section 5 by the United States District Court for the
District of Columbia irrespective of whether the changes
have been submitted to the Attorney General.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                              DE-006087

USA_00013154

Honorable Dorris Hassell
Mayor, City of Rusk
Rusk, Texas  75785

Dear Mayor Hassell:

      This is in reference to the adoption of the
place system for Aldermanic elections of the City
of Rusk, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of
1965, as amended.  Your submission was received on
March 19, 1976.

      After a careful examination of all of the
available facts and circumstances and an analysis of the
relevant decisions of the federal courts, we are unable
to conclude, as we must under the Voting Rights Act,
that the place system will not have a racially discrim-
inatory effect.  In our analysis we have considered the
factors enunciated in White v. Regester, 412 U.S. 755
(1973), and other cases to which it has given rise,
including the history of governmental discrimination
in the area, the presence of racial bloc voting, the
degree of responsiveness of the elected representatives
to the needs of the minority community, and the existence
of an at-large electoral scheme.  See also Graves v.
Barnes, 378 F. Supp. 640 (W.D. Tex. 1974).

      Under the totality of the circumstances I must
on behalf of the Attorney General interpose an objection
to the place system for Aldermanic elections of the
City of Rusk.

DE-006088

Accordingly, the Voting Rights Act permits a juris-
diction to seek the approval of changes subject to
Section 5 by the United States District Court for the
District of Columbia irrespective of whether the changes
have been submitted to the Attorney General.

                    Sincerely,


                    J. Stanley Pottinger
                    Assistant Attorney General
                    Civil Rights Division.

Defendant's Exhibit #                          DE-006089

                                        USA_00013156

DJ 166-012-3
X1770

MAY 21 1976

Mr. R. L. Burton
Superintendent
Trinity Independent School District
Trinity, Texas  75962

Dear Mr. Burton:

This is in reference to the change to a
numbered post provision for the election of the
Board of Trustees of Trinity Independent School
District, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of
1965, as amended.  Your submission was completed
on March 22, 1976.

We have given careful consideration to the
information furnished by you.  On the basis of
our analysis, we are unable to conclude, as we must
under the Voting Rights Act, that the use of numbered
posts will not have a racially discriminatory effect
in the conduct of elections in Trinity Independent
School District.

Our analysis reveals that blacks constitute
a substantial proportion of the population of Trinity
Independent School District and that bloc voting along
racial lines may exist.  Under these circumstances,
recent court decisions, to which we feel obligated to
give great weight, suggest that the combination of such
features as designated posts and at-large elections
have the potential for abridging minority voting rights.
See White v. Regester, 412 U.S. 755 (1973); Whitcomb v.
Chavis, 403 U.S. 124 (1971).

USA_00013157

- 2 -

     Accordingly, on behalf of the Attorney
General I must interpose an objection to the
implementation of the numbered post provision
of electing the board of Trustees for Trinity
Independent School District.  Of course, as pro-
vided by Section 5 of the Voting Rights Act, you
have the right to seek a declaratory judgment from
the District Court for the District of Columbia
that this change has neither the purpose nor will
have the effect of denying or abridging the right
to vote on account of race.  Until such judgment
is rendered by that Court, however, the legal
effect of the objection by the Attorney General
is to make the change in question legally unenforceable.

                Sincerely,

                J. Stanley Pottinger
             Assistant Attorney General
              Civil Rights Division

USA_00013158

DJ 166-012-3
X5431

MAY 24 1976

Mr. Richard A. Green
Witherspoon, Aikin, Langley
   Woods & Gulley
Attorneys for the Hereford
Independent School District
140 East Third Street
Hereford, Texas   79045

Dear Mr. Green:

This is in reference to the adoption of
bilingual election procedures, the change in
polling place, the designation of election by place,
and the adoption of a majority vote requirement by
the Hereford Independent School District, submitted
to the Attorney General pursuant to Section 5 of
the Voting Rights Act of 1965, as amended.  Your
submission was received on March 24, 1976.

