DJ 166-012-3
X9764

MAR 24 1977

Mr. Robert B. Spoonemore
Superintendent
Ralls Independent School
 District
Box AD
Ralls, Texas   79357

Dear Mr. Spoonemore:

This is in reference to the change to a majority
vote requirement for election to the Board of Trustees
of the Ralls Independent School District, Crosby County,
Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended.
Your submission was received on February 4, 1977.

We have given careful consideration to the informa-
tion furnished by you as well as Bureau of the Census data
and information and comments from interested parties.  On
the basis of our analysis we are unable to conclude, as we
must under the Voting Rights Act, that the imposition of
a majority vote requirement will not have a discriminatory
effect on the conduct of elections in the Ralls Independent
School District.

Our analysis reveals that Mexican Americans constitute
a substantial proportion of the population of the Ralls
Independent School District and that bloc voting along ethnic
lines may exist.  Under these circumstances, recent court
decisions, to which we feel obligated to give great weight,
indicate that a majority vote requirement in the context
of at-large elections has the potential for abridging minority
voting rights.  See White v. Regester, 412 U.S. 755 (1973);
Whitcomb v. Chavis, 403 U.S. 124 (1971).

Accordingly, on behalf of the Attorney General, I
must interpose an objection to the implementation of the
majority vote requirement for election to the Board of
Trustees of the Ralls Independent School District. · Of

Defendant's Exhibit # .                                    DE-006116

USA_00013183

- 2 -

course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, Sections 51.23 to 51.25 of the Attorney General's Section 5 guidelines (28 C.F.R. 51.23-51.25) permit reconsideration of the objection should you have new information bearing on the matter. However, until such time as the objection may be withdrawn or a judgment from the District of Columbia Court is obtained, the legal effect of the objection by the Attorney General is to make the change to a majority vote requirement legally unenforceable.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

Mr. Douglas Prewitt
Assistant Superintendent
Lufkin Public Schools
Post Office Drawer 1407
Lufkin, Texas 75901

Dear Mr. Prewitt:

This is in reference to the imposition of the numbered place feature and majority vote requirement for the election of school board members in the Lufkin Independent School District, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended. Your submission was completed on January 26, 1977. Although we noted your requests for expedited consideration, we have been unable to respond until this time.

We have given careful consideration to the information furnished by you, as well as demographic data, the decision in David v. Garrison, C.A. No. TY-73-CA-113 (E.D. Texas Jan. 27, 1975), and information furnished by other interested parties. Our analysis reveals that blacks constitute approximately 28 percent of the population of the school district, that with one exception blacks have not been elected to the school board, and that bloc voting along racial lines may exist.

Under these circumstances, recent Supreme Court decisions, to which we feel obligated to give great weight, indicate that the combination of the numbered place and majority requirements with an at-large election system may have the effect of abridging minority voting rights. See White v. Regester, 412 U.S. 755 (1973); Beer v. United States, 425 U.S. 130 (1976); United Jewish Organizations v. Carey, 45 U.S.L.W. 4221 (U.S. March 1, 1977). We are unable to conclude, as we must under the Voting Rights Act, that these requirements will not have a racially discriminatory effect.

— 2 —

Accordingly, I must on behalf of the Attorney General interpose an objection to the imposition of the numbered place system and the majority vote requirement for electing school board members in the Lufkin Independent School District.

Of course, Section 5 permits seeking approval of all changes affecting voting by the United States District Court for the District of Columbia irrespective of whether the changes have previously been submitted to the Attorney General. However, until such a judgment is rendered by that court, the legal effect of the objection by the Attorney General is to render the change to numbered place and majority vote legally unenforceable.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

USA_00013186

MAR 25 1977

Mr. Jerry Jacobs
Superintendent, Raymondville
   Independent School District
P.O. Box 429
Raymondville, Texas 78580

Dear Mr. Jacobs:

This is in reference to the polling place changes
for the Raymondville Independent School District, submitted
to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended. Your submission
was received on February 15, 1977.

Your submission consists of the following changes
in the location of polling places. The polling place for
Precinct 1 (Willacy County Precincts 1 and 7) has been
moved from the Raymondville City Hall to the American
Legion Hall. The polling place for Precinct 2 (Willacy
County Precincts 2, 8, and 11) has been moved from one
location to another within the Raymondville Community
and Historical Center.

The Attorney General does not interpose any
objection to the polling place change at the Community
and Historical Center. However, we feel a responsibility
to point out that Section 5 of the Voting Rights Act
expressly provides that the failure of the Attorney
General to object does not bar any subsequent judicial
action to enjoin the enforcement of a change.

It is our understanding that since we received
this submission the school district, as required by order
of the 107th District Court, Willacy County (March 14,
1977), has designated the Smith Elementary School as the

USA_00013187

- 2 -

polling place for those Precinct 1 voters residing in
County Precinct 1, and that this polling place will be
used in the election scheduled for April 2, 1977, unless
the district court ruling is reversed on appeal prior to
the date of the election. We also understand that the
creation of the Smith school polling place will be submitted
to the Attorney General pursuant to Section 5.

The situation with respect to polling places for
the April 2, 1977 election, therefore, is still uncertain.
Nevertheless, because of your request for the expedited
consideration of this submission and because of the need
of a resolution of this matter prior to the election, we
are responding at this time.

We will first consider the situation if only the
American Legion Hall is used as a Precinct 1 polling place.
We have received unrebutted representations indicating
that the change in the location of the Precinct 1 polling
place from the City Hall to the American Legion Hall may
have the purpose or effect of denying or abridging the
right to vote on account of race, color, or membership
in a language minority group. Specifically, it appears
that this change will result in a significant inconvenience
for many Mexican American voters residing in County
Precinct 1. In addition, the American Legion Hall appears
to be a place where many Mexican Americans feel unwelcome.
Thus it is likely that the use of the American Legion Hall
will have the effect of deterring participation by Mexican
Americans in the April 2, 1977 election. We also note that
other alternatives were available to the school district
to overcome the problems connected with the continued use
of the City Hall as a polling place location.

On the basis of these facts and circumstances, the
Attorney General is unable to conclude, as he must under
the Voting Rights Act, that the change to the use of the

USA_00013188

- 3 -

American Legion Hall as the polling place for Precinct 1 will not have the effect of discriminating on account of race, color, or membership in a language minority group. Therefore, on behalf of the Attorney General, I must interpose an objection to the implementation of this polling place change.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, Sections 51.23 to 51.25 of the Attorney General's Section 5 guidelines (28 C.F.R. 51.23-51.25) permit reconsideration of the objection should you have new information bearing on the matter. However, until such time as the objection may be withdrawn or a judgment from the District of Columbia Court is obtained, the legal effect of the objection by the Attorney General is to make the change to the American Legion Hall legally unenforceable.

It is our understanding, however, that the use of the Smith school as a polling place location would effectively eliminate whatever problems may be created by the change from the City Hall to the American Legion Hall. Therefore, the Attorney General does not interpose any objection to the use of the American Legion Hall for voters residing in County Precinct 1 if the Smith Elementary School is used. If the school district decides not to use the Smith school polling place for the April 2, 1977 election, please notify Voting Section Attorney David Hunter at 202--739-3849.

As was pointed out above, Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent

Defendant's Exhibit #                                          DE-006122

- 4 -

judicial action to enjoin the enforcement of a change.
We should further point out that the Attorney General
has no authority to waive the 60-day period for the
consideration of a submission and, as our guidelines
indicate (see 28 C.F.R. Section 51.22), we may reexamine
our position on your submission should we receive additional
information concerning the changes in voting procedure prior
to the expiration of the 60-day period.  Should such
information warrant a change in the Attorney General's
determination, you will be so advised.

                    Sincerely,


                    Drew S. Days III
                Assistant Attorney General
                   Civil Rights Division

Defendant's Exhibit #                                    DE-006123

DSD:DT:js
DJ 166-012-3
X1849-1851

Mr. Hugo J. Nowotny                          APR 4 1977
Business Manager
Comal Independent School District
1421 Highway 81 East
New Braunfels, Texas  78130

Dear Mr. Nowotny:

        This is in reference to the change to a numbered
place system for the election of members of the Board of
Trustees and the addition of two polling places in the
Comal Independent School District, Comal County, Texas,
submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended.  Your
submission was completed on February 2, 1977.

        The Attorney General does not interpose any objection
to the additional polling places.  However, we feel a respon-
sibility to point out that Section 5 of the Voting Rights Act
expressly provides that the failure of the Attorney General
to object does not bar any subsequent judicial action to
enjoin the enforcement of such changes.

        In regard to the change to numbered places, we have
given careful consideration to the materials and information
you have submitted as well as information and comments from
other interested parties, and relevant court decisions.

        The use of numbered places in at-large electoral
systems has been criticized in judicial decisions because
of its potential for diluting the voting strength of minority
group members.  The court in Gunston v. Scott, 336 F. Supp.
206, 213 n. 9 (N.D.N.C. 1972), explained:

Defendant's Exhibit #                                    DE-006124

-- 2 --

It is clear that the numbered seat law may have the effect of curtailing minority voting power. In a true at large election, if the majority spreads its vote around and the minority single shot votes, the minority strength is concentrated, thus increasing their chance of electing. However, if the minority candidate is forced to run against a specific candidate or candidates for a specific seat, the majority can readily identify for whom they must vote in order to defeat the minority candidate.

The potentially discriminatory nature of a numbered place system was also recognized in White v. Regester, 412 U.S. 755, 765-67 (1973); Zimmer v. McKeithen, 485 F.2d 1297, 1305 (5th Cir. 1973), aff'd "without approval of the constitutional views expressed by the Court of Appeals" sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636 (1976); and Blacks United for Lasting Leadership v. City of Shreveport, 71 F.R.D. 623, 628, 632, 636 (W.D. La. 1976).

The relevant circumstances in the Comal Independent School District do not foreclose the possibility that a numbered place system will have a discriminatory effect in that district. Although approximately 17 percent of the residents of the district are Mexican Americans, only about four percent of the district's registered voters are Mexican Americans, and no Mexican Americans have been elected to the Board of Trustees. These facts tend to show that Mexican Americans are less than full participants in the district's political process, and that the addition of a potentially discriminatory electoral device will further inhibit full and equal participation in that process by Mexican Americans.

In your letter of January 31, 1977, you state that "the change to running by place was done to simplify the ballot, and avoid confusion on the part of voters. Many voters could not understand that they could vote for one, two or three candidates when the ballot did not designate three (3) places." To the extent that this problem exists, it has not been demonstrated why such a problem could not be eliminated through education efforts and clear instructions on the ballot.

Defendant's Exhibit #            DE-006125

-- 3 --

As our guidelines explain (28 C.F.R. Section 51.19), under Section 5 of the Voting Rights Act the burden is on the submitting authority to establish that the submitted change does not have the purpose and will not have the effect of denying or abridging the vote on account of race, color, or membership in a language minority group. See Georgia v. United States, 411 U.S. 526 (1973). On the basis of the judicial decisions and factual circumstances that have been discussed, the Attorney General is unable to conclude that this burden has been met here. Therefore, on behalf of the Attorney General, I must interpose an objection under Section 5 to the use of the numbered place system in the election of members of the Board of Trustees of the Comal Independent School District.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the District Court for the District of Columbia that this change does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, our guidelines (28 C.F.R. Sections 51.23-51.25) permit reconsideration of the objection should you have new information bearing on the matter. However, until such time as the objection may be withdrawn or a judgment from the District of Columbia Court obtained, the legal effect of the objection by the Attorney General is to make the change of the numbered place system unenforceable.

Please inform us within 30 days of your receipt of this letter of the steps the Board of Trustees intends to take to revert to an at-large system of election without the numbered place provision or to obtain the reconsideration or judgment described in the previous paragraph. If you have any questions concerning this matter please contact Voting Section Attorney David Hunter at 202-739-3649.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-006126

USA_00013193

DSD:EF:rjs
DJ 166-012-3
X1849-1851

Mr. Hugo J. Nowotny                          APR 4 1977
Business Manager
Comal Independent School District
1421 Highway 81 East
New Braunfels, Texas  78130

Dear Mr. Nowotny:

This is in reference to the change to a numbered place system for the election of members of the Board of Trustees and the addition of two polling places in the Comal Independent School District, Comal County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended.  Your submission was completed on February 2, 1977.

The Attorney General does not interpose any objection to the additional polling places.  However, we feel a responsibility to point out that Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent judicial action to enjoin the enforcement of such changes.

In regard to the change to numbered places, we have given careful consideration to the materials and information you have submitted as well as information and comments from other interested parties, and relevant court decisions.

The use of numbered places in at-large electoral systems has been criticized in judicial decisions because of its potential for diluting the voting strength of minority group members.  The court in Dunston v. Scott, 336 F. Supp. 206, 213 n. 9 (E.D.N.C. 1972), explained:

Defendant's Exhibit #                    DE-006127

- 2 -

It is clear that the numbered seat law may have the effect of curtailing minority voting power. In a true at large election, if the majority spreads its vote around and the minority single shot votes, the minority strength is concentrated, thus increasing their chance of electing. However, if the minority candidate is forced to run against a specific candidate or candidates for a specific seat, the majority can readily identify for whom they must vote in order to defeat the minority candidate.

