IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, JANE HAMILTON, SERGIO DeLEON, FLOYD J. CARRIER, ANNA BURNS, MICHAEL MONTEZ, PENNY POPE, OSCAR ORTIZ, KOBY OZIAS, JOHN MELLOR-CRUMMEY, PEGGY HERMAN, EVELYN BRICKNER, GORDON BENJAMIN, KEN GANDY, LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) and DALLAS COUNTY, TEXAS<br>        *Plaintiffs*,<br><br>v.<br><br>RICK PERRY, Governor of Texas; and JOHN STEEN, Texas Secretary of State,<br>    *Defendants*.<br><br><br>UNITED STATES OF AMERICA,<br>        *Plaintiffs*,<br><br>TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, IMANI CLARK, AND MICHELLE BESSIAKE,<br>        *Plaintiff-Intervenors*,<br><br>TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, AND HIDALGO COUNTY,<br>        *Plaintiff-Intervenors*,<br><br>v.<br><br>STATE OF TEXAS, JOHN STEEN, in his Official capacity as Texas Secretary of State and STEVE McCRAW, in his Official capacity as Director of the Texas Department of Public Safety,<br>        *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.:<br>Case No. 2:13-CV-00193 (NGR)<br>[Lead Case]<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Civil Action No.:<br>2:13-CV-00263 (NGR) |

| | § | |
|---|---|---|
| TEXAS STATE CONFERENCE OF NAACP BRANCHES; and the MEXICAN AMERICAN LEGISLATIVE CAUCUS OF THE TEXAS HOUSE OF REPRESENTATIVES, | § § § § § § | |
| *Plaintiffs* | § | |
| v. | § § | Civil Action No.: 2:13-CV-00291 (NGR) |
| JOHN STEEN, in his official capacity as Secretary of State of Texas, and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety | § § § § § § | |
| *Defendants.* | § | |
| | § § | |
| BELINDA ORTIZ, LENARD TAYLOR, EULALIO MENDEZ, JR., LIONEL ESTRADA, ESTELA GARCIA ESPINOSA, LYDIA LARA, MARGARITO MARTINEZ LARA, MAXIMINA MARTINEZ LARA, AND *LA UNION DEL PUEBLO ENTERO, INC.* | § § § § § § § § | |
| *Plaintiffs* | § | Civil Action No.: 2:13-CV-00348 (NGR) |
| v. | § § | |
| STATE OF TEXAS, JOHN STEEN, in His official capacity as Texas Secretary of State, and STEVE McCRAW, in his Official capacity as Director of the Texas Department of Public Safety | § § § § § § | |
| *Defendants.* | § | |

---

# DECLARATION TO ACCOMPANY
# THE EXPERT REPORT OF MATTHEW A. BARRETO, Ph.D.

---

Pursuant to 28 U.S.C. §1746, I, Matthew A. Barreto, declare that:

My name is Matthew A. Barreto.  I am an expert witness designated by the Veasey-LULAC and NAACP Plaintiffs in the above referenced case now pending in the United States District Court for the Southern District of Texas.

A true and correct copy of my curriculum vitae is attached hereto as a part of my report. The following report, a true and correct copy of which is attached and incorporated herein for all purposes, is a summary of my opinions and conclusions.  The materials I relied upon to develop my analysis and opinions are produce herewith for all counsel.

The court testimony and publications I am required to disclose are described in my attached curriculum vitae.

My reasonable and necessary hourly rate for my time in this case is $250.

As explained in the attached report, I directed the firm of Pacific Market Research to conduct the survey I was asked to construct and interpret.  Pacific Market Research was paid $146,400 for their efforts with regard to this survey.

I declare under penalty of perjury that the foregoing is true and correct.


Signed this the 26th day of June, 2014.

Matthew A. Barreto

**DECLARATION OF MATTHEW BARRETO - Page 3**

Pursuant to 28 U.S.C. §1746, I, Gabriel Sanchez, declare that:

My name is Gabriel Sanchez. I am an expert witness designated by the Veasey-LULAC and NAACP Plaintiffs in the above referenced case now pending in the United States District Court for the Southern District of Texas.

A true and correct copy of my curriculum vitae is attached hereto as a part of my report. The following report, a true and correct copy of which is attached and incorporated herein for all purposes, is a summary of my opinions and conclusions. The materials I relied upon to develop my analysis and opinions are produce herewith for all counsel.

The court testimony and publications I am required to disclose are described in my attached curriculum vitae.

My reasonable and necessary hourly rate for my time in this case is $250. I have been paid $25,000 to date.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this the 26 day of June, 2014.

Gabriel Sanchez

# ACCEPTED PHOTO IDENTIFICATION

# AND DIFFERENT SUBGROUPS IN THE ELIGIBLE VOTER

# POPULATION, STATE OF TEXAS, 2014

**Expert Report Submitted on Behalf of Plaintiffs**

**in *Veasey v. Perry*, *Case 2:13-cv-00193***

**Matt A. Barreto, Ph.D., University of Washington**

**Gabriel R. Sanchez, Ph.D., University of New Mexico**

**June 27, 2014**

## I. Introduction and Question Presented

The primary objective of this research report is to determine the current rates of possession, and lack of possession, of accepted photo identification among the eligible voting population in the state of Texas. More specifically, plaintiffs in *Veasey v. Perry*, no. 2:13-cv-00193, retained the report authors, Drs. Barreto and Sanchez, to create a research design that would allow for an examination of whether Latino and Black eligible voters in the state of Texas are more or less likely than eligible non-Hispanic White voters to possess accepted photo ID, and if any differences in possession are statistically significant. The research design defined accepted photo ID as being the types of ID generally required by SB 14 to cast an in-person ballot in Texas that will be counted, for example certain types of ID that either are current or expired in the past 60 days, hereinafter called "accepted ID" or "unexpired ID"– to match the provision in the law. We also address certain related questions, such as whether those who currently lack an accepted photo ID correctly comprehend the types of photo ID acceptable under SB 14 and whether this population faces potential burdens in acquiring accepted photo ID, including whether the answers to these questions differ by race. In addition to assessing differences between Whites, Blacks, and Latinos, we also assess the extent to which differences exist among other subgroups such as by gender and socioeconomic status.

Dr. Matt Barreto is currently an Associate Professor of Political Science, and Director of the Washington Institute for the Study of Ethnicity, Race & Sexuality (WISER), at the University of Washington, Seattle. He is also an affiliated faculty, and former executive committee member, of the Center for Statistics and the Social Sciences (CSSS) at UW, and an adjunct Associate Professor at the UW School of Law. Dr. Barreto completed a Ph.D. in Political Science, with an emphasis on racial and ethnic politics in the U.S., political behavior, and public opinion, at the University of California, Irvine in 2005.

Over the past eight years, Dr. Barreto has collaborated closely on research related to voter identification laws with Professor Gabriel R. Sanchez. Dr. Sanchez is currently an Associate Professor of Political Science at the University of New Mexico, Albuquerque, and Executive Director of the Robert Wood Johnson Center for

Health Policy at UNM.  Dr. Sanchez received his Ph.D. in Political Science, with an emphasis on racial and ethnic politics in the U.S., political behavior, and public opinion, at the University of Arizona in 2005.

In 2012, Drs. Barreto and Sanchez co-authored an expert report on possession of voter ID in the state of Wisconsin for the *Frank v. Walker* lawsuit. The two scholars also co-authored a second expert report in 2012 on possession of voter ID in the state of Pennsylvania in *Applewhite v. Commonwealth of Pennsylvania*. In both instances, the presiding judge relied on the data presented in our expert reports in declaring voter ID laws unlawful under state (Pennsylvania) and federal (Wisconsin) legal provisions.

Dr. Barreto and Dr. Sanchez have together designed multiple surveys about voter ID, and co-authored conference papers and published research on voter ID laws in peer-reviewed academic journals.  We have implemented more than 100 public opinion surveys and have, in total, published 5 books and well over 60 peer-reviewed academic research articles, over 20 book chapters in academic research volumes between the two of us.

We were assisted in our research by Ms. Hannah Walker, a Ph.D. student at the University of Washington.  Ms. Walker has previously served as our research assistant on two prior surveys and expert reports on possession of voter identification. Both of our full CV's are included as appendices C and D.

While the full methodology, statistical analysis and findings are detailed throughout this report, a short overview of the most relevant findings are offered first:

- As compared to eligible non-Hispanic White voters, Black and Latino eligible voters in Texas are less likely to possess a photo ID (state or federal) acceptable under SB 14 which requires that the ID is unexpired. These differences between White voters and each minority group of voters are statistically significant. More specifically, while only 4.7% of non-Hispanic White eligible voters lack an accepted ID, 8.4% of Black eligible voters, and 11.4% of Latino eligible voters lack accepted ID.   Thus, eligible Black voters are 179 percent more likely to lack an accepted photo ID than are non-Hispanic Whites.

3

Eligible Latino voters are 242 percent more likely to lack an accepted photo ID than are non-Hispanic Whites. Applying the results of the survey to the Texas citizen voting age population (as of 2012), there are approximately 1.2 million total eligible voter in Texas who lack accepted voter ID.

- Black and Latino eligible voters are less likely than non-Hispanic Whites to have heard of an EIC. Among those who lack an unexpired photo ID, 18.2% of Whites have heard of an EIC, compared to only 13% of Blacks for whom the same is true.

- As compared to eligible non-Hispanic White voters, eligible Black and Latino voters are more likely to lack an accepted photo ID <u>and</u> report facing potential burdens in obtaining an Election Identification Certificate (EIC) ID, creating a potential <u>double- burden</u> for Blacks and Latinos. While 4.5% of non-Hispanic Whites lack an accepted ID and will face at least one major potential burden in obtaining an ID, 6.1% of Blacks lack an accepted ID and will face at least one potential burden, and 9.1% of Latinos lack an ID and will face at least one potential burden in obtaining an ID. The difference between Whites and Latinos is statistically significant.

To test these questions a survey was designed specifically focused on the Texas photo ID law which went into effect in 2013. This research approach has three critical advantages for the purpose of identifying potential disparities in access to accepted forms of identification: 1) the use of a survey provides the opportunity to directly ask residents of Texas whether they are in possession of accepted photo ID and the underlying documents that may be used to obtain an accepted ID, 2) this study is focused on eligible voters and has sizable samples of non-Hispanic Whites, Blacks, and Latinos appropriate for statistical analysis, and 3) the survey also measured knowledge among respondents of the Texas identification law, and other potential barriers to access to obtaining an EIC. This approach is an ideal way to assess rates of possession of accepted photo ID because eligible voters were contacted directly and asked what types of identification and other documents they currently possess. Other methods, such as examining existing large public databases, also may be used to

provide information on the types of ID that individuals possess, depending on factors such as whether each type of relevant ID is recorded in a database and whether the relevant databases are available for review. While very useful, a database review may be limited to assessing ID possession among individuals included on the list of registered voters (if there is no database list of all eligible voters), whereas this research was able to assess how the Texas voter ID law affects all eligible voters. Finally, a survey can ask more specifically about current physical possession of the relevant ID to capture any instances where IDs has been lost, stolen, misplaced, destroyed, etc. When combined with other approaches aimed at identifying the impact of the new law, the survey research discussed in this report helps provide a clear picture of the individuals across race, ethnicity, and other demographic factors who lack accepted ID.

In sum, the data obtained through this survey provides an accurate and reliable depiction of the rates of possession of accepted photo ID in Texas, and of certain related matters. Because the percentage figures set forth in this report were obtained from a survey, these figures should be interpreted as estimates and not exact numbers. However, using standard and well-accepted statistical techniques, the margins of error associated with the percentage estimates were all evaluated and determined to be well within conventional standards, and we likewise determined whether the differential rates between groups (most importantly, between non-Hispanic Whites, Blacks, and Latinos) are statistically significant.

## II. Survey Methodology

### A. Survey Research is a Reliable and Trusted Method in the Social Sciences

Within social science research, public opinion and political behavior have been longstanding areas of significant consequence and interest. The primary reason for using survey research to study possession of accepted photo ID is simple: if you want to know if the population has the required ID, just ask them. Early on, "pollsters" learned that you could learn a great deal about voter attitudes, and possibly even predict election results, through large quantitative surveys of the public. Over the past decades, the science of public opinion

surveys has expanded greatly and great expertise has been developed in how to accurately sample, construct, implement and analyze survey data.[1]  Survey research has become a hallmark of social science research, such that at a typical Political Science academic conference more than 500 different research papers using survey data are regularly presented.  When surveys are implemented accurately, results generated from a sample of the population can be inferred to the larger population from which the sample is drawn, given the appropriate sampling error, or confidence interval that must always be accounted for.[2]  Survey research is a standard and widely accepted practice in social science and government research.  The U.S. government regularly relies on survey methodology exactly like that relied upon in this expert report, in its collection of data and statistics, such as the U.S. Census American Community Survey and Current Population Survey, the Bureau of Labor Statistics Unemployment Survey, and surveys by the National Institutes of Health, the Department of Defense, and the Internal Revenue Service. In fact, the Office of Management and Budget has a division called the "Federal Committee on Statistical Methodology" which has reviewed best practices in survey research and recommended random digit dial ("RDD") as a method to avoid non-coverage bias because it samples all known telephone numbers.[3] According to Michael Link, formerly a research scientist for the Centers for Disease Control and Prevention, "For more than three decades, RDD telephone surveys have been the predominant method for conducting surveys of the general public."[4]

The most important starting point for sound survey research is to acquire an accurate sample frame from which to draw the eventual sample of people interviewed.  If the sample is reflective of the larger population, and the survey is administered randomly, without bias, and with an adequate sample size and response rate the

---

[1] For example, see Harold Lasswell, *Democracy Through Public Opinion*. 1941; Harry Alpert, "Public Opinion Research as Science." Public Opinion Quarterly. 20(3). 1956; and Robert Groves et. al. *Survey Methodology*, 2nd ed. 2009.
[2] Claes-Magnus Cassell et. al., *Foundations of inference in survey sampling*. 1977; Barry Graubard and Edward Korn, "Survey inference for subpopulations." *American Journal of Epidemiology*. 144(1). 1996.
[3] Federal Committee on Statistical Methodology. Statistical Working Paper 17 – Survey Coverage. 1990. http://www.fcsm.gov/working-papers/wp17.html
[4] Address-Based Versus Random-Digit Dial Sampling: Comparison of Data Quality from BRFSS Mail and Telephone Surveys. 2005. http://www.fcsm.gov/05papers/Link_Mokdad_etal_IIB.pdf

results of the eventual survey can be considered as statistically reliable estimate, at least for those questions directed at all persons sampled.[5] According to Henry Brady, Professor of Political Science at the University of California, Berkeley, "Scientific surveys are one of these tools, and they have been widely used in the social sciences since the 1940s. No other method for understanding politics is used more, and no other method has so consistently illuminated political science theories with political facts… They provided the gold standard for measuring citizen opinions… No other social science method has proven so valuable."

## B. Principal Focus: Racial Disparities in Possession of ID in Texas

Specifically, the current study is focused on whether eligible Latino, eligible Black and eligible non-Hispanic White eligible voters in Texas have statistically different rates of possession of accepted photo ID, and the survey was designed to address the provisions of the Texas law. For example, when respondents were asked to confirm that they had an "up-to-date" driver's license or other accepted form of photo ID, survey interviewers confirmed that, for those types of ID that expire, the ID was either current or had expired within the last 60 days – to match the provision in the law. Respondents were also asked to indicate whether they were in possession of any of the accepted forms of photo ID[6]: a Texas driver's license, a Texas personal ID card that was issued by the DPS, a Texas Election Identification Certificate card, a Texas concealed handgun license, a U.S. passport, a U.S. military ID card with photograph, or a U.S. citizenship certificate containing their photograph. This information provided directly by respondents was utilized to create our measure of accepted ID that is used throughout the report.

This study was designed to assess if there were any statistically significant differences in rates of possession, or lack of possession, of accepted photo ID based on race and ethnicity. To assess this, the survey started by asking respondents to provide their race/ethnicity (see Appendix B for full survey questionnaire).

---

[5] Richard Scheaffer et. al. *Elementary Survey Sampling*, 7th ed. 2012; Robert Groves, *Survey Errors and Survey Costs*, 2nd ed. 2004.
[6] Photo ID Required for Texas Voters: information guide posted online: http://votetexas.gov/wp-content/uploads/2013/09/poster-8.5x14-aw.pdf

Respondents could self-report their racial or ethnic group, and like the Census, respondents were allowed to select one or more racial groups.[7] After establishing eligibility to participate in the survey, all respondents were asked: "Just to make sure we get a representative sample of people here in Texas, can you tell me what your race or ethnicity is?" Respondents could select White or Anglo, Black or Black, Hispanic or Latino, Asian American, Native American, or Other.

To assess the differential rates of possession of accepted photo ID, in-group percentages are presented for individuals who do not possess the various forms of photo ID as well as for potential burdens faced for White,[8] Latino, and Black respondents to the survey. In addition to the frequencies associated with possession of accepted forms of ID, results from a series of statistical tests are presented to determine whether eligible Latino and Black voters in Texas are disproportionately impacted by the Texas voter ID law. In this case, logistic regression was utilized to determine whether or not different groups (racial groups in this case) are distinct from each other when observing binary outcomes, such as possession of acceptable photo ID. Logistic regression is the most appropriate statistical analysis to test these relationships for two reasons: first, because the outcome variable of interest, possession of an accepted photo ID, is binary and logistic regression is best at estimating a 0,1 binary dependent variable, and second, because the regression provides a more precise, accurate, and strict test of statistical significance than does a chi-square or t-test comparison of means. Although we find similar results for the chi-square and t-tests in our analysis, the results of the regression analysis provide a direct test of whether possession rates of acceptable ID vary in a statistically significant manner for Blacks or Latinos, as compared to Whites.

As is the norm in the social sciences, standard levels of significance are utilized of .001, .010, .050, and .100 to determine if a result is statistically significant. The following symbols in the tables provide an indication

---

[7] Out of entire sample of 2,344 respondents there were 5 respondents who said they were both Hispanic and white. In this case, we included these as part of the Hispanic group and not as white, consistent with the United States Census. In total, there were 21 respondents who stated more than one race/ethnicity which accounted for less than 1 percent of all cases analyzed.
[8] Hereinafter in this report, the category/label "White" is used to refer to non-Hispanic Whites.

of the confidence level and degree of statistical significance for the observed difference between minority

groups and whites:

*** Pr < .001 ** Pr < .010 * Pr < .050 ‡ Pr < .100. For example, if a relationship is marked with

a ** symbol, we can say that the observed difference between Latinos and whites would achieve statistical

significance at 99% certainty – that is, we have 99% statistical certainty that the difference we observe is real

and not the result of sampling error.  Similarly, if the pr value is .050, then we can say that the observed

difference would achieve statistical significance at 95% certainty. The statistical significance, or confidence

interval, essentially takes into account the survey margin of error, and degree of difference in results to

determine if the differences observed are real and true.

We also occasionally present raw number estimates of the number of persons affected.  These estimates

are included to provide further insight into the scope of the effects of SB 14, and are not used to assess the

presence or extent of differential effects by group since that differential analysis necessarily depends upon

comparisons of the rates among the different groups.  The raw number estimates are extrapolations based on

applying the survey's percentage estimates to the Census data for the citizen voting age population of Texas.

Finally, it was critical that respondents to the survey were both residents of Texas and eligible to vote.

The survey therefore started with the following question that was used as a screener for eligibility to participate

in the study:

> "Okay, just to make sure you are eligible to take part in our survey about voting, can you confirm that you
> are 18 or over, and currently a U.S. citizen, and are not currently on probation, parole, or extended
> supervision for a felony conviction, and you have lived here in Texas for more than 30 days?"

At the end of the survey, respondents were asked to confirm they were a resident of the state of Texas, and any

individual who provided a response to these items that would make them ineligible to vote were excluded from

the study, ensuring that the analysis is focused on eligible voters in Texas. Therefore, any relationships between

race and ethnicity and possession of accepted photo identification are specific to the voting eligible population of the state.

## C. The Additional Questions: Differences by Other Demographic Indicators

In addition to race and ethnicity, our analysis includes a focus on the demographic indicators of gender, age, income, and education. Similar to the approach with race, percentages for individuals who do not possess the various forms of photo ID are presented for each category of these other demographic variables. For example, rates of possession for the following income categories are presented: less than $20,000, $20,000 to $40,000, $40,000 to $60,000, $60,000 to $80,000, $80,000 to $100,000, $100,000 to $150,000 and greater than $150,000 annual household income. Likewise, similar categorical break-outs for age and education groupings are presented, as are comparisons between men and women. A series of logistic regression analyses were also conducted for these additional demographic indicators to assess whether there were statistically significant differences in possession of accepted forms of ID due to gender, income, age, and educational attainment. This additional information will provide a more comprehensive picture of how the Texas law could impact voters from the state, with a specific focus on assessing statistically significant differences in possession rates of accepted forms of ID across race, ethnicity, gender and socio-economic factors.

## D. Texas Demographics

Previous studies focused on other states indicate that voter ID laws have the potential to disproportionately affect specific segments of the population, including racial and ethnic minorities, the elderly population, and those of low socio-economic status.[9] Given the diversity of Texas, it is relevant to extend a similar analysis to this state.

---

[9] Barreto, Matt, Stephen Nuño, and Gabriel Sanchez. 2009. "The Disproportionate Impact of Voter-ID Requirements on the Electorate—New Evidence from Indiana." *PS: Political Science & Politics*. 42 (January)

According to data from the US Census Bureau, among the citizen adult population in Texas, 37.9% is Hispanic or Latino, 11.5% is Black and 44.8% is non-Hispanic White. In terms of age, one-third of the population is 18-34, and another 14.5 percent are over the age of 65. Moreover, 18.9% have not completed high school, and when coupled with those with *only* a high school degree or equivalent, nearly 45 percent of the adult population in Texas has just a high school degree or less. Finally, a full quarter of the households in Texas earn less than $25,000 per year. Thus, the demographic portrait of Texas is one that is diverse along racial and ethnic bounds, as well as socioeconomically. As one of the largest states in the country, with more than 16.5 million adult citizens as of the 2012 Census ACS, voter identification laws have the potential to impact a large number of individuals in Texas. Further, as discussed in the next section, census demographics are used in weighting the sample to help ensure that the survey data are accurately reflective of the demographics of Texas.

### E. Survey Design

In designing a survey, researchers must consider three important topics to ensure their project is of the highest quality and follows social scientific standards. Two of the three relate to the design of the survey, and are discussed in this subsection of the report.

The first issue concerns the population for which inferences will be made and the method of interacting with that population. In this case, inferences will be made about the rates of possession of accepted photo identification for the eligible voting population in the state of Texas (and related matters). With this in mind, the most accurate and efficient way to contact this population should be determined. The most common approaches are through the use of (1) random digit dial and (2) household listed samples.

Random digit dial, or RDD, takes the known area codes and prefixes for a given geographic area, and randomly generates the last four digits of phone numbers and calls those numbers entirely at random. This increases the likelihood that every possible phone number in Texas has an equal chance of being called.

A second approach that is also used quite extensively is randomly calling listed household samples. Rather than calling randomly generated phone numbers (some of which may not exist), a listed sample starts with the known universe of actual phone numbers for landline and/or cell phone subscribers that currently reside in a geographic area (Texas in this case). Listed samples are far more efficient than pure RDD because they greatly reduce the number of "dead numbers" dialed and allow interviewers to focus on known working phone numbers. Listed samples are especially useful if researchers are interested in drilling down into a particular sub-group within the population such as racial or ethnic minorities, or registered voters. Sample vendors can sell a listed sample of all households in a particular area, or they can provide sample records for just Hispanic households. Likewise, sample vendors sell lists of known cell phone/wireless phone numbers for particular geographic areas, and those can then be randomly dialed as part of a survey. One of the advantages of using a survey firm with extensive experience purchasing lists is that the firm is able to secure these lists from the most reputable vendors available. This includes being able to secure cell-phone users who may have cell-phone numbers from outside of Texas but who actually reside within the state.

For this particular survey, several sample components were used. First, an RDD sample of 800 eligible voters representative of the full demographics of Texas was targeted (the survey ended up contacting 804 such eligible voters). This initial sample provides the survey power to analyze internal variation within the state's overall population. Second, in order to reach a reliable sample of Black and Latino eligible voters, two separate listed-sample oversamples of Black and Hispanic eligible voters were undertaken, so that when point estimates are provided for these two groups they each surpass n=800 in the sample. These robust samples provide the ability to explore variation within each population as needed, and ensure that the margins of error associated with our results are well within accepted levels. In both instances, the survey reached eligible voters in landline

12

and cell-phone-only households.[10] Sample sizes and configurations are set forth in table A, and further discussed below.

Table A: Sample composition

|        | RDD | Listed |
|--------|-----|--------|
| White  | 532 | 135    |
| Black  | 77  | 724    |
| Latino | 136 | 666    |
| Other  | 59  | 15     |
| Total  | 804 | 1,540  |

The second issue to ensure that a survey meets all social science standards concerns the design and construction of the survey questionnaire itself. In designing the questionnaire, researchers should follow best practices established by existing social science research, as well as groups such as the American Association of Public Opinion Research (AAPOR). It is important that questions are direct, objective, and neutral, not meant to lead respondents to give one particular answer over another, and should give respondents an appropriate range of available answer choices. With modern survey technology, questionnaires should always be programmed to rotate question wording, randomize answer choices, rotate options forward-to-back and more, to ensure that no priming takes place whereby respondents lean towards one type of answer because it is always read as the first option. For example, if a survey always led with the negative option for a question assessing approval of the President – strongly disapprove – researchers might end up with an over-estimation of respondents who pick strongly disapprove because they hear that first. For this project, we strictly followed the best social science practices for designing and implementing a survey.

The full questionnaire is included as an appendix to this document (Appendix B) so that readers can see that all of these criteria were followed in designing and implementing this survey. In this instance, the survey

---

[10] Cell phone respondents may also include current residents of Texas who have a non-Texas area code, but who appear on a listed sample of Texas households.

questionnaire contained five main sections: first, screening questions to establish eligibility to participate in the study; second, questions focused on accepted photo ID; third, questions that probed rates of possession of documentary proof of citizenship, identity, and residency; fourth, questions about possible burdens to acquire an EAC; and fifth, demographic questions concerning the sample.

### F. Survey Execution

The third issue to ensure that a survey meets social science standards concerns the implementation of the survey instrument. In executing a survey, all possible respondents must have an equal chance to respond, participate, and be included. For example, if potential respondents were only called at home at 1:00 pm in the afternoon on Fridays, this would result in a sample that would be distinct from the overall population of Texas since many would not be able to participate in the study because they would have been at work during the call time. Instead, researchers should take an approach that gives each potential respondent an equal opportunity to be included in the survey.

The actual phone calls and implementation of the current survey was handled by Pacific Market Research (PMR), a market research firm in Renton, Washington, under our supervision and direction. This is a highly reputable survey firm that has implemented many surveys for applied, legal and academic research[11] including surveys implementing similar designs as that used here for the purposes of exploring differences in public opinion and voting behavior. Further, Pacific Market Research implemented the surveys we performed for similar voter ID studies in the litigation noted above in Pennsylvania and Wisconsin, and the courts in those cases found the survey data to be reliable and consistent with accepted social science practices.

---

[11] The surveys conducted by Pacific Market Research include surveys for the U.S. Internal Revenue Service and the U.S. Department of Defense, surveys to study juror pool knowledge of pending cases and to study public opinion and voter participation among Whites, Hispanics, Blacks, and Asian Americans, and proprietary market research for firms such as Microsoft, AT&T, and T-Mobile.

As discussed above, two sampling approaches were used in this survey. First, PMR implemented a pure RDD approach obtaining an overall sample of 804 Texas eligible voters. Numbers were randomly generated, and then randomly selected phone numbers were dialed. To target Latino and Black eligible voters for separate oversamples, PMR procured a listed sample of Black and Hispanic households in Texas, and then randomly selected phone numbers to be dialed. An additional sample list, of known cell/wireless-only households, also was used to ensure that residents who do not have a landline telephone were still included in the survey. This step was important, as more and more people are moving toward cell phone usage and cancelling their land-line telephones. Adding a cell-phone sample ensures that the data can speak to all aspects of the Texas population. In all cases, calls were made from 4pm – 9pm central time Monday through Friday, and 12pm – 8pm central time Saturday and Sunday, beginning on March 16, 2014, and continuing until April 18, 2014. Landline numbers were auto-dialed and wireless numbers were manually dialed. If a respondent completed the survey, or refused to participate, that respondent was taken off the call list for future calls. Phone numbers were dialed and re-dialed up to five times in order to avoid any possible non-response bias that may result from only making one or two attempts per number. A full analysis of the data indicates that non-response bias did not present any problems in this study, given that up to five call-back attempts were used, and thus did yield hard-to-reach respondents. Phone numbers were "released" in batches of 100, and dialed until all numbers were exhausted, and then a second batch was made available, and so on.

Respondents had the choice of completing the interview in English, or in Spanish, and among self-identified Hispanic respondents, 60% took the survey in English, and 40% in Spanish. Among Whites and Blacks, 100 percent took the survey in English. Making the survey available in both English and Spanish is critical, as many Latinos in Texas prefer to take surveys in Spanish even if they are able to do so in English. This ensures that the responses provided by respondents are accurate and not biased by communication issues related to language effects.

15

Overall, Pacific Market Research reported a Response Rate-3 of 26.3 percent and a Cooperation Rate-3 of 39.2 percent, calculated as per the American Association of Public Opinion Research (AAPOR) guidelines.[12] In the field of survey research, response rates between 20 and 30 percent are considered to be accurate and in an accepted range, and this project falls within that range.[13]

After collecting the data for the main Texas sample, and the Black and Hispanic oversamples, underlying demographic characteristics of the respective samples were examined and compared to the known universe estimates for each from the 2012 U.S. Census, *American Community Survey* for Texas. Where there were any discrepancies, a weighting algorithm was applied to balance the sample, called raking ratio estimation,[14] so that the final samples that were tabulated for the analysis were in line with the U.S. Census estimates for Texas. For example, it is well known in survey research that people under 25 years old are harder to reach than older people who are over age 65. If 8% of survey respondents are age 18-24 years old, but census data tells us they are actually 14% of the eligible voting population, then each young person needs to be "up-weighted" so that collectively they represent 14% of the sample. Overall, the discrepancies between the collected data and the Census population estimates were quite small, and therefore the resulting weights that were employed were also quite small. Still, by weighting the data to known ACS demographics for each group, or for the state at large, this helps to ensure that the sample generated for the report is reflective of the overall population of Texas and, consequently, that the inferences made regarding possession rates of accepted ID (and related matters) are reflective of that target population as well. Weighting of survey data is a very common and accepted approach in social science research, especially when inferences are made to the larger population.[15]

---

[12] For more on AAPOR guidelines: http://www.aapor.org/Response_Rates_An_Overview1.htm. The response rate refers to percent of individuals who agreed to take the survey out of the overall number of cases in the sample. In contrast, the cooperation rate refers the percent of individuals who agreed to take the survey out of the overall number of individuals actually reached by researchers.
[13] Scott Keeter et. al. 2006. "Gauging the Impact of Growing Nonresponse on Estimates from a National RDD Telephone Survey," *Public Opinion Quarterly*. 70(5)
[14] Michael Battaglia et. al. 2004. "Tips and Tricks for Raking Survey Data (a.k.a. Sample Balancing)" Proceedings of the Survey Research Methods Section, American Statistical Association.
[15] Eun Sul Lee and Ronald Forthofer. 2006. *Analyzing Complex Survey Data.* Sage Publications.

## III. Impact of the Texas Photo ID Law

As of 2014, Texas now generally requires that individuals provide accepted photo identification before they are issued a regular ballot when seeking to vote in person on election day or as part of in-person early voting. Acceptable identification includes a Texas driver's license, a Texas personal ID card that was issued by the DPS, a Texas Election Identification Certificate, a Texas concealed handgun license, a U.S. passport, a U.S. military ID card with photograph, or a U.S. citizenship certificate containing photograph. All forms of identification, aside from a U.S. citizenship certificate, must be current or have expired within 60 days of the election. The ID must have the individual's name printed on it and that name must be substantially similar to the name in the voter registration file.

### A. Impact of SB 14 on the Overall Population of Texas Eligible Voters

Among the overall population of eligible voters in Texas a sizeable portion do not possess an acceptable form of photo ID. According to the estimates obtained from the survey, 7.2 percent of eligible voters do not possess an accepted photo ID. In terms of a raw number extrapolation, approximately 1.2 million eligible voters currently do not possess an accepted ID in Texas.

The survey further found that a lack of accurate information may affect the ability of eligible voters lacking an acceptable photo ID to obtain the required photo ID. While 92.8 percent have an accepted photo ID, 97.2 percent of Texas eligible voters believe they currently have an accepted photo ID. If they believe they currently possess an accepted ID, these eligible voters with an expired or incorrect type of ID may be less likely to go to obtain a new or corrected ID than those who know they lack accepted ID simply because they believe they are already in compliance with the law. Further, we find a large number of eligible individuals do not possess documentary proof of citizenship and documentary proof of identity used to acquire an accepted form of photo ID . Among those who currently lack ID and thus generally not eligible to vote in person, 26.5 percent do not currently possess underlying documents used to obtain an EIC.

17

Finally, when asked how easy or difficult it will be to visit a DPS or County Clerk office to obtain an EIC, an overwhelming 91 percent of Texans who currently lack an ID state they will face at least one potential burden in doing so. Such burdens might include not being able to visit the office during limited operating hours, getting a ride or public transportation, or paying the costs associated with underlying documents, any of which independently present problems when attempting to access and EIC.

This initial overview indicates that there is a significant segment of the Texas population that lacks the accepted forms of identification. The next section of the analysis focuses specifically on whether possession rates of accepted ID vary significantly across racial and ethnic groups.

### B. Disparate Rates by Race/Ethnicity

#### 1. Rates of possession of accepted photo ID for eligible voters by race/ethnicity

We find differences in possession rate by race/ethnicity. Eligible Black and Latino voters disproportionately lack an accepted photo ID in Texas. In fact, the relationship between race/ethnicity and possession of an accepted photo ID is statistically significant at a very rigorous level utilized in social science research (Table 1). Among Latino eligible voters, 11.4 percent lack an accepted form of photo ID, and 8.4 percent of Black eligible voters lack an accepted form of photo ID, compared to only 4.7 percent of White eligible voters (Table 1). This means that Blacks are 1.78 times more likely *to lack* accepted ID, and Latinos are 2.42 times more likely *to lack* accepted ID than are Whites.[16] In terms of raw numbers, we may extrapolate that 180,000 Black and 555,000 Latino eligible voters do not possess accepted photo ID (Table 1). Taken together, more than 730,000 Black and Latino citizens, who are otherwise eligible to vote do not possess any of the photo ID generally required under Texas law for in-person voting.

---

[16] We arrive at this by dividing the rate of Latinos who lack ID (11.4) by the rate of Whites who lack ID (4.7) to get 1.78; and likewise for Blacks who lack ID (8.4) divided by 9.3 to get 1.42



** statistically significant difference from Whites at 95% confidence level
*** statistically significant difference from Whites at 99% confidence level

### 2. Rates of possession of accepted ID for registered voters and actual voters by race/ethnicity

The next step in the analysis was to examine the relative rates of possession, or lack of possession, of ID among those already registered to vote, by race and ethnicity. This analysis builds on the previous section and provides an assessment of the impact of the new law on both eligible voters as well as those who were already registered to vote at the time of the survey interview. Similar to the patterns among the overall population of eligible voters, possession of accepted photo ID among registered voters also varies significantly by race and ethnicity. While 2.1 percent of white registered voters do not possess an accepted photo ID, 4.9 percent of Black and 6.8 percent of Latino registered voters lack accepted photo ID (Table 2). Further, both difference between Black and White registered voters, and Latino and White registered voters are statistically significant at the 99% level.

### 3. Public knowledge of voter ID Law in Texas by race/ethnicity

As noted above, one challenge facing eligible voters in Texas without an accepted photo ID is that they correctly understand the voter ID law. In this regard, we find that Blacks and Latinos will be disadvantaged as compared to Whites: 7.0% of Blacks and 9.1% of Latinos indicate in the survey that they believe they have an

accepted photo ID when in fact they do not have an accepted photo ID, compared to 3.8% among Whites (Table 5).



** statistically significant difference from Whites at 95% confidence level
*** statistically significant difference from Whites at 99% confidence level

**4. Rates of possession of documentary proof of citizenship and identity among eligible voters who do not possess a photo ID**

The next step in the analysis was to determine the proportion of voters who not only lack possession of an acceptable form of ID, but who may lack documents used to acquire an accepted photo ID. In this case, we specifically focused on the regulations and requirement to obtain an EIC for purposes of voting. More specifically, questions were asked focused on the possession of documentary proof of citizenship and documentary proof of identity – which are both used to acquire an EIC.

Overall, the data show that about one out of four (26.4%) Texans who lack an unexpired ID also lack the underlying documents required to obtain an ID (Table 7). Among Blacks who lack an unexpired ID, 30.4% do not have underlying documents used to obtain an ID, while 23.4% of Latinos lack these underlying documents (Table 7).

5. **Are Latinos and Blacks who lack a photo ID disproportionately lower in socioeconomic status than Whites?**

Among those who lack a photo ID, some amount of resources are likely needed to obtain an accepted ID. For example, citizens without accepted ID and without the requisite underlying documents will have to have the proper information and know-how to navigate the bureaucratic systems to obtain copies of birth certificates, naturalization records, social security cards, marriage or divorce certificates and so on. In addition, those without accepted ID may have to take time off work or school to visit the appropriate state or county office, and find a means of transportation to and from. Under any scenario, eligible voters who lack ID will face some potential burdens in attempting to obtain an accepted ID.

As compared to the population who already has an unexpired ID, Texas eligible voters who lack ID are disproportionately low-income, with 44.7% of those who lack ID reporting an annual household income of less than $20,000 in 2013 (compared to only 12.8% of those who have an ID for whom the same is true). As socioeconomic and demographic research has extensively documented, Latinos and Blacks in Texas are far more likely to be in the lowest income bracket than are Whites. Looking just at respondents who lack an unexpired ID, 61% of Blacks earn less than $20,000 annual household income, as do 51% of Latinos – compared to 23% of Whites who earn less than $20,000. Thus, any burdens related to obtaining underlying documents that involve direct or indirect financial costs will disproportionately affect Black and Latino eligible voters in Texas.



*** statistically significant difference from Whites at 99% confidence level

Beyond income, we find other major discrepancies between minorities and Whites in terms of socioeconomic status (Figure 4). For example, among eligible voters who lack and unexpired ID, 39% of Whites are homeowners compared to just 29% of Blacks and just 33% of Latinos. And in terms of educational attainment, just 10.2% of Whites who lack ID did not complete a High School degree, compared to 27.6% of Blacks and 61.4% of Latinos who do not have a High School degree. These significant socioeconomic disparities will create real world differences in the burdens faced by Blacks and Latinos in attempting to obtain an accepted photo ID.

**Figure 4: Summary Socioeconomic Characteristics of Eligible Voters who Lack an Unexpired ID by Race**

|  | White | Black | {B - W} | Latino | {L - W} |
|---|---|---|---|---|---|
| Own their own home | 39 | 29 | -10 | 33 | -6 |
| Lived 2 years or less at current address | 14.6 | 36.5*** | +21.9 | 14.7 | +0.1 |
| Did not complete HS | 10.2 | 35.6 | +25.4 | 51.6*** | +41.4 |
| Less than $20K annual income | 22.9 | 61.5** | +38.6 | 51.4*** | +28.5 |

** statistically significant difference from Whites at 95% confidence level
*** statistically significant difference from Whites at 99% confidence level

## C.  Possession of Accepted photo ID and Other Demographic Indicators

Although the primary focus of this report centers on race and ethnicity, a secondary question of interest is whether rates of possession of required forms of ID vary due to other demographic factors. The next section of the report examines the relationship between gender, age, education, and income with possession of accepted forms of photo ID among eligible voters in Texas.

### 1.   Rates of possession of accepted ID by age

The analysis by age cohort indicates that younger eligible voters disproportionately lack an accepted photo ID.  Overall, just 85.2% of eligible voters in Texas age 18-24 have a proper photo ID that can be used for voting, while 14.8% lack an ID.   This is over three times the rate of lacking an ID of middle-age voters, age 35-54. What's more, these younger eligible voters are the most likely to wrongly believe that a Texas state university ID would count for purposes of voting – 73.8% of those age 18-24 who lack an unexpired photo ID think a university ID can be used to comply with the voter ID law.

### 3.   Rates of possession of accepted ID by educational attainment

Exhibiting one of the clearest direct relationships among all demographic categories, the level of educational attainment of eligible voters is strongly related to possession of an accepted photo ID. Eligible voters who have not earned a high school degree are statistically less likely to possess an acceptable photo ID. Among those without a high school degree, 14.7% lack an accepted photo ID, compared to only 1.6% of college graduates who lack an accepted photo ID. What's more, we find that eligible voters without a high school degree are the least likely to have heard of an EIC – at just 13% who lack an unexpired photo ID and say they know about the EIC. Finally, those in the lowest educational category also have the highest probability of lacking underlying documents that may be used to obtain an EIC with 36% stating they do not these underlying

documents. The relationship between education and possessing underlying documents necessary to obtain an EIC among those who lack an unexpired ID is statistically significant.

### 4. Rates of possession of accepted photo ID by income

Across all categories, individuals who make less than $20,000 a year are less likely than their wealthier counterparts to possess an accepted photo ID, at the strictest level of statistical significance in the social sciences (99%). Just over 21% (21.4%) of eligible voters who earn less than $20,000 annually do not have an accepted ID. On the other end of the income scale, just 2.6% of eligible voters who earn $100,000 to $150,000 lack photo ID and just 2% of those who earn over $150,000 lack photo ID. This means that the poorest citizens in Texas are over four times more likely to lack an accepted photo ID than the wealthiest citizens in Texas. What's more, there continues to be a lack of accurate information as we find that 22.5% of those earning less than $20,000 annually believe they have a proper ID, but in fact they do not. Finally, the data demonstrates that lower income respondents are the most likely to lack underlying documents that may be used to obtain an EIC.

**Summary of Section IV: Impact of the Texas ID Law on Eligible Voters**

In sum, Texas's voter ID law, which generally requires individuals to possess an accepted form of photo ID in order to cast an in-person ballot that will be counted, disproportionately affects racial and ethnic minorities. The results indicate that approximately 11.4 percent of Latino eligible voters and 8.4 percent of Black eligible voters lack an accepted form of photo ID, compared to only 4.7 percent of White eligible voters. This means that Blacks eligible voters are 1.78 times more likely *to lack* accepted ID, and Latino eligible are 2.4 times more likely *to lack* accepted ID than are Whites. When assessing the estimates of the number of people who will be impacted by the voter ID law in Texas, more than 180,000 Black and 555,000 Latino citizens in Texas, who are otherwise eligible to vote, will not have access to the ballot box because they do not possess an

accepted photo ID as defined by current Texas law. Beyond possession of accepted photo ID, racial and ethnic disparities were identified in knowledge and familiarity with the voter ID law.

In addition to Latinos and Blacks, the analysis indicates that other demographic groups are less likely to possess the required forms of ID generally needed to vote in person under the new law. Those with a lower socio-economic level see statistically significant disparities when compared to voting-eligible persons with a high socio-economic level. Statistically significant differences in rates of possession of accepted photo ID also were found by age groups among eligible voters.

## V.  Potential Burdens Faced in Acquiring an EIC

In addition to directly investigating the percentage of eligible voters in Texas who currently lack the photo-identification generally required for in-person voting by the new law, our study included the potential impact of increased costs or barriers to voting more broadly on voter participation. This additional analysis was motivated by the consideration that the new law could increase the cost of electoral participation by increasing the financial, time, and information costs of this activity; this, in turn, could impact turnout rates of eligible voters in Texas. More specifically, eligible voters who lack an ID may face costs such as the following to obtain an EIC:  (1) learning where to go to obtain an EIC; (2) gathering all necessary documents to present to the issuing official; (3) obtaining transportation to obtain an EIC; and (4) taking time to visit an appropriate office during business hours. We asked a battery of questions aimed at assessing whether respondents who lack a driver's license or ID card feel as though a number of increased costs or burdens associated with acquiring the ID would pose a problem for them if they attempted to obtain an EIC.

### A.  Political Science Research Shows That Added Costs May Decrease Participation

In his seminal work, *An Economic Theory of Democracy* (1957), Anthony Downs articulated a rational choice theory of voting behavior that predicts individuals will vote when the benefits of doing so outweigh the

costs.[17] This theory has been verified over time by political scientists who have identified institutional constraints (e.g. registration and voting requirements) as the chief source of cost imposition to voters.[18]  For example, Rosenstone and Wolfinger found that strict registration laws, including deadlines and limited office hours, reduce overall turnout.[19]  It is important to note that, with relatively low perceived benefits to voting among the electorate, even small increases to barriers to the ballot box can have a marked impact on turnout.

Beyond the resource-based cost-benefit analysis that voters confront in a Downsian environment, it is relevant to take into account the history of overt racial exclusion at the ballot box in the United States that researchers have found has restricted voting rates among non-White citizens.  Voting rules and regulations have been directly tied to the exclusion of Blacks, Latinos, and Native Americans, primarily in the South and Southwest, since the 15th Amendment proclaimed the right to vote shall not be denied on account of race or color.  Some scholars who study voting rights have argued that a high percentage of changes to voting requirements in the South from 1870 to 1964 were intended to limit or deny Blacks the right to vote (Davidson 1992; Grofman and Handley 1991). This history implies that institutional requirements for registration and voting have both direct and indirect racial effects, which indicates a need to explore whether the potential burdens associated with the new law in Texas differ by race and ethnicity.

Despite the passage of the VRA the relationship between obstacles to voting and race remains relevant today. Research has shown that several voting practices –  including drawing district lines that fragment minority voting populations, holding at-large elections, and changing city boundaries in order to manage the

---

[17] Downs, Anthony. 1957: *An Economic Theory of Democracy*. New York: Harper & Row.
[18] See for example: Piven, Frances Fox, and Cloward, Richard A. 1988. *Why Americans Don't Vote*. New York: Pantheon Books. Verba, Sidney, Kay Schlozman, and Henry Brady. 1995. *Voice and Equality: Civic Voluntarism in American Politics*. Cambridge, MA: Harvard University Press.
[19] Rosenstone, Steven and Raymond Wolfinger. 1978. "The Effect of Registration on Voter Turnout." The American Potlitical Science Review, 72 (1), 22-45.

racial composition of the population – can negatively impact minority voters.[20] Recently, for example, extensive analysis by Herron and Smith (2012; 2013) found that efforts to curb early voting in Florida disproportionately affected Blacks and Latinos.[21]

Not only do increased barriers to the ballot box decrease turnout among the electorate (and particularly those with fewer resources), removing barriers to voting has been found to increase turnout among these segments of the population. For example, research following the passage of the 1965 Voting Rights Act found that this major legislation along with other reforms that eliminated policies like white primaries in the South and other discriminatory practices such as poll taxes and literacy tests significantly increased participation among groups targeted by the laws.[22] By 1967, the registration gap between Blacks and whites in Alabama had closed by nearly 12 percentage points; in North Carolina it closed by nearly 20 percentage points; and, in Mississippi Black registration jumped form 6.7 percent in 1965, to 59.8 percent in 1967.[23] Similarly, with the extension of the VRA to language minorities in 1975, Hispanic registration and turnout rates increased.[24] Additional empirical analysis of the effect of a wider set of reforms supports the hypothesis that reducing institutional barriers to voting may expand participation among groups that tend to turnout at low rates.[25]

---

[20] See, *e.g.*, Davidson, Chandler. 1992. "The Voting Rights Act: A Brief History." In Controversies in Minority Voting, ed. Bernard Grofmanand and Chandler Davidson. Washington, DC: Brookings Institution.

[21] Michael Herron and Daniel A. Smith. 2013. "House Bill 1355 and Voter Registration in Florida," *State Politics and Policy Quarterly.;* Michael Herron and Daniel A. Smith. 2012. "Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355," *Election Law Journal* 11 (3): 331-47.

[22] Davidson, Chandler. 1992. "The Voting Rights Act: A Brief History." In Controversies in Minority Voting, ed. Bernard Grofmanand and Chandler Davidson. Washington, DC: Brookings Institution.; Grofman, Bernard and Handley, Lisa. 1991. "The Impact of the Voting Rights Act on Black Representation in Southern State Legislatures." *Legislative Studies Quarterly,* 16(1): 111-128.

[23] Grofman, Bernard and Handley, Lisa. 1991. "The Impact of the Voting Rights Act on Black Representation in Southern State Legislatures." *Legislative Studies Quarterly,* 16(1): 111-128.

[24] Rosenstone, Steven J., and Hansen, John Mark. 1993. *Mobilization, Participation, and Democracy in America.* New York: Macmillan Publishing.

[25] See: Rosenstone, Steven and Raymond Wolfinger. 1978. "The Effect of Registration on Voter Turnout." The American Political Science Review, 72 (1), 22-45.; Campbell, Angus, Converse, Philip E., Miller, Warren E., and Stokes, Donald E. 1960. *The American Voter.* Chicago: University of Chicago Press.; Katosh, John P., and Traugott, Michael W. (1982). Costs and values in the calculus of voting. *American Journal of Political Science* 26: 361.; Jackson, Robert A. 1993."Voter Mobilization in the 1986 Midterm *Election." Journal of Politics,* 55:1081-1099.; Kim, Jae-On, Petrocik, John R., and Enokson, Stephen N. 1975. "Voter turnout among the American states: Systemic and Individual components." *American Political Science Reiew,* 69: 107-131.

Similar to the role of race for increased costs, the positive effects associated with decreasing costs of participation also vary by race and ethnicity. For example, the National Voter Registration Act (NVRA) passed in the early 1990's increased registration among minorities more significantly than among whites.[26] The NVRA was designed to ease voter registration by incorporating registration into the activities of the department of motor vehicles and public assistance agencies, thereby increasing access. As a result, public assistance agencies registered three percent of new white registrants, seven percent of new Black voters and six percent of new Latino voters. These findings suggest that institutional rules related to voting impact minorities more than Whites.  The section below provides discussion of the results from our survey that explores the reported obstacles associated with obtaining the required ID by race in the state of Texas.

### B.  Reported Obstacles to Acquiring an EIC by Race/Ethnicity

We begin our discussion of the burdens issue with the results from our survey items on this topic among eligible voters. Here we focus on two groups: eligible voters who lack an accepted ID, and eligible voters who reported they lacked an accepted type of photo ID that is both unexpired and has a name that matches that on the voter rolls.[27] We present results by race and ethnicity to assess how minority eligible voters will be impacted and whether or not a substantial proportion will face additional potential burdens. Our findings indicate that a high percentage of Black and Latino eligible voters will encounter potential burdens in their pursuit of an accepted photo ID.

---

[26] Wolfinger, Raymond, and Jonathan Hoffman. 2001. "Registering and Voting with Motor Voter." *PS Political Science and Politics,* 34 (1), 85-92.

[27] By "name match," we mean instances where survey respondents reported that the name on their accepted  SB 14 photo identification does not exactly match their name as it appears on the registration rolls.  The ability of these voters to cast an in-person ballot that counts will depend on whether election officials determine that the two name versions for each voter are "substantially similar" or not.  The survey data relating to name matching therefore represent an outer boundary of persons who may face an obstacle in voting in person notwithstanding their possession of accepted ID.  In order to fully resolve the name mismatch issue, some voters may have to visit a DPS facility to update their identification.  Accordingly, in reporting survey data regarding potential burdens involved in going to a DPS office, we separately report data for: a) those who lack an accepted ID; and b) a combination of those who lack accepted ID and those who have a name mismatch issue.

When we look at the percentage of eligible voters who view getting time off of work as a problem we see marked differences by race and ethnicity. More specifically, among those who lack an accepted ID, while 38.7% of White eligible voters report that getting time off from work would be a problem, 40% of Blacks and 54.2% of Latinos report that this would be a problem (Table 14). Getting time off from work to attain an EIC is therefore a burden for nearly a third of White, a third of Black, and over half of Latino eligible voters who lack an unexpired photo ID. We also explored the potential burdens associated with obtaining an EIC among eligible voters who do not possess an unexpired ID without name match and see similar patterns. More specifically, while 31.2% of White eligible voters without an ID with a matching name report getting time off from work or school to be a problem, 36.1% if Black and 53.8% of Latinos in this situation report this to be a burden (Table 15). We see a sizable percentage of eligible voters across racial and ethnic groups also indicating that using or paying for public transportation would be a problem for them. Among those who lack an unexpired ID, 37.7% of Whites, 38.1% of Blacks and 36.1% of Latinos would be burdened by having to use public transit to get an EIC (Table 16). Among the broader group of individuals for whom a name match would also be a problem, 34.9% of White, 32.4% of Black, and 39.7% of Latino eligible voters without an appropriate ID would be burdened by having to use public transportation to obtain the EIC to vote (Table 17). Finally, we were interested in learning whether being able to make to the DPS office during their normal business hours would be a problem for eligible voters. Here we find that a large percentage of eligible voters, regardless of race, would be burdened by having to get to the office during their normal office hours. Among those who lack an unexpired ID, 55.7% of Whites, 45% of Blacks and 43.4% of Latinos report that this issue would be a problem for them (Table 18). Similarly, among those for whom a name match would be a problem, 44.4% of White, 37.8% of Black, and 40% of Latino eligible voters say that getting to the DPS office during their normal business hours would be burdensome (Table 19). This segment of our analysis reveals that a substantial segment of eligible voters would be burdened by the need to acquire the accepted ID.

**C. Reported Obstacles to Acquiring an EIC by Other Demographic Groups**

Potential burdens to accessing an accepted ID additionally vary by gender, age, education and income. In terms of gender, we find that women without an unexpired photo ID (52.9%) are more likely to have problems using or paying for public transportation than their male counterparts (24.5%). There are also marked differences in perceived burdens based on age. For example, the youngest cohort of eligible voters will have the most difficult time getting time off from work to acquire the accepted ID, as 82.1% of 18-24 year olds without an unexpired ID report that this will be a problem compared to 53.1% among those in the next age bracket, 25-34 year olds. Finally, we see that education has a marked impact on perceived burdens associated with acquiring the accepted ID. For example, while over 39.4% of eligible voters regardless of education level view using or paying for public transportation to obtain an ID as a problem, this burden is great for those with less than a high school education, as 42% of respondents who lack an unexpired ID, and who have the lowest educational attainment report that this would pose a problem.

**D. Implications of the Texas Voter ID Law**

The disparate impact of the Texas Voter ID law that we have documented in this report have important implications for electoral outcomes. The implication for those who lack a valid photo ID on Election Day is that they will be unable to vote. Thus the law has the potential to make the vote less effective, for certain protected classes of citizens. Here, we assess whether or not voting preferences of minorities and Whites in Texas are polarized or not. Evidence from Texas suggests a political environment characterized by racially divergent voting interests.

First, public opinion surveys in Texas indicate that policy attitudes towards immigration laws are racially divergent. When asked about their perspective on whether or not local law enforcement should enforce

30

federal immigration law, 46 percent of white survey respondents said local law enforcement should be required to enforce it, compared to only 18 percent of Hispanic respondents who said the same and 32 percent of Blacks.[28] Further public opinion data demonstrate racially polarized policy interests in Texas, beyond issues of immigration. When asked about their support for ending bilingual education, 55 percent of whites strongly supported an end to bilingual education, compared to only 22 percent of Hispanics and 30 percent of Blacks.[29] Similarly, when asked whether they favored repealing the section of the 14th amendment of the Constitution that establishes citizenship by birthright, 63 percent of whites favored ending birthright citizenship, compared to only 34 percent of Hispanics and 32 percent of Blacks[30]. Thus, public opinion data that suggest Whites diverge in their policy interests from Hispanics in Texas.

Second, exit polls from the last several presidential races in Texas indicate clearly that the voting preferences of Texans varies significantly by race. For example, in the 2010 election, 69 percent of Whites voted in favor of Rick Perry for Governor, compared to 11 percent of Blacks and 19 percent of Hispanics[31]. In the 2008 presidential election, 26 percent of Whites voted for Barack Obama compared to 98 percent of Blacks and 63 percent of Hispanics[32]. Also in 2008, election results for U.S. Senate reveal stark differences in voting patterns by race with 27 percent of Whites voting for Noriega, 89 percent of Blacks for Noriega and 61 percent of Hispanics for Noriega[33]. In the 2006 election for U.S. Senate in Texas, 68 percent of Whites voted Hutchison, compared to 26 percent of Blacks and 44 percent of Hispanics.[34] In 2004, just 25 percent of Whites voted for John Kerry in the presidential contest, compared to 83 percent of Blacks and 50 percent of

---

[28] UT-Austin/Texas Tribune Poll (a). May 2011. "Local Law Enforcement of Federal Immigration          Law." Texas Politics Project. http://texaspolitics.laits.utexas.edu/11_6_0.html
[29] UT-Austin/Texas Tribune Poll. May 2010. "Support for Ending Bilingual Education." Texas     Politics Project. http://texaspolitics.laits.utexas.edu/11_6_0.html
[30] UT-Austin/Texas Tribune Poll (b). February 2011. "14th Amendment Repeal." Texas Politics     Project. http://texaspolitics.laits.utexas.edu/11_6_0.html

[31] www.cnn.com/ELECTION/2010/results/polls/#TCG00p1 and also http://latinodecisions.files.wordpress.com/2010/12/tx_nov21.pdf
[32] www.cnn.com/ELECTION/2008/results/polls/#TXP00p1
[33] www.cnn.com/ELECTION/2008/results/polls/#TXS01p1
[34] www.cnn.com/ELECTION/2006/pages/results/states/TX/S/01/epolls.0.html

Hispanics.[35] In the 2000 presidential election, a clear majority of Whites supported Bush, while an overwhelming majority of Blacks[36] and 66 percent of Hispanics[37] supported Gore. And in the 1996 presidential election, 31 percent of Whites voted for Bill Clinton compared to 88 percent of Blacks and 75 percent of Hispanics.[38]

Furthermore, recent court cases associated with the state-wide redistricting cases in Texas have found evidence of racially polarized voting. In LULAC v. Perry the court found "severe" racially-polarized voting in Texas, according to an analysis by Kristen Clarke-Avery.[39] Indeed, the court wrote in the LULAC decision, "The District Court found 'racially polarized voting' in south and west Texas, and indeed 'throughout the State.'" Because nearly all elections in Texas are partisan, some argue that the differences between whites and minorities are simply driven by partisanship and not race. However this is irrelevant to the inquiry of whether or not whites and minorities vote differently. The question is here is just simply whether or not Blacks and Latinos – who are less likely to possess a valid photo ID – have different voting preferences than Whites. The reason for their preferences are not relevant. In *Teague v. Attala County*, 92 F.3d 283, 285 (5th Cir. 1996), the court held that the plaintiffs did not have disprove other factors other than race affect voting patterns, rather just focusing on the results of elections and showing Blacks and Whites had substantially different voting patterns was enough to meet the Gingles standards. That is, other factors can be associated with voting, but the only standard is whether or not different racial groups are voting differently.

This ideal is based in the key opinion by Brennan in *Thornburg v. Gingles*, 478 U.S. 30, 44-45, 106 S.Ct. 2752, 2763, 92 L.Ed.2d 25 (1986). Specifically Brennan wrote that "it is the difference between the choices made by black and white voters and not the reason for the difference that leads to blacks having less

---

[35] http://edition.cnn.com/ELECTION/2004/pages/results/states/TX/P/00/epolls.0.html
[36] http://www.ropercenter.uconn.edu/CFIDE/cf/action/catalog/abstract.cfm?type=&start=&id=&archno=USVNS2000-STELEC-TX&abstract=
[37] http://wcvi.org/latino_voter_research/polls/tx/2000/latino_vote_for_candidates.html
[38] http://cgi.cnn.com/ELECTION/TXPxp.html
[39] http://writ.news.findlaw.com/commentary/20060724_clarke-avery.html

opportunity to elect their candidates of choice." Justice Brennan advanced his evidentiary standard regarding racially polarized voting by repudiating certain arguments made by the state of North Carolina (and the United States as amicus). The state argued that statistical evidence must demonstrate not only that there is a correlation between race of the voters and their choice of candidates but also that race (as opposed to other factors such as socioeconomic status or party affiliation) is the principal reason for the voters' selections. According to the plurality, however, the proper inquiry under Section 2 is to ask *whether* voters of different race favor different candidates, not *why* they do so. Exploring the reasons for the relationship between race and votes cast interjects intent into the analysis, and "the legal concept of racially polarized voting incorporates neither causation nor intent," according to Justice Brennan (p. 62).

Further, a clear and consistent finding in political science research proves that discriminatory attitudes and racial prejudice are the driving factor behind White party identification, and this is especially strong in Section 5 covered jurisdictions[40].

Even before the Obama elections, political scientists had amassed data, with a particular eye towards Section 5 covered jurisdictions and concluded that racial attitudes were driving partisanship and voting. Professor Jonathan Knuckey writes, "These findings suggest that race and racial attitudes continue to shape southern party politics in the early twenty-first century… racial attitudes will have been woven into the partisan fabric that now characterizes the 'New South's' party system."[41]  In subsequent analysis of race and partisanship, Knuckey concludes that "the increase in the effect of racial resentment should give pause to those

---

[40] Knuckey, Jonathan. 2005. "Racial Resentment and the Changing Partisanship of Southern Whites." *Party Politics,* 11(1): 5-28; Carmines, Edward G., and Stimson, James A. 1989. *Issue Evolution: Race and the Transformation of American Politics.* Princeton: Princeton University Press; Morales, Dana Ables. 1999. "Racial Attitudes and Partisan Identification in the United States, 1980-1992." *Party Politics,* 5(2): 191-198; Valentino, Nicholas A., and Sears, David O. 2005. "Old Times There Are not Forgotten: Race and Partisan Realignment in the Contemporary South." American Journal of Political Science, 24(3): 672-688.
[41] Knuckey, Jonathan. 2005. "Racial Resentment and the Changing Partisanship of Southern Whites." *Party Politics,* 11(1): 5-28;

who would diminish the role that racial conservatism played as an explanation for Republican gains among southern whites in the 1990s."[42]

     Following the election of Barack Obama in 2008 a number of political scientists took up the issue of racial prejudice and the White vote for Obama, relying on nationally reputable data sources and cutting edge research methodologies. Political Scientists Michael Tesler and David Sears find a very similar pattern to what Knuckey documented in the 1990s. Even after controlling for conservative ideology, they find "the most racially resentful were more than 70 percentage points more likely to support McCain in March 2008 than were the least racially resentful."[43] In other research, Professor Michael Lewis-Beck summarizes the data succinctly when he writes, "The roots of Obama's relative underperformance electorally can be laid at the feet of race prejudice." Indeed, Political Scientist Ben Highton concludes his analysis of White vote for Obama in Southern states by noting, "at the state level, the influence of prejudice on voting was comparable to the influence of partisanship and ideology. Racial attitudes explain support for Obama and shifts in Democratic voting between 2004 and 2008."[44]

---

[42] Jonathan Knuckey, 2006. "Explaining Recent Changes in the Partisan Identifications of Southern Whites." Political Research Quarterly. Vol 59
[43] Michael Tesler and David Sears. 2010. Obama's Race: The 2008 Election and the Dream of a Post-Racial America. University of Chicago. pp61.
[44] Highton, Ben. 2011. "Prejudice Rivals Partisanship and Ideology When Explaining the 2008 Presidential Vote across the States." PS: Political Science & Politics. July.

Appendix A: Tables of Results
Texas Voter ID Survey

# Rates of Posession of Voter Identification

Table 1: Possession/Lack of Possession of Valid Photo ID in Texas, by Race

| | White | | Black | | Latino | | Total Eligible Voter Pop | |
|---|---|---|---|---|---|---|---|---|
| | Don't Have | Have | Don't Have | Have | Don't Have | Have | Don't Have | Have |
| Total Population | 8,360,000 | | 2,144,000 | | 4,867,000 | | 16,062,000 | |
| Eligible voters who have a valid, unexpired photo ID | 4.7% | 95.3% | 8.4%** | 91.6% | 11.4% *** | 88.6% | 7.2% | 92.8% |
| Est. # of eligible voters who have a valid, unexpired ID | 395,000 | 7,965,000 | 180,000 | 1,965,000 | 555,000 | 4,315,000 | 1,155,000 | 14,900,000 |
| Registered voters who have a valid, unexpired photo ID | 2.1% | 97.9% | 4.9%** | 95.1% | 6.8%*** | 93.2% | 3.8% | 96.2% |

*p<0.1; **p<0.05; ***p<0.01

Table 2: Reason People Lack Valid Photo ID in Texas, by Race

| | White | Black | Latino |
|---|---|---|---|
| Eligible voters who do not have an unexpired photo ID | 4.7% | 8.4% | 11.4% |
| Eligible voters who have an unexpired photo ID, but name does not match | 4.6% | 5.4% | 5.3% |
| Est. # of eligible voters who have an unexpired photo ID, but name does not match | 385,000 | 115,000 | 255,000 |
| Registered voters who do not have an unexpired photo ID | 2.1% | 4.9% | 6.8% |
| Registered voters who have an unexpired photo ID, but name does not match | 4.7% | 3.7% | 5.3% |

Table 3: Among Eligible Voters, by Race: Reason People Lack Valid Photo ID in Texas, Rate

| | White | Black | Latino |
|---|---|---|---|
| Total | 100.0 | 100.0 | 100.0 |
| Does not have an **unexpired** photo ID | 4.7 | 8.4 | 11.4 |
| Has unexpired ID, but Name does not match | 4.6 | 5.4 | 5.3 |
| Total who do not have an unexpired ID with name matching | 9.3 | 13.8 | 16.7 |

Table 4: Among Eligible Voters, by Race: Reason People Lack Valid Photo ID in Texas, Estimated Total Count

|  | White | Black | Latino |
|---|---|---|---|
| Total | 8,360,000 | 2,144,000 | 4,867,000 |
| Does not have an **unexpired** photo ID | 395,000 | 180,000 | 555,000 |
| Has unexpired ID, but name does not match | 385,000 | 115,000 | 255,000 |
| Total who do not have an unexpired ID with name matching | 780,000 | 295,000 | 810,000 |

# Public Knowledge and Documents Required to Obtain a Piece of Voter Identification

Table 5: Among Eligible Voters, by Race: Perceptions of Texas Photo ID Requirements

|  | White | | Black | | Latino | |
|---|---|---|---|---|---|---|
|  | No | Yes | No | Yes | No | Yes |
| Believes they have a valid photo ID | 1.8 | 98.2 | 1.5 | 98.5 | 3.9 | 96.1 |
| Believes they have a valid photo ID, but actually do not | 96.2 | 3.8 | 93.0 | 7.0 | 90.9 | 9.1 |

Table 6: Among Eligible Voters who Lack an **unexpired photo ID**, by Race: Knowledge of the Voter ID Law in Texas

|  | White | | Black | | Latino | |
|---|---|---|---|---|---|---|
|  | No | Yes | No | Yes | No | Yes |
| Has Heard of an EIC | 81.8 | 18.2 | 87.0 | 13.0 | 78.7 | 21.3 |
| Knows to Get an EIC from DPS Office | 100.0 | 0.0 | 100.0 | 0.0 | 97.9 | 2.1 |
| Knows an EIC is Free | 37.9 | 62.1 | 26.1 | 73.9 | 30.9 | 69.1 |
| Thinks a State of TX University ID Counts | 29.8 | 70.2 | 23.5 | 76.5 | 40.5 | 59.5 |
| Thinks an Employment Photo ID From the State of TX Counts | 22.0 | 78.0 | 50.0 | 50.0 | 44.6 | 55.4 |
| Thinks an Employment Photo ID From the Fed Govt Counts | 10.5 | 89.5 | 23.8 | 76.2 | 25.9 | 74.1 |

2

Table 7: Among Eligible Voters, by Race: Rates of Possession/Lack of Possession of Documentary Proof of Citizenship and Identity Needed to Acquire an Election Identification Card, Among Those Without an **unexpired photo ID**

|  | White | | Black | | Latino | |
|---|---|---|---|---|---|---|
|  | No | Yes | No | Yes | No | Yes |
| Has proof of citizenship | 21.2 | 78.8 | 30.4 | 69.6 | 23.4 | 76.6 |
| Has proof of identification | 19.7 | 80.3 | 18.2 | 81.8 | 22.3 | 77.7 |
| Has both proof of citizenship and proof of ID | 21.2 | 78.8 | 30.4 | 69.6 | 23.4 | 76.6 |

## Problems Faced Accessing a Election Identification Card Among Eligible Voters

Table 8: Among Eligible Voters without an **Unexpired Photo ID**, by Race: Percent Who Indicate They Will Face at Least One Problem Getting Free ID

|  | White | Black | Latino |
|---|---|---|---|
| Total who do not face any problems | 0.0 | 20.0 | 13.3 |
| Total who face at least one problem | 100.0 | 80.0 | 86.7 |

Table 9: Among Eligible Voters without an **Unexpired Photo ID with name matching**, by Race: Percent Who Indicate They Will Face at Least One Problem Getting Free ID

|  | White | Black | Latino |
|---|---|---|---|
| Total who face at least one problem | 7.3 | 16.7 | 11.5 |
| Total who do not face any problems | 92.7 | 83.3 | 88.5 |

Table 10: Among **ALL** Eligible Voters, by Race: Percent Who **BOTH** Lack an Unexpired ID **AND** Face Problems Getting an ID

|                        | White | Black | Latino |
|------------------------|-------|-------|--------|
| Faces at least 1 problem | 4.5   | 6.1   | 9.1    |
| Faces 5+ problems      | 2.3   | 3.7   | 4.1    |

Table 11: Among **ALL** Eligible Voters, by Race: Percent Who **BOTH** Lack an Unexpired ID with Matching Name **AND** Face Problems Getting an ID

|                        | White | Black | Latino |
|------------------------|-------|-------|--------|
| Faces at Least 1 problem | 8.8   | 11.6  | 14.9   |
| Faces 5+ problems      | 4.6   | 5.5   | 7.0    |

Table 12: Among Eligible Voters without an **Unexpired Photo ID**, by Race: Do you happen to know where the nearest Texas Department of Public Safety Office is in relation to your home?

|     | White | Black | Latino |
|-----|-------|-------|--------|
| No  | 11.3  | 31.6  | 25.3   |
| Yes | 88.7  | 68.4  | 74.7   |

Table 13: Among Eligible Voters without an **Unexpired Photo ID with name matching**, by Race: Do you happen to know where the nearest Texas Department of Public Safety Office is in relation to your home?

|     | White | Black | Latino |
|-----|-------|-------|--------|
| No  | 13.0  | 20.0  | 28.9   |
| Yes | 87.0  | 80.0  | 71.1   |

Table 14: Among Eligible Voters without an **Unexpired Photo ID**, by Race: If you needed to go to the Texas DPS office on Monday through Friday during normal business hours to obtain an Election Identification Certificate, does this pose a problem or not? **Getting time off work or school...**

|                              | White | Black | Latino |
|------------------------------|-------|-------|--------|
| Not a problem                | 61.3  | 57.1  | 45.2   |
| A little problem             | 11.3  | 19.0  | 27.4   |
| Somewhat of a problem        | 11.3  | 9.5   | 6.0    |
| A Definite Problem           | 16.1  | 14.3  | 21.4   |
| Total who say it's a problem | 38.7  | 40.0  | 54.2   |

Table 15: Among Eligible Voters without an **Unexpired Photo ID with name matching**, by Race: If you needed to go to the Texas DPS office on Monday through Friday during normal business hours to obtain an Election Identification Certificate, does this pose a problem or not? **Getting time off work or school...**

|                              | White | Black | Latino |
|------------------------------|-------|-------|--------|
| Not a problem                | 68.8  | 63.9  | 45.8   |
| A little problem             | 6.4   | 11.1  | 24.4   |
| Somewhat of a problem        | 12.8  | 8.3   | 11.5   |
| A Definite Problem           | 11.9  | 16.7  | 18.3   |
| Total who say it's a problem | 31.2  | 36.1  | 53.8   |

Table 16: Among Eligible Voters without an **Unexpired Photo ID**, by Race: If you needed to go to the Texas DPS office on Monday through Friday during normal business hours to obtain an Election Identification Certificate, does this pose a problem or not? **Using or paying for public transit to get there...**

|                              | White | Black | Latino |
|------------------------------|-------|-------|--------|
| Not a problem                | 63.3  | 61.9  | 63.9   |
| A little problem             | 15.0  | 4.8   | 21.7   |
| Somewhat of a problem        | 3.3   | 19.0  | 7.2    |
| A Definite Problem           | 18.3  | 14.3  | 7.2    |
| Total who say it's a problem | 37.7  | 38.1  | 36.1   |

Table 17: Among Eligible Voters without an **Unexpired Photo ID with name matching**, by Race: If you needed to go to the Texas DPS office on Monday through Friday during normal business hours to obtain an Election Identification Certificate, does this pose a problem or not? **Using or paying for public transit to get there...**

|  | White | Black | Latino |
|---|---|---|---|
| Not a problem | 65.7 | 67.6 | 60.3 |
| A little problem | 9.3 | 8.1 | 19.8 |
| Somewhat of a problem | 5.6 | 10.8 | 8.4 |
| A Definite Problem | 19.4 | 13.5 | 11.5 |
| Total who say it's a problem | 34.9 | 32.4 | 39.7 |

Table 18: Among Eligible Voters without an **Unexpired Photo ID**, by Race: If you needed to go to the Texas DPS office on Monday through Friday during normal business hours to obtain an Election Identification Certificate, does this pose a problem or not? **Making it to the required office during their normal business hours such as 8am to 5pm only...**

|  | White | Black | Latino |
|---|---|---|---|
| Not a problem | 44.3 | 52.4 | 56.6 |
| A little problem | 1.6 | 4.8 | 18.1 |
| Somewhat of a problem | 34.4 | 9.5 | 7.2 |
| A Definite Problem | 19.7 | 33.3 | 18.1 |
| Total who say it's a problem | 55.7 | 45.0 | 43.4 |

Table 19: Among Eligible Voters without an **Unexpired Photo ID with name matching**, by Race: If you needed to go to the Texas DPS office on Monday through Friday during normal business hours to obtain an Election Identification Certificate, does this pose a problem or not? **Making it to the required office during their normal business hours such as 8am to 5pm only...**

|  | White | Black | Latino |
|---|---|---|---|
| Not a problem | 55.6 | 62.2 | 60.5 |
| A little problem | 6.5 | 5.4 | 13.2 |
| Somewhat of a problem | 24.1 | 10.8 | 10.1 |
| A Definite Problem | 13.9 | 21.6 | 16.3 |
| Total who say it's a problem | 44.4 | 37.8 | 40.0 |

**GABRIEL R SANCHEZ**          **POLITICAL SCIENCE**          **JUNE 2014**

**RECENT EMPLOYMENT HISTORY:**

**Executive Director, Robert Wood Johnson Foundation Center for Health Policy.** April 2014-Current. University of New Mexico, Robert Wood Johnson Foundation Center for Health Policy, Albuquerque, NM.

**Interim Executive Director, Robert Wood Johnson Foundation Center for Health Policy.** February 2013-March 2014. University of New Mexico, Robert Wood Johnson Foundation Center for Health Policy, Albuquerque, NM.

**Associate Professor.** July 2011-Present. University of New Mexico, Department of Political Science, Albuquerque, NM.

**Director, American Economic Association Summer Training Program.** March 2013-Present. Housed at the University of New Mexico, Albuquerque, NM.

**Director of Research, Latino Decisions.** May 2011-Present.

**Assistant Director, Robert Wood Johnson Foundation Center for Health Policy.** July 2011-February 2013. University of New Mexico, Robert Wood Johnson Foundation Center for Health Policy, Albuquerque, NM.

**AFFILIATED DEPARTMENTS/RESEARCH CENTERS**

Department of Family and Community Medicine, University of New Mexico.

Southwest Hispanic Research Institute, University of New Mexico.

Politics of Race, Immigration, and Ethnicity Consortium (PRIEC) University of California, Riverside

Strategy Scholars Network (SSN), Southwest Region.

**EDUCATIONAL HISTORY:**

Ph.D.  May 2005.  University of Arizona.  Tucson, AZ. Political Science.
    Fields:  American Politics, Research Methods, Public Policy.

M.A.   December 2002.  University of Arizona.  Tucson, AZ.  Political Science.

B.A.   May 2001.  St. Mary's University. San Antonio. TX. Political Science.  Minor, Mexican American Studies. *Cum Laude.*

1

**ACADEMIC HONORS AND FELLOWSHIPS:**

- "Best Paper on Latino Politics" Award, Western Political Science Association. 2013.
- "Best Article" Published in Political Research Quarterly in 2011. 2012.
- "Luminaria" UNM Presidential Award for Commitment to Diversity. 2010.
- Best Paper on State Politics and Policy, American Political Science Association. 2009.
- "Faculty Service Award" -Faculty of Color Awards. 2008-2009.
- Senior Research Fellow, Robert Wood Johnson Center for Health Policy Center, University of New Mexico. 2009-Present.
- Named an Office of Support for Excellence in Teaching Faculty Fellow (Declined). 2009.
- "Best Paper on Latino Politics" Award, Western Political Science Association. 2009.
- "Faculty Excellence Award" -Faculty of Color Awards. 2007-2008.

**SCHOLARLY ACHIEVEMENTS:**

# Books Authored or Co-authored:

Gabriel R Sanchez (Editor), The Latino Vote in the 2012 Election, Michigan State University Press. Lancing, Michigan. Under Contract.

Chris Garcia and Gabriel Sanchez, *Hispanics and the U.S. Political System: Moving Into the Mainstream,* Pearson: Prentice Hall. Upper Saddle River, New Jersey, 462 pages. 2008.

# Articles in Refereed Journals:

Gabriel R. Sanchez and Shannon Sanchez-Youngmann. 2013. "The Politics of the Health Care Reform Debate: Public Support of Including Undocumented Immigrants and Their Children in Reform Efforts. *International Migration Review,* Vol. 47, No.2, pp. 442-473.

Gabriel R. Sanchez and Jillian Medeiros. 2012. "Tough Times, Tough Choices: The Impact of the Rising Medical Costs on the US Latino Population's Health Care Seeking Behaviors." *Journal of Health Care for the Poor and Underserved*, Vol. 23, No.4, pp. 1383-1398.

Gabriel R. Sanchez, Jillian Medieros and Shannon Sanchez-Youngmann. 2012. "The Impact of Health Care and Immigration Reform on Latino Support for President Obama and Congress" *Hispanic Journal of Behavioral Sciences,* Vol. 34, No. 1, pp. 3-22. 30 pages.

Michael Rocca, Gabriel R. Sanchez, and Jason Morin. 2011. "The Institutional Mobility of Minorities in Congress," *Political Research Quarterly*, Vol. 64, No.4, pp. 897-909. [Awarded "Best Article Published in PRQ" for 2011].

Gabriel R. Sanchez and Jason Morin. 2011. "The Effect of Descriptive Representation on Latino's Views of Government and of Themselves," *Social Science Quarterly,* Vol. 92, No. 2, pp. 483-508.

Gabriel R Sanchez, Shannon Sanchez-Youngman, Amy Sue-Goodin, Amelia Rousse, and Richard Santos. 2011. "Explaining Public Support (or Lack Thereof) for Extending Health Coverage to Undocumented Immigrants," *Journal of Health Care for the Poor and Underserved*, Vol.22, No.2, pp. 683-699..

Gabriel R. Sanchez and Natalie Masouka. 2010. "Brown Utility Heuristic? The Presence and Contributing Factors of Latino Linked Fate," *The Hispanic Journal of Behavioral Sciences,* Vol.32, No.4,  pp. 519-531.

Sylvia Manzano and Gabriel R. Sanchez. 2010. "Take One for The Team: Ethnic Identity, Candidate Qualification and Co-Ethnic Voting." *Political Research Quarterly*, Vol. 63, No. 3, pp. 568-580.

Jessica Lavariega-Monforti and Gabriel R. Sanchez. 2010. "The Politics of Perception: An Investigation of the Presence and Source of Perceived Discrimination Toward and Among Latinos." *Social Science Quarterly,* Vol. 90, No.1, pp. 245-265.

Gabriel R Sanchez, Amy Sue-Goodin, Amelia Rousse, and Richard Santos. 2010. "The Impact of Ethnicity on Attitudes Toward Health Care Reform in New Mexico." *The Social Science Journal,* Vol. 47, No.2, pp. 326-343.

Michael Rocca, Gabriel R. Sanchez, and Joe Uscinski. 2009. "Congress and Foreign Policy: Congressional Action on the Darfur Genocide."*PS: Political Science and Politics*, Vol. 42, No.3, pgs. 489-496.

Marks, Mara, Stephen Nuno, and Gabriel R. Sanchez. 2009. "Look Back in Anger: Voter Opinions of Mexican Immigrants in the Aftermath of the 2006 Immigration Demonstrations." *Urban Affairs Review*, Vol. 44, No. 5, pp. 695-717.

Rocca, Michael, Gabriel R. Sanchez, and Ron Nikora. 2009. "The Role of Personal Attributes in African American Roll-Call Voting Behavior," *Political Research Quarterly*, Vol. 62, No.2, pp. 408-414.

Matt Barreto, Stephen Nuno, and Gabriel R. Sanchez. 2009. "The Disproportionate Impact of Indiana Voter ID Requirements on the Electorate." *PS: Political Science and Politics,* Vol. 42, No. 2, pp. 111-116.

Sanchez, Gabriel R. "Latino Group Consciousness and Perceptions of Commonality With African Americans." 2008. *Social Science Quarterly*, Vol. 89, No.2, pp. 428-444.

Michael Rocca, Gabriel R. Sanchez, and Joe Uscinski. 2008. "Personal Attributes and Latino Voting in Congress." *Social Science Quarterly,* Vol. 89, No. 2, pp.392-405.

Michael Rocca and Gabriel R. Sanchez. 2008."The Effect of Race and Ethnicity on Bill Sponsorship and Co-sponsorship in Congress." *American Politics Research*, Vol. 36, No.1, pp. 130-152.

3

Gabriel R. Sanchez. 2006. "The Role of Group Consciousness in Latino Public Opinion," *Political Research Quarterly,* Vol.59, No. 3, pp. 435-446.

Gabriel R. Sanchez, 2006. "The Role of Group Consciousness In Political Participation Among Latinos in The United States," *American Politics Research,* Vol. 34, No. 4, pp. 427-451.

## Chapters in Edited Volumes:

Gabriel R. Sanchez and Vickie Ybarra. "New Approaches to the Study of Racial and Ethnic Health Disparities: Advocating for Better Measures and Exploration of Internal Variation Within Diverse Groups" in, *Mapping 'Race': A Critical Reader on Health Disparities Research,* edited by Laura Gomez and Nancy Lopez, Rutgers University Press, New Jersey, Forthcoming.

Gabriel R. Sanchez and Jillian Medieros. "The Economy and Latinos-Trying to find "Affordable Care" with High Medical Costs and the Economic Recession", in *The Economic Status of the Hispanic Population*, edited by Marie Mora, Information Age Publishing, Charlotte, North Carolina, Forthcoming.

Garcia, F. Chris, Christine Sierra, and Gabriel R Sanchez. "Hispanos in the 2008 Elections in New Mexico," in *Latinos in the 2008 Election*, edited by David Leal, University of Notre Dame Press, Notre Dame, Indiana, Forthcoming.

Barreto, Matt, Gabriel R. Sanchez and Ben Gonzalez.  "Rainbow Coalition in the Golden State? Exposing Myths, Uncovering New Realities in Latino Attitudes Towards Blacks,*" Black and Brown Los Angeles: A Contemporary Reader*, edited  by Laura Pulido and Josh Kun, University of California Press, Berkeley, CA, 2010.

Barreto, Matt, Gabriel Sanchez and Jason Morín. "Perceptions of Competition Between Latinos and Blacks: The Development of a Relative Measure of Inter-Group Competition,*" Black-Brown Relations*, edited by Edward Telles, Gaspar Rivera-Salgado and Sylvia Zamora, Russell Sage Foundation,  New York, New York, 2010.

John A. Garcia and Gabriel R. Sanchez. "Electoral Politics*," Latino Political Participation in the Next Millennium*, edited by S. Navarro and A. Mejia, ABC-CLIO Publishers, Santa Barbara, CA, pp. 121-169, 2004.

## Other Writings:

Gabriel R. Sanchez. "Why the Success of Health Care Reform Depends on Energetic and Nuanced Outreach to Latinos". Policy Brief of Scholars Strategy Network, September, 2013.

Gabriel R. Sanchez and Lisa Sanchez. 'The Entry of U.S. Latinos into High Profile Political Positions." Entry in the Encyclopedia of Latino Issues Today, published by Greenwood Press/ABC-CLIO.

4

"Latino Attitudes Toward the Patient Protection and Affordable Care Act." Gabriel R. Sanchez, Jillian Medeiros and Sam Howarth,  Policy Brief of the Robert Wood Johnson Foundation Center for Health Policy of the University of New Mexico, Albuquerque, NM, October, 2011.

"Latinos' Views on Health Care Reform in the Midst of the Historic Congressional Debates of 2009." Gabriel R. Sanchez and Jillian Medeiros,  Policy Brief of the Robert Wood Johnson Foundation Center for Health Policy of the University of New Mexico, Albuquerque, NM, December, 2009.

Garcia, John, Gabriel R. Sanchez, and Salvador Peralta, The Political World of Latinos: Political Behaviors, Attitudes, and Public Policy (An Annotated Bibliography of Latino Politics Research). Published electronically through the University of Arizona Library April, 2009, and available at the following link:
http://www.uair.arizona.edu/holdings/collection?r=uadc://azu_latinopolitics/.

"The Public's View on Health Care Reform prior to the 48th Legislative Second Session 2008." Gabriel R. Sanchez, Amy Sue Goodin, Amelia Rouse, Richard Santos, and Robert Berrens, Policy Brief of the Robert Wood Johnson Foundation Center for Health Policy of the University of New Mexico, Albuquerque, NM, January, 2008.

"The Disproportionate Impact of Indiana Voter ID Requirements on the Electorate." Barreto, Matt,  Stephen Nuño, and Gabriel Sanchez,  Amicus Brief Submitted to the U.S. Supreme Court, Commissioned by the Brennan Center for Justice, 2007.

## Works in Progress:

### Accepted for publication in refereed journals:

Gabriel R. Sanchez and Jillian Medeiros. "Linked Fate and Latino Attitudes Regarding Health Care Reform Policy." *Social Science Quarterly,* 30 pages. Final acceptance September 21, 2012.

### Submitted for publication in refereed journals:

Matt Barreto, Stephen Nuno and Gabriel R Sanchez. Rates of Possession of Valid Photo ID by Racial Group and the Right to Vote. ." Being Revised for Resubmission at *American Political Science Research.*

Gabriel R. Sanchez, Edward Vargas, and Ballington Kinlock. "The Enhanced Self-Reported Health Outcome Observed in Hispanics/Latinos who are Socially-Assigned as White is Dependent on Nativity." Being Revised for Resubmission at *Journal of Immigrant and Minority Health.*

Gabriel R. Sanchez, Jillian Medieros, and Shannon Sanchez-Youngmann. "Falling on Deaf Ears? The Perceived Involvement of the Latino Population in the National Health Care Reform Debate." Being Revised for Resubmission at *Latino Studies.*

5

Matt Barreto, Natalie Mosouka, and Gabriel R. Sanchez. "Discrimination and Group Consciousness Among Muslim Americans." Being Revised for Resubmission at *Politics of Groups and Identities*.

John Garcia, Gabriel R. Sanchez, Edward Vargas, Shannon Sanchez-Youngmann, and Vickie Ybarra. "Race as Lived Experience: The Impact of Multi-Dimensional Measures of Race/Ethnicity on the Self-Reported Health Status of Latinos". Being Revised for Resubmission at *The DuBois Review*.

Gabriel R. Sanchez and Eduardo Vargas. "Taking a Closer Look at Group Identity: The Link Between Theory and Measurement of Group Consciousness and Linked Fate". Under Review at *American Journal of Political Science*.

Gabriel R. Sanchez, Shannon Sanchez-Youngmann, and Jason Morin. "The Presence of Linked Fate and the Impact of Linked Fate on Political Behavior." Under Review at *Political Research Quarterly*.

Gabriel R. Sanchez and Patricia Rodriguez Espinosa. "Revisiting Discrimination Theory: The Relationship Between Co-Ethnic Discrimination and Linked Fate Among Latinos in the United States". Under Review at *American Political Science Review*.

Gabriel. R Sanchez, Vickie Ybarra, and Lisa Sanchez. "Racialized Nativism in State Policy: The Great Recession and Punitive Immigration Policy in the American States, 2005-2010". Under Review at *Policy Studies Journal*.

Gabriel R. Sanchez, Kimberly Huyser, Carmela Roybal, and Jillian Medeiros-Perez. "Do Racial Attitudes Matter? A Look at Racial Attitudes Toward Latinos and African-Americans and Their Effect on Public Policy". Under Review at *Social Science Journal*.

Vargas, Edward D., Gabriel Sanchez, and Ballington Kinlock. "The Enhanced Self-Reported Health Outcome Observed in Hispanics/Latinos who are Socially-Assigned as White is Dependent on Nativity" . Under Review at *Immigrant and Minority Health Research*.

## Works in preparation:

### Book Manuscript in Preparation:

Michael Rocca and Gabriel R. Sanchez, *Explaining Latino Congressional Behavior.* Book proposal being prepared for submission to academic presses.

### Articles in Preparation:

Gabriel R. Sanchez, Eduardo Vargas (RWJF Center Postdoc), Ballington Kinlock (RWJF Meharry Center Fellow). "The Relationship Between Ascribed Race and Latino Health Status." To be sumitted to peer-reviewed journal in Fall, 2013.

Ricardo Ramirez, Gabriel R. Sanchez and Shannon Sanchez-Youngmann (RWJF Center Fellow). "House of Mirrors?: The Effects of Overlapping Descriptive Representation on Political Attitudes". To be submitted to peer-reviewed journal in Fall, 2013.

Jillian Medeiros, Kimberly Huyser (RWJF Center Faculty) and Gabriel R. Sanchez. "Multi-Racial and Multi-Ethnic Attitudes Toward Health Care Reform Policy". To be submitted to peer-reviewed journal in Fall, 2013.

Matt Barreto, Gabriel R. Sanchez, and Stephen Nuno. "Voter ID Requirements and the Disenfranchisement of Latino, Black and Asian Voters." To be submitted to peer-reviewed journal in Fall, 2013.

Gabriel R. Sanchez and Estela Vasquez Guzman (RWJF Center Fellow). "Revisiting the Hispanic Paradox: Definitions of Acculturation and Self-Rated Health Status among Latino Citizens." To be submitted to peer-reviewed journal in Fall, 2013.


## Consultant/Expert Witness Research

Pennsylvania, 2012, Co-Wrote Expert Report (With Matt Barreto) for ACLU Foundation of Pennsylvania in voter ID lawsuit, Applewhite v. Commonwealth of Pennsylvania No. 330 MD 2012 [Referral: Vic Walczak]

Milwaukee County, WI, 2012, Co-Wrote Expert Report (With Matt Barreto) for ACLU Foundation of Wisconsin in voter ID lawsuit, Frank v. Walker 2:11-cv-01128(LA) [Referral: Jon Sherman]

New Mexico, 2011, Testifying Expert for LULAC in Redistricting lawsuit, NM LULAC et al. vs. Duran et al. [Referral: Pablo Martinez]

Brennan Center for Justice and Fried, Frank, Harris, Shriver & Jacobson LLP, 2009-10 Amicus Brief submitted to Indiana Supreme Court, League of Women Voters v. Rokita, regarding access to voter identification among minority and lower- resource citizens [Referral: Myrna Perez]

Brennan Center for Justice, 2007-08, Amicus Brief submitted to U.S. Supreme Court, and cited in Supreme Court decision, Crawford v. Marion County, regarding access to voter identification among minority and lower-resource citizens [Referral: Justin Levitt]

## Recent Invited Talks/Presenations

"Implications for Electoral and Party Alignments". Invited lecture during the Galbraith Conference on Immigration convened by the Miller Center of the University of Virginia. October, 2013.

"Creating a More Diverse and Representative Health Professional Workforce". Panelist during the Practices and Policies that Promote Health Justice Congressional Health Disparities Summit at UNM. September, 2013.

"Investigating Internal Variation Among Hard to Research Populations". Invited lecture to the Robert Wood Johnson's ICPSR Workshop at the University of Michigan. August, 2013.

"Latino Knowledge of the ACA and Best Practices for Outreach". Invited Presentation to the Legislative Health and Human Services Committee of the New Mexico State Legislature, August, 2013.

"The Role of the Latino Electorate in the 2012 Election and Electoral Power in Years to Come." Invited Presentation to the United Way of Central New Mexico, March, 2013.

"The Role of the Latino Electorate in the 2012 Election and Electoral Power in Years to Come." Invited Presentation to the United States Hispanic Leadership Instiatute National Confernce, Chicago, IL. March, 2013.

"The Role of the Latino Electorate in the 2012 Elections." Invited Presentation to the UNM Board of Regeants Academic Affairs Committee, December, 2012.

"The Politics of Racial and Ethnic Health Disparities". Inivted talk at Texas A&M University, November 1, 2012.

"What we have learned about Latino Politics from the 2012 Election". Inivited talk to the Coalition for Interdisciplinary Research on Latino Issues at the University of Michigan, November, 2012.

"Multi-Dimensional Measures of Race and Health Disparities". Invited talk to the Robert Wood Johnson's Scholars Program at the University of Michigan.

## Presentations at Professional Association Conferences:

"Illegal or Undocumented? Effects of Immigration Rhetoric on Immigration Attitudes among Blacks, Whites and Latinos in the U.S." Co-authored with Ali Valenzuela and Vickie Ybarra. Annual Meeting of the American Political Science Association, Chicago, IL, September, 2013.

"Rates of Possession of Valid Photo ID and the Right to Vote." Co-authored with Matt Barreto and Stephen Nuno.  Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 2013.

"Language of Democracy". Co-authored with Chris Mann. Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 2013.

"Taking a Closer Look at Group Identity: The Link Between Theory and Measurement of Group Consciousness and Linked Fate". Co-authored with Eduardo Vargas. Annual Meeting of the Western Political Science Association, Hollywood, CA, April 2013.

"An Examination of Inter-Group Attitudes Among Multiple Populations: The Role of Neighborhood Context and Group-Based Threat". Co-authored with Matt Barreto. Annual Meeting of the Western Political Science Association, Hollywood, CA, April 2013.

"The Latino Vote in the 2012 Battleground States". Annual Meeting of the Western Political Science Association, Hollywood, CA, April 2013.

"The Political Consequences of the Great Recession". Co-authord with Jillian Medieros, Julia Hellweggle, Lisa Sanchez, and Vickie Ybarra. Annual Meeting of the Western Political Science Association, Hollywood, CA, April 2013.

"Public Intellectualism: Academics who Engage in Real-Time Politics Through New Media", Panel Discussion of the Annual Meeting of the Western Political Science Association, Hollywood, CA, April 2013.

"Multi-Dimensional Measures of Race and Health Disparities". Co-authored with John Garcia, Vickie Ybarra, Shannon Sanchez-Youngmann, and Eduardo Vargas. Annual Meeting of the American Political Science Association, New Orleans, LA, September, 2012.

"House of Mirrors?: The Effects of Overlapping Descriptive Representation on Political Attitudes". Co-authored with Ricardo Ramirez and Shannon Sanchez-Youngmann. Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 2012.

"Filling the Void:: Factors Leading to Punitive Immigration Policy Across the American States". Co-authored with Lisa Sanchez and Vickie Ybarra. Annual Meeting of the Western Political Science Association, Portland, OR, April 2012.

"Message Received? Public Perceptions of Anti-Immigrant State Legislation by Race and Ethnicity". Co-authored Sylvia Manzano. Annual Meeting of the Western Political Science Association, Portland, OR, April 2012.

"House of Mirrors?: The Effects of Overlapping Descriptive Representation on Political Attitudes". Co-authored with Ricardo Ramirez and Shannon Sanchez-Youngmann. Annual Meeting of the Western Political Science Association, Portland, OR, April 2012.

"Multi-Racial and Multi-Ethnic Attitudes Toward Health Care Reform Policy". Co-authored with Jillian Medieros. Annual Meeting of the Western Political Science Association, San Antonio, TX, April 2011.

"The Presence of Linked Fate and the Impact of Linked Fate on Political Behavior" Co-authored with Jason Morin and Shannon Sanchez-Youngmann. Annual Meeting of the Western Political Science Association, San Antonio, TX, April 2011.

"The Missing Link in the Social Determinants Literature: The Impact of Political Factors on Health Status and Health Disparities in the United States". Co-authored with Jillian Medeiros and Vickie Ybarra. Annual Meeting of the American Political Science Association, Seattle, WA, September, 2011.

"The Legislative Effectiveness of Minority Members of Congress". Co-authored with Michael Rocca. Annual Meeting of the American Political Science Association, Seattle, WA, September, 2011.

"They're All Out to Get Me? An Examination of Inter-Group Competition Among Multiple Populations". Annual Meeting of the American Political Science Association, Seattle, WA, September, 2011.

"Multi-Racial and Multi-Ethnic Attitudes Toward Health Care Reform Policy". Co-authored with Jillian Medeiros, Annual Meeting of the Politics of Race, Immigration, and Ethnicity Conference, Stanford University, CA, May 2010.

"The Substantive Effects of Congressional Earmarks: The Case of Health Spending". Co-authored with Michael Rocca and Angelina Gonzalez-Aller, Annual Meeting of the Western Political Science Association, San Francisco, CA, April 2010.

"The Effect of Pan-Ethnic and National Origin Specific Descriptive Representation on Latino's Views of Government and of Themselves". Co-authored with Jason Morin, Annual Meeting of the Western Political Science Association, San Francisco, CA, April 2010.

"An Examination of Inter-Group Attitudes Among Multiple Populations: New Trends from the Collaborative Multi-Racial Political Study". Co-authored with Matt Barreto and Ben Gonzalez, Annual Meeting of the Midwestern Political Science Association, Chicago, IL, April 2010.

"The Impact of Latino's Perceptions of Competition and Commonality with Whites and African Americans on Latino Political Behavior". Co-authored with Betina Wilkinson, Annual Meeting of the Midwestern Political Science Association, Chicago, IL, April 2010.

"Public Support for Expanding Health Care Coverage in New Mexico." Co-authored with German Izon and Richard Santos, Annual Meeting of the Western Social Science Association, Albuquerque, NM, April 2009.

'Factors that Determine Health Care Coverage in New Mexico." Co-authored with Antonio Barreras and Richard Santos, Annual Meeting of the Western Social Science Association, Albuquerque, NM, April 2009.

"En Fuego: Latinos and the 2008 Presidential Campaign." Co-authored with Sylvia Manzano and Matt Barreto, annual meeting of the Western Political Science Association, Vancouver, BC, Canada, March, 2009.

"The Firewall: Latino Voters in the 2008 Primaries and General Election." Co-authored with Sylvia Manzano and Matt Barreto, Annual Meeting of the Midwestern Political Science Association, Chicago, IL, March, 2009.

"Voter ID Requirements and the Disenfranchisement of Latino, Black, and Asian Voters." Co-authored with Matt Barreto and Stephen Nuno, Annual Meeting of the Politics of Race, Immigration, and Ethnicity Conference, U.C. Irvine, CA, November 2009.

"Black Brown Relations in the New South". Co-authored with Matt Barreto, National Conference on Latino Politics, Power, and Policy, Brown University, Providence, RI, October, 2009.

"Racial Attitudes Across Four Major Racial Groups: Results From the Multi-Racial Post-Election Survey". Annual Meeting of the Politics of Race, Immigration, and Ethnicity Conference, University of Washington, WA, September 2009.

"The Disproportionate Impact of Photo Identification Requirements on the Indiana Electorate" Co-authored with Matt Barreto and Stephen Nuno, Annual Meeting of the American Political Science Association, Boston, MA, August 2008.

"To Shirk or Not to Shirk From the Chief Justice: Associate Justices and Separate Opinion Behavior." Co-authored with Laura Langer and Teena Willhelm, Annual Meeting of the American Political Science Association, Boston, MA, August 2008.

"Discrimination and Group Consciousness Among Muslim Americans." Co-authored with Matt Barreto and Natalie Mosouka, Annual Meeting of the American Political Science Association, Boston, MA, August 2008.

"The Impact of Ethnicity on Attitudes Toward Health Care Reform in New Mexico." Co-authored with Richard Santos, WISER Conference on Latino Public Policy, University of Washington, Seattle, WA, April 2008

"Latinos, Blacks, and Black Latinos: Competition, Cooperation, or Indifference?" Co-authored with Matt Barreto, Invited Presentation, Texas A&M University, College Station, TX, April 2008.

"Latinos, Blacks, and Black Latinos: Competition, Cooperation, or Indifference?" Co-authored with Matt Barreto, Latino National Survey Conference, Cornell University, Ithaca, New York, November 2007.

"Voter ID Requirements and the Disenfranchisement of Latino, Black and Asian Voters." Co-authored with Matt Barreto and Stephen Nuno, Annual Meeting of the American Political Science Association, Chicago, Illinois, September 2007.

"Is Perception Reality? An Investigation of the Presence and Source of Perceived Discrimination Toward and Among Latinos." Co-authored with Jessica Lavariega Monforti, Annual Meeting of the American Political Science Association, Chicago, Illinois, September 2007.

"The Role of Health Policy in Latino Political Behavior at both the State and National Levels." Co-authored with Jason Morin, Conference of the Inter-University Program for Latino Research, Austin, Texas, March 2007.

"Explaining African American Congressional Behavior: The Role of Personal Attributes in African American Roll-Call Voting Behavior." Co-authored with Mike Rocca and Ron Nikora, Annual Meeting of the Southwestern Political Science Association, Albuquerque, New Mexico, March 2007.

"The Legislative Success of Minority Members of Congress." Co-authored with Mike Rocca, Annual Meeting of the Southwestern Political Science Association, Albuquerque, New Mexico, March 2007.

"The Role of Health Policy in Latino Political Behavior." Co-authored with Jason Morin, Annual Meeting of the Southwestern Political Science Association, Albuquerque, New Mexico, March 2007.

"The Institutional Mobility of Minorities in Congress." Co-authored with Mike Rocca and Jason Morin, Annual Meeting of the Western Political Science Association, Las Vegas, Nevada, March 2007.

"Preferable Descriptive Representatives? Investigating the Impact of Demographic Attributes of Descriptive Representatives on Substantive Representation." Co-authored with Joseph E. Uscinski, 2006 Annual Meeting of the American Political Science Association, Chicago, Illinois, August 2006.

"Take One For The Team: Latinos Support and Perceptions of Descriptive Representation," co-authored with Sylvia Manzano, American Political Science Association Conference, Philadelphia, PA, August 2006.

"Latinos and African Americans Post-Katrina: A Rainbow After the Storm?," co-authored with Sylvia Manzano, Southwestern Social Science Association Conference, San Antonio, TX, April 2006.

"Latinos in Congress: The Impact of Descriptive Attributes on Substantive Representation," co-authored with Mike Rocca, Western Political Science Association, Albuquerque, NM, March 2006.

"Friends or Foes? Determinants of Latino Internal Discrimination," Western Political Science Association, Albuquerque, NM, March 2006.

"Factors Leading to Group Consciousness Formation Among Latinos," Western Political Science Association, Oakland, CA, March 2005.

"Building a Foundation For Coalitions Among Latinos and African Americans: The Impact of Latino Group Consciousness on Perceptions of Commonality With African Americans," American Political Science Association, Washington DC, August 2005.

"The Size of Majority Opinion Coalitions on State Supreme Courts: A Test of Threat Hypothesis," co-authored with Laura Langer and Jeffrey Williams, American Political Science Association, Chicago, IL, August 2004.

"The Impact of District Demographics and Party Support on Minority Representation," co-authored with Jeffrey Williams, Southern Political Science Association, New Orleans, LA, January 2003.

"The Effect of Group Cohesion on Political Participation and Political Behavior Among Latinos and African-Americans," Western Political Science Association, Denver, CO, March 2003.

"The Effect of Congressional District Demographics on Minority Representation and Political Participation During the 2000 Election," co-authored with Jeffrey Williams, Western Political Science Association, Denver, CO, March 2003.

"The Impact of Group Identity on Political Participation Among Latinos: A Probit Analysis," Conference on Political Minorities and Political Boundaries Yale University, Hartford, Connecticut, May 2002.

"United We Stand Divided We Fall, Group Cohesion in the Latino Community," American Political Science Association, Washington DC, August 2001.

## RESEARCH FUNDING (AWARDED):

Robert Wood Johnson Foundation Center for Health Policy at UNM Operating Grant. Robert Wood Johnson Foundation, awarded in 2014; $1,507,328.00. Principal Investigator.

American Economic Association Summer Training Program (AEASP). American Economic Association; $206,650.00. Principal Investigator.

The Great Recession: Implications for Minority and Immigrant Communities. Russell Sage Foundation, awarded in 2012; $100,353. Co-Principal Investigator with Jillian Medieros and Kimberly Huyser.

Developing Race as Multi-dimensional and Health Disparities. Robert Wood Johnson Foundation Health and Society Scholars Program, University of Michigan, awarded in 2011; $23,457. Co-Principal Investigator with John Garcia.

Exploring the Views of the Latino Population Toward Healthcare Reform in New Mexico. Robert Wood Johnson Foundation Interdisciplinary Research Grant, University of New Mexico, awarded in 2008; $20,000. Co-Principle Investigator with Richard Santos and Amelia Rousse.

2008 Multi-Racial Post-Election Survey. Research Allocation Committee, University of New Mexico, awarded in 2008: $4,000. Principle Investigator.

Public Opinion of New Mexicans Toward Healthcare Reform in New Mexico. Robert Wood Johnson Foundation Interdisciplinary Research Grant, University of New Mexico, awarded in 2007; $20,000. Co-Principle Investigator with Richard Santos and Amelia Rousse.

Indiana Voter Identification Study. Brenan Center for Justice, New York University, awarded in 2007; $40,000. Co-Principle Investigator with Stephen Nuño and Matt Barreto.

## TEACHING:

## Undergraduate and Graduate Student Mentoring:

Graduate Student Mentoring

*Vickie Ybarra,* Fall 2010-present, co-authorship of three working manuscripts. Chair of Committee of Studies.
*Shannon Sanchez-Youngman*, Fall 2009-present, co-authorship of two working manuscripts. Chair of Committee of Studies.
*Jason Morin*, Fall 2006-2012, Ph.D., co-authorship of several article manuscripts. Chair of PhD Examination Committee, Morin placed at California State at Northridge, Fall 2012.
*Ron Nikora,* Spring 2007-present, PhD., co-authorship of article manuscript. Member of PhD Examination Committee.

Undergraduate Student Mentoring

*Julian Benavidez,* Fall 2012-Present, research support/advising for honors thesis.
*Charles Mathews*, Spring 2011-present, research support/advising for honors thesis.
*Rebeca Gurrola*, Fall 2011-present, research support/advising for McNair Program.
*Robert Alanis,* Fall 2010-Fall 2011, research support/advising for McNair Program.
*Myra Perez,* Fall 2011-Spring 2012, BA, research support/advising for McNair Program.
*Lisa Sanchez,* Fall 2009-present, PhD, research support/advising for honors thesis. Member of PhD Examination Committee.
*Taylor Watrous,* Fall 2009-2011, BA, research support/advising for honors thesis.
*Mabel Arrelanas,* Fall 2009-2011, BA, research support/advising for McNair Program.
*Sarah Melendez,* Fall 2009-present, 2010, research support/advising for McNair Program.
*Antonio Barreras,* Fall 2008-present, 2010, co-authorship of article manuscript, research support/advising for McNair Program.
*Jaime Gonzalez*, Fall 2006-Spring 2007, BA, research support/advising for honors thesis.
*Donna Marlow*, Fall 2006-2008, BA, mentorship and preparation for Ralph Bunche Summer Institute.
*Glenda Kodaseet*, Summer 2006-Fall 2008, B.A., research support/advising for McNair Program.
*Steven Saveedra*, Summer 2006-Fall 2007, B.A., research support/advising for McNair Program.
*Nina Gardea*, Summer 2005-Spring 2006, B.A., research support/advising for McNair Program.

## Classroom Teaching:

Fall 2013 PS 308; Hispanic Politics in the US, 45 undergraduate students.
Fall 2010 PS 200; *Introduction to American Politics*, 100 undergraduate students.
Fall 2010 PS 200; *Introduction to American Politics*, 102 undergraduate students.
Spring 2010; Graduate Seminar in Racial and Ethnic Politics, 8 graduate students.
Spring 2010 PS 200; *Introduction to American Politics*, 114 undergraduate students.
Fall 2009 PS 305-001 *Public Opinion and Electoral Behavior*, 49 undergraduate students.

Fall 2009 PS 200; *Introduction to American Politics*, 114 undergraduate students.
Spring 2009 PS 307: *The Politics of Ethnic Groups,* 53 undergraduate students.
Spring 2009 *Introduction to American Politics***,** 100 undergraduate students.
Fall 2008 PS 496-003  *Pro-Seminar in American Government and Politics: Fred Harris Congressional Internship Program*, 5 undergraduate students.
Fall 2008 PS 200 *Introduction to American Politics*, 123 undergraduate students.
Spring 2008 PS 200; *Introduction to American Politics*, 123 undergraduate students.
Spring 2008 PS 307: *The Politics of Ethnic Groups*. 48 undergraduate students.
Fall 2007, PS 511 *Graduate Seminar in Racial and Ethnic Politics,* 15 graduate students.
Summer 2007, PS307: *The Politics of Ethnic Groups, 16 undergraduate students.*
Spring 2007, PS307*: The Politics of Ethnic Groups,* 45 undergraduate students.
Spring 2007, PS305: *Public Opinion and Electoral Behavior*: 49 undergraduate students, 1 graduate student.
Fall 2006, PS 200/ FLC 640: *Connecting Political Theory to Political Reality? An Inside Look at American Politics*, 22 undergraduate students.
Fall 2006, PS 200: *Introduction to American Politics,* 114 undergraduate students.
Spring 2006, PS200*: Introduction to American Politics,* 61 undergraduate students.
Spring 2006, PS305: *Public Opinion and Electoral Behavior*: 49 undergraduate students, 1 graduate student.
Fall 2005, PS307*: The Politics of Ethnic Groups,* 49 undergraduate students.
Fall 2005, PS200*: Introduction to American Politics,* 44 undergraduate students.

## Curriculum Development:
Developed curriculum for the Political Science portion of the Freshman Learning Community course, *PS200/Eng 101: Connecting Political Theory to Political Reality? An Inside Look at American Politics,* Summer 2006 for Fall 2006.

## SERVICE:

### *Reviews*

Extensive Reviews for American Journal of Political Science as Memebr of Editorial Board (2011 and 2012)
American Journal of Political Science (2010) <twice>
Journal of Politics (2010)
Political Behavior (2010)
Political Communication (2010)
American Sociological Quarterly (2010)
American Review of Politics (2010)
Social Science Journal (2010)
Social Science Quarterly (2010) <twice>
Public Opinion Quarterly (2010)
Legislative Studies Quarterly (2009)
American Journal of Political Science (2009)
Political Research Quarterly (2009) <twice>
American Politics Research (2008)
American Political Science Review (2008)
Political Research Quarterly (2008)
American Politics Research (2008)
Social Science Quarterly (2007)
American Journal of Political Science (2007)
Political Behavior (2007)
SUNY Press – Book Manuscript (2007)
American Politics Research (2006)

### *Conferences*

Chair and Discussant for "Presidential Approval" panel at the Western Social Science
   Association Conference, April 2013.
Chair and Discussant for "New Issues on Behavior, Identification and Discrimination" panel at
   the Western Social Science Association Conference, April 2013.
Chair and Discussant for "The Systematic Study of Race and Public Policy From the UNM
    RWJF Center For Health Policy" panel at Southwestern Social Science Association
Conference, April 2010.
Discussant for "Race and Electoral Politics in America" panel at the American Political Science
    Association Conference, September 2009.
Chair and Discussant for "An Interdisciplinary Examination of Health Policy From the UNM
    RWJF Center For Health Policy " panel at Western  Social Science Association Conference,
    April 2009.
Section Chair "Voting and Elections" for Western Political Science Association Conference,
    March 2009.
Discussant for "Ethnicity and Elections: American and Comparative Perspectives" panel at
     Western Political Science Association Conference, March 2009.
Chair and Discussant for "Changing the Rules: Causes and Consequences" panel at Western

17

Political Science Association Conference, March 2008.

Chair and Discussion for Latino and Latino Political Incorporation and Mobilization" panel at the Southwestern Political Science Association Conference, March 2008

Discussant for "Race, Ethnicity, and Electoral Politics" panel at the Western Political Science Association Conference, March 2007.

Served on the Ted Robinson Dissertation Award for the Southwestern Political Science Association, March 2007.

## *Committees/ Professional Association Positions*

Member, College/Institute of Public Policy Feasibility Committee, University of New Mexico, Fall 2013.

Member, School of Public Health University Committee, University of New Mexico, Fall 2013.

Member, Administrative Support Staff Search Committee, Department of Political Science, University of New Mexico, Fall 2011

Member, Vice Provost Search Committee, University of New Mexico, Spring, 2011

Member WPSA Committee On the Status of Latinas/os in the Profession, 2010-2012.

Secretary, Latino Caucus of the American Political Science Association Executive Committee, 2008-2010.

Member of the Department of Political Science Executive Committee, 2010-2011.

Member, Division of Diversity, Equity, and Inclusion (UNM) Post-Doctoral Fellowship Committee, Summer 2010.

Board Member, Common Cause of New Mexico, 2009-Present.

Member, UNM First-Generation Student Success Task Force, 2010-2011.

Member, UNM Institute for Higher Education Policy Committee, 2010-2011.

Member, Racial and Ethnic Politics Executive Committee of APSA, 2008-2010.

Member of the Department of Political Science Executive Committee, 2010-2011.

Member of Title-V at UNM Faculty Steering Committee, Fall 2008-Present.

Faculty Fellow, El Centro de La Raza at UNM, Fall 2008-Present.

Member of Hispanic Heritage Month Committee, 2007-2008.

Chair of Robert Wood Johnson Foundation Strategic Communication Committee, Fall 2007.

Member of Robert Wood Johnson Foundation Student Recruitment Committee, 2006-2007, 2007-2008.

Member Law School Minority Pipeline Committee, 2007.

Member of the Department of Political Science Executive Committee, 2006-2007.

Member of the Political Science Department Public Policy/IPP Director Search Committee, 2006.

Member of Political Science Department IPP Summer Working Group, Summer 2006.

Member of American Political Science Association Latino Caucus Nominating Committee 2005-2006.

Member of American Political Science Association Latino Caucus Outreach Committee 2005-2006.

Member of the Political Science Department Undergraduate Committee, August 2005-May 2006.

## *Other Professional Service*

Board Member, Hispanic Philanthropic Society of the United Way, January, 2010- Present.

Numerous Television, Radio, and Newspaper Interviews, 2010 Election Season.

Faculty Fellow, UNM El Centro de la Raza, 2007-Present.

Presentation "Effectively Working With Graduate Students" given to Robert Wood Johnson Foundation Center for Health Policy at UNM brown bag series, November 10, 2010.

Co-Chair, UNM El Centro de la Raza Graduate Student Fellowship Program, 2009-2010, 2010-2011.

Faculty Adviser, UNM "Bigs" Student Organization, Fall 2009-Present.

Ralph Bunche Summer Institute Recruitment for Department, Duke University (2005-2009).

Conducted television interview with Channel 13 News (Super Tuesday Segment), February 5, 2008.

Presentation "Social Inequalities in US" given to the pre-Medical Student Organization, February 19, 2008.

Participated on Round Table sponsored by Peer Mentoring of Graduate Students of Color entitled "First Critical Issues Roundtable: First Generation Graduates of Color and Mentoring." January 23, 2007.

Conducted television interview with Channel 13 News (US Attorney General Political Pressure Issue) March 5, 2007.

Invited research talk at the University of Arizona "Upward Mobility of Minority Members of Congress", March 23, 2007.

Served as Moderator for the ASUNM Spring Election Candidate Debate, 2007.

Talk given to APS students on careers in political science, April 6, 2007.

Co-presented "Health Policy and Political Science" discussion in RWJF Pro-Seminar, Spring 2007.

Talk entitled "Demographics of UNM Students" given during New Faculty Orientation, Fall 2007.

Faculty Steering Committee Member for Peer Mentoring of Graduate Students of Color, Fall 2007

Faculty Advisor for UNM student group, UNM Bigs (Affiliate of Big Brothers and Sisters of New Mexico), Summer 2007 – present.

Co-Chair RWJF and McNair Undergraduate Research Conference (November 19-21), Fall 2007.

Complied information regarding Hispanic facts and trends to create "Hispanic Facts and Figures for the Nation" report as part of Hispanic Heritage Month Committee duties.

Talk Given to First Year Graduate Students, (2005-2007).

Talk given to McNair and Research Opportunity Program Students January 17, 2007 entitled "Research Types: The Quantitative, Qualitative Debate".

Served on Panel entitled "Academic Job Search" sponsored by Career Services, Fall 2006 and 2007.

Report drafted in preparation for Expert Witness Testimony in ACLU, et al. v. HERRERA, Fall 2006.

Talk given at the "How About Grad School" Panel Sponsored by Graduate College, September 21, 2006.

Presented "Developing a Research Question" talk to McNair and Research Opportunity Program Students, June 14, 2006.

Talk Given at the "How About Grad School" program on September 21 sponsored by Graduate
College.
Mentored Freshman Learning Community Students who won Best Poster at Research
Symposium, Fall 2006.
Was quoted in several Albuquerque Tribune articles regarding Congressional Elections, Fall
2006 and in feature article "Is America Ready for a Hispanic President".
Phone Interview 770 KOB, "State Treasurer an Appointed Position?," September 26, 2005.

### Community Service:

Mentor, Big Brothers and Sisters of Central New Mexico, 2006-Present.
Mentor, Southwest Organizing Project (SWOP)

# MATT A. BARRETO – MBARRETO@UW.EDU
## DEPT OF POLITICAL SCIENCE, BOX 353530, SEATTLE, WA 98195 / 909.489.2955

**EMPLOYMENT**:

**Associate Professor**, Political Science, University of Washington (2009 – present )
**Adjunct Associate Professor,** University of Washington School of Law (2012 – present)
**Director,** Washington Institute for the Study of Ethnicity and Race (WISER)
**Director,** Center for Democracy and Voting Rights, UW School of Law

**Assistant Professor**, Political Science, University of Washington (2005 – 2009)

Affiliated Research Centers
Washington Institute for the Study of Ethnicity and Race (WISER)
University of Washington

Center for Statistics and the Social Sciences (CSSS)
University of Washington (*Member of Executive Committee 2010-2012*)

Interdisciplinary Ph.D. Award in Political Communications
University of Washington

Politics of Race, Immigration, and Ethnicity Consortium (PRIEC)
University of California, Riverside

Center for the Study of Los Angeles (CSLA)
Loyola Marymount University

**PERSONAL:**

Born: June 6, 1976
San Juan, Puerto Rico

High School: 1994, Washburn Rural HS, Topeka, KS

**EDUCATION:**

**Ph.D., Political Science, June 2005**
University of California – Irvine
Sub Fields: American Politics / Race, Ethnicity and Politics / Methodology
Thesis: Ethnic Cues: The Role of Shared Ethnicity in Latino Political Participation
Thesis Committee: Bernard Grofman (chair), Louis DeSipio, Katherine Tate, Carole Uhlaner
Thesis Awards: *Ford Foundation Dissertation Fellowship for Minorities, 04-05*
   *University of California President's Dissertation Fellowship, 04-05*
   *University of California Institute for Mexico & the U.S. Dissertation Grant, 04-05*

**Master of Science, Social Science, March 2003**
University of California – Irvine

**Bachelor of Science, Political Science, May 1998**
Eastern New Mexico University, Portales, NM
Minor: English.  Cumulative GPA: 3.9, *Summa Cum Laude*

**M.A. BARRETO – CURRICULUM VITAE – April 2014**

---

## PUBLICATION RECORD

Google Scholar citation indices:   Cites: 1,117   h-index: 16   i10-index: 24   Years post-PhD: 9   Cites/year: 124

## BOOK MANUSCRIPTS:

Barreto, Matt and Gary Segura. 2014. <u>Latino America: How America's Most Dynamic Population is Poised to Transform the Politics of the Nation.</u> Public Affairs Books. *Sept 2014*

Barreto, Matt and David Leal, editors. 2014. <u>Race, Class, and Precinct Quality in American Cities.</u> Springer Press. *Sept 2014*

Christopher Parker and Matt Barreto. 2013. <u>Change They Can't Believe In: The Tea Party and Reactionary Politics in America.</u> Princeton University Press.

Barreto, Matt. 2010. <u>Ethnic Cues: The Role of Shared Ethnicity in Latino Political Participation</u>. University of Michigan Press


## PEER-REVIEWED ARTICLES

### Academic Journals

43. Collingwood, Loren, Matt Barreto and Sergio García-Rios. 2014. "Revisiting Latino Voting: Cross-Racial Mobilization in the 2012 Election" *Political Research Quarterly*. 67:4 (Sep).

42. Barreto, Matt and Sergio García-Rios. 2012. "El poder del voto latino en Estados Unidos en 2012" *Foreign Affairs  Latino América*. 12:4 (Nov).

41. Collingwood, Loren, Matt Barreto and Todd Donovan. 2012. "Early Primaries, Viability and Changing Preferences for Presidential Candidates." *Presidential Studies Quarterly*. 42:1(Mar).

40. Barreto, Matt, Betsy Cooper, Ben Gonzalez, Chris Towler, and Christopher Parker. 2012. "The Tea Party in the Age of Obama: Mainstream Conservatism or Out-Group Anxiety?." *Political Power and Social Theory*. 22:1(Jan).

39. Dana, Karam, Matt Barreto and Kassra Oskooi. 2011. "Mosques as American Institutions: Mosque Attendance, Religiosity and Integration into the American Political System." *Religions*. 2:2 (Sept).

38. Barreto, Matt, Christian Grose and Ana Henderson. 2011. "Redistricting: Coalition Districts and the Voting Rights Act." *Warren Institute on Law and Social Policy*. (May)

37. Barreto, Matt and Stephen Nuño. 2011. "The Effectiveness of Co-Ethnic Contact on Latino Political Recruitment." *Political Research Quarterly*. 64 (June). 448-459.

36. Garcia-Castañon, Marcela, Allison Rank and Matt Barreto. 2011 "Plugged in or tuned out? Youth, Race, and Internet  Usage in the 2008 Election." *Journal of Political Marketing*. 10:2  115-138.

35. Barreto, Matt, Victoria DeFrancesco, and Jennifer Merolla. 2011 "Multiple Dimensions of Mobilization: The Impact  of Direct Contact and Political Ads on Latino Turnout in the 2000 Presidential Election." *Journal of Political Marketing*. 10:1

34. Barreto, Matt, Loren Collingwood, and Sylvia Manzano. 2010. "Measuring Latino Political Influence in National Elections" *Political Research Quarterly*. 63:4 (Dec)

33. Barreto, Matt, and Francisco Pedraza. 2009. "The Renewal and Persistence of Group Identification in American Politics." *Electoral Studies*. 28 (Dec) 595-605

32. Barreto, Matt and Dino Bozonelos. 2009. "Democrat, Republican, or None of the Above? Religiosity and the Partisan Identification of Muslim Americans" *Politics & Religion* 2 (Aug). 1-31

---

**M.A. BARRETO – CURRICULUM VITAE – April 2014**

*Journal Articles CONTINUED…*

31. Barreto, Matt, Sylvia Manzano, Ricardo Ramírez and Kathy Rim. 2009. "Immigrant Social Movement Participation: Understanding Involvement in the 2006 Immigration Protest Rallies." *Urban Affairs Review*. 44: (5) 736-764

30. Grofman, Bernard and Matt Barreto. 2009. "A Reply to Zax's (2002) Critique of        Grofman and Migalski  (1988): Double Equation Approaches to Ecological Inferences." *Sociological Methods and Research*. 37 (May)

29. Barreto, Matt, Stephen Nuño and Gabriel Sanchez. 2009.   "The Disproportionate Impact of Voter-ID Requirements  on the Electorate – New Evidence from Indiana." *PS: Political Science & Politics*. 42 (Jan)

28. Barreto, Matt, Luis Fraga, Sylvia Manzano, Valerie Martinez-Ebers, and Gary Segura. 2008.    "Should they dance with the one who brung 'em? Latinos and the 2008 Presidential election"  *PS: Political Science & Politics*. 41 (Oct).

27. Barreto, Matt, Mara Marks and Nathan Woods.    2008. "Are All Precincts Created Equal?  The Prevalence of Low- Quality Precincts in Low-Income and Minority Communities." *Political Research Quarterly*. 62

26. Barreto, Matt. 2007. "*Sí Se Puede!* Latino Candidates and the Mobilization of Latino Voters."  *American Political Science Review*. 101 (August): 425-441.

25. Barreto, Matt and David Leal. 2007. "Latinos, Military Service, and Support for Bush and Kerry in 2004." *American  Politics Research*. 35 (March): 224-251.

24. Barreto, Matt, Mara Marks and Nathan Woods. 2007. "Homeownership: Southern California's New Political Fault  Line?" *Urban Affairs Review*. 42 (January). 315-341.

23. Barreto, Matt, Matt Streb, Fernando Guerra, and Mara Marks. 2006. "Do Absentee Voters Differ From Polling Place  Voters? New Evidence From California." *Public Opinion Quarterly*. 70 (Summer): 224-34.

22. Barreto, Matt, Fernando Guerra, Mara Marks, Stephen Nuño, and Nathan Woods. 2006.  "Controversies in Exit Polling: Implementing a racially stratified homogenous precinct approach." *PS: Political Science & Politics*. 39 (July) 477-83.

21. Barreto, Matt, Ricardo Ramírez, and Nathan Woods.  2005.  "Are Naturalized Voters Driving the California Latino  Electorate? Measuring the Impact of IRCA Citizens on Latino Voting." *Social Science Quarterly*. 86 (December):  792-811.

20. Barreto, Matt. 2005. "Latino Immigrants at the Polls: Foreign-born Voter Turnout in the 2002 Election." *Political Research Quarterly*.  58 (March): 79-86.

19. Barreto, Matt, Mario Villarreal and Nathan Woods.  2005. "Metropolitan Latino Political Behavior:  Turnout and Candidate Preference in Los Angeles." *Journal of Urban Affairs*. 27(February): 71-91.

18. Leal, David, Matt Barreto, Jongho Lee and Rodolfo de la Garza. 2005.   "The Latino Vote in the 2004 Election." *PS: Political Science & Politics*. 38 (January): 41-49.

17. Marks, Mara, Matt Barreto and Nathan Woods.  2004. "Harmony and Bliss in LA? Race and Racial Attitudes a Decade After the 1992 Riots." *Urban Affairs Review*. 40 (September): 3-18.

16. Barreto, Matt, Gary Segura and Nathan Woods.  2004. "The Effects of Overlapping Majority-Minority Districts on  Latino Turnout." *American Political Science Review*. 98 (February): 65-75.

15. Barreto, Matt and Ricardo Ramírez. 2004.  "Minority Participation and the California Recall: Latino, Black, and Asian Voting Trends 1990 – 2003." *PS: Political Science & Politics*. 37 (January): 11-14.

14. Barreto, Matt and José Muñoz.  2003. "Reexamining the 'politics of in-between': political participation among Mexican immigrants in the United States." *Hispanic Journal of Behavioral Sciences*. 25 (November): 427-447.

13. Barreto, Matt. 2003. "National Origin (Mis)Identification Among Latinos in the 2000 Census:  The Growth of the  "Other Hispanic or Latino" Category."  *Harvard Journal of Hispanic Policy*. 15 (June): 39-63.

*Edited Volume Book Chapters*

12. Barreto, Matt and Gabriel Sanchez. 2014. "A 'Southern Exception' in Black-Latino Attitudes?." In Anthony Affigne, Evelyn Hu-Dehart, Marion Orr (eds.) Latino Politics en Ciencia Política. New York: New York University Press.

11. Barreto, Matt, Ben Gonzalez, and Gabriel Sanchez. 2014. "Rainbow Coalition in the Golden State? Exposing Myths, Uncovering New Realities in Latino Attitudes Towards Blacks." In Josh Kun and Laura Pulido (eds.) Black and Brown in Los Angeles: Beyond Conflict and Coalition. Berkeley, CA: University of California Press.

10. Barreto, Matt, Loren Collingwood, Ben Gonzalez, and Christopher Parker. 2011. "Tea Party Politics in a Blue State: Dino Rossi and the 2010 Washington Senate Election" In William Miller and Jeremy Walling (eds.) Stuck in the Middle to Lose: Tea Party Effects on 2010 U.S. Senate Elections. Rowman & Littlefield Publishing Group.

9. Jason Morin, Gabriel Sanchez and Matt Barreto. 2011. "Perceptions of Competition Between Latinos and Blacks: The Development of a Relative Measure of Inter-Group Competition." In Edward Telles, Gaspar Rivera-Salgado and Mark Sawyer (eds.) Just Neighbors? Research on African American and Latino Relations in the US. New York: Russell Sage Foundation.

8. Barreto, Matt, Ricardo Ramírez, Luis Fraga and Fernando Guerra. 2009. "Why California Matters: How California Latinos Influence the Presidential Election." In Rodolfo de la Garza, Louis DeSipio and David Leal (eds.) Beyond the Barrio: Latinos in the 2004 Elections. South Bend, ID: University of Notre Dame Press..

7. Francisco Pedraza and Matt Barreto. 2008. "Exit Polls and Ethnic Diversity: How to Improve Estimates and Reduce Bias Among Minority Voters." In Wendy Alvey and Fritz Scheuren (eds.) Elections and Exit Polling. Hoboken, NJ: Wiley and Sons, Inc..

6. Adrian Pantoja, Matt Barreto and Richard Anderson. 2008. "Politics *y la Iglesia*: Attitudes Toward the Role of Religion in Politics Among Latino Catholics" In Michael Genovese, Kristin Hayer and Mark J. Rozell (eds.) Catholics and Politics. Washington, D.C: Georgetown University Press..

5. Barreto, Matt. 2007. "The Role of Latino Candidates in Mobilizing Latino Voters: Revisiting Latino Vote Choice." In Rodolfo Espino, David Leal and Kenneth Meier (eds.) Latino Politics: Identity, Mobilization, and Representation. Charlottesville: University of Virginia Press.

4. Abosch, Yishaiya, Matt Barreto and Nathan Woods. 2007. "An Assessment of Racially Polarized Voting For and Against Latinos Candidates in California." In Ana Henderson (ed.) Voting Rights Act Reauthorization of 2006: Perspectives on Democracy, Participation, and Power:. Berkeley, CA: UC Berkeley Public Policy Press.

3. Barreto, Matt and Ricardo Ramírez. 2005. "The Race Card and California Politics: Minority Voters and Racial Cues in the 2003 Recall Election." In Shaun Bowler and Bruce Cain (eds.) Clicker Politics: Essays on the California Recall. Englewood-Cliffs: Prentice-Hall.

2. Barreto, Matt and Nathan Woods. 2005. "The Anti-Latino Political Context and its Impact on GOP Detachment and Increasing Latino Voter Turnout in Los Angeles County." In Gary Segura and Shawn Bowler (eds.) Diversity in Democracy: Minority Representation in the United States. Charlottesville: University of Virginia Press.

1. Pachon, Harry, Matt Barreto and Frances Marquez. 2004. "Latino Politics Comes of Age in the Golden State." In Rodolfo de la Garza and Louis DeSipio (eds.) Muted Voices: Latino Politics in the 2000 Election. New York: Rowman & Littlefield

M.A. BARRETO – CURRICULUM VITAE – April 2014

### *RESEARCH AWARDS AND FELLOWSHIPS*

| | | |
|---|---|---|
| July 2013 | Ford Foundation<br>Center for Democracy and Voting Rights | *$200,000 – 12 months*<br>*renewable annually* |
| April 2012 | American Values Institute [With Ben Gonzalez]<br>Racial Narratives and Public Response to Racialized Moments | *$40,000 – 3 months* |
| Jan 2012 | American Civil Liberties Union Foundation [With Gabriel Sanchez]<br>Voter Identification Laws in Wisconsin | *$60,000 – 6 months* |
| June 2011 | State of California Citizens Redistricting Commission<br>An Analysis of Racial Bloc Voting in California Elections | *$60,000 – 3 months* |
| Apr 2011 | Social Science Research Council (SSRC) [With Karam Dana]<br>Muslim and American? A national conference on the political and social<br>incorporation of American Muslims | *$50,000 – 18 months* |
| Jan 2011 | impreMedia [With Gary Segura]<br>Latino public opinion tracking poll of voter attitudes in 2011 | *$30,000 – 6 months* |
| Oct 2010 | National Council of La Raza (NCLR) [With Gary Segura]<br>Measuring Latino Influence in the 2010 Elections | *$128,000 – 6 months* |
| Oct 2010 | We Are America Alliance (WAAA) [With Gary Segura]<br>Latino and Asian American Immigrant Community Voter Study | *$79,000 – 3 months* |
| May 2010 | National Council of La Raza (NCLR) [With Gary Segura]<br>A Study of Latino Views Towards Arizona SB1070 | *$25,000 – 3 months* |
| Apr 2010 | Social Science Research Council (SSRC) [With Karam Dana]<br>Muslim and American? The influence of religiosity in Muslim political incorporation | *$50,000 – 18 months* |
| Oct 2009 | American Association of Retired Persons (AARP) [With Gary Segura]<br>Health care reform and Latino public opinion | *$25,000 – 3 months* |
| Nov 2008 | impreMedia & National Association of Latino Elected Officials (NALEO)<br>[With Gary Segura] 2008 National Latino Post-Election Survey, Presidential Election | *$46,000 – 3 months* |
| July 2008 | National Association of Latino Elected Officials (NALEO) [With Gary Segura]<br>Latino voter outreach survey – an evaluation of Obama and McCain | *$72,000 – 3 months* |
| June 2008 | The Pew Charitable Trusts, Make Voting Work Project<br>[with Karin MacDonald and Bonnie Glaser] Evaluating Online Voter Registration<br>(OVR) Systems in Arizona and Washington | *$220,000 – 10 months* |
| April 2008 | National Association of Latino Elected Officials (NALEO) &<br>National Council of La Raza (NCLR), 2008 Latino voter messaging survey | *$95,000 – 6 months* |
| Dec. 2007 | Research Royalty Fund, University of Washington<br>2008 Latino national post-election survey | *$39,000 – 12 months* |
| Oct. 2007 | Brenan Center for Justice, New York University<br>[with Stephen Nuño and Gabriel Sanchez]  Indiana Voter Identification Study | *$40,000 – 6 months* |
| June 2007 | National Science Foundation, Political Science Division [with Gary Segura]<br>American National Election Study – Spanish translation and Latino oversample | *$750,000 – 24 months* |

**M.A. BARRETO – CURRICULUM VITAE – April 2014**

*RESEARCH GRANTS AND FELLOWSHIPS CONTINUED…*

| | | |
|---|---|---|
| Oct. 2006 | University of Washington, Vice Provost for Undergraduate Education<br>Absentee voter study during the November 2006 election in King County, WA | *$12,000 – 6 months* |
| Mar. 2006 | Latino Policy Coalition Public Opinion Research Grant [with Gary Segura]<br>Awarded to the Washington Institute for the Study of Ethnicity and Race | *$40,000 – 18 months* |
| 2005 – 2006 | University of Washington, Institute for Ethnic Studies, Research Grant | *$8,000 – 12 months* |
| Mar. 2005 | Thomas and Dorothy Leavey Foundation Grant [with Fernando Guerra]<br>Conduct Exit Poll during Los Angeles Mayoral Election, Mar. 8 & May 17, 2005<br>Awarded to the Center for the Study of Los Angeles | *$30,000 – 6 months* |
| 2004 – 2005 | Ford Foundation Dissertation Fellowship for Minorities | *$21,000 – 12 months* |
| 2004 – 2005 | University of California President's Dissertation Fellowship | *$14,700 – 9 months* |
| 2004 – 2005 | University of California Mexico-US (UC MEXUS) Dissertation Grant | *$12,000 – 9 months* |
| Apr – 2004 | UC Regents pre-dissertation fellowship, University of California, Irvine, | *$4,700 – 3 months* |
| 2003 – 2004 | Thomas and Dorothy Leavey Foundation Grant [with Fernando Guerra]<br>Awarded to the Center for the Study of Los Angeles | *$20,000 – 12 months* |
| 2002 – 2003 | Ford Foundation Grant on Institutional Inequality [with Harry Pachon]<br>Conducted longitudinal study of Prop 209 on Latino and Black college admittance<br>Awarded to Tomás Rivera Policy Institute | *$150,000 – 12 months* |
| 2002 – 2003 | Haynes Foundation Grant on Economic Development [with Louis Tornatzky]<br>Knowledge Economy in the Inland Empire region of Southern California<br>Awarded to Tomás Rivera Policy Institute | *$150,000 – 18 months* |
| 2001 – 2002 | William F Podlich Graduate Fellowship, Center for the Study of Democracy,<br>University of California, Irvine | *$24,000 – 9 months* |

### *ARTICLES UNDER REVIEW/WORKING PAPERS:*

Barreto, Matt and Loren Collingwood. "Cross-Racial Mobilization to Latinos in 2012: How immigration became a mobilizing issue" Revise and Resubmit

Barreto, Matt, Natalie Masuoka and Gabe Sanchez. "Religiosity, Discrimination and Group Identity Among Muslim Americans" Revise and Resubmit

Barreto, Matt, Stephen Nuño, and Gabriel Sanchez, Hannah Walker. "Race, Class and Barriers to Voting in the 21st Century: The Unequal Impact of Voter ID Laws." [Under review]

Pedraza, Francisco and Matt Barreto. "Economic voting versus Ethnic voting: The case of Latino voting in 2012" [Under review]

Barreto, Matt and Karam Dana. "Religiosity and Muslim American Political Incorporation" [Under review]

Barreto, Matt Karam Dana, and Kassra Oskooii. "No Sharia, No Mosque: Orientalist Notions of Islam and Intolerance Toward Muslims in the United States" [Under review]

Barreto, Matt, Loren Collingwood, Christopher Parker, Francisco Pedraza. "Racial Attitudes and Race of Interviewer Item Non-Response" [ Under Review ]

Barreto, Matt, David Redlawsk and Caroline Tolbert. "Framing Barack Obama: Muslim, Christian or Black?" [ Under review ]

Barreto, Matt and Adrian Pantoja. "Politics and Religion in the Schoolhouse: Latino religiosity and attitudes towards  education policies." [ Under review ]

Barreto, Matt and Gabe Sanchez. "Latinos, Blacks, and Black Latinos: Competition, Cooperation, or Indifference?"  [ Under review ]

Barreto, Matt and Natalie Masuoka. "Engagement, Recruitment and Minority Participation: The Mobilizing Effects of  Ethnic Candidates on Latino and Asian American Voter Turnout." [ Working paper ]

M.A. BARRETO – CURRICULUM VITAE – April 2014

___

### *CONSULTING EXPERT*:

- Galveston County, TX Redistricting, 2013, Expert report for Dunn & Brazil, LLC, Demographic analysis, vote dilution analysis, and racially polarized voting analysis for Section 2 lawsuit Galveston County JP/Constable districting
- Pasadena, TX Redistricting, 2013, Expert report for Dunn & Brazil, LLC, Demographic analysis, voter registration analysis, and racially polarized voting analysis for Section 2 lawsuit within Pasadena School District
- Harris County, TX Redistricting, 2011, Testifying Expert for Dunn & Brazil, LLC, Demographic analysis, voter registration analysis, and racially polarized voting analysis for Section 2 lawsuit within Harris County
- Pennsylvania, 2012, Testifying Expert for ACLU Foundation of Pennsylvania in voter ID lawsuit, Applewhite v. Commonwealth of Pennsylvania No. 330 MD 2012
- Milwaukee County, WI, 2012, Testifying Expert for ACLU Foundation of Wisconsin in voter ID lawsuit, Frank v. Walker 2:11-cv-01128(LA)
- Orange County, FL, 2012, Consulting Expert for Latino Justice/PRLDEF, Racially polarized voting analysis in Orange County, Florida
- Anaheim, CA, 2012, Consulting Expert for Goldstein, Demchak & Baller Legal, Racially polarized voting analysis for CVRA redistricting case Anaheim, CA
- Los Angeles County, CA, 2011, Consulting Expert for Goldstein, Demchak & Baller Legal, Racially polarized voting analysis for three redistricting cases in L.A.: Cerritos Community College Board; ABC Unified Schools; City of West Covina
- Harris County, TX Redistricting, 2011, Consulting Expert for Dunn & Brazil, LLC, Demographic analysis, voter registration analysis, for Section 5 objection within Harris County
- Monterey County, CA Redistricting, 2011, Consulting Expert for City of Salinas, Demographic analysis, creation of alternative maps, and racially polarized Voting analysis within Monterey County
- Los Angeles County Redistricting Commission, 2011, Consulting Expert for Supervisor Gloria Molina, Racially Polarized voting analysis within L.A. County
- State of California, Citizens Redistricting Commission, 2011, Consulting Expert, Racially Polarized Voting analysis throughout state of California
- Asian Pacific American Legal Center, 2011, Racially Polarized Voting analysis of Asian American candidates in Los Angeles for APALC redistricting brief
- Lawyers' Committee for Civil Rights and Arnold & Porter, LLP, 2010-12, Racially Polarized Voting analysis of Latino and Asian candidates in San Mateo County, concerning San Mateo County Board of Supervisors
- ACLU of Washington, 2010-11, preliminary analysis of Latino population patterns in Yakima, Washington, to assess ability to draw majority Latino council districts
- State of Washington, 2010-11, provided expert analysis and research for *State of Washington v. MacLean* in case regarding election misconduct and voting patterns
- Los Angeles County Chicano Employees Association, 2008-10, Racially Polarized Voting analysis of Latino candidates in L.A. County for VRA case, concerning L.A. County Board of Supervisors redistricting (6 reports issued 08-10)
- Brennan Center for Justice and Fried, Frank, Harris, Shriver & Jacobson LLP, 2009-10 Amicus Brief submitted to Indiana Supreme Court, *League of Women Voters v. Rokita*, regarding access to voter identification among minority and lower resource citizens
- State of New Mexico, consulting expert for state in *AAPD v. New Mexico*, 2008,
- District of Columbia Public Schools (DCPS), statistical consultant for survey methodology of opinion survey of parents in DCPS district (for pending suit), 2008,
- Brennan Center for Justice, 2007-08, Amicus Brief submitted to U.S. Supreme Court, and cited in Supreme Court decision, *Crawford v. Marion County*, regarding access to voter identification among minority and lower-resource citizens
- Los Angeles County Chicano Employees Association, 2002-07, Racially Polarized Voting analysis of Latino candidates in L.A. County for VRA case, concerning L.A. County Board of Supervisors redistricting (12 + reports issued during 5 years)
- Monterrey County School Board, 2007, demographic and population analysis for VRA case
- Sweetwater Union School District, 2007-08, Racially Polarized Voting analysis, and demographic and population analysis for VRA case
- Mexican American Legal Defense Fund, 2007-08, Racially Polarized Voting analysis for Latino candidates, for City of Whittier city council races, for VRA case
- ACLU of Washington, 2008, preliminary analysis of voting patterns in Eastern Washington, related to electability of Latino candidates
- Nielsen Media Research, 2005-08, with Willie C. Velasquez Institute, assessed the methodology of Latino household recruitment in Nielsen sample

M.A. BARRETO – CURRICULUM VITAE – April 2014

| | | |
|---|---|---|
| ***TEACHING EXPERIENCE:*** | University of Washington | 2005 – Present |

- Minority Political Behavior (Grad Seminar)
- Politics of Immigration in the U.S. (Grad Seminar)
- Introduction to Empirical/Regression Analysis (Grad Seminar)
- Advanced Empirical/Regression Analysis (Grad Seminar)
- Political Participation & Elections (Grad Seminar)
- The Voting Rights Act (Law School seminar)
- Research methodology II  (Law School Ph.D. program seminar)
- U.S. Latino Politics
- Racial and Ethnic Politics in the U.S.
- Politics of Immigration in the U.S.
- Introduction to American Government
- Public Opinion Research
- Campaigns and Elections in the U.S.
- Presidential Primary Elections

**Teaching Assistant**
University of California, Irvine                                          2002 – 2005

- Intro to American Politics (K. Tate)
- Intro to Minority Politics (L. DeSipio)
  **Recognized as Outstanding Teaching Assistant, Winter 2002**
- Statistics and Research Methods (B. Grofman)
  **Recognized as Outstanding Teaching Assistant, Winter 2003**

***BOARD & RESEARCH APPOINTMENTS***

**Founding Partner**
Latino Decisions                                                        2007 – Present

**Senior Research Fellow**
Center for the Study of Los Angeles, Loyola Marymount University         2002 – Present

**Research Expert**
American Values Institute                                               2009 – Present

**Board of Overseers**
American National Election Study, University of Michigan                2010 – Present

**Expert Consultant**
State of California, Citizens Redistricting Committee                   2011 – Present

**Senior Scholar & Advisory Council**
Latino Policy Coalition, San Francisco, CA                             2006 – 2008

**Board of Directors**
CASA Latina, Seattle, WA                                               2006 – 2009

**Faculty Research Scholar**
Tomás Rivera Policy Institute, University of Southern California        1999 – 2009

Case 2:13-cv-00193   Document 671-18   Filed on 11/11/14 in TXSD   Page 75 of 211
**Texas voter identification study / Barreto and Sanchez**

PL753.1
9/2/2014
2:13-cv-000193

S0. Type of Sample

RDD … …  1
Household Listed…… 2
Wireless……..3

S1.      [IF LISTED] Hello, may I please speak with Mr./Ms.  [INPUT THE NAME OF RESPONDENT]?

RESPONDENT AVAILABLE … CONTINUE  … 1
RESPONDENT IS NOT AVAILABLE … CALL-BACK SCHEDULED … 2
**DON'T KNOW/NO OPINION (DK)/ REFUSED TO ANSWER (RF)** … TERMINATE … 9

Hello, my name is _____.  This is not a sales call. I am calling on behalf of Pacific Market Research, as part of a non-partisan, university research project.  We are conducting a short public opinion survey about important issues in the state of Texas.

S2.      Okay, just to make sure you are eligible to take part in our survey about voting, can you confirm that you are 18 or over, and currently a U.S. citizen, and have lived here in Texas for more than 30 days?

Yes ………………..………….. 1
No – not eligible…. TERMINATE … 2
DK/RF … TERMINATE ………. 99

S3.      In talking to people about voting, we often find that many people did not have time to register to vote, or just weren't interested in registering.  How about you? Would the official voter records at the Secretary of State's office indicate that you are currently registered to vote here in Texas, or not?

Yes … … 1
No…. … … 2
DK/RF… … … 99

S4.      Just to make sure we get a representative sample of people here in Texas, can you tell me what your race or ethnicity is? [ALLOW MULTIPLE RESPONSES, RECORD ORDER]

White / Anglo … …  1
Black / African American…… 2
Hispanic / Latino…… 3
Asian American…… 4
Native American…….5
Other [SPECIFY]…… 6
Don't know…88
Refused…… 99

**Texas voter identification study / Barreto and Sanchez**

## MAIN QUESTIONNAIRE

1. [IF S3=1] Here in Texas, some people vote in person at a polling place, and some have a mail ballot sent to them. How about you, when you have voted is it usually: in-person at a polling place, do you sometimes vote by mail ballot, or do you always vote by mail ballot?

Polling place.............................................................................. 1
Sometimes by mail ballot........................................................ 2
Always by mail ballot.............................................................. 3
Do not vote (VOL) ................................................................. 4
Don't Know/Not Sure ........................................................... 88
Refused .................................................................................. 99

1B. [IF Q1=1 or 2] When you vote in person at a polling place, do you always vote on Election Day, do you sometimes vote early before election day, or do you <u>ALWAYS</u> vote early before election day?

Usually vote on Election Day ................................................. 1
Sometimes before Election Day.............................................. 2
Always vote early .................................................................... 3
Do not vote (VOL) ................................................................. 5
Don't Know/Not Sure ........................................................... 88
Refused .................................................................................. 99

2. Different states have different rules on what a voter needs to show the poll worker before they can vote at the polling place.  As far as you know, does Texas have a law that **REQUIRES** voters to show a valid photo ID before they can vote in-person at their polling place either early or on Election Day, or is this not required in Texas to vote in-person?

Yes, Texas requires photo ID ................................................. 1
No, they do NOT require photo ID ...................................... 2
Something else......................................................................... 3
Don't Know/Not Sure ........................................................... 88
Refused .................................................................................. 99

3. And if a poll worker did happen to ask you to show a valid photo ID in order to vote, as far as you know, do you currently possess a valid photo ID?

Yes........................................................................................... 1
No ........................................................................................... 2
Maybe / Depends.................................................................... 3
Don't Know/Not Sure ............................................................ 4
Refused .................................................................................. 99

4. Have you ever heard of a type of photo ID called an Election Identification Certificate?

Yes, I have heard of that......................................................... 1
No, have not heard of that...................................................... 2
Don't Know/Not Sure ........................................................... 88
Refused .................................................................................. 99

**Texas voter identification study / Barreto and Sanchez**

4A. [IF Q4=Yes] Do you happen to know where to go to obtain an Election Identification Certificate? This is not a voter registration card, but rather a piece of photo identification that can be used for election purposes. [If they say yes, probe – "Where exactly would you get one of those?"] [Check all that apply]

Texas Department of Public Safety office / Driver's license office.............. 1
County Election office / Registrar..................................................................... 2
Some other place................................................................................................. 3
Don't Know/Not Sure ....................................................................................... 88
Refused............................................................................................................... 99

5. An Election identification certificate is a new type of ID issued by the state of Texas, that cannot be used for identification except for election purposes. How much do you think it costs to obtain the new election identification certificate?

[ ENTER EXACT AMOUNT:  $ _____ ]
0 = Free; -88=Don't Know; -99=Refused

5A. [IF Q5=DK/RF]. Do you think the card costs something, or that it is issued for free?

Cost something ................................................................................................... 1
Issued for Free .................................................................................................... 2
Don't know/Not Sure ........................................................................................ 88

6. Do you happen to have a valid voter registration certificate or card in your possession? This is the non-photo-ID sent to you that lists your voter district or precinct?

Yes........................................................................................................................ 1
No ......................................................................................................................... 2
Maybe / not sure / can't remember .................................... 5
Don't know........................................................................................................ 88
Refused ............................................................................................................... 99

7. Switching topics, do you happen to have a **Texas** driver's license? [If Respondent asks: This must be a driver's license from the state of Texas]

Yes........................................................................................................................ 1
No ......................................................................................................................... 2
Don't know/Not Sure ........................................................................................ 88
Refused ............................................................................................................... 99

7A. Is your license currently valid, or is it suspended or revoked? Or maybe it was lost or stolen and you don't currently have it in your possession?

None of these – it is valid.................................................................................... 1
Suspended ............................................................................................................ 2
Revoked................................................................................................................ 3
Lost or stolen....................................................................................................... 4
Don't Know/Not Sure ....................................................................................... 88
Refused ............................................................................................................... 99

3

**Texas voter identification study / Barreto and Sanchez**

7B. [IF Q7 = 1]  If you can, take your driver's license out real quick and check the expiration date?  Is the expiration date after <u>January 15, 2014</u>, or like some people we've talked to, did it expire before <u>January 15, 2014</u>? *[Programming note: update date so that it is always within 60 days of survey field date]*

If don't know or don't have license: "Well, when was the last time you went and had your driver's license updated? Was it in the last 6 years, since March 2008, or was it sometime BEFORE that?

> Yes, it expires after January 15, 2014 ..................................... 1
> Yes, in the last 6 years since 2008 ......................................... 2
> No, it expired BEFORE Jan 2014 ......................................... 3
> No, not updated in last 6 years ............................................. 4
> Maybe / not sure / can't remember ..................................... 5
> Don't know ............................................................................ 88
> Refused .................................................................................. 99

8. [IF Q7 = 2-99 or Q7A=2/99 or 7B=3/99] Okay, instead of a [IF Q7B=3/99 "an unexpired] driver's license, do you happen to have any of the following forms of photo identification? Just tell me yes or no for each one:

A. Texas non-driver photo ID card that was issued by Texas Dept. of Public Safety or DPS

B. Texas Election Identification Certificate issued by DPS or County office, not counting a voter registration card

C. A U.S. Passport, or U.S. Passport card

D. A United States military ID card that contains your photograph [SPECIFY]
> *[IF NECESSARY: US Army, Marine Corps, VA Card, Navy, Air Force, Coast Guard, Public health services commission corps, and national oceanic and atmospheric administration all count here*

> Yes ......................................................................................... 1
> No ........................................................................................... 2
> Don't know ............................................................................ 88
> Refused .................................................................................. 99

9A. [IF Q8A= 1] If you can, take your Texas photo ID out real quick and check the expiration date?  Is the expiration date after <u>January 15, 2014</u>, or like some people we've talked to, did it expire before <u>January 15, 2014</u>? *[Programming note: update date so that it is always within 60 days of survey field date]*

If don't know or don't have ID: "Well, when was the last time you went and had your ID updated? Was it in the last 6 years, since March 2008, or was it sometime BEFORE that?

> Yes, it expires after January 15, 2014 ..................................... 1
> Yes, in the last 6 years since 2008 ......................................... 2
> No, it expired BEFORE Jan 2014 ......................................... 3
> No, not updated in last 6 years ............................................. 4
> Maybe / not sure / can't remember ..................................... 5
> Don't know ............................................................................ 88
> Refused .................................................................................. 99

9C. [IF Q8C = 1] Is the expiration date on your passport after <u>January 15, 2014</u>, or like some people we've talked to, did it expire before <u>January 15, 2014</u>? [IF NECESSARY: Prompt: "Most U.S. passports are valid for 10 years after they have been issued, and then they expire"]

Yes, it current ........................................................... 1
No, it is expired .......................................................... 2
Maybe / not sure / can't remember ...................................... 3
Don't know.................................................................. 88
Refused ...................................................................... 99

9D. [IF Q9D =1]  Is the expiration date on your military ID after <u>January 15, 2014</u>, or like some people we've talked to, did it expire before <u>January 15, 2014</u>? *[Programming note: update date so that it is always within 60 days of survey field date]*

Yes, it is current ......................................................... 1
My ID has an indefinite expiration date............................... 2
No, it expired.............................................................. 3
Military ID has no date on it ............................................ 4
Maybe / not sure / can't remember ...................................... 5
Don't know.................................................................. 88
Refused ...................................................................... 99

10. [IF Q8A – 8D is not Yes or Q9A-9D is not current or DK/RF] Alright, instead of those types of identification, do you happen to have one of these other forms of identification that contains your photo, such as…. READ LIST:

A State of Texas concealed hand gun license..........1
United States citizenship certificate with your photograph.......2
No – I have none of these forms of ID.......3
Don't know.......88
Refused.......99

10A. [IF Q10=1] If you can, find your concealed hand gun license real quick and check the expiration date? Is the expiration date on your concealed hand gun license after <u>January 15, 2014</u>, or like some people we've talked to, did it expire before <u>January 15, 2014</u>? *[Programming note: update date so that it is always within 60 days of survey field date]*

Yes, it is up to date ..................................................... 1
No, it expired.............................................................. 2
Has no date printed ...................................................... 3
Maybe / not sure / can't remember ...................................... 4
Don't know.................................................................. 88
Refused ...................................................................... 99

11. [If R has any unexpired ID] A lot of people go by a nickname or go by their middle name, or maybe change their name when they get married. Is the name that is printed on your {INSERT ID TYPE} an exact match to how it would appear on your official voter registration card for example, or is there a difference or change in your name?

Yes, name is exact match……1
No, name is not exact match……2
Don't know/Not Sure……88
Refused……99

**Texas voter identification study / Barreto and Sanchez**

12 [IF Q11=2] And what kind of name difference exists between your name on your ID and your name as it might appear on the official voter registration card? Is it a nickname, did your last name change, is there a typographical error, middle name or initial difference, or some other difference with your name on your {INSERT ID TYPE} where your name would not match or conform? CHECK ALL THAT APPLY

Nickname......1
Last name changed......2
Typographical error......3
Middle name or initial difference......4
Other name difference......5
Changed entire name ..........6
Don't know/Not Sure......88
Refused......99

13. How about the date of birth and address listed on your {INSERT ID TYPE}? Is the date of birth and current address listed on your ID correct and accurate - exactly as it would appear on the official voter registration card for example, or is there a difference or mistake?
*Note: do not ask the "and address" part if only source of ID is a Passport on 8C*

Yes, both address and DOB match/correct ....................... 1
No, address does not match.................................... 2
No, DOB does not match...................................... 3
No, neither DOB or address match .................... 4
Maybe / not sure / can't remember........................5
Don't know.............................................. 88
Refused ................................................. 99

14. Okay, and were you born in the United States, Puerto Rico, or another country?

United States................................................ 1
Puerto Rico...............SKIP TO Q16A.......................... 2
Another country..........SKIP TO Q17.......................... 3
(Don't know) .............................................. 88
(Refused) ................................................ 99

15. [If Q14=1] And which state were you born in? {MENU WITH ALL STATES+PR AND OTHER US TERRITORY, LIST TEXAS 1st}

RECORD SPECIFIC STATE _____

**Proof of Citizenship**

16. [IF Q14=1,88, 99 and Q15 is NOT PR] Think about the last time you had to use or show your birth certificate?  Some of the people we've talked to have lost or misplaced their official birth certificate. How about you? Do you have your original, or an official certified copy - NOT A PHOTOCOPY - of your birth certificate with you - or like some people, do you NOT have your original or certified copy of your birth certificate?

Yes, has birth certificate.......................................... 1
No, does not have birth certificate ........................ 2
Don't know/Not Sure ....................................... 88
Refused.................................................. 99

6

**Texas voter identification study / Barreto and Sanchez**

16A. [IF Q14=2 or q16=PR]. And do you have a certified and accurate new copy of your Puerto Rican birth certificate, one that was issued on, or after July 1, 2010?

Yes............................................................................................. 1
No .............................................................................................. 2
Don't know/Not Sure ............................................................ 88
Refused .................................................................................... 99

16B. [If Q12=2 OR Q16=1 Does your birth certificate reflect your current legal name, or has your legal name changed since birth due to adoption, marriage, divorce, or some other reason? {PROBE: Why did it change}

Yes, reflects current legal name ............................................ 1
No, name changed: marriage ................................................. 2
No, name changed: divorce.................................................... 3
No, name changed: adoption ................................................. 4
No, name changed: other reason............................................ 5
Don't know/Not Sure ............................................................ 88
Refused .................................................................................... 99

17A. [IF Q16B=2] If your name changed due to marriage, do you have a certified copy of your marriage license?

Yes, I have a marriage license......1
No, do not have a marriage license......2
Don't know/Not Sure......88
Refused......99

17B. [IF Q16B=3/99] If your name changed, do you have a certified copy of a court order indicating your name change?

Yes, I have a copy of court order......1
No, do not have a copy of court order......2
Don't know/Not Sure......88
Refused......99

18.  Do you happen to have a U.S. passport or passport card? [SKIP IF YES at 8C]

Yes............................................................................................. 1
No .............................................................................................. 2
Don't know/Not Sure ............................................................ 88
Refused .................................................................................... 99

18B. [IF 18=1] Is the expiration date on your passport after January 15, 2014, or like some people we've talked to, did it expire before January 15, 2014? [IF NECESSARY: Prompt: "Most U.S. passports are valid for 10 years after they have been issued, and then they expire"]

Yes, it current ......................................................................... 1
No, it is expired ....................................................................... 2
Maybe / not sure / can't remember ...................................... 3
Don't know............................................................................. 88
Refused .................................................................................... 99

**Texas voter identification study / Barreto and Sanchez**

19. [IF Q14=3] Okay, do you happen to have your U.S. certificate of citizenship or a U.S. certificate of naturalization, a certification of birth issued by the State Department, or a US Department of Justice Immigration and Naturalization Service US Citizen ID card or have you lost or misplaced it? [IF NECESSARY: "This would be if you were born outside the United States"]

Yes............................................................................................. 1
No ............................................................................................. 2
Don't know............................................................................. 88
Refused .................................................................................. 99

20. [IF ID NOT CURRENT]  Even though you do not currently have an up to date Texas driver's license or Texas ID card, did you have a Texas driver's license or ID that expired within the last two years?

Yes, had a Texas license or ID expire in past two years......1
No, never had one that expired in last two years......2
Don't know/Not Sure......88
Refused......99

8

**Supporting identification documents**

21. [ASK ONLY IF R ONLY HAS 1 SECONDARY DOC: Birth certificate, Naturalization certificate, court order of name or gender change] Often times when you go to get a driver's license or state ID card and you don't have a primary identification document like a passport you need to provide at least two supporting identity documents. This question is completely anonymous and confidential, but important for research purposes.

For each document that I read, just tell me yes or no, if you have that document with your **full current legal name** and you could produce it at the Texas DPS office if necessary.

ONCE THEY ANSWER YES TO 2 ITEMS, END Q21

How about _____

21.1 School photo identification or school transcripts
21.2 Current insurance policy that is at least two years old
21.3 Texas vehicle or boat title or registration
21.4 Military photo ID or military records, or military dependent card
21.5 Certified copy of marriage license or divorce decree
21.6 Official copy of your Social Security card or Numerical Identification print out record
21.7 Pilot's license
21.8 Unexpired driver's license or ID card from another state
21.9 Expired driver's license or ID card from another state, so long as it is within 2 years of being expired
21.10 Texas offender ID card issued by Texas Department of Corrections
21.11 Current tax records or W-2 or 1099 forms
21.12 Professional license issued by Texas state agency
21.13 An ID card issued by a government agency
21.14 Texas Department of Criminal Justice parole or release certificate
21.15 Federal inmate ID card, or federal parole or release certificate
21.16 Medicare or Medicaid ID card
21.17 Selective Service card
21.18 Immunization records
21.19 Certificate of degree of Indian blood or tribal membership card
21.20 Veterans Affairs ID card
21.21 Hospital issued birth record

Yes ........................................................................................... 1
No .............................................................................................. 2
Don't know / not sure / can't remember ......................... 88
Refused ................................................................................. 99

22. [IF S3=1] It's hard to vote in every single election, and some people we've talked to say they didn't vote in some recent elections. Thinking back to the 2012 presidential election on November 6th 2012, try to remember as accurately as possible if you voted in the 2012 presidential election here in Texas. Did you vote in the November 2012 election or not?

Yes........................................................................................... 1
No ............................................................................................ 2
Don't know / not sure / can't remember ......................... 88
Refused ................................................................................. 99

23. [IF S3=1] What about more recent elections? Did you happen to vote in any elections here in the state of Texas since July 1, 2013 or even more recently in a 2014 election?

Yes........................................................................................... 1
No ............................................................................................ 2
Don't know / not sure / can't remember ......................... 88
Refused ................................................................................. 99

24. [IF NO LICENSE OR ID CARD] Do you happen to know where the nearest Texas Department of Public Safety office is in relation to your home, work or school?

Yes …………………..…………..… 1
No …………………………….…..… 2
DK/RF …………………..……… 99

25. [IF NO LICENSE OR ID CARD] Have you ever been to the Texas Department of Public Safety office, either to try and get a license, ID card or Election ID certificate?

Yes …………………..…………..… 1
No …………………………….…..… 2
DK/RF …………………..……… 99

26. Of the following list, please tell me if any of the items would, or would not pose a problem for you, if you needed to go to the Texas DPS office on Monday through Friday during normal business hours to obtain an Election Identification Certificate, which cannot be used as proof of identification, but can be used for election purposes?

| | Degree of a problem | | | | Don't know | Refused |
| | Definite | Some | Little | None | | |
|---|---|---|---|---|---|---|
| A. Finding out where the nearest DPS office is | 1 | 2 | 3 | 4 | 88 | 99 |
| B. Getting a ride to the DPS office | 1 | 2 | 3 | 4 | 88 | 99 |
| C. Getting time off from work or school | 1 | 2 | 3 | 4 | 88 | 99 |
| D. Getting the necessary documents in order, such as my original birth certificate, or marriage | 1 | 2 | 3 | 4 | 88 | 99 |
| E. Having to travel about 15 miles to the nearest DPS office in your community | 1 | 2 | 3 | 4 | 88 | 99 |
| F. Having to wait in line at the DPS office for about one hour to get your ID | 1 | 2 | 3 | 4 | 88 | 99 |
| G. Having to wait in line at the DPS office for about two hours to get your ID | 1 | 2 | 3 | 4 | 88 | 99 |
| H. Using or paying for public transit to get there | 1 | 2 | 3 | 4 | 88 | 99 |
| K. Paying for any required documents you | 1 | 2 | 3 | 4 | 88 | 99 |
| may not have, such as original birth certificate, or marriage certificate | | | | | | |
| L. Making it to the required office during their normal business hours such as 8am to 5pm only | 1 | 2 | 3 | 4 | 88 | 99 |
| M. Making it to the required office during their normal business hours Monday through Friday only | 1 | 2 | 3 | 4 | 88 | 99 |

10

**Texas voter identification study / Barreto and Sanchez**

27. Over the past few months, have you seen or heard any official announcements or advertisements by the state of Texas about the new voter identification law on the radio, TV, newspaper, Twitter, Facebook or the Internet?

Yes, I have heard information …………….…... 1
No, I have not heard any information……………...… 2
DK/RF …………………….……. 99

28. Of the following list, please tell me yes or no, if you believe each type of identification can be used to establish proof of identity for purposes of voting in Texas

    A.  State of Texas public university or college photo identification
    B.  Employment or work photo identification from a State of Texas agency
    C.  Employment or work photo identification from a Federal agency such as the FBI or Department of Justice

Yes......................................................................................... 1
No ......................................................................................... 2
Don't know / not sure / can't remember ........................ 88
Refused .................................................................................. 99

11

<u>**Texas voter identification study / Barreto and Sanchez**</u>

**DEMOGRAPHICS**

D1. How long have you lived in Texas? [FOLLOW UP: "How many years"]

[ RECORD NUMBER OF YEARS: _____; REFUSED=999, 0=LESS THAN ONE YEAR – ASK FOLLOW UP "How many months?" ]

D2. And how long have you lived at your current address? [FOLLOW UP: "How many years"]

[ RECORD NUMBER OF YEARS: _____; REFUSED=999, 0=LESS THAN ONE YEAR – ASK FOLLOW UP "How many months?" ]

D2. [IF Q14=3]. In what year did you become a U.S. citizen?

[ RECORD 4-DIGIT YEAR: _____; REFUSED=9999]

D3. What is the highest level of education you completed? Just stop me when I read the correct category.

Grades 1 – 8..............................................................1
Some High School ....................................................2
High School graduate or GED...................................3
Some College/Technical School ...............................4
College graduate .......................................................5
Post-graduate education............................................6
(Don't know) ..........................................................88
(Refused) ...............................................................99

D4. In what year were you born?  [ __ __ __ __ ]

D5.  Do you currently own your own home, are you renting, or something else?

Own ...........................................................................1
Rent ...........................................................................2
Something else...........................................................3
Don't know ..............................................................88
Refused ....................................................................99

D6. Do you own or lease a car, or does someone in your household own or lease a car that you have regular access to?

Yes, I own or lease....................................................1
Yes, someone in my house does...............................2
No ..............................................................................3
Don't know ..............................................................88
Refused ....................................................................99

D6B. [IF D6=3-99] Do you have regular access to some other form of reliable transportation or mass transit including the bus or the train?

Yes..............................................................................1
No ..............................................................................2
Don't know ..............................................................88
Refused ....................................................................99

D7. Generally speaking, do you think of yourself as a Republican, a Democrat, an independent, or something else?

Republican ............................................................................. 1
Democrat ............................................................................... 2
Independent........................................................................... 3
Other party............................................................................ 4
Don't know .......................................................................... 88
Refused ................................................................................ 99

D8.  This final question is just for statistical purposes, to help us better classify the answers.  Your response is completely anonymous, but extremely important to our research. What was your total combined household income in 2013 before taxes.  Just stop me when I read the correct category.

Less than $20,000....................................................................... 1
$20,000 to less than $40,000 ................................................... 2
$40,000 to less than $60,000 ................................................... 3
$60,000 to less than $80,000 ................................................... 4
$80,000 to less than $100,000 ................................................. 5
$100,000 to less than $150,000 ............................................... 6
More than $150,000................................................................. 7
(Don't know) ........................................................................ 88
(Refused) ............................................................................. 99

D9. [IF D8=88/99]  Okay, how about something a little different.  Was your household income below $20,000 or above $20,000 in 2013?  Again, this information is confidential, but very important to the survey.

Less than $20,000....................................................................... 1
More than $20,000..................................................................... 2
(Don't know) ........................................................................ 88
(Refused) ............................................................................. 99

D10. Finally, do you currently receive disability benefits from the social security administration, or have been determined by the Department of Veteran's Affairs to have a disability rating of over 50 percent?

Yes …………………..………….… 1
No ……………………….……..… 2
DK/RF ………………….……… 99

D10A. [If response to D10 =1) Do you think that people with disability benefits get an exemption and do not need to show a photo ID to vote in person at a polling place, or that people with disability benefits would have to show a photo ID to vote like everyone else?

They get an exemption…..………….… 1
They have to show ID………….…..… 2
DK/RF ………………….……… 99

**Validation Questions:**

V1. Okay, and just to confirm that you live here in Texas, can you tell me your current residential zip code?

RECORD ZIPCODE: _____

13

**Texas voter identification study / Barreto and Sanchez**

V1B.    [IF V1=99999] Alright we don't need your zip code, but can you just confirm that you are a resident of Texas?

Yes …………………..…………..… 1
No ………………………..……....… 2
DK/RF …………………..……... 99

V2. Thank you that's all the questions we have for you.  So we can take your name off our list, can you tell me the full spelling of your first name as it might appear on your identification?

RECORD NAME: _____

Thank you for your time.

[IF RESPONDENT ASKS FOR MORE INFORMATION ABOUT SURVEY:  "This survey was conducted by Pacific Market Research and is completely anonymous and confidential.  If you have any questions or concerns you can contact Pacific at phone number 425-271-2300"]

D11. [ DO NOT READ ALOUD] Record respondent's gender

Male..............................................................................................1
Female ........................................................................................2

PL754
9/2/2014
2:13-cv-00193

# Barreto and Sanchez Rebuttal Report Responding to Hood and Milyo

### Expert Report Submitted on Behalf of Plaintiffs
### in *Veasey v. Perry*, *Case 2:13-cv-00193*

### Matt A. Barreto, Ph.D., University of Washington
### Gabriel R. Sanchez, Ph.D., University of New Mexico

### August 18, 2014

1.  On June 27, 2014 we submitted an expert report in Veasey v. Perry regarding Texas SB 14 which instituted a voter photo identification requirement for in-person voting in the state of Texas. On August 1, 2014 M.V. Hood III and Jeffrey Milyo submitted rebuttal declarations on behalf of the State of Texas that, in part, provided criticisms and responses to our report. In this brief declaration, we respond to Hood and Milyo and demonstrate why our initial report and public opinion survey of eligible voters in Texas is true and accurate, and most importantly, abides by all principles of accepted social science research.

2.  In summary, there are three clear takeaways from reviewing the rebuttal declarations by Hood and Milyo.

    First, the reconstituted analysis that each offers relies on numerous errors in both (a) recoding respondents as having an accepted photo ID who they cannot prove actually have an unexpired photo ID, and (b) making assumptions about respondents that go against the norms of social science survey research.

    Second, both Hood and Milyo include extensive commentaries on issues that are not pertinent to the case. Hood for example provides analysis conducted in other states which is not helpful in this case given the nuances specific to the Texas law, and also attempts to re-define the issue to be about overall aggregate turnout, which is, methodologically incorrect. Similarly, Milyo discusses at length a debate in the academic literature surrounding the costs of voting without directly addressing the data on costs of voting presented in our report.

    Third, and perhaps most important, even in the reconstituted analysis offered by Hood, he finds that Latinos are statistically less likely to possess accepted ID than are Anglos. Quite simply, Hood concludes that there is a statistically significant racial disparity in possession of SB 14 accepted ID in Texas.

We now turn to a more detailed discussion of each of the points raised by Hood and Milyo.

3.  Hood offers extensive commentary on research he has conducted in other states such as Georgia and South Carolina. This discussion is not relevant to the case at hand, as the laws in each state vary, and more importantly, the demographic profile of each state and possession rates within each state's population are unknown and potentially different from Texas. None of this prior research has any direct bearing on whether or not eligible voters in the State of Texas lack SB 14 accepted photo ID. The entirety of this portion of his rebuttal (Section V) is irrelevant to the question before the court in this case and further this section offers no specific or direct response to our initial expert report findings about possession rates in Texas.

4.  Hood and Milyo both attempt to re-focus the question on overall aggregate voter turnout rates rather than possession rates of accepted photo ID. However this is an incorrect area

of focus which ignores the very real evidence that existing registered voters who have a right to vote are denied the opportunity to vote if they lack a photo ID, or the means to obtain a photo ID. By focusing on aggregate voter turnout Hood and Milyo are effectively saying – as long as the overall voter turnout rate does not decline under voter ID regimes there is no harm. Rather than a direct disparity in turnout, the threshold has been whether eligible voters have equal access to the *opportunity to vote*. If there are unequal possession rates of the required identification across the population in the state of Texas then many voters would be disenfranchised. Consequently, the discussion of the academic literature focused on the relationship between voter ID laws and turnout is irrelevant to the question addressed in our report. Regardless of aggregate turnout rates, harm is still being faced by the hundreds of thousands of individuals who lack ID and will not be able to vote in future elections. It is irrelevant if *other* individuals who do possess a valid ID start to vote at higher rates now. We illustrate this with a simple example:

5. Table 1: Example how turnout can increase but eligible voters remain disenfranchised

| | Year 1 | Total Voted | Turnout Rate | | Year 2 | Total Voted | Turnout Rate |
|---|---|---|---|---|---|---|---|
| Registered voters have valid photo ID | 850 | 700 | 82% | | 950 | 900 | 95% |
| Registered voters LACK valid photo ID | 150 | 100 | 67% | 100 register | 150 | 0 | 0% |
| Eligible, but not registered have valid photo ID | 200 | 0 | 0% | | 100 | 0 | 0% |
| Eligible, but not registered LACK valid photo ID | 200 | 0 | 0% | | 200 | 0 | 0% |
| Overall | 1400 | 800 | 57% | | 1400 | 900 | 64% |

6. The example in Table 1 is a very close approximation of what happened in the state of Georgia between 2004 and 2008. It is also demonstrates that the overall aggregate voter turnout rate can increase, but this does not prove voter ID laws do not have a disenfranchising effect. In the example above in Table 1 the jurisdiction goes from an overall turnout rate of 57% in year 1 to an increased turnout rate of 64% in year 2. However the turnout increase is only among those who have a valid photo ID. In year 2 after implementation of voter ID, it is likely that any registered voter who does not possess a valid photo ID on Election Day will not be able to vote – even if they had voted in year 1. Further, other eligible voters who were previously not registered to vote but have a valid ID now enter the electorate for the first time in year 2, and because they have an ID they are able to vote. Witnessing a higher voter turnout rate among those who already have a valid ID does not prove at all that voter ID laws are preventing other voters who lack ID from voting, and this is the critical question we must answer – are eligible voters being disenfranchised?

Aggregate voter turnout analysis as suggested by Hood and Milyo does not allow for us to possibly answer the question.

7.  The analysis of voter turnout rates by race in Georgia across the 2004 and 2008 elections are particularly flawed because the 2008 election marked a dramatic increase in African American voter registration and voter turnout among those who had a valid photo ID in Georgia. Hood notes that he conducted research testing whether registration and turnout among Blacks in Georgia increased or decreased between 2004 and 2008. As depicted in his Figure 1, he argues that because Georgia's voter identification law was implemented in 2007, this analysis allows for a direct test of whether the law had an impact on turnout among this population. While this seems intuitive, it ignores an important and obvious factor: the candidacy of Barack Obama in 2008 which led to truly historic. [1]

8.  A key standard in social science research that compares two points in time is that every other factor is held constant, or identical, except the one variable in question – for Hood that is voter ID law. However the 2004 and 2008 elections are far from identical due to the Obama candidacy. Thus, while registration and turnout may have increased between 2004 and 2008, this surge was not driven by the implementation of a more stringent voter ID law, but the mobilization of African American voters by the Obama campaign. Several academic publications have shown the huge impact President Obama's candidacy has had on the civic engagement of Blacks.[2] Our report's findings and those from our academic research suggest that the registration and turnout levels of Blacks in Georgia would have been *even higher* in 2008 if it were not for the voter ID law put in place in 2007. Thus, the fact that more African Americans who voted in Georgia in 2008 does not prove voter ID laws had no effect, it only proves that among African Americans who had valid photo ID, they voted at much higher rates.

9.  Hood makes clear on page 27 of his rebuttal that he did not like our weight variable and states, "I constructed my own weight variable to bring the survey data into line with known population parameters as related to race and ethnicity." Throughout the rest of his report, he then attempts to re-analyze our survey data using his reconstructed weight. However, the weight variable he created provides a very biased portrait of Texas eligible voters. He does not attempt to match the socioeconomic demographics within each racial group to ensure that the weighted data for each group has the correct socioeconomic balance.

---

[1] http://www.pewhispanic.org/2009/04/30/dissecting-the-2008-electorate-most-diverse-in-us-history/
[2] See the following publication for example that was part of a larger special issue focused on the Obama effect during the 2008 election: http://poq.oxfordjournals.org/content/73/5/995.abstract, and the following news article which is indicative of the general recognition of the massive mobilization efforts of Obama In 2008: http://colorlines.com/archives/2012/03/hans_von_spakovskys_false_conclusions_about_georgias_voter_id_impacts.html

10. As we discuss in our initial expert report, weighting the data to match the Census estimates of the population are critical to being able to generalize the findings to the entire population. The weighting must be done within each racial group, one by one, as we originally explained on page 16 of our initial report:

> "After collecting the data for the main Texas sample, and the Black and Hispanic oversamples, underlying demographic characteristics of the respective samples were examined and compared to the known universe estimates for each from the 2012 U.S. Census, *American Community Survey* for Texas. Where there were any discrepancies, a weighting algorithm was applied to balance the sample, called raking ratio estimation,[3] so that the final samples that were tabulated for the analysis were in line with the U.S. Census estimates for Texas. For example, it is well known in survey research that people under 25 years old are harder to reach than older people who are over age 65. If 8% of survey respondents are age 18-24 years old, but census data tells us they are actually 14% of the eligible voting population, then each young person needs to be "up-weighted" so that collectively they represent 14% of the sample."

11. Hood states that our weight variable does not match the Census estimate for race/ethnicity in Texas and he cites our review of Texas demographics on the top of page 11 of our report. In that review, the narrative summary at the top of page 11 of our report is based on the total population of Texas – not the citizen adult population. This is a typographic error on our part, which, however, has nothing to do with our weighting scheme or our data. Rather, this paragraph is just a summary of the diversity within the state of Texas by race, age, education and income. In fact, our weight variable is based on the Census estimates for the adult citizen population of Texas and Hood acknowledges as much in his Table 8 on page 26 of his rebuttal, where he identifies our actual weighted data in column five of his table.

12. More importantly, the critical nature of the weight is to ensure that within each racial group included in the study, the findings can be generalized to the larger population. Because the principal aim of our study was to compare across Anglos, Hispanics and African Americans it is essential that the samples of each group are weighted to reflect the Census demographics of each group, thereby enabling an accurate cross-group comparison, as we explained clearly on page 16 of our initial report and reiterate in paragraph 10 above.

13. Hood's attempt to reconstruct the weight fails to take into account the correct age distribution, educational achievement, income distribution or gender parity within each racial group. In fact, if we tabulate the survey data using Hood's reconstructed weight the respondents are severely biased and unrepresentative of the actual population of Texas. We

---

[3] Michael Battaglia et. al. 2004. "Tips and Tricks for Raking Survey Data (a.k.a. Sample Balancing)" Proceedings of the Survey Research Methods Section, American Statistical Association.

illustrate this in Table 2 below in which we compare the age, education, income and gender.

14. Table 2: Comparison of Census demographics to Hood-weighted demographics by Race

| | Anglos | | | African Americans | | | Hispanics | | |
|---|---|---|---|---|---|---|---|---|---|
| Age | Census | Hood | Diff | Census | Hood | Diff | Census | Hood | Diff |
| 18 to 29 | 19.1 | 5.4 | -13.7 | 25.8 | 4.7 | -21.1 | 32.3 | 13.1 | -19.2 |
| 30 to 44 | 23.9 | 10.4 | -13.5 | 29.8 | 11.1 | -18.7 | 29.5 | 10.5 | -13.9 |
| 45 to 54 | 19.9 | 14.8 | -5.1 | 20.2 | 13.8 | -6.4 | 16.5 | 13.7 | 1.8 |
| 55 to 64 | 17.4 | 24.1 | 6.7 | 13.4 | 24.3 | 10.9 | 11.4 | 18.8 | 7.6 |
| 65 and over | 19.6 | 45.3 | 25.7 | 10.8 | 46.1 | 35.3 | 10.3 | 24.4 | 23.6 |
| | | | | | | | | | |
| Education | | | | | | | | | |
| Grades 1-8 | 2.1 | 1.5 | -0.6 | 3.4 | 1.5 | -1.9 | 23.6 | 20.9 | -2.7 |
| Some HS | 5.5 | 3.3 | -2.2 | 9.8 | 7.3 | -2.5 | 15.9 | 9.2 | -6.7 |
| HS grad only | 25.0 | 17.1 | -8.0 | 29.9 | 24.9 | -4.9 | 25.9 | 22.3 | -3.6 |
| Some College | 32.6 | 26.7 | -5.9 | 36.2 | 33.6 | -2.7 | 22.7 | 22.6 | -0.1 |
| College grad | 23.2 | 28.3 | 5.1 | 14.0 | 18.6 | 4.6 | 8.6 | 16.7 | 8.1 |
| Post-grad | 11.6 | 23.1 | 11.5 | 6.7 | 14.1 | 7.4 | 3.4 | 8.4 | 5.0 |
| | | | | | | | | | |
| Income | | | | | | | | | |
| Less than $20K | 13.9 | 10.5 | -3.4 | 27.5 | 27.8 | 0.3 | 23.7 | 33.6 | 9.9 |
| $20 to $39K | 17.9 | 15.4 | -2.5 | 24.4 | 17.0 | -7.4 | 27.6 | 17.9 | -9.8 |
| $40 to $59K | 16.3 | 10.9 | -5.4 | 17.4 | 13.2 | -4.2 | 18.7 | 11.9 | -6.9 |
| $60 to $79K | 10.4 | 18.9 | 8.5 | 9.1 | 14.9 | 5.9 | 9.5 | 8.9 | -0.7 |
| $80K to $99K | 13.2 | 9.0 | -4.2 | 9.6 | 5.5 | -4.1 | 9.5 | 5.2 | -4.2 |
| $100K to $149K | 15.5 | 12.9 | -2.6 | 8.5 | 5.1 | -3.4 | 7.6 | 6.0 | -1.6 |
| $150K and over | 12.9 | 11.2 | -1.6 | 3.6 | 1.7 | -1.9 | 3.4 | 3.8 | 0.4 |
| | | | | | | | | | |
| Gender | | | | | | | | | |
| Male | 51.1 | 44.8 | -6.3 | 47.1 | 29.3 | -17.8 | 50.0 | 43.8 | -6.2 |
| Female | 48.9 | 55.2 | 6.3 | 52.9 | 70.7 | 17.8 | 50.0 | 56.2 | 6.2 |

15. It is immediately apparent that Hood did not employ a raking weighting scheme for each individual racial group when he created his reconstructed weight. The racial groups in Hood's weighted data are statistically different from what the U.S. Census reports for Texas and therefore we cannot generalize his findings to the state of Texas. For example, in his weighted data 32.7% of African Americans have a college degree or higher when the Census informs the correct percentage is 20.7% among Texas African Americans. Likewise, Hood's weighted data reports 25.0% of Hispanics with a college degree – over double the correct rate of 11.9% for Hispanic citizen adults in Texas. His data show statistically significant differences from the Census when it comes to age, income and gender as well. This means that when Hood tabulates the data with his reconstructed weight, the data are not at all reflective of the real eligible voting population in Texas. For this reason, his entire analysis should be rejected.

16. Despite this enormous error, we still reviewed Hood's reconstructed analysis of our possession of ID variable and found his claims to be without warrant. Upon closer inspection of our original report, we find that Hood is incorrect in his attempt to reclassify some of our respondents as having a valid unexpired photo ID when their answers to the survey indicate that they do not currently possess a valid unexpired photo ID. In several instances he incorrectly classifies someone as having a valid ID when in fact the respondent does not affirm that their ID is unexpired. In other instances our respondents indicated that their ID was lost or stolen and not in their possession, yet Hood counted them as having ID because they originally answered they had obtained a driver's license. Throughout, we found many irregularities in the efforts by both Hood and Milyo to reclassify respondents as having a valid unexpired photo ID when their answers to the survey did not confirm this. Thus, the court should not accept either Hood's or Milyo's criteria for classifying respondents as actually possessing an ID.

17. Hood indicates that twelve of our respondents appear to have an accepted photo ID because they reported having proof of citizenship, such as a naturalization certificate. However, the only accepted ID is one with a photograph and each respondents was directly asked if they had a U.S. Citizenship certificate with their photograph at question 10 on our survey. Later, foreign born respondents were asked if they had a naturalization certificate or other proof of citizenship, however this did not include a specific reference to an ID with a photograph and not all naturalization certificates contain a photograph.

18. Regardless of the errors in Hood's weighting scheme and classification scheme, it is very important to note that he still finds statistically significant differences in possession of valid photo ID by race. Throughout his own reconstructed analysis, Hood reports that Latinos are statistically less likely to possess a valid photo ID than are Anglos among all eligible voters, as well as among registered voters. This can be found in his tables 10B,

10C, and 10D where he indicates with an asterisk (*) that Latinos are less likely to possess valid ID than are Anglos at the 95% confidence level according to his reconstructed analysis.

19. Hood and Milyo both raise questions about our survey that are not plausible. For instance Hood asks why we did not cross-reference our survey respondents against the TEAM voter registration database to validate their identity. However, it is common knowledge in the field that no personal identifying information is available in the random digit dial (RDD) sample upon which the baseline survey is based and it is therefore impossible to cross-reference the respondents.

20. Likewise, Milyo in comment 55 suggests that respondents to our survey are unable to confirm if they are over the age of 18 or have lived in Texas for over 30 days. This critique is not supported with any evidence at all that respondents would somehow not know the answer to these basic questions, and further, this critique is not within the bounds of accepted social science research. The totality of survey research operates from the assumption that respondents are able to answer basic screening questions about themselves and that respondent confidentiality and anonymity is the cornerstone of collecting accurate survey data. In fact, ensuring confidentiality of respondents is one of the twelve best practices defined by the American Association for Public Opinion Research[4], the leading organization for researchers who conduct survey research. Many academic publications stress the importance of confidentiality to ensure that respondents not only are willing to participate in surveys when asked to do so by researchers, but that they also provide honest answers to the questions posed in the interviews. [5]

21. In comment 57 of his rebuttal Milyo states that social desirability could bias our results. He claims that respondents might lie and provide the response that they feel is most socially accepted, however he does not point to any specific research that indicates this would be an issue on the topic of government issued photo identification. The idea of social desirability is that respondents want to see themselves fitting in and going along with accepted group norms. If we actually think about the social desirability issue that Milyo raises, if anything, it would seem that respondents have more incentive to over-report having an accepted photo ID. Respondents may not feel comfortable admitting that they do not possess an ID, or that they let their ID expire, and thus they may incorrectly report having an accepted ID.

---

[4] See link to the AAPOR best practices:: http://www.aapor.org/Best_Practices1.htm#best11
[5] See for example: Czaja, Ronald and Blair, Johnny. 2005. "Designing Surveys: A Guide to Decisions and Procedures." Thousand Oaks: Pine Forge Press. Tourangeau, Roger, Rips, Lance J., Rasinski, Kenneth. 2000. "The Psychology of Survey Response." Cambridge: Cambridge University Press.

In short, the concept of social desirability would support the notion that our report under-reports the true number of people who lack ID.

22. Milyo also argues that respondents could strategically misrepresent their answers to the questions we pose due to their lack of support for the law. This seems highly unlikely and inconsistent with any of the norms that drive the work of the survey research community. First, it presumes that respondents know that the survey is being used as part of the current lawsuit – which they did not. Also, it assumes that supporters of the law are not similarly misrepresenting their answers.  Milyo does not substantiate any of these claims with evidence or citations to published academic research.

23. Also inconsistent with the general standards and approach within the social sciences, Milyo argues that we "subject respondents to a lengthy and repetitive set of questions regarding multiple forms of ID" that could push respondents to misrepresent that they do not have a form of ID to terminate the survey. This claim is not only without any evidence, but is essentially a critique of the thorough and comprehensive rigor of our survey which promotes the accuracy of the results. The survey was designed specifically so it could ask about all the different types of ID referenced as part of SB 14.

24. Milyo argues that our use of 2012 ACS data is now two years older than the current 2014 Citizen Voting Age Population (CVAP) in Texas. However 2014 census data is not available. If anything, his point actually strengthens the argument against the voter ID law, because in terms of raw numbers, there are more voting eligible Texas residents who are negatively impacted by the law in 2014 than in 2012. If we extrapolate the linear growth in voter registration in Texas from 2004 – 2012 according to the U.S. Census, there would be an additional 500,000 new registered voters in Texas in 2014 than in 2012, including an additional 25,000 who lack a valid photo ID.

25. The basis of Milyo's reconstituted analysis is that he attempts to reclassify persons with ambiguous answers such as "don't know" as not necessarily lacking ID. The more accurate interpretation however is that we cannot accurately classify persons who indicate "don't know" as being in the "yes, has valid ID" category. It would be highly problematic and outside of the norms of social science research to code these ambiguous responses in the affirmative suggesting that they do in fact possess ID. In fact, published research in the social sciences clearly indicates that ambiguous responses including "don't know" should not be classified as an affirmative response.[6] When given multiple chances to indicate that

[6] See for example: Osborne, Jason W. 2013. "Best Practices for Data Cleaning: A Complete Guide to Everything you need to do before and after collecting your data." Thousand Oaks: Sage Publications;  Czaja, Ronald and Blair, Johnny. 2005. "Designing Surveys: A Guide to Decisions and Procedures." Thousand Oaks: Pine Forge Press.

they currently possessed an unexpired ID, these respondents failed to say "yes" and therefore we cannot count them as having ID. Thus the primary reason Milyo is reporting lower rates of people who lack ID is that he is counting anyone who said "don't know" as actually having a valid ID, which is entirely inconsistent with the standard practices in social science survey research.  Further, if Milyo dropped the ambiguous cases from the data and analyzed a smaller sample of data, he would have needed to reconstruct the weights of the new smaller dataset before running any new analysis – which he did not. We have serious concerns in the methodology employed by Milyo in his effort to recode the various respondents as having SB 14 ID possession but even were the Court to accept some of his highly questionable methods, many of the fundamental conclusions of our initial report concerning racial disparity in ID possession would hold.

26. Milyo also makes unsubstantiated assumptions that some respondents would not have to comply with SB 14 and show a valid ID because they had previously voted absentee or they have a disability. He has no way of knowing whether these respondents would vote absentee or in-person in a future election, and he has no way of knowing whether persons with a disability have applied for, and been granted an exemption from SB 14, which they must do according to the law.  It is very problematic to assume future behavior on the part of the survey respondents.

27. Hood's concluding section included some analysis focused on the number of provisional ballots cast in recent 2013 and 2014 elections in Texas. His argument here is that if the implementation of the voter ID law was detrimental, we would have seen a greater number of provisional ballots cast. First of all, this critique assumes there is a reliable and uniform system in place to collect the number of provisional ballots across 254 counties and smaller jurisdictions.  Second, Milyo assumes any person who showed up to vote without proper ID was offered the chance to voter provisionally or otherwise availed themselves of that option but Milyo offers no evidence for these assumptions, which to us, are inappropriate.  Third, an eligible voter with a valid ID may end up casting a provisional ballot for a variety of reasons, such as being in the wrong polling place. Not having an ID is not the only reason provision ballots may have been cast in previous elections, and not having a photo ID could never have been the reason pre-implementation of SB 14. Further, this criticism is flawed and again based on Hood's narrow focus on the impact of the law on turnout rates. By focusing only on the number of provision ballots in Harris County, he ignores how many eligible voters in Texas refrained from even attempting to vote in the first place because they were not able to vote due to lacking a required ID. As our survey results indicate clearly, there are a large number of eligible voters in Texas who do not have a valid ID and therefore cannot vote. For Hood's analysis to be complete he would need to give an

indication of how many people did not show up at the polls – not how many provisional ballots were cast.

28. The discussion of other Texas survey data indicating that there is support for the voter ID law among the Texas population is irrelevant to whether or not the law will impose unreasonable burdens on hundreds of thousands of eligible voters. Further, neither Hood or Milyo implemented the surveys themselves and therefore cannot confirm the methodological accuracy of the surveys they reference. Indeed, almost no details are given about the surveys such as the sample frame, margin of error, mode of data collection, field dates, question order, or response rate. Without these important details it is not possible to verify the methodological accuracy of the surveys Hood and Milyo reference. Further, the question wording on Tab 033 from the June 2009 survey does not fully explain the actual SB 14 law that was passed, and the question is also leading the respondent to agree with voter ID laws. The question wording on Tab 036 is extremely vague and does define for the voter what a "valid photo ID" is. The question wording on three surveys in Tab 031, Tab 037, and Tab 038 does not indicate which government-issued photo ID is acceptable. Some respondents may assume that state of Texas or federal government employee IDs are acceptable, or that state university IDs are accepted because they are government issued – however these IDs are not accepted.  More important, Hood failed to acknowledge that the data he cites still reveals a statistically significant gap in support for the voter ID law of almost 20 percentage points between Anglos and African Americans in Texas.

29. Section VIII of Milyo's report discusses the concerns he has with our section on the cost of obtaining a free ID. First, neither Milyo or Hood provide any re-analysis or different data to refute the tables and findings we present which clearly show that eligible voters who lack ID will face considerable burdens in obtaining a free ID. In short, the issues raised by Milyo in his section VIII are not based on the data generated in our report, but rather his disagreement with our interpretation of the academic literature regarding the costs and benefits of voting. Instead of providing any counter evidence that said burdens do not exist, Milyo goes to considerable length to summarize theoretical research from 1957 (Downs) and 1968 (Riker and Ordeshook) which has nothing to do with the factual answers provided by our survey respondents. Very clearly, our survey respondents indicate that obtaining the free ID will involve many burdens and barriers – some of which they cannot overcome. Whether or not Milyo has a new interpretation of a decades old debate is entirely irrelevant. The hypothetical scenarios he provides to estimate differential costs by race and ethnicity are unnecessary and unfounded. Our report provides direct data – not hypothetical – on the perceived costs of obtaining a valid ID by race, ethnicity, and other demographic factors so these hypothetical tests are not helpful to the court in determining if there is a racial or ethnic difference in costs associated with obtaining an ID.

PL755
Case 2:13-cv-00193 Document 673-81 Filed on 11/11/14 in TXSD Page 100 of 211 9/2/2014
Case 2:13-cv-00193 Document 673-81 Filed on 11/11/14 in TXSD Page 1 of 21
2:13-cv-00193

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>*Plaintiff*, )<br><br>TEXAS LEAGUE OF YOUNG VOTERS<br>EDUCATION FUND and IMANI CLARK, )<br><br>*Plaintiff-Intervenors*, )<br><br>v. )<br><br>STATE OF TEXAS; NANDITA BERRY, in<br>her official capacity as Texas Secretary of<br>State; and STEVE McCRAW, in his official<br>capacity as Director of the Texas Department<br>of Public Safety, )<br><br>*Defendants*. ) | Civ. No. 2:13-cv-00263 |

EXPERT REPORT
OF
Coleman Bazelon

ON BEHALF OF PLAINTIFF-INTERVENORS TEXAS LEAGUE OF YOUNG VOTERS
EDUCATION FUND AND IMANI CLARK

June 27, 2014

# Table of Contents

I.      Summary of Conclusions ...................................................................................... 1

II.     Qualifications ........................................................................................................ 1

III.    Statement of Inquiry ............................................................................................ 2

        III.A. Assignment ................................................................................................ 2

        III.B. Materials Considered ................................................................................ 2

IV.     Case Background .................................................................................................. 2

V.      Outline of Methodology ....................................................................................... 3

        V.A.  Methodology for Testing Whether SB 14 Has a Differential Impact By Race .............. 4

        V.B.  Prevalence: Racial Composition of Affected Registered Voters ...................... 5

        V.C.  The Economic Costs Imposed by SB 14 ...................................................... 6

        V.D.  The Burden Imposed by SB 14 .................................................................... 8

VI.     Prevalence: The Racial Composition of Affected Registered Voters ...................... 8

        VI.A. The TEAM Database ................................................................................... 9

        VI.B. The ID Databases and Identifying Affected Registered Voters ...................... 10

        VI.C. Racial Composition of Affected Registered Voters ..................................... 11

VII.    The Economic Costs Imposed by SB 14 ............................................................ 15

        VII.A.    A "Free" EIC Is Not Costless to Obtain ............................................... 18

        VII.B.    The Costs of Documents Required to Obtain an EIC ............................. 19

        VII.C.    Travel Costs to Obtain an EIC ............................................................. 22

        VII.D.    Total Costs to Obtain an EIC by Race .................................................. 29

VIII.   Obtaining the Required IDs is More Burdensome for African Americans ............ 31

        VIII.A.    African Americans in Texas have Lower Incomes than White Texans .......... 31

VIII.B.    African Americans in Texas have Less Wealth than White Texans .................. 33

VIII.C.    African Americans in Texas are More Likely to be Poor than White Texans .... 34

VIII.D.    African Americans in Texas Score Lower on Other Measures of Socioeconomic Status than White Texans ...................................................... 35

VIII.E.    SB 14 Creates a Higher Expected Burden for Affected Registered Voters Who are African American than for those Who are White .......................... 36

IX.    Registered African-American Student Voters in Texas ........................................ 37

Appendix A – Curriculum Vitae of Coleman Bazelon .................................................... 38

Appendix B – Materials Relied Upon .............................................................................. 39

Appendix C – Geocoding Methodology .......................................................................... 44

I.    Racial Composition of Registered Voters ................................................................ 44

II.    Transportation Costs by Block Group .................................................................... 44

Appendix D – Determination of Affected Registered Voter Probability by Race ......... 45

Appendix E: Documentation Required to Obtain an EIC .............................................. 48

# I.  Summary of Conclusions

1.  I examined the distribution and racial composition of registered voters in Texas who, as a result of Texas Senate Bill 14 ("SB 14"), will not be able to vote without acquiring a form of photo ID permitted by SB 14.  My analysis leads to three conclusions:

  - A disproportionate share of registered voters who will need a new ID to continue to be able to vote are African American.

  - Acquiring an ID for the purpose of voting, including a nominally free ID, comes with real economic costs.  As an example, I have estimated that the average travel cost to obtain an Election Identification Certificate ("EIC") is $42.17.

  - The burden of the costs imposed by SB 14 is substantially higher for African-American Texans, who are disproportionately poorer, than for white Texans. For example, the share of wealth represented by the travel costs needed to acquire an EIC is more than four times higher for African-American Texans than they are for white Texans.

# II.  Qualifications

2.  I am a principal in the Washington, DC office of The Brattle Group ("Brattle"), an economic consulting firm that provides litigation support in a wide variety of areas.  Prior to joining Brattle, I was a vice president with Analysis Group, an economic and strategy consulting firm.  I also served as a Principal Analyst in the Microeconomic and Financial Studies Division of the Congressional Budget Office.

3.  I received a Ph.D. and M.S. in Agricultural and Resource Economics from the University of California at Berkeley, a Diploma in Economics from the London School of Economics and Political Science, and a B.A. from Wesleyan University.

4.  For the past two decades, I have been a practicing economist applying economic principles to questions of valuation, regulation, policy and strategy.  In doing so, I frequently provide testimony to federal and state courts and to arbitrators, as well as advise regulatory and legislative bodies, including the U.S. Federal Communications Commission and the U.S. Congress.  In carrying out economic analysis, I regularly utilize statistical analysis and work with large datasets.

5.  My CV is provided as Appendix A to this Expert Report.  I am being compensated at my customary rate of $550 per hour for my work on this report, including any deposition

testimony or testimony in court; however, Brattle has agreed to limit total compensation in this matter.

## III. Statement of Inquiry

### III.A.   ASSIGNMENT

6.   I have been asked to evaluate the economic burden that SB 14 imposes on Texas voters and to assess whether that burden varies depending on the voter's race.

### III.B. MATERIALS CONSIDERED

7.   I relied on numerous documents produced in this matter and data and documents available from public sources.  A full list of materials considered is provided in Appendix B.

## IV. Case Background

8.   In 2011, SB 14 was signed into law.  In relevant part, SB 14 requires voters who vote in person to show proof of identity through the presentation of one of a specific set of state or federal issued IDs that include the voter's picture ("Required IDs").[1]  The law requires would-be voters who do not have a Required ID to obtain one in order to vote.  Plaintiff-Intervenors assert that this burden falls disproportionately and severely on voters in specific sub-groups, including racial sub-groups, in violation of the Voting Rights Act ("VRA") and the U.S. Constitution, and challenge SB 14 on that basis.

9.   In 2012, the State of Texas sued the U.S. Department of Justice ("DOJ") in the United States District Court for the District of Columbia under Section 5 of the VRA to gain "preclearance" to allow SB 14 to go into effect.  In blocking SB 14 from going into effect, the court found that Texas failed to meet its burden to show that the law would not be retrogressive to minority voters.[2]  In 2013, the U.S. Supreme Court struck down Section

---

[1]   These IDs include a Texas driver's license, Texas personal identification card, United States military identification card, United States citizenship certificate that contains a photograph, United States passport, a Texas license to carry a concealed handgun, or a Texas Election Identification Certificate. *See*

http://votesmart.org/bill/12588/voter-identification-requirements#.U6Nunp3D8TQ.   Except for the U.S. citizenship certificate, these IDs must either be current or expired for no more than 60 days.

[2]   *Texas v. Holder*, 888 F.Supp.2d 113 (D.D.C. 2012).

4(b), the provision of the VRA that applied Section 5 to Texas and other jurisdictions covered by that provision.[3] That decision allowed SB 14 to go into effect and led to the current litigation brought under Section 2 of the VRA.

10. My understanding from counsel is that, unlike Section 5 of the VRA, in which the burden is on the *jurisdiction itself* to demonstrate that the voting change at issue is not discriminatory, Section 2 of the VRA requires the *party challenging the law* at issue to show that the voting change at issue is discriminatory. In the current case filed under Section 2 of the VRA, the Plaintiffs are required to make a positive showing of, among other things, the burden imposed by SB 14. This report explains my analysis of the economic costs—one type of burden—imposed by SB 14. I find that these costs are meaningful and fall disproportionately on African Americans. Because African Americans in Texas generally have lower incomes and less wealth than white Texans, the impact of these costs is even more disproportionate than are the costs themselves.

## V. Outline of Methodology

11. I examine the burden that SB 14 creates on Texans using three complementary analyses. In each case, I find that SB 14 burdens African-American Texans more heavily than white Texans. I find that:

   a. With regard to "Prevalence" — Registered voters in Texas who do not have a Required ID ("Affected Registered Voters")[4] are disproportionately African American.[5]

---

[3]   *Shelby County v. Holder*, 570 U.S. __, 133 S. Ct. 2612 (2013).

[4]   I define "Affected Registered Voters" to be those registered voters whose only option is to obtain a Required ID in order to vote. Other registered voters may also be affected by SB 14. For example, individuals with a disability rating of 50% or higher with the U.S. Social Security Administration or the U.S. Department of Veterans Affairs may apply for exemption status from a Required ID. Until they apply for and receive the disability exemption, however, they will not be able to vote without a Required ID. As my analysis is restricted to only those individuals who must obtain a Required ID in order to vote, I exclude persons eligible for a disability exemption. *See*

   http://votetexas.gov/register-to-vote/need-id/.

[5]   By focusing on registered voters, I am ignoring some potential avenues that could cause SB 14 to impact African Americans differently from non-minorities. For example, I do not investigate issues related to eligible but unregistered voters, including whether or not *their* costs of acquiring a required photo ID exhibit disproportionate burdens associated with race. Voter integrity issues have been

Continued on next page

    b.   With regard to "Cost" — Acquiring a Required ID solely for the purpose of voting is costly, including for the nominally free EIC.

    c.   With regard to "Burden" — The burden of the economic costs imposed by SB 14 is higher for African Americans in Texas because they are disproportionately poor.

## V.A. METHODOLOGY FOR TESTING WHETHER SB 14 HAS A DIFFERENTIAL IMPACT BY RACE

12.    I test to see whether the burden created by SB 14 has a disproportionate impact on minorities, specifically African Americans.  General reliance on statistical analysis to detect the disproportionate impact of a government or business practice, process, or policy on minorities is well established.  In response to courts and policymakers, a number of important and influential articles and books on the topic of differential impacts of various policies on minorities have been published.[6]  Since those early studies, disparate treatment analyses have been applied in a variety of settings including housing, employment, lending, and education.  In all of these settings, statistical analyses are employed to measure differences in observed outcomes from the application of a particular process or practice that appeared facially neutral.

---

Continued from previous page

raised to support SB 14, but most of those issues are addressed by the voter registration process.  For example, issues related to voter eligibility, such as age and citizenship, are directly addressed in the voter registration process.  *See*

http://votetexas.gov/register-to-vote/register-to-vote.

Other voter eligibility issues, such as felony status, are addressed in the voter registration process and are not enhanced by voter picture ID requirements because the IDs do not require identification of felony status.  Even residency, which is addressed at the voter registration stage, is only confirmed by some Required IDs.  Even when the Required ID is one that has the voter's address, however, the confirmation is weak in that if an individual moves but retains her original voter registration, she may also easily keep a photo ID with the prior (previously valid) address.

[6]    David C. Baldus and James W.L. Cole*, Statistical Proof of Discrimination*, Colorado Springs: Shepard's McGraw Hill, 1980; Michael Fix and Raymond J. Struyk editors, *Clear and Convincing Evidence Measurement of Discrimination in America*, Washington D.C.: The Urban Institute Press, 1993 (hereinafter "Fix and Struyk"); and Alicia H. Munnell et.al. (1996) "Mortgage Lending in Boston: Interpreting HMDA Data." *The American Economic Review* 86:25-53 (hereinafter "Munnell et al. 1996").

13. The general approach to determining the existence of a differential impact or burden of a policy or practice involves first establishing a benchmark—an expected outcome absent discrimination.

    a. In the case of housing, this may be a distribution of rental agreement outcomes based on the distribution of applicants possibly controlling for decision factors such as income.[7] These outcomes are compared statistically to actual acceptance rates or expected acceptance rates while controlling for other decision factors.

    b. In the case of mortgage lending, statistical analysis is used to establish whether a facially neutral lending decision process results in disparate results for similarly situated applicants across race and ethnic groups.[8] Again, actual rates are compared to expected rates based on application distributions and decision factors such as income or credit score.

    c. A similar approach is taken in the employment context to review hiring and promotion decisions.[9] Actual rates are compared to expected rates controlling for job qualifications such as education, test scores, and experience.

14. Traditional differential impact analysis that distinguishes between acceptable and unacceptable causes of variation in impacts is not applied here. The current analysis, however, is analogous to those analyses in that it posits that, absent a difference in impact based on race, the burden of SB 14 would be the same for African Americans as for all other Texas voters. Empirical evidence sufficient to reject this hypothesis therefore would imply a differential impact and that SB 14 imposes a greater burden on African Americans.

## V.B. PREVALENCE: RACIAL COMPOSITION OF AFFECTED REGISTERED VOTERS

15. An analysis of differential impact begins with an expectation about what various data would show absent any differential impacts. In the current case, that baseline expectation regarding the racial composition of Affected Registered Voters is that it is proportional to the racial composition of all registered voters in Texas. To test this expectation, I examine whether African-American registered voters are more likely than other Texan registered

---

[7] John Yinger, "Access Denied, Access Constrained: Results and Implications of the 1989 Housing Discrimination Study," in Fix and Struyk, 1993, pp. 69-112.

[8] Munnell et.al, 1996.

[9] Glen Cain (1986), "The Economic Analysis of Labor Market Discrimination," in O. Ashenfelter and R. Layards editors, *Handbook of Labor Economics* 1: 693-785.

voters to need to obtain a Required ID in order to vote. For my analysis, the association of race with Affected Registered Voters relies on two separate algorithms:

    a. Matching Texas' registered voters to various state and federal ID databases to identify the registered voters who would need to obtain a Required ID to retain their ability to vote.[10]

    b. Assigning these Affected Registered Voters to Census Block Groups based on their geocoded addresses, and inferring racial composition based on the racial composition of the Census Block Groups. As further explained in Section VI.C, my method is conservative in that by focusing on geographic variation at the Block Group level, I do not capture all of the expected racial variation in Affected Registered Voters.

16. I find that the proportion of Affected Registered Voters who are African American is greater than if SB 14 were race neutral. In other words, if all one knows about a registered voter is her race, then it is more likely that SB 14 imposes a burden on her if she is African American than if she is not.

## V.C. THE ECONOMIC COSTS IMPOSED BY SB 14

17. But for the passage of SB 14, Affected Registered Voters still would be able to vote without incurring any additional expenses.[11] Using standard economic and statistical methods, I estimate the additional economic costs due to the passage of SB 14 that these voters would face if they wish to vote.[12]

---

[10] The matching of registered voters with state and federal ID databases was performed by DOJ.

[11] Prior to the passage of SB 14, Texas had a voter ID law, but photo IDs were not required. The previous law allowed voters to establish identity with items such as "official mail addressed to the person by name from a governmental entity" or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter," which would create much less of a burden than a photo ID requirement. Tex. Elec. Code Ann. § 63.0101 (valid through December 31, 2011).

[12] This approach is consistent with the test set out in *Frank v. Walker*, 2014 WL 1775432, at *25 (E.D.Wis. Apr. 29, 2014) (hereinafter "Wisconsin Decision"): "Based on the text, then, I conclude that Section 2 protects against a voting practice that creates a barrier to voting that is more likely to appear in the path of a voter if that voter is a member of a minority group than if he or she is not."

The current analysis does not measure burden based on the outcome of voting. There is a rich literature on the determinants of voting, beginning with Anthony Downs, AN ECONOMIC THEORY OF DEMOCRACY, (New York: Harper & Brothers, 1957). Recent scholarship finds that, "Under [the

Continued on next page

18. This analysis is similar to those I use to estimate economic damages in other matters: I estimate the "compensating variation," which is the amount of money an individual would have to be compensated to be economically[13] as well off under SB 14 as she would have been but for the enactment of SB 14. In a damages case, the damages would be this compensation.

19. Economic damages are actual (sometimes called "out-of-pocket") cash expenses plus opportunity costs. In the current case, the opportunity cost is the value of time spent acquiring a Required ID. These costs can be direct—such as the time spent waiting to acquire an EIC at a Department of Public Safety ("DPS") office—or indirect—such as the value of time and monetary costs of acquiring documents needed to acquire an EIC, such as a birth certificate. For avoidance of doubt, I estimate the economic costs for purposes of assessing the burden they create, not for purposes of providing compensation.

20. I focus my estimations on the costs of acquiring an EIC because it is the least costly alternative for most Affected Registered Voters who still wish to vote after the passage of SB 14. Although the DPS does not charge for an EIC, there are still significant economic costs to obtain one, including travel costs to get to the DPS.[14] These costs are the focus of much of my empirical analysis. In addition to these travel costs, the costs of acquiring required supporting documents (such as a birth certificate), if needed, and the time expended to get those supporting documents, as well as other costs such as day care or time off from work, add to the economic costs associated with acquiring an EIC. I do not

---

Continued from previous page

'calculus of voting'], even small increases in the costs of voting can deter a person from voting, since the benefits of voting are slight." Wisconsin Decision at *17.

[13] I recognize that there may be non-economic harms placed on individuals, such as the social stigma of society creating a new barrier to voting, that are more analogous to pain and suffering. I do not attempt to quantify the amount of monetary compensation required to off-set these additional harms. Rather, I restrict my analysis to the more traditional areas of economic harm.

[14] For ease of exposition, I refer to "DPS" locations, although voters may go to fixed and mobile county EIC issuing locations in order to obtain a Required ID. My analysis accounts for both fixed and mobile EIC issuing locations. See "County Locations Issuing Election Identification certificates," available at

http://www.dps.texas.gov/DriverLicense/documents/EICCountyrun.pdf,

and "DPS Mobile Stations Issuing Election Identification Certificates," available at

http://www.dps.texas.gov/DriverLicense/documents/EICDPSrun.pdf.

estimate these additional costs of acquiring an EIC; rather, I focus on the travel costs of acquiring an EIC that will be borne by almost all Affected Registered Voters. The additional costs beyond travel costs, however, are among the economic costs created by SB 14. As a result, the costs estimated in this report are conservative; for many Affected Registered Voters, the total cost of obtaining an EIC will be higher than the costs estimated in this report.

21. I estimate travel costs separately for African-American and other Texan Affected Registered Voters. I find that the economic costs imposed on both African-American and other Texan Affected Registered Voters are meaningful, and average $42.17 for all registered voters in Texas.

### V.D. The Burden Imposed by SB 14

22. Beyond the difference in prevalence of these costs for African-American and white Texans, the "burden" that the same economic cost imposes on different individuals varies as their ability to bear those costs varies: all else equal, a wealthy or high income individual will find a given economic cost less burdensome than a poor or low income individual. Economists explain this as stemming from the diminishing marginal utility of wealth. In layman's—or common sense—terms it means that an extra $100 to a wealthy individual adds less to her well-being than does an extra $100 to a poor individual. Similarly, losing $100 is a greater loss to someone with a low income compared to someone with a high income. The implication of this is that any cost, whether $25 or $50, impacts the well-being of lower income individuals more acutely than higher income individuals.

23. I evaluate SB 14's burden on African-American and other Texans using data on income, wealth, and other social measures. I find that the burden created by SB 14 is higher for African-American voters than for white voters in Texas because African Americans in Texas have disproportionately low incomes and are disproportionately poor.

## VI. Prevalence: The Racial Composition of Affected Registered Voters

24. I estimate the racial composition of Affected Registered Voters by combining information from three sources.

   a. The Texas Election Administration Management ("TEAM") database lists all registered voters in Texas and provides their addresses, but does not provide information on race.

   b. DOJ has determined which registered voters lack a Required ID by matching individuals in the TEAM database to numerous other databases that list individuals who hold various Required IDs (the "ID databases"). Individuals in the TEAM

database who do not appear (do not "match") in any of the ID databases are considered to not possess a Required ID and are the Affected Registered Voters.

c. DOJ has also determined which registered voters may be eligible for disability exemption by matching individuals in the TEAM database to Social Security Administration and Veterans Affairs databases. Individuals in the TEAM database who appear in any of the disability exemption databases are considered not to be Affected Registered Voters.

d. The U.S. Census provides information on the racial composition of various geographical areas; I base my analysis on "Census Block Groups."[15] I estimate the racial composition of Affected Registered Voters by assigning to each Affected Registered Voter a probability of being African American or non–African American based on the racial proportion in that Affected Registered Voter's Census Block Group. Note that the use of Census Block Groups instead of Census Blocks biases downwards any racial differences that I find.

25. I explain each database and how I use it in my analysis below.

## VI.A. THE TEAM DATABASE

26. The publicly available TEAM database contains the name, voter ID number, address (residential and mailing), and party affiliation of each registered voter in Texas. Appendices C & D provide further details on my data manipulations with the TEAM data.

27. The geographic distribution of registered voters in the TEAM database is shown in Figure 1. In subsequent steps of my analysis, I combine the geographic distribution of voters with information from the U.S. Census on the racial and economic characteristics of geographical areas to estimate the racial and geographic characteristics of the Affected Registered Voters.

---

[15] Census Blocks are the smallest geographic unit used for Census data. Blocks are aggregated into Census Block Groups, which in turn are aggregated into Census Tracts. The state of Texas is divided into 914,231 Census Blocks, 15,811 Census Block Groups and 5,265 Census Tracts. *See*

https://www.census.gov/geo/maps-data/data/tallies/tractblock.html.

**Figure 1: Geographic Distribution of Registered Voters in Texas**



| Percentage of Registered Voters in Texas | 0% to 0.0025% | 0.0025% to 0.0050% | 0.0050% to 0.0075% | 0.0075% to 1% |

## VI.B.  THE ID DATABASES AND IDENTIFYING AFFECTED REGISTERED VOTERS

28.  I used the outputs of DOJ's database matching analysis to identify the Texas registered voters who must obtain a Required ID.  Appendices C & D contain further details on the integration of this data with the TEAM and U.S. Census data.  8.2% of registered voters in Texas would need to obtain a Required ID in order to vote.[16]  Figure 2 is identical to Figure 1 except that it shows the geographic distribution of Affected Registered Voters.

---

[16]  The ID Databases indicate that just over 9% of registered voters in Texas lack a Required ID. However, just over 100,000 of these individuals, or 1% of the registered voter population, are eligible for a disability exemption as identified in the DOJ-provided U.S. Social Security Administration and U.S. Department of Veterans Affairs databases.  I conservatively restrict my analysis to just those registered voters who, strictly speaking, *must* obtain a Required ID in order to vote and who wouldn't be able to avoid the burden of obtaining a Required ID by virtue of applying instead for a disability

Continued on next page

**Figure 2: Geographic Distribution of Affected Registered Voters in Texas**



Percentage of Affected Registered Voters in Texas  | 0% to 0.0025% | 0.0025% to 0.0050% | 0.0050% to 0.0075% | 0.0075% to 1%

## VI.C.  RACIAL COMPOSITION OF AFFECTED REGISTERED VOTERS

29.  Minorities are not evenly distributed throughout Texas. The odds that a given Affected Registered Voter is African American vary greatly depending on where that voter resides. The U.S. Census provides information on the racial composition of the populations living in various geographical areas. The racial composition of Census Block Groups (*i.e.*, the

---

Continued from previous page

exemption. Disability-eligible voters likely face additional burdens to vote imposed by SB 14 that I do not measure. Additionally, there are a variety of reasons for which some disability-eligible voters might choose to apply for an EIC; such voters would face the same burdens of obtaining an EIC discussed in this report.

fraction of the population in each Census Block Group that is African American) in Texas is shown in Figure 3.

**Figure 3: Racial Composition (Fraction African American) of Census Block Groups in Texas**



Block Group Percentage African American  0% to 4.99%  5% to 11.49%  11.5% to 24.99%  25% to 100%

30. As seen in Figure 3, many African Americans in Texas live in urban areas. The counties with the highest proportion of African Americans are generally in or very near cities, especially Dallas, Waco, Houston, and Beaumont. Nearly half of the African-American population in Texas lives in Dallas or Harris County.[17] There is also a significant presence of African Americans in Census Block Groups that contain prisons. Texas revokes the right

---

[17] Houston is located in Harris County.

to vote for convicted felons, and I conservatively remove all Census Block Groups with federal and state prisons from my analysis.[18]

31. For the purpose of the current analysis, it is not necessary to identify the race of each voter with precision; it is sufficient to estimate the number of Affected Registered Voters that are African American or not African American. I do so in three steps:

    a. First, I estimate the proportion of registered voters in each Census Block Group that is African American.[19]

    b. Second, I assign each Affected Registered Voter to a Census Block Group based on addresses in the TEAM database using geocoding software.[20]

    c. Third, I assign to each Affected Registered Voter a probability of being African American equal to the proportion of registered voters in each Census Block Group that is African American (as estimated in step (a)).

32. My method is "conservative" in the sense that, if there is a disparity in prevalence between the races, then I am likely to systematically underestimate it. Given that, as discussed below, my conservative method shows a significant racial disparity, I would expect a less aggregated analysis, or one bringing to bear additional information regarding racial composition, to show a larger racial disparity. Essentially, my method only detects a racial disparity based on where Affected Registered Voters live. If there is a racial disparity

---

[18] *See* http://tdcj.state.tx.us/unit_directory/ for a list of all state prisons in Texas.

    *See* http://www.bop.gov/locations/list.jsp for a list of all federal prisons in Texas.

[19] I calculate this proportion as the ratio of (i) the number of registered voters in the Census Block Group who are African American to (ii) all registered voters in the Census Block Group. I calculated (i) as the number of African Americans in the Census Block Group (taken from Census data) multiplied by the state-wide fraction of African Americans who are registered to vote. I calculated (ii) as the sum of the equivalent quantity as in (i) for each race. At a state-wide level, in 2012 the Census reports that 72% of white Texans are registered to vote, about 71% of African-American Texans are registered to vote, and about 39% of Hispanic Texans are registered to vote.

    Source: U.S. Census Bureau, Voting and Registration in the Election of November 2012 – Detailed Tables, Table 4b, available at

    https://www.census.gov/hhes/www/socdemo/voting/publications/p20/2012/tables.html .

[20] *See* Appendix C for details on the geocoding algorithm.

beyond controlling for where Affected Registered Voters live, my method will not capture it. Intuitively, one can see this by imagining a case where all Affected Registered Voters were actually African American (so 0% were not African American), and considering what my method would estimate. So long as some Affected Registered Voters lived in Census Block Groups that were racially mixed, my method would estimate that at least some of those Affected Registered Voter were not African-American, which necessarily understates the assumed racial disparity. In other words, by averaging over a Census Block, I lose granularity of the analysis. In Appendix D, I repeat my estimate using more aggregated Census regions and verify that the more granular the analysis regarding racial composition, the greater the number of Affected Registered Voters that are African American. In sum, I would expect to find greater racial disparity using a more granular analysis.

33. Table 1 provides my calculations of the number and share of Affected Registered Voters by race. Using my conservative method, I find that 10.7% of African-American registered voters would need to obtain a Required ID in order to vote. This is larger than the overall population of Affected Registered Voters, where I find that 8.2% of all registered voters would need to obtain a Required ID.[21] It is also larger than the white population of Affected Registered Voters, where I find that 6.9% of white registered voters in Texas would need to obtain a Required ID.

---

[21] As noted above, *see supra* footnote 15, I have restricted my analysis to those registered voters who do not have the option of applying for a disability exemption and therefore *must* obtain a Required ID in order to vote.

**Table 1: Affected Registered Voters by Race**

|  | All Texans [A] | All Registered Texan Voters [B] |  | All Affected Registered Texan Voters [C] | Affected Share of Registered Voters [D] |
|---|---|---|---|---|---|
| African American | 2,835,493 | 1,730,293 |  | 185,095 | 10.7% |
| White | 11,311,834 | 7,714,425 |  | 530,636 | 6.9% |
| Hispanic | 9,389,496 | 3,400,136 |  | 350,224 | 10.3% |
|  |  |  |  |  |  |
| All | 24,932,741 | 13,403,109 | *EIC required* | 1,103,491 | 8.2% |
|  |  |  | *EIC required, or disability exempt* | 1,232,231 | 9.2% |

Notes and Sources:

U.S. Census Bureau 2010 population counts; U.S. Census Bureau, Current Population Survey, November 2012; TEAM database.

[B]: TEAM consists of a total of 13,564,410 voters; 13,459,189 of these voters have addresses or zipcodes that are able to be mapped to Census Block Groups; 13,458,782 of these voters map to Census Block Groups with non-zero population; 13,403,109 of these voters map to Census Block Groups without prisons.

[C]: Results of DOJ Matching data.

[D]: [C] / [B].

# VII. The Economic Costs Imposed by SB 14

34.   Every Required ID has a direct fee, except for Veteran IDs and the EIC, as shown in Table 2.[22]

---

[22]   For full voting requirements in Texas, see "Required Identification for Voting in Person," available at

http://votetexas.gov/register-to-vote/need-id/ .

## Table 2: Fees to Issue Required IDs

| ID Type | Nominal Cost | |
| --- | --- | --- |
| | New ID | Renewal ID |
| [1] Texas Driver License | | |
|     Under 18 | $16 | $6 |
|     18 to 84 | $25 | $25 |
|     Over 85 | $9 | $9 |
|     Disabled Veterans | $0 | |
|     Replacement | $11 | |
| **[2] Texas Election Identification Certificate** | **$0** | |
| [3] Texas Personal Identification Card | | |
|     59 and Younger | $16 | $16 |
|     60 and Older | $6 | $6 |
|     Replacement | $11 | |
| [4] Concealed Handgun License - Standard | $140 | $70 |
| [5] Veteran ID card | $0 | |
| [6] United States Citizenship Certificate | | |
|     Naturalization Certificate | $680 | $345 |
|     Certificate for Citizenship | $600 | $345 |
| [7] United States Passport | | |
|     Book | $135 | $110 |
|     Card | $55 | $30 |

Notes and Sources:

All forms of identification, except for US citizenship certificate or certificate of naturalization, need to be current or expired no longer than 60 days at the time of voting. See http://www.txdps.state.tx.us/driverlicense/electionid.htm.

[1] & [3]: Texas Driver License and Identification Card Fees, available at http://www.txdps.state.tx.us/DriverLicense/fees.htm.

[2]: Election Identification Certificate (EIC) information, available at http://www.txdps.state.tx.us/driverlicense/electionid.htm.

[4]: Texas Concealed Handgun License (CHL) Fee Table, available at http://www.dps.texas.gov/RSD/CHL/documents/CHLFeeSchedule.pdf.

[5]: Veteran Services, available at http://www.txdps.state.tx.us/DriverLicense/vetServices.htm.

[6]: Application for Naturalization information, available at http://www.uscis.gov/n-400. Application for Certificate of Citizenship information, available at http://www.uscis.gov/n-600. Application for Replacement Naturalization/Citizenship Document information, available at http://www.uscis.gov/n-565.

[7]: United States Passport Fees, available at http://travel.state.gov/content/dam/passports/FeeChart/Passport%20Fees%20Chart%202014_TSG.pdf.

35.   In addition to the issuance fee, all other Required IDs (except the Texas Personal Identification Card) have eligibility requirements, such as military service or learning to drive, that make them unreasonable alternatives for the purpose of enabling voting.  I focus on the costs to obtain an EIC because it is the least costly remedy for most Affected Registered Voters.[23]

36.   Although there is no direct fee associated with acquiring an EIC, a voter without a Required ID bears economic costs in acquiring one.  For purposes of my analysis, I categorize these economic costs as direct or indirect, and as monetary or non-monetary.

   a.   Direct versus Indirect

      i.   *Direct Economic Costs* are costs associated with the narrow act of applying for and receiving an EIC, such as the time and expense it takes to go to the DPS and apply for an EIC.

      ii.   *Indirect Economic Costs* are costs that are incurred to support applying for and receiving an EIC, such as the cost of obtaining a birth certificate or securing childcare while obtaining the EIC.

   b.   Monetary versus Non-Monetary

      i.   *Monetary Economic Costs* include any cash expenditures related to acquiring an EIC or supporting documents.

      ii.   *Non-Monetary Economic Costs* include the non-cash economic costs associated with acquiring an EIC, such as waiting in line at the DPS or the time spent acquiring a birth certificate.

37.   Note that both direct versus indirect economic costs and monetary versus non-monetary economic costs are independent characteristics, such that both direct and indirect economic costs can be either monetary or non-monetary.  These may include the time and monetary costs of obtaining supporting documentation (such as a birth certificate), the costs in time and money of traveling to a DPS or other facility that issues EICs, lost wages,

---

[23]   Note that in addition to a fee, the Texas Personal Identification Card requires the same sort of documentation as the EIC.  *See*

   http://www.txdps.state.tx.us/DriverLicense/applyforid.htm.

the cost of child care services,[24] and the potential risk of job loss. The EIC is valid for 6 years, so some of the costs related to physical renewal of an EIC would be periodically repeated.

## VII.A.   A "FREE" EIC IS NOT COSTLESS TO OBTAIN

38.   I understand that Texas has claimed that the EIC is "free" and that there is therefore no economic cost imposed by SB 14.[25] This claim is incorrect. First, there are indirect monetary costs involved in obtaining an EIC, such as transportation costs, child care costs while traveling and waiting at the DPS, and the cost of obtaining supporting documents. Second, it is widely recognized—in the economics literature,[26] in business practice, and in U.S. government- and state-sponsored studies[27]—that non-monetary costs, such as wait or travel times, are economic costs and are an important consideration in the overall cost of a decision.

---

[24]   The Texas Workforce Commission reported that median child-care costs for part-day services range from $11 for school-age children in registered child-care homes to $26 for infants in licensed child-care centers. *See* Texas Workforce Commission (April 2011), "2010 Texas Child Care Market Rate Survey – Final Report," at 15. Report available at:

http://www.twc.state.tx.us/svcs/childcare/child-care-market-rate-report.pdf.

[25]   Defendant's Motion to Dismiss, ECF No. 52, at 2, 17-18.

[26]   For example, noted statistician and economist Harold Hotelling and antitrust economist Steven Salop give equal weight to both travel costs and the direct price of purchasing a good, noting the importance of distance from a firm in determining whether an individual will buy from the firm or its rival. *See* Harold Hotelling (1929) "Stability in Competition" *The Economic Journal* 39: 41-57 and Steven Salop (1979) "Monopolistic Competition with Outside Goods" *The Bell Journal of Economics* 10: 141-156.

[27]   Empirical studies of the value of time, particularly in travel decisions, play an explicit role in transportation planning, including highway build out, congestion management, the determination of tolls, and the setting of transit fares for buses and subway systems. *See*, for example, Texas A&M Transportation Institute (December 2012), "TTI's 2012 Urban Mobility Report"; David Ellis (May 2008), "Technical Memorandum: Cost Per Hour and Value of Time Calculations for Passenger Vehicles and Commercial Trucks for Use in the Urban Mobility Study"; Maricopa Association of Governments (February 2012), "Toll Road Modeling Support: Final Report"; and, U.S. Department of Transportation (September 28, 2011), "Revised Departmental Guidance on Valuation of Travel Time in Economic Analysis."

## VII.B.   THE COSTS OF DOCUMENTS REQUIRED TO OBTAIN AN EIC

39.   Although I do not directly estimate the costs of acquiring the documents that are required to support an application for an EIC, if needed, they are nevertheless real costs.  Individuals who have to obtain these documents would bear these costs in addition to the travel costs I estimate.

40.   To qualify for an EIC, voters must provide:[28]

    a.  documentation of identity, and

    b.  documentation of U.S. Citizenship, and

    c.  a valid Texas voter registration card.

41.   Documentation of Identity is divided into three categories: primary, secondary, and supporting.  One primary, two secondary, or one secondary and two supporting identification documents must be provided for identity verification and EIC eligibility.[29]

---

[28]   Election Identification Certificate (EIC) information, available at:

http://www.dps.texas.gov/DriverLicense/electionID.htm.

Additionally, one must be a Texas resident and be 17 years and 10 months or older, and not possess another legitimate form of voting identification.

A summary of the documents required to support an application for an EIC are provided in Table 13 in Appendix E.

[29]   Primary identification is a Texas driver's license expired more than 60 days but within two years of the expiration date.  Secondary identification includes original or certified copies of a birth certificate issued by the appropriate State Bureau of Vital Statistics or equivalent agency, United States Department of State Certification of Birth, a court order with name and date of birth indicating an official change of name and/or gender, or U.S. citizenship or naturalization papers without an identifiable photo.  Supporting identification includes twenty eight different categories of documents, including a voter registration card, Texas vehicle or boat title or registration, Social Security card, a driver's license or photo ID issued by DC or another U.S. state or territory, or school records. Election Identification Certificate (EIC) – Documentation Requirements lists all acceptable forms of documentation, available at:

http://www.txdps.state.tx.us/DriverLicense/eicDocReqmnts.htm.

42. <u>Documentation of U.S. citizenship</u> can be satisfied by several forms of identification.[30] Since some such commonly held IDs—U.S. passports or citizenship papers with photo—are sufficient to vote in their own right, it is generally the various forms of birth certificates that are relevant for obtaining an EIC.

43. For Texas-born residents, the monetary cost of obtaining a birth certificate is $22.  I understand that an individual who obtains a birth certificate in person (as opposed to by mail) for purposes of obtaining an EIC can have this fee waived.[31]  However, photo ID requirements to obtain a birth certificate may lead to additional costs.  Applicants must submit or show a valid photo ID,[32] such as a current driver's license or U.S. Passport in order to apply for a birth certificate.  Alternatively, applicants must provide a number of secondary identification documents, which also require at least one photo ID.[33]

44. For residents born outside of Texas, the monetary cost of obtaining a birth certificate varies by state.  Every U.S. state offers an option to obtain a birth certificate either online or by mail.[34]  Required documentation varies by state, but in general a valid photo ID is required in order to apply for a birth certificate.

---

[30] These include: a U.S. passport book or card, birth certificate issued by a U.S state, territory, or District of Columbia, Certificate of Report of Birth, Consular Report of Birth issued by the U.S. Department of State, U.S. Certificate of Citizenship or Certificate of Naturalization, or U.S. Department of Justice Immigration and Naturalization Service U.S. Citizen ID card.

[31] *See*

http://www.dshs.state.tx.us/Layouts/ContentPage.aspx?PageID=56719&id=8589981487&terms=election+identification.

[32] An application for birth certificate can be submitted online, by mail, or in person.  This potentially eliminates the direct travel costs associated with obtaining a birth certificate.  *See*

http://www.dshs.state.tx.us/vs/reqproc/certified_copy.shtm.

[33] For a list of acceptable primary or secondary identification requirements for a Texas birth certificate, see:

http://info.sos.state.tx.us/pls/pub/readtac$ext.TacPage?sl=R&app=9&p_dir=&p_rloc=&p_tloc=&p_ploc=&pg=1&p_tac=&ti=25&pt=1&ch=181&rl=28.

[34] All states except Wyoming and Vermont allow online application of vital records via the commercial vendor VitalChek, https://www.vitalchek.com/.  Most also host their own online vital records service. Wyoming has a by-mail application service.  *See*

Continued on next page

45.    I have not found any analyses considering whether African Americans in Texas have lower possession rates of these supporting documents than white Texans.  Indirect evidence, however, suggests that African Americans in Texas are less likely to possess such documentation.  A 2006 survey by the Brennan Center found that one-quarter of voting-age African Americans lack a government issued photo ID, versus 8% of white citizens.[35]  Another study found that 26.7% of African-American 18 to 29 year-olds lacked a birth certificate, compared to only 15.7% of white youth.[36]  According to this same study, African-American "youth reported that the lack of required identification prevented them from voting at nearly four times the rate of white youth (17.3 percent compared with 4.7 percent)."[37]  Evidence provided at trial in the recent Wisconsin voter ID case of *Frank v. Walker* found that "[m]issing birth certificates are also a common problem for older African American voters who were born at home in the South because midwives did not issue birth certificates."[38]  Furthermore, significant numbers of Katrina evacuees relocated to Texas[39] and a much higher percentage of African-American evacuees did not return to their pre-Katrina counties,[40] suggesting that a disproportionately high number of African-

---

Continued from previous page

http://www.health.wyo.gov/rfhd/vital_records/birthcertificate.html.  Vermont has an online and by-mail application service.  *See*

https://secure.vermont.gov/VSARA/vitalrecords/.

[35]    *See* "Citizens without Proof: A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification," available at:

http://www.brennancenter.org/sites/default/files/legacy/d/download_file_39242.pdf.

[36]    Jon Rogowski and Cathy Cohen, "Black and Latino Youth Disproportionately Affected by Voter Identification Laws in the 2012 Election," at 5.  Report available at:

http://research.blackyouthproject.com/files/2013/03/voter-ID-laws-feb28.pdf.

[37]    *Id.* at 1.

[38]    Wisconsin Decision at *16 n.17; *see also id.* at *30 n.36.

[39]    Jeffrey A. Groen and Anne E. Polivka (March 2008), "Hurricane Katrina evacuees: who they are, where they are, and how they are faring," BLS Monthly Labor Review, at 40.  (Hereinafter, "Groen & Polivka".)

[40]    Groen & Polivka, at 44.

American Katrina evacuees settled in Texas. Many of these evacuees lost their IDs in the storm.[41]

## VII.C.   TRAVEL COSTS TO OBTAIN AN EIC

46.   Travel costs include monetary costs such as bus or taxi fares, as well as non-monetary costs such as travel time.  To estimate travel costs, I assume that potential voters would seek to obtain an EIC from whichever DPS or other EIC issuing location that minimizes the overall travel cost of getting to that location.

47.   If the only travel option to get to a DPS were walking, then most potential voters would travel to the DPS closest to their home.[42]  Figure 4 provides an illustrative example of this selection method for the Houston area.  Each DPS is denoted by a black dot, and the collection of Census Block Groups whose residents would find that DPS to be the nearest are shown as like-colored dots surrounding the black dot.[43]  For example, the area of South Houston has a single DPS, and it is surrounded by magenta dots, which represent all of the Block Groups (and potential voters) who would choose to walk to that DPS rather than any other because it is the nearest EIC-granting location.  Just east of South Houston is a collection of grey-colored dots identifying Block Groups that would choose to go to an alternate DPS location rather than the location in South Houston.

---

[41]   Bob Sullivan (September 13, 2005), "Katrina victims face identity crisis," NBC News, available at:

http://www.nbcnews.com/id/9316512/ns/technology_and_science-security/t/katrina-victims-face-identity-crisis/#.U58Jq_ldWVM. Last accessed June 16, 2014.

[42]   It is possible that some people would travel to a DPS from work or while commuting to or from work. I do not have any information on the work addresses (or times at work) for registered Texas voters, so I model travel from home.

[43]   In this particular chart, distance is measured by the Euclidean distance metric, often referred to "as the crow flies."  It is an approximation of the walking distance, although actual street patterns would distort the distances somewhat.

**Figure 4: Block Groups with Shortest Distance to Each DPS Location (Houston)**



48.  Figure 4 does not account for differences in travel time or costs associated with different travel modes (walking, bus, taxi, or being driven by a friend or family member). For example, some Block Groups may sit on transit lines that significantly shrink the travel time to a particular DPS location, suggesting that the preferred DPS location may not be the nearest one.

49.  In this section, I explain how I account for these factors by calculating the total cost of travel, including the economic costs of travel time, for each of three possible modes of travel—walking, transit, or taxi—and selecting the lowest cost method.[44]

---

[44]  Obviously, driving oneself is not an option—otherwise the individual would already have a valid photo ID in the form of a driver's license.  The cost of a taxi also stands in for the "cost" of getting a ride from a friend or relative.

### VII.C.1.    Value of Time

50.    The amount of money an individual would be willing to pay to avoid travel time is known as the "Value of Time" in the economics and transportation literature.[45]  Everyone has a limited budget of time to allocate towards work and leisure activities, and time spent going to the DPS reduces the time available for other productive or pleasurable pursuits. Transportation departments at the state and federal levels have long recognized this fact, and the value of commuters' time plays a key role in their decisions regarding road construction and maintenance, as well as congestion management.

51.    The Texas Transportation Institute issued a report in December 2012 that valued the cost of delays while traveling at $16.79 per hour for personal (as opposed to commercial) drivers.[46] Other transportation agencies derive similar values for the value of travel time savings. Many identify a value of time that is approximately equal to 50 percent of average wages.[47] This valuation is also recommended by the U.S. Department of Transportation ("USDOT") for local personal travel, which notes explicitly that with 2009 nationwide median annual household income of $49,777, the average value of travel time savings would be $12.00 per hour.[48]   The USDOT also notes that "Personal time spent walking or waiting outside vehicles, as well as time spent standing in vehicles or bicycling [presumably when not for pleasure], should be evaluated at 100 percent of hourly income."[49]   This latter measure better captures the value of time expended to acquire an ID solely for the purpose of retaining the ability to vote.

---

[45]    *See* Small, Kenneth A. and Erik T. Verhoef, *The Economics of Urban Transportation*, New York: Routledge, 2007, at 45-46.

[46]    *See* Texas A&M Transportation Institute (December 2012), "TTI's 2012 Urban Mobility Report."  For a description of methodology, see David Ellis (May 2008), "Technical Memorandum: Cost Per Hour and Value of Time Calculations for Passenger Vehicles and Commercial Trucks for Use in the Urban Mobility Study."

[47]    *See* Maricopa Association of Governments (February 2012), "Toll Road Modeling Support: Final Report" for a useful summary of many state and federal transportation agencies' modeling efforts. Common methodologies include stated preference surveys, revealed preference analysis using observed mode choice data, and speed choice models.

[48]    *See* U.S. Department of Transportation (September 28, 2011), "Revised Departmental Guidance on Valuation of Travel Time in Economic Analysis."

[49]    *Id.* at p. 13.

52. Accordingly, I value the cost of time spent travelling to an EIC granting location at 100 percent of the median (within Tract) wage rate. I do this separately for each race and census tract.[50] The distribution of median (within Tract) wage rates in Texas is presented in Table 3. African-American Texans earn on average $13.69 per hour, compared to $23.08 for white Texans. There is also considerable variability across Census Tracts. The bottom 25% of Census Tracts have an African-American wage rate of less than $10.20, while the top 25% of Census Tracts have an African-American wage rate exceeding $16.44.

**Table 3: Wage Rates by Race**

|  | Statistic | African American | White | Hispanic |
|---|---|---|---|---|
| [1] | Overall Average | $13.69 | $23.08 | $11.28 |
| [2] | Average Across Tracts | $13.12 | $21.75 | $11.75 |
| [3] | Standard Deviation | $5.25 | $10.49 | $4.70 |
| [4] | Median | $13.03 | $20.57 | $10.39 |
| [5] | 25th Percentile | $10.20 | $16.39 | $8.71 |
| [6] | 75th Percentile | $16.44 | $26.84 | $12.88 |

Source: Census Bureau American Community Survey
Notes:
    [1]: Calculated as census tract wages weighted by total labor hours by race.
[2] - [3]: Unweighted statistics across census tracts.
[4] - [6]: Statistics weighted by labor hours by race.

### VII.C.2.　The Economic Costs of Travel to Obtain an EIC

53. The total cost of travel to a DPS location includes both monetary (*e.g.*, transit and taxi fares) and non-monetary (value of time) costs. I determine each of these based on a geocoding algorithm that allows me to calculate expected travel times and distances for each of three travel modes: walking, taxi, and public transit. I assume that voters wishing

---

50 Although I model the expected amount of travel time to EIC locations separately by Block Group, I rely on publically available Census data for income statistics, which only describe income at the Census Tract level.

to obtain an EIC will select the DPS location and travel mode that minimize the total cost of travel. Appendix C includes specific details on the algorithm.

54. Table 4 provides an illustrative example of the registered voter's decision process for two different voters living in the same location choosing a DPS location and travel mode to obtain an EIC. Each hypothetical voter is presented with three potential DPS locations to visit via any of the three travel mode options. For example, for Voter 1 to travel to DPS Location 1, she could take a taxi, with a total travel time of 10 minutes and an expected fare of $14.50.[51] If she were to walk instead, she would bear no direct monetary costs, but the walk would take 150 minutes. Finally, if instead she were to use public transit, the total trip time in this illustrative example would be 42 minutes and she would pay a fare of $4.10. Voter 1's wage rate is equal to the median wage rate for African-American Texans of $13.03/hour,[52] from which I can calculate the value of time across each option. In this instance, Voter 1 would choose to take public transit to DPS Location 1, at a total one-way travel cost of $13.22, composed of $4.10 in fare charges and $9.12 in travel time costs.

55. Voter 2 in the illustrative example would make a different decision. Her wage rate is equal to the median wage rate for white Texans of $20.57. As a consequence, two options with the same travel times and fare expenses can lead Voter 2 to choose a different DPS location. In this example, the lowest travel cost for Voter 2 is to take a taxi to DPS location 2, which costs her $3.09 in travel time costs and $13.25 in fare charges, for a total trip cost of $16.34. If she had chosen the same options as Voter 1, she would bear $14.40 in travel time costs and $4.10 in transit charges, for a total travel cost of $18.50. Importantly, the main impact of Voter 2's higher wage and subsequent value of time is to lead her to make a different travel choice than Voter 1 when faced with the same expected travel times and fare charges.

---

[51] For this analysis, I assume that the total taxi fare is the sum of a $2.50 base fare and an additional $2.00 per mile for distance traveled. These numbers were determined by taking the average of the taxi rates reported by the cities of Houston and Fort Worth. *See*

http://www.houstontx.gov/ara/regaffairs/taxicabs_rates.html and

http://fortworthtexas.gov/uploadedFiles/Municipal_Court/About_Us/Administration/Taxicab%20Rates%20and%20Approximate%20Fares.pdf, last visited June 22, 2014.

[52] In the actual travel cost analysis, the wage rate for each Block Group is specific to the Census Tract within which the Block Group is located. *See* Table 3.

**Table 4: Illustrative Example of Travel Mode Choice and Cost Calculation**

| | Voter 1 African American Wage = $13.03 DPS Location | | | Voter 2 White Wage = $20.57 DPS Location | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 1 | 2 | 3 |
| Taxi | | | | | | |
|   Travel Time (minutes) | 10 | 9 | 12 | 10 | 9 | 12 |
|   Value of Time ($) | $2.17 | $1.95 | $2.61 | $3.43 | $3.09 | $4.11 |
|   Fare ($) | $14.50 | $13.25 | $17.00 | $14.50 | $13.25 | $17.00 |
|   Total ($) | $16.67 | $15.20 | $19.61 | $17.93 | $16.34 | $21.11 |
| Walk | | | | | | |
|   Travel Time (minutes) | 150 | 135 | 180 | 150 | 135 | 180 |
|   Value of Time ($) | $32.58 | $29.32 | $39.09 | $51.43 | $46.28 | $61.71 |
|   Fare ($) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
|   Total ($) | $32.58 | $29.32 | $39.09 | $51.43 | $46.28 | $61.71 |
| Public Transit | | | | | | |
|   Travel Time (minutes) | 42 | 51 | 44 | 42 | 51 | 44 |
|   Value of Time ($) | $9.12 | $11.03 | $9.64 | $14.40 | $17.42 | $15.22 |
|   Fare ($) | $4.10 | $4.54 | $4.22 | $4.10 | $4.54 | $4.22 |
|   Total ($) | $13.22 | $15.57 | $13.86 | $18.50 | $21.96 | $19.44 |

Source: Illustrative example only.

56.   I perform similar calculations for each Census Block Group in Texas. The lower wage rates for African-American Texans tend to make public transportation and walking more attractive relative to white Texans. In addition to the wage-rate differential, the greater urbanization of African-American Texans also implies greater access to public transportation for African-American Texans than white Texans. These two impacts combined to skew the mode choice distribution. As shown in Table 5, my analysis finds that African-American Texans tend toward more time-intensive public transport and walking while white Texans are more likely to choose a quicker but more expensive taxi. As described in the illustrative example, even two individuals from the same neighborhood might choose different modes of transportation to get to a DPS location because of different opportunity costs of time.

**Table 5: Frequency of Travel Mode Choice to DPS Locations by Race**

| Mode | | African American | White | All Registered Voters |
|------|---|----------------|-------|----------------------|
| | | [A] | [B] | [C] |
| Driving | [1] | 44% | 79% | 62% |
| Transit | [2] | 41% | 14% | 26% |
| Walking | [3] | 15% | 7% | 12% |

Notes and Sources:

Results from The Brattle Group Google API Analysis.

[1]: Frequency of driving mode by race.

[2]: Frequency of transit mode by race.

[3]: Frequency of walking mode by race.

57.    Table 6 provides a summary of the expected travel costs associated with these travel mode choices across different segments of the Texas population.  Across all Affected Registered Voters in Texas, the expected travel costs to obtain an EIC are $42.17.  Among Affected Registered Voters, African Americans have an expected average travel cost to a DPS location of $28.17, composed of an expected average travel time of 81 minutes and $13.40 in expected average fare charges.  Among white Affected Registered Voters, the expected average travel cost to a DPS location is $48.79, composed of an expected average travel time of 37 minutes and $36.27 in expected average fare charges.  These numbers reflect the different options available and constraints imposed across racial groups in Texas.

**Table 6: Summary of Travel Costs by Race**

| Breakdown of Travel Costs | | African-American Affected Voters | White Affected Voters | All Registered Voters |
|---|---|---|---|---|
| | | [A] | [B] | [C] |
| Travel Time (minutes) | [1] | 81 | 37 | 48 |
| Value of Time ($) | [2] | $14.76 | $12.52 | $13.17 |
| Fare ($) | [3] | $13.40 | $36.27 | $29.00 |
| Total Cost ($) | [4] | $28.17 | $48.79 | $42.17 |

Notes and Sources:
Results from The Brattle Group Google API Analysis, TEAM Data, and DOJ matching data.

[A] - [C]: Average values across all block groups in Texas by race.
[1]: Calculated travel times to mimimum-cost DPS location.
[2]: Calculated using wage rates by race by Census tract from the
    ACS Survey 2010.
[3]: Calculated using travel distance to minimum-cost DPS location
    taxi and transit rates based.
[4]: Sum of [2] & [3].

58. Given that the prevalence of African-American Texans needing to acquire an EIC to retain the right to vote is about twice as high as for white Texans, the expected travel costs for a random Affected Registered Voter, conditioned on race, are not so different and are probably higher for African-American Texans. Nevertheless, because these cost differences are largely driven by differences in earnings, they are not directly comparable for purposes of evaluating burden. *See* Section VIII.

## VII.D.  TOTAL COSTS TO OBTAIN AN EIC BY RACE

59. The total cost to acquire an EIC will depend on many factors, specific to each voter. Some voters will live near a DPS and have a copy of their birth certificate, while others will live far away, will need to acquire a birth certificate, and possibly will incur other costs as well. Such costs could include:

- *Travel costs.* I found that the average cost for an Affected Registered Voter to travel to a DPS was $42.17. This cost varies by the voter's location. It also varies, on

average, by race, with African-American Affected Registered Voters experiencing $28.17 in travel costs and white Affected Registered Voters experiencing $48.79 in travel costs. Additional travel costs could be incurred for individuals who need to acquire other documentation to support their EIC application.

- *Documentation costs.* Applying for an EIC requires additional documentation. These documents usually require payment of fees. Additionally, the requirements to obtain such documents may lead to additional costs.

- *Time spent at DPS applying for EIC.* Some Affected Registered Voters are likely to experience long wait times at the DPS location, increasing the total time costs to acquire an EIC.[53]

- *Time lost at work.* Some Affected Registered Voters are likely to have inflexible work schedules and either suffer lost vacation time or forego lost wages for time spent acquiring an EIC. I found that the average African-American Affected Voter would spend 81 minutes in travel to and from a DPS location in order to obtain an EIC. DPS wait times could increase the total time spent acquiring an EIC to 2 hours or more. This would amount to at least $26 in lost wages for a typical working African American in Texas.

- *Child care costs.* Some Affected Registered Voters may need to secure child care services for at least a partial day in order to obtain an EIC. Such costs could range from $11 up to $26.

60. While these costs are not necessarily additive for all Affected Registered Voters, the total cost to obtaining an EIC for an Affected Registered Voter will likely include some combination of each of these costs and accumulate to potentially several multiples of the total travel costs calculated here. So, for example, an African-American Affected

---

[53] These wait times could range from 15-45 minutes, to as much as several hours.

*See*

http://www.nbcdfw.com/investigations/DPS-Wait-Times-Shorter-at-New-Mega-Center-License-Offices-200942911.html. Last visited June 26, 2014.

*See* also

http://www.khou.com/news/local/DPS-wait-times-are-longer-than-ever-161146955.html. Last visited June 26, 2014.

Registered Voter that needs a birth certificate and child care could incur the following costs:

- travel costs - $28.17,

- one hour spent at DPS - $13.03,

- one hour spent acquiring birth certificate - $13.03,

- birth certificate fees - $22, [54] and

- partial day of child care services - $11.

This hypothetical voter would incur total costs of $87.23, approximately three times the travel costs alone.

# VIII. Obtaining the Required IDs is More Burdensome for African Americans

61. As demonstrated in the previous sections, African Americans are more likely to need to acquire an ID to vote and acquiring an ID for the purpose of voting comes with a cost. As noted above, whatever its level, a cost is more burdensome the lower is the socioeconomic standing of an individual.

62. As I show below, African Americans in Texas tend to be poorer than whites in Texas, making the burden of acquiring an ID to vote higher for African-American voters than for white voters. Stated slightly differently, if all that is known about a potential Texas voter is that she is African-American, the data analyzed in this report show that the burden of acquiring an ID to vote is expected to be higher for her than if she were a white Texan.

## VIII.A. AFRICAN AMERICANS IN TEXAS HAVE LOWER INCOMES THAN WHITE TEXANS

63. It is well established that African Americans generally have substantially lower income[55] and wealth[56] than white Americans. I have examined income and wealth distributions in

---

[54] I assume that this voter would be mailing in his application for a copy of his birth certificate.

[55] In a study titled on income and poverty, the U.S. Census reported that "Comparing the 2012 income of non-Hispanic White households to that of other households shows that […] the ratio of Black to non-Hispanic white income was .58." *See* Carmen DeNavas-Walt, Bernadette D. Proctor, Jessica C. Smith

Continued on next page

Texas and find this generally to be true in this state as well, both state-wide and across households in Texas. As shown in Table 3 above, African Americans in Texas on average have significantly lower wages (59% lower) than white Texans.

64. As shown in Table 7, in 2010, white Texas residents had an annual median income of $52,392, approximately 68% greater than the median income of $31,104 for African-American residents of Texas and approximately 36% greater than the median income of other minority residents. Additionally, approximately 69% of Texas's African-American population had an income less than the median income of white residents, while approximately 66% of Texas's other minority population had an income less than the median income of white residents. If the income distribution were random across racial groups, only 50% of residents would be expected to have an income less than the white group's median income.

---

Continued from previous page

(September 2013) "Income, Poverty, and Health Insurance Coverage in the United States: 2012" (p. 8), available at:

https://www.census.gov/prod/2013pubs/p60-245.pdf .

[56] The U.S. census reports that 2010 median wealth for white (non-Hispanic) households was $110,729. For African-American households the median net worth was $4,955, or about 22 times less than the net worth of white households. *See* U.S. Census "Net Worth and Asset Ownership of Households: 2010," available at:

http://www.census.gov/people/wealth/files/Wealth_Tables_2010.xls.

**Table 7: Texas Household Income by Race**

| State of Texas 2010 | | African American | White | Other |
|---|---|---|---|---|
| | | [A] | [B] | [C] |
| Median Household Income | [1] | $ 31,104 | $ 52,392 | $ 38,412 |
| % Difference with White | [2] | 68.4% | | 36.4% |
| Total Number of Households | [3] | 263 | 1,087 | 855 |
| Households below White Median | [4] | 181 | | 560 |
| Households below White Median (%) | [5] | 68.8% | | 65.5% |

Notes and Sources:
[1], [3] & [4]: Data from the Survey of Income and Program Participation, 2008 Panel, Wave 7.
[A][2]: [B][1] / [A][1] - 1.
[C][2]: [B][1] / [C][1] - 1.
[A][5]: [A][4] / [A][3].
[C][5]: [C][4] / [C][3].

## VIII.B. AFRICAN AMERICANS IN TEXAS HAVE LESS WEALTH THAN WHITE TEXANS

65.    The distribution of wealth across racial groups in Texas is more uneven than income. Table 8 presents the breakdown of wealth by racial group. The wealth measurement is the sum of equity in homes, vehicles, businesses, interest-earning assets at banks and other institutions, stocks and mutual fund shares, non-home real estate, other assets, 401K, IRA, Keogh and thrift savings accounts.[57] The median household wealth of the white population in Texas is $97,800, more than 7 times larger than the median household wealth of $11,961 for the African-American population, and almost twice as large as the median household wealth of other minority populations.

---

[57]    *See* Peter McHenry, "Does Low Wealth Constrain Long-Distance Migration?", College of William and Mary, August 2013, p. 14, available at:

http://wmpeople.wm.edu/asset/index/pmchenry/paperwealthandmigration.

**Table 8: Texas Household Wealth by Race**

| State of Texas 2010 | | African American | White | Other |
|---|---|---|---|---|
| | | [A] | [B] | [C] |
| Median Household Wealth | [1] | $ 11,961 | $ 97,800 | $ 34,490 |
| % Difference with White | [2] | 717.7% | | 183.6% |
| Total Number of Households | [3] | 263 | 1,087 | 855 |
| Households below White Median | [4] | 217 | | 634 |
| Households below White Median (%) | [5] | 82.5% | | 74.2% |

Notes and Sources:
[1], [3] & [4]: Data from the Survey of Income and Program Participation, 2008 Panel, Wave 7.
[A][2]: [B][1] / [A][1] - 1.
[C][2]: [B][1] / [C][1] - 1.
[A][5]: [A][4] / [A][3].
[C][5]: [C][4] / [C][3].

66.   The disparity in wealth appears to be at all income levels.  Nationally, white Americans increase their wealth more quickly than African Americans do as their income rises.  One study found that over a 25 year period, every dollar increase in income raised white family wealth by $5.19, whereas over the same period a dollar increase in income raised African-American family wealth by $0.69.[58]

## VIII.C.  AFRICAN AMERICANS IN TEXAS ARE MORE LIKELY TO BE POOR THAN WHITE TEXANS

67.   As shown in Table 9, one-quarter of all African Americans in Texas live below the poverty line.  This is a rate that is two-and-a-half times as high as the poverty rate for white Texans, but similar to other minority Texans.

---

[58]   Thomas Shapiro, Tatjana Meschede and Sam Osoro, "The Roots of the Widening Racial Wealth Gap: Explaining the Black-White Economic Divide" (February 2013), Figure 3, available at:

http://iasp.brandeis.edu/pdfs/Author/shapiro-thomas-m/racialwealthgapbrief.pdf.

**Table 9: Texas Poverty Status by Race**

|  | African American | | White | | Other | | % Difference Between White and African American |
|---|---|---|---|---|---|---|---|
| At or Above the Poverty Line | 2,046,954 | 77% | 10,061,576 | 91% | 7,627,095 | 76% | 15% |
| Below the Poverty Line | 627,862 | 23% | 956,513 | 9% | 2,387,679 | 24% | -15% |

Source: U.S. Census Bureau, 2006-2010 American Community Survey.
Note: "African American" and "White" race categories do not include individuals that also identify as "Hispanic" or "Latino."

## VIII.D. AFRICAN AMERICANS IN TEXAS SCORE LOWER ON OTHER MEASURES OF SOCIOECONOMIC STATUS THAN WHITE TEXANS

68.   The disparity seen in wage rates is consistent with disparities in unemployment rates. As shown in Table 10, African-American unemployment in Texas is more than twice the rate of white unemployment in Texas.

**Table 10: Texas Employment Status by Race**

|  | African American | | White | | Other | |
|---|---|---|---|---|---|---|
| Employed | 1,186,242 | 88% | 5,627,211 | 95% | 4,312,163 | 92% |
| Unemployed | 158,430 | 12% | 317,602 | 5% | 361,199 | 8% |
| % Difference Between White and African American Unemployment | | | | | -6% | |

Source: U.S. Census Bureau, 2006-2010 American Community Survey.
Note: "African American" and "White" race categories do not include individuals that also identify as "Hispanic" or "Latino."

69.   This disparity in income and wealth is also consistent with disparities observed in other measures of social and economic well-being. For example, income and wealth is known to

be strongly correlated to education[59] and, as seen in Table 11, the educational achievement gap between African-Americans and whites is significant.

#### Table 11: Texas Education Attainment by Race

|  | Less than High School Diploma | | Less than Undergraduate Degree | |
|---|---|---|---|---|
| African American | 260,738 | 16% | 977,674 | 58% |
| White | 688,064 | 9% | 4,011,559 | 51% |
| Other | 2,072,196 | 38% | 2,257,395 | 41% |
| % Difference Between White and African American Educational Attainment | | -7% | | -8% |

Source: U.S. Census Bureau, 2006-2010 American Community Survey.
Note: "African American" and "White" race categories do not include individuals that also identify as "Hispanic" or "Latino."

### VIII.E. SB 14 CREATES A HIGHER EXPECTED BURDEN FOR AFFECTED REGISTERED VOTERS WHO ARE AFRICAN AMERICAN THAN FOR THOSE WHO ARE WHITE

70. Of the Affected Registered Voters in Texas, those who are African American are expected to experience a higher burden of acquiring an EIC to vote than the Affected Registered Voters who are white. The higher expected burden comes from the non-trivial costs of acquiring an EIC and the greater impact any cost has on lower income voters, as African-American Texans are more likely to be. The cost of acquiring an EIC, whether $25, $50, or $100, will have a much bigger impact on individuals who, on average, earn $31,104 and have household wealth of $11,961 than on individuals who, on average, earn $52,392 and have household wealth of $97,800.

71. To put my findings in perspective, the travel costs for an African-American Affected Registered Voter of $28.17 represents approximately 27% of a day's earnings, but the typical African-American Texan only has 115 days of earnings stored as wealth. In comparison, the travel costs for an white Affected Registered Voter of $48.79 represents

---

[59] *See*, for example, Steven Strauss, "The Connection Between Education, Income Inequality, and Unemployment," available at:

http://www.huffingtonpost.com/steven-strauss/the-connection-between-ed_b_1066401.html.

approximately 30% of a day's earnings, but the typical white Texan has 594 days of earnings stored as wealth. For only the travel-cost portion of the burden created by SB 14, an African-American Affected Registered Voter is required to expend a share of their wealth that is more than four times higher than the share required for a white Texan.

72. When combined with the prevalence analysis above of who is more likely to need to acquire an EIC to retain their right to vote, the burden imposed on African Americans in Texas to acquire an EIC will tend to be much greater than the burden imposed on white Texans to acquire an EIC.

## IX. Registered African-American Student Voters in Texas

73. I identified nine Historically Black Colleges and Universities (HBCUs) in Texas.[60] As expected, the Census Block Groups that these HBCUs reside in have high numbers of African-American residents—60% in the HBCU Census Block Groups versus 12% overall in Texas. Voter registration, however, was significantly higher on HBCU Census Block Groups than average voter registration rates per Census Block Groups in these areas. The nine Census Block Groups with HBCUs had an average of 86% voter registration compared with the 54% state-wide average. These same Block Groups also have a higher percentage of Affected Registered Voters, 22% versus 8% state-wide. Student IDs—even those from public institutions—are not an allowable form of photo ID under SB 14. The data thus suggests that the student population at HBCUs is disproportionately affected by SB 14 as compared to the registered voter population state-wide.

Respectfully submitted,

_____
Coleman Bazelon, Ph.D.

Date: June 27, 2014

---

[60] The nine HBCUs are Huston-Tillotson University; Paul Quinn College; Southwestern Christian College; Texas College; Wiley College; Jarvis Christian College; Prairie View A&M University; St. Philips College; and Texas Southern University.

# Appendix A – Curriculum Vitae of Coleman Bazelon

# Coleman Bazelon
## Principal

| | | |
|---|---|---|
| Washington, D.C. | +1.202.955.5050 | Coleman.Bazelon@brattle.com |

**Dr. Coleman Bazelon** is a principal in the Washington, DC office of *The Brattle Group*. He is an expert in regulation and strategy in the wireless, wireline, and video sectors. He has consulted and testified on behalf of clients in numerous telecommunications matters, ranging from wireless license auctions, spectrum management, and competition policy, to patent infringement, business valuation, and broadband deployment.

Dr. Bazelon frequently advises regulatory and legislative bodies, including the U.S. Federal Communications Commission and the U.S. Congress. He also has expertise in the federal government's use of discount rates for policy and regulatory analysis, intellectual property valuation, economic impact analysis, and antitrust and damages analysis.

Throughout his career, Dr. Bazelon has had extensive experience with spectrum license auctions. He advises on and evaluates numerous auction designs and regularly serves as an auction advisor for bidders in spectrum license auctions.

Prior to joining *Brattle*, Dr. Bazelon was a vice president with Analysis Group, an economic and strategy consulting firm. During that time, he expanded the firm's telecommunications practice area. He also served as a principal analyst in the Microeconomic and Financial Studies Division of the Congressional Budget Office where he researched reforms of radio spectrum management; estimated the budgetary and private sector impacts of spectrum-related legislative proposals; and advised on auction design and privatization issues for all research at the CBO.

## SELECTED CONSULTING PROJECTS
### Litigation

- Evaluated damages in the applications market.
- Assessed allocation theories in an international bankruptcy.
- Evaluated damages from a programming contract termination.
- Evaluated damages from allegations of reputational harm.
- Evaluated damages from non-working wireless network equipment.
- Assessed Domestic Industry requirement in ITC 337 case involving wireless equipment patents.
- Assessed commercial viability of full text searching of books business model.
- Assessed Domestic Industry requirement in ITC 337 case involving portable storage device patents.
- Estimated value of satellite assets in bankruptcy.
- Estimated damages from denial of pole attachments.



1

Case 2:13-cv-00193 Document 673-1 Filed on 11/11/14 in TXSD Page 142 of 211
Case 2:13-cv-00193 Document 673-1 Filed on 11/11/14 in TXSD Page 143 of 211

Coleman Bazelon

- Provided written testimony evaluating the performance of a numbering resource administrator.
- Provided written testimony on the ability to estimate damages for a class of satellite phone users.
- Provided written testimony on the economic value of Rights-of-Ways in Massachusetts.
- Estimated damages for a broadcast tower permit revocation.
- Provided oral testimony on the proprietary nature of specific information contained in a statewide public safety network bid.
- Provided written testimony on economic value associated with items provided in a labor neutrality agreement.
- Estimated damages associated with USF and other telephone taxes paid by a calling card reseller.
- Assessed the damages associated with the infringement of patents related to VoIP technology and the likely impact of a permanent injunction.
- Estimated recoverable data costs for two pesticides.
- Estimated cost of delay in granting local cable franchise.
- Analyzed the economic underpinnings of an exclusivity clause of a mobile phone affiliation agreement.
- Assessed commonality issues of physicians for class certification of RICO action against a set of health insurance companies.
- Estimated "Loss of Use" damages for a severed fibre optic cable.
- Provided written testimony estimating the value of a surety bond in a contract dispute involving toll free phone numbers used in an enhanced service application.
- Assessed damages associated with infringement of patents used to provide Voice over Internet Protocol (VoIP).
- Assessed basis for guidance of a large telecommunications firm in a 10-b securities litigation.
- Valued digital television radio spectrum in St. Louis in the pre-litigation phase of a breach of contract dispute.
- Estimated damages in a breach of contract case involving the sale of a fibre optic network.
- Researched the basis for generally optimistic forecasts of broadband deployment in the later 1990s and early 2000s in an anti-trust litigation.
- Researched the basis for generally optimistic beliefs about the telecommunications sector .in the late 1990s in a 10-b securities litigation.
- Assessed the market for Competitive Local Exchange Carriers in an SEC fraud case.
- Assessed a bankruptcy sale proposal for a national tier 1 broadband backbone provider.
- Examined the business case asserted for a small wireless reseller in a breach of contract litigation.
- Assessed damages associated with infringement of patents used in DNA fingerprinting applications.
- Assessed changes in contributions to the Cable Royalty Fund on behalf of Sports Claimants in a Copyright Arbitration Royalty Panel (CARP) proceeding.



Case 2:13-cv-00193 Document 673-18 Filed on 11/15/14 in TXSD Page 143 of 211
Case 2:13-cv-00193 Document 37-8 Filed on 06/2/14 Page 144 of 211

Coleman Bazelon

- Assessed the capital adequacy of the U.S. branch of a foreign bank.


**Regulatory Proceedings**
- Provided testimony in prison phone rate proceeding.
- Estimated economic impact of LNP on RLECs.
- Assessed relevance of U.S. UNE-L experience for New Zealand benchmarking proceeding.
- Authored analysis of harm from revoking LightSquared's ATC authorization.
- Estimated value of pairing Upper 700 MHz A Block with public safety.
- Estimated impact of increased regulatory uncertainty on spectrum value.
- Estimated value of government provision of GPS service to private industry.
- Coauthored analysis of feasibility of reallocating broadcast television through the use of incentive auctions.
- Analyzed impact on spectrum value of pairing AWS III spectrum.
- Coauthored analysis of the merits of licensed versus unlicensed allocation of the TV White Spaces.
- Estimated the value of TV White Spaces.
- Provided written testimony on the economic harm of using proprietary information in retention marketing.
- Provided written testimony on the economics of pole attachment rates.
- Estimated the value of the PCS H-Block spectrum band.
- Estimated the economic impact of ITC Exclusion Order on cell phone handsets.
- Authored several reports on the 700 MHz auction rules.
- Analyzed the relationship between the size of cable systems and the economics of the programming market.
- Presented analysis on pricing differentials in overlapping cable markets.
- Assessed proposed regulation of mobile phone roaming rates.
- Analyzed impact of local franchise requirements on competition in the video marketplace.
- Developed and assessed Indian spectrum management proposals.
- Analyzed economic ramifications of à la carte cable channel pricing on consumers and the cable and television programming industries.
- Examined the relative merits of licensed versus unlicensed radio spectrum and the effects of "underlay" licenses on existing commercial licensees.
- Examined federalism issues related to mobile telephony regulation.
- Examined and refuted arguments suggesting that the California Telecommunications Consumer Bill of Rights was an appropriate response to market failures.
- Assessed the impact on consumers of California's Telecommunications Consumer Bill of Rights proposal.
- Provided written testimony refuting analysis purporting to show a positive relationship between UNE-P and telecom network investment.



Case 2:13-cv-00193 Document 673-8   Filed on 11/16/14 in TXSD   Page 144 of 211
Case 2:13-cv-00193 Document 673-11   Filed on 11/11/14 in TXSD   Page 45 of 71

Coleman Bazelon

- Provided written testimony examining the effects of unbundling regulations on capital spending in the telecommunications sector.
- Estimated the adjustment to the TELRIC pricing formula to account for irreversible investment in the local telephone network.
- Examined the impact of irreversible investments in the local telephone network on the TELRIC pricing methodology.
- Assessed the degree of market overlap of two food service firms for purposes of merger review.
- Provided written testimony that assessed the validity of an analysis of the costs of a DTV tuner mandate.
- Provided written testimony of a forecast of toll free number demand for the toll free number administrator, SMS/800, in a rate case proceeding.

**Other**

- Advised bidder in Canadian 700 MHz auction.
- Evaluated performance of TV stations when repacked in an Incentive Auction.
- Analyzed differences in U.S. and European wireless markets.
- Assessed business case and value of HF license holder.
- Analyzed likely auction outcomes for TV broadcaster participating in incentive auction.
- Assessed value of commercial mobile spectrum bands.
- Analyzed economic impacts of the commercial casino industry.
- Evaluated impact of digitization on copyright industries.
- Analyzed economic and employment effects of Dutch gas hub.
- Advised bidder in Indian 3G spectrum license auction.
- Estimated economic and employment effects of network neutrality regulation.
- Analyzed relative costs of wireless and wireline deployments in rural areas.
- Analyzed potential harms from Internet gambling.
- Estimated economic value of reallocating TV spectrum for wireless broadband.
- Estimated economic and employment effects of electric power transmission construction in support of new wind generation facilities.
- Estimated economic and employment effects of broadband stimulus grant applications.
- Estimated employment effects of an ATC-mobile satellite network deployment.
- Analyzed the impact of reducing international mobile phone roaming charges.
- Developed an auction platform for an electricity procurement auction.
- Analyzed the economic impacts of reduced mobile phone taxes in Africa and the Middle East.
- Evaluated the impact of reducing ethanol requirements on gasoline prices.
- Analyzed FRAND licensing requirements for intellectual property in the DTV standard.
- Advised bidder in Canadian AWS spectrum license auction.
- Advised bidder in FCC 700 MHz spectrum license auction.
- Evaluated a business plan for proposed dam removals.
- Assessed a business plan involving the WiMAX market.



Coleman Bazelon

- Estimated the value of a portfolio of spectrum licenses.
- Assessed the budgetary impacts of legislation to license TV white spaces.
- Analyzed the economics of the military's build versus buy decision for broadband satellite communications capacity.
- Advised bidder in FCC AWS spectrum license auction.
- Provided framework to estimate impact of the effect of designation of TV white spaces as unlicensed on 700 MHz auction receipts.
- Analyzed Universal Service Fund expenditures.
- Analyzed cable franchising requirements.
- Valued proposals to re-band the Upper 700 MHz Band of radio spectrum.
- Analyzed proposed accelerated digital television transition impacts on society and the federal budget.
- Coauthored a report on the value of a portfolio of patents used to provide Voice over Internet Protocol (VoIP).
- Coauthored a report to the U.S. Chamber of Commerce on the economic effects of telecommunications deregulation.
- Assessed the business cases for IRU swaps of a large international fibre optic network owner.
- Examined the effects of unbundling regulations on broadband penetration internationally.



Coleman Bazelon

## TESTIMONY AND DECLARATIONS

"Rebuttal Expert Report of Coleman Bazelon, Ph.D.," In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, As Amended, and in the Matter of a Plan of Compromise or Arrangement of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation United States Bankruptcy Court for the District of Delaware, Case No. 09-10138 (KG), February 28, 2014.

"Supplemental Expert Report of Coleman Bazelon, Ph.D.," In the Matter of Sky Angel U.S., LLC, against Discovery Communications, LLC, Animal Planet, LLC, United States District Court for the District of Maryland, Case No. 8:13-cv-00031-DKC, January 31, 2014.

"Expert Report of Coleman Bazelon, Ph.D.," In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, As Amended, and in the Matter of a Plan of Compromise or Arrangement of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation United States Bankruptcy Court for the District of Delaware, Case No. 09-10138 (KG), January 24, 2014.

"Expert Report of Coleman Bazelon, Ph.D.," In the Matter of Sky Angel U.S., LLC, against Discovery Communications, LLC, Animal Planet, LLC, United States District Court for the District of Maryland, Case No. 8:13-cv-00031-DKC, December 6, 2013.

"Expert Report of Coleman Bazelon, Ph.D. and Armando Levy, Ph.D," In the Matter of LT Game International Ltd., against Shuffle Master, Inc., United States District Court for the District of Nevada, Case No. 2:12-cv-01216-JAD-GWF, October 4, 2013.

"Expert Report of Coleman Bazelon, Ph.D.," In the Matter of Certain Electronic Devices, Including Wireless Communications Devices, Tablet Computers, Media Players, and Televisions, and Components Thereof, United States International Trade Commission, Investigation No. 337-TA-862 (Judge Shaw), July 5, 2013.

"Declaration of Coleman Bazelon" In the Matter of PTA-FLA, Inc, Daredevil, Inc., NTCH-WEST TENN., Inc., NTCH-WA, Inc., and Eric Steinmann against ZTE Corporation, and ZTE USA, Inc. Florida Arbitration, Case No.: 50-494-T-00665-11, February 26, 2013.

"Rebuttal Testimony of Coleman Bazelon," In re: Petition for Suspension or Modification of Application of the Requirements of 47 U.S.C. § 251(b) and (c), pursuant to 47 U.S.C. § 251(f)(2) regarding Time Warner Cable Information Services (Maine) LLC's Request, State of Maine Public Utilities Commission, Docket No. 2012-198, Docket No. 2012-218, Docket No. 2012-219, Docket No. 2012-220, Docket No. 2012-221, October 12, 2012.



"Testimony of Coleman Bazelon, Ph.D.," In re: Petition for Suspension or Modification of Application of the Requirements of 47 U.S.C. § 251(b) and (c), pursuant to 47 U.S.C. § 251(f)(2) regarding Time Warner Cable Information Services (Maine) LLC's Request, State of Maine Public Utilities Commission, Docket No. 2012-198, Docket No. 2012-218, Docket No. 2012-219, Docket No. 2012-220, Docket No. 2012-221, August 20, 2012.

"Expert Report of Dr. Coleman Bazelon," *Salsgiver Communications, Inc., Salsgiver Telecom, Inc., and Salsgiver Inc. v. Consolidated Communications Holdings, Inc., North Pittsburgh Systems, Inc., and North Pittsburgh Telephone Company, Inc.,* Court of Common Pleas, Allegheny County, Pennsylvania, Civil Division, No. GD 08-7616, May 10, 2012.

"Oral Testimony of Coleman Bazelon, The Brattle Group, Inc. before the U.S. House of Representatives, Committee on Energy and Commerce Subcommittee on Communication and Technology," April 12, 2011. (spectrum)

"Testimony of Coleman Bazelon, Principal, *The Brattle Group*, before the U.S. House of Representatives, Committee on Energy and Commerce, Subcommittee on Communications, Technology, and the Internet," June 17, 2010 (spectrum valuation).

"Supplemental Expert Report of Coleman Bazelon," *Gemalto PTE LTD and Gemplus S.A. v. Telecommunications Industry Association*, United States District Court for the Eastern District of Virginia, Alexandria Division, Case 1:08-cv-00776-LMB-TRJ, December 16, 2008.

"Expert Report of Coleman Bazelon," *Gemalto PTE LTD and Gemplus S.A. v. Telecommunications Industry Association*, United States District Court for the Eastern District of Virginia, Alexandria Division, Case 1:08-cv-00776-LMB-TRJ, November 6, 2008.

"Prefiled Rebuttal Testimony of Coleman D. Bazelon," In re: Complaint and Request for Emergency Relief Against Verizon Florida LLC for anticompetitive behavior in violation of Sections 364.01(4), 364.3381, and 364.10, F.S., and for failure to facilitate transfer of customers' numbers to Bright House Networks Information Services (Florida) LLC, and its affiliate, Bright House Networks, LLC, Florida Public Service Commission, Docket No. 070691-TP, July 25, 2008.

"Prefiled Direct Testimony of Coleman D. Bazelon," In re: Complaint and Request for Emergency Relief Against Verizon Florida LLC for anticompetitive behavior in violation of Sections 364.01(4), 364.3381, and 364.10, F.S., and for failure to facilitate transfer of customers' numbers to Bright House Networks Information Services (Florida) LLC, and its affiliate, Bright House Networks, LLC, Florida Public Service Commission, Docket No. 070691-TP, May 30, 2008.

"Declaration of Coleman Bazelon in Support of Plaintiffs' Motion for Class Certification," *Kenneth Stickrath, et al v. Globalstar, Inc.*, United States District Court for the Northern District of California, San Francisco Division, Case No. 07-CV-01941 TEH, April 25, 2008.



Coleman Bazelon

"Testimony of Coleman Bazelon, Principal, *The Brattle Group*, before the U.S. House of Representatives, Committee on Energy and Commerce, Subcommittee on Telecommunications and the Internet," April 15, 2008 (reviewing the 700 MHz auction).

"Concerning the Meaning of 'Fair and Reasonable Compensation' in Section 253(c) of the Telecommunications Act of 1996 and the Comparability of the Rights-of-Way Fees Paid by Level 3 in Massachusetts and Elsewhere," *The Massachusetts Turnpike Authority v. Level 3 Communications, LLC, et al.,* The United States District Court for the District of Massachusetts, Civ. Act. No. 06-11816, December 17, 2007.

"Concerning the Effects of the Fixed Rent Charged for Access to the Massachusetts Turnpike," *The Massachusetts Turnpike Authority v. Level 3 Communications, LLC, et al.,* The United States District Court for the District of Massachusetts, Civ. Act. No. 06-11816, November 12, 2007.

"Affidavit of Dr. Coleman Bazelon," *Gulfside Casino Partnership v. Mississippi Riverboat Council, et al.,* United States District Court for the Southern District of Mississippi, Southern Division, Cause No. 1:07-CV-110-LG-JMR, May 4, 2007.

"Rebuttal Report of Dr. Coleman Bazelon," *Level 3 Communications, LLC, v. City of St. Louis, Missouri,* United States District Court for the Eastern District of Missouri, Eastern Division, Consolidated Case No. 4:04-CV-871 CAS, June 17, 2005.

"Affidavit of Dr. Coleman Bazelon," *Informed Communications Systems, Inc. v. Intelogistics Corp., d/b/a Prosodie Interactive*, United States District Court, Southern District of Florida, Miami Division, Case No.: 04-61245 CIV Huck/Turnoff (October 12, 2004).

## EXPERT DESIGNATIONS

- *Touch America, Inc. v. Qwest Communications International, Inc.*
  - Designated as an expert in Arbitration (June 2003)
- *Informed Communications Systems, Inc. v. Intelogistics Corp., d/b/a Prosodie Interactive*, United States District Court, Southern District of Florida, Miami Division, Case No.: 04-61245 CIV Huck/Turnoff
  - Filed affidavit (October 12, 2004)
- *Level 3 Communications, LLC v. City of St. Louis, Missouri*, United States District Court for the Eastern District of Missouri, Eastern Division, Consolidated Case No. 4:04-CV-871 CAS
  - Filed Rebuttal Report (June 17, 2005)
  - Deposition (July 14, 2005)


THE Brattle GROUP

- Cable Merger before the FTC
  - Presented analysis to FTC staff (March 20, 2007)

- *Gulfside Casino Partnership v. Mississippi Riverboat Council, et al.*, United States District Court for the Southern District of Mississippi, Southern Division, Cause No. 1:07-CV-110-LG-JMR
  - Filed affidavit (May 4, 2007)

- *Motorola, Inc. v. State of Mississippi Department of Information Technology Services and M/ACom, Inc.*, Chancery Court of Hinds County, Mississippi, Cause No. G2006-2179 S/2
  - Testified (May 23, 2007)

- *American Towers, Inc. v. Jackson & Campbell, P.C., et al.*, DC Superior Court, No. 003277-06
  - Deposition (March 19, 2009)
  - Filed Affidavit (May 22, 2009)

- *The Massachusetts Turnpike Authority v. Level 3 Communications, LLC, et al.,* The United States District Court for the District of Massachusetts, Civ. Act. No. 06-11816
  - Filed Expert Report (November 12, 2007)
  - Filed Rebuttal Report (December 17, 2007)
  - Deposition (January 21, 2008)

- *Kenneth Stickrath, et al v. Globalstar, Inc.,* United States District Court for the Northern District of California, San Francisco Division, Case No. 07-CV-01941 THE
  - Filed Declaration (April 25, 2008)
  - Deposition (June 11, 2008)

- In re: Complaint and request for emergency relief against Verizon Florida LLC for anticompetitive behavior in violation of Sections 364.01(4), 364.3381, and 364.10, F.S., and for failure to facilitate transfer of customers' numbers to Bright House Networks Information Services (Florida) LLC, and its affiliate, Bright House Networks, LLC, Florida Public Service Commission, Docket No. 070691-TP
  - Filed Direct Testimony (May 30, 2008)
  - Filed Rebuttal Testimony (July 25, 2008)
  - Deposition (August 13, 2008)

- *Gemalto PTE LTD and Gemplus S.A. v. Telecommunications Industry Association,* United States District Court for the Eastern District of Virginia, Alexandria Division, Case 1:08-cv-00776- LMB-TRJ
  - Filed Expert Report (November 6, 2008)



9

- o Deposition (December 2, 2008)

- o Filed Supplemental Expert Report (December 16, 2008)

- *Salsgiver Communications, Inc., Salsgiver Telecom, Inc., and Salsgiver Inc. v. Consolidated Communications Holdings, Inc., North Pittsburgh Systems, Inc., and North Pittsburgh Telephone Company, Inc.*, Court of Common Pleas, Allegheny County, Pennsylvania, Civil Division, No. GD 08-7616

- o Filed Damages Analysis (February 27, 2009)

- o Deposition (April 3, 2012)

- o Filed Expert Report (May 10, 2012)

- *Certain Products Containing Interactive Program Guide and Parental Control Technology* United States International Trade Commission, Investigation No. 337-TA-820

- o Designated as an expert (June 8, 2012)

- In re: Petition for Suspension or Modification of Application of the Requirements of 47 U.S.C. § 251(b) and (c), pursuant to 47 U.S.C. § 251(f)(2) regarding Time Warner Cable Information Services (Maine) LLC's Request, State of Maine Public Utilities Commission, Docket No. 2012-198, Docket No. 2012-218, Docket No. 2012-219, Docket No. 2012-220, Docket No. 2012-221

- o Filed Direct Testimony (August 20, 2012)

- o Filed Rebuttal Testimony (October 12, 2012)

- o Testified (October 23, 2012)

- In the matter of PTA-FLA, Inc , Daredevil, Inc., NTCH-WEST TENN., Inc., NTCH-WA, Inc., and Eric Steinmann against ZTE Corporation, and ZTE USA, Inc. Florida Arbitration, Case No.: 50-494-T-00665-11

- o Filed Expert Report (February 26, 2013)

- o Deposed (March 15, 2013)

- o Testified (August 30, 2013)

- *Certain Electronic Devices, Including Wireless Communications Devices, Tablet Computers, Media Players, and Televisions, and Components Thereof*, United States International Trade Commission, Investigation No. 337-TA-862 (Judge Shaw)

- o Filed Rebuttal Testimony (July 5, 2013)

- In the matter of LT Game International Ltd., against Shuffle Master, Inc., United States District Court for the District of Nevada, Case No. 2:12-cv-01216-JAD-GWF

- o Filed Expert Report (October 4, 2013)



- o Deposed (November 12, 2013)

- In the Matter of Sky Angel U.S., LLC, against Discovery Communications, LLC, Animal Planet, LLC, United States District Court for the District of Maryland, Case No. 8:13-cv-00031-DKC

  - o Filed Expert Report (December 6, 2013)

  - o Filed Supplemental Report (January 31, 2014)

  - o Deposed (February 14, 2014)

- In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, As Amended, and in the Matter of a Plan of Compromise or Arrangement of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation United States Bankruptcy Court for the District of Delaware, Case No. 09-10138 (KG)

  - o Filed Expert Report (January 24, 2014)

  - o Filed Rebuttal Expert Report (February 28, 2014)

  - o Deposed (April 3, 2014; May 30, 2014)

  - o Testified (June 2, 2014; June 5, 2014)

- *State of Texas v. Eric H. Holder, Jr., in his Official Capacity as Attorney General of the United States,* United States District Court for the District of Columbia, Case No. 1:12-CV-00128

- Certain Wireless Devices, Including Mobile Phones And Tablets II, United States International Trade Commission, Investigation No. 337-TA-905 (Judge Pender)


**PUBLICATIONS**

**Articles and Book Chapters**

Coleman Bazelon and Giulia McHenry, "Spectrum Value," *Telecommunications Policy*, Forthcoming.

John Jarosz, Robin Heider, Coleman Bazelon, Christine Bieri and Peter Hess, "Patent Auctions: How Far Have We Come?" *les Nouvelles*, March 2010, pp. 11-30.



Case 2:13-cv-00193 Document 673-18 Filed on 11/11/14 in TXSD Page 152 of 211
Case 2:13-cv-00193 Document 3788 Filed on TXSD on 06/27/14 Page 152 of 211

Coleman Bazelon

"Too Many Goals: Problems with the 700 MHz Auction," *Information Economics and Policy*, June 2009, pp. 115-127.

"Licensed or Unlicensed: The Economic Considerations in Incremental Spectrum Allocations," *IEEE Communications Magazine*, March 2009, pp. 110-116.

Michael H. Rothkopf and Coleman Bazelon, "Interlicense Competition: Spectrum Deregulation Without Confiscation or Giveaways," Obtaining The Best From Regulation And Competition, Michael A. Crew and Menahem Spiegel, eds., Kluwer Academic Publishers (2005), pp. 135-159.

"Next Generation Frequency Coordinator," *Telecommunications Policy* 27 (2003), pp. 517-525.

Coleman Bazelon and Kent Smetters, "Discounting in the Long Term," *Loyola of Los Angeles Law Review*, Vol. 35, Issue 1, November 2002.

Coleman Bazelon and Kent Smetters, "Discounting Inside the Washington DC Beltway," *Journal of Economic Perspectives*, Fall 1999.

"The Movement of Markets," *Wesleyan Economic Journal*, Spring 1986.

"Is the Psychogenic Theory of History Scientific?" *Journal of Psychohistory*, Fall 1985.

## White Papers, Reports, Studies, and Reviews

Kevin Hearle, Giulia McHenry, James Reitzes, Jeremy Verlinda and Coleman Bazelon, "Canadian Wireless Market Performance and the Potential Effect of an Additional Nationwide Carrier," Prepared for the Canadian Competition Bureau, May 12, 2014.

Coleman Bazelon and Giulia McHenry, "Spectrum Sharing: Taxonomy and Economics," Office of Science and Technology Policy, filed comment March 18, 2014.

Coleman Bazelon and Giulia McHenry, "Spectrum Sharing: Taxonomy and Economics," sponsored by Verizon, February 6, 2014.

Coleman Bazelon and Giulia McHenry, "The Economics of Spectrum Sharing," Telecommunications Policy Research Conference, 2013.

Coleman Bazelon and Giulia McHenry, "Violating Your Privacy: An Economic Perspective," Telecommunications Policy Research Conference, September 24, 2013.

Coleman Bazelon and Giulia McHenry, "The Economics of Spectrum Sharing," *Global Media and Communications Quarterly*, Autumn 2013, pp. 47-51.

Robert Shapiro, Douglas Holtz-Eakin and Coleman Bazelon, "The Economic Implications of Restricting Spectrum Purchases in the Incentive Auctions," **Georgetown University Center for Business & Public Policy**, April 2013.



Lisa Cameron and Coleman Bazelon, "The Impact of Digitization on Business Models in Copyright-Driven Industries: A Review of the Economic Issues," National Research Council (NRC) Committee on the Impact of Copyright Policy on Innovation in the Digital Era, February 26, 2013.

Robert A. Rogowsky, Pallavi Seth, and Coleman D. Bazelon, "An Economic View of ITC 337 Cases and the Public Interest," *Law360*, November 21, 2012.

Coleman Bazelon and Giulia McHenry, "Spectrum Value," Telecommunications Policy Research Conference, 2012.

Robert A. Rogowsky, Pallavi Seth, and Coleman D. Bazelon, "An Economic View Of The ITC's Domestic Industry," *Law360*, June 18, 2012.

Coleman Bazelon and Greg Duncan, "The Status of UNE-L in the United States," Prepared for the Commerce Commission of New Zealand, April 12, 2012.

"Implications of Regulatory Inefficiency for Innovative Wireless Investments," Sponsored by LightSquared, March 15, 2012.

Coleman Bazelon, Kevin Neels and Pallavi Seth, "Beyond the Casino Floor: Economic Impacts of the Commercial Casino Industry," sponsored by the American Gaming Association, 2012.

Coleman Bazelon, Charles Jackson and Giulia McHenry, "An Engineering and Economic Analysis of the Prospects of Reallocating Radio Spectrum from the Broadcast Band through the Use of Voluntary Incentive Auctions," Telecommunications Policy Research Conference, 2011.

"Cost of Regulatory Risk for Wireless Spectrum Values," sponsored by LightSquared, August 23, 2011.

"Expected Receipts from Proposed Spectrum Auctions," sponsored by the Wireless Broadband Coalition, July 28, 2011.

"GPS Interference: Implicit Subsidy to the GPS Industry and Cost to LightSquared of Accommodation," sponsored by LightSquared, June 22, 2011.

Lisa Cameron and Coleman Bazelon, "The Impact of Digitization on Business Models in Copyright-Driven Industries: A Review of the Economic Issues," National Research Council (NRC) Committee on the Impact of Copyright Policy on Innovation in the Digital Era, June 7, 2011.

"The Economic Basis of Spectrum Value: Pairing AWS-3 with the 1755 MHz Band is More Valuable than Pairing it with Frequencies from the 1690 MHz Band," sponsored by T-Mobile and CTIA, April 11, 2011.

"Economists Letter to Obama Regarding Incentive Auctions," April 6, 2011.

"The Indian 3G and BWA Auctions," Telecommunications Policy Research Conference, 2010.



Case 2:13-cv-00193 Document 673-18 Filed on 11/11/14 in TXSD Page 154 of 211
Case 2:13-cv-00193 Document 673-8 Filed on TXSD on 06/27/14 Page 55 of 72
Coleman Bazelon

"Economic Impact of the Dutch Gas Hub Strategy on the Netherlands," by Dan Harris, Coleman D. Bazelon, Brad Humphreys, and Penelope Dickson, *Netherlands Ministry of Economic Affairs, Agriculture and Innovation*, September 2010.

"The Employment and Economic Impacts of Network Neutrality Regulation: An Empirical Analysis," sponsored by Mobile Future, 2010.

"The Benefits of Wireless Broadband for Rural Deployments," sponsored by Qualcomm, Inc, 2010.

Malcolm K. Sparrow, Coleman Bazelon and Charles Jackson, "Can Internet Gambling Be Effectively Regulated? Managing the Risks," sponsored by Wired Safety, 2009.

"The Need for Additional Spectrum for Wireless Broadband: The Economic Benefits and Costs of Reallocations," sponsored by Consumer Electronics Association, 2009.

Coleman Bazelon and William Zarakas, "Measuring Concentration in Radio Spectrum License Holdings," Telecommunications Policy Research Conference, 2009.

"Licensed or Unlicensed: The Economic Considerations in Incremental Spectrum Allocations," in *New Frontiers in Dynamic Spectrum Access Networks, 2008*, DySPAN 2008.

"Overreaching: The Policy Failures of the 700 MHz Auction," Telecommunications Policy Research Conference, 2008.

"Cream Skimming," Telecommunications Policy Research Conference, 2007.

Thomas W. Hazlett and Coleman Bazelon, "Market Allocation for Radio Spectrum," prepared for the International Telecommunications Union Workshop on Market Mechanisms for Spectrum Management, Geneva, Switzerland, January, 2007.

"Licensed or Unlicensed: The Economics of Incremental Spectrum Allocations," Telecommunications Policy Research Conference, 2006.

"Analysis of an Accelerated Digital Television Transition," sponsored by Intel Corporation, 2005.

Thomas W. Hazlett and Coleman Bazelon, "Regulated Unbundling of Telecommunications Networks: A Stepping Stone to Facilities-Based Competition?" Telecommunications Policy Research Conference, 2005.

Thomas W. Hazlett, Coleman Bazelon, John Rutledge, and Deborah Allen Hewitt, Sending the Right Signals: Promoting Competition Through Telecommunications Reform: A Report to the U.S. Chamber of Commerce, September 22, 2004.

Thomas W. Hazlett, Arthur M. Havenner, and Coleman Bazelon, "Regulation and Investment in Local Telecommunications Networks," Working Paper, January 2004.



Michael H. Rothkopf and Coleman Bazelon, "Interlicense Competition: Spectrum Deregulation Without Confiscation or Giveaways," New America Foundation, Spectrum Series Working Paper #8, August, 2003.

"Review of Discounting and Intergenerational Equity," by Paul Portney and John Weyant, Resources for the Future (1999), in the Society of Government Economists Newsletter, Volume 34, No. 10, November 2002.

"Completing the Transition to Digital Television," Congressional Budget Office, September 1999.*

"Two Approaches for Increasing Spectrum Fees," Congressional Budget Office, November 1998 (Coauthored with David Moore*).

"Where Do We Go From Here? The FCC Auctions and the Future of Radio Spectrum Management," Congressional Budget Office, April 1997 (Coauthored with Perry Beider and David Moore*).

 * CBO publications do not cite authors' names.

## Federal Communications Commission Filings

"Declaration of Coleman Bazelon," Comments of Martha Wright, et. al., Exhibit C, WC Docket No. 12-375, March 25, 2013 (prison payphone rates).

"Unlicensed Use of the TV White Spaces: Wasteful and Harmful," FCC Filling, with Charles L. Jackson and Dorothy Robyn, *Ex Parte* Comments, ET Docket No. 04-186, ET Docket No. 02-380, August 20, 2008 (benefits of licensed over unlicensed allocation of the TV White Spaces).

"Comments of Charles L. Jackson, Dorothy Robyn and Coleman Bazelon," Comments, WC Docket No. 06-150, PS Docket No. 06-229, June 20, 2008 (value of TV White Spaces).

"Comments of Coleman Bazelon," Comments, WC Docket No. 06-150, PS Docket No. 06-229, WT Docket No. 96-86, June 20, 2008 (700 MHz D Block).

"Declaration of Coleman Bazelon," Reply Comments, WC Docket No. 07-245, April 22, 2008 (economics of pole attachment rates).

"Why the Exclusive Use of Large Licenses in the Upper or Lower 700 MHz Bands Would Reduce the Efficiency of the 700 MHz Auction," Comments, WT Docket No. 06-150, April 20, 2007.

"Principles for Choosing 700 MHz Block License Sizes," *Ex Parte* Comments, WT Docket No. 06-150, March 6, 2007.

"The Economics of License Sizes in the FCC's 700 MHz Band Auction," *Ex Parte* Comments, WT Docket No. 06-150, January 2007.



"Declaration of Thomas W. Hazlett, Ph.D., Prof. Arthur M. Havenner, and Coleman Bazelon, Ph.D.," Comments, WC Docket No. 03-173, December 16, 2003. (Wireline investment, UNE-P)

"Declaration of Thomas W. Hazlett, Ph.D., Arthur M. Havenner, Ph.D., and Coleman Bazelon, Ph.D.," Comments, WC Docket No. 03-157, September 2, 2003. (Wireline investment, UNE-P)

"Spectrum Deregulation Without Confiscation or Giveaways," with Michael Rothkopf, Comment, ET Docket No. 02-135, January 9, 2003.

Thomas W. Hazlett, Coleman Bazelon and Arthur Havenner, "Forecast of Toll Free Number Demand: 2002-2004," Attachment A, SMS/800 Transmittal No. 22, F.C.C. Tariff No. 1, November 15, 2002.

"Comments of Coleman D. Bazelon and T. Christopher Borek Relating to Arthur D. Little, Inc.'s Assessment of the Impact of DTV on the Cost of Consumer Television Receivers," *Ex Parte* Comments MM Docket 00-39, August 1, 2002.

"Use Administrative Law Judges to Adjudicate Interference Disputes Between Licensees," Comment, ET Docket No. 02-135, July 8, 2002.

## SEMINARS AND PRESENTATIONS

Ferrum College Forum: "*Internet Privacy, Civil Liberties, National Security, Law, and Economics: In Search of a Coherent Policy Path Forward*," March 19, 2014.

Bloomberg BNA Webinar: "S*pectrum Auctions Are Back: What you need to know",* February 19, 2014.

*Violating Your Privacy: An Economic Perspective*, 41st Annual Telecommunications Policy Research Conference (TPRC), Arlington, VA, September 28, 2013.

*Other Recent and Planned Spectrum Auctions: What They Portend for the Future: Economic Perspectives on the Auctions,* Law Seminars International, Washington, D.C., July 22, 2013.

*Spectrum Auction Policy: Potential Outcomes for Economic Growth and Public Safety*, Georgetown University McDonough School of Business, Rayburn House Office Building, Washington, D.C., May 14, 2013.

*Markets in Wireless Spectrum*, Towards Dynamic Markets in Electric Power, Water, and Wireless Spectrum Seminar, University of Colorado Law School, Boulder, CO, April 23, 2013.

Annual College of Social Studies Spring Banquet/ the Underwood Memorial Lecture and Hoggendorn lecture for the Economic Department, Wesleyan University, Middletown, CT, April 17 – 18, 2013.

SNL Knowledge Center Webinar: "*FCC Incentive Auction Rules: Estimating Clearing Prices and Policy Impacts*", February 27, 2013.


THE **Brattle** GROUP

*Reverse Auction Design: Dynamic or Sealed, Algorithmic Issues, Market Power, Reserves, Reference Prices*, Conference on the FCC Incentive Auction, Stanford Institute for Economic Policy Research, Stanford, CA, February 26, 2013.

*Mobile Impact on Economic Growth and Job Creation*, Consumer Electronics Show, LIT Program Innovation Policy Summit, Las Vegas, NV, January 8, 2013.

*Incentive Auctions: What Broadcasters Need to Know*, Crossfire Media Webinar, December 19, 2012.

*Spectrum Value*, 40th Annual Telecommunications Policy Research Conference (TPRC), Arlington, VA, September 22, 2012.

*FCBA Seminar: Getting from Here to There: The Road Ahead for Spectrum Auctions*, Washington, DC, June 6, 2012.

*Incentive Auctions*, 39th Annual Telecommunications Policy Research Conference (TPRC), Arlington, VA, September 24, 2011.

*Competition in the Wireless Environment: How to Get More Handsets or More Networks*, Broadband Breakfast Club, Washington, DC, February 15, 2011.

*Introducing TV White Spaces*, Spectrum Bridge webinar, October 28, 2010.

*The Indian 3G and BWA Auctions*, 38th Annual Telecommunications Policy Research Conference (TPRC), Arlington, VA, October 2, 2010.

*How Smart Public Policies Can Drive the Mobile Broadband Transformation*, Information Technology and Innovation Foundation's The Emerging Mobile Broadband Economy and its New Business Models, Washington, DC, September 14, 2010.

*Community Broadband-A Blessing or Curse?*, K&L Gates LLP Municipal Broadband Webcast, July 29, 2010.

*Towards A Sustainable Spectrum Policy: Rethinking Federal Spectrum*, Public Knowledge, Washington, DC, June 3, 2010.

*Unraveling Net Neutrality: Should the FCC Regulate Broadband*, Independence Institute, Denver, CO, May 26, 2010.

*CQ-Roll Call Policy Breakfast on the Future of Wireless Broadband*, Washington, DC, May 20, 2010.

*Congressional Staff Briefings on "The Need for Additional Spectrum for Wireless Broadband: The Economic Benefit and Costs of Reallocations,"* Washington, DC, December 8, 2009.



Case 2:13-cv-00193 Document 673-18 Filed on 11/11/14 in TXSD Page 158 of 211
Case 2:13-cv-00193 Document 673-8 Filed on 11/11/14 in TXSD Page 59 of 71

Coleman Bazelon

*The Progress and Freedom Foundation's "Let's Make a Deal: Broadcasters, Mobile Broadband, and a Market in Spectrum,"* Washington, DC, December 1, 2009.

*FCBA's Intellectual Property Practice Committee Brown Bag Lunch*, Washington, DC, November 30, 2009.

*FCC Broadband Spectrum Workshop*, Washington, DC, September 17, 2009.

*Measuring Concentration in Radio Spectrum License Holdings*, 37th Annual Telecommunications Policy Research Conference (TPRC), Arlington, VA, September 26, 2009.

*Broadband Stimulus Plan*, 2009 FLATOA-FCBA Conference, Tampa, FL, June 26, 2009.

*Leveraging the Broadband Stimulus and Licensed Spectrum*, Webinar, April 29, 2009.

*Keynote Address*, Enterprise Wireless08, Scottsdale, AZ, November 6, 2008.

*Licensed or Unlicensed: The Economic Considerations in Incremental Spectrum Allocations*, DySPAN, Chicago, IL, October 16, 2008.

*Overreaching: The Policy Failures of the 700 MHz Auction*, 36th Annual Telecommunications Policy Research Conference (TPRC), Arlington, VA, September 27, 2008.

*Cream Skimming*, 35th Annual Telecommunications Policy Research Conference (TPRC), Arlington, VA, September 29, 2007.

*Auction Revenues are not the Only Revenues that Should Drive Spectrum Policy*, Law Seminars International: Spectrum Management, Washington, DC, September 17, 2007.

*Market Allocation for Radio Spectrum*, International Telecommunications Union Workshop on Market Mechanisms for Spectrum Management, Geneva, Switzerland, January 2007.

*Licensed vs. Unlicensed Spectrum: A New Economic Model for Determining the Trade-offs*, 34th Annual Telecommunications Policy Research Conference (TPRC), Arlington, VA, September 30, 2006.

*Decoding the Future of IP-TV*, Northern California Chapter of the Federal Communications Bar Association, San Francisco, February 2006.

*Accelerating the Digital Television Transition*, COMPTEL Executive Business & Policy Summit, Washington, DC, December 2005.

*Regulated Unbundling of Telecommunications Networks: A Stepping Stone to Facilities Based Competition?* Telecommunications Policy Research Conference, Arlington, VA, September 2005.



*Sending the Right Signals: Promoting Competition Through Telecommunications Reform: A Report to the U.S. Chamber of Commerce*, presentation of report to the US Chamber of Commerce, October 6, 2004.

*Telecommunications Reform*, presentation to the U.S. Chamber of Commerce's Technology Policy Committee, April 29, 2004.

*Interlicense Competition*, Telecommunications Policy Research Conference, Arlington, VA, September 2003.

*Marketing & Legal Strategies: Hope, Hype & Crash Landings*, WCAI 2003, Washington, DC, July 10, 2003.

*Spectrum Policy Task Force Interference Recommendations*, Manhattan Institute Conference, Washington, DC, February 13, 2002.

*FCC License Auctions*, Society of Government Economists Conference, Washington, DC, November 22, 2002.

*Spectrum Management Panel*, CTIA Wireless 2002, Orlando, FL, March 18, 2002.

*A Note on Correlation*, ASSA Annual Meetings, Atlanta, GA, January 6, 2002.

*Regulatory Forbearance*, Powerline Communications Conference, Washington, DC, December 13, 2001.
*Spectrum License Valuations*, CTIA Wireless Agenda 2001, Dallas, TX, May 2001.

*Old Spectrum in the New Economy*, with David Moore, invited paper, Society of Government Economists Conference "The New 'Economy': What Has Changed and Challenges for Economic Policy," Washington, DC, November 2000.

*Discounting Inside the Washington DC Beltway*, Energy Information Agency Seminar Series, Washington, DC, March 2000.

*Discounting Inside the Washington DC Beltway*, Congressional Budget Office Seminar Series, Washington, DC, November 1999.

*Completing the Transition to Digital Television*, Telecommunications Policy Research Conference, Arlington, VA, September 1999.

*Digital Television Transition*, Congressional Budget Office Seminar Series, Washington, DC, April 1999.

*The Budgetary Treatment of Asset Sales*, briefing for the staff of the Senate Budget Committee, Washington, DC, February 1997.


THE **Brattle** GROUP

Case 2:13-cv-00193 Document 673-18 Filed on 11/11/14 in TXSD Page 160 of 211
Case 2:13-cv-00193 Document 3768 Filed on TXSD on 06/27/14 Page 61 of 71
Coleman Bazelon

*The Value Added from Multilateral Bargaining Theory for Applied Research*, with Greg Adams, Selected Paper, AAEA Annual Meeting, Baltimore, MD, August 1992.

*The Importance of Political Markets in Formulating Economic Policy Recommendations*, Selected Paper, AAEA Annual Meeting, Manhattan, KS, August 1991.

*L.D.C. Debt and Policy Linkages in the Determination of World Commodity Prices*, with Gordon Rausser, Selected Paper, AAEA Annual Meeting, Vancouver, B.C., Canada, August 1990.

**REVIEWER**

- American Journal of Agricultural Economics (1989 – 1994)
- Congressional Budget Office Reports
- Telecommunications Policy
- Telecommunications Policy Research Conference Program Committee (2011-2013)
- George Mason University

**PROFESSIONAL AFFILIATIONS**

- American Bar Association
- American Economic Association
- Federal Communications Bar Association
- National Research Council - Committee on a Survey of the Active Scientific Use of the Radio Spectrum



20

Case 2:13-cv-00193 Document 673-18 Filed on 11/11/14 in TXSD Page 161 of 211
Case 2:13-cv-00193 Document 378-1 Filed in TXSD on 06/27/14 Page 62 of 71
Coleman Bazelon

**EDUCATION**

Dr. Bazelon received his Ph.D. and M.S. in Agricultural and Resource Economics from the University of California at Berkeley. He also holds a Diploma in Economics from the London School of Economics and Political Science and a B.A. from Wesleyan University.

June 18, 2014



# Appendix B – Materials Relied Upon

## Books

1. Baldus, David C., and James W.L. Cole, *Statistical Proof of Discrimination*, Colorado Springs: Shepard's McGraw Hill, 1980.

2. Downs, Anthony, *An Economic Theory of Democracy*, New York: Harper & Brothers, 1957.

3. Fix, Michael, and Raymond J. Struyk, *Clear and Convincing Evidence: Measurement of Discrimination in America*, Washington D.C.: The Urban Institute Press, 1993.

4. Small, Kenneth A. and Erik T. Verhoef, *The Economics of Urban Transportation*, New York: Routledge, 2007.

## Articles and Book Chapters

5. Brennan Center for Justice, "Citizens Without Proof: A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification," November 2006.

6. Cain, Glen, "The Economic Analysis of Labor Market Discrimination"; in O. Ashenfelter and R. Layards, *The Handbook of Labor Economics*, Vol. 1, 1986, pp. 693-785.

7. DeNavas-Walt, Carmen, et al., "Income, Poverty, and Health Insurance Coverage in the United States: 2012," United States Census Bureau, September 2013.

8. Ellis, David, "Cost Per Hour and Value of Time Calculations for Passenger Vehicles and Commercial Trucks for Use in the Urban Mobility Study," Technical Memorandum, Texas Transportation Institute, May 2008.

9. Groen, Jeffrey A., and Anne E. Polivka, "Hurricane Katrina evacuees: who they are, where they are, and how they are faring," *Monthly Labor Review*, March 2008, pp. 40-44.

10. Hotelling, Harold, "Stability in Competition," *Economic Journal* 39, 1929, pp. 41-57.

11. McHenry, Peter, "Does Low Wealth Constrain Long-Distance Migration?" College of William and Mary, August 2013, retrieved from <http://wmpeople.wm.edu/asset/index/pmchenry/paperwealthandmigration> (accessed 06/24/2014).

12. Munnell, Alicia H., et al., "Mortgage Lending in Boston: Interpreting HMDA Data," *American Economic Review*, 86 (1), March 1996, pp. 25-53.

13. Rogowski, Jon and Cathy Cohen, "Black and Latino Youth Disproportionately Affected by Voter Identification Laws in the 2012 Election."

14. Salop, Steven, "Monopolistic Competition with Outside Goods," *Bell Journal of Economics* 10, 1979, pp. 141-156.

15. Schrank, David, et al., "TTI's 2012 Urban Mobility Report," Texas A&M Transportation Institute, December 2012.

16. Shapiro, Thomas, et al., "The Roots of the Widening Racial Wealth Gap: Explaining the Black-White Economic Divide," February 2013.

17. "Toll Road Modeling Support: Final Report," Maricopa Association of Governments, February 2012.

18. Yinger, John, "Access Denied, Access Constrained: Results and Implications of the 1989 Housing Discrimination Study"; in Fix and Struyk, *Clear and Convincing Evidence: Measurement of Discrimination in America*, Washington D.C.: The Urban Institute Press, 1993, pp. 69-112.

## News Articles

19. Friedman, Scott, "DPS Wait Times Shorter at New Mega Center License Offices," NBC News, April 2, 2013, retrieved from <http://www.nbcdfw.com/investigations/DPS-Wait-Times-Shorter-at-New-Mega-Center-License-Offices-200942911.html> (accessed 06/26/2014).

20. Strauss, Steven, "The Connection Between Education, Income Inequality, and Unemployment," Huffington Post, November 2, 2011, retrieved from <http://www.huffingtonpost.com/steven-strauss/the-connection-between-ed_b_1066401.html> (accessed 06/26/2014).

21. Sullivan, Bob, "Katrina Victims face identity crisis," NBC News, September 13, 2005, retrieved from <http://www.nbcnews.com/id/9316512/ns/technology_and_science-security/t/katrina-victims-face-identity-crisis/#.U6oESfldUt5> (accessed 06/24/2014).

22. Woodard, Brad, "DPS Wait Times are Longer than Ever," KHOU News, July 3, 2012, retrieved from <http://www.khou.com/news/local/DPS-wait-times-are-longer-than-ever-161146955.html> (accessed 06/26/2014).

## Court Documents

23. Decision and Order by the United States District Court Eastern District of Wisconsin, Case No. 11-CV-01128, filed April 29, 2014.

24. Defendant's Motion to Dismiss, ECF No. 52.

25. Syllabus of the Supreme Court of the United States in Shelby County, *Alabama v. Holder, Attorney General, et al.*, decided June 25, 2013.

26. Tex. Elec. Code Ann. § 63.0101 (valid through December 31, 2011).

27. *Texas v. Holder*, 888 F.Supp.2d 113 (2012).

## Databases

28. "Net Worth and Asset Ownership of Households: 2010," United States Census Bureau, retrieved from <http://www.census.gov/people/wealth/files/Wealth_Tables_2010.xls> (accessed 06/24/2014).

29. Google Maps API Database [see Appendix C].

30. Census Bureau American Community Survey, 2010.

31. Department of Justice Matching Data

32. Survey of Income and Program Participation, 2008 Panel, Wave 7.

33. Texas Election Administration Management Database of Registered Voters.

34. "Voting and Registration in the Election of November 2012 – Detailed Tables," United States Census Bureau, retrieved from <https://www.census.gov/hhes/www/socdemo/voting/publications/p20/2012/tables.html> (accessed 06/24/2014).

## Other Sources

35. "SB 14 – Voter Identification Requirements – Key Vote," Project Vote Smart, retrieved from <http://votesmart.org/bill/12588/voter-identification-requirements#.U6Nunp3D8TQ> (accessed 06/24/2014).

36. "2010 Census Tallies of Census Tracts, Block Groups & Blocks," retrieved from <https://www.census.gov/geo/maps-data/data/tallies/tractblock.html> (accessed 06/24/2014).

37. "2010 Texas Child Care Market Rate Survey – Final Report," Texas Workforce Commission, April 2011, retrieved from <http://www.twc.state.tx.us/svcs/childcare/child-care-market-rate-report.pdf> (accessed 06/24/2014).

38. "Apply for an Identification (ID) Card," Texas Department of Public Safety, retrieved from <http://www.txdps.state.tx.us/DriverLicense/applyforid.htm> (accessed 06/26/2014).

39. "Birth Certificate for Election Identification," Texas Department of State Health Services, retrieved from

&lt;http://www.dshs.state.tx.us/Layouts/ContentPage.aspx?PageID=56719&id=85899814 87&terms=election+identification&gt; (accessed 06/27/2014).

40. "Certified Copy of a Birth Certificate," Texas Department of State Health Services, retrieved from &lt;http://www.dshs.state.tx.us/vs/reqproc/certified_copy.shtm&gt; (accessed 06/24/2014).

41. "County Locations Issuing Election Identification Certificates," Texas Department of Public Safety Driver License Division, retrieved from &lt;http://www.dps.texas.gov/DriverLicense/documents/EICCountyrun.pdf&gt; (accessed 06/24/2014).

42. "DPS Mobile Stations Issuing Election Identification Certificates," Texas Department of Public Safety Driver License Division, retrieved from &lt;http://www.dps.texas.gov/DriverLicense/documents/EICDPSrun.pdf&gt; (accessed 06/24/2014).

43. "Driver License Division Fees," Texas Department of Public Safety, retrieved from &lt;http://www.txdps.state.tx.us/DriverLicense/fees.htm&gt; (accessed 06/25/2014).

44. "Election Identification Certificate (EIC)," Texas Department of Public Safety, retrieved from &lt;http://www.dps.texas.gov/DriverLicense/electionID.htm&gt; (accessed 06/24/2014).

45. "Election Identification Certificates (EIC) – Documentation Requirements," Texas Department of Public Safety, retrieved from &lt;http://www.txdps.state.tx.us/driverlicense/eicdocreqmnts.htm&gt; (accessed 06/24/2014).

46. "How to Obtain a Birth Certificate," Wyoming Department of Health, retrieved from &lt;http://www.health.wyo.gov/rfhd/vital_records/birthcertificate.html&gt; (accessed 06/24/2014).

47. "N-400, Application for Naturalization," U.S. Citizenship and Immigration Services, retrieved from &lt;http://www.uscis.gov/n-400&gt; (accessed 06/25/2014).

48. "N-565, Application for Replacement Naturalization/Citizenship Document," U.S. Citizenship and Immigration Services, retrieved from &lt;http://www.uscis.gov/n-565&gt; (accessed 06/25/2014).

49. "N-600, Application for Certificate of Citizenship," U.S. Citizenship and Immigration Services, retrieved from &lt;http://www.uscis.gov/n-600&gt; (accessed 06/25/2014).

50. "Our Locations," Federal Bureau of Prisons, retrieved from &lt;http://www.bop.gov/locations/list.jsp&gt; (accessed 06/27/2014).

51. "Register To Vote," VoteTexas.gov, retrieved from <http://votetexas.gov/register-to-vote/register-to-vote> (accessed 06/27/2014).

52. "Required Identification for Voting in Person," VoteTexas.gov, retrieved from <http://votetexas.gov/register-to-vote/need-id/> (accessed 06/24/2014).

53. "Taxicab Rates," City of Houston Administration and Regulatory Affairs, retrieved from <http://www.houstontx.gov/ara/regaffairs/taxicabs_rates.html> (accessed 06/24/2014).

54. "Taxicab Rates and Approximate Fares," Fort Worth Municipal Court Administration, retrieved from <http://fortworthtexas.gov/uploadedFiles/Municipal_Court/About_Us/Administration/Taxicab%20Rates%20and%20Approximate%20Fares.pdf> (accessed 06/24/2014).

55. Texas Administrative Code, Title 25, Part 1, Rule §181.28.

56. "Texas Concealed Handgun License (CHL) Fee Table," Texas Department of Public Safety, retrieved from <http://www.dps.texas.gov/rsd/chl/documents/chlfeeschedule.pdf> (accessed 06/25/2014).

57. "Unit Directory," Texas Department of Criminal Justice, retrieved from <http://tdcj.state.tx.us/unit_directory/> (accessed 06/27/2014).

58. "United States Passport Fees," U.S. Department of State, retrieved from <http://travel.state.gov/content/dam/passports/FeeChart/Passport%20Fees%20Chart%202014_TSG.pdf> (accessed 06/25/2014).

59. "Veteran Services: Fee Exemption for Disabled Veterans," Texas Department of Public Safety, retrieved from <http://www.txdps.state.tx.us/driverlicense/vetservices.htm> (accessed 06/25/2014).

60. VitalChek, retrieved from <https://www.vitalchek.com/> (accessed 06/24/2014).

61. "Vital Records Request Service," Vermont State Archives and Records Administration, retrieved from <https://secure.vermont.gov/VSARA/vitalrecords/> (accessed 06/24/2014).

62. U.S. Department of Transportation Memorandum entitled "Revised Departmental Guidance on Valuation of Travel Time in Economic Analysis," September 28, 2011.

# Appendix C – Geocoding Methodology

## I. Racial Composition of Registered Voters

74.  Determining the composition of registered voters required geocoding of the voter addresses in TEAM.  I used TransCAD to geocode the individual addresses.  This resulted in latitude and longitude coordinates for approximately 85% of the records in TEAM, which I then assigned to a Block Group using the Census TIGER shape file data.[61]  Nearly all of the remaining 15% of TEAM records contain valid zip codes, which I then assign to a Block Group based on the latitude and longitude of the zip code centroid.[62]

## II. Transportation Costs by Block Group

75.  The travel cost analysis requires multiple stages of geocoding.  First, I geocoded the addresses of all DPS locations using the Google Geocoding API.  I then determined the spherical or great circle distance from each Block Group to each DPS location and selected the three nearest DPS locations for each Block Group.  For each of the three DPS locations, I submit Google Directions API queries to determine travel durations and distances by mode for transit, walking, and driving (taxi).[63]  These values are then used in the travel cost minimization routine as describe in Section VII.C.2 above.

---

[61]  Available at http://www.census.gov/geo/maps-data/data/tiger-line.html.

[62]  TEAM consists of a total of 13,564,410 voters; 13,459,189 of these voters have addresses or zip codes that are able to be mapped to Census Block Groups; 13,458,782 of these voters map to Census Block Groups with non-zero population; 13,403,109 of these voters map to Census Block Groups without prisons.

[63]  For details on the Google Directions API, see

https://developers.google.com/maps/documentation/directions/.

# Appendix D – Determination of Affected Registered Voter Probability by Race

76. Census provides valuable information on the racial and income composition of various geographies. Public data on household income is provided at the Census tract level, while racial information is available at the Block level. I perform my analysis at the Block Group level.

77. The TEAM database records basic information about registered voters, including voter names and addresses for every registered voter in Texas. As explained in Appendix C, I use a geocoding algorithm to identify from the addresses in the TEAM database the Block Group location of registered voters in Texas and an estimate of the number of registered voters in each Block Group.

78. DOJ provided information from federal and state databases on whether each registered voter in the TEAM database held a Required ID.[64] After removing voters who are eligible for a disability exemption, I combined this with the geocoding algorithm to then calculate the number of registered voters in each Block Group who must obtain a Required ID in order to vote. This is the number of Affected Registered Voters.

79. These sets of information—racial breakdowns by Census Block Group, registered voters, and Affected Registered Voters—are not conformable between the Census data and the TEAM data. That is, I do not observe the racial identity of specific registered voters in TEAM. In order to determine the share of a racial group's registered voters that are Affected Registered Voters, I rely on the rules of probability and a couple of simplifying assumptions.

80. Let R denote the random variable for Race (*e.g.*, African American, white, Hispanic), RV the random variable for registered voter status (registered ("1"), unregistered ("0")), and BG the random variable denoting Block Group (any specific Block Group in Texas). Following Bayes' Rule,

---

[64] DOJ matching data provides multiple permutations of all primary and secondary matches. I take a conservative approach and use the union of all potential ID matches across all ID databases to indicate that the registered voter is likely to have a Required ID.

$$Pr(R|RV, BG) \;=\; \frac{Pr(R, RV|BG)}{Pr(RV|R, BG)}$$

$$\;=\; \frac{Pr(RV|R, BG)Pr(R|BG)}{Pr(RV|R, BG)}$$

$$\;=\; \frac{Pr(RV|R, BG)Pr(R|BG)}{\sum_k Pr(RV|R = k, BG)Pr(R = k|BG)}.$$

81. The conditional probability of a Block Group resident being a registered voter given that she is African American is unknown to me. But I do know this conditional probability at the state level for Texas, as described earlier in the report. I assume that the propensity to register to vote is the same for all Texas residents within the same race. That is, an African American's propensity to register to vote is assumed to be constant across all Block Groups in Texas. The probability of a registered voter in a given Block Group being of a particular race is then

$$Pr(R|RV, BG) = \frac{Pr(RV|R)Pr(R|BG)}{\sum_k Pr(RV|R = k)Pr(R = k|BG)}.$$

82. This calculation is a critical input for calculating the share of a racial group's registered voters that must obtain a Required ID.[65] The estimated number of registered voters for a racial group is determined by multiplying this probability by the number of registered voters in the Block Group. The estimated number of registered voters within a racial group that are Affected Registered Voters is determined by multiplying this probability by the number of registered voters needing a Required ID in the Block Group.[66] Across Block Groups, the share of a racial group's registered voters that must obtain a Required ID ("ID" in the formula, with "1" denoting an individual that must obtain a Required ID) is

$$Pr(ID = 1|RV = 1, R) = \frac{\sum_g Pr(R|RV = 1, BG = g) * \#(ID = 1, RV = 1|BG = g)}{\sum_g Pr(R|RV = 1, BG = g) * \#(RV = 1|BG = g)}.$$

---

[65] The assumption that registered voters status is independent of Block Group location conditional on race is restrictive, but it has the favorable outcome that the predicted proportion of registered voters by race across Block Groups will precisely match the observed state-wide Census information.

[66] This calculation further assumes that Required ID possession is independent of race conditional on registered voter and Block Group status. As with the assumption above that registered voter status is independent of Block Group location conditional on race, better data on the racial group status of individual registered votes would obviate the need to make the assumption.

83. This analysis can be done at any level of Census data aggregation, including state-wide, County, Census Tract, Census Block Group and Census Block. At the state-wide level, the share would collapse into just the share of registered voters state-wide that must obtain a Required ID.[67] (This is because the only racial information I use is based on geography, and state-wide there is no variation in geography.) As explained in Section VI.C above, I would expect that increasing levels of aggregation of racial information would tend to bias downward the estimate of the share of African-American voters that must obtain a Required ID. This can be seen in the following table, where exploitation of racial information at the Block Group yields an estimate of the proportion of African-American Affected Registered Voters to be 10.7%. If the geographic distribution of African-American residency is ignored, then the estimate would decrease to the state-wide average of 8.2%. Similar phenomena are observed for each racial group, with shares for each race converging to the state-wide average when geographic racial distributions are ignored.

**Table 12: Share of Affected Registered Voters by Geographic Aggregation Level**

|  | Percent of African-American Affected Voters | Percent of White Affected Voters | Percent of Hispanic Affected Voters | Percent of Asian Affected Voters | Percent of Other Affected Voters |
|---|---|---|---|---|---|
| Block Group | 10.7% | 6.9% | 10.3% | 5.9% | 7.6% |
| Tract | 10.4% | 7.0% | 10.2% | 6.0% | 7.5% |
| County | 8.2% | 7.9% | 9.1% | 7.4% | 7.9% |
| State | 8.2% | 8.2% | 8.2% | 8.2% | 8.2% |

Notes and Sources:
U.S. Census Bureau 2010 population counts; U.S. Census Bureau, Current Population Survey, November 2012; TEAM database.

84. Finally, for calculation of travel time costs, I weighted Block Groups by the predicted number of registered voters within a racial group that are Affected Registered Voters.

---

[67] To see this, BG in the formula would be replaced with State=TX. As the summation would contain just one summand, the numbers for Texas, the proportion of registered voters by race would cancel out of the numerator and denominator of the equation, leaving just the number of registered voters lacking an ID divided by the total number of registered voters.

# Appendix E: Documentation Required to Obtain an EIC

## Table 13: Documentation Required to Obtain an EIC

| EIC Documentation Requirements |
| --- |

**[1]   Documentation of U.S. Citizenship**
    ** U.S. Passport Book Or Card
    Birth Certificate Issued By U.S. State, Territory, Or Dc
    Certificate Of Report Of Birth Or Consuler Report Of Birth
    ** U.S. Certificate Of Citizenship Or Certificate Of Naturalization
    U.S. Department Of Justic Immigration And Naturalization Service U.S. Citizen Id Card

**[2]   Documentation Of Identity**
    Primary Identification
        Texas Driver License (expired for 60 days and is within 2 years of expiration date)
        Texas Personal Identification Card (expired for 60 days and is within 2 years of expiration date)

    Secondary Identification
        Birth Certificate Issued By State Bureau Of Vital Statistics Of Equivalent
        U.S. Department Of State Certification Of Birth
        Court Order With Name And Date Of Birth Indicating An Official Chane Of Name And/Or Gender
        U.S. Citizenship Or Naturalization Papers Without Identifiable Photo

    Supporting Identification
        Voter Registration Card
        School Records
        Insurance Policy (At Least Two Years Old)
        Texas Vehicle Or Boat Title Or Registration
        Military Records
        Unexpired Military Dependant Identification Card
        Original Or Certified Copy Of Marriage License Or Divorce Decree
        Social Security Card
        Pilot'S License
        Unexpired Photo Dl Or Photo Id Issued By Another (United States) State, U.S. Territory, The District Of Columbia
        Expired Photo Dl Or Photo Id Issued By Another (United States) State, U.S. Territory, Or The District Of Columbia That Is Within Two Years Of The Expiration Date
        An Offender Identification Card Or Similar Form Of Identification Issued By The Texas Department Of Criminal Justice
        Forms W-2 Or 1099
        Numident Record From The Social Security Administration
        Expired Texas Driver License Or Personal Identification Certificate (Expired More Than Two Years)
        Professional License Issued By Texas State Agency
        Identification Card Issued By Government Agency
        Parole Or Mandatory Release Certificate Issued By The Texas Department Of Criminal Justice
        Federal Inmate Identification Card
        Federal Parole Or Release Certificate
        Medicare Or Medicaid Card
        Selective Service Card
        Immunization Records
        Tribal Membership Card From Federally Recognized Tribe
        Certificate Of Degree Of Indian Blood
        Veteran'S Administration Card
        Hospital Issued Birth Record
        Any Document That May Be Added To §15.24 Of This Title (Relating To Identification Of Applicants) Other Than Those Issued To Persons Who Are Not Citizens Of The U.S.

Notes and Sources:
Information from http://www.txdps.state.tx.us/DriverLicense/eicDocReqmnts.htm.
    ** Denotes a document that is sufficent for voting under SB 14.
    [1] Applicants need one document of U.S. Citizenship to qualify for an EIC.
    [2] One primary, two secondary, or one secondary and two supporting identification documents must be provided
        for identity verification and EIC eligibility.

PL756
9/2/2014
2:13-cv-00193

IN THE UNITED STATES DISTRICT COURT
**FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

MARC VEASEY, *et al.*,

Plaintiffs,

v.                                          Civil Action No. 2:13-cv-193 (NGR)

RICK PERRY, *et al.*,

Defendants.

REPLY REPORT
OF
Coleman Bazelon

ON BEHALF OF PLAINTIFF-INTERVENORS TEXAS LEAGUE OF YOUNG VOTERS
EDUCATION FUND AND IMANI CLARK

August 15, 2014

# Table of Contents

I.    Assignment and Summary of Conclusions ........................................................ 1

II.   Concerns Raised About the Number of Affected Registered Voters and Their Distribution by Race ........................................................................................ 2

    II.A.  "Messiness" of the Data ........................................................................ 2

    II.B.  Preponderance of White Affected Registered Voters ............................ 4

III.  Concerns Raised About the Costs of Obtaining an Election Identification Certificate .......... 5

    III.A. Level of Travel Costs ............................................................................ 5

    III.B. Allocating Costs of Documents Over Multiple Uses ............................ 6

    III.C. Amortizing Costs Over Multiple Elections ........................................... 7

IV.   Concerns Raised About Burden .................................................................... 8

    IV.A. Travel Cost Comparisons .................................................................... 8

    IV.B. Significance of the Level of Costs ........................................................ 9

    IV.C. Validity of Welfare Comparisons ...................................................... 10

    IV.D. Calculus of Voting ............................................................................ 11

Appendix A – Explanation of Revisions to My Original Report ........................ 14

Appendix B – Materials Relied Upon .............................................................. 16

Exhibit A: Amended Expert Report of Coleman Bazelon ................................ 18

# I. Assignment and Summary of Conclusions

1.  I submitted an Expert Report in this matter on June 27, 2014.[1]  I have attached an amended version of that Report, reflecting updated data, to this Reply Report (Exhibit A).  I was asked to review the Rebuttal Declarations submitted by Professor Jeffrey Milyo[2] and Professor M.V. Hood III[3] and respond to their criticisms of my analysis.  In doing so, I also reviewed declarations submitted by Professor Stephen Ansolabehere,[4] Professor Daniel Chatman,[5] and Professor Gerald Webster.[6]

2.  The criticisms of my Report fall into three categories.  The first is that the number of Affected Registered Voters is exaggerated and biased by race.  The second is that the costs of obtaining an Election Identification Certificate (EIC) are exaggerated.  The third is that any costs associated with obtaining an EIC do not create a burden on Affected Registered Voters, or do not create a racially biased burden.  I find that:

---

[1]  "Expert Report of Coleman Bazelon," On Behalf of Plaintiff-Intervenors Texas League of Young Voters Education Fund and Imani Clark" In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

[2]  "Rebuttal Declaration of Jeffrey Milyo," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193, August 1, 2014.

[3]  "Rebuttal Declaration of M.V. Hood III," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), August 1, 2014.

[4]  "Declaration of Stephen D. Ansolabehere," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), July 1, 2014.

[5]  "Report of Daniel G. Chatman, Ph.D.," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

[6]  "Report of Gerald R. Webster, Ph.D.," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

- Concerns raised about the number of Affected Registered Voters and their distribution by race are misplaced and, regardless, significant numbers of Texans are affected by SB 14;
- Criticisms about the costs of acquiring an EIC are misplaced and Affected Registered Voters bear meaningful economic costs to retain their right to vote; and
- Concerns about my analysis of the burden imposed on Affected Registered Voters, and specifically African-American Affected Registered Voters, are misplaced and SB 14 inflicts a concrete burden.

## II. Concerns Raised About the Number of Affected Registered Voters and Their Distribution by Race

3.   On July 31, 2014, I received supplemental data from the U.S. Department of Justice ("DOJ") that included additional matching results based on a submission by the State of Texas of previously omitted Department of Public Service ID records.  These additional data have led me to submit my Amended Expert Report.[7]   My Amended Report, based on the additional data provided by the State of Texas, addresses several of the criticisms raised by Professor Milyo and Professor Hood about seeming inconsistencies in the data used by Plaintiffs' experts.[8]

### II.A. "Messiness" of the Data

4.   Professor Milyo and Professor Hood make much of the so called "messiness" of the data used for my analysis of Affected Registered Voters.  For example, Professor Milyo argues that "deadwood" or out-of-date registered voter records from the TEAM database inflate the number of registered voters.[9]  The TEAM database is the official State of Texas record of registered voters and it is well beyond the scope of the present analysis to verify each of the more than 13 million TEAM records beyond that which has already been done by DOJ.  But the specific level of potentially affected voters is not relevant here.  As I noted in my Report, the scope of potential harm from SB 14 includes all potential voters, not just registered voters.[10]   Whether the basis of the analysis is all potential voters, registered voters as reported in the TEAM database, or some subset of the TEAM database, the conclusions of my analysis would be the same so long as the difference between these sets

---

[7]   See Exhibit A.

[8]   Milyo, ¶ 92; Hood, p. 19.

[9]   Milyo, ¶ 23.

[10]   Bazelon Report, footnote 5.

of Texans were not racially biased.  I am not aware of any evidence presented that would indicate that, in particular, the so-called "deadwood" entries in the TEAM database are racially biased.

5.  Professor Milyo also criticizes the use of Current Population Survey (CPS) data, which he claims suffers from over-reporting of registration rates.  This criticism does not impact my analysis unless the over-reporting demonstrated a racial bias because I only use the CPS estimates of voter registration by race to calculate the *relative* racial composition of registered voters.[11]  Moreover, even in the case of racial bias in the CPS estimates there is unlikely to be substantial impact on my disparity analysis.  I conducted a sensitivity analysis to test the impact of reducing the CPS estimate of the African-American registration rate.  I found that while this assumption would reduce my estimate of the total number of registered African-American voters, it would not affect my estimate of the share of registered African-American voters that are affected by SB 14.[12]

6.  Professor Milyo and Professor Hood raise concerns about how inconsistencies in the data fields between databases will lead to false negatives or no-matches where there should be a match.[13]  Professor Hood uses, as an example, one database having "James" and another database having "Jim" for the same individual, leading to a no-match when comparing two strings of data that include the first name.  Although he is correct that the specific string comparison (or sweep) would not match, he mischaracterizes the matching process to suggest that the example he gives would lead to a no-match between the databases.  Of the primary identifier variables used in the matching protocol, only 4 of the 7 combinations include first names.[14]  Consequently, in his example, the individual would have matched on one of the other sweeps.  A true false positive would require multiple errors from the "messiness" of the data that would have to accumulate to run-the-table on no-match errors from individual sweeps.

7.  A final point is worth mentioning about Professor Milyo's and Professor Hood's criticisms of the number of individuals affected by SB 14:  They both agree that a substantial number of people are impacted.  Professor Milyo suggests that by one measure "fewer than 2% of all

---

[11]  Bazelon Report, Section VI.C.

[12]  I reduced the CPS estimate of the African-American registration rate to 65.9% from 70.9%.

[13]  Milyo, ¶ 28; Hood, pp. 19 – 21.

[14]  Combinations A, D, E and F include "First Name," but Combinations B, C, and M do not.  See "United States' Database Matching Protocol," p. 8.

registered voters lack SB 14 ID."[15]   Even after adjusting for his estimate of 24% "deadwood,"[16] this suggests that more than 200,000 registered voters are affected by SB 14.[17] (He also implies that a more appropriate measure would be voting age population, citizen voting age population, or voting eligible population, each of which would form a much larger base than TEAM's records of registered voters.[18])   Professor Hood suggests the number of registered voters affected by SB 14 could be over 500,000.[19]   Although I do not agree with either estimate, both suggest that a very large number of individuals will be impacted by SB 14.

## II.B. Preponderance of White Affected Registered Voters

8.   Professor Milyo asks us to "consider" that the number of white Affected Registered Voters is significantly larger than the number of African-American or Hispanic Affected Registered Voters and is about as large as both groups combined.[20]   However, evaluating these numbers outside of the context of the total number of registered voters in each racial group is very misleading, as the numbers alone do not account for the proportion of individuals in each group that are impacted.   Proportionality is important because it suggests how much the impact is *related to race*.   As an example, about 65,000 Texans are Native Americans.[21] A law that burdened *nearly all* Native Americans (say, 99%), but only 1% of white Texans, would burden about twice as many[22] white Texans as Native American Texans, even though Native Americans would be over 9,000 times more likely to be burdened by the law than whites.[23]

---

[15]   Milyo, ¶ 81.

[16]   Milyo, ¶ 25.

[17]   13,350,209 * (1 − 0.24) * 0.02 = 202,923.

[18]   Milyo, ¶ 22.

[19]   Hood, p. 37.

[20]   Milyo, ¶ 89.   In my initial report, 48% of Affected Registered Voters are white; in my Amended Report, 49% of Affected Registered Voters are white.

[21]   http://www.texasalmanac.com/topics/culture/american-indian/american-indian.

[22]   My revised Table 1 reports 11,311,834 white Texans; 1% of them would be 113,118 white Texans.

[23]   The odds ratio is [0.99/(1-0.99)] / [0.01/(1-0.01)] = 9801.

9.   Professor Milyo further compares my estimate that 48% (revised to 49% in my Amended Report) of Affected Registered Voters are white to the Barreto and Sanchez estimate that 45% of Texas citizens of voting age are white to suggest that "non-Hispanic whites are disproportionately likely to lack SB 14 ID relative to their share of CVAP."[24]   This comparison is inconsistent and incorrect.   The relevant comparison is between the 48% (revised to 49%) of Affected Registered Voters who are white and the 58% of registered voters in Texas who are white.[25]   That the share of white Affected Registered Voters is nine percentage points *fewer* than the share of white registered voters shows that whites are much *less* likely to be affected by SB 14 than African Americans or Hispanics.[26]

## III. Concerns Raised About the Costs of Obtaining an Election Identification Certificate

### III.A.   LEVEL OF TRAVEL COSTS

10.   Professor Milyo argues that experts for the Plaintiffs exaggerate travel costs.[27]   He claims that we do not take into account the marginal costs of obtaining an EIC and instead measure the total costs.   This criticism is misplaced.

11.   First, most trips to an EIC issuing center that would be taken by public transport or walking (56% of the trips taken by African-American Texans versus 21% of the trips taken by white Texans, in my travel cost analysis[28]) would be unlikely to be useful for most other errands.   If the costs of acquiring a ride were discounted because of combining trips with other errands, as Professor Milyo suggests, this would likely reduce the economic costs to

---

[24]   Milyo, ¶ 90.

[25]   Both estimates come from the same data set relied on in my initial report.   *See* Bazelon Amended Report at Table 1.

[26]   See Bazelon Report, Table 1.   The equivalent numbers from my Amended Report for African Americans are 17% Affected Registered Voters and 13% of all registered voters (four percentage points *more*) and for Hispanics are 31% of Affected Registered Voters and 25% of all registered voters (six percentage points *more*).

[27]   Milyo, ¶ 119.

[28]   Bazelon Report, Table 5.

white Texans more than to African-American Texans, who are less likely to be driven to obtain an EIC.[29]

12.   Second, Professor Milyo argues that individuals may seek rides from a "friend or relative who also desires to obtain an EIC or has some nearby errand to run."[30]  This speculation may be true in some cases (though Professor Milyo offers no empirical evidence of how often this might occur), but even in those cases that would not make the travel costs zero. The economic value of the gift from the friend or relative is the opportunity cost that would be incurred absent that gift.  For an individual who cannot drive, that opportunity cost is the cost of a taxi.  To be clear, my use of estimated taxi fares is not premised on every individual who travels to obtain an EIC by car actually taking a taxi.  It is an estimate of the economic value of being driven to obtain an EIC.

### III.B. ALLOCATING COSTS OF DOCUMENTS OVER MULTIPLE USES

13.   Professor Milyo argues that because the documents necessary to support an application for an EIC are useful to citizens for purposes beyond the EIC application, only a portion of the costs should be allocated to the EIC process.[31]  This argument ignores that it is SB 14's voter ID requirement that is causing an individual to acquire the supporting documents now instead of in the future, if at all.  If, however, such an allocation of costs were undertaken, an accounting of *when* and *whether* the other uses of the documents would take place would be important.  Paying now for a document that may be used many years in the future creates additional costs for individuals.  It ties up money now that might not need to be spent for years, if ever.  This increases the share of costs allocated to initial (EIC application) use of the documents.  Given potentially high personal discount rates, especially among minorities who are less banked and more frequent users of non-traditional financial institutions such as pay day loans,[32] this could make current costs much more salient than future benefits.

---

[29]   Apart from my analysis of transport mode choice, household vehicle ownership rates are 89% among African-American Texans, approximately 8 percentage points less than for white Texans.  Percentages calculated from Chatman Report, Table 4.

[30]   Milyo, ¶ 120.

[31]   Milyo, ¶ 121.

[32]   Nathalie Martin and Ernesto Longa, "High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Class?," available at: http://ssrn.com/abstract=2145598.

### III.C.    AMORTIZING COSTS OVER MULTIPLE ELECTIONS

14.    Professor Milyo argues that "[a]n EIC is also valid for 6 years and can be renewed.  This means that the costs of obtaining an EIC should be apportioned in some manner over this time."[33]  This argument is incorrect for at least three reasons.

    a.    It is the next election that is triggering or causing the costs of obtaining an EIC; without paying all of these costs a citizen would not be able to vote in that election.

    b.    Many registered voters do not vote in every election, so allocating the costs over several elections, as Professor Milyo suggests, is inappropriate.  Voters are not given the choice of paying for only a portion of an EIC if they only vote in this year's elections.  The investment in voting is sunk and irreversible—a voter cannot recover a portion of the cost of an EIC if she does not vote in a future election.

    c.    The benefits of voting in future elections would need to be discounted in deciding how much of the costs should be allocated to each election.  Because we value things less in the future than the same things today, the value of voting in later elections is less than the value of voting sooner.  This, in turn, means that the value of voting or, equivalently, the share of costs allocated to later elections should be less than the share of costs allocated to nearer term elections.

15.    For example, suppose that a voter goes to the polls in one election a year for six years.  For the first election, she must pay the costs of obtaining an EIC.  But, from the perspective of the first vote, she would not value the benefits of voting in the 6th year as highly she values the first vote.  Consequently, a greater share of the costs should be allocated to the nearer-term elections.

16.    Voters are not indifferent between paying for an ID now or in the future—they would always prefer to delay payment.  But because they must pay the costs of getting an ID now, the costs in the future are higher today than if those costs were paid in the future.[34]

---

[33]    Milyo, ¶ 122.

[34]    For example, pay day loans often carry implied interest rates in excess of 300% per year.  Nathalie Martin and Ernesto Longa, "High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Class?," available at: http://ssrn.com/abstract=2145598.  A voter that relies on pay day loans would pay an implicit value of $18 in interest for every $1 in costs over the course of the 6 years she used the EIC to vote.  300% of $1 is $3; over 6 years the total interest costs would be $18.  Although this calculus would not apply to all voters, it would be more likely to apply to a minority voter than a white voter because minority voters are more likely to use pay day loan services.

# IV. Concerns Raised About Burden

## IV.A.   TRAVEL COST COMPARISONS

17.   Professor Milyo argues that because my estimated travel costs of getting to an EIC issuing office are higher for white Affected Registered Voters than for African-American Affected Registered Voters, and because there are more white than African-American Affected Registered Voters, my analysis contradicts "claims made by several experts that travel costs are higher for minority voters than for white voters in Texas."[35]   This is incorrect and fundamentally misunderstands my analysis.

18.   The other Plaintiff experts in this case perform alternative analyses that are not directly comparable to mine, in part because they focus directly on measures of time and not economic costs.[36]   Importantly, their travel-time calculations support my conclusions that African-American registered voters in Texas are more burdened by SB 14 than white registered voters in Texas.[37]   My analysis, in contrast, measures economic costs and places the burden in an economically-based context.   Nevertheless, my calculations of travel costs are based on an estimation that includes African-American Texans spending significantly more time traveling than white Texans: 82 minutes on average for African-American Texans compared to 38 minutes on average for white Texans.[38]   Consequently, on the metric preferred by the other Plaintiff experts—travel time—my analysis reinforces rather than contradicts their claims.

19.   More importantly, Professor Milyo ignores *why* the nominal dollar travel costs are lower on average for African-American Texans than for white Texans—African Americans in Texas earn on average $13.69 per hour whereas white Texans earn on average $23.08 per hour.[39]   As explained in my Report, the relatively lower wage rate for African Americans skews their transport choice toward public transportation and walking.   This can be seen in Table 5:  41% of African-American Texans would choose public transport and 15% would choose walking as compared to white Texans, who choose public transportation 14% of the

---

[35]   Milyo, ¶ 116.

[36]   Chatman Declaration; Webster Declaration.

[37]   Chatman, p. 33; Webster, p. 50.

[38]   Amended Bazelon Report, Table 6.  In my initial Report the average travel time was 81 minutes for African American Texans and 37 minutes for white Texans.

[39]   Bazelon Report, Table 3.

time and walking 7% of the time.[40]   The lower value of nominal travel costs for African-American Texans in Table 6 of my Report reflects both a significantly lower wage for time spent traveling and lower out of pocket travel costs (for public transport or walking) compared to white Texans, whose higher wages lead them to take more expensive trips by car (valued at the opportunity cost of a taxi.)

20.   But more fundamentally, Professor Milyo misses the point by comparing the nominal dollar costs between different races.   My understanding is that one of the questions before the Court is whether the *burden*, not the cost, imposed by SB 14 on groups of voters, such as African-American Texans, is different than the burden imposed on other groups, such as white Texans.   Other than one (incorrect) theoretical point, neither of the experts for the Defense mentions, much less addresses, my analysis of the burden imposed by SB 14. Section VIII of my initial report illustrates why the costs imposed on African-American Texans by SB 14 are more burdensome than for white Texans.   In that analysis I conclude: "For only the travel-cost portion of the burden created by SB 14, an African-American Affected Registered Voter is required to expend a share of their wealth that is more than four times higher than the share required for a white Texan."[41]

### IV.B.   SIGNIFICANCE OF THE LEVEL OF COSTS

21.   Both Professor Milyo and Professor Hood argue that any costs imposed by SB 14 are not burdensome.   I disagree and show that the costs are burdensome.   I estimate that the average travel costs associated with obtaining an EIC, across all Affected Registered Voters, is $42.18.[42]   As discussed in my initial report, this estimate does not include all of the costs that might be incurred in obtaining an EIC.[43]   The average travel cost of $42.18 is 173% of average hourly earnings.   When, in 1966, the Supreme Court found a poll tax of $1.75 in Texas an undue burden, that amount was only 69% of average hourly earnings.[44]   Clearly, the burden estimated in terms of travel costs alone is sufficient to be considered a barrier to voting.

---

[40]   Bazelon Report, Table 5.

[41]   Bazelon Report, ¶ 71.

[42]   Bazelon Report, Table 6.

[43]   Bazelon Report, Section VII.D.

[44]   In *Harper v. Virginia*, the court said, "We conclude that a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard. Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax."  383 U.S. 663, 666 (1966).

**Table 1: Comparison of Voting Burdens Versus Wages**

|                         |     | 1966   | 2014    |
|-------------------------|-----|--------|---------|
| Average Hourly Earnings | [1] | $2.52  |         |
| Texas Poll Tax          | [2] | $1.75  |         |
| Average Hourly Earnings | [3] |        | $24.38  |
| Travel Cost Burden      | [4] |        | $42.18  |
| Percentage              | [5] | 69.4%  | 173.0%  |

Notes and Sources:

[1] & [3]: BLS total private sector average hourly earnings
   for February 1966 and May 2014.
[2]: Poll tax at date of repeal in 1966, *United States v.*
   *Texas* (1966).
[4]: Average total burden of travel cost for all registerd voters
   to obtain EIC, based on Brattle analysis.
[5]: For 1966, [2]/[1]. For 2014, [4]/[3].

## IV.C.   VALIDITY OF WELFARE COMPARISONS

22. Professor Milyo claims that my burden analysis is theoretically invalid because I compare the relative utility of money of wealthier versus less wealthy individuals.  He mistakenly claims that in doing so, I am using cardinal utility estimates where the utility level of one individual is directly compared to another individual.  My comparison of relative burdens compares *changes* in wealth (in the form of the costs of obtaining an EIC) rather than *total* utility of individuals.  Rather than making direct comparisons of how much a white or African-American Texan values a dollar, I avoid direct interpersonal utility comparisons by expressing the travel-cost portion of obtaining an EIC in terms of the average wealth of each racial group.

23. Professor Milyo is correct that economic theory has trouble comparing how two individuals value a dollar.  Nevertheless, economic theory is unambiguous that an individual with higher wealth will value a dollar less than that individual would with lower wealth.  Consequently, in assessing burden, we do not have a basis for comparing the burden of a dollar lost between two *random* or *equally situated* people, but do know that for any given person having a lower income implies a greater burden from a lost dollar.

24. In my Report I express the costs of obtaining an EIC as a share of wealth to extrapolate from the technical issues of interpersonal comparison that Professor Milyo raises.  To defeat my conclusions on relative burden, Professor Milyo would have to argue that white Texans

get more—much more—benefit from an additional dollar than African-American Texans. In fact, he would have to argue that a white Texan, who is on average 7 times wealthier than an African-American Texan, feels the pain of losing a small share of her income more than 4 times as much as a less wealthy African-American Texan would feel from losing the same share of her (smaller) wealth.   This seems a completely implausible argument to make.[45]

## IV.D.   CALCULUS OF VOTING

25.   As a threshold matter, Professors Milyo and Hood seem to believe that the only way to show harm in this matter is through statistically significant changes in voter turnout.[46] That is not my understanding of the appropriate measure of harm.  Rather, the question at hand is whether or not SB 14 creates different burdens for different groups of voters, such as African American versus white Texans.  Therefore, Professor Milyo's criticism that I, and the other Plaintiff experts, did not focus on voter turnout is misplaced.

26.   Professor Milyo helpfully explains that the calculus of voting weighs the costs and benefits of voting and that the literature recognizes that one of the benefits is what he calls "the non-instrumental value of voting."[47]  He goes on to say:

> Importantly, under the modified theory of voting, a small change in the cost of voting is expected to result in some small reduction in turnout.  This is because in general, not everyone will be just barely motivated to vote and therefore hypersensitive to small changes. … Consequently, this modified theory does imply that the costs of voting are related to turnout, but the model does not generate the dramatic prediction that even a small change in the cost of voting will result in a large change in turnout."[48]

27.   Of course, even if changing the results of an election was the correct standard, a change in turnout that changes the results of an election does not have to be large.  More importantly,

---

[45]   To illustrate with round, hypothetical numbers, Professor Milyo would have to argue that an individual with $100,000 in the bank would be more burdened by losing $100 than an individual with $15,000 in the bank would be burdened with losing $60, which assumes the share of wealth lost is 4 times as much for the lower wealth individual.

[46]   Milyo, Section VIII & ¶ 153; Hood, p. 9.

[47]   Milyo, ¶ 133.

[48]   Milyo, ¶ 134.

Professor Milyo's suggestion that I implied that the calculus of voting theory suggests that a small change in costs would "generate the dramatic prediction" of a "large change in turnout" is simply a straw man argument.

28. Professor Milyo suggests that the lack of statistically significant changes in voter turnout indicates that there must be benefits of SB 14 that offset the costs. This would depend crucially on the nature of those benefits.

29. First, Professor Milyo suggests that increasing confidence in the election process may be one offsetting benefit.[49] The Court's opinion in the recent Wisconsin decision suggests the opposite—that voter ID laws "undermine the public's confidence in the electoral process as much as they promote it."[50]

30. Second, Professor Milyo suggests that any increases in the "salience" of voting from SB 14 would create benefits. But this surely depends on how SB 14 increases salience. Voter education efforts are laudable, but if groups of voters derive a greater benefit from voting (that justifies bearing a greater cost to vote) in reaction to perceiving their right to vote being under attack, then it seems inappropriate to count that perceived attack as a benefit that off-sets the costs imposed by the law.

31. Other so-called benefits offered by Professor Milyo are more properly called efforts to mitigate harm and should not be counted as benefits of SB 14. For example, he suggests that voter ID laws may motivate advocacy groups to increase voter mobilization efforts.[51] Such efforts, however, do not change the burden created by SB 14. Even if a philanthropist paid all the costs, including opportunity cost of time, for all Affected Registered Voters to acquire ID to vote, we would not say that SB 14 did not create a burden on the Affected Registered Voters; rather we would say that the burden created by SB 14 was compensated for by the philanthropist.

---

[49]  Milyo, ¶ 149.

[50]  Frank v. Walker, 2014 WL 1775432, at *18 (E.D.Wis. Apr. 29, 2014).

[51]  Milyo, ¶ 149.

Respectfully submitted,

_____           Date: August 15, 2014

Coleman Bazelon, Ph.D.

# Appendix A – Explanation of Revisions to My Original Report

32. Following the submission of my original report, the State of Texas provided the DOJ with an updated list of records from the Texas Department of Public Service (DPS). It is my understanding that the DOJ used this list to identify additional individuals in the TEAM database who have an eligible ID. Such individuals would not be Affected Registered Voters, and, to the extent that they were not previously matched to one of the other state or Federal ID databases, this new information would decrease the number of Affected Registered Voters in my analysis.

33. The DOJ provided me with an updated list of matches for each of the databases to the TEAM database. I have examined this information and identified 397,125 registered voters that I had previously coded as Affected Registered Voters that would now be coded as "matched," *i.e.*, not needing to obtain an ID in order to vote. I now estimate there to be 706,366 (previously 1,103,491) Affected Registered Voters overall. The number of African-American Registered Voters falls to 117,563 (previously 185,095), and the associated Affected share of African-American Registered Voters falls to 6.8% (previously 10.7%). The number of white Registered Voters falls to 344,038 (previously 530,636), and the associated Affected share of white Registered Voters falls to 4.5% (previously 6.9%).

34. My Amended Report shows that African-American Registered Voters are still disproportionately more likely to be affected by SB 14, with a differential in the share of Affected Registered Voters of 2.3 percentage points. The odds ratio between African-American and white Registered Voters is 1.55, meaning that among registered voters, African-American registered voters are 1.55 times more likely to require an ID in order to vote than are white registered voters.

35. In the course of updating my Report, I discovered an error in the way that matched, deceased voters were incorporated into my analysis. This error caused me to overstate the values in column [B] of Table 1 of my original report by 4,703 voters. It had no impact on my estimates of Affected Registered Voters and an immaterial impact on my estimate of the Affected Share of Registered Voters. A version of Table 1 of my original report, correcting for this error but not incorporating the new DPS information, is provided below (as Table 2 of this reply report). Table 2 is meant only to describe the effect of the error on my original report, showing that it had no material effect on my racial disparity results. This error is not present in my Amended Report.

**Table 2: Corrected Table 1 of Original Report, Before Supplemental DOJ Data Submission**

| | All Texans | All Registered Texan Voters | | All Affected Registered Texan Voters | Affected Share of Registered Voters |
|---|---|---|---|---|---|
| | [A] | [B] | | [C] | [D] |
| African American | 2,835,493 | 1,722,452 | | 185,095 | 10.7% |
| White | 11,311,834 | 7,689,234 | | 530,636 | 6.9% |
| Hispanic | 9,389,496 | 3,386,737 | | 350,224 | 10.3% |
| All | 24,932,741 | 13,354,912 | *EIC required* | 1,103,491 | 8.3% |
| | | | *EIC required, or disability exempt* | 1,232,231 | 9.2% |

Notes and Sources:

U.S. Census Bureau 2010 population counts; U.S. Census Bureau, Current Population Survey, November 2012; TEAM database.

[B]: TEAM consists of a total of 13,564,410 voters, of whom 13,515,665 were not known to be deceased; 13,411,173 of these voters have addresses or zipcodes that are able to be mapped to Census Block Groups; 13,354,912 of these voters map to Census Block Groups without prisons.

[C]: Results of DOJ Matching data.

[D]: [C] / [B].

## Appendix B – Materials Relied Upon

### Articles and Book Chapters

1. Nathalie Martin and Ernesto Longa, "High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Class?" *Loyola Consumer Law Review,* 24 (4), 2012, p. 524. Available at: http://ssrn.com/abstract=2145598.

### Court Documents

2. "Expert Report of Coleman Bazelon," On Behalf of Plaintiff-Intervenors Texas League of Young Voters Education Fund and Imani Clark" In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

3. "Rebuttal Declaration of Jeffrey Milyo," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193, August 1, 2014.

4. "Rebuttal Declaration of M.V. Hood III," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), August 1, 2014.

5. "Declaration of Stephen D. Ansolabehere," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), July 1, 2014.

6. "Report of Daniel G. Chatman, Ph.D.," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

7. "Report of Gerald R. Webster, Ph.D.," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

8. *Harper v. Virginia,* 383 U.S. 663, 666 (1966).

9. *Frank v. Walker,* 2014 WL 1775432, at *18 (E.D.Wis. Apr. 29, 2014).

10. *United States v. Texas,* 252 F.Supp. 234 (1966).

### Databases

11. Department of Justice Matching Data

12. "Table B-3. Average hourly and weekly earnings of all employees on private nonfarm payrolls by industry sector, seasonally adjusted," U.S. Bureau of Labor Statistics Economic News Release, August 01, 2014, retrieved from < http://data.bls.gov/cgi-bin/print.pl/news.release/empsit.t19.htm> (accessed 08/15/14).

13. National Employment, Hours, and Earnings Series (SIC) EES00500006, Bureau of Labor Statistics, retrieved from < http://data.bls.gov/pdq/querytool.jsp?survey=ee> (accessed 08/08/14).

## Other Sources

14. "American Indians in Texas," Texas Almanac, retrieved from <http://www.texasalmanac.com/topics/culture/american-indian/american-indian> (accessed 08/15/14).

# Exhibit A: Amended Expert Report of Coleman Bazelon

IN THE UNITED STATES DISTRICT COURT
**FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

MARC VEASEY, *et al.*,

                 Plaintiffs,

        v.

RICK PERRY, *et al.*,

                Defendants.

Civil Action No. 2:13-cv-193 (NGR)

SECOND AMENDED REPLY REPORT
OF
Coleman Bazelon

ON BEHALF OF PLAINTIFF-INTERVENORS TEXAS LEAGUE OF YOUNG VOTERS
EDUCATION FUND AND IMANI CLARK

September 21, 2014

# Table of Contents

I.  Assignment and Summary of Conclusions ...................................................................... 1

II.  Concerns Raised About the Number of Affected Registered Voters and Their
Distribution by Race .............................................................................................................. 2

    II.A.  "Messiness" of the Data ......................................................................................... 2

    II.B.  Preponderance of White Affected Registered Voters .................................. 4

III.  Concerns Raised About the Costs of Obtaining an Election Identification Certificate ........... 5

    III.A. Level of Travel Costs ............................................................................................. 5

    III.B. Allocating Costs of Documents Over Multiple Uses ...................................... 6

    III.C. Amortizing Costs Over Multiple Elections ...................................................... 7

IV.  Concerns Raised About Burden .......................................................................................... 8

    IV.A. Travel Cost Comparisons ..................................................................................... 8

    IV.B. Significance of the Level of Costs ...................................................................... 9

    IV.C. Validity of Welfare Comparisons ..................................................................... 10

    IV.D. Calculus of Voting .............................................................................................. 11

Appendix A – Explanation of Revisions to My Original Report ...................................... 14

Appendix B – Materials Relied Upon ..................................................................................... 16

Exhibit A: Amended Expert Report of Coleman Bazelon .................................................. 18

# I. Assignment and Summary of Conclusions

1. I submitted an Expert Report in this matter on June 27, 2014.[1] I have attached an amended version of that Report, reflecting updated data, to this Reply Report (Exhibit A). I was asked to review the Rebuttal Declarations submitted by Professor Jeffrey Milyo[2] and Professor M.V. Hood III[3] and respond to their criticisms of my analysis. In doing so, I also reviewed declarations submitted by Professor Stephen Ansolabehere,[4] Professor Daniel Chatman,[5] and Professor Gerald Webster.[6]

2. The criticisms of my Report fall into three categories. The first is that the number of Affected Registered Voters is exaggerated and biased by race. The second is that the costs of obtaining an Election Identification Certificate (EIC) are exaggerated. The third is that any costs associated with obtaining an EIC do not create a burden on Affected Registered Voters, or do not create a racially biased burden. I find that:

---

[1] "Expert Report of Coleman Bazelon," On Behalf of Plaintiff-Intervenors Texas League of Young Voters Education Fund and Imani Clark" In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

[2] "Rebuttal Declaration of Jeffrey Milyo," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193, August 1, 2014.

[3] "Rebuttal Declaration of M.V. Hood III," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), August 1, 2014.

[4] "Declaration of Stephen D. Ansolabehere," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), July 1, 2014.

[5] "Report of Daniel G. Chatman, Ph.D.," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

[6] "Report of Gerald R. Webster, Ph.D.," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

- Concerns raised about the number of Affected Registered Voters and their distribution by race are misplaced and, regardless, significant numbers of Texans are affected by SB 14;
- Criticisms about the costs of acquiring an EIC are misplaced and Affected Registered Voters bear meaningful economic costs to retain their right to vote; and
- Concerns about my analysis of the burden imposed on Affected Registered Voters, and specifically African-American Affected Registered Voters, are misplaced and SB 14 inflicts a concrete burden.

## II. Concerns Raised About the Number of Affected Registered Voters and Their Distribution by Race

3.   On July 31, 2014, I received supplemental data from the U.S. Department of Justice ("DOJ") that included additional matching results based on a submission by the State of Texas of previously omitted Department of Public Service ID records.  These additional data have led me to submit my Amended Expert Report.[7]   My Amended Report, based on the additional data provided by the State of Texas, addresses several of the criticisms raised by Professor Milyo and Professor Hood about seeming inconsistencies in the data used by Plaintiffs' experts.[8]

### II.A. "Messiness" of the Data

4.   Professor Milyo and Professor Hood make much of the so called "messiness" of the data used for my analysis of Affected Registered Voters.  For example, Professor Milyo argues that "deadwood" or out-of-date registered voter records from the TEAM database inflate the number of registered voters.[9]  The TEAM database is the official State of Texas record of registered voters and it is well beyond the scope of the present analysis to verify each of the more than 13 million TEAM records beyond that which has already been done by DOJ. But the specific level of potentially affected voters is not relevant here.  As I noted in my Report, the scope of potential harm from SB 14 includes all potential voters, not just registered voters.[10]   Whether the basis of the analysis is all potential voters, registered voters as reported in the TEAM database, or some subset of the TEAM database, the conclusions of my analysis would be the same so long as the difference between these sets

---

[7]   See Exhibit A.

[8]   Milyo, ¶ 92; Hood, p. 19.

[9]   Milyo, ¶ 23.

[10]   Bazelon Report, footnote 5.

of Texans were not racially biased. I am not aware of any evidence presented that would indicate that, in particular, the so-called "deadwood" entries in the TEAM database are racially biased.

5. Professor Milyo also criticizes the use of Current Population Survey (CPS) data, which he claims suffers from over-reporting of registration rates. This criticism does not impact my analysis unless the over-reporting demonstrated a racial bias because I only use the CPS estimates of voter registration by race to calculate the *relative* racial composition of registered voters.[11] Moreover, even in the case of racial bias in the CPS estimates there is unlikely to be substantial impact on my disparity analysis. I conducted a sensitivity analysis to test the impact of reducing the CPS estimate of the African-American registration rate. I found that while this assumption would reduce my estimate of the total number of registered African-American voters, it would not affect my estimate of the share of registered African-American voters that are affected by SB 14.[12]

6. Professor Milyo and Professor Hood raise concerns about how inconsistencies in the data fields between databases will lead to false negatives or no-matches where there should be a match.[13] Professor Hood uses, as an example, one database having "James" and another database having "Jim" for the same individual, leading to a no-match when comparing two strings of data that include the first name. Although he is correct that the specific string comparison (or sweep) would not match, he mischaracterizes the matching process to suggest that the example he gives would lead to a no-match between the databases. Of the primary identifier variables used in the matching protocol, only 4 of the 7 combinations include first names.[14] Consequently, in his example, the individual would have matched on one of the other sweeps. A true false positive would require multiple errors from the "messiness" of the data that would have to accumulate to run-the-table on no-match errors from individual sweeps.

7. A final point is worth mentioning about Professor Milyo's and Professor Hood's criticisms of the number of individuals affected by SB 14: They both agree that a substantial number of people are impacted. Professor Milyo suggests that by one measure "fewer than 2% of all

---

[11] Bazelon Report, Section VI.C.

[12] I reduced the CPS estimate of the African-American registration rate to 65.9% from 70.9%.

[13] Milyo, ¶ 28; Hood, pp. 19 – 21.

[14] Combinations A, D, E and F include "First Name," but Combinations B, C, and M do not. See "United States' Database Matching Protocol," p. 8.

registered voters lack SB 14 ID."[15]   Even after adjusting for his estimate of 24% "deadwood,"[16] this suggests that more than 200,000 registered voters are affected by SB 14.[17] (He also implies that a more appropriate measure would be voting age population, citizen voting age population, or voting eligible population, each of which would form a much larger base than TEAM's records of registered voters.[18])   Professor Hood suggests the number of registered voters affected by SB 14 could be over 500,000.[19]   Although I do not agree with either estimate, both suggest that a very large number of individuals will be impacted by SB 14.

## II.B. PREPONDERANCE OF WHITE AFFECTED REGISTERED VOTERS

8.   Professor Milyo asks us to "consider" that the number of white Affected Registered Voters is significantly larger than the number of African-American or Hispanic Affected Registered Voters and is about as large as both groups combined.[20]   However, evaluating these numbers outside of the context of the total number of registered voters in each racial group is very misleading, as the numbers alone do not account for the proportion of individuals in each group that are impacted.   Proportionality is important because it suggests how much the impact is *related to race*.   As an example, about 65,000 Texans are Native Americans.[21] A law that burdened *nearly all* Native Americans (say, 99%), but only 1% of white Texans, would burden about twice as many[22] white Texans as Native American Texans, even though Native Americans would be over 9,000 times more likely to be burdened by the law than whites.[23]

---

[15]   Milyo, ¶ 81.

[16]   Milyo, ¶ 25.

[17]   $13,350,209 * (1 − 0.24) * 0.02 = 202,923$.

[18]   Milyo, ¶ 22.

[19]   Hood, p. 37.

[20]   Milyo, ¶ 89.   In my initial report, 48% of Affected Registered Voters are white; in my Amended Report, 44% of Affected Registered Voters are white.

[21]   http://www.texasalmanac.com/topics/culture/american-indian/american-indian.

[22]   My revised Table 1 reports 11,311,834 white Texans; 1% of them would be 113,118 white Texans.

[23]   The odds ratio is $[0.99/(1-0.99)] / [0.01/(1-0.01)] = 9801$.

9.  Professor Milyo further compares my estimate that 48% (revised to 45% in my Amended Report) of Affected Registered Voters are white to the Barreto and Sanchez estimate that 45% of Texas citizens of voting age are white to suggest that "non-Hispanic whites are disproportionately likely to lack SB 14 ID relative to their share of CVAP."[24]  This comparison is inconsistent and incorrect.  The relevant comparison is between the 48% (revised to 45%) of Affected Registered Voters who are white and the 58% of registered voters in Texas who are white.[25]  That the share of white Affected Registered Voters is fourteen percentage points *fewer* than the share of white registered voters shows that whites are much *less* likely to be affected by SB 14 than African Americans or Hispanics.[26]

## III. Concerns Raised About the Costs of Obtaining an Election Identification Certificate

### III.A. LEVEL OF TRAVEL COSTS

10.  Professor Milyo argues that experts for the Plaintiffs exaggerate travel costs.[27]  He claims that we do not take into account the marginal costs of obtaining an EIC and instead measure the total costs.  This criticism is misplaced.

11.  First, most trips to an EIC issuing center that would be taken by public transport or walking (56% of the trips taken by African-American Texans versus 21% of the trips taken by white Texans, in my travel cost analysis[28]) would be unlikely to be useful for most other errands.  If the costs of acquiring a ride were discounted because of combining trips with other errands, as Professor Milyo suggests, this would likely reduce the economic costs to

---

[24]  Milyo, ¶ 90.

[25]  Both estimates come from the same data set relied on in my initial report.  *See* Bazelon Amended Report at Table 1.

[26]  See Bazelon Report, Table 1.  The equivalent numbers from my Amended Report for African Americans are 18% Affected Registered Voters and 13% of all registered voters (five percentage points *more*) and for Hispanics are 34% of Affected Registered Voters and 25% of all registered voters (ten percentage points *more*).

[27]  Milyo, ¶ 119.

[28]  Bazelon Report, Table 5.

white Texans more than to African-American Texans, who are less likely to be driven to obtain an EIC.[29]

12. Second, Professor Milyo argues that individuals may seek rides from a "friend or relative who also desires to obtain an EIC or has some nearby errand to run."[30] This speculation may be true in some cases (though Professor Milyo offers no empirical evidence of how often this might occur), but even in those cases that would not make the travel costs zero. The economic value of the gift from the friend or relative is the opportunity cost that would be incurred absent that gift. For an individual who cannot drive, that opportunity cost is the cost of a taxi. To be clear, my use of estimated taxi fares is not premised on every individual who travels to obtain an EIC by car actually taking a taxi. It is an estimate of the economic value of being driven to obtain an EIC.

### III.B. ALLOCATING COSTS OF DOCUMENTS OVER MULTIPLE USES

13. Professor Milyo argues that because the documents necessary to support an application for an EIC are useful to citizens for purposes beyond the EIC application, only a portion of the costs should be allocated to the EIC process.[31] This argument ignores that it is SB 14's voter ID requirement that is causing an individual to acquire the supporting documents now instead of in the future, if at all. If, however, such an allocation of costs were undertaken, an accounting of *when* and *whether* the other uses of the documents would take place would be important. Paying now for a document that may be used many years in the future creates additional costs for individuals. It ties up money now that might not need to be spent for years, if ever. This increases the share of costs allocated to initial (EIC application) use of the documents. Given potentially high personal discount rates, especially among minorities who are less banked and more frequent users of non-traditional financial institutions such as pay day loans,[32] this could make current costs much more salient than future benefits.

---

[29] Apart from my analysis of transport mode choice, household vehicle ownership rates are 89% among African-American Texans, approximately 8 percentage points less than for white Texans. Percentages calculated from Chatman Report, Table 4.

[30] Milyo, ¶ 120.

[31] Milyo, ¶ 121.

[32] Nathalie Martin and Ernesto Longa, "High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Class?," available at: http://ssrn.com/abstract=2145598.

### III.C.  AMORTIZING COSTS OVER MULTIPLE ELECTIONS

14.  Professor Milyo argues that "[a]n EIC is also valid for 6 years and can be renewed. This means that the costs of obtaining an EIC should be apportioned in some manner over this time."[33] This argument is incorrect for at least three reasons.

    a.  It is the next election that is triggering or causing the costs of obtaining an EIC; without paying all of these costs a citizen would not be able to vote in that election.

    b.  Many registered voters do not vote in every election, so allocating the costs over several elections, as Professor Milyo suggests, is inappropriate. Voters are not given the choice of paying for only a portion of an EIC if they only vote in this year's elections. The investment in voting is sunk and irreversible—a voter cannot recover a portion of the cost of an EIC if she does not vote in a future election.

    c.  The benefits of voting in future elections would need to be discounted in deciding how much of the costs should be allocated to each election. Because we value things less in the future than the same things today, the value of voting in later elections is less than the value of voting sooner. This, in turn, means that the value of voting or, equivalently, the share of costs allocated to later elections should be less than the share of costs allocated to nearer term elections.

15.  For example, suppose that a voter goes to the polls in one election a year for six years. For the first election, she must pay the costs of obtaining an EIC. But, from the perspective of the first vote, she would not value the benefits of voting in the 6th year as highly she values the first vote. Consequently, a greater share of the costs should be allocated to the nearer-term elections.

16.  Voters are not indifferent between paying for an ID now or in the future—they would always prefer to delay payment. But because they must pay the costs of getting an ID now, the costs in the future are higher today than if those costs were paid in the future.[34]

---

[33]  Milyo, ¶ 122.

[34]  For example, pay day loans often carry implied interest rates in excess of 300% per year. Nathalie Martin and Ernesto Longa, "High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Class?," available at: http://ssrn.com/abstract=2145598. A voter that relies on pay day loans would pay an implicit value of $18 in interest for every $1 in costs over the course of the 6 years she used the EIC to vote. 300% of $1 is $3; over 6 years the total interest costs would be $18. Although this calculus would not apply to all voters, it would be more likely to apply to a minority voter than a white voter because minority voters are more likely to use pay day loan services.

# IV. Concerns Raised About Burden

## IV.A.   TRAVEL COST COMPARISONS

17. Professor Milyo argues that because my estimated travel costs of getting to an EIC issuing office are higher for white Affected Registered Voters than for African-American Affected Registered Voters, and because there are more white than African-American Affected Registered Voters, my analysis contradicts "claims made by several experts that travel costs are higher for minority voters than for white voters in Texas."[35]  This is incorrect and fundamentally misunderstands my analysis.

18. The other Plaintiff experts in this case perform alternative analyses that are not directly comparable to mine, in part because they focus directly on measures of time and not economic costs.[36]  Importantly, their travel-time calculations support my conclusions that African-American registered voters in Texas are more burdened by SB 14 than white registered voters in Texas.[37]  My analysis, in contrast, measures economic costs and places the burden in an economically-based context.  Nevertheless, my calculations of travel costs are based on an estimation that includes African-American Texans spending significantly more time traveling than white Texans: 85 minutes on average for African-American Texans compared to 38 minutes on average for white Texans.[38]  Consequently, on the metric preferred by the other Plaintiff experts—travel time—my analysis reinforces rather than contradicts their claims.

19. More importantly, Professor Milyo ignores *why* the nominal dollar travel costs are lower on average for African-American Texans than for white Texans—African Americans in Texas earn on average $13.69 per hour whereas white Texans earn on average $23.08 per hour.[39]  As explained in my Report, the relatively lower wage rate for African Americans skews their transport choice toward public transportation and walking.  This can be seen in Table 5:  41% of African-American Texans would choose public transport and 15% would choose walking as compared to white Texans, who choose public transportation 14% of the

---

[35]  Milyo, ¶ 116.

[36]  Chatman Declaration; Webster Declaration.

[37]  Chatman, p. 33; Webster, p. 50.

[38]  Amended Bazelon Report, Table 6.  In my initial Report the average travel time was 81 minutes for African American Texans and 37 minutes for white Texans.

[39]  Bazelon Report, Table 3.

time and walking 7% of the time.[40]   The lower value of nominal travel costs for African-American Texans in Table 6 of my Report reflects both a significantly lower wage for time spent traveling and lower out of pocket travel costs (for public transport or walking) compared to white Texans, whose higher wages lead them to take more expensive trips by car (valued at the opportunity cost of a taxi.)

20.   But more fundamentally, Professor Milyo misses the point by comparing the nominal dollar costs between different races.   My understanding is that one of the questions before the Court is whether the *burden*, not the cost, imposed by SB 14 on groups of voters, such as African-American Texans, is different than the burden imposed on other groups, such as white Texans.   Other than one (incorrect) theoretical point, neither of the experts for the Defense mentions, much less addresses, my analysis of the burden imposed by SB 14.   Section VIII of my initial report illustrates why the costs imposed on African-American Texans by SB 14 are more burdensome than for white Texans.   In that analysis I conclude: "For only the travel-cost portion of the burden created by SB 14, an African-American Affected Registered Voter is required to expend a share of their wealth that is more than four times higher than the share required for a white Texan."[41]

### IV.B.   SIGNIFICANCE OF THE LEVEL OF COSTS

21.   Both Professor Milyo and Professor Hood argue that any costs imposed by SB 14 are not burdensome.   I disagree and show that the costs are burdensome.   I estimate that the average travel costs associated with obtaining an EIC, across all Affected Registered Voters, is $36.33.[42]   As discussed in my initial report, this estimate does not include all of the costs that might be incurred in obtaining an EIC.[43]   The average travel cost of $36.33 is 149% of average hourly earnings.   When, in 1966, the Supreme Court found a poll tax of $1.75 in Texas an undue burden, that amount was only 69% of average hourly earnings.[44]   Clearly, the burden estimated in terms of travel costs alone is sufficient to be considered a barrier to voting.

---

[40]   Bazelon Report, Table 5.

[41]   Bazelon Report, ¶ 71.

[42]   Bazelon Report, Table 6.

[43]   Bazelon Report, Section VII.D.

[44]   In *Harper v. Virginia*, the court said, "We conclude that a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard. Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax."  383 U.S. 663, 666 (1966).

**Table 1: Comparison of Voting Burdens Versus Wages**

|  |  | 1966 | 2014 |
|---|---|---|---|
| Average Hourly Earnings | [1] | $2.52 |  |
| Texas Poll Tax | [2] | $1.75 |  |
|  |  |  |  |
| Average Hourly Earnings | [3] |  | $24.38 |
| Travel Cost Burden | [4] |  | $36.33 |
|  |  |  |  |
| Percentage | [5] | 69.4% | 149.0% |

Notes and Sources:

[1] & [3]: BLS total private sector average hourly earnings
     for February 1966 and May 2014.
[2]: Poll tax at date of repeal in 1966, *United States v.
     Texas* (1966).
[4]: Average total burden of travel cost for all registered voters
     to obtain EIC, based on Brattle analysis.
[5]: For 1966, [2]/[1]. For 2014, [4]/[3].

## IV.C.   VALIDITY OF WELFARE COMPARISONS

22.   Professor Milyo claims that my burden analysis is theoretically invalid because I compare the relative utility of money of wealthier versus less wealthy individuals. He mistakenly claims that in doing so, I am using cardinal utility estimates where the utility level of one individual is directly compared to another individual. My comparison of relative burdens compares *changes* in wealth (in the form of the costs of obtaining an EIC) rather than *total* utility of individuals. Rather than making direct comparisons of how much a white or African-American Texan values a dollar, I avoid direct interpersonal utility comparisons by expressing the travel-cost portion of obtaining an EIC in terms of the average wealth of each racial group.

23.   Professor Milyo is correct that economic theory has trouble comparing how two individuals value a dollar. Nevertheless, economic theory is unambiguous that an individual with higher wealth will value a dollar less than that individual would with lower wealth. Consequently, in assessing burden, we do not have a basis for comparing the burden of a dollar lost between two *random* or *equally situated* people, but do know that for any given person having a lower income implies a greater burden from a lost dollar.

24.   In my Report I express the costs of obtaining an EIC as a share of wealth to extrapolate from the technical issues of interpersonal comparison that Professor Milyo raises. To defeat my conclusions on relative burden, Professor Milyo would have to argue that white Texans

get more—much more—benefit from an additional dollar than African-American Texans. In fact, he would have to argue that a white Texan, who is on average 7 times wealthier than an African-American Texan, feels the pain of losing a small share of her income more than 4 times as much as a less wealthy African-American Texan would feel from losing the same share of her (smaller) wealth. This seems a completely implausible argument to make.[45]

## IV.D.  CALCULUS OF VOTING

25.  As a threshold matter, Professors Milyo and Hood seem to believe that the only way to show harm in this matter is through statistically significant changes in voter turnout.[46] That is not my understanding of the appropriate measure of harm. Rather, the question at hand is whether or not SB 14 creates different burdens for different groups of voters, such as African American versus white Texans. Therefore, Professor Milyo's criticism that I, and the other Plaintiff experts, did not focus on voter turnout is misplaced.

26.  Professor Milyo helpfully explains that the calculus of voting weighs the costs and benefits of voting and that the literature recognizes that one of the benefits is what he calls "the non-instrumental value of voting."[47] He goes on to say:

> Importantly, under the modified theory of voting, a small change in the cost of voting is expected to result in some small reduction in turnout. This is because in general, not everyone will be just barely motivated to vote and therefore hypersensitive to small changes. … Consequently, this modified theory does imply that the costs of voting are related to turnout, but the model does not generate the dramatic prediction that even a small change in the cost of voting will result in a large change in turnout."[48]

27.  Of course, even if changing the results of an election was the correct standard, a change in turnout that changes the results of an election does not have to be large. More importantly,

---

[45]  To illustrate with round, hypothetical numbers, Professor Milyo would have to argue that an individual with $100,000 in the bank would be more burdened by losing $100 than an individual with $15,000 in the bank would be burdened with losing $60, which assumes the share of wealth lost is 4 times as much for the lower wealth individual.

[46]  Milyo, Section VIII & ¶ 153; Hood, p. 9.

[47]  Milyo, ¶ 133.

[48]  Milyo, ¶ 134.

Professor Milyo's suggestion that I implied that the calculus of voting theory suggests that a small change in costs would "generate the dramatic prediction" of a "large change in turnout" is simply a straw man argument.

28. Professor Milyo suggests that the lack of statistically significant changes in voter turnout indicates that there must be benefits of SB 14 that offset the costs. This would depend crucially on the nature of those benefits.

29. First, Professor Milyo suggests that increasing confidence in the election process may be one offsetting benefit.[49] The Court's opinion in the recent Wisconsin decision suggests the opposite—that voter ID laws "undermine the public's confidence in the electoral process as much as they promote it."[50]

30. Second, Professor Milyo suggests that any increases in the "salience" of voting from SB 14 would create benefits. But this surely depends on how SB 14 increases salience. Voter education efforts are laudable, but if groups of voters derive a greater benefit from voting (that justifies bearing a greater cost to vote) in reaction to perceiving their right to vote being under attack, then it seems inappropriate to count that perceived attack as a benefit that off-sets the costs imposed by the law.

31. Other so-called benefits offered by Professor Milyo are more properly called efforts to mitigate harm and should not be counted as benefits of SB 14. For example, he suggests that voter ID laws may motivate advocacy groups to increase voter mobilization efforts.[51] Such efforts, however, do not change the burden created by SB 14. Even if a philanthropist paid all the costs, including opportunity cost of time, for all Affected Registered Voters to acquire ID to vote, we would not say that SB 14 did not create a burden on the Affected Registered Voters; rather we would say that the burden created by SB 14 was compensated for by the philanthropist.

---

[49] Milyo, ¶ 149.

[50] Frank v. Walker, 2014 WL 1775432, at *18 (E.D.Wis. Apr. 29, 2014).

[51] Milyo, ¶ 149.

Respectfully submitted,

Date: September 21, 2014

Coleman Bazelon, Ph.D.

# Appendix A – Explanation of Revisions to My Original Report

32. Following the submission of my original report, the State of Texas provided the DOJ with an updated list of records from the Texas Department of Public Service (DPS). It is my understanding that the DOJ used this list to identify additional individuals in the TEAM database who have an eligible ID. Such individuals would not be Affected Registered Voters, and, to the extent that they were not previously matched to one of the other state or Federal ID databases, this new information would decrease the number of Affected Registered Voters in my analysis.

33. The DOJ provided me with an updated list of matches for each of the databases to the TEAM database. I have examined this information and identified 562,348 registered voters that I had previously coded as Affected Registered Voters that would now be coded as "matched," *i.e.*, not needing to obtain an ID in order to vote. I now estimate there to be 541,143 (previously 1,103,491) Affected Registered Voters overall. The number of African-American Registered Voters falls to 95,393 (previously 185,095), and the associated Affected share of African-American Registered Voters falls to 5.5% (previously 10.7%). The number of white Registered Voters falls to 241,812 (previously 530,636), and the associated Affected share of white Registered Voters falls to 3.1% (previously 6.9%).

34. My Amended Report shows that African-American Registered Voters are still disproportionately more likely to be affected by SB 14, with a differential in the share of Affected Registered Voters of 2.4 percentage points. The odds ratio between African-American and white Registered Voters is 1.81, meaning that among registered voters, African-American registered voters are 1.81 times more likely to require an ID in order to vote than are white registered voters.

35. In the course of updating my Report, I discovered an error in the way that matched, deceased voters were incorporated into my analysis. This error caused me to overstate the values in column [B] of Table 1 of my original report by 4,703 voters. It had no impact on my estimates of Affected Registered Voters and an immaterial impact on my estimate of the Affected Share of Registered Voters. A version of Table 1 of my original report, correcting for this error but not incorporating the new DPS information, is provided below (as Table 2 of this reply report). Table 2 is meant only to describe the effect of the error on my original report, showing that it had no material effect on my racial disparity results. This error is not present in my Amended Report.

**Table 2: Corrected Table 1 of Original Report, Before Supplemental DOJ Data Submission**

| | All Texans | All Registered Texan Voters | | All Affected Registered Texan Voters | Affected Share of Registered Voters |
|---|---|---|---|---|---|
| | [A] | [B] | | [C] | [D] |
| African American | 2,835,493 | 1,722,452 | | 185,095 | 10.7% |
| White | 11,311,834 | 7,689,234 | | 530,636 | 6.9% |
| Hispanic | 9,389,496 | 3,386,737 | | 350,224 | 10.3% |
| | | | | | |
| All | 24,932,741 | 13,354,912 | *EIC required* | 1,103,491 | 8.3% |
| | | | *EIC required, or disability exempt* | 1,232,231 | 9.2% |

Notes and Sources:

U.S. Census Bureau 2010 population counts; U.S. Census Bureau, Current Population Survey, November 2012; TEAM database.

[B]: TEAM consists of a total of 13,564,410 voters, of whom 13,515,665 were not known to be deceased; 13,411,173 of these voters have addresses or zipcodes that are able to be mapped to Census Block Groups; 13,354,912 of these voters map to Census Block Groups without prisons.

[C]: Results of DOJ Matching data.

[D]: [C] / [B].

# Appendix B – Materials Relied Upon

## Articles and Book Chapters

1. Nathalie Martin and Ernesto Longa, "High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Class?" *Loyola Consumer Law Review,* 24 (4), 2012, p. 524. Available at: http://ssrn.com/abstract=2145598.

## Court Documents

2. "Expert Report of Coleman Bazelon," On Behalf of Plaintiff-Intervenors Texas League of Young Voters Education Fund and Imani Clark" In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

3. "Rebuttal Declaration of Jeffrey Milyo," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193, August 1, 2014.

4. "Rebuttal Declaration of M.V. Hood III," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), August 1, 2014.

5. "Declaration of Stephen D. Ansolabehere," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), July 1, 2014.

6. "Report of Daniel G. Chatman, Ph.D.," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

7. "Report of Gerald R. Webster, Ph.D.," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

8. *Harper v. Virginia,* 383 U.S. 663, 666 (1966).

9. *Frank v. Walker,* 2014 WL 1775432, at *18 (E.D.Wis. Apr. 29, 2014).

10. *United States v. Texas,* 252 F.Supp. 234 (1966).

## Databases

11. Department of Justice Matching Data

12. "Table B-3. Average hourly and weekly earnings of all employees on private nonfarm payrolls by industry sector, seasonally adjusted," U.S. Bureau of Labor Statistics Economic News Release, August 01, 2014, retrieved from < http://data.bls.gov/cgi-bin/print.pl/news.release/empsit.t19.htm> (accessed 08/15/14).

13. National Employment, Hours, and Earnings Series (SIC) EES00500006, Bureau of Labor Statistics, retrieved from < http://data.bls.gov/pdq/querytool.jsp?survey=ee> (accessed 08/08/14).

## Other Sources

14. "American Indians in Texas," Texas Almanac, retrieved from <http://www.texasalmanac.com/topics/culture/american-indian/american-indian> (accessed 08/15/14).

**Exhibit A: Amended Expert Report of Coleman Bazelon**