PL760
9/2/2014
2:13-cv-00193

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| TEXAS LEAGUE OF YOUNG VOTERS | ) |
| EDUCATION FUND; and IMANI CLARK, | )  Civ. No. 2:13-cv-00263 |
| | ) |
| *Plaintiff-Intervenors*, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE OF TEXAS; NANDITA BERRY, in | ) |
| her official capacity as Texas Secretary of | ) |
| State; and STEVE McCRAW, in his official | ) |
| capacity as Director of the Texas Department | ) |
| of Public Safety, | ) |
| | ) |
| *Defendants.* | ) |

## EXPERT REPORT
## OF
## Orville Vernon Burton, Ph.D.

## ON BEHALF OF PLAINTIFF-INTERVENORS THE TEXAS LEAGUE OF
## YOUNG VOTERS EDUCATION FUND AND IMANI CLARK

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................... 1

II.    QUALIFICATIONS AND PROCESS ...................................................................... 2

  A.    Professional Background and Experience ............................................................ 2

  B.    Statement of Inquiry and Description of Sources and Method ........................ 4

III.    THE TOTALITY OF THE CIRCUMSTANCES ..................................................... 5

  A.    Senate Factor 1: The History of Official Discrimination in Texas Voting ..................... 5

    1.    All-white primary elections (1895-1944) ................................................... 6

    2.    Discriminatory Literacy and Polling Place Requirements (1905-1970) ......................... 9

    3.    The Poll Tax (1902-1966) ................................................................. 10

    4.    Voter Registration Requirements / Purging (1966-1976) ............................... 13

    5.    Redistricting (1970-2014) ................................................................. 14

    6.    Waller County, Texas, and African-American students (1971-2008) ...................... 16

    7.    Voter Intimidation by Local Poll Officials and Police Officers in Texas .................... 19

  B.    Senate Factor 5: Racial Disparities in Socioeconomic Areas of Life ........................... 21

    1.    Education .................................................................................... 21

    2.    Employment ................................................................................ 26

    3.    Housing ..................................................................................... 27

    4.    Transportation .............................................................................. 32

  C.    Senate Factor 6: Racial Appeals in Political Campaigns in Texas ............................. 33

    1.    Racial Appeals in American Politics (1960s-1990s) ....................................... 33

    2.    Racial Appeals in Texas Politics (2008-2014) ............................................ 35

    3.    Racial Appeals and Voter Identification Laws in Texas ................................... 39

  D.    Senate Factor 9: "Voter Fraud" as a Rationale for SB 14 is Tenuous ......................... 41

IV.    CONCLUSION ...................................................................................................... 43

  A.    SB 14 Results in Discrimination Because of Race. ...................................... 44

  B.    SB 14 is Racially Discriminatory. ....................................................... 49

Exhibit 1:    "Birds of a Feather Flock Together," Austin, TX: Empower Texans, 2008.

Exhibit 2:    "Don't be a victim of voter fraud," Dallas, TX: Unknown, 2008.

Exhibit 3:    "The Great Pretender," Arlington, TX: Bill Zedler Campaign, 2008.

Appendices

Appendix A: Orville Vernon Burton, Biography and Curriculum Vitae................................ 1A

Appendix B: Passage and Implementation of Voter ID Legislation in Texas .........................1B

Appendix C: Materials Relied Upon..........................................................................................1C

## I.  INTRODUCTION

I was asked by the NAACP Legal Defense and Educational Fund, Inc. ("LDF") to render an expert opinion regarding Senate Bill 14 (SB 14), the voter photo identification (ID) law passed by the State of Texas's 82nd legislature, signed by the Texas Governor in 2011, and implemented in 2013. My report assesses the social and historical conditions in Texas, including past and present official acts of racial discrimination, to determine whether SB 14 causes an inequality in opportunities for African Americans and other minorities in Texas to vote in-person and to otherwise participate in the electoral process. I conclude that, based on the totality of the circumstances, SB 14 results in the disproportionate disfranchisement of African-American and other minority voters because of race. Additionally, my analysis of the totality of the circumstances together with other factors related to the timing and legislative history of SB 14 strongly suggests that Texas enacted and implemented the law with discriminatory intent.

My analysis of the totality of the circumstances, which is based on the presence of Senate Factors 1, 5, 6, and 9, as well as related historical facts, shows that SB 14 limits the ability of African-American, Latino, and other minority voters to participate equally in Texas elections. Throughout its history and into the present, Texas has implemented various disfranchising devices similar to SB 14 in purpose and effect, including poll taxes and re-registration requirements. Each of these devices was later invalidated by either the Voting Rights Act or the U.S. Constitution and, like SB 14, these devices acted as discriminatory prerequisites to even casting a ballot. Also like SB 14, these predecessor "race-neutral" disfranchising devices erected unnecessarily restrictive barriers to lawful African-American and minority voters' access to the ballot and relied on socioeconomic disparities, which themselves sprang from Texas's state-sponsorship of racial discrimination, to disproportionately prevent minorities from voting. Today, SB 14 inter-

1

acts with racial disparities in education, employment, housing, and transportation to substantially burden African-American and minority voters who must overcome significantly more financial and logistical difficulties to comply with SB 14. Moreover, Texas's stated impetus for passing SB 14, *i.e.*, the prevention of "voter fraud," is not a novel pretext for discrimination: it is the very same rationale that Texas has repeatedly used to pass laws that disfranchise minority voters.

Thus, SB 14 represents a modern day continuation of Texas's longstanding practice of passing election laws that make it harder for African-American and other minority citizens to vote. As my report demonstrates, the broader social and historical conditions in Texas result in African Americans and other minorities disproportionately bearing the adverse effects of SB 14 because of their race. The report also concludes that these discriminatory results are intentional.

## II. QUALIFICATIONS AND PROCESS

### A.    Professional Background and Experience

I am Creativity Professor of Humanities, History, Sociology, and Computer Science at Clemson University, as well as the Director of the Clemson CyberInstitute. From 2008 to 2010, I was the Burroughs Distinguished Professor of Southern History and Culture at Coastal Carolina University. I am emeritus University Distinguished Teacher/Scholar, University Scholar, Professor of History, African American Studies, and Sociology at the University of Illinois. My research and writing focus on American History and particularly on race relations. For the past four decades I have taught courses in U.S. History, Southern History, race and politics, the civil rights movement, race relations, discrimination, ethnicity, family, and community. I am a Senior Research Scientist at the National Center for Supercomputing Applications (NCSA) where I was Associate Director for Humanities and Social Sciences (2004-2010). I was also the founding Di-

rector of the Institute for Computing in Humanities, Arts, and Social Science (I-CHASS) at the University of Illinois, and currently chair the Advisory Board.

I have been recognized by my peers and was elected president of the Southern Historical Association and of the Agricultural History Society and elected to the Society of American Historians. I was also elected as president of Faculty Senate at the University of Illinois and for the three-campus University Senate conferences.

I have extensive experience in analyzing social and economic status, discrimination, and intent in voting rights cases and group voting behavior. I have been qualified as an expert in the fields of districting, reapportionment, and racial voting patterns and behavior in elections in the United States. I have been retained to serve as an expert witness and consultant in numerous voting rights cases by the Voting Section of the Division of Civil Rights of the United States DOJ, the Voting Rights Project of the Southern Regional Office of the American Civil Liberties Union, the Brennan Center, the NAACP, the Mexican American Legal Defense and Educational Fund, the California Rural Legal Association, the League of United Latin American Citizens, the Lawyers' Committee for Civil Rights Under Law, the Legal Services Corporation, and other individuals and groups. A detailed record of my professional qualifications is set forth in Appendix A, attached "Orville Vernon Burton, Biography and Curriculum Vitae." I am being compensated at my customary rate of $200 per hour for my work on this report, including any deposition testimony or testimony in court, however, I have agreed to limit total compensation in this matter.

To the best of my knowledge and memory, in the last five years I have given testimony and/or depositions in the following cases: (i) *Perez v. Perry* (case number 11CV00360 W.D. Tex.); (ii) *South Carolina v. United States* (case number 1:12-cv-00203 D.D.C.); and (iii) in 2012, in the habeas proceeding of Albert Woodfox (case number 3:06-00789 M.D. La.).

## B.     Statement of Inquiry and Description of Sources and Method

I have examined a wide range of sources, including published works by historians, political scientists, and sociologists, newspapers, census reports, trial transcripts, deposition transcripts, legislative journals, and other government documents and reports. (*See* Appendix C: Materials Relied Upon). Particularly important to my investigation was the previous trial records both for the latest round of redistricting where the court found that there was purposeful intent to dilute the votes of people of color, *Texas v. United States* (case number 11-1303 D.D.C.), and also Texas's suit seeking judicial preclearance of SB 14, *Texas v. Holder* (case number 12-cv-128 D.D.C.). Especially useful were expert witness reports from those cases. I also studied emails, blogs, and materials prepared by different organizations about the voter ID law, press releases from legislators, and reports from special interest groups, election data, and campaign ads, both TV commercials and mailings. For the most part, I gathered these materials independently or with the help of my research assistant, Beatrice Burton, a History Ph.D. candidate and independent scholar. In some cases I requested specific documents which were supplied by the attorneys for the Plaintiff-Intervenors.

In preparing my report and my testimony in this case, I used sources that social scientists commonly consult in investigating questions of this nature. The methodology that I have employed in preparing my report is the same methodology experts in the fields of history and sociology regularly employ when examining issues of the sort investigated here. Historians are trained to determine motivation and intent. In investigating motivating factors of a particular act of legislation, historians look carefully at the historical background of the decision and consider and evaluate the views expressed by decision-makers on related issues. Historians study the specific sequence of events leading to the decision (including whether there has

been a departure from the usual practices or procedures of the decision-making body), and finally, analyze the anticipated or foreseen effect of the change. My selection and use of sources and methodology for determining that SB 14 results in discrimination "because of race" are consistent with the accepted standards of the field.

## III. THE TOTALITY OF THE CIRCUMSTANCES

In assessing the totality of the circumstances, I have used assumptions, methods, and analytical principles consistent with those employed by historians to determine a law's effect. In 1982, with the 25-year renewal of the Voting Rights Act, the Senate Judiciary Committee issued a report to accompany the amended Section 2, generally referred to as the Senate Report. The U.S. Supreme Court has called the Senate Report "the authoritative source" on the meaning of the amended statute. The Senate Report identified factors, taken from the Supreme Court's analysis in *White v. Regester,* and the Fifth Circuit's related decision in *Zimmer v. McKeithen*, that are now commonly called "Senate Factors." The Senate Factors provide a way of organizing an independently verifiable historical/sociological analysis. Relying on Senate Factors 1, 5, 6, and 9, I conclude that SB 14 interacts with historical and social conditions in a way that disproportionally affects the ability of minorities to participate in the political process on account of their race. From my totality of the circumstances analysis, the timing and legislative history of SB 14, and other factors, I infer that SB 14 was enacted and implemented with a discriminatory intent.

### A.    Senate Factor 1: The History of Official Discrimination in Texas Voting

The atmosphere that led to the enactment of SB 14 can only be fully understood in the context of Texas's longstanding official sponsorship and enforcement of various racially discriminatory voting devices. "Texas has a long history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in

the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history."[1] This history stretches back to the late nineteenth century, when voter registration requirements were first used in Texas and elsewhere to disfranchise formerly enslaved African Americans who were often required, but unable, to answer, questions of election officials about their identity, since many did not know their exact age or place of birth.[2] Since then, Texas "has been a major battleground on which the struggle over minority voting rights has occurred."[3] In many ways, SB 14 acts as a modern-day version of the poll tax, restrictive voter registration laws, and similar devices.

### 1.  All-white primary elections (1895-1944)

The all-white primary came on the heels of the end of Reconstruction, a time when emancipated slaves and other minority men first gained access to the ballot. For half a century, the all-white primary elections in Texas served as an outright prohibition for African Americans and other minority voters to participate in state general elections.[4] As a traditional practice, this method of disfranchisement started in the 1890s. Not coincidentally, the 1890s also saw the Democratic Party's rule threatened by the Populist Party, a multiracial coalition of poorer voters.

---

[1] *League of United Latin American Citizens v. Perry*, 548 US 399, 439-440 (2006) (quoting *Vera v. Richards*, 861 F. Supp. 1304, 1317 (SD Tex. 1994)).

    Notably, my own expert witness report for the NAACP and LULAC from the 2003 redistricting trial is available as part of the record before Congress in regard to the 2006 Reauthorization Act: see *Voting Rights Act: Evidence of Continued Need: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. Volume III 3063-3090 (2006).

[2] Brief Amici Curiae Of Historians And Other Scholars In Support Of Petitioners," *Crawford v. Marion County Election Board et al.* p. 7, 9; see also Minnite, *The Myth of Voter Fraud*, p. 25. ("[V]oter registration requirements were designed and used to block voting by certain groups of people.").

[3] Robert Brischetto et al., "Texas," in *Quiet Revolution in the South: The Impact of the Voting Rights Act* ed. Chandler Davis and Bernard Grofman (Princeton: Princeton University Press, 1994), 233..

[4] Brischetto et al., "Texas," 236-39 has an excellent summary of the white primary, and table 8.9, Major Disfranchising Devices in Texas, p. 269 features the white primary.

The rise of the white primary in Texas began in 1895 when the Texas legislature first supported efforts to pass a law requiring political parties to hold primary elections.[5] In doing so, Texas recognized political parties as a functional segment of the State's governmental machinery. Political parties also could set their own racist qualifications for who could participate in the primaries. The Terrell Election Law of 1905 formalized this loose system: Texas state law now encouraged both of the major parties, and the county election committees, to more widely adopt the then-existing voter qualifications that directly barred African-American and other minority voters from primary elections.[6]

Because of restrictive voter qualifications, by the early twentieth century, the Democratic Party was the only relevant party in Texas, so keeping African-American and other minority voters out of the Democratic primary amounted to total disfranchisement.[7] Professor David Montejano writes that one of the stated purposes of the Terrell Law was to prevent opening "the flood gates for illegal voting as one person could buy up the Mexican and Negro votes," *i.e.*, to prevent *voter fraud*. The effective result of the all-white primary system, however, writes Montejano, was to prevent legitimate minority voters from participating in the nomination process in Texas. For example, the Dimmit County newspaper reported on 12 June 1914 that the "White Man's Primary Association," as the local white primary system was known, "absolutely eliminates the Mexican vote as a factor in nominating county candidates, though we graciously grant the Mexican the privilege of voting for them afterwards."[8] Thus, under the guise of preventing "fraud,"

---

[5] Henry Allen Bullock, "The Expansion of Negro Suffrage in Texas," (*The Journal of Negro Education: 1957*), 370.
[6] Brischetto et al., "Texas," 235, 237 n.37; J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (New Haven: Yale University Press, 1974), 208
[7] See Table 8.9 in Brischetto et. al., "Texas," 269.
[8] David Montejano, *Anglos and Mexicans in the Making of Texas, 1836-1986* (Austin: University of Texas Press, 1987), 143-47.

white primary laws also permitted white Democrats to control the votes of registered, but effectively disfranchised, minority voters during the primary elections.

In 1918, African Americans first successfully challenged a nonpartisan white primary system in Waco, Texas.[9] In response, the Texas State legislature in 1922 enacted a law providing that any "qualified elector under the laws of the Constitution (Texas) who is a Democrat shall be eligible to participate in Democratic primaries, but in no event shall a [N]egro participate in a Democratic primary in the State of Texas, and ballots cast by Negroes are void."[10] Any person voting in a party primary had to affirm "I am a white and I am a Democrat."[11]

In 1924, African Americans filed a federal lawsuit to stop the enforcement the 1922 statute on the grounds that it violated the Fourteenth and Fifteenth Amendments and prevent Texas from drawing a tighter stranglehold on African-American suffrage. The U.S. Supreme Court in 1927 declared the Texas statute unconstitutional.[12] The Texas legislature immediately responded by stipulating that every political party in the state, through its Executive Committee, "shall in its own way determine who shall be qualified to vote or otherwise participate in such political party."[13] Promptly thereafter, the Democratic Party again banned all non-white voters from the party's primary elections.[14] The new law barred African-American and Latino voters alike. As M. C. Gonzalez, a founder of League of United Latin American Citizens, noted in 1929, "the estab-

---

[9] Brischetto et al., "Texas," 237.

[10] Henry Allen Bullock, "The Expansion of Negro Suffrage in Texas," (*The Journal of Negro Education: 1957*), 370-71; Mark V. Tushnet, *Making Civil Rights Law: Thurgood Marshall and the Supreme Court, 1936-1961* (New York: Oxford University Press, 1994), 100. For more on the all-white primary, see Tushnet, *Making Civil Rights Law*, 100-2, 104-7, 109-12 and Darlene Clark Hine, *Black Victory: The Rise and Fall of the White Primary in Texas* (Columbia, MO: University of Missouri Press, 2003).

[11] Alwyn Barr, *Reconstruction to Reform: Texas Politics, 1876-1906* (Austin: University of Texas, 1971); Patrick G. Williams, "Suffrage Restrictions in Post-Reconstruction Texas: Urban Politics and the Specter of the Commune," *Journal of Southern History* Vol. 68, No.1 (Feb. 2002).

[12] *Nixon v. Herndon*, 273 U.S. 536 (1927).

[13] Henry Allen Bullock, "The Expansion of Negro Suffrage in Texas," (*The Journal of Negro Education: 1957*), 370-71.

[14] Brischetto et al., "Texas," 238.

lishment of 'white man's' primaries to prevent [B]lacks and Mexican Americans from exercising their right to vote" was a significant burden faced by Latinos in the 1920s. Not until 1944 did the Supreme Court also rule this form of the Texas white primary laws unconstitutional.[15]

## 2. Discriminatory Literacy and Polling Place Requirements (1905-1970)

At the same time when Texas implemented the all-white primary, the state also disfranchised African-American and Latino voters through secret ballots and polling place laws that restricted or barred assistance for illiterate voters. The Terrell Election Law of 1903 first established the secret ballot in Texas, but still allowed white Democratic partisan election judges to "assist" illiterate voters with reading and completing their ballots.[16] Prior to that, political parties would print ballots and hand them out to supporters.[17] Enslaved African Americans had largely been prohibited from learning to read,[18] and, after the Civil War, educational opportunities for African Americans remained severely limited[19] and racially segregated.[20] So the racial impact of the new secret ballot law upon its enactment was clear: in 1900, 45.1% of adult African-American men were illiterate; by comparison only 8.6% of white men in Texas were illiterate.[21] Thus, those African Americans who could not navigate complex ballots alone were largely disfranchised.

Texas polling place laws later went even further, fully prohibiting an illiterate person

---

[15] Brischetto et. al., "Texas," 237-39, quote 237-38; Montejano, *Anglos and Mexicans*, 143-45; Davidson, Expert Report, *Vera v. Richards*, 7; *Smith v. Allwright*, 321 U.S. 649 (1944).

[16] Kousser, *Shaping of Southern Politics*, 208

[17] Kousser, *Shaping of Southern Politics*, 50

[18] "Although Texas had no law against the education of slaves as did most southern states, opposition to their instruction produced a black population over 95 percent illiterate at the end of the Civil War." Alwyn Barr, *Black Texans: A History of African Americans in Texas, 1528-1995* (Norman, OK: University of Oklahoma Press, 1996), 23.

[19] Alwyn Barr, *Black Texans*, 64-65.

[20] The 1875 Texas Constitution stated that "Separate schools shall be provided for the white and colored children, and impartial provision shall be made for both." *Constitution of the State of Texas, Adopted by the Constitutional Convention, Begun and Held at the City of Austin, on the Sixth Day of September, 1875.* Official. Galveston: Printed at the "News" Steam Book and Job Establishment. [1875.] p. 14.

[21] Kousser, *Shaping of Southern Politics* 55 (Table 2.1).

from receiving *any* help with voting.[22] Latino and other citizens who did not speak English fared no better under Texas laws. According to Montejano, "in 1918, the legislature passed a law eliminating the interpreter at the voting polls and stipulating, moreover, that no naturalized citizens could receive assistance from the election judge unless they had been citizens for twenty-one years."[23]

It was not until 1970 that a federal court invalidated these restrictions on assistance for illiterate voters as unconstitutional. As that court held: "We cannot perceive how exercise of the 'fundamental right to vote' . . . can be more than an empty ritual if the right itself does not include the right to be informed of the effect that a given physical act of voting will produce."[24]

### 3. The Poll Tax (1902-1966)

The poll tax was also a critical part of Texas's system of disfranchisement. In 1902, after the growing, multiracial Populist coalition emerged in the 1890s as a political threat to the Democrats, the Texas legislature passed a state constitutional amendment requiring the payment of a poll tax as a prerequisite for voting. As one of Texas's primary disfranchising devices, the poll tax was aimed directly at African Americans, but also adversely affected other minorities and poor whites who were Populist sympathizers. Because minority voters were disproportionately poor, the cost of paying the poll tax kept their registration and turnout rates low for much of the twentieth century. The poll tax, equivalent to $15.48 in today's dollars, cost some African-American and Mexican laborers in Texas most of a day's wage.[25]

---

[22] *Garza v. Smith*, 320 F. Supp. 131, 131-33 (W.D.Tex.1970), *vacated and remanded*, 401 U.S. 1006 (1971), *appeal dismissed for lack of jurisdiction*, 450 F.2d 790 (5th Cir. 1971); Montejano, *Anglos and Mexicans*, 143.
[23] Montejano, *Anglos and Mexicans in the Making of Texas*, 143.
[24] *Garza*, 320 F. Supp. at 133-39.
[25] Brischetto et. al., "Texas, " 239-40 has a good summary of the poll tax in Texas; Davidson, "Expert Report," 12.

As with SB 14 in 2011, the creation of a poll tax was justified as a means of preventing voter fraud. A.W. Terrell, the chief architect of the Texas poll tax,[26] summarized the pretext for poll taxes: that they would "protect the citizen against machine politics, convention dictation, and corrupt methods at the polls."[27] The view at the time was that, because it costs nothing to cast a ballot, "votes are quite cheap" and were "frequently sold for a trifle." Forcing each voter to pay a poll tax increased "value" of the vote made it more difficult for "political machines," *i.e.*, any political movements that conservative Democrats viewed as a threat, to "buy" the votes of poor African-American and Latino voters.[28] "Proponents of the poll tax argued that the restriction would eliminate 'irresponsible' voters. Voting, according to these conservatives, was not a natural right, but a privilege which the state should deny to those unwilling to pay the tax."[29] An article in the *Houston Telegraph* argued: "Must the low, groveling, equal-before-the-law, lazy, purchasable Negro, who pays no taxes, have the privilege of neutralizing the vote of a good citizen and taxpayer? Ought the miserable apologies for men with white skins, who exercise the right to vote only because it furnishes them with whiskey, be allowed to vote, if they dont [*sic*] pay the state a pittance for its protection and the privileges afforded them?"[30] The poll tax was a means of eliminating "the thriftless, idle and semi-vagrant element of both races."[31] Stopping poor minorities and whites who were unable or unwilling to pay was justifiable because, argued supporters, the poll tax reduced fraud, and eliminated a "turbulent element which is always threatening our free institutions."[32] The threat of voter fraud was even used to excuse

---

[26] Davidson, Expert Report, *Vera v. Richards*, 21.

[27] A.W. Terrell, "Purity of Ballot," *Dallas Morning News,* March 8, 1906, p. 3.

[28] W.S. Vickrey, "Poll Tax Amendment Views," *Dallas Morning News,* October 26, 1902, 9.

[29] Kousser, *Shaping of Southern Politics*, 200.

[30] Lockwood, "Purity of the Ballot," *San Antonio Express,* July 21, 1902, vol. XXXII, issue 212, p. 10.

[31] Lawrence D. Rice, *The Negro in Texas, 1874-1900* (Baton Rouge: Louisiana State University Press, 1971), 133; Chandler Davidson, *Race and Class in Texas Politics* (Princeton: Princeton University Press, 1990), 21.

[32] Vickrey, "Poll Tax Amendment Views," *Dallas Morning News,* October 26, 1902, 9.

the failings of the law: "It is better than no law at all," one article pleaded, because "whatever else may be said of it, it will be found effectual to prevent fraud."[33]

Nonetheless, in a revealing *Houston Daily Post* article published 31 October 1902 entitled "The Poll Tax. Some Very Strong Reasons Why the Amendment Should Be Adopted," it is clear that the poll tax as a fraud prevention tool was a mere pretext to disguise poll tax supporters' true intent – to disfranchise African-American voters. In the article, E.G. Senter, newspaperman and eventual Democratic state senator, initially states that "the poll tax amendment to the constitution, if adopted by the people of the State at the coming general election, will preserve the purity and integrity of the ballot in this State." As he continues to argue for the adoption of the poll tax, however, it becomes clear that, for Senter, the primary justification for a poll tax is the suppression of African-American voters: "another and if possible, a more weighty reason why the poll tax amendment should be adopted is that it means the elimination of the race issue in politics… with two strong parties in Texas today, the negro would hold the balance of power."[34] Thus, preventing fraud was a pretext for the true discriminatory purpose: to minimize the minority vote so to ensure the dominance of the Democratic Party in Texas.

Through the mid-1960s, the poll tax continued to be viewed by some mainstream Texas politicians and newspapers as a legitimate means of preventing fraud, even as the poll tax's discriminatory impact on African-American voters was clear. For example, in 1963, efforts to repeal the poll tax in Texas were denounced as a communist plot.[35] In an article in the *Dallas Morning News*, Congressman Ed Gossett portrayed the poll tax as the last defense against fraudulent voting: "every pinko and every red in the country has always favored the elimination of

---

[33] "The Poll Tax Provision and the Election Law," *Dallas Morning News*, January 22, 1904, 6.
[34] E.G. Senter, "The Poll Tax. Some Very Strong Reasons Why the Amendment Should Be Adopted," *The Houston Daily Post,* October 31, 1902, 6.
[35] "The Real Issue," *The Dallas Morning News,* November 26, 1965, D2.

poll taxes. They would go further and eliminate all voting regulations and restrictions. Their reasons are obvious," he continued. "The poll tax has been some small defense, at least, against mass fraud, mass hysteria, mass ignorance, and mass indifference in the voters."[36]

By 1966, however, the poll tax's discriminatory impact was clear: of the eligible persons between the ages of 21 and 60 who were required to pay the poll tax, 57.3% of Anglo Texans and just 45.3% of African Americans had paid the tax.[37] In 1964, in part, in response to such discrimination, the Twenty-fourth Amendment to the U.S. Constitution was ratified, outlawing the poll tax for federal elections.[38] In 1966, a federal court ruled the poll tax unconstitutional, and found that one of its primary purposes had been "to disenfranchise the Negro."[39]

### 4. Voter Registration Requirements / Purging (1966-1976)

The 1965 enactment of the Voting Rights Act and the end of the poll tax in 1966 marked the potential for a substantial increase in African-American and Latino voter registration and participation in Texas. In response, the Texas legislature quickly moved to replace the poll tax with a restrictive annual re-registration requirement.[40] Texas Governor John Connally immediately called a special session of the Texas legislature to develop an annual re-registration system that a newspaper at the time described as "patterned on the old poll tax system, but minus the tax."[41] In 1966, only five states had annual re-registration requirements. Using the "old canard of turn-of-the-century disfranchisers," Connally argued that "on the subject of annual registration or permanent registration, this legislature by a two-thirds vote submitted to the people a Constitutional Amendment, to be voted upon in November, which states in part: '…before offering to vote at an

---

[36] "Poll Tax Defended by Gossett," *Dallas Morning News*, Section 4, p. 5, November 1, 1963.
[37] *United States v. State of Texas*, 252 F. Supp. 234, 245 (W.D. Tex. 1966).
[38] Bruce Ackerman and Jennifer Nou, "Canonizing the Civil Rights Revolution: The People and the Poll Tax," *Northwestern University Law Review* 103 (2009), see especially page 67.
[39] *United States v. State of Texas*, 252 F. Supp. 234, 245 (W.D. Tex. 1966), *aff'd* 384 U.S. 155 (1966).
[40] Brischetto et al, "Texas," 240.
[41] *Houston Telegraph*, October 10, 1875, also quoted in Kousser, *Shaping of Southern Politics*, 200.

13

election a voter shall have registered annually…' I agree with your position that annual registration is the most logical means of preventing fraud and guaranteeing the purity of the ballot box."[42] The re-registration law was declared unconstitutional in 1971 due to its substantial disfranchising effect.[43]

The following year, the state enacted a new voter purge law that would have required re-registration of the entire state electorate, a tactic that, despite Texas's proposals to minimize the problem, would have caused substantial difficulties for minority voters.[44] The extension of the Voting Rights Act's preclearance requirement to Texas in 1975, however, allowed the U.S. Department of Justice to object to the new purge law, which a federal court then enjoined.[45]

### 5.  Redistricting (1970-2014)

Since Reconstruction, when the newly restored white supremacist Democratic Party relied heavily on racially gerrymandered districts to dilute the voting power of African Americans and African-American supported Republicans in the State, Texas has routinely sought to disfranchise minority voters through the decennial redistricting process.[46] With the enactment of the Voting Rights Act in 1965 and the expected surge in minority voting power, the redistricting tactic again took center stage. In every redistricting cycle since 1970, Texas has been found by one or more federal courts, including the U.S. Supreme Court, to have violated the Voting Rights Act

---

[42] *The Journal of the House of Representatives of the First Called Session of the Fifty-Ninth Legislature of the State of Texas, Begun and Held at the City of Austin, February 14, 1966,* Connally quotation p. 7; Chandler Davidson, *Race and Class in Texas Politics* (Princeton: Princeton University Press, 1990), 51.

[43] Brischetto et al., "Texas," 240; citing 321 F. Supp. 1100 (S.D. Tex. 1971), aff'd sub nom *Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974); Davidson, *Race and Class in Texas Politics*, 51.

[44] Letter from J. Stanley Pottinger (U.S. Assistant Attorney General for the U.S. DOJ) to Mark White (Texas Secretary of State) 10 Dec. 1975, *available at* http://www.justice.gov/crt/records/vot/obj_letters/letters/TX/TX-1000.pdf.

[45] Brischetto et al., "Texas," 240.

[46] Brischetto et. al., "Texas," 240. The Texas legislature is required under one-person-one-vote rules to redistrict the Texas Senate, Texas House of Representatives, Texas School Board, and Texas Congressional districts after every decennial census. If the legislature and Governor cannot agree on a redistricting plan, a Legislative Redistricting Board (LRB), composed of the Lt. Governor, Speaker of the House, Attorney General, State Comptroller, and the State Land Commissioner, determine the plan.

or the U.S. Constitution.[47] Texas has vigorously fought each of these challenges, but has consistently been forced to redraw districts to meet the requirements of federal law.

Decade after decade, the Texas legislature has engaged in a pattern of racial discrimination that is apparent in statewide redistricting.[48] Federal courts have continually overturned the plans drawn by the Texas legislature and the state redistricting board and replaced them with court-drawn plans. In *LULAC v. Perry*, in 2006, the U.S. Supreme Court rejected Texas's attempt to dilute the Latino vote in U.S. Congressional District 23. The Texas legislature in 2003 engaged in a mid-decade Congressional redistricting, which was quickly challenged in a case that ultimately landed before the Supreme Court. In a strongly worded decision, the Court observed that just as "District 23's Latino voters were poised to elect their candidate of choice," the Texas legislature enacted a plan that "took away [that] opportunity because Latinos were about to exercise it." In view of "the long history of discrimination against Latinos and Blacks in Texas," the Supreme Court found that Texas's actions "b[ore] the mark of intentional discrimination that could give rise to an equal protection violation" and invalidated the 2003 redistricting plan.[49]

These efforts by the courts to prevent discrimination by Texas were capped most recently by the 2012 findings of the federal District Court in Washington, D.C.[50] A federal court in Washington, D.C., found that the 2011 Texas legislature had engaged in "substantial surgery" in order to remove key economic generators, such as hospitals, universities, sports centers, and even Congressional district offices, from the districts of African-American and Latino members of Congress, but that "[n]o such surgery was performed on the districts of Anglo incumbents." The

---

[47] *LULAC v. Perry*, 548 U.S. 399 (2006); *Bush v. Vera*, 517 U.S. 952 (1996); *Upham v. Seamon*, 456 U.S. 37 (1982); *White v. Weiser*, 412 U.S. 783 (1973); *White v. Regester*, 412 U.S. 755 (1973); *Terrazas v. Slagle*, 789 F.Supp. 828 (W.D.Tex.1992), *aff'd sub nom.*, *Richards v. Terrazas*, 505 U.S. 1214 (1992) (mem.).
[48] Monet Clarke, "Race, Partisanship, and the Voting Rights Act (VRA): African-Americans in Texas From Reconstruction to the Republican Redistricting of 2004," *Texas Journal on Civil Liberties and Civil Rights* (2005).
[49] 548 U.S. 399, 442, 438,440, 439 (citation and internal quotation marks omitted).
[50] *Texas v. United States*, 887 F. Supp. 2d 133 (D. D.C. 2012).

court noted that Texas's surgical mapmaking "alone" could support a finding of discriminatory intent because it was "unexplainable on grounds other than race." The court also found credible evidence that "the Senate Plan was enacted with discriminatory purpose." In coming to this conclusion, the court found Texas "made no real attempt" to refute claims that "the [Texas] legislature deviated from typical procedures and excluded minority voices from the process even as minority senators protested that [S]ection 5 was being run roughshod." The court also observed that "at minimum, the full record strongly suggests that the retrogressive effect [of the State House plan] may not have been accidental."[51] Importantly, here, the exact *same Texas legislature* that a court found to be intentionally discriminating in the 2011 redistricting also was responsible for enacting SB 14.

### 6.  Waller County, Texas, and African-American students (1971-2008)

Texas political subdivisions also have a long history of official discrimination. Scholars have enumerated the disheartening number of court cases (brought pursuant to both Section 2 and 5 of the Voting Rights Act), and Section 5 Objections, which together illustrate how these political subdivisions have used multimember districts, at-large elections, selective annexations, malapportionment, slating, extraordinarily high candidate fees, numbered posts and placed systems, unusually large election districts, majority vote requirements, anti-single shot voting provisions, and gerrymandering (including racial gerrymandering of local precinct lines) to exclude minorities and dilute their votes.[52] No better place illustrates this diversity of disfranchisement tactics in the face of increased minority political activity than Waller County, home to Prairie

---

[51] *Texas v. United States*, 887 F. Supp. 2d 133, 160-62, 216-17 (D. D.C. 2012). The Court found that Texas's history of discrimination and the fact that minority members of Congress "were excluded completely from the process of drafting new maps, while the preferences of Anglo members were frequently solicited and honored" were circumstantial evidence of intent. Ibid. 161.

[52] Brischetto et al., "Texas," see esp. 242-48, 258-62; Nina Perales , Louis Figueroa, and Cridelda G. Rivas, *Voting Rights in Texas, 1982-*2006 (A report for RenewtheVRA.org, June 2006).

View A&M University (PVAMU), a historically Black university. For over forty years, Waller County has consistently tried to prevent PVAMU students from voting in elections.

After the Twenty-Sixth Amendment was ratified in 1971, allowing 18-year-olds to vote, Waller County became a majority-African-American county in Texas. To forestall an increase in African-American voter participation in Waller County, the county's tax assessor and voter registrar, Leroy Symm, fought against PVAMU students' right to vote.[53] The Texas election code stated that students could only register in the county of their school if they planned on remaining in the county after they were no longer a student. Using this provision, Symm furnished a questionnaire for student voters, allowing only students who owned property in Waller County or whose parents lived in the county to vote. As all the elected officials in Waller County were white and almost all PVAMU students were African-American, there was a clear racial component to this challenge to student voting rights.[54] Indeed, throughout the 1970s, Symm's practice was repeatedly challenged in federal courts. Only in 1979 did the matter end, when the U.S. Supreme Court summarily affirmed a lower court ruling in favor of the PVAMU students, finding that the additional residency requirements violated the students' federal constitutional rights.[55]

Unfortunately, Waller County officials persisted in their campaign to suppress the African-American student vote. In 1992, a county prosecutor indicted PVAMU students for "illegally voting," but, when the U.S. Justice Department wrote to Waller County in protest, the charges were quickly dropped.[56] In 2003, after a PVAMU student announced plans to run for a seat on the Commissioner's Court, the local district attorney again threatened to prosecute any students

---

[53] David Richards, *Once Upon a Time in Texas: A Liberal in the Lone Star State* (Austin: University of Texas, 2002), 154-55.
[54] *Symm v. United States*, 439 U.S. 1105 (1979) (mem.), *summarily aff'g United States v. Texas*, 445 F. Supp. 1245, 1245-52 (S.D. Tex. 1978) (three-judge court) (describing the county's discriminatory use of the questionnaire).
[55] *Texas*, 445 F. Supp. 1245, 1261-62 (D. D.C. 2012).
[56] Perales et al., *Voting Rights in Texas*, 26; *United States v. Texas*, Amended Complaint, 17 (2013); *Prairie View Chapter of the NAACP v. Kitzman*, Settlement Agreement, 5.

for "voter fraud,"[57] the familiar pretext of other Texas disfranchisers. On 5 November 2003, the County Criminal District Attorney, Oliver Kitzman, wrote a letter to the Waller County Election Administrator. The letter stated he would prosecute those who voted and did not meet his definition of domicile. In this letter, which was published as a Letter to the Editor in the 10 November 2003 issue of the *Waller Times*, Kitzman singled out PVAMU students as not meeting his definition, despite the 1978 case in which the Court stated the students should not be treated differently than other residents on the issue of domicile.[58]

PVAMU students later successfully sued Waller County to enjoin the district attorney from making further improper threats of prosecution. Seemingly in response, Waller County officials contemporaneously voted to greatly reduce early voting nearest the campus, with the foreseeable result of reducing student voter turnout.[59] Early voting hours were reduced from 17 hours over two days, to six hours in one day. This reduction was especially egregious because Election Day was during the school's spring break. The NAACP filed a Section 5 lawsuit, and the county reversed the change. With regular early voting hours reinstated, 300 PVAMU students took advantage of early voting, whereas only 60 voted on Election Day. The PVAMU student won a seat on the Commissioner's Court by a narrow margin.[60]

Waller County's attacks on PVAMU students' voting rights did not end then. From 2007 to 2008, the county made a number of voting changes without preclearance. These changes came on the heels of Senator Barack Obama's announcement of his candidacy for president and the projected (and realized) higher African-American turnout for the election. Waller County reject-

---

[57] Perales et al., *Voting Rights in Texas*, 25.
[58] *Prairie View Chapter of NAACP v. Kitzman*, Settlement Agreement, 4-5.
[59] Perales et al., *Voting Rights in Texas*, 25-26; National Commission on the Voting Rights Act, *Protecting Minority Voters: The Voting Rights Act at Work, 1982-2005* (2006), 65-66.
[60] Perales et al., *Voting Rights in Texas*, 26.

ed "incomplete forms" (a designation that seemed to be at the county's discretion), mandated that volunteer deputy registrars (VDRs, most of whom were PVAMU students) must personally notify registrants that their applications were rejected, limited the number of registrants a VDR could submit (severely limiting the effectiveness of PVAMU voter registration drives), rejected applications that omitted a ZIP code or used an older version of the form (despite federal voting law against such rejections), and did not alert registrants if applications were sent to another non-contiguous county. Most of the rejections the county made were PVAMU students' applications.[61] According to the consent decree issued in October 2008, these practices were prohibited after the parties agreed that the changes were legally unenforceable because Waller County had not yet submitted the proper paperwork to obtain pre-clearance pursuant to Section 5 of the Voting Rights Act.[62]

### 7. Voter Intimidation by Local Poll Officials and Police Officers in Texas

In Texas, voter intimidation by poll workers and other public officials has often masqueraded as "fraud prevention." Waller County prosecutors' threats of indicting PVAMU students for voting provides just one example. Government and election officials in Texas have at times threatened minority voters with severe penalties for voting or have challenged their right to vote. Leonel Castillo, a Houston city controller and a member of the Texas advisory committee to the Civil Rights Commission, testified to the realities of discrimination in Texas in 1974 before the House subcommittee, stating that he observed "a highly visible presence of armed law enforcement officials near polling places, and excessive demands for personal identification."[63]

---

[61] Complaint, *United States v. Waller Cnty., Tex.,* No. 4:08-cv-03022 (S.D. Tex. Oct. 9, 2008), *available at* http://www.justice.gov/crt/about/vot/sec_5/waller_comp.pdf.

[62] *4.*     Consent Decree, *United States v. Waller Cnty., Tex.,* No. 4:08-cv-03022 (S.D. Tex. Oct. 17, 2008), *available at* http://www.justice.gov/crt/about/vot/sec_5/waller_cd.pdf.

[63] "Discrimination in Voting Booth Still Major Problem," *Sarasota Herald Tribune*, April 18, 1975, 5C.

Both before and after the passage of SB 14 in 2011, poll workers and other public officials have used voter ID and other requirements to intimidate African-American and Latino voters in Texas. For example, a 2013 federal court opinion found that openly discriminatory voting practices continue to exist in Texas:

> Latinos encounter resistance from poll workers. Throughout her career in politics, [State Senator Sylvia Garcia] has observed consistent problems with poll workers and access to the polls more generally. Over the course of her career in politics, voters have told her that they were told that they: (i) cannot bring someone in to assist them; (ii) are not registered to vote; and (iii) cannot vote in the election because they do not possess a valid driver's license. Occasionally, she also receives complaints that poll watchers have intimidated Latino voters at the polls, such as inquiring about the voters' citizenship status.[64]

Similarly, in 2004, poll workers in Texas also were reportedly subjecting African-American voters to racialized insults and more stringent screening processes than white voters. That same year, people allegedly left a Harris County early voting site without voting after police officers stood outside and threatened to arrest people with a warrant and demanded ID.[65]

There is a sobering conclusion about modern Texas race relations in *America's Modern Poll Tax*, which, in comparing Texas to other states, proffers that "[m]ost of the barriers to minority voting rights outlined in this report concern election administration – faulty technology, lack of poll worker training, shoddy voter registration practices, and a shortage of capacity to absorb a large turnout. In Texas, barriers to minority voting rights were of a different sort. They concerned instances of outright voter intimidation more reminiscent of the Jim Crow era than 21st century America."[66]

---

[64] Garcia and Birnberg testimonies, *Rodriguez v. Harris Co.*, Civil Action No. 4:11-2907, 2013 WL 3980651, *72 (S.D. Tex. Aug. 1, 2013)

[65] Perales et al, *Voting Rights in Texas*, 29-31.

[66] Steven Donziger, principal author, *America's Modern Poll Tax: How Structural Disenfranchisement Erodes Democracy* (Nov. 7, 2001 by Advancement Project, 1730 M Street, N.W., Suite 401, Washington, DC 20036 202- 728-9557), 24-26. http://election2000.stanford.edu/penda.pdf. The latter incident is also documented in the Sworn Tes-

## B.      Senate Factor 5: Racial Disparities in Socioeconomic Areas of Life

Since the State's admission to the Union, Texas, as well as its political subdivisions, have engaged in racial discrimination against its African-American and Latino citizens in all areas of public life,[67] including, as described below, in the areas of education, employment, housing, and transportation. The foreseeable result of such past and present discrimination is the substantial socioeconomic inequalities that exist between minority and Anglo voters in the state.

### 1.   Education

Racial segregation and discrimination in the Texas education system is longstanding. Texas's 1866 Constitution provides an early example of legislative support for separate schools: "The legislature may provide for the levying of a tax for educational purposes… provided, that all the sums arising from said tax which may be collected from Africans, or persons of African descent, shall be exclusively appropriated for the maintenance of a system of public schools for Africans and their children."[68] The earliest formal codification of segregated schools is found in the 1875 Texas Constitution, which stated that "Separate schools shall be provided for the white and colored children, and impartial provision shall be made for both."[69] Segregated schools were also incorporated into the 1879, 1895, 1911, and 1925 revisions of the *Civil Statues of Texas.*

Mexican-American students were not segregated by statute, but they also faced discrimination in Texas's schools. At the end of the nineteenth century and beginning of the twentieth,

---

timony of C. G. Walywn, who was the African-American candidate for sheriff in Wharton County, Texas, at the Voter Intimidation Hearing, Palmer Center Business and Technology Center, Houston, Texas, Dec. 19, 2000, 33-56.
[67] *LULAC v. Perry*, 548 U.S. 399, 426 (2006).
[68] *The Constitution, as Amended, and Ordinances of the Convention of 1866, Together with the Proclamation of Governor Declaring the Ratification of the Amendments to the Constitution, and the General Laws of the Regular Session of the Eleventh Legislature of the State of Texas*. Austin: Printed at the Gazette office, by Jo. Walker, state printer. 1866. pp. 29-30.
[69] *Constitution of the State of Texas, Adopted by the Constitutional Convention, Begun and Held at the City of Austin, on the Sixth Day of September, 1875.* Official. Galveston: Printed at the "News" Steam Book and Job Establishment. [1875.] p. 14.

Mexican-American families in South Texas often established *escuelitas* (private schools) because their children faced discrimination and segregation in public schools.[70] Hearne, Texas, was the home of a lawsuit because of the huge discrepancies between white and African-American schools. Other minority students in Texas also successfully sued for school equalization in the years leading to *Brown v. Board*.[71]

In 1950, *Sweatt v. Painter*, a pivotal desegregation case that preceded *Brown v. Board of Education*, dealt segregation a major blow in Texas. This critical case compelled the Supreme Court to overturn segregation in state-supported higher education, forecasting the full repeal of the "equal but separate" doctrine. Heman Sweatt, an African-American Wiley College graduate and Houston postal worker, applied to the University of Texas (UT) Law School, but was rejected in 1946 because the law school was all-white. No law school in Texas admitted African-American students. Sweat secured Thurgood Marshall's representation and sued. Executing a trial court's order, Texas quickly established an African-American law school in Houston, which the lower courts said provided an equal education, but the African-American law school was clearly unequal. Marshall argued the case before the Texas Court of Civil Appeals and Texas Supreme Court, which held that the Black law school and UT Law School were equal. Marshall appealed to the U.S. Supreme Court, where Marshall again argued the case, stressing the African-American law school's inferior facilities and its students' professional isolation.

The Supreme Court compared the two law schools and found the African-American law school significantly lacking in facilities, extracurricular activities, and overall prestige. The Afri-

---

[70] Emilio Zamora, *The World of the Mexican Worker in Texas* (College Station: Texas A&M University Press, 1993), 104-5.

[71] Mark V. Tushnet, *NAACP's Legal Strategy against Segregated Education* (Chapel Hill: University of North Carolina Press, 1987), 106. For example, in Hearne, the white school was worth $3,000,000 and had an average class size of 27 students while the Black school facilities were worth $300,000 and had an average class size of 60 students.

can-American law school was not accredited, and because of its segregated nature, would not fully prepare its students to interact with white lawyers, judges, jurors, witnesses, and experts. The Court emphasized the disparities between the racially-segregated law schools, stating "It is difficult to believe that one who had a free choice between these law schools would consider the question close."[72] Thus, convinced of the inequality, the Court ordered UT to enroll Sweatt. Although UT Law School admitted Sweatt, the Supreme Court's order did not overturn the laws of Texas and other states supporting segregation.[73]

The Supreme Court decided *Brown v. Board of Education* in 1954. Even after the Supreme Court's historic ruling, "the State of Texas adopted a policy of official resistance to integration of its public schools…. Many of the school districts found to be operating dual systems of education were also found to practice official discrimination against black and Mexican American students."[74] With *Brown v. Board*, white southerners began to fight back. The first offensive of what became known as Massive Resistance came in 1956 when many white Southern politicians drafted and signed the "Southern Manifesto." The Manifesto decried the Supreme Court's abuse of judicial powers because the Justices "substituted their personal political and social ideas for the established law of the land" and had thereby "planted hatred and suspicion where there had been heretofore friendship and understanding."[75] U.S. Senator Price Daniel of Texas was one of the signers. That year he was elected governor.

Into the 1970s, Dallas, Houston, and Austin all resisted attempts to give minority students

---

[72] *Sweatt v. Painter*, 339 U.S. 629 (1950), 631-634; see also, Merline Pitre, *In Struggle against Jim Crow: Lula B. White and the NAACP, 1900-1957* (College Station: Texas A & M University Press, 1999)*;* Amilcar Shabazz, *Advancing Democracy: African Americans and the Struggle for Access and Equity in Higher Education in Texas* (Chapel Hill: University of North Carolina Press, 2004). For more on *Sweatt v. Painter*, see Tushnet, *Making Civil Rights Law*, 126-29, 131-36; Tushnet, *NAACP's Legal Strategy against Segregated Education*, 116, 126-36.
[73] *Hopwood v. Texas*, 861 F. Supp. 551, 555 (1994).
[74] *Hopwood*, 861 F. Supp. at 554.
[75] Congressional Record, 84th Congress Second Session. Vol. 102, part 4. Washington, D.C.: Governmental Printing Office, 1956. 4459-4460.

anything more than decidedly inferior educational experiences. African-American and Latino students had "inadequate facilities, outdated curricula, and limited educational enrichment opportunities."[76] In Dallas, after several appeals and reversals, the school board submitted a desegregation plan in May 1960 that would have required schools to desegregate one grade at a time, thereby achieving desegregation in 12 years' time. A legal scholar noted that the Texas judge rejected the plan because it "imposed too much integration." The judge suggested a freedom-of-choice plan for the area schools, and the court of appeals later accepted a one-grade-a-year plan.[77] In the 1970s, the Harris County school board resisted *Brown* by labeling all Latino students as "white" and then claiming the African-American and Latino populated schools were now integrated. Latino students protested by boycotting the schools, creating their own *huelga* ("strike") schools.[78] The Austin-area school district also dragged its feet on desegregation in the 1970s, placing the burden of school closures and busing solely on African-American students and arguing that, because Texas never statutorily segregated Latino students, the district was under no obligation to integrate them into schools. A federal court rejected these arguments, finding that the district had drawn school attendance zones and built schools so that racial demographic and residential patterns "further lock[ed] the school system into a mold of separation of the races." As a result, while Latinos were never segregated by statute, they were de facto segregated by the school district's school zones and other official decisions that created segregated Latino schools.[79]

Today's young Texans do not experience state-mandated segregated schools. But the legacy of those practices remains palpable, and to a large extent race still determines their experi-

---

[76] Garcia and Birnberg testimonies, *Rodriguez v. Harris Co.*, 2013 WL 3980651, *68 (2013).
[77] Tushnet, *Making Civil Rights Law*, 251-52; *Borders v. Rippy*, 184 F. Supp. 402 (N.D. Tex 1960).
[78] Garcia and Birnberg testimonies, *Rodriguez v. Harris Co.*, 2013 WL 3980651, *68 (2013).
[79] *U.S. v. Texas Education Agency*, 467 F. 2d 848, 856-57, 872, 855, 863-64, 866 (5th Cir. 1972).

ence at school. In Texas, "black students are three times more likely to be removed from school for lower-level offenses than whites."[80] A study done by the Council of State Governments Justice Center and the Public Policy Research Institute found that "multivariate analyses, which enabled researchers to control for 83 different variables in isolating the effect of race alone on disciplinary actions, found that African-American students had a 31 percent higher likelihood of a school discretionary action, compared to otherwise identical white and Hispanic students." In real numbers, that means that if "African-American students had the same probability as whites of being involved in a school disciplinary action, there would have been 13,496 fewer African-American pupils disciplined." This disparity has significant longterm consequences as well; the students who were suspended or expelled had a higher rate of dropping out of school than those who did not receive disciplinary action.[81] Graduation rates between whites and historically-disadvantaged minorities are substantial; fewer than 60% of African-American and Latino students in Texas earn regular diplomas alongside their classmates.[82]

These problems create substantial educational deficits for minorities that continue into adulthood. In Texas, almost a third of African Americans older than 25 have not graduated from high school.[83] Similarly, the number of limited-English proficiency Latino adults in the State is in part attributable to the discrimination often experienced in their education in Texas.[84]

---

[80] "Editorial: Poverty is Root Cause of Disparities in School Discipline," *The Dallas Morning News,* March 2, 2011, http://www.dallasnews.com/opinion/editorials/20110302-editorial-poverty-is-root-cause-of-racial-disparities-in-school-discipline.ece (last accessed June 27, 2014).

[81] Fabelo, Tony et al. "Breaking School's Rules: A Statewide Study of How School Discipline Relates to Students' Success and Juvenile Justice Involvement." Council of State Governments Justice Center/ The Public Policy Research Institute. July 2011. http://csgjusticecenter.org/wp-content/uploads/2012/08/Breaking_Schools_Rules_Report_Final.pdf (last accessed June 27, 2014). p. 46, x-xi.

[82] Losen, Daniel, Gary Orfield, and Robert Balfanz, "Confronting the Graduation Rate Crisis in Texas," 22, 4, The Civil Rights Project, October 2006, http://civilrightsproject.ucla.edu/research/k-12-education/school-dropouts/confronting-the-graduation-rate-crisis-in-texas/losen-confronting-graduation-rate-texas-2006.pdf.

[83] William Earl Maxwell, Ernest Crain, and Adolfo Santos, *Texas Politics Today* (Boston: Wadsworth, 2009), 77.

[84] Garcia and Birnberg testimonies, *Rodriguez v. Harris Co.* 2013 WL 3980651, *68 (2013).

Furthermore, schools in Texas have increasingly become resegregated and racially isolated. In Texas schools typically attended by African-American students, only 30.7% of students were white in 1970, and that number increased to 35.2% in 1980, and decreased to 31.4% in 1996. In 2009-10, 82.4% of African Americans were in schools with 50-100% minority students. Over 39% of African-American students were in schools that had minority student populations of 90-100%, and 11.9% of African-American students were in schools that are 99-100% minority.[85] That is a marked increase in racial isolation and segregation in just the last two decades.[86]

## 2. Employment

Racial discrimination in employment by Texas state or local agencies continue to disadvantage African Americans and other minorities. In the 1990s, the city of Houston Police Department required officers to take promotional exams to advance to the ranks of Sergeant and Lieutenant. But these exams, which African-American and Latino police alleged "were not job-related or consistent with business necessity," discriminated against minority police officers. This issue was resolved in a 1993 Consent Decree with the City which agreed to promote minority police officers who had previously failed the exams and to strike "racially biased items" from the exams.[87] In the last decade, the Texas Department of Health, the City of El Paso, and the City of Houston have all entered into extensive consent decrees that required Texas agencies and mu-

---

[85] Gary Orfield and John Yun, Resegregation in American Schools: A Report by the Civil Rights Project at Harvard University (UCLA: The Civil Rights Project, 1999), http://escholarship.org/uc/item/6d01084d (last accessed June 27, 2014), 19; Gary Orfield, John Kucsera, and Genevieve Siegel-Hawley, "E Pluribus . . . Separation: Deepening Double Segregation for More Students," The Civil Rights Project, October 18, 2012, http://civilrightsproject.ucla.edu/research/k-12-education/integration-and-diversity/mlk-national-e-pluribus...separation-deepening-double-segregation-for-more-students/orfield_epluribus_revised_omplete_2012.pdf (last accessed June 27, 2014), 46.
[86] Gary Orfield and John Yun, Resegregation in American Schools: A Report by the Civil Rights Project at Harvard University (UCLA: The Civil Rights Project, 1999), http://escholarship.org/uc/item/6d01084d (accessed June 13, 2014), 19.
[87] *Edwards v. City of Houston* 78 F.3d 983, 989-92 (5th Cir. 1996).

nicipalities to make concessions to redress claims of racial discrimination in employment.[88] In 2002, an African-American employee in the Matagorda County sheriff's department filed a discrimination suit. He claimed he experienced "disparate discipline," including being fired, because of his race and in retaliation of his complaint.[89] In 2008, a woman filed a complaint against the Housing Authority of the City of El Paso. She claimed that she was not promoted on account of her national origin and age. In the Consent Agreement of October 2008, El Paso agreed to compensate her and to protect her from retaliation in job performance meetings.[90] An African-American man working in the Texas Department of Family and Protective Services (DFPS) filed a complaint claiming that he was discriminated against because of his race, and the Settlement Agreement required training DFPS employees on anti-discrimination and anti-harassment policies.[91]

Employment discrimination against African Americans and Latinos likely contributes to high poverty rates of 25.8% and 23.3%, respectively, compared to only 8.8% among whites. Furthermore, 21.8% of African-American and 24% of Latino Texans worked in service jobs, compared to 12.1% of whites.[92]

### 3. Housing

---

[88] *See e.g.*, *Edwards v. City of Houston*, 78 F.3d 983, 989-92 (5th Cir. 1996) (en banc); Consent Decree, *United States v. Texas Dep't of Family & Protective Serv.*, No. Ep-11-CA-364-FM (W.D. Tex. Nov. 30, 2011), ECF No. 10, *available at* http://www.justice.gov/crt/about/emp/documents/texasdeptsa.pdf; Consent Decree, *United States v. Hous. Auth. of the City of El Paso*, Tex., No. 3:08-cv-00313-KC (W.D. Tex. Oct. 21, 2008), ECF No. 15, available at http://www.justice.gov/crt/about/emp/documents/elpaso_cd.pdf.

[89] Settlement Agreement, *United States v. Matagorda County, TX*, No. G-01-010 (S.D. TX 2002), available at http://www.justice.gov/crt/about/emp/documents/matagordafinalcd.html (last accessed June 27, 2014).

[90] Complaint, *United States and EEOC v. Housing Authority of the City of El Paso, TX*, EP-08-cv-0313 (W.D. TX Aug. 11, 2008), available at http://www.justice.gov/crt/about/emp/documents/elpaso_complaint.pdf (last accessed June 27, 2014); Consent Decree, *United States and EEOC v. Housing Authority of the City of El Paso, TX*, No. 3:08-cv-00313-KC (W.D. TX Oct. 21, 2008), available at http://www.justice.gov/crt/about/emp/documents/elpaso_cd.pdf.

[91] Settlement Agreement, *United States v. Texas Department of Family and Protective Services*, No. 3:11-cv-00364-FM (W.D. TX Nov. 30, 2011), available at http://www.justice.gov/crt/about/emp/documents/texasdeptsa.pdf (last accessed June 27, 2014). DFPS denied accounts of racial discrimination.

[92] DOJ Request for Judicial Notice, Texas v. Holder, Civil Action No. 12–cv–128 (DST, RMC, RLW), ECF 219, *available at* http://moritzlaw.osu.edu/electionlaw/litigation/documents/RequestforJudicialNotice.pdf.

The State of Texas's longstanding official policy was to enforce state and local laws and private covenants that either required racial segregation or overtly permitted discrimination in housing. Even today, long after the passage of the Fair Housing Act of 1968, Texas and its political subdivisions have persisted in pursuing policies that promote discrimination in housing.

The Texas state and local governments, for example, have been complicit in promoting racial segregation in housing. In 1916, for instance, the "City of Dallas passed a law providing for segregation in residential areas,"[93] and in 1927 the state legislature passed a comprehensive zoning statute, which "would give towns and cities the right to withhold building permits to such firms or individuals as seek to build houses for negro inhabitants in white committees or visa-versa."[94] In addition, prior to the 1948 Supreme Court decision in *Shelley v. Kraemer*, Texas "enforce[d] restrictive covenants that created and maintained racially and ethnically segregated neighborhoods."[95] The impact of redlining, racially restrictive covenants, and other policies which promoted housing discrimination remains evident. In San Antonio, for instance, decisions to build the University of Texas at San Antonio and the University of Texas Health Science Center towards the city's north side and concentrating low-income housing developments on the west side were based on racial separation.[96]

Housing discrimination has continued in more recent years. A 1988 federal court decision found that HUD and the Texas Public Housing Authorities had "knowingly created, promoted, and funded racially segregated housing in thirty-six counties in East Texas."[97] In 2008, Farmers Branch, a city in Dallas County, passed Ordinance 2952, which established a classification

---

[93] Bruce A. Glasrud, "Jim Crow's Emergence in Texas," *American Studies* 15 (1974), 55
[94] *The Dallas Morning News*, February 24, 1927.
[95] Virginia Raymond "Enriching *Rodriguez*: Alberta Zepeda Snid of Edgewood," in *Recovering the Hispanic History of Texas*, ed. Monica Perales and Raul A. Ramos (Houston: Arte Púlblico Press, 2010), 82.
[96] Christopher Ramos, "The Educational Legacy of Racially Restrictive Covenants: Their Long Term Impact on Mexican Americans," *The Scholar: St. Mary's Law Review on Minority Issues* 149 (2001), 165.
[97] *Young v. Pierce*, 685 F.Supp. 984, 984 (E.D. Tex. 1988).

scheme for determining whether non-citizens may rent an apartment. A federal court invalidated

the law, and found that "Farmers Branch, rather than deferring to the federal government's de-

termination of immigration status, ... created its own classification scheme for determining which

non-citizens may rent an apartment in that city."[98] The Ordinance was widely viewed as an anti-

Latino measure designed to discourage the continued growth of the City's Latino population,[99]

which had grown significantly from 37.2% in 2000 to 45.4% in 2010.[100]

Dallas County overall provides an excellent case study because it is home to the promi-

nent, drawn-out *Walker* housing desegregation case. Beginning in 1985 — and continuing

through the 2000s[101] — a group of African-American public housing residents sued the Dallas

Housing Authority (DHA), the City of Dallas, and its surrounding suburbs for refusing to accept

public housing and Section 8 vouchers; this refusal perpetuated housing segregation.[102] As the

United States Court of Appeals for the Fifth Circuit observed in 1999, "[t]he history of public

housing in Dallas is a sordid tale of overt and covert racial discrimination and segregation":

> Virtually all non-elderly public housing units were constructed in minority areas
> of Dallas. No new public housing units were built between 1955 and 1989 at least
> in part for fear that they might be located in white areas. Tenant selection and as-
> signment procedures for public housing units were crafted and administered to
> maintain racially segregated projects. DHA's Section 8 housing programs were
> operated to discourage blacks from moving into white areas of metropolitan Dal-
> las. Blacks were purposefully segregated for decades into either Section 8 housing

---

[98] *Villas at Parkside v. City of Farmers Branch*, 577 F. Supp. 2d 858, 879 (N.D. Tex. 2008).

[99] "Texas Town Oks Anti-Immigrant Measure", Associated Press, Nov. 14, 2006, http://www.nbcnews.com/id/15686734/ns/us_news-life/t/texas-town-oks-anti-immigrant-measures/#.U1U146K9Y14

[100] U.S. Census Bureau, American Fact Finder, Race and Hispanic or Latino Origin: Texas 2010, http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=DEC_10_SF1_QTP3; U.S. Census Bureau, Population by Race and Hispanic or Latino Origin for Texas: 2010, Table 1, http://www.census.gov/census2000/pdf/tx_tab_1.PDF.

[101] See generally *Walker v. HUD*, 734 F. Supp. 1231, 1272, 1289 (N.D. Tex. 1989), which was reversed in part in *Walker v. City of Mesquite, et al.*, 912 F.2d 819 (5th Cir. 1990); *Walker v. City of Mesquite*, 169 F.3d 973 (5th Cir. 1999), *certiorari denied*, 528 U.S. 1131(2000); and *Walker v. U.S. Dept. of HUD* 326 F.Supp.2d 780, 781 (N.D. Tex. 2004), *affirmed*, 402 F.3d 532 (5th Cir. 2005).

[102] *Walker v. HUD*, 734 F.Supp. 1289, 1293-1312 (N.D. Tex. 1989); *Walker v. HUD*, 912 F.2d 819, 821-25 (5th Cir.1990); *Walker v. City of Mesquite*, 169 F. 3d 973, 976-78 (5th Cir. 1999).

in minority areas of Dallas or predominantly black housing projects in minority areas of Dallas.[103]

The predominantly white suburbs in Dallas County fought throughout *Walker* and other cases to prevent minority public housing residents from moving into their cities. In 2000, for example, a federal court found that the Town of Sunnyvale, a suburb in Dallas County, had intentionally used segregative zoning laws to keep the city 94.0% white and that city officials and residents had feared that the presence of the "kind of characters" that live in public housing and apartment complexes ("slums") would ruin the neighborhood and require "more police protection."[104] By 2004, however, the efforts to desegregate housing finally had broken ground in Dallas County.[105]

This history of racial discrimination in housing in Texas is consistently reflected in measures of housing segregation, racial disparities in homeownership, and other data. In the Houston and Dallas metropolitan areas, for example, the African-American population has always been concentrated in discrete locations. In 1980, according to the definitive study of racial segregation in American cities, the Dallas-Fort Worth area scored a 77.1 and Houston a 69.5 on the "index of dissimilarity," the standard sociological measure of segregation. This index defines a score of 60 as "high" segregation; 80 denotes "extreme" segregation. Dallas at the time was ranked the third most segregated southern city with a large African-American population.[106]

---

[103] *Walker v. City of Mesquite* , 169 F. 3d 973, 976 (5th Cir. 1999)
[104] *Dews v. Town of Sunnyvale, Texas*, 109 F. Supp. 2d 526, 526, 529, 538-39, 544-47 (N.D. Tex. 2000).
[105] *See Walker v. U.S. Dept. of HUD*, 326 F. Supp. 2d 780, 781 (N.D. Tex. 2004).
[106] The index of dissimilarity measures the degree to which racial groups are evenly spread among neighborhoods in a metro area or city, with respect to the racial composition of the city or region as a whole. Thus, as Massey and Denton note: "The index of dissimilarity gives the percentage of blacks who would have to move to achieve an 'even' residential pattern – one where every neighborhood replicates the racial composition of the city." Douglas S. Massey and Nancy A. Denton, *American Apartheid: Segregation and the Making of the Underclass* (Cambridge, Mass: Harvard University Press, 1993), 20, 64.

Three research studies based on the 2010 census continue to identify the Dallas and Houston areas as highly segregated metropolises. William Frey of the University of Michigan and the Brookings Institution, who examined segregation rates in 102 U.S. Cities, found that Houston / Sugar Land / Bayton posted a 64.1 Black-White segregation rate (ranking as 36th most segregated U.S. city) and Dallas / Fort Worth / Arlington a rate of 56.6 (ranking 48th).[107] Texas cities rank higher for Latino segregation, but the rates of Latino segregation are less intense – the "Hispanic-White" segregation rate in 2010 was 52.3 in Houston (ranked 18 overall) and 50.3 in Dallas (ranked 24). A second 2011 study of 50 U.S. cities by Brown University Professor John Logan and Brian Stults of Florida State found that Black-White segregation in Houston and Dallas is 60.6 (ranked 21st) and 55.1 (ranked 32nd), respectively.[108] According to Logan and Stults, Houston ranks 10th and Dallas 12th for Hispanic-White racial segregation. A third study by Edward Glaeser of Harvard and Jacob Vigdor of Duke measured simply "black-nonblack" segregation, which, although a less reliable measure of segregation than the traditional "Black-White" index, still found that Houston (47.8) and Dallas (47.5) are amongst the nation's most segregated cities.[109]

Racial discrimination in Texas also contributes to the significant racial disparities in the number of heads of household that own their own homes. In 2010, 72.4% of Anglo heads of households owned their own homes, while 27.6% rented. This compares strikingly to the only

---

[107] William Frey, "New Racial Segregation Measures for Large Metropolitan Areas: Analysis of 1990-2010 Decennial Census," University of Michigan Population Studies Center, Institute for Social Research, available at http://www.psc.isr.umich.edu/dis/census/segregation2010.html.

[108] John R. Logan and Brian J. Stults, The Persistence of Segregation in the Metropolis: New Findings from the 2010 Census (Mar. 24, 2011), available at http://www.s4.brown.edu/us2010/Data/Report/report2.pdf.

[109] Edward Glaeser and Jacob Vigdor, *The End of the Segregated Century: Racial Separation in America's Neighborhoods, 1890-2010,* Manhattan Institute for Policy Research, Civic Report, January 2012, available at http://www.manhattan-institute.org/html/cr_66.htm.

45.6% of African-American heads of households and 57.9% of Latino heads of households who owned their own homes and the 54.4% and 42.1% respectively that rented.[110]

<u>Home Ownership and Residency by Ethnicity, 2000, 2010</u>

| Measure | 2000 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | Anglos | Blacks | Hispanics | Anglos | Blacks | Hispanics |
| home owners | 70.7% | 46.4% | 56.1% | 72.4% | 45.6% | 57.9% |
| home renters | 29.3% | 53.6% | 43.9% | 27.6% | 54.4% | 42.1% |
| live in same place as 5 years ago | 51.2% | 47.0% | 49.1% | | | |
| live in same place as 1 year ago | | | | 82.2% | 75.5% | 80.9% |
| | 2000 Census, Summary File 3 | | | ACS, 2005-2009 Estimates | | |

The above table shows racial discrepancies in home ownership and residency in Texas. The lower rate of home ownership and the lack of wealth in minority communities in Texas is a direct consequence of the above described state-sponsorship of discrimination in education, employment, and housing. Moreover, the Pew Research Center has released a recent report that the decline in home values disproportionately affected minorities, because "a much higher share of their wealth is tied up in the value of their homes." Using the most recent national wealth data, from 2005 to 2009, Pew found that "Hispanic households saw their net worth drop 66%, while black households' fell 53% and whites' fell 16%." Another study, by the Center for Responsible Lending in 2010, determined that "Nationally, nearly 8% of African American and Latino mortgage borrowers have lost their homes to foreclosures, compared with 4.5% of whites."[111]

### 4. Transportation

Access to motor vehicles in Texas differs significantly across racial and ethnic groups. African-American and Latino households are much less likely to own a vehicle than non-Latino

---

[110] U.S. Census Bureau, 2005-2009 American Community Survey 5-Year Estimates, "TENURE", B25003.
[111] Both the Pew Study and the one from Center for Responsible Lending are reported in *USA Today*, on August 5, 2011 (p. 5B), I have requested copies of both studies and specific data for Texas.

white households. Census data shows that in Texas, 13.1% of African Americans and 7.3% of Latinos live in households without access to a motor vehicle, compared with only 3.8% of whites.[112] Texas also ranks among the bottom of states in per capita investment in public transportation, and this lack of spending on public transportation is exacerbated by Texas's recent cuts to funding for public transit.[113] Because minorities in Texas are less likely to own vehicles than whites, the lack of public transportation spending is felt more acutely by minorities.

## C. Senate Factor 6: Racial Appeals in Political Campaigns in Texas

Race has been a central feature of politics in the South and Texas from the beginning,[114] from slavery and the Civil War to the present post-civil rights movement era. Particularly since the 1970s, following the civil rights movement and the Voting Rights Act, the majority of white Texans have moved away from the Democratic Party toward voting for the Republican Party.[115] The reasons for this shift are complicated, but indicate that Southern politics was and is largely influenced by race.[116] Accordingly, racial appeals remain a mainstay of Texas politics, and played an important role in the passage of SB 14.

### 1. Racial Appeals in American Politics (1960s-1990s)

Through the twentieth century, racial appeals— once more explicit — have become increasingly subtle. Beginning in the 1960s, the modern Republican Party has become inextricably tied to distinguishing themselves from the heavily African-American Democratic Party, and in

---

[112] DOJ Request for Judicial Notice of Census Data, *Texas v. United States*, ECF No. 219 Ex. 4 at 8, 17.
[113] Gaskins and Iyer, "Challenge of Obtaining Voter Identification," 5. Texas invests only $1.16 per capita into public transportation.
[114] Nicholas A. Valentino and David O. Sears. "Old Times There Are Not Forgotten: Race and Partisan Realignment in the Contemporary South," *American Journal of Political Science.* vol. 49, no. 3., pp. 672-688. p. 673.
[115] Schaller. *Whistling Past Dixie*, 295.
[116] While white partisan affiliation is based not only on race but also on class, African Americans tend to be more monolithic in their political affiliations. Byron E. Schaffer and Richard Johnston, *The End of Southern Exceptionalism: Class, Race, and Partisan Change in the Post-War South* (Cambridge, MA: Harvard University Press, 2009),. 4, 87, 90, 82-83.

Texas, the Latino Democratic Party, as well. In other words, in Texas, the Democratic Party is heavily supported by African Americans and Latinos.[117]

This racial identification in party politics began in 1964 when, in the midst of the civil rights movement, the Republican Presidential nominee, Senator Barry Goldwater, announced that he did not support the Civil Rights Act of 1964. As he told a group of Republicans from southern states, it was better for the Republican Party to forego the "Negro vote" and instead court white southerners who opposed equal rights.[118] Historians agree that Goldwater "sought to create a general polarization of southern voters along racial lines." The effectiveness of what was called the "Southern strategy" during Richard Nixon's presidency had a profound impact on the development of the nearly all-white modern Republican Party in the South. Although more subtle in his appeal to white southern voters, Nixon followed the advice of Republican Party strategist Kevin Phillips in 1970. Phillips argued that "The GOP can build a winning coalition without Negro voters." He understood, and made certain others understood, that "Negro-Democratic mutual identification" was important for the building of a white Republican Party in the South. With Phillips's "Southern Strategy," the Democratic Party would become the "Negro party through most of the South," which, in turn, would lead whites in the South to become Republicans and allow the Republican Party to become the majority party in what had traditionally been the solid Democratic South.[119] After studying Phillips's plan, Nixon told his staff to implement the strategy and emphasized, "don't go for Jews and Blacks."[120]

---

[117] Schaffer and Johnston, *End of Southern Exceptionalism*, 4.

[118] Dan T. Carter, "Unfinished Transformation: Matthew J. Perry's South Carolina," in *Matthew J. Perry: The Man, His Times, and His Legacy*, ed., W. Lewis Burke and Belinda F. Gergel (Columbia: University of South Carolina Press, 2004), 251.

[119] Kevin P. Phillips, *The Emerging Republican Majority* (New York: Arlington House, 1969), 467-68.

[120] Carter, *From George Wallace to Newt Gingrich*, 45; Kenneth O'Reilly, *Nixon's Piano: Presidents and Racial Politics from Washington to Clinton* (New York: Free Press, 1995), 285-86; Dan Carter, "Civil Rights and Politics in South Carolina: The Perspective of One Lifetime, 1940-2003" in *Toward the Meeting of the Waters: Currents*

The Southern Strategy continued into the 1980s. Ronald Reagan, in his 1980 presidential campaign, effectively used implicit racial appeals to win white votes. Using racially coded terms such as "welfare queen" and "strapping young buck," Reagan motivated 22% of Democrats to leave the party, and this happened at even higher rates among racially conservative Democrats. Of Democrats who believed civil rights leaders were moving too fast, 34% voted for Reagan, and 71% of Democrats who felt "the government should not make any special effort to help [African Americans] because they should help themselves" voted for Reagan.

In the 1988 presidential campaign, Vice President George H.W. Bush associated Governor Michael Dukakis with Willie Horton, an African American convicted of murder who committed an additional murder and rape when released on a weekend furlough program for prisoners that Governor Dukakis had supported. The Bush campaign showed images of Mr. Horton, rendering the racial appeal clear: supporting Dukakis would allow African-American murderers to roam the streets. Bush's appeal to the racial fears of whites contributed to his victory in 1988.[121]

### 2. Racial Appeals in Texas Politics (2008-2014)

Implicit or subtle appeals to race, as well as overt racial appeals, are still common in current electoral politics in Texas. Part of the process of – and an effect of – the current racial polarization in Texas and the American South is the use of racial appeals in political campaigns.

Political operative Lee Atwater outlined the new approach to racial appeals in an interview given in 1981. According to Atwater, overt racial appeals became ineffective by 1968, and were instead supplanted by implicit racial appeals grounded in arguments about "forced busing,

---

*in the Civil Rights Movement of South Carolina during the Twentieth Century*, ed. Winfred B. Moore, Jr. and Orville Vernon Burton (Columbia: University of South Carolina Press, 2008), 413.
[121] Lopez, *Dog Whistle Politics,* 59, 105-7.

states' rights, and all that stuff."[122] Implicit racial appeals communicate the same ideas as explicit racial appeals but do so without using racial nouns or adjectives. They obliquely reference race and allude to "racial stereotypes or a perceived threat" from racial or ethnic minorities. Mendelberg defined an implicit racial appeal as "one that contains a recognizable – if subtle – racial reference, most easily through visual references."[123] Ian Haney Lopez described implicit racial appeals as a "*coded* racial appeal," with "one core point of the code being to foster deniability." One characteristic of implicit racial appeals is that they are usually most successful when their racial subtext goes undetected.[124] Implicit racial appeals make use of coded language to activate racial thinking.[125] Racial cues, in the form of code words, such as "welfare queen," "lazy," "criminal," "taking advantage," "corruption," and "fraud" are explicit racial code words that refer back to Reconstruction era when African Americans were elected to office. Other coded issues, such as "poverty" and "immigration,"[126] prime racial attitudes in white voters.[127]

Overt racial appeals still appear in Texas campaigns for national offices as well as in campaigns for state and local offices. In 2008, Texas House District 144 saw the use of an overt or explicit racial appeal. In October 2008, Empower Texans, a conservative political action committee based in Austin, sent a mailer to voters in Pasadena. The mailer showed a picture of Joel Redmond, an Anglo Democrat running for the House seat, surrounded by pictures of Demo-

[122] Rick Perlstein, "Exclusive: Lee Atwater's Infamous 1981 Interview on the Southern Strategy," *The Nation.* November 13, 2012, http://www.thenation.com/article/170841/exclusive-lee-atwaters-infamous-1981-interview-southern-strategy (last accessed June 27, 2014).

[123] Tali Mendelberg, *The Race Card: Campaign Strategy, Implicit Messages, and the Norm of Equality* (Princeton: Princeton University Press, 2001), 9, 11.

[124] Lopez, *Dog Whistle Politics*, 130, 4.

[125] Nicholas A. Valentino, Vincent L. Hutchings, and Ismail K. White. "Cues that Matter: How Political Ads Prime Racial Attitudes During Elections," *American Political Science Review* 96 (2002), 75-90.

[126] Charlton D. McIlwain and Stephen M. Caliendo, *Race Appeal: How Candidates Invoke Race in US Campaigns* (Philadelphia: Temple University Press, 2011) 19-21, 153, 154; Rosalee A. Clawson. "Poor People, Black Faces: The Portrayal of Poverty in Economics Textbooks," *Journal of Black Studies* 32 (2002), 352-61; Rosalee A. Clawson and Rakuka Trice. "Poverty as We Know It: Media Portrayals of the Poor," *Public Opinion Quarterly* 64 (2000), 53-64.

[127] Valentino, Hutchings, and White, "Cues that Matter," 87.

crats Mario Gallegos, Garnet Coleman, Shelia Jackson Lee, and Barack Obama, with a caption stating "Birds of a Feather Flock Together." The pictures of the politicians were placed over an image of a flock of black birds perched on a tree. The reverse of the flyer has Redmond in the same group of pictures but with the caption "Bad Company Corrupts Good Character." Significantly, all of the politicians surrounding Redmond are racial minorities. The racial appeal made by the mailer is obvious: Redmond is associated with minority politicians, which makes him an unacceptable candidate. While the primary argument made by the flyer is that Redmond is a liberal, the decision to surround Redmond with politicians who were racial minorities—rather than other Democrats, generally—is an unmistakable racial appeal. Moreover, the use of "black birds" is a symbolic signal, and the black birds can be interpreted as ravens or crows, which would be even more of an explicit racial appeal to "Jim Crow." (*See* Exhibit 1: Empower Texans, "Birds of a Feather Flock Together," Austin, TX: Empower Texans, 2008.).

A 2008 mailer sent to African-American voters in Dallas, Texas reads on the front "Don't be a victim of voter fraud!" The back of the mailer warns that an unnamed "national political group suspected of voter fraud is currently working in your neighborhood trying to bring people to the polls on election day." The mailer also threatens that if a person is a *victim* of "voter fraud – it could result in jail time for you," and that "[p]olice and other law enforcement agencies will be at the voting locations." (*See* Exhibit 2: "Don't be a victim of voter fraud," Dallas, TX: Unknown, 2008.).

In a Texas city council race with a Latino candidate, his Anglo opponent had a campaign mailer that showed two roads: one was clean and well-kept, the other with a dirt-road with buildings that indicated it was in Mexico. The Latino candidate interpreted the message of the mailer

37

to be that if the Anglo were elected, the neighborhood would flourish, while if he were elected, the neighborhood would become downtrodden.[128]

During a 2008 campaign for a seat in the Texas House, one non-minority candidate, Bill Zedler, used racial appeals against his non-minority opponent, Chris Turner. A computer manipulated image of Mr. Turner from a Zedler campaign mailer darkened his skin, pinned a Mexican flag button on his shirt, and placed him in front of a Chinese flag. The Zedler campaign mailer also accused Mr. Turner of "vot[ing] to give tax credit to companies that ship Texas' jobs to China" and "campaign[ing] against illegal immigration", but failing to "file a single bill to secure and protect our border," closely associating Mr. Turner with Chinese and Mexican "others" who allegedly threatened Texans' livelihoods. (Exhibit 3: "The Great Pretender," Arlington, TX: Bill Zedler Campaign, 2008.).

While implicit appeals to race are more subtle, they were recently evident in the 2014 Party Platform of the Republican Party of Texas, which opposes "reparations," presumably for African-American slavery, demands the restoration of Confederate-honoring plaques that were "illegally" removed from the State Supreme Court by former Republican Governor George W. Bush, and supports a pre-Civil War theory of a state's right to "nullify any federal mandated legislation which infringes upon the states' 10th Amendment Right."[129]

---

[128] *Rodriguez v. Harris Co.*, 2013 WL 3980651 p. *76-77.
[129] The 2014 Republican Party of Texas Platform, http://www.texasgop.org/wp-content/uploads/2014/06/2014-Platform-Final.pdf.

### 3.   Racial Appeals and Voter Identification Laws in Texas

In Texas, supporters of voter ID laws relied heavily on implicit and overt racial appeals. "[P]oorer, inner-city, and minority" voters are often associated with "voter fraud."[130] Implicit racial appeals, including code words like "immigration" and "fraud,"[131] which prime racial attitudes in white voters,[132] for instance, were prominent throughout the debates over SB 14 and its predecessor bills.

During his primary campaign for United States Senator, for example, Texas Lieutenant Governor David Dewhurst, who shepherded SB 14 through the State Senate, linked his stance on tough immigration restrictions to the need for a strict voter ID law.[133] In 2010, in a dramatic and drastic move, State Representative Debbie Riddle camped outside of the State House for two days to simultaneously file a voter ID bill and a bill empowering local police officials to arrest undocumented immigrants.[134] Later, in her 2012 deposition for the Section 5 case, Representative Riddle, who backed SB 14 in 2011, was asked to identify a specific instance of voter fraud or non-citizen voting. Her answer was that she once saw a Spanish-speaking Latina woman receive help with voting, strongly insinuating, with no basis other than the voter's language, that the Latina woman was a non-citizen engaging in voter fraud. Representative Riddle subsequently

---

[130] Spencer Overton, *Stealing Democracy: The New Politics of Voter Suppression* (New York: Norton, 2007), 160, quoting John H. Fund, *Stealing Elections: How Voter Fraud Threatens Our Democracy* (San Francisco: Encounter Books, 2004).

[131] McIlwain and Caliendo. *Race Appeal*, 19-21, 153, 154; Clawson. "Poor People, Black Faces," 352-61; Clawson and Trice. "Poverty as We Know It," 53-64.

[132] Valentino, Hutchings, and White, "Cues that Matter," 87.

[133] Attorney General's Proposed Findings of Fact and Conclusions of Law ¶ 189, *Texas v. Holder*, Civil Action No. 12–cv–128    (DST,     RMC,     RLW),     ECF    No.    223,    *available    at* http://moritzlaw.osu.edu/electionlaw/litigation/documents/HoldersProposedFindingsofFactandConclusionsofLaw.pdf.

[134] Kevin Koloian, "Debbie Riddle Files Immigration Reform, Voter ID Bills," *Spring Observer*, Nov. 17, 2010, http://www.yourhoustonnews.com/spring/news/article_e8b26a0c-ba9d-5c30-94ec-87953808de6d.html.

admitted, however, that she knew only that the voter was a Spanish-speaking Latina, and nothing about the voter's citizenship status.[135]

Racial appeals in support of voter ID legislation also came from the Texas-based affiliates of the Tea Party movement, such as the King Street Patriots. At the invitation of key sponsors of SB 14, Catherine Engelbrecht, a leader of the King Street Patriot, spoke in support of SB 14 before the 2011 Texas legislature.[136] Tellingly, this occurred soon after the King Street Patriots organized a voter intimidation campaign in Texas during the 2010 congressional elections. Before the elections, the King Street Patriots analyzed over 3,000 voter registrations in African-American Congresswoman Sheila Jackson's district. Because of the work of the King Street Patriots, over 400 voters were placed in "suspense," requiring that they update their registration information before being eligible to vote. In fall 2010, members of the group volunteered as poll watchers. Dozens of primarily white volunteers showed up at 37 polling places throughout the district, leading one observer to describe the influx of white election observers, many of whom frequently came into conflict with voters and poll workers, into African-American neighborhoods as racial intimidation.[137] On the first day of early voting for the 2010 election, the Harris County clerk's office "received 14 complaints of alleged voter intimidation at 11 voting locations."[138] As a Texas federal court found in 2013: "The racist element of these efforts was evident in a photo posted in October on the King Street Patriots website showing a black man hold-

---

[135] Defendant-Intervenors' Proposed Supplemental, Non-Duplicative Findings of Fact and Conclusions of Law, ¶ 247, *Texas v. Holder*, Civil Action No. 12–cv–128 (DST, RMC, RLW), *available at* http://www.brennancenter.org/sites/default/files/legacy/Democracy/VRE/241%20DI%20Proposed%20Findings%20of%20Fact%206.27.2012.pdf.

[136] Witness List, SB 14, House Committee, Voter Identification and Voter Fraud, Select (Mar. 23, 2011), http://www.hro.house.state.tx.us/pdf/ba82r/sb0014.pdf; Witness List, SB 14 House Committee Report, Voter Identification and Voter Fraud, Select Committee, , ftp://ftp.legis.state.tx.us/bills/82R/witlistbill/pdf/senate_bills/SB00001_SB00099/SB00014H.pdf.

[137] Stephanie Saul, "Looking, Very Closely, for Voter Fraud," *The New York Times,* September 17, 2012. A1.

[138] Joe Holley, "Some Harris County Early Voters Upset by Poll Watchers," *The Houston Chronicle,* Oct. 18, 2010.

ing a sign with the words 'I only got to vote once,' with a white woman behind him holding a second sign saying 'I'm with stupid.'"[139] The King Street Patriots' efforts failed to find reliable evidence of voter fraud but succeeded in suppressing the votes of lower income African Americans.[140] Moreover, in May 2013, Dallas Tea Party leader Ken Emmanuelson stated that "The Republican Party does not want black people to vote if they are going to vote 9-to-1 for Democrats."[141]

### D.    Senate Factor 9: "Voter Fraud" as a Rationale for SB 14 is Tenuous

Voter fraud is the primary justification of supporters of more restrictive voter identification requirements. It has been the chief reason for restricting access to the polls since the nineteenth century with the enfranchisement of African Americans during Reconstruction, it dominated the twentieth-century disfranchisers' excuses for eliminating minority voters, and it continues today with the tenuous reason given for SB 14. "Most Texas politicians grasp the basic rule that elections laws are never neutral in their effects… although the ostensible reasons given [for disfranchising election laws] are usually benign.[142]" Senate Factor 9 examines whether the prevention of "voter fraud," Texas's justification for implementing SB 14, is tenuous. Here, Texas's history of using fraud to justify everything from poll taxes to annual registration requirements, the lack of in-person voter impersonation, and the failure of SB 14 as an effective means of preventing non-citizens' voting shows the tenuousness of SB 14's purported justification.

As detailed under Senate Factor 1 above, fraud was a constant refrain for all of the major disfranchisement devices of the nineteenth and twentieth centuries, from the white primary to the

---

[139] Plaintiffs' Expert Report, *Rodriguez v. Harris Co.*, 2013 WL 3980651, at *73-74 (2013).
[140] *See* Abby Rapoport, "Voter Intimidation in Houston? The View from Acres Homes," *Texas Observer*, Oct. 29, 2010, http://www.texasobserver.org/floor-play/inside-one-harris-county-polling-station (last access June 27, 2014).
[141] Jay Root, *Tea Party Leader Says He Misspoke About Black Voters*, Texas Tribune, June 4, 2013, *available at* www.texastribune.org/2013/06/04/gop-distances-itself-tea-party-leaders-remarks/.
[142] Chandler Davidson, *Race and Class in Texas Politics* (1990), p. 51.

poll tax and the re-registration systems. As recently as 2004, the Waller County district attorney unjustifiably threatened to prosecute any African-American students of Prairie View A&M University who voted in local county elections for "voter fraud" until the students successfully sued the county to enjoin its officials from engaging in further acts of voter harassment.[143] Thus, in Texas, the purported prevention of fraud is an enduring "pretext" for exclusionary devices that have the intent or result of denying African Americans and Latinos their voting rights.

SB 14 is also justified as an anti-voter fraud measure, and yet there is not significant evidence that in-person voter impersonation actually occurs or that SB 14 would successfully prevent non-citizens from voting at the polls in Texas. First, although over 46 million votes were cast in general, primary, and special constitutional elections in Texas between 2002 and 2011, there were only two alleged instances of in-person voter fraud, i.e., the only form of fraud that SB 14 may prevent.[144] The issue of in-person fraud as a pretext for SB 14 is aptly summarized by Mr. Randall "Buck" Wood, in the affidavit that he submitted in the Section 5 case. Mr. Wood has practiced election law in Texas for over 40 years, served as the Director of Elections for the Texas Secretary of State from 1969 to 1972, and has been involved in more than 100 election contests. Mr. Wood stated that, after searching extensively for in-person fraud, he has never found "one case of in-person voter fraud in Texas involving voter impersonation, voting dead people or other fraud that would be prevented by SB 14." According to Mr. Wood, "in-person voter fraud is not difficult to detect in an election contest or by law enforcement authorities." Indeed, despite there being "significant voter fraud discovered by persons who cast ballots by mail," Mr. Wood believes that the Texas legislature did not address "ballot by mail because more

---

[143] Perales et al., *Voting Rights in Texas*, 26.
[144] Defendant-Intervenors' Proposed Supplemental, Non-Duplicative Findings of Fact and Conclusions of Law ¶¶ 86B-86D, *Texas v. Holder*, Civil Action No. 12–cv–128 (DST, RMC, RLW), ECF No. 226-2.

Anglo citizens cast ballots by mail than do minority voters." His opinion is that SB 14 dispropor-tionately burdens Latino and African-American voters who lack acceptable photo IDs.[145]

Moreover, as noted in Senate Factor 6, legislators and private political groups both used racial appeals about the threat of non-citizen immigrants voting to garner support for SB 14, but then utterly failed to draft a bill that would actually prevent a non-citizen from voting. Non-citizens may lawfully possess many of SB 14-required photo ID, like a U.S. military ID. Other odd drafting choices for SB 14 — such as forbidding the use of student IDs, but allowing the use of a concealed handgun license — are also incredible.   These deliberate choices by SB 14's drafters to permit certain forms of photo ID that white voters are perhaps more likely to possess (even if non-citizens also may also possess them) but preventing the use of other otherwise valid forms of photo ID demonstrates that voter fraud not a credible justification for SB 14 and strong-ly suggests that fraud is a pretext for unlawful racial discrimination.

## IV.    CONCLUSION

The totality of the circumstances suggest that, because of race—in particular Texas's pat-tern of official historical and modern discrimination in voting, education, employment, and hous-ing—SB 14 causes an inequality of access to the electoral process for African-American and mi-nority voters in Texas. In addition, my analysis of the totality of the circumstances together with other factors related to the timing, legislative history, and implementation of SB 14 strongly sug-gests that SB 14 is discriminatory in purpose.

---

[145] Affidavit of Randall "Buck" Wood, *Texas v. Holder*, Civil Action No. 12–cv–128 (DST, RMC, RLW) (dated June 8th, 2012). Furthermore, Mr. Wood believes that "SB 14 [was] designed to decrease the number of effective ballots cast by minority citizens" and "it was the Legislature's purpose with SB 14 to discourage turnout among mi-nority citizens." Id.

A.    **SB 14 Results in Discrimination Because of Race.**

My analysis of the totality of the circumstances reveals that SB 14 substantially burdens

the ability of African-American and minority voters in general to cast a ballot. Senate Factors 1,

5, and 6 in particular demonstrate that SB 14 causes discrimination by following in the footsteps

of Texas's infamous use of other devices that, while appearing to be race-neutral, in fact act to

hinder voting by African Americans. Since Reconstruction, Texas has used a variety of disfran-

chising devices and tactics that ranged from outright prohibitions, e.g., all-white primaries, to

those that appeared race-neutral but disproportionately disfranchised minorities, including poll

taxes and burdensome voter registration practices. Since the 1940s, however, federal courts have

invalidated each of these tactics, soundly rejecting all of Texas's arguments in their favor. Here,

the disfranchising effect of the financial costs associated with obtaining forms of SB 14-required

photo ID, including a "free" Election Identification Certificate (EIC), function much the same

way as the poll tax once did. Newspaper articles, and national studies by private organizations

have shown the prohibitive cost – both in economic terms and in energy spent – to African-

American and other minority voters who do not currently possess SB 14-required ID.[146]

For the reasons discussed above, these financial burdens fall heaviest on African-

American and Latino voters because of the continued existence of official discrimination and the

resulting racial disparities in education, employment, housing, and transportation. Education is

---

[146] Keesha Gaskins and Sundeep Iyer, *Challenge of Obtaining Voter Identification* (New York: Brennan Center for Justice, 2012); *Citizens without Proof: A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification* (New York: Brennan Center for Justice, 2006); John Lewis, "A Poll Tax by Another Name," *New York Times*, 27 August 2011, A19; Matt A. Barreto, Stephen A. Nuño, and Gabriel R. Sanchez, "The Dispro-portionate Impact of Voter-ID Requirements on the Electorate – New Evidence from Indiana," *Political Science and Politics* 42 (Jan 2009): 111-16; Letter from Thomas E. Perez (Assistant Attorney General for the U.S. DOJ) to Keith Ingram (Direct of Elections in the Office of the Texas Secretary of State) 12 March 2012, *available at* http://www.justice.gov/crt/records/vot/obj_letters/letters/TX/l_120312.pdf.

an important determinant of voter turnout.[147] Those who have graduated from college are significantly more likely to have interest in elections and their outcomes.[148] Lower minority educational attainment and the legacy of segregated schools, as well as current racial isolation and discrimination in Texas schools (all forms of state action), still have far-reaching implications for minority Texans' economic standing, political engagement, and knowledge about voting requirements. For example, a 2012 Pew Research Center poll found that 24% of the Latino registered voters, compared to 18% of all registered voters, in states with photo ID laws did not know about the photo ID requirement.[149] Many African Americans may be similarly uninformed about their state's voter ID laws.[150] Limited educational attainment also may drive minorities into hourly wage or service professions, likely creating additional burdens under SB 14. In the Section 5 case, for example, the court summarized the testimony of Lydia Camarillo of the Southwest Voter Registration Project: "[f]or working class Latinos, the requirement of travelling to the DPS during regular business hours may prevent them from obtaining ID because their work hours are not flexible."[151]

In addition to educational disparities, the effect of SB 14 is amplified by other racial disparities in poverty rates, housing patterns, and transportation, each attributable to the various forms of official discrimination, to cause a discriminatory result. African-American Texans remain largely clustered in racially identifiable and high-poverty neighborhoods that are less likely to be located near Department of Public Safety (DPS) offices, where photo IDs are issued. In

---

[147] John E., Filer, Lawrence W. Kenney and Rebecca B. Morton. "Voting Laws, Education Policies, and Minority Turnout." *Journal of Law and Economics*, vol. 34, no. 2 (October 1991), pp. 371-393. p. 374
[148] Katherine Tate, ed. *From Protest to Politics: The New Black Voters in American Elections* (Cambridge, MA: Harvard University Press, 1994). p. 87.
[149] Mark Hugo Lopez & Ana Gonzalez-Barrera, *Latino Voters Support Obama by 3-1 Ratio, But Are Less Certain than Others about Voting*, at 20, Pew Research Center, Oct. 11, 2012, *available at* http://www.pewhispanic.org/files/2012/10/2012_NSL_latino_vote_report_FINAL_10-18-12.pdf.
[150] Ibid.
[151] *Texas v. Holder*, 888 F. Supp. 2d 113, 140 (D. D.C. 2012).

Dallas County, persistent housing discrimination and segregation works in conjunction with SB 14 to make it particularly difficult for minority voters to reach DPS offices. The City of Dallas has an ID-issuing office in the city center. Yet, a 2012 analysis done by the Brennan Center shows that many of the city's African-American voters live outside of the city center in the southeastern quadrant of Dallas County, which has no DPS offices. In Dallas's southeast quadrant, there are 244,100 eligible voters, nearly 30% of residents live in poverty, and 52% are African-American residents. By contrast, in the rest of Dallas County, there are eight full-time DPS offices, 1.1 million eligible voters, just 17% of residents there live in poverty, and only 22% of residents are African Americans. Although public transportation can take one from the southeast quadrant to the Dallas city center's DPS office, many of the predominately African-American voters in the southeast quadrant must travel two-to-four hours roundtrip to reach that office.[152] The same inaccessibility exists elsewhere in Texas. As Texas Representative Trey Martinez Fischer of San Antonio testified in the Section 5 case: "you will not find a DPS office from downtown San Antonio to the western boundary, which is heavily concentrated with African-Americans, and particularly Hispanics." State Senator Carlos Uresti also testified that in his 70% Latino and 5% African-American voting district: "[t]here are some towns . . . where the nearest DPS office is about a 100 to 125" mile trip each way. State Senator Rodney Ellis testified that DPS offices in "inner city" Houston are not "easily accessible by public transportation."[153] African-American and Latino Texans are overrepresented among the 5.4% of the voting age popula-

---

[152] Keesha Gaskins and Sundeep Iyer, "The Challenge of Obtaining Voter Identification," at 12-13, Brennan Center for Justice (2012), available at http://www.brennancenter.org/sites/default/files/legacy/Democracy/VRE/Challenge_of_Obtaining_Voter_ID.pdf (last accessed June 27, 2014).
[153] *Texas v. Holder*, 888 F. Supp. 2d 113, 140 (D. D.C. 2012).

tion that lacks a vehicle.[154] Of this total, 7.2% of those without vehicle access live over ten miles away from a DPS office.[155] As the 2012 Brennan Center report concludes, although Texas offers the EIC without a direct charge, "[i]n the real world, poor voters find shuttered offices, long drives without cars or with spotty or no bus service, and sometimes prohibitive costs."[156]

Traveling to DPS offices is even more difficult for the disproportionate number of African-American and Latino voters who lack driver's licenses. Indeed, Texas's own study showed that Spanish-surnamed registered voters are between 46.5% and 120% more likely than Anglo voters to *lack* state-issued photo ID, such as driver's licenses.[157] Two national studies from 2012 suggest that these racial differences in driver's license ownership are even more pronounced among young people. A study by the AAA Foundation for Traffic Safety found that 55% of African-American and 57% of Latino youth aged 18-20 had a driver's license; substantially less than the 79% of white youth who reported having a license. Although minority youth across incomes were less likely to have a license, two of the most common reasons for delayed licensure were financial: "not having a car," and "the costs associated with driving." This suggests that racial disparities in income and/or wealth also contribute to racial differences in driver's licensure.[158] A second 2012 national study by the Black Youth Project also showed racial disparities in driver's license ownership for youth aged 18-29. Of that age group, 71.2% of African Americans, 67.0% of Latinos, but 85.1% of white youth had a driver's license. Notably, although SB

---

[154] "Undisputed census data shows that in Texas, 13.1% of African Americans and 7.3% of Hispanics live in households without access to a motor vehicle, compared with only 3.8% of whites." *Texas v. Holder*, 888 F. Supp. 2d 113, 140 (D. D.C. 2012).
[155] Gaskins and Iyer, "Challenge of Obtaining Voter Identification," 4.
[156] Ibid.
[157] Gaskins and Iyer, "Challenge of Obtaining Voter Identification," 24; Letter from Thomas E. Perez (Assistant Attorney General for the U.S. DOJ) to Keith Ingram (Direct of Elections in the Office of the Texas Secretary of State) 12 March 2012; *available at* http://www.justice.gov/crt/records/vot/obj_letters/letters/TX/l_120312.pdf.
[158] AAA Foundation for Traffic Safety, Timing of Driver's License Acquisition and Reasons for Delay among Young People in the United States, 2012, 9, 2, 11 (table 3).

14 does not permit the use of student IDs, disparities between African-American (24.9%), Latino (28.6%) and white youth (30.9%) were much less pronounced for college ID ownership.[159]

Social science research makes clear that the socioeconomic disadvantages experienced by African Americans and Latinos constitute a clear hindrance to the effective participation of those groups in the political process. In their highly regarded study, *Who Votes*, political scientists Raymond Wolfinger and Steven Rosenstone document the strong and direct correlation between political participation and socioeconomic status (SES). Their central conclusion is that "citizens of higher social and economic status participate more in politics." In the South, they conclude, this disparity in turnout between the rich and the poor and between the educated and uneducated is even more pronounced. Southerners with eight years of schooling or less, they note, vote 16 percentage points less than their northern counterparts. All these factors have a disparate racial impact since African Americans and Latinos remain grouped in the ranks of lower educational, economic, and social status. Moreover, the authors attribute some of the disparity to the past history of race discrimination, what they call a "regional memory" of the time when it was dangerous for African Americans to vote. Older, undereducated African Americans who are poor are thus particularly unlikely to vote.[160] Three more recent studies build upon Wolfinger and Rosenstone's classic work and come to similar conclusions about education and income and voter par-

---

[159] Jon C. Rogowski & Cathy J. Cohen, "Black and Latino Youth Disproportionately Affected by Voter Identification Laws in the 2012 Election" at 5, http://research.blackyouthproject.com/files/2013/03/voter-ID-laws-feb28.pdf.

[160] The standard work of the effects of SES is still Raymond E. Wolfinger and Steven J. Rosenstore, *Who Votes?* (New Haven: Yale University Press, 1980). See esp, pp.13, 93. A more current survey of research on political participation is Richard G. Niemi and Herbert F. Weisberg, eds., *Controversies in Voting Behavior* (Washington, D. C., 2001, 4th ed.), pp 22-37; and the most recent study, Jan E. Leighley and Jonathan Nagler, Who Votes Now? Demogrphics, Issues, Inequality and Turnout in the United States (Princeton: Princeton University press, 2013). None of the recent studies challenge the basic conclusions of Wolfinger and Rosenstore, In *Northwest Austin Mun. Utility Dist. Number One v. Mukasey*, 573 F. Supp. 2d 221, 248 (D.D.C, 2008), the trial court notes – citing http://www.census.gov/population/socdemo/voting/cps 2004/tab 04 a.xls - that, if one compares the registration & turnout rates for non-Hispanic whites with those for African Americans and Latinos in Texas, there remained, as of 2004, significant disparities (see the rates in Table 4a for Texas).

48

ticipation.[161] Social scientists have demonstrated that income, which is most directly related to education and employment, also correlates with housing. Income, education, employment, and housing are all areas where Texas has engaged in official discrimination, and all work together to disadvantage minority voters.[162]

As one recent study found, even a seemingly minor inconvenience, like locating a new polling place, depresses turnout, especially for poor and young voters.[163] Therefore, given the much more complicated and substantial changes associated with this voter ID law, which will then interact with the history of racial discrimination by Texas in all areas of African-American and minority voters' lives, the discriminatory disfranchisement resulting from SB 14 is foreseeable and certain.[164]

### B.  SB 14 is Racially Discriminatory.

I infer the discriminatory purpose of SB 14's photo ID requirement from my thorough examination of the totality of the circumstances and several additional factors, including: (1) the

---

[161] Steven J. Rosenstone and John Mark Hansen, *Mobilization, Participation, and Democracy in America* (New York: Macmillan, 1993), see especially Chapters 6 and 7 which focus on institutional factors that influence turnout (chp. 6) as well as the rise and decline of African American voter turnout (part of chp. 7); Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady, *Voice and Equality: Civic Voluntarism in American Politics* (Cambridge: Harvard University Press, 1995), see esp. 6, 7, 8 and 12; Leighley and Nagler, *Who Votes Now.*. See also Patricia Gurin, Shirley Hatchett, and Jon S. Jackson, *Hope and Independence: Minority's Response to Electoral and Party Politics* (New York: Russell Sage Foundation, 1989); Sidney Verba, and Norman H. Nie, *Participation in America: Social Equality and Political Democracy* (New York: Harper and Row, 1972); and for an international perspective see Sidney Verba, Norman H. Nie, and Jae-on Kim, *Participation and Political Equality: A Seven National Comparison* (Cambridge: Cambridge University Press, 1978).

[162] Leighlery and Nagler, Who Votes Now?, p. 71 analyze differences in black and white voting rates, and conclude after careful multivariate analysis, that "It is the other characteristics of blacks (most likely lower levels of education and income) that result in a lower overall voting rate as a group than whites." When controlling for education and income, African Americans actually vote at a higher rate than whites.

[163] Henry E Brady and John E. McNulty, "Turning Out to Vote: the Costs of Finding and Getting to the Polling Place." *American Political Science Review* 105 (2011):115-134.

[164] An additional broader and more general analysis of the extent to which increasing costs even slightly depresses turnout is subtitled, "How Increasing the Difficulty of Voting Dissuades Even the Most Motivated Voters." This subtitle speaks volumes to the impact that SB 14 will have on African Americans and minorities in Texas who, as the SES data shows, are less educated and poorer. John E McNulty, Conor M. Dowling, and Margret H. Ariotti. "Driving Saints to Sin: How Increasing the Difficulty of Voting Dissuades Even the Most Motivated Voters," Political Analysis 17 (2009): 435-455.

substantial and recent growth of the minority voter population in Texas; (2) SB 14's passage by the same Texas legislature that enacted intentionally discriminatory redistricting plans; (3) the ways that the Texas legislature departed from its usual procedural practices to pass SB 14; and (4) SB 14's implementation even after a court found that the voter ID law had a discriminatory effect (see Appendix B: Passage and Implementation of Voter Identification Legislation).

To begin, an important basis for understanding the motivation behind SB 14 is the integral link between race and party in the South in general, and in Texas specifically, as described above in Part C, Sections 1 and 2. Democrats in the 1890s and early 1900s disfranchised African Americans and other minorities to prevent them from asserting political power. Today, voting in Texas is extremely polarized by race — with white voters favoring the Republican Party and the Democratic Party being heavily supported by African Americans and Latinos[165] — a polarization that, in turn, means that any reduction in African-American (and Latino) turnout benefits the state's Republican Party. Conversely, significant gains in minority voting strength are a threat to the state Republican Party's electoral success.[166]

---

[165] Schaffer, Byron E. and Richard Johnston. *The End of Southern Exceptionalism: Class, Race, and Partisan Change in the Post-War South.* (Cambridge, MA: Harvard University Press, 2009), p. 4.

[166] Bernard Cosman and Herbert Huckshorn, eds., *Republican Politics: the 1964 Campaign and Its Aftermath for the Party* (NY: Praeger, 1968), p. 242; Numan Bartley and Hugh Davis Graham, *Southern Politics and the Second Reconstruction* (Baltimore: Johns Hopkins University Press, 1975), p. 187; Earl Black and Merle Black, *Politics and Society in the South* (Cambridge: Harvard University Press, 1987), pp. 143-44; Kenneth O'Reilly, *Nixon's Piano: Presidents and Racial Politics from Washington to Clinton* (NY: Free Press, 1995), pp. 285-86; Dan T. Carter, *From George Wallace to Newt Gingrich: Race in the Conservative Counterrevolution, 1963-94* (Baton Rouge: Louisiana State University Press, 1996), p. 45, and Carter, *The Politics of Rage: George Wallace, The Origins of the New Conservatism, and the Transformation of American Politics* (New York: Simon & Schuster, 1995); Declaration of Dan T. Carter, *U.S. v. Charleston County Council*, D.S.C., No. 2-01-0155-11 (2001), at 20; Carter, "Unfinished Transformation: Matthew J. Perry's South Carolina," in W. Lewis Burke and Belinda F. Gergel, *Matthew J. Perry: The Man, His Times, and His Legacy* (Columbia: University of South Carolina Press, 2004), p 251; See also, Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (New York: The New Press, 2010), 43-44 and notes for a brief description of the Southern Strategy.

Racial bloc voting remains prevalent in Texas. Voting Rights Act: Evidence of Continued Need: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. (2006), Volume IV , pp. 5340-5358, 5359-5387, 5411-5494; Davidson, Chandler, Expert Report, *Vera v. Richards* (1994), p. 39.

Other factors also tend to demonstrate that the other reasons given for enacting SB 14 was a pretext for racial discrimination. Into the 1970s, for instance, Texas used fraud as a tenuous justification for passing discriminatory laws, like the purposefully discriminatory poll tax and the annual registration requirements described in Part A, Sections 3 and 4. In addition, because of the racial polarization in Texas, overt and subtle racial appeals still play a role in current electoral politics in Texas. Indeed, as noted in Part C, Section 3 of this report, coded and overt racial appeals, like associating minority voters with "fraud" and "immigration," by politicians like Lieutenant Governor Dewhurst and Representative Riddle, and leaders in the "Tea Party" movement in Texas — active and prominent Texas partisans and voter ID supporters — led the way for the passage of voter ID legislation in Texas. Yet, SB 14 prevents neither non-citizen voting nor even absentee ballot fraud — the most prevalent form of fraud — exposing SB 14 as a "solution in search of a problem."

SB 14 also was enacted against the backdrop of substantial population growth by minorities in Texas and the increase in minority voter turnout beginning in the 2008 presidential election of Barack Obama as the nation's first African American President. Texas's population increased by 4,293,741 from the 2000 to 2010 census, with Latinos comprising 60% of this total increase. Latinos now comprise 37.6% of Texas's population. Although the total population of Texas increased by 20.6%, the Latino population increased by 41.9% and the Anglo population increased by only 4%. Between 2005 and 2009, the Latino citizen voting age population (CVAP) also increased from 24.6% of Texas's total CVAP to 25.5%. In each year from 2005 to 2009, the number and proportion of Latino CVAP increased. As the minority population has increased in Texas, so too has minority voter turnout. For instance, African-American CVAP turnout in Texas

rose from 60% in 2008 to 63.1% in 2012, making the 2012 presidential election likely the very first time that African-American voter turnout surpassed white turnout.[167]

The Texas legislators who enacted SB 14 were likely aware of these facts as they were the same legislators who had used racialized anti-immigration appeals to first garner support for the voter ID law and who had passed a series of post-2010 Census statewide redistricting plans, which a federal court in Washington, D.C., blocked under Section 5 of the Voting Rights Act.[168] That federal court also found that Texas's U.S. Congressional and State Senate redistricting plans were *intentionally discriminatory*,[169] and strongly suggested that the same was true for the State House plan.[170] The detailed manner in which the Texas legislature purposefully "cracked" and "packed" districts along racial lines, as well as its clear awareness of how high and low areas

---

[167] While there are some issues of debate on the actual rate of black turnout, it was clearly higher than usual, and it was recorded as exceeding the white turnout. Thom File, "The Diversifying Electorate—Voting Rates by Race and Hispanic Origin in 2012 (and Other Recent Elections)." U.S. Census Bureau Current Population Survey (May 2013), http://www.census.gov/prod/2013pubs/p20-568.pdf; *A Look at 2012 Turnout by Ethnicity in Texas,* Texas Redistricting & Election Law, http://txredistricting.org/post/49970427560/a-look-at-2012-turnout-by-ethnicity-in-texas; Dan Balz and Ted Mellnik, "Census: Blacks Voted at Higher Rates than Whites in 2012," *The Washington Post,* http://www.washingtonpost.com/politics/census-blacks-voted-at-higher-rates-than-whites-in-2012/2013/05/08/7d24bcaa-b800-11e2-b94c-b684dda07add_story.html.

There is a great deal of research in political science over the last three decades showing that sample data published biennially by the *Current Population Survey* (*CPS*), a monthly survey of households conducted by the Bureau of Census for the Bureau of Labor Statistics are skewed by over-reporting. An early example is Allan J. Lichtman and Samuel Issacharoff, "Black/White Voter Registration Disparities in Mississippi: Legal and Methodological Issues in Challenging Bureau of Census Data," *Journal of Law and Politics* (Spring, 1991). Every group tends to over-report registration and voting. African Americans over-report at a higher rate than whites over-report. The most recent and careful synthesis of all this literature, Jan E. Leighley and Jonathan Nagler, *Who Votes Now? Demographics, Issues, Inequality and Turnout in the United States* (Princeton: Princeton University Press, 2013), cite in their discussion articles showing that African-Americans are more likely to inflate reported registration and turnout than whites (pp. 18-23). Lieghley and Nagler conclude, "there are significant differences in misreporting rates between blacks and whites, with blacks being more likely to overreport voting." (pp. 19-20). Unless this long-standing over-reporting pattern has changed, there are questions as to whether the report that African Americans voted at a higher percentage than whites in 2012 is entirely reliable.

[168] *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012).

[169] "Although we have already concluded that the Congressional Plan cannot be precleared under section 5's effect prong, we are also persuaded by the totality of the evidence that the plan was enacted with discriminatory intent... "We conclude that Texas has not shown that the Senate Plan was enacted without discriminatory intent." *Texas v. United States*, 887 F. Supp. 2d 133, 159-66 (D.D.C. 2012).

[170] *Texas v. United States*, 887 F. Supp. 2d 133, 178 (D.D.C. 2012) ("[R]ecord evidence may support a finding of discriminatory purpose in enacting the State House Plan. Although we need not reach this issue, at minimum, the full record strongly suggests that the retrogressive effect we have found may not have been accidental.")

of minority voter turnout could be shifted to affect election outcomes, strongly suggests that the same legislature's care and knowledge of census and minority turnout data went into the crafting of SB 14.

SB 14's supporters also engaged in various unusual procedural maneuvers to pass SB 14, such as attempting to attach voter ID requirements to unrelated bills as amendments[171] and using the life-threatening illness of one Democratic senator to try to overrule dissent.[172] In response, the minority Democratic Party had a "chub" in the House[173] and threatened filibusters to prevent the passage of voter ID legislation.[174] In 2009, the Senate passed SR 14, which added Senate Rule 5.11(d), exempting voter ID legislation from the usual two-thirds rule practiced in the Senate.[175] This rule was carried over into the rules that the Senate adopted for the 82nd legislature on 19 January 2011.[176] On 20 January 2011, Governor Perry declared voter ID requirements an emergency item, which allowed lawmakers to begin considering the issue in the initial 30 days of the legislative session.[177] Lieutenant Governor Dewhurst expedited that passage of SB 14; Senator Fraser originally filed his photo identification bill as SB 178, but he was permitted to re-file the bill using a low bill number reserved by Dewhurst for legislative priorities.[178] In the House, Speaker Straus announced SB 14 would be on a "fast track" Select Committee on Voter Identification and Voter Fraud, the only committee "fast tracked" that session, with SB 14 as its only

---

[171] Texas House Journal, 79th Legislature, Regular Session. 76th day (May 24, 2005).

[172] Gary Scharrer, "Ailing Gallegos Risks Health to Stop Voter ID," *Houston Chronicle*, May 22, 2007.

[173] Dave Montgomery, "Democrats in House talk to kill voter ID bill," Fort Worth Star Telegram, May 23, 2009, B01.

[174] Associated Press, "Democrats derail voter-ID bill with threat of filibuster, exercise of Senate rules," Lubbock Avalanche-Journal, May 29, 2005.

[175] Texas Senate Resolution 14; Legislative Session 81 (R). 01/14/2009. http://www.legis.state.tx.us/tlodocs/81R/billtext/pdf/SR00014F.pdf (last accessed June 27, 2014)

[176] *Senate Rules*. Adopted by the 82nd Legislature, January 19, 2011.

[177] "Gov. Perry Adds Voter I.D. and Balanced Budget Amendment to Emergency Items for Legislative Session." Office of the Governor, Rick Perry. January 20, 2011. http://governor.state.tx.us/news/press-release/15602/ (last accessed June 27, 2014).

[178] DOJ findings of fact/law in Section 5 case, 174.

legislation.[179] Two elected House Democrats switched parties, giving Republicans a two-thirds majority in the House, allowing them to suspend the rules anytime to break a Democratic chub.[180] The House proposed 53 amendments; 35 were tabled, 3 failed, and 15 were adopted but later removed, and many of these amendments would have made the photo IDs less restrictive or would have provided a study of the impact of the voter ID law.[181] Although citing fraud prevention and claiming to use the Indiana voter ID law as a template, the authors of SB 14 ignored the various amendments that would have made the law less burdensome and rejected the more lenient aspects of the Indiana law, to craft the most extremely and exclusionary voter ID requirement in the nation. (For further details about the legislative history of SB 14, which was characterized by departures from normal legislative processes and customs, please see Appendix B: Passage and Implementation of Voter Identification Legislation).

In fact, at the time SB 14 was finally implemented in 2013, Texas was fully aware of the real difficulties that African Americans and other minority voters faced in obtaining an SB 14 required photo ID. Most tellingly, in 2012, a federal court in Washington, D.C., had already used the Voting Rights Act to block implementation of the law. On June 25, 2013, however, the U.S. Supreme Court struck down as unconstitutional a separate part of the Voting Rights Act,[182] giving Texas the option of enforcing SB 14. Within mere hours of the Supreme Court's decision, the Texas Governor and Attorney General both announced that SB 14 would be enforced immediately and without any alterations to mitigate the law's discriminatory effect.[183]

---

[179] DOJ findings of fact/law in Section 5 case, 195-196.
[180] Expert Report and Rebuttal Report of Kousser, J. Morgan, Ph.D. for *Texas v. Holder*, ¶53.
[181] DOJ findings of fact/law in Section 5 case, 200.
[182] *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612, 570 U.S. __, 186 L. Ed. 2d 651 (2013).
[183] Michael Cooper, *After Ruling, States Rush to Enact Voting Laws*, N.Y. Times, July 6, 2013, at A9, *available at* http://www.nytimes.com/2013/07./06/us/politics/after-Supreme-Court-ruling-states-rush-to-enact-voting-laws.html; Todd J. Gillman, *Texas AG Greg Abbott: Voter ID law "Will Take Effect Immediately,"* Dallas Morning News, June

Thus, the Senate Factors examined in this report, as well as the additional context above, describe the racially charged atmosphere in Texas leading to the enactment and ultimate implementation of SB 14. Following substantial increases in both African-American voter turnout and Latino population growth, the Texas legislature and others used procedural tricks, racial appeals, and the pretext of nearly non-existent fraud to pass and implement SB 14. In the past, comparable contexts also led to Texas's enactment of other discriminatory voting devices. All of this history and context strongly suggests that SB 14 was enacted with a discriminatory intent.

Respectfully submitted by,

Orville Vernon Burton, Ph.D.

Date:   June 27, 2014

---

25, 2013, *available at* http://www.wfaa.com/news/texas-news/Hours-after-SCOTUS-ruling-Texas-declares-voter-ID-law-effective-immediately-212993711.html.

# Exhibit 1



# Exhibit 2



# Important Information about Tuesday's Election.

**Beware!** A national political group suspected of voter fraud is currently working in your neighborhood trying to bring people to the polls on election day. **Do not be a victim of voter fraud – it could result in jail time for you.**

**You CANNOT vote if you are:**

- Currently a felon
- An undocumented worker
- Not a United States citizen
- Not registered to vote
- Under 18 years of age

Should you suspect someone is trying to get you to vote illegally, or if you believe that someone has stolen your identity for voting purposes, please contact your local police.

Police and other enforcement agencies will be at the voting locations.

# Exhibit 3



# Appendix A



## ORVILLE VERNON BURTON, BIOGRAPHY AND CURRICULUM VITAE

Orville Vernon Burton is Creativity Professor of Humanities, Professor of History, Sociology, and Computer Science at Clemson University, and the Director of the Clemson CyberInstitute. From 2008-2010, he was the Burroughs Distinguished Professor of Southern History and Culture at Coastal Carolina University. He was the founding Director of the Institute for Computing in Humanities, Arts, and Social Science (I-CHASS) at the University of Illinois, where he is emeritus University Distinguished Teacher/Scholar, University Scholar, and Professor of History, African American Studies, and Sociology. At the University of Illinois, he continues to chair the I-CHASS advisory board and is also a Senior Research Scientist at the National Center for Supercomputing Applications (NCSA) where he served as Associate Director for Humanities and Social Sciences from 2002-2010. Burton serves as vice-chair of the Board of Directors of the Congressional National Abraham Lincoln Bicentennial Foundation. In 2007 the Illinois State legislature honored him with a special resolution for his contributions as a scholar, teacher, and citizen of Illinois. A recognized expert on race relations and the American South, and a leader in Digital Humanities, Burton is often invited to present lectures, conduct workshops, and consult with colleges, universities, and granting agencies.

Burton is a prolific author and scholar (twenty authored or edited books and more than two hundred articles); and author or director of numerous digital humanities projects. *The Age of Lincoln* (2007) won the *Chicago Tribune* Heartland Literary Award for Nonfiction and was selected for Book of the Month Club, History Book Club, and Military Book Club. One reviewer proclaimed, "If the Civil War era was America's 'Iliad,' then historian Orville Vernon Burton is our latest Homer." The book was featured at sessions of the annual meetings of African American History and Life Association, the Social Science History Association, the Southern Intellectual History Circle, and the latter was the basis for a forum published in *The Journal of the Historical Society*. His *In My Father's House Are Many Mansions: Family and Community in Edgefield, South Carolina* (1985) was featured at sessions of the Southern Historical Association and the Social Science History Association annual meetings. *The Age of Lincoln* and *In My Fathers' House* were nominated for Pulitzers.

Recognized for his teaching, Burton was selected nationwide as the 1999 U.S. Research and Doctoral University Professor of the Year (presented by the Carnegie Foundation for the Advancement of Teaching and by the Council for Advancement and Support of Education). In 2004 he received the American Historical Association's Eugene Asher Distinguished Teaching Prize. At the University of Illinois he won teaching awards at the department, school, college, and campus levels. He was the recipient of the 2001-2002 Graduate College Outstanding Mentor Award and received the 2006 Campus Award for Excellence in Public Engagement from the University of Illinois. He was appointed an Organization of American Historians Distinguished Lecturer for 2004-14.

Burton's research and teaching interests include the American South, especially race relations and community, and the intersection of humanities and social sciences. He has served as president of the Southern Historical Association and of the Agricultural History Society. He was elected to honorary life membership in BrANCH (British American Nineteenth-Century Historians). Among his honors are fellowships and grants from the Rockefeller Foundation, the National Endowment for the Humanities, the Pew Foundation, the National Science Foundation, the American Council of Learned Societies, the Woodrow Wilson International Center for Scholars, the National Humanities Center, the U.S. Department of Education, and the Carnegie Foundation. He was a Pew National Fellow Carnegie Scholar for 2000-2001. He was elected to the Society of American Historians and was one of ten historians selected to contribute to the *Presidential Inaugural Portfolio* (January 21, 2013) by the Joint Congressional Committee on Inaugural Ceremonies.

1A

# ORVILLE VERNON BURTON

History Department, College of Architecture, Arts & Humanities, 126 Hardin Hall, Box 340527, Clemson University, Clemson, SC 29634-0527 /or/ Clemson CyberInstitute, Strom Thurmond Institute of Government and Public Affairs, 230 Kappa St., Clemson, SC 29634-0125
Tel. O -864-656-4780;  C -217-649-0608; Fax -864 -656-4780; Home -864-543-2552
Home Address:  107 Baywood Circle, Ninety Six, SC 29666
vburton@clemson.edu   http://www.ageoflincoln.com  (temporarily at 128.174.199.229)

Education:  1976, Ph.D. Princeton University        Ph.D. dissertation: "Ungrateful Servants?
        Edgefield's Black Reconstruction:  Part I of the Total History of Edgefield County, South
        Carolina."  Advisors Sheldon Hackney and James McPherson
              1969, B.A. Furman University, magnum cum laude

Military Service:  active service 1969, 1974  U.S. Army, Honorably Discharged as Captain, 1977

Academic Positions:
Creativity Chair of Humanities, Clemson University, 2013-
Professor Computer Science, Clemson University, 2011-
Director Clemson CyberInstitute, 2010-
Associate Director for Humanities, Arts, and Social Sciences, Clemson CyberInstitute, 2010
Professor of History, Clemson University, 2010-
Burroughs Distinguished Professor of Southern History & Culture, Coastal Carolina University,
        2008-10
University of Illinois at Urbana-Champaign (UIUC), 1974-2008
        2009- Chair, Advisory Board for Institute for Computing in Humanities, Arts, and
                Social Science (I-CHASS)
        2008-11, Consultant for Humanities to Chancellor's and Provost's Office
        2004-09, Founding Director I-CHASS
                2008, Emeritus University Distinguished Teacher/Scholar, University Scholar, and
                Professor History, African American Studies, and Sociology
        2006-08, Professor African American Studies
        1989-2008, Professor, History
        1989-2008, Professor, Sociology
        1988-2008, Graduate College Statistics Faculty
        1986-2008, Campus Honors Program
        1985-2006, Faculty Affiliate, African American Studies and Research Program
        1982-1989, Associate Professor, History
        1976-1982, Assistant Professor History
        1974-1976, Instructor
    National Center for Supercomputing Applications (NCSA)

              2002-10, Associate Director, Humanities and Social Sciences

              1993-2002, Head, Initiative for Social Sciences and Humanities

              1986- Senior Research Scientist

Princeton University

1972-74, Assistant Master, Woodrow Wilson Residential College
1971-72, Instructor, Mercer County Community College, NJ

College of Charleston
2001-, Executive Director, Program in the Carolina Lowcountry and the Atlantic World
(CLAW) http://claw.cofc.edu
1987, Professor of History, Governor's School of South Carolina

Selected Honors, Fellowships, Awards

U.S. Professor of the Year, Outstanding Research and Doctoral Universities Professor (Council
for Advancement and Support of Education and Carnegie Foundation for the Advance-
ment of Teaching), 1999
American Historical Association Eugene Asher Distinguished Teaching Prize, 2004
Chicago *Tribune*'s Heartland 2007 Literary award for nonfiction for *The Age of Lincoln*
Illinois House Resolution of Congratulations, HR 0711, 2007. The Illinois State legislature
passed a special resolution acknowledging my contributions as a scholar, teacher, and cit-
izen of Illinois.
Society of American Historians, Elected 2012
Fellow, National Humanities Center (NEH Senior Scholar Award), 1994-95
Fellow, Woodrow Wilson International Center for Scholars, 1988-89
Fellow, Pew Foundation, 1996
National Fellowship Program for Carnegie Scholars, 2000-2001
Rockefeller Humanities Fellowship, 1978
Earl and Edna Stice Lectureship in the Social Sciences at the University of Washington, 2005
Strickland Visiting Scholar, Department of History, Middle Tennessee State University, 2006
Pew-Lilly Foundation Graduate Professor, Notre Dame University, 2001
Mark W. Clark Distinguished Chair of History, The Citadel, 2000-01
Elected to honorary life membership in BrANCH (British American Nineteenth-Century Histori-
ans)
Organization of American Historians Distinguished Lecturer, 2004-2014
*Choice* Outstanding Academic Book for *The Age of Lincoln*, 2008
*Choice* Outstanding Academic Title for *Slavery and Anti-Slavery: Transnational Archive*, 2009
*Booklist*'s Editors' Choice Title for *Slavery and Anti-Slavery: A Transnational Archive*, 2009
*Choice* Outstanding Academic Book for *Computing in the Social Sciences and Humanities*, 2003
Richard F. Fenno Prize, Legislative Studies Section, American Political Science Association, for
*Quiet Revolution*, 1995
President Southern Historical Association, 2011-12
President Agricultural History Society, 2001-02


Publications:
*Books*:
*Penn Center: A History Preserved*. Athens: University of Georgia Press, 2014.
*The Age of Lincoln*. NY: Hill and Wang, 2007. (Audio: Blackstone Audio Books). Paperback
edition 2008. Selection for Book of the Month Club, History Book Club, Military Book
Club. *The Age of Lincoln* was nominated by Farrar, Straus, and Giroux for the Pulitzer

Prize.  Three historical associations featured sessions on the book, Association for the Study of African American Life and History, 2008; Social Science History Association, 2008; The Southern Intellectual History Circle, 2009.

(with Judy McArthur) *"A Gentleman and an Officer":  A Military and Social History of James B. Griffin's Civil War*.  NY:  Oxford University Press, 1996; second printing 1999.

*In My Father's House Are Many Mansions: Family and Community in Edgefield, South Carolina*.  Chapel Hill: University of North Carolina Press, 1985.  Paperback edition 1997; 5th printing 1998.  *In My Father's House* was nominated by the University of North Carolina Press for the Pulitzer Prize.  Two Historical Associations featured this book in sessions at their annual meetings:  Social Science History Association, 1986; Southern Historical Association, 1987.

(annotated and edited with Georganne B. Burton, introduction pp. 1-48)  *"The Free Flag of Cuba":  The Lost Novel of Lucy Pickens* [orig. pub. 1854] in the Library of Southern Civilization series, edited by Lewis P. Simpson.  Baton Rouge:  Louisiana State University Press, 2002.  Paperback 2003.

 (edited with Ray Arsenault) *Dixie Redux: Essays in Honor of F. Sheldon Hackney*.  Montgomery, AL:  New South Books, 2013.

(edited with Jerald Podair and Jennifer L. Weber) *The Struggle for Equality: Essays on Sectional Conflict, the Civil War, and the Long Reconstruction in Honor of James M. McPherson*.  Charlottesville:  University of Virginia Press, 2011.

Editor, *The Essential Lincoln*.  NY:  Hill and Wang, 2009.

(edited with Winfred B. Moore, Jr.)  *"Toward the Meeting of the Waters":  Currents in the Civil Rights Movement in South Carolina during the Twentieth Century*.  Columbia:  The University of South Carolina Press, 2008.  Paperback 2011.

(edited with David O'Brien)  *Remembering Brown at Fifty: The University of Illinois Commemorates Brown v. Board of Education*.  Urbana:  University of Illinois Press, 2009.

Editor, *Slavery in America:  Gale Library of Daily Life,* 2 vols.  NY, Detroit: Gale Cengate Learning, 2008.

Editor, *Computing in the Social Sciences and Humanities*.  Urbana:  University of Illinois Press, 2002.

(edited with David Herr and Terence Finnegan)  *Wayfarer:  Charting Advances in Social Science and Humanities Computing*.  Urbana: University of Illinois Press, 2002.  This CD-ROM contains more than 65 essays and research and teaching applications, including illustrative interactive multimedia materials.

(with et al.) *Documents Collection America's History*, vol. 1, to accompany James Henretta, et al., *America's History*, 2nd ed. NY:  Worth Publishers, 1993.

(edited with Robert C. McMath, Jr.)  *Class, Conflict, and Consensus: Antebellum Southern Community Studies*.  Westport, Conn: Greenwood Press, 1982.

(edited with Robert C. McMath, Jr.) *Toward a New South?  Studies in Post-Civil War Southern Communities*.  Westport, Conn: Greenwood Press, 1982.

Editor, *Becoming Southern Writers: Essays in Honor of Charles Joyner*.  Columbia:  University of South Carolina Press, expected 2014.

*Plays:*

(with Georganne Burton) "Abraham Lincoln's Beardstown Trial: The Play" Premiered Sept. 29, 2009, Beardstown, IL. (Endorsed by the Congressional Abraham Lincoln Bicentennial

4A

Commission, November 2009; Play available upon request); http://www.lincolnbicentennial.gov/calendar/beardstown-trial-11-10-09.aspx; http://www.civilwar.org/aboutus/events/grand-review/2009/almanac-trial.html

Editor, Book Series, *A Nation Divided: Studies in the Civil War Era Series*, University of Virginia Press, 2011-

Editor, Book Series, *The American South Series*, University of Virginia Press, 2013-

*Introductions and Forewords to Books*:

"Foreword," pp. ix-liv to *Born to Rebel: An Autobiography* by Benjamin Elijah Mays. Athens: University of Georgia Press Brown Thrasher edition, 1987, also in paperback edition (book without foreword originally published by Charles Scribner's Sons, 1971). Revd. Foreword 2003.

"Introduction," pp. 9-11 to *Roll the Union On: Southern Tenant Farmers Union*. As told by its Co-founder, H.L. Mitchell. Chicago: Charles H. Kerr Publishing Company, 1987.

"Introduction," pp. xiii-xviii to *Soldiering with Sherman: The Civil War Letters of George F. Cram*. Jennifer Cain Bohrnstedt, ed., DeKalb: Northern Illinois University Press, 2000.

"Introduction," pp. x-xxxiv to *Pitchfork Ben Tillman: South Carolinian* by Francis Butler Simkins, for the reprint edition of the Southern Classics Series of the Institute for Southern Studies. Columbia: University of South Carolina Press, 2002 (book without Introduction originally published by Louisiana State University Press, 1944).

(with James Barrett) "Foreword," pp. xi-xxv to paperback edition of *Cause at Heart: A Former Communist Remembers* by Junius Irving Scales with Richard Nickson. Athens: University of Georgia Press, 2005 (book without Foreword originally published 1987).

"Foreword," pp. vii-xi to *Recovering the Piedmont Past: Unexplored Moments in Nineteenth-Century Upcountry South Carolina History*, edited by Timothy P. Grady and Melissa Walker. Columbia: University of South Carolina Press, 2013.

Foreword to *Our Ancestors – Our Stories*, edited by Candice Davis. Suwanee, Georgia: The Write Image, 2014.

*Journals Edited*:

"Three Articles from a Century of Excellence: The Best of *The South Carolina Historical Magazine*," pp. 182-89 for *South Carolina History Magazine* 101: 3 (July 2000).

"Introduction," pp. 161-65 for *Social Science Computer Review* 12:2 (Summer 1994).

Co-editor, "Technology and Education," *International Journal of Social Education* 5:1 (Spring 1990).

*History Articles, Chapters, and Essays*:

"Building the Transcontinental Railroad," *Presidential Inaugural Portfolio*, Joint Congressional Committee on Inaugural Ceremonies, January 21, 2013.

"The South as Other, The Southerner as Stranger," Presidential address for the Southern Historical Association, *The Journal of Southern History* LXXIX:1 (February 2013): 7-50.

"Revisiting the Myth of the Black Matriarchy," pp. 119-65 in Orville Vernon Burton and Ray Arsenault, eds., *Dixie Redux: Essays in Honor of F. Sheldon Hackney* (Montgomery, AL: New South Books, 2013).

Remembering the Civil War," pp. 278-85 in *The Civil War as Global Conflict*. Edited by Simon Lewis and David Gleeson (Columbia:  University of South Carolina, 2014).

 "The Gettysburg Address Revisited." In *1863:  Lincoln's Pivotal Year*.  Edited by Harold Holzer and Sara Vaughn Gabbard (Carbondale: Southern Illinois University Press, 2013), pp. 137-55.

(with Ian Binnington)  "And Bid Him Bear A Patriot's Part": National and Local Perspectives on Confederate Nationalism in *Deconstructing Dixie,* pp 126-155.  Edited by Jason Kyle Phillips (Athens: University of Georgia Press, 2013).

"The Silence of a Slaveholder:  The Civil War Letters of James B. Griffin," in *The Battlefield and Beyond: Essays on the American Civil War*.  Edited by Clayton E. Jewett (Baton Rouge:  Louisiana State University Press, 2012), pp. 13-27.

"Abraham Lincoln," in *The Oxford Encyclopedia of American Political and Legal History*.  Edited by Donald T. Chritchlow and Philip R.VanderMeer, 1:560-64. 2 vols. (NY:  Oxford University Press, 2012).

(with    Lewie    Reece)    "Abraham    Lincoln,"    Essential    Civil    War    Curriculum, http://www.essentialcivilwarcurriculum.com/.  Edited by William C. Davis and James I. Robertson, Sesquicentennial Project of the Virginia Center for Civil War Studies and the History Department of Virginia Polytechnic Institute and State University (Virginia Tech, 2012).

"Family," in *Enslaved Women in America: An Encyclopedia.* Edited by Daina R. Berry and Deleso Alford Washington (Santa Barbara & Westport, CN: Greenwood Press, 2012), pp. 83-87.

"Lincoln at Two Hundred: Have We Finally Reached Randall's Point of Exhaustion?" In *The Living Lincoln:  Essays from the Harvard Lincoln Bicentennial Symposium*, pp. 204-25. Edited by Thomas A. Horrocks, Harold Holzer, and Frank J. Williams (Carbondale: Southern Illinois University Press, 2011), pp. 204-25.

(with Nick Gaffney) "South Carolina," Vol. 2:  pp. 745-764 in *Black America:  A State by State Encyclopedia*.  Edited by Alton Hornsby (Westport, CN:  Greenwood Press, 2011).

"Mays, Benjamin" *in The New Encyclopedia of Southern Culture.* Vol. 19 *Education,* Edited by Clarence Mohr.  (Chapel Hill:  University of North Carolina Press, 2012), pp. 254-255.

"The Age of Lincoln:  Then and Now," Keynote for the South Carolina Historical Association Annual Meeting, *The Proceedings of the South Carolina Historical Association*, 2010, pp. 7-22.  Edited by Robert Figueira and Stephen Lowe (Columbia: South Carolina Department of Archives and History, 2010).

(with Larry McDonnell and Troy D. Smith) "Slavery and Anti-Slavery: A Transnational Archive," pp. 121-26 in L'abolition de l'esclavage au Royaume-Uni 1787-1840 : débats et dissensions The abolition of slavery in Britain 1787-1840 : debate and dissension." Edited by Susan Finding (Paris:  ArmandColin, November 2009).

"Abraham Lincoln at Two Hundred," *OAH* (Organization of American Historians) *Newsletter*, 37:4 (November 2009), pp. 1, 8, 12.

"Author's Response to the Southern Intellectual History Circle Forum on *The Age of Lincoln*." *The Journal of the Historical Society* IX:3 (September 2009): 355-72.

"Colbert History," *Pan-African Studies*, Fall 2009, p. 3.

(with Georganne Burton) "Lucy Holcombe Pickens: Belle, Political Novelist, and Southern Lady," in *South Carolina Women: Their Lives and Times*, Vol 1. Edited by Marjorie Julian Spruill, Valinda W. Littlefield, and Joan Marie Johnson (Athens: University of Georgia Press, 2009), pp.273-98.

Three essays in the *International Encyclopedia of Revolution and Protest: 1500 to the Present*. Edited by Immanuel Ness. (Oxford: Wiley-Blackwell, 2009).
"Radical Reconstruction, United States, Promise and Failure of" VI: 2798-2801 <http://www.revolutionprotestencyclopedia.com/public/tocnode?query=burton%2C+vern on&widen=1&result_number=3&from=search&id=g9781405184649_chunk_g97814051 846491238&type=std&fuzzy=0&slop=1>;
(with Beatrice Burton) "American Civil War and Slavery," I: 70-72 http://www.revolutionprotestencyclopedia.com/public/tocnode?query=burton%2C+verno n&widen=1&result_number=1&from=search&id=g9781405184649_chunk_g978140518 464940&type=std&fuzzy=0&slop=1;
(with Beatrice Burton) "Lincoln, Abraham (1809-1865) and African Americans," Volume V: 2121-2123" <http://www.revolutionprotestencyclopedia.com/public/tocnode?query=burton%2C+vern on&widen=1&result_number=2&from=search&id=g9781405184649_chunk_g97814051 84649925&type=std&fuzzy=0&slop=1>;

"Imagine Another Ending: Tweaking History to Shape an Alternative World," pp. 48-50 in *A New Birth of Freedom, 1809*2009: Abraham Lincoln's Bicentennial*. Edited by Don Wycliff (Washington, D.C.: The Lincoln Bicentennial Commission, 2009).

(with Simon Appleford and Beatrice Burton) "Seeds in Unlikely Soil: The *Briggs v. Elliott* School Segregation Case," pp 176-200 in *Toward the Meeting of the Waters: Currents in the Civil Rights Movement of South Carolina during the Twentieth Century*. Edited by Orville Vernon Burton and Winfred B. Moore, Jr. (Columbia: The University of South Carolina Press, 2008).

(with Lewie Reece) "*Palmetto Revolution: The Coming of Desegregation in South Carolina,"* pp. 59-91, 283-94 in *With All Deliberate Speed: Implementing Brown v. Board of Education.* Edited by Brian Daugherity and Charles Bolton. (Fayetteville: University of Arkansas Press, 2008).

"Civil Rights Movement in South Carolina," pp. 178-80; (with Matthew Cheney) "Benjamin Mays," pp. 601-02; (with Beatrice Burton) "Francis Butler Simkins," 866; (with Beatrice Burton) "Lucy Pickens"; (with Beatrice Burton) "Sharecropping/ Tenantry," pp. 952-54 in *The South Carolina Encyclopedia* [A project of the South Carolina Humanities Council]. Edited by Walter Edgar. (Columbia: University of South Carolina Press, 2006).

(with Matthew Cheney) "African Americans," pp. 245-248 in *The Encyclopedia of the Midwest* [a project of the Institute for Collaborative Research and Public Humanities at The Ohio State University]. Edited by Richard Sisson, et al. (print version. Bloomington: Indiana University Press, 2007).

"The Voting Rights Act," pp. 1134-1136 in Vol. 4: *Postwar America: An Encyclopedia of Social, Political, Cultural, and Economic History*. Edited by James Ciment. (M.E. Sharpe, 2006).

"Emancipation," pp. 237-42, "Sharecropping," pp. 563-67, "South Carolina," pp. 584-593, "Suffrage," pp. 614-20, "Wade Hampton, III," pp. 306-08, in *Encyclopedia of the Reconstruction Era*. Edited by Richard Zuczek. (Westport, CN: Greenwood Press, 2006).

(with David Herr) "Religious Tolerance and the Growth of the Evangelical Ethos in South Carolina," pp. 146-64 in *The Dawn of Religious Freedom in South Carolina*, Edited by James Lowell Underwood and W. Lewis Burke. (Columbia: University of South Carolina Press, 2006).

(with Beatrice Burton) "Jefferson Davis," pp. 43-44 in *The Frederick Douglass Encyclopedia*. Edited by Julius E. Thompson, James L. Conyers, Jr., and Nancy J. Dawson. (Westport, CN: Greenwood Press, 2010).

"The 1965 Voting Rights Act in the South," in *History* Vol. 3 (2007) *The Encyclopedia of Southern Culture*, 2nd revised ed. Edited by Charles Reagan Wilson. (Chapel Hill: University of North Carolina Press, 2007); and revised in James W. Ely, Jr. and Bradley G. Bond, eds., *Law and Politics* Vol. 10 of *The New Encyclopedia of Southern Culture*, pp. 399-401 (2008); and revised in Thomas C. Holt and Laurie B. Green, eds., *Race* Vol. 24, pp. 265-68 of *The New Encyclopedia of Southern Culture* (2013).

"Problems and Methods in Family History Research," *Journal of Humanities* (National Central University at Chuhgli/Taoyuen), 2006.

(with David Herr) "Defining Reconstruction," pp. 299-322 in *The Blackwell Companion to the Civil War and Reconstruction*. Edited by Lacy Ford. (Boston: Blackwell Publishers, 2005).

"John H. McCray," pp. 125-27 in the *Dictionary of Twentieth Century Black Leaders*. Edited by Alton Hornsby, Jr. Montgomery. (AL: E-Book Time, LLC, 2005).

"Stranger in a Strange Land: Crossing Boundaries," pp. 256-283 in *Shapers of Southern History: Autobiographical Essays by Fifteen Historians*. Edited by John Boles. (Athens: University of Georgia Press, 2004).

"Dining with Harvey Gantt: Myth and Realities of 'Integration with Dignity,'" pp. 183-220 in *Matthew J. Perry: The Man, His Times and His Legacy*. Edited by W. Lewis Burke and Belinda F. Gergel. (Columbia: University of South Carolina Press, 2004).

"'Tis True that Our Southern Ladies have Done and are Still Acting a Conspicuous Part in this War': Women on the Confederate Home Front in Edgefield, South Carolina," pp. 95-108 in *"Lives Full of Struggle and Triumph": Southern Women, Their Institutions, and Their Communities*. Edited by Bruce L. Clayton and John A. Salmond. (Gainesville: University of Florida Press, 2003).

"Reaping What We Sow: Community and Rural History," Presidential address in *Agricultural History* (Fall 2002): 631-58.

(with Georganne Burton) "Lucy Holcombe Pickens and *The Free Flag of Cuba*," *South Carolina History Magazine* 103:4 (October 2002): 296-324.

(with Ian Binnington) "Civil War: The Homefront in the South," *Encyclopedia of the United States in the Nineteenth Century*, vol. 1, pp. 256-59. Edited by Paul Finkelman. (New York: Charles Scribner's Sons, 2001).

"Civil War and Reconstruction," pp. 47-60 in *A Companion to Nineteenth Century America*. Edited by William L. Barney. (Oxford, UK: Blackwell Publishers, 2001, paperback 2006).

"South Carolina" and "South Carolina Democratic Party (PDP)," vol. 2: pp. 692-94 in *Civil Rights in the United States*. Edited by Waldo E. Martin and Patricia Sullivan. (NY: Macmillan, 2000).

"A Monumental Labor," Review Essay of Walter Edgar's *South Carolina: A History*," *South Carolina Historical Magazine* 100:3 (July 1999): 262-268.

"Bosket Family," pp. 166-68 in vol. 1, *Violence in America: An Encyclopedia*. Edited by Ronald Gottesman. (NY: Charles Scribner's Sons, 1999).

"Butler, Andrew Pickens," 4:88-90; "Gary, Martin Witherspoon," 8:775-77; "Mays, Benjamin Elijah," 14: 795-97; "Mitchell, Harry Leland," 15: 602-3; "Owsley, Frank Lawrence," 16: 870-72; "Simkins, Francis Butler," 19: 942-44; and "Tillman, Benjamin Ryan," 21: 672-75, in *American National Biography*. Edited by John A. Garraty and Mark C. Carnes, 24 vols. (NY: Oxford University Press, 1999).

"Legislative and Congressional Redistricting in South Carolina," pp. 290-314 in *Race and Redistricting in the 1990s*. Edited by Bernard Grofman. (NY: Agathon Press, 1998).

"Race Relations in the Rural South Since 1945," pp. 28-58 in *The Rural South Since World War II*. Edited by R. Douglas Hurt. (Baton Rouge: Louisiana State University Press, 1998).

"Benjamin E. Mays: Born to Rebel," pp. 21-75 in *Walking Integrity: Benjamin Elijah Mays: Mentor to Generations*. Edited by Lawrence E. Carter, Sr. (Atlanta: Scholars Press of Emory University, 1996; paperback, Mercer University Press, 1998).

"Edgefield, South Carolina: Home to Dave the Potter," pp. 38-52 in *I Made This Jar: The Life and Works of the Enslaved African-American Potter, Dave*. Edited by Jill Beute Koverman. (Columbia: McKissick Museum University of South Carolina, 1998).

"African American Status and Identity in a Postbellum Community: An Analysis of the Manuscript Census Returns," *Agricultural History* 72:2 (Spring 1998): 213-240.

"Confederate States of America: Homefront," pp. 163-64 in *Reader's Guide to American History*. Edited by Peter Parrish. (London: Fitzroy Dearborn, 1997).

"The 'New' South in a Postmodern Academy: A Review Essay," *Journal of Southern History*, LXII:4 (Nov. 1996):767-786.

"The Ninety Six Story," pp. 4-7 in *Historic Ninety Six, South Carolina* in 9/6/96 Special Issue.

"South Carolina" in *Encyclopedia of African-American Culture and History*, vol 5: 2529-2533. Edited by Jack Salzman, et al. (NY: Macmillan, 1996, rev. ed. and CD-ROM 2000).

"Farm Protest\Populism," pp. 265-267, and "Tenancy," pp. 747-749, in *Encyclopedia of Social History*. Edited by Peter N. Stearns. (NY: Garland Publishing, Inc., 1994).

NSF investigator and principal author (with Terrence R. Finnegan, Peyton McCrary, and James W. Loewen) "South Carolina" chap. 7, pp. 191-232, 420-432, in *The Quiet Revolution in the South: The Impact of the Voting Rights, 1965-1990*. Edited by Chandler Davidson and Bernard Grofman. (Princeton: Princeton University Press, 1994). Winner of the 1995 Richard F. Fenno Prize, Legislative Studies Section, American Political Science Association.

"Society," 4:1483-1493, "Family Life," 2:562-565, "Cotton" (with Patricia Bonnin), 1:416-420, and "Tobacco" (with Henry Kamerling), 4:1597-1599, in *Encyclopedia of the Confederacy*. Edited by Richard N. Current. (NY: Simon and Schuster, 1993).

"Large Questions in Small Places: Why Study Mount Pleasant's Institutions," pp. 37-48, in *Mount Pleasant's Institutions: Proceedings of the Third Forum of the History of Mount Pleasant*. Edited by Amy Thompson McCandless. (Mount Pleasant, September 1993).

"Sectional Conflict, Civil War, and Reconstruction," pp. 131-157, in *Encyclopedia of American Social History*, vol. 1. Edited by Mary Kupiec Cayton, Elliott J. Gorn, and Peter W. Williams. (NY: Charles Scribner's Sons, 1993; with revisions on CD-ROM 1998).

"The Burden of Southern Historiography: W J. Cash and the Old South," pp. 59-79, in *The Mind of the South Fifty Years Later*. Edited by Charles W. Eagles. (Oxford: University Press of Mississippi, 1992).

"'The Black Squint of the Law': Racism in South Carolina," pp. 161-185, in *The Meaning of South Carolina History: Essays in Honor of George C. Rogers, Jr.* Edited by David R. Chesnutt and Clyde N. Wilson. (Columbia: University of South Carolina Press, 1991).

"Reconstruction," review essay of Eric Foner's *Reconstruction* in *South Carolina Historical Magazine* 91:3 (July 1990): 217-220.

"Howard Kester," pp. 401-03 (414-15 2nd rev); "Edward Britt McKinney," pp. 462-63 (489-90 rev. 2nd); "Henry Leland Mitchell," pp. 475-76 (502 rev. 2nd); Modjeska Monteith Simkins, pp. 700-01 (747-48 rev. 2nd ) in *The Encyclopedia of the American Left*. Edited by Mari Jo Buhle, Paul Buhle, and Dan Georgakas. (NY: Garland Publishing, 1990, University of Illinois Press paperback, 1992 [rev. 2nd ed. Oxford University Press, 1998]).

"Whence Cometh Rural Black Reconstruction Leadership: Edgefield County, South Carolina," *The Proceedings of the South Carolina Historical Association, 1988-1989*. Aiken: The South Carolina Historical Association, 1989, pp 27-38.

"Fatherhood," pp. 1106-07; "Motherhood," pp. 1111-13; "Family, Modernization of," pp. 1540-41 in *Encyclopedia of Southern Culture*. Edited by Charles Reagan Wilson and William Ferris. (Chapel Hill: The University of North Carolina Press, 1989; paperback 1991; rev. ed.) "Motherhood" and "Fatherhood" in *Myth, Manners, and Memory* vol 4 (2007) and also in *Gender* vol. 13 (2009).

"Hiring Out," pp. 320-26, in the *Dictionary of Afro-American Slavery*. Edited by Randall M. Miller and John David Smith. (Westport, Conn.: Greenwood Press, 1988 [rev. 2nd. ed. 1997]).

"In My Father's House Are Many Leaders: Can the Extreme Be Typical?" *The Proceedings of the South Carolina Historical Association, 1987*. (Aiken: The South Carolina Historical Association, 1988), pp 23-32.

"The Development of the Tenant Farm System in the Postbellum South," *Tar Hill Junior Historian* 27, #1 (Fall 1987): 16-18.

"The Effects of the Civil War and Reconstruction on the Coming of Age of Southern Males, Edgefield County, South Carolina," pp. 204-223 in *The Web of Southern Relations: Women, Family and Education*. Edited by Walter J. Fraser, Jr., R. Frank Saunders, Jr., and Jon L. Wakelyn. (Athens: University of Georgia Press, 1985, paperback ed. 1987).

"Economics as Postbellum Southern History." A Review Essay of *Old South, New South: Revolutions in the Southern Economy Since the Civil War* by Gavin Wright. (NY: Basic Books, 1986) in *Reviews in American History* 16:2 (June 1988): 233-40.

"Anatomy of an Antebellum Rural Free Black Community: Social Structure and Social Interaction in Edgefield District, South Carolina," *Southern Studies: Interdisciplinary Journal of the South* 21 (Fall 1982): 294-325. Special editor, Ira Berlin.

"The Rise and Fall of Afro-American Town Life: Town and Country in Reconstruction Edgefield County, South Carolina," pp. 152-92 in *Toward a New South? Studies in Post-Civil War Southern Communities*, Edited by Orville Vernon Burton and Robert C. McMath, Jr. (Westport, Conn: Greenwood Press, 1982). .

Review essay of Elizabeth H. Pleck, *Black Migration and Poverty: Boston, 1865-1900*, in *Social Science History*, vol. 5 (Fall 1981): 483-88.

10A

"The Development of Tenantry and the Post-Bellum Afro-American Social Structure in Edgefield County, South Carolina." In *Presentations Paysannes, Dimes, Rente fonciere et Mouvement de la Production Agricole a l'epoque Preindustrielle: Actes du Colloque preparatoire* (30 juin-let et 2 juillet 1977) au VIIe *Congres international d'Histoire economique Section A3*. Edimbourg 13-19 aout 1978, Vol. 2: 762-78. Edited by E. LeRoy Ladurie and J. Goy. Paris: Editions De L'Ecole des Hautes Etudes En Sciences Sociales, 1982. Reprinted pp.19-35 in *From Slavery to Sharecropping: White Land and Black Labor in the Rural South, 1865-1900*, vol. 3 of *African American Life in the Post-Emancipation South 1861-1900.* Edited by Donald G. Nieman. (Hamden, CT: Garland Publishing, 1994).

"Race and Reconstruction: Edgefield County, South Carolina," *Journal of Social History* 12 (Fall 1978): 31-56. Referenced and summarized in *Sociological Abstracts* 12, #1 (April 1978): 45. Reprinted in *The Southern Common People: Studies in Nineteenth Century Social History*. Edited by Edward Magdol and Jon L. Wakelyn, pp. 221-37. (Westport, Conn: Greenwood Press, 1980). Reprinted pp. 87-112 in *The Politics of Freedom: African Americans and the Political Process During Reconstruction*, vol. 5 of *African American Life in the Post-Emancipation South 1861-1900*. Edited by Donald G. Nieman. (Hamden, CT: Garland Publishing, 1994).

"The Antebellum Free Black Community: Edgefield's Rehearsal for Reconstruction," *The Furman Review* 5 (Spring 1974): 18-26.

*Accepted and in Press*:

"Lincoln and Secession." In *Secession and War Come to Washington*. Edited by Paul Finkelman and Donald R. Kennon for the U.S. Capitol Historical Society (Athens: Ohio University Press, expected 2014).

"Religion and the Academy," *Books and Culture* 17:3 (May/June), 2014.

"Race, Place, and the American Dream: A Digital History Case Study." Commissioned by Editor of the *American Historical Review,* expected 2015.

"The Voting Rights Right of 1965 in Historical Perspective," *The Journal of the Historical Society* (expected 2015).

"Picturing Lincoln in the 1850s," *Journal of the Abraham Lincoln Association*, expected 2015.

"Wolf Was Right: You Can't Come Home Again," in Orville Vernon Burton, Editor, *Writing the South in Fact, Fiction, and Poetry: Essays in Honor of Charles Joyner* (Columbia: University of South Carolina Press, expected 2014)

"Clarendon County and *Briggs v. Elliot*," and "The Integration of Clemson and South Carolina Schools," in Cecil Williams, *Photographing the South Carolina Civil Rights Movement* (Columbia: University of South Carolina Press, expected 2014).

"The Passage of Lincoln's Republic: Providence in Progress," in Stephen Engle, ed. *Abraham Lincoln's Presidency and Civil War America* (Gainesville: University of Florida Press, expected 2014).

"Lincoln's Gettysburg Address in Context of the Emancipation Proclamation and 13[th] Amendment," *Lincoln Lore*, expected Fall 2014.

"Education and Class in South Carolina," in Robert H. Brinkmeyer, Jr., *Writing South Carolina's History: Essays in Honor of Walter B. Edgar* (Columbia: University of South Carolina Press, expected 2015).

(with Michael Mahieu), "Remembering the American Civil War and the Civil Rights Movement and Their Relationship*," Journal of American Studies* (expected 2015).

"Southern Honor and Bertram Wyatt-Brown," Georgia Historical Quarterly (expected 2015).

*Articles on Digital History, Statistics, Computing, and Scholarship of Teaching and Learning (SoTL)*:

(with Simon Appleford) "Cyberinfrastructure for the Humanities, Arts, and Social Sciences," in *ECAR (Educause Center for Applied Research) Bulletin* 9: 1 (January 13, 2009): 2-11.

(with James Onderdonk and Simon Appleford) "History: The Role of Technology in the Democratization of Learning," pp. 197-205 in *Ubiquitous Learning*. Edited by Bill Cope and Mary Kalantzis. (Urbana: University of Illinois Press, 2009).

"Teaching Race and Citizenship," pp. 229-35 in *America on the World Stage: A Global Approach to U.S. History*. Edited by Ted Dickinson and Gary Reichard. Published for the Organization of American Historians by University of Illinois Press, 2008.

(with Simon Appleford) "Digital History: Using New Technologies to Enhance Teaching and Research," Web Site Reviews in *The Journal of American History* 99 (March 2008): 1329-31.

(with James Onderdonk and Simon Appleford) "A Question of Centers: One Approach to Establishing a Cyberinfrastructure for the Humanities, Arts, and Social Sciences," *Cyberinfrastructure Technology Watch Quarterly* 3:2 (May 2007) –*CTWatch*, http://www.ctwarch.org.

Chapter 3, U.S. History Survey Syllabus (annotated), Teaching Philosophy, and examples, pp. 94-107 in *AP US History Teacher's Guide*. Edited by Nancy Schick and Warren Hierl (with Marc Singer, Assessment Specialist). (Princeton: College Board Advanced Placement of the Educational Testing Service, 2007). Also available at (http://apcentral.collegeboard.com/apc/public/courses/teachers_corner/3501.html).

"American Digital History," *Social Science Computer Review* 23: 2 (Summer 2005): 206-220, reprinted in "Essays on History and New Media," Roy Rosenzweig Center for History and New Media, at http://chnm.gmu.edu/essays-on-his-new-media/essays/?essayid=30

"Creating a Sense of Community in the Classroom," pp. 131-35 in *The Art of College Teaching: 28 Takes*. Edited by Marilyn Kallet and April Morgan. (Knoxville, University of Tennessee Press, 2005).

(with Ian Binnington and David Herr) "What Difference Do Computers Make? History, Historians, and Computer-Mediated Learning Environments," *History Computer Review* 19 (Spring 2003): 98-103.

(with Ian Binnington and David Herr) "Computer Mediated Learning Environments: How Useful Are They?" *AHR Perspectives: Newsmagazine of the American Historical Association* 41:1 (January 2003): 14, 22 (More detailed Carnegie Report as "Historians Face the E-Future: Findings from the Carnegie Scholar Survey on Computer Mediated Learning Environments," at AHA Website www.theaha.org/perspectives/issues/2003/0301/0301not3.cfm).

(with Terence Finnegan and Beatrice Burton) "The Census Workbench: A Distributed Computing U.S. Census Database Linkage System," in *Wayfarer: Charting Advances in Social Science and Humanities Computing*. Edited by Orville Vernon Burton, David Herr, and Terence R. Finnegan. (Urbana: University of Illinois Press, 2002).

(with David Herr and Beatrice Burton) "RiverWeb: History and Culture of the Mississippi River Basin American Bottom," in *Wayfarer: Charting Advances in Social Science and Humanities Computing*. Edited by Orville Vernon Burton, David Herr, and Terence R. Finnegan. (Urbana: University of Illinois Press, 2002).

"Interviews with Exemplary Teachers: Orville Vernon Burton," *The History Teacher* 35 (February 2002): 237-251.

"A Special Kind of Community," *Furman Magazine* 44, no. 1 (Spring 2001), 16-19.

"Why Care About Teaching? An interview with an Accomplished Scholar and National Teaching Award Winner," *The Real Issue* (January/February 2000): 2-5.

"The Use of Historical and Statistical Data in Voting Rights Cases and Redistricting: Intent and Totality of Circumstances Since the Shaw Cases," "Understanding Ecological Regression Techniques for Determining Racial Bloc Voting: An Emphasis on Multiple Ecological Regression," and "Report on South Carolina Legislative Delegation System for *Vander Linden v. South Carolina*, Civ. Non. 2-91-3635-1, December 1995," in *Conference Workbook*. Lawyer's Committee for Civil Rights Under Law Voting Rights Project, American University Washington College of Law, Voting Rights Conference, November 19-20, 1999, Washington D.C.

"Presenting Expert Testimony in Voting Rights Cases" and "Understanding Ecological Regression Techniques for Determining Racial Bloc Voting," in *Conference Proceedings*. CLE/NAACP Annual Meeting, Indianapolis, IN, 1993.

(with James W. Loewen, Terence Finnegan, Robert Brischetto) "It Ain't Broke, So Don't Fix It: The Legal and Factual Importance of Recent Attacks on Methods Used in Vote Dilution Litigation," lead article in *The University of San Francisco Law Review* 27:4 (Summer 1993): 737-780.

"Teaching Historians with Databases," *History Microcomputer Review* 9:1 (Spring 1993): 7, 9-17.

(with Terence Finnegan), "Two Societies at War, 1861-1865," pp. 273-90 in *Documents Collection America's History*, vol. 1. Edited by Orville Vernon Burton, et al., to accompany James Henretta, et al., *America's History*, 2nd ed. (NY: Worth Publishers, 1993).

"Populism," pp. E7-E11, in *Instructor's Resource Manual America's History*, 2nd ed., vol. 2 to accompany James Henretta, et al., *America's History* (NY: Worth Publishing, 1993).

"Quantitative Methods for Historians: A Review Essay," *Historical Methods* 25:4 (Fall 1992): 181-88.

"Computers, History, and Historians: Historians and Converging Cultures?" *History Microcomputer Review* 7:2 (Fall 1991): 11-23.

(with Terence Finnegan) "Historians, Supercomputers, and the U.S. Manuscript Census," in *Proceedings of the Advanced Computing for the Social Sciences Conference*. Edited by Bruce Tonn and Robert Hammond. Washington, D.C.: GPO (U.S. Department of Commerce Bureau of the Census), 1990. Revised edition published in *Social Science Computer Review* 9:1 (Spring 1991), 1-12.

(with Terence Finnegan) "Developing Computer Assisted Instructional (CAI) Materials in the American History Surveys," *The History Teacher* 24:1 (Nov. 1990): 1-12.

(with Terence Finnegan) "Teaching Historians to Use Technology: Databases and Computers," *International Journal of Social Education* 5:1 (Spring 1990): 23-35.

13A

"Complementary Processing: A Supercomputer/Personal Computer U.S. Census Database Project" in *Supercomputing 88*, vol. 2 *Science and Applications*. Edited by Joanne L. Martin and Stephen Lundstrom. Washington, D.C.: IEEE Computer Society Press, 1990, pp. 167-177.

"History's Electric Future" in *OAH* (Organization of American Historians) *Newsletter* 17: #4 (November 1989): 12-13.

"New Tools for 'New' History: Computers and the Teaching of Quantitative Historical Methods" in *Proceedings of the 1988 IBM Academic Information Systems University AEP Conference, "Tools for Learning*," Dallas/Ft. Worth, Texas, June 1988. Edited by Frederick D. Dwyer. Abstract in *Agenda*, pp. 73-74. An expanded and significantly different version with Terence Finnegan as coauthor appears in *History Microcomputer Review* 5:1 (Spring 1989): 3, 13-18.

(with Robert Blomeyer, Atsushi Fukada, and Steven J. White) "Historical Research Techniques: Teaching with Database Exercises on the Microcomputer," *Social Science History* 11:4 (Winter 1987): 433-448.

*The United States in the Twentieth Century* (History 262). Champaign: University of Illinois Guided Individual Study, Continuing Education and Public Service, 1986.

"The South in American History" in *American History: Survey and Chronological Courses, Selected Reading Lists and Course Outlines from American Colleges and Universities*, Edited by Warren Susman and John Chambers, vol. 1: 121-27. (NY: Marcus Wiener Publishing, Inc., 1983, rev. 2nd ed. 1987, rev. 3rd ed. 1991).

"Using the Computer and the Federal Manuscript Census Returns to Teach an Interdisciplinary American Social History Course," *The History Teacher* 12 (November 1979): 71-88. Reprinted with a few changes in *Indiana Social Studies Quarterly* 33 (Winter 1980-81): 21-37.

*Interviews, Reports, and Other Publications*:

"A Brief Conversation with James M. McPherson," in *The Struggle for Equality: Essays on Sectional Conflict, the Civil War, and the Long Reconstruction in Honor of James M. McPherson.* Edited by Burton et al., pp. 288-92 (Charlottesville: University of Virginia Press, 2011).

"A Few Words about Allen Stokes as He Retires as Director of the South Caroliniana Library, U.S. Caroliniana Society Newsletter, Spring 2013, pp. 1, 4-5.

"UI Earns Right to be Mr. Lincoln's University*:* Excerpted from remarks by Prof. Vernon Burton, April 1, 2010 keynote address at the UI College of Law," *The News Gazette* (Champaign, Illinois) May 23, 2010, pp. C-1 and C-4.

"Learning from the Bicentennial: Lincoln's Legacy Gives Americans Something for which to Strive," *The News Gazette* (Champaign, Illinois) February 12, 2010, pp. C-1 and C-4.

"Life of Lincoln Resonates Today," *The Atlanta Journal-Constitution*, Opinion, Dec. 9, 2009, A19.

"Remarks by Professor Orville Vernon Burton at the October 10, 2009 Celebration of Abraham Lincoln's September 30, 1959 Speech," Delivered at the Milwaukee War Memorial Center at the Invitation of the Wisconsin Lincoln Bicentennial Commission, Appendix pages 166-177 in *Final Report and Appendix of the Wisconsin Lincoln Bicentennial Commission*, To: The Governor of the State of Wisconsin, Jim Doyle, Responsive to: Executive Order #245, Date: February 12, 2010.

14A

"Max Bachmann's Bust of Abraham Lincoln, Circa 1915," pp. 88-89 in *Lincoln in Illinois*, Ron Schramm, Photographer and Richard E. Hart, Compiler and Editor (Springfield: published by the Abraham Lincoln Association, 2009.

"Is There Anything Left to Be Said about Abraham Lincoln?" *Historically Speaking* 9:7 (September/October 2008): 6-8.

"An Interview with Vernon Burton" *Lincoln Lore*, no. 1894 (Fall 2008), pp. 18-24.

"Lincoln's Generation also Faced Crisis Involving Religion and Terrorism," in *History Network Newsletter*, February 25, 2008.

"Abraham Lincoln, Southern Conservative: An Interview with Orville Vernon Burton" ( 2 Parts), posted by Allen Barra, October 2, 2007. http://www.americanheritage.com/blog/200710_2_1259.shtml and http://www.americanheritage.com/blog/200710_2_1260.shtml

Interview by Roy A. Rosenzweig, 2001, "Secrets of Great History Teachers," *History Matters*, at http://historymatters.gmu.edu/browse/secrets/.

"Keeping Up With the e-joneses:  Information Technology and the Teaching of History," *Proceedings for First Annual Charleston Connections:  Innovations in Higher Education Conference.  Learning from Each Other:  The Citadel, The College of Charleston, The Medical University of South Carolina, Charleston Southern University and Trident Technical College*.  June 1 and 2, 2001, The Citadel, Charleston, South Carolina, p. 63.

(with Terence Finnegan and Barbara Mihalas) "Developing a Distributed Computing U.S. Census Database Linkage System," Technical Report 027 (December 1994).  National Center for Supercomputing Applications, UIUC.

"On the Study of Race and Politics," *Clio:  Newsletter of Politics & History,  An Organized Section of the American Political Science Association* 3:1 (Fall & Winter, 1992/1993): 6.

"Benjamin Mays of Greenwood County:  Schoolmaster of the Civil Rights Movement," *South Carolina Historical Society* News Service, published in various newspapers, 1990.

"Quantitative Historical U.S. Census Data Base" in *Science: The State of Knowing*.  National Center for Supercomputing Applications, Annual Report to the National Science Foundation 1987, p. 29.

"Computer-Assisted Instructional Database Programs for History Curricula" *Project EXCEL*. 1986-87 Annual Report.  Office of the Chancellor, UI at Urbana-Champaign, pp. 41-42.

"Postmodern Academy," *The Octopus*, January 24, 1997, p. 6.

(with David Herr and Ian Binnington) "Providing Lessons in Mississippi River Basin Culture and History: riverweb.ncsa.uiuc.edu," in *Touch the Future:  EOT-PACI*, 1997, p. 43.

"The Coming of Age of Southern Males During Reconstruction:  Edgefield County, South Carolina," Working Papers in Population Studies, School of Social Sciences, University of Illinois at Urbana-Champaign, 1984.

In Memorial – Essays for F. Sheldon Hackney and Bertram Wyatt-Brown in the American Historical Association (AHA)  *Perspectives*; Thomas Krueger and Philip Paladin in Organization of American Historians *OAH Newsletter*, and F. Sheldon Hackney and Ernest L. "Whitey" Lander, in *Journal of Southern History*.

A number of brief essays about the Clemson CyberInstitute, for example, "Clemson's Cyber-Institute encourages Collaboration," http://features.clemson.edu/inside-clemson/inside-news/clemson%E2%80%99s-cyberinstitute-encourages-collaboration/

In addition, I have written a number of reports as expert witness for minority plaintiffs in voting rights and discrimination cases.

15A

*Accepted and In Press*:
"Liberty," in the Fetzer Institute's *Booklet of Notable Lincoln Quotations*, expected 2014.

*Digital Publications and Projects*:
Editor in Chief, *The Long Civil War: A Digital Research and Teaching Resource*, Alexander
    Street Publishers, 2013-
Editor in Chief, *Slavery and Anti-Slavery: A Transnational Archive.* The Largest Digital Ar-
    chive on the History of Slavery. Farmington Hills, MI: Thompson-Gale, 2008-- 14.
http://www.galetrials.com/default.aspx?TrialID=16394;ContactID=15613. Advisory Board: Ira
    Berlin, Laurent Dubois, James O. Horton, Charles Joyner, Wilma King, Dan Littlefield,
    Cassandra Pybus, John Thornton, Chris Waldrep.
    Part I: Debates Over Slavery and Abolition, 2009
    Part II: Slave Trade in the Atlantic World, 2011
    Part III: Institution of Slavery, 2012
    Part IV: Age of Emancipation, 2013
Webmaster for the Abraham Lincoln Bicentennial Commission Website, 2007-10, now main-
    tained by the ALB Foundation. http://www.lincolnbicentennial.gov/
Lincoln Remembered: Nine essays – "Lincoln and the Founding of Democracy's Colleges,"
    "Lincoln: America's "First and Only Choice," "Picturing Lincoln," "Putting His Politics
    on Paper," "Belief in the Rule of Law," "Taking a Stand Against Slavery," "The Move-
    ment Toward Civil Rights," "Political Brilliance on the Path to the Emancipation Proc-
    lamation," "Lincoln's Last Speech," commemorating the bicentennial of Lincoln's birth,
    February 2009 to February 2010. A monthly blog for the Illinois LAS On-line Newslet-
    ter; available at http://www.las.illinois.edu/news/lincoln/.
Writing the South in Fact, Fiction and Poetry: A Conference Honoring Charles Joyner. Thurs-
    day and Friday Sessions. DVD produced of Conference I organized at Coastal Carolina
    University, Conway, SC, Feb. 17-19. Produced CD Aug. 2011.
Editor, "Slavery in America in Sources in U.S. History Online." Farmington Hills, MI: Thomp-
    son Gale, 2007.
"The Mississippi River in American History," for *Mark Twain's Mississippi*, including essays
    with Simon Appleford and Troy Smith, on "Economic Development, 1851–1900," "Poli-
    tics, 1851–1900," "African Americans in the Mississippi River Valley, 1851–1900," "Na-
    tive Americans in the Mississippi River Valley, 1851–1900," "Religion and Culture,
    1851–1900," and "Women in the Trans-Mississippi West,1851–1900." Edited by Drew
    E. VandeCreek, Institute of Museum and Library Services *(IMSL)* Project (2007). Online
    Resource: http://dig.lib.niu.edu/twain/.
RiverWeb: An interdisciplinary, multimedia, collaborative exploration of the Mississippi River's
    interaction with people over time (now redone as Cultural Explorer). CD-ROM and
    Website http://riverweb.ncsa.uiuc.edu/.
The Illinois RiverBottom Explorer (IBEX). Part of the East Saint Louis Action Research Project
    (ESLARP) where Faculty and East St. Louis neighborhood groups and local churches
    work on tangible and visible projects that address the immediate and long-term needs of
    some of the city's poorest communities. (More is available at
    http://www.eslarp.uiuc.edu/). IBEX serves as a resource for historical documents, prima-
    ry and secondary sources, and oral history interviews. Website:
    http://www.eslarp.uiuc.edu/ibex/archive/default.htm.

Text96. A collection of primary source electronic texts for teaching American History. Website http://www.history.uiuc.edu/uitext96/uitexttoc.html.

"Database Exercises and Quantitative Techniques: Exercise I: Colonial America." Madison, WI: Wiscware, 1987. (for IBM and compatible computers, 1 disk, Instructional Workbook, and Teacher's Instructional Sheet).

"Lessons in the History of the United States." Wentworth, NH: COMPress, 1987 (1989 with QUEUE, Fairfield, CT). For IBM color monitor; originally 50 computer exercise modules on 25 computer disks + instructor's manual. An interactive electronic textbook of U.S. history.

Automated linkage and statistical systems Unix Matchmaker, AutoLoad, RuleMatch, DisplayMatch, ViewCreate (Urbana: UI NCSA, 2000).
Website http://www.granger.uiuc.edu/aitg/maps/1870/htm/default.htm

"Illinois Windows Dataentry System for U.S. Census." University of Illinois, 1988 (for IBM PS2 and compatible computers with Windows applications, 1 disk, Instructional Sheet)

*The Age of Lincoln* website at (ageoflincoln.com) temporarily housed at 128.174.199.229.

Current Digital Projects include Social Media Learning Center Studies of Elections, Redistricting, Minorities, and Discussions of the American South, Race, and the Civil War. Also text and data analytics (mining) – developing techniques using the HathiTrust, Internet Archive II Digital Book Collection, and Library of Congress Chronicling America U.S. newspaper archive to study "DNA" of writings of Abraham Lincoln, changing views of American South over time, interpretations of Civil War and development of "Lost Cause Mythology."

In addition, I continue to use Edgefield County, South Carolina to investigate, "large questions in small places." I have accumulated a quantitative database that includes every person and farm recorded in the U.S. manuscript census returns linked from 1850 to 1880 for old Edgefield District, South Carolina (a region now comprising five different counties). With this unique database I (and my students) can study, test, and suggest themes in American History with details and specificity related to the lives of ordinary folks.


Other Selected Honors, Awards, and Grants:

Certificate of Excellence from the Carnegie Academy for the Scholarship of Teaching and Learning for Work that Advances the Practice and Profession of Teaching In Support of Significant Student Learning, 2001

H-Net received the James Harvey Robinson Prize for teaching from the American Historical Association, 1997

Award of Distinction in the Film/Video-History/Biography category from the International Academy of the Visual Arts, 16th Annual Communicator Awards, for "People: A Lincoln Portrait" television interstitial series (The Communicator Awards is the leading international awards program honoring creative excellence for communications professionals), 2010 (part of program I put together for Lincoln commemoration at UIUC).

SC African American Heritage Commission's 2009 "Preserving Our Places in History" Project Award for Claw's (Executive Director, College of Charleston Carolina Lowcountry and Atlantic World) work in commemorating the banning of the international slave trade

Florida Historical Society, Medallion Lecture, 2002

Auburn University, Eminence in the Arts and Humanities Fellows Lectures Medallion, "awarded to persons of distinguished achievement in the arts and humanities: writers, artists or renowned scholars in one or more of the liberal arts disciplines," 2012

Senior Research Fellow, Southern Studies, University of South Carolina, 1988

Phi Beta Kappa, Furman University, 1986

Princeton University Scholar Award, 1969

National Defense Educational Award Title IV Fellowship, 1971 (Princeton University)

Clark Foundation Scholarship, 1966-69 (Furman University)

Wicker Award for Outstanding Student (sophomore), Furman University, 1967

Endel History Award, Furman, 1969

Bradshaw-Feaster General Excellence Award (Furman's highest honor for the graduating senior selected by faculty), 1969


*UIUC Honors and Teaching Awards and Recognition*

Inaugural University "Distinguished Teacher/Scholar," 1999-2008

University Scholar, 1988 – 2008

Campus Award for Excellence in Public Engagement, 2006

Graduate College Outstanding Mentoring award, 2001-02

Fellow, Center for Advanced Study, 1982, Associate, 1994

Burlington Northern Faculty Achievement Award (UIUC), 1986

Study in a Second Discipline, Statistics and Demography, 1984

All-Campus Award for Excellence in Undergraduate Teaching, 1999

LAS Dean's Award for Excellence in Undergraduate Teaching, 1999

LAS Award for Distinguished Teaching, 1986

School of Humanities Teaching Award, 1986

George and Gladys Queen Excellence in Teaching Award in History, 1986

Undergraduate Instructional Award (UIUC), 1984

Every semester and for every undergraduate course that I taught at the University of Illinois (excluding large survey classes of between 300-750 students), I was deemed excellent in the UIUC "Incomplete List of Excellent Teachers." I was noted on the list for more than twenty different courses. I was noted as "outstanding" from 1979 as long as they used that designation.

Recognized by the Pan-Hellenic Council at as an "outstanding staff member for furthering scholastic achievement"

Selected by History Department as the "one instructor whom you believe best at creating intellectual excitement in students" for an educational study of teaching practices of college teachers, 1978

Received the Resident Hall Association Award for the Best Educational Program for lectures/discussion on *Gone With the Wind* and *Jubilee* for Black History Month, 1996

The Honor Society of Phi Kappa Phi, UIUC, Vice President, 2002-03; President, 2003-04

Ronald E. McNair Scholars Program Dedicated Service Award for Minority Students, 1996

Associate Vice Chancellor Academic Affairs award for contributions to the Student Research Opportunities Program and work with minority students (1995, 2006)

*Selected Grants*:

National Science Foundation (NSF), GK-12: Ed Grid Graduate Teaching Fellows Program, 2003-09 ($4,990,015)

NSF, EAGER: Prototype Tool for Visualizing Online Polarization (co-Pi), 2012-14 ($262,654)

NSF CISE/IRIS Division Award, Grant No. ASC 89-02829, Automated Record Linkage, 1991

NSF Grant No. CDA-92-11139, "Historical U.S. Census Database with High Performance Computing," 1992

NSF, EPIC Grant, 2006-08 ($20,000)

NSF Catalyst Grant for Social Science Learning Center (with MATRIX, Michigan State University), 2006-09 ($175K)

NSF, Senior Investigator on the MRI award, Award #1228312 MRI: Acquisition of High Performance Computing Instrument for Collaborative Data-Enabled Science ($1,009,160) See:

http://nsf.gov/awardsearch/showAward?AWD_ID=1228312&HistoricalAwards=false

Abraham Lincoln Bicentennial Foundation, "Lincoln's Unfinished Business: Conference on The South and Race," 2012-2015 ($27,000)

Clemson University, "Tracking Themes Across Time and Space," 2012 ($10,000)

National Endowment for the Humanities (NEH) Challenge Grant for Institute for Computing in Humanities, Arts, and Social Science, 2008-11 ($750,000, 3 mil. Total with challenge matches)

NEH Educational Technologies Grant, ED-20758, 1997-99

NEH Humanities High Performance Computing Advance Research and Technology (HpC): Coordinating High Performance Computing Institutes and the Digital, 2008-09 ($249,997). To support a total of nine institutes and one joint conference for humanities scholars, to be hosted by three different high-performance computer centers: the National Center for Supercomputing Applications, the Pittsburgh Supercomputing Center, and the San Diego Supercomputer Center.

NEH, NSF, and the Joint Information Systems Committee, "Digging Into Image Data to Answer Authorship Related Questions," 2009-11 ($100,000).

(with Max Edelson) NEH, The Cartography of American Colonization Database Project, To support the development of a database of 1000 historical maps illustrating the trajectory of colonization in the Americas. The database will provide a searchable introduction to the mapping of the western hemisphere in the era of European expansion, ca. 1500-1800. 2008-09 ($24,997)

NEH Conference Grant (with R. C. McMath, Jr., History and Social Sciences, Georgia Institute of Technology), 1978

NEH Summer Research Fellowship, 1983

American Council of Learned Societies (ACLS) Travel grant, 1977

American Council of Learned Societies (ACLS) Grant- to Recent Recipients of the Ph.D., 1977

PT3/Technology Across Learning Environments for New Teachers grant, U.S. Department of Education, 2002-03, 2003-04

Academy of Academic Entrepreneurship, 2006-08

National Archives Record Administration grant for digital records, 2003-05

IBM Shared University Research Grant, 1994

IBM Innovations grant, Educational Technologies Board, 1992

IBM Technology Transfer IBM grant, 1988
IBM EXCEL II, History Database Teaching Project, 1987
IBM EXCEL Project, History Database Teaching Project, 1986
Partnership Illinois Award, 1998 (with Brian Orland, Pennsylvania State University Landscape
    Architecture, East St. Louis Research Project), RiverWeb 2002-03, 2003-04
East Saint Louis Action Research Program Grant, 2005-06, 06-07, 07-08
Andrew Carnegie Foundation 3-year Baccalaureate Study Grant, 1976
Sloan Center for Asynchronous Learning Environment Grant, 1998
The Humanities Council (South Carolina) Outright Grant ($8,000), THC grant #10-1363-1
    (Writing the South in Fact, Fiction, and Poetry), 2011
South Carolina Humanities Council Conference Grant (with Tricia Glenn), 2005
South Carolina Humanities Council Conference Grant (with Winfred Moore), 2002-03
South Carolina Humanities Council Conference Grant (with Bettis Rainsford), 2000-01

*Selected Grants from University of Illinois*
Office of Continuing Education Grant, 2005-06, 06-07
Chancellor, Provost, and Vice Chancellor Research, RiverWeb Grant, 2004-05 ($30K)
Advanced Information Technologies Group Research Award, 1994, 96, 97, 2000
Applications of Learning Technologies in Higher Education grant for UI--Text96 Project, 1995--
    2000 (co-principal investigator with Richard Jensen of UIC campus)
Educational Technologies Board Grant for RiverWeb 1998
Guided Individual Study Grant for RiverWeb, 1997-98
Program for the Study of Cultural Values and Ethics, Course Development Award, 1993
Arnold O. Beckman Research Grant Award, UIUC Research Board, 1989, 1992
Language Laboratory Computer Assisted Instruction Award, 1988
Research Board Humanities Faculty Research Grant, 1986
Graduate Research Board, support for various projects, 1976-08

*Selected Grants from Clemson University*
2011/2012 University Research Grant Committee (URGC) Program ($10,000)
2013-14  CAAH & Library Digital Humanities Grant ($4000)

Selected Professional Activities and Service:
Officer Congressional Abraham Lincoln Bicentennial Commission Foundation, 2008-2010;
    Board of Directors, Abraham Lincoln Bicentennial Foundation, interim President, 2010,
    vice-chair 2010-
Southern Historical Association, President 2011-12, President Elect, 2011, Vice President Elect,
    2010, Executive Council, 2005-08; Program Committee 1989, 1998; 2005 (Chair); Mem-
    bership Committee, 1986-87, 1991-92; 1995-98; 2002; Committee on Women, 1992-95,
    Nominating Committee, 1999-2000, Chair H.L. Mitchell Book Award Committee, 2000-
    02
    Agricultural History Society, President 2001-02, Vice President 2000-01, Executive Commit-
    tee, 1997-2006; Committee to Review and Revise Constitution and By-Laws, 2004-05; Nom-
    inating Committee, 1991-94, chair 1993-94; Committee to Select first Group of Fellows for
    Society, 1995; Committee to select new Secretary/Treasurer, 2009-10

Organization of American Historians, OAH/ALBC (Abraham Lincoln Bicentennial Commission) Abraham Lincoln Higher Education Awards Committee, 2007-09; ABC-CLIO "America: History and Life" Award Committee, 1997-99; Membership Committee, 1990-94

Social Science History Association, Executive Committee 2000-03; Nominating Committee 1990-91; Program Committee 1989, 1993; Community History Network Convener, 1976-79; Rural History Network Convener, 1988-90, 1993-94

Social Science Computing Association, Executive Council, 1993-2002; Organizing Committee Chairperson for Annual Conference, 1993, Conference on Computing for the Social Sciences (CSS93); program committee 1993-95, 2001

Southern Association for Women Historians, Membership Committee, 1996-99

South Carolina Historical Association, Executive Board, 2009-12

H-Net, founding member of H-Net, Treasurer and Executive Committee, 1993-99; Chair, committee to evaluate multimedia NEH grant; Editor H-South (book review editor 1997-2000); Editorial Board of H-Rural, H-Slavery, and H-CivWar.

Advisory Board, The Virtual Archives for Land-Grant History Project, Association of Public-Land Grant Universities, 2012-

Scholarly Advisory Group, President Lincoln's Cottage at the Soldier's Home, 2012-

Executive Council, The University South Caroliniana Society, 2011-14

University of South Carolina, Search Committee for Director South Caroliniana Library, 2012

Executive Board South Carolina Jubilee Project, 2012-14

Member South Carolina Abraham Lincoln Bicentennial Commission, 2008-2010

Member Champaign County, Illinois, Abraham Lincoln Bicentennial Commission, 2006-10 Council, U.S. Civil War Sesquicentennial Commission, 2009-15

Historical Advisory Committee to the "Fort Sumter/Fort Moultrie Trust," charged with organizing Sesquicentennial Activities in Charleston and South Carolina Lowcountry, 2010-15

Associate Editor for History, *Social Science Computer Review*, 2012-

Editorial Board, Digital Humanities Series, University of Illinois Press, 2005-

Editorial Board, *Change and Continuity*, 1995-

Editorial Board *Fides et Historia*, 2010-

Editorial Board *Proceedings of the South Carolina Historical Association*, 2009-

Editorial Board, *History Computer Review*, 1990-2003

Editorial Board, *Locus: An Historical Journal of Regional Perspectives on National Topics*, 1994-96

The Illinois Humanities Council Scholar, 2004-05

Invited to present to President's Information Technology Advisory Commission (PITAC), 9-16-2004

Invited to NEH Digital Humanities Initiative Mini-Conference, March 2006 and Digital Humanities Summit, April 2011, December 2007

Digital Library Federation Scholars' Advisory Panel, 2004-7

University of Tennessee Knoxville Horizon Project Steering Committee, 2014-

Peer Reviewer, ACH/ALLC/SDH-SEMI Joint Digital Humanities Conferences, 2007-13

*E-Docs*, (one of 3 founding members) Editorial Board, 1998-2005

Advisory Board, *Postwar America: An Encyclopedia of Social, Political, Cultural, and Economic History*

Mentor for Southern Regional Council Minority Scholars Program, 1992-96

UIUC Representative to Lincoln Presidential Library Committee: Educational Activities Committee, 2001; Fellowship Committee, 2002

Faculty Associate, Council for International Exchange of Scholars, 2002-03

Evaluator/Referee (one of two for history) for the Pew Foundation Faculty Research Fellowships, 1997-98, 1998-99; 2001 (for graduate students for summer seminar)

Evaluator and Referee for American Council of Learned Societies Grants, 2005-08

National Endowment Humanities, Review Panels: Scholarly Editions Program, 2007-08, for Digital Humanities Grants, 2010, NEH Division of Public Programs Panel, "America's Historical and Cultural Organizations" (AHCO) grant initiative, 2013

National Science Foundation Review Panel for Knowledge and Distributed Intelligence grants, 1998, 1999

Advisory Board for *International Journal of Social Education*, 1986-2000

Advisory Reviewer for *The Journal of Negro History* (since 2002, *The Journal of African American History*), 1992-

Editorial Advisory Board, *The South Carolina Encyclopedia*, gen. editor Walter Edgar, 2000-06

Advisory Board, Digital Library on American Slavery, University of North Carolina, Greensboro, 2004-10

Advisory Board, Biographies: The Atlantic Slaves Data Network (ASDN), 2010-

Advisory Board, The Simms Initiatives of the Library at the University of South Carolina, 2009-

Advisory Board, American Insight, 2013- (www.AmericanINSIGHT.org)

Strategic Advisory Council for MATRIX: The Center for Humane Arts, Letters and Social Sciences On-line at Michigan State University, 2004-

Humanities, Arts, Science, and Technology Advanced Collaboratory (HASTAC), Steering Committee and Planning Committee, 2003-04, Program Committee, 2009, 2010, 2013-14

External Advisory Board, National Historic Preservation Research Commission (NHPRC) "Effective User-Centered Access For Heterogeneous Electronic Archives" project, Illinois Institute of Technology, 2003-05

Advisory Committee, American Studies Program, Bureau of Educational and Cultural Affairs, U.S. Information Agency, 1989-93

Delegate to the Mexican/American Commission on Cultural Cooperation, Mexico City, June 1990; Chairperson of United States delegation (Co-Chairperson with Mexican counterpart), U.S. Studies Working Group

National Advisory Board to Alan Lomax's Global Jukebox: 1993-

Advisor for "Crossroads of Clay": NEH Alkaline Glazed Stoneware Exhibition and Catalog, McKissick Museum, University of South Carolina, 1987-90

Advisory Committee Film Project for Historic Southern Tenant Farmers Union, 1986-90

Consultant, Commercial film, "Roll the Union On" about H.L. Mitchell and the Southern Tenant Farmers Union

Consultant on the Renewal of the 1965 Voting Rights Act, 1981-82, 2004-07, including consultation for an NBC TV Special.

The Civil Rights Project at University of California, Berkeley, Advisory Board for "The Decade Ahead: Reauthorization of the Voting Rights Act and the Future of Democratic Participation," 2004-07

Consultant for Documentary, "Behind the Veil," 1995-2005

Board of Directors of the Abraham Lincoln Historical Digitization Project, 1997-

Advisory Council for the Lincoln Prize at Gettysburg College, 1997-

Prize Committee for the Technology and History Award, The Gilder Lehrman Institute of American History, 2000-01

International Committee on Historic Black Colleges and Universities, 2001-

Consultant, Belle Meade and The Hermitage and Vanderbilt University.  Presentations of slavery.

Consultant, Morven Park, 2010-

Consultant, for Matt Burrows, documentary "The Assassination of N.G. Gonzales by James H. Tillman," 2010-

Consultant, for Chris Vallilo musical performance, "This Land is Your Land:  Woody Guthrie and the Meaning of America," 2010-

Organizing and Founding Committee International Society for the Scholarship of Teaching and Learning (IS-SOTL), 2003-7.  Drafted initial mission statement for Society.

Advance Research and Technology Collaboratory for the Americas (ARTCA) –Organization of American States, Advisory Board Chair, 2008-

Furman University Alumni Council Board, 2010-15

*Service - University of Illinois* (three campus system – Urbana, Chicago, Springfield)

UI Senate Conferences (elected), all three campuses of the University of Illinois, 2006-09, Presiding officer (chair) 2007-08

Lincoln Bicentennial Commission, 2006-09

Academic Affairs Management Team, 2007-08

Task Force for Global Campus, 2006-07

External Relations Management Team, 2006-09

Strategic Plan Committee, 2005-06

Service (selected) University of Illinois at Urbana-Champaign

Faculty Senate (elected), 1999-2001, 2002-03; 2005-06, 2006-07, Presiding Officer (Chair, Senate Executive Committee), 2005-06, 2006-07 (was Senate Council) elected 2000-01, 2003-04; 2005-06; 2006-07; Chair, Education Policy Committee, 2002-03, Chair 2003-04; Budget and Priorities Committee, 1999-01, Chair 2000-01

As Chair Faculty Senate Executive Committee, 2005-07 represented faculty at Board of Trustee meetings, and CIC meetings.  Led in developing ideas of shared governance, helped in the drafting and implementing of a strategic plan for both the University of Illinois and the Urbana-Champaign campus. Oversaw establishment of the Illinois Informatics Institute (I3) and the School of Earth, Society, and Environment.  Dealt with issues of multi-year contracts for research faculty and staff policy, rehiring of retirees, Global Campus, and led study of Academic effects of Chief Illini and diversity issues.

Organizer and Chair, Planning Committee for the Lincoln Bicentennial, 2006-09

Task Force for Diversity and Freedom of Speech, 2007-08

Convocation address, August 21, 2000

Search Committee for Chancellor, vice-chair, 2004-5

Association of American Colleges and Universities campus representative and Assoc., 2004-05

Martin Luther King, Jr., Week Planning Committee, co-chair, 2002-03, 03-04, 04-05, 05-06

Strategic Plan Committee, 2005-06

Chancellor's Task Force ("Kitchen Cabinet") for the Humanities, 2002-04

Provost's ad hoc Committee on Evaluating Public Service for Promotion and Tenure, 2003-04

Brown Jubilee Planning Committee, Diversity Initiative, 2002-04

Law-Education *Brown* Jubilee Conference Program Committee, 2002-04

East St. Louis Action Research Projects (ESLARP) Campus Advisory Committee, 2004-

University Planning Council, 2000-01

Selection Committee for University Scholars, 1999 -- 2000, Chair Subcommittee for Social Sciences, Humanities, FAA, Communications, Education, Law 2000

UI President's Distinguished Speakers Program, 2000-02, 2006-08

University of Illinois Press Board, 1995-2000, Chair 1998-2000

Search Committee for Director University of Illinois Press, 1998-99

Committee on University Publishing, 1997-98

Graduate College Executive Committee, 1998-2000; Committee to Evaluate Dean of Graduate College, Committee to Review and Implement Graduate Program Revisions, Graduate Student Grievance Policy Committee

Graduate College Office of Minority Affairs Strategic Planning Committee, 1999-2000

University Administration Budget and Benefits Study Committee, 2000-02

Budget Strategies Committee, 1993-94, Subcommittee for Library. Subcommittee for Faculty Productivity and Teaching Models

Illinois Program for Research in the Humanities (IPRH) Advisory Committee, 2001-03

Center for Democracy in a Multicultural Society, Advisory Committee, 2002-08

Center for Advanced Study George A. Miller Committee, 2000-03

UI-Integrate Faculty Advisory Committee, 2003-04

Graduate College Area Subcommittee for the Humanities and Creative Arts, 1996-98

Campus-wide Advisory Committee for the Center for Writing Studies, 2000-01

Committee on Institutional Cooperation (CIC), Selection Committee for CIC Research Grants in the Humanities, 1993-94

Chancellor's Task Force for Minority Graduate Students, 1989-92

Chair, Subcommittee for Summer Program for Minority Graduate Students, 1990

Computer Resources Development Committee, Program for the Study of Cultural Values and Ethics, 1991-93

High Performance Computing Committee for the Social Sciences, 1989-95

Rural History Workshop Convener, 1989-94 (with Sonya Salamon)

Faculty Fellow, 1990-2003

Graduate College Fellowship Committee, 1988

Selection Committee for Lily Fellows, 1987

Social Studies Committee for the Preparation of Teachers, Council on Teacher Education, 1986

African American Studies and Research Program (AASRP), later Department of African American Studies, Advisory Council, 1982-86; Curriculum Development & Faculty Recruitment Committee, 2002-2003; Research and Course Competition Committee, 1991-94, Chair 93-94; Electronic Networking Committee, 1996-2000, Chair 1997-98; Library Advisory Committee, 1997-2003

Chair, Search Committee for African-American Scholar, 1986-87

Search Committee, Director for AASRP, 1985-86, Chair 87-88

24A

Graduate College Appeals Committee, 1984
> Chancellor's Allerton Conference, 1988; Chancellor's Beckman Conference, 2001-06; Chancellor's Conference on Diversity, 2002, faculty facilitator

Combating Discrimination and Prejudice Workshop, 1988
Krannert Art Museum, Committee on The Black Woman as Artist, 1992
H. W. Wilson Faculty Panel, 1993
Advanced Information and Technology Committee, 1992-97, Advisory Committee, 1993-94
Honors Symposium for UI recruitment of High School Seniors, 1993
Search Committee for Archivist, UIUC Computing and Communications Service Office, 1993
Search Committee for Research Librarian, UIUC Library, 1997; Undergraduate Library Advisory Committee, 2002-
Member Human Dimensions of Environmental Systems Group, 1997-
Faculty Learning Circle for 2003-04
Illini Days Speaker, 1999, 2000, 2002
Public Interest Fund of Illinois Representative, 1996- 08
> Facilitator for Interinstitutional Faculty Summer Institute on Learning Technologies, UIUC, 2000, 2002

> Board Advisors, Collaborative for Cultural Heritage and Museum Practices (CHAMP), 2005-08

Faculty Mentor for Campus Honors Program, 1980-2008


*Service - College of Liberal Arts and Science UI*:
Lecturer at Pedagogy 2000:  Teaching, Learning and Technology, Annual UIUC Retreat on Active Learning (2000)
Keynote Address at LAS Awards Banquet, 2000 and Keynote at UIUC Campus Awards Banquet, 2000
Dean's Committee to Evaluate Chair of History Department (1 of 3 elected by History Department), 1996
Oversight Committee Computing for the Social Sciences, 1993-95
Committee to select nominees for election to College Executive Committee, 1992
Academic Standards Committee, 1983-85, Chair 1984-85
School of Humanities Scholarship and Honors, 1986-88, Chair 1987-88
Social Sciences and Humanities Respondent to the Joint Task Force on Admission Requirements and Learning Outcomes, 1988
Advisory Committee, Social Sciences Quantitative Laboratory, 1987-88, 1989-93
Alumni Association Annual Speaker, 1990
General Education Committee, 1990-91
Awards Committee, Chair, 1991-92
Race & Ethnicity, Class & Community Area Committee of Sociology Graduate Program, 1993-
LAS Alumni Association Speaker, 2000
Cohn Scholars Honors Mentoring Program (choosing the 10-14 best Humanities first-year students), 1986-88, 1989-90, 1992-93, 1995-96, 1998-99, 2002
Faculty Mentor, Committee of Institutional Cooperation Summer Research Opportunities Program for Minority Students, 1987, 1991-95, 1997-2000, 2002, 2003

Faculty Mentor, McNair Minority Scholars, 1993-94, 1996-97
Summer Orientation and Advance Enrollment Program, Faculty Leader, 1991-93, 2000, 2002, 2004
Gender Inclusivity Seminar, 1992
The African-American Experience:  A Framework for Integrating American History:  An Institute for High School Teachers of History, instructor 1992, 1994
Faculty Advisor for UIUC Law School Humanities Teaching Program, 1998-99
Senior Faculty Mentor, LAS Teaching Academy, 1999-2008


*Service - Department of History UI*:
Lincoln Bicentennial Committee, Chair, 2005-06, co-Chair 2006-08
Department Distance Learning and Global Campus committee, 2007-08
Carnegie Initiative on the Doctorate, 2003-05
Ethical Conduct Liaison, 2004-05
Phi Alpha Theta Faculty Advisor, 2005-06
Graduate Placement Officer, 1990, 1991-94, 1997-99
Graduate Admissions Officer, 1990-91
Graduate Committee, 1990-93
Organizer of OAH Breakfast Meeting, 1989-90, 1993-94
Computer Resources, 1976-88, 1989-91, 1995-99, Chair 1976-85, 1997-99
Teaching Awards, 1986-88, 1992-93, 1997-98, 1999-2000, Chair, 1987-88, 1997-98, 1999-2000
T.A. Evaluation, 1975-76, 1978-82, 1984-88, 1990-91, 1995, 1998-99, 2002, 2005-06
Speakers and Colloquia, 1981-82
Grants and Funding, 1981-82
Capricious Grading, 1985-86, 2002-03
Social Science History Committee, 1980
Advisor, History Undergraduate Club, 1976-78
Swain Publication Prize Essay Committee, 1991
Proposal-Writing Workshop, 1991-92, 2002
Teaching Workshop, 1993
Chair Library Committee, 1996-97
Faculty Advisor for Phi Alpha Theta, 2005-06
American History Search Committee, 1991-92
Chair, American History Search Committee, 1993-94
James G. Randall Distinguished Chair Search Committee, 1999-2000

*Service Coastal Carolina University*:
        Search committee for Archaeologist, 2008-09
        Selection Committee for Clark Chair of History, 2010
        Third Year Assistant Professor Faculty Review Committee, 2010

*Service Clemson University*:
        History Department Civil War Sesquicentennial Committee
        History Department Digital MA committee
        GIS Steering Committee, 2012-

Clemson University Computational Advisory Team (CU-CAT)
University Academic Technology Committee, 2010-
Ex-officio Steering Committee, Clemson CyberInstitute
University Committee to commemorate the 50th Anniversary of the Integration of Clemson, 2011-13
    Outstanding Staff Employee Award, Academic Affairs Selection Committee, 2011
University Morrill Act Anniversary Celebration, 2011-13
Ben Robertson Society (BRS) Foundation Advisory Board, 2013-
Chair, Clemson University Humanities Grid committee, 2012-
Chair, CAAH Humanities Computing committee, 2013-

A more complete list of Service and Public Engagement is available upon request.

Conferences Organized (selected list):

In 1978, I (with Robert C. McMath, Jr.) organized and chaired a National Endowment for the Humanities Conference on Southern Communities at the Newberry Library. In 1993, I organized, hosted, and chaired the annual meeting of the Conference on Computing for the Social Sciences at the National Center for Supercomputing Applications. In 1999, I organized and hosted the 12th Annual Meeting of the Southern Intellectual History Circle (SIHC) in Edgefield and Ninety Six, S.C, and again hosted SIHC for its 16th Annual meeting in 2004 at the College of Charleston. In 2001, I organized a workshop and conference on diversity and racism in the classroom with Carnegie Scholars at The Citadel in Charleston, S.C. In 2001, I organized a South Carolina Humanities Council Edgefield Summit History Conference. In January 2003, I organized a Workshop on Diversity and Racism and a Conference on the Scholarship of Teaching and Learning, both at the University of Illinois. In March 2003 I organized The Citadel Conference on the South: "The Citadel Symposium on the Civil Rights Movement in South Carolina." I organized the Humanities, Arts, Science, and Technology Advanced Collaboratory (HASTAC) meeting in January 2004 in Washington, D.C. I organized and hosted a Humanities Computing Summit in August 2004 at NCSA and UIUC. In 2005, I planned and hosted the British American Nineteenth Century History (BrANCH) Conference in Edgefield, South Carolina and a symposium honoring Jim McPherson's retirement in April 2005 in Princeton. As program chair I helped organize the Southern Historical Annual meeting in Atlanta in November 2005. In 2011, I organized a conference in honor of Charles Joyner, *Writing the South in Fact, Fiction, and Poetry*, at Coastal Carolina University. In 2013, I organized a conference honoring F. Sheldon Hackney at Martha's Vineyard. As Director of I-CHASS, I regularly organized conferences and workshops, at least two major conferences a year such as "Computing in Humanities, Arts, and Social Sciences" (2005), "Spatial Thinking in the Social Sciences and Humanities" (2006), and the "e-Science for Arts and Humanities Research: Early Adopters Forum" (2007). In 2007 we hosted the annual international meeting of The Alliance of Digital Humanities Organizations including The Association for Computers and the Humanities. As Director of the Clemson CyberInstitute, I regularly organize workshops, brownbags, conferences, and meetings. And as Executive Director of the College of Charleston Atlantic World and Lowcountry (CLAW) Program, I regularly work with others to organize conferences and meetings.

Reviews:

I have reviewed books for numerous journals and book manuscripts for numerous presses. In addition, I have refereed article manuscripts for numerous journals. I have also reviewed proposals for various granting agencies. I have also reviewed and written outside letters of recommendation for promotion, tenure, and endowed chair decisions for more than ninety cases at various colleges and universities. Lists of these reviews, presses, journals, universities, and granting agencies are available upon request.

Invited lectures and conference participation available upon request. From 2010-14, selected invited lectures include those at Harvard University, University of Pennsylvania, Black Congressional Caucus, Printers Row Book Fair, Society of Civil War Historians, Society of Historians of Early America, Abraham Lincoln Bicentennial Commission (ALBC), Atlanta Town Hall meeting on Race at Morehouse College and at Jimmy Carter Presidential Library Center, the Crown Forum Martin Luther King, Jr. lecture at Morehouse College, Western Illinois University, Drake University, University of Illinois Law School, Union League Club of Chicago, Association of Archivists and Librarians, CASC, University of Georgia, Lawrence University, Wisconsin Lincoln Bicentennial, University of Wisconsin at Milwaukee, University of Wisconsin at Madison, University of Wisconsin at Eau Claire, University of Kansas, Samford University, Talladega University, ALBC Morrill Act Conference, Arkansas State University, San Francisco State University, Lewis University, Clemson University, Notre Dame, University of Oklahoma, University of Florida, University of Southern Florida, Florida State University, University of South Carolina, South Carolina State University, North Greenville University, Anderson University, Augusta State University, Auburn University, Mercer University, American Historical Association, Organization of American Historians, Southern Historical Association, Agricultural History Society, Wheaton College, University of Illinois, Florida Atlantic University, Lincoln College, Claflin University, Francis Marion University, Policy Studies Association, Southern Studies Association Meeting (regional affiliate of American Studies Association), Association for the Study of African American Life and History (ASALH), Penn Center, Coastal Carolina University, Virginia Polytechnic Institute and State University (Virginia Tech), South Carolina Historical Society, South Carolina Department of Archives and History Civil War Symposium, Supercomputing11 (Seattle), History Miami, William Patterson University, USC Upstate, University of Hawaii, University of North Carolina at Charlotte, University of North Carolina at Chapel Hill, The Lincoln Forum, Abraham Lincoln Presidential Library and Museum, Furman University, Berry College, High Noon series at S.C. Upstate Museum, Erskine College, Mississippi State University.

Samples of recognition given to me or my work:

*The Chronicle of Higher Education*, Vol. L: 2 (September 5, 2003), cover page, A37-38. Online at http://chronicle.com/prm/weekly/v50/i02/02a03701.htm

C. Vann Woodward, "District of Devils," *New York Review of Books*, xxxii #15: 30-31

*Chicago Tribune*, October 13, 2007, cover of the Book Review Section, "Orville Vernon Burton's Heartland Prize-winning The Age of Lincoln." Catherine Clinton, "Lincoln and His Complex Times," pp. 4-5.

Featured as example of "Faculty Excellence" on UIUC Homepage: http://www.uiuc.edu/overview/explore/

Call out in Sonia Sotomayor, *My Beloved World* (NY: Alfred A. Knopf, 2013), p. 132, and her Commencement Address at the University of South Carolina, 2011 (on C-Span) and "Supreme Court Justice Sonia Sotomayor uses vivid examples from two key figures in her life—her mother and South Carolina native and historian Vernon Burton"; Wayne Washington, "You Learn Values from Your Family, Supreme Court Justice Tells Grads," *The Columbia State*, May 9, 2011; http://www.thestate.com/2011/05/07/1808978/sotomayor-parents-are-key.html#storylink=misearch#ixzz1NljBBgHA and http://dailygamecock.com/news/item/1422-sonya-sotomayor-delivers-personal-inspiring-message-at-university-of-south-carolina-graduation

In last three years, numerous national and local television, radio (NPR—for example, June 27, 2013, "On Point" discussing the Supreme Court Ruling on Voting Rights Act, Sections 4 and 5-- http://onpoint.wbur.org/2013/06/27/scotus-voting-rights; and http://wbur.fm/138DolQ -- and commercial), and other media interviews and programs, including several C-SPAN Book TV (for example, "President Lincoln and Secession," http://www.c-spanvideo.org/program/293631-3) and a two-hour Clemson University lecture on Southern Identity at "Lectures in History," http://www.c-span.org/History/ – downloaded 492,791 times in 2012.  Numerous appearances on SC ETV for documentaries (more complete list available upon request).

# Appendix B

**PASSAGE AND IMPLEMENTATION OF VOTER IDENTIFICATION LEGISLATION**

**A. Previous Voter Identification Legislation in Texas**

      The passage of Senate Bill (SB) 14, Texas voter photo identification (ID) law, was the culmination of repeated attempts to pass more restrictive voter identification requirements. From 2005 to 2011, the Texas Legislature considered four different bills which increased the voter identification requirements: House Bill (HB) 1706 (2005), HB 218 (2007), SB 362 (2009), and SB 14 (2011). Legislation passed by the 75th Regular Session of the Texas Legislature in 1997, HB 330, amended Section 63.0101 of the Election Code and provided that the following forms of documentation were acceptable forms of identification: a driver's license or personal identification card issued by the Texas Department of Public Safety, a form of identification containing the person's photograph that establishes the person's identity; a birth certificate or other document confirming birth that is admissible in court of law and established the person's identity; U.S. citizenship papers; a U.S. passport; pre-printed checks; official mail; two other forms of identification that establish a person's identity; or any form of identification prescribed by the secretary of state.[184] HB 1549, which was passed by the 78th Legislature in 2003, amended these requirements and limited the number of acceptable forms of identification. The legislation removed pre-printed checks from the list of acceptable forms of identification and narrowed the types of documents allowed by removing the statement which stipulated that two other forms of identification that establish a person's identity could be used. The amended election law, however, did allow voters to use a copy of a current utility bill, bank statement, government check,

---

[184] 75(R) HB 330 Enrolled Version-Bill Text. http://www.legis.state.tx.us/tlodocs/75R/billtext/html/HB00330F.htm (accessed June 4, 2014)

paycheck, or other government document that shows the name and address of the voter. [185] HB

1549, authored by Mary Denny (R-Flowermound), amended election laws to implement the fed-

eral Help America Vote Act of 2002 (HAVA).

In 2005, Mary Denny authored HB 1706, which sought to further limit the acceptable

forms of identification by requiring photo identification. Under HB 1706, in addition to a voter

registration certificate, voters would have to submit either one form of photo identification, or

two other pieces of identifying documentation. Acceptable forms of photo identification would

have included:

- a driver's license or personal identification card issued to the person by the Department of Public Safety or the equivalent agency of another state that has not expired or that expired no earlier than two years before the date of presentation;
- a United States military identification card that contains the person's photograph;
- a valid employee identification card that contains the person's photograph and is issued by an employer of the person in the ordinary course of the employer's business;
- a United States citizenship certificate issued to the person that contains the person's photograph;
- a United States passport issued to the person;
- a student identification card issued by a public or private institution of higher education that contains the person's photograph;
- a license to carry a concealed handgun issued to the person by the Department of Public Safety;
- an identification card issued by a Texas state agency that contains the person's photograph; or
- an identification card that contains the person's photograph and is issued by a county elections administrator or a county clerk.

Acceptable pieces of identifying documentation would have included:

- a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter;
- official mail addressed to the person by name from a governmental entity;
- a certified copy of a birth certificate or other document confirming birth that is admissible in a court of law and establishes the person's identity;

---

[185] 78 (R) HB 1549 Enrolled Version-Bill Text. http://www.legis.state.tx.us/tlodocs/78R/billtext/pdf/HB01549F.pdf (accessed June 4, 2014)

2B

- United States citizenship papers issued to the person;
- an original or certified copy of the person's marriage license or divorce decree;
- court records of the person's adoption, name change, or sex change;
- an identification card issued to the person by a governmental entity of Texas or the United States for the purpose of obtaining public benefits, including veteran's benefits, Medicaid, or Medicare;
- a temporary driving permit issued to the person by the Department of Public Safety;
- a pilot's license issued to the person by the Federal Aviation Administration or another authorized agency of the United States;
- a library card that contains the person's name issued to the person by a public library located in Texas; or,
- a hunting or fishing license issued to a person by the Parks and Wildlife Department.[186]

HB 1706 passed the Texas House, however, because of a Senate rule that required the approval of two-thirds of the body to consider legislation outside of the regular order of business, 11 Senate Democrats were able to prevent the consideration of the bill by the Senate.[187] Despite this set-back to the enactment of photo identification requirements, Denny and other House Republicans were determined to pass HB 1706, so Denny amended the House version of SB 89, which added election officials to the list of individuals who were permitted to access the electronically readable information on a driver's license, to include the voter identification regulations of HB 1706.[188] However, the Senate minority leader, Leticia Van de Putte, a Democrat from San Antonio, raised a point of order that the House amendments to SB 89 were not germane to the body of the bill and that further consideration was in violation of Senate rules. The chair ruled that the point of order was well-taken and sustained the point of order.[189] SB 89 was

---

[186] 79 (R) HB 1706 Enrolled Version-Bill Text. http://www.legis.state.tx.us/tlodocs/79R/billtext/pdf/HB01706E.pdf (accessed June 4, 2014).
[187] No byline, "In Session," *San Antonio Evening News*, May 4, 2005.
[188] *Texas House Journal*, 79th Legislature, Regular Session. 76th day (May 24, 2005). p. 4321.
[189] *Texas Senate Journal*, 79th Legislature, Regular Session. 80th day (May 27, 2005). p. 4509.

referred to a conference committee, but the committee was unable to consider the legislation before the end of the session.[190]

In 2007, Betty Brown (R-Athens) authored HB 218. This legislation, like HB 1706, required voters to present, in addition to a voter registration certificate, either one form of acceptable photo identification or two other pieces of identifying documentation. Acceptable forms of photo identification would have included:

- a driver's license or personal identification card issued to the person by the Department of Public Safety that has not expired or that expired no earlier than two years before the date of presentation;
- a United States military identification card that contains the person's photograph;
- a valid employee identification card that contains the person's photograph and is issued by an employer of the person in the ordinary course of the employer's business;
- a United States citizenship certificate;
- a United States passport issued to the person;
- a student identification card issued by a public or private institution of higher education located in the United States that contains the person's photograph;
- a license to carry a concealed handgun issued to the person by the Department of Public Safety; or
- A valid identification card that contains the person's photograph and is issued by:
  - an agency or institution of the federal government; or
  - an agency, institution, or political subdivision of Texas.

HB 218 provided fewer acceptable forms of photo identification than HB 1706. While HB 1706 would have permitted a driver's license or personal identification card issued by the Texas Department of Public Safety (DPS) or the equivalent agency of another state to be used by voters as a form of photo identification, HB 218 allowed only a driver's license or personal identification card issued by the Texas DPS. Additionally, while HB 1706 would have permitted county commissioners courts to authorize county elections officials or county clerks to issue photo identification cards to be used as proof of a voter's identification, this provision is con-

---

[190] Associated Press, "Democrats derail voter-ID bill with threat of filibuster, exercise of Senate rules," *Lubbock Avalanche-Journal*, May 29, 2005.

spiciously absent from HB 218. Like HB 1706, HB 218 would have allowed voters to present two pieces of identifying documentation instead of photo identification. Acceptable pieces of identifying documentation would have included:

- a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter;
- official mail addressed to the person by name from a governmental entity;
- a certified copy of a birth certificate or other document confirming birth that is admissible in a court of law and establishes the person's identity;
- United States citizenship papers issued to the person;
- an original or certified copy of the person's marriage license or divorce decree;
- court records of the person's adoption, name change, or sex change;
- an identification card issued to the person by a governmental entity of Texas or the United States for the purpose of obtaining public benefits, including veteran's benefits, Medicaid, or Medicare;
- a temporary driving permit issued to the person by the Department of Public Safety;
- a pilot's license issued to the person by the Federal Aviation Administration or another authorized agency of the United States;
- a library card that contains the person's name issued to the person by a public library located in Texas; or
- a hunting or fishing license issued to a person by the Parks and Wildlife Department.[191]

The House passed HB 218 on 23 April 2007. Lieutenant Governor David Dewhurst took advantage of the absence of two Democratic senators to schedule HB 218 for debate.[192] Because of the threat of a filibuster, however, Senator Troy Fraser, the bill's sponsor, agreed to a recount. Democratic Senator Mario Gallegos whose biopsy indicated that his body was rejecting the liver that had been transplanted four months earlier, ignored doctors' advice, and returned to the Senate chamber. Because of the return of Senator Gallegos, the Democrats were able to block HB 218 from consideration by the Senate.[193]

---

[191] 80 (R) HB 218 Enrolled Version-Bill Text. http://www.legis.state.tx.us/tlodocs/80R/billtext/pdf/HB00218E.pdf (accessed June 5, 2014).
[192] Kristen Mack, "In trying to win, has Dewhurst lost a friend?," *Houston Chronicle*, May 17, 2007.
[193] Mark Lisheron, "Senate, used to solidarity, repairs split," *Austin American Statesman*, May 18, 2007

Following the large turnout of minorities in the 2008 election of President Obama, in 2009, Troy Fraser (R-Horseshoe Bay) and Craig Estes (R-Wichita Falls) introduced SB 362. Like HB 1706 and HB 218, SB 362 would have required voters to present, in addition to a voter registration certificate, either one form of acceptable photo identification or two other pieces of identifying documentation. Acceptable forms of photo identification would have included:

- driver's license or personal identification card issued to the person by the Department of Public Safety that has not expired or that expired no earlier than two years before the date of presentation;
- a United States military identification card that contains the person's photograph;
- a United States citizenship certificate issued to the person that contains the person's photograph;
- a United States passport issued to the person;
- a license to carry a concealed handgun issued to the person by the Department of Public Safety; or
- a valid identification card that contains the person's photograph and is issued by:
  - an agency or institution of the federal government; or
  - an agency, institution, or political subdivision of Texas.

SB 362 provided four fewer acceptable forms of photo identification than HB 218. While HB 218 would have permitted a valid employee identification card or a student identification card to be used as forms of photo identification, both of these forms of identification were not included in the list of acceptable photo identification in SB 362. Like HB 1706 and HB 218, SB 362 would have allowed voters to present two pieces of identifying documentation instead of photo identification. Acceptable pieces of identifying documentation would have included:

- the voter's voter registration certificate or a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter;
- official mail addressed to the person by name from a governmental entity;
- a certified copy of a birth certificate or other document confirming birth that is admissible in a court of law and establishes the person's identity;
- United States citizenship papers issued to the person;
- an original or certified copy of the person's marriage license or divorce decree;
- court records of the person's adoption, name change, or sex change;

6B

- an identification card issued to the person by a governmental entity of Texas or the United States for the purpose of obtaining public benefits, including veteran's benefits, Medicaid, or Medicare;
- a temporary driving permit issued to the person by the Department of Public Safety;
- a pilot's license issued to the person by the Federal Aviation Administration or another authorized agency of the United States;
- a library card that contains the person's name issued to the person by a public library located in Texas; or
- a hunting or fishing license issued to a person by the Parks and Wildlife Department.[194]

SB 362 passed the Senate, in part because Lieutenant Governor Dewhurst and Senate Republicans successfully changed Senate rules to allow legislation dealing with voter identification to be brought to the floor as a special order with only the consent of a majority of the Senate instead of the two-thirds majority normally required. [195] Disagreements between House Republicans, however, delayed consideration of SB 362 until the end of the session, which allowed Democrats to successfully "chub" to prevent the House from considering the bill.[196] Chubbing is a sort of filibuster practiced primarily in the Texas House of Representatives.[197] While chubbing can be used in both the Senate and the House, chubbing is a particularly attractive delaying tactic in the House, since filibusters are not permitted in the House of Representatives. Because debate is limited to 10 minutes in duration,[198] in the House, however, chubbing is used instead of a filibuster. Successful use of chubbing by the minority can be used to slow the legislative process and even kill legislation.[199] In 2009, House Democrats successfully chubbed a voter ID bill and

---

[194] 81 (R) SB 362 Enrolled Version-Bill Text. http://www.legis.state.tx.us/tlodocs/81R/billtext/pdf/SB00362E.pdf (accessed June 5, 2014).
[195] Jaime Castillo, "Redistricting, voter ID bills take wrong tracks," *San Antonio Evening News*, April 1, 2009, p. 1B
[196] Dave Montgomery, "Democrats in House talk to kill voter ID bill," *Fort Worth Star Telegram*, May 23, 2009, B01.
[197] "Filibusters and Chubbing," Legislative Reference Library of Texas. May 23, 2011.
http://www.lrl.state.tx.us/whatsnew/client/index.cfm/2011/5/23/Filibusters-and-Chubbing (accessed March 24, 2014); Grant Barrett, ed. *The Oxford Dictionary of American Political Slang.* New York: Oxford University Press, 2006. p. 80.
[198] *Texas House Rules, 83rd Legislature.* Austin, TX: Texas Legislative, 2013. pp. 74-75.
[199] Andrew Weber. "Texplainer: What is Chubbing?" *The Texas Tribune.* Feburary 2, 2011.
http://www.texastribune.org/2011/02/02/texplainer-what-is-chubbing/ (accessed March 24, 2014.

7B

prevented the bill (SB 362) from reaching the floor by discussing other bills on the Local and Consent Calendar.[200]  Chubbing can be ended only if 100 members vote to suspend the rules.[201]

As long as Democrats kept up the chub, the House could not vote on any bills, so more than 200 bills died at the end of legislative session to keep SB 362 from passing.[202]  Republicans blamed Speaker Straus for the failure to pass SB 362 because he complied with legislative procedure, which accommodated the chub.

## B.  Minority Demographic Shifts and Electoral Gains Motivate Stricter Voter Identification Requirements

Two 2010 events changed the face and tone of the Texas congress and made Republicans' need for voter ID more urgent.  First, the 2010 decennial census showed that Texas is now a majority-minority state.  Anglos, though still comprising the plurality, had decreased to less than 50 percent of the Texas population.  Second, Republicans saw a landslide victory in the 2010 midterm elections.  In the House, Democrats lost 23 seats, of which 19 were held by Anglo representatives.  The vast majority of Democrats remaining in the house were African American or Latino. [203]  Morgan Kousser referred to this landslide as "The Irony of Victory."  Republicans swept the elections, yet claimed there was widespread use of voter fraud, presumably to the advantage of Democrats.  After their huge electoral victory, Republicans undermined the confidence in the system that put them in the Capitol.  As Sen. John Whitmire replied to voter ID bill

---

[200] Richard Whitaker. "Chubbing Republicans to Over the Head," *The Austin Chronicle*. May 29, 2009. http://www.austinchronicle.com/news/2009-05-29/787160/ (accessed March 24, 2014); James C. McKinley, Jr. "The Talk, and the Talk, and the Talk, of Austin," *The New York Times*. May 30, 2009.  p. A7.

[201] Lyle Brown, Joyce A. Langenegger, Sonia R. Garcia, Ted Lewis, and Robert E. Biles. *Practicing Texas Politics: 2013-14 Edition*. Stamford, CT: Cenage Learning, 2014. p.  282.

[202] Expert Report and Rebuttal Report of Kousser, J. Morgan, Ph.D. for *Texas v. Holder*,  ¶48.

[203] Expert Report and Rebuttal Report of Kousser, J. Morgan, Ph.D. for *Texas v. Holder*, ¶49.  Of these 23 seats, 19 had been held by Anglos.  The vast majority of the remaining Democrats in the House were African American or Latino representatives.

sponsor Troy Fraser (R), "Are you suggesting there was significant fraud in that election?"[204] Sen. Rodney Ellis (D) suggested Republicans' real purpose in pushing for voter ID was the "changing demographics of Texas."[205]

Stymied the previous three sessions and now with their gains from the 2010 election, Republicans were geared to make voter ID their priority for the legislative session. Representative Wayne Smith (R-Baytown) had learned he would have to take a hard party line if he were to remain chair of the Election Committee. He introduced HB 401, a tougher ID bill, in December 2010, immediately after midterm elections. Smith said his constituents wanted "*a hard photo ID*."[206] Despite Smith's efforts, Patricia Harless, a conservative Republican, was named chair of the Election Committee.[207] Representative Debbie Riddle (R-Tomball) was also eager for voter ID. She waited two days outside the clerk's office at the beginning of the session so she could be the first to file an ID bill and, significantly at the same time, an anti-immigration bill.[208] Sen. Fraser, too, began working on new voter ID legislation – what would become SB 14 – immediately after SB 362 died, on 31 May 2009. Dewhurst's staff assisted with the drafting of the bill, and "thus Sen. Fraser was prepared when a wave election cleared remaining procedural hurdles to passage."[209]

In 2011, Troy Fraser introduced SB 14. Unlike HB 1706, HB 218, and SB 362, SB 14 would have required voters to present, instead of a voter registration certificate and either one form of

---

[204] Expert Report and Rebuttal Report of Kousser, J. Morgan, Ph.D. for *Texas v. Holder*, ¶50 originally in R.G. Ratcliffe, in *HC* blogs, "The Lege, Voting," 26 Jan 2011 <http://blogs.chron.com/texaspolitics/>

[205] Expert Report and Rebuttal Report of Kousser, J. Morgan, Ph.D. for *Texas v. Holder*, ¶52 originally quoted in Gary Scharrer, "Senate is set to ponder voter Ids," SAEN, 21 Jan 2011, 1A

[206] David Montgomery, "Republicans Confident of Passing Texas Voter ID bill," *Fort Worth Star Telegram*, December 18, 2010.

[207] Expert Report and Rebuttal Report of Kousser, J. Morgan, Ph.D. for *Texas v. Holder*, ¶53.

[208] Expert Report and Rebuttal Report of Kousser, J. Morgan, Ph.D. for *Texas v. Holder*, ¶51.

[209] DOJ findings of fact/law in Section 5 case, 164.

acceptable photo identification or two other pieces of identifying documentation, one form of photo identification. Acceptable forms of photo identification would have included:

- a driver's license, election identification certificate, or personal identification card issued to the person by the Department of Public Safety that has not expired or that expired no earlier than 60 days before the date of presentation;
- a United States military identification card that contains the person's photograph that has not expired or that expired no earlier than 60 days before the date of presentation;
- United States citizenship certificate issued to the person that contains the person's photograph;
- a United States passport issued to the person that has not expired or that expired no earlier than 60 days before the date of presentation; or
- a license to carry a concealed handgun issued to the person by the Department of Public Safety that has not expired or that expired no earlier than 60 days before the date of presentation.

SB 14 permits even fewer forms of acceptable photo identification than previous iterations of the voter identification legislation. While SB 14 continues to allow a driver's license, a military identification card, a U.S. passport, and a license to carry a concealed handgun to be used as a form of photo identification, it only permits the use of these documents if they have not expired more than 60 days before the date of presentation. Furthermore, while previous versions of voter identification legislation had allowed voters to present a valid identification card that contains the person's photograph and is issued by an agency or institution of the federal government or an agency, institution, or political subdivision of Texas, SB 14 makes no such allowance. Significantly, unlike HB 1702, HB 218, or SB 362, SB 14 does not allow voters to substitute two other forms of approved documentation in place of a photo ID, or accept college student ID, even state supported school IDs.[210]

---

[210] 82 (R) SB 14 Enrolled Version-Bill Text.  http://www.capitol.state.tx.us/tlodocs/82R/billtext/pdf/SB00014F.pdf (accessed June 6, 2014).

## C. Texas Voter ID Law Compared to Voter ID Laws in Other States

When one places passage of Texas SB 14 into the larger context of what is happening in other states and the courts, there is a strong implication of intent to discriminate against minority voters. The passage of SB 14 was the culmination of repeated attempts to pass increased voter ID requirements, restricting which IDs would be acceptable.  Attempts to pass photo voter ID requirements in Texas occurred as other states attempted to pass similar legislation.

Since it went to the Supreme Court, the Indiana voter ID case was the one most studied across the nation.  In 2005, Indiana passed a voter identification law which required voters to present proof of identification, defined as a document that shows the name of the individual to whom the document was issued, and the name conforms to the name in the individual's voter registration record; shows a photograph of the individual to whom the document was issued; includes an expiration date, and is not expired or expired after the date of the most recent general election; and was issued by the United States or the state of Indiana. Under the new law, voters who did not have a photo ID were allowed to cast a provisional ballot. In order to have their votes counted, voters were required to visit a designated government office within ten days and either bring a photo ID or sign a statement saying they cannot afford one.[211] The District Court and the Seventh U.S. Circuit Court of Appeals upheld the law, which was then appealed to the U.S. Supreme Court. In *Crawford v. Marion County Election Board* (553 U.S. 181 (2008)), the Supreme Court upheld the election law.[212] Also in 2005, Georgia passed a voter identification

---

[211]Acts 2005, First Regular Session of the 114th Indiana General Assembly. P.L.109-2005
[S.483. Approved April 27, 2005]. http://www.in.gov/legislative/pdf/acts_2005.pdf 109 (accessed June 5, 2014).
[212] *Crawford v. Marion County Election Board* (553 U.S. 181, 128 S. Ct. 1610, 170 L. Ed. 2d 574, 2008 WL 1848103, 2008 U.S. LEXIS 3846).  Justice Stevens, in the majority opinion, stated that "each of Indiana's asserted interests in unquestionably relevant to its interests in protecting the integrity and reliability of the electoral process."

law, HB 244, which required voters to present proof of identification. Acceptable proofs of iden-

tification included: a Georgia driver's license that was properly issued by the appropriate state

agency; a valid Georgia voter identification card or other valid identification card issued by a

branch, department, agency, or entity of the State of Georgia, any other state, or the United

States authorized by law to issue personal identification, provided that such identification card

contains a photograph of the elector; a valid United States passport; a valid employee identifica-

tion card containing a photograph of the elector and issued by any branch, department, agency,

or entity of the United States government, Georgia, or any county, municipality, board, authority,

or other entity of Georgia; a valid United States military identification card, provided that such

identification card contains a photograph of the elector; or a valid tribal identification card con-

taining a photograph of the elector. Student photo IDs from public colleges and universities are

also acceptable forms of voter identification.[213] HB 244 dramatically reduced the number of ac-

ceptable forms of voter identification from 17 to 6. Under the law, those unable to produce any

of the items of identification would be allowed to vote a provisional ballot upon swearing or af-

firming that the elector is the person identified in the elector's voter certification. The provisional

ballot would only be counted if the registrars were able to verify current and valid identification

of the elector.[214] In September 2005, Common Cause/Georgia and others filed a lawsuit, *Com-

mon Cause/Georgia v. Billups*, against various Georgia county Boards of Elections and then-

Secretary of State Cathy Cox challenging the constitutionality of the new law. On 18 October

2005, the U.S. District Court for the Northern District of Georgia enjoined the voter identifica-

---

[213] "I Vote Students Corner: Beyond High School." Georgia Secretary of State.
<http://sos.ga.gov/index.php/elections/students_corner>(accessed June 23, 2014).
[214] Georgia Legislature, 2005-06 session, House Bill 244 (As Passed by House and Senate). Section 59.
http://www.legis.ga.gov/Legislation/20052006/52923.pdf (accessed June 5, 2014).

tion law.[215] The case was then appealed to the US Court of Appeals for the Eleventh District. In 2006, the Georgia legislature passed SB 84, which required that "each county board of registrars shall provide at least one place in the county at which it shall accept applications for and issue Georgia voter identification cards to registered Georgia electors which shall under state law be valid only for purposes of voter identification under Code Section 21-2-417 and available only to registered electors of this state. No fee shall be charged or collected for the application for or issuance of a Georgia voter identification card."[216] On 26 April 2006, the plaintiffs in the case filed a second amended complaint to reflect these changes, and the District Court enjoined enforcement of SB 84 on 14 July 2006. The Court again enjoined enforcement of the amended law on 15 September 2006, but on 6 September 2007, the District Court upheld the voter identification law.[217]

The more restrictive requirements of SB 14 and its predecessor, SB 362, seem to be counter-intuitive if, like supporters of photo voter identification argued, the legislation was intended to reduce voter fraud, and points instead toward intent to discriminate against minority voters. The voter identification laws of both Indiana and Georgia were upheld by federal courts in 2008 and 2007, respectively. In *Crawford v. Marion County Board of Elections*, the Supreme Court ruled that voter identification laws were constitutional if the laws balanced the state's legitimate interest in preventing fraud with the need to expand the franchise to as many voters as possible.[218] Since 2011, 14 states, eight of which are in the South (including Texas), have passed voter ID laws, many with requirements similar to those of Indiana and Georgia. Texas's and

---

[215] Tom Crawford. "Voter ID Law is Enjoined," Tom Crawford's Georgia Report. October 18, 2005.
http://gareport.com/story/2005/10/18/voter-id-law-is-enjoined/(accessed June 5, 2014).
[216] Georgia Legislature, 2005-2006 session, House Bill 84 (As Passed) Section 2.
http://www.legis.ga.gov/Legislation/20052006/54785.pdf(accessed June 5, 2014).
[217] "*Common Cause/Georgia v. Billups*." Brennan Center for Justice. June 5, 2008.
http://www.brennancenter.org/legal-work/common-causegeorgia-v-billups (accessed June 5, 2014).
[218] *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008).

South Carolina's attempt to pass voter ID laws paralleled one another.  While awaiting the U.S. Department of Justice's (DOJ) decision on preclearance under Section 5 of the Voting Rights Act for SB 14, Texas noted that the DOJ objected to South Carolina's implementation of a voter ID law, and Texas then requested judicial preclearance from the courts. South Carolina's voter ID law, H 3003 (2011) required voters to produce a "valid and current" South Carolina driver's license, any other photo ID issued by South Carolina Department of Motor Vehicles; U.S. passport; U.S. military photo ID; or a new, free ID card for voters, a South Carolina voter registration card with photo.[219]  But when challenged in court, as Texas SB 14 had been, the South Carolina attorney general assured the courts that, under a very expansive reading of the South Carolina law's "safety valve" provision, no one would be kept from voting if they did not have one of the required picture IDs, and the Court reflected that in its opinion.[220] The authors of SB 14 and its predecessor, SB 362, had to be aware of the South Carolina ruling as well as the Indiana and Georgia rulings, and, instead of emulating the more inclusive voter identification laws of Indiana that had received approval from the Supreme Court, crafted increasingly exclusionary voter identification requirements. In *Common Cause/Georgia v. Billups*, a major cause behind the favorable ruling of the Eleventh Circuit Court of Appeals was the 2006 version of Georgia's voter identification law, SB 84, which provided a way for voters to obtain, for no cost, photo identification, and Georgia also accepted public or state school student IDs.  Even as the federal courts articulated the need for less restrictive voter identification requirements, Texas legislators worked to enact more restrictive voter identification requirements. And certainly the South Carolina trial and decision made it clear what courts expected.  Even as the federal courts articulated the need

---

[219] South Carolina General Assembly, 119th Session, 2011-2012, House Bill 3003 (As Signed by the Governor). http://www.scstatehouse.gov/sess119_2011-2012/bills/3003.htm (accessed June 12, 2014).
[220] *South Carolina v. United States*, 898 F. Supp. 2d 30 (D.D.C. 2012).

for less restrictive voter ID requirements, succeeding Texas legislatures worked to enact more restrictive voter ID requirements.

## D.  SB 14 Passage Characterized by Legislative Irregularities

Republicans in the Texas legislature took advantage of legislative rules and traditions and success in the 2010 elections to force the passage of SB 14.  First, Senate rules continued to exempt voter identification legislation from the two-thirds rule.  In 2009, the Senate passed SR 14, which amended Senate Rule 5.11. Rule 5.11 governs special orders. It mandates that "any bill, resolution, or other measure may on any day be made a special order for a future time of the session by an affirmative vote of two-thirds of the members present." In 2009, however, the Senate approved a change which allowed voter identification requirement legislation to be exempted from this rule. Rule 5.11(d) stated that "a bill or resolution relating to voter identification requirements reported favorably from the Committee of the Whole Senate may be set as a special order for a time at least 24 hours after the motion is adopted by a majority of the members of the Senate."[221] This rule was carried over into the rules for the Senate rules adopted by the 82nd legislature on 19 January 2011.[222]

Second, on 20 January 2011, Governor Rick Perry declared voter identification requirements be an emergency item, which allowed lawmakers to begin considering the issue in the initial 30 days of the legislative session.[223] During the first 60 days of a session, the Texas legisla-

---

[221] Texas Senate Resolution 14; Legislative Session 81 (R).  01/14/2009.
http://www.legis.state.tx.us/tlodocs/81R/billtext/pdf/SR00014F.pdf (accessed June 3, 2014)
[222] *Senate Rules*. Adopted by the 82nd Legislature, January 19, 2011.
[223]"Gov. Perry Adds Voter I.D. and Balanced Budget Amendment to Emergency Items for Legislative Session."
Office of the Governor, Rick Perry. January 20, 2011.  http://governor.state.tx.us/news/press-release/15602/ (accessed June 3, 2014).

ture is barred from passing legislation, unless an issue is declared an emergency by the governor.[224]

Perry named three emergency measures; one of the others also targeted Latinos and dealt with an imagined immigration problem by "outlawing non-existent 'sanctuary cities' for illegal immigrants."[225] Perry included the voter ID bill as an emergency item just one day after the Senate adopted Rule 5.11(d).[226]

Third, on 21 January 2011, Lieutenant Governor David Dewhurst notified the Senate that the Committee on the Whole would consider SB 14 on 24 January 2011. Dewhurst expedited the passage of SB 14; Senator Fraser originally filed his photo identification bill as SB 178, but he was permitted to re-file the bill using a low bill number reserved by Dewhurst for legislative priorities.[227]

Fourth, two elected House Democrats switched parties. This meant that if all the Democrats left the state, as they had done during the highly divisive 2003 redistricting plans, Republicans still had a quorum. Furthermore, Republicans had a two-thirds majority in the House, meaning they could suspend the rules anytime and break a Democratic chub.[228]

Republicans in the House also adopted a rule which limited the consideration of a bill on Local, Consent, and Resolutions calendar to one calendar day. An unfinished Local and Consent calendar would no longer have special status requiring it to be considered first the very next day.

---

[224] Ross Ramsey. "Texplainer: What's an Emergency Item in Texas?" *The Texas Tribune.* January 12, 2011. http://www.texastribune.org/2011/01/12/texplainer-whats-an-emergency-item-in-texas/ (accessed June 2, 2014).
[225] Expert Report and Rebuttal Report of Kousser, J. Morgan, Ph.D. for *Texas v. Holder*, ¶54.
[226] DOJ findings of fact/law in Section 5 case, 170-173.
[227] DOJ findings of fact/law in Section 5 case, 174.
[228] Expert Report and Rebuttal Report of Kousser, J. Morgan, Ph.D. for *Texas v. Holder*, ¶53.

Local bills not considered would go to the next Local and Consent calendar. This rule change was designed to prevent Democrats from chubbing to prevent consideration of legislation.[229]

With some of typical House and Senate rules suspended and in the wake of the 2010 elections, Democrats in both chambers knew they would be unable to stop SB 14 from passing. But they fought anyway.

On 21 January 2011, Dewhurst announced to the Senate that SB 14 would go to the Texas Senate Committee of the Whole in three days. This was such unusually short notice that many senators expressed concern they would not have the time to find any witnesses for the hearing.[230] In the Senate, legislators proposed 37 amendments to SB 14. Twenty-eight were tabled and nine were adopted, and in the end only six passed.[231] Democrats' amendments focused on making more IDs eligible, providing more information to voters, relieving the burden on voters to obtain identification, and studying the effects of the voter ID law on minorities.[232] Democrats stressed the hardships voters faced in getting identification from distant and often understaffed DPS offices, and they pointed out SB 14 was more restrictive than the Indiana or Georgia laws, which legislators had looked to as models.[233] Republican Sen. Lloyd Duncan, a supporter of the bill, added provisions to SB 14 that would alleviate the burden on voters who could not afford the cost of a birth certificate, but the House removed the provision.[234] Senators and witnesses testified and made statements that they were concerned that SB 14 would lead to minority disfranchisement.[235] In the end, SB 14 passed the Senate in a highly racially polarized vote; no minori-

---

[229] *Rules and Precedents of the Texas House, 82nd Legislature* (Austin, TX: Texas Legislative Council, 2011), p. 31; Robert T. Garrett, "Republicans act to avert Dems' stalling," Dallas Morning News, January 25, 2011, A03.
[230] DOJ findings of fact/law in Section 5 case, 174.
[231] DOJ findings of fact/law in Section 5 case, 186.
[232] Expert Report and Rebuttal Report of Kousser, J. Morgan, Ph.D. for *Texas v. Holder*, ¶112, 54.
[233] Expert Report and Rebuttal Report of Kousser, J. Morgan, Ph.D. for *Texas v. Holder*, ¶54.
[234] DOJ findings of fact/law in Section 5 case, 185.
[235] DOJ findings of fact/law in Section 5 case, 175, 177-178.

ty senators voting for it and nearly all Anglo senators voting for it.[236]  As the Justice Department noted, "It is unusual for legislation to pass the Senate within the legislative session's first two weeks."[237]

In the House, Speaker Straus announced SB 14 would be on a "fast track" Select Committee on Voter Identification and Voter Fraud, the only committee "fast tracked" that session, and its only legislation was SB 14.[238]  The Select Committee had one hearing on SB 14.  Witnesses testified that voter ID laws had a negative impact on minority voters, and most voters who cast provisional ballots do not return to verify their identities.  No one testified to accounts of fraud in the election system.  Some witnesses did offer testimony about noncitizens voting, but they could not provide evidence or examples.[239]

The House proposed 53 amendments; 35 were tabled, 3 failed, and 15 were adopted. Several of the amendments that passed were removed prior to enactment. Democrats' amendments focused on mitigating the cost on voters and the impact on minority voters, including by prohibiting DPS from charging a fee for underlying ID; reimbursing the costs for indigent individuals to travel to obtain compliant ID; requiring a study showing no adverse impact on minorities; requiring the Secretary of State to determine whether a majority of voters who cast provisional ballots were minorities; requiring a study by county and ethnicity to determine access to necessary ID and analysis of impact on voters; and, allowing county clerks to issue voter ID cards.[240]  Because of the Republican win in 2010, voter ID legislation had a "foolproof majority" in the House, and advocates of the law saw compromising with Democrats as "not relevant."

---

[236] DOJ findings of fact/law in Section 5 case, 120A.
[237] DOJ findings of fact/law in Section 5 case, 188.
[238] DOJ findings of fact/law in Section 5 case, 192.
[239] DOJ findings of fact/law in Section 5 case, 195-196.
[240] DOJ findings of fact/law in Section 5 case, 200.

One legislator explained that they "had their minds made up" before the debate and already knew "we're not taking any amendments."[241]

In the House, no racial minority Democrats voted for SB 14, and the "minority legislators who voted in favor of SB 14 either did not receive the support of minority constituencies or switched parties after the 2010 election."[242]

Later the conference committee narrowed the acceptable identification even more by removing tribal ID and also eliminated a provision that prioritized voter education programs to minority and low-income communities.[243]  Perry signed SB 14 into law on 27 May 2011.  As the Department of Justice noted in its Finding of Fact/Law in the Section 5 case, "The bill analysis prepared in his office included no analysis of the bill's impact on minority voters….In a contemporaneous signing statement, he equated voting with cashing a check or applying for a library card,"[244] ignoring that access to the ballot is a constitutionally-protected right.

## E.  The Hurried, Problematic Implementation of SB 14

On the morning of 25 June 2013, in its decision in *Shelby County v. Holder*, the U.S. Supreme Court found part of the Voting Rights Act to be unconstitutional, giving Texas the authority to implement SB 14 without being subjected to Section 5 preclearance.[245]

Almost immediately after the Supreme Court ruled on *Shelby County v. Holder*, Texas Attorney General Greg Abbott announced that Texas would begin the process of implementing SB 14, the Texas voter ID law.  Within two hours after the announcement of the Court's decision, Abbott declared in a statement that "With today's decision, the State's voter ID law will

---

[241] DOJ findings of fact/law in Section 5 case, 193-194.
[242] DOJ findings of fact/law in Section 5 case, 120B-C.
[243] DOJ findings of fact/law in Section 5 case, 204.
[244] DOJ findings of fact/law in Section 5 case, 205.
[245] *Shelby County, Alabama v. Holder* (570 U.S._ (2013)) at pp. 11, 21.

take effect immediately. Redistricting maps passed by the Legislature may also take effect without approval from the federal government."[246] On Wednesday, 26 June, Texas Governor Rick Perry signed three redistricting bills, setting the district boundaries for the U.S. House of Representatives, the state Senate, and the state House.[247] On Thursday, 27 June, the Supreme Court vacated an earlier decision made by a federal district court in D.C. that had denied federal preclearance of Texas's voter ID and redistricting laws,[248] and the Texas Department of Public Safety began issuing election identification certificates (EICs) to voters.

In the first few days of the implementation of SB 14, it became apparent that the process would be plagued with difficulties. In order to obtain a "free" EIC, voters were required to apply in person at a Texas DPS office. Seventy counties in Texas, however, did not provide Texas DPS offices when the implementation process began, and uncertainty about the process was widespread.[249]  More problems with the implementation of the voter identification law soon became evident. Some women voters encountered problems when trying to cast their ballots because their maiden names were listed as their middle name on their driver license or other forms of identification, while on state voting rolls given middle names were used instead.[250] The law requires that voters bring a form of photo identification, and that the name on that photo identifica-

---

[246] "Statement by Texas Attorney General Greg Abbot." www.oag.state.tx.us. June 25, 2013.
https://www.oag.state.tx.us/oagNews/release.php?id=4435 (accessed March 23, 2014).
[247] Tim Eaton. "Perry Signs Redistricting Maps," *American-Statesman*, June 26, 2013.
http://www.statesman.com/news/news/perry-signs-redistricting-maps/nYXFZ/ (accessed March 23, 2014).
[248] "Supreme Court Throws Out D.C. Court's Rulings Against Texas' Voter ID, Redistricting Bills."
www.oag.state.tx.us. June 27, 2013. https://www.oag.state.tx.us/oagNews/release.php?id=4438 (accessed March 23, 2014).
[249] Casey Michael. "New Voter ID, Unavailable in Seventy Counties in State, Opens With Wealth of Issues Remaining," HoustonPress. June 28, 2013. http://blogs.houstonpress.com/hairballs/2013/06/voter_id_problems_texas.php (accessed March 23, 2014).
[250] Wade Goodwyn. "Texas' Voter ID Law Creates A Problem For Some Women," National Public Radio. October 30, 2013.  http://www.npr.org/2013/10/30/241891800/texas-voter-id-law-creates-a-problem-for-some-women (accessed March 23, 2014).

tion match the name of the official list of registered voters.  Implementation of the voter identifi-

cation bill has been complicated by the speed at which the law has been implemented.[251]

National Public Radio (NPR) carried a story by Wade Goodwyn, "Texas' voter ID law

creates a problem for some women," on 30 October 2013.  It recounted that the courts had

blocked Texas voter ID laws because "it would potentially disenfranchise hundreds of thousands

of minority voters."  Upon the implantation of "one of the most restrictive voter ID laws in the

nation," it is also affecting others.  Commenting on the voter IDs that Texas accepts, NPR noted,

"it is fine to use a concealed handgun carry permit to vote, but a student can't use his or her uni-

versity photo ID as he could before. Texas Democrats complain that's because those who carry

concealed tend to vote Republican while university students tend to vote Democratic."

The Democratic candidate for governor, state Sen. Wendy Davis, was forced to sign an

affidavit before she could vote , as was her colleague Sen. Leticia Van de Putte.  Only because of

Wendy Davis' amendment to SB 14, one of the few passed on SB 14 and one that allowed voters

with names that were close but not a complete match to cast a provisional ballot at the polls,

could these women cast even a provisional vote.[252]  Ironically, Texas General Attorney Greg

Abbott, who previously sought to indict those involved in the "epidemic of voter fraud" and a

champion of strict voter ID law, had to utilize Senator Davis' amendment.  His photo ID lists his

name as "Gregory Abbott," but his voter registration is for "Greg Abbott."[253]

Implementation of the voter identification bill has been complicated by the speed at

which the law has been implemented. For the first primary, in March 2014, Meg Bonacorsi wrote

---

[251] ibid.

[252] Meg Bonacorsi, "Low turnout for voter identification program," KXXV News Channel 25, February 25, 2014.
<http://www.kxxv.com/story/24821425/low-turnout-for-voter-identification-program>(accessed June 23, 2014)

[253] Dan Solomon, "Prominent Texans Who Have Struggled To Vote Under Texas' New Voter ID Law," *Texas Monthly,* November 5, 2013.

in an article on a Dallas Television website in late February, "Low turnout for voter identification program," that the DPS "is responsible for issuing election identification certificates, but not many people are getting them."  According to Bonacorsi, since the DPS set up mobile stations to "process election identification certificates or EIC's" in June, fewer than 200 individuals had acquired EICs.  Noting that there are fewer mobile stations for primaries than the general election, she reported that there is "only one open in our area this time around is in Falls County and they haven't had anyone come in.[254]

A story titled "Texas granny collides with Texas voter ID law" in the Texas "progressive" political blog called *Crooks and Liars* was picked up by a number of news outlets. The article explained all the difficulties that 80-year-old Laura Troth encountered in trying to vote, and it provides a good illustration of all the hidden costs, a kind of subtle poll tax, of the new Texas voter ID law.  Twice she tried, and each time, "there was something else, another document, another piece of proof she needed to convince the clerks that she's the woman pictured in her expired Texas driver's license."  Troth was not allowed to vote because she did not have a photo ID so that very day a friend drove her to the DPS Office to acquire her voter ID, and she presented her expired driver's license, Social Security card, and Medicare card.  The DPS worker told her she needed her birth certificate.  She returned with the birth certificate and described the clerk, the same she had dealt with the first time as "rude."  That clerk then informed Troth that the "birth certificate wasn't good enough because the name on it differed from her married name."  Troth explained, "I told them I didn't get married out of the womb."  The clerk told Troth she had to come back a third time, and to bring her marriage license, and that her daughter with whom she lived, Alana Troth, needed to accompany her mother, "in person to verify her mother's

---

[254]  Meg Bonacorsi, "Low turnout for voter identification program," KXXV News Channel 25, February 25, 2014. <http://www.kxxv.com/story/24821425/low-turnout-for-voter-identification-program>(accessed June 23, 2014)

residency." Troth, who was a licensed vocational nurse and who sees herself as neither Republican or Democrat, protested, "I just don't understand why they're trying to keep me from voting ….To me, they're taking my rights away." The liberal blogger commented on how married names are a problem for women, and raged, "This stupid law designed to solve a non-existent problem only makes it worse."[255]

In another story, Dr. Mark McKenzie, a political science professor at Texas Tech, worried that there has been inadequate preparation for the actual people supervising elections. "It's unclear to me that the election officers will even inform the voters who vote provisionally that in order for their vote to count they have to go back and show more documents."[256] Even after the 1965 Voting Rights Act, local poll workers had too much discretion in determining who could vote and who could not. Local election officials must be properly trained to apply the law equally to all voters because historically such officials have served as the last blockade to minority voters' right to cast a ballot.

Patrick Michels, a reporter for a weekly newspaper, *The Texas Observer*, recounted the well-known stories of the Greg Abbott and Senators Wendy Davis and Leticia Van de Putte, who "had to sign affidavits in order to vote because the names of their IDs don't exactly match their voter registrations." He also told the ordeal of the 90-year-old former Speaker of the U.S. House, Jim Wright, who needed someone to drive him to a DPS office to get a voter ID card, Michels, explained that for ordinary citizens, including elderly, the poorer, and minorities, "will struggle with his system, or choose not to, quietly. They won't have time to miss work while a poll worker confirms their ID over the phone." Unlike Wright, most "won't have a personal as-

---

[255] karoli, "Texas Granny Colides With Texas Voter ID Law," *CrooksandLiars*, February 12, 2014, http://crooksandliars.com/2014/02/texas-granny-collides-texas-voterid-law (last accessed June 27, 2014).
[256] The Two-Way, "Supreme Court Strikes Down Key Provision Of Voting Rights Law, NPR broadcast.

sistant to drive them around town." Michels predicted that "Texas' voter ID law is so dangerous because its real harm is difficult to measure. The state that already has the lowest voter turnout in the nation just sinks a little lower. High-level election administrators will simply see a system running smoothly. And the prevalence of voter fraud will remain steady at almost zero."[257] A number of the stories commented on the pretext that the law was to reduce or forestall in-person voter fraud, all noting that there was none, or at most one case could be documented.

As the chair of the History Department at the University of Texas, who also is African American and a noted scholar of Texas politics and race, informed me, "The rollout of the law has been a bit intimidating. We are constant[ly] warned that we will not be able to vote if we forget our picture ID or if we do not have the registration card. As you will read, the law also expects everyone to have access to a computer to find your precinct. Of course, my precinct has changed three times in the last two years because of the changes wrought by the ID law."[258]

---

[257] Patrick Michels, "Texas' Voter ID Law: Nothing to See Here, Move Along," *Texas Observer*, Tuesday, November 5, 2013< http://www.texasobserver.org/texas-voter-id-law-move-along/ >(accessed June 23, 2014)
[258] Email to Vernon Burton from Marvin Dulaney, March 17, 2014.

# Appendix C

## MATERIALS RELIED UPON

**Books**

1. Alexander, Michelle, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (New York: The New Press, 2010).

2. Barr, Alwyn, *Reconstruction to Reform: Texas Politics, 1876-1906* (Austin: University of Texas, 1971).

3. Bartley, Numan and Hugh Davis Graham, *Southern Politics and the Second Reconstruction* (Baltimore: Johns Hopkins University Press, 1975).

4. Bickerstaff, Steve, *Lines in the Sand: Congressional Redistricting in Texas and the Downfall of Tom DeLay* (Austin: University of Texas Press, 2007).

5. Billington, Monroe Lee, *The Political South in the Twentieth Century* (New York: Holt, Reinhart, and Winston, 1969).

6. Black, Earl, and Merle Black, *Politics and Society in the South* (Cambridge: Harvard University Press, 1987).

7. Blue, Carroll Parrot, *The Dawn at My Back: Memoir of a Black Texas Upbringing* (Austin: University of Texas, 2003).

8. Burton, Orville Vernon, *The Age of Lincoln* (New York: Hill & Wang, 2007).

9. Campbell, Randolph B., *An Empire for Slavery: The Peculiar Institution in Texas, 1821-1865* (Baton Rouge: Louisiana State University Press, 1989).

10. Campbell, Randolph B., *Gone to Texas: A History of the Lone Star State* (New York: Oxford University Press, 2003).

11. Campbell, Randolph B., *Grass Roots Reconstruction in Texas, 1865-1880* (Baton Rouge: Louisiana State University Press, 1997).

12. Cantrell, Gregg, *Kenneth and John B. Rayner and the Limits of Southern Dissent* (Urbana: University of Illinois Press, 1993).

13. Cantrell, Gregg, *Stephen F. Austin: Empresario of Texas* (New Haven: Yale University Press, 1999).

14. Carter, Dan T., *From George Wallace to Newt Gingrich: Race in the Conservative Counterrevolution, 1963-94* (Baton Rouge: Louisiana State University Press, 1996).

15. Cash, W.J., *The Mind of the South* (New York: A.A. Knopf, 1941).

16. Carter, Dan T., *The Politics of Rage: George Wallace, The Origins of the New Conservatism, and the Transformation of American Politics* (New York: Simon & Schuster, 1995).

17. Cohodas, Nadine, *Strom Thurmond and the Politics of Southern Change* (New York: Simon & Schuster, 1993).

18. Cosman, Bernard and Herbert Huckshorn, eds., *Republican Politics: the 1964 Campaign and Its Aftermath for the Party* (NY: Praeger, 1968).

1C

19. Craven, Avery O., *Reconstruction: The Ending of the Civil War* (New York: Holt McDougal, 1968).

20. Crouch, Barry A., *The Freedman's Bureau and Black Texans*, (Austin: University of Texas Press, 1992).

21. Robert Cruden, *The Negro in Reconstruction* (Englewood Cliffs, NJ: Prentiss-Hall, 1969).

22. Davidson, Chandler, *Bi-Racial Politics: Conflict and Coalition in the Metropolitan South* (Baton Rouge: Louisiana State Press, 1972).

23. Davidson, Chandler, *Race and Class in Texas Politics* (Princeton: Princeton University Press, 1990).

24. Davidson, Chandler and Bernard Grofman, eds. *Quiet Revolution in the South: Impact of the Voting Rights Act, 1965-1990* (Princeton, N.J.: Princeton University Press, 1994).

25. Degler, Carl, *The Other South: Southern Dissenters in the Nineteenth Century* (Boston: Northeastern University, 1982).

26. Feldman, Glenn, *From Demagogue to Dixiecrat: Horace Wilkinson and the Politics of Race* (Lanham, MD: University Press of America, 1995).

27. Foley, Neil, *The White Scourge: Mexicans, Blacks and Poor Whites in Texas Cotton Culture* (Berkeley: University of California Press, 1997).

28. Foner, Eric, *A Short History of Reconstruction, 1863-1877* (New York: Harper and Row, 1990).

29. Foner, Eric, *Reconstruction: The Unfinished Revolution* (New York: Harper Collins, 1988).

30. Frazier, Thomas R., ed., Afro-American History: Primary Sources, 2nd ed.. (Chicago: Doresey Press, 1988)

31. Gammel, H.P.N. and C.W. Raines. *The Laws of Texas, 1822-1897*, *Volume V*. Austin, TX: The Gammel Book Company, 1898.

32. Goodwyn, Lawrence. *Democratic Promise: The Populist Moment in America*. (New York: Oxford University Press, 1976).

33. Gurin, Patricia, Shirley Hatchett, and Jon S. Jackson, *Hope and Independence: Minority's Response to Electoral and Party Politics* (New York: Russell Sage Foundation, 1989).

34. Hine, Darlene Clark, *Black Victory: The Rise and Fall of the White Primary in Texas* (Columbia, MO: University of Missouri Press, 2003).

35. Johnson, Benjamin H., *A Revolution in Texas: How a Forgotten Rebellion and its Blood Suppression Turned Mexicans into Americans* (New Haven: Yale University Press, 2003).

36. Kellar, William Henry, *Make Haste Slowly: Moderates, Conservatives, and School Desegregation in Houston* (College Station: Texas A&M University, 1999).

37. Key, V.O., *Southern Politics in State and Nation* (A.A. Knopf, 1949).

38. Kousser, J. Morgan, *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* (Chapel Hill: University of North Carolina Press, 1999).

39. Lack, Paul D., *The Texas Revolution Experience: A Political and Social History* (College Station: Texas A&M University Press, 1992).

40. Leighley, Jan E., and Jonathan Nagler, *Who Votes Now? Demogrpahics, Issues, Inequality and Turnout in the United States* (Princeton: Princeton University press, 2013).

41. Lind, Michael, *Made in Texas: George W. Bush and the Southern Takeover of American Politics* (New York: 2003).

42. Lipsitz, George, *How Racism Takes Place* (Philadelphia: Temple University Press, 2011).

43. Lipsitz, George, *The Possessive Investment in Whiteness: How White People Profit from Identity Politics* (Philadelphia: Temple University Press, 1998).

44. López, Ian Haney, *Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class* (New York: Oxford University Press, 2014).

45. Massey, Douglas S. and Nancy A. Denton, *American Apartheid: Segregation and the Making of the Underclass* (Cambridge, Mass: Harvard University Press, 1993).

46. Maxwell, William Earl, Ernest Crain, and Adolfo Santos, *Texas Politics Today* (Boston: Wadsworth, 2009).

47. McIlwain, Charlton D. and Stephen M. Caliendo, *Race Appeal: How Candidates Invoke Race in US Campaigns* (Philadelphia: Temple University Press, 2011).

48. Mendelberg, Tali, *The Race Card: Campaign Strategy, Implicit Messages, and the Norm of Equality* (Princeton, N.J.: Princeton University Press, 2001).

49. Minnite, Lorraine C., *The Myth of Voter Fraud* (Ithaca, N.Y.: Cornell University Press, 2010).

50. Montejano, David, *Anglos and Mexicans in the Making of Texas, 1836-1986* (Austin: University of Texas Press, 1987).

51. Niemi, Richard G., and Herbert F. Weisberg, eds., *Controversies in Voting Behavior* (Washington, D. C., 2001, 4th ed.).

52. Olien, Roger M., *From Token to Triumph: The Texas Republicans Since 1920.* (Dallas: SMU Press, 1982).

3C

53. O'Reilly, Kenneth, *Nixon's Piano: Presidents and Racial Politics from Washington to Clinton* (New York: Free Press, 1995).

54. Overton, Spencer, *Stealing Democracy: The New Politics of Voter Suppression* (New York: Norton, 2007).

55. Phillips, Kevin P., *The Emerging Republican Majority* (New York: Arlington House, 1969).

56. Piatt, Robert William, Jr. *Black and Brown in America: The Case for Cooperation* (New York: New York University Press, 1997).

57. Pitre, Merline, *In Struggle against Jim Crow: Lula B. White and the NAACP, 1900-1957* (College Station: Texas A & M University Press, 1999).

58. Raston, Dina Temple. *A Death in Texas: A Story of Race, Murder, and a Small Town's Struggle for Redemption*. (New York: H. Holt, 2002).

59. Rice, Lawrence D., *The Negro in Texas, 1874-1900* (Baton Rouge: Louisiana State University Press, 1971).

60. Richards, David, *Once Upon a Time in Texas: A Liberal in the Lone Star State* (Austin: University of Texas, 2002).

61. Rosenstone, Steven J. and John Mark Hansen, *Mobilization, Participation, and Democracy in America* (New York: Macmillan, 1993).

62. San Miguel, Guadalupe, Jr., *Let All of Them Take Heed: Mexican Americans and the Campaign for Educational Equality in Texas, 1910-1981* (Austin: University of Texas Press, 1987).

63. Schaffer, Byron E., and Richard Johnston, *The End of Southern Exceptionalism: Class, Race, and Partisan Change in the Post-War South* (Cambridge, MA: Harvard University Press, 2009).

64. Schaller, Thomas F., *Whistling Past Dixie: How Democrats Can Win Without the South* (Riverside, NJ: Simon & Schuster, 2006).

65. Shabazz, Amilcar, *Advancing Democracy: African Americans and the Struggle for Access and Equity in Higher Education in Texas* (Chapel Hill: University of North Carolina Press, 2004).

66. Simkins, Francis Butler, *The South Old and New: A History, 1820-1947.*New York: A.A. Knopf, 1947).

67. Stampp, Kenneth M., *The Era of Reconstruction 1865-1877* (New York: Alfred A. Knopf, 1965).

68. Tate, Katherine, ed. *From Protest to Politics: The New Black Voters in American Elections* (Cambridge, MA: Harvard University Press, 1994).

69. Teja, Jesús F. de la, Paula Marks, and Ron Tyler, *Texas: Crossroads of North America* (Houghton Mifflin, 2004)

70. Temple-Raston, Dina, *A Death in Texas* (Henry Holt & Co, 2002).

71. Tushnet, Mark V., *Making Civil Rights Law: Thurgood Marshall and the Supreme Court, 1936-1961* (New York: Oxford University Press, 1994).

72. Tushnet, Mark V., *NAACP's Legal Strategy against Segregated Education* (Chapel Hill: University of North Carolina Press, 1987).

73. Williamson, Joel, *The Crucible of Race: Black-White Relations in the American South Since Emancipation* (New York: Oxford University Press, 1984).

74. Wolfinger, Raymond E., and Steven J. Rosenstone, *Who Votes?* (New Haven: Yale University Press, 1980).

75. Wood, Forrest, *Black Scare: The Racist Response to Emancipation and Reconstruction* (Berkeley: University of California Press, 1968).

76. Woodward, C. Vann, *The Burden of Southern History* (Baton Rouge: Louisiana State University Press, 1960).

77. Woodward, C. Vann, *Origins of the New South* (Baton Rouge: Louisiana State University Press, 1951).

78. Woodward, C. Vann, *The Strange Career of Jim Crow*. New York: Oxford University Press, 1957.

79. Verba, Sidney, Kay Lehman Schlozman, and Henry E. Brady, *Voice and Equality: Civic Voluntarism in American Politics* (Cambridge: Harvard University Press, 1995).

80. Verba, Sidney, and Norman H. Nie, *Participation in America: Social Equality and Political Democracy* (New York: Harper and Row, 1972).

81. Verba, Sidney, Norman H. Nie, and Jae-on Kim, *Participation and Political Equality: A Seven National Comparison* (Cambridge: Cambridge University Press, 1978).

82. Verba, Sidney, Kay Lehman Schlozman, and Henry E. Brady, *Voice and Equality: Civic Volunteerism in American Politics* (Cambridge: Harvard University Press, 1995).

83. Zamora, Emilio, *The World of the Mexican Worker in Texas* (College Station: Texas A&M University Press, 1993).

**Articles and Book Chapters**

1. Ackerman, Bruce, and Jennifer Nou, "Canonizing the Civil Rights Revolution: The People and the Poll Tax," *Northwestern University Law Review* 103 (2009).

2. Barreto, Matt A., Stephen A. Nuño, and Gabriel R. Sanchez, "The Disproportionate Impact of Voter-ID Requirements on the Electorate – New Evidence from Indiana," *Political Science and Politics* 42 (Jan 2009).

3. Brady, Henry E., and John E. McNulty, "Turning Out to Vote: the Costs of Finding and Getting to the Polling Place," *American Political Science Review* 105 (2011).

5C

4. Brischetto, Robert, et al., "Texas," in *Quiet Revolution in the South: The Impact of the Voting Rights Act* ed. Chandler Davis and Bernard Grofman (Princeton: Princeton University Press, 1994).

5. Bullock, Henry Allen, "The Expansion of Negro Suffrage in Texas," *Journal of Negro Education* (1957).

6. Cantrell, Gregg and Kristopher B. Paschal, "Texas Populism at High-Tide: The Case of the Sixth Congressional District, 1894." Under consideration *Southwest Historical Quarterly*.

7. Cantrell, Gregg, et. al. "Texas Populists and the Failure of Biracial Politics." *Journal of Southern History*, Vol. 55 No. 4 (Nov. 1989).

8. Carter, Dan, "Civil Rights and Politics in South Carolina: The Perspective of One Lifetime, 1940-2003" in *Toward the Meeting of the Waters: Currents in the Civil Rights Movement of South Carolina during the Twentieth Century*, ed. Winfred B. Moore, Jr. and Orville Vernon Burton (Columbia: University of South Carolina Press, 2008).

9. Carter, Dan, "Unfinished Transformation: Matthew J. Perry's South Carolina," in *Matthew J. Perry: The Man, His Times, and His Legacy*, ed., W. Lewis Burke and Belinda F. Gergel (Columbia: University of South Carolina Press, 2004)

10. Clawson, Rosalee A., "Poor People, Black Faces: The Portrayal of Poverty in Economics Textbooks," *Journal of Black Studies* 32 (2002).

11. Clawson, Rosalee A., and Rakuka Trice. "Poverty as We Know It: Media Portrayals of the Poor," *Public Opinion Quarterly* 64 (2000).

12. Fabelo, Tony, et al. "Breaking School's Rules: A Statewide Study of How School Discipline Relates to Students' Success and Juvenile Justice Involvement." Justice Center, The Council of State Government, and Public Policy Research Institute. July 2011. http://csgjusticecenter.org/wp-content/uploads/2012/08/Breaking_Schools_Rules_Report_Final.pdf.

13. Filer, John E., Lawrence W. Kenney and Rebecca B. Morton. "Voting Laws, Education Policies, and Minority Turnout." *Journal of Law and Economics, vol. 34, no. 2* (October 1991).

14. Frey, William, "New Racial Segregation Measures for Large Metropolitan Areas: Analysis of 1990-2010 Decennial Census," University of Michigan Population Studies Center, Institute for Social Research, available at http://www.psc.isr.umich.edu/dis/census/segregation2010.html.

15. Gaskins, Keesha, and Sundeep Iyer, *Challenge of Obtaining Voter Identification* (New York: Brennan Center for Justice, 2012).

16. Glaeser, Edward, and Jacob Vigdor, *The End of the Segregated Century: Racial Separation in America's Neighborhoods, 1890-2010,* Manhattan Institute for Policy Research, Civic Report, January 2012, available at http://www.manhattan-institute.org/html/cr_66.htm.

17. Glasrud, Bruce A., "Jim Crow's Emergence in Texas," *American Studies* 15 (1974).

18. Goldberg, Robert A., "Racial Change on the Southern Periphery: The Case of San Antonio, Texas, 1960-1965," *The Journal of Southern History* Vol. 49 No. 3. Aug. 1983.

19. Houston, Ramona. "The NAACP State Conference in Texas: Intermediary and Catalyst for Change, 1937-1957," *The Journal of African American History* (2009).

20. Lawyers Comm. for Civil Rights Under the Law, *Shattering the Myth: An Initial Snapshot of Voter Disenfranchisement in the 2004 Election* at 66-67 (2004), available at http://www.lawyerscommittee.org/admin/voting_rights/documents/files/0022.pdf.

21. Lewis, Elsie M., "The Political Mind of the Negro, 1865-1900," *Journal of Southern History* 21 (May 1955).

22. Lichtman, Allan J., and Samuel Issacharoff, "Black/White Voter Registration Disparities in Mississippi: Legal and Methodological Issues in Challenging Bureau of Census Data," *Journal of Law and Politics* (Spring, 1991).

23. Logan, John R., and Brian J. Stults, The Persistence of Segregation in the Metropolis: New Findings from the 2010 Census (Mar. 24, 2011), available at http://www.s4.brown.edu/us2010/Data/Report/report2.pdf.

24. Lopez, Mark Hugo, & Ana Gonzalez-Barrera, *Latino Voters Support Obama by 3-1 Ratio, But Are Less Certain than Others about Voting*, at 20, Pew Research Center, Oct. 11, 2012, *available at* http://www.pewhispanic.org/files/2012/10/2012_NSL_latino_vote_report_FINAL_10-18-12.pdf.

25. Losen, Daniel, Gary Orfield, and Robert Balfanz, "Confronting the Graduation Rate Crisis in Texas," The Civil Rights Project, October 2006, http://civilrightsproject.ucla.edu/research/k-12-education/school-dropouts/confronting-the-graduation-rate-crisis-in-texas/losen-confronting-graduation-rate-texas-2006.pdf.

26. McNulty, John E., Conor M. Dowling, and Margret H. Ariotti. "Driving Saints to Sin: How Increasing the Difficulty of Voting Dissuades Even the Most Motivated Voters," *Political Analysis* 17 (2009).

27. Olivery, Melvin L. and Thomas M. Shapiro, "Race and Wealth," *Review of Black Political Economy* 17 (1989).

28. O'Loughlin, John, "The Identification and Evaluation of Racial Gerrymandering," *Annals of the Association of American Geographers* Vol. 72 No. 2. June 1982: 165-184.

29. Orfield, Gary, John Kucsera, and Genevieve Siegel-Hawley, "E Pluribus . . . Separation: Deepening Double Segregation for More Students," The Civil Rights Project, October 18, 2012, http://civilrightsproject.ucla.edu/research/k-12-

education/integration-and-diversity/mlk-national/e-pluribus...separation-deepening-double-segregation-for-more-students/orfield_epluribus_revised_omplete_2012.pdf.

30. Orfield, Gary, and John Yun, Resegregation in American Schools: A Report by the Civil Rights Project at Harvard University (UCLA: The Civil Rights Project, 1999), http://escholarship.org/uc/item/6d01084d.

31. Paschal, Kristopher B., "Melvin Wade, The Dallas People's Party, and Bi-Racial Political Fellowship," Under consideration, *Southwest Historical Quarterly*.

32. Perales, Nina, et al., *Voting Rights in Texas*, 25-26; National Commission on the Voting Rights Act, *Protecting Minority Voters: The Voting Rights Act at Work, 1982-2005* (2006) (Exhibit to Texas League Group's Amended Complaint (2013)).

33. Phillips, Michael, "Texan by Color: The Racialization of the Lone Star State" in David O'Donald Cullen and Kyle G. Wilson, eds. *The Texas Right: The Roots of Lone Star Conservatism* (College Station, TX: Texas A&M University Press, 2014).

34. Phillips, Ulrich B., "The Central Theme of Southern History," *The American Historical Review*. vol. 34, no. 1 (October 1928).

35. Ramos, Christopher, "The Educational Legacy of Racially Restrictive Covenants: Their Long Term Impact on Mexican Americans," *The Scholar: St. Mary's Law Review on Minority Issues* 149 (2001).

36. Raymond, Virginia, "Enriching *Rodriguez*: Alberta Zepeda Snid of Edgewood," in *Recovering the Hispanic History of Texas*, ed. Monica Perales and Raul A. Ramos (Houston: Arte Púlblico Press, 2010).

37. Rodriquez, Alicia, "Urban Populism: Challenges to Democratic Party Control in Dallas, Texas," PhD diss., University of California-Santa Barbara, 1998.

38. Rogowski, Jon C., and Cathy J. Cohen, "Black and Latino Youth Disproportionately Affected by Voter Identification Laws in the 2012 Election" at 5, http://research.blackyouthproject.com/files/2013/03/voter-ID-laws-feb28.pdf.

39. Smallwood, James M., "Black Texans During Reconstruction, 1865-1874" (PhD diss., Texas Tech University, 1974).

40. Valentino, Nicholas A., Vincent L. Hutchings, and Ismail K. White, "Cues that Matter: How Political Ads Prime Racial Attitudes During Elections," *American Political Science Review* 96 (2002).

41. Williams, Patrick G., "Suffrage Restrictions in Post-Reconstruction Texas: Urban Politics and the Specter of the Commune," *Journal of Southern History* Vol. 68, No.1 (Feb. 2002).

42. Wood, W.D., "The Ku Klux Klan," *The Quarterly of the Texas State Historical Association*, vol. 9, no. 4 (April, 1906).

**News Articles**

1. Associated Press, "Democrats derail voter-ID bill with threat of filibuster, exercise of Senate rules," *Lubbock Avalanche-Journal*, May 29, 2005.

2. Associated Press, "Texas Town Oks Anti-Immigrant Measure", Nov. 14, 2006, http://www.nbcnews.com/id/15686734/ns/us_news-life/t/texas-town-oks-anti-immigrant-measures/#.U1U146K9Y14http://www.dallasobserver.com/2012-06-21/news/farmers-branch-has-spent-five-years-and-millions-of-dollars-trying-to-keep-out-mexicans-is-it-time-for-a-truce/

3. Balz, Dan, and Ted Mellnik, "Census: Blacks Voted at Higher Rates than Whites in 2012," *The Washington Post*, http://www.washingtonpost.com/politics/census-blacks-voted-at-higher-rates-than-whites-in-2012/2013/05/08/7d24bcaa-b800-11e2-b94c-b684dda07add_story.html

4. Cooper, Michael, "After Ruling, States Rush to Enact Voting Laws," *New York Times*, July 6, 2013.

5. "Editorial: Poverty is Root Cause of Disparities in School Discipline," *The Dallas Morning News,* March 2, 2011, http://www.dallasnews.com/opinion/editorials/20110302-editorial-poverty-is-root-cause-of-racial-disparities-in-school-discipline.ece.

6. Gillman, Todd J., Texas AG Greg Abbott: Voter ID law "Will Take Effect Immediately," *Dallas Morning News*, June 25, 2013, *available at* http://www.wfaa.com/news/texas-news/Hours-after-SCOTUS-ruling-Texas-declares-voter-ID-law-effective-immediately-212993711.html.

7. Holley, Joe, "Some Harris County Early Voters Upset by Poll Watchers," *The Houston Chronicle,* Oct. 18, 2010.

8. Koloian, Kevin, "Debbie Riddle Files Immigration Reform, Voter ID Bills," *Spring Observer*, Nov. 17, 2010, http://www.yourhoustonnews.com/spring/news/article_e8b26a0c-ba9d-5c30-94ec-87953808de6d.html.

9. Lewis, John, "A Poll Tax by Another Name," *New York Times*, 27 August 2011, A19.

10. Montgomery, Dave, "Democrats in House talk to kill voter ID bill," *Fort Worth Star Telegram*, May 23, 2009, B01.

11. Rapoport, Abby, "Voter Intimidation in Houston? The View from Acres Homes," *Texas Observer*, Oct. 29, 2010, http://www.texasobserver.org/floor-play/inside-one-harris-county-polling-station.

12. Saul, Stephanie, "Looking, Very Closely, for Voter Fraud," *The New York Times,* September 17, 2012. A1.

13. Scharrer, Gary, "Ailing Gallegos Risks Health to Stop Voter ID," *Houston Chronicle*, May 22, 2007.

14. Senter, E.G., "The Poll Tax. Some Very Strong Reasons Why the Amendment Should Be Adopted," *The Houston Daily Post,* October 31, 1902.

15. Terrell, A.W., "Purity of Ballot," *Dallas Morning News,* March 8, 1906, p. 3

16. Vickrey, W.S., "Poll Tax Amendment Views," *Dallas Morning News,* October 26, 1902.

17. Lockwood, "Purity of the Ballot," *San Antonio Express,* July 21, 1902, vol. XXXII, issue 212.

18. *The Dallas Morning News*, February 24, 1927.

19. *USA Today*, on August 5, 2011 (p. 5B).

**Cases**

1. *Nixon v. Herndon*, 273 U.S. 536 (1927).

2. *Smith v. Allwright*, 321 US 649 (1944).

3. *Sweatt v. Painter*, 339 U.S. 629 (1950).

4. *United States v. Texas*, 252 F. Supp. 234 (W.D. Tex. 1966).

5. *Garza v. Smith*, 320 F. Supp. 131 (W.D. Tex. 1970), *vacated and remanded*, 401 U.S. 1006, *appeal dismissed for lack of jurisdiction*, 450 F.2d 790 (5th Cir. 1971).

6. *United States v. Tex. Educ. Agency*, 467 F. 2d 848 (5th Cir. 1972).

7. *Rodríguez. v. San Antonio Indep. School District*, 337 F. Supp. 280 (W.D. Tex. 1971).

8. *Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex. 1971).

9. *Graves v. Barnes*, 343 F. Supp. 704 (W.D. Tex. 1972).

10. *White v. Weiser*, 412 U.S. 783 (1973).

11. *White v. Regester*, 412 U.S. 755 (1973).

12. *Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974).

13. *Symm v. United States*, 439 U.S. 1105 (1979).

14. *Mobile v. Bolden*, 446 U.S. 55 (1980).

15. *Upham v. Seamon*, 456 U.S. 37 (1982).

16. *Seaman v. Upham*, 536 Supp. 931 (1982).

17. *McCain v. Lybrand*, 465 U.S. 236 (1984).

18. *Strake v. Seaman*, 469 U.S. 801 (1984).

19. *Jackson v. Edgefield Cnty., S.C. School District*, 650 F. Supp. 1176 (D.S.C. 1986).

20. *United States v. Marengo Cnty. Commission*, 731 F.2d 1546 (11th Cir. 1984).

21. *Thornburg v. Gingles*, 478 U.S. 37 (1986).

22. *Young v. Pierce*, 685 F. Supp. 984 (E.D. Tex. 1988).

23. *Walker v. HUD*, 734 F. Supp. 1231 (N.D. Tex. 1989), *rev'd in part*, *Walker v. City of Mesquite, et al.*, 912 F.2d 819 (5th Cir. 1990).

24. *Walker v. HUD,* 912 F.2d 819 (5th Cir. 1990).

25. *Terrazas v. Slagle*, 789 F. Supp. 828 (W.D. Tex.), *aff'd sub nom.*, *Richards v. Terrazas*, 505 U.S. 1214 (1992).

26. *Hopwood v. Texas*, 861 F. Supp. 551 (1994).

27. *Vera v. Richards*, 861 F. Supp. 1304 (S.D. Tex. 1994).

28. *Bush v. Vera*, 517 U.S. 952 (1996).

29. *Edwards v. City of Houston*, 78 F.3d 983 (5th Cir. 1996).

30. *Walker v. City of Mesquite*, 169 F.3d 973 (5th Cir. 1999), *cert. denied*, 528 U.S. 1131 (2000).

31. *Dews v. Town of Sunnyvale, Tex.*, 109 F. Supp. 2d 526 (N.D. Tex. 2000).

32. *Walker v. U.S. Dept. of HUD* 326 F.Supp.2d 780 (N.D. Tex. 2004), *affirmed*, 402 F.3d 532 (5th Cir. 2005).

33. *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006).

34. *Nw. Austin Mun. Util. Dist. No. One v. Mukasey*, 573 F. Supp. 2d 221 (D.D.C. 2008).

35. *Texas v. Holder*, 888 F. Supp. 2d 113 (D. D.C. 2012).

36. *Texas v. United States*, 887 F. Supp. 2d 133 (D. D.C. 2012).

37. *Rodriguez v. Harris Co.*, Civil Action No. 4:11-2907, 2013 WL 3980651 (S.D. Tex. Aug. 1, 2013).

38. *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612, 570 U.S. __ (2013).

**Briefs and Court Documents**

1. Brief Amici Curiae of Historians And Other Scholars In Support of Petitioners, United States Supreme Court, *Crawford v. Marion Cnty. Election Bd. et al.*, Nos. 07-21, 07-25, November 2007.

2. Declaration of Dan T. Carter, *U.S. v. Charleston Cnty. Council*, D.S.C., No. 2-01-0155-11 (2001).

3. Settlement Agreement, *United States v. Matagorda Cnty., TX*, No. G-01-010 (S.D. Tex. 2002), *available at* http://www.justice.gov/crt/about/emp/documents/matagordafinalcd.html.

4. Consent Decree, *United States v. Waller Cnty., Tex.*, No. 4:08-cv-03022 (S.D. Tex. Oct. 17, 2008), *available at* http://www.justice.gov/crt/about/vot/sec_5/waller_cd.pdf.

5. Complaint, *United States v. Waller Cnty., Tex.*, No. 4:08-cv-03022 (S.D. Tex. Oct. 9, 2008), *available at* http://www.justice.gov/crt/about/vot/sec_5/waller_comp.pdf.

6. Settlement Agreement, *Prairie View Chapter of NAACP v. Kitzman*, No. H-04-459 (S.D. Texas Feb. 25, 2004), ECF no. 11.

7. Attorney General's Proposed Findings of Fact and Conclusions of Law ¶ 189, *Texas v. Holder*, Civil Action No. 12–cv–128 (DST, RMC, RLW), ECF No. 223, *available at* http://moritzlaw.osu.edu/electionlaw/litigation/documents/HoldersProposedFindingsofFactandConclusionsofLaw.pdf.

8. Defendant-Intervenors' Proposed Supplemental, Non-Duplicative Findings of Fact and Conclusions of Law, ¶ 247, *Texas v. Holder*, No. 12–cv–128 (DST, RMC, RLW), *available at* http://www.brennancenter.org/sites/default/files/legacy/Democracy/VRE/241%20DI%20Proposed%20Findings%20of%20Fact%206.27.2012.pdf.

9. Affidavit of Randall "Buck" Wood, *Texas v. Holder*, No. 12–cv–128 (DST, RMC, RLW) (June 8th, 2012).

10. DOJ Request for Judicial Notice, *Texas v. Holder*, No. 12–cv–128 (DST, RMC, RLW), ECF 219, *available at* http://moritzlaw.osu.edu/electionlaw/litigation/documents/RequestforJudicialNotice.pdf.

11. Complaint, *United States and EEOC v. Housing Authority of the City of El Paso, TX*, EP-08-cv-0313 (W.D. Tex. Aug. 11, 2008), *available at* www.justice.gov/crt/about/emp/documents/elpaso_complaint.pdf.

12. Consent Decree, *United States v. Hous. Auth. of the City of El Paso*, Tex., No. 3:08-cv-00313-KC (W.D. Tex. Oct. 21, 2008), ECF No. 15, *available at* http://www.justice.gov/crt/about/emp/documents/elpaso_cd.pdf.

13. Consent Decree, *United States v. Tex. Dep't of Family & Protective Serv.*, No. Ep-11-CA-364-FM (W.D. Tex. Nov. 30, 2011), ECF No. 10, *available at* http://www.justice.gov/crt/about/emp/documents/texasdeptsa.pdf.

14. Settlement Agreement, *United States v. Texas Department of Family and Protective Services*, No. 3:11-cv-00364-FM (W.D. Tex. Nov. 30, 2011), *available at* http://www.justice.gov/crt/about/emp/documents/texasdeptsa.pdf.

15. Expert Report of Davidson, Ph.D. for *Vera v. Richards*.

16. Expert Report and Rebuttal Report of Kousser, J. Morgan, Ph.D. for Texas v. Holder, June 20, 2012.

**Databases**

1. American Fact Finder, http://factfinder2.census.gov.

2. American Community Survey.  "Geographical Mobility in the Past Year by Race for Current Residence in the United States."  B07004.  2005-2009 5-Year Estimate.

3. American Community Survey.  "Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over (Hispanic or Latino)."  B16006. 2005-2009 5-Year Estimate.

4. American Community Survey.  "Per Capita Income in the Past 12 Months (In 2009 Inflation-Adjusted Dollars."  B19301.  2005-2009 5-Year Estimate.

5. American Community Survey.  "Place of Birth by Race in the United States."  B06004.  2005-2009 5-Year Estimate.

6. American Community Survey.  "Poverty Status in the Past 12 Months by Sex by Age."  B17001. 2005-2009 5-Year Estimate.

7. American Community Survey.  "Sex by Age by Employment Status for the Population 16 Years and Over."  C23002.  2005-2009 5-Year Estimate.

8. American Community Survey.  "Tenure."  B25003.  2005-2009 5-Year Estimate.

9. U.S. Census Bureau, 2005-2009 American Community Survey 5-Year Estimates.

10. U.S. Census Bureau.  Current Population Survey.  "Reported Internet Usage for Households, by Selected Householder Characteristics: 2009."  October 2009.

11. U.S. Census Bureau.  Current Population Survey.  "Reported Internet Usage for Individuals 3 Years and Older, by State: 2009." October 2009.

12. U.S. Census Bureau.  "Multimedia Audiences – Summary: 2001 Statistical Abstract of the U.S., 2002."  December 2002.

13. U.S. Census Bureau.  "2010 Census Redistricting Data (Public Law 94-171) Summary File, Tables P1, P2, P3, P4, H1."  2010.

14. U.S. Census Bureau.  "Place of Birth by Citizenship Status."  2000.

15. U.S. Census Bureau.  "Population 5 Years and Over by Language Spoken at Home and Ability to Speak English."  2000.

16. U.S. Census Bureau.  "Poverty Status in 1999 by Age."  2000.

17. U.S. Census Bureau.  "Residence in 1995 for the Population 5 Years and Over."  2000.

18. U.S. Census Bureau.  "Vehicles Available."  2000.

19. U.S. Census Bureau, American Fact Finder, Race and Hispanic or Latino Origin: Texas 2010, http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid =DEC_10_SF1_QTP3.

20. U.S. Census Bureau, Population by Race and Hispanic or Latino Origin for Texas: 2010, Table 1, http://www.census.gov/census2000/pdf/tx_tab_1.PDF.

**Other Sources**

1. AAA Foundation for Traffic Safety, Timing of Driver's License Acquisition and Reasons for Delay among Young People in the United States, 2012, 9, 2, 11 (table 3).

2. *A Look at 2012 Turnout by Ethnicity in Texas,* Texas Redistricting & Election Law, http://txredistricting.org/post/49970427560/a-look-at-2012-turnout-by-ethnicity-in-texas.

3. Anti-Defamation League. "Extremists Declare 'Open Season' on Immigrants; Hispanics Target of Incitement and Violence." www.adl.org/PresRele/Extremism_72/4904_12.htm.

4. Bill Zedler campaign literature (on file with author).

5. Congressional Record, 84th Congress Second Session. Vol. 102, part 4. Washington, D.C.: Governmental Printing Office, 1956. 4459-4460.

6. Donziger, Steven, *America's Modern Poll Tax: How Structural Disenfranchisement Erodes Democracy* (Nov. 7, 2001 by Advancement Project), *available at* http://election2000.stanford.edu/penda.pdf.

7. Empower Texans, "Birds of a Feather Flock Together," Austin, TX: Empower Texans, 2008.

8. File, Thom, "The Diversifying Electorate—Voting Rates by Race and Hispanic Origin in 2012 (and Other Recent Elections)," U.S. Census Bureau Current Population Survey (May 2013), http://www.census.gov/prod/2013pubs/p20-568.pdf.

9. "Gov. Perry Adds Voter I.D. and Balanced Budget Amendment to Emergency Items for Legislative Session." Office of the Governor, Rick Perry. January 20, 2011. http://governor.state.tx.us/news/press-release/15602/.

10. Institute for Research & Education on Human Rights, Special Report. "Tea Party Nationalism." Fall 2010.

11. Letter from Thomas E. Perez (Assistant Attorney General for the U.S. DOJ) to Keith Ingram (Direct of Elections in the Office of the Texas Secretary of State) 12 March 2012, *available at* http://www.justice.gov/crt/records/vot/obj_letters/letters/TX/l_120312.pdf.

12. Loewen, James W. "Preliminary Report on Racial Bloc Voting, Political Mobilization, and Redistricting Plans in New York City." 8 July 1991.

13. Minority Health and Health Disparities Research and Education Act of 2000. Pub. L. no. 106-525, 114 STAT. 2495. 2000.

14. Perlstein, Rick, "Exclusive: Lee Atwater's Infamous 1981 Interview on the Southern Strategy," *The Nation.* November 13, 2012,

http://www.thenation.com/article/170841/exclusive-lee-atwaters-infamous-1981-interview-southern-strategy (accessed March 31, 2014).

15. S.Rep., at 28-29, U.S.Code Cong. & Admin.News 1982.

16. *Senate Rules*. Adopted by the 82nd Legislature, January 19, 2011.

17. Texas Education Agency. "2010 Texas AEIS Report." BR11 602 01.

18. Texas Education Agency. "TEA Pocket-Edition Performance Statistics, 2009-2010."

19. Texas Education Agency, Division of Performance Reporting. "Academic Excellence Indicator System, 2009-10 State Performance Report." http://ritter.tea.state.tx.us/perfreport/aeis/2010/state.html.

20. Texas Higher Education Coordinating Board. "High School Graduates in the Top 10% of Their Classes Found in Texas Public Higher Education, Fall 2009 and Fall 2010 Cohorts." http://www.thecb.state.tx.us.

21. Texas House Journal, 79th Legislature, Regular Session. 76th day (May 24, 2005).

22. Texas Senate Resolution 14; Legislative Session 81 (R). 01/14/2009. http://www.legis.state.tx.us/tlodocs/81R/billtext/pdf/SR00014F.pdf (accessed June 3, 2014)

23. The 2014 Republican Party of Texas Platform, http://www.texasgop.org/wp-content/uploads/2014/06/2014-Platform-Final.pdf

24. Witness List, SB 14, House Committee, Voter Identification and Voter Fraud, Select (Mar. 23, 2011), http://www.hro.house.state.tx.us/pdf/ba82r/sb0014.pdf

25. Witness List, SB 14 House Committee Report, Voter Identification and Voter Fraud, Select Committee, ftp://ftp.legis.state.tx.us/bills/82R/witlistbill/pdf/senate_bills/SB00001_SB00099/SB00014H.pdf.

26. Voting Rights Act: Evidence of Continued Need: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. Volume III 3063-3090 (2006).

27. Voting Rights Act: Evidence of Continued Need: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. Volume IV (2006).

**DANIEL G. CHATMAN**
410A Wurster Hall
University of California
Berkeley, CA 94720-1850
(510) 642-2454
dgc@berkeley.edu

## EDUCATION

2005      Ph.D. in Urban Planning, University of California, Los Angeles
1997      Master in Public Policy, Harvard University (Outstanding Thesis Award)
1991      Bachelor of Arts, Individual Studies: The English Language (High Honors), University of
          California, Berkeley

## ACADEMIC APPOINTMENTS

2014–     Associate Professor
          Department of City and Regional Planning, College of Environmental Design
          University of California, Berkeley

2008–14   Assistant Professor
          Department of City and Regional Planning, College of Environmental Design
          University of California, Berkeley

2005–09   Assistant Professor
          Edward J. Bloustein School of Planning and Public Policy
          Rutgers, The State University of New Jersey

## RESEARCH APPOINTMENTS

2007–08   Director
          Alan M. Voorhees Transportation Center
          Edward J. Bloustein School of Planning and Public Policy
          Rutgers, The State University of New Jersey

2008–09   Research Director
2005–06   Alan M. Voorhees Transportation Center
          Edward J. Bloustein School of Planning and Public Policy
          Rutgers, The State University of New Jersey

## PUBLICATIONS

**Peer-Reviewed Journal Articles**

15.  Chatman, Daniel G. In press. Estimating the effect of land use and transportation planning on
     travel patterns: Three problems in controlling for "residential self-selection." *Journal of
     Transport and Land Use*, forthcoming.

PL761.1

*Daniel G. Chatman, curriculum vitae*

14. Chatman, Daniel G. and Michael Manville. Theory versus implementation in congestion-based parking pricing: An evaluation of SFpark, 2011 to 2012. *Research in Transportation Economics*, 2014, pp. 52-60. Final version available online 2 June, 10.1016/j.retrec.2014.04.005.

13. Chatman, Daniel G. and Nicholas J. Klein. Why do immigrants drive less? Confirmations, complications, and new hypotheses from a qualitative study in New Jersey, USA. *Transport Policy*, 2013, 30 (Nov): 336-344. http://dx.doi.org/10.1016/j.tranpol.2013.10.002.

12. Chatman, Daniel G. and Robert B. Noland. Transit service, physical agglomeration, and productivity in US metropolitan areas. *Urban Studies*, 2013, published online before print August 1, DOI: 10.1177/0042098013494426.

11. Chatman, Daniel G. Explaining the ''immigrant effect'' on auto use: The influences of neighborhoods and preferences. *Transportation*, published online before print May 2013, DOI: 10.1007/s11116-013-9475-4.

10. _____. Does TOD need the T? On the importance of factors other than rail access. *Journal of the American Planning Association*, 2013, 79 (1): 17-31.

9. Chatman, Daniel G., Nicholas Tulach and Kyeoungsu Kim. Evaluating the economic impacts of light rail by measuring home appreciation: A first look at New Jersey's River Line. *Urban Studies*, 2012, 49 (3): 467-487. DOI: 10.1177/0042098011404933.

8. Chatman, Daniel G. and  Robert B. Noland. Do public transport improvements increase agglomeration economies? A review of literature and an agenda for research. *Transport Reviews*, 2011, 31 (6): 725-742.  DOI: 10.1080/01441647.2011.58790.

7. Chatman, Daniel G. and Niels Voorhoeve. The transportation credit mortage: A post-mortem. *Housing Policy Debate*, 2010, 20 (3): 355–382.

6. Chatman, Daniel G. and Nicholas Klein. Immigrants and travel demand in the US: Implications for transportation policy and future research. *Public Works Management and Policy*, 2009, 13 (4): 312–327.

5. Chatman, Daniel G. Residential choice, the built environment, and non-work travel: Evidence using new data and methods. *Environment and Planning A*, 2009, 41 (5): 1072–1089.

4. _____. Deconstructing development density: Quality, quantity and price effects on household travel. *Transportation Research A*, 2008, 42 (7): 1009–1031.

3. Boarnet, Marlon, Randall Crane, Daniel G. Chatman, and Michael Manville. Emerging planning challenges in retail: The case of Wal-Mart. *Journal of the American Planning Association*, 2005, 71 (4): 433–449.

2. Chatman, Daniel G. How workplace land use affects personal commercial travel and commute mode choice. *Transportation Research Record: Journal of the Transportation Research Board*, 2003, 1831: 193–201.

1. Crane, Randall and Daniel G. Chatman. Traffic and sprawl: Evidence from US commuting, 1985 to 1997. *Planning and Markets*, 2003, 6 (1): 14–22.

*Daniel G. Chatman, curriculum vitae*

**Peer-Reviewed Book Chapters**

2.  Chatman, Daniel G., and Nicholas Klein. 2011. Immigrants and automobility in New Jersey: The role of spatial and occupational factors in commuting to work. In *Auto motives: Understanding car use behaviours*, 2011, edited by Karen Lucas, Evelyn Blumenberg and Rachel Weinberger. Bingley, UK: Emerald Group Publishing Ltd.

1.  Crane, Randall and Daniel G. Chatman. Traffic and sprawl: Evidence from US commuting, 1985 to 1997. In *Urban sprawl in Western Europe and the United States*, 2004, edited by C. Bae and H. Richardson. Aldershot, Hampshire, UK: Ashgate.

**Reports**

11. Chatman, Daniel G., Robert Cervero, Don Emerson, Ian Carlton, Dana Weissman, Emily Moylan, Joe Zissman, et al. *An exploration of fixed guideway transit criteria revisited: Preliminary draft final report and handbook.* Project H-42, Transit Cooperative Research Program, Transportation Research Board, National Academies. 236 pp (report, appendixes, handbook, spreadsheet tool). January 11, 2013.

10. Chatman, Daniel G., Andrea Broaddus, Matt Klein, and Cheryl Young. *Are movers irrational? A pilot study of the happiness, commuting, housing, and social lives of undergraduates before and after a move*. Working paper, University of California Transportation Center, 56 pp. August 16, 2012.

9.  Chatman, Daniel G., Robert B. Noland, Nicholas K. Tulach, Lars Rognlien, Andrew Desautels, Lauren Alexander, and Kaan Ozbay, with contributions from Bryan P. Grady, Daniel J. Graham, Peter Bilton, Deva Deka, Joseph Berechman, and Niels Voorhoeve. 2012. *Methodology for determining the economic development impacts of transit projects*. Project H-39, Transit Cooperative Research Program, Transportation Research Board, National Academies. 355 pages + spreadsheet. April, 2012. http://www.trb.org/Main/Blurbs/167284.aspx

8.  Chatman, Daniel G. and Andrea Broaddus. *Psychological economics, travel behavior, residential location choice, and sustainability: Possible new rationales for policy intervention*. Working paper, University of California Transportation Center, 32 pp + appendices. August 22, 2011.

7.  Chatman, Daniel G., Nicholas Klein, and Stephanie DiPetrillo. *The impact of demographic changes on transit patterns in New Jersey*. Trenton, NJ: New Jersey Department of Transportation, 139 pp + appendices. 2010.

6.  Chatman, Daniel G., Stephanie DiPetrillo, et al. *Economic development benefits of new transit service: RiverLINE*. Trenton, NJ: New Jersey Department of Transportation, 115 pp + appendices. 2010.

5.  Chatman, Daniel G. and Stephanie DiPetrillo. *Eliminating barriers to transit-oriented development*. Trenton, NJ: New Jersey Department of Transportation, 75 pp. 2010.

4.  Chatman, Daniel G. *Transit-oriented development and household travel: A study of California cities*. Sacramento: California Department of Transportation, 2006.

3. Boarnet, Marlon, Randall Crane, Daniel Chatman, and Michael Manville. *Supercenters and the transformation of the Bay Area grocery industry: Issues, trends, and impacts*. San Francisco: Bay Area Economic Forum. 2004.

2. Crane, Randall, Abel Valenzuela, Dan Chatman, Lisa Schweitzer and Peter Wong. *California travel trends and demographics study*. Sacramento: California Department of Transportation, 2002.

1. Crane, Randall, Dan Chatman, Lisa Schweitzer and Lois Takahashi. *Water governance in the San Francisco Bay Area: Challenges and opportunities*. Oakland, CA: California Policy Research Center, 2001.

## Other Journal Articles

2. Chatman, Daniel G.Will transportation credit mortgages work in practice? *Intransition Magazine*, 2007, Spring, pp. 5–6.

1. Crane, Randall and Daniel G. Chatman. As jobs sprawl, whither the commute? *Access*, 2003, 23, (Fall): 14–19.

## Conference Proceedings

2. Chatman, Dan and Lisa Schweitzer. 2001. *Transportation strategies to serve California's people, enhance its prosperity, and protect its resources: Proceedings of the California Transportation Futures Conference*, Los Angeles, California, June 21 to 22, 2001. Sacramento: California Department of Transportation. 2001

1. Chatman, Dan and Lisa Schweitzer. *Growth and the quality of life: Summary of symposium proceedings*. Los Angeles: UCLA Extension Public Policy Program. 2000

## Book Reviews

3. Chatman, Daniel G. Review of *Still stuck in traffic: Coping with peak-hour traffic congestion*, Anthony Downs, 2004. *Urban Studies* 42 (12). 2005

2. ———. Book review: Global culture. [Review of *Global Culture: Media, arts, policy, and globalization* (2002), edited by Diana Crane, Nobuko Kawashima and Ken'ichi Kawasaki.] *Critical Planning* 10: 109–113. 2003

1. ———. Review essay: New works on the new regionalism. [Review of *The Regional City* (2001), Peter Calthorpe and William Fulton; *Regions that Work* (2000), Manuel Pastor, Jr., Peter Dreier, J. Eugene Grigsby and Marta Lopéz-Garza; and *City Making* (1999), Gerald R. Frug.] *Critical Planning* 8: 113–120. 2001

## UNPUBLISHED RESEARCH

## Dissertation and Thesis

2. *How the built environment influences non-work travel: Theoretical and empirical essays*. Dissertation, Department of Urban Planning, School of Public Affairs, University of California, Los Angeles. 2005

*Daniel G. Chatman, curriculum vitae*

1. *An economic development policy for the Oglala Nation*. Policy Analysis Exercise (Master's thesis), with Andrew Aoki. John F. Kennedy School of Government, Harvard University. 1997

**Report**

1. *The impact of land use on travel: A review of current literature.* Los Angeles: UCLA Institute of Transportation Studies. 2002

## RESEARCH GRANTS AND CONTRACTS

16. Principal investigator, "Bicycling and access to transit by low-income immigrants." Mineta Transportation Institute, San Jose State University. $61,000, 9/2013–12/2014.

15. Co-principal investigator, "Social equity in regional transportation planning: Developing a new methodology for analyzing potential displacement," California Environmental Protection Agency, Air Resources Board. $645,792, 09/2013–09/2015.

14. Co-principal investigator, "Leveraging advances in technology and the behavioral sciences to institute long-term behavioral change." Innovation Seed Fund in Energy and Climate Research at U.C. Berkeley. $120,000, 3/2013–12/2013.

13. Principal investigator, "The economic costs and benefits of smart growth strategies," California Environmental Protection Agency, Air Resources Board. $330,000, 9/2012–12/2014.

12. Principal investigator, "Evaluating the effectiveness of congestion-priced parking in California," Multicampus Research Programs and Initiatives, Institute of Transportation Studies. $120,000, 1/2011–6/2014.

11. Principal investigator, "Psychological economics, travel behavior, residential location choice, and sustainability: Possible new rationales for policy intervention." University of California Transportation Center. $158,796, 9/2010–6/2014.

10. Principal investigator, "An exploration of fixed-guideway transit criteria revisited." Transit Cooperative Research Program, National Academy of Sciences. $500,000, 11/2010–1/2014.

9. Principal investigator, "Methodology for determining the economic development impacts of transit investments." Transit Cooperative Research Program, National Academy of Sciences. $500,000, 11/2008–12/2011.

8. Co-principal investigator, "Habitat conservation areas and the transportation planning process," University of California Transportation Center. $15,000, 1/2011-6/2011.

7. Principal investigator, "The impact of demographic changes and immigration on transit patterns in New Jersey," New Jersey Department of Transportation. $286,000, 6/2008–7/2010.

6. Principal investigator, "Economic benefits of new transit service: RiverLINE," New Jersey Department of Transportation and the University Transportation Research Center, Region II. $317,000, 5/2007–6/2010.

5. Principal investigator, "Eliminating barriers to transit-oriented development," New Jersey Department of Transportation. $164,000, 1/2007–3/2010.

4.  Principal investigator, "Location-efficient mortgages and the land market: Who benefits?" University Transportation Research Center, Region II. $8,000, 6/2006-12/2006.

3.  Principal investigator, "Transit-oriented developments and travel in California: Phase II, workers." California Department of Transportation. $175,000, 05/2003-09/2006.

2.  Principal investigator, "Transit-oriented developments and travel in California: Phase I, households." California Department of Transportation. $180,000, 9/2002–6/2005.

1.  Co-investigator, "California transportation plan trends and demographic study." California Department of Transportation. $350,000, 7/2001–12/2002.

## PRESENTATIONS

**Invited Talks (through July 2013)**

23.  "Residential self-selection in land use and transportation research." Invited panel member. With Xinyu Cao, Petter Naess, and Carey Curtis. Association of European Schools of Planning / Association of Collegiate Schools of Planning 5th Joint Congress: Planning for Resilient Cities and Regions, Dublin, Ireland, July 15, 2013.

24.  "SF park: Initial findings from observational data." On panel, "SFpark Project: Lessons Learned & Research Understanding," with Allen Greenberg and Jay Primus. The Intelligent Transportation Society of America: Smart Parking Symposium. Berkeley, CA, March 19, 2013.

23.  "Evaluating the effectiveness of congestion-priced parking in Los Angeles." On panel, "Los Angeles ExpressPark: Demand based pricing: How is it working?" with Daniel E. Mitchell, Arti Gupta, and Zia Yusuf. The Intelligent Transportation Society of America: Smart Parking Symposium. Berkeley, CA, March 18, 2013.

22.  "Do public transport investments cause agglomeration economies?" Invited talk at colloquium, "Transit Investments and Economic Productivity: a Debate," with David Levinson, Daniel Graham and Robert Helsley. Berkeley, CA, April 2, 2012.

21.  "Transit investments and agglomeration economies: An empirical study of US metropolitan areas." Transportation Seminar Series, Center for Integrated Transportation Systems Management, University of Maryland, College Park, March 28, 2012.

20.  "Parking pricing in San Francisco." On panel, "Transportation Pricing," at symposium, "Sustainable Mobility & Cities: Marrying Technology and Policy" David Brower Center, Berkeley, February 24, 2012.

19.  "Gaps and issues in land use and transportation research." Plenary wrap-up for World Symposium on Transport and Land Use Research, Whistler, British Columbia, Canada, July 30, 2011.

18.  "Using the National Household Travel Survey for transportation decision making: Future research and modeling, innovative methods for data collection and usability." Plenary wrap-up. Using National Household Travel Survey Data for Transportation Decision Making: A Workshop. Sponsored by the Transportation Research Board and the Office of Highway Policy

Information, Federal Highway Administration. The Keck Center of the National Academies, Washington, D.C., June 7, 2011.

17. "Challenges in using qualitative methods for transportation research," with Nick Klein. On panel, "Qualitative Research Methods in Transportation: New Approaches to New Challenges." Annual Meeting of the Transportation Research Board, Washington, DC., January 23, 2011.

16. "Smart growth in the U.S.: Problems and prospects." IN[CITY]: The Berkeley [IN]STITUTES in Environmental Design, July 27, 2010.

15. "Summing it up: Directions for future research and policy." Transit-Oriented Development and Social Equity: An Agenda for Research and Action. Conference sponsored by the University of California Transportation Center and the Center for Community Innovation at the UC Berkeley Institute for Urban and Regional Development, David Brower Center, June 1, 2010.

14. "Do transit investments increase agglomeration economies?" Spring Seminar Series, Institute of Transportation Studies, University of California, Davis. May 21, 2010.

13. "Property value impacts of New Jersey's River Line: A home price appreciation model using repeat sales data." Institute of Transportation Studies Friday Seminar Series, University of California, Berkeley, September 11, 2009.

12. "Cultures of transit: Immigrants and public transportation in New Jersey." Third Annual Faculty Forum on Race and Ethnicity. Center for Race and Ethnicity. Rutgers University, March 27, 2009.

11. "Immigration trends in the US: Implications for travel demand, transportation systems, and public policy." Bloustein Hour. Edward J. Bloustein School of Planning and Public Policy. Rutgers University, March 26, 2009.

10. "Property value impacts of New Jersey's River Line: A home price appreciation model using repeat sales data." Rena Sivitanidou Annual Research Symposium. Lusk Center for Real Estate / METRANS Transportation Center, University of Southern California, February 27–28, 2009.

9. "Smart growth in the U.S.: Problems and prospects." The Sustainable City of 2030/2050: Anticipating Changes in Energy Demand, Technology and Market Structures. Center for Energy, Marine Transportation and Public Policy. Columbia University, February 10, 2009.

8. "Economic impacts of new light rail service: A study of New Jersey's River Line." Penn Design Doctoral Seminar, University of Pennsylvania, December 1, 2008.

7. "Immigration trends in the US: Implications for travel demand, transportation systems, and public policy." Plenary paper, Conference on the Impact of Changing Demographics on the Transportation System. Transportation Research Board and Research and Innovative Technology Administration. Keck Center of the National Academies, Washington, DC., October 27–28, 2008.

6. "Economic impacts of the River Line: Preliminary results." American Society of Civil Engineers, New Jersey Chapter Meeeting. New Brunswick, NJ, February 2008.

5. "Walking and the built environment: The role of development density in the duration, distance and frequency of walking for non-work purposes." Nutritional Sciences Seminar, Department of Nutritional Sciences, at Rutgers University, New Brunswick, NJ, November 2006.

4. "Concentrating at work: Reducing auto use via transit-oriented development at the workplace." New Jersey Department of Transportation, at Ewing, NJ, September 2006.

3. "The death and life of smart growth." Enlightening Lunch seminar presentation, Bloustein School, at Rutgers University, New Brunswick, NJ, April 2006.

2. "Concentrating at work: Reducing auto use via transit-oriented development at the workplace." Brown Bag Lunch Seminar, New York Metropolitan Transportation Council. New York, February 2006.

1. Invited talks at Harvard University (2005), Arizona State University (2005), Cleveland State University (2005), Georgia Institute of Technology (2005), Massachusetts Institute of Technology (2004), University of Pennsylvania (2004), University of Texas, Austin (2004), New York University (2004).

**Refereed Conference Presentations (through July 2013)**

36. "Are movers irrational? On the travel, housing, social lives, and happiness of university students before and after a move." Association of European Schools of Planning / Association of Collegiate Schools of Planning 5th Joint Congress: Planning for Resilient Cities and Regions, Dublin, Ireland, July 18, 2013.

35. "Transit service, physical agglomeration, and productivity in US metro areas." With Bob Noland. Transportation Research Board Annual Meeting, at Washington, DC, January 16, 2013.

34. "Which matters more: neighborhoods or preferences? Explaining the 'immigrant effect' on auto use in the United States." Transportation Research Board Annual Meeting, at Washington, DC, January 15, 2013.

33. "Does TOD need the T? On the importance of factors other than rail access." Transportation Research Board Annual Meeting, at Washington, DC, January 14, 2013.

32. "Transit service, physical agglomeration, and productivity in US metro areas". With Bob Noland. Associated Collegiate Schools of Planning Annual Conference, at Cincinatti, OH, November 3, 2012.

31. "How will land use policies affect travel? The importance of residential sorting." With Jason Cao. Transportation Research Board Annual Meeting, at Washington, DC, January 25, 2012.

30. "Travel, home, and work choices of immigrants and US-born: Initial findings from a survey in New Jersey." Associated Collegiate Schools of Planning Annual Conference, at Salt Lake City, UT, October 13, 2011.

29. "How will land use policies affect travel? The importance of residential sorting." With Jason Cao. World Symposium on Transport and Land Use Research, Whistler, British Columbia, Canada, July 30, 2011.

28. "Recent changes in travel patterns of the foreign-born, and implications for sustainable urban growth." With Nicholas Klein. Using National Household Travel Survey Data for Transportation Decision Making: A Workshop. Sponsored by the Transportation Research Board and the Office of Highway Policy Information, Federal Highway Administration. The Keck Center of the National Academies, Washington, D.C., June 6, 2011.

27. "Immigrants and automobility in New Jersey: The role of spatial and occupational factors in commuting to work." With Nicholas Klein. Transportation Research Board Annual Meeting, at Washington, DC, January 26, 2011.

26. "Do public transport investments increase agglomeration economies? Literature review and research agenda," With Bob Noland. Transportation Research Board Annual Meeting, at Washington, DC, January 26, 2011.

25. "Immigration, sustainability, and alternative mode use: Ten hypotheses from a qualitative study in New Jersey, USA." With Nicholas Klein. Transportation Research Board Annual Meeting, at Washington, DC, January 24, 2011.

24. "How transit affects agglomeration economies." With Bob Noland. Associated Collegiate Schools of Planning Annual Conference, at Minneapolis, MN, October 9, 2010.

23. "Challenges in estimating the economic impacts of transit investments beyond cost and travel time savings." With Bob Noland. 56th Annual North American Meetings of the Regional Science Association International, at San Francisco, California, November 21, 2009.

22. "Barriers to transit-oriented development in New Jersey." 56th Annual North American Meetings of the Regional Science Association International, at San Francisco, California, November 21, 2009.

21. "Impacts of new light rail service on property values: New Jersey's River Line." 56th Annual North American Meetings of the Regional Science Association International, at San Francisco, California, November 20, 2009.

20. "Barriers to transit-oriented development: Supply and demand considerations." Associated Collegiate Schools of Planning Annual Conference, at Crystal City, Virginia, October 2, 2009.

19. "Economic impacts of new light rail service: A study of New Jersey's River Line." ACSP–AESOP 4th Joint Congress, at Chicago, Illinois, July 6–11, 2008.

18. "Residential self-selection and non-work travel: Evidence using new data and methods." Transportation Research Board Annual Meeting, at Washington, DC, January 14, 2008.

17. "Deconstructing development density: Quality, quantity and price effects on household non-work travel." Transportation Research Board Annual Meeting, at Washington, DC, January 14, 2008.

16. "Transportation credit mortgages, spatial sorting, and housing supply: Who benefits?" Associated Collegiate Schools of Planning Annual Conference, at Milwaukee, Wisconsin, October 20, 2007.

15. "Concentrating at work: Reducing auto use via transit-oriented development at the workplace." Associated Collegiate Schools of Planning Annual Conference, at Fort Worth, Texas, November 12, 2006.

*Daniel G. Chatman, curriculum vitae*

14. "Location efficient mortgages and the land market: Who benefits?" Association of Public Policy Analysis and Management conference, at Madison, Wisconsin, November 4, 2006.

13. "For a few dollars less: Estimating the costs and benefits of Wal-Mart's entry into unionized grocery markets." With Randall Crane. Economic Impact Research Conference: An In-Depth Look at Wal-Mart and Society, at Washington, DC, November 4, 2005.

12. "Deconstructing development density in nonwork travel decisions." Associated Collegiate Schools of Planning Annual Conference, at Kansas City, Missouri, October 2005.

11. "TODs and travel: A study of two metropolitan areas in California." 10th Transportation Research Board Transportation Planning Applications Conference, at Portland, Oregon, April 2005.

10. "A household activity survey designed for land use and travel research." 10th Transportation Research Board Transportation Planning Applications Conference, at Portland, Oregon, April 2005.

9. "Deconstructing density's effect on walking: Nonwork travel as a function of activity, network load and built form density." Poster presentation at Active Living Research Annual Conference, at San Diego, California, February 2005.

8. "Elephant or bogeyman? Land use, non-commute travel and the role of residential self-selection." Associated Collegiate Schools of Planning Annual Conference, at Portland, Oregon, October 2004.

7. "Big boxes and fiscal payoffs." Urban Affairs Conference, at Washington DC, April 2004.

6. "The influence of workplace land use and commute mode choice on mileage traveled for personal commercial purposes." Transportation Research Board Annual Meeting, at Washington, DC, January 2003.

5. "Modeling the relationship between land use and travel behavior." Associated Collegiate Schools of Planning Annual Conference, at Baltimore, Maryland, November 2002.

4. "Evaluating smart growth: Governance elements." Associated Collegiate Schools of Planning Annual Conference, at Baltimore, Maryland, November 2002.

3. "Travel behavior and sprawl: Theory and estimation." With Randall Crane. Associated Collegiate Schools of Planning Annual Conference, at Baltimore, Maryland, November 2002.

2. "The influence of employment density and mix on personal trip making by workers." Association of Collegiate Schools of Planning Annual Conference, at Atlanta, Georgia, November 2000.

1. "The influence of workplace density and mix on personal trip making by workers in urban areas." Travel Behavior, Planning, Modeling and Policy: IGERT Graduate Student Research Conference, at Davis, California, April 2000.

**TEACHING**

**U.C. Berkeley (through July 2013)**

CP 114. Introduction to Urban and Regional Transportation Planning. Undergraduate elective course. Spring 2010, 40 students; Spring 2011, 50 students; Spring 2012, 65 students; Spring 2013, 66 students.

CP 213. Transportation and Land Use Planning. Required graduate course in transportation concentration for MCP students. Fall 2009, 40 students; Fall 2010, 27 students; Fall 2012, 35 students.

CP 204A Part II. Statistics for Planners. Course meeting MCP methods requirement. Fall 2009, 25 students; Fall 2010, 28 students; Fall 2012, 20 students.

Transportation and land use doctoral seminar, Fall 2010 (5 students).

**Rutgers University**

Transportation, Land Use and Urban Form (10:970:665). Graduate course in transportation concentration. Fall 2005, 16 students; Spring 2007, 20 students; Spring 2008, 5 students; Spring 2009, 21 students.

Methods of Planning Analysis II (10:970:516). Required course for MCRP students. Fall 2006, 11 students; Fall 2007, 22 students; Fall 2008, 21 students.

Principles of Urban Planning (10:970:306). Undergraduate elective course. Spring 2006, 11 students.

Senior Seminar in Policy and Planning (32:762:494). Required course for undergraduate seniors. Spring 2007, 12 students.

**ADVISING AND MENTORING (through July 2013)**

*U.C. Berkeley—Dissertation committee*: Ian Carlton (Chair), Erick Guerra, Elisa Barbour, Andrea Broaddus, Wei-Shiuen Ng, Ilgin Guler (CE), Celeste Chavis (CE), Stacy Jackson (ERG). *Primary doctoral advisor:* Jesus Barajas, Lisa Rayle. *PhD exam committee*: Erick Guerra, Ian Carlton, Wei-Shiuen Ng, Andrea Broaddus, Elisa Barbour, Carrie Makarewicz, Eleni Christofa (CE), Ilgin Guler (CE), Celeste Chavis (CE). *Informal doctoral advising*: Yizhen Gu, Geoff Boeing, Fletcher Foti, Pille Metspalu. *Masters' thesis chair*:  Matthew Braughton, Timothy Fok, Kathleen Sullivan, Kim Lucas, Carmen Oleksinksi, Taylor Reiss, Michael Rhodes, Teresa Tapia, Dan Tischler, Dana Weissman.  *Masters' thesis inside member:* Monica Altmaier, Matthew Brill, Diego Canales, Connery Cepeda, Colin Dentel-Post, Brian Gould, Seung-Yen Hong, Paolo Ikezoe, Eddie Janowicz,Megan Kanagy, Jessica Kuo, Matt Schabas, Margot Spiller, Michelle Thong, Dan Tischler.  *Independent study, field study:* Timothy Fok, Kim Lucas, Zakhary Mallett, Carmen Oleksinski, Taylor Reiss, Jonathan Rogers, Fernanda Roveri, Teresa Tapia.

*Rutgers University— PhD*: Nicholas Tulach (primary advisor, major field examiner), Nick Klein (primary advisor, dissertation committee), Bob Checcio (major field examiner), Bryan Grady (major field examiner), Michael Strange (dissertation committee, inside member), Anil Yazici (dissertation commitee, Civil Engineering), Cory Yemen, Jeremy Nemeth, Ralph Buehler, Richard Rabinowitz, Matt Cuddy, Stephan Schmidt. *Graduate professional reports*: Alex Barron, Jamey Dempster, Beth Gordon, Darlene Jay, Kyeongsu Kim, Susan Lutin, Harry Smith.  *Undergraduate honors theses*: Mabel Smith Douglass,  Dorothy Morallos, second reader; Sophonie Joseph, Honors Program. *Independent study*: Amit Arora, Elizabeth Thompson.

*Daniel G. Chatman, curriculum vitae*

**SERVICE (through July 2013)**

**Community**

Expert Panel, Member, "Tools for California Smart-Growth Plans and Projects," California Department of Transportation (9/2010–12/2011)

Pedestrian and Bicycle Safety Task Force, Member, Borough of Highland Park, New Jersey (8/2005–6/2009)

Transportation Working Group, Member, Innovations Roundtable, City of Los Angeles (12/2005–10/2006)

**Institutional**

*U.C. Berkeley—University Level:* Chancellor's Advisory Committee on Dependent Care (2010-), Transportation Advisory Group (2010-), Reviewer, Richmond Bay Campus Long-Range Development Plan (2013). *College of Environmental Design*: Future of Cities task force, Strategic Plan (December 2012-January 2013). *Department of City and Regional Planning*: Co-Chair, Master's Program in City and Regional Planning (2011-12), Master's Program in City and Regional Planning Committee (2012-), Urban Studies Program Committee (2009-11), Doctoral Admissions Committee (2009-), MCRP Admissions Committee (2009-), Doctoral Program Committee (2010-11).

*Rutgers University—*Board member, University Transportation Research Center, Region II (2006-09). *Edward J. Bloustein School of Planning and Public Policy*: Faculty Search Committee (2006-07, 2007-08), Representative to University-wide meetings on Software Site Licensing (2006-07), Ad-hoc Curriculum Committee, Public Policy Program (2005), PhD Admissions Committee (2005-09), MCRP Admissions Committee (2005-09), ITS Specialist Hiring Committee (2005).

**Academic**

**Professional Committees**

Member, Transportation Research Board, Task Force on Understanding New Directions for the National Household Travel Survey (2011–present).

Member, Conference Organizing Committee, World Symposium on Transport and Land Use Research, Delft (2013–present).

Member, Conference Organizing Committee, World Symposium on Transport and Land Use Research, Whistler, British Columbia, Canada (2010–2011).

National Research Council Committee, Member, "Using National Household Travel Survey Data for Transportation Decision Making" (2010–2011).

**Talk and Colloquium Organizing**

Organizer, talk and brown-bag lunch by John Pucher. "Promoting cycling and walking for sustainable cities." University of California, Berkeley, Department of City and Regional Planning. November 16, 2012.

Organizer, talk by Bhargav Adhyaryu ,"Urban modeling for enhancing master plan making: SIMPLAN for Ahmedabad, India." Visiting Scholars Roundtable Series, Institute for Urban and Regional Development, June 8, 2012.

Organizer, colloquium, "Transit Investments and Economic Productivity: A Debate," with David Levinson, Daniel Graham, and Robert Helsley. Department of City and Regional Planning Colloquium Series, April 2, 2012.

Organizer, panel on "Transportation Pricing," at "Sustainable Mobility & Cities: Marrying Technology and Policy" conference, David Brower Center, Berkeley, February 24, 2012.

Moderator and organizer, "Creative Financial Tools and Techniques for Infill," 4th of 5 seminars in the "Infill Seminar Series" sponsored by the Center for Sustainable California and the Institute for Urban and Regional Development (April, 2011).

**Reviewing and Editorial**

Reviewer: [Prior to July 2008] *American Journal of Preventive Medicine, Journal of Geographical Systems, Journal of Planning Education and Research, Journal of Planning Literature, Journal of the American Planning Association, Transport Reviews, Transportation Research A, Urban Studies*, Transportation Northwest (UTC Region X) research proposals (2008), World Conference on Transportation Research (Berkeley, 2007).

[2008–09] *International Journal of Sustainable Transportation, Journal of Planning Education and Research, Journal of Planning Literature, Journal of the American Planning Association, Journal of Transport and Land Use, Transport Policy, Transport Reviews, Transportation Research A*, TRB Demographics and Transportation Symposium, TRB 4th National Conference on Women's Issues in Transportation, Transportation Northwest (UTC Region X) reports.

[2009–10] *International Journal of Public Administration, Journal of the American Planning Association, Journal of Planning Education and Research, Transport Policy, Urban Studies,* Social Sciences and Humanities Research Council of Canada, World Conference on Transportation Research (Spain, 2010).

[2010-11] *Journal of the American Planning Association, Journal of Planning Education and Research, Journal of Public Transportation, Journal of Transport and Land Use, Transport Policy, Transportation Science, Urban Studies,* Annual Meeting of the Transportation Research Board, UC Davis Sustainable Transportation Center, Routledge Publishing, Social Sciences and Humanities Research Council of Canada.

[2011-12] *Environment and Planning A, Housing Policy Debate, IEEE Technology and Society, Journal of Public Transportation, Journal of Transport Geography, Transport Policy, Urban Studies,* Oxford University Press, Annual Meeting of the Transportation Research Board, International Association of Travel Behavior Research, University of California Transportation Center.

[2012-13]  *Housing Policy Debate, Journal of the American Planning Association, Journal of Planning Education and Research, Journal of Transport and Land Use, Transport Policy, Urban Geography, Urban Studies,* Annual Meeting of the Transportation Research Board, Intergovernmental Panel on Climate Change, National Science Foundation.

*Daniel G. Chatman, curriculum vitae*

Conference Discussant: Associated Collegiate Schools of Planning Conference, 10/2005, 10/2007, 7/2008, 10/2010; Society for American City and Regional Planning History Conference, 10/2009; North American Regional Science Council Conference, 10/2009; Using National Household Travel Survey Data for Transportation Decision Making, 6/2011; World Symposium on Transportation and Land Use Research, 7/2011.

Co-Editor, 8/2000-6/2004.*Critical Planning*, Department of Urban Planning, UCLA.

**AWARDS AND HONORS**

Student of the Year, University of California Transportation Center, 12/2005
Outstanding Graduating Doctoral Student, Department of Urban Planning, UCLA, 6/2005
Departmental Fellowship, Department of Urban Planning, UCLA, 9/2004-6/2005
Major Field Examination Pass With Distinction, 6/2002
Eno Transportation Foundation Fellow, 5/2002
Dwight D. Eisenhower Graduate Fellow, U.S. Department of Transportation, 9/2000–8/2003
Chancellor's Fellow, University of California, Los Angeles, 9/1999–6/2004

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

|  |  |
|---|---|
| MARC VEASEY, *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>RICK PERRY, *et al.*,<br><br>                    Defendants. | Civil Action No. 2:13-cv-193 (NGR) |

**NOTICE BY TEXAS STATE CONFERENCE OF NAACP BRANCHES AND THE
MEXICAN AMERICAN LEGISLATIVE CAUCUS OF THE TEXAS HOUSE OF
REPRESENTATIVES OF FILING A CORRECTED EXPERT REPORT OF
DR. DANIEL G. CHATMAN**

The Texas State Conference of NAACP Branches and the Mexican American Legislative

Caucus of the Texas House of Representatives hereby files the corrected expert report of Dr.

Daniel G. Chatman, which is attached hereto.  The correction involves deleting one word, "not,"

which Dr. Chatman inadvertently included in the second line of the second bullet in paragraph

49.  Defendants previously have been advised of this correction.

Date:   July 21, 2014                    Respectfully submitted,

                              s/ Ezra Rosenberg
                              Ezra D. Rosenberg
                              Michelle Hart Yeary
                              Dechert LLP
                              902 Carnegie Center, Suite 500
                              Princeton, New Jersey 08540-6531
                              ezra.rosenberg@dechert.com

Amy L. Rudd
Lindsey Cohan
Dechert LLP
500 W. 6th Street, Suite 2010
Austin, Texas 78701
lindsey.cohan@dechert.com

Wendy Weiser
Myrna Pérez
Vishal Agraharkar
Jennifer Clark
The Brennan Center for Justice at NYU Law School
161 Avenue of the Americas, Floor 12
New York, New York 10013-1205
wendy.weiser@nyu.edu
myrna.perez@nyu.edu
vishal.agraharkar@nyu.edu
jenniferl.clark@nyu.edu

Robert A. Kengle
Mark A. Posner
Sonia Kaur Gill
Erandi Zamora
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, N.W., Suite 400
Washington, D.C. 20005
mposner@lawyerscommittee.org

Daniel Gavin Covich
Covich Law Firm LLC
Frost Bank Plaza
802 N Carancahua, Ste 2100
Corpus Christi, TX 78401
daniel@covichlawfirm.com

Gary Bledsoe
PotterBledsoe, L.L.P.
316 W. 12th Street, Suite 307
Austin, Texas 78701
garybledsoe@sbcglobal.net

Robert Notzon
The Law Office of Robert Notzon
1502 West Avenue
Austin, Texas 78701
Robert@NotzonLaw.com

Jose Garza
Law Office of Jose Garza
7414 Robin Rest Drive
San Antonio, Texas 98209
garzapalm@aol.com

Kim Keenan
Marshall Taylor
Victor Goode
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215
kkeenan@naacpnet.org
mtaylor@naaacpnet.org
vgoode@naacpnet.org

*Counsel for Plaintiffs Texas State Conference of
NAACP Branches, Mexican American Legislative
Caucus of the Texas House of Representatives*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2014, I served a true and correct copy of the foregoing on all counsel of record.

/s/ Lindsey B. Cohan
Lindsey B. Cohan
State Bar No. 24083903
Dechert LLP
500 W. 6th Street, Suite 2010
Austin, TX 78701
Telephone: (512) 394-3000
Facsimile: (512) 394-3001
lindsey.cohan@dechert.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | |
|---|---|
| MARC VEASEY, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 2:13-cv-193 (NGR) |
| RICK PERRY, *et al.*, | |
| Defendants. | |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, *et al.*, | |
| Plaintiff-Intervenors, | Civil Action No. 2:13-cv-263 (NGR) |
| TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, *et al.*, | |
| Plaintiff-Intervenors, | |
| v. | |
| STATE OF TEXAS, *et al.*, | |
| Defendants. | |

|   |   |
|---|---|
| TEXAS STATE CONFERENCE OF NAACP BRANCHES, *et al.*, <br><br>                Plaintiffs, <br><br>    v. <br><br>NANDITA BERRY, *et al.*, <br><br>                Defendants. | Civil Action No. 2:13-cv-291 (NGR) |
| BELINDA ORTIZ, *et al.*, <br><br>                Plaintiffs, <br><br>    v. <br><br>STATE OF TEXAS, *et al.*, <br><br>                Defendants | Civil Action No. 2:13-cv-348 (NGR) |

REPORT OF DANIEL G. CHATMAN, Ph.D.

Declaration of Dr. Daniel G. Chatman

1.     My name is Daniel G. Chatman. I am an Associate Professor of City and Regional Planning at the University of California, Berkeley. I have taught undergraduate and graduate courses in urban and regional transportation planning, transportation and land use planning, and research methods.

2.	I received a B.A. degree from the University of California, Berkeley in 1991, a Master's degree in Public Policy from the Kennedy School of Government at Harvard University in 1997, and a Ph.D. in Urban Planning at the University of California, Los Angeles in 2005. From 2005 to 2009 I was Assistant Professor in the Bloustein School of Planning and Public Policy at Rutgers University, where I also served as Director and Research Director of the Alan M. Voorhees Transportation Center. I was appointed as Assistant Professor at U.C. Berkeley in 2008, and was recently promoted to Associate Professor with tenure, effective July 1, 2014.

3.	I conduct research on travel behavior and the built environment, immigrants and travel in the United States, and the relationships between public transportation services and the economy. I have published 13 articles in peer reviewed scholarly journals as well as a number of book chapters, research reports, and lay articles on these topics. I have been principal investigator on transportation and land use research grants and contracts totaling about $2.5 million in funding. There are no cases in which I testified as an expert, either at trial or by deposition, in the previous four years. I am being compensated at the rate of $250 per hour.

4.	I was retained to analyze the travel burdens associated with the State of Texas provision that individuals generally must present one of several approved forms of photo identification in order to cast an in-person ballot that will be counted. More specifically, I was retained to investigate the travel burdens associated with citizens of voting age who do not already hold an accepted photo ID to travel to an officially designated location to apply for and obtain a photo identification card called an Election Identification Certificate (EIC). In this report I focus on the time required to access an EIC location by car, via public transportation, or on foot, because time is the most salient and readily quantifiable of the various costs involved in travel. The main output of the analysis and of this report is an estimate of travel time burdens

Page 3

across the population of all citizens of voting age, by race/ethnicity, as well as a description of different rates of poverty among the racial/ethnic groups generally and an estimate of travel time burdens among those burdened by poverty.

5.     As explained in the remainder of this report, the Texas photo ID requirement for voting will place a disproportionate and significant travel burden on Blacks and Hispanics in comparison to non-Hispanic Whites. I define a travel burden as being required to travel for more than an hour and a half round trip on public transportation or on foot. Less than one percent of trips in Texas fall in this category, according to data from the National Household Travel Survey. The share of the population burdened would be from 3.5 to 4 times as high for Blacks, and about 1.5 times as high for Hispanics, as it would be for non-Hispanic Whites. The *average* round trip duration for these burdened individuals is more than two and one half hours, due to a significant number of those who would be required to travel for more than four hours round trip, most of them on foot. The share of the population that is in poverty, and for whom travel burdens are therefore particularly difficult, is also much higher among Blacks and Hispanics than among non-Hispanic Whites. Among this poorest group of citizens, Blacks are particularly likely to experience a travel burden due to the photo ID requirement, with more than a quarter of the poor Black population being required to travel for more than 90 minutes on public transportation or on foot.

6.     I defined and carried out the main analytic body of this work in four parts. First, I identified a simplified set of home starting points for trips that would be undertaken by those who seek to obtain an EIC, consisting of the "centroids," or central geographical coordinates, of the 15,811 Census-defined block groups in the state of Texas. I also identified and mapped the individual office locations where EICs can be obtained (i.e., Department of Public Safety offices

and county offices) ("EIC location(s)"). Second, I estimated the time it would take to travel from home to the nearest EIC location by each of three travel modes: personal automobile, public transportation, and on foot. Third, I compiled and estimated information about the citizens of voting age (CVAs) by race/ethnicity located in the 15,811 block groups throughout the state, with a focus on those living in households without access to an auto. Fourth, I estimated the one-way travel times for CVAs by racial/ethnic group to access the nearest EIC locations to obtain a photo identification card (round trip travel times are defined simply as twice the one-way times). I describe these steps in more detail below.

7.      I was assisted in geocoding, data procurement, data management, and data analysis by Nicholas Klein, Ph.D., a 2014 graduate of the Department of City and Regional Planning at Rutgers University; Jonathan Plowman, who holds a 2014 Master's degree in city planning from U.C. Berkeley; Kelly Clonts, who holds two 2013 Master's degrees from U.C. Berkeley, one in city planning and the other in civil engineering with concentration in transportation engineering; and Dylan Baker, who graduated with a Bachelor's degree in urban studies from U.C. Berkeley in 2014. These individuals were respectively compensated at the rates of $75, $40, $50, and $25 per hour for their assistance.

8.      I also relied on public transportation travel time estimates provided to me by the Center for Neighborhood Technology (CNT) in Chicago, from CNT staff including Linda Young, Paul Esling, Peter Haas, Sofia Becker, and Greg Newmark. For these estimates I worked intensively with the CNT staff, and I and my assistants carried out numerous checks on the work to ensure it was consistent with third party calculations, e.g. from Google Maps in locations where it was possible to obtain publicly provided General Transit Feed Specification data (a location-based data source for public transportation routes and schedule information).

Page 5

**Travel burden: A definition**

9.       As noted above, for purposes of this investigation, I define "travel burden" in terms of time.  This is based on a comparison with both national travel survey data and survey data from the state of Texas, and I present the burden (time) estimates using different approaches, which yield consistent results.

10.      The time that individuals spend traveling every day varies a great deal by household, and usually is greater for those of higher income (National Household Travel Survey, 2009). In the state of Texas, among those of income greater than $20,000, the average daily time spent traveling for personal and household purposes was 73 minutes; for those making less than $20,000, the average was 66 minutes per day. These figures are slightly lower than the US averages for the same groups (see Table 1 below). A starting point for any definition of "travel burden" is the current amount of time that an individual already spends traveling each day, because this pattern typically reflects constraints that make it difficult to travel more without having financial impacts or causing time scarcity (Farber and Páez, 2011).

**Table 1: Average minutes spent traveling per day, by income**

|            | All persons |            |
|------------|-------------|------------|
|            | <$20,000    | >$20,000   |
| Texas      | 65.8        | 72.7       |
| U.S. Total | 66.5        | 75.8       |

*Source: National Transportation Survey, 2009*

11.      The average trip duration for home-based trips for non-work purposes, excluding trips taken by air or intercity bus—that is, the time needed to travel from home to carry out activities such as grocery shopping, seeing the doctor, or dropping one's child off at school—was 8.0  minutes in the US and 8.2  minutes in Texas. The average time duration of a round trip is higher on both public transportation and walking than in a car, reflecting slower travel speeds

than for auto. Across all trip purposes, average trip durations for public transportation and walking are 35.7 and 14.9 minutes respectively in the US, and 38.2 and 14.4 minutes in the state of Texas (Nationwide Household Transportation Survey, 2009). Regardless of trip purpose, almost all trips in both the US and in Texas are taken by personal vehicle, due to the relatively slow speeds and incomplete spatial coverage afforded by public transportation in most parts of the US and of Texas, as well as the long distances between activity locations, and often hazardous or strenuous walking conditions, that make walking impractical. Just 1.7 percent of all trips in Texas are taken on public transportation, while 6.7 percent of all trips are taken on foot.

12.     While some individuals may have time to spare for any of a number of activities, most individuals must make tradeoffs when there is any new demand on time. An increase in the amount of time required to travel can cut into discretionary time for activities like entertainment, socializing, and shopping, and then into non-discretionary time for activities like work, meals, child care, and buying groceries (Farber and Páez, 2011).

13.     There are a number of burdens associated with accessing EIC locations in order to obtain an EIC, the largest and most quantifiable of which may be time. The primary burden arises from the fact that anyone who lacks the identification generally required in order to vote in person, by definition, does not have a driver's license. Therefore, in order to obtain an EIC, he or she must rely on either a ride from someone else in the household, a ride from someone else not living in the household, or an alternative travel mode such as public transportation or walking. Since there are only a few hundred EIC locations in a state of 25 million people, travel distances can be quite large. The burden is higher for those without the ability to call on another member of their household to drive them, and highest for those without familiarity with public transportation routes, with physical difficulties in walking, and so on.

Page 7

14.    While acknowledging the existence of a subjective aspect of travel burden that goes beyond travel *time*, the primary focus of this report is to investigate the number and share of CVAs by race/ethnicity who would undertake trips of long duration in order to obtain an EIC. Calculating the travel burden based on the amount of time required to access an EIC location does not account for the relative inconvenience and physical discomfort associated with the walking, waiting, and in-vehicle times associated with long public transportation rides; or the physical effort involved with walking all or some of the distance to the location, along routes that may be largely inhospitable to pedestrians.

15.    There is some scientific literature that has translated these qualitative facts about accessing and egressing public transportation on foot into estimates of the valuation of time associated with waiting, walking, and riding on vehicles in transit, by analyzing survey data for the purpose of predicting choices between travel modes. Based on a set of 192 studies of walk time values and 77 of waiting time values, the time that people spend waiting for public transportation or walking to and from public transportation stops, is about 1.6 times as burdensome as time spent traveling in a personal vehicle (Abrantes and Wardman, 2011, Table 21). In turn, time spent riding the bus or rail is somewhat more burdensome than time spent in a personal vehicle. One quantitative figure averaging a smaller set of studies puts the value at 1.2 for the value (burden) of time spent on a bus compared to time spent in a car (Abrantes and Wardman, 2011, Table 19).

16.    In addition, people of lower income can be expected to have more difficulty than people of higher income in managing to find additional time to procure an EIC. Those of lower income usually do not have the option of purchasing services to reduce time requirements in other areas, such as paying for child care, laundry service, home cleaning services, meals out, or

prepared food. Travel becomes particularly burdensome when it requires difficult choices such as whether to work fewer hours in the week (and thus to pay in dollar terms, not just in time terms); to require children to stay up later than normal in order to accommodate the lengthened schedule for that day; or to forgo a trip to the doctor that week. Because these kinds of burdens are more likely to be borne by those of lower income, but cannot be otherwise measured directly with the available data, I also analyze how access to EICs by race/ethnicity is affected by poverty status.

17.     A final aspect of the analysis is to look more generally at travel time burdens across the population, regardless of particular racial/ethnic burdens.

18.     For the purpose of this analysis I define a travel burden as a trip that exceeds 90 minutes, two hours, or three hours round-trip. I focus on trips on foot or via public transit, which are more onerous than trips undertaken in a private vehicle, as explained above. Less than one percent of trips in Texas exceeded 90 minutes on public transportation or on foot, according to the most recent data for Texas from the National Household Travel Survey (2009). The fact that such long trips on foot or via public transportation are so rare suggests that people avoid them whenever possible.

**Starting and ending points for travel to obtain EICs**

19.     There are three sets of locations from which an accepted state photo identification card can be procured, consisting of permanent offices of the Department of Public Safety (DPS), where one can apply for a driver's license, Texas personal ID card, EIC, or license to carry a weapon; a set of county offices that have agreed to issue EICs; and finally a set of "mobile" offices where one may apply for an EIC. I have conducted analysis for the 226 DPS offices and 55 of the 61 county offices for which it was possible to find address data. As of the writing of this report (June 2014), the "mobile" offices have been only sporadically available to those

Page 9

seeking to acquire an EIC, having been open for only a few days at a time at a limited number of locations. I therefore do not include these in the travel time estimates, as they have a very small influence on accessibility.

20.     I obtained online listings of permanent DPS locations where EICs are being issued and geocoded these using ArcMap and Google maps. In addition to these 226 DPS locations, as noted above, there were another 61 county offices, serving counties whose total populations added up to 657,131 in population, which is 2.6 percent of the state population. (These counties were all outside areas served by public transportation.) Addresses were available online for 55 of the 61 county office locations. Figure 1 (below) displays the geocoded DPS and county offices on a county map of Texas.

**Figure 1: Geocoded DPS offices and county offices providing EICs**



21.     There are more than 10 million housing units in the state of Texas (U.S. Census

Bureau, 2014), and therefore I used a set of simplified home locations to estimate the travel times

for those who may seek to access EIC locations. These consisted of Census block groups, which

typically include between 1,000 and 2,000 residents. I defined the location for all households in

the block group as consisting of the centroid of the block group (the spatial center of gravity of

the polygon comprising the block group). Figure 2 (below) displays the centroids, and county

boundaries are also shown. Block group boundaries are not shown.

22.     Figure 2 also illustrates the fact that any meaningful spatial error in identifying

the locations of specific housing units is likely of most concern in locations in the outlying and

less dense parts of the state. In these locations it is more likely that travel time estimates are disproportionately inaccurate because the block group centroid may be located farther from the average household than in block groups in the most densely populated parts of the state. However, by the same token, this error exists only with regard to a small fraction of the Texas population.

**Figure 2: Block group centroids (estimated home locations)**



**Travel times between home and EIC locations**

      23.     For each block group centroid I estimated the travel time to the nearest EIC location, where "nearest" is defined using one of three methods depending on the mode: auto (drive), public transportation, or walking. The latter two modes are the most relevant, under the

assumption that citizens of voting age who do not hold some form of accepted photo identification are more likely to have to rely on a non-auto mode to obtain the EIC. Even without this assumption, however, the results I discuss here do not vary very much.

24. There are many possibilities to obtain data to estimate travel times, but the best estimates are based on distances along the road network, travel times on public transportation, and distances along the pedestrian network. I used network and schedule based estimates rather than more commonly calculated "zone to zone" estimates of travel time, which rely on aggregated information about trip destinations and are therefore less accurate.

**Public transportation times**

25. There are eight large public transportation agencies (with at least 2 million one-way trips per year) in the state of Texas serving the metropolitan areas of Austin, Corpus Christi, Dallas-Fort Worth, El Paso, Houston, Laredo, Lubbock, and San Antonio. Of these, three metropolitan regions offer rail systems. Commuter rail systems include the Capital MetroRail (Austin metropolitan area) and Trinity Railway Express (Fort Worth & Dallas commuter rail). Light rail systems in Texas include the Dallas Area Rapid Transit (DART) and Houston's METROrail. In addition to the eight large metropolitan-area public transportation agencies, there are 30 local public transportation agencies providing bus service, and nine additional agencies providing paratransit or demand–and-response based services, according to the Federal Transit Administration's National Transit Database. At least four counties within Texas do not provide any local public transportation service at all (Brewster, Hudspeth, Presidio, and Jeff Davis Counties) and some others have very little service.

26. According to the National Transit Database, 23.7 million of the 25 million in population in Texas are covered by public transportation service. However, this estimate includes the entire city population for each system, and actual public transportation accessibility in the

state is much lower. I contracted with the Center for Neighborhood Technology (CNT) in Chicago to obtain more accurate estimates of public transportation travel time for the entire state than could be calculated by using publicly available data sources. CNT is a well-known and highly respected center for the collection and dissemination of transportation and land use metrics. As noted above, I worked intensively with the CNT staff in obtaining the public transportation data, and I and my assistants carried out checks to ensure the data were consistent with third party calculations.

27. The CNT estimates rely on spatially specific information about the routes of public transportation vehicles, location of stops, and schedules. In Texas, at least four major metropolitan planning organizations make specific public transportation data available in General Transit Feed Specification (GTFS) format. The CNT staff supplemented this information with schedules that they collected and entered into GTFS format, covering an additional third of the population with some form of public transportation service in the state. These schedules were collected in different years, as far back as 2009 and as recently as 2014. Since the base population data used here are from the 2010 Decennial Census, these different years of data collection are roughly appropriate for the data. GTFS data make it possible to estimate public transportation travel times that take into account actual service frequency, scheduled public transportation times, and waiting times between buses and trains. The CNT travel information accounts for public transportation use throughout almost the entirety of the state, and for almost all Texas residents who have any access to public transportation. Finally, I carried out a separate estimation procedure to estimate walking network distances and times to the nearest transit stop, and from the final stop to the EIC location.

28.     The travel time by public transportation was estimated from each block group centroid to the nearest EIC location as follows. Block groups were classified as accessible to public transportation if (1) there was at least one transit stop within one mile of the block group centroid, (2) there was scheduled public transportation service within 30 minutes of the predicted arrival time at the transit station, assuming an 8:00 am start, (3) the route could be completed with no more than two transfers, and (4) the EIC location on the other end of the trip was located within one mile of a transit stop. Studies in the US of walk distances to public transportation find steep drop-offs in the likelihood of walking to rail stations after a half mile distance, and faster drop-offs in willingness to walk to bus stations as distance decreases. There are similar steep drop-offs in usage for routes with more than two transfers being required.

29.     By this definition, 6,973 of the block groups in the state (44 percent) were defined as accessible. Among the block groups defined as inaccessible, almost all—7,858, or 89 percent— had no public transportation service within a mile, and the remaining 980 block groups had various other constraints, such as too many transfers required, too long a wait time, or no EIC location within a mile of a destination transit stop.

1.  **Accessible**  (6,973 block groups)
    Block groups where public transport can be used to travel to an EIC location

2.  **Inaccessible: Constraints** (980 block groups)
    Block groups with one or more transit stops within one mile, but for which an EIC location is not accessible via public transportation either because public transportation does not run at the origin or transfer stops within the 30 minutes of arrival, the trip would require more than 2 transfers, or there is no EIC location within a mile of a transit stop.

3.  **Inaccessible: No transit stop within one mile** (7,858 block groups)
    Block groups that do not have transit stops within one mile of home.

30.     Table 2 below summarizes the distribution across all block groups. Note that about 40 percent of the state's population is, according to this definition, able to access an EIC location via public transit.

**Table 2: Distribution of accessibility to EIC locations**

| Category | Block Groups | | Population | |
| --- | --- | --- | --- | --- |
| | Count | Pct | Sum | Pct |
| Accessible via public transportation | 6,973 | 44% | 9,955,201 | 40% |
| Inaccessible: Too many transfers required, etc. | 980 | 6% | 1,638,076 | 7% |
| Inaccessible: No transit stop within one mile | 7858 | 50% | 13,552,284 | 54% |
| Total | 15,811 | | 25,145,561 | |

The same information is shown spatially in Figure 3 below. Areas that are inaccessible because the nearest public transportation service is more than a mile away, are shown in white. These are the majority of the non-urban areas of the state.

**Figure 3: Accessible and inaccessible block group locations**



31.     For every trip on public transportation, travel time includes walking to the nearest bus or rail stop from home, waiting for a bus or train, and walking from the destination stop to

the EIC location itself. These public transportation travel times assume the best case scenario of highest schedule availability and no travel delay. For example, it is assumed that everyone can travel to an EIC location on Monday morning, which is typically the highest frequency public transportation schedule, despite the fact that many people will find it difficult to travel at that time due to obligations like work. Those who travel to an EIC location during the middle of the day, or on Saturday, could encounter a much less frequent schedule than what is assumed here, and would almost never encounter a more frequent schedule.

32.    For the 6,973 block groups for which public transportation travel times were calculated, the average total time to travel from home to the nearest EIC location was one hour and 15 minutes, or two and one-half hours round trip. This total trip time consisted on average of a half hour of time in the public transportation vehicle each way, a half hour of walking (both to get to the nearest stop, and to walk the remaining distance from the closest stop to the EIC location), and about 15 minutes of waiting for a public transportation vehicle. There was substantial variance. For example, ten percent of block groups with public transportation access have a one-way trip exceeding two hours to arrive at an EIC location, or more than four hours round trip. In many of these cases, walking to the nearest EIC location is faster than taking transit.

**Travel times on foot**

33.    Using ArcMAP GIS software, I identified the shortest route to an EIC location from the geographic center of each census block group using the road network. The distance to the nearest EIC location ranged from anywhere to a few hundred feet to as far as 81 miles away, with an average distance of 7.8 miles. I calculated walk times by dividing the route distance in miles by an average walking speed of 2.2 miles per hour, a figure based on a discount of 25 percent to the standard estimate for pedestrian walking speed of three miles per hour over short

trips of one-half mile or less. The 25 percent discount accounts for the fact that walking distances to the nearest EIC location exceeded a mile in almost all instances, while the main observational study upon which the standard walk speed assumption is based comes from measured speeds of a sample of 230 adult volunteers taken over a 25-foot expanse of floor (Bohannon, 1997) . The walk time figures were estimated using both the ArcMap outputs of the distance over the shortest route, as well as the Google Maps calculation of the distance associated with the shortest time route for driving. There was relatively little difference in the estimates. This resulted in estimated walk times as long as 36 hours and as short as a few minutes.

**Road travel times**

34.     To estimate the driving time between block group centroids and EIC locations, I used an automated batch interface for Google Maps, providing a time estimate for a standard, time-efficient route that accounted for travel delays caused by road congestion and traffic signals. The Google interface, accessed via a software add-on to Stata (the statistical software program I used), allowed queries of up to 2,500 origins and destinations at a time to calculate the driving time and distance from the geographic center of each census block group to the nearest EIC location, where "nearest" is defined from the ArcMap nearest network neighbor analysis described above under "Travel times on foot." The average distances from block group centroids to EIC locations were very similar to the pedestrian distances, and the times ranged from a few minutes to as long as 2.2 hours. The average speed of travel for these estimated trips ranged from around 5 miles per hour to around 67 miles per hour, with a median value of 32 miles per hour.

**Spatial distribution of CVAs by race/ethnicity, auto ownership and poverty status**

35.     With regard to obtaining an accepted photo ID, the photo ID law is relevant only to those citizens of voting age who are eligible to vote and do not hold a driver's license, other accepted state photo ID, or an accepted federal form of photo identification. There currently are

no secondary data available to me to determine the locations of individuals—and therefore the travel times of those individuals—who do not hold some eligible form of photo identification, yet are either eligible to vote or are in fact registered to vote. Therefore, for the analysis presented here, I focus on estimating the locations and characteristics of several relevant populations of interest, distinguishing residents of voting age who are citizens by race/ethnicity, by auto ownership, and by poverty status.

36.     For each of the three demographic Census data sets described below, I used the following racial and ethnic categories: non-Hispanic White alone; Black or African-American alone; Asian alone; and Hispanic (Latino). A small percentage of those self-reporting in the Census that their only race was Black/African-American or Asian also reported, in a separate question, that they are Hispanic/Latino (3.2 percent and 1.7 percent respectively). The remaining residents enumerated in the 2010 Census are not included in this analysis. This excluded group (making up 1.8 percent of the Texas population in the 2010 Census) did not identify as Hispanic/Latino, and either reported two or more races (1.3 percent) or some other race (0.5 percent), such as Native Hawaiian and Other Pacific Islander alone, American Indian and Alaska Native alone or Some Other Race alone.

37.     Calculating the travel burden associated with accessing an EIC location requires, first, knowing how many citizens of voting age there are in each racial or ethnic group in each Census block group. I obtained block group counts of the number of residents of each race or ethnicity in each Census block group who were of voting age (18 or over) from the 2010 US Census. There are 15,811 block groups in the state. The Census is designed as a 100 percent count of every person living in the US. These are the most accurate data available for a base

count of the population by race/ethnicity and age, even though changes to the population may have occurred in the last few years.

38.     The decennial Census tells us how many people of voting age there are in each racial or ethnic category in each block group, but not whether they are citizens. I used another Census Bureau data source, the 2008-2012 American Community Survey (ACS) five-year Census tract level estimates, to obtain the share of voting-age residents of each race or ethnicity who were citizens in each Census tract. There are 5,265 Census tracts in Texas, containing between one and eight block groups, with a median of three block groups. To estimate citizens of voting age by race in each block group, I first calculated the share of adults of voting age in each racial or ethnic group that are citizens in the five year sample for each Census tract. I then multiplied this ratio by the number of people of each racial or ethnic category in each block group to estimate the citizens of voting age (CVAs) by race/ethnicity in each block group (Chapa et al., 2011).

39.     The American Community Survey (ACS) five-year Census tract estimates are based on a one percent sample conducted every year, and this provides a good estimate of the share of people in each racial or ethnic group that are citizens at the Census tract level. The ACS is conducted upon a sample of the population, rather than a complete count, so its estimates are subject to some error, but the five year estimates are the most precise and spatially specific available for citizenship status. Note that the ACS tract data both pre-date and post-date the year of collection of the 2010 Census data, aggregating data over a five year period.

40.     Because there is no generally accepted methodology for aggregating confidence intervals from the Census tract level to higher levels of geography (in this case, statewide), I simply report these estimates without confidence intervals. The very large numbers of the sample

across the state mean that the differences between Blacks and non-Hispanic Whites, and between Hispanics and non-Hispanic Whites, presented later in the report are statistically significant at the 0.001 level or better.

41. The next step was to calculate auto availability among CVAs by race/ethnicity in each block group. To do this I used data from the Census Bureau's Public Use Microdata Sample (PUMS) to calculate the share of CVAs in each racial/ethnic category who did not have access to an auto owned by their household, and multiplied that share by the number of CVAs in each racial/ethnic category in each block group contained within each Public Use Microdata Area (PUMA) (Chapa et al., 2011). No other source of Census data would permit this calculation because there are no such four-way tables publicly provided by the U.S. Census. PUMAs are areas containing between 80,000 and 120,000 people and thus containing a large number of block groups (see Figure 4 below for a spatial example in Texas). Thus the rates are applied to a number of different block groups within the PUMA which might in fact have some variance in auto ownership between each other and within the PUMA. Any such spatial variance among racial/ethnic groups of CVAs cannot be calculated and is therefore ignored here.

42. Figure 4 below displays the spatial structure of PUMAs, tracts and block groups. PUMA outlines are represented with double lines, tract outlines with single lines, and block group outlines with dashed lines. There are 153 PUMAs in Texas, with an average of about 100 block groups in each.

**Figure 4: Spatial structure of PUMAs, tracts and block groups**



43.     I estimated travel burdens among households in poverty using PUMS data about the rate of poverty among citizens living in households with and without cars by race/ethnicity, using the variable "poverty" which reports household income as a percentile of the poverty threshold (poverty threshold is a dollar figure that varies depending on household size) . I applied these percentages to all block groups inside each PUMA to estimate the number of CVAs by race/ethnicity with and without vehicles whose reported household income was either below or above the poverty threshold.

44.    I identified three methods for determining the share of CVAs in each racial/ethnic category that did and did not have access to an auto in the household, and performed the necessary calculations for each method. In the first, I calculated separate rates of auto ownership for CVAs in each ethnic group above and below the poverty threshold in each PUMA in the state, and then applied those auto ownership rates to the estimated number of CVAs by race/ethnicity who were above and below the poverty threshold in each block group contained in that PUMA.. In the second, I calculated separate rates of auto ownership for CVAs by race/ethnicity living in rented and in owned housing in the PUMA, and then carried out a similar calculation. In the third method, I did not take account of either poverty rates or home renting/owning, simply estimating the rates of auto ownership among all CVAs in each racial/ethnic category in each PUMA, and applying that ratio to the CVAs by race/ethnicity in each block group. The most accurate estimates are those taking into account the poverty rate, since one of the most important determinants of auto ownership is income. I present only that set of estimates here, but I note that the figures do not vary very much from the estimates that use housing tenure to estimate auto ownership, or those that take into account neither poverty nor housing tenure.

45.    Table 3 summarizes the sources of data used to estimate the number of citizens of voting age in each block group by racial/ethnic category, with and without access to an automobile in the household.

Page 23

**Table 3: Data sources for estimating household automobile access**

| Data source | Geographic resolution | Relevant information |
|---|---|---|
| 2010 Census | Census block groups | Voting age population by race/ethnicity; housing tenure (renting or owning one's home) by race/ethnicity |
| American Community Survey 2008-2012 (5-year sample) | Census tracts | Share of voting age population that are US citizens by race/ethnicity; poverty rates by race/ethnicity |
| Census Public Use Microdata Sample (PUMS) from the 2009-2011 American Community Survey | Public Use Microdata Areas (PUM areas) | Share in each PUM area of citizens of voting age by race/ethnicity living in (i) households that do not own a personal vehicle, (ii) households in rented or owned housing, and (iii) households below and above the poverty line |

## Travel times by race/ethnicity, auto ownership and poverty status

46.    To assign a one-way travel time to any given citizen of voting age in any given Census block, I followed the following deterministic algorithm. First, if the individual lives in a household with an auto available, he or she will be driven by another household member to the nearest EIC location, unless taking public transportation or walking is faster, in which case the faster of those alternative modes will be assigned. Second, if the individual lives in a household without an automobile, he or she will take public transportation if it is faster than walking, and will otherwise walk to the nearest EIC location. The need for an algorithm arises from two factors. First, there is uncertainty about both the location and the auto access of those who are citizens of voting age and who do not hold a photo identification card. Second, it is not possible to quantify the burden of requesting and obtaining assistance from a family member outside the home, a friend, or a co-worker, to drive the individual to an EIC location.

47.    Using this algorithm, the fastest travel time between the home location (block group centroid) and the nearest EIC location was nearly always via driving. Of the 15,811 simplified home locations (block group centroids), in only one case was public transportation faster. In instances where an auto was not available, and public transportation was accessible,

Page 24

public transportation was faster in most but not all cases: in 936 of the 6,973 cases (13 percent) in which an EIC location could be reached by transit, walking access was faster.

48. In order to evaluate the extent to which all Texas citizens seeking an EIC will encounter a travel burden in going to an EIC location, and in order to compare travel burden by race/ethnicity, I divided the voting age citizens of Texas into three groups based on the extent of their travel burden: those who in order to obtain a photo ID would have to travel ninety minutes or more, two hours or more, or three hours or more from home to the EIC location and back again. A round trip of more than 90 minutes is particularly significant because a trip of that length more than doubles the average amount of travel carried out per day by an individual in the state of Texas.

49. I performed this burden analysis using two scenarios:

- In the first version ("scenario 1"), I assumed that in Texas citizens without an accepted photo ID are equally likely to live in an household without an automobile as citizens generally. I consider this to be a conservative estimate of travel burden because individuals without an accepted photo ID – and thus, without a driver's license – are more likely than the population generally to reside in households without a car available. Accordingly, scenario 1 examines the numbers and in-group percentages of persons who would travel round trip 90 minutes or more, two hours or more, and three hours or more by relying on both those who travel by car and those who would travel by public transportation or by walking (I refer to the latter group as the "no car" group).

- In the second version ("scenario 2" below), I assumed that relatively few citizens of voting age without photo IDs live in households owning their own autos, and that for

those voting-age citizens without photo IDs who do live in a household with an auto, the burden of traveling by car to an EIC location is not meaningfully large compared to the burden of traveling by transit or on foot. Accordingly, scenario 2 examines the numbers and in-group percentages of persons who would travel round trip 90 minutes or more, two hours or more, and three hours or more. by relying in the numerator only on the data for those who would travel by public transportation or by walking, while continuing (as in scenario 1) to rely in the denominator on data for all citizens of voting age in the applicable subgroup.

- Neither of these two scenarios can be entirely correct, but they provide boundaries on the possible effects of the actual spatial distributions and modal distributions of those without photo ID upon the relative burden of the photo ID requirement.

50.    As it turns out, and as I show below, Blacks have the highest burden and Hispanics the second-highest burden regardless of which scenario is used, and regardless of whether a burden is defined as having to travel more than 90 minutes, two hours, or three hours round trip. I therefore simply show the 90 minute burden definition in the two graphs below, reflecting the percentage of CVAs who I estimate would have to travel 45 minutes or more each way to travel to the EIC location.

51.    As set forth below, I also present the data for each scenario using two population groupings.  First, data for the two scenarios are presented for all citizens of voting age in Texas. Second, I focus on citizens of voting age whose income is below the poverty level, because among this group any large amount of travel is not burdensome only in time terms but also in financial terms.  The estimates of travel burden set forth in the first two scenarios for all citizens of voting age do not account for the fact that poor households are likely to experience the

required travel as a financial burden as well. They are therefore underestimates of the true burden of travel for Hispanic and Black citizens of voting age, who are much more likely to live in poverty, regardless of whether they own a car or not. Regardless, among both all CVAs, and among only CVAs in poverty, Blacks have the highest burden and Hispanics the second highest burden in comparison to non-Hispanic Whites.

*All citizens of voting age, scenarios 1 and 2:*

52. Scenario 1: Of the estimated 8.9 million White, non-Hispanic citizens of voting age, I estimate that about 8.7 million have access to a vehicle owned by the household ("Car"), and about 256,000 do not. Of the 8.7 million with a car available, about 57,000 have a round trip to access an EIC location of more than 90 minutes, and over 17,000 of those have to travel more than two hours by car, round trip, to access an EIC location. The remainder of Table 4 below can be read in the same way.

**Table 4: Citizens of voting age (CVAs) in Texas, total and by race/ethnicity , whose travel to obtain an EIC would exceed 90m, 2h and 3h**

| Racial/ethnic group | Subgroup | Total | 90 minutes or more | Two hours or more | Three hours or more |
|---|---|---|---|---|---|
| All | All | 15,806,213 | 737,841 | 596,102 | 418,879 |
| | Car | 15,054,163 | 79,092 | 25,213 | 12,850 |
| | No Car | 752,050 | 658,749 | 570,889 | 406,029 |
| White. Non-Hispanic | All | 8,922,732 | 290,260 | 228,458 | 177,900 |
| | Car | 8,667,192 | 56,568 | 17,497 | 9,028 |
| | No Car | 255,541 | 233,691 | 210,962 | 168,872 |
| Black | All | 2,022,070 | 219,764 | 188,745 | 120,154 |
| | Car | 1,781,853 | 847 | 251 | 117 |
| | No Car | 240,218 | 218,917 | 188,494 | 120,037 |
| Asian | All | 443,816 | 9,358 | 8,179 | 5,289 |
| | Car | 433,645 | 417 | 63 | 40 |
| | No Car | 10,170 | 8,941 | 8,116 | 5,249 |
| Hispanic/Latino | All | 4,184,116 | 209,577 | 161,808 | 104,884 |
| | Car | 3,947,414 | 21,129 | 7,356 | 3,423 |
| | No Car | 236,702 | 188,448 | 154,452 | 101,461 |

53.     In order to evaluate proportional burden among these racial/ethnic groups, the figures in the table above can be translated into within-group percentages. In Table 5 (below), the share of each racial/ethnic group with travel times exceeding 90 minutes, two hours, and three hours round-trip is shown, both for the racial ethnic group as a whole, as well as within the car-owning and the non-car-owning populations (shaded rows). The "all" lines are computed by dividing the number of households with round trips exceeding 90 minutes, 2 hours, and 3 hours by the total number in that racial/ethnic category. These percentages, in the white rows, refer to all households regardless of auto ownership.

54.     The two shaded rows below each "all" row show respectively, among CVAs with cars in their household and CVAs without cars, the percentage who have round trips exceeding the same time thresholds. It is helpful in understanding the calculations of overall burden that appear in the "All" rows, in white, that among CVAs living in car-owning households—97 percent of non-Hispanic White, 88 percent of Black, 98 percent of Asian, and 94 percent of Hispanic/Latino CVAs—there is a very low share of people who have to travel more than 90 minutes round trip to access an EIC location. In stark contrast, very large majorities of citizens of voting age living in households without cars are unable to access a EIC location within two or three hours, round trip, via public transportation or walking. This is true regardless of race/ethnicity, but higher percentages of Black and Hispanic citizens of voting age live in households without an auto available – 12 and  6 percent respectively, compared to 3 percent of non-Hispanic Whites.

**Table 5: CVAs by race/ethnicity and total, percentages whose travel to obtain an EIC would exceed 90m, 2h and 3h: all, with a vehicle in the household, and without a vehicle in the household**

| Racial/ethnic group | Subgroup | 90 minutes or more | Two hours or more | Three hours or more |
|---|---|---|---|---|
| All | All | 4.7% | 3.8% | 2.7% |
| | Car (95%) | 0.5% | 0.2% | 0.1% |
| | No Car (5%) | 87.6% | 75.9% | 54.0% |
| White. Non-Hispanic | All | 3.3% | 2.6% | 2.0% |
| | Car (97%) | 0.7% | 0.2% | 0.1% |
| | No Car (3%) | 91.4% | 82.6% | 66.1% |
| Black | All | 10.9% | 9.3% | 5.9% |
| | Car (88%) | 0.0% | 0.0% | 0.0% |
| | No Car (12%) | 91.1% | 78.5% | 50.0% |
| Asian | All | 2.1% | 1.8% | 1.2% |
| | Car (98%) | 0.1% | 0.0% | 0.0% |
| | No Car (2%) | 87.9% | 79.8% | 51.6% |
| Hispanic/Latino | All | 5.0% | 3.9% | 2.5% |
| | Car (94%) | 0.5% | 0.2% | 0.1% |
| | No Car (6%) | 79.6% | 65.3% | 42.9% |

55.     As indicated above, in scenario 1, about 11 percent of the Black citizen voting-age population must travel 90 minutes or more to access an EIC location, while Hispanics have the second highest burden, at 5 percent, compared to non-Hispanic Whites among whom 3.3 percent have travel times longer than 90 minutes (Figure 5). Under this 90-minute round trip definition, African Americans are 3.3 times as likely to have a burden as non-Hispanic Whites, while Hispanics are 1.5 times as likely.

**Figure 5: Scenario 1, Share having to travel 90 minutes or more, by race/ethnicity**



56.     Scenario 2:  Using this estimation procedure, the relative burden increases somewhat for Blacks and Hispanics, although the absolute shares are lower (Figure 6). Blacks are 4.1 times as likely as non-Hispanic Whites to have a round trip to access an EIC location exceeding 90 minutes of time on public transportation or walking, and Hispanics are 1.7 times as likely to have such a long round trip. Note that the Scenario 2 figures are simply the share of the total population in each racial/ethnic category that lives in households without vehicles (the "No Car" category) with a round trip greater than 90 minutes, divided by the total population in that group.

**Figure 6: Scenario 2, Share having to travel 90 minutes or more, by race/ethnicity**



57.     I also investigated the share of the transit-taking population that must transfer once or more between buses, because transfers increase the complexity and difficulty of public transportation trips. Among those who have the option of taking public transportation and for whom this choice is faster than walking, a lower share of Blacks has a direct route (31 percent) in comparison to Hispanics and non-Hispanic Whites who are more similar to each other at 37 percent and 35 percent respectively (see Table 6).

Page 30

**Table 6: CVAs taking public transportation to and from EIC location, by race/ethnicity and number of transfers required**

|  | Total | Direct Route | | One Transfer | | Two Transfers | |
|---|---|---|---|---|---|---|---|
|  |  | Count | Percent | Count | Percent | Count | Percent |
| All CVAP | 305,842 | 103,262 | 34% | 187,256 | 61% | 15,324 | 5% |
| White. Non-Hispanic | 76,998 | 26,650 | 35% | 45,501 | 59% | 4,847 | 6% |
| Black | 131,780 | 41,084 | 31% | 85,000 | 65% | 5,696 | 4% |
| Asian | 5,614 | 2,195 | 39% | 3,097 | 55% | 322 | 6% |
| Hispanic/Latino | 104,761 | 38,286 | 37% | 61,634 | 59% | 4,841 | 5% |

*Citizens of voting age below the poverty line, scenarios 1 and 2:*

58.     Using the same methods described previously, I estimate that the poverty rate for Black CVAs is 24.2 percent and for Hispanic CVAs 24.5 percent, compared to 9.5 percent of non-Hispanic Whites (see Table 8). The share of CVAs both living in households below the poverty line and not having access to a car is seven times as high for Blacks and almost four times as high for Hispanics as for non-Hispanic Whites, at 7.1 and 3.6 percent respectively, in comparison to 1.0 percent for non-Hispanic Whites.

**Table 8: Percent of individuals below poverty threshold, with and without a car, by race/ethnicity**

|  | Below poverty threshold | Below poverty threshold, no car |
|---|---|---|
| All CVAP | 16.3% | 2.5% |
| White. Non-Hispanic | 9.5% | 1.0% |
| Black | 24.2% | 7.1% |
| Asian | 10.3% | 0.9% |
| Hispanic/Latino | 24.5% | 3.6% |

59.     When estimating the share of the population in poverty that is likely to have a travel burden, I used the same methods described earlier. The results just for households in poverty are shown in Table 9, below.

**Table 9: Poverty status CVAs by race/ethnicity, with and without vehicle, and subgroups whose travel to obtain an EIC would exceed 90m, 2h and 3h**

| Racial/ethnic group | Subgroup | Total | 90 minutes or more | Two hours or more | Three hours or more |
|---|---|---|---|---|---|
| All CVAP | All | 2,575,664 | 356,059 | 297,438 | 202,009 |
| | Car | 2,173,382 | 11,793 | 4,145 | 1,875 |
| | No Car | 402,282 | 344,266 | 293,293 | 200,134 |
| White, Non-Hispanic | All | 845,848 | 84,213 | 71,867 | 55,999 |
| | Car | 757,543 | 5,563 | 1,914 | 896 |
| | No Car | 88,305 | 78,650 | 69,953 | 55,103 |
| Black | All | 488,475 | 129,811 | 110,835 | 69,977 |
| | Car | 345,114 | 195 | 26 | 4 |
| | No Car | 143,362 | 129,616 | 110,809 | 69,974 |
| Asian | All | 45,922 | 3,196 | 2,718 | 1,477 |
| | Car | 42,002 | 62 | 2 | 2 |
| | No Car | 3,920 | 3,133 | 2,716 | 1,474 |
| Hispanic/Latino | All | 1,026,494 | 122,194 | 97,269 | 62,585 |
| | Car | 877,156 | 5,139 | 1,894 | 865 |
| | No Car | 149,339 | 117,054 | 95,375 | 61,720 |

60.     These figures can be translated again to the share of the racial/ethnic groups bearing a travel burden, under the same two scenarios as defined previously. Figures 7 and 8 below are the same as Figures 5 and 6, except that they apply only to the population of people who are in poverty in each racial/ethnic group. The remarkable fact about these results is that even when controlling for poverty, the burden is still substantially higher for Blacks and Hispanics than for non-Hispanic whites, suggesting that indeed, the burden is associated with race/ethnicity regardless of income. Although the rate of travel burden is indeed much higher for all CVAs living in households below the poverty threshold, it is higher for Hispanic CVAs in poverty (about 12 percent) than for non-Hispanic White CVAs in poverty (10 percent), and much higher for Black CVAs in poverty (almost 27 percent).

**Figure 7: Scenario 1P, Share having to travel 90 minutes or more, by race/ethnicity**



**Figure 8: Scenario 2P, Sharing having to travel 90 minutes or more, by race/ethnicity**



**Conclusion**

61.     I find significant differences in travel burden by racial/ethnic category and also according to poverty level. Even when considering poverty, there is still a racial impact. In fact, poorest minorities are likely to be most affected by the travel needed to obtain an EIC. It takes a long time to access EIC locations by public transportation or on foot, regardless of the race/ethnicity of citizens of voting age (CVAs). More than 90 percent of CVAs in all racial

groups without a car would have a long trip to an EIC location, whether on foot or via transit. The main difference between the travel time burden for non-Hispanic White, Black, and Hispanic CVAs in the state of Texas is primarily the share that is likely to have to rely on public transportation or walking. About one in ten African American CVAs, and one in twenty Hispanic CVAs, does not have an auto available in their household, as compared to just one in 33 white CVAs, and the likelihood of auto ownership is lower still for those in poverty. Walking or using public transportation is generally much less convenient than driving in the state of Texas, and there is about one EIC location for every 90,000 people in the state. Given these facts, the relative rates of auto ownership among racial/ethnic groups practically predetermine the conclusion that the burden of the State of Texas photo ID requirement falls disproportionately upon African Americans and Hispanics, and is particularly high for the poorest citizens.

## References

ABRANTES, P. A. L. & WARDMAN, M. R. 2011. Meta-analysis of UK values of travel time: An update. *Transportation Research Part A: Policy and Practice,* 45**,** 1-17.

BOHANNON, R. W. 1997. Comfortable and maximum walking speed of adults aged 20—79 years: reference values and determinants. *Age and Ageing,* 26**,** 15-19.

CHAPA, J., HENDERSON, A., NOAH, A. J., SCHINKIV, W. & KENGLE, R. 2011. Redistricting: Estimating citizen voting age population. Research Brief. Berkeley, CA: Berkeley Law Center for Research and Administration, University of California, Berkeley School of Law.

FARBER, S. & PÁEZ, A. 2011. Mobility without accessibility: the case of car use and discretionary activities. *In:* LUCAS, K., BLUMENBERG, E. & WEINBERGER, R. (eds.) *Auto motives. Understanding car use behaviours.* United Kingdom: Emerald Group Publishing Limited.

U.S. CENSUS BUREAU. 2014. *American Community Survey: Public Use Microdata Sample (PUMS)* [Online]. Available: www.census.gov/acs [Accessed June 23 2014].

U.S. CENSUS BUREAU. 2014. *American FactFinder* [Online]. Available: factfinder2.census.gov [Accessed June 23 2014].

NATIONAL HOUSEHOLD TRAVEL SURVEY. 2009. *NHTS Data Center – Version 2.1, February 2011.*[Online]. Available: hts.ornl.gov [Accessed June 23, 2014].

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  This Declaration was executed on July 18, 2014 in Berkeley, California.

Daniel G. Chatman, Ph.D.

PL761.1
9/2/2014
2:13-cv-00193

**DANIEL G. CHATMAN**
410A Wurster Hall
University of California
Berkeley, CA 94720-1850
(510) 642-2454
dgc@berkeley.edu

---

## EDUCATION

2005   Ph.D. in Urban Planning, University of California, Los Angeles
1997   Master in Public Policy, Harvard University (Outstanding Thesis Award)
1991   Bachelor of Arts, Individual Studies: The English Language (High Honors), University of California, Berkeley

## ACADEMIC APPOINTMENTS

2014–   Associate Professor
Department of City and Regional Planning, College of Environmental Design
University of California, Berkeley

2008–14   Assistant Professor
Department of City and Regional Planning, College of Environmental Design
University of California, Berkeley

2005–09   Assistant Professor
Edward J. Bloustein School of Planning and Public Policy
Rutgers, The State University of New Jersey

## RESEARCH APPOINTMENTS

2007–08   Director
Alan M. Voorhees Transportation Center
Edward J. Bloustein School of Planning and Public Policy
Rutgers, The State University of New Jersey

2008–09   Research Director
2005–06   Alan M. Voorhees Transportation Center
Edward J. Bloustein School of Planning and Public Policy
Rutgers, The State University of New Jersey

## PUBLICATIONS

### Peer-Reviewed Journal Articles

15.   Chatman, Daniel G. In press. Estimating the effect of land use and transportation planning on travel patterns: Three problems in controlling for "residential self-selection." *Journal of Transport and Land Use*, forthcoming.

14. Chatman, Daniel G. and Michael Manville. Theory versus implementation in congestion-based parking pricing: An evaluation of SFpark, 2011 to 2012. *Research in Transportation Economics*, 2014, pp. 52-60. Final version available online 2 June, 10.1016/j.retrec.2014.04.005.

13. Chatman, Daniel G. and Nicholas J. Klein. Why do immigrants drive less? Confirmations, complications, and new hypotheses from a qualitative study in New Jersey, USA. *Transport Policy*, 2013, 30 (Nov): 336-344. http://dx.doi.org/10.1016/j.tranpol.2013.10.002.

12. Chatman, Daniel G. and Robert B. Noland. Transit service, physical agglomeration, and productivity in US metropolitan areas. *Urban Studies*, 2013, published online before print August 1, DOI: 10.1177/0042098013494426.

11. Chatman, Daniel G. Explaining the ''immigrant effect'' on auto use: The influences of neighborhoods and preferences. *Transportation*, published online before print May 2013, DOI: 10.1007/s11116-013-9475-4.

10. _____. Does TOD need the T? On the importance of factors other than rail access. *Journal of the American Planning Association*, 2013, 79 (1): 17-31.

9. Chatman, Daniel G., Nicholas Tulach and Kyeoungsu Kim. Evaluating the economic impacts of light rail by measuring home appreciation: A first look at New Jersey's River Line. *Urban Studies*, 2012, 49 (3): 467-487. DOI: 10.1177/0042098011404933.

8. Chatman, Daniel G. and  Robert B. Noland. Do public transport improvements increase agglomeration economies? A review of literature and an agenda for research. *Transport Reviews*, 2011, 31 (6): 725-742.  DOI: 10.1080/01441647.2011.58790.

7. Chatman, Daniel G. and Niels Voorhoeve. The transportation credit mortage: A post-mortem. *Housing Policy Debate*, 2010, 20 (3): 355–382.

6. Chatman, Daniel G. and Nicholas Klein. Immigrants and travel demand in the US: Implications for transportation policy and future research. *Public Works Management and Policy*, 2009, 13 (4): 312–327.

5. Chatman, Daniel G. Residential choice, the built environment, and non-work travel: Evidence using new data and methods. *Environment and Planning A*, 2009, 41 (5): 1072–1089.

4. _____. Deconstructing development density: Quality, quantity and price effects on household travel. *Transportation Research A*, 2008, 42 (7): 1009–1031.

3. Boarnet, Marlon, Randall Crane, Daniel G. Chatman, and Michael Manville. Emerging planning challenges in retail: The case of Wal-Mart. *Journal of the American Planning Association*, 2005, 71 (4): 433–449.

2. Chatman, Daniel G. How workplace land use affects personal commercial travel and commute mode choice. *Transportation Research Record: Journal of the Transportation Research Board*, 2003, 1831: 193–201.

1. Crane, Randall and Daniel G. Chatman. Traffic and sprawl: Evidence from US commuting, 1985 to 1997. *Planning and Markets*, 2003, 6 (1): 14–22.

*Daniel G. Chatman, curriculum vitae*

**Peer-Reviewed Book Chapters**

2.  Chatman, Daniel G., and Nicholas Klein. 2011. Immigrants and automobility in New Jersey: The role of spatial and occupational factors in commuting to work. In *Auto motives: Understanding car use behaviours*, 2011, edited by Karen Lucas, Evelyn Blumenberg and Rachel Weinberger. Bingley, UK: Emerald Group Publishing Ltd.

1.  Crane, Randall and Daniel G. Chatman. Traffic and sprawl: Evidence from US commuting, 1985 to 1997. In *Urban sprawl in Western Europe and the United States*, 2004, edited by C. Bae and H. Richardson. Aldershot, Hampshire, UK: Ashgate.

**Reports**

11. Chatman, Daniel G., Robert Cervero, Don Emerson, Ian Carlton, Dana Weissman, Emily Moylan, Joe Zissman, et al. *An exploration of fixed guideway transit criteria revisited: Preliminary draft final report and handbook.* Project H-42, Transit Cooperative Research Program, Transportation Research Board, National Academies. 236 pp (report, appendixes, handbook, spreadsheet tool). January 11, 2013.

10. Chatman, Daniel G., Andrea Broaddus, Matt Klein, and Cheryl Young. *Are movers irrational? A pilot study of the happiness, commuting, housing, and social lives of undergraduates before and after a move.* Working paper, University of California Transportation Center, 56 pp. August 16, 2012.

9.  Chatman, Daniel G., Robert B. Noland, Nicholas K. Tulach, Lars Rognlien, Andrew Desautels, Lauren Alexander, and Kaan Ozbay, with contributions from Bryan P. Grady, Daniel J. Graham, Peter Bilton, Deva Deka, Joseph Berechman, and Niels Voorhoeve. 2012. *Methodology for determining the economic development impacts of transit projects.* Project H-39, Transit Cooperative Research Program, Transportation Research Board, National Academies. 355 pages + spreadsheet. April, 2012. http://www.trb.org/Main/Blurbs/167284.aspx

8.  Chatman, Daniel G. and Andrea Broaddus. *Psychological economics, travel behavior, residential location choice, and sustainability: Possible new rationales for policy intervention.* Working paper, University of California Transportation Center, 32 pp + appendices. August 22, 2011.

7.  Chatman, Daniel G., Nicholas Klein, and Stephanie DiPetrillo. *The impact of demographic changes on transit patterns in New Jersey.* Trenton, NJ: New Jersey Department of Transportation, 139 pp + appendices. 2010.

6.  Chatman, Daniel G., Stephanie DiPetrillo, et al. *Economic development benefits of new transit service: RiverLINE.* Trenton, NJ: New Jersey Department of Transportation, 115 pp + appendices. 2010.

5.  Chatman, Daniel G. and Stephanie DiPetrillo. *Eliminating barriers to transit-oriented development.* Trenton, NJ: New Jersey Department of Transportation, 75 pp. 2010.

4.  Chatman, Daniel G. *Transit-oriented development and household travel: A study of California cities.* Sacramento: California Department of Transportation, 2006.

3. Boarnet, Marlon, Randall Crane, Daniel Chatman, and Michael Manville. *Supercenters and the transformation of the Bay Area grocery industry: Issues, trends, and impacts*. San Francisco: Bay Area Economic Forum. 2004.

2. Crane, Randall, Abel Valenzuela, Dan Chatman, Lisa Schweitzer and Peter Wong. *California travel trends and demographics study*. Sacramento: California Department of Transportation, 2002.

1. Crane, Randall, Dan Chatman, Lisa Schweitzer and Lois Takahashi. *Water governance in the San Francisco Bay Area: Challenges and opportunities*. Oakland, CA: California Policy Research Center, 2001.

## Other Journal Articles

2. Chatman, Daniel G.Will transportation credit mortgages work in practice? *Intransition Magazine*, 2007, Spring, pp. 5–6.

1. Crane, Randall and Daniel G. Chatman. As jobs sprawl, whither the commute? *Access*, 2003, 23, (Fall): 14–19.

## Conference Proceedings

2. Chatman, Dan and Lisa Schweitzer. 2001. *Transportation strategies to serve California's people, enhance its prosperity, and protect its resources: Proceedings of the California Transportation Futures Conference*, Los Angeles, California, June 21 to 22, 2001. Sacramento: California Department of Transportation. 2001

1. Chatman, Dan and Lisa Schweitzer. *Growth and the quality of life: Summary of symposium proceedings*. Los Angeles: UCLA Extension Public Policy Program. 2000

## Book Reviews

3. Chatman, Daniel G. Review of *Still stuck in traffic: Coping with peak-hour traffic congestion*, Anthony Downs, 2004. *Urban Studies* 42 (12). 2005

2. ———. Book review: Global culture. [Review of *Global Culture: Media, arts, policy, and globalization* (2002), edited by Diana Crane, Nobuko Kawashima and Ken'ichi Kawasaki.] *Critical Planning* 10: 109–113. 2003

1. ———. Review essay: New works on the new regionalism. [Review of *The Regional City* (2001), Peter Calthorpe and William Fulton; *Regions that Work* (2000), Manuel Pastor, Jr., Peter Dreier, J. Eugene Grigsby and Marta Lopéz-Garza; and *City Making* (1999), Gerald R. Frug.] *Critical Planning* 8: 113–120. 2001

## UNPUBLISHED RESEARCH

## Dissertation and Thesis

2. *How the built environment influences non-work travel: Theoretical and empirical essays*. Dissertation, Department of Urban Planning, School of Public Affairs, University of California, Los Angeles. 2005

1. *An economic development policy for the Oglala Nation.* Policy Analysis Exercise (Master's thesis), with Andrew Aoki. John F. Kennedy School of Government, Harvard University. 1997

**Report**

1. *The impact of land use on travel: A review of current literature.* Los Angeles: UCLA Institute of Transportation Studies. 2002

## RESEARCH GRANTS AND CONTRACTS

16. Principal investigator, "Bicycling and access to transit by low-income immigrants." Mineta Transportation Institute, San Jose State University. $61,000, 9/2013–12/2014.

15. Co-principal investigator, "Social equity in regional transportation planning: Developing a new methodology for analyzing potential displacement," California Environmental Protection Agency, Air Resources Board. $645,792, 09/2013–09/2015.

14. Co-principal investigator, "Leveraging advances in technology and the behavioral sciences to institute long-term behavioral change." Innovation Seed Fund in Energy and Climate Research at U.C. Berkeley. $120,000, 3/2013–12/2013.

13. Principal investigator, "The economic costs and benefits of smart growth strategies," California Environmental Protection Agency, Air Resources Board. $330,000, 9/2012–12/2014.

12. Principal investigator, "Evaluating the effectiveness of congestion-priced parking in California," Multicampus Research Programs and Initiatives, Institute of Transportation Studies. $120,000, 1/2011–6/2014.

11. Principal investigator, "Psychological economics, travel behavior, residential location choice, and sustainability: Possible new rationales for policy intervention." University of California Transportation Center. $158,796, 9/2010–6/2014.

10. Principal investigator, "An exploration of fixed-guideway transit criteria revisited." Transit Cooperative Research Program, National Academy of Sciences. $500,000, 11/2010–1/2014.

9. Principal investigator, "Methodology for determining the economic development impacts of transit investments." Transit Cooperative Research Program, National Academy of Sciences. $500,000, 11/2008–12/2011.

8. Co-principal investigator, "Habitat conservation areas and the transportation planning process," University of California Transportation Center. $15,000, 1/2011-6/2011.

7. Principal investigator, "The impact of demographic changes and immigration on transit patterns in New Jersey," New Jersey Department of Transportation. $286,000, 6/2008–7/2010.

6. Principal investigator, "Economic benefits of new transit service: RiverLINE," New Jersey Department of Transportation and the University Transportation Research Center, Region II. $317,000, 5/2007–6/2010.

5. Principal investigator, "Eliminating barriers to transit-oriented development," New Jersey Department of Transportation. $164,000, 1/2007–3/2010.

4.  Principal investigator, "Location-efficient mortgages and the land market: Who benefits?" University Transportation Research Center, Region II. $8,000, 6/2006-12/2006.

3.  Principal investigator, "Transit-oriented developments and travel in California: Phase II, workers." California Department of Transportation. $175,000, 05/2003-09/2006.

2.  Principal investigator, "Transit-oriented developments and travel in California: Phase I, households." California Department of Transportation. $180,000, 9/2002–6/2005.

1.  Co-investigator, "California transportation plan trends and demographic study." California Department of Transportation. $350,000, 7/2001–12/2002.


## PRESENTATIONS

**Invited Talks**

23.  "Residential self-selection in land use and transportation research." Invited panel member. With Xinyu Cao, Petter Naess, and Carey Curtis. Association of European Schools of Planning / Association of Collegiate Schools of Planning 5th Joint Congress: Planning for Resilient Cities and Regions, Dublin, Ireland, July 15, 2013.

24.  "SF park: Initial findings from observational data." On panel, "SFpark Project: Lessons Learned & Research Understanding," with Allen Greenberg and Jay Primus. The Intelligent Transportation Society of America: Smart Parking Symposium. Berkeley, CA, March 19, 2013.

23.  "Evaluating the effectiveness of congestion-priced parking in Los Angeles." On panel, "Los Angeles ExpressPark: Demand based pricing: How is it working?" with Daniel E. Mitchell, Arti Gupta, and Zia Yusuf. The Intelligent Transportation Society of America: Smart Parking Symposium. Berkeley, CA, March 18, 2013.

22.  "Do public transport investments cause agglomeration economies?" Invited talk at colloquium, "Transit Investments and Economic Productivity: a Debate," with David Levinson, Daniel Graham and Robert Helsley. Berkeley, CA, April 2, 2012.

21.  "Transit investments and agglomeration economies: An empirical study of US metropolitan areas." Transportation Seminar Series, Center for Integrated Transportation Systems Management, University of Maryland, College Park, March 28, 2012.

20.  "Parking pricing in San Francisco." On panel, "Transportation Pricing," at symposium, "Sustainable Mobility & Cities: Marrying Technology and Policy" David Brower Center, Berkeley, February 24, 2012.

19.  "Gaps and issues in land use and transportation research." Plenary wrap-up for World Symposium on Transport and Land Use Research, Whistler, British Columbia, Canada, July 30, 2011.

18.  "Using the National Household Travel Survey for transportation decision making: Future research and modeling, innovative methods for data collection and usability." Plenary wrap-up. Using National Household Travel Survey Data for Transportation Decision Making: A Workshop. Sponsored by the Transportation Research Board and the Office of Highway Policy

Information, Federal Highway Administration. The Keck Center of the National Academies, Washington, D.C., June 7, 2011.

17. "Challenges in using qualitative methods for transportation research," with Nick Klein. On panel, "Qualitative Research Methods in Transportation: New Approaches to New Challenges." Annual Meeting of the Transportation Research Board, Washington, DC., January 23, 2011.

16. "Smart growth in the U.S.: Problems and prospects." IN[CITY]: The Berkeley [IN]STITUTES in Environmental Design, July 27, 2010.

15. "Summing it up: Directions for future research and policy." Transit-Oriented Development and Social Equity: An Agenda for Research and Action. Conference sponsored by the University of California Transportation Center and the Center for Community Innovation at the UC Berkeley Institute for Urban and Regional Development, David Brower Center, June 1, 2010.

14. "Do transit investments increase agglomeration economies?" Spring Seminar Series, Institute of Transportation Studies, University of California, Davis. May 21, 2010.

13. "Property value impacts of New Jersey's River Line: A home price appreciation model using repeat sales data." Institute of Transportation Studies Friday Seminar Series, University of California, Berkeley, September 11, 2009.

12. "Cultures of transit: Immigrants and public transportation in New Jersey." Third Annual Faculty Forum on Race and Ethnicity. Center for Race and Ethnicity. Rutgers University, March 27, 2009.

11. "Immigration trends in the US: Implications for travel demand, transportation systems, and public policy." Bloustein Hour. Edward J. Bloustein School of Planning and Public Policy. Rutgers University, March 26, 2009.

10. "Property value impacts of New Jersey's River Line: A home price appreciation model using repeat sales data." Rena Sivitanidou Annual Research Symposium. Lusk Center for Real Estate / METRANS Transportation Center, University of Southern California, February 27–28, 2009.

9. "Smart growth in the U.S.: Problems and prospects." The Sustainable City of 2030/2050: Anticipating Changes in Energy Demand, Technology and Market Structures. Center for Energy, Marine Transportation and Public Policy. Columbia University, February 10, 2009.

8. "Economic impacts of new light rail service: A study of New Jersey's River Line." Penn Design Doctoral Seminar, University of Pennsylvania, December 1, 2008.

7. "Immigration trends in the US: Implications for travel demand, transportation systems, and public policy." Plenary paper, Conference on the Impact of Changing Demographics on the Transportation System. Transportation Research Board and Research and Innovative Technology Administration. Keck Center of the National Academies, Washington, DC., October 27–28, 2008.

6. "Economic impacts of the River Line: Preliminary results." American Society of Civil Engineers, New Jersey Chapter Meeeting. New Brunswick, NJ, February 2008.

5.  "Walking and the built environment: The role of development density in the duration, distance and frequency of walking for non-work purposes." Nutritional Sciences Seminar, Department of Nutritional Sciences, at Rutgers University, New Brunswick, NJ, November 2006.

4.  "Concentrating at work: Reducing auto use via transit-oriented development at the workplace." New Jersey Department of Transportation, at Ewing, NJ, September 2006.

3.  "The death and life of smart growth." Enlightening Lunch seminar presentation, Bloustein School, at Rutgers University, New Brunswick, NJ, April 2006.

2.  "Concentrating at work: Reducing auto use via transit-oriented development at the workplace." Brown Bag Lunch Seminar, New York Metropolitan Transportation Council. New York, February 2006.

1.  Invited talks at Harvard University (2005), Arizona State University (2005), Cleveland State University (2005), Georgia Institute of Technology (2005), Massachusetts Institute of Technology (2004), University of Pennsylvania (2004), University of Texas, Austin (2004), New York University (2004).

**Refereed Conference Presentations**

36.  "Are movers irrational? On the travel, housing, social lives, and happiness of university students before and after a move." Association of European Schools of Planning / Association of Collegiate Schools of Planning 5th Joint Congress: Planning for Resilient Cities and Regions, Dublin, Ireland, July 18, 2013.

35.  "Transit service, physical agglomeration, and productivity in US metro areas." With Bob Noland. Transportation Research Board Annual Meeting, at Washington, DC, January 16, 2013.

34.  "Which matters more: neighborhoods or preferences? Explaining the 'immigrant effect' on auto use in the United States."  Transportation Research Board Annual Meeting, at Washington, DC, January 15, 2013.

33.  "Does TOD need the T? On the importance of factors other than rail access." Transportation Research Board Annual Meeting, at Washington, DC, January 14, 2013.

32.  "Transit service, physical agglomeration, and productivity in US metro areas". With Bob Noland. Associated Collegiate Schools of Planning Annual Conference, at Cincinatti, OH, November 3, 2012.

31.  "How will land use policies affect travel? The importance of residential sorting." With Jason Cao. Transportation Research Board Annual Meeting, at Washington, DC, January 25, 2012.

30.  "Travel, home, and work choices of immigrants and US-born: Initial findings from a survey in New Jersey." Associated Collegiate Schools of Planning Annual Conference, at Salt Lake City, UT, October 13, 2011.

29.  "How will land use policies affect travel? The importance of residential sorting." With Jason Cao. World Symposium on Transport and Land Use Research, Whistler, British Columbia, Canada, July 30, 2011.

28. "Recent changes in travel patterns of the foreign-born, and implications for sustainable urban growth." With Nicholas Klein. Using National Household Travel Survey Data for Transportation Decision Making: A Workshop. Sponsored by the Transportation Research Board and the Office of Highway Policy Information, Federal Highway Administration. The Keck Center of the National Academies, Washington, D.C., June 6, 2011.

27. "Immigrants and automobility in New Jersey: The role of spatial and occupational factors in commuting to work." With Nicholas Klein. Transportation Research Board Annual Meeting, at Washington, DC, January 26, 2011.

26. "Do public transport investments increase agglomeration economies? Literature review and research agenda," With Bob Noland. Transportation Research Board Annual Meeting, at Washington, DC, January 26, 2011.

25. "Immigration, sustainability, and alternative mode use: Ten hypotheses from a qualitative study in New Jersey, USA." With Nicholas Klein. Transportation Research Board Annual Meeting, at Washington, DC, January 24, 2011.

24. "How transit affects agglomeration economies." With Bob Noland. Associated Collegiate Schools of Planning Annual Conference, at Minneapolis, MN, October 9, 2010.

23. "Challenges in estimating the economic impacts of transit investments beyond cost and travel time savings." With Bob Noland. 56th Annual North American Meetings of the Regional Science Association International, at San Francisco, California, November 21, 2009.

22. "Barriers to transit-oriented development in New Jersey." 56th Annual North American Meetings of the Regional Science Association International, at San Francisco, California, November 21, 2009.

21. "Impacts of new light rail service on property values: New Jersey's River Line." 56th Annual North American Meetings of the Regional Science Association International, at San Francisco, California, November 20, 2009.

20. "Barriers to transit-oriented development: Supply and demand considerations." Associated Collegiate Schools of Planning Annual Conference, at Crystal City, Virginia, October 2, 2009.

19. "Economic impacts of new light rail service: A study of New Jersey's River Line." ACSP–AESOP 4th Joint Congress, at Chicago, Illinois, July 6–11, 2008.

18. "Residential self-selection and non-work travel: Evidence using new data and methods." Transportation Research Board Annual Meeting, at Washington, DC, January 14, 2008.

17. "Deconstructing development density: Quality, quantity and price effects on household non-work travel."  Transportation Research Board Annual Meeting, at Washington, DC, January 14, 2008.

16. "Transportation credit mortgages, spatial sorting, and housing supply: Who benefits?" Associated Collegiate Schools of Planning Annual Conference, at Milwaukee, Wisconsin, October 20, 2007.

15. "Concentrating at work: Reducing auto use via transit-oriented development at the workplace." Associated Collegiate Schools of Planning Annual Conference, at Fort Worth, Texas, November 12, 2006.

*Daniel G. Chatman, curriculum vitae*

14. "Location efficient mortgages and the land market: Who benefits?" Association of Public Policy Analysis and Management conference, at Madison, Wisconsin, November 4, 2006.

13. "For a few dollars less: Estimating the costs and benefits of Wal-Mart's entry into unionized grocery markets." With Randall Crane. Economic Impact Research Conference: An In-Depth Look at Wal-Mart and Society, at Washington, DC, November 4, 2005.

12. "Deconstructing development density in nonwork travel decisions." Associated Collegiate Schools of Planning Annual Conference, at Kansas City, Missouri, October 2005.

11. "TODs and travel: A study of two metropolitan areas in California." 10th Transportation Research Board Transportation Planning Applications Conference, at Portland, Oregon, April 2005.

10. "A household activity survey designed for land use and travel research." 10th Transportation Research Board Transportation Planning Applications Conference, at Portland, Oregon, April 2005.

9. "Deconstructing density's effect on walking: Nonwork travel as a function of activity, network load and built form density." Poster presentation at Active Living Research Annual Conference, at San Diego, California, February 2005.

8. "Elephant or bogeyman? Land use, non-commute travel and the role of residential self-selection." Associated Collegiate Schools of Planning Annual Conference, at Portland, Oregon, October 2004.

7. "Big boxes and fiscal payoffs." Urban Affairs Conference, at Washington DC, April 2004.

6. "The influence of workplace land use and commute mode choice on mileage traveled for personal commercial purposes." Transportation Research Board Annual Meeting, at Washington, DC, January 2003.

5. "Modeling the relationship between land use and travel behavior." Associated Collegiate Schools of Planning Annual Conference, at Baltimore, Maryland, November 2002.

4. "Evaluating smart growth: Governance elements." Associated Collegiate Schools of Planning Annual Conference, at Baltimore, Maryland, November 2002.

3. "Travel behavior and sprawl: Theory and estimation." With Randall Crane. Associated Collegiate Schools of Planning Annual Conference, at Baltimore, Maryland, November 2002.

2. "The influence of employment density and mix on personal trip making by workers." Association of Collegiate Schools of Planning Annual Conference, at Atlanta, Georgia, November 2000.

1. "The influence of workplace density and mix on personal trip making by workers in urban areas." Travel Behavior, Planning, Modeling and Policy: IGERT Graduate Student Research Conference, at Davis, California, April 2000.

## TEACHING

## U.C. Berkeley

*Daniel G. Chatman, curriculum vitae*

CP 114. Introduction to Urban and Regional Transportation Planning. Undergraduate elective course. Spring 2010, 40 students; Spring 2011, 50 students; Spring 2012, 65 students; Spring 2013, 66 students.

CP 213. Transportation and Land Use Planning. Required graduate course in transportation concentration for MCP students. Fall 2009, 40 students; Fall 2010, 27 students; Fall 2012, 35 students.

CP 204A Part II. Statistics for Planners. Course meeting MCP methods requirement. Fall 2009, 25 students; Fall 2010, 28 students; Fall 2012, 20 students.

Transportation and land use doctoral seminar, Fall 2010 (5 students).

**Rutgers University**

Transportation, Land Use and Urban Form (10:970:665). Graduate course in transportation concentration. Fall 2005, 16 students; Spring 2007, 20 students; Spring 2008, 5 students; Spring 2009, 21 students.

Methods of Planning Analysis II (10:970:516). Required course for MCRP students. Fall 2006, 11 students; Fall 2007, 22 students; Fall 2008, 21 students.

Principles of Urban Planning (10:970:306). Undergraduate elective course. Spring 2006, 11 students.

Senior Seminar in Policy and Planning (32:762:494). Required course for undergraduate seniors. Spring 2007, 12 students.

**ADVISING AND MENTORING**

*U.C. Berkeley—Dissertation committee*: Ian Carlton (Chair), Erick Guerra, Elisa Barbour, Andrea Broaddus, Wei-Shiuen Ng, Ilgin Guler (CE), Celeste Chavis (CE), Stacy Jackson (ERG). *Primary doctoral advisor:* Jesus Barajas, Lisa Rayle. *PhD exam committee*: Erick Guerra, Ian Carlton, Wei-Shiuen Ng, Andrea Broaddus, Elisa Barbour, Carrie Makarewicz, Eleni Christofa (CE), Ilgin Guler (CE), Celeste Chavis (CE). *Informal doctoral advising*: Yizhen Gu, Geoff Boeing, Fletcher Foti, Pille Metspalu. *Masters' thesis chair*: Matthew Braughton, Timothy Fok, Kathleen Sullivan, Kim Lucas, Carmen Oleksinksi, Taylor Reiss, Michael Rhodes, Teresa Tapia, Dan Tischler, Dana Weissman. *Masters' thesis inside member:* Monica Altmaier, Matthew Brill, Diego Canales, Connery Cepeda, Colin Dentel-Post, Brian Gould, Seung-Yen Hong, Paolo Ikezoe, Eddie Janowicz,Megan Kanagy, Jessica Kuo, Matt Schabas, Margot Spiller, Michelle Thong, Dan Tischler. *Independent study, field study:* Timothy Fok, Kim Lucas, Zakhary Mallett, Carmen Oleksinski, Taylor Reiss, Jonathan Rogers, Fernanda Roveri, Teresa Tapia.

*Rutgers University— PhD*: Nicholas Tulach (primary advisor, major field examiner), Nick Klein (primary advisor, dissertation committee), Bob Checcio (major field examiner), Bryan Grady (major field examiner), Michael Strange (dissertation committee, inside member), Anil Yazici (dissertation commitee, Civil Engineering), Cory Yemen, Jeremy Nemeth, Ralph Buehler, Richard Rabinowitz, Matt Cuddy, Stephan Schmidt. *Graduate professional reports*: Alex Barron, Jamey Dempster, Beth Gordon, Darlene Jay, Kyeongsu Kim, Susan Lutin, Harry Smith. *Undergraduate honors theses*: Mabel Smith Douglass, Dorothy Morallos, second reader; Sophonie Joseph, Honors Program. *Independent study*: Amit Arora, Elizabeth Thompson.

*Daniel G. Chatman, curriculum vitae*

**SERVICE**

**Community**

Expert Panel, Member, "Tools for California Smart-Growth Plans and Projects," California Department of Transportation (9/2010–12/2011)

Pedestrian and Bicycle Safety Task Force, Member, Borough of Highland Park, New Jersey (8/2005–6/2009)

Transportation Working Group, Member, Innovations Roundtable, City of Los Angeles (12/2005–10/2006)

**Institutional**

*U.C. Berkeley—University Level:* Chancellor's Advisory Committee on Dependent Care (2010-), Transportation Advisory Group (2010-), Reviewer, Richmond Bay Campus Long-Range Development Plan (2013).  *College of Environmental Design*: Future of Cities task force, Strategic Plan (December 2012-January 2013).  *Department of City and Regional Planning*: Co-Chair, Master's Program in City and Regional Planning (2011-12), Master's Program in City and Regional Planning Committee (2012-), Urban Studies Program Committee (2009-11), Doctoral Admissions Committee (2009-), MCRP Admissions Committee (2009-), Doctoral Program Committee (2010-11).

*Rutgers University*—Board member, University Transportation Research Center, Region II (2006-09).  *Edward J. Bloustein School of Planning and Public Policy*: Faculty Search Committee (2006-07, 2007-08), Representative to University-wide meetings on Software Site Licensing (2006-07), Ad-hoc Curriculum Committee, Public Policy Program (2005), PhD Admissions Committee (2005-09), MCRP Admissions Committee (2005-09), ITS Specialist Hiring Committee (2005).

**Academic**

**Professional Committees**

Member, Transportation Research Board, Task Force on Understanding New Directions for the National Household Travel Survey (2011–present).

Member, Conference Organizing Committee, World Symposium on Transport and Land Use Research, Delft (2013–present).

Member, Conference Organizing Committee, World Symposium on Transport and Land Use Research, Whistler, British Columbia, Canada (2010–2011).

National Research Council Committee, Member, "Using National Household Travel Survey Data for Transportation Decision Making" (2010–2011).

**Talk and Colloquium Organizing**

Organizer, talk and brown-bag lunch by John Pucher.  "Promoting cycling and walking for sustainable cities."  University of California, Berkeley, Department of City and Regional Planning. November 16, 2012.

*Daniel G. Chatman, curriculum vitae*

Organizer, talk by Bhargav Adhyaryu ,"Urban modeling for enhancing master plan making: SIMPLAN for Ahmedabad, India." Visiting Scholars Roundtable Series, Institute for Urban and Regional Development, June 8, 2012.

Organizer, colloquium, "Transit Investments and Economic Productivity: A Debate," with David Levinson, Daniel Graham, and Robert Helsley. Department of City and Regional Planning Colloquium Series, April 2, 2012.

Organizer, panel on "Transportation Pricing," at "Sustainable Mobility & Cities: Marrying Technology and Policy" conference, David Brower Center, Berkeley, February 24, 2012.

Moderator and organizer, "Creative Financial Tools and Techniques for Infill," 4th of 5 seminars in the "Infill Seminar Series" sponsored by the Center for Sustainable California and the Institute for Urban and Regional Development (April, 2011).

**Reviewing and Editorial**

Reviewer: [Prior to July 2008] *American Journal of Preventive Medicine, Journal of Geographical Systems, Journal of Planning Education and Research, Journal of Planning Literature, Journal of the American Planning Association, Transport Reviews, Transportation Research A, Urban Studies,* Transportation Northwest (UTC Region X) research proposals (2008), World Conference on Transportation Research (Berkeley, 2007).

[2008–09] *International Journal of Sustainable Transportation, Journal of Planning Education and Research, Journal of Planning Literature, Journal of the American Planning Association, Journal of Transport and Land Use, Transport Policy, Transport Reviews, Transportation Research A,* TRB Demographics and Transportation Symposium, TRB 4th National Conference on Women's Issues in Transportation, Transportation Northwest (UTC Region X) reports.

[2009–10] *International Journal of Public Administration, Journal of the American Planning Association, Journal of Planning Education and Research, Transport Policy, Urban Studies,* Social Sciences and Humanities Research Council of Canada, World Conference on Transportation Research (Spain, 2010).

[2010-11] *Journal of the American Planning Association, Journal of Planning Education and Research, Journal of Public Transportation, Journal of Transport and Land Use, Transport Policy, Transportation Science, Urban Studies,* Annual Meeting of the Transportation Research Board, UC Davis Sustainable Transportation Center, Routledge Publishing, Social Sciences and Humanities Research Council of Canada.

[2011-12] *Environment and Planning A, Housing Policy Debate, IEEE Technology and Society, Journal of Public Transportation, Journal of Transport Geography, Transport Policy, Urban Studies,* Oxford University Press, Annual Meeting of the Transportation Research Board, International Association of Travel Behavior Research, University of California Transportation Center.

[2012-13] *Housing Policy Debate, Journal of the American Planning Association, Journal of Planning Education and Research, Journal of Transport and Land Use, Transport Policy, Urban Geography, Urban Studies,* Annual Meeting of the Transportation Research Board, Intergovernmental Panel on Climate Change, National Science Foundation.

*Daniel G. Chatman, curriculum vitae*

Conference Discussant: Associated Collegiate Schools of Planning Conference, 10/2005, 10/2007, 7/2008, 10/2010; Society for American City and Regional Planning History Conference, 10/2009; North American Regional Science Council Conference, 10/2009; Using National Household Travel Survey Data for Transportation Decision Making, 6/2011; World Symposium on Transportation and Land Use Research, 7/2011.

Co-Editor, 8/2000-6/2004. *Critical Planning*, Department of Urban Planning, UCLA.

## AWARDS AND HONORS

Student of the Year, University of California Transportation Center, 12/2005
Outstanding Graduating Doctoral Student, Department of Urban Planning, UCLA, 6/2005
Departmental Fellowship, Department of Urban Planning, UCLA, 9/2004-6/2005
Major Field Examination Pass With Distinction, 6/2002
Eno Transportation Foundation Fellow, 5/2002
Dwight D. Eisenhower Graduate Fellow, U.S. Department of Transportation, 9/2000–8/2003
Chancellor's Fellow, University of California, Los Angeles, 9/1999–6/2004

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARC VEASEY, *et al.*,

        Plaintiffs,

    v.                                    Civil Action No. 2:13-cv-193 (NGR)

RICK PERRY, *et al.*,

        Defendants.

## REPLY REPORT OF DANIEL G. CHATMAN, Ph.D.

### Declaration of Dr. Daniel G. Chatman

1.  My name is Daniel G. Chatman. I am an Associate Professor of City and Regional Planning at the University of California, Berkeley. I previously submitted a report in this litigation on behalf of plaintiffs Texas State Conference of NAACP Branches (Texas NAACP) and the Mexican American Legislative Caucus of the Texas House of Representatives (MALC). That report addressed the travel burdens for citizens of voting age, who do not already hold an accepted photo ID, to travel to an officially designated location to apply for a photo identification card called an Election Identification Certificate (EIC).

2.  I have been asked by counsel for Texas NAACP and MALC to review the expert report submitted by Dr. Jeffrey Milyo, specifically the section of that report entitled "Costs of Obtaining ID" (pp. 24-26) insofar as that section relates to the report I previously submitted (no other portion of Dr. Milyo's report relates to my report). In that section of his report, Dr. Milyo does not perform any independent analysis of travel burdens associated with applying

2

for an EIC nor does he cite any academic studies of travel behavior or modes of

transportation. Instead, Dr. Milyo notes six questions or concerns with the analysis contained

in my prior report. In this Reply Report, I explain why those questions and concerns are

either erroneous or irrelevant.

3.   First, Dr. Milyo makes the following assertion (at p. 24 of his report):

> One cost of obtaining an EIC is the opportunity cost of travel time. Both Dr.
> Chatman and Dr. Webster analyze the travel time in minutes for different types of
> voters. However, Dr. Bazelon correctly notes that the opportunity costs of time
> vary by race and ethnicity, so this must be taken into consideration.

Implicit in Dr. Milyo's criticism is an assertion that travel time must be monetized (*i.e.*,

expressed in dollar terms) in order to compare the travel time experienced by different racial

and ethnic groups in Texas. My report, instead, compared travel-time burdens by race and

ethnicity by relying on estimates of the hours and minutes involved in conducting a round

trip from a citizen's home to a location where citizens may apply for an EIC.

4.   It is well accepted within the fields of urban planning and transportation studies that the

effort involved in individuals traveling from one location to another by automobile, public

transportation, or walking may be measured by examining the time or distance associated

with such trips, with a preference for using time because it accounts for differential speeds of

different mode choices.[1]

---

[1] See, for example, Susan Handy & Deb Niemeier (1997) Measuring accessibility: an exploration of
issues and alternatives, *Environment and Planning A* 29: 1175-1194; Paul Ong & Evelyn Blumenberg
(1998) Job access, commute and travel burden among welfare recipients, *Urban Studies* 35: 77-93;
Harvey J. Miller (1999) Measuring space-time accessibility benefits within transportation networks: Basic
theory and computational procedures, *Geographical Analysis* (31) 1: 1–26; Andrew Lovett, Robin
Haynes, Gisela Sünnenberg, & Susan Gale (2002) Car travel time and accessibility by bus to general
practitioner services: a study using patient registers and GIS, *Social Science & Medicine* 55 (1): 97-
111;and Karst T. Geurs & Bert van Wee (2004) Accessibility evaluation of land-use and transport
strategies: review and research directions, *Journal of Transport Geography* 12 (2) 127-140.

5.   The most direct and obvious unit of analysis in understanding travel time is simply the number of hours involved in undertaking a particular round trip; since that unit of analysis may be used for all racial and ethnic groups, it also serves as an appropriate comparator. Travel burdens, in turn, may be defined – as done in my report – by setting reasonable time thresholds for round trips beyond which the travel presents a burden to the traveler (variously set in my report as a 90-minute plus, two-hour plus, or three-hour plus round-trip).

6.   Travel time does not have to be monetized in order to estimate or compare the travel-time burdens associated with applying for an EIC. Monetizing time is simply a convenience sometimes used in order to compare time in the same unit of measurement as other benefits or costs being studied, such as financial expenses. For example, monetizing time may be done in order to evaluate public investment decisions, such as whether to build a road, where the analysis compares the cost of constructing and maintaining the new road to the monetized value of the expected travel-time savings. Monetizing travel time also may be useful where the researcher is examining both the direct money costs and the time costs of travel, and also where the researcher wants to analyze these costs from the perspective of the relative incomes of the travelers (as was done in the report submitted in this litigation by Dr. Bazelon).

7.   Dr. Milyo suggests that the opportunity costs of travel time may vary by race and ethnicity to the extent that income in Texas varies by race and ethnicity, but this position is simplistic, because it equates opportunity costs with income. Higher income makes travel easier, because the relative share of one's income devoted to travel costs (*e.g.*, car purchases, gasoline, and car repair) is generally smaller for higher income individuals and because more income enables one to purchase goods with money to offset the loss of discretionary time in

the day in which the travel occurs (such as paying for extra day care for children, prepared

meals, laundry service, or taxi travel). Thus, the real costs of travel time are likely to be

greater, not lower, for poorer people, and Blacks and Hispanics in Texas are substantially

poorer than the non-Hispanic White population. Dr. Milyo apparently prefers to monetize

time based on average wage rates. If this is done without reference to the total income of

individuals, it places a greater value on the time of higher-income people (*i.e.*, the non-

Hispanic White population in Texas) as compared to lower-income people (*i.e.*, Blacks and

Hispanics in Texas). This is an incorrect characterization of opportunity costs.

8. Second, Dr. Milyo asserts that individuals sometimes combine multiple trip purposes, or "trip

chain," when traveling to run errands, go to work, or carry out other out-of-home activities,

and that the asserted availability of trip chaining may reduce the travel burdens associated

with obtaining an EIC. Dr. Milyo bases this analysis on his assessment of what "rational"

people do. Dr. Milyo states (at page 25 of his report):

> Experts for the plaintiff adopt methodologies that exaggerate the travel costs of
> obtaining IDs. In every instance, these estimates are founded on the assumption
> that an individual makes a dedicated trip solely for the purpose of obtaining an
> EIC. This is ridiculous. If a rational person desires to travel to multiple
> destinations (e.g. the bank, the grocery store and the post office), then they
> endeavor to minimize travel time by combining activities into as few tips as
> possible. In general, the costs of travel can be cut dramatically by combining the
> errand of obtaining an EIC with another activity. In other words, experts for the
> plaintiff do not estimate the relevant marginal costs of obtaining an EIC.

9. There are three significant problems with Dr. Milyo's postulate.

    a.      First, trip chaining is substantially harder for individuals who are not traveling by

car but, instead, by public transportation or walking. For example, a one-mile detour to pick

up a carton of milk will frequently be quite simple if one is driving, but is significantly more

difficult otherwise. Someone traveling on public transportation obviously cannot re-direct a

bus or a rail car, and thus would either need to take a two-mile round trip by foot, or transfer to a different bus, if there is one that goes to the desired location. A detour by foot also can be quite difficult depending (among other things) upon the distance, the available time, weather conditions, and the physical ability of the individual. Moreover, as set forth in my prior report, it is almost entirely those individuals who would travel by public transportation or by walking to an EIC location who would experience a travel burden. Thus, it is unlikely that trip chaining will produce any notable reduction in the burdens experienced by those traveling to an EIC location.

b.      Second, trip chaining is typically used to combine multiple short trips, and thus individuals who would need to take long round trips to apply for an EIC, *i.e.*, a trip that exceeds the burden thresholds identified in my prior report, are less likely to be helped by trip chaining. For example, a short trip within one's neighborhood may involve all the locations set forth by Dr. Milyo as examples of trip chaining ("the bank, the grocery store and the post office"), but by definition the burdensome, long trips identified in my prior analysis do not involve travel within individuals' neighborhoods.

c.      Third, trip chaining is less likely to make sense for those with lower incomes because these individuals are less likely to be engaging in potentially compatible trip activities (such as purchases or entertainment) in the first place.

d.      Trip chaining, in short, is very unlikely to relieve the most significant travel burdens associated with obtaining an EIC, *i.e.*., those trips whose travel times are 45 minutes or longer each way.

9.  Third, Dr. Milyo suggests that it may be possible for some individuals who live in a household without a car to be driven to an EIC location by someone who lives in another

6

household who does have a car. This again is based on his assessment of what "rational"

people do. He states (at page 25 of his report):

> Experts for the plaintiffs also fail to consider how the potential costs of obtaining identification may be ameliorated by the actions of neighbors, friends, relatives, co-workers, political groups, and religious or civic organizations. For example, an individual may travel with a friend or relative who also desires to obtain an EIC or has some nearby errand to run. This not only reduces total travel costs, but may yield benefits from time spent together. Alternatively, a civic or political group may organize rides or otherwise facilitate the task of obtaining ID. Individuals desiring assistance in obtaining an EIC are presumably capable of seeking and finding some assistance. Instead, experts for the plaintiff base their estimates of travel costs on the assumption that individuals are isolated, hapless and irrational.

10. However, as Dr. Milyo himself at least implicitly recognizes, getting assistance from others

in the form of a car ride to an EIC location is an unpredictable mechanism and is not costless

(he notes that assistance "may" be obtained from someone outside the household but does not

indicate whether this is likely or not). While it no doubt is true that some citizens without

access to a vehicle in their household will manage to get a car ride to an EIC location, this

also will involve a degree of cost, such as obtaining a favor from an individual who also may

have limited available time, and searching for an individual who is willing to assist and also

is available at the times that the voter is available.

11. Moreover, even if trip chaining and obtaining assistance from an individual with a car would

decrease (to some extent) the overall number of individuals who will be burdened in

traveling to and from an EIC location, there is no reason to believe that these phenomena

would decrease the *relative* travel-time burden borne by Blacks and Hispanics compared to

non-Hispanic Whites. Indeed, nowhere in his report does Dr. Milyo contend that either of

these phenomena would disproportionately benefit Blacks and Hispanics who lack a photo

ID.

12. Fourth, Dr. Milyo hypothesizes that travel-time burdens associated with obtaining an EIC should be amortized over time. He states (at page 25 of his report):

> An EIC is also valid for 6 years and can be renewed. This means that the costs of obtaining an EIC should be apportioned in some manner over this time. One way of doing so would be divide the costs by the number of elections that a voter will be able to participate in during this 6 year period (perhaps discounting future benefits). Alternatively, the costs of obtaining ID may be apportioned over the number of races and ballot questions that the voter is now able to participate in over a 6 year period. In either case, the net cost of obtaining ID per-election or per-contest will be dramatically lower than the one-time fixed cost examined by experts for the plaintiff.

13. The scientific literature on travel behavior and travel-choice modeling is voluminous and long-standing. The proposition that people plan their travel by car, public transportation, and/or walking by amortizing travel costs over time does not appear in this literature, and thus is not supported by it. Time spent in travel is perishable, and day-to-day time scarcity is a significant determinant of how individuals use or do not use their time for travel on a daily basis. Thus, there is no basis to speculate that individuals eligible to vote, who lack the acceptable photo ID, will, when confronted with a burdensome round trip to an EIC location, divide the time involved in making that trip by a certain number of years or elections when deciding what to do. For example, a trip that takes two hours to and from an EIC location will still take two hours regardless of any thoughts about amortization, and there are consequences that flow from that (such as taking time away from obligations such as work and dependent care, or from other activities less onerous than traveling on foot and/or in a bus for an hour each way to and from an EIC location). In addition, there is no evidence that individuals view travel time in the same way that they may view an investment in durable goods (such as a refrigerator or television), where a theory of behavior based on amortization may have some value.

14. Fifth, Dr. Milyo complains that my report does "not provide any sense of when [the] costs [of obtaining an EIC] are 'too high.'" (See page 26 of his report.) However, this either mistakes the content of my report or misses its point, since that report first clearly identifies the round trip travel times that constitute a burden on individuals, and then performs a comparative analysis of burdens by race and ethnicity.

15. Lastly, Dr. Milyo apparently asks that a moral or ethical judgment be made about individuals who lack a photo ID (at page 26 of his report). This is beyond the scope of my report but, in any event, does not contradict my conclusion that Black and Hispanic citizens face travel burdens that are significantly greater than the travel burdens faced by non-Hispanic Whites in obtaining an EIC.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge. This declaration was executed on August 8, 2014 in Berkeley, California.

Daniel G. Chatman, Ph.D.