UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MARC VEASEY, *et al.,* | |
| Plaintiffs, | |
| v. | Civil Action No. 2:13-cv-193 (NGR) |
| RICK PERRY, *et al.,* | |
| Defendants | |
| UNITED STATES OF AMERICA | |
| Plaintiff, | |
| TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, *et al.,* | |
| Plaintiff-Intervenors, | |
| TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS,  *et al.,* | Civil Action No. 2:13-cv-263 (NGR) |
| Plaintiff-Intervenors, | |
| v. | |
| STATE OF TEXAS,  *et al.,* | |
| Defendants, | |
| TRUE THE VOTE | |
| Movant-Intervenor. | |

## DECLARATION OF T. RANSOM CORNISH

Pursuant to 28 U.S.C. §1746, I, T. Ransom Cornish, J.D, C.P.A, declare that:

My name is T. Ransom Cornish.  I am an expert witness designated by Plaintiffs in the above referenced case now pending in the United States District Court for the Southern District of Texas – Corpus Christi Division.

I hold a B.B.A. in Accounting from the University of Houston and a Doctor of Jurisprudence from the University of Houston.  I became a Certified Public Accountant in 1979.  A true and correct copy of my resume is attached hereto as Exhibit "B" as a part of my report.  Attached hereto as Exhibit "C" is a listing of those cases in which I have been designated as an expert.  The following report, a true and correct copy of which is attached as Exhibit "A" and incorporated herein for all purposes, is a general review of evidence relevant to this case and my opinions and conclusions.

I declare under penalty of perjury that the foregoing is true and correct.

This the 26TH day of June 2014.

T. Ransom Cornish, J.D., C.P.A.

## EXHIBIT "A"

## REPORT OF T. RANSOM CORNISH

I hold a B.B.A. in Accounting from the University of Houston and a Doctor of Jurisprudence from the University of Houston. I became a Certified Public Accountant in 1979. A true and correct copy of my resume, which describes my qualifications, is attached hereto as Exhibit "B" and incorporated herein for all purposes.

I have authored no publications within the last ten (10) years.

My compensation for study and testimony in this case is $225.00 per hour plus reimbursement of expenses. I have received a retainer in the amount of $15,000.00 for my services. To date I have spent 58.25 hours on this case. This report contains my opinions, the basis and reasons for them, the facts and data considered by me and exhibits used to summarize or support my opinions. I reserve the right to review additional information, exhibits, depositions or documents as they become available.

I have been designated as an expert witness in other cases. A list of such cases is attached hereto as Exhibit C. I have noted the cases where I have given my deposition.

The data and other information considered by me in forming my opinions are as follows:

(1)     Pleadings of the parties;

(2)     Information received from the following Texas counties:  Collin, El Paso, Lubbock, Nueces, Hidalgo, Montgomery, Brazoria, Jefferson, Galveston, Baxer, Fort Bend, Travis, Harris, Tarrant, Denton, and Dallas.

(3)     Deposition testimony of Keith Ingram.

(4)     Deposition testimony of Joe Peters.

(5)     TEX_00007419 – 00007429.

(6)     PDF copies of provisional ballots received from Collin County.

(7)     PDF copies of provisional ballots received from Harris County.

(8)     Information available from Georgia Secretary of State.

(9)     Article "Lessons from the Voter ID Experience in Georgia" By Hans A. von
        Spakovshy.

(10)    J. Grious discovery responses provided by the State of Texas.

(11)    State of Texas issued Request for Proposal Number 12111 TEX_00312556 –
        00312559.

(12)    Burson-Marsteller (B-M) submission in response RFP 12111.

(13)    Burson-Marsteller 2012 General Election Wrap Up Report.

(14)    State of Texas Fiscal Note of May 11, 2011.

(15)    Senate hearing testimony of Ms. Ann McGeehan.

(16)    Proposed Activity Plan of B-M Schedule D


Although others directed my attention to particular evidence in some instances, I have made my own judgment about the significance of any particular evidence that I have reviewed and I have confirmed information that I relied upon in records or depositions.  I understand discovery is ongoing. There are also deposition transcripts which are not yet available to me.  I reserve the right to amend, expand, adjust or withdraw any of my opinions herein upon review of new documents, depositions or information.

