PL771
9/2/2014
2:13-cv-00193

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISON

MARC VEASEY, *et al.*,

Plaintiffs,

v.

RICK PERRY, *et al.*,

Defendants.

Civil Action No. 2:13-cv-193 (lead)
(consolidated w/ 2:13-cv-263)

## EXPERT WITNESS REPORT OF GEORGE KORBEL

I have evaluated the Texas voter ID statute which is at issue in this case (SB 14, codified in Texas Election Code Chapter 63) in the context of the history of discrimination in Texas.  (See Appendix 1 of this report, detailing the long history of discrimination in Texas).  In this report, I analyze and discuss the history of electoral discrimination in Texas from approximately ten years before SB 14 was first passed until the present.  The report documents numerous instances in which either the federal courts or the Department of Justice have found that voting or electoral discrimination occurred in Texas.

I have also analyzed the current social and economic conditions of Texans by race and ethnicity.  In this report, I summarize these conditions on a statewide level referring to data points that have often been used by the federal courts in considering Section 2 and constitutional litigation, as well as in cases alleging intentional unconstitutional discrimination using the "*Arlington Heights* framework."  In Appendix 2, I include charts and graphs of this data statewide and in selected Texas counties.  The data documents the fact that minorities in all parts

of Texas rank far behind non-minorities in almost every important social and economic category. The depressed socio-economic conditions of racial and ethnic minorities in Texas today are a direct result of Texas' long history of discrimination against these groups.

For example, I compare educational considerations by race and ethnic origin based on the Academic Excellence Indicator System (AEIS) published on an annual basis by the Texas Education Agency. This data has frequently been utilized in Section 2 and constitutional litigation. I discuss the most recent data available in 2014 on a statewide basis. In Appendix 3, I have included charts and graphs detailing this information on a statewide basis and also in selected Texas school districts. The data confirms that Hispanics and African-Americans in Texas still perform below non-minorities in every significant category relevant to education on a statewide basis.

I have also analyzed population growth information by race and ethnic origin in the state from 1970 through 2010. In addition, I have analyzed projected population growth by race and ethnicity through 2050. Appendix 4 contains charts and graphs detailing this growth data, both statewide and in selected counties or groups of counties.

I have evaluated the new Texas voter ID law in the context of the history of voter discrimination in Texas. Based on my experience as both an attorney and an expert witness handling and testifying in election discrimination cases for the past 45 years, I have also likewise examined whether the new Texas voter ID law will effectively combat election fraud.

I have also examined logistical problems presented by the voter ID statute. In particular, I have measured the time it would require to travel from counties which do not have a DPS office to the DPS offices that are recommended on the DPS website. (http://www.txdps.state.tx.us/administration/driver_licensing_control/rolodex/search.asp). In

2

Appendix 5, I include a series of charts and graphs that examine the time required to travel by bus or car to the closest DPS office.

In general, I contend that Texas has a long history of electoral discrimination against African-Americans and Hispanics, and that those minorities in Texas trail non-minorities in many essential areas, including receipt of resources for education.  I further contend that minorities, particularly Hispanics, have constituted a major share of the population growth in Texas since 1970 and will continue to do so for the next several decades.  The Texas Legislature passed SB 14 utilizing an unprecedented parliamentary maneuver, and SB 14 appears to be yet another example of a Texas law that violates the Voting Rights Act.  SB 14 will make it more difficult for minorities in Texas to participate effectively in the political process and elect candidates of their choice.

## INTRODUCTION

## THE LEGAL CONTEXT FOR THIS REPORT

The fundamental question in a Section 2 vote dilution case is whether minority voters "have an equal opportunity **to participate in the political processes and to elect candidates of their choice.**" *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986) (emphasis added).  Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, as amended, provides that:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color. . . .

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members

3

of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion of the population.

42 U.S.C. § 1973 (emphasis in original)(2014).

In *Gingles, supra*, the Supreme Court identified the existence of racially polarized voting and the effect that this has on "the ability of minority voters to elect representatives of their choice." 478 U.S. at 48.

## I.   Totality of the Circumstances

Essentially, the *Gingles* holding requires in a Section 2 case that the plaintiffs establish the existence of certain preconditions, including racial polarization and the possibility of a remedy at equity.  Once plaintiffs meet their burden of establishing the *Gingles* preconditions, courts have been directed to consider the "totality of the circumstances" to determine whether minority voters have the same opportunities to participate in the political process and elect representatives of their choice as do other voters. (S. Rep. at 28, U.S. Code Cong. & Admin. News 1982, p.206.  See also *Clark*, 88 F.3d at 1396 ("it will be only the very unusual case in which the plaintiffs can establish the existence of the... *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances"), and in the Senate Report of the 1982 Amendments to the Act. *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ*., 4 F3d 1103, 1116 (3d Cir. 1993) ("While it would be a highly unusual case in which a plaintiff successfully proved the existence of the . . . *Gingles* factors and still failed to establish a violation , I cannot rule out that possibility entirely").   See also *Baird v. Consolidated City of Indianapolis*, 976 F.2d 357, 359 (7th Cir. 1992).

## A. The Relevant Factors

In *Gingles,* the Supreme Court identified a number of factors that could intensify the potential of an election process to discriminate against minority voters.  The 1982 Senate Report on the legislation (which is the key legislative history of Section 2 of the Voting Rights Act) listed these factors, and they are frequently referred to as "the Senate Factors."  They include:

> 1.  The extent of any official history of discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or to otherwise participate in the democratic process.

> 2.  The extent to which voting in the state or political subdivision is racially polarized.

> 3.  The extent to which the state or political subdivision has used unusually large districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.

> 4.  If there is a candidate slating process, whether the members of the minority group have been denied access to that process.

> 5.  The extent to which the members of the minority group bear the effects of discrimination in such areas as education, employment and health which hinders their ability to participate effectively in the political process.

> 6.  Whether political campaigns have been characterized by overt or subtle racial appeals.

> 7.  The extent to which the minority group have been elected to public office in the jurisdiction.

S. Rep. No. 97-417,  at 28-29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07.

The Senate Committee was careful to stress that:

> "[T]here is no requirement that any particular number of factors be proved, or that the majority of them point in one way or the other."  . . .  Rather, the Committee determined that "the question of whether the political processes are equally open depends upon a searching practical evaluation of the 'past and present reality.'" *Id*. at 30, U.S. Code Cong. & Admin News 1982 p 208. (footnote omitted), and on a "functional" view of the political process.

cited in *Gingles*, *supra*, 478 U.S. at 45.

### B.  History of Discrimination

The first Senate Factor is commonly referred to as the History of Discrimination Factor. Appendix 1 to this report contains a history of general discrimination in Texas, as well as a list of voting cases brought against Texas jurisdictions from the late 1960s to 1999.  Since the specific issues before this Court involve the voter ID statute and Section 3 coverage, and are heavily dependent on voting discrimination, I will discuss the most recent findings here.  I define "recent" as cases occurring since 2000.  These include specific findings of federal district and circuit courts and the U.S. Supreme Court, in cases dealing specifically with Texas.  I also include voting rights objections interposed by the Department of Justice (DOJ) pursuant to Section 5 of the Voting Rights Act, and specific decisions by DOJ to send federal election observers under Section 8 of the Voting Rights Act to monitor problem areas.

Since the application of the Voting Rights Act to Texas, the DOJ has sent almost 1,400 federal observers to 70 Jurisdictions within Texas.  There have been more than 200 voting rights objections interposed by DOJ since the application of the VRA to Texas, and there have been more than 200 federal and state court findings of election discrimination in Texas.  These have involved approximately 70% of the state's population.

Since 2000, there have been more than 50 instances in which federal courts have found voting or election discrimination in Texas; or the DOJ has issued a voting rights objection finding voting discrimination under Section 5 of the Voting Rights Act; or federal observers have been sent to Texas election locations.  In fact, since 2000, approximately 1,099 federal observers

have been sent to various Texas election locations and voting sites pursuant to Section 8 of the

Voting Rights Act.  See Appendix 1.

### C.  Recent Judicial or Administrative Determinations of Election Discriminations in Texas

In this section, I provide a listing of Texas voting discrimination cases over the last ten

years.  A more comprehensive summary extending further back in time is detailed in Appendix

1.  The cases detail the how Latino and black voters continue to be the victims of discriminatory

voting practices and procedures throughout the state:

As the Supreme Court noted less than a decade ago in *LULAC v. Perry:*

The District Court recognized the long history of discrimination against Latinos
and Blacks in Texas, and other courts have elaborated on this history with respect
to electoral processes. Texas has a long, well-documented history of
discrimination that has touched upon the rights of African- Americans and
Hispanics to register, to vote, or to participate otherwise in the electoral process.
Devices such as the poll tax, an all-white primary system, and restrictive voter
registration time periods are an unfortunate part of this State's minority voting
rights history. The history of official discrimination in the Texas election process
stretching back to Reconstruction led to the inclusion of the State as a covered
jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act.
Since Texas became a covered jurisdiction, the Department of Justice has
frequently interposed objections against the State and its subdivisions. In addition,
the political, social, and economic legacy of past discrimination for Latinos in
Texas, may well hinder their ability to participate effectively in the political
process.

It is significant to note that no decade has passed since 1970 in which Courts have

not found Texas Redistricting plans in violation of  federal, and on occasion, State law.

As the three-judge court of the District of Columbia found just two years ago when they

specifically held that the Texas congressional and state senate redistricting plans were

enacted with discriminatory intent:

In the last four decades, Texas has found itself in court every redistricting cycle, and each time it has lost. See, *e.g., LULAC*, 548 U.S. 399, 126 S.Ct. 2594; *Vera*, 517 U.S. 952, 116 S.Ct. 1941; *Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982); *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Terrazas v. Slagle*, 789 F.Supp. 828 (W.D.Tex.1992), *aff'd sub nom.*, *Richards v. Terrazas*, 505 U.S. 1214, 112 S.Ct. 3019, 120 L.Ed.2d 891 (1992) (mem.). While a losing streak alone does not control our decision, Texas's history of failures to comply with the VRA is one of the circumstantial factors that *Arlington Heights* instructs us to consider.

*Texas v. United States*, 887 F. Supp. 2d 133, 160-161 (D.D.C. 2012)

Texas argues that, "[a]t worst, the evidence shows that [it] was guilty of blithe indifference to the wants of certain [minority] Congressmen." Tex. Post–Trial Br. 29. But we do not find this explanation credible. Although we have already concluded that the Congressional Plan cannot be precleared under section 5's effect prong, we are also persuaded by the totality of the evidence that the plan was enacted with discriminatory intent. Texas did not adequately engage with the evidence raised by the other parties on this point, and under *Arlington Heights* we find sufficient evidence to conclude that the Congressional Plan was motivated, at least in part, by discriminatory intent.

The parties have provided more evidence of discriminatory intent than we have space, or need, to address here. Our silence on other arguments the parties raised, such as potential discriminatory intent in the selective drawing of CD 23 and failure to include a Hispanic ability district in the Dallas–Fort Worth metroplex, reflects only this, and not our views on the merits of these additional claims.

*Texas v. United States*, 887 F. Supp. 2d 133, 165 (D.D.C. 2012).

One would expect a state that is as experienced with VRA litigation as Texas to have ensured that its redistricting process was beyond reproach. That Texas did not, and now fails to respond sufficiently to the parties' evidence of discriminatory intent, compels us to conclude that the Senate Plan was enacted with discriminatory purpose as to SD 10.

*Texas v. United States*, 887 F. Supp. 2d 133, 165 (D.D.C. 2012).

As noted above, that history of voting discrimination continues to this day.  For example, in the last five years, there have been more findings of racially polarized voting and the Attorney General has continued to determine that Federal Observers should be sent into several Counties

8

and cities to observe elections and protect the right to vote against discriminatory conduct.   By way of examples, the following is a list of Texas cases in which courts have made findings regarding the current existence of specific *Gingles* preconditions:

- ***Hubbard v. Lonestar Community College District***, No. 4:13-CV-01635 (S.D. Tex., filed June 4, 2013): After limited discovery, the parties negotiated a settlement with nine single-member districts.  The district court held a settlement hearing and approved the settlement in November of 2013.

- ***Rodriguez v Harris County***, 964 F. Supp. 2d 686 (S.D. Tex. 2013): This was a lawsuit against Harris County, alleging that the redistricting of the Harris County Commissioners' Court violated Section 2 of the Voting Rights Act.  The Court found racially polarized voting in the county, and found that significant barriers to voting remain in Harris County.  The case is on appeal to the 5th Circuit.

- ***Fabela et al v. City of Farmers Branch***, 2012 U.S. Dist. LEXIS 108086 (N.D. Tex. 2012): The court found that "the City Council elections" for Farmers Branch "in 2007, 2008, 2009, and 2011 were . . . racially polarized." *Id.* at *58. It also found: "Hispanics in Farmers Branch have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* at *61.

- ***Hernandez et al v. Nueces County***, No. 2:2012cv00047 (S.D. Tex. filed Feb. 10, 2012): This was a Section 5 enforcement action against Nueces County. It was dismissed when Nueces County made changes to the county's redistricting map. *See also* ***Nueces County v United States***, No. 1:11cv1784 (D.D.C., dismissed

9

Mar. 21, 2012).

- ***Vasquez-Lopez v. Medina County***, No. 5:2011cv00945 (W.D. Tex. filed Nov. 10, 2011): A number of Hispanic plaintiffs opposed Medina County's 2011 redistricting plan and filed suit.  After a period of time the county agreed to make changes in the plan, which satisfied the plaintiffs.

- ***McBride et al v. City Of Jasper***, No. 1:11cv00443 (E.D. Tex. dismissed Dec. 21, 2011): This case involved the recall of African-American councilmen who had been elected from single-member districts and who had voted for an African-American retired Texas Ranger to be the city's Chief of Police.  Although the case has been dismissed, I include some of the findings made by the federal court:

Lance Caraway, one of nine citizens who collected petition signatures, used racial epithets and made racist jokes in Facebook posts after Chief Pearson was appointed. . . .  "From the testimony elicited at the hearing, it appears that all of the citizens who spearheaded the recall effort and all of the signers of the petitions were white. Order Denying Preliminary Injunction, *McBride* (Oct. 20, 2011) at 4, *available at* http://s3.amazonaws.com/static.texastribune.org/media/documents/City_of_Jasper_Injunction.pdf.

The petitions for [recalling two African-American] Councilpersons . . . were signed by white citizens who did not reside in the councilpersons' districts. *Id.* at 5.

Neither the city nor the county verified the authenticity of the signatures. At the hearing on the pending motion, evidence was presented that several signatures appeared in almost identical handwriting, raising the inference that the same person signed on behalf of multiple individuals. A handwriting expert who reviewed half of the petitions testified that two people were responsible for fifteen signatures and that as many as 225 signatures warranted further investigation. *Id.* at 6.

[S]ome of the recall petitioners acted with racial animus towards [the African-American councilmen] . . . .  Lance Caraway, one of the white Jasper citizens who gathered signatures on the recall petitions, used racial epithets in Facebook posts after [the African-American] Chief [of police]

10

was appointed. He also posted a most distasteful picture featuring Chief
Pearson, two of the African-American council members, the President of
the United States, and the First Lady. Not to be outdone, at the evidentiary
hearing, Mr. Caraway failed to appear pursuant to an executed subpoena.

- ***Petteway, et al. v. Galveston County, Texas, et al.***, No. 3:2011cv00511 (S.D.

  Tex. filed Nov. 14, 2011): This was a Section 5 enforcement action.  Galveston

  County agreed to remedy the vote dilution present in its Commissioner precinct

  plan. The county agreed to hold its elections in 2012 under this new benchmark

  plan, and then try the remaining Section 5 issue: the county's reduction of Justice

  of the Peace positions from nine to five.  The portion of the case dealing with the

  Justices of the Peace has now been tried and is pending decision.

### D.  Administrative Objections to Texas Election Procedures

Additionally, since 2010, there have been numerous examples of DOJ objections to
various election procedures (prior to *Shelby County,* of course), as well as the assignment by the
United States Attorney General of federal observers to monitor elections throughout the State of
Texas to protect the right to vote.   The following list details these incidents:

- **May 13, 2013** Department of Justice sent Federal Election Monitors to

  monitor elections in cities of **Corrigan**, **Farmers Branch**, **Irving** and

  **Orange**, Texas, to ensure compliance with the Voting Rights Act of

  1965.[1]

---

[1]Section 8 of the Voting Rights Act provides for the appointment of federal observers within
political subdivisions certified by the Attorney General or by order of a federal court pursuant to
the Voting Rights Act. The monitoring of elections by federal observers is an important aspect of
the Voting Section's enforcement efforts. In some instances, there are concerns about racial
discrimination in the voting process; other times monitoring is done to ensure compliance with
bilingual election procedures. The United States Office of Personnel Management recruit [s],

- **April 8, 2013 Section 5** Objection Letter from the Thomas E Perez, Assistant Attorney General to Melody Thomas Chappell, Beaumont ISD school attorney:

  Submission of referendum election to change the School Trustee election system from seven single member districts to five single member districts and two elected at-large.  ("There is overwhelming evidence that both the campaign leading to the election as well as the issue itself carried racial overtones with the genesis of the change and virtually all of its support coming from white residents. A statistical analysis of the election confirms the extreme racial polarization that the issue created. Black voters cohesively voted to maintain the current method of election and white voters voted cohesively for the proposed change. We estimate over 90 percent of white voters, but less than 10 percent of black voters, supported the change."

  An examination of at-large elections for the Beaumont City Council also proved informative because of the overlap in population and the similarity in demographics. There, we found racial cohesion among black voters at levels similar to those identified in the school district election. More significantly, we found significant racial polarization and the same unwillingness of white voters to support a black-preferred candidate, with little evidence of crossover voting by white voters in the city's at-large council races.

  In the past ten years, numerous black-preferred candidates have sought municipal office in the city. With the sole exception of one candidate, African Americans have been unable to elect candidates of choice to the city's at-large council positions. Our analyses showed that this candidate only received about eight percent of the non-black vote in both the 2007 and 2011 elections, placing second to last among non-black voters in 2011. … [O]ur analyses demonstrate that this candidate's election was dependent on single-shot voting, in which black voters withheld their votes for the second at-large city council seat in both 2007 and 2011, voting only for this candidate. The statistical and anecdotal evidence therefore confirm that this one candidate's experience is not indicative of black-preferred candidates' prospects for success in

---

train[s], and supervise[s] these federal employees, who serve as neutral and impartial observers of election-day procedures. See http://www.justice.gov/crt/about/vot/examine/activ_exam.php

at-large elections. *See Texas v. United States*, 2012 WL 3671924, at *22-23 (D.D.C. Aug. 28, 2012) (three-judge court) (isolated electoral success by one candidate is insufficient to demonstrate that minority voters have the consistent ability to elect their preferred candidates of choice).

- **April 8, 2013 Section 5** Objection Letter from the Thomas E. Perez, Assistant Attorney General to Melody Thomas Chappell, Beaumont ISD school attorney. (Finding that State Court Order shortening terms and ordering an election out of time violated Section 5 of the Voting Rights Act).

- **November 6, 2012 General Election.** The Department of Justice sent 119 Federal Election Observers to **Dallas County**, **Fort Bend County** and **Jefferson County** to ensure compliance with the Voting Rights Act of 1965.

- **May 29, 2012 Primary Elections** Department of Justice sent Federal Election Observers to **Dallas** County, **Galveston** County, **Jasper** County, **Jefferson** County and Harris County per Attorney General's certification.  Federal observers sent to **Fort Bend** County, which is subject to a court order entered in 2009, which requires the jurisdiction to comply with the minority language and assistor of choice requirements of the Voting Rights Act, as well as the requirements of the Help America Vote Act.  http://www.justice.gov/opa/pr/2012/May/12-crt-677.html

- **May 12,  2012 Municipal Elections.**  The Department of Justice sent 39 Federal Election Observers to the cities of **Galveston (Galveston County) and Irving (Dallas County)** to ensure compliance with the Voting Rights Act of 1965.

- **March 7, 2012 Section 5 Objection Letter** from the Thomas E Perez, Assistant

  Attorney General to Keith Ingram , Director of Elections:

  [T]he state has not met its burden of proving that, when compared to the benchmark, the proposed requirement will not have a retrogressive effect, or that any specific features of the proposed law will prevent or mitigate that retrogression. Additionally, the state has failed to demonstrate why it could not meet its stated goals of ensuring electoral integrity and deterring ineligible voters from voting in a manner that would have avoided this retrogressive effect...

- **March 5, 2012 Section 5 Objection Letter** from Thomas E. Perez, Assistant

  Attorney General to Trey Traynor, attorney for Galveston County:

  With regard to the election for justices of the peace and constables, there are eight election precincts under the benchmark method. Each elects one person to each position, except for Precinct 8, which elects two justices of the peace. The county has proposed to reduce the number of election precincts to five, with a justice of the peace and a constable elected from each.

  Our analysis of the benchmark justice of the peace and constable districts indicates that minority voters possess the ability to elect candidates of choice in Precincts 2, 3 and 5. With respect to Precincts 2 and 3, this ability is the continuing result of the court's order in *Hoskins* v. *Hannah*, Civil Action No. G-92-12 (S.D. Tex. Aug. 19, 1992), which created these two districts. Following the proposed consolidation and reduction in the number of precincts, only Precinct 3 would provide that requisite ability to elect. In the simplest terms, under the benchmark plan, minority voters in three districts could elect candidates of choice; but under the proposed plan, that ability is reduced to one.

- **October 3, 2011 Section 5 Objection Letter** from Thomas E. Perez, Assistant

  Attorney General to Bob Heath attorney for the City of Galveston, Texas:

  Our review of the demographics of the current districts and the results for elections conducted since 2001 as well as the information provided by the city does not alter our earlier determination that city has not established the absence of a retrogressive effect. **Racial bloc voting continues to play a significant role in city elections.** Under the existing method of election, minority voters currently have the ability to elect a candidate of

14

choice in three of the six single-member districts. In contrast, this ability would exist only in two of the four districts and in neither of the two at-large positions under the proposed system.  Indeed, **in the course of our investigation, the city acknowledged that the proposed method of election will decrease the number of minority ability-to-elect districts.** As a result, the city has failed to establish that the proposed 4-2-1 method of election with numbered posts would not lead to a retrogression in minority voting strength prohibited by Section 5.

- **May 14, 2011 Municipal and School District Elections.** The Department of Justice sent 57 Federal Election Observers to the cities of **Beaumont (Jefferson County), La Marque (Galveston County) and Hondo (Medina County)** to ensure compliance with the Voting Rights Act of 1965.

- **November 2,  2010 General Elections** The Department of Justice sent 93 Federal Election Observers to **Dallas County, Fort Bend County, Galveston County and Williamson County** to ensure compliance with the Voting Rights Act of 1965.

- **Spanish Language Procedures for Runnels County, Texas.  June 28, 2010 Section 5 Objection Letter** from the Thomas E. Perez, Assistant Attorney General to Elise Ocker, Runnels County Clerk, Objection to changes in Bilingual Procedures:

   Under the benchmark procedures enumerated in the 1984 order, the county was required to assign one bilingual poll worker to each of its five consolidated polling places. Despite an almost fifty percent increase in the county's Hispanic population percentage since 1984, our examination of the November 2008 general and November 2009 constitutional amendment elections show that at least half of county voting precincts did not have a bilingual poll worker for the November 4, 2008, general election, and no voting precincts had a bilingual poll worker for the November 3, 2009, constitutional amendment election. Both census data and anecdotal evidence from members of the minority community indicate, however, that there continues to be a significant need for such assistance. The proposed level of assignment, moreover, is below the

15

Texas Secretary of State's recommended guidelines that bilingual poll workers be stationed in election precincts where five percent or more of the inhabitants are persons of Spanish origin.

Instead of applying the benchmark standard for the elections in question, the county implemented a practice in the 2008 and 2009 elections of having only having an on-call bilingual assistor available by phone in the event that Spanish language oral assistance was required on election day. We note that procedure has not been reviewed under Section 5. **The evidence available to us, however, demonstrates that this procedure does not provide effective Spanish language oral assistance. In fact, it appears that the on-call bilingual assistor has not received a single call for assistance in the approximately seven years that she has served in that capacity. We also note that the county does not test the Spanish language proficiency of its bilingual poll workers, or provide training for bilingual assistance. Our information suggests that one of the individuals asserted by the county to be a bilingual poll worker is not proficient in Spanish. (Emphasis added)**

- **Spanish Language Procedures for Gonzales County, Texas.  March 10, 2010**

**Section 5 Objection Letter** from the Thomas E. Perez, Assistant Attorney

General to Elise Bob Bass Attorney for Gonzales County:

The county proposes to use an internet machine translator, such as Google Translator, for the initial translation of county-produced election materials. The county indicates that the resulting translations will then be sent to the Office of the Texas Secretary of State...to confirm its accuracy. However...the Secretary of State ...has also informed us that it has had no communication with the county on this matter [and] does not offer this service....

*       *       *

If anything, the current proposal is retrogressive even when measured against the 2008 bilingual program to which an objection was interposed. Moreover, even after the objection, the county continues to post English-only election notices on its website, raising concerns about its stated commitment to provide translations of all election materials.

County officials have openly expressed hostility toward complying with the language minority provisions of the Voting Rights Act. In local news articles, the county official who has direct control over the election process has expressed frustration with this Department's efforts to increase

the availability of bilingual poll workers, suggesting that language
minority voters are not citizens if they do not speak English.

- **June 19, 2010 General Elections.** The Department of Justice sent 11 Federal
  Election Observers to the **City of Galveston (Galveston County)** to ensure
  compliance with the Voting Rights Act of 1965.

- **May 8, 2010 Municipal and School District Elections.**  The Department of
  Justice sent 39 Federal Election Observers to the cities of **Irving (Dallas County)**
  and **Galveston (Galveston County)** to ensure compliance with the Voting Rights
  Act of 1965.

- **March 2, 2010 Primary Elections.**  The Department of Justice sent 68 Federal
  Election Observers to  **Fort Bend County, Williamson County, Galveston
  County** and **Wilson County** to ensure compliance with the Voting Rights Act of
  1965.

- **February 11, 2010.**   The Department of Justice sent 22 Federal Election
  Observers to **Galveston County** to ensure compliance with the Voting Rights Act
  of 1965.

- **January 23, 2010.**   The Department of Justice sent 4 Federal Election Observers
  to the **City of Hondo (Medina County)** to ensure compliance with the Voting
  Rights Act of 1965

**A.  Voting Rights Act Section 2 Cases, Recent, Pending Trial or Decision on the Merits**

In addition, there are a number of recent cases that have been filed throughout the
State of Texas that are currently pending alleging violations of the Voting Rights Act.
These include:

17

- *Williams et al v. Edwards Aquifer Authority*, No. 5:92-cv-00144-FB (W.D. Tex. 2012): This case, currently pending order on cross motions for summary judgment, involves a claim of discrimination against Hispanics in a jurisdiction of nearly 1.5 million persons that is in charge of protecting the sole water source of the City of San Antonio as well as agricultural irrigation. The jurisdiction is governed by a sixteen-person board elected by single-member districts as a result of a series of litigation and Section 5 objections. These districts are grossly malapportioned, with some in the 10,000 person range and others upwards of 300,000. The only district in which African Americans have the opportunity to elect their representatives of choice is more than ten times smaller than the smallest Anglo district.

- *Jones v. Beaumont Independent School District*, 1:2013-cv-00177 (E.D. Tex. filed March 27, 2013): This case, currently in discovery, was filed to enjoin the Beaumont Independent School District from reducing the number of trustee single-member districts from 7 to 5. *See also Rodriguez v. Beaumont Independent School District*, 1:2013cv00304 (E.D. Tex. filed May 14, 2013).

- *Rodriguez v. Grand Prairie Independent School District*, No. 3:2013-cv-01788 (N.D. Tex. filed in 2013): This is a suit against a large school district that continues to elect its board members on an at-large basis.

- *Cisneros v. San Jacinto College District*, 4:2013-cv-00903 (filed April 1, 2013): In this case, currently pending trial, plaintiffs claim that at-large elections of trustees to the San Jacinto College District in South East Harris County violates Section 2 of the Voting Rights Act. No African American or Hispanic has been elected to this nine-district board.

18

- *Benavidez v. Irving Independent School District*, 3:2013cv00087 (filed January 8, 2013): This is a suit against an at-large election scheme in the Irving Independent School District.

- *Roberts v. Ortega, et al,*, No. 3:2010-cv-00072 (W.D. Tex. filed February 22, 2010)

In sum, it is clear that the history of discrimination referenced by the three-judge court in *Texas v United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) continues to the present day in Texas. In that context, it is worth noting that the Texas Attorney General, Greg Abbott, announced that the state would implement the current voter ID law within hours of the issuance of the *Shelby County* decision, even though a three-judge federal court had determined that the same law was not entitled to preclearance under Section 5 of the Voting Rights Act because it would have a discriminatory effect on racial and language minority voters.

This conduct on the part of the Texas Attorney General, with regard to immediate implementation of the voter ID bill after *Shelby County* in complete disregard of the findings of the three-judge District Court in the DC Section 5 litigation, is consistent with the response of the state in years past -- when the federal courts struck down the "white primary" system in Texas, the poll tax, the annual voter registration system, and Texas' attempt at a complete purge of its voting lists.  As in the instant case, the state then also disregarded federal court decisions. Texas made every effort to enact legislation that would allow them to maintain the "white primary" system, the poll tax, the annual voter registration system, and voter purges.  Many of the federal court decisions regarding Texas' long history of discrimination prior to 2000 are discussed and/or cited in Appendix 1.

## II.   Other Factors in the Totality of Circumstances Analysis

In addition to my analysis of the history of discrimination in Texas, I have also analyzed

some of the other factors that make up the "totality of circumstances" test established in ***Gingles***

for the purpose of presenting my opinions in this case.  The discussion of that analysis follows.

## A.   The Current Effects of Discrimination in Such Areas as Education, Employment, and Health, which Hinder Minority Citizens' Ability to Participate Effectively in the Political Process

Courts and political scientists have looked to current socio-economic conditions for three

purposes:

> [L]ower socio-economic status gives rise to special group interests centered upon
> those factors.  At the same time, it operates to hinder the group's ability to
> participate in the political process and to elect representatives of its choice as a
> means of seeking governmental awareness of and attention to those interests.
> ***Gingles v. Edmisten***, 590 F. Supp. 345, 363 (E.D. N. C. 1984) *affirmed in relevant part
> sub nom.* ***Thornburg v. Gingles***, 478 U.S. 25, (1986).

