IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

|  |  |
|---|---|
| MARC VEASEY, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> RICK PERRY, *et al.*, <br><br> Defendants. | Civil Action No. 2:13-cv-193 (lead) <br> (consolidated w/ 2:13-cv-263) |

### Declaration of Allan Lichtman

Attached is my expert report in this litigation.  I declare, under penalty of perjury, under the laws of the United States, that the report is true and correct to the best of my knowledge.

Dated:  June 27, 2014

## REPORT ON RACIALLY DISCRIMINATORY INTENT UNDERLYING TEXAS'S PHOTO VOTER IDENTIFICATON LAW, SB 14

### I. Statement of Purpose

I have been asked to consider whether the photographic identification law enacted by the Texas State Legislature in 2011 (SB 14) and signed into law by Governor Rick Perry represents intentional discrimination against the voting rights of the state's African-American and Latino minorities. My fee in this matter is $400 per hour. I have enclosed an updated CV and a table of cases in which I have provided written or oral testimony.

### II. Evidence, Methodology, and Summary of Opinions

This report draws upon sources standard in historical and social scientific analysis. These include scholarly books, articles and reports; newspaper and other journalistic articles; demographic information; election returns; court opinions, briefs, and reports; government documents; and scientific surveys.

In assessing intentional discrimination, this report will focus on how the State of Texas intentionally and deliberately sought to suppress the votes of African-Americans and Latinos in order to gain partisan advantages in elections. It will show that the Republicans in the State of Texas are dependent in general elections upon the votes of a shrinking white population. Absent realistic prospects of expanding their vote among minorities, the Republican majority in the state legislature intentionally and deliberately, through the specific provisions of its new photo identification law, sought to impede the opportunities for African-Americans and Latinos to fully participate in the political process in Texas and elect candidates of their choice. The study will focus not on the adoption of generic voter photo identification legislation, but on the specific decisions made by the Republican majority in 2011 to craft the nation's strictest law and the one

1

most burdensome on African-American and Latino voting rights. The 2011 legislation – SB 14 – departed substantially from prior Republican bills and from the precedents set in other states in ways that will make it more difficult for African-Americans and Latinos to meet its requirements. The stated justifications by sponsors and backers for the 2011 bill are contradictory and appear pretextual.

The report closely follows the standard procedures employed by historians such as myself in assessing discriminatory intent.  These standard procedures are actually similar to the methodological guidelines set forth by the United States Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). In this case the Court focused on five distinct factors that are relevant to ascertaining intentional discrimination: (1) discriminatory impact, (2) historical background, (3) the sequence of events leading up to the decision, (4) procedural or substantive deviations from the normal decision-making process, and (5) contemporaneous viewpoints expressed by the decision-makers. However, this report will not only examine circumstantial indicators of discriminatory intent. It will also provide evidence of the intent to discriminate against minorities through direct evidence: the contemporary statements of Republican leaders and Republican officials in the State of Texas. The purpose of this report is not to make legal conclusions, but to establish substantive findings about discriminatory intent as trained historians do in their scholarly work.

**III. Qualifications**

This study draws on my experience in voting rights litigation and expertise in political history, political analysis, and historical and statistical methodology. I am Distinguished Professor of History at American University in Washington, D.C., where I have been employed

for 40 years.  Formerly, I served as Chair of the History Department and Associate Dean of the

College of Arts and Sciences at American University.  I received my B.A. in History from

Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a

specialty in the mathematical analysis of historical data.  My areas of expertise include political

history, electoral analysis, and historical and quantitative methodology.

I am the author of numerous scholarly works on quantitative methodology in social

science.  This scholarship includes articles in such academic journals as *Political Methodology,*

*Journal of Interdisciplinary History, International Journal of Forecasting,* and *Social Science*

*History*.  In addition, I have coauthored *Ecological Inference* with Dr. Laura Langbein, a

standard text on the analysis of social science data, including political information.  I have

published articles on the application of social science analysis to civil rights issues.  This work

includes articles in such journals as *Journal of Law and Politics, La Raza Law Journal,*

*Evaluation Review, Journal of Legal Studies,* and *National Law Journal*.  My scholarship also

includes the use of quantitative and qualitative techniques to conduct contemporary and

historical studies, published in such academic journals as *The Proceedings of the National*

*Academy of Sciences, The American Historical Review, The International Journal of*

*Forecasting, The International Journal of Information Systems & Social Change,* and *The*

*Journal of Social History*.  Quantitative and historical analyses also ground my books, *Prejudice*

*and the Old Politics: The Presidential Election of 1928, The Thirteen Keys to the Presidency* (co-

authored with Ken DeCell), *The Keys to the White House, White Protestant Nation: The Rise of*

*the American Conservative Movement,* and *FDR and the Jews* (co-authored with Richard

Breitman).

My book, *White Protestant Nation*, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America. My most recent book, *FDR and the Jews*, was published under the Belknap Imprint of the Harvard University Press, reserved for works of special significance and lasting impact. This book was an editor's choice book of the *New York Times* in 2013, the winner of the most prestigious prize in American Jewish Studies, the National Jewish Book Award, and a finalist for Los Angeles Times Book Prize in history.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than eighty voting and civil rights cases. These include several cases in the State of Texas. In the U. S. Supreme Court case, *League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), the majority opinion written by Justice Kennedy authoritatively cited my statistical work several times. The three-judge court in the District of Columbia in the Section 5 litigation on the 2011 State of Texas redistricting plan also cited my work multiple times in support of their finding that this plan intentionally discriminated against minority voters (*State of Texas v. United States and Eric H. Holder*, 887 F. Supp. 2d 133, 138-39 (D.D.C. 2012), at 46, 49, 128, and 132). My work includes more than a dozen cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consultant or expert witness numerous times for states and local jurisdictions, including the State of Texas.

This report will first consider the history of discrimination against African-Americans and Latinos in the State of Texas and then proceed to consider other issues. The focus will be on intentional discrimination against minorities to achieve partisan political advantage, not on racial animus per se, although the evidence indicates that such animus is present as well.

## IV. Historical and Ongoing Discrimination Against Minorities in Texas

The State of Texas has a long and ongoing history of discrimination against minorities that has substantially impacted the opportunity for African-Americans and Latinos to participate fully in the political process and elect candidates of their choice. According to a study of this history by F. Chandler Davidson, Radoslav Tsanoff Professor of Public Affairs Emeritus at Rice University, an authority on Texas history, politics, and voting rights, "Racial discrimination is a basic feature of Texas history."[1] Examples affecting voting include:

* Laws as early as 1845 prohibited Mexicans from organizing political rallies or serving as election judges.

* After the Civil War, in 1866, an all-white constitutional convention prohibited freed slaves from voting, holding office, or serving on juries.

* After the Reconstruction period that enfranchised African-Americans in the late nineteenth and early twentieth centuries, white-dominated governments sharply curtailed African-American and Latino political rights through the poll tax, the gerrymandering of legislative districts, restrictive registration laws, and the all-white Democratic primary.

* African-American and Latino political rights advanced after the U.S. Supreme Court invalidated the white primary in 1944 and especially after the elimination of the poll tax by constitutional amendment in 1963 and the passage of the Voting Rights Act in 1965.[2]

* However, the opportunity for African-American and Latinos to participate fully in the

---

1 Declaration of F. Chandler Davidson, *Report on the History of Vote Discrimination Against Citizens of Color in the State of Texas*, Exhibit A, Submission No. 2011-2775: Comment Under Section 5 of the Voting Rights Act, USA_00001864. This declaration is based largely on published work. Davidson notes, "This declaration is taken largely from an article I wrote in the *Handbook of Texas Politics*. See (http://www.tshonline.org/handbook/online/articles/wmafr.)

2 For the history in the paragraphs above, see, *Ibid.*, pp. 3-9; Alwyn Barr, *A History of Negroes in Texas, 1528 to 1971* (Austin: Jenkins, 1973); David Montejano, *Anglos And Mexicans in the Making of Texas,* 1836-1986 130 (University of Texas, 1987);

5

political process met with considerable resistance in mid to late twentieth century and twenty-first century Texas.

* In the election of 1964, as part of so-called "Operation Eagle Eye," Republican operatives circulated information in black neighborhoods in Houston which falsely warned that authorities could arrest voters who had an outstanding parking tickets or traffic convictions.[3]

* In 1975, Congress found that Texas's history and ongoing discrimination against minorities justified including Texas under Section 5 of the Voting Rights Act, which required preclearance from the U.S. Department of Justice for all changes in electoral arrangements, including voting requirements and redistricting.

* Since the 1970s, minorities have successfully sued the State of Texas and its subdivisions numerous times to eliminate illegal vote dilution.[4]

* In every redistricting since the 1970s, courts have found that at least one of Texas's statewide redistricting plans violated the Voting Rights Act or the Constitution.

* From the post-1980 redistricting – the first in which Texas was covered under Section 5 – through the post-2000 redistricting, the United States Department of Justice has interposed an objection to at least one of Texas's statewide redistricting plans for Congress or the state legislature. It is the only state with this consistent record of objections to such statewide plans.[5]

* In the post-2010 redistricting, Texas was the only state in the union to have any one of its statewide congressional or state legislative plans rejected under Section 5. It had all three

---

3 Allan J. Lichtman, *White Protestant Nation: The Rise of the American Conservative Movement* (New York: Grove/Atlantic, 2008), pp.
4 *Op cit.*, n. 1, Davidson Declaration, pp.-8-9.
5 For searchable Section 5 objections see the Department of Justice site, http://www.justice.gov/crt/about/vot/sec_5/about.php  and the Lawyer's Committee for Civil Rights Under Law searchable Section 5 site, http://www.lawyerscommittee.org/projects/section_5/.

rejected under Section 5 by the DC District Court.[6]

 * Until halted by intervention from the U. S. Justice Department and the federal courts between 2004 and 2008, students at the mostly African-American Prairie View A&M University in Waller County, Texas had been the target of vote suppression efforts by county officials. The students, however, did not get an on-campus polling place until 2013.[7]

 * In the 2008 and 2009 elections, officials in Runnels County, Texas defied a long-standing U.S. Justice Department directive (under Section 5 of the Voting Rights Act) to assign one bilingual poll worker to each of its five voting precincts. In 2008, at least half of the polling places did not have a bilingual worker and, in 2009, none of the polling places had a bilingual worker.[8]

 * After the *Shelby County* decision on June 25, 2013 (*Shelby County v. Holder*, 133 S. Ct. 2612 (2013)) invalidated the Section 4 coverage formula for the Section 5 preclearance provisions of the Voting Rights Act, bipartisan members of Congress introduced legislation to create a new Section 4 formula. The legislation would cover only states with five or more violations of federal law to their voting changes over the past fifteen years. Texas is one of only four states with this type of significant record of recent voting rights violations (the others are Georgia, Louisiana, and Mississippi).[9]

---

6 *Ibid*., Texas v. US, 887 F.Supp.2d 133, 155-156 (D.D.C. 2012).

7 Reeve Hamilton, Prairie View Campus Gets Long-Awaitied Polling Location, *Texas Tribune*, 30 September 2013, http://www.texastribune.org/2013/09/30/prairie-view-campus-gets-long-awaited-voting-locat/; *Houston Chronicle*, Terry Kliewer,"Waller County DA Apologizes in Vote Flap," 25 Feb. 2004, http://www.chron.com/news/houston-texas/article/Waller-County-DA-apologizes-in-vote-flap-1957246.php ;United States Department of Justice, "Justice Department Announces Agreement with Waller County, Texas, to Remedy Alleged Violations of Voting Rights Statutes," 21 Oct. 2008, http://www.justice.gov/opa/pr/2008/October/08-crt-917.html; *Davidson Declaration*, pp. 10-11.

8 Assistant Attorney General Thomas E. Perez, to County Clerk Elesa Ocker, 10 June 2010, http://www.justice.gov/crt/records/vot/obj_letters/letters/TX/l_100628.php.

9 Ari Berman, "Members of Congress Introduce a New Fix for the Voting Rights Act, *The Nation*,  16 January

**V. Sequence of Events Leading to Adoption of the Photo Identification Law**

Critical to understanding the sequence of events leading to adoption of the photo identification law in 2011 – the same year in which the legislature passed racially discriminatory redistricting plans – are demographic changes in Texas since the 2000 Census. Demographic changes help explain why the Republican-dominated state legislature and the Republican governor enacted the specific provisions of the photo identification law that discriminate against African-Americans and Latinos.

From 2000 to 2010, the total population of Texas rose from 20,851,820 to 25,145,561, an increase of 20.6 percent. Latinos and African-Americans accounted for most of Texas's population growth since 2000, and all minority groups combined counted for nearly all of Texas's population growth. African-Americans and Latinos accounted for 78.7 percent of the Texas total population growth between 2000 and 2010. All minorities combined accounted for 89 percent of the Texas total population growth between 2000 and 2010; Anglos accounted for only 11 percent of that growth. As a result of their rapid growth, African-Americans and Latinos have come to comprise nearly a majority of Texas's total population in 2010 – 49.6 percent. All minority groups combined comprise a majority of Texas's total population – 54.6 percent, with Anglos in the minority, at 45.4 percent.

With respect to *voting age* population, African-Americans and Latinos also accounted for 70.3 percent of the growth in Texas's voting age population.  As a result of the disproportionate growth in Texas's minority population, African-Americans and Latinos in the 2010 Census comprised 45.2 percent of Texas's voting age population and minorities combined comprised 50.3 percent. In addition, according to the most recent compilation of the U.S. Census American

2014, http://www.thenation.com/blog/177962/members-congress-introduce-new-fix-voting-rights-act#.

Community Survey African-Americans and Latinos also comprise 39.5 percent of the state's citizen voting age population, substantially up from 34.7 percent in 2000, according to Census data. Whites comprise 56.4 percent, which represents a sharp decline from whites' 64.5 percent share of Texas's white citizen age voting population in 2000.[10]

According to population projections by the Texas State Data Center, the white share of the population of the state will continue to shrink and the African-American and Latino share will continue to grow. These projections indicate that by the time of the 2020 Census, the white population in Texas is expected to shrink from 45.4 percent to 42.3 percent and the combined African-American and Latino population is expected to rise from 49.6 percent to a 52.1 percent majority.  By 2020, the voting age white population in Texas is expected to shrink from 49.6 percent to 45.7 percent and the combined African-American and Latino population to rise from 45.2 percent to 48.6 percent. By 2030, the voting age white population in Texas is expected to shrink to 42.0 percent and the combined African-American and Latino population to rise to a majority of 52.0 percent.[11]

The combination of these demographic trends and polarized voting patterns between whites in Texas on the one hand and African-Americans and Hispanics on the other hand demonstrate that Republicans in Texas are inevitably facing a declining voter base and can gain partisan advantage by suppressing the overwhelmingly Democratic votes of African-Americans and Latinos.

---

10 United States Census Report, 2000, SF 2 2010, SF 2 and the American Community Survey Special Tabulation on Citizen Population, 2008-2012.
11 Texas State Data Center, Population Projections Program, *Population Projections for the State of Texas*, http://txsdc.utsa.edu/Data/TPEPP/Projections/Index.aspx.

Experts for plaintiffs testifying before the San Antonio Court in the initial 2011 trial in *Perez v. Perry*, all agreed that, on average in Texas, whites overwhelmingly backed white candidates (most of whom are Republicans), whereas African-Americans (nearly unanimously) and Latinos overwhelmingly backed minority candidates (most of whom were Democrats). But the experts also found that this powerful link between party voting and race in Texas is independent of the race of the candidate. Even when Republicans run minority candidates against white or minority Democrats, African-Americans and Hispanics still back the Democratic candidates. Thus, the Republicans cannot overcome their problem of a shrinking white voter base simply by recruiting minority candidates. The polarization that they need to overcome is embedded within the structure of Texas politics. Any diminution of the white voter base or expansion of the African-American and Hispanic voter base is detrimental to the Republican's political future in Texas. As will be demonstrated in the section on contemporaneous statements below, a number of Republican leaders in Texas have, in candid moments, admitted this reality.

The State of Texas's expert in the Texas redistricting cases, Dr. John Alford, also corroborated this unshakable structure of Texas politics. In his 2011 report for the San Antonio court (*Perez v. Perry*), he states, "General election voting in Texas is highly partisan, and that partisanship is strong enough to almost completely overpower any underlying appeal of a particular candidate's race or ethnicity." (p. 21-22). In his deposition for that San Antonio case, he states, "[T]he rest of the analysis shows basically that there is – beyond the partisan pattern, there is remarkably little response to the ethnicity of candidates in the general election."[12]

In detailing the sequence of events, it is also important to note that passage of SB 14

---

12 Expert Report of Dr. John Alford, *Perez v. Perry*, 22 August 2011, pp. 21-22;Deposition of John Alford, *Perez v. Perry*, 2 September 2011, 104: 15-18.

10

followed a long history of partisan/racial dispute over Republican-proposed voter identification laws, with specific bills introduced in the legislative sessions of 2005, 2007, and 2009. Both parties had, for some time, recognized the partisan stakes involved in the enactment of such legislation. In 2005, HB 1706, sponsored by Republican legislators, passed the Texas House of Representatives but was blocked in the Senate by Democratic members. The legislation would have required in-person voters at the polls to present a form of photo identification or, alternatively, two forms of non-photo identification. The legislature did not investigate the impact of the bill on minority voters, even though Texas was covered by the Section 5 preclearance requirements of the Voting Rights Act and would have to demonstrate to the U.S. Department of Justice that the bill was not retrogressive of minority voting opportunities. In addition, by 2005 there was already considerable controversy about the impact of voter ID on minorities. In Georgia, for example, in March 2005, African-American members of the state legislature led a walkout to protest a voter ID bill which they said discriminated against minorities.[13]

Acceptable forms of photo identification under HB 1706 as it passed the Texas State House included:[14]

- A driver 's license or personal identification card issued to the person by the Department of Public Safety or the equivalent agency of another state that has not expired or that expired no earlier than two years before the date of presentation, or:
- A U.S. military identification card;
- A valid employee identification card [public or private];
- A U.S. citizenship certificate;
- A U.S. passport;

---

13 Ariel Hart, Gerogia Lawmakers Pass Demand for Voter ID Bill," *New York Times*, 1 April 2005, http://www.nytimes.com/2005/04/01/national/01vote.html?pagewanted=print&position=&_r=0; Morris News Service, Burmeister is Pushing for Change, *Augusta Chronicle*, 2 April 2005, http://chronicle.augusta.com/stories/2005/04/02/met_449124.shtml.
14 By: Denny, Pitts, Woolley, Nixon, Bohac, et al., H.B.No.1706, pp. 1-2, 4-5 HB01706E. pdf.

- A student identification card issued by a public or private institution of higher education;
- A Texas license to carry a concealed handgun;
- An identification card issued by a state agency of this state;
- An identification card issued by a county elections commission or a county clerk.

Acceptable forms of non-photo identification under HB 1706 included:[15]

- A copy of a current utility bill, bank statement, government check, paycheck, or other government document that showed the name and address of the voter;
- Official mail addressed to the person by name from a governmental entity;
- A certified copy of a birth certificate or other document confirming birth that was admissible in a court of law;
- U.S. citizenship papers issued to the person;
- An original or certified copy of the person's marriage license or divorce decree;
- Court records of the person's adoption, name change, or sex change;
- An identification card issued to the person by a Texas or U.S. governmental entity for the purpose of obtaining public benefits;
- A temporary driving permit issued to the person by DPS;
- A pilot's license issued to the person by the FAA or another authorized, federal agency.
- A library card issued by a public library located in Texas;
- A hunting or fishing license issued the Texas Parks and Wildlife Department.

In response to criticism that the bill would burden certain types of voters, Election Committee Chair and sponsor of HB 1706, Republican State Representative Lois Denny stressed that the combination of photo identification and two forms of non-photo identification created "a very long and liberal list" that guarded against any disparate burdens. Nonetheless, she affirmed that the bill was sufficient with both photo and non-photo ID options to meet the goal "to make sure that you are the person that is voting the ballot and you are who you are."[16]

In 2007, another photo identification bill, HB 218, also sponsored by Republican legislators, passed the Texas House of Representatives, but was blocked in the Senate by Democratic members. Again, the legislature did not investigate the impact of the bill on minority

---

15 *Ibid.,* pp. 5-6.
16 2005 (79R) HB 1706 HOUSE CALENDAR, 2ND READ 5/2/05, Transcribed by Lynne M. Rodriguez, CSR, p. 5 l. 17, p. 7, l. 16-18.

voters. In an effort to pass this legislation, the Republican Senate leadership sought to suspend the traditional rule requiring that no bill could be taken up by the Senate out of order unless 2/3 of the Senators agreed to do so.  Democrats had just enough members (11) to defeat the two-thirds vote required to suspend the regular order of business. The Republican leadership, however, called for a vote when Democratic Latino Senator Carlos Uresti was absent due to illness. Alerted by a Democratic colleague, however, Uresti left his sick bed and arrived at the Senate just in time to defeat the two-thirds vote and stop consideration of the bill. Republican Lieutenant Governor David Dewhurst, who presided over the Senate, had already taken a vote before Senator Uresti's arrival and announced that the two-thirds majority necessary to call up the bill had been achieved. However, the senior member of the Senate, Democrat John Whitmire, insisted that the vote be re-polled because his vote had not been recorded. Then Senator Uresti showed up unexpectedly – at least to the Republican leadership – and his vote defeated the motion to suspend the regular order of business and bring up the bill.[17]

Shortly thereafter, another ill Democratic minority, Senator Mario Gallegos, also arose from his sick bed to prevent the Republican leadership from gaining their needed super-majority in his absence. In this case the medical issue was quite serious. Gallegos was suffering from complications from a liver transplant he had received four months earlier. Against his doctor's advice he returned to Austin where fellow Democrats set up a hospital bed in the Senate sergeant's office so that he would be available for any votes on the voter ID bill. The bill then died in the Senate.[18] Thus, perhaps to tie this all together – this bill was so charged with

---

17 Gary Scharrer, "Senator Leaves Sick Bed to Vote," *Chron*, 16 May 2007,
http://www.chron.com/news/article/Senator-leaves-sick-bed-to-vote-1808552.php.
18 Gary Scharrer, "Ailing Gallegos Risks Health to Stop Voter Id Bill," *Chron*, 22 May 2007,
http://m.chron.com/news/article/Ailing-Gallegos-risks-health-to-stop-voter-ID-bill-1795678.php.

partisanship that Republicans were willing to subvert long-standing procedure to pass the bill and some Democrats were willing to risk their health – and Senator Gallegos his life – to defeat it.

Similar to the 2005 HB 1706, the 2007 HB 218 would have required in-person voters at the polls to present photo identification or, alternatively, two forms of non-photo identification. However, as compared to the 2005 bill, the 2007 bill modified the forms of acceptable photo identification while maintaining the same forms of alternative non-photo IDs.

Acceptable forms of photo identification under HB 218 included:[19]

- A driver's license or personal ID card issued by DPS that was current or had expired no more than two years earlier;
- A U.S. military ID card or a valid employee ID card;
- A U.S. citizenship certificate or a U.S. passport;
- A student ID card issued by a public or private higher education institution in Texas;
- A concealed handgun license issued by DPS; or
- Identification issued by an agency or institution of the federal government; or an agency, institution, or political subdivision of this state.

Thus, as compared to the 2005 bill, the 2007 bill eliminated as acceptable forms of photo identification out-of-state driver's licenses and ID cards, but added ID cards issued by a federal agency and local governments.

In response to criticism that many voters did not possess photo identification, the bill's sponsor, Republican Representative Betty Brown, again stressed the importance of the option to present two forms of non-photo identification: "Well, I react by saying that there are differing opinions by the number of people that do not have photo ID. We're not requiring that everyone

---

19 House Research Organization: Bill Analysis, HB 218, 23 April 20007, http://www.lrl.state.tx.us/scanned/hroBillAnalyses/80-0/HB218.PDF;  Texas Legislature Online History, *HB 218*, http://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=80R&Bill=HB218.

have photo ID to vote. We're saying if you can't present a photo ID, then two forms of non-photo ID will be acceptable."[20]

In 2009, SB 362, also sponsored by Republican legislators, passed the Texas Senate but was blocked in the State House, which was closely divided between Republicans and Democrats. After the elections of 2008, Democrats held 74 seats in House compared to 76 for Republicans. For a third time the legislature did not investigate the impact of the bill on minority voters. Departing from customary practice, the Republican controlled Senate adopted Rules 5.11(d) and 16.07(7), which enabled it to bypass the traditional two-thirds rule for considering bills and bring the bill to the floor for a vote. This rule was adopted solely for photo identification legislation and not any other matters before the Senate in 2009. According to the deposition of Karina Davis, the State Senate Parliamentarian, since 1981, the Senate has designated only two categories of legislation to be set as a special order pursuant to a majority vote: redistricting and voter identification bills.[21]

SB 362 in 2009 was more restrictive than the 2005 or 2007 Texas voter ID bills. The forms of acceptable alternative non-photo identification remained the same, but the forms of photo identification differed. The following forms of photo identification were acceptable under SB 362:

---

20 HOUSE COMMITTEE ON ELECTIONS HOUSE FLOOR DEBATE,VOLUME I, April 23, 2007, p. 27, l. 8-13.

21 Deposition of Karina Davis, June 12, 2012, *State of Texas vs, Eric Holder, Jr. et al.*, United States District Court for the District of Columbia (three-judge court), NO. 1:12-CV-00128 (Voter ID case), 57:14-22, 59:6-17.

- A driver's license or personal identification card issued to the person by the Department of Public Safety that has not expired or expired no earlier than two years before the date of presentation.
- A U.S. military identification card.
- U.S. citizenship papers.
- A U.S. Passport.
- A Texas concealed carry permit.
- Identification issued by an agency or institution of the federal government or an agency, institution or political subdivision of this state.

Thus, the 2009 bill eliminated privately issued employee IDs and cut all mention of student identification, although it is possible that an ID card from a public institution could have counted under the last provision of acceptable photo identification.

As in previous debates, Republican Senator Troy Fraser, the sponsor of the 2009 photo ID bill, stressed the importance of the non-photo identification alternative: "it is the intent that I have an either/or, either they can show a photo, a form of photo identification or two other types of identification, which could be a utility bill and a library card."[22]

 The sequence of events leading up to the 2011 session establishes the following:

* The demographic base in Texas among whites was sharply declining, whereas the demographic base among African-Americans and Latinos was sharply rising.

* Population projections indicated that this trend would and will continue.

* Voting in general elections in Texas was extremely polarized along racial lines, with whites strongly favoring Republican candidates for public office and African-Americans (nearly unanimously) and Latinos strongly favoring Democratic candidates.

* This polarization is embedded in the structure of Texas politics and cannot be resolved

---

22 2009 (81R) SB 362, SENATE FLR DEBATE, 2ND READING, Transcribed by Lynne M. Rodriguez, CSR, March 17, 2009, p. 7, l. 17-20.

for Republicans by running minority candidates.

* Thus any diminution of the white voter base or increase of the African-American and Latino voter base is inimical to Republican political strength in Texas.

* There were partisan disputes over voter photo identification bills introduced by Republicans in 2005, 2007, and 2009.

* Republican leaders departed from traditional parliamentary practices in their attempt to enact these bills against concerted Democratic opposition.

* The Republican-led legislature never conducted an investigation of the effects of these bills on the opportunity for minorities in Texas to participate fully in the political process and elect candidates of their choice.

* As compared to the initial 2005 bill, subsequent bills were more restrictive.

* Sponsors of the photo identification bills in all three sessions stressed that those who lack photo identification could still present two forms of non-photo identification and this option did not undermine the goals of preventing alleged voter impersonation or securing the integrity of the ballot.

After the elections of 2010, the Republicans made major gains in the state legislature. As compared to the 2009 session, in the 2011 session, the House shifted from 79 Republicans and 74 Democrats to 101 Republicans and 49 Democrats. The Senate shifted from 20 Republicans and 12 Democrats to 23 Republicans and 9 Democrats. These margins constituted the largest Republican legislative majorities in Texas since Reconstruction.

With such overwhelming and unprecedented majority strength, Republicans introduced and ultimately enacted along party lines photo identification legislation for voters at the polls that

was far more restrictive than any of the prior bills introduced from 2005 to 2009. Once again, the legislature did not study the impact of the proposed bill on minority voting opportunities in Texas.

This same legislative session also enacted, nearly entirely along party lines, a congressional and state senate redistricting bill that a three-judge court for the District of Columbia found intentionally discriminated against minorities. After the passage of its congressional and state legislative redistricting plans in 2011, the State of Texas recognized that its plans were unlikely to gain Section 5 preclearance from the United States Department of Justice. As a result, it bypassed the Justice Department and on July 19, 2011 and petitioned the federal District Court for the District of Columbia (DC Court) for a declaratory judgment upholding its plans. On August 28, 2012 the DC Court issued its ruling denying preclearance to Texas's State Senate, State House, and congressional plans. The Court found that the State of Texas had passed the State Senate and congressional plans with the intent to discriminate against minority voters.[23] (I am not citing here or elsewhere the DC Court's ruling or its findings described below for any legal precedent, but rather, following standard historical methods and the framework set forth in *Arlington Heights*, only as an integral part of the sequence of events leading to adoption of the 2011 photo voter identification law.)

The Court did not just rule that Texas had failed to meet its burden to prove a lack of intentional discrimination. Rather the Court ruled affirmatively that Texas had intentionally discriminated against minorities in adopting its 2011 redistricting plans for State Senate and

---

23 *State of Texas v. United States*, 887 F. Supp. 2d 133, 138-39 (D.D.C. 2012. The Court did not reach the issue of intentional discrimination in the State House plan but stated, "Because of the retrogressive effect of the State House Plan on minority voters, we do not reach whether the Plan was drawn with discriminatory purpose. But we note record evidence that causes concern." *Texas v. Holder*, at 70.

Congress.  With respect to the congressional plan, the Court reached this unanimous conclusion: "But because we agree that the plan was enacted with discriminatory purpose, we reach this issue as an alternative, unanimous basis to deny preclearance for the Congressional Plan." (*Texas v. United States,* at 38).  The Court additionally stated, "Although we have already concluded that the Congressional Plan cannot be precleared under section 5's effect prong, we are also persuaded by the totality of the evidence that the plan was enacted with discriminatory intent." Beyond the evidence that it considered, the Court also stated, "The parties have provided more evidence of discriminatory intent than we have space, or need, to address here." (*Texas v. United States*, at 42).

In addition to the fact that the same legislature enacted discriminatory redistricting plans that diluted minority voting strength, SB 14 itself evidences discriminatory purpose in the ways that it restricted valid forms of identification.  In contrast, to all previous Texas bills, the enacted photo identification legislation eliminated the option for voters to present, as an alternative to photo identification, two forms of non-photo identification. It also eliminated, as valid forms of photo identification, both student IDs and government worker IDs. Only the following forms of voter identification are acceptable at the polls under SB 14:[24]

- Texas driver license issued by the Texas Department of Public Safety (DPS);
- Texas Election Identification Certificate issued by DPS;
- Texas personal identification card issued by DPS;
- Texas concealed handgun license issued by DPS;
- United States military identification card containing the person's photograph;
- United States citizenship certificate containing the person's photograph;
- United States passport;

The 2011 legislation also sharply restricted the expiration requirement for driver's licenses from

---

24 Texas Secretary of State, "Required Identification for Voting in Person," http://votetexas.gov/register-to-vote/need-id/.

two years in prior bills to 60 days. Unlike prior bills, the 2011 legislation also extended the expiration requirement not just to driver's licenses, but to all forms of photo identification, with the exception of citizenship certifications.

The enacted 2011 SB 14 also includes certain limited exceptions and exemptions. Persons with disabilities may apply to the county registrar for authorization to present only their registration certificate. Such persons must certify that they do not possess an acceptable form of photo identification and present written evidence of a Social Security disability or a 50%+ U. S. Department of Veteran's Affairs disability. Under these conditions they can vote a regular ballot at the polls. There are also exceptions to the presentation of photo ID at the polls for voters who have a consistent religious objection to being photographed and voters who do not have any valid form of photo identification as a result of certain declared natural disasters. Voters falling into either of these two categories may vote a provisional ballot, and then appear at the voter registrar's office within six calendar days after Election Day, and sign an affidavit swearing to the religious objection or natural disaster. In addition, voters 65 years or older could vote by absentee ballot without providing any of the rationales otherwise required under state law.[25]

The enacted 2011 SB 14 in Texas also represents the "strict" form of voter photo identification laws. According to the National Conference of State Legislatures, "strict" photo ID states are distinguished from "non-strict" states as follows: In non-strict states, voters without an acceptable photo identification may be able to cast a regular ballot by signing "an affidavit of identity or poll workers may be able to vouch for them if they know them personally." In strict states, voters without acceptable photo identification can vote only by provisional ballots and are required "to return to election officials and show ID in order to have their ballot counted." In

---

[25] *Ibid.*

Texas, a voter casting a provisional ballot must present valid photo identification to the registrar's office within 6 days of the election or by that time submit an affidavit regarding one of the exemptions listed above.[26]

## VI. Procedural Deviations

Although Republicans gained overwhelming majorities of both houses of the state legislature in 2011, they still turned to procedural and substantive deviations to enact a voter photo identification law that was far more restrictive than any of the bills presented from 2005 to 2009. First, even before the legislature met in 2011, Republican Governor Rick Perry, indicated his determination to push through, by whatever means necessary, a voter photo identification law in the 2011 session. "This next session of the legislature," he said during a Tea Party Virtual debate in February 2010, "one thing they [lawmakers] do understand is that the governor has the ability to keep them in town until they address some issues. So I guess I might as well put them on notice today: We're going to do voter ID in 2011. We can either do it early, or we can do it late. Their call."[27] Because the Texas governor can call the Legislature into special session if they fail to pass a bill the governor deems a priority, this quote put the Texas Legislature on notice that they needed to pass a photo ID bill in the regular session or they would be likely be called back into special session if they failed to do so.

In 2011, after easily securing reelection in 2010, Governor Perry continued to demonstrate his commitment to voter ID, by designating voter photo identification legislation as an emergency measure. This designation made photo identification one of the very few matters

---

26 Ibid. Distinctions between strict and non-strict states is explained in: National Conference of State Legislatures (NCSL), Voter Identification Requirements, http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx#sd.

27 Perry quoted by *Austin American Statesman, Polifact*, http://www.politifact.com/texas/promises/perry-o-meter/promise/892/ensure-legislature-acts-proposal-requiring-voters-/.

before the legislature that would be exempted from the standard procedural requirement barring legislators from taking a vote on legislation during the first 60 days of the session. If it didn't pass, the governor had already indicated his determination to wait it out as long as it takes. Nothing had emerged about in-person voter fraud in the 2010 elections, which Republicans swept across Texas, to make passage of a voter photo identification bill a genuine emergency. It only was an emergency because the governor had declared it as such.[28]

At the beginning of the session, the Senate also carried over procedures from the previous session including Rule 5.11(d), which authorized voter photo identification bills to reach the floor out of order on a simple majority vote, rather than the traditional two-thirds majority.

In the 2012 Section 5 trial on SB 14, the State of Texas called upon Republican State Senator Thomas Williams to testify about general Senate procedure and procedures utilized during the 82nd [2011] as well as past legislative session. At trial it was revealed that Senator Williams, during the 2009 debate on voter identification legislation, had defended the importance of the two-thirds rule in the Senate:

> Bringing substantive issues before the body is an important process that we go through in this Senate to build a consensus and to allow us to work with the Lieutenant Governor, so that through our ability to get 21 votes [two-thirds of the Senate], and his ability to recognize us, there's a balancing of the issues that come before this body. And I think that's a good thing.[29]

The deposition of Republican State Representative Patricia Harless (in the DC voter ID case), a leader in the enactment of SB 14, reveals additional indicia of deviations from normal procedures. For example, she testified that "the voter ID legislation was an emergency item for

---

**28** "Perry Declares More Emergency Items, Including Voter ID," *Texas Tribune*, 20 January 2011, https://www.texastribune.org/2011/01/20/perry-emergency-items-including-voter-id/.
29 *Texas v. Holder*, (P. M. SESSION), TRANSCRIPT OF BENCH TRIAL, 9 July 2012, p. 108 l. 10-18.

the governor's office" and that the Select Committee on Voter Identification and Voter Fraud was a "fast track" committee. (p. 35, lines 6-11). She testified that she could not recall any other committee designated as a fast track committee or any other committee dedicated to a single piece of legislation (p. 36, lines 11-17, 24-37; p. 37, line 8). Other bills, she testified, addressing mail-in voter fraud submitted in the 82nd legislature were not heard by the Select Committee on Voter Identification and Voter Fraud (p. 37, lines 10-20; p. 39, lines 13-15). Representative Harless further refused to answer why she had limited SB 14 to in-person voter fraud.[30] These extraordinary procedures and practices could not be justified by any emergency with respect to in-person voter fraud, which the state's own study and experts indicated was barely present in Texas. Likewise, the state could not muster evidence of a widespread lack of confidence in the electoral process because of the apprehension of in-person voter fraud. [31]

### VII. Substantive Deviations

Intentional discrimination by the Texas legislature is most clearly revealed, not by the adoption of a generic photo identification bill, but by the many particular substantive deviations in SB 14 that make it much more restrictive than prior bills, particularly for African-Americans and Latinos. As compared to all versions of prior bills, SB 14 makes the following restrictive changes:

* Eliminates the opportunity to vote through the presentation of two forms of non-photo identification.

---

30 Texas v. Holder, *Deposition of State Representative Patricia Harless*, 15 May 2012.
31 Wayne Slater, "Few Texas Voter-fraud Cases Would Have Been Prevented by Photo ID law, Review Shows," Dallasnews.com, 11 September 2013, http://www.dallasnews.com/news/politics/headlines/20130908-few-texas-voter-fraud-cases-would-have-been-prevented-by-photo-id-law-review-shows.ece. See generally, the testimony of State Representative Jose Aliseda and Major Forrest Mitchell at the DC voter ID trial: *Texas v. Holder*, (A.M. SESSION), PP. 123-153; TRANSCRIPT OF BENCH TRIAL, 9 July 2012, P. M. SESSION, pp. 5-69

* Reduces the expiration period for driver's licenses from two years to 60 days.

* Applies the expiration period beyond driver's licenses to all forms of photo identification, with the exception of citizenship certificates.

* Eliminates any kind of student photo identification cards as an acceptable form of identification for voting.

* Eliminates any kind of employee photo identification, including government employment identification.

* Eliminates identification cards issued by a state agency.

In addition, as compared to the 2007 and 2009 bills, SB 14 also eliminates identification cards issued by a federal agency. While these many forms of ID were excluded, SB 14 retains concealed carry permits as an acceptable form of photo identification for voting.

These decisions by the 2011 Republican majority legislature (which was nearly all-white) to deviate from prior bills made identification requirements more restrictive and in ways that would impose disparate burdens on African-Americans and Latinos as compared to whites. As demonstrated below, based on data publicly available prior to the enactment of SB 14 in 2011, whites are disproportionately represented among Texans with concealed carry permits, whereas African-Americans and Latinos are disproportionately represented among students and government employees. Thus, in crafting a more restrictive photo voter identification bill in 2011, the legislature targeted for elimination those forms of identification more accessible to minorities and retained those forms of identification more accessible to whites.

Table 1 examines the racial composition of holders of concealed carry permits in Texas through 2010. The racial data collected for these permits combine together whites and Latinos,

but separately identifies African-Americans, which are the focus of Table 1. The data reported in Table 1 demonstrates that, as compared to their percentage of the voting age population, African-Americans are underrepresented among concealed carry permit holders. As indicated in Table 1, the percentage of African-Americans among concealed carry permit holders is 49 percent lower than the percentage of African-Americans in the voting age population, for a difference of -5.7 percentage points.

| TABLE 1 PERCENT AFRICAN-AMERICAN AMONG PERMIT HOLDERS COMPARED TO PERCENT AFRICAN-AMERICAN VOTING AGE POPULATION | | | |
|---|---|---|---|
| PERCENT AFRICAN-AMERICAN AMONG PERMIT HOLDERS, 1996-2010 * | PERCENT AFRICAN-AMERICAN AMONG VOTING AGE POPULATION 2010 ** | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| 5.9% | 11.6% | 49% LOWER | -5.7 |
| | | | |
| * Texas Department of Public Safety, *Concealed Carry Reports and Statistics*, http://www.txdps.state.tx.us/rsd/chl/reports/demographics.htm | | | |

Concealed carry permits are also expensive, costing $140 for an initial permit and $70 for renewals. The cost is $70 for a permit and $35 for a renewal for seniors and the indigent. Initial licenses must be renewed after four years and renewed licenses again after five years.[32] These costs disparately burden African-Americans and Latinos. As demonstrated in Table 2, members of these two minority groups have much lower incomes than whites and much higher rates of poverty.

---

32 Texas Department of Public Safety, *Concealed Handgun Licenses*, http://www.txdps.state.tx.us/rsd/chl/#.

25

| TABLE 2<br>INCOME AND POVERTY MEASURES, AFRICAN-AMERICANS, LATINOS AND<br>WHITES, TEXAS, 2008-2010 US CENSUS, AMERICAN COMMUNITY SURVEY,<br>SELECTED POPULATION PROFILE IN THE UNITED STATES | | | |
|---|---|---|---|
| | NON-HISPANIC AFRICAN AMERICANS | LATINOS | NON-HISPANIC WHITES |
| MEDIAN HOUSEHOLD INCOME | $36,731 | $36,957 | $60,856 |
| PERCENT DIFFERENCE WITH WHITES | 40% LOWER | 39% LOWER | NA |
| NUMERICAL DIFFERENCE WITH WHITES | -$24,125 | -$23,899 | NA |
| PER CAPITA INCOME | $18,210 | $14,189 | $34,652 |
| PERCENT DIFFERENCE WITH WHITES | 47% LOWER | 59% LOWER | NA |
| NUMERICAL DIFFERENCE WITH WHITES | -$16,442 | -$20,463 | NA |
| **PERCENT PERSONS 18 YEARS OLD+ IN POVERTY** | 19.7% | 21.2% | 8.6% |
| PERCENT DIFFERENCE WITH WHITES | 129% HIGHER | 147% HIGHER | NA |
| PERCENTAGE POINT DIFFERENCE WITH WHITES | +11.1% | +12.6% | NA |

As indicated in Table 2, the median household income of African-Americans is 40 percent lower than the median household income of whites, for a numerical difference of -$24,125. The median household income of Latinos is 39 percent lower than the median household income of whites, for a numerical difference of -$23,899. As additionally detailed in Table 2, the per capita income of African-Americans is 47 percent lower than the per capita income of whites, for a numerical difference of -$16,442. The per capita income of Latinos is 59

percent lower than the per capita income of whites, for a numerical difference of -$20,463. The

poverty rate for voting age African-Americans is 129 percent higher than the rate for voting age

whites, for a difference of +11.1 percentage points.  The poverty rate for voting age Latinos is

147 percent higher than for voting age whites, for a difference of +12.6 percentage points.

Table 3 portrays the racial composition of government workers in Texas, using data from

the U.S. Census, American Community Survey, 2008 to 2010.

| TABLE 3 PERCENT VOTING AGE* GOVERNMENT EMPLOYEES BY RACE, TEXAS, 2008-2010- US CENSUS, AMERICAN COMMUNITY SURVEY,  SELECTED POPULATION PROFILE IN THE UNITED STATES | | | |
|---|---|---|---|
| GROUP | PERCENT GOVERNMENT EMPLOYEE VOTING AGE POPULATION | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE WITH WHITES |
| **AFRICAN-AMERICAN** | 11.6% | 21% HIGHER | +2.0% |
| | | | |
| **LATINO** | 10.1% | 5% HIGHER | +0.5% |
| | | | |
| **ANGLO** | 9.6% | NA | NA |
| | | | |
| * Adjusted for undocumented immigrants as described in fn 33. | | | |

Unlike the results for concealed carry permits, the data reported in Table 3 demonstrates

that African-Americans and Latinos are overrepresented among government workers, whereas

whites are underrepresented. As indicated in Table 3, the percentage of government workers

among voting age African-Americans is 21 percent higher than the percentage of government

workers among voting age whites, for a difference of +2.0 percentage points. The percentage of

government workers among adjusted voting age Latinos is 5 percent higher than the percentage

27

of government workers among voting age whites, for a difference of +0.5 percentage points.[33]

Survey data is also available on the percentage of government workers among registered voters, eliminating the need to adjust the voting age population and focusing on the group most directly affected by photo identification requirements. The data is obtained from the Cooperative Congressional Election Survey (CCES). This well-respected source in social science research, sponsored by Harvard University, is a large-scale survey of the electorate that includes a sufficiently large sample for the analysis of individual states. In 2006, the CCES asked whether registered voters worked for federal, state or local governments. The survey results reported in Table 4 show even more substantial differences between whites and minorities in government employment than does the data for the voting age population.

---

[33] The Latino voting age population is adjusted to eliminate undocumented immigrants who are not eligible for government employment. According to the Pew Hispanic Center, there were between 1,450,000 and 1,850,000 undocumented immigrants in Texas in 2010. Although, with age distribution is not available for individually states, nationally an estimated 87 percent of undocumented immigrants were of voting age. Taking conservatively, the lower bound 1,450,000 estimate and multiplying by .87 yields a reduction of 1,261,500 from the Latino voting age population of 5,985,410 in the 2008-2010 American Community Survey. Data on the number of undocumented immigrants in Texas are from Pew Research, *Hispanic Trends Project, State Settlement Patterns*, 2011, http://www.pewhispanic.org/2011/02/01/iv-state-settlement-patterns/. Estimates of age distribution are from: Pew Research, *Hispanic Trends Project,  Demographic And Family Characteristics*, 2009, http://www.pewhispanic.org/2009/04/14/iii-demographic-and-family-characteristics/.

| TABLE 4 PERCENT REGISTERED VOTERS GOVERNMENT EMPLOYEES BY RACE, TEXAS, 2006 CCES SURVEY | | | |
|---|---|---|---|
| GROUP | PERCENT GOVERNMENT EMPLOYEE REGISTERED VOTERS | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE WITH WHITES |
| AFRICAN-AMERICAN N=265 | 16.2% | 157% HIGHER | +9.9% |
| | | | |
| LATINO N=627 | 12.0% | 90% HIGHER | +5.7% |
| | | | |
| ANGLO N=1770 | 6.3% | NA | NA |

As indicated in Table 4, the percentage of government workers among registered African-Americans is 157 percent higher the percentage of government workers among registered whites, for a difference of +9.9 percentage points. The percentage of government workers among registered Latinos is 90 percent higher than the percentage of government workers among registered age whites, for a difference of +5.7 percentage points. Both individually and combined, the differences between whites and the two minority groups are statistically significant at the stringent .01 level in social science, corresponding to less than a one in one hundred chance of obtaining the results due to chance.

Table 5 portrays the racial composition of college and university students in Texas, using data from the U.S. Census, American Community Survey, 2008 to 2010 and adjusted for undocumented immigrants in the Latino voting age population as described above. The results reported in Table 5 demonstrate that, as compared to their percentage of the voting age population, whites are underrepresented among students, whereas both African-Americans and

29

Latinos are overrepresented. As indicated in Table 5, the percentage of students among voting age African-Americans is 43 percent higher the percentage of students among voting age whites, for a difference of +3.6 percentage points. The percentage of students among adjusted voting age Latinos is 26 percent higher than the percentage of students among voting age whites, for a difference of +2.2 percentage points.[34]

Survey data is also available from the CCES for 2006 and 2008 on the percentage of students among registered voters. As indicated in Table 6, the percentage of students among registered African-Americans is 136 percent higher than the percentage of students among registered whites, for a difference of +2.5 percentage points. The percentage of students among registered Latinos is 109 percent higher than the percentage of students among registered whites, for a difference of +2.4 percentage points. Both individually and combined the differences between whites and the two minority groups are statistically significant at the stringent .01 level in social science.

---

34 There may be some undocumented immigrants among Texas college students, but the number is likely very small. See, Roberto G. Gonzalez, *Young Lives on Hold: The College Dreams of Undocumented Students*, College Board Advocacy, April 2009, http://professionals.collegeboard.com/profdownload/young-lives-on-hold-college-board.pdf.; Texas Higher Education Coordinating Board, Texas Higher Education Coordinating Board,  *Eligibility for In-State Tuition and State Financial Aid Programs*, October 2011. And Texas Controller of Public Accounts, Education, http://www.window.state.tx.us/specialrpt/undocumented/3education.html. non-citizens "meeting statutory requirements for establishing Texas resident status for in-state tuition … totaled 16,476 students in FY 2010, or about 1 percent of total enrollment." This slight overestimation is also likely to be more than offset by the large number of documented non-citizens in the Latino voting age population

| TABLE 5 PERCENT VOTING AGE* COLLEGE AND UNIVERSITY STUDENTS BY RACE, TEXAS, 2008-2010- US CENSUS, AMERICAN COMMUNITY SURVEY, SELECTED POPULATION PROFILE IN THE UNITED STATES | | | |
|---|---|---|---|
| GROUP | PERCENT STUDENT VOTING AGE POPULATION | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE WITH WHITES |
| AFRICAN-AMERICAN | 12.0% | 43% HIGHER | +3.6% |
| | | | |
| LATINO | 10.6% | 26% HIGHER | +2.2% |
| | | | |
| ANGLO | 8.4% | NA | NA |
| | | | |
| * Adjusted for undocumented immigrants as described in fn 33. | | | |

| TABLE 6 PERCENT COLLEGE & UNIVERSITY STUDENTS, REGISTERED VOTERS, BY RACE, TEXAS, 2006 & 2008 CCES SURVEY | | | |
|---|---|---|---|
| GROUP | PERCENT STUDENTS REGISTERED VOTERS | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE WITH WHITES |
| AFRICAN-AMERICAN N=663 | 4.7% | 136% HIGHER | +2.5% |
| | | | |
| LATINO N=1054 | 4.6% | 109% HIGHER | +2.4% |
| | | | |
| ANGLO N=4242 | 2.2% | NA | NA |

As indicated in Table 7 substantial disparities between whites and African-Americans and minorities persist when the analysis is limited to in-state enrollment at public universities

31

and colleges in Texas. As indicated in Table 6, the percentage of public school students among voting age African-Americans is 43 percent higher than the percentage of such students among voting age whites, for a difference of +2.0 percentage points. The percentage of public school students among adjusted voting age Latinos is 46 percent higher than the percentage of such students among voting age whites, for a difference of +2.7 percentage points.

| TABLE 7 PERCENT VOTING AGE* COLLEGE AND UNIVERSITY STUDENTS BY RACE, PUBLIC SCHOOLS ONLY, TEXAS | | | |
|---|---|---|---|
| GROUP | PERCENT STUDENT VOTING AGE POPULATION | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE WITH WHITES |
| **AFRICAN-AMERICAN** | 7.9% | 34% HIGHER | +2.0% |
| | | | |
| **LATINO** | 8.6% | 46% HIGHER | +2.7% |
| | | | |
| **ANGLO** | 5.9% | NA | NA |
| | | | |
| * Adjusted for undocumented immigrants as described in fn 27. | | | |
| | | | |
| Source: Texas Higher Education Coordinating Board, Texas Institutions of Higher Education, January 2013, Fall 2010 Enrollment by Race Public Universities, Fall 2010 Enrollment Public Colleges, http://www.thecb.state.tx.us/reports/PDF/2964.PDF?CFID=12122792&CFTOKEN=25764689. | | | |

The combination of the inclusion of concealed carry permits but not government employee or student IDs also interacts with the decision to eliminate non-photo forms of identification. The elimination of non-photo identification is critically important because it eliminates an option for minorities who lack concealed carry permits or other forms of authorized photo identification. The primary forms of photo identification which are included in SB 14 – concealed carry permits, driver's licenses, and passports – all require fees to obtain;

fees that are especially burdensome for minorities as demonstrated in Table 2 above, given their low incomes relative to whites. Concealed carry permits cost $140 and $70 to renew or $70 and $35 to renew for the indigent; Texas driver's licenses cost $25 and $25 to renew (6 years); and U.S. Passports cost in excess of $100. In contrast, at least half a dozen forms of alternative non-photo IDs under previous photo ID bills presented by Republican legislators in Texas have no cost. These include a copy of a current utility bill, a bank statement, a government check or paycheck, official mail to the person from a governmental entity, a public benefit's identification card, and a public library card. [35] The decision to limit expiration from two years to 60 days also disparately burdens African-Americans and Latinos, given the hefty renewal fees relative to the incomes and poverty levels of these populations.

In addition, given the elimination of free non-photo identification in SB 14, African-Americans and Latinos are also disparately burdened by the suspension of more than one million driver's licenses through a program in Texas that tacks on substantial surcharges to various traffic violations. Texas is one of only about a half dozen states with a so-called Driver's Responsibility Law that adds on surcharges to various traffic offenses such as drunk driving.36 Since the law was adopted in 2003, more than two million Texans have been assessed such surcharges, which can range from hundreds to more than a thousand dollars. The penalty for failing to pay surcharges is the suspension of the individual's driver's license. Some 60 percent of drivers with traffic surcharges have not paid these bills, meaning that about 1.2 to 1.3 million Texans have had their driver's licenses – the primary form of voter identification under SB 14 –

---

35 Texas DPS, *Driver License Division Fees*, http://www.txdps.state.tx.us/DriverLicense/fees.htm;US Department of State, *Passport Fees*, http://travel.state.gov/content/passports/english/passports/information/costs.html.
36 Texas Department of Public Safety, Driver Responsibility Program, http://www.txdps.state.tx.us/driverlicense/drp.htm.

suspended.[37]

  This burden is especially onerous for African-Americans and Latinos, given their much lower incomes compared to whites and their much higher rates of poverty. Suspended licenses cannot be renewed and while it is possible that they could be presented for photo ID at the polls if not expired for more than 60 days, Texans with suspended licenses may be deterred from presenting such licenses to government officials of any kind. Also, Texans may not be aware that suspended licenses are valid for voting at the polls. The Secretary of State has not publicized any information on the use of suspended licenses for voter identification.[38]

  The DPS has also released the ten zip codes with the largest numbers of surcharges. As indicated in Table 8 as compared to state-level demography these zip codes are overwhelmingly Latino and African American in their voting age population. All of the top-10 zip codes are 57 percent or more African American and Latino combined in their voting age population; nine of ten are 65 percent or more combined African American and Latino. On average, the top-10 surcharge zip codes are 81.0 percent African American and Latino combined in their voting age population, 79 percent higher than the statewide percentage of 45.2 percent of these combined minorities, for a difference of +35.8 percentage points. On average the top-10 surcharge zip codes are 15.8 percent white in their voting age population, less than half the statewide white percentage of 33.6%, for a difference of -17.8 percentage points. Overall Latinos predominate in these 10 zip codes. Eight of the ten zip codes have a Latino voting age population majority.

---

37 Marty Schladen, "Reform Sought in Texas Ticket Surcharge Program," 22 September 2013, *El Paso Times.com*, http://www.elpasotimes.com/ci_24149800/state-tickets; Terrence Stutz, "Hefty Surcharges for Texas Drivers With Violations Remain Mostly Uncollected," *Dallasnews.com*, http://www.dallasnews.com/news/politics/texas-legislature/headlines/20100130-Hefty-surcharges-for-Texas-drivers-with-5026.ece; Cathaleen Qiao Chen, "Despite Changes, Driver Surcharge Program Faces Opposition," *Texas Tribune*, 24 April 2014, http://www.texastribune.org/2014/04/14/driver-responsibility-program-still-problematic/.
38 Texas Secretary of State, http://votetexas.gov/register-to-vote/need-id/, accessed June 27, 2014.

| TABLE 8<br>RACIAL COMPOSITION OF 10 TEXAS ZIPCODES WITH LARGEST<br>NUMBER OF DRIVER RESPONSIBILITY SURCHARGES | | | | | |
|---|---|---|---|---|---|
| | CITY OF ZIP CODE | PERCENT LATINO VOTING AGE POP | PERCENT NH AFRICAN-AMERICAN VOTING AGE POP | PERCENT NH WHITE VOTING AGE POP | PERCENT LATINO+ BLACK VOTING AGE POP |
| Z79936 | EL PASO | 84.3% | 2.2% | 11.8% | 86.6% |
| Z75217 | DALLAS | 59.6% | 29.2% | 10.4% | 88.8% |
| Z19907 | EL PASO | 95.3% | 0.43% | 3.5% | 95.7% |
| Z75216 | DALLAS | 25.1% | 71.6% | 2.8% | 96.7% |
| Z79924 | EL PASO | 63.7% | 7.6% | 25.1% | 71.4% |
| Z75211 | DALLAS | 78.7% | 7.3% | 12.4% | 86.0% |
| Z75061 | IRVING | 56.5% | 9.0% | 30.2% | 65.5% |
| Z75228 | DALLAS | 43.4% | 13.6% | 31.0% | 57.0% |
| Z79915 | EL PASO | 94.3% | 1.4% | 3.8% | 95.7% |
| Z78741 | AUSTIN | 56.4% | 10.6% | 27.0% | 67.1% |
| **STATE** | **NA** | **33.6%** | **11.6%** | **49.6%** | **45.2%** |
| MEAN FOR ZIP CODES | | **65.7%** | **15.3%** | **15.8%** | **81.0%** |
| Sources: DPS data as reported in Schladen, *El Paso Times*, fn. 26; US Census, 2010, Census Summary File 2, 5-digit zip code tabulation area. | | | | | |

IX. **Contemporaneous Viewpoints Expressed by the Decision-Makers.**

The viewpoints expressed by decision-makers and their supporters during the debates and

subsequent controversy over Texas's photo voter ID law reinforce the strong circumstantial evidence of intentional discrimination provided by the substantive deviations of SB 14 from prior voter photo identification bills. The justifications for these decisions are contradictory and can only be understood as a pretext for some other motivation. As recognized by the Supreme Court in the *Arlington Heights* case, unambiguous statements of intentional discrimination against minorities are very rare. However, such statements have been uttered by Republican leaders in Texas, indicating the presence of a deliberate political strategy of suppressing the minority vote.

As indicated in the following excerpts from the 2011 legislative record, backers of SB 14 justified the substantive deviations from previous bills on the grounds that the current bill was modeled on Indiana's voter photo identification legislation that the U.S. Supreme Court upheld in *Crawford v. Marion County*.

> Senator Leticia Van de Putte: And I understand it, this year's model is fashioned after the Indiana law?
>
> Senator Tory Fraser [bill sponsor]: And I think you actually have made the point that I was going to make. Two years have passed. Since that time, we've had, you know, obviously, the confirmation by the Supreme Court on the photo ID and then also the preclearance of the Georgia bill. …
>
> Senator Fraser: We are offering a bill that has been approved by the U.S. Supreme Court.[39]

---

[39] TRANSCRIPT OF PROCEEDINGS BEFORE THE SENATE OF THE STATE OF TEXAS VOL. 1, 25 January 2011, TX_00000062 ,p. 34, l.24, p. 35, l. 1-8, p. 38, l. 9-10.

To reinforce the notion that SB 14 was based on Indiana's law, the Republican leadership invited Jerry Bonnett, then the Indiana Secretary of State, to testify before the Senate in 2011 about the Indiana photo voter identification law. In the House, Representative Patricia Harless, echoed Senator Fraser's comments: "SB-14 is similar to Georgia's photo I.D., which was approved by the Department of Justice, and Indiana's photo I.D., which was upheld by the Supreme Court."[40]

In fact, Indiana adopted its photo voter identification law in 2005 and the U.S. Supreme Court upheld the law in April 2008, many months before the onset of the 2009 Texas legislative session. So the passage of the Indiana law and the Supreme Court decision in the *Crawford* case cannot explain the substantive deviations between the 2009 bill and SB 14, which the legislature enacted in 2011.[41]

In response to claims from opposition senators that SB 14 differed substantially from the Indiana statute, sponsor Fraser assured legislators and the public that the Texas law made only a "Very, very, small change" from the Indiana model. Likewise, Representative Harless said, "The bill that we filed is modeled on the Georgia and Indiana legislation."[42] Fraser's and Harless's justifications are contradicted by the plain facts of the two laws. A comparison between the Indiana and Texas law reveals that SB 14 includes substantial changes that make the law much more restrictive and impose disparate burdens on minorities that are absent from the Indiana law.

The Indiana law is based on a fundamentally different approach to photo voter identification than is the 2011 Texas law. The Indiana law does not establish specific forms of acceptable government issued photo ID. Rather, it allows a voter to present any ID that is "issued

---

40 *Ibid.*, p. 270, l. 3-4; HOUSE CHAMBERS FLOOR DEBATE 2ND READING MARCH 21, 2011 Transcribed by Rhonda Howard, CSR, TX_00210900, p. 3, l.12-15.
41 *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008).
42 Op Cit., n 39, p. 205, l. 9; *Op cit.*, n. 40, p. 29, l. 5-7.

by the State of Indiana or the U.S. government."[43] The Texas law is in principle based on an entirely different premise than the Indiana law. It *does* specify particular forms of government issued photo IDS, which are the only photo IDS acceptable for voting at the polls.

As compared to the Indiana laws these specific decisions about acceptable and non-acceptable photo ID in Texas pose particular burdens on African Americans and Latinos as compared to whites. In Indiana, persons can vote at the polls by presenting state or federal government employee photo identification or student photo identification issued by a public university in the state. Both these forms of identification are prohibited under the 2011 Texas law, although they had been authorized for voting under prior Texas bills as indicated above. In addition, under SB 14 in Texas, concealed carry permits issued by the state are authorized for voting, although those IDs are not acceptable in Indiana since that state's concealed carry permits do not contain a photo.[44] As also demonstrated above, these critical distinctions between the Texas and Indiana laws impose unique burdens on African Americans and Latinos who are underrepresented holders of concealed carry permits, but overrepresented among students and government workers.

In defense of limiting acceptable photo voter ID in Texas, sponsor Sen. Fraser said:

> The four types of identification that we are offering up we believe are less confusing, they're simpler for both voters and election voters (sic). Everyone knows what they look like. There is a standardization of those, and they all look alike and it would be less confusing for the systems who are accepting the voter IT (sic).[45]

---

43 Indiana Election Division, *Photo ID Law*, http://www.in.gov/sos/elections/2401.htm.
44 USA CARRY, Indiana Concealed Carry Permit Information,
http://www.usacarry.com/indiana_concealed_carry_permit_information.html.
45 *Op Cit.*, n 39, p.41,13-19.

This justification, however, is contradicted by the positive claims made by Senator Fraser and other backers of SB 14 about the implementation of the Indiana law, which authorizes government worker and student IDs issued by public universities. Fraser said, with respect Indiana, "to my knowledge, there has not been a single person that has come forward to identify themself (sic) that they were in any way, you -- you know, kept from voting or inconvenienced by voting."[46] So despite the use of student and government worker IDs, there has not been any confusion that has even inconvenienced a single voter. The Indiana Secretary of State testified that the state's photo ID law has been "has been applied in routine use" with no problems.[47]

In addition, earlier photo voter ID bills, which Senator Fraser and other backers of SB 14 had defended from 2005 to 2009, included a much greater variety of acceptable photo IDs as documented above, including student photo IDs issued by private colleges and universities. These bills had also included as an alternative to photo identification the presentation of two forms of more than fifteen varieties of non-photo identification.

The Indiana law also provides a ten-day period for voters lacking photo identification at the polls to validate a provisional ballot by presenting an acceptable ID. Texas has a shorter period of six days. This difference is significant for African-Americans and Latinos. As demonstrated in Table 9, these minorities have less access to vehicles than whites and thus are likely to have greater difficulty travelling to the office of the voter registrar. The percentage of African-Americans in households with no vehicle available is 242 percent higher than the percentage of whites in such households, for a difference of 13.0 percentage points. The

---

46 *Ibid*., p. 164, l. 18-22.
47 *Ibid*., p.275,  l. 19.

percentage of Latinos in households with no vehicle available is 92 percent higher than the

percentage of whites in such households, for a difference of 3.5 percentage points.

| TABLE 9<br>VEHICLE AVAILABILITY, AFRICAN-AMERICANS, LATINOS AND WHITES,<br>TEXAS, 2008-2010 US CENSUS, AMERICAN COMMUNITY SURVEY, SELECTED<br>POPULATION PROFILE IN THE UNITED STATES | | | |
|---|---|---|---|
| | NON-HISPANIC AFRICAN-AMERICANS | LATINOS | NON-HISPANIC WHITES |
| | | | |
| **PERCENT WITH NO VEHICLE IN HOUSEHOLD** | 13.0% | 7.3% | 3.8% |
| | | | |
| PERCENT DIFFERENCE WITH WHITES | 242% HIGHER | 92% HIGHER | NA |
| | | | |
| NUMERICAL DIFFERENCE WITH WHITES | 9.2% | 3.5% | NA |

In addition, voters who lack a photo ID in Indiana can validate a provisional ballot by

signing an affidavit affirming that they are indigent. No such exemption for the indigent exists

under the 2011 Texas law. This divergence from the Indiana law poses yet another differential

burden on African-Americans and Latinos. As demonstrated in Table 2 above, voting age

African-Americans and Latinos are much more likely to be in poverty than Anglos in Texas.

Under Indiana law a photo ID is valid for in-person voting if it has an expiration date

after the last general election. Texas, however, imposes the much more stringent requirement of

an expiration of just 60 days or less. This has a disparate burden on minorities who are

disproportionately represented among those with suspended licenses under the Driver's

Responsibility Program and cannot renew such licenses. Minorities are also disproportionately burdened by the costs of renewal of licenses and other forms of acceptable Texas photo ID.[48]

Senator Fraser and other backers of SB 14 also cite in support of the legislation the U.S. Justice Department's preclearance of Georgia's voter photo identification law. Until the U.S. Supreme Court struck down the formula for Section 5 coverage in 2013, both Texas and Georgia, but not Indiana, were included in the Section 5 preclearance requirement. However, proponents of SB 14 did not mention that career lawyers at the U.S. Department of Justice had recommended against preclearance of the Georgia law, but were overruled by the Department's political appointees.[49]

In pointing to the Georgia pre-clearance precedent, backers of SB 14 also neglected to note that the Texas bill differed fundamentally from the Georgia bill and as a result was not likely to gain preclearance. Unlike the Texas law, the Georgia law did not specify particular forms of acceptable photo ID for voting at the polls. They withheld this information even after being warned in a memo sent to numerous Republican legislative staffers by Bryan Hebert, Deputy General Counsel in the Office of the Lieutenant Governor (the Lieutenant Governor in Texas presides over the State Senate). Counsel Hebert assessed the prospects for preclearance of SB 14: "The bottom line: doubtful." He recommended that the Republican leadership revise SB 14 by "using the language in Georgia's law (*i.e.,* any ID issued by the federal govt, state govt, or local govt within the state)." He added that, "At a minimum, we might use the language used in our bill that passed last session: 'a valid identification card that contains the person's photograph

---

48 *Op Cit.*, n. 43.
49 "Standard of Review by Department of Justice," undated circular, State email submission, TX_00034559. This email presented by the state includes as reference to the recommendation of the career lawyers and their overruling by the political appointees. See also, Dan Eggen, "Criticism of Voting Law was Overruled, *Washington Post*, 17 November 2005, http://www.washingtonpost.com/wp-dyn/content/article/2005/11/16/AR2005111602504.html.

and is issued by: (A) an agency or institution of the federal government; or (B) an agency, institution, or political subdivision of the state.'" The Republican majority in the legislature declined to adopt either of these recommendations.[50]

Georgia's photo ID law differs in a number of important ways from SB 14. Unlike Texas, Georgia authorizes the use of government worker photo identification and student photo identification issued by public institutions of higher education. Georgia does not authorize the use of concealed carry permits for voting, because Georgia's permits do not include the holder's photograph. Furthermore, Georgia imposes no expiration requirement for driver's licenses and does not limit state-issued acceptable photo ID to those issued by the State of Georgia. It allows out-of-state driver's licenses as well as tribal ID cards. The only way in which the Georgia law is stricter than the Texas legislation is that it includes a three-day (later expanded from two) rather than a six-day period for validating a provisional ballot cast by voters who did not present acceptable photo identification at the polls. However, Georgia is a much smaller state than Texas with shorter distances to county registrar offices.[51]

Table 9 compares SB 14 in Texas to the voter photo identification laws in effect in other states prior to 2011. The data in Table 10 demonstrates that the decisions made by the Texas state legislature in 2011 make the Texas law a restrictive outlier that imposes greater disparate

---

50 Bryan Hebert to Jason Baxter, et al., 22 January 2011, "Fwd: preclearance," State email submission, TX_00015831.
51 Georgia Secretary of State, *Georgia Voter Identification Requirements*, http://sos.ga.gov/index.php/elections/georgia_voter_identification_requirements2; USA CARRY, Georgia Concealed Carry Permit Information, http://www.usacarry.com/georgia_concealed_carry_permit_information.html; § 21-2-419. Method of voting and counting provisional ballots, GA ST § 21-2-419 and updated, Gerogia Secretary of State, *Provisional Ballots*, http://sos.ga.gov/admin/files/GAInfoguide.pdf.

| TABLE 10<br>TEXAS VOTER PHOTO IDENTIFICATION LAW AS COMPARED TO LAWS IN<br>EFFECT IN OTHER STATES PRIOR TO 2011 | | | | | |
|---|---|---|---|---|---|
| STATE | GOVERNMENT EMPLOYEE ID | STUDENT ID | LONGER THAN 60 DAY EXPIRATION FOR IDS | DOES NOT ALLOW CONCEALED CARRY ID | "STRICT" OR "NON-STRICT" PHOTO ID STATE |
| FLORIDA | NO | YES | YES | YES | NON-STRICT |
| GEORGIA | YES | YES ** | YES | YES | STRICT |
| HAWAII | YES | YES | YES | YES*** | NON-STRICT |
| IDAHO | YES* | YES | YES | YES | NON-STRICT |
| INDIANA | YES | YES ** | YES | YES | STRICT |
| LOUISIANA | YES | YES | YES | NO | NON-STRICT |
| MICHIGAN | YES | YES | YES | NO | NON-STRICT |
| SOUTH DAKOTA | YES * | YES | YES | YES | NON-STRICT |
| **TEXAS** | **NO** | **NO** | **NO** | **NO** | **STRICT** |
| Source: National Conference of State Legislatures (NCSL), Voter Identification Requirements, http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx#sd, Individual State Websites. ** U.S. government issued ID. *** Government issued student ID. *** Other than in exceptional circumstances, Hawaii does not issue concealed carry permits. | | | | | |

burdens on minorities compared to the laws other states. These burdens results from the particular decisions made by the Texas legislature in 2011 that had no precedent in the laws previously in effect in other states.

Texas, along with Indiana and Georgia, is one of only three states with a strict form of photo voter ID law. As also indicated in Table 10, all other states except Florida allow some form of **both** government employee photo identification and student photo identification. Texas is the only state that prohibits the use of either one of these photo identification cards. Although Florida – a non-strict state – does not authorize the use of government worker IDs, it does

43

authorize the use of student IDs, credit or debit cards, retirement center identification, neighborhood association identification, and public assistance identification – none of which are authorized for voting in Texas. Also, Texas is the only state with an expiration period of 60 days or less for photo identification. All other states either have longer expiration periods or no expiration period.[52]  Only two other states (Louisiana and Michigan) authorize the use of concealed carry permits for voting, and these are both non-strict states in which voters lacking authorized photo identification can vote a regular ballot by affidavit. These states also authorize both government and student IDs for voting. In private communications, Republicans recognized the unique restrictiveness of the Texas law. An email from Allison Winney legislative aide to Republican Speaker Joe Straus to Meredith Fowler, the Speaker's Policy Analyst said, "Texas passed arguably the strictest Voter ID law in the nation."[53]

Republican backers of SB 14 also were aware of the problem stemming from the suspension of driver's licenses for failure to pay surcharges, an issue not present in Indiana or Georgia. The issue of driver's surcharges was already controversial and the subject of legislative debate and news stories before the 2011 Texas state legislative session.[54] Also, in a memo written shortly after the U.S. Justice Department denied pre-clearance to the Texas photo voter ID law, Andrew Blifford, Budget Director for the Republican Speaker of the State House, circulated a blog entry that blamed the Driver's Responsibility Law in large part for this rejection. The anonymous blogger wrote that the  "Texas secretary of state officials did not find

---

52 Georgia, for example, does not include any expiration date for driver's licenses.
53 Allison Winney to Meredith Fowler, "Please Update Voter ID Bullets," 15 March 2012, State email submission, TX_00011999.
54 Peggy O'Hare, "Critics say costly DPS fines put drivers on road to ruin," *Chron.com*, 20 March 2010, http://www.chron.com/news/houston-texas/article/Critics-say-costly-DPS-fines-put-drivers-on-road-1623025.php.

matching 2012 driver's licenses or state-issued photo identification for 2.4 million of the state's 12.8 million registered voters, though all but about 800,000 of those voters supplied a valid identification number when they first registered to vote." The blogger largely attributes this discrepancy to the Driver's Responsibility Program, which he says "could account for as much as three-quarters (1.2 out of 1.6 million) of those who had ID when they registered to vote but do not today." Thus, "it appears the surcharge is a major contributor to Texas's Voter ID law being challenged." Fowler's response indicated that she was familiar with this data: "Ah yea, this came up in the debate, thanks for passing it along!" Clearly then, legislators were aware of this problems and did not address it in SB 14.[55]

During the debate on SB 14, Democratic Representative Burnam raised a distinct but related point. Separate and apart from suspensions arising under the surcharge program, motorists can have their licenses suspended and confiscated for drunken driving arrests under what is known as the Texas Administrative License Revocation or ALR program. He pointed out that "100,000 Texans a year have had their driver's license suspended. … They've had that driver's license taken from them." Representative Harless responded that those who are registered voters (hypothetically 75,000, as Burnam suggested) would have to cast a provisional ballot "If they don't have another alternative form of photo ID, such as a passport or citizenship paper with their photo on it or either a CHL [concealed handgun license] license." She provided no indication of whether Texans in this situation would in fact have any of these other photo IDs.[56]

---

48 Andrew Blifford to Meredith Fowler, 19 March 2012, "Did the Driver Responsibility Surcharge Cause Texas's Voter ID law to be Rejected?," Reply, Fowler to Blifford, 19 March 2012, State email submission, _TX_00012029.
56 TEXAS HOUSE OF REPRESENTATIVES 2011 (82R) SB 14 3/23/11 House Floor Debate (Emergency Calendar)Volume 2, p. 35, l. 7-25, p. 36, l. 1-9, TX_00212711.

According to an email from DPS official Tom Vinger to journalist Gardner Selby in January 2011, in 2008 112,250 licenses were suspended under the ALR process, although not every suspension may have involved a license being confiscated. The time of suspension can vary for an adult from 90 days to two years and it requires a fee of $125 to reinstate a license, which is particularly onerous for African Americans and Hispanics.[57] Thus, through both the Driver's Responsibility Program and the Administrative License Revocation Program, very large numbers of Texans may lose their opportunity to present a driver's license for voting at the polls. The burden falls disproportionately on minorities who have much lower income levels than whites and much higher poverty levels.

Backers of SB 14 also cited polls showing strong public support in Texas for a voter photo identification law, as well as the recommendations of the Carter-Baker Commission on Federal Election Reform. However, polls relied upon by Texas usually include reference to a government issued ID.  Texas's voter ID law is far more restrictive and does not permit any government issued ID to be used as voter identification.  In addition, a Texas poll taken in February 2011, in the midst of the debate over the photo ID law, shows that voter fraud and ballot integrity do not register among the thirteen most important state problems cited by respondents. And, although the Carter-Baker Commission does recommend the use of certain forms of photo identification for voting, it also notes, that "each state would also decide whether to require voters to present an ID at the polls." It also recommends a 5-year phase in period.[58]

---

57 Vinger Tom to Gardner, Selby, 15 January 2011," RE: Administrative License Revocation,"
http://alt.coxnewsweb.com/statesman/politifact/01252011_txdpsresponsespftexas.html.
58 University of Texas at Austin, "Most Important Problems," February 2011,
http://www.laits.utexas.edu/txp_media/html/poll/features/201102_important/slide3.html; Commission on Federal Election Reform, *Final Commission Report: Building Confidence in US Election*, p. 19,
http://www1.american.edu/ia/cfer/.

The Commission also includes a number of recommendations for "expanding access to elections." It considered reforms to achieve universal registration and other measures for expanding access an essential complement to a photo ID requirement. Such reforms are not included in the Texas law or other measures enacted by the legislature. The Commission report notes, "The Commission's proposals for a new electoral system contain elements to assure the quality of the list and the integrity of the ballot. But to move beyond the debate between integrity and access, specific and important steps need to be taken to assure and improve access to voting."[59] Recommendations include: allowing voter registration at social service agencies, providing voter centers "that allow citizens to vote anywhere in the county rather than just at a designated precinct;" establishing mobile voting units that provide both free voter identification and opportunities for registration; re-enfranchising ex-felons who fully served their time, and expanding programs of voter information and education.[60]

In short, the Commission urged a comprehensive electoral reform program that both expanded access to the polls while providing greater security for elections. Texas implemented only a fraction of the Commission recommendations regarding photo ID, while ignoring recommendations designed to expand registration and voting. Thus it is not correct for backers of SB 14 to say that the law is consistent with the Carter-Baker recommendations.

In terms of meeting the stated goals of the backers of SB 14 – preventing fraud and assuring the integrity of the ballot – absentee ballot fraud was a more pressing problem, not voter impersonation at the polls. Impersonating voters at the polls is a very inefficient, dangerous, and costly means of fraudulent voting. It risks identification by poll officials who may know

---

59 *Ibid.*, p.33.
60 *Ibid.*, pp. 33, 36, 41

registered voters in their community and requires assurance that the person being impersonated has not already voted. Anyone caught impersonating a voter at the polls faces serious felony prosecution and conviction.[61] For all these reasons, this form of fraud is extremely rare.

The United States Election Commission also recognized that absentee ballot fraud was and is a more pressing problem. For example, after interviewing authories in the field and examing books, articles, and reports on voter fraud found that "absentee balloting is subject to the greatest proportion of fraudulent acts." They did not find that voter impersonation at the polls ranked among the acts subject to significant voter fraud. Among authorities in the field, the Commission found,  "Many asserted that impersonation of voters is probably the least frequent type of fraud because it is the most likely type of fraud to be discovered, there are stiff penalties associated with this type of fraud, and it is an inefficient method of influencing an election." Similarly, data collected by News21, a national reporting project made up of 11 universities found that absentee voting fraud was the most common type of fraud, outnumbering voter impersonation by a ratio of 49 to 1. Texas also has a documented history of absentee ballot fraud.[62]

Representative Denny, the sponsor of the 2005 Texas photo voter ID bill, acknowledged that the bill had a major omission in that it did not address mail-in absentee ballots. She vowed to correct that omission: "And so, anyway, I -- I am working on a Committee Substitute that will address early voting by mail, the -- because I think -- or voting by mail. And -- because that is --

---

61 Photo identification requirements for voting in-person would also have no impact on double registration or voting in more than one state, given that the voter would be legitimately registered in each state.
62 U.S. Election Assistance Commission, *Election Crimes: An Initial Review and Recommendations for Additional Study*, December 2006, p. 9, http://www.eac.gov/assets/1/workflow_staging/Page/57.PDF; Natahsa Khan and Corbin Carson, Comprehensive Database Of U.S. Voter Fraud Uncovers No Evidence That Photo Id Is Needed," News21, 12 August 2012, http://votingrights.news21.com/article/election-fraud/. Op cit., Slater, 31.

that was overlooked in this provision and -- or in this bill, and we don't want to overlook that, because we do want to require a copy of a photo I.D. to be mailed in with that."[63] However, the final bill continued to ignore voting by mail as did all subsequent bills, including SB 14 in 2011.

At the July 2012 trial before the District of Columbia regarding Texas's lawsuit seeking preclearance of the 2011 photo voter ID law, Texas designated Republican State Representative Jose Aliseda as a witness whose testimony "will rebut arguments that the stated justifications for SB 14 were a mere pretext." The state said that, "Because Rep. Aliseda campaigned on the voter ID issue, spoke publicly on the House Floor about it, and has experience prosecuting voter fraud actions. He can speak extensively about voter ID without invading any privileges. He also has a unique understanding of South Texas politics and could inform the Court of election integrity concerns that are particularly prevalent there."[64]

Yet rather than focus on voter impersonation at the polls, which is covered by SB 14, Aliseda focused his testimony on absentee ballot fraud, which is not addressed:

Q. What did your experience as county attorney in Bee County tell you about voter attitudes on voter fraud in south Texas?

A. At least in my county the people were clamoring for somebody to do something, they didn't trust the system. Some would say, you know, what's the point of voting if my vote is going to be canceled out by one of these mail-in ballot fraud votes. So as a whole, the reason I did what I did was to give people back the confidence in the system.[65]

---

63 TEXAS HOUSE OF REPRESENTATIVES COMMITTEE ON ELECTIONS SUBCOMMITTEE ON VERIFICATION VOTERS MARCH 17, 2005, Transcribed by Rhonda Howard, CSR p. 106, l. 2-9.
64 *Texas v. Holder*, Case No. 1:12-CV-00128, Notice of Plaintiff's Live Witness List, 12 June 2012, pp. 1-2,
65 *Texas v. Holder*, (A.M. SESSION), TRANSCRIPT OF BENCH TRIAL, 9 July 2012, p. 131, l. 13-20.

After continued testimony in this regard, Federal Judge Rosemary Collyer picked up on the fact that Aliseda was testifying about mail-in ballot fraud, not impersonation at the polls:

> JUDGE COLLYER: Right, but it's all based on mail fraud. But you described as some large mail -- ballot mail fraud involved with balloting; right?
>
> MR. McKENZIE: [Attorney for Texas]: Yes.[66]

When prompted to testify about voter fraud at the polls, Representative Aliseda said only that some of his non-citizen clients had told him privately that they had voted and were worried about their legal status as a result. However, this was not a public matter and a photo voter ID law would not have prevented these non-citizens from voting, since non-citizens can obtain driver's licenses and such licenses do not distinguish between citizens and non-citizens. Non-citizens can also obtain concealed carry permits in Texas.[67] In cross-examination, Representative Aliseda admitted that the non-citizens to which he had earlier referred in fact had driver's licenses and that non-citizens could obtain Texas driver's licenses:

> Q. And that's because all of those noncitizens have driver's licenses. Correct?
>
> A. That's correct.
>
> Q. And that's because noncitizens can obtain a Texas driver's license. Correct?
>
> A. They can.[68]

Representative Aliseda did not testify that the voters in Bee County (and elsewhere) were clamoring for control over voter impersonation at the polls – they were concerned about mail-in

---

66 Ibid., p136, l.20-13.
67 Veasey v. Perry, Civil Case Number 2:13-cv-193, *Deposition of Joe Peters, Texas Department of Public Safety*, 30 April 2014, pp. 145-147; USA CARRY, Texas Concealed Carry Permit Information, http://www.usacarry.com/texas_concealed_carry_permit_information.html.
68 *Texas v. Holder*, (P. M. SESSION), TRANSCRIPT OF BENCH TRIAL, 9 July 2012, p. 27, l. 16-21.

ballot fraud. Thus, the testimony of Representative Aliseda, which Texas offered to show that the arguments for SB 14 were not pretextual, in fact demonstrates just the opposite. Neither SB 14 nor any other bill that the legislature enacted did anything to stop mail-in voter fraud, which he testified the voters were clamoring to solve. The failure to act on mail-in ballots also contradicts the findings and recommendations of the Carter-Baker Commission. The Commission report observed that "absentee ballots remain the largest source of potential voter fraud" and recommended tightened control of this type of voting.[69]

The failure to act on mail-in absentee ballots also contradicts the findings of Republican legislators in Texas. An August 2010 report by Republican Representative Todd Smith, Chairman of the House Committee on Elections, for the upcoming 2011 session, summarized earlier findings of the House Committee on Elections, from the 80th Legislative Session that began in 2007. The Committee, then Chaired by Republican Representative Leo Berman and consisting of four Republicans and three Democrats concluded:

> At the end of the hearing all committee members could agree that there is some amount of fraud in Texas's election process. What the committee found is most election fraud happening in Texas occurs within the absentee or mail-in process, through voter registration, and through *politiqueras* or *vote brokers* which are usually found in South Texas.
>
> (*politiqueras* are paid to deliver votes, usually by shepherding elderly to the polls or by manipulating the mail-in ballot system)[70]

There is no mention in these findings of fraud by voter impersonation at the polls, which voter photo identification bills are purportedly designed to deter.

---

69 Carter-Baker Commission Report, pp. 46-47.
70 Representative Todd Smith, *Voter Identification Forum*, 81st Session Interim, 6 August 2010, p. 31, State email submission, 008252_TX_00091058.

A report prepared shortly before the debate over the 2011 voter identification bill by the Texas Conservative Coalition, a group of Texas Republican legislators, also pointed to the importance of mail-in ballot fraud: "Mailed ballots present unique opportunities for fraud because the voter is not required to present themselves to a poll worker on election day."[71]

Two respected polls for the elections of 2006 and 2008 demonstrate that whites are overrepresented and African-Americans and Latinos are underrepresented among the mail-in voters, which are not regulated under SB 14. In contrast, whites are underrepresented and African-Americans and Latinos are overrepresented among the in-persons voters, regulated under SB 14. These two surveys are the CCES survey, described above, and the Current Population Survey conducted by the U.S. Census. It includes some 60,000 households, which is also large enough for the analysis of individual states.

For the CCES survey, as indicated in Table 11, the percentage of mail-in voters among African-Americans is 45 percent lower than the percentage of mail-in voters among whites, for a difference of -2.6 percentage points. The percentage of mail-in voters among Latinos is 53 percent lower than the percentage of mail-in voters among whites, for a difference of -3.1 percentage points. As also indicated in Table 11, the percentage of in-person voters among African-Americans is 3 percent higher than the percentage of in-person voters among whites, for a difference of +2.6 percentage points. The percentage of in-person voters among Latinos is 2

---

71 Texas Conservative Coalition, *Election Integrity: Analysis and Talking Points*, 10 September, 2010, p. 3, State email submission, 00202700.

| SURVEY | % WHITES VOTING BY MAIL | % AFRICAN AMERICANS VOTING BY MAIL | % LATINOS VOTING BY MAIL | % WHITES VOTING IN PERSON | % AFRICAN AMERICANS VOTING IN PERSON | % LATINOS VOTING IN PERSON |
|---|---|---|---|---|---|---|
| **2006-2008 CCES** | 5.8% N=2597 | 3.2% N=285 | 2.7% N=583 | 93.9% | 96.5% | 96.1% |
| PERCENT DIFFERENCE WITH WHITES | NA | 45% LOWER | 53% LOWER | NA | 3% HIGHER | 2% HIGHER |
| PERCENTAGE POINT DIFFERENCE WITH WHITES | NA | -2.6% | -3.1% | NA | +2.6% | +2.2% |
| **2006-2008 CPS** | 5.3% N=2766 | 3.2% N=507 | 4.0% N=779 | 94.3% | 96.3% | 95.5% |
| PERCENT DIFFERENCE WITH WHITES | NA | 40% LOWER | 25% LOWER | NA | 2% HIGHER | 1% HIGHER |
| PERCENTAGE POINT DIFFERENCE WITH WHITES | NA | -2.1% | -1.3% | NA | +2.0% | +1.2% |
| | | | | | | |

**TABLE 11**
**MAIL-IN ABSENTEE BALLOTS IN TEXAS, BY RACE, 2006 AND 2008, CCES AND CURRENT POPULATION SURVEYS**

The sample size N is the same for voting by mail and in-person given that these are different answers to the same question. The percentages do not quite add to 100 percent, because a very few respondents were uncertain about how they voted.

percent higher than the percentage of in-person voters among whites, for a difference of +2.2 percentage points. Both individually and combined, the differences between whites and the two minority groups are statistically significant at the stringent .01 level in social science. Given that many millions of Texans vote in midterm and presidential elections, even differences of just a few percentage points amount to large numbers of voters.

Similar results are obtained in the CPS survey. As indicated in Table 11, for this survey

53

the percentage of mail-in voters among African-Americans is 40 percent lower than the percentage of mail-in voters among whites, for a difference of -2.1 percentage points. The percentage of mail-in voters among Latinos is 25 percent lower than the percentage of mail-in among age whites, for a difference of -1.3 percentage points. As also indicated in Table 11, the percentage of in-person voters among African-Americans is 2 percent higher than the percentage of in-person voters among whites, for a difference of +2.0 percentage points. The percentage of in-person voters among Latinos is 1 percent higher than the percentage of in-person voters among whites, for a difference of +1.2 percentage points. The differences between whites and African-Americans and between whites and both minorities combined are statistically significant at the standard .05 level in social science.

Proponents of SB 14 also gave assurances that anyone lacking an acceptable photo ID under the new law could obtain a free Election Identification Certificate (EIC) that would enable them to vote at the polls. There are, however, substantial and complex documentation requirements to obtain an EIC. To obtain an EIC a Texan must:[72]

- Present documentation to verify U.S. citizenship
- Present documentation to verify identity
- Be eligible to vote in Texas (Either present a valid voter registration card, or submit a voter registration application to the Texas Department of Public Safety)
- Be a Texas resident
- Be 17 years and 10 months or older

Proof of citizenship requires one of the following documents:

A. U.S. passport book or card; or

---

[72] Information on EIC requirements is obtained from Texas Department of Public Safety, Election Identification Certificate, http://www.txdps.state.tx.us/driverlicense/electionid.htm.

B. Birth certificate issued by a U.S. state, U.S. territory or District of Columbia; or

C. For U.S. citizens born abroad—Certificate of Report of Birth (DS-1350 or FS-545) or Consular Report of Birth (FS-240) issued by the U.S. Department of State; or

D. U.S. Certificate of Citizenship or Certificate of Naturalization (N-560, N-561, N-645, N-550, N-55G, N-570 or N-578); or

E. U.S. Department of Justice Immigration and Naturalization Service U.S. Citizen ID Card (Form I-197 or I-179)

To obtain an EIC, applicants must also provide documentation establishing their identity. These may include one primary document, or two secondary documents, or one secondary document and two additional supporting documents. Documents that fulfill these requirements are the following.

Primary Documents:

A Texas driver license or personal identification card issued to the person that has been expired for 60 days and is within two years of expiration date may be presented as primary identification.

Secondary Documents:

A. Original or certified copy of a birth certificate issued by the appropriate State Bureau of Vital Statistics or equivalent agency;

B. Original or certified copy of United States Department of State Certification of Birth (issued to United States citizens born abroad);

C. Original or certified copy of court order with name and date of birth (DOB) indicating an official change of name and/or gender; or

D. U.S. citizenship or naturalization papers without identifiable photo.

Supporting Documents:

A. voter registration card;

B. school records;

C. insurance policy (at least two years old);

D. Texas vehicle or boat title or registration;

E. military records;

55

F.   unexpired military dependent identification card;

G.   original or certified copy of marriage license or divorce decree;

H.   Social Security card;

I.   pilot's license;

J.   unexpired photo driver's license or photo ID issued by another (United States) state, U.S. territory, the District of Columbia;

K.   expired photo driver's license or photo ID issued by another (United States) state, U.S. territory, or the District of Columbia that is within two years of the expiration date;

L.   an offender identification card or similar form of identification issued by the Texas Department of Criminal Justice;

M.   forms W-2 or 1099;

N.   Numident record from the Social Security Administration;

O.   expired Texas driver license or personal identification certificate (expired more than two years);

P.   professional license issued by Texas state agency;

Q.   identification card issued by government agency;

R.   parole or mandatory release certificate issued by the Texas Department of Criminal Justice;

S.   federal inmate identification card;

T.   federal parole or release certificate;

U.   Medicare or Medicaid card;

V.   Selective Service card;

W.   immunization records;

X.   tribal membership card from federally recognized tribe;

Y.   Certificate of Degree of Indian Blood;

Z.   Veteran's Administration card;

AA.     hospital issued birth record; or

BB.     any document that may be added to §15.24 of this title (relating to Identification of Applicants) other than those issued to persons who are not citizens of the U.S.


SB 14 did not include the necessary provisions to assure that the process for obtaining an EIC would not impose a disparate burden on those lacking access to transportation and those with low or poverty-level incomes. These groups, as demonstrated above, are disproportionately African-American and Latino. There is no appropriation in SB 14 to assist counties in training for the issuance of the EIC. There is no requirement or budget for the deployment of mobile units

56

to provide EICs as an alternative to traveling to a DPS office. There is no budgetary assistance to the DPS for administering the EIC program. There is generally no waiver of the fees required to obtain a birth certificate to comply with the proof of citizenship requirements for an EIC. No assistance is provided for Texas citizens born outside the state who would have to obtain birth certificates from another state.

And there are significant costs associated with obtaining an EIC. A certified copy of a Texas birth certificate costs $22. Under a new rule, the Texas Department of Health Services will waive the birth certificate fee for those that certify they require the certificate for an EIC. However, to receive this waiver the individual must appear personally at the Heath Services office or the office of a local registrar or county clerk. Health Services will also continue to charge a $2 fee required by the State Health and Safety Code. The waiver, of course, will be of no assistance to anyone seeking an EIC who was born out-of-state.[73]

In the state of Texas there are unique burdens associated with travel to the offices that provide driver's licenses and EICs. Testimony and documents presented to the DC Court in the Voter ID litigation indicate that about a third of Texas counties do not have such offices and many others are open only two days a week or less. The Court noted that "Georgia and Indiana voters face no such burdens. Indeed, Georgia law requires each county to "provide at least one place in the county at which it shall accept applications for and issue [free] Georgia voter identification cards." Similarly, every Indiana county has a DMV office that is required by law to disperse "free" photo IDs." Texas is also a much larger state geographically than either Indiana or Georgia. According to the testimony of State Senator Carlos Uresti, "in his district—which is '70 percent

---

[73] Texas Department of State Health Services, *Birth Certificate for Election Identification*, http://www.dshs.state.tx.us/vs/field/Birth-Certificate-for-Election-Identification/.

Hispanic, about 5 percent African-American'—'[t]here are some towns . . . where the nearest DPS office is about a 100 to 125 mile[] one way' trip away." In addition State Representative Rodney Ellis, who represents an inner city district in Houston, the state's largest city, testified that "DPS offices are not 'easily accessible by public transportation.'"[74]

The legislature was well aware of these and other burdens associated with travelling to DPS offices.  For instance, in March 2011 the Speaker of the House's Chief of Staff, Denise Davis, sent an e-mail to a DPS employee requesting information on average wait times at driver's license offices because the "Speaker is asking."  In response, the DPS person acknowledged that wait times at driver's license offices could be extremely long: "Denise, it depends on the office and where it is located but the times can range from 25 minutes in our smaller cities to as long as 3 hours just to get waited on in our larger cities particularly Houston." The DPS also provided context on the difficulty of serving the people of a large, populous and rapidly growing state like Texas. "It has been over 10 years since we hired an additional DL employee or built additional DL space while the State's population has increased by 5 million people and we have imposed more requirements which increases the time".[75]

In another memo circulated among Republican legislative staff members, they acknowledge the problems arising from a lack of DPS offices in many counties and the long distances that Texans may have to travel to reach such offices: "77 counties in Texas do not have a DPS office. Therefore, a disabled person may be able to get a ride to their local precinct, but not a ride over 75 miles if they live in one of these counties to get the photo ID. It could even be a burden in a suburban or urban area. *e.g.,* there is not a single DPS office inside the [Houston]

---

74 *Texas v. Holder*, Civil Action No. 12-cv-128, Opinion, p. 46, p. 48.
75 *Ibid.*, p. 27, p. 47, p. 49; Steven McCraw, DPS, to Denise Davis, "RE," 5 March 2011,State email submission, TX_00219279.

58

loop."[76] Although discussed in the context of disabled persons, these same access problems would apply to low income persons and persons lacking access to a vehicle.

Although the DPS will also be deploying some mobile EIC units, as indicated above it is very difficult for Texans to learn of the dates, times, and hours of these units. As explained below, they relied on press releases that newspapers may or may not pick up and social media information that few may see. Moreover, the DPS has resisted any effort to open these units in the evening.[77]

Discretion for developing the rules and procedures for the EIC was largely vested in the Department of Public Safety. This is an agency that administers driver's licenses and concealed carry permits and deals with law enforcement. It has no mandate for assuring access to voting. In addition, given that the EIC program comes out of the general DPS budget with other responsibilities and constraints or money allocated ad hoc from other state agencies, the agency has a financial incentive to minimize the program. Joe Peters, the DPS's Assistant Director for the Driver's License Division confirms this in his deposition:

> Q. Uh-huh. And is there any -- I believe your testimony was before there is no specific line item in DPS's appropriation -- or in the transportation budget generally for EIC unit; is that correct?
>
> A. That's correct.
>
> Q. So if there were unexpected needs in some of the other, quote/unquote, "DL mission," you would face resource constraints just like any agency; is that correct?
>
> A. Yes, sir.[78]

---

76 Dan Patrick to Paul Bettencourt, "Subject: Voter ID disabled person exemption explanation," 1 February 2011, TX_00261259.
77 *Peters Deposition*, pp. 289-293.
78 *Ibid.,* p. 217, l. 4-13.

In an email of September 2013, from Robert Bodisch, Assistant Director, Chief of Staff, Texas Homeland Security to  MacGregor Stevenson, Deputy Chief of Staff in the Texas Governor's office, Mr. Bodisch expressed concerns about the impact of the EIC program on DPS resources. Resource constraints, Bodisch wrote, would "Severely degrade our DL [driver's license] mission."[79] Joe Peters testified in his deposition that since the time of the memo those fears had been alleviated, in part because of the low number of EIC applications:

A. Based on our experience since June 26th, I think those fears have been allayed.

Q. And what is the experience since June 26th, 16 you simply mean the rollout of the various mobile EIC units and the DPS offices handling EIC applications?

A. One is the volume of applicants that have applied for volume of people that have applied for EICs.[80]

The following are the documented failures of DPS to take action to facilitate the distribution of EICS, particularly by those who have low incomes and lack of access to vehicles:

* It failed even to consider procedures that would enable Texans to obtain an EIC without presenting a birth certification by allowing the DPS to link up with the Department of Vital Statistics to access birth records.[81]

* It budgeted no funds for publicity and issues only press releases that may or may not be picked up and social media communication that would not be available to those lacking internet access.[82]

* In a series of emails, Tony Rodriguez, the EIC coordinator for DPS, indicated the Department of Public Safety's institutional interest in minimizing the EIC program.

---

79 *Ibid.*, p. 215, l.17-20.
80 *Ibid.*, p. 216, l. 13-20.
81 *Veasey v. Perry*, Deposition of Tony Rodriguez, 8 May 2014, p. 181-182, l. 10-25, l. 1.
82 *Peters Deposition*, p. 85, l. 21-25, p. 86, l. 1-8, p. 269, l. 12-25, p. 270, l. 1-8.

On June 26, 2013, close to the time when DPS first began the EIC program, Rodriguez wrote to DPS regional managers and assistant managers that "Folks, election certificates will be a big deal for the next week to ten days. Expect to be peppered with requests regarding the number of certificates we have issued and if there are any problems with issuance." He then added toward the end of the email, "I will need negative activity reports to feed the machine up here."[83]

The following day, Rodriguez sent an email to his supervisor Joe Peters saying, "Sir, we continue our clean sweep; no EICs issued. We have had a close call on Vantage Park, but the customer opted out and left the office."[84]

On June 27, 2013, in response to an email from a regional DPS manager, Salestus Winkley, which indicated that his employees had zero requests for EICs, Rodriguez responded, "zero is a good number."[85]

In response to a July 5, 2013 email from another DPS manager Tom Carter, Rodriguez wrote, "No inquiries either? This is getting better by the day…."[86]

In response to a September 2013 email from Dallas County requesting the deployment of EIC mobile units to events that might attract large numbers of people, Rodriguez forwarded the memo with the comment, "mission creep." The units were eventually deployed but only over the objections of the official in charge of coordinating the EIC effort. Joe Peters, Rodriguez's supervisor, explains in his deposition:

---

83 *Deposition of Tony Rodriguez*, 8 May 2012, *Ibid*., pp.  112-115; Deposition Exhibit 69.
84 Ibid., p. 136, l. 19-25, p. 137, l. 1-7, Deposition Exhibit 73.
85 *Ibid*;, pp. 125-126, Deposition Exhibit 70.
86 *Ibid*., pp, Deposition Exhibit 71.

Q. So you -- so your testimony is that you understand Mr. Rodriguez's e-mail to reflect that it was a negative development that a county was asking for expanded mobile EIC access; is that correct?

A. Well, yes. …

Q. (BY MR. DUNBAR) Okay. What was the ultimate resolution of Dallas County's request?

A. We sent mobile units to Dallas County.

Q. So Dallas County won over Mr. Rodriguez's objections?

A. Yes.[87]

Rodriguez attempted to explain away each of these emails. However, he cannot circumvent the plain meaning of the words he used and the cumulative impact of four separate emails with similar negative messages about the EIC program. This is not the case of a single inadvertent turn of phrase. In addition, for the "mission creep" email, Rodriguez's explanations are refuted by his own supervisor at DPS, as indicated above. Peters' testimony contradicts Rodriguez's claim that "mission creep" in this context "has no negative connotation whatsoever" in the context of a request for additional deployment of EIC mobile units.[88]

These communications certainly indicate, at a minimum, a desire among DPS officials not to maximize Texans' access to EICs. This is especially telling when all the emails are taken together.

---

[87] *Peters Deposition*, p. 219-221, p, 222, l. 5-9, p. 223, l. 813.
[88] *Rodriguez Deposition*, p. 309, l. 6-9.

As of May 5, about ten and a half months after the onset of the EIC program, Texas had issued a mere 252 EICS, out of 271 applicants.[89] By contrast the state of Pennsylvania, which has many fewer registered voters than Texas, but conducted an extensive campaign of public education and outreach issued 16,700 free voter ID cards in the first year and a quarter after adoption of its new photo ID law. In Mississippi, a much less populous state than Texas, officials had issued more than a thousand free voter ID cards in just some five months. The state distributed more than 1.5 million pieces of literature to educate voters on the new photo ID law and provides transportation assistance and birth certificate verification for those needing free ID cards.[90]

Racial data on applicants compiled by the DPS also shows that African-Americans and Latinos were substantially overrepresented among EIC applicants, whereas whites were substantially underrepresented. As indicated in Table 12, the percentage of African-Americans among EIC applicants is 81 percent higher than the percentage of African-Americans in the Texas citizen voting age population, for a percentage point difference of +15.1 percentage points. The percentage of Latinos among EIC applicants is 29 percent higher than the percentage of Latinos in the Texas citizen voting age population, for a percentage point difference of +7.8 percentage points. The percentage of whites among EIC applicants is 27 percent lower than the percentage of whites in the Texas citizen voting age population, for a percentage point difference of -15.1 percentage points.

---

89 *Ibid.*, p. 285, l. 23.
90 "Pennsylvania Voter ID Law Back in Court: Can it be enforced?" *Christian Science Monitor*, 15 July 2013. Pennsylvania Department of State,
http://www.portal.state.pa.us/portal/server.pt/community/voter_registration_statistics/12725; Jimmie E. Gates, More than 1,000 Voter ID Cards Issued," *The Clarion Ledger*, 26 May 2014,
http://www.clarionledger.com/story/news/2014/05/28/voter-cards-issued/9665649/.

| GROUP | PERCENT AMONG EIC APPLICANTS | PERCENT IN CITIZEN VOTING AGE POPULATION ** | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
|---|---|---|---|---|
| | | | | |
| **WHITES** | 41.3% | 56.4% | 27% LOWER | -15.1% |
| | | | | |
| AFRICAN-AMERICANS | 23.2% | 12.8% | 81% HIGHER | +10.4% |
| | | | | |
| LATINOS | 34.3% | 26.5% | 29% HIGHER | +7.8% |
| | | | | |

**TABLE 12**
**PERCENTAGE OF ELECTION IDENTIFICATION CERTIFICATE (EIC) APPLICANTS BY RACE, TEXAS MAY 2014 ***

Source: * DPS, EIC Dashboard, Rodriguez Deposition, Exhibit 80. ** U.S. Census,

These results are indicative of the finding that the burden of photo identification falls most heavily on African-Americans and Latinos. Although the numbers are small, the differences among the races are statistically significant at the stringent .01 level.

Proponents of SB 14 claimed that its effects will be mitigated because persons 65 years or older will be able to automatically cast an absentee ballot without a photo ID and without providing a reason for voting by mail, which is otherwise required under Texas law. However, this provision also creates a disparate burden on African-Americans and Hispanics as compared to whites. African-Americans and Hispanics are underrepresented among seniors in Texas, whereas whites are overrepresented. According to 2010 U.S. Census data, 19.4 percent of voting age whites are 65 years or older, compared to 8.7 percent of voting age Latinos, and 10.5 percent of voting age African-Americans. (2010 Census, Summary File 2). This represents another

decision by the Texas legislature that favors white and disproportionately burdens African Americans and Latinos who have less opportunity than whites to take advantage of this exception to the absentee voting rules.

Additional statements indicating intentional discrimination are found in Representative Harless's deposition in the DC voter ID case, cited above. She testified that SB 14 would stop non-citizens from voting because "I think you have to answer a question that you're a citizen or provide some type of citizenship paper to get a driver's license" (p. 27, line 15; p. 28, line 6). In fact, non-citizens can obtain driver's licenses (and licenses to carry firearms) in Texas, which suggests that one of the rationales for SB 14 may have been only pretext. Representative Harless additionally testified that she was not interested in obtaining information from Texas agencies about registered voters who lacked proper photo IDs (p. 151, line 22 – p. 153, line 11). Yet such information would bear directly on whether SB 14 discriminated against minorities under Section 5 preclearance, which was still in force until 2013. Representative Harless further asserted privilege and refused to answer whether she conducted or instructed anyone to conduct an analysis of the impact of new voter ID legislation on minority voters.  She also asserted privilege in response to follow-up question "Why not?" (p. 193, lines 5-14).

Outside the legislative debates or litigation, several Republican office holders and activists made the connection between restricting minority voting opportunities and the political fortunes of Republicans. Several of these comments came from Texas members of the U.S. Congress. Congressional Representatives are influential in their state parties and have a deep stake in rules and regulations for elections. During a U.S. House Judiciary hearing in July 2013 on a bill to limit the implementation of federal regulatory actions by allowing third-party

interventions, Texas Republican member of the U.S. Congress Louie Gohmert (an Anglo) objected to an amendment from Democrat Steve Cohen of Tennessee to prevent third-party intervention on matters involving racial discrimination. Gohmert's response compared civil rights for minority Americans with rights for fish, snails, lizards, prairie chickens, and insects:

> There is nobody in this chamber who is more appreciative than I am for the gentleman from Tennessee and my friend from Michigan standing up for the rights of race, religion, national religion of the Delta Smelt, the snail darter, various lizards, the lesser prairie chicken, the greater sage grouts and so many other insects who would want someone standing for their religion, their race, their national origin and I think that's wonderful.[91]

Other Texas Republican Representatives in Congress have yet more explicitly expressed their interest in limiting minority voting. In June 2013, Texas Republican Representative Kenny Marchant (an Anglo), in expressing opposition to overhauling the immigration laws said, "If you give the legal right to vote to 10 Hispanics in my district, seven to eight of them are going to vote Democrat." A day after Marchant's comments were reported, at a national Republican meeting on immigration, another Texas Representative Michael Burgess (Anglo) questioned the wisdom of providing citizenship to "11 million undocumented Democrats." Consistent with these views, a 2012 CCES survey found that 70 percent of white Texas Republicans affirmed that the "the courts should NOT uphold the Voting Rights Act" (emphasis in original).[92]

Another example, this time regarding African-American voting, comes from Ken Emanuelson. Although not a public or party official, he is a leader of the Tea Party with close

---

91 "Rep. Louis Gohmert Likens Minorities' Plight to That of Chickens, Snail Darters," *New York Daily News*, 25 July 2013, http://www.nydailynews.com/news/politics/rep-louie-gohmert-likens-minorities-plight-chickens-snail-darters-article-1.1408909.

92 *Yahoo News*, "Immigration Splits GOP's National House Interests," http://news.yahoo.com/immigration-splits-gops-national-house-interests-194350094.html; *Examiner.com*, "Troubling Comments From Texas Lawmakers Suggest Legislating Racism not far Flung," 7 August 2013, http://www.examiner.com/article/troubling-comments-from-texas-lawmakers-suggest-legislating-racsim-not-far-flung. CCES Survey 2012, http://projects.iq.harvard.edu/cces/data.

ties to the Dallas County Republican Party. In May 2013 he was leading a meeting of Battlefield Dallas County, a group dedicated to turning out Republican voters. John Lawson, Pastor of Children of God Ministry in Dallas, asked Emanuelson, "What are the Republicans doing to get black people to vote?" Emanuelson responded, "Well, I'm going to be real honest with you. The Republican Party doesn't want black people to vote if they're going to vote nine to one for Democrats." After being confronted with this embarrassing and incendiary statement, Emanuelson sought to protect his party by saying later said that this was his personal opinion only and not the official position of the Texas Republican party. [93]

In an August 2013 brief submitted in the Texas redistricting litigation, Texas Attorney General Greg Abbott acknowledged that the dominant Republicans in Texas were willing to knowingly inflict "incidental effects" on minority voting opportunities in pursuit of the goal of achieving partisan advantage for Republicans:

> DOJ's accusations of racial discrimination are baseless. In 2011, both houses of the Texas Legislature were controlled by large Republican majorities, and their redistricting decisions were designed to increase the Republican Party's electoral prospects at the expense of the Democrats. It is perfectly constitutional for a Republican-controlled legislature to make partisan districting decisions, even if there are incidental effects on minority voters who support Democratic candidates.[94]

This is the same rationale held by supporters of the Texas Poll Tax when repeal of the tax was on the ballot in November 1963. According to the *Dallas Express* at the time: "All the power structure [then white Democrats] knew that if we voted out the poll tax this state would have to go liberal; so in order to keep it conservative, they had to keep the poll tax." Scholars

---

93 *Bloomberg News*, "Tea Party Activist: No Thanks for Black Voters Voting Democratic," 4 June 2013, http://go.bloomberg.com/political-capital/2013-06-04/tea-party-activist-no-thanks-for-black-voters-voting-democratic/.
94 DEFENDANTS' RESPONSE TO PLAINTIFFS AND THE UNITED STATES REGARDING SECTION 3(C) OF THE VOTING RIGHTS ACT, *Perez v. Texas*, 26 August 2013, p. 19.

have long known that when Texas first enacted the poll tax in 1901, the tax generally restricted the franchise of poor Texans who might vote Republican or join insurgent movements that challenged the Democratic Party establishment. By the logic of Attorney General Abbott's claim, the disenfranchisement of African-Americans – who were disproportionately poor – under the poll tax was an "incidental effect."[95]

The survey results and the candid remarks of Texas Republican leaders indicate the strategy of the predominantly white Republican Party in Texas. Rather than shifting their approach to court minority voters, the Party is intentionally impeding voting by these groups.

In a remarkable statement, Republican Senator Rand Paul of Kentucky, one of the party's most prominent national conservative leaders, recently warned Texas Republicans that its hostility to minorities is counterproductive and that they will lose their grip on Texas unless they change their approach. Senator Paul, who grew up in Texas and whose father Ron Paul was a long-serving member of the Texas congressional delegation and a candidate for the Republican presidential nomination, said at an early February 2014 dinner held by the Harris County Republican Party, "What I do believe is Texas is going to be a Democrat state within 10 years if we don't change. That means we evolve, it doesn't mean we give up on what we believe in, but it means we have to be a welcoming party." He added, "We won't all agree on it, but I'll tell you, what I will say and what I'll continue to say, and it's not an exact policy prescription … but if

---

95 Dallas Express, "Texas Does Not Want Voter Participation in Government," 23 November 1963, http://dallaslibrary2.org/mbutts/assets/lessons/L9-voting+rights/Marion%20Butts%20-%20Voting%20Rights(PPT).pdf; Donald S. Strong, "The Poll Tax: The Case of Texas," *American Political Science Review*, 38 (August, 1944).

you want to work and you want a job and you want to be part of America, we'll find a place for you."[96]

A week later, Attorney General Abbott, a Republican candidate for governor, signaled his disregard for Paul's warning when he invited rock performer Ted Nugent, notorious for his bigoted anti-minority tirades, to join him as a featured guest on a campaign tour. During the 2012 campaign Nugent said, "If Barack Obama becomes the president in November, I will either be dead or in jail by this time next year," which prompted a visit from Secret Service agents. He called President Obama a "sub-human mongrel" and a "chimpanzee." A candidate like Attorney General Abbott cannot choose those who decide to support him, but he does choose those he decides to campaign with, a decision that is carefully calculated.[97]

It is also important to note that Attorney General Abbott was a key player in SB 14's implementation:  immediately after the Supreme Court struck down the preclearance requirements of Section 5, Abbott declared that the photo ID law was in effect, even though the DC Court had found that the law discriminated against minorities. In contrast, when it came to redistricting, he urged the legislature to adopt the interim plans drawn by a three-judge court in San Antonio that fixed some of the defects found by the DC Court in the redistricting plans.[98]

---

96 *Politico*, "Rand Paul Warns Texas Could Turn Blue," 9 February 2014
http://www.politico.com/story/2014/02/rand-paul-texas-could-turn-blue-103292.html.
97 ABC News, "Ted Nugent Rocks Texas Campaign for GOP's Greg Abbott,"  18 Feb. 2014,
http://abcnews.go.com/blogs/politics/2014/02/ted-nugent-rocks-texas-campaign-for-gops-greg-abbott/; *New York Daily News,* "Crowd Protests Nugent Concert," 6 Aug. 2013; http://www.nydailynews.com/news/national/ted-nugent-protesters-target-new-haven-club-article-1.1419543; *Examiner.Com*, "Ted Nugent: 'Democratic Slave Drivers' Dishonoring Martin Luther King," 16 January 2014, http://www.examiner.com/article/ted-nugent-democratic-slave-drivers-dishonoring-martin-luther-king;*Hannity & Colmes* via Nexis, 10/13/08.
http://trailblazersblog.dallasnews.com/2014/02/agriculture-commissioner-candidate-stands-by-ted-nugent.html/
98 Todd J. Gillman, "Texas voter ID law "will take effect immediately," says Attorney General Greg Abbott,"
*Dallas Morning News*, 25 June 2013, http://trailblazersblog.dallasnews.com/2013/06/texas-voter-id-law-could-start-now-attorney-general-greg-abbott.html/; Paricia Kilday Hart, "Abbott's redistricting advice has lawmakers nervous," *Houston Chronicle*, 15 June 2013, http://www.houstonchronicle.com/news/kilday-hart/article/Abbott-s-redistricting-advice-has-lawmakers-4602773.php.

Abbott is not the only Texas Republican leader to associate himself closely with Ted Nugent. Sid Miller, a former Republican member of the Texas House, the head of the House Republican Caucus and a co-sponsor of the Texas the 2011 photo voter identification legislation, made Nugent the Treasurer of his campaign for Agriculture Commissioner.[99] Thus, key members of the Texas Republican Party – and key players in SB 14's enactment and implementation – have publicly associated with openly racist individuals.

**Conclusions**

Texas has a long and ongoing history of discrimination that has impeded the voting opportunities of African-Americans and Latinos in the state. The sequence of events leading to the adoption of SB 14 is consistent with this history: the bill's discriminatory impact on African-Americans and Latinos, and the actions and statements of Republican leadership behind the legislation, all point to discriminatory intent in the adoption of this law. The Texas Republican sponsors of the 2011 voter photo identification law could easily have done what they falsely claimed to have done: modeled a bill on the 2005 Indiana legislation with "very, very, small change." Instead, they crafted a bill that was fundamentally different from the Indiana law in many ways, all of which placed disparate burdens on African-Americans and Latinos. These differences with the Indiana law include the following:

* A limitation of the expiration date for photo ID from "after the last general election" to just 60 days.

---

99 *Dallas Morning News*, "Agriculture Commissioner Candidate Stands by Ted Nugent," 19 February 2014, http://trailblazersblog.dallasnews.com/2014/02/agriculture-commissioner-candidate-stands-by-ted-nugent.html/; *Project Vote Smart*, Sid Miller, http://votesmart.org/candidate/49720/sid-miller?categoryId=&type=V,S,R,E,F,P&p=3#.Uw31t_ldVSI.

* Authorization of concealed carry permits, but not government employee or student identification.

* No exemptions from photo ID requirements for indigent voters.

* A Reduction from 10 to 6 days the period for a provisional voter to present a valid photo identification.

* No validation of provisional ballots by signing an affidavit of indigency.

* No acceptance of federal government IDs beyond those specified.

In addition, Texas did not make any accommodations for other circumstances that would have a disparate impact, such as greater distances in Texas than Indiana for voters to travel to a registrar's office to present an ID or to a DPS office to obtain a free voter identification card, More than a million drivers in Texas have had their licenses suspended because of surcharges levied under the Driver's Responsibility Program. The surcharges are heavily concentrated in overwhelmingly minority areas of Texas.

The Texas law also differed substantially from the Georgia law that proponents had cited in support of SB 14 – and in nearly every respect these differences skewed towards greater strictness. It differed so much from the Georgia statute that the Deputy Counsel in the Lieutenant Governor's Office recommended scrapping SB 14 in favor of the Georgia law in order to gain preclearance from the U.S. Department of Justice. That recommendation was ignored.

The decisions made by the Texas Republican leadership in 2011 also crafted a law that was more stringent than the laws in any other states and more stringent than the leadership's own bills that they had presented in the legislative sessions of 2005, 2007, and 2009. Additionally significant is the deficient and reluctant administration by the Department of Public Safety of the

71

program for issuing Election Identification Certificates. In addition, there are the direct statements of Republican leaders in Texas indicating their partisan interest in limiting voter opportunities for African-Americans and Hispanics. Also, the same legislature that enacted the 2011 photo voter ID bill also enacted redistricting plans that according to the substantive findings of a three-judge court intentionally discriminated against minority voters.

Thus, strong circumstantial and direct evidence all points in the same direction. The weight of evidence indicates that, facing a declining white political base, Texas's Republican leaders have sought intentionally to maintain their political fortunes by following a strategy of discrimination.

## Curriculum Vitae

Allan J. Lichtman
9219 Villa Dr.
Bethesda, MD 20817

(240) 498-8738 h
(202) 885-2411 o

Updated February 2014

**EDUCATION**

BA, Brandeis University, Phi Beta Kappa, Magna Cum Laude, 1967

PhD, Harvard University, Graduate Prize Fellow, 1973

**PROFESSIONAL EXPERIENCE**

Teaching Fellow, American History, Harvard University, 1969-73

Instructor, Brandeis University, 1970, quantitative history.

Assistant Professor of History, American University, 1973-1977

Associate Professor of History, American University, 1977-1978

Professor of History, American University, 1979 –

Distinguished Professor, 2011 -

**Expert witness in more than 80 redistricting, voting rights and civil rights cases (see Table of Cases attached)**

Associate Dean for Faculty and Curricular Development, College of Arts & Sciences, The American University 1985-1987

Chair, Department of History, American University, 1997- 2001

Regular political analyst for CNN Headline News, 2003-2006

**HONORS AND AWARDS**

Outstanding Teacher, College of Arts and Sciences, 1975-76

Outstanding Scholar, College of Arts and Sciences, 1978-79

Outstanding Scholar, The American University, 1982-83

Outstanding Scholar/Teacher, The American University, 1992-93 (Highest University faculty award)

Sherman Fairchild Distinguished Visiting Scholar, California Institute of Technology, 1980-81

American University summer research grant, 1978 & 1982

Chamber of Commerce, Outstanding Young Men of America 1979-80

Graduate Student Council, American University, Faculty Award, 1982

Top Speaker Award, National Convention of the International Platform Association, 1983, 1984, 1987

National Age Group Champion (30-34) 3000 meter steeplechase 1979

Eastern Region Age Group Champion (30-34) 1500 meter run 1979

Defeated twenty opponents on nationally syndicated quiz show, TIC TAC DOUGH, 1981

 Listing in Marquis, WHO'S WHO IN THE AMERICA AND WHO'S WHO IN THE WORLD

McDonnell Foundation, Prediction of Complex Systems ($50,000, three years), 2003-2005

Organization of American Historians, Distinguished Lecturer, 2004 -

Selected by the Teaching Company as one of America's Super Star Teachers."

Associate Editor, International Journal of Operations Research and Information Systems, 2008 -

Keynote Speaker, International Forecasting Summit, 2007 and 2008

Cited authoritatively by United States Supreme Court in statewide Texas Congressional redistricting case *LULAC v. Perry* (2006)

Finalist for the 2008 National Book Critics Circle Award in general nonfiction for WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT.

Interviews nominated by the Associated Press for the Edward R. Murrow Award for

broadcasting excellence.

Elected Member, PEN American Center, 2009

Appointed Distinguished Professor, 2011

FDR AND THE JEWS designated for Belknap Imprint of the Harvard University Press, reserved for works of special distinction and lasting value; *New York Times* editors choice book for 2013, submitted for Pulitzer Prize 2013 (finalist announced in April 2014), winner of Tikkun Olam Award for Holocaust Studies, winner of National Jewish Book Award in American Jewish Studies, finalist for Los Angeles Times Book Award in History (winner announced in April 2014).

## SCHOLARSHIP

A. Books

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Chapel Hill: University of North Carolina Press, 1979)

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Lanham, MD: Lexington Books, 2000), reprint of 1979 edition with new introduction.

HISTORIANS AND THE LIVING PAST: THE THEORY AND PRACTICE OF HISTORICAL STUDY (Arlington Heights, Ill.: Harlan Davidson, Inc., 1978, with Valerie French)

ECOLOGICAL INFERENCE (Sage Series in Quantitative Applications in the Social Sciences, 1978, with Laura Irwin Langbein)

YOUR FAMILY HISTORY: HOW TO USE ORAL HISTORY, PERSONAL FAMILY ARCHIVES, AND PUBLIC DOCUMENTS TO DISCOVER YOUR HERITAGE (New York: Random House, 1978)

KIN AND COMMUNITIES: FAMILIES IN AMERICA (edited, Washington, D. C.: Smithsonian Press, 1979, , with Joan Challinor)

THE THIRTEEN KEYS TO THE PRESIDENCY (Lanham: Madison Books, 1990, with Ken DeCell)

THE KEYS TO THE WHITE HOUSE, 1996 EDITION (Lanham: Madison Books, 1996)

THE KEYS TO THE WHITE HOUSE, (Lanham: Lexington Books Edition, 2000)

THE KEYS TO THE WHITE HOUSE, POST-2004 EDITION (Lanham: Lexington Books

Edition, 2005)

THE KEYS TO THE WHITE HOUSE, 2008 EDITION (Lanham: Rowman & Littlefield, 2008)

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT (New York: Grove/Atlantic Press, 2008)

THE KEYS TO THE WHITE HOUSE, 2012 EDITION (2012, Lanham: Rowman & Littlefield)

FDR AND THE JEWS, (Cambridge: Harvard University Press, Belknap Imprint, 2013, with Richard Breitman).


Monograph:

"Report on the Racial Impact of the Rejection of Ballots Cast in the 2000 Presidential Election in the State of Florida," and "Supplemental Report," in VOTING IRREGULARITIES IN FLORIDA DURING THE 2000 PRESIDENTIAL ELECTION, United States Commission on Civil Rights, June 2001


B. Scholarly Articles

"The Federal Assault Against Voting Discrimination in the Deep South, 1957-1967," JOURNAL OF NEGRO HISTORY (Oct. 1969) REF

"Executive Enforcement of Voting Rights, 1957-60," in Terrence Goggin and John Seidel, eds., POLITICS AMERICAN STYLE (1971)

"Correlation, Regression, and the Ecological Fallacy: A Critique," JOURNAL OF INTERDISCIPLINARY HISTORY (Winter 1974) REF

"Critical Election Theory and the Reality of American Presidential Politics, 1916-1940," AMERICAN HISTORICAL REVIEW (April 1976) REF

"Across the Great Divide: Inferring Individual Behavior From Aggregate Data," POLITICAL METHODOLOGY (with Laura Irwin, Fall 1976) REF

"Regression vs. Homogeneous Units: A Specification Analysis," SOCIAL SCIENCE HISTORY (Winter 1978) REF

"Language Games, Social Science, and Public Policy: The Case of the Family," in Harold Wallach, ed., APPROACHES TO CHILD AND FAMILY POLICY (Washington, D. C.:

American Association for the Advancement of Science, 1981)

"Pattern Recognition Applied to Presidential Elections in the United States, 1860-1980: The Role of Integral Social, Economic, and Political Traits," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCE (with V. I. Keilis-Borok, November 1981) REF

"The End of Realignment Theory? Toward a New Research Program for American Political History," HISTORICAL METHODS (Fall 1982)

"Kinship and Family in American History," in National Council for Social Studies Bulletin, UNITED STATES HISTORY IN THE 1980s (1982)

"Modeling the Past: The Specification of Functional Form," JOURNAL OF INTERDISCIPLINARY HISTORY (with Ivy Broder, Winter 1983) REF

"Political Realignment and `Ethnocultural` Voting in Late Nineteenth Century America," JOURNAL OF SOCIAL HISTORY (March 1983) REF

"The `New Political History:`Some Statistical Questions Answered," SOCIAL SCIENCE HISTORY (with J. Morgan Kousser, August 1983) REF

"Personal Family History: A Bridge to the Past," PROLOGUE (Spring 1984)

"Geography as Destiny," REVIEWS IN AMERICAN HISTORY (September 1985)

"Civil Rights Law: High Court Decision on Voting Act Helps to Remove Minority Barriers," NATIONAL LAW JOURNAL (with Gerald Hebert, November 10, 1986).

"Tommy The Cork: The Secret World of Washington`s First Modern Lobbyist," WASHINGTON MONTHLY (February 1987).

"Discriminatory Election Systems and the Political Cohesion Doctrine," NATIONAL LAW JOURNAL (with Gerald Hebert, Oct. 5, 1987)

"Aggregate-Level Analysis of American Midterm Senatorial Election Results, 1974-1986," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES (Dec. 1989, with Volodia Keilis-Borok) REF

"Black/White Voter Registration Disparities in Mississippi: Legal and Methodological Issues in Challenging Bureau of Census Data," JOURNAL OF LAW AND POLITICS (Spring, 1991, with Samuel Issacharoff) REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," NATIONAL BLACK LAW JOURNAL (1991)

"Passing the Test: Ecological Regression in the Los Angeles County Case and Beyond," EVALUATION REVIEW (December 1991) REF

Understanding and Prediction of Large Unstable Systems in the Absence of Basic Equations," PROCEEDINGS OF THE INTERNATIONAL SYMPOSIUM ON CONCEPTUAL TOOLS FOR UNDERSTANDING NATURE (with V. I. Keilis-Borok, Trieste, Italy, 1991).

"The Self-Organization of American Society in Presidential and Senatorial Elections," in Yu. Krautsov, ed., THE LIMITS OF PREDICTABILITY (with V.I. Keilis-Borok, Nauka, Moscow, 1992).

"'They Endured:' The Democratic Party in the 1920s," in Ira Foreman, ed., DEMOCRATS AND THE AMERICAN IDEA: A BICENTENNIAL APPRAISAL (1992).

"A General Theory of Vote Dilution," LA RAZA (with Gerald Hebert) 6 (1993). REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," JOURNAL OF LITIGATION (December 1993, with Samuel Issacharoff)

"The Keys to the White House: Who Will be the Next American President?," SOCIAL EDUCATION  60 (1996)

"The Rise of Big Government: Not As Simple As It Seems," REVIEWS IN AMERICAN HISTORY 26 (1998)

"The Keys to Election 2000," SOCIAL EDUCATION (Nov/Dec. 1999)

"The Keys to the White House 2000," NATIONAL FORUM (Winter 2000)

"Report on the Implications for Minority Voter Opportunities if Corrected census Data Had Been Used for the Post-1990 Redistricting: States With The Largest Numerical Undercount," UNITED STATES CENSUS MONITORING BOARD, January 2001

 "What Really Happened in Florida's 2000 Presidential Election," JOURNAL OF LEGAL STUDIES (January 2003) REF

"The Keys to Election 2004," SOCIAL EDUCATION (January 2004)

"History: Social Science Applications," ENCYCLOPEDIA OF SOCIAL MEASUREMENT (Elseveir, 2006)

"The Keys to the White House: Forecast for 2008," SPECIAL FEATURE, *FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 3 (February 2006), 5-9 with

response: J. Scott Armstrong and Alfred G. Cuzan, "Index Methods for Forecasting: An Application to the American Presidential Elections."

"The Keys to the White House: Updated Forecast for 2008," *FORESIGHT; THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 7 (Fall 2007)

"The Keys to the White House: Prediction for 2008," SOCIAL EDUCATION (January 2008)

"The Keys to the White House: An Index Forecast for 2008," INTERNATIONAL JOURNAL OF FORECASTING 4 (April-June 2008) REF

"The Updated Version of the Keys," SOCIAL EDUCATION (October 2008)

"Extreme Events in Socio-Economic and Political Complex Systems, Predictability of," ENCYCLOPEDIA OF COMPLEXITY AND SYSTEMS SCIENCE (Springer, 2009, with Vladimir Keilis-Borok & Alexandre Soloviev)

"The Keys to the White House:  A Preliminary Forecast for 2012" INTERNATIONAL JOURNAL OF INFORMATION SYSTEMS & SOCIAL CHANGE (Jan.-March 2010) REF

 "The Keys to the White House:  Forecast for 2012," <u>FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING</u> (Summer 2010)

"The Keys to the White House: Prediction for 2012," SOCIAL EDUCATION (March 2012)

 "The Alternative-Justification Affirmative: A New Case Form," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Charles Garvin and Jerome Corsi, Fall 1973) REF

"The Alternative-Justification Case Revisited: A Critique of Goodnight, Balthrop and Parsons, `The Substance of Inherency,`" JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Jerome Corsi, Spring 1975) REF

"A General Theory of the Counterplan," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1975) REF

"The Logic of Policy Dispute," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Spring 1980) REF

"Policy Dispute and Paradigm Evaluation," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1982) REF

"New Paradigms For Academic Debate," JOURNAL OF THE AMERICAN FORENSIC

ASSOCIATION (Fall 1985) REF

"Competing Models of the Debate Process," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Winter 1986) REF

"The Role of the Criteria Case in the Conceptual Framework of Academic Debate," in Donald Terry, ed., MODERN DEBATE CASE TECHNIQUES (with Daniel Rohrer, 1970)

"Decision Rules for Policy Debate," and "Debate as a Comparison of Policy Systems," in Robert 2, ed., THE NEW DEBATE: READINGS IN CONTEMPORARY DEBATE THEORY (with Daniel Rohrer, 1975)

"A Systems Approach to Presumption and Burden of Proof;" "The Role of Empirical Evidence in Debate;" and "A General Theory of the Counterplan," in David Thomas, ed., ADVANCED DEBATE: READINGS IN THEORY, PRACTICE, AND TEACHING (with Daniel Rohrer, 1975)

"Decision Rules in Policy Debate;" "The Debate Resolution;" "Affirmative Case Approaches;" "A General Theory of the Counterplan;" "The Role of Empirical Evidence in Debate;" and "Policy Systems Analysis in Debate," in David Thomas, ed., ADVANCED DEBATE (revised edition, with Daniel Rohrer and Jerome Corsi, 1979)

C. Selected Popular Articles

"Presidency By The Book," POLITICS TODAY (November 1979) Reprinted:
LOS ANGELES TIMES

"The Grand Old Ploys," NEW YORK TIMES
Op Ed (July 18, 1980)

"The New Prohibitionism," THE CHRISTIAN CENTURY (October 29, 1980)

"Which Party Really Wants to `Get Government Off Our Backs`?" CHRISTIAN SCIENCE MONITOR Opinion Page (December 2, 1980)

"Do Americans Really Want `Coolidge Prosperity` Again?" CHRISTIAN SCIENCE MONITOR Opinion Page (August 19, 1981)

"Chipping Away at Civil Rights," CHRISTIAN SCIENCE MONITOR Opinion Page (February 17, 1982)

"How to Bet in 1984.  A Presidential Election Guide," WASHINGTONIAN MAGAZINE (April 1982) Reprinted: THE CHICAGO TRIBUNE

"The Mirage of Efficiency," CHRISTIAN SCIENCE MONITOR Opinion Page (October 6, 1982)

"For RIFs, It Should Be RIP," LOS ANGELES TIMES Opinion Page (January 25, 1983)

"The Patronage Monster, Con`t." WASHINGTON POST Free For All Page (March 16, 1983)

"A Strong Rights Unit," NEW YORK TIMES Op Ed Page (June 19, 1983)

"Abusing the Public Till," LOS ANGELES TIMES Opinion Page (July 26, 1983)

The First Gender Gap," CHRISTIAN SCIENCE MONITOR Opinion Page (August 16, 1983)

"Is Reagan A Sure Thing?" FT. LAUDERDALE NEWS Outlook Section (February 5, 1984)

"The Keys to the American Presidency: Predicting the Next Election," TALENT (Summer 1984)

"GOP: Winning the Political Battle for `88," CHRISTIAN SCIENCE MONITOR, Opinion Page, (December 27, 1984)

"The Return of `Benign Neglect`," WASHINGTON POST, Free For All, (May 25, 1985)

"Selma Revisited: A Quiet Revolution," CHRISTIAN SCIENCE MONITOR, Opinion Page, (April 1, 1986)

"Democrats Take Over the Senate" THE WASHINGTONIAN (November 1986; article by Ken DeCell on Lichtman`s advance predictions that the Democrats would recapture the Senate in 1986)

"Welcome War?" THE BALTIMORE EVENING SUN, Opinion Page, (July 15, 1987)

"How to Bet in 1988," WASHINGTONIAN (May 1988; advance prediction of George Bush's 1988 victory)

"President Bill?," WASHINGTONIAN (October 1992; advance prediction of Bill Clinton's 1992 victory)

"Don't be Talked Out of Boldness," CHRISTIAN SCIENCE MONITOR, Opinion Page (with Jesse Jackson, November 9, 1992)

"Defending the Second Reconstruction," CHRISTIAN SCIENCE MONITOR, Opinion Page (April 8, 1994)

"Quotas Aren't The Issue," NEW YORK TIMES, Op Ed Page (December 7, 1994)

"History According to Newt," WASHINGTON MONTHLY (May, 1995)

"A Ballot on Democracy," WASHINGTON POST Op Ed (November 1, 1998)

"The Theory of Counting Heads vs. One, Two, Three," CHRISTIAN SCIENCE MONITOR Op Ed (June 22, 1999)

"Race Was Big Factor in Ballot Rejection, BALTIMORE SUN Op Ed (March 5, 2002)

"Why is George Bush President?" NATIONAL CATHOLIC REPORTER (Dec. 19, 2003)

"In Plain Sight: With the Public Distracted, George W. Bush is Building a Big Government of the Right," NEWSDAY, (August 7, 2005)

"Why Obama is Colorblind and McCain is Ageless," JEWISH DAILY FORWARD (June 26, 2008)

"Splintered Conservatives McCain," POLITICO ( June 24, 2008)

"Will Obama be a Smith or a Kennedy," NATIONAL CATHOLIC REPOTER (October 17, 2008)

"What Obama Should Do Now," POLITICO (Jan. 22, 2010)

Bi-weekly column, THE MONTGOMERY JOURNAL, GAZETTE 1990 - 2013

Election-year column, REUTERS NEWS SERVICE 1996 & 2000

D. Video Publication

"Great American Presidents," The Teaching Company, 2000.


**TEACHING**

Ongoing Courses

The History of the U. S. I & II, The Emergence of Modern America, The U. S. in the Twentieth

Century, United States Economic History, Historiography, Major Seminar in History, Graduate Research Seminar, Colloquium in U. S. History Since 1865, The American Dream, The Urban-Technological Era, Senior Seminar in American Studies, Seminar in Human Communication.

New Courses: Taught for the first time at The American University

Quantification in History, Women in Twentieth Century American Politics, Women in Twentieth Century America, Historians and the Living Past (a course designed to introduce students to the excitement and relevance of historical study), **Historians and the Living Past for Honors Students**, How to Think: Critical Analysis in the Social Sciences, Pivotal Years of American Politics, **Government and the Citizen (Honors Program),** Introduction to Historical Quantification, Public Policy in U. S. History, **Honors Seminar in U.S. Presidential Elections**, America's Presidential Elections, What Is America?, **Honors Seminar on FDR, Jews, and the Holocaust**.


**TELEVISION APPEARANCES**

More than 1,000 instances of political commentary on NBC, CBS, ABC, CNN, C-SPAN, FOX, MSNBC, BBC, CBC, CTV, NPR, VOA, and numerous other broadcasting outlets internationally, including Japanese, Russian, Chinese, German, French, Irish, Austrian, Australian, Russian, Swedish, Danish, Dutch, and Middle Eastern television.

Regular political commentary for NBC News Nightside.

Regular political commentary for Voice of America and USIA.

Regular political commentary for America's Talking Cable Network.

Regular political commentary for the Canadian Broadcasting System.

Regular political commentary for CNN, Headline News

Consultant and on-air commentator for NBC special productions video project on the history of the American presidency.

CBS New Consultant, 1998 and 1999

Featured appearances on several History Channel specials including *The Nuclear Football* and *The President's Book of Secrets*.

**RADIO SHOWS**

I have participated in more than 2000 radio interview and talk shows broadcast nationwide, in foreign nations, and in cities such as Washington, D. C., New York, Atlanta, Chicago, Los Angeles and Detroit. My appearances include the Voice of America, National Public Radio, and well as all major commercial radio networks.

**PRESS CITATIONS**

I have been cited many hundreds of times on public affairs in the leading newspapers and magazines worldwide. These include, among many others,

*New York Times, Washington Post, USA Today, Los Angeles Times, Wall Street Journal, Miami Herald, Washington Times, St. Louis Post Dispatch, Christian Science Monitor, Philadelphia Inquirer, Time, Newsweek, Business  Week, Le Monde, Globe and Mail, Yomuiri Shimbun, Die Welt, El Mundo, and South China Post,* among others.

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: UNITED STATES**

Invited participant and speaker, Bostick Conference on Fogel and Engerman`s TIME ON THE CROSS, University of South Carolina, November 1-2, 1974

"Critical Election Theory and the Presidential Election of 1928," Annual Meeting of the American Historical Association, December 1974

"A Psychological Model of American Nativism," Bloomsberg State Historical Conference, April 1975

"Methodology for Aggregating Data in Education Research," National Institute of Education, Symposium on Methodology, July 1975, with Laura Irwin

Featured Speaker, The Joint Washington State Bicentennial Conference on Family History, October 1975

Featured Speaker, The Santa Barbara Conference on Family History, May 1976

Chair, The Smithsonian Institution and the American University Conference on Techniques for Studying Historical and Contemporary Families, June 1976

Panel Chair, Sixth International Smithsonian Symposium on Kin and Communities in America, June 1977

84

"The uses of History for Policy Analysis," invited lecture, Federal Interagency Panel on Early Childhood Research, October 1977

Invited participant, Conference on "Child Development within the Family - Evolving New Research Approaches," Interagency Panel of the Federal Government for Research and Development on Adolescence, June 1978

Commentator on papers in argumentation, Annual Meeting of the Speech Communication Association, November 1978

Commentator on papers on family policy, Annual Meeting of the American Association for the Advancement of Science, Jan. 1979

"Phenomenology, History, and Social Science," Graduate Colloquium of the Department of Philosophy," The American University, March 1979

"Comparing Tests for Aggregation Bias: Party Realignments of the 1930`s," Annual Meeting of the Midwest Political Science Association March 1979, with Laura Irwin Langbein

"Party Loyalty and Progressive Politics: Quantitative Analysis of the Vote for President in 1912," Annual Meeting of the Organization of American Historians, April 1979, with Jack Lord II

"Policy Systems Debate: A Reaffirmation," Annual Meeting of the Speech Communication Association, November 1979

"Personal Family History: Toward a Unified Approach," Invited Paper, World Conference on Records, Salt Lake City, August 1980

"Crisis at the Archives: The Acquisition, Preservation, and Dissemination of Public Documents," Annual Meeting of the Speech Communication Association, November 1980

"Recruitment, Conversion, and Political Realignment in America: 1888- 1940," Social Science Seminar, California Institute of Technology, April 1980

"Toward a Situational Logic of American Presidential Elections," Annual Meeting of the Speech Communication Association, November 1981

"Political Realignment in American History," Annual Meeting of the Social Science History Association, October 1981

"Critical Elections in Historical Perspective: the 1890s and the 1930s," Annual Meeting of the Social Science History Association, November 1982

Commentator for Papers on the use of Census data for historical research, Annual Meeting of the Organization of American Historians, April 1983

"Thirteen Keys to the Presidency: How to Predict the Next Election," Featured Presentation, Annual Conference of the International Platform Association, August 1983, Received a Top Speaker Award

"Paradigms for Academic Debate," Annual Meeting of the Speech Communication Association, November 1983

Local Arrangements Chair, Annual Convention of the Social Science History Association, October 1983

"Forecasting the Next Election," Featured Speaker, Annual Convention of the American Feed Manufacturers Association, May 1984

Featured Speaker, "The Ferraro Nomination," Annual Convention of The International Platform Association, August 1984, Top Speaker Award

"Forecasting the 1984 Election," Annual Convention of the Social Science History Association Oct. 1984,

Featured Speaker, "The Keys to the Presidency," Meeting of Women in Government Relations October 1984

Featured Speaker, "The Presidential Election of 1988," Convention of the American Association of Political Consultants, December 1986

Featured Speaker, "The Presidential Election of 1988," Convention of the Senior Executive Service of the United States, July 1987

Commentary on Papers on Voting Rights, Annual Meeting of the American Political Science Association, September 1987.

Commentary on Papers on Ecological Inference, Annual Meeting of the Social Science History Association, November 1987.

Featured Speaker: "Expert Witnesses in Federal Voting Rights Cases," National Conference on Voting Rights, November 1987.

Featured Speaker: "The Quantitative Analysis of Electoral Data," NAACP National Conference on Voting Rights and School Desegregation, July 1988.

Panel Chair, "Quantitative Analysis of the New Deal Realignment," Annual Meeting of the

Social Science History Association, Nov. 1989.

Keynote Speaker, Convocation of Lake Forest College, Nov. 1989.

Featured Speaker, The American University-Smithsonian Institution Conference on the Voting Rights Act, April 1990

Panel Speaker, Voting Rights Conference of the Lawyer's Committee for Civil Rights Under Law, April 1990

Panel Speaker, Voting Rights Conference of the NAACP, July 1990

Panel Speaker, Voting Rights Conference of Stetson University, April 1991

Panel Chair, Annual Meeting of the Organization of American Historians, April, 1992

Panel Speaker, Symposium on "Lessons from 200 Years of Democratic Party History, Center for National Policy, May 1992

Olin Memorial Lecture, U.S. Naval Academy, October 1992

Commentator, Annual Meeting of the Organization of American Historians, April, 1993

Panel presentation, Conference on Indian Law, National Bar Association, April 1993

Feature Presentation, Black Political Science Association, Norfolk State University, June 1993

Feature Presentation, Southern Regional Council Conference, Atlanta Georgia, November, 1994

Master of Ceremonies and Speaker, State of the County Brunch, Montgomery County, February, 1996

Feature Presentation, Predicting The Next Presidential Election, Freedom's Foundation Seminar on the American Presidency, August 1996

Feature Presentation, Predicting The Next Presidential Election, Salisbury State College, October 1996

Feature Presentation on the Keys to the White House, Dirksen Center, Peoria, Illinois, August, 2000

Feature Presentation on American Political History, Regional Conference of the Organization of American Historians, August 2000

Testimony Presented Before the United States Commission on Civil Rights Regarding Voting Systems and Voting Rights, January 2001

Testimony Presented Before the United States House of Representatives, Judiciary Committee, Subcommittee on the Constitution, February 2001

Testimony Presented Before the United States Senate, Government Operations Committee, Regarding Racial Differentials in Ballot Rejection Rates in the Florida Presidential Election, June 2001

Testimony Presented Before the Texas State Senate Redistricting Committee, Congressional Redistricting, July 2003

Testimony Presented Before the Texas State House Redistricting Committee, Congressional Redistricting, July 2003

American University Honors Program Tea Talk on the Election, September 2004

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, June 2006.

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, New York, June 2007.

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia, 2007-2008

Feature Presentation, Forecasting 2008, Annual Meeting of the American Political Science Association, Chicago, August 2007

Keynote Speaker, International Forecasting Summit, Orlando, Florida, February 2008.

Feature Presentation on the Keys to the White House, Senior Executive's Service, Washington, DC, June 2008

Feature Presentation, American Political History, Rockford Illinois School District, July 2008

American University Honors Program Tea Talk on the Election, September 2008

Featured Lecture, Keys to the White House, American Association for the Advancement of Science, Washington, DC, September 2008

Keynote Speaker, International Forecasting Summit, Boston, September 2008

Keynote Lecture, Hubert Humphrey Fellows, Arlington, Virginia October 2008

Featured Lectures, Keys to the White, Oklahoma Central and East Central Universities, October 2008

Bishop C. C. McCabe Lecture, "Seven Days until Tomorrow" American University, October 28, 2008

Featured Lecture, WHITE PROTESTANT NATION, Eisenhower Institute, December 2008

American University Faculty on the Road Lecture, **"Election 2008: What Happened and Why?" Boston, February 2009**

Critic Meets Author Session on WHITE PROTESTANT NATION, Social Science History Association, November 2009

American University Faculty on the Road Lecture, **"The Keys for 2012" Chicago, April 2010**

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia October, 2010, 2011

Panel Participant, Search for Common Ground, Washington, DC, April 2011

Presentation, The Keys to the White House, International Symposium on Forecasting, June 2012

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: INTERNATIONAL**

Featured Speaker, World Conference on Disarmament, Moscow, Russia, November 1986

Delegation Head, Delegation of Washington Area Scholars to Taiwan, Presented Paper on the promotion of democracy based on the American experience, July 1993

Lecture Series, American History, Doshisha University, Kyoto, Japan, December 2000

Lectures and Political Consultation, Nairobi, Kenya, for RFK Memorial Institute, October 2002

Featured Lectures, US Department of State, Scotland and England, including Oxford University, University of Edinburg, and Chatham House, June 2004

Keynote Speech, American University in Cairo, October 2004

Feature Presentation on the Keys to the White House, University of Munich, June 2008

Featured Lectures, US Department of State, Russia, Ukraine, Slovenia, Austria, and Romania, 2008-2010

89

Paper Presentation, Fourth International Conference on Interdisciplinary Social Science, Athens, Greece, July 2009

Featured Lectures, US Department of State, India, Korea, and Belgium 2012

Panel Speaker, Economic Forun, Krynica, Poland, 2013

## DEPARTMENTAL AND UNIVERSITY SERVICE

Department of History Council 1973 -

Undergraduate Committee, Department of History 1973-1977

Chair Undergraduate Committee, Department of History 1984-1985

Graduate Committee, Department of History, 1978-1984

Freshman Advisor, 1973-1979

First Year Module in Human Communications, 1977-1979

University Committee on Fellowships and Awards 1976-1978

University Senate 1978-1979, 1984-1985

University Senate Parliamentarian and Executive Board 1978-1979

Founding Director, American University Honors Program, 1977-1979

Chair, College of Arts and Sciences Budget Committee 1977-1978, 1982-1984

University Grievance Committee, 1984-1985

Member, University Honors Committee 1981-1982

College of Arts and Sciences Curriculum Committee 1981-1982

Jewish Studies Advisory Board, 1982-1984

Mellon Grant Executive Board, College of Arts & Sciences, 1982-1983

Chair, College of Arts and Sciences Faculty Colloquium, 1983

Chair, College of Arts and Sciences Task Force on the Department

of Performing Arts, 1984-1985

Local Arrangements Chair, National Convention of the Social
Science History Association, 1983

Chair, Rank & Tenure Committee of the Department of History,
1981-1982, 1984-1985

Board Member, Center for Congressional and Presidential Studies, The American University,
1988-1989

Chair, Graduate Committee, Department of History, 1989 - 1991

Chair, Distinguished Professor Search Committee 1991

Member, College of Arts & Sciences Associate Dean Search Committee, 1991

Board Member, The American University Press, 1991-1995

Chair, Subcommittee on Demographic Change, The American University Committee on Middle
States Accreditation Review 1992-1994

Member, Dean's Committee on Curriculum Change, College of Arts and Sciences 1992-1993

Member, Dean's Committee on Teaching, College of Arts and Sciences 1992

Co-Chair, Department of History Graduate Committee, 1994-1995

Vice-Chair, College of Arts & Sciences Educational Policy Committee, 1994-1995

Elected Member, University Provost Search Committee, 1995-1996

Chair, Search Committee for British and European Historian, Department of History, 1996

Department Chair, 1999-2001

CAS Research Committee, 2006-2007

University Budget and Benefits Committee, 2008

Chair, Personnel Committee, Department of History, 2010-11, 2012-13

Chair, Term Faculty Search Committee, Department of History, 2011

**OTHER POSITIONS**

Director of Forensics, Brandeis University, 1968-71

Director of Forensics, Harvard University, 1971-72

Chair, New York-New England Debate Committee, 1970-71

Historical consultant to the Kin and Communities Program of the Smithsonian Institution 1974-1979

Along with general advisory duties, this position has involved the following activities:

    1. Directing a national conference on techniques for studying historical and contemporary families held at the Smithsonian in June 1976.
    2. Chairing a public session at the Smithsonian on how to do the history of one's own family.
    3. Helping to direct the Sixth International Smithsonian Symposium on Kin and Communities in America (June 1977).
    4. Editing the volume of essays from the symposium.

Consultant to John Anderson campaign for president, 1980.

I researched and wrote a study on "Restrictive Ballot Laws and Third-Force Presidential Candidates." This document was a major component of Anderson's legal arguments against restrictive ballot laws that ultimately prevailed in the Supreme Court (Anderson v. Celebreeze 1983).  According to Anderson's attorney: "the basis for the majority's decision echoes the themes you incorporated in your original historical piece we filed in the District Court."

Statistical Consultant to the George Washington University Program of Policy Studies in Science and Technology, 1983

I advised researchers at the Policy Studies Program on the application of pattern recognition techniques to their work on the recovery of communities from the effects of such natural disasters as earthquakes and floods.

Consultant to the New York City Charter Revision Commission, 2000-2006

I analyzed the implications of non-partisan elections for voting rights issues for the Charter Revision Commissions appointed by mayors Rudy Giuliani and Michael Bloomberg.

## ALLAN J. LICHTMAN, CASES (DATES APPROXIMATE)
## DEPOSITION, AFFIDAVIT, OR ORAL TESTIMONY

Newton, et al.  vs. Alabama (U. S. District Court, Alabama) 2013

North Carolina NAACP v. North Carolina (State Superior Court, North Carolina) 2013

Texas v. United States (Voter ID) (U. S. District Court, District of Columbia) 2012

Texas v. United States (Redistricting) (U. S. District Court, District of Columbia) 2012

Coalition for Equity and Excellence in Higher Education v. Maryland Higher Education Committee, et al. (U. S. District Court, Maryland) 2012

Radogno, et al. v. Illinois State Board of Elections, et al. (U.S. District Court, Illinois) 2011

Committee for a Fair and Balanced Map, et al. v. Illinois State Board of Elections, et al. (U.S. District Court, Illinois) 2011

Perez, et al. v. Perry, et al. (U. S. District Court, Texas) 2011

United States vs. Demario James Atwater (U. S. District Court, North Carolina) 2010

Boddie v. Cleveland School Board, Mississippi (U.S. District Court, Mississippi) 2010

Esther V. Madera Unified School District (Superior Court, California) 2008

Negron v. Bethlehem Area School District (U.S. District Court, Pennsylvania) 2008

Farley v. City of Hattiesburg (U.S. District Court, Mississippi) 2008

Jamison v. City of Tupelo (U.S. District Court, Mississippi) 2005

Session v. Perry (U.S. District Court, Texas) 2003

Rodriguez v. Pataki (U.S. District Court, New York) 2003

Boddie v. Cleveland, Mississippi (U.S. District Court, Mississippi) 2003

Levy v. Miami-Dade County (U.S. District Court, Florida) 2002

Martinez v. Bush (U.S. District Court, Florida) 2002

Curry v. Glendening (Maryland, State Court) 2002

O'Lear v. Miller (U.S. District Court, Michigan) 2002

Campuzano v. Illinois Board of Election (U.S. District Court, Illinois) 2002

Vieth v. Commonwealth of Pennsylvania (U.S. District Court, Pennsylvania) 2002

Leroux v. Miller (Michigan, State Supreme Court) 2002

Balderas v. State of Texas (U.S. District Court, Texas) 2001

Del Rio v. Perry (Texas, State Court) 2001

Page V. Bartels (U.S. District Court, New Jersey) 2001

West v. Gilmore (Virginia, State Court), 2001

U.S. v. City of Santa Paula (California, U.S. District Court) 2001

NAACP v. Fordice (Mississippi, U.S. District Court) 2000

Voting Integrity Project v. Marc Fleisher (Arizona, U.S. District Court) 2000

Packingham v. Metropolitan Dade County (U.S. District Court, Florida) 1999

Houston v. Lafayette County (U.S. District Court, Northern District of Mississippi, Western District) 1991, 1998

Citizens to Establish a Reform Party in Arkansas v. Sharon Priest (U.S. District Court, Eastern District of Arkansas) 1996

National Coalition v. Glendening (U.S. District Court, Maryland) 1996

Vecinos de Barrio Uno v. Holyoke (U.S. District Court, Massachusetts), 1996

Scott v. Florida Senate (U.S. District Court, Middle District of Florida) 1995

King v. Board of Elections (U.S. District Court, Northern District of Illinois) 1995

Vera v. Richards (U.S. District Court, Southern District of Texas) 1994

United States v. Jones (U.S. District Court, Southern District of Alabama) 1994

Johnson v. Miller (U.S. District Court, Southern District of Georgia, Augusta Division) 1994

Hays v. Louisiana (U.S. District Court, Western District of Louisiana, Shreveport Division) 1993

People Who Care v. Rockford Board of Education (U.S. District Court, Northern District of Illinois, Eastern Division) 1993

Republican Party of North Carolina v. Hunt (U.S. District Court, Eastern District of North Carolina, Raleigh District) 1993

Shaw v. Hunt (U.S. District Court, Eastern District of North Carolina, Raleigh District) 1993

Neff v. Austin (State of Michigan, Supreme Court) 1992

Terrazas v. Slagle (U.S. District Court, Western District of Texas, Austin Division) 1992

Gonzalez v. Monterey County (U.S. District Court, Northern District of California) 1992

DeGrandy v. Wetherell (U.S. District Court, Northern District of Florida, Tallahassee Division) 1992

NAACP v. Austin (U.S. District Court, Eastern District of Michigan, Eastern Division) 1992

Good v. Austin (U.S. District Court, Eastern District of Michigan, Southern Division) 1992

Ortiz v. City of Philadelphia (U.S. District Court, Eastern District of Pennsylvania) 1991-1993

FAIR v. Weprin (U.S. District Court, Northern District, of New York) 1992

Davis v. Chiles (U.S. District Court, Northern District of Florida) 1991

McDaniels v. Mehfoud (U.S. District Court, Eastern District of Virginia) 1991

Rollins v. Dallas County Commission (U.S. District Court, Southern District of Alabama) 1991-1992

Ward v. Columbus County (U.S. District Court, Eastern District of North Carolina) 1991

Republican Party State Committee v. Michael J. Connolly (U.S. District Court, Massachusetts) 1991

Jenkins v. Red Clay Consolidated School District (U.S. District Court, District of Delaware) 1991

Watkins v. Mabus (U.S. District Court, Southern District of Mississippi) 1991

<u>Mena v. Richards</u> (Hidalgo County Texas District Court) 1991

<u>Republican Party of Virginia v. Wilder</u> (U.S. District Court, Western District of Virginia) 1991

<u>Nipper v. Chiles</u> (U.S. District Court, Middle District of Florida) 1991-1994

<u>Smith v. Board of Superivsors of Brunswick County</u> (U.S. District Court, Eastern District of Virginia) 1991-1992

<u>New Alliance Party v. Hand</u> (U.S. District Court, Alabama) 1990

<u>Concerned Citizens v. Hardee County</u> (U.S. District Court, Florida) 1990

<u>United Parents Association v. NYC Board of Elections</u> (U.S. District Court, New York) 1990

<u>Garza v. County of Los Angeles</u> (U.S. District Court, California) 1990

<u>Person v. Moore County</u> (U.S. District Court, Middle District of North Carolina, Rockingham Division) 1989

<u>Ewing v. Monroe County</u> (U.S. District Court, Northern District of Mississippi) 1989

<u>White v. Daniel</u> (U.S. District Court, Eastern District of Virginia) 1989

<u>Gunn v. Chickasaw County</u> (U.S. District Court, Mississippi) 1989

<u>SCLC v. State of Alabama</u> (U.S. District Court, Middle District of Alabama, Northern Division) 1989-1995

<u>Bradford County NAACP v. City of Starke</u> (U.S. District Court, Middle District of Florida) 1988

<u>PUSH v. Allain</u> (U.S. District Court, Mississippi) 1988

<u>Baltimore Neighborhoods, Inc. v. C.F. Sauers</u> (U.S. District Court, Maryland) 1988

<u>United States v. Wicomico County</u> (U.S. District Court, Maryland) 1988

<u>Metropolitan Pittsburgh Crusade v. City of Pittsburgh</u> (U.S. District Court, Western District of Pennsylvania) 1987

<u>McNeil v. City of Springfield</u> (U.S. District Court, Central District of Illinois) 1987

<u>Harper v. City of Chicago Heights</u> (U.S. District Court, Northern District of Illinois) 1987-1993

<u>Robinson v. City of Cleveland</u> (U.S. District Court, Delta District of Mississippi) 1987

<u>Martin v. Allain</u> (U.S. District Court, Southern District of Mississippi) 1987

<u>Smith v. Clinton</u> (U.S. District Court, Eastern District of Arkansas) 1987

<u>Burrell v. Allain</u> (U.S. District Court, Southern District, of Mississippi) 1986

<u>United States v. Dallas County</u> (U.S. District Court, Southern District of Alabama) 1986

<u>United States v. Marengo County</u> (U.S. District Court, Southern District of Alabama) 1986

<u>Jordan v. City of Greenwood</u> (U.S. District Court, Mississippi) 1984

<u>Johnson v. Halifax County</u> (U.S. District Court, Eastern District of North Carolina) 1984

<u>Anderson v. Celebreeze</u> (U.S. District Court, Ohio) 1980

PL773
9/2/2014
2:13-cv-00193

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | |
|---|---|
| MARC VEASEY, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 2:13-cv-193 (NGR) |
| RICK PERRY, *et al.*, | **FILED UNDER SEAL** |
| Defendants. | **PURSUANT TO CONSENT** |
| | **PROTECTIVE ORDER [DOC #105]** |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, *et al.*, | |
| Plaintiff-Intervenors, | |
| TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, *et al.*, | Civil Action No. 2:13-cv-263 (NGR) |
| Plaintiff-Intervenors, | |
| v. | |
| STATE OF TEXAS, *et al.*, | |
| Defendants. | |

DESIGNATED HIGHLY CONFIDENTIAL                                    2

| | |
|---|---|
| TEXAS STATE CONFERENCE OF NAACP BRANCHES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> NANDITA BERRY, *et al.*, <br><br> Defendants. | Civil Action No. 2:13-cv-291 (NGR) |
| BELINDA ORTIZ, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> STATE OF TEXAS, *et al.*, <br><br> Defendants | Civil Action No. 2:13-cv-348 (NGR) |

DESIGNATED HIGHLY CONFIDENTIAL                                                3

**SEALED ATTACHMENT TO DESIGNATION OF
EXPERT WITNESSES BY TEXAS STATE CONFERENCE OF
NAACP BRANCHES AND THE MEXICAN AMERICAN
LEGISLATIVE CAUCUS OF THE TEXAS HOUSE OF REPRESENTATIVES**


**REPORT OF LORRAINE C. MNNITE**


## I.   BACKGROUND & QUALIFICATIONS

I am an associate professor in the Department of Public Policy and Administration at Rutgers, The State University of New Jersey-Camden.  I received a Bachelor of Arts degree in History from Boston University, and two Master's Degrees and a Ph.D. in Political Science from the City University of New York.  One of my areas of expertise is American Politics with a specialization in elections and the political process.  Specifically, I study the incidence and effect of voter fraud in American elections.

In 2003, I co-authored a study of voter fraud with David Callahan for the public policy research and advocacy organization, Demos, titled, "Securing the Vote: An Analysis of Voter Fraud;" I updated this study with new material in 2007.[1]  At that time, Demos published a preliminary report I wrote on voter fraud and same-day registration,[2] and in March of 2007, I published a report, "The Politics of Voter Fraud," for Project Vote, a national nonpartisan, nonprofit voting rights organization.[3]  In June 2010, Cornell University Press published *The Myth of Voter Fraud*, my full-length scholarly treatment of the subject.  The book analyzes the evidence of voter fraud and concludes that the widespread allegation of significant voter fraud is unsupported by the data.  In *The Myth of Voter Fraud*, I conclude and provide evidence to show that having no basis in fact, these allegations are motivated by political interests, and are designed to make voting harder for certain populations.

---

[1] Lorraine C. Minnite, "An Analysis of Voter Fraud," (New York: Demos, 2007), *available at* http://www.demos.org/publication/analysis-voter-fraud-united-states-adapted-2003-report-securing-vote.

[2] Lorraine C. Minnite, "Election Day Registration: A Study of Voter Fraud Allegations and Findings on Voter Roll Security," (New York: Demos, 2007), *available at* http://www.demos.org/publication/election-day-registration-study-voter-fraud-allegations-and-findings-voter-roll-security.

[3] Lorraine C. Minnite, "The Politics of Voter Fraud," (Washington, D.C.: Project Vote, 2007), *available at* http://www.projectvote.org/newsreleases/222-new-report-examines-qthe-politics-of-voter-fraudq.html.

DESIGNATED HIGHLY CONFIDENTIAL                                            4

## II.   SUMMARY OF CONCLUSIONS

1. I have studied S.B. 14 and believe the only kind of potential voter fraud it could prevent is voter impersonation at the polling place.

2. Nationwide, and in Texas, voter impersonation at the polls is very, very rare.  In fact, from 2000 to 2010, I found fewer than ten credible claims of impersonation fraud at the polling place across the country.  In Texas, I have found only four credible claims of voter impersonation fraud at the polls from 2000 to the present.

3. From the period of 2000 to 2011, when S.B. 14 was passed, there were only two credible claims of impersonation fraud at the polls.  The rare incidents of fraud were not widely publicized, making it highly unlikely that these rare credible claims could have inspired the legislators who voted for this bill.

## III.   METHODOLOGY

This report incorporates all of the research I have conducted on the subject of voter fraud and voter ID laws since 2001, cited above and published in peer-reviewed books and journals.[4]  To expand my research to include recent evidence of voter fraud in Texas, I analyzed the following additional materials:

- documents from discovery in this case and from discovery and trial in *State of Texas v. Holder*, the Section 5 case seeking preclearance of Texas' photo ID law made available to me by lawyers, including discovery responses and findings of fact, interrogatories and objections and various other pleadings in this case, transcripts of hearings, proceedings, and floor debates of the full House and Senate of the Texas State Legislature, deposition and trial transcript materials, and a 2006 file from the Texas Legislative Council concerning background research materials on election fraud in Texas[5] (see attached reference list);

- hundreds of news reports from Texas news sources concerning voter fraud in the state, focusing my analysis on articles appearing since 2000 (see attached description of the news database  and search parameters, and list of articles analyzed);

- copies of referrals (with back-up documents) sent by the Texas Secretary of State's Office to the Texas Attorney General concerning complaints of alleged election fraud for the period 2002 through mid-2006, obtained through a public records request made by me to the Texas Secretary of State in September 2006;

---

[4] A complete list of my peer-reviewed publications is set forth in my *Curriculum Vitae*.

[5] This file is marked "Highly Confidential."

DESIGNATED HIGHLY CONFIDENTIAL                                              5

- all press releases and documents posted or archived on the Texas Attorney General's Office website generated by a search of the terms "vote fraud," "voter fraud," and "election fraud," conducted between June 7 and June 26, 2014;[6]

- the Texas Election Code (2014);[7]

- S.B. 14, as enrolled on August 3, 2011, with bill analysis provided by the Senate Research Center as posted to the Texas Legislature's website.[8]

Given the volume of new materials, and the limited time to review them, I hired a research assistant named Mr. Curtis Williams. Mr. Williams holds a Bachelor's Degree in History and African American History from Rutgers University and a Master's Degree from New York University in Humanities and Social Thought. He currently is a first-year student in Rutgers-Camden's Public Affairs Ph.D. program. Under my supervision, Mr. Williams screened a CD provided to me by lawyers containing over 400 documents produced by the State of Texas in this case. Mr. Williams examined all of the files listed and recorded the contents of each. I then instructed Mr. Williams to review all of the legislative material contained on the CD, search on the terms voter and fraud, review and briefly summarize for me what was said. In this way, Mr. Williams helped me prioritize my own examination of these materials. Mr. Williams is being compensated at a rate of $30 an hour.

## III.   DISCUSSION

### A.   Brief History of Voting Restrictions

Prior to the late nineteenth century, there were very limited voter registration requirements placed upon eligible voters.[9] The earliest of registration laws put the obligation on the government to enroll qualified voters, and allowed voters to register on Election Day.[10] The pool of eligible voters vastly expanded in the nineteenth century

---

[6] The website address is https://www.texasattorneygeneral.gov/index.shtml.

[7] The Texas Election Code may be accessed from the website of the Texas state legislature (see: http://www.statutes.legis.state.tx.us).

[8] The Senate Research Center's Bill Analysis may be found here: http://www.capitol.state.tx.us/tlodocs/82R/analysis/pdf/SB00014F.pdf#navpanes=0.

[9] Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the U.S.* (New York: Basic Books, 2000), 151; Joseph P. Harris, *The Registration of Voters in the United States* (Baltimore: Lord Baltimore Press, 1929), 65-66; *see also*, John Mark Hansen, et al., "Voter Registration," Reports of The Task Force on the Federal Election System (to accompany the Report of the National Commission on Election Reform, *To Assure Pride and Confidence in the Electoral Process*), National Commission on Federal Election Reform, August 2001, 2 (on file with author).

[10] Charles Edward Merriam and Harold Foote Gosnell, *The American Party System: An Introduction*

when property and tax-paying requirements for voter eligibility were mostly eliminated. By the end of the century, a competitive party system was helping to produce the highest rates of voter turnout in U.S. history.  At the same time, however, states began adopting more onerous voter registration and voting laws, supplanting the restrictive effects of property requirements and shifting the burden of establishing voter eligibility away from the government to the individual.[11]

The United States has a long history of using electoral rules to suppress voting. Following the emancipation of African Americans and the enfranchisement of black men by the Civil War Amendments, a reactionary, white supremacist counter-movement in the South arose to re-erect a system of racial subordination.  By the turn of the twentieth century, African Americans had been virtually purged from the electorate of the southern states, at first by the use of violent intimidation and trickery, later by the introduction or reintroduction of a series of superficially color-blind requirements intended to circumvent the Fourteenth and Fifteenth Amendments. [12]

Voter registration requirements were especially important because of the degree to which they ceded discretion to local registrars and election officials.[13]  Thus, an 1873 Georgia law permitted local registrars to close their books to new registrants except during the planting and harvesting months, or in other words, during the time of the year that African-American farm workers most likely would be unable to make the trip to the county seat to register to vote.  Once word spread of the effectiveness of this stratagem and other election administration techniques to disfranchise blacks, similar laws followed in North Carolina[14] and Alabama.

---

*to the Study of Political Parties in the United States* (New York: The Macmillan Company, 1929); Harris, *Registration of Voters*, xi.

[11] Dayna L. Cunningham, "Who Are to Be the Electors? A Reflection on the History of Voter Registration in the United States," *Yale Law and Policy Review* 9, no. 2 (1991): 370-404.

[12] *See* Frances Fox Piven, Lorraine C. Minnite, and Margaret Groarke, *Keeping Down the Black Vote: Race and the Demobilization of American Voters* (New York: The New Press, 2009).  The authoritative work on this subject is J. Morgan Kousser, *The Shaping of the Southern Politics: Suffrage Restriction and the Establishment of the One-Party South* (New Haven: Yale University Press, 1974).

[13] On the power of local elected officials to wield public authority in the post-Civil War South, in general, see Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (New York: HarperCollins, 1988), 355-356; see also, Randolph B. Campbell, "Grass Roots Reconstruction: The Personnel of County Government in Texas, 1865-1876," *Journal of Southern History* 58, no. 1 (1992): 99-116.

[14] Logan writes of the suffrage qualification laws passed in North Carolina during the 1876-1877 legislative session: "The most thorough and wide sweeping of these enactments was the act to regulate elections.  The wide, almost autocratic powers granted to the registrars and judges of elections, the residence requirements, and the right of one voter to challenge another – all of these pointed to the intent of the framers to disfranchise or reduce the number of Negro voters."  *See* Frenise A. Logan, *The Negro in North Carolina, 1876-1894,* UNC Enduring Edition (Chapel Hill, N.C.: University of North Carolina Press, [1964] 2011), 55.  For more on North Carolina's election law of 1877, *see* chapter 5 "Fusion Election Law," in Helen G. Edmonds, *Negro and Fusion Politics in North Carolina, 1894-1901* (Chapel Hill, N.C.:

DESIGNATED HIGHLY CONFIDENTIAL                                                           7

When Texas adopted the option of personal voter registration in 1895, it applied only to those qualified electors who resided in cities of 10,000 or more if 500 citizens petitioned to adopt such a system.   Cities immediately affected included Dallas, Galveston, Houston, Austin, Laredo, San Antonio, El Paso, Fort Worth, Denison and Waco.   According to Williams, the vast population increases in these cities over the preceding two decades by white and black laborers and railroad workers threatened business elites who championed the new rules as a means of tamping down a turbulent urban politics rife with Populist appeal.[15]     Registrars, appointed by a commissioners' court in the county in which such cities were located, had the power to demand proof in the form of sworn affidavits from two "well known citizens of the city" that an applicant for registration was qualified to vote.   Registration could be denied "should the registrar have doubts or not be satisfied as to the qualifications of the applicant…"[16]  Each person who successfully registered was presented with a certificate of registration that was to be preserved and presented to the election judges.   If the election judges were not satisfied that the person presenting the certificate corresponded with the description of the person as it appeared on the registrar's books, the election judges could deny the person his right to vote.[17]

Laws requiring voters to show their registration certificates before they were permitted to cast ballots were effective in disenfranchising African Americans in the South.   Most states adopting personal registration closed registration periods long before an election, and it would not be uncommon for illiterate and impoverished migrant farmers to lose track of paperwork.   In addition, this rule made blacks doubly vulnerable to harassment and attack as they made their way to the polling place.   There are numerous accounts from the period of blacks walking to the county seat to vote and being set upon by white mobs who robbed them of their registration papers.   For example, in November 1876, the Republican governor of Louisiana wrote to Republican National Committee officials in New York:

> Dispatches from Ouachita and Morehouse Parishes, near the Arkansas line, and West Feliciana near the Mississippi line, report that their parishes are now patrolled by the White League, reinforced by armed bodies from Arkansas and Mississippi.   Most of the Republican leaders have been driven away or murdered.   Under the State law voters are entitled to vote at any poll in the parish in which they reside.   The colored people generally are attempting to

---

University of North Carolina Press, [1951] 1979).

[15] Patrick G. Williams, "Suffrage Restriction in Post-Reconstruction Texas: Urban Politics and the Specter of the Commune," *Journal of Southern History* 68, no. 1 (2002): 31-64.

[16] Revised Civil and Criminal Statutes of Texas, 1895, ch. 6, art. 1781; available at http://www.sll.texas.gov/assets/pdf/historical-codes/1895/1895civ8.pdf.  See also, Williams, "Suffrage Restriction in Post-Reconstruction Texas."

[17] *Ibid.*, ch. 6, art. 1782.

DESIGNATED HIGHLY CONFIDENTIAL                                                            8

reach the parish seats of those parishes in order to vote under the protection of the authorities.  Numbers of them have been intercepted by the White League pickets, and their registration papers destroyed.[18]

After Texas amended its constitution in 1902 to institute a poll tax as prerequisite to voting, certified lists of citizens who paid their poll taxes or received certificates of exemption compiled by the county tax assessor functioned like registration (cities of 10,000 or more could continue to require voter registration).[19]  Poll taxes were paid on an annual basis between the first day of October and the first day of February after otherwise qualified voters had resided in the state on the first day of January preceding the poll tax levy.  When a federal court challenge nullified Texas' poll tax,[20] "the state enacted the most restrictive voter registration procedures in the nation to replace the poll tax,"[21] an annual registration requirement that was also then struck down as an unconstitutional infringement on the right to vote.[22]  The state responded by enacting another law in 1975 purging the entire registration list and requiring all voters to re-register, and that requirement likewise was blocked when Texas became covered for preclearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, and the Justice Department interposed an objection to it.[23]

Election fraud documented by early election reformers was not primarily committed by individual voters, who are the target of election reforms to widen the franchise, but instead by election officials and politicians engaging in conspiracies who were unaffected by these types of reforms.[24]  In some places, corrupt politicians used the police to "colonize" closely contested elections with fraudulently registered voters.[25]

---

[18] "The Close of the Canvass," *New York Times*, November 7, 1876, 1.

[19] Donald S. Strong, "The Poll Tax: The Case of Texas," *American Political Science Review* 38, no. 4 (1944): 693-679, 695.

[20] *United States v. Texas*, 252 F. Supp. 234 (W.D. Texas) (three-judge court), aff'd. 384 U.S. 155 (1966).

[21] S. Rep. 94-295, at 25 (1975) (reporting P.L. 94-73, "Voting Rights Act of 1965 – Extension").

[22] *Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974).

[23] "Voting Determination Letters for Texas," http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=tx (copy of letter at listing for Dec. 10, 1975 objection).

[24] *See* Joseph P. Harris, *Election Administration in the United States* (Washington, D.C.: The Brookings Institution, 1934), 375-376 ("Isolated, individual cases of election frauds are uncommon and unimportant.  Election frauds cannot be carried on successfully and upon a wide scale without protection, without the pre-arrangement of election officers who will 'deliver' if necessary, and without the backing of a powerful political organization.")

[25] Richard L. McCormick, *From Realignment to Reform: Political Change in New York State, 1893-1910* (Ithaca: Cornell University Press, 1981), 44.

DESIGNATED HIGHLY CONFIDENTIAL                                              9

Reformers enacted voter registration as a means to subdue broader electoral fraud, yet it remains unclear whether the reforms played any part in reducing it.[26]

No conclusive tie between enfranchising reforms and voter fraud has ever been proven. The Civil Rights Era in American history marked a time of activism to promote, amongst other goals, voting rights. At each significant effort to protect and extend the right to vote, franchising opponents argued that reduced barriers would lead to voter fraud. This alleged threat to election integrity created by reducing barriers of access has been taken up by congressional opponents, time and time again, for example, in debates over the Voting Rights Act of 1965, the Universal Voter Registration Act of 1977, and the National Voter Registration Act of 1993.[27] Prior to the widespread adoption of the secret ballot, party agents arguably used "inflationary" corruption by buying votes and recycling voters.[28] Afterward, parties pursued "deflationary" corruption by paying opponents to stay home or otherwise defeating their efforts to vote, using devices such as poll taxes, literacy tests, long residency periods and other onerous requirements for voter registration to further their means.

## B.        Definition of "Voter Fraud"

No statute exists specifically defining "voter fraud." Instead, nefarious election-related practices are prevented by state laws making "double voting" or "falsifying records," and the like, illegal.[29] Nevertheless, the process of formulating precise

---

[26] Paul Kleppner, *Who Voted? The Dynamics of Voter Turnout 1870-1980*, American Political Party and Election Series (New York: Greenwood Publishing Group, Inc., 1982), 59-60.

[27] *See, e.g.*, U.S. Congress, Senate Committee on the Judiciary, "To Enforce the 15th Amendment to the Constitution of the United States: Hearings on S.1564," 89th Cong., 1st sess., 1965; U.S. Congress, House Committee on House Administration, "To Establish a Universal Voter Registration Program, and for Other Purposes: Hearings on H.R. 5400," 95th Cong., 1st sess., 1977; and U.S. Congress, House Committee on House Administration, Subcommittee on Elections, "Hearing on Voter Registration," 103rd Cong., 1st sess., January 26, 1993. For an important account of the movement to reform voter registration laws leading to the passage of the National Voter Registration Act of 1993, *see* Frances Fox Piven and Richard A. Cloward, *Why Americans Don't Vote and Why Politicians Want It That Way* (Boston: Beacon Press, 2000); *see also*, Piven, et al., *Keeping Down the Black Vote*.

[28] Gary W. Cox and J. Morgan Kousser, "Turnout and Rural Corruption: New York as a Test Case," *American Journal of Political Science* 25, no. 4 (November 1981), 646-63.

[29] For example, in Texas a person commits a second degree felony if that person "votes or attempts to vote in an election in which the person knows the person is not eligible to vote; knowingly votes or attempts to vote more than once in an election; [or] knowingly impersonates another person and votes as the impersonated person..." in violation of Tex. Elec. Code Ann. § 64.012 (2014) according to the Texas' Legislature's website -- http://www.statutes.legis.state.tx.us/Docs/SDocs/ELECTIONCODE.pdf. Note that other sources list the same crime as a third degree felony, for example, http://law.onecle.com/texas/election/64.012.00.html. In North Carolina, it is a Class 1 felony for any person "knowingly to swear falsely with respect to any matter pertaining to any primary or election" or "to take corruptly the oath prescribed for voters." N.C. Gen. Stat. § 163-275 (2013). California prohibits specific election-related activity like fraudulent registration, voting in an election in which one is not entitled to vote, voting more than once or to try to buy a vote with the promise of a job. Cal. Elec. Code § 18520 (1994). In Minnesota, it is a felony to submit more than one absentee ballot or to assist another in

DESIGNATED HIGHLY CONFIDENTIAL                                                    10

definitions is critical in the social sciences because it allows accurate measurement of empirical phenomena.[30]  To develop a definition of voter fraud, I examined the electoral process and looked at the capacity of various actors in the political process to impact the outcome and integrity of elections.  Various actors with that capacity include, but are not limited to, voters, campaign officials, elected officials, and election poll workers.

I examined the parts of the political process that different actors could corrupt, and found a distinction between what voters can corrupt compared to what other electoral actors can corrupt.  Voters are only capable of corrupting that part of the electoral process to which they have access.  For example, voters cannot corrupt the election count; only an official with broad access could corrupt an entire count.  But, individual voters can corrupt the registration process and the casting of ballots by falsifying their records or identity on a registration application and/or fraudulently misrepresenting themselves to poll workers or absentee voting officials.

Accordingly, my definition of voter fraud is "the intentional corruption of the voting process by voters."[31]  Importantly, that is the definition used in this report.

Given that intent is an essential element in my definition, my definition does not include election errors such as misspelled names and recording mistakes.  Admittedly, these mistakes can produce irregularities, but they should not be included in a definition of fraud.   Notably, Texas statutes that criminalize illegal voting also include intent as an essential element of the crime.[32]  Moreover, the Texas voter ID law at issue in this litigation (referred to as S.B. 14) does not address irregularities caused by mistakes.

### C.      Indictments as an Indicator

There are no officially compiled national or statewide statistics reliably reporting the instances of voter fraud.  One of the measures I use both in *The Myth of Voter Fraud* and in this report to estimate the incidence of voter fraud is indictments.  The basis of the

---

submitting more than one absentee ballot, or to alter another's absentee ballot.  Minn. Stat. § 203B.03 (1999).  In New Jersey, it is a third degree crime to "fraudulently vote…or in any manner so interfere…with the voters lawfully exercising their rights of voting at the election, as to prevent the election or canvass from being fairly had and lawfully conducted."  N.J. Stat. Ann. § 19:34-11 (2011).

[30] W. Phillips Shively, *The Craft of Political Research*, 5th ed. (Upper Saddle River, New Jersey: Prentice Hall, 2002), 30-8.

[31] The next best definition I found is provided by the U.S. Department of Justice.  Their definition of "election fraud" is over-broad because it includes acts to intimidate voters and covers official malfeasance, such as ballot box stuffing or corruption of the count.  *See*, Craig C. Donsanto and Nancy L. Simmons, *Federal Prosecution of Election Offenses*, 7th ed., U.S. Department of Justice, Criminal Division, Public Integrity Section (Washington, D.C.: Government Printing Office, 2007).  *See also*, U.S. Department of Justice, "Fact Sheet: Protecting Voting Rights and Preventing Election Fraud," July 2, 2008, *available at*: http://www.justice.gov/opa/pr/2008/July/08-crt-585.html.  Because voters do not have access to those activities, they are not included in my more accurate definition of voter fraud.

[32] *See, e.g.,*Tex. Elec. Code Ann. § 64.012 (2014).

DESIGNATED HIGHLY CONFIDENTIAL                                                    11

quantitative research reported in *The Myth of Voter Fraud* comes from a data set produced by the Administrative Office of the United States Courts that is available to researchers through the Inter-University Consortium for Political and Social Research ("ICPSR").[33]  This data set is a complete and total record of all indictments and cases tried annually in federal courts (district and appellate, including the Supreme Court).

In addition, I relied on the record of federal indictments generated during the first three years of a special program at the U.S. Department of Justice.  In March 2001, United States Attorney General John Ashcroft announced the Ballot Access and Voting Integrity Initiative ("BAVII").[34]  BAVII was initiated to bring together civil rights and criminal division lawyers of the Justice Department for an Election Day program.  The stated purpose of this program was to help attorneys recognize election fraud and voter intimidation and to provide their services to voters to receive complaints of the same.

I requested information about the BAVII from the Justice Department, but before I received it I found a case list of indictments brought under the program in the records of a congressional hearing held in 2006.[35]  The list, which was prepared by the U.S. Department of Justice, records 95 indictments over the first three years of the program (FY2002 to FY2005).  I concluded that this was a complete list of indictments brought under the BAVII by comparing it to Justice Department press releases announcing numbers of indictments brought under the program.  I researched the BAVII indictments and concluded that only 40 of the 95 people indicted were voters; the other 55 people were associated with elections in other ways, for example, serving as campaign, party or election officials.  Of the 40 voters indicted, none were residents of Texas.  The significance of the BAVII program is that it represented a heightened federal prosecutorial effort to find voter fraud, and also a shift away from settled practices in the investigation of criminal conspiracies to subvert the integrity of elections toward the targeting of individual voters.  According to the long-time director of the Elections Crimes branch of the Criminal Division's Public Integrity Section (which retains authority to investigate and prosecute criminal violations of federal election laws), at the time, "…the investigation and prosecution of election crimes…was outranked [in official prioritizing] only by crimes involving terrorism and espionage."[36]

---

[33] The ICPSR is an international consortium of about 700 academic institutions and research organizations that maintains a data archive of more than half a million files of research in the social sciences.  *See* www.icpsr.umich.edu for more information.

[34] U.S. Department of Justice, press conference, Washington, D.C., March 7, 2001, available at http://www.justice.gov/archive/ag/speeches/2001/0307civilrightspressconf.htm.  *See also*, Dan Eggen and David A. Vise, "Ashcroft Takes On Voting Issues; Enforcement, Monitoring of Election Laws to Be Increased," *Washington Post*, March 8, 2001, A19.

[35] U.S. Congress, House Committee on House Administration, "Hearing on 'You Don't Need Papers to Vote?': Non-Citizen Voting and ID Requirements in U.S. Elections," 109th Congress, 2d Sess., June 22, 2006, 245-54.

[36] Craig C. Donsanto, "Corruption of the Election Process under U.S. Federal Law," in *Election*

DESIGNATED HIGHLY CONFIDENTIAL                                          12

### D.    The Lack of Evidence of Voter Fraud Nationwide

Using the same standard for judging voter fraud crime rates as social scientists and others do for other crimes (which is to calculate the incidence of crime from law enforcement statistics on arrests, indictments and convictions), I conclude that the scant evidence of arrests, indictments or convictions for any of the practices I define as voter fraud for purposes of my research means that little fraud is being committed relative to the millions of votes cast each year in state, local and federal elections. In other words, the lack of an accurate centralized tracking system is itself evidence that voter fraud is not the threat to elections some claim it is.

Some argue that crime statistics are an invalid measure of the extent of voter fraud. Proponents of this view typically offer two reasons for this: 1) prosecutors are biased and do not pursue voter fraud cases; and 2) voter fraud escapes detection. Neither of these arguments is supported by evidence.

First, as described above, the federal government designed a program in 2001 to root out voter fraud in federal elections. In its first three years, under vigorous prosecution, this program produced just 40 indictments of voters, 26 of whom pleaded or were found guilty. More than 200 million votes were cast in the 2002 and 2004 federal elections combined. Thus, we have an important example in which it cannot be said that prosecutors do not pursue voter fraud cases, and yet almost no voter fraud was actually prosecuted. This suggests that, upon investigation, the potential cases identified did not turn out to be instances of fraud and/or that few potential cases were even identified. A Minnesota example also disputes the claim that voter fraud is not investigated. In that state, county district attorneys are required by law to investigate complaints of voter fraud at risk of losing their jobs. My research into voter fraud in Minnesota between 1999 and 2005 turned up only one prosecuted case, however.[37]

Second, some argue that voter fraud is next to impossible to detect, and therefore, again, statistics from the law enforcement effort against it are irrelevant. This argument is not persuasive. It is simply illogical to argue that a lack of evidence that a phenomenon is occurring means it is widespread. All crime, including fraud, is meant to be concealed, and yet there are many types of fraud that are routinely detected and prosecuted. There is no reason to believe that voter fraud is less detectable than Social Security fraud, or counterfeiting, or tax evasion, or postal or wire fraud. These forms of fraud share qualities with voter fraud. For example, Social Security fraud can involve impersonation and making false claims about eligibility, counterfeiting can involve forgery and making false claims about identity, and tax evasion can involve false claims of residence; mail fraud statutes have been used to prosecute voter fraud. In federal fiscal

---

*Fraud: Detecting and Deterring Electoral Manipulation*, ed. R. Michael Alvarez, Thad F. Hall, and Susan D. Hyde (Washington, D.C.: Brookings Institution, 2008), 34.

[37] *See*, *The Myth of Voter Fraud*, 61-6.

DESIGNATED HIGHLY CONFIDENTIAL                                                 13

year 2005, there were 183,284 criminal indictments brought in the federal courts.[38] Among these we find the following:

| Criminal charge[39] | FY2005 |
|---|---|
| Election fraud violations[40] | 60 |
| Other fraud violations | |
| Citizenship fraud | 776 |
| Social Security fraud | 1,980 |
| False claims and statements | 6,658 |
| Counterfeiting | 3,161 |
| Postal, Internet, and wire fraud | 6,929 |
| Tax evasion | 781 |
| **Total criminal defendants** | **183,284** |

These data suggest that the claim against a methodology relying on measures of law enforcement to assess the threat of voter fraud to the integrity of U.S. elections is of little merit. It is not unreasonable to estimate crime rates from data produced by the law enforcement effort against it. In the absence of contradictory or alternative evidence, such as expert opinion, crime statistics on voter fraud present benchmarks that can guide policymakers in establishing priorities and designing election systems to provide the widest possible access to the franchise.

Data collected in close elections and recounts provide the best documented cases of the operations of election administration, and therefore, generate data we can use to examine voting irregularities more closely. In these instances, the statistics on voter fraud committed in polling locations are virtually zero. An important example is the 2004 Washington State gubernatorial election, one of the most closely scrutinized elections in modern history. The initial winner lost on a recount spurring a blizzard of litigation that produced scrupulous documentation of the electoral process.[41] In the end,

---

[38] Federal Judicial Center, Federal Court Cases: Integrated Database, 1997, 2005 [computer file], conducted by the Federal Judicial Center, ICPSR04306, ICPSR04382, Ann Arbor, Mich.: Inter-University Consortium for Political and Social Research [producer and distributor]; author's calculations.

[39] At least one of the top five filing charges for each defendant falls into crime category.

[40] The Federal Court Cases Integrated Database (FCCID), which purports to be "the official public record of the business of the U.S. courts," does not code indictments for voter fraud. Instead, it includes a category of "election law violations," following the coding scheme of the Administrative Office of the U.S. Courts, which is responsible for compiling this data. I created a category of "election fraud violations" by excluding indictments for campaign finance violations, however, I was not able to further exclude non-voters. This measure, therefore, is not directly comparable to other sources of data on federal investigations and prosecutions of voter fraud cases cited in this report. On the FCCID, see Federal Judicial Center, "Description," Federal Court Cases Integrated Database, 2005, conducted by the Federal Judicial Center ICPSR04382 (Ann Arbor, Mich.: Inter-University Consortium for Political and Social Research).

[41] See chapter 6 of *The Myth of Voter Fraud* for a case study of this election.

DESIGNATED HIGHLY CONFIDENTIAL                                              14

after allegations of voter fraud surfaced during trial proceedings, Chelan County Superior Court Judge, Honorable John E. Bridges, concluded that some 25 ballots or .0009 percent of the total 2,812,675 ballots cast were invalid because they were either cast in the names of deceased voters or were double votes.[42]  What the judge did not find was voter fraud.[43] In Judge Bridges' words, "The Court concludes that, having neither pled nor disclosed . . . fraud [it] cannot now be claimed and that to the extent that it was claimed, neither the act of fraud nor the causation arising therefrom were proved by the higher burden of proof of clear, cogent and convincing."[44]  Many of these ballots were mailed in for absentee voters, and the judge made no determination that any were in fact *fraudulently* (i.e., intentionally illegally) cast as opposed to attributable to a mistake.

Finally, where the authorities are focused on observing fraud in the polling places, there have been very few indictments nationally.  As noted above, in the first three years of the BAVII, the Justice Department brought a total of 95 indictments against an array of voters, election workers, and party and public officials.[45]  Committing voter fraud at the polling place would appear to be a most inefficient method for corrupting an election. The perpetrator must commit the crime in front of the very people charged with preventing it.[46]

Based on my extensive research, allegations of voter fraud, with few exceptions, tend to fall into one of the three following categories: unsubstantiated or false allegations

---

[42] "Final Judgment Dismissing Election Contest with Prejudice and Confirming Certification of Election of Christine Gregoire," *Timothy Borders, et al. v. King County et al.*, Case No. 05-2-00027-3, Superior Court of the State of Washington for Chelan County, June 24, 2005.

[43] In 2005, the King County Prosecutor Norm Maleng (a Republican) prosecuted eight criminal cases of voter fraud in the 2004 election.  Seven of the eight were charged with voting for a deceased spouse, partner, or other relative, and one person was charged with voting twice after registering twice, once under his real name and again under an alias.  All eight pleaded guilty.  See Letter to Jonathan Bechtle from Norm Maleng, January 31, 2007 (on file with author).  Some of the voter fraud perpetrators were in their seventies and eighties.  The lawyer for one, Doris McFarland, age eighty-three, said his client "simply did not know what to do with the absentee ballot after her husband of 63 years, Earl, passed away" in the month before the election, so she signed his name and mailed the ballot.  Another man, Robert Holmgren, age fifty-nine, told the judge for his case that "my wife died just before this election.  My judgment was clouded by the grief, I'm really sorry for what I did."  According to a news report, "The judge told each client the court was sorry for their losses and wished them luck." Gene Johnson, "Two Plead Guilty to Voting Twice in 2004 General Election," *Associated Press State & Local Wire*, June 2, 2005.

[44] *Ibid.*, 24.

[45] *See* BAVII cast list, U.S. Department of Justice, Criminal Division, Public Integrity Section, "Election Fraud Prosecutions and Convictions: Ballot Access and Voting Integrity Initiative, Oct. 2002 – Sept. 2005, n.d. (on file with author).

[46] For that reason, Craig Donsanto, the veteran former director of the Elections Crimes Branch of the Justice Department's Public Integrity Section, states that, "Most election fraud is easily recognized."  Craig C. Donsanto, "Federal Jurisdiction Over Local Vote Fraud," *University of Baltimore Law Review* 13(1), 4.

of voter fraud made by the losers of close elections;[47] mischief (as in the alleged successful registration of a ventriloquist's wooden puppet in Texas[48]); and claims that later turned out to be based upon cases of voter error or administrative mistakes, but not fraud.[49]

### E.       Examination of Voter Fraud in Texas

To analyze the incidence of voter fraud in Texas in the contemporary period, I relied on a number of official records and hundreds of news reports since 2000 contained in the Texas state file of Newsbank (Access World News) (see attached for details of the search parameters used, the data source and results).  Before discussing my conclusions, it is important to reiterate that my analysis of voter fraud distinguishes among the different actors who participate in the electoral process (i.e., voters, candidates, campaign operatives, political parties, election officials, etc.), and the methods used to cast allegedly fraudulent votes.  Much of the news reporting and also the definitions and rhetoric used by politicians, law enforcement officers, and legislative researchers both in Texas and nationally do not heed these important and meaningful distinctions.  For example, the term "vote fraud" appears to be widely used in Texas to indicate all manner of electoral corruption, including, according to a 2006 Texas Legislative Council Memorandum to the Chair of the House Committee on Elections,

> …armed persons threatening voters at the polls to intimidate them; major employers delivering to the polls truckloads of workers who had been directed how to vote; officials discounting the ballots of a candidate who won, resulting in the victory of a

---

[47] For a discussion of fraud and the sore loser, *see generally* Michelle L. Robertson, "Election Fraud – Winning at All Costs: Election Fraud in the Third Circuit (*Marks v. Stinson*)," Villanova Law Review 40, no. 3 (1995): 869-925.

[48] According to Tarrant County (Texas) Elections Administrator Robert Parten, in 1987, a patron at an Arlington, Texas bar successfully applied for a voter registration card for a ventriloquist's wooden dummy named Yippie.  Yippie, who resided on the bar counter, remained registered until 1991, when authorities tried to summon the puppet for jury duty.  See, Jack Douglas, Jr., "Officials Target Ballot Fraud," *Fort Worth Star-Telegram*, February 25, 2002, 1.

[49] Minnite, "The Politics of Voter Fraud," 12-13.  For a discussion and extensive documentation of a slightly different set of categories of voter fraud, see also, Justin Levitt, "The Truth About Fraud," Brennan Center for Justice, 2007; available at http://www.brennancenter.org/sites/default/files/legacy/The%20Truth%20About%20Voter%20Fraud.pdf. For the research published in *The Myth of Voter Fraud*, I reviewed hundreds of news articles cited in a report by the now defunct American Center for Voting Rights, which purported to be "the most comprehensive and authoritative review of the facts surrounding allegations of vote fraud, intimidation and suppression made during the 2004 presidential election."  From this review I concluded that "among the more than one hundred cases cited of alleged voter fraud implicating nearly 300,000 potentially fraudulent votes in the 2004 election cycle, only about 185 votes could be confirmed as *possibly* tainted by fraud [emphasis added]."

DESIGNATED HIGHLY CONFIDENTIAL                                                    16

party machine's chosen candidate; and officials changing vote tallies for ballot boxes to swing an election to a favored candidate.[50]

Similarly, a 2008 interim report by the Committee on Elections to the Texas House of Representatives, 81st Texas Legislature, conflates the terminology of voter and election fraud, broadly defining election fraud as "illegal conduct committed in an election." Fraudulent voting is identified as one form of election fraud, but the terms "election fraud" and "voter fraud" are used interchangeably throughout the report, with illustrations of election fraud such as stolen ballot boxes cited as examples of voter fraud. The same pattern of conflating election and voter fraud and mixing up examples of one with examples of the other is widely evident in the nearly 700 news articles I reviewed for this report.

None of the forms of election fraud cited in the Texas documents above qualify as "voter fraud" pursuant to my definition. In fact, what they represent are criminal acts perpetrated *against* the voter in the form of voter intimidation and official tampering with the count. To produce the best public policy remedies where problems exist, it is important to distinguish among the different parties who come together to conduct an election, the voters, candidates and their campaigns, etc., all with different interests and access to different parts of the electoral process; and to identify the methods by which different types of fraud committed by these different actors can corrupt elections. Restricting my analysis of voter fraud in Texas to fraud (intentionally) committed by voters is appropriate, especially with respect to controversies over voter identification laws like S.B. 14 which are proposed as remedies for voter impersonation at the polling place. Thus, the analytical framework that I elaborate in *The Myth of Voter Fraud,* of identifying the type of person committing the fraud and the type of fraud, is what I use here to analyze news coverage of voter fraud and election fraud in Texas, the legislative record on S.B. 14, and official law enforcement and other records created by the Texas Attorney General's Office, the Texas Secretary of State's Office and the Texas Legislative Council. In other words, the focus of this report is on the intentional corruption of the voting process by voters.

I begin with evidence of voter fraud (so defined) produced by law enforcement efforts. On March 12, 2012, the Texas Attorney General's Office issued a press release claiming that,

> Since 2002, the U.S. Department of Justice has prosecuted more than 100 defendants for election fraud.[51] During the same period, election fraud investigations by the Texas Attorney General's Office have resulted in 50 convictions. Those cases include a woman who submitted her dead mother's ballot, a paid operative who cast two elderly voters' ballots after transporting

---

[50] Texas Legislative Council Memorandum from Amy M. Young to The Honorable May Denny, Chair, House Committee on Elections, June 14, 2006.

[51] I discuss the first 95 of those indictments above, noting that only 40 of the people indicted were voters, and of these, only 26 were convicted or pleaded guilty.

DESIGNATED HIGHLY CONFIDENTIAL                                                                    17

them to the polling place, a city council member who unlawfully registered ineligible foreign nationals to vote in an election that was decided by a 19-vote margin, a Starr County defendant who voted twice on Election Day, a Harris County man who used his deceased father's voter registration card to vote in an election, an election worker who pled guilty after attempting to vote for another individual with the same last name, and a Hidalgo County man who presented another voter's registration card and illegally cast that voter's ballot on Election Day.[52]

Politifact Texas followed up with the Office of the Attorney General (OAG). OAG spokesperson Jerry Strickland sent Politifact reporter Sue Owen a table of 57 election fraud prosecutions.[53]   This table appears to be a version of a spreadsheet maintained by Major Forrest Mitchell, a criminal investigator with the Texas Attorney General's Office.[54]   The most recent version of the Mitchell spreadsheet that I am aware of is dated June 5, 2012, and contains 62 prosecutions.[55]  Only one of those prosecutions, however, appears to be for voter impersonation at the polling place.[56]   The others primarily involved the mishandling of absentee ballots (see list of cases sorted by type of election crime (provided separately)).

---

[52] See, "Attorney General Greg Abbott on the Department of Justice Denial of Voter ID Preclearance," March 12, 2012; available at https://www.texasattorneygeneral.gov/oagNews/release.php?print=1&id=3991.

[53] "Greg Abbott Claims 50 Election Fraud Convictions Since 2002," PolitiFact Texas, April 17, 2012; available at http://www.politifact.com/texas/statements/2012/apr/17/greg-abbott/greg-abbott-claims-50-election-fraud-convictions-2/.  The table is available at https://docs.google.com/file/d/0B2Wzr4_cemD5UUtFclRjbl9QSTQ/edit?pli=1.  See *State of Texas v. Holder*, U. S. District Court for the District of Columbia, Docket No. CA 12-128, Transcript of Bench Trial, July 9, 2012, 40.

[54] See Plaintiff's Exhibit 42, *State of Texas v. Holder*, U. S. District Court for the District of Columbia, Docket No. CA 12-128, Transcript of Bench Trial, July 9, 2012, 40.  In his testimony in *State of Texas v. Holder*, Major Mitchell explained that, "This is the spreadsheet that I maintain as the supervisor of the Special Investigations Unit, and it contains the prosecutions that the Attorney General's Office has either prosecuted or worked with a local district attorney or county attorney to prosecute."

[55] The table was provided to me by lawyers in this case.

[56] In *State of Texas v. Holder* before a July 9, 2012, bench trial of three judges of the U.S. District Court for the District of Columbia, Major Mitchell testified that over a ten year period beginning in 2002, the OAG received 320 referrals of potentially criminal election fraud from the Texas Secretary of State's Office and local prosecutors.  These 320 referrals were investigated, resulting in the 62 prosecutions listed in Major Mitchell's spreadsheet (Exhibit 42).  Of the 62 prosecutions, Major Mitchell testified that five concerned voter impersonation (p. 45).  Upon cross-examination, Major Mitchell conceded that in fact, only two of those cases actually involved voters impersonating other voters at the polling place (p. 67). However, of those two cases, only one was a "resolved prosecution," while the other case was pending at the time of Major Mitchell's testimony.

DESIGNATED HIGHLY CONFIDENTIAL                                        18

In *State of Texas v. Holder*, Major Mitchell testified that he maintained a separate spreadsheet of "charges pending resolution" listing cases of election crimes indicted and awaiting trial.[57]  That list contained two people indicted for voter impersonation.  One involved an 81-year old mentally incompetent woman in a wheelchair charged with impersonating her long-dead sister to obtain a second drivers license and vote twice in the 2008 election.[58]   The other concerned a young man who was indicted and pleaded guilty for having impersonated his incarcerated brother in order to vote twice in a 2009 school board election (the man was sentenced to two years in jail).  Finally, Major Mitchell mentioned one more case of family-organized voter impersonation[59] that was not handled by his office but was prosecuted by a local district attorney.  At the behest of his mother, a young man who was not registered to vote impersonated his father and cast a ballot, presumably for his mother in a Democratic Party Precinct Chairwoman race.[60]

The paltry evidence of voter impersonation and voter fraud in Texas found in the investigation and prosecution records of the OAG is significant in light of the statutory authority of the office, and the priority given to voter fraud by Attorney General Greg Abbott.  The efforts of the U.S. Justice Department to find and prosecute voter fraud over the 2002 to 2005 period represent a similar instance in which a major law enforcement agency has the authority to investigate and prosecute voters for intentionally corrupting the electoral process, and was given a mandate to do so.  And like the Ballot Access and Voting Integrity Initiative outlined above, the determined efforts of the Texas Attorney General's office to find and prosecute voter fraud fizzled.

The file of a Texas Legislative Council researcher tasked with "…look[-ing] into fraud in elections in TX" for the House Committee on Elections in 2006[61] provides an important record of both the effort required in attempting to procure statistics and evidence of voter fraud from local elections and law enforcement officials.  I commend this researcher for her methodical approach, thoroughness and tenacity, as documented in her detailed notes of phone calls and follow up with state and local officials as she

---

[57] See *State of Texas v. Holder*, U. S. District Court for the District of Columbia, Docket No. CA 12-128, Transcript of Bench Trial, July 9, 2012, 42.

[58] See, Zachary Roth, "Greg Abbott's Bogus Voter Fraud Crusade," MSNBC.com, March 24, 2014; available at http://www.msnbc.com/msnbc/greg-abbott-bogus-voter-fraud-crusade.

[59] It is notable that the four known cases of voter impersonation at the polling place in Texas since 2000 all involve family members voting in the name of a deceased father (Jack Carol Crowder), a live father (the son of Hazel Woodard James), a live brother (Lorenzo Almanza) and a deceased sister (Mary Comparin).

[60] Dianna Hunt, "Democratic Precinct Chairwoman Candidate Indicted in Voter Fraud Case in Fort Worth," *Fort-Worth Star-Telegram*, May 1, 2012.

[61] See email from Nicole Tunks, Committee Clerk, (Texas) House Committee on Elections to Liz Morris, dated February 24, 2006, requesting research assistance, including "…a brief historical perspective of the allegations, traditions, or actual prosecutions of voter/ballot fraud in the state."  Texas Legislative Council, provided to me by lawyers, and marked "TX_00043798."

DESIGNATED HIGHLY CONFIDENTIAL                                      19

gathered data for her report (discussed above).[62]  She did what I would have done for this report, given the time and resources.  In the end, the researcher was unable to document voter impersonation at the polls or a significant record of intentional corruption of the voting process by voters.  Summarizing the opinions of the local election administrators she interviewed, she concludes: "The most consistently noted area of vulnerability in the voting system is the early voting mail ballot."[63]  This is borne out by the files notes from conversations with local officials:

From a *Conversation of Record* with Beverly B. Kaufman, Harris County Election Administrator (County Clerk), dated June 2, 2006:

> "The most prevalent problem, but it's not on large scale is bounty hunting by campaign – in a recent runoff a campaign was so intent on signing up as many voters as possible for mail ballots – didn't fill out accurately by age or eligibility…typically if someone commits vote fraud it's in onsies and twosies out of ingnorance (sic) or misinformation after seeing her share of election contests and recounts she's not convinced of any grand conspiracies by any one person or group to commit fraud."

From a *Conversation of Record* with Linda, Hardeman County Courthouse/County Clerk, dated May 30, 2006:

> "…there has only been one case that went to court.  Confirmed that it matched the arrest in June of 2005 – the gentleman got probation and a fine – the description makes it sound bad but all he did was mail it.  Possessing a ballot or envelope of another.  Count 1, 2-6 dismissed, campaigning to the homebound they requested ballots by mail – they then called him and said they were ready – stamped and sealed and everything but they couldn't get out to mail them so he went by, picked them up and mailed them.  Linda said – look there are less than 3,000 people here and everybody knows everybody – this was his first time running and now he knows he can't do that."

From a *Conversation of Record* with Helen Jamison, El Paso County Election Administrator, dated June 2, 2006:

> "Last year there was in investigation on ballot by mail issue – young lady working at a senior center had residents sign more than one request for a ballot by mail and leave the date of the election blank, as elections came aroung (sic) she would fill in the date of the election and send in the requests.  When the requests came in for a water district election last year it turned out that two of the seniors had died.  She was indicted but cleared.  There were accusations that the woman had told the seniors how to vote but that was not proven…They

---

[62] Texas Legislative Council Memorandum from Amy M. Young to The Honorable May Denny, Chair, House Committee on Elections, June 14, 2006.

[63] *Ibid.*,6.

DESIGNATED HIGHLY CONFIDENTIAL

are now more careful to check for original information on the requests…Vote fraud or manipulation of touch screen machines are not a problem in el Paso County –he feels like they have a handle on it and that she can truthfully say that there's not an individual or organization that is trying to commit vote fraud."

From a *Conversation of Record* with Jacque Callanen, Election Administrator, Bexar County, dated June 1, 2006:

"Huge issue – coyotes chase the ballots – most of the voter fraud is by mail – consultant (coyotes) and candidates flood senior citizens with mail in ballot applications – they either influence the voter when the ballot comes in or fill out the ballot application for the people and pick them up when the ballot comes in before the person can get it – the list of folks can be published after the primary so in primary runoffs coyotes knew who were getting a ballot and would get the runoff ballot – people get to polls and say didn't request …"

My review of the legislative record of public hearings and debates on S.B. 14 before the Texas state legislature corroborates this conclusion about the lack of evidence of voter impersonation at the polling place, and more broadly voter fraud in Texas.  No witness providing testimony at these hearings presented any compelling evidence of voters intentionally corrupting the voting process in the state of Texas in recent years. Instead, legislators were regaled with anecdotes, uncorroborated, allegedly eye-witness accounts and hearsay of stories of mysterious men with scars and purple-haired ladies,[64]

---

[64] *See, e.g.,* Carol Kitson, a retiree working as an alternate judge at a Harris County precinct during the 2010 election told the Committee:

In the late afternoon the election clerk, who was responsible for giving each voter their JBC ticket to allow them to use the machine, commented to the poll watcher -- to a poll watcher that he had just given a code to a man who had voted earlier that day. The poll watcher agreed with that and I, too, had noticed that particular voter, because he had a very distinguishing characteristic. He had a very distinct -- distinctive facial scar and he had very limited use of one arm, so he was very easy to note. The problem is I did not remember what name was on the voter card that he had used for his first vote. And because we had no way of correctly identifying him, as it is currently illegal to ask for a photo I.D., he voted a second time.

Transcript of Hearing on Voter Fraud Before the House of Representatives of the State of Texas, 82nd Legislature, Vol. 2 (March 1, 2011), 260.

Another election judge named Mary Ann Collins provided a similar unsubstantiated anecdote:

I have poll watched early voting. And while I was poll watching early voting, I saw a lady come in with purple hair, and that absolutely got my attention. Later that afternoon I saw what I thought was the very same lady with the purple hair coming in to vote, and I thought, she's been here before. Then I thought, oh, no, she's passed the qualifying table, so I'm just misreading things. It turned out later I was talking -- it dawned on me that she indeed probably had been there before and was voting on another person's certificate at that time.

*Ibid.*, 255.

DESIGNATED HIGHLY CONFIDENTIAL                                                   21

among examples of voter intimidation, mishandling of absentee ballots, and other forms of electoral corruption that are not addressed by S.B. 14.

News reports over the 2000 to 2014 period similarly provide no counterfactual information challenging the conclusion that voter impersonation and voter fraud are rare in Texas (see attached list of news articles reviewed for this report).

Finally, in the course of conducting the research on voter fraud that is published in *The Myth of Voter Fraud*, I sent public records requests to all state Attorneys General and all Secretaries of State in those states where the Secretary of State serves at the chief elections official, for copies of all records and referrals of all voter fraud cases sent to U.S. Attorneys, the Texas Attorney General and local prosecutors since 2000 (see copy of letters sent to then-Secretary of State Roger Williams, dated September 6, 2006, and then-Attorney General John Cornyn (provided separately)). The Attorney General's office never replied to my letter; however, the Secretary of State's office sent me the requested information. In all, there are records of 60 referrals to the OAG, some accompanied by responses from prosecutors.[65] Of these 60 referrals, none concern allegations of voter impersonation at the polls. Instead, consistent with patterns observed in the other data and records analyzed above, most of the referrals dealt with allegations of criminal violations of the state's absentee and early voting laws, mishandling of mail ballots, unlawful assistance to the voter, coercion or intimidation of voters, and alleged ballot tampering and electioneering at the polls.

## IV. CONCLUSION

Voters can only influence the part of the electoral process to which they have access, namely casting their votes. There is virtually no evidence available suggesting that voters are intentionally corrupting the electoral process in Texas or nationally. Accordingly, I conclude that stringent photo identification requirements to vote are not justified by claims that such requirements are needed to reduce or prevent voter impersonation forms of election fraud because as the empirical record makes clear, fraud committed by voters in Texas on Election Day is exceedingly rare.

---

[65] I cross-checked (by date referred) the materials provided by the Texas Secretary of State's office against Major Mitchell's spreadsheet, titled "Election Code Referrals to the Office of the Attorney General, August 2002 – Present," (Exhibit 41 accompanying Major Mitchell's testimony in *State of Texas v. Holder* referenced above). The two compilations of data largely, but not perfectly, correspond. Between August 28, 2002 and September 25, 2006, Major Mitchell accounts for 46 referrals, several of which are not accounted for in the Secretary of State's documents.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct to the best of my knowledge and this Declaration was executed on June _26^TH_

2014 in _Montreal, Canada_.


_Lorraine C. Minnite_

Lorraine C. Minnite

# LORRAINE C. MINNITE

Rutgers, State University of New Jersey-Camden
Dept. of Public Policy & Administration
401 Cooper Street, Rm. 102
Camden, New Jersey 08102
lcm130@camden.rutgers.edu
Tel. (856) 225-2526

## EDUCATION

**The Graduate School and University Center of the City University of New York**
    **Ph.D.** in Political Science, 2000
    *Dissertation:* "Identity, Voting Rights and the Remapping of Political Representation in New York City"
    *Honors:* Distinction

    **M.Phil.** in Political Science, 1994
    *Major field:* American Politics
    *Minor field:* Public Policy

    **M.A.** in Political Science, 1992
    *Master's Thesis:* "The Ecology of the Underclass: William Julius Wilson and the Chicago School"

**Boston University, College of Liberal Arts**
    **B.A.** in History, 1983
    *Area of Concentration:* American Civilization
    *Honors:* Cum Laude

## ACADEMIC EXPERIENCE

**Associate Professor**
*Rutgers, The State University of New Jersey – Camden Campus, 2011 to present.*
Teach graduate courses in public policy and community development and undergraduate courses in urban studies.

**Assistant Professor**
*Barnard College, Columbia University, January 2000 to 2011.*
Taught undergraduate courses in American politics and urban studies.

**Associate Director**
*The Center for Urban Research and Policy, Columbia University, December 1993 to 2000.*
Responsible for the day-to-day management of the Center; wrote grant proposals and helped secure funding from government and private sources for all activities totaling nearly $2,000,000.

**Instructor and Research Associate**
*Metropolitan Studies Department, New York University, Spring 1991.*
Designed and taught a core course for undergraduates on the political and economic development of post-war American cities.

**Assistant Program Director**
*Borough of Manhattan Community College, City University of New York, 1987 to 1990.*
Assisted the Director in all administrative aspects of the BMCC Summer Immersion Program, a non-traditional, intensive, remedial education program.

**Research Assistant and Data Analyst**
*CUNY Data Service, The Graduate School, City University of New York, 1987 to 1991.*
Programmed and analyzed large data sets from the 1980 STF and PUMS (microdata) Census files, and the New York City Housing and Vacancy Surveys.

**Research Assistant**
*Department of Political Science, The Graduate School, City University of New York, 1985 to 1987.*
Worked on various research projects for Prof. Marilyn Gittell.

# OTHER EMPLOYMENT

**Research Director**
*Project Vote, 2010 to 2011.*
Developed a research program and conducted research for a non-profit organization that runs voter registration drives, litigates violations of the National Voter Registration Act of 1993, and advocates for the voting rights of minorities, youth and the poor.

**Issues Director**
*The Committee for David N. Dinkins, II, New York City, 1991 to 1993.*
Conducted research for Mayor David N. Dinkins' campaign committee on a wide range of public policy issues and problems facing New York City.

**Campaign Manager**
*McCabe for City Council, Brooklyn, New York, 1991.*
Organized and administered a successful campaign for the Democratic Party nomination and the New York City Council seat in the 38th Council District.

**Union Organizer**
*District 65/UAW, (AFL-CIO), Northeast Regional Office, Boston, Massachusetts, 1984 to 1985, Summer 1986.*
Participated in the planning and implementation of a union organizing campaign; served as editor of a union local's newsletter; assisted negotiating committee in contract negotiations.

# ACADEMIC AND PROFESSIONAL HONORS

Distinguished Alumni Award, Department of Political Science, CUNY Graduate School, 2014
Jay Sigler Award for Teaching Excellence, Rutgers-Camden Public Administration Student Association, 2013
Affiliated Faculty, Center for Community Leadership, Rutgers-Camden, 2013 to present
Affiliated Faculty, Center for Urban Research and Education, Rutgers-Camden, 2012 to present
Civic Engagement Faculty Fellow, Rutgers-Camden, 2012
Selected a "Top Wonk" in Democracy and Elections, The Agenda Project, 2012
2011 *Choice* Magazine "Outstanding Academic Title" for *The Myth of Voter Fraud*
Carnegie Corporation of New York Special Opportunities Fund Award ($50,000), 2007
Senior Fellow, Dēmos – A Network for Ideas and Action, 2006 to present
Member, Working Group on Immigration Challenges, The Century Foundation Homeland Security Project, 2004
Faculty Fellow, Institute for Social and Economic Research and Policy, Columbia University, 2002 to 2011
Member, Working Group on New York's Recovery from 9-11, Russell Sage Foundation, 2002 to 2005
Curriculum Development Award ($1,500), Barnard Project on Diaspora and Migration, 2000
CUNY Graduate School Dissertation Year Fellowship ($10,000), 1996-1997

# PROFESSIONAL AFFILIATIONS

American Political Science Association
American Sociological Association
European Sociological Association

2

Planners Network
Social Science History Association
Urban Affairs Association

## COURSES

*Rutgers-Camden*
Alternative Development Strategies for Distressed Cities
Civic Engagement, Nonprofits and Community Development
Foundations of Policy Analysis
Politics of Community Development
Poverty and the Urban Environment
Research Workshop

*Barnard College*
American Urban Politics
Contemporary Urban Problems
Dynamics of American Politics
Participation and Democracy
Senior Research Seminar in American Politics
Urban Myths and the American City

*New York University*
The Crisis of the Modern American City

*Graduate Committees (Examiner)*
Columbia University Ph.D. Program in Political Science, Dissertation Committee, 12/00, 5/03, 5/09.
Columbia University School of Architecture, Planning and Preservation, Dissertation Proposal Committee, 2/08.
Columbia University School of Architecture, Planning and Preservation, Dissertation Committee, 4/10.
CUNY Graduate Center Ph.D. Program in Political Science, Dissertation Committee, 4/05, 5/06, 8/06.
CUNY Graduate Center Ph.D. Program in Political Science, Oral Doctoral Exam, 12/00.

## PEER-REVIEWED PUBLICATIONS

*Books*

*The Myth of Voter Fraud*, Ithaca, New York: Cornell University Press, 2010.

*Keeping Down the Black Vote: Race and the Demobilization of American Voters*, New York: The New Press, 2009; co-authored with Frances Fox Piven and Margaret Groarke.

*Journal Articles*

"New Challenges in the Study of Right-wing Propaganda: Priming the Populist Backlash to 'Hope and Change,'" *New Political Science* 34:4 (2012), 506-526.

 "Modeling Problems in the Voter ID-Voter Turnout Debate," *Election Law Journal* 8:2 (2009), 85-102; co-authored with Robert S. Erikson.

 "Models, Assumptions, and Model Checking in Ecological Regressions," *Journal of the Royal Statistical Society* 164, Part 1 (2001), 101-118; co-authored with Andrew Gelman, David K. Park, Stephen Ansolabehere, and Phillip N. Price.

*Chapters in Edited Volumes*

"Competing Concepts of Social Class: Implications and Applications for Community Development," in Mae Shaw and Marjorie Mayo, eds., *Class, Inequality and Community Development*, Bristol, UK: Policy Press at the University of

Bristol, *in progress*; co-authored with Frances Fox Piven.

"Making Policy in the Streets," in James DeFilippis, *Urban Policy in the Age of Obama*, Minneapolis: University of Minnesota Press, *in-progress;* co-authored with Frances Fox Piven.

"Crisis, Convulsion and the Welfare State," in Kevin Farnsworth and Zoë Irving, eds. *Social Policy in an Age of Austerity*, Policy Press, *in-progress*; co-authored with Frances Fox Piven.

"Poor People's Politics," in David Brady and Linda Burton, eds., *Oxford Handbook of Poverty and Society*, New York: Oxford University Press, *forthcoming* (2015); co-authored with Frances Fox Piven.

"Voter Identification Laws: The Controversy Over Voter Fraud," in Matthew J. Streb, ed., *Law and Election Politics: The Rules of the Game*, 2nd Ed., New York: Routledge, 2012.

"Lost in Translation? A Critical Reappraisal of the Concept of Immigrant Political Incorporation," in Jennifer Hochschild and John H. Mollenkopf, eds., *Bringing Outsiders In: Transatlantic Perspectives on Immigrant Political Incorporation*, Ithaca, New York: Cornell University Press, 2009.

"Environmental Risk and Childhood Disease in an Urban Working Class Caribbean Neighborhood," in Sherrie L. Baver and Barbara Lynch Deutsch, ed., *Beyond Sun and Sand: Caribbean Environmentalisms*, New Brunswick, NJ: Rutgers University Press, 2006; co-authored with Immanuel Ness.

"Outside the Circle: The Impact of Post-9/11 Responses on the Immigrant Communities of New York City," in John H. Mollenkopf, ed., *Contentious City: The Politics of Recovery in New York City*, New York: Russell Sage Foundation, 2005.

"Between White and Black: Asian and Latino Political Participation in the 2000 Presidential Election in New York City," in William E. Nelson, Jr. and Jessica Lavariega Monforti, eds., *Black and Latino/a Politics: Issues in Political Development in the United States*, Miami: Barnhardt and Ash, 2005; co-authored with John Mollenkopf.

"The Changing Arab New York Community," in Kathleen Benson and Philip M. Kayal, eds., *A Community of Many Worlds: Arab Americans in New York City*, Syracuse: Syracuse University Press, 2002; co-authored with Louis Abdellatif Cristillo.

"Social Capital, Political Participation and the Urban Community," in Susan Saegert, J. Phillip Thompson, and Mark Warren, eds., *Social Capital and Poor Communities*, New York: Russell Sage Foundation, 2001; co-authored with Ester R. Fuchs and Robert Y. Shapiro.

"Patterns of Neighborhood Change," in John H. Mollenkopf and Manuel Castells, eds., *Dual City: Restructuring New York*, New York: Russell Sage, 1991; co-authored with Frank F. DeGiovanni.


## OTHER PUBLICATIONS

### Chapter in Conference Proceedings

"The Political Participation of Immigrants in New York," in *In Defense of the Alien: Proceedings of the 2000 Annual National Legal Conference on Immigration and Refugee Policy*, Vol. XXIII. New York: Center for Migration Studies, 2001; co-authored with Jennifer Holdaway and Ronald Hayduk.

### Encyclopedia Entries

"The Underclass," in *The International Encyclopedia of Social and Behavioral Sciences*, Elsevier, *forthcoming*; co-authored with Paul J. Jargowsky.

"Welfare," in *The International Encyclopedia of Social and Behavioral Sciences*, Elsevier, *forthcoming*; co-authored with Joan Maya Mazelis.

"Voter Participation," in *The Encyclopedia of Social Work*, 20th ed., New York: Oxford University Press, 2008, online

version 2013; co-authored with Frances Fox Piven.

"The Working Families Party," in Immanuel Ness, ed. *The Encyclopedia of American Third Parties*, Armonk, New York: M.E. Sharpe, Inc., 2000.

### Book Reviews

*Waiting for the Cemetery Vote,* by Tom Glaze*, American Review of Politics*, (Spring/Summer 2012).

*Election Fraud: Detecting and Deterring Electoral Manipulation* edited by R. Michael Alvarez, Thad Hall and Susan D. Hyde, *Election Law Journal* 8:3 (2009).

*Governing From Below: Urban Regions and the Global Economy* by Jefferey M. Sellers, Cambridge University Press, 2002, in *Political Science Quarterly* Vol. 118, No. 4 (Winter 2003-2004).

*Social Class, Politics, and Urban Markets: The Makings of Bias in Policy Outcomes* by Herman L. Boschken, Stanford, CA: Stanford University Press, 2002, in *The International Journal of Urban and Regional Research*, Vol. 27, No. 4 (December 2003).

*The Miami Fiscal Crisis: Can A Poor City Regain Prosperity?* by Milan J. Dluhy and Howard A. Frank, Westport, Connecticut: Praeger Publishers, 2002, in *Political Science Quarterly* Vol. 117, No. 4 (Winter 2002-2003).

### Research Reports, Memoranda and Briefs

*The Misleading Myth of Voter Fraud in American Elections*, Key Findings Brief, Scholars Strategy Network, February 2014.

*Latino New Yorkers in the 2008 Presidential Election: The New Americans Exit Poll,* New York Latino Research Network (NYLARNet) at The University of Albany, Fall 2011.

*Research Memo: First-time Voters in the 2008 Election,* Project Vote, Washington, D.C., April 2011.

*An Analysis of Who Voted (And Who Didn't Vote) in the 2010 Election*, Project Vote, Washington, D.C., November 2010.

*Research Memo: Debunking the Tea Party's Election Night Message,* Project Vote, Washington, D.C., October 26, 2010.

*What Happened to Hope and Change? A Poll of 2008 Voters*, Project Vote, Washington, D.C., September 2010.

*Election Day Registration: A Study of Voter Fraud Allegations and Findings on Voter Roll Security*, Dēmos – A Network for Ideas and Action, New York, November 2007.

*The Politics of Voter Fraud*, Project Vote, Washington, D.C., March 2007.

*Securing the Vote: An Analysis of Election Fraud*, Dēmos – A Network for Ideas and Action, 2003, New York; updated 2007; co-authored with David Callahan.

### Journalism

My expertise on elections and voter fraud was sought and widely cited and I was quoted in print and broadcast media during the 2008, 2010 and 2012 election seasons, including, for example, in the following: *The New Yorker Magazine*, *The New Republic*, *Mother Jones*, *The Wall Street Journal*, *In These Times*, *American Prospect*, *Washington Monthly*, *Monthly Review*, *New Left Review*, *The New York Times*, *The Washington Post*, Associated Press, McClatchy, Al Jazeera English (*Fault Lines*, Washington, D.C.), WZBC (*News*, Boston), WBAI (*Democracy Now!*, New York), WNYC (*The Brian Lehrer Show*, New York), WHYY (*Radio Times*, Philadelphia), NPR (*Morning Edition*, Washington, D.C.), CBS News, ABC News Radio, Salon.com, Talking Points Memo, Alternet, The Huffington Post, Slate Magazine, and CQ Researcher, among others.

"Movements Need Politicians – And Vice Versa," *The Nation*, October 22, 2012; co-authored with Frances Fox Piven.

"The Other Campaign: Who Gets To Vote," *New Labor Forum*, May 2012; co-authored with Frances Fox Piven.

"Why We Need ACORN," *Los Angeles Times*, April 22, 2010; co-authored with Frances Fox Piven.

"Re-Drawing the Map of U.S. Politics," *Red Pepper*, April, 2008; co-authored with Frances Fox Piven.

"N.C. Rejects Politics of Fear," *The Charlotte Observer*, Charlotte, North Carolina, July 18, 2007.

"They Are Arriving: Immigrants Are Gaining Power in New York's Voting Booths," *New York Daily News,* New York, July 24, 2005.

"Albany's Making Bad Elections Worse," *New York Daily News,* New York, August 22, 2004.

## UNPUBLISHED PAPERS, PRESENTATIONS AND REPORTS

### *Works in Progress*

"The Political Exclusion of the Urban Poor"

"Food Movements and Food Policy"

 "Voter Purging Under the National Voter Registration Act of 1993"

 "Is Political Polarization Good or Bad for Democracy?"

 "To Comply Or Not To Comply: Bureaucratic Barriers and Political Resistance in the Implementation of the National Voter Registration Act of 1993"

"Latino Voting Patterns in New York State"

"The Supreme Court's Tortured Voting Rights Jurisprudence"

### *Conference Participation, Papers and Invited Presentations*

"The Poverty of Politics in a Northern City: A Case Study of Democratic Inclusion and Economic Exclusion in Philadelphia, 1960-2010," paper presented at the 39th Annual Meeting of the Social Science History Association, Toronto, November 6-9, 2014.

"Crisis, Convulsion and the Welfare State," roundtable presentation at the 109th Annual Meeting of the American Sociological Association, San Francisco, August 16-19, 2014; co-authored with Frances Fox Piven.

 "Making Policy in the Streets," paper presented at the 44th Annual Meeting of the Urban Affairs Association, San Antonio, March 20, 2014; co-authored with Frances Fox Piven.

Invited Panelist, "Voter Suppression, Equal Rights, and the Promise of Democracy," sponsored by the Scholars Strategy Network, the Center for American Political Studies, and the Malcolm Wiener Center for Social Policy, Harvard University, March 6, 2014.

"Crisis, Convulsion and the Welfare State," paper presented at the 11th Annual Meeting of the European Sociological Association, Torino, Italy, August 28-31, 2013; co-authored with Frances Fox Piven.

Invited Panelist, "Anatomy of A Public Interest Lawsuit: Voter ID Legislation – A Public Interest Legal Challenge," sponsored by Penn Law Clinical Programs, Lawyering in the Public Interest, Toll Public Interest Center, American Constitution Society and the Civil Rights Law Project, University of Pennsylvania Law School, Philadelphia, Pennsylvania, November 5, 2012.

Invited Panelist, "The Voting Rights Act: Where Do We Go From Here?" Rutgers University Law Review Symposium,

Trenton, New Jersey, April 13, 2012.

Invited Panelist, "Voting Rights," Civil Rights Law Society, Columbia University Law School, New York City, March 20, 2012.

Invited Panelist, "Race and Public Policy," conference at George Mason University School of Public Policy, Arlington, Virginia, October 10, 2011.

Invited Panelist, "Organizing the Poor for Rights: The Work of Frances Fox Piven," 107th Annual Meeting of the American Political Science Association, Seattle, September 1-4, 2011.

"Is Political Polarization Good or Bad for Democracy?," paper presented at the 69th Annual Meeting of the Midwest Political Science Association, Chicago, March 30-April 2, 2011.

Invited Roundtable Participant, "Voter Disenfranchisement in American Politics," 82nd Annual Meeting of the Southern Political Science Association, New Orleans, January 6-8, 2011.

Invited Panelist, "Voter Participation," New York City Charter Revision Commission, New York City, June 2, 2010.

Discussant, "Immigrant Voters: Asian Americans and the 2008 Election," Immigration Seminar Series, Graduate School and University Center of the City University of New York, May 4, 2009.

"Purging Voters Under the NVRA," paper presented at the 67th Annual Meeting of the Midwest Political Science Association, Chicago, April 2-5, 2009; co-authored with Margaret Groarke.

Invited Panelist, "Democracy in America: The African-American Experience – Then, Now and Future," U.S. Mission to the United Nations, New York, March 17, 2009.

Invited Speaker, "Voter Suppression in the 2008 Presidential Election," Funders Committee for Civic Participation, Washington, D.C., December 9, 2008.

Invited Panelist, "Stealing the Vote in 2008," A Panel Discussion at New York University, October 16, 2008.

Invited Panelist, "Keeping Down the Vote: Vote Suppression and the 2008 Election," Sarah Lawrence College, September 23, 2008.

"Modeling Problems in the Voter ID-Voter Turnout Debate," paper presented at the 8th Annual State Politics and Policy Conference, Temple University, Philadelphia, May 30-31, 2008; co-authored with Robert S. Erikson.

Panelist, "Keeping Down the Black Voter: Race and the Demobilization of American Voters," *Left Forum*, New York, March 16, 2008.

Panel Discussant, "Group Mobilization, Partisanship, Ideas, and Leadership: The Los Angeles and New York Mayoral Elections of 2005," 102nd Annual Meeting of the American Political Science Association, Philadelphia, August 31-September 3, 2006.

"Re-thinking Immigrant Political Incorporation," paper presented at the 36th Annual Meeting of the Urban Affairs Association, Montreal, Canada, April 19-22, 2006.

"Immigrant Politics in an Age of Terror," paper presented at the 101st Annual Meeting of the American Political Science Association, Washington, D.C., September 1-4, 2005.

Panel Discussant, "Immigrants As Local Political Actors," 100th Annual Meeting of the American Political Science Association, Chicago, September 1-4, 2004.

Invited Lecturer, "Literature of Immigration," New Jersey Council for the Humanities Teacher Institute, Monmouth University, Long Branch, New Jersey, August 5, 2004.

"The Impact of 9/11 on Immigrant Politics in New York, With a Focus on Arab, Muslim, and South Asian Immigrant

Communities," Columbia University Seminar on the City, New York City, March 23, 2004.

Invited Participant, "The Impact of Post-9/11 Immigration and Law Enforcement Policies," The Century Foundation, New York City, February 4, 2004.

Workshop Participant, Multi-race Study Group, *Harvard CAPS Workshop on Methodologies to Study Immigrant Political Incorporation*, Harvard University, Cambridge, October 30-31, 2003.

Invited Lecturer, "Literature of Immigration," New Jersey Council for the Humanities Teacher Institute, Monmouth University, Long Branch, New Jersey, July 10, 2003.

Panelist, "Rebuilding Post-War Iraq: Domestic and International Implications;" Community Forum, Barnard College, New York City, April 21, 2003.

"Political Participation and the Neglected Role of Spatial Form;" paper presented at the 33rd Annual Meeting of the Urban Affairs Association, Cleveland, Ohio, March 27-30, 2003.

Invited Speaker, "Teach-In on Iraq;" Barnard College, New York City, November 8, 2002.

Panelist, "Colloquium on Responding to Violence," in honor of Virginia C. Gildersleeve Lecturer, Jody Williams, Barnard Center for Research on Women, Barnard College, New York City, October 25, 2002.

Panel Moderator, "Who is Brooklyn?" at *The Future of Brooklyn* Conference, Brooklyn College, June 7, 2002.

"Asian and Latino Participation in New York City: The 2000 Presidential Election," paper presented at the 97th Annual Meeting of the American Political Science Association, San Francisco, August 29 – September 2, 2001; co-authored with John H. Mollenkopf.

Organizer and Panelist, *The Changing Face of New York's Electorate: The Immigrant Vote in 2000 and Beyond*, A Panel Discussion and Media Briefing sponsored by the New York Immigration Coalition and Barnard College, New York City, May 2, 2001.

Organizer and Panelist, *The Muslim Communities in New York City Project; A One-Day Conference*, sponsored by the Center for Urban Research and Policy and the Middle East Institute at the School of International and Public Affairs, Columbia University, New York City, April 30, 2001.

Panelist, *Democratizing New York City; Re-imagining City Government*, sponsored by the Center for Humanities, CUNY Graduate Center, New York City, March 27, 2001.

Organizer and Panel Moderator, *Independent Politics in A Global World*, sponsored by the Independent Politics Group, CUNY Graduate Center, New York City, October 6-7, 2000.

"Political Capital and Political Participation," paper presented at the 96th Annual Meeting of the American Political Science Association, Washington, D.C., August 31-September 3, 2000; co-authored with Ester R. Fuchs and Robert Y. Shapiro.

"The Political Participation of Immigrants in New York," at *Immigrant Political Participation in New York City; A One-Day Working Conference*, sponsored by the Center for Urban Research/CUNY and the International Center for Migration, Ethnicity, and Citizenship, New York City, June 16, 2000

"The Muslim Community in New York City Project," with Louis Abdellatif Cristillo; *Muslims in New York: An Educational Program for Religious Leaders in New York City*, seminar on faith traditions in New York; sponsored by the Interfaith Center of New York and the Imans Council of New York, New York City, June 14, 2000.

"The Political Participation of Immigrants in New York," Session VI on *Integration of Immigrants and Their Descendents*, Center for Migration Studies 20th Annual National Legal Conference on Immigration and Refugee Policy, Washington, D.C., March 30-31, 2000.

"The Changing Arab New York Community," with Louis Abdellatif Cristillo; *A Community of Many Worlds: Arab*

*Americans in New York City*, symposium sponsored by the Museum of the City of New York, New York City, February 5-6, 2000.

"The Political Incorporation of Immigrants in New York," paper presented at the 95th Annual Meeting of the American Political Science Association, Atlanta, September 1-4, 1999; co-authored with Jennifer Holdaway and Ronald Hayduk .

"Political Capital and Political Participation," co-authored with Ester R. Fuchs and Robert Y. Shapiro; paper presented at the 58th Annual Meeting of the Midwest Political Science Association, Chicago, April 15-17, 1999.

"Racial and Ethnic and Urban/Suburban Differences in Public Opinion and Policy Priorities," paper presented at the 58th Annual Meeting of the Midwest Political Science Association, Chicago, April 15-17, 1999; co-authored with Ester R. Fuchs, Robert Y. Shapiro, and Gustavo Cano.

"The Importance of Full Disclosure of Non-response Due to Refusals and the Nature of Potential Bias in Phone Surveys," with Robert Y. Shapiro, evening workshop presentation to the New York City chapter of the American Association for Public Opinion Research, New York City, March 9, 1999.

"White, Black and Latino Voter Turnout in the 1993 New York City Mayoral Election:  A Comparison of Ecological Regression Techniques and Exit Poll Data," paper presented at the 94th Annual Meeting of the American Political Science Association, Boston, September 4, 1998; co-authored with David K. Park and Daniel M. Slotwiner.

Panel Discussant, "Race, Rights, and American Politics;" panel at the 27th Annual Meeting of the Northeastern Political Science Association and International Studies Association-Northeast, Newark, New Jersey, November 9-11, 1995.

"Assessing the Quality of Political Reform: Redistricting and the Case of New York City," paper presented at the Annual Meeting of the New York State Political Science Association, Albany, New York, April 22, 1994.

### Research Reports

*How to Think About Voter Participation*, White Paper, New York City Charter Revision Commission, July 2010.

*The Myth of Voter Fraud*, White Paper, Dēmos – A Network for Ideas and Action, May 2002.

*Evaluation of the New York Immigration Coalition's '200,000 in 2000: New Americans Pledging to Strengthen Democracy and New York' Initiative,* Final Report to the New York Foundation, with John H. Mollenkopf, August 2001.

*A Study of Attitudes Among Low-Income Parents Toward Environmental Health Risks and Childhood Disease: The Brooklyn College COPC Survey*, with Immanuel Ness, June 2001.

*Political Participation and Political Representation in New York City; With a Special Focus on Latino New Yorkers*, Report of the Columbia University/Hispanic Education and Legal Fund Opinion Research Project, co-authored with Robert Y. Shapiro and Ester R. Fuchs, December 1997.

### Congressional Testimony, Amicus Filings and Expert Witness Participation in Court Cases

Expert Witness, *LULAC (formerly Jones) et al. v. Deininger*, U.S. District Court for the Eastern District of Wisconsin, 2012-2013.

Expert Witness, *Applewhite v. Commonwealth of Pennsylvania*, Commonwealth Court of Pennsylvania, 2012-2013.

*Shelby County, Alabama v. Holder*, U.S. Supreme Court, Brief of Historians and Social Scientists as *Amici Curiae* in Support of Respondents, February 1, 2013 (signatory).

Expert Certification, *Rutgers University Student Assembly et al. v. Middlesex County Board of Elections*, Superior Court of New Jersey/Middlesex County, 2011-present.

*League of Women Voters v. Rokita;* Supreme Court of Indiana, Brief of *Amici Curiae* Lonna Rae Atkeson, Matt A. Barreto, Lorraine C. Minnite, Jonathan Nagler, Stephen A. Nuño and Gabriel Ramon Sanchez in Opposition to Defendant's Petition to Transfer, November  2009.

Expert Witness, *Democratic National Committee, et al. v. Republican National Committee, et al.*, U.S. District Court in the District of New Jersey, 2008-2009.

U.S. Senate Committee on Rules and Administration, *Hearing on In-Person Voter Fraud: Myth and Trigger for Voter Disenfranchisement?*, March 12, 2008 (written testimony).

Expert Witness, U.S. House Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Civil Liberties, *Oversight Hearing on Voter Suppression*, February 26th, 2008 (oral and written testimony).

*William Crawford, et al. v. Marion County Election Board, et al.; Indiana Democratic Party, et al. v. Todd Rokita et al.; U.S. Supreme Court,* Brief of *Amici Curiae* The Brennan Center for Justice, Demos: A Network for Ideas and Action, Lorraine C. Minnite, Project Vote, and People for the American Way Foundation *in Support of Petitioners*, November 2007.

*William Crawford, et al. v. Marion County Election Board, et al.; Indiana Democratic Party, et al. v. Todd Rokita et al.; U.S. Supreme Court,* Brief of *Amici Curiae* of Historians and Other Scholars *in Support of Petitioners*, November 2007 (signatory).

Fact Witness, *ACORN et al. v. Bysiewicz*, U.S. District Court in the District of Connecticut, 2004-2005.

## RESEARCH GRANTS

*Principle Investigator*, "The Political Exclusion of the Urban Poor," Rutgers Research Council Award, 2013-2014 ($3,000).

*Recipient*, RU FAIR ADVANCE (NSF) Camden Travel Award, March/April 2013 ($1,590).
Funded by the Rutgers University Office for the Promotion of Women in Science, Engineering, and Mathematics (SciWomen) Institutional Transformation grant from the ADVANCE program of the National Science Foundation.

*Principal Investigator*, "University Collaborative Exit Poll," November 2008 to October 2009 ($30,000). Funded by Columbia University Institute of Social and Economic Research and Policy, Center for Urban Research at the Graduate School and University Center of the City University of New York, and the New York Latino Research and Resources Network at the University of Albany, State University of New York.

*Co-Principal Investigator*, "2006 New Americans Exit Poll," November 2006 to October 2007 ($10,000). Funded by the Graduate School of Arts and Sciences, Columbia University.

*Recipient*, Special Assistant Professor Leave Travel Grant, September 2003 to September 2005 ($7,700). Funded by the Provost's Office, Winston Fund, Barnard College.

*Recipient*, Conference Grant, September 2003 to September 2005 ($3,000). Funded by the Provost's Office, Forman Fund, Barnard College.

*Member*, Working Group on New York's Recovery from September 11th, June 2002 to June 2005 ($30,000). Funded by the Russell Sage Foundation.

*Principal Investigator*, "2002 New Americans Exit Poll," December 2002 to March 2003 ($1,800). Funded by the Faculty Research Fund of Barnard College.

*Principal Investigator*, "Evaluation of the New York Immigration Coalition's '200,000 in 2000' Campaign," July 2000 to July 2001 ($40,000). Barnard College, Columbia University. Funded by the New York Foundation.

*Co-Principal Investigator*, "Muslim Communities in New York City," July 1998 to July 2001 ($350,000). The Center for Urban Research and Policy, Columbia University. Funded by the Ford Foundation.

# SERVICE

### College and University

Member, General Education Committee, Subcommittee on Engaged Civic Learning, 2013-2014.
Marshal, Rutgers-Camden Commencement, 2013, 2014.
Director, Undergraduate Urban Studies Program, Rutgers-Camden, 2011-to present.
Member, Ford Faculty Seminar on Inequality in New York, Barnard College, 2009-2010.
Panelist, "Obama and the Immigrant Vote," Barnard Forum on Migration, October 30, 2008.
Panel Moderator, "Is Democracy Democratic?" at the Thirty-Third Annual *The Scholar and the Feminist Conference*, Barnard College, March 11, 2008.
Participant, Mellon 23 Assembly, Macalester College, St. Paul, Minnesota, February 15-17, 2008.
Panelist, "Election Reflections: The Bush Legacy and the Coming Presidential Elections," Barnard College, Oct. 8, 2007.
Member, *The Scholar and the Feminist Conference* Planning Committee, Barnard Center for Research on Women, 2006.
Member, Faculty Programs and Governance Committee, 2005-2007 (on leave Spring 2007).
Member, Faculty Committee, Barnard Leadership Initiative, 2005-2007 (on leave Spring 2007).
Member, Medalist Committee, Barnard College, 2004-2006, 2007-2009 (on leave Spring 2007).
Member, Columbia University Seminar in Political and Social Thought, 2004 to 2011.
Faculty Mentor, Francene Rodgers Scholarship Program, Barnard College, Summer 2004.
Panel Moderator, "Governance by the Media: Feminists and the Coming Election," at the Twenty-Ninth Annual *The Scholar and the Feminist Conference*, Barnard College, April 3, 2004.
Member, Ph.D. Subcommittee in Urban Planning, Columbia University School of Architecture, Planning and Preservation, 2003 to 2011.
Member, Columbia University Seminar on Globalization, Labor, and Popular Struggles, 2001 to 2011.
Member, Columbia University Seminar on the City, 2001 to 2011.
Faculty Mentor, Columbia University Graduate School of Arts and Sciences Summer Research Program, 2001.
Advisory Board Member, Barnard Center for Research on Women, 2000 to 2011.
First Year Adviser, Barnard College, 2000 to 2004, 2009 to 2011.
One-Year Replacement Member, Committee on Programs and Academic Standing, Barnard College, 2000-2001.

### Professional

I have reviewed numerous journal articles for the *American Political Science Review*, *American Journal of Political Science*, *American Review of Politics*, *British Journal of Industrial Relations*, *Ethnic and Racial Studies*, *Journal of Ethnic and Migration Studies*, *Law and Society Review*, *New Political Science*, *Perspectives on Politics*, *Political Research Quarterly*, *Political Science Quarterly*, *Public Opinion Quarterly*, *Urban Affairs Review*, and *Working U.S.A.: The Journal of Labor and Society*; and book proposals and manuscripts for Blackwell Publishers, Lexington Books, Routledge, M.E. Sharpe, Inc., and The New Press.

Seminar Speaker, Carnegie-Knight News21 Initiative Reporting Seminar on Voting Rights, The Walter Cronkite School of Journalism and Mass Communication, Arizona State University, February 2, 2012.
Member, Best Book Committee, Urban Section, American Political Science Association, 2010-2011, 2012-2013.
Executive Council Member, Urban Section, American Political Science Association, 2005-2006, 2008-2010.
Member, Charles A. McCoy Career Achievement Award, New Politics Section, APSA, 2008-2009.
Member, Best Dissertation Committee, Urban Section, American Political Science Association, 2008-2009.
Co-chair, Local Host Committee, American Sociological Association Annual Conference, 2006-2007.
Nominating Committee, Urban Section, American Political Science Association, 2006-2007.
Chair, Piven and Cloward Award Committee, New Political Science Section, American Political Science Association, 2005-6.
Member, Best Paper Committee, Urban Section, American Political Science Association, 2005-2006.
Editorial Board Member, *Working USA: The Journal of Labor and Society*, 2004 to present.
Grant Reviewer, Research Award Program, The City University of New York, 2003.
Member, New York Colloquium on American Political Development, 2001 to 2011.

### Community

Board Member, Participatory Budgeting in New York City Research Board, 2013 to present.
Invited Speaker, Registrar's of Voters Association of Connecticut, Annual Meeting, Cromwell, CT, April 12, 2012.
Keynote Speaker, Federal Aviation Administration William J. Hughes Technical Center 2012 Black History Month

Celebration, Atlantic City, New Jersey, February 15, 2012.

Organizer, "National Teach-in on Debt, Austerity and How People Are Fighting Back," Judson Memorial Church, New York City, April 11, 2011.

Host Committee, New York State Immigrant Action Fund, 2010.

Board Member, The Left Forum, 2009 to 2013.

Member, New York City Comptroller-Elect John Liu Transition Committee Working Group on External Affairs, 2009.

Board Member, Project Vote, 2008-2009.

Speaker, "The Immigrant Voter in New York City," New York Voter Assistance Commission, New York City, May 19, 2005; Citizens Union, New York City, May 18, 2005; New York Immigration Coalition, New York City, February 17, 2005; New York City Central Labor Council, New York City, April 28, 2004.

Speaker, "The Post-9/11 Crackdown on Immigrants," Coney Island Avenue Project, Brooklyn, New York, March 25, 2004.

Volunteer, *New York Immigration Coalition*, Voter Registration at INS Naturalization Ceremonies, 1998 to 2002.


## PAID CONSULTANTSHIPS

*Arnold & Porter LLP, 2012-2013.*
Wrote expert reports for plaintiffs (2012, 2013) and testified (2012) as an expert witness in *Applewhite v. Commonwealth of Pennsylvania*, Commonwealth Court of Pennsylvania.

*New York City Charter Revision Commission, 2010.*
Analyzed the problem of voter participation in New York City and possible solutions for consideration by Commissioners as they prepared ballot referenda to be placed before the voters in 2010.

*New York Latino Research and Resources Network at the University of Albany, State University of New York, 2008.*
Analyzed survey and other data and wrote report on Latino political participation in New York City and New York State in the 2008 presidential election.

*New York Immigration Coalition, New York, New York, 2006.*
Provided technical assistance to a three-city exit poll survey project for the 2006 national midterm elections.

*Brennan Center for Justice at New York University School of Law, 2004-2005.*
Provided expert report on voter fraud and testified as a fact witness in *ACORN, et al. v. Bysiewicz* (Civil Action No. 3:04-CV-1624 (MRK)).

*Howard Samuels State Management and Policy Center, Graduate School and University Center of CUNY, 2002.*
Consulted on survey design for a project on the efficacy of community-based organizations.

*Dēmos, New York, New York, 2001 to 2002.*
Researched and wrote a study of voter fraud in contemporary American politics.

*1199 Child Care Fund, New York, New York, 2000 to 2002.*
Prepared demographic data for Fund-eligible union members and their children.

(6/14)

# LORRAINE C. MINNITE

### Description and Results of Access World News (Newsbank) Database Search

Newsbank's Access World News database is a premier academic resource providing full-text content of over 2,200 North American newspapers and more than 1,200 international newspapers, plus 300 wire services and over 200 broadcast news transcripts.[1]  The entire collection or a selection of newspapers by specific title, region, state, country, or continent can be searched.

For this report I searched the Access World News Texas state file for local news reports concerning voter fraud in Texas, using the Boolean search term: ["vote fraud" OR "voter fraud" OR "election fraud]" for January 1, 2000 to June 12, 2014.  The newspaper records in Access World News go back 10 to 30 years (see "Texas Newspapers and News Sources Included in Access World News Database" below for details).  The search produced 3,822 "hits."  I then scanned the titles and abstracts and selected a set of **698 articles**, to read and analyze in full.[2]  A list of these articles is attached.

---

[1] See, http://www.newsbankcolleges.com/colleges/product.cfm?product=269, for more information.

[2] I intended my search to be over-inclusive, and as a result, it produced many articles of no relevance to voter fraud in Texas, for example, coverage of elections in Afghanistan and the Ukraine where fraud was alleged.  In screening out the irrelevant material, I also excluded duplicate articles reporting redundant facts.  Identical wire service stories, for example, might be published across several different Texas newspapers.  Only one version of the story was included in the final set of articles I reviewed in full.

### Texas Newspapers and News Sources Included in Access World News Database

| Title | Date Range | Location | Source Type |
|---|---|---|---|
| *Abilene Examiner* | 11/22/2009-Current | Abilene | Web-Only Sources |
| *Abilene Reporter-News* | 12/12/2002-Current | Abilene | Newspapers |
| *Aggie Sports* | 06/24/2005-Current | Bryan-College Station | Newspapers |
| *Alvarado Post* | 01/04/2005-11/26/2010 | Alvarado | Newspapers |
| *Amarillo Examiner* | 10/14/2009-Current | Amarillo | Web-Only Sources |
| *Amarillo Globe-News* | 06/20/2002-Current | Amarillo | Newspapers |
| *Angleton Times, The* | 07/03/2002-03/27/2004 | Angleton | Newspapers |
| *Argyle Messenger, The* | 10/27/2006-11/30/2007 | Argyle | Newspapers |
| *Arlington Morning News* | 04/01/1996-01/12/2003 | Arlington | Newspapers |
| *Associated Press State Wire: Texas* | 12/31/2010-Current | TX | Newswires |
| *Athens Daily Review* | 07/30/2008-Current | Athens | Newspapers |
| *Austin American-Statesman* | 01/01/1989-Current | Austin | Newspapers |
| *Austin Examiner* | 10/10/2008-Current | Austin | Web-Only Sources |
| *Bay City Tribune, The* | 06/03/2001-Current | Bay City | Newspapers |
| *Baytown Sun, The* | 04/01/2001-Current | Baytown | Newspapers |
| *Beaumont Enterprise, The* | 01/01/2000-Current | Beaumont | Newspapers |
| *Beaumont Examiner* | 11/23/2009-06/10/2013 | Beaumont | Web-Only Sources |
| *Big Spring Herald* | 08/26/2008-Current | Big Spring | Newspapers |
| *Borger News-Herald* | 07/14/2008-Current | Borger | Newspapers |
| *Brazos Sports* | 06/24/2005-Current | Bryan-College Station | Newspapers |
| *Brazosport Facts, The* | 09/01/2001-Current | Clute | Newspapers |
| *Brownsville Examiner* | 10/01/2009-Current | Brownsville | Web-Only Sources |
| *Brownsville Herald, The* | 01/12/1993-Current | Brownsville | Newspapers |
| *Brownwood Bulletin* | 01/01/2006-Current | Brownwood | Newspapers |
| *Cedar Creek Pilot* | 07/30/2007-08/25/2011 | Gun Barrel City | Newspapers |
| *Cleburne Times-Review* | 08/04/2008-Current | Cleburne | Newspapers |
| *Commerce Journal* | 08/08/2008-Current | Commerce | Newspapers |
| *Corpus Christi Caller-Times* | 04/20/1993-Current | Corpus Christi | Newspapers |
| *Corpus Christi Examiner* | 06/25/2009-Current | Corpus Christi | Web-Only Sources |
| *Corsicana Daily Sun* | 12/19/2007-Current | Corsicana | Newspapers |
| *Daily Sentinel, The* | 08/31/2004-Current | Nacogdoches | Newspapers |
| *Dallas Examiner* | 07/08/2008-Current | Dallas | Web-Only Sources |
| *Dallas Morning News, The* | 08/12/1984-Current | Dallas | Newspapers |
| *Del Rio News-Herald* | 08/30/2001-Current | Del Rio | Newspapers |
| *Denton Record-Chronicle* | 07/30/2004-04/22/2014 | Denton | Newspapers |
| *Eagle, The* | 05/01/2002-Current | Bryan-College Station | Newspapers |
| *El Paso Examiner* | 07/17/2009-Current | El Paso | Web-Only Sources |
| *El Paso Times* | 01/01/1999-Current | El Paso | Newspapers |
| *Ennis Journal* | 11/09/2004-11/26/2010 | Ennis | Newspapers |
| *Fort Worth Examiner* | 03/18/2009-Current | Fort Worth | Web-Only Sources |
| *Fort Worth Star-Telegram* | 12/01/1990-Current | Fort Worth | Newspapers |
| *Gainesville Daily Register* | 12/17/2007-Current | Gainesville | Newspapers |
| *Galveston County Daily News, The* | 01/01/2002-Current | Galveston | Newspapers |
| *Garland Examiner* | 11/07/2009-Current | Garland | Web-Only Sources |
| *Graham Leader* | 11/04/2002-07/25/2005 | Graham | Newspapers |
| *Greenville Herald-Banner* | 06/19/2008-Current | Greenville | Newspapers |
| *Herald Democrat* | 11/30/2004-Current | Sherman | Newspapers |
| *Houston Chronicle* | 10/29/1985-Current | Houston | Newspapers |
| *Houston Examiner* | 08/28/2008-Current | Houston | Web-Only Sources |
| *Huntsville Item, The* | 11/28/2007-Current | Huntsville | Newspapers |

| | | | |
|---|---|---|---|
| *Jacksonville Daily Progress* | 07/15/2008-Current | Jacksonville | Newspapers |
| *Kerrville Daily Times* | 01/07/2001-Current | Kerrville | Newspapers |
| *Laredo Examiner* | 12/27/2009-09/20/2013 | Laredo | Web-Only Sources |
| *Longview News-Journal* | 04/27/2002-Current | Longview | Newspapers |
| *Lubbock Avalanche-Journal* | 06/06/2003-Current | Lubbock | Newspapers |
| *Lubbock Examiner* | 07/13/2009-Current | Lubbock | Web-Only Sources |
| *Lufkin Daily News, The* | 08/30/2004-Current | Lufkin | Newspapers |
| *Marshall News Messenger* | 08/30/2004-Current | Marshall | Newspapers |
| *Mexia News, The* | 09/13/2012-Current | Mexia | Newspapers |
| *Midland Reporter-Telegram* | 03/10/2001-Current | Midland | Newspapers |
| *Midland-Odessa Examiner* | 02/26/2009-Current | Midland, Odessa | Web-Only Sources |
| *Mineral Wells Index* | 11/29/2007-Current | Mineral Wells | Newspapers |
| *Monitor, The* | 02/06/2007-Current | McAllen | Newspapers |
| *Mount Pleasant Daily Tribune* | 05/09/2007-Current | Mount Pleasant | Newspapers |
| *New Braunfels Herald-Zeitung* | 03/21/2001-Current | New Braunfels | Newspapers |
| *Odessa American* | 08/15/1995-Current | Odessa | Newspapers |
| *Orange Leader, The* | 01/02/2008-Current | Orange | Newspapers |
| *Palestine Herald-Press* | 01/13/2008-Current | Palestine | Newspapers |
| *Paris News, The* | 11/30/2000-Current | Paris | Newspapers |
| *Plainview Daily Herald* | 05/03/1996-Current | Plainview | Newspapers |
| *Plano Examiner* | 08/24/2009-Current | Plano | Web-Only Sources |
| *Port Arthur News* | 07/03/2008-Current | Port Arthur | Newspapers |
| *Quick* | 11/10/2003-08/04/2011 | Dallas | Newspapers |
| *Rockwall County Herald Banner* | 08/29/2007-Current | Greenville | Newspapers |
| *Royse City Herald Banner* | 08/19/2008-Current | Royse City | Newspapers |
| *San Angelo Examiner* | 12/01/2009-Current | San Angelo | Web-Only Sources |
| *San Angelo Standard-Times* | 12/07/2004-Current | San Angelo | Newspapers |
| *San Antonio Examiner* | 02/28/2009-Current | San Antonio | Web-Only Sources |
| *San Antonio Express-News* | 01/01/1990-Current | San Antonio | Newspapers |
| *San Marcos Daily Record* | 05/01/2008-Current | San Marcos | Newspapers |
| *Seguin Gazette-Enterprise, The* | 02/01/2005-Current | Seguin | Newspapers |
| *Sherman Examiner* | 01/28/2010-Current | Sherman | Web-Only Sources |
| *Sweetwater Reporter* | 09/17/2008-Current | Sweetwater | Newspapers |
| *Texas City Sun* | 06/14/2002-11/06/2004 | Texas City | Newspapers |
| *Tyler Morning Telegraph* | 12/16/2006-Current | Tyler | Newspapers |
| *Valley Morning Star* | 02/08/2007-Current | Harlingen | Newspapers |
| *Van Alstyne Leader* | 09/18/2009-Current | Van Alstyne | Newspapers |
| *Victoria Advocate, The* | 01/01/1999-Current | Victoria | Newspapers |
| *Waco Examiner* | 09/03/2009-Current | Waco | Web-Only Sources |
| *Waco Tribune-Herald* | 12/10/1999-Current | Waco | Newspapers |
| *Weatherford Democrat, The* | 06/11/2008-Current | Weatherford | Newspapers |
| *Wichita Falls Examiner* | 10/15/2008-Current | Wichita Falls | Web-Only Sources |
| *Wichita Falls Times Record News* | 11/16/1998-Current | Wichita Falls | Newspapers |

## LORRAINE C. MINNITE

## LITIGATION MATERIALS REVIEWED

### State of Texas v. Erich H. Holder, Jr., et al. – Case No. 1:12-cv-00128

Forrest Mitchell Deposition – 6/15/2012

Forrest Mitchell Trial Testimony – 7/9/2012

Plaintiff's Objections and Responses to Defendant's First Set of Interrogatories – 3/30/2012

Plaintiff's Objections and Responses to Interrogatories to Defendant-Intervenors Eric Kennie, et al. – 4/2/2012

Plaintiff's Supplemental Objections and Responses to Interrogatories of Defendant-Intervenors Texas NAACP, MALC, Texas League of Young Voters Education Fund, and Kennie Intervenors – 4/19/2012

Proposed Findings of Fact and Conclusions of Law – 6/20/2012

Plaintiff's Responses to the Attorney General's Proposed Findings of Fact and Conclusions of Law and Reply in Support of Plaintiff's Proposed Findings of Fact and Conclusions of Law – 7/1/2012

### Veasey et al. v. Perry et al. – Case No. 2:13-cv-00193

Defendants' Objections and responses to Plaintiffs and Plaintiff-Intervenors' First Set of Interrogatories – 2/28/2014

### Bates Stamped Documents:

TEX I.R. 229 – TEX I.R. 261
TEX00000001 - TEX00004075
TEX00018125 - TEX00018126
TEX00028108 - TEX00028586
TEX00056816 - TEX00056817
TEX00057255 - TEX00057284
TEX00148056 - TEX00148061
TEX00148163 - TEX00148170
TEX00267733 - TEX00269313

TX_00043803 – TX_00043814
TX_00043775 – TX_00044164

**LORRAINE C. MINNITE**

**LIST OF EXPERT TESTIMONY SINCE 2010**

- *Lulac v. Deininger*, Civ. No. 2:12-cv-00185 (E.D. Wis. 2013).

- *Applewhite v. Pennsylvania*, No. 330 MD 2012 (Pa. Cmmw. Ct. 2014).

- *North Carolina State Conference of the NAACP v. McCrory, et al.*, No. 1:13-cv-00658 (M.D.N.C.).

**LORRAINE C. MINNITE**

**STATEMENT OF COMPENSATION**

- Lorraine C. Minnite, Ph.D.          $100 per hour

- Research Assistant                       $30 per hour

- Travel & Expenses                       Reimbursed at cost

PL774
9/2/2014
2:13-cv-00193

HIGHLY CONFIDENTIAL MATERIAL SUBMITTED UNDER SEAL PURSUANT TO THE
CONSENT PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARC VEASEY, *et al.*,

           Plaintiffs,

    v.

RICK PERRY, *et al.*,

           Defendants.

Civil Action No. 2:13-cv-193 (NGR)

Declaration of Dr. Chandler Davidson

Pursuant to 28 U.S.C. § 1746, I, Chandler Davidson, make the following declaration:

1.      Attorneys for the U.S. Department of Justice have asked me to conduct research on a bill enacted in 2011 by the Texas legislature, Senate Bill 14 (SB 14). I was asked to provide information that would assist the Court in determining whether the bill was adopted with a racially discriminatory purpose.[1] In the context of SB 14's origins and passage, I have examined the bill's historical provenance, the political context of the decision-making process, arguments by proponents and opponents, the sequence of events leading to its passage, and the anticipated impact of the new law from the viewpoint of legislators and other government officials involved in the adoption and implementation of SB 14. These

---

[1] At present there are diverse terms used in common discourse and the media to refer to racial and ethnic membership in the U.S. I shall use the term *ethnic minority* to refer both to racial and ethnic minority populations in Texas. These are primarily African Americans, Asian Americans, and Hispanic Americans, although there are of course ethnic subcategories of each. These minorities are distinct from Anglos, *i.e.*, Whites of non-Hispanic heritage. I shall also use different terms to refer to specific groups, *e.g.*, *African Americans* and *Blacks*; *Latinos*, *Hispanics*, and *Spanish-surnamed persons;* and *Whites* and *Anglos.*

1

factors are the sort of evidence most social scientists consider when assessing the decisions

of a legislative body, as I have in my prior scholarly writing.

2.        I am a professor emeritus of sociology and political science at Rice University.  My

*curriculum vitae* is attached.  I received a B.A. degree from the University of Texas and a

Ph.D. degree from Princeton.  My academic research has focused on race and politics,

particularly in Texas.  I have received research grants from the National Science

Foundation and The National Endowment for the Humanities, among others.  In 1995, the

Legislative Studies Section of the American Political Science Association named a book that

I co-edited, *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990*,[2]

winner of its annual prize for the best book in legislative studies published the previous

year.  It is a collection of essays, including one that I authored, on the impact of the Voting

Rights Act of 1965 (hereafter "VRA").  Another of my edited volumes, *Minority Vote*

*Dilution,*[3] was later named to the Howard University Press Classic Editions Library Series in

2004.  Another co-edited volume to which I contributed, *Controversies in Minority Voting*:

*The Voting Rights Act in Perspective*, is well-known among voting rights scholars.[4]  Since

retiring from teaching in 2003, I have been invited to testify on voting issues before the

Texas Senate meeting as a whole, as well as before U.S. Senate and House committees.  In

the course of my career, I have testified as an expert or served as a consultant in over thirty

---

[2] Chandler Davidson and Bernard Grofman (eds.), *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990* (Princeton, N.J.: Princeton Univ. Press, 1994).

[3] Chandler Davidson (ed.), *Minority Vote Dilution* (Washington, D.C.: Howard Univ. Press, 1984).

[4] Bernard Grofman and Chandler Davidson (eds.), *Controversies in Minority Voting: The Voting Rights Act in Perspective* (Washington, D.C.: The Brookings Institution, 1992).

lawsuits in nine states, mostly on behalf of plaintiffs in voting rights cases.  In this case, I am being compensated for my work at my standard rate of $350 per hour.

3.      In this report, my primary focus is on Texas' adoption of SB 14 in 2011, and efforts to adopt a photo identification requirement for voting, beginning in 2005.  In describing the conflicts over photo ID bills in the four legislative sessions leading to passage of SB 14, I examine the stated intentions of supporters of SB 14, and the claim by SB 14's opponents that it was intended to place a heavier burden at polling sites on registered Blacks and Latinos than on Anglos.  In order to put those events in perspective, I place the legislative efforts in the years 2005 through 2011 in the context of the history of discrimination affecting voting in Texas, which has been the subject of significant parts of my scholarly writing for the past four decades.

## Executive Summary

4.      The history of Texas politics from statehood to 1965 is one of perpetual discrimination targeting and affecting the state's two largest ethnic minority groups: Latinos and Blacks.  The poll tax, the white primary, laws restricting voter registration to a brief time period, acts of brutality and lethal violence, efforts to intimidate minorities at the polls, misinformation given to minorities about the election process, and minority vote dilution through racial gerrymandering and the imposition of at-large elections, *inter alia*, have depressed the Black and Latino vote throughout Texas' existence as a state. Minorities and their leaders and allies have fought continuously for more than a century to destroy these barriers to voting, and the VRA, including Texas' coverage by Section 5 from 1975 to 2013, strengthened minorities' ability to vote without hindrance and elect their candidates of choice.  Ethnic minority leaders' most notable recent efforts regarding

3

discriminatory election laws consisted of a high-profile battle over four legislative sessions to prevent a photo ID requirement at the polling place, a battle they lost in 2011, resulting in passage of SB 14.  Although a three-judge court in the District of Columbia found SB 14 to violate Section 5 of the VRA,[5] it nonetheless became enforceable in June 2013 after the United States Supreme Court decided *Shelby County v. Holder,*[6] which in effect rendered Section 5 inoperative.

5.      The claims of lawmakers and top state government officials—almost all of whom were white—favoring SB 14 and its predecessors in 2005, 2007, and 2009—were, first, that there was significant vote fraud in Texas of the kind a photo ID law would prevent and, second, when the first claim was shown to be highly dubious, that such a law would reassure the public that election results were correct.  Opponents argued that the law was not necessary, given the extremely small amount of fraud of the kind the law would prevent, *i.e.*, voter impersonation at the polls; that despite the political debate about suspected fraud there was little evidence of public concern about the integrity of the electoral process in Texas; that the likely effect of such a law would be to place a heavier burden on Blacks and Hispanics who do not have one of the required photo IDs—compared with Anglos—given that the two minority groups are disproportionately poor; and that the goal of a strict photo ID requirement was to skew elections in favor of Anglos, who vote overwhelmingly Republican.  After considering the history of racial politics in Texas generally and SB 14 in particular, I conclude the evidence undermines the stated purposes of the state's photo identification requirement for voting and better fits the claims of the

---

[5] *Texas v. Holder,* 888 F. Supp 2d 113 (D.D.C. 2012), *vacated*, 133 S. Ct. 2886 (2013).

[6] 133 S. Ct. 2612 (2013).

bill's opponents that a) its intent was to discriminate disproportionately against minority voters, and b) that bill supporters knew, and intended, the significant burdens the law would disproportionately impose on ethnic minorities compared to the Anglo majority.

### The Background of Voter Identification Bills in Texas, 2005-2011

6.     Between 2005 and the final adoption of SB 14 in 2011, the Texas legislature considered a series of increasingly restrictive voter identification bills, including photo ID requirements, but—until 2011—allowed non-photo alternatives.  Texas was aware that other states had begun enacting similar photo ID laws and still more were considering them.  During these years the proponents of restrictive photo ID requirements gained legislative seats.  The transformative 2010 election provided the key to final passage of SB 14.  Looming over the legislative debates over voter ID laws, however, was the changing demography of Texas.

7.     In 2000, 52.4% of the state's population was Anglo; Hispanics were 32%; and African Americans were 11.3%.  By 2010, however, Anglos made up only 45.3% of the state's population; Hispanics were now 37.6%; and African Americans constituted 11.8% of the population.  Asian Americans made up another 3.8%.[7]  As early as 2005—the year a predecessor to SB 14 was first introduced—the Census Bureau announced Texas had become a minority-majority state, a widely publicized fact the state comptroller highlighted on her website.[8]  According to the Census figures, in Harris County (Houston), the state's

---

[7] U.S. Census Bureau, *American Fact Finder.*  "Profile of General Population and Housing Characteristics:  2010 Demographic Profile Data, Texas," U.S. Census 2010.

[8] http://www.window.state.tx.us/specialrpt/tif/population.html.

most populous, Hispanics for the first time outnumbered Anglos.[9]  General awareness of the state's changing demography was routinely discussed in the legislature, beginning as early as 2005.[10] As I shall explain later, this context parallels earlier contexts in Texas' political history where increased potential participation by ethnic minorities triggered restrictive responses about which a consensus now exists that there was purposeful discrimination.

### The First Photo ID Bill: 2005

8.      When the legislative battle over adopting a photo identification requirement began in 2005, the partisan makeup in the Senate was 19 Republicans and 12 Democrats; and in the house, 86 Republicans and 63 Democrats.  This meant that under the rules in the Senate, opponents of photo ID requirements—virtually all of them Democrats—had the ability to block any photo ID bill.  The photo ID bill, House Bill 1706, was filed by Elections Committee Chair Mary Denny, a conservative representing a heavily white district.  The law then current, passed in 1997, required only that voters at the polls show their voter registration card, a card issued by the state without charge.[11]  It had no photo on it.  It could easily be carried in a billfold or purse, like a driver license.  To obtain this card, a Texan filed a voter registration application with the county elections registrar.  The application included the voter's name, address, date of birth, and a sworn affirmation of U.S.

---

[9] Staff, "The new California—Latest U.S. census figures on the Hispanic population herald major change and challenges for Texas," *Houston Chronicle,* Aug. 13, 2007.

[10] *See, e.g.*, comments of Rep. Debbie Riddle, Texas House Elections Committee, Hearing on HB 516, at 1:36-1:37 (responding to Rep Anchia's comments about Latino population trends) (Feb. 16, 2005), http://tlchouse.granicus.com/MediaPlayer.php?view_id=23&clip_id=6139.

[11] Tex. Elec. Code § 13.142(a).

citizenship, among other information.  When the application was approved, the registrar would mail the "voter registration certificate" to the applicant.  If a voter did not bring the card to the polls on election day, an election official would ask for other documents, some with photos, others without, such as a current or expired driver license from any state, a passport, a utility bill, or a bank statement, among others—a total of eight.[12]

9.      House proponents decided to enact a more stringent set of requirements. (At that point, 29% of the House consisted of Blacks, Latinos, and Asian Americans.)  The stated rationale behind HB 1706 was fraud prevention.[13]  HB 1706 would have required a voter at the polling place to show a voter registration certificate and either one form of specified photo identification or two forms of specified non-photo identification.  If the voter's name was on the precinct list of registered voters or if he was eligible under other provisions, and if his identity could have been verified from the identification presented, he would have been allowed to vote without a registration certificate.[14]

_____

[12] Tex. Elec. Code § 13.142(a).  Specifically, acceptable forms of identification for voting included 1) a driver license or personal identification card issued by the Department of Public Safety or a similar document issued to the person by an agency of another state, regardless of whether the license or card had expired; 2) a form of identification containing the person's photograph that established the person's identity; 3) a birth certificate or other document confirming birth that was admissible in a court of law and established the person's identity; 4) United States citizenship papers issued to the person; 5) a United States passport issued to the person; 6)official mail addressed to the person by name from a governmental entity; 7) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that showed the name and address of the voter; or  8) any other form of identification prescribed by the secretary of state.

[13] Guillermo X. Garcia, "Interest groups oppose voter identification bill," *San Antonio Express-News*, Apr. 19, 2005.

[14]  House Research Organization: Texas House of Representatives, *Focus Report: Major Issues of the Texas House of Representatives*, "H.B. 1706:  Requiring voters to present proof of identification at polling places," Nov. 9, 2009, at 50; for the bill's text, see

10.     In hearings before the House Elections Committee, representatives of Hispanic and African-American rights organizations voiced strong opposition, claiming the real purpose of the proposed requirement was to disfranchise a number of groups, including rural residents, the elderly, and ethnic minorities.  One of the bill's authors responded that the proposed law would "simply force you to prove that you are who you say you are."  The executive director of Common Cause-Texas responded: "Where is the fraud?  Where is the problem that [the bills] are attempting to address?  I believe this will have a real chilling effect" on efforts to promote greater turnout.[15]  Rep. Ruth Jones McClendon, a veteran African-American legislator from San Antonio, also raised a key demographic issue: "The state is rapidly becoming more Hispanic, African-American and Asian, and we're becoming younger and more mobile," she claimed.  "We should make it easier for all citizens to vote, not harder."[16]  This particular point/counterpoint would be heard often during the following three sessions.[17]

11.     As the bill moved forward, Rep. Rafael Anchia, who would become one of the chief opponents of photo ID bills in future sessions, asserted, "We did not hear one shred of evidence that there is voter fraud in this state.  If this was a court of law, this case would be thrown out for lack of evidence."  African-American Rep. Garnett Coleman noted that if the

---

http://www.capitol.state.tx.us/Search/DocViewer.aspx?ID=79RHB017063B&QueryText=%22HB+1706%22&DocType=B; http://www.hro.house.state.tx.us/focus/major79.pdf.

[15] Guillermo X. Garcia, "GOP wants to make voters prove themselves," *San Antonio Express-News*, Mar. 18, 2005.

[16] Guillermo X. Garcia, "Voter ID measure gets House nod," *San Antonio Express-News*, May 3, 2005.

[17] For a summary account of the issues dividing the parties regarding HB 1706, see House Research Organization: Texas House of Representatives, *op. cit.*, at 50-51.

bill passed, voters who appeared at the polls only with the then-current required document—a registration card—would have to cast a provisional ballot and then within five days go to the county registrar's office with proof of their identity, if their ballot was to be counted.[18]

12.     HB 1706 was passed in the House 78-67 in early May over the opposition of every Black legislator and all but one Latino legislator.[19]  But it faced problems in the Senate. Under a long-standing arrangement known as "the two-thirds rule" in that body, a bill cannot be considered on the floor out of the regular order of business unless two-thirds of those present in the 31-member body are present and approve.[20]  The rule has been justified since its adoption in the middle of the Twentieth Century as fostering comity in the Senate.  Eleven senators vowed to prevent the bill's consideration by the full Senate.[21]  To overcome this barrier, the House then appended the provisions of HB 1706 to a Senate bill concerning another aspect of elections.[22]  This move enabled the bill's proponents to evade the two-thirds rule through the use of yet another rule, which allows the Senate to debate a bill if its author accepts amendments added in the House, provided a majority of the Senate

---

[18] R.G. Ratcliffe, "Multiple ID voting bill wins preliminary OK—House foes say additional proofs meant to keep some groups away from ballots," *Houston Chronicle,* May 3, 2005.

[19] HJ 2005, at 2554-55, JA 8900-02 (*Texas v. Holder*), USA_0023782-84.

[20] The two-thirds rule has been in effect since the 1950s.  *See* Stuart Long, "With 11 Senators For You, Kill any Bill You Want to," *Temple Telegram*, Jan. 22, 1956.  For a brief description of the rule, see William Earl Maxwell, Ernest Crain, Adolfo Santos, *Texas Politics Today: 2009-2010 Edition* 202 (Boston: Wadsworth 2010); *see also* K. Davis Dep. 57:11-59:16 (*Texas v. Holder*).

[21] Karen Brooks, "Voter ID proposal revived—House plan, added to Senate bill, may avoid Democratic blockade," *Dallas Morning News*, May 25, 2005.

[22] Karen Brooks*, ibid.*

so votes.[23]  Sen. Rodney Ellis, an African American, then vowed to defeat the bill in the Senate chamber through a filibuster, but he faced a formidable difficulty.  Senate rules require members to stay on the floor while speaking, not even to leave for a quick trip to the restroom, and to remain standing throughout the filibuster.  On the appointed day he appeared early in the morning, letting it be known he was wearing a catheter and indicating he would stay as long as necessary.  Fortunately for Sen. Ellis, Senate Minority Leader Leticia Van de Putte, a Latina, successfully challenged the Senate's right to debate the bill, invoking the state constitution.[24]  That the two leaders of this countermovement represented two of the state's districts with the largest black and Hispanic populations did not go unnoticed.

13.     Supporters of the bill tried one more maneuver: sending it to the House-Senate conference committee.  However, the session was almost over, and several important bills were still in process of being finalized.  The session ended before further action on voter ID could be taken, given the rules governing the order in which bills could be considered.[25]  As one journalist put it, the bill "died peacefully in the Senate."[26]  Despite its death, proponents' hopes of passing a similar bill were very much alive when the next session convened.

---

[23] Staff, "House would make voters show IDs," *Austin Am.-Statesman*, May 25, 2005.

[24] Associated Press, "Democrats derail voter-ID bill with threat of filibuster, exercise of Senate rules," *Lubbock Avalanche-Journal* May 29, 2005; Guillermo X. Garcia, "Voter identification bill may be dead for session," *San Antonio Express-News,* May 29, 2005.

[25] Clay Robinson, R.G. Ratcliffe, "As clock ticks, tax bill seems doomed," *Houston Chronicle*, May 29, 2005; Kristen Mack, "The Legislature—Session's close crammed with action—Filibuster threat and phone calls fill lawmaker's time," *Houston Chronicle*, May 30, 2005.

[26] Paul Burka, "Manic Suppression," *Texas Monthly,* Apr. 2009 http://www.texasmonthly.com/story/manic-suppression.

### The Battle Continues: 2007

14.     In January 2006, Attorney General Greg Abbott announced on his website that he was launching a statewide initiative "to combat and prevent the persistent problem of voter fraud . . . triggered by a dramatic increase in indictments for voter fraud."  He characterized such fraud as "an epidemic."[27]  Given this assertion, readers might have expected the website to tally or at least mention several instances of successfully prosecuted vote fraud.  Such was not the case, either at the time of this first announcement or at any point leading up to passage of SB 14 more than five years later.  Instead, Abbott, after inveighing against Texas' having "turned a blind eye to this fraud," and reiterating that "voter fraud is occurring on a large scale when viewed statewide," announced that he had obtained four sets of indictments against individuals for voter fraud in Texas since 2005.  The four sets of indictments were against eight people, only two of whom had at that point been found guilty, according to his same message.  Neither had engaged in voter impersonation at a polling site, which is the kind of fraud a photo ID requirement might plausibly prevent. [28]

15.     Abbott's announcement described the ambitious hunt for voter fraud his office would be undertaking.  A new Special Investigations Unit (SIU) was being established, with a $1.5 million grant from Gov. Rick Perry's office.  (The full amount was subsequently not used.)  The SIU would primarily help local law enforcement and prosecutors identify,

---

[27] "Attorney General Abbott Launches Training Initiative To Identify, Prosecute, Prevent Voter Fraud," https://www.texasattorneygeneral.gov/oagnews/release.php?id=1423.

[28]  One was a county commissioner who had collected mail-in ballots while he was a candidate running for office.  The other was a woman who had mailed an absentee ballot in the name of her dead mother.  *Ibid.*

investigate, and prosecute various types of voter fraud offenses.  The SIU's activities,

however, were not to be undertaken statewide, but instead, in only 44 of Texas' 254

counties which, taken together, contained most of the state's Blacks and Latinos.[29]  There

was no indication as to why these counties rather than others were chosen.

16.     As quickly became clear, a major focus of the 2007 legislative session would again

be a photo ID bill—HB 218—even though its proponents' margin in the House was smaller

than in 2005.  Three bills addressing the issue were soon filed.  The bill authored by

Representative Betty Brown, who represented an East Texas district whose voting age

population was nearly 80% white, advanced.  Rep. Brown's bill would have required a

voter at the polls to present a valid voter registration certificate and either one form of

photo identification or two forms of non-photo identification.  It would have changed the

list of proof of identification, specifying eight acceptable forms of photo ID and eleven

forms of non-photo ID.[30]  Rep. Brown justified her bill as preventing non-citizens from

voting.[31]  However, since a photo ID bill was first introduced in 2005, no evidence of

convictions of non-citizen voting had been brought to the legislature's attention.[32]  More

important, one form of ID—a Texas driver license—could be obtained by non-citizens.

Other supporters of HB 218 justified it as establishing a "uniform standard" for voting at

---

[29] *Ibid.* These counties contained El Paso, Harris, Bexar, Dallas, and Fort Worth, among others, where a large percentage of the state's minority population resided.

[30] [Texas] House Research Organization, *Focus Report: Major Issues of the 80th Legislature, Regular Session,* July 17, 2007, http://www.hro.house.state.tx.us/focus/major80.pdf; Staff, "Ballot barriers—Legislation requiring Texas voters to present extensive identification would create far more problems than it would solve," *Houston Chronicle,* Apr. 26, 2007.

[31] Joint Appendix 7396-97, 7583 (*Texas v. Holder*), USA_0022278-79, USA_00022465.

[32] Joint Appendix 1507 (*Texas v. Holder*), USA_00016389; T. Williams Dep. 148:25-150:4 (*Texas v. Holder*); Straus Dep. 100:12-101:1 (*Texas v. Holder*).

the polls, reducing voter fraud generally, and "restoring confidence" in elections.  (Of course, there was already a uniform standard—a voter registration certificate.)  The bill's proponents also argued, from 2005 through the 2011 session, that so many everyday events, whether cashing checks or traveling by plane or renting a movie at Blockbuster, require a photo ID that it was unreasonable to believe many people lacked it.[33]

17.     HB 218 was immediately attacked by opponents, including those representing majority-minority districts, as well as on newspaper opinion pages.  In the words of an editorial in the *Fort Worth Star-Telegram*:

> An insidious scheme to turn back the clock on voting rights in Texas tragically has once again made its way to the state House floor.  The architects of this idea, pitched as a noble effort to prevent voter fraud, cannot be allowed to succeed with what is surely one of the greatest assaults on the right to vote in this state since passage of the federal Voting Rights Act in 1965.[34]

18.     Rep. Anchia pointed out that the bill only addressed voter impersonation and cited testimony from Abbott's office that no case of voter impersonation at the polls in Texas had ever been prosecuted.[35]

19.     Royal Masset, former political director of the Texas Republican Party, agreed that among Republicans it was "an article of religious faith that voter fraud is causing us to lose elections."[36]  Yet Massett strongly opposed photo ID bills.  In an article on the subject he wrote, "Anyone who says all legal voters under this bill can vote doesn't know what he is

---

[33] Joint Appendix 2160 (*Texas v. Holder*), USA_00017042.

[34] Editorial, "A poll tax?" *Fort Worth Star-Telegram,* Apr. 23, 2007.

[35] Karen Brooks, "House OKs voter ID bill—Legislature:  License or nonphoto alternatives would be required," *Dallas Morning News,* Apr. 24, 2007; R.G. Ratcliffe, "Voting Requirements—House passes photo ID bill—GOP says it will hinder fraud; Democrats see harm to black, Hispanic turnout," *Houston Chronicle,* Apr. 24, 2007.

[36] *Ibid.*

talking about.  And anyone who says a lack of IDs won't discriminate against otherwise legal minority voters is lying."[37]

20.      All eleven opposing senators, ten of whom represented Black or Latino districts, signed a letter advising Lt. Gov. Dewhurst, presiding over the Senate, that they would vote against any procedural motion to debate voter ID legislation.[38]  Given the two-thirds rule, that would just be sufficient to kill the bill.  Sen. Mario Gallegos was scheduled to receive a liver transplant in a Houston hospital.  It was possible that he would not be able to return for the rest of the session.[39]  In Gallegos' absence, there would be only ten opponents of the bill in the 31-member Senate.[40]

21.      As the session moved forward, many of the same debates surfaced over the need for a photo ID bill as in 2005.  Dewhurst, for example, asserted that "with eight to 12 million illegal aliens currently living in the U.S., the basic American principle of one person, one vote, is in danger," although he did not cite any evidence of non-citizens participating in U.S. elections or attempting to do so.[41]  Dewhurst was echoing the House bill's sponsor, Rep. Betty Brown, who had said the previous month that it was "designed to keep illegal aliens,

---

[37] Royal Masset, "The Voter ID Bill Will Kill My Mother's Right to Vote," *The Quorum Report,* Apr. 23, 2007, http://quorumreport.com/rd/rd_masset.cfm; http://blog.chron.com/texaspolitics/2007/04/a-republican-his-mother-and-voter-id/.

[38] Clay Robison, "Disarming visitors at the Capitol," *Houston Chronicle,* Apr. 23, 2007.

[39] Mark Lisheron, "Senate, used to solidarity, repairs split," *Austin Am.-Statesman,* May 18, 2007.

[40] However, Gallegos asked Lt. Gov. Dewhurst to give him a 24-hour warning if an ID bill were brought up.  Dewhurst agreed. Kristin Mack, "Gallegos tells state Senate he needs new liver," *Houston Chronicle,* Jan. 12, 2007.

[41] Austin Am.-Statesman blog, "Letter from Lt. Gov. on voter ID bill," May 16, 2007.

non-citizens and other people otherwise not qualified" from voting.[42]  There was still no evidence in the legislative record—then or in later sessions—that non-citizens had voted.[43]  Moreover, a Texas driver license could legally be obtained by a non-citizen.  The House passed the bill by a vote of 76 to 68 in April, once more virtually along party lines and over the opposition of all Black members and nearly all Latino members.

22.      In spite of his doctor's orders to stay in Houston—a biopsy having revealed that he was rejecting his new liver—Sen. Gallegos returned to the capital and vowed to stay there to block the bill.[44]  Gallegos was not the only senator with health problems.  In May, Sen. Carlos Uresti, representing a majority-Latino district in west Texas, was in bed with severe flu and had given notice to the Secretary of State that he would be absent.  Seeing an opportunity, Sen. Troy Fraser, the Senate sponsor of HB 218, successfully moved to put aside the two-thirds rule and suspend the order of business so that HB 218 could be voted on.  Apprised of the fact in an urgent phone call from a fellow Latino senator, Sen. Uresti rushed to the Capitol, but the vote occurred before he reached the Senate chambers.  Sen. John Whitmire, however, convinced Lt. Gov. Dewhurst, presiding over the Senate, to verify the vote.  Sen. Uresti "sprinted up the Capitol steps to reach the chamber just seconds before his name was called," and, as Sen. Gallegos (still in the chamber) had before him,

---

[42] W. Gardner Selby, "House Republicans squeak through voter ID mandate—Senate chances uncertain, pitting Dewhurst against Democrats," *Austin Am.-Statesman,* Apr. 24, 2007.

[43] T. Williams Dep. 148:25-150:4 (*Texas v. Holder*).

[44] A senator who was a physician ordered a hospital bed for Gallegos in a capitol office. Mark Lisheron, "Ill senator settles in for voter ID fight," *Austin Am.-Statesman,* May 22, 2007.

prevented passage of the bill.[45]  This time opponents were able to prevail despite the

change in the temporary suspension of the two-thirds rule.  The session ended without HB

218 coming up for a vote.

### The Battle Continues: 2009

23.    In the summer before the 2009 session began, more than two years after Attorney

General Abbott had announced his intentions to prosecute perpetrators of the vote-fraud

"epidemic," he announced the findings of his labors.  He reported that he had "prosecuted"

26 cases, two of which involved voter impersonation, but he did not say the two cases had

led to a conviction.  And, although another case was characterized as "non-citizen

registration," the perpetrator was not in fact a non-citizen but a candidate for local office

convicted of lying to non-citizens about their eligibility to register to vote.[46]

24.    Abbott's report in no way dampened proponents' enthusiasm for a new ID law.  Lt.

Gov. Dewhurst pledged a renewed push.  He ran a series of ads stressing the need to stop

"non-citizens" from voting, even though the legislative record contained no evidence that

non-citizens had been convicted of voting in person illegally.[47]  Indeed, Speaker Straus later

---

[45] Uresti Dep. 62:1-21, 59:25-60:7 (*Texas v. Holder*); Def.'s Trial Ex. 413 at 1 (*Texas v. Holder*); Joint Appendix 8297 (*Texas v. Holder*), USA_00023178; Uresti Dep. 63:16-64:3 (*Texas v. Holder*); Def.'s Trial Ex.283 ¶¶ 6-9 (*Texas v. Holder*); Def.'s Trial Ex. 413 at 1 (*Texas v. Holder*); Joint Appendix 8313 (*Texas v. Holder*), USA_00023195; Joint Appendix 8307-08 (*Texas v. Holder*), USA_ 00023189-90; Uresti Dep. 64:4-67:6 (*Texas v. Holder*); Joint Appendix 8315 (*Texas v. Holder*), USA_00023197; Def.'s Trial Ex. 413 at 1 (*Texas v. Holder*); Def.'s Trial Ex. 283 at 2 (*Texas v. Holder*); Gary Scharrer, "Flu-stricken Uresti rushes in to vote," *San Antonio Express-News,* May 16, 2007.

[46] Wayne Slater, "BALLOT-BOX SCRUTINY—AG Fails to uncover major voting fraud—Abbot saw epidemic, but prosecuted only 26 cases—all Dems," *Dallas Morning News,* May 18, 2008.

[47] Ross Ramsey, "The Cure for Record Turnout," *Texas Weekly*, Mar. 31, 2008; T. Williams Dep. 148:25-150:4 (*Texas v. Holder*).

testified in deposition that he was not aware of any documented cases of non-citizens voting in the state.[48]

25.     Shortly before the 2009 session began, Lt. Gov. Dewhurst announced he was reaching out to Democratic senators—including Sen. Gallegos—about possible compromises regarding a new bill.[49]  On the second day of the session, however, the Texas Senate "adopted a change in its rules that will benefit Republicans by allowing a vote on the voter ID bill," according to a news account.[50]  The upper chamber, "long known for its decorum and reluctance to publicly air its dirty laundry," spent the day fiercely debating a measure, applying only to voter identification legislation, which would replace the two-thirds rule with a mere majority requirement.[51]  Sen. Tommy Williams, who chaired the Senate Administration Committee, bragged that he had "led the successful effort which allowed the Photo Voter ID bill to be brought to a vote and passed in the Texas Senate."[52] As Sen. Williams explained: "After thoroughly researching parliamentary procedure, we engineered the designation of Voter ID as a special order calendar item."[53]

---

[48] Straus Dep. 100:12-101:1 (*Texas v. Holder*).

[49] Clay Robinson, "Republicans revive voter ID proposal," *Houston Chronicle,* Dec. 15, 2008.

[50] Mike Ward, "Texas Senate adopts rules change to allow Voter ID vote," *Austin Am.-Statesman*, Jan. 15, 2009.

[51] Paul Burka, "Manic Suppression," *Texas Monthly*, Apr. 2009; Texas Senate Rules (adopted by 81st Legislature), Jan. 14, 2009, Sen. Res. No. 14, at Rule 5.11.

[52] Email from Sen. T. Williams to Janet Stieben, Chief of Staff for Senator T. Williams and Jason Baxter, Legislative Dir. for Sen. T. Williams, Oct. 20, 2009.  TX 00202988; TX 00202990; TX 00202996; House Research Organization: Texas House of Representatives, *Legislative Staff:83rd Legislature,* Mar. 1, 2013, http://www.hro.house.state.tx.us/staff.aspx.

[53] *Ibid.*, TX_00202996.

26.    Senator John Carona was the sole Republican to oppose the measure.[54]  Although he said he favored photo ID, breaking the two-thirds rule in this case "sends a terrible message."[55]  Rep. Trey Martinez-Fischer, chair of the House Mexican American Caucus, added, "This nonissue of voter ID has the potential to melt down this chamber.  Who wants to do that when we have public education and the budget, [the widespread devastation caused by] Hurricane Ike and health care [issues to address]?"[56]

27.    Photo ID became what news sources called the "marquee issue" in the 2009 legislative session.[57]  SB 362 was introduced by Sen. Troy Fraser, who represented a district whose voting age population was 80% white.  As passed by the Senate, the bill would have required a voter to present to an election officer at the polls one form of photo ID or two forms of non-photo ID.  The bill would have modified the list of acceptable proof of identification, specifying six acceptable forms of photo ID and 11 acceptable forms of non-photo ID.  A voter registration certificate—previously sufficient to enable a voter to cast her ballot—would have been acceptable only as one of the two required forms of non-photo ID.[58]  Sen. Van de Putte called it a "true vote-suppression bill."[59]  Other opponents

---

[54] Mike Ward, *op. cit.*

[55] "Exception to Senate rule was a bad GOP maneuver," *San Antonio Express-News*, Jan. 16, 2009; "Texas GOP senators gain advantage on voter ID bill" (editorial), *Fort Worth Star-Telegram,* Mar. 13, 2009.

[56] Janet Elliott, Gary Scharrer, and R.G. Ratcliffe, "Senate Dems open fight on voter ID bill," *Houston Chronicle,* Mar. 11, 2009.

[57] Gary Scharrer, "Lull before 'Voter ID' storm," *San Antonio Express-News*, May 23, 2009.

[58] House Research Organization, "Revising voter identification requirements: SB 362 by Fraser," at 58; http://www.lrl.state.tx.us/scanned/sessionoverviews/major/major81.pdf.

voiced concerns about its impact on minority voters, but no investigation of the issue occurred in the legislature.[60]

28.　　Bryan Hebert, then-deputy general counsel to Lt. Gov. Dewhurst, wrote an email to Janice McCoy, chief of staff to Sen. Fraser, that attached talking points and arguments in support of SB 362.  Mr. Hebert wrote that SB 362 was a "compromise" bill that would create "less chance of disenfranchising elderly, poor, or minority voters."  Hebert later testified in deposition that he may have been contrasting SB 362 with voter ID bills that did not allow the use of non-photo ID.[61]   Hebert also wrote that allowing voters to present a range of IDs, as SB 362 provided, increased the likelihood of federal preclearance pursuant to Section 5 of the VRA.[62]

29.　　In their public discussion of fraud, proponents tended to obscure the distinction between voter impersonation and other kinds of electoral improprieties.  This was brought home by the invited expert testimony of Justin Levitt, a lawyer with the Brennan Center, who had conducted extensive research on voter fraud across the nation over a period of years.[63]  "There have been a tiny handful of substantiated [impersonation] cases out of hundreds of millions of ballots," he said.  "Americans are struck by lightning far more

---

[59] Jay Root, "Partisan fight looms over ID bill," *Chron.com* AP Texas News, Feb. 27, 2009; W. Gardner Selby, "Voter ID fights take new shape at Capitol," *Austin Am.-Statesman*, Mar. 9, 2009.

[60] McCoy Dep. 115:6-116:15 (*Texas v. Holder*).

[61] Hebert Dep. at 83:11-18, 88:14-93:3, June 17, 2014.

[62] Email Bryan Hebert to Janice McCoy (Mar. 4, 2009), TX_00087007-14; House Research Organization: Texas House of Representatives, *Legislative Staff: 81st Legislature,* Mar. 23, 2009, http://www.hro.house.state.tx.us/staff.aspx.

[63] *See, e.g.,* Justin Levitt, *The Truth About Vote Fraud* (New York: Brennan Center for Justice, 2007).

often."[64]  Testifying for the bill's proponents was Indiana Secretary of State Todd Rokita, who argued that the difficulty of catching voter impersonation explained the absence of prosecutions of that crime.[65]  Neither of the two other witnesses testifying in support of SB 362 could, under questioning, name an instance of documented voter impersonation in Texas.[66]

30.     During a meeting of the Senate Committee of the Whole, Mr. Levitt of the Brennan Center presented data collected by the Center, showing that nationally 8% of whites and 25% of Blacks lacked photo IDs.  Moreover, people earning less than $35,000 per year were twice as likely to lack them as those earning more than that amount.[67]  The same figures were also produced by an attorney with the Mexican American Legal Defense and Education Fund (MALDEF) in 2011, as were new data by a political scientist who found that minority voters were significantly less likely than non-Hispanic whites to have any of several identifying documents.[68]

31.     The Senate Journal from March 18, 2009 includes a statement submitted by ten Senators noting that all of the Senators in the Senate during the 81st legislative session who

---

[64] W. Gardner Selby, "House hears testimony on voter ID bill," *Austin Am.-Statesman*, Apr. 7, 2009.  Levitt actually testified three times—on Jan. 25, 2008, April 6, 2009, and March 1, 2011.

[65] *Ibid.*  For a comprehensive list of arguments for and against the bill, *see* [Texas] House Research Organization, "Revising voter identification requirements: SB 362 by Fraser."

[66] Exhibit 14 to Sen. Debate, Mar. 10, 2009, Testimony of Hans A. von Spakovsky, at 143; House Comm., Apr. 6, 2009, at 128, 142-43.

[67] Sen. Debate, Mar. 10, 2009, at 417-19; TX_00001425-26 (*Texas v. Holder*).

[68] Sen. Debate, Jan. 25, 2011, at 306-07; TX_00000133 (*Texas v. Holder*).

are ethnic minorities voted against voter identification legislation and the process related to such legislation at every opportunity they received in that session.[69]

32.      Beginning on March 10, the Senate held a 23-hour hearing on SB 362 that lasted until 6 a.m. the next morning.  While this lengthy hearing ostensibly allowed the public to testify, most people left the chamber before they got a chance to testify and others waited as long as 20 hours to do so.  At the end of the hearing, the Senate voted for the bill, with less than two-thirds of the Senators supporting the bill.[70]  The eight Senate members who were Black or Hispanic voted against it, as well as one Anglo representing a predominantly minority district.[71]  They heard testimony during the hearing that of 190 cases of alleged fraud submitted to the Attorney General's office since 2002, none involved voter impersonation at the polls.[72]

33.      Hearings by the House Committee on Elections got underway in early April.  The House version of the bill encountered immediate criticism.[73]  The House that year was presided over by Rep. Joe Straus, a moderate in comparison with his predecessor, Tom Craddick.  Early on he seemed eager to reach a compromise.  He appointed another moderate, Rep. Todd Smith, to chair the Election Commission.  "We will create an

---

[69] Sen. Journal, 81st Legislature, Mar. 18, 2009, USA_ 00013431.

[70] Sen. Journal, 81st Legislature, Mar. 18, 2009, USA_ 00013433-34; Terrence Stutz and Robert T. Garrett, "Texas Senate committee approves voter ID bill, will face tougher test in House," *The Dallas Morning News,* Mar. 12, 2009.

[71] Def.'s Trial Ex. 566 at 9-10 (*Texas v. Holder*).

[72] Anna M.  Tinsley, "Fort Worth woman, 98, proves photo ID not always easy to get," *Fort Worth Star-Telegram*, Mar. 12, 2009.

[73] Terrence Stutz, "Partisan split on display at voter ID hearing in Texas legislature," *The Dallas Morning News*, Apr. 7, 2009.

atmosphere where everyone's voice can and should be heard," Rep. Smith announced.[74]  In

reaching out to opponents of a photo ID bill, Rep. Smith envisioned a law that would not be

as strict as Indiana's—one more in tune with the Senate bill that allowed a voter without

photo ID to present other kinds of identification.[75]  Moreover, to give time for those

without the proper photo ID to obtain it, Rep. Smith said he would be willing to delay the

law's taking effect until 2013.[76]

34.     House opponents of the bill expressed concern that minorities were less likely to

have a photo ID.[77]  During consideration of SB 362, Rep. Smith estimated that roughly

700,000 Texas voters lacked a driver license.[78]  He later testified in deposition that he was

aware that minorities were less likely to have a photo ID.[79]  He also testified that it was "a

matter of common sense" that the hundreds of thousands of people without a driver license

would be "disproportionately poor, and therefore minority."[80]

---

[74]  Mike Ward and Laylan Copelin, "House elects speaker; Senate in uproar—Potential rule change in upper body infuriates Democrats," *Austin Am.-Statesman*, Jan. 14, 2009.

[75] Dave Montgomery, "Hot debate over voter ID hits Texas House this week," *Fort Worth Star-Telegram*, Apr. 6, 2009.

[76] However, 71 House Republicans had signed a statement of principle indicating that any proposed ID must take effect at the "next possible uniform election date" that year, and the proposal should require voters to present only photo IDs.  W. Gardner Selby, "Witnesses give varying views of voter ID bill," *Austin Am.-Statesman,* Apr. 7, 2009.

[77] Smith Dep. 101:7-102:5, 116:21-117.28 (*Texas v. Holder*).

[78] Smith Dep. 159:5-163:7 (*Texas v. Holder*).

[79] Smith Dep. 154:1-156:20, 196:19-198:2 (*Texas v. Holder*).

[80] Smith Dep. 164:8-16 (*Texas v. Holder*).

35.     After a brief hearing the House Committee on Elections reported out a version of SB 362 favored by Rep. Smith providing a fund of $7.5 million to encourage registration.[81]  It was met with strong resistance among many House members favoring photo ID, who wanted it to take effect the following year, without any funding for registration efforts. Opponents of Rep. Smith's moderate version also wanted a photo ID as the sole form of identification, foreshadowing SB 14.[82]  On the other side, African-American Rep. Mark Veasey alleged that "this is a racial issue—make no mistake about it.  This is about skimming enough minority votes so some people can't get elected."[83]  Unable to work out a compromise, Rep. Smith decided to move the Senate version of the bill to the full House without any changes.[84]

36.     Opponents of SB 362 fairly quickly decided on a strategy known as "chubbing," a procedure used to stall legislation.  To chub, legislators speak about legislation calendared for consideration prior to the bill they oppose, to delay or avoid altogether consideration of the bill they oppose. [85]  While filibusters are not allowed in the House, members are allowed a maximum of ten minutes to speak on bills, unless the majority gives them more time.  Proponents of SB 362 were in the majority, however.  Opponents could speak their ten minutes in favor of any bill they favored, and one after another did so, over five days,

---

[81] Gardner W. Selby, "Compromise on voter ID bill coolly received," *Austin Am.-Statesman,* Apr. 30, 2009.

[82] *Ibid.*

[83] Stutz, "Partisan Split," *op. cit.*

[84] Terrence Stutz, "Voter ID bill clears Texas House committee," *Dallas Morning News,* May 12, 2009.

[85] Texas Tribune, "*Texplainer: What is Chubbing?*," Feb. 2, 2011, available at http://www.texastribune.org/2011/02/02/texplainer-what-is-chubbing/.

running down the clock and preventing over 200 bills from being passed.  The session

ended June 1, 2009.[86]  It was unclear if a special session would be called.  Only the governor

can call a special session, and Gov. Perry vacillated.  Near the end of June, he ordered the

session to be held but, contrary to the wishes of fellow proponents of voter ID, did not place

voter ID on the agenda, apparently fearful that it could create equally contentious problems

in that session as well.[87]  The observation of a news reporter near the end of 2009 summed

up the session vividly: "Voter ID was a stick of dynamite with a five-month fuse . . . lit [by

proponents] in January, when they changed their longstanding operating rules to prevent

[opponents] from blocking a vote on the issue."[88]

## The Passage of Senate Bill 14: 2011

### *Introduction of SB 14*

37.      As soon as SB 362 failed passage in May 2009, Sen. Fraser began working on a new

bill—one that would eventually become SB 14 two years later.  His chief of staff, Janice

McCoy, worked with Bryan Hebert, then-deputy general counsel to Lt. Gov. Dewhurst, in

developing the bill.[89]  He also had a great deal of help from the newly-formed Tea Party,

thanks to which the November 2010 elections produced a Republican landslide of historic

proportions in the Texas House.  It was the largest Republican freshman class since 1876,

---

[86] James C. McKinley Jr., "Statehouse Journal: The Talk, and the Talk, and the Talk, of Austin," *N.Y. Times*, May 30, 2009; Mike Ward, "Outlook bad for 200 bills in stalemate," *Austin Am.-Statesman,* May 29, 2009.

[87] Peggy Fikac, "Calling special session, Perry wants quick action," *Houston Chronicle,* June 26, 2009; Mike Ward, "Special session to cover 3 issues," *Austin Am.-Statesman*, June 26, 2009.

[88] Jason Embry, "Voter ID fight took unexpected turns," *Austin Am.-Statesman*, Nov. 13, 2009.

[89] Fraser Dep. 225:24-25 (*Texas v. Holder*); Brunson Dep. 63:8-14 (*Texas v. Holder*).

transforming the minuscule 76/74 Republican majority in 2009 to 101/49 in 2011.[90]  The Democrats lost 23 House seats, 19 of which had been occupied by Anglos.  Over 80% of the remaining Democrats were Latinos or Blacks.  The partisan composition of the Senate remained unchanged: 19 Republicans and 12 Democrats.

38.     All Senate Democrats represented majority-minority districts.  Among political observers—and legislators as well—from Election Day forward it seemed likely that a photo ID bill would soon be passed, if the two-thirds rule were again broken and the chubbing tactic could be prevented.  The only question was the bill's nature.  The answer shortly became clear.[91]

39.     Two days before the session began, Rep. Debbie Riddle started a two-day wait outside the clerk's office at the Capitol in order to be the first to file both voter ID and anti-immigration bills—prefiguring the volatile linkage during the session between alleged vote fraud and Hispanic immigrants, with clear racial overtones.[92]  Rep. Riddle represented a majority-Anglo district in Houston.  Her ID bill would have required in-person voters to present a photo ID or two forms of non-photo ID.  Rep. Jessica Farrar countered that the problem could be resolved simply by putting the voters' photo on their voter registration card, which at that point was the primary form of ID required.[93]  Moreover, legislative

---

[90] R.G. Ratcliffe and Peggy Fikac, "Curtain to rise on a Legislature facing drama," *Houston Chronicle*, Jan. 9, 2011; *Senate Journal,* Jan. 26, 2011.
http://www.journals.senate.state.tx.us/sjrnl/82r/pdf/82RSJ01-26-F.PDF#page=17.

[91] Sen. Van de Putte admitted "the outcome [of SB 14] is inevitable" on January 26, 2011. Press release, http://www.vandeputte.senate.state.tx.us/pr11/p012611a.htm.

[92] Erin Mulvaney and Christy Hoppe, "First bills reflect GOP's new clout," *Dallas Morning News,* Nov. 9, 2010.

[93] Gary Scharrar, "Immigration, voter ID bills filed," *San Antonio Express-News,* Nov. 9, 2010.

testimony indicated that mail-in ballot fraud—which SB 14 did not address—was the most common election crime in the state.[94]  Even a supporter of SB 14, testifying at a hearing before the House Select Committee, asserted that "voter impersonation is a minuscule problem."[95]  Indeed, legislative testimony indicated that mail-in ballot fraud was the most common election crime in the state,[96] and even it was exceptionally rare.

40.     In December Rep. Todd Smith, who in 2009 had been a moderate on the ID issue, introduced an even more demanding bill than Rep. Riddle's.  "The feedback we got from our local party representatives and from the grass roots is that their preference is for a hard photo ID," said Rep. Smith.  "They were not comfortable with the concept of non-photo alternatives unless it was necessary as a political compromise."[97]  Both Rep. Riddle and Rep. Smith mentioned "immigration" or "illegal immigration" in various bills they filed.[98]

41.     Nine photo ID bills were introduced in the Senate.  The one adopted was Sen. Fraser's.  It was originally introduced as SB 178, but Sen. Fraser re-filed the bill at the request of Lt. Gov. Dewhurst, in order to receive a lower number that Dewhurst reserved for legislative priorities.[99]  It thus became SB 14.  In terms of allowable forms of ID, SB 14

---

[94] Joint Appendix 3154-55, 3174-78 (*Texas v. Holder*), USA_0018036-37, USA_00018056-60; Davis Depo. 39:16-41:8, 45:4-45: 15 (*Texas v. Holder*).

[95] Joint Appendix 1504 (*Texas v. Holder*), USA_00016386.

[96] Joint Appendix 3154-55, 3174-78 (*Texas v. Holder*), USA_0018036-37, USA_0018056-60; Davis Dep. 39:16-41:8, 45:4-45:15(*Texas v. Holder*).

[97] Dave Montgomery, "Republicans confident of passing Texas voter ID bill," *Fort Worth Star-Telegram,* Dec. 18, 2010; Gary Scharrar, "Immigration . . . ," *op. cit.*

[98] Robin Foster, "2011 Legislature 82nd session starts Jan. 11: Conservatives focus on illegal immigration, education system," *Houston Chronicle,* Jan. 6, 2011*.*

[99] SB 178, 82nd Legislature, Reg. Session, 2011 http://www.legis.state.tx.us/tlodocs/82R/billtext/pdf/SB00178I.pdf#navpanes=0.

went far beyond bills favored by photo ID proponents in the previous three sessions.  The

bill as filed required all in-person voters to present a photo ID at the polling place, with

almost no exceptions for able-bodied voters of any age.  Six, and only six, forms of photo ID

were allowed:

- Current Texas driver license issued by the Texas Department of Public Safety (DPS)
- Current Texas personal identification card issued by DPS
- Current Texas personal identification card issued by DPS to be used for voting (later known as the Election Identification Certificate (EIC))
- Current United States military identification card containing the person's photograph
- United States citizenship certificate containing the person's photograph
- Current United States passport

### Senate Consideration of SB 14

42.     As in 2009, the Senate once again exempted the bill, and only that bill, from its two-

thirds rule, thus allowing it to be passed by a simple majority rather than by two-thirds of

the Senate.[100]  Since 1981 the Senate rules have designated only two categories of

legislation to be set as a special order pursuant to a majority vote: redistricting bills and

voter ID bills.[101]  All senators present representing minority-majority districts voted

against abrogating the traditional two-thirds rule.  Sen. Eddie Lucio, representing a South

Texas district, claimed breaking the rule "silences the voices of my constituents."[102]  Sen.

Dan Patrick wanted to abolish the two-thirds rule entirely, but was unable to do so.[103]

---

[100] Texas Sen. Rules (adopted by the 82nd Legislature), Jan 19, 2011, at Rule 5.11, Sen. Res. 36.

[101]  K. Davis Dep. 57:14-22, 59:6-17 (*Texas v. Holder*).

[102] Def.'s Trial Ex 567 at 6 (*Texas v. Holder*).

[103] Abolishing the rule would become a campaign plank in his successful 2014 effort to defeat Dewhurst for the lieutenant governorship in the party primary.  Gary Scharrar, "Senate moves to retain two-thirds voting rule," *Houston Chronicle,* Jan. 20, 2011; Anna M.

43.     The Texas Constitution prohibits passage of bills within the first 60 days of a legislative session unless a topic is designated as an emergency by the Governor.  Gov. Perry did so, possibly at the request of Lt. Gov Dewhurst.[104]  Designating the topic an emergency allowed the Senate to hold a hearing on SB 14 within the first thirty days of the session, which it did, despite protests from ethnic-minority senators that due to the bill's expedited consideration, the senators lacked adequate time to secure and prepare witnesses for the hearing.[105]

44.     On January 20, 2011, the day after the Senate passed its rules, the day that the Governor designated voter identification as "emergency" legislation, Lt. Gov. Dewhurst called senators to tell them that the Committee of the Whole would take up SB 14 the following week.  He said that he wanted to "move the bill as expeditiously as possible" and that the Senate would meet as long as it took to get voter ID done.  He also told senators that it was in the Senate's best interest to "complete work on voter ID" before focusing on other legislative issues.[106]  In order to expedite consideration of SB 14, Lt. Gov. Dewhurst assigned the bill to the Senate Committee of the Whole, with Sen. Duncan presiding.[107]

Tinsley, "Dewhurst, Patrick square off Wednesday in lieutenant governor's debate," *Fort Worth Star-Telegram,* May 3, 2014.

[104] Brunson Dep. 64:20-65:13 (*Texas v. Holder*).

[105] Armbrister Dep. 212:8-21; K. Davis Dep. 118:7-15, 178:18-179:6; Def.'s Trial Ex. 352; Joint Appendix 100-01; 140; 171 (*Texas v. Holder*); USA_00014982-83; USA_00015022; USA_00015053.

[106] Talking Points for DHD Call to Members, Voter ID Timeline & Procedures, TX_00034560.

[107] Duncan Dep 220:5-7 (*Texas v. Holder*); Rathgeber Dep. 291:19-21 (*Texas v. Holder*).

45.     At least one Republican senator, Senator Estes, expressed concern that SB 14 was not compliant with the Voting Rights Act.[108]  Shortly before the Senate's consideration of SB 14, Bryan Hebert, then-deputy general counsel for Dewhurst, sent an email to other senate staff, including Sen. Fraser's chief of staff, Janice McCoy, expressing skepticism about the likelihood that SB 14 would be precleared and suggesting the inclusion of additional forms of photo ID, such as those accepted in Georgia's photo id law.  "At a minimum, we might use the language used in our bill that passed [the Senate] last session: 'a valid identification card that contains the person's photograph and is issued by: (A) an agency or institution of the federal government; or (B) an agency, institution, or political subdivision of this state."[109]  Hebert expressed concern with inflammatory issues raised by some supporters of photo ID requirements.  In response to an email from another staff person attaching a memo from Texas Conservative Coalition that expressed support for SB 14 on the basis of its effect on undocumented immigrants, Hebert expressed displeasure with the message, noting, "We are not doing this to crack down on illegals but to generally strengthen the security and integrity of the voting process."[110]

---

[108] Email from Bryan Hebert to Noe Barrios, Chief of Staff for Senator Estes, Jan. 13, 2011, (responding to Estes' "concerns about whether Fraser's voter ID bill complied with the Voting Rights Act"),TX_00034442; House Research Organization: Texas House of Representatives, *Legislative Staff:82nd Legislature,* Mar. 8, 2011, http://www.hro.house.state.tx.us/staff.aspx; Hebert Dep 108:3-109:5.

[109] Email from Bryan Hebert to Jason Baxter, Legislative Dir. for Sen. T. Williams; Janice McCoy; Jonathan Stinson, Legislative Dir. for Sen. Huffman; Blaine Brunson, Chief of Staff for Lt. Gov., and Julia Rathgeber, Deputy Chief of Staff for Lt. Gov., Jan. 22, 2011, TX_00262650; House Research Organization: Texas House of Representatives, *Legislative Staff: 82nd Legislature,* Mar. 8, 2011, http://www.hro.house.state.tx.us/staff.aspx.

[110] Email from Bryan Hebert to Jason Baxter, Legislative Dir. for Senator T. Williams; Amanda Montagne, Gen. Counsel for Sen. T. Williams; and Ryan LaRue, Comm. Dir. for Transp., Jan. 24, 2011, TX_00081510; House Research Organization: Texas House of

46.    At the Senate hearing on SB 14, testifying in favor of it were numerous conservative citizens, perhaps the most prominent being Catherine Engelbrecht, founder of Houston-based King Street Patriots and True the Vote.[111]  This organization had received publicity for its focus on Houston minority polling sites, beginning in 2010, and the office of Harris County Attorney Vince Ryan mounted an investigation of charges that True the Vote volunteers had intimidated prospective voters at these sites.[112]

47.    And as in previous sessions, when the bill was considered during debate in the Senate's Committee of the Whole, proponents made claims that a photo ID law was needed to restore voter confidence in election results.[113]  However, they did not present evidence that there had been a loss of confidence among the public; indeed, national polling evidence suggested otherwise.[114]  A number of witnesses and senators expressed their concerns about the impact on minorities the bill might possibly have.[115]  But apparently the Senate

---

Representatives, *Legislative Staff:82nd Legislature,* Mar. 8, 2011, http://www.hro.house.state.tx.us/staff.aspx.

[111] A.J. Vicens and Natasha Khan, "Election observers True the Vote accused of intimidating minority voters," Aug. 25, 2012, ABC News. http://investigations.nbcnews.com/_news/2012/08/25/13473761-election-observers-true-the-vote-accused-of-intimidating-minority-voters.

[112] True the Vote, "For the Record: Facts About True the Vote," May 5, 2014; Letter from Vince Ryan, Harris County Attorney, to Catherine Engelbrecht, June 5, 2014 (letter in possession of the author).

[113] *See, e.g.,* Transcript of Proceedings Before the Senate of the State of Texas Eighty-Second Legislature (Committee of the Whole Senate), Jan. 25, 2011, at TEX00000383, TEX00000401, TEX00000512, TEX00000513, TEX00000604.

[114] *See* Stephen Ansolobehere and Nathaniel Persily, "Voter Fraud in the Eye of the Beholder:  The Role of Public Opinion in the Challenge to Voter Identification Requirements," 121 *Harvard Law Review* 1737, 1751-58 (2008) (national survey).

[115] Joint Appendix 100-01, 140, 171(*Texas v Holder*), USA_00014982-82, USA_00015022, USA_00015053.

leadership favored a policy of minimizing discussion of the bill's rationale.  Senator Fraser

repeatedly answered "I am not advised" in response to questions from bill opponents.[116]

48.      During its consideration of SB 14, the Senate supporters knew that many Texans live

far away from a driver license office—in some cases more than a hundred miles distant

from their homes—and many offices were not open on weekends.  There were no DPS

offices in 81 of the state's 254 counties.  And even in large counties where they existed—

Harris County, for example—taking a bus to reach one and then waiting in line before

returning home could take hours—sometimes as long as three hours.[117]  DPS admitted that

SB 14 "could affect wait times at [DPS] offices, particularly surrounding major voting times

like a Presidential election."[118]  Moreover, in addition to the 81 counties with no DPS

offices, 34 had offices open only two days a week or less.[119]

49.      During Senate debate on the bill, Sen. Mario Gallegos pointed to the difficulty that

voters without necessary photo ID would have in accessing a driver license office to obtain

an EIC.  He said inner-city Houston had none.   Senator Carlos Uresti of San Antonio said

some of his constituents in his geographically huge west Texas district would have to drive

175-200 miles round trip to obtain an EIC.[120]  Senator John Whitmire of Houston spoke of

---

[116]  Joint Appendix 60 (*Texas v. Holder*), USA_00014942, Jan. 25, 2011; *see also* Joint Appendix 3280 (*Texas v. Holder*), USA_00018162, Mar 10, 2009.

[117] Def.'s Trial Ex. 10; Straus Dep. 18:8-19-17 (*Texas v. Holder*).  For current information about how to obtain an EIC, see http://www.txdps.state.tx.us/driverlicense/electionid.htm.

[118] Def.'s Trial Ex. 29 at 1 (*Texas v. Holder*).

[119] Def.'s Trial Ex 361 (*Texas v. Holder*).

[120] Sen. Debate, Jan. 25, 2011, at 71-73; TX_00000074 (*Texas v Holder*).

long waits—two to three hours—to obtain a driver license at the DPS there.[121]  Some of SB

14's proponents acknowledged barriers, but as one added, "[W]e have done everything we

can to make sure the inconvenience is mitigated.  People should have to show they are who

they say they are when they come to vote."[122]

50.     Senators proposed 37 amendments to SB 14, 28 of which were tabled, and nine of

which were adopted.[123]  Some of the tabled amendments included provisions to: require

evening and weekend hours at driver license offices;[124] require the Secretary of State to

analyze SB 14's impact on minorities;[125] and allow additional forms of voter ID, including a

Medicare ID card, a student photo ID, or a federal or state photo ID card.[126]

51.     When the vote for the bill occurred, no minority senators voted in favor of it, and

almost all Anglo senators voted in favor.[127]  After the bill passed the Senate, Bryan Hebert

drafted and circulated a memo to select Senate staff summarizing the Senate-passed

version of SB 14 in which he described it as "the strictest photo ID law in the country."[128]

---

[121] Sen. Debate, Jan. 25, 2011, at 65-66; TX_00000073 (*Texas v Holder*).

[122] Terrence Stutz, "Voter ID bill passes first vote in Senate," *Dallas Morning News*, Jan. 26, 2011.

[123] Joint Appendix 1228-69 (*Texas v. Holder*), USA_00016110-51.

[124] Joint Appendix 1337 (*Texas v. Holder*), USA_00016219; Joint Appendix 1300-04 (*Texas v. Holder*), USA_00016182-86.

[125] Joint Appendix 1337-39 (*Texas v. Holder*), USA_0016219-21.

[126] Joint Appendix 1246-47(*Texas v. Holder*), USA_0016128-29.

[127] Joint Appendix 1265 (*Texas v. Holder*), USA_00016147; Def.'s Trial Ex. 548 ¶ 98 (*Texas v. Holder*).

[128] Email from Bryan Hebert to Jonathan Stinson, Legislative Dir. for Sen. Huffman; Janice McCoy; Amanda Montagne, Gen. Counsel for Sen. T. Williams; Jennifer Fagan, Comm. Dir. for State Affairs; Ryan LaRue, Comm. Dir. for Transp. and Homeland Security; Wroe Jackson, Legislative Aide for Sen. Huffman, Jan. 27, 2011, TX_00034469-71; House Research

***House Consideration of SB 14***

52.     On February 9, 2011, Speaker Straus announced a "fast track" Select Committee on Voter Identification and Voter Fraud, which was to consider one bill: SB 14.[129]

53.     In the House, two Democratic members were persuaded by Republican colleagues to switch parties, thereby precluding a repeat of an event in 2003, where Democrats had left the state *en masse*, preventing a quorum needed for a controversial mid-decade redistricting plan urged by then-Congressman Tom DeLay.  Finally, to keep the previous session's "chub" strategy from recurring, the House majority changed the rules in this regard as well.[130]  In spite of the hopelessness of their task, opponents fought back. Numerous minority legislators stressed that if it became law, it would be the most restrictive ID bill in the United States—more so than either Georgia's or Indiana's.[131]  The bill's opponents again pointed out that there were virtually no prosecuted cases of voter impersonation at the polls in Texas.  When Rep. Rafael Anchia asked Rep. Patricia Harless, who sponsored the House bill, "Do you have any cases of voter impersonation?" she

---

Organization: Texas House of Representatives, *Legislative Staff:82nd Legislature,* Mar. 8, 2011, http://www.hro.house.state.tx.us/staff.aspx.

[129] Def.'s Trial Exs. 409, 411; Fowler Dep. 146:10-147:1; D. Davis Dep. 141:19-142:20 (*Texas v. Holder*).

[130] Peggy Fikac, "The power of the party switch," *Houston Chronicle*, Politics Blog, Dec. 14, 2010, http://blog.mysanantonio.com/texas-politics/2010/12/the-power-of-the-party-switch/; Jim Vertuno, "The Senate could be Texas Democrats' 'Alamo'," *San Antonio Express-News*, Dec. 19, 2010.

[131] Mike Ward, "After initial OK, Senate set to finish on voter ID," *Austin Am.-Statesman,* Jan. 26, 2011.  Indeed, in its finding that SB 14 violated Section 5 of the VRA, the three-judge court in the District of Columbia called it "the most stringent [voter ID law] in the country." *Texas v. Holder,* 888 F. Supp. 2d at 144, *vacated*, 133 S. Ct. 2886 (2013).

retorted, "I'm sure you know more about that than I do."[132]  As in previous sessions,
supporters of the photo ID requirement ignored minority members' requests to collect
information regarding minorities' possession of relevant ID documents or automobiles.[133]

54.      Opponents of SB 14 had already made the point that, while the EIC was available at
no cost in a limited sense (ignoring, *e.g.*, travel costs), obtaining the documents some
people would have to show to qualify for an EIC —such as a certified birth certificate
costing $22, or a copy of U.S. citizenship or naturalization papers, costing $345—would be
quite burdensome to many of those living in poverty.  In 2011, the poverty threshold for a
family of four was $22,350, and many families, of course, were even poorer.  While 12% of
white Texans were below the poverty level, 29% of Blacks and 33% of Hispanics were.[134]

55.      South Texas voting officials complained that the bill did not address what they took
to be their most serious form of voter fraud: mail-in voting.  Starr County elections
administrator Rafael Montalvo said the ID bill would not have much effect on fraud
prevention.  "Our fraud has not been on election day.  It's been through the mail-ins and to
this date, that issue has not been addressed," he said.  "I don't care how many ID laws we
pass, as long as we don't address the issue of mail-ins, we'll have problems."[135]  As in
previous sessions, bill opponents stressed that there were virtually no proven cases of

---

[132] House Debate, Mar. 21, 2011, at 18; TX_00210917 (*Texas v. Holder*).

[133] *See, e.g.*, House Debate, Mar. 21, 2011, at 35; Sen. Debate, Mar. 10, 2009, at 165.

[134] The Henry J. Kaiser Family Found., "State Health Facts: Poverty Rate by Race/Ethnicity," http://kff.org/other/state-indicator/poverty-rate-by-raceethnicity/.

[135] John MacCormack, "Few S. Texas elections officials back ID plan," *San Antonio Express-News,* Jan. 27, 2011.

voter impersonation in the state.[136]  No one supporting a photo ID bill, including Attorney

Gen. Abbott, presented data to the contrary.  Rep. Anchia called the bill ill-timed, saying

voter turnout in Texas was the worst of any state in the Union—32 percent of registered

voters in the 2010 general election.[137]

56.     The House Select Committee on Voter Identification and Voter Fraud voted SB 14

out of committee after holding a single hearing.  It was the only bill on which the committee

held hearings.[138]  Among those testifying was a constituent of a committee member who

claimed that a photo ID was necessary to prevent non-citizens from voting.  Asked to

present supporting facts to the committee, he responded that SB 14 would "fix the problem

whether it exists or not."[139]  Just how much more restrictive the 2011 bill was than its

predecessor was underlined by a reporter, noting the irony of the Senate's leading

opponent of the 2009 bill, Sen. Van de Putte, "imploring her colleagues to approve a version

of the voter ID bill she and other Democrats railed against two years ago."[140]  The claim of

proponents that SB 14 was designed, among other things, to prevent non-citizens from

voting is undermined by the admission by some of the legislative leaders in the fight for the

bill that they did not know whether it was possible for non-citizens to obtain a required

photo ID.  Indeed, the 2011 chair of the Select House Committee on Voter Identification and

---

[136] Terrence Stutz, "House poised to pass voter ID," *Dallas Morning News*, Mar. 24, 2011.

[137] *Ibid*.  For statistics from this election, see United States Election Project, "2010 General Election Turnout Rates," Feb. 4, 2012, http://elections.gmu.edu/Turnout_2010G.html.

[138] Def.'s Trial Ex. 410 at 6 (*Texas v. Holder*); Bonnen Dep. 44:24-45:2 (*Texas v. Holder*).

[139] Joint Appendix 1507 (*Texas v. Holder*), USA_00016389.

[140] Ken Herman, "Dems left longing for dreaded bill from '09 session," *Austin Am.-Statesman*, Jan. 31, 2011.

Voter Fraud later testified in deposition that he did not know that one of the IDs that SB 14 permitted could be legally obtained by a non-citizen.  The 2009 chair of the House Elections Committee also revealed his ignorance on this score.[141]

57.     Throughout the session, immigration issues, non-citizens voting, and the alleged need for a new photo ID law were linked, both in discussions and in bills, causing concern among Latinos in the legislature.  Rep. Aaron Peña, one of the few Latino Republicans, was worried about this connection, and said at one point:  "The tone of the debate is basically saying, 'We don't want you. . . .  This is a war over our culture.  These people bring diseases into our country.'"  He also tried, he said, while alone with his Republican colleagues to tone down the racial aspects of the debates.[142]  These implicit linkages between "illegal immigrants" and Latinos in general were made by some Republicans in all four sessions. Several bills introduced in 2011, including SB 14 and bills that specified English as the state's official language,[143] were perceived as anti-Latino.  Rep. Anchia believed that supporters of SB 14, in focusing on "non-citizen voting," were actually targeting Hispanics.[144]

58.     During the House consideration of SB 14, a key amendment by bill opponents was rejected in what was in practice a closed meeting.  A committee meeting that was supposed to be open to the public was held after 10 p.m., and the Capitol was always closed to the

---

[141] Bonnen Dep. 95.9-96:19 (*Texas v. Holder*); Smith Dep. 188:16-189:7 (*Texas v. Holder*).

[142] Wade Goodwyn, "Texas Republicans Take Harder Line On Immigration," National Public Radio, Mar. 29, 2011.  http://www.npr.org/2011/03/29/134956690/texas-republicans-take-harder-line-on-immigration.

[143] HB 176 by Jim Jackson; HB 301 by Leo Berman; and HB 81 by Dan Flynn.

[144] Anchia Dep. 59:13-19 (*Texas v Holder*).

public from 10 p.m. till 7 a.m.  Rep. Jessica Farrar objected, calling for the bill to be returned to the committee for a hearing the public could attend.  Speaker Straus replied that because the meeting had been scheduled to begin at 9 p.m., any member of the public who had wished to attend could have remained in the building until the hearing began.[145]  It was in this meeting the bill's proponents struck down a proposed amendment that would have allowed college and high-school students to use their ID cards for voting.[146]

59.     Also rejected by the House were amendments that would have waived all fees for indigent persons who needed the documents to obtain an EIC; reimbursed low-income Texans for EIC-related travel costs; allowed student or Medicare ID cards as acceptable ID at the polling place; and required DPS offices to remain open in the evening and on weekends.[147]

60.     In addition to rejecting these amendments, the House also removed from SB 14 the exemption for voters over 70 and the provision allowing indigent voters' provisional ballots to be counted without showing photo ID.[148]  The vote on final passage of the bill in the House reflected the same pattern of racial polarization as in the Senate vote.[149]

61.     Finally, on May 9, after much contention, the Senate reported out its final version. The House shortly thereafter approved it and Gov. Perry signed SB 14 on May 27, 2011.

---

[145] Terrence Stutz, "Dems say debate rules violated," *Dallas Morning News*, Mar. 24, 2011.

[146] Gary Scharrer, "Voter ID clears hurdle in House," *San Antonio Express-News*, Mar. 24, 2011.

[147] House Journal, Mar. 23, 2011 at 958-1029; TX_00002940-3011 (*Texas v Holder*).

[148] [No author], "Hits and Misses," *Dallas Morning News*, Mar. 26, 2011.

[149] Joint Appendix 2160-70 (*Texas v. Holder*), USA_00017042-52; Def.'s Trial Ex. 548 ¶¶ 90, 97-101 (*Texas v. Holder*); Def.'s Trial Ex. 506 at 120C (*Texas v. Holder*).

***SB 14 as Enacted***

62.     The bill as passed requires all in-person voters to present a photo ID at the polling place, with almost no exceptions for able-bodied voters of any age.  Seven, and only seven, forms of photo ID are allowed:

- Texas driver license issued by the Texas Department of Public Safety (DPS), current or expired within 60 days
- Texas Election Identification Certificate (EIC) issued by DPS, current or expired within 60 days
- Texas personal identification card issued by DPS, current or expired within 60 days
- Texas concealed handgun license, current or expired within 60 days
- United States military identification card containing the person's photograph, current or expired within 60 days
- United States citizenship certificate or certificate of nationalization containing the person's photograph
- United States passport, current or expired within 60 days

These new requirements would supersede then-existing law, which permitted eight categories of both photo and non-photo ID.

63.     Lacking one of these forms, a voter may cast a provisional ballot, but SB 14 provides that the ballot will not be counted unless, within six days, the voter goes to the voter registrar's office and presents one of the forms of acceptable photo ID.  The only exceptions are for voters who swear to have a consistent religious exception to being photographed or to not have the required documents as a result of certain specified natural disasters.

64.     Finally, if the voter, in advance of the election, provides the registrar with documentation from the Social Security Administration of having a disability or documentation from the Department of Veterans Affairs of having a disability rating "of at least 50 percent," she may obtain a certificate exempting her from presenting a photo ID. Among the acceptable types of ID in the final version of SB 14 is an "election identification certificate" (EIC), which, for voters under the age of 70, is valid for only six years.

38

65.    Otherwise qualified voters without one of the other six forms of photo ID can obtain

an EIC without cost at Department of Public Safety (DPS) offices, where driver licenses are

obtained.  However, SB 14 allowed DPS to require EIC applicants to present one of five

other forms of IDs to verify U.S. citizenship, the least expensive of which was a birth

certificate obtained from a state agency, which for most voters costs $22 to someone

without a certificate but born in the state.[150]  The most expensive—a copy of U.S.

citizenship or naturalization papers—costs $354.

66.    After Gov. Perry signed SB 14 into law, Texas submitted SB 14 to the Justice

Department for preclearance under Section 5 of the Voting Rights Act.  While awaiting a

determination from the Department, Texas filed suit in U.S. District Court for the District of

Columbia for judicial preclearance of SB 14.

67.    In August 2012, a three-judge court unanimously held that the state had indeed not

met its burden under Section 5 of the VRA because it had not shown that SB 14 would not

have a retrogressive effect on minority voters, and therefore SB 14 could not be

enforced.[151]  That changed, however, in June 2013 when the U.S. Supreme Court held in

*Shelby County* that Section 4 of the Voting Rights Act, which contained the coverage formula

for Section 5, was unconstitutional.[152]  The day the decision was announced, Texas put SB

14 into effect, and prospective voters in elections thenceforward were required to meet its

standards.

**Likely Effect of SB 14**

---

[150] Def.'s Trial Ex. 314 at 2 (*Texas v Holder*); Abshier Dep. 24:25-25:5 (*Texas v Holder*).
[151] *Texas v. Holder* 888 F. Supp. 2d 113 (D.D.C. 2012), *vacated*, 133 S. Ct. 2886 (2013).
[152] 133 S. Ct. 2612 (2013).

68.     The starting point of a court's analysis of the purpose behind a legislative decision is often the likely or expected effect of the decision.  Assessing the likely effect of SB 14 is the task of other experts in this case.  I have, however, been provided with their findings, which I summarize here.

69.     One of the United States' experts, Prof. Stephen Ansolabehere, was asked to determine the number of Texas registered voters who lack acceptable SB 14 identification, as well as to identify any racial disparities in rates of ID possession between Anglos, African Americans, and Hispanics.  He found that approximately 1.2 million Texas registered voters lack an accepted form of SB 14 ID, and that Black and Hispanic voters were much more likely to lack ID than Anglo voters.   Through database matching and individual and aggregate-level estimates of the race of those without acceptable ID, he estimated that 5 to 7 percent of registered Anglos lack ID, as compared to 13 to 15 percent of registered blacks and 9 to 11 percent of registered Hispanics.  In other words, black registered voters are roughly 100 to 150 percent more likely to lack ID as compared with Anglo voters.  Hispanic registered voters are roughly 50 to 100 percent more likely to lack ID as compared with Anglo voters.  Prof. Ansolabehere's findings indicate that registered voters without necessary photo ID are disproportionately African American or Hispanic.

70.     In his report, geographer Gerald Webster investigated racial disparities in social and economic characteristics in Texas and how those disparities affect access to DPS driver license offices, particularly in the state's three largest cities.  He finds that the time required to travel to and from a DPS office can pose a significant obstacle for voters to obtain an EIC, with the burden falling most heavily on potential voters who lack access to a motor vehicle.  Professor Webster's data show that the cities of Houston, San Antonio, and Dallas contain

40

more than half of the census tracts in Texas in which more than 25% of households do not have access to a motor vehicle.  In Houston, San Antonio and Dallas, he finds that these tracts are overwhelmingly populated by African Americans and Hispanics and exhibit high rates of poverty.  Prof. Webster's spatial analysis demonstrates that the use of the public bus system increases trip travel time several fold over the use of a motor vehicle.  These findings indicate that in the three largest cities of the state registered voters who lack one of the specific photo ID documents required by SB 14 and who do not have access to a vehicle in their household, will have difficulty obtaining a document from DPS.  Prof. Webster also shows that in Houston, San Antonio, and Dallas such persons are disproportionately African American or Hispanic.

71.     The findings by Professors Ansolabehere and Webster provide systematic quantitative evidence that confirms the common-sense arguments made by bill opponents throughout the debates that photo ID requirements would disproportionately burden Hispanic and Black voters.

### The Struggle Over Minority Voting Rights in Texas, 1865-1965

72.     Evaluating the historical background of any decision often assists in determining its purpose.  In this instance the rationale offered for photo ID requirements in the bills considered by the Texas legislature from 2005 to the passage of SB 14 bears a striking resemblance to arguments for racially discriminatory restrictions on voting in the past. This justifies a brief review of the many efforts by Texas officials over the years to limit the political participation of African Americans and Mexican Americans.

73.     Anglo Texans hostile to the political influence, potential or actual, of racial and ethnic minorities have attempted to minimize their voting strength from the Nineteenth

41

Century to the present.  Following passage of the Reconstruction Acts and the Fifteenth

Amendment to the U.S. Constitution, Blacks and Latinos continued to vote for three decades

despite harassment and increasing violence by Whites against them until the state, under

Democratic control, enacted a series of laws designed to disfranchise both groups,

including a constitutional amendment in 1902 imposing a poll tax as a prerequisite to

vote.[153]  These laws, combined with others, disproportionately discouraged minorities and

the poor in general from voting.[154]  A political science text summarizes this history

succinctly: "Texas utilized almost every technique available except the literacy test and the

grandfather clause to deny the vote or to make it expensive in terms of time, money, and

psychological costs."[155]

74.     The poll tax was justified in 1902 as a means of preventing voter fraud.  As the

editor of the *San Antonio Express* wrote that year: "By requiring a poll tax receipt, secured

six months previous to an election, fraudulent elections can be prevented almost

entirely."[156]  There were three features of the poll tax requirement that created obstacles to

prospective voters.  As political scientist Donald Strong noted during the period when the

poll tax was still in force: "The poll tax discourages voting by the lower-income groups.  The

tax is a trifle for the well-to-do; to the poor man it represents the price of a pair of

---

[153] V.O. Key, Jr., *Southern Politics in State and Nation*, 578, 581, 585, 587-88 (New York: Alfred A. Knopf 1949).

[154] J. Morgan Kousser, *The Shaping of Southern Politics:  Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (New Haven: Yale Univ. Press 1974), at 206-09.

[155] William Earl Maxwell and Ernest Crain, *Texas Politics Today* 69 (New York: West Publishing Co. 1987, 4th ed.).

[156] Quoted in Frederick D. Ogden, *The Poll Tax in the South* 7 (Tuscaloosa: Univ. of Alabama Press 1958).

shoes."[157]  Political scientist V.O. Key points to a second major obstacle, "the requirement that the tax be paid long in advance of the primary or election," long before voter interest in the contest is at its height.  Key noted a third problem, the logistical burden associated with paying the tax.  "The necessity of taking a half day off to make a trip to the courthouse to pay the poll tax probably disfranchises more urban wage and salaried workers than does the disinclination to part with the dollar or so for the tax."[158]

75.      In addition to the poll tax, which imposed a significant burden on low-income voters, in 1923 the legislature passed the "white primary" statute forbidding Blacks from voting in Democratic primaries when nomination therein guaranteed election.[159]  The Democrats were essentially committed to white domination[160] and this continued to be true into the early 1960s despite growing factional splits among Democrats.  There were also, however, overt expressions of racial prejudice among some Republicans as well.[161]

76.      In 1927 the state's white primary law was unanimously overturned by the U.S. Supreme Court as violating the Fourteenth Amendment of the U.S. Constitution,[162] but as the Court's opinion applied solely to laws enacted by the state, the legislature soon passed a

---

[157] Donald S. Strong, "The Poll Tax: The Case of Texas," 38 *American Pol. Sci. Rev.* 701 (Aug. 1944).

[158] Key, *op.cit.*, 585, 589.

[159] For an in-depth description, see Sanford N. Greenberg, "White Primary," 6 *The New Handbook of Texas* 940-41 (Austin: The Texas State Historical Ass'n 1996).

[160] In the 1950s, the strongly segregationist Democratic governor, Allan Shivers, headed what at the time was called the "Shivercrats."  On the side of civil rights for minorities was U.S. Sen. Ralph Yarborough, one of only three southern senators—and the only one from Texas—to vote in favor of the VRA.

[161] For the gradual shift in partisanship, see Davidson, *Race and Class in Texas Politics* (Princeton, N.J.: Princeton Univ. Press: 1990), at 158-72.

[162] *Nixon v. Herndon*, 273 U.S. 536, 540-41 (1927).

statute authorizing political parties to define the qualifications of their members, which the Democratic party then did—limiting members to Whites.[163]  The U.S. Supreme Court in 1935 first held this to be constitutional[164] but in 1944 struck down that law as well in *Smith v. Allwright.*[165]

77.    The situation of Latino citizens during the first half of the Twentieth Century was in significant respects similar to that of Blacks.  They were discouraged from participating effectively in politics.  Although spread among all social classes, they were disproportionately poor and usually perceived as intellectually inferior.  Like Blacks, they were relegated to an inferior caste status.[166]  Anglo lynching of Latinos in Texas was widespread during Reconstruction and the decades immediately thereafter, and was quite similar in number to that of Blacks, *i.e.*, around 600.[167]  Like Blacks, they consequently formed local and statewide organizations to protect their very lives, as well as their interests, dignity, and rights in their sometimes physically dangerous quest for justice.[168]  As with other Texans who were disproportionally poor, Latinos as a group had their vote suppressed by the financial burden of the poll tax.  They were also discriminated against as

---

[163] Greenberg, *op. cit.*

[164] *Grovey v. Townsend*, 295 U.S. 45 (1935).

[165] 321 U.S. 649 (1944).  For an account of the context in which *Smith* was announced, see Davidson, *Race and Class in Texas Politics, op. cit.* at 159.

[166] Edward E. Telles and Vilma Ortiz, *Generations of Exclusion: Mexican-Americans, Assimilation, and Race* at 76-77 (New York: Russell Sage Found. 2008).

[167] Richard Delgado, "The Law of the Noose: A History of Latino Lynching," 44 *Harvard Civil Rights-Civil Liberties Law Review* 297-99 (Summer 2009).

[168] Arnoldo de Léon and Robert A. Calvert, "Civil Rights," *Handbook of Texas Online* (http://www.tshaonline.org/handbook/online/articles/pkcfl); Steve Bickerstaff, *Lines in the Sand: Congressional Redistricting and the Downfall of Tom DeLay* at 37-38 (Austin: Univ. of Texas Press 2007).

allegedly non-white, and in some locales were subjected to the equivalent of the white primary law even before it became a statewide requirement.  In historian David Montejano's words:

> In 1904 the State Democratic Executive Committee approved the practice of the White Man's Primary Association [a local South Texas organization] by suggesting that county committees require primary voters to affirm that "I am a white person and a Democrat."  And in 1918, the legislature passed a law eliminating the interpreter at the polls and stipulating, moreover, that no naturalized citizens could receive assistance from the election judge unless they had been citizens for twenty-one years.[169]

78.     In short, like blacks, Latinos have long been relegated to an inferior social and political position, and as the U.S. Supreme Court has recently noted, "'the political, social, and economic legacy of past discrimination' for Latinos in Texas may well 'hinder their ability to participate effectively in the political process.'"[170]

### The Era of the Voting Rights Act: 1965-2014

79.     The racial divide in the early sixties was large.  Jim Crow was still widespread—a fact dramatically illustrated when, in 1962, President John F. Kennedy's assistant secretary of labor, George Weaver, was turned away from the newly built Shamrock Hilton Hotel because he was black.[171]  This was in Houston, the state's largest city and one of its most

---

[169] David Montejano, *Anglos and Mexicans in the Making of Texas, 1838-1986* 143 (Austin*:* Univ. of Texas Press).

[170] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) (quoting *Session v. Perry*, 298 F. Supp. 2d 451, 492 (E.D. Tex. 2004), *Thornburg v. Gingles*, 478 U.S. 30, 45 (1986)).

[171] Mary Beth Rogers, *Barbara Jordan: American Hero* (New York: Bantam Books 1998), at 89.

urbane.  Jim Crow remained in effect in some Texas venues even after passage of the Civil Rights Act of 1964.[172]

80.     In 1964, one year before passage of the VRA, the Twenty-fourth Amendment of the U.S. Constitution became law, abolishing the poll tax in federal elections, and two years later the U.S. Supreme Court in *Harper v. Virginia State Board of Elections* overturned its use in state and local elections as well. [173]  Texas had always relied on the poll tax list in lieu of an official voter registration list, as political scientist Walter Dean Burnham points out: "The paid-up poll tax receipt was used by election officials as the equivalent of personal registration."[174]  Following *Harper*, Gov. John Connally, a Democratic racial conservative, called a special session of the legislature in 1966 to create a new registration system, and over the objections of the few ethnic minority members and their allies charged the body with drawing up an annual registration system described by one reporter as "patterned on the old poll tax system, but minus the tax."  Anticipating the justification offered for SB 14 almost half a century later, Gov. Connally described the bill as "the most logical means of preventing fraud and guaranteeing purity of the ballot box."[175]  The legislature then proposed an amendment to the state constitution—subsequently ratified by a majority of voters—providing an annual four-month registration period, similar to that in 1904,

---

[172] Montejano, *op. cit.* at 285-6.

[173] 383 U.S. 663, 666-67 (1966).

[174] Walter Dean Burnham, "A Political Scientist and Voting Rights Litigation: The Case of the 1966 Texas Registration Statute," 1971 *Wash. U.L.Q.* 335, 339 (1971).

[175] "The Special Session," 58 *The Texas Observer* 7(Feb. 18, 1966); *see also* Chandler Davidson, *Race and Class in Texas Politics, op. cit.,* at 51-53.

ending approximately nine months before the November election.  This was subsequently ruled unconstitutional in *Beare v. Briscoe* (1971).[176]

81.      Passage of the VRA in 1965 was hailed by the state's minority leaders as a huge step forward.  Soon numerous suits were filed challenging a host of discriminatory election laws.  Some targeted laws diluting minority voting strength through such measures as gerrymandering and at-large elections—practices judged unconstitutional in a legislative redistricting case originating in Texas, *White v. Regester.*[177]  *White* led to numerous challenges to at-large and multi-member districts locally in Texas.  Most of the changes from at-large to district elections in Texas were the result of either litigation or credible threats thereof.[178]

82.      A 1981 study of changes from at-large to single-member-district elections in 41 Texas jurisdictions, all of which had a minority population of at least 10%, reported a tripling of the number of Black and Hispanic officeholders as a result of the adoption of fair district election plans.[179]  Race also played a major role in the redistricting process— sometimes with Republicans, Blacks, and liberal white Democrats working together against the gerrymandering efforts of conservative Democrats, and then, as the two-party system

---

[176] 498 F.2d 244, 245 (5th Cir. 1974).

[177] Brischetto, *et al., op. cit.,* at 242-6; *White v. Regester*, 412 U.S. 755 (1973).

[178] *Ibid.,* 254.

[179] Chandler Davidson, "Reforming a Reform: The Attack on Multimember Districts," in Merle Black and John Shelton Reed (eds.), 1 *Perspectives on the American South,* 145-46 (New York: Gordon and Breach 1981).

developed more robustly, with pro-civil rights Whites and their minority colleagues working together in the Democratic party and conservative Whites migrating to the GOP.[180]

83.    A major step forward in preventing vote discrimination occurred in 1975 when the Congress decided to bring Texas and various other states with significant language-minority populations under coverage of Section 5 of the VRA, thanks in significant measure to the 1972 election of a black Congresswoman, Barbara Jordan from Houston, who as a member of the Judiciary Committee helped lead efforts to bring these states under Section 5.[181]

84.    In the same period the legislature finally passed a law requiring bilingual ballots in Spanish-speaking areas.[182]  Leonel Castillo, Houston city controller and one of the first Latinos elected in Houston citywide, testified before Congress that he had received complaints from South Texas Latinos of harassment by Anglo poll watchers, insufficient or incorrect voting assistance from officials, absentee ballot bias, intimidation by law enforcement officers, economic reprisals against Latinos who voted, and prejudicial location of polling places.[183]

---

[180] Kousser, *Colorblind Injustice, op. cit.,* at 283-316.

[181] Rogers, *op. cit.* Chapter 15.  Before her election to Congress Jordan, talented though she was, ran in 1962 and 1964 for a seat in the state legislature and lost.  At that time all legislative seats in Harris County were elected at-large.  The same was true of senatorial seats, but a court ruling forced Texas to draw districts roughly equal in population, giving the county three districts and part of a fourth—one with a sufficiently large minority population for Jordan to win a seat—the first African American elected to the state senate since Reconstruction.

[182] Art Wiese, "All Texas Counties Affected if Voting Rights Act Broadened," *Houston Post,* May 4, 1975.

[183] *Ibid.*

85.     Between the time Texas was brought under Section 5 coverage in 1975 and April 2013, the Justice Department posted 207 objection letters to jurisdictions planning election-related changes within the state.[184]  As more than one voting change can be targeted in a single objection letter the actual number of objections understates the totality of affected practices.  These practices embrace the spectrum of discriminatory election procedures: racial gerrymandering, racially discriminatory purges of registered voters, imposition of dilutive laws requiring numbered posts and the majority-runoff requirement, annexations diluting minority votes, a faulty bilingual oral assistance program, reduction in the number of elected officials, transfer of duties from an official of one race to that of another, and unfair changes in election dates, among other infractions.

86.     Among the numerous Texas objections were three interposed in Waller County, the first in 1976 and the most recent in 2002.  About forty miles west of Houston, the county is home to Prairie View A&M, an historically black university whose students have been a target of vote suppression by white county officials from the 1970s on, when the Twenty-Sixth Amendment to the U.S. Constitution enabled citizens 18 years old and over to vote. These officials tried numerous ploys over the years, beginning with efforts by the county tax assessor, to prevent students from voting—claiming they were not legal residents of the county unless their parents lived there or the students owned real estate in the county. These discriminatory efforts were rejected in the 1979 U.S. Supreme Court decision, *Symm*

---

[184] U.S. Dep't of Justice,
http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=tx.

*v. United States.*[185]  White officials on a number of occasions continued trying to suppress

minority student voting in the county into the 21st century.[186]

87.    In preparation for congressional hearings on renewing the nonpermanent

provisions of the VRA, the National Commission on the Voting Rights Act conducted an

extensive study, based in part on information obtained at ten hearings across the country,

that was published by the Lawyers Committee for Civil Rights Under Law.[187]  The National

Commission was, according to its organizers, a "politically and ethnically diverse group of

men and women, including former elected and appointed public officials, scholars, lawyers,

and leaders."[188]  The Commission reviewed the number of Section 5 declaratory judgment

actions favorable to minority voters and the number of successful Section 2 cases filed by

minority plaintiffs.  Section 5 declaratory judgment actions were relatively rare but Texas

filed nine between 1975 and 2004.[189]  In addition, Texas led all nine states covered by

Section 5 in the number of successful Section 2 cases (reported and unreported) filed

---

[185] 439 U.S. 1105 (1979).

[186] For an historical overview of these student-targeted suppression efforts, see David R. Richards, *Once Upon a Time in Texas: A Liberal in the Lone Star State* (Austin: Univ. of Texas Press, 2002), Chapter 16; Nina Perales, Luis Figueroa and Criselda G. Rivas, "Voting Rights in Texas: 1982-2006," 71:2 *Review of Law and Social Justice,* 733 (2008).

[187] The National Commission on the Voting Rights Act, *Protecting Minority Voters:  The Voting Rights Act at Work, 1982-2005* (Washington, D.C.: Lawyers Comm. for Civil Rights Under Law 2006); *see also Highlights of Hearings of the National Commission on the Voting Rights Act* (Washington, D.C.: Lawyers Comm. for Civil rights Under Law 2006) (supplement).  In the interest of full disclosure, I was the principal author of this report and the supplement.

[188] *Ibid.* (*Protecting Minority Voters*), at 1*.*

[189] *Protecting Minority Voters*, *op. cit.*, Map 6 (no pagination).

between 1982 and 2005.  There were a total of 653 such cases, and 206 were in Texas.[190]

Most of these were cases settled through a court-ordered consent decree without trial.[191]

In recent decades, courts do not often make findings that a law was adopted with a racially

discriminatory intent because the Section 5 effects and Section 2 results tests have been

available.  Even so, as recently as August 2012, a federal court ruled that Texas had failed to

meet its burden under Section 5 of proving that its state senate and congressional

redistricting plans were not intentionally racially discriminatory.[192]  That the same

legislature enacted intentionally discriminatory redistricting plans in 2011, according to

this court finding, provides a strong indicator that the same decision-makers were acting

with a racial purpose in adopting SB 14.

## Racial Appeals in Electoral Contests

88.      Racial prejudice in Texas campaigns has by no means disappeared in the current

century and is reflected in appeals to voters made by candidates and officeholders.

Dramatic examples are found occasionally in campaign advertisements or mailers.  In one

case, Terry McConn, a white candidate and son of Houston's former mayor Jim McConn,

campaigned for a post on the non-partisan Houston city council in 2003 opposing

Pakistani-American M.J. Khan—sending a mailer showing a photo of the latter.  Under the

heading, "Birds of a Feather Flock Together," were photos of five local minority

---

[190] *Ibid.,* Table 5 (no pagination).  For an in-depth account of voting problems in Texas through 2006, see Nina Perales, Luis Figueroa and Criselda G. Rivas, *op. cit.*, at 713ff.

[191] Ellen Katz, *et. al.*, *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982* (2005), reprinted in, *To Examine Impact and Effectiveness of the Voting Rights Act: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 16, 964-1124 (2005).

[192] *Texas v. United States,* 887 F. Supp 2d 133 (D.D.C. 2012)*, vacated*, 133 S. Ct. 2886 (2013).

officeholders, four Blacks and the Asian American Khan, with this message: "M.J. Khan thought you'd be impressed with these endorsements—because he sought and earned each one."[193]  There was no discussion of issues, only the implication that Khan was aligned with Blacks and not Whites.[194]

89.     More germane to the photo ID issue was another mailer sent out by the conservative Empower Texas PAC in 2008, attacking Democrat Joel Redmond, a white candidate for state representative in the Houston area, who is shown surrounded by ethnic minorities— three well-known black officeholders, a Latino officeholder, and President Obama.  Among his positions listed in the mailer is "opposed to voter photo ID."[195]  Intra-party racial issues also occasionally surface in public.  In the 2012 U.S. Senate contest between Texas Solicitor General Ted Cruz, of Cuban ancestry, and Lt. Gov. David Dewhurst, the Dewhurst campaign used an advertisement that accused Cruz of aligning with groups favoring amnesty for illegal immigrants—a claim immediately denied by a Cruz spokesman.  Cruz allies alleged that racism in Dewhurst's ad played on anti-Hispanic fears in the state.[196]

90.     More recently, in early 2014 former Republican representative Aaron Peña, who had supported passage of SB 14, publicly warned his party that if its "inflammatory rhetoric" on issues such as immigration went too far, it would cause even Hispanic

---

[193] Mailer in possession of the author.

[194] For more on the racial aspects of the campaign, see Bruce Nichols, "Front-runner in council race builds on growing ethnic clout," *Dallas Morning News,* Nov. 23, 2003.  A copy of the flier is in the possession of the author.

[195] Mailer in the possession of the author.

[196] Robert T. Garrett, *Dallas News,* May 24, 2012.

conservatives to protest in the run-off elections.[197]  In Texas, invoking the threat of

"immigrants" voting can be an indirect appeal to anti-Latino voters in general.[198]

91.     Racial appeals continued in the 2014 election season.  Dan Patrick, a popular

Houston talk-show host and Texas state senator, used anti-immigrant rhetoric in his

successful Republican primary campaign for lieutenant governor against Dewhurst,

charging that Texas faced an "invasion" from Mexico.[199]  This kind of language reflected

racial attitudes long expressed by some Texans.  During the 1920s "whether born in the

United States or Mexico, all persons of Mexican origin were often considered Mexican and

alien."[200]  "Twenty-five percent of the newcomers," estimated Cameron County sheriff

Emilio Forto (in 1919), "usually look upon the Mexican as filthy, unsanitary and sickly."[201]

92.     According to news accounts, Sen. Patrick's anti-immigrant comments in the 2014

campaign for lieutenant governor were criticized by fellow Republicans who were

Hispanics.  Hector De Leon, chairman of the Associated Republicans of Texas, referred to

---

[197] Peggy Fikac, "Intramural struggles dog Democrats, GOP as Election Day nears," *Houston Chronicle,* Feb. 27, 2014.

[198] In this regard, recent research has found that white respondents do not treat threatening immigrant behavior equally with respect to different immigrant groups. Instead, transgressions such as remaining in the country without legal documentation, working without paying taxes, and failing to support traditional symbols of American identity, are considered more offensive if committed by Hispanic than non-Hispanic immigrants. *See* Todd K. Hartman, Benjamin J. Newman, and C. Scott Bell, "Decoding Prejudice Toward Hispanics:  Group Cues and Public Reactions to Threatening Immigrant Behavior," 36:1 *Political Behavior* 145, Mar. 2013.

[199] Patricia Kilday Hart, "Are Democrats pulling for Patrick?" *Houston Chronicle,* Mar. 3, 2014; Mike Ward, "Analysts:  Dewhurst win not in the cards from start," *Houston Chronicle,* May 29, 2014.

[200] Edward Telles and Vilma Ortiz, *Generations of Exclusion:  Mexican Americans, Assimilation, and Race* 84 (New York: Russell Sage Found. 2008).

[201] Montejano *op. cit.*, at 225.

Patrick's "illegal invasion" remarks regarding Latinos as "thinly veiled racism." [202]

93.    During the current contest between Attorney General Greg Abbott and State Senator Wendy Davis, Abbott asked Ted Nugent, a rock musician and long-time Texas resident, to accompany him on the campaign trail.  Nugent is well-known for his public vulgarity and racism.  He has used the N-word in radio interviews, said illegal immigrants should be treated as "indentured servants," and a month before joining Abbott, publicly called President Obama "a subhuman mongrel."[203]  Abbott, when criticized for asking Nugent to campaign with him, denied knowledge of these statements, but not until several days after the news broke and Nugent had apologized for his remarks about the President did Abbott finally say Nugent was right to apologize for what he called the "wrong" language. According to a University of Texas political scientist and pollster, "I see it as speaking to the electorate as Greg Abbott finds it in 2014"—an electorate that is approximately two-thirds white and quite conservative on matters of race.[204]

### Summary and Conclusions

94.    The adoption of SB 14 by the State of Texas in 2011 culminated years of conflict between advocates of more restrictive voter identification laws, including the use of photo

---

[202] *See, e.g.*, Carlos Sanchez, "COMMENTARY:  Wooing Hispanic votes," *Houston Chronicle,* 9 Mar. 2014; Alexa Ura, "Eyeing Hispanic Voters, Patrick Shifts His Tone," *Texas Tribune,* May 29, 2014.

[203] Peggy Fikac, "Abbott takes heat for Nugent invite," *Houston Chronicle,* Feb. 18, 2014.

[204] Julie Fancher and Christy Hoppe, "Abbott defends Nugent with knock at Obama," dallasnews, Feb. 18, 2014. http://www.dallasnews.com/news/politics/headlines/20140218-abbott-dash-defends-nugent-with-knock-at-obama.ece; Peggy Fikac, "Nugent flap proof that it matters who's at table," *Houston Chronicle,* Feb. 24, 2014; Jay Root, "Analysis: In Abbott World, Nugent Flap Much Ado About Nothing," *The Texas Tribune,* Feb. 26, 2014.

ID requirements, that began in 2005.  Following the Republican landslide victory in the 2010 legislative elections, supporters of a restrictive photo ID bill had sufficient votes to impose its will on the opponents of photo ID requirements, who were by then almost entirely African American and Hispanic.  The majority rejected most of the ameliorative amendments introduced by minority legislators and as a result the law adopted in 2011, SB 14, was among the most restrictive photo ID laws in the nation.  The warnings of bill opponents about the likely effects of SB 14 have proven accurate.  Analysis by other experts in this case concludes that registered voters without necessary photo ID 1) are disproportionately African American or Hispanic; 2) are numerically concentrated in large cities; 3) in the three large cities examined are more likely than Anglos to live in households without access to vehicles; 4) as a result of lacking access to vehicles are dependent on public transportation in those three cities; and 5) as a result of dependence on bus systems in those three cities face a greater cost in time spent obtaining a state-issued photo id needed to satisfy SB 14.

95.    The timing of the first introduction of voter ID legislation, in 2005, is an indicator of the purposes of those advocating photo ID requirements.  The 2000 census data, showing a significant increase in the ratio of Texas Latinos of voting age to Whites, and a disproportionate increase in Latino children compared to Anglo children, received attention across the state.  Before the 2007 session the Census Bureau announced that in 2004 Texas had become a minority-majority state, although a significant percentage of Hispanic persons were not citizens (and thus not eligible to vote).  Nevertheless, legislators were well aware that Hispanic voting strength was increasing rapidly.

96.     In 2007 and 2009, the legislature again considered voter identification bills.  As opponents of voter identification successfully blocked the bills introduced in each legislative session, by heroic efforts, bill supporters decided to change the procedures in each successive session to minimize their opponents' influence.  These procedural changes are an important part of the sequence of events culminating in the final adoption of a strict photo ID requirement.

97.     In 2009 the Texas Senate changed the long-standing practice of requiring the support of two-thirds of Senators to consider a bill out of order on the calendar.  The only other type of bill for which the two-thirds rule had been altered in recent decades was redistricting.  The rule change adopted in 2009 created a special exception for "voter identification requirements"—and no other legislation—to be set as a special order by a majority of the Senators.   Adoption of this rule guaranteed that, even if every bill opponent were present and voting, opponents would be unable to block passage of a voter identification bill.  This rule change enabled voter identification supporters to pass SB 362 in the Senate.  Opponents in the House, however, used a procedure similar to a filibuster, known in Texas as "chubbing," to block the passage of SB 362.

98.     In response to this defeat, in 2011, not only did bill supporters in the Senate once again adopt the 2009 rule absolving voter identification bills from the two-thirds requirement, but Lt. Gov. Dewhurst referred SB 14 directly to the Senate Committee of the Whole, which allowed the chamber to expedite consideration of the bill.  The House changed its procedures related to chubbing.  Speaker Straus also departed from the usual practice of committee assignment by referring the bill to a Select Committee on Voter Identification and Voter Fraud, which considered only SB 14 and no other legislation.  Yet

another departure was the House's refusal to allow the public to attend a house committee meeting that was supposed to be open to the public.  Because the meeting was held at night after the Capitol was closed, public attendance was precluded.  In addition, Gov. Perry designated SB 14 as emergency legislation, allowing it to be considered in the early days of the legislative session.

99.    As SB 14 was considered, ethnic minorities complained publicly about the use of racially insensitive language by some of the supporters of the bill, and their tendency to conflate "non-citizens" and "illegal immigrants" with Latinos generally in discussing voter fraud.  This is perhaps not surprising in light of the continuing use of racial campaign appeals by some of those legislators when on the hustings.

100.    Despite proponents' claim that SB 14 would help combat voter fraud by non-citizens, the most common form of acceptable ID at the polls, a Texas driver license, may be obtained legally by non-citizens who are lawfully residing in Texas.  Key bill supporters failed to determine whether, in fact, SB 14 would prevent non-citizens from voting by restricting allowable forms of ID to U.S. citizens while arguing repeatedly that SB 14 would have that effect.

101.    Supporters of SB 14—the most draconian of all the bills filed beginning in 2005—rejected almost all of the ameliorative provisions introduced by minority legislators, including amendments that would not alter the stated purpose of the bill, such as extending the hours at DPS offices or studying the impact of SB 14 on minority voters.  Even the bill that caused such a bitter fight in 2009 allowed non-photo alternatives, but amendments that would have allowed the use of the 2009 alternatives were voted down by the majority,

leaving only seven state or federal documents with photo ID that would satisfy the requirements of SB 14.

102.    Despite numerous claims of widespread election fraud of many kinds by legislative supporters of more stringent voting laws from 2005 to passage of SB 14 in 2011, and despite ongoing attempts to uncover such fraud throughout this period, virtually no cases of impersonation fraud were discovered.[205]  The absence of evidence of widespread fraud of the only kind a photo ID would prevent (in-person voter impersonation) forced supporters of strict photo ID laws search for other justifications, such as preserving public confidence in the integrity of the Texas electoral process.  But legislators could point to nothing more than anecdotal evidence that the public doubted the integrity of the state's electoral process and public opinion polls showing support for voter ID.[206]

103.    In examining the purposes underlying a decision, it is important to understand the historical context in which the decision was made.  Texas has a long history of racial discrimination affecting voting, both in the long term and the short term.  Like other states of the former Confederacy, Texas was particularly harsh in its efforts to prevent minority citizens from voting or from electing their candidates of choice—from the end of Reconstruction until the enactment of the Voting Rights Act.  The poll tax was the key disenfranchising device adopted at the turn of the Twentieth Century (1902).  The rationale

---

[205] During this period, tens of millions of votes were cast in Texas in national, state, and local elections.  In the 2008 and 2012 presidential elections alone Texans cast 16,071,646 votes.  The latter figure represents only a portion of all the ballots cast in Texas in that four-year period, including votes in party primaries and run-offs, statewide off-year elections, and those cast in local jurisdictions.  In 2007 Texas had 4,835 local jurisdictions.  Yet despite all the votes cast in all these elections, virtually no in-person voter fraud has been documented.

[206] Sen. Debate, Mar. 10, 2009, at 742-50; TX_00001569-71 (*Texas v. Holder*).

offered by supporters for its adoption—to prevent voter fraud—bears a striking resemblance to one of the arguments used by proponents of SB 14.  The same rationale was also used to justify a restrictive voter registration law adopted in 1966 after the poll tax was found unconstitutional.  In both the poll tax and the 1966 registration law, meeting the requirements placed obstacles in the path of the prospective voter.  The need to obtain and keep for months the poll tax receipt needed to vote in primary or general elections was difficult, as was the need to give up hours of work (and thus wages) to go to the courthouse and pay the tax.  The need to re-register at the courthouse annually after 1966 was far more burdensome than the registration process in any other state.

104.    Despite the fact that the 1902 poll tax disenfranchised most African Americans and Hispanics, Texas law authorized the Democratic Party's use of what was called a "white primary," that after several decades was struck down as unconstitutional by the U.S. Supreme Court, first in 1927 and again in 1944.

105.    Passage of the Voting Rights Act by no means brought an end to efforts to limit the ability of minority citizens to participate equally in the political process.   Along with important U.S. Supreme Court cases such as *White v. Regester,* the VRA provided legal tools with which minorities, with help from the U.S. Department of Justice and the Federal judiciary, could combat the efforts of Texas officials to limit or dilute minority voting strength.  Texas has seen some aspects of its redistricting process struck down as racially discriminatory by Federal courts in every redistricting cycle since 1970.  A Federal court's conclusion in a recent Texas redistricting case that the same Anglo-dominated legislature that passed SB 14 also intentionally discriminated against minority voters in legislative redistricting lends added weight, beyond the facts presented here, to the claim that passage

59

of SB 14 was an intentional racially discriminatory act.  In both instances the Anglo majority who were the key decision-makers, along with the Anglo Governor and Lieutenant Governor, changed procedural rules, refused to examine data regarding the likely impact of their bills, ignored ameliorative amendments proposed by minority legislators, and used pretextual arguments to defend their bills.[207]

106.    In sum, the evidence presented in the preceding pages, examined with the methodology common to social scientists such as myself, indicates that SB 14 was adopted with a racially discriminatory purpose.

---

[207] *Texas v. United States,* 887 F. Supp. 2d 133, 161 (D.D.C. 2012)*, vacated*, 133 S. Ct. 2886 (2013).  In that case, the court found that Texas failed to meet its burden of demonstrating that its state senate and congressional redistricting plans were not enacted with a racially discriminatory purpose and that the state house and congressional redistricting plans violated Section 5 of the VRA in terms of their effect on minority groups.  The court noted: "The parties have provided more evidence of discriminatory intent than we have space, or need, to address here."

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 9th day of July, 2014.

Chandler Davidson

10 April 2014

## CURRICULUM VITAE

NAME:                    F. Chandler Davidson

TITLE:                   Research Professor,
                         Department of Sociology,
                         Radoslav Tsanoff Professor of Public Affairs Emeritus

ADDRESS:                 Department of Sociology MS 28
                         Rice University
                         P.O. Box 1892
                         Houston, Texas  77251-1892

PHONE NUMBERS:           713-669-0521
                         713-540-0478

DATE OF BIRTH:           13 May 1936

EDUCATION:               University of Texas      B.A.   1961
                         Princeton University     M.A.   1966
                         Princeton University     Ph.D.  1969

MILITARY SERVICE:        U.S. Navy  (Honorable Discharge, 1962)

TEACHING EXPERIENCE:
        1966-1968   Instructor, Rice University
        1968-1973   Assistant Professor, Rice University
        1973-1983   Associate Professor with tenure, Rice University
        1983-2003   Professor, Rice University
        2003-       Professor Emeritus, Research Professor

                    ****NB: Post-retirement events in red****

HONORS:
        Senior Honors Program, Dept. of Philosophy, University of Texas, 1960-61
        Undergraduate Philosophy Scholarship, University of Texas, 1960-61
        Phi Beta Kappa, University of Texas, 1961
        Fulbright Scholar, University of Poitiers, Faculté des Lettres, 1961-62
        Woodrow Wilson Fellow, Princeton University, 1963-64

Brown College (Rice University), Teaching Excellence Award in the Humanities 1969-70

Outstanding Texas author, 1972, Theta Sigma Phi, Austin Professional Chapter of Women in Communications (award given for <u>Biracial Politics</u>).

Research Fellow, National Endowment for the Humanities, 1976-77

Rice University Provost Lecturer, 1985

<u>Controversies in Minority Voting</u>, co-edited with Bernard Grofman, chosen as an Outstanding Book on Human Rights in the United States by the Gustavus Myers Center for the Study of Human Rights, 1993

<u>Quiet Revolution in the South</u>, co-edited with Bernard Grofman, chosen as the winner of the Richard F. Fenno Prize awarded annually by the Legislative Studies section of the American  Political Science Association for the best book in legislative studies published in the previous year, 1995

Ally Award, Center for the Healing of Racism (Houston), 1996

George R. Brown Award for Superior Teaching, Rice University, 1997, 1999, 2000, 2002

George R. Brown Award for Excellence in Teaching, Rice University, 1998

Texas Philosophical Society of Texas, 1998-2006

<u>Minority Vote Dilution</u> named to Howard University Press Classic Editions Library Series, 2004

C.M. and Demaris Hudspeth Award for Outstanding Service as a Faculty Sponsor of a Student Organization, Rice University, 2010.

Rice University Veteran of the Year, Veterans Day 2011

Recipient, Association of Rice University Black Alumni, Legacy Award for "advancing the interests of Black students, faculty and alumni at Rice through exceptional dedication and commitment," Rice University Centennial Celebration, 2012

Recipient, Association of Rice Alumni, Meritorious Service Award, 2013.

MEMBERSHIP ON ADVISORY PANELS, COMMISSIONS

Voting Rights Research Advisory Board, University of California, Berkeley, 2004-05

National Commission on the Voting Rights Act, 2005-06

Advisory Committee, Democracy, Diversity, and Voice (The Democracy Collaborative, University of Maryland)  2004-05

Advisory Committee, Voting Rights Research Initiative, Warren College of Law, University of California at Berkeley, 2004-06

BIOGRAPHICAL ENTRIES:

<u>Who's Who in America</u>

<u>Who's Who in The Southwest</u>

<u>Who's Who in American Education</u>

JOINT APPOINTMENTS:

Professor, Department of Political Science, Rice University (1997-2003)

PROFESSIONAL ACTIVITIES AND MEMBERSHIPS:
    American Sociological Association
    American Political Science Association
    American Association of University Professors

SELECTED RICE UNIVERSITY ADMINISTRATIVE SERVICE:
    1973-75  Chair, University Library Committee
    1977-78  President, Rice Chapter, American Association of University
              Professors
    1979-83  Chair, Department of Sociology
    1986-89  Chair, Department of Sociology
    1987-88  Chair, Rice Task Force on Substance Abuse
    1988      Chair, Search Committee, Director of Office of Minority Affairs
    1988-90  Co-founder and first coordinator of interdisciplinary teaching team for
              "Intellectual Foundations of the Social Sciences," core curriculum
              course
    1993-96  Chair, Committee on Undergraduate Admission
    1995-03  Chair, Department of Sociology
    1997      Chair, President's Ad Hoc Committee to Revise Faculty Dismissal
              Policy
    1999-00  Chair, Committee on Teaching
    1998-02  Chair, Inter-institutional Search Committee , University of Texas
              School of Public Health and Rice University Department of
              Sociology
    2002-03  Chair, Athletic Subcommittee of Faculty Council
    2006-07  Chair, Committee on the Rice Undergraduate Program
    2009-12  Member, Benefits Committee
    2011      Member, Ad Hoc Committee on Phased Retirement
    2012-     Member, Veterans Affairs Committee

AREAS OF SCHOLARLY ACTIVITY:
    Politics and Society
    Social Stratification
    Race and Ethnic Relations
    Electoral Behavior
    Texas Politics
    Minority Voting Rights

EXTERNAL RESEARCH SUPPORT:
    National Endowment for the Humanities, full salary support for the year  (1976-
        77)
    National Science Foundation, $231,331 grant, "Collaborative Research on the
        Implementation and Effects of the 1965 Voting Rights Act," co-principal
        investigator with Bernard Grofman, University of California at Irvine (1988-92)

National Science Foundation Law and Social Sciences Program, $8,500 grant, "Supplementary Grant for Collaborative Research on the Voting Rights Act: The Effects of Changing Electoral Systems on the Election of Women" (NSF SES #88-09329), co-principal investigator with Bernard Grofman and Susan Welch (1989-90).

Rockefeller Foundation, $50,000 grant, "A Conference on the Voting Rights Act: A Twenty-five Year Perspective," with Thomas Mann and Bernard Grofman, under the auspices of the Brookings Institution (1989-90).

Ford Foundation, $6,000 grant.  "Newspaper Data Base on 1990s Redistricting," Bernard Grofman, principal investigator (1991-93).

Center for Voting Rights and Protection, Inc., Washington D.C.  Director of research on ballot security programs as instruments of minority vote suppression.

Lawyers' Committee for Civil Rights Under Law, Washington, D.C.  Director of research on the status of minority voting rights in the U.S.

## PARTICIPATION IN AMICUS BRIEFS:

"Brief *Amici Curiae* of Historians and Other Scholars in Support of Petitioners," *William Crawford et al., Petitioners, v. Marion County Election Board, et al*., in the Supreme Court of the United States, Nov. 2007," principal author, 2007.

"Brief of Historians and Social Scientists as *Amici Curiae* in Support of Respondents," *Shelby County, Alabama v. Eric H. Holder, Jr., Attorney General, et al*. in the Supreme Court of the United States, Feb. 2013," principal author, 2013.

## CONGRESSIONAL AND LEGISLATIVE TESTIMONY

"Prepared statement of Chandler Davidson, Chair, Department of Sociology, Rice University, Houston, Tex." Voting Rights Act:  Hearings before the Subcommittee on the Constitution of the Committee on the Judiciary, United States Senate, 1982 (Volume 2), Serial No. J-97-92; Washington, D.C.:  U.S. Government Printing Office, 1983, pp. 293-303.

"Voting Rights Roundtable," Subcommittee on Civil and Constitutional Rights, Judiciary Committee, U.S. House of Representatives, May 25, 1994, invited participant.

"Prepared statement of Chandler Davidson, Radoslav Tsanoff Professor of Public Affairs Emeritus, Rice University: 'An Introduction to the Expiring Provisions of the Voting Rights Act.'" Voting Rights Act:  Hearings before the Committee on the Judiciary, United States Senate, May 9, 2006.  Invited participant. http://thomas.loc.gov/cgi-bin/cpquery/T?&report=sr295&dbname=109&

"Prepared statement of Chandler Davidson:  'Vote Caging'," Hearing on Abusive Robocalls and Vote Caging, Committee on Rules and Administration, United States Senate, February 27, 2008.  Invited participant. http://rules.senate.gov/hearings/2008/022708hrg.htm

"Prepared statement of Chandler Davidson:  'The Historical Context of Senate Bill 362'," Hearings Before the Texas Senate Meeting as a Committee of the Whole to consider a bill to enact a voter photo ID requirement, March 10, 2009.  Invited participant.

U. S. SUPREME COURT CITATIONS OF PUBLICATIONS
   Thornburg v. Gingles, 478 U.S. 30, 106 S. Ct. 2752 (1986).
   Shaw v. Reno, 509 U.S. 630, 113 S. Ct. 2816 (1993).
   Johnson v. De Grandy, 512 U.S. 997, 114 S. Ct. 2647 (1994).
   Miller v. Johnson, 515 U.S. 900, 115 S. Ct. 2475 (1995).
   Bush v. Vera, 517 U.S. 952, 116 S. Ct. 1941 (1996).
   Shaw v. Hunt, 517 U.S. 899, 116 S. Ct. 1896 (1996).
   Abrams v. Johnson, 521 U.S. 74, 117 S. Ct. 1925 (1997).
   Shelby County, Alabama v. Holder, Attorney General, 679 F. 3d 348 (2013)

OTHER RECENT LOWER COURT CITATIONS OF PUBLICATIONS
   Northwest Austin Municipal Utility District Number One v. Mukasey, U.S. District Court for the District of Columbia, Civil Action No 06-1384, p. 12 ([Protecting Minority Voters:  The Voting Rights Act at Work, 1982-2005] 2008).

   Democratic National Committee et al., v. Republican National Committee, et al., U.S. District Court, District of New Jersey, Civil Action No 81-3876 (DRD) p. 21. ["Republican Ballot Security Programs: Vote Protection or Minority Vote Suppression—Or Both?"] (2009)

PUBLICATIONS:

   Books:
      Biracial Politics:  Conflict and Coalition in the Metropolitan South, Louisiana State University Press, 1972.
      Minority Vote Dilution (editor), Howard University Press, 1984 (paperback ed., 1989).
      Race and Class in Texas Politics, Princeton University Press, 1990 (paperback ed. 1992).
      Controversies in Minority Voting:  The Voting Rights Act in Perspective (ed. with Bernard Grofman), The Brookings Institution, 1992 (hardcover and paperback).
      Quiet Revolution in the South:  The Impact of the Voting Rights  Act, 1965-1990 (ed. with Bernard Grofman), Princeton University Press, 1994 (hardcover and paperback).

Commissioned Reports:

Republican Ballot Security Programs:  Vote Protection or Minority Vote Suppression—or Both?, in co-authorship with Tanya Dunlap, Gale Kenny, and Benjamin Wise, Center for Voting Rights and Protection, Washington, D.C. (2004).
http://www.votelaw.com/blog/blogdocs/GOP_Ballot_Security_Programs.pdf

Protecting Minority Voting Rights:  The Voting Rights Act at Work 1982-2005, National Commission on the Voting Rights Act, Washington, D.C. ( 2006). (Lawyers' Committee for Civil Rights Under Law), primary author.
http://www.lawyerscommittee.org/admin/voting_rights/documents/files/0023.pdf

Highlights of Hearings of the National Commission on the Voting Rights Act 2005, National Commission on the Voting Rights Act, Washington, D.C. (2006).  (Lawyers' Committee for Civil Rights Under Law)
http://www2.ohchr.org/english/bodies/hrc/docs/ngos/lccr3.pdf


Selected Articles and Book Chapters :

"A Summer  Enrichment Program for Black Pre-Medical students," in co-authorship with Daniel Creson, M.D., Texas Reports on Biology and Medicine, 29 (1971), 443-50.

"Houston Elects a Mayor," in co-authorship with Douglas Longshore, New South: A Quarterly Journal of Southern Affairs, 27 (1972), 47-61.

"Ethnic Attitudes as a Basis for Minority Cooperation in a Southwestern Metropolis," in co-authorship with Charles Gaitz, Social Science Quarterly, 22 (1974), 738-48.

"Are the Poor Different?," in co-authorship with Charles Gaitz, Social Problems, 22 (1974), 230-45.

"Variations in Gender Roles Among Classes," in co-authorship with Virginia Davidson, M.D., Sex Roles:  A Journal of Research, 3  (1977) , 459-67.

"At-Large Elections and Minority Representation, " Social Science Quarterly, 60 (1979), 337-38.

"The Effects of At-Large Elections on Minority Representation:  A Review of Historical and Recent Evidence, " in co-authorship with George Korbel, Journal of Politics, 43 (1981), 982-1005.

"Reforming a Reform," in Merle Black and John Shelton Reed (eds.), Perspectives on the American South, London, New York, Paris:  Gordon and Breach Science Publishers, 1981, 143-49.

"Houston:  The City Where the Business of Government is Business," in Wendell Bedichek and Neal Tannahill (eds.), Public Policy in Texas, Glenview, Ill.: Scott, Foresman and Company, 1982, 275-88.

"The Democrats," in Wendell Bedichek and Neal Tannahill (eds.), Public Policy in Texas, Glenview, Ill.:  Scott, Foresman and Company, 1982, 160-70.

"Carter Wesley, " in Rayford Logan and Jeremy Townsend (eds.), The Dictionary of American Negro Biography, New York and London:  W. W. Norton and Company, 1983, 639-40.

"Minority Vote Dilution:  An Overview, " in Chandler Davidson (ed.), <u>Minority Vote Dilution</u>, Washington, D.C.:  Howard University Press, 1984, 1-23.

"Nonpartisan Slating Groups in an At-Large Setting, " in co-authorship with Luis Fraga, in Chandler Davidson, <u>Minority Vote Dilution</u>, Washington, D.C.: Howard University Press, 1984, 119-43.

 "Ethnic Jokes:  An Introduction to Race and Nationality," <u>Teaching Sociology</u>,15 (1987), 296-302.

"Slating Groups as Parties in a 'Nonpartisan' Setting," in co-authorship with Luis Fraga, <u>Western Political Quarterly</u>, 41 (1988), 373-90.

"The Voting Rights Act:  A Brief History," in Grofman and Davidson (eds.), <u>Controversies in Minority Voting</u> (1992), 7-51.

"Postscript:  What is the Best Route to a Color-Blind Society?," with B. Grofman, in Grofman and Davidson (eds.), <u>Controversies in Minority Voting</u> (1992), 300-17.

"The Voting Rights Act:  Protecting the Rights of Racial and Language Minorities in the Electoral Process" (Introduction to special issue on the Voting Rights Act), <u>Chicano-Latino Law Review</u>, 13 (1993), 1-14.

"Editors' Introduction" (in co-authorship with B. Grofman), in Davidson and Grofman (eds.), <u>Quiet Revolution in the South</u> (1994), 3-17.

 "The Recent Evolution of Voting Rights Law Affecting Racial and Language Minorities," in Davidson and Grofman (eds.), <u>Quiet Revolution in the South</u> (1994), 21-37.

 "Texas" (with R. Brischetto, D. Richards, and B. Grofman), in Davidson and Grofman (eds.), <u>Quiet Revolution in the South</u> (1994), 233-70.

"The Effect of Municipal Election Structure on Black Representation in Eight Southern States," (with B. Grofman) in Davidson and Grofman (eds.), <u>Quiet Revolution in the South</u> (1994), 301-34.

"The Voting Rights Act and the Second Reconstruction" (with B. Grofman) in Davidson and Grofman (eds.), <u>Quiet Revolution in the South</u> (1994), 378-87.

"African Americans and Politics," <u>The New Handbook of Texas</u> (1996) Vol. 1, 51-55.

"Voting Rights Act of 1965 and its Amendments," in Leonard W. Levy and Kenneth L. Karst, eds<u>., Supplement II, Encyclopedia of the American Constitution</u>, 2d. ed. (2000) 2813-14.

"Race and Voting," in Leonard W. Levy and Kenneth L. Karst, eds., <u>Supplement II, Encyclopedia of the American Constitution</u>, 2d. ed. (2000) 2093-94.

"White Gerrymandering of Black Voters:  A Response to Professor Everett," <u>North Carolina Law Review</u> 79 (2001), 1333-43.

<span style="color:red">"Renewing the Non-permanent Features of the Voting Rights Act," <u>Focus Magazine</u>, July-August 2006, 1-14.</span>

<span style="color:red">"The Historical Context of Voter Photo ID Laws," <u>PS:  Political Science and Politics</u> 42 (January 2009), 93-96.</span>

THESIS AND DISSERTATION COMMITTEES:

1971   James Cogan, "An Essay on Phenomenological Ontology:  On Description and Analysis."  Ph.D. Dissertation in Philosophy, Anthony Palmer, Director.

1971   Julie Roy Jeffrey, "Education for Children of the Poor:  A Study of the Origins and Implementation of the Elementary and Secondary Education Act of 1965."  Ph.D. Dissertation in History, Allen Matusow, Director.

1972   Fernando Rodriguez Casas, "Substance and Referring."  M.A. Thesis in Philosophy, James Street Fulton, Director.

1973   Barbara Thompson Day, "The Oil and Gas Industry in Texas Politics, 1920-1935."  Ph.D. Dissertation in History, Allen Matusow, Director.

1973   Ronald Schlundt, "Civil Rights Policies in the Eisenhower Years."  Ph.D. Dissertation in History, Allen Matusow, Director.

1975   Patricia Goudreau, "Investigation of Sex Differences Across Job Levels."  Ph.D. Dissertation in Psychology, William C. Howell, Director.

1975   Kenneth Mladenka, "Distribution of Urban Public Services."  Ph.D. Dissertation in Political Science, Robert H. Dix, Director.

1975   Rudi Volti, "Agricultural Development and Organizational Changes:  Agro-Technical Extension Services in the People's Republic of China."  Ph.D. Dissertation in Behavioral Science, Chandler Davidson, Director.

1976   Michael Freney, "The Political Element in Military Expertise."  Ph.D. Dissertation in Political Science, John Ambler, Director.

1976   Louis J. Marchiafava, "Institutional and Legal Aspects of the Growth of Professional Urban Police Service:  The Houston Experience."  Ph.D. Dissertation in History, Harold Hyman, Director.

1978   Cheryl Walker Casey, "From Myth to Reality:  A Study of the Theme of Rebirth in the Tragedies of Aimé Césaire."  Ph.D. Dissertation in French, Maurice Lecuyer, Director.

1981   Robert Eubank, "Incumbency, Partisanship and Salience Effects in Congressional Elections, 1956-1978."  Ph.D. Dissertation in Political Science, David Brady, Director.

1983   Luis Ricardo Fraga, "Nonpartisan Slating Groups:  The Role of Reformed Parties In Substate Policy Making."  Ph.D. Dissertation in Political Science, David Brady, Director.

1986   Douglas J. Brems, "Risk Perception for Common Consumer Products." Ph.D. Dissertation in Psychology,  Kenneth Laughery, Director.

1988   Morgan Slusher, "Differential Impact of Causal and Statistical Evidence in Counteracting Belief Perseverance:  Changing Beliefs about Acquired Immune Deficiency Syndrome." Ph.D. Dissertation in Psychology, Craig Anderson, Director.

1989   Peter Cobin, "Linguistic Subsystems of a Chicano Child."  Ph.D. Dissertation in Linguistics, Sidney Lamb, Director.

1991   Kerri D. Gantz, "On the Basis of Merit Alone:  Integration, Tuition, Rice University, and the Charter Change Trial, 1963-1966."  M. A. Thesis in History,  John Boles, Director.

1991   Albert L. Ellis, III, "The Regressive Era : Progressive Era Tax Reform and the National Tax Association : Roots of the Modern American tax structure." Ph.D. in Political Science, Robert Stein, Director.

1992   James D. Schmidt, "Neither Slavery nor Involuntary Servitude:  Free Labor and American Law, 1815-1880."  Ph.D.  Dissertation in History, Harold M. Hyman, Director.

1992   Charles Zelden, "Justice Lies in the District:  A History of the U.S. District Court, Southern District of Texas, 1902-1960."  Ph.D. Dissertation in History, Harold Hyman, Director.

1993   Leslie Lovett, "The Jaybird-Woodpecker War:  Reconstruction and Redemption in Forty Bend County, 1865-90."  M.A. Thesis in History, Harold Hyman, Director.

1994   Nicholas George Malavis, "Bless the Pure and Humble:  Texas Lawyers and Oil Regulation, 1919-1936."  Ph.D. Dissertation in History,  Harold M. Hyman, Director.

1994   Barbara Jane Rozek, "Words of Enticement:  The Effort to Attract Immigrants to Texas, 1865-1914."  Ph.D. Dissertation in History, John Boles, Director.

1996   Loreta Kovacic, "The Piano Music of Boris Papandopulo."  M.A. Thesis in Music, Walter Bayle, Director.

1996   Sam Watson, "Professionalism, Social Attitudes, and Civil-Military Accountability in the United States Army Officer Corps, 1815-1846." Ph. D. Dissertation in History, Ira Gruber, Director.

1997   Bruce Anderson, "Electoral Competition and Party Complexity:  A Dynamic Model of Minority Party Success and Legislative Organization in Transforming State House Chambers."  Ph.D. Dissertation in Political Science, Keith Hamm, Director.

1997   Ellen Renee Read, "The Effects of Social Security Reforms on Health, Leisure, and Consumption Decisions." Ph.D. Dissertation in Economics, Robin Sickles, Director.

1998   Maria Anderson, "Private Choices vs. Public Voices:  The History of Planned Parenthood in Houston." Ph.D. Dissertation in History, Harold Hyman, Director.

1998   Philip D. Dillard, "The Confederate Debate Over Arming the Slaves." Ph.D. Dissertation in History, John Boles, Director.

1999   Jonathan W. Singer, "Broken Trusts:  The Texas Attorney General Versus the Oil Industry, 1889-1909." Ph.D. dissertation in History, Harold Hyman, Director.

2000   Melissa Kean, "At a Most Uncomfortable Speed:  The Desegregation of the South's Private Universities, 1945-1964." Ph.D. dissertation in History, John Boles, Director.

2001   Robert S. Shelton, "Waterfront Workers of Galveston, 1838-1920." Ph.D. dissertation in History, John Boles, Director.

2002   Richard Engstrom, ""Electoral District Structure and Political Behavior." Ph.D. dissertation in Political Science, John Alford, Director.

2003   Stacey Ulbig, "Subnational Contextual Influences on Political Trust." Ph.D. dissertation in Political Science, John Alford, Director.

2004   Elaine Thompson, "Southern Small Towns:  Society, Politics, and Race Relations in Clinton, Louisiana." Ph.D. dissertation in History, John Boles, Director.

2005   Janet Malek, "The Decision to Conceive and the Concept of Harm:  A Defense of a Child-Centered Ethical Appeal."  Ph.D. Dissertation in Philosophy, George Sher, Director.

2006   Scott P. Marler, "Merchants and the Political Economy of Nineteenth-Century Louisiana: New Orleans and Its Hinterlands." Ph.D. dissertation in History, John Boles, Director.

2010   Wesley Phelps, "The War on Poverty in Houston," Ph.D. dissertation in History, Allen Matusow, Director.

SENIOR HONORS THESES DIRECTED:

1969   Nancy Dietz, "The Developmental Psychology of Jean Piaget and Its Implications for the Field of Mental Retardation."

1983   Meredith Gibbs, "Admissions Policies at Rice University."

1990   Victoria Soto, "Poor Women's Experience with Prenatal Care in Houston, Texas."

1993   Elizabeth Lock,"The Texas At-Large System and Possibilities for Multiracial Coalition Formation."

1996   Mary Elizabeth Stearns, "Business-Elementary School Partnerships in the Houston Independent School District."

1996   Carolyn Chi,  "Students' Views on the Racial Climate at Rice University."

1998   Felisa Sanchez, "Ethnic Composition of Congressional Districts and Hispanic Candidates' Electoral Success."

1999   Elisheva Budabin McQuown, "Believing, Achieving, and Succeeding:  An Experimental Language Arts Program."

1999   Claudia Gee, "Factors Influencing Occupational Prestige."

2001   Kelly Bolen, "Juvenile Probation in Harris County:  A Case Study."

2002   Lori Hellkamp, "After Affirmative Action:  Percent Plans?" (Rice Undergraduate Scholars Program).

2005   Caitlin Rosenthal.  "Beyond the Bake Sale:  Assessing the Social and Economic Capital of Parent-Teacher Organizations" (Political Science Senior Honors Thesis).

UNIVERSITY SERVICE

Standing Committees:

University Welfare Committee, 1970-71
Library Committee, 1971-75 (Chair, 1973-75)
Affirmative Action Committee, 1971-74, 1992-93
Education Council, 1977-86
Committee on Teaching, 1977-80, 1996-97, 1999-2000 (chair)
Admissions Committee, 1981-89, 1993-96 (chair)
Parking Committee, 1991-93
Faculty Council, 2002-03

Chandler Davidson                    Curriculum Vitae                              page 11

Promotion and Tenure Committee, 2002-03
University Council, 2002-03

Other Committees:

Minority Student Recruitment Committee, 1968-72
Sloan Grant Committee, 1972-75
Danforth Fellowship Committee, 1974-75
Rice Task Force on Substance Abuse (Chair), 1987-88
Search Committee, Director, Office of Minority Affairs (Chair), 1987-88
Personnel Grievance Committee, 1988-89
Committee of Inquiry into Sexual Harassment Charges (Chair), 1991
Search Committee, Vice President for Student Affairs, 1993-94
President's Ad Hoc Committee on Athletic Admissions, 1994
President's Ad Hoc Committee on Minority Concerns, 1994-2003
Sallyport Board of Advisors, 1994-98
Search Committee, Dean of Social Sciences, 1995-96
President's Ad Hoc Committee on Faculty Dismissal Policy (Chair), 1997
Search Committee, Richardson Senior Fellow in Public Policy, Baker Institute, Rice University, 1998-99
Search Committee, Medical Sociology Joint Appointment, Rice University and University of Texas School of Public Health (Chair), 1998-2002
Search Committee, Sociology faculty replacements (Chair), 1998-2000
President's Ad Hoc Planning Committee for the Center for Teaching and Curricular Innovation, 1999-2000
President's "KTRU Friendly" Committee, 2001-03
Ad Hoc Committee on Status of Rice Thresher, 2002-03
President's Ad Hoc Committee on Gays, Lesbians, Bi-sexuals, and the Transgendered, 2002-03
Committee on the Rice Undergraduate Program (Chair), 2005-06
Rice Benefits Committee,  2009-11
Rice Veterans Affairs Committee 2011-
President's Ad Hoc Committee on Phased Retirement 2011

Residential College Associateships

Jones College, 1967-76
Baker College, 1982-87

Faculty Sponsorships of Student Groups

Rice Democratic Caucus, 1977-86
Rice Young Democrats, 1987-94; 2003-
Rice TexPIRG (Texas Public Interest Research Group), 1979-83
Rice Gay-Lesbian Support Group, 1979-88
Rice GALOR, 1989-95
Rice PRIDE, 1995-2003
Rice Black Students Union, 1987-93
Rice Black Student Association, 1993-

Rice Fellows, 1999-2001
NAACP, Rice Chapter, 2001-03

## Residential College Courses Taught

"Violence" (Jones College), 1968
"The Social Conditioning of Interpersonal Relations" (Jones College), 1969
"The University" (Jones College), 1969
"Electoral Politics" (with Prof. George Antunes), 1972
"Money and Politics in Texas" (Will Rice College), 1976
"Houston Beyond the Hedges" (Baker College), 1981

## Selected Miscellaneous University Service

Rice Summer Honors Program in the Social Sciences, 1970
Coordinator, Jones College Freshman Tutorial Project, 1970-72
Sponsor, "Ugly Artifacts Exhibition," Rice Memorial Center, 1971
Speaker, "Rice and the Houston Black Community," Rice Alumni
    Homecoming Weekend, 1971
Participant, "Max Weber in the Social Sciences," History Department
    Graduate Colloquium, 1974
Teacher (with others), Interdisciplinary Sloan Grant Courses, 1975
Lecturer, Education Council-sponsored in-service teaching training, 1977
Teacher (with Profs. Thomas Haskell and Martin Weiner), "The New
    Shape of Work," NEH-funded interdisciplinary course, 1978
Organizer, "Texas Democratic Party, 1936-1988" Oral History and
    Personal Paper Archives, Woodson Center, 1978-1988
Organizer, Interdisciplinary Study Group on Social Theory, 1980
Moderator, faculty panel discussion on U.S. foreign policy in El Salvador,
    sponsored by Rice Democratic Caucus, 1981
Speaker, Sid Richardson College Forum, 1982
Moderator, faculty panel discussion on Soviet foreign policy, sponsored by
    Rice Democratic Caucus and Rice TexPIRG, 1983
Co-founder, Walter and Helen Hall Annual Lecture Series, 1983-present
Chair, Minority-Group Subcommittee of Admissions Committee, 1986-89
Originator and Co-coordinator, The Rice Urban Lecture Series, 1992-93
Co-sponsor and moderator, Public Symposium on The Bell Curve, 1995
Moderator, Debate on Affirmative Action, sponsored by ADVANCE, 1996
Coordinator, "A Celebration of the Life of Barbara Jordan," public
    memorial tribute to Barbara Jordan sponsored by the Department of
    Sociology, 1996
Moderator, "Diversity at Rice," Student Association Annual Retreat, 1996
Moderator, Debate on Immigration, sponsored by ADVANCE, 1996
Co-organizer and participant, campus-wide meeting on sexism at Rice,
    1996
Speaker, "Race and Rice," panel on the situation of minority students at
    Rice on the first anniversary of the Hopwood decision, Rice University,
    1997

Judge, Phi Beta Kappa teaching award, Rice University, 1998-03
Judge, Hudspeth Awards Committee, 2000
Chair, Phi Beta Kappa teaching award committee, Rice University. 2001-02
Faculty chair, United Way Fund Drive, Rice University 2001-02
Keynote speaker, campus-wide 9/11 anniversary remembrance service, Rice
   University, 2002
Moderator, "Homophobia at Rice," forum sponsored by ADVANCE on Rice
   University campus, 2002
Panelist, "Reverse Discrimination or Equal Opportunity?:  Discussing Affirmative
   Action," forum sponsored by ADVANCE, Rice University , 2003

SELECTED COMMUNITY SERVICE:

<u>Presentations</u>
"The Feasibility of Biracial Voting Coalitions," Citizens for Good Schools,
   Houston, 1967
"The Social Responsibilities of Business," Southwestern Bell College-
   Business Socioeconomic Seminar, Austin, 1969
"The Military-Industrial Complex," Rice University, Vietnam Moratorium
   Day, 1969
"Institutional Racism," annual regional meeting of YWCA directors,
   Houston, 1971
"Race, Class and Politics in Texas," South Park Civic Club, Houston, 1974
"Women and other Minorities at Rice," Society of Rice University Women,
   1975
"Measuring the Effects of the 'Second Reconstruction,' " Rice Bicentennial
   Public Lecture Series, 1976
"Texas Political Parties," lecture in a series on Texas politics, sponsored
   by the Breakthrough Foundation, Houston, 1978
"The Effects of Single-member Districts on Houston City Elections,"
   presented at various times to the Harris County Council of
   Organizations, Jones Memorial Methodist Church, Jewish Community
   Center Public Affairs Forum and The Metropolitan Organization, 1979
"Race and the 1984 Presidential Election," Rice Alumni Lecture Series,
   1984
"Recent Houston Politics," public lecture given to the Cross-cultural
   Development Organization, Houston, 1985
"The City and Its People.  The Ethnic Groups Who Shaped Houston's
   Population," Rice Continuing Studies Lecture Series, "The Way We
   Were:  A History of Houston," 1993.
"Trends in Rice Undergraduate Admissions," Board of Trustees, Rice
   University, 1995.
"The Rise of Racial Gerrymandering in Houston," First Unitarian-
   Universalist Church, Lecture Series on Houston, 1996.
"The Struggle for Black Political Equality in Texas," ninth-grade history
   class, Stafford High School, Stafford, Texas, 1997.

"The Rise of the Meritocracy?" Rice Lecture Series Featuring Teaching Award Winners, 1998.

"The Idea of Equality in the Paintings of Norman Rockwell," Rice Lecture Series Featuring Teaching Award Winners, 1999.

"Teaching Across the Millennia:  A Rice Professor Reminisces," Society for Rice University Women, January 2000; also given to Rice Alumni, Vienna, Austria, August 2000.

"Redistricting:  The Blood Sport of Politics," Rice Lecture Series Featuring Teaching Award Winners, 2000.

"Is Equality in America a Chimera?", Rice Lecture Series Featuring Teaching Award Winners, 2002; also given as part Continuing Studies Lecture Series Featuring Sociology Department, 2003.

SELECTED PROFESSIONAL ACTIVITIES:

"An Introduction to Sociology," ten-week seminar for resident psychiatrists, The University of Texas Medical Branch, Galveston, 1971.

Invited response to two papers, Southern Historical Association annual meeting, Atlanta, 1974.

"Roundtable on Peace Education:  Regional Experiences and Resources," Southwestern Social Science Association annual meeting, San Antonio, 1975.

"The Culture of Poverty and the Culture of Wealth," paper, Southwestern Social Science Association annual meeting, Dallas, 1976.

Charter member, Board of Directors, Houston Metropolitan Research Center, Houston Public Library, 1977.

"The Influence of Money on Elections:  The Texas Case," jointly authored paper, Southwestern Social Science Association annual meetings, Dallas, 1977.

"The Struggle for Control of the Democratic Party in Texas," paper, Eastern Sociological Association annual meeting, New York City, 1976.

"The Mobilization of Bias in Houston City Politics," co-authored paper, Southwestern Social Science Association annual meeting, Houston, 1978.

"The Political Economy of Contemporary Public Policy," Symposium participant, Department of Government, The University of Texas at Austin, 1978.

Invited response to two papers, Southern Historical Association annual meeting, Atlanta, 1979.

"Increasing Opportunities for Political Participation," invited panelist, Texas Advisory Committee to the U.S. Commission on Civil Rights, San Antonio, 1979.

"A Model of Contemporary Houston Politics," paper, Social Sciences Faculty, Houston Community College, 1980.

"At-Large Elections and Minority-Group Representation," co-authored paper, Texas Southern University Conference on Afro-American Studies, Houston, 1981.

"At-Large Election Systems and the Dilution of the Black Vote:  Historians as Expert Witnesses," panelist, Social Science History Association annual meeting, Nashville, 1981.

"Minority Politics and Political Cultures," panelist, Southwestern Social Science Association annual meeting, San Antonio, 1982.

"Continuity and Change in a Sunbelt City:  Perspectives on Houston and Survey Research in the 1980s," panel chair, Southeastern Sociological Association Annual Meetings, Houston, 1983.

"The Social Scientist as Expert Witness," panelist, Southwestern Political Science Association annual meetings, Houston, 1983.

"Minority Vote Dilution," panel chair, Southern Political Science Association Annual Meeting, Birmingham, 1983.

"Power, Influence, and Public Policy in Houston," panelist, Southwestern Political Science Association annual meeting, Houston, 1985.

"Nonpartisan Slating Groups and Minority Representation," paper, American Political Science Association annual meeting, New Orleans, 1985.

"Partisans in Sheep's Clothing:  The Ambiguous Legacy of Municipal Reform," Rice University Provost's Lecture Series, 1985.

"The Impact of the Voting Rights Act of 1965," co-organizer (with Bernard Grofman) planning conference, Rice University, 1988.

"Municipal and Special District Elections," panelist, Southwestern Political Science Association annual meetings, 1988.

"V. O. Key's Vision of Texas Politics," presentation, symposium on "The World of Texas Politics," sponsored by The Houston Post and the LBJ School of Public Affairs, Houston, 1988.

"Texas Politics," invited panelist, Lee College Symposium on "Texas Politics in Transition," Baytown, 1988

"Race and Class in Texas Politics," paper, Conference on Social Class, University of Kansas, 1989.

"Race and Class in Texas Politics," paper, American Sociological Association, San Francisco, 1989.

"The Impact of the Voting Rights Act," panel chair, American Political Science Association, Atlanta, 1989.

"The Voting and Campaign Process," panel moderator, Symposium on Democracy in the 1990s:  Voting in the United States, Lyndon Baines Johnson School of Public Affairs, Austin, 1990.

"The Voting Rights Act and the Transformation of Urban Politics," panel chair, Western Political Science Association, Seattle, March 1991.

"What is Election Discrimination?  Argument and Proof in Voting Rights Cases," panelist, American Association of Black Political Scientists annual meeting, Houston, March 1992.

"Recent Controversies over The Voting Rights Act," invited lecture, Seminar on Voting Rights, University of San Francisco School of Law, San Francisco, March 1992.

"1990s Redistricting," panelist, Western Political Science Association annual meeting, San Francisco, March 1992.

"Regulating the Electoral Process," invited panelist, Texas Law Review Symposium, University of Texas Law School, Austin, Texas, 1992.

"The Impact of the Voting Rights Act in the South:  The First Twenty-five Years," invited panelist, Southern Regional Council Voting Rights Conference, Atlanta, 1993.

"Voting Rights After Shaw v. Reno," invited panelist, American Political Science Association annual meeting, New York City, 1994.

"Response to Gary Orfield," invited panelist on "Educational Policy," Conference on the Impact of the Civil Rights Act of 1964, National Judicial Center, Washington, D.C., 1994.

"Diversity and Democracy:  Creating the Common Good," invited paper, 75th Anniversary of the Southern Regional Council, Atlanta, 1994.

"The Voting Rights Act:  The Accomplishments."  Panel moderator, Conference on the Voting Rights Act, Thurgood Marshall School of Law, Texas Southern University, 1995.

"Voting Rights in the Wake of Recent Supreme Court Decisions," panel moderator, American Political Science Association annual meeting, Chicago, 1995.

"The Media and the Quiet Revolution:  Public Opinion and Voting Rights," invited paper, Conference on "The Voting Rights After Thirty Years," co-sponsored by the Southern Regional Council and the Lawyers Committee for Civil Rights Under Law, New Orleans, 1995.

"Mechanisms of Ethnic/Racial Conflict Resolution," invited panelist,  "E Pluribus Unum" conference, Stanford University, 1996.

"Tenth Anniversary Roundtable on Voting Rights Issues," invited panelist, The Citadel Symposium on Southern Politics, Charleston, March 7-8, 1996.

"The Rise of Racial Gerrymandering in Texas," invited public lecture, Lamar University, Beaumont, March 25, 1997.

"Contemporary Districting Challenges and Opportunities," invited panelist, conference on "Geographic Information Systems and Political Redistricting," National Center for Geographic Information and Analysis, SUNY at Buffalo, Oct. 26, 1997.

"Perspectives on the 2000 Redistricting," invited panelist, Joint Center for Political and Economic Studies, Washington, D.C. , July 9, 1998.

"Author Meets Critics," invited panelist responding to Morgan Kousser's Color Blind Injustice, Southern Sociological Society, Nashville, April 9, 1999.

"Race and Redistricting," invited paper, Conference on "African Americans: Research and Policy Perspectives at the Turn of the Century," Stanford University, November 11-13, 1999.

"And Then You Are Sued:  Examining the Role of the U.S. Department of Justice and the Federal Courts in the Fifth Wave of Redistricting Since the Passage of the Voting Rights Act," invited chair, Conference on "Power Shift: Redrawing America's Political Boundaries After the 2000 Elections and Census," University of Houston Center for Public Policy, December 8, 2000.

"White Gerrymandering of Black Voters:  A Response to Professor Everett," invited paper, "Democracy in a New America:  A Symposium," sponsored by the University of North Carolina Law Review, Chapel Hill, February 2001.

"Urban Disfranchisement," invited organizer and chair, plenary session of American Sociological Association annual meeting, Anaheim, California, August 20, 2001.

"Author Meets Critics:  S.M. Lipset and Gary Marks's <u>Why There is No Socialism in the United States</u>," organizer of panel, American Sociological Association annual meeting, Anaheim, California, August 18-21, 2001.

"The Future of the Voting Rights Act," invited participant, conference at Columbia University, September 20-21, 2003.

"Protecting Democracy:  Defining the Research Agenda for the 2007 Voting Rights Act Reauthorization," invited participant, Harvard Civil Rights Project, Harvard University, May 9-12, 2004.

"Protecting Our Voices:  The Significance of the Voting Rights Act," invited participant, Mexican American Legal Defense Fund, the Lawyers Committee for Civil Rights Under Law, and the NAACP Legal Defense Fund, Washington, D.C., June 17-18, 2004.

"One Nation with Many Voices," invited participant, conference on the Voting Rights Act and minority language provisions, Arizona State University, Phoenix, April 6, 2005.

"Lessons From the Past, Prospects for the Future: Honoring the 40th Anniversary of the Voting Rights Act of 1965," invited panelist, Yale University, April 21-23, 2005.

"Past and Prologue," invited panelist, National Conference Commemorating the 40th Anniversary of the Voting Rights Act of 1965" (Sponsored by the Lawyers Committee for Civil Rights, LDF, MALDEF, ACLU, and Native American Rights Fund), July 25-26, 2005, Washington, D.C.

"Documenting Discrimination in Voting:  Judicial Findings Under Section 2 of the Voting Rights Act since 1982," invited panelist, The Voting Rights Initiative, University of Michigan Law School, November 10, 2005.

"Conference on the Voting Rights Act," invited panelist, Duke University, April 7-8, 2006.

"Research on Minority Vote Suppression," convener, unofficial colloquium in conjunction with the annual meeting of the American Political Science Association, Philadelphia, August 31, 2006.

"Democracy, Disenfranchisement, and November 2008," invited panelist, Rice University, September 24, 2008.

"Shaking the Foundations," invited panelist, conference, Stanford Law School, October 3-4, 2008.

"A Brief History of Vote Suppression in America from the Civil Rights Movement to the Present," invited lecture, American Constitution Society, Houston Lawyers Chapter, October 28, 2008.

"Vote Suppression," invited lecture, Community Census and Redistricting Institute, Southern Coalition for Social Justice, Duke University, July 29, 2010.

CONSULTING AND EXPERT TESTIMONY IN LAW SUITS:

1971      Sparks v. Griffin, U.S. District Court, Marshall, Texas.  Expert witness for
          plaintiffs, black school teachers who were fired when Upshur Independent
          School District was required to desegregate.

1973-74   USA v. Griggs, U.S. District Court, Gainesville, Florida.  Consultant to
          defendants in their efforts to demonstrate that the jury selection procedure in
          Florida was unfair.

1973-74   Sabala v. Western Gillette, Inc. and Ramirez v. Western Gillette, Inc., U.S.
          District Court, Houston, Texas (Case Nos. 71-H-961 and 71-H-1336).
          Consultant to plaintiffs in class-action employment discrimination suit.

1975-76   Greater Houston Civic Council v. Mann, U.S. District Court, Houston (Case
          No. 73-H-1650).  Expert witness for plaintiffs, who alleged minority vote
          dilution as a result of the City of Houston's at-large election system.

1978      Three-judge panel, U.S. District Court, Houston.  Expert witness for plaintiffs-
          intervenors attempting to enjoin the City of Houston from holding elections
          until it complied with Section 5 pre-clearance requirements of the Voting
          Rights Act.

1979-80   Whitfield v. City of Taylor, Texas U.S. District Court, Austin, Texas (Case No.
          A-79-CA-0015).  Consultant to plaintiffs, who alleged unconstitutional dilution
          of their votes.

1979-83   Jones v. City of Lubbock, Texas, U.S. Court of Appeals, Fifth Circuit, Unit A
          (No. 79-2744).  Consultant and expert witness for plaintiffs-appellants, who
          alleged unconstitutional dilution of their votes.

1979-86   Velasquez v. City of Abilene, Texas, , U.S. District Court, Abilene (Case No.
          CA-1-80-57).  Consultant and expert witness for plaintiffs, who alleged
          unconstitutional dilution of their votes.

1980      City of Port Arthur, Texas v. United States of America, U.S. District Court for
          the District of Columbia (Case No. 80-064P).  Expert witness for USA, who
          contended that a consolidation election by the city illegally diluted the votes of
          minorities under the Voting Rights Act.

1980-81   Oxford Place Welfare Rights Organization v. Jerome Chapman, U.S. District
          Court, Houston (Case No. 79-H-1283).  Consultant to plaintiffs, welfare
          recipients who alleged that long delays in receipt of their welfare payments
          were unconstitutional.

1981       At the request of the Legal Aid Society of Central Texas, analyzed voting data for the City of Austin, Texas, relevant to a preclearance submission the city made to the Justice Department under the Voting Rights Act.

1981       Brown v. Board of School Commissioners of Mobile County, U.S. District Court, Mobile, Alabama (Case No. CV-75-298-P).  Expert witness for USA, intervenors in the rehearing of a vote-dilution suit, remanded by the U.S. Supreme Court.

1981       Bolden v. City of Mobile, U.S. District Court, Mobile, Alabama (Case No. 75-297-P).  Expert witness for plaintiffs in the rehearing of a vote-dilution case, remanded by the U.S. Supreme Court.

1981       Walton  v. Henson, U.S. District Court, Paris, Texas (Case No. P-80-39-CA).  Expert witness for plaintiffs, who alleged unconstitutional dilution of their votes.

1981       Seaman v. Upham.  Three-judge panel, U.S. District Court, Austin, Texas (Case No. P-81-49-CA).  Expert witness for plaintiffs, who alleged unconstitutional dilution of their votes.

1982       Texas v. Martin, 104th District Court of Taylor County, Texas.  Consultant to defendant, Dee Dee Martin, indicted on capital murder charges, who claimed the jury selection system discriminated against blacks.

1982       Harris v. City of Hopewell, Virginia, U.S. District Court, Richmond, Virginia (Case No. 82-0036-R).  Consultant to plaintiffs, who claimed unconstitutional dilution of their votes.

1983-84    Kirksey v. Danks, Mayor of Jackson, Mississippi, U.S. District Court, Jackson (Civil Action No. J83-0077-C).  Expert witness for plaintiffs, who claimed dilution of their votes under Section 2 of the Voting Rights Act.

1985       Sumbry v. Russell County, Alabama.  Consultant to plaintiffs, who claimed dilution of their voting strength under Section 2 of the Voting Rights Act.

1985       Lee County Branch of the NAACP v. City of Opelika, Alabama,  (Case No. 83-7275).  Consultant to plaintiffs, who claimed dilution of their voting strength under Section 2 of the Voting Rights Act.

1985       Tallahassee NAACP v. Leon County, Florida.  Consultant to plaintiffs alleging dilution of their votes in county commission elections.

1985        Harris v. Graddick,  U.S. District Court, Birmingham (C.A. No. 84-T-595-N). Expert witness for plaintiffs alleging that the state of Alabama employed a system for appointing poll officials that denied blacks equal access to the political process.

1985-86     LULAC v. Midland Independent School District , U.S. District Court, Midland, Texas (MO-85-CA-001).  Expert witness for plaintiffs alleging vote dilution.

1985-86     United States of America v.  Dallas County (Alabama) Commission, U.S. District Court, Selma (C.A. No. 78-578-H).  Expert witness for U.S.A. in case alleging the dilution of minority votes in Dallas County.

1986-87     Martin v. Allain, Governor of Mississippi, U.S. District Court, Jackson (C.A. No. J84-0708 (W)).  Expert witness for plaintiffs alleging vote dilution.

1985-87     McNeil v. City of Springfield, U.S. District Court, Springfield, IL.  (C.A. No. 85-2365).  Expert witness for plaintiffs alleging minority vote dilution.

1987        Martin v. Allain (see above) consolidated with Kirksey v. Allain, U.S. District Court, Jackson (C.A. No. J85-0960 (W)).  Expert witness for plaintiffs, alleging violation of their voting rights under the Constitution and the Voting Rights Act.

1987        Metropolitan Pittsburgh Crusade for Votes v. City of Pittsburgh (C.A. No. 86-173).  Consultant to plaintiffs alleging vote dilution.

1988-89     Badillo v. City of Stockton, California (C.A. No. 87-1726, U. S.  District Court, Eastern District of California).  Consultant to plaintiffs alleging vote dilution.

1988-89     Russell Yarbrough  v. City of Birmingham, Alabama (C.A. No. CV87-PT-1947-S).  Consultant to defendants, a racially-mixed city council elected at large in a system white plaintiffs claimed diluted their votes.

1988-89     League of United Latin American Citizens (LULAC) v. Clements, U.S. District Court, Western District of Texas (No.  88-CA-154).  Consultant to plaintiffs alleging vote dilution in multi-member district state judicial elections.

1994        Vera v. Richards, U.S. District Court, Southern District of Texas (C.A. No. H-94-0227).  Expert for State of Texas, which was alleged to have violated the U.S. Constitution in creating majority-minority districts in the 1990s round of congressional redistricting.

Chandler Davidson                    Curriculum Vitae                               page 21

2009          *Democratic National Committee et al.,* v. Republican National Committee *et al,* Civil Action No. 81-3876 (DRD), U.S. District Court:  District of New Jersey.  Expert for the DNC, who argued that a consent decree requiring the RNC to obtain permission from Federal Judge Dickinson Debevoise before engaging in any ballot security program should not be vacated, as requested by the RNC.