PL779
9/2/2014
2:13-cv-00193

# BRENNAN

# CENTER

# FOR JUSTICE

# THE CHALLENGE OF OBTAINING VOTER IDENTIFICATION

Keesha Gaskins and Sundeep Iyer

Brennan Center for Justice *at New York University School of Law*

## ABOUT THE BRENNAN CENTER FOR JUSTICE

The Brennan Center for Justice at New York University School of Law is a non-partisan public policy and law institute that focuses on the fundamental issues of democracy and justice. Our work ranges from voting rights to campaign finance reform, from racial justice in criminal law to Constitutional protection in the fight against terrorism. A singular institution — part think tank, part public interest law firm, part advocacy group — the Brennan Center combines scholarship, legislative and legal advocacy, and communications to win meaningful, measurable change in the public sector.

## ABOUT THE BRENNAN CENTER'S DEMOCRACY PROGRAM

The Brennan Center's Democracy Program works to repair the broken systems of American democracy. We encourage broad citizen participation by promoting voting and campaign reform. We work to secure fair courts and to advance a First Amendment jurisprudence that puts the rights of citizens — not special interests — at the center of our democracy. We collaborate with grassroots groups, advocacy organizations, and government officials to eliminate the obstacles to an effective democracy.

## ACKNOWLEDGEMENTS

The Brennan Center gratefully acknowledges the Democracy Alliance Partners, Ford Foundation, Anne Gumowitz, Irving Harris Foundation, The Joyce Foundation, The JPB Foundation, Mitchell Kapor Foundation, John D. and Catherine T. MacArthur Foundation, Open Society Foundations, Rockefeller Family Fund, the State Infrastructure Fund, and Nancy Meyer and Marc Weiss for their generous support of our voting work.

The authors thank colleagues Lawrence Norden, Wendy Weiser, and Jim Lyons for their invaluable input throughout the drafting process. The report could not have been completed without many hours of wonderful research assistance from Brennan Center research associate Lianna Reagan and Brennan Center intern Andrew Tepper. We thank Ian Vandewalker, John Kowal, Jafreen Uddin, and Poy Winichakul, who reviewed and edited portions of the document. We also thank Brennan Center legal intern Angelica Cesario for her research assistance. This report benefited greatly from the thoughtful and thorough editorial assistance of Desiree Ramos Reiner, Erik Opsal, and Edwina Saddington. Finally, we thank Brennan Center President Michael Waldman for his strategic insight throughout the drafting process.

*Updated as of July 29, 2012*

© 2012. This paper is covered by the Creative Commons "Attribution-No Derivs-NonCommercial" license (see http://creativecommons.org). It may be reproduced in its entirety as long as the Brennan Center for Justice at NYU School of Law is credited, a link to the Center's web pages is provided, and no charge is imposed. The paper may not be reproduced in part or in altered form, or if a fee is charged, without the Center's permission. Please let the Center know if you reprint.

## ABOUT THE AUTHORS

**Keesha Gaskins** is Senior Counsel in the Brennan Center's Democracy Program. Ms. Gaskins' portfolio includes voting rights and elections with a particular focus on voter suppression issues including voter identification and proof of citizenship laws. She is also an expert on redistricting and redistricting reform. Ms. Gaskins is a frequent lecturer and writer on issues related to women and politics, movement building, and democratic reform. Her political analysis and commentary is regularly featured in news articles and on media outlets nationwide.

Ms. Gaskins is a long-time organizer, lobbyist, and an experienced trial attorney. A graduate of Northeastern University School of Law, she is a 2008 Feminist Leadership Fellow with the University of Minnesota, Hubert H. Humphrey Institute of Public Affairs - Center on Women and Public Policy. Prior to joining the Brennan Center, Ms. Gaskins served as the Executive Director for the League of Women Voters Minnesota and as past Executive Director for the Minnesota Women's Political Caucus.

**Sundeep Iyer** is the Principal Quantitative Analyst at the Brennan Center for Justice. He provides statistical and geographic analysis across a range of the Center's programmatic areas, with expertise in empirical analysis of voting rights, money in politics, and redistricting issues. His statistical estimates and political commentary regularly appear in media outlets across the country.

From June 2011 to April 2012, Mr. Iyer was a Fellow with the Brennan Center, providing statistical analysis for the Center's Democracy Program. Mr. Iyer received his A.B. summa cum laude from Harvard College. He was awarded the Gerda Richards Crosby Prize, given annually to the College's most outstanding graduate in the Government department. For his research on voting, he also received Harvard University's Thomas Temple Hoopes Prize.

## TABLE OF CONTENTS

**Foreword**                                                                                        **i**

**Executive Summary**                                                                               **1**

**I.**      **Introduction**                                                                        **2**

**II.**     **More Than 10 Miles for Voting Rights**                                                 **3**

            A. The Challenge of Finding Transportation to ID-Issuing Offices                        4
            B. The Challenge of Finding an Open ID Office                                            6
            C. The Challenge in Rural Areas: Limited ID Office Access                                7
            D. The Challenge in Cities: People of Color and the Poor Live
               Far From ID Offices                                                                   10

**III.**    **The Cost of "Free" Photo ID**                                                         **14**

**Appendix A: Data and Methodology**                                                                **16**

**Endnotes**                                                                                        **23**

# FOREWORD

"All men are created equal." This shining vision of political equality, set out in the Declaration of Independence, makes the United States exceptional, two centuries later.

Thus it is wrong to enact laws to make it harder for some Americans to vote — not only wrong, but utterly at odds with our most basic national values. Every eligible citizen should be able to vote. And every citizen should take the responsibility to do so. One person, one vote: no more, no less.

Yet since January 2011, partisans in 19 states have rushed through new laws that cut back on voting rights. In a comprehensive study released last October, the Brennan Center concluded these laws could make it far harder for millions of eligible citizens to vote. Fortunately, the Justice Department, courts, and voters have blocked or blunted many of these laws. Many, but not all. And those who would curb the franchise are fiercely fighting in court, going so far as to insist that the Voting Rights Act is in fact unconstitutional.

Among the most controversial measures are new voter identification laws. They require voters to produce specific government papers, usually with a photo and an expiration date, to cast a ballot. Let's be clear: Election integrity is vital. The problem is not requiring voter ID, per se — the problem is requiring ID that many voters simply do not have. Study after study confirms that 1 in 10 eligible voters lack these specific government documents.

Federal courts have previously declared that states with restrictive voter ID laws must make the necessary paperwork available for free. Problem solved? Hardly. This report conclusively demonstrates that this promise of free voter ID is a mirage. In the real world, poor voters find shuttered offices, long drives without cars or with spotty or no bus service, and sometimes prohibitive costs.

It need not be this way. Once partisan "voting wars" have subsided, we can easily move to modernize our ramshackle voter registration system. Using digital technology, states can assure that every eligible voter is on the rolls. That would add millions to the rolls, cost less, and curb the potential for fraud.

Meanwhile, we face a critical national election that may be marred by vast numbers of Americans effectively blocked from the vote. We can and must make sure that the reality of 2012 does not repudiate the civic creed first articulated in 1776.

**Michael Waldman**
President, Brennan Center for Justice at New York University School of Law
July 2012

# EXECUTIVE SUMMARY

Ten states now have unprecedented restrictive voter ID laws. Alabama, Georgia, Indiana, Kansas, Mississippi, Pennsylvania, South Carolina, Tennessee, Texas, and Wisconsin all require citizens to produce specific types of government-issued photo identification before they can cast a vote that will count.[1] Legal precedent requires these states to provide free photo ID to eligible voters who do not have one.[2]

Unfortunately, these free IDs are not equally accessible to all voters. This report is the first comprehensive assessment of the difficulties that eligible voters face in obtaining free photo ID.

The 11 percent of eligible voters who lack the required photo ID must travel to a designated government office to obtain one.[3] Yet many citizens will have trouble making this trip. In the 10 states with restrictive voter ID laws:

- Nearly 500,000 eligible voters do not have access to a vehicle and live more than 10 miles from the nearest state ID-issuing office open more than two days a week. Many of them live in rural areas with dwindling public transportation options.
- More than 10 million eligible voters live more than 10 miles from their nearest state ID-issuing office open more than two days a week.
- 1.2 million eligible black voters and 500,000 eligible Hispanic voters live more than 10 miles from their nearest ID-issuing office open more than two days a week. People of color are more likely to be disenfranchised by these laws since they are less likely to have photo ID than the general population.[4]
- Many ID-issuing offices maintain limited business hours. For example, the office in Sauk City, Wisconsin is open only on the fifth Wednesday of any month. But only four months in 2012 — February, May, August, and October — have five Wednesdays. In other states — Alabama, Georgia, Mississippi, and Texas — many part-time ID-issuing offices are in the rural regions with the highest concentrations of people of color and people in poverty.

More than 1 million eligible voters in these states fall below the federal poverty line and live more than 10 miles from their nearest ID-issuing office open more than two days a week. These voters may be particularly affected by the significant costs of the documentation required to obtain a photo ID. Birth certificates can cost between $8 and $25. Marriage licenses, required for married women whose birth certificates include a maiden name, can cost between $8 and $20. By comparison, the notorious poll tax — outlawed during the civil rights era — cost $10.64 in current dollars.[5]

The result is plain: Voter ID laws will make it harder for hundreds of thousands of poor Americans to vote. They place a serious burden on a core constitutional right that should be universally available to every American citizen.

This November, restrictive voter ID states will provide 127 electoral votes[6] — nearly half of the 270 needed to win the presidency.[7] Therefore, the ability of eligible citizens without photo ID to obtain one could have a major influence on the outcome of the 2012 election.

# I.    INTRODUCTION

During the 2011-12 legislative sessions, states enacted an unprecedented number of laws restricting access to voting. Voter ID laws are the most common type of restriction. Ten states — Alabama, Georgia, Indiana, Kansas, Mississippi, Pennsylvania, South Carolina, Tennessee, Texas, and Wisconsin[8] — now have restrictive "no-photo, no-vote" voter ID laws.[9]

Many American citizens lack the documentation these laws require. In fact, more than 1 in 10 voting-age citizens do not have current, government-issued photo ID.[10] Some populations lack these documents at even higher rates: 25 percent of African-Americans, 16 percent of Hispanics, and 18 percent of Americans over age 65 do not have such ID.[11] Data supplied by Texas and South Carolina also show that poor and minority voters are substantially less likely to have the kind of photo ID these states require.[12]

Of course, 9 in 10 Americans do have photo IDs. These documents are used to drive cars, board airplanes, enter government buildings, and purchase various consumer products. Accordingly, many Americans might find it difficult to understand how so many of their fellow citizens lack such basic documentation. They might also assume that it must be relatively easy for these citizens to get photo ID. After all, all states with restrictive voter ID laws provide some way for voters to obtain a free one.[13]

However, making the ID itself free does not address the significant obstacles that can make it difficult for Americans who lack the required photo ID to obtain one. Many of these voters do not have a car and will have to rely on public transportation — where it exists — to travel to a far-away government office. That office may be open only a few hours a week, and rarely on weekends or in the evening. Voters may have to miss work or arrange for childcare to make the trip. And even if they can make it there, they may not be able to afford the costly supporting documentation — such as birth certificates or marriage licenses — required to apply for photo ID.

This report describes the burden on Americans who must obtain government-issued photo ID to comply with restrictive voter ID laws. The study demonstrates that many rural, urban, poor, and minority voters must overcome substantial obstacles in order to retain their right to vote.

## II.    MORE THAN 10 MILES FOR VOTING RIGHTS

To apply for a free photo ID, eligible voters must travel to a designated government office. That can be hard for many Americans who live and work in areas far from an ID-issuing office. By definition, eligible voters who need photo ID will not have a driver's license, so they cannot drive themselves to a government office.

In this report, "ID-issuing offices" are state offices that issue new photo identification and are open more than twice a week. Offices open twice a week or less are "part-time ID-issuing offices."[14] All distances discussed in this report are straight-line distances. That is, they do not represent travel distances. Therefore, our counts of people living more than 10 miles from an ID office significantly underestimate the number of people who must *travel* more than 10 miles to obtain free ID. Appendix A explains in detail all methodology and definitions used in this report.

Table 1 provides the percentage of eligible voters in each restrictive voter ID state who live more than 10 miles from a state ID-issuing office. Overall, **more than 10 million eligible voters live more than 10 miles from their nearest state ID-issuing office open more than two days a week.**[15] In Mississippi, Alabama, and Wisconsin, the burden of traveling to the ID office is particularly severe: More than 30 percent of voting-age citizens must travel more than 10 miles to the nearest ID-issuing office.

| | Voting-Age Citizens More Than 10 Miles from Nearest State ID-Issuing Office | % of State's Voting-Age Citizens |
|---|---|---|
| Mississippi | 746,316 | 34.8% |
| Alabama | 1,137,724 | 32.7% |
| Wisconsin | 1,254,320 | 30.1% |
| Pennsylvania | 2,273,960 | 24.0% |
| Tennessee | 960,074 | 21.0% |
| Georgia | 1,290,092 | 19.9% |
| Kansas | 261,996 | 13.2% |
| Texas | 1,936,097 | 12.7% |
| South Carolina | 273,150 | 8.2% |
| Indiana | 159,536 | 3.4% |
| **Total** | **10,333,265** | **17.5%** |

**Table 1**: *Citizen Voting-Age Population Located More than 10 miles from Nearest ID-Issuing Office*. The table displays the number of voting-age citizens (CVAP) who live in census blocks that are in their entirety more than 10 miles from the nearest ID-issuing office that is open more than two days a week. It displays this number as a percentage of the total citizen voting-age population.

Voter ID laws are especially burdensome for citizens in high-poverty areas. Not only are these eligible voters among the least likely to have photo ID,[16] they are also among the least likely to have access to government services, such as public transportation.[17] In the 10 states with restrictive laws, **1.2 million eligible voters whose incomes fall below the federal poverty line live more than 10 miles from their nearest state ID-issuing office open more than two days a week.[18]**

Voter ID laws also place a particular burden on black and Hispanic eligible voters, who are less likely to have ID than the general population.[19] In these 10 states, **1.2 million black and 500,000 Hispanic eligible voters live more than 10 miles from their nearest state ID-issuing office open more than two days a week.[20]**

## A. The Challenge of Finding Transportation to ID-Issuing Offices

The distances that many voters must travel to their nearest ID-issuing office will be particularly burdensome for voters who do not have vehicle access.

Table 2 estimates the number of voting-age citizens in each restrictive voter ID state who do not have vehicle access. It also displays this number as a percentage of the state's total voting-age citizen population. The table demonstrates that in the 10 restrictive voter ID states, more than 1 in every 20 voting-age citizens do not have vehicle access.[21]

| | Voting-Age Citizens Without Vehicle Access | % of Voting-Age Citizens Without Vehicle Access | Voting-Age Citizens Without Vehicle, More Than 10 Miles from State ID-Issuing Office | % of Voting-Age Citizens Without Vehicle Access Who Live More Than 10 Miles from State ID-Issuing Office |
|---|---|---|---|---|
| Pennsylvania | 985,414 | 10.4% | 135,544 | 13.8% |
| South Carolina | 222,144 | 6.7% | 7,251 | 3.3% |
| Mississippi | 143,933 | 6.7% | 48,329 | 33.6% |
| Georgia | 400,841 | 6.2% | 66,516 | 16.6% |
| Wisconsin | 256,981 | 6.2% | 47,161 | 18.4% |
| Alabama | 213,386 | 6.1% | 57,285 | 26.8% |
| Indiana | 268,535 | 5.8% | 3,235 | 1.2% |
| Tennessee | 262,954 | 5.7% | 40,089 | 15.2% |
| Texas | 831,652 | 5.4% | 59,740 | 7.2% |
| Kansas | 95,973 | 4.8% | 7,373 | 7.7% |
| **Total** | **3,681,813** | **6.6%** | **472,523** | **12.8%** |

**Table 2:** *Voting-Age Citizens without Vehicle Access.* The table estimates the number of voting-age citizens who do not have vehicles available to them. It also estimates this as a percentage of the total voting-age citizen population in the state, and it provides the number and percentage of voting-age citizens without a vehicle who live more than 10 miles from their nearest ID-issuing office open more than two days a week.

Many eligible voters who do not have vehicle access live in urban areas, close to an ID-issuing office. But as the third column in Table 2 demonstrates, many who do not have vehicle access actually live a significant distance from an ID-issuing office. **In the 10 states with restrictive voter ID laws, more than 450,000 eligible voters do not have vehicle access and live more than 10 miles from their nearest state ID-issuing office open more than two days a week.** Almost all of these citizens live in rural areas. Not only are they among the most likely not to have photo ID, they are also the most likely to have difficulty traveling to an ID-issuing office to obtain one.

Citizens with limited vehicle access will be highly dependent on public transportation to obtain the ID necessary for voting. However, the states that passed the most restrictive voter ID laws are among the nation's worst investors in public transportation. Table 3 displays the per capita state public transportation funding in 2009 in each restrictive voter ID state. As reference points, the table also reports the states that provide the highest, median, and lowest levels of per capita public transportation in the country.[22]

| State | Per Capita Investment in Public Transportation by State |
|---|---|
| New York (highest) | $224.85 |
| Pennsylvania | $94.77 |
| Wisconsin | $22.31 |
| Indiana | $8.63 |
| Tennessee (median) | $5.59 |
| Kansas | $2.14 |
| South Carolina | $1.40 |
| Texas | $1.16 |
| Mississippi | $0.54 |
| Georgia | $0.54 |
| Alabama (lowest) | State does not provide public transportation funding |

**Table 3**: *Reported per capita Investment in Public Transportation*. The table shows the per capita investment on public transportation in the 10 restrictive voter ID states, as well as the national high and low amounts of per capita investment. New York does not have a restrictive voter ID law; it is shown here as a reference point.

Seven of the ten restrictive voter ID states rank in the bottom half of the country when it comes to investment in public transportation. Nationally, only four states that spend money on public transportation provide less per capita funding than Mississippi and Georgia. Alabama relies solely on federal funds and does not invest any state money in public transportation. The state is tied for last in the country in public transportation funding.[23]

Access to public transportation is declining across the country, particularly in rural areas.[24] Nationally, 3.5 million rural residents — 4 percent of the nation's rural population — lost access to bus, ferry,

or rail transportation between 2005 and 2010. Alabama's situation is particularly acute.[25] The state relies solely on funding from the federal government for public transportation projects. As a result, public transportation in Alabama's rural areas is deteriorating. According to a 2011 U.S. Department of Transportation report, approximately 700,000 people in rural Alabama communities lost access to intercity transit service in the five years between 2005 and 2010. Those 700,000 residents comprised 29 percent of the state's 2.4 million rural residents.[26]

## B. The Challenge of Finding an Open ID Office

Even if a registered voter can travel to an ID office, the nearest location may not keep standard business hours (defined as eight hours a day, five days a week). Many ID offices have reduced hours: They are open less than five days per week or fewer than eight hours per day. Others have irregular hours: They are not open every day and have an unusual pattern of business hours.

Reduced and irregular hours may pose significant problems for eligible voters who need photo identification. Citizens may have to take time off from work if the ID-issuing office does not have Saturday or late night hours. States guarantee employees time off to vote, but none provide similar protections for workers who must take time off to obtain the necessary photo ID for voting.  Irregular hours may also be confusing and create a significant deterrent to obtaining ID.

Examples of reduced and irregular hours in restrictive voter ID states include:

- **Offices without Regular Business Hours:** In Wisconsin**,** Alabama, and Mississippi, less than half of all ID-issuing offices in the state are open five days a week.[27]

- **Limited Weekend Hours**: In South Carolina, only six of the state's 68 ID offices are open on Saturday. No state ID-issuing offices are open on Saturdays in Alabama, Kansas, Mississippi, Texas, and Wisconsin. All ID-issuing offices in restrictive voter ID states are closed on Sunday.[28]

- **Reduced Business Hours in Areas with High Concentrations of People of Color**: Many of the offices with limited hours are in areas with high concentrations of minority voters. In Texas, 40 ID-issuing offices are open three days per week or less; the majority of these are in the rural border region, home to a heavy concentration of eligible Hispanic voters. In Georgia, Mississippi, and Alabama, many of the ID offices with limited hours are located in the areas with the highest concentrations of black voters.[29]

- **Idiosyncratic Hours**: Some ID offices maintain hours so bizarre that it is necessary to consult a calendar to determine when the office is open. The office in Sauk City, Wisconsin is open only on the fifth Wednesday of any month. But only four months in 2012 have five Wednesdays. Other offices in Wisconsin are open only once every two months: For example, the office in Phillips is open only on the first Wednesday of February, April, June, August, October, and December. In Alabama, the Rockford office is open only on the third Thursday of the month. In Mississippi, the Woodville office is open only on the second Thursday of each month.[30]

**January**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 4 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

**February**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | (29) | | | |

**March**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**April**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 4 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

**Table 4**: *Sauk City, Wisconsin ID-Issuing Office, Calendar of Open Days*. This calendar of the first four months in 2012 highlights the days that the Sauk City office was open between January and April 2012.

## C. The Challenge in Rural Areas: Limited ID Office Access

Residents of some rural communities in the 10 states with restrictive voter ID laws will find it particularly hard to travel to an ID-issuing office or a part-time ID-issuing office.

### 1. The Southern Black Belt

The large rural concentrations of black voters in Mississippi, Alabama, and Georgia form a geographically distinct "black belt." Large portions of the "black belt" in each of these states are located a significant distance from state driver's license offices.

For instance, in 11 contiguous counties in Alabama,[31] all of which are squarely located in the black belt, all state driver's license offices are part-time and are open only one or two days per week.[32] More than 135,000 eligible voters live in these 11 counties. Nearly half of them are black, and the black poverty rate is 41 percent.[33]



**Figure 1:** *Percentage Black and State Driver's License Offices, Mississippi, Alabama, and Georgia.* The map demonstrates that in the areas with the greatest concentrations of rural black voters, no state driver's license offices are open more than two days per week. The figure also shows that many of these states' part-time offices are located in the areas with the highest concentrations of black voters. The crosshatched areas outline the 13 contiguous "black belt" counties in Mississippi, 11 contiguous "black belt" counties in Alabama, and 21 contiguous "black belt" counties in Georgia where all state driver's license offices are open two days per week or less.

Voters living in the black belt in Georgia and Mississippi may face similar hurdles. As in Alabama, there are 21 contiguous counties in Georgia and 13 contiguous counties in Mississippi[34] — all within the black belt — that do not have a single full-time driver's license office.[35]

At first glance, the situation in Georgia is better than it is in Alabama since Georgia requires county offices to provide free voter ID.[36] But research conducted by the Brennan Center found that many citizens may have trouble getting free ID from Georgia's county offices. First, most county offices in Georgia do not print their business hours in an easily accessible location online, and some have even printed incorrect office addresses or phone numbers online.[37]

Second, even when contacted directly, county offices in Georgia frequently gave incorrect information about free IDs.[38] In 12 of the 21 county offices in the Georgia black belt, election officials could not correctly describe what forms of identification would be required to obtain a free photo ID.[39] For instance, officials in the Bartow and Sumter County offices said that applicants must show a Social Security card to obtain free ID, but the Georgia law has no such requirement.[40] In four other offices, the election officials who answered our phone calls said they knew very little about free voter IDs. The remaining five offices in the Georgia black belt did not answer multiple calls from the Brennan Center.[41]

Mississippi's law also requires county offices to provide ID.[42] The Mississippi ID requirement must be pre-cleared by the Department of Justice before it can take effect.[43] As of the date of this publication, the Department has not issued a determination on the law. Without additional information we cannot assess how Mississippi county offices will respond to requests for free photo ID.

More than 500,000 eligible voters live in the 45 black belt counties, highlighted in Figure 1.[44] Rural public transportation in these areas is limited,[45] which could prove particularly challenging for the 50,000 eligible voters in these areas who do not have vehicle access.[46] In addition, the heavy concentrations of rural poverty suggest that transportation infrastructure is less likely to be well-developed.[47] This means that many eligible voters in these rural black belt areas may have significant difficulty traveling to an office to obtain photo ID.

### 2. The Texas Border Region

Two areas along the U.S.-Mexico border — one in west Texas and the other in south Texas — are home to sizable rural Hispanic populations but few or no ID-issuing offices. These areas are displayed in Figure 2.[48] Across the 32 counties in these regions, there are approximately 134,000 voting-age citizens. About 61 percent of them are Hispanic, which is almost twice the relative concentration of Hispanics in the rest of the state. The poverty rate is 22.4 percent, about 30 percent higher than the rest of the state.[49] Thus, there is a disproportionately high concentration of people who will need free ID in the Texas border region.

But 9 of the 11 offices in these 32 counties are open part-time (only once or twice per week). Some voters, like those in Cotulla, a small rural town in south Texas, live an hour's drive from the nearest part-time ID-issuing office, and that location is often open only one day per week. Accessing photo ID could be especially hard for the nearly 10,000 eligible voters in these 32 counties who do not have vehicle access.[50]



**Figure 2:** *Percentage Hispanic Population and Driver's License Office Locations, Texas.* The map shows that in some areas in Texas with high concentrations of Hispanic voters, there are few or no ID-issuing offices. The map depicts concentrations of the Hispanic voting-age population, by 2010 Census Block Group, together with the number of hours per week each office location is open. The crosshatched areas represent the 32 counties in the U.S.-Mexico border region with few or no ID-issuing offices.

### *3. Rural Tennessee*

Three rural regions in Tennessee — one in the west, one in the north, and a third in the southeast — have large populations but *no ID-issuing offices*. These regions are displayed in Figure 3.[51] All of the 27 counties in these three rural regions are more than five miles from the nearest ID-issuing office location. More than 330,000 voting-age citizens live in these 27 counties. The poverty rate is 19.4 percent, nearly 20 percent greater than in the rest of the state.[52] The 18,000 eligible voters in this area who do not have vehicle access will have particular trouble obtaining free ID.[53]



**Figure 3:** *Poverty Rate and Driver Service Center Locations, Tennessee.* The figure shows three rural regions of the state (crosshatched) — cumulatively home to more than 300,000 eligible voters — with no ID-issuing offices. The map shows the poverty rate, by 2010 Census Tract, and the locations of Tennessee Driver Service Centers.

## D. The Challenge in Cities: People of Color and the Poor Live Far From ID Offices

Urban populations usually live closer to their nearest ID-issuing office than rural populations. Metropolitan public transportation systems also make most ID offices located in cities more accessible than rural offices. Yet many urban people of color and the urban poor still face a substantial burden when ID-issuing offices are not located nearby. For those dependent on public transportation, it may take hours to get to the right government office. Some ID offices that serve large urban communities may also have long wait times. This could be a problem for people who may not have the flexibility in their work schedules to stand in line for hours.

### *1. Rock Hill, South Carolina*

The city's largest concentration of eligible black voters — nearly 42,000 of them — live in the city center.[54] Yet the city's one ID-issuing office is located seven miles outside the city center. The city has no regularly scheduled public transportation; the only available public transportation to an ID office requires 48 hours notice for a scheduled pick up.[55] This will disproportionately affect the 10,800 eligible voters in the city center — pictured in Figure 4 — who do not have a vehicle available in their household and who live more than five miles from the Rock Hill ID office.[56]



**Figure 4:** *Percentage of Households without a Vehicle and Department of Motor Vehicles Locations*, Rock Hill, South Carolina. The figure demonstrates that the only ID-issuing office in Rock Hill is located west of the city, seven miles away from the largest concentration of people without vehicles. The map shows the percentage of households without vehicle access, by 2010 Census Tract, and the location of ID-issuing offices. Darker areas in the map indicate higher concentrations of people without cars in their household.

## *2. Knoxville, Tennessee:*

The nearest ID-issuing office is 11 miles east of the city center, which is home to the city's largest concentration of black voters.[57] There are 61,600 eligible voters in downtown Knoxville who live more than five miles from that ID-issuing office; 26 percent of them are black, and 27.5 percent live in poverty.[58] The office is not served by the city's public bus system.[59] This could pose a particular challenge for the 7,000 eligible voters living downtown who do not have a car.[60]



**Figure 5:** *Poverty Rate and Driver's Service Center Locations, Knoxville, Tennessee.* The figure shows that the one ID-issuing office near Knoxville is located outside of the city center, which is home to the city's largest concentration of poor residents. The map shows the poverty rate by 2010 Census Tract, and the location of the one ID-issuing office by Knoxville.

### 3. Dallas, Texas

Dallas has an ID-issuing office in the city center. However, many of the city's black and poor voters live outside the city center in the southeastern quadrant of Dallas County, which has no ID-issuing offices. By contrast, there are eight full-time offices in the rest of the county. In the southeast quadrant, there are 244,100 eligible voters: nearly 30 percent live in poverty and 52 percent are black. Compare this with the 1.1 million eligible voters in the rest of the county, where just 17 percent live in poverty and 22 percent are black.[61]





**Figure 6** (top): *Percentage Black and Driver's License Office Locations, Dallas County, Texas*; **Figure 7** (bottom): *Poverty Rate and Driver's License Office Locations, Dallas County*. These two maps show that the southeastern quadrant of Dallas County, which houses many of the city's poor and black residents, does not have an ID-issuing office. The rest of the county has eight offices. The line in each figure demarcates the southeastern quadrant of Dallas County.

Public transportation does go from the southeast quadrant to the ID-issuing office in the city center.[62] But the residents in the southeast, among the least likely to have photo ID, may have to travel further than others in Dallas County. For some residents, a trip to the ID-issuing office could take as long as two hours, or four hours roundtrip.[63]

### 4. Wichita, Kansas:

Outside of Wichita, there are 90 ID-issuing offices in Kansas — about one for every 22,000 votingage citizens. But in downtown Wichita, pictured in Figure 8, there is only one office to serve 160,700 eligible voters.[64] In other words, the one office in Wichita serves nearly eight times the "customer base" of the average office statewide. Compared to the rest of the state, Wichita also has a disproportionately high concentration of people of color and people in poverty. Wichita is home to 22 percent of the state's black eligible voting population, 15.6 percent of the state's Hispanic citizen population, and 12.8 percent of the state's population in poverty.[65]



**Figure 8:** *Poverty Rate and Department of Revenue ID-issuing Offices, Wichita, Kansas.* The map shows the poverty rate, by 2010 Census Tract, and the location of ID-issuing offices near Wichita.

According to one account, when a group of voters seeking free voter IDs came to the Wichita office earlier this year, DMV employees "were at a loss to explain who was eligible or how to apply."[66] Given that this DMV serves a large population disproportionately likely to lack the ID necessary to vote, the account suggests the office should receive additional resources and training to ensure that those requesting free ID get them quickly and easily.

### III.   THE COST OF "FREE" PHOTO ID

Proponents of voter ID laws often say the requirement is not onerous because state-issued photo ID is available at no charge. But in all restrictive ID states except South Carolina, even if an eligible voter does not have to pay for the ID itself, he or she must provide supporting documentation — such as a birth certificate or a naturalization certificate — to obtain a state-issued photo ID suitable for voting.[67] These records can be very costly.

An official copy of a birth certificate can cost anywhere from $15 to $30, depending on the state.[68] The fees for a new passport or to renew a passport are $135 and $110, respectively.[69] The price of a replacement naturalization certificate or certificate of citizenship is $345.[70]

Married women who have changed their surname face an additional burden: They may need to present a marriage license with their current name to obtain a photo ID. Only 48 percent of voting-age American women who have ready access to their birth certificate have their current name on it.[71] Fees for official copies of marriage licenses range from $5 to $40. Thus, a married woman who does not have a certified copy of her birth certificate and marriage license could easily spend $30 to $70 acquiring the documents necessary to obtain a photo ID.

But even these costs pale in comparison to the potential costs for people who were never issued birth certificates or whose birth certificates contain significant errors with respect to their race, name, or other key identifiers. These individuals often must obtain other official records, such as their school attendance records, spouse's documentation, or childhood documentation.[72] Each document carries with it separate costs and administrative processes.

Table 5 (on page 15) details the cost of official copies of birth certificates and marriage licenses in the 10 states with restrictive ID laws. Citizens born or married in another state may incur additional charges (not listed in Table 5).

| | Cost of Birth Certificate | Cost of Marriage License |
|---|---|---|
| Georgia | $25 | $10 |
| Texas | $22 | Must be requested at county level (costs vary) |
| Wisconsin | $20 | $20 |
| Mississippi | $15 | Must be requested at the county level (costs vary) |
| Alabama | $15 | $15 |
| Kansas | $15 (free for KS residents seeking voter ID) [73] | $15 |
| South Carolina | $12 | $12 |
| Pennsylvania | $10 (free for PA residents seeking voter ID)[74] | Must be requested at the county level (costs vary) |
| Indiana | $10 | $8 |
| Tennessee | $8 | $15 if available from the state vital records office. If not, then must be requested at county level (costs vary) |

**Table 5**: *Birth Certificates and Marriage License Costs in Restrictive Voter ID States.*

For individuals who wish to order copies of their documentation online, all restrictive voter ID states except Texas use VitalChek, a private express document delivery service.[75] VitalChek imposes an additional charge of $5 to $16 per records request, based on the state or county holding the records.[76] This is in addition to the cost of the document or any charge by the state for expedited processing. For example, if a state charges $10 for a birth certificate, an additional $10 for expedited processing, and the VitalChek fee is $10, then an online request will cost $30. Moreover, this transaction must be completed with a credit card.[77]

## The Mississippi Catch-22

Although Mississippi's restrictive law is not yet in force, citizens there without ID face a particularly perverse set of rules. To secure government-issued photo ID, many voters will need a birth certificate. Yet the state requires a government-issued photo ID to obtain a certified copy of a birth certificate.[78] These rules make it extremely difficult to get a birth certificate, the first step toward obtaining voter ID. They represent another hurdle to voting placed in the path of those who have the least means to surmount them.

## Appendix A: Data and Methodology

This appendix documents the data sources and methodology used to calculate all quantitative estimates in this report. We begin by detailing how we obtained information on ID-issuing office locations and hours in the 10 states profiled in the report. The appendix then documents how we calculated distance between eligible voters and their nearest ID-issuing office.

### 1. ID-Issuing Office Locations and Hours

All state offices that issue new driver's licenses are counted as ID-issuing offices. Because this report focuses on individuals who do not have photo identification and who must obtain a new ID in order to vote, we exclude all offices that provide only driver's license replacement services and not new driver's licenses.

An "ID-issuing office" is any state office that issues new photo ID and that is open more than two days a week. We made the choice to define only these state offices as ID-issuing offices because they are the only offices that offer eligible voters some modicum of flexibility in when they can travel to obtain photo ID. Two days per week was a natural cut-off point since it does not include offices that are open for fewer than half the days in the work-week. Offices open twice per week or less are called "part-time ID-issuing offices." Unless otherwise noted, the calculations in this report do not include part-time ID-issuing offices.

The locations and hours of ID-issuing offices were obtained from the following sources, using the procedures listed below. For offices that do not have consistent hours from week to week, we calculated the number of hours each office is open per week by adding the total number of hours open during the year (ignoring holidays) and dividing that by the number of weeks in the year.

Below is a list of procedures and sources for ID-issuing office locations and hours in the 10 states considered in this report:

- Alabama: ID-issuing office information current as of January 9, 2012. Locations and hours obtained from listing of Driver's License Offices on website of Alabama Department of Public Safety.[79]

- Georgia: ID-issuing office information current as of January 23, 2012. Locations and hours obtained from listing of Driver's License Customer Service Centers on website of Georgia Department of Driver Services.[80]

- Indiana: ID-issuing office information current as of January 23, 2012. Locations and hours obtained from listing of Branch Locations on website of Indiana Bureau of Motor Vehicles.[81] ID-issuing office listings obtained county by county.

- Kansas: ID-issuing office information current as of October 19, 2011. Locations and hours obtained from listing of Driver's License and ID Card Services by County on website of Kansas Department of Revenue.[82] ID-issuing office hours compiled with support from the ACLU Voting Rights Project.

- Mississippi: ID-issuing office information current as of December 8, 2011. Locations and hours obtained from listing of District Locations on Mississippi Department of Public Safety website.[83]

- Pennsylvania: ID-issuing office information current as of March 12, 2012. Locations and hours obtained from the Locations Info Center on the Pennsylvania Department of Transportation website.[84] In step 1c, answered "Yes" to the question "Search the Entire State?" In Step 2, we first checked "New Driver's License/Transfer" to gather all offices that issue new driver's licenses, and then separately checked "Photo ID Card" to gather all offices that issue new photo IDs.

- South Carolina: ID-issuing office information current as of October 19, 2011. Locations and hours obtained from listing of Office Locations, Hours and Wait Times on website of South Carolina Department of Motor Vehicles.[85] ID-issuing office hours compiled with support from the ACLU Voting Rights Project.

- Tennessee: ID-issuing office information current as of October 31, 2011. Locations and hours obtained from listing of Driver Service Center Locations by Service on Tennessee Department of Safety and Homeland Security website.[86] Only full-service offices and Identification License offices are included since only these offices issue free voter IDs.

- Texas: ID-issuing office information current as of March 26, 2012. Locations and hours obtained from Texas Driver's License Office Map listing on Texas Department of Public Safety website.[87]

- Wisconsin: ID-issuing office information current as of October 19, 2011. Locations and hours obtained from DMV Service Centers by County listing on Wisconsin Department of Transportation website.[88] ID-issuing office hours compiled with support from the ACLU Voting Rights Project.

All ID-issuing office information was analyzed using the ArcGIS software suite.

## 2. Distance to ID-Issuing Offices

All distances discussed are straight-line distances. That is, they do not represent travel distances. The straight-line distances represent the shortest possible geometric route between two points. This means that our counts of people living more than 10 miles from an ID office *significantly underestimate* the number of people who must *travel* more than 10 miles to obtain free ID. Although we use "living more than 10 miles" and "must travel more than 10 miles" interchangeably throughout the report, it is worth bearing in mind that the counts provided in this report are significant underestimates of the number of people in the latter category.

To determine the number of voting-age people living more than 10 miles from their nearest ID-issuing office, we added the number of voting-age people living in 2010 Census Block Groups that were *in their entirety* more than 10 miles from the nearest ID-issuing office. In other words, if any part of a block group fell within a 10-mile radius of an ID-issuing office, then all voting-age people in that block group would not be included in our estimate of the number of people living 10 or more miles from their nearest ID-issuing office. Therefore, our counts substantially *underestimate* the number of voting-age people who live 10 or more miles from their nearest ID-issuing office. We use 2010 Census Block Group data on the voting-age population in the state, obtained from Table P4 of the 2010 National Redistricting Data release, titled "Hispanic or Latino, and Not Hispanic or Latino by Race for the Population 18 Years and Over."[89]

To determine the number of voting-age citizens living more than 10 miles from their nearest ID-issuing office, we then use 2010 Census Tract data on citizenship status by age from the 2006-2010 American Community Survey (ACS) five-year estimate. That data is obtained from the following series of ACS data tables, all titled "Sex by Age by Citizenship Status"[90]:

| | ACS Table ID |
|---|---|
| **Total** | B05003 |
| **White Alone, Not Hispanic** | B05003H |
| **Hispanic Alone** | B05003I |
| **Black Alone** | B05003B |
| **American Indian Alone** | B05003C |
| **Asian Alone** | B05003D |

**Table A.1:** *2006-2010 American Community Survey Tables Used to Obtain Data on Citizenship Status, by Age and Race.*

From the ACS data, it is possible to calculate the number of people of voting age and citizens of voting age, by race, in each 2010 Census Tract. We then identify those Census Tracts that are in their entirety more than 10 miles from the nearest ID-issuing office. These tracts are roughly coterminous with the block groups that are in their entirety more than 10 miles from the nearest office. However, because tracts are larger than block groups, and because all block groups are nested within tracts, the tracts that are in their entirety more than 10 miles from an office cover less area (and fewer people) than the block groups that are in their entirety more than 10 miles from an office. Therefore, we use as a baseline the number of voting-age people, from Table P4 of the 2010 Census National Redistricting Data release, in the Census block groups that are at least that far from an ID-issuing office. This baseline number is more reflective of the number of people of voting age who live more than 10 miles from their nearest ID-issuing office.

Because the Census tracts and block groups that are more than 10 miles from an office are nearly coterminous, the ACS data from the Census tracts more than 10 miles from an office provides a very close approximation of the percentage of voting-age people who are citizens in the Census block groups

more than 10 miles from an office. To estimate the total number of voting-age citizens living 10 or more miles from their nearest ID-issuing office, we multiply the baseline voting-age population by the percentage of voting-age people who are citizens across all 2010 Census Tracts that are in their entirety more than 10 miles from an ID-issuing office. An identical procedure was used to estimate the number of voting-age citizens, by race, who live more than 10 miles from their nearest ID-issuing office.

Our citizen voting-age population counts significantly *underestimate* the number of eligible voters who live more than 10 miles from their nearest ID-issuing office. After all, if any part of a block group fell within a 10-mile radius of an ID-issuing office, then all voting-age citizens in that block group would not be included in our estimate of the number of eligible voters living 10 or more miles from their nearest ID-issuing office.

### 3. Poverty Statistics

All poverty statistics are obtained at the 2010 Census Tract level from the 2006-2010 five-year American Community Survey (ACS) estimate. All reported poverty estimates in the report are made with respect to the federal poverty threshold and includes all people who had incomes below the threshold during the previous year. The data is obtained from the following series of ACS data tables, all titled "Poverty Status in the Past 12 Months By Sex By Age"[91]:

|  | ACS Table ID |
|---|---|
| **Total** | B17001 |
| **White Alone, Not Hispanic** | B17001H |
| **Hispanic Alone** | B17001I |
| **Black Alone** | B17001B |
| **American Indian Alone** | B17001C |
| **Asian Alone** | B17001D |

**Table A.2:** *2006-2010 American Community Survey Tables Used to Obtain Poverty Status, by Age and Race.*

To estimate the number of voting-age citizens in poverty living more than 10 miles from their nearest ID-issuing office, we select all Census Tracts that are in their entirety more than 10 miles from the nearest office. We sum across the ACS data tables to obtain estimates of the number of voting-age people in poverty, by race, living in these tracts. We then multiply the number of voting-age people in poverty in each tract by the percentage of the voting-age population who are citizens in that tract. To obtain the final estimate of the number of voting-age citizens in poverty living more than 10 miles from their nearest ID-issuing office, we then sum that product across all tracts that are in their entirety more than 10 miles from the nearest office.

This procedure for determining the voting-age citizen population in poverty is extremely conservative since the methodology underestimates the number of eligible voters in poverty who live more than 10

miles from their nearest ID-issuing office. Just as with the census block group analysis, if any part of a tract fell within a 10-mile radius of an ID-issuing office, then all voting-age citizens in that tract were excluded from our estimates of the number of eligible voters in poverty living 10 or more miles from their nearest ID-issuing office.

Our methodology for estimating the number of voting-age citizens in poverty is imperfect since it is possible that the voting-age people in poverty are more or less likely to be citizens than the general population. However, the inaccuracies resulting from this methodology are likely to be small. By estimating the number of voting-age citizens in each tract, we account for the possibility that people living in high-poverty areas may have a different citizenship profile than the rest of the population. This tract-by-tract mode of processing the data is likely to eliminate much, if not all, of any systematic bias resulting from possible differences in the citizenship profile of those in poverty.

## 4. Vehicle Access Statistics

In Table B25044, titled "Tenure by Vehicles Available," the 2006-2010 American Community Survey (ACS) five-year estimate offers counts of the number of owner-occupied and renter-occupied housing units with 0, 1, 2, 3 or 4 or more vehicles available, by 2010 Census Tracts.[92] From this data, we extract the total number of owner-occupied and renter-occupied households in each tract that do not have a vehicle available. Next, we load the ACS average household size data for owner-occupied and renter-occupied housing units in Table B25010, titled "Average Household Size of Occupied Housing Units by Tenure," available by 2010 Census Tracts.[93] We then multiply the number of owner-occupied housing units with no vehicle available by the average household size in owner-occupied housing units, do the same for renter-occupied housing units, and add the two products together.

This methodology yielded a tract-level estimate of the total number of residents who do not have a vehicle available in their housing unit. To obtain an estimate of the number of voting-age citizens who do not have a vehicle available in a Census tract, we multiply the total number of residents who do not have a vehicle available in their housing unit by the percentage of all residents in that tract who are citizens, derived from Table B05003 in the 2006-2010 ACS five-year estimate.

To calculate the total number of voting-age citizens who do not have a vehicle available and who live more than 10 miles from their nearest ID-issuing office, we select those Census tracts that are in their entirety more than 10 miles from an ID office, and we sum the number of voting-age citizens without a vehicle available in those tracts. This method *significantly underestimates* the total number of eligible voters who do not have vehicle access and who live that far from an ID office: It excludes those eligible voters who live more than 10 miles from an ID-issuing office but who live in a Census tract that falls partly within a 10 mile radius of the ID office.

As with our methodology for estimating the number of voting-age citizens in poverty, our methodology for estimating the number of voting-age citizens without a vehicle available is imperfect. It is possible that households without a vehicle available may be smaller or larger, on average, than households with

vehicle access. It is also possible that those without a vehicle available in their households are more or less likely, on average, to be eligible voters than those who do have vehicles in their household. But the methodological inaccuracies are likely to be small. By estimating the number of voting-age citizens directly in each tract, the possibility that those living in areas with low vehicle access rates may have different household profiles and different citizenship profile than the rest of the population is accounted for. This tract-by-tract mode of processing the data is likely to eliminate much of any systematic bias resulting from possible differences in the household size or citizenship profile of those in who do not have a vehicle available in their households.

# ENDNOTES

1 Of those states, Wisconsin, Kansas, and Alabama extend the strict ID requirements to absentee voting. *See* Wendy R. Weiser & Lawrence Norden, Voting Law Changes in 2012 6 (2011), available at http://brennan.3cdn.net/d16bab3d00e5a82413_66m6y5xpw.pdf.

2 *See Crawford v. Marion County Elections Bd.*, 128 S.Ct. 1610, 1621 (2008) (holding that the ban on poll taxes in *Harper v. Virginia Bd. of Elections,* 383 U. S. 663 (1966) would invalidate Indiana's photo ID law but for the fact that the Indiana required its Bureau of Motor Vehicles to provide free ID cards to voters).

3 Brennan Center for Justice, Citizens without Proof (2006), http://www.brennancenter.org/page/-/d/download_file_39242.pdf.

4 *Id.*; *see also* Lorrie Frasure et al., 2008 Collaborative Multi-Racial Post-Election Survey: Comparative Multi-Racial Survey Toplines 24 (2008), *available at* http://cmpstudy.com/assets/CMPS-toplines.pdf; Matt A. Barreto et al., The Disproportionate Impact of Voter-ID Requirements on the Electorate — New Evidence from Indiana, 42 PS: Pol. Sci. & Pol. 111 (2009), *available at* http://faculty.washington.edu/mbarreto/papers/PS_VoterID.pdf; M.V. Hood III & Charles S. Bullock III, Worth a Thousand Words: An Analysis of Georgia's Voter Identification Statute, 36 Am. Pol. Res. 555 (2008), *available at* http://apr.sagepub.com/content/36/4/555.abstract; Matt A. Barreto et al., Voter ID Requirements and the Disenfranchisement of Latino, Black and Asian Voters (2007), *available at* http://www.brennancenter.org/dynamic/subpages/download_file_50884.pdf.

5 The poll tax the Supreme Court outlawed as unconstitutional in 1966 was $1.50. *See Harper v. Virginia Board of Elections*, *supra* note 2. For conversion to current-day dollars, *see CPI Inflation Calculator*, U.S. Bureau of Labor Statistics, http://www.bls.gov/data/inflation_calculator.htm (last visited June 20, 2012).

6 In each of the strict voter ID states except Alabama, voter ID laws were enacted with the intention of taking effect before the 2012 presidential election. Pursuant to the Voting Rights Act of 1965, voter ID laws in Mississippi, South Carolina, Alabama, and Texas must be precleared by the Department of Justice or a federal court prior to going into effect. *See Section 5 Covered Jurisdictions*, U.S. Dep't of Justice, http://www.justice.gov/crt/about/vot/sec_5/covered.php (last visited May 22, 2012). In addition, in two separate Dane County District Court opinions, the Wisconsin photo ID law was placed under both a temporary injunction, *Milwaukee Branch of the NAACP v. Walker*, 11 Wis. 9d 5492 (2012), and a permanent injunction, *League of Women Voters of Wisconsin v. Walker*, 11 Wis. 9d 4669 (2012), for violations of Wisconsin's state constitution. The permanent injunction is on appeal to the Wisconsin Court of Appeals, and the Dane County District Court has not yet issued a decision in the other trial. In either case, a contrary decision by the courts could allow Wisconsin to enforce its restrictive voter ID law this November.

7 *See* U.S. Election Assistance Commission, The Electoral College 11 (2011), http://www.eac.gov/assets/1/Documents/The%20Electoral%20College%20(Jan.%202011).pdf (calculated by adding together the number of electoral votes for each strict voter ID state). Alabama's voter ID law is not due to go into effect until 2013, so we do not include Alabama's electoral votes.

8 Of these states, Georgia and Indiana passed their strict voter ID laws in 2006, as did another state, Missouri. The Missouri Supreme Court found the strict voter ID law unconstitutional on state law grounds in *Weinschenk v. State*, 203 S.W.3d 201 (Mo. 2006). Therefore, Missouri is not included in this analysis.

9 Four general categories of degree of ID are required in order to vote in-person on Election Day: (1) states that do not require additional levels of proof of identity beyond federal HAVA requirements (2) states that accept both photo and non-photo as proof of identity (3) states that prefer, but do not require photo identification for proof of identity and (4) strict "no-photo, no-vote" voter ID states. The analysis in this report is limited to the impact of the laws in strict "no-photo, no-vote" states.

10 *See* Brennan Center for Justice, *supra* note 3.

11 *Id.* African-American voters and voters over age 65 are significantly more likely to not have photo ID than the general population. Because it contained a small sample of Hispanic voters, the cited study was unable to conclude that Hispanic eligible voters were significantly less likely to possess photo ID than the general population. The findings in the cited study have been confirmed by the most reliable academic studies to date. *See supra* note 3.

[12] *See* Letter from Thomas E. Perez, Assistant Attorney General, U.S. Dep't. of Justice, to Keith Ingram, Director of Elections, Office of the Texas Secretary of State (Mar. 12, 2012), *available at* http://brennan.3cdn.net/fe6a21493d7ec1aafc_vym6b91dt.pdf; Letter from Thomas E. Perez, Assistant Attorney General, U.S. Dep't. of Justice, to C. Havird Jones, South Carolina Assistant Deputy Attorney General (Dec. 23, 2011), *available at* http://brennan.3cdn.net/594b9cf4396b e7ebc8_0pm6i2fx6.pdf. In Texas, the Department of Justice concluded that Hispanic registered voters are between 46.5 percent and 120 percent more likely than white voters to lack a driver's license or non-driver's photo ID. In South Carolina, the Department of Justice concluded that minorities were almost 20 percent more likely than white voters to lack DMV-issued photo IDs.

[13] Brennan Center for Justice, *Summary of Voter ID Laws Passed in 2011* (April 2012), http://www.brennancenter.org/content/resource/voter_id_laws_passed_in_2011/.

[14] In this report, we focus only on state offices that issue free photo identification for voters. Therefore, offices that only provide license renewal services and do not issue new photo IDs are not considered ID-issuing offices or part-time ID-issuing offices for the purposes of this report.

Some county offices issue photo IDs in Georgia and Mississippi. *See* Secretary of State Brian P. Kemp, *Georgia Voter Identification Requirements*, http://www.sos.georgia.gov/gaphotoid/default.htm (last visited Jun. 1, 2012); House Bill 921, Miss. Code Ann. §023-0015-0719 (2011). We do not include these county offices in our analysis. Full explanation for the exclusion of these offices is provided in Section II.C of this report, under the "Southern Black Belt" bullet.

In Tennessee, some county offices issue free photo ID to eligible voters who chose to obtain a Tennessee driver's license without a photo. *See generally* Anderson County Clerk, *Voter Photo ID*, http://andersoncountyclerk.com/index.php?option=com_content&view=article&id=27&Itemid=32 (last visited May 17, 2012); County Clerk, Knox County, *Photo Identification for Voting*, http://www.knoxcounty.org/clerk/photo_id.php (last visited May 17, 2012). We do not include these county offices because they only serve eligible voters who already have a driver's license.

[15] All data and methodology for calculating the estimates in Table 1 are available in Appendix A, Sections 1 and 2.

[16] Brennan Center for Justice, *supra* note 3, at 3.

[17] *See, e.g.* U.S. Federal Reserve System & The Brookings Institution, The Enduring Challenge of Concentrated Poverty in America: Case Studies from Communities Across the U.S.A. (2008), *available at* http://www.frbsf.org/cpreport/docs/cp_fullreport.pdf.

[18] *See* Appendix A, Section 3.

[19] Brennan Center for Justice, *supra* note 3, at 3.

[20] *See* Appendix A, Section 2.

[21] For methodology and data for Table 2, see Appendix A, Section 4.

[22] *See* American Ass'n of State Highway and Transp. Officials, Survey of State Funding for Public Transportation, Final Report 2011, 1-17 to 1-18, *available at* http://scopt.transportation.org/Documents/2011%20Survey%20of%20State%20Funding%20for%20Public%20Transportation%20-%20FY%202009%20data.pdf. (reporting per capita investment for 50 states and DC).

[23] *Id.*

[24] *See generally,* Jeremy Gray, *Rural Alabamians Access to Public Transportation Hits Dead End,* The Birmingham News, Feb. 17, 2011, *available at* http://blog.al.com/spotnews/2011/02/rural_alabamians_access_to_pub.html; Theresa Firestine, The U.S. Rural Population and Scheduled Intercity Transportation in 2010: A Five-Year Decline in Transportation Access, U.S. Dep't of Transp (2011), *available at* http://www.bts.gov/publications/scheduled_intercity_transportation_and_the_us_rural_population/2010/pdf/entire.pdf.

[25] Firestine, *supra* note 24, at 2.

[26]  *Id.*

[27]  *See* Appendix A, Section 1 for source of ID-issuing office hours data.

[28]  *Id.* Between November 2011 and March 2012, in advance of the state's presidential primary, Tennessee opened ID offices in some counties on the first Saturday of the month for the exclusive purpose of issuing voter IDs. Tenn. Dep't of Safety & Homeland Security, *Voter Photo ID*, http://www.tn.gov/safety/photoids.shtml (last visited May 17, 2012). The state has yet to publicize whether they intend to add similar Saturday hours in advance of the 2012 general election.

[29]  *See* Appendix A, *supra* note 27. We provide a more detailed explanation of this last point in Section II.C of this report, under the "Southern Black Belt" bullet.

[30]  *Id.*

[31]  The 11 counties in Alabama, crosshatched in Figure 1, are Choctaw, Clarke, Greene, Hale, Marengo, Monroe, Perry, Pickens, Sumter, Washington, and Wilcox Counties.

[32]  In the 11 identified counties in the Alabama black belt, there are 11 total part-time state ID-issuing offices, but none are open more than two days a week. Eight of these offices are open only once a week. The presence of so many ID-issuing offices with reduced hours in the Alabama black belt underscores the argument made earlier that the limited hours of ID-issuing offices in Southern black belt states make it harder for people without photo ID to obtain it.

[33]  See Appendix A, Section 1 for ID-issuing office locations citations; see Appendix A, Section 2 for demographic data citations and methodology; and see Appendix A, Section 3 for poverty data citations and methodology.

[34]  The counties in these states, crosshatched in Figure 1, are as follows:
  • Georgia (21): Baker, Bartow, Chattahoochee, Clay, Decatur, Early, Grady, Lee, Macon, Marion, Miller, Quitman, Randolph, Schley, Seminole, Stewart, Sumter, Talbot, Taylor, Terrell, and Webster.
  • Mississippi (13): Attala, Carroll, Choctaw, Holmes, Humphreys, Issaquena, Leflore, Madison, Montgomery, Sharkey, Sunflower, Webster, and Yazoo.

[35]  In the 34 identified counties in the Georgia and Mississippi black belts, there are 10 total part-time state ID-issuing offices, but none of these offices are open more than two days a week. Eight of these 10 offices are open once a week or less. Again, the presence of so many ID-issuing offices with reduced hours in the black belt underscores the argument made earlier that the limited hours of ID-issuing offices in Southern black belt states make it harder for people without photo ID to obtain it.

[36]  *See* Secretary of State Brian P. Kemp, *Georgia Voter Identification Requirements*, *supra* note 14.

[37]  For example, in Georgia, there is one central website providing information about county registrar offices. This website does not include any information about the business hours of these offices. *See* Georgia Secretary of State Brian P. Kemp, *County Board of Registrars Office*, http://sos.georgia.gov/cgi-bin/countyregistrarsindex.asp (last visited Jun. 1, 2012). The central website also provides incorrect information for several county offices. For instance, the site lists the wrong physical address and web address for the office in Bartow County. It also lists the wrong phone number for the office in Seminole County.

[38]  The Brennan Center contacted each of the 21 county registrar offices in the black belt about their provision of voter IDs. All phone calls by the Brennan Center were placed between 9 AM and 3 PM on June 4, June 5, and June 8, 2012. Records of interviews with county officials are on file with the Brennan Center for Justice.

[39]  Several counties also said that voters must call in advance in order to obtain voter ID, either because election officials were not able to operate the ID-issuing technology without external assistance (as in Miller County) or because the office is infrequently staffed (as in Webster County).

[40]  For a list of the required documents to obtain a free photo ID, *see* Secretary of State Brian P. Kemp, *Georgia Voter Identification Requirements, supra* note 14.

[41]  For each of these eight offices, the Brennan Center placed at least three calls, over three days, with no response.

[42]  House Bill 921, *supra* note 14.

43  *See Section 5 Covered Jurisdictions*, *supra* note 6.

44  Appendix A, *supra* note 33.

45  *See supra* note 24; *see also* Ga. Dep't of Human Resources and Ga. Dep't of Transp., *Coordinated Public Transit- Human Services Transportation Plan*, http://web1.ctaa.org/webmodules/webarticles/articlefiles/GeorgiaCoordinationPlan.pdf (finding that in a group of 14 counties included in the crosshatched area of Figure 1 in southwest Georgia, there is an unmet need for approximately 50,000 additional public transport trips every year); Miss. Dep't of Transp., *Multiplan - Phase I* 8-6 (2011), http://www.gomdot.com/Divisions/IntermodalPlanning/resources/Programs/MultiPlan/pdf/Phase%20I/Chapter%208%20 Transit%20Modal%20Assessment.pdf (demonstrating that in 32 of the 82 counties in Mississippi, including several in the crosshatched area of Figure 1, there is no rural public transportation service).

46  See Appendix A, Section 4 for vehicle access data citations and methodology.

47  *See* U.S. Federal Reserve System & The Brookings Institution, The Enduring Challenge of Concentrated Poverty in America: Case Studies from Communities Across the U.S.A., *supra* note 17.

48  The counties in each region are as follows:
   - West Texas (22): Hudspeth, Culberson, Jeff Davis, Presidio, Reeves, Brewster, Pecos, Loving, Winkler, Ward, Crane, Upton, Crockett, Reagan, Glasscock, Sterling, Irion, Schleicher, Sutton, Menard, Kimble, and Terrell.
   - Southern Texas (10): Frio, La Salle, McMullen, Live Oak, Duval, Zapata, Jim Hogg, Brooks, Kenedy, and Willacy.

49  Appendix A, supra note 33.

50  Appendix A, supra note 46.

51  The counties in each region are as follows:
   - Western Tennessee (11): Benton, Carroll, Chester, Decatur, Henderson, Hickman, Houston, Humphreys, Lewis, Perry, and Stewart.
   - Northern Tennessee (10): Clay, Fentress, Jackson, Macon, Morgan, Overton, Pickett, Scott, Smith, and Trousdale.
   - Southeastern Tennessee (6): Bledsoe, Grundy, Meigs, Rhea, Sequatchie, and Van Buren.

52  Appendix A, supra note 33.

53  Appendix A, supra note 46.

54  Appendix A, supra note 33.

55  Rock Hill-Fort Mill Area Transportation Study, *Public Transit,* http://www.rfatsmpo.org/index.php?option=com_conte nt&view=article&id=21&Itemid=6 (last visited May 22, 2012). The City of Rock Hill does provide demand-response transportation service. This service is available only Monday through Friday. Those who wish to use the service must reserve it at least two days in advance.

56  Appendix A, supra note 46.

57  Drivers age 60 and over who chose to obtain a Tennessee driver's license without a photo can obtain a photo ID for voting purposes at one of four county clerks offices in Knox County. County Clerk, Knox County, *Photo Identification for Voting*, http://www.knoxcounty.org/clerk/photo_id.php (last visited May 17, 2012). All other voters must travel to the one office in the city that issues new photo IDs.

58  Appendix A, *supra* note 46.

59  Knoxville Area Transit, *Knoxville City Bus Map*, http://www.katbus.com/maps/systemmap8-10.pdf (last visited May 17, 2012).

60  Appendix A, supra note 46.

61  Appendix A, supra note 33.

62 Dallas Area Rapid Transit, *System Map*, http://www.dart.org/maps/pdfmaps/DARTSystemMap12mar12.pdf (last visited May 17, 2012).

63 Google Maps, http://maps.google.com (last visited May 22, 2012) (accessed by searching for public transportation directions from Balch Springs, Texas to 1500 Marilla St # 1BS, Dallas, TX).

64 Appendix A, supra note 33.

65 Appendix A, supra note 33.

66 Michael Shatz, *KanVote and Occupy Wichita Unable to Obtain Free Voter IDs Despite New Law,* Lawyer's Comm. For Civil Rights Under Law, Jan. 12, 2012, http://www.lawyerscommittee.org/newsroom/clips?id=0423

67 Texas and South Carolina created a category of photo voter registration cards that the states provide free to voters who require them to vote. In Texas, a voter must still produce proof of identity. In South Carolina, at present, the photo voter registration cards do not require proof of identity beyond proof that the person is a registered voter, but the state has not established practices or procedures in the 46 county election offices to ensure those IDs can be easily distributed to South Carolina voters in need.

68 In May 2012, Pennsylvania introduced a new process that allows residents born in the state to apply for photo ID without having to purchase a physical copy of their birth certificate. When applying for ID at an ID-issuing office, individuals submit all necessary identifying information. The ID-issuing office then contacts the Pennsylvania Department of Health to locate the birth certificate. Once the Department of Health locates the birth certificate and verifies the individual's identity, applicants are notified by mail that their photo ID is available for pick-up. The process is expected to take about 10 business days. Penn. Dep't of State*, Secretary of Commonwealth Announces Simplified Method to Obtain Photo ID for Pennsylvania-Born Voters* (May 23, 2012), http://www.portal.state.pa.us/portal/http://www.portal.state.pa.us;80/portal/server.pt/gateway/PTARGS_0_879406_1259092_0_0_18/rls-DOS-VoterIDupdate-052312.pdf.

69 U.S. Dep't of State, *Passport Fees,* http://travel.state.gov/passport/fees/fees_837.html (last visited May 11, 2012).

70 U.S. Citizenship and Immigration Servs., *Application for Replacement Citizenship/Naturalization Document*, http://www.ucis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextchannel=db029c7755cb9010VgnVCM10000045f3d6a1RCRD&vgnextoid=a910cac09aa5d010VgnVCM10000048f3d6a1RCRD (last updated July 27, 2011).

71 Brennan Center for Justice, *supra* note 3, at 2.

72 For example, a South Carolina delayed birth certificate (an official birth record for persons lacking a certified birth certificate) can be established if three different documents verifying the birth facts claimed are submitted. The documents that are submitted must be at least 10 years old and must show the place and the date the document was filed. Only original or certified copies will be accepted. One of the three documents must show the full name of the mother prior to any marriages and the full name of the father. Examples of acceptable documentation are: birth certificates of children born to the person whose record is being established, voters' registration records, marriage records of person whose birth record is being established, insurance policies, school records, medical records, or military records. S.C. Dep't of Health & Envtl. Control, *Vital Records – FAQ,* http://www.scdhec.gov/administration/vr/faq.htm (last visited May 17, 2012).

73 K.S.A. 25-2358 (2012).

74 Penn. Dep't of State, Secretary *of Commonwealth Announces Simplified Method to Obtain Photo ID for Pennsylvania-Born Voters, supra note 69.*

75 *What We Do - Vital Records: Birth Certificates, Death Certificates, Marriage Records and Divorce Records*, VitalChek, http://www.vitalchek.com/content/whatwedo.aspx (last visited May 17, 2012).

76 *How much does it cost to place an order and what fees are involved?*, VitalChek, https://vitalchek-solutions.custhelp.com/app/answers/detail/a_id/3211/kw/price (last visited May 17, 2012).

77 *What Forms of Payment Do You Accept,* VitalChek, https://vitalchek-solutions.custhelp.com/app/answers/detail/a_id/3148/

kw/credit%20card (last visited May 22, 2012).

[78]  Miss. State Dep't of Health, *Application for Certified Copy of Birth Certificate,* http://msdh.ms.gov/msdhsite/_static/31,1240,109,62.html (last visited May 17, 2012).

[79]  Ala. Dep't of Public Safety, *Driver License Office Schedules,* http://dps.alabama.gov/Home/wfContentTableDB.aspx?ID=30&PLH1=DLOFFICES (last visited Jan. 9, 2012).

[80]  Ga. Dep't of Driver Services, *Driver Services Locations List,* http://www.dds.ga.gov/locations/LocationList.aspx (last visited Jan. 23, 2012).

[81]  Ind. Bureau of Motor Vehicles, *Branch Locations and Hours,* http://www.in.gov/bmv/2337.htm (last visited Jan. 23, 2012).

[82]  Kan. Dep't of Revenue, *Driver's License and ID Card Services by County,* http://www.ksrevenue.org/pdf/dmvdlstations.pdf (last visited Oct. 19, 2011).

[83]  Miss. Dep't of Public Safety, *District Locations,* http://www.dps.state.ms.us/driver-services/new-drivers-license/district-one-locations/ (last visited Dec. 8, 2011).

[84]  Penn. Dep't of Transportation, *Locate Service Center,* https://www.dot33.state.pa.us/locator/locator.jsp#top?201205171 40843856=20120517140843856 (last visited Mar. 12, 2012).

[85]  S.C. Dep't of Motor Vehicles, *Office Locations, Hours and Wait Times,* http://www.scdmvonline.com/DMVNew/offloclist.aspx (last visited Oct. 19, 2011).

[86]  Tenn. Dep't of Safety and Homeland Security, *Driver Service Center Locations by Service,* http://www.tn.gov/safety/driverlicense/dllocationserv.shtml (last visited Oct. 31, 2011).

[87]  Tex. Dep't of Public Safety, *Driver License Office Locations,* http://www.txdps.state.tx.us/administration/driver_licensing_control/rolodex/search.asp (last visited Mar. 26, 2012).

[88]  Wis. Dep't of Transportation, *DMV Service Centers by County,* http://dot.wi.gov/about/locate/dmv/scmap.htm#textlist (last visited Oct. 19, 2011).

[89]  U.S. Census Bureau, *Hispanic or Latino, and Not Hispanic or Latino by Race for the Population 18 Years and Over* (Mar. 8, 2011), http://www.ci.temple-city.ca.us/Census/Hispanic%20latino%2018+.pdf.

[90]  "Sex by Age by Citizenship Status" U.S. Census Bureau, *The 2006-2010 ACS 5-Year Summary File Technical Documentation* 45 (Dec. 8, 2011), http://www2.census.gov/acs2010_5yr/summaryfile/ACS_2006-2010_SF_Tech_Doc.pdf (tables available at http://factfinder2.census.gov).

[91]  *Id.* at 56.

[92]  *Id.* at 67.

[93]  *Id.* at 66.

## STAY CONNECTED TO THE BRENNAN CENTER

Sign up for our electronic newsletters at **www.brennancenter.org/signup**
and visit our **Election 2012 page** at **www.brennancenter.org/election2012.**

**Latest News** | Up-to-the-minute info on our work, publications, events and more.

**Voting Newsletter** | Latest developments, state updates, new research, and media roundup.

**Legal Services** | Weekly civil legal aid and access-to-justice news summaries from across the country.

**Fair Courts** | Comprehensive news roundup spotlighting judges and the courts.

**Twitter** | www.twitter.com/BrennanCenter
**Facebook** | www.facebook.com/BrennanCenter

## NEW & FORTHCOMING BRENNAN CENTER PUBLICATIONS

*Voting Law Changes in 2012*
Wendy R. Weiser and Lawrence Norden

*Donor Diversity Through Public Matching Funds*
Elisabeth Genn, Sundeep Iyer, Michael J. Malbin, and Brendan Glavin

*A Proposal for an NYPD Inspector General*
Faiza Patel and Andrew Sullivan

*Criminal Justice Debt: A Toolkit for Action*
Roopal Patel and Meghna Philip

*Democracy & Justice: Collected Writings, Volume V*
Brennan Center for Justice

*National Survey: Super PACs, Corruption, and Democracy*
Brennan Center for Justice

*Voter Registration Modernization: A National Reform Proposal*
Wendy R. Weiser and Jonathan Brater

*Design Deficiencies and Lost Votes*
Lawrence Norden and Sundeep Iyer

For more information, please visit www.brennancenter.org.

BRENNAN
CENTER
FOR JUSTICE

*at New York University School of Law*

161 Avenue of the Americas
12th Floor
New York, NY 10013
646-292-8310
www.brennancenter.org

PL780
9/2/2014
2:13-cv-00193



# BREAKING SCHOOLS' RULES:

A Statewide Study of How School Discipline Relates to Students' Success and Juvenile Justice Involvement

JUSTICE ★ CENTER
THE COUNCIL OF STATE GOVERNMENTS

PPRI  Public Policy
Research Institute

# BREAKING
## SCHOOLS' RULES:

A Statewide Study of How School Discipline Relates to Students' Success and Juvenile Justice Involvement

July 2011

Tony Fabelo, Ph.D.
Michael D. Thompson
Martha Plotkin, J.D.
*Council of State Governments Justice Center*

Dottie Carmichael, Ph.D.
Miner P. Marchbanks III, Ph.D.
Eric A. Booth, M.A.
*The Public Policy Research Institute, Texas A&M University*



JUSTICE ★ CENTER
THE COUNCIL OF STATE GOVERNMENTS

PPRI  Public Policy
Research Institute

This report was prepared by the Council of State Governments Justice Center in partnership with the Public Policy Research Institute at Texas A&M University. The research and report were made possible with the generous support of the Atlantic Philanthropies and Open Society Foundations.

The opinions and findings in this document are those of the authors and do not necessarily represent the official position or policies of the Atlantic Philanthropies and Open Society Foundations, Texas A&M, members of the Council of State Governments, the Texas Education Agency, the Texas Higher Education Coordinating Board, or the State of Texas. The findings have been reviewed by the State of Texas Education Research Center at Texas A&M University as meeting confidentiality requirements and by the Texas A&M University Institutional Review Board for conformance with standards of ethics in research. Websites and sources referenced in this publication provided useful information at the time of this writing. The authors do not necessarily endorse the information of the sponsoring organizations or other materials from these sources.

Council of State Governments Justice Center, New York, 10005
© 2011 by the Council of State Governments Justice Center
All rights reserved. Published July 19, 2011
Cover design by Mina Bellomy. Layout and typesetting by smbolic.

# CONTENTS

ACKNOWLEDGMENTS.................................................v

EXECUTIVE SUMMARY...............................................ix

INTRODUCTION.....................................................1
*Juvenile Justice and School Discipline Trends*..................2
*The Texas Statewide Study* ....................................6
*The Gap in Research that Texas Addresses* .....................6
*Organization of this Report* .................................12
*Scope of the Report* .........................................12

OVERVIEW OF THE TEXAS SCHOOL
DISCIPLINARY SYSTEM AND KEY TERMS..........................15
*Statutory Framework* ........................................ 15
*Locally Administered "Code of Conduct"* ......................16
*Explanation of Suspension, Expulsion, and Out-of-School Placement*..............18
*In-school Suspension (ISS)* ..................................20
*Out-of-school Suspension (OSS)* ..............................20
*Disciplinary Alternative Education Program (DAEP)*............ 21
*Juvenile Justice Alternative Education Program (JJAEP)*........22
*The Role of Law Enforcement in Texas Public Schools*..........23

METHODOLOGY...................................................25
*About the Study Population* ..................................28
*The Research Questions* ......................................30
*Analysis* ....................................................31

STUDY FINDINGS................................................35
*Finding 1* ...................................................35
*Finding 2* ...................................................40
*Finding 3* ...................................................47
*Finding 4* ...................................................54
*Finding 5* ...................................................61
*Finding 6* ...................................................73

CONCLUSION....................................................85

APPENDICES....................................................87

REFERENCES....................................................99

ABOUT THE ORGANIZATIONS AND FOUNDATIONS.........106

# ACKNOWLEDGMENTS

A study of this magnitude, on a topic of significance both in Texas and nationwide, is possible only with the help and support of many people and organizations. It is impossible to list each person who contributed considerable time, thought, and resources to make this report of value to policymakers and practitioners. Several individuals, however, made such outsized contributions that they deserve special mention here.

Deborah Fowler of Texas Appleseed has dedicated much of her career to improving schools. Her tireless efforts on behalf of students and their parents have not only helped put school discipline issues on Texas policymakers' radar, but have prompted improvements to policy and state law. Her expertise on suspensions, expulsions, and the ticketing of students who misbehave, coupled with her approach to advocacy—passionate but constructive and respectful, and above all loyal to the facts—made her a valued contributor on this project. On countless occasions, the authors turned to her to improve their understanding of the state's school discipline system and to assist in composing text for the report that explained the intricacies of the issues to readers.

Three members of the Public Policy Research Institute (PPRI) at Texas A&M University (TAMU) are listed as co-authors of this report, but this work benefited from the contributions of several additional faculty and research team members who warrant special thanks. Dr. Guy D. Whitten, associate professor of political science, provided extensive guidance and advice regarding the research methodology. Dr. Jim Scheurich, professor of education administration, provided input in planning analyses and interpreting findings. Staff of the State of Texas Education Research Center at Texas A&M University, including Dr. Hersh C. Waxman, professor of education and director of the Education Research Center; Dr. Jacqueline R. Stillisano, co-director of the Education Research Center; and Dr. Danielle Bairrington Brown, research associate, made it possible to access and analyze very large and rich databases across multiple systems.

The authors are also grateful to several Texas state legislators: Senator Florence Shapiro, chair of the Senate Education Committee; Senator John Whitmire, chair of the Senate Criminal Justice Committee and dean of the Texas Senate; and Representative Jerry Madden, chair of the House Corrections Committee (and a

member of the CSG Justice Center board of directors) all have made data-driven policymaking a hallmark of their accomplished legislative careers. They made it a priority for the Texas Education Agency (TEA) and the Texas Juvenile Probation Commission (TJPC) to develop and maintain state-of-the-art information systems. They also shined a spotlight on the issue of school discipline in particular, sponsoring legislation to improve policies in this area, and encouraging state agencies to cooperate fully with this important, nonpartisan study. Representative Rob Eissler, who chairs the House Public Education Committee, endorsed the concept for this study. Representative Scott Hochberg, vice-chair of the same committee, continued this support, making his staff available to facilitate work related to the study.

Special thanks also are due to Ray Sullivan, chief of staff to Governor Rick Perry, and to Ryan Franklin, policy advisor to Robert Scott, the Commissioner of the TEA. Mr. Sullivan facilitated access to the governor's policy staff to review early findings of the report. Mr. Franklin served as the main contact with the TEA, arranged for the research team to meet with a focus group of top agency officials, and assisted in making possible other briefings of agency representatives.

We are very grateful to TEA and TJPC officials for facilitating the complicated processes involved in assembling the data for this report. In particular, we are indebted to TJPC Executive Director Vickie Spriggs; Director of External Affairs and Policy Development Linda Brooke; and Director of Research and Statistics Nancy Arrigona.

In his biennial address to the Texas state legislature and governor, Chief Justice Wallace Jefferson highlighted how common it is for students to be removed from school for disciplinary reasons, adding, "[L]et us endeavor to give these kids a chance at life before sending them into the criminal justice system." Chief Justice Jefferson, along with his court administrator Carl Reynolds and juvenile court judges, particularly Judge Jeanne Meurer, have put their weight behind this project at key junctures.

Officials from the front lines of Travis County's school and juvenile justice systems took time from their busy schedules for lengthy discussions that ensured we would remember that there are people and stories behind the numbers we endlessly examined. We are grateful to Dr. Dora Fabelo for helping to organize these focus groups and to Dr. Andri Lyons and Dr. Linda Webb for constructive ideas on an earlier draft.

This report follows in the wake of many years of research conducted on this topic, from which we benefited considerably. One of the most renowned experts in the nation for the quality and thoughtfulness of his published research on school discipline is Dr. Russell Skiba, a professor in counseling and educational psychology at Indiana University. His encyclopedic knowledge of the literature and practical insights, coupled with his deep commitment to children at risk of being pushed or pulled out of school, were put to use reviewing drafts of this report, providing extensive comments, and participating in numerous meetings and conference calls. He repeatedly, but appropriately, pushed us to present ideas more clearly and to ensure the data supported the findings. This report is much improved because of him.

Early on, we candidly acknowledged our lack of expertise in the thorny, complicated issues involving students with educational disabilities, and students with mental health needs in particular. In between trips to Boston and Bangladesh, Dr. David Osher, who is the vice president of the American Institutes for Research, and who has written extensively on these topics, found time to review an entire draft of the report, retrieve additional research, and provide valuable edits.

The questions that this report sought to answer first emerged through a series of conversations with the leadership of the CSG Justice Center board of directors: Michael Festa, the founding board chair and former secretary of elder affairs in Massachusetts; Sharon Keller, the past chair of the board and presiding judge of the Texas Court of Criminal Appeals; Jeffrion L. Aubry, a New York State assemblyman and the outgoing chair; Pat Colloton, the incoming chair and a Kansas state representative; and Tom Stickrath of the Ohio Attorney General's Office, who is incoming vice-chair of the board. They, along with Idaho State Court Administrator Patti Tobias and the other members of the board, have skillfully charted the course of the organization in exploring the issue of school discipline. They highlighted where the potential for bipartisan consensus exists and focused us on the importance of data to explain how suspensions and expulsions relate to students' involvement in the juvenile justice system.

The authors at the CSG Justice Center turned frequently, and at all hours, to colleagues in their New York, Bethesda, Seattle, and Austin offices, to review drafts, provide advice, check facts, and conduct background research. In particular, Mike Eisenberg frequently acted as a sounding board as we interpreted the data; Laura Draper worked nights and weekends to track down hard-to-locate

research; and Dr. Fred Osher scrutinized sections of the report addressing mental health issues. Megan Grasso conducted much needed fact-checking support. We are grateful also to CSG CEO David Adkins and the regional directors who provided unqualified support for this study. The CSG Justice Center staff thanks Joan Oleck for making us look good by putting her expert proofing skills to work on this report.

It took more than two years and thousands of hours of many people's time to conceptualize this study, to collect and analyze data that yielded various findings, and to prepare this report. This study and resulting report would not have been possible without the support that came from the Atlantic Philanthropies and the Open Society Foundations (OSF). From Atlantic, Kavitha Mediratta and Tanya Coke not only made the funding available, but connected us to a community of people and organizations working on this issue. Leonard Noisette, Susan Tucker (now with New York City Probation) Luisa Taveras, William Johnston, and Angela Cheng from OSF were instrumental in helping us secure an award; they provided useful advice and guidance during the course of this project as well. We are extremely grateful to them.

Officials from The U.S. Department of Education and the U.S. Department of Justice have convened large national conferences on the subject of school discipline and its relationship to academic performance and juvenile justice involvement. Those events, along with various meetings in which staff from both agencies met with us to discuss the research methodology and the report in general, provided us with important national context.

Above all, we thank the people on the front lines of the education, juvenile justice, and health systems who work day in and day out, buoyed by few resources but sustained by their determination to help the millions of children in the nation succeed. This report is written for them and for the public school students and their parents or guardians who depend on these systems' professionals for support and guidance.

## EXECUTIVE SUMMARY

This report describes the results of an extraordinary analysis of millions of school and juvenile justice records in Texas. It was conducted to improve policymakers' understanding of who is suspended and expelled from public secondary schools, and the impact of those removals on students' academic performance and juvenile justice system involvement.

Like other states, school suspensions—and, to a lesser degree, expulsions—have become relatively common in Texas. For this reason and because Texas has the second largest public school system in the nation (where nonwhite children make up nearly two-thirds of the student population), this study's findings have significance for—and relevance to—states across the country.

Several aspects of the study make it groundbreaking. First, the research team did not rely on a sample of students, but instead examined individual school records and school campus data pertaining to all seventh-grade public school students in Texas in 2000, 2001, and 2002. Second, the analysis of each grade's student records covered at least a six-year period, creating a statewide longitudinal study. Third, access to the state juvenile justice database allowed the researchers to learn about the school disciplinary history of youth who had juvenile records. Fourth, the study group size and rich datasets from the education and juvenile justice systems made it possible to conduct multivariate analyses. Using this approach, the researchers could control for more than 80 variables, effectively isolating the impact that independent factors had on the likelihood of a student's being suspended and expelled, and on the relationship between these disciplinary actions and a student's academic performance or juvenile justice involvement.

### Key findings in the report include the following:

*1. Nearly six in ten public school students studied were suspended or expelled at least once between their seventh- and twelfth-grade school years.*

- About 54 percent of students experienced in-school suspension, which could be as brief as one period or as long as several consecutive days. Thirty-one percent of students experienced out-of-school suspension, which averaged two days per incident.

- Of the nearly 1 million students studied, about 15 percent were assigned at least once to disciplinary alternative education programs (27 days, on average) between seventh and twelfth grade; about 8 percent were placed at least once in juvenile justice alternative education programs (73 days on average).

- Only 3 percent of the disciplinary actions were for conduct for which state law mandates suspensions and expulsions; the remainder of disciplinary actions was made at the discretion of school officials, primarily in response to violations of local schools' conduct codes.

- Students who were involved in the school disciplinary system averaged eight suspensions and/or expulsions during their middle or high school years; among this group, the median number of suspensions and expulsions was four. Fifteen percent of students studied were disciplined 11 or more separate times.

*2. African-American students and those with particular educational disabilities were disproportionately likely to be removed from the classroom for disciplinary reasons.*

- The great majority of African-American male students had at least one discretionary violation (83 percent), compared to 74 percent for Hispanic male students, and 59 percent for white male students. The same pattern was found, though at lower levels of involvement, for females—with 70 percent of African-American female pupils having at least one discretionary violation, compared to 58 percent of Hispanic female pupils and 37 percent of white female pupils.

- Whereas white, Hispanic, and African-American students experienced discretionary actions at significantly different rates, students in these racial groups were removed from school for mandatory violations at comparable rates.

- Multivariate analyses, which enabled researchers to control for 83 different variables in isolating the effect of race alone on disciplinary actions, found that African-American students had a 31 percent higher likelihood of a school discretionary action, compared to otherwise identical white and Hispanic students.

- Nearly three-quarters of the students who qualified for special education services during the study period were suspended or expelled at least once. The level of school disciplinary involvement, however, varied significantly according to the specific type of disability. For example, students coded as having an "emotional disturbance" were especially likely to be suspended or expelled. In contrast, students with autism or mental retardation—where a host of other factors was controlled for—were considerably less likely than otherwise identical students without disabilities to experience a discretionary or mandatory school disciplinary action.

*3. Students who were suspended and/or expelled, particularly those who were repeatedly disciplined, were more likely to be held back a grade or to drop out than were students not involved in the disciplinary system.*

- Of all students who were suspended or expelled 31 percent repeated their grade at least once. In contrast, only 5 percent of students with no disciplinary involvement were held back.

- About 10 percent of students suspended or expelled between seventh and twelfth grade dropped out. About 59 percent of those students disciplined 11 times or more did not graduate from high school during the study period.[1]

- A student who was suspended or expelled for a discretionary violation was twice as likely to repeat his or her grade compared to a student with the same characteristics, attending a similar school, who had not been suspended or expelled.

---

**1.** Students were followed for one to three years beyond the year they were projected to graduate when they were in seventh grade.  Whether a student graduated during the study period is distinct from whether a student dropped out. A student who did not graduate may have dropped out. Or, he or she repeated a grade at least once and was still involved in the Texas public school system in some capacity when the study period concluded.  Another scenario, which applied to a small subset of students, is that they left the Texas public school system, transferring out of state or into private schools or home-schooling. There is no reason to believe that the effect of prior discipline on graduation rates differs for students who left the Texas public school system than for those who remained.

*4. When a student was suspended or expelled, his or her likelihood of being involved in the juvenile justice system the subsequent year increased significantly.*

- More than one in seven students was in contact with the juvenile justice system (i.e., contact with a county's juvenile probation department) at least once between seventh and twelfth grade.[2]

- Nearly half of those students who were disciplined 11 or more times were in contact with the juvenile justice system. In contrast, 2 percent of the students who had no school disciplinary actions were in contact with the juvenile justice system.

- When controlling for campus and individual student characteristics, the data revealed that a student who was suspended or expelled for a discretionary violation was nearly three times as likely to be in contact with the juvenile justice system the following year.

*5. Suspension and expulsion rates among schools—even those schools with similar student compositions and campus characteristics—varied significantly.*

- Half of the 1,504 high schools analyzed had disciplinary rates consistent with what researchers had projected, based on the characteristics/risk factors of the student population and the school campus.[3] The other half of the high schools, however, had actual disciplinary rates that varied greatly from what was projected: 339 (or 22.5 percent) had disciplinary rates that were significantly higher than what researchers had projected, and 409 of the schools (or 27.2 percent) had disciplinary rates that were significantly lower than what had been projected.

The findings summarized above demonstrate why it is important for policymakers everywhere to examine the school disciplinary systems in their jurisdictions. This will not be without challenges for many states and will likely include significant

---

**2.** Few of these contacts with the juvenile justice system were the direct result of misconduct at school. According to the Texas Juvenile Probation Commission, in 2009–2010, of the 85,548 formal referrals to juvenile probation in Texas from all sources, only about 6 percent (just 5,349) came directly from schools. In that same year, more than one million students in the grades studied were disciplined by school officials, but the referrals from schools directly to juvenile probation represented less than 1 percent of all the disciplined students.

**3.** Researchers isolated the degree to which different student and campus characteristics influenced disciplinary rates in a school, and using that information, predicted rates of suspension and expulsion at the 1,504 high schools.  They compared that predicted rate of discipline with the school's actual rate of discipline.

investments in state-of-the-art information systems. Having quality data available is only the first step. To produce the unprecedented level of analyses found in this report, policymakers will need to follow the example set by Texas leaders across the political spectrum that showed courage and commitment by digging deep into an issue that has received relatively little public scrutiny.

An important take-away from this study is that individual schools within a state, working with the same resources and within the same statutory framework, have the power to affect their school disciplinary rates. In communities across the country, educators, juvenile justice system officials, service providers, students and parents, and advocates are also taking steps to implement innovative approaches that yield different disciplinary results. Nationally, a growing number of advocacy organizations and membership associations are drawing increased attention for their efforts to come up with more effective and fair approaches to school discipline. And a growing body of research is supporting and expanding upon these efforts. An essential next step is to convene experts, policymakers and advocates from education, juvenile justice, health, and child welfare systems to build on the important work of these stakeholders and to begin developing a consensus around approaches that will improve outcomes for students and teachers.

# INTRODUCTION

Policymakers, educators, parents, and school children nationwide understand that for schools to provide safe and positive learning environments, there must be rules that govern student conduct. To enforce schools' rules effectively, they agree that teachers must have the tools, and the discretion to use those tools, to keep order and help students be academically successful. No one disagrees that teachers face enormous challenges in the classroom, and that managing the behavior of large groups of adolescents day in and day out can be a seemingly impossible assignment. Less consensus exists, however, on the issues of how, when, and against whom schools' rules should be enforced.

The Texas study that is the subject of this report took advantage of one of the nation's most mature and comprehensive school record systems. These data were used to make sense of the millions of suspensions and expulsions that Texas students experienced in their secondary school years. This report details a rigorous analysis of who was formally disciplined in the state's approximately 3,900 public middle and high schools. The results are intended to inform state and local government officials, community leaders, and others vested in reducing student misconduct and juvenile crime while improving education environments—both within and outside of Texas. The characteristics of students who were suspended and expelled from school are outlined, as are the characteristics of the subset of students who were disciplined repeatedly. The report further explains the effects of classroom removal on misbehaving students' academic performance and on their potential involvement in the juvenile justice system.

Why should anyone outside of Texas care about the findings presented in this report? First, nearly one in ten public school children in the United States are educated in the Texas public school system.[1] In the 2009–2010 school year alone, there were nearly five million students enrolled in more than 1,200 Texas Independent School Districts.[2] Second, not only does Texas have the second largest public school system among the states, but the student population, which is 49 percent Hispanic, 33 percent white, and 14 percent African American, reflects a

**1**. Chen-Su Chen, Public Elementary and Secondary School Student Enrollment and Staff Counts From the Common Core of Data: School Year 2009–10, NCES 2011–347 (U.S. Department of Education. Washington, DC: National Center for Education Statistics, 2011), retrieved May 31, 2011 from http://nces.ed.gov/pubsearch; Texas Education Agency, Enrollment in Texas Public Schools, 2009–10, Document No. GE11 601 01 (Austin, TX: Author, 2010).

**2**. The term "districts" typically includes open-enrollment charter districts. In the 2009–2010 school year, Texas had 1,030 traditional school districts and 207 open-enrollment charter districts.

diversity that increasingly typifies many school systems in the United States.[3] Third, school discipline rates in other large states are similar to or higher than those in Texas, suggesting that the findings presented here may have relevance for other state education systems. For example, in 2010 the percentage of K–12 students in Texas receiving out-of-school suspensions or expulsions (5.7%) was considerably lower than in either California (12.75%) or Florida (8.7%), and was similar to the rate in New York (5.2%, although expulsion data were unavailable for that state).[4]

This report is meant to provide a starting point for other jurisdictions where officials want to improve their understanding of who is being suspended and expelled from school, and what those patterns mean for juvenile justice involvement and academic performance. In addition, this report may help stimulate or advance discussions that assist educators, and communities at large, to improve outcomes for youth who routinely misbehave or engage in serious misconduct in school.

## Juvenile Justice and School Discipline Trends

The debate about how schools should respond to student misconduct is not new, but school discipline and juvenile justice policies have changed over time. Commensurate with the trend to be "tough on crime" in the late 1980s and early 1990s to increase public safety in the community (including a focus on perceived "hardened" juveniles), was a change that took hold to make schools safer as well. During that period, state legislatures overhauled their juvenile justice laws to ease accessibility to juvenile justice records, increase opportunities for prosecutors to try juveniles as adults for serious crimes, enable local governments to enact curfews, and expand definitions of what constituted "gang involvement" and other youth-related crimes.[5]

**3.** Texas Education Agency, *Enrollment in Texas Public Schools, 2009–10*, Document No. GE11 60101 (Austin TX: Author, 2010).

**4.** Texas Education Agency (2010). "Counts of Students and Discipline Action Groupings." Retrieved June 13, 2011, from *http://ritter.tea.state.tx.us/cgi/sas/broker?_service=marykay&_program=adhoc.download_static_DAG_summary.sas&district=&agg_level=STATE&referrer=Download_State_DAG_Summaries.html&test_flag=&_debug=0&school_yr=10&report=01&report_type=html&Download_State_Summary=Submit*; California Department of Education (2011). "California State—Expulsion, Suspension, and Truancy Information for 2009–10." Retrieved June 13, 2011, from *http://dq.cde.ca.gov/dataquest/Expulsion/ExpReports/StateExp.aspx?cYear=2009-10&cChoice=ExpData1&Pageno=1*; Florida Department of Education (2010). "Trends in Discipline and the Decline in the Use of Corporal Punishment, 2008-09." Data Report 2010-16D. Retrieved June 13, 2011, from *http://www.fldoe.org/eias/eiaspubs/word/discipline0809.doc*; The University of The State of New York (2011). "The New York State Report Card: Accountability and Overview Report 2009-10." Retrieved June 13, 2011, from *https://www.nystart.gov/publicweb-external/2010statewideAOR.pdf*.

**5.** Patricia Torbet and Linda Szymanski, *State Legislative Responses to Violent Juvenile Crime: 1996–97 Update* (Washington, DC: Office of Juvenile Justice and Delinquency Prevention, 1998).

In the years that followed, anxiety about and perceptions of out-of-control youth were fueled in part by frequent news stories of teachers and students being shot or killed in high school classrooms, hallways, and cafeterias. The shootings took place in towns previously unknown to most Americans: Moses Lake, Washington; Bethel, Alaska; Pearl, Mississippi; Paducah, Kentucky; Jonesboro, Arkansas; Edinboro, Pennsylvania; Fayetteville, Tennessee; Springfield, Oregon; and Littleton, Colorado.[6]

In response, Congress took direct action to address crime in local schools. For example, President Clinton in 1994 signed into law the Gun-Free Schools Act. Under this legislation, local schools could seek funding if they could demonstrate that when a student brought a weapon to campus, he or she would be expelled for at least one year and referred to appropriate authorities in the justice system.[7] Officials in many jurisdictions went beyond these minimum standards, mandating, for example, the suspension and/or expulsion from school of any student who brought *any* weapon onto campus.[8]

Policymakers and practitioners alike, taking a page from the shift toward more stringent adult crime policy, urged stricter enforcement of disruptive or dangerous actions in schools.[9] Calls for swift and sure punishment for students who misbehaved resulted in the adoption of "zero tolerance" disciplinary policy in districts across the nation.[10] By 1997, at least 79 percent of schools nationwide had adopted zero tolerance policies toward alcohol, drugs, and violence.[11] In

**6.** U.S. News Staff, "Timeline of School Shootings," *U.S. News and World Report*, February 15, 2008, retrieved May 31, 2011 from *http://www.usnews.com/news/national/articles/2008/02/15/timeline-of-school-shootings*.

**7.** John Cloud, Sylvester Monroe, and Todd Murphy, "The Columbine Effect," *Time* magazine, December 6, 1999, retrieved May 31, 2011 from *http://www.time.com/time/magazine/article/0,9171,992754,00.html*.

**8.** "Many school districts have adopted more expansive variations of the policy that covers numerous other violations, such as bullying, fighting, using drugs or alcohol, and even swearing or wearing 'banned' types of clothing." Christopher Boccanfuso and Megan Kuhfield, *Multiple Responses, Promising Results: Evidence-Based Nonpunitive Alternatives to Zero Tolerance* (Washington, DC: Child Trends, 2011), referencing Russell Skiba, *Zero Tolerance, Zero Evidence: An Analysis of School Disciplinary Practice* (Bloomington, IN: Education Policy Center Indiana University, 2000).

**9.** *See* Kathy Koch, "Zero Tolerance: Is Mandatory Punishment in Schools Unfair?" *Congressional Quarterly Researcher*, 10 (2000): 185–208; the Texas State Board of Education began to call for zero tolerance measures as early as 1992, and the Texas Federation of Teachers endorsed a zero tolerance policy in 1993. Texas Education Agency, Safe Texas Schools: Policy Initiatives and Programs (Austin, TX: Author, 1994); "We must adopt one policy for those who terrorize teachers or disrupt classrooms—zero tolerance." State of the State Address by the Honorable George W. Bush, S.J. of Tex., 74th Leg. R. S. 235–40 (1995).

**10.** Researchers define zero tolerance as a "policy that assigns explicit, predetermined punishments to specific violations of school rules, regardless of the situation or context of the behavior." (Christopher Boccanfuso and Megan Kuhfield, *Multiple Responses, Promising Results: Evidence-Based Nonpunitive Alternatives to Zero Tolerance* (Washington, DC: Child Trends, 2011), 1). The term also has come to be associated with severe punishment, such as suspension or expulsion from school, for relatively minor misbehavior. (See also, Donna St. George, "More Schools Rethinking Zero-Tolerance Discipline Stand," *Washington Post*, June 1, 2011, retrieved June 10, 2011, from *http://www.washingtonpost.com/local/education/more-schools-are-rethinking-zero-tolerance/2011/05/26/AGSIKmGH_story.html*.

**11.** Boccanfuso and Kuhfield, supra note 10, at 2.

many places, these policies were expanded to include a wide range of misbehavior.[12] The specifics of strict discipline policies, often loosely packaged under the rubric of "zero tolerance," vary from state to state and even school to school.[13] Policies also differ in terms of how expelled or suspended students are directed, following a removal. For example, 26 states, including Texas, require alternative educational assignments for expelled or suspended students; in others, a suspension or expulsion results simply in the student serving out the punishment at home.[14] In sum, although school responses to student misconduct typically are distinct to the individual jurisdiction, and even the individual school campus, the past two decades have witnessed a widespread reliance on suspension and expulsion as swift sanctions to disruptive classroom behavior.

While this emphasis on exclusionary school discipline policies has occurred, the rate of crimes against students has also declined, by 67 percent.[15] Despite these coinciding trends, research to date does not support the conclusion that "zero tolerance" and other efforts emphasizing suspension and expulsion are responsible for the reduction in crimes committed in schools.[16]

## Bipartisan Texas Support for This Study

Senator Florence Shapiro (R), chair of the Texas Senate Education Committee, and Senator John Whitmire (D), chair of the Texas Criminal Justice Committee, formally supported an analysis of these data to improve policymakers' understanding of the state's school discipline system.

Representative Jerry Madden (R), chair of the Texas House Corrections Committee, and Representative Rob Eissler (R), chair of the House Public Education Committee, participated in briefings related to the study and also voiced support for the initiative.

*continued on page 5*

---

**12.** In this respect, the policy looked to "broken windows" criminal justice theory, which recommended vigorously pursuing and prosecuting lower-level violations as a method of deterring offenders from going on to commit more serious crimes. *See* James Q. Wilson & George L. Kelling, "Broken Windows," *Atlantic Monthly*, March 1982; *see also* National Institute of Justice, *The Appropriate and Effective Use of Security Technologies in U.S. Schools*, p. 21, 1999, (stating that "[i]f a school is perceived as unsafe (i.e., it appears that no adult authority prevails on a campus), then 'undesirables' will come in, and the school will actually become unsafe. This is an embodiment of the broken windows theory…Seemingly small incidents or issues such as litter on a school campus can provide the groundwork for…a problem school").

**13.** Civil Rights Project, & Advancement Project, "Opportunities Suspended: The Devastating Consequences of Zero Tolerance and School Discipline Policies" (paper presented at the National Summit on Zero Tolerance, Washington, DC, June 15–16, 2000).

**14.** *Id.*

**15.** In 1992, the rate of student-reported nonfatal crimes against students between the ages of 12 and 18 years old was 144 per 1,000 students. By 2008, the rate had fallen to 47 per 1,000 students. Simone Robers, Jijun Zhang, Jennifer Truman, and Thomas D. Snyder, *Indicators of School Crime and Safety: 2010*, NCES 2011–2012/NCJ 230812 (Washington, DC: National Center for Education Statistics, U.S. Department of Education, and Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice, 2010).

**16.** Some studies have shown that "target-hardening" strategies, such as the presence of guards and metal detectors, and strict disciplinary policies, are ineffective at reducing school crime and disorder, and may even do more harm than good. Russell Skiba, Cecil R. Reynolds, Sandra Graham, Peter Sheras, Jane Close Conoley, and Enedina Garcia-Vazquez, "Are Zero Tolerance Policies Effective in the Schools? An Evidentiary Review and Recommendations," *American Psychologist* 63 (2008): 852–862; Christopher J. Schreck, J. Mitchell Miller, and Chris L. Gibson, "Trouble in the School Yard: a Study of the Risk Factors of Victimization at School," *Crime & Delinquency* 29 (2003): 460–484.

*continued from page 4*

In addition, representatives of the state's juvenile justice system, both from the executive and judicial branches of government, expressed strong support for the project at the outset.

These legislative leaders, from both political parties, plus court officials and representatives of the executive branch informed the CSG Justice Center that they were interested in learning more about school discipline issues in Texas. The Justice Center partnered with the Public Policy Research Institute (PPRI) of Texas A&M University (TAMU) to conduct this investigation.

What is evident is that strict enforcement of schools' rules has resulted in significant overall increases in the national number of suspensions: from about 1.7 million (3.7 percent of all students) in 1974 to more than 3.3 million (6.8 percent of all students) in 2006.[17] Although perspectives differ on whether students today misbehave more than they did two decades ago,[18] on this point everyone agrees: Suspensions, and to a lesser degree expulsions, are common in today's school systems.

Nationwide, the large number of suspensions and expulsions has prompted state and local policymakers, people working on the front lines of schools and juvenile justice systems, parents, students, and community leaders to ask for data explaining the impact this practice is having on students. Increasingly, observers are also asking about the consequences of suspending or expelling large numbers of students, such as whether these policies contribute to high drop-out rates or to students' involvement in the juvenile justice system—particularly students of color or those who have special needs. [19]

**17**. Hanno Petras, Katherine Masyn, Jacquelyn A. Buckley, Nicholas S. Ialongo, and Sheppard Kellam, "Who is Most at Risk for School Removal? A Multilevel Discrete-Time Survival Analysis of Individual-and-Context-Level Influences," *Journal of Educational Psychology*, 103 (2011): 223–237; Kim Brooks, Vincent Schiraldi, and Jason Ziedenberg, *School House Hype: Two Years Later*, NCJ 182894 (Washington, DC: Justice Policy Institute, Children's Law Center, 2000); "2006 National and State Projections," U.S. Department of Education, accessed May 31, 2011, **http://ocrdata.ed.gov/Projections_2006.aspx**. Readers will note that these numbers appear relatively small in comparison with the Texas data because the Department of Education included in the national numbers only out-of-school suspensions, while the Texas data also included the large number of in-school suspensions.

**18**. During this same time period, filings in juvenile court have declined, which, taken by itself, could indicate that the commission of delinquent acts by juveniles has declined. Michael P. Krezmien, Peter E. Leone, Mark S. Zablocki, and Craig S. Wells, "Juvenile Court Referrals and the Public Schools: Nature and Extent of the Practice in Five States," *Journal of Contemporary Criminal Justice* 26 (2010): 273–293; "Discipline Data Products: Annual State Summary," Texas Education Agency, last updated November 5, 2010, **http://ritter.tea.state.tx.us/adhocrpt/Disciplinary_Data_Products/Download_State_Summaries.html**.

**19**. Legislative leaders in the North Carolina General Assembly have expressed concern about high rates of suspension and expulsion in that state and are considering legislation to address this situation. ["N.C. lawmakers revisit school zero-tolerance rules," *HamptonRoads.com*, May 11, 2011, accessed May 31, 2011, **http://hamptonroads.com/2011/05/nc-lawmakers-revisit-school-zerotolerance-rules.**]. See also, Colorado Senate Bill 133: **http://coloradosenate.org/home/press/governor-hickenlooper-in-arvada-today-signing-bill-by-senator-hudak-to-reform-discipline-in-public-schools**. For more on the disparate impact on students of color and those with special needs, *see* Tona M. Boyd, Confronting Racial Disparity: Legislative Responses to the School-to-Prison Pipeline, *Harvard Civil Rights-Civil Liberties Law Review*, 44 (2009), 571–580; M. Karega Rausch and Russell Skiba, *Discipline, Disability, and Race: Disproportionality in Indiana Schools*, Education Policy Brief (Bloomington, IN: Center for Evaluation and Education Policy, 2006); Michael P. Krezmien, Peter E. Leone, and Georgianna M. Achilles, "Suspension, Race, and Disability: Analysis of Statewide Practices and Reporting," *Journal of Emotional and Behavioral Disorders* 14 (2006): 217–26; Sid Cooley, *Suspension/expulsion of regular and special education students in Kansas: A report to the Kansas State Board of Education* (Topeka: Kansas State Board of Education, 1995); and Dalun Zhang, Antonis Katsiyannis, and Maria Herbst, "Disciplinary Exclusions in Special Education: A 4-Year Analysis," *Behavioral Disorders* 29 (2004): 337–47.

## The Texas Statewide Study

In 2009, Texas state leaders supported a proposed study by the Council of State Governments (CSG) Justice Center to examine school discipline data and other information maintained by the Texas Education Agency (TEA). Data collected for the resulting study relate to nearly one million public school students in Texas. The records assembled are not for a *sample* of Texas secondary school children, but rather pertain to *every* student who was in seventh grade in a Texas public school in the academic years 2000, 2001, or 2002. These students' records were analyzed for at least six years.[20] Researchers also were given access—without identifiers for individual children—to all matching records during this time period for youths who came into contact with Texas's juvenile justice system. Analyses conducted of the millions of records within the study's datasets have enabled unique insights into school disciplinary policies and their possible link to juvenile justice involvement and other outcomes.

## The Gap in Research that Texas Addresses

Researchers, responding to the concerns of both professionals in the field and policymakers about large numbers of suspensions and expulsions, have made important in-roads toward determining the common characteristics of children who are disciplined. The researchers also have looked extensively at factors that appear to put children at risk of disciplinary action and juvenile justice contact.

Among the many issues studied have been those on disparities between referrals of minority and special education students, as well as the link between the drop-out rate and the rate of student suspensions and expulsions.[21] Study after

---

20. See pages 25–30 of this report for an explanation of the study period and methodology.

21. *See* Russell J. Skiba, Robert S. Michael, Abra Carroll Nardo, and Reece L. Peterson, "The Color of Discipline: Sources of Racial and Gender Disproportionality in School Punishment," *The Urban Review* 34 (2002): 317–342; Russell J. Skiba, *Zero Tolerance, Zero Evidence: An Analysis of School Disciplinary Practice* (Bloomington, IN: Education Policy Center, Indiana University, 2000); Linda M. Raffaela Mendez, "Predictors of Suspension and Negative School Outcomes: A Longitudinal Investigation," *New Directions for Youth Development* 99 (2003): 17–33; Johanna Wald and Michael Kurlaendar, "Connected in Seattle? An Exploratory Study of Student Perceptions of Discipline and Attachments to Teachers," *New Directions for Youth Development* 99 (2003): 35–54; Edward W. Morris, "'Tuck in That Shirt!' Race, Class, Gender, and Discipline in an Urban School," *Sociological Perspectives*, 48 (2005): 35–48; Elizabeth Stearns and Elizabeth J. Glennie, "When and Why Dropouts Leave High School," *Youth & Society* 38 (2006): 29–57; Michael P. Krezmien, Peter E. Leone, and Georgianna M. Achilles, "Suspension, Race, and Disability: Analysis of Statewide Practices and Reporting," *Journal of Emotional & Behavioral Disorders* 14 (2006): 217–226; Edward W. Morris, " 'Ladies' or 'Loudies'? Perceptions and Experiences of Black Girls in Classrooms," *Youth & Society* 38 (2007): 490–515; Anne Gregory and Rhona S. Weinstein, "The discipline gap and African Americans: Defiance or cooperation in the high school classroom," *Journal of School Psychology*, 46 (2008): 455–475; Michael P. Krezmien, Peter E. Leone, Mark S. Zablocki, and Craig S. Wells, "Juvenile Court Referrals and the Public Schools: Nature and Extent of the Practice in Five States," *Journal of Contemporary Criminal Justice* 26 (2010): 273–93.

study has found that African-American students experience suspension and expulsion at disproportionately high rates; that socioeconomic factors increase children's likelihood of experiencing suspension and expulsion; and that boys are disciplined more frequently than girls. The American Psychological Association (APA) published a landmark study, reviewing published research related to "zero-tolerance" discipline methods, that found that these policies may negatively affect academic outcomes and increase the likelihood of students dropping out.[22]

National and state-level advocacy organizations also have examined disciplinary practices. Advocates approach the issue from a variety of perspectives, including civil rights problems associated with overrepresentation of minority youth in disciplinary referrals; poor academic outcomes associated with the use of punitive disciplinary policies that remove youth from the school environment; and the "School to Prison Pipeline"—a tagline created by advocates who argue that school discipline has increasingly become a gateway to the juvenile system, and, subsequently, adult prisons.[23] Some advocates further argue that relying on suspension and expulsion policies wastes taxpayer dollars on ineffective tools, encourages overreaching government intrusion, and "overcriminalizes" youthful behavior.[24] Educators, for their part, including those who responded in focus groups to this study's preliminary findings, have cautioned that high rates of suspension and expulsion reflect unrealistic expectations that teachers alone can change behaviors that parents and communities have had no success addressing.

In Texas, similarly, there has been no shortage of focus on the issue.[25] At the same time that the research for this report began, the Texas Legislative Budget

---

**22**. American Psychological Association, *Are Zero Tolerance Policies Effective in the Schools? An Evidentiary Review and Recommendations* (2006). A summary is available in Russell Skiba, Cecil R. Reynolds, Sandra Graham, Peter Sheras, Jane Close Conoley, and Enedina Garcia-Vazquez, "Are Zero Tolerance Policies Effective in the Schools? An Evidentiary Review and Recommendations," *American Psychologist* 63 (2008): 852– 62.

**23**. *See* The American Civil Liberties Union, *Locating the School to Prison Pipeline* (New York: Author, 2008); The Advancement Project, *Test, Punish, and Push Out: How Zero Tolerance and High-Stakes Testing Funnel Youth Into the School to Prison Pipeline* (Washington, DC: Author, 2010); Daniel J. Losen and Russell J. Skiba, *Suspended Education: Urban Middle Schools in Crisis* (Montgomery, AL: Southern Poverty Law Center, 2010); Matt Cregor and Damon Hewitt, "Dismantling the School-to-Prison Pipeline: A Survey from the Field," *Poverty & Race* 20 (2011): 223–237.

**24**. Paul Rosenzweig and Trent England, "Zero Tolerance for Zero Tolerance," *The Heritage Foundation*, May 6, 2004, available at **http://www.heritage.org/ research/commentary/2004/05/zero-tolerance-for-zero-tolerance**; Overcriminalized.com, *Case Studies: Criminalizing Kids I, True Tales of Zero Tolerance Overcriminalization*, available at **http://www.overcriminalized.com/CaseStudy/Tales-of-Zero-Tolerance-One.aspx**.

**25**. *See* Marc Levin, *Disciplinary Alternative Education Programs: What Is and What Should Be* (Austin, TX: Texas Public Policy Foundation, 2005); Marc Levin, *Schooling a New Class of Criminals? Better Disciplinary Alternatives for Texas Students* (Austin, TX: Texas Public Policy Foundation, 2006); Augustina H. Reyes, *Discipline, Achievement, Race: Is Zero Tolerance the Answer?* (Lanham, MD: Rowman & Littlefield, 2006); Texas Appleseed, *Texas' School-to-Prison Pipeline: Dropout to Incarceration* (Austin, TX: Author, 2007); Texas Appleseed, *Texas' School-to-Prison Pipeline: School Expulsion* (Austin, TX: Author, 2010); Texas Appleseed, *Texas' School-to-Prison Pipeline: Ticketing, Arrest & Use of Force in Schools* (Austin, TX: Author, 2010).

Board (LBB) undertook a qualitative examination of six school districts across the state, publishing reports that examined strengths and weaknesses in existing disciplinary practices.[26] The LBB included recommendations for districts interested in making improvements.[27]

This report adds to existing work by being the first to offer information gleaned from data of a quality and scale previously unavailable to researchers. This study also provides a longitudinal examination of data on school disciplinary policies and their relationship to juvenile justice involvement and other outcomes. True, multivariate analyses conducted elsewhere have established relationships between school disciplinary action and students' race or presence of a disability. But none of these previous studies has been able to draw on millions of student and school-campus records that are both comprehensive and statewide, and to match such records against a similarly extensive set of juvenile justice data.

### Texas's Progress on School Disciplinary Policies

*Texas Stakeholders Explore New Models for Discipline*

Texas's reliance on data-driven educational programming has given the state a distinct advantage in evaluating the success of disciplinary initiatives. Few states in the nation collect the data on disciplinary actions that Texas requires its school districts to report. Education stakeholders have already begun to use this data to explore effective options.

Initiatives have included legislative change, training and grant funding, and district-level innovations aimed at reducing disciplinary and court referrals.

*continued on page 9*

---

26. MGT of America, Inc., *Amarillo Independent School District: A Review of the Student Behavior Management System* (Austin, TX: Texas Legislative Budget Board, 2011); MGT of America, Inc., *Conroe Independent School District: A Review of the Student Behavior Management System* (Austin, TX: Texas Legislative Budget Board, 2011); MGT of America, Inc., *Dallas Independent School District: A Review of the Student Behavior Management System* (Austin, TX: Texas Legislative Budget Board, 2011); MGT of America, Inc., *Fort Bend Independent School District: A Review of the Student Behavior Management System* (Austin, TX: Texas Legislative Budget Board, 2011); MGT of America, Inc., *Ingleside Independent School District: A Review of the Student Behavior Management System* (Austin, TX: Texas Legislative Budget Board, 2011); MGT of America, Inc., *San Antonio Independent School District: A Review of the Student Behavior Management System* (Austin, TX: Texas Legislative Budget Board, 2011).

27. Texas Legislative Budget Board, *Student Behavior Management Review Summary* (Austin, TX: Author, 2011).

---

*Legislative Initiatives:*

The disciplinary policies included in the Texas Education Code have been amended nearly every legislative session since 1995. While many changes have added additional behavioral violations to the list of mandatory or discretionary actions, key changes have included the following:

- repealing a statutory provision that allowed school districts to charge students with a Class C Misdemeanor for *any* Code of Conduct violation[28]

- requiring the Texas Education Agency to develop minimum standards for Disciplinary Alternative Education Programs (DAEPs)[29]

- requiring school districts to consider mitigating factors, such as self-defense, intent, disciplinary history, and a student's disability, before making a disciplinary decision[30]

- eliminating "persistent misbehavior" as a reason for expulsion[31]

- eliminating ticketing of students in sixth grade and younger for nonviolent misbehavior[32]

- eliminating ticketing of students under age 12 for truancy, and reserving ticketing of older students as a last resort to be used only after the school has tried internal measures that failed[33]

*continued on page 10*

---

**28**. Tex. H.B. 278, 80th Leg., R.S. (2007).

**29**. Tex. H.B. 426, 80th Leg. R.S. (2007).

**30**. Tex. H.B. 171, 81st Leg. R.S.(2009).

**31**. Tex. H.B. 968, 82nd Leg. R.S. (2011).

**32**. Tex. H.B. 359, 82nd Leg. R. S. (2011).

**33**. Tex. S.B. 1489, 82nd Leg. R.S.(2011).

*continued from page 9*

*Texas Education Agency (TEA) Initiatives:*

- TEA provides training to districts interested in learning about positive, proactive discipline methods.[34]

- Regional Education Service Centers (ESCs) across the state offer a number of activities, trainings, and technical assistance services for member districts interested in a positive and preventative approach to discipline.  The Region 4 ESC provides leadership for two additional statewide initiatives including the Texas Behavior Support (TBS) network for children with disabilities and an online training that helps districts and campuses meet legislatively mandated training that incorporates a full continuum of positive behavioral intervention strategies.

- A 2011 pilot program uses statewide data to implement systems that will document student achievement and measure the effectiveness of specific professional development programs and activities. The Positive Proactive Response for Outcome-Based Success program (PROS) focuses on student data analysis, continuous coaching, and support—meant to result in fewer discipline referrals, increased attendance and graduation rates, and greater student achievement. The program will continue through the 2011–2012 school year.[35]

- TEA has established standards for DAEPs, and included a requirement that a DAEP student's test scores be attributed to the student's home campus for purposes of accountability.[36]  This mirrors language in the Education Code for Juvenile Justice Alternative Education Programs (JJAEPs).[37]  These provisions ensure that Texas campuses do not have an incentive to push students with low test scores out to an alternative education placement—a problem reportedly occurring in other states.[38]

*continued on page 11*

---

**34**. *See* Texas Education Agency, Positive Proactive Discipline Video, available at *http://www.tea.state.tx.us/DAEP.html.*

**35**. Information provided by TEA to author Tony Fabelo, June 17, 2011.

**36**. 19 Tex. Admin. Code sec.  103.1201(e)

**37**. Tex. Edu. Code 37.011(h).

**38**. The Advancement Project, *Test, Punish, and Push Out: How Zero Tolerance and High-Stakes Testing Funnel Youth Into the School to Prison Pipeline* (Washington, DC: Author, 2010), available at *http://www.advancementproject.org/digital-library/publications/test-punish-and-push-out-how-zero-tolerance-and-high-stakes-testing-fu.*

continued from page 10

*Local Initiatives:*

- With support from a discretionary grant provided by the Criminal Justice Division of Governor Rick Perry's office, and with technical assistance from the TEA, the Waco Independent School District has created a pilot program aimed at reducing disciplinary actions and Class C ticketing on middle and high school campuses by as much as 25 percent per year over two years. The program, scheduled to be in place for the 2011–2012 school year, includes the following:

  ◦ increased use of "Safe School Ambassadors," meaning students trained to offer peer support and mediation services

  ◦ a Parent Education Diversion Program, offered as an alternative to a DAEP or JJAEP placement. Social workers offer parents instruction and information relating to adolescent development, positive discipline, anger management and impulse control, and additional community resources available to support children and families

  ◦ additional training for teachers in classroom management

- An increasing number of districts across the state have adopted Schoolwide Positive Behavioral Interventions and Supports (SW PBIS), an evidence-based disciplinary model that has been shown to reduce disciplinary actions by more than half.

- The Bexar County Juvenile Probation Department created the Children's Crisis Intervention Training (CCIT) in 2009 as specialized training for school district police officers. This 40-hour training is offered during the summer and includes information regarding active listening and de-escalation techniques; mental, learning, and developmental disorders in children; substance abuse; and available community resources for families and children. To date, Bexar County has trained more than 70 officers.

Although no state can provide a perfect case study of school disciplinary policies to which officials in any state can relate, Texas does offer a particularly useful laboratory to examine these issues. It is highly unusual in its maintenance of individual electronic records, rich with information about each public school student. This system facilitates tracking of students over their school careers, even as they move from one school (or district) to the next. Individual electronic records also are maintained for youths who come into contact with the juvenile

justice system. What further distinguished Texas from every other state at the start of this study in 2009 was the opportunity to study at least six years' worth of state student-level education and juvenile justice electronic records, and to benefit from broad bipartisan support for this research.

## Organization of this Report

This report begins with a summary of the methodology used to analyze student, school campus, and juvenile justice records in Texas. A description of the Texas school disciplinary system follows, including the legal framework and key terms, to help readers understand which behaviors are likely to result in specific types of school action (as well as the nature and duration of those actions). The centerpiece of the report is six findings. Each finding, in turn, contains an overview of the issue that the researchers explored, and a concise description of the approach they used to analyze relevant data. Facts, figures, and tables that provide the basis for the finding are also included.

## Scope of the Report

Leaders of the CSG Justice Center believed this project should be intensely focused on what the data tell us about school disciplinary outcomes related to the juvenile justice system and academic performance. Accordingly, the report provides readers with statistical information on the number and type of suspensions and expulsions made in Texas's public secondary schools and a profile of the students affected. It defines key problems and highlights the consequences of disciplinary actions. While the study cannot account for every imaginable variable that could impact academic success, as well as juvenile justice involvement and other outcomes highlighted in the report, the multivariate analyses do control for the 83 variables listed in Appendix A.

Many aspects of school discipline that are the subject of intense debate, in Texas and nationally, are not addressed in this report. Truancy analyses and the role of local law enforcement in schools (including the practice of issuing misdemeanor "tickets" to misbehaving students who are subject to the municipal courts) were largely outside the scope of the data analysis described in this publication. Similarly, this report does not contemplate how students' involvement in the child welfare system relates to suspension and expulsion rates. These issues could not be properly addressed using the study's datasets, beyond what is included in this report.

Despite the comprehensiveness of this study, it could not pinpoint to what extent student *behaviors* actually differed from one school to the next. A seemingly obvious metric available in the dataset that researchers could use to gauge misbehavior in a particular school would be the rate at which disciplinary actions were recorded there. Because state law mandates a student's removal from the classroom when he or she commits certain offenses (e.g., bringing a gun to campus), the rate of those types of serious incidents occurring is one objective measure of safety at a school. As this report explains, however, the overwhelming majority of disciplinary actions taken are discretionary responses. Consequently, researchers could not rule out the possibility that when fewer disciplinary incidents were recorded at a particular campus, educators may simply have been more tolerant of misbehavior—or they may have been able to mitigate misbehavior (by engaging students more effectively, for example).

Other researchers have cautioned against using discretionary disciplinary actions as a proxy for gauging student behavior in a school. One study, for example, demonstrated that office referrals are not a pure index of student behavior but rather an index of the disciplinary systems within a school.[39] There are major differences within and among schools in the processes, forms, terminology, and training they employ, each of which are factors that influence office referrals.[40] For similar reasons, readers should be careful not to equate this report's data on discretionary actions as a proxy for measures on school safety.

Readers outside Texas also are cautioned about generalizing these findings, in part because they will see differences between Texas's practices and their own districts' student record-keeping and school discipline or juvenile justice systems.[41] Nevertheless, this report should still provide insights relevant to other jurisdictions.

This report stops short of suggesting programs and practices that may be effective in reducing suspensions and expulsions or minimizing their impact. It also does not describe individual school initiatives or approaches related to safety

**39**. George Sugai, Jeffrey R. Sprague, Robert H. Horner, and Hill M. Walker, "Preventing School Violence: The Use of Office Discipline Referrals to Assess and Monitor School-Wide Discipline Interventions," *Journal of Emotional and Behavioral Disorders* 8 (2000): 94–101.

**40**. Gale M. Morrison, Reece Peterson, Stacy O'Farrell, and Megan Redding, "Using Office Referral Records in School Violence Research: Possibilities and Limitations," *Journal of School Violence* 3 (2004): 39–61.

**41**. For example, unlike Texas, which established and maintains the Disciplinary Alternative Education Programs, nearly half the states do not require alternative educational assignments for expelled or suspended students. Civil Rights Project and the Advancement Project, "Opportunities Suspended: The Devastating Consequences of Zero Tolerance and School Discipline Policies" (paper presented at the National Summit on Zero Tolerance; Washington, DC, June 15–16, 2000).

and improving student outcomes. Other publications are dedicated to these purposes.[42] The CSG Justice Center does plan to convene a national cross-section of innovative thinkers and opinion leaders, in follow-up to this study, to discuss recommendations for a broad spectrum of systems that address the report's themes and build on the work of experts in the field.

---

**42.** *See*, for example, Russell Skiba and M. Karega Rausch, "School Disciplinary Systems," in *Children's Needs III: Development, Prevention, and Intervention*, ed. George G. Bear and Kathleen M. Minke (Bethesda, MD: National Association of School Psychologists, 2006) 87–102; or *see* Social and Character Development Research Consortium, *Efficacy of Schoolwide Programs to Promote Social and Character Development and Reduce Problem Behavior in Elementary School Children*, NCER 2011–2012 (Washington, DC: National Center for Education Research, Institute of Education Sciences, U.S. Department of Education).

## OVERVIEW OF THE TEXAS SCHOOL DISCIPLINARY SYSTEM AND KEY TERMS

Every state's public school disciplinary system has its own distinct mandates, culture, and quirks. Yet all public school models share enough common elements and objectives that findings from this Texas study can direct officials in other jurisdictions to similar questions and analyses that can help determine how school discipline affects student involvement with the juvenile justice system and other related outcomes.

Like many states, Texas's legal and policy structure is quite complex. The discussion that follows highlights key features of the system to ensure that all study results are considered in their proper context. To interpret results accurately, it is important to keep in mind the definitions that relate to the different categories of disciplinary actions, and what conduct prompts these actions. Readers also should note what kind of discretion school and other officials have when addressing students' violations of school codes or state law.

### Statutory Framework

In 1995, the Texas legislature established a statewide, legal framework to promote safety and discipline in its public school system.[43] Chapter 37 of the Education Code created two categories of disciplinary actions: mandatory and discretionary. Within the mandatory category, the Code lists specific serious criminal behaviors that qualify as felony offenses (such as use of firearms on school grounds, aggravated assault, and sexual assault). These trigger mandatory removal of the individual from the school (for a full listing of mandatory offenses and the discretionary violations that follow below, see Appendix B).

Chapter 37 also identifies less severe offenses, which include conduct occurring off campus or at a school-sponsored or school-related activity, such as felony criminal mischief; misdemeanor drug, alcohol, or inhalants offenses; and fighting/mutual combat. For these offenses, school district officials have the discretion to remove a student from the classroom or school.

In addition, Chapter 37 requires each school district to adopt a student "code of conduct." Districts have the authority to include in their codes of conduct

---

43. Texas Education Agency, Chapter 37, Safe Schools, available at *http://www.tea.state.tx.us/index2.aspx?id=262*.

additional offenses requiring disciplinary action. They thus have a great deal of leeway to enlarge upon the mandatory and discretionary offenses included in Chapter 37. These locally designed and administered rules provide written guidance to students, teachers, and parents on acceptable student behavior; describe which violations dictate mandatory or discretionary action; and outline district processes for disciplining students who break these rules.

## Locally Administered "Code of Conduct"

School districts' codes of conduct are often more than 50 pages in length, reflecting the intricacy of these frameworks. Many districts require the student and his or her parent or guardian to sign the code at the beginning of each school year, attesting that they have read and discussed it and understand the consequences it outlines.[44] These codes typically organize violations into five levels: Level I violations are the least serious, addressing behavior such as being tardy, leaving class early, or violating the dress code. Violations that are particularly serious, and amount to criminal behavior, are Level IV or V violations, discussed in more detail below.

The level of the offense determines how broad the range of sanctions may be that are available to school administrators. Generally speaking, the lower the level of the violation, the larger the menu of potential consequences. For example, if a student's misbehavior constitutes a Level I violation, a teacher or other school employee may choose from among many sanctions that neither require referral to the principal's designee nor removal

---

### TRUANCY

Texas's relevant state statute defines truancy as the unexcused failure to attend school for ten or more days, or parts of days, during a six-month period—or failure to attend three or more days, or parts of days, within a month. When local officials determine that a student is truant, they have two options:

1. They may refer the student to the juvenile justice system for "conduct indicating a need for supervision" (CINS)—an offense defined in Title 3 of the Family Code. The youth is typically placed on probation, with attending school as one of the terms for successful completion. The local juvenile probation department may then refer the youth to additional services.

*continued on page 17*

---

44. *Id.*

*continued from page 16*

2. The school district's truancy officer may issue the student a Class C misdemeanor ticket, in which case the youth is prosecuted through the municipal court system.*

In either event, state-level data regarding truancy are not comprehensive because many truancy cases are prosecuted but never recorded as a disciplinary violation in TEA's database. Accordingly, for this study, municipal and justice court data on truancy were not addressed, and an examination of truancy issues was beyond the scope of this report.

* See page 23 for a discussion on youths who violate school rules and are charged with a Class C misdemeanor offense.

from the classroom. These might include lunch or after-school detention, Saturday school, or extra school work. Even though Level 1 offenses are less serious, a more serious consequence may be imposed, such as an in-school suspension, or even an out-of-school suspension. The higher the level of the violation, the fewer options a school administrator has for disciplining a student. For example, sanctions from which a school administrator may choose when disciplining a student who has committed a Level III violation include suspension or possible Disciplinary Alternative Education Program (DAEP) removal. A Level V violation triggers automatic referral to an available Juvenile Justice Alternative Education Program (JJAEP). [45]

The determining factor as to which disciplinary consequences are used among districts, or even from one school to another, is not so much the substantive content of the codes of conduct, the variation in the rules they establish, or even the range of consequences associated with different violation levels. Instead, the determining factor is how teachers and administrators interpret and apply these codes of conduct. What behaviors, for example, amount to "classroom disruption"? Should a student immediately be removed from the classroom for any sign of it, and, if so, which of the various possible consequences listed in the code of conduct should be imposed? How school administrators interpret these codes, and their responses to violations, varies enormously. [46]

Complicating the understanding of administrators' responses to behavioral violations is the way student discipline data are

---

45. Jurisdictions that are not large enough to be required to have a JJAEP may expel students to the street.

46. *See*, e.g., Texas Appleseed, T*exas' School-to-Prison Pipeline: Dropout to Incarceration: The Impact of School Discipline and Zero Tolerance* (2007); Texas Appleseed, *Texas' School-to-Prison Pipeline: School Expulsion: The Path from Lockout to Dropout* (2010); *See* also, the discussion in this report's Finding 6.

reported and maintained. For example, data available in TEA's information systems permit a nuanced analysis of serious offenses committed in public schools, but not of low-level offenses.

Serious offenses that amount to criminal behaviors and are explicitly identified in Chapter 37 also are reported to TEA and reflected in a district's disciplinary data, but most low-level offenses, including classroom disruption, use of profanity, or involvement in a schoolyard scuffle (that does not rise to the level of an assault), are categorized generally as a "violation of the local code of conduct" and coded as such in reports to TEA. For this reason, the overwhelming majority of disciplinary violations reported to TEA appear as generic violations of the code of conduct, making it impossible to determine more precisely the behavior for which the student was disciplined.

## Explanation of Suspension, Expulsion, and Out-of-School Placement

Although the process may vary, when a teacher or other school employee observes a student committing a violation of the code of conduct (or learns of an alleged violation), campus policy often calls, first, for the behavior to be managed through informal discipline by the classroom teacher. If a pattern of disruptive behavior continues or interferes with instruction to other students, the child may be referred to the office of the designated administrator, usually the principal or vice principal. If the administrator determines that the offense is a lower-level violation of the school code of conduct, he or she has discretion about how to respond. The administrator may decide to do nothing formal, but may instruct the teacher to take further action by contacting parents and/or organizing a team response in collaboration with behavioral specialists and colleagues who also teach the student. In this case, no violation is noted in TEA's Public Education Information Management System (PEIMS) database used for this study.[47] The administrator also may choose from among a range of options outlined in the school code of conduct.

This report analyzes the use of the four sanctions for which school districts are required to report data to the TEA (see Figure 1): in-school suspensions (ISS),

---

47. Although the study findings exclude the informal actions for which data are not kept, such as the parent-teacher or school personnel team meeting, these data may be available in local databases that were not accessible through this study.

out-of-school suspensions (OSS), Disciplinary Alternative Education Programs (DAEP), and Juvenile Justice Alternative Education Programs (JJAEP) (or expulsion to the street where unavailable).[48] If the designated administrator determines that classroom removal is appropriate, or that state law or the local code of conduct mandates the student be taken out of the classroom or school, the removal process is begun.



**FIGURE 1:** Disciplinary Actions within the Texas Public School System

**Referral**
School employee refers student to designated administrator for disciplinary action.

**Referral Campus Police***

Mainly student code of conduct violations and others defined as discretionary

**Designated Campus Administrator**
(Usually Principal or Vice-Principal)
What type of violation? Discretionary or mandatory?

Mainly serious violations listed in statute

Discretionary Violation
Administrator has discretion to remove student from classroom.

Mandatory Violation
Administrator is required to remove student from classroom

**Misdemeanor C Violation**
"Ticket and Release"*

**Informal Disposition***

In-School Suspension (ISS)

Out-of-School Suspension (OSS)

Disciplinary Alternative Education Program (DAEP)

Juvenile Justice Alternative Education Program** (JJAEP)

* Violations and dispositions not coded in the TEA student database are not part of this study.
** In counties without a JJAEP, students can be expelled to the streets.

**Source: Texas Education Agency, Counts of Students and Disciplinary Actions by Disciplinary Actions Groupings, Public Education Information Management System (PEIMS) 2009–2010 Data, see http://ritter.tea.state.tx.us/adhocrpt/Disciplinary_Data_Products/Disciplinary_Data_Products.html.**

---

48.  Chapter 37 only requires counties of 125,000 or greater population to have a JJAEP.

## In-school Suspension (ISS)

A student may be placed in ISS, which requires reporting to a designated room on the school campus other than the student's assigned classroom, for as short a duration as a single class period or for as long as several days. Chapter 37 does not speak to what is required in an ISS classroom.

According to the Legislative Budget Board, documented problems with ISS programs in Texas include[49]

- lack of written procedures for ISS,

- inadequate training for ISS staff, and

- failure to ensure students are given academic work during their stay in an ISS classroom, which can cause students to fall behind academically—particularly when this action is coupled with lack of direct instruction.

## Out-of-school Suspension (OSS)

A student may be suspended from school for no longer than three days. There is no cap on the number of OSS actions that may occur in a school year. Students who are repeatedly referred to OSS over the course of a single school year may lose a significant amount of instructional time. This may place students who are already likely to be disengaged from school, at higher risk for falling significantly behind their peers.[50]

---

**49**. *See* Legislative Budget Board, *Amarillo Independent School District—A Review of the Student Behavior Management System* (2011); Legislative Budget Board, *Conroe Independent School District—A Review of the Student Behavior Management System* (2011); Legislative Budget Board, *Fort Bend Independent School District—A Review of the Student Behavior Management System* (2011).

**50**. Johanna Wald & Michael Kurlander, *Connected in Seattle? An exploratory study of student perceptions of discipline and attachment to teachers*, in Deconstructing the School to Prison Pipeline 35, 38 (New Directions for Youth Development 2003); Linda M. Raffaela Mendez, *Predictors of Suspension and Negative School Outcomes: A Longitudinal Investigation*, in Deconstructing the School to Prison Pipeline 17, 25 (New Directions for Youth Development 2003).

## Disciplinary Alternative Education Program (DAEP)

A student who is removed for more than three days from school is assigned to an alternative education campus. Policymakers created DAEPs to require school districts to provide students with a suitable educational setting during their suspension. Chapter 37 requires these programs to include a behavioral component meant to address the problem that resulted in a student's referral, and requires the instructional program to include the core components of English, math, science, and history.[51]

However, because there has been little monitoring and oversight of DAEPs, the quality of the programming and instruction varies among districts, with some students in DAEPs poorly served by under-resourced programs. The Legislative Budget Board has expressed the following concerns:[52]

- failure to staff the DAEP with certified teachers

- failure to provide a learning environment equivalent to mainstream campuses

- inadequate training for DAEP instructors and staff

- lack of instructional alignment between DAEP and mainstream campuses

- insufficient communication between a student's home campus and DAEP

- absence of transitional programming upon a student's return from a DAEP

Students may be expelled from a DAEP for "serious or persistent misbehavior," a term that many districts define simply as two or more documented violations of the student code of conduct during the course of the student's attendance there. Thus, a high number of expulsions are made from DAEPs for the very same behaviors that brought the student there initially. Expulsion from a DAEP for serious or persistent misbehavior is a CINS offense in the Family Code. This

---

51. Tex. Edu. Code §37.008

52. Legislative Budget Board, *Amarillo Independent School District—A Review of the Student Behavior Management System* (2011); Legislative Budget Board, *Dallas Independent School District—A Review of the Student Behavior Management System* (2011); Legislative Budget Board, *Fort Bend Independent School District—A Review of the Student Behavior Management System* (2011); Legislative Budget Board, *Ingleside Independent School District—A Review of the Student Behavior Management System* (2011).

means that students can be brought into direct contact with the juvenile justice system for low-level misbehavior.[53]

## Juvenile Justice Alternative Education Program (JJAEP)

In the most populous counties where this option is available, expelling a student results in removal to the juvenile justice-operated school. This consequence is generally reserved for students accused of engaging in delinquent conduct or CINS offenses under Title 3 of the Texas Family Code.[54] The Texas Juvenile Probation Commission (TJPC) provides state oversight of JJAEPs, and has adopted more rigorous standards and requirements for these programs than the TEA created for DAEPs.[55]

Chapter 37 does not require written notice or a conference with parents prior to disciplinary actions, including suspensions, that fall short of removal to an alternative education program. It does, however, require schools to *notify* parents when a student has been disciplined.[56] When the principal or administrator in charge of discipline decides to impose a sanction that requires removal to a DAEP, he or she must first schedule a conference with the student and his or her parent or guardian within three days of the child's removal from the classroom.[57] If a student is expelled, a more formal hearing is required.[58] Consequently, a student may spend time in an immediate ISS or OSS placement, pending a hearing, or may do so to fulfill notice requirements before being sent to one of the alternative education programs. Chapter 37 does not allow students to return to their regular classroom to await the hearing or a decision on an appeal of a disciplinary referral to the DAEP or JJAEP.

---

**53.** Aggregate data provided by the Texas Juvenile Probation Commission, on file with the author, show that 1,227 youth were referred to the juvenile justice system in 2010 for the CINS offense of expulsion for serious or persistent misbehavior while in a DAEP. *See* also, the sidebar on Texas's progress on school disciplinary changes in the Introduction on pages 8–11.

**54.** Because juveniles are not prosecuted in the criminal justice system, "delinquent conduct" is described in the Family Code rather than the Penal Code. Title 3 defines delinquent conduct and CINS offenses.

**55.** Texas Juvenile Probation Commission (May, 2010). Juvenile Justice Alternative Education Programs Performance Assessment Report, School Year 2008–09. Available online at *http://www.tjpc.state.tx.us/publications/reports/TJPCMISC0310.pdf*.

**56.** Tex. Edu. Code §37.001(6).

**57.** Tex. Edu. Code §37.009.

**58.** *Id.*

---

## The Role of Law Enforcement in Texas Public Schools

Police, or another local law enforcement authority, often have some type of presence in Texas schools, and a role in the school's disciplinary system. Officers typically assume primary responsibility for enforcing the law, but there is no consensus about whether their mission includes ensuring compliance with those school rules which, when violated by students, do not necessarily amount to criminal offenses.

When law enforcement officials assigned to a Texas campus observe a student violating school rules (or learn of such behavior), they may send the student to the designated administrator. Alternately, for behavior that can be punished as a Misdemeanor C violation, officials may pursue a criminal justice response. Officers have the legal authority to issue "tickets" that are the equivalent of an "arrest and release on the spot" for offenses such as disruption of the class, disorderly conduct, failure to attend school, or a minor's possession of alcohol or tobacco. A student receiving such a ticket is not subject to jail time, but must appear before a municipal or justice court, where a judge typically imposes a fine of up to $500 and/or community service.

It is also possible to receive a Misdemeanor C "ticket" *and* be subject to the school's disciplinary action, in accordance with Chapter 37. The number of Misdemeanor C tickets issued annually, and the extent to which students are disciplined pursuant to a school's code of conduct, is unclear because information about Misdemeanor C tickets is not captured in a student's record within the TEA database.

Texas Appleseed issued a report studying the impact of this ticketing policy.[59] The organization estimated the potential number of citations involving students as being well over 100,000 a year, with most citations generated in school districts that have their own police departments.[60] The report went on to cite concerns that ticketing turns the misdeeds of a large number of students into criminal behavior at an early age. That may be one reason why the policy was under

---

59. Texas Appleseed, *Texas' School to Prison Pipeline: Ticketing, Arrest & Use of Force in Schools* (2011). Texas Appleseed works with lawyers and other professionals to identify and resolve difficult systemic problems. It has focused on the impacts of in-school and out-of-school student suspension and referrals to Disciplinary Alternative Education Programs; the group documented the disproportionate impact of discretionary school expulsion on minority and special education students; and the shift of student discipline from schools to the courthouse in ticketing, arrest and use of force in schools.

60. *Id.* at 76–77.

scrutiny by Texas policymakers as part of an overall effort to review the state's school disciplinary policies.[61]

### School Districts' Options for a Law Enforcement Presence

In Texas, school districts that opt to have a law enforcement presence on school campuses may choose from two models:

- a traditional School Resource Officer model, which requires the district to contract with a local policing agency to assign officers to the district's campuses

- an in-house school district police department, with a force commissioned by the school board and overseen by the superintendent. Chapter 37 allows school districts to commission their own police forces with licensed peace officers who have the power to arrest, issue citations, and conduct other law enforcement duties.

Within these models, roles for school officers can vary across districts or even among area schools.[62] In some districts, officers are unlikely to deviate from a traditional law enforcement model. In others, officers' duties may include mentoring and teaching, particularly in districts that use the Drug Abuse Resistance Education (D.A.R.E.) curriculum.[63] Typically, a school police officer's more traditional tasks include patrolling the campus and its surroundings, providing security for school events, enforcing traffic laws on and around campus, and issuing tickets for Class C misdemeanors, or making arrests if a more serious violation occurs.[64] School police officers may also investigate crimes that occur on campus, and conduct drug sweeps or weapons searches.[65]

Although Texas schools report a great deal of school disciplinary data to the TEA, school district police are not required to report *any* data relating to school crime, including tickets issued or arrests made.[66] This makes it very difficult to get a clear picture of the level of crime that takes place on Texas's school campuses, or the impact that school-based ticketing and arrest may have on students.

---

**61**.  In preparation for the 2011 legislative session, the Senate Criminal Justice Committee issued an interim report recommending changes to this policy. Texas Senate Criminal Justice Committee, Interim Report, December 15, 2010, at *http://www.senate.state.tx.us/75r/senate/commit/c590/c590.htm*. For updates on the legislation that passed, see the sidebar about Texas legislative measures on page 9.

**62**.  Texas Appleseed, supra note 59, at 37–44.

**63**.  *Id.*

**64**.  *Id.* at 58.

**65**.  *Id.*

**66**.  *Id.* at 30–34.

## METHODOLOGY

In 2009 the TEA, under the authority granted in the Education Code,[67] merged identified school and juvenile justice records needed to complete this study. The agency then made these records available, without identifiers, to the research team through the State of Texas Education Research Center (ERC) at Texas A&M University (TAMU). Between January 2010 and March 2011, the Texas research team conducted the descriptive and multivariate analyses for this study.

The data analyzed for this study came from two Texas state agencies:

- The Texas Education Agency (TEA), which oversees and manages funding for the state public education system

- The Texas Juvenile Probation Commission (TJPC), which monitors state funding and standards for its juvenile probation system.

Figure 2 depicts how the records were compiled for the study. In Stage 1 of data assembly, TEA provided access to two key databases for this project: the Public Education Information Management System (PEIMS) is the central repository for all student records statewide. More than 500 variables were initially made available describing each individual public school student enrolled in grades six to twelve between student years 1999–2000 and 2008–2009 (representing more than five million students).[68] The second database—TEA's Academic Excellence Indicator System (AEIS)—made available more than 6,000 additional variables describing the approximately 1,200 school districts and 3,900 campuses these students attended.[69]

Because TEA had access to student names and other confidential information needed to merge external records, the agency also brought in information from TJPC, which is charged with collecting case records on all referrals to the juvenile justice system in Texas from county juvenile probation departments statewide.

**67**. Texas Education Code, Title 1, Chapter 1, §1.005.

**68**. The study did not examine children in primary schools because the types of disciplinary events analyzed in this report are less common at that age and because the majority (94%) of the referrals to the Texas juvenile justice system are for individuals between ages 13 and 17.

**69**. For more information on PEIMS, see Texas Education Agency, *http://www.tea.state.tx.us/index4.aspx?id=3012* . More information on AEIS is available at *http://ritter.tea.state.tx.us/perfreport/aeis/*.

Upon completion of the merge, TEA programmers were able to locate a school record for an impressive 87 percent of the youth represented in the juvenile justice record set. After removing all identifiers from this final "matched" group, TEA provided access to the research team under the supervision of TAMU's ERC.

Once the compiled dataset was available, in Stage 2 of the data assembly process, the research team extracted the study groups: three seventh-grade cohorts enrolled during the 2000–2001, 2001–2002, or 2002–2003 academic years. With more than 300,000 individuals in each seventh-grade class, the study sample represented a total of 928,940 students. Of these, 136,592 students had at least one matching record in the juvenile justice database.

Although a massive number of student, district, and campus variables were available in these combined datasets, only the most theoretically relevant measures were initially selected; the list was then further reduced by eliminating "collinear" variables shown through statistical tests to measure highly similar constructs. A list of the 83 variables ultimately used in the research is provided in Appendix A.[70]

- Student variables included measures such as demographics, attendance, course completion, special program enrollment (e.g., special education, bilingual education, career and technology, gifted and talented), standardized performance, and disciplinary violations resulting in a formal punishment (i.e., suspension or expulsion).

- Campus variables included measures such as aggregations of all individual student variables, standardized test performances, resources and expenditures, teacher characteristics, attendance rates, drop-out rates, campus structure (i.e., grades and enrollment), and student-teacher ratios.

- Although juvenile justice variables included information about each individual's characteristics, the referral reason, and the disposition for each juvenile encounter, the dataset was used in this research simply as a "yes/no" measure to identify youth who had any type of encounter with the juvenile justice system.

---

**70**. A graphic depiction of the conceptual relationship between these variables is provided in Figure 4 of this report on page 32 in the discussion of the multivariate model used).



**FIGURE 2:** Overview of Data Sources and Data-Matching Protocols

Texas Education Agency

Texas Juvenile Probation Commission

**STAGE 1:**
**State Agency**
**Databases**
**Merged**

Academic Excellence
Indicator System (AEIS)

1,231 school districts
3,896 campuses 6th & up

6,799 district &
campus variables

Public Education
Information Management
System (PEIMS)

1999–2009
Grades 6–12

5,157,683 individuals
19,413,590 student/year
records

87% of juvenile
records have a
matched student
record

Caseworker MIS System

1994–2008

254 County Juvenile
Probation departments

840,831 individuals
1,973,333 referrals

De-identified Merged Records Made Available to the Research Team*

**STAGE 2:**
**Research Team**
**Extracts the**
**Study Groups**

Students in 3 grade/year
cohorts

928,940 individuals
6,610,914 student/year
records

Juvenile records for
students in 3 grade/year
cohorts

136,592 individuals
331,405 referrals

Final Data Set Compiled for Analysis/Modeling

\* Note that no TEA records were eliminated from the match of juvenile justice records with TEA student/school data.

## About the Study Population

As shown in Figure 3, each of the three selected seventh-grade groups was tracked over a minimum eight-year period. The study period in which data were extensively analyzed was considered to be six years, with the preceding sixth-grade year and the year following twelfth grade considered as "reference years" for researchers to check whether an event occurred, such as a *prior* disciplinary event or a *subsequent* repetition of a grade. No additional data were analyzed for those years.

In most studies that track children over several years, the nature of the study sample changes as individuals drop out. Because those who leave may be different in important ways from those who remain, such attrition can potentially skew the results. Because PEIMS records are maintained for all public school students in Texas, even when they transfer between campuses or districts within the state, the impact of attrition was minimized. Accordingly, as long as the student remained in the state's public school system, his or her record also survived in PEIMS, and consequently in this study.

Slightly more than half of the 928,940 students in the study were male (51%), 14 percent were African American, 40 percent Hispanic, and 43 percent White/ Not Hispanic. About 13 percent of the students were classified as receiving special education at any time during the tracking period, and 60 percent of the students studied were classified as "economically disadvantaged" for the same time period (as indicated by their eligibility for free or reduced-cost meals).

Approximately 70 percent of the students, who were studied for up to three years following their expected completion of high school, either graduated or received a General Education Diploma (GED).[71] Of the 30 percent of students who left the three seventh-grade groups studied, the TEA data reflect that only 6.7 percent of these non-completers were formally identified as having dropped out of school.[72, 73] Although this drop-out figure is consistent with the official seventh-

---

71.  Because students entering the study in the academic year 2000–2001 could be followed for three years after their scheduled graduation date, they had a longer period of time to successfully complete high school than did students in the 2001–2002 and 2002–2003 cohorts (followed for two years and one year respectively). Consequently, these data reflect that students in the earliest group studied had slightly higher rates of completion.

72.  According to a 2010 study conducted by TEA, among the most prevalent other reasons given for leaving school prior to completion were enrollment in an out-of-state school (41%), home schooling (23%), private school (14%), or return to a home country (17%). See Texas Education Agency, *Secondary School Completion and Dropouts in Texas Public Schools 2008–2009* Table 6, July 2010, Austin, TX.

73.  The TEA has an extensive compendium of documents discussing drop-out trends each year back to 1996. *See http://www.tea.state.tx.us/index4. aspx?id=4080.* There are several studies in Texas of drop-out rates. *See* Texas Education Agency, *Secondary School Completion and Dropouts in Texas Public Schools 2008–2009*, Table 1, July 2010, Austin, TX (The TEA longitudinal drop-out rate for the high school class of 2009, for example, was 9.5 (Continued on page 29)



**FIGURE 3:** Study Groups' Size and the Total Completing High School at the End of the Tracking Period

| School Year* | | | | | | | | | | Total Completing | Leaver Reason = Dropped Out |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1999–2000 | 2000–2001 | 2001–2002 | 2002–2003 | 2003–2004 | 2004–2005 | 2005–2006 | 2006–2007 | 2007–2008 | 2008–2009 | | |
| 6th | 7th | 8th | 9th | 10th | 11th | 12th | X | X | X | | |
| 305,767 Students | | | | | | | | | | 213,638 (70%) | 19,088 (6.2%) |
| | 6th | 7th | 8th | 9th | 10th | 11th | 12th | X | X | | |
| | 306,544 Students | | | | | | | | | 211,605 (69%) | 23,242 (7.6%) |
| | | 6th | 7th | 8th | 9th | 10th | 11th | 12th | X | | |
| | | 316,629 Students | | | | | | | | 212,727 (67%) | 19,524 (6.2%) |
| Total Number of Students Tracked in Study **928,940** | | | | | | | | | | 637,970 (69%) | 61,854 (6.7%) |

*School Grade — Class*

\* Students who entered the school system in the years after the study cohorts were selected were not included in the analyses.

**(73 cont.)** percent (students who began Grade 9 in 2005–2006 and were expected to graduate in 2008–2009); *See* also, Daniel Losen, Gary Orfield, and Robert Balfanz, *Confronting the Graduation Rate Crisis in Texas*, October 2006, The Civil Rights Project, Harvard University, Cambridge, MA; *See* also various authors, *The ABCD's of Texas Education: Assessing the Benefits and Costs of Reducing the Dropout Rate*, The Bush School of Government and Public Service, Texas A&M University, May 2009, page 26 (The "upper bound" high school drop-out rate for 2007, for example, was 20 percent and the "lower bound" was 11.4 percent.). For more information on comparing the various methods of calculating drop-out rates, *see* Texas Education Agency, *Secondary School Completion and Dropouts in Texas Public Schools 2008–2009* Table 1, July 2010, Austin, TX.

to-twelfth-grade longitudinal drop-out rate reported by TEA, there are reasons to believe that it under-reports the percentage of students who actually dropped out. Importantly, for most of the tracking period (between the 1999–2000 and 2005–2006 school years), TEA used a less inclusive measure of annual dropouts than that recommended by the National Center for Education Statistics (NCES). When NCES standards were adopted by TEA in the 2006–2007 school year, the official number of dropouts more than doubled. This study's participants were held to the prevailing definitions, thereby using these more inclusive standards in only two of the eight years of the tracking period, resulting in a lower reported drop-out count.

## The Research Questions

The project team, together with expert advisors, developed a list of research questions that are addressed in each of the findings described in the following report sections. They focused on the following:

1. How many children are affected by disciplinary actions?

2. Do these actions result from discretionary decisions made by educators/school officials or from actions mandated by policy or law?

3. Who is being removed from the classroom or school, and do the removals disproportionately impact students of a particular race and gender?

4. Are children with specific disabilities more likely to be suspended or expelled?

5. Is being suspended or expelled an indicator for students' dropping out or repeating a grade?

6. To what extent is school discipline an indicator of risk for juvenile justice involvement, particularly for students who cycle through the disciplinary system?

7. How does the use of disciplinary actions vary among schools—even those that have similar campus and student characteristics?

## Analysis

Two statistical approaches primarily were used to respond to these research questions: descriptive and multivariate.

*Descriptive:* Most of the report is based on simple descriptions of relationships between two variables. Examples of such "bivariate" relationships, where only two variables are considered, include disciplinary involvement by race, or disciplinary involvement by disability. These types of statistics reveal important patterns that are often used to guide policy decisions. Yet descriptive statistics alone can provide an incomplete picture and can even be misleading.

*Multivariate:* Multivariate analyses allow for the simultaneous consideration of many different factors that combine to influence the likelihood that a student will be disciplined or encounter the juvenile justice system. Gender, race/ ethnicity, socioeconomic status, language, special education needs, prior school performance, disciplinary history, and many other characteristics all can have an independent effect. Multivariate methodologies make it possible to isolate the effect of a single factor, while holding the remainder of the factors statistically constant. For instance, when the role of race in predicting school discipline is examined, multivariate methodologies allow for the comparison of juveniles who are identical in all characteristics measured except for their race.

Unlike simple frequencies or proportions, multivariate methods can untangle complex and overlapping relationships. As an example, adolescents who are poor, experience language or cultural barriers, and/or have learning disabilities may be more likely to become involved in school disciplinary or juvenile justice systems. These same adolescents also may be more likely to belong to racial or ethnic minority groups. Absent multivariate approaches, it is difficult to determine how much of their over-representation in the justice system is due to race alone and how much is due to other social and economic factors. The strength of this study is largely its ability to distinguish the separate effects of each characteristic examined. Figure 4 depicts some of the key variables in the multivariate analysis and how these relationships were modeled.

The multivariate analysis also considered a host of campus characteristics that can have an effect on school disciplinary rates as well. For instance, schools with the highest per-pupil expenditures might have been less likely to discipline their students—regardless of the pupils' own socioeconomic status. Because of this, the analyses controlled for campus characteristics such as teacher experience, district wealth, and performance on the state's standardized test among many others.



**FIGURE 4:** Key Student and Campus Attributes for Multivariate Analysis Model

**STUDENT ATTRIBUTES\***

- Demographics
- Grade
- At-risk status
- Discipline history
- Campus mobility
- Attendance rate
- Pregnancy

- Majority of teachers are of student's race
- Majority of student body is of student's race
- Socioeconomic status
- Disability status
- Demographics
- Retained

- Immigrant/migrant status
- Limited Engligh proficiency status
- Title 1 elgibility
- Gifted/talented status
- Career/tech course participation

**CAMPUS ATTRIBUTES\***

- Campus accountability rating
- Percentage that met state test standard
- Percentage that enrolled in bilingual, vocational, or special education programs
- Annual drop-out rate

- Percentage who were economically disadvantaged
- Student body racial/ethnic diversity
- Teacher racial/ethnic diversity
- Instructional expenditures per student

- Attendance rate
- Student/teacher ratio
- Teacher salary
- Teacher experience
- Charter campus
- Title 1 campus

**OUTCOMES**

DISCIPLINE INVOLVEMENT

↓

DROP OUT / REPEAT GRADE

↕

JUVENILE JUSTICE CONTACT

**\* See Appendix A for a complete list of variables modeled.**

In 2010, the CSG Justice Center convened a series of meetings with leading researchers, representatives of the U.S. Department of Education, the U.S. Department of Justice, various foundations and advocacy groups, and criminal justice and education policymakers. The purpose was to review the research methodology and the scope of the findings. Those conversations helped shape this report. The project team received ongoing support from several education experts within universities in and outside Texas to refine the analyses. They shared emerging findings with top administrators of the TEA, the policy staff of the Texas Office of the Governor, and a small group of administrators and teachers of the Austin Independent School District. A focus group was held to gather additional input from juvenile judges, a juvenile prosecutor, a public defender, and representatives from school police departments and personnel working in the juvenile probation system. These discussions led to refinements and conceptual clarifications that were integrated into the study report.

# STUDY FINDINGS

> ## FINDING 1
> The majority of students in the public school system (59.6%) experienced some form of suspension or expulsion in middle or high school.

As discussed in the overview of the Texas disciplinary system, for the purposes of this study, disciplinary action means that the pupil was assigned to in-school suspension,[74] assigned to out-of-school suspension (removed from school for up to three days), placed in a Disciplinary Alternative Education Program (DAEP), or expelled to a Juvenile Justice Alternative Education Program (JJAEP)—or to the street if no JJAEP was available in that county.

Statistics presented in this section demonstrate that a high proportion of students are involved in the school disciplinary system.[75] Having calculated what percentage of students experienced suspension or expulsion, researchers examined the basis for school administrators' actions. Was it behavior for which state law mandates a particular response, or was it for violations of a school's code of conduct that are subject to school employees' discretion? Researchers also explored whether disciplinary action tended to be a one-time or repeat event and how administrators used the range of sanctions at their disposal.

---

**74.** It is important to recall that there is no cap on the number of days that can be spent in in-school suspensions. In-school suspensions can also be administered in partial-day increments—even a single class period. Out-of-school suspensions are limited to a maximum of three days per incident, but there is no cap on the total number of days that a student can be suspended during the school year (Texas Education Code, Title 2, Chapter 37, Section 37.005).

**75.** The formal disciplinary actions described in this study do not include the issuance of Class C misdemeanor offense tickets by law enforcement in the schools. As mentioned earlier, the study findings also exclude the informal actions for which data are not kept, such as parent-teacher or school personnel team meetings. These data may be available in local databases that were not accessible through the study's databases. Research conducted by Texas Appleseed found that only 26 school districts and eight municipal courts had a searchable database with information about Class C ticketing and arrest data. The TEA does not mandate school districts to report this information, and few districts submit crime data to the Texas Department of Public Safety for federal Uniform Crime Reporting purposes. *See Ticketing, Arrest & Use of Force in Schools: How the Myth of the "Blackboard Jungle" Reshaped School Disciplinary Policy*, December 2010. Texas Appleseed, Austin, TX, at *http://www.texasappleseed.net/images/stories/reports/Ticketing_Booklet_web.pdf*.

## Supporting Data

*Bivariate Analyses*

- More than half of the 928,940 students studied (59.6%) received at least one disciplinary action between seventh grade and twelfth grade (see Figure 5).



**FIGURE 5:** Overview of Study Groups' Experience with Suspensions and Expulsions

| 7ᵗʰ Grade Study Groups, Number of Students | Tracked to 12th Grade 2000 – 2009 | Number of Students with One or More Disciplinary Events |
|---|---|---|
| 2000 305,767 | | 179,693 (58.8%) |
| 2001 306,544 | | 182,468 (59.5%) |
| 2002 316,629 | | 191,252 (60.4%) |
| Total 928,940 | | 553,413 (59.6%) |

- For the majority of students who were suspended or expelled, this was not a one-time event. Half of all students who received such disciplinary actions were involved in at least four violations, and the average number of violations experienced by each disciplined student was more than eight. The three groups of students collectively accounted for more than 4.9 million violations during the eight-year tracking period (the six study years and the two reference years). (See Figure 6.)[76]



**FIGURE 6:** Types of Suspensions and Expulsions Experienced by All Students during Their Seventh- to Twelfth-Grade School Years

All Students in Study Group
928,940

Average Number of Actions Per Student Disciplined
Mean = 8.36
(Median= 4)

Number with One or More Disciplinary Actions
553,413
**(59.6%)**

Total Disciplinary Actions
4,910,917

Discretionary School Code of Conduct Actions
4,534,882
**(92.4%)**

Other Discretionary Actions
241,774
**(4.9%)**

Mandatory Expulsion
134,261
**(2.7%)**

---

76. One of the variables in the PEIMS database is an offense code for disciplinary violations. This offense code tracks more than 75 individual violation types. The researchers grouped these violation types into the three categories in Figure 6: discretionary school code-of-conduct violations, other discretionary violations, and mandatory expulsion or removal violations. More than 90 percent of all formal disciplinary actions are coded in the record simply as a school code-of-conduct violation, without more specification. The category for "Other Discretionary Violations" includes violations outlined by state law for which school officials are permitted to use their discretion in how they respond. The most common other violations are Fighting/Mutual Combat (85%), Criminal Mischief (6%), Gang Violence (4%), and Misconduct Off-Campus at School-Related Activity (2%). There is no specification in the student electronic record to note the severity of any of these violations.

- As Figure 6 indicates, nine times out of ten, a student was suspended or expelled for violating the school's code of conduct (in which school officials have broad discretion on responsive actions). About 5 percent of violations were for non-code-of-conduct rule violations that are defined in state law but still allow school officials broad discretion as well. Less than 3 percent of violations were related to behavior for which state law mandates expulsion or removal.

**FIGURE 7:** Number of Disciplinary Dispositions for the Study Group during Their Seventh- to Twelfth-Grade School Years

**All Students in Study Group**
**928,940**

Average Number of Disciplinary Actions Per Student

Mean = 8.36
(Median= 4)

Number with One or More Disciplinary Actions

553,413
**(59.6%)**

Total Disciplinary Actions during Study Period

4,910,917

In-School Suspensions (ISS)

505,718 students
(54.4% of study group)

3,409,198 incidents
(69.4%)

Out-of-School Suspensions (OSS)

287,816 students
(31.0% of study group)

1,092,399 incidents
(22.2%)

Disciplinary Alternative Education Programs (DAEPs)

143,707 students
(15.5% of study group)

299,426 incidents
(6.1%)

*Juvenile Justice Alternative Education Programs (JJAEPs) and Other Expulsions

77,399 students
(8.3% of study group)

109,548 incidents
(2.2%)

* Includes expulsions to JJAEPs (.17%) expulsions to the streets in counties with less than 125,000 population that are not required to operate a JJAEP (.09%), and truancy charges (1.97%).

Note: The number of students in each disposition category adds to more than 553,413 because students can receive more than one disposition during the study period. For example, if a student received both ISS and OSS during the study period, that student is counted in both ISS and OSS categories above. Also, 346 disciplinary events had no action recorded.

- Almost 70 percent of the disciplinary incidents resulted in in-school suspensions. Twenty-two percent of the dispositions were for out-of-school suspensions of up to three days. An additional 6 percent of the incidents led to an expulsion to a DAEP placement. Expulsion to JJAEPs and the street accounted for a very small minority of the dispositions (approximately 2 percent). (See Figure 7.)

- A greater percentage of the male students (59%) than female students (41%) were disciplined with an in-school suspension. Males also experienced out-of-school suspension at a higher level than females (63.5% of males and 36.5% of females). An even greater percentage of males experienced DAEP (68.5%) or expulsion (78.6%) than did females (31.5% and 21.4%, respectively).

- The average number of days on which students missed at least some class time due to a disciplinary incident was 2 days for out-of-school suspension, 27 days for a DAEP placement, and 73 days for a JJAEP placement.[77]

## Conclusion for Finding 1

The majority of Texas secondary public school students studied were suspended from the classroom for at least one class period during their secondary school years. These removals were nearly always discretionary actions for violations of the school's locally determined code of conduct. Because so many students cycled through the disciplinary system repeatedly, additional examination is warranted to determine whether the experience of being suspended or expelled is having the desired impact on students' behavior. Continued research and discussion can help determine whether these suspensions and expulsions are yielding other sought-after outcomes, such as better academic performance, higher rates of high school completion, fewer juvenile justice contacts, and other results discussed in the findings that follow.

---

77.  The exact amount of class time missed due to in-school suspension could not be determined because this punishment is commonly administered in partial-day increments over multiple days, but the data available to researchers recorded the punishment in one-day units.

### FINDING 2

African-American students were more likely than students of other races to be disciplined during their seventh- to twelfth-grade school years.

Because this study followed all students in the Texas public school system who began seventh grade in the academic years 2000, 2001, or 2002 through to twelfth grade, the gender and racial breakdown of the groups studied represents that entire student body tracked for the full study period (see Figure 8). Of the nearly one million students whose records were reviewed for this study, slightly more than half of the students were male (51%), 14 percent were African American, 40 percent Hispanic, and 43 percent White/not Hispanic.[78]

Researchers looked at which types of behavior prompted disciplinary action, to what extent involvement in the school disciplinary system was a one-time event, and whether sanctions varied among students of different races. In addition, the researchers tested hypotheses about whether, after other known contributing factors are considered, children of color were disproportionately disciplined. The use of complex multivariate analyses made it possible to review millions of school records while controlling for 83 variables (see Appendix A). For example, the researchers were able to examine whether white children living in poverty frequently absent from school, or performing poorly in school (as measured by test scores), were just as likely as their African-American counterparts with these same attributes (determined by using the same measures) to be involved in the

---

78. The PEIMS database used for this study included five student racial/ethnic classifications: (1) American Indian or Alaskan Native; (2) Asian or Pacific Islander; (3) Black, not of Hispanic origin, (4) Hispanic, and (5) White, not of Hispanic origin. This report focuses on African-American, Hispanic, and white students because the other categories, taken together (Asian/Pacific Islander, and American Indian or Alaskan Native students) compose less than 5 percent of the total student population. Furthermore, although the Asian/Pacific Islander population has increased steadily over the past decade, the risk for that population of the outcomes studied here (i.e., discipline, retention, dropping out, and juvenile justice contact) is the lowest of all the ethnic groups. Due to these considerations—small numbers of students and low risk attributes—Asian/Pacific Islanders, American Indians, and Alaskan Natives were not featured in the study.

school disciplinary system. They looked at ninth-grade students with identical profiles except for race and concluded that African-American students were still more likely to be disciplined than students of other races.[79]

To address any suggestions that children of color in Texas simply are more likely to break school rules than their white counterparts, researchers included in their analyses a comparison between profiles for students whose behavior prompted a discretionary action and students who received a mandatory removal from school. Interestingly, as the findings below reflect, although Hispanic students experienced a disparate level of involvement in school disciplinary actions, that disparity was not nearly as pronounced as that found for African-American students.

**FIGURE 8:** Overall Discretionary Disciplinary Actions by Race/Ethnicity and First Discipline Disposition Was for Discretionary Code of Conduct Violation

| | Percent with One or More Disciplinary Actions during Study Period | Percent FIRST DISCIPLINARY Action Was Code of Conduct Violation | FIRST DISPOSITION if FIRST DISCIPLINARY Action Was for a Discretionary Code of Conduct Violation: | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | In-School Suspension | Out-of-School Suspension | DAEP | Expulsion/ JJAEP |
| African American | 75.1% | 94.2% | 71.5% | 26.2% | 2.2% | 0.01% |
| Hispanic | 64.8% | 92.7% | 79.1% | 18.0% | 2.7% | 0.001% |
| White | 46.9% | 93.3% | 86.5% | 9.9% | 3.5% | 0.01% |

---

79.  Researchers decided to focus on one ninth-grade year for each of the three student cohorts because that is the grade level that Texas students between seventh and twelfth grades most commonly repeat. In 2006–2007, 18 percent of males and 13 percent of females repeated ninth grade, whereas just 2 percent and 1 percent of eighth graders repeated that grade. Texas Education Agency. 2008. *Grade Level Retention in Texas Public Schools, 2006–07*, p. 29. Available at *http://ritter.tea. state.tx.us/research/pdfs/retention_2006-07.pdf* ; accessed on June 2, 2011.

## Supporting Data

*Bivariate Analysis*

- Seventy-five percent of the 133,719 African-American public school students (male and female) experienced involvement in the school disciplinary system between seventh and twelfth grades—either as a result of a discretionary or mandatory response to student misconduct—as compared with 64.8 percent of the 366,900 Hispanic and 46.9 percent of the 400,104 white students. (See Figure 8.)

- The great majority of African-American *male* students had at least one discretionary violation (83%) compared to 74 percent for Hispanic male students, and 59 percent for white male students. The same pattern was found, though at lower levels of involvement, for females—with 70 percent of African-American female pupils having at least one discretionary violation, compared to 58 percent of Hispanic female pupils and 37 percent of white female pupils.

- More than 90 percent of all students with a disciplinary action (94.2% of African Americans, 92.7% of Hispanics, and 93.3% of whites) first became involved in the school disciplinary system because of a violation of the school district's code of conduct (behaviors that are not subject to mandatory removal under state law). (See Figure 8.)

- A much larger percentage of African-American (26.2%) and Hispanic (18%) students were placed in out-of-school suspensions for their first violation than were whites (9.9%).

- A greater percentage of white students (86.5%) had as their first disposition an in-school suspension compared to African-American (71.5%) and Hispanic (79.1%) pupils.

- African-American and Hispanic students were more likely than white students to experience repeated involvement with the school disciplinary system for multiple school code of conduct violations. About one-fourth of African-American students (25.7%) had more than 11 discretionary disciplinary actions, compared to about one-fifth of Hispanic students (18.1%) and less than one-tenth of white students (9.5%). (See Figure 9.)[80]

---

80. The reader should not discount the possibility that overrepresentation of African Americans among students who are repeatedly disciplined flows from the previous finding that African-American students are disproportionately involved in the discipline system in the first place.



**FIGURE 9:** Percent of Students with Mandatory and/or Discretionary Violations, by Race

- In contrast to students subject to discretionary actions—where a notable disparity among racial groups was seen—the percentages of white, Hispanic, and African-American students *subject to mandatory removal from school* for serious violations (which meet the definition of a felony and include illegal use of a firearm and sexual assault on school property), were, in contrast, low and comparable (less than 8 percent of all violations). (See Figure 10.)

- The percentage of Hispanic students who committed a mandatory violation was the highest, at 7.9 percent, followed by African-American students at 7.2 percent, and whites at 5.3 percent. Almost 1 in 10 males had a mandatory violation, compared to 1 in 27 females.

- A very small percentage of white, Hispanic, and African-American students experienced expulsion to a JJAEP or the streets (the most severe response a school can impose) as their first disposition. On the other hand, 3.5 percent of white students and 2.7 percent of Hispanic students experienced placement in a DAEP as a first disposition, whereas this happened to just 2.2 percent of African-American students. (Refer back to Figure 8.)



**FIGURE 10:** Percent of Students Committing Discretionary and Mandatory Violations, by Gender and Race/Ethnicity[81]

■ Discretionary   ■ Mandatory

| | Female (n=453,873) | Male (n=475,067) | African American (n=133,719) | Hispanic (n=366,900) | White (n=400,104) |
|---|---|---|---|---|---|
| Mandatory | 3.8% | 9.1% | 7.2% | 7.9% | 5.3% |
| Discretionary | 49.9% | 67.8% | 76.7% | 66.7% | 47.9% |

Note: Because students could have received both mandatory and discretionary violations, the total percent of students with mandatory and/or discretionary violations in the bars above is greater than the total percent of students that received disciplinary actions as reported elsewhere in this report.

The aggregate statistics presented thus far suggest that African-American students, and to a lesser extent Hispanic students, were more frequently involved in discretionary school discipline incidents than white students. However, these statistics do not tell the whole story. It is possible that the relationships observed could be explained by factors that correlate with race. Multivariate analyses offer a tool to account statistically for other possible competing explanations for which data are available, yielding a better estimate of the effect of race.

---

81.  As shown in Figure 6 on page 37, 553,413 (59.6%) of the 928,940 students in the study had ever received at least one disciplinary action of any kind. Figure 10 shows the percentage of students of each race and gender category that had ever received *discretionary or mandatory* violations: 548,905 (59.1%) of the 928,940 students in the study had ever received a discretionary violation; 60,558 (6.5%) of the 928,940 students in the study had ever received a mandatory violation. There were 56,050 students who had ever received both mandatory and discretionary violations, so those students were counted in both of these categories in Figure 10 above.

*Multivariate Analysis*

- Within the ninth-grade year, African-American students had about a 31 percent higher likelihood of a discretionary school disciplinary action, compared to the rate for otherwise identical white students (see Table 1). Hispanic students, on the other hand—when a host of other factors were controlled for—were no more likely than otherwise identical white students to experience a discretionary school disciplinary action.

- Within the ninth-grade school year, African-American students had about a 23 percent *lower* likelihood of facing a mandatory school disciplinary action while Hispanic students had about a 16 percent higher likelihood of receiving a mandatory action, compared to otherwise identical white students. (See Table 1.)

## Conclusion for Finding 2

African-American students (particularly African-American males) were especially likely to be involved in the school disciplinary system. This finding is consistent with previous research highlighting the disproportionate impact of school

| **TABLE 1:** Probability of School Discipline Involvement in 9th Grade by Race (Controlling for All Other Measurable Student and Campus Attributes) | | |
|---|---|---|
| Chance of → | **DISCRETIONARY** disciplinary action in 9th grade | **MANDATORY** disciplinary action in 9th grade |
| **For students who are...** | | |
| White | **Reference Group** | **Reference Group** |
| African American | 31.1% higher | 23.3% lower |
| Hispanic | Equal chance | 16.4% higher |

discipline policies on students of color.[82] One explanation offered for this disparity has been that African-American students disproportionately may come from low-income households, may be overly represented among special education students, or may have missed more school than students of other races, which some researchers have correlated with misbehavior in school. This study, however, controlled for these and the remainder of the variables in Appendix A. Although it was impossible to control for every conceivable factor, the multivariate analysis was able to account for the factors most often associated with poor school performance. Still, race was a predictive factor for whether a student would be disciplined, particularly for discretionary disciplinary actions.

Consistent with national studies, this study found that African-American students were no more likely than students of other races to commit serious offenses that mandate that a student be removed from the campus.[83] Indeed, analyses conducted for this report demonstrated that white and Hispanic students were *more likely* than African-American students to commit offenses that trigger mandatory expulsion.

While refuting some potential explanations why African-American students were particularly likely to be disciplined for lower-level violations of a school code of conduct, this analysis does not pinpoint the reasons for it. High rates of disciplinary involvement among African-American students were driven chiefly by violations that are subject to the discretion of school employees. It is important to explore, with educators, parents, students, and others, what might be contributing to this disproportionality. Bringing rates of discipline for these violations in line with those for white students (i.e., reducing them by 10 percent) would have significant implications. If the African-American students had the same probability as whites of being involved in a school disciplinary action, there would have been 13,496 fewer African-American pupils disciplined in the groups studied between their seventh- and twelfth-grade school years—or roughly 4,500 African-American students for every cohort.[84]

---

**82**. See, for example, Russell Skiba, Robert S. Michael, Abra C. Nardo, and Reece L. Peterson, "The Color of Discipline: Sources of Racial and Gender Disporportionality in School Punishment," *Urban Review* 34 (2002): 317–342; Michael P. Krezmien, Peter E. Leone, and Georgianna M. Achilles, "Suspension, Race, and Disability: Analysis of Statewide Practices and Reporting," *Journal of Emotional and Behavioral Disorders* 14 (2006): 217–226 (see discussion on pp. 222 and 223, in particular); and Virginia Costenbader and Samia Markson, "School Suspension: A Study with Secondary School Students," *Journal of School Psychology* 36 (1998): 59–82.

**83**. R. Skiba, Michael, R., A. Nardo, and R. Peterson. (2002). The color of discipline: Sources of racial and gender disproportionality in school punishment. *The Urban Review*, 34(4), 317–342.

**84**. This figure represents the difference between the 133,719 African-American students disciplined at 56.7 percent (75,861) and the number that would have been disciplined at the rate of 46.6 percent for whites (62,365). The discipline rates are based on the multivariate analysis that eliminates the (Continued on p. 47)

**FINDING 3**

Nearly three out of four students who qualified for special education services during the study period were suspended or expelled at least once between their seventh- and twelfth-grade school years. The level of disciplinary involvement by these students, however, varied significantly according to the specific type of educational disability they had.[85]

Primary and secondary schools have become increasingly sophisticated in identifying children with special needs related to both physical and mental health. These special needs make learning the standard curriculum without modifications or additional services and supports especially challenging for these students. Pursuant to the Individuals with Disabilities Education Act (IDEA), the U.S. Department of Education requires schools that receive federal funding to provide "appropriate" education programs to students with disabilities, which meet those students' individual needs, "to the same extent that the needs of nondisabled students are met."[86] School officials and personnel long have recognized that effectively meeting the needs of these students is of great importance, but that goal poses distinct challenges. Improving outcomes for this population in particular is, appropriately, an especially high priority for education administrators everywhere.

---

**(84 cont.)**  effect of the variables in Appendix A to better isolate the predictive effect of race/ethnicity on school discipline.

**85.**  In the context of this report, "educational disability" is the umbrella term used to encompass those disabilities defined in the Individuals with Disabilities Education Act. Individual states, including Texas, use that federal statute and associated regulations as parameters for identifying those disabilities, which, when present in a student, make him or her eligible for additional school-based supports and services.

**86.**  U.S. Department of Education, Office for Civil Rights, *Free Appropriate Public Education for Students With Disabilities: Requirements Under Section 504 of the Rehabilitation Act of 1973* (Washington, DC: Author, 2010) retrieved June 11, 2011 from *http://www2.ed.gov/about/offices/list/ocr/docs/edlite-FAPE504.html*. Terms and definitions provided in the IDEA and its regulations guide how states, in turn, define disability.

For this report, researchers explored whether students with disabilities were involved more frequently in the school disciplinary system than their peers without these disabilities. To that end, the research team isolated the records of those students who, in any year during the six-year analysis period (grades seven to twelve), were coded as having a disability that made them eligible for special education.[87]

Of the 928,940 students tracked for this study, nearly 13.2 percent (122,250) were recorded as having a disability or a special need that made them eligible for special education services under federal law. Of these 122,250 students with special needs, 70.8 percent had a learning disability, 9.9 percent had an emotional disturbance,[88] and 1.6 percent had some other disability, such as autism, mental retardation, traumatic brain injury, or development delay.[89] An additional 17.7 percent of these 122,250 students were eligible for special education services because, according to their student records, they were coded as having an orthopedic, auditory, visual, speech, or other physical health impairment. (See Figure 11.)

Focusing on the 122,250 students who qualified for special education, researchers determined whether, at any point between seventh and twelfth grades, these youths were involved in the school discipline system. In fact, nearly three-quarters of the students with educational disabilities were suspended or expelled.

---

87.  A student may decline special education services, or may avail him- or herself of special education one year, but not in a subsequent year.

88.  Data reported in PEIMS reflect that 1.3 percent of the entire group of students studied (not just those with educational disabilities) had an emotional disturbance. There is considerable variation in what states report as the prevalence rates of emotional disturbance among students in their school systems, but the average prevalence rate that states report, taken in the aggregate, is approximately 0.9 percent of the student population, and that rate has remained relatively unchanged since the Office of Special Education Programs began collecting these data in 1976. [Donald P. Oswald and Martha J. Coutinho, "Identification and Placement of Students with Serious Emotional Disturbance. Part I: Correlates of State Child-Count Data," *Journal of Emotional & Behavioral Disorders* 3 (1995): 224–229.]

Federal agencies, national advocacy groups, and mental health experts, however, have estimated higher national prevalence rates of emotional disturbances among children. Many experts believe that an identification rate of 3 percent to 6 percent would be more accurate than 0.9 percent, and the rate of children and adolescents with emotional disturbances, not just those who meet federal guidelines for special education, may be as high as 8 percent to 12 percent. [*See* Robert M. Friedman, Krista Kutash, and Albert J. Duchnowski, "The Population of Concern: Defining the Issues," in *Children's Mental Health: Creating Systems of Care in a Changing Society*, ed. Beth A. Stroul (Baltimore, MD: Brookes, 1996), 69–96; Mary M. Wagner, "Outcomes for Youths with Serious Emotional Disturbance in Secondary School and Early Adulthood," *Critical Issues for Children and Youths* 5 (1995): 90–112.]

89.  Students may have more than one disability, but, in these instances, researchers considered the primary disability only. The PEIMS database indicates which disability was the "primary" disability. The terms and definitions of emotional disturbance, mental retardation, and other disabilities in this study are consistent with the parameters provided in IDEA and associated regulations. Other federal agencies use different criteria to determine whether a youth with an emotional disturbance qualifies for services for which federal funding is made available. Definitions provided by the other federal agencies contemplate a broad array of mental health conditions, some of which may also lead to eligibility under IDEA. For example, the Center for Mental Health Services (Continued on page 49)

In addition to the analyses above, researchers used a multivariate analysis to control for various factors to determine whether students with particular disabilities were especially likely to experience suspension or expulsion.[90]



**FIGURE 11:** Overview of Discretionary Disciplinary Actions by Disability Status of Students

*Includes students with Autism, Mental Retardation, Traumatic Brain Injury, and Developmental Delay.

Note: There were approximately 6,900 students who were not coded as having/not having a disability. They are included in the count of students with "No Disability" in this figure.

(89 cont.) defines children with serious mental illnesses to guide state access to public mental health services. That definition, developed "pursuant to Section 1911(c) of the Public Health Service Act, defines 'children with a serious emotional disturbance' as persons:(1) [who are] from birth up to age 18; (2) who currently have, or at any time during the past year have had a diagnosable mental, behavioral or emotional disorder of sufficient duration to meet diagnostic criteria specified within DSM-III-R; and (3) [who display behavior that has] resulted in functional impairment which substantially interferes with or limits the child's role or functioning in family, school, or community activities." Federal Register Volume 58 No. 96, May 20, 1993, pp. 29422–29425. The Social Security Administration's (SSA) definition of eligibility for the children's Supplemental Security Income program is the presence of a mental condition that can be medically proven and that results in marked and severe functional limitations of substantial duration. Meeting these CMHS and/or SSA criteria described above, however, does not automatically qualify a student for services funded through IDEA.

90.  The researchers examined disciplinary actions in the academic year following the year in which that student's record reflected the disability.

## Supporting Data

*Bivariate Analysis*

- Fifty-five percent of students with no recorded disability had a suspension and/or expulsion during the study period. In contrast, 74.6 percent of students with *any* educational disability had at least one suspension and/or expulsion. Breaking this down further, 76.2 percent of students with a learning disability code and 90.2 percent of students identified as having an emotional disturbance had at least one disciplinary action during the study period. In addition, 62.9 percent of students with a physical disability were disciplined during that time.

- As Figure 11 suggests, although students with learning disabilities and emotional disturbances were disciplined more than students with no disability, children with "other" types of disabilities had comparatively less involvement in the disciplinary system: 37 percent of students with such other disabilities as autism and mental retardation were disciplined during the study period.

- As was the case with other categories of students studied who were disciplined, nearly all of the suspensions or expulsions (98.1%) resulted from a discretionary decision by a school official—not a mandatory removal under state law.

- Of those students between the seventh and twelfth grades who experienced suspension and/or expulsion no more than one time, less than one in 12 was identified as having a learning disability. In contrast, one out of every six of those students who experienced suspension and/or expulsion 11 or more times in the same timeframe had a learning disability.

- Of those students who experienced suspension and/or expulsion between seventh and twelfth grades (59 percent of all students studied), about one out of every 50 students was at some point identified as "emotionally disturbed." In contrast, nearly one out of every 20 students disciplined 11 times or more (4.2 percent) was given this designation during the study period.

- Approximately half (48.4%) of the students coded as having an emotional disturbance were suspended or expelled 11 or more times.

*Multivariate Analyses*

- When controlling for all other study variables, researchers found that the presence of a learning disability increased the likelihood of the student's being suspended or expelled as the result of a school official's discretionary decision, but by just 2.5 percent. Students with other disabilities, including autism, mental retardation, and physical disability, were substantially less likely to experience such a suspension or expulsion.

- When controlling for all other study variables, the study showed that youths whose student records reflected that they had been coded as emotionally disturbed had a 23.9 percent higher probability of being suspended or expelled for a discretionary action.

**TABLE 2:** Probability of Disciplinary Action in the School Year, Controlling for Disability Status and for All Measurable Student and Campus Attributes

| Chance of → | DISCRETIONARY disciplinary action in the school year | MANDATORY disciplinary action in the school year |
|---|---|---|
| For students who have… | | |
| No Disability | Reference Group | Reference Group |
| Emotional Disturbance | 23.9% higher | 13.4% higher |
| Learning Disability | 2.5% higher | 8.1% higher |
| Physical Disability | 8.9% lower | Equal chance |
| Mental Retardation | 50.0% lower | 41.9% lower |
| Autism | 63.8% lower | 71.3% lower |

## Conclusion for Finding 3

Approximately three out of every four students (74.6%) with a disability were suspended or expelled between the seventh and twelfth grades. Analyzing these data closely, however, revealed that a student's involvement in the disciplinary system varied significantly, depending on his or her disability. Whereas nine out of ten students identified as emotionally disturbed were removed from the classroom at least once because of a violation of their local code of conduct, just a little more than one in three (37%) of the students with a disability such as autism or mental retardation were similarly involved in the disciplinary system.

The multivariate analyses conducted demonstrated that, when other factors were controlled for, having an emotional disturbance increased the likelihood of a student's removal from the classroom. On the other hand, having a learning disability essentially did little to increase the probability of suspension or expulsion. Students with other disabilities, namely mental retardation or autism, were at a much lower risk of exposure to disciplinary actions. The data revealed also that students with a learning disability and students with an emotional disturbance were more likely than students with no disability to receive a state law-mandated suspension or expulsion for serious misconduct at school.

There is an important contrast between the descriptive findings from the bivariate analysis and the multivariate analysis: The descriptive findings of the aggregate data show significant overrepresentation of students with educational disabilities experiencing suspension and expulsion. The multivariate analysis suggests that simply having an educational disability did not increase a student's likelihood of being suspended or expelled; the *type* of educational disability was the better predictor of disciplinary action. For example, students coded as having an emotional disturbance had a greater likelihood of being suspended or expelled than students with a learning disability. This contrast demonstrates why a multivariate analysis is so useful, in this case enabling researchers to isolate with more precision those factors that seemed to contribute most to involvement in the school disciplinary system. Given the finding that the presence of an emotional disturbance, but not a learning disability, had such a significant impact on suspension and/or expulsion, additional research would be helpful in understanding why this is the case.

No one needs another study to confirm that managing, within one classroom, the behaviors of children with diverse needs, including those with particular disabilities, can be challenging. That said, to maintain safe and effective learning environments for all students, and to improve outcomes for students with educational disabilities—in particular students with emotional disturbances—state and local government officials need assistance across systems. They need input from health professionals, educators, advocates for children with disabilities, researchers, representatives of the juvenile justice system, and others whose differing perspectives about policies, programs, and practices may shape future multidisciplinary initiatives to reduce high rates of suspension or expulsion among this particular subset of students.

## FINDING 4

**Students who experienced suspension or expulsion, especially those who did so repeatedly, were more likely to be held back a grade or drop out of school than students who were not involved in the disciplinary system.**

Previous research has found that students who are suspended or expelled from school tend to do worse academically over time than students who comply with school rules.[91] The findings from the Texas study confirm that vast numbers of students were involved in the school disciplinary system—and many of them repeatedly. Understanding the implications of these classroom removals for Texas students is important to policymakers as they seek to improve children's academic performance. As mentioned previously, even when educators ensure that students are given their schoolwork when they are suspended (and many school officials acknowledge that this is not always the case), the environment may not be conducive to learning.[92] This finding focuses on this question: To what degree, if any, are suspensions and expulsions affecting the academic outcomes for students who misbehave?

In response to this question, the researchers conducted a bivariate analysis comparing students who had been suspended and/or expelled to students who had not been disciplined. For each group, the percentage of students who dropped out of school or repeated a grade (or both) was calculated. But the question remained whether the suspensions or expulsions were related to these undesired academic outcomes, or whether other factors were responsible.

---

**91.** *See*, e.g., I.S. Gersch and A. Nolan, "Exclusions: What the children think," *Educational Psychology in Practice 10 (1994): 35–45*: P. Yelsma, J. Yelsma, and A. Hovestadt, "Autonomy and intimacy of self- and externally disciplined students: Families of origin and the implementation of the adult mentor program," *School Counselor* 39 (1991): 20–29; Russell Skiba and M. Karega Rausch, *The Relationship between Achievement, Discipline, and Race: An Analysis of Factors Predicting ISTEP Scores. Children Left Behind Policy Briefs. Supplementary Analysis* 2-D (Bloomington, IN: Center for Evaluation and Education Policy, 2004).

**92.** See discussion on pages 20–21 of the Overview of the Texas System citing the Legislative Budget Board findings.

To eliminate the possibility that other factors in the study, rather than the disciplinary event, were related to repeating a grade, the researchers used multivariate analyses to create statistically identical profiles for students, who differed in one respect—whether they had been involved in the school disciplinary system.[93] Using these profiles, the researchers then determined whether suspension or expulsion had increased the likelihood of a student repeating a grade that same academic year.

Although grade-retention statistics drawn from the state PEIMS are reliable, the database likely does not reflect the full number of school dropouts.[94] Accordingly, the findings below likely understate the impact that school discipline had on student drop-out rates.



**FIGURE 12:** Relationship between Any Disciplinary Contact and Repeating a Grade or Dropping Out

---

93. The variables that were controlled for are the 83 listed in Appendix A.

94. Grade retention (repeating a grade) was computed based upon whether a student was in the same grade in the previous school year. Recall from the discussion in the methodology (pages 28–30) that the drop-out measure is not stable over time. TEA used a less inclusive measure for the annual drop-out rate for the study's academic years 1999–2006 before adopting the National Center for Education Statistics' definition in the 2006 school year. Drop-out measures based on "annual" drop-out indicators are much lower than the percentage reflected in the TEA's "longitudinal" drop-out findings. Accordingly, using a one-year perspective, the findings here likely understate the impact of school discipline on students' completion of high school.

## Supporting Data

*Bivariate Analysis*

- Thirty-one percent of those students with one or more suspensions or expulsions repeated their grade level at least once. In contrast, about 5 percent of students (5.2%) with no disciplinary actions were held back. (See Figure 12.)

- Nearly 10 percent of those students with at least one disciplinary contact dropped out of school, compared to just 2 percent of students with no disciplinary action. (See Figure 12.)

- Whereas just 5.3 percent of students who had no *discretionary* actions repeated a grade, 55.6 percent of students who had experienced 11 or more discretionary suspensions and/or expulsions were held back at least once during the study period. (See Figure 13.)

- Fifteen percent of students with 11 or more suspensions or expulsions dropped out of school prior to graduation, compared to a 2 percent drop-out rate among students with no disciplinary actions.

Whether a student graduated during the study period is also an important metric of academic performance; graduation is a measure distinct from whether a student dropped out or repeated a grade. Figure 14 describes what researchers found while examining the percentage of students who did not graduate during the study period.[95] A student who did not graduate may have dropped out; or may have repeated a grade at least once and still been involved in the Texas public school system in some capacity when the study period concluded.[96]

---

**95.** As explained previously [see methodology, pages 28–29], students were followed for one to three years beyond the year they were projected to graduate when they were in seventh grade. Students who were in seventh grade in 2000 were followed through 2009, or three years beyond the year they were originally scheduled to graduate; students who were in seventh grade in 2002 were also followed through 2009, or one year beyond the year they were originally scheduled to graduate.

**96.** It is possible for a student to have repeated a grade at some point during the study period *and* subsequently to have dropped out, meaning he or she would show up as both "not graduating" *and* "repeating a grade" and "dropped out."



**FIGURE 13:** Percent of Students by Level of Discretionary Disciplinary Involvement That Repeated a Grade or Dropped Out within the Study Period

| | Percent Repeated Grade (7–12) | Percent Dropped Out |
|---|---|---|
| No Disciplinary Violations — 380,035 (41%) | 5.3% | 2.2% |
| 1 Minor Involvement — 122,112 (13.1%) | 11.7% | 4.8% |
| 2–5 Repeat Involvement — 192,448 (20.7%) | 22.2% | 8.0% |
| 6–10 High Involvement — 93,685 (10%) | 36.3% | 11.4% |
| 11 or More Very High Involvement — 140,660 (15.2%) | 55.6% | 15.3% |

All Students in Study Group — 928,940



**FIGURE 14:** Percent of Students by Level of Discretionary Disciplinary Involvement That Did Not Graduate within the Study Period

Percent That Did Not Graduate (7–12)

**All Students in Study Group**
928,940

| | Percent That Did Not Graduate (7–12) |
|---|---|
| No Disciplinary Violations — 380,035 (**41%**) | **18.2%** |
| 1 Minor Involvement — 122,112 (**13.1%**) | **24.1%** |
| 2–5 Repeat Involvement — 192,448 (**20.7%**) | **34.1%** |
| 6–10 High Involvement — 93,685 (**10%**) | **46.2%** |
| 11 or More Very High Involvement — 140,660 (**15.2%**) | **59.3%** |

Another scenario, which applied to a small subset of students, was that they left the Texas public school system, transferring out of state or into private schools or home-schooling. There is no reason to believe that the effect of prior discipline on graduation rates differed for students who left the Texas public school system versus for those who remained.

- Whereas 18.2 percent of students who had not been disciplined did not graduate from a public school in Texas during the study period, 59.3 percent of students who had experienced 11 or more suspensions or expulsions failed to complete high school during the study period. (See Figure 14.)

*Multivariate Analysis*

In addition to the descriptive bivariate relationships described above, researchers used a multivariate analysis to help isolate the relationship between suspension and expulsion and the likelihood of a student's repeating a grade. These multivariate analyses controlled for individual student and campus characteristics so that students were statistically similar except for their involvement in the school discipline system.

- The multivariate analysis revealed that a student who had experienced a discretionary disciplinary action was twice as likely to repeat a grade compared to a student who had the same characteristics and attended a similar school but was not suspended or expelled.

## Conclusion for Finding 4

These results indicate that a student disciplined and removed from the classroom for a suspension or expulsion was more likely to be held back that year or to drop out than was a student who had not been similarly disciplined. This finding appears to highlight an opportunity to reduce drop-out rates and increase rates of grade completion at the time students are in contact with the disciplinary system. Given how many students experience suspension or expulsion, often repeatedly, between seventh and twelfth grade, schools that are successful in addressing those student behaviors that result in disciplinary action could potentially improve academic outcomes. For example, researchers calculated that, had students in the study group who had been suspended or expelled repeated a grade with the same frequency as those students not involved in the disciplinary system, a total of 14,320 students across the entire study group would not have repeated a grade. [97]

---

**97.** This estimate assumes that the child received in-school suspension each year during grades seven through twelve. Researchers also ran a scenario using a lower discipline rate, in which students received an in-school suspension just once (in the ninth grade). In that case, where students received in-school suspension only once in the ninth grade, the model still predicted 12,466 fewer students held back. See footnote 79 in Finding 2 for an explanation as to why grade nine is used for this model.

**FINDING 5**

More than one in seven students were in contact with the juvenile justice system between seventh and twelfth grade. Students who were suspended or expelled had a greater likelihood of contact with the juvenile justice system in their middle or high school years, particularly when they were disciplined multiple times.

The proposition that a student who misbehaves in school is more likely to become involved in the juvenile justice system than a student who adheres to a school's code of conduct seems intuitive, but the dynamics related to how and when students who are disciplined end up in the juvenile justice system has not been adequately explored in a statewide context. A fundamental goal of the school discipline system is to correct student behavior, increase student compliance with the code of conduct, and prevent additional rule-breaking or criminal activity—which in turn should reduce the likelihood of more serious engagement with the juvenile justice system. Accordingly, a key objective of this study was to determine whether there is a relationship between disciplinary action for failure to comply with a school's code of conduct and the probability of juvenile justice system engagement.

The first step in assessing linkages between discipline and delinquency was to determine how many of the nearly one million students tracked for this analysis had contact with the juvenile justice system between seventh and twelfth grade. To that end, researchers obtained the records of all boys and girls who had contact with the juvenile justice system during the study period. (For the purposes of this report, "contact with the juvenile justice system" refers to contact with a county's juvenile probation department. See sidebar (p. 62) for further explanation.) The research team then determined who of those youths with juvenile justice records were also among the three groups studied—all Texas public school students who were in seventh grade during the 2000–2001, 2001–2002, or 2002–2003 academic school years. This analysis yielded an important finding: Sometime between seventh and twelfth grade, nearly 15 percent of the Texas students studied (more than one in every seven students) had contact with the juvenile justice system.

## WHAT "CONTACT WITH THE JUVENILE JUSTICE SYSTEM" MEANS

As used in this study, contact with the juvenile justice system refers to a student's contact with a county's juvenile probation department. Such interactions may come from a number of sources (with a very small percentage from direct school referrals) and may occur for any reason, ranging from a paper referral (in which a police officer counsels and releases a youth engaged in minor delinquent activity, and then submits paperwork to the local juvenile probation department) to a more serious violation involving detention or arrest. A juvenile who is taken into custody may either be detained in a juvenile detention facility or released to a parent or guardian.

If juveniles' alleged "delinquent offenses" qualify as crimes punishable by jail had they been committed by an adult, the youths are fingerprinted and their records are entered into a statewide central repository at the Texas Department of Public Safety (TDPS). The resulting criminal history record may then be accessed by law enforcement and juvenile justice agencies throughout the state. Any youth referred to the local probation department for truancy, running away, or expulsion from a disciplinary alternative education program for serious or persistent misconduct is considered a Child in Need of Supervision (CINS) under the Texas Family Code. He or she is not fingerprinted and may not be detained more than 24 hours.

In either case, all referrals to the county juvenile probation department result in a record that is reported to the state juvenile justice agency: the Texas Juvenile Probation Commission (TJPC). For the current study, the TEA matched these TJPC records with student records, enabling researchers to identify the number of students between seventh and twelfth grade who had been in contact with the juvenile justice system.

As high as this study's reported rate of juvenile justice involvement appears to be (nearly 15% of the 928,940 students studied), it does not factor in other relatively common circumstances in which students can come into contact with law enforcement. For example, a juvenile may be arrested and/or detained by police and released to his or her parent or guardian without notification to TJPC. Similarly, TJPC records may not capture occasions when police, particularly school police, issue tickets to students for Misdemeanor C offenses that are referred to municipal courts. In both scenarios, the juvenile justice contacts are not counted in this study because they are not included in the study's databases of student records or in the juvenile probation system information that is reported to the state.

Having identified the number of all students studied who had juvenile justice contact between seventh and twelfth grade, the project team sought to determine the relationship between this involvement and prior school disciplinary action. Previous findings in this report explain that the majority of the students in Texas public schools who were studied were involved in the school disciplinary system at least once during middle or high school. In the vast majority of these instances, suspensions and expulsions were a discretionary response to students' violations of the school code of conduct. Less than 3 percent of the disciplinary actions were triggered by behavior severe enough to warrant a mandatory expulsion or mandatory DAEP referral, such as assault or bringing a gun to school.[98]

A school official's discretionary decision to suspend or expel a student may include a referral to the juvenile court system.[99] For example, destruction of school property, a school fight, or theft amount not only to violations of a school's code of conduct, but can also be subject to criminal prosecution. Data available for this study were not sufficient to determine, however, when a student's suspension was coupled with a referral by school officials to the juvenile court system. The disciplinary events in the PEIMS database that were available to researchers reflected only the academic year in which the disciplinary action was taken (not the specific date), making it impossible to determine when, for the same disciplinary event, a student was suspended *and* referred to the juvenile court system.[100]

What is clear is that few *discretionary* school disciplinary actions were coupled with a referral by school officials to the juvenile justice system. In 2009–2010, of the 85,548 formal referrals to juvenile probation in Texas from all sources, only about 6 percent (just 5,349) came directly from schools.[101] In that same year, more than one

---

**98.** Mandatory expulsion does not necessarily mean automatic contact with the juvenile justice system. For instance, a student can be expelled to a Disciplinary Alternative Education Program (DAEP), which is not part of the juvenile justice system.

**99.** Readers should recall that referrals to the juvenile justice system may also come from law enforcement officers who are assigned to the school or who are alerted to the offense (see discussion pages 23–24). Such referrals, however, were not necessarily captured in the PEIMS database used for this study.

**100.** The researchers did not know when a disciplinary action *led* to a juvenile justice referral, but they did know when a disciplinary action *occurred before* a juvenile justice system referral. Although they were unable to isolate whenever a specific school disciplinary event included a referral to juvenile justice system, they were able to identify when a disciplinary event occurred in the academic year preceding the juvenile justice referral, which in turn enabled researchers to calculate a statistical relationship between disciplinary action and juvenile justice involvement.

**101.** Statistical tables from Texas Juvenile Probation Commission provided to researchers by Nancy Arrigona, director of research, May 2011.

million students in the grades studied were disciplined by school officials, [102] but the referrals from schools directly to juvenile probation represented less than 1 percent of all the disciplined students. The researchers investigated further whether students who were disciplined in school were more likely to have contact with the juvenile justice system even if the school was not the referring agent. That is, even if schools were referring only a small number of students directly to the juvenile justice system, there was still the need to investigate whether students' involvement in the school disciplinary system could predict subsequent juvenile justice contact.

Multivariate analyses enabled the researchers to control for all study variables, to create statistically identical student profiles, with one difference—whether the student had been involved in the disciplinary system during the preceding academic year.[103] In conducting these analyses, researchers identified students subject to a discretionary action in a particular academic year and determined which of those students were then in contact with the juvenile justice system at any time during the following school year. Because the model was predicting "first" juvenile contact, once a student was observed to have a juvenile justice referral, he or she was dropped from analyses in subsequent school years.

A second multivariate analysis then examined whether frequency of discipline affected the chance students would come into contact with the juvenile justice system. Students were sorted into the same five categories as those found in previous figures, based on their number of discretionary disciplinary actions: those with no violations, those with minor involvement (one discretionary action), those with repeat involvement (two to five discretionary actions), those with frequent involvement (six to ten discretionary actions), and those with very frequent involvement (11 or more discretionary actions).[104] For each of these groups, researchers conducted additional analyses to ascertain the impact of multiple disciplinary violations on juvenile justice involvement.

---

**102.** Texas Juvenile Probation Commission statistical run per request of the authors, May 2011. These were formal referrals. See sidebar on page 62 for an explanation regarding "paper" referrals, which are not included in this total. Including those referrals would not substantially change the finding that few referrals to the juvenile justice system came directly from schools.

**103.** The variables that were controlled can be found in Appendix A.

**104.** The multivariate model assumed that the "1 discipline" group was disciplined in sixth grade, the "2–5 disciplines" group was disciplined once each year over a five-year period, the "6–10 disciplines" group was disciplined twice each year for five years, and the "11+ disciplines" group was disciplined three times per year for five years.

### Risk and Needs Assessments that Consider School Disciplinary Action

The Texas Juvenile Probation Commission's Risk and Needs Assessment instrument (RANA) is designed to measure a juvenile's risk of committing a subsequent offense and his or her need for programs and services. The assessment was developed by the agency's research division based on information gathered on more than 3,000 youths referred to juvenile probation departments throughout the state in 2003. Data elements collected for the assessment study included demographic, juvenile justice, family dynamics, substance use, education, abuse and neglect, runaway behavior, and mental health information. Analysis of the more than 500 data elements collected identified 11 factors that best predicted a juvenile's risk of becoming a chronic offender. Top among these factors were frequent drug use, lack of parental control, and school disciplinary referrals.

School disciplinary referrals, chronic truancy, and failing a grade in school are common characteristics of youth in the juvenile justice system. The study found that when assessing risk, juvenile probation youth with one school disciplinary referral were 10 percent more likely to become chronic offenders than juveniles with no school disciplinary referrals. Each additional referral increased a youth's risk of re-offense by an added 10 percent. In 2010, 64 percent of juveniles assessed had one or more school disciplinary referrals in the year prior to their offense.

The RANA, in use by local Texas juvenile probation departments since June 2009, provides information on a juvenile's risk and needs levels as well as case management recommendations based on the juvenile's risk and need factors. The education domain appears when a juvenile has had three or more school disciplinary referrals in the year prior to an offense. Probation staff and officers supervising the youth are encouraged to provide the supervision and services necessary to increase school success and reduce subsequent juvenile justice involvement.[105]

---

**105.** The information for this sidebar was provided by Nancy Arrigona, director of research for the Texas Juvenile Probation Commission; conversation with the author Tony Fabelo, April 20, 2011.

## Supporting Data

*Bivariate Analyses*

• Of the 928,940 children studied, nearly 15 percent (19 percent of the males and nearly 10 percent of the females) had juvenile justice system contact.

• As Figure 15, indicates, 23 percent of students who were involved in the school disciplinary system (including those students subject to a mandatory removal from the school) had a contact with the juvenile justice system. Of those students who had no involvement in the school disciplinary system, just 2 percent had contact with the juvenile justice system.



**FIGURE 15:** Relationship between Disciplinary Action and Juvenile Justice Contact

• Figure 16 reveals that one in five (20%) of African-American students were in contact with the juvenile justice system during the study period. In contrast, about 1 in 6 (17%) Hispanic students had a juvenile justice contact, and about 1 in 10 (11%) of white students were involved with the juvenile justice system.



**FIGURE 16:** Race of Students with Juvenile Justice Contact

1 in 5
African-American Students

1 in 6
Hispanic Students

1 in 10
White Students

- African-American males (25.6%) had greater involvement in the juvenile justice system than Hispanic (22%) or white male students (13.9%) during the study period. (See Figure 17.)



**FIGURE 17:** Percent of Males and Females by Racial/Ethnic Group with Juvenile Justice Contact

| Male Racial/Ethnic Distribution of Study Group | Male Racial/Ethnic Distribution of Students with Juvenile Justice Contact | Female Racial/Ethnic Distribution of Study Group | Female Racial/Ethnic Distribution of Students with Juvenile Justice Contact |
|---|---|---|---|
| African-American Male 67,919 | African-American Male 17,360 (25.6%) | African-American Female 65,800 | African-American Female 9,474 (14.4%) |
| Hispanic Male 187,099 | Hispanic Male 41,123 (22.0%) | Hispanic Female 179,801 | Hispanic Female 22,870 (12.7%) |
| White Male 205,519 | White Male 28,642 (13.9%) | White Female 194,585 | White Female 15,366 (7.9%) |

\* Other races/ethnic groups not shown. Racial/ethnic distribution of study group population was 14.3% African American, 39.4% Hispanic, 43% white.

- The same pattern held for the female students studied: African-American girls had greater contact (14.4%) with the juvenile justice system than their peers who were Hispanic (12.7%) or white (7.9%).

- Figure 18 indicates that nearly half (48%) of the students classified as having an emotional disturbance during the study period had contact with the juvenile justice system, compared with just over 13 percent of the students with no disability.



**FIGURE 18:** Percent of Students in Different Disability Categories with Juvenile Justice Contact

\* Note: There were approximately 6,900 students who were not coded as having/not having a disability. They are included in the count of students with "No Disability" in this figure.

- Students with a learning disability or a physical disability also had higher rates of contact with the juvenile justice system (24.4% and 18.0%, respectively), while students in the "other" category—such as autism, mental retardation, traumatic brain injury, and development delay—had a lower rate (5.8%).



**FIGURE 19:** Percent of Students (by Number of Discretionary Disciplinary Actions) with Juvenile Justice Involvement during the Study Period

All Students in Study Group
928,940

| No Disciplinary Action | 1 Minor Involvement | 2–5 Repeat Involvement | 6–10 High Involvement | 11 or More Very High Involvement |
|---|---|---|---|---|
| **380,035** (41%) | **122,112** (13.1%) | **192,448** (20.7%) | **93,685** (10%) | **140,660** (15.2%) |
| **2.4%** | **6.8%** | **14.7%** | **27.3%** | **46.0%** |

PERCENT WITH JUVENILE JUSTICE CONTACT

Figure 19 shows that 10 percent of the students had high involvement (six to ten discretionary actions) and 15 percent had very high involvement (11 or more discretionary actions) in the school disciplinary system. More than one quarter of the students with high involvement (27.3%), and nearly half of the students with very high involvement (46%), had a contact with the juvenile justice system.

- For those students who were not disciplined or were disciplined just once (discretionary actions) in the years from seventh to twelfth grade (collectively, 54 percent of all students in these grades), contact with the juvenile justice system was extremely low (2.4% and 6.8%, respectively).

- Recall that more than one in four African-American students were disciplined 11 or more times (25.7%), compared to nearly one in five Hispanic (18.1%) and nearly one in ten (9.5%) white students. (See Figure 9 on page 43.)

*Multivariate Analysis*

- The results of the first multivariate analysis demonstrated that when a student was suspended or expelled for a discretionary school disciplinary violation, this action nearly tripled (2.85 times) the likelihood of juvenile justice contact within the subsequent academic year. Further, as shown in Figure 20, each additional discretionary encounter exponentially increased further the likelihood of juvenile justice involvement.



**FIGURE 20:** Effect of Discretionary Disciplinary Action on the Chance of a First Juvenile Probation Referral



**FIGURE 21:** Probability of Juvenile Justice Contact by Number of Discretionary Disciplinary Actions

- A multivariate model controlling for all campus and student variables except disciplinary history demonstrates that a student with no prior school discipline involvement had about a one in 20 (5.5%) chance of ultimate juvenile justice contact.[106] In contrast, a student who had been disciplined more than 11 times faced a nearly one in five chance (17.3 percent) of a juvenile justice contact. (See Figure 21.)

## Conclusion for Finding 5

The data summarized above make it evident that large numbers of students in the Texas school system have been in contact with the juvenile justice system. These data also provide statistical support for the long-standing concerns among policymakers, practitioners, and advocates that some children are cycling through the school disciplinary system without positive effect. The data reflect calls from

---

**106.** Variables included a student's socioeconomic status, standardized test scores, attendance rates, income of parents, learning disability, grades, race, and many others. For a full list of the variables that were controlled, see Appendix A.

school officials and educators to provide more effective tools and supports that can be applied early, to prevent repeated disciplinary involvement and stem the flow of children into the juvenile justice system. Had the disciplined students in this study had a rate of juvenile justice referrals that was similar to that of non-disciplined students, then, assuming all other things being equal—as the multivariate analysis model did—52,159 students in the study groups would not have been in contact with TJPC. That is more than 17,000 students per study group. [107]

Learning more about the subset of students who are repeatedly in contact with the school disciplinary system makes particular sense. When so many students are suspended (or worse) again and again, for discretionary violations, the school's objectives of correcting student behavior and preventing more serious violations are not achieved. Although there will always be some subset of students who simply cannot abide by school rules and need to be removed from the classroom, many educators and juvenile justice professionals would agree that the number of children who cycle through the school disciplinary system should be reduced.[108] Effective interventions to prevent repeat disciplinary actions will likely improve not only the academic and juvenile justice outcomes for these pupils, but also ensure that teachers and the remaining classmates can enjoy a safer environment that is conducive to learning. These data confirm that reducing students' contact with the juvenile justice system depends in part on finding ways to lower the number of students who cycle in and out of in-school and out-of-school expulsions and removals.

---

**107.** This estimate assumed that disciplined children received in-school suspension once each year during grades six through ten. When researchers employed a scenario assuming a lower disciplinary rate, where students only received in-school suspension once in the eighth grade, the model still predicted 37,169 fewer students in contact with TJPC.

**108.** These perspectives were offered by focus group members convened for this study.

**FINDING 6**
Schools that had similar student populations and were alike in other important regards varied signficantly in how often they suspended or expelled pupils.

Previous findings underscore that the vast majority of decisions to discipline students in this study were discretionary—not made in response to misbehaviors for which state law mandates suspension or expulsion. Focus groups emphasized that the large numbers of discretionary actions reflected teachers' needs for additional tools to maintain order and hold students accountable for their actions. But can schools really be expected to change their use of suspension and expulsion, given the levels of student disruption and disorder that many face? This question prompted the study team to examine closely whether schools with similar campus and student characteristics react the same way to common challenges.

The most obvious way to gauge the extent to which students are disciplined differently across schools is simply to compare disciplinary rates among individual school campuses. Ensuring, however, that comparisons are made among schools that have similar characteristics, particularly in the composition of their student bodies, is difficult. To address this challenge, researchers conducted multivariate modeling—a widely accepted, methodologically-rigorous approach that allows the comparison of schools that are statistically identical in terms of a broad array of measured characteristics. Figure 22 depicts the key student and campus attributes for the multivariate analysis model.

Using this modeling, researchers could identify broad discipline patterns based on data representing all campuses. Furthermore, this approach made it possible to highlight variations among different types of campuses in their levels of disciplinary action, without calling out particular schools by name and/or district. Specific schools with unusually high or low disciplinary rates were not named because extensive visits would have been needed to explain the factors underlying these differences, and such visits were beyond the scope of this project.



**FIGURE 22:** Key Student and Campus Attributes for the Multivariate Analysis as Applied to the Campus-Based Model

**STUDENT ATTRIBUTES**

- Demographics
- Grade
- At-risk status
- Discipline history
- Campus mobility
- Attendance
- State standardized test score
- Socioeconomic status
- Immigrant/migrant status
- Disability status
- Limited English proficiency status
- Title I eligibility
- Gifted/talented status
- Career/tech course participation
- Retained
- Pregnancy

**CAMPUS ATTRIBUTES**

- Campus accountability rating
- Percentage met state standardized test
- Percentage enrolled in bilingual, vocational, or special education programs
- Percentage economically disadvantaged
- Student body racial/ethnic diversity
- Teacher racial/ethnic diversity
- Instructional expenditures per student
- Annual drop-out rate
- Attendance rate
- Student/teacher ratio
- Teacher salary
- Teacher experience
- Charter campus
- Title I campus

Model predicts disciplinary rate for specific campuses in which data were available

Campuses in which disciplinary rates are higher than expected

Campuses in which disciplinary rates are as expected

Campuses in which disciplinary rates are lower than expected

Constructing this particular model involved several steps. First, the research team computed the *chance of discipline for each student* by considering the study's individual and campus characteristics in Appendix A. Such factors included the student's race, his/her test scores, the presence of a particular type of disability, economic status, prior disciplinary history, and dozens of other factors, including those discussed in previous findings. Campus characteristics included students' and teachers' racial makeup, percentage of students who were economically disadvantaged or had a disability, percentage of students enrolled in special programs such as career and technical education, the campus attendance rate,

teacher experience, and indicators of wealth (e.g., taxable property value per student). Individual risk probabilities were averaged for all students in the study group attending the same school, making it possible to estimate the percentage of students *expected to be disciplined* at each campus.

For the second step, the researchers derived *the actual rate of disciplinary contact for these same students* at each campus using information from the PEIMS database. The research team computed the difference between the expected and actual rates of suspensions and expulsions to identify campuses that had significantly higher- or lower-than-expected rates of discipline.

With data in hand identifying the percentage of students expected to be disciplined at each campus and the actual rate of disciplinary contact for these same students, the researchers, as part of step three, then looked at the data three different ways to examine more closely how much disciplinary rates varied among schools with statistically similar student and campus characteristics.

### 1. The Comparison of Campuses' Actual and Predicted Levels of Disciplinary Actions

To what extent was it common for a school to use suspension and expulsion at rates that differed from the expected disciplinary level, given a particular school's student population and campus risk factors? Also, did discrepancies between actual and predicted levels of discipline occur only in schools expected to have high disciplinary rates? Researchers analyzed the data to answer these questions.

In order to reduce the complexity of all the available data for campuses and years, researchers selected results for a single school year (2004–2005), when the largest percentage of students involved in the study were in grades nine to eleven (the grades when students were most likely to be disciplined). Focusing on the 1,504 high school campuses where those ninth, tenth, and eleventh graders were enrolled that year, the research team was able to calculate for each school the *average* student's risk of being disciplined in that academic year (as described above).[109]

---

**109.** Examples of factors that, according to this study's multivariate analyses, increased the likelihood that a student would be involved in the school disciplinary system in any given school year included the following: Students whom the TEA designated "at-risk" were 20.8 percent more likely to be disciplined; students who were economically disadvantaged were 19.3 percent more likely; students who had ever failed a state standardized exam were 18 percent more likely; students who had been retained in their grade were 16.3 percent more likely; also, with every standard deviation decrease in students' school attendance, there occurred a commensurate increase in the risk of school discipline involvement by 25.5 percent. Students with limited English proficiency were 8.6 percent less likely to be involved in school discipline. Many school campuses with higher-than-average numbers of students designated as "at-risk" (or those schools that had a number of factors indicating a higher probability of school disciplinary system involvement), had rates of suspension or expulsion considerably lower than ordinarily would have corresponded to a student body with these characteristics.

Using these data, the research team assigned the 1,504 school campuses to one of three categories based on whether each school was "expected" to have a low, medium, or high rate of disciplinary actions. Within each category, the researchers then organized the schools into three sub-groups to examine which schools' actual discipline rates were significantly lower or higher than, or consistent with, the predicted rate.[110]

The findings showed that there was, indeed, significant variation in discipline rates among schools with similar characteristics.

*Supporting Data for the Analysis of Campuses' Actual and Predicted Levels of Disciplinary Actions*



**FIGURE 23:** Actual and Predicted Rates of Disciplinary Action for the High Schools Studied (2004–2005 School Year)

22.5%
27.2%
50.3%

■ Actual disciplinary rate is lower than expected, n=409

□ Actual disciplinary rate is as expected, n=756

■ Actual disciplinary rate is higher than expected, n=339

---

**110.** In schools with higher-than-expected discipline rates, 32 percent of the students had six or more disciplinary actions; in schools with expected rates, 24 percent of students had six or more disciplinary actions; and in schools with lower-than-expected discipline rates, 12 percent of students had six or more actions.

- As Figure 23 indicates, while half (50.3 percent) of the high schools analyzed had discipline rates consistent with what researchers had projected, given the characteristics of the student population and the school campus, the other half had significantly higher or significantly lower rates of school discipline than projected. Among the 1,504 high schools in the multivariate analysis, 339 schools (or 22.5 percent) had disciplinary rates that were significantly higher than what researchers had projected, and 409 of the schools (or 27.2 percent) had disciplinary rates that were significantly lower than what had been projected.



**FIGURE 24:** Actual Disciplinary Rates Compared to Predicted Disciplinary Rates for Campuses Attended by Study Participants in Grades 9–11 (2004–2005)

Figure 24 demonstrates how the 1,504 high schools analyzed were organized into three clusters of approximately 500 schools according to these categories: "low predicted discipline" (where 0.7 to 21.5 percent of the students were projected to be suspended or expelled in academic year 2004–2005); "average predicted

discipline" (where 21.6 to 29.3 percent of students were projected to be suspended or expelled in 2004–2005); and "high predicted discipline" (where schools were predicted to be suspended or expelled, equaling more than 29.3 percent of students in 2004–2005).

- Nearly one quarter (24%) of the schools predicted to have "low" rates of school discipline had actual rates of suspension/expulsion that were even lower than expected. On the other hand, 12.3 percent of the schools predicted to have "low" rates of school discipline had actual rates of suspension/expulsion that were higher than expected.

- Nearly three in ten (29.5 percent) of the schools predicted to have "high" rates of school discipline had actual rates of suspension/expulsion that were lower than expected. In contrast, just as many (32.2 percent) of the schools predicted to have "high" rates of school discipline had actual rates of suspension/expulsion that were even higher than expected.

### 2. Examples of Schools with Similar Characteristics and Academic Outcomes, but Different Discipline Rates

In the second analysis, the research team looked for examples to see whether it was possible for comparable schools to perform similarly on dimensions such as school attendance and grade completion—even when the schools' rates of disciplining students differed. To this end, the researchers identified nine middle school campuses from the 2000–2001 through 2003–2004 school years, when members of the three study groups were in grades seven or eight.[111] The selected campuses differed in their use of suspension and expulsion, but the student bodies were nearly identical in terms of size, and other indicators commonly believed to explain discipline rates. These indicators included the racial composition of the student body and the percentage of students who were economically disadvantaged, behind their grade for their age, and who had limited English proficiency.

---

111. To identify these schools, researchers divided into three groups the middle schools that study participants attended during the 2001–2002 through 2003–2004 school years. The groups were organized according to four variables, including their percentages of African-American, Latino, and at-risk students, and number of students enrolled. Forty-four campuses were identified that were in the middle third on all of these variables. These 44 campuses were then organized into subgroups based on whether their disciplinary rates were higher than expected, as expected, or lower than expected. Within each subgroup, the research team identified three campuses that were similar with regard to key characteristics.

*Supporting Data for Analysis of Nine Middle Schools with Similar Student Compositions and Comparable Academic Outcomes, but Different Discipline Rates*

- Nine selected middle schools were nearly identical in their racial composition and their percentage of students who were "economically disadvantaged" or "at risk," but varied significantly in their use of student discipline: Three of the schools had "higher than expected" rates of discipline and three of the schools had "lower than expected" rates of discipline. (See Figure 25.)

- Even though these nine selected schools, alike in their student populations, disciplined students at different rates, they did not differ in attendance rates or in the percentage of students who repeated a grade. (See Figure 26.)



FIGURE 25: Nine Selected Middle School Campuses with Similar Student Bodies, but Different School Discipline Rates

Legend:
- Average Lower than Expected Discipline (n=3)
- Average Expected Rate of Discipline (n=3)
- Average Higher than Expected Discipline (n=3)



**FIGURE 26:** Nine Selected Middle School Campuses with Similar Academic Outcomes, but Different Rates of School Discipline

Legend:
- Average Lower than Expected Discipline (n=3)
- Average Expected Rate of Discipline (n=3)
- Average Higher than Expected Discipline (n=3)

*3. Analysis of Disciplinary Variation Among and Within Texas's Largest School Districts*

The third analysis focused on the five largest school districts in Texas to determine whether individual schools within each of these districts had rates of discipline substantially different from what the multivariate model had predicted. The specific districts are neither identified by name in this report nor listed in order of size, in order to preserve anonymity. The researchers had two objectives: to examine how the use of school discipline differed from one large school district to the next, and to gauge the extent to which schools within the same district (where officials reported to the same superintendent) varied in their use of disciplinary actions. The data that follow provide compelling evidence to show that how a school uses suspension and expulsion is driven in large part by the decisions of officials at *both* the district and individual school level.

*Supporting Data for the Analysis of Disciplinary Variation Among and Within Texas's Largest School Districts*

- The use of discipline in the five largest school districts (largest both in terms of numbers of school campuses and in terms of overall students) varied significantly among these independent school systems.[112] As Table 3 indicates, there was also considerable variation even within a district.

**Table 3:** Percent of Campuses in Five Largest School Districts: Annual Disciplinary Rates Compared with Predicted Performance from Campus-Based Multivariate Model

|  | Lower Than Expected | As Expected | Higher Than Expected |
|---|---|---|---|
| District 1 | 64.3 % | 14.3 % | 21.4 % |
| District 2 | 55.6 % | 27.8 % | 16.7 % |
| District 3 | 76.9 % | 15.4 % | 7.7 % |
| District 4 | 20.0 % | 33.3 % | 46.7 % |
| District 5 | 23.7 % | 39.5 % | 36.8 % |
| Number of Campuses | 51 | 34 | 31 |

- In three of the five largest districts (those labeled 1, 2, and 3), the majority of the schools had disciplinary rates that were lower than what was expected, based on the risk factors and the composition of these schools' student bodies (ranging from 55.6 percent to nearly 77 percent of each district's schools with lower-than-predicted disciplinary rates).[113]

---

**112.** These five districts collectively had 116 campuses.

**113.** Schools in impoverished areas with large numbers of students with characteristics related to misbehavior may have been predicted to have a high number of disciplinary actions. Given that high threshold, some schools may still have had high numbers of disciplinary actions but managed to stay below the large number of predicted actions.

- The proportion of campuses within a single district with higher-than-expected disciplinary rates ranged from 7.7 percent to 46.7 percent—a six-fold difference. Similarly, the proportion of campuses within a district with lower-than-expected disciplinary rates was as low as 20 percent and as high as 76.9 percent.

- Variation was obvious even within a single district. For example, in one district (labeled "District 4"), disciplinary rates were as expected in one-third of the schools; on the other hand, one-fifth of the schools disciplined students at lower-than-expected rates; and nearly half (46.7 percent) of the schools disciplined students at higher-than-expected rates.

## Conclusion for Finding 6

Three themes emerged from these data:

First, how and when students—with very similar characteristics and risk factors—were disciplined appears to depend on which school they attend. Many schools with large numbers of students at high risk of school disciplinary action actually suspended and expelled those students less frequently than schools with comparable student compositions.

Second, a school that makes frequent use of suspension and expulsion does not necessarily create an environment that enables the overall school to achieve better academic outcomes. Stated another way, a school that does not suspend or expel students at the high rates that had been expected does not doom that school to underperform academically. The researchers identified examples in which schools with similar student bodies that suspended and expelled students at higher rates did no better on key school performance measures than those schools that had fewer suspensions and expulsions.

Third, it was not unusual for administrators working at different school campuses, but employed by the same school district and accountable to the same superintendent, to differ in how they used the school disciplinary system. Data illustrating variations in school disciplinary involvement within the five largest school districts indicate that how student behavior was managed and how school officials approached the use of suspension and expulsion depended in part on the officials in a particular school.

What these data suggest is that individual school campuses can make a difference in whether students are successful in avoiding disciplinary actions independent of their risk factors. Certainly, schools in distressed neighborhoods may have more students facing poverty and related factors that put them in greater jeopardy of school disciplinary involvement. But these analyses showed that schools do not all respond in the same ways. The three analyses described above, however, do not reveal what schools were doing differently. It was not possible in this study to isolate the reasons why some campuses appeared to achieve the lower-than-expected disciplinary rates that they did—whether schools with unexpectedly lower disciplinary rates tended to be more tolerant of misbehavior or were particularly effective in managing and changing student behavior. Similarly unclear was why some campuses with an affluent or otherwise advantaged student population had higher discipline rates than expected relative to similar schools.[114]

---

**114.** Initiatives, such as those described in the introduction to this report, are underway in Texas and elsewhere to understand apparent successes and to determine how to replicate them. See, for example, pages 7–8, citing work by the Texas Legislative Budget Board—a nonpartisan, authoritative source of analysis for state lawmakers—that examined strategies from six different school districts, and different campuses within those school districts, to identify approaches with the potential to yield better outcomes.

# CONCLUSION

Texas state leaders' interest in learning what the data say about school discipline policies and practices in their state made this report possible. The commitment they demonstrated to research-driven policymaking should be a model for all elected state officials, regardless of their political views. Policymakers elsewhere, however, may find it challenging to replicate this report's comprehensive analyses without a state-of-the-art electronic school-records system and statewide juvenile justice database comparable to those found in Texas.

Still, a rigorous analysis like the one in this report depends on more than just available data. As Texas officials have demonstrated, examining these issues publicly requires considerable courage, as the same issues being discussed nationally are brought into stark detail at the state level.

A major revelation in this report is that, during the study's six-year analysis period, it was common for students to be suspended, for intervals ranging from a single class period to several consecutive days, at least once between their seventh- and twelfth-grade years. Nonwhite students and students with specific educational disabilities were especially likely to be removed from the classroom for disciplinary reasons. In addition, students who were suspended or expelled were at increased risk of repeating a grade, dropping out, or coming into contact with the juvenile justice system.

These findings should prompt policymakers to ask whether the school discipline system, as it is currently functioning, is achieving its objectives. In answering this question, policymakers should consider in particular the students who are suspended or expelled over and over again (15 percent in Texas—in excess of ten times) during the course of their middle and high school years.

Surely Texas is not alone in seeing groups of adolescents disengage from school and come into contact with the juvenile justice system. For anyone determined to lower drop-out rates, improve academic performance, and decrease the number of children involved in the juvenile justice system, this report makes a compelling case that those efforts should include strategies to change student behaviors that can reduce the use of suspensions and expulsions.

The last finding in this report is perhaps its most encouraging: Schools do not need to wait for a change in law or state policy to improve outcomes for

misbehaving students. As it is, schools' approaches to the use of suspension and expulsion vary significantly from each district—and each campus—to the next.

This report builds on a considerable body of knowledge regarding the effects of removing students from the classroom for disciplinary reasons. In compiling their research, the authors consulted many national experts who have written on this subject, along with people who work on the front lines of the systems that serve school-age children. These exchanges made clear that everyone cares deeply about the large number of students involved in the school discipline system; ensuring that *all* children succeed is a goal everyone shares. But each constituency views this goal through a different lens. Accordingly, policymakers seeking to improve outcomes for students who engage in misconduct in school find that the recommendations they receive depend on whom you ask. As they query professionals from different systems, these same policymakers gradually end up hearing a cacophony of suggestions. Above that din are the voices of students, community-based advocates, and parents, who also need to be heard.

At the end of the day, no single system—not law enforcement, the courts, health services, departments of children and families, schools, or others—is exclusively responsible for the students who are repeatedly suspended or expelled. Instead, all of these systems have a role to play in supporting these students, their families, teachers, and the communities where they live.

What policymakers need most are consensus-based recommendations: a chorus from these distinct stakeholders. The tune, though, cannot simply be about their need for more resources—that is just not feasible, given state and local government budgets. Instead, agreement among the different systems and advocacy groups should translate into specific and practical ideas that are not all contingent on more money.

This report is a contribution to the research base and hopefully advances discussions on finding greater common ground among the many people focused on improving the response to students who break schools' rules. To what degree these stakeholders can work in concert, employing strategies that research says will work, will dictate in part the success of our next generation.

A list of Frequently Asked Questions and related resources about the study findings and their implications is available at **http://justicecenter.csg.org/resources/juveniles**.

## APPENDIX A. VARIABLES MODELED

The following is the list of independent variables included in the multivariate models predicting student disciplinary actions, retention (repeating a grade), dropping out, and juvenile justice contact. Variables were lagged by one school year where appropriate to account for a temporal order of events. In instances where the first occurrence of one of these variables was used as a dependent variable (e.g., retention or disciplinary action), that variable was excluded from the set of independent variables.

| STUDENT DEMOGRAPHICS | | |
|---|---|---|
| **Label** | **Definition** | **Type** |
| 1. African American | Student is African American | Binary |
| 2. Latino | Student is Hispanic | Binary |
| 3. Other Race | Student is not a white, Hispanic, or African-American student | Binary |
| 4. Male | Student is male | Binary |
| 5. African American in a Non-African American Majority School | Student is African American in a school with a majority of students that are non-African American; must be a clear majority of another race | Binary |
| 6. Hispanic in a Non-Hispanic Majority School | Student is Hispanic in a school with a majority of students that are non-Hispanic; must be a clear majority of one race | Binary |
| 7. Other Race in a Non-Other Race Majority School | Student is "Other Race" in a school with a majority of students that are non-"Other Race"; must be a clear majority of one race | Binary |
| 8. White in a Non-White Majority School | Student is white in a school with a majority of students that are non-white; must be a clear majority of one race | Binary |

## APPENDIX A. VARIABLES MODELED (continued)

| STUDENT ATTRIBUTES | | |
|---|---|---|
| Label | Definition | Type |
| 9. Title I Indicator | Student receives Title I services | Binary |
| 10. Economically Disadvantaged | Student is eligible for free or reduced-price lunch or other public assistance | Binary |
| 11. Limited English Proficiency | Student is classified as having limited English proficiency | Binary |
| 12. Immigrant | Student is classified as an immigrant | Binary |
| 13. Migrant | Student is classified as a migrant | Binary |
| 14. Ever Pregnant | Student was pregnant in any previous year | Binary |
| 15. Student Racial Majority | Majority of students on the campus are of the student's race | Binary |
| 16. Teacher Racial Majority | Majority of teachers on the campus are of the student's race | Binary |
| 17. Number of Schools Attended | Number of schools the student attended in the year | Continuous |
| 18. Autism | Student is diagnosed with autism | Binary |
| 19. Emotional Disturbance | Student is diagnosed with an emotional disturbance | Binary |
| 20. Learning Disability | Student is diagnosed with a learning disability | Binary |
| 21. Mental Retardation | Student is diagnosed with mental retardation | Binary |
| 22. Physical Disability | Student is diagnosed with an orthopedic impairment, auditory impairment, visual impairment, deaf-blind diagnosis, speech impairment, non-categorical early childhood or other health impairment | Binary |
| 23. Traumatic Brain Injury | Student is diagnosed with a traumatic brain injury | Binary |

| STUDENT ACADEMIC PERFORMANCE | | |
| --- | --- | --- |
| **Label** | **Definition** | **Type** |
| 24. At-Risk of Dropping Out | Student is at risk of dropping out (TEA designation) | Binary |
| 25. Gifted | Student is classified as gifted | Binary |
| 26. Vocational Education | Student is in a vocational education class | Binary |
| 27. Has Failed a TAKS Test | Student has failed a TAAS/TAKS test (state test) before or during the study period | Binary |
| 28. Failed Last TAKS Test | Student failed at least one section of the TAAS/TAKS test (state test) at least one time in the last year he or she took the exam | Binary |
| 29. Retained | Student was retained in the previous year (repeated a grade) | Binary |
| 30. Years Behind | Number of years student is behind expected grade level | Continuous |
| 31. Attendance Rate | Student's attendance rate | Continuous |

| STUDENT DISCIPLINE CONTACT | | |
| --- | --- | --- |
| **Label** | **Definition** | **Type** |
| 32. Disciplined | Student was disciplined | Binary |
| 33. Encountered TJPC in the Past | Student was referred to TJPC in the past | Binary |
| 34. Number of ISS Disciplinary Actions | Total number of disciplinary events where the action taken was in-school suspension | Continuous |
| 35. Number of OSS Disciplinary Actions | Total number of disciplinary events where the action taken was out-of-school suspension | Continuous |

## APPENDIX A. VARIABLES MODELED (continued)

| STUDENT DISCIPLINE CONTACT (continued) | | |
|---|---|---|
| **Label** | **Definition** | **Type** |
| 36. Number of DAEP Disciplinary Actions | Total number of disciplinary events where the action taken was referral to a DAEP | Continuous |
| 37. Number of JJAEP Disciplinary Actions | Total number of disciplinary events where the action taken was referral to a JJAEP | Continuous |
| 38. Number of Expulsion Disciplinary Actions | Total number of disciplinary events where the action taken was expulsion | Continuous |
| 39. Number of Fine Disciplinary Actions | Total number of disciplinary events where the action taken was truancy-related fines | Continuous |
| 40. Number of No-Action Disciplinary Events | Total number of disciplinary events where no action was taken | Continuous |
| 41. Number of Unknown Disciplinary Actions | Total number of disciplinary events where the action taken was not reported. | Continuous |
| 42. Number of TJPC Referrals | The number of TJPC referrals that the student had in the year | Continuous |

| COHORT MEASURES | | |
|---|---|---|
| **Label** | **Definition** | **Type** |
| **43. 7th Grade** | Student is in the seventh grade | Binary |
| **44. 8th Grade** | Student is in the eighth grade | Binary |
| **45. 9th Grade** | Student is in the ninth grade | Binary |
| **46. Ninth Grade * Held Back** | Student is in the ninth grade and is at least two years behind expected grade level | Binary |
| **47. 10th Grade** | Student is in the tenth grade | Binary |
| **48. 11th Grade** | Student is in the eleventh grade | Binary |
| **49. Cohort Year** | The number of years the student's cohort has been in the study | Continuous |
| **50. African American * Cohort Year** | The cohort year for African-American students; all other students receive a 0 | Continuous |
| **51. Latino * Cohort Year** | The cohort year for Latino students; all other students receive a 0 | Continuous |
| **52. Other Race * Cohort Year** | The cohort year for Other Race students; all other students receive a 0 | Continuous |

## APPENDIX A. VARIABLES MODELED (continued)

| CAMPUS MEASURES | | |
|---|---|---|
| **Label** | **Definition** | **Type** |
| 53. Charter School | Student attends a charter school | Binary |
| 54. Title I School | Student attends a Title I school | Binary |
| 55. Exemplary Campus | Campus accountability rating is "exemplary" | Binary |
| 56. Recognized Campus | Campus accountability rating is "recognized" | Binary |
| 57. Unacceptable Campus | Campus accountability rating is "unacceptable" | Binary |
| 58. Missing Rating | Campus accountability rating is "missing" | Binary |
| 59. AEA-Acceptable Campus | Alternative education accountability campus rating is "acceptable" — for alternative campuses only | Binary |
| 60. AEA-Unacceptable Campus | Alternative education accountability campus rating is "unacceptable " — for alternative campuses only | Binary |
| 61. Average Campus Attendance Rate | Average attendance rate for all students at a campus over the entire schoo year | Continuous |
| 62. Annual Campus Drop-out Rate | Percentage of 7th–12th grade students in attendance at a campus at any time during the school year who drop out before the next school year | Continuous |
| 63. Student/Teacher Ratio | The number of students per teacher on the campus | Continuous |
| 64. Percent Bilingual/ESL Education | Percentage of students at the campus enrolled in bilingual/ESL education | Continuous |
| 65. Percent Career and Technical Education | Percentage of students at the campus enrolled in career and technical education | Continuous |
| 66. Percent Special Education | Percentage of students at the campus enrolled in special education | Continuous |

| CAMPUS MEASURES (continued) | | |
|---|---|---|
| **Label** | **Definition** | **Type** |
| 67. Percent Met Standard on all TAKS Subjects | Percentage of students at the campus who met the standard on all TAKS subjects (state test) | Continuous |
| 68. Percent Economically Disadvantaged | Percentage of students at the campus eligible for free or reduced-price lunch or other public assistance | Continuous |
| 69. Teachers' Average Salaries | Average salary paid to each FTE teacher at the campus | Continuous |
| 70. Average Years of Experience of Teachers | Average years experience for teachers at the campus | Continuous |
| 71. Per-Capita Instructional $ | Average total instructional expenditures per student at the campus | Continuous |
| 72. District Wealth Per Capita | Total taxable property value per student | Continuous |
| 73. Diversity Measure (Student) | Measure of student diversity at the campus. Calculated: $1-(\text{Percentage, black students})^2 - (\text{Percentage, white students})^2 - (\text{Percentage, Hispanic students})^2 - (\text{Percentage, Other students})^2$ [0 = perfect homogeneity; 0.75 = perfect diversity] | Continuous |
| 74. Diversity Measure (Teacher) | Measure of teacher diversity at the campus. Calculated: $1-(\text{Percentage, black teachers})^2 - (\text{Percentage, white teachers})^2 - (\text{Percentage, Hispanic teachers})^2 - (\text{Percentage, Other teachers})^2$ [0 = perfect homogeneity; 0.75 = perfect diversity] | Continuous |
| 75. Student/Teacher Racial Congruence (Higher Value =Less Congruence) | Chi-square based measure indicating the student /teacher racial congruence at the campus [0= perfect congruence. Higher values indicated less congruence (more differences)] | Continuous |

## APPENDIX A. VARIABLES MODELED (continued)

| COUNTY MEASURES | | |
|---|---|---|
| **Label** | **Definition** | **Type** |
| 76. Suburban County | Student lives in a suburban county | Binary |
| 77. Non-Metro Adjacent County | Student lives in a non-metro county adjacent to a metro county | Binary |
| 78. Rural County | Student lives in a rural county | Binary |
| 79. Percentage, Single Parent Families | Percentage of families in the student's county headed by either a father or mother only (2000 Census) | Continuous |
| 80. Percentage, Population With Diploma | Sum total of the percentage of individuals ages 25 and up within the student's county with one of the following educational attainments: high school graduate (includes equivalency), some college, no degree, associate degree, bachelor's degree, or graduate/professional degree | Continuous |
| 81. Percentage, Homes Rented | Percentage of occupied homes in the student's county that are rented by the occupant (2000 Census) | Continuous |
| 82. Average Household Size in County | Average household size in the student's county (2000 Census) | Continuous |
| 83. Income per Capita | 2006 per capita income in the student's county (Comptroller's Office) | Continuous |

## APPENDIX B: DISCIPLINARY VIOLATIONS

The 43 possible student discipline violations reported by school districts to the Texas Education Agency were recoded into five categories reflecting the nature or seriousness of the offenses involved. The following tables show the violations that comprised each category used in the analysis. Additional information related to discipline is available at *http://www.tea.state.tx.us/chapter37_reporting.html*, Appendix E.

| VIOLATIONS REQUIRING MANDATORY EXPULSION | |
|---|---|
| 11 | Used, exhibited, or possessed a firearm — TEC §§37.007(a)(1)(A) and 37.007(e) and/or brought a firearm to school– EC §37.007(e) |
| 12 | Used, exhibited, or possessed an illegal knife — TEC §37.007(a)(1)(B) (Illegal knife blade longer than 5.5 inches) |
| 13 | Used, exhibited, or possessed a club — TEC §37.007(a)(1)(C) |
| 14 | Used, exhibited, or possessed a prohibited weapon under Penal Code §46.05 — TEC §37.007(a)(1)(D) |
| 16 | Arson — TEC §37.007(a)(2)(B) |
| 17 | Murder, capital murder, criminal attempt to commit murder, or capital murder — TEC §37.007(a)(2)(C) |
| 18 | Indecency with a child — TEC §37.007(a)(2)(D) |
| 19 | Aggravated kidnapping — TEC §37.007(a)(2)(E) |
| 29 | Aggravated assault under Penal Code §22.02 against a school district employee or volunteer — TEC §37.007(d) |
| 30 | Aggravated assault under Penal Code §22.02 against someone other than a school district employee or volunteer — TEC §37.007 (a)(2)(A) |
| 31 | Sexual assault under Penal Code §22.011 or aggravated sexual assault under Penal Code §22.021 against a school district employee or volunteer — TEC §37.007(d) |

## APPENDIX B. DISCIPLINARY VIOLATIONS (continued)

| VIOLATIONS REQUIRING MANDATORY EXPULSION (continued) | |
|---|---|
| 32 | Sexual assault under Penal Code §22.011 or aggravated sexual assault under Penal Code §22.021 against someone other than a school district employee or volunteer — TEC §37.007(a)(2)(A) |
| 36 | Felony controlled substance violation — TEC §37.007(a)(3) |
| 37 | Felony alcohol violation — TEC §37.007(a)(3) |
| 46 | Aggravated robbery — TEC §37.007(a)(2)(F) |
| 47 | Manslaughter — TEC §37.007(a)(2)(G) |
| 48 | Criminally negligent homicide — TEC §37.007(a)(2)(H) |

| VIOLATIONS REQUIRING MANDATORY REFERRAL TO A DISCIPLINARY ALTERNATIVE EDUCATION PROGRAM (DAEP) | |
|---|---|
| 02 | Conduct punishable as a felony — TEC §37.006(a)(2)(A) |
| 04 | Possessed, sold, used, or was under the influence of marihuana or other controlled substance — TEC §§37.006(a)(2)(C) and 37.007(b) |
| 05 | Possessed, sold, used, or was under the influence of an alcoholic beverage — TEC §§37.006(a)(2)(D) and 37.007(b) |
| 06 | Abuse of a volatile chemical — TEC §37.006(a)(2)(E) |
| 07 | Public lewdness or indecent exposure — TEC §37.006(a)(2)(F) |
| 08 | Retaliation against school employee — TEC §§37.006(b) and 37.007(d) |
| 09 | Based on conduct occurring off campus and while the student is not in attendance at a school-sponsored or school-related activity for felony offenses in Title 5, Penal Code — TEC §37.006I and TEC §37.007(b)(4) |
| 23 | Emergency Placement/expulsion — TEC §37.019 |

| VIOLATIONS REQUIRING MANDATORY REFERRAL TO A DISCIPLINARY ALTERNATIVE EDUCATION PROGRAM (DAEP) (continued) | |
|---|---|
| 26 | Terrorist threat — TEC §37.006(a)(1) or §37.007(b) |
| 27 | Assault under Penal Code §22.01(a)(1) against a school district employee or volunteer — TEC §37.007(b)(2)(C) |
| 28 | Assault under Penal Code §22.01(a)(1) against someone other than a school district employee or volunteer — TEC §37.006(a)(2)(B) |
| 35 | False alarm/false report — TEC §§37.006(a)(1) and 37.007(b) |

| STUDENT CODE OF CONDUCT VIOLATIONS ALLOWING FOR DISCRETIONARY PUNISHMENT | |
|---|---|
| 01 | Permanent Removal by a Teacher from Class (Teacher has removed the student from classroom and denied the student the right to return. TEC §37.003 has been invoked.) — TEC §37.002(b) |
| 20 | Serious or persistent misconduct violating the student code of conduct while placed in a disciplinary alternative education program — TEC §37.007I |
| 21 | Violation of student code of conduct not included under TEC §§37.002(b), 37.006, or 37.007 (does not include student code of conduct violations covered in reason codes 33 and 34) |

| TRUANCY AND TOBACCO VIOLATIONS ALLOWING FOR DISCRETIONARY JUVENILE COURT REFERRALS | |
|---|---|
| 33 | Possessed, purchased, used, or accepted a cigarette or tobacco product as defined in the Health and Safety Code, Section 3.01, Chapter 161.252 |
| 42 | Truancy (failure to attend school) — Parent contributing to truancy — TEC §25.093(a) |
| 43 | Truancy (failure to attend school) — Student with at least three unexcused absences — TEC §25.094 |

## APPENDIX B. DISCIPLINARY VIOLATIONS (continued)

| TRUANCY AND TOBACCO VIOLATIONS ALLOWING FOR DISCRETIONARY JUVENILE COURT REFERRALS (continued) | |
|---|---|
| 44 | Truancy (failure to attend school) — Student with 10 unexcused absences — TEC §25.094 |
| 45 | Truancy (failure to attend school) Student failure to enroll in school — TEC §25.085 |

| OTHER VIOLATIONS ALLOWING FOR DISCRETIONARY PUNISHMENT | |
|---|---|
| 10 | Based on conduct occurring off campus and while the student is not in attendance at a school-sponsored or school-related activity for felony offenses not in Title 5, Penal Code — TEC §37.006(d) and TEC §37.007(b)(4) |
| 22 | Criminal mischief — TEC §37.007(f) |
| 34 | School-related gang violence — Action by three or more persons having a common identifying sign or symbol or an identifiable sign or symbol or an identifiable leadership who associate in the commission of criminal activities under Penal Code §71.01 |
| 41 | Fighting/Mutual Combat — Excludes all offenses under Penal Code §22.01 |
| 49 | Engages in deadly conduct — TEC §37.007(b)(3) |
| 50 | Used, exhibited, or possessed a non-illegal knife as defined by student code of conduct and as allowed under TEC 37.007. (Knife blade equal to or less than 5.5 inches.) |

# REFERENCES

Advancement Project, The. 2010. *Test, Punish, and Push Out: How Zero Tolerance and High-Stakes Testing Funnel Youth Into the School to Prison Pipeline.* Washington, D.C.: Author.

American Civil Liberties Union. 2008. *Locating the School to Prison Pipeline.* New York: Author.

American Psychological Association Zero Tolerance Task Force. 2006. *Are Zero Tolerance Policies Effective in the Schools?* Available at *http://www.apa.org/pubs/info/reports/zero-tolerance-report.pdf.*

Arrigona, Nancy. Director of research for the Texas Juvenile Probation Commission. April 20, 2011. Conversation with the author, Tony Fabelo.

Boccanfuso, Christopher and Megan Kuhfield. 2011. *Multiple Responses, Promising Results: Evidence-Based Nonpunitive Alternatives to Zero Tolerance.* Washington, D.C.: Child Trends.

Boyd, Tona M. 2009. Confronting Racial Disparity: Legislative Responses to the School-to-Prison Pipeline. Cambridge: *Harvard Civil Rights–Civil Liberties Law Review,* 44: 571–80.

Brooks, Kim, Vincent Schiraldi, and Jason Ziedenberg. 2000. *School House Hype: Two Years Later.* NCJ 182894. Washington, D.C.: Justice Policy Institute, Children's Law Center.

Bush School of Government and Public Service. 2009. *The ABCDs of Texas Education: Assessing the Benefits and Costs of Reducing the Dropout Rate.* Texas A&M University: 26.

Bush, George. 1995. State of the State Address by the Honorable George W. Bush, S.J. of Tex., 74th Leg. R.S.: 235–40.

California State—Expulsion, Suspension, and Truancy Information for 2009–10. Retrieved June 13, 2011, from *http://dq.cde.ca.gov/dataquest/Expulsion/ExpReports/StateExp.aspx?cYear=2009-10&cChoice=ExpData1&Pageno=1.*

Chen-Su Chen. *Public Elementary and Secondary School Student Enrollment and Staff Counts from the Common Core of Data: School Year 2009–10.* NCES 2011–347. U.S. Department of Education. Washington, D.C.: National Center for Education Statistics, 2011, retrieved May 31, 2011, from *http://nces.ed.gov/pubsearch/pubsinfo.asp?pubid=2011347.*

Civil Rights Project, & Advancement Project. June 15–16, 2000. "Opportunities Suspended: The Devastating Consequences of Zero Tolerance and School Discipline Policies." Washington, D.C.: Paper presented at the National Summit on Zero Tolerance.

Cloud, John, Sylvester Monroe, and Todd Murphy. December 6, 1999. "The Columbine Effect," *Time* magazine, retrieved from *http://www.time.com/time/ magazine/article/0,9171,992754,00.html*.

Cooley, Sid. 1995. *Suspension/expulsion of regular and special education students in Kansas: A report to the Kansas State Board of Education.* Topeka: Kansas State Board of Education.

Cregor, Matt and Damon Hewitt. 2011. "Dismantling the School-to-Prison Pipeline: A Survey from the Field," *Poverty & Race* 20: 223–37.

Florida Department of Education. 2010. "Trends in Discipline and the Decline in the Use of Corporal Punishment, 2008–09." Data Report 2010-16D. Retrieved June 13, 2011, from *http://www.fldoe.org/eias/eiaspubs/word/discipline0809.doc*.

Friedman, Robert M., Krista Kutash, and Albert J. Duchnowski. 1996. "The Population of Concern: Defining the Issues," in *Children's Mental Health: Creating Systems of Care in a Changing Society,* ed. Beth A. Stroul. Baltimore, MD: Brookes: 69–96.

Gersch, I.S. and A. Nolan. 1994. "Exclusions: What the children think," *Educational Psychology in Practice* 10: 35–45.

Gregory, Anne and Rhona S. Weinstein. 2008. "The discipline gap and African Americans: Defiance or cooperation in the high school classroom," *Journal of School Psychology* 46: 455–75.

HamptonRoads.com. May 11, 2011. "N.C. lawmakers revisit school zero-tolerance rules," accessed May 31, 2011, *http://hamptonroads.com/2011/05/nc-lawmakers-revisit-school-zerotolerance-rules*.

Koch, Kathy. 2000. "Zero Tolerance: Is Mandatory Punishment in Schools Unfair?" *Congressional Quarterly Researcher,* 10: 185–208.

Krezmien, Michael P., Peter E. Leone, Mark S. Zablocki, and Craig S. Wells. 2010. "Juvenile Court Referrals and the Public Schools: Nature and Extent of the Practice in Five States." *Journal of Contemporary Criminal Justice* 26: 273–93.

Krezmien, Michael P., Peter E. Leone, and Georgianna M. Achilles. 2006. "Suspension, Race, and Disability: Analysis of Statewide Practices and Reporting." *Journal of Emotional & Behavioral Disorders* 14: 217–26.

Levin, Marc. 2005. *Disciplinary Alternative Education Programs: What Is and What Should Be.* Austin, TX: Texas Public Policy Foundation.

_____. 2006. *Schooling a New Class of Criminals? Better Disciplinary Alternatives for Texas Students.* Austin, TX: Texas Public Policy Foundation. 2006.

Losen, Daniel J. and Russell J. Skiba. 2010. *Suspended Education: Urban Middle Schools in Crisis.* Montgomery, AL: Southern Poverty Law Center.

Losen, Daniel J., Gary Orfield, and Robert Balfanz. 2006. *Confronting the Graduation Rate Crisis in Texas.* Cambridge, MA: The Civil Rights Project, Harvard University.

Mendez, Linda M. Raffaela. 2003. "Predictors of Suspension and Negative School Outcomes: A Longitudinal Investigation." *New Directions for Youth Development* 99: 17–33.

MGT of America, Inc. 2011. *Amarillo Independent School District: A Review of the Student Behavior Management System.* Austin, TX: Texas Legislative Budget Board.

_____. 2011. *Conroe Independent School District: A Review of the Student Behavior Management System.* Austin, TX: Texas Legislative Budget Board.

_____. 2011. *Dallas Independent School District: A Review of the Student Behavior Management System.* Austin, TX: Texas Legislative Budget Board.

_____. 2011. *Fort Bend Independent School District: A Review of the Student Behavior Management System.* Austin, TX: Texas Legislative Budget Board.

_____. 2011. *Ingleside Independent School District: A Review of the Student Behavior Management System.* Austin, TX: Texas Legislative Budget Board.

_____. 2011. *San Antonio Independent School District: A Review of the Student Behavior Management System.* Austin, TX: Texas Legislative Budget Board.

Morris, Edward W. 2005. "'Tuck in That Shirt!' Race, Class, Gender, and Discipline in an Urban School." *Sociological Perspectives*, 48: 35–48.

_____. 2007. "'Ladies' or 'Loudies'? Perceptions and Experiences of Black Girls in Classrooms," *Youth & Society* 38: 490–95.

Morrison, Gale M., Reece Peterson, Stacy O'Farrell, and Megan Redding. 2004. "Using Office Referral Records in School Violence Research: Possibilities and Limitations." *Journal of School Violence* 3: 39–61.

Oswald, Donald P. and Martha J. Coutinho. 1995. "Identification and Placement of Students with Serious Emotional Disturbance. Part I: Correlates of State Child-Count Data." *Journal of Emotional & Behavioral Disorders* 3: 224–29.

Overcriminalized.com. *Case Studies: Criminalizing Kids I, True Tales of Zero Tolerance Overcriminalization*, available at *http://www.overcriminalized.com/ CaseStudy/Tales-of-Zero-Tolerance-One.aspx*.

Petras, Hanno, Katherine Masyn, Jacquelyn A. Buckley, Nicholas S. Ialongo, and Sheppard Kellam. 2011. "Who is Most at Risk for School Removal? A Multilevel Discrete-Time Survival Analysis of Individual-and-Context-Level Influences." *Journal of Educational Psychology*, 103: 223–37.

Rausch, M. Karega and Russell Skiba. 2006. *Discipline, Disability, and Race: Disproportionality in Indiana Schools.* Education Policy Brief. Bloomington, IN: Center for Evaluation and Education Policy.

Reyes, Augustina H. 2006. *Discipline, Achievement, Race: Is Zero Tolerance the Answer?* Lanham, MD: Rowman & Littlefield.

Robers, Simone, Jijun Zhang, Jennifer Truman, and Thomas D. Snyder. 2010. *Indicators of School Crime and Safety: 2010,* NCES 2011–002/NCJ 230812. Washington, DC: National Center for Education Statistics, U.S. Department of Education, and Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice.

Rosenweig, Paul and Trent England, "Zero Tolerance for Zero Tolerance." *The Heritage Foundation,* May 6, 2004, available at *http://www.heritage.org/research/ commentary/2004/05/zero-tolerance-for-zero-tolerance*.

Schreck, Christopher J., J. Mitchell Miller, and Chris L. Gibson. 2003. "Trouble in the School Yard: a Study of the Risk Factors of Victimization at School." *Crime & Delinquency* 29: 460–84.

Skiba, Russell, Cecil R. Reynolds, Sandra Graham, Peter Sheras, Jane Close Conoley, and Enedina Garcia-Vazquez. 2008. "Are Zero Tolerance Policies Effective in the Schools? An Evidentiary Review and Recommendations." *American Psychologist* 63: 852–62.

_____, Robert S. Michael, Abra Carroll Nardo, and Reece L. Peterson. 2002. "The Color of Discipline: Sources of Racial and Gender Disproportionality in School Punishment," *The Urban Review* 34: 317–42.

_____, 2000. *Zero Tolerance, Zero Evidence: An Analysis of School Disciplinary Practice.* Bloomington, IN: Education Policy Center, Indiana University.

_____ and M. Karega Rausch. 2004, *The Relationship between Achievement, Discipline, and Race: An Analysis of Factors Predicting ISTEP Scores. Children Left Behind Policy Briefs. Supplementary Analysis 2-D.* Bloomington, IN: Center for Evaluation and Education Policy.

_____ and M. Karega Rausch. 2006. "School Disciplinary Systems," in *Children's Needs III: Development, Prevention, and Intervention*, ed. George G. Bear and Kathleen M. Minke. Bethesda, MD: National Association of School Psychologists: 87–102.

St. George, Donna. June 1, 2011. "More Schools Rethinking Zero-Tolerance Discipline Stand," *Washington Post*, retrieved June 10, 2011, from *http://www.washingtonpost.com/local/education/more-schools-are-rethinking-zero-tolerance/2011/05/26/AGSIKmGH_story.html*.

Sugai, George, Jeffrey R. Sprague, Robert H. Horner, and Hill M. Walker. 2000. "Preventing School Violence: The Use of Office Discipline Referrals to Assess and Monitor School-Wide Discipline Interventions." *Journal of Emotional and Behavioral Disorders* 8:94–101.

Texas Appleseed. 2007. *Texas' School-to-Prison Pipeline: Dropout to Incarceration. The Impact of School Discipline and Zero Tolerance.* Austin, TX: Author, available at *http://www.texasappleseed.net/pdf/Pipeline%20Report.pdf*.

_____. April 2010. *Texas' School-to-Prison Pipeline: School Expulsion: The Path from Lockout to Dropout* Austin, TX: Author, available at *http://www.texasappleseed.net/index.php?option=com_docman&task=doc_download&gid=380&Itemid=*.

_____. December 2010. *Texas' School-to-Prison Pipeline: Ticketing, Arrest & Use of Force in Schools: How the Myth of the "Blackboard Jungle" Reshaped School Disciplinary Policy.* December 2010. Austin, TX: Author, available at *http://www. texasappleseed.net/images/stories/reports/Ticketing_Booklet_web.pdf*.

Texas Education Agency. 2010. *Enrollment in Texas Public Schools, 2009–10,* Document No. GE11 60101 (Austin TX: Author).

_____. November 5, 2010. "Discipline Data Products: Annual State Summary," *http://ritter.tea.state.tx.us/adhocrpt/Disciplinary_Data_Products/Download_State_Summaries.html*.

_____. 2010. "Counts of Students and Discipline Action Groupings." Retrieved June 13, 2011, from *http://ritter.tea.state.tx.us/cgi/sas/broker?_service=marykay&_program=adhoc.download_static_DAG_summary. sas&district=&agg_level=STATE&referrer=Download_State_DAG_Summaries. html&test_flag=&_debug=0&school_yr=10&report=01&reporttype=html&Download_State_Summary=Submit*.

_____. Undated. Positive Proactive Discipline Video, available at *http://www. tea.state.tx.us/DAEP.html*.

_____. Undated. Chapter 37, Safe Schools, *http://www.tea.state.tx.us/index2. aspx?id=262*.

_____. July 2010. *Secondary School Completion and Dropouts in Texas Public Schools 2008–2009,* Table 6. Austin, TX.

Texas Juvenile Probation Commission. May, 2010. Juvenile Justice Alternative Education Programs Performance Assessment Report, School Year 2008–09. Available online at *http://www.tjpc.state.tx.us/publications/reports/ TJPCMISC0310.pdf*.

Texas Legislative Budget Board. 2011. *Student Behavior Management Review Summary.* Austin, TX: Author.

Texas Senate Criminal Justice Committee. December 15, 2010. Interim Report, available at *http://www.senate.state.tx.us/75r/senate/commit/c590/c590. InterimReport81.pdf*.

Torbet, Patricia and Linda Szymanski. 1998. *State Legislative Responses to Violent Juvenile Crime: 1996–97 Update.* Washington, DC: Office of Juvenile Justice and

Delinquency Prevention.

University of The State of New York. 2011. "The New York State Report Card: Accountability and Overview Report 2009–10." Retrieved June 13, 2011, from *https://www.nystart.gov/publicweb-external/2010statewideAOR.pdf*.

U.S. Department of Education, Office for Civil Rights. 2010. *Free Appropriate Public Education for Students With Disabilities: Requirements Under Section 504 of the Rehabilitation Act of 1973*. Washington, DC: Author. Retrieved June 11, 2011, from *http://www2.ed.gov/about/offices/list/ocr/docs/edlite-FAPE504.html*.

U.S. Department of Education. 2011. "2006 National and State Projections." Accessed May 31, 2011, from *http://ocrdata.ed.gov/Projections_2006.aspx*.

U.S. News Staff. "Timeline of School Shootings." February 15, 2008. *U.S. News and World Report*, retrieved May 31, 2011, from *http://www.usnews.com/news/national/articles/2008/02/15/timeline-of-school-shootings*.

Wagner, Mary M. 1995. "Outcomes for Youths with Serious Emotional Disturbance in Secondary School and Early Adulthood," *Critical Issues for Children and Youths* 5: 90–112.

Wald, Johanna and Michael Kurlander. 2003. *Connected in Seattle? An exploratory study of student perceptions of discipline and attachment to teachers*. In Deconstructing the School to Prison Pipeline 99: 35–54, New Directions for Youth Development.

Wilson, James Q. & George L. Kelling. March 1982. "Broken Windows." *Atlantic Monthly*.

Yelsma, P., J. Yelsma, and A. Hovestadt. 1991. "Autonomy and intimacy of self- and externally disciplined students: Families of origin and the implementation of the adult mentor program." *School Counselor* 39: 20–29.

Zhang, Dalun, Antonis Katsiyannis, and Maria Herbst. 2004. "Disciplinary Exclusions in Special Education: A 4-Year Analysis." *Behavioral Disorders* 29: 337–47.

# ABOUT THE ORGANIZATIONS AND FOUNDATIONS

### About the CSG Justice Center:

The Council of State Governments Justice Center is a national nonprofit organization that serves policymakers at the local, state, and federal levels from all branches of government. It provides practical, nonpartisan advice and consensus-driven strategies—informed by available evidence—to increase public safety and strengthen communities. To learn more about the CSG Justice Center, see *www.justicecenter.csg.org*.

### About the Public Policy Research Institute at Texas A&M:

Established by the Texas State Legislature in 1983, the Public Policy Research Institute (PPRI) at Texas A&M University is a multidisciplinary government and social policy research organization. Since its inception, PPRI has fulfilled external research contracts totaling $110 million and has provided scientific research and evaluative services to more than 90 public and private sponsors. PPRI research informs decision-making in a variety of policy areas, including education, juvenile justice, the courts, public health, the workforce and employment, and child and family well-being. To learn more, please visit *http://ppri.tamu.edu*.

### About The Atlantic Philanthropies:

The Atlantic Philanthropies are dedicated to bringing about lasting changes in the lives of disadvantaged and vulnerable people. Atlantic focuses on four critical social problems: Aging, Children & Youth, Population Health, and Reconciliation & Human Rights. Programs funded by Atlantic operate in Australia, Bermuda, Northern Ireland, the Republic of Ireland, South Africa, the United States and Vietnam. To learn more, please visit *www.atlanticphilanthropies.org*.

### About The Open Society Foundations:

The Open Society Foundations work to build vibrant and tolerant democracies whose governments are accountable to their citizens. To achieve this mission, the Foundations seek to shape public policies that assure greater fairness in political, legal, and economic systems and safeguard fundamental rights. On a local level, the Open Society Foundations implement a range of initiatives to advance justice, education, public health, and independent media. To learn more, please visit *http://www.soros.org*.



www.justicecenter.csg.org

PL781
9/2/2014
2:13-cv-00193

# Cues that Matter: How Political Ads Prime Racial Attitudes During Campaigns

NICHOLAS A. VALENTINO, VINCENT L. HUTCHINGS, AND ISMAIL K. WHITE   *University of Michigan*

*R*ecent evidence suggests that elites can capitalize on preexisting linkages between issues and social groups to alter the criteria citizens use to make political decisions. In particular, studies have shown that subtle racial cues in campaign communications may activate racial attitudes, thereby altering the foundations of mass political decision making. However, the precise psychological mechanism by which such attitudes are activated has not been empirically demonstrated, and the range of implicit cues powerful enough to produce this effect is still unknown. In an experiment, we tested whether subtle racial cues embedded in political advertisements prime racial attitudes as predictors of candidate preference by making them more accessible in memory. Results show that a wide range of implicit race cues can prime racial attitudes and that cognitive accessibility mediates the effect. Furthermore, counter-stereotypic cues—especially those implying blacks are deserving of government resources—dampen racial priming, suggesting that the meaning drawn from the visual/narrative pairing in an advertisement, and not simply the presence of black images, triggers the effect.

The public expression of racist attitudes has dramatically declined over the last several decades (Schuman et al. 1997). Racial issues have also been approached rather obliquely in most federal and state election campaigns since 1968 (Mendelberg 2001). Still, there are indications that contemporary mainstream media reinforce negative stereotypes about minorities (Coltrane and Messineo 2000; Entman 1990, 1992; Entman and Rojecki 2000; Gray 1995). For example, crime news coverage often employs racial imagery, reinforcing linkages between blacks and violence (Dixon and Linz 2000; Gilliam and Iyengar 2000; Peffley, Shields, and Williams 1996). Reporting about poverty and social welfare has also become racialized, even though African Americans remain a minority of those in poverty or on government assistance (Gilens 1999; Mendelberg 2001).

The racial "coding" of crime and welfare in the minds of many Americans leads to the possibility that invoking these concepts, even without explicitly referring to race, can activate racial thinking (Gilens 1996, 1998; Jamieson 1992; Mendelberg 1997, 2001; Valentino 1999). Some have argued that elites foster and reinforce these connections to gain a strategic political advantage. For example, Edsall and Edsall (1991) argue that Ronald Reagan nurtured the linkages among "special interests," "big government," and particular minority groups during the 1980s. The result, they claim, was that Americans perceived unpopular groups such as trade unionists, blacks, Hispanics, feminists, and homosexuals, to be united in making unreasonable demands for rights and resources they did not deserve (p. 203). These requests for "special preferences" were repeatedly juxtaposed against the interests of "ordinary" Americans. According to this argument, opinions about certain policies and programs became linked to attitudes about minority groups, thereby creating a powerful tool for strategic communicators to exploit during campaigns.

Coded language, understood by large segments of the public, affords elites the opportunity and incentive to activate racial thinking without explicitly "playing the race card." Obvious examples are the 1988 "Willie Horton" appeal and its next of kin, the "Turnstile" ad that invoked the same issue (Massachusetts' prison furlough program under Governor Dukakis) without mentioning Horton specifically. The Horton ad paired nonracial narratives with racial imagery to produce an "implicitly" racial message (Jamieson 1992), and news about the ad primed racial attitudes in opinions about various policies (Mendelberg 1997).

Mendelberg (2001) has outlined a theoretical approach for understanding the impact of racialized campaign messages. This argument has four components. First, white Americans are torn between the "norm of equality" and resentment toward blacks for their perceived failure to abide by the American creed of individualism and hard work. Second, racial priming works because certain cues make racial schemas more accessible in memory so that they are automatically employed during subsequent political decision making. Third, becoming aware of the racial content of a message would lead most people to reject it because they would not want to violate the norm of equality. Therefore,

Nicholas A. Valentino is Assistant Professor of Communication Studies and faculty associate at the Center for Political Studies, University of Michigan. His mailing address is 4244 Center for Political Studies, Institute for Social Research, 426 Thompson Street, P.O. Box 1248, Ann Arbor, MI 48106-1248 (nvalenti@umich.edu). All correspondence regarding the manuscript should be directed to the first author. Vincent L. Hutchings is Assistant Professor of Political Science and faculty associate at the Center for Political Studies, University of Michigan. Ismail K. White is a graduate student in political science at the University of Michigan.

This research was supported by generous grants from the College of Literature, Sciences, and the Arts, the Office for the Vice President of Research, and the Marsh Center for Journalistic Performance at the University of Michigan. This research would not have been possible without the extraordinary efforts of several research assistants including Tasha Philpot, Dmitri Williams, Lara Rusch, Matthew Beckmann, and Dara Faris. We thank Ted Brader, Martin Gilens, Ben Highton, Don Kinder, Tom Nelson, Wendy Rahn, David Sears, Mike Traugott, and Nick Winter for helpful feedback at various stages of this project. Errors are the authors' alone.

fourth, racial appeals are effective only if they are not recognized as such by the audience. Mendelberg argues that "implicit" (i.e., visual but not verbal) cues rather than "explicit" (i.e., visual *plus* verbal) ones are likely to meet this fourth requirement. Experimental and survey data support her claim that implicitly racial messages can powerfully prime racial attitudes during campaigns.

Underlying Mendelberg's approach is the assumption that racial attitudes are still a potent force in American politics, a claim supported by research linking such attitudes to opposition to racially redistributive policies (e.g., Bobo and Kluegel 1997; Bobo, Kluegel, and Smith 1997; Sears 1988; Kinder and Sanders 1996) and to ideological transformations in general (Carmines and Stimson 1989). But the precise nature and extent of the role of racial attitudes in mass political preferences are still hotly debated (Sears, Sidanius, and Bobo 2000). Some argue that a fundamental change in the politics of race in America has taken place over the last four decades, such that most Americans now evaluate policies and candidates according to their resonance with basic nonracial values such as individualism (Sniderman and Hagen 1985; Sniderman and Piazza 1993), egalitarianism, and the ideal size of government (Hurwitz and Peffley 1998; Sniderman and Carmines 1997). If so, one might predict that standard political appeals involving government spending or taxation activate more global values, and not attitudes about race in particular, even if racial cues are present. Or, finally, exposure to political messages might simply activate existing predispositions, such as party identification, bringing candidate preferences into line with these attachments (Campbell et al. 1960; Finkel 1993).

We find Mendelberg's theoretical approach convincing, and her findings persuasive, but additional conceptual clarity and more precise testing of the fundamental assumptions of the model are necessary to understand fully the nature and extent of racial priming in modern American politics. We explore three related questions here. First, do subtle racial cues in standard political appeals actually prime racial attitudes? Much of the research demonstrating race priming via political advertisements focuses on the issue of crime or welfare spending (Gilens 1999; Jamieson 1992; Mendelberg 1997, 2001), indicating some of the ways racial attitudes can be brought to bear on political judgments. We further explore the race priming effect by testing the impact of racial cues embedded within appeals involving references to wasteful government spending and taxation, not crime or welfare.

Second, which types of cues most powerfully prime racial attitudes? Current research draws a distinction between "implicit" and "explicit" racial messages, with the Horton ad exemplifying the former because the narrator never uttered a noun such as "black" or "race" (Mendelberg 2000). We agree that explicit and implicit racial appeals should have different effects, but also suspect that variation among implicit cues is important. The set of racial cues that one might consider to be "implicit" might vary widely along several dimensions.

Some advertisements make only oblique narrative references to racialized issues, such as crime, welfare, or government spending, without presenting images of blacks or other minorities at all. For example, an advertisement run by Bob Dole's campaign in 1996 criticized Bill Clinton for sponsoring several "wasteful spending proposals" such as "midnight basketball" and "alpine slides in Puerto Rico," but contained no visual images of blacks.[1] Other appeals might emphasize racial or ethnic group comparisons with regard to access to jobs or other resources, with the goal of implying that one group is disadvantaged relative to another. An advertisement sponsored by the California Democratic Party in 1996, for example, highlighted Clinton's efforts to stop illegal immigration. The ad was filled with images of Hispanics coming across the Mexican/American border, while the narrator claimed that these "foreign workers" were stealing jobs from "American workers." When the narrator claimed that Clinton was working to halt the flow of illegal immigrants in order to protect "our jobs and our values," a white family appeared on screen. Finally, advertisements could contain narrative references to these same issues accompanied by racial imagery that simply make one-sided, negative attributions about blacks without comparisons with any other group. Each of these appeals is "implicitly" racial, because none makes direct verbal reference to race. Yet the size of the priming effect they produce might vary considerably because the cues they employ differ in the perceptual salience of race or the type of racial problem invoked. In this paper, we compare three types of implicit racial cues (narrative only, visual race comparisons, and visual one-sided negative cues) to determine which produces the largest racial priming effect. We expect more salient, yet still implicit, racial cues to produce larger priming effects, thus the latter two types of cues should be strongest.[2]

Third, what is the psychological mechanism underlying racial priming? Previous work has assumed that cognitive accessibility moderates media-based priming effects (e.g., Iyengar and Kinder 1987; Kinder and Sanders 1996; Mendelberg 2001; Price and Tewksbury 1997; Valentino 1999). In other words, ideas and considerations that have been activated recently or often, those at the "top-of-the-head," are more likely to be used automatically in subsequent decision-making tasks (Taylor and Fiske 1978). No study to date, however, has demonstrated that news or political advertising primes concepts in memory via this automatic process.[3] In fact, recent evidence suggests a much more intentioned psychological mediator: inferences about the importance of a given criterion for the decision at hand (Miller and Krosnick 2000; Nelson,

---

[1] With this type of appeal, one could presume that it was racialized only by observing its effects.

[2] For reasons we delineate below, we do not make a directional prediction with regard to whether group comparisons or one-sided negative depictions of blacks will produce the largest effects.

[3] Fazio and Williams (1986) show that more accessible attitudes have a larger impact on preferences for the 1984 presidential candidates, but they do not manipulate the accessibility of these attitudes.

Clawson, and Oxley 1997). We argue, however, that racial priming *must* be mediated by the cognitive accessibility of racial attitudes in memory. The reason is that people are motivated to suppress the outward expression of racist attitudes and behaviors (Gaertner and Dovidio 1986). When people pay close attention to a racial message, they are better able to identify and suppress priming effects (Blair and Banaji 1996). For most people, the theory goes, negative racial attitudes affect political thinking automatically or not at all.

Additional evidence about the psychological mechanism underlying race priming can be gathered by examining whether the effect is always triggered by images of blacks or if it depends upon whether the ad resonates with negative stereotypes in particular. It has been suggested that exposure to stereotype-discrepant information boosts attention to the stimulus, so that the information can be explained and either incorporated into the existing cognitive structure or rejected entirely (Brewer, Dull, and Lui 1981; Hastie 1981). If racial priming takes place automatically, the added thought stimulated by a stereotype-inconsistent cue might reduce priming (Mendelberg 2001).[4] Therefore, we expect that appeals that violate the stereotype of blacks as undeserving beneficiaries of government spending, or those that challenge the notion that whites deserve those same benefits, will diminish the priming effect.

To summarize, we predict that racial cues embedded in standard political appeals prime racial attitudes during campaigns. This effect should manifest itself as an increase in the impact of racial attitudes on candidate preference. Since racial cues activate primarily racial attitudes, the power of nonracial global values such as egalitarianism and individualism, or predispositions such as party identification, should not be affected as strongly. Second, we attempt to determine which types of implicit cues—those in which the narrative alone invokes racialized issues, those wherein a comparison of racial group access to valued resources is visually presented (with whites apparently disadvantaged), or those that visually imply that blacks are undeserving—most powerfully prime attitudes toward blacks. Third, we investigate whether racial priming is mediated by the cognitive accessibility of racial considerations in memory. We expect racially counter-stereotypical cues to undermine priming, ostensibly by stimulating conscious processing of the racial content of the message.

Determining the scope of racial priming, and the mechanism by which it occurs, is important for several reasons. First, if such a phenomenon exists, it suggests that racial attitudes continue to exert a powerful influence on American politics and, at least to some extent, this role is dependent on elite communication strate-

gies. Furthermore, it would indicate that racial attitudes can be activated by basic appeals about government spending, not just issues that touch directly on negative stereotypes about blacks (e.g., welfare and crime). In other words, such findings would undermine the current perception among most whites that the power of racism in American politics has largely disappeared (Schuman et al. 1997).

Second, implicit racial priming is inherently manipulative, as it encourages voters to evaluate candidates based on criteria they would likely ignore if they were aware of the intent of the appeal. Finally, implicitly racial messages may heighten social group conflicts not only by propagating negative stereotypes about racial minorities, but by reinforcing their political relevance. If we are ever to resolve the "American dilemma" (Mrydal 1944), therefore, we must understand whether and how elite communication strategies activate racial considerations in contemporary American politics. If implicit racial priming is rare or relatively weak in its effects, then our continued focus on the phenomenon would be at best a waste of intellectual energy. At worst, it might distract us from the damage that obvious and blatant racism produces.

## METHODS AND PROCEDURES

Experiments are now widely accepted as a valid method for studying political communication processes and effects such as agenda setting, priming, and framing (e.g., Iyengar and Kinder 1987; Nelson and Kinder, 1996; Nelson, Clawson, and Oxley 1997; Miller and Krosnick 2000; Iyengar 1991; Mendelberg 1997, 2001; Domke, McCoy, and Torres 1999; Valentino 1999). The method's greatest strength is its ability to isolate the causal impact of communication factors on political attitudes and behavior. The direct manipulation of media content, coupled with random assignment of subjects to treatment and control conditions, produces strong inferences about specific elements of a message that alter citizens' decision-making criteria. This methodology is especially useful for studying the psychological processes underlying media effects. We therefore employ an experiment to test our hypotheses about the extent and nature of implicit racial priming.

Several experimental studies of media-based priming rely on undergraduate student samples [(Miller and Krosnick 2000; Mendelberg 1997; Nelson, Clawson, and Oxley 1997); but see Iyengar and Kinder (1987); Iyengar (1991); and Mendelberg (2000) for examples of experiments employing adult samples]. The use of such samples raises concerns about the generalizability of results, since undergraduates usually have limited personal experience with the political process and therefore may be especially vulnerable to persuasive campaign communication. Therefore nonstudent adult subjects are desirable in studying the impact of political advertising on candidate evaluations.

Most racial priming studies focus exclusively on white Americans. One justification for the decision to

---

[4] Mendelberg (2001) also examines the effects of counter-stereotypic images on racial priming. However, she examines only the effects of negative portrayals of whites rather than positive portrayals of African Americans. As described more fully below, we test both scenarios.

restrict such analyses to whites is the particular interest in the impact of white racial attitudes on race-relevant policy opinion. The concept of symbolic racism (Kinder and Sears 1981; Sears 1988), in particular, was designed solely with white Americans in mind. Subsequent studies that utilize this concept, or its next-of-kin racial resentment, analyze exclusively nonblack respondents (Kinder and Sanders 1996; Mendelberg 1997, 2001). In keeping with this practice, we too focus on nonblacks, though we do so reluctantly. We believe that the theory of implicit communication applies to blacks as well as whites, though individual differences will certainly moderate the size of the effect (Lau 1988; Devine 1989). Indeed, when we run our analyses with blacks included, our results are essentially identical. We do not, unfortunately, have enough African American respondents to test adequately the theory on different racial groups separately. Ultimately, however, the theory of racial priming must be extended to include and understand the reactions of *all* audience members.

Our study was conducted in a computer lab at the Marsh Center for Journalistic Performance at the University of Michigan, with a total of 346 adult, nonstudent subjects in late June through early July of 2000.[5] Subjects were recruited with flyers in a downtown area, at local businesses, and in university office buildings. Our convenience sample is not perfectly representative of the nation as a whole: it contains too many college-educated respondents (42%) and too few Republicans (19%). The sample does, however, contain reasonable variation along several important demographic and attitudinal dimensions.[6]

Respondents were told they would receive $15 for watching several television advertisements and answering questions about "current events." As subjects entered the lab they were randomly assigned to one of several advertising conditions, which are described below, and then escorted to a computer terminal. To minimize interviewer biases, subjects interacted solely with the computer throughout the interview. Once the subjects completed a demographic questionnaire, the computer instructed them to don a pair of headphones and watch a series of television advertisements. Each subject viewed three advertisements. The control group viewed three common product commercials.[7] Those in the treatment conditions viewed two product ads and a political spot that we constructed. After viewing the ads, subjects immediately performed a lexical task designed to measure the accessibility of racial attitudes in memory. Following this task, respondents answered an extensive posttest questionnaire that included candidate evaluations, issue importance ratings, and racial

and political attitudes.[8] Subjects were then debriefed, paid, and dismissed.[9]

## THE EXPERIMENTAL MANIPULATION

One limitation of many experimental media effects studies is the absence of realistic stimuli. Producing and manipulating realistic political advertisements is technically challenging and resource intensive. As a result, most priming studies utilize news coverage, which is plentiful and easy to edit, as stimulus material (Gilliam and Iyengar 2000; Iyengar and Kinder 1987; Mendelberg 1997, 2001; Miller and Krosnick 2000; Nelson, Clawson, and Oxley 1997). Since political advertisements and campaign news coverage are likely to differ in terms of the source's perceived credibility and motivation, we decided that it was critical to manipulate particular racial cues embedded in standard political appeals. The only way to achieve this kind of control is to construct the advertisements from the ground up. We first produced a narrative focusing on general government spending, taxes, and funding for health care. We chose George W. Bush as the sponsoring candidate because Republicans are typically viewed as most competent on economic and spending issues (Petrocik 1996). Furthermore, the Republican Party has targeted government spending on "wasteful" programs that benefited particular groups in society (Edsall and Edsall 1991). The narrative plays into these assumptions intentionally.[10]

A complete description of the experimental treatments used in the first part of the study is presented in Table 1. After invoking Bush's "dedication to an America with strong values," the male narrator contrasts Bush with Democrats who would "spend your tax dollars on wasteful government programs." Bush, the narrator continues, pledges to cut taxes because "you know best how to spend the money you earn." The second half of the narrative focuses on health care, with the claim that Bush will reform an "unfair system

---

[5] After excluding black subjects, our sample size drops to 293.

[6] Women also made up about half of our sample, and conservatives represented about 30%. There were no significant differences across cells of the design in the proportions of these sociodemographic and partisan variables. Therefore, differences we observe between conditions can be attributed to the stimuli.

[7] These were Duralast Batteries, Staples Office Supplies, and Wallside Windows, in that order. In the treatment conditions, those who viewed the political spot did not see the Staples commercial.

[8] We treat political and racial attitudes as independent variables in our analyses. Technically, then, we should have placed all these items in the pretest. Unfortunately, we would then run the risk of priming respondents to think about race and politics *before* exposure to the advertisement, thereby confounding the potential effects of the cues we manipulated. We decided, therefore, to place these measures in the posttest. We were concerned that what we describe as "priming" effects (where candidate evaluations are brought into line with attitudes about race) might in fact be "projection" effects (where attitudes about race are brought into line with candidate evaluations). Given that racial attitudes and other political predispositions are acquired at an early age and stable throughout the life span, we felt that this was unlikely. This is also the standard procedure in many priming studies (Iyengar and Kinder 1987; Mendelberg 1997; 2001; Valentino 1999). Mean levels of racial and political predispositions did not change substantially as a function of exposure.

[9] Since we expose subjects to fictitious ads sponsored by an actual candidate, we provided an extensive debriefing interview to ensure that no one left with the mistaken impression that the advertisement they saw was authentic.

[10] We do not assume that only George W. Bush or only Republican candidates in general are capable of or motivated to prime racial attitudes. Either party may have incentives, depending on the circumstances, to activate racial or other group dimensions.

American Political Science Review | Vol. 96, No. 1

---

**TABLE 1.   Transcripts of Implicit Race Cue Advertising Manipulation**

| Narrative | Neutral Visuals | Race Comparison | Undeserving Blacks |
|---|---|---|---|
| *George W. Bush, dedicated to building an America with strong values* | George Bush in crowd shaking hands | George Bush in crowd shaking hands | George Bush in crowd shaking hands |
| *Democrats want to spend your tax dollars on wasteful government programs, but George W. Bush will cut taxes because you know best how to spend the money you earn.* | Image of Statue of Liberty, Treasury building<br>Bush sitting on couch, residential street (no people) | **Black person counting money, black mother and child in office**<br>Bush sitting on couch, **white person writing check, white person counting money, white teacher** | **Black person counting money, black mother and child in office**<br>Bush sitting on couch, residential street (no people) |
| *Governor Bush cares about families.* | Laboratory workers (race unclear) looking into microscopes | **White parents walking with child** | Residential street (shot continued as above) |
| *He'll reform an unfair system that only provides health care for some, while others go without proper treatment because their employer can't afford it.* | Medical files | **White nurse assisting black mother, child**<br>**White mother holding child** | **White nurse assisting black mother, child**<br>Medical files |
| *When he's president, every hard-working American will have affordable, high-quality health care.* | X-rays against lit background | **Bush talking to white family, Bush talking to white child, Bush kissing white girl** | X-rays against lit background |
| *George W. Bush, a fresh start for America* | Bush, arm around wife. Screen reads "George W. Bush" and "A Fresh Start" | Bush, arm around wife. Screen reads "George W. Bush" and "A Fresh Start" | Bush, arm around wife. Screen reads "George W. Bush" and "A Fresh Start" |

---

that only provides health care for some, while others go without proper treatment because their employer can't afford it." The narrator closes the 30-sec spot with the refrain, "George W. Bush, a fresh start for America."

By itself, the advertisement's narrative carries no obvious racial significance. Only if the language of wasteful government, unfair allocation of government resources, and taxation carries racial connotations for some viewers could this appeal prime attitudes about blacks. In the *neutral visuals* condition, presented in Table 1, we insert racially neutral visuals such as the Statue of Liberty, the Treasury building, and residential neighborhoods (devoid of people) over this narrative. When health care is invoked, racially ambiguous images of the medical profession appear.[11] The resulting ad contains no visual race cues but delivers the "wasteful government spending" message quite clearly.

In the second and third versions of the ad, visual racial cues are substituted for some of the visual symbolism overlaying the basic narrative. In what we call the *race comparison* condition, an image of a black

person counting money is followed by that of a black woman and child in an office setting. At this point, the narrator says, "Democrats want to spend your tax dollars on wasteful government programs." As the narrator notes that Bush supports tax cuts "because you know best how to spend the money you earn," white images appear. Further, as the narrator highlights Bush's intention to "reform an unfair system that only provides health care for some . . . ," an image of a black mother and child in a hospital bed are on screen. When the narrator refers to other Americans going without proper medical treatment "because their employer can't afford it," a white mother and child appear. The other visuals in the ad remain identical to those in the neutral version. Finally, in what we refer to as the *undeserving blacks* condition, the white images in the racial comparison cell are removed, so that only black images with negative connotations remain. These three versions of the ad all carry implicit racial cues: the first simply refers to issues that might carry racial significance; the second visually highlights racial comparisons, with the implication that whites are receiving fewer resources than blacks; and the third visually depicts blacks as undeserving.

---

[11] The individuals shown are wearing full-body lab coats and masks that obscure racial characteristics.

**TABLE 2.   Transcripts of Counter-Stereotypic Advertising Manipulation**

| Narrative | Deserving Blacks | Deserving Whites | Undeserving Whites |
|---|---|---|---|
| *George W. Bush, dedicated to building an America with strong values* | George W. Bush in crowd shaking hands, **black woman with American flag in the background, black veteran smiling** | George W. Bush in crowd shaking hands | George W. Bush in crowd shaking hands Image of Statue of Liberty |
| *Democrats want to spend your tax dollars on wasteful government programs, but George W. Bush will cut taxes because you know best how to spend the money you earn.* | Treasury building<br><br>Bush sitting on couch, **black person laying money on a counter** | Treasury building<br><br>Bush sitting on couch, **white person writing a check, white person counting money** | **White person counting money, white mother and child in office**<br><br>Bush sitting on couch, residential street (no people) |
| *Governor Bush cares about families.* | **Black family using a computer, black family eating at a restaurant** | **White teacher, white parents walking with child** | Residential street (shot continued as above) |
| *He'll reform an unfair system that only provides health care for some, while others go without proper treatment because their employer can't afford it.* | Laboratory workers (race unclear) looking into microscopes **Black women holding baby** | Laboratory workers (race unclear) looking into microscopes **White mother holding child** | **White mother holding newborn receiving care in hospital** Medical files |
| *When he's president, every hard-working American will have affordable, high-quality health care.* | **Bush shaking hands with black children, black kids sitting in school yard, Bush sitting in classroom reading with black kids** | **Bush talking to white family, Bush talking to white child, Bush kissing white girl** | X-rays against lit background |
| *George W. Bush, a fresh start for America* | Bush, arm around wife. Screen reads "George W. Bush" and "A Fresh Start" | Bush, arm around wife. Screen reads "George W. Bush" and "A Fresh Start" | Bush, arm around wife. Screen reads "George W. Bush" and "A Fresh Start" |

To test the impact of stereotype-inconsistent cues, three additional versions of the ad are constructed by rearranging the timing of the visual race cues. Transcriptions of these versions are detailed in Table 2. First, we attempt to produce positive connotations about blacks by inserting images of blacks at the point when the narrator claims, "You know best how to spend the money you earn." Blacks are also shown when the narrator mentions that Bush "cares about families" and when he states that under Bush "every hard-working American will have affordable, high-quality health care." We call this condition the *deserving blacks* condition, it provides a direct, counter-stereotypical comparison to the cell involving blacks as undeserving beneficiaries of government spending. The final two versions of the ad depict whites as either deserving (labeled *deserving whites*, in column 3) or undeserving (labeled *undeserving whites*, in column 4) beneficiaries of government spending. These additional cells create a comparison between stereotype consistent versus inconsistent cues that target either whites or blacks.

## RESULTS

Our first hypothesis predicts racially coded appeals will boost the explanatory power of racial attitudes on candidate evaluations. To test this, we estimate the impact of racial attitudes on vote choice across the conditions of the design. The dependent variable ranges from 0 to 1, with higher values indicating greater support for Bush relative to Gore. We examine three measures of racial attitudes: racial resentment, laissez-faire racism, and perceived influence of blacks. Though they are composed of different survey items, these indicators are conceptually interrelated. The racial resentment scale is based on the contention that "blacks do not try hard enough to overcome the difficulties they face and that they take what they have not earned" (Kinder and Sanders 1996, 106).[12] The concept of laissez-faire racism springs from the idea that maintenance of racial

---

[12] See the Appendix for exact question wordings. Cronbach's α for the racial resentment scale was 0.78.

**TABLE 3.   Predicting Candidate Preference with Racial Attitudes and Racialized Issue Opinions, by Condition**

| Dependent Variable Is Candidate Preference (Bush = High) | Racial Attitudes | | | Racialized Issue Opinions | |
|---|---|---|---|---|---|
| | Racial Resentment | Laissez-Faire Racism | Blacks Have Too Much Influence | Opposition to Affirmative Action | Opposition to Welfare Spending |
| Attitude or opinion (see column heading) | 0.01 | −0.30 | −0.12 | −0.19 | −0.09 |
| | (0.19) | (0.20) | (0.17) | (0.16) | (0.19) |
| Neutral visuals | −0.18 | −0.23 | −11 | −0.23 | −0.10 |
| | (0.17) | (0.15) | (0.15) | (0.15) | (0.14) |
| Race comparison | −0.11 | −0.26 | −0.18 | −0.03 | −0.01 |
| | (0.18) | (0.17) | (0.16) | (0.17) | (0.15) |
| Undeserving blacks | −0.22 | −0.31* | −0.27* | −0.25 | −0.18 |
| | (0.19) | (0.16) | (0.15) | (0.16) | (0.14) |
| Attitude or opinion × neutral visuals | 0.41 | 0.49* | 0.25 | 0.45* | 0.24 |
| | (0.29) | (0.26) | (0.25) | (0.24) | (0.27) |
| Attitude or opinion × race comparison | 0.35 | 0.61* | 0.46* | 0.18 | 0.17 |
| | (0.29) | (0.30) | (0.26) | (0.27) | (0.30) |
| Attitude or opinion × undeserving blacks | 0.61* | 0.77** | 0.60** | 0.51* | 0.53* |
| | (0.37) | (0.31) | (0.25) | (0.25) | (0.28) |
| Number of cases | 156 | 156 | 156 | 156 | 156 |
| Adjusted $R^2$ | 0.21 | 0.22 | 0.23 | 0.21 | 0.20 |

*Note*: Entries are ordinary least-squares regression coefficients. The dependent variable is the 5-point candidate preference item, running from strong support for Gore to strong support for Bush. This variable has been recoded to run from 0 to 1. The impact of each attitude scale is estimated separately. Baseline effect corresponds to the main effect of racial attitude/issue opinion in the control condition. Incremental effects are estimated with interactions between treatment dummy variables and the attitude/issue. Controls in each analysis, not shown here, include political ideology, gender, and educational attainment. Sample sizes for each cell were as controls: control = 49; Neutral visuals cell = 43; race comparison cell = 31; undeserving blacks cell = 35. $*p < 0.05$; $**p < 0.01$. Predictions are unidirectional; significance tests are one-tailed.

hierarchies no longer requires widespread endorsement of the idea that blacks are genetically inferior to whites (Bobo, Kluegel, and Smith 1997). Instead, it presumes only that all major obstacles facing blacks as a group have been removed. As a result, government-sponsored efforts to address racial inequality are unnecessary.[13] A third indicator focuses more narrowly on perceived racial conflict: the extent to which blacks have "too much influence in American life and politics." We include results for all three of these indicators in part to check the robustness of the priming effect across measures of similar concepts. However, one might expect that the last two concepts, which tap into competition between whites and blacks for societal resources, should be primed most powerfully by the race comparison cues, while racial resentment may be activated most powerfully by the undeserving blacks condition.

Table 3 displays the results of our first test. Each column represents a separate OLS regression equation where the candidate preference scale is regressed upon a given racial attitude or issue opinion measure (listed in the column head), dummy variables for each treatment condition (with the control group as the excluded category), and interactions between the racial attitude measure and each dummy variable to capture the slope shift associated with exposure to each ad. With this specification, we can compare the baseline effect of racial attitudes with the impact of those same attitudes in the presence of various primes. To guard against the possibility that differences in the distribution of sociodemographic or political variables across cells of the design might account for differences we observe, controls for global ideology, gender, and education are included.[14] The functional form of the model is as follows:

$$\text{Candidate Preference} = B_1(\text{Racial Attitude})$$
$$+ B_2(\text{Neutral Visuals})$$
$$+ B_5(\text{Neutral Visuals} * \text{Racial Attitude})$$
$$+ B_3(\text{Race Comparison})$$
$$+ B_6(\text{Race Comparison} * \text{Racial Attitude})$$
$$+ B_4(\text{Undeserving Blacks})$$
$$+ B_7(\text{Undeserving Blacks} * \text{Racial Attitude})$$
$$+ B_{8-10}(\text{Controls}) + \text{Constant}$$

Our hypotheses hinge most directly on the direction and magnitude of coefficients $B_1$, $B_5$, $B_6$, and $B_7$. Tables 3 and 4 present all the coefficients in the model

---

[13] See the Appendix for exact question wordings. Cronbach's $\alpha$ for the laissez-faire racism scale was 0.79.

[14] There are no significant differences in the distributions of these variables across cells, and excluding these controls does not alter the direction or magnitude of the results.

TABLE 4.   The Impact of Partisan Identification and Global Values on Candidate Preference, by Condition

| Dependent Variable Is Candidate Preference (Bush = High) | Party Identification | Individualism | Egalitarianism |
|---|---|---|---|
| Attitude (see column heading) | 0.91** | 0.20 | −0.06 |
|  | (0.18) | (0.17) | (0.15) |
| Neutral visuals | 0.19 | 0.03 | 0.10 |
|  | (0.14) | (0.14) | (0.11) |
| Race comparison | 0.25* | 0.08 | 0.14 |
|  | (0.15) | (0.16) | (0.11) |
| Undeserving blacks | 0.05 | −0.08 | 0.11 |
|  | (0.14) | (0.15) | (0.11) |
| Attitude × neutral visuals | −0.27 | −0.03 | −0.17 |
|  | (0.26) | (0.23) | (0.20) |
| Attitude × race comparison | −0.30 | −0.05 | −0.15 |
|  | (0.27) | (0.26) | (0.21) |
| Attitude × undeserving blacks | −0.02 | 0.16 | −0.17 |
|  | (0.25) | (0.25) | (0.20) |
| Number of cases | 156 | 156 | 156 |
| Adjusted $R^2$ | 0.32 | 0.04 | 0.05 |

*Note:* Entries are ordinary least-squares regression coefficients. The dependent variable is the 5-point candidate preference item, running from strong support for Gore to strong support for Bush. This variable has been recoded to run from 0 to 1. The impact of each attitude scale was estimated separately. Baseline effect in first row corresponds to the main effect of racial attitude in the control condition. Incremental effects are estimated with interactions between treatment dummy variables and the attitude/issue opinion listed in the column head. Controls in each analysis include gender and educational attainment. Sample sizes for each cell were as follows: control = 49; neutral visuals cell = 43; race comparison cell = 31; undeserving blacks cell = 35. $*p < 0.05$; $**p < 0.01$. Significance tests are one-tailed.

except for the controls.[15] Our predictions are directional: If racial attitudes are primed, the interactions will be positive.

Entries in the first row in Table 3 are estimates of the baseline effect of each racial attitude/issue measure on the candidate preference scale. The intercept shifts associated with exposure to each advertising condition are located in the second, third, and fourth rows. All of these coefficients, across all attitudinal dimensions, are negative. This means that for those very low in racial resentment or other forms of racial conservatism, seeing any of our ads boosts support for Gore. These main effects make sense intuitively, since subjects these subjects are perhaps prone to vote for Gore to begin with. However, these coefficients are rarely statistically significant. More important for our hypothesis are the slope shifts between the control group and each treatment group, presented in rows 5 through 7. To calculate the overall effect of a given attitude among those exposed to a particular ad, one must combine the baseline effect in the first row with the slope shift represented by the interaction coefficient of interest in that same column.

Reading down the rows in the first column, we see that *racial resentment* has little effect on support for Bush among those subjects who did not view a political advertisement. The interaction in the fourth row indicates that, among those who saw an ad with neutral visual cues, the impact of racial resentment is boosted.

The resulting association between this racial attitude and preference for Bush over Gore in this condition is 0.42 (0.01 + 0.41). In the fifth row, we see that the priming effect of the race comparison cues is substantively similar to that of the neutral version (0.35). Neither of these slope shifts is statistically significant, but their direction is consistent with the first hypothesis. Finally, in the undeserving blacks condition, the impact of racial resentment reaches its zenith, at 0.62 (0.01 + 0.61). This statistically significant shift indicates a large substantive effect: In the presence of the undeserving blacks cue, moving from the lowest to the highest level of racial resentment produces a shift across more than half of the entire candidate preference scale running from Gore to Bush.

The basic pattern of results is strongly replicated when our attention shifts to other measures of racial attitudes. The impacts of *laissez-faire racism* and *blacks have too much influence* are statistically indistinguishable from 0 in the control group but grow large and positive for respondents who see ads containing implicit racial primes. The race comparison condition strongly primes both of these attitude dimensions. Across all three measures, however, the race priming effect is largest in the undeserving blacks condition.

The last two columns in Table 3 examine whether implicit race cues prime racialized policy opinions as predictors of candidate preference. *Opposition to affirmative action* is statistically unrelated to candidate preference among those who saw no political advertisement. All three versions of the advertisement, however, produce a positive relationship between these

---

[15] Results for the full model are available upon request from the first author.

variables, and the difference reaches statistical significance for the neutral visuals and undeserving blacks conditions. The same basic pattern is replicated for *opposition to welfare spending* for the poor. In other words, the impact of the race comparison cues is somewhat weak as a prime for opinions about these racialized policies, while the undeserving blacks condition produces a large effect.

These results confirm our suspicion about the power of subtle racial cues. However, it is possible that some other set of predispositions or values is actually activated by these appeals and that our indicators of racial attitudes simply covary with those other dimensions. Next, therefore, we focus on partisanship and global values such as individualism and egalitarianism. If our ads prime these dimensions, the pattern of relationships between them and candidate preference should be similar to that observed for racial attitudes across the cells of the design. The evidence presented in Table 4, however, suggests that this is not the case. The results for *party identification* are presented in the first column. In the first row, we see that party identification is a powerful predictor of candidate preference in the baseline condition. Exposure to racial cues, however, does nothing to boost this relationship.[16] In fact, the impact of partisanship declines slightly, though not significantly, in the presence of race cues.

These ads may also activate nonracial values such as individualism and egalitarianism.[17] Indeed, the narrator invokes the size of government, taxation, and fairness in the distribution of health care resources. However, the results in the second and third columns in Table 4 do not provide much support for these alternative hypotheses. *Individualism* is never very strongly or significantly related to vote preference. The impact of individualism is smaller in the neutral visuals and race comparison visuals cells, and slightly larger in the undeserving blacks condition, but none of these differences approaches statistical significance. The case for *egalitarianism* is also weak. If the our ads primed that dimension, then egalitarians should be *more* likely to support Bush after seeing that he makes a special plea for equal treatment. In fact, the relationship is negative in the control group and is more negative in each of the ad conditions, as the interactions in the fifth through seventh rows suggest. In other words, these cues make egalitarians slightly *less* likely to support Bush. None of these differences is statistically significant, however, and the overall pattern suggests that nonracial political orientations were not primed at all.[18]

## THE PSYCHOLOGICAL MEDIATOR OF RACIAL PRIMING: ACCESSIBILITY OR IMPORTANCE?

The results presented thus far suggest that a variety of implicit racial cues, embedded in appeals about nonracial issues, can serve as racial primes, especially those implying that blacks are undeserving recipients of government spending. However, we still know little about the particular psychological process underlying these effects. The theory proposed by Mendelberg (2001) identifies accessibility as the mediator: racial attitudes are made more accessible in memory such that they are automatically employed in subsequent decisions. We tested for accessibility affects in the standard way, using a lexical task identical to the one employed by Nelson, Clawson, and Oxley (1997), who in turn draws on a technique developed by Fazio (1990). Immediately after viewing the ads, subjects were told that they would need to discriminate between words and nonsense letter strings flashed on the computer screen by pressing keys marked on the keyboard.[19] Subjects were asked to perform this task "as quickly and accurately as possible" and were given several trial letter strings for practice. A randomized series of letter strings was then flashed on the screen, one at a time. Five words were intended to be race-relevant, including "black," "white," "lazy," "drug," and "crime." Nonracial filler words ("cars," "yellow," and "blue") were also shown as distractors. Nonsense letter strings included "awor," "clipr," "dryck," "fsapt," "gammr," "poprq," "seltf," and "lramp." The length of time between the appearance of the letter string and the pressing of a key was measured by the computer. The time to respond to the letter string was transformed via natural log to normalize the distribution, and extreme outliers were removed. The basic assumption underlying this task is that respondents will take less time to identify race-relevant words when race has been primed. Previous research has shown this technique to be a valid measure of cognitive accessibility (Fazio 1990).

Figure 1 suggests that racial cues increased the accessibility of racial schemas in memory. Compared to the control group, each of the three advertising conditions records faster response times to race relevant words (neutral visuals, $t = 2.17$, $p < 0.05$; racial comparison visuals, $t = 2.12$, $p < 0.05$; undeserving blacks visuals, $t = 3.01$, $p < 0.01$). An analysis of variance reveals the significance of the overall trend ($F = 3.36$, 3 df,

---

[16] Party identification is measured in the standard way, drawn directly from the National Election Studies, and collapsed to form a 7-point scale running from strong Democrat to strong Republican.

[17] These concepts are measured with standard National Election Study items. For question wording, see the Appendix.

[18] We could have tested these alternatives with a saturated model containing all condition dummies, each attitude dimension, and interactions between condition dummies and attitudinal measures. This would have produced a large and unwieldy model to present. We therefore tested each of these dimensions separately, assuming that the absence of changes in the bivariate relationship indicates an absence of priming. It is difficult to imagine how these nonracial

attitudes could be primed in the omnibus model if effects are absent using the bivariate setup.

[19] We choose to measure accessibility immediately after the stimulus for all subjects. Other studies, including those by Nelson et al. (1997) and Miller and Krosnick (2001), do not measure accessibility and importance for every subject, because of the concern that the accessibility task might signal what the experimenters deem important, thereby creating a demand that might affect importance ratings appearing later in the questionnaire. We find this implausible in the current study, because the judgment made (word versus nonsense string) is unrelated to racial attitudes, the advertising stimuli, or politics in general. Still, if such demands exist, this test is a conservative one because they should depress differences between control and treatment groups.



FIGURE 1.   The Impact of Exposure to Advertising Race Cues on Response Time to Race-Relevant Word Probes

F (df, 3)=3.36, p=.01.

*Note*: Bars represent mean log milliseconds of response time for race-relevant word probes. Race-relevant word probes included "white," "black," "drug," "lazy," and "crime." The analysis of variance used to estimate the significance of differences between conditions included controls for education, gender, and ideology.

$p < 0.01$). These results corroborate the previous evidence that racial cues prime viewers' attitudes about blacks, but they also illuminate the psychological mechanism: the accessibility of those attitudes in memory. The narrative alone did much of the work, but adding visual racial cues boosted the accessibility of these attitudes even further. Finally, to control for individual differences in reading speed, the response time to filler words was subtracted from the response time to race-relevant words. The pattern of results across the cells is unchanged for this relative response time measure, with the undeserving blacks and racial comparison conditions producing the fastest scores ($F = 2.91$, 3 df, $p < 0.05$).

Extending the work of Nelson, Clawson, and Oxley (1997) and Miller and Krosnick (2001), we hypothesize that these ads may alter the level of *importance* viewers assign to group representation in candidate evaluations. Their results suggest that this difference in importance, and not simply the increased accessibility of racial schemas in memory, could drive the slope shifts displayed in Table 3. We examine this possibility by asking respondents to rate the importance of various criteria in their own voting calculus. One item read, "When you evaluate a candidate for president, how important

are the groups in society the candidate cares about?" Racial cues might boost the mean score on this item if the importance of group representation mediates the impact of the appeal. There is some evidence that this occurs. The importance of group concerns is slightly higher in the neutral and racial comparison cells (5.23 and 5.13, respectively, on a 1–7 scale) than in the control (4.82), though neither of these differences reaches statistical significance. However, the mean importance of groups in the undeserving blacks condition is even higher (5.71), and this difference is significant ($t = 2.46$, $p < 0.01$). The overall trend, however, falls short of statistical significance ($F = 1.44$, 3 df, $p = 0.23$). In sum, the undeserving blacks condition seems to boost the importance of groups as a voting criterion, while the neutral and racial comparison cues do not.

These results suggest that exposure to implicit racial cues, especially the undeserving blacks cues, makes racial attitudes more accessible *and* makes group concerns more important in the voting calculus. Therefore, we need another test to determine whether accessibility or importance ratings actually mediates the racial priming effect. According to the technique employed by Miller and Krosnick (2000), accessibility will be determined to mediate priming if the interaction between

**TABLE 5.   Accessibility Versus Importance as Mediators of Priming Effects of Ads on Candidate Preference**

| Dependent Variable Is Candidate Preference (Bush = High) | Model | | |
|---|---|---|---|
| | Racial Accessibility | Group Importance | Joint |
| Racial resentment | −0.07 | 0.49 | 0.24 |
| | (0.17) | (0.39) | (0.41) |
| Accessibility of race | −0.23* | — | −0.23* |
| | (0.12) | | (0.12) |
| Group importance | — | 0.04 | 0.04 |
| | | (0.04) | (0.04) |
| Racial resentment × accessibility of race | 0.44* | — | 0.44* |
| | (0.22) | | (0.22) |
| Racial resentment × group importance | — | −0.04 | −0.05 |
| | | (0.07) | (0.07) |
| Number of cases | 153 | 156 | 153 |
| Adjusted $R^2$ | 0.23 | 0.21 | 0.22 |

*Note:* Entries are unstandardized ordinary least-squares regression coefficients. The dependent variable is the 5-point candidate preference item, running from strong support for Gore to strong support for Bush. This variable has been recoded to run from 0 to 1. Controls in these analyses include gender, education, and political ideology. *$p < 0.05$. Significance tests are one-tailed.

accessibility and racial resentment is positive and statistically significant. In our study, this would mean that racial resentment would be boosted as a predictor of candidate evaluations primarily among those for whom race is accessible in memory. The alternative hypothesis is that citizens employ a more intentioned psychological process when evaluating candidates, such that racial resentment plays a larger role among those who decide that "the groups in society that the candidate cares about" is an important vote criterion. The results of these analyses appear in Table 5.

In the first column in the table, we estimate the effects of accessibility, racial resentment, and the interaction between the two on candidate evaluations.[20] For ease of interpretation, we split the response time difference scores at the median.[21] The coefficient in the second row corresponds to the effect of race accessibility on candidate preference when the racial resentment score is 0. This term is negative, suggesting that among those lowest in racial resentment, making race accessible leads to support for Gore. The interaction term captures the difference in the impact of accessibility as racial resentment grows. This interaction is positive and significant, implying that at higher levels of racial resentment, the accessibility of race boosts support for Bush.[22] The second column tests the alternative hypothesis, that inferences about the importance of group concerns mediates racial priming. If so, racial attitudes should be a better predictor of candidate evaluations among those for whom group concerns are considered

important. This does not appear to be the case. The interaction between group importance and racial attitudes is small and in the wrong direction. The third column presents the estimates for the joint model and finds accessibility undiminished as a mediator of racial priming. Overall, these results suggest that racial cues make racial concerns more accessible in memory, subsequently boosting the impact of these concerns on candidate evaluations.[23]

To this point, the analyses focus on stimuli that conform to racial stereotypes. Blacks are depicted as undeserving beneficiaries of, and whites are shown bearing the tax burden for, "wasteful government programs." In the second set of experimental conditions, we compare the power of stereotype consistent versus inconsistent cues as racial primes. Remember from Table 2 that we create a "deserving blacks" condition that implies that blacks are hardworking Americans supporting unidentified "others." Next we replace images of blacks in the undeserving blacks condition with whites, thereby producing an "undeserving whites" condition. Finally, we create a condition that places whites in a positive light, without any images of blacks, as a baseline against which to compare the undeserving whites cell. These additional three cells contain a total of 135 subjects beyond those analyzed above.

The prediction is that stereotype inconsistent cues might lead to more intentioned thought, thereby suppressing racial priming effects. Table 6 replicates the basic analyses from Table 3, with regard to the strength of racial attitudes as predictors of candidate preference when the black stereotype is violated. In the first row we import the previous results from the undeserving blacks condition. Recall that this cell produced powerful race priming effects, as indicated by the positive relationship

---

[20] The constant and controls for ideology, gender, and education are not presented here.

[21] Results are substantively equivalent and remain statistically significant when the full linear measure is employed.

[22] Note that this effect is pooled across all the cells of the design. The three-way interaction, accessibility × racial attitudes × exposure to ad, would test the hypothesis that accessibility would mediate priming *differentially*, depending on the salience of race in the ad. This is possible, but not predicted by the theory of implicit communication.

[23] We also ran these analyses for the other two racial attitude measures (laissez-faire racism and "blacks have too much influence"). The results are almost-identical in direction and magnitude.

---

**TABLE 6.   Violating Negative Black Stereotypes and the Effect of Racial Attitudes on Candidate Preference**

| Dependent Variable Is Candidate Preference (Bush = High) | Racial Resentment | Laissez-Faire Racism | Blacks Have Too Much Influence |
|---|---|---|---|
| Racial attitude (see column head) | 0.67* | 0.45 | 0.46* |
| | (0.38) | (0.29) | (0.21) |
| Deserving blacks | 0.35 | 0.35* | 0.02 |
| | (0.22) | (0.18) | (0.17) |
| Deserving blacks × racial attitude | −0.80* | −0.83* | −0.09 |
| | (0.43) | (0.35) | (0.28) |
| $N$ | 79 | 79 | 79 |
| Adjusted $R^2$ | 0.11 | 0.13 | 0.17 |

*Note*: The dependent variable is the 5-point candidate preference item, running from strong support for Gore to strong support for Bush. The impact of each attitude scale on candidate preference is estimated separately. Controls in each analysis, not shown here, include gender, educational attainment, and ideology. Cell sizes are as follows: negative black visuals = 35; positive black visuals = 45. *$p < 0.05$. Significance tests are one-tailed.

---

**TABLE 7.   Violating Positive White Stereotypes and the Effect of Racial Attitudes on Candidate Preference**

| Dependent Variable Is Candidate Preference (Bush = High) | Racial Resentment | Laissez-Faire Racism | Blacks Have Too Much Influence |
|---|---|---|---|
| Racial attitude (see column head) | 0.22 | −0.04 | 0.02 |
| | (0.21) | (0.18) | (0.16) |
| Undeserving white visuals | −0.12 | −0.14 | −0.19 |
| | (0.19) | (0.17) | (0.16) |
| Undeserving white visuals × racial attitude | 0.22 | 0.27 | 0.35 |
| | (0.31) | (0.30) | (0.27) |
| Number of cases | 88 | 88 | 88 |
| Adjusted $R^2$ | 0.20 | 0.17 | 0.19 |

*Note*: The dependent variable is the 5-point candidate preference item, running from strong support for Gore to strong support for Bush. The impact of each attitude scale on candidate preference is estimated separately. Controls in each analysis, not shown here, include gender, educational attainment, and ideology. Cell sizes are as follows: positive white cue = 57; negative white cue = 33. *$p < 0.05$. Significance tests are one-tailed.

---

between all three racial attitude measures and the vote. When the black racial cues are stereotype-inconsistent, however, the relationship between racial attitudes and the vote disappears, as indicated by the large negative interaction term in the third row. Violating racial stereotypes with positive images of blacks dramatically undermines racial priming. The presence of black images alone, therefore, does not prime negative racial attitudes. The effect emerges only when the pairing of the visuals with the narrative subtly reinforces negative stereotypes in the mind of the viewer.

Table 7 compares the impact of white stereotype-consistent versus inconsistent cues, and a somewhat different pattern emerges. First, none of the coefficients in the deserving white condition is very large, suggesting that this cue did not produce a strong relationship between racial attitudes and candidate preference. However, cues implying that whites are the undeserving beneficiaries of government spending *boost* the impact of racial attitudes on the vote. Only the increase in the impact of the *blacks have too much influence* item even approaches statistical significance ($p = 0.09$, one-tailed), but the overall pattern implies that violating positive stereotypes of whites is not the same as violating negative stereotypes of blacks in terms of racial priming.[24]

Violating the negative black stereotype did not make racial considerations more accessible in memory relative to the control group (mean difference = 0.04 log msec, $p = 0.87$). Violating the white stereotype did produce slightly faster response times to race relevant words, but the difference was not statistically significant (mean difference = 0.30 log msec, $p = 0.19$). On the other hand, the deserving blacks condition boosted

---

[24] These findings also allay our concern that the lexical task, and not simply our ads, primed respondents to think about race in the visually neutral condition. If such a task were powerful enough to racialize the neutral stimulus, we would expect that it might also racialize the versions of the ads with positive or negative depictions of whites. This does not happen. The impact of racial attitudes is not significantly different in the control condition compared to the negative or positive white conditions. The absence of visual race cues in the neutral cell must permit viewers to "fill in" the stereotypical group, blacks.

the self-reported importance of group considerations in the vote calculus relative to the control (mean difference = 0.65 on a 1–7 scale, $p = 0.03$). The undeserving whites condition also significantly boosted the importance of group considerations compared to the control (mean difference = 0.91, $p = 0.01$). This pattern suggests that counter-stereotypical cues do not make racial attitudes more accessible but, instead, may induce conscious processing of the racial content of the message, thereby increasing the self-reported importance of groups. We speculate about the explanation for this last set of results in the discussion.

## DISCUSSION

We set out to explore how standard political appeals alter the criteria citizens use to select candidates. Three major findings emerge. First, our evidence is consistent with Edsall and Edsall's (1991) claim that the language of government spending and taxation has become racially "coded," such that its invocation in political appeals primes racial considerations even in the absence of racial imagery. More powerful effects emerge, however, when the imagery in political ads links blacks to the narrator's comments about undeserving groups. Ads that visually compare the interests of whites and blacks are slightly less powerful racial primes. Furthermore, none of the cues we manipulate prime racial individualism, egalitarianism, or partisan identification. We also find that racial priming is mediated by the accessibility of race in memory, not the self-reported importance of group representation. Finally, counter-stereotypic black cues suppress racial priming, while violating positive stereotypes of whites has, if anything, a positive racial priming effect.

Though the differences are small, the particular effects of the racial comparison versus the undeserving black cues conditions warrant further attention. One somewhat subtle pattern emerges from the finding that racial comparison cues primed racial attitudes that tapped the notion of resource competition in society (laissez-faire racism and "blacks have too much influence") more powerfully than they primed direct resentment toward blacks or opinions about affirmative action or welfare. The undeserving blacks cues, however, powerfully primed all three racial attitude dimensions, as well as opinions about redistributive policies such as affirmative action and welfare. This pattern suggests that raising negative attributions about blacks, without referring to implications for whites, is a powerful political strategy. Highlighting resource competition is a somewhat weaker priming agent. Why might this be the case? Two explanations seem plausible. First, the salience of the racial stimulus in the comparison condition may have been diluted by the presence of white images. On the other hand, the salience of the racial stimulus in that condition may have been so high that subjects became conscious of it and consequently suppressed racial criteria in evaluating candidates. Given that the salience of the racial stimulus and the specific problem that it raised are confounded in these two conditions, we must reserve judgment with regard to which explanation is correct.

Interesting differences in priming effects appear when racial stereotypes are violated in different ways. Although neither the black nor the white counter-stereotypic cells significantly boosted the accessibility of race compared to the control group, both significantly raised the self-reported importance of group representation as a voting criterion. However, violating black stereotypes produces far weaker associations between racial attitudes and candidate evaluations than conforming to them did. Finally, violating the white stereotype slightly boosted the impact of racial attitudes compared to reinforcing the white stereotype. This pattern suggests that violating stereotypes may trigger increased attention and conscious processing of the stimulus, but the result for racial priming depends on the group involved. When the violated stereotype involves blacks, white respondents who wish to avoid race-based decision making suppress race as a criterion in their vote, even as they claim that group representation is important. When the white stereotype is violated, however, racial criteria are not suppressed because there is no obvious way that responding one way or another could be considered racist. Ironically, then, the increased importance of groups slightly boosts the association between racial attitudes and candidate evaluations in that instance.

The above speculation about the overall pattern of findings presented here is consistent with research demonstrating that priming is more powerful when subjects do not attend closely to the stimulus (Lombardi, Higgins, and Bargh 1987; Strack et al. 1993). Research on social categorization and group stereotyping also suggests that these processes operate mostly below the level of conscious awareness (Banaji and Hardin 1996; Bargh and Pietromonaco 1982). Mendelberg (2001) finds support for this as well, though she draws a dichotomous distinction between "implicit" appeals whose narratives do not mention racial groups and "explicit" ones that do. We think that it would be more useful to think of the underlying racial salience dimension as continuous: As the salience of race increases, the power of racial priming grows, until some point at which each viewer becomes conscious of the prime and begins to suppress race as a criterion. Our present findings merely provide a hint of evidence to support this claim: Some implicit cues seem more powerful than others in priming racial attitudes.

Our central finding, that subtle racial cues in political advertising can prime racial attitudes, should encourage investigations of racial priming effects beyond the classic instances of the 1988 Willie Horton ads, the Helms "White Hands" ad, and other racial appeals. It seems reasonable to expect that candidates will attempt to infuse particular group cues into the political debate, to shape the criteria that citizens use when evaluating candidates. If, as many suggest, attitudes about groups help voters organize the political world (Campbell et al. 1960; Converse 1964; Conover 1984), then priming those attitudes should comprise an effective communication strategy for candidates when they expect a

large proportion of the "activated" group to vote for them.

Our results are consistent with Mendelberg's (2001), but we do not agree with all of her conclusions. Highly salient, or explicit, racial appeals may be less effective than more subtle or implicit ones, because some voters might intentionally avoid racial criteria when they become aware of them. Similarly, stereotype-inconsistent cues may also suppress priming by making people spend time thinking about how to reconcile the new information with prior beliefs. However, this does not necessarily mean that a different candidate will be preferred. Sensitizing people to the racial content of an appeal may undermine its persuasive impact, or it may lead to a more involved set of rationalizations to justify support for a prior choice. Individuals might suppress the expression of racial conservatism while leaving their candidate preference unchanged, thereby reducing the correlation between racial attitudes and vote choice. Further research on the behavioral consequences of long-term exposure to racial cues, varied across a wide range of perceptual salience, is needed.

These results leave several questions unanswered. First, further exploration is needed to determine the message characteristics that drive automatic, versus intentioned, priming effects. Prior work has found little evidence that accessibility mediates the impact of media exposure. Why do we get such strong and consistent results in this regard? One speculation is that the stimuli and the judgment tasks used in previous studies demand more conscious thought, thereby overwhelming subtler, automatic effects. Nelson, Clawson, and Oxley (1997), for example, had subjects view news stories about a Ku Klux Klan rally, framed in terms of either free speech or public order. The dependent variable in their analysis was tolerance for racist groups. Perhaps these stimuli, and the judgments they were designed to affect, required more careful consideration than was present in the political appeals and judgments we are concerned with in this paper. When either the priming stimulus or the target decision requires a great deal of conscious attention, we expect racial priming to be diminished. In the case of exposure to 30-sec advertisements and candidate preference formation, however, racial priming may exhibit quite pervasive effects.

Our results are based on a disproportionately educated and Democratic sample compared to the nation as a whole. We are somewhat reluctant, therefore, to generalize our findings to all citizens. However, studies employing entirely different samples have discovered similar effects (Mendelberg 2001; Reeves 1997; Valentino 1999). Further, by exposing a largely Democratic audience to a Republican message, ours is probably a conservative test of the theory, because priming may be more powerful when the party of the sponsor matches the partisan leanings of the viewer (Ansolabehere and Iyengar 1995). Nevertheless, studies that vary source characteristics and test racial priming hypotheses across a wider demographic and partisan range are warranted.

## CONCLUSION

The evidence provided here, in combination with recent theoretical and empirical advances, suggests that a broadening of the debate about race in American politics is necessary. Far from being a spent force, the impact of race and racism in America can emerge from some of the most common political messages that mainstream candidates rely upon as their stock-in-trade. But this force is not overwhelming and constant, nor is it beyond the power of elites and masses to control. When campaigns emphasize policies that have been linked previously to blacks, they boost the impact of racial attitudes on candidate evaluations. When they reinforce negative stereotypes, the impact of racial attitudes grows. But when they violate those stereotypes by presenting blacks in a favorable light, or present images of nonstereotyped groups in these negative roles, that impact declines. When citizens are aware of the racial cues in a particular message, they seem to suppress racial thinking.

Unfortunately, the potential remedies for race priming we can offer—violating negative stereotypes, avoiding overemphasis on racialized issues—are meager, short-term fixes for a larger problem. By priming group attitudes, candidates take advantage of the ways citizens store political information in memory and attempt to simplify decision making. How, then, might one control some of the more pernicious effects of implicit racial priming during campaigns? A start would be to reduce elite incentives to prime racial attitudes in the first place, by breaking down invalid linkages between groups and social problems from which stereotypes spring. For example, the public's misperception of the proportion of welfare recipients who are African American could perhaps be remedied if news organizations took a proactive stance against perpetuating these inaccurate, negative stereotypes (Gilens 1999). Subsequently, invoking welfare issues, even coupled with images of blacks, might not pack the same punch when it comes to priming racial attitudes. The more general version of this plea is as controversial in some circles as it is commonsensical in others: We must engage in honest public discussion of the ways in which race, gender, and other group cleavages affect policymaking, election outcomes, and day-to-day living conditions in America. To begin this dialogue, we must recognize that implicit racial cues have been, and continue to be, cues that matter.

## APPENDIX: SCALE/INDEX CONSTRUCTION

*Racial resentment* consisted of four items, agree strongly to disagree strongly, recoded so that high values mean more racially conservative responses. Four items were additively scaled. (1) "The Irish, Italians, Jews and many other minorities overcame prejudice and worked their way up. Blacks should do the same without any special favors." (2) "Generations of slavery and discrimination have created conditions that make it difficult for blacks to work there way out of the lower class." (3) "It is really a matter of some people not trying hard enough; if blacks would only try harder they could be just as well off as whites." (4) "Over the past few

American Political Science Review
Vol. 96, No. 1

years, blacks have gotten less than they deserve." Cronbach's $\alpha = 0.78$.

*Laissez-faire racism* consisted of the three items, coded so that higher values indicate denial of discrimination, and additively scaled. The battery began with the statement, "Some people think that discrimination against blacks is a big problem in this country, while others think that it is not a big problem. We would like to know what you think about it." (1) "How much discrimination would you say there is that hurts the chances of blacks to get good-paying jobs?" (1 = a lot through 5 = none at all). (2) "How much discrimination would you say there is that makes it hard for blacks to buy or rent housing wherever they want?" (1 = a lot through 5 = none at all). (3) "On average blacks have worse jobs, income, and housing than white people. Do you think these differences are mainly due to discrimination?" (1 = yes, 3 = don't know, 5 = no). Cronbach's $\alpha = 0.79$.

*For blacks have too much influence*, the following single item was used: "Some people think that certain groups have too much influence in American life and politics, while others feel that they don't have enough influence. You will see three statements about how much influence a group might have (1 = not enough to 3 = too much).

*Individualism* consisted of three agree–disagree items, coded so that high values correspond to stronger endorsement of individualism, were additively scaled. (1) "Most people who do not get ahead should not blame the system. They have only themselves to blame" (1 = strongly agree to 5 = strongly disagree). (2) "Any person who is willing to work hard has a good chance of succeeding" (1 = strongly agree to 5 = strongly disagree). (3) "Even if people try hard they often cannot reach their goals" (1 = strongly agree to 5 = strongly disagree). Cronbach's $\alpha = 0.51$.

*Egalitarianism* consisted of three agree–disagree items, coded so that higher values mean higher endorsement of egalitarianism, were additively scaled. (1) "Our society should do whatever is necessary to make sure that everyone has an equal opportunity to succeed" (1 = strongly agree to 5 = strongly disagree). (2) "The country would be better off if we worried less about how equal people are" (1 = strongly agree to 5 = strongly disagree). (3) "If people were treated more equally in this country, we would have many fewer problems" (1 = strongly agree to 5 = strongly disagree). Cronbach's $\alpha = 0.58$.

*For party identification* the standard 7-point party identification scale as measured in the National Election Studies, with a three-item, skip pattern design, was used: (1) "Generally speaking, do you usually think of yourself as a Republican, a Democrat, and Independent, or what?" (2) [If R answers Rep or Dem] "Would you call yourself a strong Republican/Democrat or a not very strong Republican/Democrat?" [3] [If R answers Independent] "Do you think of yourself as closer to the Republican Party or the Democratic Party?

*The candidate preference* measure was based on a five-item sequence with skip patterns. (1) "So far as you know now, do you expect to vote in the national election this coming November or not?" (1 = yes, 5 = no, 8 = don't know). (2) [If R plans to vote] "We all know the election is some time away and people are not certain at this point who they will vote for. Still, who do you think you will vote for in the election for President?" (Bush, Gore, Nader, other, don't know, undecided). (3) "Would you say that your preference for (candidate specified in item 2) is strong or not strong?" (4) [If R plans not to vote] "If you were going to vote, who do you think you would vote for in the election for president?" (same response options as in item 2). (5) [For those who answered item 4] "Would you say that your preference for (candidate specified

in item 4) is strong or not strong?" An index was constructed, running from 1 (strong support for Gore) to 5 (strong support for Bush). Those preferring a third-party candidate (Nader, Buchanan, or other) were placed at the midpoint (3). Several versions of this variable were tested, including ones that discarded subjects with non-major-party candidate preferences and one which employed a three-level variable (1 = support for Gore; 2 = neither, other, 3 = support for Bush). Results were nearly identical for these alternative specifications.

# REFERENCES

Ansolabehere, Stephen, and Shanto Iyengar. 1995. *Going Negative: How Political Advertisements Shrink and Polarize the Electorate*. New York: Free Press.

Banaji, Mahzarin R., and Curtis Hardin. 1996. "Automatic Stereotyping." *Psychological Science* 7 (May): 136–41.

Bargh, John A., and Paula Pietromonaco. 1982. "Automatic Information Processing and Social Perception: The Influence of Trait Information Presented Outside of Conscious Awareness on Impression Formation." *Journal of Personality and Social Psychology* 43 (September): 437–49.

Blair, Irene V., and Mahzarin R. Banaji. 1996. "Automatic and Controlled Processes in Stereotype Priming." *Journal of Personality and Social Psychology* 70 (June): 1142–63.

Bobo, Lawrence. 2000. "Race and Beliefs About Affirmative Action: Assessing the Effects of Interests, Group Threat, Ideology, and Racism." In *Racialized Politics*, eds. David O. Sears, Jim Sidanius, and Lawrence Bobo. Chicago: University of Chicago Press, Pp. 137–64.

Bobo, Lawrence, and James R. Kluegel. 1997. "Status, Ideology, and Dimensions of Whites' Racial Beliefs and Attitudes: Progress and Stagnation." In *Racial Attitudes in the 1990's: Continuity and Change*, eds. Steven A. Tuch and Jack K. Martin. Westport, CT: Praeger. Pp. 93–120.

Bobo, Lawrence, James R. Kluegel, and Ryan A. Smith. 1997. "Laissez-Faire Racism: The Crystallization of a Kinder, Gentler, Antiblack Ideology." In *Racial Attitudes in the 1990's: Continuity and Change*, eds. Steven A. Tuch and Jack K. Martin. Westport, CT: Praeger. Pp. 15–41.

Brewer, Marilyn B., Valerie Dull, and Layton Lui. 1981. "Perceptions of the Elderly: Stereotypes as Prototypes." *Journal of Personality & Social Psychology* 41 (October): 656–70.

Campbell, Angus, Philip E. Converse, Warren E. Miller, and Donald E. Stokes. 1960. *The American Voter*. Chicago: University of Chicago Press.

Carmines, Edward G., and James A. Stimson. 1989. *Issue Evolution: Race and the Transformation of American Politics*. Princeton, NJ: Princeton University Press.

Coltrane, Scott, and Melinda Messineo. 2000. "The Perpetuation of Subtle Prejudice: Race and Gender Imagery in the 1990's Television Advertising." *Sex Roles* 42 (March): 363–89.

Conover, Pamela. 1984. "The Influence of Group Identifications on Political Perception and Evaluation." *Journal of Politics* 46 (August): 760–85.

Converse, Philip E. 1964. "The Nature of Belief Systems in Mass Publics." In *Ideology and Discontent*, ed. David Apter. New York: Free Press. Pp. 206–61.

Devine, Patricia. 1989. "Stereotypes and Prejudice: Their Automatic and Controlled Components." *Journal of Personality and Social Psychology* 56 (January): 5–18.

Dixon, Travis L., and Daniel Linz. 2000. "Overrepresentation and Underrepresentation of African Americans and Latinos as Lawbreakers on Television News." *Journal of Communication* 50(2): 131–54.

Domke, David, Kelley McCoy, and Marcos Torres. 1999. "News Media, Racial Perceptions, and Political Cognition." *Communication Research* 26 (October): 570–607.

Edsall, Thomas B., and Mary D. Edsall. 1991. *Chain Reaction: The Impact of Race, Rights, and Taxes on American Politics*. New York: Norton.

Entman, Robert M. 1990. "Modern Racism and the Images of Blacks in Local Television News." *Critical Studies in Mass Communication* 7 (4): 332–46.

Entman, Robert M. 1992. "Blacks in the News: Television, Modern Racism, and Cultural Change." *Journal Quarterly* 69 (Summer): 341–62.

Entman, Robert M., and Andrew Rojecki. 2000. *The Black Image in the White Mind: Media and Race in America*. Chicago: University of Chicago Press.

Fazio, Russell H., and Carol J. Williams. 1986. "Attitude Accessibility as a Moderator of the Attitude-Perception and Attitude-Behavior Relations: An Investigation of the 1984 Presidential Election." *Journal of Personality and Social Psychology* 51 (September): 505–14.

Fazio, Russell H. 1990. "A Practical Guide to the Use of Response Latency in Social Psychological Research." In *Review of Personality and Social Psychology, Vol. 11. Research Methods in Personality and Social Psychology*, eds. C. Hendrick and Margaret S. Clark. Newbury Park, CA: Sage. Pp. 74–97.

Finkel, Steven E. 1993. "Reexamining the 'Minimal Effects' Model in Recent Presidential Campaigns." *Journal of Politics* 55 (February): 1–21.

Gaertner, Samuel L., and John F. Dovidio. 1986. "The Aversive Form of Racism." In *Prejudice, Discrimination, and Racism*, eds. John F. Dovidio and Samuel L. Gaertner. Orlando, FL: Academic Press. Pp. 61–89.

Gilens, Martin. 1996. "'Race Coding' and White Opposition to Welfare." *American Political Science Review* 90(3): 593–604.

Gilens, Martin. 1998. "Racial Attitudes and Race-Neutral Social Policies: White Opposition to Welfare and the Politics of Racial Inequality." In *Perception & Prejudice*, eds. Jon Hurwitz and Mark Peffley. New Haven, CT: Yale University Press. Pp. 171–201.

Gilens, Martin. 1999. *Why Americans Hate Welfare*. Chicago: University of Chicago Press.

Gilliam, Franklin D. Jr., and Shanto Iyengar. 2000. "Prime Suspects: The Influence of Local Television News on the Viewing Public." *American Journal of Political Science* 44 (July): 560–73.

Gray, Herman. 1995. *Watching Race: Television and the Struggle for "Blackness."* Minneapolis: University of Minnesota Press.

Hastie, Reid. 1981. "Schematic Principles in Human Memory." In *Social Cognition: The Ontario Symposium*, Vol. 1, eds. E. Tory Higgins, C. Peter Herman, and Mark P. Zanna. Hillsdale, NJ: Erlbaum. Pp. 39–88.

Hurwitz, Jon, and Mark Peffley. 1998. *Perception and Prejudice: Race and Politics in the United States*. New Haven, CT: Yale University Press.

Iyengar, Shanto. 1991. *Is Anyone Responsible?* Chicago: University of Chicago Press.

Iyengar, Shanto, and Donald R. Kinder. 1987. *News that Matters: Television and American Public Opinion*. Chicago: University of Chicago Press.

Jamieson, Kathleen Hall. 1992. *Dirty Politics: Deception, Distraction, and Democracy*. New York: Oxford University Press.

Kinder, Donald R., and Lynn Sanders. 1996. *Divided by Color: Racial Politics and Democratic Ideals*. Chicago: University of Chicago Press.

Kinder, Donald R., and David Sears. 1981. "Prejudice and Politics: Symbolic Racism versus Racial Threats to the Good Life." *Journal of Personality and Social Psychology* 40 (March): 414–32.

Lau, Richard. 1989. Individual and contextual influences on group identification. *Social Psychology Quarterly* 52 (September): 220–31.

Lombardi, Wendy J., E. Tory Higgins, and John A. Bargh. 1987. "The Role of Conscious in Priming Effects on Categorization: Assimilation versus Contrast as a function of Awareness of the Priming Task." *Personality and Social Psychology Bulletin* 13 (September): 411–29.

Mendelberg, Tali. 1997. "Executing Hortons: Racial Crime in the 1988 Presidential Campaign." *Public Opinion Quarterly* 61 (Spring): 134–57.

Mendelberg, Tali. 2001. *The Race Card: Campaign Strategy, Implicit Messages, and the Norm of Equality*. Princeton, NJ: Princeton University Press.

Miller, Joanne, and Jon A. Krosnick. 2000. "News Media Impact on the Ingredients of Presidential Evaluations: Politically Knowledgeable Citizens are Guided by Trusted Sources" *American Journal of Political Science* 44 (April): 301–15.

Myrdal, Gunnar. 1944. *An American Dilemma: The Negro Problem and Modern Democracy*. New York: Harper & Row.

Nelson, Thomas, and Donald R. Kinder. 1996. "Issue Frames and Group-Centrism in American Public Opinion." *Journal of Politics* 58 (November): 1055–78.

Nelson, Thomas, Rosalee Clawson, and Zoe Oxley. 1997. "Media Framing of a Civil Liberties Conflict and Its Effect on Tolerance." *American Political Science Review* 91 (September): 567–83.

Peffley, Mark, Todd Shields, and Bruce Williams. 1996. "The Intersection of Race and Crime in Television News Stories: An Experimental Study." *Political Communication* 13 (July/September): 309–27.

Petrocik, John R. 1996. "Issue Ownership in Presidential Elections, with a 1980 Case Study." *American Journal of Political Science* 40 (August): 825–50.

Price, Vincent, and David Tewksbury. 1997. "News Values and Public Opinion: A Theoretical Account of Media Priming and Framing." In *Progress In Communication Sciences, Vol. 13*, eds. G. A. Barnett and F. J. Boster. Greenwich, CT: Ablex. Pp. 173–212.

Reeves, Keith. 1997. *Voting Hopes or Fears?: White Voters, Black Candidates, and Racial Politics in America*. Oxford: Oxford University Press.

Schuman, Howard, Charlotte Steeh, Lawrence Bobo, and Maria Krysan. 1997. *Racial Attitudes in America*. Cambridge, MA: Harvard University Press.

Sears, David O. 1988. "Symbolic Racism." In *Eliminating Racism: Profiles in Controversy*, eds. Phyllis A. Katz and Dalmas A. Taylor. New York: Plenum Press. Pp. 53–84.

Sears, David O., Jim Sidanius, and Lawrence Bobo. 2000. *Racialized Politics: The Debate About Racism in America*. Chicago: University of Chicago Press.

Sniderman, Paul M., and Edward G. Carmines. 1997. *Reaching Beyond Race*. Cambridge, MA: Harvard University Press.

Sniderman, Paul M., and Michael G. Hagen. 1985. *Race and Inequality: A Study in American Values*. Chatham, NJ: Chatham House.

Sniderman, Paul M., and Thomas Piazza. 1993. *The Scar of Race*. Cambridge, MA: Harvard University Press.

Strack, Fritz, Norbert Schwarz, Herbert Blass, Almut Kubler, and Michaela Wanke. 1993. "Awareness of the Influence as a Determination of Assimilation Versus Contrast." *European Journal of Social Psychology* 23 (January/February): 53–62.

Taylor, Shelley E., and Susan Fiske. 1978. "Salience, Attention, and Attribution: Top of the Head Phenomena." In *Advances in Experimental Social Psychology*, ed. Leonard Berkowitz. New York: Academic Press. Pp. 249–88.

Valentino, Nicholas A. 1999. "Crime News and the Priming of Racial Attitudes During Evaluations of the President." *Public Opinion Quarterly* 63 (Fall): 293–320.

PL782
9/2/2014
2:13-cv-00193



# DEMOCRACY REMIXED:
### Black Youth and the Future of American Politics

*A Series on Black Youth Political Engagement*

JON C. ROGOWSKI                                               CATHY J. COHEN

## Black and Latino Youth Disproportionately Affected by Voter Identification Laws in the 2012 Election

Thirty states had voter identification laws in effect for the 2012 presidential election. In some states, voters were requested to show some non-photo form of identification, such as a utility bill or voter registration card, while in other states voters were required to show photo identification, such as a driver's license or U.S. passport, before they could cast a valid ballot. We examined the impact that these laws had on turnout among youth (ages 18-29) in the 2012 presidential election. Our data reveal the following:

- *Voter identification laws are applied unevenly across racial groups.*
  - Black (72.9 percent) and Latino (60.8 percent) youth were asked to show identification before being allowed to vote at disproportionately higher rates than white youth (50.8 percent).
  - Black (65.2 percent) and Latino youth (57.0 percent) were also asked to show **photo** identification at significantly higher rates than white youth (42.3 percent).
  - Even in states with **no identification laws**, 65.5 percent of Black youth were asked to show identification when voting, compared with 55.3 percent of Latino youth and 42.8 percent of white youth.

- *Voter identification laws appear to have racially discriminatory effects.*
  - Black youth reported that the lack of required identification prevented them from voting at nearly **four times** the rate of white youth (17.3 percent compared with 4.7 percent). Latino youth (8.1 percent) were also affected at higher rates than white youth.

o Black and Latino youth possess official state-issued identification (including driver's licenses, U.S. passports, college identification cards, and birth certificates) at considerably lower rates than white youth.
o Unequal access to photo identification documents indicates that voter identification laws will continue to disproportionately demobilize young people of color.

- *Section 5 of the Voting Rights Act, currently contested before the Supreme Court in* Shelby County v. Holder, *plays important role in protecting the ability of people of color to participate in elections as full and equal citizens.*

## Identification Requirements Apply Disproportionately to Youth of Color

The increase in voter identification requirements at the state level indicates that large numbers of voters would be asked or required to show some form of identification when going to vote. As Table 1 shows, over half (56.3 percent) of all young voters under the age of 30 were asked to show some form of identification. Moreover, nearly half (48.5 percent) of young voters were asked to show **photo** identification.

However, there are substantial differences across racial groups in the rate at which young voters were asked for identification. Nearly three-quarters (72.3 percent) of young Black voters were asked for some form of identification, compared with 50.8 percent of young white voters and 60.8 percent of young Latino voters. The racial disparities are similar for the number of young voters that were asked to show photo identification. Young Black (64.5 percent) and Latino (57.0 percent) voters were considerably more likely to be asked to show photo identification to vote compared to young white voters (42.2 percent).

**Table 1: Percentage of Young Voters (ages 18-29) Asked for Identification**

| Form of ID | Blacks (%) | Whites (%) | Latinos (%) | All (%) |
|---|---|---|---|---|
| Any identification | 72.9 | 50.8 | 60.8 | 56.3 |
| Photo identification | 64.5 | 42.2 | 57.0 | 48.5 |

Source: Black Youth Project Quarterly Survey, November 2012.

These differences hold up even while accounting for the differences in state identification laws. Table 2 below shows the percentages of youth asked for some form of identification based on the state's voter identification laws. As expected, larger percentages of youth were asked to show identification in states that required some form of identification. But significant numbers of youth were also asked to show identification in states that do not require identification in order to vote. Once again, there are important differences by racial group. In states **with no identification requirements**, nearly two-thirds (65.5 percent) of Black youth were asked to show identification in states without ID requirements, compared with 55.3 percent of Latino youth and 42.8 percent of white youth.  And in states with voter identification laws, higher percentages of Black youth (94.3 percent) were asked for ID compared with Latino (81.8 percent) and white (84.3 percent) youth.

### Table 2: Percentage of Young Voters (ages 18-29) Asked for Identification by Type of State Law

| Group | No identification required (%) | Identification required (%) |
|---|---|---|
| All youth | 48.6 | 86.1 |
| Black youth | 65.5 | 94.3 |
| White youth | 42.8 | 84.3 |
| Latino youth | 55.3 | 81.8 |

Source: Black Youth Project Quarterly Survey, November 2012.

These data indicate that voter identification laws are applied disproportionately across racial groups. Among youth, people of color—black youth in particular—are considerably more likely to be asked for identification in order to vote. This is true for identification in general as well as photo ID in particular, and also applies whether or not a state has an identification requirement in place. The uneven application of these laws suggests that polling place workers exercise a high level of discretion in requesting ID from potential voters. Unless all polling places—and all poll workers—apply voting laws in a consistent manner, the very existence of identification laws implies that young people of color are more likely than white youth to be asked to prove their identify before being allowed to vote.

## Voter Identification Requirements Reduce Turnout

State voter identification requirements were an important reason for why many youth did not vote, as Table 3 shows. While the most common explanations for not voting were that youth were not registered to vote (55.8 percent), were disinterested in politics (19.7 percent), or because they didn't like the candidates (16.4 percent), nearly seven percent of young nonvoters said that they did not vote because they lacked the proper identification.

However, there are substantial differences across racial groups, indicating that voter identification laws have racially discriminatory effects. Fewer than five percent of young white nonvoters said that voter identification requirements deterred them from voting, while **17.3 percent** of young Black and **8.1 percent** of young Latino nonvoters said that the reason they did not vote was because they did not have the proper identification. These findings suggest that voter identification laws were especially consequential in reducing turnout among young people of color.

### Table 3: Common Explanations for Nonvoting Among Youth (Ages 18-29)
*(Nonvoters Only)*

| Reason for not voting | Blacks (%) | Whites (%) | Latinos (%) | All (%) |
|---|---|---|---|---|
| Not registered to vote | 55.0 | 61.4 | 45.0 | 55.8 |
| **Didn't have proper ID** | **17.3** | **4.7** | **8.1** | **6.9** |
| Disinterested in politics | 13.2 | 23.9 | 13.2 | 19.7 |
| Didn't like the candidates | 11.3 | 19.8 | 11.3 | 16.4 |
| Couldn't find polling place | 11.4 | 4.4 | 2.9 | 4.6 |
| Lines were too long | 8.5 | 2.3 | 1.7 | 2.7 |

Source: Black Youth Project Quarterly Survey, November 2012.

## Identification Documents Are Not Distributed Equally

A key reason that youth of color are disproportionately affected by voter identification requirements is because they are less likely than white youth to possess the forms of identification that are required either to vote (such as a driver's license or U.S. passport), or to receive the kinds of identification that one must show in order to vote (such as a birth certificate). Figure 1 below shows the percentages of youth who said they had various forms of

identification. Across all four types of ID—driver's license, birth certification, U.S. passport, and a college ID card that includes a photo and a signature—rates of possession were lower among Black and Latino youth than they are for white youth. Over 85 percent of white youth have a driver's license, compared with 71.2 percent of Black youth and 67.0 percent of Latino youth. The differences are similar when looking at birth certificates—which most people must show in order to receive a driver's license, state ID card, or U.S. passport: 84.3 percent of white youth have a birth certificate at home, compared with 73.3 percent of Black youth and 55.1 percent of Latino youth. White youth also have U.S. passports at much greater rates (47.5 percent) than Black (22.0 percent) and Latino (37.1 percent) youth. The differences are somewhat smaller in examining the percentages of youth with college identification cards, yet the racial differences persist.



**Figure 1: Rates of ID Possession Among Youth (Ages 18-29)**

Source: Black Youth Project Quarterly Survey, November 2012.

## Voting Rights and American Democracy

Though the media made much of the fact that the 2012 election was marked by surprisingly high levels of turnout from youth, and especially from youth of color, this should not distract attention away from the disproportionate impact of state voter identification requirements. This report shows that young people of color were asked to show identification at considerably higher rates than white youth, which indicates that youth of color are disproportionately affected by the implementation of voter ID laws. These findings suggest that voter ID laws are applied inconsistently by pollworkers, who appear more likely to request or require ID from youth of color. Our data also show that young people of color, and especially Black youth, were considerably more likely than young whites to report that voter identification requirements influenced their decision not to vote. Finally, we report that the reason that youth of color are affected more significantly than young whites by voter identification requirements is because youth of color are less likely to hold most forms of ID—including driver's licenses, birth certificates, passports, and college IDs.  There are many reasons why people may choose not to turn out to vote, but enacting new laws that disproportionately affect particular populations should not be among them.

Moreover, these data underscore the importance of protecting the provisions of the Voting Rights Act that guard against states' interference with individuals' right to vote. In *Shelby County v. Holder*, the Supreme Court is currently considering the constitutionality of Section 5 of the Voting Rights Act, which requires states with a history of discrimination to receive pre-clearance from the Justice Department before implementing changes to their voting laws. As a result of this provision, new voter ID laws passed recently in South Carolina and Texas were challenged by the Justice Department and ultimately struck down due to the Department's finding that the laws would have racially discriminatory effects. Shelby County (Alabama) is arguing that this provision interferes with the ability of state and local governments to develop their own laws. However, the data presented here suggest that voter ID requirements passed by states do in fact have significant consequences for ballot access, particularly among youth of color. Protecting the ability of these populations to participate in elections as full and equal citizens should be a priority, and upholding the Voting Rights Act is an important step toward doing so.

Our data also provide empirical support for President Obama's interest in ensuring that "no citizen is forced to wait for hours to exercise the right to vote," as he declared in his second inaugural address. As anecdotes reported in the media have suggested, we find that long voting lines have disproportionately severe consequences for youth of color. Making it easier to vote is certain to increase voter turnout and enhance the representation of all voices in the electoral process.

## Methodology

The data for this project were collected by GfK Knowledge Networks. The survey was conducted in English and Spanish and was fielded between November 21 and December 5, 2012. The target population consists of non-institutionalized African American, Latino, and White adults residing in the U.S. and between the ages of 18 and 29. Households were sampled by KnowledgePanel, a probability-based web panel that is designed to be representative of the U.S. population. A total of 3,517 households were sampled, with a completion rate of 43.3%, yielding a sample size of 1,522 respondents.

Surveys were completed online. Households selected for the survey initially received an email announcing the availability of a new survey for them to take. After three days, email reminders were sent to those panel members that had not responded. Several days after that, panel members yet to respond were contacted by phone. Modest incentives were also offered to encourage participation. These procedures were followed until the desired sample size was achieved.

After the survey was fielded, the data are weighted so that the sample reflects the characteristics of the population of U.S. African American, Latino, and White adults between the ages of 18 and 29. These adjustments correct for any differences between the sample and the population that result from survey non-response as well as the oversampling of African Americans and Latinos. Demographic (i.e., gender, age, race/ethnicity, education, income) and geographic (i.e., census region, metropolitan area, primary language by census region) distributions from the most recent Current Population Studies were used as benchmarks in this adjustment.