PL806
9/2/2014
2:13-cv-00193



# DRIVER LICENSE DIVISION

JUDY E. BROWN, CHIEF

ROBERT H. BURROUGHS, ASSISTANT CHIEF
GREG  J. GLORIA, ASSISTANT CHIEF
KIM SMITH, DEPUTY ADMINISTRATOR
RHONDA FLEMING, MAJOR
LAWRENCE CUNY, MAJOR

Headquarts Service
Field Service
Administrative License Revocation

## JANUARY, 2006

TX_00230055

TEX00230055



# DRIVER LICENSE DIVISION

| 5805 NORTH LAMAR | PO BOX 4087 |
|---|---|
| AUSTIN, TEXAS 78752-0300 | AUSTIN, TEXAS 78752-0300 |

JUDY E. BROWN, CHIEF . . . . . . . . . . . . . . . . . . . . . . .(512)424-5232

ROBERT H. BURROUGHS, ASSISTANT CHIEF . . . .(512)424-2584
GREG J. GLORIA, ASSISTANT CHIEF . . . . . . . . . .(512)424-2346
DIRECTOR OF HEARINGS . . . . . . . . . . . . . . . . . . . .(512)424-5235
KIM SMITH, DEPUTY ADMINISTRATOR . . . . . . . .(512)424-2346
RHONDA FLEMING, MAJOR . . . . . . . . . . . . . . . . .(512)424-5062
LAWRENCE CUNY, MAJOR . . . . . . . . . . . . . . . . . . .(512)424-5365

TX_00230056

TEX00230056



# TABLE OF CONTENTS

Chief's Staff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Administrative License Revocation Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Field Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

Headquarters Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      Crash Records Bureau . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
      Customer Service Bureau . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
      Driver Improvement Bureau . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
      Driver Records Bureau . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28
      License Issuance Bureau . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
      Safety Responsibility Bureau . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

Organizational Chart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

TX_00230057

TEX00230057

DRIVER LICENSE  DIVISION



# CHIEF'S STAFF

**OVERVIEW:**  The purpose and goals of the Driver License Division (DLD) are to maintain and improve the integrity of driver licenses and identification cards issued in Texas, to improve and control problem drivers and to enforce traffic and criminal laws. The DLD also provides services to meet the needs and demands of the public, and continues to expand these services to meet delivery standards. The DLD is comprised of three services; Field Service, Headquarters Service and the Administrative License Revocation Service. These services provide the infrastructure to support the Agency's goal of ensuring the competency of Texas drivers through licensing and the management of licensing and traffic safety records. Staff assigned to the Chief or Assistant Chiefs of DLD oversee a wide variety of projects and programs on behalf of the entire Division.

**MISSION:** The Driver License Division provides our customers with an exceptionally positive experience, promotes public safety, and enhances safe driving on all Texas roadways by:

Issuing quality driver licenses and identification cards;
Collecting, maintaining and providing reliable, accurate records;
Enforcing and administering laws in a way that upholds our reputation
for integrity and fairness.

**PERSONNEL:**  The Driver License Division is comprised of 1,811 positions.

**BUDGET:**

| Approved (FY) | Salary | Operating | Capital | Travel | TOTAL |
|---|---|---|---|---|---|
| 2006 | 897,480 | 330,919 | 380,800 | 12,000 | $1,621,199 |
| 2005 | 896,000 | 343,751 | 128,167 | 17,000 | $1,384,918 |
| 2004 | 872,750 | 330,857 | 160,292 | 16,500 | $1,380,399 |
| 2003 | 872,756 | 190,585 | 72,218 | 16,500 | $1,152,059 |
| 2002 | 872,756 | 120,000 | 100,000 | 16,500 | $1,109,256 |

**PROGRAMS:**
**Fraud Unit** – The 78th Texas Legislature authorized the creation of the DLD Fraud Investigation Unit (FIU) which became operational in May 2004 and is composed of eleven (11) Trooper Investigators and six (6) non-commissioned analysts, under the direction of a Lieutenant and Major. The mission of the FIU is to identify, eliminate, and deter identification fraud through the successful application of investigative techniques resulting in the prosecution and arrest of violators. The FIU is also working to inform, advise, and educate the general public regarding Identity Theft, using both preventative and repercussion measures.

All fraud troopers are trained in investigative techniques, search and seizure, warrants, and other criminal procedures and work in conjunction with other law enforcement agencies, including Secret Service, Federal Bureau of Investigation, Texas Rangers, U.S. Marshals, Immigration and Customs Enforcement, and the U.S. Postal Service. The FIU Troopers participate in task forces in Houston, Austin, and San Antonio and are also members of the North

1

TX_00230058

TEX00230058

**DRIVER LICENSE DIVISION**
**CHIEF'S STAFF**

Texas Identity Theft Task Force and the Central Texas Secret Service Task Force.

Cases investigated by the FIU include ID Theft, Forgery, Tampering with Government Records, Manufacturing of DL/IDs, Internal Fraud, Mail Fraud, and Theft. In 2005, the FIU opened 768 cases, which resulted in 245 arrests and 277 warrants. As incidents and monetary loss resulting from identity theft continue to rise, the FIU has strengthened it's investigative efforts by identifying areas of weakness, improving public awareness, and promoting employee preparedness in eliminating internal, as well as, external fraud.

**Cost Recovery** – The Division staffs a Program Administrator as a cost recovery specialist. Duties include grant research and writing, coordination of contracts with vendors, statistical and budget analysis, and drafting correspondence from the Division. The position partners closely with IMS staff to implement and manage the installation and maintenance of automated systems in the DL offices. Other projects under consideration involve marketing, improving online resources, and the production of DLD brochures.

**Program Compliance** – A project specialist is staffed to facilitate the DLD's compliance with federal and state laws with regard to licensing programs. Emphasis is placed on ensuring compliance with the agency's Commercial Driver License (CDL) program, as federal requirements are complex and change frequently. The project specialist coordinates the Division's response to requests for comment regarding proposed changes and acts as a lead, both with internal and external entities, during project implementation and federal audits. As grant monies are made available for programs such as CDL, the project specialist is responsible for identifying priority requests and coordinating the final authoring of the grant request between the agency's Information Management Service and the DLD.

**Reengineering** – The Driver License Division's primary initiative in 2002 was to seek necessary funding from the 78th Legislative Session to implement the Driver License Reengineering Project (DLR). The objective of this project is to initiate a comprehensive plan to resolve current driver license system failures throughout the issuance process. This project will replace failing hardware in the driver license offices, rewrite outdated driver license programs, and provide retrieval capabilities through identity authentication, document verification, and automated auditing processes to prevent fraud.

During the 78th Legislative Session, HB3588 provided the Department with the necessary authority to reengineer the driver license system. Funding for this project was realized during the 3rd Special Session with the passage of HB2, authorizing a $1 additional fee increase on motor vehicle registrations to be designated to the Department for the purposes of implementing the DLR program. In addition, funding from this bill is to be used to conduct a feasibility study with the Department of Insurance to determine the effectiveness of interface software for determining financial responsibility and to create the Division's Fraud Investigative Unit. Should the revenue generated not be sufficient to fully fund both of these projects, the Department is authorized to utilize lease payments to the Master Lease Purchase Program for any purpose necessary to accomplish these projects.

Currently, the Driver License Division is aggressively pursuing project objectives. A Project Management Office has been established, a Project Manager has been hired and agency-wide project teams have been assigned to write business rules and prepare specification documents.

On April 1, 2005, the Driver License Reengineering (DLR) contract was awarded to BearingPoint, Inc. This contract specifically targets the redesign of all issuance programs and related systems to be referred to as the New Driver License System (NDLS). Staffing procedures began immediately and the BearingPoint team was onsite April 11, 2005 to begin work on the Project Plan.

TX_00230059

TEX00230059

**DRIVER LICENSE DIVISION**
**CHIEF'S STAFF**

The Image Collection and Card Production (ICCP) contract was awarded to Digimarc ID Systems on October 13, 2005. This contract specifically provides for new image collection equipment in the driver license offices, image verification technology to include facial and thumbprint comparison, card production equipment to produce new driver licenses and identification cards with enhanced card security features and new scanning equipment for the Private Security and Concealed Handgun programs.

The Digimarc and BearingPoint teams began collaborating to identify the integration points between the NDLS and ICCP Systems. Our vendor partners and the DPS project team will continue to collaborate throughout the project to ensure the NDLS and ICCP meets the needs of our users and customers.

**Ecommerce** – The Ecommerce project implemented several web-based programs, which utilize the official online web site for the State of Texas, www.TexasOnline.com. This web site improves public access to government information, programs and services and has allowed the Division to provide a convenient, efficient and secure method for the citizens of Texas to renew and/or change their address on their driver license or identification card.

In May 2001, the Driver License Division introduced its first online service that allows eligible individuals to renew their driver license or identification card through the Internet or by telephone. Individuals are eligible to use this service if they over the age of 18, the last renewal was not completed by mail or through the web, their license has not been expired for more than 2 years and he/she has no current suspensions or revocations.

In December 2001, the Driver License Division implemented its second web-based program, which allows authorized contractors (e.g. insurance companies, government agencies) to obtain driver record information in an interactive format. To become authorized, a contractor must have an approved contract on file with the Department and meet at least one of the privacy exemptions provided for in the TRC Chapter 730. This service has allowed the Division to become more efficient in responding to bulk requests for driver record information and has decreased the manual intervention required for processing traditional taped responses.

In February 2003, the Division implemented the DL Image Retrieval System. This online service assists investigative efforts by enabling authorized law enforcement personnel to obtain the latest driver license or identification card photograph on record. To become eligible to access this system, a law enforcement agency must have an approved Memo of Understanding (MOU) on file with the Department. Each user of the system is assigned a unique user ID and password. Access is strictly limited for law enforcement investigation purposes.

In April 2003, web-based services provided by the Division were enhanced to enable eligible individuals to change their address through the Internet. Eligibility criteria for address changes follow the same basic guidelines as those for renewals.

In April 2004, the Division implemented the Licensee Driver Record Request application. This application allows a Texas driver license or commercial driver license holder to request their driver record online. Additionally, the Division implemented the Contractor Driver Record Request application. This application allows companies with an approved contract on file to request driver records online. The non-certified driver records are returned interactively to the company for printing or review. Certified records are mailed from DPS within 5 business days. Type 3, 3A, and abstract of records may only be requested on CDLs.

TX_00230060

TEX00230060

DRIVER LICENSE DIVISION



# ALR SERVICE

**OVERVIEW:** The Administrative License Revocation (ALR) Service was established in response to passage of ALR statute effective on January 1, 1995. The ALR program is the administrative process by which the Department suspends the driver licenses of individuals who are arrested for the offense of driving while intoxicated (DWI). Specifically, an individual may be suspended if he/she either refused to submit to a chemical test or provided a specimen with an alcohol concentration of 0.08 or greater. The DPS is also authorized to suspend the driver licenses of minors who commit the offense of driving under the influence (DUI) as well as the licenses of those individuals who refuse to provide a specimen following an arrest for the offense of boating while intoxicated (BWI).

**MISSION:** The ALR Service is committed to swift and absolute driver license suspensions of dangerous drivers thereby protecting the safety of Texas roadways.

**PERSONNEL:** The ALR Legal Section consists of 52 employees, including 43 attorneys and 9 support personnel. For staffing purposes, the state is divided into six regions, with regional offices located in Austin, Houston, San Antonio, Garland, Fort Worth and Lubbock. Each region is managed by a Field Supervising Attorney who is responsible to the Director of Legal Staff for the operation of personnel and activities in that region. The program also has satellite offices in Waco, Bryan, Corpus Christi, McAllen, Tyler, Midland, Amarillo and El Paso.

The staff attorneys stationed in each office prepare and prosecute administrative hearings before the State Office of Administrative Hearings (SOAH). These attorneys also respond to appeals by defendants, which are filed in the County Court at Law in the county of arrest. In addition, the ALR staff occasionally assists with Concealed Handgun and Expunction hearings and non-ALR driver license appeals.

**BUDGET:** The ALR program is supported entirely by state funds. To date, no federal funds have been received by DPS to administer the program.

| Approved (FY) | Salary | Operating | Total |
|---|---|---|---|
| 2006 | 2,003,552 | 129,500 | $2,133,052 |
| 2005 | 2,035,650 | 157,000 | $2,192,650 |
| 2004 | 2,035,650 | 160,000 | $2,195,650 |
| 2003 | 1,888,114 | 189,902 | $2,078,016 |
| 2002 | 1,888,114 | 230,414 | $2,118,528 |

## HOW THE LAW WORKS IN TEXAS

**Adult Offenders** – A law enforcement officer determines that there is reasonable suspicion for an initial traffic stop of a motorist. After contact with the individual is initiated, the officer develops probable cause to arrest the person for DWI. Specifically, if the officer has reason to believe that the driver is impaired, a set of field sobriety tests may be administered. If the driver performs poorly, the driver is arrested for DWI and transported to the police station.

