1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS        )
                      )
                      )
VS.                   )   NO. 12-CV-128
                      )   (DST, RMC, RLW)
                      )
ERIC H. HOLDER, JR.,  )
In his official          )
Capacity as Attorney     )
General of the United    )
States, ET AL            )

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
ORAL DEPOSITION OF MAJOR FORREST MITCHELL
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ANSWERS AND DEPOSITION OF MAJOR FORREST MITCHELL, a
witness called by the United States taken before Janalyn
Reeves, Certified Shorthand Reporter for the State of
Texas, on the 15th day of June, 2012, between the hours
of 9:30 a.m. and 5:46 p.m., in the offices the United
States Department of Justice, 816 Congress Street, Suite
1000, Austin, Texas, pursuant to the agreement of
counsel for the respective parties as hereinafter set
forth.



Major Forrest Mitchell                          June 15, 2012

```
                                                           2
 1                    A P P E A R A N C E S
 2      FOR THE PLAINTIFF, STATE OF TEXAS:
             OFFICE OF THE ATTORNEY GENERAL:
 3             By:  MR. PATRICK SWEETEN
                    - and -
 4                MR. REYNOLDS BRISSENDEN
          209 West 14th Street
 5          Austin, Texas  78701
            PH:  (512) 936-6432
 6
        FOR THE DEFENDANT:
 7          DEPARTMENT OF JUSTICE
             By:  MR. BRUCE GEAR
 8                - and -
               MR. VICTOR WILLIAMSON
 9          950 Pennsylvania Avenue, NW
            Room 7161 NWB
10          Washington, DC  20530
            PH:  (202) 305-0185
11
        FOR THE INTEVENORS:
12          DECHERT, LLP
             By:  MR. EZRA ROSENBERG
13          902 Carnegie Center
            Suite 500
14          Princeton, New Jersey 08540
            Ph:  (609)) 955-3259
15

16

17

18

19

20

21

22

23

24

25
```

3

INDEX

PAGE

Appearances                                    2

MAJOR FORREST MITCHELL
    Examination by Mr. Gear Maranzano ....      5
    Clarifying Examination by Mr. Rosenberg     146
    Further Examination by Mr. Gear......       147
    Examination by Mr. Rosenberg.........       210
    Examination by Mr. Sweeten............       215
    Further Examination by Mr. Gear......       225
    Further Examination by Mr. Rosenberg..      238

Signature and Changes                    245

Reporter's Certificate                    247

Major Forrest Mitchell                           June 15, 2012

4

1                              EXHIBITS

2        NO.              DESCRIPTION                        PAGE
         580              Notice of Deposition               16
3        581              Letter                    20
         582              Objections and to Notice           27
4        583              Election Code Prosecution          59
         584              Press Release             98
5        585              Spreadsheet               99
         586              Press Release             108
6        587              Press Release             109
         588              Press Release             115
7        589              Press Release             120
         590              Press Release             128
8        591              Report                    177
         592              Article                   177
9        593              Article                   196
         594              Resource Witness Testimony      204
10       595              Document                            205

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                  MAJOR FORREST MITCHELL,

2        having being first duly sworn, testified as follows:

3                           EXAMINATION

4        BY MR. GEAR:

5             Q.   This is the deposition of Major Forrest Mitchell

6        in the matter of Texas V Holder, US DC for DC docket No.

7        1:11 CV 128.  Good morning, Major Mitchell.

8             A.   Good morning.

9             Q.   Could you state your name and spell your name for

10       the record?

11            A.   My name is Forrest Mitchell, F-O-R-R-E-S-T,

12       M-I-T-C-H-E-L-L.

13            Q.   My name is Bruce Gear.  I'm with the Department

14       of Justice.  I represent Eric Holder who is the United

15       States Attorney General.  And could everybody else

16       introduce themselves?

17                 MR. SWEETEN:  Patrick Sweeten with the Texas

18       Attorney General's office on the behalf of the State of

19       Texas and on behalf of the witness, Forrest Mitchell.

20                 MR. BRISSENDEN:  Reynolds Brissenden for the

21       State of Texas and the witness.

22                 MR. ROSENBERG:  Ezra Rosenberg from

23       Dechert LLP representing the Legislative Conference of

24       NAACP branches and the Mexican American legislative

25       caucus.

Major Forrest Mitchell                           June 15, 2012

6

1              MR. WILLIAMSON:  Victor Williamson from the

2     US Department of Justice.

3     BY MR. GEAR:

4          Q.  Now, you've been sworn in under oath.  You

5     understand that you've been sworn in?

6          A.  Yes, sir.

7          Q.  That you are under oath.  That you're here today

8     to provide testimony and that you're expected to testify

9     completely and as fully as possible.  You understand

10    that?

11         A.  Yes, sir, I do.

12         Q.  Okay.  So I just want to start off with a couple

13    of ground rules so that we understand exactly what we're

14    doing.  I'm going to be asking you questions.  You're

15    going to be providing the answers and so it's very

16    important that during the course of the deposition you

17    allow me to get out my question and then I will allow

18    you to get out your answer completely and fully.  And at

19    anytime during this deposition if you believe you recall

20    something or you stated something in accurately, let me

21    know and I'll allow do you correct that on the record.

22    Do you understand?

23         A.  Yes, sir.

24         Q.  Okay.  You know, so it's important that you allow

25    me to finish my questions and I'll allow you to finish

7

```
1     your answers.  It's important to answer verbally because
2     a nonverbal answer is hard to catch on a record and the
3     court reporter needs to hear your response.  Do you
4     understand that?
5          A.  Yes, sir.
6          Q.  Okay.  So -- which may happen during this
7     deposition if I ask you a question you don't understand,
8     then, you know, don't hesitate to ask me to repeat it or
9     don't hesitate to ask me to try to restate it so that
10    you can understand it.  This is my opportunity to
11    understand what you know.  So I'm going to be asking a
12    lot of questions, none of them are intended to be
13    personal.  It's intended to get to exactly that, what do
14    you know.  Do you understand that?
15         A.  Yes, sir.
16         Q.  All right.  Is there any reason you think you may
17    not be able to answer completely and truthfully today?
18         A.  No, sir.
19         Q.  Are you taking any type of drugs or medication
20    that may affect your ability to understand the questions
21    that I ask or provide answers today?
22         A.  No, sir.
23         Q.  At any point during this deposition, if you would
24    like to take a break, just what I would ask you to do is
25    work through the question that's before you, complete
```

8

1      that, let me know that you need to take a break and then
2      I'll allow you do to that.  Is that understandable?
3          A.  Yes, sir.
4          Q.  Okay.  And what may happen during the course of
5      this deposition, there may be objections, there may be
6      discussions between the attorneys.  I just ask that if
7      there's a question before you that you answer that
8      question unless you're directed otherwise by your
9      attorney.  Do you understand that?
10         A.  Yes, sir.
11         Q.  Okay.  Now, during the course of this deposition,
12     we're going to be talking about voter ID, photo ID.  And
13     I would ask that you consider those terms
14     interchangeably throughout this deposition.  I want you
15     to interpret those terms broadly, to mean that the
16     requirement that a voter present a form of
17     identification, whether it has a photo or otherwise,
18     when voting in person before being permitted to vote
19     with a regular ballot.  Do you understand that?
20         A.  Yes, sir.
21         Q.  If I refer to you, I'm asking you a question
22     about you as a member of the special investigations unit
23     of the law enforcement division of the office of the
24     Texas Attorney General's office.  Do you understand
25     that?

9

1        A.   Yes, sir.

2        Q.   Okay.  If I refer to you, I'm also including any

3    staff that you may supervise, but before your attorney

4    objects to this because we've gone down this road

5    before, I am going to do my best during the course of

6    this deposition to identify when I'm referring to you in

7    your capacity in the special investigations unit or when

8    I'm broadening that definition to include others that

9    may be underneath you or within your office.  Do you

10   understand that?

11       A.   Yes, sir.

12       Q.   Okay.  If I say the Texas Attorney General, I

13   mean the Attorney General Greg Abbott.  Do you

14   understand that?

15       A.   Yes, sir.

16       Q.   All right.  And we may, as we get into this

17   deposition, we may be talking about the special

18   investigations unit or the office of the attorney

19   general I may use those interchangeably.  So would you

20   mind if I use the term SIU for the special

21   investigations unit at times and would you understand

22   that?

23       A.   That would be fine, sir.  Yes, I will.

24       Q.   Okay.  So do you understand everything that we've

25   talked about so far?

Major Forrest Mitchell                            June 15, 2012

                                                               10
1           A.   Yes, sir, I do.

2           Q.   All right.  And are you represented by counsel

3       today?

4           A.   Yes, sir.

5           Q.   And who is your counsel?

6           A.   Patrick Sweeny and -- I'm sorry.

7                MR. BRISSENDEN:   Reynolds.

8           A.   Reynolds.

9           Q.   Have you ever been deposed before?

10          A.   No, sir.  This is the first time.

11          Q.   Have you ever provided testimony at trial?

12          A.   Yes, sir.

13          Q.   And I know you're an investigator and you

14      probably have provided quite a bit of testimony.  But

15      generally, talk to me and tell me about what type of

16      testimony you provided in the past?

17          A.   Well, for the first year -- first eight years

18      with the Texas Attorney General's office I worked in the

19      prosecutor assistance division.  And one of my charges

20      was to investigate capital murder cases which occurred

21      in the State of Texas.  And so I would testify about my

22      investigative work on those kinds of cases.

23          Q.   And those dealt specifically with capital murder

24      cases?

25          A.   Yes, sir.  During that time I also worked other

11

1     types of cases including public integrity cases, fraud

2     cases, other index crimes and I would testify in

3     criminal proceedings about whatever investigative work

4     that I had done on those cases.

5          Q.   And you said, "during your first eight years"?

6          A.   Correct.

7          Q.   How long have you been with the office of the

8     attorney general?

9          A.   In September I will have been there 15 years.

10         Q.   15 years.  Okay.  So after your first eight

11    years, where did you go?

12         A.   I became the lieutenant of the special

13    investigations unit.

14         Q.   And that was what time period?

15         A.   In 2005.

16         Q.   And the title you just told me you became the?

17         A.   I became the lieutenant.

18         Q.   Lieutenant.  And was that the lead investigator?

19         A.   No.  It was a supervisory position.

20         Q.   Supervisor.  Okay.  So let's focus on 2005.  We

21    were still talking about the types of testimony you may

22    have provided.  So from 2005 forward, have you been

23    involved in trials where you provided testimony under

24    oath?

25         A.   I haven't really testified much up until 2010.

12

1          Q.   2010.   Okay.   And in 2010 can you tell me a

2     little bit about that testimony?

3          A.   Yes, sir.   I was one of the investigators who

4     assisted on the YFZ case, which occurred out in

5     Schleicher County.

6          Q.   YFZ?

7          A.   YFZ.

8          Q.   Is that short for something else?

9          A.   Yearning for Zion.

10         Q.   Yearning for Zion, okay.   And tell me a little

11    bit about that case?

12         A.   That was a case involving men who had married

13    under age women and had fathered children with those

14    under age women.   And had married multiple women in

15    Schleicher County.

16         Q.   And so as I understand your testimony, that did

17    not involve election code violations?

18         A.   No, sir.

19         Q.   Something completely different?

20         A.   Yes, sir.

21         Q.   Have you testified on any matters that involved

22    election code violations?

23         A.   No, sir.

24         Q.   So other than the YFZ in 2010, have you provided

25    any other testimony at trial, 2005 forward?

13

1          A.    There was one other case that I testified in, but

2      it was in a suppression hearing.

3          Q.    And when you say suppression hearing, what do you

4      mean?

5          A.    It was a suppression hearing on a search warrant

6      that was run.

7          Q.    And did that have anything to do with election

8      code violations?

9          A.    No, sir.

10         Q.    And for the record, what was the issue on the

11     suppression hearing?

12         A.    The scope of the search warrant and items seized.

13         Q.    And you had to appear in court and provide

14     testimony?

15         A.    Yes, sir.

16         Q.    And about what time period was that?

17         A.    I would say it's -- it was either 2006 or 2007.

18         Q.    Okay.  And just so I'm clear now, from 2005

19     forward, I've asked you if you've provided any testimony

20     regarding election code violations.  I believe the

21     answer has been no?

22         A.    That's correct, sir.

23         Q.    Okay.  All right.  And so what did you do to

24     prepare for the deposition today?

25         A.    I reviewed my spread sheets that I prepared.

                                                                    14

1        Q.   Okay.   And were you -- did you review those with

2    anyone else present?

3        A.   I reviewed those with counsel here.

4        Q.   Anyone else?

5        A.   Huh-uh.  Oh, I'm sorry.   John McKenzie as well.

6        Q.   John McKenzie is also counsel?

7        A.   Yes, sir.

8        Q.   When did you review the spread sheets?

9        A.   Last night and part of last week.

10       Q.   Did you have any other material with you while

11   reviewing the spread sheets?

12       A.   Well, yes.   Indictments and judgments and

13   sentences.

14       Q.   And did you produce the indictments, judgments

15   and sentences to your counsel?

16       A.   Yes, sir.

17       Q.   And when did you produce these?

18       A.   I believe last week.

19       Q.   And any other material that you reviewed while

20   looking at the spread sheets?

21       A.   Are we talking about preparing or providing

22   discovery?

23       Q.   Well, let's start with preparing for the

24   deposition.

25       A.   No, it was just really the spread sheets.

                                                                    15

1          Q.   In addition to the indictments, judgments and

2     statements?

3          A.   Yes.

4          Q.   Okay.  And when you were talking about preparing

5     or discovery, what were you referencing?

6          A.   The discovery order asked for all documents

7     dealing with voter fraud.

8          Q.   Okay.  And what did you do in response to the

9     discovery?

10         A.   I reviewed my personal e-mail, my work e-mail and

11    documents that I had electronically saved on our

12    network.

13         Q.   Did you produce any of those to your attorney?

14         A.   Yes, sir.

15         Q.   And when did you produce those?

16         A.   It's been an ongoing process.  I started

17    producing them early part of last week.

18              MR. GEAR:  Patrick, do you know if these

19    have been produced to us at this point?

20              MR. SWEETEN:  I know that we produced

21    sentences, judgments, indictments, his spread sheet,

22    everything that was discussed there.  And I think what

23    we've set forth in our objections, whatever we've set

24    forth in our objections we produced all that.

25              MR. GEAR:  Okay.  Because I don't actually

                                                                    16

1        recall ever seeing any e-mails.
2                    MR. SWEETEN:  I can check on that at a
3        break.
4        BY MR. GEAR:
5            Q.  So we talked about, and we'll get into that a
6        little bit later, but we talked about documents that you
7        reviewed in response to the discovery.  Anything else
8        that you may have reviewed?
9            A.  I can't think of anything else right now.
10           Q.  Okay.
11                   (Exhibit No. 580 was marked.)
12       BY MR. GEAR:
13           Q.  I'm showing you what's been marked as
14       Exhibit 580.  I ask you to just take a look at that.
15                   MR. SWEETEN:  I would note for the record,
16       that the Attorney General has filed objections and
17       responses to these.
18       BY MR. GEAR:
19           Q.  Just let me know when you've had a chance to look
20       at it.
21           A.  Yes, sir.  Okay, sir.
22           Q.  All right.  I turn your attention to what I
23       believe is Page 3, they're unnumbered, but it starts
24       with documents.  Do you see that?
25           A.  Yes, sir.

17

1          Q.   Okay.  And have you reviewed this before, this

2     document?

3          A.   I do not believe I've seen the one for June 15th.

4          Q.   All right.  You saw an earlier version?

5          A.   Yes, sir.

6          Q.   And you reviewed the earlier version?

7          A.   Yes, sir.

8          Q.   Would you say that this is substantially similar

9     but for the date, June 15th?

10         A.   Yes, sir, it looks similar.

11         Q.   Okay.  So directing your attention to paragraph 1

12    under documents, it indicates all documents and

13    communications including but not limited to those among

14    and between the office of the Texas Attorney General.

15    And I goes on to say more.  Do you see that paragraph

16    that I'm referring to?

17         A.   Yes, sir.

18         Q.   What, if anything, did you do to respond to

19    paragraph 1?

20         A.   Knowing that --

21              MR. SWEETEN:  Hold on a minute.  When you're

22    answering the question don't reveal communications that

23    you've had with attorneys of our office.  Okay?  So

24    don't reveal matters of attorney/client privilege.  But

25    you can answer otherwise.

Major Forrest Mitchell                          June 15, 2012

                                                                    18

 1    BY MR. GEAR:

 2        Q.  And I'm not asking you to reveal communications

 3    at this point.  I'm just asking you what, if anything,

 4    you or anyone else in your office did to determine if

 5    there were responsive documents to paragraph 1?

 6        A.  Reviewed my saved files to see if I had anything

 7    responsive to SB 14.

 8        Q.  Did you have any documents that were responsive

 9    to paragraph 1, communications including but not limited

10    to the office of the Secretary of State, division of

11    elections, members of the Texas Legislature?

12        A.  Yes, sir.  I mean, I didn't have anything

13    responsive to that.

14               MR. SWEETEN:  Bruce, let me just tell you

15    I've gotten an e-mail from counsel.  You asked about, I

16    think there was one remaining document or type of

17    documents you asked about, which was e-mails.  I just

18    got an e-mail that indicated that was uploaded last

19    night.  So we have produced some e-mails to you from

20    Mitchell and then all the other areas that we talked

21    about have been provided.

22               MR. GEAR:  Do you know about what time they

23    were uploaded?

24               MR. SWEETEN:  I don't have that.  The

25    attorney was communicating with us in another one of

19

1      these depositions.  And so he just indicated it was

2      produced to us last night.  I don't have the time.

3                    MR. GEAR:  Okay.

4      BY MR. GEAR:

5          Q.   All right.  And so I believe your response was

6      that you did not have documents responsive to paragraph

7      No. 1 when it came to communications between the

8      attorney general's office, Secretary of State's office;

9      is that correct?

10         A.   Yes, sir.

11         Q.   And you also indicated that you did not have

12     documents responsive to the members of the Texas

13     legislature; is that correct?

14                    MR. SWEETEN:  I'm sorry.

15     BY MR. GEAR:

16         Q.   Paragraph 1; is that correct?

17         A.   No, sir, I don't have any responsive documents to

18     that.

19                    MR. SWEETEN:  Bruce, I think it's fair to

20     show him his responses when you're going through these.

21     We formally responded to this and I think it would be

22     helpful to him and I think it would make this go faster

23     if you provide him a copy of how we responded because we

24     have listed some documents.

25     BY MR. GEAR:

1        Q.   Did you prepare any written response to this
2    notice of deposition?
3        A.   I think I prepared an e-mail that said, yes, no,
4    yes, no, yes, no.
5             MR. SWEETEN:   Don't reveal the subject of
6    any e-mails you sent to me or John or Mr. Bruce.  Okay?
7    BY MR. GEAR:
8        Q.   Did your assistant prepare any written
9    communication or document to the Department of Justice?
10       A.   No.
11            (Exhibit No. 581 was marked.)
12   BY MR. GEAR:
13       Q.   I'm showing you what's been marked as
14   Exhibit 581.  I'll give you a chance to look at that.
15       A.   Okay.
16       Q.   Have you seen Exhibit 581 before?
17       A.   No, sir.
18       Q.   Did you assist in preparing Exhibit 581?
19            MR. SWEETEN:   Do you mean the actual
20   drafting?  He's not going to talk about communications
21   we've had regarding documents.  So he's not going to
22   answer substantive communications you've had.  If you're
23   asking about the drafting, I'll let him answer questions
24   as posed.
25   BY MR. GEAR:

Major Forrest Mitchell                                    June 15, 2012

21

1          Q.  You indicated that you sent an e-mail saying yes,

2     no, yes, no in response to the notice of depositions and

3     I don't want do you get into privileged communication

4     with your counsel.  But was that e-mail sent to your

5     counsel?

6          A.  Yes, sir.

7          Q.  And when was that e-mail sent?

8          A.  Sometime last week.

9          Q.  And who was it sent to?

10         A.  John McKenzie.

11         Q.  Turning your attention to Page 2, last full

12    paragraph where it indicates, "Mr. Mitchell will produce

13    the -- to the Department of Justice convictions and

14    indictments for voter fraud for the time period

15    identified in Exhibit A to Mr. Mitchell's notice by

16    6:00 p.m. on June 8, 2012."  It also goes on to say

17    that, "Mr. Mitchell will produce another spread sheet,

18    redacted of personal identifying information, for the

19    309 voter fraud investigations that he maintains in the

20    ordinary course of duties."  Do you see that?

21         A.  Yes, sir.

22         Q.  It also indicates that, "we continue to assert

23    our objections as to the production of over 10,000 pages

24    of largely irrelevant documents and maintain our belief

25    that a request calling for such as production far

Major Forrest Mitchell                              June 15, 2012

22

1    exceeds the scope of discovery."  Do you see that?

2        A.  Yes, sir.

3        Q.  Now, when you talk about "10,000 pages of

4    irrelevant documents," can you give me an idea of what

5    you're actually referring to?

6        A.  Case files.

7        Q.  And those are case files that regard the spread

8    sheets that you've provided to the defendant, Eric

9    Holder, in this case?

10       A.  Yes, sir.

11       Q.  And those case files include conviction records,

12   if any?

13       A.  Correct.

14       Q.  They include testimony, if any?

15       A.  I do not believe the case files would include

16   testimony.

17       Q.  Okay.  Why don't we do it this way.  Generally

18   what would the case files include?

19       A.  The case file would generally contain a referral

20   document from an outside agency.

21       Q.  Okay.

22       A.  Such as the Secretary of State's office, a local

23   district attorney's office or county attorney's office.

24       Q.  Which would initiate the action in the attorney

25   general's office?

23

1          A.   Correct.

2          Q.   Okay.  What else would it include?

3          A.   It also could include affidavits from

4     complainants --

5          Q.   Okay.

6          A.   Who forwarded that information to whatever

7     referral agency.  It may contain documents such as voter

8     registration records or mail-in ballot applications or

9     poll place combination forms.

10         Q.   And those documents would have come from the?

11         A.   Referring agency.

12         Q.   Referring agency.  Okay.  Anything else that

13    would be in the files, generally?

14         A.   In the entire case file would be investigative

15    work product, such as interviews of witnesses.

16         Q.   Notes?

17         A.   Notes.  Suspect interviews, audio recordings,

18    personal identifying information of witnesses or

19    suspects contacted, additional election records

20    obtained.  And each one will generally contain an open

21    case form and a closed case form, along with any sorts

22    of court pleadings such as, indictments or information

23    or the final disposition of the case.

24         Q.   Okay.  And do you agree with what's stated here

25    that these would be irrelevant; in particular,

24

1      irrelevant to understanding your spread sheet?
2                  MR. SWEETEN:  That's communication that we
3      provided to you on behalf of the witness.  He's not
4      going to comment on what he thinks of the words on the
5      page.
6                  MR. GEAR:  Well, I'm asking you --
7                  MR. SWEETEN:  That's a legal term.
8      "Relevance" is a legal term.  We're his legal counsel.
9      We represent Mr. -- Major Mitchell.  And we provided to
10     you what our belief is and his position is.  That
11     continues to be his position for you to ask him to
12     characterize our legal interpretation of his words would
13     invade the attorney/client privilege and frankly, is
14     irrelevant.  We're representing him in this case.  So I
15     object to the question.
16     BY MR. GEAR:
17         Q.  You can answer.
18         A.  Can you repeat that, sir.
19         Q.  Can you read back?
20                  (Requested question was read.)
21                  MR. SWEETEN:  Objection; calls for a legal
22     conclusion.  Objection; relevance.  You can go ahead and
23     answer.
24         A.  There are many documents in these case files that
25     don't deal with SB 14 at all.

Major Forrest Mitchell                                    June 15, 2012

25

1       Q.   But they deal with the issue of -- in this case

2   referring to your spread sheet, which we'll get to

3   later, refer to the issue of voter fraud?

4       A.   In the broad sense, yes.

5       Q.   Well, they're from the referring agency, correct?

6       A.   Correct.

7       Q.   And they're regarding election code violations?

8       A.   Correct.

9       Q.   And in that, when you say, "the broad sense,"

10  they're referring to election code violations referred

11  from a particular agency?

12      A.   Correct.

13      Q.   To the attorney general's office?

14      A.   Yes, sir.

15      Q.   And did you complete your answer?  I'm sorry.

16      A.   I apologize.

17      Q.   You were answering and I interrupted you, I

18  think.  So were you able to complete your answer on

19  that?

20      A.   The large volume of documents deals with all of

21  the election code referrals that this office has

22  received over the years.

23      Q.   Okay.  And am I understanding correctly that

24  there's also and off-site location where files are

25  maintained?

Major Forrest Mitchell                            June 15, 2012

26

1      A.   Multiple.

2      Q.   Okay.  And did you search those off-site

3   locations in response to the notice of deposition?

4      A.   Electronically.

5      Q.   So they are both electronic files and paper

6   files.  Is that your testimony?

7      A.   Yes, sir.  If I could clarify?

8      Q.   Sure, please.

9      A.   We have a case management system and what we did

10   was try to determine the location of the closed case

11   files, all of the election code case files which are

12   maintained off-site.

13      Q.   So it's the closed case files that are maintained

14   off-site?

15      A.   Yes, sir.  If I could clarify that as well?

16      Q.   Please.

17      A.   Due to the large volume of documents, some open

18   case files require that we store them off-site as well.

19      Q.   So they're both open and closed files?  And would

20   all those -- would the information in those files be

21   maintained both by paper and electronically?

22      A.   Only a small portion is maintained

23   electronically.

24      Q.   Okay.  And so my original question was, did you

25   search those files in response to the notice of

27

1     deposition, you indicated electronically, correct?

2         A.   Correct.

3         Q.   So am I -- is it fair to say that you did not

4     search the paper files to determine if there were any

5     responsive documents?

6         A.   I did not search paper files.

7         Q.   Okay.  And I want to be clear on this when I'm

8     saying "you," I mean you or anyone else within your

9     office?

10        A.   Correct.

11             (Exhibit No. 582 was marked.)

12    BY MR. GEAR:

13        Q.   Okay.  I'm showing you what's been marked as

14    Exhibit 582.  I'll give you a chance to take a look at

15    that.  Have you had a chance to look at Exhibit 582?

16        A.   Yes, sir.

17        Q.   And have you seen that exhibit before?

18        A.   Yes, sir.

19        Q.   Did you assist in preparing the answers on

20    Exhibit 582?

21        A.   Can you explain, "prepare"?

22        Q.   Did you provide any input on Exhibit 582?

23             MR. SWEETEN:  Don't reveal anything you said

24    to us, not one word.  You can just say if you've had any

25    effort in drafting that or not and this's all -- that's

1      all we're going to give them.

2          A.   I did not provide any effort in drafting this

3      document.

4          Q.   (By Mr. Gear)  Okay.  And that -- okay.  Your

5      counsel referred to a document that would provide a

6      clearer understanding of what you did to respond to the

7      notice of deposition.  Would that be the document

8      that --

9                   MR. SWEETEN:  Feel free to review the

10     document to the extent you need to.

11     BY MR. GEAR:

12         Q.   I mean, if your testimony is that you didn't

13     provide any assistance or input into the drafting of

14     that particular document, I understand that and we can

15     move on.  Is that your testimony?

16                  MR. SWEETEN:  No.  What I said earlier is I

17     think it would be fair if you're going to ask him about

18     the categories of documents that you show him the

19     official responses that we submitted to you a week ago.

20     And so he's -- now that he has that in front of him, I'm

21     going to advise him to review it to the extent he needs

22     to in order to answer your question.

23         A.   I apologize, again.  Can you restate your

24     question one more time?

25         Q.   Well, let me actually ask you a different

29

 1     question.  Did you search open files as you've testified
 2     to in response to the notice of deposition?
 3          A.  No, I did not.
 4          Q.  So I'm trying to understand where files are
 5     maintained in your office.  I understand there's an
 6     off-site location that contains both open and closed
 7     files.  In your -- in your physical office where you
 8     work on a day-to-day basis, can you describe to me the
 9     file system there?
10          A.  Investigators who work in the special
11     investigations unit will have a case file at their
12     actual desk.
13          Q.  And is that paper, is that electronic or both?
14          A.  It would be predominantly a paper file.  There
15     will also be an electronic report that is maintained
16     through our report writing system.
17          Q.  And so in addition to the paper file on your
18     desk, you would have a computer, is my understanding?
19          A.  Yes.
20          Q.  Okay.  Where your electronic files would be
21     maintained?
22          A.  Yes, sir.
23          Q.  And when I asked you, did you search the open
24     files, let me include that to the -- the question to ask
25     you, did you search the paper files that you maintain in

                                                          30
1       your office?

2            A.   Yes, sir.

3            Q.   And those would be open files, closed files or

4       both?

5            A.   Both.

6            Q.   And I believe you also testified that you

7       searched your electronic files?

8            A.   Yes, sir.

9            Q.   And would those contain the open files?

10           A.   And when I say "open," it could be a case that

11      has not been finally adjudicated so it could include

12      that, yes.

13           Q.   Could "open" mean anything else because I would

14      like to understand what you mean by open?

15           A.   We consider a case still open if it's still

16      pending trial and there's not been a final disposition

17      in the case.  And so electronically I would look for

18      indictments, for instance.

19           Q.   Is there a record retention policy in your

20      office?

21           A.   I believe so, yes.

22           Q.   Do you know what that is?

23           A.   Well, it depends on the category of file.

24           Q.   Well, when we're talking about election code

25      violations, are we talking about -- are we always

31

1      talking about a criminal investigation?

2           A.   Yes, sir.

3           Q.   So in terms of criminal investigations, is there

4      a retention policy in your office?

5           A.   Yes.

6                MR. SWEETEN:   Are you asking about SIU or

7      are you asking about the office of the Attorney General?

8                MR. CEAR:   And that's a good point.

9      BY MR. CEAR:

10          Q.   So let's talk about the SIU first.  Is there a

11     specific retention policy for criminal investigations,

12     the files in your office?

13          A.   Our policy is that once the case is closed and

14     adjudicated or closed unfounded, that the files are

15     given to our records manager.

16          Q.   And who is your records manager?

17          A.   For SIU the records manager would be Sherry

18     Patke.

19          Q.   Can you spell the last name for me?

20          A.   P-A-T-K-E.

21          Q.   And once they've reached the final adjudication,

22     I believe that's how you stated it, what would Sherry do

23     with the files?

24          A.   Sherry would update our mainframe system and then

25     prepare the files for storage.

32

1      Q.  And when you talk about updating the mainframe
2      system, what do you mean by that?
3           A.  Each of our cases is -- each case is assigned a
4      case number through our OAG mainframe.  And each case
5      has a status, open/closed.  And so upon receiving the
6      file, she will update the mainframe to indicate the case
7      is closed.
8           Q.  Okay.  And so when we're talking about a file, do
9      those files include e-mail communications?
10          A.  Only if that e-mail was printed by the
11     investigator.
12          Q.  Do they include correspondence?
13          A.  Yes.
14          Q.  I believe you testified that they would include
15     the investigator's notes?
16          A.  Yes.
17          Q.  Would they include any other type of analysis or
18     report?
19          A.  They would include a narrative report of the
20     investigation.
21          Q.  Generally, any other documents that you would
22     find in one of these files?
23          A.  These files contain lots of documentary items.
24          Q.  Okay.  So once there's a final adjudication, you
25     indicated Sherry would upload it to the mainframe --

                                                                    33

1      update it to the mainframe.  And then would they be sent
2      to the off-site location?
3           A.   Just the status is updated in mainframe.
4           Q.   Okay.
5           A.   All the documentary files are placed in a box or
6      boxes.  And prepared for long-term storage.
7           Q.   And long-term storage is as we talked about at
8      off-site locations?
9           A.   We keep them in our division for a short period
10     of time.
11          Q.   Is there a determination that certain time period
12     that you keep them there?
13          A.   I don't really know what that is.
14          Q.   And after that short period of time what happens?
15          A.   They're sent to, I believe a warehouse.
16          Q.   And so you indicated there were multiple
17     locations.  Can you tell me how many different locations
18     there are off-site?
19          A.   I do not know how many warehouses we have for the
20     State records system.
21          Q.   Okay.
22          A.   We do have a couple of cases that have large
23     volumes of documentary evidence or records.  And we have
24     those stored in off-site location.  That would be just
25     one location.

34

1       Q.   And what's the name of that location, if you
2   know?
3       A.   I don't really know the name of it.
4       Q.   Is it here in Austin?
5       A.   Yes, sir, it is.
6       Q.   Okay.  Let me change the subject for a minute and
7   talk about your background.  Could you tell me what your
8   educational background is?
9       A.   I graduated from Southwest Texas State University
10  in 1997 with a bachelor's degree in criminal justice and
11  a minor in sociology.  And then I have attended graduate
12  level courses at the University of Virginia at the FBI
13  academy and then also through Sam Houston State
14  University in Huntsville Texas for the leadership
15  command college.
16      Q.   So the graduate level courses, what was the
17  subject matter of the study?
18      A.   I attended the 233rd FBI national academy in
19  Quantico, VA in 2008.  And while you're attending the
20  academy, you can take graduate level classes through
21  University of Virginia.  I took courses in
22  organizational communication.  I took courses in
23  intelligence, in law enforcement, organizational change,
24  ethics and integrity in law enforcement and forensics
25  for supervisor?

1      Q.   Okay.  So as I understand your testimony, you

2    have an undergraduate degree in criminal justice?

3      A.   Yes, sir.

4      Q.   And do you currently hold a master's in any

5    field?

6      A.   No, sir.

7      Q.   Okay.  Any other education generally?

8      A.   Well, yes, sir.  I attended basic peace officer

9    academy in 1993 through the San Antonio College in

10   San Antonio, Texas.  And then over the course of my

11   20 years of public service, I have taken many

12   investigative courses.

13     Q.   Continuing education?

14     A.   Yes, sir.

15     Q.   I understand that.  So you do not hold a law

16   license, correct?

17     A.   No, sir, I do not.

18     Q.   Are there any privileges that you're asserting

19   today?

20          MR. SWEETEN:  I'll assert the privileges as

21   they may come up.  It depends on what you ask him.  If

22   you ask him about his doctor/patient relationship, we'll

23   assert the privilege there.  With respect to -- he's

24   going to assert as to any attorney/client privilege.

25   There also may be occasion wherein the event it comes

36

1    up, the law investigatory privilege.  And that's a

2    privilege that would -- if in the event he were asked to

3    reveal a law enforcement investigatory technique, that

4    we would assert as to that.  Otherwise, it will depend

5    on the questions that are asked.  Thus far, he hasn't

6    asserted any privilege other than the discussions he's

7    had with us.

8    BY MR. GEAR:

9        Q.  I promise you I won't ask you about your

10   doctor/client privilege?

11               MR. SWEETEN:  That was sort of in gest.

12               MR. GEAR:  I know.

13   BY MR. GEAR:

14       Q.  Are you a member of any organizations?

15       A.  Currently I'm a member of the FBI national

16   academy graduate.

17       Q.  Anything else?

18       A.  No, sir.

19       Q.  Have you ever heard of the Austin Area Chapter

20   Association of Certified Fraud Examiners?

21       A.  Yes, sir, I have.

22       Q.  Is that an organization with a membership?

23       A.  Yes, sir.

24       Q.  Are you a member of that organization?

25       A.  No, sir.

37

1          Q.   Have you ever presented for that organization,

2     provided any speeches, information related to what you

3     do in the office of the Attorney General?

4          A.   Yes, sir.

5          Q.   Okay.  Do you know how often you do presentations

6     in front of this organization?

7          A.   I believe I've done two presentations for the

8     Austin chapter.

9          Q.   And do you recall when those presentations were?

10         A.   They were a few years ago.

11         Q.   General time period?

12         A.   I would say between 2006 and maybe 2010.

13         Q.   And you indicated that that particular

14    organization, The Association of Certified Fraud

15    Examiners, has a membership?

16         A.   Yes, sir.

17         Q.   Okay.  And have you ever been a member?

18         A.   I don't believe -- no, I have not.

19         Q.   All right.  Any other -- let's talk a little bit

20    about your work experience.  So you indicated that

21    you're currently with the SIU division.  Can we walk

22    that back a little bit and tell me about your work

23    experience?

24         A.   Well, if I could clarify, I now also supervise

25    the fugitive apprehension unit or the sex apprehension

38

1    unit as well.  Those are the two units that I'm

2    responsible for supervising, SIU and the fugitive

3    apprehension unit.

4        Q.  And just briefly, for the fugitive apprehension

5    unit, when did you become a supervisor?

6        A.  May 1st.

7        Q.  Does that have anything to do with election code

8    violations?

9        A.  No, sir.

10       Q.  Okay.  So turning your attention back to the SIU,

11   when did you become a supervisor there?

12       A.  In 2005.

13       Q.  And prior to 2005, were you in the office of the

14   Attorney General?

15       A.  Yes, I was.

16       Q.  And can you tell me a little bit about what you

17   did prior to 2005?

18       A.  I was hired with the Texas Attorney General's

19   office the Fall of 1997.  I was an investigator assigned

20   to the prosecutor assistance division in special

21   investigations for -- I'm sorry.  From 1997 to 2003, I

22   worked in that division.  As I stated previously, a good

23   portion of that was working on capital murder

24   investigations throughout the state.  We also did other

25   types of investigations at the request of local district

1   county attorneys.  These could be any kind of case from
2   an aggravated robbery to a public integrity
3   investigation.
4       Q.  When you say, "public integrity," what are you
5   referring to?
6       A.  This -- a typical case would involve a local
7   official who could be in law enforcement or an elected
8   official or an appointed official who engages in any
9   kind of criminal misconduct associated with their office
10  or while in office.
11      Q.  So you were with -- you were with this particular
12  division from 1997 to 2003, correct?
13      A.  With an exception of about two and a half weeks.
14  I left the office of the Attorney General and went to
15  the Texas Department of Insurance for about two and a
16  half weeks.
17      Q.  And the Texas Department of Insurance has nothing
18  to do with election code violations?
19      A.  That's correct.
20      Q.  All right.  And so let's just focus on the 1997
21  to 2003.
22      A.  Okay.
23      Q.  Did you -- did you ever have an occasion during
24  that time period to work on election code violation
25  referrals, allegations?

