PL1030
9/2/2014
2:13-cv-00193



# SENATE RULES

adopted by
81st LEGISLATURE
January 14, 2009

Senate Resolution No. 14





rerefer bills, to concur in House amendments to Senate bills, to not concur in House amendments to Senate bills, to request the appointment of conference committees, and to adopt conference committee reports.

This concludes the morning call, which the President shall announce to the Senate.

It shall not be in order, during the morning call, to move to take up a bill or resolution out of its regular order, and the presiding officer shall not recognize any Senator for the purpose of making any such motion or making a motion to suspend this rule.

**Editorial Note**

A motion to set a bill for a special order may be made under Item (5) of this rule, and motions to reconsider, to print or not print bills, and to re-refer bills may properly be made under Item (5) of the morning call.

## ORDER OF CONSIDERING BILLS AND RESOLUTIONS

Rule 5.09.  At the conclusion of the morning call, the Senate shall proceed to consider business on the President's table, which shall be disposed of in the following order:

(1)  special orders;

(2)  unfinished business;

(3)  Senate Joint Resolutions;

(4)  Senate Resolutions;

(5)  Senate Concurrent Resolutions;

(6)  Senate bills on third reading;

(7)  Senate bills on second reading;

21

Rule 5.09

(8)  House Joint Resolutions;

(9)  House bills on third reading;

(10)  House bills on second reading;

(11)  House Concurrent Resolutions.

The above order is for Senate bill days, except as modified by any Joint Rules.

### Notes of Rulings

The order of business as set forth above may be changed by a two-thirds vote of the Senate (42 S.J. Reg. 1682 (1931)).

A House bill laid before the Senate as an unfinished special order should be disposed of before any other House bill which has been set for a special order is taken up for consideration (46 S.J. Reg. 1853 (1939)).

A motion to suspend the regular order of business is not in order while other business is pending under a rule suspension (46 S.J. Reg. 1886 (1939)).

The bill next on calendar is not to be passed over, due to author's absence (47 S.J. Reg. 397 (1941)).

A motion to suspend the regular order of business is not a debatable motion (61 S.J. Reg. 1101 (1969)).

### HOUSE BILL DAYS

**Rule 5.10.**  On calendar Wednesday and calendar Thursday of each week, House Joint Resolutions and House bills on special order and on third and second readings, respectively, and House Concurrent Resolutions shall be taken up and considered until disposed of; provided in case one should be pending at adjournment on

22

Rule 5.10

Thursday, it shall go over until the succeeding calendar Wednesday as unfinished business.

### Notes of Rulings

A House bill, by a two-thirds vote, may be taken up and considered by the Senate on any day of the week (46 S.J. Reg. 635-636 (1939)).

When the Senate adjourns on Thursday of any week with a House bill pending, the bill then pending, whether it is a special order or not, may not be further considered until Wednesday of the next succeeding week unless the Senate by a two-thirds vote agrees to consider it further prior to that day (46 S.J. Reg. 1704 (1939)).

House bills may be considered in Senate under a suspension of the regular order of business on days other than calendar Wednesday and calendar Thursday (48 S.J. Reg. 1051 (1943)).

When a member is discussing a Senate bill on calendar Monday or calendar Tuesday (which are considered Senate bill days in the Senate) and 12:01 o'clock a.m. Wednesday arrives (which is considered a House bill day in the Senate), no further discussion may be had on the Senate bill (61 S.J. Reg. 956 (1969)).

Consideration of a Senate bill taken up out of order on a Senate bill day may not be continued when a House bill day arrives (66 S.J. Reg. 1355 (1979)).

A House Concurrent Resolution taken up in its calendar order on a House bill day may not be further considered when a Senate bill day arrives (71 S.J. 1 C.S. 73 (1989)).

When rules have been suspended to permit consideration of a Senate bill on a House bill day, an additional suspension is

23

not required to permit consideration to continue when a Senate bill day arrives (73 S.J. Reg. 1082 (1993)).

## SPECIAL ORDERS

Rule 5.11. (a) Any bill, resolution, or other measure may on any day be made a special order for a future time of the session by an affirmative vote of two-thirds of the members present.

(b) A special order shall be considered at the time for which it is set and considered from day to day until disposed of, unless at the time so fixed there is pending business under a special order, but such pending business may be suspended by a two-thirds vote of all the members present. If a special order is not reached or considered at the time fixed, it shall not lose its place as a special order. All special orders shall be subject to any Joint Rules and Rule 5.10.

(c) Upon the affirmative vote of four-fifths of the members present, a special order may be reset to an earlier time than previously scheduled.

(d) Notwithstanding Subsection (a) of this rule, a bill or resolution relating to voter identification requirements reported favorably from the Committee of the Whole Senate may be set as a special order for a time at least 24 hours after the motion is adopted by a majority of the members of the Senate.

### Editorial Notes

A bill once set as a special order does not lose its place on the calendar of special orders if not taken up at the hour for which it is set.

A special order, the hour for the consideration of which has arrived, takes precedence of the unfinished business unless the unfinished business is itself a special order.

### Notes of Rulings

A bill being considered as a special order that is laid on the table subject to call is no longer a special order (43 S.J. Reg. 980 (1933)).

Refusal of Senate to set bill as special order for a certain hour does not prevent a motion being made and adopted

24

immediately thereafter to set the bill as a special order for a different specified hour (45 S.J. Reg. 860 (1937)).

The motion to set a bill for a special order is not a proper substitute for a motion to suspend the regular order of business and take up a bill for immediate consideration (50 S.J. Reg. 1055 (1947)).

When the business before the Senate is a special order, the order of business may be suspended in order to consider other business (61 S.J. Reg. 2034 (1969)).

A motion to set a bill for special order may be made when the Senate is not in morning call (67 S.J. Reg. 1430 (1981)).

When the time set for consideration of a special order arrives, the special order displaces pending business (67 S.J. Reg. 1449 (1981)).

A motion to suspend the regular order of business is not in order when the time set for consideration of a special order has arrived (67 S.J. Reg. 1558 (1981)).

### REGULAR ORDER OF BUSINESS

Rule 5.12. (a) Bills and resolutions shall be considered on second reading and shall be listed on the daily calendar of bills and resolutions on the President's table for second reading in the order in which the committee reports on them are received by the Senate. Upon the filing of a committee report on a bill or resolution as provided by Rule 11.12, the Secretary of the Senate shall note the date and time the report was filed. The Journal Clerk shall record the order in which the committee report was received in the Senate Journal for the day on which the Senate next convenes.

25

Rule 5.12

(b) Bills and resolutions shall be considered on third reading in the order in which they were passed on second reading.

### Editorial Notes

On the very important matter of the order of considering each of the several bills reported from committees, the rules of the Senate were silent until Senate Rule 5.12 was amended on June 6, 1947, to provide that bills be placed on the calendars of Senate and House bills on the President's table in the order in which the committee reports on the bills are submitted by the respective chairmen from the floor. Bills are listed for consideration on third reading in the order in which they have been passed by the Senate to engrossment or to third reading.

The Senate Agenda is prepared daily and lists the bills in their order of consideration.

### Notes of Rulings

A bill may not be considered by the Senate which has not been reported from a committee (44 S.J. Reg. 713 (1935)).

A report of a committee on a bill may be received only, and the question of its adoption is not voted on by the Senate (42 S.J. 1 C.S. 748 (1931)).

### SUSPENSION OF THE REGULAR ORDER OF BUSINESS

Rule 5.13. No bill, joint resolution, or resolution affecting state policy may be considered out of its regular calendar order unless the regular order is suspended by a vote of two-thirds of the members present.

### Notes of Rulings

By suspending the regular order of business, the Senate may take up a bill before the day to which it previously was postponed (67 S.J. Reg. 1057 (1981)).

26



Your complimentary
use period has ended.
Thank you for using
PDF Complete.

Click Here to upgrade to
Unlimited Pages

PL1031
9/2/2014
2:13-cv-00193

Blake Green <blake.green@gmail.com>

## Voter ID Project Coalition Meeting tonight

Jeremy Brown <Jeremy.Brown@senate.state.tx.us>                    Mon, Oct 7, 2013 at 2:05 PM
To: "danielle.codova@house.state.tx.us" <danielle.codova@house.state.tx.us>, Myriam Saldivar
<Myriam.Saldivar@house.state.tx.us>, Ryan Hogue <Ryan.Hogue@senate.state.tx.us>, "kgrobkr@aol.com"
<kgrobkr@aol.com>, "vicepresident@haulyp.org" <vicepresident@haulyp.org>, "rlillieins@sbcglobal.net"
<rlillieins@sbcglobal.net>, Ariana Campos <Ariana.Campos@house.state.tx.us>, Tamoria Jones
<Tamoria.Jones@house.state.tx.us>, "nkorigaonkar@naacpldf.org" <nkorigaonkar@naacpldf.org>, Mary Seymore
<Mary.Seymore@house.state.tx.us>, "retherton@neighborhood-centers.org" <retherton@neighborhood-centers.org>,
"tarah.m.taylor@gmail.com" <tarah.m.taylor@gmail.com>, "vote0026@gmail.com" <vote0026@gmail.com>,
"ward@anniseparker.com" <ward@anniseparker.com>, Daisy Mitchell <Daisy.Mitchell@house.state.tx.us>, Crystal Ford
<Crystal.Ford@house.state.tx.us>, "camille@scottmediallc.com" <camille@scottmediallc.com>,
"cfoster@bmilesinsurance.com" <cfoster@bmilesinsurance.com>, "trivera@neighborhood-centers.com"
<trivera@neighborhood-centers.com>, "amin.alehashem@gmail.com" <amin.alehashem@gmail.com>,
"shawtrek@aol.com" <shawtrek@aol.com>, "joecullar@gmail.com" <joecullar@gmail.com>,
"civicengagement@haulyp.org" <civicengagement@haulyp.org>, "rthomas@organizetexas.org"
<rthomas@organizetexas.org>, "k.alexisgunn@yahoo.com" <k.alexisgunn@yahoo.com>, "okieward@gmail.com"
<okieward@gmail.com>, "blake@youngvoter.org" <blake@youngvoter.org>, "Marianela Acuña Arreaza
(marianela@texastable.org)" <marianela@texastable.org>
Cc: Brandon Dudley <Brandon.Dudley@senate.state.tx.us>, Lara Wendler <Lara.Wendler@senate.state.tx.us>,
"Michael.Halpin@mail.house.gov" <Michael.Halpin@mail.house.gov>, "yuroba.harris@mail.house.gov"
<yuroba.harris@mail.house.gov>, Mary Ann Carrion <MaryAnn.Carrion@house.state.tx.us>, Rahul Sreenivasan
<Rahul.Sreenivasan@house.state.tx.us>, Lesley A Nelson <Lesley.Nelson@house.state.tx.us>, Christopher Walker
<Christopher.Walker@house.state.tx.us>, Allison Schmitz <Allison.Schmitz@house.state.tx.us>, Anneliese Vogel
<Anneliese.Vogel@house.state.tx.us>, Amy Bruno <Amy.Bruno@house.state.tx.us>, Brete Anderson
<Brete.Anderson@house.state.tx.us>, Crystal Ford <Crystal.Ford@house.state.tx.us>, Rob Borja
<Rob.Borja@house.state.tx.us>, Karen Loper <Karen.Loper@house.state.tx.us>, Nicole Bates_HC
<Nicole.Bates_HC@house.state.tx.us>, Alison Brock <Alison.Brock@house.state.tx.us>, Mechelle Phillips
<Mechelle.Phillips@senate.state.tx.us>, Jennifer Brader <Jennifer.Brader@house.state.tx.us>, Greg Wythe
<Greg.Wythe@house.state.tx.us>, Milda Mora <Milda.Mora@house.state.tx.us>, Murry Matthews
<Murry.Matthews@house.state.tx.us>, Danielle Cordova <Danielle.Cordova@house.state.tx.us>, Lillie Schechter
<Lillie.Schechter@senate.state.tx.us>

Hello All:

As a reminder there will be coalition meeting on **Monday, October 7, 2013 at the TOP Headquarters**
to update everyone on current outreach efforts  and planning going forward.

If you have any questions please don't hesitate to call at the below number. Thank you for your
consideration.



EXHIBIT
4

4/14/2014 2:10 PM
LYV00000121



Blake Green <blake.green@gmail.com>

## October 15th Voter ID Community Workshop Flyer

**Tarsha Jackson** <tjackson@organizetexas.org>                              Fri, Sep 27, 2013 at 1:42 PM
To: Resha Thomas <rthomas@organizetexas.org>, Marianela Acuña Arreaza <marianela@texastable.org>, Jeremy
Brown <Jeremy.Brown@senate.state.tx.us>, Amin Alehashem <amin.alehashem@gmail.com>, Blake Green
<blake@youngvoter.org>, Tarsha Jackson <tjackson@organizetexas.org>

Greetings All,

Attached you will find an updated flyer for October 15th Voter ID Community Workshop.
Please let me know if you have any questions.

Thanks,

--
Tarsha Jackson
Texas Organizing Project
832-289-2370

📎 **Election Law Changes Voter ID Flyer.doc**
    1015K

Highly Confidential

LYV00000123

Plaintiff Exhibit
PL1032

FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | |
|---|---|
| MARC VEASEY, JANE HAMILTON, SERGIO DELEON, FLOYD J. CARRIER, ANNA BURNS, MICHAEL MONTEZ, PENNY POPE, OSCAR ORTIZ, KOBY OZIAS, JOHN MELLOR-CRUMLEY, PEGGY HERMAN, EVELYN BRICKNER, GORDON BENJAMIN, KEN GANDY, LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), AND DALLAS COUNTY, TEXAS, *Plaintiffs,* v. RICK PERRY, Governor of Texas; and JOHN STEEN, Texas Secretary of State, *Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NO. 2:13-CV-193 (NGR) [Lead case] |
| UNITED STATES OF AMERICA, *Plaintiffs,* TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, IMANI CLARK, AURICA WASHINGTON, CRYSTAL OWENS, AND MICHELLE BESSIAKE, *Plaintiff-Intervenors,* TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, HIDALGO COUNTY, AND MARIA LONGORIA BENAVIDES, *Plaintiff-Intervenors,* v. STATE OF TEXAS, JOHN STEEN, in his official capacity as Texas Secretary of State; and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety, *Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NO. 2:13-CV-263 (NGR) [Consolidated case] |

1

|  |  |  |
|---|---|---|
| TEXAS STATE CONFERENCE OF NAACP BRANCHES; and the MEXICAN AMERICAN LEGISLATIVE CAUCUS OF THE TEXAS HOUSE OF REPRESENTATIVES, | ) ) ) ) ) ) |  |
| *Plaintiffs,* | ) ) |  |
| v. | ) ) | CIVIL ACTION NO. 2:13-CV-291 (NGR) [Consolidated case] |
| JOHN STEEN, in his official capacity as Secretary of State of Texas; and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety, | ) ) ) ) ) |  |
| *Defendants.* | ) ) |  |
| BELINDA ORTIZ, LENARD TAYLOR, EULALIO MENDEZ JR., LIONEL ESTRADA; ESTELA GARCIA ESPINOSA, ROXANNE HERNANDEZ, LYDIA LARA, MARGARITO MARTINEZ LARA, MAXIMINA MARTINEZ LARA, AND *LA UNION DEL PUEBLO ENTERO, INC.* | ) ) ) ) ) ) ) ) ) ) |  |
| *Plaintiffs,* | ) ) |  |
| v. | ) ) ) | CIVIL ACTION NO. 2:13-CV-348 (NGR) [Consolidated case] |
| STATE OF TEXAS; JOHN STEEN, in his Official capacity as Texas Secretary of State; and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety, | ) ) ) ) ) ) ) |  |
| *Defendants.* | ) |  |

## DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS AND PLAINTIFF-INTERVENORS' SECOND SET OF INTERROGATORIES

**TO:** All Plaintiffs and Plaintiff-Intervenors, by and through their attorneys of record.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, the State of

Texas, Rick Perry, John Steen and Steve McCraw, by and through the Attorney General for the State of Texas, serve these Objections and Responses to Plaintiffs and Plaintiff-Intervenors' Second Set of Interrogatories.

## **GENERAL OBJECTIONS**

Defendants object to each interrogatory: (1) insofar as it seeks information not in Defendants' possession, custody, or control; (2) insofar as it seeks information that was prepared for or in anticipation of litigation, constitutes attorney work product, contains attorney-client communications, or is otherwise privileged; (3) insofar as it seeks information which is publicly available or otherwise equally available and/or uniquely or equally available from third parties; (4) insofar as it seeks information that does not specifically refer to the events which are the subject matter of this litigation; and (5) insofar as it seeks information not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

These responses and objections are made on the basis of information now known to Defendants and are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested. Defendants' investigation, discovery, and preparation for proceedings are continuing and all answers are given without prejudice to Defendants' right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof.  Defendants likewise do not waive the right to object, on any and all grounds, to (1) the evidentiary use of the information contained in these responses

3

and objections; and (2) discovery requests relating to these objections and responses.

Defendants will provide their responses based on terms as they are commonly understood, and consistent with the Federal Rules of Civil Procedure. Defendants object to and will refrain from extending or modifying any words employed in the requests to comport with expanded definitions or instructions.

## INTERROGATORIES

**1.     For each date between January 1, 2006, and November 1, 2011 on which a person had to provide documentation to prove U.S. citizenship or lawful U.S. presence to obtain a Texas driver's license or DPS personal identification card, identify the documents that were acceptable to prove U.S. citizenship, and identify by specific citation (including date) each statute, rule, other authority, or other writing authorizing the Department to request or require such proof.**

**RESPONSE:** Defendants object to this interrogatory on the ground that it contains at least two separate interrogatories. By asking the Defendants to "identify the documents that were acceptable to prove U.S. citizenship" [hereafter Interrogatory 1a] and then asking Defendants to "identify by specific citation (including date) each statute, rule, other authority, or other writing authorizing the Department to request or require such proof" [hereafter Interrogatory 1b], the interrogatory introduces lines of inquiry that are separate and distinct from the inquiry made by the portion of the inquiry that precedes each. *See Willingham v. Ashcroft*, 226 F.R.D. 57, 59 (D.D.C. 2005). Defendants will, therefore, construe

4

Interrogatory 1 as two separate interrogatories.

Further, Defendants object to both interrogatories as being vague, not reasonably specific, overly broad and unduly burdensome to the extent they require the Defendants to provide a catalog of literally hundreds of responses accounting "for each date between January 1, 2006 and November 1, 2011 on which a person had to provide documentation to prove U.S. citizenship or lawful U.S. presence to obtain a Texas driver's license or DPS personal identification card". These interrogatories seek to narrow the Defendants' responses without the benefit of specific questions during direct or cross-examination. Defendants would object that a detailed explanation of these issues is more appropriate by deposition. Defendants similarly object to the extent the interrogatories seek information regarding the Texas Administrative Code that is publicly available and/or equally accessible to the Plaintiffs and Plaintiff-Intervenors. Defendants object to the extent these interrogatories seek information that is not relevant to this cause of action and is not likely to lead to the discovery of relevant or admissible evidence.

Defendants object specifically to Interrogatory 1a to the extent it calls on Defendants to express legal opinions about "documentation to prove U.S. citizenship or lawful U.S. presence" requiring legal expertise with respect to "acceptable" proof of citizenship under the Texas Administrative Code.

Defendants object specifically to Interrogatory 1b as being vague, not reasonably specific, overly broad and unduly burdensome insofar as it calls for

Defendants to "identify by specific citation (including date) each . . . rule, other authority, or other writing authorizing the Department to request or require such proof."  Defendants also object to Interrogatory 1b to the extent it requires the Defendants to express legal opinions regarding which "statute, rule, other authority, or other writing authorize[es] the Department to request or require" proof of "U.S. citizenship" requiring legal expertise with respect to the Department of Public Safety's "authority" under the Texas Administrative Code.

Subject to and without waiving the foregoing objections, the Defendants generally respond as follows:

**Interrogatory 1a**

*"For each date between January 1, 2006, and November 1, 2011 on which a person had to provide documentation to prove U.S. citizenship or lawful U.S. presence to obtain a Texas driver's license or DPS personal identification card, identify the documents that were acceptable to prove U.S. citizenship . . ."*

Defendants respond generally that the Texas Department of Public Safety's website provides a publicly available list of acceptable documents to prove U.S. citizenship.  This list can be found on page one of the Verifying Lawful Presence document at:

http://www.txdps.state.tx.us/DriverLicense/documents/verifyingLawfulPresence.pdf.  Included are the following:

- Birth certificate issued by the appropriate vital statistics agency of a U.S. State, a U.S. territory, or the District of Columbia indicating birth in U.S.
- Department of State Certification of Birth issued to U.S. Citizens born abroad (FS-240, DS-1350, or FS-545) or Consular Report of Birth Abroad
- Certificate of U.S. Citizenship
- Certificate of Naturalization

- U.S. Dept. of Justice – INS U.S. Citizenship Identification Card (I-197 or I-179)
- Northern Mariana Card (I-873)
- U.S. passport book that **does not** indicate on the last page that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN"
- U.S. passport card
- American Indian Card (form I-872) which indicates "KIC."

While this list covers the majority of applicants who are U.S citizens, the Department of Public Safety has discretion to accept other documents that sufficiently prove an applicant is a U.S. citizen pursuant to Texas Transportation Code § 521.142(e).

**Interrogatory 1b**

*"For each date between January 1, 2006, and November 1, 2011 on which a person had to provide documentation to prove U.S. citizenship or lawful U.S. presence to obtain a Texas driver's license or DPS personal identification card . . . identify by specific citation (including date) each statute, rule, other authority, or other writing authorizing the Department to request or require such proof."*

Defendants respond generally that as a result of the federal Motor Voter Act, Texas Transportation Code § 521.142 was amended in 1999 to add subsection (c)(7) to require applicants to indicate whether or not they are a U.S. citizen on an application.   The legislative history of this statute is publically available.   From October 2008 until December 2011, applicants were required by the previous version of 37 Texas Administrative Code § 15.171 to provide documentation proving their U.S. citizenship.   The history of this administrative rule is publically available. Chapter 521 of the Texas Transportation Code was amended in 2011 to add section 521.1425 which requires applicants to provide

7

documentation proving their U.S. citizenship. The legislative history of these amendments is publically available.