The Attorney General does not interpose an
objection to the bilingual election procedures
adopted by the District.  However, we feel a
responsibility to point out that Section 5 of the
Voting Rights Act expressly provides that the failure
of the Attorney General to object does not bar any
subsequent judicial action to enjoin the enforcement
of such change..

The Attorney General will make no determination
with regard to the change in polling place since this
change was made prior to November 1, 1972 and is
therefore not subject to the preclearance requirements
of Section 5.

USA_00013159

With respect to the designation of election by
place and the majority vote requirement, we have given
careful consideration to the materials and information
you have submitted as well as information and comments
from other interested parties. We have noted particu-
larly the growing minority population of the district,
the electoral history of the district, the increase in
minority political activity, the lack of any minority
representation on the Board of Trustees of the district,
and the fact that those features would be added to an
at-large election system.

The place system in effect creates separate
offices and permits each voter to vote for only one
candidate in each place. In the context of an at-large
electoral system, and other circumstances as they
affect the electoral process in the Hereford Indepen-
dent School District, the opportunity for minority
voters to elect a representative of their choice to
the School Board is significantly lessened by the
addition of the numbered place requirement. As one
court decision indicates:

> In a true at large election, if the
> majority spreads its votes around
> and the minority single shot votes,
> the minority strength is concentra-
> ted, thus increasing their chance of
> electing. However, if the minority
> candidate is forced to run against a
> specific candidate for a specific
> seat, the majority can readily identi-
> fy for whom they must vote in order to
> defeat the minority candidate.

Defendant's Exhibit #

DE-006093

- 5 -

Lunsten v. Scott, 336 F. Supp. 206, 213, n. 9 (E.D. N.C. 1971). The majority vote requirement exacerbates this problem, by preventing a minority candidate who receives a plurality against two or more majority candidates from being elected without facing a run-off election against a single majority candidate.

For these reasons, the Attorney General has interposed objections under Section 5 of the Voting Rights Act to numbered place systems and majority requirements in a number of other similar jurisdictions, and we are unable to conclude, as we must under the Voting Rights Act, that the numbered place and majority vote requirements in the Hereford Independent School District will not have the effect of discriminating on account of race, color, or membership in a language minority group. Therefore, on behalf of the Attorney General, I must interpose an objection under Section 5. However, as the law provides, a declaratory judgment that this change does not have the proscribed purpose or effect may be sought in the United States District Court for the District of Columbia notwithstanding this objection.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                DE-006094

JUN 1 1976

Mr. L. Holt Magee
Attorney at Law
P. O. Box 1626
Monahans, Texas   79756

Dear Mr. Magee:

     This is in reply to your letter of March 17,
1976, in which you requested reconsideration by the
Attorney General of his March 11, 1976, objection to
Ordinance No. 667 (1974) of the City of Monahans
instituting numbered posts for city council elections.
Your request for reconsideration was received by this
Department on March 22, 1976.  We are also in receipt
of election results of 1968 county commissioner elec-
tions and six affidavits which were presented to
Mr. Kieckhefer at your conference with him at the
Office of the United States Attorney in San Antonio
on March 30, 1976.

     We have carefully examined the material which
you have presented and concluded that the premise
upon which we based our original objection, _i.e.,_
ethnic bloc voting, does not appear to be as prevalent
as we originally determined.  While the evidence is
not demonstrably clear one way or the other, there
appear to be instances where bloc voting did not
occur.  Accordingly and pursuant to the reconsideration
guidelines promulgated for the administration of
Section 5, 28 C.F.R. 51.23 through 51.25, the objection
interposed to Ordinance No. 667 (1974) in my letter of
March 11, 1976, is hereby withdrawn.  However, we feel
a responsibility to point out that Section 5 of the