The potentially discriminatory nature of a numbered place system was also recognized in White v. Regester, 412 U.S. 755, 766-67 (1973); Zimmer v. McKeithen, 485 F.2d 1297, 1305 (5th Cir. 1973), aff'd "without approval of the constitutional views expressed by the Court of Appeals" sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636 (1976); and Blacks United for Lasting Leadership v. City of Shreveport, 71 F.R.D. 623, 628, 632, 636 (W.D. La. 1976).

The relevant circumstances in the Comal Independent School District do not foreclose the possibility that a numbered place system will have a discriminatory effect in that district. Although approximately 17 percent of the residents of the district are Mexican Americans, only about four percent of the district's registered voters are Mexican Americans, and no Mexican Americans have been elected to the board of trustees. These facts tend to show that Mexican Americans are less than full participants in the district's political process, and that the addition of a potentially discriminatory electoral device will further inhibit full and equal participation in that process by Mexican Americans.

In your letter of January 31, 1977, you state that "the change to running by place was done to simplify the ballot, and avoid confusion on the part of voters. Many voters could not understand that they could vote for one, two or three candidates when the ballot did not designate three (3) places." To the extent that this problem exists, it has not been demonstrated why such a problem could not be eliminated through education efforts and clear instructions on the ballot.



- 3 -

As our guidelines explain (28 C.F.R. Section 51.19), under Section 5 of the Voting Rights Act the burden is on the submitting authority to establish that the submitted change does not have the purpose and will not have the effect of denying or abridging the vote on account of race, color, or membership in a language minority group. See Georgia v. United States, 411 U.S. 526 (1973).  On the basis of the judicial decisions and factual circumstances that have been discussed, the Attorney General is unable to conclude that this burden has been met here.  Therefore, on behalf of the Attorney General, I must interpose an objection under Section 5 to the use of the numbered place system in the election of members of the Board of Trustees of the Comal Independent School District.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the District Court for the District of Columbia that this change does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, our guidelines (28 C.F.R. Sections 51.33-51.26) permit reconsideration of the objection should you have new information bearing on the matter.  However, until such time as the objection may be withdrawn or a judgment from the District of Columbia Court obtained, the legal effect of the objection by the Attorney General is to make the change to the numbered place system unenforceable.

Please inform us within 30 days of your receipt of this letter of the steps the Board of Trustees intends to take to revert to an at-large system of election without the numbered place provision or to obtain the reconsideration or judgment described in the previous paragraph.  If you have any questions concerning this matter please contact Voting Section Attorney David Hunter at 202--739-3649.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-006129

APR 11 1977

Mr. W. Z. Miller
Superintendent
Prairie Lea Independent
  School District
Box 12
Prairie Lea, Texas   78661

Dear Mr. Miller:

    This is in reference to the imposition of numbered
place and majority vote requirements for the election of
school board members of the Prairie Lea Independent School
District, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended.
Your submission was received on February 10, 1977.

    We have given careful consideration to the information
you have provided as well as to relevant demographic data
and court decisions.  The courts have held that, in the
context of at-large elections, the imposition of numbered
place and majority vote requirements can have a discri-
minatory effect on minority political influence.  See White
v. Regester, 412 U.S. 755, 766-67 (1973), and Zimmer v.
McKeithen, 485 F.2d 1297, 1305 (5th Cir. 1973), aff'd sub
nom. East Carroll School Board v. Marshall, 424 U.S. 636
(1976).

    Our analysis reveals that Mexican Americans constitute
approximately 20 percent of the district's population and
blacks approximately 10 percent.  No minorities serve on the
school board and, except for one who later withdrew, there
have been no minority candidates at least since 1969.
Although we have no specific evidence that this absence of
minority participation in the affairs of the Prairie Lea
Independent School District is either the direct or indirect
result of discrimination, your submission indicated no
compelling need for the adoption of the numbered place and
majority vote requirements, and in the course of our research
with respect to this change we have discovered none.

    In these circumstances, the Attorney General is unable
to determine whether or not the imposition of numbered place
and majority vote requirements by the Prairie Lea Indepen-
dent School District has the purpose or will have the effect

Defendant's Exhibit #                                    DE-006130

USA_00013197

-2-

of denying or abridging the right to vote on account of race
or color.  Because the burden is on the submitting authority
to prove the absence of discrimination, Section 5 of the
Voting Rights Act requires that in such a situation an
objection be interposed.  See 28 C.F.R. Section 51.19.
Accordingly, on behalf of the Attorney General, I must
interpose an objection to the numbered place and majority
vote requirements.

     If, however, you have new information indicating that
these requirements do not have a discriminatory purpose or
effect, you may request us to reconsider this determination.
See 28 C.F.R. Sections 51.12, 51.12, and 51.24.  In addition,
Section 5 permits the Prairie Lea Independent School District
to seek a declaratory judgment from the United States District
Court for the District of Columbia that the imposition of
numbered place and majority vote requirements does not have
the purpose and will not have the effect of denying or
abridging the right to vote on account of race, color, or
membership in a language minority group.  Until the ob-
jection is withdrawn or such a declaratory judgment ob-
tained, the legal effect of this objection is to render the
numbered place and majority requirements unenforceable.

                              Sincerely,


                              Drew S. Days III
                              Assistant Attorney General
                              Civil Rights Division

MAY 2 1977

Mr. William A. Meitzen
District Attorney
Fort Bend County
Richmond, Texas   77469

Dear Mr. Meitzen:

This is in reference to the changes in voting precincts
and polling places for Fort Bend County since November,
1972, submitted to the Attorney General pursuant to Section
5 of the Voting Rights Act of 1965, as amended.  Your sub-
mission was completed on March 3, 1977.

We have given careful consideration to these changes
and to the supporting materials you have provided, as well
as to comments from interested parties and relevant demo-
graphic data.  The Attorney General does not interpose any
objections to the changes in voting precincts or to the
changes in polling places for Precincts 3, 9, 11, 13, 17,
22, 23, 26, 27, 28, and 29.  However, we feel a responsi-
bility to point out that Section 5 of the Voting Rights Act
expressly provides that the failure of the Attorney General
to object does not bar any subsequent judicial action to
enjoin the enforcement of such changes.

With respect to the change of polling place for Pre-
cinct 12-A from the City Hall to the Rose Rich Shopping
Center and to the selection of the Deaf Smith School for the
polling place for Precinct 1-B we are unable to make the
same determination.  Our analysis reveals that the Rose Rich
Shopping Center, the new polling place for Precinct 12-A, is
located several miles from the heaviest concentration of
minority population and that public transportation to the
shopping center is not available. The shopping center is
significantly less convenient for the minority population
than was the prior polling place, at City Hall.  We have
been informed that more convenient sites within Precinct 12-
A are available.  In addition, it appears that confusion has
resulted from the shift of the polling place within the
shopping location center itself without adequate notice.

cc:  Public File
     X 8240

-2-

Similarly, the polling place located at the Deaf Smith
School in the Anglo section in the southern tip of Precinct
1-B creates a significant inconvenience to minority voters,
who are concentrated in the northern end of the precinct.
The prior polling place location, at the courthouse, was
substantially more accessible.

Under these circumstances, the Attorney General cannot
conclude, as he must under Section 5, that the polling place
locations for Precincts 12-A and 1-B do not have the purpose
or effect of discriminating on account of race, color, or
membership in a language minority group.  Accordingly, I
must, on behalf of the Attorney General, interpose an
objection to these polling place changes.

If, however, you have new information indicating that
these polling place changes do not have a discriminatory
purpose or effect, you may request us to reconsider this
determination.  See 28 C.F.R. Section 51.21, 51.23, and
51.24.  In addition, Section 5 permits Fort Bend County to
seek a declaratory judgment from the United States District
Court for the District of Columbia that these polling place
changes do not have the purpose and will not have the effect
of denying or abridging the right to vote on account of
race, color, or membership in a language minority group.
However, until the objection is withdrawn or such a de-
claratory judgment obtained, the legal effect of this
objection is to make these two changes in polling places
legally unenforceable.

Finally, our review of the maps you provided of pre-
cincts in the City of Rosenberg in 1972 and 1976 suggests
that between 1972 and 1976 there may have been a reapportionment
of Commissioners' Precincts in Fort Bend County.  If this is
the case, that is a change that must be the subject of a
declaratory judgment action in the District of Columbia
District Court or submitted to the Attorney General for
preclearance.

                    Sincerely,


                    Drew S. Days III
                    Assistant Attorney General
                    Civil Rights Division

USA_00013200

JUN 17 1977

Mr. Wallace Shaw
City Attorney
City of Clute
P. O. Box 997
Clute, Texas   77531

Dear Mr. Shaw:

This is in reference to the change to a majority vote
requirement for election to the City Council of Clute,
Brazoria County, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended.  Your submission was completed on April 18, 1977.

We have given careful consideration to the information
furnished by you and information and comments from interested
parties.  On the basis of our analysis we are unable to
conclude, as we must under the Voting Rights Act, that the
imposition of a majority vote requirement will not have a
discriminatory effect on the conduct of elections in the
City of Clute.

Our analysis reveals that the only successful Mexican
American candidate for the city council received only a
plurality of the votes, that bloc voting along ethnic lines
may exist, and that no minorities served as members of the
Charter Review Commission, which recommended the adoption of
the majority vote requirement.  Under these circumstances,
recent court decisions, to which we feel obligated to give
great weight, indicate that a majority vote requirement in
the context of at-large elections has the potential for
abridging minority voting rights.  See White v. Regester,
412 U.S. 755 (1973); and Zimmer v. McKeithen, 485 F. 2d 1297
(5th Cir. 1973) aff'd sub nom. East Carroll School Board v.
Marshall, 424 U.S. 636 (1976).

Under Section 5 of the Voting Rights Act the submitting
authority has the burden of proving that a submitted change
will not have a discriminatory effect.  See, e.g., Georgia
v. United States, 411 U.S. 526 (1973); 28 C.F.R. 51.19.  In
light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that that
burden has been sustained in this instance.

USA_00013201

-2-

Accordingly, on behalf of the Attorney General, I must interpose an objection to the implementation of the majority vote requirement for election to the City Council in the City of Clute. Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, Sections 51.21, 51.23, and 51.24 of the Attorney General's Section 5 guidelines (28 C.F.R. 51.21, 51.23, and 51.24) permit reconsideration of the objection should you have new information bearing on the matter. However, until such time as the objection may be withdrawn or a judgment from the District Court of Columbia is obtained, the legal effect of the objection by the Attorney General is to make the change to the majority vote requirement legally unenforceable.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-006135

USA_00013202

DSD:DHH:ED:rjs
DJ 166-012-3
A 1082

Mr. J. W. Booher                                    OCT  3 1977
Assistant Superintendent for
  Business
Lamar Consolidated Independent
  School District
Administration Building
930 East Stadium Drive
Rosenberg, Texas  77471

Dear Mr. Booher:

        This is in reference to the bilingual election
procedures for the Lamar Consolidated Independent School
District, Fort Bend County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of
1965, as amended.  Your submission was completed on August 4,
1977.

        In regard to the bilingual written materials used by
the school district, the Attorney General does not interpose
any objection to the change in question.  However, we feel
a responsibility to point out that Section 5 of the Voting
Rights Act expressly provides that the failure of the Attorney
General to object does not bar any subsequent judicial action
to enjoin the enforcement of such change.

        In regard to the school district's bilingual oral
assistance program, we have given careful consideration to
the information furnished by you as well as information
and comments from interested parties.  On the basis of our
analysis, we are unable to conclude, as we must under the
Voting Rights Act, that the Lamar Consolidated Independent
School District's bilingual oral assistance program does
not have a discriminatory effect on Mexican Americans in
the school district.

USA_00013203

- 2 -

Our analysis reveals that Mexican Americans constitute a significant proportion of the population of the Lamar Consolidated Independent School District and that a substantial proportion of the Mexican Americans need assistance because they are illiterate in both English and Spanish. Leaders in the Mexican American community consider it very important that people chosen to provide assistance in Spanish be identified with the Mexican American community in order for language minority citizens to participate fully and effectively in the electoral process. In addition, Section 55.16 of the Interpretative Guidelines on the Implementation of the Provisions of the Voting Rights Act Regarding Language Minority Groups (41 Fed. Reg. 29998 (1976)) sets forth the following as a guide for compliance with the language minority requirements of the Voting Rights Act:

A jurisdiction is more likely to achieve compliance with these requirements if it has worked with the cooperation of and to the satisfaction of organizations representing members of the applicable language minority group.

The school district has supplied no information revealing contacts or communications with representatives of Mexican Americans in the community who would be knowledge-able about the need for bilingual oral assistance and who would be able to suggest Mexican Americans to provide such assistance. Neither have our contacts with the Mexican American community established that any such contacts or consultations by the school district have been made. More importantly, however, information we have received from the Mexican American community indicates that Mexican Americans in fact consider the oral assistance that is available inadequate to assure effective voting by those needing assistance.