It should be noted that often times the information provided by the state, through depositions and discovery, was sparse and sometimes contradictory.

I have attached hereto some of the documentation I reviewed that assisted me in forming the conclusion and opinions contained herein;

(1)     TKO review and scope of work related to Fall 2013 Voter Education Campaign based on emergency requisition.

(2)     Documents which indicate the cost of the mobile EIC units and their weekly operating costs

(3)     Deposition testimony of Keith Ingram dated April 23, 2014, selected pages

(4)     Information related to cost of cameras in the State of South Carolina.

(5)     E-mails relating to the efforts taken by the State of Texas to provide answers to Bloomberg News inquire relating to issuance of EIC's by DPS.

(6)     DPS Government Relations Action Sheet dated July 17, 2013.

(7)     Documentation related to State of Georgia and that State's implementation of voter education.

(8)     Invoices of TKO related to Fall 2013 Voter Education Campaign.

(9)     Initial request for proposal issued by State of Texas for 2012 Voter Education Campaign for $3,000,000.

(10)    E-mail from Robert Bodisch to MacGregor Stephenson and replies.

(11)    State of Georgia Secretary of State Brian P. Kemp's power point presentation.

(12)    State of Texas Fiscal Note related to SB14.

(13)    Analysis made by Keith Ingram of the 2013 and 2014 Voter Education Campaigns and a synopsis of the planed 2014 Phase II Campaign.

(14)    Recap of the Media/Public Outreach program of the DPS related to the issuance of EIC from August 2012 to May of 2014.

(15)    Transcript of the Proceedings before the Senate of the State of Texas 82 legislature January 25, 2011.  Testimony of Ann McGeehan, Director of Elections, Secretary of State. Selected Pages.

I was retained to review and analyze issues related to the number of provisional ballots cast in the State of Texas and the various fiscal considerations related to the moneys promised, budgeted allocated and/or spent on outreach education and implementation of the new voter photo ID law by the State of Texas. Because the State of Texas did not collect statewide data on provisional ballots, and because I was only able to obtain data for a small number of counties, I present only limited findings on the provisional ballot issues.  The bulk of this report therefore focuses on the second issue: the comparison between the money promised/budgeted and the money actually spent.

In addition to the analysis and conclusions described below, I intend to describe in my testimony at trial, the various events and monetary transactions of which I am aware.  The source for these events and transactions are the document production, depositions and publicly available documents and information.

### Summary of My Analysis and Conclusion

Overall it is my opinion that the State of Texas has failed to effectively budget, allocate and spend sufficient money for voter education outreach and registration. Furthermore, it is clear that the state did not spend all of the money it promised to allocate

and it is further my opinion that the state did not work effectively with the counties to assist them in educational outreach and registration issues.

The State of Texas failed to perform any meaningful analysis of the effect of the little amount of spending which has done to educate voters regarding the need for a proper photo ID. It appears that the resources which the State had were spent on ferreting the Secretary of State across Texas to events which had dubious results. The State did not perform any analysis of the results of the significant amount of money wasted in 2012. In addition, no information was noted which detailed the actual number of provisional ballots, not was there a determination as to why such ballots occurred.

Even though the State of Texas had in excess of $46 million of HAVA fund to use after initial capital costs, no amounts of such funds have been spent on voter education after the State began the Photo ID requirement.

## II. Education and Outreach from 2011 to the Present

In SB 14, the legislature explicitly mandated that the Secretary of State conduct a statewide education campaign on voter ID. Specifically, the statute provided that "The secretary of state shall conduct a statewide effort to educate voters regarding the identification requirements for voting prescribed by Chapter 63." Several other requirements, such as the posting of notices about voter ID requirements on county websites, were also included in the bill. The legislative documents and transcripts suggest that the legislature understood that at least $2 million would be spent on voter education related to photo ID, but the post-enactment implementation shows that far less has actually been spent."