The social and economic situation of minority residents of the State of Texas in general

and in discrete areas is an excellent example of the current effects of past discrimination.  I have

examined the available data from the most recent American Community Survey and Academic

Excellence Indicator System (AEIS).   Hispanic and African-American residents, statewide and

in specific geographic areas discussed in the report, rank significantly worse in the traditional

areas that have been identified by the courts as important to political participation.   A series of

charts showing this analysis is attached to this report.  These charts isolate the counties and

districts at issue.   In every situation, the minority population performs significantly lower on all

levels of social analysis.  For example, minorities comprise a disproportionate percentage of the

functionally illiterate, non-high school graduates in the state and in specific regions.  Other

examples are contained in the attached charts.  See Appendices 2 and 3.

In the area of economic well-being, the minority community represents a disproportionate

percentage of the impoverished population, of those who rely on food stamps, and of those who

make an income of less than $25,000 per year.    The level of Hispanic and African-American

poverty is several times that of Whites (or Anglos).  The per capita income of minorities is

around half that of Whites.  Whites comprise roughly 80% of the families with incomes over

$50,000.  Minority unemployment is approximately twice that of Whites.  The attached

appendices demonstrate a vast differential in social and economic status between minorities and

non-minorities.  See Appendices 2 and 3.

In general, both federal courts and legislators have recognized the relationship between

low socio-economic status and reduced participation in the electoral process.  For example, the

1982 Senate report that accompanied the amendments to Section 2 of the Voting Rights Act

stated:

> Courts have recognized that disproportionate educational, employment, income
> level and living conditions arising from past discrimination tend to depress
> minority political participation.  Where these conditions are shown, and where the
> level of black participation in politics is depressed, plaintiffs need not prove any
> further causal nexus between their disparate socio-economic status and the
> depressed level of political participation.

> S. Rep. No. 97-417 at 29 *reprinted in* 1982 U.S.C.C.A.N. 177, 207 n.114.

The Fifth Circuit has also recognized the same reasonable link between low socio-

economic status and reduced participation in the electoral process.

> The Supreme Court and this Court have recognized that disproportionate
> educational, employment, income level, and living conditions tend to operate to
> deny access to political life…It is not necessary in any case that a minority prove
> that these economic and educational factors have 'significant effect' on political

21

access.... Inequality of access is an inference which flows from the existence on
economic and educational inequalities.

*Kirksey v. Board of Supervisors*, 554 F.2d 139, 145 (5th Cir. 1977).

Congress and the federal courts have directed that, where there is clear evidence of socio-
economic or political disadvantage, the burden is not on the plaintiffs to prove that this
disadvantage is causing reduced political participation.  Rather, the burden falls on those who
deny the causal nexus to show that the actual cause is something else.  *Cross v. Baxter*, 604 F. 2d
875, 881-882 (5th Cir. 1979); *Kirksey*, *supra*, 554 F. 2d at 144-46; *Zimmer v. McKeithen*, 485 F.
2d 1297, 1306 (5th Cir. 1973).   Appendix 2 and Appendix 3 include charts and graphs which
demonstrate on a state-wide basis -- and also with regard to specific counties or school districts --
that minorities in Texas fall far behind their non-minority counterparts in areas of education,
wage earning capacity, and other general socio-economic categories.

### B.   Whether Political Campaigns Have Been Characterized by Overt or Subtle Racial Appeals

This is another category which seems to have grown out of the Dallas County portion of
*White v. Regester,* 412 U.S. 755 (1973).  In that case, Plaintiffs demonstrated that in Dallas
County, the Dallas County for Responsible Government (D.C.R.G.) slating group had utilized
racial tactics to identify and defeat Black candidates that it had not slated.

Since Blacks have Anglo-Saxon-sounding surnames, those using racial appeals in
elections found it important in a county the size of Dallas to identify the Black candidates in
order to effectuate the racial prejudice of the White community.  No similar evidence was
produced in the Bexar County portion of *White v. Regester* where the minority candidates had all
been Mexican-Americans who were self-identified by their surnames.  Regardless, a court may

22

consider overt or subtle appeals to race in campaigns as a factor in the "totality of circumstances" analysis.

It is clear that many elections in Texas continue to see race and ethnicity utilized either subtly or overtly in an appeal to voters. One recent local example was the Houston Community College Board of Trustee elections when David Wilson, an Anglo anti-gay activist running against a black incumbent, issued campaign mailers featuring pictures of African Americans that said: "Vote for our friend and neighbor Dave Wilson.".. He also stated on his campaign mail piece that he was endorsed by Ron Wilson, who is a popular former African-American State Representative from Houston. In the fine print, Ron Wilson was actually identified as Dave Wilson's -- presumably Anglo -- cousin. Numerous complaints have been made that Mr. Wilson subtly, or perhaps not so subtly, pretended to be African-American in order to defeat his African-American opponent.

Even more recently on a statewide level, State Senator Dan Patrick played to his Tea Party supporters on the issue of immigration by calling the influx of undocumented immigrants from Mexico an "illegal invasion." Patrick also tied undocumented immigrants to violent crime and third world diseases. Patrick was quoted as saying: "They [presumably undocumented immigrants] threaten your life. They threaten your business. They threaten our state." Patrick swept to victory in the 2014 Republican runoff over incumbent Lieutenant Governor David Dewhurst. Other racial appeals in recent elections have appeared in campaign materials in Houston and in the Fort Worth region of the State. There is little doubt that campaigns in Texas are still characterized by both subtle and overt appeals to race.

**C. The Extent To Which the State or Political Subdivisions Have Used Unusually Large Districts, Majority Vote Requirements, Anti-single Shot Provisions, or Other Voting Practices or Procedures That May Enhance the Opportunity for Discrimination Against the Minority Group.**

The vast majority of voting discrimination cases over the last few decades have involved the issue of at-large elections and/or the majority vote requirement and anti-single shot provisions.  In each judicial determination, the remedy adopted by the court was specifically designed to either eliminate these features or remedy their discriminatory impact on minority voters.   The issue of unusually large districts is particularly common to Texas.  With the exception of Austin, at-large city council seats have been eliminated judicially in the following large Texas cities

- **Houston***: Leroy v. City of Houston*, 831 F2d 576, 578-79 (5th Cir 1987) ("[P]laintiffs-appellees, black and Hispanic voters in Houston, Texas, filed suit alleging that their votes were unconstitutionally diluted by the at-large method of electing the Houston City Council….That plaintiffs eventually obtained the objective of their litigation is not seriously disputed.")

- **Dallas**:  *Lipscomb v Wise*, 399 F. Supp. 782, 795 (N.D. Tex. 1975)  ("This is dilution. In other words, when all members of the city council are elected at large, … black voters of Dallas do have less opportunity than do the white voters to elect councilmen of their choice.")

- **San Antonio:**  *Martinez v Becker* (1977);

- **Waco**: *Calderon v McGee*, 584 F.2d 66 (5th Cir. 1978) ("[T]he at-large election method, overlaid, as it is, upon the historic, cultural, economic and political realities of the black and Mexican-American communities in Waco, results in a marked dilution of black and Mexican-American votes. . . . (and) the lack of equal access by blacks and Mexican-Americans to the political processes leading to the election of school board trustees is an empirically obvious political reality. This lack of equal access, resulting from past discrimination, compels a finding that the present at-large election of school board trustees violated the Equal Protection Clause of the Fourteenth Amendment.") see also  *Derrick v. Mathias*, W-74-CA-2

(W.D. Tex 1976) (successful single member district case against the Waco City Council tried at the same time as *Calderon*);

- **El Paso:** *Sierra* **v.** *El Paso Independent School Dist.*, 591 F. Supp. 802, 806 (WD Tex. 1984); the Court's findings with respect to the ... three *Gingles* factors in combination inescapably point to a result which violates the Voting Rights Act as amended in 1982. Therefore, judgment must be entered in favor of the Plaintiffs, and the Defendants must be ordered to implement single-member districts in place of the present at-large scheme.");

- **City of Lubbock***: Jones v. City of Lubbock,* 727 F.2d 364 (5th Cir.1984), ("The Lubbock at-large system aggravates the political disadvantage of the City's minorities.");

- **City of Irving**: *Benavidez v. City of Irving*, 638 F.2d 709, 731-32 (N.D. Tex. 2009) ("The Court concludes that racially polarized voting is clear in Irving....Dr. Engstrom employed HPA, ER, and EI analysis, and the results of all three methods demonstrate that the white majority in Irving votes cohesively to defeat Hispanic preferred candidates.").

- **City of Corpus Christi**: *Alonzo v. City of Corpus Christi*, 68 F. 3d 944,946 (5th Cir. 1995). (citing court approved consent decree in *Alonzo v. Jones*)


Texas, in part because of its geographic size and its large population, has many examples of unusually large political divisions.  For example, Texas' United States Senate and Texas State Senate seats have the second largest populations of any United States Senate or State Senate seats in the country.  Local municipal governments, such as the Houston City Council, have much larger populations than, for example, city council seats in New York.  Even some of Texas' local school districts, such as the Lone Star College District, are the largest of their type in the country.  Traditionally, minorities have a much more difficult time electing candidates of their choice in such large districts because of the costs of campaigning and the difficulty of registering and turning out voters in extremely large precincts.

25

With the invalidation of Section 5 of the Voting Rights Act, several jurisdictions have begun to reinstall these sorts of problematic electoral districts.  For example, Pasadena, Texas, recently implemented a redistricting of their city council in which they eliminated two single-member districts and replaced them with at large districts.  Beaumont Independent School District is currently involved in litigation as a result of their elimination of two single-member districts which were replaced by at-large districts.

## D. The Extent to Which Members of the Minority Group Have Been Elected to Public Office in the Jurisdiction

In the past decade, virtually no minorities have been elected to Congress and to the state legislature in Texas except in districts that are overwhelmingly (or at least majority) minority.  In the few instances where a member of a minority group has managed to win election in a district that does not contain a supermajority of minority voters, the minority elected official has been voted out of office in the next election.  My experience tells me that this is also true for local elections, including cities, school districts, Commissioners Courts, and various sorts of special districts.

For example, in Harris and Dallas Counties, minority residents comprise over half of the population.  In each county, the Anglo population has declined over the past decade.  All growth has come from the minority residents of these two counties.  It is significant that, had the minority population grown at the same rate as the Anglo population, Dallas County would have lost 3-5 members of the legislature and Harris would have lost 2-3.  In spite of this minority population growth and Anglo decline, minority representation remained the same as it was in the last redistricting plan.

In Tarrant County, although the Anglo population grew slightly, the minority population represented virtually all of the growth.  Had the minority population grown at the same rate as the Anglo population, the County would have lost at least one House seat.  Nevertheless, despite minority population growth, the number of districts in which minority voters are able to elect the representatives of their choice has also remained constant.   These growth patterns are described by charts and graphs in Appendix 4.

Texas was apportioned an unprecedented four additional congressional seats in 2010 as a result of the state's population growth of more than 5 million persons.   The minority population (with Hispanics representing the lion's share) provided nearly 90% of the state's growth.  Had the minority population in Texas grown at the same rate as the Anglo population, the state would likely have lost at least 1 and possible 2 congressional seats.  Nevertheless, the state congressional redistricting plan created no additional congressional districts where the minority voters could elect the candidate of choice.   A three-judge court in the United States District Court for the District of Columbia found the congressional plan to be the product of intentional discrimination and to violate Section 5 of the Voting Rights Act.  With no legal plan in effect, a three-judge court in Texas (*Perez v. Perry*) ordered into effect an interim plan that was the result of negotiation among the parties.  In it, the West Texas District 23 was improved and elected the minority candidate of choice in 2012.  The State also agreed to the use of one of Plaintiffs' proposed plans in the Dallas and Tarrant County area which created a new congressional district where minority voters were able to elect the candidate of choice.  The Texas Legislature has since adopted the interim Congressional Plan as its permanent plan.  It is significant that the additional minority Congressional Districts came about only as a result of judicial action, not

initially as legislative action.   On the Congressional level, additional litigation continues to this day.

The three-judge district court in the District of Columbia also found the 2011 Texas State House redistricting plan violative of Section 5 of the Voting Rights Act.  Unable to obtain preclearance, the state agreed to an interim plan with modifications that likewise increased the number of districts where minority voters were able to elect the representatives of their choice. This interim plan (with minor changes that are not relevant to the interim remedy) also adopted the interim plan as permanent in the 2013 session of the legislature.  As with the Congressional plan, the increase in minority opportunity is from judicial impetus and not legislative action. Further litigation before the Texas three-judge district court also continues and is tentatively scheduled for trial later this summer.

The three-judge district court in the District of Columbia also found that the 2011 Texas State Senate Plan was enacted with a racially discriminatory purpose and thus not entitled to Voting Rights Act preclearance.  As with the Congress and the state House, elections were held under an interim plan agreed to by the parties which restored Senate District 10 to its pre-2011 configuration and thereby restored the ability of minority voters to elect a Senator of their choice. The Legislature has also adopted this interim plan as permanent and the Plaintiffs who challenged the senate plan have indicated that they are satisfied with it.  A final judgment has been entered.  An appeal from an award of attorneys' fees in favor of Plaintiffs is currently pending in the Fifth Circuit.

### E.   Tenuousness of the Policy

In addition to the seven "Senate factors" the Senate report that accompanied the 1982 Amendments to the Voting Rights Act identified two additional areas of inquiry that courts have discretion to evaluate when determining whether a Voting Rights Act violation has occurred. One of those areas is the tenuousness of the policy at issue.   One of the main justifications for the passage of and immediate implementation of SB 14 was the contention that Texas elections were affected by in-person voter fraud.  It is my belief that this contention was a pretext to politically facilitate passage of SB 14 and that SB 14 does absolutely nothing to combat in-person voter fraud.

I have been involved in a number of cases as an attorney involving election fraud and have followed several others.  The sorts of fraud I have seen have included stuffing ballot boxes, removing or replacing votes in the boxes, spoiling votes, and over voting.   None of these sorts of fraud would be prevented or affected in any way by SB 14.

I have interviewed and examined election experts and other witnesses who have described various sorts of election machine fraud, such as printing of the ballots, hacking into the counting process and, when punch cards were used, changing the pagination order in the voting booklet.   In the more than 40 years I have practiced in this area, no one has ever referred to fraud involving impersonating voters.  The reason that impersonating voters does not work as a fraud in elections is that it extremely inefficient.  In person voter fraud only allows a person to cast one fraudulent ballot at a time.  For example, look at the last Democratic Party primary for the U.S. Senate, involving David Alameel.  There were five candidates:  Alameel, Fjetland, Kim, Rodgers, and Scherr.   There were 510,009 votes cast, which meant that, to avoid a runoff, one of the candidates would have required 255,005 votes.  Mr. Alameel received 239,914 votes, which

was 15,009 short of fifty percent needed to avoid a runoff.  This is a close election by statewide standards.

I decided to conduct an experiment to see how in person voter fraud could have been used to guarantee that Mr. Alameel would avoid the runoff.  On this past primary election day, I attempted to see how many polling places I could drive to and vote at.  I found that I could get to an average of 4 polling places per hour, allowing 7.5 minutes per polling place to actually wait in line and go through the voting process.  If that were true, in the 12 hours that the polls are open, I could have cast a total of 48 votes.   If others could do it this quickly, then I would have needed 314 people, each voting 48 times to make sure that Mr. Alameel avoided the runoff.

It is unlikely that anyone would attempt such a fraud.  Three hundred people is a very large conspiracy involving a lot of risk.  If any one of the poll workers knew me or the person I was impersonating, or if anyone of the 48 people I was trying to impersonate had already voted, it would be reflected on the sign-in sheets and I would easily be discovered.    If any of the 48 people I was trying to impersonate voted on Election Day, either before or after me, I would be discovered.   If anyone involved mentioned what was going on to their significant other or to a friend, the risk of the conspiracy would become even greater.  Remember, I would need 314 other people, who would be facing the same risks.  If anyone was discovered, I would run the risk of them disclosing that this was a conspiracy.   I know a lot of people who have very strong beliefs, but I cannot imagine even one who would take this sort of risk.  And of course, the punishment for voter impersonation fraud under the Texas Election Code is quite significant, which also deters people is another reason why in-person voting fraud rarely, if ever, occurs.

In this regard, it is significant that the example of the Alameel primary was a very close but low turnout statewide election.  If we were dealing with a general election, there would be

30

hundreds of thousands of votes to make up.  In 2010, for example, Governor Perry defeated the former Mayor of Houston by 632,086 votes.   At 48 illegal votes per person, it would take a conspiracy of 13,148 persons to make up that difference.

If you examine the possibility of in-person voting fraud in a smaller jurisdiction, the possibility of such a fraudulent scheme being successfully enacted becomes even less likely.  For example, let's look at the November 6, 2013 General Election for Commissioner Precinct 3 in Comal County (New Braunfels).  The Democratic candidate was Kathleen Krueger, who is married to Ambassador Bob Kruger.  He is probably the most well-known and popular person in the county.  He was a long term member of Congress representing Comal County, and also a US Senator.  His family has lived in Comal County and operated businesses there for many years. Kathleen Tobin Kruger is a successful author and long-term member of the New Braunfels City Council.  Even though she was running as a Democratic candidate in a Republican district, she was a serious contender.

Kathleen Krueger lost the race to Republican Kevin Webb 4,592 to 3,105.  In other words, there was a 1,487 vote difference.  Since there are only 5 voting precincts in Commissioners Precinct 3, someone wishing to commit voter impersonation fraud would be able to cast only 5 votes for Ms. Krueger.  This means that the person wishing to commit in-person voter fraud would need almost 300 additional conspirators to cast enough votes by impersonation to change the results of the election.   Comal County had 108,472 persons under the 2010 Census.  This means that a Commissioners precinct would contain approximately 25,000 persons.  It is virtually impossible that 300 people could get away with each casting 5 votes.   As the jurisdictions get smaller and smaller, the logistics become even more difficult to control because everyone knows everyone.

The enactment and implementation of SB 14 creates well-documented voting problems that fall most heavily on the minority population.   The record before the legislature is replete with this sort of evidence.   The statute is simply ineffective, and it purports to prevent election fraud that does not and could not exist.   The state was on notice that SB 14 would create burdens on voters, and that in-person voter fraud is virtually non-existent or nearly impossible to commit in a way that could change the results of an election.   Witness after witness from virtually every voting and civil rights group in the state testified against SB 14, but the state enacted it anyway. Later, the state sought approval of SB 14 under Section 5 of the Voting Rights Act before a three-judge federal court in the District of Columbia.  That Court also told the state that it had not proven its case and the statute was discriminatory.  Despite years of debate over voter ID in Texas, and hotly contested litigation in D.C., absolutely no record has ever been made justifying impersonation fraud as a problem, let alone a serious one.   In forty years of practice involving elections in Texas, I can recall no case of in-person election fraud.

### III. Logistics of Obtaining a Voter Identification Card

In addition to my analysis of the history of discrimination in Texas and certain of the other Senate factors I have also briefly reviewed the effect of SB14 on residents who reside in counties that do not have a DPS office and/or who reside in the Houston and Dallas urban areas.

Approximately a third of Texas counties have no DPS office.  I have done a study of the time it would take to travel from various counties where there is no such office to the nearest one in another county.   For the most part my results show that it would take at least an hour of travel (usually 60 to 120 miles round-trip) in addition to the time it would take waiting to obtain

identification at the DPS office.  The results of this study on rural areas are attached as Appendix 5.

I have also looked at the Dallas and Harris Counties' urban areas and determined how much time it would take for someone to travel by bus to the nearest DPS office.  In most cases, it would require from one to two hours round-trip on the bus, often involving several bus changes and numerous stops.  The results of my studies on urban areas are also attached as Appendix 5.[2]

I have a client who is disabled but sufficiently mobile to take the bus.  When she lost her car because she could not afford it on SSI, she did not renew her driver's license.  She asked me how she would be able to vote, because she had heard discussion about the voter ID statute.  I asked her if she had a birth certificate, and she carefully removed her original birth certificate from her wallet.  She currently lives in Section 8 public housing.  I asked her if she knew the bus route to get to the nearest DPS office here in San Antonio.  I asked her to keep notes and call me when she went through the process.   When she took the bus, she had to make one change and several stops, and it took her about one hour to get to the DPS office.  She then waited in line.  When she presented her birth certificate, she was told that she needed a certified copy and was given a sheet of paper with the address of the place in San Antonio where she could get a certified copy.  She then had to walk a mile up a steep hill to the closest direct bus line downtown.  She took the bus and then waited for a long time to get the certified copy, which she paid for.  At that point, it was close to 4:00 pm, and she did not think that she could get back to

---

[2] I have personal experience with the process of obtaining and renewing a driver's license in Texas.  In the past, I have been to a number of DPS offices concerning my own driver's license and those of my children and spouses.  It is not unusual to spend several hours waiting in very small crowded waiting rooms.

the DPS office before it closed.   So she took a cab, which cost her $30.00.  She had intended to use that money to pay her light bill.  All told, she spent a full day and almost $60.00 to get her identification card.

These are real problems to real people.

## Conclusion

I have been involved in election issues with the Texas legislature for more than 40 years. For all of that time, the Texas Senate maintained a practice of requiring two-thirds of the vote of the Senate to bring a bill to the floor.   In 2007, this process prevented the voter ID bill from coming to the floor.  What happened is illuminating.  Senator Mario Gallegos, who was the first Hispanic senator elected from Houston, was waiting for a liver transplant when the 2007 session of the legislature opened.  When a liver became available, Senator Gallegos made a handshake deal with Lt. Governor Dewhurst: that Dewhurst would hold no vote in which Senator Gallegos' vote would make the difference.  In late May, just a few months after the agreement and transplant surgery, Lt. Governor Dewhurst welched on the deal and announced that he would bring the voter ID bill to the floor.   Although fighting organ rejection, from which he eventually died, Senator Gallegos traveled by ambulance to Austin and waited in an ante-room on a hospital bed until the Lt. Governor brought the bill up.  Senator Gallegos' vote gave the minority senators the needed vote so that the voter ID bill could not be brought to the floor due to the two-thirds rule being in effect.   After voting to effectively defeat the bill, Senator Gallegos said: "It's very important to me…. I think my constituents feel strongly about this. As long as I can stand, I need to be here." http://www.texastribune.org/2012/10/16/texas-state-senator-mario-gallegos-jr-dies/

During the 2011 legislative session, when the voter ID bill (SB 14) was passed, Senator Gallegos had recovered partially from his organ rejection problems and was not going to have to be brought by ambulance from Houston.  Since he was going to be available to cast the deciding vote, which would have blocked the bill, the senate adopted a rule -- without a single vote from a Black or Hispanic Senator -- that exempted the voter ID bill from the two-thirds requirement. The voter ID bill thus was passed using a parliamentary procedure that ignored decades of historical deference to minority interests in the Texas Senate.

The majority party of the Texas Legislature used strong-arm tactics to bring SB 14 to a vote, and ignored all proposed amendments from the minority party.  It then immediately implemented SB 14 after the *Shelby County* decision was issued by the United States Supreme Court.  SB 14 is significantly flawed.  There is a significant educational and financial gap between the racial groups.  The biggest problems in complying with the voter identification requirements will be faced by those on the lowest rungs of society.  All of the data shows that the poor and under-educated are disproportionately minorities.   The state was well aware of this and did nothing to rebut these facts during the trial in Washington, D.C.

The state was unable to preclear the voter ID bill.  It was unable to preclear its Congressional and legislative redistricting plans.  The state was roundly criticized by three three-judge district courts: two in the District of Columbia and one in Texas.   Indeed, the D.C. Court found racial intent in two of the states' redistricting plans.   Significantly, in order to pass both bills, the state had to change the rules that have been in place for decades.   This is reminiscent of old school electoral discrimination involving the right to vote in Texas.    Unfortunately, as the Attorney General showed when he announced the immediate implementation of SB14 within hours of the issuance of the *Shelby County* decision not much appears to have changed.

35

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, JANE HAMILTON, SERGIO DeLEON, FLOYD J. CARRIER, ANNA BURNS, MICHAEL MONTEZ, PENNY POPE, OSCAR ORTIZ, KOBY OZIAS, JOHN MELLOR-CRUMMEY, PEGGY HERMAN, EVELYN BRICKNER, GORDON BENJAMIN, KEN GANDY, LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) and DALLAS COUNTY, TEXAS<br>        *Plaintiffs*,<br><br>v.<br><br>RICK PERRY, Governor of Texas; and JOHN STEEN, Texas Secretary of State,<br>        *Defendants*.<br><br><br>UNITED STATES OF AMERICA,<br>        *Plaintiffs*,<br><br>TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, IMANI CLARK, AND MICHELLE BESSIAKE,<br>        *Plaintiff-Intervenors*,<br><br>TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, AND HIDALGO COUNTY,<br>        *Plaintiff-Intervenors*,<br><br>v.<br><br>STATE OF TEXAS, JOHN STEEN, in his Official capacity as Texas Secretary of State and STEVE McCRAW, in his Official capacity as Director of the Texas Department of Public Safety,<br>        *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.:<br>Case No. 2:13-CV-00193 (NGR)<br>[Lead Case]<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Civil Action No.:<br>2:13-CV-00263 (NGR) |

|  |  |  |
|---|---|---|
| TEXAS STATE CONFERENCE OF NAACP BRANCHES; and the MEXICAN AMERICAN LEGISLATIVE CAUCUS OF THE TEXAS HOUSE OF REPRESENTATIVES, <br> *Plaintiffs* <br><br> v. <br><br> JOHN STEEN, in his official capacity as Secretary of State of Texas, and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety <br> *Defendants*. | § § § § § § § § § § § § § § § | <br><br><br><br><br><br> Civil Action No.: <br> 2:13-CV-00291 (NGR) |
| BELINDA ORTIZ, LENARD TAYLOR, EULALIO MENDEZ, JR., LIONEL ESTRADA, ESTELA GARCIA ESPINOSA, LYDIA LARA, MARGARITO MARTINEZ LARA, MAXIMINA MARTINEZ LARA, AND *LA UNION DEL PUEBLO ENTERO, INC.* <br> *Plaintiffs* <br><br> v. <br><br> STATE OF TEXAS, JOHN STEEN, in His official capacity as Texas Secretary of State, and STEVE McCRAW, in his Official capacity as Director of the Texas Department of Public Safety <br> *Defendants*. | § § § § § § § § § § § § § § § § § | <br><br><br><br><br><br><br> Civil Action No.: <br> 2:13-CV-00348 (NGR) |

**Disclosure under Federal Rules of Civil Procedure/Background of Witness**

I have not written any articles in the last ten (10) years and I have testified in eight (8)

cases in the past four (4) years which are attached to this disclosure.   I have agreed to provide

my services in this matter at an hourly rate of $350.00 per hour.  I have spent approximately 94

hours on this case so far.  I anticipate that I will spend an additional forty (40) hours to complete

my work including preparing for and providing my deposition and preparing for and providing my trial testimony.  I have been paid a total of $10,000.00 to date.

The facts and data considered by me in forming the opinion expressed in my report are contained in the various appendices attached to the report and/or are included in the report together with case citations and other research performed by me and/or are based on my personal experience as a lawyer and witness in numerous election law cases in the State of Texas over the last 40 years.

Although I am a lawyer, I have also been an adjunct faculty member in the Department of Political Science and Geography and have taught a course on the redistricting process.  I have testified in a number of at-large vote dilution cases beginning in 1971 with the district court trial of *Graves v. Barnes*[3] /.  In *Graves* my testimony was used to identify the socio-economic, historical, and other such considerations that used to test for the degree of vote dilution which are sometimes referred to as *White*, *Zimmer* of Senate factors.[4]/ Articles I have written or testimony

---

[3]/ *Graves v. Barnes*, 343 F. Supp. 704 (Class action certified for all four districts in Texas 1972) (three judge) (*Graves I*)*; Graves v. Barnes*, 405 U.S. 1201 (1972);  *White v. v. Regester*, 412 U.S. 755; 93 S. Ct. 2332; 37 L. Ed. 2d 314 (1973); on remand *Graves v. Barnes*, 378 F. Supp. 640, (Class action certified for all four districts in Texas 1974) (Graves II) (three judge);  *White v. Regester*, 422 U.S. 935, 45 L. Ed. 2d 662, 95 S. Ct. 2670 (1975); on remand *Graves v. Barnes*, 408 F. Supp. 1050, (Class action certified for all four districts in Texas 1976) (Graves III) (three judge);  *Graves v. Barnes*, 446 F. Supp. 560  (Class action certified for all four districts in Texas 1976) (Graves IV)

[4]/  These factors were derived from the analytical framework of *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.ED...2d 314 (1973), as refined and developed by the lower courts, in particular by the Fifth Circuit in *Zimmer v. McKeithen*, 485 F. 2d 1297 (1973) (en banc), aff'd sub nom *East Carroll Parish School Board v. Marshall*, 434 U.S. 636, 96 S.Ct. 1083, 47 L.ED..2d 296 (1976) (*per curiam*) S.Rep., at 28, n. 113.

which I have given have been cited by numerous Federal Courts including three occasions by the Supreme Court in interpreting the Voting Rights Act,

I was also called upon to prepare plans of apportionment to demonstrate various ways that a jurisdiction can be divided into districting arrangements.  Plans which I drew or collaborated upon were used in the ***Graves/White*** litigation to split formerly at-large legislative districts in all Texas urban areas including Bexar (San Antonio), Dallas, Travis (Austin), El Paso, McLennan (Waco), Nueces (Corpus Christi), and Lubbock counties. 5/

I was responsible for or significantly involved in negotiation which led to the drawing of single member districting plans used after litigation for a number of the Cities in Texas including Houston6/, San Antonio, and Waco.  I also testified as an expert in litigation after the 1981, and the 1991 redistricting of the Texas legislature.  In 1981, I was the expert witness for the effort which led to the invalidation of the entire Texas legislative plan on a combination of State Constitutional and Fourteenth Amendments theories.

---

[5]/  Although I had been named as an attorney in the case,  with the agreement of the defendants, I participated in the first trial of the case (***Graves I***) as an expert witness on issues of remedy (creation of single member districts) polarization and cohesion.  In addition I did a number of socio-economic studies on the majority and minority communities and the history of discrimination in Texas.  In later stages, (***Graves II*** and ***Graves III***) I functioned as the lead counsel for the Hispanic plaintiffs and intervenors.