At the station, the driver is asked to submit to a chemical test to measure his/her alcohol concentration. Usually, the individual is asked to take a breath test, although the officer may

4

TX_00230061

TEX00230061

request a blood specimen. If the driver refuses to provide a specimen or provides a specimen with a prohibited alcohol concentration, the officer serves the individual with a Notice of Suspension and confiscates the driver license.

**Offenders Under 21 Years of Age** – As with adult offenders, a law enforcement officer must have reasonable suspicion to conduct a traffic stop. However, a full custodial arrest is not required for a DUI offense, but is permitted, according to the officer's discretion. Once the officer determines that the individual is under 21 years of age, and has reason to believe that he/she has consumed alcohol, two distinct methods of enforcement are possible.

In less serious cases, the officer will issue the driver a citation for DUI, serve the individual with a Notice of Suspension and confiscate the driver license. The minor will not be placed under arrest and no chemical test will be requested. Alternatively, the officer may proceed with a custodial arrest procedure if he believes that the individual is seriously impaired. Field sobriety tests may be administered and the minor will be arrested (or taken into custody) and transported to the police station. The driver may be asked to submit to a chemical test to measure his/her alcohol concentration. If the minor refuses to provide a specimen or provides a specimen with any detectable amount of alcohol, the officer will issue a citation for DUI, serve the individual with a Notice of Suspension and confiscate the driver license. Of course, the officer may arrest the minor for the more serious offense of DWI if the circumstances warrant such a charge.

Regardless of age, the driver has 15 days from the date the Notice of Suspension is served to request a hearing. If no hearing is requested, the suspension automatically goes into effect on the 40th day after notice was served. If the individual requests a hearing, the temporary driving permit remains in effect until the date of the final decision of the administrative law judge. The driver is required to pay a fee of $125 to reinstate the license after the suspension period expires.

## *HEARING PROCEDURES*

The ALR hearing is conducted at a location designated by SOAH in either the county of arrest (if the arrest occurred in a county with a population in excess of 300,00) or within 75 miles of the county seat of the county of arrest. Alternatively, both parties may agree to hold the hearing by tele-conference. The hearing is conducted by an Administrative Law Judge (ALJ) employed by SOAH and the DPS has the burden of proof by a preponderance of the evidence. If the judge makes an affirmative finding on all the relevant issues, the license is suspended.

**Adult Offenders** – If the driver failed the breath or blood test, the ALJ must determine whether (1) the person had an alcohol concentration of 0.08 or greater while operating a motor vehicle in a public place; and (2) reasonable suspicion to stop or probable cause to arrest the person existed.

If the driver refused to submit to a chemical test, the ALJ must determine whether (1) reasonable suspicion or probable cause existed to stop or arrest the person; (2) probable cause existed to believe that the person was operating a motor vehicle in a public place while intoxicated or operating a watercraft powered with an engine having a manufacturer's rating of 50 horsepower or more while intoxicated; (3) the person was placed under arrest by the officer and was requested to submit to the taking of a specimen; and (4) the person refused to submit to the taking of a specimen on request of the officer.

**Offenders Under 21 Years of Age** – If a chemical test was not requested or if the driver provided a specimen with any detectable amount of alcohol, the ALJ must determine whether: (1) the person is a minor and had any detectable amount of alcohol in the minor's system while operating a motor vehicle in a public place; and (2) whether reasonable suspicion to stop or probable cause to arrest or take the minor into custody existed.

TX_00230062

TEX00230062

**DRIVER LICENSE DIVISION**
**ALR SERVICE**

If the driver refused to submit to a chemical test, the ALJ must determine whether: (1) reasonable suspicion or probable cause existed to arrest or take the minor into custody; (2) probable cause existed to believe that the minor was operating a motor vehicle in a public place while intoxicated or while having any detectable amount of alcohol in the minor's system or operating a watercraft powered with an engine having a manufacturer's rating of 50 horsepower or above while intoxicated; (3) the minor was placed under arrest or taken into custody and was requested to submit to the taking of a specimen; and (4) the minor refused to submit to the taking of a specimen on request of the officer.

An individual whose license has been suspended following an administrative hearing may appeal the decision rendered by the ALJ. The petition must be filed within thirty days of the decision in the county court in the county of arrest. A properly filed appeal petition stays the suspension for first offenders for up to ninety days.

## *PERIODS OF SUSPENSION*

**Penalties for Adults** – Refused to provide a specimen following an arrest for an offense prohibiting the operation of a motor vehicle or watercraft while intoxicated, while under the influence of alcohol, or while under the influence of a controlled substance:

| | |
|---|---|
| **180 days** | First offense |
| **2 years** | If previously suspended for failing or refusing a specimen test or previously suspended for a DWI, Intoxication Assault or Intoxication Manslaughter conviction during the 10 years preceding the date of arrest |

Provided a specimen with an alcohol concentration of 0.08 or greater, following an arrest for an offense under Section 49.04, 49.07, or 49.08, Penal Code, involving the operation of a motor vehicle:

| | |
|---|---|
| **90 days** | First offense |
| **1 year** | If previously suspended for failing or refusing a specimen test or previously suspended for a DWI, Intoxication Assault or Intoxication Manslaughter conviction during the 10 years preceding the date of arrest |

**Penalties for Offenders Under 21 Years of Age** – Refused to provide a specimen following an arrest for an offense prohibiting the operation of a motor vehicle or watercraft while intoxicated, while under the influence of alcohol, or while under the influence of a controlled substance:

| | |
|---|---|
| **180 days** | First offense |
| **2 years** | If previously suspended for failing or refusing a specimen test or previously suspended for a DWI, Intoxication Assault or Intoxication Manslaughter conviction during the 10 years preceding the date of arrest |

TX_00230063

TEX00230063

**DRIVER LICENSE DIVISION**
**ALR SERVICE**

Provided blood or breath specimen with an alcohol concentration of 0.08 or greater (or any detectable amount of alcohol) or was not requested to provide a specimen following an arrest for an offense under Section 106.041 Alcoholic Beverage Code or Sections 49.04, 49.07, or 49.08, Penal Code, involving the operation of a motor vehicle:

| | |
|---|---|
| **60 days** | First offense |
| **120 days** | If previously convicted of an offense under Section 106.041, Alcoholic Beverage Code or Sections 49.04, 49.07, or 49.08 Penal Code, involving the operation of a motor vehicle |
| **180 days** | If previously convicted twice or more of an offense under Section 106.041, Alcoholic Beverage Code or Sections 49.04, 49.07, or 49.08 Penal Code, involving the operation of a motor vehicle |

## RESULTS OF OPERATIONS

**Licenses Suspended** – DPS records indicate that 106,770 Notices of Suspension were served during calendar year 2005. Of that number, 15,803 notices were served to offenders less than 21 years of age.

During the same time period, DPS processed 98,139 suspensions, including 15,178 actions involving minors. This number includes uncontested administrative suspensions as well as suspensions that occurred as a result of a hearing.

**Administrative Hearings** – The Department received 28,075 hearing requests during calendar year 2005, including 2,636 requests by minors, and 27,708 hearings were actually conducted. "Hearings conducted" includes any case that was scheduled and prepared for hearing and some action had to be taken to remove the setting from the docket. The results of those administrative hearings are as follows:

| | |
|---|---|
| Affirmative | 17,714 |
| Default | 3,686 |
| Negative | 2,228 |
| Dismissed | 4,080 |

7

TX_00230064

TEX00230064

DRIVER LICENSE DIVISION



# FIELD SERVICE

**OVERVIEW:** The Driver License Field Service is charged with the licensing and control of more than 20 million licensed drivers and identification card holders in Texas. The Service operates 256 full and part-time Driver License offices. Part-time offices service 141 rural locations across the state of Texas. In 2005, these locations issued 5,688,735 driver licenses and identification cards.

The Division and Field Service has made progress on reducing the lines and waiting time at our offices without jeopardizing our fight against terrorism or fraud. Our larger offices have extended their hours of operation during the week. The Division has added on-line and telephone renewals as well as online duplicates and added resources on our website to provide information that was previously accessible only in our offices.

**MISSION:** The DL Field Service is committed to efficient license issuance of safe drivers and to improving the safety of Texas roadways with license removal of unsafe drivers.

**PERSONNEL:** The DL Field Service consists of 1,171 positions, including 210 commissioned officers and supervisors, 405 examiners, 537 technicians, 17 secretaries, and 2 custodians. The Service is divided into eight regions, and a captain supervises each region.  The captains are responsible to the Major for the total administration and operation of the Driver License personnel and activities in their region. The captain, lieutenants, sergeants, troopers, examiners, and technicians carry out the Driver License Programs in the field.

**BUDGET:**

| Approved (FY) | Salary | Operating | Total |
|---|---|---|---|
| 2006 | 33,206,573 | 1,648,250 | $34,854,823 |
| 2005 | 33,206,573 | 1,648,250 | $34,854,823 |
| 2004 | 30,712,425 | 1,364,375 | $32,076,800 |
| 2003 | 30,684,300 | 1,357,500 | $32,041,800 |
| 2002 | 30,684,300 | 1,357,500 | $32,041,800 |

**PROGRAMS:** Many of the fundamental principles of driver licensing are based on either statute or case law.  Some of these precepts include:

- The state has the power to legislate for the welfare and safety of its citizens. As such, the Texas Department of Public Safety has been charged with the task as it relates to the administration of standards for the licensing, improving, or "un-licensing" of drivers.
- The judicial branch for years has held that a license to operate a motor vehicle is a privilege granted by law and that no inherent right is involved; however, recent case law has established a different position.  Specifically, driving has been defined as a right, liberty, or an entitlement, subject to withdrawal for cause with due process of law.
- The state, through the Texas Department of Public Safety, assumes responsibility for the quality of drivers using its streets and highways.

TX_00230065

TEX00230065

**DRIVER LICENSE DIVISION**
**FIELD SERVICE**

The entire DL Field Service administers and supports a broad range of Driver License programs, which include examination of new drivers, improvement and control of problem drivers and general enforcement activities.

Tasks specific to Field Service employees include:
- Determining applicant's identity and eligibility for a license.
- Conducting tests and related duties to determine the applicant's ability to drive safely.
- Accepting renewal and duplicate applications for driver licenses and identification cards.
- Inspecting vehicles to determine their safety for use on road tests.
- Capturing the licensee's photograph, signature, and thumbprint.
- Providing accurate information regarding driver licensing and motor vehicle laws.
- Collecting and remitting all fees for licenses and identification cards.
- Conducting comprehensive examinations to determine driver limitations.
- Conducting comprehensive driver investigations to determine a driver's physical or mental impairment.
- Representing the Department in administrative hearings for driver improvement.
- Verifying that original license applicants meet minimum requirements for financial responsibility.
- Registering applicants to vote.
- Verifying enrollment and school attendance of driver license applicants under 18.
- Validating and recording the social security number of all driver license applicants.
- Verifying vehicle registration of new resident driver license applicants.
- Assisting Vehicle Inspection Service with sales of VI stickers and related supplies.
- Collecting applicant donations for blindness education and organ donor programs.
- Securing and recording acknowledgment of the state's "Zero Tolerance" for underage alcoholic consumption for driver license applicants 18 and under.
- Processing Parent Taught Driver Education applicants.
- Processing the Graduated Driver License applicants.
- Processing the Sex Offender License.
- Processing Haz-Mat driver license applicants under the Patriot Act.

Commissioned personnel are present in the DL offices and intercede on a variety of traffic and criminal law enforcement matters. On a routine basis, Troopers arrest wanted persons and file complaints for violations of various statutes. Troopers conduct extensive and lengthy investigations involving fraudulent documents, counterfeit driver licenses and identification cards and investigations involving the theft of a person's identity. Troopers also investigate employee misconduct involving the selling or tampering of driver licenses and identification cards and employee theft. As needed, commissioned personnel provide training and other public service information to other law enforcement agencies and affected groups on a variety of subjects. For example, as the private sector has adopted the driver license as the preferred document to establish a person's identity, providing general education on the DL's security features has become increasingly important.

Prior to licensure, it is critical to determine the purpose for which the driving privilege is to be used so that specific standards can be defined for the applicant, based on the type of license to be issued. Accordingly, the Field Service involves the following processes and services:

**Driver Examinations** – Driver examinations are administered to determine applicant eligibility. Vision tests are conducted during each in-office original and renewal transaction. Written skills tests ensure sufficient knowledge of driver license laws for motor vehicle operation and, as necessary, these tests are conducted orally.  Driving skills tests are also conducted, as required, to ensure the applicant can apply their knowledge of the laws while safely operating the motor vehicle. These examinations are critical not only because they test an applicant's

9

TX_00230066

TEX00230066

DRIVER LICENSE DIVISION
FIELD SERVICE

general knowledge of driver license laws, but also because they serve as a tool in detecting/offsetting driver limitations and any possible physical or mental impairments that warrant further investigation.