1      A.   One.

2      Q.   One.  Can you tell me about that?

3      A.   There was -- and I can't give you the date.  But

4   it was when I came on as a new investigator, there was

5   an allegation of election misconduct in the handling of

6   ballot boxes in Liberty County.

7      Q.   Do you recall who was the alleged wrong doer in

8   that case?

9      A.   No, sir, I don't.

10      Q.   Do you recall any specifics about the

11   investigation?

12      A.   No, sir.  By the time I got the case the statute

13   of limitations expired.

14      Q.   And the overall allegation was, could you say

15   that again?

16      A.   I believe the handling of the ballot boxes.

17      Q.   Was that misconduct by an official?

18      A.   I don't remember.

19      Q.   Is it fair to say that -- that the one case that

20   you dealt with between 1997 and 2003 did not deal with

21   voter impersonation?

22      A.   Yes, sir, that's fair.

23      Q.   So between 2003 to 2005, what responsibilities

24   did you have within the attorney general's office?

25      A.   I was assigned as a long-term case investigator.

41

1      Q.   And tell me what the responsibilities are and

2  what division you were in?

3      A.   In 2003, all of the investigators with the office

4  of the Attorney General merged into the criminal

5  investigations division.  Previously we had been

6  assigned to specific divisions that handled specific

7  types of cases.  The prosecutor assistance division did

8  any type of case that a local district or county

9  attorney needed assistance on or had been recused in.

10  And so again, I could work any type of case.  And there

11  were other divisions that had like financial crimes,

12  they had investigators as well.  And the cyber crimes

13  was another particular unit.  In 2003 all of the

14  investigators were merged into one division focusing the

15  same in units of specialization.

16      Q.   Okay.  So I think I understand that.  So between

17  2003 and 2005, did you ever have an occasion to work on

18  an election code violation case?

19      A.   In mid-2005 I did when I became the lieutenant.

20      Q.   And when you say, "when you became the

21  lieutenant," were you part of the SIU at this time?

22      A.   Yes, sir.

23      Q.   So between 2003, 2005 until you became the

24  lieutenant in the SIU, you did not work on any election

25  code violation cases?

Major Forrest Mitchell                                June 15, 2012

42

1       A.   That's correct.

2       Q.   Okay.  So let's move forward then, regarding --

3   actually, I would like to back up.  I'm sorry.  You were

4   talking about the records that are maintained in your

5   office.  Do the electronic records contain scans of

6   every hard copy document in storage?

7       A.   No, sir.

8       Q.   They do not.  Moving forward to 2005 when you

9   became the lieutenant in the SIU, how did you become the

10  lieutenant for that particular position?

11      A.   I believe we submitted our names for

12  consideration and the supervisor of the division

13  reviewed memos and our personnel files and then made a

14  selection.

15      Q.   And who did you submit your -- did you say letter

16  of recommendation?  I'm sorry.

17      A.   I'm sorry.  We submitted our names for

18  consideration and we submitted those to David Boatright.

19      Q.   David Boatright.  And who is David Boatright?

20      A.   He was the division chief at the time and was

21  later my Major.

22      Q.   And he was the division chief for the SIU?

23      A.   For the entire criminal investigations division.

24      Q.   And obviously you were selected?

25      A.   Yes, sir.

43

1        Q.   So when you were selected, was that automatically

2   a supervisory position?

3        A.   Yes, sir.

4        Q.   And I believe you said you held the rank of

5   lieutenant?

6        A.   Yes, sir.   If I could clarify?

7        Q.   Please.

8        A.   It was an investigator supervisor.   Because we're

9   so small, I still had to work some cases.

10       Q.   So in 2005 you became the investigative

11  supervisor.   Can you tell me how many people you

12  supervised, if any?

13       A.   I think it was a small group of maybe -- it

14  varied over the years.   But anywhere between 8 and 12.

15       Q.   And we're talking about 2005 at this point?

16       A.   Yes, sir.

17       Q.   Between 8 and 12.   Can you tell me generally what

18  the responsibility of the -- were they all

19  investigators?

20       A.   Yes, sir.

21       Q.   Of the investigators you supervised, what was

22  their responsibility?

23       A.   What was their responsibility or mine?

24       Q.   What was their responsibility?

25       A.   To conduct investigations that were referred to

44

1      our office.

2          Q.   And am I accurate to say that the SIU does not

3      only deal with election code violations, it deals with a

4      broad variety of different violations?

5          A.   That would be accurate.   We deal with a wide

6      variety of criminal investigations.

7          Q.   And generally, can you tell me the types of

8      investigations that the SIU deals with?

9          A.   Public integrity, election violations, white

10     color crimes such as fraud.   And are you talking 2005 or

11     all the way to present, now?

12         Q.   Let's start off in 2005, just so we're clear.

13     When you started off in 2005, what was the

14     responsibility of the SIU?

15         A.   I would say fraud, election fraud, public

16     integrity and whatever type of case needed additional

17     investigative assistance.   An example, around that time

18     there were many death penalty cases that were under

19     review for consideration of mental retardation.   So some

20     of our investigators had to go back and examine those

21     cases to determine whether or not there was evidence of

22     mental retardation.

23         Q.   Okay.   So you started off as a lieutenant.   Can

24     you tell me how -- the time periods of which you gained

25     your promotion to a different rank?

45

1          A.   I was promoted to captain of the special
2     investigations unit in, I believe the Fall of 2007.
3          Q.   And you just recently became a major?
4          A.   Yes, sir.
5          Q.   In 2012?
6          A.   Yes, sir.
7          Q.   And I believe, off the record you said May of
8     2012?
9          A.   Yes, sir, May of 2012.
10         Q.   Now, does the increase in rank does that give you
11    any additional responsibility?
12         A.   Yes, sir.
13         Q.   It does.  Okay.  So as a lieutenant in the SIU,
14    can you tell me what your identified responsibilities
15    were?
16         A.   Was to supervise the daily and weekly
17    investigative activity of the investigators in my unit.
18    That would include reviewing case reports, and providing
19    them assistance or guidance as needed.  In many cases, I
20    would also actually accompany the investigators out into
21    the field if they needed additional manpower.
22         Q.   Would you sign off on the case reports?  Was that
23    part of your responsibility?
24         A.   Either I would or my captain at the time.
25         Q.   Who was your captain at the time?

1          A.   In 2005 it would be Greg Lucus.

2          Q.   Is he still there with you now?

3          A.   Yes.

4          Q.   Still a captain?

5          A.   Yes.  He is not a part of the special

6     investigations unit, however.

7          Q.   From 2005 to the present, has the size of the

8     investigators underneath you changed?

9          A.   Substantially.

10         Q.   Okay.  And so I understand in 2005 there were

11    between 10 to 12.  Can you tell me how the growth has

12    occurred within your office?

13         A.   Well, I believe it was in 2008, the money

14    laundering unit was absorbed into the special

15    investigations unit.  And that area of responsibility

16    was added.

17         Q.   How many investigators came along with that?

18         A.   I would say about eight or nine.

19         Q.   Any other units that have been absorbed into the

20    SIU?

21         A.   Also the -- what we call the criminal litigation

22    unit, which would be the group of investigators who

23    assist prosecutors in the prosecution of cases.  That's

24    about six.

25         Q.   About six.  Any other units?

Major Forrest Mitchell                                    June 15, 2012

47

1     A.   I have a group that is assigned to the joint

2   terrorism task force.  And that has a ranged between two

3   and three employees.

4     Q.   So is that it?  Are there any other units?

5     A.   Well, in May of 2012, I also was added to the --

6   the fugitive apprehension was added to my

7   responsibility.

8     Q.   And they were absorbed into the SIU?

9     A.   No, sir, it's a separate group, but it's about 24

10  or 25 employees.

11    Q.   Okay.  Do their responsibilities cross over?

12    A.   No, sir, they do not.

13    Q.   Okay.  So if my calculations are correct, there

14  are approximately 30 investigators underneath you from

15  the various units that have been absorbed?

16    A.   I think it would be a more accurate statement to

17  say between -- I think there's 40 commissioned state

18  police officers in special investigations unit and about

19  24 in the fugitive apprehension unit.

20    Q.   So 40 in SIU?

21    A.   Correct.

22    Q.   And you said "commissioned police officers," what

23  does that mean?

24    A.   Investigators who are commissioned through the

25  State law enforcement.

Major Forrest Mitchell                                    June 15, 2012

48

1      Q.   And they all carry badges?

2      A.   Yes, sir.

3      Q.   They are police officers?

4      A.   Yes, sir.

5      Q.   Okay.  And you indicated that there was a captain

6   underneath you.  Did you say Greg Russ?

7      A.   I'm sorry.  His name -- he is not part of my

8   unit.  But he was my captain back in 2006.

9      Q.   Okay.  Do you have -- I'm trying to understand

10   the structure.  I know you've got 40 commissioned police

11   officers, investigators that work underneath you and

12   that you supervise.  Is there another structure?  Are

13   there other managers within your unit?

14      A.   Yes, sir there are.

15      Q.   Okay.

16      A.   There are two captains.

17      Q.   Two captains.

18      A.   One for the special investigations unit and one

19   for the sex offender apprehension unit, fugitive unit.

20      Q.   And the name of the captain that's in the SIU

21   unit?

22      A.   Would be Daniel Guajardo.

23      Q.   And Daniel reports directly to you?

24      A.   That is correct, sir.

25      Q.   What about the other captain?

Major Forrest Mitchell                              June 15, 2012

49

1          A.   He reports to me as well.  And his name is Bruce

2     Cook.

3          Q.   Does Bruce Cook's responsibilities cross over

4     into the SIU unit?

5          A.   No, sir.

6          Q.   Okay.  So as I understand the structure of the

7     SIU, you are the lead investigator, the supervisor.

8     There's one captain, Daniel?

9          A.   Guajardo.

10          Q.   Guajardo.  And then there are 40 police officers,

11     investigators that are underneath you, correct?

12          A.   Yes, sir.

13          Q.   Okay.  And do you have general staff that

14     assists, supports -- support staff?

15          A.   Yes, we do.

16          Q.   And generally how large is your support staff?

17          A.   I believe we have four auditors.

18          Q.   What does that mean, "auditors"?

19          A.   These are, in some cases they're CFEs or CPAs who

20     assist in the investigation that we conduct.  They're

21     noncommissioned personnel.

22          Q.   CPA's?

23          A.   Certified public accountants.

24          Q.   Accountants.  They would be assisting with

25     white-collar crimes?

Major Forrest Mitchell                                    June 15, 2012

                                                                    50

1         A.   Correct.

2         Q.   Okay.  Do you have any other support staff that

3    would actually go out into the field?  And I'm just

4    speaking specifically about the election code violations

5    to assist with investigations?

6         A.   No.  Civilians wouldn't go in the field.

7         Q.   Okay.  What are the names of the auditors?

8         A.   Kyle Swihart, Roxanne Mendoza, Rebeka Rutland,

9    Kim Holderread.

10        Q.   And would any of the individuals that you just

11   mentioned, would they be involved in election code

12   violations?

13        A.   The only way they would be involved in election

14   code violations is if we were conducting an

15   investigation of campaign finance violations or the

16   improper use of government monies for political

17   purposes.

18        Q.   Have you had those types of investigations within

19   your office?

20        A.   Yes, sir.

21        Q.   All right.  And can you tell me how many of those

22   types of investigations you've conducted within your

23   office?

24        A.   I would -- to give you a firm number I would have

25   the review my spread sheet.  But if I were to hazard a

51

1       guess it would be half a dozen or so.

2            Q.   One more time focusing on your promotion, what is

3       the process of moving from lieutenant to major?  What is

4       the process that you had to go through for your

5       promotions?

6            A.   We generally prepare a memo involving our core

7       competencies in the identified areas for the position.

8       And this could be a two to three page memorandum, along

9       with a resume.  And then there is a board review.

10           Q.   Okay.  And after each board review, you're told

11      of the determination, if you've been promoted.  Would

12      that be fair to say?

13           A.   Yes, sir.  You are scored by the board and then

14      you're advised of the promotion.

15           Q.   Okay.  And so you indicated previously that there

16      are additional responsibilities that are added with each

17      promotion.  So as a major, is there any other

18      responsibilities that we haven't discussed here?  I

19      mean, I understand the structure of your office.  I

20      understand that there have been units that have been

21      added to your office.  Is there anything else that is

22      of -- that I should know about the structure or your

23      responsibilities?

24           A.   Since I've been promoted to major, I think one of

25      the more substantial responsibilities is now budget, is

1    dealing with budgets and hiring.
2         Q.   And when you say budgets, generally what do you
3    mean by that?
4         A.   Both general revenue funding and then grants that
5    we may have through the attorney general's office.
6         Q.   Okay.  So again, I understand the structure of
7    your office now, but what is the special investigations
8    unit?  What are the specific responsibilities of that
9    unit?
10        A.   Currently there is an election team, a fraud
11   team, a public integrity team, a human trafficking team,
12   a financial investigations team, a money laundering team
13   and a prosecution assistance team.  There is also a
14   group of auditors who assist those different teams and a
15   group of analysts who assist those teams.
16        Q.   And what are the responsibilities of the
17   analysts?
18        A.   The analysts would assist investigators in
19   obtaining contact information regarding witnesses.
20        Q.   Do they help maintain the files?
21        A.   No.
22        Q.   Is it the investigator's responsibility to
23   maintain the individual file?
24        A.   Yes, until it's finally done.
25        Q.   Okay.  And then at that point it would go to

53

1      Sherry, if I understand correctly?

2          A.   Yes, sir it would.

3          Q.   Okay.  What else do the analysts do?  You said

4      they assist with contact information?

5          A.   They would help prepare any kind of charts, if

6      there were any kind of charts developed.  They would

7      search criminal history information.

8          Q.   And they're civilians, correct?

9          A.   Yes, sir, that's correct.

10         Q.   All right.  And so out of all these teams that

11     you have described, which ones would deal with election

12     code violations?

13         A.   Just the elections team.

14         Q.   So you have an elections team and a fraud team.

15     Does the fraud team deal with election code violations?

16         A.   If I could clarify?

17         Q.   Sure.

18         A.   It depends on the volume of cases that we have or

19     the volume of work required for any of the

20     investigations.

21         Q.   Okay.

22         A.   I would have a public integrity investigator

23     assist the elections team or I could have a human

24     trafficker investigator assist so long as it's not

25     prohibited by their grants or anything like that.

54

1       Q.   Okay.

2       A.   So there have been some investigations which have

3   required more investigators than what are currently

4   assigned to the elections team.

5       Q.   So as I understand it, the area of concentration

6   for the elections team is election code violations?

7       A.   Correct.

8       Q.   But other teams can assist when necessary or

9   individuals from those teams?

10      A.   Yes, sir.

11      Q.   How many individuals do you have working on the

12  elections team?

13      A.   I think there are three right now.

14      Q.   Three.  And who are those individuals?

15      A.   It would be Stormy Jackson, Wayne Rubio and

16  Jeanette.  I'm sorry.  Oh, gosh.

17      Q.   Take your time.  That's a lot of people you

18  supervise.

19      A.   It's Jeanette, I can't remember her -- I'm sorry.

20  Jeanette -- Josephine Smith.

21      Q.   And did any of these individuals, Jackson, Rubio

22  or Smith, assist you in searching documents for the

23  notice of deposition?

24      A.   No.  The only instruction I gave them was to get

25  their investigative files in order.

                                                                  55

1          Q.   And that's both paper and electronic?

2          A.   I just said investigative case files.

3          Q.   Okay.  And what does that mean?

4          A.   It would mean their actual paper files.

5          Q.   Okay.  That would not include the electronic

6      files -- strike that.  Do they maintain electronic

7      files?

8          A.   Through our case reporting system.

9          Q.   When was the special investigations unit formed?

10         A.   I believe in June of 2005.

11         Q.   And how was it formed?

12         A.   I don't know.

13         Q.   Why was it formed?

14         A.   I don't really know.

15         Q.   Was it in response to any particular concerns

16     that you're aware of?

17         A.   I don't know.

18         Q.   Was it the subject of a grant?

19         A.   At some point in time, SIU has had, and still

20     does today, have investigators who are grant funded

21     positions.

22         Q.   Where would those grants come from?

23         A.   I don't know much about the grants reporting back

24     in 2005, but I do know that the grants that we currently

25     have are typically through the governor's office.

1      Q.   Do you know the amount of the grants that have
2  come from the governor's office?
3      A.   In total or the ones we currently -- the ones we
4  currently have.
5      Q.   Are you aware of the grant coming from the
6  governor's office in 2005?
7      A.   Yes, I'm somewhat aware of it.
8      Q.   What was the amount of that grant?
9      A.   I would say it's in excess of probably a million
10 dollars.
11     Q.   A million dollars.  And when you say "in total,"
12 do you mean that there have been a series of grants from
13 the governor's office?
14     A.   Yes.  Because we also have grants that are
15 through the -- for instance, an example would be the
16 HIDTA task forces.
17     Q.   HIDTA stands for?
18     A.   High intensity drug trafficking area.
19     Q.   Okay.
20     A.   So we have grants through there.
21     Q.   Okay.  So let me see if I can ask this in a way
22 that it makes sense.  In total, how much in the form of
23 grants from the governor have been dedicated to the SIU
24 division?
25     A.   I don't think I have that answer.

57

1          Q.   In total, how much in grants from the governor's

2      office have been dedicated to dealing with the issue of

3      election code violation?

4          A.   It would only be a portion of the grants that we

5      receive.

6          Q.   Okay.   And can you give me a general total as to

7      what we're talking about?

8          A.   Well, in -- if I could.   In 200s, I think we did

9      get a Burns Grant from the governor's office.   And

10     that's the grant I think that was in excess of a million

11     dollars.

12         Q.   Okay.

13         A.   Out of that grant the OAG hired a number of

14     investigators.   A portion of which served in the special

15     investigations unit.

16         Q.   Now, when these grants are issued, is there an

17     indication of the purpose or the reason for the grants?

18         A.   Yes.

19         Q.   Okay.   And so you talked about the Burns Grant in

20     2005.   What was the reason for the Burns Grant?

21         A.   To conduct criminal investigations.   I believe,

22     if my memory is correct, it was for money laundering,

23     sex offender apprehension, cyber crimes, public

24     integrity and election code violations and white-collar

25     crimes.

1       Q.   So it was not just election code.  It was a
2   series of different responsibilities that the SIU had at
3   the time.
4       A.   I'm sorry.  Could you restate that one more time?
5       Q.   Sure.  The grant that was in excess of a million
6   dollars was -- was that for the SIU unit or was that for
7   the OAG's office in general, and it was disbursed
8   amongst the various units?
9       A.   It was a grant for the entire criminal
10  investigations division and it was disbursed between the
11  various units.
12      Q.   Okay.  Can you tell me, either specifically or
13  generally, how much money has been dedicated to election
14  code violations in the State of Texas at this point?
15  And I'm talking about the SIU unit.
16      A.   I really don't have that number.
17      Q.   You give me a general ball park?
18      A.   I believe we only had that grant for one or
19  two years.
20      Q.   Okay.
21      A.   And I want to say that -- my memory is that about
22  $90,000 of that grant was used for the investigation and
23  prosecution of election code offenses.
24      Q.   And you're talking about the 2035 grant?
25      A.   Yes, sir.

                                                                    59

1                    (Exhibit No. 583 was marked.)

2        BY MR. GEAR:

3            Q.   I'm showing you what's been marked as Exhibit 583

4        and I'll give you a chance to take a look at that.

5            A.   Okay, sir.

6            Q.   Okay.  Have you seen this document before, sir?

7            A.   No, sir.

8            Q.   Okay.  Can you tell me what it?

9            A.   It is titled election code -- election code

10       resolve prosecutions by the office of the Attorney

11       General.

12           Q.   Okay.  And can you tell me what this is in

13       reference to?

14           A.   It indicates the number of cases, criminal

15       investigation division case hours, criminal prosecution

16       division case hours, criminal investigation division

17       cost, criminal prosecutions division cost and then a

18       combined cost.

19           Q.   And have you prepare add similar form in

20       functions of your duties?

21           A.   No, sir.

22           Q.   This indicates -- and if you look at the bottom

23       right-hand corner, it indicates January 25, 2011.  Do

24       you see that?

25           A.   Yes, sir.

Major Forrest Mitchell                                June 15, 2012

                                                                60

1          Q.   And it says, "as of January 25, 2011?"
2          A.   Yes, sir.
3          Q.   So as of January 25, 2011 it indicates that -- up
4     at the top, "resolved prosecutions."  Do you see that?
5          A.   Yes, sir.
6          Q.   And it says, "number of cases."  Do you see that?
7          A.   Yes, sir.
8          Q.   And what's that number of cases?
9          A.   62.
10         Q.   And would that be accurate as of January 25,
11    2011?
12         A.   I believe that would be representative of that
13    time.
14         Q.   It says, "criminal investigation division case
15    hours."  And do you see the number there?
16         A.   Yes, sir.
17         Q.   And how many number -- what is that number?
18         A.   10,649.
19         Q.   Do you believe that that would be accurate
20    representation?
21         A.   I don't know if that number deals with just those
22    specific prosecutions or if it's actually larger.
23         Q.   And when you say, "specific prosecutions," you're
24    talking about if it just deals with election code
25    violations?

Major Forrest Mitchell                                June 15, 2012

                                                                    61

1          A.   Yes, sir.

2          Q.   Okay.  So it could be more or it could be less,

3     if I understand your testimony?

4          A.   Correct.

5          Q.   Do you know who prepared -- who prepared this

6     form?

7          A.   I don't know who prepared the form.

8          Q.   Do you know who would be responsible for

9     preparing this form?

10          A.   I believe it would be our budget or accounting

11     division.

12          Q.   Okay.  And if I understood your testimony, you

13     are now in charge of budgeting aspects?

14          A.   No, sir, not completely.  We have a budget and

15     accounting division and I would work with them on

16     various issues.

17          Q.   Does that have a supervisor?

18          A.   Budget has a supervisor and I think accounting

19     has a supervisor as well.

20          Q.   And who would that supervisor be for budgeting,

21     first?

22          A.   I've met a lot of new people in the last month

23     and a half.  I don't know who's in charge of the budget

24     right now.

25          Q.   Okay.  And the other division that you --

Major Forrest Mitchell                                    June 15, 2012

62

1          A.   The other would be accounting division.

2          Q.   And do you know who the supervisor for accounting

3     is?

4          A.   I believe that's Greg Herbert.

5          Q.   Greg Herbert.  Okay.  All right.  So essentially

6     this goes through -- and again, the title of this

7     document is election code resolve prosecutions.  And it

8     goes through number of cases, the number of hours,

9     criminal prosecution division case hours.  Why would

10    that be distinguished between investigation division

11    case hours and prosecution division case hours?

12         A.   I believe internally within the OAG they have

13    divided budgets.

14         Q.   Okay.  And so who would be the supervisor of the

15    budget division in 2011, if you know?

16         A.   I don't know.

17         Q.   It says, "combined CID, CPD hours."  Do you know

18    what that stands for?

19         A.   Combined CID and CPD hours I believe would

20    represent a total of the hours worked by the criminal

21    investigations division or the criminal prosecutions

22    division.

23         Q.   Okay.  And that number is 16,952?

24         A.   Yes, sir.

25         Q.   And then its goes on to indicate, "criminal

63

1      investigation division costs:"  Do you see that?
2           A.   Yes, sir.
3           Q.   And what is that cost?
4           A.   $792,217.
5           Q.   Okay.  And then, the next line is, "criminal
6      prosecution division cost."  Do you see that?
7           A.   Yes, sir.
8           Q.   All right.  And do you see what the number is?
9           A.   $483,258.
10          Q.   And the combined cost of both?
11          A.   $1.275475.
12          Q.   All right.  And then in -- at the bottom of this
13     sheet it indicates, "statistics on this sheet relate to
14     election code prosecutions during the Abbott
15     Administration as of January 21, 2010," correct?
16          A.   Yes, sir.  That's what it says.
17          Q.   Okay.  And so it also includes a total direct
18     expense such as travel, court cost and other case fees.
19     Do you see that?
20          A.   Yes, sir.
21          Q.   All right.  Any reason to dispute the numbers
22     that are indicated on this exhibit?
23          A.   No, sir.
24          Q.   All right.  Do you know how much has been
25     expended for election code violation prosecutions from

64

1   January of 2010 to the present?

2        A.   No, sir, I do not.

3        Q.   So what is the purpose of the, I believe you

4   said, "election team," what is the purpose of the

5   election team?

6        A.   The elections team responsibility would be to

7   conduct criminal allegations of election code offenses.

8   These are typically referred by the Secretary of State,

9   local, district county attorneys, local elections

10  administrators or local law enforcement.

11       Q.   Okay.  And I believe I asked you this before, but

12  let me make it more specific to the elections team.  Was

13  the elections team formed in response to any concerns

14  that you're aware of?

15       A.   It's my understanding that since 1985 the office

16  of the Attorney General has had jurisdiction in election

17  code offenses or concurrent jurisdiction.  So the office

18  of the Attorney General conducts those kinds of

19  investigations.

20       Q.   And do you have knowledge of election code

21  prosecutions, investigations going back to 1985?

22       A.   No, sir, I do not.

23       Q.   Would those records be maintained somewhere?

24       A.   I don't know what the records retention is for

25  those.

                                                                    65

1            Q.   How far back does your knowledge extend?

2            A.   I would say it goes back to, I think, 2002.

3            Q.   Are you aware of any voter impersonation

4       investigations, prosecutions, that occurred prior to

5       2002?

6            A.   No, sir.

7            Q.   You talked a little bit about the jurisdiction of

8       the SIU.  What jurisdiction does the special

9       investigations unit have in the State of Texas?

10           A.   Do you mean specifically towards elections or in

11      the broader sense?

12           Q.   Elections.

13           A.   Chapter 273 of the Texas Elections Code discusses

14      the investigations of election code violations.  If you

15      have a single jurisdictional election, the jurisdiction

16      may rest with the local district or county attorney.  If

17      you have multi-jurisdictional elections, then the

18      jurisdiction may rest with the Texas Attorney General's

19      office.  Chapter 273 authorizes the Texas Attorney

20      General's office to conduct investigations and

21      prosecutions of either type, working in conjunction with

22      local DAs or law enforcement.

23           Q.   So when you say, "it authorizes them," does that

24      mean they have direct jurisdiction?

25           A.   Yes, I believe the statutory language says they

Major Forrest Mitchell                           June 15, 2012

66

1    have concurrent jurisdiction.

2        Q.   Are they authorized to take the lead on any of

3    these particular investigations, prosecutions?

4        A.   I believe that in the case of

5    multi-jurisdictional elections, the answer would be yes.

6        Q.   All right.  And I believe you've answered this in

7    a general way.  Does the SIU prosecute the cases that it

8    investigates?

9        A.   Oh, no, sir.

10       Q.   So let's talk about that structure a little bit.

11   Your unit, the SIU, conducts the investigations.  How

12   does it then, shift to the prosecution stage?

13       A.   At the completion of our investigation, we would

14   prepare an investigative packet with statements,

15   reports, supporting documentation, it could be recorded

16   interviews, those kinds of things.  And that would be

17   presented to the local district attorney, county

18   attorney or to the criminal prosecutions division.

19       Q.   And did you produce these election investigation

20   packets to your attorney, to your attorney in this case?

21       A.   In the scope of this?

22       Q.   Yes.

23       A.   No.

24       Q.   All right.  And you said something in your

25   answer, and I want to kind of flesh that out a little

67

1    bit.   The investigations packet would be then, turned

2    over to -- can you go through those again for me?

3         A.   It would be either the criminal prosecutions

4    division, or a local district or county attorney.

5         Q.   Okay.   And so the criminal prosecutions division

6    is within the office of the Attorney General, correct?

7         A.   Yes, sir.

8         Q.   Okay.   And they would be the ones that would be

9    primarily responsible for prosecutions within your

10   office, the OAG's office?

11        A.   Unless it was the joint prosecution with the

12   local DA.

13        Q.   Okay.   And is there a supervisor in the criminal

14   prosecutions division?

15        A.   Yes, sir.

16        Q.   And do you know who that is?

17        A.   Adrian McFarland.

18        Q.   And how long -- and is that a he or she?

19        A.   It's a she.

20        Q.   And do you know how long Ms. McFarland has been

21   the director of that -- of the criminal prosecution

22   division?

23        A.   I don't know.

24        Q.   So other than providing the investigations

25   packet, are there communications regarding -- that

1     you're -- the SIU would engage in regarding the contents

2     of the investigations package? I'm talking about with

3     the criminal prosecutions division. How does the

4     package get delivered? I mean, is there -- is it simply

5     the package is prepared and passed off and that's the

6     end of your role? Do you understand what I'm trying to

7     ask you?

8          A.  Yes, sir.

9          Q.  Okay.

10         A.  And I would have to say it depends. Over the

11    years it has changed. And it does not end our role.

12    Frequently, the prosecutors identify additional

13    witnesses they want interviewed or additional documents

14    they want obtained. And so they might ask the

15    investigators to do additional work.

16         Q.  So is it fair to say the investigator would stay

17    with the case through the prosecution, the process of

18    prosecution to assist when necessary?

19         A.  Ideally, yes.

20         Q.  Okay. Are the investigators called to testify at

21    all in these election code violation prosecutions?

22         A.  Yes, sir.

23         Q.  Have you ever been called to testify during any

24    of the election code prosecutions?

25         A.  I have been subpoenaed, however, never had to

69

1      testify.

2           Q.   How often has that happened, subpoenaed?

3           A.   I would say once or twice -- I would say twice.

4           Q.   Do you recall the specific case?

5           A.   It would be the State of Texas versus Anita

6      Baeza.

7           Q.   BI?

8           A.   B-A-E-Z-A.

9           Q.   Okay.

10          A.   There was another case that was -- I don't

11     remember the defendant's name, but it was out of Hidalgo

12     County and was prosecuted in Brooks County?

13          Q.   Do you remember the time period on that one?

14          A.   I would say it was probably a case we

15     investigated in 2008 or 2009.  I was summons down

16     probably about 2010.

17               MR. GEAR:  We've been going for a while.  Do

18     you guys want to take a break?

19               THE WITNESS:  Yes, please.

20               MR. GEAR:  Let's take a little short break.

21     Ten minutes.

22               MR. SWEETEN:  That's fine.

23               (Brief recess.)

24     BY MR. GEAR:

25          Q.   Back on the record.  We talked a little bit about

70

1      what the -- actually we talked a lot about what the SIU
2      does, what their responsibilities are.  I just wanted to
3      circle back to get a clear understanding, the SIU
4      conducts criminal investigations?
5          A.   For the most part, yes.
6          Q.   And let's narrow that even more and talk about
7      election code violations.  Are those always criminal
8      investigations?
9                   MR. SWEETEN:  That he conducted?
10     BY MR. SEAR:
11         Q.   The SIU that you conduct as a supervisor?
12         A.   I would say the vast majority are criminal.
13         Q.   And when you say, "vast majority," the other
14     portion of it, when would that cross over, or why would
15     that cross over into the civil realm?
16         A.   Can I give you an example?
17         Q.   Please.
18         A.   We were referred a criminal case from the
19     Secretary of State's office from Waller County and it
20     involved allegations of voters not being allowed to vote
21     in an election.  I think it was the 2006 general
22     election.  And there's a particular university there
23     named Prairie View University, Prairie View A&M
24     University.  And there were allegations that the
25     elections department did not process their voter

71

1    registration applications.  And consequently, when the
2    voters went to the polls, they weren't allowed to vote.
3    So our office worked on the investigation of the
4    potential criminal misconduct for unlawfully rejecting
5    voters.  But we also assisted the Department of Justice,
6    I think it was a civil rights division, in the analysis
7    of the data regarding the voter registration and what --
8    why voters weren't processed properly and what were the
9    reasons.  So many were -- because the address wasn't
10   complete, so many didn't provide necessary -- so we did
11   a statistical analysis during that investigation, which
12   was then used, I believe civilly in action by the
13   Department of Justice against Waller County.
14       Q.  So your overall responsibilities in SIU have also
15   involved both communications and in conjunction with
16   working with the Department of Justice?
17       A.  Occasionally, yes.
18       Q.  So for the vast majority of the criminal
19   investigations, what is the standard that these cases
20   would ultimately have to be prosecuted by?  Is it beyond
21   a reasonable doubt?
22       A.  Yes, sir.
23       Q.  Okay.  So it's also fair to say that just because
24   you receive a referral does not mean that that person is
25   guilty of what the allegation is.  There's an

72

1      investigation and until proven guilty, it's simply a
2      referral?
3          A.   That's correct.
4          Q.   Okay.  And so we spoke a little bit about fraud
5      in the State of Texas.  So I would like to define that a
6      little bit more.  How do you define voter fraud?
7                    MR. SWEETEN:  Do -- let me make sure I'm
8      clear.  Do you mean how does the SIU?  Because that was
9      in your definition.
10                   MR. GEAR:  Yes.  Yes.
11                   MR. SWEETEN:  Okay.
12         A.   We would define it as a violation of election
13     code offenses or other penal code offenses associated
14     with elections.
15         Q.   (By Mr. Gear)  And there are two chapters that
16     deal with election code violations, if I'm correct or
17     multiple?
18         A.   Oh, no.  Yeah, there's multiple chapters that
19     deal with violations.
20         Q.   Okay.  Let me try my hand at this.  Chapter 68
21     deals with what type of election code violations?
22         A.   I don't think chapter 68 deals with election code
23     violations.  64 deals with some.
24         Q.   64?
25         A.   63, 84, 86, 253, and I know there are others.

73

1        Q.   And I'm not going to ask you to identify and
2   define each of these chapters.  Which of these chapters
3   deals with voter impersonation?
4        A.   That would be the -- it could potentially be the
5   voter registration.  And that would be in, I believe
6   Chapter 13.  And then also, it could also be during the
7   early voting which is covered in 86 or 84.  And it also
8   could be during a poll place violation which is, I think
9   in 64.
10       Q.   You said 86 or 84?
11       A.   Yes, sir.  I'm not sure I know -- I'm not sure I
12  remember perfectly.
13       Q.   Okay.
14       A.   If I could just say that we have different
15  categories.  We have early voting.  We have -- which
16  early voting also includes mail-in ballot.  And then, we
17  also have poll place violations.
18       Q.   And poll place violations would be chapter 64, if
19  I understood you correctly?
20       A.   Some of the early voting can also involve poll
21  place violations.  But I think predominantly 64 is poll
22  place.
23       Q.   Okay.  So early voting involves both by mail and
24  poll place?
25       A.   Yes, sir.

74

1          Q.   Okay.  And I threw out the term "voter
2     impersonation."  What is voter impersonation?  How do
3     you define that?
4          A.   Voter impersonation is either someone who is not
5     registered to vote or has -- is registered to vote and
6     has already voted and using somebody else's voters
7     registration certificate to vote again.
8          Q.   When you say, "not register to vote," what do you
9     mean by that?
10         A.   This could be a person who has not gone through
11    the process of registering to vote, but is using
12    somebody else's certificate to vote.
13         Q.   So the underlying premise, for lack of better
14    words, is they are using somebody else's identity to
15    cast a ballot?
16         A.   Correct.
17         Q.   Now, are you familiar at all with SB 14?
18         A.   Some of it.
19         Q.   Were you involved in any communications during
20    the legislative debates on SB 14?
21         A.   No, I wasn't involved in the communication.
22         Q.   Okay.  And let me be more specific on that.  Were
23    you involved in, for instance, communicating with the
24    governor's office regarding voter ID during the
25    legislative debates on SB 14?

75

1          A.   No, sir.

2          Q.   All right.  And again, were you involved in any

3     communication with any of the State agencies regarding

4     SB 14 during the legislative debates?

5          A.   No, sir.

6          Q.   And so how did you become familiar with SB 14?

7          A.   One of our responsibilities at the attorney

8     general's office is to review, you know, statutes.

9          Q.   Okay.

10         A.   So obviously, as kind of a criminal investigator

11    with -- that's charged with the responsibility of

12    looking at election laws, I looked at that one.

13         Q.   And so when you say, "review statutes," can you

14    tell me what you mean.  And specifically in terms of

15    voter ID legislation or SB 14, what would -- what would

16    your responsibility be in that respect?

17         A.   Just reviewing the proposed statutes.

18         Q.   Do you provide an analysis?  Do you provide a

19    summary of the -- of your review of SB 14?

20         A.   No.  I did not.

21         Q.   So help me understand.  Other than it being a

22    provision that deals with election code, what other

23    reasons would you have to look at it?

24         A.   And this is more broad.  In some cases we are

25    asked to do a bill analysis and assess a fiscal impact.

76

1      Q.   Were you asked to do a bill analysis for SB 14?

2      A.   No, sir.

3      Q.   Was anyone within your office asked to do a bill

4    analysis?

5      A.   I don't know.

6      Q.   Is that something that you would generally do

7    for -- let me narrow this down so it's easier.  Would

8    that be something that your office has done in the past

9    for voter ID legislation?

10     A.   I don't know if we have been asked to do that.

11     Q.   Who would be the entity that would make that

12   request?

13     A.   I believe it would come from our governmental

14   relations division.

15     Q.   And where is that division located within the

16   structure of the government?

17     A.   I mean, it would be within the intergovernmental

18   relations division within the office of the attorney

19   general.

20     Q.   Okay.  And so tell me a little bit about that

21   particular division, what do they do?

22     A.   They deal with other branches of State

23   government.