**2.     As of April 18, 2014 (or any other named date since November 1, 2013), state the number of holders of non-expired Texas driver licenses or DPS personal identification cards who are (1) U.S. citizens for whom DPS records reflect that they have satisfied the current requirements for documentary proof of U.S. citizenship; (2) persons whom DPS records list as U.S. citizens but for whom the records do not reflect that they have satisfied the current requirements for documentary proof of U.S. citizenship; (3) persons for whom DPS records do not list a country of citizenship; and (4) persons for whom DPS records list a foreign country as the country of citizenship.**

**RESPONSE:** Defendants object to this interrogatory on the ground that it contains at least four separate interrogatories. By asking the Defendants to "state the number of holders of non-expired Texas driver licenses or DPS personal identification cards who are (1) U.S. citizens for whom DPS records reflect that they have satisfied the current requirements for documentary proof of U.S. citizenship" [hereafter Interrogatory 2a], asking Defendants to "state the number of holders of non-expired Texas driver licenses or DPS personal identification cards who are . . . (2) persons whom DPS records list as U.S. citizens but for whom the records do not reflect that they have satisfied the current requirements for documentary proof of U.S. citizenship" [hereafter Interrogatory 2b], asking

Defendants to "state the number of holders of non-expired Texas driver licenses or DPS personal identification cards who are . . . (3) persons for whom DPS records do not list a country of citizenship" [hereafter interrogatory 2c], and asking Defendants to "state the number of holders of non-expired Texas driver licenses or DPS personal identification cards who are . . . (4) persons for whom DPS records list a foreign country as the country of citizenship" [hereafter interrogatory 2d], the interrogatory introduced lines of inquiry that are separate and distinct from the inquiry made by the portion of the inquiry that precedes each. *See Willingham v. Ashcroft*, 226 F.R.D. 57, 59 (D.D.C. 2005). Defendants will, therefore, construe Interrogatory 2 as four separate interrogatories.

Further, Defendants object to all four interrogatories as being vague, not reasonably specific, overly broad and unduly burdensome to the extent they attempt to create an ongoing duty to provide responses as of "any other named date since November 1, 2013." Defendants further object to the interrogatories as seeking information that is neither relevant to this cause of action nor likely to lead to the discovery of relevant or admissible evidence.

Subject to and without waiving the foregoing objections, the Defendants generally respond as follows:

**Interrogatory 2a**

*"As of April 18, 2014 (or any other named date since November 1, 2013), state the number of holders of non-expired Texas driver licenses or DPS personal identification cards who are (1) U.S. citizens for whom DPS records reflect that they have satisfied the current requirements for documentary proof of U.S. citizenship."*

Defendants respond that as of May 18, 2014, 4,134,370 is the number of persons with an unexpired license, occupational license and/or identification card who are identified as US citizens in the DLS database and who have provided DPS with proof of US citizenship with one of the following documents: 'Certificate of Citizenship', 'Naturalization Certificate', 'US Passport', 'US Citizen ID Card', 'American Indian Card', 'US Passport Card', 'US Birth Certificate', 'US Department of State Certification of Birth'.

**Interrogatory 2b**

*"As of April 18, 2014 (or any other named date since November 1, 2013), state the number of holders of non-expired Texas driver licenses or DPS personal identification cards who are . . . (2) persons whom DPS records list as U.S. citizens but for whom the records do not reflect that they have satisfied the current requirements for documentary proof of U.S. citizenship."*

Defendants respond that as of May 18, 2014, 14,039,884 is the number of persons with an unexpired license, occupational license and/or identification card who are identified as US citizens in the DLS database and who have provided DPS with proof of identity that is NOT one of the following documents: 'Certificate of Citizenship ', 'Naturalization Certificate', 'US Passport', 'US Citizen ID Card', 'American Indian Card', 'US Passport Card', 'US Birth Certificate', or 'US Department of State Certification of Birth'.

**Interrogatory 2c**

*"As of April 18, 2014 (or any other named date since November 1, 2013), state the number of holders of non-expired Texas driver licenses or DPS personal identification cards who  are . . . (3) persons for whom DPS records do  not list a country of citizenship."*

Defendants respond that as of May 18, 2014, 211,167 is the number

persons with an unexpired license, occupational license and/or identification card who do not have citizenship identified in the DLS database.

**Interrogatory 2d**

*"As of April 18, 2014 (or any other named date since November 1, 2013), state the number of holders of non-expired Texas driver licenses or DPS personal identification cards who are . . . (4) persons for whom DPS records list a foreign country as the country of citizenship."*

        Defendants respond that as of May 18, 2014, 2,120,288 is the number of persons with an unexpired license, occupational license and/or identification card who are identified as Non-US citizens in the DLS database.

Dated: May 22, 2014

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

JONATHAN F. MITCHELL
Solicitor General

J. REED CLAY, JR.
Special Assistant and Senior Counsel
to the Attorney General
Southern District of Texas No. 1160600

*/s/ John B. Scott*
JOHN B. SCOTT
Deputy Attorney General for Civil Litigation
Southern District of Texas No. 10418
Texas State Bar No. 17901500
ATTORNEY-IN-CHARGE

G. DAVID WHITLEY
Assistant Deputy Attorney General
Southern District of Texas No. 2080496

STEPHEN RONALD KEISTER
Assistant Attorney General
Southern District of Texas No. 18580

JENNIFER MARIE ROSCETTI
Assistant Attorney General
Southern District of Texas No. 224780

209 West 14th Street
P.O. Box 12548
Austin, Texas 70711-2548
(512) 475-0131

DONNELL, ABERNETHY & KIESCHNICK
Ben A. Donnell
555 N. Carancahua, Suite 1770
Corpus Christi, Texas  78401-0853
Southern District of Texas No. 5689

COUNSEL FOR THE STATE OF TEXAS, RICK
PERRY, JOHN STEEN, and STEVE MCCRAW

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2014, a true and correct copy of the foregoing document is being served via the Court's ECF system to all counsel of record.

*/s/ John B. Scott*
JOHN B. SCOTT
Deputy Attorney General for Civil Litigation

PL1034
9/2/2014
2:13-cv-000193

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

MARC VEASEY, *et al*,                           §
                                                §
                    Plaintiffs,                 §
VS.                                             §          CIVIL ACTION NO. 2:13-CV-00193
                                                §
RICK PERRY, *et al*,                            §
                                                §
                    Defendants.                 §

## DEFENDANTS' FIRST AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFFS AND PLAINTIFF-INTERVENORS' THIRD SET OF INTERROGATORIES

**TO:**    All Plaintiffs and Plaintiff-Intervenors, by and through their attorneys of record.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, the State of Texas, Rick Perry, Nandita Berry, and Steve McCraw, by and through the Attorney General for the State of Texas, serve these First Amended Objections and Responses to Plaintiffs and Plaintiff-Intervenors' Third Set of Interrogatories.

## GENERAL OBJECTIONS

Defendants object to each interrogatory: (1) insofar as it seeks information not in Defendants' possession, custody, or control; (2) insofar as it seeks information that was prepared for or in anticipation of litigation, constitutes attorney work product, contains attorney-client communications, or is otherwise privileged; (3) insofar as it seeks information which is publicly available or otherwise equally available and/or uniquely or equally available from third parties; (4) insofar as it seeks information that does not specifically refer to the events which are the subject matter of this

litigation; and (5) insofar as it seeks information not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

These responses and objections are made on the basis of information now known to Defendants and are made without waiving any further objections to, or admitting the relevancy or materiality of, any of the information requested. Defendants' investigation, discovery, and preparation for proceedings are continuing and all answers are given without prejudice to Defendants' right to introduce or object to the discovery of any documents, facts, or information discovered after the date hereof.  Defendants likewise do not waive the right to object, on any and all grounds, to (1) the evidentiary use of the information contained in these responses and objections; and (2) discovery requests relating to these objections and responses.

Defendants will provide their responses based on terms as they are commonly understood, and consistent with the Federal Rules of Civil Procedure.  Defendants object to and will refrain from extending or modifying any words employed in the requests to comport with expanded definitions or instructions.

## **INTERROGATORIES**

**1.     Provide the total number of individuals whose Texas driver's licenses were  confiscated at any time between May 1, 2013 and April 30, 2014 as a result of a license suspension, revocation, or cancellation, breaking that total down by race and ethnicity.  If these numbers are not available for the specified one-year time period, provide these numbers**

for the most recent one-year time period for which such numbers are available and state the dates for which those numbers are provided.

**NOTE:** Plaintiffs on clarified that they seek information on the number of individuals who had their licenses confiscated, for instance, under programs such as the ALR program (see 524.011 of the Transportation Code) and suggest that information like this is available and was provided to the legislature in 2011?

**RESPONSE:** Defendants respond to this interrogatory as amended by Plaintiffs. Defendants object to this interrogatory pursuant to the General Objections above. Subject to and without waiving the foregoing objections, Defendants generally respond as follows: Defendants have produced to Plaintiffs the database dictionary for the driver's license database maintained by the Department of Public Safety ("DPS"). The database dictionary references a data field titled "Licenses Confiscated," but that field has not been implemented into the driver's license database. Thus, while DPS does, on occasion, confiscate driver's licenses as provided under Texas law (*see, e.g.,* Tex. Transp. Code § 524.011(b)(2)), the DPS driver's license database contains no information or corresponding data field indicating specifically the number of individuals who have had their driver's license confiscated.

2.     **Provide the total number of people, broken down by race and ethnicity, who possessed an unexpired ID as of October 1, 2010, for each of the forms of DPS-issued, SB 14- approved ID, excluding the election**

**identification certificate (i.e., for Texas driver's licenses, personal IDs, and concealed handgun permits).  If these numbers are not available for October 1, 2010, provide these numbers for the earliest date after October 1, 2010 for which such numbers are available and state the date for which those numbers are provided.**

**RESPONSE:**    Defendants object this interrogatory pursuant to the General Objections above.    Subject to and without waiving the foregoing objections, Defendants generally respond as follows:  DPS ran a query against the concealed handgun license ("CHL") database to ascertain the total number of people, broken down by race and ethnicity, who possessed an unexpired CHL.  The numbers were not available for October 1, 2010.  The following numbers represent the active CHL holders as of January 15, 2014, and the numbers are broken down by the race information maintained in the CHL database as self-reported by applicants.  The CHL data does not include ethnicity or a marker to determine Spanish surnames.

| | |
|---|---:|
| American Indian or Alaskan Native: | 2,645 |
| Asian or Pacific Islander: | 14,382 |
| Black: | 45,750 |
| Multi-Racial: | 7,346 |
| Other/Unknown: | 25,398 |
| White: | 617,098 |
| **Total:** | **712,619** |

A query was run against the driver license system ("DLS") database to ascertain the total number of people, broken down by race and ethnicity, who possessed an unexpired driver license or personal identification card.  The numbers were not available for October 1, 2010.  As of June 13, 2014, the number of people,

broken down by race and ethnicity, who possess an unexpired Texas ID, Texas Driver License, or Texas Occupational Driver License, according to records stored in the DPS Driver License database, is as follows:

| | |
|---|---:|
| White: | 13,719,182 |
| Black: | 2,560,675 |
| Asian/Pacific Islander: | 973,324 |
| Hispanic: | 2,570,095 |
| American Indian/Alaskan Native: | 41,502 |
| Other: | 676,031 |
| **Total:** | **20,540,809** |

**Dated:** August 1, 2014

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

JONATHAN F. MITCHELL
Solicitor General

J. REED CLAY, JR.
Special Assistant and Senior Counsel
to the Attorney General
Southern District of Texas No. 1160600

*/s/ John B. Scott*
JOHN B. SCOTT
Deputy Attorney General for Civil Litigation
Southern District of Texas No. 10418
Texas State Bar No. 17901500
ATTORNEY-IN-CHARGE

G. DAVID WHITLEY
Assistant Deputy Attorney General
Southern District of Texas No. 2080496

STEPHEN RONALD KEISTER
Assistant Attorney General
Southern District of Texas No. 18580

JENNIFER MARIE ROSCETTI
Assistant Attorney General
Southern District of Texas No. 224780

LINDSEY ELIZABETH WOLF
Assistant Attorney General
Southern District of Texas No. 2292940

209 West 14th Street
P.O. Box 12548
Austin, Texas 70711-2548
(512) 475-0131

BEN A. DONNELL
Donnell, Abernethy & Kieschnick
555 N. Carancahua, Suite 1770
Corpus Christi, Texas 78401-0853
Southern District of Texas No. 5689
COUNSEL FOR THE STATE OF TEXAS,
RICK PERRY, JOHN STEEN, and STEVE
MCCRAW

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2014, a true and correct copy of the foregoing document was served via electronic mail to all counsel of record.

_/s/ John B. Scott_
JOHN B. SCOTT

PL1035
9/2/2014
2:13-cv-00193

# What Will It Take to Fix Driver License?

Submitted by the Texas Department of Public Safety

February 28, 2011



TX_00245744

Defendant's Exhibit #
226

DE-001459

USA_00009232

**Executive Summary**

Getting a driver license in Texas should not have to be a painful experience. The typical driver license customer complaint is about uncomfortable, long wait times before they get to the counter to be helped. Long wait times and crowded facilities developed as the State's population grew and the length of time required to process increasingly-complex driver license transactions expanded over the years.

The Department of Public Safety (DPS) has begun making changes which have yielded reductions in customer wait times. These changes alone, however, are not enough to achieve the desired service quality and driver license document security. There are specific legislative changes recommended to reduce driver license office visits and increase the security of DLs and IDs.  Other changes recommended to improve the driver license process include leveraging technology to improve service quality and operational efficiency, and investing in additional employees and facilities to catch up with the rapid population increase over the previous decades.

The recommendation is to increase the number of employees and the capacity of our facilities to match the population growth over the past decade while maintaining all existing driver license offices.  The projected state cost for this is $63 million per biennium.

This recommendation includes: 361 FTEs for Driver License, Contact Center, and Indirect Support Staff; appropriate compensation for job duty responsibilities; 20 FTEs to augment staff during summer months; six new mega centers (mega facilities have 25 or more employees) [one in the Metroplex, three in Harris County, and one each in San Antonio and Austin]; furniture, fixtures, and equipment for the new mega centers; new technology initiatives to reduce customer wait times; and new equipment to re-open 96 mobile offices.

Texans currently pay $4 per year for their driver license.  This fee is low in comparison to most other states.  Thirty-five states have driver license fees higher than Texas.  Some examples of states:  Massachusetts charges $15 per year, Florida charges $8, Illinois charges $7.50, New York charges $6.50, and California charges $6.20 per year.

---

What Will It Take to Fix Driver License?                                          Page 2

TX_00245745

**Defendant's Exhibit #**
226

DE-001460

USA_00009233

**Background**

The Texas State Legislature requested that DPS make specific recommendations to enhance the services provided by its Driver License Division to meet current and future needs of the State.  In offering these recommendations, the Department considered the dynamically changing demographics, changes to legislation requiring additional services from the Division, and the increased need for secure driver license and identification cards.

In addition to supporting the law enforcement environment, citizens now expect world-class customer service from the Driver License Division while employees need a pay classification structure that reflects the increasing skill requirements of the job and a support structure that provides the tools and training to be successful in their jobs.  Elected officials expect financial transparency and accountability for performance. Other federal, state, and local law enforcement agencies expect collaboration, information sharing, professionalism, and leadership.

According to the Deloitte *Management and Organizational Structure Study* dated October 28, 2008, DPS's driver license function is one of the most customer-intensive functions of any Texas state agency. Unfortunately, visiting some DPS Driver License offices can be an unpleasant experience. Lines are long, technology is underutilized, and the facilities themselves are old, overcrowded, and poorly maintained.

To provide word class services, DPS will need changes in legislation to reduce demand and increase driver license security, as well as additional investments in Technology, People, and Facilities.

TX_00245746

**Defendant's Exhibit #**
226

DE-001461

USA_00009234

**Changing Demographics**

Texas has one of the largest and most rapidly growing economies in the United States. In 2006, Texas was home to six of the top 50 companies on the Fortune 500 List. Texas' economy is the 15th largest in the world, based on nominal GDP figures.

Texas has the second largest workforce in the United States, with almost 11 million civilian workers. This robust economy, plus the lack of personal income tax and the largely undervalued real estate throughout Texas, has led to significant population growth.

Texas' population is projected to grow by seven million people over the next 20 years, a 28 percent increase, or roughly 1.24 percent per year compounded. Migration to the large metropolitan areas is expected, creating mega MSAs (Metropolitan Statistical Areas) as shown in the dark green areas on the population maps below.



Source:  Texas State Data Center

---

What Will It Take to Fix Driver License?                                                    Page 4

TX_00245747

**Defendant's Exhibit #**
226

DE-001462

USA_00009235

**Defining the Problem**

**Customer Service**

There are two primary factors that have contributed to the decline in customer service quality in driver license offices over the past 20 years:

1. An increase in the number of transactions while the number of employees and the capacity of facilities have remained constant

2. An increase in the length of driver license and ID transactions due to the need to increase document security and perform non-driver license related functions

The population in Texas has grown almost 21 percent over the last 10 years while the number of driver license examiners has remained constant. Over 20,000 driver license-related customer calls are received daily, and over 85 percent of those calls go unanswered each day.

Exacerbating the employee shortfall are the increase in non-driver license responsibilities (e.g., organ donor, selective service, and voter registration) and the complexity of services that extend transaction time. (See Appendix 1 for a complete list of transaction-extending items.)

Driver license offices today provide a myriad of services to other government agencies, and the demand for data and ancillary services is increasing regularly. While this degrades driver license service quality somewhat, it is less expensive to provide incremental resources to Driver License than to set up redundant systems.

**TX_00245748**

**Defendant's Exhibit #**
226

DE-001463

USA_00009236

# Driver License Service Quality



**\*Additional mandates include state and federal requirements placed upon Driver License Division that impact transaction times and ultimately wait times.  Examples of non-driver license requirements include organ donation, selective service, and voter registration.  Secure credentialing requirements such as birth certificates and lawful presence documents also extend transaction times.**

Just as the number of driver license employees has remained constant, the quality and capacity of facilities has not kept pace with the growing population. The vast majority of driver license facilities were built in the 1960s, '70s, and early '80s. Customers complain about the condition, size, and appearance of many offices. Last summer, three customers fainted in one of our offices in the same week because the air conditioning was failing.  Wait times were extended, and there was insufficient room to provide chairs in the waiting area.

Population growth has occurred mostly in the five large metropolitan areas. This has resulted in the Division's inability to provide consistent high quality services to all of its customers.  In 2010, 26 percent of the offices completed 85 percent of transactions. This means that 80 offices processed nearly 5 million transactions combined, while the remaining 227 offices completed a total of only one million transactions.  Over half (53%) of the 307 driver license offices have only one employee.

What Will It Take to Fix Driver License?                                                Page 6

TX_00245749

**Defendant's Exhibit #**
**226**

DE-001464

USA_00009237

According to preliminary data from the business intelligence analysis being conducted by Texas State University, offices with only one employee operate less productively than larger offices. For example, a mega office (25+ employees) processes 18 times more transactions per employee than a small office (defined as three or fewer employees).   A mega office processes 50 times more transactions per employee than a one person mobile office[1]. The efficiency of driver license operations is reduced by having so many small, less productive offices. This does not mean that employees in small offices have a different work ethic than those in larger offices, but the demand in the small offices is significantly less than in the metropolitan areas. The average customer volume in small offices is fewer than three transactions per hour, whereas Mega offices complete over 50 transactions per hour.

---

[1] Mobile offices require a Driver License employee to drive their personal vehicle to another town, transporting and setting up equipment each day the office is open.  The equipment used is outdated and not replaceable.  As the equipment fails, we have no option but to temporarily close the office because months of testing new equipment have been unsuccessful.  To date, 79 of the 96 mobile offices have been closed.

TX_00245750

**Defendant's Exhibit #**
226

DE-001465

USA_00009238

**Office Size Productivity Comparison
(Transactions Per Office Per Employee Per Hour)**



Efforts to improve efficiency and reduce the number of people who visit driver license offices will help improve service quality for those customers who must complete their transactions in person. However, these efforts cannot offset the State's population increase or account for the growing number of more complex transactions. For example, the Division provides online services for driver license and ID renewal. Last year, approximately 450,000 of the 800,000 eligible renewals were done online, alleviating some of the in-office workload.  Persuading another 200,000-250,000 applicants to renew online will not close the service gap.

**Safety and Security**

A driver license is no longer just a license to operate a vehicle. Today, a driver license or ID is essentially the gateway to legitimacy. These are legal documents used by government agencies, corporations, and financial institutions as the trusted validation of a person's identity. Because of this, there is considerable fraud risk.  Criminals have offered as much as $10,000 for a Texas driver license.  Fraudulent driver licenses are sought because multiple driver licenses can be used to defraud other government programs.

---

TX_00245751

**Defendant's Exhibit #**
**226**

DE-001466

USA_00009239

It is imperative to protect the integrity of these documents. Driver license examiners are our front-line protection. They examine documents and enforce secure credentialing statutory requirements. Technology, providing access to federal and state databases, can also be used to verify document legitimacy.

**Employee Environment**

With very rare exceptions, driver license employees are trustworthy and dedicated to providing quality customer service under challenging circumstances: frustrated customers, long lines, long days, and low pay. They are committed to their duties to protect the safety and security of their fellow Texans. They work hard to understand and administer complex statutory requirements.

Over the years, the responsibilities placed on driver license employees have increased while salaries have remained constant. Typing speed is no longer the most important driver license examiner skill. DPS needs to be able to attract and retain employees with a valuable mix of customer service and critical thinking skills, as well as employees who have good interpersonal skills, can understand complex statutory requirements, and can identify fraudulent documents.

According to a driver license employee survey conducted in January 2011, 25 percent of respondents reported they work a second job because they are unable to support themselves on their $12 per hour salary. In some metropolitan areas, it is possible to get a job at a fast food restaurant with fewer responsibilities but higher pay and benefits.

Paying employees a salary commensurate with their responsibilities would allow DPS to recruit employees with more developed skills. Additionally, higher pay makes employees less vulnerable to bribes. Maintaining a strong employee base will enable Driver License to fulfill its mission of providing good quality service and protecting the safety and security of Texas.

TX_00245752

**Defendant's Exhibit #**
**226**                                          DE-001467

USA_00009240

### Driver License Transaction Volumes and Fees

Most Texans currently pay $4 per year for their driver license.  This fee is low in comparison to other states; thirty-five states have driver license fees higher than Texas. The highest per year fee is in Massachusetts at $15 per year.  Arizona charges the lowest annual fee of $0.51 per year.  Other comparable states charge: Florida - $8, Illinois - $7.50, New York - $6.50, and California - $6.20. (See Appendix 3 for a complete list of other states' driver license fees.)

In total, the Driver License Division generated approximately $330 million in revenue in FY10.  Approximately 28% ($94 million) of these fees were collected via driver license, ID certificate, and Parent Taught Driver Education fees.  Approximately 54% of the Driver License Division fees were collected via driver Enforcement and Compliance fees, including driver responsibility surcharges.  Driver Record Sales generated 17% of the FY10 Driver License Division fees.  (See Appendix 4 for Driver License Division Generated Revenue for FY09 and FY10.)