Defendant's Exhibit #                                    DE-006095

USA_00013162

Voting Act has expressly provides that the failure
of the Attorney General to object does not bar any
subsequent judicial action to enjoin the enforcement
of such change.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                    DE-006096

USA_00013163

JUN 1 1976

Mr. L. Holt Magee
Attorney at Law
P. O. Box 1826
Monahans, Texas  79756

Dear Mr. Magee:

This is in reply to your letter of March 17, 1976, in which you requested reconsideration by the Attorney General of his March 11, 1976, objection to Ordinance No. 667 (1974) of the City of Monahans instituting numbered posts for city council elections. Your request for reconsideration was received by this Department on March 22, 1976. We are also in receipt of election results of 1966 county commissioner elections and six affidavits which were presented to Mr. Kienshofer at your conference with him at the Office of the United States Attorney in San Antonio on March 30, 1976.

We have carefully examined the material which you have presented and concluded that the premise upon which we based our original objection, i.e., ethnic bloc voting, does not appear to be as prevalent as we originally determined. While the evidence is not demonstrably clear one way or the other, there appear to be instances where bloc voting did not occur. Accordingly and pursuant to the reconsideration guidelines promulgated for the administration of Section 5, 28 C.F.R. 51.2O through 51.25, the objection interposed to Ordinance No. 667 (1974) in my letter of March 11, 1976, is hereby withdrawn. However, we feel a responsibility to point out that Section 5 of the

cc: Public File
    X1277

Defendant's Exhibit #                                    DE-006097

USA_00013164

- 2 -

Voting Rights Act expressly provides that the failure
of the Attorney General to object does not bar any
subsequent judicial action to enjoin the enforcement
of such change.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

USA_00013165



Office of the Attorney General
Washington, D. C. 20530

D.J. 166-012-3
X0567-0588

July 15, 1976

Seagal V. Wheatley, Esq.
Oppenheimer, Rosenberg,
   Kelleher & Wheatley
Attorneys at Law
Suite 620
711 Navarro
San Antonio, Texas   78205

Dear Mr. Wheatley:

          This is in reference to the request of the City
of San Antonio for reconsideration of the objections
interposed on April 2, 1976, to 13 annexations, pursuant
to Section 5 of the Voting Rights Act of 1965, as amended.

          I have given careful and personal review to
the materials provided by the city attorney and you
in your letters and in our meeting with Mayor Cockrell,
Congressman Krueger and others on June 22, 1976.

          The Voting Rights Act, as interpreted by the
Supreme Court, places on a covered jurisdiction such as
San Antonio the special burden of proving that changes
which affect voting do not have a discriminatory purpose
or effect.  I have found no basis for concluding that the
annexations in question were purposefully dilutive of
protected minority voting rights.  However, I am not
able to conclude that the annexations in question do
not have the proscribed effect on the voting rights
of Mexican-Americans in San Antonio.  In this connection
I have had to keep in mind the opinion of the Supreme
Court in White v. Regester, 412 U.S.755 (1973), which
left standing the 1972 three-judge District Court ruling
invalidating multimember districts in Bexar County and
which refers to the District Court's assessment of the
various factors involved.  Were this a standard
constitutional challenge to the annexations, one might
well reach a contrary conclusion.  Because the burden of
proof imposed by Congress in the Voting Rights Act

Defendant's Exhibit #                                    DE-006099

- 2 -

rests with the covered jurisdiction to show that
there is no effect, and requires me to object in
the absence of such a showing, I am obliged to
continue the objections previously interposed.

In establishing a method for prompt review
of voting changes by the Attorney General, the
Voting Rights Act recognized that there would be
disagreements with the Attorney General's view of the
law and provided that a jurisdiction may test
its correctness in legal proceedings.  I was most
impressed by Mayor Cockrell's presentation of the
significance of these annexations to the City of
San Antonio and would, of course, understand if the
city desired to contest this determination.  Should you
decide not to seek such review, however, I am sure
that Assistant Attorney General Pottinger and his
staff will assist the city in seeking the most
sensible way to formulate a transitional remedy which
meets the congressional purposes.