Under Section 5 of the Voting Rights Act the burden is on the submitting authority to establish that the change submitted does not have a discriminatory effect. (See 28 C.F.R. 51.19). Our analysis does not show that the Lamar Consolidated Independent School District has carried that burden. Accordingly, I must, on behalf of the Attorney General, interpose an objection to the bilingual oral assistance program for the Lamar Consolidated Independent School District.

USA_00013204

1

However, if you have information showing that our
understanding of the school district's bilingual oral
assistance program is incorrect, or if the school district
changes its oral assistance program to more accurately
reflect the needs of the Mexican American community, you
may ask the Attorney General to reconsider his objection.
See our Section 5 Guidelines, 28 C.F.R. Sections 51.21,
51.23 and 51.24.  Such information might include, for
example, evidence of consultations with Mexican American
groups in the school district and the use of interpreters
suggested by such groups, appointment of Mexican Americans
as election judges and clerks, rather than just interpreters,
and other evidence of input from Mexican Americans in the
community in the formulation of the school district's
bilingual program.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the District Court for the District of Columbia
that this change does not have the purpose and will not have
the effect of denying or abridging the right to vote on
account of race, color or membership in a language minority
group.  However, until such time as the objection may be
withdrawn or a judgment from the District of Columbia Court
obtained, the legal effect of the objection by the Attorney
General is to make the change in question unenforceable.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                          DE-006138

USA_00013205

OCT 3, 1977

Mr. J. W. Booher
**Assistant Superintendent for
   Business**
**Lamar Consolidated** Independent
   School District
Administration Building
930 East Stadium Drive
Rosenberg, Texas  77471

Dear Mr. Booher:

This is in reference to the bilingual election
procedures for the Lamar Consolidated Independent School
District, Fort Bend County, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of
1965, as amended.  Your submission was completed on August 4,
1977.

In regard to the bilingual written materials used by
the school district, the Attorney General does not interpose
any objection to the change in question.  However, we feel
a responsibility to point out that Section 5 of the Voting
Rights Act expressly provides that the failure of the Attorney
General to object does not bar any subsequent judicial action
to enjoin the enforcement of such change.

In regard to the school district's **bilingual oral
assistance program**, we have given careful consideration to
the information furnished by you as well as information
and comments from interested parties.  On the basis of our
analysis, we are unable to conclude, as we must under the
Voting Rights Act, that the **Lamar Consolidated Independent
School District's bilingual oral assistance program does
not have a discriminatory effect on Mexican Americans in
the school district.**





- 2 -

Our analysis reveals that Mexican Americans constitute a significant proportion of the population of the Lamar Consolidated Independent School District and that a substantial proportion of the Mexican Americans need assistance because they are illiterate in both English and Spanish. Leaders in the Mexican American community consider it very important that people chosen to provide assistance in Spanish be identified with the Mexican American community in order for language minority citizens to participate fully and effectively in the electoral process.  In addition, Section 55.16 of the Interpretative Guidelines on the Implementation of the Provisions of the Voting Rights Act Regarding Language Minority Groups (41 Fed. Reg. 29998 (1976)) sets forth the following as a guide for compliance with the language minority requirements of the Voting Rights Act:

> A jurisdiction is more likely to achieve
> compliance with these requirements if it
> has worked with the cooperation of and to the
> satisfaction of organizations representing
> members of the applicable language minority
> group.

The school district has supplied no information revealing contacts or communications with representatives of Mexican Americans in the community who would be knowledgeable about the need for bilingual oral assistance and who would be able to suggest Mexican Americans to provide such assistance. Neither have our contacts with the Mexican American community established that any such contacts or consultations by the school district have been made.  More importantly, however, information we have received from the Mexican American community indicates that Mexican Americans in fact consider the oral assistance that is available inadequate to assure effective voting by those needing assistance.

Under Section 5 of the Voting Rights Act the burden is on the submitting authority to establish that the change submitted does not have a discriminatory effect.  (See 28 C.F.R. 51.19).  Our analysis does not show that the Lamar Consolidated Independent School District has carried that burden.  Accordingly, I must, on behalf of the Attorney General, interpose an objection to the bilingual oral assistance program for the Lamar Consolidated Independent School District.

3

However, if you have information showing that our understanding of the school district's bilingual oral assistance program is incorrect, or if the school district changes its oral assistance program to more accurately reflect the needs of the Mexican American community, you may ask the Attorney General to reconsider his objection. See our Section 5 Guidelines, 28 C.F.R. Sections 51.21, 51.23 and 51.24. Such information might include, for example, evidence of consultations with Mexican American groups in the school district and the use of interpreters suggested by such groups, appointment of Mexican Americans as election judges and clerks, rather than just interpreters, and other evidence of input from Mexican Americans in the community in the formulation of the school district's bilingual program.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the District Court for the District of Columbia that this change does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. However, until such time as the objection may be withdrawn or a judgment from the District of Columbia Court obtained, the legal effect of the objection by the Attorney General is to make the change in question unenforceable.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                    DE-006141

USA_00013208

NOV 15 1977

Mr. J. W. Booher
Assistant Superintendent for
  Business
Lamar Consolidated Independent
  School District
Administration Building
930 East Stadium Drive
Rosenberg, Texas  77471

Dear Mr. Booher:

        This is in reference to your request that the Attorney
General reconsider his October 3, 1977, objection under Section 5
of the Voting Rights Act of 1965, as amended to the bilingual
oral assistance program for the Lamar Consolidated Independent
School District, Fort Bend County, Texas.  Your request for
reconsideration was received on October 17, 1977.  In accor-
dance with your request, expedited consideration has been
given this submission pursuant to the procedural guidelines
for the administration of Section 5 (28 C.F.R Section 51.22).

        We have given careful consideration to the information
which you have recently forwarded as well as information
and comments from interested parties.  We have taken particular
note of the fact that you have consulted with representatives
of the Voter Registration and Education Project in Fort Bend
County and assigned Mexican American clerks suggested by
them to the polling places used by the school district.  On
the basis of this, it is our opinion that the school district's
bilingual oral assistance program will now assure that
language minority citizens who need assistance to effectively
realize their right to vote will receive such assistance.

Defendant's Exhibit #                                    DE-006142

USA_00013209

- 2 --

Therefore, on behalf of the Attorney General, I am withdrawing
the objection to the bilingual oral assistance program for
the Lamar Consolidated Independent School District.  The
decision to withdraw the objection is based on our under-
standing that the oral assistance procedures now in effect
(i.e. consultations with Mexican American groups in the
community on the need for and provision of oral assistance)
will be used for all elections conducted by the school district.

                    Sincerely,



               Drew S. Days III
            Assistant Attorney General
               Civil Rights Division

Defendant's Exhibit #                              DE-006143

USA_00013210

JAN 16 1978

Mr. John F. Pettit
Assistant Secretary of State
Capitol Station
Austin, Texas  78711

Mr. Cecil A. Morgan
Morgan, Gambill & Owen
2108 Continental Life Building
Fort Worth, Texas  76102

Dear Messrs. Pettit and Morgan:

        This is in reference to House Bill 2152, 65th Legis-
lature, Regular Session, 1977, and to the implementation,
as set forth below, of House Bill 2152 by the Fort Worth
Independent School District, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act,
as amended.  The submission of House Bill 2152 was originally
received on July 1, 1977.  Additional information with
respect to this submission was received on October 31 and
November 17, 1977.  The submission of the implementation of
House Bill 2152 by the Fort Worth Independent School District
was originally received on October 31, 1977, and was supple-
mented on November 17, 1977.  Because House Bill 2152 at
this time directly affects only the Fort Worth Independent
School District, we have considered it appropriate to analyze
this legislation in connection with our analysis of its
implementation by the Fort Worth Independent School District.
Similarly, because the changes adopted by the Fort Worth
Independent School District are authorized or required by
House Bill 2152, we can make a determination with respect
to these changes under Section 5 only after a determination
has been made with respect to House Bill 2152.  Although we
noted your request for expedited consideration, we have been
unable to respond until this time.

        With the condition specified below, the Attorney
General does not interpose any objection to House Bill
2152.  However, we feel a responsibility to point out
that Section 5 of the Voting Rights Act expressly provides
that the failure of the Attorney General to object does not
bar any subsequent judicial action to enjoin the enforcement
of such changes.

cc:  Public File

USA_00013211

- 2 -

Any changes affecting voting made by independent school districts pursuant to House Bill 2152 are subject to the preclearance requirement of Section 5. Such changes include, but are not limited to, the increase in size of the board of trustees, the selection by the electorate of the president and vice-president of the board, the use and creation of single-member districts, the use of a majority vote requirement pursuant to Section 23.023(e) of the Texas Education Code, a change in the length of terms or in the staggering of terms, and the method of transition from the old to the new system of election.

With respect to the implementation of House Bill 2152 by the Fort Worth Independent School District, your submission, as we understand it, includes the following changes: (1) changes required by House Bill 2152: the increase in the size of the board of trustees from seven to nine members, the use of single-member districts for the election of seven members of the board, the selection of the president and vice-president of the board by the electorate by means of an election held at large, the use pursuant to Section 23.023(e) of a majority vote requirement in the selection of trustees, a decrease in the length of terms of office from six years to four years, and a change in the system of staggering the terms of office; (2) changes partially provided for by House Bill 2152: the method of transition from the old to the new system of election, and (3) changes adopted by the Fort Worth Independent School District: a districting plan for seven single-member districts. Except as specified below, the Attorney General does not interpose any objections to these changes. However we feel a responsibilty to point out that Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent judicial action to enjoin the enforcement of such changes.

Section 23.023(h) of the Texas Education Code, as amended by House Bill 2152, specifies the method of transition from the old electoral system to the system specified by Section 23.023. Under this system trustees representing two of the seven single-member districts will be elected in 1978. Trustees representing the remaining five single-member districts will not be elected until 1980 or 1982. In our analysis of this method of transition we have considered the legislative findings contained in Section 3 of House Bill 2152 and have been mindful of the pending lawsuit challenging

Defendant's Exhibit #                    DE-006145

USA_00013212

- 3 -

the at-large election of trustees of the Fort Worth
Independent School District.  As a result, we are unable to
conclude, as we must under the Voting Rights Act, that the
delay in the implementation of the use of the seven single-
member district plan by the Fort Worth Independent School
District does not have the purpose and will not have the
effect of denying or abridging the right to vote on account
of race, color, or membership in a language minority group.
Therefore, on behalf of the Attorney General, I must interpose
an objection to the implementation by the Fort Worth Indepen-
dent School District of Section 23.023(h) of the Texas
Education Code.

Of course, as provided by Section 5 you have the right
to seek a declaratory judgment from the United States District
Court for the District of Columbia that the change in question
neither has the purpose nor will have the effect of denying or
abridging the right to vote on account of race, color, or
membership in a language minority group.  In addition, the
Attorney General's Section 5 guidelines (28 C.F.R. 51.21,
51.23 and 51.24) permit you to request reconsideration of
this matter.  However, until such time as the objection may
be withdrawn or a favorable judgment from the District of
Columbia Court is obtained, the effect of the objection by
the Attorney General is to make the method of transition
specified by Section 23.023(h) legally unenforceable for the
Fort Worth Independent School District.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                    DE-006146

USA_00013213

MAR 1 1978

Mr. Joe Resweber
Harris County Attorney
Harris County Courthouse
Houston, Texas   77002

Dear Mr. Resweber:

      This is in reference to the changes in election
precincts and polling places for Harris County, Texas,
submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended.  Your
submission was completed on January 30, 1978, upon our
receipt of your January 27, 1978, letter forwarding
supplemental information.

      We have given careful consideration to these
changes and to the supporting materials you have pro-
vided, as well as to comments from interested parties
and relevant demographic data.  Except as indicated
below, the Attorney General does not interpose any
objections to the changes in election precincts and
changes in polling places under submission.  However,
we feel a responsibility to point out that Section 5
of the Voting Rights Act expressly provides that the
failure of the Attorney General to object does not bar
any subsequent judicial action to enjoin the enforce-
ment of such changes.

      With respect to the change of polling place
resulting from the consolidation of Precincts Nos. 55
and 340 we are unable to reach a like conclusion.  Our
analysis reveals that the 8th Avenue School, the
polling place for the newly consolidated precinct,
is located several miles from the heavy concentration
of minority population in old Precinct 340, that those

cc:  Public File
A3388

USA_00013214

- 2 -

persons, many of whom are elderly, will have to cross
the Katy Freeway which lacks a pedestrian overpass and
that public transportation to the 8th Avenue School is
not available.  Thus, it appears that the 8th Avenue
School is significantly less convenient for the minority
population in old Precinct 340 than was the prior polling
place at the West End Civic Club.  In addition, it appears
that confusion has resulted from the shift of the polling
place without adequate notice or a public hearing.