A. The Funding Promised for Voter Education and Outreach

When the legislature considered SB 14 in 2011, the estimated Two-Year Net Impact to the general revenue related funds was set at $2,024,000. Prior to passing the legislation, Ann McGeehan, Director of Elections in the Texas Secretary of State's Office, provided testimony regarding several aspects of funding for SB14. The first issue which Ms. McGeehan gave testimony regarding was related to historical funding of voter education programs. She stated that in each of the three prior election cycles, the State of Texas had used approximately $3,000,000 in each election for "voter education programs, one in 2006, one in 2008, and one in 2010" all using HAVA Federal funds. (Transcript of the Proceedings before the Senate of the State of Texas 82 legislature January 25, 2011 Page 436, 437)

Next Ms. McGeehan testified about the amount of HAVA Federal funds which the State had been allocated and the use of those funds. The State of Texas was allocated $224,092,477 pursuant to the Help America Vote Act which was passed in 2002. Ms. McGeehan indicated that, as of the date of the hearing, the State of Texas had spent approximately $177,798,448 of the allocation. As such, the State still had $46,294,029 HAVA funds remaining. Ms. McGeehan testified that, of the $177,798,488, the State of Texas had spent $9,500,000 on voter education, or about 5.3% of the total between 2006 and 2010.

Ms. McGeehan further testified that, of the $46 million that remained available to the State, about $24 million was to be used for grants to counties for additional voting

equipment. That of the remaining funds, about $5 to $7 million would go for voter education, election official training, and poll worker training.

Ms McGeehan clearly indicated that if the $2 million voter education program (reflected in the Fiscal Note attached to SB14) was added to a planned fourth $3 million historical (each election cycle) voter education program (HAVA) then "you've got a $5 Million program." Transcript of the Proceedings before the Senate of the State of Texas 82 legislature January 25, 2011 Page 448)  Ms. McGeehan expressed concern that if the State actually used $5 million and not the normal $3 million to do a general voter education plan (HAVA) and also spent the $2 million that the State allocated then "that might use it up."

Surprisingly Ms McGeehan stated that the State had never appropriated state funds to educate voters.  What is of note is that according to the testimony of Keith Ingram, HAVA funds could not be used for education specifically related to photo ID issues but was required to be used for general voter education.

The Secretary of State representative stated in her testimony that the determination of the $2 million fiscal note on the bill was not the result of any analysis or investigation as to the actual need for voter education but was more of a result of the number being consistent with the fiscal note used in the previous legislative session of $2 million.

B.  The 2012 Voter Education Campaign

After passage of SB14 in 2011, the State of Texas issued Request for Proposal (RFP) Number 12111 in anticipation of the State's implementation of SB14, including the voter education program called for in the statute. The purpose of the RFP was to educate and train Texans on the voting and election process in Texas. The RFP indicated that the education

campaign should focus but not be limited on four areas: (1) how to register to vote; (2) how to comply with the photo identification requirements; (3) how polling place processes work; and (4) how to properly cast a ballot. The term of the contract was from January 4, 2012 (project start date) to January 31, 2013.  The information provided relating to this RFP indicated that the winning bidder was Burson-Marsteller (B-M) with a total contract price of $3,000,000 maximum.

There were various specific requirements the RFP contained relating to proposal format.  One specific requirement was section 3.4, was that a Proposed Activity Plan which was to be attached to any proposal as an Attachment D.  Such was to contain a timeline of the major tasks to be performed by the proposer was to indicate the proposed tasks and activities envisioned by the proposer.   As such, B-M provided attachment D(attached as Exhibit 16) to their proposal, which in part allocated the estimated $3 million budget among various events tasks and activities.  The proposal did not allocate specific dollar amounts to voter education regarding the photo ID requirements.

A review of the 2012 General Election Wrap Up Report provides detail for the activities promoted by B-M from January of 2012 through November of 2012. The events, activities and media placement all were related to the general election which occurred in November 2012.  None of the information provided by B-M indicated that Voter Photo ID information was included in their advertising campaign.  Of the 3 million dollars spent, no amount was used to provide education or voter awareness regarding the specific requirement of a photo ID.  This was necessary because the State of Texas, after passing SB 14 in 2011, was required under the Voting Rights Act to submit election changes for approval to the

Department of Justice or a three judge court for the U.S. District Court of D.C. Texas initially sought preclearance for SB 14 from the Department of Justice but, before the Department reached a final decision, Texas sought preclearance from the district court. That case was filed in January 2012 and did not conclude until August 30, 2012. That court ultimately denied preclearance (as did the Department of Justice in March 2012) so the law did not go into effect. This appears to be why voter ID was not included in the 2012 education campaign.