[6]/  ***Leroy v. City of Houston***, No. H-75-1731 (S.D.Tex. 1975)  (*Leroy I*)***; Greater Houston Civic Counsel v. Mann (GHCCO)***, 440 F. Supp. 696 (S.D. Tex. 1977)***; Leroy v. City of Houston***, No. H-78-2174 (S.D.Tex. 1979) (*Leroy II*)***; In re Houston***, 745 F.2d 925 (5th Cir. Tex. 1984)***; Leroy v. Houston***, 584 F. Supp. 653 (S.D. Tex. 1984) (Leroy III)***; Le Roy v. Houston***, 592 F. Supp. 415 (S.D. Tex. 1984)***; Leroy v. Houston***, 648 F. Supp. 537 (S.D. Tex. 1986)***; Leroy v. Houston***, 831 F.2d 576 (5th Cir. Tex. 1987) *cert. denied*, 486 U.S. 1008, 108 S. Ct. 1735, 100 L. Ed. 2d 199 (1988) (*Leroy IV*)***; Leroy v. Houston***, 906 F.2d 1068 (1990) (*Leroy V*)

Much of the Texas House redistricting which followed was based upon plans which I drew or collaborated upon.  After the 1990 Census, I testified in state court in a successful effort to invalidate the 1991 apportionments of the House, Senate and Congress using the Texas Constitution's Equal Rights Amendment.7/   The District Court ordered plans into effect which I offered in litigation and the 1990 redistricting plans used by Texas for the House, Senate and Congressional Districts are the result of negotiation which followed using the plaintiff's plans which I sponsored as the essential element.

I have testified in a number of cases in both State and Federal Court which have been litigated in the Southeast Texas including *Perez v. Pasadena Ind. Sch. Dist*., 958 F. Supp. 1196 (S.D. Tex. 1997).  In that case, the district court found:

> Plaintiffs also offered the testimony of George Korbel as an expert witness on the *Gingles* threshold, as well as on the Zimmer factors. Korbel is a recognized voting rights expert, whose focus is on the non-statistical analysis of elections and the factors that influence their outcome.
>
> The court finds that ...Mr. Korbel is an expert in the field of non-statistical voting rights analysis.

*Perez* 958 F. Supp.  at 1204 (S.D. Tex. 1997)

*See also* **League of United Latin American Citizens (LULAC) v. North East Ind. Sch. Dist**.,903 F. Supp. 1071(W.D. Tex. 1995).

After the 2000 Census I acted as coordinator and expert in redistricting by a number of jurisdictions including the Houston Community College District, the Houston ISD, the San

---

7/ During the effort to pass the Federal Equal Rights Amendment, the Texas legislature not only ratified the proposal but the voters overwhelmingly installed it a part of our Constitution.  It was argued that the rights guaranteed under our Constitution were similar to but stronger than those in Section 2 of the Federal Voting Rights Act or the Fourteenth Amendment.

Antonio ISD, the San Antonio Community College, the City of San Antonio, Webb County (Laredo),  Gregg County (Longview), Cameron County (Brownsville), Red River County, the San Marcos ISD, the Bexar Metropolitan Water District, Uvalde County, Bastrop County, Hays County and Val Verde County

I was involved as a lawyer and also as a witness before both the House and Senate Committees in the successful effort to extend the special provisions of the Voting Rights Act of 1965 to cover Texas.  My testimony on the historical pattern of discrimination is generally credited as forming the basis for the legal argument to include Texas and has been cited by several federal courts including the Supreme Court in the interpretation of Sections 2 and 5 of the Act.  In 1982, I again offered Congressional testimony in support of the adoption of the new provisions for Section 2 of the Voting Rights Act.  As the legislative history indicates, the effort was to install the legal analysis which resulted from *Graves/White.*

Most recently I have testified in State Court concerning the redistricting of the Beaumont ISD, in Federal Court concerning the Pasadena ISD, the Galveston County Commissioners and Constables.  I was involved in drawing and negotiating the districts in the settlement of a Federal Court Action in a case against the Lone Star Community College District (population of just under 2,000,000 persons.   I testified at the settlement hearing held by the Court to adopt the plan in November 2013.

I have testified in the earlier hearings that have been held in this matter and in the parallel case which was tried in the District Court for the District of Columbia.  I am currently acting in the capacity of expert witness in redistricting matters in both the state and Federal Court matters against the Beaumont ISD.  I am also acting as an expert witness in the case of *LULAC v. The*

42

*Edwards Aquifer Authority.*   Late last year I testified in a case against the Pasadena ISD and against Galveston County.  I was involved as a lawyer and also as a congressional witness in the successful effort to extend the special provisions of the Voting Rights Act of 1965 to cover Texas.  I declare under penalty of perjury under the laws of the United States that this report is true and correct to the best of my knowledge.

Signed this the 27th day of June, 2014.


<u>/s/ George Korbel</u>
George Korbel

43

*ATTACHMENT*

***Cases in which I have Testified and or Given Depositions in the Past Five Years***

***Rodriguez et al v. Harris County, Texas*** , (Filed: August 5, 2011 as 4:2011cv02907) Testimony at deposition and at trial.

***Cisneros v Pasadena ISD*** 4:12-CV-2579 Testimony at trial.

***Rodriguez v. Beaumont Independent School District***, E-194-295 172 District Court Jefferson County. Testimony at hearing.

***Petteway, et al. v. Galveston County, Texas, et al.*** (Filed: November 14, 2011 as 3:2011cv00511) Deposed, testimony at hearing and at trial.

***Hubbard et al v. Lone Star College System,*** (Filed: June 4, 2013 as 4:2013cv01 Testimony at hearing.

***League of United Latin American Citizens et al v. Edwards Aquifer Authority,*** (Filed: June 21, 2012 as 5:2012cv00620 deposed Cross Motions for Summary Judgment/trial on merits pending)

***Texas v United States*** United States District Court for the District of Columbia 1:11-cv-01303 Testimony at trial

***Perez v Texas***, (US District Court for the Western District of Texas *Case 5:11-cv-00360)* testimony by deposition and at trial.  Trial on merits pending.

Appendix 1 to Report of George Korbel

A Brief History of Racial and Ethnic Discrimination in Texas from 1970 to Date

Texas has a long history of racial discrimination, which is consistent with the problems facing minorities in the other states that were covered by the Voting Rights Act.  See generally *Beal v. Holcombe*, 1951, 193 F.2d 384 (holding that a city ordinance setting aside public parks for the exclusive use of Negroes and reserving all other public parks for the exclusive use of white people was unconstitutional); *Tippins v. State*, 1920, 86 Tex.Cr.R. 205, 217 S.W. 380 (holding that a complaint charging delinquency need not allege that a child is white or black because under the Texas Code of Criminal Procedure a separate place of confinement is provided for Negro delinquents); *Strauss v. State*, 1915, 76 Tex.Cr.R. 132, 173 S.W. 663 (upholding the constitutionality of a city ordinance making it unlawful for a white person and any Negro to have sexual intercourse with each other within the city limits); *In Re Gomez*, Tex.Civ.App.1967, 424 S.W.2d 656 (declaring unconstitutional a statute prohibiting the adoption of a white child by a Negro person or of a Negro child by a white person); *Harvey v. Morgan*, Tex.Civ.App.1954, 272 S.W.2d 621 (declaring unconstitutional a criminal provision prohibiting any fistic combat, match, boxing, sparring, or wrestling contest or exhibition between any person of the white race and any person of the Negro race); *O'Connor v. Dallas Cotton Exchange*, Tex.Civ.App.1941, 153 S.W.2d 266 (holding that plaintiff alleged a cause of action when his wife was wrongfully excluded from a passenger elevator set apart for whites and compelled to ride in an elevator set aside for Negroes).



Veasey Plaintiffs
Appendix
No. 1

Other minorities faced grand jury issues throughout the 1970s, which mirrored those against Blacks.  See, for example, *Juarez v. State*, 102 Tex.Cr.R. 297, 277 S.W. 1091 (prohibiting the systematic exclusion of Roman Catholics from juries on Fourteenth Amendment grounds).  See also *Hernandez v. Texas*, 347 U.S. 475 (1954) and *Castaneda v. Partida*, 430 U.S. 482 (1972), discussed in greater detail later.

Many jurisdictions instituted restrictive covenants against Hispanics.  *See Clifton v. Puente* [Tex.Civ.App.] 218 S.W.2d 272 (outlawing restrictive covenants prohibiting the sale of land to persons of Mexican descent).  Essentially, discrimination against Hispanics mirrored discrimination against African-Americans.

And then there was school desegregation.

## School Desegregation

Texas had a Constitutional provision that required the segregation of African-American students.  There was no similar provision for Hispanics.  However, many school districts maintained so-called "Mexican Schools."  *See, e.g.*, *Independent School District v. Salvatierra*, 33 S.W.2d 790 (Tex. Civ. App. 1930), *appeal dismissed for want of jurisdiction and cert. denied*, 284 U.S. 580 (1931) (enjoining Del Rio Independent School District from constructing an addition to a Mexican School).  On a later appeal, *Salvatierria* was reversed by the Texas Court of Appeals and the Supreme Court denied cert. [need citation]

In some other districts where there were few Hispanic students, those students attended Black schools or, in areas where there were few Blacks, they were assigned to the Mexican Schools.  This sort of segregation continued through the 1950s when the school districts in Travis, Hays, Bastrop, Caldwell, and Colorado Counties were enjoined from such segregation.  *See, e.g.*, *Delgado v. Bastrop ISD*, 388 Civil (June 15, 1948 W.D. Tex) ("The Defendant LA

Woods, as state Superintendent of Public Instruction is hereby permanently restrained and enjoined from in any manner participating in the custom, usage or practice of segregating pupils of Mexican or other Latin American descent in separate schools or classes.").

The effect of *Delgado* on school integration was limited by resistance on the part of the state educational complex.  In what Allsup (1979) described as "White obstinacy," school districts throughout Texas failed to comply with the *Delgado* decision. This was encouraged by the State Board of Education, which created a complex bureaucratic system of grievances and redress that abetted noncompliance with the *Delgado* ruling (San Miguel, 1987).[1] *See also Hernandez v. Driscoll Consolidated Independent School District*, 1957 U.S. Dist. LEXIS 4784 (S.D. Tex. 1957); *Perez v. Sonora Independent School District*, C.A. 6-224 (N.D. Tex.1969); *Cisneros v. Corpus Christi Independent School District,* 324 F.Supp. 599 (S.D. Tex.1970), *affirmed in part and modified in part*, 467 F.2d 142 (5th Cir. 1971). Judge Seals stated in *Cisneros*:

> [I]t is clear to this court that these people for whom we have used the word Mexican-Americans to describe their class, group, or segment of our population, are an identifiable ethnic-minority in the United States, and especially so in the South-west [and] in Texas. . . . This is not surprising; we can notice and identify their physical characteristics, their language, their predominant religion, their distinct culture, and, of course, their Spanish surnames. And if there were any doubt in this court's mind, this court could take notice, which it does, of the congressional enactments, governmental studies and commissions on this problem.

324 F. Supp. at 607-08 (footnotes omitted).

---

[1] Allsup, C. (1977). Education is Our Freedom: The American G.I. Forum and the Mexican American School Segregation in Texas, 1948–1957. *Aztlán*, 8, 27–50; San Miguel, G., Jr. (1987). "Let All of Them Take Heed'': Mexican Americans and the Campaign for Educational Equality in Texas, 1910–1981. Austin, TX: University of Texas Press; Valencia, Richard (Columbia University Teachers College Record Volume 107, Number 3, March 2005), The Mexican American Struggle for Equal Educational Opportunity.

In the late 1970s, Texas attempted to exclude undocumented persons from free public education.  This was stricken in **Plyler v. Doe,** 457 U.S. 202 (1982), in which the Court stated:

> There is simply no support for appellants' suggestion that "due process" is somehow of greater stature than "equal protection" and therefore available to a larger class of persons. To the contrary, each aspect of the Fourteenth Amendment reflects an elementary limitation on state power. To permit a State to employ the phrase "within its jurisdiction" in order to identify subclasses of persons whom it would define as beyond its jurisdiction, thereby relieving itself of the obligation to assure that its laws are designed and applied equally to those persons, would undermine the principal purpose for which the Equal Protection Clause was incorporated in the Fourteenth Amendment. The Equal Protection Clause was intended to work nothing less than the abolition of all caste-based and invidious class-based legislation. That objective is fundamentally at odds with the power the State asserts here to classify persons subject to its laws as nonetheless excepted from its protection.

457 U.S. at 213.

In the initial Texas desegregation decisions following **Brown v Bd. of Education**, Texas school districts had attempted to minimize the extent of Black integration by following up on the **Delgado** case, which had essentially found that Hispanics were not Black and therefore were not covered by the Texas constitutional prohibition against school integration.  So Texas districts engaged in desegregation mainly between Blacks and Hispanics, and only minimally with Whites.  A series of cases in the Fifth Circuit decided in the early- to mid-1970s made it clear that this was not integration.

However, school districts throughout the state continued to fight against desegregation. There were battles over the Houston ISD, the Corpus Christi ISD, The Waco ISD, the Austin ISD, and virtually all of the other school districts in the state.  Virtually all of Texas's school districts were subject to school desegregation orders.  In the larger cities these lawsuits were mammoth.  A case in point: the desegregation of the Dallas ISD, which was an almost fifty-year odyssey.

Within days after the decision in **Brown v. Bd. of Education**, a desegregation case was filed against the Dallas ISD, which was promptly dismissed by a federal district court.  The Fifth Circuit had to reverse the district court's dismissal.  ***Brown v. Rippy***, 233 F.2d 796 (5th Cir. 1956), *cert. denied* 352 U.S. 878 (1956).  After a remand, the Fifth Circuit was forced to reverse the District Court again in ***Borders v. Rippy***, 247 F.2d 268 (5th Cir. 1957) (reversing an order of the district court dismissing the suit for failure of the plaintiffs to exhaust their state administrative remedies).  Later in the year, the Fifth Circuit set aside another district court order because "that court had rather petulantly directed immediate massive desegregation of the DISD without holding hearings, making findings, and directing submission of a plan."  ***Rippy v. Borders***, 250 F.2d 690 (5th Cir 1957). *See also **Boson v. Rippy***, 275 F.2d 850 (5th Cir. 1960) (directing the District Court to hold hearings and requiring that the DISD submit a desegregation plan); ***Boson v. Rippy***, 285 F.2d 43 (5th Cir. 1960) (ordering the district court to require the DISD to adopt a "stair-step" plan of desegregation under which one grade per year would be removed from the dual educational structure and administered in a unitary fashion).

In 1965, the Fifth Circuit twice ordered the Dallas ISD to immediately desegregate the twelfth grade. ***Britton v. Folsom***, 348 F.2d 158 (5th Cir. 1965); ***Britton v. Folsom***, 350 F.2d 1022 (5th Cir 1965).

In spite of all of the litigation in the 1950s that required schools to be desegregated, the Fifth Circuit pointed out that no actual integration had yet taken place:

(a) 71 of the DISD's 180 schools were 90% or greater white.
(b) 40 of the DISD's schools were 90% or greater black.
(c) 49 of the DISD's schools' student populations were 90% or greater of minority races (i.e., black and Mexican-American combined).
(d) 91.7% of all black students in the DISD attended schools in which the student body was composed of 90% or greater minority racial makeup.
(e) Less than 3% of all black students in the DISD attended elementary or secondary schools in which the majority of the student body was white.

(f) Only 2% of black elementary students in the DISD attended schools in which the majority of the student body was white.

(g) Of the 37 new schools constructed, or those to which additions had been made, between 1965 and 1970, 34 had student enrollments 90% or greater black, 90% or greater minority (black and Mexican-American), or 90% or greater white.

*Tasby v. Estes*, 517 F.2d 92, 96 (5th Cir. 1975).

With the help of the Texas Education Agency, the district court in *Tasby* came up with a novel way to avoid bussing:

> I am opposed to and do not believe in massive cross-town bussing of students for the sole purpose of mixing bodies. I doubt that there is a Federal Judge anywhere that would advocate that type of integration as distinguished from desegregation. There are many many other tools at the command of the School Board and I would direct its attention to part of one of the plans suggested by TEDTAC (Texas Education Desegregation Technical Assistance Center) which proposed the use of television in the elementary grades and the transfer of classes on occasion by bus during school hours in order to enable the different ethnic groups to communicate. How better could lines of communication be established than by saying, "I saw you on TV yesterday," and, besides that, a television is much cheaper than bussing and a lot faster and safer.

517 F. 2d at 97, *citing Tasby v Estes*, 342 F.Supp. 945 (S.D. Tex.1971).

The final order of the District Court adopted a version of the television integration along with a weekly field trip to Anglo schools:

> C. To establish elementary class schedules and courses of study so as to provide each elementary student with a daily minimum of one hour of contact with students of another race. Such contact shall be a simultaneous two-way oral and visual communication via television cable between two or more schools; classrooms of each such elementary school shall be identifiably paired in such a manner so that approximately two Anglo classrooms are paired with one minority classroom for the entire academic year. It is contemplated that from two to seven studio classrooms will be established at each elementary school.

*Tasby*, 517 F 2d at 99.

The Fifth Circuit also found that the Dallas school district was discriminating against Hispanic students. "Sufficient statistical evidence is available in the record," the court said, "to establish the isolation of Mexican-American students in the DISD from white students and the

DISD's practice of 'integrating' its Mexican-American students with black students." *Tasby v. Estes*, 517 F.2d 92, 106 (5th Cir. 1975), *cert denied* 423 U.S. 939 (1975). The court reiterated its position from *United States v. Texas Education Agency*, 467 F.2d 848 (5th Cir. 1972) that, "at least in the State of Texas, segregation of Mexican-Americans in the public schools constitutes a deprivation of the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution." *Estes*, 517 F.2d at 107.

This litigation remained ongoing into the 1980s. *See Tasby v. Estes*, 572 F.2d 1010 (5th Cir. 1978), *cert dismissed as improvidently granted sub nom. Estes v. Metropolitan Branches of Dallas NAACP*, 444 U.S. 437 (1980); *Tasby v. Estes,* 651 F.2d 287, 288 (5th Cir. 1981), *rev'ing and remanding Tasby v. Estes*, 498 F.Supp. 1130 (N.D.Tex.1980) (reversing the district court's denial of fee application on behalf of James Nabritt of the NAACP Legal Defense Fund); *Tasby v. Wright*, 585 F. Supp. 453 (N.D. Tex. 1984); *Tasby v. Wright*, 520 F.Supp. 683, 741 (N.D. Tex. 1981).

The district court finally moved the school district to a three-year monitoring period in 1994, the first letup in over twenty years:

> The skepticism of the Black School Board trustees and some in the Black community toward the Board's commitment to desegregation is understandable in light of the history of this case. For many years the DISD refused to recognize the Supreme Court's 1954-55 command to desegregate. However, the desegregation achievements of recent years lead the Court to believe that such intransigence no longer exists. The desegregation shortcomings pointed out in this Opinion are due primarily, and perhaps solely, to failures by a few district personnel to follow through in the implementation of established desegregation policies.
>
> From time to time the Court has expressed its impatience at the apparent lack of motivation and good management responsible for these problems. The three year monitoring period which now commences affords the District ample time to remedy the relatively few problems mentioned in this Opinion. During the three year period the District will continue to report to the Court and the Auditor will continue to monitor the operations of the District. After three years, if the District has continued to substantially comply with the Judgment and other desegregation decrees of the Court, and has met the requirements of this Opinion,

the Court will hold a hearing at which Plaintiffs and Intervenor will have opportunity to show cause why the case should not be dismissed. Unless good cause is shown, the Court will then relinquish jurisdiction and dismiss the case by appropriate decree.

***Tasby v. Woolery***, 869 F. Supp. 454, 477-78 (N.D. Tex. 1994).

In 2003, the district court dismissed the case. Only after more than thirty years

had Dallas ISD's intransigence finally given way to compliance:

With today's ruling the Court ends the lawsuit filed in 1970 by the courageous African American Plaintiff, Sam Tasby. In the 33 years since the suit was filed the Dallas Independent School District has accomplished much. Although in past years it has seemed that the School District lacked determination to comply with Constitutional requirements and Court orders, that is no longer the case. The segregation prohibited by the United States Constitution, the United States Supreme Court, and federal statutes no longer exists in the DISD.

***Tasby v. Moses***, 265 F. Supp. 2d 757, 780-81 (N.D. Tex. 2003).

While the case of Dallas is illustrative, it is by no means unique. The Houston ISD

desegregation process was as complicated as that in Dallas, and did not end until the 1980s:

In 1956, two years after the Supreme Court decided Brown v. Topeka Board of Education, . . . a group of parents of black children enrolled in the Houston Independent School District (HISD) filed this suit to desegregate its schools. After twenty-five years of court proceedings and twelve years of operation under a court-ordered desegregation plan, the district court has now decided that the school district has eliminated all vestiges of de jure segregation and has become unitary. The vestiges of all discriminatory practices have been eliminated in every aspect of school operations, but efforts at integration have failed in one aspect alone: the district has not achieved integrated student attendance. The district court found, however, that the homogeneous student composition of the schools does not stem from the unconstitutional segregation practiced in the past but from population changes that have occurred since this litigation commenced, and that the geography of the school district, traffic conditions, and population patterns make further efforts to eliminate all one-race schools impractical.

***Ross v Houston ISD***, 699 F.2d 218 (5th Cir. 1983)

The efforts to prevent desegregation were not limited to individual school districts. The

state of Texas itself engaged in discrimination. In what is certainly the largest school

desegregation case at the time, the federal government sued the state of Texas. The case resulted

in a desegregation order that applied to over two million students in more than 1,000 school

districts.  *United States v. Texas Education Agency*, 321 F. Supp. 1043 (E.D. Tex 1970),*aff'd*,

447 F.2d 441 (5th Cir. 1971). The district court noted that the state of Texas encouraged school

discrimination:

> In its Memorandum Opinion of December 4, 1970, the Court stated that "the
> policies and practices of TEA in administering the public school system in Texas
> have frequently — whether inadvertently or by design —encouraged or resulted
> in the continuation of vestiges of racially segregated public education within the
> State." 321 F.Supp. 1043 (E.D.Tex. 1970). The impetus for the scope of this
> portion of the Order, therefore, came largely from the Court's belief that the all-
> black school districts involved in this case could not have operated without state
> support . . .

*United States v. Texas Education Agency*, 330 F.Supp. 235, 241-42 (E.D. Tex. 1971); *see also*

*United States v. Tyler Indep. Sch. Dist.* Civil Action No. 5176 (E.D. Tex. July 8, 1971),

*available at* http://tarlton.law.utexas.edu/exhibits/ww_justice/documents_2/Tyler_order

_1_1971.pdf (noting that the level of segregation is demonstrated by "[t]he mere fact that a

dispute arising out of a cheerleader election [involving separate elections for 2 black and 4 white

cheerleaders] has been brought before the Federal Courts").


## Housing Discrimination

Texas authorities engaged in housing discrimination that extended into the early 1990s.

*See* *Young, v Pierce*, 544 F. Supp. 1010 (E.D. Tex. 1982); *Young v Pierce*, 628 F. Supp. 1037

(E.D. Tex. 1985) ("HUD has intentionally and knowingly continued to promote purposefully

segregated housing in the class action counties. It is beyond dispute that the Constitution

prohibits the government from funding racial discrimination.").

The *Young* case began in 1980 and involved over seventy housing authorities in thirty-six East Texas counties. The named plaintiffs, Lucille Young, Virginia Wyatt, and Helen Ruth Jackson, had applied for low-income housing operated by the Clarksville and Pittsburg Public Housing Authorities. The plaintiffs alleged that tenants were assigned on the basis of race, that black and white residents of the same complex were placed into segregated areas, and that sites for new construction had the effect of maintaining black housing in primarily black neighborhoods and white housing in primarily white neighborhoods. A federal district court agreed with the plaintiffs, holding that the county housing authorities had engaged in racial discrimination:

> The record in this case clearly makes out defendant's violation of the Fifth Amendment to the United States Constitution. HUD has consistently supported and funded each project instituted under its aegis.  HUD's inactivity has been limited to those aspects of its affirmative action responsibilities which might have an actual impact in desegregating federally funded housing. It has actively employed race-conscious policies which result in segregation. In the area covered by this action, those who have administered these projects have done so in a way clearly animated by racial prejudice. HUD has a duty to know how its money is spent, and in fact has known that it is supporting segregated housing in East Texas. Notwithstanding, it has continued to actively support the system in perhaps the most effective possible way—by paying for it. HUD has thus played a crucial and continuing role in creating and maintaining a large system of publicly funded segregated housing.

*Young v. Pierce*, 628 F. Supp. at 1056-57.

The *Young* case was not ultimately resolved until the entry of a settlement agreement and the payment of attorneys' fees in the mid-1990s. *See Young v Cisneros*, Civil Action No. P-80-8-CA (E.D. Tex. 1995), *aff'd,* 74 F.3d 1237 (5th Cir. 1995).

Dallas public housing was little better than in the East Texas counties involved in *Young*:

> The history of public housing in Dallas is a sordid tale of overt and covert racial discrimination and segregation. . . . Virtually all non-elderly public housing units were constructed in minority areas of Dallas. No new public housing units were built between 1955 and 1989 at least in part for fear that they might be located in

white areas. Tenant selection and assignment procedures for public housing units were crafted and administered to maintain racially segregated projects. DHA's Section 8 housing programs were operated to discourage blacks from moving into white areas of metropolitan Dallas. . . . Blacks were purposefully segregated for decades into either Section 8 housing in minority areas of Dallas or predominantly black housing projects in minority areas of Dallas.

*Walker v. City of Mesquite*, 169 F.3d 973 (1999) (citations and footnotes omitted).

The extended litigation against Dallas to remedy this discrimination was not ultimately disposed of until 2005:

The long saga of this case began in 1985 with a lawsuit filed on behalf of African-American plaintiffs against DHA. It alleged, inter alia, that DHA engaged in systematic racial segregation through its construction and maintenance of public housing in Dallas. In order to settle the claim that it consciously failed to locate public housing in predominantly white neighborhoods, DHA agreed to a 1987 consent decree integrating Dallas public housing. In 1994, after repeated breaches of the consent decree, DHA and the plaintiffs in that case negotiated a remedial order which was then imposed by the district court.

*Walker v. City of Mesquite*, 402 F.3d 532 (5th Cir. 2005) (footnote omitted); *see* **Walker v. City of Mesquite**, 313 F.3d 246 (5th Cir 2002).

**School Finance Litigation**

The now almost 45-year struggle for equalizing school finance in Texas continues to this day. *See generally* **San Antonio Indep. Sch. Dist. v. Rodriguez**, 411 U.S. 1 (1973). The Texas Supreme Court itself has noted the uneven financing of schools throughout the state:

There are glaring disparities in the abilities of the various school districts to raise revenues from property taxes because taxable property wealth varies greatly from district to district. The wealthiest district has over $14,000,000 of property wealth per student, while the poorest has approximately $20,000; this disparity reflects a 700 to 1 ratio. The 300,000 students in the lowest-wealth schools have less than 3% of the state's property wealth to support their education while the 300,000 students in the highest-wealth schools have over 25% of the state's property wealth; thus the 300,000 students in the wealthiest districts have more than eight times the property value to support their education as the 300,000 students in the poorest districts. The average property wealth in the 100 wealthiest districts is more than twenty times greater than the average property wealth in the 100 poorest districts.  Edgewood I.S.D. has $38,854 in property wealth per student;

Alamo Heights I.S.D., in the same county, has $570,109 in property wealth per student.

***Edgewood v. Kirby***, 777 S.W.2d 391, 392 (Tex.1989).

The need for equality in school finance is underlined by the studies which set out examples of the continuing poor performance of minority students.  As a recent example, see ***Texas Taxpayer and Student Fairness Coalition v Williams***. Cause No. D-1-GN-11-003130 (200th State District Court, February 4, 2013), *available at* https://www.tasb.org/Legislative/Issue-Based-Resources/School-Finance /documents/ruling.aspx, in which a state judge ruled that the system Texas uses to fund public schools violates the state's constitution by not providing enough money to school districts and failing to distribute the money fairly. "This was the sixth case of its kind since 1984." Will Weissert, *Texas School System Finance Plan Unconstitutional, Judge Rules*, Huffington Post (Feb. 4, 2013, 7:14 PM), http://www.huffingtonpost.com/2013/02/05/texas- school-system- finan_n_2622002.html. That case continues to this very day. *See* Joshua Fechter, *Judge Refuses to Recuse Self, Despite Claims of Coaching Attorneys*, San Antonio Express News, June 3, 2014, at 1. Judge Dietz had previously ruled that the school finance system was unconstitutional after the Texas Legislature cut roughly $5.4 billion out of Texas public schools in 2011. He reopened the trial earlier this year to weigh how restoration of some of those funds and new testing standards approved by state lawmakers will impact the system. *Id.*

## Discrimination in the Provision of Higher Education

The school finance litigation spawned an effort to increase university availability in the heavily Hispanic Rio Grande Valley. Plaintiffs brought a class action suit alleging that the almost totally Hispanic area along the Rio Grande River in South Texas was discriminated against in the provision of higher education. *See **Clements v LULAC**, 800 S.W.2d 948 (1990) (ruling on

standing). The courts found that there were significant funding disparities between the heavily

Hispanic border area and other parts of the state, and that these disparities occurred in the

shadow of discrimination:

> Although the case was tried to a jury, at the close of evidence the trial court granted plaintiffs' motions for instructed verdict and for uncontroverted fact findings on certain statistical matters. Among these were the following: (1) about 20% of all Texans live in the border area, yet only about 10% of the State funds spent for public universities are spent on public universities in that region; (2) about 54% of the public university students in the border area are Hispanic, as compared to 7% in the rest of Texas; (3) the average public college or university student in the rest of Texas must travel 45 miles from his or her home county to the nearest public university offering a broad range of masters and doctoral programs, but the average border area student must travel 225 miles; (4) only three of the approximately 590 doctoral programs in Texas are at border area universities; (5) about 15% of the Hispanic students from the border area who attend a Texas public university are at a school with a broad range of masters and doctoral programs, as compared to 61% of public university students in the rest of Texas; (6) the physical plant value per capita and number of library volumes per capita for public universities in the border area are approximately one-half of the comparable figures for non-border universities; and (7) these disparities exist against a history of discriminatory treatment of Mexican Americans in the border area (with regard to education and otherwise), and against a present climate of economic disadvantage for border area residents.

*Richards v. LULAC*, 868 S.W.2d 306 (Tex. 1993).

The *LULAC* suit ultimately led to legislative action to remedy this history of

discrimination. The legislature created a program to increase higher education opportunities for

Hispanics, which was referred to as "The South Texas/Border Initiative." *See* Teri Flack,

*Presentation on South Texas Border Initiatives*, Presentation Before the House Border and

International Affairs Comm. of the Texas House of Representatives, March 6, 2003, *available at*

http://www.thecb.state.tx.us/reports/PDF/0592.PDF.