**Commercial Motor Vehicle Safety Act and Problem Driver Pointer System** – Current state law requires the surrender of any and all licenses prior to the issuance of any Texas driver's license. This statute exists to support the premise that multiple licenses undermine public safety/law enforcement efforts. When multiple licenses have been issued to one driver, it is difficult to ensure that the full driver history "follows" the driver in his subsequent license applications. Two national databases are accessed in conjunction with the federal Commercial Motor Vehicle Safety Act of 1986 and the 1982 Act of the National Driver Register's Problem Driver Pointer System. Licensing jurisdictions nationwide inquire into both databases to support the one license concept and the idea that the driver record of an individual will "follow" him or her. Field Service personnel carefully evaluate responses from these two databases to determine an individual's eligibility for the class of license for which they are applying.

An increasingly important task the Division faces is determining the applicant's identity. The criticality of this task is evidenced by virtue of specific guidelines appearing both in the Department's administrative rules and applicable manuals. The same is true as it concerns the methodology prescribed for transaction record keeping. Driver license forms, the mainframe computer, and image workstations serve as "processing" prompts for DL office employees; however, it is their attention to detail which provides, at a minimum, an audit trail for both fee remittance and traffic safety/law enforcement purposes.

**"Zero Tolerance"** – Currently, DL Field Service employees also support a variety of other miscellaneous programs. Most of the programs are geared towards the general population, but a few target the teen population. For example, the "Zero Tolerance" statute provides that driver license applicants, under 18 years of age, and their parent of guardian must certify to their receipt of information regarding state laws on driving while intoxicated, minor's operation of a motor vehicle while under the influence, and implied consent. In general, the annual volume of public contacts occurring in DL offices statewide underscores the Department's involvement with these programs.

**Driver License Express** – The Driver License Express is a mobile driver license office which issues driver license renewals, original and renewal identification certificates and transfer of out-of-state licenses for Texas driver licenses. The Driver License Express is a 35 foot Recreational Vehicle that has been converted into a state-of-the-art driver license office. It provides doorstep service to many businesses, universities, hospitals and other organizations throughout the Dallas/Fort Worth Metroplex. It is the first and only vehicle of its kind in Texas and is a standalone unit powered by a generator and equipped with satellite communication.

**Document Investigation and Seizure Procedures** – After the Department's identification policy was changed, more applicants resorted to fraud in order to obtain a driver license or identification card. The Division established document investigation and seizure procedures to instruct commissioned officers and our civilian personnel on how to handle fraudulent documents.

**Field Training Officer Program** – The Division recognized the troopers that are assigned to our field offices from the recruit school needed training in all aspects of enforcement rather than just the training they were receiving on handling enforcement activity that occurs at a driver license office. The new training program ensures they get the proper training in violator contacts away from the office, with an emphasis on pursuit driving and traffic stops.

TX_00230067

TEX00230067

**DRIVER LICENSE DIVISION**
**FIELD SERVICE**

**Homeland Security/Anti-Terrorism** – The Division has taken a proactive stance against terrorism and has established clear guidelines for our employees on what their duties are in relation to the threat level the country is facing. They also assist other agencies by providing driver license information. Division personnel scrutinize documents presented by applicants in an effort to identify possible security risks. Any suspicious documents or any passports that are presented to our employees that are expired will be referred to our Special Crimes Service by the employee filling out an INT-7 form. An investigator from Special Crimes will investigate to determine if there is a threat to our country.

**Internal and External Fraud** – The Division continues to move forward on efforts to eliminate fraud in our offices. A pilot project is under way in Region 1A and 1B to prevent employees from issuing licenses or identification cards to applicants who do not meet our identification policy. Currently, employees copy all primary or secondary identification documents for submission with the original application.

Field employees have also made a strong effort by using DDL reports to detect possible internal fraud. Field employees also pay particular attention when applicants return to be retested to ensure they are the same person who originally applied for the license.

**Training** – The Division has made training one of their top priorities. Since 1998, the Division has scheduled in-service schools every other year for Driver License Technicians and Examiners. The in-service schools take place at our training academy in Austin and are typically three days. The training consists of updated policies and procedures, customer service, and specialized training. All employees also attend a two-day customer service class.

**Q-matic** – Q-matic is an applicant queuing system, which manages the applicant flow in our large offices. The applicant will obtain a Q-matic number from the employee at the information booth. When it is the applicant's turn to be processed, the Q-matic system will call off the applicant's number and tell the applicant which processing window he should go to. The system will provide this information in English or Spanish.

**Automated Driver License Testing System (ADLTS)** – The Automated Driver License Testing System (ADLTS) is currently installed in 88 driver license offices across the state. This system provides state of the art applications to allow customers to complete a written examination using a touch screen. In 2006, (7) seven additional driver license offices will receive ADLTS via funding available through a Federal MCSIA grant. The division's goal is to continue to seek funding to provide ADLTS to 98 full-time offices that do not have the system.

**Field Compliance Report** – The success of the 2003 Field Compliance Pilot Project at the South Gessner Driver License Office in Houston has been phenomenal. The Houston office provides customers a convenient alternative to processing compliance items and obtaining driver records via the standard mail process or traveling to Austin Headquarters for immediate service.

The Department continued to expand these services to other metropolitan cities. Aside from the Houston compliance office, our customers now have the benefit of acquiring compliance services in San Antonio and Garland, with the San Antonio compliance office offering the sale of driver records. Over $7 million dollars has been collected in these locations over the last two years. Approximately 89,000 transactions were processed. Overwhelming customer response confirms the necessity for these services to be available to customers in the larger metropolitan areas. The El Paso area has been targeted as the next possible location to offer these services.

TX_00230068

TEX00230068

DRIVER LICENSE DIVISION



# CRASH RECORDS BUREAU

**OVERVIEW:** The Crash Records Bureau (CRB) is the state repository for motor vehicle traffic crash records, in accordance with Texas Transportation Code Chapter 550, Texas Government Code 411.0175, and various other state and federal regulations. The crash records system is the single most comprehensive information system regarding traffic crashes in Texas. Crash reports received are analyzed and extensive data is extracted, coded and tabulated. Comprehensive data is captured and maintained including information about the crash and its contributing factors, the location, date, time, and people (injuries, fatalities and vehicles involved). There is an increasing demand for crash data from:

- DPS and other law enforcement agencies for crash investigation, resource allocation and in long-term planning activities;
- Department of Transportation for identifying hazardous locations and prioritizing capital construction projects for supporting federal funding requests; and,
- Texas Attorney General for defending DPS and other state agencies and for collecting damages to state property.

Statistical information derived from the reports - the number, cause and location of highway crashes - is published and distributed to the Texas Highway Patrol, traffic safety officials and other interested parties. Non-standard summarized data provided upon request requires analysis of crash data performed through data extraction and manipulation. This involves creating detailed and complex Statistical Analysis Software (SAS) programs to extract the fields of data required for the end result and designing the printed reports format.

Crash data is the primary source for statistics used in evaluating the effectiveness of safety programs, determining rural death rate, and obtaining funding to support traffic safety. Crash data is also critical to state and local transportation project planning and prioritization, highway and railroad crossing safety evaluation, and tort claim support. An estimated $1.3 billion of federal funds are linked to crash records data.

The Crash Records Bureau is also responsible for the design, maintenance, and distribution of crash report forms and training/reference material. These publications must conform to American National Standards and statutory reporting requirements (both state and federal).

**MISSION:** The Crash Records Bureau is committed to maintaining comprehensive traffic crash records for the State of Texas and efficient distribution of crash record report forms, training material and traffic crash statistics.

**PERSONNEL:** The Crash Records Bureau consists of 94 positions. CRB personnel are responsible for receipt, processing, and maintenance of crash reports and data. Personnel respond to written and telephone requests for information relating to crash, entries on an individual's driver record, their Safety Responsibility status and assisting law enforcement agencies regarding erroneous or incomplete reporting of crashes.

**BUDGET:** The table includes contributions from an interagency contract maintained with the Texas Department of Transportation and the National Highway Traffic Safety Administration, which provides reimbursement of some salaried monies and funding for technical support of the Crash Records Information System (CRIS).

TX_00230069

TEX00230069

DRIVER LICENSE DIVISION
CRASH RECORDS BUREAU

| Approved (FY) | Salary | Operating | Total |
|---|---|---|---|
| 2006 | 2,477,247 | 768,096 | $3,245,343 |
| 2005 | 2,402,704 | 768,096 | $3,170,800 |
| 2004 | 2,526,972 | 274,411 | $2,801,383 |
| 2003 | 1,429,984 | 276,605 | $1,706,589 |
| 2002 | 1,321,236 | 225,176 | $1,546,412 |

***PROGRAMS:*** In addition to the receipt, processing, and maintenance of crash reports and data, the Bureau also performs the following functions:

**Crash Review – Safety Responsibility Administration –** Personnel review peace officers' crash reports to determine whether an uninsured driver is involved who is likely liable for the damage to another person's property or injury to another person. Copies of those reports meeting select criteria are forwarded to the Driver Improvement Bureau for administration of the security provisions of the Texas Safety Responsibility Act.

**Crash Report Sales –** CRB receives and processes written and walk-in requests for copies of peace officers' crash reports. Fee documentation associated with these requests must be balanced against the actual number of requests received. Certification of the reports is also performed. Subpoenas for copies of reports and for written depositions are received and processed.

**Expunction of Information –** Court orders for the expunction of criminal information from the reports (e.g., charges filed, under influence of alcohol, etc.) are received and processed. This involves locating the report and excising the information. If the report is on microfilm, it requires excising of the information, refilming the report and witnessing and certifying back to the court that the old film has been destroyed and the new film of the document has been inserted in its place.

**Fatality Analysis Reporting System (FARS) –** FARS collects crash data from reports of motor vehicle traffic accidents in which a fatality occurred and enters this data into a national data base maintained by the National Highway Traffic Safety Administration (NHTSA). Each state participates in this system, which has been in existence since 1975.

**Publications –** Publications are designed, prepared, and distributed by the Analysis Section of the Crash Records Bureau.

   1. Motor Vehicle Traffic Crashes In Texas (Annual) which includes:
    1.1. General Data
      1.1.1. Deaths and Casualties
      1.1.2. Where Crashes Happen
      1.1.3. When Crashes Happen
      1.1.4. How Crashes Happen
      1.1.5. Driver Data
      1.1.6. Vehicle Data

    1.2. DWI Involved Crashes
      1.2.1. Deaths and Casualties
      1.2.2. Where Crashes Happen
      1.2.3. When Crashes Happen
      1.2.4. How Crashes Happen
      1.2.5. Driver Data

TX_00230070

TEX00230070

**DRIVER LICENSE DIVISION**
**CRASH RECORDS BUREAU**

    1.2.6. DWI Arrests
    1.2.7. Breath Alcohol

2. State Of Texas Instructions to Police For Reporting Crashes On Texas Peace Officer's Crash Report Form And Commercial Motor Vehicle Supplement Form.

3. Manual On Classification Of Motor Vehicle Traffic Crashes In Texas.

4. Winning The Battle; Losing the War. A snapshot look at the figurative cost of traffic crashes.

5. The Vehicle Damage Scale For Traffic Crash Investigators is also maintained and distributed by the Analysis Section; however, this Booklet was published by the Traffic Accident Data Project of the National Safety Council and is copyrighted. The Department of Public Safety has permission to distribute this booklet to Texas law enforcement agencies. Other distribution is prohibited.

**Crash Records Information System (CRIS)** – The Crash Records Information System is a joint initiative between the DPS and the Texas Department of Transportation (TxDOT). The vision of the project is to implement a new crash records information system that will provide enhanced efficiencies to capture, manage, and disseminate timely and accurate data to parties who need it to improve the safety of Texas roadways. The system in use today was designed in the 1970s, using technologies available at that time that do not meet the current needs of DPS, TxDOT or other local and state agencies. The limits of this technology result in a system that is manually intensive and untimely in its reporting capabilities.

The CRIS project includes the redesign of the current crash records system resulting in the creation of a new crash records information system. A steering committee comprised of DPS and TxDOT stakeholders will provide guidance. Co-sponsors for the project are the Assistant Chief of the Driver License Division, a representative of the Highway Patrol Division and the Deputy Director of Traffic Operations at TxDOT.

The first phase of CRIS began production in the first quarter of 2006. The system is being hosted at the Texas State Data Center (WTDROC) in San Angelo and has testing and disaster recovery capabilities at the States Austin Data Center (ADROC).

TX_00230071

TEX00230071

DRIVER LICENSE DIVISION



# CUSTOMER SERVICE BUREAU

**OVERVIEW:** The Customer Service Bureau (CSB) is the call/contact center for the Driver License Division.  Established in 1995, it serves to centralize the dissemination of driver license related information to customers via the telephone, website, fax or e-mail. The CSB is also responsible for the main DPS Headquarters switchboard on a rotation basis. In April of 2003, a tracking system was created and installed in CSB. All customer contacts are recorded in this database for training purposes, customer convenience and collection of data for performance measures.

**MISSION:** The Customer Service Bureau demonstrates committed effort towards organizational excellence by providing quality information necessary to encourage and promote exceptional customer service.

**PERSONNEL:**  The Customer Service Bureau consists of 52 positions. CSB staff performs various functions in the customer call center; assisting the public, law enforcement, and other state and government agencies with questions related to services in the Driver License Division.