24     Q.   Specifically as it relates to voter ID

25   legislation, what would they -- what would their

77

1      responsibilities be?

2          A.   They would serve as a liaison, I believe, between

3      the legislative branch and the office of the attorney

4      general.   But I don't know their specific -- their

5      specific duties.

6          Q.   So the intergovernmental division?

7          A.   Intergovernmental relations division.

8          Q.   Relations division.   Did you have any

9      communications with that division regarding SB 14?

10         A.   I don't believe so.

11         Q.   And when I say, "you," I mean anyone within the

12     SIU.   Are you aware of anyone who had communications

13     with the intergovernmental division?

14         A.   Like I said, I would like to make a

15     clarification.

16         Q.   Sure.

17         A.   I think I may have been asked to provide my

18     spread sheets, at some point in time.

19         Q.   And who asked you to provide the spread sheets?

20         A.   I don't remember if it was my division chief or

21     someone within the intergovernmental relations division.

22         Q.   Did you provide the spread sheets?

23         A.   Yes, sir.

24         Q.   When did you provide the spread sheets?

25         A.   I routinely update those on about a monthly

Major Forrest Mitchell                           June 15, 2012

78

1    basis.  So I just provided them as requested.

2         Q.   Okay.  So help me understand.  You said, "you

3    provide them as requested."  You testified that you

4    recall being asked to provide your spread sheets,

5    correct?

6         A.   Uh-huh.

7         Q.   Were you asked to provide them on a monthly

8    basis?

9         A.   I generally am asked almost on a monthly basis to

10   provide these.  It could be for a public information

11   request.  It could be a specific legislative request

12   or...

13        Q.   Do you track who makes a request for your spread

14   sheets?

15        A.   I don't.  I -- public information request would

16   be tracked through our public information officer.

17        Q.   What about request from legislatures?

18        A.   Do I track that?

19        Q.   Do you track that?  "You," being you or your

20   office staff in your office?

21        A.   Well, I would believe that the Intergovernmental

22   relations division would track it.

23        Q.   Do you track from your office, SIU, how many

24   times you produce the spread sheet?

25        A.   No.

79

1       Q.   Are you aware of any legislators that the spread

2   sheet had been provided to?

3       A.   Yes.

4       Q.   All right.  And who was your spread sheet

5   provided to?

6            MR. SWEETEN:  Okay.  Here we're getting into

7   a potential area of privilege.  I think the court's

8   order has said the transmission of information is fine,

9   but as to the identity of a legislator it -- he wouldn't

10  reveal that.  So I think that would be subject to the

11  court's order on privilege.

12           MR. GEAR:  And that's not my understanding

13  of the court's order.  I think we've been asking,

14  generally through all these depositions the who, what,

15  when, where.  It's the substance of that communication

16  that may be privileged.

17           MR. SWEETEN:  Yeah.

18           MR. GEAR:  Is my understanding.

19           MR. SWEETEN:  But I think there's a separate

20  issue on -- and Risa and I discussed this yesterday.  I

21  believe it is on Page 7 of the court's order.  That

22  would prevent -- let me see if I can find that.  Let me

23  go off the record.

24           MR. GEAR:  Go ahead.

25           (Discussion off the record.)

80

BY MR. GEAR:

Q.   So off the record we had a brief discussion of
privilege.  There's been a determination that the
individual who requested the spread sheet from you has
waived that privilege.  So let me go back to the
question.  What was the name of the legislator that
requested the spread sheet?

A.   First let me say that I don't communicate
directly with them at all.  They communicate through our
intergovernmental relations division.

Q.   Okay.

A.   I was advised that Representative, I think his
name is Raphael Anchia, requested the spread sheet.

Q.   Did you receive that request by e-mail?  How does
that request come to you?

A.   I don't specifically recall exactly how that one
request came in.  It could have been through e-mail.  It
could have been on the phone.  I could have been
directed by my division chief.  Most times it's either
on the phone or by e-mail.

Q.   Do you recall when that request was made?

A.   He's requested my spread sheets multiple times so
I don't know.

Q.   Well, let's kind of break that down.  Can you
give me a general time period for when he's requested

81

1     your spread sheets?

2          A.   He's requested updates on election

3     investigations.   I think dating back to like 2006 and

4     2007, all the way to the present.

5          Q.   Did you ever have any direct contact or

6     communication with Representative Anchia?

7          A.   No, sir.

8          Q.   Did anyone within your office have any direct

9     contact or communication with Representative Anchia

10    regarding the spread sheets?

11         A.   I don't know.

12         Q.   How would you produce those spread sheets to

13    Representative Anchia?

14         A.   I would send them electronically, via e-mail.   In

15    a PDF format.

16         Q.   Did you search your electronic files for any

17    e-mails dealing with your communications or dealing with

18    the production of the spread sheets that were given to

19    Representative Anchia?

20         A.   Yes, sir.

21         Q.   Did you find those?

22         A.   I found some.

23         Q.   And did you produce those to your attorney?

24         A.   Yes.

25         Q.   And are you aware of whether or not your office,

1      the SIU, or the attorney general's office for that

2      matter, had any communications with Representative

3      Anchia regarding SB 14?

4          A.   I did not have any communication with

5      Representative Anchia and I do not believe that anybody

6      in the special investigations unit had any

7      communications with Representative Anchia.

8          Q.   Are you aware of any communications with the

9      OAG's office with Representative Anchia?

10         A.   Yes, I am aware of communications between the two

11     offices.

12         Q.   Regarding SB 14?

13              MR. SWEETEN:   Don't speculate.   If you don't

14     know.

15         A.   I don't know for sure.

16         Q.   (By Mr. Gear) Do you know when that communication

17     took place?   Was it during the legislative session,

18     2011?

19         A.   Yes, sir, I believe so.

20         Q.   Do you know who initiated that communication?

21         A.   No, sir.

22         Q.   Do you know who that communication was with out

23     of the OAG's office?

24         A.   Again, it would be someone in our

25     intergovernmental relations division.   And potentially

                                                                        83

 1      also our public information division.
 2           Q.   Are you aware of any communication with
 3      Representative Anchia regarding any voter ID
 4      legislation?  And I'm talking about from the SIU
 5      division.
 6           A.   Can you say that one more time?
 7           Q.   Are you aware of any communication from the SIU
 8      division, and of the -- from either you or any of your
 9      staff to Representative Anchia regarding any of the
10      voter ID legislation.
11           A.   We don't communicate with the representatives.
12           Q.   So the answer to that is no?
13           A.   No.
14           Q.   Are you aware of any communications from the
15      intergovernmental -- is it special division?
16           A.   Intergovernmental relations division.
17           Q.   Relations division with Representative Anchia
18      regarding any of the voter ID legislation?
19                MR. SWEETEN:  Objection; asked and answered.
20      Go ahead.
21      BY MR. GEAR:
22           Q.   You can answer.
23           A.   I don't know.
24           Q.   Was that it?
25           A.   Yeah.  I don't know.

Major Forrest Mitchell                           June 15, 2012

84

1      Q.   Okay.  Can you tell me what version of the spread
2   sheet was produced to Representative Anchia?
3      A.   The most current at the time.  As I said, I
4   update it monthly or as new referrals come in or as we
5   obtain new indictments new or judgments and sentences, I
6   update them at that time.
7      Q.   And when you say, "at the time," I'm trying to
8   get an idea of the time frame you're talking about here.
9   It was during the 2011 legislative session?
10      A.   I'm sorry.  What 2000 what.
11      Q.   '11 I believe you said?
12      A.   Yes, sir.  2011.
13      Q.   Okay.  And you said there were also periods prior
14   to that.  I think you said 2006, 2007, that you provided
15   him, "you," being your spread sheet has been provided to
16   Representative Anchia?
17      A.   If I could clarify?
18      Q.   Please do.
19      A.   Back in 2006 and 2007 it wasn't -- it wasn't a
20   spread sheet.  It was just a little summary of where we
21   got our referrals from.
22      Q.   Okay.  Did you produce that to your attorneys?
23      A.   Yes, sir.
24      Q.   Any other representatives or senators that you're
25   aware of that received a copy of the spread sheet?

85

1        A.   Not that I recall.

2        Q.   So I was asking you about voter impersonation.

3   And I believe you said that was -- one of which was at

4   the poles.  And it was under Chapter 64.  Chapter 64,

5   does it cover more than just voter impersonation?

6        A.   Yes, sir.

7        Q.   Can you give me a general idea of the types of

8   violations covered under chapter 64?

9        A.   64 contains the illegal voting statute, which

10  there are four different types of illegal voting in the

11  State of Texas.

12             THE REPORTER:  Are you saying legal or

13  illegal?

14       A.   Illegal, sorry.  Chapter 64 contains the four

15  different types of illegal voting.  It also contains

16  other provisions such as unlawful assistance and

17  prohibited conduct in polling places, such as

18  electioneering, lawyering, I believe candidate in a

19  polling place.

20       Q.   When you say, "illegal voting," can you identify

21  that a little bit more?

22       A.   Yes, sir.  There are different elements to

23  illegal voting.

24       Q.   Okay.

25       A.   One form of illegal voting is voter

Major Forrest Mitchell                              June 15, 2012

86

1    impersonation.

2         Q.   Okay.

3         A.   Another form of illegal voting is a person who

4    votes more than once in an election.  Another type is a

5    person who is ineligible for election.  And the final

6    type is a person who marks a ballot contrary to the

7    instructions of the voter.

8         Q.   So based on your familiarity with SB 14, what

9    type of violation would be covered under SB 14, the

10   provisions of SB 14?

11        A.   The voter impersonation.

12        Q.   Anything else?

13        A.   I think that would be it.

14        Q.   Has the Texas Attorney General made investigating

15   voter fraud one of his top priorities?

16        A.   It is one of the -- on of our investigative

17   functions in our office.

18        Q.   And the question was, is it a priority within

19   your office?

20        A.   As much as any other priority.  And we have

21   multiple priorities.

22        Q.   So is your answer, yes, it is one of the AG's

23   priorities?

24        A.   I would say yes.

25             MR. SWEETEN:   Objection; asked and answered.

87

1    BY MR. GEAR:

2        Q.   Can you tell me how long it's been one of the

3    priorities of the Texas Attorney General?

4        A.   That, I don't know.

5        Q.   Investigating election code violations, is it one

6    of the primary responsibilities of the special

7    investigation unit?

8        A.   It's one of the investigative responsibilities of

9    the special investigations unit.

10       Q.   But it would be the primary responsibility of the

11   elections team?

12       A.   Correct.

13       Q.   I want to change your focus about the referral

14   process and how that actually comes into the attorney

15   general's office.   Is there a provision of the Texas

16   election code that allows -- that sets out the process

17   for referrals?

18       A.   Yes, sir, there are.

19       Q.   And can you tell me generally what those are?

20       A.   There's -- it's found in two places in the Texas

21   election code.   One indicates a direct referral from the

22   elections administrator themselves.   If they have reason

23   to believe that a voter has committed illegal voting.

24       Q.   Okay.

25       A.   The second is found in chapter 273 of the

1    election code, which talks about the investigations of
2    election code violations.  And it indicates that the
3    Secretary of State may refer a case to our office.  It
4    indicates that two voters themselves who file an
5    affidavit, sworn affidavit, can refer to our office.
6    And also local district attorneys and county attorneys
7    can file it with our office.
8        Q.   So let me just kind of summarize that, if I can.
9    So there are referrals that come from the Secretary of
10   State's office?
11       A.   That's correct.
12       Q.   There are referrals that come from citizens and
13   local election officials?
14       A.   Yes.
15       Q.   There are referrals that come from law
16   enforcement agencies?
17       A.   Yes.
18       Q.   Including local DA's or local prosecutors?
19       A.   Yes, sir.
20       Q.   Are -- SIU, are they limited to election codes in
21   the State of Texas?  Do they investigate outside of the
22   state?
23       A.   Oh, no, sir.
24       Q.   So other than what we've just summarized about
25   how referrals come in, are there any other ways that

89

1    referrals could be received by the OAG's office?

2         A.    No, sir.

3         Q.    And who in the OAG's office is in charge of

4    receiving and maintaining election code violation

5    referrals?

6         A.    It depends on the source of the referral.

7         Q.    So there are various sources that you've

8    testified to?

9         A.    Correct.

10        Q.    So is there a different person responsible for

11   each source of referral?

12        A.. Yes, sir.  If it comes from the Secretary of

13   State's office, it currently goes to the director of law

14   enforcement.  If it comes from a local DA or prosecutor,

15   it would generally go to the criminal prosecutions

16   division.  If it comes from a direct referral from law

17   enforcement agency, it could come to the director of law

18   enforcement or it could come in to our peace officer

19   liaison.

20        Q.    Do you supervise all of these various entities?

21        A.    No.

22        Q.    Would you know when a referral has come into the

23   OAG's office?  Is there a way for you to keep track of

24   the various forms of referrals?

25        A.    Yes, sir.

Major Forrest Mitchell                          June 15, 2012

90

1        Q.   And how do you do that?

2        A.   Through the spread sheet.

3        Q.   Okay.  And so who actually maintains that spread

4    sheet?

5        A.   I do.

6        Q.   So in order to maintain that spread sheet, if it

7    comes in, for instance through the director of law

8    enforcement, how would you actually know it came into

9    the office?

10       A.   He provides it to me.

11       Q.   Okay.  And so that's what I was trying to get at.

12   So there are various entities or sources that it would

13   come to.  They provide you with an electronic version of

14   the referral or do they provide you with paper copy or

15   both?

16       A.   I would say sometimes both.  They definitely

17   provide me with a written copy.

18       Q.   And is there a specific process in your office

19   for making sure you're provided with copies of the

20   referrals that come in?

21       A.   Yes, sir.

22       Q.   And what is that process?

23       A.   We have an internal computer system which is

24   called Webpass, which tracts referrals.

25       Q.   Webpass?

91

1        A.   Yes, sir, W-E-B-P-A-S-S.

2        Q.   Is there a specific program that you use to

3   maintain the spread sheet?

4        A.   I maintain the spread sheet through Excel.

5        Q.   Excel.  Does anyone else, or is anyone else

6   responsible within your office that maintains the spread

7   sheet?

8        A.   No, I'm the one who maintains the spread sheet.

9        Q.   And you've been doing that since 2005?

10       A.   No.  I want to say 2007, 2008, somewhere around

11  there.

12       Q.   So when you talked about Representative Anchia

13  back in 2006, that wouldn't have been the spread sheet

14  in the version that you're currently maintaining?

15       A.   That's correct.

16       Q.   And I believe you indicated -- I believe you

17  indicated that it was a summary.  And can you describe

18  what that summary would have looked like?

19       A.   Yes, sir.  It was a -- I believe it was a

20  WordPerfect document.  And it would identify the county

21  of the offense, the referral source, and then the

22  allegation.

23       Q.   At some point, was your spread sheet updated to

24  include violations from 2002?

25       A.   Yes.

 1      Q.   And when did that happen?

 2      A.   I would say the spread sheet, the information we

 3  obtained on the 2002 cases, was probably around 2005.

 4      Q.   I'm not sure I understand your testimony now,

 5  because you said in 2005 -- 2006 when there was

 6  communication with Representative Anchia there was no

 7  spread sheet in the current form, correct?

 8      A.   Correct.

 9      Q.   And so that would have been in the form of a

10  WordPerfect summary of referrals that have come into the

11  OAG's office.  Is that fair to say?

12      A.   Yes, sir.

13      Q.   Okay.  And so you believe that -- now you're

14  saying that in 2005, the spread sheet would have been

15  updated?

16      A.   If I could clarify.

17      Q.   Please.

18      A.   I found -- or obtained the information in 2005

19  about the 2002 cases, but it was for a different

20  purpose.

21      Q.   And what was that purpose?

22      A.   It was to identify the geographical regions in

23  Texas that had election code violations.

24      Q.   And when you say you, "found or obtained the

25  information," what do you mean by that?

93

1          A.    I queried our mainframe system to determine the
2     election cases that we had on file.
3          Q.    And why were you trying to determine the
4     geographical area of violations?
5          A.    To conduct -- to do a geographic analysis to
6     determine where we would conduct training.
7          Q.    Okay.  And we'll get into the training a little
8     bit later.
9          A.    Yes, sir.
10         Q.    So I think I understand the process by which
11    referrals come into your office.  They come into
12    different sections depending on the source of the
13    referral, correct?
14         A.    Yes, sir.
15         Q.    Is there a specific individual that conducts the
16    intake of these referrals?  Does that make sense?
17         A.    There are different people conducting the intake,
18    depending on where the referral source is.
19         Q.    And you've testified to that already, correct?
20         A.    When it comes -- when it's identified as an
21    election violation referral, it comes to me and then I
22    conduct an intake.
23         Q.    And what is your intake process?
24         A.    I obtain and review the referral packet and I
25    identify the county of the offense, the election

Major Forrest Mitchell                          June 15, 2012

94

1    involved, the referral source and the nature of the

2    allegation.

3        Q.   And you also update your spread sheet, as I

4    understand it?

5        A.   That's correct.

6        Q.   Do referrals -- are they automatically given a

7    complaint number or a tracking number?

8        A.   They are given -- yes, they are given what we

9    call a call for service number.

10       Q.   And at that point, are they considered an

11   official investigation or is that just simply to track

12   the file as it moves through the system?

13       A.   It's to track the file.

14       Q.   Are there -- is it -- or has it occurred within

15   your office where a referral has been given a call for

16   service number, but it didn't actually generate into an

17   official investigation?

18       A.   Yes, sir.

19       Q.   Who makes the actual decision to investigate or

20   not to investigate?

21       A.   It's a multi-person decision.

22       Q.   Help me understand it.

23       A.   Okay.  The division chief or the major is

24   required to approve it.

25       Q.   Is that you?

95

1      A.   That would be me now.  The captain, the

2   lieutenant, and then the director of law enforcement as

3   well.

4      Q.   So does that occur during a meeting or is there

5   e-mail communication that's passed between the

6   individuals you just testified about?  How is that

7   decision actually made?

8      A.   It's generally meetings.

9      Q.   Okay.  And so is that a weekly meeting, monthly

10  meeting, how do these meetings occur?

11     A.   Generally as referrals come in.

12     Q.   Okay.  Do you wait until you have a certain

13  number of referrals or is it each referral?

14     A.   It's generally each referral.

15     Q.   All right.  And so during this meeting what is

16  actually discussed regarding the referral?

17     A.   The first thing that's discussed and evaluated is

18  what -- what kind of offenses are they.  We have a

19  practice that some of the referrals that we get are

20  class C misdemeanors.

21     Q.   Okay.

22     A.   And those are fine-only offenses.  And all

23  election cases are labor intensive and so we generally

24  discuss the fact that this is a class C misdemeanor and

25  so we don't investigate those.

1          Q.   And who would investigate the class C
2    misdemeanors, if anyone?
3          A.   The local jurisdictions like sheriff's
4    departments, police departments, local county attorneys.
5          Q.   So is there a determination made at that meeting
6    whether or not to refer it back to the referring source?
7          A.   Right.  If we determine that it's a class C
8    misdemeanor then we will say we do not have the
9    resources to investigate this.  Suggest contacting your
10   county attorney or local law enforcement officials.
11         Q.   Does your spread sheet indicate which ones are
12   referred back or whether there was a determination not
13   to investigate?
14         A.   No, sir.
15         Q.   Do you keep a separate tracking system of what
16   has been closed, essentially in your office and referred
17   back to the referring source?
18         A.   Webpass may have that indication in it.
19         Q.   Did you produce that information to your
20   attorney?
21         A.   No, I did not.
22         Q.   So as I understand it, Webpass would indicate the
23   determination on how that case would be handled within
24   the OAG's office or the SIU's office; is that correct?
25         A.   If we advised that we were not going to

97

1    investigate a class C misdemeanor, yes.

2        Q.   Okay.   Once it's referred back, is there any

3    additional tracking down by your office?

4        A.   No, sir.

5        Q.   Does the Texas OAG's office ever initiate its own

6    investigations of alleged election code violations?

7        A.   No, sir.

8        Q.   It's 100 percent referral based?

9        A.   It is referral driven.

10       Q.   Are the referrals in the Texas OAG's office or

11   the SIU maintained by subject matter or category?

12       A.   No, sir.

13       Q.   Are they maintained by county or by agency

14   referring agency?

15       A.   We generally maintain them by county and whether

16   or not there's SOS referrals or whether or not they're

17   other referrals.

18       Q.   Is it possible to search within your mainframe

19   database to determine the exact number of referrals from

20   the SOS, for instance?

21       A.   Yes, sir.

22       Q.   And then it -- if I understood you correctly, the

23   other search would be for others.   And is it possible to

24   determine the other source for referrals?

25       A.   Yes, sir.

Major Forrest Mitchell                              June 15, 2012

                                                                    98

1          Q.   Okay.

2          A.   If I could clarify?

3          Q.   Please.

4          A.   The ability to search all of the election

5     violations will require like a -- it will just

6     categorize it as an election violation and I will have

7     to go through manually and determine whether or not it

8     was an SOS or a other referral.

9          Q.   So it would require manual search?

10         A.   Right.

11         Q.   Okay.

12              (Exhibit No. 584 was marked.)

13    BY MR. GEAR:

14         Q.   I've shown you what has been marked as

15    Exhibit 584.  Take your time and take a look at this.

16         A.   Yes, sir.

17         Q.   So first of all, I want to see if -- have you

18    reviewed these types of documents before?

19         A.   These types of documents, but not specifically

20    this document.

21         Q.   Okay.  And what is this?

22         A.   This is a -- I would call this a press release.

23         Q.   And it comes directly out of the attorney

24    general's office?

25         A.   That's correct.

                                                                99
1          Q.   All right.  And when I say the attorney general,
2     I mean Greg Abbott in 2005?
3          A.   Yes, sir.
4          Q.   Okay.  And do you see the date on this, Friday
5     June 3, 2005?
6          A.   Yes, sir.
7          Q.   All right.  This indicates -- actually let me do
8     something else just to make this go a little smoother.
9     You've testified routinely about the existence of a
10    spread sheet, correct?
11         A.   Yes, sir.
12         Q.   All right.  Let me mark this, please.
13              (Exhibit No. 585 was marked.)
14    BY MR. GEAR:
15         Q.   I'm showing you what's been marked as
16    Exhibit 585.  And I just asked you to take a look at
17    that and identify it for the record, please.
18              MR. SWEETEN:  Bruce, can I get a copy of
19         that?
20              MR. GEAR:  I do not have an extra copy of
21         that.  I don't not, sorry.  I can make a copy if you
22         want to do that.
23              MR. SWEETEN:  Let's just do it at the break.
24    BY MR. GEAR:
25         Q.   Is this the spread sheet that you've been

                                                                    100

1       referring to?  And to be fair, this may be a series of

2       spread sheets and I'm just trying to understand what

3       exactly they are.

4            A.   If you could just give me a moment.

5            Q.   Sure.

6            A.   Yes, sir.  They appear to be the spread sheet

7       I've been referencing.

8            Q.   Okay.  Now, are all of these maintained by you,

9       created by you?

10           A.   Yes, sir.

11           Q.   And this would be a version that was if I'm

12      correct, and correct me if I'm wrong, that was printed

13      in 2012.  Do you see the date on the bottom of the

14      spread sheet?

15           A.   Yes, sir.

16           Q.   And to be accurate, it was March 12th of 2012?

17           A.   Yes, sir.

18           Q.   And there's also another version here that was

19      printed on March 9th of 2012.  And it would be the

20      election code referrals to the office of the attorney

21      general August 2002 to the present.  Do you see that

22      particular version they I'm talking about?

23           A.   Yes, sir.

24           Q.   And would these have been printed by you?

25           A.   They would be electronically published by me.

101

1     Q.  Okay.  And when you say, "electronically

2  published," do you publish these spread sheets on any

3  particular system?  Do you make them publicly available?

4     A.  If I could explain?

5     Q.  Sure.

6     A.  I maintain an Excel spread sheet that has three

7  different books.  One book is specifically for

8  referrals.  One book is specifically for prosecution

9  resolved.  And one book is for charges pending.  And

10  then I publish to a PDF any one of those three books or

11  a combination of all three or all three.

12     Q.  And when you say, "publish to a PDF," where does

13  that go?

14     A.  It could go to somebody in our open records

15  division who has requested a copy.  It could go to our

16  intergovernmental relations division.

17     Q.  So if a news agency wanted a copy of your spread

18  sheets, then that would be published and released to the

19  news agency?

20     A.  Yes, sir.

21     Q.  Okay.  When news -- have news agencies made

22  request for your spread sheets in the past?

23     A.  Yes, sir.

24     Q.  And other than the spread sheet, do you provide

25  them with any additional information?

1        A.   No, sir.

2        Q.   So it's generally the spread sheet that is

3    publicly released when requested?

4        A.   Yeah.   If I could clarify.

5        Q.   Please.

6        A.   Unless they specifically asked for another

7    document, such as a charging instrument or indictment or

8    judgments or sentence.

9        Q.   And those --

10       A.   In some cases they do ask for those as well as

11   the spread sheets.

12       Q.   Okay.   All right.   So now you have your spread

13   sheet in front of you that you've identified.   And let

14   me actually clarify something.   You said there were

15   three different versions of the spread sheet or three

16   different books:   The referrals, the prosecutions and

17   pending.   Can you identify for me, are there three

18   different versions here or three different books or is

19   this all from one of these versions of the spread sheets

20   that you have testified?

21       A.   This is one spread sheet which contains three

22   books.

23       Q.   Okay.   And so looking at the spread sheet, it

24   starts with TX 000036816.   Could you -- I'm trying to

25   get you to identify the books for me that are contained

103

1     within the spread sheet?

2          A.   Referral TX 0056816, contains the charges pending

3     resolution.

4          Q.   And how far does that -- how many pages is that?

5          A.   It's two-pages, sir.

6          Q.   Okay.  So the next set of spread sheet would be

7     TX 0056818.  And that indicates election code referrals

8     to the office of the attorney general, prosecutions

9     resolved.  Is that accurate?

10         A.   My Bates stamp is cut off on that.  But this

11    document contains the prosecutions resolved.

12         Q.   And how many pages is that?

13         A.   Contains five pages, sir.

14         Q.   Okay.  And then the -- there's another spread

15    sheet that indicates on -- starts with TX 0056823.  It

16    indicates on the top, election code referrals to the

17    office of the attorney general, August 2002 to the

18    present.  Do you see that one?

19         A.   Yes, sir.

20         Q.   And which one would this represent?

21         A.   This one represents the referrals.

22         Q.   And so I see that this is 2002 to 2012.  Is that

23    accurate?

24         A.   Yes, sir.

25         Q.   So during the 2011 session, this would not have

104

1     been the spread sheet that was provided to

2     Representative Anchia?

3         A.   Yes, that would be incorrect.

4         Q.   That would be incorrect?

5         A.   I'm sorry.  This would not be the spread sheet

6     that was provided to Representative Anchia.

7         Q.   It would have only included the 2011 referrals?

8         A.   Up to the most current, at the time of the

9     request.

10        Q.   And I believe I asked you and I'm sorry if I did,

11    do you recall when you provided him a copy -- there were

12    multiple occasions, but in 2011, do you recall the time

13    period you provided to him these spread sheets?

14        A.   It may have preceded the legislative session and

15    it would have -- but we can provide him continuous

16    updates.  So he made multiple request.

17        Q.   And you said, "it may have preceded the

18    legislative session."  Could it have been during the

19    legislative session?

20        A.   Yes, sir.

21        Q.   Okay.  All right.  Do you know if he got a copy

22    of the March 12, 2012 version?

23        A.   I don't know.

24        Q.   You don't know.  Okay.  So turning your attention

25    back to Exhibit 384, I believe, which is the press

105

1      release from Attorney General Greg Abbott.  It indicates

2      on here that the attorney general's office announced the

3      first indictments for alleged voter fraud in Texas.

4      Would 2005 be the -- be the time period in which the

5      first indictments were issued from regarding voter

6      fraud?

7           A.   I don't know that.

8           Q.   Okay.  And 2005 would have been when you came on

9      board for the SIU?

10          A.   That's correct.

11          Q.   Do you know how these press releases are created,

12     how they're generated?

13               MR. SWEETEN:  Objection; calls for

14     speculation.

15     BY MR. SEAR:

16          Q.   So ahead.  Do you know how?

17          A.   No, not really.

18          Q.   Okay.  Are you involved in the information that's

19     contained within this particular press release?

20          A.   No.

21          Q.   Would you ever be asked for information prior to

22     the release of these particular press releases?

23          A.   Occasionally, yes.

24          Q.   So the information that these -- that at least

25     the 2005 press release is addressing, is election code

                                                                  106
1      violations, correct?

2          A.   Yes, sir, it is.

3          Q.   And would you have provided information regarding

4      these election code violations?

5          A.   Not for this press release.

6          Q.   Okay.  So the first violation that's referenced

7      in here is the Hardeman County, Precinct 1, Commissioner

8      Johnny Akers, do you see that?

9          A.   Yes, sir, I do.

10         Q.   All right.  And looking at Exhibit 585, which is

11     your spread sheet, do you see that referenced in --

12     within your spread sheet?

13         A.   Yes, sir, I do.

14         Q.   And specifically turning your attention to

15     TX 0056818, is that the page that you're looking at?

16         A.   Again, the Bates stamp is cut off on this one.

17     But it is Page 1 of the prosecutions resolved.

18         Q.   All right.  And can you tell me what happened

19     with the -- what were the facts of the Johnny Akers

20     case?

21         A.   He was -- the allegation is that he was handling

22     mail-in ballots during the course of the election.  And

23     he was charged with six counts of possession of official

24     ballot or carrier envelope of another.  And then he

25     plead guilty to one count of possession of an official

107

1     ballot or carrier envelope of another.

2         Q.   And that's indicated in the press release as

3     well, Exhibit 584?

4         A.   In the press release it does not indicate that he

5     has plead guilty.  It only indicates that he has been

6     charged with possession of a mail-in ballot.

7         Q.   And just so that we clarify this as we move

8     along, would this have been chapter 64 or would it have

9     been a different chapter?

10        A.   This would have been chapter 86 or 84.

11        Q.   And that would not have involved voter

12    impersonation, correct?

13        A.   No, it would not have involved voter

14    impersonation.

15        Q.   There is a second indictment that's discussed

16    here on May 27, Beeville resident, Melva Kay Ponce, do

17    you see that?

18        A.   Yes, sir, I do.

19        Q.   And generally, can you tell me, does this

20    allegation involve voter impersonation?

21        A.   Yes, sir, it does.

22        Q.   And looking at Exhibit 584, can you explain to me

23    what the facts are?

24        A.   Melva Kay Ponce utilized her mother's mail-in

25    ballot to cast a vote in the 2004 general election.

```
                                                              108
1        Q.   So that's a by mail violation?
2        A.   It's a by mail voter impersonation, yes, sir.
3        Q.   Would that have been covered under the provisions
4    of SB 14?  Would it have been prevented if SB 14 was in
5    place?
6        A.   No, sir.
7                 (Exhibit No. 586 was marked.)
8    BY MR. GEAR:
9        Q.   Just so I'm clear, both Akers and Ponce dealt
10   with by mail ballot fraud?
11       A.   Yes, sir.
12       Q.   I'm showing you what's been marked as
13   Exhibit 586.  And take your time and take a look at
14   that.  Generally, just so we can move along, you
15   indicated that Mr. Akers plead to the charge?
16       A.   Yes, sir.
17       Q.   Do you know what he plead to?
18       A.   Plead guilty to one count of possession of
19   official ballot or carrier envelope of another.
20       Q.   And the Exhibit I just handed you, the press
21   release from Greg Abbott indicates what he plead to?
22       A.   Yes, sir.
23       Q.   Okay.  And again, just so I'm clear on the
24   record, this is another press release from the attorney
25   general's office?
```

```
                                                          109
 1          A.   Yes, sir.
 2          Q.   And the date of the press release is
 3     November 7th, 2005?
 4          A.   Yes, sir.
 5          Q.   All right.
 6               (Exhibit No. 587 was marked.)
 7     BY MR. GEAR:
 8          Q.   All right.  So I'm showing you what's been marked
 9     as Exhibit 587.  Take your time and then identify what
10     it is for me, please.
11          A.   Okay, sir.
12          Q.   Can you identify that for me, please?
13          A.   This appears to be a press release regarding
14     indictments against four Nueces County voters.
15          Q.   And the date of the press release?
16          A.   Would be December 19, 2005.
17          Q.   Okay.  And it indicates who was indicted within
18     the press release?
19          A.   Yes, sir, it does.
20          Q.   And can you tell me who was indicted?
21          A.   Elida Garza Flores, Isabel Rios Gonzales,
22     Josefina Marinas Suarez and Virginia Ramos Garza.
23          Q.   And so either looking at your spread sheet or at
24     Exhibit 587, can you tell me what the facts of that
25     indictment were?
```

110

1      A.   Okay.   This case was a 2005 school district
2   election.   And it would have been referred to our office
3   by the Secretary of State's office.   And it involved
4   mail-in ballot fraud.   And when I mean mail-in ballot
5   fraud, it involves the unlawful handling of the mail-in
6   ballots and also unlawful assistance in assisting the
7   voter in the preparation of those ballots or the
8   application to obtain those ballots.
9      Q.   So if I'm correct, this would not have been
10   chapter 64, which deals with voter impersonation,
11   correct?
12      A.   It potentially could have been.
13      Q.   Turning your attention to Exhibit 587, do you see
14   where it says the indictments apply to violations of
15   chapter 86?
16      A.   Yes.
17      Q.   Any reason to dispute that?
18      A.   No, sir.
19      Q.   Okay.   And turning to your spread sheet, do you
20   see those individuals indicated on your spread sheet?
21      A.   Yes, sir, I do.
22      Q.   And can you tell me, ultimately, what the
23   determination was on these cases, were they resolved?
24      A.   Yes, they were resolved.   Virginia Ramos Garza
25   accepted a one-year pretrial diversion, which involved

Major Forrest Mitchell                                          June 15, 2012

111

1    12 months of community supervision.  Elida Garza Flores

2    also accepted a one-year pre-trial diversion in which

3    she received 12 months of community supervision.

4    Isabel Lisa Rios Gonzalez pleaded no contest to two

5    counts of possession of an official ballot or carrier

6    envelop of another, and received one-year deferred

7    adjudication.

8         Q.  All right.  And so I want to ask you, there's a

9    couple of things that you said that I didn't completely

10   understand.  A class C or class E misdemeanor, what does

11   that actually mean?

12        A.  We have three claims of misdemeanor offenses in

13   the State of Texas.  We have a class C misdemeanor, a

14   class B misdemeanor and a class A misdemeanor.  A class

15   C is punishable by fine only.  And I believe the fine is

16   $500 or less.  A class B is punishable by up to six

17   months in a county correctional facility and a fine, I

18   think $2,000 or less.  And then a class A misdemeanor is

19   punishable by up to one year in a county correctional

20   facility and a fine of $4,000 or less.

21        Q.  So class C and class E, they non-criminal

22   offenses?

23        A.  We don't have a class E.  Class B, as in Brava.

24        Q.  Okay.  Class B, is that a non-criminal offense?

25        A.  No, sir, that's a criminal offense.

Major Forrest Mitchell                                    June 15, 2012

112

1        Q.   So focusing on class C then, you previously
2    testified that if there was a determination that it was
3    a class C offense, it would be referred back to the
4    referring agency?
5        A.   Yes, sir.
6        Q.   So would that then, be a non-criminal offense or
7    is it just -- you tell me.
8        A.   It's a criminal offense.  However, it's only
9    punishable by fine only.
10       Q.   Okay.  Would that be considered an ordinance
11   under Texas law?
12       A.   Ordinances passed by city councils or county
13   commissioner's courts are also potential class C's only.
14   They don't involve jail time.
15       Q.   And those would also be referred back if they
16   came to your office?
17       A.   We wouldn't investigate municipal or county
18   ordinances.
19       Q.   Okay.  But local election officials could refer
20   various allegations to you regarding election code
21   violations; isn't that correct?
22       A.   Local officials could refer election cases to us.
23       Q.   Okay.  Do they ever refer allegations that would
24   fall under the class C or ordinance type violations?
25       A.   Yes, they do.

113

1          Q.   Okay.  And those would not be investigated by

2     your office?

3          A.   Not now, no.

4          Q.   Okay.  When you say, "not now," let me understand

5     that.  Was there ever a time when you actually

6     investigated class C or ordinance-type violations?

7          A.   When -- in some of these referrals that come into

8     our office, they include a whole host of allegations.

9          Q.   Okay.  Including class Cs?

10          A.   Including class Cs.  And so if we were already

11     there investigating other offenses, we would address the

12     class C, but we would not initiate a case just off of a

13     class C.

14          Q.   Okay.  That's understandable.  All right.  And so

15     turning back to, I believe it's Exhibit 387, with the

16     four indictments, that was indictments for chapter 86,

17     and that's by mail ballot or fraud; is that correct?

18          A.   That's correct.

19          Q.   And that would not have included voter

20     impersonation?

21          A.   It potentially could have.

22          Q.   But again, the press release indicates that the

23     violations apply to chapter 86?

24          A.   The press release does say that they were

25     indicted for mail-in ballot, yes.

Major Forrest Mitchell                                     June 15, 2012

114

1      Q.  And so when you keep -- you testified several

2   times that it potentially could have.  What do you mean

3   by that?

4      A.  I mean that one of the schemes of conduct that we

5   have seen in mail-in ballot fraud, and examples by

6   Melva Kay Ponce, is that she impersonated her mother.

7   And some cases, some of the mail-in ballot case that we

8   examined, campaign workers will obtain a blank ballot

9   from the voter and then cast those ballots as if they

10  were the voter.

11     Q.  And again, that's through the by mail ballot

12  system?

13     A.  That is correct.

14     Q.  And that would not have, as I understand your

15  testimony, been covered by -- if SB 14 was implemented?