### Driver License Division Fees - FY10

| Driver License Fees | Collected 2010 | % FY10 | Legislative Appropriation |
|---|---|---|---|
| Driver Responsibility Program - Trauma Fund | $ 77,075,001 | | Trauma Fund |
| Driver Responsibility Program - General Revenue | $ 77,075,001 | | GR Unappropriated |
| Driver Responsibility Program - Vendor Fees | $ 13,154,340 | | DPS |
| Driver License Reinstatement - Administrative License Revocation | $ 6,235,092 | | Texas Mobility Fund |
| Motor Vehicle Safety Responsibility Fees (Reinstatement Fees) | $ 3,745,315 | | GR Unappropriated |
| Reinstatement Fees | $ 1,759,972 | | Texas Mobility Fund |
| Driver Responsibility Program - Driver License Division | $ 1,555,959 | | DPS |
| Ignition Interlock DL Fees | $ 35,436 | | Texas Mobility Fund |
| **Subtotal** | **$ 180,600,679** | **54%** | **Enforcement/Compliance** |
| | | | |
| Driver License Fees | $ 85,421,363 | | Texas Mobility Fund |
| ID Certificates | $ 6,005,865 | | Texas Mobility Fund |
| Parent Taught Driver Education | $ 1,749,442 | | DPS |
| Motorcycle License Fees | $ 997,776 | | Texas Mobility Fund |
| Occupational Driver License Fees | $ 196,280 | | Texas Mobility Fund |
| **Subtotal** | **$ 94,370,725** | **28%** | **DL/ID fees** |
| | | | |
| Driver Record and Interactive Record Fees | $ 55,956,414 | | Texas Mobility Fund |
| Sale of License Information - (Weekly Update) | $ 163,329 | | Texas Mobility Fund |
| Sale of License Information   (Complete List) | $ 18,000 | | Texas Mobility Fund |
| **Subtotal** | **$ 56,137,743** | **17%** | **Driver Record Sales** |
| | | | |
| Voluntary Driver License Fee - Donor Education Awareness and Registry | $ 280,790 | | DSHS |
| Voluntary Driver License Fee | $ 293,448 | | GR Unappropriated |
| Helmet Sticker Fee | $ - | | Motorcycle Education Fund |
| National Driver Registry | $ 2,669 | | DPS |
| **Subtotal** | **$ 576,907** | **0%** | **Miscellaneous** |
| **Grand Total** | **$ 331,686,053** | **100%** | |

TX_00245753

**Defendant's Exhibit #**
226

DE-001468

USA_00009241

### Recommended Changes

The Driver License Division has initiated an aggressive FY11 Driver License Improvement Plan designed to improve customer service, enhance the safety and security of Texans, and improve the driver license employee environment. (See Appendix 2 for the Improvement Plan.) Wait time reductions have already occurred in some offices due to the installation of queuing systems; however, without other changes, the desired customer service quality and document security cannot be achieved. Specific changes proposed include no-cost legislative changes, as well as, additional funding to improve technical capacity, hire additional employees, and acquire facilities to accommodate the growing population.

**Legislative**

Legislative changes can be made to optimize the operational efficiency within the Driver License Division. There are several legislative changes that would reduce the volume of customers required to visit a driver license office:

- Modify the fee structure to encourage customers to complete transactions online (Transportation Code §§ 521.421, 521.422, and 521.424)
- Extend driver license and ID expiration from six years to eight years and increase fees accordingly (Transportation Code § 521.271)
- Allow the DPS Director to waive road tests for qualified providers (Transportation Code § 521.165)

There are also a number of legislative changes that would enhance the security and integrity of driver licenses and ID cards and ensure compliance with Federal requirements:

- Require lawful presence for driver license or ID issuance  (this is currently addressed by administrative rule but is subject  to a court challenge which potentially could repeal the administrative rule)(Transportation Code § 521.141)
- Issue limited-term driver license/ID for non-immigrants (Transportation Code §§ 521.101, 521.271, and 521.2711)
- Repeal provision indicating that an ID card issued to an applicant over 60 does not expire (Transportation Code § 521.101)
- Require Social Security number for driver license/ID issuance (Transportation Code § 521.142)
- Expand authority to disclose SSN for purposes of verification with other driver license/ID issuing agencies (Transportation Code § 521.044)
- Only allow one driver license or ID card that is compliant with federal security standards per person (Transportation Code § 521.182)
- Provide authority to place an indicator on the face of the driver license/ID for purposes of identifying cards that are compliant and non-compliant with federal security standards (Transportation Code § 521.121)

---

TX_00245754

**Defendant's Exhibit #**
226

DE-001469

USA_00009242

**Technology**

DPS's vision is to leverage technology to improve the quality and speed of the services provided online and at our offices. To do this, we must expand our online capabilities and enhance our means to protect and utilize driver license data for use by law enforcement and other governmental entities in as efficient a manner as possible.

With the right technology the Division can provide customized lists of required documentation, offer online appointment scheduling, and electronically collect and check documents in advance. After visiting an office, customers could check the status of their cards online and access help through online chats, phone calls, or email. This would save time and money for both customers and DPS on every transaction.

With additional funding, the Driver License Division will be able to leverage new technology for driver licenses, our customers, and to help other governmental entities.

**People and Facilities**

As stated previously, the driver license facilities have not been updated nor the number of employees increased to match the ever-increasing population or transaction complexity. Meeting customer expectations and providing their desired level of customer service will require additional employees and upgraded or new facilities.

DPS, in conjunction with Texas State University, is conducting a systematic evaluation of current driver license operations to improve service within current resource constraints. Texas State is analyzing existing staffing levels and office locations based on population density and projected population growth. This information will be used to develop strategies to achieve the highest, most-consistent level of service across the state.

There are a number of different ways to approach the mismatch between population and employee/facility resources. The least costly approach that maximizes operational efficiency is to realign driver license employees and facilities to match current population distribution. However, this approach may not address requirements to provide locally-desired services. Two options for how to approach the people and facilities needs of Driver License are addressed below.

Whichever option is selected, it is important to note that these FTE increases will only allow us to serve the State's current population at an acceptable level of service. Additional FTEs will be needed over the years as the State's population continues to grow.

**TX_00245755**

**Defendant's Exhibit #**
**226**

DE-001470

USA_00009243

## Recommendation

**Increase the number of employees and the capacity of our facilities to match population growth while maintaining all existing driver license offices.**

**What's Included:**
- 361 full-time Driver License, Contact Center, and Indirect Support staff
- Appropriate compensation for job duty responsibilities
- 19.5 FTEs (which equates to 78 employees) to augment staff during summer months
- Six new mega centers (one in the Metroplex, three in Harris County, and one each in San Antonio and Austin)
- Furniture and equipment for the new mega centers
- New technology initiatives to reduce customer wait times
- New equipment to re-open 96 mobile offices

**Advantages:**
- Improved service quality
- Supports local communities by maintaining driver license presence and providing customer convenience

**Disadvantages:**
- Higher cost to the State

**Projected State Costs for the Biennium:**

| Description | Amounts | | |
| --- | --- | --- | --- |
| | FY12 | FY13 | Biennial Cost |
| Annual Salary | 9,371,433 | 19,923,873 | 29,295,306 |
| Longevity | 80,496 | 274,464 | 354,960 |
| Professional Fees | 3,000,000 | 3,000,000 | 6,000,000 |
| Consumables | 143,040 | 502,860 | 645,900 |
| Utilities | 1,736,349 | 1,880,439 | 3,616,788 |
| Rent - Building* | 40,422 | 3,237,179 | 3,277,601 |
| Other Operating | 8,036,317 | 897,000 | 8,933,317 |
| Capital Expenditures | 1,413,252 | - | 1,413,252 |
| | | | |
| Subtotal Excl Emp Benefits | 23,821,309 | 29,715,814 | 53,537,123 |
| Employee Benefits | 2,633,287 | 5,627,188 | 8,260,474 |
| 5% Contingency(Non Employee) | 718,469 | 475,874 | 1,194,343 |
| **Totals**** | **27,173,065** | **35,818,876** | **62,991,940** |

*Construction costs as an alternative to leasing are estimated to be $47 million.

**The restoration of $4,772,388 for Driver License card stock is also needed to fund license issuance costs.

TX_00245756

**Defendant's Exhibit #**
226

DE-001471

USA_00009244

**County Opt-In Alternative**

**Realign office locations and minimally increase employees to maximize service quality and efficiency and allow counties the choice to fund local services**

**What's Included:**
- 285 Full time Driver License, Contact Center, and Indirect Support Staff*
- Appropriate compensation for job duty responsibilities
- 19.5 FTEs (which equates to 78 employees) to augment staff during summer months
- Six new mega centers (one in the Metroplex, three in Harris County, and one each in San Antonio and Austin)
- Furniture and equipment for the new mega centers
- New technology initiatives to reduce customer wait times

**Advantages:**
- Lowest cost option to the state, minimizing resource expenditures for facilities and FTE increases
- Improves service quality
- Aligns existing resources with customer demand
- Allows counties to opt-in for local service

**Disadvantages:**
- Some customers may experience longer drive times to conduct driver license transactions which typically occurs once every six years
- Some DPS employees would be required to re-locate

---

What Will It Take to Fix Driver License?                                      Page 14

TX_00245757

**Defendant's Exhibit #**
226

DE-001472

USA_00009245

**Projected State Costs for the Biennium:**

| Description | Amounts | | |
|---|---|---|---|
| | FY12 | FY13 | Biennial Cost |
| Annual Salary | 8,600,969 | 16,860,242 | 25,461,211 |
| Longevity | 66,672 | 219,384 | 286,056 |
| Professional Fees | 3,000,000 | 3,000,000 | 6,000,000 |
| Consumables | 122,880 | 422,535 | 545,415 |
| Utilities | 584,349 | 728,439 | 1,312,788 |
| Rent - Building** | 40,422 | 3,237,179 | 3,277,601 |
| Other Operating | 8,036,317 | 897,000 | 8,933,317 |
| Capital Expenditures | 558,852 | - | 558,852 |
| | | | |
| Subtotal Excl Emp Benefits | 21,010,461 | 25,364,778 | 46,375,239 |
| Employee Benefits | 2,414,787 | 4,758,329 | 7,173,116 |
| 5% Contingency(Non Employee) | 617,141 | 414,258 | 1,031,399 |
| **Totals*** | **24,042,389** | **30,537,365** | **54,579,754** |

**Cost Sharing with Participating Counties:**

Many mobile driver license offices have been temporarily closed due to equipment failure. For those currently without a driver license presence that previously had a mobile office, the Driver License Division would continue to pay the salary, mileage, and per diem costs. In return, the county could sign a Memorandum of Understanding (MOU) and provide a lockable, exclusive use, ADA-compliant facility with bathroom access, and pay for the equipment costs estimated at $20,900 per location for the first year; approximately $12,000 per year thereafter.

If a county wanted to open a new mobile office location previously un-served by the Division, they would be required to pay the above costs plus the personnel-related costs for each day they desired to have their new local office open for business.  The total estimated cost for service two times per month is approximately $60,000 per year.

*The remaining FTEs to fully staff the new Mega Centers will be transferred from other driver license offices within the State.

**Construction costs as an alternative to leasing are estimated to be $47 million.

***The restoration of $4,772,388 for Driver License card stock is also needed to fund license issuance costs.

TX_00245758

**Defendant's Exhibit #**
**226**

DE-001473

USA_00009246

**Conclusion**

The Driver License Division has undergone a transformation to become a customer driven organization. We want to serve our customers as efficiently as possible, making it easy and painless to complete their required driver license and ID transactions.

Driver License has offered recommendations on two courses of action. The first recommendation allows Driver License to build efficiencies into its business while maintaining the small office locations desired by most counties. The alternate recommendation builds additional efficiencies into the business and allows the Division to use the State's resources more cost effectively.

TX_00245759

Defendant's Exhibit #
226

DE-001474

USA_00009247

**Appendix 1 - Additional Requirements that Impact Driver License Service Quality**

| Implementation Date | Additional Requirements |
|---|---|
| January 1992 | Voter Registration was implemented. |
| January 1995 | Donor information collection began. |
| February 3, 1997 | Mandatory collection of SSN on original, renewal, or duplicate driver license began. |
| April 1, 1997 | Parent-Taught Driver Education began requiring the collection of documentation demonstrating successful completion prior to the issuance of a driver license to persons under 18. |
| January 2, 2002 | Implementation of the Graduated Driver License Program to restricted levels of driving permissions for persons under 18. |
| January 22, 2002 | Original and renewal registration of sex offenders on an annual basis began. |
| January 22, 2002 | Collection of a voluntary donation of $1 for anatomical gift education program began. |
| January 22, 2002 | Collection of citizenship status for the issuance of a driver license and ID card began. |
| December 2002 | Registration with the Selective Service System began. |
| May 31, 2005 | Hazardous Materials Endorsement (HME) application procedures went into effect requiring background checks for CDL applicants requesting an HME. |
| March 6, 2006 | Fee exemption for disabled veterans became effective. |
| September 1, 2006 | Voluntary organ donor registry collection to provide for a statement of gift on a driver license/ID became available. |
| September 1, 2009 | Waivers of driving tests eliminated for persons under 18 years of age. |

**TX_00245760**

**Defendant's Exhibit #**
**226**

DE-001475

USA_00009248

**Appendix 2 – Driver License Division FY11 Improvement Plan**

Focus
Areas:

| Customer Service | Safety/ Security | Employee Environment |

Goals:

CS1 – Provide customers easy-to-access, easy-to-understand information

CS2 – Minimize process time and provide a customer friendly environment

CS3 – Provide stakeholders useful/interesting information about DL operations

SS1 – Use internal controls to reduce illegal activity

SS2 – Work to improve driver safety

EE1 – Hire good people and treat them right

EE2 – Provide training and tools to enable employees to succeed

**TX_00245761**

**Defendant's Exhibit #
226**

DE-001476

USA_00009249

**FY 2011 DL Improvement Project List**

| Project | Customer Service | Safety-Security | Employee Environment |
|---|---|---|---|
| Business Intelligence Analysis | CS2 | | √ |
| Division Reorganization and Staffing | CS2 | | √ |
| Proactive Customer Communication Plan | CS1 | | √ |
| DL Improvement Metrics Dashboard | CS2 | √ | √ |
| DL Staffing and Facility Situation Analysis | CS3 | √ | √ |
| DL/ID Issuance Requirements | CS1 | √ | √ |
| Mailer Upgrade | CS2 | | √ |
| Form Letter Revisions (50) | CS1 | | √ |
| IDs for Inmates | CS2 | | |
| Customer Flow Solution | CS2 | | √ |
| DL/DPS Message Development for Visual Displays | CS3 | √ | √ |
| Signage Standardization | CS1 | | √ |
| Model Office Design | CS2 | | √ |
| Credit/Debit Card Acceptance | CS2 | √ | √ |
| Parent Taught Driver Education Improvement | CS1 | √ | √ |
| Regional Management Empowerment Project | CS2 | √ | √ |
| Online Training Plan | √ | √ | EE2 |
| Internal Communication Plan | | | EE1 |
| Employee Uniforms | √ | | EE1 |
| Job Descriptions Revamp | √ | √ | EE1 |
| DL Manual Revision + DLD Fact Sheet Development | √ | √ | EE2 |
| IT Project Prioritization/Communication Plan | √ | SS1 | √ |
| ADLTS (Automated Driver License Testing System) | √ | SS2 | √ |

TX_00245762

**Defendant's Exhibit #**
**226**

DE-001477

USA_00009250

**FY 2011 DL Improvement Project Descriptions**

<u>**Customer Service Projects:**</u>

**Business Intelligence Analysis** – This project will help the Driver License Division understand the details about the transactions processed in our 307 offices located across the state so we can target our improvement efforts to achieve the greatest impact.  This analysis, for example, will help us understand the optimal location and size of offices based on population density and population growth.

 **Division Reorganization and Staffing** – This project will help us realign staffing to optimize division efficiency and add some new employees with skill sets that we don't currently have.

**Proactive Customer Communication Plan** – This project will help us identify ways to make sure our customers have easy access to information that they need to quickly complete their DL/ID transactions.  In addition to making sure that we get information up to date on the web and in our offices, we may also consider using Twitter or Facebook to share information.

**DL Improvement Metrics Dashboard** – This project will make sure we can tangibly demonstrate the benefits of our DL Improvement Plan by developing performance measures to quantify how much we improved customer service, employee environment, and safety and security. Developing this at-a-glance assessment tool for managers, employees, and other interested parties will let us quickly gauge our progress toward improving customer service, ensuring safety and security, and enhancing our employee environment.

**DL Staffing and Facility Situation Analysis** – This project will analyze and briefly present information about the change in DL staffing levels over the years compared to population growth and the increasing complexity of transactions.

**DL/ID Issuance Requirements** – This project will clarify—for our employees and customers—exactly what documents must be presented in order to receive a Texas DL or ID card.  This project will identify the best ways to present this information to our customers including the possibilities of presenting this information on the web, on large display boards at our offices, and via handouts or brochures.

**Mailer Upgrade** – This project will define the processes to improve the efficiency of the mailing process for the millions of documents DLD mails each year including renewal notices, DL/ID card mailings, and suspensions and surcharge notices.

TX_00245763

**Defendant's Exhibit #**
226

DE-001478

USA_00009251

**Form Letter Revisions** – This project will review approximately 50 different form letters we send out to make sure they are easy to understand. Many times, customers get these letters and immediately call us because they are confused. The hope is that by making the letters easier to understand we can reduce customer frustration and reduce the number of calls answered by DLD and Contact Center employees.

**IDs for Inmates** – This project, as required by HB2161, will develop a procedure to allow TDCJ staff to help inmates get ID cards before they are released so they can transition into society.

**Customer Flow Solution** – This project will provide a queuing system for our 50 largest offices allowing us to separate quick transactions from slower, more complex transactions. This capability will eventually allow us to provide online scheduling and online sharing of office wait times. This project will dramatically improve our customer service.

**DL/DPS Message Development for Visual Displays** – This project is related to the customer flow solution. The display screens for the queuing system also allow the display of important information for our customers. We can help them understand the requirements, share interesting facts, and convey key department messages.

**Signage Standardization** – By standardizing signage in our offices we will identify our most important messages and make sure they are presented uniformly and neatly in all our offices.

**Model Office Design** – This project will develop a standard appearance for our offices and define minimum space per counter window. While we will not be able to implement the standard appearance in all offices, having a target to shoot for will help us prepare for future facility changes.

**Credit/Debit Card Acceptance** – Develop the policy to accept alternate methods of payment which will improve customer convenience and reduce the threat of monetary loss to the state.

**Parent Taught Driver Education Improvement** – There is a great deal of confusion and frustration on all fronts regarding Parent Taught Driver Education. This project will work to simplify and clarify the requirements for this method of driver education, streamlining the process for everyone.

**Regional Management Empowerment Project** – This project will help develop a strong team of DL field managers who work together to solve challenges such as how to develop incident response teams, how to respond to customer calls, ways to reduce unproductive supervisory responsibility.

TX_00245764

**Defendant's Exhibit #**
226

DE-001479

USA_00009252

**Employee Environment Projects:**

**Online Training Plan** – We will develop a clear roadmap for what training can be presented online and prioritize which training modules should be developed first.  Online training offers many advantages:  course content is presented consistently; employees can repeat courses they did not fully grasp the first time; supervisors can easily track training; and online training doesn't require any travel time or expenditures.

**Internal Communication Plan** – We will consciously think about and develop a plan to make sure that there are ample opportunities to engage in 2 way communication between employees and supervisors.

**Employee Uniforms** – Providing field office employees department-issued shirts will ensure a professional, recognizable appearance and relieve employees of the need to replace clothing items at their own expense when they are damaged on the job.

**Job Descriptions Revamp –** This project will update the job descriptions for DL employees building in opportunities for career ladder advancement as knowledge and responsibility expand. This project will also look at defining ideal employee characteristics for each job.

**DL Manual Revision + DLD Fact Sheet development** – The current DL Manual will be revamped to make it easier to understand and to use as the reference tool it should be.  A revamped manual should make it easier for employees to do their job right. Additionally, a series of fact sheets will be developed to provide high-level brief overviews of some of DLD's high-profile activities, providing employees, regional commanders, and other stakeholders.  Fact sheets have already been drafted on DRP and DPS actions to combat DL Fraud.

**Safety and Security Projects:**

**IT Project Prioritization/Communication Plan** – Using technology is key to reducing office lines and improving customer satisfaction but it is also critical to achievement of many of our other projects.  This project will develop a method to prioritize IT requirements and communicate that with employees and other interested parties.

**ADLTS** – An Automated Driver License Testing System (ADLTS) will significantly reduce the potential for a driver license to be issued without the applicant passing the traffic law knowledge test because ADLTS will be directly connected to DLS.

---

TX_00245765

**Defendant's Exhibit #**
**226**

DE-001480

USA_00009253

**Appendix 3 – Other States Driver License Fees**

| | State | DL Fee * | AVG Fee/Year | Renewal Term by Years |
|---|---|---|---|---|
| 1 | Massachusetts | $75.00 | $15.00 | 5 |
| 2 | Vermont | $28.00 | $14.00 | 2 |
| 3 | Connecticut | $66.00 | $11.00 | 6 |
| 4 | Iowa | $20.00 | $10.00 | 2 |
| 5 | New Hampshire | $50.00 | $10.00 | 5 |
| 6 | Maryland | $45.00 | $9.00 | 5 |
| 7 | Florida | $48.00 | $8.00 | 6 |
| 8 | Idaho | $30.00 | $7.50 | 4 |
| 9 | Illinois | $30.00 | $7.50 | 4 |
| 10 | Oregon | $60.00 | $7.50 | 8 |
| 11 | Pennsylvania | $28.00 | $7.00 | 4 |
| 12 | New York | $52.00 | $6.50 | 8 |
| 13 | Rhode Island | $31.50 | $6.30 | 5 |
| 14 | Michigan | $25.00 | $6.25 | 4 |
| 15 | California | $31.00 | $6.20 | 5 |
| 16 | Ohio | $24.50 | $6.13 | 4 |
| 17 | Minnesota | $24.00 | $6.00 | 4 |
| 18 | New Jersey | $24.00 | $6.00 | 4 |
| 19 | Utah | $30.00 | $6.00 | 5 |
| 20 | Alabama | $23.00 | $5.75 | 4 |
| 21 | Nevada | $22.00 | $5.50 | 4 |
| 22 | Oklahoma | $21.50 | $5.38 | 4 |
| 23 | Maine | $21.00 | $5.25 | 4 |
| 24 | Mississippi | $21.00 | $5.25 | 4 |
| 25 | Arkansas | $20.00 | $5.00 | 4 |
| 26 | Delaware | $25.00 | $5.00 | 5 |
| 27 | Hawaii | $40.00 | $5.00 | 8 |
| 28 | Kentucky | $20.00 | $5.00 | 4 |
| 29 | Montana | $40.00 | $5.00 | 8 |
| 30 | Washington | $25.00 | $5.00 | 5 |
| 31 | Wyoming | $20.00 | $5.00 | 4 |
| 32 | Nebraska | $24.00 | $4.80 | 5 |
| 33 | New Mexico | $18.00 | $4.50 | 4 |
| 34 | Wisconsin | $34.00 | $4.25 | 8 |
| 35 | Colorado | $21.00 | $4.20 | 5 |
| 36 | Alaska | $20.00 | $4.00 | 5 |
| 37 | North Carolina | $32.00 | $4.00 | 8 |
| 38 | South Dakota | $20.00 | $4.00 | 5 |
| **39** | **Texas** | **$24.00** | **$4.00** | **6** |
| 40 | Virginia | $32.00 | $4.00 | 8 |
| 41 | Tennessee | $19.50 | $3.90 | 5 |
| 42 | Kansas | $22.00 | $3.67 | 6 |
| 43 | Georgia | $35.00 | $3.50 | 10 |
| 44 | Indiana | $21.00 | $3.50 | 6 |
| 45 | Louisiana | $13.50 | $3.38 | 4 |
| 46 | Missouri | $20.00 | $3.33 | 6 |
| 47 | West Virginia | $13.00 | $2.60 | 5 |
| 48 | North Dakota | $10.00 | $2.50 | 4 |
| 49 | South Carolina | $25.00 | $2.50 | 10 |
| 50 | Arizona | $25.00 | $0.51 | 49 |

\* Some states have different driver license fees.  The fees shown are the highest fees for a non-commercial license.
Source:  American Association of Motor Vehicle Administrators, September 2010

TX_00245766

**Defendant's Exhibit #**
226

DE-001481

USA_00009254

Defendant's Exhibit #

226

DE-001482

TX_00245767

What Will It Take to Fix Driver License?