I earnestly hope that the matter can be
resolved to the mutual satisfaction of all concerned.

Sincerely,

Edward H. Levi
Attorney General

JUL 29 1976

Mr. Russell R. Murphy
Assistant Superintendent
Marshall Independent School
    District
Marshall, Texas   75670

Dear Mr. Murphy:

    This is in reference to the change to a
majority vote requirement for election to the
Board of Trustees for Marshall Independent School
District, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of
1965, as amended.   Your submission was completed
on May 31, 1976.

    We have given careful consideration to the
information furnished by you as well as Bureau of
the Census data and information and comments from
interested parties.   On the basis of our analysis
we are unable to conclude, as we must under the
Voting Rights Act, that the imposition of a majority
vote requirement will not have a racially discriminatory
effect in the conduct of elections in Marshall Inde-
pendent School District.

    Our analysis reveals that blacks constitute
a substantial proportion of the population of
Marshall Independent School District and that bloc
voting along racial lines may exist.   Under these
circumstances, recent court decisions, to which we

Defendant's Exhibit #                                        DE-006101

USA_00013168

- 2 -

feel obligated to give great weight, indicate that a
majority vote requirement in the context of at-large
elections has the potential for abridging minority
voting rights. See White v. Regester, 412 U.S. 755
(1973); Whitcomb v. Chavis, 403 U.S. 124 (1971).

Accordingly, on behalf of the Attorney General,
I must interpose an objection to the implementation of
majority vote requirement for election to the Board
of Trustees for Marshall Independent School District.
Of course as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the District Court for the District of
Columbia that this change has neither the purpose nor
will have the effect of denying or abridging the right
to vote on account of race or color.  Until such judgment
is rendered by that Court, however, the legal effect of
the objection by the Attorney General is to make the
change in question legally unenforceable.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-006102

USA_00013169

JSP:YL:rjs
DJ 166-012-3
X5014-5015

AUG 2 1976

Mr. James Mason
Superintendent
Hawkins Independent School
   District
Post Office Drawer L
Hawkins, Texas  75765

Dear Mr. Mason:

        This is in reference to the change to a numbered
post provision and majority vote requirement for the
election of the Board of Trustees of Hawkins Independent
School District, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965,
as amended.  Your submission was completed on June 3, 1976.

        We have given careful consideration to the informa-
tion furnished by you.  On the basis of our analysis
and comments from interested parties, as well as analysis
of recent court decisions, we are unable to conclude,
as we must under the Voting Rights Act, that the numbered
post provision and the majority vote requirement will not
have a racially discriminatory effect.  Our analysis
reveals that blacks constitute a substantial proportion
of the population of the Hawkins Independent School District
and that bloc voting along racial lines may exist.  Under
these circumstances, recent Supreme Court decisions, to
which we feel obligated to give great weight, indicate
that the combination of the above features may have
the effect of abridging minority voting rights.  See
White v. Regester, 412 U.S. 755 (1973); Whitcomb v. Chavis,
403 U.S. 124 (1971).

USA_00013170

- 2 -

Accordingly, on behalf of the Attorney General
I must interpose an objection to the implementation of
numbered post and majority vote requirement of electing
the Board of Trustees for Hawkins Independent School
District.  Of course, as provided by Section 5 of the
Voting Rights Act, you have the right to seek a declaratory
judgment from the District Court for the District of
Columbia that these changes neither have the purpose nor
will have the effect of denying or abridging the right
to vote on account of race.  Until such judgment is
rendered by that Court, however, the effect of the
objection by the Attorney General is to make the changes
in question legally unenforceable.