Under these circumstances, the Attorney General
cannot conclude, as he must under Section 5, that this
change in polling place location does not have the effect
of discriminating on account of race, color, or membership
in a language minority group insofar as the minority
voters in old Precinct 340 are concerned.  Accordingly,
I must, on behalf of the Attorney General, interpose an
objection to this polling place change.

If, however, you have new information indicating
this polling place change does not have a discriminatory
purpose or effect, you may request us to reconsider this
determination.  See 28 C.F.R. Section 51.21, 51.23, and
51.24.  In addition, Section 5 permits Harris County to
seek a declaratory judgment from the United States
District Court for the District of Columbia that this
polling place change does not have the purpose and will
not have the effect of denying or abridging the right
to vote on account of race, color, or membership in a
language minority group.  However, until the objection
is withdrawn or such a declaratory judgment obtained,
the legal effect of this objection is to make this
change in polling place legally unenforceable.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                    DE-006148

USA_00013215

MAR 7  1978

Mr. Edgar Coble
Education Service Center
Region XIII
7703 North Lamar Boulevard
Austin, Texas  78752

Dear Mr. Coble:

This is in response to your request for
reconsideration of the objection interposed
April 11, 1977, to the imposition of numbered
place and majority vote requirements for the
election of school board members of the Prairie
Lea Independent School District, Texas. Your
request was received on January 6, 1978.

We have given careful consideration to the
new information furnished by you.  On the basis of
our analysis of this information, we have concluded
that this change has neither the purpose nor will
have the effect of denying or abridging the right
to vote on account of race, color, or membership
in a language minority group.  I, therefore, on
behalf of the Attorney General am withdrawing the
previously interposed objection to the numbered
place and majority vote requirement in Prairie Lea
Independent School District.  We feel a responsi-
bility to point out that Section 5 of the Voting
Rights Act expressly provides that the failure to
object does not bar any subsequent judicial action
to enjoin the enforcement of such change.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division


Defendant's Exhibit #                                    DE-006149

USA_00013216

MAR 10 1978

Mr. Richard G. Sedgeley
Attorney at Law
600 Fannin Building
Suite 1301
Houston, Texas 77002

Dear Mr. Sedgeley:

This is in reference to the change in election
date for the Board of Trustees for the Waller Consoli-
dated Independent School District of Harris and Waller
County, Texas, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of
1965, as amended. Your submission was received on
February 28, 1978.

We have given careful consideration to the
information furnished by you, as well as demographic
data, the decision in the United States v. State of
Texas and Waller County, C.A. No. 76-H-1681 (S.D.
Texas February 16, 1978), and information furnished
by other interested parties. On the basis of our
analysis we were unable to conclude, as we must under
the Voting Rights Act, that the change in election
date from the first Saturday in April to the second
Saturday in August will not have a discriminatory
effect on the conduct of elections in the Waller
Consolidated Independent School District.

According to information furnished by School
District officials, blacks constitute approximately
40 percent of the population of the School District.
Our understanding is, however, that this does not
include an estimated 3,000 students and faculty members
of Prairie View A&M University located in the district.

Defendant's Exhibit #

DE-006150

Our analysis shows that virtually all of the resident students at Prairie View A&M University are black, that by virtue of the court decision in United States v. State of Texas and Waller County, supra, many of them now have a realistic opportunity to register and vote in Waller County, and that moving the School District election date from April to August will have the effect of conducting the election during a period when most of those student-voters are away from the area on summer school vacation. Under these circumstances, we cannot conclude, as we must under the Voting Rights Act, that this change in dates does not have a discriminatory purpose or effect. Accordingly, on behalf of the Attorney General, I must interpose an objection to the change in election dates from April to August.

Of course, Section 5 permits you to seek a declaratory judgment in the United States District Court for the District of Columbia that this change in dates does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color. However, unless and until such a declaratory judgment is obtained the legal effect of this objection is to render the change legally unenforceable.

In view of the approach of the April 1 election, please advise us within ten days of the action intended to be taken by the Waller Consolidated Independent School District.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

USA_00013218

MAR 24 1978

Mr. Jimmy Goodson
Dean of Administrative Services
Southwest Texas Junior College
Real, Uvalde, and Zavala Counties
Uvalde, Texas  78801

Dear Mr. Goodson:

This is in reference to the polling place change for the election of Trustees of the Southwest Texas Joint County Junior College District, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended. Your submission was received on February 27, 1978.

Your submission involves a change in the Crystal City polling place from the S and L Building to the Zavala Agricultural Exposition Building. Your submission explains that "control of the building housing the existing polling place has changed hands and the new parties are reluctant to allow its continued use as a polling place. The proposed new site will provide better facilities, more parking area, and is equally accessible to all Crystal City voters as the former site was."

Under Section 5 of the Voting Rights Act, changes such as the one in question here cannot be made unless the Attorney General is persuaded that they do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In order to make the determination required of the Attorney General under Section 5 we have carefully studied the information you have provided as well as information provided by and views of other interested persons.

Based on this inquiry, it is our understanding that the S and L Building remains available as a polling place and indeed will be used on April 1, 1978 as the polling place for the Zavala County Board of Education. Concern has been expressed to us that the use of a polling place at a separate location by the Junior College District will have the effect of reducing Mexican American participation in the election. In addition, we have been told that Mexican Americans are generally less familiar with the Agricultural Exposition Building than with the S and L Building and feel less welcome there.

DE-006152

USA_00013219

- 2 -

Under these circumstances, we are unable to conclude that the polling place change in question does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. Accordingly, on behalf of the Attorney General, I must interpose an objection to the change in the location of the Crystal City polling place for the election of Trustees of the Southwest Texas Joint County Junior College District from the S and L Building to the Zavala Agricultural Exposition Building.

Under the Procedures for the Administration of Section 5, 28 C.F.R. 51.21(b), 51.23, and 51.24, you may request the Attorney General to reconsider this objection. In addition, as provided by Section 5, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this polling place change does not have the prohibited discriminatory purpose or effect. However, until the objection is withdrawn or the declaratory judgment obtained, the change is legally unenforceable.

Finally, because an election is scheduled to be held on April 1, 1978, please notify us immediately, by telephoning Voting Section Attorney David H. Hunter at 202-739-3349, of the Junior College District's response to this objection.

Sincerely,

John Huerta
Acting Assistant Attorney General
Civil Rights Division

USA_00013220

DJ 166-012-3
A2564-65

APR 7 1978

Mr. M. R. Parrish, Superintendent
Neches Independent School District
Box 1208
Neches, Texas  75779

Dear Mr. Parrish:

This is in reference to the numbered post and majority requirements for the election of members of the Board of Trustees of the Neches Independent School District of Anderson County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended.   Your submission was completed on February 6, 1978.

We have given careful consideration to the information you have furnished.   Our analysis reveals that blacks constitute a substantial proportion of the population of the Neches Independent School District, that trustees are elected at large with staggered terms,   and that blacks have not been elected to the Board of Trustees.   Under these circumstances, recent court decisions, to which we feel obligated to give great weight, indicate that the numbered post and majority vote requirements could have the potential for abridging minority voting rights.   See White v. Regester, 412 U.S.  755, 766-67 (1973); Zimmer v. McKeithen, 485 F.2d 1297, 1305 (5th Cir. 1973), aff'd sub nom. East Carroll School Board v. Marshall, 424 U.S. 636 (1976); Robinson v. Commissioners Court, Anderson County, 505 F.2d 674 (5th Cir. 1974).

Section 5 of the Voting Rights Act places upon the submitting authority the burden of proving that a submitted change in voting practice and procedure does not have a racially discriminatory purpose or effect. (See Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R. 51.19.) Because of the potential for diluting black voting strength inherent in the use of a numbered post and majority vote requirements for the Neches Independent School District and because the District has advanced no compelling reason for their use, we are unable to conclude that the burden of proof has been sustained and that the imposition of these requirements in the context of an at-large system will not have a racially discriminatory effect in the Neches Independent School District.   Accordingly, on behalf of the Attorney   General,   I   must   interpose   an   objection   to   the implementation of the numbered post and majority vote requirements for the election of members of the Board of Trustees of the Neches Independent School District.

USA_00013221

- 2 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the numbered post and majority vote requirements legally unenforceable.

Sincerely,


James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                        DE-006155

USA_00013222

APR 2 8 1978

Mr. Glenn Sodd
Dawson, Dawson, Sodd & Davis
Attorneys at Law
State National Bank Building
Corsicana, Texas 75110

Dear Mr. Sodd:

This is in reference to the numbered post and
majority vote requirements for the election of the
Board of Trustees of the Corsicana Independent School
District, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act, as amended.
Information completing your submission was received
on February 27, 1978.

We have examined this electoral system in view
of the circumstances in Corsicana, Texas that, under
the legal principles by which we are guided, we must
consider relevant. See White v. Regester, 412 U.S.
755 (1973); Zimmer v. McKeithen, 485 F.2d 1297 (1973).
Navitt v. Sides, _____ F.2d _____ (5th Cir. 1978).

According to the information you have provided,
information and comments from other interested persons,
research conducted by our staff, and data contained in
the 1970 Census, the following circumstances appear to
exist. About 23 percent of the residents of the school
district are black. There are indications that white
voters in the district are reluctant to support black
candidates but that candidates supported by black
voters may in some circumstances be elected through
the use of single-shot voting or when the vote of the
white electorate is split among two or more candidates.
In these circumstances the imposition of numbered post
and majority vote requirements may have the effect of
diluting black voting strength in elections for school
trustees.

cc: Redacted
    Chron.
    Jones/Watkins/Blumstein/Hunter/Days, and
    Gordon/Abbott
    Public File
    John Wilson

Defendant's Exhibit #

DE-006156

USA_00013223

- 2 -

Under Section 5 the burden is on the juris-
diction proposing a voting change to show that the new
practice or procedure is not discriminatory in purpose
or effect.  The burden of proof is the same when a
submission is made to the Attorney General as it would
be in a suit for a declaratory judgment under Section 5
brought in the United States District Court for the
District of Columbia.  See Georgia v. United States,
411 U.S. 526 (1973).  The Procedures for the Admini-
stration of Section 5 of the Voting Rights Act of 1965,
C.F.R. 51.19, state:

> If the evidence as to the purpose or
> effect of the change is conflicting,
> and the Attorney General is unable to
> resolve the conflict within the 60-
> day period, he shall, consistent with
> the above-described burden of proof
> applicable in the district court,
> enter an objection. . . .

Under the circumstances of this case, we are
unable to conclude that the school district has
sustained its burden of showing that the adoption and
use of numbered post and majority vote requirements
for trustee elections of the Corsicana Independent
School District does not have a discriminatory purpose
and will not have a discriminatory effect.  Accordingly,
on behalf of the Attorney General, I must interpose an
objection to these requirements.

Under the Procedures for the Administration of
Section 5 of the Voting Rights Act (42 C.F.R. 51.21(b)
and (c), 51.23, and 51.24) you may request the Attorney
General to reconsider this objection.  In addition,
Section 5 permits you to seek a declaratory judgment
from the United States District Court for the District
of Columbia that these changes do not have the purpose
and will not have the effect of denying or abridging the

USA_00013224

- 3 -

right to vote on account of race or color.  However,
until such time as the objection may be withdrawn or
a favorable judgment from the District of Columbia
Court obtained, the effect of the objection by the
Attorney General is to make the numbered post and
majority vote requirements for the election of the
Board of Trustees of the Corsicana School Board legally
unenforceable.

                    Sincerely,


                    Drew S. Days III
                 Assistant Attorney General
                    Civil Rights Division

Defendant's Exhibit #                                    DE-006158

USA_00013225

MAY 1   1978


Mr. Richard G. Sedgeley, Esquire
609 Fannin Building
Suite 1301
Houston, Texas  77002

Dear Mr. Sedgeley:

    This is in reference to the choice of election date
for the elections of the County School Trustees of Harris
County, Texas, and to changes in election publicity and in
polling places resulting from the choice of election date,
submitted to the Attorney General pursuant to Section 5 of
the Voting Rights Act of 1965, as amended.  Your submission
was completed on February 28, 1978.

    Prior to 1977, elections for the County School Trustees
were held on the first Saturday of October of odd-numbered
years.  This was the election date for 15 of the 20 school
districts within Harris County, and joint elections were
held with these 15 districts.  As a result of the Uniform
Election Act of 1977, this October date was no longer
available.  For the new date the County School Trustees
chose the third Saturday in January of even-numbered years.

    We have carefully considered the information you have
provided with respect to this choice of election date and
the information provided by other interested parties.  In
our analysis we have been guided by relevant judicial
decisions, by which we feel bound.  See Beer v. United States,
425 U.S. 130 (1976).


cc:  Public File
     A3355

- 2 -

According to the information provided by you the January election date was chosen by 9 of the 20 school districts in Harris County, more than any other date. However, much less than 45 percent of the voting age population or of the registered voters of Harris County resides in these 9 school districts. It further appears from the data you have presented that an equally large proportion of the county's voting age population and registered voters reside in a single district, the Houston Independent School District, whose elections will be held in November. The Houston district, moreover, appears to contain a substantial majority of the county's black and Mexican American voters and potential voters. In addition, the district that would appear to have the next greatest number of minority voters or potential voters, the North Forest Independent School District, also will not be holding January elections.