C.  The State's Actual Voter Education Campaigns

The actual education campaign related to photo ID was divided into three separate campaign phases.

i.       The Fall 2013 Campaign

The first piece of the state's education campaign on photo ID was the Fall 2013 Voter Education Campaign, which budgeted $400,000 (all non-HAVA money, See Exhibit 13-3). The efforts of that campaign are detailed on a summary that was prepared by Keith Ingram. TEX0524736.  That program began in September of 2013 and was funded pursuant to an emergency contract with TKO advertising.  Testimony given by Keith Ingram, the Director of Elections, was that this campaign was focused on photo ID issues and that all such funds were used for education related to the photo ID requirements.  This was the only paid advertising performed before the November 2013 election. Pursuant to TEX00306416 the Secretary of State prepared an analysis of the fall 2013 voter education campaign.  It appears that the initial adverting began on September 23, 2013.  However there were several elections starting in August of 2013.  None of the Fall 2013 Education Campaign did not occur in time

to educate those voters who voted in those smaller elections. This is confirmed by the billings which were submitted by TKO, the contractor hired on an emergency basis to head up the campaign. The first invoice tendered by TKO which indicated any media were for the weeks of 9/16, 9/23, and 9/30 of 2013.

An analysis of the advertising strategy utilized by the State indicated that a significant effort was made to obtain earned media. This strategy was a part of the B-M contract which was discussed earlier. Such efforts during the Fall 2013 Campaign were supposed to result in awareness of the photo ID issue. Earned media was expected after issuing various press releases and after sending letters to elected officials requesting that they issue such statements at the local level. However, there was very little follow-up to see if these earned media strategies worked (i.e. whether any elected officials sent out the press releases, whether newspapers printed the information, whether these methods were effective.

Counties

ii.     The Primary 2014 Campaign

The second piece of the state's campaign was the 2014 Voter Education Campaign Phase 1 – which included about $400,000 (HAVA funds). The efforts of that campaign are detailed on a summary that was prepared by Keith Ingram TEX0524659. Testimony given by Keith Ingram was that such funds were not specifically used on photo ID issues but that all of the advertising mentioned photo ID. No information has been provided to indicate the allocation between the various segments.

iii     The General 2014 Campaign

The third education program is the 2014 Voter Education Campaign Phase II. The testimony of Keith Ingram was that $1.675 million of the SB 14 fiscal note was allocated in a second contract with Burson Marsteller (B-M). A review and analysis of the production by the State of Texas contains no document which indicates that a contract has actually been signed nor has any invoice of Burson Marsteller been noted. (Deposition of Keith Ingram page 345, 346) The difference between the asserted $1.675 million dollar contract and the 2011 Fiscal Note for over 2 million dollars of spending, or about $400,000, has been held back for the Mobile EIC units according to Keith Ingram.

Given that none of the 3 million dollars in the 2012 campaign could be used for voter education of the requirements of presenting a photo ID, the State has spent or will shortly spend less than $800,000 on voter education. Of this amount, only the phase I $400,000 (non-HAVA) which was spent between September 2013 and November 2013 was used specifically for photo ID education, as opposed to general voter education that includes information on topics such as how to register to vote and how to locate polling places. The remaining $400,000 is budgeted to be spent in 2014, however no information was noted as the amount actually spent as of the date of this report.

No information was produced which detailed the actual allocation of such spending between photo ID education and general voter advertising. In fact, testimony was that the remaining $300,000 to $400,000 was reserved for use on the mobile EIC unit program. However no information was provided which disclosed where the approximately $400,000

for the mobile EIC units comes from.  It appears that such funds have already been spent on the Phase I Primary Campaign.