**The Poll Tax to Voter ID: An Effort to Make It More Difficult to Qualify to Vote**

The struggle for voting rights has stretched over the past century and a half.  After Reconstruction ended, Texas maintained the same sorts of discriminatory statutes that marked the other Confederate States.

In the early 1900s Texas adopted the Poll Tax. *See* Tex. Rev. Civ. Stat. Ann. § 2959 (1925).  This was in addition to a provision that prohibited Black voting in the only election that mattered: the Democratic primary.  *See* Tex. Rev. Civ. Stat. Ann. § 3107 (1925) ("[I]n no event shall a Negro be eligible to participate in a Democratic party primary election . . . in the State of Texas."). In 1926 the voting exclusion was struck down by the Supreme Court in ***Nixon v. Herndon***, 273 U.S. 536 (1926).

Quite literally before the ink was dry on the ***Herndon*** case, the legislature passed a statute which provided that political parties could make their own rules relating to membership.[2]

> Promptly after the announcement of that decision, the Legislature of Texas enacted a new statute . . . repealing the article condemned by this Court; declaring that the effect of the decision was to create an emergency with a need for immediate action; and substituting for the article so repealed another bearing the same number. By the article thus substituted, "every political party in this State through its State Executive Committee shall have the power to prescribe the qualifications of its own members and shall in its own way determine who shall be qualified to vote or otherwise participate in such political party; provided that no person shall be denied the right to participate in a primary in this State because of former political views or affiliations or because of membership or nonmembership in organizations other than the political party."

---

[2] "Texas was the only State where the white primary was required by law. All other states that had the white primary did so as a matter of party rules or custom rather than law. . . . Finally, violence and intimidation were also used in Texas to discourage African-Americans and, at times, Hispanics from voting. The use of these techniques against Hispanics also set Texas apart from other southern states." Ken Collier, Steven Galatas, & Julie Harrelson-Stephens, *Lonestar Politics: Tradition and Transformation in Texas* 246-47 (3d ed. 2013), *available at* http://www.cqpress.com/docs/college/Collier_Lone%20Star%203e%20CH9.pdf.

*Nixon v Condon* 286 U.S. 73, 81-82 (1932) (citation omitted).

Under the aegis of this statute, the Harris County Democratic party adopted a resolution providing that "all white democrats who are qualified under the constitution and laws of Texas and who subscribe to the statutory pledge provided in Article 3110, Revised Civil Statutes of Texas, and none other, be allowed to participate in the primary elections." This was initially affirmed by the Federal Courts in *Grigsby v Harris*, 27 F.2d 942, 943 (1928), and later in *Nixon v. Herndon*, 34 F.2d 464 (W.D. Tex. 1929), *aff'd* 49 F.2d 1012 (5th Cir. 1931).

> The Fourteenth Amendment is expressly directed against prohibitions and restraints imposed by the states, and the Fifteenth protects the right to vote against denial or abridgment by any state or by the United States; neither operates against private individuals or voluntary associations. United States v. Cruikshank, 92 U.S. 542, 23 L. Ed. 588; Virginia v. Rives, 100 U.S. 313, 25 L. Ed. 667; James v. Bowman, 190 U.S. 127, 23 S. Ct. 678, 47 L. Ed. 979. A political party is a voluntary association, and as such has the inherent power to prescribe the qualifications of its members. The act of 1927 was not needed to confer such power; it merely recognized a power that already existed.

*Nixon v Condon*, 49 F.2D 1012, 1013-1014 (5th Cir. 1931)

> [Texas] say[s] that the legislative intent to make the test of Democratic party affiliation a matter of state rather than party action is evidenced by the enactment in May, 1923, at the second called session of the Thirty-Eighth Legislature of a law then designated article 3093a, reading as follows: "Article 3093a. All qualified voters under the laws and Constitution of the state of Texas, who are bona fide members of the Democratic party, shall be eligible to participate in any Democratic
> party primary election, provided such voter complies with all laws and rules governing party primary elections; however, in no event shall a negro be eligible to participate in a Democratic party primary election held in the state of Texas, and should a negro vote in a Democratic primary election, such ballot shall be void and election officials are herein directed to throw out such ballot and not count the same" — and later by the enactment in June, 1927, of an act repealing same and enacting new article 3107, reading as follows: "Article 3107. Every political party in this state through the state executive committee shall have the power to prescribe the qualifications of its own members and shall in its own way determine who shall be qualified to vote or otherwise participate in such political party: Provided that no person shall ever be denied the right to participate in a primary in this state because of former political views or affiliations or because of membership or nonmembership in organizations other than the political party."

*Nixon v Condon*, 286 U.S. 73 (1932).

The Supreme Court would have none of this, and called the new law what it was:

discrimination.

> Delegates of the state's power have discharged their official functions in such a way as to discriminate invidiously between white citizens and black. . . . The Fourteenth Amendment, adopted as it was with special solicitude for the equal protection of members of the Negro race, lays a duty upon the court to level by its judgment these barriers of color.

*Nixon v Condon*, 286 U.S. 73, 89 (1932) (citations omitted).

Shortly after *Condon*, Texas abandoned all responsibility for primaries, handing over

power to the political parties.  The Democratic Party immediately adopted the same exclusionary

language that had been stricken in *Condon.*   The Court, illogically, found this arrangement to be

acceptable: "We are not prepared to hold that in Texas the state convention of a party has

become a mere instrumentality or agency for expressing the voice or will of the state." *Grovey v*

*Townsend*, 295 U.S. 45 (1935).

The exclusion of African-Americans from voting in Texas continued through the Second

World War.  In 1944, the issue again came to the U.S. Supreme Court.  *Grovey* was specifically

overruled with the recognition that

> [t]he United States is a constitutional democracy. Its organic law grants to all citizens a right to participate in the choice of elected officials without restriction by any state because of race. This grant to the people of the opportunity for choice is not to be nullified by a state through casting its electoral process in a form which permits a private organization to practice racial discrimination in the election.

*Smith v. Allwright* , 321 U.S. 649, 664 (1944).

Defeated in its use of the white primary, the State continued its effort to exclude

minorities from the process. This time, Texas used the so-called Jaybird technique: a pre-primary

in which only whites were allowed to participate.  The Supreme Court struck this new method

down in **Terry v. Adams**, 345 U.S. 461 (1953).[3]  A method similar to the Jaybird techniques was

then used by all-white groups to slate candidates for another two decades.  Although sometimes

an African-American or Hispanic was slated, it was only because of action by the white-

dominated slating group.  A three-judge court, and then the Supreme Court, found this practice to

be unconstitutional:

> [T]he facts clearly show that the Negro community in Dallas County participates
> in the selection of the Democratic primary candidates only in the recruiting
> process. But it is hardly adequate, for purposes of claiming effective participation,
> to say that the black community is consulted with respect to the sole black
> candidate placed on the [Dallas Committee for Responsible Government] slate.
> The requirement of effective participation can be answered only by showing that
> the interests of the black ghetto, like those of the white areas, are taken into
> consideration in the formulation of the entire slate. It is clear from the evidence in
> this case that such consideration never occurs. **In essence, we find that the
> plaintiffs have shown that Negroes in Dallas County are permitted to enter
> the political process in any meaningful manner only through the benevolence
> of the dominant white majority. If participation is to be labeled "effective"
> then it certainly must be a matter of right, and not a function of grace.**

**Graves v Barnes**, 343 F.Supp. 704, 726 (W.D. Tx 1972) (three-judge court), *aff'd sub nom.*

**White v Regester**, 412 U.S. 755 (1973) (emphasis added).

Slating groups such as this were also common in at-large municipal and school board

elections.  In San Antonio, until at-large elections were judicially eliminated in the late 1970s, an

organization known as the Good Government League controlled the elections to the City

Council. *See generally* Leslie Bargsley & Leslie Friedlander, *Chapter One – San Antonio*, *in* 2

*Local Government Election Systems*, at 3 (Special Project Report, Lyndon B Johnson School of

Public Affairs, University of Texas at Austin, 1984) ("Under the at-large system, most agreed

---

[3] The District Court held that the Jaybird racial discriminations were invalid, and entered judgment accordingly. **Terry v Adams**, 90 F. Supp. 595 (S.D. Tex. 1950). The Court of Appeals reversed, holding that there was no constitutional or congressional bar to the admitted discriminatory exclusion of Negroes because the Jaybird primaries were not to any extent state-controlled. **Adams v Terry**, 193 F.2d 600 (5th Cir. 1952).

that only those minorities anointed by the GGL were given the chance to serve."). In Dallas, city elections were controlled by the Citizens Charter Association (CCA). *See* Claire Brewer & Jim Witcher, *Chapter Five – Dallas*, *in Local Government Elections Systems*, *supra*, at 45 ("From the late 1920s until the early 1970s, the CCA was unbeatable. The CCA candidates for the 11 at-large seats did not campaign individually, but were promoted as a team. The CCA was able to retain control of the city council through carefully chosen slates of candidates and money.").

When minorities were finally allowed to vote in the Democratic primary, they faced the poll tax—which had been found constitutional in ***Breedlove v. Suttles***, 302 U.S. 277 (1937).  The poll tax was not repealed until 1964, with the adoption of the 24th Amendment.[4] Even then, the Southern States continued to enforce a poll tax in state elections until the Supreme Court overruled ***Breeedlove*** in 1966. The Texas poll tax remained in effect until it was invalidated in 1966. ***United States v. Texas***, 252 F. Supp. 234 (W.D. Tex. 1966), *aff'd* ***Texas v. United States***, 384 U.S. 155 (1966).

In response, the Texas Legislature immediately enacted an annual voter registration requirement, which was not removed until 1971. ***Beare v. Smith***, 321 F. Supp. 1100 (W.D. Tex. 1971) (three-judge court), *aff'd sub nom.* ***Beare v. Briscoe***, 498 F.2d 244 (5th Cir. 1974). The court in ***Smith*** recognized that this was just the old discrimination in a new form:

> It is beyond doubt that the present Texas voter registration procedures tend to disenfranchise multitudes of Texas citizens otherwise qualified to vote. The

---

[4] As an aside, Texas was one of the few states that failed to ratify the 24th amendment prior to its passage in 1966.  Texas's ratification came forty-three years later, in 2009, as a result of House Joint Resolution 39. The resolution was offered by Rep. Alma Allen, an African-American congresswoman from Dallas.  After it passed the House, Senator Rodney Ellis, an African-American from Houston, rose in the Senate: "I move passage, better late than never."  One of the members of the Capitol press corps coined the joke of the Session: "Welcome to the 1960s, Texas." Lee Nichols, *Texas Just Abolished Poll Taxes!*, Austin Chronicle (May. 22, 2009, 4:15 PM), http://www.austinchronicle.com/daily/news/2009-05-22/785067/.

present system, being a direct descendant of the poll tax, . . . has all of the features which the poll tax system had except the payment of an annual fee. The closing of registration so far in advance of the general election, in the years one is held, perpetuates the obstacles the twenty-fourth amendment prohibits. The evidence presented in this case shows that if the annual registration obstacle were removed over one million Texans would be eligible to vote that would not have been eligible with that requirement. Without annual registration, the number of persons who would actually vote would be increased by about the same number. Similarly, if registration were open until a month before the general election and had been open for the preceding eight months, voter registration would increase by over one million. In short, the present system closes the election hall door to a million citizens.

321 F. Supp. at 1103-04.

The district court allowed the Texas Legislature to try to correct its discriminatory laws. "In an effort to correct the objectionable features of the law, the Legislature thereafter enacted a temporary statute inaugurating permanent voter registration, with provisions for the automatic re-registration of those voting within a succeeding three-year period, and extended the time period for registration beyond the former cutoff date of January 31." *Briscoe*, 498 F.2d at 246. However, the Fifth Circuit determined that this supposed fix was no fix at all. Texas did not have a compelling state interest that would allow it to deprive a large portion of its citizens of the right to register to vote. *Id.* at 247.

In 1975, in apparent response to **Beare**, the legislature passed a statute which required a complete purge of all registrants and a total re-registration of every voter in Texas.  All this was to be accomplished before the 1976 general election.

By this time, Congress had expanded Section 5 coverage to include Texas.  In fact, the first Section 5 objection issued in Texas was in response to this complete purge.  The state had more than four million stamped envelopes ready to be sent out, informing voters that they had been purged and that, if they wanted to vote, they had to re-register.  Instead of complying with the requirement for preclearance of the purge, the state filed suit in the District Court for the

District of Columbia seeking a declaratory judgment that Texas was not covered.  They promptly lost the case. *See Briscoe v. Bell*, 432 U.S. 404, 410 (1977), *vacating and remanding sub nom. Briscoe v Levi*, 535 F.2d 1259 (D.D.C. 1976) (holding that preclearance determinations by the Attorney General are not subject to judicial review, because withholding review "implements Congress' intention to eradicate the blight of voting discrimination with all possible speed").

Since the state refused to make any effort to comply with the requirement to preclear the purge, black and Hispanic plaintiffs filed a Section 5 injunctive action to stop the sending out of the notice.  The state took the position that the purge was not a change involving voting and that, even if it were a change in voting, merely sending letters informing people that they were purged and had to re-register was not in itself an action affecting voting.

The plaintiffs filed a class action suit and served process on the state and every one of the 254 voter registrars in Texas. Quite literally in the days before the mailing, a three-judge federal court enjoined the mailing, because the purge and re registration had not been precleared. Even then, Texas continued to attempt to send the notices out, along with a second notice that the issue was on appeal.  *See generally Flowers v Wiley*, 675 F. 2d 704 (5th Cir. 1982).  This was denied and, after further efforts to convince the court that it should be allowed to send out the notices, the state finally complied with the voting rights objection.

After the injunctive relief was granted, the state submitted the purge to the Department of Justice, and DOJ issued an objection to the purge. *See* Section 5 Objection Letter from J. Stanley Pottinger, Assistant Attorney General of the United States, to Mark White, Texas Secretary of State (April 8, 1975). The Justice Department noted that such a purge would be discriminatory:

> [A] study of the historical voting problems of blacks and Mexican Americans and a review of statistical data, including that related to literacy disclose that a total voter registration purge under existing circumstances may have a discriminatory effect on their voting rights.  Comments from interested parties as well as our own

investigation, indicates that a substantial number of minority registrants may be confused, unable to comply with the statutory registration requirements...or only able to comply with substantial difficulty.  Moreover, representations have been made to this office that a requirement that everyone register anew on the heels of registration difficulties experienced in the past could cause significant frustration and result in creating voter apathy among minority citizens, thus erasing the gains already accomplished in registering minority voters.

*Id.*

In 1981, the Texas Secretary of State took a new tack: he claimed that there were too many felons voting.  Although there was no evidence that this was happening, the state announced that it had compiled a felons list and sent it to the voter registrars in every county in Texas.  This was again done without any effort to obtain Section 5 preclearance. This list was compiled for the Secretary of State by the Texas Department of Public Safety from the National Crime Information Center (NCIC).  In fact, Texas law at the time required notice and an opportunity to be heard before any person could be removed from the voter rolls.  As a result, some voter registrars began to complain that they could not legally purge anyone.  A suit was filed and, upon limited discovery, it was established that the Texas Department of Safety did a sample of the felons list and found that 90% of the people on the list were not felons.  The use of the felons list was enjoined and eventually the court directed that all of the lists be destroyed. See **Vota v. Dean**.

However, in Dallas County—which had just flipped to the Republican party[6]—a group of elected state district judges got together and, on Election Day, went to African-American polling

---

[6] I identify them as Republican district judges because that is what they were.  It was clear that the general election was going to be close, and they were trying to discourage persons who they believed would vote for Democrats.  Hence the signs were taken only to the black polling places.   In the election, Governor Clements, a Republican, was narrowly defeated by Mark White.  Although Mark White had led the effort to prevent the Section 5 coverage of Texas, he had modified his position and was supported by most African-Americans and Hispanics.

places. They identified themselves and told the election officials that they were required to post a large sign, prepared by the Judges, giving a warning from the Sheriff of Dallas County that it was a felony to vote if one has been convicted of a felony.  This was an obvious attempt to discourage African-Americans from voting.[7]

Although the state complained that Section 5 was not necessary, there were more total Voting Rights Act objections to Texas jurisdictions within a year after the extension of the Act to Texas than there were to any of the other covered states—which by that time had been covered for eleven years.  This is discussed later in this appendix.

After the turn of the twenty-first century, Texas began a series of attempts to discourage voting using one form or another of voter ID legislation.  When S.B. 14 finally passed in 2011, a three-judge district court for the District of Columbia found it to be in violation of federal law. The state had appealed the case to the United States Supreme Court when the Court invalidated Section 4 of the Voting Rights Act.

Mere hours after the Supreme Court decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), the Texas Attorney General announced that he would begin enforcing the Voter ID law. *See* Maria Recio, *Texas to Immediately Enforce Voter ID Bill*, Fort Worth Star-Telegram (June 25, 2013), http://www.star-telegram.com/2013/06/25/4963135/texas-to-immediately-enact-voter.html?rh=1.

---

[7] I drove to Dallas on the day following the election and found a copy of this sign.  I gave it to David Richards and a copy of it is in his book on Texas politics. [citation would be helpful]  These district judges claimed that they were not aware of the injunction against posting signs that we had obtained against the Texas Secretary of State.  Depositions from the Texas Secretary of State's office established that at least one of the judges and the sheriff under whose authority the signs claimed to be issued had been told of the injunction.  These judges went on to have careers that included appointment to federal and state appellate courts.  Significantly, one of these judges was subsequently appointed to and retains a federal judgeship today.

To me, the significance of the voter ID case is this broader context. Initially, the state prohibited minority voting in its elections. Then, when the Supreme Court put an end to that blatant practice, the state began to pass other restrictive barriers to minority voting. The voter ID law at issue in this case is just another chapter in this ongoing saga.

Texas claims that electoral discrimination is a thing of the past in the state, so I now turn toward the present day.

### Recent Election Discrimination in Texas

Since the specific issues before this court involve the voter ID statute and Section 3 coverage, which are heavily dependent on the existence of voting discrimination, I will discuss the most recent findings here. I define "recent" as events occurring since 2000. This includes specific findings of district and circuit courts, as well as Supreme Court cases dealing specifically with Texas. I also include voting rights objections and specific decisions by the Department of Justice to send federal election observers to monitor problem areas under Section 8 of the Voting Rights Act.

Since the application of the Voting Rights Act to Texas, the DOJ has sent almost 1,400 federal observers to 70 state jurisdictions. The Department of Justice has issued more than 200 voting rights objections since the application of the Act to Texas, and there have been more than 200 federal and state court findings of election discrimination in Texas. These findings cover approximately 70% of the state's population.

Since 2000, approximately 50 court decisions and voting rights objections have found electoral discrimination under Section 2 and Section 5 of the Voting Rights Act. Additionally, the DOJ has sent 1,099 federal observers to various Texas election locations—including voting sites—under Section 8 of the Voting Rights Act since 2000.

**Recent Judicial or Administrative Determinations of Election Discriminations in Texas**

As the Supreme Court noted recently in ***LULAC v Perry***, 548 U.S. 399 (2006):.

> Texas has a long, well-documented history of discrimination that has touched
> upon the rights of African-Americans and Hispanics to register, to vote, or to
> participate otherwise in the electoral process. Devices such as the poll tax, an all-
> white primary system, and restrictive voter registration time periods are an
> unfortunate part of this State's minority voting rights history. The history of
> official discrimination in the Texas election process—stretching back to
> Reconstruction—led to the inclusion of the State as a covered jurisdiction under
> Section 5 in the 1975 amendments to the Voting Rights Act. Since Texas became
> a covered jurisdiction, the Department of Justice has frequently interposed
> objections against the State and its subdivisions. *Vera* v. *Richards,* 861 F. Supp.
> 1304, 1317 (SD Tex. 1994) (citations omitted).
> . . . In addition, the "political, social, and economic legacy of past discrimination"
> for Latinos in Texas, *Session, supra,* at 492, may well "hinder their ability to
> participate effectively in the political process." *Gingles,* 478 U. S., at 45 (citing
> Senate Report factors).

548 U.S. at 439-40.

Other court cases finding voting discrimination in Texas abound. *See, e.g.*, ;

***Overton v. Austin***, 871 F.2d 529, 536 (5th Cir. 1989) (noting the "common histories of

discrimination" of African-Americans and Mexican-Americans in Austin); ***United States***

***v. Uvalde Consol. Indep. Sch. Dist***., 625 F.2d 547, 556 n.16 (5th Cir. 1980) (Texas

school district at-large elections "effectively deny Mexican American and black voters in

Texas political access in terms of recruitment, nomination, election and ultimately,

representation"); ***Sessions v. Perry***, 298 F. Supp. 2d 451, 473 (E.D. Tex. 2004) (noting

that the court is "keenly aware of the long history of discrimination against Latinos and

Blacks in Texas, and recognize[s] that their long struggle for economic and personal

freedom is not over"); ***League of United Latin Am. Citizens v. North East Indep. Sch.***

***Dist.***, 903 F. Supp. 1071, 1085 (W.D. Tex. 1995) ("There is no dispute that Texas has a

long history of discrimination against its Black and Hispanic citizens in all areas of public

life."); ***Sierra v. El Paso Indep. Sch. Dist.***, 591 F. Supp. 802, 807-809 (W.D. Tex. 1984) ("[C]onsidered in conjunction with the history of official discrimination and the pattern of polarized voting the conclusion is inescapable that Mexican-Americans have less opportunity than do other members of the electorate to participate in the political process."); ***Seamon v. Upham***, 536 F. Supp. 931, 987 (E.D. Tex. 1982) ("Even when official discrimination in politics and the political process is viewed in isolation, the legacy is long and almost overwhelming. No one can seriously contend that a catalog of legal actions pertaining to discrimination in voting adequately captures the harsh reality of political racism in Texas."); ***Graves v. Barnes***, 343 F.Supp 704, 728 (W.D. Texas 1972), *aff'd in part sub nom*. ***White v Regester***, 405 U.S. 1201 (1972) ("[T]he Mexican-American population of Texas . . . has historically suffered from, and continues to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and  others.").

No decade has passed since 1970 in which the courts have not found that Texas's redistricting plans violate federal—and, on occasion, state—law.  As the three-judge court of the District of Columbia found just two years ago, when they specifically held that Texas's latest legislative redistricting plan was enacted with discriminatory intent: "In the last four decades, Texas has found itself in court every redistricting cycle, and each time it has lost. . . . While a losing streak alone does not control our decision, Texas's history of failures to comply with the VRA is one of the circumstantial factors that *Arlington Heights* instructs us to consider." ***Texas v. United States***, 887 F. Supp. 2d 133, 161 (D.D.C. 2012). The court went on:

> Texas argues that, "[a]t worst, the evidence shows that [it] was guilty of
> blithe indifference to the wants of certain [minority] Congressmen." Tex. Post–

Trial Br. 29. But we do not find this explanation credible. Although we have already concluded that the Congressional Plan cannot be precleared under section 5's effect prong, we are also persuaded by the totality of the evidence that the plan was enacted with discriminatory intent. Texas did not adequately engage with the evidence raised by the other parties on this point, and under Arlington Heights we find sufficient evidence to conclude that the Congressional Plan was motivated, at least in part, by discriminatory intent.

. . .

. . . One would expect a state that is as experienced with VRA litigation as Texas to have ensured that its redistricting process was beyond reproach. That Texas did not, and now fails to respond sufficiently to the parties' evidence of discriminatory intent, compels us to conclude that the Senate Plan was enacted with discriminatory purpose as to SD 10.

*Id.*, 887 F. Supp. 2d at 161, 166

Since 2000, the Justice Department and the courts have found local electoral discrimination in areas that include more than nine million people—almost 40% of the state's population.  This is more than the entire population of Mississippi (2,967,297); South Carolina (4,625,364); Alabama (4,749,936); Louisiana (4,533,397); or Virginia (8,001,024).  It is around the same population size as the entire state of Georgia (9,687,653), or of North Carolina (9,535,483).  The Justice Department has sent a total of 1,099 federal observers to various Texas election locations to monitor elections which the DOJ had reason to believe might involve discrimination.

This appendix contains a list of almost four hundred judicial and administrative findings of discrimination against minority voting interests in Texas. Here are some of the specific findings from the past ten years:

***Hubbard v. Lonestar Community College District***, No. 4:13-CV-01635 (S.D. Tex., filed June 4, 2013): After limited discovery, the parties negotiated a settlement with nine single-member districts.  The district court held a settlement hearing and approved the settlement in November of 2013.

*Rodriguez v Harris County*, 964 F. Supp. 2d 686 (S.D. Tex. 2013): This was a lawsuit against Harris County, alleging that the redistricting of the Harris County Commissioners' Court violated Section 2 of the Voting Rights Act. The Court found racially polarized voting in the county, and found that significant barriers to voting remain in Harris County. However, the court refused to redraw the Commissioners' Districts (precincts) because of a concern that doing so would compromise the reelection of African-American officeholders. The case is on appeal to the 5th Circuit.

*Fabela et al v. City of Farmers Branch*, 2012 U.S. Dist. LEXIS 108086 (N.D. Tex. 2012): The court found that "the City Council elections" for Farmers Branch "in 2007, 2008, 2009, and 2011 were . . . racially polarized." *Id.* at *58. It also found: "Hispanics in Farmers Branch have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* at *61.

*Hernandez et al v. Nueces County*, No. 2:2012cv00047 (S.D. Tex. filed Feb. 10, 2012): This was a Section 5 enforcement action against Nueces County. It was dismissed when Nueces County made changes to the county's redistricting map. *See also Nueces County v United States*, No. 1:11cv1784 (D.D.C., dismissed Mar. 21, 2012).

*Vasquez-Lopez v. Medina County*, No. 5:2011cv00945 (W.D. Tex. filed Nov. 10, 2011): A number of Hispanic plaintiffs opposed Medina County's 2011 redistricting plan and filed suit. After a period of time the county agreed to make changes in the plan, which satisfied the plaintiffs.

*McBride et al v. City Of Jasper*, No. 1:11cv00443 (E.D. Tex. dismissed Dec. 21, 2011): This case involved the recall of African-American councilmen who had been elected from single-member districts and who had voted for an African-American retired Texas Ranger to be

the city's Chief of Police.  Although the case has been dismissed, I include some of the findings

made by the federal court:

> Lance Caraway, one of nine citizens who collected petition signatures, used racial epithets and made racist jokes in Facebook posts after Chief Pearson was appointed. . . .  "From the testimony elicited at the hearing, it appears that all of the citizens who spearheaded the recall effort and all of the signers of the petitions were white. Order Denying Preliminary Injunction, *McBride* (Oct. 20, 2011) at 4, *available at* http://s3.amazonaws.com/static.texastribune.org/media/documents /City_of_Jasper_Injunction.pdf.

> The petitions for [recalling two African-American] Councilpersons . . . were signed by white citizens who did not reside in the councilpersons' districts. *Id.* at 5.

> Neither the city nor the county verified the authenticity of the signatures. At the hearing on the pending motion, evidence was presented that several signatures appeared in almost identical handwriting, raising the inference that the same person signed on behalf of multiple individuals. A handwriting expert who reviewed half of the petitions testified that two people were responsible for fifteen signatures and that as many as 225 signatures warranted further investigation. *Id.* at 6.

> [S]ome of the recall petitioners acted with racial animus towards [the African-American councilmen] . . . .  Lance Caraway, one of the white Jasper citizens who gathered signatures on the recall petitions, used racial epithets in Facebook posts after [the African-American] Chief [of police] was appointed. He also posted a most distasteful picture featuring Chief Pearson, two of the African-American council members, the President of the United States, and the First Lady. Not to be outdone, at the evidentiary hearing, Mr. Caraway failed to appear pursuant to an executed subpoena.

> ***Petteway, et al. v. Galveston County, Texas, et al.***, No. 3:2011cv00511 (S.D. Tex. filed

Nov. 14, 2011): This was a Section 5 enforcement action.  Galveston County agreed to remedy

the vote dilution present in its Commissioner precinct plan. The county agreed to hold its

elections in 2012 under this new benchmark plan, and then try the remaining Section 5 issue: the

county's reduction of Justice of the Peace positions from nine to five.  The portion of the case

dealing with the Justices of the Peace has now been tried and is pending decision.

Additionally, in the last three years there have been numerous examples of DOJ

objections to various election procedures (prior to **Shelby County**, of course), and utilization of federal monitors to monitor elections throughout the state of Texas.  For example, note the following which can be verified by referring to http://www.lawyerscommittee.org/projects/section_5/.  :

**May 13, 2013:** The Department of Justice sent federal election monitors to monitor elections in the cities of **Corrigan**, **Farmers Branch**, **Irving** and **Orange**, Texas, to ensure compliance with the Voting Rights Act of 1965.[8]

**April 8, 2013:** Thomas E Perez, Assistant Attorney General, sent a Section 5 objection letter to Melody Thomas Chappell, Beaumont ISD school attorney, pursuant to the submission of a referendum election to change the school trustee election system from seven single-member districts to five single-member districts and two elected at-large. The letter expressed DOJ's belief that a state court order shortening the African-American school trustees' terms and ordering an election out of time violated Section 5 of the Voting Rights Act:

> There is overwhelming evidence that both the campaign leading to the election as well as the issue itself carried racial overtones with the genesis of the change and virtually all of its support coming from white residents. A statistical analysis of the election confirms the extreme racial polarization that the issue created. Black voters cohesively voted to maintain the current method of election and white voters voted cohesively for the proposed change. We estimate over 90 percent of white voters, but less than 10 percent of black voters, supported the change.

---

[8] "Section 8 of the Voting Rights Act[] provides for the appointment of federal observers within political subdivisions certified by the Attorney General or by order of a federal court pursuant to the Voting Rights Act. The monitoring of elections by federal observers is an important aspect of the Voting Section's enforcement efforts. In some instances there are concerns about racial discrimination in the voting process; other times monitoring is done to ensure compliance with bilingual election procedures. The . . . United States Office of Personnel Management . . . recruit[s], train[s], and supervise[s] these federal employees, who serve as neutral and impartial observers of election-day procedures . . ." United States Dept. of Justice, *About Federal Observers and Election Monitoring* (last updated 2014), http://www.justice.gov/crt/about/vot/examine/activ_exam.php.

An examination of at-large elections for the Beaumont City Council also proved informative because of the overlap in population and the similarity in demographics. There, we found racial cohesion among black voters at levels similar to those identified in the school district election. More significantly, we found significant racial polarization and the same unwillingness of white voters to support a black-preferred candidate, with little evidence of crossover voting by white voters in the city's at-large council races.