**BUDGET:**

| Approved (FY) | Salary | Operating | Total |
|---|---|---|---|
| 2006 | 1,114,912 | 30,000 | $1,144,912 |
| 2005 | 1,191,000 | 30,000 | $1,221,000 |
| 2004 | 1,114,632 | 40,000 | $1,154,632 |
| 2003 | 1,114,632 | 40,000 | $1,154,632 |
| 2002 | 1,075,632 | 50,000 | $1,125,632 |

**PROGRAMS:** The Customer Service Bureau personnel assignments reflect its commitment to three functions, as described below:
**Switchboard** – The Headquarters main switchboard is staffed by two representatives daily from 7:30 a.m. to 5:00 p.m. Representatives respond to 17,500 incoming telephone calls monthly regarding DPS-wide matters. Staff either provide direct responses to incoming questions, ensure the caller's routing to the correct internal destination, and/or informs the caller of the responsible state agency. Another 8,000 calls received monthly are handled automatically through the menu tree. A procedural manual is located in the switchboard area with specific instructions in handling bomb threats or any other threatening situations.

**Call/Contact Center** – The call center is staffed Monday thru Friday, 7:30 am to 5:00 pm. On average, 242,000 calls are attempted monthly through the primary line. With current staffing, 87,000 calls are handled each month, with an additional 8,000 calls processed by an automated menu tree installed in October 2001. Each representative handles an average of 100 calls daily. Customers are becoming more familiar with our internet services and web addresses and, alternatively, are choosing to e-mail their questions directly to our site. We have an e-mail team that responds to an average of 4,200 e-mail inquiries each month.

The main function of the call center is to assist customers with driver license issues by reviewing

15

TX_00230072

TEX00230072

**DRIVER LICENSE DIVISION**
**CUSTOMER SERVICE BUREAU**

their driver history and providing the necessary information. Calls or e-mails range in subject matter from driver license issuance questions, crash report information, and driver records to more technical calls regarding the suspension and/or reinstatement of Texas driver licenses.

A separate number (512/424-7181) is available to Spanish speaking customers and staffed by bilingual representatives.

A non-published number is available to the driver license field offices. This private number expedites response time.

**Training** – All customer service representatives receive an intensive, four-week training and are taught by subject matter experts from the various Driver License Division bureaus. After the training, an assessment is given to test their knowledge base. A 90% score is required before representatives are assigned to live calls.  The training program includes:

- Technical training in relation to driver license and safety responsibility laws.
- Service related training including listening skills, customer relations, and stress related classes.
- Training from Driver License Division bureaus regarding overall functions and questions.
- How to handle bomb threats and other emergency related calls.
- Continuing education/refresher training.
- Legislative changes.

Meetings are held on a bi-monthly basis and information is shared with all employees. Team meetings are held on an as needed basis, however, daily updates are provided to representatives and technicians as changes occur via a custom intranet instant messaging application, and handouts.

The CSB training specialist provides additional training to all Division employees. The trainer develops schedules and presents classes on customer service, teambuilding, new employee orientations and leadership.

**Special Programs** – The CSB also coordinates the agency-wide customer service survey as legislatively required. Agency customers are surveyed on a continual basis via the online customer survey. The information and comments from those surveys are distributed to the respective departments for response and data analysis. In addition to the online survey, a random sample of agency customers are contacted quarterly soliciting input on the services provided. The results are reported in the Public Safety Commission Report and Strategic Plan. The University of Texas Survey of Organizational Excellence provides the survey instruments, data collection and results. In September 2004, the University of Texas implemented a new way to track TXDPS customer comments via the online survey on the agency's web page. This new process is called the "Thought Bubble". This system enables the handlers and or administrators to view the comments, respond to the customer, forward the comment to another area, recognize employees for outstanding work performance and review all resolved comments.

TX_00230073

TEX00230073

DRIVER LICENSE DIVISION



# DRIVER IMPROVEMENT BUREAU

**OVERVIEW:** The Driver Improvement Bureau's (DIB) primary function is to help ensure the safety of all licensed Texas drivers and to promote responsible driving characteristics on Texas Roadways. Driver Improvement has the statutory authority to suspend, revoke, disqualify, or cancel driving privileges. When applicable, DIB also provides options to Texas drivers for restoration of their driving privilege. DIB evaluates the driving performance of those who jeopardize the safety of others. The drivers are identified through receipt of convictions of traffic violations or information concerning a medical condition which could prevent safe operation of a motor vehicle. Upon identification, the bureau takes corrective action that may result in the loss of license and/or driving privilege. This includes out-of-state violations as well as an adverse driving status in other states. DIB responds to written inquiries and telephone calls from effected citizens and communicates with courts throughout the state and U.S. to insure the accuracy of conviction reports.

While traffic safety remains DIB's primary focus, administering numerous laws that require the Department to take withdrawal action for non-traffic offenses has become equally important. Failure to pay child support, failure to pay a surcharge required by the Driver Responsibility Program, minors who have non-traffic related alcohol offenses, minors who have been determined to be truant, and drug convictions that are not traffic related are several examples of these programs.

**MISSION:** The Driver Improvement Bureau ensures the safety of Texas roadways by identifying problem drivers, initiating enforcement action against problem drivers and maintaining all necessary records.

**PERSONNEL:** The Driver Improvement Bureau consists of 112 positions. DIB is comprised of several sections responsible for supporting numerous programs and essential statutory requirements related to driver improvement actions.

## BUDGET:

| Approved (FY) | Salary | Operating | Total |
|---|---|---|---|
| 2006 | 2,394,753 | 492,537 | $2,887,290 |
| 2005 | 2,428,000 | 395,000 | $2,823,000 |
| 2004 | 2,275,000 | 358,000 | $2,633,000 |
| 2003 | 2,275,000 | 353,000 | $2,628,000 |
| 2002 | 2,250,000 | 350,000 | $2,600,000 |

## PROGRAMS:

**Driving While Intoxicated Offenses and Consequences** – Offenders convicted of Driving While Intoxicated (DWI) who are 21 years of age or over may be required to attend an authorized Alcohol Education Program, may be suspended, or may receive probation for their offenses in addition to the Safety Responsibility requirements.

Offenders convicted of Driving While Intoxicated who are under 21 years of age will receive a driver license suspension of one (1) year, in addition to the Safety Responsibility requirements.

TX_00230074

TEX00230074

**DRIVER LICENSE DIVISION**
**DRIVER IMPROVEMENT BUREAU**

An authorized Alcohol Education Program may also be required before the license may be reinstated. Other special terms may reduce the length of suspension.

DWI conviction information is reported through several formats. Counties that have electronic capabilities may report their convictions through the Criminal Justice Information System (CJIS), while other counties utilize a paper format which is the equivalent to this electronic transmission. For those counties that do not have this ability, conviction information is reported on a conviction information reporting form (DIC-17). Electronic reporting is continually encouraged as the preferred format.

**Administrative License Revocation (ALR)** – As highlighted in the ALR Service section portion of this document, the ALR program went into effect on January 1, 1995. This program is the administrative process by which the Department suspends the driver licenses of individuals who are arrested for the offense of driving while intoxicated (DWI). DIB maintains the automated database for the ALR program and supports the ALR attorney group on technical matters specific to offense reports.

**Drug Offenses and Consequences** – Offenders 17 years and older convicted of a drug offense or controlled substance offense will receive a driver license suspension of 180 days. In addition to the suspension, the offender must comply with the Safety Responsibility requirements and complete an authorized Drug Education Program through the Texas Commission on Alcohol and Drug Abuse. Failure to complete the program will result in a revocation of the license beyond the 180 days suspension until the Department receives a completion certificate.

Offenders who do not have a Texas driver license at the time of offense will be denied a Texas driver license for a period of 180 days. The Order of Prohibition (180 days) will begin upon first contact with DPS Driver License Personnel. Safety Responsibility requirements will be in effect for this suspension. The SR-22 insurance certificate will be required for two (2) years from date of conviction.

**Administrative Suspensions** – Texas Transportation Code sections 521.292 and 521.294 permit the Department to take action against a driver license or privilege under certain circumstances. The Driver Improvement Bureau's responsibility is to review driver record histories to determine if the driver license should be suspended, revoked, or disqualified because it has been determined that the individual has violated relevant provisions.

Administrative actions include the following:

- Habitual Violator
- Provisional Violator
- Medically Incapable
- Nonresident Violator Compact
- Driving While License Invalid
- Minor Restricted Driver License
- Subsequent Conviction CMV
- Railroad Violations
- Violate Driver License Restrictions
- Serious Traffic Violations
- Minor Failure to Appear/Pay
- Violation of Probation
- Fleeing from Police
- Habitual Reckless Negligent
- Driving While License Disqualified

Notification is sent by first class mail to the offender indicating the driving privilege is to be suspended, revoked, or disqualified as authorized by the Texas Transportation Code. This action becomes effective on the 45th day from the notification date. An individual may request a hearing to contest the adverse action, however this request must be made to the Department within 20 days from the notification date. If an administrative hearing is requested, the administrative

18

TX_00230075

TEX00230075

**DRIVER LICENSE DIVISION**
**DRIVER IMPROVEMENT BUREAU**

hearing is held in the driver's county of residence. A representative for the Department (usually a Driver License Examiner) will attend and present the case to the Justice of the Peace or Municipal Court Judge. A decision may then be rendered to suspend, revoke, or disqualify the driving privilege. Reinstatement fees may apply.

**Minor Alcohol Offenses and Consequences** – Individuals under 21 years of age who are convicted of the following offenses will receive a 30-day suspension for the first offense. Subsequent convictions will have enhanced suspensions from 60 to 180 days.

- Minor in possession
- Attempt to purchase alcohol by a minor
- Purchase of alcohol by a minor
- Consumption of alcohol by a minor
- Misrepresentation of age by a minor
- Public Intoxication

House Bill 1357 was passed during the 79th Legislative Session which creates a six-month driver license suspension for a person convicted of providing alcohol to a minor. The second offense increases the driver license suspension to one year.

**Medical Advisory Board** – A panel of thirty-five physicians that are appointed by the Texas Department of State Health Services governs the Medical Advisory Board (MAB). The panel convenes every other week to review possible medical conditions as they relate to the driving ability of reported Texas drivers. This panel reviews medical documentation submitted by the subject's personal doctor regarding the condition in question.

The DPS acts in accordance with the findings of the Medical Advisory Board. If the Medical Advisory Board determines that an individual is medically incapable of safely operating a motor vehicle, administrative action is taken to revoke the privilege. An occupational or essential need license may not be issued for a revocation due to a medical condition.

Physicians, family, friends, acquaintances, and driver license field personnel may report a Texas driver to the Medical Advisory Board. In addition, admission of a possible health condition that may interfere with the safe operation of a motor vehicle during application or renewal for a Texas driver license may result in referral.

**Delinquent Child Support** – Upon receipt of a Notice of Revocation from the Attorney General's Office or a Texas District Court, DIB will take revocation action against a Texas driver licensee for failure to pay child support. The license will remain revoked until the Attorney General's Office or a Texas District Court submits an order vacating or staying the order of suspension. No reinstatement fee is required and an occupational or essential need license may not be issued for a revocation due to delinquent child support.

**Classified Sex Offender Requirement** – HB 1939, passed by the 76th Legislature, tasked the Driver License Division with the responsibility to issue a driver license or identification card to individuals subject to registration as a sex offender as required by Chapter 62, Code of Criminal Procedure. Driver Improvement will place an entry on the driver history of each registered sex offender as identified by the Registered Sex Offender database maintained by Crime Records Service (CRS). The entry appears on the computerized driver history available to law enforcement personnel and on the driver record issued by the Department. An individual subject to these requirements must obtain a driver license or identification card on an annual basis. If the individual does not renew their driver license or identification card annually, then revocation action will be enforced. In order to lift a revocation for failure to comply with this requirement, an individual is required to obtain and or renew the driver license and/or identification card.

TX_00230076

TEX00230076

**DRIVER LICENSE DIVISION**
**DRIVER IMPROVEMENT BUREAU**

**Crash Suspension Cases** – The Safety Responsibility Act allows for the Department to take suspension action against an uninsured motorist's driving privilege if it has been determined that there is reasonable probability of a judgment being rendered against the owner and/or operator of the motor vehicle, due to an automobile crash in which the individual was at fault. Notification is sent to the individual requesting evidence of settlement for costs incurred by the innocent party as a result of property damage or medical bills. Administrative hearing provisions are available to the driver if he/she wishes to contest the suspension action.

**Financial Responsibility Requirement** – Texas Transportation Code Chapter 601 provides a safety responsibility requirement for individuals whose driver license or privilege has been suspended as a result of a conviction. Additionally, a person commits an offense by operating a motor vehicle in this state without liability insurance. A second or subsequent conviction for such an offense results in a suspension of the driver license unless the person provides the Department proof of financial responsibility. The Safety Responsibility Act requires an individual to file proof of and maintain financial responsibility, in the form of a SR-22 insurance certificate, with the Department for a period of two (2) years after the conviction date. If the individual fails to maintain the SR-22 as required, upon notification from the insurance company that the insurance coverage has been cancelled, the individual's driver license is suspended.