16            MR. SWEETEN:  Objection; calls for

17  speculation.

18     A.  That is also correct.

19     Q.  (By Mr. Gear)  And your answer was?

20     A.  No, it would not.

21     Q.  Okay.  And I'm sorry if I got off track.  Can you

22  tell me, did you testify to what the conviction was, if

23  any?

24     A.  I got the -- I got the first two down.  The final

25  two Isabel Lisa Rice Gonzales pled no contest.  And was,

115

1     on two counts of possession of an official ballot or
2     carrier envelope of another, received one year
3     adjudication, a $500 fine and 12 months community
4     supervision.  Josefina Suarez also pled guilty to one
5     count of illegally possession of an official ballot or
6     carrier envelope of another, received one year
7     adjudication, a $500 fine and was sentenced to 12 months
8     community supervision.
9          Q.   What does deferred -- retrial diversion mean?
10         A.   Pretrial diversion is an agreement between the
11    defense attorney and the prosecuting attorney to some
12    sort of alternative punishment without any finding of
13    guilt.
14         Q.   So in the case of Ms. Garza, Ms. Flores,
15    Ms. Gonzales, there was no finding of guilt?
16         A.   With Garza and Flores, they both accepted a
17    pretrial diversion so there was no court finding.
18         Q.   And then for Ms. Gonzales?
19         A.   She plead no contest.
20         Q.   Which is not an admission of guilt, correct?
21         A.   Correct.
22         Q.   And for Ms. Suarez, she pled guilty?
23         A.   That's correct.
24                   (Exhibit No. 588 was marked.)
25    BY MR. GEAR:

Major Forrest Mitchell                              June 15, 2012

116

1      Q.   Showing you what's been marked as 588.   Take your
2   time and then identify that document for me, please.
3      A.   Okay, sir.   This document appears to be a press
4   release that was issued in Friday -- on Friday
5   January 13, 2006 by the office of the attorney general.
6      Q.   Okay.   And do you see the individual who was
7   indicted in this press release?
8      A.   Yes, sir, I do.
9      Q.   You say the name for the record?
10      A.   There were actually two persons indicted in this
11   case.   That would be Anita Baeza and Trinidad
12   Villalobos.
13      Q.   Okay.   So starting with Ms. Baeza, indicates that
14   she's a 68-year old mother of the sheriff's officer
15   candidate Jeffery Baeza.   Can you tell me what the
16   allegation is for her?
17      A.   This move involved mail-in ballot fraud.
18      Q.   And I just say for the record, you refer to your
19   spread sheet?
20      A.   Correct.
21      Q.   So again, this is mail-in ballot fraud?         .
22      A.   Yes, sir.   In the 2006 primary election.   No.
23   I'm sorry.   Incorrect.   The 2004 primary election.
24      Q.   And there was another individual that you
25   indicated, Villalobos?

117

1          A.   Yes, sir.   Trinidad Villalobos.

2          Q.   And can you tell me what the allegation for that

3     was?

4          A.   Also mail-in ballot fraud.

5          Q.   From the same election?

6          A.   Referring to my spread sheet, it was the 2004

7     primary election yes, sir.

8          Q.   So both were the 2004 primary election.  Can you

9     tell me generally what the allegations of this

10    indictment were?

11         A.   This again, goes to persons who were assisting in

12    the application for mail-in ballots during the early

13    voting in that election.  And then also, once early

14    voting started assisted in either the completion of the

15    ballot or the handling of the ballot.

16         Q.   And if I'm correct, these would have been under

17    chapter 86, dealing with mail-in ballot fraud?

18         A.   Yes, sir 86006.

19         Q.   And do you know what the outcome of these

20    indictments were?

21         A.   Trinidad Villalobos was found guilty by a jury on

22    four counts of possession of mail-in ballot or carrier

23    of another.  She received ten days in jail.  And she was

24    sentenced to six months of probation.  And then Anita

25    Baeza accepted six months of pretrial diversion.

118

1        Q.   And again, neither of those dealt with voter

2    impersonation.  Or let me put it a different way so it's

3    easier for you to understand, perhaps.  Both of those

4    dealt with chapter 86 of the election codes?

5        A.   Yes, sir, that's what they were charged with.

6        Q.   And neither of them pled to a charge of voter

7    impersonation?

8        A.   That's correct, sir.

9        Q.   Okay.  It also says at the bottom of, I believe

10   Exhibit 588, that in December, four individuals were

11   indicted for illegally possessing and transporting

12   election ballots following the 2005 ISD election in, is

13   it Nueces County?

14       A.   Yes, sir, that's correct.

15       Q.   And that's what we've previously referred to in

16   your testimony?

17       A.   Yes, sir, the 2005 Robstown independent school

18   district election.  On the chart, it's listed as the

19   2005 school district election.

20       Q.   Okay.  And it also says, the paragraph underneath

21   that attorney general obtained a guilty plea from Bee

22   County woman accused of voter fraud.  And the Bee County

23   woman this is referring to would be Melva Ponce, is that

24   accurate?

25       A.   Yes, sir.  Melva Kay Ponce.

Major Forrest Mitchell                              June 15, 2012

119

1       Q.   Okay.  So far is, it fair to say that all of

2   these violations dealt with by mail ballot fraud?

3            MR. SWEETEN:  Objection; asked and answered.

4   Objection; compound.  You can answer.

5       A.   These all involved mail-in ballot fraud, which

6   could potentially include voter impersonation.

7       Q.   You keep indicating that, but these were charged

8   under chapter 86, correct?

9            MR. SWEETEN:  Objection; argumentative.

10  BY MR. GEAR:

11      Q.   Well, were they charged under chapter 86?

12      A.   They were charged under chapter 86.  Yes, sir.

13      Q.   Chapter 86 does not include voter impersonation,

14  correct?

15      A.   Well Melva Kay Ponce was charged with voter

16  impersonation.

17      Q.   But it was through the by mail ballot system?

18      A.   That's correct.

19      Q.   And again, I believe you testified that that

20  would not have been prevented if SB 14 was in place?

21           MR. SWEETEN:  Objection; calls for

22  speculation.

23  BY MR. GEAR:

24      Q.   You can answer.

25      A.   I don't believe it would have.

1                    (Exhibit No. 589 was marked.)

2      BY MR. GEAR:

3          Q.   Showing you what's been marked as Exhibit 589.

4      Take a second to look at this, please.

5          A.   Okay, sir.

6          Q.   Can you tell me what this?

7          A.   Sir, appears to be a press release issued by the

8      Texas Attorney General's office regarding a training

9      initiative our office was conducting.

10         Q.   And the date of the press release?

11         A.   Wednesday January 25, 2006.

12         Q.   And before we talk about this, I would like to

13     talk about your spread sheet.  From -- the SIU was

14     established in 2005, correct?

15         A.   Yes, sir.

16         Q.   And what month in 2005?

17         A.   I want to say June.

18         Q.   June of 2005.  So between June 2005 to

19     January 25th of 2006, how many referrals did the OAG's

20     office receive?

21         A.   I'm sorry.  Could you repeat that one more time?

22         Q.   Between June of 2005, the establishment of SIU,

23     to January of 2006, the date of this press release, how

24     many referrals were received by the OAG office?  And can

25     you tell that based on your spread sheet?

Major Forrest Mitchell                                    June 15, 2012

121

1        A.   Yes, sir I could tell the referral that we

2   received from the SOS.

3        Q.   Okay.  And how many referrals were those?

4        A.   To January 2006?

5        Q.   Yes, sir.

6        A.   Six, sir, in the Secretary of State's office.

7        Q.   And I believe that you said -- do one of these

8   spread sheets show the other referrals?

9        A.   Yes, sir, it does.

10        Q.   And which portion of the spread sheet or which

11   Bates stamp number would that be?

12        A.   My Bates stamp number is partially cut off.

13        Q.   And I apologize for that.

14        A.   But it would start on Page 6 with a title heading

15   selection code referrals of the office of the

16   attorney general -- August 2, 2002 to present.

17        Q.   What's the Bates stamp number on the bottom?

18        A.   I have, it starts with TX 3005632.

19        Q.   And the top is election code referrals to the

20   office of the attorney general, prosecutions revolved,

21   or am I looking at the wrong one?

22        A.   I believe you're looking at the wrong one.  It

23   would be election code referrals to the office of the

24   attorney general, August 2, 2002 to the present, Page 6.

25   It was published 3/9/2012.

Major Forrest Mitchell                           June 15, 2012

122

1          Q.  All right.  And so I believe your testimony was

2     there were six referrals from the Secretary of State's

3     office.  Between that time period, how many from other

4     sources?

5          A.  I wouldn't be able to determine this off the

6     spread sheet.

7          Q.  How would you make that determination then?

8          A.  I would have to go back and look at the call for

9     service.

10         Q.  Okay.  Does this give you a general ball park of

11    the number of referrals?

12         A.  I would say yes, because there were only two

13    elections that occurred in -- based off this document in

14    2005.

15         Q.  Okay.  And so how many referrals are we talking

16    about then, in a general ball park basically?

17         A.  It would be two.

18         Q.  Two.  So we're talking about a total of seven

19    referrals from the date of the establishment of the SIU

20    to the date of this press release, which is January 25,

21    2006.  Is that fair to say?

22         A.  I believe I said there were six referrals from

23    the Secretary of State's office.

24         Q.  Okay.

25         A.  And then there appears to be two from other

123

1       sources.

2          Q.   Eight?

3          A.   Eight.

4          Q.   Okay.  Turning your attention back to 589,

5       indicates that, "the Attorney General Greg Abbott

6       launches initiative training -- training initiative to

7       identify, prosecute, prevent voter fraud."  Was that

8       initiative launched in 2005 or was it launched in 2006?

9          A.   It was initiated in late 2005 and finalized in

10      the first part of 2006.

11         Q.   Okay.  And so the initiative -- what did the

12      initiative involve?  And you can refer to 589 if you

13      would like to.

14         A.   It involved developing, first of all, identifying

15      geographical regions in the State of Texas where the

16      office had previously investigated and prosecuted

17      allegations of election misconduct.  It involved the

18      development of a law enforcement outreach training

19      program.  And then it involved scheduling and conducting

20      training to law enforcement officers in Texas.

21         Q.   Before we get into the various categories, were

22      there training materials produced or created as a result

23      of this initiative?

24         A.   Yes, sir.

25         Q.   And were those training materials specific to the

124

1        different agencies that you were focusing on or was

2        there just one general training -- source of training

3        material?

4            A.   Just one source of training.

5            Q.   Okay.  And were these training materials turned

6        over or provided to the different agencies that the

7        training was conducted?

8            A.   I believe a -- I believe a copy of the PowerPoint

9        presentation would have been provided as an instructor

10       note -- or class notes.

11           Q.   Who created the PowerPoint presentation?

12           A.   It was a combined effort of multiple

13       investigators.

14           Q.   Including yourself?

15           A.   Yes.

16           Q.   Were you in charge of the ultimate message or the

17       material that was produced in the PowerPoint

18       presentation?

19           A.   No, I was not in charge at the time.

20           Q.   Now, this training initiative in Exhibit 589, it

21       indicates that it targeted 44 key counties that either

22       have a history of voter fraud or the population of which

23       exceeds 100,000.  Do you see that?

24           A.   Yes, sir.

25           Q.   Can you tell me, as of this date, how many

125

1      different counties have been provided training by the

2      attorney general's office?

3          A.   As of today's date?

4          Q.   As of today's date.

5          A.   I couldn't -- I don't know.

6          Q.   More than 44 counties?

7          A.   I don't recall.

8          Q.   Okay.  And just to be fair, and I'm trying to

9      understand this initiative.  You were the lead

10     investigator of the supervisor of the SLU, correct?

11         A.   At the time I was the lieutenant and Greg Lucus

12     was the captain over the unit.

13         Q.   Okay.  Would you have been involved in any

14     aspects of the training?

15         A.   Yes, I was involved in some of the training.

16         Q.   And that would have been to go out into the field

17     and provide the training?

18         A.   Yes, sir.

19         Q.   All right.  And how many investigators were

20     involved in providing training?

21         A.   I don't recall.

22         Q.   Do you have a general idea of the number of

23     investigators?

24         A.   It would just be a guess.  And it would be,

25     perhaps ten.

1        Q.   Okay.   And so when we're talking about 44
2    counties and populations of 100,000 or more, can you
3    tell me the different types of agencies that were
4    targeted?
5        A.   We conducted a total of, I believe, approximately
6    80 presentations through out the state.   And in those
7    presentations would have been police departments,
8    sheriff's departments, Texas highway patrol, local
9    district attorney investigators or county attorney
10   investigators or anybody who was a Texas peace officer.
11       Q.   Would that have involved local DAs or local
12   county attorneys as well?
13       A.   Yes, sir.
14       Q.   What about election officials?
15       A.   No, sir.
16       Q.   So local election officials were not invited to
17   the training?
18       A.   This was a TCLEOSE, which is our State law
19   enforcement regulatory agency.   It was designed to be a
20   peace officer presentation for training on election code
21   offenses.
22       Q.   Was there a training initiative established for
23   local election officials?
24       A.   No, not that I'm aware of.
25       Q.   Okay.   And maybe I should be clearer on that.

127

1    Through the SIU or through the OAG's office, was there a
2    training established for local election officials?
3         A.   No, sir.
4         Q.   Do you see in the fourth paragraph again, where
5    it's talking about 44 key counties including 18 cities
6    where the attorney general has previously investigated
7    or prosecuted alleged election code violations, do you
8    see that paragraph?
9         A.   Yes, sir.
10        Q.   The 44 counties contain 78 percent of eligible
11   registered voters in Texas.  Do you see that?
12        A.   Yes, sir.
13        Q.   Any reason to dispute that?
14        A.   No, sir.
15        Q.   Underneath it indicates that, "earlier this
16   month, two Reeves County women were indicted on charges
17   of illegally possessing an transporting election ballots
18   of several voters."  Do you see that?
19        A.   Yes, sir.
20        Q.   Looking at your spread sheet, can you identify
21   who the two women were?
22        A.   That would be Anita Baeza and Trinidad
23   Villalobos.
24        Q.   And you testified to that already, correct?
25        A.   Yes, sir.

128

1       Q.   Okay.  So is this training initiative still in
2    place?
3       A.   No, sir.
4       Q.   And I believe I asked you what the number of
5    counties that actually received training was, and I
6    can't recall your answer?
7       A.   I don't recall.
8       Q.   And so generally would it have been -- how long
9    did this training initiative last?
10      A.   About a month.
11      Q.   Were there any other versions of this training
12   initiative that were put in place after this particular
13   training initiative?  We're talking about, I believe
14   between 2005 and 2006.
15      A.   No, sir.
16      Q.   And the answer is no, no other training?
17      A.   No other training initiatives.
18      Q.   Okay.
19              (Exhibit No. 590 was marked.)
20   BY MR. GEAR:
21      Q.   Go ahead and take a look at Exhibit 590.  When
22   you've had a chance we'll talk about it.
23      A.   Okay, sir.
24      Q.   Okay.  The fourth paragraph, "and the fraud
25   continues since last summer.  My office has been

129

1    involved in several voter fraud cases across the state."

2    Are there any -- from 2002 to 2006, March 1st 2006 the

3    date of this article, are there any additional voter

4    fraud prosecutions or convictions that you're aware of,

5    based on this spread sheet?

6        A.   I think there were three additional persons

7    charged with election misconduct.

8        Q.   And which three are you referring to?

9        A.   Willie Howard Ray, Jamillah Johnson and Melinda

10   Hunter.

11       Q.   And they're in -- is it Bowie County?

12       A.   Bowie County.

13       Q.   Bowie County.  Thank you.  So let's talk about

14   them real quick.  Can you tell me what the allegation

15   for Willie Ray, Jamillah Johnson and Melinda Hunter are?

16       A.   Yes, sir.  This case was referred by the

17   Secretary of State's office.

18       Q.   Okay.

19       A.   It involved the 2004 primary election.  And the

20   allegations were unlawfully obstructing a poll watcher,

21   unlawfully witnessing the application of more than one

22   application, unlawful assistance, security of ballots,

23   ballot boxes and envelopes.

24       Q.   And would this have been a charge under chapter

25   86 or chapter 64?

Major Forrest Mitchell                              June 15, 2012

130

1      A.   These -- the allegations involved multiple

2    chapters of the Texas election code.

3      Q.   Okay.  And would any of these allegations have

4    involved a charge of voter impersonation?

5      A.   The mail-in ballot applications and the unlawful

6    assistance could lead to potential illegal voting

7    charges under 64.  However, only charges that were filed

8    were under chapter 86.

9      Q.   Okay.  So is it fair to say there were no charges

10   filed under chapter 64 for any of the individuals who

11   were indicted that you just identified?

12     A.   That is correct.

13     Q.   And ultimately, was there a conviction?

14     A.   Willie Ray pled to one count of possession of an

15   official ballot or carrier envelope of another, which is

16   a class B misdemeanor.  She received a fine.  I'm sorry.

17   I'm having a hard time reading it.

18     Q.   It's small print.

19     A.   And then Jamillah Johnson was -- received

20   six months deferred adjudication and a $200 fine.

21     Q.   And again, that's not a criminal conviction?

22     A.   No.  For the purpose it's not a final conviction.

23     Q.   Okay.

24     A.   And then Melinda Hunter received six months

25   pretrial diversion.

131

1          Q.   And again, these were by mail ballot violations?

2          A.   Yes, sir, 86006 is possession of a mail-in

3     ballot.

4          Q.   Turning your attention back to Exhibit 590, there

5     are a number of different discussions of indictments

6     here.   Reeves County, the mother of the 2004 primary

7     candidate I believe you already testified that, correct?

8          A.   Yes, sir.

9          Q.   Nueces County, the four women allegedly targeting

10    elderly voters during last year's local school board

11    election, I believe you testified to that?

12         A.   Yes, sir.

13         Q.   Hardeman County commissioner pled guilty to

14    illegally collecting mail-in ballots during the 2004

15    election.   And that would have been Johnny Wayne Akers,

16    correct, for Hardeman County?

17         A.   Yes, sir.

18              MR. SWEETEN:   Bruce, we're getting close to

19    1:15, so if you get to a logical stopping point.

20              MR. GEAR:   Did you want to go to 1:30?

21              MR. SWEETEN:   Well, we were going to try

22    to -- we've got to be somewhere at 1:30.   It's short,

23    but yeah.   Just, I mean, I don't want to stop you I'm

24    just letting you know.

25              MR. GEAR:   I'll finish this and then we can

1     take a break.

2                 MR. SWEETEN:  Sure.  That's fine.

3     BY MR. GEAR:

4          Q.  There's another indication here about, "I know

5     local prosecutor's are dealing with voter fraud, too.

6     The week before Christmas."  And they talk about

7     Hidalgo.  Did I pronounce that correct?

8          A.  Yes, sir.  Hidalgo County.

9          Q.  "Hidalgo County district attorney's office

10    obtained indictments against nine people in connection

11    with the McAllen City election in May of 2005."  Would

12    that be included on your spread sheet?

13         A.  No, sir.  It's included on our spread sheet in

14    referrals.

15         Q.  Okay.

16         A.  But not in prosecutions.

17         Q.  So is this one that you would have worked in

18    conjunction with the local prosecutor.  How does that

19    work?

20         A.  Yes, sir.  The Secretary of State's office

21    referred it to us, as well as the Texas Ranger assigned

22    to that jurisdiction.  And then also the district

23    attorney.  So all three requested assistance.

24         Q.  Okay.  Can you tell me on the referrals where

25    these nine individuals would be identified?

Major Forrest Mitchell                                    June 15, 2012

133

1          A.   I would only have listed it once.

2          Q.   Okay.

3          A.   And it would be listed on Page 1 of election code

4     referrals to the office of the attorney general,

5     August 2007 to present.  And it would be Page 1.  And it

6     would be Hidalgo 2005 municipal election with the SOS

7     date of 6/16/2005.  And the office was method of

8     returning marked ballot, unlawful assistance and

9     assisting voter.

10         Q.   And that would have included the nine individuals

11    that the allegations pertained to?

12         A.   Yes, sir.

13         Q.   And this is -- the allegation at least is, method

14    of returning marked ballots, unlawful assistance,

15    assisting voter, illegal voting.  Can you tell me what

16    the result of these allegations were?

17         A.   I believe nine defendants were charged with a

18    variety of those offenses.

19         Q.   Okay.

20         A.   By the grand jury.  They were indicted.  And the

21    district attorney prosecuted that case.

22         Q.   Go ahead.

23         A.   I believe each of the indictments were

24    subsequently dismissed by the local district attorney in

25    the interest of justice or for insufficient evidence.

Major Forrest Mitchell                                    June 15, 2012

                                                                    134

1          Q.   Okay.   So there were no convictions regarding
2     this matter?
3          A.   I don't believe so.
4          Q.   Okay.
5               MR. GEAR:   I think this is a good place to
6     stop.
7               MR. SWEETEN:   Okay.   Very good.
8               (Brief recess.)
9     BY MR. GEAR:
10         Q.   Back on the record.   Back from lunch.   All right.
11    I think we ended with Exhibit 590, which takes us up to
12    March 1st of 2006.   So I just want to ask you some
13    general questions about your spread sheet.   From 2002 to
14    March 1st of 2006, how many referrals, total, were
15    received in the office of the Attorney General?
16         A.   From 2002 to 2006?
17         Q.   Yes, sir.
18         A.   18 SOS referrals.
19         Q.   And what about other?
20         A.   That's not going to be as good of a number
21    because I can only distinguish elections prior to 2006,
22    so on the others, it would be two elections.
23         Q.   So 20 referrals between 2002 to 2006.   Is that a
24    fair estimate?
25         A.   Yes, sir.

135

1          Q.   Okay.   Out of those 20 referrals -- and that

2     would have included referrals from the Secretary of

3     State's office, as well as other sources as you've

4     testified here.   How many of those dealt with voter

5     impersonation?

6          A.   The one that I can definitely say dealt with

7     voter impersonation would be Melva Kay Ponce, through

8     Bee County.

9          Q.   And we've talked about that, correct?

10         A.   Yes, sir.   On the other cases that involved

11    mail-in ballot fraud, there were no other persons

12    charged with voter impersonation.

13         Q.   Okay.   Which leads me to my next question

14    between -- other than Ms. Ponce who, I understand your

15    testimony about.   Between 2002 and 2006, were there any

16    charges of voter impersonation?

17         A.   No, sir.

18         Q.   Were there any investigations of voter

19    impersonation?

20         A.   When we examine allegations of mail-in ballot

21    fraud, we sometimes have allegations that the voter

22    didn't cast the mail-in ballot and that someone assisted

23    them with their mail-in ballot or took their blank

24    mail-in ballot.   So there are potential cases that were

25    there.

136

1       Q.  And those, again, would have been under

2    chapter 86, not chapter 64 because they're dealing with

3    mail-in ballots?

4       A.  If you had a suspect who assisted a voter with

5    the mail-in ballot application and also the completion

6    of the ballot, and marked the ballot contrary to the

7    voter's intent or marked the ballot as if they were

8    themselves the voter as in the case of Melva Kay Ponce,

9    that would be under 64.

10       Q.  Okay.  And again, the question I have for you is,

11    that would have fallen under the by mail ballot system,

12    however?

13       A.  Yes.  You can commit illegal voting by -- you can

14    commit illegal voting by -- in the early voting mail-in

15    ballot portion, early voting polling place or actually

16    on election day itself.

17       Q.  Okay.  And so from 2002 to 2006 dealing with

18    early voting at the polling place, were there any

19    charges, referrals or allegations of voter

20    impersonation?

21       A.  No, sir.

22       Q.  Were there any prosecutions of voter

23    impersonation, either early voting, by mail ballot or at

24    the polling place between 2002 and 2006?

25       A.  By our office or the State of Texas as a whole?

137

1        Q.   Start with your office.

2        A.   No, sir.

3        Q.   Are you aware of any in the State of Texas as a

4    whole?

5        A.   No, sir.  Our data only represents what was

6    referred to the Attorney General's office.

7        Q.   Okay.  And as I understand your testimony, the

8    referrals come from a variety of sources?

9        A.   That's correct.

10        Q.   So going forward from 2006 to the end of 2011,

11    can you tell me how many referrals you received in your

12    office between 2006 to 2011?

13        A.   If you give me just a moment.

14        Q.   Sure.  I know it's going to take a little time.

15    Just for the record, I would indicate that the witness

16    is referring to his spread sheet.

17        A.   Did you say the end date was 2011?

18        Q.   Yes, sir.

19        A.   100 from the Secretary of State's office.

20        Q.   And other?

21        A.   Okay.  Since 2006, we each received approximately

22    160 allegations of misconduct in elections in that time

23    frame.

24        Q.   Total?

25        A.   168 from other sources outside of the SOS.

138

1                    MR. ROSENBERG:   168?

2          A.   168.

3          Q.   So total would be, if I'm counting correctly, 268

4    referrals between 2006 to 2011.  Is that yes?

5          A.   Of elections from that time frame -- in that time

6    frame, yes, sir.

7          Q.   And I assume you -- counting on your spread sheet

8    you counted to the end of 2011?

9          A.   I counted to 2010, 2009, 2008, 2007 elections.

10         Q.   And you counted 2011 elections, correct?

11         A.   The -- on the other category in the other sources

12    outside of the SOS, we didn't have any in 2011.

13         Q.   Okay.  Did you have any in 2011 for SOS?

14         A.   Yes, sir.  But I didn't count those.

15         Q.   You did not count those.  Go ahead and count

16    those as well?

17         A.   Eight SOS referrals in 2011.

18         Q.   So what does that take our total to, 268 plus

19    eight?

20         A.   268 plus eight?

21         Q.   Uh-huh.

22         A.   276.

23         Q.   276.  And that would represent all of the

24    referrals from any source to the OAG's office from 2006

25    to the end of 2011?

139

1          A.   Yes, sir, I believe so.

2          Q.   Did I state that right, because I'm just trying

3     to make sure I'm clear on it?

4          A.   There are some, if I may clarify?

5          Q.   Please.

6          A.   There are some elections, which I'm unable the

7     determine exactly what election actually it involved.

8     There were complaints about unspecified elections.   And

9     I did not include those.

10         Q.   Okay.  And where in the spread sheet are you

11    referring to?

12         A.   If you would look at Page 11 of the election code

13    referrals office of the Attorney General, 2002 to the

14    present.

15         Q.   Okay.

16         A.   Undetermined in Nueces County, undetermined in

17    Duval County.

18         Q.   I see what you're referring to.  So there are two

19    referrals that are undetermined?

20         A.   Well, on other pages there are as well, sir.

21         Q.   Why don't you go ahead and add those in as well.

22    As far as referrals are concerned.  I see one on

23    Page 10.

24         A.   Looks like it would be, maybe five.

25         Q.   Five?

Major Forrest Mitchell                                    June 15, 2012

1       A.   Yes, sir.

2       Q.   So adding those five to the 276, what is your

3  total?

4       A.   It would be 281.

5       Q.   So the 281 referrals, as I understand it,

6  represent all of the referrals from any source from 2006

7  to 2011, including undetermined election dates?

8       A.   That were received by the Texas Attorney

9  General's office, yes, sir.

10      Q.   Okay.  Out of those 281, can you tell me how in

11  were actually investigated?

12      A.   I can tell you that when I reviewed the number of

13  investigations that we conducted in the period from 2004

14  to present, the number is 186.

15      Q.   The present, including 2012?

16      A.   Correct, sir.

17      Q.   Okay.  So let's go with that for a minute.  You

18  said from 2002 or 2004 to the present?

19      A.   2004 to the present.

20      Q.   Okay.  So from 2004 to the present, kind of

21  throws off our other estimate of referrals, but there

22  have been 186 that have been investigated?

23      A.   Yes, sir.

24      Q.   How many of those have resulted in -- of the 186

25  resulted in charges?

141

1          A.   We referred 62 cases for prosecution.

2          Q.   Out of the 186 from 2004 to the present, how many

3     of those referrals dealt with voter impersonation?

4          A.   I have to go and count them on the spread sheet.

5          Q.   Please do.

6               MR. SWEETEN:   Can you read the question back

7     while he's doing that?

8               (Requested question was read.)

9     BY MR. GEAR:

10         Q.   I should be clear, how many of those were

11    allegations of voter impersonation?

12              MR. SWEETEN:   Same thing.  Do you understand

13    what he wants?

14         A.   Of the prosecutions?

15         Q.   (By Mr. Gear)  Of the -- of the 186 that were

16    received as -- I'm sorry.  I'm confused myself now.

17              MR. SWEETEN:   Investigations.

18    BY MR. GEAR:

19         Q.   Yeah.  Of the 186 investigations, how many of

20    those were allegations of voter impersonation?

21         A.   On the spread sheet that I maintain, voter

22    impersonation is included in the allegation of illegal

23    voting.  I would have to go through and count those as

24    well.

25         Q.   Help me understand when you're talking about

1        "illegal voting," that's under chapter 64?

2            A.   Yes, sir.

3            Q.   And chapter 64 has a multitude of different

4        potential violations.

5            A.   Yes, sir.

6            Q.   And is illegal voting a general term or is it a

7        specific allegation.

8            A.   It is a -- it is an offense title that includes

9        four different elements of -- four different ways to

10       commit that offense title.

11           Q.   Okay.  Is there any way to distinguish between

12       allegations of illegal voting versus allegations of

13       voter impersonation?

14                MR. SWEETEN:  On the spread sheet, Bruce?

15                MR. GEAR:  Well, I'm asking him in general.

16       BY MR. GEAR:

17           Q.   I'm just trying to understand how this is

18       inputted.

19           A.   It only is inputted if that clearly is

20       articulated in the referral source.  In many cases, the

21       Secretary of State's office just refers a case to us and

22       says here is an allegation of -- a violation of 64012,

23       illegal voting.  And some other referrals they break it

24       down exactly how the offense is committed, either

25       through voter impersonation, voting twice, being an

143

1    ineligible voter.  In other cases, especially those that

2    are referred to the DA or other persons, they don't

3    break that down in the referral document.  So this is

4    created off that referral document.

5         Q.   Okay.  So trying to move forward from the

6    referral, because we're talking about 2004 to the

7    present, correct?

8         A.   Yes, sir.

9         Q.   At some point is there a charging decision from

10   the OAG's office?

11        A.   Yes, sir.

12        Q.   How many of the -- this might be one step before

13   that.  But how many of the 186 referrals were

14   investigated as voter impersonation?  And let me narrow

15   that down even farther.  Were investigated as voter

16   impersonation at the polling place.  Can you identify

17   that?

18        A.   I can identify that the defendants who have been

19   charged for that are Jack Carol Crowder out of Harris

20   County.  Reyna Almanza out of Hidalgo County.  Lorenzo

21   Antonio Almanza out of Hidalgo County.  And I believe

22   Mary Comparin out of Bexar County.

23        Q.   So as I understand your testimony, there are four

24   individuals that have been charged with voter

25   impersonation between -- are you limiting this testimony

1       to 2004 to the present or are you going from 2002 to the
2       present?
3           A.   I'm going to from 2004 to the present.
4           Q.   Okay.  And so since we're going down this road,
5       were there any charged with voter impersonation at the
6       polling place between 2002 to the present?  And I
7       understand there are four that you already identified.
8       So I'm trying to get the total number of individuals
9       that were charged with voter impersonation at the
10      polling place between 2002 to the present.
11          A.   Of the cases that were referred to our office and
12      the Attorney General's office, yes.  I believe there are
13      four.
14          Q.   Okay.
15          A.   Total.
16          Q.   And those are the four you just identified?
17          A.   Yes, sir.
18          Q.   Would you say that the majority of the referrals
19      that come to your office are based on the by mail ballot
20      system?
21          A.   I wouldn't say majority, no.
22          Q.   What percentage would you say?
23          A.   I know that illegal voting represents -- I'm
24      sorry.  I did the numbers.  I remember that 133 of the
25      Secretary of State's referrals, approximately 60 dealt

145

1      with illegal voting of any type.

2          Q.   That's out of the 186 referrals?

3          A.   Well, the 133 would be part of the 186.

4          Q.   Okay.  Let's see if we can clarify this.

5          A.   Sorry.

6          Q.   We're getting into the numbers now.  So you said

7      133 and 186 would be part -- 133 would be part of 186.

8      What time period are we talking about?

9          A.   Of the spread sheet, would be 2002 to present.

10         Q.   And so the total number of referrals between 2002

11     to the present that were received by the OAG's office

12     would have been what number?

13         A.   The total number of SOS referrals in that time

14     frame was 133.

15         Q.   Okay.  And that's where the 133 came from.  And

16     then the total number of other referrals?

17         A.   I believe that number was 2 --

18         Q.   You gave me a number earlier of 276?

19         A.   Yeah.  That would be pretty close.

20                   MR. SWEETEN:  I'm sorry.  What is 276?

21                   MR. ROSENBERG:  Can we clear this up or

22     we'll go crazy.

23                   MR. GEAR:  Yeah, I know.  Right.  I know.

24                   MR. ROSENBERG:  Do you mind if I just -- to

25     get the numbers here's --

```
                                                                    146
 1                 MR. SWEETEN:  I don't mind.
 2                 MR. GEAR:  Go ahead.  That's fine.
 3                 CLARIFYING EXAMINATION.
 4       BY MR. ROSENBERG:
 5            Q.   The 133 include -- from the Secretary of State,
 6       includes 100 from 2006 to 2011; am I correct?  Just from
 7       the Secretary of State.
 8            A.   I believe the question earlier was 2006 to
 9       present or to 2011?
10                 MR. GEAR:  Yes.
11            A.   And I think that number I gave was, I believe
12       100.
13            Q.   (By Mr. Rosenberg)  Right.  The 133 is from 2002
14       to the present just from the Secretary of State?
15            A.   I believe that's correct, sir.
16            Q.   There were an additional 178 referrals that
17       weren't from the Secretary of State from 2002 forward,
18       which were based on two between 2002 and 2006?
19            A.   In 2005 there were two referrals from another
20       source.
21            Q.   168 between 2006 and 2011.  Non-referrals -- let
22       me say, not from the Secretary of State, not referrals
23       from the Secretary of State.
24            A.   As I can determine.
25            Q.   Eight from the 2011 election?
```

147

1        A.    Those would be SOS referrals.

2        Q.    Those were within the SOS.  Okay.  And five that

3    were undetermined?

4        A.    Yes, sir, I believe so.

5        Q.    So the total referrals from 2002 to 2000 -- to

6    date are 301?

7        A.    The number that I have in my head is, I think

8    around 320.

9        Q.    Okay.  So we're missing some.  That's the best I

10   can do.  I turn it back.

11              MR. SWEETEN:  Ezra, you were supposed to

12   clear this up.

13              BY MR. ROSENBERG:  I tried.  I tried.

14              FURTHER EXAMINATION

15   BY MR. SEAR:

16       Q.    So 320 is the number that is in your head, would

17   represent all referrals from any source that were

18   received from the OAG's office.  Is that accurate?

19       A.    One more time.  I'm sorry.

20       Q.    The 320 number that you said you had in your head

21   would be reflective of all of the referrals from any

22   source that were received by the OAG's office regarding

23   election code violations?

24       A.    Yes, sir.

25       Q.    And that would have been from 2002 to the

1       present, 2012?

2            A.   Yes, sir.

3            Q.   And so let's start from there since we've got

4       that number down.  So we've got 320 total referrals.  Of

5       those 320, how many were investigated?

6            A.   That's where the number -- I have to clarify.  I

7       have 186 investigations from 2004 to present.  And the

8       reason for that is the report system that we used.  I'm

9       able to query our report system that only goes back to

10      2004.

11           Q.   So then based on your testimony, is it fair to

12      say that you do not know the number of investigations

13      between 2002 up to 2004?  Let me ask that a different

14      way.  Are there files maintained somewhere that would

15      tell us what happened between 2002 and 2004 regarding

16      referrals?

17           .A.   I believe that the records retention for election

18      code offense, I believe is like five years.  And so I

19      only can give you a number of the number of

20      investigations that we conducted based on our report

21      writing system that goes from 2004 to present.

22           Q.   So again, not to belabor the point, I'm just

23      trying to make sure I understand your testimony.  If I

24      was to ask you or anyone within your office to go back

25      and look at either electronic files or paper files for

149

1     investigations between 2002 to 2004, you would not be

2     able to do that?

3          A.   I don't know.

4          Q.   Is it fair to say that in preparation for this

5     deposition you didn't look at any files, either

6     electronic or paper, between 2002 up to 2004?

7          A.   I was able to query all of our election cases

8     which was through our system -- which showed me cases

9     from 2004 to present.

10         Q.   So is that a yes or no?  I'm sorry.

11         A.   I did not look at any files -- investigative case

12    files from 2002 to present -- or to 2004.

13         Q.   So we're still working with the 320 number, which

14    would be reflective of 2004 to the present, correct?

15         A.   No.  Actually that number would be -- that time

16    frame -- the 320 encompasses --

17         Q.   2002?

18         A.   2002 to the present.

19         Q.   Now, I'm sorry.  I talked over you.  That was

20    2002 to the present?

21         A.   Yes, sir.

22         Q.   I think we're getting there.  All right.  So of

23    the 320 referrals from all sources to the OAG's office

24    from 2002 to the present, how many of those were

25    investigated?

150

1          A.   I believe 186.

2          Q.   Okay.  Of those 186 referrals that were

3     investigated from 2002 to the present, how many of those

4     dealt with voter impersonation at the polling place?

5          A.   I can clearly identify four.

6          Q.   And you've done that already on the record?

7          A.   Yes, sir.

8          Q.   Other than those four, are you aware of any

9     others?

10              MR. SWEETEN:  And you're asking allegations,

11     just so I'm clear.

12              MR. GEAR:  No.  I'm asking about

13     investigations.