Page 24

## Appendix 4 - Driver License Division Generated Revenue By Source Of Income

| Driver License Fees | Fund | Fee | # Assessed 2010 | Collected 2009 | % FY09 | Collected 2010 | % FY10 | Legislative Appropriation |
|---|---|---|---|---|---|---|---|---|
| Driver Responsibility Program - Trauma Fund | 0111 | $100-$2,000 | 1,430,014 | $ 83,922,031 | | $ 77,075,001 | | Trauma Fund |
| Driver Responsibility Program - General Revenue | 0001 | $100-$2,000 | 1,430,014 | $ 83,922,031 | | $ 77,075,001 | | GR Unappropriated |
| Driver Responsibility Program - Vendor Fees** | 0001 | Varies | Unknown | $ 11,857,495 | | $ 13,154,340 | | DPS |
| Driver License Reinstatement - Administrative License Revocation | 0365 | $125 | 49,881 | $ 6,385,358 | | $ 6,235,092 | | Texas Mobility Fund |
| Motor Vehicle Safety Responsibility Fees (Reinstatement Fees) | 0001 | $100 | 37,453 | $ 4,729,778 | | $ 3,745,315 | | GR Unappropriated |
| Reinstatement Fees | 0365 | $50-$100 | 258,920 | $ 1,685,944 | | $ 1,759,972 | | Texas Mobility Fund |
| Driver Responsibility Program - Driver License Division | 0001 | $100-$2,000 | 1,430,014 | $ 1,675,971 | | $ 1,555,959 | | DPS |
| Ignition Interlock DL Fees | 0365 | $10 | 3,544 | $ 15,540 | | $ 35,436 | | Texas Mobility Fund |
| **Subtotal** | | | | $ 194,176,808 | 56% | $ 180,696,679 | 54% | Enforcement/Compliance |
| Driver License Fees | 0365 | $5-$120 | 4,661,912 | $ 83,996,739 | | $ 85,421,383 | | Texas Mobility Fund |
| ID Certificates | 0365 | $6-$15 | 787,905 | $ 9,649,515 | | $ 6,008,665 | | Texas Mobility Fund |
| Parent Taught Driver Education | 0006 | $20 | 87,472 | $ 1,913,037 | | $ 1,749,442 | | DPS |
| Motorcycle License Fees | 0365 | $8-$15 | Unknown | $ 1,153,510 | | $ 897,776 | | Texas Mobility Fund |
| Occupational Driver License Fees | 0365 | $10-$20 | 17,361 | $ 185,458 | | $ 198,280 | | Texas Mobility Fund |
| **Subtotal** | | | | $ 96,848,259 | 28% | $ 94,375,725 | 28% | DL/ID fees |
| Driver Record and Interactive Record Fees | 0365 | $4-$22 | 11,320,809 | $ 55,677,932 | | $ 55,956,414 | | Texas Mobility Fund |
| Sale of License Information - (Weekly Update) | 0365 | $75 | 2,178 | $ 166,410 | | $ 163,329 | | Texas Mobility Fund |
| Sale of License Information - (Complete List) | 0365 | $2,000 | 9 | $ 8,000 | | $ 18,000 | | Texas Mobility Fund |
| **Subtotal** | | | | $ 55,852,342 | 16% | $ 56,137,743 | 17% | Driver Record Sales |
| Voluntary Driver License Fee - Donor Education Awareness and Registry | 0001 | $1 | 280,790 | $ 324,399 | | $ 280,790 | | DSHS |
| Voluntary Driver License Fee | 0001 | $1 | 293,448 | $ 381,311 | | $ 293,448 | | GR Unappropriated |
| Helmet Sticker Fee*** | 0501 | $5 | 0 | $ 18,965 | | $ | | Motorcycle Education Fund |
| National Driver Registry | 0006 | $4 | 667 | $ 2,828 | | $ 2,669 | | DPS |
| **Subtotal** | | | | $ 727,523 | 0% | $ 876,907 | 0% | Miscellaneous |
| **Grand Total** | | | | $ 347,605,732 | 100% | $ 331,686,053 | 100% | |

** These fees are appropriated to DPS but are used to pay the vendors who assist with
*** The Helmet Sticker Fee is no longer collected (starting in 2010)

USA_00009255

Election Night Returns (https://team1.sos.state.tx.us/enr/)    Last day to apply for ballot by mail for the May 27, 2014 Primary Runoff Election (recer    CONTACT
                                                                                                          (HTTP://VOTETEXAS.GOV
                                                                                                          /CONTACT/)   |

**Qualified voters without an approved photo ID may obtain a free Election Identification Card from DPS.** Find out more at dps.texas.gov (http://www.txdps.state.tx.us/DriverLicense/electionID.htm)

 (/)

**PL1036**
**9/2/2014**
**2:13-cv-00193**

REGISTER TO VOTE    WHO, WHAT, WHERE    MILITARY & OVERSEAS    VOTERS WITH SPECIAL    YOUR RIGHTS (HTTP://VOTETE    FAQ (HTTP://VOTETE    RESOURCES (HTTP://VOTETE

Like ⟨ 386    Tweet ⟨ 43    g+1 ⟨ 1    1

## Election Identification Certificate Mobile Stations

The Office of the Texas Secretary of State and the Texas Department of Public Safety have joined in partnership to offer Election Identification Certificates (EICs) at mobile stations across the state. Election Identification Cards are available to qualified voters who do not otherwise have an approved form of photo ID for voting. Learn more about EICs (http://www.txdps.state.tx.us/DriverLicense/electionID.htm) here.

EIC applicants will need to bring evidence of citizenship and identity (http://www.txdps.state.tx.us/DriverLicense /eicDocReqmnts.htm). To avoid confusion or delays, please review the list of required documents before applying for an EIC.

Below are EIC mobile station locations scheduled so far. More locations will be added as they are scheduled and confirmed. Based on the mobile nature of the units, locations, dates and times are subject to change.

**May 15, 2014**

| Location | Address |
|---|---|
| El Paso County Courthouse, 10:00 AM – 4:00 PM | 500 E. San Antonio, 1st Floor, El Paso, Texas 79901 |

**May 14, 2014**

| Location | Address |
|---|---|
| El Paso County, Bassett Place, 10:00 AM – 4:00 PM | 6101 Gateway West, El Paso, Texas 79925 |

**February 28, 2014**

| Location | Address |
|---|---|
| Collin County, Commissioner's Courtroom | 2300 Bloomdale Road Suite 4152, McKinney, Texas 75071 |
| Harris County, Lone Star College System | 4141 Victory Dr., Houston, Texas 77088 |
| Harris County, Holman Street Baptist Church | 3422 Holman St # B, Houston , Texas 77004 |

**February 27, 2014**

| Location | Address |
|---|---|
| Jefferson County, Port Arthur Public Library | 4615 Ninth Ave., Port Arthur, Texas 77642 |
| Collin County, Commissioner's Courtroom | 2300 Bloomdale Road Suite 4152, McKinney, Texas 75071 |
| Harris County, Lone Star College System | 4141 Victory Dr., Houston, Texas 77088 |
| Harris County, Holman Street Baptist Church | 3422 Holman St # B., Houston, Texas 77004 |

**February 26, 2014**

| Location | Address |
|---|---|
|  |  |

| | |
|---|---|
| Travis County, Clerk's Office | 5501 Airport Blvd., Austin, Texas 78751 |
| Fort Bend County, Missouri City Annex | 307 Texas Parkway, Missouri City, Texas 77489 |
| Bexar County, Las Palmas Library | 515 Castroville Rd., San Antonio, Texas 78237 |
| Montgomery County, Central Library | 104 I-45 North, Conroe, Texas 77301 |
| Williamson County, The Caring Place | 2000 Railroad St., Georgetown, Texas 78626 |
| Jefferson County, Alice Keith Community Center | 4075 Highland, Beaumont, Texas 77705 |

**February 25, 2014**

| Location | Address |
|---|---|
| Travis County, Clerk's Office | 5501 Airport Blvd., Austin, Texas 78751 |
| Fort Bend County, Missouri City Annex | 307 Texas Parkway, Missouri City, Texas 77489 |
| Bexar County, Claude Black Community Center | 2805 E Commerce St., San Antonio, Texas 78203 |
| Montgomery County, Central Library | 104 I-45 North, Conroe, Texas 77301 |
| Williamson County, BACA Senior Center Lobby | 303 W. Bagdad Road, Round Rock, Texas 78664 |

**February 21, 2014**

| Location | Address |
|---|---|
| Hidalgo County, South Texas College Building H – Student Lounge | 3201 W. Pecan, McAllen, Texas 78501 |
| Tarrant County, Plaza Building | 201 Burnett Street, 3rd Floor, Fort Worth, Texas 76102 |
| El Paso County, Courthouse Main Lobby – First Floor | 500 East San Antonio, El Paso, Texas 79901 |
| Brooks County Library | 203 Calixto Mora Ave., Falfurrias, Texas 78355 |

**February 20, 2014**

| Location | Address |
|---|---|
| Hidalgo County, South Texas College Building H – Student Lounge | 3201 W. Pecan, McAllen, Texas 78501 |
| Trinity County, Trinity Fire Department | 201 S Elm St., Trinity, Texas 75862 |
| Galveston County, Dickinson Community Center | 2714 Highway 3, Dickinson, Texas 77539 |
| Tarrant County Plaza Building | 201 Burnett Street, 3rd Floor, Fort Worth, Texas 76102 |
| El Paso County Courthouse Main Lobby – First Floor | 500 East San Antonio, El Paso, Texas 79901 |

| | |
|---|---|
| Brooks County Library | 203 Calixto Mora Ave., Falfurrias, Texas 78355 |

## February 19, 2014

| Location | Address |
|---|---|
| Hidalgo County, University of Texas Pan American, Student Union | 1201 West University Drive Edinburg, Texas 78539 |
| Nueces County Courthouse Room 203 | 901 Leopard St., Corpus Christi, Texas 78401 |
| Cameron County, Dancy Building Exhibit Room | 1100 East Monroe St., Brownsville, Texas 78520 |
| Trinity County, Trinity Fire Department | 201 S Elm St., Trinity, Texas 75862 |
| Galveston County Courthouse | Commissioner's Room 722 Moody (21st St.), Galveston, Texas 77550 |
| Denton County, Texas Woman's University Student Union Building | 304 Administration Drive, Denton, Texas 76204 |

## February 18, 2014

| Location | Address |
|---|---|
| Cameron County, Harlingen City Hall | 118 East Tyler Ave., Harlingen, Texas 78550 |
| Dallas County, J. Erik Jonsson Central Library, 1st Floor Lobby | 1515 Young Street, Dallas, Texas 75201 |
| Nueces County Courthouse | 901 Leopard St Rm 203, Corpus Christi, Texas 78401 |
| Hidalgo County, University of Texas Pan American Student Union Building | 1201 West University Drive, Edinburg, Texas 78539 |

View the Identification Certificate Mobile Station location during 2013 (/election-identification-certificate-mobile-stations-used-in-2013/)

### Not Registered?

To vote in Texas, you must be registered. Simply pick up a voter registration application (http://www.sos.state.tx.us /elections/voter/reqvr.shtml), fill it out, and mail it at least 30 days before the election date.
MORE ABOUT REGISTRATION > (http://votetexas.gov/register-to-vote/register-to-vote/)

### Remind your friends to vote

Spread the word, share important election information with your friends and family!
MORE ABOUT REMINDING > (http://votetexas.gov/remind/)

### Voting is easy, so is getting the facts

Texans must show an approved photo ID when voting in person.
MORE ABOUT PHOTO ID > (http://votetexas.gov/register-to-vote /need-id/)

Home (/) | Register to Vote (http://votetexas.gov/register-to-vote/) | Who, What, Where, When, How (http://votetexas.gov/voting/) | Military & Overseas Voters (http://votetexas.gov/military-overseas-voters/) | Voters With Special Needs (http://votetexas.gov/voters-with-special-needs/) | Your Rights (http://votetexas.gov/your-rights/ FAQ (http://votetexas.gov/faq/) | Resources (http://votetexas.gov/resources/)

(800) 252-VOTE    www.sos.state.tx.us (http://www.sos.state.tx.us)

Switch to our mobile site (http://votetexas.gov/election-identification-certificate-mobile-stations/?wpmp_switcher=mobile)

3 of 3        5/14/2014 1:40 PM

# Plaintiff Exhibit PL1037

# WITHDRAWN

PL1038
9/2/2014
2:13-cv-00193

By:  Eissler                                                      H.B. No. 6

A BILL TO BE ENTITLED

1                               AN ACT

2    relating to the foundation curriculum, the establishment of the

3    instructional materials allotment, and the adoption, review, and

4    purchase of instructional materials and technological equipment

5    for public schools.

6          BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

7          SECTION 1.  Section 7.055(b)(28), Education Code, is amended

8    to read as follows:

9                (28)  The commissioner shall perform duties relating to

10   the funding, adoption, and purchase of instructional materials

11   [textbooks] under Chapter 31.

12         SECTION 2.  Section 7.056(f), Education Code, is amended to

13   read as follows:

14         (f)  A school district or campus that is required to develop

15   and implement a student achievement improvement plan under Section

16   39.102 or 39.103 may receive an exemption or waiver under this

17   section from any law or rule other than:

18                (1)  a prohibition on conduct that constitutes a

19   criminal offense;

20                (2)  a requirement imposed by federal law or rule;

21                (3)  a requirement, restriction, or prohibition

22   imposed by state law or rule relating to:

23                      (A)  public school accountability as provided by

24   Subchapters B, C, D, E, and J, Chapter 39; or

82R10472 CAE-D                     1

H.B. No. 6

1                       (B)  educator   rights   and   benefits   under

2  Subchapters A, C, D, E, F, G, and I, Chapter 21, or under Subchapter

3  A, Chapter 22; or

4                       (4)  [textbook] selection of instructional materials

5  under Chapter 31.

6           SECTION 3.  Section 7.102(c)(23), Education Code, is amended

7  to read as follows:

8                       (23)  The board shall adopt and purchase or license

9  instructional materials [textbooks] as provided by Chapter 31 and

10  adopt rules required by that chapter.

11          SECTION 4.  Sections 7.108(a) and (c), Education Code, are

12  amended to read as follows:

13          (a)  A person interested in selling bonds of any type or a

14  person engaged in manufacturing, shipping, selling, or advertising

15  instructional materials [textbooks] or otherwise connected with

16  the instructional material [textbook] business commits an offense

17  if the person makes or authorizes a political contribution to or

18  takes part in, directly or indirectly, the campaign of any person

19  seeking election to or serving on the board.

20          (c)  In this section:

21                       (1)  "Instructional material" has the meaning assigned

22  by Section 31.002.

23                       (2)  "Political contribution" has the meaning assigned

24  by Section 251.001, Election Code.

25                       [(2)  "Textbook" has the meaning assigned by Section

26  31.002.]

27          SECTION 5.  The heading to Section 7.112, Education Code, is

2

H.B. No. 6

1  amended to read as follows:

2      Sec. 7.112.  REPRESENTATION  OF  [TEXTBOOK]  PUBLISHER  OF
3  INSTRUCTIONAL MATERIALS BY FORMER MEMBER OF BOARD.

4      SECTION 6.  Section 7.112(a), Education Code, is amended to
5  read as follows:

6      (a)  A former member of the State Board of Education who is
7  employed by or otherwise receives compensation from a [textbook]
8  publisher of instructional materials may not, before the second
9  anniversary of the date on which the person last served as a member
10 of the State Board of Education:

11         (1)  confer with a member of the board of trustees of a
12 school district concerning instructional materials [a textbook]
13 published by that [textbook] publisher; or

14         (2)  appear at a meeting of the board of trustees on
15 behalf of the [textbook] publisher.

16     SECTION 7.  Section 7.112(c)(2), Education Code, is amended
17 to read as follows:

18         (2)  "Instructional  material"  and  "publisher"
19 ["Publisher" and "textbook"] have the meanings assigned by Section
20 31.002.

21     SECTION 8.  Section 11.158(b), Education Code, is amended to
22 read as follows:

23     (b)  The board may not charge fees for:

24         (1)  instructional materials [textbooks], workbooks,
25 laboratory supplies, or other supplies necessary for participation
26 in any instructional course except as authorized under this code;

27         (2)  field trips required as a part of a basic education

3

H.B. No. 6

1   program or course;

2          (3)  any  specific  form  of  dress  necessary  for  any
3   required educational program or diplomas;

4          (4)  the  payment  of  instructional  costs  for  necessary
5   school  personnel  employed  in  any  course  or  educational  program
6   required for graduation;

7          (5)  library  materials  [books]  required  to  be  used  for
8   any  educational  course  or  program,  other  than  fines  for  lost,
9   damaged, or overdue materials [books];

10          (6)  admission to any activity the student is required
11   to attend as a prerequisite to graduation;

12          (7)  admission  to  or  examination  in  any  required
13   educational course or program; or

14          (8)  lockers.

15      SECTION 9.  Section 11.164(a), Education Code, is amended to
16   read as follows:

17      (a)  The  board  of  trustees  of  each  school  district  shall
18   limit redundant requests for information and the number and length
19   of written reports that a classroom teacher is required to prepare.
20   A  classroom  teacher  may  not  be  required  to  prepare  any  written
21   information other than:

22          (1)  any  report  concerning  the  health,  safety,  or
23   welfare of a student;

24          (2)  a report of a student's grade on an assignment or
25   examination;

26          (3)  a  report  of  a  student's  academic  progress  in  a
27   class or course;

4

H.B. No. 6

1          (4)  a report of a student's grades at the end of each

2  grade reporting period;

3          (5)  a [textbook] report on instructional materials;

4          (6)  a unit or weekly lesson plan that outlines, in a

5  brief and general manner, the information to be presented during

6  each period at the secondary level or in each subject or topic at

7  the elementary level;

8          (7)  an attendance report;

9          (8)  any report required for accreditation review;

10          (9)  any information required by a school district that

11  relates  to  a  complaint,  grievance,  or  actual  or  potential

12  litigation and that requires the classroom teacher's involvement;

13  or

14          (10)  any information specifically required by law,

15  rule, or regulation.

16      SECTION 10.  Section 19.007(e), Education Code, is amended

17  to read as follows:

18      (e)  The  district  may  participate  in  the  instructional

19  materials [textbook] program under Chapter 31.

20      SECTION 11.  Sections 26.006(a) and (c), Education Code, are

21  amended to read as follows:

22      (a)  A parent is entitled to:

23          (1)  review  all  teaching  materials,  instructional

24  materials [textbooks], and other teaching aids used in the

25  classroom of the parent's child; and

26          (2)  review each test administered to the parent's

27  child after the test is administered.

H.B. No. 6

1    (c)  A student's parent is entitled to request that the
2    school district or open-enrollment charter school the student
3    attends allow the student to take home any <u>instructional materials</u>
4    [<s>textbook</s>] used by the student.  Subject to the availability of <u>the</u>
5    <u>instructional materials</u> [<s>a textbook</s>], the district or school shall
6    honor the request.  A student who takes home <u>instructional</u>
7    <u>materials</u> [<s>a textbook</s>] must return the <u>instructional materials</u>
8    [<s>textbook</s>] to school at the beginning of the next school day if
9    requested to do so by the student's teacher.  In this subsection,
10   <u>"instructional material"</u> [<s>"textbook"</s>] has the meaning assigned by
11   Section 31.002.

12       SECTION 12.  Sections 28.002(a), (c), (h), and (n),
13   Education Code, are amended to read as follows:

14   (a)  Each school district that offers kindergarten through
15   grade 12 shall offer, as a required curriculum:

16           (1)  a foundation curriculum that includes:

17               (A)  English language arts;

18               (B)  mathematics;

19               (C)  science; and

20               (D)  social studies, consisting of Texas, United
21   States, and world history, government, <u>economics, with emphasis on</u>
22   <u>the free enterprise system and its benefits,</u> and geography; and

23           (2)  an enrichment curriculum that includes:

24               (A)  to the extent possible, languages other than
25   English;

26               (B)  health, with emphasis on the importance of
27   proper nutrition and exercise;

6

H.B. No. 6

1                (C)  physical education;

2                (D)  fine arts;

3                (E)  [~~economics, with emphasis on the free~~

4 ~~enterprise system and its benefits;~~

5                  [~~(F)~~]  career and technology education;

6                  (F) [~~(G)~~]  technology applications; and

7                  (G) [~~(H)~~]  religious literature, including the

8 Hebrew Scriptures (Old Testament) and New Testament, and its impact

9 on history and literature.

10      (c)  The State Board of Education, with the direct

11 participation of educators, parents, business and industry

12 representatives, and employers shall by rule identify the essential

13 knowledge and skills of each subject of the required curriculum

14 that all students should be able to demonstrate and that will be

15 used in evaluating <u>instructional materials</u> [~~textbooks~~] under

16 Chapter 31 and addressed on the assessment instruments required

17 under Subchapter B, Chapter 39. As a condition of accreditation,

18 the board shall require each district to provide instruction in the

19 essential knowledge and skills at appropriate grade levels.

20      (h)  The State Board of Education and each school district

21 shall foster the continuation of the tradition of teaching United

22 States and Texas history and the free enterprise system in regular

23 subject matter and in reading courses and in the adoption of

24 <u>instructional materials</u> [~~textbooks~~]. A primary purpose of the

25 public school curriculum is to prepare thoughtful, active citizens

26 who understand the importance of patriotism and can function

27 productively in a free enterprise society with appreciation for the

H.B. No. 6

1  basic democratic values of our state and national heritage.

2      (n)  The State Board of Education may by rule develop and
3  implement a plan designed to incorporate foundation curriculum
4  requirements into the career and technology education curriculum
5  under Subsection (a)(2)(E) [(a)(2)(F)].

6      SECTION 13.  Sections 28.0022(a) and (d), Education Code,
7  are amended to read as follows:

8      (a)  Not later than November 1, 2007, the agency shall
9  establish a panel under this section to:

10          (1)  review and recommend revisions to the career and
11  technical education curriculum under Section 28.002(a)(2)(E)
12  [28.002(a)(2)(F)]; and

13          (2)  review and recommend revisions for the program in
14  which high schools and articulated postsecondary institutions
15  allow high school students to take advanced technical credit
16  courses.