                    Sincerely,


                    J. Stanley Pottinger
                    Assistant Attorney General
                    Civil Rights Division

Defendant's Exhibit #                                    DE-006104

Mr. James L. Mailey
Superintendent
Midland Independent School
   District
702 North N. Street
Midland, Texas   79701

AUG 6 1976

Dear Mr. Mailey:

        This is in reference to the change to numbered post
and majority vote requirements for the election of the Board
of Trustees of the Midland Independent School District,
Midland, Texas, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended.
Your submission was completed on June 7, 1976.

        We have given careful consideration to the information
furnished by you and to comments from interested parties.
On the basis of our analysis of this information and of
relevant judicial decisions, we are unable to conclude, as
we must under the Voting Rights Act, that these requirements
will not have a discriminatory effect on the basis of
race, color, or membership in a language minority group.
In this regard, we have noted the stated purpose of the
numbered post requirement to prevent single shot voting
and that racial bloc voting appears to exist in the district
(see Dunston v. Scott, 336 F. Supp 206, 213 n. 9 (E.D.N.C.
1972)).

        Accordingly, on behalf of the Attorney General, I
must interpose an objection to the implementation of the
numbered posts and majority vote requirements for the
election of the Board of Trustees of Midland Independent
School District.  I note that although the evidence with
regard to racial bloc voting is, to some extent, conflicting,
the procedural guidelines for the administration of Section 5
provide, "If the evidence as to the purpose or effect of
the change is conflicting, and the Attorney General is
unable to resolve the conflict within the 60 day period,
he shall, consistent with the above-described burden of
proof applicable in the District Court, enter an objection
and so notify the submitting authority."  28 C.F.R. 51.19.

DE-006105

- 2 -

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory judg-
ment from the District Court for the District of Columbia
that these changes neither have the purpose nor will have
the effect of denying or abridging the right to vote on
account of race, color, or membership in a language minority
group.  Until such judgment is rendered by the Court, however,
the effect of the objection by the Attorney General is to
make the changes in question legally unenforceable.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                          DE-006106

USA_00013173

JSP:RAC:aaf
DJ 166-012-3
X7305

12 NOV 1976

Mr. Josiah Wheat
City Attorney
Box 517
Woodville, Texas  75979

Dear Mr. Wheat:

     This is in reference to the change to a
numbered place system for alderman elections in the
City of Woodville, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended.  Your submission was com-
pleted on September 13, 1976.

     We have given careful consideration to the
materials and information you have submitted as well
as information and comments from other interested
parties.  We have noted particularly, the electoral
history in the City of Woodville, the increase in
minority political activity, the lack of any black
representation on the City Council and the fact
that the numbered place system would be added to
an at-large election system.

     The place system in effect creates separate
offices and permits each voter to vote for only one
candidate in each place.  In the context of an at-
large electoral system, and other factors as they
affect the electoral process in the City of Woodville,
the opportunity for black voters to elect a repre-
sentative of their choice to the City Council is
significantly lessened by the addition of the numbered
place requirement.  See Dunston v. Scott, 336 F. Supp.
206, 213 n.9 (E.D.N.C. 1972).

Defendant's Exhibit #          DE-006107

USA_00013174

- 2 -

For these reasons, the Attorney General has interposed objections under Section 5 of the Voting Rights Act to numbered place systems in a number of other similar jurisdictions. We are unable to conclude, as we must under the Voting Rights Act, that the addition of the numbered place feature to the election method of the City Council in the City of Woodville will not have the effect of discriminating on account of race or color. Therefore, on behalf of the Attorney General, I must interpose an objection under Section 5.