Thus, one result of the choice of the January date is that voters residing in the school districts, all predominantly white Anglo, that use the January election date will have the added incentive of participating in two elections held jointly, while other voters, including virtually all of the minority voters, will only have the County School Trustee election to attract them. In addition, in districts with joint elections all regular school district polling places will be in use, while in other districts a reduced number of polling places will be used. Thus in the January 1978 election there were only 10 polling places within the vast Houston Independent School District while during its last school district election, the Houston Independent School District used 168 polling places.

Finally, the disadvantage to minority voters and potential voters within Harris County does not appear to be counteracted by publicity with respect to the County School Trustee elections. Publicity appears to be limited primarily to legal notices and posting, and oral publicity in the Spanish language is not provided, despite the substantial Mexican American population affected.

Under Section 5 the burden is on the jurisdiction proposing a voting change to show that the new practice or procedure is not discriminatory in purpose or effect. The burden of proof is the same when a submission is made to the Attorney General as it would be in a suit for a declaratory judgment under Section 5 brought in the United States District Court for the District of Columbia. See Georgia v. United States, 411 U.S. 526 (1973). The Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, C.F.R. 51.19, state:

Defendant's Exhibit #                                    DE-006160

USA_00013227

- 3 -

If the evidence as to the purpose or effect of the
change is conflicting, and the Attorney General is
unable to resolve the conflict within the 60-day
period, he shall, consistent with the above-described
burden of proof applicable in the district court,
enter an objection. . .

Under these circumstances, we are unable to conclude,
as we must under the Voting Rights Act, that the election
date chosen by the County School Trustees of Harris County
and the changes in election publicity and in polling places
resulting from the choice of election date do not have the
purpose and will not have the effect of denying or abridging
the right to vote on account of race, color, or membership in
a language minority group.  Accordingly, on behalf of the
Attorney General, I must interpose an objection to these
practices or procedures with respect to voting.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory judgment
from the United States District Court for the District of
Columbia that these changes do not have the purpose and will
not have the effect of denying or abridging the right to vote
on account of race, color, or membership in a language minority
group.  In addition, the Procedures for the Administration of
Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24)
permit you to request the Attorney General to reconsider this
objection.  However, until the objection is withdrawn or the
judgment from the District of Columbia Court obtained, the
effect of the objection by the Attorney General is to make
the County School Trustees' choice of election date and the
changes in election publicity and in polling places legally
unenforceable.

Sincerely,

Brian K. Landsberg
Drew S. Days III
Actg. Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                          DE-006161

USA_00013228

DJ 166-012-3
A4277-4283

JUN 30 1978

Honorable William R. Vance
County Judge
Brazos County
P. O. Box 3935
Bryan, Texas 77801

Dear Judge Vance:

This is in reference to the reapportionment of Commissioner
Precincts submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended. Your
submission was completed on May 1, 1978.

On June 9, 1978 we sent you a letter informing you that
the Attorney General does not interpose any objection to this
change. However, Section 5 allows the Attorney General sixty days
in which to make a determination with respect to submitted changes
affecting voting and, as provided in the Attorney General's guidelines,
(28 C.F.R. 51.22), the Attorney General may reexamine the submission
if additional information comes to his attention during the remainder
of the sixty-day period. This sixty-day period expires today.

Information has been brought to our attention this week
that has necessitated our reconsideration of the initial determination
with respect to the county's plan. Our reanalysis of the information
you provided concerning your methodology in determining the population
of the old and new commissioner precincts indicates that the statistics
you have provided may be less accurate than it initially appeared.
In addition, we note that Commissioner Precinct 4, the precinct
with the greatest minority percentage prior to the redistricting,
was increased in population by over 5,000 persons, although it was
very close to ideal size prior to the redistricting.

Because the information that prompted our reconsideration
of this submission was not received until late in the sixty-day statutory
period, we have not been able to reanalyze the matter sufficiently
to adhere to our previous conclusion that the plan does not have
a discriminatory effect.   Accordingly, on behalf of the
Attorney General, I must interpose an objection to this plan. However,
we will continue our reanalysis and if this reanalysis leads to the
conclusion that the submitted redistricting does not have the prohibited

discriminatory effect, the objection will be withdrawn. We will notify you as soon as possible of the Attorney General's final decision in this matter.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the redistricting plan legally unenforceable.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #

DE-006163

JUL 3 1978

Mr. Romeo Flores
County Attorney
Jim Wells County
P. O. Drawer 2080
Alice, Texas 78332

Dear Mr. Flores:

This is in reference to the August 11, 1975 redistricting of the Commissioners Precincts of Jim Wells County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended. Your submission was completed on May 5, 1978.

We have analyzed the information contained in your submission, comments of other interested persons, and data obtained from the Bureau of the Census in the light of relevant judicial decisions. See, e.g., Kirksey v. Hinds County Board of Supervisors, 554 F. 2d 139 (5th Cir. 1977), cert. denied, 46 U.S.L.W. 3357 (Nov. 18, 1977); Robinson v. Commissioners Court, 505 F.2d 674 (5th Cir. 1974).

Although Mexican-Americans constitute 64 percent of the population of Jim Wells County, only one of the four commissioners is a Mexican-American. An analysis of election returns for Jim Wells County reveals a clear pattern of racial bloc voting. We note that a redistricting of the Commissioners Precincts was ordered by a Federal district court on January 18, 1974. We have not been provided information indicating why a second redistricting was necessary only one and one half years after the first. According to the statistics you have provided the 1974 plan contained a total deviation from equal population of 28.4 percentage points; the deviation under the 1975 plan is substantially greater—40 percentage points.

cc: Public File

Defendant's Exhibit #                                    DE-006164

USA_00013231

Under the 1976 plan two of the four precincts had a Mexican-American population of greater than 65 percent, and a third precinct had a Mexican-American population of greater than 60 percent. Under the submitted plan, the Mexican-American percentage is above 65 percent in only one precinct and is above 60 percent in one other.

Under Section 5 the burden is on the jurisdiction proposing a voting change to show that the new practice or procedure is not discriminatory in purpose or effect. The burden of proof is the same when a submission is made to the Attorney General as it would be in a suit for a declaratory judgment under Section 5 brought in the United States District Court for the District of Columbia. See Georgia v. United States, 411 U.S. 526 (1973). The Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, 28 C.F.R. 51.9, states:

If the evidence as to the purpose or effect of the change is conflicting, and the Attorney General is unable to resolve the conflict within the sixty-day period, he shall, consistent with the above-mentioned burden of proof applicable in the district court, enter an objection. . . .

Under these circumstances, we are unable to conclude that the county has carried its burden of proving that the submitted redistricting plan for Jim Wells County does not have the purpose and will not have the effect of diluting the vote of Mexican-Americans. Accordingly, on behalf of the Attorney General, I must interpose an objection to this plan.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, the Procedures for the Administration of Section 5, 28 C.F.R. 51.20(b) & (c), 51.23, and 51.24, permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the redistricting plan legally unenforceable.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                    DE-006165

USA_00013232

JUL 7 1978

Mr. W. M. Holm
Superintendent
Ector County Independent
    School District
Post Office Box 3912
Odessa, Texas  79760

Dear Mr. Holm:

     This is in reference to the numbered post and
majority vote requirements for the election of Trustees
of the Ector County Independent School District, Texas,
submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended.  Your
submission was completed on May 8, 1978.

     We have given careful consideration to the information
furnished by you as well as Bureau of the Census data and
information and comments from other interested parties.  Our
analysis reveals that Mexican Americans and blacks constitute
a substantial proportion of the population of the Ector County
Independent School District, that the Board of Trustees is
elected at-large, and that racial bloc voting may exist.
Under these circumstances, recent court decisions, to which
we feel obligated to give great weight, indicate that
numbered post majority vote requirements could have the
potential for abridging minority voting rights.  See White v.
Regester, 412 U.S. 755, 766-67 (1973), Zimmer v. McKeithen,
485 F.2d 1297, 1305 (5th Cir. 1973), aff'd sub nom.
East Carroll Parish School Board v. Marshall, 424 U.S. 636
(1976); Nevitt v. Sides, 571 F.2d 209 (5th Cir. 1978).

USA_00013233

- 2 -

Section 5 of the Voting Rights Act places upon the submitting authority the burden of proving that a submitted change in voting practice and procedure does not have a racially discriminatory purpose or effect. (See Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R. 51.19.) Because of the potential for diluting black voting strength inherent in the use of numbered post and majority vote requirements under circumstances such as exist in the Ector County Independent School District and because the district has advanced no compelling reason for their use, we are unable to conclude that the burden of proof has been sustained and that the imposition of these requirements, in the context of an at-large election system, will not have a racially discriminatory effect. Accordingly, on behalf of the Attorney General, I must interpose an objection to the numbered post majority vote requirements for the election of Trustees of the Ector County Independent School District.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.2(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the Attorney General's objection is to make the numbered post and majority vote requirements legally unenforceable.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

NOV 1 3 1978

Mr. Charles Tighe
Attorney
Midland Independent School
  District
Cotton, Bledsoe, Tighe,
  Morrow and Dawson
Suite 1930, Wilco Building
Midland, Texas 79701

Dear Mr. Tighe:

This is in reference to your request for
reconsideration of the objection pursuant to
Section 5 of the Voting Rights Act, as amended,
to the numbered post and majority vote requirements
for the election of Trustees to the Midland Inde-
pendent School District of Midland County, Texas.
The objection was interposed on behalf of the
Attorney General on August 6, 1976; your request for
reconsideration was received on September 11, 1978.

We have reviewed the information provided and
we have reanalyzed the information previously available
to us. As our August 6, 1976, letter indicated, our
objection at that time was based primarily on our in-
ability to conclude that racial bloc voting did not
exist in the Midland Independent School District.
Having now had the opportunity to reevaluate the
information available to us, including the results
of the 1977 and 1978 elections we do not conclude
that racial bloc voting exists in the Midland
ISD elections to such an extent as to provide the
necessary basis for a continued objection to the
implementation of the majority vote and numbered
posts requirements. Accordingly, on behalf of the
Attorney General, I hereby withdraw the objection to

Defendant's Exhibit #

DE-006168

USA_00013235

- 2 -

the numbered post and majority vote requirements
for the election of Trustees to the Midland Inde-
pendent School District.  However, I feel the
responsibility to point out that Section 5 of the
Voting Rights Act expressly provides that the
failure of the Attorney General to object does
not bar any subsequent judicial action to enjoin
the enforcement of such changes.

              Sincerely,


              Drew S. Days III
         Assistant Attorney General
            Civil Rights Division

USA_00013236

DEC 27 1978

Mr. Lucius D. Bunton
Shafer, Gilliland, Davis,
 Bunton & McCollum
Attorneys at Law
First National Bank Building
Post Office Drawer 1552
Odessa, Texas  79760

Dear Mr. Bunton:

        This is in reference to the reapportionment of
commissioner precincts, polling place changes, addition
of voting precincts and additional locations for absentee
voting in 1975, in Terrell County, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended.  Your submission was received on
October 26, 1978.  In accordance with the request of the
Court in Escamilla v. Stavley C.A. No. DR-76-CA-23 (W.D.
Texas), we have made every effort to expedite our considera-
tion of this submission pursuant to the procedural guidelines
for the administration of Section 5 (28 C.F.R. 51.22) but
have been unable to respond until this time.

        We have given careful consideration to the changes
involved and the supporting materials, as well as informa-
tion and comments from other interested parties.  The
Attorney General does not interpose any objections to the
polling place changes, addition of voting precincts and
additional locations for absentee voting.in 1975.  However,
we feel a responsibility to point out that Section 5 of the
Voting Rights Act expressly provides that the failure of
the Attorney General to object does not bar any subsequent
judicial action to enjoin the enforcement of such changes.

Defendant's Exhibit #

DE-006170

USA_00013237

- 2 -

In our review of districting plans we are guided by
relevant judicial decisions.  See Beer v. United States,
425 U.S. 130 (1976); Kirksey v. Hinds County Board of
Supervisors, 554 F.2d 139 (5th Cir.), cert. denied,
54 L.Ed.2d 454 (1977); Wilkes County v. United States,
450 F. Supp. 1171 (D.D.C. 1978), affirmed, 47 U.S.L.W.
3391 (U.S. Dec. 4, 1978) (78-70).  Under Section 5 the
submitting jurisdiction has the burden of proving both
that the change in question was not adopted with a dis-
criminatory purpose and that its effect will not be dis-
criminatory.  Procedures for the Administration of
Section 5 of the Voting Rights Act of 1965, 28 C.F.R. 51.19;
Georgia v. United States, 411 U.S. 526, 538 (1973); City of
Richmond v. United States, 422 U.S. 358, 300-01 (1975)
(Brennan, J., dissenting).