D.  The Effectiveness of the State's Education Campaign

It appears that the State has made no effort during the elections since June 2013 to gather specific information regarding the effectiveness of any advertising campaign that was performed even though the original fiscal note for SB 14 indicated that $500,000 would be used to "research and develop ways to inform the public of the new identification requirements"  The B-M 2012 General Election Wrap-Up Report contained no evaluation as the effectiveness of any of the various advertising strategies but only detailed the number and timing of such.

This is also so, even though the 2012 RFP reflected an intention to conduct surveys and other research methods to assess the effectiveness of certain messages and the actual campaign.  For instance, the B-M proposed activity plan in 2012 contained in its second section the required "Opinion Research and Awareness Tracking" portion of the plan.  Such is best evaluated by noting herein the specific recommendation of B-M.  Their plan stated;

> "Initially, we propose to use Penn, Schoen Berland's Program Impact method to track awareness and impact of our efforts at several points; benchmark wave prior to Phase I, mid-wave at the conclusion of Phase I and post-wave at the conclusion of Phase II.  The tracking polls will be designed to measure KPI's for the program and to specifically track awareness, perceptions of and receptivity toward the new voter ID law throughout the course of the program.  This will help us to understand whether the program is having the desired impact, and to inform course corrections to our efforts as necessary."

The B-M proposal indicated that 500 respondents from across the state were to be polled.  A review of the B-M 2012 General Election Wrap-Up Report did not indicate that the tracking polls were performed, nor did it indicate why such polls were not performed. The amounts which have been spent on advertising by the State of Texas were not entirely focused on issues surrounding photo ID requirement.  The majority of the funds spent have been Federal HAVA funds, which limits the ability to focus the adverting on photo ID.  The state's fiscal note indicated that $2 million would be used on *photo* ID education, but instead, only $400,000 has been spent on photo ID education and none has been spent on general voter education.

E.  Comparisons to Other States

Texas has spent substantially less money than other states on education about photo ID.  In Minnesota, for example, the state has spent and/or budgeted $4,805,000 for the years 2012-2015. (Minnesota Management and Budget, "Consolidated Fiscal Note – 2011-12 Session," Bill#S0509-4E) The state has a registered voter population of about 3,900,000 (**http://www.sos.state.mn.us/Modules/ShowDocument.aspx?documentid=9232**). Therefore, the state spent $1.23 per registered voter or $.31 per voter per year.  Texas, by comparison, has spent approximately $800,000 on voter education in the first year of implementation (June 2013-June 2014).  The state has about 16,000,000 registered voters. Texas has therefore spent a mere $.05 per registered voter.

Georgia's initial voter education campaign took place from September 2007 to November 2008.  Georgia conducted a statewide, multimedia education campaign that

included sending out over 5 million pieces of direct mail and utility bill inserts to individual voters, as well as 633 packages of 57,000 brochures and other materials to chambers of commerce, churches, libraries, and other nongovernment organizations all over the state. This also included automated reminder phone calls, video and radio public service announcements and press releases.

### III. Efforts to Ensure Voters Have the Necessary ID

Of the seven approved forms of photo ID, four are issued by the Texas Department of Public Safety (DPS): Texas driver's licenses, Texas personal ID cards, Texas concealed handgun licenses, and the Election Identification Certificate (EIC). Of the 254 counties in Texas, DPS does not operate driver's license offices in 78. This appears to be largely the result of significant closures since 2008.[1] Even within counties that have DPS driver's license offices, those offices may be far from population centers and difficult to reach via public transportation.

To assist voters that may not have an acceptable form of identification, the State devised a scheme to construct mobile EIC units which could be ferried around the State to visit rural counties which did not have a DPS office and to Zip codes which had a perceived need due to large numbers of voters who could not be matched to DPS ID records.

In June or July 2013, the State began the planning and implementation of a mobile EIC program. It appears the plan began operations in mid-September. As late as March 19, 2014, there were 18 counties that did not have permanent EIC capability. Such lack of

---

[1] In an answer to a Bloomberg News inquiry regarding DPS offices, the State of Texas noted that since 2008 a total of 86 offices, mostly part-time, low volume offices have closed.

interest appears to be related to the unwillingness to fund the cost of establishing and maintaining the capability. TEX0525002.