In the past ten years, numerous black-preferred candidates have sought municipal office in the city. With the sole exception of one candidate, African Americans have been unable to elect candidates of choice to the city's at-large council positions. Our analyses showed that this candidate only received about eight percent of the non-black vote in both the 2007 and 2011 elections, placing second to last among non-black voters in 2011.

. . .

. . . [O]ur analyses demonstrate that this candidate's election was dependent on single-shot voting, in which black voters withheld their votes for the second at-large city council seat in both 2007 and 2011, voting only for this candidate. The statistical and anecdotal evidence therefore confirm that this one candidate's experience is not indicative of black-preferred candidates' prospects for success in at-large elections.

**November 6, 2012 General Election:** The Department of Justice sent 119 federal election observers to **Dallas County**, **Fort Bend County**, and **Jefferson County** to ensure compliance with the Voting Rights Act of 1965.

**May 29, 2012 Primary Elections:** The Department of Justice sent federal election observers to **Dallas**, **Galveston**, **Jasper**, **Jefferson,** and Harris Counties per the Attorney General's certification.  Federal observers were also sent to **Fort Bend County**, which is subject to a court order entered in 2009. The order requires the jurisdiction to comply with the minority language and assistor of choice requirements of the Voting Rights Act, as well as the requirements of the Help America Vote Act. *See* Office of Public Affairs, *Justice Department to Monitor Elections in Texas*, U.S. Dept. of Justice (May 25, 2012), http://www.justice.gov/opa /pr/2012/May/12-crt-677.html.

**May 12, 2012 Municipal Elections:** The Department of Justice sent 39 federal election observers to the cities of **Galveston (Galveston County) and Irving (Dallas County)** to ensure

compliance with the Voting Rights Act of 1965.

**March 7, 2012:** Thomas E Perez, Assistant Attorney General, sent a Section 5 objection letter to Keith Ingram, Texas Director of Elections:

> [T]he state has not met its burden of proving that, when compared to the benchmark, the proposed requirement will not have a retrogressive effect, or that any specific features of the proposed law will prevent or mitigate that retrogression. Additionally, the state has failed to demonstrate why it could not meet its stated goals of ensuring electoral integrity and deterring ineligible voters from voting in a manner that would have avoided this retrogressive effect . . .

**March 5, 2012:** Thomas E Perez, Assistant Attorney General, sent a Section 5 objection letter to Trey Traynor, attorney for Galveston County:

> With regard to the election for justices of the peace and constables, there are eight election precincts under the benchmark method. Each elects one person to each position, except for Precinct 8, which elects two justices of the peace. The county has proposed to reduce the number of election precincts to five, with a justice of the peace and a constable elected from each.
>
> Our analysis of the benchmark justice of the peace and constable districts indicates that minority voters possess the ability to elect candidates of choice in Precincts 2, 3 and 5. With respect to Precincts 2 and 3, this ability is the continuing result of the court's order in *Hoskins* v. *Hannah*, Civil Action No. G-92-12 (S.D. Tex. Aug. 19, 1992), which created these two districts. Following the proposed consolidation and reduction in the number of precincts, only Precinct 3 would provide that requisite ability to elect. In the simplest terms, under the benchmark plan, minority voters in three districts could elect candidates of choice; but under the proposed plan, that ability is reduced to one.

On October 3, 2011, the Department of Justice objected to a proposal to reorganize the Galveston City Council from all single-member districts to a mixed plan comprising 4 district and 3 at-large seats (including the Mayor's seat).  In a Section 5 objection letter sent to Bob Heath, attorney for the City of Galveston, Thomas E Perez wrote:

> Our review of the demographics of the current districts and the results for elections conducted since 2001 as well as the information provided by the city does not alter our earlier determination that city has not established the absence of a retrogressive effect. *Racial bloc voting continues to play a significant role in city elections.* Under the existing method of election, minority voters currently

have the ability to elect a candidate of choice in three of the six single-member districts. In contrast, this ability would exist only in two of the four districts and in neither of the two at-large positions under the proposed system. Indeed, *in the course of our investigation, the city acknowledged that the proposed method of election will decrease the number of minority ability-to-elect districts*. As a result, the city has failed to establish that the proposed 4-2-1 method of election with numbered posts would not lead to a retrogression in minority voting strength prohibited by Section 5. (Emphasis added)

On May 14, 2011, the Department of Justice sent 57 federal election observers to the cities of Beaumont (Jefferson County), La Marque (Galveston County), and Hondo (Medina County) to ensure that municipal and school district elections complied with the Voting Rights Act of 1965.

On November 2, 2010, the Department of Justice sent 93 federal election observers to Dallas County, Fort Bend County, Galveston County, and Williamson County to ensure that the counties' general elections complied with the Voting Rights Act of 1965.

On June 28, 2010, the Department of Justice objected to proposed changes in Runnels County's Spanish language procedures.  In a Section 5 objection letter sent to Elise Ocker, Runnels County Clerk, Thomas E Perez wrote:

Under the benchmark procedures enumerated in the 1984 order, the county was required to assign one bilingual poll worker to each of its five consolidated polling places. Despite an almost fifty percent increase in the county's Hispanic population percentage since 1984, our examination of the November 2008 general and November 2009 constitutional amendment elections show that at least half of county voting precincts did not have a bilingual poll worker for the November 4, 2008, general election, and no voting precincts had a bilingual poll worker for the November 3, 2009, constitutional amendment election. Both census data and anecdotal evidence from members of the minority community indicate, however, that there continues to be a significant need for such assistance. The proposed level of assignment, moreover, is below the Texas Secretary of State's recommended guidelines that bilingual poll workers be stationed in election precincts where five percent or more of the inhabitants are persons of Spanish origin.

Instead of applying the benchmark standard for the elections in question, the county implemented a practice in the 2008 and 2009 elections of having only having an on-call bilingual assistor available by phone in the event that Spanish

language oral assistance was required on election day. We note that procedure has not been reviewed under Section 5. *The evidence available to us, however, demonstrates that this procedure does not provide effective Spanish language oral assistance. In fact, it appears that the on-call bilingual assistor has not received a single call for assistance in the approximately seven years that she has served in that capacity. We also note that the county does not test the Spanish language proficiency of its bilingual poll workers, or provide training for bilingual assistance. Our information suggests that one of the individuals asserted by the county to be a bilingual poll worker is not proficient in Spanish.* (Emphasis added)

On March 10, 2010, the Department of Justice objected to proposed changes in Gonzales

County's Spanish language procedures.  In an objection letter sent to Elise Bob Bass, attorney

for Gonzales County, Thomas E Perez wrote:

> The county proposes to use an internet machine translator, such as Google Translator, for the initial translation of county-produced election materials. The county indicates that the resulting translations will then be sent to the Office of the Texas Secretary of State...to confirm its accuracy. However . . . the Secretary of State . . . has also informed us that it has had no communication with the county on this matter [and] does not offer this service . . . .
>
> [. . .]
>
> If anything, the current proposal is retrogressive even when measured against the 2008 bilingual program to which an objection was interposed. Moreover, even after the objection, the county continues to post English-only election notices on its website, raising concerns about its stated commitment to provide translations of all election materials.
> *County officials have openly expressed hostility toward complying with the language minority provisions of the Voting Rights Act. In local news articles, the county official who has direct control over the election process has expressed frustration with this Department's efforts to increase the availability of bilingual poll workers, suggesting that language minority voters are not citizens if they do not speak English.* (Emphasis added)

On June 19, 2010, The Department of Justice sent 11 federal election observers to the

City of Galveston (Galveston County) to ensure that the City's general elections complied with

the Voting Rights Act of 1965.

On May 8, 2010, the Department of Justice sent 39 federal election observers to the City

of Irving (Dallas County) and the City of Galveston (Galveston County) to ensure that their

municipal and school district elections complied with the Voting Rights Act of 1965.

On March 2, 2010, the Department of Justice sent 68 federal election observers to Fort

Bend County, Williamson County, Galveston County, and Wilson County to ensure that their

primary elections complied with the Voting Rights Act of 1965.

On February 11, 2010, the Department of Justice sent 22 federal election observers to

Galveston County to ensure compliance with the Voting Rights Act of 1965.

On January 23, 2010, the Department of Justice sent 4 federal election observers to the

City of Hondo (Medina County) to ensure compliance with the Voting Rights Act of 1965.

On August 21, 2008, the Department of Justice objected to a statute passed by the state of

Texas requiring land ownership to serve as a member of the Board of Trustees of Fresh Water

Districts.  In a letter sent to Phil Watson, Texas Secretary of State, Grace Chung Becker, Acting

Assistant Attorney General for Civil Rights, wrote:

> The submitted data confirms that there are Hispanic supervisors who are known to
> be non-landholding of their districts. If the proposed candidate qualifications were
> implemented, these individuals would be unable to run for reelection. Concerns
> that the proposed change may have a future retrogressive effect also are raised by
> the statistics that reveal a significant disparity in home and agricultural land
> ownership rates between Caucasians and minorities in Texas.

On May 9, 2009, the Department of Justice sent 25 federal election observers to the City

of Hondo (Medina County) and the City of Irving (Dallas County) to ensure compliance with the

Voting Rights Act of 1965.

On November 4, 2008, the Department of Justice sent 113 federal election observers to

Dallas County, Fort Bend County, and Galveston County to ensure compliance with the Voting

Rights Act of 1965.

On May 10, 2008, the Department of Justice sent 36 federal election observers to the

**City of Irving (Dallas County)** to ensure compliance with the Voting Rights Act of 1965.

On August 21, 2008, the Department of Justice objected to an attempt by the Sealy

Independent School District to adopt at-large elections by numbered post.  In an objection letter

sent to David Mendez Bickerstaff, Heath, Smiley, Pollan, Kever & McDanie, Bill Lann Lee,

Acting Assistant Attorney General Civil Rights Division, wrote:

> Under the existing system, the school district elects its seven-member board of trustees on an at-large basis to three-year staggered terms of office (3-2-2). Only one minority representative, an African American, has been elected to the school board in recent times. After two unsuccessful efforts, this individual succeeded in gaining election when she ran for office in an election year when three trustee seats were up for election. In that contest in 1992 she placed last among the three winning candidates, which was also true of her reelection in 1995. In her two unsuccessful bids for the school board, she, like other minority candidates, appears to have failed to garner sufficient white voter support to get elected under the at-large system.
>
> In our view, the available information concerning voting patterns within the school district is not inconsistent with a pattern of racially polarized voting, although it does appear that some minority candidates in the school district and other local elections have received a level of support from white voters, as well as from minority voters, sufficient to gain election. By and large, however, this level of white voter support appears to have been reserved for a very small number of minority candidates. Most minority candidates have been unsuccessful in election contests for at-large seats on the school board, as well as for other local offices when they face white opposition. Electoral patterns such as these are typically observed in instances where voting is racially polarized.
>
> The school district now seeks to add to its at-large electoral system a numbered post requirement that, in effect, will convert each election for a seat on the board into a separate election contest. In these separate contests for school board seats, minority-supported candidates are more likely to be pitted against white incumbents or challengers in "head-to-head" contests. Where voting is racially polarized, our experience suggests that minority-supported candidates are more likely to lose because they are unlikely to garner a majority of the votes in the bid for a single seat. Indeed, it appears that the school district's sole minority trustee may not have fared well under the proposed system, given her third place showing in the two successful bids for the board in which she faced white opposition.

On March 3, 2008, the Department of Justice sent 46 federal election observers to Brazos

County, Fort Bend County, and Galveston County to ensure compliance with the Voting Rights

Act of 1965.

On May 12, 2007, the Department of Justice sent 32 federal election observers to Fort Bend County and to the City of Farmers Branch (Dallas County) to ensure compliance with the Voting Rights Act of 1965.

On May 5, 2006, the Department of Justice objected to changes in the number and local of polling places for the North Harris Montgomery County College District.  In an objection letter sent to Renee Smith Byas, Vice Chancellor and General Counsel for the College District, Wan J Kim, Assistant Attorney General for Civil Rights, wrote:

> We note that currently elections of the District are consolidated with other elections including those of 11 of the 12 ISDs that comprise the District.  Voters currently may go to a single polling place and vote in elections of the District, as well as elections of their respective ISDs.  In the last election 84 polling places served the voters of the District.
>      Under the proposed change District elections will be held separately from the ISD elections so that voters will have to travel to two separate polling places to cast their ballots. Moreover instead of 84 polling places, there will be 12 polling places. These 12 polling places will serve a geographic area of well over 1,000 square miles with over 540,000 registered voters. The assignment of votes to these 12 sites is remarkably uneven,: the site with the smallest proportion of minority voters will serve 6,500 voters, while te most heavily minority site (79.2% black and Hispanic) will serve over 67,000 voters.

On November 7, 2006, the Department of Justice sent 113 federal election observers to Brazos County, Ector County, Hale County, Medina County, Wilson County, Fort Bend County, and Galveston County to ensure compliance with the Voting Rights Act of 1965.

On May 13, 2006, the Department of Justice sent 8 federal election observers to Ector County to ensure that its joint municipal and school district election complied with the Voting Rights Act of 1965.

On March 7, 2006, the Department of Justice sent 25 federal election observers to Ector County to ensure that its primary election complied with the Voting Rights Act of 1965.

On November 8, 2005, the Department of Justice sent 21 federal election observers to Ector County to ensure that its general election complied with the Voting Rights Act of 1965.

On November 2, 2004, the Department of Justice sent 99 federal election observers to Dallas County to ensure that its general election complied with the Voting Rights Act of 1965.

On May 14, 2004, the Department of Justice sent 46 federal election observers to Dallas County to ensure that its municipal and school district elections complied with the Voting Rights Act of 1965.

**Voting Rights Act Section 2 Cases Pending Trial or Decision on the Merits**

*Williams et al v. Edwards Aquifer Authority*, No. 5:92-cv-00144-FB (W.D. Tex. 2012): This case, currently pending order on cross motions for summary judgment, involves a claim of discrimination against Hispanics in a jurisdiction of nearly 1.5 million persons that is in charge of protecting the sole water source of the City of San Antonio as well as agricultural irrigation. The jurisdiction is governed by a sixteen-person board elected by single-member districts as a result of a series of litigation and Section 5 objections.  These districts are grossly malapportioned, with disparities ranging from 10,000 persons to upwards of 300,000.  The only district in which African Americans have the opportunity to elect their representatives of choice is more than ten times smaller than the smallest Anglo district.

*Jones v. Beaumont Independent School District*, 1:2013-cv-00177 (E.D. Tex. filed March 27, 2013): This case, currently in discovery, was filed to enjoin the Beaumont Independent School District from reducing the number of trustee single-member districts from 7 to 5.  *See also Rodriguez v. Beaumont Independent School District*, 1:2013cv00304 (E.D. Tex. filed May 14, 2013).

*Rodriguez v. Grand Prairie Independent School District*, No. 3:2013-cv-01788 (N.D. Tex. filed in 2013): This is a suit against a large school district that continues to elect its board members on an at-large basis.

*Cisneros v. San Jacinto College District*, 4:2013-cv-00903 (filed April 1, 2013): In this case, currently pending trial, plaintiffs claim that at-large elections of trustees to the San Jacinto College District in the southeast portion Harris County violates Section 2 of the Voting Rights Act.  No African American or Hispanic has been elected to this nine-district board.

*Benavidez v. Irving Independent School District*, 3:2013cv00087 (filed January 8, 2013): This is a suit against an at-large election scheme in the Irving Independent School District.

*Roberts v. Ortega et al*, No. 3:2010-cv-00072 (W.D. Tex. filed February 22, 2010).

*LULAC v. Texas Democratic Party*, 5:20-cv-00389 (filed May 9, 2008): This is a suit against the Texas Democratic Party for failing to comply with Section 5 by refusing to submit the Texas two-step primary process.  Ultimately the Democratic Party abandoned the procedure.

## Additional Findings Relating to Election Discrimination

Below is a partial list of reported decisions by state and federal courts relating to redistricting in Texas.  In some years, multiple plans have been invalidated.  The courts have been the constant source of implementation of statewide redistricting plans in Texas.  In virtually every case, interim plans were installed by the courts out of necessity.

*Bush v. Martin*, 224 F. Supp. 499 (S.D. Tex. 1963), *aff'd per curiam*, 376 U.S. 222 (1964) *on remand Bush v. Martin*, 251 F. Supp. 484, (S.D. Tex. 1966)*;*

*Kilgarlin v. Martin*, No. 63-H-390 (S.D. Tex. 1965) (summary judgment);

*Spears v. Davis*, 398 S.W.2d 921 (Tex. 1966);

*Hainsworth v. Martin*, 386 S.W.2d 202 (Tex. Civ. App.—Austin, *writ ref'd n.r.e.*), *vacated as*

*moot*, 382 U.S. 109 (1965)

*Kilgarlin v. Martin*, 252 F. Supp. 404, 434-441 (S.D. Tex. 1966), *aff'd in part, rev'd in part*,

      *Kilgarlin v. Hill*, 386 U.S. 120 (1967) (per curiam);

*Smith v. Craddick*, 471 S.W.2d 375, 377 (Tex. 1971);

*Mauzy v. Legislative Redistricting Board*, 471 S.W.2d 570 (Tex. 1971)*;*

*Graves v. Barnes*, 343 F. Supp. 704 (W.D. Tex 1971), *aff'd in part and rev'd in part sub nom.*

      *White v. Regester*, 412 U.S. 755 (1973);

*Graves v. Barnes* (*Graves II*), 378 F. Supp. 640 (W.D. Tex. 1974);

*White v. Regester*, 422 U.S. 935 (1975);

*Graves v. Barnes* (*Graves III*), 408 F. Supp. 1050 (W.D. Tex. 1976);

*Graves v. Barnes* (*Graves IV*), 446 F. Supp. 560 *(Graves V)* (W.D.Tex.1977);

*White v. Regester*, 412 U.S. 755 (1973)

*Graves v. Barnes* (*Graves VI*), 700 F. 2d 220 (5th Cir. 1983)

*White v. Weiser*, 412 U.S. 983 (1973);

*Clements v. Valles*, 620 S.W.2d 112 (Tex. 1981);

*Terrazas v. Clements*, 581 F. Supp. 1319 (N.D. Tex. 1983);

*Terrazas v. Ramirez*, 829 S.W.2d 712, 726 (Tex. 1991)*;*

*Armbrister v. Morales*, 943 S.W.2d 202 (Tex. App.—Austin 1997, no writ);

*Thomas v. Bush*, No. A-95 CV 186-SS (W.D. Tex. Sept. 15, 1995 order);

*Terrazas v. Slagle*, 821 F. Supp. 1162, 1172 (W.D. Tex. 1993) (per curiam);

*Seamon v. Upham*, 536 F.Supp. 931, *vacated and remanded sub nom. Upham v. Seamon*, 456

      U.S. 37 (1982);

*Vera v. Richards*, 861 F. Supp. 1304, 1338, 1340 (S.D. Tex. 1994), *aff'd sub nom. Bush v. Vera*,

517 U.S. 952 (1996);

*Del Rio v. Perry*, No. GN 003665 (353rd Dist. Ct., Travis County, Tex. Dec. 27, 2000);

*Mayfield v. State*, Civ. No. 2-00 CV 268-DF (E.D. Tex. Dec. 28, 2000);

*Teuber v. State*, No. 4:11-CV-0059 (E.D. Tex. Feb. 10, 2011);

*Del Rio v. Perry*, No. GN-003665 (Travis County Dist. Ct.);

*Brown v. Perry*, No. GN-100812 (Travis County Dist. Ct.);

*Cotera v. Perry*, No. GN-101660 (Travis County Dist. Ct.);

*Connolly v. Perry*, No. GN-102250 (Travis County Dist. Ct.);

*Associated Republicans of Texas v. Cuellar*, No. 2001-26894 (Harris County Dist. Ct.);

*Rivas v. Cuellar*, No. 2001-33760 (Harris County Dist. Ct.);

*Perry v Del Rio*, 66 S.W.3d 239 (Tex. 2001) ("We hold, for reasons that we explain, that the district court in Travis County has dominant jurisdiction and should proceed to trial immediately, and that the district court in Harris County should abate the cases pending there");

*Mayfield v. Texas*, No. 2:00-cv-00268 206 F. Supp.2d 820 (E.D.2001) ("Because we find that the State of Texas has not been allowed to respond to the new census figures and because there is no reason to believe that the Texas Legislature will fail to do so, we conclude that resolution of this case rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas, 523 U.S. at 300");

*Mayfield v. Texas*, No. 6:01-cv-00218 (E.D. Tex.);

*Lee v. Texas*, No. 6:01-cv-00098 (E.D. Tex.);

*Manley v. Texas*, No. 6:01-cv-00231 (E.D. Tex.);

*Associated Republicans of Texas v. Texas*, No. 6:01-cv-00083-WSS-WRF (W.D. Tex. 2001);

*Associated Republicans of Texas v. Texas*, No. 6:01-cv-00167-WSS-PEH (W.D. Tex. 2002);

*Anderson v. Texas*, No. 6:01-cv-00214 (W.D. Tex. 2002)

*Session v. Perry*, 298 F. Supp.2d 451 (E.D Tex. 2004) *vacated and cases remanded for further consideration in light of Vieth v. Jubelirer*, 541 U. S. 267 (2004) sub nom *Henderson v. Perry,* 543 US 941 (2004); o*n remand Henderson* v. Perry, 399 F. Supp. 2d 756 (E.D. Tex. 2005) rev'd sub nom *LULAC v. Perry*, 548 U.S. 399 (2006) *on remand*; *LULAC v. Perry*, 457 F. Supp. 2d 716 (E.D. Tex. 2006).

## Single-Member District Litigation

At the time of the 1975 extension of the special provisions of the Voting Rights Act to cover Texas, all people lived in school districts and cities that elected representatives on an at-large basis.  Many, if not most, of these elections had majority run-off requirements and the place requirement or similar restrictions on single-shot voting.  Thereafter, litigation was filed against cities and school districts from one end of the state to the other.  At first, the litigation was against the largest cities in Texas, including Dallas, San Antonio, Houston, El Paso, Fort Worth, Corpus Christi, and Waco.

When that round of litigation concluded, litigation began against smaller jurisdictions was begun in earnest.  These efforts were further intensified with the adoption of new Section 2 provisions in the early 1980s.  Much of this litigation was brought on behalf of Hispanics and African Americans represented by organizations such as the NAACP, LULAC, and the like.  The initial suits were handled primarily by Rolando Rios, David Richards, Betsy Julian, Mike Daniels, Jose Garza, Judith Sanders Castro, Juaquin Avila and George Korbel.  Limited financial support was provided by the Southwest Voter Registration Project, the Mexican American Legal Defense and Educational Fund, the Texas Rural Legal Aid, the East Texas Legal Services, and

the Dallas Legal Services.  But for the most part, the money came out of the lawyers' own pockets.

Most of the cases against these (smaller?) jurisdictions were settled, and the jurisdictions agreed to adopt plans for single-member districts.  In a few cases, most notably against the City of Amarillo, cumulative voting was used as a remedy.  While I have attempted to keep track of these cases over the years, the list—even as long as it is—leaves out many.

*Aguero v. Lubbock ISD* (N.D. Tex. Lubbock Div, April 30, 1984);

*LULAC v. City of Midland*, No. MO-CA-106 (W.D. Tex. Midland Div. May 31, 1984);

*LULAC v. Midland ISD*, No. MO-85-CA-1 (W.D. Tex. Midland Div. January 3, 1985);

*LULAC v. Ector ISD*, No. MO 91-CA-48 (W.D. Tex., Midland Div April 16, 1991);

*LULAC # 4429 v. City of Monahans*, No. MO-89-CA-44 (W.D. Tex. Midland Div. Feb. 23, 1989);

*LULAC # 4429 v. Monahans ISD*, No. MO-89-CA-45 (W.D. Tex. Midland Div. Feb. 23, 1989);

*LULAC # 4456 v. Colorado City*, No. CA-1-89-164 (W.D. Tex Midland Div. Jan. 30, 1989);

*LULAC v. Crane ISD*, No. MO 91-CA-48 (W.D. Tex. Midland Div. June 5, 1991);

*LULAC #4375 v. City of Big Spring*, No. CA-1-97-87 (N.D. Tex. Abilene Div. July 1, 1991);

*LULAC v. City of Rosenberg*, No. H-91-2776 (S.D. Tex. Houston Div. Sept. 19, 1991);

*LULAC # 4409 v. Comfort ISD,* No. SA-93-CA-70 (W.D. Tex. San Antonio Div. Jan. 22, 1993);

*LULAC Dist. 5 v. Andrews Independent School District* No. MO-93-CA-95 (W.D. Tex. Midland Div. March 4, 1993);

*City of Andrews v. Reno*, No. 1:95-cv-01477-SS-EGS (D.D.C. 1996);

*LULAC v. Eden ISD*, No. 6-93-CV-96-C (W.D. Tex Midland Div. April 13, 1993);

*LULAC v. Plains ISD*, No. 5-93-CV-96-C (W.D. Tex Midland Div. April 12, 1993);

*LULAC v. Winters ISD*, No. 6-93-CV-32-C (N.D. Tex San Angelo Div. May 12, 1993);

*LULAC v. Friona ISD*, No. 2-93-CV-141 (N.D. Tex Amarillo Div. June 4, 1993);

*LULAC v. Sterling City ISD*, No. 6-93-CV-35-C (N.D. Tex San Angelo Div. May 21, 1993);

*LULAC v. City of Sterling*, No. 6-93-CV-42-C;

*LULAC v. Hale Center ISD*, No. 5-93-CV-145-C (N.D. Tex Lubbock  Div. June 10, 1993);

*LULAC v. City of Hale Center*, No. 5-93-CV-145-C (N.D. Tex Lubbock Div. June 10, 1993);

*LULAC v. Bovina ISD*, No. 2-93-CA-145 (N.D. Tex San Angelo Div. May 23, 1993);

*LULAC v. City of Big Lake*, No. 6-93-CV146 (N.D. Tex San Angelo Div. June 11, 1993);

*LULAC v. City of Morton*, No. 5-93-CV-148-C (N.D. Tex Lubbock  Div. June 14, 1993):

*LULAC v. Morton ISD*, No. 5-93-CV-149-C (N.D. Tex Lubbock  Div. June 14, 1993);

*LULAC v. City Castroville*, No. SA-93-CA-455-C (W.D. Tex San Antonio  Div. June 11, 1993);

*LULAC v. Medina Valley ISD*, No. SA-93-CA-454 (W.D. Tex San Antonio  Div. June 11, 1993);

*LULAC v. Reagan County ISD*, No. 6-CV-45 (N.D. Tex San Angelo  Div. June 11, 1993):

*LULAC v. City of Rotan*, No. 1-94-CV-42-C (N.D. Tex Abilene  Div. June 14, 1993);

*Binkendorf v. City of Alvin*, No. G84-436 (S.D. Tex Galveston  Div. Nov. 30 1984);

*Leal v. San Antonio River Authority*, No. SA-85-CA-2988 (W.D. Tex. San Antonio Div. Nov. 1, 1985) (At large elections in a multi county river authority found to make it more difficult for Hispanics to elect the representatives of their choice);

*Rodriguez v. Hondo ISD*, No. SA-85-CA-82 (W.D. Tex. San Antonio Div. June 21, 1987);

*Daniel v. Muleshoe ISD,* No. 89-219-C (N.D. Tex. Lubbock   Div. Oct. 4, 1989);

*Sam v. City of LaMarqe*, No. G-90-171 (S.D. Tex. Galveston Div. July 7, 1990);

*Williams v. East Central ISD*, No. SA-91-CA-167 (W.D. Tex. San Antonio Div. Feb. 14, 1991);

*Marquez v. City of Freeport,* No. G-91-82 (S.D. Tex. Galveston Div. Mr. 29, 1991);

*Almager v. Seminole ISD*, No. 5-91-CA-134 (N.D. Tex. Lubbock Div. May 6, 1991);

*Conejo v. City of Seagraves,* No. 5-91-140-C (N.D. Tex. Lubbock   Div. May 10, 1991);

*Zungia v. McCamry ISD*, No. MO-91-CA-67 (W.D. Tex. Midland Div. May 16, 1991);

*Arredondo v City of Lamesa*, No. CA-5-91-153-C (N.D. Tex. Lubbock Div. May 28 1991);

*Coger v. Hitchcock ISD*, No. G-91-218 (S.D. Tex. Galveston Div. June 10, 1991);

*Alexander v. Texas City ISD*, No. G-91-226 (S.D. Tex. June 17, 1991);

*Prieto v. City of Kermit*, No. P-91-CA-17 (N.D. Tex. Div. July 1, 1991);

*Woods v. Dickerson ISD,* No. CA-6-91-288 S.D. Tex. Galveston Div. July 1, 1991);

*Ruiz v. Slayton ISD,* No. CA-6-91-220-C (N.D. Tex. Lubbock Div. Oct. 11, 1991);

*Garcia v. City of Clute,* No. G-91-399 CA-5-89-52 (S.D. Tex. Galveston Div. Nov. 7, 1991);

*Vargas v. City of Yorktown*, No. V-91-53 (S.D. Tex. Victoria Div. Dec. 2, 1991);

*Amerson v. South San Antonio ISD*, No. SA-92-CA-81(W.D. Tex. San Antonio Div. Jan. 14
     1992);

*American GI Forum v. San Marcos ISD*, No. A-91-CA-64 (W.D. Tex. Austin Div. Jan. 30,
     1992);

*Alejandro v. City of Victoria*, No. V-92-6 (S.D. Tex Victoria Div. Feb. 13, 1992);

*Rojas v. Victoria College District*, No. V-9220 (S.D. Tex. Victoria Div. May 20, 1992);

*Almaguer v. Seminole ISD*, No. 5-92-CV–77C (N.D. Tex. Lubbock   Div. May 18, 1992);

*Romero v. Yoakum ISD*, No. V-92-21 (S.D. Tex. Victoria Div. May 21, 1992);

*Stewart v. City of China*, No. 1-92-CV 246 (S.D. Tex. Beaumont Div. June 18, 1992);

*Gonzales v. Lamesa ISD*, No. 92-CV-162C (N.D. Tex. Lubbock Div. June 20, 1992);

*Perez v. Lockney ISD*, No. CA-5-92-189C (N.D. Tex. Lubbock   Div. Aug. 23, 1992);

*Perez v. City of Lockney*, No. 5-92-CV207-189C (N.D. Tex. Lubbock   Div. Sept. 4 1992);

*Herrera v. Victoria ISD*, No. V-92-055 (S.D. Tex. Victoria Div. Oct 27, 1992);

*Torres v. Comal ISD*, No. SA-93-CA-36 (W.D. Tex. San Antonio Div. Jan. 8, 1993);

*Carrasco v. Tulia ISD*, No. CA-2-91-53 (N.D. Tex. Amarillo Div. March 11, 1991);

*Torres v. City of Stamford*, No. 1-94-CV-2-C (N.D. Tex. Abilene Div. Jan 5, 1994);

*Scott v. Navarro Junior College District* (N.D. Tex. 1995);

*Rendon v. Anton ISD*, No. 5-94-CV-66C (N.D. Tex. Lubbock Div. Mr. 14, 1994);

*Rios v. Bexar Metro. Water Dist.*, No. SA-96-CA-335 (W.D. Tex. Apr. 22, 1996) (at-large
elections found to violate Sec. 2);

*LULAC v. North East ISD*, 903 F. Supp. 1071 (W.D. Tex. 1995);

*Arriola v. Northside ISD*, No. 5:94-cv-00699-OLG (W.D. Tex. 1997);

*Chavez v. City of Muleshoe*, No. 89-219-C (1989)

*Williams v. City of Dallas*, 734 F. Supp. 1317 (N.D. Tex. 1990);

*Brinkerhoff v. City of Alvin,* No. G-84-436 (S.D. Tex. Galveston Div. Nov. 30 1984);

*Williams v. Edwards Underground Water Dist.*, No. 5:92-cv-00144-FB (W.D. Tex. 2012)
(Successful single member district case against a jurisdiction of more than a million
persons);

*LULAC v. Lytle ISD*, No. 5:95-cv-00857 (W.D. Tex. 1997);

*LULAC v. Harlandale ISD*, No. 5:98-cv-00966-OLG (W.D. Tex. 2000);

*LULAC v. Judson ISD*, No. 5:96-cv-00878-ECP (W.D. Tex. 1997);

*Robinson v. Commissioners Court*, 505 F.2d 674 (5th Cir. 1974)

*Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988) ("Here, the evidence of racially
polarized voting supports the district court's conclusion that white bloc voting usually
defeats the minority candidate.");

*David v. Garrison*, 553 F.2d 953 (5th Cir 1977) (at large elections in the City of Lufkin);

*Alonzo v. City of Corpus Christi* (*Alonzo I*), No. C-81-227 (S.D. Tex. Feb. 3, 1983)  ("The 5-3-1
system was implemented under federal court supervision for the express purpose of
guaranteeing "Hispanic residents of the City of Corpus Christi, Texas equal access to the
political procedures leading to nomination or election of City Council members and
Mayor and an equal opportunity with other members of the electorate to participate in the
political process");

*LeRoy v. City of Houston*, No. H-75-1731 (S.D. Tex. 1986) (*Leroy IV*) (Section 5 suit filed in
1975 and dismissed after the Department of Justice precleared limited annexations);

*Texas Democratic Party v. Harris County*, No. 4:08-cv-3332 (S.D. Tex.);

*Texas Democratic Party v. Dallas County*, No. 3:08-cv-02117-P (N.D. Tex., filed 2008).