**Driver Responsibility Program** – The Driver Responsibility Program (DRP) was created by HB3588 in the 78th Legislative Session establishing a system that requires the Department to assess a surcharge based on certain traffic offenses. HB2 passed in a Special Session of the 78th Legislature, made some amendments and provided the appropriation language to direct revenue collected.

The two methods below detail how surcharges will be assessed.

Points System Surcharges
Points are assessed to moving violations classified as Class C misdemeanors. Points are assigned as follows:
* Two points for a moving violation conviction in Texas or that of another state.
* Points will not be assigned for speeding less than 10% over the speed limit or seat belt convictions.
* Three points for a moving violation conviction in Texas or another state that resulted in an accident.

DPS will assess a surcharge when the driver accumulates a total of six (6) ponts or more on their driver record during a three-year period. The driver must pay a $100 surcharge for the first six-points and $25 for each additional point, in addition to any related service fees.

NOTE:  Traffic offenses which result in points are designated in 37 TAC §15.89.

Conviction Based Surcharges
Drivers who receive a conviction for an offense listed below will pay an annual surcharge for a period of three (3) years from date of conviction.  No points are accessed for these offenses because the surcharge is automatic upon conviction.

* Driving While Intoxicated, Intoxication Assault, and Intoxication Manslaughter
  ➣ First time offense = $1,000
  ➣ Second or subsequent offense = $1,500
  ➣ DWI 0.16 or greater = $2,000

* Failure to Maintain Financial Responsibility
  ➣ $250

TX_00230077

TEX00230077

**DRIVER LICENSE DIVISION**
**DRIVER IMPROVEMENT BUREAU**

- Driving While License Invalid
  - $250

- No Driver License
  - $100

NOTE: The surcharges are cumulative, meaning if a driver received two DWI offenses the total amount of surcharges to be paid would be $2,500 annually for three (3) years.

Drivers are notified when a surcharge has been assessed and given thirty (30) days to comply. Failure to pay will result in a suspension of the driver license and/or driving privilege. Drivers are offered the opportunity to pay in full or to submit monthly installment payments.

TX_00230078

TEX00230078

DRIVER LICENSE DIVISION



# DRIVER RECORDS BUREAU

**OVERVIEW:** The Driver Records Bureau (DRB) processes and maintains records of all driver license and identification cards issued by the Department. Each record is automated and contains a listing of traffic convictions and accident involvement in Texas, as well as other states. Files are maintained on over 17 million Texas drivers and 3 million identification cards. The bureau implemented a document imaging system that allows increased efficiency and customer support, working in conjunction with Central Cash Receiving.

**MISSION:** The Driver Records Bureau administers a comprehensive reporting system and promotes efficient and accurate processing, maintenance, and filing of records pertaining to individual drivers.

**PERSONNEL:** The Driver Records Bureau consists of 86 positions. The Driver Records Bureau is comprised of several sections responsible for data entry and providing driver records and certification of driver records to the general public, law enforcement personnel, insurance companies, and driver records agencies.

**BUDGET:**

| Approved (FY) | Salary | Operating | Total |
|---------------|--------|-----------|-------|
| 2006 | 1,906,144 | 1,085,000 | $2,991,144 |
| 2005 | 1,695,000 | 770,491 | $2,465,491 |
| 2004 | 1,892,000 | 830,491 | $2,722,491 |
| 2003 | 2,564,937 | 970,769 | $3,535,706 |
| 2002 | 1,769,223 | 1,278,600 | $3,047,823 |

**PROGRAMS:**

**Automated Conviction Reporting** – Traffic convictions are electronically submitted via diskette, modem transfer, electronic mail, and File Transfer Protocol (FTP). Currently, 710 Municipal and Justice of the Peace Courts report by automated methods. Any hard copy tickets or computer generated listings of convictions submitted by the courts are reviewed for pertinent and accurate information to ensure that final disposition is a conviction or a dismissal by completing a driving safety course before being added to the driver history. When necessary, courts are contacted to verify reported information.

**Data Entry** – Miscellaneous updates from the six Driver License Division Headquarter Service bureaus are entered onto the driver history including name and address changes, crash data, suspensions, traffic convictions, and other driver related information.

**Verification and Edit** – DRB verifies and edits processes for error resolution of data entered on the driver record.

**Driver Records** – DRB provides driver records and certification of driver records to the general public, law enforcement personnel, insurance companies, and driver records agencies.

TX_00230079

TEX00230079

**DRIVER LICENSE DIVISION**
**DRIVER RECORDS BUREAU**

Over twelve million driver record requests are processed annually, generating approximately 50 million dollars in revenue each year for the state of Texas.

**E-Commerce** – This area is responsible for transmission and the processing of online transactions and for providing technical support for Texas Online driver license renewals, address changes and the sale of driver record processes.

**Correspondence** – DRB provides written information on driver license related issues to Departmental personnel, other law enforcement agencies, and the general public.

23

TX_00230080

TEX00230080

DRIVER LICENSE DIVISION



# LICENSE ISSUANCE BUREAU

**OVERVIEW:** The License Issuance Bureau (LIB) determines the eligibility of all driver license and identification cards issued prior to mailing. Each year, over 5 million DL/IDs are issued in the state of Texas. Annual production volumes, ensuring issuance quality and meeting customer needs places high demands on LIB employees. As well, LIB personnel manage several high-profile programs related to state and federal licensing systems.

Introduced in March 1995, the Digital Driver License program enabled the License Issuance Bureau to establish new standards for many driver license functions. Digital technology provided the agency an opportunity to redesign the license document, improving quality and enhancing security features. Applicant-specific restriction and endorsement information, as well as the inclusion of a magnetic stripe and barcode on the back of the license, created a more effective document for law enforcement and the retail community. Security features have been incorporated into the Texas driver license, making it more resistant to counterfeit attempts. LIB produces and mails the license within 10 days from the time the customer visits the office. Automated programs allow LIB staff to correct and then reproduce a driver license without inconvenience to the customer.

**MISSION:** It is the mission of the License Issuance Bureau (LIB) to provide administrative and technical support to driver license personnel, law enforcement agencies, legislators and the citizens of Texas. LIB is committed to integrity, promptness and professionalism in the completion of our duties. All laws of the state of Texas and all rules of the Department are adhered to with the highest level of integrity.

**PERSONNEL:** The License Issuance Bureau consists of 117 positions. LIB is comprised of several sections responsible for supporting multiple driver license related programs. Administrative support includes verifying the eligibility of Texas driver license and identification card holders and accuracy/quality of the document prior to the issuance, technical support for field driver license offices, and compliance with state and federal laws.

**BUDGET:**

| Approved (FY) | Salary | Operating | Total |
|---|---|---|---|
| 2006 | 2,055,000 | 7,350,000 | $9,405,000 |
| 2005 | 2,458,000 | 6,993,600 | $9,451,600 |
| 2004 | 2,543,000 | 7,313,231 | $9,856,231 |
| 2003 | 2,489,000 | 8,113,231 | $10,602,231 |
| 2002 | 2,450,000 | 8,152,231 | $10,602,231 |

**PROGRAMS:** Technical sections within the License Issuance Bureau support the following programs.
**Distributive Driver License (DDL) Program** – This program is utilized throughout the state for the collection and update of all demographic data related directly to the issuance of driver licenses and identification cards. In conjunction with this program, a vendor system

24

TX_00230081

TEX00230081

**DRIVER LICENSE DIVISION**
**LICENSE ISSUANCE BUREAU**

operating digital imaging software is used to collect applicant signature, thumbprints, and portrait images to complete the issuance process. Data transmission to headquarters is monitored daily by technical staff to ensure program completion and DL/ID production. Staff provides technical support to system application processing, as well as support to DL/ID related issuance processing. Other mandated programs required at the time of driver license issuance include:

- Commercial Driver License Information System (CDLIS);
- Problem Driver Pointer System (PDPS);
- Blindness Education Screening and Treatment (BEST);
- Donor Education, Awareness, and Registry (DEAR);
- Parent Taught Driver Education (PTDE);
- Voter Registration;
- Citizenship Status;
- Motorcycle Safety; and,
- United States Selective Service.

**System Testing** – Technical Support coordinates, designs, develops, tests and implements new or modified versions to existing driver license programs for dissemination to Field Services statewide. Staff also works closely with driver license personnel, IMS personnel, other departmental areas, law enforcement, other state licensing authorities, federal program personnel, judges/county officials, program vendors, and the public.

**Data Analysis/Fund Disbursement** – Technicians compile and maintain statistical data related to DL/ID issuances. Data collection ranges from total number and type of driver licenses issued on a monthly basis, to the identification and subsequent allocation of funds collected for DL/IDs, Blindness Education Screening and Treatment (BEST) and the Donor Education Awareness, and Registry (DEAR). This data is critical to the agency by identifying the disbursement of related funds to the State Comptroller, as well as providing projections based on future growth and budgetary impacts.

**Failure to Appear/Failure to Pay (FTA/FTP) Program** – In accordance with Texas Transportation Code Chapter 706, the department contracts with political subdivisions to deny renewal of a driver license of a person who fails to appear for a complaint or citation or fails to pay or satisfy a judgement. Established in October 1996, the FTA program provides for an automated system that collects and maintains violator information until all fines and court related costs are paid to the originating court for final disposition. Technical staff coordinates with a third-party vendor, judges, court officials and the public to ensure program compliance. To date, the department has entered into contract with 815 political subdivisions across the state. There have been over 4,264,307 offenses entered into the FTA database and over 2,068,717 resulting compliances.

**Texas Intrastate Vision and Limb Waiver Program** – Vision waivers are issued to commercial drivers whose vision does not meet Federal Motor Carrier Safety Regulations. Applicants for a vision waiver must submit information that contains a vision and physical examination and a vision waiver application. Technical staff evaluates these forms and, if approved, the driver will be issued a vision waiver card, which allows him/her to driver commercially within the state of Texas.

The Texas intrastate limb waiver program is available for those Texas license holders that wish to obtain a Texas commercial driver license and do not meet the federal requirements. Technical staff evaluates these forms and, if approved, the driver will be issued a limb waiver, which allows him/her to drive commercially within the state of Texas. Specific qualifications for a Texas

TX_00230082

TEX00230082

**DRIVER LICENSE DIVISION**
**LICENSE ISSUANCE BUREAU**

intrastate vision or limb waiver are outlined in the Texas Administrative Code Rule 16.9.

**DLD Website** – Via the Internet, electronic mail has become a means by which the License Issuance Bureau provides enhanced customer service to Texas residents all over the world. Incoming e-mail requesting additional service related information is monitored by LIB technical staff and forwarded to the appropriate area for response. LIB technical staff responds to questions that are driver license related. Updates and new site requests are coordinated between this staff and IMS. An average of 1,500 e-mails are responded to each month.

**Parent-Taught Driver Education Program (PTDE)** – In accordance with Texas Transportation Code 521.205, the Department was directed to provide a driver-training course, which can be given by a parent, stepparent, grandparent, stepgrandparent, foster parent or legal guardian. In the past, driver education programs in Texas were only granted by schools and instructors certified by the Texas Education Agency. The 'Driver Education Instruction Curriculum Model' was developed by the department, and became the curriculum for those individuals who wished to teach their child/ward to drive. Functions of this program include:

- Verify request form (DL-92) for completeness and accuracy;
- Enter requestor and applicant information in network database;
- Issue and mail driver education form (DE-964) to driver license offices;
- Mail curriculum package to requestor;
- Update the internal database upon the receipt of DE-964s from the field offices; and,
- The Department is also charged with the responsibility of reviewing parent-taught driver education curriculum that is at least equal to those required in a course approved by the Texas Education Agency. The Department has approved seven (7) driver education courses that may be utilized by a PTDE instructor.

**License Verification/Quality Control** – LIB personnel are responsible for multiple functions related to verifying the eligibility of Texas driver license and identification card holders. With an average of 21,500 DL/ID issues in Texas daily, section personnel are responsible for the verification of issuance materials from over 256 driver license offices across the state. This requires section personnel to handle an average of 5.7 million issuance documents a year. Verification of issuance materials prior to imaging includes:

- Ensuring completeness of all documents and required certifications;
- Accurate recording and verification of license type and class;
- Eligibility and proper reporting of out-of-state/country jurisdictional exchange; and,
- Accuracy of remittance reports and end of day total money transactions.

Using an automated program, personnel are also responsible for verifying the quality of all DL/IDs prior to mailing. This mainframe program, Verification (VER) is accessed through the use of the barcode on the back of the DL/ID. Quality control includes:

- Verifying the data collected is accurate and complete;
- Production quality checks of DL/IDs;
- Distribution of DL/IDs designated for further handling; and,
- Update and reproduction of incorrect DL/IDs.

**Military/Out of State Issuance Program** – This program allows military personnel and civilians currently residing out of the state or country to renew or receive a duplicate of their license or ID by mail. During fiscal year 2005, a total 3,942 applications were processed through this program. Applicants can now access downloadable forms from the TxDPS website www.txdps.state.tx.us to help expedite the process.