14              MR. SWEETEN:  Investigations.  Okay.

15          A.   There are more.  But those four are the ones that

16     were charged.  I do not know the number off the top of

17     my head for the other ones that weren't charged.

18          Q.   (By Mr. Gear)  And as we've -- as you've

19     testified before, that a referral can come into your

20     office and not result in a charge, correct?

21          A.   That's correct.

22          Q.   And that they can come in your office and not be

23     supported by, either the facts of the law, would that be

24     accurate?

25          A.   That's correct.

151

1          Q.   Which would be a reason not to charge?

2          A.   That's correct.

3          Q.   Okay.  So -- and now you've used the term "those

4     are the four,"and you're talking about Mr. Crowder,

5     Mary Comparin and can you remind me of the other two

6     names?

7          A.   Reyna Almanza and Lorenzo Antonio Almanza.  I

8     think his name was junior.

9          Q.   Okay.  Let's first start with Mr. Crowder.  Can

10    you tell me when that investigation occurred?  For the

11    record, the witness is referring to his spread sheet.

12    And I just direct your attention to Page 3 of the Texas

13    code of referrals to the office of Attorney General

14    prosecutions resolved, Bates stamped TX 00056820.  I

15    believe it's the third.

16         A.   Right.  This case was referred to our office by

17    the Secretary of State's office.

18         Q.   And when was it referred?

19         A.   It would have been -- the SOS document date was

20    1/14/09.  I mean, the date of the referral from the

21    Secretary of State's office was January 14, 2009.

22         Q.   2099.  What election --

23         A.   I'm sorry.

24         Q.   Go ahead.

25         A.   It involved the 2008 and 2000 -- primary and

1    general elections.

2        Q.   From the spread sheet referring to Page 3, I see

3    it indicates the primary election.  Where do you pick up

4    the general election?

5        A.   Because that's the actual election that he was

6    charged for illegally voting in and impersonating in.

7        Q.   In the general election?

8        A.   The actual referral indicates there were deceased

9    voters voting both the general and primary elections.

10       Q.   And is that indicated in the spread sheet?

11       A.   It's indicated -- yes, sir.  In the referral

12   spread sheet.

13       Q.   And which page is that?

14       A.   That would be Page 3 of the referral sheet,

15   spread sheet.

16       Q.   Can you tell me which --

17       A.   The -- eight from the bottom.  And it says,

18   "Harris 2008, primary and general elections, 1/14/09,

19   deceased voters voting."

20       Q.   And how do you know that this deals with

21   Mr. Crowder?

22       A.   Because that -- I just know that that's the

23   referral that we got which we initiated the

24   investigation at which Jack Carol Crowder was

25   subsequently charged.

153

1      Q.   Okay.  And so can you tell me what the facts are
2      for that case?
3           A.   A group of citizens had obtained voter
4      registration records and then compared that to the
5      actual voting records in those two elections.  And they
6      had come up with a list of names that they suspected
7      were potential dead persons voting.  They then presented
8      that information to the Secretary of State's office who
9      evaluated and then sent it to us for investigation.
10          Q.   And the group of citizens that you're referring
11     to?
12          A.   I'm sorry.  I don't know their name.
13          Q.   Was it an actual group that made this referral or
14     was it -- or are you just referring to that, generally a
15     group of citizens?
16          A.   I believe the SOS referral itself actually says
17     the name of the group.
18          Q.   Is that indicated anywhere in your spread sheet?
19          A.   No, sir.
20          Q.   Do you know if that name would have been the King
21     Street Patriots?
22          A.   No, I don't believe that was it.
23          Q.   But as you sit here today, you don't know the
24     name of the group?
25                    MR. SWEETEN:  Objection' asked and answered.

Major Forrest Mitchell                              June 15, 2012

154

1      A.  No, sir, I do not know the name of the group.

2      Q.  (By Mr. Gear)  So they conducted their own, I

3   guess informal investigation, and referred it on to the

4   Secretary of State's office.  Can you tell me what the

5   facts are of the case?

6      A.  Yes, I can.  Jack Carol Crowder -- Jack Carol

7   Crowder's father died preceding the election and his

8   son, Jack Carol Crowder also, used his voter

9   registration card to vote in that election.  The

10  investigation revealed that at no time did Jack Carol

11  Crowder attempt to register to vote, either through the

12  signing up for his Texas driver's license or by actually

13  completing a voter registration card.  And he was

14  interviewed and advised that he didn't complete a voter

15  registration card.  He thought that he had asked to be

16  registered on his Texas driver's license.

17     Q.  So let me flesh out the facts now.  Jack Carol

18  Crowder, the individual who voted, has the same last

19  name as his father who was deceased?

20     A.  That is correct.

21     Q.  And the same first name as well?

22     A.  That's correct.

23     Q.  Is there any difference in the Jack Carol

24  Crowder, Jr., Jack Carol Crowder the third --

25     A.  I think Jack Carol Crowder the actual suspect is

155

1      the third.

2           Q.  Okay.  And do you know if the father has -- what

3      is the suffix on his last name?

4           A.  I don't remember.

5           Q.  Okay.  And you said that he presented some form

6      of identification when he voted?

7           A.  No, sir.  He presented his deceased father's

8      voter registration certificate.

9           Q.  And is that indicated anywhere here on your

10     spread sheet?

11          A.  No, sir.

12          Q.  And how would I know -- how would I determine

13     exactly what happened on the day of that election?  Are

14     there documents, reports that are available that would

15     clarify that?

16          A.  Yes, sir.  The combination form that was used at

17     the polling place indicates the kind of documentation

18     that the voter used to sign up at the polling place.  It

19     generally indicates if they presented a voter

20     registration certificate or some other form of ID.  I

21     believe the charging document itself, the indictment

22     that Jack Carol Crowder -- it actually mentions that he

23     used his father's voter registration certificate to cast

24     a ballot in that election as well.

25          Q.  Did you actually conduct this investigation?

156

1        A.   No, but I assisted in it.

2        Q.   What was the basis of the group believing or

3   attempting to determine that Mr. Crowder may have been

4   using a deceased voter certificate, in this case his

5   father's?

6        A.   I don't know what the group -- or why they did

7   what they did.

8        Q.   And he was ultimately indicted?

9        A.   Yes, sir.

10       Q.   What was he indicted for?

11       A.   The Harris County district attorney's office

12  indicted him for illegal voting, for impersonating his

13  deceased father.

14       Q.   Was there a resolution to the case?

15       A.   Yes, sir, there was.

16       Q.   And what was the resolution?

17       A.   He pled guilty to one count of fraudulent use of

18  identifying information and received one-year deferred

19  adjudication and a $200 fine.

20       Q.   Fraudulent use of -- did you say of information?

21       A.   Fraudulent use of identifying information.

22       Q.   What chapter would that have been under?

23       A.   That's actually in our Texas penal code.

24       Q.   And can you explain that for those of us who

25  don't know?

157

1      A.   Yes, sir.   If a person possesses identifying

2    information of another and uses it with intent to harm

3    or defraud, they can be charged under the penal code as

4    well.   And identifying information under Texas law would

5    be a unique identifying number to that person, such as a

6    Texas driver's license, voter identification number, a

7    Texas voter ID, a social security number or a date of

8    birth.

9      Q.   So as I understand it, there was no conviction

10   under chapter 64, which as I understand it, identifies

11   voter impersonation?

12     A.   No, sir.   He pled guilty to possession and use of

13   identifying information.

14     Q.   And again, would that have been under chapter 64?

15     A.   No, sir.   That's a penal code offense.

16     Q.   This may be a silly question, but I'm just trying

17   to understand the range of this.   What would be the

18   basis of pleading under the penal code versus pleading

19   under the election code?

20     A.   It would be speculation on my part.   I don't know

21   why Harris County made the decision to reduce the

22   offense.   But illegal voting is a third degree felony

23   and -- which is punishable by up to two to 10 years in

24   the State penitentiary.   And a person who has no

25   criminal history whatsoever, might be charged for a

Major Forrest Mitchell                                    June 15, 2012

                                                                    158

1      lesser offense for reduced punishment based on the fact

2      that they had no prior criminal history?

3          Q.  Okay.  So it was the result of a plea agreement,

4      essentially?

5          A.  I believe so, yes, sir.

6          Q.  Do you know what the punishment or the penalty

7      was for his violation?

8          A.  He pled to one year deferred adjudication and a

9      $200 fine.  So with that one year deferred adjudication

10     he probably had to report to a community supervision

11     department for the period of a year.

12         Q.  So the deferred adjudication means there was no

13     actual conviction?

14         A.  At the successful completion of a deferred

15     adjudication there's no final conviction; that's

16     correct.

17         Q.  Did he successfully complete his period of

18     deferred adjudication?

19         A.  I'm sorry.  I don't know that, standing here

20     today.  I don't know.

21         Q.  If he didn't successfully complete it, what would

22     have happened?

23         A.  If he didn't successfully complete it, he would

24     have been adjudicated and he could be forced to serve

25     the entire year in the county jail.

159

1      Q.   Are you aware of whether or not Mr. Crowder ended
2  up serving any time in jail?
3      A.   I'm not aware.
4      Q.   So the end result in this is, if I understand
5  your testimony, if he successfully completed the
6  deferred adjudication, then he would not have been
7  convicted of a crime?
8      A.   That's correct.
9      Q.   You also said Mary Comparin.  Can you tell me,
10  based on your spread sheet, when that referral came into
11  the office?
12     A.   This referral is going to be found in the other
13  category, as it was referred by law enforcement.  And so
14  I don't have a date in the spread sheet that says the
15  actual date of the referral.
16     Q.   What page are you referring to, if any?
17     A.   If you'll just give me a moment I'll look for it.
18     Q.   Sure.
19     A.   I believe I'm referring to Page 9 of the election
20  code referrals of the office of Attorney General, 2002
21  to present.  That says, "Bexar multiple primary and
22  general elections, other illegal voting."
23     Q.   And again, how do you know that this particular
24  referral deals with Mary Comparin?
25     A.   Because the DPS trooper who discovered this case

1        referred it directly to me.

2            Q.   Which county did this come out of?

3            A.   Bexar County.

4            Q.   And again, we don't know which election?

5            A.   It was multiple elections.

6            Q.   Do you know the year of these elections?

7            A.   If I could explain the facts, I probably could.

8            Q.   Go ahead, please.

9            A.   Mary Comparin was discovered by the Texas

10       Department of public safety, as through the Texas

11       driver's license image system had developed multiple

12       identities in her own name.  And the DPS trooper who

13       discovered this also discovered that in the -- in those

14       identities, she was voting in multiple elections.  Every

15       election that basically took place she would vote two to

16       three times.

17           Q.   You're saying, "every election that took place."

18       I'm trying to understand the time frame in which you're

19       talking about.  Do you know the elections she allegedly

20       voted in?  And I understand the spread sheet to say,

21       "multiple primary and general elections."  But do you

22       know the actual elections that she allegedly voted in?

23           A.   I know what we charged her for.  And I believe it

24       was the -- based off the spread sheet, she was charged

25       for voting in the 2008 general election.

Major Forrest Mitchell                                    June 15, 2012

161

1      Q.   You said, "2008 general"?

2      A.   Yes.

3      Q.   And you refer to your spread sheet.  Do you see

4   Ms. Comparin's name on here anywhere?

5      A.   Yes, sir.  It's on Page 1 of charges pending

6   resolution.

7      Q.   Would this charge still be pending at this point?

8      A.   Yes, sir, it is.

9      Q.   And she was charged with illegal voting?

10     A.   Yes, sir, in that election.

11     Q.   And is this set for trial?  Can you tell me where

12   it is in the process?

13     A.   I think she's currently been found by the court

14   as -- I don't know exactly the term.  But she's --

15     Q.   Give it a shot.

16     A.   Mentally incompetent.

17     Q.   That would be a legal term.  Do you know if this

18   case -- if there's any intention to proceed to trial in

19   this case?

20     A.   I think that we have to -- the State has to find

21   that she is competent through a court before it can

22   proceed to trial.  I think they have regular settings to

23   determine that.

24     Q.   And have you gone through that process?

25     A.   I personally haven't.  But I believe that the

Major Forrest Mitchell                                    June 15, 2012

162

1    prosecutor assigned has.

2         Q.   What was the end result of that?

3         A.   I think she's been found incompetent.

4              MR. SWEETEN:  Bruce, I'm going to, at this

5    point, I'm going to designate any discussion of an

6    active case, Ms. Comparin's case as under the protective

7    order, just this section related to questioning on her.

8    BY MR. GEAR:

9         Q.   Let's move forward to the next -- there's two

10   left, correct?

11        A.   Yes, sir, I believe so.

12        Q.   And did you say Almanza?

13        A.   Almanza.

14        Q.   Almanza.  Can you tell me when that referral came

15   into your office?

16        A.   I believe it was in 2009.

17        Q.   Can you tell me what page you're referring to on

18   your spread sheet?

19        A.   It would be Page 10 of the election code

20   referrals of the office of the Attorney General, 2002 to

21   the present.  And it would be the first entry, Hidalgo

22   2009 school district election, voter -- illegal voting.

23        Q.   Is this case still pending?

24        A.   There are actually two cases.  One of the cases

25   is pending.

163

1          Q.   Okay.   Well, let's break that out.   You said
2     there's two cases.   Did both of them deal with the 2009
3     school district election?
4          A.   Yes, sir, they did.
5          Q.   And they both deal with Mr. Almanza?
6          A.   Lorenzo Antonio Almanza, Jr.
7          Q.   Junior, okay.
8          A.   And his mother, Reyna Almanza.
9          Q.   And what are the facts for that case or those
10    cases, I guess properly stated?
11         A.   Lorenzo Almanza and his mother went into the
12    Progresso school district to vote in that election.
13    Lorenzo Almanza had already voted days prior to that
14    election and used his brother's voter registration
15    certificate to cast a second ballot in that election.
16    His brother was an ineligible voter because he was
17    incarcerated in San Antonio for a felony offense at the
18    time.
19         Upon presenting the card to the elections
20    official, a poll watcher who was present recognized the
21    name of the person who was presenting themselves to vote
22    with the card and said that's not that person.   The
23    election judge actually contacted the county elections
24    department to determine what to do because he wasn't
25    familiar what to do in such a circumstance.   And the

1      elections department told the election judge at the
2      polling place, since he's presented a lawful voting
3      registration certificate he must be allowed to vote.
4           The poll watcher was emphatic that he wasn't the
5      person and Reyna Almanza, the mother, interjected
6      herself and vouched for his identity as being Lorenzo
7      Antonio -- or Orlando Almanza, his brother.
8           Q.   So Reyna Almanza, the mother, has not been
9      charged with voter impersonation?
10          A.   No.  She was charged as a party to and illegal
11     voting impersonation.
12          Q.   So as far as -- as for as Mr. Almanza, that's
13     still an allegation at this point, correct?
14          A.   Yes, sir.  He was indicted and he is currently
15     awaiting trial.
16          Q.   Do you know the trial date?
17          A.   No, sir.  He was subsequently rearrested for a
18     federal violation.  And so I think he's in the custody
19     of the US government at this time.
20          Q.   Is there a scheduled trial date that you're aware
21     of?
22          A.   No, not that I'm aware of.
23          Q.   When you say, "he's in the custody of the US
24     government," is he in state, out of state?
25          A.   I believe he is, the last check I heard, he was

165

1     in the South Texas federal detention facility.

2                 MR. SWEETEN:  Again, because this is an open

3     case, I'm going to designate this portion of the

4     testimony, the specifics about it as eyes only,

5     protective order.

6     BY MR. GEAR:

7         Q.  At this point I think we went through all four.

8     But let me just if back to the mother.  And her first

9     name, again, was?

10        A.  Reyna Almanza.

11        Q.  Okay.  So she was charged as a party to, but did

12    not actually, based on the allegations, cast a vote in

13    someone else's name.  Is that accurate?

14        A.  Yes.  She did not cast a ballot in that election.

15        Q.  She didn't vote at all in that election?

16        A.  I don't know at this time, sir.

17        Q.  Did she attempt to vote at all during that

18    election?

19        A.  I'm not sure she's a US citizen.

20        Q.  I don't know if that answers the question.  Are

21    you aware of whether or not she attempted to vote?

22        A.  I didn't look.  I don't know.

23        Q.  So in summary, I believe you said the total from

24    2002 to the present is 320 referrals, correct?

25        A.  Yes, sir, I believe that's correct.

166

1          Q.   And out of those 320 referrals, there have been
2      four charges of voter impersonation at the polls, if I
3      understand your testimony correctly?
4          A.   Yes, sir.  I believe there have been four charges
5      at the polling place.
6          Q.   And actually, one of those charges was a party
7      to, and that person did not, in fact, attempt to cast a
8      ballot as you know, as you sit here?
9          A.   I don't know if she did or not.
10         Q.   Out of the four charges, how many convictions
11     have there been for voter impersonation at the poles?
12              MR. SWEETEN:  Does that include pleas or are
13     you talking about convictions only by jury?
14              MR. GEAR:  Let's make it a general question
15     including pleas.
16     BY MR. GEAR:
17         Q.   How many of the four charges have actually
18     resulted in a conviction, including a plea of voter
19     impersonation at the polling place?
20         A.   The only person that comes to mind is Reyna
21     Almanza as voter impersonation.
22         Q.   Has that gone to trial?
23         A.   Oh, yes, sir.
24         Q.   What was the result of that trial?  I'm sorry.  I
25     might have glazed over that one?

Major Forrest Mitchell                           June 15, 2012

167

1          A.   She was convicted by a jury in Brooks County on

2     November 16, 2011 and sentenced to two years in prison,

3     which was suspended for five years of probation.  And as

4     a condition of the punishment, she was ordered to serve

5     90 days in jail, and as a condition of the probation

6     just pay $313 in court costs.

7          Q.   Which page of the spread sheet are you referring

8     to?

9          A.   I'm referring to the election code referrals

10    office of the Attorney General's prosecution resolve.

11    And I'm referring to Page 4, Reyna Almanza is the third

12    from the bottom.

13         Q.   I apologize.  Can you tell me the facts of this

14    case?

15         A.   That is the mother who interjected herself on

16    behalf of her son who was committing the voter

17    impersonation.

18         Q.   And she was charged as party to?

19         A.   Yes, sir.  And if I may clarify one thing.

20         Q.   Please.

21         A.   I left off Delores McMillian.  She, too, was

22    charged with voter impersonation or attempted voter

23    impersonation.

24         Q.   And she appears on Page 4 of your spread sheet

25    for --

Major Forrest Mitchell                                    June 15, 2012

168

1        A.   Yes, sir.

2        Q.   Prosecutions resolved?

3        A.   Yes, sir.

4        Q.   Can you tell me, just so we're clear, Delores

5   McMillian, was the election that the referral came from

6   is the 2010 primary election?

7        A.   In Dallas County.  Correct, sir.

8        Q.   In Dallas County.  Actually, Dallas

9   County/Rockwell as I see it here?

10       A.   The two counties, under Texas State law, when you

11   prosecute an election code offense, you can take it to

12   an adjoining county.

13       Q.   Okay.  And so can you tell me exactly what the

14   charges were for Delores McMillian?

15       A.   She was charged for attempted voter imperson --

16   she was charged for attempted illegal voting, voter

17   impersonation.

18       Q.   All right.  And can you tell me what the facts of

19   this case are?

20       A.   Delores McMillian and her mother, who is now

21   deceased, are both elections officials working at a

22   polling place in Dallas County during that election.

23   Both Delores and her mother used other voter's

24   information to cast ballots on behalf of those -- on

25   behalf of these other people.

Major Forrest Mitchell                                    June 15, 2012

169

1          Q.   Are we talking about at the polls or by mail?

2          A.   At the polls.

3          Q.   Okay.  I'm not clear on the facts.  You say,

4     "they used other people's information to cast ballots at

5     the poles."  Can you clarify that for me?

6          A.   Yes.  Their voter -- their voter registration

7     numbers.

8          Q.   And how did they -- how did they do this?

9          A.   I don't know off the top of my head.

10         Q.   Is there a file that would clarify that?

11         A.   Yes, sir.  There's an investigative file that

12    would be able to clarify that.

13         Q.   And was there a plea in this case?

14         A.   Yes, sir, I believe so.

15         Q.   And what was the plea?

16         A.   She pled guilty to one count of attempted illegal

17    voting and served -- was sentenced to one year probation

18    and paid $227 in court costs.

19         Q.   So you said they used other people's voter

20    registration -- their registration information.  Am I

21    saying that correctly?

22         A.   Yes, sir, I believe so.

23         Q.   How many people are we talking about that were

24    involved in this?

25         A.   I believe Delores used one person's identity.

Major Forrest Mitchell                              June 15, 2012

170

1     And I do not remember how many her deceased mother used.

2     She died during the course of the investigation.

3         Q.   So that allegation was never proven?

4         A.   She was never charged for it.

5         Q.   Do we know the name of the voter that Delores

6     allegedly used?

7         A.   I don't know the name today.

8         Q.   Do you know how she obtained the voter

9     registration information or the voter's information?

10        A.   I'm sorry.  I don't know right now.

11        Q.   And when you say, "attempted illegal voting," do

12    you know if she actually cast a ballot?

13        A.   It was actually stopped by a fellow elections

14    worker.

15        Q.   And can you tell me the facts behind that?

16        A.   No, sir, I can't.  Other than to say that I

17    believe the other elections worker discovered that these

18    names appeared on the list prior to the opening of the

19    polling place.

20        Q.   When you say, "the list," are you talking about

21    the voter registration polls?

22        A.   No, sir.  The combination form at each polling

23    place.  And in Texas when a voter presents themselves to

24    vote, there is a combination form which election

25    officials complete and then the voter has to sign.  And

1      you either have to provide the certificate or some other

2      form of identification for that purpose.  So I'm

3      referring to the combination form.

4          Q.  So in the case where you have an election

5      official using -- impersonating another voter, is that

6      something that would be prevented by -- if SB 14 was

7      implemented?

8                  MR. SWEETEN:  Objection; calls for

9      speculation.  You can answer.

10     BY MR. GEAR:

11         Q.  You can answer.

12         A.  I don't know.

13         Q.  But when you've got the election official who is

14     in charge of attempting to identify and prevent voter

15     impersonation, actually engaging in the voter

16     impersonation, who, if anyone, is left to prevent that

17     from happening?

18                 MR. SWEETEN:  Same objection.

19         A.  I don't really know.

20         Q.  (By Mr. Gear)  Delores pled guilty to illegal

21     voting.  Do you know what chapter she entered a plea

22     under?

23         A.  64012.

24         Q.  So was the ultimate conviction voter

25     impersonation?

Major Forrest Mitchell                              June 15, 2012

172

1        A.  It's attempted illegal voting, voter

2   impersonation.  I'm sorry.  If I could clarify.  The

3   judgments -- the judgments sometimes say the entire

4   title of the offense or sometimes just give the title.

5   In other words, illegal voting chapter 64012.  Didn't

6   break it down to Section 1, an ineligible voter,

7   Section 2, voting twice in an election, Section 3,

8   marking a ballot contrary.  So I believe the judgment

9   says attempted illegal voting.

10       Q.  Are there any of the four that you've actually

11  identified here today that actually have a judgment that

12  indicates voter impersonation?

13       A.  I would have to looking back at the judgments and

14  sentence.

15       Q.  Of the five.  I'm sorry.  Of the five you added

16  additional?

17       A.  I'm sorry, sir.  I would have to go back and look

18  at the judgments and sentences.

19       Q.  So as you sit here today, you don't know?

20       A.  Yes, sir.

21       Q.  Why don't we take a quick break if you don't

22  mind?

23            MR. SWEETEN:  In the break, can we get a

24  copy of this?  So I can look at it, too.

25            MR. GEAR:  Sure.

Major Forrest Mitchell                                    June 15, 2012

173

1                    (Brief recess.)

2       BY MR. GEAR:

3           Q.   Back on the record.   Does the OAG's office have

4       primary jurisdiction or direct jurisdiction over voter

5       impersonation cases?

6           A.   I believe it has, going back to what I kind of

7       testified earlier, it depends on the type of election

8       that's conducted.   A single jurisdiction versus a

9       multi-jurisdiction case.   I think the attorney general's

10      office, under the Texas election code, can advise a

11      district attorney that they would be conducting the

12      prosecution.   I think that the attorney general's

13      office, under the chapter 273, can direct a DA or county

14      attorney to assist in the prosecution of the case as

15      well.

16          Q.   So as I understand your testimony, out of all of

17      the referrals that have been received by the OAG's

18      office, there have been five that were in some form

19      voter impersonation?

20          A.   Yes, sir.

21          Q.   At the poles; is that correct?

22          A.   Yes, sir.

23          Q.   Are you aware of any investigations of voter

24      impersonation that did not -- that were not referred to

25      the OAG's office?

Major Forrest Mitchell                          June 15, 2012

174

1        A.   Yeah.   I'm only aware of cases that were referred
2    to our office.
3        Q.   And again, when we're talking about referrals,
4    we're talking about from multiple sources?
5        A.   Yes, sir.
6        Q.   Including police departments, correct?
7        A.   Yes, sir.
8        Q.   Local election officials?
9        A.   Yes, sir.
10       Q.   Local DA's and prosecutor's?
11       A.   Yes, sir.
12       Q.   Are you aware of any convictions of voter
13   impersonation other than the five cases that we've --
14   you've talked about here today, on the record?
15       A.   Yeah.   I don't really think there is a way to
16   know because I don't think -- you know, DA's offices
17   across the state don't report their -- don't report
18   their prosecutions to our office.   So I don't know any
19   other cases in Texas.
20       Q.   Well, let me explore that for a second.   At some
21   point there was an initiative that reached out to at
22   least 44 different counties or populations over 100,000
23   or more, correct?
24       A.   Yes, sir.
25       Q.   And did you -- "you," meaning your office.   Did

Major Forrest Mitchell                                    June 15, 2012

175

1    you create a referral system with the 44 different
2    counties?  Did you set up a way to communicate with them
3    regarding voter fraud in the State of Texas?
4         A.   If my memory serves me correctly, we took a look
5    at the referrals that our office had and then looked at
6    them geographically and divided the state based upon the
7    council of government divisions.  Because our hope was
8    to utilize the council of governments to help facilitate
9    the training.
10        Q.   And so just so I'm clear, on the record, "the
11   council of governments," what is that?
12        A.   Council of government is -- I don't know if it's
13   an actual political subdivision of the State.  But it is
14   a -- it is a group of counties and municipalities that
15   work together through a council of governments to share
16   resources.
17        Q.   And when you talked -- or when you discussed the
18   initiative, was there any specific training given to the
19   council of governments?
20        A.   No.  When I mentioned the council of governments,
21   we were hoping to -- council of governments provide a
22   lot of law enforcement training throughout the state.
23   And many of them actually have their own police
24   academies.
25        Q.   Okay.

Major Forrest Mitchell                          June 15, 2012

176

1      A.   Which are State subsidized.  So we were hoping to

2   utilize their academies to help facilitate the training.

3      Q.   And did you?

4      A.   Yes, sir.

5      Q.   So as you sit here today, other than the five

6   that you've testified about, the five voter

7   impersonation cases that you've testified about, you're

8   unaware of any others?

9      A.   Yes, sir.  I don't have any knowledge of any

10   cases that the local DA's have prosecuted.

11      Q.   Have you attempted to determine if there's been

12   any prosecutions by local DA's regarding voter

13   impersonation claims?

14      A.   No, sir.

15      Q.   Have you attempted, and "you," being your office,

16   have you attempted to set up a system by which the local

17   DA's and prosecutors report to your office regarding

18   voter claims in general?

19      A.   No, sir, not that I'm aware of.  I would say that

20   it's statutorily required that if a DA's office is going

21   to do an investigation, that they notice the Secretary

22   of State's office if it involves a case.

23      Q.   Okay.  And so when the Secretary of State's

24   office is noticed, that may, in fact, result in a

25   referral to your office?

177

1      A.   No, it wouldn't.

2      Q.   Can you tell me what the process is?

3      A.   If a local DA advises the Secretary of State's

4   office that they're going to investigate and prosecute a

5   case, it wouldn't generate a referral.  Because we limit

6   to those cases that -- the SOS, I believe, would refer a

7   case to us if the local jurisdiction wasn't going to

8   handle it.

9      Q.   Would -- I understand that it may not necessarily

10  generate a referral.  Would it generate communication

11  between the Secretary of State's office and your office

12  regarding that potential prosecution?

13     A.   No, sir, I don't believe so.

14           (Exhibit No. 591-592 was marked.)

15  BY MR. GEAR:

16     Q.   I'm showing you what's been marked as

17  Exhibit 591.  Take a look at it and then once you've had

18  a chance to review it, we can talk about it.

19     A.   Do you want me to read the whole thing.

20     Q.   No.  And actually, why don't I ask you the

21  question.  Have you seen this report before?

22     A.   No, sir.

23     Q.   Do you know what this is?

24     A.   It's titled the House Committee on elections

25  Texas House of representative interim report.  A report

Major Forrest Mitchell                          June 15, 2012

178

1     to the Texas House of -- to the House of

2     Representatives, 81st Legislature.

3         Q.   And I direct your attention to Page 37, where it

4     says prosecution rates and fraud in Texas.

5              MR. SWEETEN:   Counsel, is this excerpted.

6     This isn't the full thing; is that right.

7              MR. GEAR:   I do not believe it's the full

8     thing.

9              MR. SWEETEN:   So we've got an excerpted.

10    Okay.  Page 37, now.  Is that what you said.

11             MR. GEAR:   Yes.

12    BY MR. GEAR:

13        Q.   Who is Eric Nichols?

14        A.   Eric Nichols used to be the deputy for the office

15    of the Attorney General.

16        Q.   Have you ever had any communications with Eric

17    Nichols regarding voter fraud?

18        A.   Oh, yes, sir.  He would have been my supervisor.

19    He supervised all criminal justice divisions within the

20    office of the attorney general.

21        Q.   And he supervised prosecutions of voter fraud

22    claims?

23        A.   Yes, sir.

24        Q.   And when would he have been your supervisor, if

25    you can give me the dates?

Major Forrest Mitchell                                    June 15, 2012

                                                                    179

1          A.   I believe he would have been the Deputy Attorney

2     General for the office of the attorney general from 2010

3     to 2007, is my best guess.

4          Q.   Were you aware that he provided testimony in 2008

5     before the House Committee on elections?

6          A.   I wasn't aware that he provided testimony to the

7     House Committee.

8          Q.   Were you aware that he provided testimony

9     regarding prosecution rates of voter fraud in the State

10    of Texas?

11         A.   I know that he provided testimony to the Senate

12    Committee in 2009.

13         Q.   Okay.  Not so much asking you about the -- have

14    you seen this document.  I really want to focus on the

15    substance of his testimony and ask you a few questions

16    about that.  On the -- in the second paragraph,

17    prosecution rates and fraud in Texas, do you see where

18    it says, "that what the committee found is most election

19    fraud happened in Texas occurs with the absentee or

20    mail-in ballot system."  Do you agree with that

21    statement?

22         A.   I would -- actually, I don't know that I can

23    totally agree with that statement.

24         Q.   Why not?

25         A.   Because that's just the offenses that we have

Major Forrest Mitchell                          June 15, 2012

180

1    detected and prosecuted.
2        Q.   So specifically dealing with referrals to the
3    OAG's office, would you agree that the majority of the
4    referrals deal with the by mail ballot system?  And I
5    understand that there could be a variety of violations
6    within that system.
7        A.   To me, a majority means more than 50 percent.
8    And I don't know that the main-in ballot fraud
9    represents 50 percent or more of our election code
10   referrals.  I do believe that it is a significant
11   portion of the referrals.
12       Q.   Well and you -- you maintain the spread sheets?
13       A.   Yes, sir.
14       Q.   You update it whenever a referral comes in, and I
15   believe you testified to monthly?
16       A.   Yes, sir.
17       Q.   If you looked at your spread sheet, could you
18   tell me what percentage of the cases involved deal with
19   the by mail ballot system?
20       A.   Yeah.  I could go through and do a quick analysis
21   or an analysis.  I don't know how quick.
22       Q.   Well, in looking at your spread sheet, could you
23   give me a general number, percentage?
24       A.   I would say it's probably close to 50 percent.
25   It's not a majority, but it's close.

181

1         Q.  Okay.  And so the other 50 percent, what would

2    you say that...

3         A.  That comprises illegal voting as a whole.  And

4    then other types of poll place violations.  And then

5    election misconduct by actual elections officials,

6    campaign finance violations, those kinds of things.

7         Q.  So the charge of voter impersonation at the

8    polling place, what percentage would you say that makes

9    up of the 320 referrals that you've received in the

10   OAG's office?

11        A.  A small portion.

12        Q.  Five to be exact?

13        A.  Five.

14        Q.  Do you see the very next paragraph, "another

15   highly controversial topic brought up during the hearing

16   was the debate of whether or not illegal aliens or

17   illegal non-citizens were voting?"  And again, that's

18   Page 37.

19        A.  Yes, sir.

20        Q.  Were you aware of this controversy?

21        A.  Yes, sir.

22        Q.  Were you involved in any communications regarding

23   the controversy that illegal aliens -- illegal

24   non-citizens were voting?

25        A.  Could you repeat that one more time?

182

1    Q.   Were you involved in any communications regarding
2    the controversy as to whether or not illegal aliens or
3    legal non-citizens were voting?
4         MR. SWEETEN:   Objection; foundation.
5    Objection; scope.  Go ahead.  You can answer.
6    A.   I guess you would have to ask me communications
7    with who.
8    Q.   (By Mr. Gear)  Well, and that's why I
9    intentionally stated it broadly.  To find out if you
10   were first involved in any communications regarding this
11   topic.  And then if it will help, I will narrow that
12   down.
13   A.   Our investigations have revealed non-citizens and
14   illegal aliens casting ballots in elections.
15   Q.   Okay.  And so based on your referrals, can you
16   tell me, out of the 320, how many dealt with
17   non-citizens voting or illegal non-citizens voting?
18   A.   I do know that -- I do know that in the Dallas
19   2010 election that was referred to our office from the
20   Secretary of State, there was a non-citizen who voted in
21   that election.  I do know that in the Debra Briseno
22   case, which is a prosecution, that there were
23   non-citizens who voted in that election.  I am also
24   aware that in the Hidalgo County elections that there
25   were non-citizens who voted in those elections as well.

183

1     Q.  And Hidalgo County, what time period are we

2  talking about?

3     A.  I want to say that was the 2008 time frame.

4     Q.  Let's start with Hidalgo County 2008.  Is that

5  reflected in your spread sheet?

6     A.  I believe that would be on Page 3 of the election

7  code referrals office of Attorney General 2002 to

8  present.  And I believe it would be Hidalgo County

9  2008 municipal election, unlawfully rejecting voters,

10  illegal voting and unlawfully accepting voters.

11     Q.  What are the facts of that case?

12     A.  That was the City of Progresso municipal

13  election.  And our office assisted a portion of the

14  investigation that was conducted by the local district

15  attorney's office.

16     Q.  What did the facts show?

17     A.  I believe there was a Mexican national who voted

18  in that election.

19     Q.  And who was that, based on your spread sheet?

20     A.  It's not one of our prosecutions.  We just

21  assisted in the investigation.  It's not reflected in

22  our spread sheet.

23     Q.  And what was the end result of -- first of all,

24  was that referred to your office?

25     A.  It was referred to our office.  However, the

Major Forrest Mitchell                           June 15, 2012

184

1    district attorney's office was prosecuting it already.

2        Q.   Did you work in conjunction with the district

3    attorney's office on that investigation?

4        A.   Yes, sir.  We helped out on the mail-in ballot

5    portion of that case because many of the mail-in ballots

6    were outside Hidalgo County.  We assisted them in

7    interviewing voters and checking addresses in other

8    parts of Texas.

9        Q.   So again, and I'm sorry.  I'm trying to

10   understand what the facts are of this case.  So did this

11   case deal with a mail-in ballot system, if you know?

12       A.   That I don't know.  The ADA, I believe, told me

13   that a non-citizen had voted in the election.  I don't

14   think she clarified whether it was in person voting or

15   mail-in ballot fraud.

16       Q.   And that was the allegation.  Was there a

17   conviction in this case?

18       A.   I don't know.

19       Q.   Were these cases dismissed?

20       A.   I don't know.

21       Q.   So as you sit here today, you don't know if -- do

22   you know if those went into prosecution?

23       A.   Yes, sir.  I believe that -- I don't know for

24   sure.

25       Q.   And as you sit here today, you don't know the

185

1     extent of the facts involving those cases, correct?

2         A.   No, sir.   I only know a portion of the case.

3         Q.   And they would not be reflected in your spread

4     sheet?

5         A.   No, sir.

6         Q.   All right.   Let's see.   The other case that you

7     mentioned was Dallas County in 2010?

8         A.   Yes, sir.

9         Q.   Was that referred to the OAG's office?

10        A.   Yes, sir it was.

11        Q.   And can you show me on the spread sheet where

12    that is?

13        A.   That would be on Page 4 of the election code

14    referrals of the office of the Attorney General 2002 to

15    the present.   It would be, I believe was sixth case

16    down.   And it says, "Dallas 2010 primary elections.

17    Unlawfully obstructing watcher.   Illegal voting,

18    unlawful assistance, failure to witness application,

19    unlawfully witnessing more than one application.

20    Providing false information on application, possession

21    of mail-in ballots.   Unlawful assistance in bribery."

22    And the referral date was 4/20/2010.

23        Q.   So I see it here.   I don't see any names

24    indicated on Page 4, as you're testifying to.   Would it

25    be in any other portion of your spread sheet?

                                                              186

1        A.   No, sir.  She was not prosecuted.

2        Q.   So the allegation was not substantiated?

3        A.   No, sir.  She is a non-citizen.  However, we

4    didn't think that she had the mens rea.  Because someone

5    led her to believe that as a resident she could vote in

6    an election.