17      (d)  Not later than November 1, 2008, the panel shall:

18          (1)  complete the review as required by this section
19  of:

20              (A)  the  career  and  technical  education
21  curriculum; and

22              (B)  the program under which high schools and
23  articulated postsecondary institutions allow high school students
24  to take advanced technical credit courses; and

25          (2)  make  recommendations  to  the  State  Board  of
26  Education as necessary to:

27              (A)  increase the academic rigor of the career and

8

H.B. No. 6

1  technical   education   curriculum   under   Section   28.002(a)(2)(E)

2  [28.002(a)(2)(F)]; and

3          (B)   improve   and   increase   participation   in   the

4  program   under   which   high   schools   and   articulated   postsecondary

5  institutions allow high school students to take advanced technical

6  credit courses.

7      SECTION 14.   Section 28.003(b), Education Code, is amended

8  to read as follows:

9      (b)   In this section, "educational program" means a course or

10  series of courses in the required curriculum under Section 28.002,

11  other than a fine arts course under Section  28.002(a)(2)(D) or a

12  career   and   technology   course   under   Section   28.002(a)(2)(E)

13  [28.002(a)(2)(F)].

14      SECTION 15.   Section 28.011(c), Education Code, is amended

15  to read as follows:

16      (c)   A   student   may   not   be   required   to   use   a   specific

17  translation   as   the   sole   text   of   the   Hebrew   Scriptures   or   New

18  Testament   and   may   use   as   the   basic   instructional   material

19  [textbook] a different translation of the Hebrew Scriptures or New

20  Testament from that chosen by the board of trustees of the student's

21  school district or the student's teacher.

22      SECTION 16.   The heading to Chapter 31, Education Code, is

23  amended to read as follows:

24       CHAPTER 31.  INSTRUCTIONAL MATERIALS [TEXTBOOKS]

25      SECTION 17.   Section 31.001, Education Code, is amended to

26  read as follows:

27       Sec. 31.001.  FREE   INSTRUCTIONAL   MATERIALS   [TEXTBOOKS].

9

H.B. No. 6

1  Instructional materials [Textbooks] selected for use in the public

2  schools shall be furnished without cost to the students attending

3  those schools.  Except as provided by Section 31.104(d), a school

4  district may not charge a student for instructional material or

5  technological equipment purchased by the district with the

6  district's instructional materials allotment.

7      SECTION 18.  Sections 31.002(1), (1-a), (2), and (4),

8  Education Code, are amended to read as follows:

9          (1)  "Instructional material" ["Electronic textbook"]

10  means content that conveys the essential knowledge and skills of a

11  subject in the public school curriculum through a medium or a

12  combination of media for conveying information to a student.  The

13  term includes a book, supplementary materials, a combination of a

14  book, workbook, and supplementary materials, computer software,

15  [interactive videodisc,] magnetic media, DVD, CD-ROM, computer

16  courseware, on-line services, or an electronic medium, or other

17  means of conveying information to the student or otherwise

18  contributing to the learning process through electronic means,

19  including [an] open-source instructional material [textbook].

20          (1-a)  "Open-source   instructional   material"

21  [textbook"] means [an] electronic instructional material

22  [textbook] that is available for downloading from the Internet at

23  no charge to a student and without requiring the purchase of an

24  unlock code, membership, or other access or use charge, except for a

25  charge to order an optional printed copy of all or part of the

26  instructional material [textbook].  The term includes [a]

27  state-developed open-source instructional material [textbook]

H.B. No. 6

1  purchased under Subchapter B-1.

2          (2)  "Publisher"  includes  an  on-line  service  or  a
3  developer  or  distributor  of  [an]  electronic  instructional
4  materials [textbook].

5          (4)  "Technological  equipment"  means  hardware,  a
6  device, or equipment necessary for:

7              (A)  instructional  use  in  the  classroom,
8  including to gain access to or enhance the use of [an] electronic
9  instructional materials [textbook]; or

10             (B)  professional use by a classroom teacher.

11     SECTION 19.  Subchapter A, Chapter 31, Education Code, is
12  amended by amending Sections 31.003 and 31.004 and adding Section
13  31.005 to read as follows:

14     Sec. 31.003.  RULES.  The State Board of Education may adopt
15  rules, consistent with this chapter, for the adoption, requisition,
16  distribution, care, use, and disposal of instructional materials
17  [textbooks].

18     Sec. 31.004.  CERTIFICATION  OF  PROVISION  OF  [TEXTBOOKS,
19  ELECTRONIC TEXTBOOKS, AND] INSTRUCTIONAL MATERIALS.  Each school
20  district and open-enrollment charter school shall annually certify
21  to the State Board of Education and the commissioner that, for each
22  subject  in  the  foundation  [required]  curriculum  under Section
23  28.002  and  each  grade  level,  the  district  provides  each  student
24  with [textbooks, electronic textbooks, or] instructional materials
25  that  cover  all  elements  of  the  essential  knowledge  and  skills
26  adopted by the State Board of Education for that subject and grade
27  level.

11

H.B. No. 6

1    Sec. 31.005.  FUNDING FOR OPEN-ENROLLMENT CHARTER SCHOOLS.
2    An open-enrollment charter school is entitled to the instructional
3    materials allotment under this chapter and is subject to this
4    chapter as if the school were a school district.

5    SECTION 20.  The heading to Section 31.021, Education Code,
6    is amended to read as follows:

7    Sec. 31.021.  STATE INSTRUCTIONAL MATERIALS [TEXTBOOK]
8    FUND.

9    SECTION 21.  Section 31.021, Education Code, is amended by
10   amending Subsections (a) and (d) and adding Subsection (c) to read
11   as follows:

12   (a)  The state instructional materials [textbook] fund
13   consists of:

14       (1)  an amount set aside by the State Board of Education
15   from the available school fund, in accordance with Section
16   43.001(d); and

17       (2)  [all funds accruing from the state's sale of
18   disused textbooks; and

19       [(3)]  all amounts lawfully paid into the fund from any
20   other source.

21   (c)  Money in the state instructional materials fund shall be
22   used to:

23       (1)  fund the instructional materials allotment, as
24   provided by Section 31.0211;

25       (2)  purchase special instructional materials for the
26   education of blind and visually impaired students in public
27   schools;

12

H.B. No. 6

1    (3)  pay the expenses associated with the instructional
2 materials adoption and review process under this chapter;
3    (4)  pay the expenses associated with the purchase or
4 licensing of open-source instructional material, to the extent
5 authorized by the General Appropriations Act; and
6    (5)  pay the expenses associated with the purchase of
7 instructional material, including freight, shipping, and insurance
8 expenses.
9    (d)  Money transferred to the state instructional materials
10 [textbook] fund remains in the fund until spent and does not lapse
11 to the state at the end of the fiscal year.
12    SECTION 22.  Subchapter B, Chapter 31, Education Code, is
13 amended by adding Sections 31.0211, 31.0212, 31.0213, and 31.0214
14 to read as follows:
15    Sec. 31.0211.  INSTRUCTIONAL MATERIALS ALLOTMENT.  (a)  A
16 school district is entitled to an annual allotment from the state
17 instructional materials fund for each student enrolled in the
18 district on a date during the preceding school year specified by the
19 commissioner.  The commissioner shall determine the amount of the
20 allotment per student each year on the basis of the amount of money
21 available in the state instructional materials fund to fund the
22 allotment.  An allotment under this section shall be transferred
23 from the state instructional materials fund to the credit of the
24 district's instructional materials account as provided by Section
25 31.0212.
26    (b)  A juvenile justice alternative education program under
27 Section 37.011 is entitled to an allotment from the state

H.B. No. 6

1   instructional materials fund in an amount determined by the
2   commissioner.  The program shall use the allotment to purchase
3   items listed in Subsection (c) for students enrolled in the
4   program. The commissioner's determination under this subsection is
5   final and may not be appealed.
6        (c)  Subject to Subsection (d), funds allotted under this
7   section may be used to:
8             (1)  purchase:
9                  (A)  materials on the list adopted by the
10  commissioner, as provided by Section 31.0231;
11                 (B)  instructional materials, regardless of
12  whether the instructional materials are on the conforming or
13  nonconforming list, as provided by Section 31.024;
14                 (C)  consumable instructional materials,
15  including workbooks;
16                 (D)  instructional materials for use in bilingual
17  education classes, as provided by Section 31.029;
18                 (E)  supplemental instructional materials, as
19  provided by Section 31.035;
20                 (F)  state-developed open-source instructional
21  materials, as provided by Subchapter B-1;
22                 (G)  instructional materials and technological
23  equipment under any continuing contracts of the district in effect
24  on September 1, 2011; and
25                 (H)  technological equipment necessary to support
26  the use of materials included on the list adopted by the
27  commissioner under Section 31.0231 or any instructional materials

14

H.B. No. 6

1  purchased with an allotment under this section; and

2         (2)  pay for training educational personnel directly

3  involved   in   student   learning   in   the   appropriate   use   of

4  instructional   materials   and   for   providing   for   access   to

5  technological equipment for instructional use.

6     (d)  Each year a school district shall use the district's

7  allotment under this section to purchase:

8         (1)  a sufficient quantity of instructional materials

9  or technological equipment that corresponds to the adoption cycle

10 under Section 31.022;

11        (2)  instructional materials necessary to permit the

12 district to certify that the district has instructional materials

13 that cover all elements of the essential knowledge and skills of the

14 foundation curriculum for each grade level as required by Section

15 31.004; and

16        (3)  any   other   instructional   materials   or

17 technological equipment as determined by the district.

18    (d-1)  Notwithstanding Subsection (d), for the state fiscal

19 year beginning September 1, 2011, a school district may use an

20 allotment received under this section to purchase any combination

21 of:

22        (1)  instructional materials available for selection

23 under the 2011 proclamation issued by the State Board of Education;

24 or

25        (2)  other   instructional   materials   or   technological

26 equipment available to the district under a continuing contract in

27 effect on September 1, 2011.

15

H.B. No. 6

1       (d-2)  Subsection  (d-1)  and  this  subsection  expire  August

2   31, 2012.

3       (e)  Not  later  than  May  31  of  each  school  year,  a  school

4   district  may  request  that  the  commissioner  adjust  the  number  of

5   students  for  which  the  district  is  entitled  to  receive  an  allotment

6   under  Subsection  (a)  on  the  grounds  that  the  number  of  students

7   attending  school  in  the  district  will  increase  or  decrease  during

8   the  school  year  for  which  the  allotment  is  provided.   The

9   commissioner  may  also  adjust  the  number  of  students  for  which  a

10  district  is  entitled  to  receive  an  allotment,  without  a  request  by

11  the  district,  if  the  commissioner  determines  a  different  number  of

12  students  is  a  more  accurate  reflection  of  students  who  will  be

13  attending  school  in  the  district.   The  commissioner's  determination

14  under  this  subsection  is  final.

15      (f)  The  commissioner  may  adopt  rules  as  necessary  to

16  implement this section.

17      Sec. 31.0212.  INSTRUCTIONAL  MATERIALS  ACCOUNT.   (a)   The

18  commissioner  shall  maintain  an  instructional  materials  account  for

19  each  school  district.   Each  school  year,  the  commissioner  shall

20  deposit  in  the  account  for  each  district  the  amount  of  the

21  district's  instructional  materials  allotment  under  Section

22  31.0211.

23      (b)  The  commissioner  shall  pay  the  cost  of  instructional

24  materials  requisitioned  by  a  school  district  under  Section  31.103

25  using funds from the district's instructional materials account.

26      (c)  A school district may also use funds in the district's

27  account  to  purchase  electronic  instructional  materials  or

16

H.B. No. 6

1   technological   equipment.    The   district   shall   submit   to   the

2   commissioner   a   request   for   funds   for   this   purpose   from   the

3   district's account.   The commissioner shall adopt rules regarding

4   the documentation a school district must submit to receive funds

5   under this subsection.

6        (d)   Money deposited in a school district's instructional

7   materials account during each state fiscal biennium remains in the

8   account   and   available   for   use   by   the   district   for   the   entire

9   biennium. At the end of each biennium, a district with unused money

10  in the district's account may carry forward any remaining balance

11  to the next biennium.

12       (e)   The   commissioner   may   adopt   rules   as   necessary   to

13  implement this section.

14       Sec. 31.0213.   CERTIFICATION   OF   USE   OF   INSTRUCTIONAL

15  MATERIALS ALLOTMENT.   Each school district shall annually certify

16  to the commissioner that the district's instructional materials

17  allotment   has   been   used   only   for   expenses   allowed   by   Section

18  31.0211.

19       Sec. 31.0214.   ADJUSTMENT   FOR   HIGH   ENROLLMENT   GROWTH

20  DISTRICTS.   (a)   Each  year  the  commissioner  shall  adjust  the

21  instructional materials allotment of school districts experiencing

22  high  enrollment  growth.    The  commissioner  shall  establish  a

23  procedure   for   determining   high   enrollment   growth   districts

24  eligible to receive an adjustment under this section and the amount

25  of  the  instructional  materials  allotment  those  districts  will

26  receive.

27       (b)   The   commissioner   may   adopt   rules   as   necessary   to

H.B. No. 6

1  implement this section.

2      SECTION 23.  The heading to Section 31.022, Education Code,

3  is amended to read as follows:

4      Sec. 31.022.  INSTRUCTIONAL MATERIALS [~~TEXTBOOK~~] REVIEW AND

5  ADOPTION.

6      SECTION 24.  Section 31.022, Education Code, is amended by

7  amending Subsections (a), (b), (c), (e), and (f) and adding

8  Subsection (b-1) to read as follows:

9      (a)  The State Board of Education shall adopt a review and

10  adoption cycle for instructional materials [~~textbooks~~] for

11  elementary grade levels, including prekindergarten, and secondary

12  grade levels, for each subject in the required curriculum under

13  Section 28.002.  In adopting the cycle, the board:

14          (1)  is not required to review and adopt instructional

15  materials for all grade levels in a single year; and

16          (2)  shall give priority to instructional materials for

17  subjects in the following order:

18              (A)  foundation curriculum subjects for which the

19  essential knowledge and skills have been substantially revised and

20  for which assessment instruments are required under Subchapter B,

21  Chapter 39, including career and technology courses that satisfy

22  foundation curriculum requirements as provided by Section

23  28.002(n);

24              (B)  foundation curriculum subjects for which the

25  essential knowledge and skills have been substantially revised,

26  including career and technology courses that satisfy foundation

27  curriculum requirements as provided by Section 28.002(n);

H.B. No. 6

1          (C)  foundation curriculum subjects not described

2   by Paragraph (A) or (B), including career and technology courses

3   that satisfy foundation curriculum requirements as provided by

4   Section 28.002(n); and

5          (D)  enrichment curriculum subjects.

6      (b)  The board shall organize the cycle for subjects in the

7   foundation curriculum so that not more than one-fourth [one-sixth]

8   of the instructional materials [textbooks] for subjects in the

9   foundation curriculum are reviewed each biennium [year].  The board

10  shall adopt rules to provide for a full and complete investigation

11  of instructional materials [textbooks] for each subject in the

12  foundation curriculum [at least] every eight [six] years.   The

13  adoption of instructional materials [textbooks] for a subject in

14  the foundation curriculum may be extended beyond the eight-year

15  [six-year] period only if the content of instructional materials

16  [textbooks] for a subject is sufficiently current.

17      (b-1)  For the biennium beginning September 1, 2011, the

18  board shall review and adopt instructional materials for English

19  language arts.  This subsection expires September 1, 2013.

20      (c)  The board shall adopt rules to provide for a full and

21  complete investigation of instructional materials [textbooks] for

22  each subject in the enrichment curriculum on a cycle the board

23  considers appropriate.

24      (e)  The board shall designate a request for production of

25  instructional materials [textbooks] in a subject area and grade

26  level by the school year in which the instructional materials

27  [textbooks] are intended to be made available in classrooms and not

19

H.B. No. 6

1 by the school year in which the board makes the request for
2 production.

3     (f)  The board shall amend any request for production issued
4 for the purchase of instructional materials [textbooks] to conform
5 to the instructional materials [textbook] funding levels provided
6 by the General Appropriations Act for the year of implementation.

7     SECTION 25.  Section 31.0221, Education Code, is amended to
8 read as follows:

9     Sec. 31.0221.  MIDCYCLE REVIEW AND ADOPTION OF INSTRUCTIONAL
10 MATERIALS [TEXTBOOKS].  (a)  The State Board of Education shall
11 adopt rules for the midcycle review and adoption of instructional
12 material [a textbook] for a subject for which instructional
13 materials [textbooks] are not currently under review by the board
14 under Section 31.022.  The rules must require:

15     (1)  the publisher of the instructional material
16 [textbook] to pay a fee to the board to cover the cost of the
17 midcycle review and adoption of the instructional material
18 [textbook];

19     (2)  the publisher of the instructional material
20 [textbook] to enter into a contract with the board concerning the
21 instructional material [textbook] for a term that ends at the same
22 time as any contract entered into by the board for other
23 instructional materials [another textbook] for the same subject and
24 grade level; and

25     (3)  a commitment from the publisher to provide the
26 instructional material [textbook] to school districts in the manner
27 specified by the publisher, which may include:

20

H.B. No. 6

1          (A)  providing  the  <u>instructional  material</u>
2  [~~textbook~~] to any district in a regional education service center
3  area identified by the publisher; or
4          (B)  providing  a  certain  maximum  number  of
5  <u>instructional materials</u> [~~textbooks~~] specified by the publisher.
6     (b)  Sections  31.023  and  31.024  apply  to  <u>instructional</u>
7  <u>material</u> [~~a textbook~~] adopted under this section.  Section 31.027
8  does not apply to <u>instructional material</u> [~~a textbook~~] adopted under
9  this section.
10     SECTION 26.  Section 31.023, Education Code, is amended to
11  read as follows:
12     Sec. 31.023.  <u>INSTRUCTIONAL MATERIAL</u> [~~TEXTBOOK~~] LISTS.  (a)
13  For each subject and grade level, the State Board of Education shall
14  adopt  two  lists  of  <u>instructional  materials</u>  [~~textbooks~~].   The
15  conforming  list  includes  each  <u>instructional  material</u>  [~~textbook~~]
16  submitted  for  the  subject  and  grade  level  that  meets  applicable
17  physical specifications adopted by the State Board of Education and
18  contains material covering each element of the essential knowledge
19  and skills of the subject and grade level in the student version of
20  the  <u>instructional  material</u>  [~~textbook~~],  as  well  as  in  the  teacher
21  version of the <u>instructional material</u> [~~textbook~~], as determined by
22  the  State Board of Education under Section 28.002 and adopted under
23  Section 31.024.  The nonconforming list includes each <u>instructional</u>
24  <u>material</u> [~~textbook~~] submitted for the subject and grade level that:
25          (1)  meets  applicable  physical  specifications  adopted
26  by the State Board of Education;
27          (2)  contains material covering at least half, but not

21

H.B. No. 6

1  all, of the elements of the essential knowledge and skills of the

2  subject and grade level in the student version of the <u>instructional</u>

3  <u>material</u> [~~textbook~~], as well as in the teacher version of the

4  <u>instructional material</u> [~~textbook~~]; and

5          (3)  is adopted under Section 31.024.

6      (b)  Each <u>instructional material</u> [~~textbook~~] on a conforming

7  or nonconforming list must be free from factual errors.

8      SECTION 27.  Section 31.0231, Education Code, is amended to

9  read as follows:

10     Sec. 31.0231.  <u>COMMISSIONER'S</u>  [~~ELECTRONIC   TEXTBOOK   AND~~

11  ~~INSTRUCTIONAL MATERIAL~~] LIST.  (a)  The commissioner shall adopt a

12  list of:

13          (1)  electronic  <u>instructional  material</u>  [~~textbooks~~];

14  and

15          (2)  <u>science</u>  [~~instructional~~]  material  that  conveys

16  information to the student or otherwise contributes to the learning

17  process,  including  tools,  models,  and  investigative  materials

18  designed for use as part of the foundation curriculum for science in

19  kindergarten through grade five.

20     (b)  A school district may select [~~an electronic textbook or~~

21  ~~instructional~~] material on the list adopted under Subsection (a) to

22  be  funded  by  the  <u>district's instructional materials allotment</u>

23  [~~state textbook fund~~] under Section <u>31.0211</u> [~~31.021~~].

24     (c)  Before the commissioner places [~~an electronic textbook~~

25  ~~or instructional~~] material on the list adopted under Subsection

26  (a), the State Board of Education must be given an opportunity to

27  comment on the [~~electronic textbook or instructional~~] material.

H.B. No. 6

1  Material [An electronic textbook or instructional material] placed

2  on the list adopted under Subsection (a):

3          (1)  must  be  reviewed  and  recommended  to  the

4  commissioner by a panel of recognized experts in the subject area of

5  the [electronic textbook or instructional] material and experts in

6  education technology;

7          (2)  must satisfy criteria adopted for the purpose by

8  commissioner rule; and

9          (3)  must  meet  the  National  Instructional  Materials

10  Accessibility Standard, to the extent practicable as determined by

11  the commissioner.

12      (d)  The criteria adopted under Subsection (c)(2) must:

13          (1)  include  evidence  of  alignment  with  current

14  research  in  the  subject  for  which  the  [electronic  textbook  or

15  instructional] material is intended to be used;

16          (2)  include coverage of the essential knowledge and

17  skills  identified  under  Section  28.002  for  the  subject  for  which

18  the [electronic textbook or instructional] material is intended to

19  be used and identify:

20              (A)  each of the essential knowledge and skills

21  for the subject and grade level or levels covered by the [electronic

22  textbook or instructional] material; and

23              (B)  the percentage of the essential knowledge and

24  skills  for  the  subject  and  grade  level  or  levels  covered  by  the

25  [electronic textbook or instructional] material; and

26          (3)  include appropriate training for teachers.

27      (e)  The  commissioner  shall  update,  as  necessary,  the  list

H.B. No. 6

1   adopted under Subsection (a).  Before the commissioner places [~~an~~

2   ~~electronic textbook or instructional~~] material on the updated list,

3   the  requirements  of  Subsection  (c)  must  be  met.  [~~Before  the~~

4   ~~commissioner  removes  an  electronic  textbook  or  instructional~~

5   ~~material from the updated list, the removal must be recommended by a~~

6   ~~panel of recognized experts in the subject area of the electronic~~

7   ~~textbook  or  instructional  material  and  experts  in  education~~

8   ~~technology.~~]

9           (f)  After notice to the commissioner explaining in detail

10  the  changes,  the  provider  of  [~~an  electronic  textbook  or~~

11  ~~instructional~~] material on the list adopted under Subsection (a)

12  may update the navigational features or management system related

13  to the [~~electronic textbook or instructional~~] material.

14          (g)  After notice to the commissioner and a review by the

15  commissioner,  the  provider  of  [~~an  electronic  textbook  or~~

16  ~~instructional~~] material on the list adopted under Subsection (a)

17  may  update  the  content  of  the  [~~electronic  textbook  or~~

18  ~~instructional~~] material if needed to accurately reflect current

19  knowledge or information.