Of course, as provided by Section 5 of the Voting Rights Act, you have the alternative of instituting an action in the United States District Court for the District of Columbia seeking a declaratory judgment that the change to a numbered post system does not have the purpose and will not have the effect of denying or abridging the right to vote to members of a minority group based on race or color. However, until and unless such a judgment is obtained, the change to a numbered place system for alderman elections in the City of Woodville, Texas, is legally unenforceable.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

USA_00013175

JSP:JPT:JKT:wmd:vm
DJ 166-012-3
X9082, 9242-9245

Mr. Noel B. Coolidge, President
Interim Board of Trustees
Proposed Westheimer Independent
    School District
Suite 400, 777 South Post Oak Blvd.
Houston, Texas  77056

Dear Mr. Coolidge:

    This is in reference to the January 15, 1977,
special election implementing a new governmental body,
the Westheimer Independent School District of Harris
County, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965,
as amended.  Your submission was received on December 17,
1976.  In accordance with your request expedited con-
sideration has been given this submission pursuant to
the procedural guidelines for the administration of
Section 5 (28 C.F.R. Section 51.22).

    We have given careful consideration to the
materials and information you have submitted, as well
as information and comments from other interested parties.
We have given particular attention to the relative
potential for minority members in the affected area to
achieve adequate representation in school affairs under
the status quo and under the proposed change.  In the
course of our review, we have received comments from
interested persons alleging that one of the reasons for
the proposal to create the Westheimer District was to
separate the predominately white-anglo Westheimer area
from the HISD because of the emerging minority political
influence on the HISD board.  Such comments point out
that the Westheimer district was first proposed shortly
after the 1969 HISD elections where minority-backed
candidates first gained control of the board and shortly
after the HISD had been ordered to undertake substantial

USA_00013176

school desegregation.  The materials which accompany
your submission do not refute such allegations.  In
addition it appears that minority residents in the
proposed Westheimer District will have no realistic
opportunity to achieve the sort of representation in
the proposed Westheimer Independent School District
that they now enjoy in the Houston Independent School
District.  Finally, minority parents in the Houston
Independent School District whose children, in order
to enjoy the benefits of a desegregated education,
attend schools located in what would be the Westheimer
Independent School District would be disfranchised with
respect to all matters relating to the education of
their children.

For the above reasons, therefore, we are unable
to conclude, as we must under the Voting Rights Act,
that the submitting authority has met its burden of
showing that the proposed change does not have the purpose
and will not have the effect of discriminating on
account of race or membership in a language minority
group.  Consequently, I must on behalf of the Attorney
General interpose an objection to the January 15, 1977,
special election implementing a new governmental body,
the Westheimer Independent School District.

The effect of this objection is to make the election
legally unenforceable.  Of course, the Voting Rights
Act provides that a declaratory judgment that this
change does not have the proscribed purpose or effect
may be sought in the United States District Court for
the District of Columbia notwithstanding this objection.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

USA_00013177

DJ 166-012-3
X0567-X0568

Mr. James M. Parker
City Attorney
City of San Antonio
200 Main Plaza, Suite #103
San Antonio, Texas 78205

Dear Mr. Parker:

     This is in reference to your request for
reconsideration of the objection to the annexations
by the City of San Antonio, Texas, interposed by the
Attorney General on April 2, 1976, pursuant to Section 5
of the Voting Rights Act of 1965, as amended.  Your
request was received on January 17, 1977.  In accordance
with your request expedited consideration has been given
this submission pursuant to the procedural guidelines
for the administration of Section 5 (28 C.F.R. Section 51.22).

     In a referendum election on January 15, 1977, the
electors of the City of San Antonio gave final approval
to a plan for the election of members of the city council
from single-member districts.  Because the adoption of this
plan remedies the adverse effect on minority voting
strength caused by the annexations, I hereby, on behalf
of the Attorney General, withdraw the objection.

               Sincerely,

                 J. Stanley Pottinger
                 Assistant Attorney General
                 Civil Rights Division

USA_00013178



25 FEB 1977

Mr. Tanner T. Hunt, Jr.
Attorney for the South Park
    Independent School District
P. O. Box 3708
Beaumont, Texas  77704

Dear Mr. Hunt:

        This is in reference to the change to election
by position for the Board of Trustees of South Park
Independent School District, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended.  Your submission was received on
December 28, 1976.