In regard to the 1973 reapportionment of commissioner
precincts in Terrell County, our analysis reveals that,
according to the population survey conducted by the county,
Mexican Americans constitute approximately 41 percent of the
population of Terrell County.  Under the submitted reappor-
tionment plan, Mexican Americans constitute 75.6 percent
of the population of Commissioner Precinct 2, 43.6 percent
of the population of Commissioner Precinct 1, and 38.8
percent of the population of Commissioner Precinct 4.  In
our opinion, the effect of the 1973 reapportionment plan
is to dilute minority voting strength by unnecessarily
dividing the Mexican American community in Sanderson among
three commissioner precincts.  As a result, it would seem
that Mexican American voters in Terrell County are afforded
less of an opportunity than other residents to participate
in the political processes and elect candidates of their
choice.  By splitting the Mexican American community with
Precinct 2 and dispersing the remainder of that community
between commissioner precincts 1 and 4, the plan has the
effect of minimizing the overall impact of the Mexican
American vote.  Fairly drawn alternative reapportionment
plans could easily avoid this result.

Under these circumstances, therefore, we are unable
to conclude, as we must under the Voting Rights Act, that
the plan does not discriminate against Mexican American
voters.  Accordingly, on behalf of the Attorney General,
I must interpose an objection to the reapportionment plan
here under submission.

USA_00013238

- 3 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection.  However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection the Attorney General is to make the reapportionment plan for commissioner precincts in Terrell County legally unenforceable.

As requested by the Court in the above cited litigation, we are providing a copy of this letter to the Court and to counsel for plaintiffs.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

cc:   United States Circuit Judge Homer Thornberry
United States District Judge John Howland Wood, Jr.
United States District Judge D. W. Suttle

Clerk, U.S. District Court
Western District of Texas
Post Office Box 1349
Del Rio, Texas  78840

Joaquin G. Avila, Esquire
201 N. St. Mary's Street
Suite 517
San Antonio, Texas  78205

USA_00013239



ASSISTANT ATTORNEY GENERAL

**United States Department of Justice**

WASHINGTON, D.C. 20530

JAN 1 8 1979

Mr. Earnest L. Langley
Witherspoon, Aiker & Langley
Attorneys at Law
P. O. Box 1818
Hereford, Texas 79045

Dear Mr. Langley:

This is in reference to the adoption of a numbered place requirement for election to the Board of Trustees of Hereford Independent School District, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended. Your submission was received on November 20, 1978.

We have given careful consideration to the information presented by you and to information and comments from other interested parties. Under Section 5 of the Voting Rights Act, the submitting authority has the burden of proving that a proposed change will not have a racially discriminatory purpose or effect. (See Georgia v. United States, 411 U.S. 526 (1973) and 28 C.F.R. 51.19). Given the potentially discriminatory effect which the courts have found present in numbered place systems (see Dunston v. Scott, 336 F. Supp. 206 (E.D. N.C. 1972)), we are unable to conclude that the burden of proving that the implementation of a numbered place system in Hereford I.S.D. will not have such an effect has been met. Accordingly, on behalf of the Attorney General, I must interpose an objection to the implementation of a numbered place system of election in Hereford I.S.D.

USA_00013240

- 2 -

Of course, as provided by Section 5 of the
Voting Rights Act, you have the right to seek a
declaratory judgment from the District Court for
the District of Columbia that this change does
not have the purpose or effect of denying or abridging
the right to vote on account of race, color, or
membership in a language minority group.  In addition
the Procedures for the Administration of Section 5
(28 C.F.R. 51.21 (b) and (c), 51.23, and 51.24) permit
you to request the Attorney General to reconsider the
objection.  However, until the objection is withdrawn
or the judgment from the District of Columbia Court
obtained, the effect of the objection by the Attorney
General is to make the change to a numbered place
system legally unenforceable.

To enable this Department to meet its responsi-
bility to enforce the Voting Rights Act, please inform
us within twenty days of your receipt of this letter
of the course of action the Hereford Independent School
District plans to take with respect to this matter.
If you have any questions concerning this letter,
please feel free to call Voting Section Attorney David
Hunter at 202--633-3849.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                DE-006174

D.J. 166-012-3
A3674-A3687

JAN 31 1979

Mr. David E. Owen
Morgan, Gambill & Owen
Attorneys at Law
2109 Continental Life Building
Fort Worth, Texas 76102

Dear Mr. Owen:

This is in reference to your request for
reconsideration of the objection interposed on
January 16, 1978 to the implementation by the
Fort Worth Independent School District of
Section 23.025(h) of the Texas Education Code
and to the changes in polling places in Fort Worth
Independent School District, submitted to the
Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended. Your request for
reconsideration was received on January 23, 1978;
your submission of polling place changes was received
on January 5, 1978.

The Attorney General does not interpose any
objections to the changes in polling places. How-
ever, we feel a responsibility to point out that
Section 5 of the Voting Rights Act expressly provides
that the failure of the Attorney General to object
does not bar any subsequent judicial action to enjoin
the enforcement of such changes.

In reference to your request for reconsideration,
we have given careful consideration to the new infor-
mation furnished by you as to the manner in which
Section 23.025(h) of the Texas Education Code will be
implemented by Fort Worth Independent School District.

Defendant's Exhibit #

DE-006175

USA_00013242

As indicated in our letter of January 11, 1972, our original objection was based on the concern which we identified in that case with respect to questions that may arise relative to the delayed transition to the new districting system. The information now furnished shows that one district having the potential for minorities to elect a candidate of their choice will have that opportunity this year. However, with respect to the other two districts where minorities have the potential for electing representation of their choice the present incumbents will continue in office until 19[??].

While our concerns have been allayed with respect to the district which will choose its representation this year, the concerns which led to our initial objection remain in regard to the two districts which will not hold elections until 1988. Accordingly, the Attorney General cannot withdraw his objection to the delayed election in those districts.

Since we understand that related issues are pending before the District Court in Williams v Dougherty, CA4-26-44, I am taking the liberty of sending the Court a copy of this letter.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                                    DE-006176

USA_00013243

MAY 11 1979

Mr. William N. Holland
Attorney at Law
Post Office Drawer 230
Rusk, Texas 75785

Dear Mr. Holland:

This is in reference to the imposition of a place
system and a majority vote requirement for the election of
trustees to the Board of Trustees of the Alto Independent
School District, Cherokee County, Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended.  Your submission was completed on
March 15, 1979.

We have given careful consideration to the information
furnished by you as well as Bureau of the Census data and
information and comments from interested parties.  Although
we have received conflicting information as to the black
population of the Alto Independent School District, there
is apparent agreement on the black student population which
is estimated to be approximately 40%.  We must assume, there-
fore, that the total population of the school district is at
least 20-30% black, which represents a substantial proportion
of the overall population of the Alto Independent School
District.  Under the present method of election, school trustees
are elected at-large.  Under these circumstances, court
decisions, to which we feel obligated to give great weight,
indicate that a place system and majority vote requirement can
have the potential for abridging minority voting rights.  See
Dunston v. Scott, 336 F. Supp. 206, 213 (N.D.N.C. 1972); White
v. Regester, 412 U.S. 755, 766-67 (1973); Zimmer v. McKeithen,
485 F. 2d 1297, 1305 (5th Cir. 1973), aff'd sub nom. East
Carroll Parish School Board v. Marshall, 424 U.S. 636 (1976);
and Blacks United for Lasting Leadership v. City of Shreveport,
71 F.R.D. 623, 628, 632, 636 (W.D. La. 1976).

The information we have been provided does not
demonstrate that the place system and majority vote require-
ment's recognized potential for diluting minority voting
strength does not exist in the Alto Independent School District.

Defendant's Exhibit #                    DE-006177

- 2 -

Although black candidates have been elected to the Board
of Trustees, this was under the at-large, plurality method
of election.  The addition of potentially discriminatory
electoral devices such as the place system and majority
vote requirement will make it more difficult for black
candidates to be elected and inhibit their full and equal
participation in the school district's political process.

Section 5 of the Voting Rights Act places upon the
submitting authority the burden of proving that submitted
changes in voting practice and procedure do not have a
racially discriminatory purpose or effect.  See, e.g.,
Georgia v. United States, 411 U.S. 526, 538 (1973); City of
Richmond v. United States, 422 U.S. 358, 380-81 (1975)
(Brennan, J., dissenting); 28 C.F.R. 51.19.  Because of the
potential for diluting black voting strength inherent in the
use of a place system and majority vote requirement in the
Alto Independent School District and because the school
district has advanced no compelling reason for their use, we
are unable to conclude that the burden of proof has been
sustained and that the imposition of the place system and
majority vote requirement, in the context of an at-large
election system, does not have a racially discriminatory
purpose and will not have a racially discriminatory effect
in the Alto Independent School District.  Accordingly, on
behalf of the Attorney General, I must interpose an objection
to the implementation of the place system and majority vote
requirement for the election of trustees to the Board of
Trustees of the Alto Independent School District.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the United States District Court for the
District of Columbia that these changes have neither the
purpose nor will have the effect of denying or abridging
the right to vote on account of race or color.  In addition,
the Procedures for the Administration of Section 5 (28 C.F.R.
51.21(b) and (c), 51.23, and 51.24) permit you to request
the Attorney General to reconsider the objection.  However,
until the objection is withdrawn or the judgment from the
District of Columbia Court obtained, the effect of the
objection by the Attorney General is to make the place
system and majority vote requirement legally unenforceable.

USA_00013245

- 3 -

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us within
twenty days of your receipt of this letter of the course
of action the Alto Independent School District plans to take
with respect to this matter.  If you have any questions
concerning this letter, please feel free to call Voting
Section Attorney David Hunter at 202--724-7439.

                    Sincerely,


                    Drew S. Days III
                    Assistant Attorney General
                    Civil Rights Division

DSD:BHH:rjs
DJ 166-012-3
C1424-33; C1447-48
C1490-92; C15?8-11

**JUN 11 1979**

Mr. Robert M. Collie, Jr.
City Attorney
City of Houston
Legal Department
Post Office Box 1562
Houston, Texas 77001

Dear Mr. Collie:

This is in reference to the annexations and disannexations by the City of Houston, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended. Your submission was completed on April 12, 1979. Although we have attempted to make our determination with respect to this submission on an expedited basis, we have been unable to respond until this time.

To determine that a change in the composition of a city's population resulting from annexations does not have the effect of abridging the right to vote on account of race, color, or membership in a language minority group the Attorney General must be satisfied either that the percentage of members of a racial or language minority group in the city has not been appreciably reduced, that voting is not polarized between racial or language groups, or that, nevertheless, the city's electoral system will afford minority groups "representation reasonably equivalent to their political strength in the enlarged community. City of Richmond v. United States, 422 U.S. 358, 370 (1975).

USA_00013247

- 2 -

To apply this legal standard to this submission we have carefully examined the information you have provided with respect to this submission, information provided by other interested persons, information in our files with respect to prior submissions by the City of Houston, and information in the record in *Greater Houston Civic Council v. Mann*, 440 F. Supp. 696 (S.D. Tex. 1977), pending on appeal, No. 77-2953 (5th Cir.).

According to the statistics you have provided, the submitted annexations have proportionally reduced the black population in the City of Houston from 25.0 percent to 24.8 percent, a reduction of 1.2 percentage points, and have reduced the Mexican American population from 14.0 percent to 13.5 percent, a reduction of 0.5 percentage points. Based on the relevant court decisions and in view of the relevant characteristics of the City of Houston, we find such reductions to be legally significant. See *City of Richmond v. United States*, 422 U.S. at 368-70; *City of Petersburg v. United States*, 354 F. Supp. 1021, 1028-29 (D.D.C. 1972), affirmed, 410 U.S. 962 (1973); *City of Rome v. United States*, C.A. No. 77-0797 (D.D.C. 1979), slip opinion at 63-64.

Our analysis of the statistics you have provided with respect to the voting patterns of different groups in the City of Houston and of precinct election returns for city elections reveals the frequent occurrence of polarized voting between blacks and whites and between Mexican Americans and whites. For example, in the 1977 election for the council position for majority black District D, 64.8 percent of the white voters but only 11.6 percent of the black voters voted for the white incumbent, Homer Ford, instead of for one of his three black challengers. See *City of Richmond v. United States* 376 F. Supp. 1344, 1349, 1356 (D.D.C. 1974), reversed on other grounds, 422 U.S. 358 (1975); *City of Petersburg*, 354 F. Supp. at 1025-26; *City of Rome*, slip opinion at 9-13, 64-66.

Although approximately two of every eight residents of the City of Houston are black, and approximately one of every eight residents is a Mexican-American, only one black, and no Mexican-American, has ever served on the eight-member City Council under the present electoral system.

Defendant's Exhibit #

DE-006181

USA_00013248

- 3 -

Finally, a consideration of elections in the City of Houston, of the responsiveness of the City to the concerns and needs of blacks and Mexican Americans, and of the views of blacks and Mexican Americans and their representatives, leads to the conclusion that the present electoral system, under which all members of the City Council are elected in citywide elections, will not afford blacks and Mexican Americans "representation reasonably equivalent to their political strength in the enlarged community." City of Richmond, 422 U.S. at 370. See City of Petersburg, 354 F. Supp. at 1025-27; City of Rome, slip opinion at 7-9, 64-66.