Of significance is the comparison between the State of Texas and the State of Georgia. During the nine month period between June 26, 2013 and March 19, 2014 the State of Texas had only issued 245 Election Identification Certificates. TEX 0525002. In comparison, the State of Georgia issued 6,411 Voter Identification Cards during 2006 and 2007. (Exhibit 7-3) Assuming that this represented a full 24 months, such indicates that the state was issuing 267 certificates per month. The State of Texas is issuing certificates at an approximate rate of 30 per month.

Initially, 25 mobile EIC units were established for the Secretary of State's Office to use. These units were owned and operated, in conjunction with the Department of Public Safety, by the Secretary of State's Office. The testimony of Keith Ingram indicated that the limitation of EIC units had more to do with the lack of being able to man them with DPS employees than the ability to fund additional units. (Ingram Deposition at 66) In addition, the testimony of Joe Peters, DPS assistant director for driver's license, indicated that in addition to the 25 Secretary of State units, the DPS also had several units but could not recall the total number.

Though specific information was not provided which clearly indicated the cost of the mobile EIC units, information showed that each unit cost approximately $4,100.00 in equipment costs. As such, Texas spent approximately $103,000.00 in equipment costs alone on Secretary of State EIC units. Joe Peters testified that the total cost to operate the mobile EIC units during Phase I was $845,000.00. (Peters Deposition @ 170) This amount includes

both the cost of equipment and personnel. This represents about $33,800 per unit. This cost was paid for by the DPS.

Under Phase III of the mobile EIC program, counties are being enlisted to process applications for EICs. To do so, the counties must sign a contract with the DPS. The counties then receive training to process EIC applications and receive equipment to do so. It appears that such units are able to move around the county to locations determined by local officials. (Peters Deposition @ 171)

The mere operation of a Phase III programs raises the question as to why the State of Texas did not just equip each county with a mobile EIC unit. The program demonstrates that local county employees or even local election offices are clearly capable of performing the duties to properly issue EICs. Having an EIC unit in each county could provide coverage for those counties which do not have a driver's license office, provide an opportunity for local management and evaluation of the issuance of EICs, and give local election officials the ability to meet needs on a timely basis. This would also alleviate the costs associated with taking the mobile devices from county to county and requiring DPS workers to travel from location to location. All of these costs have not been detailed.

Given a cost of $4,100 per unit, the State of Texas could have provided a mobile unit to each of the 254 counties for a total of approximately $1,000.000. The county officials, who already have staff, could process EICs at nominal additional cost. It is worth noting that DPS estimated that Phase I alone cost in excess of $800,000.

Other states have taken the relatively low-cost approach of giving equipment to local county offices to issue their free voter photo ID cards. Georgia, for instance, enacted a photo

ID law in 2006 (Senate Bill 84), which required voters to present one of six forms of identifications when voting in person.  In contrast to Texas, Georgia purchased machines to issue free identification cards at all 159 Georgia election offices.  The cost to purchase and maintain the machines at Georgia's local election offices has been just over $770,000, or less than $5,000 per office. (TX 00007429)

South Carolina followed a similar approach.  The state placed two cameras in each of their 46 county offices. (Exhibit 4-2) The local South Carolina Election Commission employees, who work at the county offices, can then take and send digital photos to the SEC.  The SEC can then use one of their two printers to process the voter photo ID.  The total cost to purchase the cameras and the two printers was $20,471 used by the State of South Carolina of voter photo ID. (Exhibit 4-2)

It is also worth noting that local county offices may be more effective at ensuring that registered voters obtain the necessary IDs to vote.  In Georgia, for example, those offices appear to be responsible for the large number of voter IDs that have been issued.  Between the passage of the bill in 2006 and January 2013, Georgia issued in excess of 25,000 Voter Identification Cards (analogous to Texas's EICs).  Local county election offices issued 24,064 of these (2005 through January 13, 2011), while the Georgia Department of Driver Service Centers issued only 1,052 during the same period. (TX00007421) In other words, , Georgia's county election offices had issued 96% of the free ID cards, while the Department of Driver Services had issued only 4% of the free ID cards.

The State of Texas has spent in excess of a million dollars on its complicated mobile EIC program.