One particularly noteworthy episode is the thirteen-year struggle beginning in the early
1970s to force the City of Houston into single-member districts.  In *Greater Houston Civic
Council v. Mann*, F. Supp. 696 (S.D. Tex. 1977), the Court noted that the point of all of these
cases was to get Houston to change the at-large system as a way of electing the members of its
city council, that "the city was inundated with complex litigation at all times," and that "[i]t was
these cases . . . that ultimately forced the City to adopt . . . single member districts.".  *See also
Leroy v. City of Houston*, 831 F2d 576 (5th Cir. 1987) ("The skirmish over attorneys' fees
culminates a complex, protracted and in many ways unique battle between the protagonists in
this litigation . . . .  The plaintiffs were, in sum, the irresistible force pressing on the City as
immovable object."); *Leroy v. City of Houston*, No. H-75-1731 (S.D. Tex. 1975) (*Leroy I*);
*Greater Houston Civic Counsel v. Mann (GHCCO)*, 440 F. Supp. 696 (S.D. Tex. 1977); *Leroy v.
Houston*, 584 F. Supp. 653 (S.D. Tex. 1984) (*Leroy III*); *Leroy v. City of Houston*, No. H-78-

2174 (S.D. Tex. 1979) (*Leroy II*); *Leroy v. Houston*, 592 F. Supp. 415 (S.D. Tex. 1984); *Leroy v. Houston*, 648 F. Supp. 537 (S.D. Tex. 1986).

The *Leroy* saga also included a unique case of first impression involving the forced recusal of an African American judge who took over the case after the original judge died. *In re Houston*, 745 F.2d 925, 933 (5th Cir. Tex. 1984) (The City of Houston argued that the Judge "should be recused . . . on the grounds that her impartiality might reasonable be questioned because she was African American."). Although, the effort might seem harsh and trivial in retrospect, it in fact dealt with an issue that was bound to become controversial with the increase of minority judges on the federal bench. The Fifth Circuit ultimately held that minority judges were not disqualified from hearing civil rights cases even though the definition of the class might theoretically include them.

If anything, the litigation over at-large elections in the city of Dallas was even more protracted than it was in Houston. *See generally Lipscomb v. Jonsson,* 549 F.2d 335 (5th Cir. April 27, 1972); *Lipscomb v. Wise*, 399 F. Supp. 782 (N.D. Tex. March 25, 1975) (Mahon, J.); *Lipscomb v. Wise,* 551 F.2d 1043 (5th Cir. 1977); *Wise v. Lipscomb,* 437 U.S. 535 (1978); *Lipscomb v. Wise,* 583 F.2d 212 (5th Cir. 1978); *Heggins v. City of Dallas*, 469 F. Supp. 739 (N.D. Tex. 1979) (three-judge court); *City of Dallas v. United States,* 482 F. Supp. 183 (D.D.C. Dec. 7, 1979 and Feb. 25, 1980) (three-judge court); *Williams v. City of Dallas,* 734 F. Supp. 1317 (N.D. Tex. 1990) ("it is clear that there is white bloc voting in Dallas which usually defeats the preferred choice of African-Americans. This is precisely what Judge Mahon found in his 1975 opinion in *Lipscomb,* 399 F. Supp. 782, 785-786 (N.D.Tex.1975). The racial factors influencing Dallas political life have not changed significantly since then.").

**County Commissioner Redistricting Litigation**

The Constitution of the State of Texas requires that there be four county commissioners in each county.  Tex. Const. art. V, § 18(b).  But in many counties, the commissioner districts were not reapportioned for generations.  This led to several constitutional challenges in federal court, including:

*LULAC v. Ward County*, No. 87-CA-37 (W.D. Tex. Nov, 25, 1987);

*MPAC v. Calhoun County*, No. V-92-CA-13 (S.D. Tex. Victoria Div. Feb. 13, 1989);

*Almager v. Gaines County*, No. 9-92–6 (N.D. Tex. Lubbock Div. April 8, 1992);

*Gamez v. Deaf Smith County Commissioners Court*, No. C-2-92–115 (N.D. Tex. Amarillo Div. April 14, 1992);

 *Lopez v. Hale County Commissioners Court*, No. 5-92-CV-78-C (N.D. Tex. Lubbock Div. April 23, 1992);

*Perez v. Terry County Commissioners Court*, No. CA-5-92-CV-77C (N.D. Tex. Lubbock Div. April 23, 1992);

*Cassarez v. Cochran County Commissioners Court*, No. 5-92-CV-102-3 (N.D. Tex. Lubbock Div. April 13, 1002); and

*Aguero v. Lubbock County Commissioners Court*, No. CA-5-89-52 (N.D. Tex. Lubbock  Div. Feb. 16, 1989).

There were also cases against the County Commission elections in Bexar, Harris, Bailey, Lamb, Martin, Crockett, Uvalde, and Dallas counties.  I have not located those citations.

**<u>Suits brought by the Department of Justice against the State and certain counties, cities, and school districts for failure to comply with registration procedures, bilingual</u>**

**procedures, various provisions of the Help America Vote Act, and the overseas and**
**military voting procedures of the Voting Rights Act, as well with the preclearance**
**provisions of Section 5**.

*United States v. Waller County,* No. 4:08-cv-03022  (S.D. Tex. 2008): The Court held that the County's voter registration practices and procedures violated Section 5 of the Voting Rights Act and Title I of the Civil Rights Act of 1964, 42. U.S.C. § 1971(a)(2)(B).  The violations primarily affected students at Prairie View A&M University, a historically Black college.  Waller County was enjoined from further implementation of unprecleared registration practices and required to reprocess those applications that were wrongly rejected, develop a training program for voluntary deputy registrars, and initiate voter registration programs on the Prairie View A&M campus.

*United States v. North Harris Montgomery Community College District*, No. H 06-2488 (S.D. Tex. 2006): In this case, the district court held that the Community College District violated Section 5 of the Voting Rights Act by rescheduling its trustee and bond election and eliminating polling places in Hispanic and African American areas without obtaining the requisite determination under Section 5.  The court required the District to reschedule the cancelled election.

*United States v. Fort Bend County*, No. 4:09-cv-1058 (S.D. Tex. 2009): In this case, the Court found that the county failed to implement an effective bilingual election program for Spanish-speaking voters in violation of Section 4(f)(4) of the Voting Rights Act and failed to allow eligible voters to receive assistance from the persons of their choice in violation of Section 208 of the VRA.  In addition, the County failed to offer provisional ballots to eligible voters in

federal elections, and it failed to provide required information to provisional voters, in violation of HAVA.

*United States v. City of Earth,* No. 5:07-cv-00144 (N.D. Tex. 2007): The Court found that the City of Earth "failed to provide certain Spanish language election information accurately as required by Section 203 to limited English proficient Hispanic citizens in the ISD."  Order at 2.

*United States v. Littlefield ISD*, No. 5:07-cv-00145 (N.D. Tex 2007): The Court found that the Littlefield Independent School District "[has] not complied with the requirements of Section 203 in that [it has] failed to translate certain written election materials and information accurately into Spanish."  Order at 1-2.

*United States v. Post ISD*, No. 5:07-cv-00146 (N.D. Tex 2007): The Court found that the Post Independent School District "failed to provide certain Spanish language election information accurately as required by Section 203 to limited English proficient Hispanic citizens in the ISD."  Order at 2.

*United States v. City of Seagraves ISD*, No. 5:07-cv-00147 (N.D. Tex. 2007): The Court found that the Seagraves Independent School District has "not complied with the requirements of Section 203 in that they have failed to translate certain written election materials and information accurately into Spanish." Order at 1-2.

*United States v. Smyer ISD*,  No. 5:07-cv-00148 (N.D. Tex. 2007): The Court found that the Smyer Independent School District "failed to provide certain Spanish language election information accurately as required by Section 203 to limited English proficient Hispanic citizens in the ISD."  Order at 2.

*United States v. Galveston County*, No. 3:07-cv-00377 (S.D. Tex. 2007): The Court found that the "[d]efendants . . . have not successfully complied with all of the provisions of

Section 4(f)(4) of the Voting Rights Act and Sections 302(a) and 302(b) of the Help America Vote Act."  Order at 3.

*United States v. Brazos County*, No. H-06-2165 (S.D. Tex. 2006): The Court found that Brazos County violated Section 4(f)(4) by failing to translate all election-related material into Spanish, by failing to provide an adequate number of bilingual poll workers trained to assist Spanish-speaking voters on election day, and by failing to ensure that voters who were disabled, blind, or illiterate were allowed to use their chosen assistors.  The Court ordered that the County increase the number of bilingual poll workers, translate all election-related material in Spanish, and permit voters their assistor of choice consistent with Section 208.  The Court found that

> Brazos County is covered under Section 4(f)(4) of the Voting Rights Act, as amended, 42 U.S.C. § 1973b(f)(4) ("Section 4(f)(4)"), to provide Spanish language written materials and assistance to voters. The State of Texas, including Brazos County, has been subject to the requirements of Section 4(f)(4) since September 23, 1975. 40 Fed. Reg. 43,746; see also 28 C.F.R. pt. 51, Appendix. As a result, Brazos County has been under notice of its obligations under Section 4(f)(4) since 1975. The Department has sent Brazos County and other covered jurisdictions information regarding the bilingual election requirements of the Voting Rights Act.

> [. . .]

> Defendants admit that they have not fully complied with all of the provisions of Sections 4(f)(4) and 208.  Order at 2-3.

*United States v. Hale County*, No. 5-05CV0043-C (N.D. Tex. 2006): The Court found that Hale County violated Section 203 of the Voting Rights Act of 1965 by failing to provide an adequate number of bilingual poll workers trained to assist Spanish-speaking voters on election day and by failing to effectively publicize election information in Spanish.  The Court directed that the Department of Justice monitor future elections in Hale County and ordered the County to increase the number of bilingual poll workers, employ a bilingual coordinator, and establish a

bilingual advisory group.  As the Court held:

> Defendants have not complied with the requirements of Section 203 for Spanish-speaking citizens residing in Hale County by failing to train poll workers on how properly to provide assistance to Spanish-speaking LEP voters, failing effectively to recruit qualified bilingual poll workers, and failing to provide in an effective manner certain election-related information to Spanish-speaking voters.  Order at 2.

*United States v. Ector County,* No. M005CV131 (W.D. Tex. 2005): The Court found that the Ector County Independent School District violated Section 4(f)(4) of the Voting Rights Act by failing to provide an adequate number of bilingual workers to serve the county's Spanish-speaking population and failed to effectively publicize information to the Spanish-speaking community.  The County was ordered to establish an effective Spanish language program and provided that there could be federal observers to monitor the County's elections.

*United States v. State of Texas*, No. A-02-CA-195-SS (W.D. Tex. 2002):  The Court found that the State failed to enforce the rights of overseas voters in Texas to vote by absentee ballot in the April 9, 2002 federal primary run-off election because there was insufficient time after the March 12 primary election for overseas voters to receive, cast, and return absentee ballots by mail in time to be counted for the run-off election.  The Court issued a preliminary injunction requiring that the State accept the federal write-in ballot from overseas voters for the run-off election.  While the suit was pending, Texas enacted legislation providing for permanent relief, and the Case was dismissed as moot.

In 1975, the Special Provisions of the Voting Rights Act were extended to Texas and has accounted to a large number of Section 5 Objections invalidating Texas Statewide redistricting.

**Objections to State Redistricting**[9]

State of Texas (X0164) (1/23/1976): H.B. No. 1097 (1975)—redistricting of State Representative

      Districts in Jefferson and Tarrant Counties;

State of Texas (X0614) (1/26/1976): H.B. No. 1097 (1975)—redistricting of State Representative

      Districts in Nueces County;

State of Texas (81-0306) (1/25/1982): Legislative Redistricting Board Plan No. 3—Senate

      Redistricting 1-25-82

State of Texas (81-0306) (1/25/1982): Legislative Redistricting Board Plan No. 3—House

      Redistricting 1-25-82

State of Texas (81-0298) (1/29/1982): S.B. No. 1 (1981)—Congressional redistricting;

State of Texas (92-0070) (03/09/1992): S.B. No. 1 (1992)—Senate redistricting plan;

State of Texas (91-3395) (11/12/1991): Texas House redistricting plan;

State of Texas (92-0070) (03/09/1992): S.B. No. 1 (1992)—Senate redistricting plan;

State of Texas (2001-2430) (11/16/2001)—House redistricting plan.

---

[9] Department of Justice, *Voting Determination Letters for Texas*,
http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=txhttp://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=tx.

## Other statewide objections relating to statutes adopted by the legislature[10]

State of Texas (X0335) (12/10/1975): S.B. No. 300, Section 2 (1975)—purge of all registered

      voters;

State of Texas (X0612) (1/26/1976): S.B. No. 11, Section 6 (1973)—requiring certain parties to

      choose candidates by convention instead of holding primary elections;

State of Texas (90-0003) (08/23/1991): Chapter 206, S.B. No. 907 (1989), which provides for

      three alternative methods of election for hospital district governing boards (at large; at

      large with numbered posts; mixed single-member districts and at large);

Nolan County Hospital District (89-0794) (02/12/1990): S.B. 315 (1989)—method of election

      and districting plan . . . for the board of directors of the newly created Nolan County

      Hospital District;

State of Texas (90-0015) (11/05/1990): Chapter 632, S.B. No. 1379 (1989)—creation of fifteen

      additional judicial districts and the implementation schedule;

State of Texas (90-0003) (08/23/1991): Chapter 206, S.B. No. 907 (1989), which provides for

      three alternative methods of election for hospital district governing boards (at large; at

      large with numbered posts; mixed single-member districts and at large);

---

[10] Department of Justice, *Voting Determination Letters for Texas*,
http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=tx.

State of Texas (92-0146) (03/10/1992): Chapter 3, Section 8, H.B. No. 2 (1992), procedures for nomination of candidates by political party executive committees in the event that a different redistricting plan for either house of the legislature is used for the 1992 general election than was used for the primary;

Edwards Underground Water District (93-2267) (11/19/1993): Chapter 626 (1993)—dissolution of the Edwards Underground Water District with elected governing body, and its replacement by the Edwards Aquifer Authority with an appointed governing body;

State of Texas (92-0146) (03/10/1992): Chapter 3, Section 8, H.B. No. 2 (1992)—procedures for nomination of candidates by political party executive committees in the event that a different redistricting plan for either house of the legislature is used for the 1992 general election than was used for the primary;

Fort Bend County Court at Law (93-2475) (05/31/1994): Chapter 653 (1993)—creates a third county court at law judgeship;

Tarrant County (94-3012) (08/15/1994): Chapter 38 (1987)—creation of, and implementation schedule for, Tarrant County Criminal Court Nos. 7 through;

State of Texas (94-4077) (02/17/1995): Spanish language versions of registration forms and instructions;

State of Texas (95-2017) (01/16/1996): Chapter 797 (1995)—authorizes agency employees to

make determinations of an individual's eligibility to register based on citizenship

information contained in the agency's file;

State of Texas (98-1365) (09/29/1998) (Withdrawn 10-21-98): Procedure for filling prospective

judicial vacancies;

State of Texas (2007-5032) (08/21/2008): Chapter 912, H.B. 2984 (2007)—candidate

qualifications.

**Litigation filed in 2011 relating to Texas Statewide redistricting.**

**In the Federal Courts**

*Teuber, et al. v. Texas, et al.*, Cause No. 5:11-cv-572-OLG-JES-XR (W.D. Tex., filed Feb. 10,

2011) (Texas House, Senate, and Congress);

*Mexican American Legislative Caucus v. Texas, et al.*, Cause No. 7:11-cv-144 (S.D. Tex., filed

April 5, 2011) (removed from the 139th District Court of Hidalgo county May 13, 2011)

(State House, Senate and Congress);

*Perez, et al. v. Texas, et al.*, No. 5:11-cv-360-OLG-JES-XR (W.D. Tex., filed May 9, 2011)

(State House, Senate and Congress);

*Mexican American Legislative Caucus v. Texas, et al.*, No. 5:11-cv-361-OLG-JES-XR (W.D.

Tex., filed May 9, 2011) (State House and Congress);

*Rodriguez, et al. v. Texas, et al.*, No. 1:11-cv-451-LY (W.D. Tex., filed May 30, 2011)

(Congress);

*Morris v. State of Texas, et al.*, No. 4:11-cv-2244 (S.D. Tex., filed June 15, 2011) (Congress);

*Texas Latino Redistricting Task Force, et al. v. Perry*, No. 5:11-cv-490-OLG-JES-XR (W.D.

Tex., filed June 17, 2011) (State House and Congress);

*Quesada, et al. v. Perry, et al.*, No. 5:1-cv-592-OLG (W.D. Tex., filed July 15, 2011)

(Congress);

*LULAC v. Perry*, No. 5:11-cv-00855 (W.D. Tex.) (Senate);

*Davis v. Perry*, No. 5:11-cv-00788 (W.D. Tex.) (Congress).

**In the State Courts:**

*Teuber, et al. v. Texas, et al.*, No. CV-11-270, (397th District Court of Grayson County, Texas,

filed February 16, 2011) (use of census unadjusted for undocumented persons);

*Barton, et al. v. Texas, et al.*, No. 11-20238-CV, (13th District Court of Navarro County, Texas,

filed May 22, 2011) (Congress);

*Washburn v. Texas, et al.*, No. CV 110921, (397th District Court of Grayson County, Texas,

filed May 26, 2011) (Congress and State Board of Education);

*Barton, et al. v. Texas, et al.*, No. 11-20263-CV, (13th District Court of Navarro County, Texas,

filed May 30, 2011) (Congress);

*Washburn v. Texas, et al.*, No. CV 110931, (397th District Court of Grayson County, Texas,

filed May 30, 2011) (Congress);

*Limon v. Perry, et al.*, No. D-1-GN-11-1611, (351st Judicial District Court of Travis County,

Texas, filed May 30, 2011) (Congress);

*Garcia, et al. v. Perry, et al.*, No. D-1-GN-11-1612, (351st Judicial District Court of Travis

County, Texas, filed May 30, 2011) (Congress).

## Section 5 enforcement actions brought by the Department of Justice[11]

*U.S. v. City Commission of Texas City*, (S.D. Tex. 05/12/77);

*U.S. v. Uvalde Consolidated ISD*, 461 F. Supp. 117 (W.D. Tex. 1978);

*U.S. v. Temple Independent School District*,  (W.D. Tex. 01/12/78);

*U.S. v. Board of Trustees of Westheimer ISD* (S.D. Tex. 01/20/77) (suit to enforce a Section 5

objection which prohibited the creation the Westheimer ISD from a high income

---

[11] http://www.justice.gov/crt/about/vot/litigation/caselist.php

primarily Anglo portion of the Houston ISD.   This would not only have removed a significant portion of the taxable base of the district but would have effectively stymied the process of desegregation);

*U.S. v. Board of Trustees of Midland ISD*, (W.D. Tex. 03/24/77);

*U.S. v. Hawkins ISD,* (E.D. Tex. 03/26/77);

*U.S. v. Board of Trustees of Trinity ISD,* (S.D. Tex. 03/28/77);

*U.S. v. Board of Trustees of Chapel Hill ISD* (E.D. Tex. 05/06/77);

*U.S. v. Village of Dickenson* (S.D. Tex. 02/17/78);

*U.S. v. Board of Trustees of Somerset ISD*, No. SA-78-CA-24 (W.D. Tex. 03/10/78);

*U.S. v. City of Houston*, (S.D. Tex. 12/13/78);

*U.S. v. County School Trustees of Harris County*, (S.D. Tex. 01/18/80);

*U.S. v. City of Port Arthur*, (E.D. Tex. 03/14/80);

*U.S. v. State of Texas*, (W.D. Tex. 07/19/85);

*U.S. v. Victoria Independent School District*, (S.D. Tex. 04/04/86);

*U.S. v. La Vernia ISD*, (W.D. Tex. 03/02/90);

*U.S. v. State of Texas,* (S.D. Tex. 11/27/90);

*U.S. v. City of Houston*, (S.D. Tex. 10/17/91);

*U.S. v. City of Wilmer,* (N.D. Tex. 01/18/91);

*U.S. v. Moses,* (S.D. Tex. 03/29/95);

*Garza v. Gates*, 482 F. Supp. 1211 (W.D. Tex. 1980) (Section 5 Objection to the 1973

reapportionment of Atascosa County found to be untimely made as a result of "an

incredible and inexcusable lack of diligence by the Department of Justice . . . .").

## Section 5 Enforcement Actions by Individuals

*Thelma Area Neighborhood Corp v. Evergreen Underground Water Cons. Dist.*, No. 5:01-cv-

01191-ECP (W.D. Tex. 2002) (Section 5 enforcement) (Action to enjoin annexation of

area of Bexar County by an Anglo dominated Water District that elected Board Members

at-large from the area of an Hispanic dominated water district electing by single member

district).

## Other Cases

*Whatley v. Clark*, 482 F.2d 1230 (5th Cir. 1973);

*Alonzo v. Jones*, No. C-81-227 (S.D.Tex. Feb. 3, 1983), (*Alonzo I*) ("the plaintiffs successfully

challenged this method of electing city council members as discriminatory against

Mexican Americans.");

*Vasquez v. City of Wichita Falls, TXs*

*LULAC v. Lytle ISD*, No. SA-95-CA-267 ;

*LULAC v. City of Lytle*, No. 5:95-cv-00857-DWS (W.D. Tex. 1997);

*LULAC v. Jourdanton ISD*, No. SA-95-CA-0490 or 49;

*LULAC v. City of Jourdanton ISD*, No. SA 95-113;

*LULAC v. Karnes City ISD*, No. ;

*Trevino v. Pleasanton ISD*, No. ,

*Davila v. Sudan ISD*, No. 5:94-cv-00082-C (N.D. Tex. 1997);

*Arriola v. Northside ISD*, No. 5:94-cv-00699-OLG (W.D. Tex. 1997);

*Ortiz v. Cockrell*, No.

*LULAC v. Elgin ISD*, No. A-95-cv-458-JN

*LULAC v. Pettus ISD*, No. 2:95-cv-00545 (S.D. Tex. 1996);

*Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989) (case dismissed on *Gingles* I grounds.

*Nisby v. Commissioners Court of Jefferson County*, 798 F.2d 134 (5th Circuit 1986);

*Vera v. Richards*, 861 F. Supp. 1304, 1317 (S.D. Tex. 1994) *aff'd sub nom Bush v. Vera*, 517
U.S. 952 (1996) ("Texas has a long, well-documented history of discrimination that has
touched upon the rights of African-Americans and Hispanics to register, to vote, or to
participate otherwise in the electoral process.  Devices such as the poll tax, an all-white
primary system, and restrictive voter registration time periods are an unfortunate part of
this State's minority voting rights history.");

*LULAC v. N. E. Indep. Sch. Dist.*, 903 F. Supp. 1071, 1085 (W.D. Tex. 1995) ("There is no
dispute that Texas has a long history of discrimination against its Black and Hispanic
citizens in all areas of public life.");

*Overton v. Austin*, 871 F.2d 529, 536 (5th Cir. 1989) ("common histories of discrimination" of
African Americans and Mexican Americans in Austin);

*Sierra v. El Paso Indep. Sch. Dist.*, 591 F. Supp. 802, 807-809 (W.D. Tex. 1984) ("[C]onsidered
in conjunction with the history of official discrimination and the pattern of polarized
voting,the conclusion is inescapable that Mexican-Americans have less opportunity than
do other members of the electorate to participate in the political process.");

*Seamon v. Upham*, 536 F. Supp. 931, 987 (E.D. Tex. 1982) (Justice, C.J., dissenting) ("Even

    when official discrimination in politics and the political process is viewed in isolation, the

    legacy is long and almost overwhelming. No one can seriously contend that a catalog of

    legal actions pertaining to discrimination in voting adequately captures the harsh reality

    of political racism in Texas.")

*United States v. Uvalde Consol. Indep. Sch. Dist.*, 625 F.2d 547, 556n16 (5th Cir. 1980)

    (Elections held at-large "effectively deny Mexican American and black voters in Texas

    political access in terms of recruitment, nomination, election and ultimately,

    representation")

*Pablo Puente v. Crystal City, Texas*, No. DR-70-CA- 4 (April 3, 1970) (finding that the real

    property ownership requirement incorporated in the Charter of Crystal City for

    candidates for city office was invidiously discriminatory against the Mexican-American

    Plaintiffs and their class and hence was unconstitutional);

*Muniz v. Beto*, 434 F.2d 697 (5th Cir. 1970) (finding exclusion of Mexican Americans from

    juries in El Paso).