26

TX_00230083

TEX00230083

**DRIVER LICENSE DIVISION**
**LICENSE ISSUANCE BUREAU**

**Accessibility Program** – This program was designed to assist individuals with disabilities who are unable to visit the driver license office to obtain an identification card.

**Record Evaluation** – Record evaluation involves review and compilation of various source documents to determine validity or authenticity of driver license and/or identification card numbers. LIB staff performs the following processes:

- Identification of DL/ID records with matching Social Security Numbers or matching names and dates of birth;
- Assisting field personnel with investigations related to fraudulent use;
- Transferring and updating driver history information when necessary; and,
- Transferring and updating PDPS pointers as necessary with driver history transfers.

**Social Security Online Verification (SSOLV) Program** – SSOLV was developed to enable online access to the Social Security Administration (SSA) for social security number verification. A comparison of SSA and DPS records is completed at the time of issuance for original applicants in the field. If the SSN information does not match, the license is not issued and the DPS record is placed under alarm. Upon notification from a field office that the reason for the discrepancy was valid or has been corrected, the alarm is removed and the license is issued.

**Commercial Driver License Information System (CDLIS)** – The Commercial Driver License Information System (CDLIS) manages the issuance of commercial driver licenses by jurisdictions and eliminates the fraudulent practice of having commercial licenses from more than one jurisdiction in order to distribute driving violations. It requires the entry of all commercial drivers into the CDLIS system. Data collected on Texas CDL operators is electronically transmitted by LIB staff into the national clearinghouse, which maintains the identity and location of commercial operators across the country. As commercial operators move from state to state, driver histories, including moving violations, are electronically sent through this system for maintenance in the current state of record.

**Hazardous Materials Endorsement (HME) Program** – As a result of the Patriot Act, enacted by Congress in 2001, CDL holders who wish to apply for an HME are required to pass a federal background check and receive clearance from the Department of Homeland Security (DHS) to haul hazardous materials. Applicant data is collected in the field and sent to LIB for review and submission to the Transportation Security Administration (TSA). Upon notification from TSA, LIB staff updates CDL with or without the HME as appropriate.

**Automated Mailing Machine** – The automated mailing machine is a computerized electronic high-speed mailer that accesses a database, prints and inserts materials at a rate of 3,000 - 4,000 documents an hour. Operators download and upload data from the department's mainframe computer to perform program activities. The driver license and identification cards contain a barcode that is utilized to access program applications for the retrieval of mailing address information. As a result, DL/IDs are scanned, read, inserted and mailed. Speed, combined with effective automated programs, has allowed the department to maintain an average mailing cycle of 7 days from the date of issue for driver license and identification cards. Additionally, the mailer is responsible for inserting the alternate renewal program.

During Fiscal Year 2005 a total of 5,301,260 DL/IDs and 1,366,001 alternate renewal applications were mailed.

**Microfilm** – LIB personnel maintain a system for the storage and retrieval of driver license records, including digital image photos, and provide assistance to law enforcement and DPS

TX_00230084

TEX00230084

**DRIVER LICENSE DIVISION**
**LICENSE ISSUANCE BUREAU**

personnel in obtaining correct record information. Microfilm-related processes include:

- Film driver license/identification card record material using a microfilm camera, which creates a photographic record on a reduced scale. Paper records are prepared for filming/indexing by a vendor. An indexing system is maintained on all filmed documents.
- Maintain black and white photograph film file for all applicants photographed after 1986. Retrieval from the black and white file and the digital imaging file is initiated for law enforcement purposes or in response to subpoenas.
- Responses to subpoenas with printed microfilmed documents and digital/black and white photographs. Upon retrieval, all confidential information is redacted.
- Maintain microfiche record retrieval system to reference previous mainframe transactions.
- Coordinate transfer, processing, storage and destruction of exposed/developed microfilm and fiche for the Division.
- Maintain database of all requests received and processed since 1991.  Provide assistance to the Terrorism Task Force/Special Crimes since September 11, 2001.

The Microfilm Section implemented a document imaging system in the License Issuance Bureau. Imaging equipment such as document scanners, desktop scanners and personal computers were installed to enable all workstations in LIB access to the document imaging system.  LIB users and the DLD Fraud Investigative Unit utilize the document imaging program on a daily basis to process various business requests.

The Imaging program continues to be enhanced by incorporating documents to be imaged for the Commercial Driver License Section (HME letters).  Documents imaged also include identification application documents that were used to issue Texas Temporary Identification Cards to the Hurricane Katrina/Rita evacuees.

The License Issuance Bureau continues to use the offsite microfilm vendor to microfilm driver license documents for Region 1 and 2.  It is anticipated that the LIB document imaging program will incorporate all driver license documents by March 2006.

28

TX_00230085

TEX00230085

DRIVER LICENSE DIVISION



# SAFETY RESPONSIBILITY BUREAU

**OVERVIEW:** The Safety Responsibility Bureau (SRB) derives its authority from Texas Transportation Code Chapter 601, known as the Motor Vehicle Safety Responsibility Act. The Bureau collects reinstatement fees paid to the Department for withdrawing driver license suspensions, processes all compliance items related to accident, departmental, and/or mandatory suspensions, and manages filing of proof of insurance certificates (SR-22). The SRB is also responsible for providing reinstatement service to citizens who visit compliance offices located in Austin, Houston, San Antonio and Garland.

**MISSION:** The Safety Responsibility Bureau ensures customers' operating privileges are restored in a timely manner following receipt of required compliance items.

**PERSONNEL:** The Safety Responsibility Bureau consists of 90 positions. SRB is comprised of several sections responsible for compliance related programs. Bureau staff also supports the Denson Compliance Office by assisting customers with driver record requests and suspension related items.

**BUDGET:**

| Approved (FY) | Salary | Operating | Total |
|---|---|---|---|
| 2006 | 2,383,104 | 355,442 | $2,738,546 |
| 2005 | 2,141,994 | 247,730 | $2,389,724 |
| 2004 | 2,261,994 | 247,730 | $2,509,724 |
| 2003 | 1,731,994 | 207,726 | $1,939,720 |
| 2002 | 1,691,994 | 207,726 | $1,899,720 |

**PROGRAMS:** Safety Responsibility is charged with collecting reinstatement fees for license suspension activity. For FY2005, the Safety Responsibility Bureau received and processed the following fees. All of the funds listed below, with the exception of the funds collected under the security provisions of the Safety Responsibility Act, are deposited in Fund 001 with the Comptroller of Public Accounts. The money collected for security is deposited in Trust Fund 914 with the Comptroller of Public Accounts.

| | |
|---|---|
| SR | $7,054,956.91 |
| ALR | $7,724,512.19 |
| DIB | $2,565,720.18 |
| Occupational licenses | $190,725.65 |
| Security Trust Fund | $346,262.41 |
| TOTAL COLLECTED | $17,882,177.34 |

The following programs are supported by all five sections of Safety Responsibility to ensure compliance items required by suspension activity are processed quickly and driving privileges are reinstated.

29

TX_00230086

TEX00230086

**DRIVER LICENSE DIVISION**
**SAFETY RESPONSIBILITY BUREAU**

**Financial Responsibility Reinstatement** – A person commits an offense by operating a motor vehicle in this state without liability insurance. A second or subsequent conviction for such an offense results in a suspension of the driver license unless the person provides the Department proof of financial responsibility. The most common method of providing such proof is in the form of an SR-22 insurance certificate. This type of compliance must be maintained for a period of two years from the date of conviction and requires a $100.00 reinstatement fee once the suspension becomes effective that may be paid at any time prior to renewal of the license.

**Security Following Accidents** – Under the Safety Responsibility Act when an uninsured motorist is involved in an accident, the Department must determine if there is a reasonable probability of a judgment being rendered against the owner or operator. Should the suspension become effective, the person must comply by filing one of the following:

- A release from all liability regarding the accident;
- An installment agreement indicating monthly payments are being made until the claim has been satisfied;
- Security in the form of cash, cashier's check or money order in the amount of damages, along with proof of insurance in the form of an SR-22, and proof of a six-month prepaid premium in the form of an SR-22a; or
- Valid proof of insurance at the time of the accident.

A $100.00 reinstatement fee is also required if the suspension becomes effective that may be paid at any time prior to renewal of the license.

**Administrative License Revocation (ALR)** – A refusal or failure of a blood/breath test results in an administrative suspension. A $125.00 reinstatement fee is required for offenses after September 1, 2001. Offenses occurring prior to that date require a $100.00 reinstatement fee. The reinstatement fee may be paid at any time prior to renewal of the license.

**Departmental Suspensions** – When the Department issues a suspension, such as habitual violator, provisional restriction violator, driving while license suspended, etc., a $100.00 reinstatement fee is required. The reinstatement fee may be paid at any time prior to renewal of the license.

**Judgment Suspensions** – Suspension under the judgment provisions require the filing of evidence that the judgment has been satisfied, proof of financial responsibility in the form of an SR-22 and a $100.00 reinstatement fee. The reinstatement fee may be paid at any time prior to renewal of the license.

**Default Suspensions** – Suspension under the default provisions require filing a release or security deposit with proof of financial responsibility in the form of an original pink SR-22 and certificate of a six-month prepaid premium in the form of an SR-22a, if applicable, and a $100.00 reinstatement fee. The reinstatement fee may be paid at any time prior to renewal of the license.

**Reciprocity Suspensions** – Suspension of Texas license or vehicle registration resulting from an accident that occurred in another state requires a clearance letter from that state. If the suspension has become effective, a $100.00 reinstatement fee is required. The reinstatement fee may be paid at any time prior to renewal of the license.

**Mandatory Suspensions** – Certain convictions, such as a non-probated DWI, result in a mandatory license suspension. Proof of financial responsibility in the form of an SR-22 is required to be maintained for two years from the date of conviction. A $100.00 reinstatement fee is required prior to renewal of the driver license if the SR-22 was not on file when the conviction was placed on the driver record.

TX_00230087

TEX00230087

**DRIVER LICENSE DIVISION**
**SAFETY RESPONSIBILITY BUREAU**

**Occupational Licenses** – If a motorist's driving privileges have been suspended for any reason other than delinquent child support, unpaid surcharges, or physical/mental health reasons, they may seek relief from the courts in the form of an occupational license. An occupational license may be issued upon receipt of a court order, proof of financial responsibility in the form of an SR-22, all reinstatement fees and a $10.00 occupational license fee.

**Ignition Interlock** – Upon receipt of information from a court that an individual is required to operate a motor vehicle with a device that uses a deep-lung breath analysis mechanism, a notice of cancellation is mailed. A cancellation becomes effective until a release from the court is received. A restricted license may be issued if the individual's license status is clear of all other suspension action, license has not expired, all reinstatement fees have been paid and a $10.00 restricted license fee is submitted.

**DWI/Drug Certificates** – Under certain circumstances, a DWI, Drug or Repeat Offender Education Program may be required by a court. If the DWI or Repeat Offender Program is not completed in a timely manner, a revocation becomes effective.

**Minor Failure to Appear/Failure to Pay** – Minors in Texas who have committed traffic and/or non-traffic offenses and have not complied with the court by failure to appear or failure to pay (offenses prior to 09/01/03) are revoked. Disposition from the court that the minor has complied and a $100.00 reinstatement fee is required. The reinstatement fee may be paid at any time prior to renewal of the license.

**Juvenile Suspension Contempt or Deny Contempt** – Minors in Texas who fail to pay for traffic and/or non-traffic offenses committed on or after 09/01/03, are in contempt of court. Their license will be suspended, or if unlicensed, will be denied issuance of a license until final disposition from the court is received. No reinstatement fee is required.

**Non Resident Violator Compact** – Another state notifies the Department of an unpaid citation issued to a Texas licensed driver. If compliance is not received, revocation will occur. A receipt of payment from the court, a copy of the money order issued to the court or a copy of the front and back of the cancelled check made payable to the court must be submitted. If the revocation has become effective, a $100.00 reinstatement fee is required. The reinstatement fee may be paid at any time prior to renewal of the license.

**Financial Responsibility/Self Insurance** – An alternate method of financial responsibility issued by this agency is a Financial Responsibility Certificate. This is issued to an individual that submits cash or securities in the amount of $55,000.00. A Self Insured Certificate can be issued to a company that has at least 26 vehicles registered in the company's name and submits an audited financial statement to substantiate their funds in the amount of $165,000.00.

TX_00230088

TEX00230088

**DRIVER LICENSE DIVISION**
**SAFETY RESPONSIBILITY BUREAU**



32

TX_00230089

TEX00230089

PL807
9/2/2014
2:13-cv-00193

| | |
|---|---|
| **From:** | Dawnna Dukes [Dawnna.Dukes@house.state.tx.us] |
| **Sent:** | Tuesday, April 03, 2012 2:12 PM |
| **To:** | Gear, Bruce (CRT) |
| **Cc:** | Dawnna Dukes |
| **Subject:** | Information Requested |
| **Attachments:** | ConstituentLetter.pdf; OccupationalLicense.xlsx; RepCraigEiland_Memo.pdf; SidebySide_2009to2011.pdf; SuspendedLicenseInfo.pdf; TXOAG_ElectionCodeCases.pdf |

Mr. Gear,


Please find attached the information you requested during our conversation on Friday, March 30, 2012.  If you need any additional information, please do not hesitate to contact me at either of the emails listed.