7        Q.   So tell me what the facts are.  What did you

8    find?  Did you investigate the case?

9        A.   I didn't personally.  But one of my investigators

10   did.

11       Q.   And who was the investigator?

12       A.   Sergeant Jennifer Bloodworth.

13       Q.   And can you tell me what the facts of the

14   investigation found?

15       A.   Specific to that non-citizen or generally as a

16   whole?  Because it's a substantial case.

17       Q.   Let's talk about the substantial case.  And we're

18   talking about, just so this is clear, we're talking

19   about Dallas County, the 2010 primary election, correct?

20       A.   Yes, sir.

21       Q.   And there was one individual that was ultimately

22   investigated?

23       A.   No, sir.  There were multiple individuals that

24   were investigated.  And those -- many of those

25   individuals are indicated in the prosecution's and

187

1    charges pending spread sheet.

2        Q.   Okay.  So you seem to have in mind one

3    individual?

4        A.   Yes, sir.

5        Q.   And you mentioned mens rea, which is, did not

6    have the intent, essentially?

7        A.   Correct.

8        Q.   Okay.  Can you tell me what the facts -- the

9    overall facts are of the case that you're talking about?

10       A.   Yes, sir.  She was approached by someone who was

11   canvassing her neighborhood.  And she wasn't certain

12   about when the time frame was, but that person assisted

13   her in the completion of a mail-in ballot application --

14   I'm sorry.  Correction.  Of a voter registration

15   certificate.

16       Q.   Okay.

17       A.   And on that voter registration certificate,

18   indicated that she had checked she was US citizen when

19   indeed she was not.  So therefore, the elections office

20   processed her voter registration application and she was

21   issued a voter registration certificate.  And so she had

22   voted in an election.

23       Q.   And when you say that "she did not have the men

24   rea," can you tell me what you mean in the context of

25   the facts?

188

1         A.   Yes, sir.  The actual person who helped her
2    register was a deputy voter registrar who was sworn by
3    the county to help her -- to help voters fill out their
4    registration cards.
5         Q.   Okay.
6         A.   And the deputy voter registrar checked that she
7    was a US citizen and told her that she could vote.  And
8    so she believed she actually could vote in an election.
9         Q.   Do you know the name of the deputy registrar?
10        A.   No, sir, I do not.
11        Q.   And now, you seem to suggest that there were
12   other individuals involved in this?
13        A.   Yes, sir.  This case was one of the largest cases
14   that we have investigated over the years.  It had
15   multiple allegations.  And we charged multiple
16   defendants, Delores McMillian was part of this referral.
17        Q.   Okay.  And you've testified to Ms. McMillian?
18        A.   Correct.  Another defendant in the spread sheet
19   who was identified during that investigation was Sylvia
20   Medrano, whose case is currently pending?
21        Q.   And that would be on page -- the first page of
22   the exhibit?
23        A.   Yes, sir.
24        Q.   And Sylvia Medrano was charged with what?
25        A.   Seven counts of illegal voting, ineligible voter.

189

1        Q.   And would this be by absentee ballot?

2        A.   I don't know for sure.

3        Q.   Well, tell me what you know about the facts for

4    Sylvia Medrano.

5        A.   This case involves a very contentious justice of

6    the peace election in the Dallas County area.  I think

7    the election was decided by a little more than 100

8    votes.  And a long serving justice of the peace was --

9    lost the election to a challenger.  The investigation

10   revealed that many people who were family members and

11   friends of the challenger had just changed their voter

12   registration to addresses within the precinct for the

13   purposes of registering to vote in just that election

14   and to cast ballots.

15       Q.   But as you sit here today, you don't know if it

16   was ballots by mail or ballots cast in person?

17       A.   I don't know specifically which voters cast in

18   person.  I do remember that a number of the family

19   members went together to the polling place on the same

20   day and voted in that precinct.

21       Q.   And again, looking at the spread sheet, the

22   charges are unlawfully obstructing a watcher, what does

23   that mean?

24       A.   A poll watcher is allowed to witness the

25   activity.  And I think each candidate who's running for

Major Forrest Mitchell                          June 15, 2012

190

1    office in Texas can designate a poll watcher.  And it is

2    a criminal offense in the State of Texas for an

3    elections official to obstruct the poll watcher from

4    generally observing what kind of conduct is occur.

5        Q.  Sylvia Mendrano was an election official?

6        A.  No, sir, I don't believe so.

7        Q.  Was she a candidate?

8        A.  I don't believe she was a candidate in that

9    election.

10       Q.  But she's charged with unlawfully obstructing a

11   watcher?

12       A.  No, sir.  I think you're looking at the

13   allegation portion and not the actual charge.

14       Q.  Sure.  But as I understood your testimony,

15   unlawfully obstructing a watcher is generally a charge

16   or allegation that's levied against an election

17   official?

18       A.  Yes, sir.  If I would clarify.

19       Q.  Please.

20       A.  When -- the design of the spread sheet is that we

21   take all of the allegations that are contained in the

22   referral for that specific election.  So the spread

23   sheet shows all of the allegations that were logged in

24   that case or in that referral.

25       Q.  Against the individual?

Major Forrest Mitchell                                    June 15, 2012

191

1       A.   Against -- in that election.  And then what we do

2   is we actually show that the actual charge -- I guess

3   maybe I'm not making myself clear.

4       Q.   Well, if I understood you correctly, you're

5   telling me that there may be multiple defendants -- and

6   we'll stay with Sylvia Medrano for a second.  There may

7   be multiple defendants in the allegations.  Are all of

8   the potential charges against all of the defendants?

9       A.   No, sir.

10      Q.   Okay.  Then I didn't understand you.

11      A.   If I can kind of explain the mechanics of how I

12  do it.  You know, I do have three books in the Excel

13  spread sheet.  And as somebody is charged, I cut and

14  paste all of the allegations contained in the referral

15  into the charging book so that it shows the county and

16  all of the allegations that were in that election.  And

17  then the election itself and then the cause number of a

18  charging instrument.  And then the actual charge.

19      Q.   So ultimately she was charged with four counts of

20  illegal voting.  Sorry.  Looking at the wrong one.  She

21  was charged with seven counts of illegal voting?

22      A.   Yes, sir.

23      Q.   And you're not -- as you testify today, you're

24  not saying that she voted seven times in a polling

25  place?

Major Forrest Mitchell                              June 15, 2012

192

        A.  I don't know how many times that she voted in a

polling place.

        Q.  Is it fair to say that this charge is addressing

the issue of by mail ballots?

        A.  I don't know if it was a poll place violation, in

person voting or mail-in ballots.

        Q.  You don't know.

        A.  Not off the top of my head, no, sir?

        Q.  I believe you also said Ms. Briseno?

        A.  Yes, sir.

        Q.  Can you tell me what the facts of that were?

        A.  This case was referred to our office by the

district attorney of, I believe it was Lavaca County.

        Q.  Port Lavaca?

        A.  Port Lavaca.  And he requested investigative

assistance from our office in determining allegations of

illegal voting and misconduct in the election.  It was a

very heated contested election.  And I think three

candidates emerged with a very close margin in that

election.  I think there were about 19 votes that

separated the three candidates.  And I think Debra

Briseno was the winning candidate.

        Q.  Can you tell me what the facts of the case are?

        A.  Debra Briseno signed up as a deputy voter

registrar.  So she assisted in the voter registration of

Major Forrest Mitchell                                    June 15, 2012

193

1    citizens in the county.  She additionally registered

2    non-citizens to vote during that election and informed

3    them that they could indeed vote in that election

4    despite the fact that they were not citizens in the US.

5         Q.   And Ms. Briseno was the only one charged in that

6    case?

7         A.   That's correct.

8         Q.   And was there a determination as to why not to

9    charge the non-citizens who had registered?

10        A.   Again, you have a person who is sworn as a deputy

11   voter registrar by the elections department who the

12   voters -- the non-citizens perceived to be as a

13   representative of the government.  At the time, she was

14   actually a city council person for the City of Port

15   Lavaca.  So these voters believed that what they were

16   telling -- what she was telling them, that they could

17   vote in the election, they took at face value.

18        Q.   And again, in this case there would have been no

19   mens rea?

20        A.   I believe that is why they were not charged in

21   this case.

22        Q.   Okay and so I believe we've gone through the

23   cases where non-citizens were alleged to have voted,

24   Dallas 2010, Ms. Briseno and Hidalgo County.  Were there

25   any others that you're aware of on these spread sheets?

Major Forrest Mitchell                                    June 15, 2012

194

1      A.   I remember a case in Culberson County where
2    allegations were made, but they were unsubstantiated.
3      Q.   Did that result in an investigation?
4      A.   Yes it did.
5      Q.   Did it result in any charges?
6      A.   No, sir, it did not.
7      Q.   So other than the -- the three distinct cases,
8    Dallas County, Ms. Briseno and Hidalgo, are you aware of
9    any others?
10     A.   No, sir.  Not that resulted in criminal charges.
11     Q.   So out of the 320 referrals that came into your
12   office, are you aware of any others that alleged
13   non-citizens voting?
14     A.   Not of the cases that were referred to our
15   office.
16     Q.   Referring back to the 2008 report, page -- Page
17   37, paragraph 3, after prosecution rates and fraud in
18   Texas, it says, "through talking with our county
19   election officials and other experts the committee found
20   the chance of a legal alien -- of an illegal alien
21   actually voting are very slim."  Based on your
22   experience as an investigator who's been in the OAG's
23   office for -- since prior to 2005 and been with the SIU
24   the entire time of its creation, would you agree with
25   this statement?

Major Forrest Mitchell                                    June 15, 2012

195

1              MR. SWEETEN:  Can you read the question

2      back?

3      BY MR. GEAR:

4          Q.  And I can try to pose it again.  It was kind of a

5      long, run-on question.  Would you agree that based on

6      your experience in the -- as an investigator and

7      supervisor in the SIU, would you agree that the chance

8      of an illegal alien actually voting in an election in

9      the State of Texas, are very slim?

10              MR. SWEETEN:  Objection; calls for

11      speculation.  You can answer.

12          A.  I don't believe it's very slim.  It all depends

13      on the motivation to do so.  Through my investigations

14      over the years that I have worked with the Texas

15      Attorney General's office, it has come to our attention

16      that in some elections officials have told us, people

17      working in the voter registration departments, that

18      non-citizens have gotten voter identification cards to

19      try to develop -- to try to validate -- to validate

20      themselves inside Texas or the United States.  That it

21      is one of the precursor documents that they can obtain

22      to try to obtain other things like a Texas driver's

23      license, so they can remain here illegally.

24              So it really depends on the motivation.  If the

25      motivation to obtain a voter registration certificate is

Major Forrest Mitchell                                        June 15, 2012

196

1   simply to try to get documents, then I would say it is

2   not very likely.  But our investigations have also

3   revealed in certain areas of the state, that voters are

4   paid to vote.  And they might be persuaded to vote in an

5   election.

6        Q.  (By Mr. Gear)  Okay.  And so let me break that

7   down a little bit, because my question was voting.  Is

8   the chance slim?  So I understand your testimony that

9   there may be other motivations for them to obtain a

10  voter registration card.  But in your experience in the

11  SIU and based on the referrals that you've seen, is the

12  occurrence of an illegal alien or illegal non-citizen,

13  is that type of referral rare to your office?

14       A.  When I look at the 320 referrals that we have,

15  the allegations of a non-citizens voting in an election,

16  the number is small.

17       Q.  And "small," meaning three distinct cases that

18  you've identified here on the record?

19       A.  Yes, sir.  I can think of three to come to mind.

20            (Exhibit No. 593 was marked.)

21  BY MR. GEAR:

22       Q.  Let me know when you've had a chance to review

23  the document.

24       A.  Yes, sir.

25       Q.  Can you tell me what this is?

Major Forrest Mitchell                                    June 15, 2012

197

1          A.   This appears to be an article out of the Dallas

2    Morning News.  It's dated May 18, 2008, and it's titled

3    Abbott GOP Pressing For Required Photo ID.

4          Q.   Do you see the paragraph that indicates,

5    "Republicans say that the mere possibility of illegal

6    voting merits changes.  Particularly with the rising

7    illegal immigration population and that the photo ID

8    requirement is not onerous."  Do you see that?

9          A.   I'm sorry.  Okay.  Yes, sir, I see that.

10         Q.   As a supervisor in the SIU, were you aware of any

11   debate regarding the rise of -- rising illegal immigrant

12   population in reference to photo ID?

13         A.   You mean globally as a --

14         Q.   State of Texas.

15         A.   As a citizen of the State of Texas or...

16         Q.   Yes.  Well, no.  As your -- as the supervisor in

17   the SIU, were you aware of this debate?

18              MR. SWEETEN:   Assumes facts not in evidence.

19   Objection.

20         A.   I'm aware of the debate as a whole of this issue.

21   But not in the special investigations unit.

22         Q.   (By Mr. Gear)  Were you involved in any

23   communications with either the Attorney General or the

24   Secretary of State's office that -- where the topic of

25   rising illegal immigrant population was the topic of

Major Forrest Mitchell                              June 15, 2012

198

1    discussion?

2        A.  No, sir.

3        Q.  During the consideration of the referrals or

4    investigations, were you ever asked to give special

5    attention or focus on illegal aliens or non-citizens

6    voting?

7        A.  No, sir.  I was never asked to give any special

8    consideration to that.  At some point in time, I had

9    been asked, "Hey, are there any cases on your spread

10   sheet?"  And in those circumstances I identified the

11   ones on the spread sheet, as I have done today.

12       Q.  Who made this request?

13       A.  I don't remember.

14       Q.  Well, let's see if we can flesh this out.  When

15   were you asked to identify these types of cases on your

16   spread sheet?

17       A.  I don't remember.

18       Q.  Was it during the 2011 legislative session?

19       A.  I couldn't say for certain.

20       Q.  Was it by a legislator?

21       A.  Oh, no, sir.

22       Q.  Was it by someone in the Secretary of State's

23   office?

24       A.  I don't believe so, no.

25       Q.  Do you recall which office the request came from?

199

1       A.   I would believe it came from -- internally within

2   the law enforcement division.

3       Q.   Internally from which division?

4       A.   Well, the special -- I would say that it came

5   from either my division chief or my, at the time, who

6   would have been Major Boatright or the Deputy Attorney

7   General for criminal justice Eric Nichols.

8       Q.   Do you know what the reason for that request was?

9       A.   No, sir.

10      Q.   And did you respond to that request?

11      A.   I would presume so, yes.

12                (Exhibit No. 593 was marked.)

13  BY MR. GEAR:

14      Q.   I'm showing you what's been marked as Exhibit 593

15  and give you a chance to look at that.  Have you had a

16  chance to review the document?

17      A.   I'm almost done.  Sorry.

18      Q.   Take your time.

19      A.   Okay, sir.

20      Q.   Can you tell me what this is?

21      A.   This document appears to be a clipping of the

22  Dallas Morning News, dated May 18, 2008.  And it is

23  titled AG Fails to Uncover Major Voting Fraud.

24      Q.   Have you seen this newspaper article before?

25      A.   Not to my memory.

Major Forrest Mitchell                                    June 15, 2012

200

1       Q.   Focusing on the article itself, by May 18, 2008
2   it indicates that, "Mr. Abbott has prosecuted 26 cases."
3   Would that be accurate based on your spread sheet?
4       A.   I think about that time that would be pretty
5   close.
6       Q.   Okay.   Is it also accurate to say that in 18 of
7   the 26 cases the voters were eligible voters with -- the
8   votes were properly cast and no vote was changed, 18 of
9   the 26?
10      A.   I do know that no vote was changed, but I don't
11  know that it was properly cast.
12      Q.   It also goes on to say, "but people who collected
13  the ballots for mail-in were prosecuted."   Would that be
14  fair to say?
15      A.   Yes, sir.   If I could clarify.
16      Q.   Please.
17      A.   If someone assists in the completion of a mail-in
18  ballot, someone assists the voter, fails to sign as
19  assisting the voter and -- or possesses the ballot, they
20  would be prosecuted for the position of the ballot or
21  carrier of envelope of another.   Many of these cases
22  also involve unlawful assistance.   And if a voter was
23  unlawfully assisted in the completion of a mail-in
24  ballot or any other type of ballot, under State law that
25  ballot would be stricken.

201

 1      Q.   Okay.  And it says, in 593, that "the State law
 2   makes it a crime to carrier someone else's filled out
 3   ballot to the ballot box."  Is that fair?
 4      A.   It is a crime unless they identify themselves on
 5   the carrier envelope.
 6      Q.   Unless the carrier puts his or her own name on
 7   the -- and address on the envelope?
 8      A.   Yes, sir.  I believe there are also defenses to
 9   prosecution to that.
10      Q.   In the middle column of Exhibit 593, I think it's
11   the third paragraph in the bottom, "when an attorney
12   general makes certain cases a priority, you can dispatch
13   investigators, assign teams of State lawyers and direct
14   millions of dollars from federal grants and the agency
15   budget, such assistance helps bolster action in counties
16   especially where local prosecutor's lack the resources."
17   Is that a fair statement?  And let me -- why don't you
18   strike that.  Is it accurate that when an attorney
19   general, in this case Attorney General Abbott, makes
20   voter fraud a priority, he can do the types of things
21   described here?
22              MR. SWEETEN:  Assumes facts not in evidence.
23   Calls for speculation.  Objection.
24   BY MR. GEAR:
25      Q.   Well, let me see if I can come at that a little

1      bit differently then.  Is it accurate to say that

2      Attorney Abbott dispatched investigators throughout the

3      state to root out and prosecute voter fraud cases?

4           A.   No, I wouldn't say that's an accurate statement.

5           Q.   What would you say is an accurate statement?

6           A.   I would say that our office receives referrals

7      from third parties, such as the Secretary of State or

8      the DA's offices or local law enforcement, asking us to

9      help them in the investigation of election code

10     violations.  And that we have a group of investigators

11     who perform their duty in that regard.

12          Q.   Does he have an authority to assign teams of

13     State lawyers?

14               MR. SWEETEN:  Objection; calls for

15     speculation.  You can answer.

16          A.   I don't think the Attorney General would direct

17     the assignment of prosecutor's to cases.  I think that

18     we have a number of prosecutor's within our office who

19     handle a wide variety of cases, some which include

20     election cases.

21          Q.   (By Mr. Gear)  Is it accurate in this article

22     that there was a $1.4 million federal crime fighting

23     grant?

24          A.   As I think I previously discussed in my

25     testimony, I think the criminal investigations division,

203

1      just the criminal investigations division, got a $1.4
2      million grant.  And of that grant, a portion of
3      investigators were hired and the special investigations
4      unit, the money laundering unit, the cyber crimes unit
5      and the fugitive apprehension unit.
6          Q.  Previously you testified to a case regarding
7      Hidalgo County.  If you look at paragraph 3, second
8      paragraph I believe, from the top, it says, "in another
9      case, three Hidalgo County women were indicted on
10     charges.  They illegal assisted elderly voters and
11     mishandled the mail-in ballots in 2005, McAllen mayor's
12     race."  Was that the Hidalgo case that you were
13     referencing that was handled by a different agency?
14         A.  No.  This is actually a different case.
15         Q.  It is a different case?
16         A.  Yes, sir.  And I think in that case there were --
17              MR. SWEETEN:  Just answer his question.
18         A.  I'm sorry.
19         Q.  (By Mr. Gear)  And the answer was this is a
20     different case?
21         A.  This is a different case.
22         Q.  And in this case in 2005, the judge dismissed the
23     allegations.  Is that accurate?
24         A.  Yes, sir, I believe so.
25         Q.  And is this particular case referenced in your

Major Forrest Mitchell                          June 15, 2012

                                                              204

1     spread sheet?

2          A.   Yes, sir.  It's referenced in the referrals.

3          Q.   I think I'm almost done.  Let me kind of go

4     through my notes here?

5          A.   Yes, sir.

6          Q.   Are you aware of any testimony during the 2011

7     legislative session where SB 14 was discussed where your

8     spread sheet was the topic of discussion?

9          A.   I believe I was present when Deputy Director

10    David Maxwell testified, but I don't recall which

11    session -- which House.

12         Q.   And he testified in 2011?

13         A.   Yes, sir, I believe so.

14              (Exhibit No. 594 was marked.)

15    BY MR. GEAR:

16         Q.   I'm going to show you what's been marked as

17    Exhibit 594 and give you a chance to look at that.  You

18    indicated that David Maxwell provided testimony.  And

19    the question is, is that what you were referring to?

20         A.   Yes, sir, I believe so.

21         Q.   Do you see any reference to a spread sheet in his

22    testimony, more specifically, to your spread sheet?

23         A.   I don't see anything that says my spread sheet.

24         Q.   Okay.  Does anything he testified to in 2011

25    change any of the answers that you gave here today?

205

1          A.   No, sir, I don't believe so.

2               MR. SWEETEN:   I'm going to object to the

3    question as compound.   But he's answered it.

4               (Exhibit No. 595 was marked.)

5    BY MR. GEAR:

6          Q.   Did you still want the take some time to review

7    that?

8          A.   I don't believe Mr. Maxwell's testimony will

9    change my testimony.

10         Q.   Okay.   Take some time to review that exhibit and

11   then we can talk about it.

12         A.   This one right here, sir?

13         Q.   Yes.   And specifically, just so we can move this

14   forward a little bit, I think it's Page 7, do you see

15   your name indicated?

16         A.   Yes, sir, I do.

17         Q.   Have you seen this document before?

18         A.   No, sir.

19         Q.   And for the record, this is the plaintiffs

20   supplemental initial disclosures pursuant to federal

21   rules of civil procedure 26 A.   Were you involved in any

22   aspect of preparing this particular document?

23         A.   No, sir.

24         Q.   All right.   And I ask you, did you see your name

25   indicated in it under, I believe No. 12, it indicates

Major Forrest Mitchell                              June 15, 2012

206

1       Captain Forrest Mitchell.  That's actually Major
2   Mitchell at this point, correct?
3       A.  Yes, sir.
4       Q.  All right.  And it says, "Captain Mitchell is a
5   member of the special investigations unit of the law
6   enforcement division of the office of the Texas Attorney
7   General," which is accurate, correct?
8       A.  Yes, sir.
9       Q.  "Captain Mitchell or Major Mitchell, has
10  knowledge regarding election fraud in the State of
11  Texas."  Other than the testimony that you provided
12  today, is there any additional knowledge that may be
13  relevant to voter fraud in the State of Texas?
14              MR. SWEETEN:  Counsel, I'm going to the
15  object to the question as vague.  We've provided a
16  description of his areas of testimony.  Obviously you've
17  had the opportunity to, now for six hours, to question
18  him on that.  We intend to ask him questions, and in
19  relation to the substance of the matters here.  So I
20  think the question is -- I think it's unfair.
21              MR. GEAR:  I withdraw the question.
22  BY MR. GEAR:
23      Q.  Other than what you've testified to here today,
24  are you aware of any other cases of voter impersonation
25  in the State of Texas?

                                                                    207
1              A.   No.   I'm only aware of the ones that were
2         referred to our office.
3              Q.   Other than what you testified to here today, are
4         you aware of any other cases where the allegation was
5         illegal aliens or illegal non-citizens voting?
6              A.   No, sir.
7              Q.   Other than what you testified to here today, are
8         you aware of any other investigations regarding voter
9         impersonation?
10             A.   Could you repeat that one more time?
11             Q.   Other than what you testified to here today, are
12        you aware of any other investigations involving voter
13        impersonation in the State of Texas?
14             A.   I am aware of one.
15             Q.   And what would that be?
16             A.   I read an article about a case that's ongoing now
17        in Tarrant County where the -- a son used his father's
18        voter registration card to cast a ballot in an election.
19        But I just read that in the open source newspaper.
20             Q.   So you gained that knowledge from the newspaper?
21             A.   Uh-huh.
22             Q.   Has any allegation been referred to the OAG's
23        office?
24             A.   No, sir.   That's being conducted by the Tarrant
25        County district attorney's office.

208

1         Q.   Has there been any communication with the Tarrant

2    County district attorney's office regarding that

3    allegation?

4         A.   No, I haven't talked to them at all.

5         Q.   Do you know the name of the alleged?

6         A.   No, sir, I'm sorry.

7         Q.   Perpetrator, for lack of a better word?

8         A.   No, sir, I'm sorry.

9         Q.   Do you know the election that it allegedly

10   occurred?

11        A.   I want to say it was this primary election.

12        Q.   2012?

13        A.   Uh-huh.

14        Q.   And that occurred on?

15        A.   I think it would be May 29th.

16        Q.   May 29 primary election.  And other than what you

17   read from the newspaper, are you aware of any other

18   facts pertaining to that?

19        A.   No, sir.

20        Q.   Can you investigate alleged voter fraud without a

21   referral?

22        A.   The Texas election code does say that if we had

23   reason to believe that a violation occurred, that the

24   attorney general's office could investigate.

25        Q.   Have you ever investigated a voter fraud case

Major Forrest Mitchell                                          June 15, 2012

209

1    without an official referral?

2         A.   No, sir.  We generally -- we request a referral

3    before we initiate an investigation.

4         Q.   Have you requested a referral for the case which

5    you just referenced?

6         A.   No, sir.

7         Q.   Other than what you testified today, are you

8    aware of any prosecutions for voter impersonation in the

9    State of Texas?

10        A.   I believe the DA has indicted that case in

11   Tarrant County, the one I said regarded voter

12   impersonation.

13        Q.   Is the OAG's office involved in that case in any

14   aspect?

15        A.   No, sir.

16        Q.   I believe you testified that you have not

17   requested a referral?

18        A.   No, sir.

19        Q.   Why not request a referral for that particular

20   case?

21        A.   Because we have plenty of work to do on our own.

22        Q.   Fair answer.  I think I am done.

23             MR. GEAR:  And I will pass the questioning

24   to Ezra.

25             MR. ROSENBERG:  Thanks.

Major Forrest Mitchell                          June 15, 2012

210

1           EXAMINATION

2     BY MR. ROSENBERG:

3         Q.  And I will be very short, Major.  Thanks for your

4     time today.

5         A.  Yes, sir.

6         Q.  Just a couple of questions.  You testified that

7     statutorily required for the district attorneys to

8     notice the Secretary of State when they are charging

9     someone with election fraud.  Is that what the

10    requirement is?

11        A.  I believe the statutory language says if they are

12    going to initiate an investigation of prosecution.

13        Q.  And I think you also testified then, that the

14    Secretary of State maintains a list of those instances

15    when it has been notified?

16        A.  I don't remember that.

17        Q.  Have you ever seen a list that's maintained by

18    the Secretary of State of investigations that were

19    initiated by the district attorney?

20        A.  No, I've never seen such a list.

21        Q.  Do you know if any such list has been produced in

22    this litigation?

23        A.  No, sir, I do not.

24        Q.  Other than the spread sheet that you maintained,

25    have you ever created any reports related to voter

211

1      fraud?

2         A.   As I previously testified, sir, preceding the --

3      preceding the creation of the spread sheet, I was

4      required to produce a WordPerfect document that talked

5      about the types of cases that we would referred and the

6      referral sources and the allegations contained.

7         Q.   And has that document been produced in this

8      litigation?

9         A.   I provided it to counsel.

10        Q.   Other than that WordPerfect document, have you

11     ever created any other report related to voter fraud?

12        A.   No, sir.

13        Q.   Have you ever done any specific analysis of in

14     person voter fraud, other than the spread sheet and the

15     WordPerfect document?

16        A.   One time in, I want to say 2006, I looked at the

17     incidents of mail-in -- not mail-in ballot fraud, but

18     the proportion of mail-in ballots received by a county.

19        Q.   And what was your purpose in doing that?

20        A.   I wanted to see what the typical average is in

21     the State of Texas for an elections office to receive --

22     for the number of registered voters to the number of

23     mail-in ballots cast.

24        Q.   Did you draw any conclusions in that report?

25        A.   If memory serves me correctly, I think it was,

212

1    the average county might receive two to three percent of

2    their registered voters for mail-in applications.

3        Q.   Did you break down that percentage by any

4    demographics?

5        A.   No.

6        Q.   Other than that report and the spread sheet and

7    the WordPerfect document, have you done any specific

8    analysis of in person voter fraud?

9        A.   No, sir.

10       Q.   Have you ever been asked to do any specific

11   analysis of in person voter fraud?

12       A.   No, sir.

13       Q.   To your knowledge, has anyone in your office ever

14   been asked to do any specific analysis of in person

15   voter fraud?

16       A.   No, sir.

17       Q.   To your knowledge, has anyone in your office ever

18   been asked to do an analysis of how various forms of

19   voter identification would affect the level of voter

20   fraud?

21       A.   No, sir.

22       Q.   I would like to talk, very briefly about the four

23   instances of voters who tried to impersonate -- who are

24   alleged to have tried to impersonate others.  And by

25   that -- I said four.  You can correct me if I'm wrong.

213

1        As I understand it, it is only four instances of persons

2        trying to impersonate others.  The fifth person was

3        charged with trying to help one of these four people

4        impersonate someone else.  Is that correct?

5            A.   That's correct.

6            Q.   So it is four instances where a person tried to

7        impersonate someone else.  One of those instances was

8        McMillian.  And as I understand that, that was an

9        election official; is that correct, McMillian?

10           A.   Yes, sir.  Delores McMillian was an elections

11       worker in Dallas County.

12           Q.   And somehow, prior to the polls opening, she had

13       somehow signed herself up as someone else?

14           A.   Yes, sir, that's my understanding.

15           Q.   So that wasn't a situation where

16       Delores McMillian walked into the polling place and

17       pretended, to the election official, that she was

18       someone else; is that correct?  She was basically

19       cooking the books because she was the election official

20       herself, right?

21           A.   My understanding is that she marked that voter on

22       the ballot before the polls were even opened.

23           Q.   Without having to interact with any other

24       election official, right?

25           A.   I believe that she was interacting with her

214

1     mother who was doing the same thing.

2          Q.   So it's not a situation where she presented an

3     identification to someone and said I'm someone else.

4     She just manufactured this along with her mother because

5     she was the election official, correct?

6          A.   That's my understanding, yes, sir.

7          Q.   Now, you also talk about a Mary Comparin.  And

8     did you say that that was a situation where

9     Ms. Comparin, and I know this is -- I've only,

10    Mr. Sweeten, because it's a company situation.  But

11    she's alleged to have gotten, I think you used the term

12    "various images of driver's licenses, et cetera?"

13         A.   It's my understanding that Mary Comparin had

14    obtained three or four Texas driver's licenses in

15    different names.

16         Q.   With her photo on them?

17         A.   Yes, sir.

18         Q.   So if she were to produce those driver's licenses

19    at the polling place, the photo would match her face,

20    correct?

21         A.   Yes, sir.

22         Q.   So SB 14 would not really help that situation; is

23    that correct?

24              MR. SWEETEN:  Objection; calls for legal

25    conclusions, speculation.  But you can answer.

215

1          A.    It depends on whether she used her voter

2     registration certificate to come to the polling place to

3     cast her ballot, or whether she used her Texas driver's

4     license.   That suspect had obtained four different voter

5     registrations that were mailed to her residence.

6          Q.    (By Mr. Rosenberg)   Right.   But for terms of the

7     photo ID that she had, there was three different photos

8     of her, but under three different names; is that

9     correct?

10         A.    Yes.   She had three different IDs in different

11    names.

12         Q.    Are you aware of anyone more knowledgeable than

13    yourself in the SUI or the OAG who has knowledge of

14    voter fraud?

15         A.    No, sir.

16         Q.    I didn't think so.

17              MR. ROSENBERG:   And I think I don't have any

18    further questions.

19              MR. SWEETEN:   I'm probably going to have a

20    short redirect.   So I'm going to speak with counsel

21    about it so let's take about a 5-minute break.

22              (Brief recess.)

23              EXAMINATION

24    BY MR. SWEETEN:

25         Q.    Major Mitchell, you have been asked a number of

1      questions today about voter fraud.  And I want to ask

2      you a few questions based upon your experience as an

3      investigator.  What types of cases do you work on in

4      addition to voter fraud?

5              MR. GEAR:  I just object; asked and

6      answered.  But go ahead.

7          A.  Currently, I don't do any investigations myself.

8      I'm just a supervisor investigator at this point in

9      time.  But historically, I have worked capital murder

10     investigations, public integrity investigations, money

11     laundering investigations, fraud investigations.

12     Citizen investigation, administrative investigations.

13     And a wide variety of criminal offense.

14         Q.  (By Mr. Sweeten)  How long have you worked

15     specifically on the issue of investigating voter fraud

16     as part of the many things you do?

17         A.  I would say since 2005.

18         Q.  Now, with respect to the issue of in person voter

19     fraud, can you tell us how difficult is in person voter

20     fraud to defect as a general matter?

21         A.  It is incredibly difficult to detect.

22         Q.  Why is that?

23         A.  Because the only way that -- it's my experience

24     that the only way that you would detect in person voter

25     fraud is if someone inside the polling place personally

217

1    knows the person who's presenting the fraudulent voter

2    registration certificate. And additionally, there is an

3    absence of a positive identification in that regard, in

4    that it's difficult, many times when we get these cases

5    referred to us, that they are coming months after the

6    fact. And many cases, it could be there's already

7    another election that has taken place.

8            And when I interview witnesses or any one of my

9    investigators interview witnesses it's very difficult

10   for voters to identify a potential suspect, if there was

11   one, through conventional photo line-ups or that regard.

12   So it is very hard to detect unless someone in the

13   actual polling place knows that person personally.

14       Q.  Okay.  How difficult is in person voting fraud to

15   detect as compared to other types of crimes, such as

16   white-color crime that you investigate?

17               MR. ROSENBERG:  I'm going to object to form.

18               MR. GEAR:  I would object; calls for

19   speculation.

20   BY MR. SWEETEN:

21       Q.  Just based upon your experience as an officer,

22   can you compare as far as detecting in person voter

23   fraud, how it compares to other types of crimes that you

24   investigate?

25               MR. SWEETEN:  I will also object to

Major Forrest Mitchell                                    June 15, 2012

218

1    relevance.

2                MR. ROSENBERG:  And compound.  Go ahead.

3         A.   I believe that in person voter fraud is very

4    difficult to detect in comparison to other cases because

5    in other cases I have, in many cases, forensic evidence

6    that I can rely upon to detect a potential suspect that

7    do not exist in in person voter fraud.

8         Q.   (By Mr. Sweeten)  Okay.  Now, when we talked --

9    we talked about, I think to a large degree, about the

10   sources of referrals that the office of attorney general

11   received.  You talked about referrals from the Secretary

12   of State from local election officials and from local

13   law enforcements.  Let me ask you, when the district

14   attorney's office is prosecuting an election fraud case,

15   do you -- are you aware of that?  Are you made aware of

16   that?

17        A.   Not necessarily.

18        Q.   Okay.  And in the three most popular counties in

19   the State of Texas would Harris County.  When the Harris

20   County DA prosecutes a voter fraud case, is that

21   something you're made aware of?

22        A.   No, sir.

23        Q.   Do you have any access to statistics about how

24   often voter fraud is prosecuted by that agency?

25        A.   No, sir.

219

1      Q.   What about the Harris County attorney, same set

2  of questions.  Are you given the -- do you have access

3  to data regarding how much in person voter fraud they

4  prosecute in a given year?

5      A.   No, sir.

6      Q.   Are you necessarily made aware of any in person

7  voter fraud case that's occurring by the Harris County

8  attorney?

9      A.   No, sir.

10     Q.   What about Bexar County?  What about the Bexar

11  County district attorney.  Are you made aware

12  specifically of instances of in person voter fraud or

13  prosecutions?

14             MR. GEAR:  Are you saying bare or bared.

15             MR. SWEETEN:  Its' B-E-X-A-R, Bexar.  It's

16  San Antonio.

17     A.   No, sir.

18     Q.   (By Mr. Sweeten)  Okay.  With -- if the -- if a

19  county attorney prosecutes a case of voter fraud, are

20  you made aware of that?

21     A.   No, sir.

22     Q.   How about Dallas County, same question, are you

23  made aware when the Dallas County district attorney is

24  prosecuting a case of in person voter fraud?

25     A.   No, sir.

Major Forrest Mitchell                              June 15, 2012

220

```
1        Q.   Do you have access to statistics related to that?
2        A.   No, sir.
3        Q.   What about if a county attorney is prosecuting a
4   case, do you have access to that information?
5        A.   No, sir.
6        Q.   Data regarding that?
7        A.   No, sir.
8        Q.   What about as to any other county in the State of
9   Texas, do you get automatically -- are you given data
10  regarding those prosecutions?
11       A.   No, sir.
12       Q.   Now, we've talked about other prosecutorial
13  entities within the State of Texas that prosecute.  Are
14  there other law enforcement agencies that prosecute in
15  person voter fraud?
16       A.   I believe there could be more.
17       Q.   Okay.  Does the federal -- does federal law
18  enforcement refer or do they investigate allegations of
19  voter fraud?
20       A.   I believe the FBI and the Department of Justice
21  could investigate allegations of in person voter fraud
22  if it was a national election.
23       Q.   From 2002 through 2011, did any federal law
24  enforcement agency refer any cases to your office?
25       A.   Would you repeat that one more time?
```

221

1          Q.   From 2002 through 2011, did any federal law

2     enforcement agency refer any voter fraud cases to your

3     office?

4          A.   No, sir, not voter fraud.

5          Q.   Does your spread sheet include any cases

6     investigated by federal law enforcement officials?

7          A.   No, sir.

8          Q.   Does your spread sheet include any entries

9     related to district attorneys or county attorneys that

10    have prosecuted voter fraud?

11         A.   Only the ones that we cooperated with or assisted

12    them on the investigation.

13         Q.   Okay.  If you wanted to find out what federal law

14    enforcement agencies have prosecuted voter fraud in this

15    State, who would you ask?

16         A.   I would think I would have to ask the four

17    different US districts department of justice.