20          (h)  The  commissioner  shall  adopt  rules  as  necessary  to

21  implement this section.  The rules must:

22               (1)  be consistent with Section 31.151 regarding the

23  duties of publishers and manufacturers, as appropriate, and the

24  imposition of a reasonable administrative penalty; and

25               (2)  require public notice of an opportunity for the

26  submission of [~~an electronic textbook or instructional~~] material.

27          SECTION 28.  Section 31.024, Education Code, is amended to

24

H.B. No. 6

1  read as follows:

2      Sec. 31.024.  ADOPTION BY STATE BOARD OF EDUCATION.  (a)  By

3  majority vote, the State Board of Education shall:

4          (1)  place   each   submitted   <u>instructional   material</u>

5  [~~textbook~~] on a conforming or nonconforming list; or

6          (2)  reject   <u>instructional   material</u>   [~~a   textbook~~]

7  submitted for placement on a conforming or nonconforming list.

8      (b)  Not later than December 1 of the year preceding the

9  school year for which the <u>instructional materials</u> [~~textbooks~~] for a

10  particular  subject  and  grade  level  will  be  purchased  under  the

11  cycle adopted by the board under Section 31.022, the board shall

12  provide the lists of adopted <u>instructional materials</u> [~~textbooks~~] to

13  each  school  district.   Each  nonconforming  list  must  include  the

14  reasons  [~~an~~]  adopted  <u>instructional material</u>  [~~textbook~~]  is  not

15  eligible for the conforming list.

16      SECTION 29.  The heading to Section 31.0241, Education Code,

17  is amended to read as follows:

18      Sec. 31.0241.  ADOPTION   OF   OPEN-SOURCE   <u>INSTRUCTIONAL</u>

19  <u>MATERIALS</u> [~~TEXTBOOKS~~].

20      SECTION 30.  Sections 31.0241(b) and (c), Education Code,

21  are amended to read as follows:

22      (b)  The   State   Board   of   Education   shall   place   [~~an~~]

23  open-source  <u>instructional   material</u>   [~~textbook~~]   for   a

24  secondary-level  course  submitted  for  adoption  by  an  eligible

25  institution on a conforming or nonconforming list if:

26          (1)  the <u>instructional material</u> [~~textbook~~] is written,

27  compiled,  or  edited  primarily  by  faculty  of  the  eligible

25

H.B. No. 6

1  institution who specialize in the subject area of the underline(instructional

2  material) [strikethrough(textbook)];

3          (2)   the   eligible   institution   identifies   each

4  contributing author;

5          (3)   the   appropriate   department   of   the   eligible

6  institution certifies the underline(instructional material) [strikethrough(textbook)] for

7  accuracy; and

8          (4)   the   eligible   institution   determines   that   the

9  underline(instructional material) [strikethrough(textbook)] qualifies for placement on the

10  conforming or nonconforming list based on the extent to which the

11  underline(instructional material) [strikethrough(textbook)] covers the essential knowledge

12  and skills identified under Section 28.002 for the subject for

13  which   the   underline(instructional   material)   [strikethrough(textbook)]   is   written   and

14  certifies that:

15          (A)  for underline(instructional material) [strikethrough(a textbook)] for a

16  senior-level course, a student who successfully completes a course

17  based on the underline(instructional material) [strikethrough(textbook)] will be prepared,

18  without  remediation,  for  entry  into  the  eligible  institution's

19  freshman-level course in that subject; or

20          (B)  for underline(instructional material) [strikethrough(a textbook)] for a

21  junior-level and senior-level course, a student who successfully

22  completes   the   junior-level   course   based   on   the   underline(instructional

23  material)   [strikethrough(textbook)]   will   be   prepared   for   entry   into   the

24  senior-level course.

25      (c)  This section does not prohibit an eligible institution

26  from submitting underline(instructional material) [strikethrough(a textbook)] for placement

27  on a conforming or nonconforming list through any other adoption

H.B. No. 6

1  process provided by this chapter.

2       SECTION 31.  Section 31.026, Education Code, is amended to

3  read as follows:

4       Sec. 31.026.  CONTRACT;  PRICE.  (a)  The State Board of

5  Education shall execute a contract[:

6            [(1)]  for the purchase [of each adopted textbook other

7  than an electronic textbook; and

8            [(2)  for the purchase] or licensing of each adopted

9  instructional material [electronic textbook].

10      (b)  A contract must require the publisher to provide the

11  number of instructional materials [textbooks] required by school

12  districts in this state for the term of the contract, which must

13  coincide with the board's adoption cycle.

14      (c)  As applicable, a contract must provide for the purchase

15  or licensing of instructional material [a textbook] at a specific

16  price, which may not exceed the lowest price paid by any other state

17  or any school or school district.  The price must be fixed for the

18  term of the contract.

19      (d) [(c)]  This section does not apply to [an] open-source

20  instructional material [textbook].

21      SECTION 32.  Section 31.0261, Education Code, is amended to

22  read as follows:

23      Sec. 31.0261.  CONTRACTS  FOR  PRINTING  OF  OPEN-SOURCE

24  INSTRUCTIONAL MATERIALS [TEXTBOOKS].  The State Board of Education

25  may  execute  a  contract  for  the  printing  of  [an]  open-source

26  instructional materials [textbook] listed on the conforming or

27  nonconforming list.  The contract must allow a school district to

27

H.B. No. 6

1  requisition  printed  copies  of  [an]  open-source  instructional

2  materials [textbook] as provided by Section 31.103.

3       SECTION 33.  Section 31.027, Education Code, is amended to

4  read as follows:

5       Sec. 31.027.  INFORMATION  TO  SCHOOL  DISTRICTS;  SAMPLE

6  COPIES.  (a)  A publisher shall provide each school district and

7  open-enrollment  charter  school  with  information  that  fully

8  describes  each  of  the  publisher's  submitted  instructional

9  materials [adopted textbooks].  On request of a school district, a

10  publisher  shall  provide  a  sample  copy  in digital format  of

11  submitted instructional material [an adopted textbook].

12       (b)  A publisher shall provide at least two sample copies in

13  digital format of each submitted instructional material [adopted

14  textbook]  to  be  maintained  at  each  regional  education  service

15  center.

16       (c) [(d)]  This section does not apply to [an] open-source

17  instructional material [textbook].

18       SECTION 34.  Section 31.028, Education Code, is amended to

19  read as follows:

20       Sec. 31.028.  SPECIAL  INSTRUCTIONAL MATERIALS  [TEXTBOOKS].

21  (a)  The  commissioner  [State Board of Education] may purchase

22  special  instructional materials [textbooks] for the education of

23  blind  and  visually  impaired  students  in  public  schools.   In

24  addition,  for  a  teacher  who  is  blind  or  visually  impaired,  the

25  commissioner [board] shall provide a teacher's edition in Braille

26  or large type, as requested by the teacher, for each instructional

27  material  [textbook]  the  teacher  uses  in  the  instruction  of

28

H.B. No. 6

1  students.  The teacher edition must be available at the same time

2  the student instructional materials [textbooks] become available.

3       (b)  The publisher of [an] adopted instructional material

4  [textbook]   shall   provide   the   agency   with   computerized

5  instructional  material  [textbook]  files  for  the  production  of

6  Braille  instructional  materials  [textbooks]  or  other  versions  of

7  instructional  materials  [textbooks]  to  be  used  by  students  with

8  disabilities,  on  request  of  the  commissioner  [State  Board  of

9  Education].  A  publisher  shall  arrange  computerized  instructional

10 material  [textbook]  files  in  one  of  several  optional  formats

11 specified by the commissioner [State Board of Education].

12      (c)  The commissioner [board] may also enter into agreements

13 providing  for  the  acceptance,  requisition,  and  distribution  of

14 special instructional materials [textbooks] and instructional aids

15 pursuant  to  20  U.S.C.  Section  101  et  seq.  for  use  by  students

16 enrolled in:

17           (1)  public schools; or

18           (2)  private nonprofit schools, if state funds, other

19 than for administrative costs, are not involved.

20      (d)  In this section:

21           (1)  "Blind or visually impaired student" includes any

22 student  whose  visual  acuity  is  impaired  to  the  extent  that  the

23 student is unable to read the text [print] in [a] regularly adopted

24 instructional material [textbook] used in the student's class.

25           (2)  "Special instructional material [textbook]" means

26 instructional material [a textbook] in Braille, large type or any

27 other medium or any apparatus that conveys information to a student

H.B. No. 6

1  or otherwise contributes to the learning process.

2       SECTION 35.  Section 31.029, Education Code, is amended to
3  read as follows:

4       Sec. 31.029.  BILINGUAL          INSTRUCTIONAL         MATERIALS
5  [TEXTBOOKS].  (a)  A school district [The board] shall purchase with
6  the  district's  instructional  materials  allotment  or  otherwise
7  acquire  instructional materials [textbooks]  for use in bilingual
8  education classes.

9       (b)  The  commissioner  shall  adopt  rules  regarding  the
10  purchase of instructional materials under this section.

11      SECTION 36.  Section 31.030, Education Code, is amended to
12  read as follows:

13      Sec. 31.030.  USED INSTRUCTIONAL MATERIALS [TEXTBOOKS].  The
14  State  Board  of  Education  shall  adopt  rules  to  ensure  that  used
15  instructional materials [textbooks]  sold to school districts and
16  open-enrollment charter schools are not sample copies that contain
17  factual errors.  The rules may provide for the imposition of an
18  administrative penalty in accordance with Section 31.151 against a
19  seller of used  instructional materials [textbooks] who knowingly
20  violates this section.

21      SECTION 37.  The heading to Section 31.035, Education Code,
22  is amended to read as follows:

23      Sec. 31.035.  SUPPLEMENTAL       INSTRUCTIONAL        MATERIALS
24  [TEXTBOOKS].

25      SECTION 38.  Sections 31.035(a), (b), (c), (d), and (f),
26  Education Code, are amended to read as follows:

27      (a)  Notwithstanding any other provision of this subchapter,

30

H.B. No. 6

1   the State Board of Education may adopt supplemental instructional

2   materials [textbooks] that are not on the conforming or

3   nonconforming list under Section 31.023.  The State Board of

4   Education may adopt [a] supplemental instructional material

5   [textbook] under this section only if the instructional material

6   [textbook]:

7               (1)  contains material covering one or more primary

8   focal points or primary topics of a subject in the required

9   curriculum under Section 28.002, as determined by the State Board

10  of Education;

11              (2)  is not designed to serve as the sole instructional

12  material [textbook] for a full course;

13              (3)  meets applicable physical specifications adopted

14  by the State Board of Education; and

15              (4)  is free from factual errors.

16      (b)  The State Board of Education shall identify the

17  essential knowledge and skills identified under Section 28.002 that

18  are covered by [a] supplemental instructional material [textbook]

19  adopted by the board under this section.

20      (c)  Supplemental instructional material [A supplemental

21  textbook] is subject to the review and adoption cycle provisions,

22  including the midcycle review and adoption cycle provisions, of

23  this subchapter.

24      (d)  A school district or open-enrollment charter school may

25  requisition [a] supplemental instructional material [textbook]

26  adopted under this section only if the district or school, [+

27              [(1)  uses textbook credits received under Section

31

H.B. No. 6

1  ~~31.1011 to purchase the supplemental textbook; or~~

2       [~~(2)~~] instead of requisitioning <u>instructional</u>

3  <u>material</u> [~~a textbook~~] on the conforming list under Section 31.023

4  for a course in the foundation curriculum under Section 28.002,

5  requisitions the supplemental <u>instructional material</u> [~~textbook~~]

6  along with other supplemental <u>instructional materials</u> [~~textbooks~~]

7  or <u>instructional materials</u> [~~textbooks~~] on the nonconforming list

8  under Section 31.023 that in combination cover each element of the

9  essential knowledge and skills for the course for which the

10 district or school is requisitioning the supplemental

11 <u>instructional materials</u> [~~textbooks~~].

12      (f)  A school district or open-enrollment charter school

13 that requisitions supplemental <u>instructional materials</u> [~~textbooks~~

14 ~~under Subsection (d)(2)~~] shall certify to the agency that the

15 supplemental <u>instructional materials</u> [~~textbooks~~], in combination

16 with any other <u>instructional materials</u> [~~textbooks~~] or supplemental

17 <u>instructional materials</u> [~~textbooks~~] used by the district or school,

18 cover the essential knowledge and skills identified under Section

19 28.002 by the State Board of Education for the subject and grade

20 level for which the district or school is requisitioning the

21 supplemental <u>instructional materials</u> [~~textbooks~~].

22      SECTION 39.  The heading to Subchapter B-1, Chapter 31,

23 Education Code, is amended to read as follows:

24      SUBCHAPTER B-1.  STATE-DEVELOPED OPEN-SOURCE <u>INSTRUCTIONAL</u>

25                 <u>MATERIALS</u> [~~TEXTBOOKS~~]

26      SECTION 40.  Section 31.071, Education Code, is amended to

27 read as follows:

32

H.B. No. 6

1      Sec. 31.071.  PURCHASE AUTHORITY.  (a)  The commissioner may

2  purchase  state-developed  open-source  <u>instructional  materials</u>

3  [~~textbooks~~] in accordance with this subchapter.

4      (b)  The commissioner:

5          (1)  shall purchase  any  state-developed  open-source

6  <u>instructional materials</u> [~~textbooks~~] through a competitive process;

7  and

8          (2)  may  purchase  more  than  one  state-developed

9  open-source <u>instructional material</u> [~~textbook~~] for a subject or

10  grade level.

11      (c)  <u>State-developed</u>  [A  ~~state-developed~~]  open-source

12  <u>instructional material</u> [~~textbook~~] must be irrevocably owned by or

13  licensed to the state for use in the applicable subject or grade

14  level.  The state must have unlimited authority to modify, delete,

15  combine, or add content to the <u>instructional material</u> [~~textbook~~]

16  after purchase.

17      (d)  The commissioner may issue a request for proposals for

18  [~~a~~] state-developed open-source <u>instructional material</u> [~~textbook~~]:

19          (1)  in  accordance  with  the  <u>instructional material</u>

20  [~~textbook~~] review and adoption cycle under Section 31.022; or

21          (2)  at any other time the commissioner determines that

22  a need exists for additional <u>instructional material</u> [~~textbook~~]

23  options.

24      (e)  The  costs  of  administering  this  subchapter  and

25  purchasing state-developed open-source <u>instructional materials</u>

26  [~~textbooks~~] shall be paid from the state <u>instructional materials</u>

27  [~~textbook~~] fund, as determined by the commissioner <u>and subject to</u>

33

H.B. No. 6

1  Section 31.021.

2      SECTION 41.  Sections 31.072(a) and (b), Education Code, are

3  amended to read as follows:

4      (a)  State-developed  [A  state-developed]  open-source

5  instructional material [textbook] must:

6          (1)  be  evaluated  by  teachers  or  other  experts,  as

7  determined by the commissioner, before purchase; and

8          (2)  meet  the  requirements  for  inclusion  on  a

9  conforming or nonconforming instructional material [textbook] list

10  under Section 31.023.

11      (b)  Following a curriculum revision by the State Board of

12  Education,  the  commissioner  shall  require  the  revision  of  [a]

13  state-developed  open-source  instructional  material  [textbook]

14  relating to that curriculum.  The commissioner may, at any time,

15  require an additional revision of [a] state-developed open-source

16  instructional  material  [textbook]  or  contract  for  ongoing

17  revisions of state-developed instructional material [a textbook]

18  for a period not to exceed the period under Section 31.022 for which

19  instructional material [a textbook] for that subject and grade

20  level may be adopted.  The commissioner shall use a competitive

21  process  to  request  proposals  to  revise  [a]  state-developed

22  open-source  instructional  material  [textbook]  under  this

23  subsection.

24      SECTION 42.  The heading to Section 31.073, Education Code,

25  is amended to read as follows:

26      Sec. 31.073.  SELECTION BY SCHOOL DISTRICT [COST].

27      SECTION 43.  Sections 31.073(c) and (d), Education Code, are

34

H.B. No. 6

1  amended to read as follows:

2       (c)  Notwithstanding Section 31.022, a school district or

3  open-enrollment  charter  school  may  adopt  [a]  state-developed

4  open-source  instructional  material  [textbook]  at  any  time,

5  regardless  of  the  instructional material  [textbook]  review  and

6  adoption cycle under that section.

7       (d)  A school district or open-enrollment charter school may

8  not  be  charged  for  selection  of  [a]  state-developed  open-source

9  instructional  material  [textbook]  in  addition  to  instructional

10 material [a textbook] adopted under Subchapter B.

11      SECTION 44.  Section 31.074, Education Code, is amended to

12 read as follows:

13      Sec. 31.074.  DISTRIBUTION.  (a)  The  commissioner  shall

14 provide  for  the  distribution  of  state-developed  open-source

15 instructional  materials  [textbooks]  in  a  manner  consistent  with

16 distribution of  instructional materials  [textbooks]  adopted  under

17 Subchapter B.

18      (b)  The  commissioner  may  use  a  competitive  process  to

19 contract for printing or other reproduction of [a] state-developed

20 open-source  instructional material  [textbook]  on  behalf  of  a  school

21 district  or  open-enrollment  charter  school.  The  commissioner  may

22 not  require  a  school  district  or  open-enrollment  charter  school  to

23 contract  with  a  state-approved  provider  for  the  printing  or

24 reproduction  of  [a]  state-developed  open-source  instructional

25 material [textbook].

26      SECTION 45.  Section 31.075, Education Code, is amended to

27 read as follows:

35

H.B. No. 6

1    Sec. 31.075.  OWNERSHIP; LICENSING. (a)  State-developed [A

2    state-developed] open-source instructional material [textbook] is

3    the property of the state.

4        (b)  The commissioner shall provide a license to each public

5    school   in   the   state,   including   a   school   district,   an

6    open-enrollment  charter  school,  and  a  state  or  local  agency

7    educating students in any grade from prekindergarten through high

8    school,  to  use  and  reproduce  [a]  state-developed  open-source

9    instructional material [textbook].

10        (c)  The  commissioner  may  provide  a  license  to  use  [a]

11   state-developed open-source instructional material [textbook] to

12   an entity not listed in Subsection (b).  In determining the cost of

13   a license under this subsection, the commissioner shall seek, to

14   the extent feasible, to recover the costs of developing, revising,

15   and   distributing   state-developed   open-source   instructional

16   materials [textbooks].

17        SECTION 46.  Section 31.076(b), Education Code, is amended

18   to read as follows:

19        (b)  A decision by the commissioner regarding the purchase,

20   revision, cost, or distribution of [a] state-developed open-source

21   instructional material [textbook] is final and may not be appealed.

22        SECTION 47.  Section 31.077, Education Code, is amended to

23   read as follows:

24        Sec. 31.077.  ADOPTION SCHEDULE.  The  commissioner  shall

25   develop a schedule for the adoption of state-developed open-source

26   instructional  materials  [textbooks]  under  this  subchapter.  In

27   developing   the   adoption   schedule   under   this   section,   the

36

H.B. No. 6

1  commissioner shall consider:

2          (1)  the availability of funds;

3          (2)  the existing  instructional material  [textbook]

4  adoption cycles under Subchapter B; and

5          (3)  the  availability  of  instructional  materials

6  [textbooks] for development or purchase by the state.

7       SECTION 48.  The heading to Section 31.101, Education Code,

8  is amended to read as follows:

9       Sec. 31.101.  SELECTION  AND  PURCHASE  OF  INSTRUCTIONAL

10  MATERIALS [TEXTBOOKS] BY SCHOOL DISTRICTS.

11       SECTION 49.  Section 31.101, Education Code, is amended by

12  amending Subsections (a), (d), and (e) and adding Subsection (f) to

13  read as follows:

14       (a)  Each year, during a period established by the State

15  Board of Education, the board of trustees of each school district

16  and the governing body of each open-enrollment charter school

17  shall:

18          (1)  for a subject in the foundation curriculum, notify

19  the State Board of Education of the  instructional materials

20  [textbooks] selected by the board of trustees or governing body for

21  the following school year from among the  instructional materials

22  [textbooks] on the appropriate conforming or nonconforming list,

23  including the list adopted under Section 31.0231; or

24          (2)  for a subject in the enrichment curriculum:

25              (A)  notify the State Board of Education of each

26  instructional material [textbook] selected by the board of trustees

27  or governing body for the following school year from among the

37

H.B. No. 6

1   instructional materials [textbooks] on the appropriate conforming

2   or nonconforming list, including the list adopted under Section

3   31.0231; or

4           (B)  notify the State Board of Education that the

5   board of trustees or governing body has selected instructional

6   material [a textbook] that is not on the conforming or

7   nonconforming list.

8      (d)  For instructional material [a textbook] that is not on

9   the conforming or nonconforming list, a school district or

10  open-enrollment charter school must use the instructional material

11  [textbook] for the period of the review and adoption cycle the State

12  Board of Education has established for the subject and grade level

13  for which the instructional material [textbook] is used.

14      (e)  A school district or open-enrollment charter school

15  that selects [a] subscription-based [electronic textbook or]

16  instructional material on the conforming list under Section 31.023

17  or electronic instructional material on the list adopted by the

18  commissioner under Section 31.0231 may cancel the subscription and

19  subscribe to [a] new [electronic textbook or] instructional

20  material on the conforming list under Section 31.023 or electronic

21  instructional material on the list adopted by the commissioner

22  under Section 31.0231 before the end of the state contract period

23  under Section 31.026 if:

24           (1)  the district or school has used the [electronic

25  textbook or] instructional material for at least one school year;

26  and

27           (2)  the agency approves the change based on a written

H.B. No. 6

1  request to the agency by the district or school that specifies the

2  reasons for changing the [~~electronic textbook or~~] instructional

3  material used by the district or school.

4       (f)  The commissioner shall maintain an online requisition

5  system for school districts to requisition instructional materials

6  to be purchased with the district's instructional materials

7  allotment.

8       SECTION 50.  Section 31.102, Education Code, is amended to

9  read as follows:

10      Sec. 31.102.  TITLE AND CUSTODY.  (a)  Except as provided by

11 Subsection (d), printed instructional material [~~Each textbook~~]

12 purchased as provided by this chapter is the property of this state.

13 Any electronic instructional material or technological equipment

14 purchased with a school district's instructional materials

15 allotment is the property of the school district.

16      (b)  Subsection (a) applies to [~~an~~] electronic instructional

17 material [~~textbook~~] only to the extent of any applicable licensing

18 agreement.

19      (c)  The board of trustees of a school district or the

20 governing body of an open-enrollment charter school is the legal

21 custodian of printed instructional materials [~~textbooks~~] purchased

22 as provided by this chapter for the district or school.  The board

23 of trustees shall distribute printed instructional materials

24 [~~textbooks~~] to students in the manner that the board or governing

25 body determines is most effective and economical.