        We have given careful consideration to the infor-
mation furnished by you as well as information and comments
from interested parties.  Our analysis reveals that blacks
constitute a substantial proportion of the population of
South Park Independent School District and that bloc
voting along racial lines may exist.  Under these circum-
stances, recent court decisions, to which we feel
obligated to give great weight, suggest that the
combination of such features as numbered positions
and at-large elections have the potential for abridging
minority voting rights.  See White v. Regester, 412 U.S.
755 (1973); Whitcomb v. Chavis, 403 U.S. 124 (1971).

        On the basis of our analysis, we are unable to
conclude, as we must under the Voting Rights Act, that
this change will not have a racially discriminatory
effect on the conduct of elections in South Park

Defendant's Exhibit #                                    DE-006112

USA_00013179

- 2 -

Independent School District. Accordingly, on behalf
of the Attorney General I must interpose an objection
to the implementation of the change to electing the
Board of Trustees of South Park Independent School
District by designated position.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the District Court for the District of
Columbia that this change has neither the purpose nor
will have the effect of denying or abridging the right
to vote on account of race. Until such judgment is
rendered by that Court, however, the legal effect is
to make the change in question unenforceable.

Sincerely,


DREW S. DAYS, III
Acting Assistant Attorney General
Civil Rights Division

USA_00013180

Mr. W. G. Morton
President, Board of Trustees
Somerset Independent School
   District Post Office Box 278
Somerset, Texas  78069

MAR 1 0 1977

Dear Mr. Morton:

    This is in reference to the imposition of a place
system and the bilingual election procedures for the
April 2, 1977 election for the Somerset Independent
School District, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965,
as amended.  Your submission was received on January 17,
1977.  Although we noted your request for expedited consid-
eration, we were unable to comply.

    The Attorney General does not interpose an objection
to the bilingual procedures for the April 2, 1977 election.
However, we feel a responsibility to point out that Section 5
of the Voting Rights Act expressly provides that the failure
of the Attorney General to object does not bar any subsequent
judicial action to enjoin the enforcement of such change.

    In regard to the addition of the place system to the
at-large election of school board members, we have made a
careful examination of the information you provided and
comments from interested parties, as well as recent court
decisions.  Our analysis reveals that Mexican-Americans
constitute a substantial proportion of the population of
the Somerset Independent School District and that there are
indications that bloc voting along ethnic lines exists.
Under such circumstances, recent Supreme Court decisions,
to which we feel obligated to give great weight, indicate
that the combination of the above features would have the
effect of abridging minority voting rights.  See White v.
Regester, 412 U.S. 755 (1973), and Beer v. United States,
425 U.S. 130 (1976); see also Zimmer v. McKeithen, 485
F. 2d 1297 (5th Cir. 1973), affirmed on other grounds
sub nom. East Carroll Parish School Board v. Marshall,
424 U.S. 636 (1976) and Graves v. Barnes, 378 F. Supp.
640 (W.D. Tex. 1974).

Defendant's Exhibit #                 DE-006114

USA_00013181

- 2 -

On the basis of our examination, we are unable to conclude, as we must under the Voting Rights Act, that the imposition of the place system in the context of the at-large election system for the school board will not have a discriminatory effect on the basis of race, color, or membership in a language minority group.

Accordingly, I must on behalf of the Attorney General interpose an objection of the imposition of the place system for electing school board members in the Somerset Independent School District.

Of course, Section 5 permits your seeking a declaratory judgment in the United States District Court for the District of Columbia that the change does not have the proscribed purpose or effect irrespective of whether the changes have previously been submitted to the Attorney General. However, until such a judgment is rendered by that court, the legal effect of the objection by the Attorney General is to render the change in question legally unenforceable.

Please advise us within 10 days of the steps that you intend to take to comply with this decision.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division

USA_00013182