Thus none of the three conclusions that would support a determination that the annexations do not have a discriminatory effect can be reached. I am unable to conclude, therefore, as I must under the Voting Rights Act, that the submitted annexations will not have the effect of abridging the right to vote on account of race, color, or membership in a language minority group.

Nevertheless, the two deannexations (Ordinance Nos. 78-2671 and 77-2197) and one annexation (Ordinance No. 77-2462) do not involve populated areas, and two annexations involve areas with substantial minority populations (Ordinance Nos. 77-2354 and 78-2386). With respect to the two deannexations and to those three annexations the Attorney General, accordingly, does not interpose any objection. (We feel a responsibility to point out, however, that Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent judicial action to enjoin the enforcement of such changes.)

With respect to the voting changes occasioned by the remaining fourteen annexations (Ordinance Nos. 77-1668, 77-2353, 77-2355, 77-2356, 77-2357, 78-2378, 78-2381, 78-2382, 78-2383, 78-2384, 78-2385, 78-2386, 78-2397, and 78-2398), because of the conclusion we have reached, I must, on behalf of the Attorney General, interpose an objection pursuant to Section 5.

Defendant's Exhibit # ___ DE-006182

- 4 -

Should the City of Houston adopt an electoral system
in which blacks and Mexican Americans are afforded "repre-
sentation reasonably equivalent to their political strength
in the enlarged community" the Attorney General will consider
withdrawal of this objection.  Our analysis indicates that
one such system would include the election of some members
of the City Council from single-member districts, if the
districts are fairly drawn and if the number of districts
is sufficient to enable both blacks and Mexican Americans
to elect candidates of their choice.  See City of Richmond,
422 U.S. at 370-73; City of Petersburg, 354 F. Supp. at 1027,
1031; City of Rome, slip opinion at 65-70.

        I wish to stress that this determination relates
only to the voting changes occasioned by the annexations in
question.  The objection to the implementation of such
changes does not affect the validity of the annexations
themselves.

        Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the United States District Court for the
District of Columbia that the changes affecting voting
resulting from these annexations have neither the purpose
nor will have the effect of denying or abridging the right
to vote on account of race, color, or membership in a
language minority group.  However, until such a judg-
ment is obtained from the District of Columbia Court, the
effect of the objection by the Attorney General is to make
the voting changes resulting from these annexations legally
unenforceable.

                        Sincerely,


                        Drew S. Days III
                        Assistant Attorney General
                        Civil Rights Division

DSD:BEH:rjs
DJ 166-012-3
C1424-33; C1447-48
C1490-92; C1508-11

**JUN 11 1979**

Mr. Robert M. Collie, Jr.
City Attorney
City of Houston
Legal Department
Post Office Box 1562
Houston, Texas  77001

Dear Mr. Collie:

This is in reference to the annexations and disannexa-
tions by the City of Houston, Texas, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended. Your submission was completed on April 12, 1979.
Although we have attempted to make our determination with
respect to this submission on an expedited basis, we have
been unable to respond until this time.

To determine that a change in the composition of a
city's population resulting from annexations does not have
the effect of abridging the right to vote on account of
race, color, or membership in a language minority group
the Attorney General must be satisfied either that the
percentage of members of a racial or language minority
group in the city has not been appreciably reduced, that
voting is not polarized between racial or language groups,
or that, nevertheless, the city's electoral system will
afford minority groups "representation reasonably equiva-
lent to their political strength in the enlarged community.
City of Richmond v. United States, 422 U.S. 358, 370 (1975).

Defendant's Exhibit #                                    DE-006184

- 2 -

To apply this legal standard to this submission we have carefully examined the information you have provided with respect to this submission. Information provided by other interested persons, information in our files with respect to prior submissions by the City of Houston, and information in the record in Greater Houston Civic Council v. Mann, 440 F. Supp. 696 (S.D. Tex. 1977), pending on appeal, No. 77-3083 (5th Cir.).

According to the statistics you have provided, the submitted annexations have proportionally reduced the black population in the City of Houston from 26.0 percent to 24.8 percent, a reduction of 1.2 percentage points, and have reduced the Mexican American population from 14.0 percent to 13.5 percent, a reduction of 0.5 percentage points. Based on the relevant court decisions and in view of the relevant characteristics of the City of Houston, we find such reductions to be legally significant. See City of Richmond v. United States, 422 U.S. at 368-70; City of Petersburg v. United States, 354 F. Supp. 1021, 1028-29 (D.D.C. 1972), affirmed, 410 U.S. 962 (1973); City of Rome v. United States, C.A. No. 77-0797 (D.D.C. 1977), slip opinion at 63-64.

Our analysis of the statistics you have provided with respect to the voting patterns of different groups in the City of Houston and of precinct election returns for City elections reveals the frequent occurrence of polarized voting between blacks and whites and between Mexican Americans and whites. For example, in the 1977 election for the council position for majority black District D, 64.8 percent of the white voters but only 11.6 percent of the black voters voted for the white incumbent, Homer Ford, instead of for one of his three black challengers. See City of Richmond v. United States 376 F. Supp. 1344, 1345, 1356 (D.D.C. 1974), reversed on other grounds, 422 U.S. 358 (1975); City of Petersburg, 354 F. Supp. at 1025-26; City of Rome, slip opinion at 9-13, 64-66.

Although approximately two of every eight residents of the City of Houston are black, and approximately one of every eight residents is a Mexican-American, only one black, and no Mexican-American, has ever served on the eight-member City Council under the present electoral system.

Defendant's Exhibit #          DE-006185

USA_00013252

- 3 -

Finally, a consideration of elections in the City of Houston, of the responsiveness of the City to the concerns and needs of blacks and Mexican Americans, and of the views of blacks and Mexican Americans and their representatives, leads to the conclusion that the present electoral system, under which all members of the City Council are elected in citywide elections, will not afford blacks and Mexican Americans "representation reasonably equivalent to their political strength in the enlarged community."  City of Richmond, 422 U.S. at 370.  See City of Petersburg, 354 F. Supp. at 1025-27; City of Rome, slip opinion at 7-9, 64-66.

Thus none of the three conclusions that would support a determination that the annexations do not have a discriminatory effect can be reached.  I am unable to conclude, therefore, as I must under the Voting Rights Act, that the submitted annexations will not have the effect of abridging the right to vote on account of race, color, or membership in a language minority group.

Nevertheless, the two deannexations (Ordinance Nos. 78-2671 and 77-2197) and one annexation (Ordinance No. 77-2402) do not involve populated areas, and two annexations involve areas with substantial minority populations (Ordinance Nos. 77-2354 and 78-2380).  With respect to the two deannexations and to these three annexations the Attorney General, accordingly, does not interpose any objection.  (We feel a responsibility to point out, however, that Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent judicial action to enjoin the enforcement of such changes.)

With respect to the voting changes occasioned by the remaining fourteen annexations (Ordinance Nos. 77-1668, 77-2353, 77-2355, 77-2357, 78-2378, 78-2381, 78-2382, 78-2383, 78-2384, 78-2385, 78-2386, 78-2387, and 78-2388), because of the conclusion we have reached, I must, on behalf of the Attorney General, interpose an objection pursuant to Section 5.

Defendant's Exhibit #                              DE-0061

USA_00013253

- 4 -

Should the City of Houston adopt an electoral system
in which blacks and Mexican Americans are afforded "representation
reasonably equivalent to their political strength
in the enlarged community" the Attorney General will consider
withdrawal of this objection.  Our analysis indicates that
one such system would include the election of some members
of the City Council from single-member districts, if the
districts are fairly drawn and if the number of districts
is sufficient to enable both blacks and Mexican Americans
to elect candidates of their choice.  See City of Richmond,
422 U.S. at 370-73; City of Petersburg, 354 F. Supp. at 1027,
1031; City of Rome, slip opinion at 65-70.

I wish to stress that this determination relates
only to the voting changes occasioned by the annexations in
question.  The objection to the implementation of such
changes does not affect the validity of the annexations
themselves.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory
judgment from the United States District Court for the
District of Columbia that the changes affecting voting
resulting from these annexations have neither the purpose
nor will have the effect of denying or abridging the right
to vote on account of race, color, or membership in a
language minority group.  However, until such a judgment
is obtained from the District of Columbia Court, the
effect of the objection by the Attorney General is to make
the voting changes resulting from these annexations legally
unenforceable.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #                    DE-006187

USA_00013254

JUL 18 1979

DSD:BHW:DHH:mrk
DJ 166-012-3
C1424-28, 1431, 1433, 1447-48,
1490-92, 1508-09, 5075-90


Mr. Robert M. Collie, Jr.
City Attorney
City of Houston
Legal Department
Post Office Box 1562
Houston, Texas  77001

Dear Mr. Collie:

        This is in reference to the application of
Section 5 of the Voting Rights Act of 1965, as
amended, to the City of Houston.

        The following matters are before us:

        (1) A request for reconsideration by the
City of Houston of the June 11, 1979 objection
pursuant to Section 5 to the voting changes
occasioned by fourteen annexations to the City of
Houston.  This request, set forth in your letter
of June 13, 1979, was received on June 19, 1979.

        (2) A request that the Attorney General
"limit [the June 11, 1979] objection, or otherwise
modify, suspend, or clarify it, so that it does not
extend to the enforcement of voting changes (i.e.,
the annexations) for the limited purposes proposed
to be included on the August 11 ballot."  This request,
set forth in your letter of July 9, 1979, was received
on that date.

        (3) The submission pursuant to Section 5 of
a City Charter amendment election to be conducted
on August 11, 1979.  This submission was received
on July 9, 1979 and amended and supplemented on
July 10, 13, and 17, 1979.

Defendant's Exhibit #                                          DE-006188

USA_00013255

- 2 -

(4) The submission pursuant to Section 5 of
the eight propositions that are to be the subject
of the August 11 election.  This submission was
received on July 9, 1979 and amended and supplemented
on July 10, 13, and 17, 1979.

To the extent possible we have, as you requested,
expedited our consideration of these matters.

With respect to the reconsideration request, we
have carefully considered the information and legal
arguments presented in your letter, and for the reasons
set out in my letter of June 11, 1979, on behalf of the
Attorney General, I decline to withdraw the objection
to the voting changes occasioned by the fourteen
annexations.

With respect to the conduct of elections by the
City of Houston while the objection remains outstanding,
I should clarify the impact of our objection as it
affects the referendum you propose to hold on Proposition 3.
It is our view that Section 5 should not serve to prevent
actions by the City that would be likely to provide a
basis for curing the dilutive aspects of the annexation
if those actions are taken consistent with state law and
are not otherwise inconsistent with the purposes of the
Voting Rights Act.  Proposition 3 appears to be designed
as an attempt to remedy the objection interposed on
June 11, 1979, by defining a new method of election in
the City as ultimately expanded, and on the basis of
information presently available to us it appears that
such a method of election, if adopted, may directly or
indirectly lead to a withdrawal of the objection.  In
this light, and under the totality of the circumstances,
on behalf of the Attorney General I do not object to
the conduct of the August 11, 1979, referendum on
Proposition 3 as proposed.

However, the same conclusion cannot be reached
with respect to the nature of the referendum you propose
to conduct on the remaining propositions.  Those

- 3 -

propositions do not have the potential for remedying
the objection interposed on June 11, 1979, and under
the circumstances the referendum as proposed on
Propositions 1, 2, 4, 5, 6, 7 and 8 would be inconsistent
with the purposes of the Voting Rights Act while the
June 11, 1979, objection remains outstanding.  Accordingly,
our objection cannot be modified or otherwise limited,
suspended or clarified to allow the referendum on those
propositions to proceed as proposed, and on behalf of
the Attorney General I must object to the referendum
as proposed on Propositions 1, 2, 4, 5, 6, 7 and 8.

With respect to the submission under Section 5
of the eight propositions themselves, review under
Section 5 is only permitted when a completed enactment
is submitted to the Attorney General or enactment complete
in all respects except for the holding of a required
referendum.  28 C.F.R. 51.7.  Because of the objections
interposed above to the holding of referenda on propositions
1, 2, and 4 through 8, this standard of finality is not
satisfied and accordingly, on behalf of the Attorney
General, I will make no determination at this time.

By the same standard, however, Proposition No. 3
is ripe for review at this time.  Proposition 3 creates
a new electoral system for the City Council of the City of
Houston.  The present system of nine Council members
(including the Mayor) elected at large is replaced by a
system under which nine (and once a certain population
level is reached, eleven) members will be elected from
single-member districts and six members (including the
Mayor) will be elected at large.  Although it appears
that this change is of the kind that could meet the
preclearance standards of Section 5, we have not yet
been able to complete our review of this proposition
in the time available to us so far.  However, we will
continue to expedite this review insofar as the
circumstances allow and I will notify you of my decision
on behalf of the Attorney General as soon as possible.