It is also interesting to note that DPS was required to play the primary role in the issuance of EICs, even though the agency was not provided any additional funds.  DPS therefore had to pay for equipment to establish mobile EIC units, allocate staff to run mobile EIC stations, pay for staff to travel across the state, and extend hours at various locations to include Saturdays.  These program costs were significant.  DPS estimated, for instance, that the weekly cost to run a Saturday EIC program was in excess of $37,000. (Exhibit 2-3)

## IV. Provisional Ballots

As mentioned previously, I was asked to analyze the number of provisional ballots cast as a result of an ID issue. Seventeen of the larger Texas counties were initially contacted about information related to provisional ballots cast in four elections: the general elections of 2010, 2012 and 2013 and the primary election of March 2014.

The analysis originally anticipated was not ultimately possible, however, due to a lack of data.  Of the counties that were canvassed, only two provided information as to the number of provisional ballots cast on their web-site.  Only three other counties were able to provide scanned PDF copies of each provisional ballot affidavit for the 2013 and 2014 elections.  The remaining counties did not or were not able to provide complete data.  Two counties, for example, failed to respond to a written request for information relating to provisional ballots.  One county did not maintain the provisional ballot affidavits and did not

have access to any provisional ballots except for the March primaries. Several other counties were unable to provide complete data because of Texas Election Code Section 66.058.[2]

These counties indicated that information contained on the provisional ballot affidavits were placed with the custodian and could not be retrieved during the preservation period absent a Court Order.

Of significant note is the total lack of consistency between the counties as to whether or not specific information is available, the type of information available and the general policies followed by each county. For example, none of the counties contacted had maintained any statistical information related to the number of provisional ballots required due to either lack of proper photo ID or substantially similar name issues. Such statistical information related to the casting of provisional ballots would surely be relevant to assessing the implementation of SB 14. In fact, the State of Texas produced documents (TEX_00007419 – 00007429), which show that the State of Georgia was able to gather information which specifically tracked the number of provisional ballots that related to lack of photo ID.

---

2 The Election Code states:
Sec. 66.058. PRESERVATION OF PRECINCT ELECTION RECORDS. (a) Except as otherwise provided by this code, the precinct election records shall be preserved by the authority to whom they are distributed:
    (1) in an election involving a federal office, for at least 22 months after election day in accordance with federal law;
The Election Code further states:
On the 61st day after election day, the general custodian of election records may:
    (1) require a person who has possession of a key that operates the lock on a ballot box containing voted ballots to return the key to the custodian; and
    (2) unlock the ballot box and transfer the voted ballots to another secure container for the remainder of the preservation period.
(b-1) Except as permitted by this code, a ballot box or other   secure container containing voted ballots may not be opened during the preservation period.

Of the nine counties that responded with information relating to provisional ballots cast in the March 4th primaries, the ratio of provisional ballots cast increased over the November 5, 2013 general election in seven counties.  The only counties that experienced a decline in the ratio of provisional ballots were Nueces County and Jefferson County.

An analysis of the actual provisional ballot affidavits for Harris County, one of the counties that I was able to acquire actual copies of the redacted provisional affidavits indicated that there were significant numbers of provisional ballots cast because of the lack of photo ID.  During these two elections in Harris County a total of 219,928 votes were cast. The number of rejected provisional ballots totaled 579 for the elections.  A review of general election held on November 5, 2013 in Harris County indicated that 22.5% of the rejected provisional ballots cast were due to lack of a photo ID.  Similarly in Harris County during the primary elections held on March 4, 2014, 18.8% of the rejected provisional ballots were being cast due to lack of photo ID.



| **Memo to:** | Alicia Pierce, Communications Director, |
|---|---|
| | Office of the Texas Secretary of State |

| **CC:** | Wroe Jackson, General Counsel |
|---|---|
| | Leticia Salazar, Elections |
| | Dan Blotzer, Purchasing |

| **From:** | Raul Garza, Account Director, TKO Advertising |
|---|---|
| **Re**: | Voter Education Creative + Media Buy |
| | August-November 2013 |

| **Date:** | August 26, 2013 |
|---|---|

Alicia and team, thank you for meeting with us this morning to review the scope of work for the Secretary of State's Fall 2013 campaign. The campaign will focus on educating Texans that photo ID is required when voting in Texas elections. Key messages of the campaign will be consistent with photo ID requirements as outlined in your June 25th press release unless you provide other direction. http://www.sos.state.tx.us/about/newsreleases/2013/062513.shtml