**Federal Election Observers Sent to Jurisdictions in Texas from May, 1976 to November, 2012[12]**

| Date | Type of Election | State | County | Local Government | Number of Observers |
|---|---|---|---|---|---|
| 11/6/2012 | General | Texas | Dallas County | | 69 |
| 11/6/2012 | General | Texas | Fort Bend County | | 24 |
| 11/6/2012 | General | Texas | Jefferson County | | 26 |
| 5/29/2012 | Primary | Texas | Fort Bend | | 23 |

---

[12] Lawyers' Committee for Civil Rights Under Law, *Voting Rights Act: Objections and Observers Searchable Index*, http://www.lawyerscommittee.org/projects/section_5/ (select the "Observer Coverage" bubble under the "Search By" heading; then select the "State" bubble under the "Observer Coverage" heading; then select "Texas" from the list of states under the "Geographical Search" heading).

| | | | County | | |
|---|---|---|---|---|---|
| 5/29/2012 | Primary | Texas | Jefferson County (AL) | | 27 |
| 5/12/2012 | Municipal | Texas | Dallas County | Irving | 16 |
| 5/12/2012 | Municipal | Texas | Galveston County | Galveston | 19 |
| 5/14/2011 | Mun & Sch District | Texas | Jefferson County | Beaumont | 43 |
| 5/14/2011 | Mun Recall | Texas | Galveston County | La Marque | 10 |
| 5/14/2011 | Municipal | Texas | Medina County | Hondo | 4 |
| 11/2/2010 | General | Texas | Dallas County | | 20 |
| 11/2/2010 | General | Texas | Fort Bend County | | 22 |
| 11/2/2010 | General | Texas | Galveston County | | 22 |
| 11/2/2010 | General | Texas | Williamson County | | 29 |
| 6/19/2010 | Mun Runoff | Texas | Galveston County | Galveston | 11 |
| 5/8/2010 | Municipal | Texas | Dallas County | Irvin | 20 |
| 5/8/2010 | Municipal | Texas | Galveston County | Galveston | 19 |
| 3/2/2010 | Primary | Texas | Fort Bend County | | 16 |
| 3/2/2010 | Primary | Texas | Galveston County | | 17 |
| 3/2/2010 | Primary | Texas | Williamson County | | 19 |
| 3/2/2010 | Primary | Texas | Wilson County | | 16 |
| 2/11/2010 | General | Texas | Galveston County | | 22 |
| 1/23/2010 | Spec Municipal | Texas | Medina County | Hondo | 4 |
| 5/9/2009 | Mun Recall | Texas | Dallas County | Hondo | 5 |
| 5/9/2009 | Municipal | Texas | Dallas County | Farmers Branch | 20 |
| 11/4/2008 | General | Texas | Dallas County | | 43 |
| 11/4/2008 | General | Texas | Fort Bend County | | 41 |
| 11/4/2008 | General | Texas | Galveston County | | 29 |
| 5/10/2008 | Municipal | Texas | Dallas County | Farmers Branch | 17 |
| 5/10/2008 | Municipal | Texas | Dallas County | Irving | 19 |
| 3/4/2008 | Pres Preference | Texas | Brazos County | | 8 |
| 3/4/2008 | Pres Preference | Texas | Fort Bend | | 21 |

| | | | County | | |
|---|---|---|---|---|---|
| 3/4/2008 | Pres Preference | Texas | Galveston County | | 17 |
| 5/12/2007 | Local | Texas | Fort Bend County | | 13 |
| 5/12/2007 | Municipal | Texas | Dallas County | Farmers Branch | 19 |
| 11/7/2006 | General | Texas | Brazos County | | 17 |
| 11/7/2006 | General | Texas | Ector County | | 11 |
| 11/7/2006 | General | Texas | Fort Bend County | | 20 |
| 11/7/2006 | General | Texas | Galveston County | | 20 |
| 11/7/2006 | General | Texas | Hale County | | 11 |
| 11/7/2006 | General | Texas | Medina County | | 12 |
| 11/7/2006 | General | Texas | Wilson County | | 12 |
| 5/13/2006 | Joint Mun / Sch Dist | Texas | Ector County | | 8 |
| 3/7/2006 | Primary | Texas | Ector County | | 25 |
| 11/8/2005 | General | Texas | Ector County | | 21 |
| 11/2/2004 | General | Texas | Dallas County | | 99 |
| 5/14/2004 | Mun & Sch District | Texas | Dallas County | | 46 |
| 10/5/2002 | Federal | Texas | Titus County | | 12 |
| 5/5/2001 | Municipal | Texas | Dallas County | Irving | 19 |
| 5/6/2000 | Municipal | Texas | Dallas County | Irving | 16 |
| 12/10/1996 | Runoff | Texas | Jefferson County | | 15 |
| 12/10/1996 | Runoff | Texas | Galveston County | | 9 |
| 4/14/1992 | Primary Runoff | Texas | Frio County | | 5 |
| 11/8/1988 | Federal | Texas | Hidalgo County | | 31 |
| 4/4/1987 | Mun Primary | Texas | Victoria County | Victoria | 15 |
| 4/7/1984 | General | Texas | Dallas County | Wilmer-Hutchins Independent School District | 10 |
| 11/4/1980 | Federal | Texas | Atascosa County | | 19 |
| 11/7/1978 | Federal | Texas | El Paso County | | 8 |
| 8/12/1978 | Spec Runoff | Texas | Crockett County | | 8 |
| 6/3/1978 | Primary Runoff | Texas | Reeves County | | 15 |
| 5/6/1978 | Primary | Texas | Reeves County | | 59 |
| 11/2/1976 | Federal | Texas | Bee County | | 24 |

| 11/2/1976 | Federal | Texas | Frio County | | 26 |
| 11/2/1976 | Federal | Texas | La Salle County | | 26 |
| 5/1/1976 | Primary | Texas | Fort Bend County | | 18 |
| 5/1/1976 | Primary | Texas | Medina County | | 57 |
| 5/1/1976 | Primary | Texas | Uvalde County | | 24 |
| 5/1/1976 | Primary | Texas | Wilson County | | 18 |

**Section 5 Objections to State, County, and Municipal Voting Changes in Texas Issued by DOJ from December, 1975 to February, 2012[13]**

| Date | Type of Objection | County | Jurisdiction | Description |
|---|---|---|---|---|
| 2/21/2012 | Method of Election | Jefferson County | Beaumont ISD | Method of election from seven single-member districts to five single-member districts |
| 3/12/2012 | Voter Registration Procedures / Voter Qualifications | Texas | | Voter registration and photographic identification procedures contained in Chapter 123 (S.C. 14) (2011) |
| 3/5/2012 | Redistricting / Reapportionment | Galveston County | | Redistricting plan for the commissioners court; reduction in the number of justice of the peace and constable precincts and redistricting plans for those offices |
| 2/7/2012 | Redistricting / Reapportionment | Nueces County | | Redistricting plan for the commissioners court |
| 10/3/2011 | Method of Election | Galveston County | Galveston | Method of election to four single-member districts and two at-large seats, the adoption of numbered posted for the at-large seats, and the proposed redistricting criteria |
| 12/9/2010 | Bilingual Procedures | Runnels County | | Bilingual election procedures |
| 2/12/2010 | Bilingual Procedures | Gonzales County | | Bilingual election procedures for the November 2, 2004, November 7, 2006, and |

---

[13] Lawyers' Committee for Civil Rights Under Law, *Voting Rights Act: Objections and Observers Searchable Index*, http://www.lawyerscommittee.org/projects/section_5/ (select the "Objection Letters" bubble under the "Search By" heading; then select the "State" bubble under the "Observer Coverage" heading; then select "Texas" from the list of states under the "Geographical Search" heading).

| | | | | November 4, 2008 general elections |
|---|---|---|---|---|
| 3/24/2009 | Bilingual Procedures | Gonzales County | | Bilingual election procedures for the November 2, 2004, November 7, 2006, and November 4, 2008 general elections |
| 8/21/2008 | Candidate Qualifications | Texas | | Candidate qualifications |
| 5/5/2006 | Polling Place / Absentee & Early Voting Locations | Harris and Montgomery counties | North Harris Montgomery Community College District | Reduction in polling places and early voting locations |
| 8/12/2002 | Method of Election | Brazoria County | Freeport | Method of electing city council members |
| 6/21/2002 | Redistricting / Reapportionment | Waller County | | 2001 redistricting plans for the commissioners court, justice of the peace and constable districts |
| 11/16/2001 | Redistricting / Reapportionment | Texas | | Redistricting plan (House) |
| 9/24/2001 | Method of Election | Haskell, Knox, and Throckmorton counties | Haskell Cons ISD | Cumulative voting with staggered terms |
| 6/5/2000 | Method of Election | Austin County | Sealy Independent School District | Numbered posts |
| 7/16/1999 | Annexation | Dawson Co | Lamesa | Deannexation by referendum of the property annexed under Ordinance No. 0-06-98 |
| 12/14/1998 | Method of Election, Redistricting / Reapportionment | Galveston County | Galveston | Method of election to four single-member districts and two at-large seats, the adoption of numbered posts for the at-large seats, the adoption of a majority-vote requirement for the election of city officers, and the proposed redistricting criteria |
| 9/29/1998 | Miscellaneous | Texas | | Procedure for filling prospective judicial vacancies |
| 3/17/1997 | Annexation | Harris County | Webster | Annexation (Ordinance No. 95-33) |

| 1/16/1996 | Voter Registration Procedures / Voter Qualifications | Texas | | Chapter 797 (1995— authorizes agency employees to make determinations of an individual's eligibility to register based on citizenship information contained in the agency's file |
|---|---|---|---|---|
| 6/26/1995 | Method of Election | Andrews County | Andrews | Method of election from at-large by majority vote with numbered posts, staggered terms, and a 2-2-1 method of staggering to cumulative voting by plurality vote with numbered posts, staggered terms, and a 3-2 method of staggering |
| 3/2/1995 | Voting Methods | Bexar, Hays, and Comal counties | Edwards Underground Water District | Temporary use of punch card ballots and the procedures relating thereto |
| 2/17/1995 | Bilingual Procedures | Texas | | Spanish language versions of registration forms and instructions |
| 11/18/1994 | Special Election / Regular Election Date | Bexar County | Judson Independent School District | Special bond election |
| 10/31/1994 | Redistricting / Reapportionment | Gonzales County | Gonzales County Underground Water Conservation District | Districting plan |
| 10/31/1994 | Method of Election | Karnes County | Karnes City | Increase in the number of officials from two to five insofar as the additional positions would be elected at large with staggered terms |
| 10/21/1994 | Special Election / Regular Election Date, Bilingual Procedures | Bexar County | San Antonio | Special election procedures— failure to comply with bilingual procedures |
| 9/12/1994 | Method of Election | Cochran County | Morton | Method of election— cumulative voting |
| 8/22/1994 | Method of Election | Jackson County | Edna Independent School District | Method of election—five single-member districts and two at-large |

| 8/15/1994 | Number of Judicial Positions | Texas | | Chapter 38 (1987)—creation of, and implementation schedule for, Tarrant County Criminal Court Nos. 7 through 10 |
| --- | --- | --- | --- | --- |
| 6/13/1994 | Method of Election | Limestone County | Mexia Independent School District | Method of election—five single-member districts and two at-large |
| 5/31/1994 | Number of Judicial Positions | Texas | | Chapter 653 (1993)—creates a third county court at law judgeship |
| 5/31/1994 | Number of Judicial Positions | Texas | | Chapter 318 (1993)—creates a fifteenth county criminal court at law judgeship |
| 5/9/1994 | Number of Judicial Positions | Texas | | Chapter 1032 (1993)—creation of the 385th Judicial District Court in Midland County |
| 4/18/1994 | Polling Place / Absentee & Early Voting Locations | Marion County | | Polling place change |
| 11/19/1993 | Incorporation / Dissolution | Bexar, Hays, and Comal counties | Edwards Underground Water District | Chapter 626 (1993)—dissolution of the Edwards Underground Water District with elected governing body, and its replacement by the Edwards Aquifer Authority with an appointed governing body |
| 8/30/1993 | Redistricting / Reapportionment | Wharton County | | Redistricting plans (commissioners court, justices of the peace/constables) |
| 7/19/1993 | Method of Election | Bailey County | | Reduction in the number of justice of the peace and constable districts from four to one |
| 6/4/1993 | Redistricting / Reapportionment | McCulloch County | | 1991 redistricting plan for the commissioners court |
| 5/10/1993 | Redistricting / Reapportionment | Castro County | | 1993 redistricting plan for the commissioners court |
| 5/4/1993 | Special Election / Regular Election Date | Bailey County | | Procedures for conducting the January 5, 1993, special local option election |
| 4/26/1993 | Method of Election | Dawson County | Lamesa | Majority-vote requirement for election of mayor |
| 3/22/1993 | Method of Election | Navarro County | Corsicana Independent | Majority-vote requirement for election of school board |

| | | | School District | trustees |
|---|---|---|---|---|
| 3/22/1993 | Method of Election | Panola County | Carthage Independent School District | Method of election from seven members elected at-large by numbered places and majority vote to five members elected from single-member districts and two at-large seats by numbered places with a majority-vote requirement |
| 2/19/1993 | Method of Election | Cass County | Atlanta Independent School District | Method of election; five single-member districts and two at-large seats |
| 12/14/1992 | Method of Election | Galveston Co | Galveston | Method of election; four single-member districts and two at-large seats; the adoption of numbered posts |
| 10/6/1992 | Redistricting / Reapportionment | Castro County | | 1992 redistricting plan (commissioners court districts) |
| 8/17/1992 | Method of Election, Special Election / Regular Election Date | Jackson County | Ganado | The adoption of numbered positions and staggered terms; and the implementation schedule |
| 7/31/1992 | Method of Election, Redistricting / Reapportionment | Travis County | Del Valle Independent School District | Method of election, districting plan, and the majority-vote requirement for at-large position |
| 7/20/1992 | Method of Election | Dallas County | City of Wilmer | Use of numbered positions for city council elections |
| 7/14/1992 | Redistricting / Reapportionment | Gaines County | | 1991 redistricting plan (commissioners court districts) |
| 4/10/1992 | Redistricting / Reapportionment | Hale County | | 1991 redistricting plan (commissioners court districts) |
| 4/10/1992 | Redistricting / Reapportionment | Deaf Smith Co | | 1991 redistricting plan (commissioners court districts) |
| 4/6/1992 | Redistricting / Reapportionment | Bailey County | | 1991 redistricting plan (commissioner and justice of the peace/constable districts) |
| 4/6/1992 | Redistricting / Reapportionment | Cochran Co | | 1991 redistricting plan commissioners court districts) |
| 4/6/1992 | Redistricting / Reapportionment | Terrell County | | 1991 redistricting plan (commissioners court districts) |
| 3/30/1992 | Redistricting / Reapportionment | Ward County | Monahans-Wickett-Pyote Independent | 1991 redistricting plan (trustee districts) |

| | | | School District | |
|---|---|---|---|---|
| 3/30/1992 | Redistricting / Reapportionment | Castro County | | 1991 redistricting plan (commissioners court districts) |
| 3/30/1992 | Redistricting / Reapportionment | Lubbock County | Lubbock Independent School District | 1991 redistricting plan |
| 3/30/1992 | Redistricting / Reapportionment | Ellis County | | 1991 redistricting plan (commissioners court districts) |
| 3/17/1992 | Redistricting / Reapportionment | Gregg County | | Redistricting plan (commissioners court districts) |
| 3/17/1992 | Redistricting / Reapportionment | Calhoun County | | Redistricting plan (commissioners court districts, and justice of the peace and constable districts) |
| 3/17/1992 | Redistricting / Reapportionment | Galveston County | | Redistricting plan (justice of the peace/constable districts) |
| 3/10/1992 | Method of Election | Texas | | Chapter 3, Section 8, H.B. No. 2 (1992), procedures for nomination of candidates by political party executive committees in the event that a different redistricting plan for either house of the legislature is used for the 1992 general election than was used for the primary |
| 3/9/1992 | Redistricting / Reapportionment | Texas | | Senate redistricting plan (S.B. No. 1 (1992)) |
| 1/7/1992 | Method of Election | Wharton County | El Campo | Method of electing the at-large councilmembers (in a four district, three at-large method of election) involving the separate designation of one seat on the ballot and the adoption of a majority vote requirement for that seat |
| 12/24/1991 | Method of Election, Redistricting / Reapportionment, Polling Place / Absentee & Early Voting Locations | Travis County | Del Valle Independent School District | Change in method of election to five trustees elected from single-member districts and two elected at large, the districting plan, and a polling place change |
| 11/12/1991 | Redistricting / | Texas | | Texas House redistricting plan |

| | Reapportionment | | | |
|---|---|---|---|---|
| 10/4/1991 | Redistricting / Reapportionment | Harris, Montgomery, and Ft. Bend counties | Houston | Redistricting plan |
| 8/23/1991 | Method of Election | Texas | | Chapter 206, S.B. No. 907 (1989), which provides for three alternative methods of election for hospital district governing boards (at large; at large with numbered posts; mixed single-member districts and at large) |
| 5/6/1991 | Method of Election, Redistricting / Reapportionment | Collin, Dallas, Denton, Kaufman, and Rockwall counties | Dallas | Redistricting plans and the proposed charter amendments establishing the 10-4-1 method of election and changing the definition of terms under the consecutive terms provisions for non-mayoral candidate eligibility |
| 4/22/1991 | Method of Election, Redistricting / Reapportionment, Special Election / Regular Election Date | Refugio County | Refugio Independent School District | Method of electing the school board from at large to five single-member districts and two at-large, the concurrent election of the at-large seats by numbered position, the districting plan and the implementation schedule |
| 3/19/1991 | Polling Place / Absentee & Early Voting Locations | Lubbock County | Lubbock County Water Control and Improvement District No.1 | Selection of polling places for Precincts 2 and 3 |
| 3/13/1991 | Special Election / Regular Election Date | Collin, Dallas, Denton, Kaufman, and Rockwall counties | Dallas | Charter amendments under Chapter XXIV, Section 21 (1-5), which provide for a delay of the regularly scheduled May 4, 1991, election and an implementation schedule therefor |
| 12/21/1990 | Annexation | Houston County | Grapeland | Four annexations (March 27, 1990) |
| 11/13/1990 | Method of Election | Brazoria County | Freeport | Majority vote requirement |

| | | | | |
|---|---|---|---|---|
| 11/5/1990 | Number of Judicial Positions | Texas | | Chapter 632, S.B. No. 1379 (1989)—creation of fifteen additional judicial districts and the implementation schedule |
| 5/7/1990 | Voter Registration Procedures / Voter Qualifications | San Patricio County | | 1987 transfer of registration duties from the county clerk to the county tax assessor/collector |
| 2/12/1990 | Method of Election, Redistricting / Reapportionment | Nolan County | Nolan County Hospital District | Method of election and districting plan, as contained in Senate Bill No. 315 (1989), for the board of directors of the newly created Nolan County Hospital District |
| 2/5/1990 | Method of Election | Yoakum County | Denver City | Adoption of numbered positions and a majority vote requirement for council elections |
| 10/27/1989 | Redistricting / Reapportionment | DeWitt County | Cuero | Districting plan |
| 5/8/1989 | Method of Election, Redistricting / Reapportionment, Polling Place / Absentee & Early Voting Locations | Refugio County | Refugio Independent School District | Method of election from seven trustees elected at-large (with numbered posts and plurality win) to five single-member districts and two at-large positions (plurality win), the districting plan, an implementation schedule which includes staggered terms for the two at-large seats, and the selection of two polling places |
| 3/20/1989 | Method of Election, Redistricting / Reapportionment | Chambers and Harris Counties | Baytown | Method of election (5-3-1); districting plan; increase in number of councilmembers from seven to nine; provision that the three at-large members other than the mayor will be elected from numbered positions to staggered terms |
| 2/27/1989 | Polling Place / Absentee & Early Voting Locations | Dallas County | | Absentee voting procedures for the November 8, 1988, general election |
| 2/3/1989 | Method of Election | Wharton County | El Campo | Numbered positions and a majority-vote requirement for |

| | | | | the at-large positions |
|---|---|---|---|---|
| 9/26/1988 | Method of Election | Lynn County | | Reduction in the number of justice of the peace and constable precincts from five to one |
| 8/12/1988 | Annexation | Jasper County | Jasper | Ordinance No. 3-88-1--annexation |
| 6/14/1988 | Method of Election, Redistricting / Reapportionment | San Patricio Co | | Reduction in the number of justice of the peace and constable precincts and the districting plan adopted for its implementation |
| 4/18/1988 | Method of Election, Redistricting / Reapportionment, Polling Place / Absentee & Early Voting Locations | Harrison County | Marshall Independent School District | Method of election; districting plan; majority-vote requirement for trustees elected from single-member districts; polling place consolidation |
| 1/22/1988 | Method of Election, Redistricting / Reapportionment | Frio County, Medina County | Hondo Independent School District | Method of election; districting plan |
| 1/4/1988 | Method of Election | Colorado, Austin Counties | Columbus Independent School District | Numbered positions and majority vote requirement |
| 10/2/1987 | Method of Election | Crockett County | | Chapter 2, S.B. No. 88 (1987)—to the extent that it proposes to use the at-large system with numbered positions for electing the board of directors for the newly created Crockett County Hospital District |
| 6/22/1987 | Method of Election, Special Election / Regular Election Date | Falls County | Marlin Independent School District | Method of election; numbered positions and staggered terms for two at-large seats; implementation schedule |
| 12/29/1986 | Method of Election | Wharton County | Wharton Independent School District | Majority-vote requirement |

| 10/14/1986 | Redistricting / Reapportionment | Anderson , Henderson, Hunt, Kaufman, and Van Zandt counties | Trinity Valley Community College District | Redistricting plan |
|---|---|---|---|---|
| 7/18/1986 | Redistricting / Reapportionment | Wharton County | El Campo | Two districting plans |
| 4/10/1986 | Method of Election, Redistricting / Reapportionment | Hale County | Plainview | Method of election and districting plan |
| 1/13/1986 | Method of Election | Terrell County | | Reduction in number of justices of the peace from four to one and the resulting at-large method of election |
| 11/18/1985 | Method of Election, Redistricting / Reapportionment | Lynn County | | Redistricting (justice of the peace and constable precincts); reduction in the number of justices and constables from five to two |
| 11/8/1985 | Method of Election | Wharton County | El Campo | 1975 imposition of numbered positions and a majority vote requirement, and the 1985 change to the election of four councilmembers by single-member districts and three at-large with a new staggering method |
| 8/6/1985 | Bilingual Procedures | Dawson County | | Bilingual election procedures |
| 2/26/1985 | Method of Election | Bowie County | Liberty-Eylau Independent School District | Majority vote requirement |
| 1/18/1985 | Method of Election | Cherokee County | Rusk Independent School District | Numbered posts |
| 11/9/1984 | Special Election / Regular Election Date | El Paso County | El Paso Independent School District | Implementation schedule for the election of board members |
| 4/2/1984 | Polling Place / Absentee & Early Voting Locations | Dallas County | Wilmer-Hutchins Independent School District | Four polling place and absentee voting location changes |
| 12/27/1983 | Method of Election | Cass, Morris, and Titus counties | Pewitt Independent School District | Numbered posts |

| 10/20/1983 | Incorporation / Dissolution, Consolidation or Division of Political Units | Jefferson County | Beaumont and South Park Independent School District | Dissolution of the Beaumont Independent School District; the creation of a common school district and its attachment to the South Park Independent School District |
|---|---|---|---|---|
| 8/19/1983 | Method of Election | Wilson County | Stockdale Independent School District | Numbered posts |
| 10/14/1982 | Method of Election | Atascosa County | Pleasanton | Numbered posts |
| 10/4/1982 | Special Election / Regular Election Date | Harris County | Harris County School District | Election date |
| 3/15/1982 | Method of Election | Brazoria County | Angleton Independent School District | Numbered posts; majority-vote requirement |
| 3/12/1982 | Consolidation or Division of Political Units, Method of Election | Jefferson County | Port Arthur | Consolidation of City of Port Arthur and Town of Griffing Park; method of election |
| 2/18/1982 | Redistricting / Reapportionment | Uvalde County | | Redistricting |
| 1/29/1982 | Redistricting / Reapportionment | Texas | | S.B. No. 1 (1981)—Congressional redistricting |
| 1/25/1982 | Redistricting / Reapportionment | Texas | | Legislative Redistricting Board Plan No. 1—Senate Redistricting |
| 1/25/1982 | Redistricting / Reapportionment | Texas | | Legislative Redistricting Board Plan No. 3—House Redistricting |
| 1/22/1982 | Redistricting / Reapportionment | Uvalde County | | Redistricting |
| 6/5/1981 | Polling Place / Absentee & Early Voting Locations | Burleson County | Burleson County Hospital District | Reduction of polling places from thirteen to one |
| 3/16/1981 | Method of Election | Liberty County | Liberty Independent School District | Numbered posts |
| 2/9/1981 | Method of Election | Orange County | West Orange-Cove Cons Independent School District | Numbered posts; majority-vote requirement |

| 11/4/1980 | Polling Place / Absentee & Early Voting Locations | Wilson County | | Polling place |
|---|---|---|---|---|
| 9/3/1980 | Annexation | Victoria County | Victoria | Four annexations |
| 8/12/1980 | Redistricting / Reapportionment | Jim Wells County | | Redistricting |
| 8/8/1980 | Method of Election | Liberty County | Cleveland Independent School District | Numbered posts |
| 7/23/1980 | Special Election / Regular Election Date | Jefferson County | Port Arthur | Referendum election |
| 4/16/1980 | Method of Election | Nueces County | Corpus Christi Independent School District | Apportionment plan (four single-member districts, three at-large) |
| 4/3/1980 | Method of Election | Nacogdoches County | Nacogdoches Independent School District | Apportionment plan (five single-member districts, two at-large) |
| 3/5/1980 | Annexation | Jefferson County | Port Arthur | Six annexations |
| 2/25/1980 | Redistricting / Reapportionment, Precinct, Polling Place / Absentee & Early Voting Locations | Cochran County | | Redistricting; additional voting precincts; polling places |
| 2/1/1980 | Redistricting / Reapportionment | Comal County | | Redistricting |
| 2/1/1980 | Redistricting / Reapportionment | Jim Wells County | | Redistricting |
| 1/17/1980 | Special Election / Regular Election Date | Harris County | Harris County School District | Election date |
| 1/15/1980 | Special Election / Regular Election Date | Jefferson County | Port Arthur | Ordinance No. 79-119—referendum election |
| 12/27/1979 | Method of Election, Redistricting / Reapportionment | Harris County | La Porte | Method of election (four districts, three at-large with numbered posts), districting plan, majority-vote requirement, three-year staggered terms |
| 12/21/1979 | Special Election / Regular Election Date | Jefferson County | Port Arthur | Ordinance No. 79-108—referendum election |
| 12/11/1979 | Redistricting / Reapportionment | Medina County | | Redistricting |

| 12/7/1979 | Redistricting / Reapportionment | Atascosa County | | Redistricting |
| 12/3/1979 | Polling Place / Absentee & Early Voting Locations | Williamson County | Taylor | Polling place |
| 9/14/1979 | Method of Election | Caldwell County | Lockhart | Home Rule Charter—numbered posts; staggered terms |
| 9/12/1979 | Method of Election | Bexar, Comal, and Guadalupe counties | Comal Independent School District | Numbered posts |
| 8/17/1979 | Polling Place / Absentee & Early Voting Locations | Bexar County | San Antonio | Polling place |
| 7/18/1979 | Special Election / Regular Election Date | Harris County | Houston | Referendum election on seven of eight propositions |
| 6/11/1979 | Annexation | Harris County | Houston | Fourteen annexations |
| 5/11/1979 | Method of Election | Cherokee County | Alto Independent School District | Numbered posts; majority-vote requirement |
| 2/1/1979 | Method of Election | Bee County | Beeville | Single-member district plan |
| 1/18/1979 | Method of Election | Castro, Deaf Smith, and Parmer counties | Hereford Independent School District | Numbered posts |
| 12/27/1978 | Redistricting / Reapportionment | Terrell County | | Redistricting |
| 8/8/1978 | Redistricting / Reapportionment | Harrison County | | Redistricting |
| 7/7/1978 | Method of Election | Ector County | Ector Independent School District | Numbered posts; majority-vote requirement |
| 7/3/1978 | Redistricting / Reapportionment | Jim Wells County | | Redistricting |
| 6/30/1978 | Redistricting / Reapportionment | Brazos County | | Redistricting |
| 5/1/1978 | Special Election / Regular Election Date | Harris County | Harris Independent School District | Election date |
| 4/28/1978 | Redistricting / Reapportionment | Aransas County | | Redistricting |
| 4/28/1978 | Method of Election | Navarro County | Corsicana Independent School District | Numbered posts; majority-vote requirement |

| | | | | |
|---|---|---|---|---|
| 4/26/1978 | Redistricting / Reapportionment | Edwards County | | Redistricting |
| 4/14/1978 | Redistricting / Reapportionment | Medina County | | Redistricting |
| 4/7/1978 | Method of Election | Anderson County | Neches Independent School District | Numbered posts; majority-vote requirement |
| 3/24/1978 | Redistricting / Reapportionment | Nueces County | | Redistricting |
| 3/24/1978 | Consolidation or Division of Political Units, Redistricting / Reapportionment | Jefferson County | Port Arthur | Consolidation of the cities of Lakeview and Pear Ridge with the City of Port Arthur; redistricting of residency districts |
| 3/24/1978 | Polling Place / Absentee & Early Voting Locations | Uvalde and Zavala counties | Southwest Texas Junior College District | Polling place |
| 3/10/1978 | Special Election / Regular Election Date | Harris and Waller counties | Waller Cons Independent School District | Election date |
| 3/1/1978 | Polling Place / Absentee & Early Voting Locations | Texas | | Polling place |
| 1/16/1978 | Special Election / Regular Election Date | Tarrant County | Fort Worth Independent School District | Delayed implementation of single-member districts (Section 23-023(h), Texas Education Code) |
| 10/3/1977 | Bilingual Procedures | Fort Bend County | Lamar Cons Independent School District | Bilingual oral assistance program |
| 8/1/1977 | Redistricting / Reapportionment | Caldwell County | | Redistricting |
| 6/17/1977 | Method of Election | Brazoria County | Clute | Majority-vote requirement |
| 5/2/1977 | Polling Place / Absentee & Early Voting Locations | Fort Bend County | | Polling places |
| 4/11/1977 | Method of Election | Caldwell County | Prairie Lea Independent School District | Numbered posts; majority-vote requirement |
| 4/4/1977 | Method of Election | Bexar, Comal and Guadalupe Counties | Comal Independent School District | Numbered posts |

| 3/25/1977 | Polling Place / Absentee & Early Voting Locations | Willacy County | Raymondville Independent School District | Polling place |
|---|---|---|---|---|
| 3/24/1977 | Method of Election | Angelina County | Lufkin Independent School District | Numbered posts; majority-vote requirement |
| 3/22/1977 | Method of Election | Crosby County | Ralls Independent School District | Majority-vote requirement |
| 3/17/1977 | Method of Election | Atascosa and Bexar counties | Somerset Independent School District | Numbered posts |
| 2/25/1977 | Method of Election | Jefferson County | South Park Independent School District | Numbered posts |
| 1/13/1977 | Special Election / Regular Election Date | Harris County | Westheimer Independent School District | Special election implementing new district |
| 11/12/1976 | Method of Election | Tyler County | Woodville | Numbered posts |
| 10/13/1976 | Redistricting / Reapportionment | Uvalde County | | Redistricting |
| 8/6/1976 | Method of Election | Midland County | Midland Independent School District | Numbered posts; majority-vote requirement |
| 8/2/1976 | Method of Election | Wood County | Hawkins Independent School District | Numbered posts; majority-vote requirement |
| 7/29/1976 | Method of Election | Harrison County | Marshall Independent School District | Majority-vote requirement |
| 7/27/1976 | Redistricting / Reapportionment | Waller County | | Redistricting (commissioner, justice of the peace and voting precincts) |
| 7/7/1976 | Redistricting / Reapportionment | Crockett County | | Redistricting |
| 5/24/1976 | Method of Election | Castro, Deaf Smith, and Parmer counties | Hereford Independent School District | Numbered posts; majority-vote requirement |
| 5/21/1976 | Method of Election | Trinity and Walker counties | Trinity Independent School District | Numbered posts |
| 5/17/1976 | Method of Election | Cherokee County | Rusk | Numbered posts |
| 5/11/1976 | Method of Election | Caldwell County | Lockhart | Majority-vote requirement |

| 5/5/1976 | Method of Election | Bee and Karnes counties | Pettus Independent School District | Numbered posts |
| 4/19/1976 | Method of Election | Liberty County | Liberty Independent School District | Numbered posts; majority-vote requirement |
| 4/16/1976 | Redistricting / Reapportionment | Frio County | | 1973 redistricting |
| 4/2/1976 | Annexation | Bexar Count | San Antonio | Thirteen annexations |
| 4/2/1976 | Consolidation or Division of Political Units | Victoria County | | Consolidation of two school districts |
| 3/30/1976 | Method of Election | Floyd and Hale counties | Lockney Independent School District | Numbered posts; majority-vote requirement |
| 3/29/1976 | Method of Election | Caldwell County | Luling | Numbered posts |
| 3/24/1976 | Method of Election | Smith County | Chapel Hill Independent School District | Majority-vote requirement |
| 3/23/1976 | Method of Election | Reeves County | Pecos | Numbered posts |
| 3/19/1976 | Method of Election | Jim Wells County | Orange Grove Independent School District | Numbered posts |
| 3/12/1976 | Method of Election | Moore County | Dumas Independent School District | Numbered posts; majority-vote requirement |
| 3/11/1976 | Method of Election | Ward County | Monahans | Numbered posts |
| 3/10/1976 | Method of Election | Galveston County | Texas City | Numbered posts |
| 3/9/1976 | Method of Election | Kaufman County | Forney Independent School District | Numbered posts; majority-vote requirement |
| 3/5/1976 | Miscellaneous | Harris County | | Precinct election judges |
| 2/25/1976 | Redistricting / Reapportionment | Smith County | Tyler | Redistricting |
| 1/26/1976 | Redistricting / Reapportionment | Texas | | H.B. No. 1097 (1975)— redistricting of State Representative Districts in Nueces County |

| | | | | |
|---|---|---|---|---|
| 1/26/1976 | Method of Election | Texas | | S.B. No. 11, Section 6 (1973)—requiring certain parties to choose candidates by convention instead of holding primary elections |
| 1/23/1976 | Redistricting / Reapportionment | Texas | | H.B. No. 1097 (1975)— redistricting of State Representative Districts in Jefferson and Tarrant Counties |
| 12/10/1975 | Reregistration / Purge | Texas | | S.B. No. 300, Section 2 (1975)—purge of currently registered voters |

# Selected Socio-Economic Data For

# **State of Texas**
## **and Certain Counties or Groups of Counties**

Veasey Plaintiffs
Appendix
No. 2

Source: 2010 American Community Survey

**Korbel Research**

# State of Texas
## Per Capita Income

**$34,826**

**$18,418**

**$14,169**

The White Per Capita
Income is Approximately
Twice That of Hispanics
and African Americans

**White**

**Af.Am.**

**Hispanic**

Source: 2010 American Community Survey

**Korbel Research 1**

# State of Texas

## Median Family Income

The Median Income of Hispanics and African American Families is Approximately 60% that of White Families

$76,350

$43,547

$38,916



**White**

**Af. Am.**

**Hispanic**

Source: 2010 American Community Survey

**Korbel Research 2**

# State of Texas
## Poverty in Families by Race and Ethnicity

The Poverty Rate for
Hispanics and African
Americans is
Approximately Five Times
that of Whites



**22.9%**

**20.0%**

**5.6%**

**White**   **Af.Am.**   **Hispanic**

Source: 2010 American Community Survey

Korbel Research 3



# State of Texas
Poverty In Single Female Parent Families

Over 40% of the Single Female Parented Hispanic Families Are In Poverty

Source: 2010 American Community Survey

**Korbel Research 4**

20.8%
White

34.6%
Af.Am.