There was one question you posed during the deposition that after some thought, I would like to clarify.  You asked why there was an urgency to facilitate getting the method in place prior to the November 2012 elections.  If you look at the increase in minority turn-out in the 2008 Presidential election you will glean a greater than 15% increase in African American turnout.  The impact it had on the balance of power in the Texas House of Representatives brought the body in 2009 to 76:74 Republicans vs. Democrats respectively.  The 2010 elections had a lower minority turnout and imbalanced the power overwhelmingly to 101 Republicans to 49 Democrats.  Limiting minority voters through Voter ID could prevent such an increase in minority turnout and prevent Democrats from regaining a balance in the Texas House.


I have requested raced breakdowns of DIC-25 and DIC-57 offenses from 2005-2011.  I will forward such data when recieved.


Please feel free to contact me at 512.913.0081 (cell) if you need additional information.


Regards,

Dawnna Dukes

Texas State Representative

District 46

1

Eyes Only

US_00006635

USA_00006637

PL808
9/2/2014
2:13-cv-00193

| | |
|---|---|
| **From:** | Essell, Gretchen |
| **To:** | 'Debra Gonzales' |
| **Sent:** | 1/25/2011 1:35:17 PM |
| **Subject:** | RE: DWI's |
| **Attachments:** | DIC-25.pdf |

Since you asked so nicely!

Here you go.

---

**From:** Debra Gonzales [mailto:Debra.Gonzales@senate.state.tx.us]
**Sent:** Tuesday, January 25, 2011 1:33 PM
**To:** Essell, Gretchen
**Subject:** RE: DWI's

Gretchen,

May I have a copy of a DIC-25 form? pretty please?!

Thanks for all your help!!!

Debbie

---

**From:** Essell, Gretchen [mailto:Gretchen.Essell@txdps.state.tx.us]
**Sent:** Tuesday, January 25, 2011 11:57 AM
**To:** Debra Gonzales
**Subject:** FW: DWI's

Debbie,

In 2010, there were 98,910 DWI arrests and 63,803 convictions.  Bear in mind, like the numbers from yesterday, that the convictions may not be associated with the arrests since the judicial process takes awhile...it wouldn't necessarily be accurate to say "of the 98,810 DWI arrests, 63,803 resulted in convictions."

I confirmed with Highway Patrol, to be absolutely certain- most, if not all, of those arrested for DWI would receive a DIC-25 or DIC-57.

If you have any other questions, let us know!

Thanks,

Gretchen Essell
Office of Government Relations
Texas Department of Public Safety
(512) 424-2933
gretchen.essell@txdps.state.tx.us

TEX0507666

PL809
9/2/2014
2:13-cv-00193

| | |
|---|---|
| **From:** | Essell, Gretchen |
| **Sent:** | Wednesday, January 26, 2011 5:10 PM |
| **To:** | Cory Pomeroy |
| **Cc:** | Arriaga, Amanda |
| **Subject:** | Reference to commercial licenses in Temporary Driving Permit |

Cory,

I understand you were looking for clarification on the Notice of Suspension- Temporary Driving Permit  (DIC-25) and Notice of Revocation- Temporary Driving Permit (DIC-57).

The DIC-25 applies to an individual's eligibility to operate a passenger vehicle.  This document will be issued to them if:
1) They refuse a blood/breath specimen
2) They provide a specimen, which comes out to be .08 or higher

The DIC-57 applies only to the eligibility to operate a commercial motor vehicle.  Commercial drivers are not supposed to have any breath or blood alcohol reading.  They would be issued a DIC-57 if:
1) They have a reading of .04 to .08.  Their commercial driving privileges are suspended, but they retain the ability to operate a passenger vehicle, and would retain their actual driver license.
2) They refuse to provide a specimen.  They would receive a DIC-57 and a DIC-25.

If they have a reading above 0 but below .04, they are placed out of service for 24 hours.  They would not be issued a DIC-57.


I have provided further clarification on these types of temporary licenses below.  If you have any further questions, please do not hesitate to ask.


**What is the protocol for confiscated licenses?**
*Texas Transportation Code §§ 524.011(b)(2) and (3), and 724.032(2) and (3) provide the requirements for a peace officer to  confiscate a driver license where a driver is arrested for an alcohol related offense  under the Administrative License Revocation program(ALR) in accordance to Section 49.04, 49.045, or 49.06, Penal Code, or an offense under Section 49.07 or 49.08 of that code involving the operation of a motor vehicle or watercraft.  These statutes provide that the peace officer shall take possession of any driver license issued by this state and held by the person arrested, and issue a temporary driving permit to the person unless department records show or the officer otherwise determines that the person does not hold a driver's license to operate a motor vehicle in this state.*

*This permit (form DIC-25), handwritten by the peace officer, is inclusive of the arrest documentation provided to the driver and contains the driver's name, driver license number, date of birth, address, physician description including race, sex, height, weight, eyes, and hair color.  This temporary driving permit does not contain a photograph of the driver.  A temporary driving provision issued under these sections of the Transportation Code expires on the 41st day after the date of issuance, which coincides with the effective date of the driver license suspension.  Commercial drivers are issued a similar temporary permit (form DIC-57) however, the permit becomes effective beginning 24 hours from the*

TEX0508411

*time of arrest.   The peace officer is required to forward the appropriate ALR paperwork with the confiscated license to the Department for processing.  Upon completion of the suspension period, the driver license is returned to the driver.  During the suspension period, the driver is eligible to make application for an identification card with a photograph during this suspension period.*

Thanks,

Gretchen Essell
Office of Government Relations
Texas Department of Public Safety
(512) 424-2933
gretchen.essell@txdps.state.tx.us

TEX0508412

PL810
9/2/2014
2:13-cv-00193

| | |
|---|---|
| **From:** | Melanie Huff |
| **To:** | Elec Legal |
| **Sent:** | 7/26/2013 9:15:28 AM |
| **Subject:** | Election Judges and Clerks Contacting the Voter Registrar on Election Day |

Here are the slides on this subject that I placed in the Election Day Procedures power point:

**Contacting Voter Registrar**

In the past, our office has said election judges and clerks should contact voter registrar in two instances:

1.  When a voter comes into the polling place and his/her name is not on the list of registered voters for the precinct, while insisting that he or she is a registered voter and has voted before, usually for the purpose of directing voter to correct precinct; and

2.  Under former Section 63.009(b), repealed by SB 14, if a voter did not have a voter registration certificate in his/her possession and was not on the list of registered voters for the precinct in which voter was seeking to vote, voter would be allowed to vote a regular ballot **IF:**

  – Voter presents proof of identification, and
  – The election judge or clerk can determine from the <u>voter registrar</u> that voter is a registered voter of the county.

With the implementation of SB 14, our office does not believe there is any prohibition in election judges and clerks contacting voter registrar in order to steer voters to their correct precinct.

However, you may no longer contact voter registrar to confirm voter is registered voter for the purpose of allowing voter to vote a regular ballot under now repealed Section 63.009(b).


Melanie Huff
Staff Attorney – Elections Division
Office of the Texas Secretary of State
1.800.252.2216
<u>elections@sos.state.tx.us</u> | <u>www.sos.state.tx.us</u>



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

TEX00311740

**Meredyth Fowler**

| | |
|---|---|
| **From:** | Meredyth Fowler |
| **Sent:** | Monday, March 19, 2012 12:23 PM |
| **To:** | Andrew Blifford |
| **Subject:** | Re: Did the Driver Responsibility Surcharge cause Texas' voter ID law to be rejected? |
| **Attachments:** | image001.jpg |

Ah yea, this came up in the debate...thanks for passing it along!

Sent from my iPhone

On Mar 19, 2012, at 10:08 AM, "Andrew Blifford" <Andrew.Blifford@speaker.state.tx.us> wrote:

# Friday, March 16, 2012

## Did the Driver Responsibility Surcharge cause Texas' voter ID law to be rejected?

Aside from redistricting, the big electoral news recently was the Justice Department's decision to oppose implementation of Texas' new "voter ID" statute, leading the state to launch its own counter-challenge to the Voting Rights Act. I don't care to debate the merits of the DOJ decision - which was based on alleged discriminatory outcomes - but instead am interested in WHY so many Texans lack a state-issued photo ID? Pondering that subject leads to a corollary question: Did the Driver Responsibility Surcharge cause Texas' voter ID law to be rejected? As Lise Olsen reported in the Houston Chronicle:
as many as 18 percent of all registered voters across Texas apparently [lack] state government-issued photo IDs to match their voter registration cards, according to records obtained by the Houston Chronicle.

Texas secretary of state officials did not find matching 2012 driver's licenses or state-issued photo IDs for 2.4 million of the state's 12.8 million registered voters, though all but about 800,000 of those voters supplied a valid identification number when they first registered to vote. The findings come from documents submitted by the state to the U.S. Department of Justice as part of an ongoing review of the new voter ID law.

The "matching" exercises conducted by the state showed up to 22 percent of Bexar County voters apparently lacked the IDs, as well as 20 percent in Dallas County and 19 percent in Harris County, based on the Chronicle's review of the state data.
Here's the Chronicle's summary of the rate of voters with no state ID in selected larger counties:


<image001.jpg>

Why do so many adult Texans lack ID? In part because 2 million drivers have had their drivers licenses revoked because of nonpayment of the Driver Responsibility Surcharge, which readers will recall is a stiff civil penalty tacked on top of any fines, punishments or court costs stemming from certain traffic offenses, including driving without a license, driving without insurance, "point" accumulation, and DWI. Of those, around 1.2 million have not had their licenses reinstated, which would explain why so many voters may have had a DL number when they registered to vote but don't now. If 2.4 million Texas voters lack state ID, and all but 800,000 had IDs when they registered, then the Driver Responsibility Surcharge could account for as much as three-quarters (1.2 out of 1.6 million) of those who had ID when they registered to vote but do not today.

1

HIGHLY CONFIDENTIAL

I'd love to see the state run another matching program to find out how many voters without a current ID have defaulted on one or more Driver Responsibility Surcharges. This redundant civil penalty has inflicted untold misery on drivers who owe it, and judges blame the surcharge for Texas' declining DWI conviction rate. Now it appears the surcharge is a major contributor to Texas' Voter ID law being challenged. Meanwhile the Lege is using most of the "dedicated" funds from the surcharge to balance the budget instead of dispensing it to trauma center hospitals as they promised.

At this point, the surcharge has not only failed at all its goals - both in the enforcement realm and providing revenue for trauma hospitals - it is now interfering with other state goals like DWI enforcement and the Voter ID law. How many negative consequences must the state suffer from this ill-conceived revenue-generation scheme before the Legislature finally repeals it?

Via Kuff.
Posted by Gritsforbreakfast at 6:37 AM
Email ThisBlogThis!Share to TwitterShare to Facebook
Labels: Driver licenses, Driver Responsibility Fee, Voting

2

HIGHLY CONFIDENTIAL

PL812
9/2/2014
2:13-cv-00193

| From: | Wroe Jackson |
|---|---|
| To: | Keith Ingram; Ashley Fischer |
| Sent: | 10/23/2013 12:53:42 PM |
| Subject: | FW: ID Clarification |

A follow-up to our earlier DPS-commissioned peace officer ID conversation.

Wroe Jackson
General Counsel
Texas Secretary of State

*This communication may be privileged and confidential. Any copying, use, or distribution of any information or materials by or to anyone other than the recipients listed above is prohibited without express authorization from the sender.*

**Please note my new email address effective immediately: wjackson@sos.texas.gov**

**From:** Nolte, Candace [mailto:Candace.Nolte@dps.texas.gov]
**Sent:** Wednesday, October 23, 2013 12:46 PM
**To:** Wroe Jackson
**Subject:** RE: ID Clarification

For your reference:

These cards are issued pursuant to Chapter 614 of the Government Code:

SUBCHAPTER H.  PEACE OFFICER IDENTIFICATION CARDS

Sec. 614.121.  DEFINITIONS.  In this subchapter:
(1)  "Full-time peace officer" means a person elected, employed, or appointed as a peace officer under Article 2.12, Code of Criminal Procedure, or other law, who:
(A)  works as a peace officer on average at least 32 hours per week, exclusive of paid vacation; and
(B)  is compensated by this state or a political subdivision of this state at least at the federal minimum wage and is entitled to all employee benefits offered to a peace officer by the state or political subdivision.
(2)  "Honorably retired peace officer" means a former peace officer who:
(A)  previously served but is not currently serving as an elected, appointed, or employed peace officer under Article 2.12, Code of Criminal Procedure, or other law;
(B)  did not retire in lieu of any disciplinary action;
(C)  was eligible to retire from a law enforcement agency in this state or was ineligible to retire only as a result of an injury received in the course of the officer's employment with the agency;  and
(D)  is eligible to receive a pension or annuity for service as a law enforcement officer in this state or is ineligible to receive a pension or annuity only because the law enforcement agency that employed the officer does not offer a pension or annuity to its employees.
(3)  "Part-time peace officer" means a person elected, employed, or appointed as a peace officer under Article 2.12, Code of Criminal Procedure, or other law, who:
(A)  works as a peace officer on average less than 32 hours per week, exclusive of paid vacation; and
(B)  is compensated by this state or a political subdivision of this state at least at the federal minimum wage and is entitled to all employee benefits offered to a peace officer by the state or political subdivision.
(4)  "Reserve law enforcement officer" has the meaning assigned by Section 1701.001, Occupations Code.