18         Q.   Does -- let me ask you the question.  Does the

19    fact that the office of the attorney general, and you

20    testified earlier that the office of the attorney

21    general received approximately 320 referrals from 2002

22    to the present for alleged election code violations.  Do

23    you recall that testimony?

24         A.   Yes, sir, I do.

25         Q.   Does the fact that your list contains 320

Major Forrest Mitchell                               June 15, 2012

                                                                    222

1        entries, does that mean since 2002 there have been 320

2        voter fraud cases in Texas?

3                MR. ROSENBERG:  Objection; leading.

4        BY MR. SWEETEN:

5            Q.   Does it mean that?

6                MR. GEAR:  Same objection.

7                MR. ROSENBERG:  Same objections.

8        BY MR. SWEETEN:

9            Q.   You can answer.

10           A.   I do not believe that the 320 referrals listed on

11       my spread sheets are representative of the actual

12       misconduct that's occurring in the State of Texas.  I

13       believe that there's many that go undetected.

14           Q.   And so is it your belief that in addition to the

15       320 referrals, what is your belief as to whether there

16       are additional cases of voter fraud that go undetected?

17           A.   I believe that there are cases of voter fraud

18       that go undetected and unreported.

19           Q.   Okay.  Let me ask you, does the fact that the

20       office of attorney general receive more referrals

21       related to mail-in voting fraud, meaning that it is any

22       less serious of -- actually that it's less serious a

23       crime than mail-in ballot fraud?

24                MR. ROSENBERG:  Objection; leading.

25                MR. GEAR:  Objection; leading.

223

1          A.    I'm sorry.  Could you restate the question?

2          Q.    (By Mr. Sweeten)  Yeah.  Does the fact that the

3     office of the attorney general received 3 -- I think you

4     testified, received more mail-in ballot fraud

5     allegations and referrals than in person mail-in

6     referrals, does that make it a less serious crime under

7     the Texas statutes of the penal code?

8                MR. ROSENBERG:  Same objection; leading.

9                MR. GEAR:  Also same objection.

10         A.    No, sir.

11         Q.    (By Mr. Sweeten)  In your experience as a law

12    enforcement officer, does increasing the severity of

13    criminal penalties act as a deterrent to those intends

14    to commit a criminal act?

15         A.    Yes, sir 1 believe so.

16         Q.    Does Senate Bill 14 increase criminal penalties

17    for attempts?

18         A.    Yes, sir I believe it does.

19         Q.    And what about for actual voter fraud?

20         A.    I think it increases the penalty.

21         Q.    Between mail-in voter fraud and in person voting

22    fraud, which of those two crimes is, as an investigator

23    more difficult to investigate?

24                MR. GEAR:  Objection; vague.  Objection;

25    calls for speculation.

                                                                   224

1    BY MR. SWEETEN:

2         Q.   You can answer.

3         A.   It has been my experience that the most difficult

4    case to investigate would be in person voter fraud.

5         Q.   I'm going to read a statement to you and I'm

6    going to ask you if you agree with this.  "The well

7    publicized fact that voter registration lists

8    fraudulent, deceased or otherwise invalid names

9    undermines the public confidence in the electoral

10   process that is the life blood of Democratic

11   institutions."  As your experience as an investigator,

12   would you agree with this statement?

13             MR. ROSENBERG:  Objection; leading.

14             MR. GEAR:  Same objection.

15   BY MR. SWEETEN:

16        Q.   Would you agree with this statement?

17        A.   I absolutely believe so.

18        Q.   "Particularly given that in person voter fraud is

19   difficult to detect without rigorous ID requirements and

20   that as a practical matter, it is important for the

21   State to deter and not just detect and punish voter

22   fraud."  Do you agree that, the first part of that, that

23   in person voter fraud is difficult to detect without

24   rigorous ID requirements?

25             MR. ROSENBERG:  Objection; extraordinarily

225

1    leading.

2                    MR. GEAR:  Objection; leading.

3        A.   I believe that in person voter fraud is difficult

4    to detect absent a photo ID requirement.

5        Q.   (By Mr. Sweeten)  Is that statement consistent or

6    inconsistent with your experience?

7                    MR. ROSENBERG:  Same objection.

8                    MR. GEAR:  Same objection.

9        A.   I believe that that statement is consistent with

10   my experience.

11                   MR. ROSENBERG:  Why don't we take a couple

12   of minutes and we'll probably have a little redirect or

13   recross.

14                   MR. GEAR:  We will have a redirect.

15                   (Brief recess.)

16                   FURTHER EXAMINATION

17   BY MR. GEAR:

18       Q.   You were asked a question by your counsel

19   regarding whether or not SB 14, the penalties in SB 14,

20   would act as a deterrent to voter fraud.  Do you recall

21   those questions?

22       A.   Yes, sir, I do.

23       Q.   Do you believe that the current laws as they are

24   in the State of Texas act as a deterrent to voter fraud?

25       A.   I believe they act as somewhat of a deterrent.

Major Forrest Mitchell                                    June 15, 2012

226

1     Q.   Do you believe that the current laws are

2     sufficient to act as a deterrent to voter fraud?

3     A.   It is my opinion that I believe that they're

4     insufficient in the penalty to deter voter fraud.

5     Q.   And what are the current penalties as they are

6     for voter fraud in the State of Texas?

7     A.   Currently an attempt is -- an attempt to commit

8     voter fraud or voter impersonation as characterized

9     would be a class A misdemeanor, which is punishable by

10    only up to a year in jail and a fine of $4,000.

11    Q.   And an actual act of voting -- voter

12    impersonation?

13    A.   I believe it's only, and I believe right now it's

14    only a third degree penalty.  Only two to three years in

15    the State of Texas and up to a $10,000 fine.

16    Q.   You're saying only two to 10 years.  Would you

17    consider that a significant amount of time for the act

18    of voter impersonation?

19    A.   And this is my opinion.  We have a statute in the

20    State of Texas which says that if you tamper with an

21    electronic voting device, in other words an electronic

22    E-machine, that is a first degree felony which is punish

23    able by up to five to 99.  I think tampering with an

24    electronic voting machine or illegal voting, in my mind

25    are not dissimilar.  So I think it should be more

227

1    severe.

2       Q.  So are you suggesting that a voter who commits

3    voter impersonation at the polls should be subject to up

4    to 99 years in prison?

5       A.  I think that's a very serious offense and that

6    elections in Texas are decided, in some cases, in small

7    rural jurisdictions by a handful of votes and just one

8    vote can swing an election.

9       Q.  Under the current law, non-citizens if they

10   voted, there's an enhancer penalty, correct?

11      A.  I can't remember all the laws.  I don't recall

12   that specific one right now.

13      Q.  Are the penalties specific to non-citizens

14   voting?

15      A.  I would think it would be just under 64012, which

16   would be illegal voting.

17      Q.  If a non-citizen represents that they're a

18   citizen when they register to vote, is there an

19   additional penalty to that?

20      A.  Yes, sir.  There is an offense for providing

21   false information on the voter registration application.

22      Q.  That would be perjury, correct?

23      A.  Under the Texas election code it could be

24   prosecuted either way.  As perjury or the false

25   statement on the voter registration application.

Major Forrest Mitchell                                    June 15, 2012

228

1          Q.   And that would be an additional penalty to the
2      other penalties you've discussed?
3          A.   Yes, sir.
4          Q.   And a voter, a non-citizen, who votes at a
5      polling place would also be subject to deportation if
6      they were discovered?
7          A.   It's my understanding that the only way someone
8      would be deported at this time is if they were convicted
9      of a felony criminal offense.
10         Q.   And what are you basing that on?
11         A.   Articles I've read in the newspaper.
12         Q.   So as the supervisor for the SIU, are you aware
13     of what the penalties are for an illegal alien or
14     non-citizen voting?  And that would be an illegal
15     non-citizen voting.
16         A.   Federally or State?
17         Q.   State.
18         A.   I would think it would be -- I don't know exactly
19     what the penalties are.  I believe illegal voting is a
20     third degree felony.
21         Q.   And you mentioned federal.  There are additional
22     federal penalties for illegal aliens voting.  Would that
23     be correct?
24         A.   I don't know, sir.
25         Q.   You were asked a question about whether or not

Major Forrest Mitchell                              June 15, 2012

229

1    you knew if there were additional allegations or

2    investigations of voter fraud in Harris County, Dallas

3    County, Bexar County.  Do you recall that testimony?

4         A.  Yes, sir, I do.

5         Q.  In fact, you received, you being the office of

6    the attorney general, has received referrals from all of

7    those counties, Harris County, Dallas and Bexar County;

8    isn't that correct?

9         A.  I do not think we have received any referrals

10   from the district attorney's office in Dallas County.

11   We have received allegations -- we have received

12   referrals from the Secretary of State referencing Dallas

13   elections.

14        Q.  And the initiative that you engaged in to train

15   various, I believe you said peace officers, that

16   included Harris, Dallas and Bexar County?

17        A.  I don't recall the exact specific locations that

18   we trained.  I do know that we enlisted the support of

19   the councils of government in geographical areas.  I

20   don't remember if Dallas or Houston were specific

21   locations that we trained.  I do know that we trained

22   all over Texas.

23        Q.  Specifically cities that had 100,000 or more?

24        A.  No, we trained in locations that were actually

25   even smaller than that.  The training that I personally

Major Forrest Mitchell                                    June 15, 2012

230

1    conducted was in deep East Texas, Smith County and Bowie

2    County.

3        Q.   Now, you've relied on your spread sheet for

4    various aspects of voter fraud in the State of Texas;

5    isn't that correct?

6        A.   Yes, sir, I have.

7        Q.   In fact, you relied on that to determine the

8    geographical areas of the violations were occurring in.

9    I believe that was your testimony?

10       A.   Yes, sir.

11       Q.   And so as you sit here today, you're aware of 320

12   referrals that came to the office of the Attorney

13   General, correct?

14       A.   Yes, sir.

15       Q.   And I believe I asked you during the initial part

16   of your testimony whether or not you were aware of any

17   other allegations of voter impersonation or

18   investigations of voter impersonation in the State of

19   Texas and I believe your answer was no; is that correct?

20            MR. SWEETEN:   I think that misstates the

21   testimony.

22   BY MR. GEAR:

23       Q.   Well, are you aware of any other investigations

24   of voter impersonation in the State of Texas, other than

25   the ones that have been investigated by the attorney

231

1   general's office?

2        A.   I believe I mentioned the fact that I was aware

3   of one that occurred in Tarrant County as well.

4        Q.   Other than Tarrant County?

5        A.   No, sir.

6        Q.   So your opinion that there are many and they are

7   undirected is just that, an opinion; is that correct?

8        A.   Yes, sir it is an opinion based upon

9   investigation that we've conducted and witnesses we've

10  interviewed and allegations that we've reviewed.

11       Q.   And based on investigations that you've

12  conducted, you would have pursued those if the facts and

13  the law warranted a charge of voter impersonation.  Is

14  that fair to say?

15            MR. SWEETEN:  Objection; compound.

16       A.   There are many reasons why we may not pursue

17  allegations or prosecute somebody for voter

18  impersonation.  We have the proof of -- we have the

19  burden of proof of beyond the reasonable doubt.

20       Q.   (By Mr. Gear)  Correct, because it's a criminal

21  offense.

22       A.   And there are cases where we may not have felt

23  that we had proof beyond the reasonable doubt to

24  prosecute somebody.

25       Q.   Are there cases that you believed you had proof

232

1      beyond a reasonable doubt that you determined not to
2      prosecute?
3           A.   No.   I don't believe that we had proof beyond a
4      reasonable doubt that we chose not to prosecute.
5           Q.   And as you sit here today, are you aware of
6      any -- are you aware of any cases that have not been
7      prosecuted for voter impersonation that should have
8      been?
9           A.   No, sir.
10          Q.   You were asked a question about the federal law
11     enforcement having the ability to prosecute voter
12     impersonation and investigating and prosecute voter
13     impersonation in the State of Texas.  Do you recall that
14     question?
15          A.   Yes, sir.
16          Q.   Are you aware of any investigations conducted by
17     federal law enforcement between 2002 and 2012 that
18     involved voter impersonation?
19          A.   Yes, sir, I'm aware that in the Dallas 2010
20     investigation that the FBI was also involved.
21          Q.   And you've testified to that particular case in
22     2010, correct?
23          A.   Yes, sir.
24          Q.   In any event, would you agree that if there was
25     federal investigation in the State of Texas that they

233

1    would communicate with the State of Texas Attorney

2    General before conducting an investigation in your

3    jurisdiction?

4              MR. SWEETEN:   Objection; it calls for

5    speculation.

6    BY MR. GEAR:

7       Q.   Well, I mean, based on your experience as a

8    supervisor, a police officer, the supervisor of the SIU,

9    are you aware of any cases where the federal government

10   has investigated without first informing you of the

11   investigation?

12      A.   No, I'm not aware of any.  I would hope that the

13   FBI would communicate with us.  But I know that that's

14   not always the case.

15      Q.   Regarding your opinion that there are cases that

16   have gone undetected, which investigations, if any, are

17   you referring to and which witnesses are you referring

18   to that lead you to this opinion?

19              MR. SWEETEN:   Objection; compound.

20   BY MR. GEAR:

21      Q.   Well, let's start with investigations.  Are you

22   aware of any investigations that lead you to the opinion

23   that there are cases that have gone undetected?

24      A.   I believe that there was a case in Progresso

25   which is Hidalgo County.

234

1          Q.   Does that appear on your spread sheet?

2          A.   Yes.

3          Q.   And can you show me where it appears on your

4     spread sheet?

5          A.   I believe it appears on Page 3 of election code

6     referrals, office of the attorney general, August 2002

7     to present.  It is approximately.

8          Q.   What was the date of the alleged election?

9          A.   It was the 2008 municipal election.

10         Q.   What are the facts of that case?

11         A.   This is a case that was referred to our office,

12    but also the local district attorney, I believe, got the

13    referral as well.

14         Q.   Okay.  And what are the facts of the case?

15         A.   We had witnesses who informed us that some

16    suspects were outside of the polling place and that they

17    were handing out voter registration cards to vote, to go

18    cast votes in that election.

19         Q.   Those were the allegations?

20         A.   Those were the allegations.

21         Q.   Did your office handle the investigation?

22         A.   We investigated that, yes.

23         Q.   What was the outcome of that investigation?

24         A.   No criminal charges were filed.

25         Q.   And what was the reason no criminal charges were

Major Forrest Mitchell                                    June 15, 2012

235

1        filed?

2            A.   The witness who gave us that information had

3        inconsistent statements between interviews.

4            Q.   Are there any other cases that you're basing your

5        opinion on, the opinion that there are cases that go

6        undetected?

7            A.   Well, if I could go back to the Harris County

8        case from the 2008 primary election, which I previously

9        testified to.

10           Q.   Can you tell me which case that is, who was

11       involved in that?

12           A.   That would be Jack Carol Crowder.

13           Q.   Okay.  Mr. Crowder who was ultimately convicted?

14           A.   Yes, sir.

15           Q.   Based on a plea?

16           A.   Yes, sir.  The group that did the analysis

17       comparing Harris County voters to deceased voters had --

18       and I don't remember the exact number, but I want the

19       say it was hundreds, if not thousands of voters who they

20       believed were deceased and who actually voted.

21           Q.   Did you investigate that?

22           A.   We could only -- we only have the resources to

23       investigate a small portion of that allegation.

24           Q.   Other than Mr. Crowder, are there any other open

25       investigations on your spread sheet?  Were there any

Major Forrest Mitchell                                    June 15, 2012

                                                                    236

1    other investigations based on what the group presented

2    on your spread sheet?

3        A.   No.  I mean.

4        Q.   So you're saying hundreds if not thousands of

5    possible dead people that have voted, wouldn't that be

6    something that your office would investigate?

7        A.   I only have a limited number of investigators and

8    the ability to investigate all of the names on that list

9    was not feasible.

10       Q.   And isn't it a fact that there are people who

11   have passed away that are still on a voter registration

12   role and that's not -- that's because the roles have not

13   been updated to remove them?

14       A.   One of the difficulties in the State of Texas is

15   that there are multiple jurisdictions that have voter --

16   each county has their own voter registration department.

17   It could be based as an election office or it could be

18   based in a county clerk's office to handle the voter

19   registration.  So there's 254 different ways.  Not all

20   of them share the same systems.  And it's my experience

21   as an investigator, that many of the counties, the way

22   they purge their roles of deceased voters is by looking

23   at obituaries.  And in some cases they obtain the social

24   security death index, which could take months to do if

25   that's what they're relying on.  So there could be a

237

1    number of voters who are deceased.

2         Q.   So ultimately, the answer to my question is yes?

3         A.   Yes, sir.

4         Q.   And the fact that there is a person who is

5    deceased on the voter registration role does not mean

6    that there is an incident of voter fraud, does not

7    necessarily mean that there's any type of fraud going

8    on?

9         A.   Well, there's the opportunity for fraud.

10        Q.   You said that you based your opinion that there

11   are undetected cases on speaking with witnesses, can you

12   name the witnesses who you're referring to?

13        A.   No, I don't know their names today.

14        Q.   And they would have been in connection with the

15   group that you've been speaking about?

16        A.   No.  I was mentioning witnesses down in the

17   Progresso case.

18        Q.   And you've testified about that case, correct?

19        A.   Yes, sir.

20             MR. GEAR:  I don't think I have any further

21   questions.  I am going to leave the deposition open.

22             MR. SWEETEN:  I have a few follow-ups.

23             MR. ROSENBERG:  If you're going to go I'll

24   go after you.

25             MR. SWEETEN:  Okay.  That's fine.

1               MR. ROSENBERG:  You go first.

2               BY MR. ROSENBERG:  It's your turn and then I

3     get it back.  Go ahead.

4               FURTHER EXAMINATION.

5     BY MR. ROSENBERG:

6        Q.  Major, just because a crime may be difficult to

7     detect doesn't mean the crime has necessarily been

8     committed, does it.

9        A.  I'm sorry.  Would you repeat that one more time?

10       Q.  Sure.  Just because a crime may be difficult to

11    detect doesn't mean that it's being committed, does it?

12       A.  That's correct.

13       Q.  Okay.  And also you testified in response to

14    questions from Mr. Sweeten about the fact that he didn't

15    have access to the data from other counties, correct?

16       A.  That's correct.

17       Q.  But you have no basis upon which to quantify any

18    additional instances of in person voter impersonation,

19    other than those which you testified today, correct?

20       A.  I have no other means to identify additional

21    cases.

22       Q.  And you would also agree, wouldn't you, that if a

23    crime, in fact, even if it were difficult to detect

24    became more prevalent, the more prevalent it became the

25    more easy it would be to detect it.  Isn't that a fact?

239

1              MR. SWEETEN:  Objection; calls for

2       speculation.

3          A.  I don't believe just because it's prevalent that

4       it's easier to detect.

5          Q.  (By Mr. Rosenberg)  The more prevalent it

6       becomes, isn't this what happens in your police work,

7       that more people know about things, more people talk

8       about things.  More people may know the person who walks

9       into a polling place, isn't that likely to happen if it

10      were very much more prevalent and than it is according

11      to your statistics?

12              MR. SWEETEN:  Objection; assumes facts not

13      in evidence.  Objection; calls for speculation.  You can

14      answer.

15         A.  I believe that even if it's more prevalent in a

16      jurisdiction like Harris County or Dallas County or

17      Bexar County that it would still be very difficult to

18      defect because the key to detecting voter impersonation

19      fraud is that someone in the polling place must be able

20      to identify the person whose name appears in the voter

21      registration certificate as the system is currently

22      designed.

23         Q.  (By Mr. Rosenberg)  And the more prevalent in

24      person voter fraud was, the more likely it would be that

25      someone would be identifying someone; isn't that

                                                         240

1       correct?

2                     MR. SWEETEN:  Same objection.

3       BY MR. ROSENBERG:

4          Q.  Common sense tells you that.

5          A.  I don't believe so because there is a limited

6       number of people inside the polling place.  It's limited

7       to the number of election officials working there and

8       limited to pole watchers who are there.

9          Q.  That's correct, but the more people there are the

10      more likely there are going to be connections.  Isn't

11      that just a matter of common sense?

12                    MR. SWEETEN:  Same objection.  And asked and

13      answered, by the way.

14         A.  You're talking about polling places which process

15      thousands of people a day for elections.  And absent

16      some sort of ID requirement, it would -- the likelihood

17      that they themselves know the voters representing

18      themselves is very slim.  In fact, some elections

19      officials I don't think even necessarily work or live in

20      the precincts where they're assigned.

21         Q.  (By Mr. Rosenberg)  But the more it happens, the

22      more likely it is people would recognize people, isn't

23      that correct?

24                    MR. SWEETEN:  Asked and answered.

25      Objection.

Major Forrest Mitchell                                    June 15, 2012

241

1        A.   I don't believe that's case.

2        Q.   (By Mr. Rosenberg)  Let me ask another question.

3   You have no basis on which to say whether there's one

4   more instance of in person voter fraud or five more;

5   isn't that correct?

6             MR. SWEETEN:  Objection; argumentative.

7        A.   I believe with a fact that we have thousands of

8   people who are deceased on our pole lists, who every

9   year voter registration cards get mailed out, I believe

10  that's an incredible opportunity to commit fraud and

11  that the government has a responsibility to stop that.

12       Q.   (By Mr. Rosenberg)  But you have no basis upon

13  which to quantify it whatsoever?

14            MR. SWEETEN:  Objection; asked and answered.

15  Objection; argumentative.

16       A.   The basis I would have to argue that would be

17  that we know there are thousands and tens of thousands

18  of deceased voters on our roles in the State of Texas

19  and that opportunity exist.

20       Q.   (By Mr. Rosenberg)  But you cannot identify any

21  instances of voter fraud, other than those that you've

22  identified in your in person voter fraud, other than

23  those you've identified in your spread sheet?

24            MR. SWEETEN:  Objection; asked and answered.

25  Go ahead.  Objection; argumentative.

Major Forrest Mitchell                          June 15, 2012

242

1          A.   It's a very difficult crime to detect.

2               BY MR. ROSENBERG:  Pass to Mr. Sweeten.

3               MR. SWEETEN:  I have no further question

4     thank you.

5               MR. GEAR:  Again, I'm going to hold this

6     deposition open.

7               MR. SWEETEN:  Let's talk about that.  What

8     you're talking about.  What is your specific complaint,

9     Mr. Gear.

10              MR. GEAR:  Well, my specific complaint is

11    that your client has testified on numerous occasions

12    during this deposition that there are other documents

13    that are available that may provide support to his

14    testimony.  These documents, as I know, have not been

15    produced.  And there are multiple documents that we have

16    gone through.  I believe I have a right to hold this

17    deposition open based on that.  And that's what I intend

18    to do.

19              MR. SWEETEN:  Well, let me give you a brief

20    response on the record.

21              MR. GEAR:  Sure.

22              MR. SWEETEN:  First of all, you requested

23    documents from us and I -- your request has been

24    objected to, both in the request to produce which was

25    answered on March 30th where we objected that it was

Major Forrest Mitchell                          June 15, 2012

243

1    overly broad, unduly burdensome.  And then we also have
2    requested to the deposition notice.  I'll also say that
3    we have offered the Department of Justice and we've
4    provided you the indictments, the convictions, we
5    provided you a stack of documents.  You have not --
6    we've also attempted to discuss with you and your office
7    in particular, the -- what it is specifically you're
8    looking for because if you're request really is that you
9    want every single case file underlying the 320
10   investigations on this spread sheet, it is an
11   extraordinarily difficult request based upon those
12   documents.  I have not gotten any sense from you-all
13   that you want anything less than everything, and so
14   we've objected we're standing by that objection.  We
15   stand ready to discuss the matter if with you.  In light
16   of -- if you want to discuss this issue, we will do
17   that.  But we've provided you -- and we've maintained
18   our objection throughout and we still maintain that
19   objection based upon the breadth of the request that
20   have been made.
21              MR. GEAR:  And I respect that.  And part of
22   that conversation has been with me.  And part of that
23   conversation has essentially said -- asked me to
24   identify what I believe I need in response to the spread
25   sheet and I've said I could not do that.  I believe I

Major Forrest Mitchell                                    June 15, 2012

                                                                    244

1     said that both in writing and orally.  And again,

2     there's no need to argue this much farther on the

3     record.

4                    MR. SWEETEN:  I agree.

5                    MR. GEAR:  But I intend on holding this

6     deposition open.

7                    MR. SWEETEN:  Okay.  We can go off the

8     record.

9                    (Deposition concluded)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

245

1                    CHANGES AND SIGNATURE

2              RE: STATE OF TEXAS VS. HOLDER

3

4       PAGE    LINE    CHANGE              REASON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Major Forrest Mitchell                                    June 15, 2012

246

1        I, MAJOR FORREST MITCHELL, have read the
foregoing deposition and hereby affix my signature that
2   same is true and correct, except as noted above.

3
                        MAJOR FORREST MITCHELL
4   THE STATE OF TEXAS        )
                                            )
5   COUNTY OF _____    )
             Before me,                    , on this day
6   personally appeared MAJOR FORREST MITCHELL, known to me
    (or proved to me under oath or through
7   (description of identity card or other document) to be
    the person whose name is subscribed to the foregoing
8   instrument and acknowledged to me that they executed the
    same for the purposes and consideration therein
9   expressed.

10           Given under my hand and seal of office this ____
    day of             ,        .
11

12                        NOTARY PUBLIC IN AND FOR
                          THE STATE OF
13

14

15

16

17

18

19

20

21

22

23

24

25

247

1                   IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2
    STATE OF TEXAS             )
3                              )
                               )
4   VS.                        )  NO. 12-CV-128
                               )  (DST, RMC, RLW)
5                              )
    ERIC H. HOLDER, JR.,       )
6   In his official                          )
    Capacity as Attorney           )
7   General of the United          )
    States, ET AL               )
8
9   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
                       CERTIFICATE FROM THE
                       ORAL DEPOSITION OF
10      MAJOR FORREST MITCHELL
                       JUNE 15, 2012
11
    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
12           I, Janalyn Reeves, a Certified Shorthand Reporter
13  in and for the State of Texas, do hereby certify that
14  the foregoing deposition is a full, true and correct
15  transcript;
16       That the foregoing deposition of MAJOR FORREST
17  MITCHELL, the Witness, hereinbefore named was at the
18  time named, taken by me in stenograph on June 15, 2012,
19  the said Witness having been by me first duly cautioned
20  and sworn to tell the truth, the whole truth, and
21  nothing but the truth, and the same were thereafter
22  reduced to typewriting by me or under my direction.  The
23  charge for the completed deposition is $ _____ due
24  from Defendant.
25       () That pursuant to the Federal Rules of Civil

Major Forrest Mitchell                           June 15, 2012

248

1    Procedure, the Witness shall have 30 days after being

2    notified by certified mail, return receipt requested, by

3    the deposition officer that the original deposition

4    transcript is available in her office for review and

5    signature by the Witness and if any corrections made are

6    attached hereto;

7        () That by agreement of counsel, a reading condensed

8    copy of the deposition transcript along with the

9    full-size original changes and Signature Sheet has been

10   sent to_____ on_____, for review and

11   signature within 30 days and if any corrections returned

12   are attached hereto;

13       () That by agreement of counsel, the deposition

14   officer is instructed to release the original deposition

15   transcript to _____ on_____, for review and

16   signature, and the deposition officer is thereafter

17   released of any further responsibility with regard to

18   the original.

19       () That the Witness shall have thirty (30) days for

20   review and signature of the original transcript and if

21   any corrections returned are attached hereto.

22       () That the signed transcript () was () was not

23   received from the Witness within 30 days.

24       () That the examination and signature of the Witness

25   is waived by the Witness and the parties;

249

1          That the amount of time used by each party at the

2     deposition is as follows:

3                   Mr. Bruce Gear - 5 hours 46 minutes

4                   Mr. Ezra Rosenberg - 16 minutes

5                   Mr. Patrick Sweeten - 14 minutes

6          I further certify that I am neither counsel for,

7     related to, nor employed by any of the parties in the

8     action in which this proceeding was taken, and further

9     that I am not financially or otherwise interested in the

10    outcome of the action.

11                  WITNESS MY HAND, this the_____ day

12    of          , A.D., 2012.

13                        _____
                          JANALYN REEVES
14                        Cert. No. 3631
                          Expires Dec. 12
15                        100 Congress Avenue
                          Suite 220
16                        Austin, Texas  78701
                          (512)634-1980
17                        Firm Registration No. 283

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    :    Docket No. CA 12-128
                                   :
        Plaintiff                  :
v.                                 :
                                   :
ERIC H. HOLDER, JR., in his        :    Washington, D.C.
Official Capacity as               :    Monday, July 9, 2012
Attorney General of the            :    P.M. SESSION
United States,                     :
                                   :
        Defendant, and             :
                                   :
ERIC KENNIE, et al.,               :
                                   :
        Intervenor-Defendants  :        2:00 p.m.
. . . . . . . . . . . . . . . . :       . . . . . . . . . . . .

TRANSCRIPT OF BENCH TRIAL
DAY 1 - P.M. SESSION
BEFORE THE HONORABLE DAVID S. TATEL
UNITED STATES CIRCUIT JUDGE
THE HONORABLE ROSEMARY M. COLLYER
THE HONORABLE ROBERT L. WILKINS
UNITED STATES DISTRICT JUDGES

APPEARANCES:

For the Plaintiff:        PATRICK K. SWEETEN
                          JOHN WILLIAM MCKENZIE
                          MATTHEW H. FREDERICK
                          STACEY NAPIER
                          OFFICE OF THE ATTORNEY GENERAL
                          OF TEXAS
                          209 West 14th Street
                          7th Floor (MC-059)
                          Austin, TX 78701
                          (512) 936-1695

                          ADAM K. MORTARA
                          ASHA L. I. SPENCER
                          JOHN M. HUGHES
                          BARTLIT BECK HERMAN
                            PALENCHAR & SCOTT, LLP
                          54 West Hubbard Street
                          Suite 300
                          Chicago, IL.  60654
                          (312) 494-4469

*Rebecca Stonestreet*          *(202) 354-3249*          *kingreporter2@verizon.net*


EXHIBIT
2
Mitchell 8-12-14
PENGAD 800-631-6989

For the Defendant:               ELIZABETH STEWART WESTFALL
                                 MEREDITH BELL-PLATTS
                                 JENNIFER MARANZANO
                                 DANIEL J. FREEMAN
                                 RISA BERKOWER
                                 BRUCE I. GEAR
                                 SPENCER R. FISHER
                                 U.S. DEPARTMENT OF JUSTICE
                                 Civil Rights Division,
                                 Voting Section
                                 950 Pennsylvania Avenue, NW
                                 NWB-Room 7202
                                 Washington, DC 20530
                                 (202) 305-7766


For the Intervenor              EZRA D. ROSENBERG
Defendants:                     DECHERT LLP
                                 902 Carnegie Center
                                 Suite 500
                                 Princeton, NJ  08540-6531
                                 (609) 955-3200

                                 JOSEPH GERALD HEBERT
                                 J. GERALD HEBERT, P.C.
                                 191 Somervelle Street
                                 Suite 405
                                 Alexandria, VA  22304
                                 (703) 628-4673

                                 CHAD W. DUNN
                                 BRAZIL & DUNN
                                 4201 FM 1960 West
                                 Suite 530
                                 Houston, TX 77068
                                 (281) 580-6310

                                 ADAM M. HARRIS
                                 FRIED, FRANK, HARRIS, SHRIVER &
                                    JACOBSON LLP
                                 One New York Plaza
                                 24th Floor
                                 New York, NY 10004
                                 (212) 859-8953

JORGE SANCHEZ
MEXICAN AMERICAN LEGAL DEFENSE &
    EDUCATIONAL FUND, INC
11 East Adams Suite #700
Chicago, IL 60603
(312) 427-0701

NANCY G. ABUDU
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
230 Peachtree Street, NW
Suite 1440
Atlanta, GA  30303
(404) 523-2721

Court Reporter:          REBECCA STONESTREET, RPR, CRR
                         Official Court Reporter
                         Room 6511, U.S. Courthouse
                         Washington, D.C.  20001
                         (202) 354-3249


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOSE ALISEDA | | | | |
| By Mr. Freeman | 5 | -- | -- | -- |
| By Mr. Sanchez | -- | 31 | -- | -- |
| | | | | |
| FORREST MITCHELL | | | | |
| By Mr. Sweeten | 33 | -- | 69 | -- |
| By Mr. Gear | -- | 49 | -- | -- |
| | | | | |
| SENATOR THOMAS WILLIAMS | | | | |
| By Mr. Frederick | 69 | -- | -- | -- |
| By Mr. Fisher | -- | 100 | -- | -- |
| By Ms. Abudu | -- | 129 | -- | -- |
| | | | | |
| THOMAS SAGER | | | | |
| By Mr. Mortara | 135 | -- | -- | -- |

# E X H I B I T S

| NUMBER | ADMITTED |
|---|---|

(NO EXHIBITS MOVED INTO EVIDENCE.)

```
 1    purpose.  Through lunch -- not counting the cross-examinations
 2    of Representative Aliseda, through lunch Texas had used 12.5 of
 3    its hours, the United States had used 41 minutes, and the
 4    intervenors had used 13 minutes.
 5              Go right ahead, sir.  Nice to see you again.
 6              MR. SWEETEN:  Good afternoon, Your Honor.  Thank you.
 7    Patrick Sweeten on behalf of the State of Texas.  The State of
 8    Texas calls Major Forrest Mitchell.
 9              (Oath administered by Courtroom Clerk.)
10    (FORREST MITCHELL, PLAINTIFF witness, having been duly sworn,
11                    testified as follows:)
12                    DIRECT EXAMINATION
13    BY MR. SWEETEN:
14    Q.  Good afternoon, Major Mitchell.
15    A.  Good afternoon, sir.
16    Q.  Can you introduce yourself to the court, please?
17    A.  Yes.  My name is Forrest Andrew Mitchell and I am a major
18    with the law enforcement division of the Attorney General's
19    Office for the State of Texas.
20    Q.  What is it you do for the Texas Attorney General's Office?
21              JUDGE COLLYER:  Excuse me.  Is major a title?  Is major
22    a rank or is major a name?
23              THE WITNESS:  Major is a rank that I hold.
24              THE COURT:  Thank you, sir.  Go ahead.
25    BY MR. SWEETEN:
```

1  Q.  What is it that you do for the Texas Attorney General's

2  Office?

3  A.  I'm a state criminal investigator with supervisory

4  responsibility.

5  Q.  And where do you currently live?

6  A.  I live in Austin, Texas with my wife and children.

7  Q.  How long have you worked for the Office of Attorney General

8  in Austin?

9  A.  Since -- in September it will be 15 years.

10  Q.  And what did you do when you first joined the office?

11  A.  When I first joined the office, I was assigned to the

12  prosecution assistance division, and our job was to travel

13  around the state and help smaller rural jurisdictions in the

14  capital murder prosecutions.

15  Q.  And what was your next position with the Office of Attorney

16  General after that?

17  A.  In June of 2005 I was promoted to the rank of lieutenant

18  within the Special Investigations Unit.

19  Q.  Can you tell the Court what it is that the Special

20  Investigations Unit does?

21  A.  Yes.  The Special Investigations Unit is a team of -- or has

22  teams of investigators that conduct criminal investigations in a

23  wide variety of areas.  Some of these areas include money

24  laundering, human trafficking, public integrity, white collar

25  crime, and election violations.  I also have a team of

1    investigators who assist local DA's with criminal cases as well.

2    Q.   When was this unit formed, sir?

3    A.   It was formed in the summer of 2005.

4    Q.   And how many law enforcement officers do you supervise total

5    within the SIU?

6    A.   There are 40 investigators in the Special Investigations

7    Unit.

8    Q.   How, do all of those work on elections investigations?

9    A.   No, sir, only a portion.

10   Q.   And in fact, of the 64 officers under your charge, how many

11   work on elections violations?

12   A.   We currently have three investigators assigned to work

13   election cases in the State of Texas.

14   Q.   And how do you refer to that subgroup of the SIU?

15   A.   We refer to them as the elections team.

16   Q.   Now, what are the types of election code violations that the

17   election team investigates?

18   A.   It would be illegal voting and other violations of the Texas

19   election code, or Penal Code offenses surrounding elections.

20   Q.   And let's focus on the illegal voting cases for a moment.

21   Are there different types of illegal voting cases that you

22   investigate?

23   A.   Yes, sir.   Under Chapter 64 of the Texas Election Code, the

24   offense of illegal voting is kind of broken into four

25   categories:   The first category would be an ineligible voter

1    casting a ballot in an election; another would be voter

2    impersonation; another example is a voter who votes more than

3    once in an election; and then the final type of illegal voting

4    is a person who marks a ballot contrary to the instructions of a

5    voter.

6    Q.  Okay.  Now, one of the things you said is "voter

7    impersonation."  What is that?

8    A.  Voter impersonation is when someone uses another's identity

9    to cast a ballot in an election, either to vote again or to vote

10   in an election they're not eligible to vote in.

11   Q.  Now, I want to talk first before we go into that in more

12   detail about the referral investigation process.  How does the

13   SIU learn of potential cases of election violations?

14   A.  The Office of the Attorney General receives investigative

15   referral requests from a wide variety of sources.  The first

16   would be the Texas Secretary of State's Office; another source

17   would be the local district and county attorneys, and then also

18   from elections administrators and then from local law

19   enforcement.  And then when the Attorney General's Office

20   receives these referrals, they're routed to the Special

21   Investigations Unit.

22   Q.  So we're clear, does the Office of Attorney General ever

23   initiate investigations on its own without a referral?

24   A.  By our policy, we're referral driven.

25   Q.  Are all election violation referrals to the Office of

1    Attorney General typically routed to the SIU office?

2    A.   Yes, sir.

3    Q.   Does the SIU or the Office of Attorney General's office have

4    sole jurisdiction over election violation cases within the

5    State of Texas?

6    A.   No, sir.  Local district and county attorneys have

7    concurrent jurisdiction on elections, and also the federal

8    government has jurisdiction in, I would presume, national

9    elections.