26      (d)  Printed instructional material purchased with a school

27 district's instructional materials allotment becomes the property

39

H.B. No. 6

1  of the district on the date the printed instructional material is

2  discontinued for use in the public schools by the State Board of

3  Education or the commissioner.

4        SECTION 51.  The heading to Section 31.103, Education Code,

5  is amended to read as follows:

6        Sec. 31.103.  INSTRUCTIONAL      MATERIAL      [TEXTBOOK]

7  REQUISITIONS.

8        SECTION 52.  Sections 31.103(b), (c), and (d), Education

9  Code, are amended to read as follows:

10        (b)  [A requisition for textbooks for the following school

11  year shall be based on the maximum attendance reports under

12  Subsection (a), plus an additional 10 percent, except as otherwise

13  provided.]  A school district or open-enrollment charter school

14  shall make a requisition for instructional material using the

15  online requisition program maintained by [a textbook on the

16  conforming or nonconforming list through] the commissioner [to the

17  state depository designated by the publisher or as provided by

18  State Board of Education rule, as applicable,] not later than June 1

19  of each year.  The [designated state depository or, if the publisher

20  or manufacturer does not have a designated textbook depository in

21  this state under Section 31.151(a)(6)(B), the] publisher or

22  manufacturer shall fill a requisition approved by the agency [at

23  any other time in the case of an emergency].  [As made necessary by

24  available funds, the commissioner shall reduce the additional

25  percentage of attendance for which a district or school may

26  requisition textbooks.  The commissioner may, on application of a

27  district or school that is experiencing high enrollment growth,

H.B. No. 6

1   ~~increase  the  additional  percentage  of  attendance  for  which  the~~

2   ~~district or school may requisition textbooks.~~]

3        (c)  In  making  a  requisition  under  this  section,  a  school

4   district  or  open-enrollment  charter  school  may  requisition

5   <u>instructional  materials</u>  [~~textbooks~~]  on  the  conforming  or

6   nonconforming  list  for  grades  above  the  grade  level  in  which  a

7   student  is  enrolled[~~,  except  that  the  total  quantity  of  textbooks~~

8   ~~requisitioned  under  this  section  may  not  exceed  the  limit~~

9   ~~prescribed by Subsection (b)~~].

10       (d)  A  school  district  or  open-enrollment  charter  school

11  that  selects  [~~an~~]  open-source  <u>instructional  material</u>  [~~textbook~~]

12  shall  requisition  a  sufficient  number  of  printed  copies  for  use  by

13  students  unable  to  access  the  <u>instructional  material</u>  [~~textbook~~]

14  electronically  unless  the  district  or  school  provides  to  each

15  student:

16            (1)  electronic  access  to  the  <u>instructional  material</u>

17  [~~textbook~~] at no cost to the student; or

18            (2)  printed  copies  of  the  portion  of  the  <u>instructional</u>

19  <u>material</u> [~~textbook~~] that will be used in the course.

20       SECTION 53.  Section 31.1031, Education Code, is amended to

21  read as follows:

22       Sec. 31.1031.  SHORTAGE    OF    REQUISITIONED    <u>PRINTED</u>

23  <u>INSTRUCTIONAL  MATERIALS</u>  [~~TEXTBOOKS~~].   If  a  school  district  or

24  open-enrollment  charter  school  does  not  have  a  sufficient  number  of

25  copies  of  <u>printed instructional materials</u>  [~~a textbook~~] used by the

26  district  or  school  for  use  during  the  following  school  year,  and  a

27  sufficient  number  of  additional  copies  will  not  be  available  from

41

H.B. No. 6

1  the [depository or the] publisher within the time specified by

2  Section 31.151(a)(8), the district or school is entitled to[:

3          [(1)  be reimbursed from the state textbook fund, at a

4  rate and in the manner provided by State Board of Education rule,

5  for the purchase of a sufficient number of used adopted textbooks;

6  or

7          [(2)] return  currently  used  _printed  instructional_

8  _materials_  [textbooks]  to  the  commissioner  in  exchange  for

9  sufficient  copies,  if  available,  of  other  _printed  instructional_

10 _materials_ [textbooks] on the conforming or nonconforming list to be

11 used during the following school year.

12         SECTION 54.  Section 31.104, Education Code, is amended to

13 read as follows:

14         Sec. 31.104.  DISTRIBUTION AND HANDLING.  (a)  The board of

15 trustees  of  a  school  district  or  the  governing  body  of  an

16 open-enrollment  charter  school  may  delegate  to  an  employee  the

17 authority to requisition, distribute, and manage the inventory of

18 _instructional materials_ [textbooks] in a manner  consistent  with

19 this chapter and rules adopted under this chapter.

20         (b)  A school district or open-enrollment charter school may

21 order  replacements  for  _instructional materials_ [textbooks] that

22 have been lost or damaged directly from[:

23         [(1)  the textbook depository;

24         [(2)] the [textbook] publisher _of the instructional_

25 _materials_  or  [manufacturer  if  the  textbook  publisher  or

26 manufacturer does not have a designated textbook depository in this

27 state under Section 31.151(a)(6)(B); or

42

H.B. No. 6

1       [(3)] any source for a printed copy of [an]
2  open-source instructional material [textbook].

3       (c)  Each instructional material [textbook] must state that
4  the instructional material [textbook] is the property of or is
5  licensed to this state or the school district, as appropriate.  Each
6  instructional material [textbook], other than [an] electronic
7  instructional material [textbook] or a printed copy of [an]
8  open-source instructional material [textbook], must be covered by
9  the student under the direction of the teacher.  Except as provided
10  by Subsection (g), a student must return all instructional
11  materials [textbooks] to the teacher at the end of the school year
12  or when the student withdraws from school.

13       (d)  Each student, or the student's parent or guardian, is
14  responsible for all instructional materials [each textbook,
15  including an electronic textbook,] and [all] technological
16  equipment not returned in an acceptable condition by the
17  student.  A student who fails to return in an acceptable condition
18  all instructional materials [textbooks, including electronic
19  textbooks,] and technological equipment forfeits the right to free
20  instructional materials [textbooks, including electronic
21  textbooks,] and technological equipment until all instructional
22  materials [each textbook, including an electronic textbook,] and
23  [all] technological equipment previously issued but not returned in
24  an acceptable condition are [is] paid for by the student, parent, or
25  guardian.  As provided by policy of the board of trustees or
26  governing body, a school district or open-enrollment charter school
27  may waive or reduce the payment requirement if the student is from a

43

H.B. No. 6

1   low-income family.  The district or school shall allow the student

2   to use <u>instructional materials</u> [~~textbooks, including electronic~~

3   ~~textbooks,~~] and technological equipment at school during each

4   school day.  If <u>instructional materials</u> [~~a textbook, including an~~

5   ~~electronic textbook,~~] or technological equipment is not returned in

6   an acceptable condition or paid for, the district or school may

7   withhold the student's records.  A district or school may not,

8   under this subsection, prevent a student from graduating,

9   participating in a graduation ceremony, or receiving a

10  diploma.  The commissioner by rule shall adopt criteria for

11  determining whether <u>instructional materials</u> [~~a textbook, including~~

12  ~~an electronic textbook,~~] and technological equipment are returned

13  in an acceptable condition.

14       (e)  The board of trustees of a school district may not

15  require an employee of the district who acts in good faith to pay

16  for <u>instructional materials</u> [~~a textbook, electronic textbook,~~] or

17  technological equipment that is damaged, stolen, misplaced, or not

18  returned.  A school district employee may not waive this provision

19  by contract or any other means, except that a district may enter

20  into a written agreement with a school employee whereby the

21  employee assumes financial responsibility for electronic

22  <u>instructional material</u> [~~textbook~~] or technological equipment usage

23  off school property or outside of a school-sponsored event in

24  consideration for the ability of the school employee to use the

25  electronic <u>instructional material</u> [~~textbook~~] or technological

26  equipment for personal business.  Such a written agreement shall be

27  separate from the employee's contract of employment, if applicable,

44

H.B. No. 6

1  and shall clearly inform the employee of the amount of the financial

2  responsibility  and  advise  the  employee  to  consider  obtaining

3  appropriate insurance.  An employee may not be required to agree to

4  such an agreement as a condition of employment.

5       (g)  At the end of the school year for which [an] open-source

6  instructional  material  [textbook]  that  a  school  district  or

7  open-enrollment charter school does not intend to use for another

8  student  is  distributed,  the  printed  copy  of  the  open-source

9  instructional  material  [textbook]  becomes  the  property  of  the

10  student to whom it is distributed.

11       (h)  This section does not apply to an electronic copy of

12  [an] open-source instructional material [textbook].

13       SECTION 55.  Section 31.105, Education Code, is amended to

14  read as follows:

15       Sec. 31.105.  SALE OR DISPOSAL OF INSTRUCTIONAL MATERIALS

16  AND  TECHNOLOGICAL  EQUIPMENT  [TEXTBOOKS].  (a)  The  board  of

17  trustees  of  a  school  district  or  governing  body  of  an

18  open-enrollment  charter  school  may  sell  printed  instructional

19  materials on the date the instructional material is discontinued

20  for use in the public schools by the State Board of Education or the

21  commissioner.  The board of trustees or governing body may also sell

22  electronic  instructional  materials  and  technological  equipment

23  owned by the district or school.  Any funds received by a district

24  or school from a sale authorized by this subsection must be used to

25  purchase  instructional  materials  and  technological  equipment

26  allowed under Section 31.0211 [textbooks, other than electronic

27  textbooks, to a student or another school at the state contract

45

H.B. No. 6

1  price.  The district shall send money from the sale of textbooks to
2  the commissioner as required by the commissioner.  The commissioner
3  shall deposit the money in the state textbook fund].

4       (b)  The  board  of  trustees  of  a  school  district  shall
5  determine  how  the  district  will  dispose  of  discontinued  printed
6  instructional  materials,  electronic  instructional  materials,  and
7  technological equipment.

8       SECTION 56.  Section 31.106, Education Code, is amended to
9  read as follows:

10      Sec. 31.106.  USE  OF  LOCAL  FUNDS.   In  addition  to  any
11  instructional material [textbook] selected under this chapter, a
12  school  district  or  open-enrollment  charter  school  may  use  local
13  funds to purchase any instructional materials [textbooks].

14      SECTION 57.  Sections 31.151(a) and (d), Education Code, are
15  amended to read as follows:

16      (a)  A publisher or manufacturer of instructional materials
17  [textbooks]:

18           (1)  shall   furnish   any   instructional   material
19  [textbook] the publisher or manufacturer offers in this state[,] at
20  a price that does not exceed the lowest price at which the publisher
21  offers that instructional material [textbook] for adoption or sale
22  to  any  state,  public  school,  or  school  district  in  the  United
23  States;

24           (2)  shall   automatically   reduce   the   price   of
25  instructional  material  [a  textbook]  sold  for  use  in  a  school
26  district  or  open-enrollment  charter  school  to  the  extent  that  the
27  price is reduced elsewhere in the United States;

H.B. No. 6

1          (3) shall provide any <u>instructional material</u>
2 [~~textbook~~] or ancillary item free of charge in this state to the
3 same extent that the publisher or manufacturer provides the
4 <u>instructional material</u> [~~textbook~~] or ancillary item free of charge
5 to any state, public school, or school district in the United
6 States;

7          (4) shall guarantee that each copy of <u>instructional</u>
8 <u>material</u> [~~a textbook~~] sold in this state is at least equal in
9 quality to copies of that <u>instructional material</u> [~~textbook~~] sold
10 elsewhere in the United States and is free from factual error;

11          (5) may not become associated or connected with,
12 directly or indirectly, any combination in restraint of trade in
13 <u>instructional materials</u> [~~textbooks~~] or enter into any
14 understanding or combination to control prices or restrict
15 competition in the sale of <u>instructional materials</u> [~~textbooks~~] for
16 use in this state;

17          (6) shall[~~:~~

18          [~~(A) maintain a depository in this state or~~
19 ~~arrange with a depository in this state to receive and fill orders~~
20 ~~for textbooks, other than open-source textbooks, on-line~~
21 ~~textbooks, or on-line textbook components, consistent with State~~
22 ~~Board of Education rules; or~~

23          [~~(B)~~] deliver <u>instructional materials</u>
24 [~~textbooks~~] to a school district or open-enrollment charter school
25 without a delivery charge to the school district, open-enrollment
26 charter school, or state [~~, if:~~

27          [~~(i) the publisher or manufacturer does not~~

47

H.B. No. 6

1  ~~maintain or arrange with a depository in this state under Paragraph~~
2  ~~(A)  and  the  publisher's  or  manufacturer's  textbooks  and  related~~
3  ~~products  are  warehoused  or  otherwise  stored  less  than  300  miles~~
4  ~~from a border of this state; or~~

5              [~~(ii)  the  textbooks  are  open-source~~
6  ~~textbooks, on-line textbooks, or on-line textbook components~~];

7          (7)  shall,  at  the  time  an  order  for  <u>instructional</u>
8  <u>materials</u> [~~textbooks~~] is acknowledged, provide to school districts
9  or  open-enrollment  charter  schools  an  accurate  shipping  date  for
10 <u>instructional materials</u> [~~textbooks~~] that are back-ordered;

11         (8)  shall   guarantee   delivery   of   <u>instructional</u>
12 <u>materials</u> [~~textbooks~~] at least 10 business days before the opening
13 day  of  school  of  the  year  for  which  the  <u>instructional materials</u>
14 [~~textbooks~~] are ordered if the <u>instructional materials</u> [~~textbooks~~]
15 are ordered by a date specified in the sales contract; and

16         (9)  shall  submit  to  the  State  Board  of  Education  an
17 affidavit  certifying  any  <u>instructional  material</u>  [~~textbook~~]  the
18 publisher  or  manufacturer  offers  in  this  state  to  be  free  of  factual
19 errors  at  the  time  the  publisher  executes  the  contract  required  by
20 Section 31.026.

21     (d)  A  penalty  collected  under  this  section  shall  be
22 deposited  to  the  credit  of  the  state  <u>instructional  materials</u>
23 [~~textbook~~] fund.

24     SECTION 58.  The heading to Section 31.152, Education Code,
25 is amended to read as follows:

26     Sec. 31.152.  ACCEPTING  REBATE  ON  [~~TEXTBOOKS,  ELECTRONIC~~
27 ~~TEXTBOOKS,~~] INSTRUCTIONAL MATERIALS[~~,~~] OR TECHNOLOGICAL EQUIPMENT.

48

H.B. No. 6

1      SECTION 59.  Sections 31.152(a), (b), and (d), Education

2  Code, are amended to read as follows:

3      (a)  A school trustee, administrator, or teacher commits an

4  offense if that person receives any commission or rebate on any

5  [textbooks, electronic textbooks,] instructional materials[,] or

6  technological equipment used in the schools with which the person

7  is associated as a trustee, administrator, or teacher.

8      (b)  A school trustee, administrator, or teacher commits an

9  offense if the person accepts a gift, favor, or service that:

10          (1)  is given to the person or the person's school;

11          (2)  might reasonably tend to influence a trustee,

12  administrator, or teacher in the selection of [a textbook,

13  electronic textbook,] instructional material[,] or technological

14  equipment; and

15          (3)  could not be lawfully purchased with state

16  instructional materials funds [from the state textbook fund].

17      (d)  In this section, "gift, favor, or service" does not

18  include:

19          (1)  staff development, in-service, or teacher

20  training; [or]

21          (2)  ancillary [instructional] materials, such as maps

22  or worksheets, that convey information to the student or otherwise

23  contribute to the learning process; or

24          (3)  the provision of food or beverages with a value

25  that does not exceed $50.

26      SECTION 60.  The heading to Section 31.153, Education Code,

27  is amended to read as follows:

49

H.B. No. 6

1      Sec. 31.153.   VIOLATION   OF   FREE   <u>INSTRUCTIONAL   MATERIALS</u>

2  [~~TEXTBOOK~~] LAW.

3      SECTION 61.   Section 31.153(a), Education Code, is amended

4  to read as follows:

5      (a)   A person commits an offense if the person knowingly

6  violates any law providing for the purchase or distribution of free

7  <u>instructional materials</u> [~~textbooks~~] for the public schools.

8      SECTION 62.   Section 39.303(b), Education Code, is amended

9  to read as follows:

10      (b)   For a student who failed to perform satisfactorily as

11  determined under either performance standard under Section 39.0241

12  on an assessment instrument administered under Section 39.023(a),

13  (c),  or  (l),  the  school  district  shall  include  in  the  notice

14  specific information relating to access to [~~online~~] educational

15  resources at the appropriate assessment instrument content level,

16  including [~~educational resources described by Section 32.252(b)(2)~~

17  ~~and~~] assessment  instrument  questions  and  answers  released  under

18  Section 39.023(e).

19      SECTION 63.   Section 41.124(c), Education Code, is amended

20  to read as follows:

21      (c)   A school district that receives tuition for a student

22  from a school district with a wealth per student that exceeds the

23  equalized wealth level may not claim attendance for that student

24  for purposes of Chapters 42 and 46 and the <u>instructional materials</u>

25  [~~technology~~] allotment under Section <u>31.0211</u> [~~31.021(b)(2)~~].

26      SECTION 64.   Section 43.001(b), Education Code, as amended

27  by Chapters 201 (H.B. 3459) and 328 (S.B. 206), Acts of the 78th

H.B. No. 6

1  Legislature, Regular Session, 2003, is reenacted to read as

2  follows:

3      (b)  The available school fund, which shall be apportioned

4  annually to each county according to its scholastic population,

5  consists of:

6          (1)  the distributions to the fund from the permanent

7  school fund as provided by Section 5(a), Article VII, Texas

8  Constitution;

9          (2)  one-fourth of all revenue derived from all state

10  occupation taxes, exclusive of delinquencies and cost of

11  collection;

12          (3)  one-fourth of revenue derived from state gasoline

13  and special fuels excise taxes as provided by law; and

14          (4)  all other appropriations to the available school

15  fund made by the legislature for public school purposes.

16      SECTION 65.  Section 43.001, Education Code, is amended by

17  adding Subsections (d) and (e) to read as follows:

18      (d)  Each year the State Board of Education shall set aside

19  an amount equal to 50 percent of the annual distribution for that

20  year from the permanent school fund to the available school fund as

21  provided by Section 5(a), Article VII, Texas Constitution, to be

22  placed, subject to the General Appropriations Act, in the state

23  instructional materials fund established under Section 31.021.

24      (e)  In calculating the amounts to be set aside as provided

25  by Subsection (d) for the state fiscal biennium beginning September

26  1, 2011, the State Board of Education shall consider only the

27  amounts of the annual distribution of the permanent school fund for

51

H.B. No. 6

1    that biennium.  The board shall not consider amounts distributed

2    for the state fiscal biennium beginning September 1, 2009,

3    regardless of the date on which those amounts were approved for

4    distribution.  This subsection expires September 1, 2014.

5    SECTION 66.  The following provisions of the Education Code

6    are repealed:

7              (1)  Section 31.002(3);

8              (2)  Sections 31.021(b), (e), and (f);

9              (3)  Section 31.022(d);

10             (4)  Section 31.0222;

11             (5)  Section 31.025;

12             (6)  Sections 31.035(e) and (g);

13             (7)  Section 31.072(c);

14             (8)  Sections 31.073(a) and (b);

15             (9)  Sections 31.101(b), (b-1), (c), and (c-1);

16             (10)  Section 31.1011;

17             (11)  Sections 31.103(a) and (e);

18             (12)  Subchapter E, Chapter 31;

19             (13)  Section 32.005;

20             (14)  Sections 32.251 through 32.257; and

21             (15)  Sections 32.259 through 32.263.

22   SECTION 67.  This Act takes effect September 1, 2011.

By:  Harless                                      H.B. No. 112

A BILL TO BE ENTITLED

1                            AN ACT

2    relating to requiring a voter to present proof of identification.

3           BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

4           SECTION 1.  Effective  September  1,  2011,  Subchapter  A,

5    Chapter 15, Election Code, is amended by adding Section 15.005 to

6    read as follows:

7           Sec. 15.005.  NOTICE    OF    IDENTIFICATION    REQUIREMENTS.

8    (a)  The voter registrar of each county shall provide notice of the

9    identification requirements for voting prescribed by Chapter 63 and

10   a  detailed  description  of  those  requirements  with  each  voter

11   registration  certificate  issued  under  Section  13.142  or  renewal

12   registration certificate issued under Section 14.001.

13          (b)  The secretary of state shall prescribe the wording of

14   the notice to be included on the certificate under this section.

15          SECTION 2.  Effective  September  1,  2011,  Subchapter  A,

16   Chapter 31, Election Code, is amended by adding Section 31.012 to

17   read as follows:

18          Sec. 31.012.  VOTER  IDENTIFICATION  EDUCATION.   (a)  The

19   secretary  of  state  and  the  voter  registrar  of  each  county  that

20   maintains  a  website  shall  provide  notice  of  the  identification

21   requirements for voting prescribed by Chapter 63 on each entity's

22   respective  website.   The  secretary  of  state  shall  prescribe  the

23   wording of the notice to be included on the websites.

24          (b)  The secretary of state, in cooperation with appropriate

82R1864 JRJ-F                      1

H.B. No. 112

1   nonprofit organizations as determined by the secretary of state and
2   with each party whose nominee for governor in the most recent
3   gubernatorial general election received 20 percent or more of the
4   total number of votes received by all candidates for governor in the
5   election, shall establish a statewide effort to educate voters
6   regarding the identification requirements for voting prescribed by
7   Chapter 63.  The secretary of state may use any available funds,
8   including federal funds, for the purposes of this section.

9   SECTION 3.  Effective September 1, 2011, Section 32.111,
10  Election Code, is amended by adding Subsection (c) to read as
11  follows:

12  (c)  The training standards adopted under Subsection (a)
13  must include provisions on the acceptance and handling of the
14  identification presented by a voter to an election officer under
15  Section 63.001.

16  SECTION 4.  Effective September 1, 2011, Section 32.114(a),
17  Election Code, is amended to read as follows:

18  (a)  The county clerk shall provide one or more sessions of
19  training using the standardized training program and materials
20  developed and provided by the secretary of state under Section
21  32.111 for the election judges and clerks appointed to serve in
22  elections ordered by the governor or a county authority.  Each
23  election judge shall complete the training program.  Each election
24  clerk shall complete the part of the training program relating to
25  the acceptance and handling of the identification presented by a
26  voter to an election officer under Section 63.001.

27  SECTION 5.  Chapter 62, Election Code, is amended by adding

2

H.B. No. 112

1  Section 62.016 to read as follows:

2       Sec. 62.016.  NOTICE OF ACCEPTABLE IDENTIFICATION OUTSIDE

3  POLLING PLACES.  The presiding judge shall post in a prominent place

4  on the outside of each polling location a list of the acceptable

5  forms of photographic and nonphotographic identification.  The list

6  must be printed using a font that is at least 24-point.

7       SECTION 6.  Section 63.001, Election Code, is amended by

8  amending Subsections (b), (c), (d), and (f) and adding Subsection

9  (g) to read as follows:

10      (b)  On offering to vote, a voter must present to an election

11  officer at the polling place either:

12           (1)  one form of identification listed in Section

13  63.0101(a); or

14           (2)  two different forms of identification listed in

15  Section 63.0101(b) [the voter's voter registration certificate to

16  an election officer at the polling place].