Defendant's Exhibit #

DE-006190

USA_00013257

- 4 -

It is our understanding that the City Charter
may be amended only once in a two-year period, and thus
our review included a consideration of whether our
decision to preclear only the potentially ameliorative
portion of the referendum for the expanded City might
affect the ability of the City to subsequently present
the remaining issues to the electorate.  Although it is
our belief that at this time only the issue that could
lead to a withdrawal of the objection can be placed
before the electorate for referendum as was proposed,
it is our view that if the resolution of that issue
results in a withdrawal of the objection the City should
not be precluded, notwithstanding the Charter provision,
from subsequently presenting the remaining issues to the
electorate.  Thus, if the objection is withdrawn our
staff is willing to support reasonable steps by the
City to achieve this result, including any orders the
City believes necessary to obtain in federal court.

With respect to the decision made on behalf of
the Attorney General not to interpose an objection to
the holding of a referendum on Proposition 3, as authorized
by Section 5, the Attorney General reserves the right to
reexamine this change if additional information that
would otherwise require an objection comes to his
attention during the remainder of the sixty-day period.
In addition, we feel a responsibility to point out that
Section 5 of the Voting Rights Act expressly provides
that the failure of the Attorney General to object does
not bar any subsequent judicial action to enjoin the
enforcement of such change.

With respect to the objections to the voting
changes resulting from the fourteen annexations and
to the holding of referenda on Propositions 1, 2, and
4 through 8, you have the right, as provided by Section 5,
to seek a declaratory judgment from the United States
District Court for the District of Columbia that these
changes do not have the purpose and will not have the
effect of denying or abridging the right to vote on

USA_00013258

- 5 -

account of race, color, or membership in a language
minority group.  In addition, our administrative
procedures, 28 C.F.R. 51.21(b) and (c), 51.23, and
51.24, permit you to request the Attorney General to
reconsider these objections.  However, until the
objections are withdrawn or the judgment from the
District of Columbia Court is obtained, the effect
of the objections by the Attorney General is to make
these voting changes legally unenforceable.

Because the Court in the consolidated cases of
Leroy v. City of Houston and United States v. Houston,
C.A. No. 76-H-2174 and 78-H-2407 (S.D. Texas), has
indicated a desire to hear any motions later this
week insofar as the recent submissions are involved,
I would appreciate it if you will inform us immediately
of the manner in which the City intends to comply with
the decisions set out above.  I am taking the liberty of
providing copies of this letter to the Court and to
counsel for the private plaintiffs.

                    Sincerely,


                    Drew S. Days III
                    Assistant Attorney General
                    Civil Rights Division


cc:  Honorable Gabrielle K. McDonald
     L. A. Greene, Jr., Esquire

Defendant's Exhibit #                              DE-006192



**United States Department of Justice**
WASHINGTON, D.C. 20530

ASSISTANT ATTORNEY GENERAL

Mr. G. V. Jackson, Jr.
Office of the City Clerk
City of San Antonio
P. O. Box 9066
San Antonio, Texas 78285

AUG 17 1979

Dear Mr. Jackson:

This is in reference to the polling place location for Precinct 205 for the April 7, 1979 municipal election in San Antonio, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended. Your submission was completed on June 18, 1979.

We have given careful consideration to the information provided by you as well as information and comments from other interested parties. Our analysis reveals that District 6 is majority Mexican-American, that Precinct 205 is heavily Mexican-American, and that a pattern of racial bloc voting exists in District 6. Our analysis further reveals that the location of the polling place for Precinct 205 at Our Lady of the Lake University, although a suitable location for future elections, was on April 7, 1979 inaccessible to voters because of construction that blocked the two main thoroughfares leading to the university. The inaccessibility of the polling place was further aggravated by the lack of public notice concerning the exact location of the polling place on the campus.

Under Section 5 the submitting jurisdiction has the burden of proving that the voting change was not adopted with a discriminatory purpose or effect. See Beer v. United States, 425 U.S. 130 (1976); Wilkes County v. United States, 450 F. Supp. 1171 (D.D.C. 1978), affirmed U.S. Law Week 3391 (Dec. 4, 1978) (No. 78-76). See also 28 C.F.R. 51.19. The facts described above lead us to conclude that you have not sustained your burden of demonstrating that the polling place change for Precinct 205 did not have the purpose or effect of discriminating against Mexican-American voters in District 6 at the April 7, 1979 election. Accordingly, on behalf of the Attorney General, I must interpose an objection to that location.

Defendant's Exhibit #                          DE-006193

USA_00013260

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the change in polling place location legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter of the course of action the City of San Antonio plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call the Director of the Section 5 Unit Mr. John P. MacCoon at 202—724-7439.

Sincerely,

JOHN E. HUERTA
Acting Assistant Attorney General
Civil Rights Division

SEP 12 1979

DSD:JMC:RW:rjs
DJ 166-012-3
C5242

Mr. Hugo J. Nowotny
Business Manager
Comal Independent School District
Central Administrative Offices
1421 Highway 81 East
New Braunfels, Texas  78130

Dear Mr. Nowotny:

    This is in reference to the numbered place system for
the election of members to the Board of Trustees for Comal
Independent School District, Comal County, Texas, and to our
letter to you of August 30, 1979, in which we advised of the
continuance of the April 4, 1977, Attorney General objection
to that method.

    To remove any doubt as to the legal effect of our
August 30, 1979 letter to you, I thought this letter of
clarification appropriate.  It should be understood that the
Attorney General objects both to the submission completed on
February 2, 1977 (to which the Attorney General initially
objected on April 4, 1977), and to your submission on
July 17, 1979 of the June 19, 1979 Resolution of the Board
of Trustees of the Comal Independent School District.  Since
the June 19, 1979 Resolution provides for the identical
practice previously objected to, and since you have fur-
nished no new information justifying any change in our
position, I must, on behalf of the Attorney General,
continue the objection of April 4, 1977, and object to the
June 19, 1979 Resolution providing for numbered posts.

Defendant's Exhibit #

DE-006195

USA_00013262

- 2 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.  In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection.  However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the numbered place system legally unenforceable.

Sincerely,


DREW S. DAYS III
Assistant Attorney General
Civil Rights Division

USA_00013263

14 SEP 1979

Mr. Walter E. Nisell
City Attorney
City of Lockhart
Brown, Maroney, Rose,
   Baker and Barber
1300 American Bank Tower
221 West Sixth Street
Austin, Texas  78701

Dear Mr. Nisell:

This is in reference to the Home Rule Charter
adopted on February 20, 1973 for the City of Lockhart,
Texas, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended.
Your submission was completed on July 16, 1979.

We have given careful consideration to the infor-
mation provided by you, as well as information and comments
from other interested parties.  Our analysis reveals that
the Home Rule Charter for Lockhart provides for an at-large
election scheme, which includes the use of staggered terms
and numbered places.  The new form of government also
provides for two additional representatives, and a council
with somewhat greater power than the prior form of govern-
ment.  There are, in addition, indications that racial bloc-
voting exists in Lockhart elections, and that the city
government may not be as responsive to its minority con-
stituents as to its Anglo constituents.

Recent court decisions suggest that an at-large
voting system which incorporates features such as numbered
posts and staggered terms may operate to minimize or dilute
the voting strength of minority groups and thus have an
invidious discriminatory effect.  See White v. Regester,
412 U.S. 755 (1973); Whitcomb v. Chavis, 403 U.S. 124 (1971).

Defendant's Exhibit                                    DE 066197

USA_00013264

- 2 -

In view of these court decisions, and on the basis of all the available facts and circumstances, the Attorney General is unable to conclude, as he must under the Voting Rights Act, that the Home Rule Charter, in its present form will not have a discriminatory effect on the voting rights of racial or language minorities in the City of Lockhart. On behalf of the Attorney General, I must interpose an objection to the Home Rule Charter insofar as it incorporates an at-large method of election, with numbered posts and staggered terms.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the Home Rule Charter legally unenforceable with respect to the at-large method of election, and the numbered post and staggered term features.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter of the course of action the City of Lockhart plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call John MacCoon, the Director of the Section 5 Unit, at 202-724-7439.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

Defendant's Exhibit #
DE-006198

USA_00013265

SEP 21 1979

DSD:GWJ:DHH:mrk
DJ 166-012-3
C1424-28, 1431, 1433, 1447-48,
1490-92, 1409-09, C5899,
C5898, C6150-53

Mr. Robert M. Collie, Jr.
City Attorney
City of Houston
Legal Department
Post Office Box 1562
Houston, Texas  77001

Dear Mr. Collie:

This is in reference to the application of
Section 5 of the Voting Rights Act of 1965, as
amended, to the City of Houston.

The following matters are before us:

(1) The submission pursuant to Section 5 of
the plan adopted by the City of Houston for nine
councilmanic districts, Ordinance No. 79-1584, as
modified by Ordinance No. 79-1638.  Your submission
was received on September 13, 1979; the modification
was received on September 19, 1979; preliminary
information was received on August 20, 24, 27, and
30 and September 6, 1979, and supplementary information
was received on September 14 and 19, 1979.

(2) A request that the Attorney General withdraw
the objection pursuant to Section 5 interposed on
June 11, 1979, to fourteen annexations to the City of
Houston.  Your request was received on August 21, 1979;
information supplementing this request was received on
August 24 and September 14, 1979.

(3) The submission pursuant to Section 5 of
changes with respect to voting to be implemented in
the bond election scheduled for September 25, 1979,
Ordinance No. 79-1429.  Your submission was received
on August 24, 1979.

Defendant's Exhibit #                                        DE-006199

- 2 -

(4) The submission pursuant to Section 5 of polling place changes in precincts 187, 313, 476 and 494, Ordinance No. 79-1637.  Your submission was received on September 19, 1979.

In approaching these matters we are mindful that the City has determined a need to have a bond election on September 25, 1979.  We are also mindful of the upcoming councilmanic election and the importance to the citizens of Houston to have the electoral system to be used in that election determined well in advance of its November 6, 1979, date.  For these reasons, we have expedited our consideration of these matters as you requested.  We have been able to expedite to the extent that we have primarily because of our continued study of the Houston situation since the receipt on February 8, 1979, of the City's initial submission of its annexations and deannexations, our constant communication with the City and other interested parties during the preparation for and our monitoring of the process leading up to the September 12, 1979, adoption by the City Council of the districting plan, and our intensive review of the plan since its adoption.

Our analysis has involved two basic questions: whether the districting plan adopted by the City satisfies the standards of Section 5 of the Voting Rights Act and whether the expanded city council membership elected under that districting plan provides a basis for the withdrawal of the June 11, 1979 objection.  During our review we have sought to follow the legal principles developed by the courts in their interpretation of Section 5.  See Beer v. United States, 425 U.S. 130 (1976); City of Richmond v. United States, 422 U.S. 358 (1975).  We have also conducted intensive research and obtained the views of blacks, Mexican-Americans and other interested persons residing in the City of Houston.  In particular we have considered the accuracy of the statistics used by the City in the creation of the adopted plan, the proportions of the City's population that blacks and Mexican-Americans constitute, the probable composition of a district

Defendant's Exhibit #                    DE 006206

USA_00013267

- 3 -

that could be expected to afford blacks or Mexican-
Americans a reasonable opportunity to elect candidates
of their choice, the probable impact that black and
Mexican-American voters will be able to have in the
nine districts created by the City's plan and in
various alternative proposals, the factors given
weight by the City in the development of the adopted
plan, and the probable impact that black and Mexican-
American voters will be able to have on the election
of at-large-elected members of the council, including
the Mayor.

On the basis of this research and analysis I am
persuaded that the City of Houston has satisfied its
burden of proving that the adopted districting plan
does not have the purpose and will not have the effect
of abridging the right to vote on account of race, color,
or membership in a language minority group and that the
new councilmanic electoral system (the nine-five plan)
with the districts that have been created for use under
this system afford blacks and Mexican-Americans a fair
opportunity to obtain "representation reasonably
equivalent to their political strength in the enlarged
community." City of Richmond v. United States, 422 U.S.
at 370. Accordingly, on behalf of the Attorney General
I am not interposing an objection to the districting plan
and I am withdrawing the June 11, 1979, objection to the
fourteen annexations to the City of Houston.

In view of the foregoing, I also do not interpose
any objection to the voting changes to be implemented in
the bond election scheduled for September 25, 1979, nor
to the four polling place changes.

We feel a responsibility to point out, however, that
Section 5 of the Voting Rights Act expressly provides that
the failure of the Attorney General to object does not bar
any subsequent judicial action to enjoin the enforcement of
such changes. In addition, as authorized by Section 5, the
Attorney General reserves the right to reexamine these sub-
missions if additional information that would otherwise
require an objection comes to his attention during the
remainder of the sixty-day periods.

Defendant's Exhibit #                                    DE-006201

- 4 -

I am taking the liberty of providing copies of
this letter to the Court and to counsel for the private
plaintiffs in Leroy v. City of Houston, C.A. Nos. 78-H-
2174 and 78-H-2407 (S.D. Texas).

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

cc: Honorable Gabrielle K. McDonald
L.A. Greene, Jr., Esquire

Defendant's Exhibit #          DE-006202