This cover letter is designed to accompany your request for an emergency work order to secure funds for this project. This letter revises information in our original scope of work memo provided Aug. 14, based on our phone conversations, emails, our meeting with your team on Aug. 22nd, and our continued negotiations on Aug. 23. Your media buy will reflect additional impression levels and PSA matches, in order to both increase the value of your overall campaign and go deeper with the media buy to reach your target audiences — diversity, seniors, and rural — without increasing costs to the SOS, and without taking away impressions from your general audiences. **This is our final and best offer.**

### Overview of Project

As of June 2013, Photo ID is now required for voting in Texas. The Secretary of State is charged with quickly reaching as many Texans as possible. The SOS is partnering with TKO Advertising to create broadcast, print, digital, and smartphone app creative deliverables that will reach Texans statewide through multiple channels including TV-Cable, radio, online advertising, social media, print, and email.

This education campaign will run in specified channels in specified time lengths, as determined by TKO, leading up to the constitution election in November. TKO is committed to securing additional cost-free coverage, including PSA broadcast, as part of our negotiations with the SOS. Additionally, to increase the value of this campaign to the State of Texas, TKO deliverables — when possible — will be evergreen or be adaptable for use in future elections.

1

TEX00306413



**Deliverables**

- Photo ID broadcast scripts:
    - (1) 30-second radio script in English
    - (1) 30-second radio script in Spanish
    - (1) 30-second television script in English
    - (1) 30-second television script in Spanish
    - Produce 2 radio spots
    - Produce 2 television spots

- Broadcast Media Buy
    - TV/Cable Statewide
        - English
        - Spanish
    - Radio Statewide
        - English
        - Spanish

- Digital Media Buy
    - Static advertising banners in (3) sizes
        - English
        - Spanish
    - Mobile advertising banners in (3) sizes
        - English
        - Spanish

- Poster creative (can be printed or shared digitally)
        - English
        - Spanish
        - Traditional Chinese
        - Vietnamese

- Diversity and Special Populations Media Buy + Creative
    - Print ads in African-American newspapers
    - Create/coordinate online resource materials, such as web-friendly poster on votetexas.gov/voters-with-special-needs/

- SmartTXVoter smartphone application updates to potentially include:
    - Changing the name of the app
    - Updating app for dual use of parties/candidates and constitutional amendments
    - All updates will be at minimum for iOS and Android (additional platforms TBD based on budget and timeframe)
    - All updates will be in both English and Spanish

2

TEX00306414



## SOS Texas Voter Education Proposed Campaign Budget — Fall 2013

| DELIVERABLES | ESTIMATED COST |
|---|---|
| **Deliverable 1: Production budget** | $50,000 |
| • 2 30-second radio spots | |
|    ○ 1 English | |
|    ○ 1 Spanish | |
| • 2 30-second TV spots | |
|    ○ 1 English | |
|    ○ 1 Spanish | |
| **Deliverable 2: Digital media buy** | $40,000 |
| online static banners and mobile banners | |
| **Deliverable 3: Broadcast media budget** | $225,000 |
| TV-Cable and Radio, statewide | |
| **Deliverable 4: Diversity-focused media buy** | $25,000 |
| including AA newspapers | |
| **Deliverable 5: Update smartphone app** | $20,000 |
| include both amendments and candidate info | |
| **Deliverable 6: Agency services budget** | $40,000 |
| to revamp broadcast script, supervise production, and format/program digital assets, coordinate calendar, client approval, and vendor support | |
| | |
| **TOTAL** | **$400,000** |

Again, we are very excited to be working with you and look forward to hearing back from you so that we can get started right away.

Sincerely,

Raul Garza
raul@tkoadvertising.com
700 N. Lamar, Suite 200B
Austin, TX  78703
512.472.4856 x304

3

TEX00306415