42.9%
Hispanic

# State of Texas

## Households Receiving Food Stamps

## Minority Families Are In the Range of 4 Times More Likely to Receive Food Stamps



**18.8%**

**18.2%**

**4.9%**

**Af.Am.** **Hispanic** **White**

Source: 2010 American Community Survey

Korbel Research 5

# State of Texas

Unemployment by Race and Ethnicity

## Minority Unemployment is Significantly Higher Then that of Whites



11.8%

7.9%

5.3%

White        Hispanic        Af.Am.

Source: 2010 American Community Survey

**Korbel Research 6**

# State of Texas
## Functional Illiteracy in Persons 25 Years and Older

More than One Quarter of Hispanics are Functionally Illiterate Compared to 2.4% of Whites

Source: 2010 American Community Survey

**Korbel Research 7**



25.4%



2.4%          4.1%

**White**      **Af.Am**      **Hispanic**

# State of Texas
## Functional Illiteracy in Persons 25 Years and Older

Hispanics Comprise More
Than 80% of the
Functionally Illiterate
Persons in Texas



**82.1%**



**6.0%**   **4.1%**





**White**      **Af.Am**      **Hispanic**

Source: 2010 American Community Survey

Korbel Research 8

8/21/2014          Korbel Research for Perez v Perry          9

# State of Texas
## Not High School Graduates

Almost 42% of Hispanics Over the Age of 25 Have Not Graduated From High School Compared to 8.7% of Whites

Source: 2010 American Community Survey

**Korbel Research 9**



8.7%

White

15.7%

Af.Am

41.8%

Hispanic

# State of Texas

## Persons over 25 With a Professional or Graduate Degree

Hispanics and African Americans
Comprise More Half of the State
Population But Anglos Make Up
Almost 80% of Those Over 25
With Professional or Post
Graduate Degrees.

**77.7%**

**9.1%**

**13.6%**



White

Af.Am

Hispanic

Source: 2010 American Community Survey

**Korbel Research 10**

# Harris County

Districts 126-135 and 137-150
**Functional Illiteracy**

**Almost 30% of Hispanics
Compared to 1.7% of Whites
Over The Age of 25
Are Functionally Illiterate**



# Harris County

Districts 126-135 and 137-150
**Not High School Graduates**

**47.4% of Hispanics and
15.3% of African Americans
Over The Age of 25
Compared to 6.7% of Whites
Are Not High School Graduates**



**47.4%**

**15.3%**

**6.1%**

**White**   **Black**   **Hispanic**

# Harris County

## Districts 126-135 and 137-150

**Household that Received SNAP or
Food Stamps in the Past 12 Months
by Race and Ethnicity**

**Hispanics and African
Americans are 5 Times
More Likely to Qualify for
Food Stamps  than Whites**



**18.3%**

**11.9%**

**2.8%**

**White**  **Black**  **Hispanic**

Korbel Research for Perez v Perry

# Harris County
Districts 126-135 and 137-150

**Percentage of Families Whose Income in the Past 12 Months was Below the Poverty Level**

**Hispanics and African American Families are Approximately 3 to4 Times More Likely to Experience  Poverty than White Families**



20.5%

21.2%

4.1%

**White**

**Black**

**Hispanic**

Korbel Research for Perez v Perry

# Harris County

### Districts 126-135 and 137-150

**Mean Family Income**

**The Mean Family Income for Whites is More Than Twice That of Hispanics and African Americans**

**$126,369**

**$55,276**

**$51,770**



**White**

**Black**

**Hispanic**

Kimball Research for Perez v Perry

# Dallas County

Districts 100, 102-105 and 107-116
**Functional Illiteracy**

**32.4% of Hispanics
Compared to 1.8% of Whites
Over The Age of 25
are Functionally Illiterate**



# Dallas County

Districts 100, 102-105 and 107-116
**Not High School Graduates**

**54.1% of Hispanics and
14.9% of African Americans
Compared to 7.2% of Whites
Over The Age of 25
Are Not High School Graduates**



**54.1%**

**14.9%**

**7.2%**

**White**

**Black**

**Hispanic**

Korbel Research for Perez v Perry

# Dallas County
### Districts 100, 102-105 and 107-116
### Mean Family Income



**The Mean Family Income for Whites is More Than Twice That of African Americans and Almost Three Times That of Hispanics**

$121,389 — White
$54,141 — Black
$47,305 — Hispanic

# Tarrant County

Districts 90-00 and 101
**Functional Illiteracy**

**26.7% of Hispanics
Compared to 1.7% of Whites
Over The Age of 25
are Functionally Illiterate**



**26.7%**

**1.7%**

**2.9%**

**White**  **Black**  **Hispanic**

Korbel Research for Perez v Perry

# Tarrant County

Districts 90-00 and 101
**Mean Family Income**

**The Mean Family Income for Whites is Essentially Twice That of Hispanics and African Americans**



$102,866 — White

$58,101 — Black

$51,725 — Hispanic

# Tarrant County

Districts 90-00 and 101
**Not High School Graduates**

**44.7% of Hispanics and
12.6% of African Americans
Compared to 7.4% of Whites
Over The Age of 25
Have Not Graduated from
High School**



44.7%

12.6%

7.4%

White    Black    Hispanic

# Tarrant County
Districts 90-00 and 101

**Household that Received SNAP or Food Stamps in the Past 12 Months by Race and Ethnicity**

**Hispanics and African Americans are 3 to 4 Times More Likely to Qualify for Food Stamps than Whites**



17.6%

12.4%

4.2%

White

Black

Hispanic

# Tarrant County

Districts 90-00 and 101

**Percentage of Families Whose Income in the Past 12 Months Is Below the Poverty Level**

**Hispanics and African American Families are Approximately 3 to4 Times More Likely to Experience Poverty than White Families**



# Fort Bend, Wharton and Jackson Counties

### Districts 26, 27, 28 and 85
### Functional Illiteracy

**Just Under 20% of
Hispanics are Over The Age of 25 are
Functionally Illiterate
Compared to 2% for Whites
and African Americans**

**19.9%**

**2.0%** **2.2%**





White    Black    Hispanic

# Fort Bend, Wharton and Jackson Counties

### Districts 26, 27, 28 and 85
### Functional Illiteracy

**Hispanics Comprise
More than
Three Fourths of the
Functionally Illiterate
Persons Over 25**



**76.7%**

**7.9%**

**15.4%**

**White**   **Black**   **Hispanic**



# Fort Bend, Wharton and Jackson Counties

Districts 26, 27, 28 and 85
**College Graduates**

**14.6% of Hispanics Over The Age of 25 are College Graduates Compared to 44.3% Of Whites**

44.3% — White
33.8% — Black
14.6% — Hispanic

# Fort Bend, Wharton and Jackson Counties

### Districts 26, 27, 28 and 85
**Household that Received SNAP or Food Stamps in the Past 12 Months by Race and Ethnicity**

**Hispanics and African Americans are 5 Times More Likely to Qualify for Food Stamps  than Whites**



11.3%

10.3%

1.9%

White   Black   Hispanic

# Fort Bend, Wharton and Jackson Counties

Districts 26, 27, 28 and 85
Percentage of Families and People
Whose Income in the Past 12 Months
is Below the Poverty Level

**Hispanics Families are
More than Twice as
Likely to Be Below
Poverty as
White Families**



**46.8%**

**31.4%**

**21.8%**

**White**

**Black**

**Hispanic**

8/21/2014

Korbel Research for Perez v. Perry

29

# Fort Bend, Wharton and Jackson Counties

Districts 26, 27, 28 and 85
Percentage of Households
With Income of Less Than $25,000

**20% of Hispanic and More Than 17% of Black Have Incomes of Less Than $25,000 Compared to 11.3% of Whites Households**



**11.2%** White

**17.2%** Black

**20.0%** Hispanic



# Fort Bend, Wharton and Jackson Counties
Districts 26, 27, 28 and 85
Percentage of Households With
Income of Greater Than $150,000.00

**More Than 25% of White
Compared to Less Than 9% of
Black and Hispanic Households
have Incomes In Excess $150,000**

**25.4%**

**9.3%**

**6.1%**



White    Black    Hispanic

# Fort Bend, Wharton and Jackson Counties

Districts 26, 27, 28 and 85
Percentage of Households With An
Annual Income in Excess of $150,000

**Whites Households Comprise
More Than Three Fourths of the
Households With Incomes Over $150,000**

**78.6%**

**13.3%**

**8.1%**



**White**　　**Black**　　**Hispanic**

# Bell and Lampasas Counties

### Districts 54 and 55
## Not High School Graduates

**25.5% of Hispanics Over the Age of 23 Have Not Graduated from High School Compared to 8.8% for Whites**



# Bell and Lampasas Counties

Districts 54 and 55
**Functional Illiteracy**

**15.0% of Hispanics
Compared to 2.4% of Whites
Over The Age of 25
Functionally Illiterate**

Plaintiffs
*LULAC, Perez & MALC*

Exhibit No_____



**15.0%**

**2.4%**   **2.5%**

**White**   **Black**   **Hispanic**

# Bell and Lampasas Counties

Districts 54 and 55
**College Graduates**



**10.9% of Hispanics and 14% Of African Americans Over The Age of 25 are College Graduates Compared to 25.2% of Whites**

25.2%

14.0%

10.9%

**White**      **Black**      **Hispanic**

# Bell and Lampasas Counties

Districts 54 and 55
**Household that Received SNAP or
Food Stamps in the Past 12 Months
by Race and Ethnicity**

**13% of Hispanic and 12.1% of
African American Households
Received in the Past Year
Compared to Only 5% for Whites**



13.0%   12.1%

5.3%

White   Black   Hispanic

Korbel Research for Perez v Perry

# Bell and Lampasas Counties

Districts 54 and 55
Percentage of Families and People
Whose Income in the Past 12 Months
is Below the Poverty Level

**Hispanics And African
Families are Almost Twice
as Likely to Be
Below Poverty as
White Families**



**8.1%**

**15.7%**

**16.0%**

**White**

**Black**

**Hispanic**

Korbel Research for Perez v Perry

# Bell and Lampasas Counties

Districts 54 and 55
Percentage of Households
With Income of Less Than $25,000

**20% of Hispanic and More Than
17% of Black Have Incomes of
Less Than $25,000 Compared to
11.3% of Whites Households**



**11.2%**  **17.2%**  **20.0%**

**White**  **Black**  **Hispanic**

# Mclennan, Brazos, Falls, Limestone and Robertson County Mix

Districts 12, 14 and 56
**Functional Illiteracy**

**Just Under 30% of
Hispanics are Over The Age of 25 are
Functionally Illiterate
Compared to 3.2% for Whites
and 6.2% for African Americans**



**29.0%**

**6.2%**

**3.1%**

**White**     **Black**     **Hispanic**

# Mclennan, Brazos, Falls, Limestone and Robertson County Mix

Districts 12, 14 and 56
**Functional Illiteracy**

**Although Hispanics Make Up Only 18.7% Of The Persons Over 25, they Comprise 64.5% Of the Functionally Illiterate**



# Mclennan, Brazos, Falls, Limestone and Robertson County Mix

Districts 12, 14 and 56

**Not High School Graduates**

**One Third of Hispanics Over the Age of 23 Have Not Graduated from High School Compared to 5.8% for Whites**



10.4%  White
23.3%  Black
48.0%  Hispanic

# Mclennan, Brazos, Falls, Limestone and Robertson County Mix

Districts 12, 14 and 56
**College Graduates**

**Just Over 8% of Hispanics are Over The Age of 25 are College Graduates Compared to 31.9% Of Whites**



**31.9%**

**11.2%**

**8.3%**

**White**   **Black**   **Hispanic**

# Mclennan, Brazos, Falls, Limestone and Robertson County Mix

### Districts 12, 14 and 56
Percentage of Households
With Income of Less Than $25,000

**34.9% of Hispanic and More Than 44% of Blacks Households Have Incomes of Less Than $25,000 Compared to 13.5% of Whites Households**



44.3%

34.9%

13.5%

White    Black    Hispanic

# Mclennan, Brazos, Falls, Limestone and Robertson County Mix

Districts 12, 14 and 56
Percentage of Families and People
Whose Income in the Past 12 Months
is Below the Poverty Level

**Hispanics And African American
Families are More than Three Times as
Likely to Be Below Poverty as
White Families**



**8.0%**

**28.4%**

**26.6%**

**White**   **Black**   **Hispanic**

Korbel Research for Perez v Perry

44

# Mclennan, Brazos, Falls, Limestone and Robertson County Mix

## Districts 12, 14 and 56
Percentage of Households With
Income of Greater Than $150,000.00

**More Than 10% of White
Compared to Fewer Than 2.1% of
Black and Hispanic Households
have Incomes In Excess $150,000**

**10.1%**

**1.2%**

**2.1%**



White

Black

Hispanic



# Corpus Christi ISD
Summary Analysis from the 2011-2012
Academic Excellence Indicator System
(AEIS) Report

http://ritter.tea.state.tx.us/cgi/sas/broker

Veasey Plaintiffs
*Appendix*

3 A

# Corpus Christi ISD

## TAKS Commended Performance [1/]

## All Tests 2012

**(Combined Grades 10 and 11)**

**By Race and Ethnicity**

http://ritter.tea.state.tx.us/cgi/sas/broker

**14.0%**

**4.0%**

**1.0%**



**White ***

**Hispanic**

**Af.American**



# Corpus Christi ISD
## Advanced Course
## Dual Enrollment  2011
## By Race and  Ethnicity
**Ethnicityhttp://ritter.tea.state.tx.us/cgi/sas/brok3.8er**

**45.0%**

**26.9%**

**26.5%**

**White***

**Hispanic**

**Af.American**

# Corpus Christi ISD

## SAT Test
## At or Above Criterion 2011
### By Race and Ethnicity
http://ritter.tea.state.tx.us/cgi/sas/broker

**34.8%**

**13.4%**

**2.6%**





**White ***   **Hispanic**   **Af.American**



# Corpus Christi ISD
## Advanced Placement/IP 2011(Grade 11)
### By Race and Ethnicity
http://ritter.tea.state.tx.us/cgi/sas/broker

**47.8%**

**23.6%**

**15.4%**

**White***

**Hispanic**

**Af. American**

8/21/2014

Korbel Research Based on TEA Reports

# Corpus Christi ISD

## College Ready Graduates
## By Race and Ethnicity
http://ritter.tea.state.tx.us/cgi/sas/broker

**63.0%**



**White***

**45.0%**



**Hispanic**

**33.0%**



**Af. American**

# Corpus Christi ISD

## Average SAT 2011

### By Race and Ethnicity

http://ritter.tea.state.tx.us/cgi/sas/broker



**1021**

**899**

**812**

**White***

**Hispanic**

**Af. American**

12/17/12                                    **T E X A S   E D U C A T I O N   A G E N C Y**                    Section II - Page 1
District Name: CORPUS CHRISTI ISD              Academic Excellence Indicator System
County Name: NUECES                                2011-12 District Profile
District #: 178904

| STUDENT INFORMATION | |--------District-------| | |-----------State-----------| |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| **Total Students:** | 38,608 | 100.0% | 4,978,120 | 100.0% |
| Students By Grade: Early Childhood Education | 81 | 0.2% | 13,231 | 0.3% |
| Pre-Kindergarten | 1,354 | 3.5% | 224,322 | 4.5% |
| Kindergarten | 2,950 | 7.6% | 379,093 | 7.6% |
| Grade 1 | 3,192 | 8.3% | 392,017 | 7.9% |
| Grade 2 | 3,024 | 7.8% | 383,181 | 7.7% |
| Grade 3 | 2,923 | 7.6% | 379,079 | 7.6% |
| Grade 4 | 3,097 | 8.0% | 375,473 | 7.5% |
| Grade 5 | 3,120 | 8.1% | 377,502 | 7.6% |
| Grade 6 | 2,968 | 7.7% | 372,602 | 7.5% |
| Grade 7 | 2,872 | 7.4% | 365,903 | 7.4% |
| Grade 8 | 2,784 | 7.2% | 360,027 | 7.2% |
| Grade 9 | 2,919 | 7.6% | 393,268 | 7.9% |
| Grade 10 | 2,574 | 6.7% | 346,573 | 7.0% |
| Grade 11 | 2,407 | 6.2% | 322,783 | 6.5% |
| Grade 12 | 2,343 | 6.1% | 293,066 | 5.9% |
| Ethnic Distribution: African American | 1,621 | 4.2% | 637,934 | 12.8% |
| Hispanic | 30,472 | 78.9% | 2,530,789 | 50.8% |
| White | 5,430 | 14.1% | 1,520,320 | 30.5% |
| American Indian | 77 | 0.2% | 22,224 | 0.4% |
| Asian | 611 | 1.6% | 176,755 | 3.6% |
| Pacific Islander | 33 | 0.1% | 6,227 | 0.1% |
| Two or More Races | 364 | 0.9% | 83,871 | 1.7% |
| **Economically Disadvantaged** | 26,957 | 69.8% | 3,008,464 | 60.4% |
| **Non-Educationally Disadvantaged** | 11,651 | 30.2% | 1,969,656 | 39.6% |
| **Limited English Proficient (LEP)** | 1,761 | 4.6% | 837,536 | 16.8% |
| **Students w/Disciplinary Placements (2010-11)** | 1,082 | 2.6% | 89,719 | 1.8% |
| **At-Risk** | 20,178 | 52.3% | 2,262,066 | 45.4% |
| **Graduates (Class of 2011):** | | | | |
| **Total Graduates** | 2,152 | 100.0% | 290,581 | 100.0% |
| By Ethnicity (incl. Special Ed.): | | | | |
| African American | 117 | 5.4% | 38,755 | 13.3% |
| Hispanic | 1,599 | 74.3% | 127,746 | 44.0% |
| White | 366 | 17.0% | 107,597 | 37.0% |
| American Indian | 4 | 0.2% | 1,430 | 0.5% |
| Asian | 39 | 1.8% | 10,468 | 3.6% |
| Pacific Islander | 1 | 0.0% | 406 | 0.1% |
| Two or More Races | 26 | 1.2% | 4,179 | 1.4% |

**TAKS Commended
Performance
All Tests
2011-2012**
(Combined Grades 10 and 11)
**By Race and Ethnicity**
http://ritter.tea.state.tx.us/cgi/sas/broker

**Fort Worth ISD**

**15.0%**

**4.0%**

**2.0%**





**White**

**Hispanic**

**Af.American**

Veasey Plaintiffs
Appendix 3 B

# Advanced Course Dual Enrollment  2011
### By Race and  Ethnicity
Ethnicityhttp://ritter.tea.state.tx.us/cgi/sas/brok3.8er

**Fort Worth ISD**



**44.4%**

**White**



**29.4%**

**Hispanic**

**23.8%**

**Af.America.**

Korbel Research Based on TEA Reports

# Fort Worth ISD

## SAT Test
## At or Above
## Criterion 2011
### By Race and Ethnicity
http://ritter.tea.state.tx.us/cgi/sas/broker

**43.0%**

**6.4%**

**3.6%**

**White**

**Hispanic**

**Af.American**



# Fort Worth ISD

# Advanced Placement/IB
## 2011
### (Grade 11)
**By Race and Ethnicity**
http://ritter.tea.state.tx.us/cgi/sas/broker

**46.7%**

**15.4%**

**11.7%**



**Fort Worth Advanced
Course/Dual Enrollment
Completion**
11.7% 15.4% 46.7% 46.2%
44.0%

**White**



**Hispanic**



**Af.American**

8/21/2014

Korbel Research Based on TEA Reports

# College Ready
# Graduates

## By Race and Ethnicity
http://ritter.tea.state.tx.us/cgi/sas/broker

**Fort Worth ISD**

**65.0%**



Fort Worth
College-Ready
Graduates English
and Math
27% 36% 65% 20%
49%

**White**

**36.0%**



**Hispanic**

**27.0%**



**Af.American**



12/17/12                          T E X A S   E D U C A T I O N   A G E N C Y                    Section II - Page  1
District Name: FORT WORTH ISD          Academic Excellence Indicator System
County Name: TARRANT                       2011-12 District Profile
District #: 220905

| STUDENT INFORMATION | |--------District-------| | |-----------State-----------| |
| --- | ---: | ---: | ---: | ---: |
| | Count | Percent | Count | Percent |
| **Total Students:** | 82,853 | 100.0% | 4,978,120 | 100.0% |
| Students By Grade: Early Childhood Education | 202 | 0.2% | 13,231 | 0.3% |
| Pre-Kindergarten | 4,361 | 5.3% | 224,322 | 4.5% |
| Kindergarten | 7,304 | 8.8% | 379,093 | 7.6% |
| Grade 1 | 7,651 | 9.2% | 392,017 | 7.9% |
| Grade 2 | 7,081 | 8.5% | 383,181 | 7.7% |
| Grade 3 | 6,861 | 8.3% | 379,079 | 7.6% |
| Grade 4 | 6,688 | 8.1% | 375,473 | 7.5% |
| Grade 5 | 6,432 | 7.8% | 377,502 | 7.6% |
| Grade 6 | 5,823 | 7.0% | 372,602 | 7.5% |
| Grade 7 | 5,805 | 7.0% | 365,903 | 7.4% |
| Grade 8 | 5,442 | 6.6% | 360,027 | 7.2% |
| Grade 9 | 6,182 | 7.5% | 393,268 | 7.9% |
| Grade 10 | 4,878 | 5.9% | 346,573 | 7.0% |
| Grade 11 | 4,449 | 5.4% | 322,783 | 6.5% |
| Grade 12 | 3,694 | 4.5% | 293,066 | 5.9% |
| Ethnic Distribution: African American | 19,231 | 23.2% | 637,934 | 12.8% |
| Hispanic | 49,565 | 59.8% | 2,530,789 | 50.8% |
| White | 11,316 | 13.7% | 1,520,320 | 30.5% |
| American Indian | 259 | 0.3% | 22,224 | 0.4% |
| Asian | 1,470 | 1.8% | 176,755 | 3.6% |
| Pacific Islander | 53 | 0.1% | 6,227 | 0.1% |
| Two or More Races | 959 | 1.2% | 83,871 | 1.7% |
| **Economically Disadvantaged** | 64,235 | 77.5% | 3,008,464 | 60.4% |
| **Non-Educationally Disadvantaged** | 18,618 | 22.5% | 1,969,656 | 39.6% |
| **Limited English Proficient (LEP)** | 23,197 | 28.0% | 837,536 | 16.8% |
| **Students w/Disciplinary Placements (2010-11)** | 1,974 | 2.2% | 89,719 | 1.8% |
| **At-Risk** | 42,222 | 51.0% | 2,262,066 | 45.4% |
| **Graduates (Class of 2011):** | | | | |
| **Total Graduates** | 3,863 | 100.0% | 290,581 | 100.0% |
| By Ethnicity (incl. Special Ed.): | | | | |
| African American | 899 | 23.3% | 38,755 | 13.3% |
| Hispanic | 2,114 | 54.7% | 127,746 | 44.0% |
| White | 718 | 18.6% | 107,597 | 37.0% |
| American Indian | 31 | 0.8% | 1,430 | 0.5% |
| Asian | 57 | 1.5% | 10,468 | 3.6% |
| Pacific Islander | 5 | 0.1% | 406 | 0.1% |
| Two or More Races | 39 | 1.0% | 4,179 | 1.4% |

# **Houston ISD**

# Summary Analysis from the 2011-2012 Academic Excellence Indicator System (AEIS) Report

http://ritter.tea.state.tx.us/cgi/sas/broker

Veasey Plaintiffs

Appendix
No. 3 C

**Houston ISD**

**38.0%**

**27.0%**

**6%**

**4%**

**TAKS Commended
Performance
All Tests  2012**
**(Combined Grades 10 and 11)**
**By Race and Ethnicity**
http://ritter.tea.state.tx.us/cgi/sas/broker





# SAT Test
# At or Above
# Criterion 2011
### By Race and Ethnicity
**http://ritter.tea.state.tx.us/cgi/sas/broker**



**Houston ISD**

**60.2%** — **White ***

**62.3%** — **Asian**

**9.8%** — **Hispanic**

**8.1%** — **Af.Am.**



**Advanced Course Dual Enrollment  2011**
**By Race and  Ethnicity**
Ethnicityhttp://ritter.tea.state.tx.us/cgi/sas/brok3.8er

Houston ISD

60.3%   58.8%   34.1%   32.2%

White*   Asian   Hispanic   Af.Am.

# College Ready Graduates

## By Race and Ethnicity

http://ritter.tea.state.tx.us/cgi/sas/broker

**Houston ISD**

**85.0%**

**83.0%**

**52.0%**

**50.0%**






**White***     **Asian**     **Hispanic**     **Af.Am.**

**Average SAT 2011**
**By Race and Ethnicity**
http://ritter.tea.state.tx.us/cgi/sas/broker

**Houston ISD**

1134 — White*
1157 — Asian
866 — Hispanic
834 — Af.Am.

12/17/12

**TEXAS EDUCATION AGENCY**

Section II

District Name: HOUSTON ISD
County Name: HARRIS
District #: 101912

Academic Excellence Indicator System
2011-12 District Profile

| STUDENT INFORMATION | |--------District-------| | |------------State-----------| |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Total Students: | 201,594 | 100.0% | 4,978,120 | 100.0% |
| Students By Grade: Early Childhood Education | 270 | 0.1% | 13,231 | 0.3% |
| Pre-Kindergarten | 16,442 | 8.2% | 224,322 | 4.5% |
| Kindergarten | 16,653 | 8.3% | 379,093 | 7.6% |
| Grade 1 | 17,228 | 8.5% | 392,017 | 7.9% |
| Grade 2 | 16,554 | 8.2% | 383,181 | 7.7% |
| Grade 3 | 16,702 | 8.3% | 379,079 | 7.6% |
| Grade 4 | 15,810 | 7.8% | 375,473 | 7.5% |
| Grade 5 | 15,577 | 7.7% | 377,502 | 7.6% |
| Grade 6 | 13,286 | 6.6% | 372,602 | 7.5% |
| Grade 7 | 12,727 | 6.3% | 365,903 | 7.4% |
| Grade 8 | 12,504 | 6.2% | 360,027 | 7.2% |
| Grade 9 | 14,623 | 7.3% | 393,268 | 7.9% |
| Grade 10 | 11,870 | 5.9% | 346,573 | 7.0% |
| Grade 11 | 11,077 | 5.5% | 322,783 | 6.5% |
| Grade 12 | 10,271 | 5.1% | 293,066 | 5.9% |
| Ethnic Distribution: African American | 50,778 | 25.2% | 637,934 | 12.8% |
| Hispanic | 126,149 | 62.6% | 2,530,789 | 50.8% |
| White | 15,879 | 7.9% | 1,520,320 | 30.5% |
| American Indian | 465 | 0.2% | 22,224 | 0.4% |
| Asian | 6,611 | 3.3% | 176,755 | 3.6% |
| Pacific Islander | 216 | 0.1% | 6,227 | 0.1% |
| Two or More Races | 1,496 | 0.7% | 83,871 | 1.7% |
| Economically Disadvantaged | 162,699 | 80.7% | 3,008,464 | 60.4% |
| Non-Educationally Disadvantaged | 38,895 | 19.3% | 1,969,656 | 39.6% |
| Limited English Proficient (LEP) | 60,546 | 30.0% | 837,536 | 16.8% |
| Students w/Disciplinary Placements (2010-11) | 3,475 | 1.6% | 89,719 | 1.8% |
| At-Risk | 125,224 | 62.1% | 2,262,066 | 45.4% |
| Graduates (Class of 2011): | | | | |
| Total Graduates | 9,954 | 100.0% | 290,581 | 100.0% |
| By Ethnicity (incl. Special Ed.): | | | | |
| African American | 3,105 | 31.2% | 38,755 | 13.3% |
| Hispanic | 5,332 | 53.6% | 127,746 | 44.0% |
| White | 1,013 | 10.2% | 107,897 | 37.0% |
| American Indian | 22 | 0.2% | 1,430 | 0.5% |
| Asian | 379 | 3.8% | 10,468 | 3.6% |
| Pacific Islander | 47 | 0.5% | 406 | 0.1% |
| Two or More Races | 56 | 0.6% | 4,179 | 1.4% |

Korbel Research Based on TEA Reports