Added by Acts 2007, 80th Leg., R.S., Ch. 938, Sec. 1, eff. September 1, 2007.

Sec. 614.122.  PEACE OFFICERS.  (a)  The law enforcement agency or other governmental entity that appoints or employs a peace officer shall issue an identification card to its full-time or part-time peace officers.
(b)  The identification card must include:

TEX00312016

(1)  the full name of the peace officer;

(2)  a photograph of the peace officer consistent with the peace officer's appearance;

(3)  the name of the law enforcement agency or other governmental entity that appointed or employs the peace officer or that the peace officer was elected to serve;

(4)  if applicable, the signature of the person appointing or employing the person as a peace officer on behalf of the law enforcement agency or other governmental entity;

(5)  a brief description of the peace officer, including the peace officer's height, weight, and eye color;

(6)  the thumbprint of the peace officer or a bar code with a unique identification label for the peace officer;

(7)  the date the law enforcement agency or other governmental entity appointed or employed the peace officer;

(8)  the date the law enforcement agency or other governmental entity issued the card to the peace officer; and

(9)  a phone number operational 24 hours a day, seven days a week that a person may call to verify the validity of the identification card.

(c)  On the identification card, the law enforcement agency or other governmental entity that issues the card shall print:

(1)  "State of Texas" and the state seal; and

(2)  "This identification card certifies that (insert name of peace officer) is commissioned by (insert name of law enforcement agency or other governmental entity that appoints or employs the peace officer) as a (insert "full-time peace officer" or "part-time peace officer")."

(d)  The head of a law enforcement agency or other governmental entity that appoints or employs a peace officer shall recover the identification card at the time of the peace officer's resignation or termination.

Added by Acts 2007, 80th Leg., R.S., Ch. 938, Sec. 1, eff. September 1, 2007.


Sec. 614.123.  RESERVE LAW ENFORCEMENT OFFICER.  (a)  The law enforcement agency or other governmental entity that appoints or employs a reserve law enforcement officer shall issue an identification card to its reserve law enforcement officers.

(b)  The identification card must include:

(1)  the full name of the reserve law enforcement officer;

(2)  a photograph of the reserve law enforcement officer consistent with the reserve law enforcement officer's appearance;

(3)  the name of the law enforcement agency or other governmental entity that appointed or employs the reserve law enforcement officer;

(4)  if applicable, the signature of the person appointing or employing the person as a reserve law enforcement officer on behalf of the law enforcement agency or other governmental entity;

(5)  a brief description of the reserve law enforcement officer, including the reserve law enforcement officer's height, weight, and eye color;

(6)  the thumbprint of the reserve law enforcement officer or a bar code with a unique identification label for the reserve law enforcement officer;

(7)  the date the law enforcement agency or other governmental entity appointed or employed the reserve law enforcement officer;

(8)  the date the law enforcement agency or other governmental entity issued the card to the reserve law enforcement officer; and

(9)  a phone number operational 24 hours a day, seven days a week that a person may call to verify the validity of the identification card.

(c)  On the identification card, the law enforcement agency or other governmental entity that issues the card shall print:

(1)  "State of Texas" and the state seal; and

(2)  "This identification card certifies that (insert name of reserve law enforcement officer) is commissioned by (insert name of law enforcement agency or other governmental entity that appoints or employs the reserve law enforcement officer) as a reserve law enforcement officer."

(d)  The head of a law enforcement agency or other governmental entity that appoints or employs a reserve law enforcement officer shall recover the identification card at the time of the reserve law enforcement officer's resignation or termination.

Added by Acts 2007, 80th Leg., R.S., Ch. 938, Sec. 1, eff. September 1, 2007.


Sec. 614.124.  HONORABLY RETIRED PEACE OFFICER.  (a)  On request of an honorably retired peace officer who holds a certificate of proficiency under Section 1701.357, Occupations Code, the law enforcement agency or

other governmental entity that was the last entity to appoint or employ the honorably retired peace officer as a peace officer shall issue an identification card to the honorably retired peace officer.

(b)  The identification card must include:

(1)  the full name of the honorably retired peace officer;

(2)  a photograph of the honorably retired peace officer consistent with the honorably retired peace officer's appearance;

(3)  the name of the law enforcement agency or other governmental entity that issued the card to the honorably retired peace officer;

(4)  if applicable, the signature of the person authorizing the issuance of the card on behalf of the law enforcement agency or other governmental entity to the honorably retired peace officer;

(5)  a brief description of the honorably retired peace officer, including the honorably retired peace officer's height, weight, and eye color;

(6)  the thumbprint of the honorably retired peace officer or a bar code with a unique identification label for the honorably retired peace officer;

(7)  the date the honorably retired peace officer last served as a peace officer for the law enforcement agency or other governmental entity;

(8)  the date the law enforcement agency or other governmental entity issued the card to the honorably retired peace officer; and

(9)  a phone number operational 24 hours a day, seven days a week that a person may call to verify the validity of the identification card.

(c)  On the identification card, the law enforcement agency or other governmental entity that issues the card shall print:

(1)  "State of Texas" and the state seal; and

(2)  "This identification card certifies that (insert name of honorably retired peace officer) is an honorably retired peace officer of (insert name of law enforcement agency or other governmental entity that last appointed or employed the honorably retired peace officer)."

(d)  The head of a law enforcement agency or other governmental entity that issued the identification card shall recover the identification card on the date the identification card expires.

Added by Acts 2007, 80th Leg., R.S., Ch. 938, Sec. 1, eff. September 1, 2007.
Amended by:
Acts 2011, 82nd Leg., R.S., Ch. 738, Sec. 1, eff. June 17, 2011.


Sec. 614.125.  EXPIRATION DATE.  An identification card issued under this subchapter expires on a date specified by the law enforcement agency or other governmental entity issuing the card.

Added by Acts 2007, 80th Leg., R.S., Ch. 938, Sec. 1, eff. September 1, 2007.


Sec. 614.126.  TAMPER-PROOF CARDS.  An identification card issued under this subchapter must be, to the extent practicable, tamper-proof.

Added by Acts 2007, 80th Leg., R.S., Ch. 938, Sec. 1, eff. September 1, 2007.

**Candace Nolte**
*Deputy Assistant Director*
*Chief, Office of Government Relations*
Texas Department of Public Safety
(512) 424-7272
5805 N. Lamar Blvd.
P.O. Box 4087
Austin, TX 78773-0170
candace.nolte@dps.texas.gov

TEX00312018

**From:** Wroe Jackson [mailto:SJackson@sos.texas.gov]
**Sent:** Tuesday, October 22, 2013 8:58 AM
**To:** Nolte, Candace
**Cc:** Keith Ingram; Ashley Fischer
**Subject:** FW: ID Clarification

Candace,

We received an inquiry this morning from Walker County (Huntsville) about a particular type of identification issued by DPS. The voter registrar states that a voter presented an ID described as a "Texas DPS issued Identification for a Commissioned Peace Officer." Is this type of identification (or similar) issued by DPS? If it is, would that be classified as a "Driver License" or "Personal Identification Card?"

I ask because, if this type of identification is indeed classified as a license or ID card, this particular type of identification could be construed as within the definitions of "driver's license...or personal identification card issued by the Texas Department of Public Safety" as contemplated in SB 14 and now codified at Section 63.0101(1) of the Texas Election Code. We would need to let Walker County (and likely the rest of the State) know that this would be an acceptable form of identification for voting.

Thank you in advance for any assistance you can provide.

Best,
Wroe


Wroe Jackson
General Counsel
Texas Secretary of State
512/463-5770 (w), 512/475-2761 (f)
wjackson@sos.texas.gov

*This communication may be privileged and confidential. Any copying, use, or distribution of any information or materials by or to anyone other than the recipients listed above is prohibited without express authorization from the sender.*

**Please note my new email address effective immediately: wjackson@sos.texas.gov**


---

**From:** Diana McRae [mailto:dianamcrae@co.walker.tx.us]
**Sent:** Tuesday, October 22, 2013 8:03 AM
**To:** Elections Internet
**Subject:** ID Clarification

A DPS Officer came in to vote this morning with:

Texas DPS issued Identification for a Commissioned Peace Officer

He said he can drive with it as well.  It does contain his photo.  Is this acceptable ID for voting?

Thanks,
Diana

**Diana L. McRae**
**Tax Assessor-Collector**
**County Election Officer**
**Walker County, Texas**
1301 Sam Houston Avenue Suite 100
Huntsville, Texas  77340
(936) 436-4950 Office

TEX00312019

*The material in this email is intended only for the use of the individual to whom it is addressed and may contain information that is confidential, privileged, and or exempt from disclosure under applicable law.*

TEX00312020

Plaintiff Exhibit
PL813

FILED UNDER SEAL

# Plaintiff Exhibit
# PL814

# FILED UNDER SEAL

Plaintiff Exhibit
PL815

FILED UNDER SEAL

# Plaintiff Exhibit
# PL816

# FILED UNDER SEAL

# Plaintiff Exhibit PL817

# WITHDRAWN

Veasey000243

**EFFECTIVE SEPTEMBER 1, 2013**

## HAYS COUNTY CLERK FEES * RECORDS DIVISION * 2013
### LGC §118.011

**OFFICIAL PUBLIC RECORDS:**
      **STANDARD DOCUMENTS**

| | | |
|---|---|---|
| First page | $ 26.00 | |
| Each additional page of the document | $ 4.00 | |
| Each additional name (after first 5) to be indexed | $ 0.25 | |
| **Plat**  (Must be approved by County or City) | $ 71.00 | 1st page |
| **(break down)** Rec Mng ($10) Security Fee ($1) Archive ($10) | $ 50.00 | each add'l page |
| **State Tax Liens  [exempt from Archive Fee]** | $ 16.00 | |
| Each additional page of the document | $ 4.00 | |
| **Federal Tax Liens  [Prop Code 14.001-14.007]** | $ 31.00 | |
| Each additional page of the document | $ 4.00 | |

> **UCC Filed in Real Property Records:**  We accept only those UCC's required to be filed in the real property records (fixture filings).  *Same filing fee as standard documents listed above*

**ASSUMED NAME CERTIFICATES**

| | | |
|---|---|---|
| Business Name registered (with one Registrant) | $ 26.00 | first page |
| For each additional Registrant listed | $ .50 | |

**CATTLE BRAND REGISTRATION**      $ 26.00  each  location
**A Certificate of Registration is issued for each Mark/Brand**

**MARRIAGE LICENSE**

| | | |
|---|---|---|
| **Marriage License <u>without</u> Premarital Education Course Certificate** | $ 82.00 | (cash only) |
| **Marriage License  <u>with</u>  Premarital Education Course Certificate** | $ 22.00 | (cash only) |
| **Informal Marriage License**     [no ceremony/declaration] | $ 82.00 | (cash only) |

**POSTING NOTICES**      $ 3.00

**COPIES**

| | | |
|---|---|---|
| Birth Record | $ 23.00 | each |
| Death Record | $ 21.00 | 1st copy |
| for each additional copy | $ 4.00 | each |
| Marriage License – certified copy of original | $ 20.00 | each |
| Marriage License – verification of marriage | $ 5.00 | each |
| Plats | $ 4.00 | each |
| Legal document (not otherwise specified) a fee to be paid at time copy is made: | | |
| Plain copy with no certificate | $ 1.00 | per page |
| *Certified Copy* | $ 1.00 | per page + |
| County Clerk's Certificate | $ 5.00 | per doc |
| Note:  Certificate must be placed on each page certified | | |

**SEARCHES:**

| | | |
|---|---|---|
| Abstracts of Judgment, State Tax Liens, etc. | $ 10.00 | each name |
| Birth Record | $ 23.00 | each name |
| Death Record | $ 21.00 | each name |
| Federal Tax Lien | $ 10.00 | each name |
| Copy w/search | $ 1.50 | each |
| UCC/Financing Statements | $ 15.00 | each name |

**EVERY DOCUMENT MUST HAVE:**  (1) a heading at the top of the first page to identify the type of legal paper, (2) names typed or printed under signatures, (3) signatures must be notarized, and (4) contain an address for the grantee.  Documents not meeting these requirements may be rejected or charged double the recording fees as set out by statute.

> **Some of the filing fees listed above include the following additional fees:**
> **Records Management Fee** *[LGC 118.0216]* = $10   **Security Fee** *[LGC 291.008]* = $1
> **Archives Fee** *[LGC 118.025]* =  $10    **Vital Preservation Fee** *[HSC 191.0045(h)]* = $1

Veasey000243