10   Q.   Now, are those county DA's or county attorneys, are they

11   required to refer to the Office of Attorney General cases to

12   you, or can they prosecute those on their own?

13   A.   There's no legal requirement for the local county and

14   district attorneys to refer a case to us.  They have concurrent

15   jurisdiction and they're capable of investigating and

16   prosecuting those on their own.

17   Q.   In addition to your supervisory responsibilities, have you

18   personally been assigned to investigate election violations?

19   A.   Yes, sir.  I have been assigned cases and I have assisted in

20   investigation of election code offenses.

21   Q.   And do you keep track of all election violation cases that

22   are referred to your office?

23   A.   Yes, sir, I do.

24   Q.   And how do you do that?

25   A.   I maintain an Excel spreadsheet which is divided into three

```
 1    books.   The first book would be all of the election code
 2    referrals that come into our office; and the second book would
 3    be the prosecutions resolved; and then the third book of the
 4    spreadsheet would be the charges pending.
 5    Q.   So when the SIU receives a referral, what do you do with
 6    respect to the spreadsheet?
 7    A.   The first thing that we do is that we assign the referral a
 8    tracking number, and then we examine the allegations and record
 9    them on our spreadsheet.
10    Q.   And how do you maintain those spreadsheets?
11              JUDGE COLLYER:   Isn't this already addressed in the
12    record and ruled on by the court?
13              MR. SWEETEN:   Yes, Your Honor.   I'm just laying
14    foundation for the spreadsheets that I'm going to talk about.
15              JUDGE COLLYER:   Yes, but we've already ruled on the
16    spreadsheets, didn't we?   Wasn't there an objection to the
17    spreadsheets because the government didn't see the underlying
18    documentation, and I ruled it was a business record?
19              MR. SWEETEN:   Yes, i think that's right.
20              THE COURT:   So why don't we just move on?
21              MR. SWEETEN:   Yes, ma'am.
22              THE COURT:   Great.   Good thinking.
23    BY MR. SWEETEN:
24    Q.   So let's talk about the spreadsheets, and in particular I'm
25    going to show you what's been marked as PX-41.   Can you see
```

1    that?

2    A.   Yes, sir, I can.

3    Q.   Can you identify for us what is PX-41?

4    A.   This is the election code violation spreadsheet that I

5    maintain as the supervisor of the Special Investigations Unit,

6    and it contains the referrals that our office receives.

7    Q.   And can you tell us what data that you input into this

8    spreadsheet?

9    A.   In this spreadsheet I input the county of the alleged

10   violation, and then also the election involved, and then the

11   Secretary of State's Office referral date, and then also the

12   allegations that were made.  I also, if the source is from a

13   local DA or a local law enforcement officer or local elections

14   administrator, I'll record that.

15   Q.   And you update this how frequently?

16   A.   Monthly.

17   Q.   I'm going to show you what's been marked as Plaintiff's

18   Exhibit 42.  Can you tell the Court what this spreadsheet is,

19   PX-42?

20   A.   This is the spreadsheet that I maintain as the supervisor of

21   the Special Investigations Unit, and it contains the

22   prosecutions that the Attorney General's Office has either

23   prosecuted or worked with a local district attorney or county

24   attorney to prosecute.

25              JUDGE COLLYER:   What is the title of this document at

 1    the top?

 2            THE WITNESS:  The title says "Election Code Referrals

 3    of the Office of the Attorney General, Prosecutions Resolved."

 4            JUDGE COLLYER:  Thank you.  And that's PX-42?

 5            THE WITNESS:  Yes, Your Honor.

 6            JUDGE COLLYER:  Thank you, sir.

 7    BY MR. SWEETEN:

 8    Q.  And can you tell us just generally what's contained in this

 9    document?

10    A.  This document is going to contain the county of the offense,

11    the county where it was prosecuted, the name of the defendant,

12    the allegations that were made in that election, the election

13    involved, the cause number of the case, and then the charge that

14    was filed by indictment, and then also the resolution date, the

15    relevant statute under the Election Code or Penal Code, and then

16    finally what the disposition of the case is.

17    Q.  And I'll show you one more document --

18            JUDGE COLLYER:  Mr. Sweeten, I'm sorry to interrupt

19    you.  Do you know how to operate that well enough to just blow

20    up a little bit of that last exhibit?

21            MR. SWEETEN:  No, I'm afraid I don't, but someone at my

22    table can.

23            THE COURT: All lawyers need friends.

24            MR. HUGHES:  Is that too close, Your Honor?

25            THE COURT:  Oh, no, not for me.

```
 1              MR. SWEETEN:  Your Honor, I can give the court paper
 2      copies if the court wants it.
 3              JUDGE COLLYER:  No, I got it.  I just actually wanted
 4      to see how it was because I couldn't see it.  Thank you, sir.
 5      Thank you, Mr. Sweeten.
 6      BY MR. SWEETEN:
 7      Q.  And I'm going to show you the third document, the last one,
 8      and I'll try to center it so Your Honor can see it.  Okay.  And
 9      there's the title of that document is "Election Code Referrals
10      to the Office of Attorney General, Charges Pending Resolution."
11      Can you tell the court briefly what this document shows?
12              JUDGE WILKINS:  What is the exhibit number, sir?
13              MR. SWEETEN:  It's PX-43.
14      A.  Exhibit 43 represents the cases which are currently pending
15      resolution.  These are cases that have been indicted and are
16      currently awaiting trial.
17      BY MR. SWEETEN:
18      Q.  And these last two, PX-42 and 43, how often are they
19      updated?
20      A.  I maintain those or update those as there's some sort of
21      resolution or disposition in the case.
22      Q.  Now, after you receive the referral and enter it on your
23      spreadsheet, what do you do after that?
24      A.  Well, we evaluate the case and make sure that the criminal
25      investigation is warranted, and then it would be approved -- or
```

1    it would be assigned to a member of the elections team to

2    investigate.

3    Q.  Now, is every case that's referred to SIU, is that

4    investigated?

5    A.  No, sir, there are certain circumstances where the cases

6    aren't investigated.  One example may be that the statute of

7    limitations has expired; it could also be that it is not really

8    a criminal offense; or it could be that it's a Class C

9    misdemeanor, which is the lowest level of criminal offense in

10   the State of Texas which is punishable by a fine only.  Because

11   we have a limited amount of resources, we wouldn't investigate

12   those.

13   Q.  When you refer an election violation for additional

14   investigation, what do you do after that?

15   A.  It would go to a member of the special investigations

16   election team.

17   Q.  And does SIU actually handle the prosecution of cases?

18   A.  No, sir.  Upon the completion of a criminal investigation

19   where we believe that there's sufficient evidence to charge a

20   case, we would refer that to the criminal prosecutions of the

21   Office of Attorney General, or a local district or county

22   attorney.

23   Q.  Do your spreadsheets, PX-41 through 43, do they contain any

24   entries related to cases that are investigated by county

25   district attorneys or county attorneys?

1    A.   If and only if the Special Investigations Unit or the

2    criminal prosecutions division has been involved in the case.

3    Q.   Does your spreadsheet contain federal investigations of

4    election violations?

5    A.   No, sir, we don't have information on federal prosecutions

6    or investigations.

7    Q.   All right.  Now, in terms of referrals of election

8    violations to SIU for investigation, how many have been

9    referred?

10   A.   Since approximately 2002, there have been 320 referrals made

11   to the Office of the Attorney General.

12   Q.   And of those 320 referrals, how many different Texas

13   counties does that represent?

14   A.   I believe it represents 97 of the 254 counties.

15   Q.   Now, you talked about the referral process and sometimes you

16   don't proceed with it.  So let me ask you, of the 320 referrals,

17   how many has the SIU actually investigated?

18   A.   Since 2004, we've investigated a total of 186 cases.

19   Q.   So of the 186 investigated cases that SIU has investigated,

20   in general terms, the types of election code violations, what

21   types of election code violations do those involve?

22   A.   These could be illegal voting or other violations of the

23   Texas Election Code or Penal Code offenses.

24   Q.   Of the 186 cases, how many of those have been referred for

25   prosecution?

1    A.   62.

2    Q.   Of the 62 cases that have been referred to prosecution, how

3    many have resulted in positive outcomes or convictions?

4    A.   I believe that number is 50.

5    Q.   One of the areas you described earlier is illegal voting,

6    and I think one of those types is in-person voter fraud.  So I

7    want to ask you, of the 62 cases referred for prosecution, how

8    many of those involved voter impersonation?

9    A.   There are a total of six cases that involved voter

10   impersonation that were prosecuted.

11   Q.   And of the 62 cases referred for prosecution, how many

12   involve in-person voter impersonation?

13   A.   There have been five cases that have been sent for

14   prosecution involving in-person voter impersonation.

15   Q.   Does this tally include any referrals from the May

16   primaries?

17   A.   No, sir.

18   Q.   Is there any case that you've investigated that comes to

19   mind that involves in-person voter impersonation?

20   A.   Yes, sir, there is a case.

21   Q.   Can you tell the Court the general facts of that case?

22   A.   This case involved the 2009 Progreso Independent School

23   District election down in Hidalgo County and this case involved

24   two brothers and their mother who went to the polling place.

25   One brother -- I'm sorry, if I may clarify.  One brother was

1    actually incarcerated in the state penitentiary in San Antonio;

2    the other brother went to the polling place with the

3    incarcerated brother's voter registration certificate and he

4    presented himself as if he were his brother.

5            This was discovered by a poll worker inside the

6    location, and she alerted the election judge.  However, since

7    the voter had a lawful voter registration certificate, the

8    elections department let him proceed to vote.

9    Q.   Now, were there -- other than the two -- other than the

10   brother who attempted to vote on behalf of the other brother,

11   was there another defendant involved in that case?

12   A.   Yes, there was.  The other defendant, Reyna Almanza, is the

13   mother of the two sons, and she was actually present with

14   Lorenzo Antonio Almanza, and she interjected with the election

15   judge and vouched for the identity of her son who was using the

16   impersonation -- the impersonated voter registration

17   certificate.

18   Q.   How was it that case was discovered and brought to the

19   attention of the authorities?

20   A.   The case was brought to light through the poll worker who

21   was present at the polling place.

22   Q.   And the poll worker, did she know both brothers?

23   A.   Yes, she did.  The poll worker actually went to high school

24   with the incarcerated brother.

25   Q.   As a supervisor or an investigator with SIU, you've worked

1    on cases involving voter impersonation at the polling place?

2    A.  That's correct.

3    Q.  From your experience, can you tell us how difficult it is to

4    detect in-person voter impersonation at the polling place?

5    A.  I would say it's very difficult to detect.

6    Q.  Why is that?

7    A.  Because it would require somebody at the polling place

8    actually having personal knowledge of the voter who is

9    presenting themselves as the impersonated voter, and then they

10   would also additionally have to be able to observe how that

11   person is checked in during the accepting a voter process.

12   Q.  As compared to mail-in voting fraud, how difficult is

13   in-person voter impersonation to detect or investigate?

14           MR. GEAR:  Objection.  Calls for speculation.

15           JUDGE COLLYER:  I think that adds not quite

16   speculation, given the witness' experience.  I don't know that

17   it has a whole lot of foundation, but that goes to weight, not

18   admissibility, so we'll let him answer the question.

19           Go ahead, sir.

20   A.  I believe in-person voter impersonation is more difficult to

21   detect than mail-in ballot, for instance, voter impersonation.

22   And it really deals with the amount of time that the suspect

23   spends with the voters.  In mail-in ballot cases, they spend a

24   great deal of time with the voters, and use their mail-in

25   ballots to cast the election.  In voter impersonation cases

```
 1    there's very little interaction with the witnesses, so

 2    frequently they're unable to identify the suspects through a

 3    conventional photo array.

 4    BY MR. SWEETEN:

 5    Q.  In addition to this case, have you -- are you aware of any

 6    other additional pending voter impersonation cases within the

 7    State of Texas?

 8    A.  Pending criminal cases?

 9    Q.  Yeah, currently.

10    A.  We have currently two pending criminal cases in the State of

11    Texas right now with the Attorney General's Office that involve

12    voter impersonation.  One is the Mara Comparion (ph) case out of

13    Bexar County, and then the second case is Lorenzo Antonio

14    Almanza, the one in Hildago County.

15    Q.  Are you aware of any others that your office is not pursuing

16    or investigating?

17    A.  No, I'm not aware.

18    Q.  Are you familiar --

19    A.  I apologize.

20    Q.  Okay.

21    A.  I am aware of another case that is being investigated by a

22    local district attorney up in Tarrant County, where a mother had

23    her son vote in an election.

24    Q.  Are you familiar with a voter ID bill at issue in this case,

25    Senate Bill 14, just generally the terms?
```

1    A.   Yes, I am.

2    Q.   Does Senate Bill 14 increase the penalties for voter

3    impersonation?

4    A.   Yes, sir, it does.  It affects all types of illegal voting,

5    not just voter impersonation.  It enhances the penalty for a

6    criminal attempt from a Class A misdemeanor to a state jail

7    felony, and then it also it enhances the actual offense of

8    illegal voting from a third degree felony to a second degree

9    felony.  And that would apply to all four types of illegal

10   voting.

11   Q.   As a law enforcement officer, do you have an opinion whether

12   requiring identification at the polling places will be helpful

13   with your investigative efforts?

14   A.   I do.

15             MR. GEAR:  Objection.

16             THE COURT:  Objection sustained.  The witness' answer

17   will be stricken.

18             MR. SWEETEN:  I pass the witness.  Thanks.

19             THE COURT:  Thank you, Mr. Sweeten.

20             MR. GEAR:  My name is Bruce Gear.  I represent

21   Eric Holder in this case.

22                    **CROSS-EXAMINATION**

23   BY MR. GEAR:

24   Q.   Major Mitchell, isn't it true that you did not testify

25   before the legislature during the 2011 legislative session?

1    A.   That is correct, I did not testify.

2    Q.   During your direct testimony you identified five cases of

3    voter impersonation, and I assume, that's five cases of voter

4    impersonation at the polling place?

5    A.   Yes, sir, there are five cases of in-person voter

6    impersonation at the polling place.

7    Q.   And then you identified a second -- or a sixth case, and I

8    believe, you identified that as Tarrant County?

9    A.   Well, sir, I identified a case that we were also involved in

10   which was the Melvin K. Ponce (ph) investigation, which was a

11   mail-in ballot voter impersonation.

12   Q.   And the Melvin K. Ponce case, that would not have been

13   covered by SB14 had it been in place.   Isn't that correct?

14   A.   Into what regard?

15   Q.   In regards SB14 would not have stopped the Melvin K. Ponce

16   case.   Isn't that correct?

17   A.   It could have had a deterrent effect.

18   Q.   It's a by mail ballot case.   Correct?

19   A.   Yes, sir, it is.

20   Q.   It is not a case where Melvin K. Ponce appeared in person

21   and pretended to be someone else at the polling place.   Correct?

22   A.   Yes, sir, you are correct.

23   Q.   And just so I'm clear, SB14, as it's drafted, deals

24   specifically with voter impersonation at the polling place.

25   Isn't that your understanding?

1    A.   No, sir, it is drafted in that one of the portions of SB14

2    deals with the offense of illegal voting, and there are four

3    categories of that.  And it enhances the penalty range for all

4    four types of the offense.

5    Q.   You had a deposition in this case.  Correct?

6    A.   Yes, sir.

7    Q.   And we discussed Melvin K. Ponce.  Correct?

8    A.   Yes, sir, we did.

9    Q.   And didn't I ask you the question whether or not SB14 would

10   have prevented voter fraud in that case as it applies to SB14?

11   A.   For the purposes of the voter ID requirement at a polling

12   place, that case would not have -- it would not have prevented

13   it.

14   Q.   Now, the other case that you spoke about was Reyna Almanza.

15   Is that correct?

16   A.   Yes, sir.

17   Q.   And isn't it true that Reyna Almanza did not cast a ballot

18   during the 2009 school district election?

19   A.   I do not believe that Reyna Almanza cast a ballot in that

20   election.

21   Q.   The second case that you talked about was Lorenzo Antonio

22   Almanza.  Correct?

23   A.   Yes, sir.

24   Q.   Isn't it true that there's no conviction in this case?

25   A.   Yes, sir, that case is currently pending.

1  Q.  The third case that you talked about was Delores McMillan.

2  Or you didn't actually identify that, but do you understand

3  Delores McMillan as being one of the voter impersonation cases

4  that you've identified here today?

5  A.  Yes, sir, it is one of the five.

6  Q.  And Delores Millan (sic) was an election worker.  Correct?

7  A.  Yes, sir, she was an election worker in the 2010 primary

8  elections in Dallas County.

9  Q.  Now, the election code violation that you're referencing

10  regarding Delores McMillan was one that occurred before the

11  polling place even opened.  Isn't that accurate?

12  A.  Yes, sir, that is my understanding of the case facts.

13  Q.  This is not a case where she presented an identification to

14  someone and pretended to be someone else.  Isn't that accurate?

15  A.  That's correct.

16  Q.  SB14 would not have prevented the case of Delores McMillan

17  because it occurred before the polls opened.  Isn't that

18  correct?

19  A.  Again, I believe there could have been a deterrent effect

20  based upon the statute, but it would not have prevented her from

21  doing so.

22  Q.  And you also mentioned, and I believe you mentioned her by

23  name, but I'm going to use the initials M.C.  If I do that,

24  would you understand who I'm talking about?

25  A.  Yes, sir, I would.

1    Q.  And there's no conviction in the M.C. case, is there?

2    A.  No, that case is currently pending as well, sir.

3    Q.  And M.C. has been found mentally incompetent.  Isn't that

4    correct?

5    A.  I believe so, yes, sir.

6    Q.  And under the charge of voter impersonation, there would

7    need to be a finding of intent, that that person intended to

8    violate the law.  Isn't that correct?

9    A.  The elements of the offense, I believe, are intentionally or

10   knowingly.

11   Q.  And then finally, the last case that you mentioned was --

12   and actually didn't mention it by name, but Jack Crowder, III.

13   Would that be one of the voter impersonation cases that you're

14   identifying here today for the judges?

15   A.  Yes, sir, that is Jack Carol Crowder and that was the 2008

16   general elections in Harris County, Houston, Texas.

17   Q.  Now, the allegation for the Jack Carol Crowder case is that

18   he voted on behalf of his deceased father.  Is that accurate?

19   A.  Yes, sir, he presented his deceased father's voter

20   registration certificate and cast a ballot in that election.

21   Q.  And how do you know he presented his father's voter

22   registration card?

23   A.  I believe he told me that, and he provided the voter

24   registration certificate to us during an interview.

25   Q.  Again, you had a deposition in this case.  Correct?

```
 1    A.  Yes, sir.

 2    Q.  And you believe it's important to tell the truth, or you did

 3    tell the truth during your deposition.  Correct?

 4    A.  Yes, sir, I did.

 5    Q.  And during the deposition didn't you tell me that you

 6    learned that information by looking at the indictment papers,

 7    that it would be included in the indictment papers that he used

 8    his father's voter registration card?

 9    A.  You could find -- yes, I believe I did say that.

10            MR. GEAR:  Permission to hand something to the other

11    counsel.

12            THE COURT:  Yes, go right ahead.  Thank you, sir.

13            MR. GEAR:  Could you present Exhibit 240, please?

14            JUDGE WILKINS:  Whose Exhibit 240?

15            MR. GEAR:  It's DE 240.

16    BY MR. GEAR:

17    Q.  I'll give you a chance to look at this document before I ask

18    you any questions.

19    A.  Yes, sir.

20    Q.  Is this the indictment document that you were referring to

21    regarding Jack Carol Crowder?

22    A.  Yes, sir, I believe it is.

23            MR. GEAR:  Could you pull up the last paragraph,

24    please.

25
```

```
 1    BY MR. GEAR:
 2    Q.  I would ask you to take a look at the paragraph that's been
 3    called up and tell me if you see anywhere in that paragraph that
 4    he used his father's voter registration card to vote?
 5    A.  No, sir, I don't see it in there.
 6    Q.  So you could be incorrect on that point.  Right?
 7    A.  As far as my deposition, I was incorrect.  I said that I
 8    thought the one place it may be would be in the indictment.
 9    Q.  But it's your testimony today that he told you that?
10    A.  It is my testimony today that we interviewed Jack Carol
11    Crowder during this investigation, and Jack Carol Crowder
12    advised us that he --
13    Q.  Can you -- I'm sorry.  Were you done?
14         MR. SWEETEN:  Your Honor, the witness wasn't finished
15    responding t0 --
16         THE COURT:  He's letting him finish, I promise,
17    Mr. Sweeten.
18    A.  Yes, sir, during the investigation, he advised us that he
19    used his father's voter registration certificate and he gave it
20    to us.
21    BY MR. GEAR:
22    Q.  Now, you've referenced your spreadsheet, which is
23    Exhibit 41, I believe?
24    A.  41, 42, and 43.
25    Q.  That information is not contained anywhere within your
```

1    spreadsheet, is it?

2    A.  No, sir.

3    Q.  During your direct testimony you also talked about

4    noncitizen voting.  Do you recall that?

5    A.  In today's?

6    Q.  Yes.

7    A.  I don't believe I've discussed noncitizens voting today.

8    Q.  Let me ask you this question:  Based on the referrals to the

9    Office of the Attorney General, between 2002 and 2012, how many

10   cases of noncitizen voting can you identify?

11   A.  I can think of a few, probably three or four.

12   Q.  During your deposition did you indicate that you had three

13   that you could call to mind?

14   A.  That seems correct.

15   Q.  In discussing specifically those three cases, the first case

16   would be Debra Briseno, which was a 2006 primary election.

17   Isn't that correct?

18   A.  Yes, sir, Debra Briseno was a defendant that was charged as

19   a result of elections misconduct in the 2008 primary election.

20   Q.  And she was a voter registrar during that election, wasn't

21   she?

22   A.  Yes, sir.  She was a city councilperson for the City of

23   Port Lavaca, and had signed up as a deputy voter registrar for

24   the 2008 primary.

25   Q.  And that case did not result in any charges to noncitizens.

1      Isn't that accurate?

2      A.   No, sir, no noncitizens were charged in that criminal

3      investigation.

4      Q.   The second case that, I believe, you have in mind is the

5      2008 Hidalgo County election.   Is that accurate?

6      A.   I believe so, yes.

7      Q.   And you don't actually know the facts of that case, do you,

8      all of the facts?

9      A.   I'm not aware of all of the facts because our office only

10     assisted in a portion of the investigation that was conducted by

11     the local district attorney's office.

12     Q.   And as you sit here today, you can not testify before the

13     court that there were any noncitizens charged in that case, can

14     you?

15     A.   No, sir.

16     Q.   The third case, and I believe this is the final case that

17     you are able to identify, is the 2010 Dallas County election.

18     Isn't that right?

19     A.   That is correct, sir.   That was the 2010 primary election in

20     Dallas, Dallas County.

21     Q.   And that case involved by-mail ballot fraud.   Correct?

22     A.   That case involved a number of allegations, I think, maybe

23     10 allegations of different types.   One of the allegations was

24     mail-in ballot fraud; others were illegal voting.

25     Q.   Well, it's true, is it not, that there were no noncitizens

```
 1    charged in the 2010 Dallas County election?
 2    A.    That is correct.  There were no charges of noncitizen
 3    illegal voting.
 4    Q.    And you have no knowledge of any other cases where
 5    noncitizens were alleged to have voted.  Isn't that correct?
 6    A.    I really only know the cases that are referred to our
 7    office.
 8              JUDGE COLLYER:  But the answer to the question is no,
 9    you know of none?
10              THE WITNESS:  Yes, Your Honor, I don't know of any
11    others.
12              JUDGE COLLYER:  No, you don't know of any involving
13    noncitizen illegal voting?
14              THE WITNESS:  Yes, Your Honor, I do not know of any
15    others involving noncitizen U.S. -- or noncitizens voting.
16              JUDGE COLLYER:  Let me back up.  The 2010 Dallas
17    primary, you just said that didn't include any charge of
18    noncitizen voting.  Right?
19              THE WITNESS:  That is correct, Your Honor.
20              JUDGE COLLYER:  And the 2008 Hidalgo County election,
21    you said you can't say that there was any noncitizen voting in
22    that case?
23              THE WITNESS:  That's correct, Your Honor.
24              JUDGE COLLYER:  And the voter registrar case involving
25    somebody named Briseno, that didn't include any charge about
```

```
 1    noncitizens?

 2             THE WITNESS:  No, noncitizens were charged in that

 3    case.

 4             JUDGE COLLYER:  Okay.  So those are the three cases I

 5    thought you identified during your deposition as possibly

 6    involving noncitizens.

 7             THE WITNESS:  Yes, Your Honor.

 8             JUDGE COLLYER:  Are there others?

 9             THE WITNESS:  There are others that we conducted

10    investigations, but the allegations were unsubstantiated.

11             JUDGE COLLYER:  Okay.  So there are no noncitizen

12    voting cases in which the allegations were substantiated?

13             THE WITNESS:  If I may, Your Honor, in the Dallas 2010

14    case, and in the Hidalgo County case -- I'm sorry, the

15    Calhoun County case involving deputy voter registrar, it was

16    determined that noncitizens had voted in those elections;

17    however, they lacked the mens rea, the intentionally or

18    knowingly, for them to be criminally charged.

19             JUDGE COLLYER:  Okay.  Go ahead.

20    BY MR. GEAR:

21    Q.  So to sum that up, as far as the Attorney General's Office

22    is concerned of Texas, there's been no cases where noncitizen

23    voters have been charged for voter impersonation.  Isn't that

24    accurate?

25    A.  Yes, sir.
```

1    Q.  Now, the Attorney General's Office for Texas has had

2    jurisdiction over Election Code violations since --

3         JUDGE WILKINS:  I'm sorry, I need to interrupt for a

4    second.  When you said that there was a lack of mens rea and so

5    there were no charges brought, what did you mean by "a lack of

6    mens rea"?

7         THE WITNESS:  The noncitizens in this case were

8    approached by deputy voter registrars and told that if they had

9    a driver's license, that they were eligible to vote in an

10   election.  And these deputy voter registrars, for the purposes

11   of Texas law, are considered public servants.  So the voters

12   were unaware that they were not eligible to vote in the election

13   as defined in the illegal voting statute.

14        JUDGE WILKINS:  So they did not intend to break the

15   law, is what you're saying?

16        THE WITNESS:  Yes, Your Honor.

17        JUDGE WILKINS:  All right.  Thank you.

18   BY MR. GEAR:

19   Q.  Are you aware of whether or not the noncitizens that were --

20   the allegations of noncitizens in those cases, are you aware of

21   whether or not those noncitizens had driver's licenses?

22   A.  I can say in the Debra Briseno case, I believe they did have

23   Texas driver's licenses.  I'm not certain about the Dallas case.

24   Q.  So the previous question I asked, and I'm sorry, I didn't

25   hear the answer, the Office of the Attorney General had

1    jurisdiction, or has jurisdiction, and has had jurisdiction over

2    Election Code violations since 1985.   Correct?

3    A.   Yes, sir, I believe the Office of the Attorney General has

4    that concurrent jurisdiction with local prosecutors for quite

5    some time.

6    Q.   And the Office of the Attorney General has made

7    Election Code violations a priority of the office.   Isn't that

8    correct?

9    A.   Yes, sir, it is a priority amongst many.

10   Q.   And isn't it a fact that pursuant to Texas Election Code

11   annotated 273.001, local prosecutors and DA's are required to

12   deliver notice to the Secretary of State within 30 days of

13   beginning an Election Code investigation?   Isn't it true?

14   A.   I believe that's correct.

15   Q.   And that notice also requires that they include the date on

16   which the election was held.   Isn't that also true?

17   A.   I would have to look at the statute to be absolutely

18   certain.

19   Q.   You were asked about the referral system, but isn't it, in

20   fact, true that the Office of the Attorney General has the

21   authority to investigate an Election Code on their own

22   initiative?

23   A.   Yes, sir, if we have reason to believe an offense occurred.

24   However, our policy, we restrict ourselves to just referrals.

25   Q.   And they have the authority to do that even without a

1    referral if they believe a violation has occurred.  Isn't that

2    correct?

3    A.  We have the legal authority under Chapter 273 to do so, yes,

4    sir.

5    Q.  Pursuant to Texas Election Code annotated 273.001, again,

6    the Office of the Attorney General has the authority to direct

7    county and district attorneys to conduct or assist the Office of

8    the Attorney General in investigations.  Isn't that correct?

9    A.  I believe that's the statute, yes, sir.

10   Q.  The Office of the Attorney General even has the authority to

11   direct the Department of Public Safety to conduct investigations

12   if they so choose.  Isn't that correct?

13   A.  Yes, sir, I believe, that's accurate.

14   Q.  You indicated during your direct that voter impersonation at

15   the polls is difficult to detect.  Do you recall that testimony?

16   A.  Yes, sir, I do.

17   Q.  Voter impersonation is similar to any other crime, in that

18   it involves proof beyond a reasonable doubt.  Correct?

19   A.  Yes, sir.

20   Q.  You would agree that anyone at the polling place has the

21   ability to detect in-person voter impersonation.  Correct?

22   A.  I'm sorry, could you ask the question again?

23   Q.  There are a lot of people in the polling place on election

24   day generally.  Correct?

25   A.  No, sir, there's a restricted number.  Only the voters

1    representing themselves to vote, and then also the poll workers

2    who are present during that election.

3    Q.  Let me rephrase that question for you.  There are poll

4    workers?

5    A.  Yes, sir.

6    Q.  Poll watchers?

7    A.  Yes, sir.

8    Q.  Voters?

9    A.  Yes, sir.

10   Q.  And there's any other host of individuals that may come and

11   go from the polling place at any given time.  Correct?

12   A.  Yes, sir.

13   Q.  And so my question to you was:  Any of those individuals

14   have the ability to detect in-person voter impersonation.

15   Correct?

16   A.  I think I said in my deposition and also here today that I

17   think the only way it will be detected is if the person actually

18   has a personal relationship and knows the voter who is

19   presenting the false documents.

20   Q.  Well, in fact, one of the voter impersonation cases that you

21   have before the Office of the Attorney General was detected by a

22   DPS trooper who was not in the polling place at the time.

23   Correct?

24   A.  Yes, sir, it was detected sometimes afterwards.

25   Q.  And there's also another in-person voter impersonation case

1    that was detected by a citizen group who was not necessarily in

2    the polling place at the time.  Correct?

3    A.  Yes, sir, it was.

4    Q.  And regarding the evidence in a polling place, isn't it a

5    fact that by statutory law, the Office of the Attorney General

6    has the ability to impound evidence following an election?

7    A.  Yes, sir.  The Texas Attorney General's Office or local

8    district or county attorney may request from a district judge in

9    state court the ability to impound election records.

10   Q.  And I also want to ask you, isn't it a fact that the Office

11   of the Attorney General has a long-standing policy of working

12   with local law enforcement, district attorneys, and county

13   attorneys, in investigating Election Code violations?

14   A.  We try to work with local law enforcement and local

15   prosecutors on all types of cases, including election cases.

16   Q.  And you often work in conjunction with local attorneys and

17   DA's in investigating and sometimes prosecuting Election Code

18   violations.  Isn't that correct?

19   A.  Yes, sir.  The Jack Carol Crowder is an example of that

20   case.  That was actually prosecuted with the assistance of the

21   Harris County District Attorney's Office.

22   Q.  So the answer to that was yes?

23   A.  Yes, sir.

24           MR. GEAR:  If I could have one moment, please.

25           JUDGE COLLYER:  Yes, sir.

```
 1    BY MR. GEAR:

 2    Q.   Isn't it true that the criminal charges or the criminal

 3    portion of SB14 has already been precleared and is currently in

 4    effect?

 5    A.   I don't know that, sir.

 6    Q.   Would you agree that the current laws as they're in place

 7    act as a deterrent in preventing in-person voter impersonation?

 8              MR. SWEETEN:   Objection, Your Honor.   Outside the

 9    scope, and the court didn't allow me to ask this question.

10              JUDGE COLLYER:   Yeah, I think more the latter, but I

11    think this witness can't make that conclusion.

12              MR. GEAR:   I have nothing further.

13              JUDGE COLLYER:   Thank you very much, Mr. Gear.   Oh I'm

14    sorry, sir, go right ahead.

15              MR. ROSENBERG:   Thank you.   I'll be very quick.

16    Ezra Rosenberg for the intervenor defendants.

17    BY MR. ROSENBERG:

18    Q.   Major Mitchell, nice to see you again.

19    A.   Yes, sir.

20    Q.   Very quickly, you started out -- in response to

21    Mr. Sweeten's questions you said there were six cases of voter

22    impersonation.   But just to make sure we all know what we're

23    talking about, one was Ponce, which was an absentee ballot case.

24    Right?

25    A.   That is correct, sir.
```

1    Q.   One of them was Ms. Almanza, the mother who, herself, didn't

2    try to impersonate anyone.  Right?

3    A.   No, sir, she was charged as a party to the offense of

4    illegal voter.

5    Q.   Right.  But that's one of your five?

6    A.   Yes, sir.

7    Q.   But she, herself, didn't try to impersonate anyone.  She

8    aided and abetted, allegedly, her son.  Is that correct?

9    A.   Well, she's been convicted of that, yes, sir.

10   Q.   But again, so we're really dealing with four allegations of

11   individual people who went to a polling booth, supposedly - I'll

12   get to two more - and tried to impersonate someone else, not

13   five.  Isn't that correct?  Because Mrs. Almanza didn't do that?

14   A.   That's correct.

15   Q.   Then of the four, we have Ms. McMillan, who was the election

16   worker herself, who kind of cooked the books before the polls

17   opened.  Right?

18   A.   Yes, sir, that's correct.

19   Q.   So then we're down to three.  And the other one, M.C., we've

20   been calling her, is a woman who has been declared mentally

21   incompetent and used photo IDs that she had to identify herself

22   at the polling place.  So she didn't try to impersonate anyone

23   but herself.  Right?

24   A.   She used multiple identities, including her deceased sister.

25   Q.   But they were all photo IDs with her photo on it.  Correct?

```
 1   A.  I'm not sure which type of document she used at the polling
 2   place.  She had driver's license and she also had voter
 3   registration certificates and all the different identities.
 4   Q.  But sitting here today, you can't say one way or the other.
 5   A.  No, sir.
 6   Q.  Then we're down to two, Crowder and Mr. Almanza.  Correct?
 7   A.  Yes, sir.
 8   Q.  And that's over 10 years from 2002 to 2011, two people whom
 9   you're saying might have been prevented from impersonating
10   someone else by SB14's photo ID requirements.  Right?
11   A.  These are two cases of the cases that have been referred to
12   our office.
13   Q.  And those are the only ones you know of that you've
14   testified to.  Is that correct?
15   A.  With the exception of the case I've become aware of in
16   Tarrant County.
17   Q.  I understand.  The one you read about in the newspaper.
18   Correct?
19   A.  Yes, sir.
20   Q.  Then prior to 2002, you're not aware of any others.  Isn't
21   that correct?
22   A.  That's correct, sir.
23   Q.  And just because a crime is difficult to detect doesn't
24   necessarily mean people are committing it.  Isn't that correct?
25   A.  I'm sorry, could you state that one more time?
```

```
 1    Q.   Sure.  Just because a crime may be difficult to detect

 2    doesn't necessarily mean that people are committing it.  Isn't

 3    that correct?

 4    A.   I would agree.

 5    Q.   And in fact, in-person voter impersonation in the polling

 6    booth is a crime that, by definition, is committed in broad

 7    daylight in front of people.  Right?

 8    A.   In-person voter impersonation would be in front of somebody,

 9    that's correct.

10    Q.   And in fact, it's committed, if committed at all, in front

11    of people who are looking out for that kind of thing, isn't it?

12    A.   Well, I don't know if I would agree with that statement

13    completely.

14    Q.   Well, poll watchers, election workers, aren't they supposed

15    to be looking out for that sort of thing?

16    A.   The job of a poll worker who is accepting voters is to

17    verify the voter's eligibility to vote in an election.  They do

18    not have the ability to verify their identity.  An example would

19    be if someone came into the polling place with a bank statement,

20    which is currently authorized under Texas law.

21    Q.   But in fact, you've already talked about at least one of

22    your cases that was, in fact, spotted by a poll worker.  Wasn't

23    that so?

24    A.   That is correct, sir.

25         MR. ROSENBERG:  I have no further questions.  Thank
```

1    you.

2              JUDGE COLLYER:  Thank you, sir.  Is there any redirect?

3              MR. SWEETEN:  Yes, Your Honor, short redirect.

4                        REDIRECT EXAMINATION

5    BY MR. SWEETEN:

6    Q.  Of all the types of voter fraud that you investigate as an

7    investigator, which is the most difficult to detect?

8    A.  I would think in-person voter impersonation.

9    Q.  With respect to the Almanza case, can you tell us who has

10   been charged in that fact pattern that you described earlier in

11   your testimony?

12   A.  Both Lorenzo Almanza and Reyna Almanza were charged with

13   illegal voter impersonation, and then Reyna Almanza has been

14   convicted by Brooks County court for illegal voting, voting

15   impersonation.

16   Q.  And the other case is pending.  Is that correct?

17   A.  Yes, sir.

18              MR. SWEETEN:  No further questions.

19              JUDGE COLLYER:  Well, all right, then, you are excused.

20   Thank you very much, Major.

21              MR. FREDERICK:  Matthew Frederick for the State of

22   Texas.  The State calls Senator Thomas Williams.

23              (Oath administered by Courtroom Clerk.)

24   **(SENATOR THOMAS WILLIAMS, PLAINTIFF witness, having been duly**

25                   **sworn, testified as follows:)**