17      (c)  On presentation of the documentation required by

18  Subsection (b) [a registration certificate], an election officer

19  shall determine whether the voter's name on the documentation

20  [registration certificate] is on the list of registered voters for

21  the precinct.

22      (d)  If the voter's name is on the precinct list of

23  registered voters and the voter's identity can be verified from the

24  documentation presented under Subsection (b), the voter shall be

25  accepted for voting.

26      (f)  After determining whether to accept a voter, an election

27  officer shall return the voter's documentation [registration

3

H.B. No. 112

1  ~~certificate~~] to the voter.

2      (g)  If the requirements for identification prescribed by

3  Subsection (b) are not met, regardless of whether the voter's name

4  is on the precinct list of registered voters, the voter may be

5  accepted for provisional voting only under Section 63.011.  An

6  election officer shall inform a voter who is not accepted for voting

7  under this section of the voter's right to cast a provisional ballot

8  under Section 63.011.

9      SECTION 7.  Section 63.0011(a), Election Code, is amended to

10 read as follows:

11     (a)  Before a voter may be accepted for voting, an election

12 officer shall ask the voter if the voter's residence address on the

13 precinct list of registered voters is current and whether the voter

14 has changed residence within the county.  If the voter's address is

15 omitted from the precinct list under Section 18.005(c), the officer

16 shall ask the voter if the voter's residence as listed on

17 identification presented by the voter under Section 63.001(b) [~~the~~

18 ~~voter's voter registration certificate~~] is current and whether the

19 voter has changed residence within the county.

20     SECTION 8.  Section 63.006(a), Election Code, is amended to

21 read as follows:

22     (a)  A voter who, when offering to vote, presents a voter

23 registration certificate indicating that the voter is currently

24 registered in the precinct in which the voter is offering to vote,

25 but whose name is not on the precinct list of registered voters,

26 shall be accepted for voting if the voter's identity can be verified

27 from the documentation presented under Section 63.001(b).

4

H.B. No. 112

1      SECTION 9.   Section 63.007(a), Election Code, is amended to
2  read as follows:
3      (a)  A  voter  who,  when  offering  to  vote,  presents
4  documentation required under Section 63.001(b) that indicates [a
5  voter  registration  certificate  indicating  that]  the  voter  is
6  currently registered in a different precinct from the one in which
7  the voter is offering to vote, and whose name is not on the precinct
8  list  of  registered  voters,  shall  be  accepted  for  voting  if  the
9  voter's identity can be verified from the documentation and  the
10  voter executes an affidavit stating that the voter:
11          (1)  is a resident of the precinct in which the voter is
12  offering to vote or is otherwise entitled by law to vote in that
13  precinct;
14          (2)  was a resident of the precinct in which the voter
15  is offering to vote at the time that information on the voter's
16  residence address was last provided to the voter registrar;
17          (3)  did not deliberately provide false information to
18  secure  registration  in  a  precinct  in  which  the  voter  does  not
19  reside; and
20          (4)  is voting only once in the election.
21      SECTION 10.   Section 63.0101, Election Code, is amended to
22  read as follows:
23      Sec. 63.0101.  DOCUMENTATION  OF  PROOF  OF  IDENTIFICATION.
24  (a) The following documentation is an acceptable form [as proof] of
25  photo identification under this chapter:
26          (1)  a driver's license or personal identification card
27  issued to the person by the Department of Public Safety that has not

5

H.B. No. 112

1 expired or that expired no earlier than two years before the date of

2 presentation [or a similar document issued to the person by an

3 agency of another state, regardless of whether the license or card

4 has expired];

5       (2)  a United States military identification card that

6 contains the person's photograph [form of identification

7 containing the person's photograph that establishes the person's

8 identity];

9       (3)  a [birth certificate or other document confirming

10 birth that is admissible in a court of law and establishes the

11 person's identity;

12      [(4)] United States citizenship certificate [papers]

13 issued to the person that contains the person's photograph;

14      (4) [(5)] a United States passport issued to the

15 person;

16      (5)  a license to carry a concealed handgun issued to

17 the person by the Department of Public Safety; or

18      (6) [official mail addressed to the person by name

19 from a governmental entity;

20      [(7)] a valid identification card that contains the

21 person's photograph and is issued by:

22           (A)  an agency or institution of the federal

23 government; or

24           (B)  an agency, institution, or political

25 subdivision of this state.

26     (b)  The following documentation is acceptable as proof of

27 identification under this chapter:

H.B. No. 112

1    (1)  the voter's voter registration certificate or a
2  copy of a current utility bill, bank statement, government check,
3  paycheck, or other government document that shows the name and
4  address of the voter;

5    (2)  official mail addressed to the person by name from
6  a governmental entity;

7    (3)  a certified copy of a birth certificate or other
8  document confirming birth that is admissible in a court of law and
9  establishes the person's identity;

10    (4)  United States citizenship papers issued to the
11  person;

12    (5)  an original or certified copy of the person's
13  marriage license or divorce decree;

14    (6)  court records of the person's adoption, name
15  change, or sex change;

16    (7)  an identification card issued to the person by a
17  governmental entity of this state or the United States for the
18  purpose of obtaining public benefits, including veteran's
19  benefits, Medicaid, or Medicare;

20    (8)  a temporary driving permit issued to the person by
21  the Department of Public Safety;

22    (9)  a pilot's license issued to the person by the
23  Federal Aviation Administration or another authorized agency of the
24  United States;

25    (10)  a library card that contains the person's name
26  issued to the person by a public library located in this state; or

27    (11)  a hunting or fishing license issued to a person by

H.B. No. 112

1  the Parks and Wildlife Department [or

2       [(8)  any other form of identification prescribed by

3  the secretary of state].

4       SECTION 11.  Sections 63.011(a) and (b), Election Code, are

5  amended to read as follows:

6       (a)  A person  to whom  Section  63.001(g)  [63.008(b)  or

7  63.009(a)] applies may cast a provisional ballot if the person

8  executes an affidavit stating that the person:

9            (1)  is a registered voter in the precinct in which the

10 person seeks to vote; and

11           (2)  is eligible to vote in the election.

12      (b)  A form for an affidavit required by this section must

13 [shall] be printed on an envelope in which the provisional ballot

14 voted by the person may be placed and must include a space for

15 entering the identification number of the provisional ballot voted

16 by the person and a space for an election officer to indicate

17 whether the person presented proof of identification as required by

18 Section 63.001(b).  The affidavit form may include space for

19 disclosure of any necessary information to enable the person to

20 register to vote under Chapter 13.  The secretary of state shall

21 prescribe the form of the affidavit under this section.

22      SECTION 12.  Section 65.054(b), Election Code, is amended to

23 read as follows:

24      (b)  A provisional ballot may be accepted only if:

25           (1)  the board determines that, from the information in

26 the affidavit or contained in public records, the person is

27 eligible to vote in the election and has not previously voted in

8

H.B. No. 112

1  that election; and

2          (2)  the  voter  presents  proof  of  identification  as

3  required by Section 63.001(b):

4                  (A)  at the time the ballot was cast; or

5                  (B)  in  the  period  prescribed  under  Section

6  65.0541.

7          SECTION 13.  Subchapter  B,  Chapter  65,  Election  Code,  is

8  amended by adding Section 65.0541 to read as follows:

9          Sec. 65.0541.  PRESENTATION  OF  IDENTIFICATION  FOR  CERTAIN

10  PROVISIONAL BALLOTS.  (a)  A voter who is accepted for provisional

11  voting  under  Section  63.011  because  the  voter  does  not  present

12  proof  of  identification  as  required  by  Section  63.001(b)  may,  not

13  later  than  the  sixth  business  day  after  the  date  of  the  election,

14  present  proof  of  identification  to  the  voter  registrar  for

15  examination by the early voting ballot board.

16          (b)  The  secretary  of  state  shall  prescribe  procedures  as

17  necessary to implement this section.

18          SECTION 14.  Section  521.422,  Transportation  Code,  is

19  amended by amending Subsection (a) and adding Subsection (d) to

20  read as follows:

21          (a)  Except as provided by Subsection (d), the [The] fee for

22  a personal identification certificate is:

23              (1)  $15 for a person under 60 years of age;

24              (2)  $5 for a person 60 years of age or older; and

25              (3)  $20  for  a  person  subject  to  the  registration

26  requirements under Chapter 62, Code of Criminal Procedure.

27          (d)  The  department  may  not  collect  a  fee  for  a  personal

H.B. No. 112

1   identification certificate issued to a person who states that the

2   person is obtaining the personal identification certificate for the

3   sole purpose of satisfying Section 63.001(b)(1), Election Code,

4   and:

5           (1) who is a registered voter in this state and

6   presents a valid voter registration certificate; or

7           (2) who is eligible for registration under Section

8   13.001, Election Code, and submits a registration application to

9   the department.

10      SECTION 15.  Sections 63.008 and 63.009, Election Code, are

11  repealed.

12      SECTION 16.  Effective September 1, 2011:

13          (1) as soon as practicable, the secretary of state

14  shall adopt the training standards and develop the training

15  materials required to implement the change in law made by this Act

16  to Section 32.111, Election Code; and

17          (2) as soon as practicable, the county clerk of each

18  county shall provide a session of training under Section 32.114,

19  Election Code, as amended by this Act, using the standards adopted

20  and materials developed to implement the change in law made by this

21  Act to Section 32.111, Election Code.

22      SECTION 17.  Except as otherwise provided by this Act, this

23  Act takes effect January 1, 2012.

10

By:  Perry                                          H.B. No. 186


A BILL TO BE ENTITLED

1                          AN ACT

2   relating to requiring a voter to present proof of identification;

3   creating a penalty.

4       BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

5       SECTION 1.  Subchapter A, Chapter 15, Election Code, is

6   amended by adding Section 15.005 to read as follows:

7       Sec. 15.005.  NOTICE OF IDENTIFICATION REQUIREMENTS.  (a)

8   The voter registrar of each county shall provide notice of the

9   identification requirements for voting prescribed by Chapter 63 and

10  a detailed description of those requirements with each voter

11  registration certificate issued under Section 13.142 or renewal

12  registration certificate issued under Section 14.001.

13      (b)  The secretary of state shall prescribe the wording of

14  the notice to be included on the certificate under this section.

15      SECTION 2.  Effective January 1, 2012, Subchapter A, Chapter

16  31, Election Code, is amended by adding Section 31.012 to read as

17  follows:

18      Sec. 31.012.  VOTER IDENTIFICATION EDUCATION.  (a)  Not

19  earlier than 60 days or later than 30 days before each primary and

20  general election, the secretary of state shall mail a notice

21  describing in detail the identification requirements for voting

22  prescribed by Chapter 63 to each voter who, in the last election:

23          (1)  voted provisionally under Section 63.001(g); and

24          (2)  did not submit proof of identification under

82R527 JRJ-F                    1

H.B. No. 186

1  Section 65.0541.

2       (b)  The secretary of state by rule may create innovative

3  programs  to  educate  the  population  of  this  state  about  the

4  requirements for voting prescribed by Chapter 63.

5       (c)  The secretary of state and the voter registrar of each

6  county  that  maintains  a  website  shall  provide  notice  of  the

7  identification requirements for voting prescribed by Chapter 63 on

8  each entity's respective website.   The secretary of state shall

9  prescribe the wording of the notice to be included on the websites.

10      SECTION 3.  Section 32.111, Election Code, is amended by

11  adding Subsection (c) to read as follows:

12      (c)  The  training  standards  adopted  under  Subsection  (a)

13  must  include  provisions  on  the  acceptance  and  handling  of  the

14  identification presented by a voter to an election officer under

15  Section 63.001.

16      SECTION 4.  Section 32.114(a), Election Code, is amended to

17  read as follows:

18      (a)  The county clerk shall provide one or more sessions of

19  training using the standardized training program and materials

20  developed and provided by the secretary of state under Section

21  32.111 for the election judges and clerks appointed to serve in

22  elections ordered by the governor or a county authority.   Each

23  election judge shall complete the training program.  Each election

24  clerk shall complete the part of the training program relating to

25  the acceptance and handling of the identification presented by a

26  voter to an election officer under Section 63.001.

27      SECTION 5.  Effective January 1, 2012, Chapter 62, Election

H.B. No. 186

1  Code, is amended by adding Section 62.016 to read as follows:

2      Sec. 62.016.  NOTICE OF ACCEPTABLE IDENTIFICATION OUTSIDE

3  POLLING PLACES.  The presiding judge shall post in a prominent place

4  on the outside of each polling location notice that a provisional

5  ballot will be provided to a person who executes the appropriate

6  affidavit and a list of the acceptable forms of photographic

7  identification.  The notice and list must be printed:

8          (1)  in English, Spanish, and any other language

9  appropriate to the precinct in which the polling place is located;

10  and

11          (2)  using a font that is at least 24 point.

12      SECTION 6.  Effective January 1, 2012, Section 63.001,

13  Election Code, is amended by amending Subsections (b), (c), (d),

14  and (f) and adding Subsection (g) to read as follows:

15      (b)  On offering to vote, a voter must present one form of

16  identification listed in Section 63.0101 [the voter's voter

17  registration certificate] to an election officer at the polling

18  place.

19      (c)  On presentation of the documentation required by

20  Subsection (b) [a registration certificate], an election officer

21  shall determine whether the voter's name on the documentation

22  [registration certificate] is on the list of registered voters for

23  the precinct.

24      (d)  If the voter's name is on the precinct list of

25  registered voters and the voter's identity can be verified from the

26  documentation presented under Subsection (b), the voter shall be

27  accepted for voting.

H.B. No. 186

1      (f)  After determining whether to accept a voter, an election

2  officer  shall  return  the  voter's  <u>documentation</u>  [~~registration~~

3  ~~certificate~~] to the voter.

4      <u>(g)  A voter  shall  be  accepted  for  provisional  voting  only</u>

5  <u>under  Section  63.011  if  the  requirement  for  identification</u>

6  <u>prescribed by Subsection (b) is not met.</u>

7      SECTION 7.  Effective  January  1,  2012,  Section  63.007,

8  Election Code, is amended to read as follows:

9      Sec. 63.007.  VOTER WITH <u>REQUIRED DOCUMENTATION</u> [~~INCORRECT~~

10  ~~CERTIFICATE~~] WHO IS NOT ON LIST.  (a)  A voter who, when offering to

11  vote, presents <u>the documentation required under Section 63.001</u> [~~a~~

12  ~~voter  registration  certificate  indicating  that  the  voter  is~~

13  ~~currently registered in a different precinct from the one in which~~

14  ~~the  voter  is  offering  to  vote~~], and  whose  name  is  not  on  the

15  precinct  list  of  registered  voters,  shall  be  accepted  for  voting  if

16  the voter executes an affidavit stating that the voter:

17      (1)  is a resident of the precinct in which the voter is

18  offering  to  vote  or  is  otherwise  entitled  by  law  to  vote  in  that

19  precinct;

20      (2)  was a resident of the precinct in which the voter

21  is  offering  to  vote  at  the  time  that  information  on  the  voter's

22  residence address was last provided to the voter registrar;

23      (3)  did not deliberately provide false information to

24  secure  registration  in  a  precinct  in  which  the  voter  does  not

25  reside; and

26      (4)  is voting only once in the election.

27      (b)  After the voter is accepted, an election officer shall:

H.B. No. 186

1        (1)  indicate beside the voter's name on the poll list

2  that the voter was accepted under this section;  and

3        (2)  if the voter presents the voter's voter

4  registration certificate, enter on the registration omissions list

5  the precinct of the voter's registration as indicated by the voter's

6  registration certificate.

7      SECTION 8.  Effective January 1, 2012, Section 63.0101,

8  Election Code, is amended to read as follows:

9      Sec. 63.0101.  DOCUMENTATION OF PROOF OF IDENTIFICATION.

10  The following documentation containing the person's photograph is

11  acceptable as proof of identification under this chapter:

12        (1)  a driver's license or personal identification card

13  issued to the person by the Department of Public Safety or a similar

14  document issued to the person by an agency of another state that[,

15  regardless of whether the license or card] has not expired or that

16  expired no earlier than two years before the date of presentation;

17        (2)  a United States military [form of] identification

18  card [containing the person's photograph that establishes the

19  person's identity];

20        (3)  a valid Veteran's Identification Card [birth

21  certificate or other document confirming birth that is admissible

22  in a court of law and establishes the person's identity];

23        (4)  a United States citizenship certificate [papers]

24  issued to the person;

25        (5)  a United States passport issued to the person;

26        (6)  a license to carry a concealed handgun issued to

27  the person by the Department of Public Safety [official mail

H.B. No. 186

1  ~~addressed to the person by name from a governmental entity~~]; or

2              (7)  a <u>valid identification card that contains the</u>

3  <u>person's photograph and is issued to the person by:</u>

4                      (A)  <u>an agency or institution of the federal</u>

5  <u>government; or</u>

6                      (B)  <u>an agency, institution, or political</u>

7  <u>subdivision of this state</u> [~~copy of a current utility bill, bank~~

8  ~~statement, government check, paycheck, or other government~~

9  ~~document that shows the name and address of the voter; or~~

10             [~~(8)  any other form of identification prescribed by~~

11  ~~the secretary of state~~].

12        SECTION 9.  Effective January 1, 2012, Sections 63.011(a)

13  and (b), Election Code, are amended to read as follows:

14        (a)  A person to whom Section <u>63.001(g)</u> [~~63.008(b)  or~~

15  ~~63.009(a)~~] applies may cast a provisional ballot if the person

16  executes an affidavit stating that the person:

17             (1)  is a registered voter in the precinct in which the

18  person seeks to vote; and

19             (2)  is eligible to vote in the election.

20        (b)  A form for an affidavit required by this section <u>must</u>

21  [~~shall~~] be printed on an envelope in which the provisional ballot

22  voted by the person may be placed and must include a space for

23  entering the identification number of the provisional ballot voted

24  by the person <u>and a space for an election officer to indicate</u>

25  <u>whether the person presented proof of identification as required by</u>

26  <u>Section 63.001(b)</u>.  The affidavit form may include space for

27  disclosure of any necessary information to enable the person to

... 

H.B. No. 186

1 register to vote under Chapter 13.  The secretary of state shall
2 prescribe the form of the affidavit under this section.

3     SECTION 10.  Effective January 1, 2012, Section 65.054(b),
4 Election Code, is amended to read as follows:

5     (b)  A provisional ballot may be accepted only if:

6         (1)  the board determines that, from the information in
7 the  affidavit  or  contained  in  public  records,  the  person  is
8 eligible to vote in the election and has not previously voted in
9 that election; and

10        (2)  the  voter  presents  proof  of  identification  as
11 required by Section 63.001(b):

12             (A)  at the time the ballot was cast; or
13             (B)  in  the  period  prescribed  under  Section
14 65.0541.

15    SECTION 11.  Effective  January  1,  2012,  Subchapter  B,
16 Chapter 65, Election Code, is amended by adding Section 65.0541 to
17 read as follows:

18    Sec. 65.0541.  PRESENTATION  OF  IDENTIFICATION  FOR  CERTAIN
19 PROVISIONAL BALLOTS.  (a)  A voter who is accepted for provisional
20 voting  under  Section  63.011  because  the  voter  does  not  present
21 proof  of  identification  as  required  by  Section  63.001(b)  may,  not
22 later  than  the  sixth  business  day  after  the  date  of  the  election,
23 present  proof  of  identification  to  the  voter  registrar  for
24 examination by the early voting ballot board.

25    (b)  The  secretary  of  state  shall  prescribe  procedures  as
26 necessary to implement this section.

27    SECTION 12.  Effective  January  1,  2012,  Section  521.422,

H.B. No. 186

1  Transportation Code, is amended by amending Subsection (a) and
2  adding Subsection (d) to read as follows:

3       (a)  Except as provided by Subsection (d), the [The] fee for
4  a personal identification certificate is:

5            (1)  $15 for a person under 60 years of age;

6            (2)  $5 for a person 60 years of age or older; and

7            (3)  $20 for a person subject to the registration
8  requirements under Chapter 62, Code of Criminal Procedure.

9       (d)  The department may not collect a fee for a personal
10  identification certificate issued to a person who:

11           (1)  executes an affidavit stating that the person:

12                (A)  is obtaining the personal identification
13  certificate for the sole purpose of satisfying Section 63.001(b),
14  Election Code;

15                (B)  is financially unable to pay the required
16  fee; and

17                (C)  does not have another form of identification
18  acceptable under Section 63.0101, Election Code; and

19           (2)  is:

20                (A)  a registered voter in this state and presents
21  a valid voter registration certificate; or

22                (B)  eligible for registration under Section
23  13.001, Election Code, and submits a registration application to
24  the department.

25       SECTION 13.  Effective January 1, 2012, Sections 521.453(a)
26  and (h), Transportation Code, are amended to read as follows:

27       (a)  Except as provided by Subsection (f), a person [under

8

H.B. No. 186

1  the age of 21 years] commits an offense if the person possesses[,
2  with the intent to represent that the person is 21 years of age or
3  older,] a document that is deceptively similar to a driver's
4  license or a personal identification certificate unless the
5  document displays the statement "NOT A GOVERNMENT DOCUMENT"
6  diagonally printed clearly and indelibly on both the front and back
7  of the document in solid red capital letters at least one-fourth
8  inch in height and the person:

9          (1) is under the age of 21 years and possesses the
10 document with the intent to represent that the person is 21 years of
11 age or older; or

12         (2) possesses the document with the intent to use the
13 document as a form of identification for the purposes of Section
14 63.001(b), Election Code.

15      (h)  In addition to the punishment provided by Subsection
16 (d), a court, if the court is located in a municipality or county
17 that has established a community service program, may order a
18 person [younger than 21 years of age] who commits an offense under
19 this section to perform eight hours of community service unless the
20 person is shown to have previously committed an offense under this
21 section, in which case the court may order the person to perform 12
22 hours of community service.

23      SECTION 14.  Effective January 1, 2012, Sections 63.006,
24 63.008, and 63.009, Election Code, are repealed.

25      SECTION 15.  As soon as practicable after September 1, 2011:

26         (1) the secretary of state shall adopt the training
27 standards and develop the training materials required to implement

9

H.B. No. 186

1  the change in law made by this Act to Section 32.111, Election Code;

2  and

3          (2)  the county clerk of each county shall provide a

4  session of training under Section 32.114, Election Code, as amended

5  by this Act, using the standards adopted and materials developed to

6  implement the change in law made by this Act to Section 32.111,

7  Election Code.

8          SECTION 16.  The secretary of state, attorney general, or

9  other state officer shall submit this Act to the United States

10  District Court for the District of Columbia under Section 5 of the

11  Voting Rights Act of 1965 (42 U.S.C. Section 1973c) to determine

12  whether this Act has the purpose or effect of denying or abridging

13  the right to vote on account of race or color or in contravention of

14  the guarantees set forth in 42 U.S.C. Section 1973b(f)(2).

15          SECTION 17.  Except as otherwise provided by this Act, this

16  Act takes effect September 1, 2011.