IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| STATE OF TEXAS, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |
| ERIC KENNIE, et al., | ) |
|  | ) |
| Defendant-Intervenors, | ) |
|  | ) |
| TEXAS STATE CONFERENCE OF NAACP BRANCHES, et al., | ) |
|  | ) |
| Defendant-Intervenors, | ) |
|  | ) |
| TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, et al., | ) |
|  | ) |
| Defendant-Intervenors. | ) |
|  | ) |
| TEXAS LEGISLATIVE BLACK CAUCUS, et al., | ) |
|  | ) |
| Defendant-Intervenors, | ) |
|  | ) |
| VICTORIA RODRIGUEZ, et al., | ) |
|  | ) |
| Defendant-Intervenors. | ) |
|  | ) |

CASE NO. 1:12-CV-00128
(RMC-DST-RLW)
Three-Judge Court

Declaration of J. Morgan Kousser

Attached is my expert report in this litigation, followed by my curriculum vitae.

I declare under penalty of perjury that the report is true and correct, to the best of my knowledge.

Executed this 1st day of June 2012.

J. Morgan Kousser

2

**Defendant's Exhibit #**
548

DE-005415

# Voter Identification in Texas:
# What Was the Purpose of S.B. 14?

## I. Introduction: Credentials, Methods and Abstract

### A. Credentials

1. I am a professor of history and social science at the California Institute of Technology. Educated at Princeton and Yale, I have been a visiting professor at Michigan, Harvard, and Claremont. In 1984-85, I was Harmsworth Professor of American History at Oxford. As my curriculum vitae, attached, shows, I've published three books and edited another, in addition to 42 scholarly articles, 79 book reviews, and 24 entries in reference works. My work has focused on minority voting rights, educational discrimination, race relations, the legal history of all of the foregoing subjects, political history, and quantitative methods. I have been executive editor of the journal *Historical Methods*, which specializes in interdisciplinary and quantitative history, since 2001. My 1974 book, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of of the One-Party South, 1880-1910*, studied the transformation of southern politics wrought by the disfranchisement of blacks and poor whites who opposed or might oppose the dominant Democratic party. A central concern of that book was the intentions of the framers of the statutes and constitutional amendments that my quantitative analysis showed effected the disfranchisement: Did they merely intend to disfranchise African-Americans, or did they want to rid the electorate of socioeconomically disadvantaged whites, as well? Did they design the laws to create what political scientist V.O. Key, Jr. had described as a South without political parties, a South where the lower orders could not organize political opposition to the

Defendant's Exhibit #
548                                          DE-005416

dominant powers?  Extensively analyzing legislative records and newspaper treatments of the relevant years, as well as roll calls from the legislators of the eleven ex-confederate states, I concluded that the disfranchisers had shaped the no-party, low-turnout, racially-discriminatory political order quite deliberately.

2.  My 1999 book, *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction*, was co-winner of the annual Lillian Smith Award of the Southern Regional Council for the best book on the South and co-winner of the annual Ralph J. Bunche Award of the American Political Science Association for the best scholarly work in political science which explores the phenomenon of ethnic and cultural pluralism.  Of particular relevance to this case is the fact that five of the chapters of that work are concerned with the intent of various legislative bodies in passing not only redistricting plans – including a chapter on Texas redistricting from 1970 through 1992 – but also majority vote requirements, at-large elections, and designated post requirements.  A chapter titled "Intent and Effect in Law and History" analyzes federal court opinions and historical practice to come up with a list of ten "intent factors" that provide and explicit set of rubrics with which to analyze the intent of the framers of laws, particularly election laws.  I will employ that scheme (available at pp. 347-58 of the book) in this report.  One of my most recent articles, "The Strange, Ironic Career of Section Five of the Voting Rights Act, 1965-2007," published in the *Texas Law Review*, is a comprehensive, 108-page history of the first 42 years of that section of Act.  My *curriculum vitae* is appended to this report as Attachment A.

3.  I have previously testified or consulted in 37 federal voting rights or redistricting cases and

2

Defendant's Exhibit #
548

DE-005417

five state cases (in Alaska and California).  Many, such as the key case of *City of Mobile v. Bolden,* concerned whether at-large systems of voting were adopted or maintained with a racially discriminatory intent or whether they had discriminatory effects.  Others, such as *Garza v. Los Angeles County Board of Supervisors*, involved questions of "racial gerrymandering."  Judges in both the district and appeals courts relied on my testimony on the racial intent of those who redistricted the Los Angeles County Board in their treatments of that issue, which became the central issue in the appeals court decision in *Garza*.  In some cases, such as *Bolden*, *Garza*, and the 2003 Texas "re-redistricting" case, *LULAC v. Perry*, the sources of my testimony were primarily qualitative.  During the 1990s round of redistricting, I wrote expert reports for the cases of *Shaw v. Hunt* (North Carolina) and *Bush v. Vera* (Texas) examining the history of redistricting in those states from 1970 on.  Revised for publication in *Colorblind Injustice*, those reports take up two chapters totaling 74 pages with numerous citations to newspapers, depositions, and governmental documents, as well as to secondary sources.  A revised version of my *Garza* report, based on similar sources, comprises a 69-page chapter of the same book.  A 140-page law review article entitled "How To Determine Intent: Lessons from L.A." was the basis for the *Garza* chapter as well as the chapter on "Intent and Effect in Law and History" in *Colorblind Injustice*. In six other federal cases, such as the 2002 California state redistricting case, *Cano v. Davis*, and four cases brought under the California Voting Rights Act, the sources of my testimony were primarily quantitative.  In the two recent Texas statewide redistricting cases, *Perez v. Perry* and *Texas v. United States*, I testified on both the intent of the framers of the redistricting measures and on their effects.

3

**Defendant's Exhibit #**
**548**

DE-005418

## B. Abstract of the Paper

4.  I have been asked by the Department of Justice to assess evidence drawn from debates, hearings, newspaper articles, and other sources concerning the question of whether S.B. 14, the photo identification (hereinafter "id") law passed by the Texas legislature and signed by Gov. Rick Perry in 2011 was adopted with a racially discriminatory intent.  After examining the evidence for competing hypotheses, as well as for the racial discrimination hypothesis, in considerable detail, I conclude that S.B. 14 was, indeed, adopted with a discriminatory intent. The rest of this abstract gives a brief summary of the body of the report.

5.  After setting out my credentials, including a reference to a paper and sections of a longer monograph that set out the methodology I employ to evaluate the evidence of intent, I examine an instance, the consideration and passage of a law regulating mail-in ballots in 2003, that contrasts starkly with the analogous considerations of voter id bills in the 2005-2011 legislatures. The Wollens absentee ballot bill was a response to a specific, documented scandal that had led to the overturning of a particular election for the Dallas City Council.  Although there was considerable opposition to the bill, it had bipartisan support, including some support from ethnic minority legislators, and it was very specifically directed at a particular problem and carefully drafted to insure that it did not burden voters.  In sum, the 2003 bill was a narrow response to a specific, well-documented problem and it had minimal discriminatory consequences.  I would not conclude on the basis of that evidence that it was adopted with a racially discriminatory

4

Defendant's Exhibit #
548

DE-005419

purpose.[1]

6.  To determine whether the voter id bills had such purposes, I present a basic narrative of the consideration of voter id bills in each of the four legislative sessions from 2005 through 2011. The story of S.B. 14 does not begin in 2011.  Rather, the bill was the end of a long and bitter struggle.  The motives of its supporters can best be understood, therefore, by looking at the whole struggle.  If the case for a photo id law had been as simple and straightforward as proponents often declared, if it had been aimed at a demonstrated problem of widespread in-person voting fraud, and if it had not aroused strong suspicions that its purpose was, instead, to disfranchise elderly, disabled, poor, and minority citizens, who disproportionately supported Democrats, then it would have been uncontroversial.  Instead, it became the "marquee issue" between the two major political parties in the legislature for four legislative terms, and to pass it, proponents had to rewrite longstanding legislative rules completely, a departure from normal procedures that can be counted as a factor proving discriminatory intent.[2]

7. I begin with a table that summarizes the documents that could be used for voter identification under the status quo and under the four voter id bills from 2005 through 2011. Although it may strike the reader as long and overly detailed, Table 1 makes clear at a glance how stark the contrast is between the status quo and all of the pre-2011 bills, on the one hand, and S.B. 14, on

[1]The Wollens Bill provides evidence that is relevant to the first of the ten factors that I have developed for analyzing intent because it represents a typical example of the consideration of a non-partisan and basically non-discriminatory electoral reform law.

[2]This is relevant to my ninth factor, state policies and institutional rules.

5

**Defendant's Exhibit #**
548                                    DE-005420

the other.[3]

8. I then turn to a series of session narratives. Democrats used three rules in those sessions to prevent the passage of voter identification bills: a generations-old State Senate rule that bills could be considered on the floor only if a two-thirds majority voted to allow that to happen; a Senate filibuster rule that was designed to limit, but allow filibusters; and a rule on taking up bills in the House that allowed a multi-representative filibuster that went by the uniquely Texan name of "chub." In response, Republicans used control of the Senate gavel and the ability to amend a Senate bill into a previously-passed House bill to attempt to circumvent the Democrats' strategems. The tangle of these rules and the depth of determination of each side of the voter id issue produced dramatic episodes in three consecutive legislatures from 2005 through 2009, episodes that underline the stakes that each side felt were at issue and illuminate the legislators' motives. It was only when the landslide 2010 election swept overwhelming Republican majorities into the legislature that proponents of voter id laws could repeal the last of the legislative rules that had allowed opponents to hold off passage. Ironically, the Republicans who had overwhelmingly dominated the 2010 elections and who finally pushed the very restrictive S.B. 14 through in 2011 had to argue that the electorate had lost so much confidence in the legitimacy of the electoral process because of intimations of in-person voter fraud that the legislature had to pass S.B. 14.[4]

---

[3]The comparisons of the provisions of the successive bills specifies my third factor, the text of the law or the lines of districts.

[4]The discussion of all of these sessions and the associated elections constitutes the historical context, the second of my ten factors.

6

**Defendant's Exhibit #**
548                                                    DE-005421

9. I then turn to a section of the paper that concentrates more directly on motives and arguments, rather than on events, focusing first on the evidence that was offered to support and undermine the central proposition of proponents of voter id laws – that they are aimed at actual, well-documented, in-person voter fraud.  Texans made unparalleled efforts to uncover such fraud.  The Attorney General's office conducted an expensive six-year-long, high-visibility campaign to find it and came up with perhaps one prosecuted case of possible voter impersonation among the millions of people who voted.  Websites, a prominent Republican activist in Harris County who doubled as the voting registrar for the county, and various Republican leaders made splashy public assertions that they had found massive fraud.  But when newspapers, tv stations, and more careful legislators investigated more rigorously, the assertions utterly collapsed.  Legislative hearings brought in scores of Texan and non-Texan experts to examine every issue related to voter id, but even the most prominent national proponents of voter id laws did not claim that there was much in-person fraud anywhere, and they could point to none in Texas specifically.  That all of these efforts produced such little reliable evidence leads me to discount the desire to correct actual fraud as a motive for passing S.B. 14.

10.  Seeming to backtrack from assertions that the purpose of the bills was to correct actual fraud, proponents retreated to the notion that the bills ought to be passed because some constituents believed that there was fraud.  As one supporter told the legislature, "Well, I support the bill because it would fix the problem whether it exists or not."  This is a peculiar argument, one that could be used to justify any bill about anything.  But strikingly, with all of the witnesses that appeared at hearings, none said that they themselves had become so disillusioned with in-person

7

Defendant's Exhibit #
548

voting fraud that they had dropped out of politics.  The legitimacy argument is further undermined by proponents' overreach – assertions that a voter id law would actually increase minority turnout, because those currently too skeptical of the honesty of the electoral process would return to the polls if they knew every voter had to be identified by a photo.  As opponents pointed out, proponents offered absolutely no evidence of this, and representatives from minority communities were openly scornful of the the notion.[5]

11.  I then investigate the burdens that photo id laws posed in the particular demographic, geographical, and fiscal conditions of Texas.  The legislature was presented with evidence and arguments that up to a million Texans did not possess photo ids, and subsequent, more careful studies have raised that to a million and a half.  Distances in Texas are great – much greater than in relatively small, densely-populated Indiana, whose voter id law was often compared to S.B. 14 – and large numbers of counties contained no government offices at which photo ids could be acquired, or those offices were open only spordically.  In urban areas, there were too few of such offices, they were too distant from minority communities, especially for those without automobiles, and the lines at these offices were already too long for many employed people to have time to navigate.  Proponents of S.B. 14 blithely ignored the repeated demonstrations of such burdens by opposition legislators, an indication of proponents' desires to impose the burdens, which, census figures show, bore most heavily on poorer, disproportionately-minority

---

[5]These are one of several classes of statements that relate to my factor 8, statements by important participants.

**Defendant's Exhibit #**
548

DE-005423

citizens.[6]

12.  I turn next to other potential non-discriminatory motives for passing S.B. 14.  The first is partisanship.  Suppose that proponents and their attorneys had claimed, as they did in the Texas redistricting cases, that partisanship trumped race – that the reasons for passing S.B. 14 were to disadvantage Democrats, not minorities.  In addition to the fact that they made no such claims (though Democrats often asserted that that was the motive of voter id laws), the explanation runs aground on the fact that Democratic support and representation in the legislature is much more disproportionately minority than Republican support is.  I demonstrate this through examples of racially polarized voting, drawn from my testimony in *Texas v. United States*, as well as from an analysis of the ethnicity by party of state legislators.  Partisanship and ethnicity are so closely correlated in contemporary Texas that to strike at Democrats, you must necessarily strike at minorities.

13.  Prominent proponents of voter id characterized it as an effort to prevent large numbers of undocumented immigrants, implicitly Latino, from perpetrating vote fraud.  Should this be considered evidence of a discriminatory intent?  I conclude that it should because of the improbability that undocumented people, so concerned with staying the shadows, would creep out at such potential cost for so little benefit.

14.  Proponents have recently pushed forward the few minority legislators who were elected as

---

[6]The burdens are another measure of discriminatory impact, the tenth of my intent factors.

**Defendant's Exhibit #**
548

DE-005424

Republicans in 2010 or who switched to the Republican party afterwards as spokesmen for S.B. 14. If they are legitimate representatives of minority communities, then this fact could partly undermine a case for discriminatory intent. But racially polarized voting analysis of their elections, drawn from my report in *Texas v. United States*, shows that their elections were opposed by their ethnic communities.

15. Although minority representatives repeatedly called on proponents of voter id bills to make studies of the effects of such laws on minority voters in Texas, and although State election officials and legislators were well aware that the Section 5 submission process would require a demonstration that the law had no discriminatory effect on protected minorities, neither the legislature nor executive agencies made any such study public before S.B. 14 passed.[7] Surveys and data matching by the Brennan Center and other national organizations strongly suggested that a study of the racially differential effects of a photo id law would have shown such effects in Texas. If the state had made public such a study that showed discriminatory effects, whether survey or data-matching, while the debates were going on, and if the legislature had voted for the law anyway, that would have counted toward a finding of intentionally discriminatory intent. That they remained deliberately ignorant in such a circumstance is itself evidence toward such a finding.

---

[7]The head of the Elections Office in the Secretary of State's office declared that her office ran only a general matching program in February or March of 2011 to determine how many people listed on the voting rolls did not have drivers' licenses. She says the office did not run the matching through a Spanish-surname list or make any other attempt to determine the ethnic consequences of enacting a voter id law. And she says that no one in the legislature asked her for the matching study that she did run. See rough deposition transcript of Ann McGeehan, at 232-33.

10

**Defendant's Exhibit #**
548

DE-005425

16.  Finally, I consider roads not taken, amendments offered to S.B. 14 in the Senate in 2011 that would have made it considerably easier for people to vote, particularly minorities who disproportionately lacked photo ids.  The overwhelming rejection of all of the really important amendments by the 2011 legislature is an indication of who was targeted by the bill and the fact that proponents' assertions that no one would be disfranchised by it were hollow.

17.  All of these considerations, all of this evidence and argument, leads me to the conclusion that S.B. 14 was adopted with a racially discriminatory intent.

## II.  Narrative

### A.  What Did Not Happen During the Voter ID Struggle

18.  During the epic 2003 legislative session, when congressional Majority Leader Tom DeLay's mid-term redistricting of the Texas congressional delegation roiled the legislature, sending Democratic members of the Texas House to Ardmore, Oklahoma and those from the more high-toned Texas Senate to Sante Fe, New Mexico to break quorums and try fruitlessly to block the DeLay redistricting, the legislature coalesced on a bipartisan bill to attack some real problems related to absentee voting fraud.   Recent examples of "vote harvesting" of the absentee ballots of older or disabled voters by political operatives in local Dallas elections led Rep. Steve Wollens (D, Dallas) to propose a carefully-targeted, though controversial bill aimed at the practice.  At the time, and still in 2012, as a newspaper story in the Dallas Morning News put it,  ". . . residents can

11

Defendant's Exhibit #
548

DE-005426

vote by mail if they are at least 65 years old, disabled or plan to be gone during the period of early

voting and on election day. Voters must sign an application for a mail ballot, which authorizes the

elections department to send them a ballot."[8]  The difficulties were that there was little regulation

of the process of applying for or casting absentee ballots, and there was no requirement for a

friend or activist who picked up a ballot and later mailed it to send it in right away, instead of at

the last moment, or to sign that they had mailed the ballot for the voter.  Mail ballot forgeries were

among the irregularities that led a state district judge to void the results of the Dallas City Council

District 4 race in 2001.[9]


19.  News stories carried the names of specific voters who denied applying for absentee ballots,

though county election officials had received applications, signed in apparently identical

handwriting, under their names.  The stories named and ran inculpatory statements from political

activists and officials who had taken part in some of these activities.  In an editorial, the *Dallas

Morning News* denounced the practice:

> Mail voting is supposed to be a convenience for the sick, the elderly and people
> who will be away during an election. But in the hands of dishonest campaign operatives
> called vote harvesters, it becomes a vehicle for fraud. The methods vary. Harvesters
> complete false applications for mail ballots, intercept ballots from voters' mailboxes and
> "help" pliable elders to mark their ballots.
>
> The practice is illegal. Nevertheless, vote harvesters operate with virtual impunity.
> Texas' electoral laws are so weak that it is virtually impossible for district attorneys to
> obtain convictions. Dallas County hasn't successfully prosecuted a case of electoral fraud
> in 22 years, even though vote harvesting has changed the results of some local races. City

---

[8]Dave Michaels, "Voters: Mail ballot signatures forged - Candidate denies signing
applications; DA investigating," *DMN*, April 22, 2003.

[9]Id.

12

DE-005427

Council elections are particularly vulnerable. Few people vote in them, so results can be changed through the manipulation of relatively few mail ballots.[10]

20. Wollens's bill, in the newspaper's summary,

> . . . would increase the penalties for marking or attempting to mark another's ballot without their consent. It also would require people who assist others with voting to put their names, addresses and signatures on the "carrier" envelopes of mail-in ballots.
>
> It would ban the practice of storing mail ballots and sending them to the elections department at the last minute - a practice prosecutors say is vulnerable to ballot tampering.[11]

21. In another editorial, the Dallas paper said the white Democrat's bill

> . . . would require anyone who assists a voter to record his identity on the ballot and ballot application materials, make it illegal to mark voters' ballots without their consent and increase the penalties for fraud.
>
> Texas needs the reforms. Sixteen months ago, a state judge voided a Dallas City Council election on grounds that fraudulent mail ballots had changed the outcome. Since then, fraud may have determined at least one other local race. The Texas House should approve the legislation, which already has passed the Elections Committee, and the Senate should follow suit.[12]

22. Many, though not all minority members of the legislature opposed the bill on the grounds that

---

[10]"Vote Harvesters - Beware of fraud in local elections," *DMN*, April 16, 2003. In another incident in 2002, ". . . a Dallas County grand jury indicted an operative on allegations that she had tampered with a blind woman's mail ballot. The voter accused Felicia Ann Pitre, who had been working for a Dallas school board candidate, of taking her ballot before she could mark it.

"Prosecutors lost that case after a judge ruled that the allegation against Ms. Pitre was not a crime under the state election code." Dave Michaels, "Measure aims to cut vote cheating - But some fear that mail ballot bill would stifle minority turnout," *DMN*, March 12, 2003.

[11]George Kuempel, "Bill would restrict mail-in ballot aid - Critics say limits may intimidate minorities," *DMN*, April 9, 2003.

[12]"Harvesting Votes - Texas must crack down on this abuse," *DMN*, March 22, 2003.

it primarily affected political practices that minority activists used.[13]

23.  The contrast between the example of the successful Wollens bill – a contrast later pointed out by minority legislators[14] – and the voter identification issue is instructive.  The Wollens bill was a response to specific scandals that had changed the results of particular elections, not vague, undocumented allegations that there must be voter impersonation fraud, even if there was no precise, documented evidence of it.  It was narrowly circumscribed to attack practices that distorted voters' will without depriving them of their votes: friends and even ward heelers could continue to assist voters who actually wanted their help; they just had to identify themselves to authorities as providing that assistance. When its implementation caused some needless prosecutions, there was an easy bureaucratic fix – including another line on a mail ballot envelope.[15]  Framed by a Dallas County Democrat who was a leader in ethics reform[16] and the husband of Dallas Mayor Laura Miller,[17] it had bipartisan support, protecting it from charges that it aimed to disadvantage the party to which minority voters overwhelmingly adhered by depriving them and other Democrats of their votes.  Even though the measure may have affected minority

---

[13]Dave Michaels, "Measure aims to cut vote cheating - But some fear that mail ballot bill would stifle minority turnout," *DMN*, March 12, 2003; George Kuempel, "Bill would restrict mail-in ballot aid  - Critics say limits may intimidate minorities," *DMN*, April 9, 2003.

[14]S Debate, March 10, 2009, at 140-41, where African-American Democrat Rodney Ellis says he voted for the Wollens bill in 2003.

[15]See S Debate, March 10, 2009, at 467-68.

[16]Stephanie Sandoval, "Ethics bill faulted - Local officials' reactions mixed on possibility of financial statements," *DMN*, June 15, 2003.

[17]Henry Tatum, "Warm-up period is over for Miller," *DMN*, May 7, 2003.

14

Defendant's Exhibit #
548                                                          DE-005429

voters somewhat more than white voters, it seemed congruent and proportional (in the every day,

not the constitutional meaning, of the phrase) to a demonstrated problem and aimed to do no more

than alleviate that problem. Perhaps just as important, despite considerable evidence during the

lengthy debates over voter identification that fraud was much, much more prevalent in absentee

ballots than in polling-place balloting,[18] there was never an effort to reform absentee voting as part

of any voter identification bill in Texas.


## B. Bitter, Bloody Melodrama

24.  If the rationale for a voter identification law had been as obvious[19] and its partisan and racial

consequences as trivial[20] as proponents claimed, then the path to passage should have been short

and easy. Instead, it was long and astonishingly hard-fought. The course of the legislation, the

issues in the debates, the changing provisions of the successive bills, and the identities of the

players cast considerable light on the question of whether the law was adopted with a racial

purpose. A relatively brief chronological, session-by-session review of the progress of voter

---

[18]Deputy Attorney-General Eric Nichols's office investigated 192 complaints of election code violations and prosecuted 30 persons for election fraud from August, 2002 through March 2009. None of the prosecutions was for in-person voter impersonation, and the first class of crimes Nichols mentioned in his testimony before the Committee of the Whole Senate in 2009 was "abuse of the mail-in ballot process . . ." S Debate, March 10, 2009, at 745-49.

[19]Closing the Senate debate on the voter id bill in 2009, Senate Elections Committee Chairman Troy Fraser blithely remarked that "The goal is to make sure that every person arriving at a polling site is the same one who is named on that voter list; that you are who you say you are. I believe Senate bill 362 makes voting easy." S Debate, 2nd Reading, 2009, at 49-50, Bates# TX_00076052-53

[20]Defending S.B. 362, the 2009 version of the voter id bill, Senate Elections Committee Chairman Troy Fraser declared: "I want a large turnout of all Texans, and I want a large turnout of minorities, making sure that they are encouraged to vote." S Debate, March 10, 2009, at 111.

15

**Defendant's Exhibit #**
548                                                    DE-005430

identification bills from 2005 through 2011 will be instructive.

### 1. A Drastic Shrinking of Acceptable Identification Documents

25.  A typical multi-year reform drive in a legislature dilutes a measure before it passes, as more discussion and the necessity to compromise to win passage cause proponents to court at least some opponents by loosening up the bill's provisions.  On voter id in Texas, the opposite happened.  Bills that allowed many documents in addition to drivers' licenses and passports, including a great many that did not have photos attached, were initially proposed, but with the landslide 2010 elections, the Republican majority strikingly cut back on the documentary evidence of identity that voters could use to identify themselves at the polls.  If majorities in the legislature had really wanted to protect the franchises of minorities, students, the disabled, and older voters, they would have moved in the opposite direction, expanding the range of eligible documents, instead of contracting them.  The direction of change indicates a desire to contract, rather than to expand the electorate.

26.  Table 1 summarizes those changes, demonstrating that a very wide range of documents were acceptable as of the most recent law to pass prior to 2011, the 1997 election law.  It was clearly aimed just at requiring a prospective voter to provide some material identification of their identity, and it even allowed a voter without documents to execute a sworn affidavit attesting to their identity, so long as the name of the voter appeared on the registration rolls.  A substantial penalty for breaking the law – jail time and a large fine –  was considered a sufficient deterrent to illegal in-person voting.

16

**Defendant's Exhibit #**
548

DE-005431

27. The bills considered in subsequent years, H.B. 1706 (2005), H.B. 218 (2007), and S.B. 362 (2009) narrowed the required identification – the benchmark's vague "any photo id" was specified much more closely in the 2005-09 bills, expanding the number of photo ids listed, but actually contracting the number acceptable.  But all of the bills considered before 2011 were relatively lenient, compared to the drastically shrunk number of documents legitimate under S.B. 14.

**Defendant's Exhibit #**
548

DE-005432

**Table 1: Acceptable Identification Documents Under Status Quo
and 2005-2011 Voter Identification Bills**

| ID | Current | H.B. 1706 | H.B. 218 | S.B. 362 | S.B. 14 |
|---|---|---|---|---|---|
| voter registration card | A | A | A | A | R |
| affidavit | A | | A (if no VR card) | | |
| at least 80 years old | | | A | | |
| in county with weather disaster within one year | | | A | | |
| service-disabled vet | | | A | | |
| military widow or widower | | | A | | |
| Social Security Disability Determination + SoS certification | | | | | A |
| > 50% military disability + SoS certification | | | | | A |
| **Photo IDs** | | | | | |
| TX driver's license (could be expired) | A | | | | |
| TX DPS id card (could be expired) | A | | | | |
| Other state driver's license (could be expired) | A | | | | |
| other state id card (could be expired) | A | | | | |
| TX driver's license (current or expired< 2 yrs) | | A | A | A | |
| TX DPS id card (current or expired<2 yrs) | | A | A | A | |
| other state driver's license (expired < 2 yrs) | | A | | | |
| other state id card (expired < 2 yrs) | | A | | | |
| TX driver's license (current or expired<60 days) | | | | | A |
| TX DPS id card (current or expired<60 days) | | | | | A |
| any photo id | A | | | | |

18

Defendant's Exhibit #
548

DE-005433

| | | | | |
|---|---|---|---|---|
| U.S. military id with photo | | A | A | A | A |
| employee id card with photo | | A | A | | |
| U.S. citizenship papers with photo | | A | A | A | A |
| U.S. passport (could be expired) | A | A | A | A | |
| U.S. passport (current or expired<60 days) | | | | | A |
| college student id card (public or private) | | A | A | | |
| college student id card (public) | | | | ? | |
| id card issued by TX state agency | | A | A | A | |
| id card issued by U.S. government agency | | | A | A | |
| id card issued by county clerk or elections office | | A | A | | |
| concealed handgun license (could be expired) | | A | A | A | |
| concealed handgun license (expired<60 days) | | | | | A |
| **Non-Photo IDs** | | | | | |
| birth certificate or other legal birth document | A | A (2) | A (2) | A (2) | |
| official mail from government entity | A | A (2) | A (2) | A (2) | |
| copy of current utility bill | A | A (2) | A (2) | A (2) | |
| copy of current bank statement | A | A (2) | A (2) | A (2) | |
| copy of current government check | A | A (2) | A (2) | A (2) | |
| copy of current government paycheck | A | A (2) | A (2) | A (2) | |
| copy of other government doc that shows name and address | A | A (2) | A(2) | A (2) | |
| U.S. citizenship papers | | A (2) | A (2) | A (2) | |
| copy of marriage license or divorce decree | | A (2) | A (2) | A (2) | |
| copy of court records of adoption, name change, or sex change | | A (2) | A (2) | A (2) | |
| veteran's benefits id card | | A (2) | A (2) | A (2) | |
| Medicaid id card | | A (2) | A (2) | A (2) | |

19

**Defendant's Exhibit #**
548

DE-005434

| | | | | |
|---|---|---|---|---|
| Medicare id card | | A (2) | A (2) | A (2) | |
| temporary driving permit issued by TX DPS | | A (2) | A (2) | A (2) | |
| pilot's license | | A (2) | A (2) | A (2) | |
| TX library card | | A (2) | A (2) | A (2) | |
| TX hunting or fishing license | | A (2) | A (2) | A (2) | |
| any other id prescribed by TX Sec. of State | A | | | | |

Sourrce: Texas Legislature Online, history of bills by number and legislative session

Key:
R = Required
A = Alternatives
A (2) = One of two alternative documents that could be used
? = may be considered id issued by state institution

Notes:
For H.B 1706, H.B. 218, and S.B. 362, one form of photo id **OR** two forms of non-photo id required
For S.B. 14, one form of photo id required

SB14 (2011) allows the following exemptions from ID if the voter swears an affidavit, not at the polling place, but only during the determination of whether to count a provisional ballot. See Section 17.
    1. The voter has a religious objection to photography, and has consistently refused to be photographed for ID purposes since having the belief.
    2. A natural disaster, as declared by Pres. or Gov., occurred 45 days or fewer before ballot was cast and destroyed the voter's ID.

20

**Defendant's Exhibit #**
**548**

DE-005435

## 2. 2005: What Rodney Ellis Was Willing to Wear

28.  The skeletal outline of bill provisions in Table 1 misses the drama and strategy of the legislative sessions which, along with statements of the participants on and off of the legislative floor, make the search for discriminatory motives a human story.

29.  The long road of endless hearings, heated debates, and thrilling legislative gamesmanship that led to S.B. 14 began in 2005.  As of 2005, a registered Texas voter who appeared at the polls with her state-issued voter registration card, which did not contain a photo, or a photo id such as a driver's license or passport, or the wide range of other identifying documents indicated in Table 1 was allowed to vote by signing a poll book.  H.B. 1706, which increased the identification requirements to include either a variety of photo ids, including an easily counterfeited identification card from any business employing the voter or two other pieces of identifying documents, including a card from a Texas public library and the voter's voter registration card, was carried by five-term House Elections Committee member Mary Denny, a Republican from Denton County, an overwhelmingly white county just north of Dallas.  Bitterly fought in the House, it passed that body by an almost straight party-line vote of 78-67.[21]

30.  The Democrats' attack on the bill from the beginning stressed what they contended were its racial motives and consequences:  Texas "is rapidly becoming more Hispanic, African American and Asian, and we're becoming younger and more mobile," said Rep. Ruth Jones McClendon,

---

[21]HJ 2005, at 2554-55, Bates # Bates TX_00030738-39.

21

**Defendant's Exhibit #**
548

DE-005436

D-San Antonio. "We should make it easier for all citizens to vote, not harder."[22]  According to the

*San Antonio Express-News*,

>       Members of the Legislative Black Caucus, which opposes the measure, said too
> many minority and poor voters are likely to be excluded from casting ballots, even if their
> registration is valid.
>       Rep. Garnet Coleman, who chairs the caucus, said Denny's bill is part of a nationwide
> push by Republicans to suppress voting within traditionally Democratic voting blocs --
> minorities, the elderly and the poor.[23]

According to Rep. Rafael Anchia (D, Dallas), proponents of the bill ". . . have admitted that it will

impact some people more than others . . .It will disenfranchise people, but," this leading opponent

of the bill surmised, "they don't care."[24]

31.  In the Senate, H.B. 1706 came up against the longstanding rule[25] that required a vote of two-

thirds of the Senate's membership for a bill to be brought to the floor for action.  With 12

members of the 31-member Senate, Democrats could block any measure if they stuck together,

and the day after it passed the House, 11signed a pledge to vote against taking up H.B. 1706.[26]

The bill seemed dead for the session.  But it was not.  Three weeks later, as the regular session of

---

[22]Guillermo X. Garcia, "Voter ID measure gets House nod," *SAEN*, May 3, 2005, p. 11A.

[23]Guillermo X. Garcia, "Voter ID measure gets House nod," *SAEN*, May 3, 2005, p. 11A.

[24]Karen Brooks, "Voter ID proposal revived - House plan, added to Senate bill, may avoid Democratic blockade," DMN, May 25, 2005.

[25]The rule had been in place, "at least since the 1950s," according to Mike Ward, "Gallegos to miss part of session," *AAS*, Jan. 19, 2007.

[26]No byline, "In Session," *SAEN*, May 4, 2005.

22

**Defendant's Exhibit #**
**548**

DE-005437

the legislature was drawing to a close, Denny attached her measure to S.B. 89, a bill that had

previously passed the Senate, which added polling place workers to the list of officials who were

authorized to swipe drivers' licenses.  This authority could be used to check the validity of a

driver's license if a voter presented it at the polls, instead of a state voter registration card.[27]  The

maneuver gave Republicans a way around the two-thirds rule, because, according to another

strange legislative rule, if the Senate author of S.B. 89 accepted the House amendments to his bill,

the bill could be taken up by the Senate with only a majority vote.[28]


32.  At first, it seemed that the only hope to stop the appended H.B. 1706 in the Senate was to

filibuster, and other bizarre legislative rules made that difficult.  Senators who spoke were not

allowed to yield the floor temporarily or to be able to duck out to use the bathroom by moving for

a quorum call, and they had to stand, not sit or even lean on something, during their speeches.  As

a consequence, Sen. Rodney Ellis, a usually-dapper African-American Democrat from Houston,

appeared on the legislative floor at 1:15 a.m. Saturday morning prepared to filibuster for the last

weekend of the regular session, with a pair of black sneakers, instead of his usual Bruno Maglis, a

12-inch thick stack of books about minority voting rights to read into the record as background for

---

[27]Karen Brooks, "Voter ID proposal revived - House plan, added to Senate bill, may avoid
Democratic blockade," *DMN*, May 25, 2005.  Counties had the option of buying and providing
such card-swipe machines at the polls if they wished, and few did in the harsh economic
conditions of the Great Recession.

[28]No byline, "House would make voters show Ids," *AAS*, May 25, 2005.

23

discussion of the voter identification bill, and, he let it be known, wearing a catheter.[29]  Ellis was

said to have been relieved when Senate Minority Leader Leticia Van de Putte, a Latina from San

Antonio, successfully challenged taking up the bill on the grounds that the amendment violated a

provision of the state constitution, because S.B. 89 amended the state transportation code, while

H.B. 1706 amended the election code.  In a last gasp effort, Republicans sent the bill to a House-

Senate conference committee.[30]  But the usual end-of-session logjam, with major tax and

education bills still being negotiated and Ellis resting nearby, ready to filibuster the voter id

measure if necessary, ended the effort for this legislative session.[31]


### 3. 2007: What Mario Gallegos Was Willing to Risk

33.  H.B. 1706 became H.B. 218 in the 2007 legislature, and the fight became even more bitter

and partisan, because Democrats gained ten House seats and lost one Senate seat in the 2006

elections.  The House now stood at 77-73 Republican, while the Democrats needed to keep all 11

of their Senators well and on the floor to preserve their one-third representation, allowing them to

---

[29]Gary Scharrer, "El Paso footwear may aid filibuster," SAEN, May 29, 2005; Associated Press, "Democrats derail voter-ID bill with threat of filibuster, exercise of Senate rules," *Lubbock Avalanche-Journal* (TX)-May 29, 2005; Kristen Mack, "THE LEGISLATURE - Session's close crammed with action - Filibuster threat and phone calls fill lawmaker's time, *HC*, May 30, 2005.

[30]Associated Press, "Democrats derail voter-ID bill with threat of filibuster, exercise of Senate rules," *Lubbock Avalanche-Journal* (TX)-May 29, 2005; Guillermo X. Garcia, "Voter identification bill may be dead for session," *SAEN*, May 29, 2005.

[31]Clay Robison and R.G. Ratcliffe, "THE LEGISLATURE - AS CLOCK TICKS, TAX BILL SEEMS DOOMED - Lawmakers struggle to bridge rifts 2 days before the session ends," *HC*, May 29, 2005; Kristen Mack, "THE LEGISLATURE - Session's close crammed with action - Filibuster threat and phone calls fill lawmaker's time, *HC*, May 30, 2005; No byline, "CAPITOL ROUNDUP," *AAS*, May 30, 2005.

Defendant's Exhibit #
548

DE-005439

block consideration of bills the party opposed.  In the 2005 House, at least 4 Republicans crossed

over on the third reading and voted "nay" on H.B. 1706.  A similar crossover in 2007 would kill

H. B. 218, assuming that all Democrats voted and opposed the bill.

34.  The difficulty for the Democrats became clear almost immediately after the regular session of

the legislature was gaveled  into order in early January.  Shortly after he was elected President

Pro-Tem of the Senate, the third highest office in Texas state government, Sen. Mario Gallegos,

Jr. (D, Houston) announced that he was checking into a Houston hospital for a liver transplant.

Although no final action could be taken on a (non-"emergency") bill for 60 days, Gallegos's

condition meant that in late March, Lt. Gov. David Dewhurst, an ardent proponent of a voter id

law, could order a snap roll call on taking the bill up, and the ten Democratic senators would be

powerless to stop the bill.[32]

35.  Fortunately for Gallegos and the Democrats, the House did not pass the bill until April 23, by

a vote of 76-68, with all the Democrats who were present joined by two Republicans in opposing

the bill.  Closing the 6-hour-long debate, Rep. Betty Brown of Henderson County in East Texas

said her proposal was "designed to keep *illegal aliens*, noncitizens and other people otherwise not

qualified" from voting.[33]

---

[32]Mike Ward, "Gallegos to miss part of session," *AAS*, Jan 19, 2007; Kelley Shannon, AP, "Senator returns, vows to block voter ID bill - For now, Senate Democrats have votes needed to block measure," *AAS*, May 4, 2007.

[33]W. Gardner Selby, "House Republicans squeak through voter ID mandate - Senate chances uncertain, pitting Dewhurst against Democrats," *AAS*, April 24, 2007.  The bill did not require proof of citizenship to be presented at the polls.

Defendant's Exhibit #
548                                    DE-005440

36.  The capital city's leading newspaper echoed charges by minority legislators that the bill had partisan and racially discriminatory purposes:

> This bill, if it passes the Senate and becomes law, takes Texas back to the bad old days of poll taxes and literacy tests. It's a voter suppression bill, pure and simple. No matter how much its supporters protest that it's not, the bill is designed to suppress certain groups of voters who tend to vote for Democrats: the poor and elderly and minorities. . . .
> The legislation, House Bill 218 authored by Rep. Betty Brown, R-Athens, will discourage thousands of voters on election day to prevent a handful of people from voting illegally. That is political overkill that can only be explained as a partisan Republican attack.[34]

Democrats denied that the bill would do anything to stop anyone who really wished to cast a fraudulent vote at the polls.[35]  "You can buy any of the documents on this bill," said Rep. Rafael Anchía, D-Dallas. "College students do it all the time to drink."[36]

37.  By May 2, Lt. Gov. David Dewhurst, an ardent proponent of voter id, who presided over the Senate, threatened to call the bill up, but gave Sen. Gallegos a 24-hour warning, as Gallegos had requested.  With nearly a month to go in the regular session of the legislature, Gallegos returned from Houston, against his doctors' orders.[37]  Violating the traditionally civil, considerate mores of

---

[34]"House Republicans swarm to vote ... hoping that others won't," *AAS*, April 26, 2007.

[35]Ironically, the votes on H.B. 218 of some legislative supporters of voter id were actually cast by other legislators, who pushed the buttons for their absent colleagues.  The practice on this roll call was filmed by an Austin tv station and displayed on YouTube.  Bill Hobby, "All in favor of a better state House vote system?" *FWST*, Feb. 4, 2008.

[36]W. Gardner Selby, "House Republicans squeak through voter ID mandate    Senate chances uncertain, pitting Dewhurst against Democrats." *AAS*, April 24, 2007.  My italics.

[37]Kelley Shannon, AP, "Senator returns, vows to block voter ID bill - For now, Senate Democrats have votes needed to block measure," *AAS*, May 4, 2007.

26

**Defendant's Exhibit #**
548                                    DE-005441

the relatively tiny Senate, which was barely a fifth the size of the more contentious House,

Dewhurst took advantage of the severe flu of Sen. Carlos Uresti and the temporary absence from

the floor of the Senate's senior member, Sen. John Whitmire, to schedule H.B. 218 for debate.

Whitmire, a longtime hunting buddy and ally of the Lt. Gov., cursed and stabbed his finger at

Dewhurst for failing to count his vote against the motion to take up the bill, and Dewhurst

threatened to have Whitmire removed from the floor.  Fearing that neither Whitmire's nor Uresti's

votes would stop the debate from going forward, but seemingly not prepared with the same

survival gear as Rodney Ellis had adorned himself with two years earlier,[38] Democratic leader

Letitia Van de Putte rose to begin a filibuster, and the bill's sponsor, Sen. Troy Fraser, agreed to a

recount.  This time, Whitmire stayed on the floor and Uresti rushed from his Austin lodgings,

bounded up the capitol steps, hurried into the senate chamber, cast his ballot, and promptly

proceeded to Senate lounge, where he could hear the applause of his Democratic colleagues for

his efforts as he immediately began to vomit.[39]


38.  Lt. Gov. Dewhurst reacted to the controversy his actions had precipitated by issuing a long

public letter questioning the patriotism of Whitmire and the Democrats and charging that they

---

[38]The Latina Sen. Van de Putte told her hometown newspaper that "Dewhurst will try again if he sees a Democrat missing, 'but I'd like to be able to go to the bathroom before then.'" Gary Scharrer, "Flu-stricken Uresti rushes in to vote," *SAEN*, May 16, 2007, at 10A.

[39]*AAS* blog, Mark Lisheron, "Senate skirmishes on voter ID bill," May 15, 2007, </blogs/content/shared-gen/blogs/austin/legislature/entries/2007/05/15/senate_skirmishes_on_vo ter_id_bill.html>; Gary Scharrer, "Flu-stricken Uresti rushes in to vote," *SAEN*, May 16, 2007, at 10A; Kristen Mack, "In trying to win, has Dewhurst lost a friend?" *HC*, May 17, 2007.  In 2011, a sick Republican senator's vote for S.B. 14 was cast for him even though he was not on the floor and probably not even in the Capitol building at the time.  Mike Ward, "After initial OK, Senate set to finish on voter ID," *AAS*, Jan. 26, 2011.

Defendant's Exhibit #
548                                              DE-005442

opposed H.B. 218 "because they don't believe in the basic American principle of one person, one vote." Like Rep. Betty Brown two years earlier, the Lt. Gov. treated the bill as an effort to protect Texas elections against the depredations of non-citizens: "With eight to 12 million illegal aliens currently living in the U.S., the basic American principle of one person, one vote, is in danger," he charged, and he cited statistics that more than 6000 non-citizens (of tens of millions of voters over time) had been removed from the voter rolls in five counties over the last fifteen years.[40] Significantly, he did not charge that any non-citizens had cast ballots at the polls, and if they had had drivers' licenses[41] or other forms of identification, it is difficult to see how H.B. 218 would have had any effect on them.

39. An all-day effort the next day, full of informal meetings and apologies, to restore the "family"character of the Senate[42] drew public opposition from Republican Senator Dan Patrick of

---

[40]AAS blog, "Letter from Lt. Gov. on voter ID bill," May 16, 2007, </blogs/content/shared-gen/blogs/austin/capitolpressreleases/entries/2007/05/16/letter_from_lt_gov_on_voter_id.html>. As a report in the *AAS* noted, "Opponents dispute the data, which was drawn from jury summons, arguing that some people claimed that they were not citizens merely to get out of jury duty." Juan Castillo, "ID plan puts spotlight on voter fraud," *AAS*, May 23, 2007. The report noted that in Texas, drivers' licenses could be issued to legal permanent residents, who were ineligible to vote. Two years later, Dewhurst himself seemed to discount it, remarking that "In Harris County, we had 4-5,000 people registered to vote who, when they were called for jury duty, they sent their (voter) cards back. That could have been a felony." Mike Ward, "Dewhurst: Voter ID compromise hoped for," *AAS* Blog, Mar. 2, 2009, <http://www.statesman.com/blogs/content/shared-gen/blogs/austin/politics/entries/2009/03/02/dewhurst_voter_id_compromise_h.html>.

[41]In Texas, non-citizens are eligible for drivers' licenses and Department of Public Safety identity cards.

[42]Editorial,"Texas' big three  cut down to size  during session," *AAS*, May 29, 2007: ". . . all Senate business came to a halt for a day to restore peace."

28

**Defendant's Exhibit #**
548                                    DE-005443

Houston, a radio talk-show host even during legislative sessions,[43] who blasted Dewhurst's effort

to conciliate the Democrats.   "'I think he reacted the way he did because he was challenged on

what I think is a definitive issue,' Patrick said. 'He was challenged, and he blinked by allowing

the second vote.'"[44] But Dewhurst, then rumored to be considering a Republican primary

campaign against incumbent Gov. Rick Perry in 2010, would have a chance to redeem himself in

the eyes of the party faithful,[45] for, as the *Austin American-Statesman* noted,

> Democratic Sen. Mario Gallegos, a liver transplant recipent, will go to Houston for a surgical procedure and may not return to Austin for the rest of the legislative session, his spokesman said.
>
> Without all 11 Democratic senators on the floor, Republicans have the minimum votes needed to start debate.[46]

40.   Ten days before the end of the regular session of the legislature, Gallegos's biopsy in Houston

indicated that his body was rejecting the liver that had been transplanted four months earlier.

Ignoring the advice of his doctors, Gallegos returned to the Senate chamber, promising to spend

the week there to prevent consideration of H.B. 218.   "'If not for voter ID, I wouldn't be here;

---

[43]<http://www.senate.state.tx.us/75r/Senate/members/dist7/dist7.htm>.

[44]Mark Lisheron, "Senate, used to solidarity, repairs split," *AA*S, May 18, 2007.

[45]According to *Houston Chronicle* reporter Kristen Mack, "In trying to win, has Dewhurst lost a friend?" May 17, 2007, "Voter identification legislation has always been a hot-button issue. It's even hotter this year because of Democratic gains in 2006, concern about illegal immigration and Dewhurst's political ambition. He has designs on the governor's seat, and he has been much more political this session as he tries to shore up support among the Republican base. Republicans like the voter ID bill because they believe it will weaken Democrats, but can argue that it is a reasonable requirement."

[46]Mark Lisheron, "Senate, used to solidarity, repairs split," *AA*S, May 18, 2007.

29

that's how serious the issue is for me,' said Gallegos, D-Houston. 'It's very important for my community that we block this legislation.'"[47]  Although Gallegos hoped to be able to return to Houston after Wednesday, the last day that the original H.B. 218 could be considered by the senate, he was willing to stay until the next Monday, because it was possible that H.B. 218 could be amended into an existing bill and put up for consideration in that manner.  Republican Sen. Bob Deuell, a physician, attracted public praise by temporarily setting aside partisanship and ordering a hospital bed for Gallegos to be delivered to the room of the Senate Sergeant-at-Arms, as did Lt. Gov. Dewhurst for not calling a vote on H.B. 218 when Gallegos took a day off for his biopsy.[48]  The *American-Statesman* was appalled:

> That hospital bed is a poignant reminder of the poisonous politics of the voter ID bill. The bill is based on the false premise that Texas is suffering a wave of voting by illegal immigrants, which is patently not true.  Democrats believe the bill is part of a national effort to disenfranchise poor and elderly voters who are inclined to support Democratic candidates. . . .
> According to polls and conventional political wisdom, Texans think there's a problem with illegal voting and support voters producing identification at the polls. So Republicans see a political advantage in pushing the bill. There's no downside for them, and if it suppresses some Democratic Party votes, so much the better. They don't care if the "problem" doesn't exist.
> But a Senate colleague's health is on the line and partisan politics should take a back

---

[47]Mark Lisheron, "Ill senator settles in for voter ID fight," *AAS*, May 22, 2007.

[48]Mark Lisheron, "Ill senator settles in for voter ID fight," *AAS*, May 22, 2007; Editorial, "Hospital bed handy for Gallegos, Senate ill will," *AAS*, May 23, 2007.  Perhaps coincidentally, a Deuell-sponsored bill extending the time for families to contest doctors' decisions to cease treatment for terminally-ill patients, a bill that easily passed the Senate and should have been popular with conservatives who controlled the House, was allowed to die in the House without being brought to a vote, a day after Deuell had publicly assisted Sen. Gallegos.  Lisa Sandberg, "End-of-life bill one of many whose life is ended by House clock," SAEN, May 24, 2007, p. 12A.

30

DE-005445

seat.[49]

41.  Perhaps in response to such criticism, perhaps in response to a threat by Democrats to bring yet another legislative session to a halt by filibustering H.B. 218 in any form, and certainly in an effort to restore decorum and comity to the Senate, Lt. Gov. Dewhurst promised after the last Wednesday of the session not to allow H.B. 218 to be attached to any other legislative measure. Gallegos' return to the Houston hospital was eased by the tribute from his Latina colleague, Letitia Van de Putte:  "(Gallegos) has risked everything to stand on principle and defeat this legislation. No matter what else he accomplished in life, his actions this week will never be forgotten."[50]

### 4.  What Todd Smith Unwillingly Learned About Compromise

42.  Certainly Lt. Gov. Dewhurst did not forget.  His prospective campaign for governor was so tied to the issue that the measure was known in some quarters as "Dewhurst's voter ID bill."[51] Dewhurst insured at the start of the 2009 session that there would be no repeat of Gallegos's or Uresti's dramatic gestures by successfully pushing a repeal of the Senate's fifty-plus-year-old two-thirds rule for the sole issue of voter id.  Democratic attempts to preserve the traditional rule for

---

[49]Editorial, "Hospital bed handy for Gallegos, Senate ill will," *AAS*, May 23, 2007.

[50]No byline,"Voter ID Measure Dies In Texas Senate Without Vote," AP (no newspaper source) May 24, 2007.

[51]Patrick McGee, "Republican ballot has more than just candidates on it," FWST, March 3, 2008, p. B6; editorial, "Face it: Texas doesn't need voter ID law," *AAS*, May 4, 2008; editorial, "Texas AG's wild goose chase," *AAS*, May 23, 2008.  "Lt. Gov. David Dewhurst was unable to muster the two-thirds vote necessary to move the bill through the Senate . . ." Clay Robison, "COMMENTARY Republicans revive voter ID proposal," *HC*, Dec. 14, 2008.

31

Defendant's Exhibit #
548

DE-005446

all issues or to add other issues – funding for public schools and children's health programs,

college tuition reforms, insurance rate regulation, veterans mental health programs – were slapped

down by the 19-12 Republican majority.  Even on the hyper-partisan issue of redistricting,

Republicans were willing to allow Democrats, or any other combination of one-third of the

senators, a veto on taking up any preliminary measures, such as a proposal for a redistricting

commission that had majority support in the Senate.[52] In the midst of the most serious economic

meltdown in 72 years, the Senate began its session in what the *American-Statesman* called "a

dramatic display of partisan bloodletting . . ."[53]  With the rule change, Dewhurst was certain that

the bill would pass, for, he said "Everybody wants to make sure that only U.S. citizens vote in our

elections."[54]

43.  The situation in the House, however, belied Dewhurst's sunny assurances.  The heavy

conservative hand of Tom Craddick, elected Speaker in 2003 as the first Republican House

Speaker since Reconstruction, was lifted when eleven back-bench Republicans joined at the last

minute with all of the Democrats in the razor-thin 76-74 Republican House to elect a relatively

---

[52]Jaime Castillo, "Redistricting, voter ID bills take wrong tracks," *SAEN*, April 1, 2009, p. 1B.

[53]Mike Ward, "GOP wins voter ID bout," *AAS*, Jan. 15, 2009;  Terrence Stutz, "Senate poised to pass voter ID - Session off to divisive start as exemption to two-thirds rule angers Democrats," *DMN*, Jan. 15, 2009, p. 1A.

[54]Terrence Stutz, "Senate begins session at odds - Voter ID proposal, measure to change two-thirds rule cause rancor for parties," *DMN*,  Jan. 14, 2009, p. 12A.

32

Defendant's Exhibit #
548                                    DE-005447

unknown two-term member from San Antonio, Joe Straus, as Speaker.[55]  As conservative

Republicans worried that Straus might have won Democratic votes by agreeing to abandon or

compromise on voter id, Straus promised that "We will create an atmosphere where everyone's

voice can and should be heard," he said. "A place where we respect each other's points of view —

Democrat and Republican, urban and rural, liberal and conservative."[56]  Most significantly, he

named Rep. Todd Smith, a comparatively moderate Republican from the Ft. Worth suburbs, to

head the Election Committee.  And Smith launched his chairmanship with a statement that should

be borne in mind not only in considering the legislature's actions in 2009, but also in evaluating

the body's motives in passing S.B. 14 in 2011:

> "I wasn't put on this committee to rig elections in my party's favor," Smith said, vowing to
> "do everything in my power to accommodate [Democrats'] concerns about
> disenfranchising any legal voters, including constituencies that may traditionally support
> Democrats more than Republicans."[57]

44.  Smith immediately began bargaining with Democrats on the Committee over the voter id bill.

In the Senate, Dewhurst had also bargained, but his offer to exempt more seniors than had the

2007 bill, which required everyone under 80 years old to have a photo id or other id, and to delay

---

[55]Jason Embry, "House leader draws heat from both sides," *AAS*, July 2, 2010.

[56]Laylan Copelin, "Lawmakers optimistic as they size up speaker," *AAS*, Jan 11, 2009;
Mike Ward and Laylan Copelin, "House elects speaker; Senate in uproar - Potential rule change
in upper body infuriates Democrats,"*AAS*, Jan. 14, 2009.

[57]Dave Montgomery, "He's on the inside now - of a pressure cooker," *FWST*, Feb. 23,
2009, p. b01.

33

Defendant's Exhibit #
548                                                    DE-005448

the starting date for the law by two years found no Democratic takers.[58]  Democrats apparently

floated swapping voter id for same-day registration, but such a hope was always hallucinatory.[59]

A Democratic member of the Elections Committee, Rafael Anchia, was skeptical that Smith could

deliver a compromise bill:  "We have no confidence that if something gets out of committee, it

won't be loaded up on the House floor or get loaded up in conference," he said.[60]  And Speaker

Straus expressed the worry as soon as S.B. 362 had passed the Senate that, as the *Dallas Morning*

*News* put it, " voter ID will rip apart his chamber . . ."[61]  A 23-hour-long hearing of the whole

Senate, in which Lt. Gov. Dewhurst turned over the gavel to a Republican Senator so that

Dewhurst could be recorded as voting for S.B. 362, and in which teary public testimony on the

bill began at 4 a.m., was not a good omen for compromise.[62]


45.  Patterning his proposal on the Carter-Baker Commission's recommendation for voter id laws

---

[58]Clay Robison,  "COMMENTARY - Republicans revive voter ID proposal,"*HC*,  Dec. 14, 2008; Mike Ward and Laylan Copelin, "House elects speaker; Senate in uproar - Potential rule change in upper body infuriates Democrats,"*AAS*, Jan. 14, 2009; Mike Ward, "Behind scenes of Senate's public fight," *AAS*, Jan. 16, 2009; Mike Ward, "Dewhurst: Voter ID compromise hoped for," *AAS* Blog, Mar. 2, 2009, <http://www.statesman.com/blogs/content/shared-gen/blogs/austin/politics/entries/2009/03/02/dewhurst_voter_id_compromise_h.html>..

[59]Arnold Garcia, Jr., "No country for unarmed men," *AAS*, Mar. 8, 2009.

[60]Terrence Stutz and Robert T. Garrett, "Voter ID bill clears Senate hurdle - Proposal expected to face tougher test in House after 23-hour hearing," *DMN*, Mar. 12, 2009, at 3A.

[61]Terrence Stutz and Robert T. Garrett, "Voter ID bill clears Senate hurdle - Proposal expected to face tougher test in House after 23-hour hearing," *DMN*, Mar. 12, 2009, at 3A.

[62]W. Gardner Selby, "After marathon session, Senate advances bill to toughen voter ID requirements," *AAS*, Mar. 12, 2009; Dave Montgomery, "Debate on voter ID will move to House, *FWST*, Mar. 12, 2009, p. B01.

**Defendant's Exhibit #**
**548**                                        DE-005449

only if they were paired with intensive government outreach to insure that as many potential

voters as possible were registered,[63] Smith stated that his goal was "to do everything within my

power to minimize any argument that there is any legal voter whose vote is not going to be

counted as a result of this legislation." This goal required that "he would oppose a duplication of

Indiana's strict requirement for photo ID. He says he is more receptive to the concept in the

Senate-passed bill, which calls for a photo ID but allows voters without one to present two other

forms of identification," as the *Ft. Worth Star-Telegram* paraphrased his words in an interview.[64]

This admission by the 2009 Republican Election Committee Chairman about a bill like what later

would become S.B. 14 – a bill with an even stricter photo id requirement than the Indiana law,

and with no outreach campaign to increase registration – lends strong support to the argument that

S.B. 14 was understood, even by Republican insiders, to suppress votes.


46.  Smith's willingness to include an appropriation to encourage voter registation and to delay

the law for four years, giving time for a public information campaign, may have tempted

Democrats,[65] but it outraged Rep. Betty Brown, already reported to be angry at being pushed aside

to make way for Smith as Elections Committee Chair.  She threatened to amend S.B. 362 (which

---

[63]See Jimmy Carter and James A. Baker III, op ed, *New York Times*, Sept. 23, 2005, included as Exhibit 11 in S Debate, March 10, 2009, at 135, favoring voter identification laws only if "states finally assume the responsibility to seek out citizens to both register voters and provide them with free ids that meet federal standards."

[64]Dave Montgomery, "Hot debate over voter ID hits Texas House this week," FWST, April 6, 2009, at B01.

[65]W. Gardner Selby, "Witnesses give varying views of voter ID bill," *AAS*, April 7, 2009.

Defendant's Exhibit #
548                              DE-005450

closely resembled her H.B. 218 from 2007) into an existing bill that provided ballots by e-mail to

people in the armed forces or living abroad, and she quickly obtained 55 House co-sponsors.  This

was enough to elicit a promise from Speaker Straus that the Elections Committee would give S.B.

362 a full hearing.  Smith's promise to draft a bill that "is not going to create a partisan advantage

for one party or the other" was put at risk.[66]

47.  Indeed, when after a two-day committee hearing, Smith unveiled an amended bill with a $7.5

million fund to promote voter registration, which would go into effect only in 2013, and which,

like S.B. 362, would allow registration with either a photo id or two other documents, he lost the

support of his party.   The Executive Director of the Republican Party of Texas, Eric Opiela,[67] got

---

[66]Jay Root, "Republican seeks delay on Texas voter ID plan," AP (no newspaper source),
Mar. 28, 2009; Editorial, "Looking for the middle ground," FWST, April 1, 2009, at A10 W;
Gardner Selby, "UDPATED: By a handshake, House sidesteps early floor fight on voter ID,"
AAS Blog, Mar. 30, 2009,
<http://www.statesman.com/blogs/content/shared-gen/blogs/austin/politics/entries/2009/03/30/by
_a_handshake_house_sidesteps.html>.

[67]Opiela, one of the chief line-drawers in the 2011 redistricting in Texas, became locally
famous during the *Texas v. United States* trial for an email he wrote about ways to increase the
nominal Latino percentage in congressional district 23, while at the same time making it safer for
the Republican candidate, "Quico" Canseco, who had not been the choice of the Latino
community in the district in 2010.   In a supplemental report in that case, I put the email in
context:

> One of the most interesting emails is from Eric Opiela to Gerardo Interiano on Nov. 17,
> 2010, six-and-a-half months before the congressional plan was made public, that detailed
> exactly how – and how early – the line-drawers planned to raise the ethnic threshold, but
> decrease the actual ability to elect a Latino candidate of choice in the crucial 23rd
> congressional district.

> . . . it would be really useful [Opiela remarked] for someone to go in and calculate
> a ratio for every census block in the state of CVAP/Total Population, a ratio of
> Hispanic CVAP/Total Hispanic Population, a ratio of Spanish Surname RV
> [registered voters]/Hispanic CVAP, and a ratio of Spanish Surname RV/Total

36

Defendant's Exhibit #
548                                          DE-005451

the signatures of 71 of the 76 House Republicans on a petition pledging not to vote for a bill

unless it took effect in 2010, allocated no money at all for voter registration, and required voters at

the polls to present a photo id, without alternatives – a much tougher stance than S.B. 362, but the

same as the next legislature's S.B. 14.[68]   The House then zig-zaged, Smith first offering a photo

id-only bill, Brown countering by retreating to S.B. 362, and the Election Committee reporting

S.B. 362 to the floor, but with both Democratic and Republican Committee members threatening

to amend the bill or send it back to the Committee.   Smith's attempt at compromise on "his

---

> Hispanic Population . . . . It also would be good to calculate a Spanish Surname
> Turnout/Total Turnout ratio for the 2006-2010 General Elections for all VTDs
> [voter tabulation districts].  (I already have the data for this for 2006-2008 in a
> spreadsheet, just need to gather it for every VTD for 2010.)  These metrics would
> be useful in identifying a "nudge factor" by which one can analyze which census
> blocks, when added to a particular district (especially 50+1 minority majority
> districts) help pull the district's Total Hispanic Pop[ulation] and Hispanic CVAPs
> up to majority status,but leave the Spanish Surname RV and TO [turnout] to the
> lowest.  This is especially valuable in shoring up Canseco and Farenthold.

After Interiano promised to help, Opiela replied that he should think of this as "OHRVS"
[:] Optimal Hispanic Republican Voting Strength . . .[his elision] a measure of how
Hispanic, and Republican at the same time we can make a particular census block."
(Citing Interiano deposition, Jan. 10, 2012, exhibit 8.  Bracketed information added for
clarity.  Interiano followed up Opiela's request with Clare Dyer, manager of the Mapping
and Redistricting Section, Research Division, TLC.  See Dyer to Interiano, Dec. 9, 2010,
at LP0000487 [Bates number for Legislative Privilege Documents].)
Opiela's partisanship and desire to disadvantage Latino voters to help Republicans in the
redistricting context sheds light on his motives in trying to insure an ultra-strict photo id
requirement in 2009.

[68]W. Gardner Selby, "Republican Blowup Over Voter Identification," *AAS* Blog, April
28, 2009,
<http://www.statesman.com/blogs/content/shared-gen/blogs/austin/politics/entries/2009/04/28/lo
oming_republican_blowup_over.html>; W. Gardner Selby, "Rep. Smith's voter ID revisions
surfacing Wednesday; he disputes any GOP blow-up," *AAS* Blog, April 28, 2009,
<http://www.statesman.com/blogs/content/shared-gen/blogs/austin/politics/entries/2009/04/28/re
p_smiths_voter_id_revisions.html#postcomment>; W. Gardner Selby, "Voter ID compromise
gets cool reception - Most House Republicans oppose delay in effective date," *AAS*, April 30,
2009.

**Defendant's Exhibit #**
**548**                                                    DE-005452

party's marquee issue" brought condemnation from the Chairwoman of his home county Republican Party, condemnation that would blossom in 2010 into primary opposition that attacked Smith for failing to pass a strong voter id bill.[69]  Democratic fears that even a relatively mild bill would disfranchise more and more of their supporters each year were fed by statements such as that by Skipper Wallace, the chairman of the state's Republican County Chairmen's Association, who temporarily supported S.B. 362 because "It gives me a starting point as far as the next legislative session."[70]  And Betty Brown vowed to introduce an amendment on the floor to pass a photo id-only law.[71]

48.  All this negotiating and internicine Republican warfare that delayed the bill until the last days of the regular legislative session may not have led to compromise, but it did give the Democrats leverage.  The first rumors were that House Democrats would leave the state, breaking the

_____

[69]W. Gardner Selby, "Compromise elusive on voter ID bill," *AAS*, May 11, 2009; Paul Burka, "McCraig defends Todd Smith on Voter ID issue," BurkaBlog (*Texas Monthly*), Jan. 28, 2010; Aman Batheja, "GOP race centers on voter ID bill, party leader's role," *FWST*, Feb. 10, 2010, at B08:  "The Republican primary race between state Rep. Todd Smith of Euless and former Bedford Councilman Jeff Cason has turned into a statewide argument over one issue: Smith's failed effort to pass a voter ID bill last year."

[70]CAPITOL DIGEST, "Proposal would require photo ID for most voters; Senate OKs children's insurance program expansion," *AAS* Blog, May 7, 2009, <http://www.statesman.com/news/content/region/legislature/stories/05/07/0507legebriefs.html>; W. Gardner Selby, "Chairman says committee-approved voter ID plan unlikely to pass full House," *AAS* Blog, May 11, 2009, <http://www.statesman.com/blogs/content/shared-gen/blogs/austin/politics/entries/2009/05/11/chairman_says_committeeapprove.html>

[71]Gary Scharrer, "Lull before 'Voter ID' storm," *SAEN*, May 23, 2009, at 1A.

38

Defendant's Exhibit #
548

DE-005453

quorum, as they had in 2003 in an attempt to block the DeLay redistricting plan.[72]  Perhaps

remembering the hardships of living apart from families and staff at the Holiday Inn in Ardmore,

Oklahoma, where they had decamped in 2003, Democrats began to "chub" non-controversial bills.

A unique Texas institution, the "chub" differed from a filibuster in the Senate because one senator

could hold the floor indefinitely; whereas, a member of the House was limited to speaking for a

maximum of ten minutes unless a majority of members extended the speaking time.[73]  Therefore,

a "chub" had to be exceptionally well organized.  This one was.  Democrats insisted on addressing

the House on every local and "consent" bill; Republicans insisted on keeping each day's session

going indefinitely, forcing Democrats to man the floor at all hours.  Every attempt to compromise

by shelving or amending S.B. 362 was rejected by the Republican leadership.[74]  To prevent the

House from taking up S.B. 362 or any form of a voter id bill, Democrats quizzed sponsors of bills

about, for example, the intricacies of a reform of Matagorda County Navigation District No. 1.[75]

Cherished priorities of legislators of both parties on air quality, insurance reform, transportation

funding, and a major expansion of children's health programs were sacrificed because no

compromise could be negotiated on voter id, and because Democrats were sure that any bill would

---

[72]W. Gardner Selby, "UPDATED: Close to 50 House Democrats oppose floor action on voter ID measure," *AAS* Blog, May 20, 2009, <http://www.statesman.com/blogs/content/shared-gen/blogs/austin/politics/entries/2009/05/20/close_to_50_close_to_50_house.html>.

[73]Andrew Weber, "Texplainer: What is Chubbing?" *Texas Tribune*, Feb. 2, 2011.

[74]Jason Embry, "Slowdown  plan took a  few turns," *AAS*, May 31, 2009 is the best treatment of the chub.

[75]Dave Montgomery, "Democrats in House talk to kill voter ID bill," *FWST*, May 23, 2009, at B01.

**Defendant's Exhibit #**
**548**

DE-005454

disfranchise its minority, student, and elderly supporters.[76]  The five-day chub killed more than

200 bills, because they were never taken up.[77]  As Speaker Straus remarked, the voter id issue

"just suck[ed] all the political oxygen out of the [legislative] session . . ."[78]


### 5: 2011: The Irony of Victory

49.  The 2010 elections breathed life back into the Texas legislature, or at least the Republican

part of it.  Democrats lost 23 seats in the House, 19 of them held by Anglos.  Outside of heavily

Latino South Texas, there was only one Democrat in the House from the rural areas of Texas.[79]

Five out of six Democrats in the 2011 House were Latinos or African-Americans, making it

clearer than ever that any measure with a disproportionate effect on Democrats would have to

have a disproportionate effect on members of minority groups.  The first measure that a post-

---

[76]Jason Embry and W. Gardner Selby, "As House delays, senators scramble to save their work," *AAS*, May 24, 2009; Corrie MacLaggan, "Delays by Democrats draw fire from Straus," *AAS*, May 26, 2009;  Jason Embry and Corrie MacLaggan, "Key bills left for dead amid House slowdown," *AAS*, May 27, 2009..

[77]James C. McKinley Jr, "Statehouse Journal:  The Talk, and the Talk, and the Talk, of Austin," *New York Times*, May 30, 2009; Mike Ward, "Outlook bad for 200 bills in stalemate," *AAS*, May 29, 2009.

[78]Gary Scharrer, "How Texas speaker handled voter ID issue," *SAEN*, June 7, 2009, at 17A. Conservative Rep. Leo Berman, running against Straus for Speaker in 2011, accused Straus of deliberately allowing the chub to kill S.B. 362 when the Speaker complied with legislative custom by allowing Democratic Speaker Pro Tem Craig Eiland to preside over the local and consent calendar, giving Eiland the power to recognize speakers.  It was yet another indication of how adamant the Republican core was on the voter id issue.  See Julian Aguilar, "Rep. Berman Explains Why He Wants to Oust Straus," *Texas Tribune*, June 22, 2010; Scott Stroud, "Immigration policy crucial to GOP," SAEN, Nov. 12, 2010, at 1B.

[79]R.G. Ratcliffe and Gary Scharrer, "Republican gains in Texas House may pose challenge to Straus," *HC*, Nov. 3, 2010.

40

Defendant's Exhibit #
548

DE-005455

election story in the capital city's newspaper mentioned as likely to pass because of the "50-year flood [that] hit Texas politics" the previous day was "a tougher voter identification requirement."[80]

50.  If one believed that a voter id measure was a response to election fraud, and if one thought, as Republicans certainly did, that such fraud would disproportionately help Democrats and that it would increase the number of recorded votes, it was extremely odd that such a bill would be pushed so hard after the 2010 election, a landslide for the Republicans and a low point in voter turnout even for notoriously low-turnout Texas.  As John Whitmire (D, Houston) remarked to Senate voter id sponsor Troy Fraser during that chamber's 2011 debate on the measure, "Are you suggesting there was significant fraud in that election?"[81]

51.  When the legislature met, "Rep. Debbie Riddle, R-Tomball, waited outside the clerk's office for two days to be first in line to file voter ID and anti-illegal-immigration bills . . ."[82]  Riddle's Arizona-style immigration bill made entering the State illegally a state crime, and the pairing of

---

[80]Jason Embry, "Republicans now firmly in control of Texas ... but which Republicans?" *AAS*, Nov. 3, 2010.  There were similar reports in other newspapers:  Robert T. Garrett and Terrence Stutz, "GOP legislators ready to resurrect divisive bills," *DMN*, Nov. 4, 2010, at A01; Dave Montgomery, "Hispanic Republicans celebrate midterm election victories," *FWST*, Nov. 7, 2010.

[81]R.G. Ratcliffe, in *HC* blogs, "The Lege, Voting," Jan. 26, 2011, <http://blogs.chron.com/texaspolitics/>.

[82] Erin Mulvaney and Christy Hoppe, "First bills reflect GOP's new clout," *DMN*, Nov. 9, 2010, at A01

41

Defendant's Exhibit #
548

DE-005456

this with a voter identification measure again ties voter id to ethnic antagonism.[83]  In the 2009

legislative session, a reporter noted,

> some Democrats worked on what they billed as a compromise voter ID bill. Instead of simply requiring more identification at the polls, it would have allowed voters to register at the polls during early voting and implemented the new ID requirements in four years.
>
> "I'm afraid there's going to be very little space for that kind of bipartisan problem-solving," Rep. Mike Villarreal , D-San Antonio , said. "Because the balance between Republicans and Democrats is so extreme, they'll be able to pass just about any bill they want without having to negotiate with the other party."[84]

52.  Hoping to return to the Election Committee chairmanship, Todd Smith introduced a much

tougher bill, H.B. 401, in December, 2010.  Smith told a reporter that "The feedback we got from

our local party representatives and from the grass roots is that their preference is for *a hard photo*

*ID*.  They were not comfortable with the concept of nonphoto alternatives unless it was necessary

as a political compromise."[85]  Democratic Sen. Rodney Ellis suggested a racial angle to the

Republican grass roots feeling, saying that Republican legislators were "getting a lot of pressure

from their base, in part because their base recognizes the changing demographics of Texas."[86]

That is, as of the 2010 census, non-Hispanic whites no longer comprised a majority of Texas's

population.  If the party that in 2010 represented the vast majority of whites was to retain power,

Ellis was implying, it would have to do something to discourage large numbers of non-whites

---

[83]Jason Embry, "15 bills focus on the border," *AAS*, Nov. 9, 2010.

[84]Jason Embry, "15 bills focus on the border," *AAS*, Nov. 9, 2010.

[85]Dave Montgomery,"Republicans confident of passing Texas voter ID bill," *FWST* Dec. 18, 2010.  Italics supplied.

[86]Gary Scharrer, "Senate is set to ponder voter Ids," SAEN, Jan. 21, 2011, at 1A.

42

from voting.

53.  Although Smith was ousted from the chairmanship in favor of a more dependable
conservative, Patricia Harless of Spring, a rapidly-growing, overwhelmingly white area on the
northern border of Harris County, and there were nine other voter id bills introduced, what
became the lead measure, S.B. 14, was also a "hard photo id" bill.  It was speeded to passage by
four maneuvers at the beginning of the legislative session: First, Gov. Rick Perry designated voter
id an "emergency" measure, allowing it to be debated and passed within the session's first sixty
days.[87]  Second, Lt. Gov. Dewhurst again successfully pressed the senate to exempt photo id
measures from its two-thirds rule for consideration of a bill, and in what a reporter depicted as
part of Dewhurst's "bid for the U.S. Senate in 2012," the Lt. Gov. pushed voter id to the front of
the queue, scheduling it first among the major issues the senate would consider.[88]  Third,
Republicans persuaded two legislators who had been elected as Democrats to switch parties.  This
meant that even if every Democrat left the state, Republicans would still be able to retain a
quorum of 100 members.  The two-thirds majority also meant that Republicans could suspend the
rules at any point, which would allow them to break any chub.[89]  Fourth, to prevent a chub from
even getting started, the House passed a rule saying that debate on the Local and Consent

[87]Jason Embry, "Senate taking up voter ID Monday," *AAS* blog, Jan 20, 2011,
<http://www.statesman.com/blogs/content/shared-gen/blogs/austin/politics/entries/2011/01/20/se
nate_taking_up_voter_id_mond.html>.

[88]Dave Montgomery, "Governor gives voter ID bill emergency status in legislative
session," *FWST*, Jan. 21, 2011.

[89]Peggy Fikac, "The power of the party switch," *HC* Politics Blog, Dec. 14, 2010; Jim
Vertuno, "The Senate could be Texas Democrats' 'Alamo'," *SAEN*, Dec. 19, 2010.

43

**Defendant's Exhibit #**
**548**                                              DE-005458

Calendar could not continue past midnight.[90]  This meant that bills on other calendars, including

voter id bills, would be taken up in their regular order, and that debate on local and consent bills

could not block their consideration.[91]


54.  Although Democrats recognized that their opposition to voter id in this legislative term was

futile, their protest was as vehement and fact-filled as the Republican side of the debate was

perfunctory and evasive, Troy Fraser's and Patricia Harless's favorite answer to questions

seeming to be "I am not advised."  In the Senate, Democrats filed 37 amendments to S.B. 14, only

6 of which passed, all minor.(See below, Section III.I.)  They detailed the burdens that obtaining a

"free" id from Department of Public Safety offices would pose on those who did not have drivers'

licenses or other acceptable forms of photo id, because 77 counties in Texas currently had no DPS

offices, others were rarely open, and offices in central metropolitan areas were inaccessible to

minority areas and had long lines, even without a torrent of people needing new photo ids to vote.

(See below, Section III. C.)  They complained that in the face of a massive budget deficit and huge

program cuts, Gov. Perry had declared bills providing for photo id, requiring sonograms before

abortions, and outlawing non-existent "sanctuary cities" for illegal immigrants as the only

"emergency" bills, thereby insuring that those controversial bills would be taken up before, for

example, schools, taxes, and health care.[92]  They pointed out that S.B. 14 was the most restrictive

---

[90]Andrew Weber, "Texplainer: What is Chubbing?" *Texas Tribune*, Feb. 2, 2011.

[91]Robert T. Garrett, "Republicans act to avert Dems' stalling," *DMN*, Jan. 25, 2011, at
A03.

[92]Nolan Hicks, in *HC* blogs, "The Lege, Voting," Jan. 26, 2011,
<http://blogs.chron.com/texaspolitics/>.

44

Defendant's Exhibit #
548                                    DE-005459

voter id bill in the country, having many fewer alternative documents authorized for identification

than the laws of Georgia or Indiana and much less money per voter allocated to retraining polling

place officials and alerting voters to the new prerequisites.[93]

55.  Most of all, Democrats denied that there was any problem of voter impersonation fraud to

correct and charged that S.B. 14 would have a disparate impact on seniors, the disabled, the poor,

and minorities.  Their spokespersons were chiefly minorities not because they were shoving a few

minority members to the front row, as the Republicans were, but because the vast majority of

Democrats in the legislature were Latinos and African-Americans.  Perhaps the most interesting

part of the debate took place between Rep. Rafael Anchia, the Democrats' expert on voter id, and

Patricia Harless, the sponsor of S.B. 14 in the House.  Seeking to demonstrate how unlikely voter

impersonation fraud was, Anchia first made clear to Harless that the penalties for voting fraud

under current law were substantial – up to 2 to 10 years in prison and a $10,000 fine.  Next, he

reminded her how powerful the polling place judges were.  According to the Election Code, as

Rep. Anchia quoted it,

> "The presiding judge at a at a polling location can prevent violations of the Election Code
> at the polling place. And in performing those duties, the presiding judge has the power of a
> state District Judge, including – including the power to issue an arrest warrant." Were you
> aware of that?
> REPRESENTATIVE HARLESS: No.[94]

Finally, Anchia asked "Do you have any cases of voter impersonation?"  Seemingly flustered,

---

[93]Mike Ward, "After initial OK, Senate set to finish on voter ID," *AAS*, Jan. 26, 2011.

[94]H Debate, March 21, 2011, at 15, Bates #TX_00210914.

45

**Defendant's Exhibit #**
548

DE-005460

Harless could only reply: "I'm sure you know more about that than I do."[95]

56.  Anchia ended the debate with a long narrative of the futile search for voter impersonation

fraud since 2004, which is worth quoting selectively, but at some length, as a summary of the

evidentiary part, rather than the strategic moves in the debate over the four sessions of the

legislature, ending where we began, with absentee ballots in 2003, and the surprising dissimilarity

of the 2003 and later experiences:

> The narrative started, I guess, a couple years ago with allegations of bus loads of
> 1undocumented immigrants coming and voting in our elections and stealing our elections.
> I mean, if that happens -- I mean, clearly they're all voting straight ticket Republican if -- if
> the results of the last election are to believe to be believed. . . .
>
> In 2005, Mary Denny filed our -- our first photo I.D. bill. She took testimony, and
> she couldn't find any cases of voter impersonation. In 2006, I sat on the Interim
> Committee, and we studied it again. And, again, no -- no documented cases of voter
> impersonation.
>
> In 2006, the A.G. said that voter fraud was epidemic, and he started a multi-year
> investigation that resulted in one case of voter impersonation. Again, ironically, that would
> not have been prevented by this current bill, because he used the -- the perpetrator used a
> photo I.D.  In 2007 we again heard testimony and again  found no evidence of voter
> impersonation.
>
> On the House floor in 2007, Representative Betty Brown, the author of the
> photo I.D. bill, held  up a stack of papers where she alleged that there was a great number
> of illegal immigrants that were voting in our elections. And when Representative Hochberg
> examined those papers, the allegations were proved to be false. At that point the
> Republican D.A. of San Antonio launched a county-wide initiative on voter and found no
> cases of voter impersonation.
>
> In the 2008 interim, the Elections Committee Chair wrote a letter ceasing [sic]
> upon the state audit of our statewide voter registration database, saying -- saying that
> 90,000 felons and illegal aliens had voted. That also  proved to be false, and he was forced
> to retract the statement to the press.
>
> In 2009, again we took testimony until the late hours; and, again, no documented
> cases of voter impersonation.  And we have recently conducted an election contest where,
> again, hundreds of votes were examined, and no cases of voter impersonation.
>
> So ladies and gentlemen, the goal post has now moved, because, as the author's

---

[95]H Debate, March 21, 2011, at 18, Bates # TX_00210917.

**Defendant's Exhibit #**
**548**

DE-005461

pointed out, this is no longer about voter impersonation. This is about the integrity of elections.

Really? Do we really believe that? Because if this was about the integrity of elections -- of elections then we would clearly be focused on the place where 90 percent -- or 70 percent of all the Attorney General's investigations have been -- excuse me, investigations and prosecutions have been, which is in mail-in ballots. . . .

And my fear is, Members, that the way this bill is crafted, it's going to have a disproportionate impact on the poor. It's going to have -- not indigent, as the bill says, but the poor, on African Americans and Hispanics. And I hope that this is not what it's about, because we know it's not about voter -- voter impersonation. We still don't have one case here on the House floor. And we know about -- it's not about the integrity of elections, because if it was about the integrity of elections it would be about mail-in ballots. So we know it's not about those things. And I fear, Members, that it's about something else, and it's about fewer people voting.[96]

# III. Motives

## A. Was S.B. 14 Aimed at Real Fraud?

### 1. Undocumented Fraud

57.  The central public claim of proponents of voter identification laws across the country has been that the laws are aimed at preventing actual fraudulent voting.  If the claim were credible or well supported by evidence, it would go far towards justifying the laws, and unless charges of fraud nearly all concerned alleged illegal voting by Latinos and African-Americans, it would cast doubt upon an argument that a particular law was adopted with a racially discriminatory purpose. But in the Texas portion of the national debate, at least, the most energetic and extensive efforts to find proven instances of voter impersonation fraud turned up few or possibly no examples among tens of millions of votes cast, and the undertone of debate, both by proponents on the floor of the

---

[96]H Debates, March 21, 2011, at 39-42, 46-47, Bates # TX_00210938-41, 00210946047.

47

**Defendant's Exhibit #**
548                                    DE-005462

legislature, and even more stridently, in less carefully censored arenas, was distinctly racial.  As

the longest-serving current Texas state senator, referred to by members of both parties as the

chamber's "dean," John Whitmire, noted during the 2011 debate, "I think it's largely being done

so some communities can think they're getting after undocumented citizens. It's not mentioned in

many of the debate conversations, but I  listen to talk shows, I read comments, I get my share of

letters. There's a misconception that's being encouraged by this legislation that undocumented

citizens are voting. It does not occur. You can't find the instance. Those folks don't want nothing

to do about the ballot box, but this is largely driving it."[97]  The former state political director of

the Texas Republican Party, Royal Masset, said of proponents of voter id that

> "They're just basically using sheer racism to pump their own political points. They're
> trying to exploit the public fear of illegal aliens."
> Masset said voter ID bills are an "extremely popular vote on the grassroots level." But
> the idea that illegal immigrants vote "is one of those urban myths that just has caught on
> and everyone assumes is true."[98]

## 2. Empty Words

58.  Most of the mentions of voter fraud by proponents of the various voter id bills from 2005

---

[97]S Deb, 2nd Reading 2011, at 47 Bates # TX_0076050.  Good examples of what
Whitmire referred to were in a column in the San Antonio Express-News by former Bexar
County Republican state representative Ken Mercer: "Many believe the coyote network in Texas
has evolved into voter fraud brokering -- the sophisticated buying and selling of illegal votes."
Mercer, "Voter ID bill puts fraud in cross hairs," *SAEN*, May 12, 2005.

[98]Juan Castillo, "ID plan puts spotlight on voter fraud," *AAS*, May 23, 2007. Speaking
about a border security bill being considered in the 2007 House, leading conservative Republican
Rep. Leo Berman of Tyler, Texas, demonstrated the candor for which he was known: "Everyone
on this floor needs a vote on illegal aliens to take home and say we did a little something about
it."

Defendant's Exhibit #
548                                     DE-005463

through 2011 in the Texas legislature were vague and general.[99]  When Elections Committee

Chair Mary Denny introduced HB 1706 in her committee in 2005, for instance, she merely

announced that

> to vote a regular ballot, voters are only required to present their voter registration
> certificate to a poll worker.
>      While this practice attempts to ensure that only registered voters receive a regular
> ballot on election day, it leaves a potential loophole for fraud individuals that are not
> required to show identification to register to vote.
>      Because of this, it is possible for an unscrupulous individual to submit several false
> filed voter registration applications and to receive the voter registration certificates for the
> fake individuals.[100]

59.  When Denny presented the bill on the House floor, she declared that

> "We have had stories and documentation of people showing up multiple times with
> voter registration cards and voting in multiple precincts," Denny said.
>      Rep. Rafael Anchia, -Dallas, a committee member, said there was no testimony of
> voter fraud, just anecdotal stories.
>      "We did not hear one shred of evidence that there is voter fraud in this state," Anchia
>
> said. "If this was a court of law, this case would be thrown out for lack of evidence."[101]

---

[99]Thus, former state representative Ken Mercer, "Voter ID bill puts fraud in cross hairs," *SAEN*, May 12, 2005, referred to "stacks of returned or falsified voter registration cards [that] are political gold to voter fraud brokers," and he asserted that "There are those who purposely request multiple cards using variations of their name." He provided no examples of such a scheme.

[100]H Comm 2005, at 53-54, Bates # TX 0021207-08.

[101]R.G. Ratcliffe, "Multiple ID voting bill wins preliminary OK - House foes say additional proofs meant to keep some groups away from ballots," HC, May 3, 2005.  Another reporter summarized and quoted Denny as declaring  "Texas elections usually conjure up reports of votes emanating from graveyards, and if voters have to present identification, 'the dead person won't be voting any longer.'" Guillermo X. Garcia, "Voter ID measure gets House nod," *SAEN*, May 3, 2005, p. 11A.

49

**Defendant's Exhibit #**
**548**                                        DE-005464

60.  Even the two most prominent national campaigners for voter identification laws, both of

whom testified in front of committees of the Texas legislature on the issue, did not claim that

fraud, especially by voters impersonating other voters, was widespread, and they cited no

evidence from Texas in their remarks.  Hans von Spakovsky, who had animated discussion of

the issue since the 1990s, conceded that "I do not claim that there is massive voter fraud in TX

or anywhere else.  In fact, as a former election official, I think we do a good job overall in

administering our elections.  But the potential for abuse exists, and there are many close

elections that could turn on a very small number of votes."[102]  John Fund, whose book and *Wall*

*St. Journal* articles had keep up a constant drum roll on the issue, said of voter impersonation

fraud: "Is it common?  Probably not.  Does it happen?  You betcha." Under questioning by Rep.

Rafael Anchia, Fund admitted that he did not know of any documented cases of voter

impersonation fraud in TX.[103]  When during the 2011 House debate on S.B. 14, Rep. Anchia

asked the bill's chief sponsor, Rep. Patricia Harless, how often voter impersonation happened in

Texas, she replied in the formulaic evasion that became a joke during the 2011 session: "I'm not

advised."[104]


61.  Yet repeated refutations of claims of fraud never seemed to bother proponents of these

---

[102]Exhibit 14 to S Debate, 3/10/2009, Testimony of Hans A. von Spakovsky, at 143.

[103]H Comm, April 6, 2009, at 128, 142-43.

[104]H Debate, March 21, 2011, at 7, Bates # TX_00210906.

50

**Defendant's Exhibit #**
548

DE-005465

laws.  For instance, the chief senate sponsor of both S.B. 362 in 2009 and S.B. 14 in 2011, Troy

Fraser ( R, Horseshoe Bend) declared during the second reading debate in 2009 that "To assume

there is not voting fraud in Texas is really almost laughable."[105]  Indeed, according to Fraser and

other proponents, the very lack of evidence of voter impersonation fraud itself constituted an

argument for adopting voter id laws, for "The problem in Texas is, we don't have the ability to

identify when somebody is doing this."[106]

62.  But the most perfect example of this tendency of the proponents came during the testimony

of David Carter before the House Committee, March 1, 2011.  Carter, who had served as an

election judge in Temple, Texas, told the Committee that

> The danger of voter fraud is the illegals that come into this country, fraudulently commit
> perjury, commit -- say they're citizens, and they get automatically on the voter list. That's
> a problem. And the photo ID kills that problem. It solves it with no changes to
> registration or anything else. Voter ID lS the only thing that can fix the problem.[107]

63.  Asked by Committee Vice-Chairman Marc Veasey, an African-American Democrat from

Fort Worth, "Why would people that are in the shadows, why would they want to risk a jail

sentence by casting a vote as an illegal alien?" Carter began to backtrack, saying that no one

currently had the resources to investigate the subject.  Still, he held to his belief, affirming it

when Committee member Roland Gutierrez asked him

---

[105]S Debate, 2nd Reading, 2009, at 56, Bates # TX_00076059.

[106]W. Gardner Selby, "Voter ID back in spotlight," *AAS*, Mar. 9, 2009.

[107]H Comm, March 1, 2011, at 44, Bates # TX 00028151.

51

**Defendant's Exhibit #**
548                                                        DE-005466

So it's your contention that there's hoards of illegal immigrants coming to vote in Texas? MR. CARTER: Yes. . . . I think the problem of voter impersonation is a minuscule problem, and it's very hard to do, and I think that having -- getting three fake IDs would be a real problem. I don't worry about that. I worry about a 20 percent increase in the state population of illegal aliens coming across in McAllen and Mission and points further west, Laredo, and not being caught by Border Patrol and not being detected in the interior – and they're registering to vote. They are being registered.[108]

64.  Finally, confronted by Committee member Aaron Pena, the former Democrat who turned Republican after his 2010 election, but who still denied that there were "large numbers of illegal immigrants voting," Mr. Carter made the perfect retreat: "Well, I support the bill because it would fix the problem whether it exists or not."[109]

### 3. Greg Abbott's "Epidemic"

65.  After the failure of H.B. 1706 in 2005, Attorney General Greg Abbott launched a very public investigation, using $700,000 in funds from the federal Help America Vote Act, into what his office's press release insisted was an "epidemic of voter fraud" in Texas.  His "Special Investigations Unit," the Attorney General promised, would "work with police departments, sheriff's [sic] offices, and district and county attorneys to successfully identify, investigate and prosecute various types of voter fraud offenses."[110]  The result, the Attorney General trumpeted, would be "a dramatic increase in indictments for voter fraud."[111]  Interestingly, every example of

---

[108]H Comm, March 1, 2011, at 50-53, Bates # TX 00028157-60.

[109]H Comm, March 1, 2011, at 55, Bates # TX 00028162.

[110]S Debate, 3/10/2009, Exhibit 2.

[111]Editorial, *AAS*, "Texas AG's  wild goose chase", May 23, 2008.

52

Defendant's Exhibit #
548                                    DE-005467

alleged fraud that the Attorney General posted on his website newsletter the week that he

launched his crusade involved mail-in ballots, which would not have been touched by any of the

voter id bills that Texas considered.[112]


66.  The results of the Attorney General's efforts must have been disappointing. In January,

2008, representatives of the Attorney General's office admitted to the legislature, as a report in

the *Dallas Morning News* put it, that it

> has prosecuted 22 cases of voting or other election fraud in nearly six years, and none
> would have been prevented with a law requiring photo IDs at polling stations, officials
> from his office told state lawmakers on Friday.
>
> Most involved mailed ballots, which were exempt from proposed photo ID bills that
> Republican lawmakers twice tried unsuccessfully to pass in Texas, and only one actually
> happened at the polls, said Eric Nichols, the state's deputy attorney general for criminal
> justice.[113]

County elections officials from Bexar (San Antonio), Tarrant (Ft. Worth), Travis (Austin),

Comal (New Braunfels), and Starr (Rio Grande City) counties who testified at the same hearing

said that they knew of few or no cases of voter impersonation in their counties that would have

---

[112]S Debate, 3/10/2009, Exhibit 30, at 407-08.

[113]Karen Brooks, "ID views heat up voter fraud hearing - Backers pressed on whether
requiring proof at polls deters violators,"*DMN*, Jan 26, 2008.  An investigation into political
activists who allegedly helped older voters cast their ballots in McAllen, which Abbott touted as
an example of a successful prosecution as a result of his efforts, largely collapsed for failure to
produce evidence that local prosecutors judged would stand up in court.  See Jeremy Roebuck,
"Two more fraud cases dismissed," *The Monitor* (McAllen, Texas), March 11, 2008.

**Defendant's Exhibit #**
**548**                                           DE-005468

been prevented by a voter identification law.[114]

67.  In 2008, there were 13.6 million Texans registered to vote, and over 8 million votes were cast. As Prof. Chandler Davidson noted in testimony before the Texas Senate in 2009,

> In the four years between Jan. 25, 2006, the day the initiative was announced, and March 6, 2009, 26 people have been *indicted* for vote fraud. A mere 5 persons in this same period had been *convicted* of one or more counts of vote fraud, and 2 of those 5 convictions were of people who had committed the fraud before January 2006.  In short, of the 26 people indicted over the three-year period since Gen. Abbott's initiative was announced, only 3 have so far been convicted.  Most of the indictments concern older women who handled write-in ballots for elderly or disabled friends, some apparently unaware of a law passed in 2003 requiring those rendering such aid to sign the envelope containing the friend's ballot before mailing it.[115]

68.  None of the cases that Abbott uncovered or prosecuted involved voter impersonation fraud, and all of the people his office prosecuted, according to the *Dallas Morning News*, were Democrats, most of them Latinos or African-Americans.[116]  The Attorney General's office refused to release documents sought by the *News* under the state's public records act that would have allowed the newspaper to determine how many complaints of voter fraud had been received and how many investigations had been initiated.[117]

---

[114]Karen Brooks, "ID views heat up voter fraud hearing - Backers pressed on whether requiring proof at polls deters violators,"*DMN*, Jan 26, 2008.

[115]S Debate, 3/10/2009, Exhibit 30, at 402.  The indictments were under the Wollens law described above.

[116]Wayne Slater, "Democrats use voter fraud allegations as rallying point," *DMN*, June 8, 2008, p. 13A.

[117]Wayne Slater, "Texas AG fails to unravel large-scale voter-fraud schemes in his two-year campaign," *DMN*, May 18, 2008.

**Defendant's Exhibit #**
**548**

DE-005469

69.  As a 2006 federal lawsuit that accused the Attorney General of using his vote fraud

investigations to intimidate minority voters documented, PowerPoint slides used by the Attorney

General's office to train officials in voter fraud cases included, according to the *Dallas Morning

News*, "a photograph of African-American voters standing in line to vote. Another shows a

sickle-cell anemia postage stamp that depicts a black woman holding an infant."[118]


70.  Reflecting the popular debate that was often cleansed from the legislative halls, the *News*

editorialized that

> self-styled voting reformers have focused on other kinds of perceived threats to clean
> elections – patterns of voter impersonation at the polls and massive fraud using illegal
> immigrants.
>
> Were those threats real, Mr. Abbott most certainly would have provided proof, helping
> Republican state lawmakers make their case for new laws requiring a photo ID at the
> polls to go along with the traditional Texas voter registration card.[119]


### 4. Dead Men Voting

71.  One of the most often-repeated charges about voter fraud was that voting registrars failed to

purge deceased voters from the rolls quickly, making it possible for others to cast ballots in their

names.  Photo id was needed, the argument went, to prevent ward heelers from harvesting dead

---

[118]Wayne Slater, "Texas AG fails to unravel large-scale voter-fraud schemes in his
two-year campaign," *DMN*, May 18, 2008.  The lawsuit was settled in May, 2008, with an
agreement of the Attorney General to prosecute only cases of actual fraud.  Wayne Slater,
"Democrats use voter fraud allegations as rallying point," *DMN*, June 8, 2008, p. 13A.

[119]Editorial, "Still looking for massive vote fraud," *DMN*, May 23, 2008.

Defendant's Exhibit #
548

DE-005470

people's voter registration cards to be used as identification, passing them out to confederates, and having them impersonate the deceased at the polls.  It would be more difficult for them to carry out these schemes if they had to obtain fake picture id's containing the deceased's name and the live impersonator's visage.

72.  In the most sensational charge, on Oct. 30, 2008 general election, the "Texas Watchdog" website, under the sensational headline "Dead Voters Cast Ballots in Dallas County,"reported that [120] 6000 people in Dallas County whom it claimed were still on the voter rolls, though they were, in fact, dead.  News media repeated the story immediately, and before anyone could check or explain the shocking news, it became urban myth.  It took the *Dallas Morning News* six weeks to follow up each "dead" voter meticulously and to explain the bureaucratic procedures that led to clerical errors – an insignificant number, given that there were 1.2 million voters in Dallas County – which produced the Watchdog's irresponsible story.  The unraveling was devastatingly summarized by the newspaper:

> 6,000 – In a report filed just before Election Day, the number of deceased persons the online journalism group Texas Watchdog concluded might be registered to vote in Dallas County.
>
> 3,000 – Roughly the number of dead voters county officials concluded were already "in suspense" on Election Day, meaning ballots could not be cast in their names without additional paperwork.
>
> 48 – The number of voters Texas Watchdog concluded might have been dead when votes were cast in their names. A review by The Dallas Morning News indicated a series of clerical errors appears to explain why those people were listed as having voted.

---

[120]The story is still available, rather more carefully qualified, on the organization's website at <http://www.texaswatchdog.org/2008/10/dead-voters-cast-ballots-in-dallas-county/>.

**Defendant's Exhibit #**
**548**                                          DE-005471

23 – Number of people who appear to have been improperly stamped in precinct poll books as having voted. Frequently, the voter never signed an accompanying signature roster required to receive a ballot.

12 – Number of living registered voters whose names and birthdays match those of dead voters.

7 – Number of people listed as having voted by county employees who incorrectly scanned bar codes listed next to the names in the precinct poll books.

3 – Number of the 48 who cast votes, and whose signatures in the poll books match the signatures on their voter registration cards, suggesting they were alive and properly registered during the elections in question.

2 – Number of people for whom poll books were not available for review. But the accompanying signature roster was not signed, suggesting the voters never received ballots to vote.

1 – The person for whom no information was available for review because the election took place in 2004. The county purges poll books and signature rosters 22 months after an undisputed election.[121]

73.  In other words, long after the story, sprung on the public at the height of political consciousness, had entered viral fame, it was debunked by responsible reporting by the "old media."  Six thousand dead voters became, at most, one, and probably zero, and even if that one ballot had somehow been cast, there was no evidence that it was cast at the polls or that it would have been inhibited by a voter id requirement.

74.  Earlier in October, 2008, Texas Watchdog presented a similar expose of "dead people"

---

[121]Randolph Bush, "Review finds no vote fraud in Dallas County," *DMN*, Dec. 13, 2008.

**Defendant's Exhibit #**
**548**                                                   DE-005472

voting in Harris County.[122]  As in Dallas County, the Watchdog compared federal death records

with county voting rolls, finding in this instance 4000 dead voters still on the rolls.  A report by a

Houston television station reduced the number of people listed as dead who may actually have

voted from 4000 to 2 (not two thousand).  In a House Elections Committee hearing on S.B. 362

in 2009, Rep. Rafael Anchia questioned George Hammerlein, the Director of Voter Registration

for the Harris County Tax Collector's Office, about the Watchdog's and other claims.  In a model

cross examination over fifteen pages of the hearing record, Anchia got Hammerlein to admit that

one of the two remaining from the Texas Watchdog's two lists, a person with the common

surname of "Hill," might well have represented a clerical error, and that other specific allegations

of fraud from other sources were either explained by more careful checking or, in any event,

would not have been discovered through a photo id requirement.[123]


75.  The examples from Dallas and Harris Counties[124] show how irresponsible headlines

_____

[122]See
<http://www.texaswatchdog.org/2008/10/dead-voters-still-registered-in-harris-county/>.

[123]H Comm, April 6, 2009, at 527-42, Bates # TX_00031557-72.

[124]Next to Attorney General Abbott and Lt. Gov. Dewhurst, the elected official most prone to make inflated claims about voter fraud was Harris County Assessor-Tax Collector Paul Bettencourt, a Republican activist whose office ran voter registration in the state's largest county. According to the *Houston Chronicle*, Bettencourt made "frequent appearances on highly partisan radio talk shows" and had been condemned for "hassling of minority citizens seeking to register and/or vote . . ."  Editorial, "Tax assessor - collector - No more mixing of politics with vitl services - we recommend a vote for Diane Trautman," *HC*, Oct. 26, 2008.  At a January, 2008 hearing in the interim between the 2007 and 2009 legislatures Bettencourt ". . . brought in boxes of what he said was documentation of voter fraud but acknowledged under questioning from Mr. [Rafael] Anchia that most of it didn't occur at the polls."  Karen Brooks, "ID views heat up voter fraud hearing - Backers pressed on whether requiring proof at polls deters violators," *DMN*, Jan. 26, 2008.

Defendant's Exhibit #
548

DE-005473

apparently designed to inflame credulous members of the public may create an impression of widespread fraud and a consequent demand for legislation – the Watchdog was a fervid proponent of photo id laws – while more careful investigations completely dispel the initial impression.  The undermining of the two stories by careful organs of the responsible media should have convinced legislators considering whether there was enough evidence of fraud to justify passing voter id legislation to approach such stories with great skepticism.  That is, every careful legislator should have had the same response as Rep. Anchia, who said of the proprietor of the Texas Watchdog website  "I think he's not credible because he alleged 4,000 and then ultimately there were 2, right?  And in Dallas County, by the way, they alleged 6,000 and found none."[125] That Republican legislators voted unanimously in favor of S.B. 14 in spite of devastating refutations of high-profile allegations further undermines any contention that their votes were motivated by a desire to combat real fraud.

### 5.  Dogs That Did Not Bark

76.  Had voter impersonation fraud been widespread, one would have expected it to be turned up in the frequent election contests in a huge state with a very large number of elected officials, for partisans of one candidate or another would have every incentive to ferret it out.  But according to Steve Bickerstaff, an election law attorney in Texas for three decades and an Adjunct Professor of Law at the University of Texas, Austin, voter impersonation charges had never been made during election contests.[126]  His view was seconded by elections attorney and former

---

[125]H Comm, April 6, 2009, at 527-42, Bates # TX_00031566.

[126]Editorial, "Attacking Texas' identity crisis," *AAS*, Mar. 9, 2009, at A10.

59

DE-005474

official in the Texas Secretary of State's office, Randall Buck Wood, during a 2009 hearing in the House.[127]   In the most high-profile election contest for the state legislature in recent years, that involving 11-term Republican Talmadge Heflin and Democrat Hubert Vo in House district 149 in the 2004 election, the Republican House member who led the investigation for a Republican-majority House committee, Will Hartnett, found that Heflin produced "'no evidence of any intentional voter fraud which affected the final vote tally to his detriment.  Contestant's challenge to the vast bulk of the votes in question is based on technical, and apparently unintentional, violations of election law.'"[128]

77.  Another source of confirmation of the existence or strong suspicion of voter impersonation fraud would have been local district attorneys.  Politicians and political operatives, who would have to organize campaigns of voter impersonation for it to have any real effect on elections, would make juicy and easy targets for prosecutors, especially if they were members of opposing political parties.  Indeed, it is difficult to conceive of a more enticing or rapid way for a district

---

[127]Dave Montgomery, "Hearing on voter ID draws crowd to Austin," *FWST*, April 8, 2009, at B03.

[128]S Debate, March 10, 2009, Exhibit 12, at 137.  See also No byline, "The poorest loser - His vote fraud claims have evaporated, but Heflin continues to fight the bad fight to overturn his electoral defeat," *HC*, Jan. 31, 2005, which notes that "Last Tuesday, Andy Taylor, the attorney representing State Rep. Talmadge Heflin in his election challenge, told reporters his team had discovered deeply disturbing evidence of voter fraud in Democrat Hubert Vo's 33-vote victory in last November's District 149 contest. By Thursday, the word 'fraud' had vanished from Taylor's vocabulary when he addressed a hearing chaired by Rep. Will Hartnett, R-Dallas, the special master appointed by House Speaker Tom Craddick to hear Heflin's challenge in Austin.
    "As the participants commenced sorting through disputed votes, it soon became clear that rather than some grand conspiracy, irregularities documented were of an accidental nature and not orchestrated by either candidate."

Defendant's Exhibit #
548                                          DE-005475

attorney to gain a reputation as a crusader against corrupt interests than to prosecute voting fraud. Any Republican district attorney who uncovered and successfully prosecuted the "hordes of illegal aliens" rumored to have voted would be an instant and very public hero to his fellow partisans, his road to reelection or higher office assured.  And unlike prosecutions of corrupt business owners or bankers or high-level politicians, the poor and/or undocumented illicit in-person voters would have few resources with which to fight back.  If it was only the lack of means of discovering such fraud that prevented prosecution, and if a voter id law would provide that means, as proponents often contended, then one would have expected local district attorneys to be lining up to testify in favor of such a law and to provide whatever evidence they could of the existence of such fraud.  But as the astute, long-time Capitol Hill reporter W. Gardner Selby noted, "Curiously, local prosecutors never have joined the simmering debate over whether voters should better prove their identities. . . . Prosecutors in several counties reported few voting fraud charges."[129]

78.  That neither of these obvious sources of evidence of actual fraud at the polls was brought forward during the several years of debate on voter id bills in Texas argues further for the non-existence of the problem and against considering a desire to suppress fraud as a motive for passing S.B. 14.

---

[129]W. Gardner Selby, "House takes on voter ID bill," *AAS*, April 6, 2009, at B01.

**Defendant's Exhibit #**
**548**

DE-005476

## B. Confidence-Building

79.  As the evidence of significant numbers of occurrences of actual voter impersonation fraud

proved impossible to find, proponents of voter id repeatedly fell back on a line of argument that

did not need any connection with real events at all: that enough people believed that voter fraud

took place that voter id was needed to "instill . . . voter confidence in elections."[130]  For instance,

Republican Senators Huffman and Fraser engaged in a patterned colloquy during the 2011

debates on S.B. 14:

> SEN HUFFMAN And do you believe that once we have established these safeguards that
> the voters will feel more confident about their vote being counted and only the votes of
> registered Texans who can vote to be counted[.]
> SEN FRASER Yes that is our belief[.]
> SEN HUFFMAN Do you think that once that's established that it will actually encourage
> the democratic process and that it will encourage more voters to go to the polls[.]
> SEN FRASER The thing we've seen in other states that have implemented photo ID the
> voter turnout actually increased[.]And so yes we believe the confidence in the voters will
> increase and we believe it will actually increase the voting percentages.[131]

80.  What Fraser was referring to was increases in turnout in Indiana in 2006 and 2008, when that

state became for the first time in a generation a focus of the presidential election, and Georgia in

2008, which was a hotly contested battleground at least during the early part of the 2008

presidential general election campaign.  Increases in turnout in those states, as was pointed out

repeatedly during the debates, had more to do with the degree of political contestation than with

any alleged increase in confidence because of voter id laws.[132]  For example, during the 2009

---

[130]H Comm, March 1, 2011, at 156, Bates # TX 00028263.

[131]S Debate, Jan. 25, 2011, at 262.

[132]S Debate, March 10, 2009, at 104, comments of Sen. Zaffarini.

62

**Defendant's Exhibit #**
548                                                    DE-005477

Hearing of the Committee of the Whole Senate, Brennan Center lawyer Adam Skaggs,

commenting on studies of turnout changes in Georgia and Indiana, commented that

> "What these studies didn't take account of at all is the status of these states, the swing states, the status of these as hotly contested elections.  There was no controlling for the amount of advertising that was run in Indiana vss Illinois.  There was no taking account for the number of candidate appearances in Indiana versus Illinois or Georgia vs Mississippi, the number of ads run by the campaigns that are ads run by other interested groups."[133]

81.  Three facts make clear how empty the "restoring confidence" argument was.  First was the

striking fact that proponents of voter id laws in Texas never produced a single witness who said

that they had become so skeptical of the validity of election returns in the state that they had

stopped voting or that they felt disfranchised.  Second was the fact that the political party that

was overwhelmingly dominant – was winning every statewide election and, since the DeLay-

fostered victories in the 2002 legislative elections and his subsequent mid-term redistricting, a

majority of legislative and congressional seats, as well – was the one that was complaining about

fraud in elections.  Few American political parties have ever had more reasons to be content with

the outcomes of elections than Texas Republicans since 2000, and their success and confidence

was at its height after 2010.  Third was the exaggerated nature of the claims for the benefits of

voter id – not only that it would lead to increased turnout, but actually that it would lead to

increased turnout among minorities, whose voting participation, proponents of voter id

contended, was currently depressed because of rumors of fraud.  Thus, in a colloquy with

African-American Sen. Royce West, Sen. Troy Fraser averred that

---

[133]S Debate, March 10, 2009, at 428.

**Defendant's Exhibit #**
548                    DE-005478

> I think my bill is going to increase African-American and Hispanic turnout in Texas.  I think those people today feel disenfranchised because they feel like there is fraud going on in votes today –
> Sen. West: Well, have you talked to any – . . . My question is, who have you spoken to, to come to that assertion that those people feel as though that there's fraud and all that stuff?"[134]

Fraser had not talked to such people, and he did not directly answer the question of Sen. West, who represented just such voters.

82.  There was no more evidence of a loss of confidence in the validity of election returns in Texas than there was of in-person voting fraud, and any contention that this is what motivated the passage of S.B. 14 must be treated with extreme skepticism.

## C.  Burdens

### 1. Numbers

83.  If members of the legislature really believed, as they repeatedly said, that every voter already had a photo id or could easily obtain one, then any contention that S.B. 14 was adopted with a racially discriminatory purpose would be more difficult to support.  Yet even though Republicans repeatedly brushed aside Democratic requests for information on the possible differential racial effects of the various voter id bills, legislators were fully aware of the burdens that obtaining photo ids would place on Texans.  For instance, presenting S.B. 362 on the Senate floor in 2009, Elections Committee Chair Troy Fraser ( R, Horseshoe Bay) cited statistics from the Secretary of

---

[134]S Debate, March 10, 2009, at 170.

64

Defendant's Exhibit #
548

State's office.  In a colloquy with Sen. Kirk Watson (D, Austin), Fraser announced that of recently-registered voters, there were 5,601,000 who had registered using a driver's license as identification, and 809,000 (12%) who had not.  Some of the 12%, Fraser suggested, might have another kind of photo id.  Watson asked what the racial breakdown of the 12% was.  Fraser didn't know.  Watson asked whether there had been any statistical analysis of potential effects of S.B.362 on African-Americans, Latinos, or poor people?  None in Texas, Fraser replied.[135] During the same debate, Democratic Caucus Chairwoman Leticia Van de Putte, citing studies that estimated that 8% or more adults nationally did not possess photo ids, applied that percentage to Texas's roughly 13.5 million voters and concluded that "that would be a million Texans who are currently registered to vote who don't have a photo id."[136]  The legislature must be taken to have been aware, then, that up to 800,000 - 1 million people might have to obtain photo ids if S.B. 14 were passed – rather a large sum to weigh against perhaps one case of voter impersonation fraud during recent times.

84.  These estimates, it turns out, comparing them to Prof. Ansolobehere's estimates of about 1.5 million Texans without photo ids acceptable under S.B. 14, were quite low.[137] But even if the legislature had mistakenly believed them, they posed a very dramatic burden, quite analogous to

---

[135]S Debate, March 10, 2009, at 71-74.

[136]S Debate, March 10, 2009, at 355.  The spectacular figure received the publicity at which it was no doubt aimed.  See Terrence Stutz, "Voter ID bill hotly debated - GOP fears fraud; Democrats say rule will keep some from polls," *DMN*, Mar. 11, 2009, p. 1A.

[137]I was provided with a copy of tables from the report of Prof. Ansolobehere, but I have not, at this writing, seen a copy of his whole report.

65

**Defendant's Exhibit #**
548                                                    DE-005480

a wholesale re-registration of voters, which has been properly taken by the Justice Department in the past as having such a marked racially discriminatory effect as to necessitate the denial of preclearance.[138]

## 2. Distances

85.  During the 2009 and 2011 debates, there was extensive discussion in the Senate about the burden that would be placed on voters, especially poor and minority voters, who would have to go to Department of Public Safety offices and apply for photo id cards in order to be able to vote. In a colloquy with Sen. Fraser, Sen. Uresti detailed the distances that people in his Senate district, which stretched from San Antonio to El Paso, would have to travel to get to a DPS office:

> For example my constituents in Crockett County Ozona will  have to travel 163 miles round trip to San Angelo to get to the nearest DPS office[.] And if you live in Sanderson[,] in Terrell County you will have to travel 170 miles  round trip to get to Fort Stockton[.] If you live in  Sierra Blanca in Hudspeth County[,] you have to travel 176 miles to get to El Paso in order to get to the DPS office. . . .
> If you live in Van Horn in Culberson County[,] you have to travel 200 miles round trip to Marfa[,] which is the nearest DPS office[.] If you live in Pecos[,] which is in Reeves County[,] you have to travel 143 miles to Fort Stockton[.] If you live in Rocksprings in Edwards County[,] it's 152 miles round trip to Del Rio[,] Sen Fraser[.] And finally[,] if you live in . . Hondo[,] which is in Medina County[,] you have to travel 84 miles[.][139]

---

[138]See, e.g., Section 5 objection letters to re-registration statutes in Mississippi and Alabama, in the files of the Department of Justice:  David L. Norman to Marvin Gates, June 8, 1971 (Jasper County, MS); William Bradford Reynolds to Floyd R. Cook, Sept. 25, 1981 (Perry County, Alabama); Reynolds to F.R. Albritton, Jr., Oct 26, 1981(Wilcox County, Alabama); Reynolds to I. Drayton Pruitt, Jr., Oct. 2, 1981 (Sumter County, Alabama).

[139]S Debate, Jan. 25, 2011, at 71-73.

Defendant's Exhibit #
548                                    DE-005481

Eight of 23 counties, containing 47,000 people, in his heavily Latino district, had no DPS office, Uresti continued, and other counties in his district had DPS offices that were open only one day a month.[140]

86.  The distances between minority population concentrations and DPS offices in central cities were also spotlighted.  In 2009, Sen. Mario Gallegos introduced maps of Houston and Ft. Worth that showed no DPS offices inside the ring road where most minorities lived, and only one in Dallas, and he discussed those maps again in 2011.  In his native Houston, Gallegos remarked, it would take someone without a car who lived inside the I-610 loop three transfers of bus routes just to get near a DPS office.[141]  As Sen. Whitmire noted during the same debate, there was even then a 2-3-hour wait to get a driver's license in Houston.  How long would the wait be, he wondered, if the lines lengthened to accommodate voters who had to acquire new photo ids?  And could poor people afford to take that much time off from work?[142]

87.  Of the 254 counties in Texas, 77 were without DPS offices in 2011.  Of the 226 offices still operating after budget cuts, 174 were full-time, 34 were part-time, and 18 were largely inoperative "mobile" offices.[143]  For a million and a half people without qualifying photo ids, the difficulty of obtaining them in the dense metropolitan areas, as well as the wide spaces of Texas

---

[140]S Debate, Jan. 25, 2011, at 67-70.

[141]S Debate, Jan. 25, 2011, at 83-84.

[142]S Debate, Jan. 25, 2011, at 65-66.

[143]S Debate, Jan. 25, 2011, at 376-77.

67

**Defendant's Exhibit #**
548

DE-005482

far surpassed anything that Hoosiers, for example, had to undergo to obtain their photo ids.  For people without automobiles, these were heavy burdens, indeed, and the legislature had been informed of them extensively and repeatedly.[144]


## D.  Partisanship

88.  During debates over redistricting in 2003 and 2011, Republicans never feared to trumpet their partisan motives for acting.  Indeed, in the 2011-12 Section 2 and Section 5 federal legal cases, partisanship became their chief defense against charges that the district lines they drew had been designed to disadvantage minorities.  By contrast, during the debates over the various voter id bills, Republicans never admitted to partisan motives, though Democrats and newspaper editorials often charged that partisan advantage was exactly the intent of the legislation.[145]  In private, according to political consultant Royal Masset, who had been political director of the Republican party in the state for fifteen years,[146] but who by 2007 opposed voter id laws,

> Among Republicans it is an "article of religious faith that voter fraud is causing us to lose elections," Masset said. He doesn't agree with that, but does believe that requiring photo

---

[144]The American Community Survey, Table DP04 , Selected Housing Characteristics, shows that in Texas in 2010 the percentage of owner-occupied housing units without access to automobiles varied strikingly by race.  Only 3.7% of non-Hispanic whites had no such access, compared to 7.5% among Hispanics and 13.3%  among African-Americans.

[145]"The real purpose is to suppress Democratic voter turnout. The people most likely to be deterred from voting by a photo voter ID law aren't fraudulent voters but the elderly, minority group members and lower-income Americans - people more likely to vote Democratic than Republican - who may not have a photo ID handy when they show up to vote."  Editorial, "Face it: Texas doesn't need voter ID law," *AAS*, May 4, 2008.

[146]<http://www.quorumreport.com/Bio_Masset.cfm>.

68

**Defendant's Exhibit #**
**548**

DE-005483

IDs could cause enough of a dropoff in legitimate Democratic voting to add 3 percent to the Republican vote."[147]

89.  Suppose that Republicans in the legislature had openly avowed that they favored the voter id bills because the resulting electorate would be more favorable to the Republican party, and that the attorneys for the State carried that line through all of their legal papers in this case.  Would that prove that in passing S.B. 14, the majority of the legislature had acted without a racial purpose?  The simple answer is that it would not, because minorities comprise a much larger and, indeed, dramatically increasing part of the Democratic coalition than they do of the Republican coalition.  Consider the legislature.

90.  Table 2 demonstrates that in no session of the legislature did white non-Hispanics comprise fewer than 90% of the Republican legislators.  In no session of the legislature did white non-Hispanics comprise more than 37% of the Democratic legislators.  In the 2011 session (elected in 2010), which passed S.B. 14, non-Hispanic whites comprised only 18% of Democratic legislators, having declined by nearly two-thirds from the presidential election year number.

---

[147]Kristen Mack, "In trying to win, has Dewhurst lost a friend?" May 17, 2007.

69

Defendant's Exhibit #
548

DE-005484

**Table 2: Ethnic Composition of the Texas Legislature, 2002-2010 Elections**

| Year Elected | Party | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Democrats | | | | Republicans | | | |
| | White | Black | Hispanic | Asian | White | Black | Hispanic | Asian |
| 2002* | 19 | 14 | 29 | 0 | 86 | 0 | 1 | 1 |
| 2004 | 22 | 16 | 36 | 1 | 102 | 0 | 1 | 1 |
| 2006 | 31 | 16 | 36 | 1 | 94 | 0 | 1 | 0 |
| 2008 | 30 | 16 | 38 | 1 | 93 | 0 | 0 | 1 |
| 2010 | 11 | 17 | 32 | 2 | 112 | 0 | 5 | 1 |

*House only

70

**Defendant's Exhibit #
548**                                        DE-005485

91.  What was true of legislators was true of voters.  In my report in *Texas v. United States*, I included an extensive statistical analysis, using standard statistical methods, of racially polarized voting in recent Texas elections that featured minority candidates.  Table 16 from that report, included below, illustrates the dependence of Democratic candidates in Texas on the votes of minority citizens and the almost complete independence of Republican candidates from minority voters.  If David Dewhurst had received not a single Latino or Asian vote (as he is estimated to have received almost no African-American votes), he still would have been overwhelmingly reelected Lieutenant Governor.  If, on the other hand, Democrat Linda Chavez-Thompson had received no minority votes, she would have barely beaten out the Libertarian and Green candidates.

71

**Defendant's Exhibit #**
548

DE-005486

**Table 16:  General Election, 2010, Least Squares, Weighted by % of Vote, by Precincts (n = 8400)**

| Candidate | Anglo | Black | Hispanic | Other |
|---|---|---|---|---|
| Lieutenant Governor | | | | |
| Dewhurst, R | 88.1 | -1.4 | 28.8 | 48.8 |
| Chavez-Thompson,D | 8.3 | 100.4 | 66.1 | 47.4 |
| Jameson, L | 3.1 | 0.3 | 2.0 | 2.5 |
| Gonzales, G | 0.5 | -0.2 | 2.5 | 0.6 |
| **Land Commissioner** | | | | |
| Patterson, R | 88.5 | -1.5 | 27.4 | 50.4 |
| Uribe D | 7.7 | 100.1 | 69.3 | 46.4 |
| Holdar L | 3.7 | 0.4 | 2.7 | 2.5 |
| **Supreme Court, Position 9** | | | | |
| Guzman, R | 83.5 | -3.4 | 32.8 | 60.8 |
| Bailey, D | 11.2 | 102.6 | 62.7 | 38.9 |
| Armstrong L | 5.2 | -0.1 | 4.0 | -0.5 |

72

Defendant's Exhibit #
548

DE-005487

92.  These two tables show that if Republican legislators and the State's attorneys had admitted that S.B. 14 and its predecessors were aimed to disadvantage the Democratic party, that statement would have been tantamount to an admission that they meant to discriminate against minorities, because Democratic voters and legislators were so much more likely than Republican voters and legislators to be Latino or African-American.  Any proposal that would restrict voting in order to disadvantage Democrats would necessarily work by disfranchising Latinos and African-Americans.

## E.  Should Expressions of Support for Voter ID As Aimed at Undocumented Immigrants Count as Racially Discriminatory Intent?

93.  As the statements from Rep. Betty Brown and Lt. Gov. David Dewhurst make clear, contentions that voter id laws were aimed to stop massive voter fraud by illegal immigrants were not just the views of a few unimportant extremists.  Indeed, voter id bills and "a crackdown on illegal immigrants" were so widely understood to be connected that a reporter previewing bills about illegal immigrants to be introduced into the 2009 legislature noted that "The proposals go well beyond the *usual proposals* to require ID to vote or requiring citizenship to get a driver's license," and another said that Republicans who favored voter id were "arguing that noncitizens are compromising the integrity of elections."[148]  Or as Rep. Rafael Anchia put it, Republicans "would have you believe that busloads of illegal immigrants are coming to a district near you and

---

[148]Karen Brooks, "New bills take tougher stance - Failure of several measures in '07 session doesn't deter legislators," *DMN*, Nov. 18, 2008, p. 3A.  Italics supplied. Aman Batheja, "Lawmakers eye election overhaul," *FWST*, Jan. 10, 2009, at B02.

Defendant's Exhibit #
548                                    DE-005488

engaging in voter impersonation in order to vote for Democrats . . ."[149]

94.  Former Texas State Republican Party Political Director Royal Masset, decried voter id as " the kind of issue that could lose the Latino vote for the Republican Party for the next 30 years. . . . One way to get Latinos upset is to start criminalizing them, to imply they are criminals.  And Hispanics should take this personally, *because it is aimed at them*."[150]

95.  That it was completely implausible that undocumented people frightened of attracting any attention whatsoever from the authorites would procure or even accept voter registration cards of photo ids with someone else's name on it was often pointed out during the debates.[151]  This implausibility suggests that the assertion was made as a barely veiled reference to white voters' uneasiness about the increasing percentage of non-whites in what was revealed by the 2010 census to be a majority-minority state.

---

[149]Christy Hoppe and Terrence Stutz, "ID win could backfire for GOP - Many Latinos say bill targets them; experts see that costing votes," *DMN*, Mar. 16, 2009, at 1A.

[150]Christy Hoppe and Terrence Stutz, "ID win could backfire for GOP - Many Latinos say bill targets them; experts see that costing votes," *DMN*, Mar. 16, 2009, at 1A.  Italics supplied.

[151]For instance, Juan Castillo, "ID plan puts spotlight on voter fraud," *AAS*, May 23, 2007; Ricardo Pimentel, "Voter ID: A bogus solution for a pretend crisis," SAEN, May 24, 2011, at 11A.

74

**Defendant's Exhibit #**
**548**                                                                    DE-005489

## F.  Why the Views of Minority Republican Legislators on S.B. 14 Should Not Count Against the Contention that the Voter ID Law Was Adopted with a Racially Discriminatory Purpose

96.  In its defense of S.B.14, both on the floor of the Texas House of Representatives and in its Section 5 submission to the Department of Justice, the State thrust minority Republican representatives into the front ranks, presumably as evidence of the non-discriminatory purpose of the law.[152]  This is not a new tactic.  Attempting to represent its school segregation policies as the preference of the local African-American community in the first well-documented struggle over racial discrimination in public services in American history, the Boston School Committee in the 1840s replaced a white with a black teacher in the "colored school" and dug up 50-year-old petitions from African-Americans proposing to establish the first racially separate school in Boston (at a time when black children were excluded from any public education whatever).[153]  Texas was following in an obvious and well-worn tradition when it used minority spokespersons to defend itself against charges of anti-minority discrimination.

---

[152]Thus, Texas ended its revised Section 5 submission to the Department of Justice by saying "To the extent the Department seeks more information regarding the Act, please contact The Honorable Aaron Pena (joint sponsor), Texas House of Representatives . . . [and] The Honorable Larry Gonzales (co-sponsor), Texas House of Representatives."  Ann McGeehan to T. Christian Herren, Jr., July 25, 2011, at 14.  It did not suggest that the Department contact the major sponsors in the House (Patricia Harless) or Senate (Troy Fraser), both of whom were inconveniently Anglo.

[153]See Kousser, "'The Supremacy of Equal Rights," The Struggle Against Racial Discrimination in Antebellum Massachusetts and the Foundations of the Fourteenth Amendment," 82 N.W.U.L.R. 941 (1988), at 982-83.

75

Defendant's Exhibit #
548

DE-005490

97. The difficulty in the present case is that none of the Latino, African-American, or Asian-American Republicans who served in the Texas State Legislature in 2011 can legitimately be viewed as spokespersons of their ethnic communities, because none was elected with majority support from that community.  I considered this question in my declaration in *Texas v. United States* in the District Court of the District of Columbia, where I provided statistical evidence that Latino voters throughout the decade of the 2000s always voted overwhelmingly against Latino Republican candidates and that the other four minority Republicans who served in the Texas House in 2011 were elected from overwhelmingly-white constituencies.[154]  All of the Republicans in the state senate and 92 of the 101 Republicans in the state House were Anglo. Tables 12-14 of my earlier declaration demonstrate that four Latino Republicans were opposed by Latino voters in the 2010 election.  Rep. Aaron Pena of the 41st District was elected as a Democrat, and Republicans went to great lengths in the H283 redistricting plan to protect him from what they obviously expected to be rejection by Latino voters in future elections.  That leaves four minority Republicans.  Table 24, which was  based on ordinary least-squares regression, showed that all of their elections in 2010 were generally opposed by minority voters. All but one of the districts in which they were elected were majority-Anglo, and in every contest, Anglos provided the bulk of the votes for the minority Republican candidates.  It is notable that the two African-American Republicans seem to have been opposed by nearly all black voters. The only Republican candidate with very substantial support from minority voters, Chen, had no Democratic opponent, but only a Libertarian. I reprint relevant parts of those two tables below.

---

[154]This evidence and line of argument was not disputed in either redistricting case, at least not with regard to my testimony.

**Defendant's Exhibit #
548**

DE-005491

98.  All minority members of the State Senate in 2011 were Democrats, and as they emphasized in a statement inserted into the State Senate Journal, they unanimously opposed the bill at all points.  The hearings document the minority senators' stalwart and often quite vociferous opposition to all of the voter id bills from 2005 on.

99.  In her opinion in Georgia v. Ashcroft, Justice Sandra Day O'Connor emphasized the importance of the support of 33 of 34 members of the Georgia Black Caucus in 2001 for the State Senate redistricting plan that she approved.  If the redistricting plan had had a racially discriminatory intent, she reasoned, why would representatives of the black community have nearly unanimously supported it?  In the current case, Texas is trying to muddy the waters, representing the minority community as divided on whether S.B. 14 was adopted with a racially discriminatory purpose by parading Republican House members who are Latino, African-American, or Asian-American as supporters of the law.  This tactic should be rejected and even count in favor of the case for discriminatory intent, because those legislators were elected as representatives of white voters, not minorities.

100.  In the special case of Rep. Aaron Pena, it is useful to compare his voting record and statements on the voter id issue before and after he switched from the Democratic to the Republican party.  From 2002 through 2010, Rep. Pena was elected as a Democrat, without ever facing Republican opposition in his House seat.  In 2007, he was paired against the third reading passage of H.B. 218 because he had a speaking engagement in his district on the day of the

**Defendant's Exhibit #**
**548**

DE-005492

vote.[155]  In 2009, Pena was vice-chair of the Elections Committee, the highest-ranking Democrat

on the Committee.[156]  When the Elections Committee, after a bitter struggle, passed S.B. 362 out

of committee on a 5-4 vote, with one Democrat and one Republican member crossing over to the

other partisan side, Pena voted "nay," along with two other Democrats, Rafael Anchia and Alma

Allen, and Republican Dennis Bonnen.[157]

101.  That Pena opposed the relatively lenient bills of 2005, 2007, and 2009, the latter as Vice-

Chairman of the Election Committee, while supporting the much stricter S.B. 14 in 2011, after he

had switched parties and, as my report in *Texas v. United States* showed, become entirely

dependent on Republican redistricting leaders to design a district in which he would have some

chance of reelection, leads to an obvious conclusion.  Pena's support for S.B. 14 was purely

opportunistic and should not count toward a conclusion that Latino leaders favored voter id as a

matter of principle.

---

[155]H JL 2007, at 2228, Bates # TX_00030940.

[156]H Comm April 6, 2009, at 2, Bates # TX_00031030.

[157]Dave Montgomery, *FWST*, "Voter ID bill faces uncertain fate as it heads for House
floor," May 12, 2009, p. B07.

78

Defendant's Exhibit #
548                                              DE-005493

**From Table 14 of My Declaration in *Texas v. U.S.*:**
**State Representative General Elections in which**
**Spanish-surnamed Republicans Ran against Democrats, 2002-10:**
**EI, % of Voters, by District[158]**

| Candidate | Latino | Non-Latino |
|---|---|---|
| **State Rep. 33, 2002** | | |
| Luna, D | 97.3 (0.7) | 36.4 (0.7) |
| Cuellar, R | 2.7 (0.7) | 63.5 (0.7) |
| | | |
| **State Rep. 33, 2008** | | |
| Ortiz, D | 93.2 (0.9) | 22.7 (1.0) |
| Torres, R | 6.3 (0.9) | 66.6 (0.9) |
| Garrett, L | 1.0 (0.1) | 10.2 (0.1) |
| | | |
| **State Rep. 33, 2010** | | |
| Ortiz, D | 86.3 (0.8) | 8.7 (0.8) |
| Torres, R | 15.4 (0.5) | 89.6 (0.5) |
| | | |
| **State Rep. 35, 2004** | | |
| Gonzalez-Toureilles, D | 89.1 (0.8) | 11.1 (0.8) |
| Opiela, R | 11.0 (0.8) | 88.8 (0.8) |
| | | |
| **State Rep. 35, 2006** | | |
| Gonzalez-Toureilles, D | 82.4 (1.1) | 22.6 (1.1) |

---

[158]Calculated by "EI" (ecological inference), a statistical technique explained in my declaration in *Texas v. U.S.*

79

**Defendant's Exhibit #**
**548**                                    DE-005494

| | | |
|---|---|---|
| Esparza, R | 16.9 (1.1) | 67.4 (1.1) |
| Elmer, L | 0.8 (0.3) | 9.9 (0.3) |
| | | |
| | | |
| **State Rep. 35, 2010** | | |
| Gonzalez-Toureilles, D | 76.9 (1.6) | 17.7 (1.6) |
| Aliseda, R | 23.1 (1.5) | 82.4 (1.5) |
| | | |
| **State Rep. 78, 2008** | | |
| Moody, D | 81.0 (1.4) | 27.0 (1.2) |
| Margo, R | 15.9 (1.2) | 69.5 (1.0) |
| Collins, L | 6.0 (0.2) | 1.2 (0.1) |
| | | |
| **State Rep. 78, 2010** | | |
| Moody, D | 78.2 (1.5) | 23.0 (1.2) |
| Margo, R | 21.8 (1.8) | 77.1 (1.4) |
| | | |
| **State Rep. 117, 2008** | | |
| Leibowitz, D | 86.4 (1.4) | 30.7 (0.7) |
| Garza, R | 13.8 (0.7) | 69.2 (0.6) |
| | | |
| **State Rep. 117, 2010** | | |
| Leibowitz, D | 88.7 (1.7) | 14.4 (1.4) |
| Garza, R | 11.3 (1.8) | 85.7 (1.5) |

Defendant's Exhibit #
548

DE-005495

**From Table 24 of My Declaration in Texas v. U.S.:**
**Other Minority Republican Legislators Were Also Opposed**
**by Most Minority Voters in 2010[159]**

| District | % Anglo VAP | % Black VAP | % Latino VAP | % Other VAP |
|---|---|---|---|---|
| **Ethnic Composition of District** | | | | |
| 12 | 76.2 | 11.8 | 9.6 | 1.5 |
| 52 | 62.4 | 7.5 | 24.3 | 6.3 |
| 102 | 48.3 | 15.6 | 23.9 | 9.9 |
| 112 | 57.3 | 11.5 | 17.5 | 14.0 |
| **% Support for Republican Candidate** | | | | |
| 12 White (black) | 62.3 (1.9) | -3.7 (5.5) | 62.4 (8.4) | 132.7 (91.1) |
| 52 Gonzales (Latino) | 66.0 (3.7) | 17.5 (32.2) | 45.2 (10.5) | 35.5 (20.8) |
| 102 Carter (black) | 71.1 (6.8) | -6.4 (15.0) | 50.7 (12.6) | 38.7 (35.8) |
| 112 Chen (Asian-Amer) | 88.5 (2.0) | 34.8 (7.8) | 81.3 (5.5) | 84.6 (9.0) |

---

[159]Calculated by "OLS" (ordinary least squares), a statistical technique explained in my declaration in *Texas v. U.S.*

81

**Defendant's Exhibit #**
548                                                DE-005496

## G.  Deliberate Ignorance as Evidence of Discriminatory Purpose

102.  The extensive litigation that accompanied every redistricting in Texas since 1971[160] and the

certainty that any voter id law would be subject to a Section 5 preclearance action and probably

additional lawsuits put Texas legislators on notice that every word that they spoke, every fact that

they gathered, every witness that they heard from would be part of "making a record" for a court

to pick over.[161]  As Sen. Judith Zaffarini remarked during the 2009 Senate debate,

> There was much discussion yesterday and today and even before that, including by Sen.
> Duncan and Sen. Van de Putte, Sen. West and others regarding the need for each side to
> make a record, and then each side, those who support this legislation and those who
> oppose it are  making a record for two purposes: No.1, because a  lawsuit is expected;
> No.2, because we will be dealing  with challenges before the Department of Justice.[162]

103.  Suppose the legislature had ordered a survey of  Texans with an adequate sampling design

and size to insure that inferences could be made about the differential possession of identification

---

[160]See my *Colorblind Injustice*, ch. 6, "Traditional Districting Principles, Texas-style," at
277-316 for the 1971-92 story.

[161]Previewing the March 10, 2009 debate on voter id, a reporter commented that
"Democrats want as much of a record as they can possibly build to take to the U.S. Department
of Justice, which has the authority to review changes in Texas election law under the federal
Voting Rights Act."  Arnold Garcia, Jr., "No country for unarmed men," *AAS*, Mar. 8, 2009.
Democratic Caucus Chairwoman Leticia Van de Putte remarked that "Our job was to make sure
the record was set and that the facts were there" for the Justice Department's Section 5
consideration.  Terrence Stutz and Robert T. Garrett, "Voter ID bill clears Senate hurdle -
Proposal expected to face tougher test in House after 23-hour hearing," *DMN*, Mar. 12, 2009, at
3A.

[162]S Debate, March 10, 2009, at 102.  Robert Duncan was a Republican leader; Van de
Putte and the African-American Sen. Royce West were Democratic leaders.

82

**Defendant's Exhibit #**
548                                              DE-005497

documents by members of different major ethnic groups.[163]  Or suppose that the legislature or the

Attorney General's or Secretary of State's offices had worked with the Department of Public

Safety to match drivers' license and voting registration records and use the names of those who

were registered to vote, but did not have drivers' licenses or DPS identification cards, to make

inferences about the ethnic consequences of adopting a photo id law.[164]  And suppose further that

the survey or matching data had shown that non-Hispanic white voters were significantly more

likely than African-American or Latino voters were to have photo ids.  Then if the legislature,

knowing the discriminatory consequences of its action, had still adopted a photo id law, it would

have been virtually impossible for the State to convince the public or a panel of judges that it had

not acted with a discriminatory intent.


104.  But no such survey of the population was undertaken, and although the State must have

carried out a limited matching study before the passage of S.B. 14, because it included

preliminary results in its Section 5 submission, which was made soon after Gov. Perry signed the

law, it had not made the matching study generally available to legislators before they voted.

Were legislators unaware of the possibility of such consequences or more particularly, of the

possibility of making such studies? Or were they willfully ignorant, deliberately avoiding

---

[163]Such a survey was discussed during the 2009 Senate Committee of the Whole hearing by an expert witness who had run a survey related to voter id for the Carter-Baker Commission, and Sen. Van de Putte.  See S Debate, March 10, 2009, at 346-49.

[164]During the 2011 debate, Sen. Wendy Davis, a Democrat, urged Ann McGeehan, the chief of the elections division in the Secretary of State's office, to collect data on ethnicity on voter registration forms to prepare for lawsuits and Section 5 preclearance actions.  S Debate, Jan. 25, 2011, at 461-62.

83

**Defendant's Exhibit #**      DE-005498
548

gathering evidence that they had reason to suspect would be incriminating?  And if they were

willfully keeping blinders on, is it justifiable to infer that they intended to create discriminatory

effects?

105.  The legislature was certainly aware of the results of national surveys on ethnic differences

in photo id possession.  In the 24-hour-long hearing on S.B. 362 in the Senate Committee of the

Whole in 2009, Adam Skaggs of the Brennan Center presented the results of a national 2006

survey by the Center, which found that 8% of whites, 11% of the overall sample, 18% of persons

over 65, and 25% of African-Americans did not have photo ids.  People making less that

$35,000/year were twice as likely not to have them as people making more than that amount.[165]

These figures were repeated in 2011 testimony on S.B. 14 by Luis Figueroa of MALDEF, who

also cited a survey of white, black, Latino, and Asian-American voters by Matt Barretto et al. that

found that minority voters were significantly less likely than non-Hispanic whites to have any of

a series of identifying documents.  Figueroa went on to quote a study of Wisconsin drivers'

license possession by  John Pawasarat.  As Figueroa told the Senate,

> It stated that Minorities in poor populations are the most likely to have driver's license
> problems.  Less than half, 40 percent, of Milwaukee County African American adults and
> 43 percent of Hispanic adults have a valid driver's license compared to 85 percent of
> white adults in the balance of the state.[166]

106.  And as officials of a state that had been submitting materials for preclearance since 1975

---

[165]S Debate, March 10, 2009, at 417-19.  The whole transcript of that debate was
introduced into the record of the 2011 debate in the Senate, so the 2011 senators could certainly
be assumed to be aware of the testimony of Skaggs and the myriad of other witnesses.

[166]S Debate, Jan. 25, 2011, at 306-07.  (Punctuation and repetition in transcript corrected.)

Defendant's Exhibit #
548                                                        DE-005499

surely knew, during the Section 5 preclearance process, the Justice Department would require the

State to present quantitative evidence that any voter id law did not have a discriminatory effect

on Latinos and African-Americans, and that the State had the burden of proof in that inquiry

107.  So the State knew that it had to have data on the differential effects of a voter id

requirement on Latinos and blacks, it had been repeatedly told that national studies showed that

members of minority groups were considerably less likely than non-Hispanic whites to have cars

or drivers' licenses or other forms of identification, and it had been asked again and again to

gather such data if it did not have it.  In such a circumstance, the failure to gather relevant

information and make it part of the public discussion must be considered to be evidence of a

racially discriminatory intent.

108.  Again and again, minority members of the legislature asked for the legislature or the

Secretary of State's office or somebody in the State government to compile such data and to

make it available during the debates on the subject.[167]  For example, in Exhibit 1 to the 2009

hearing of the Committee of the Whole Senate, Leticia Van de Putte asked Sen. Robert Duncan,

who was scheduled to preside over the Senate that day, that the Republican leadership provide a

"detailed analysis on the effects [of S.B. 14] on minority voters protected under the VRA."[168]

---

[167]See, for example, S Debate, March 10, 2009, at 165, a question from Sen. Royce West
to Sen. Troy Fraser, H Debate March 21, 2011, at 35, a comment of Rep. Rafael Anchia.

[168]Van de Putte to Duncan, March 3, 2009, in Exhibit 1 to S Debate, March 10, 2009.
Duncan's reply on this point was evasive.

85

**Defendant's Exhibit #**
548                          DE-005500

109.  But if anyone in the State government ever collected such information, they never made it

public.  The way the Republican sponsor of S.B. 14, Sen. Troy Fraser, blatantly ignored the

question is itself evidence that he recognized the danger for preclearance of looking into it.

Witness his colloquy with Leticia Van de Putte:

> SEN VAN de PUTTE To your knowledge have any studies been done to determine if
> there has been under current Texas voter laws any impact that it would have on affected
> class of Latino and African American voters
> SEN FRASER The bill that I'm laying out today is a model that has been approved by the
> U.S. Supreme Court[.  I]t has been precleared by the Department of Justice in Georgia[.]
> It will deter fraud[.] We're providing free access of cards[.] And yes we believe this will
> protect confidence in election in making sure only eligible voters are counted [.][169]

110.  Or this one, with Sen. Royce West:

> SEN WEST:  Studies have shown that African Americans and  Hispanics are more
> affected by poverty and therefore are more likely to participate in government benefit
> programs[.] Will the elimination of the government documents as a form of ID
> disproportionately affect African Americans and Hispanics[?]   SEN FRASER I'm not
> advised[.][170](170)

111.  When Sen. Fraser told Sen. Rodney Ellis that he was "confident" that S.B. 14 would have

no impact on minority voting, Ellis tried to call his bluff by proposing an amendment that

required the Secretary of State to report annually on whether the voter id law had a

disproportionate impact on minorities.  Fraser and the Senate rejected the amendment.[171]  They

---

[169]S Debate, Jan. 25, 2011, at 44-45.

[170]S Debate, Jan. 25, 2011, at 170.

[171]S Debate, Jan. 25, 2011, at 201-02.

86

**Defendant's Exhibit #**
**548**                                        DE-005501

did not want to know, and they did not want anyone else to know, either.

## H. Rejected Amendments as Evidence of Intent

112.  The constriction of documents eligible to identify voters presented in Table 1, above, from the large number under the benchmark to the smaller, but still substantial number in the 2005-09 bills, to the drastically reduced number in S.B. 14 is testimony to the desire to constrict the electorate.  So is the rejection of amendments to loosen those constraints offered in the Senate in 2011.  Table 3 gives a brief description of each of the 37 amendments to S.B. 14 that were proposed in the Senate in 2011, along with the sponsor and whether the amendment passed. Each of the Democrats' amendments would have broadened the number of documents available for identification purposes or increased the information available to the voters or reduced the burden on voters of procuring the relevant identifying documents.[172]  The proponents of S.B. 14 claimed to want to make it easy for legitimate voters to vote.  But they vastly underestimated the burdens that a voter id law placed on the poor, the disabled, the old, the minorities.  Sen. Fraser blithely announced when rejecting Sen. Gallegos's amendment to make more DPS offices available to facilitate the acquisition of photo ids, "I'm sure that everyone will be able to get an ID to be able to vote."[173]  If he truly wanted everyone to vote, he would have accepted many more of these amendments.  That proponents did not represents another piece of evidence of how retrogressive this legislation was, a foreseeable and foreseen retrogressive effect that is

--------

[172]There is a similar series of amendments to the 2007 bill in H JL, 2007, at Bates # TX 00030908-36.  Almost all were rejected on nearly party-line votes.

[173]S Debate, Jan. 26, 2011, at 62, Bates # TX_00203433.

87

**Defendant's Exhibit #**
**548**                                                    DE-005502

commonly taken as an indication of a discriminatory intent.[174]

---

[174]See my *Colorblind Injustice*, at 358.

**Defendant's Exhibit #**
548

DE-005503

**Table 3: Amendments to S.B. 14 Defeated in the Senate in 2011**

| Nature of Amendment | Sponsor | result |
|---|---|---|
| makes voter impersonation or voter suppression first degree felonies | Watson | r |
| DPS must inform anyone applying for state id that it's free | Davis | r |
| required election notices to be in both English and Spanish | Lucio | a |
| required notices of vid requirements to be listed separately | Zaffirini | a |
| if address on id and registered voter list doesn't match precisely, voter may vote | Van de Putte | r |
| time for free voter id extended to 2017 | Hinojosa | a |
| made affidavit a substitute for photo id | Zaffirini | r |
| allowed indigents to get all documents needed to vote (e.g., birth cert.) free | Davis | r |
| allow use of expired id | Davis | r |
| eased rules on identifying documents necessary to get photo id | Lucio | r |
| substitute documents in S.B. 362 (2009) for S.B. 14 | Van de Putte | r |
| adds temporarily-suspended drivers' licenses to list of acceptable ids | Gallegos | r |
| adds concealed handgun permit as acceptable id | Hinojosa and Patrick | a |
| adds student id from public university in TX to list of acceptable ids | Ellis | r |
| adds Medicare card to list of acceptable ids | West | r |
| adds photo ids issued by agencies of federal, state, or local governments and higher education institutions to list of acceptable photo ids | Davis | r |
| adds drivers' licenses expired within 60 days, or forever for those over 65, to list of acceptable ids | Lucio | r |
| adds drivers' licenses expired within 60 days to list of acceptable ids | Lucio | a |
| allows counties to issue photo ids for voting | Hinojosa | r |

89

Defendant's Exhibit # 548

DE-005504

| | | |
|---|---|---|
| requires one DPS office for every 15 voting precincts | Gallegos | r |
| requires a DPS office within 5 miles of public transportation | Gallegos | r |
| requires county clerks to tell women receiving marriage certificates that they will have to have photo id with same name as voter reg | Lucio and Ellis | r |
| same-day registration | Ellis, Lucio, and Rodriguez | r |
| require DPS offices open until 7 one day/week and 4 hours on Saturday twice a month | Gallegos | r |
| require Sec. Of State to produce annual report on disparate racial impact of vid | Ellis | r |
| delay law until counties have written regulations, completed training of polling place officials | Van de Putte | r |
| added specific appropriation to fund law | West and Rodriguez | a |
| law wouldn't go into effect if State cut # of teachers in State | West | r |
| makes State pay for any County spending under vid | West | r |
| required disabled to have dr. certification | Patrick | a |
| give disabled permanent absentee ballot rights | Davis | r |
| expanded voter registration outreach | Davis | r |
| expand reasons for notifying voter who has been removed from rolls | Davis | r |
| allow voter too indigent to procure documents to vote by affidavit | Duncan, Ogden, and Patrick | a |
| allow expired govt-issued id for up to 2 years | Davis | r |
| allow to vote if names on photo id and registration rolls are "substantially similar" and voter signs affidavit | Davis | a |

Source: S Debate, Jan. 26, 2011, at Bates #TX00203381-3462

90

DE-005505

# Abbreviations for Citations

## Legislative Documents

HJ 2005 = Texas House of Representatives, Journal, May 2-3, 2005, Bates # TX_00030672-82, TX_00030725-39

H Comm, 2005 = Texas House of Representatives, Committee on Elections, Subcommittee on Verification Voters, March 17, 2005, Bates # TX_00212030 - TX_00212

H JL, 2007 = Texas House of Representatives, Journal, April 23, 24, 2007, Bates # TX_00030778 - TX_00030940.

S Debate, March 10, 2009 = Transcript of Proceedings Before The Senate of the State of Texas, Eighty-First Legislature (Committee of the Whole Senate), Austin, Texas, In Re: Consideration of Senate Bill 362, March 10, 2009

H Comm, April 6, 2009 = The House Committee on Elections, 81st Legislature, April 6, 2009, Bates # TX_00031029 - TX_00031834

S Debate, 2nd Reading 2009 = 2009 SB 362, Senate Flr Debate, 2nd Reading, Part 2, Bates # TX_000760004 - TX_000760061

S Debate, 2nd Reading 2011 = 2009 SB 362, Senate Flr Debate, 2nd Reading, Part 2, Bates # TX_000760004 - TX_000760061

S Debate, 3rd Reading 2011 = *2009 SB 362, Senate Flr Debate, 3rd Reading, March 18, 2009 (Transcript 2), Bates # TX_00203348 - TX_0020358

S Debate, Jan. 25, 2011 = Transcript of Proceedings Before the Senate of the State of Texas, Eighty Second Legislature, Committee of the Whole Senate, Austin Texas In Re Consideration of Senate Bill 14, Committee of the Whole Senate, January 25, 2011, no Bates #

S Debate, Jan. 26, 2011 = Senate Floor Debate, Jan 26, 2011, on SB 14, Transcript 3, Bates # TX_0020328 - TX_00203474

H Comm, March 1, 2011 = Texas House of Representatives, 82nd Legislature, Select Committee on Voter Identification and Voter Fraud Hearing, March 1, Bates # TX 00028108-TX 00028521.

H Debate, March 21, 2011 = 2011 (82R) SB 143.21.11 House Chambers Floor Debate, 2nd Reading, March 21, 2011, Bates # TX_00210900.

**Defendant's Exhibit #**
548

DE-005506

## Newspapers

*AAS = Austin American-Statesman*

*DMN = Dallas Morning News*

*FWST = Fort Worth Star-Tribune*

*HC = Houston Chronicle*

*SAEN = San Antonio Express-News*

92

**Defendant's Exhibit #**
548                                      DE-005507

| | |
|---|---|
| **From:** | John Mendoza |
| **Sent:** | Tuesday, January 25, 2011 3:35 PM |
| **To:** | Karen Richards |
| **Cc:** | Lee Guyette |
| **Subject:** | Emergency Special Query - Statewide count of voters without TDL/ID (but that have a match in the DPS driver file)...revised |
| **Attachments:** | statewide_voters_wo_tdl_cnts_younger_than70.xls |

Revised query to look only at the voters that are younger than 70 years of age.

Hope that was what you asked for on the phone.

Add another 30 minutes to time spent on this request.

JohnM.

---

**From:** John Mendoza
**Sent:** Tuesday, January 25, 2011 1:03 PM
**To:** Karen Richards
**Cc:** Lee Guyette
**Subject:** Emergency Special Query - Statewide count of voters without TDL/ID (but that have a match in the DPS driver file)...

Karen,

Here's the totals I came up with on short notice.

Per our discussion:
- "Without TDL/ID" means doesn't have a Texas drivers license or ID
- "Without TDL/ID with DPS match" means using the information we received from DPS for the Annual Jury Wheel process, we found a match using the following criteria:
    1. Same County Code
    2. Same Last Name
    3. Same First Name
    4. Same Date of Birth
- Only looked at the V and S voter status records (Note: there were no "L" voter status records).
- Only look at Voters whose date of birth is on or after 1/26/1941

Note: 2 ½ hours spent on this request.

JohnM.



U.S. EXHIBIT
977
6-19-12
PENGAD 800-631-6989

1

|   | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | Without TDL/ID | | Without TDL/ID | |
| 2 | County Code | County Name | Active | Suspense | Active | Suspense |
| 3 | 001 | ANDERSON | 4,677 | 215 | 3,665 | 99 |
| 4 | 002 | ANDREWS | 1,459 | 70 | 1,138 | 33 |
| 5 | 003 | ANGELINA | 7,541 | 577 | 5,572 | 292 |
| 6 | 004 | ARANSAS | 1,177 | 100 | 858 | 44 |
| 7 | 005 | ARCHER | 1,390 | 49 | 1,097 | 17 |
| 8 | 006 | ARMSTRONG | 261 | 0 | 194 | 0 |
| 9 | 007 | ATASCOSA | 3,874 | 167 | 2,634 | 65 |
| 10 | 008 | AUSTIN | 2,769 | 125 | 2,252 | 44 |
| 11 | 009 | BAILEY | 298 | 18 | 129 | 9 |
| 12 | 010 | BANDERA | 750 | 102 | 475 | 31 |
| 13 | 011 | BASTROP | 5,016 | 385 | 3,724 | 152 |
| 14 | 012 | BAYLOR | 134 | 3 | 47 | 0 |
| 15 | 013 | BEE | 1,904 | 151 | 1,167 | 84 |
| 16 | 014 | BELL | 16,635 | 3,701 | 10,470 | 1,221 |
| 17 | 015 | BEXAR | 151,572 | 12,360 | 108,659 | 5,408 |
| 18 | 016 | BLANCO | 1,020 | 45 | 812 | 16 |
| 19 | 017 | BORDEN | 142 | 0 | 114 | 0 |
| 20 | 018 | BOSQUE | 1,904 | 100 | 1,475 | 43 |
| 21 | 019 | BOWIE | 9,875 | 798 | 7,666 | 340 |
| 22 | 020 | BRAZORIA | 19,862 | 1,597 | 15,816 | 760 |
| 23 | 021 | BRAZOS | 6,799 | 1,073 | 4,241 | 354 |
| 24 | 022 | BREWSTER | 1,272 | 126 | 824 | 57 |
| 25 | 023 | BRISCOE | 140 | 6 | 61 | 1 |
| 26 | 024 | BROOKS | 2,541 | 1 | 1,261 | 0 |
| 27 | 025 | BROWN | 2,925 | 164 | 2,237 | 63 |
| 28 | 026 | BURLESON | 2,135 | 116 | 1,614 | 47 |
| 29 | 027 | BURNET | 2,114 | 155 | 1,574 | 78 |
| 30 | 028 | CALDWELL | 3,353 | 296 | 2,185 | 86 |
| 31 | 029 | CALHOUN | 1,987 | 85 | 1,416 | 25 |
| 32 | 030 | CALLAHAN | 1,769 | 100 | 1,375 | 40 |
| 33 | 031 | CAMERON | 43,441 | 2,597 | 30,186 | 1,398 |
| 34 | 032 | CAMP | 1,438 | 82 | 1,055 | 34 |
| 35 | 033 | CARSON | 1,055 | 41 | 866 | 9 |
| 36 | 034 | CASS | 3,633 | 178 | 2,698 | 90 |
| 37 | 035 | CASTRO | 1,096 | 65 | 786 | 20 |
| 38 | 036 | CHAMBERS | 4,347 | 337 | 2,907 | 108 |
| 39 | 037 | CHEROKEE | 1,829 | 238 | 1,101 | 75 |
| 40 | 038 | CHILDRESS | 795 | 32 | 596 | 17 |
| 41 | 039 | CLAY | 1,572 | 68 | 1,304 | 33 |
| 42 | 040 | COCHRAN | 400 | 34 | 291 | 8 |
| 43 | 041 | COKE | 408 | 49 | 297 | 12 |
| 44 | 042 | COLEMAN | 846 | 47 | 660 | 16 |
| 45 | 043 | COLLIN | 39,349 | 3,321 | 31,524 | 1,590 |

TX_00053958

Defendant's Exhibit #566

|    | A   | B            | C       | D      | E       | F     |
|----|-----|--------------|---------|--------|---------|-------|
| 46 | 044 | COLLINGSWORTH | 692     | 26     | 496     | 9     |
| 47 | 045 | COLORADO     | 2,125   | 86     | 1,567   | 30    |
| 48 | 046 | COMAL        | 6,635   | 706    | 4,977   | 304   |
| 49 | 047 | COMANCHE     | 1,925   | 203    | 1,417   | 51    |
| 50 | 048 | CONCHO       | 354     | 10     | 256     | 0     |
| 51 | 049 | COOKE        | 3,138   | 137    | 2,588   | 67    |
| 52 | 050 | CORYELL      | 3,161   | 874    | 1,723   | 219   |
| 53 | 051 | COTTLE       | 154     | 11     | 80      | 0     |
| 54 | 052 | CRANE        | 707     | 46     | 556     | 22    |
| 55 | 053 | CROCKETT     | 588     | 25     | 343     | 5     |
| 56 | 054 | CROSBY       | 886     | 50     | 572     | 23    |
| 57 | 055 | CULBERSON    | 510     | 35     | 294     | 14    |
| 58 | 056 | DALLAM       | 725     | 64     | 542     | 29    |
| 59 | 057 | DALLAS       | 176,037 | 12,685 | 122,079 | 5,196 |
| 60 | 058 | DAWSON       | 1,899   | 100    | 1,184   | 32    |
| 61 | 059 | DEAF SMITH   | 1,942   | 147    | 1,397   | 72    |
| 62 | 060 | DELTA        | 1,134   | 12     | 808     | 4     |
| 63 | 061 | DENTON       | 41,522  | 3,828  | 34,662  | 1,694 |
| 64 | 062 | DEWITT       | 2,197   | 106    | 1,690   | 41    |
| 65 | 063 | DICKENS      | 209     | 3      | 124     | 1     |
| 66 | 064 | DIMMIT       | 2,548   | 165    | 1,463   | 72    |
| 67 | 065 | DONLEY       | 532     | 37     | 378     | 12    |
| 68 | 066 | DUVAL        | 2,373   | 312    | 1,410   | 105   |
| 69 | 067 | EASTLAND     | 2,162   | 136    | 1,665   | 75    |
| 70 | 068 | ECTOR        | 9,660   | 626    | 7,120   | 274   |
| 71 | 069 | EDWARDS      | 276     | 35     | 192     | 8     |
| 72 | 070 | ELLIS        | 11,528  | 621    | 9,010   | 234   |
| 73 | 071 | EL PASO      | 73,740  | 1,063  | 45,363  | 661   |
| 74 | 072 | ERATH        | 852     | 205    | 550     | 56    |
| 75 | 073 | FALLS        | 1,806   | 25     | 1,143   | 8     |
| 76 | 074 | FANNIN       | 4,723   | 251    | 3,503   | 105   |
| 77 | 075 | FAYETTE      | 2,431   | 65     | 1,879   | 19    |
| 78 | 076 | FISHER       | 610     | 29     | 449     | 6     |
| 79 | 077 | FLOYD        | 317     | 45     | 161     | 10    |
| 80 | 078 | FOARD        | 195     | 0      | 82      | 0     |
| 81 | 079 | FORT BEND    | 42,774  | 2,817  | 33,837  | 1,315 |
| 82 | 080 | FRANKLIN     | 685     | 63     | 504     | 25    |
| 83 | 081 | FREESTONE    | 1,826   | 129    | 1,396   | 61    |
| 84 | 082 | FRIO         | 3,030   | 311    | 1,700   | 107   |
| 85 | 083 | GAINES       | 1,829   | 93     | 1,307   | 40    |
| 86 | 084 | GALVESTON    | 25,849  | 2,668  | 19,431  | 1,266 |
| 87 | 085 | GARZA        | 941     | 61     | 634     | 27    |
| 88 | 086 | GILLESPIE    | 2,046   | 43     | 1,761   | 22    |
| 89 | 087 | GLASSCOCK    | 221     | 4      | 170     | 1     |
| 90 | 088 | GOLIAD       | 1,380   | 61     | 930     | 15    |

TX_00053959

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 91 | 089 | GONZALES | 2,371 | 116 | 1,579 | 37 |
| 92 | 090 | GRAY | 2,663 | 0 | 1,975 | 0 |
| 93 | 091 | GRAYSON | 8,711 | 624 | 6,769 | 302 |
| 94 | 092 | GREGG | 9,853 | 951 | 7,353 | 432 |
| 95 | 093 | GRIMES | 1,424 | 129 | 819 | 45 |
| 96 | 094 | GUADALUPE | 8,763 | 508 | 6,658 | 194 |
| 97 | 095 | HALE | 4,626 | 435 | 3,168 | 182 |
| 98 | 096 | HALL | 242 | 24 | 122 | 9 |
| 99 | 097 | HAMILTON | 955 | 45 | 777 | 15 |
| 100 | 098 | HANSFORD | 702 | 20 | 514 | 7 |
| 101 | 099 | HARDEMAN | 200 | 21 | 122 | 7 |
| 102 | 100 | HARDIN | 6,139 | 180 | 4,553 | 51 |
| 103 | 101 | HARRIS | 281,147 | 19,898 | 204,561 | 8,605 |
| 104 | 102 | HARRISON | 7,646 | 724 | 5,341 | 264 |
| 105 | 103 | HARTLEY | 562 | 29 | 430 | 14 |
| 106 | 104 | HASKELL | 1,320 | 94 | 1,001 | 31 |
| 107 | 105 | HAYS | 13,277 | 1,722 | 9,300 | 423 |
| 108 | 106 | HEMPHILL | 523 | 2 | 412 | 0 |
| 109 | 107 | HENDERSON | 6,192 | 541 | 4,388 | 232 |
| 110 | 108 | HIDALGO | 68,145 | 4,771 | 45,621 | 2,571 |
| 111 | 109 | HILL | 2,550 | 172 | 1,937 | 83 |
| 112 | 110 | HOCKLEY | 2,587 | 123 | 1,927 | 46 |
| 113 | 111 | HOOD | 3,428 | 271 | 2,786 | 138 |
| 114 | 112 | HOPKINS | 2,382 | 176 | 1,741 | 76 |
| 115 | 113 | HOUSTON | 2,298 | 252 | 1,718 | 119 |
| 116 | 114 | HOWARD | 3,300 | 251 | 2,362 | 119 |
| 117 | 115 | HUDSPETH | 390 | 20 | 266 | 9 |
| 118 | 116 | HUNT | 6,272 | 592 | 5,015 | 266 |
| 119 | 117 | HUTCHINSON | 2,389 | 148 | 1,793 | 66 |
| 120 | 118 | IRION | 308 | 12 | 221 | 2 |
| 121 | 119 | JACK | 918 | 49 | 730 | 20 |
| 122 | 120 | JACKSON | 1,732 | 90 | 1,335 | 39 |
| 123 | 121 | JASPER | 6,115 | 436 | 4,268 | 191 |
| 124 | 122 | JEFF DAVIS | 315 | 1 | 201 | 0 |
| 125 | 123 | JEFFERSON | 8,505 | 1,086 | 4,146 | 373 |
| 126 | 124 | JIM HOGG | 1,271 | 52 | 770 | 25 |
| 127 | 125 | JIM WELLS | 5,997 | 326 | 3,879 | 141 |
| 128 | 126 | JOHNSON | 9,871 | 514 | 8,085 | 239 |
| 129 | 127 | JONES | 1,467 | 98 | 1,139 | 35 |
| 130 | 128 | KARNES | 1,716 | 96 | 1,206 | 45 |
| 131 | 129 | KAUFMAN | 8,398 | 605 | 6,273 | 238 |
| 132 | 130 | KENDALL | 2,748 | 132 | 2,210 | 55 |
| 133 | 131 | KENEDY | 84 | 7 | 50 | 4 |
| 134 | 132 | KENT | 167 | 3 | 125 | 1 |
| 135 | 133 | KERR | 2,929 | 272 | 2,218 | 118 |

TX_00053960

Defendant's Exhibit #566                DE-006354

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 136 | 134 | KIMBLE | 386 | 16 | 311 | 2 |
| 137 | 135 | KING | 69 | 0 | 55 | 0 |
| 138 | 136 | KINNEY | 494 | 30 | 327 | 7 |
| 139 | 137 | KLEBERG | 2,634 | 241 | 1,814 | 76 |
| 140 | 138 | KNOX | 349 | 15 | 247 | 9 |
| 141 | 139 | LAMAR | 4,038 | 290 | 2,908 | 147 |
| 142 | 140 | LAMB | 2,093 | 137 | 1,358 | 54 |
| 143 | 141 | LAMPASAS | 1,411 | 129 | 1,006 | 56 |
| 144 | 142 | LA SALLE | 1,462 | 53 | 799 | 18 |
| 145 | 143 | LAVACA | 2,589 | 66 | 2,095 | 22 |
| 146 | 144 | LEE | 2,176 | 73 | 1,701 | 38 |
| 147 | 145 | LEON | 2,019 | 155 | 1,581 | 59 |
| 148 | 146 | LIBERTY | 7,556 | 881 | 5,125 | 387 |
| 149 | 147 | LIMESTONE | 2,549 | 175 | 1,797 | 66 |
| 150 | 148 | LIPSCOMB | 409 | 22 | 319 | 10 |
| 151 | 149 | LIVE OAK | 1,098 | 89 | 674 | 36 |
| 152 | 150 | LLANO | 972 | 85 | 713 | 45 |
| 153 | 151 | LOVING | 58 | 0 | 25 | 0 |
| 154 | 152 | LUBBOCK | 20,810 | 1,907 | 15,658 | 726 |
| 155 | 153 | LYNN | 1,292 | 28 | 861 | 5 |
| 156 | 154 | MADISON | 1,315 | 15 | 930 | 10 |
| 157 | 155 | MARION | 604 | 69 | 273 | 22 |
| 158 | 156 | MARTIN | 756 | 11 | 504 | 2 |
| 159 | 157 | MASON | 593 | 20 | 468 | 9 |
| 160 | 158 | MATAGORDA | 3,954 | 544 | 2,925 | 290 |
| 161 | 159 | MAVERICK | 7,018 | 255 | 4,156 | 103 |
| 162 | 160 | MCCULLOCH | 865 | 54 | 655 | 16 |
| 163 | 161 | MCLENNAN | 16,874 | 1,421 | 12,317 | 507 |
| 164 | 162 | MCMULLEN | 215 | 14 | 154 | 2 |
| 165 | 163 | MEDINA | 4,751 | 206 | 3,568 | 98 |
| 166 | 164 | MENARD | 421 | 78 | 296 | 16 |
| 167 | 165 | MIDLAND | 9,809 | 580 | 8,189 | 318 |
| 168 | 166 | MILAM | 2,890 | 188 | 2,277 | 87 |
| 169 | 167 | MILLS | 696 | 1 | 519 | 1 |
| 170 | 168 | MITCHELL | 856 | 71 | 546 | 18 |
| 171 | 169 | MONTAGUE | 1,574 | 92 | 1,218 | 44 |
| 172 | 170 | MONTGOMERY | 28,044 | 1,874 | 23,502 | 939 |
| 173 | 171 | MOORE | 1,750 | 99 | 1,387 | 38 |
| 174 | 172 | MORRIS | 687 | 226 | 345 | 39 |
| 175 | 173 | MOTLEY | 61 | 6 | 27 | 1 |
| 176 | 174 | NACOGDOCHES | 4,500 | 432 | 3,327 | 131 |
| 177 | 175 | NAVARRO | 3,778 | 171 | 2,717 | 74 |
| 178 | 176 | NEWTON | 2,702 | 143 | 1,564 | 59 |
| 179 | 177 | NOLAN | 267 | 31 | 120 | 8 |
| 180 | 178 | NUECES | 33,571 | 3,875 | 25,043 | 1,769 |

TX_00053961

Defendant's Exhibit #566

DE-006355

|  | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 181 | 179 | OCHILTREE | 1,551 | 89 | 1,236 | 44 |
| 182 | 180 | OLDHAM | 327 | 25 | 265 | 4 |
| 183 | 181 | ORANGE | 7,078 | 520 | 5,634 | 245 |
| 184 | 182 | PALO PINTO | 2,458 | 177 | 1,881 | 77 |
| 185 | 183 | PANOLA | 1,267 | 133 | 680 | 64 |
| 186 | 184 | PARKER | 9,378 | 520 | 7,791 | 217 |
| 187 | 185 | PARMER | 1,989 | 127 | 1,456 | 55 |
| 188 | 186 | PECOS | 1,562 | 60 | 1,050 | 21 |
| 189 | 187 | POLK | 7,565 | 443 | 5,548 | 207 |
| 190 | 188 | POTTER | 6,389 | 537 | 5,189 | 238 |
| 191 | 189 | PRESIDIO | 2,445 | 12 | 1,165 | 1 |
| 192 | 190 | RAINS | 1,005 | 75 | 778 | 26 |
| 193 | 191 | RANDALL | 9,739 | 587 | 8,048 | 246 |
| 194 | 192 | REAGAN | 396 | 31 | 307 | 13 |
| 195 | 193 | REAL | 450 | 21 | 290 | 5 |
| 196 | 194 | RED RIVER | 1,745 | 85 | 1,277 | 47 |
| 197 | 195 | REEVES | 1,771 | 53 | 1,209 | 25 |
| 198 | 196 | REFUGIO | 997 | 56 | 705 | 29 |
| 199 | 197 | ROBERTS | 99 | 10 | 56 | 3 |
| 200 | 198 | ROBERTSON | 2,517 | 320 | 1,675 | 111 |
| 201 | 199 | ROCKWALL | 5,201 | 289 | 4,137 | 124 |
| 202 | 200 | RUNNELS | 236 | 25 | 118 | 10 |
| 203 | 201 | RUSK | 6,820 | 391 | 5,044 | 172 |
| 204 | 202 | SABINE | 1,520 | 169 | 980 | 82 |
| 205 | 203 | SAN AUGUSTINE | 1,815 | 94 | 1,068 | 31 |
| 206 | 204 | SAN JACINTO | 2,409 | 183 | 1,649 | 59 |
| 207 | 205 | SAN PATRICIO | 7,446 | 1,409 | 4,705 | 428 |
| 208 | 206 | SAN SABA | 766 | 25 | 579 | 12 |
| 209 | 207 | SCHLEICHER | 276 | 13 | 156 | 4 |
| 210 | 208 | SCURRY | 1,062 | 82 | 648 | 27 |
| 211 | 209 | SHACKELFORD | 595 | 30 | 434 | 11 |
| 212 | 210 | SHELBY | 1,455 | 129 | 629 | 38 |
| 213 | 211 | SHERMAN | 450 | 18 | 340 | 9 |
| 214 | 212 | SMITH | 6,023 | 1,584 | 2,750 | 347 |
| 215 | 213 | SOMERVELL | 1,084 | 43 | 806 | 13 |
| 216 | 214 | STARR | 8,604 | 1,216 | 5,233 | 439 |
| 217 | 215 | STEPHENS | 1,316 | 59 | 976 | 25 |
| 218 | 216 | STERLING | 239 | 16 | 178 | 4 |
| 219 | 217 | STONEWALL | 124 | 0 | 73 | 0 |
| 220 | 218 | SUTTON | 710 | 49 | 505 | 21 |
| 221 | 219 | SWISHER | 227 | 32 | 103 | 14 |
| 222 | 220 | TARRANT | 117,463 | 9,148 | 95,873 | 4,574 |
| 223 | 221 | TAYLOR | 9,173 | 934 | 7,160 | 339 |
| 224 | 222 | TERRELL | 221 | 0 | 134 | 0 |
| 225 | 223 | TERRY | 1,120 | 112 | 715 | 30 |

TX_00053962

Defendant's Exhibit #566

DE-006356

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 226 | 224 | THROCKMORTON | 353 | 3 | 270 | 0 |
| 227 | 225 | TITUS | 2,341 | 185 | 1,616 | 75 |
| 228 | 226 | TOM GREEN | 8,665 | 674 | 6,813 | 267 |
| 229 | 227 | TRAVIS | 92,269 | 9,824 | 65,903 | 3,617 |
| 230 | 228 | TRINITY | 2,722 | 414 | 1,683 | 118 |
| 231 | 229 | TYLER | 1,661 | 245 | 1,028 | 120 |
| 232 | 230 | UPSHUR | 4,695 | 532 | 3,389 | 211 |
| 233 | 231 | UPTON | 499 | 20 | 324 | 3 |
| 234 | 232 | UVALDE | 3,741 | 214 | 2,382 | 91 |
| 235 | 233 | VAL VERDE | 1,890 | 480 | 975 | 160 |
| 236 | 234 | VAN ZANDT | 4,504 | 120 | 3,217 | 44 |
| 237 | 235 | VICTORIA | 8,108 | 389 | 6,350 | 172 |
| 238 | 236 | WALKER | 2,644 | 286 | 1,899 | 86 |
| 239 | 237 | WALLER | 4,959 | 1,017 | 2,372 | 113 |
| 240 | 238 | WARD | 1,244 | 68 | 975 | 31 |
| 241 | 239 | WASHINGTON | 3,568 | 214 | 2,835 | 92 |
| 242 | 240 | WEBB | 20,106 | 949 | 13,648 | 474 |
| 243 | 241 | WHARTON | 5,225 | 265 | 4,051 | 117 |
| 244 | 242 | WHEELER | 270 | 32 | 163 | 13 |
| 245 | 243 | WICHITA | 2,298 | 1,222 | 886 | 313 |
| 246 | 244 | WILBARGER | 1,697 | 73 | 1,274 | 28 |
| 247 | 245 | WILLACY | 3,791 | 2 | 2,250 | 0 |
| 248 | 246 | WILLIAMSON | 24,412 | 1,784 | 19,962 | 796 |
| 249 | 247 | WILSON | 5,658 | 243 | 4,334 | 97 |
| 250 | 248 | WINKLER | 709 | 42 | 506 | 20 |
| 251 | 249 | WISE | 3,271 | 217 | 2,618 | 112 |
| 252 | 250 | WOOD | 3,668 | 398 | 2,847 | 90 |
| 253 | 251 | YOAKUM | 819 | 60 | 590 | 22 |
| 254 | 252 | YOUNG | 2,203 | 106 | 1,717 | 55 |
| 255 | 253 | ZAPATA | 2,294 | 88 | 1,540 | 27 |
| 256 | 254 | ZAVALA | 3,998 | 155 | 2,256 | 66 |
| 257 | | | | | | |
| 258 | | Statewide Total | 1,946,256 | 150,533 | 1,412,627 | 63,265 |

TX_00053963

Defendant's Exhibit #566

DE-006357



**HOUSE
RESEARCH
ORGANIZATION**
*Texas House of Representatives*

*focus* REPORT

*November 9, 2005*

*7* **Business Regulation**

*17* **Civil Liability**

*21* **Criminal Justice**

*39* **Economic Development**

*46* **Elections**

*55* **Environment**

*67* **Families & Children**

*78* **Government Affairs**

*89* **Health & Human Services**

*98* **Higher Education**

*108* **Judiciary**

*114* **Public Education**

*131* **Public Employees**

*136* **Taxation & Revenue**

*148* **Transportation**

*160* **Utilities**

# *Major Issues*
## *of the 79th Legislature, Regular Session and First and Second Called Sessions*

During its 2005 regular session, the 79th Texas Legislature enacted 1,389 bills and adopted nine joint resolutions after considering more than 5,600 measures filed. It also enacted two bills during the first called session and three bills during the second called session. This report provides an overview of some of the highlights of the regular session and the first and second called sessions, summarizing some proposals that were approved and some that were not. Also included is a brief review of the arguments offered for and against each measure as it was debated. The measures featured in this report are a sampling and are not intended to be comprehensive.

Other House Research Organization reports covering the 2005 sessions include those examining the bills vetoed by the governor and the constitutional amendments on the November 8, 2005, ballot and an upcoming report summarizing the general appropriations act for fiscal 2006-07.

# Contents

Page:

## Synopsis of Legislation, 79th Legislature                                          6

## Business Regulation                                                                7

| * HB 7 | Solomons | Workers' compensation revisions | 8 |
| HB 846 | Flynn | Regulation of payday loans | 11 |
| * HB 2026 | Hilderbran | Prohibiting Internet hunting | 13 |
| * SB 14 | Jackson | Penalties for insurers that unsuccessfully appeal rate rollbacks | 14 |
| * SB 327 | Zaffirini | Prohibiting Internet "spyware" transmission of unauthorized software | 15 |

## Civil Liability                                                                    17

| * HB 107 | Van Arsdale | Barring lawsuits alleging injury related to obesity or weight gain | 18 |
| * SB 15 | Janek | Civil claims involving exposure to asbestos and silica | 19 |

## Criminal Justice                                                                   21

| * HB 51 | T. Smith | Penalties and community supervision conditions for intoxication offenses | 22 |
| HB 151 | Truitt | Increasing the penalty for burglary of a vehicle offense | 23 |
| * HB 164 | Berman | Restricting the sale of products used to manufacture methamphetamines | 24 |
| HB 268 | Keel | Qualifications of appointed counsel for indigent defendants in capital cases | 26 |
| * HB 1068 | Driver | Creating the Texas Forensic Science Commission | 28 |
| HB 2193 | Madden | Revising the community supervision (probation) system | 30 |
| * SB 60 | Lucio | Life without parole for capital murder and eliminating life sentences | 33 |
| * SB 122 | Hinojosa | Prohibitions against identity theft | 35 |
| SB 1195 | Hinojosa | Requiring written, oral permission for police to conduct consent searches | 38 |

## Economic Development                                                               39

| * HB 1765 | Morrison | Establishing the Texas Emerging Technology Fund | 40 |
| * HB 1938 | Ritter | Reporting and oversight of grants from the Texas Enterprise Fund | 42 |
| * SB 877 | Madla | Direct shipment to consumers by domestic and out-of-state wineries | 43 |
| SJR 21 | Averitt/ | Authorizing the Legislature to exempt commercial loans from | |
| * HB 955 | Solomons | interest rate caps | 44 |

\* Enacted or approved by voters
(#) Introduced or enacted during first or second called session

## Elections 46

| | | | |
|---|---|---|---|
| * HB 57 | Denny | Limiting uniform election dates to May and November | 47 |
| HB 1348 | Eiland | Defining and clarifying political contributions and expenditures | 48 |
| HB 1706 | Denny | Requiring voters to present proof of identification at polling places | 50 |
| HB 2030 | Nixon | Residency eligibility to be a candidate for or to hold public office | 52 |
| HB 2405 | Keel | Return of marked, early mail ballot from a voter without application | 54 |

## Environment 55

| | | | |
|---|---|---|---|
| HB 86 | W. Smith | Standards for compliance histories of TCEQ-regulated industries | 56 |
| * HB 2481 | Bonnen | Revising the Texas Emissions Reduction Plan | 57 |
| HB 2833 | R. Cook | Revising regulatory takings to include impervious cover restrictions | 59 |
| HB 2915 | Puente | Allowing redesignation of river basins based on scientific evidence | 61 |
| SB 3 | Armbrister | Developing, managing, and conserving water resources | 62 |
| SB 1667 | Duncan | Transfer to TCEQ of responsibilities concerning radioactive substances | 65 |

## Families and Children 67

| | | | |
|---|---|---|---|
| * HB 1357 | Flores/ | Penalties for serving alcohol to minors | 68 |
| * HB 2868 | Frost | | |
| * HJR 6 | Chisum | Defining marriage as a union of one man and one woman | 70 |
| * SB 6 | Nelson | Child and adult protective services revisions | 72 |
| * SB 419 | Nelson | Abortion – parental consent and third trimester restrictions | 76 |

## Government Affairs 78

| | | | |
|---|---|---|---|
| HB 1434 | Hamric | Continuing the Texas Lottery Commission | 79 |
| HB 2544 | Hamric | Continuing the Texas Alcoholic Beverage Commission | 81 |
| * SB 7 (2) | Janek | Restricting eminent domain use for economic development purposes | 82 |
| * SB 9 | Staples | Expansion and modification of homeland security efforts | 84 |
| SB 1140 | Carona | Requiring legislators to cast record votes | 86 |
| * SB 1863 | Ogden | Appropriations-related statutory changes | 87 |

## Health and Human Services 89

| | | | |
|---|---|---|---|
| HB 1135 | Delisi | Creating a Medicaid buy-in program | 90 |
| * HB 1771 | Delisi | Establishing a Medicaid integrated care management pilot project | 91 |
| HB 1929 | Woolley/ | Stem cell research and ban on human cloning | 93 |
| HB 864 | P. King | | |
| HB 2572 | Truitt | Local MH/MR authorities serving as providers | 95 |
| * SB 410 | Whitmire | Standards for Canadian pharmacies shipping prescription drugs to Texas | 96 |

## Higher Education                                                                        **98**

| | | | |
|---|---|---|---|
| HB 6 (2) | Morrison | Authorizing tuition revenue bonds for higher education institutions | 99 |
| HB 2330 | Morrison | Limiting Top 10 Percent automatic admissions of undergraduate students | 101 |
| * SB 1227 | Shapiro | Student financial aid revisions and nonvoting student regent | 104 |
| SB 1228 | Shapiro | Statewide accountability system and tuition regulation review | 106 |


## Judiciary                                                                              **108**

| | | | |
|---|---|---|---|
| * HB 11 (2) | Hartnett | Increasing compensation for state judges and adding court fees | 109 |
| * SB 1189 | Wentworth | Creating new judicial districts in certain counties | 111 |
| * SB 1704 | Ellis | Raising the pay for jury service | 113 |


## Public Education                                                                        **114**

| | | | |
|---|---|---|---|
| HB 2 (2) | Grusendorf | School finance and public education revisions | 115 |
| HB 4 | Grusendorf | Funding instructional materials and technology for public schools | 120 |
| * HB 283 | Hope | Prevention of bullying in public schools | 123 |
| * HB 603 | Eissler | Consideration of intent or disciplinary history in student discipline policies | 124 |
| HB 1445 | Madden | Establishing a state virtual school network | 125 |
| HB 1476 | Edwards | Prohibiting sexually suggestive performances at school events | 127 |
| SB 422 | Jackson | Creating a publicly funded school voucher pilot program | 128 |


## Public Employees                                                                        **131**

| | | | |
|---|---|---|---|
| HB 1795 | Crownover | Authorizing health savings accounts for state employees | 132 |
| * SB 1691 | Duncan | Revising TRS retirement and benefit plans | 134 |


## Taxation and Revenue                                                                    **136**

| | | | |
|---|---|---|---|
| HB 3 (2) | J. Keffer | Restructuring the Texas tax system | 137 |
| HB 5 | Krusee | Indexing gasoline taxes to inflation | 141 |
| HB 9 | Flores | Authorizing video lottery terminals and casino gambling | 142 |
| HB 879 SB 447 | Madden/ Janek | Authorizing sale of local governments' tax receivables | 144 |
| HB 1006 | Isett | Lowering the rollback tax rate and setting notification requirements for taxing units | 145 |
| HJR 35 | Bohac | Authorizing a 5 percent cap on real property appraised value increases | 147 |

## Transportation                                                                148

| | | | |
|---|---|---|---|
| HB 1347 | Isett | Repealing authority to use red-light cameras and to civilly enforce traffic offenses | 149 |
| * HB 1546<br>* HJR 54 | McClendon/<br>McClendon | Creating the Texas Rail Relocation and Improvement Fund | 151 |
| * HB 2337 | Corte | Image verification system for issuance of driver's licenses | 152 |
| * HB 2702 | Krusee | Trans-Texas Corridor revisions and toll road conversion restrictions | 154 |
| * SB 1257 | Lindsay | Prohibitions against cell phone use while driving | 157 |
| * SB 1670 | Staples | Creating a motor vehicle liability insurance verification program | 158 |

## Utilities                                                                     160

| | | | |
|---|---|---|---|
| * HB 412 | Turner | Prohibiting use of credit scoring by electric and telecommunications providers | 161 |
| * SB 5 (2) | Fraser | Restructuring telecommunications and cable regulation | 162 |
| * SB 20 (1) | Fraser | Expanding the state's renewable energy portfolio standard program | 166 |
| * SB 408 | Nelson | Continuing the Public Utility Commission and revising ERCOT | 168 |

## Index by Bill Number                                                          170

# SYNOPSIS OF LEGISLATION
## 79th Legislature, Regular Session

|  | Introduced | Enacted* | Percent enacted |
|---|---|---|---|
| **House bills** | 3,592 | 876 | 24.4% |
| **Senate bills** | 1,892 | 513 | 27.1% |
| **TOTAL bills** | 5,484 | 1,389 | 25.3% |
| **HJRs** | 102 | 5 | 4.9% |
| **SJRs** | 43 | 4 | 9.3% |
| **TOTAL joint resolutions** | 145 | 9 | 6.2% |

*Includes 19 vetoed bills — eight House bills and 11 Senate bills

|  | 2003 | 2005 | Percent change |
|---|---|---|---|
| **Bills filed** | 5,596 | 5,484 | -2.0% |
| **Bills enacted** | 1,383 | 1,389 | 0.4% |
| **Bills vetoed** | 48 | 19 | -50.0% |
| **Joint resolutions filed** | 161 | 145 | -10.0% |
| **Joint resolutions adopted** | 21 | 9 | -57.1% |
| **Legislation sent or transferred to Calendars Committee** | 1,255 | 1,492 | 18.9% |
| **Legislation sent to Local and Consent Calendars Committee** | 1,096 | 921 | -16.0% |

*Source: Texas Legislative Information System.*



## Business Regulation

| | | | |
|---|---|---|---|
| * HB 7 | Solomons | Workers' compensation revisions | 8 |
| HB 846 | Flynn | Regulation of payday loans | 11 |
| * HB 2026 | Hilderbran | Prohibiting Internet hunting | 13 |
| * SB 14 | Jackson | Penalties for insurers that unsuccessfully appeal rate rollbacks | 14 |
| * SB 327 | Zaffirini | Prohibiting Internet "spyware" transmission of unauthorized software | 15 |

# Workers' compensation revisions

**HB 7 by Solomons**
*Effective generally September 1, 2005*

**HB 7** revises the Texas workers' compensation system, a no-fault, state supervised, employer-funded system established under the Workers' Compensation Act (Labor Code, Title 5, subtitle A) to pay the medical expenses of employees who are injured on the job and to compensate them for lost earnings.

***Administrative structure.*** HB 7 abolishes the Texas Workers' Compensation Commission (TWCC) and creates a Division of Workers' Compensation (TDWC) within the Texas Department of Insurance (TDI) with a commissioner appointed by the governor. The new commissioner exercises all authority over workers' compensation with the advice of the TDI commissioner. The bill creates an Office of Injured Employee Counsel (OIEC) administratively attached to, but independent of, TDI to represent the interests of injured employees as a group and to supervise and advise ombudsmen.

Other regulatory functions that TDWC performs include performance-based oversight and prioritization of complaints, preparation of return-to-work educational materials, and a requirement that insurers offer skilled case management for certain injured workers.

***Networks of providers.*** Medical care under HB 7 is managed through networks of providers, certified by TDI and similar to those used in group health. Under the bill, a network must include providers within 30 miles of an employee's home in urban areas and within 60 miles in rural areas, with a 75-mile standard for access to specialists. It also establishes a structure for out-of-network care. The bill permits a group health network to become certified as a workers' compensation network. Employers that choose to use a workers' compensation network may require their employees who live in the network area to use an in-network provider, but a carrier is required to pay for out-of-network care for employees who live outside the network. An employee in an HMO group health plan also may opt to receive care from his or her HMO primary care provider.

The bill sets up treatment guidelines, fee guidelines, prompt pay requirements, limited liability of $7,000 for medical care prior to a denial of compensability, and preauthorization requirements and prohibits retrospective denial. It requires the adoption of a closed formulary for prescription drugs. Networks are not required to accept any willing provider.

***Dispute resolution.*** Much of the existing dispute system is maintained for medical disputes, including the use of Independent Review Organizations for medical necessity disputes both in and out of network, although in-network fee disputes will not be subject to outside review. Appeal to the State Office of Administrative Hearings no longer is included in the dispute resolution process. TDWC also will adopt rules determining the requirements for doctors that perform peer review and rules regarding electronic billing.

Dispute resolution for income benefits largely is retained, although the number of Benefit Review Conferences is limited, with mediation as their goal. HB 7 permits involvement of a designated doctor in more disputes where the central issue is related to a medical determination and establishes appeal and evidentiary standards. The appeals panel process remains but is modified to include a three-member panel.

***Income benefits.*** HB 7 sets the basis for the cap on weekly workers' compensation income benefits, the State Average Weekly Wage, at 88 percent of the average weekly wage computed by the Texas Workforce Commission (TWC). The TDWC commissioner also is authorized to increase the State Average Weekly Wage up to 100 percent of the TWC rate. The current requirement that an injured employee who receives supplemental income benefits make a "good faith effort" to find work was strengthened.

***Post-injury waivers.*** The bill establishes a "cooling-off" period for post-injury waivers by non-subscribers – companies that do not participate in workers' compensation through TDWC. The waiver is not effective if it is signed less than 10 days post-injury and after the employee has been evaluated by a non-emergency provider.

## Supporters said

The Texas workers' compensation system is broken: return-to-work rates are too low; utilization is too high; physicians are leaving the system; and premiums are rising. The regulatory structure under TWCC has little strategic direction, inefficient management, and no accountability. Nothing short of a complete overhaul of workers' compensation in Texas will give injured employees the assistance they deserve. Injured employees bear the brunt of this inefficient system. Compared to other states, Texas

workers are off work longer, and fewer return to work within two years. After two years, one-third of injured workers in Texas have not returned to their jobs, and 15 percent never go back. It also is more difficult for Texas workers to find doctors to treat them. According to physician groups, the number of doctors who will treat workers' compensation patients has declined by 50 percent over the last two years.

The regulatory structure is to blame for many of the problems in the workers' compensation system. Two of the most significant hurdles the regulatory structure creates are the time it takes to resolve complaints and an inability to implement measures to stem rising costs of medical care. Merely applying new fixes to the existing regulatory structure would doom any reform. TWCC should be abolished because the agency has a long history of failing adequately to manage the workers' compensation system. The agency is burdened by layers of administration and history, as attempts to reform the workers' compensation system over the years have created a Byzantine administrative structure. For example, the policy goal in the 1980s of moving dispute resolution out of the courts created a duplicative and endless dispute resolution and appeal process at TWCC. Also, the six-commissioner structure leads more often to gridlock than to efficient administration.

TDI, with a single commissioner and experience in other insurance products, would be the best place for the new workers' compensation system. A single commissioner would be responsive and accountable, and the department has demonstrated efficient regulation of the insurance industry for years. Because the medical side of workers' compensation would be modeled after group health, TDI would be the logical place to put the new regulatory structure.

The new Office of Injured Employee Counsel would improve employees' access to information and assistance. Even though workers' compensation would not be under a stand-alone agency, employees actually would have better access because the OIEC would serve as a single point of contact for assistance in obtaining benefits, sorting through disputes with carriers, receiving information about return-to-work, and helping navigate services at other state agencies.

Networks of providers would fix many of the problems in the system. Because networks use primary-care doctors to ensure appropriate utilization, injured employees would be treated more efficiently and appropriately. No longer would they be seen for weeks or months on end by a practitioner whose motivation is continued payment by the workers' compensation carrier. Providers also would be better off under a network structure. The current system requires retrospective review and can make payment very slow because the carrier has little assurance that the medical service is appropriate. Also, providers are paid a fixed rate under the current system, whereas networks base their negotiations on market rates, which would result in more appropriate compensation for providers.

Because workers' compensation networks would look like group health networks, dispute resolution for medical necessity and fee disputes would be removed from the state regulator to the well established and universally agreed-upon system of independent review and contract agreements. In addition, the bill would offer an alternative to independent review for claims that were too small to justify the cost.

What constitutes an adequate network is clearly defined in this bill and would ensure that all workers in Texas have access to care, no matter where they live. Requiring the availability of a broad range of medical services within a 30-mile radius in urban areas and within 60 miles in rural areas would assure the availability of care. In areas of the state without sufficient medical resources, the bill includes procedures for out-of-network care.

The bill includes prompt pay protection for providers and carriers to ensure that bills are submitted and paid in a timely manner. The issue of compensability, unique to workers' compensation, is addressed by requiring carriers to pay for services until the compensability issue is identified by the carrier, but limiting their exposure to $7,000. This would ensure that patients received timely treatment and that providers were not left with unpaid bills.

In addition to improving the medical side of workers' compensation, HB 7 would increase the income benefits that injured workers receive. The basis for wages currently used to calculate income benefits lags behind the market and leaves workers under-compensated. The bill would tie it to the basis used for unemployment, which is higher and tracks the market.

This package of changes represents a new era in workers' compensation for Texas and could lay the groundwork for more participation by employers. The current system is so fraught with problems that many employers choose to go without workers' compensation insurance or to purchase policies outside the system that offer neither employer nor employee significant protections. Making workers' compensation mandatory is not feasible from an economic development perspective, but it makes sense to improve the system so that more companies will join.

## Opponents said

HB 7 would not produce all of the promised improvements in the workers' compensation system. Although the bill would prescribe sweeping changes, lawmakers should consider closely the finer points of the proposed revisions.

Moving workers' compensation to TDI would be a mistake. Workers' compensation is not an insurance product like property or health insurance, but is a way to manage the relationship between employers and injured workers without involving the courts. Without a dedicated, stand-alone agency, workers would not have adequate influence concerning the rules governing the system and could be treated unfairly without legal recourse. A better approach would be to take the elements that work at TDI – a single commissioner, streamlined review processes, and an office that represents individuals – and apply them to TWCC. TDI could have a conflict of interest with workers' compensation under its purview. The agency that regulates the carriers that write workers' compensation policies should not also administer dispute resolutions between carriers and providers or employees.

The bill should have more stringent return-to-work requirements. The problem with injured employees returning often is not with the employee but rather with the employer. Even if the worker is ready to come back at light or modified duty, some employers are reluctant to allow them due to fears of subsequent injury or low productivity. The longer an employee stays off work, the less likely he or she is to return, which may result in permanent disability or the need for public assistance. Texas seriously should encourage employee reintegration with work by requiring employers to accept employees when they are ready to return.

HB 7 also would fail to address the suitability of work for injured employees trying to comply with the requirement that they look for work in order to receive Supplemental Income Benefits. The requirement would be a step in the right direction, but injured employees should not be forced into taking jobs that are far below their skill levels in order to avoid penalties. The Texas Unemployment Compensation Act and TWC rules address this issue for unemployed workers because the goal is to get workers back into sustainable, appropriate jobs or careers, which also should be the goal for workers' compensation.

Compensability is a difficult issue to reconcile with prompt pay, and this bill would not completely solve the problem. Although a $7,000 limit on carrier liability would pay for some services, it would not come close to covering spinal surgery or multiple bone scans, for example. A higher limit would be more appropriate, particularly one that floats with the market because any fixed amount could be outpaced by new technology and higher costs within a few years.

Because networks are designed to reduce costs and improve treatment outcomes, which should translate into reduced workers' compensation premiums, the bill should ensure that all employers can participate. Carriers might offer network access only to large employers because their business is more valuable. Small employers have experienced similar discrimination in group health where it has been difficult for them to obtain affordable health coverage for their employees.

The "cooling off" requirement before workers sign waivers of liability could cause workers to go without care. Some companies that do not have workers' compensation insurance still carry an insurance product that would give injured workers some benefits and often ask the worker to sign a waiver of future liability in exchange for access to the benefits. Companies are not required to carry any insurance, and requiring a cooling off period might cause them to withhold medical treatment until the waiver was signed.

## Notes

The **HRO analysis** of HB 7 appeared in the March 30 *Daily Floor Report*. The analysis of the companion bill, SB 5 by Staples, which included the substance of HB 7 as passed by the House, appeared in the May 13 *Daily Floor Report*.

# Regulation of payday loans

**HB 846 by Flynn**
*Died in the House*

**HB 846** would have revised provisions governing deferred presentment transactions, commonly known as "payday loans," by both lenders and third-party providers. A lender could not have advanced more than $1,000, engaged in a transaction with a term of less than seven days or more than 45 days, or assessed a finance charge of more than $15 for every $100 advanced. A borrower could have rescinded the transaction by 5 p.m. on the business day after the transaction. A borrower could not have entered into more than two consecutive transactions following an initial transaction, and each consecutive transaction would have required a 10 percent reduction in the principal amount of the debt. The borrower could have entered a repayment plan if the borrower entered into a second consecutive transaction.

The lender could have collected a one-time insufficient funds fee of $20 or less per returned instrument and only could have used civil means to collect unless the borrower had employed deception in obtaining the loan. A lender could not have contacted a borrower's employer about a deferred presentment debt, communicated facts about a borrower's indebtedness to an employer, or threatened criminal prosecution to collect an amount due. A lender could not have garnished the wages of a borrower who was a member of the armed forces or engaged in collection activity against a member of the armed forces or national guard member on active duty.

The consumer credit commissioner annually would have prepared a consolidated analysis and recapitulation of reports from each lender to the Legislature and the governor and made aggregate data available to the public. A licensed lender or third-party provider could have been examined and investigated by the commissioner. The bill also would have required distribution of certain consumer education materials and reference information on credit counseling agencies.

## Supporters said

HB 846 would provide extensive protections to consumers who seek payday loans. It would limit the amounts of fees that could be charged and the number of times a transaction could be renewed, add requirements for an extended repayment plan and a 10 percent pay-down

for the principal on a loan, and allow rescission of the loan if the borrower had concerns after signing an agreement. In addition, the bill would provide special protections for military personnel.

HB 846 would reduce the cost of payday loans to Texas consumers, who currently pay between $17 and $24 per $100 borrowed from out-of-state banks and about $30 per $100 to Internet and disguised payday lenders. The $15 per $100 fee in this bill generally would be less than fees for bouncing a check, overdraft protection, or late fees on bills. A more restrictive rate would prohibit most businesses from operating in Texas, and Texas consumers would be forced to do business either with more expensive out-of-state banks or unregulated operators. Annualized percentage rates are a deceiving comparison for the cost of loans. Consumers have choices in financing short-term needs, and they routinely choose payday loans over other options.

Payday loans are not targeted specifically to low-income families. More than 50 percent of Texans who use this product earn between $25,000 and $50,000 per year. A $1,000 loan limit would be appropriate to meet the loan needs of many middle-income people without unduly burdening them with debt. Most payday lenders use income testing as a criterion for extending a loan so that people whose salaries could not support such an extension of credit would receive only the appropriate amount of funds.

## Opponents said

HB 846 would allow lenders to prey on poor and working-class families. It would increase the cap on interest rates consumers pay on loans to $15 per $100 loan. For an average loan of two weeks, this would be the equivalent of 390 percent APR – almost one-third higher than the cap allowed under current law. In addition, most of the 34 other states regulating payday loans set the maximum loan at $500 or less. Even with a 45-day term, a $1,000 loan is equal to 75 percent of a minimum wage worker's gross salary during that time period.

Many low-income borrowers find themselves unable to repay their loan amounts plus fees at the end of the loan term, and these individuals are forced to carry their debt past the original term, incurring more fees in the process.

Although the bill would allow borrowers to engage in no more than three consecutive transactions, new fees would be added each time, and the borrower would be required to pay down only 10 percent of the principal. In addition, even when a borrower paid off one loan, he or she still could obtain another one the next day. This bill would not provide enough protections to advance a borrower out of a cycle of debt.

Regardless of all its supposed protections, HB 846 would not protect Texas borrowers from higher rates charged by lenders affiliated with out-of-state banks. If Texas wishes to compete more effectively with out-of-state-banks, it should close the loophole allowing out-of-state banks to export exorbitant rates to their Texas affiliates instead of increasing the rate cap on loans at Texas-chartered banks.

## Notes

The **HRO analysis** appeared in Part Two of the May 5 *Daily Floor Report*.

# Prohibiting Internet hunting

**HB 2026 by Hilderbran**
*Effective June 18, 2005*

**HB 2026** prohibits a person from engaging in computer-assisted remote hunting or providing or operating facilities for computer-assisted remote hunting, if the animal being hunted is located in Texas. This practice involves the use of computer technology, including the Internet, to shoot animals or birds using a firearm or archery equipment via remote control in real time. The first offense is a class B Parks and Wildlife Code misdemeanor, punishable by a fine of between $200 and $2,000 and/or a jail term of 180 days. A subsequent offense is a class A misdemeanor, punishable by a fine of between $500 and $4,000 and/or a jail term of one year. Simply providing materials that could be used in the process of computer-assisted hunting, such as a computer or camera, does not constitute an offense.

In addition to prohibiting Internet hunting, HB 2026 makes numerous other changes to the Parks and Wildlife Code.

## Supporters said

Computer-assisted remote hunting is not "hunting" in any meaningful sense of the word because animals have no chance to sense and flee the hunter, who is miles away in front of a computer screen. In reality, Internet hunting is cruel, pay-per-view slaughter. No self-respecting hunter would condone such a practice, and neither should the state.

Hunters in Texas must have a hunting license. When someone "hunts" in Texas via the Internet, there is no way to verify that the person sitting in front of the computer screen has a valid Texas hunting license. This practice should be banned altogether, if only for the sake of enforcing hunting license requirements.

There is no assurance that a remote hunting company would have a safety manager on site because the state does not regulate these businesses. Also, Internet hunting would not be the only opportunity for people with disabilities to participate in hunting because many groups offer assistance that allows such people to participate in legitimate hunting activities.

## Opponents said

Internet hunting is a new development that allows many people to enjoy the sport of hunting who otherwise could not. For example, computer-assisted remote hunting gives people with severe disabilities the chance to participate in this activity. Also, because there is always a human managing the rifle on site for safety reasons, animals have the chance to sense the hunter's assistant. Internet hunting should not be banned because it could be a growth industry in Texas and a potential source of tax revenue.

## Notes

The **HRO analysis** appeared in Part One of the May 11 *Daily Floor Report.*

HB 391 by T. Smith, which died in the House, also would have outlawed computer-assisted remote hunting. It would have made a first offense and subsequent offenses class A Parks and Wildlife Code misdemeanors. The HRO analysis appeared in Part Two of the May 12 *Daily Floor Report.*

# Penalties for insurers that unsuccessfully appeal rate rollbacks

**SB 14 by Jackson**
*Effective September 1, 2005*

**SB 14** increases the interest penalty required if an insurer unsuccessfully appeals a rate refund in court. The interest will be the lesser of 18 percent or 6 percent plus the prime rate for the calendar year in which the commissioner's order was issued. Interest accrues beginning on the date when the commissioner issued the order and continues to accrue until the refund is paid. An insurer will not be required to pay any interest penalty if the company prevails in an appeal of the commissioner's order. An insurer may not claim a premium tax credit to which it otherwise would be entitled if it does not comply with the requirements of the bill.

SB 14 also adds a new section to the Insurance Code governing regulation of insurer market conduct to establish a framework for market conduct actions by the Texas Department of Insurance (TDI), including:

- processes and systems for identifying, assessing, and prioritizing market conduct problems that have a substantial adverse effect on consumers, policyholders, and claimants;
- development of appropriate market conduct actions by TDI to substantiate and remedy market conduct problems; and
- procedures to communicate and coordinate market conduct actions with other states to foster the most efficient and effective use of resources.

## Supporters said

Prompted by skyrocketing property insurance premiums, the 78th Legislature in 2003 enacted SB 14 by Jackson, which authorized the insurance commissioner to order rate cuts if rates were found to be excessive. Two of the state's largest insurers challenged the rate cuts in court, denying immediate relief to Texas homeowners. By imposing stiff penalties on insurers that unsuccessfully challenge rate rollbacks, SB 14 would provide fair compensation to consumers and serve as a deterrent to companies that try to game the system. The penalties in existing law are not severe enough to prevent insurers from using court challenges as a stalling tactic when a refund is ordered.

The bill would help deter companies from charging consumers excessive or unfairly discriminatory premiums, as State Farm has continued to do even though TDI ordered the company to roll back its rates by 12 percent in 2003. By using appeals to the courts as a stalling tactic, State Farm has withheld from consumers an estimated $155 million in overcharges each year. Stiffer penalties are needed to prevent such actions in the future.

## Opponents said

SB 14 is unnecessary because the current penalty of 1 percent interest is sufficient to prevent a company from pursuing an unsuccessful appeal in court as a stalling tactic. The bill would not have affected State Farm because their appeal was successful, and the company continues to contend that its rates are justified.

## Notes

The **HRO analysis** of SB 14 appeared in Part One of the May 24 *Daily Floor Report.*

# Prohibiting Internet "spyware" transmission of unauthorized software

**SB 327 by Zaffirini**
*Effective September 1, 2005*

**SB 327** prohibits a person who is not the owner or operator of a computer from knowingly transmitting computer software to a computer in Texas and using the software, through intentionally deceptive means, to collect personally identifiable information, modify settings, disable software, open advertisements, or produce other results, each specified in the bill, that are typically the effects of computer "spyware."

The bill allows a provider of computer software, an owner of a web page or trademark, or a telecommunications carrier or Internet service provider adversely affected by violations in the bill to bring a civil action against the person committing the violation and makes a person who commits a violation liable to the state for a civil penalty of up to $100,000 for each violation. If it appears to the attorney general that a person is engaging in, has engaged in, or is about to engage in a violation, the attorney general may request a temporary restraining order or a permanent or temporary injunction.

## Supporters said

SB 327 would prohibit a number of activities related to "spyware," which is software secretly placed on a user's computer to monitor, collect, and transmit personally identifiable information without the user's knowledge or consent. Spyware is installed for a myriad of reasons, including tracking a user's online behavior, browsing for market research, sending pop-up ads, redirecting computer users to web sites, or recording keystrokes, and can be transferred via spam or bundled with freeware, shareware, or games downloaded from the Internet. Spyware can cause the drastic slowing of infected computers, corruption of the hard drive, or disabling of hardware and software settings.

According to the National Cyber Security Alliance, nine out of 10 computers connected to the Internet are infected with spyware. A recent audit by Earthlink found that the average computer had more than 26 spyware programs installed. The net impact of this problem will be citizens' loss of confidence in the Internet and a reluctance to engage in online business transactions.

The bill would protect the privacy of Texas consumers and establish a cause of action for those adversely affected by spyware, including software companies, web page or trademark owners, and the general public through actions brought by the attorney general. Existing statutes do not expressly prohibit activities relating to spyware. By specifically identifying such prohibitions, the bill would provide clear authority for the attorney general and others to pursue civil actions against those who knowingly and deceptively transmit and use spyware.

The bill is carefully crafted to define and outline prohibited behaviors, rather than actually to define spyware. Beneficial uses of technology that could be defined as spyware would not be prohibited because the bill would specify that prohibited activities must be conducted with an intent to deceive.

## Opponents said

The activities addressed in SB 327 already are prohibited under existing laws addressing fraud and deceptive trade practices. Nothing prevents the attorney general or anyone else from taking civil action under these statutes. The bill broadly would apply the term "intent to deceive" in connection with prohibited behaviors, establishing a standard that could be difficult to prove and would raise the bar for litigation. Because of the difficulty of proving intent, the bill could be virtually unenforceable. Spyware is difficult to define, and beneficial uses, such as using "cookies" to collect and save credit card information so that it does not have to be reentered, could be affected. This is a rapidly changing technology, and many potentially beneficial uses yet to be developed could be outlawed.

## Other opponents said

SB 327 should include provisions on notice, consent, and specification of purpose when spyware was used without the intent to deceive and thus not prohibited by most provisions in the bill. The bill would have limited impact on the spyware problem because it does not address all

uses of spyware. Various types of known spyware, many of which are not addressed by SB 327, could continue to be distributed.

## Notes

The **HRO analysis** of SB 327 appeared in Part One of the May 23 *Daily Floor Report*.

A related bill, HB 1098 by McCall, effective September 1, 2005, prohibits Internet "phishing" fraud. It prohibits creating a web page or Internet domain name representing a legitimate online business without the business owner's authorization and using that web page or domain name to solicit personal identifying information with the intent to use it fraudulently. The bill also prohibits sending an e-mail that falsely represents itself as being sent from a legitimate business, refers the recipient to a falsely represented Web site, and solicits personal identifying information from the recipient for a purpose that the recipient believes to be legitimate. The HRO analysis of HB 1098 appeared in the April 4 *Daily Floor Report*.



Civil Liability

* HB 107   Van Arsdale   Barring lawsuits alleging injury related to obesity or weight gain   18
* SB 15    Janek        Civil claims involving exposure to asbestos and silica   19

# Barring lawsuits alleging injuries related to obesity or weight gain

**HB 107 by Van Arsdale**
*Effective September 1, 2005*

**HB 107** bars lawsuits against a manufacturer, seller, trade association, livestock producer, or agricultural producer for claims arising from weight gain or obesity or a health condition associated with weight gain or obesity.  The following actions are not barred: claims for damages arising from obesity-related injuries caused by cosmetics, medicine, or dietary supplements; claims alleging that a manufacturer or seller knowingly and willfully violated a federal or state law in the manufacture, marketing, distribution, advertisement, labeling, or sale of a food if the violation was a cause of the person's obesity-related injury; claims under the Texas Food, Drug, and Cosmetic Act; and requests by the attorney general for restraining orders for deceptive trade practices. The bill limits discovery for claims permitted by the bill.

## Supporters said

Frivolous claims alleging obesity or weight gain recently have been filed in the United States and should not be permitted in Texas. The bill would protect manufacturers, sellers, trade associations, livestock producers, and agricultural producers against liability from frivolous claims. Individuals are responsible for their food and nutrition choices, and excessive litigation restricts the range of choices that otherwise would be available to those who consume products responsibly. Changing regulation of the food industry through lawsuits rather than new laws or regulations undermines the balance between personal responsibility for one's food choices and the supplier's right to provide those choices. HB 107 would affirm that each individual must assume responsibility for his or her own food choices.

## Opponents said

Food companies should not have immunity from suit for intentionally enticing children to eat unhealthy food. Young children should not be held to the same standard of personal responsibility in food choices as adults. Children are not personally accountable for their food choices in the same way that adults are because children do not have the capacity to make educated decisions about nutrition. Many food companies take advantage of this by marketing unhealthy food specifically to children. Very few of these suits have been filed in the United States, and none has succeeded.

HB 107 is a solution in search of a problem. Legislative intervention in the form of blanket immunity is not necessary. Consumers are entitled to due process, which the bill would deny them. The Legislature should not interfere with the job of the courts.

## Notes

The **HRO analysis** appeared in the May 4 *Daily Floor Report.*

# Civil claims involving exposure to asbestos and silica

**SB 15 by Janek**
*Effective September 1, 2005*

**SB 15** requires persons who claim an asbestos or silica-related injury to file a report proving that they meet certain medical criteria before they can proceed with their action in court. The bill establishes a pretrial multidistrict litigation process and changes the statute of limitations for bringing an action for personal injury or death related to asbestos or silica.

***Asbestos claims.*** A plaintiff claiming an asbestos-related injury must serve on each defendant a report prepared by a board-certified doctor establishing that the plaintiff has been diagnosed with mesothelioma or another asbestos-related cancer and that the plaintiff's exposure to asbestos was a likely cause of the plaintiff's illness. Alternately, a separate report may establish that the plaintiff has been diagnosed with a less serious health condition as a result of exposure to asbestos. In order to proceed with the suit, a certain level of impairment is required. For plaintiffs who have filed actions before May 1, 2005, a lower level of impairment is required.

***Silica claims.*** A plaintiff claiming a silica-related injury must serve on each defendant a report prepared by a board-certified doctor confirming that the doctor has performed a physical examination of the plaintiff and that the plaintiff's condition probably was caused by silica exposure. The report must include numerous medical reports, including pulmonary function tests and lung volume tests, that the doctor reviewed to reach the conclusions. In order to proceed with the suit, a certain level of impairment is required.

***Multidistrict litigation.*** SB 15 establishes multidistrict litigation (MDL) proceedings for asbestos and silica claims. MDL rules apply to any action pending on September 1, 2005, unless the action was filed before September 1, 2003, and:

- the trial already had begun or begins within 90 days of September 1, 2005;
- the plaintiff serves a report compliant with the one required by the bill within 90 days after September 1, 2005; or
- the plaintiff has malignant mesothelioma or a malignant asbestos or silica-related cancer.

For a case that is pending on September 1, 2005, the plaintiff has the option to file an alternate medical report based on different criteria than the previously described medical reports to determine asbestos- or silica-related impairment. The doctor making such a report must conclude that the plaintiff's condition probably was caused by exposure to asbestos or silica and that the plaintiff has physical impairment comparable to the impairment a person would have if the plaintiff met the criteria established in the medical report that would be required of a plaintiff whose case was not pending on September 1, 2005.

An alternate report also may be introduced in lieu of a regular medical report for an action filed on or after September 1, 2005, under certain circumstances. For example, a MDL court could find that, due to unique or extraordinary physical or medical characteristics of the plaintiff, the criteria in a regular medical report do not adequately assess the plaintiff's impairment.

***Statute of limitations and other provisions.*** The bill changes the date on which the two-year statute of limitations begins to run for asbestos and silica-related injuries. The period begins to run either on the exposed person's death or when the plaintiff serves on the defendant a report that complies with the bill. The change in the statute of limitations applies only to an action that commences or is pending on or after September 1, 2005.

## Supporters said

SB 15 would establish a fair compromise between the interests of those who have been exposed to asbestos and silica and companies that may be sued for such exposure. The bill would ensure that only those who were already ill from exposure to asbestos or silica could bring a case in Texas. It also would protect those people who had been exposed to asbestos or silica but had not become ill by changing the way the statute of limitations applies to their claims.

Exposure to asbestos or silica does not necessarily mean that a person will become ill. Under current law, however, persons who believe they might have an asbestos or silica-

related disease must file a claim for damages within two years or lose the ability to file a claim at all. This results in thousands of people filing claims each year simply so they will not lose the ability to file a claim later should they develop an illness. SB 15 would address this problem by changing the statute of limitations as it applies to asbestos and silica-related illnesses such that the two-year period would not begin to run until a plaintiff served a defendant with a medical report establishing that the plaintiff had an asbestos- or silica-related impairment. This alone would clear thousands of cases from Texas courts, allowing cases involving plaintiffs who already are gravely ill to be heard much more quickly.

The bill also would require plaintiffs to meet certain minimum medical criteria to establish that they truly are ill. This would save millions of dollars for businesses that might have exposed their workers to asbestos or silica because people who were not sick could not file claims, and these businesses, as a result, would not have to pay attorney's fees and damage awards to people who were not, and might never become, ill.

By establishing a pretrial MDL process, SB 15 dramatically would decrease forum shopping in Texas. While asbestos cases may be filed in either state or federal court, the percentage of cases filed in federal court has fallen to less than 20 percent since the early 1990s when the federal court system began transferring cases to a single judge for multidistrict litigation. At that time, Texas saw a sharp increase in the number of asbestos cases filed in state court. Texas has about half of all asbestos claims filed in the nation. Claimants frequently "forum shop" and often wind up in Texas courts because the laws governing punitive damages and the juries in Texas are favorable to plaintiffs. By routing cases through MDL proceedings, rather than allowing them to go straight to trial before a jury, SB 15 would reduce the number of asbestos and silica cases filed in Texas.

## Opponents said

SB 15 unfairly would limit Texans' access to courts, rationing justice by limiting those who could pursue their claims. Many people who have asbestos- or silica-related illnesses would be precluded by the minimum medical criteria from seeking justice through the courts. Many workers would not be qualified to bring a case even if they were too ill to work. Under the current system, juries decide whether a claimant is impaired as part of their deliberations

about liability. SB 15 would take that power away from juries and give it the Legislature. Texas relies on juries to make decisions in highly complex cases, including life and death decisions in capital murder cases, and they are sufficiently qualified to evaluate asbestos and silica cases as well. Additionally, only 6 percent of personal injury suits filed in Texas do not involve auto accidents, and asbestos and silica cases are only a small portion of those non-auto cases. Texas courts are not overwhelmed by asbestos and silica cases, so there is no justification for limiting access to the courts in this way.

The implication that healthy individuals are filing claims is false. Asbestos cases are very difficult and costly to pursue, so lawyers have an economic interest only in taking cases in which an actual injury occurred. Texas may have a larger proportion of asbestos cases than other states because it has a significant industrial base, a large resident retiree population that was exposed to asbestos years before, a transitory industrial workforce that has temporary residency, and a history of product liability litigation with specialized legal practices. Changes in the venue laws in the mid-1990s required that plaintiffs plead and prove sufficient facts to show that a Texas venue was proper in filing such cases. The new venue rules authorize judges to remove cases that do not belong in the state. Because cases take years to resolve, there may be cases in the system that were filed under old venue rules, which may have inflated Texas' numbers.

The recent resurgence in the number of cases filed in Texas is due to a one-time underlying factor — mass screening. During the late 1990s, some plaintiff law firms offered free x-ray screening for members of certain unions whose work might have exposed them to asbestos. That screening caught a number of cases that otherwise would have gone undetected for many more years. It created a false "bubble" in filings because workers who otherwise would not have filed until a disease was diagnosed proceeded with a claim while the statute of limitations still applied.

Applying SB 15 retroactively to certain claimants who already have cases pending would be unfair. These cases should be governed by the law in effect when they were filed.

## Notes

The **HRO analysis** appeared in the May 10 *Daily Floor Report.*



Criminal Justice

| * HB 51 | T. Smith | Penalties and community supervision conditions for intoxication offenses | 22 |
| HB 151 | Truitt | Increasing the penalty for burglary of a vehicle offense | 23 |
| * HB 164 | Berman | Restricting the sale of products used to manufacture methamphetamines | 24 |
| HB 268 | Keel | Qualifications of appointed counsel for indigent defendants in capital cases | 26 |
| * HB 1068 | Driver | Creating the Texas Forensic Science Commission | 28 |
| HB 2193 | Madden | Revising the community supervision (probation) system | 30 |
| * SB 60 | Lucio | Life without parole for capital murder and eliminating life sentences | 33 |
| * SB 122 | Hinojosa | Prohibitions against identity theft | 35 |
| SB 1195 | Hinojosa | Requiring written, oral permission for police to conduct consent searches | 38 |

# Penalties and community supervision conditions for intoxication offenses

**HB 51 by T. Smith**
*Effective September 1, 2005*

**HB 51** requires those granted community supervision (probation) for intoxication while driving, boating, flying, or operating an amusement ride to install ignition interlock systems on their vehicles when placed on probation if they had a blood-alcohol concentration of 0.15 or greater when the offense took place. The bill repeals provisions in the Penal Code that limit consideration of previous intoxication offenses to 10 years for purposes of enhancing penalties. It also allows consideration of previous offenses of driving while intoxicated (DWI) with a child in the vehicle for penalty enhancement.

## Supporters said

HB 51 would require careful monitoring of the most serious DWI offenders, which could save lives. A person with an alcohol level of 0.15 or higher is much more intoxicated than a person with an alcohol level of 0.08, the minimum point at which the Penal Code deems someone to be intoxicated. Texas is among the states with the highest rates of alcohol-related traffic deaths, and lawmakers should do everything possible to change that. In 1999, Texas drivers with blood alcohol levels of 0.15 or greater were involved in an estimated 161,900 crashes that killed 1,345 people and injured 55,600. Statistics show that although these drivers represent only 1 percent of all drivers on a weekend night, they are involved in about 50 percent of fatal crashes in that period. HB 51 also would deter offenders on probation from committing repeat offenses and subject them to a high level of monitoring by requiring them to install ignition interlock systems.

By removing the current 10-year limit on using a prior offense to enhance punishment, the bill would make the enhancement for repeat intoxication offenses similar to that used for all other types of criminal offenses. There

is no logical reason for this 10-year limit because there is no such limitation for any other offense. Eliminating this rule is especially important when a repeat offender commits a serious intoxication offense such as intoxication manslaughter. Limiting prior convictions to those that occur within 10 years allows a person periodically to start with a clean slate. This is inappropriate for alcohol offenses because it limits courts in their analysis of a person's crimes and potential to behave dangerously in the future.

## Opponents said

It would be unfair to eliminate the current 10-year time limit on intoxication offenses. This could allow for an enhanced punishment even if a previous offense occurred 25 years before, when the driver was a teenager. The former law was designed to enable someone convicted of an intoxication offense to earn a fresh start by abiding by the law for a decade. This is especially important when dealing with intoxication offenses, because without these provisions, a small lapse in judgment, especially during a period when society viewed alcohol use more leniently, could lead to an enhanced penalty later.

## Notes

The **HRO analysis** appeared in Part Two of the May 10 *Daily Floor Report*.

HB 49 by T. Smith, which also would have allowed prior convictions of driving while intoxicated with a child in the vehicle and certain intoxication convictions that were more than 10 years old to be used for enhancement purposes, passed the House but died in the Senate.

# Increasing the penalty for burglary of a vehicle offense

**HB 151 by Truitt**
*Died in Senate committee*

**HB 151** would have increased the penalty for burglarizing a vehicle from a class A misdemeanor to a state jail felony (180 days to two years in a state jail and an optional fine of up to $10,000).

## Supporters said

Since 1994, when the penalty for burglary of a vehicle was reduced to a misdemeanor, burglaries of vehicles have increased dramatically in Texas. Many offenders arrested for burglary of a vehicle are repeat offenders, indicating that the current punishment is not an effective deterrent. Many offenders deliberately choose to burglarize vehicles rather than commit other crimes because they are aware of the minimal punishment for vehicular burglary.

In addition, many repeat offenders burglarize vehicles to support their drug habits. Because drug treatment programs in state jails can be more effective than those in county jails and misdemeanor probation programs, HB 151 could result in addicted offenders receiving the treatment they need to rehabilitate themselves. Even if such offenders were not rehabilitated in state jail, it could be better to keep them safely behind bars while they struggled with their drug problems than to release them into society, where they almost certainly would commit more criminal offenses. Increasing the penalty also would give more leverage to prosecutors, who frequently accept plea bargains for vehicular burglary charges in order to move cases more quickly through the overcrowded misdemeanor docket.

## Opponents said

The statistics showing that vehicular burglaries have increased during the past decade neglect the fact that poverty and drug use – two key reasons people burglarize vehicles – also have increased during this time. As a result, increasing the penalty would not affect the cause of the increase, and vehicular burglary rates would continue to rise. The Penal Code properly reserves incarceration in state facilities for the most serious and violent crimes, and burglary of a vehicle does not rise to that level.

Many repeat offenders burglarize vehicles for money to support their drug addictions. Statistics have shown that imprisoning drug addicts does not help them conquer their addictions. Substance abuse programs in state jail would offer no solution because funding for these programs has decreased in the past few years, reducing their effectiveness. The answer to reducing the rate of vehicular burglaries lies in treatment for drug addiction, not in increased penalties. Increasing the penalties for even first-time offenders would dramatically increase the number of felons in Texas each year, and making this crime to a felony would stigmatize more Texans, making it more difficult for them to find employment and safe housing while not addressing the underlying reasons for this offense.

## Other opponents said

The prison system in Texas already is nearing capacity and could not bear the burden of hundreds, possibly thousands, of additional felons entering the system each year. It would make more sense to focus on repeat offenders and enhance the penalty in those cases than to raise the penalty for all cases, including first offenses.

## Notes

The **HRO analysis** appeared in the March 29 *Daily Floor Report*.

A related bill, HB 1324 by Pena, which would have increased the penalty for third and subsequent offenses of burglarizing a vehicle from a class A misdemeanor to a state jail felony (180 days to two years in a state jail and an optional fine of up to $10,000), passed in the House on April 20 but died in the Senate Criminal Justice Committee along with HB 151.

# Restricting the sale of products used to manufacture methamphetamines

**HB 164 by Berman**
*Effective August 1, 2005*

**HB 164** restricts the sale of over-the-counter products containing ephedrine, pseudoephedrine, or norpseudoephedrine to pharmacies and to licensed non-pharmacies. It does not apply to the sale of liquid products containing these chemicals. Any business that sells such products in solid form is required to display them either behind the counter or in a locked case. In deciding whether to issue a license to a non-pharmacy, the Department of State Health Services (DSHS) must consider whether the business sells a variety of medicines and whether it employs measures to deter the theft of products containing ephedrine, pseudoephedrine, or norpseudoephedrine.

A person who wishes to purchase products containing these chemicals must show a driver's license, be at least 16 years of age, and sign for the purchase. The store must keep a record of the sale that includes the name of the customer, the date of purchase, and the amount of pseudoephedrine or related substances purchased. The store must limit a customer's single-transaction purchase of pseudoephedrine or related substances to either two packages or six grams. Violation of the laws regulating the sale of ephedrine, pseudoephedrine, or norpseudoephedrine may result in an administrative penalty of up to $10,000. Any wholesaler who furnishes products containing these chemicals to retailers must make available to the Department of Public Safety (DPS) all records of such transactions and must notify DPS of any order for a suspicious quantity of such products.

A Department of Family and Protective Services employee, a law enforcement officer, or a juvenile probation officer may take possession of a child if the child's parent or a person who had possession of the child permitted the child to remain on premises used for the manufacture of methamphetamine. Such an action could lead to a conviction of abandoning or endangering a child, punishable as a state-jail felony (180 days to two years in a state jail and an optional fine of up to $10,000).

Any wholesale distributor of either prescription or nonprescription drugs must obtain a wholesale drug distribution license from DSHS. The department may refuse an application or suspend or revoke a license if the applicant or licensee created or sold a counterfeit drug or violated the Texas Controlled Substances Act or the Texas Dangerous Drugs Act.

Possession or transport of anhydrous ammonia in violation of procedures delineated in HB 164 is a third-degree felony (two to 10 years in prison and an optional fine of up to $10,000).

## Supporters said

HB 164 would restrict the ability of a person to obtain large quantities of chemicals necessary in the process of manufacturing methamphetamine. Ephedrine, pseudoephedrine, and norpseudoephedrine normally are obtained within the United States by chemically processing cold tablets. The number of meth labs operating in Oklahoma has decreased dramatically since that state began regulating the purchase of products containing such chemicals. Texas could achieve similar success in reducing the manufacture of methamphetamine by adopting such measures.

Methamphetamine abuse has become an enormous problem in Texas, hitting rural areas the hardest. This drug is highly addictive and inexpensive to make, and methamphetamine addicts have very low rates of recovery, even with full drug rehabilitation treatment. Addicts often manufacture the drug themselves by combining with other common chemicals pseudoephedrine or related substances from cold tablets. The manufacturing process involves highly combustible substances – explosions in meth labs are common, and cleaning up a meth lab is hazardous and can cost between $45,000 and $50,000. The fumes and chemical residue produced by the manufacturing process are highly dangerous, especially to the children of addicts who often are exposed to such chemicals. Police frequently find children in meth labs, and children of methamphetamine addicts are much more likely to be neglected and physically and sexually abused.

HB 164 would allow cold and allergy sufferers to continue to purchase products containing pseudoephedrine and related substances and would not penalize people who purchase such products for legal use. It would require only common sense regulations that have been adopted by other states and have proven effective in reducing the manufacture of methamphetamine. While the bill would not affect pseudoephedrine or related substances imported illegally from Mexico, it would take an important first step in decreasing the number of meth labs and the amount of the drug available in Texas.

## Opponents said

Products containing pseudoephedrine or related substances are very effective in combating allergy and cold symptoms, helping millions of people lead productive lives. Regulating products containing pseudoephedrine or related substances by requiring purchasers to sign a log could discourage people from making legitimate purchases, which might injure pharmaceutical companies or result in other unintended consequences. The existence of such logs also could result in the abuse of purchasers' personal information and privacy.

Only a very small percentage of people who purchase products containing such chemicals do so in order to produce methamphetamine. Tightly regulating sales of such products in the hopes of targeting this minority would be unfair to the majority of people who purchase those products for legal use. People who live in rural areas many miles away from pharmacies legitimately may need to buy large quantities of cold and allergy products, which this bill would not allow.

## Other opponents said

People who manufacture methamphetamine using products purchased in the United States that contain pseudoephedrine or related substances typically run small labs and are producing mainly to satisfy their own addictions. The largest manufacturers illegally obtain such chemicals from Mexico, and the bill would not target those large-scale manufacturers.

Currently, only ephedrine, pseudoephedrine, or norpseudoephedrine contained in a solid form can be used to manufacture methamphetamine. However, it possible that one day manufacturers of methamphetamine may learn how to extract these chemicals from liquid preparations, so the bill also should regulate the sale of liquid products.

Instead of simply targeting the production of methamphetamine, the Legislature should attempt to reduce demand for the drug by expanding treatment programs and increasing public awareness about the dangers of methamphetamine.

## Notes

The **HRO analysis** appeared in the May 12 *Daily Floor Report*.

SB 66 by Nelson, effective September 1, 2005, establishes the Methamphetamine Watch Program, administered by DSHS, which is designed to:

- educate retailers about the problems associated with methamphetamine use and production and how to deter theft or improper purchase of products containing ephedrine, pseudoephedrine, or norpseudoephedrine;
- inform farmers and retailers about the use of anhydrous ammonia in the production of methamphetamine and how to deter theft of anhydrous ammonia;
- prevent methamphetamine use among school-age children and help parents and teachers identify kids who might be using the drug; and
- require DSHS to work with DPS to protect children exposed to methamphetamine or the chemicals used in its production.

# Qualifications of appointed counsel for indigent defendants in capital cases

**HB 268 by Keel**
*Died in the Senate*

**HB 268**, as adopted by the House in the conference committee report, would have established separate requirements for attorneys appointed for the trial and the direct appeal stages of death penalty cases involving indigent defendants. It also would have changed the qualifications for attorneys to be appointed at the trial and appellate stages.

The bill would have allowed prosecutors, and others who are not now eligible, to be appointed as lead attorneys by eliminating the current requirement that appointed attorneys have tried a significant number of felony cases to a verdict as lead defense counsel. Instead, attorneys appointed as lead counsel would have to have tried felony cases to a verdict as either a lead prosecutor or lead defense counsel. The bill also would have removed a requirement that appointed attorneys, both lead and appellate, have experience investigating and presenting mitigating evidence at the penalty phase of a death penalty trial. HB 268 would have required experience for lead attorneys in the presentation or cross examination of mitigating evidence at the penalty phase of a homicide trial. Appeals attorneys would have to have participated in the presentation of appellate briefs or in the drafting of appellate opinions as an attorney for an appeals court in felony cases, including homicide and other capital or first or second-degree felonies.

HB 268 also would have authorized the Task Force on Indigent Defense to set guidelines for attorneys appointed in habeas corpus appeals and eliminated the current requirement that the Court of Criminal Appeals adopt rules for the appointment of these attorneys. The bill listed some qualifications the guidelines could have included. The Task Force would have been required to determine on a case-by-case basis whether attorneys were qualified for appointment. The Task Force would have had to keep a list of attorneys qualified for appointments in habeas proceedings, which could have been reviewed annually by the Court of Criminal Appeals.

The bill would have prohibited the appointment of attorneys found to have rendered ineffective assistance of counsel during the trial or appeal of any capital case.

## Supporters said

HB 268 would raise the bar on indigent defense by changing the qualifications required of defense attorneys appointed to death penalty cases so more capable, skilled attorneys could qualify for appointments. Current law does not distinguish among skills necessary for trial, appeal, and habeas corpus proceedings, although each requires a unique set of skills and experience. HB 268 would require skills and experience unique to the appellate and trial stages of defense. It also would address the problem of an insufficient number of qualified attorneys to represent indigent capital defendants by expanding the available pool of qualified attorneys. The bill would retain the requirement that an appointed attorney exhibit proficiency and commitment to providing quality representation to defendants in death penalty cases.

HB 268 would improve current requirements for appointed attorneys by removing the meaningless requirement for experience in a "significant number" of felony cases and specifically outlining other standards that would have to be met. Allowing former prosecutors to serve as defense counsel would not weaken current law because prosecutors can have valuable experience and skills that defense attorneys lack. A former prosecutor also may be able to foresee how another prosecutor would think and anticipate a prosecutor's strategy and how a prosecutor would cross-examine a witness. Current law requiring attorneys to have presented mitigating evidence in a death penalty trial unnecessarily excludes many qualified attorneys. HB 268 would address this by allowing the appointment of attorneys who have been involved with mitigating evidence in the penalty phase of a homicide trial. Both types of trials are essentially the same in the type of evidence that is presented.

While outlining high standards for defense in a habeas proceeding and authorizing the Task Force to adopt guidelines for appointed attorneys could potentially result in Texas being declared an "opt-in" state and in shorter deadlines for habeas proceedings in federal courts, this ultimately is a federal decision and not a good reason for failing to improve standards. Texas has a duty to provide the best representation possible, regardless of federal law.

HB 268 also would transfer the responsibility for maintaining a list of qualified attorneys to the Task Force on Indigent Defense, which would be better equipped to gauge the quality and effectiveness of eligible attorneys.

## Opponents said

Expanding the pool of available counsel for appointment in death penalty cases would not guarantee a larger pool of qualified attorneys. The better route would be to require an attorney to develop skills by serving as second chair in a death penalty trial before acting as lead defense counsel.

HB 268 would weaken minimum standards for attorneys defending capital crimes and could result in more inferior lawyers being appointed in death penalty cases. For example, removing the current requirement that appointed trial attorneys have tried *a significant number* of cases as lead defense counsel could result in the appointment of lawyers with little or no experience. This bill also could result in the appointment of lawyers whose only experience was as a prosecutor and who may lack crucial experience in unique and key aspects of defense in capital trials. For example, an important role of the defense counsel is to humanize the defendant by developing and presenting the client's social history, a skill that can take years to develop. While a former prosecutor may have excellent trial skills, a prosecutor's job is to dehumanize the defendant, and

after doing so for many years, an attorney could become entrenched in this role. By eliminating a requirement that those handling the punishment phase of a trial and an appeal have defense experience in death penalty cases, the bill would increase the likelihood that trials or appeals would be inadequate.

If the Task Force were to establish a certain type of mandatory guidelines under HB 268 for appointments in habeas proceedings, Texas could qualify as an "opt-in" state, which would shorten the time for filing a habeas petition and limit federal courts' authority to intervene by granting execution stays. Under federal law, when a state statutory scheme for representation of indigent capital defendants meets certain standards, federal law shortens deadlines in the federal post-conviction proceedings.

## Notes

The **HRO analysis** appeared in the March 17 *Daily Floor Report*.

SB 60 by Lucio and HB 1701 by Keel, effective September 1, 2005, prohibit the appointment of a lead attorney found to have rendered ineffective assistance of counsel during the trial, appeal, or habeas proceeding of any death penalty case.

# Creating the Texas Forensic Science Commission

**HB 1068 by Driver**
*Effective September 1, 2005*

**HB 1068** creates the Texas Forensic Science Commission to investigate allegations of professional negligence or misconduct that substantially would affect the integrity of the results of a forensic analysis conducted by an accredited laboratory, facility, or entity. The commission also is charged with developing and implementing a system to report professional negligence and misconduct and with requiring all labs and other entities that conduct forensic analyses to report professional negligence or misconduct to the commission. The commission comprises nine members, of which the governor appoints four, the lieutenant governor appoints three, and the attorney general appoints two. HB 1068 requires that many of these appointments have specific types of expertise or hold certain faculty positions at Texas universities.

HB 1068 also gives the Department of Public Safety (DPS) more authority to inspect crime labs and DNA labs in Texas. It authorizes DPS to enter and inspect the premises of an accredited crime lab or one seeking accreditation and to audit a lab's records, reports, procedures, and other quality assurance matters. The bill expands DPS' current authority to inspect the premises and audit the procedures of DNA labs that *provide* DNA records or forensic analysis to DPS. The department also can audit the records, reports, and other quality assurance matters of DNA labs that provide DNA records to DPS or that *conduct* forensic analysis.

The bill also expands who must contribute samples for the state DNA database by requiring a sample from all persons confined in the Texas Department of Criminal Justice system and from all juvenile offenders adjudicated of felonies who are committed to the Texas Youth Commission.

## Supporters said

HB 1068 would be another step in addressing problems with the state's crime labs. Creating an independent, expert body to investigate problems and misconduct at the labs would help ensure the quality of their work and maintain the integrity of evidence used in criminal trials. The bill would allow legislation enacted by the 78th Legislature to require

accreditation of crime labs in Texas to come to fruition with the newly created commission providing a check and balance to the accreditation process. An independent entity divorced from DPS and local officials is necessary to ensure that problems and misconduct are handled appropriately and impartially.

The bill also would address some problems identified since 2003 by putting more teeth into the law that requires crime labs to be accredited and would clarify provisions in that law. HB 1068 would expand DPS' audit and inspection powers so that DPS could examine a lab if it lost its accreditation or evaluate a situation at an accredited lab and determine if further agency or accreditation action were necessary. It also would expand the state's inspection authority over DNA labs to include records, reports, and other quality assurance matters and would ensure that DPS could enter and inspect private labs and labs that had lost their accreditation. The state currently does not have authority to enter private labs, even though it has an obligation to regulate them.

## Opponents said

It is unnecessary to establish a new commission to oversee the allegations of problems or misconduct at crime labs. DPS has authority to look into accredited labs, and local officials are in the best position to undertake investigations into problems at local labs. There is no need to create a new state entity to oversee crime labs when DPS has the experience and expertise to perform this duty.

## Other opponents said

HB 1068 would not go far enough in addressing the state's need for independent crime labs. It also should establish regional crime labs so that work done by the state's crime labs would be subject to scrutiny by an outside, independent entity and would be divorced from local law enforcement agencies and DPS.

## Notes

The **HRO analysis** appeared in Part Two of the May 9 *Daily Floor Report*.

The provisions creating the Texas Forensic Science Commission were added to HB 1068 through an amendment by Sen. Juan Hinojosa on the Senate floor. SB 1263 by Whitmire, which was approved by the House Law Enforcement Committee and sent to the Calendars Committee, also would have created the Texas Forensic Science Commission and given it the same duties as those in HB 1068.

HB 1788 by Bailey, which died in the House Law Enforcement Committee, would have required DPS to designate existing laboratories as regional DNA labs if a lab accredited by DPS did not exist in that region. These regional labs would have been authorized to collect a fee for performing forensic analysis.

# Revising the community supervision (probation) system

**HB 2193 by Madden**
*Vetoed by the governor*

HB 2193 would have revised the state's community supervision (probation) system and, in general, would have applied to persons on probation on or after September 1, 2005, regardless of when the person initially was placed on probation. The reduction in the maximum probation terms would have applied only to those placed on probation on or after September 1, 2005.

***Length of probation terms.*** HB 2193 would have reduced from 10 years to five years the initial probation and deferred adjudication terms that judges could impose for third-degree felonies that were not "3g" or sex offenses. ("3g" offenses are certain violent and serious crimes listed in Code of Criminal Procedure, art. 42.12, sec. 3g.) These probation terms could have been extended up to 10 years through a maximum of five one-year extensions. HB 2193 would have kept the 10-year maximum period of probation and deferred adjudication for offenders guilty of "3g" felony offenses, offenses that result in a person having to register as a sex offender, and first- and second-degree felonies.

HB 2193 would not have changed the minimum or maximum probation terms for state-jail felons. The bill would have repealed certain minimums, maximums, and extensions for probation terms that could be given to some sex offenders. It would have expanded the current mandate that some low-level state jail drug offenders be placed on probation to include state-jail felons with previous state-jail drug offenses that were punished as misdemeanors. HB 2193 would have prohibited a person convicted of murder from receiving jury-recommended probation.

***Mandatory review for possible reduction or termination of probation.*** Judges would have been required to review defendants' records and consider whether to reduce or terminate probation after defendants had served one-half of their sentences. Judges would have retained their current authority to reduce or terminate probation terms after the lesser of one-third of the term or two years.

Judges would not have had to review defendants' records if defendants were delinquent in paying restitution, fines, costs, or fees that they had the ability to pay or if they had not completed court-ordered counseling or treatment. Judges could not have refused to terminate probation solely on the grounds that a defendant was indigent and unable to pay restitution, fines, costs, or fees.

HB 2193 would have applied provisions on early termination to state jail felons but made "3g" defendants ineligible for early termination and continued the prohibition on early termination for offenders subject to the state's sex offender registration laws.

***Giving credit against a sentence.*** HB 2193 would have made changes in the laws governing when judges had to give probationers credit for time spent in court-ordered residential treatment programs or facilities.

***Community service.*** The bill would have given judges discretion about whether to require probationers to perform community service, instead of the current mandate requiring all defendants to do so.

***Drug courts.*** HB 2193 would have required more counties to establish drug courts, but the requirement would have taken effect only if a county received federal or state funding for the courts. The requirement to establish drug courts would have been applied to counties with populations of at least 200,000, instead of the current 550,000. The bill would have authorized a new $50 fee to fund the state's drug courts, which would have been charged to defendants convicted of driving while intoxicated and other intoxication, alcoholic beverage, and drug offenses. Counties would have been able to keep 10 percent of the fee.

## Supporters said

HB 2193 would create a stronger and more effective probation/community supervision system that better supervised and rehabilitated probationers, which would enhance public safety. This could encourage judges to place appropriate offenders on probation, rather than sending them to prison, and could result in fewer probationers being sent to prison after having their probations revoked.

The changes made in HB 2193, in conjunction with additional funding provided in the general appropriations bill for fiscal 2006-07, would give judges more community

resources to do a better job of handling probationers. The budget would fund about 500 local beds, which would serve about 1,500 offenders per year and 3,000 over the biennium, to be used for residential treatment and for sanctioning offenders. Some $7.2 million would fund outpatient substance abuse treatment for about 2,000 offenders per year or 4,000 for the biennium. About $28.2 million would provide funds to local probation departments for 350 to 400 new probation officers so that the average direct supervision caseload could be reduced from 116 cases per probation officer to about 95 cases per officer.

**Length of probation terms.** HB 2193 would allow for shorter, but more intense, probation terms for some felons, which would result in more judicial involvement and more meaningful probation oversight and would improve public safety. Judges would be able to extend probation terms for third-degree felonies to up to 10 years. HB 2193 would not shorten terms for the more serious and violent "3g" offenses and sex offenses. For many of the third-degree felonies that would fall under the provisions of HB 2193 – for example, assaulting a peace officer – there are different degrees of the offense, and probation already is an option in these cases. A defendant who seriously assaults a peace officer or commits another serious offense most likely would not – and should not – receive probation.

HB 2193 more closely would align some of Texas' probation terms with those in other states. According to a 2002 report, Texas probation terms were about 67 percent longer than the national average, with a Texas average of 67 months compared to a national average of 40 months.

**Mandatory review for possible reduction or termination of probation.** HB 2193 would ensure that judicial involvement with probationers was increased and that judges took a critical look at all probationers by instituting a required review of a defendant's probation. This would give judges a formal opportunity to release from probation those defendants who were doing a good job. The bill would not institute a bias toward early release because judges would retain full authority to continue under supervision any offender for whom they deemed it appropriate. Although current law authorizes judges to review probationers, it would be better to have a requirement for review so all cases were examined. Public safety would be protected by making those convicted of "3g" offenses and sex crimes ineligible for early termination. Probation officers could concentrate on supervising those offenders who needed closer watching and on trying to find those who had absconded from probation.

**Giving credit against a sentence.** HB 2193 would provide judges with more flexibility to give defendants credit against a sentence for time spent in court-ordered treatment programs. This is only fair since the time spent in the program is court-ordered and analogous to time spent in jail. Judges have discretion to deal with offenders who have not become rehabilitated through treatment programs.

**Community service.** HB 2193 would give judges more discretion and flexibility in assigning community service. It is more important that judges have authority to make decisions on a case-by-case basis about imposing community service than to have a uniform statewide requirement. Defendants who would benefit from community service still could be required to perform it, and local governments and charities could continue to use that service.

**Drug courts.** HB 2193 would expand the state's successful drug court programs so that more probationers could take advantage of the opportunities they afford. HB 2193 would not be an unfunded mandate because the bill would make this requirement take effect only if the county received state or federal funding for the courts. Lowering to 200,000 the population threshold for requiring counties to have drug courts would take in 13 additional counties, six of which already have drug courts, and bring the state total to 20 counties. HB 2193 would enable the state to fund these new drug courts through a new $50 fee.

## Opponents said

HB 2193 could result in more – not fewer – criminals being sent to state prisons and could compromise public safety if defendants did not receive adequate, long-term supervision. Shorter probation terms for some felons and a mechanism for early release from probation would make probation a less attractive option in many cases, which could result in defendants being sentenced directly to prison. Many of the changes in HB 2193 would be unnecessary because judges already have authority to do these things but choose not to.

Not enough study has been done of the effect that proposed changes such as early release would have on the state. HB 2193 could create a system biased toward early release of offenders as a way to address a lack of state resources and growth in the prison population similar to the one employed decades ago when the state's parole rate peaked at almost 80 percent. That resulted in increased crime, which preceded the state's massive prison expansion program.

*Length of probation terms.* Reducing the maximum length of probation terms for some offenders would upset the state's current sentencing dynamics. Long probation terms can help ensure that a defendant is rehabilitated and not a danger to the public. Without this option, prosecutors could be less inclined to agree to probation in some cases, which could lead to more direct prison sentences. Some third-degree felonies that would be subject to the shorter probation terms are serious crimes such as assault on a peace officer.

*Mandatory review for possible reduction or termination of probation.* It is unnecessary to require judges to review probationers upon completion of half of their terms. Current law allows judges to review offenders at their own discretion and to reduce or terminate a probation term after one-third of the original term, or two years, whichever is less. The mandatory review established in HB 2193 would contribute to distortions in the state's sentencing dynamics. Because many prosecutors would assume up front that any term of probation could or would be cut in half, they could be less willing to place people on probation and work for more direct prison sentences. The bill would expand this review requirement to misdemeanor probations, which could burden misdemeanor courts without saving the state any money since misdemeanants who have their probation revoked go to county jails.

*Giving credit against a sentence.* HB 2193 would infringe on judicial discretion by requiring judges to give credit to defendants for time spent in court-ordered residential programs or facilities in some situations. It would be better to give judges authority to make these decisions on a case-by-case basis without a mandate. Mandatory credit also could lead to instances in which credit was given to someone who wasted limited treatment resources and did not become rehabilitated.

*Community service.* Eliminating the requirement for mandatory community service for probationers could result in disparate treatment of defendants from court to court. Community service helps rehabilitate offenders and can help local governments and charities get much-needed work done.

*Drug courts.* The state should not mandate that any counties establish drug courts. It would be better to authorize or encourage the courts but not to institute something that could become an unfunded mandate in the future.

## Notes

The **HRO analysis** appeared in Part One of the May 12 *Daily Floor Report.*

# Life without parole for capital murder and eliminating life sentences

**SB 60 by Lucio**
**Effective September 1, 2005**

**SB 60** institutes "life without parole" as a possible sentence in death penalty cases and eliminates "life" sentences as an option for capital murder. In capital murder cases in which the state seeks the death penalty, a person found guilty must be sentenced either to life without parole or death. In capital murder cases in which the state does not seek the death penalty, the sentence must be life without parole. Capital felons sentenced by a judge rather than a jury must receive life without parole. Those serving sentences of life without parole are not eligible for release on parole or on medically recommended intensive supervision.

SB 60 also changes from 17 to 18 years old the minimum age that a defendant must be when a capital murder is committed for the death penalty to be imposed.

## Supporters said

Juries in capital murder cases now are limited to a choice of death or a life sentence that carries a possibility of parole – not always acceptable alternatives. Under the bill, juries could reserve the death penalty for the most heinous cases, while ensuring that other criminals stayed behind bars for life. Life without parole would allow a more appropriate sentence when the crime was heinous but for other reasons the prosecutor did not seek the death penalty.

Life without parole also would apply when an offender committed a capital murder while under age 18. Since the U.S. Supreme Court banned execution of such offenders, only a life sentence is available for these cases in Texas. SB 60 would change the minimum age for an offender to be given the death penalty so that the Texas statutes comply with the U.S. Supreme Court ban on the execution of persons who committed their offense when younger than 18.

Life without parole would not mislead victims' families or the public because it would mean just what it says – that offenders would spend the rest of their lives in prison. Concerns that a person sentenced to life without parole would be released under clemency or a prison management act are far-fetched.

There is no evidence that allowing a sentence of life without parole would dilute the death penalty or lead to its demise. The procedures for imposing a sentence of death

or life in prison in capital cases would not be changed, so the changes proposed by SB 60 would not generate court challenges that could jeopardize Texas' death penalty system.

Texans support life without parole. A fall 2004 survey by the Scripps Howard Texas Poll reported that 78 percent of those surveyed favored creating a sentence of life without parole. SB 60 would bring Texas in line with the federal government and 36 of the 38 states with the death penalty that have a sentence of life without parole.

The Texas Department of Criminal Justice has the expertise and resources to manage a prison population sentenced to life without parole. Studies have shown that these offenders do not pose a disproportionate risk of violence in prison.

It would be unwise for Texas to have three capital murder sentencing options – death, life without parole, and a life sentence. Jurors easily could be confused over when to impose each type of sentence.

## Opponents said

SB 60 is unnecessary because the options already available to Texas juries in capital cases punish offenders adequately and protect the public. Texas now has a statute that effectively is life without parole. Capital murderers sentenced to life imprisonment face 40 years of calendar time in prison before they are eligible for parole, and being eligible does not guarantee release. Two-thirds of the Board of Pardons and Paroles must approve an eligible capital felon's release, an unlikely scenario in light of the tough parole policies of the last decade.

SB 60 would be misleading and would give only the illusion of comfort to victims because it would not guarantee that a person would never be released from prison. Releases due to court decisions, medical parole, executive clemency, or a prison management act designed to reduce overcrowding could lead to those given life without parole getting out of prison.

SB 60 inappropriately could replace the death penalty or weaken the state's death penalty scheme if judges and

juries consistently sentenced capital offenders to life without parole. But life without parole would be inadequate for the most heinous crimes. While the sentence might satisfy one purpose of the death penalty – protecting society – it would not serve other functions, such as deterring crime and giving closure to victims' families and friends. Procedures used in Texas to determine punishment in capital murder cases have been well litigated and established and may not easily withstand change.

Comparisons to the experiences of other states with sentences of life without parole are not valid. Other states have small death rows and few, if any, states execute as many people as Texas. Also, SB 60 could result in problems with prison management. Being unable to use parole as an incentive for good behavior could be difficult and expensive.

## Other opponents said

Texas should have three options for sentences in capital murder cases – death, life without parole, and life in prison. This would give juries maximum flexibility to tailor sentences to individual crimes and offenders. SB 60 would not give juries any flexibility when the jury had decided against the death penalty but thought a defendant deserved at least a remote possibility of release later in life.

## Notes

**The HRO analysis** appeared in Part One of the May 23 *Daily Floor Report*.

# Prohibitions against identity theft

**SB 122 by Hinojosa**
*Effective September 1, 2005*

**SB 122** prohibits a person from obtaining, possessing, transferring, or using the personal identifying information of another without the other's consent and with intent to obtain a good, service, insurance, extension of credit, or any other thing of value. It requires peace officers who receive reports of criminal violations involving the fraudulent use or possession of identifying information to make a written report. Businesses must implement and maintain procedures to prevent the unlawful use of personal identifying information that they collect. In addition, businesses must destroy customer records that they are not retaining that contain personal identifying information.

A person or business is required to disclose any unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of sensitive personal information. The security breach must be disclosed to people whose sensitive personal information was acquired, or reasonably believed to have been acquired, by an unauthorized person. A person who was injured by a security breach or has filed a complaint alleging criminal identity theft can file an application with a district court to be declared a "victim" of identity theft, defined as a person whose identifying information was used by an unauthorized person. A violation of a provision in SB 122 can be punished by a civil penalty ranging from $2,000 to $50,000.

## Supporters said

SB 122 would address a problem some identity theft victims encounter in obtaining police reports by requiring law enforcement authorities to make written reports about these crimes. Police reports often are necessary to trigger other actions or protections for victims, and without these reports, it can be difficult for victims to convince creditors that they should not be held responsible for unauthorized purchases.

A specific provision prohibiting identity theft and placing requirements on businesses is needed in the Business and Commerce Code so that identity theft can be battled on all fronts. It is not unusual for the state to prohibit in the civil codes something that is also a crime. This helps to serve as an additional deterrent and gives enforcement of the laws more teeth.

SB 122 would help protect individuals by specifically requiring businesses to safeguard personal information, to destroy certain information, and to notify consumers about breaches in the security of computerized data. Self-regulation of the industry has not worked, and individuals can take action to protect their bank accounts, credit rating, and identity if they learn quickly that their personal information may have fallen into the wrong hands. The prevalence of identity theft makes it essential that all businesses, even small ones, safeguard personal information. The requirements in SB 122 would be reasonable and would not burden businesses or significantly increase their costs. Consumers who are victims of identity theft carry a far larger burden than any cost that may be passed on to them as a result of SB 122. Businesses also accrue costs due to identity theft and already pass these on to consumers.

SB 122 also would establish procedures and definitions so that victims could receive a court order naming them as victims, which would help them in challenging financial transactions and in establishing their identities for criminal law purposes. In some cases, individuals have reported difficulties in having law enforcement authorities, credit bureaus, and others involved with personal information consider them victims because such entities tend to consider merchants that have been defrauded as the only victims.

The bill would hold businesses accountable if they did not adequately safeguard personal information by allowing the imposition of civil penalties. It includes a wide range of penalties, from $2,000 to $50,000, to give the courts flexibility to assess an appropriate penalty based on various factors, such as the nature of a violation and the size of a business.

## Opponents said

The state should not dictate decisions about when to generate police reports, which is best left to the discretion of officers who can determine the merits of each case.

It is unnecessary to place in the Business and Commerce Code what already is a crime in the Penal Code – obtaining, possessing, transferring, or using another's information without authorization. The requirements

for handling information and notification about security breaches that SB 122 would impose on businesses could be interpreted by some businesses as a new mandate that might increase business costs, which in the long run would be borne by consumers. New mandates especially burden small businesses.

The penalties authorized by the bill could be too onerous in some situations. The range for the penalties is wide, and the imposition of a large penalty on a small business for what might be an honest oversight could be too harsh.

## Notes

The **HRO analysis** of the companion bill, HB 1321 by Giddings, appeared in Part Two of the May 11 *Daily Floor Report*.

Numerous other bills dealing with identity theft were considered by the 79th Legislature, including:

**HB 699** by McCall (effective September 1) increases the penalty from a class B misdemeanor to a class A misdemeanor for displaying or possessing a driver's license or certificate that is fictitious, altered, or belongs to another individual. The penalty also is increased for possessing more than one currently valid driver's license or certificate, lending one of these documents to another person, or applying for one of these documents using false information. If a minor presents false identification in an attempt to purchase alcoholic beverages, the severity of the penalty would be governed by separate provisions in the Alcoholic Beverage Code.

**HB 1323** by Swinford (effective September 1) makes it an offense to possess, rather than sign or write one's name on, another individual's credit or debit card without the individual's effective consent and with intent to use it. The offense is a state-jail felony (180 days to two years in a state jail and an optional fine of up to $10,000).

**HB 628** by Giddings (effective September 1) prohibits debt collectors from attempting to collect an obligation if a transaction was not initiated by an authorized user, and the authorized user had filed a report with law enforcement and sent the debt collector written notice that the transaction was unauthorized. The debt collector may collect on such obligations if the collector has credible evidence that the report was fraudulent and that the transaction was indeed authorized.

**HB 2223** by Giddings and Bohac (effective September 1) describes procedures by which a customer who has closed an account at a financial institution due to identity theft may provide the institution certain documentation of the identity theft and request that the institution return checks with the notation "forgery." The financial institution would be held harmless for acting in accordance with the individual's request and would not be held liable for dishonoring a check.

**HB 1379** by J. Jones (effective June 18) makes a business record inadmissible in a civil trial if the record was provided to a law enforcement agency in connection with the investigation of identity theft. If a party seeking to admit the record into evidence obtains the record from a source other than a law enforcement agency, the record is not automatically inadmissible.

**SB 99** by Ellis (effective September 1) prohibits a lender from denying or restricting the extension of credit solely on the basis that an individual has been a victim of identity theft. A creditor who violates this provision is subject to license suspension or revocation. An insurer authorized to write property and casualty insurance may offer and issue coverage for a loss suffered by a policyholder as a result of the policyholders' being a victim of identity theft or attempted identity theft.

**HB 345** by Solomons (effective June 17) prohibits a voter registrar or other county official with access to information furnished on a voter registration application from posting the following on a web site – a telephone number, a Social Security number, a date of birth, or the number on a driver's license or personal identification card.

**HB 607** by Giddings (effective June 1, 2006) prohibits a check provider, such as a check-printing company or bank, from delivering check-form orders by courier to unattended addresses without the consent of customers. The bill allows for the imposition of a $1,000 civil penalty per violation.

**HB 698** by McCall (effective September 1) requires businesses that have personal identifying information of customers in their records to shred, erase, or modify them upon disposal and authorizes a civil penalty of up to $500 per record. The bill exempts insurers subject to laws in the Insurance Code on privacy of health information as well as financial institutions that are required to maintain certain financial records for five years under the Gramm-Leach-Bliley Act, a federal law that combats money-laundering and other crimes.

**HB 853** by Solomons (effective September 1) requires merchants to use Social Security and driver's license numbers only for identification purposes in the course of accepting returned merchandise from customers without receipts. Each violation of this provision can be punished by a civil penalty of up to $500.

**HB 982** by Reyna (effective September 1) requires restaurants and bars to post signs on their premises warning employees that the fraudulent use of debit or credit cards is a state-jail felony. Failure to comply with the posting requirements can be punished by a fine of $25.

**HB 1855** by Giddings (effective September 1) directs a business that accepts checks from customers to delete, in the event of receiving an unauthorized bad check, any electronic record, except for the customer's checking account number or bank routing number, indicating that a customer had issued a dishonored check. The business must delete such records within 30 days after the date that the customer demonstrated to the business that the dishonored check was unauthorized. Failure to comply with these provisions may result in a civil penalty of up to $1,000. The bill exempts financial institutions subject to the federal Gramm-Leach-Bliley Act.

# Requiring written, oral permission for police to conduct consent searches

**SB 1195 by Hinojosa**
*Vetoed by the governor*

**SB 1195** would have prohibited peace officers who stop motor vehicles for alleged violations of the law from searching the vehicle unless the officer:

- had probable cause or another legal basis for the search;
- conducted a search for weapons based on an articulation of a reasonable fear for the officer's safety or the safety of others;
- obtained the written consent of the vehicle's operator on a form that complied with provisions of the bill; or
- obtained the oral consent of the vehicle's operator and ensured that the oral consent was recorded in compliance with the bill.

DPS would have established requirements for the written consent form and for the audio and video recordings in line with the minimum requirements set forth in the bill. The written form and the recording would have included a statement that the driver understood that he or she could refuse to give consent and a statement that the driver voluntarily had given consent to search the vehicle.

## Supporters said

SB 1195 is necessary to stop an unproductive law enforcement practice that also could be used to inflict injustices or unfairly target minorities. Rather than ban all consent searches, the bill would take the reasonable approach of allowing these searches as long as drivers gave their written or oral permission.

Many people agree to consent searches because they do not understand their right to decline a search, which is illustrated by the experiences of law enforcement agencies that require written permission for consent searches. In some cases, the current approach results in people being harassed by law enforcement officers with no justification. SB 1195 would educate drivers about their rights.

Consent searches sometimes are used for racial profiling by disproportionately targeting minority drivers' vehicles. SB 1195 would help ensure that minority drivers were clear about their right to refuse a search.

SB 1195 would not prevent law enforcement officers from doing their jobs, and far from impeding their efforts, it would help them. It is more difficult for a person to contest a vehicle search when an officer has written permission. This makes prosecution easier in cases where illegal items are found.

## Opponents said

In the majority of cases, consent searches are used as a law enforcement tool, not as a means of harassment or racial profiling. SB 1195 is unnecessary because drivers know they have the right to refuse a search and often agree to a search in order to cooperate with law enforcement officers. The U.S. Supreme Court has ruled that written permission is not needed for consent searches and that it is presumed that people know they can refuse.

Although SB 1195 would not outlaw consent searches, the requirements for the consent form are so detailed that they could result in a bias toward those who refuse to give permission for the search. If people agree to consent searches because they do not know that they can refuse, a better response would be to educate people about their rights.

## Other opponents said

It would be better to prohibit explicitly all consent searches rather than to allow them with written or oral permission. Law enforcement still could intimidate drivers, intentionally or not, into agreeing to a consent search even with the written or oral permission requirement. Searches should be based solely on probable cause.

## Notes

The **HRO analysis** appeared in Part One of the May 24 *Daily Floor Report*.



# Economic Development

| | | | |
|---|---|---|---|
| * HB 1765 | Morrison | Establishing the Texas Emerging Technology Fund | 40 |
| * HB 1938 | Ritter | Reporting and oversight of grants from the Texas Enterprise Fund | 42 |
| * SB 877 | Madla | Direct shipment to consumers by domestic and out-of-state wineries | 43 |
| SJR 21 | Averitt/ | Authorizing the Legislature to exempt commercial loans from | |
| * HB 955 | Solomons | interest rate caps | 44 |

# Establishing the Texas Emerging Technology Fund

**HB 1765 by Morrison**
*Effective June 14, 2005*

**HB 1765** establishes the Texas Emerging Technology Fund (TETF) to finance projects designed to expedite innovation, commercialize research, create businesses, increase high-quality jobs, and improve research capabilities. An entity is eligible for funding if it proposes to create new, high-quality jobs in Texas and if its work has the potential to result in a medical or scientific breakthrough. The following industries are eligible for funding: semiconductor; information; computer and software technology; energy; manufactured energy systems; micro-electromechanical systems; nanotechnology; biotechnology; medicine; life sciences; petroleum refining and chemical processes; aerospace; and defense.

The TETF is overseen by the Texas Emerging Technology Committee, made up of 17 members appointed by the governor. The fund is a dedicated account in the general revenue fund that is considered a trusteed program within the Office of the Governor. The governor will negotiate on behalf of the state in awarding money from the fund, with approval from the lieutenant governor and the speaker of the House. The bill describes the terms of contracts made with entities funded as well as other administrative requirements and requires an entity to return to the fund any money received if the entity fails to perform specific actions guaranteed to provide benefits to the state.

Fifty percent of the money appropriated to the fund by the Legislature is allocated for use as incentives for private or nonprofit entities to collaborate with institutions of higher education on economic development projects. These regional centers of innovation and commercialization will be established in Harris, Lubbock, Bexar, and El Paso counties, the Dallas-Fort Worth metroplex, the Middle and Lower Rio Grande Valley, and other locations deemed suitable. Twenty-five percent of the money appropriated to the fund is allocated for the purpose of matching research grants awarded by federal or private sponsors, with a focus on partnerships with Texas colleges and universities. The remaining 25 percent is allocated for use in creating or attracting to Texas world-class or nationally recognized researchers in relevant technology fields.

## Supporters said

The TETF would boost the state's reputation as a global leader in technology. It would foster innovation, attract high-quality jobs, and increase research capabilities at universities. The plan is an outgrowth of the Governor's Council on Science and Biotechnology Development, and the TETF also would dovetail with the governor's long-term strategic job creation plan, which focuses on many of the same industry clusters. The TETF would provide economic development incentives targeted to emerging technologies with the highest job-creation potential rather than requiring such projects to compete with more generalized projects backed by the Texas Enterprise Fund.

Many states, including California, Florida, North Carolina, Ohio, and Pennsylvania, are infusing billions of dollars into high-tech research and development. Studies show that $3 trillion in revenue will be generated worldwide by emerging technologies over the next decade. Without the TETF, Texas could be left behind. In addition, this fund would provide a vital link to close the present market funding gap between research and commercialization. Also, by attracting outside businesses, the bill would broaden the state's tax base, which would help pay for essential services. Entities receiving incentives from the TETF would have to guarantee specific benefits to the state or else refund the money.

## Opponents said

The Legislature should not approve this new fund until it finds money to fund higher priorities, including health care and public education. Tax-funded incentive packages for businesses are inefficient and often play a minor role in relocation and expansion decisions. Instead, tax dollars should support job training programs and infrastructure improvements that are more generally beneficial for promoting economic development.

The bill should require the governor to submit a report outlining a long-range plan for use of the funds. It also should include more specific accountability requirements to ensure that the incentives produce the promised benefits to the state.

## Notes

The **HRO analysis** appeared in Part Two of the May 10 *Daily Floor Report*.

HB 10 by Pitts, the supplemental appropriations bill, grants $100 million from the general revenue fund for the TETF. Also, if during fiscal 2005-06 the amount in the state's "rainy day fund" exceeds comptroller's estimate, the first $100 million in excess of the estimate will be appropriated from that fund to the TETF.

# Reporting and oversight of grants from the Texas Enterprise Fund

**HB 1938 by Ritter**
*Effective generally September 1, 2005*

**HB 1938** makes several changes to the reporting and oversight process for grants from the Texas Enterprise Fund (TEF), an economic development grant program established in 2003 by the 78th Legislature. It requires the governor to enter into a written agreement with a recipient of a TEF grant. Under this agreement, the state can retain a lien on a capital improvement funded with a TEF grant and can require the grant recipient to repay the grant if a capital improvement is sold. If a grantee has not used the grant money for the purposes for which the funds were intended by a date certain, the recipient must repay that amount plus interest to the state. If a grantee does not meet specific performance targets established by the governor, the state will withhold grant disbursements or require repayment of disbursements already made. Grantees must issue annual progress reports on the attainment of performance targets to the governor, the lieutenant governor, and the speaker of the House.

The governor must submit to each member of the Legislature a biennial report on TEF grants that includes such information as the number of jobs grantees have committed to creating, the median wage of jobs created, the amount of capital investment by grantees, and the number of positions with health insurance created by each grantee. In addition, the governor must issue an economic impact statement for a proposed grant, stating the grant's size and the jobs, wages, and taxes expected to result from a project.

## Supporters said

HB 1938 would introduce much-needed accountability controls and reporting requirements to the TEF, ensuring that the fund would operate no differently than other state programs in terms of open government and accountability. Current state law governing the TEF does not require the governor to report to the Legislature on the fund's grants, activities, or performance. The bill would create reasonable performance standards to demonstrate the effectiveness of projects funded by the TEF and hold companies accountable for the money they receive. It also would require the governor to report to the Legislature on projects funded by the TEF. With this detailed information, legislators could decide how effectively money appropriated to TEF had been spent and how best to reform the TEF's administration in the future.

## Opponents said

HB 1938 is unnecessary because the TEF already has safeguards to prevent misuse of grants from the fund. Every project funded by the TEF requires the unanimous written consent of the governor, the lieutenant governor, and the speaker of the House. The Governor's Office has included in all agreements "clawback" provisions that deny funds to grantees that do not meet their performance targets. The additional requirements in HB 1938 could slow the application and approval process, causing Texas to miss out on investment from some firms.

## Other opponents said

The bill should be strengthened to ensure the maximum economic benefit from TEF grants. Companies receiving TEF money should be required to provide a minimum level of health care coverage, a living wage, and a safe workplace for employees. Projects should be distributed geographically across the state and directed particularly to areas of the greatest economic need.

## Notes

The **HRO analysis** appeared in the April 11 *Daily Floor Report*.

HB 2421 by Chavez, effective June 18, 2005, establishes a funding mechanism for the Skills Development Fund and the TEF to support job training and economic development grants and programs in the state. The funds are supported through an assessment of 0.1 percent on wages paid by employers participating in the state's unemployment insurance program.

# Direct shipment to consumers by domestic and out-of-state wineries

**SB 877 by Madla**
*Effective May 9, 2005*

**SB 877** allows holders of winery permits and out-of-state winery direct shipper's permits issued by the Texas Alcoholic Beverage Commission (TABC) to ship wine directly to Texas consumers, including consumers in dry areas. These permit holders cannot sell or ship wine to a minor and cannot deliver more than three gallons of wine within any 30-day period to the same Texas consumer. The wine delivery carrier must be permitted by TABC, and the recipient must be at least 21 years of age, among other mailing and delivery requirements.

SB 877 also creates an out-of-state winery direct shipper's permit. These permit holders cannot sell more than 35,000 gallons of wine annually to direct Texas consumers. These out-of-state permit holders are allowed to sell and deliver only wine that they produced or bottled, must keep certain sales records, and must pay excise and sales and use taxes at the same rate as if the winery were located in Texas.

Any person without an out-of-state direct shipper's permit who sells or ships alcohol from outside the state to a consumer in Texas commits an offense. A first offense is a class B misdemeanor, a second offense is a class A misdemeanor, and a third offense is a state-jail felony.

## Supporters said

SB 877 would take advantage of an important economic development opportunity by allowing Texas wineries to sell their products directly to consumers. At present, Texas wineries can ship wine only to consumers who first have visited in person. The bill would expand the possible market for Texas wineries by allowing them to take orders over the Internet and ship wine anywhere in the world. SB 877 contains provisions to enforce the law and require out-of-state permit holders to pay taxes and submit records of sales and delivery to TABC. The bill would establish a reasonable regulatory system that has proven effective at protecting minors in other states.

SB 877 would remedy problems with current law governing transportation of wine that were ruled unconstitutional in *Dickerson v. Bailey*, 336 F.3d 388 (5th Cir. 2003). In this ruling, the 5th U.S. Circuit Court of Appeals held that Alcoholic Beverage Code, sec. 107.07 discriminates against out-of-state wine producers and shippers by compelling them to go through Texas wholesalers and retailers. As a result, out-of-state wineries now may ship to Texas consumers, but Texas wineries are prohibited from doing the same thing, a situation that SB 877 would correct.

## Opponents said

SB 877 could create a public safety problem by making it easier for minors to purchase alcohol. The bill also would place improper responsibility on package delivery companies, which are not trained to recognize false identification. It would weaken the established three-tier alcohol retail system that is easily regulated by TABC. Allowing wineries to ship wine to consumers in dry areas would subvert the will of the people who voted to keep these areas dry.

## Notes

On May 16, 2005, in its ruling in *Granholm v. Heald* (03-1116), the U.S. Supreme Court stuck down laws in Michigan and New York that prevented or made it difficult for out-of-state wineries to sell and ship directly to consumers.

The **HRO analysis** appeared in Part Two of the April 26 *Daily Floor Report*.

# Authorizing the Legislature to exempt commercial loans from interest rate caps

**SJR 21 by Averitt/HB 955 by Solomons**
*Rejected by voters at November 8, 2005, election*

**SJR 21** would have amended the Texas Constitution to allow the Legislature to create exemptions from the maximum rates of interest on commercial loans. A commercial loan would have been considered a loan made primarily for business, commercial, investment, agricultural, or similar purposes and not primarily for personal, family, or household purposes.

**HB 955**, which was generally effective September 1, 2005, makes various revisions to the Finance Code and included the enabling legislation for SJR 21. If voters had approved SJR 21, HB 955 would have allowed parties to an exempt commercial loan to contract for, charge, and receive any rate or amount to which the parties had agreed. An exempt commercial loan would have been any commercial loan of $7 million or more that was secured primarily by real property or any loan of $500,000 or more that was not secured primarily by real property.

## Supporters said

SJR 21 would allow the Legislature to exempt certain commercial loans from maximum interest rates. Texas' commercial lending laws place both Texas borrowers and lenders at a competitive disadvantage compared to the laws of 46 other states, which give sophisticated commercial lenders and borrowers greater freedom to structure the unique loan arrangements that commercial parties often require. Texas-chartered banks and other commercial lenders do not share this freedom.

Because of Texas' low interest-rate ceiling, the vast majority of commercial loan transactions are made by out-of-state entities in accordance with the lending laws of other states. Texas' existing commercial lending laws increase costs for Texas businesses, limit opportunities for Texas-chartered banks attempting to make commercial loans, and require Texas businesses to obtain loans from lenders whose decision makers are located out-of-state. SJR 21 would allow the Legislature to level the playing field by permitting Texas' commercial borrowers and lenders to compete with

financial institutions from across the country. This limited change also would provide opportunities for economic development because it would increase incentives for large banks to locate their headquarters in Texas.

Often, Texas banks and lenders cannot obtain a great enough yield to make high-dollar commercial lending worthwhile because of the greater risk involved in making large loans. Loosening the restrictions on certain commercial lending further would reduce costs because parties to large commercial loans with Texas banks often must obtain elaborate legal opinions to navigate the complex laws governing which fees and charges constitute interest.

SJR 21 would grant sophisticated borrowers the freedom to structure loan deals with proper incentives to compensate banks with reasonable rewards for the risk they assumed. This change would not remove the protections of rate ceilings for less sophisticated borrowers because the Legislature, as demonstrated in the reasonable criteria set forth in HB 955, still would exercise judgment in determining eligibility criteria for which commercial loans would receive interest-ceiling exemptions. In addition, regardless of whether or not Texas institutes such exemptions, out-of-state banks and commercial lenders still would have the ability to contract with small, commercial borrowers according to the rate standards in accordance with laws from their home states.

## Opponents said

The interest-rate ceilings in the Texas Constitution and statutes create a protection from usurious lending practices. While some commercial borrowers have the sophistication to enter into complex loan agreements, not all commercial loans are obtained by sophisticated borrowers. Certain borrowers may not recognize the implications of all the terms included in a loan contract and often do not possess adequate resources to subject the contract to legal review prior to signing. The exemption criteria included in HB 955 is based upon the loan amount, and the size of a loan is not

always an accurate measure of borrower sophistication. Even though HB 955 sets forth exemption criteria to protect less sophisticated borrowers, SJR 21 would open the door for the Legislature to change these criteria in the future. Texas should not follow the dangerous lead of other states that have exempted all commercial lending from interest-rate ceilings.

## Notes

The **HRO analyses** of SJR 21 and HB 955 appeared in Part One of the May 9 *Daily Floor Report*.



**E**lections

| * HB 57 | Denny | Limiting uniform election dates to May and November | 47 |
| HB 1348 | Eiland | Defining and clarifying political contributions and expenditures | 48 |
| HB 1706 | Denny | Requiring voters to present proof of identification at polling places | 50 |
| HB 2030 | Nixon | Residency eligibility to be a candidate for or to hold public office | 52 |
| HB 2405 | Keel | Return of marked, early mail ballot from a voter without application | 54 |

# Limiting uniform election dates to May and November

**HB 57 by Denny**
*Effective October 1, 2005*

**HB 57** eliminates two uniform election dates – the first Saturday in February and the second Saturday in September – and moves the uniform election date in May from the first Saturday to the second Saturday. General and special elections are required to be held on either the uniform election date in May or the uniform election date in November, which is the first Tuesday after the first Monday.

The exception for bond elections for education institutions is eliminated, and those elections now must occur on uniform election dates in May or November. The period for early voting by personal appearance for an election held in May must begin on the 12th day before election day and continue through the fourth day before election day. Finally, the time for local canvassing for the May election date is delayed to account for the receipt of overseas ballots.

## Supporters said

HB 57 would make voting more convenient, increase public awareness of elections, and reduce the costs of holding elections. Texas has 254 counties, more than 1,000 school districts, and more than 1,000 cities, as well as many other political subdivisions. Each of these entities hold elections, and all can be held on different dates. Texas has so many elections that voters have "turnout burnout" and are staying away from the polls, even though Texas has a two-week early-voting period with accessible and convenient voting locations. Limiting uniform election dates would help alleviate voter fatigue.

School district elections held on non-uniform dates in large districts have cost more than $180,000 per election, and a city election in Dallas held on a non-uniform date in early 2000 cost $1.1 million. Reducing the number of uniform dates would encourage political subdivisions to combine elections and could result in significant savings for some local governments.

Current election law allows an exception to the uniform date requirement for school and college districts to hold elections to levy taxes or issue bonds. These elections are costly and often are not well publicized, which tends to restrict voter turnout to those with a vested interest in approving the bonds. The exception has been removed for every other governmental body except school districts, and it has not proved to be a hardship.

Moving the May election date one week later would address concerns of elections administrators regarding the potential for conflict in even-numbered years between the primary runoff election, which is the second Tuesday in April, and early voting for the May uniform election date.

## Opponents said

HB 57 would remove local control from school boards and other local entities by eliminating their ability to hold elections when needed. School districts that are experiencing dramatic enrollment increases must be able to respond to the needs of the community, and bond funding is an important way to address rapid growth.

Many school districts choose to hold bond elections on either the September or November uniform date or on a non-uniform date during the months before winter break. Similarly, many districts use the February date or a non-uniform date in the spring because students are in school and the community is more likely to be informed and involved. School districts should continue to be able to determine what election date best corresponds to local needs.

An issue as critical as setting aside tax money for debt service sometimes should be a single-focus issue. Allowing school districts to hold bond elections on non-uniform dates enables voters to devote their full attention to the specifics of the bond campaign. Advocates on both sides of bond issues especially would have difficulty reaching voters in the midst of electioneering that accompanies local, state, and federal elections.

## Notes

The **HRO analysis** appeared in Part Two of the May 18 *Daily Floor Report*.

# Defining and clarifying political contributions and expenditures

**HB 1348 by Eiland**
*Died in House committee*

**HB 1348** would have made various revisions to the Election Code provisions concerning political contributions and expenditures. It would have specified that a political party that accepted authorized corporate or union contributions could use those contributions only for its own administrative expenses, for administration of a primary election, for the establishment or administrative expenses of a convention held by the party, or for expenses related to redistricting. A political party would have had to maintain these funds in a separate account and pay vendors directly from that account.

The bill would have raised the threshold for reporting individual, independent expenditures in an election from $100 to $1,000. It would have defined what constituted coordination resulting in attribution of a third-party expenditure as a contribution to a candidate, political committee, or political party.

The current corporate campaign prohibition would have applied to any entity with a parent, subsidiary, or affiliate under the Texas Business Corporation Act, the Texas Non-profit Corporation Act, federal law, or law of another state or nation. HB 1348 would have clarified that a corporation, labor organization, or membership organization could use treasury funds to communicate with their restricted class and conduct non-partisan voter registration drives and get-out-the-vote campaigns aimed at that group.

A "restricted class" would have been defined as the group of individuals who could be solicited for contributions. For a corporation, this would have included its employees, stockholders, and their respective families; for a union, its members, employees, and their respective families; for a membership organization, its members, employees, and the employees' family members.

The bill would have provided explicitly for when a corporation, labor organization, or membership organization could use its funds for administrative expenses. A related organization could have solicited only its own restricted class with its funds. A corporation or labor organization could not have made more than two written solicitations for contributions in one calendar year to employees who were not stockholders, executive or administrative personnel, or their respective families. Current law prohibiting a corporation or labor organization from making a contribution for 60 days before a general election for state and county officers also would have applied to a primary election.

The bill would have authorized the Texas Ethics Commission to adopt rules to implement the legislation and to ensure that corporate or labor organization funds were not used for political activity in circumvention of these provisions.

The bill would have defined several terms to be consistent with federal law. "Administrative expense" would have been an expenditure incurred in the normal course of business, including for office space, phones, supplies, and utilities but not for political activity. "Direct campaign expenditures" would have included express advocacy and electioneering communications that were not made in coordination with a candidate or political committee. "Electioneering communication" would have included broadcast ads, mass mailings, and telephone banks that referred to an identified candidate that were publicly distributed within 60 days of a general election or 30 days of a primary, and that targeted the candidate's electorate. "Express advocacy" would have been a communication that referred to a candidate and expressly advocated the election or defeat of the candidate.

## Supporters said

HB 1348 would clarify and modernize current law to strengthen the state's 100-year prohibition against the use of corporate money and union funds in political campaigns, mostly by adopting well established federal standards. The bill would ban corporate-funded "issue ads" that target candidates 60 days before a general election and make clear that donations from political action committees or individuals used for political attack ads must be disclosed. Under the legislation, any direct-mail or broadcast ads funded by corporate or union money would be prohibited within 30 days of a primary election and 60 days of a general election if they clearly targeted a candidate – even if the mailing or ad did not ask a person to vote a certain way.

## Opponents said

HB 1348 contains vague terminology and would be overly broad for such a complex issue. Under the legislation, voter guides and newsletters of advocacy groups could be prohibited, and the restriction on corporate and labor organization speech could infringe upon First Amendment rights. The public would be better served by an interim study to further clarify the bill's provisions.

## Other opponents said

The bill would not stop last-minute attack ads financed by wealthy individuals or remove the influence of large donations from state politics. It should include limits on political contribution amounts, as under federal law.

# Requiring voters to present proof of identification at polling places

**HB 1706 by Denny**
*Died in the Senate*

**HB 1706** would have required a voter to present to an election officer at the polling place his or her voter registration certificate and either one form of specified photo identification or two different forms of specified non-photo identification. If the voter's name was on the precinct list of registered voters or if the voter was eligible under other existing eligibility provisions, and if the voter's identity could have been verified from the identification presented, the voter would have been accepted for voting without a voter registration certificate. An election officer could not have considered whether the voter's address on the voter's identification forms matched the voter's address on the voter registration certificate or the list of eligible voters.

The bill would have modified the list of acceptable proof of identification, specifying acceptable forms of photo identification and acceptable forms of non-photo identification. A county commissioners court could have authorized the county elections administrator or the county clerk to issue photo identification cards for use as proof of a voter's identity.

The bill would have allowed a voter who did not show either the specified photo identification or two forms of non-photo identification to cast a provisional ballot if the person executed a provisional ballot affidavit. Proof of identification would have been added to requirements for a provisional ballot to be accepted by the early voting ballot board. A voter accepted for provisional voting could have submitted proof of identification to the voter registrar not later than the fifth day after the date of the election. The office of the voter registrar would have been open on a Saturday within the five-day period in which the voter had to present identification. The secretary of state would have prescribed procedures as necessary to implement identification provisions for these voters who were accepted for provisional voting.

The presiding election judge would have posted in a prominent location on the outside of each polling place notice that a provisional ballot would be provided to a person who executed the appropriate affidavit and a list of the acceptable forms of photo and non-photo identification.

The notice would have had to be printed in English, Spanish, and any other language appropriate to the polling place's precinct and in at least 24-point type.

The bill also would have prohibited the Department of Public Safety (DPS) from collecting a fee for a personal identification certificate issued to a person who executed an affidavit stating that the person was financially unable to pay the required fee, who was a registered Texas voter and presented a valid voter registration certificate, or who was eligible for voter registration and submitted a voter registration application to DPS.

## Supporters said

HB 1706 would increase public confidence in voter registration rolls and election outcomes and help prevent voter fraud. No statutory provisions now provide for verifying the identity of those who present voter registration certificates at polling places, and the bill would close a potential loophole for fraud. More situations in everyday life require photo identification, including traveling on airplanes and cashing checks. It is time to conform the voting system to provide identity protection.

Voters with voter registration cards would have to show photo identification from an acceptable list or show two forms of acceptable non-photo identification. A voter without a registration card but on the registered voter list still could vote by presenting the required identification – in most cases, a Texas driver's license. Those unable to present the required identification could cast provisional ballots by completing a related affidavit. The bill would not result in voters being turned away from the polls.

The bill would not be an onerous burden on Texas voters. According to the National Conference of State Legislators, five states now require some form of photo ID for voter identification, and 14 more require proof of identification that does not necessarily include the voter's picture. In addition, by authorizing DPS to issue personal identification cards without a fee to those unable to pay, the bill would assure inclusion of the state's diverse voting population.

## Opponents said

HB 1706 would address a perceived problem for which there is no evidence – identification fraud at polling places by registered voters. Anecdotal reports of voter fraud in other settings have not involved registered voters with valid voter registration certificates, and no one has produced evidence of eligible voters falsifying identities at polling places. Rather than combatting voter fraud, the bill's onerous requirements would disenfranchise some eligible voters.

The bill would discourage some voters by creating long lines at the polls as election officials were required to verify more forms of identification. In addition, a prospective voter without the specified forms of identification who went home to retrieve acceptable identification, assuming he or she possessed it, might face even longer lines upon returning to the polling place. While such a voter could cast a provisional ballot under this bill, a voter who has voted faithfully for many years by presenting a voter registration card should not be left to wonder whether the provisional ballot actually would count.

While citizens are required to show proof of identification in situations ranging from flying on an airplane to renting movies, none of those is a constitutional right and only one ID is necessary in such settings, not two or three as this bill could require. Also, when the state of Texas accepted federal Help Americans Vote Act (HAVA) funds, it agreed to certain conditions. As written, these bills could jeopardize additional HAVA federal funds for Texas, estimated at $103.2 million.

## Other opponents said

HB 1706 would be impractical and difficult to enforce. Mandating that every person who appears at a polling place to vote have specified proof of identification – beyond a voter registration card – would be a major departure from current law. A grace period of at least one election would be needed to educate election workers and voters. Even that might not be sufficient time to change habits among voters accustomed to needing only voter registration certificates to vote at the polls.

With respect to the list of acceptable non-photo IDs, a variety of official documents are issued to people under age 18, including library cards, temporary driving permits, and junior hunting or fishing licenses. By recognizing these forms of ID, the bill could generate more problems with voter eligibility and underage voting than it would solve.

## Notes

The **HRO analysis** of HB 1706 appeared in Part Two of the April 19 *Daily Floor Report* and Part Two of the May 2 *Daily Floor Report*.

The House-passed version of SB 89 by Averitt, which died in conference committee, contained similar requirements with regard to the presentation of voter identification at a polling place. In addition, it would have permitted election officers to access electronically readable information from driver's licenses to determine a voter's identity. As amended on the House floor, the bill would have allowed a business to access the electronic information to verify the identification of an individual or the validity of a check at the point of sale.

# Residency eligibility to be a candidate for or to hold public office

**HB 2030 by Nixon**
*Died in the House*

**HB 2030** would have established residency requirements to be eligible to hold or be elected to public office. It would have applied to public offices established under state law, including offices of political subdivisions. A person would have been considered a resident of a territory if the person had maintained a principal, regular place of residence in that territory at a specified time or throughout a specified period. A person's stated intent to reside at a place other than the individual's principal, regular place of residence would not have determined residency.

A person would not have been considered a resident of a territory if:

- the person received a residence homestead exemption from ad valorem taxes for a residence outside the territory, unless the person acted to cancel the exemption;
- the person was registered to vote at a residence outside the territory, unless the person acted to change the registration to a residence in the territory; or
- at the specified time or period, the person identified the address of a residence, other than the person's business address, outside the territory as the person's residence address, or failed to identify a residence address in the territory as required, on one of the following: a tax document the person filed with a governmental entity, on any other document the person submitted to a governmental entity for any purpose, or on a document submitted to a political party in connection with the person's status as a candidate for public office.

The homestead exemption requirement would not have applied for one year after the election of a person to an office if the person previously met residency requirements for election and no longer met requirements as a result of the redrawing of districts used to elect a person to the Legislature or the governing body of a political subdivision.

HB 2030 would have required a candidate to have lived in Texas for two years and in the territory from which the office was elected for 12 months to be eligible for office. An eligible candidate could not have been convicted of

providing false information on a ballot application in the previous 24 months. The bill would have lengthened residency requirements from 12 months to two years for home-rule city office holders and candidates from areas that recently had undergone redistricting.

Candidates would have had to sign affidavits stating that they were not currently violating the constitution or laws of the United States or Texas. Providing false information would have been an offense punishable as a class A misdemeanor (up to one year in jail and/or a maximum fine of $4,000).

## Supporters said

HB 2030 would ensure that elected officials represented the territories in which they actually lived. The bill would establish qualifications and standards for determining whether a candidate or office holder could be considered a resident and would encompass state and local elections. It would define two important factors in deciding residency – physical conduct and intent. Residency would be fixed when those two elements coincided. Rather than relying on case law, the bill would provide a statutory standard to determine residency. It is designed not to conflict with the Election Code and would apply to several other statutes in the Water Code, Election Code, and other codes affecting elected officials.

## Opponents said

No one-size-fits-all pattern fits the residency issue. The courts have long reviewed residency for office holders and candidates on a case-by-case basis and examined the issue as a matter of both presence and intent. The provision in HB 2030 declaring that "The person's stated intent to reside at a place other than the individual's principal, regular place of residence does not determine whether the person resides at that other place," would pose constitutional problems. Federal courts have rejected attempts to fix residency regardless of intent, and Texas courts have rejected using homestead or homestead exemptions in determining residency.

## Other opponents said

The provision in HB 2030 related to receiving a homestead exemption could favor a person without a homestead who thus would not be held to that standard. Because it would not treat prospective candidates or office holders equally, it could raise discrimination issues.

The candidate affidavit requirement is overly broad and should be refined. As written, it would require candidates for office to sign an oath stating that they were not currently violating the constitution or laws of the United States or Texas. The implications of such an oath could encompass many circumstances not contemplated by the bill.

## Notes

The **HRO analysis** appeared in Part One of the May 11 *Daily Floor Report*.

# Return of marked, early mail ballot from a voter without application

**HB 2405 by Keel**
*Died in Senate committee*

**HB 2405** would have prohibited counting a marked ballot voted by mail from a person who had not applied for that ballot. A person would have committed a class C misdemeanor (maximum fine of $500) if, with the intent that an unlawful ballot be cast, the person had directed the return of a marked, early mail ballot with the knowledge that the ballot was from a voter who was not entitled to receive a mail ballot. The bill would have instructed the early voting clerk to include with the balloting materials a notice prescribed by the secretary of state informing the voter of the categories of people eligible to vote by mail and stating that the voter should not cast the ballot unless the voter, or a person authorized by the Election Code to assist that voter, requested the ballot.

## Supporters said

HB 2405 would create a penalty for intentionally directing a person to vote a ballot by mail if that person had not applied for the ballot, thus establishing an enforcement mechanism for a practice already prohibited. More reports of fraud related to early voting by mail are cropping up. If the elections process in Texas is to have integrity, the state must be able to punish fraudulent voting by mail.

The Election Code makes it expressly clear that a person who has not applied for an early ballot by mail is not entitled to receive a mail ballot, regardless of whether the voter meets one or more eligibility requirements. In recent elections, however, evidence has surfaced that the law has been interpreted to allow such mail ballots to be cast and counted, despite voters' ineligibility to receive them in the first place. To protect unsuspecting voters, the bill would require a prosecutor to show that a person who directed the return of a marked, early mail ballot with the knowledge that the mail ballot was from a voter not entitled to that ballot had the intent to cast an unlawful ballot.

HB 2405 further would reduce the chance of ensnaring innocent voters by requiring early voting clerks to include with the balloting materials information prescribed by the secretary of state on the categories of those eligible to vote by mail and a statement that the voter, or a person authorized by the Election Code to assist that voter, should not cast that ballot unless the voter or the authorized person requested it.

## Opponents said

If a sizeable number of voters who did not request mail ballots are receiving them, the problem lies with county clerks and elections administrators, not with voters. These officials should be trained to watch for signature discrepancies and other irregularities because confusion surrounding procedures for requesting and accepting mail ballots likely will increase with time. For example, the federal Help America Vote Act (HAVA) contains provisions stipulating that voters cannot be questioned if they identify themselves as disabled, which will likely increase the number of voters who use mail ballots. The best approach to avoid future problems is to educate election officials.

## Notes

The **HRO analysis** appeared in Part Two of the April 18 *Daily Floor Report* and Part Two of the May 2 *Daily Floor Report*.



**E**nvironment

| | | | |
|---|---|---|---|
| HB 86 | W. Smith | Standards for compliance histories of TCEQ-regulated industries | 56 |
| * HB 2481 | Bonnen | Revising the Texas Emissions Reduction Plan | 57 |
| HB 2833 | R. Cook | Revising regulatory takings to include impervious cover restrictions | 59 |
| HB 2915 | Puente | Allowing redesignation of river basins based on scientific evidence | 61 |
| SB 3 | Armbrister | Developing, managing, and conserving water resources | 62 |
| SB 1667 | Duncan | Transfer to TCEQ of responsibilities concerning radioactive substances | 65 |

# Standards for compliance histories of TCEQ-regulated entities

**HB 86 by W. Smith**
*Died in the Senate*

**HB 86** would have repealed the classification system implemented in 2001 that ranks entities regulated by the Texas Commission on Environmental Quality (TCEQ) according to their compliance histories based on a formula. TCEQ no longer would have been required to classify regulated entities into the categories of "high," "average," and "poor" based on compliance history. TCEQ would have evaluated compliance histories using varying standards, including the size of a regulated entity and any violations. Individualized criteria also would have been used in determining if an emissions event were excessive.

The bill would have changed the definition of "repeat violator" to include only entities that committed violations of the same nature in the same environmental media rather than entities that had committed any repeated violations. "Repeat violators," unlike other regulated entities, would have been denied the chance to correct violations after receiving notice. TCEQ would have included notices of violations only as part of the compliance histories of "repeat violators."

HB 86 would have allowed regulated entities to use alternative pollution control or abatement methods that were as protective, rather than more protective, of the environment and public health than the standard prescribed by law.

Compliance history information held by the federal Environmental Protection Agency (EPA) about a regulated entity would have been used by TCEQ only when readily available, and violations in other states no longer would be included in an entity's compliance history. TCEQ would have had to notify entities before displaying their compliance history information on its website, giving an entity time to review the accuracy of the information.

## Supporters said

TCEQ's current way of evaluating compliance history is unnecessarily restrictive and prevents the agency from assessing compliance histories on a case-by-case basis. TCEQ's use of a uniform standard for all regulated entities creates a bias against small businesses as they do not have the same resources nor do they cause as much environmental damage as large industries. HB 86 would eliminate the bias against small businesses by allowing TCEQ to consider important factors when evaluating compliance history, including an entity's size and the magnitude of the environmental impact of any violations.

The definition of "repeat violator" now used is overly broad and does not target only entities that commit the same violation on more than one occasion. A "repeat violator" should be an entity that repeats an identical violation in the same environmental medium rather than any entity that has more than one serious violation. For example, an entity that failed to obtain an air permit and later failed to obtain a water permit should not be considered a repeat violator because the violations involved different environmental media.

## Opponents said

HB 86 would decrease the regulatory authority of TCEQ by excluding notices of violations from most entities' compliance histories and by relaxing restrictions on polluters. Notices of violation are a vital component of compliance history and should not be eliminated. Including them in compliance history allows permit reviewers, inspectors, and citizens to recognize patterns of repeat notices of violation. HB 86 also would allow polluters that repeatedly violate the agency's rules to avoid classification as "repeat violators." The bill further would assist polluters by permitting them to use alternative pollution control or abatement methods not proven to have a better impact on the environment and public health than the standard prescribed by law.

## Notes

The **HRO analysis** appeared on the March 16 *Daily Floor Report*.

# Revising the Texas Emissions Reduction Plan

**HB 2481 by Bonnen**
*Effective September 1, 2005*

**HB 2481** extends the Texas Emissions Reduction Plan (TERP) until 2013, revises the plan's funding structure, requires the Texas Commission on Environmental Quality (TCEQ) to adopt new federal Environmental Protection Agency (EPA) rules, and establishes rebate programs to streamline TCEQ's emissions-related grant programs.

***Allocation of TERP funds.*** HB 2481 changes the allocation of TERP funding by increasing the portion of TERP funds used for research and development. Beginning in 2008, 64 percent of TERP funding will be directed toward reductions in diesel emissions and 33 percent will be used for research and development. Until 2008, TERP funding will maintain the current allocation of 87.5 percent for diesel reductions and 9.5 percent for research and development.

The bill requires at least 10 percent of research and development funds to be used to support air quality research in the Houston-Galveston-Brazoria (HGA) and Dallas-Fort Worth (DFW) areas, where emissions exceed federal standards. A minimum of 25.5 percent of the HGA and DFW research is reserved for a Houston-based technology research nonprofit organization charged with responsibility for administering the new technology research and development program. The bill gives a representative of the Houston-based non-profit a seat on the TERP advisory board.

***TERP Title Transfer Fees.*** Beginning in 2010, a $28 title transfer fee will be assigned to applications for certificate of titles in all counties of the state. Between 2008 and 2010, $5 of the title transfer fee will continue to be deposited in the TERP account. In 2010, title transfer fees will be deposited entirely into the Texas Mobility Fund instead of the TERP account.

HB 2481 establishes rebate programs designed to streamline TCEQ's emissions reductions grant programs.

***EPA Clean Air Interstate Rule and Clean Air Mercury Rule.*** HB 2481 requires TCEQ to implement the EPA's Clean Air Interstate Rule and Clean Air Mercury Rule. The Clean Air Interstate Rule is designed to reduce emissions of sulfur dioxide ($SO_2$) and nitrogen oxides (NOx), and the Clean Air Mercury Rule is designed to reduce utility emissions of mercury. Each program works through a cap-and-trade system by which the EPA allocates emissions allowances to the state. The state then distributes the allowances to sources of emissions (i.e., power plants or utilities), which can trade them. The bill creates additional restrictions that specifically pertain to NOx emissions.

## Supporters say

By prioritizing investment in cutting edge, emissions-reducing technologies, HB 2481 would facilitate complying with federal air quality standards. Increasing the state's investment in the development of new emissions-reducing technology has proven to be a cost-effective strategy in combating air pollution. State funding for research and air planning activities has yielded optimum results in developing science-based, practical, economically viable state implementation plans for non-attainment areas and air planning activities for near-non attainment areas. The availability of more efficient emissions technologies on the market would save the state money by reducing the cost per ton of emission reductions.

HB 2481 significantly would increase the bonding authority of the Texas Department of Transportation (TxDOT) by requiring that title transfer fees be temporarily deposited in the Texas Mobility Fund. The additional leveraging authority given to TxDOT could help relieve the state's current congestion crisis. The bill simultaneously would benefit TCEQ and TxDOT by providing funding for TERP and allowing TxDOT to finance needed transportation projects around the state.

## Opponents say

The bill's incremental approach to investment in research and development of new technologies would not be substantial enough to bring Texas into compliance with EPA standards in 2010. The bill would not increase funding for research and development until 2008 – leaving little time to develop new emissions-reducing technologies. Further, the provisions of the bill would not be strong enough to bring the HGA area into compliance with the EPA's new eight-hour ozone standard. Texas has a long way to go before meeting EPA standards on air quality, so the majority of

TERP funds should continue to be used to fund emission reductions, not research. If Texas failed to comply with federal standards, the state could risk losing vital federal highway funding or suffering restrictions on industrial development in major metropolitan areas.

## Notes

The **HRO analysis** appeared in the April 27 *Daily Floor Report.*

HB 3469 by Hochberg, effective June 17, 2005, establishes a grant program for projects to reduce emissions of diesel exhaust from school buses by way of the TERP if money is available after allocations from the fund have been made for other purposes required by the State Implementation Plan (SIP). HB 1611 by Chisum, effective June 18, 2005, creates a sub-account within the clean air account in an amount not to exceed $20 million, with funds available but otherwise not appropriated for vehicle repair and retrofit to fund programs to improve air quality. SB 784 by Shapleigh, effective September 1, 2005, authorizes TCEQ to allow substitution of emissions reductions either if reduction of emissions of one air contaminent for which an area is designated non-attainment are substituted for reduction of emissions of another air contaminent for which the area is designated non-attainment, or if the TCEQ finds the reduction clearly will result in greater health benefits for the community than would reductions at the original facility. Previous law required the TCEQ to meet both standards. HB 2481 also includes this provision.

# Revising regulatory takings to include impervious cover restrictions

**HB 2833 by R. Cook**
*Died in the Senate*

**HB 2833** would have specified that a taking of private property by a governmental entity could result not just from a governmental action but from a series of governmental actions. Governmental actions resulting in a taking would have included those that limited impervious cover – surfaces that prevent the infiltration of water into the soil – to less than 45 percent of a property's surface area, excluding land within the 100-year floodplain and lands sloping 35 percent or more.

The bill would have removed an exemption for municipal actions, including actions that imposed regulations on a city's extraterritorial jurisdiction but not on the city itself. It would have retained exemptions for certain actions when they did not affect building size, lot size, or impervious cover, including municipal regulations of sexually oriented businesses, fireworks, noise, and smoking, among other matters.

HB 2833 would have required impact assessment statements to be made before governmental actions were taken and would have provided recourse for the public to ensure impact assessments complied with attorney general guidelines.

Under the bill, a suit or a contested case would have to have been filed not later than two years from the later of the date on which a governmental action was enforced and affected private real property, the date on which a governmental action was enforced and affected a permit application on the property, or September 1, 2005.

## Supporters said

HB 2833 would strengthen takings provisions for land owners when certain regulations unfairly devalued their property. Municipal regulations continue to impose restrictions on the use and development of private property, despite federal and Texas constitutional protections with respect to the taking of private property by government entities. The bill would not prevent a city from applying any regulations deemed necessary to protect public health and safety.

Through technological advances, development – specifically, impervious cover – can take place while preserving environmental quality. Engineered storm water retention/detention systems can help maintain water quality, regardless of impervious ground cover, to protect water quality downstream.

Property owners should not have to bear the costs of regulations imposed to support the public good. Cities already issue bonds and purchase mitigation lands to prevent hazards and protect the public. Private property owners should not be required to subsidize what government already can do with tax dollars.

Expanding use of impact assessments would save the state money in the long run by preventing actions that could require compensation. While finding that a governmental action was a taking could keep a regulation from being enforced until compensation was made, the process of proving a government action had reduced property value and was cause for compensation could be difficult. Under such circumstances, a property owner and a regulatory agency might well be more inclined to negotiate on the regulation and agree upon a less intrusive means of accomplishing regulatory goals.

## Opponents said

HB 2833 would create a new cause of action for regulations to preserve environmental standards and drinking water quality. Many city ordinances, including some adopted by Austin, Buda, and San Antonio, that limit impervious cover on environmentally sensitive areas would amount to takings of property requiring compensation at market value.

Raising impervious ground cover limits would endanger stream flow, groundwater recharge, stream banks, and water quality. Safe drinking water supplies could not be maintained at 45 percent impervious cover. Pollutants would increase, even with engineered water quality controls. Storm flow – the volume of water flowing during storms – would increase, as would erosion and flooding. Base flow, water that flows between storms, could decrease, preventing water from reaching the recharge zone.

The bill would reverse protections for water sources such as the Edwards Aquifer. The aquifer's unique geology increases its vulnerability to pollution. Regulations on surrounding land owners may seem severe, but preserving the aquifer's water quality is essential for the 1.5 million people who depend on it for drinking water. It also provides fresh water flows for rivers that feed bays and estuaries along the Texas coast, supporting fish, wildlife, and economic activity. Even with structural controls, pollution could enter the aquifer. Relying on structural controls would require a political subdivision's maintenance and upgrades, which could increase fees to developers.

The bill would hamper a city's ability to regulate land use to protect property values.  In cities such as Austin, where impervious cover limits have been adopted, the bill would invalidate voter initiatives instituted by the public. HB 2833 would require a city to pay for enforcing regulatory protections for which city residents hold government responsible. City residents depend on regulation to protect drinking water. While the bill would not prevent cities from enforcing regulations, it would make enforcement prohibitive and coerce cities into diluting regulatory protection. Cities would have to pay landowners not to pollute water.

Cities would have to pay for more public notices and impact assessments, providing 30 days' notice by publication in a newspaper of a governmental action that could result in a regulatory taking. The bill would require impact assessments for regulations that might reduce property value, which would be administratively and fiscally demanding on local governments and would penalize cities for proposing routine regulations. Some cities could afford the increased costs, but others would have to forego regulatory enforcement. With weakened ability to regulate land use, property values would decrease.

## Notes

The **HRO analysis** appeared in Part One of the May 9 *Daily Floor Report.*

# Allowing redesignation of river basins based on scientific evidence

**HB 2915 by Puente**
*Died in the House*

**HB 2915** would have allowed the Texas Water Development Board (TWDB) to redesignate a river basin based on scientific or hydrologic evidence, whether or not such a redesignation facilitated the transfer or diversion of water.

## Supporters said

By specifying that TWDB could redesignate river basins when there was a sound hydrologic basis for doing so, HB 2915 would clarify that state law restricting interbasin transfers of surface water was based upon accurate scientific data. When defining the parameters of a river basin, TWDB bases its determination on the extent to which an area is linked hydrologically. If water in a region flows into a single watershed that empties into the Gulf of Mexico, that watershed is designated as a single river basin. However, years ago the determination was made to classify the Guadalupe and San Antonio river basins separately, even though they are linked hydrologically. The current designation contradicts policy governing river basin classification across the state, and HB 2915 would correct this inconsistency.

Current law requires a person to apply to the Texas Commission on Environmental Quality (TCEQ) before diverting water from one river basin to another. Upon receiving an application for an interbasin transfer, TCEQ must hold public hearings and review the effect of such a transfer on factors such as the economies of both basins, existing water rights, and bays and estuaries. TWDB is prohibited from redesignating a river basin in order to allow a transfer of water that otherwise would violate provisions governing interbasin transfers. An application is pending that would divert water from the Guadalupe River basin into

what currently is the San Antonio River basin, and TWDB has interpreted the law to prevent it from redesignating these two basins as one. Without direction from the Legislature, the current designation would continue, even though this designation does not reflect the hydrology of the Guadalupe and San Antonio rivers.

## Opponents said

HB 2915 would allow for circumvention of current laws restricting interbasin transfers, a pillar of state water policy. Redesignation of the San Antonio and Guadalupe rivers as one basin would enable diversions from the Guadalupe to go forward without meeting the public hearing and evaluation requirements in current law. The bill would provide an end-run around the reviews, studies, and junior water rights protections established by the Legislature to protect water rights holders and residents in the Guadalupe River basin.

## Other opponents said

The bill should be amended to protect instream flows in the unified river basin. Freshwater flows from the Guadalupe River are vital to the unique ecological balance in bays and estuaries along the coast. Specifying a minimum flow in case of drought could address many of the environmental and other concerns associated with the project.

## Notes

The **HRO analysis** appeared in Part Three of the May 10 *Daily Floor Report*.

# Developing, managing, and conserving water resources

**SB 3 by Armbrister**
*Died in the House*

**SB 3**, as reported by the House Natural Resources Committee, would have made comprehensive changes in state water policies concerning environmental flows, water conservation and planning, and water project financing. It also would have modified the Edwards Aquifer Authority and created two new groundwater districts.

*Environmental flows.* SB 3 would have established a system for evaluating and setting aside in-stream surface water flows in watersheds throughout the state.

The bill would have established an Environmental Flows Commission (EFC) that would have issued a report to the governor with recommendations on environmental flows. EFC recommendations would have been based upon recommendations for environmental flow protection made by an environmental flows Science Advisory Committee (SAC).

Under the bill, the EFC would have defined geographically each river basin and bay system for the purpose of developing environmental flow recommendations. For each river basin and bay system, the EFC would have appointed a stakeholders' committee consisting of representatives from such interests as agriculture, municipalities, water districts, commercial fishermen, environmental interests, and recreational water users, among others. This stakeholders' group would have appointed an expert science team to submit environmental flow recommendations. Each expert science team would have recommended an environmental flow regime based solely on the best science available, without regard for other water use needs. The Texas Commission on Environmental Quality (TCEQ) would have adopted environmental flow standards based on those recommendations and would have determined the amount of unappropriated water to be set aside for environmental flow standards.

TCEQ could not have issued a new water right that would impair an environmental flow set-aside, but the agency could have adjusted a permit for a new water right or amendment to an existing water right to protect instream flows or freshwater inflows. This provision would not have affected any water right or amendment issued before September 1, 2005.

*Water Conservation and Planning.* A retail public utility providing potable water service to a population of at least 3,300 would have been required to submit to the Texas Water Development Board's (TWDB) chief administrator a water conservation plan that was consistent with minimum requirements adopted by TWDB and TCEQ.

TWDB would have been required to implement a statewide public awareness program to educate Texas residents about water conservation. TCEQ would have been required to contract with a private vendor, at no cost to the state, to install electronic water conservation systems on toilets, sinks, and showers in state buildings. Private vendors would have had to demonstrate that water conservation systems would result in an annual cost savings of at least 50 percent of current costs.

A municipality with a population of 5,000 or greater would have had to require an irrigation system installer to hold a license and obtain a permit prior to installing a system in the municipality or the municipality's extraterritorial jurisdiction. Such a municipality also would have been required to establish minimum standards for irrigation systems.

A change in the purpose and place of use under an historic or existing-use permit could not have been made without a permit amendment. In addition, the bill would have prevented a groundwater district from discriminating between an owner of land that was irrigated for production and a landowner participating in a federal conservation program.

The bill would have established a stakeholder committee to study management of groundwater underneath state-owned lands. The committee would have made recommendations to the Legislature regarding appropriate management techniques and availability of groundwater under such lands.

For applications for funds to implement water supply projects in the state water plan, TWDB would have given priority to entities that had demonstrated significant water supply savings or that would achieve savings by implementing the project for which funding was sought.

***Financing of water projects.*** SB 3 would have established a Legislative Oversight Committee on Water Financing to study the implications of a water conservation and development fee as a source for funding water infrastructure.

***Edwards Aquifer Authority.*** The amount of permitted withdrawals from the Edwards Aquifer could not have exceeded the sum of all regular permits issued or for which an application had been filed and issuance was pending as of January 1, 2005.

The Edwards Aquifer Authority (EAA) would have adopted a critical period management plan with withdrawal reduction percentages that would have reduced the amount of withdrawals from the aquifer during varying stages of drought.

The EAA could not have allowed withdrawals beyond specified levels during serious droughts unless the EAA determined that a different volume of withdrawals was consistent with maintaining protection for endangered species as required by federal law.

***Creation of groundwater districts.*** The bill would have created two new local groundwater conservation districts, the Victoria County Groundwater Conservation District and the Val Verde County Groundwater Conservation District.

## Supporters said

***Environmental flows.*** SB 3 would mark an historic step toward protecting the environment by dedicating instream flows for rivers and freshwater inflows for bays and estuaries. Currently, no state law provides designated protection to ensure minimum flows in rivers and into bays and estuaries. Instead, priority is given to other uses such as agricultural, commercial, and residential uses. Water rights in several river basins have been over-permitted, and other basins likely will follow suit. SB 3 would provide a means to balance agricultural, commercial, and residential needs with important environmental considerations.

In order to determine standards and set-asides for environmental flows, the bill would establish a consensus-based process relying upon the best available science to determine the amount of flows needed for environmental considerations. Because water is a vital resource for so many diverse interests, it is important that the environmental flow planning process be as inclusive as practicable.

The planning process established under SB 3 would establish set-asides in rivers where unappropriated water still exists. The bill would not infringe on the water rights of existing water holders. It would include protections for other beneficial uses in case a drought or other emergency required diversion of environmental flows.

***Water conservation.*** The bill would establish and expand several important programs to encourage conservation of water resources in the state. It would recognize the importance of such strategies as private land stewardship and residential conservation measures, while moving cities toward more efficient use of the state's limited water resources.

The bill would prevent discriminatory treatment in the groundwater permitting process against landowners who placed their property in the federal conservation reserve program, an important conservation program that helps prevent overuse and improves the ecological balance of pastureland in the state.

***Water infrastructure funding.*** By establishing a legislative oversight committee on water infrastructure financing, the bill would help future legislatures address pressing needs for funding water development. Texas has a rapidly growing population, and this committee could provide recommendations regarding how best to fund water infrastructure demands.

***Edwards Aquifer Authority.*** The bill appropriately would balance environmental, residential, and other concerns with respect to the EAA. To protect environmental considerations, the bill would establish reduction requirements during critical periods of drought when springs were affected most severely.

## Opponents said

***Environmental flows.*** SB 3 would establish an unnecessarily complicated tangle of bureaucracy. The bill would create two new statewide committees as well as stakeholder and science boards in every river basin and bay system in the state. The majority of members on these policymaking bodies would not be accountable to the voters in the way that elected officials are. These bodies would hold excessive power to seize water rights for what could be marginally important purposes.

*Water conservation.* CSSB 3 would place several unfunded mandates on local governments that would have to comply with the bill's extensive water conservation requirements. For example, water utilities would have to develop and abide by water conservation plans, and municipalities would have to regulate more extensively residential irrigation facilities and installers. It would be inappropriate for the state to mandate these requirements without providing the funds for their implementation.

The provision on nondiscrimination against conservation reserve program lands is unnecessary because current law sufficiently protects the water rights of landowners enrolled in a government program. Districts must consider idle land in a government program as agricultural land, preventing disparate treatment of these types of land.

*Water infrastructure funding.* Establishing a legislative oversight committee on water infrastructure financing could lay the groundwork for new taxes and fees for costly water projects. A water infrastructure fee is an idea that the Legislature repeatedly has rejected, yet this committee could serve as a vehicle to resurrect this discredited concept.

*Edwards Aquifer Authority.* The level of pumping from the Edwards Aquifer allowed under SB 3 likely would be unsustainable over the long term. Although the bill would incorporate important reductions in pumpage during drought periods, it would be better for the aquifer ecologically and hydrologically if a lower level of regular pumping were allowed.

## Notes

The **HRO analysis** appeared in the Part Three of the May 24 *Daily Floor Report.*

As passed by the Senate on April 29, SB 3 included several provisions relating to management of groundwater resources, including:

- providing remedies for interference with a domestic or agricultural well;
- requiring registration and reporting of water transactions;
- establishing training requirements for groundwater conservation districts; and
- establishing a groundwater management area council to coordinate the activities of groundwater conservation districts.

# Transfer to TCEQ of responsibilities concerning radioactive substances

**SB 1667 by Duncan**
*Died in the House*

**SB 1667** would have shifted jurisdiction from the Health and Human Services Commission (HHSC) and the Department of State Health Services (DSHS) to the Texas Commission on Environmental Quality (TCEQ) for the licensing and regulation of:

- the processing of low-level radioactive waste or naturally occurring radioactive material (NORM) waste received from other persons, except oil and gas NORM waste;
- the recovery or processing of source material;
- the processing of by-product material; and
- sites for the disposal of these regulated materials.

The Texas Railroad Commission would have licensed and regulated the possession, storage, processing, handling and disposal of oil and gas NORM waste and the decontamination and maintenance of oil-field equipment.

A licensee authorized to dispose of radioactive substances from other persons would have transferred 8 percent of its gross receipts from disposal operations to the state as general revenue and 2 percent to the host county. TCEQ could have held contested case hearings on license applications under the Texas Radiation Control Act only if an affected person filed a timely request regarding the renewal or amendment of a license if a requested change had constituted a major amendment. TCEQ could have issued, as a component of an injection well permit, authorization for *in situ* mining of radioactive substances in a specified area. The authorization could not have required additional approval by TCEQ or any additional hearing for the permit holder to conduct minor in situ mining in the production area.

## Supporters said

SB 1667 would consolidate regulatory powers over waste disposal under one agency, assure consistent regulations across the board, and ensure that the state and counties received more financial benefits from radioactive waste disposal, adding an estimated $4,334,332 in general revenue over the upcoming biennium. The U.S. Nuclear Regulatory Commission (NRC) has cited the number of overdue inspections, vacant positions, and staff turnover

from the DSHS radiation program as the basis for its "heightened oversight" of Texas. Transferring the licensing and regulatory duties to TCEQ would address the issues cited by NRC and eliminate the threat of NRC's resuming regulatory functions in Texas. If Texas lost "agreement state" status, it would increase administrative burdens and costs to businesses, which would discourage industry development in Texas.

The transfer of radioactive materials jurisdiction to TCEQ would provide for a more holistic regulatory approach because TCEQ would be equipped to address the disposal, geological, engineering, and safety aspects of the process. The timelines provided for the transfer would be adequate to meet the need to review thoroughly applications to ascertain their validity and adherence to public safety requirements. Ensuring efficient processing of applications would protect current applicants who should not have to encounter processing delays due to reorganization of the state's licensing authorities.

The current process in Texas to obtain permits to mine uranium is unlike any other in the nation in that a business can do all that was required to obtain a permit to drill in a certain area yet later have permits denied to drill individual wells. An initial permit thoroughly reviewed by TCEQ should be enough for a company to carry out business within the parameters of the permit. The public still would have a mechanism to hold a contested case hearing if a major amendment were made to a permit that would change the outcomes of drilling for which the business initially applied.

## Opponents said

DSHS has an extensive history and greater expertise in regulating radioactive materials than does TCEQ. Duties should not be transferred at a time when TCEQ and DSHS are beginning to find a balance of authority in their respective areas of expertise, and the transfer could interfere with pending applications. An attempt to move programs from the Texas Department of Health (TDH) regulating radioactive issues in 1993 failed because the bulk of the staff with the expertise on radioactive matters remained with TDH. SB 1857 in 1997 reversed the transfer

of the by-product materials program primarily because the need was recognized to take advantage of the expertise in radioactive matters that remained with TDH.

The bill's deadlines would not provide enough time for the responsible transfer of powers and duties among departments and would rush the processing of pending license applications. This would include deadlines for decisions on applications pertaining to uranium mining waste recovery, low-level waste processing, and by-product disposal. Such a fast review of applications for a company to dispose of radioactive waste would be irresponsible and serve only the business interests of applicants.

The bill would eliminate the public's recourse to hold contested case hearings on minor in situ mining and would limit their ability to conduct all contested case hearings except on amendments deemed major. The public has a right to protect its health and should retain all proper protections to ensure it is not threatened by exposure to radioactive substances.

## Notes

The **HRO analysis** appeared in Part Two of the May 24 *Daily Floor Report*.



Families & Children

* HB 1357   Flores/          Penalties for serving alcohol to minors                        68
    * HB 2868   Frost
* HJR 6     Chisum           Defining marriage as a union of one man and one woman         70
* SB 6      Nelson           Child and adult protective services revisions                72
* SB 419    Nelson           Abortion – parental consent and third trimester restrictions 76

# Penalties for serving alcohol to minors

**HB 1357 by Flores/HB 2868 by Frost**
*Effective September 1, 2005*

## *Driver's license suspension*

**HB 1357** requires the automatic suspension of the driver's license of a person convicted of purchasing alcohol for a minor or supplying it to a minor. It also prohibits the Department of Public Safety (DPS) from issuing a driver's license to anyone convicted of these offenses. For a first offense, the driver's license is suspended for 180 days after the final conviction or cannot be issued for 180 days after an application for a license is made. A second offense results in a one-year suspension after the conviction or after the submission of a license application.

If a minor who is a repeat offender for certain offenses involving alcohol does not present to the court evidence showing successful completion of a required alcohol awareness program, the court must order DPS to suspend the minor's license or permit, or deny the issuance of such documents, for up to one year.

## Supporters said

HB 1357 would give the courts another tool to combat the problem of underage drinking. Studies show that minors most often get alcohol from adults, and current law making it a misdemeanor for adults to supply alcohol to minors is not a sufficient deterrent. Providing alcohol to minors, who often drive after drinking, is akin to giving them a lethal weapon. The seriousness of this offense and its key role in enabling underage drinking warrants suspending the driver's licenses of adults who provide alcohol to minors. At least four other states have enacted similar legislation.

The bill would not place an undue hardship on anyone who had a legitimate transportation need that could not be met except by driving. Current law includes procedures by which adults may request a provisional license from a court. The state has chosen in other situations to suspend driver's licenses for non-driving actions, including non-payment of child support by a non-custodial parent and conviction for graffiti-related offenses.

HB 1357 would change only the penalty, not what is considered a criminal offense or existing exceptions to the law. The current exception allowing parents to give alcohol to their own children or to their underage spouses would remain, as would the laws allowing use of alcohol for religious or sacramental purposes.

## Opponents said

Adults who provide alcohol to minors already are subject to criminal penalties, which should be enforced. The state generally reserves the penalty of license suspension for offenses tied to driving, and obtaining a provisional license could be expensive and time consuming for adults who supplied alcohol to minors. Driver's license suspension also could make it difficult or impossible for such adults to perform necessary tasks, such as driving to work or taking family members to school.

## *Civil liability*

**HB 2868** makes an adult 21 years of age or older liable for damages caused by the intoxication of a minor under the age of 18 if the adult knowingly served or provided alcohol to the minor or if the adult allowed the minor to be served or provided with alcohol on the adult's premises. This liability does not extend to the minor's parent, guardian, spouse, or an adult who has legal custody of the minor.

## Supporters said

HB 2868 appropriately would impose civil liability on an adult who knowingly served or provided alcohol to a minor and would help discourage such behavior. Parents who permit the consumption of alcohol by minors in their homes and then allow intoxicated children to leave in automobiles are not providing a safe environment in which to drink. On the contrary, these adults are contributing to the problem of drunk driving on Texas roads, and they should be liable for damages caused by intoxicated teenagers who drive away from their homes.

In addition to the personal costs to families who lose children to drunk driving are the associated medical costs, which are borne by society. Imposing liability for damages associated with drunk driving on adults who knowingly

provide minors with alcohol would decrease these costs to taxpayers and result in fewer adults providing alcohol to minors, which would lead to fewer drunk driving accidents.

## Opponents said

A large percentage of minors drink and can find ways to obtain alcohol, with or without the help of adults. To protect their children, some parents allow them to drink or hold parties in the safety of the home in an effort to keep drunk teens off the road. HB 2868 would impose liability on any parent who allowed a child to have a party with alcohol if one of the minor party goers caused damage because of being intoxicated. This would discourage parents from providing a safe environment in which their children and their children's friends could drink and might result in those teenagers drinking and driving elsewhere.

## Notes

The **HRO analysis** of HB 1357 appeared in Part Two of the April 26 *Daily Floor Report*, and the analysis of HB 2868 appeared in Part Two of the May 9 *Daily Floor Report*.

# Defining marriage as a union of one man and one woman

**HJR 6 by Chisum**
*Approved by voters at November 8, 2005, election*

**HJR 6** amends the Texas Constitution by adding Art. 1, sec. 32 stating that marriage in this state would consist only of the union of one man and one woman. The provision also prohibits the state or a political subdivision of the state from creating or recognizing any legal status that is identical or similar to marriage.

## Supporters said

The Legislature should bring this issue before voters in November so that the citizens of Texas, not the courts, can decide what constitutes marriage in this state. A constitutional amendment would prevent a possible challenge to the state's marriage statutes. Even though Texas courts may be unlikely to interpret the Constitution to allow same-sex marriage today, it could happen in the future. Texas' equal protection clause is not so different from that of other states that it could not be interpreted to permit same-sex marriage. Preserving marriage for unions between a man and a woman should be defined beyond doubt, not left to the whims of future judges.

A constitutional provision also would protect the definition of marriage by ensuring that civil unions would not be permitted in the future. Civil unions are a way for same-sex couples to circumvent laws protecting marriage by creating a legal arrangement that is substantially the same as marriage in all but the name.

The amendment would not discriminate against individuals based on their sexual preference but merely would permit the voters of Texas to decide the scope of marriage in the state. Same-sex couples would not be prohibited from pursuing their lifestyle if this amendment were approved by voters. It just would not be sanctioned by the state. Also, a constitutional provision is not written in stone, and future citizens and lawmakers could amend the provision if values and mores change in the future.

The prohibition against recognition of any legal status that is identical or similar to marriage would not infringe on individuals' ability to enter into contracts or change the way common law marriage is treated today. The amendment would not apply to contracts because they would not be

considered the same or similar to marriage, and common-law marriage would not be affected because it is viewed as marriage today.

The contention that this proposed amendment would invalidate traditional marriage is erroneous and false. No court in Texas would interpret the wording of the amendment to deny recognition of a traditional marriage. Judges are reasonable and take intent into account when deciding how the law should be applied. This amendment simply would place into the Constitution an existing provision in Texas law.

## Opponents said

Amending the Texas Constitution to ban same-sex marriage is entirely unnecessary because, in practical terms, no case would get far enough to challenge the state's marriage statutes. The courts in Texas are considered so unlikely to be sympathetic to arguments favoring same-sex marriage that no one has even filed a suit to start the process. Recent examples of how the courts likely would rule prevent challengers from wasting time and resources filing in Texas. Other challenges have been a part of a national campaign, with national funding and resources, to seek same-sex marriage status in certain states. Texas is not one of them, so the state should not change the Constitution unnecessarily.

This proposed amendment would take the issue of same-sex marriage out of the hands of citizens even though the institution of marriage has proven dynamic. It is noteworthy that anti-miscegenation laws banning inter-racial marriage were struck down less than 40 years ago. Although same-sex marriage is not contemplated widely today, future generations may see value in creating alternatives to traditional marriage. Already many Texas families are being formed that look different from the traditional format, either because of divorce and remarriage, single parenthood, or other circumstances. A constitutional amendment would limit future lawmakers' ability to respond to constituents' changing needs.

This proposed amendment essentially would determine that the state's equal protection clause would not apply to one group of people. Texas should not discriminate against

a group of citizens in the state constitution. Nowhere else in the constitution is a group of people singled out to be denied rights.

This proposed amendment could threaten some contracts and other arrangements between individuals, such as common law marriage or certain domestic partner arrangements. Though not all contracts are similar to marriage, some relating to the transfer of property, medical decision-making authority, and other family issues could be construed as granting privileges similar to those enjoyed by married people. Common law marriage also could be threatened as it is not explicitly excluded from the prohibition this amendment would add to the Texas Constitution.

Further, this proposed amendment is clumsily worded and could be interpreted to mean that the state might not recognize existing marriages. Other states have worded their amendements to specify that the prohibition against recognizing or creating a legal status identical or similar to marriage does not include traditional marriage. Courts in Texas are unlikely to invalidate existing marriages, but they are equally unlikely to conclude that marriage can include same-sex unions given the existing statutory prohibition.

## Notes

The **HRO analysis** appeared in Part One of the April 25 *Daily Floor Report.*

# Child and adult protective services revisions

**SB 6 by Nelson**
*Effective September 1, 2005*

## *Child Protective Services (CPS)*

**SB 6** changes the CPS system by implementing statewide privatization of substitute care and case management services by September 1, 2011. The Department of Family and Protective Services (DFPS) will develop performance-based contracting practices and new payment methodologies to maintain oversight of the newly privatized system and hold service providers accountable for outcomes. Independent administrators will manage substitute care services and case management services regionally if it is deemed cost beneficial. Services provided by an independent administrator will include recruiting and subcontracting with community-based substitute care providers to ensure a full array of services, managing placements and making referrals for placement, monitoring services delivered by subcontractors, providing training and technical assistance to contract providers, and ensuring accountability for achieving defined client and system outcomes. Residential treatment facilities and administrators will be licensed and monitored by DFPS.

DFPS will develop and implement a staffing and workload distribution plan to reduce caseloads and improve the quality of investigations. CPS investigators will incorporate forensic methods of investigation with an emphasis on screening out less serious cases not requiring further investigation and responding to cases on a shorter timeline based on severity. Along with the new screening procedures, penalties are increased for people knowingly making false reports of abuse. Caseworkers will conduct joint investigations and training with law enforcement, incorporating the use of forensic methods of investigating alleged abuse, and will co-locate, to the extent possible, with law enforcement, shelters, and health care providers. The use of technology will be encouraged throughout the system. Attorneys *ad litem* will complete continuing education on child advocacy and will be appointed not only for children but also for indigent parents. DFPS will support the expansion of court-appointed volunteer advocate programs into counties in which there is a need for such programs.

DFPS first will seek placement for a child with relative caregivers, and these individuals may be located through the use of a child placement resources form upon which

parents will indicate potential caregivers. Assistance may be provided to relative caregivers in obtaining permanent legal status for a child and by providing, based upon a family's need, a one-time cash payment of not more than $1,000, specified reimbursements for child-care expenses, and support services. Children in foster care will receive medical care through a medical home at which the child will receive necessary treatments to meet the child's ongoing physical and mental health needs. Medical care will not be provided to a child in foster care unless approval is obtained from a person authorized to provide consent for medical care. Health and education passports will be readily accessible to authorized individuals containing the child's full educational and medical history. The department will increase discharge planning and coordinate, to the extent possible, extended foster care eligibility, transition services, workforce-related services, referrals for short-term housing stays, and Medicaid coverage for youths age 21 or younger who formerly were in foster care. If DFPS determines that the number of children of a particular race or ethnicity in the CPS system is not proportionate, the department will attempt to reduce the disproportionate representation by documenting it and instituting policies to promote parity in outcomes for all children.

## Supporters said

SB 6 would roll out privatization of substitute care and case management services in a highly planned and responsible fashion so that Texas children no longer would be endangered by the failings of the current CPS system. Evidence and experience have shown that adding more resources to the current system has not resolved CPS's problems. Privatization would balance the need for immediate action with a process to assess each regional privatization effort so that the state could learn from best practices and implement them in other regions. Contracting with community-based organizations for substitute care and case management services would allow CPS to focus on performing effective investigations and making determinations on child removals in each child's best interest. The infrastructure already exists for privatization because about 75 percent of foster care services currently are privately provided. The array of private services available, including basic care, emergency shelters, therapeutic foster

care, group homes, and residential treatment centers, assures that the remaining children in public foster care easily would be absorbed into the private system.

The current system is inefficient because case management services are duplicated by CPS staff and case managers within child care facilities. The privatized system would result in greater efficiency because those best equipped to determine each child's needs — the people who work with the child on a daily basis — would make case management decisions. Under the current system, DFPS both regulates and manages itself, which creates a conflict of interest. The privatization plan would remove this conflict because the independent administrators who select the substitute care provider statutorily would be prevented from providing such services themselves or having a financial interest in such providers. Performance measures would be built into each contract, and payment methodologies would be aimed at achieving desired outcomes. In addition, nonprofits would be accountable to multiple stakeholders, including donors, and many have longstanding reputations for providing quality service.

DFPS would maintain the authority to provide services in emergencies. Ultimate decision-making authority would remain with DFPS as the child's managing conservator, so the department could weigh in on contested terminations and exercise its authority when necessary. Other states have demonstrated positive outcomes from privatization, and costs would not be too high unless DFPS micromanaged at the case level, rather than effectively monitoring results and ensuring compliance with federal and state laws.

The bill would include other positive provisions, including proven prevention services, enhanced collaboration with law enforcement and the community, more cultural awareness, increased assistance to foster and adoptive children and families, heightened emphasis on kinship care, and increased use of technology. Enhanced call-screening processes would allow caseworkers to reduce caseloads through better fact-gathering, allowing the state's overburdened investigators to focus more time on helping true victims of abuse and neglect. Increasing the penalty for false reports would allow caseworkers to focus on cases where the safety of children truly was at risk. Following recommendations on the proper administration of psychotropic drugs would safeguard children against over-medication when they could have benefited from other treatments or were the subject of misdiagnosed behavioral problems. Medical passports would be a tremendous resource because medical histories would be maintained as children move from place to place and could provide

critical information relevant to determining treatments and understanding what therapies previously had been attempted.

Requiring DFPS to inquire about the sexual orientation of prospective families is unnecessary. The department already screens families for their suitability as foster parents and any person exhibiting behavior that truly is unstable or unhealthy is disqualified. There is no justification for discriminating against homosexual or bisexual applicants based solely on their sexual orientation. They may be the best placement for children given the small pool of families willing to become foster parents.

## Opponents said

Privatization is not the answer to problems caused by a shortage of well trained CPS workers, a dearth of high-quality foster homes, and insufficient social services such as mental health and drug and alcohol counseling. The major crisis in the CPS system, contributing to the tragic, recent cases of child abuse and death despite CPS involvement, is occurring at the investigations level, which privatization would not resolve. Although financial resources have been added to the current system, sufficient resources have never been committed to keep pace with caseload growth, leaving CPS starved for adequate funding to achieve its mission. The reason children often are sent to far-off treatment facilities is not because of a lack of effort by DFPS to obtain services locally but rather because reimbursement rates are not adequate to fund the higher costs of providing services in certain areas. Only more money will entice service providers into these hard-to-serve areas, which could be allocated without privatization.

It makes no sense to transfer case management to private providers when many of the supposed benefits of privatization could be obtained under the current system. With more resources, caseloads would be reduced and CPS caseworkers could spend more time interacting with children and families and ensure that parents' input was heard and addressed. DFPS could build, train, and support networks of providers on a regional basis and also could enhance outcomes for children through performance-based contracting and various payment methodologies. Privatizing on the basis of benefits that DFPS could provide under the current system only would add another administrative layer of costs for oversight of cases and contract management.

The definition of case management would leave room for harmful conflicts of interest because the independent administrator only would make the initial child placement,

after which case managers working for specific providers would make determinations on child and family service needs and would have an incentive to make decisions that could benefit their facilities. If payment methodologies intended to prevent abuses by minimizing the time a child spent in out-of-home care were not implemented carefully, they inadvertently could provide an incentive to deny children and families the full array of services needed. Although reunification is ideal, it should not be promoted at the expense of child welfare.

Private providers would lack the relevant experience, including dealings with the court system, to take over case management responsibilities. While CPS caseworkers deal with case decisions and related litigation, case managers at facilities deal with specific services provided to children and families. Privatizing case management responsibilities currently held by CPS caseworkers only would impose increased liability on the state. While ultimate responsibility for child outcomes still would fall to the state, CPS no longer would have control over case decision-making. Instead of implementing privatization statewide, Texas should implement a pilot program to examine fully various privatization models and weigh the consequences of each. Such a pilot would prevent resources from being pumped into a system that has not been proven safe or beneficial to the welfare of children and families in Texas.

Other harmful outcomes could arise from this bill. Placing a greater emphasis on screening calls could influence intake specialists to report fewer cases allowing more cases of real neglect and abuse to be overlooked. Increasing penalties for giving false reports could deter some sincere individuals from making reports of abuse for fear that they could be prosecuted if their allegations were not proven. Caution should be exercised in introducing stringent protocols regulating a doctor's administration of psychotropic drugs to children because a physician is in the best position to assess a child's treatment needs and sometimes treatment should involve the proper mix of multiple medications. The proposal for medical passports accessible by computer poses a privacy concern given the rise in incidences of identity theft and recent break-ins to major computer systems.

## Other opponents said

DFPS should require foster parents to state whether they are homosexual or bisexual and disqualify applicants who answer affirmatively from becoming foster parents or continuing as foster parents. If DFPS determined after a reasonable investigation that an applicant had not answered truthfully, the department also should remove the children. This would ensure that children were not placed in unstable or unhealthy environments. Already children in the foster care system have undergone traumatic events, and the state should not compound their difficulties by placing them with individuals who live such lifestyles.

## *Adult Protective Services (APS)*

**SB 6** makes systemic changes to the APS program. The bill transfers authority over the state's guardianship services from DFPS to the Department of Aging and Disability Services (DADS). The bill establishes new risk assessment criteria for use by APS personnel in determining whether an elderly or disabled person requires protective services due to imminent risk of abuse, neglect, or exploitation. It requires the creation of an investigation unit for APS that will investigate reports of abuse and contact the appropriate law enforcement agency if it finds abuse, neglect, or exploitation due to the criminal conduct of another person. The investigation process will provide for a special task unit and qualified personnel to handle complex cases and for an internal review of completed investigations.

APS will implement a quality assurance program based on client-centered outcome measures, including the intake process, investigations, risk assessment determinations, and the delivery of protective services. APS also will develop and implement a training program that new employees must complete before initiating an investigation of a report of alleged abuse or providing protective services to elderly or disabled persons. The Health and Human Services Commission must implement a caseload reduction program, a pilot program to monitor and remediate certain unlicensed long-term care facilities, and, if funding is available, a media campaign to educate the public and potentially prevent the mistreatment of elderly and disabled people. The commission also must develop an annual community satisfaction survey.

The bill also allows DADS to contract with a political subdivision of the state, a guardianship program, a private agency, or another state agency for the provision of guardianship services. DADS must develop or implement a quality assurance program for guardianship services to monitor any contracts DADS entered into to ensure the quality of the guardianship services. A guardianship advisory board will study the feasibility of adult protective services provided through a statewide network of local adult protective services boards making up a statewide guardianship program.

## Supporters said

SB 6 would raise the bar for APS investigations and improve the quality of caseworkers that citizens depend on to safeguard the vulnerable adults of the state. Widespread problems have been documented in the state's existing systems for protecting elderly and disabled persons from abuse and neglect, and the state cannot depend on the agency to reform itself. Provisions in the bill would improve investigative practices concerning elder abuse and neglect, support quality casework, improve the effectiveness of ongoing services, reform the guardianship system, increase the coordination with and involvement of community organizations, and enhance agency accountability. SB 6 also would improve the training of direct delivery staff to improve incapacity determinations. The current assessment test, consisting of a handful of questions, is ineffective and inconsistently applied and allows cases to be closed early without intervention. The new test would evaluate better the mental capacity of elderly individuals by assessing their living conditions, financial status, physical and medical status, and social interaction and support. SB 6 would encourage the retention of effective caseworkers by providing better training and support for employees who provide protective services to the aged and disabled.

The caseload reduction plan mandated by the bill would help to maintain caseloads and increase the quality of investigations. SB 6 would improve state guardianship services by transferring responsibilities from DFPS to DADS. Currently, there is a conflict of interest regarding placement of the guardianship program in APS because the agency also is responsible for reviewing and determining the necessity for guardianship. The agency that investigates should not be the same one handling guardianship duties. Individuals would be better served if the guardianship responsibilities were given to another agency.

## Opponents said

APS should not contract with protective services agencies for the provision of direct services to elderly and disabled persons. The state should be responsible for the care of its citizens, and services offered by private protective services agencies might be inferior to those offered by the state, as well as more difficult to supervise. SB 6 should require funding for a public awareness campaign, rather than base its implementation on the availability of funds. A public education campaign would improve citizens' awareness of the abuse, neglect, and exploitation that face elderly and disabled persons. The public must learn about, and be encouraged to help prevent, the mistreatment of the elderly and disabled. The bill also should provide for the creation of a second probate court in certain counties that face large and rising caseloads. Probate courts around the state have struggled with their dockets due to a lack of resources to handle growing caseloads.

## Notes

HB 920 by Uresti, which passed the House but died in the Senate Health and Human Services Committee, was identical to the adult protective services provisions in Article 2 of SB 6 by Nelson.

The **HRO analysis** of SB 6 appeared in Part One of the April 19 *Daily Floor Report*. HB 920 was analyzed in the April 28 floor report.

# Abortion – parental consent and third trimester restrictions

**SB 419 by Nelson**
*Effective September 1, 2005*

**SB 419**, the State Board of Medical Examiners Sunset bill, adds to the list of prohibited activities by a physician the performance of an abortion on an unemancipated minor without the written consent of the child's parent or guardian or without a court order permitting the abortion.

The bill also adds to the list of prohibited activities the performance of a third-trimester abortion of a viable unborn child unless the abortion would prevent the death or imminent, severe brain damage or paralysis of the woman. Such an abortion also would not be prohibited if the fetus had a severe, irreversible brain impairment.

## Supporters said

Requiring consent would improve parental involvement in a minor's decision about whether or not to have an abortion. While Texas has a parental notification requirement, physicians do not always follow it, and parents may find out too late or not at all. The bill would make Texas consistent with neighboring states as well as 18 other states currently requiring parental consent.

Parental involvement is important. By involving parents in a medical procedure performed on their children, parental consent could reduce the medical risk to minors. Parents are a key source of important medical information that may be relevant to surgery, such as allergies, medical conditions, and medical histories. After a minor had an abortion, a parent who had been involved could watch for and react to any possible negative consequences, such as infection or depression. Some school districts require consent of the parent before giving children aspirin in school and Texas requires it for ear-piercing, so the state should require parental consent for the much more serious procedure of abortion.

Requiring consent would not compromise a minor's ability to obtain alternate authorization under certain circumstances. Minors still would have available the option of seeking authorization from a court.

Parental consent, rather than notification, could make the decision process less difficult for a minor. Under the notification law, a minor still could have the procedure performed regardless of whether her parents had a moral objection. With required consent, parents would have veto power and would not have to convince their child not to have the procedure.

An abortion of a viable child in the third trimester should be performed only to prevent the death or severe, irreversible brain damage or paralysis of the mother. A caesarian section to deliver a healthy unborn child in the third trimester often can be performed if continuing the pregnancy could jeopardize the mother's health.

## Opponents said

The existing notification law adequately ensures parental involvement in a minor's decision about whether or not to have an abortion. Parents who otherwise might be left out of their daughters' life choices have the chance to counsel and advise them. There is no evidence that parents are not being notified under the existing law. No court case has been brought by a parent against a provider alleging that the physician performed an abortion on an identified minor without first notifying the parents.

Texas' notification law is consistent with those of comparable states, such as New York and Florida, that, along with 10 other states, require parental notification. None of Texas' neighboring states require consent, as New Mexico's and Oklahoma's consent statutes currently are not in effect as a result of an attorney general opinion or because they are enjoined by the courts. California's consent statute also currently is enjoined by the courts based on state constitutional challenges.

Requiring parental consent could endanger a woman's health. Many young women who are pregnant wait as long as possible before seeking medical care and are likely to put off their decisions even longer if required to get consent from parents. Any delay increases the medical risk for a pregnant girl, and the risk grows as the pregnancy progresses. Judicial bypass can delay access to abortion by several more weeks.

In Texas and most other states, minors are assured of confidentiality when they seek sensitive medical services, such as pregnancy and delivery, treatment of sexually transmitted disease, and therapy for drug abuse. These

conditions often entail greater health risk than abortion, yet the decision is left to the minor and remains confidential. Mandatory consent for abortion cannot be compared to receiving aspirin in school because school districts have adopted those policies voluntarily to protect themselves from liability concerns.

Requiring parental consent, rather than notification, could increase the number of judicial bypass cases. Young women who have been abandoned by their parents or whose only surviving parent is in jail would be forced to go to court, even if the reason consent could not be obtained was not a parent's objections. The panoply of family situations for young women could not adequately be accounted for under a parental consent law. Notification strikes the right balance between encouraging parental involvement and respecting a young woman's ultimate right to choose.

Restricting a physician's authority to perform a third trimester abortion to instances when the mother's life was at risk of severe, irreversible brain damage or paralysis would ignore other equally devastating outcomes, such as risks to her health. No woman who has carried an unborn child to the third trimester wants an abortion, but there are medical conditions and other unforeseen complications that can occur, and families, with their physicians, should make decisions based on individual circumstances rather than the Legislature's making arbitrary distinctions.

## Other opponents said

This amendment would not go far enough and could be open to challenge in court because it is not explicit in its provisions for judicial bypass of parental consent for a minor to have an abortion. The additional requirements in HB 1212 by P. King and SB 1150 by Harris would include extending the time frame for a judge to hear and decide such cases from two to five business days, limiting venue to the minor's county of residence or the county where the abortion would be performed, requiring the judge to determine whether the abortion was in the minor's best interests, and changing the burden of proof from a preponderance of evidence to clear and convincing evidence. In addition, HB 1212 would have required disclosure of certain judicial information and made coercing a woman to have an abortion an offense.

## Notes

The **HRO analysis** appeared in the May 16 *Daily Floor Report*. The abortion consent amendment and third trimester abortion restrictions were added on the House floor and did not appear in the original analysis of SB 419 .

HB 1212 by P. King and SB 1150 by Harris, requiring parental consent for abortion by a minor, both died on the House floor. The HRO analysis of HB 1212 appeared in Part One of the May 10 *Daily Floor Report*, and the analysis of SB 1150 appeared in the May 22 *Daily Floor Report*.



# Government Affairs

| HB 1434 | Hamric | Continuing the Texas Lottery Commission | 79 |
| HB 2544 | Hamric | Continuing the Texas Alcoholic Beverage Commission | 81 |
| * SB 7 (2) | Janek | Restricting eminent domain use for economic development purposes | 82 |
| * SB 9 | Staples | Expansion and modification of homeland security efforts | 84 |
| SB 1140 | Carona | Requiring legislators to cast record votes | 86 |
| * SB 1863 | Ogden | Appropriations-related statutory changes | 87 |

# Continuing the Texas Lottery Commission

**HB 1434 by Hamric**
*Died in the Senate*

**HB 1434** would have continued the Texas Lottery Commission, the State Lottery Act, and the Bingo Enabling Act until September 1, 2017.

*General agency administration.* HB 1434 would have changed the size of the commission from three to five members. The bill would have directed the commission to develop a comprehensive business plan and to make an annual assessment of the performance of each project described by the business plan.

The bill would have made the general law governing purchasing and contracts by state agencies apply to the commission, except as otherwise provided by the lottery act. HB 1434 would have required the commission to analyze complaints to identify any trends related to certain types of violations. The bill would have required the commission to identify and adopt polices complying with relevant laws governing consumer information and protection.

*Lottery.* The bill would have added a definition of "minor" to specify that a prize could be paid directly to a person age 18 or older. It would have allowed a lottery sales agent's license to be transferred from one location to another under certain circumstances and would have allowed a license that had been expired for not more than 10 days to be renewed under certain circumstances.

*Bingo.* HB 1434 would have prohibited the use of certain types of equipment by stating that the definition of bingo equipment would not include an electronic monitoring terminal, a site controller, or any electronic device used to play an electronic version of pull-tab bingo. The bill also said that this provision would prevail over any other conflicting act of the 79th Legislature.

The commission would have had to establish comprehensive qualifications for licensure and renewal of licenses, develop a standard license renewal process, and establish standards of conduct for licensees. It would have had to consider the compliance history of licensees when deciding whether to renew a license.

HB 1434 would have required, instead of authorized, the commission to take certain actions when suspending or revoking a license for failure to comply with a code or rule or for a reason that would allow or require the commission to refuse to issue or renew a license in the same class. It would have established a new option for a reprimand in these cases. The bill would have allowed the commission to place on probation those whose licenses were suspended. Upon a suspension of a bingo organization's license, the commission would have been required to issue an amended or temporary license to other organizations that conducted bingo at the same location so they could conduct bingo during the time that the suspended organization conducted games.

HB 1434 would have eliminated current requirements that certain types of organizations be in existence for a specified numbers of years to be authorized to conduct bingo. Instead, the commission would have been able to specify by rule the length of time that organizations must have been in existence.

## Supporters say

*General agency administration.* The Texas Lottery Commission should be continued since the state lottery and bingo are important sources of revenue for the state, local jurisdictions, and charities. The work of the commission in operating the lottery and regulating charitable bingo is hampered by having only three commissioners. In the absence of one commissioner, for example, the other two cannot informally discuss the work of the agency without violating the Open Meetings Act. Also, because of its small size, the commission cannot form subcommittees to help it oversee the agency.

*Lottery.* It is necessary to clarify the definition of a minor because current law refers to a definition in the Property Code that describes a person younger than 21 years of age. This limit prevents people between the ages of 18 and 20 from receiving major winnings directly. Since people above the age of 18 legally are allowed to purchase lottery tickets, they should be able to receive any winnings as a result. The bill would resolve this conflict.

*Bingo.* Electronic pull-tab bingo should be prohibited explicitly by the bill to ensure that gambling would not be expanded in Texas and that authorization of electronic pull-tab bingo would not used as a back-door way to legalize video lottery terminals or other gambling machines.

HB 1434 would make numerous changes to the commission's licensing procedures to ensure a consistent licensing process and to standardize enforcement provisions. These changes would help ensure that the procedures were fair to licensees, adequately protected the public, and safeguarded charitable revenue. The bill would achieve these objectives by requiring that the commission establish the qualifications for licensure and renewal so that all licensees were subject to the same requirements and aware of the qualifications. The bill also would give the commission more flexibility to respond appropriately to licensees by authorizing a system of probation.

## Opponents say

***General agency administration.*** The Lottery Commission should be merged with the Racing Commission to form a new gaming commission. Alternatively, the operation of the lottery should be transferred back to the Comptroller's Office, allowing the agency to operate more independently. The regulation of bingo should be separated. A three-member commission properly ensures that two commissioners cannot discuss business in a casual way outside of a formal meeting. This restriction assures the public that business is never discussed behind closed doors.

If the Lottery Commission is to be expanded, it should include two representatives of bingo interests, instead of the one currently required. This would help ensure that the bingo industry was adequately represented. If more commissioners were added, the governor should appoint a representative who could speak for underprivileged people, who play the lottery in disproportionate numbers.

***Bingo.*** HB 1434 should include authorization for electronic pull-tab bingo. This would not expand gambling but simply would be a new way to play the existing game of pull-tab bingo and would increase revenues to the charities and the state. Authorizing electronic pull-tab bingo would not be a back-door way of authorizing video lottery terminals or other gambling machines.

The commission should continue to be authorized, instead of required as in HB 1434, to take certain actions when it considers a license suspension or revocation. The bill would tie the hands of the commission by requiring certain types of actions, which in some cases may not be appropriate or could result in less money for charitable purposes.

## Notes

The **HRO analysis** appeared in Part One of the May 12 *Daily Floor Report.*

HB 1116 by Solomons, revising the Sunset schedule, continued the Texas Lottery Commission, the State Lottery Act, and the Bingo Enabling Act until 2011, at which time the Sunset Advisory Commission will conduct a full review.

The House engrossed version of HB 1434 would have prohibited bingo-related electronic monitoring terminals, site controllers, or any devices used to play an electronic version of pull-tab bingo.  However, the Senate adopted an amendment by Armbrister to HB 3 by J. Keffer, the omnibus revenue bill, that would have authorized electronic pull-tab bingo. When the House appointed its conferees for HB 3, it adopted a motion to instruct the conferees to remove the Armbrister amendment from the bill. HB 3 died in conference committee.

An unsuccessful amendment to HB 3540 by Pitts, appropriations-related legislation that was not enacted, would have authorized the Lottery Commission to establish a system to sell lottery tickets through the Internet.

# Continuing the Texas Alcoholic Beverage Commission

**HB 2544 by Hamric**
*Died in Senate Committee*

**HB 2544**, the Texas Alcoholic Beverage Commission (TABC) Sunset bill, would have continued the commission until September 1, 2011.

***General powers and public health.*** The bill would have given TABC a number of general powers and duties, including the protection of public safety, promotion of legal and responsible alcohol consumption, and enforcement of the Alcoholic Beverage Code and the licensing and permitting process. Among the bill's provisions, on-premise permit and license holders would have been required to display on the door to each restroom a warning sign informing the public of the risks of drinking alcohol during pregnancy.

***Enforcement.*** TABC would have been required to adopt a schedule of sanctions to ensure that the severity of each sanction appropriately matched the severity of the corresponding violation. TABC could have used funds gained through the sale of seized alcoholic beverages to help defray the costs of forfeiture lawsuits.

***Regulation of business practices.*** The bill would have repealed Alcoholic Beverage Code, sec. 101.44, which requires that beer be sold only in specific container sizes. It would have removed the requirement that TABC approve liquor and wine labels and conduct chemical analyses of liquor and wine. Some requirements of beer testing also would have been relaxed.

The commission could have issued licenses that expired in two years, rather than one, to businesses that had no previous violations. HB 2544 would have required the commission to authorize payment for beer deliveries to retailers by electronic funds transfer initiated on or before the day of delivery.

## Supporters said

According to a recent survey, up to 50 percent of women do not connect the consumption of alcohol with the risk of birth defects. Posting signs to inform the public about these risks would be an important step in preventing health problems among many of the state's citizens.

Currently, TABC cannot use proceeds from the sale of seized property to pay the costs of forfeiture lawsuits, which establish the state's right to illegal property. HB 2544 would allow TABC to file forfeiture suits and give it a mechanism for paying the associated court costs. This would bring the process in step with other law enforcement agencies and enable TABC to afford to file more forfeiture lawsuits. Also, developing a new schedule of sanctions would help ensure that penalties were fair and consistently applied.

The bill would allow market preference, not the size of a bottle, to determine which beers could be sold in Texas. The consumer would benefit from this choice. Also, the proposed biennial license renewal would ease administrative burdens.

## Opponents said

The commission should go further in its efforts to combat the damage created by alcohol abuse by abolishing happy hour practices at bars and restaurants. Also, rather than eliminating all size restrictions for beer containers, the commission should set a maximum size limit, which would help prevent alcohol abuse.

In reviewing its sanctions on license holders, the commission should consider limiting the lifetime of a violation on record. Also, graduated penalties should be tied to the relevant licensed location where an offense took place, not to the entire company.

## Notes

The **HRO analysis** appeared in Part One of the May 5 *Daily Floor Report*.

Two of the Sunset commission's recommendations initially included in HB 2544 ultimately were included in SB 1255 by Brimer (effective June 18), allowing TABC to use funds gained through the sale of seized property to help defray the costs of forfeiture lawsuits and repealing Alcoholic Beverage Code, sec. 101.44, which required that beer be sold only in specific container sizes.

HB 1116 by Solomons, revising the Sunset review schedule, continues the TABC until September 1, 2007.

# Restricting eminent domain use for economic development purposes

**SB 7 by Janek, Second Called Session**
*Effective November 18, 2005*

**SB 7** prohibits governmental or private entities from using eminent domain to take private property if the taking confers a private benefit on a particular private party through the use of the property or is for a public use that merely is a pretext to confer a private benefit on a particular private party.

It also prohibits the exercise of eminent domain to seize private property if the taking is for economic development purposes, unless economic development is a secondary purpose that results from municipal community development or municipal urban renewal activities to eliminate an existing affirmative harm on society from slum or blighted areas under specific provisions of the Local Government Code or the Tax Code.

A determination by a governmental or private entity that a proposed taking of property does not involve one of these prohibited reasons does not create a presumption about what the taking involved.

SB 7 does not affect the authority of any entity authorized to use eminent domain for:

- transportation projects, including railroads, airports, or public roads or highways;
- conservation and reclamation districts created under the Texas Constitution, including port authorities, navigation districts, and any other conservation or reclamation districts that act as ports;
- water supply, wastewater, flood control, and drainage projects; public buildings, hospitals, and parks; and provision of utility services;
- a sports and community venue project approved by voters at an election held on or before December 1, 2005, under Local Government Code, chapters 334 or 335;
- pipeline operations;
- a purpose authorized by Utilities Code, ch. 181 regulating private gas and electric utilities;
- oil and gas underground storage operations subject to Natural Resources Code, ch. 91;
- a waste disposal project; or
- a library, museum, or related facility and any infrastructure related to the facility.

The bill does not affect the authority of a governmental entity to condemn a leasehold estate on property owned by that entity.

These provisions apply to the use of eminent domain under all state laws, including a local or special law, by any governmental or private entity including:

- a state agency, including an institution of higher education;
- a political subdivision of the state; or
- a corporation created by a governmental entity to act on behalf of the entity.

The Texas Department of Transportation (TxDOT) is prohibited from using eminent domain to take property for an ancillary facility, such as a gas station or convenience store, on both the Trans-Texas Corridor and other state-owned toll roads unless the acquisition is for one of multiple ancillary facilities included in a comprehensive development plan approved by the county commissioners court of each county in which the property is located.

SB 7 prohibits a governing board of an institution of higher education from using the power of eminent domain to acquire land for a lodging facility, parking, or a parking structure intended to be used in conjunction with the use of a lodging facility.

The bill creates an interim legislative committee to study the use of the power of eminent domain, including its use for economic development and the issue of what constitutes adequate compensation for property taken through eminent domain, and to report to the 80th Legislature by December 1, 2006.

## Supporters said

SB 7 is necessary to protect property rights in Texas following the recent U.S. Supreme Court ruling that allowed a local government to seize property from private owners and transfer it to another owner simply to increase tax revenues through economic development. Under the precedent established by the U.S. Supreme Court's decision in *Kelo v. City of New London*, cities or other entities with

eminent domain authority could argue that nearly any project benefited the public through economic development and could, for example, take private homes to enable the construction of a shopping mall that would generate more tax revenue than the homes. Without SB 7, the state and local governments could subject Texans to the same abuse of eminent domain power that has occurred in the *Kelo* case. The bill is not an overreaction to the *Kelo* decision because similar cases have occurred in Texas, including in the cities of Freeport and Hurst. The bill would be in line with similar policies in use or under consideration in several other states and in the U.S. Congress.

The language in SB 7 is specific enough to protect private property from inappropriate takings for economic development, yet also to allow state and local governments to continue to use eminent domain in clear public-use situations. To avoid confusion, the bill specifically lists certain types of projects that clearly would not be subject to the prohibitions in the bill. SB 7 also would require local approval for the use of eminent domain for ancillary toll-road facilities to ensure that there was local support and a local official to hold accountable in these cases.

The bill would not violate the state's policies of local control or of encouraging economic development. It would not take away the authority that any entity currently has to use eminent domain and would not prohibit the exercise of that authority for projects with economic development ramifications as long as these projects were undertaken for legitimate public uses in which economic development was not the primary purpose. Even if done purely for economic development, such projects could proceed with government participation without the use of eminent domain.

## Opponents said

Enacting new restrictions on eminent domain use would be an overreaction to the *Kelo* decision. The laws and Constitution of Texas allow for a broad interpretation of public use to include economic development in some situations involving eminent domain, and that flexibility should not be eliminated. Economic development is an

accepted role for government that in some cases has a defined public benefit and can satisfy a public purpose as much as more traditional government projects. An overly broad statewide limit on the use of eminent domain for all economic development projects could conflict with the state's policy of encouraging state and local officials to think creatively about economic development and of local control.

The *Kelo* decision illustrates when it might be acceptable to exercise eminent domain for economic development purposes, such as when an area is distressed enough to justify an economic development program and when the property is taken under a carefully formulated development plan to provide appreciable benefits to the entire community, rather than a particular class of identifiable individuals. For example, the exercise of eminent domain over the objections of a few property owners might be appropriate if an entire community stood to benefit from a carefully crafted economic development project, such as the development of a consumer/retail area.

SB 7 could have the unintended consequence of restricting many legitimate uses of the power of eminent domain for public purposes. Private property owners could challenge its legitimate exercise by claiming that almost any project was being undertaken primarily for economic development reasons and could take the matter to court.

This bill would conflict with the principle of local control by interfering with decisions made by local officials about when to use eminent domain for public uses and when public use should be broadly interpreted to include economic development. Local officials are in the best position to make these decisions about the greater good of local communities because these officials are closest to the projects and can be held accountable for their actions by voters.

## Notes

The **HRO analysis** of the companion bill, HB 16 by Woolley, appeared in the August 10 *Daily Floor Report*.

# Expansion and modification of homeland security efforts

**SB 9 by Staples**
*Effective May 28, 2005*

**SB 9** changes the name of the Critical Infrastructure Protection Council to the Homeland Security Council. Fifteen government entities will be newly represented on the council, and representatives are to be appointed by December 1, 2005. The bill establishes a First Responder Advisory Council as a permanent special advisory committee to advise the Governor's Office on homeland security issues relevant to first responders, radio interoperability, the integration of statewide exercises for hazards, and the related use of available funding. It also creates the Private Sector Advisory Council to advise the Governor's Office on homeland security issues relevant to the private sector.

The Governor's Office must develop and administer a strategic plan to design and implement a statewide integrated public safety radio communications system to promote interoperability within and between local, state, and federal agencies and first responders. A report on the status of its duties must be submitted to the Legislature by the Governor's Office not later than September 1 each year. The bill abolishes the Public Safety Radio Communications Council (PSRCC) and makes the Governor's Office responsible for the interoperability of radio communications. The Governor's Office will take ownership and custody of all property, including records, of PSRCC by December 1, 2005.

The bill requires an owner, agent, manager, operator, or other person in charge of a public water supply system or wastewater system providing services for public or private use to notify the Texas Commission on Environmental Quality (TCEQ) of certain events that negatively could affect the production or delivery of safe and adequate drinking water, such as unauthorized entry on property, an act of terrorism, property theft, or a natural disaster, accident, or act resulting in damage to the water supply or system.

The Texas Department of Agriculture (TDA) and Texas Animal Health Commission (TAHC) must pursue a policy of ensuring that state borders are secure from shipments of potentially dangerous pests and diseases carried by plants and animals. TDA and TAHC must jointly conduct road station and interstate shipment inspections, as feasible and

appropriate, at strategic locations throughout the state. TDA may enter into agreements with private entities to implement these requirements.

SB 9 includes a comprehensive definition of critical infrastructure facility and increases the penalty from a class B misdemeanor (up to 180 days in jail and/or a maximum fine of $2,000) to a class A misdemeanor (up to one year in jail and/or a maximum fine of $4,000) for trespass on or in refineries, chemical and power plants, and the other critical infrastructure facilities. The enhanced penalty will not apply if a defendant can prove by a preponderance of the evidence that the defendant entered or remained on or in a critical infrastructure facility as part of a peaceful or lawful assembly.

SB 9 also repeals a requirement that the operator of a crane or similar apparatus, any part of which is capable of vertical, lateral, or swinging motion, post a warning sign and install and equip the crane with an insulating device or guard to prevent electrocution.

## Supporters said

A strategy to detect, deter and respond to homeland security threats and emergencies is crucial for the safety and security of the state and its citizens. Much has been accomplished, but the state needs consistently to strengthen its capacity to enhance domestic security and combat terrorist activities. SB 9 would provide for improvements in areas not now covered for homeland security purposes, including efforts to protect public health, agricultural crops and livestock, drinking water, and critical infrastructure. The bill would improve anti-terrorism planning, coordination, and communication between state and local agencies and would encourage more inspections of livestock, produce, and pesticides entering the state.

Adding the 15 state agencies to the Homeland Security Council would provide a more balanced and complete representation of the entities crucial to homeland security. Establishing two permanent special advisory committees would keep the Governor's Office better advised on homeland security issues in the public and private sectors.

In Texas, several different radio systems are used by federal, state, and local emergency responders and law enforcement officials. These overlapping systems fail to communicate for several reasons, including frequency variations, age, incompatible equipment, or lack of coordination among interested parties. SB 9 would require the Governor's Office to link various existing radio systems regionally and throughout the state with radio systems that would be purchased in the future by using some of the Homeland Security grant program money.

The tougher penalty for trespassers on or in critical infrastructure facilities would make it more difficult for terrorists to scout and investigate targeted facilities. The extra time that a terror suspect remained in custody would increase the likelihood of law enforcement agents obtaining information on plans and accomplices, as well as deter others from committing similar acts.

Current federal safety regulations, which require cranes to be kept a certain distance from power lines, are sufficient. The repeal of the installation requirements would assist municipalities, districts, first responders, and emergency services in protecting critical infrastructure facilities and in disaster recovery.

## Opponents said

SB 9 should provide harsher penalties for those trespassing on or in critical infrastructure facilities. This bill would increase the penalty for trespassing at refineries, ports, and other prime infrastructure facilities from a class B to a class A misdemeanor, which would amount to merely a harder slap on the wrist for offenders. Instead of risking six months in the county jail, the maximum penalty under current law for a class B misdemeanor, a trespasser scouting a refinery as a potential target could wind up in jail for a year, the maximum penalty for a class A misdemeanor. Such a penalty would be unlikely to make a terrorist, such as a suicide bomber, think twice about committing a terrorist act.

This bill also would repeal an important safety requirement for operators of cranes and similar apparatuses. According to the U.S. Bureau of Labor Statistics, between 10 and 36 workers have died each year since 1992 as a result of a crane coming into contact with electric current. By removing the 16-year-old requirement for installing insulating devices on cranes, SB 9 could result in unnecessary deaths of crane workers.

## Notes

The **HRO analysis** appeared in Part One of the May 24 *Daily Floor Report.*

# Requiring legislators to cast record votes

**SB 1140 by Carona**
***Died in House committee***

**SB 1140** would have required record votes on votes taken by the House or the Senate or a committee on any of the following:

- approval or disapproval of a bill, amendment, or substitute bill;
- approval or disapproval of a joint resolution or related amendment or substitute;
- appointment or election of a legislative officer or other public official; or
- confirmation of an appointment to public office.

Record votes would have been published in the journals and committee minutes of each house and for two years following the vote would have been published and maintained on the Internet in a user-friendly manner.

## Supporters said

SB 1140 would require that legislators be accountable for their votes. Texas legislators currently record their votes on just a fraction of the bills and amendments they pass each session. According to the National Conference of State Legislatures, Texas is one of a handful of states that does not require record votes on final passage of legislation or other important stages in the legislative process. For example, the California Assembly takes more than 5,000 votes in a two-year session, all of which not only are recorded but are easily accessible online. Further, Arizona's part-time legislature routinely records votes without creating unreasonable delays in the legislative process. Texas should demonstrate a similar commitment to open government by requiring the elected representatives of its citizens to cast record votes.

While the votes of individual legislators on some measures are printed in the House or Senate journals, there is no way to determine how each member voted during a voice vote, a common method of passing or defeating legislation in both chambers. Texas citizens did not elect their lawmakers to vote anonymously on major issues that affect the state, and SB 1140 would prohibit legislators from picking and choosing when to be accountable for the ballots they cast. In addition, SB 1140 would make it easier for the public to view members' voting records on the web by requiring online storage of such information "in a manner that is easily accessible and searchable." Although the journals of both legislative chambers currently are available online, it is very difficult to uncover even a record vote on the state's online system without knowing, for example, the exact bill number or date on which the vote or debate took place. Recent procedural changes have made finding record votes somewhat easier, but the Legislature by law should be required to make record votes readily accessible.

## Opponents said

Requiring record votes on all legislation, even when the vote is routine and unanimous, would be expensive, time-consuming, and logistically burdensome. According to the House Journal Clerk, the estimated cost of each recorded vote is $55, which would have cost approximately $200,000 if all votes, including amendments and votes on second and third reading, had been recorded during the 2003 regular session and subsequent special sessions. Requiring record votes also could hinder behind-the-scenes negotiations, which allow lawmakers to pass bills that, while regionally unpopular, might benefit state as a whole.

Under recent House rules changes, any member can ask for a record vote on any measure at any time. In addition, voice votes are recorded in the journal with the understanding that each member voted "yes" unless otherwise indicated. Even on non-record votes, members may notify the journal clerk to have their votes recorded, and members also may submit statements to the journal explaining their votes, which sheds additional light on the process. Current procedures in both chambers offer a practical way of informing the public while allowing the Legislature to carry out its business in an efficient and cost-effective manner during brief biennial sessions.

# Appropriations-related statutory changes

**SB 1863 by Ogden**
*Effective September 1, 2005*

**SB 1863** makes appropriations-related statutory changes that are expected to result in a gain to general revenue and related funds of $725 million in fiscal 2006-07. Significant provisions include:

***Telecommunications Infrastructure Fund (TIF).*** SB 1863 repeals the current $1.75 billion cap on the total revenue that can be raised for the TIF. The bill also extends the expiration date of the fund until September 1, 2011. Revenue collected under this TIF assessment will go into the general revenue fund.

After the amount paid into the fund by all utilities equals $1.5 billion, a telecommunications utility can recover the amount that it paid into the fund from its customers through their monthly bills. A utility can collect from its customers only the amount assessed after the fund reaches $1.5 billion. The comptroller will publish in the *Texas Register* the date on which the fund equals this amount. A utility that wishes to recover its assessment will have to file an affidavit no later than February 15 of each year stating the amount it paid to the fund and the amount it collected from its customers during the previous year.

***Delayed transfers.*** The bill deposits driver's license and other fees to general revenue, rather than the Texas Mobility Fund, in fiscal 2006-07. This section took effect September 1, 2005, and will expire January 1, 2008.

***Increased fees.*** SB 1863 raises the registration fee for lobbyists from $300 to $500 per year.

***Audits.*** The bill requires agencies with expenditures of greater than $100 million each biennium to participate in recovery audits.

***Health and human services (HHS) changes.*** SB 1863 continues six-month eligibility for Medicaid and the Children's Health Insurance Program and continues the existing quality assurance fee for intermediate care facilities for the mentally retarded. HHS agencies are permitted in conjunction with other states to jointly purchase prescription drugs, if feasible and cost effective.

***State employee waiver of health benefits.*** A state employee wishing to waive health coverage is required to show coverage by a substantially similar plan or eligibility

for benefits under TRICARE military coverage, in which case an employee will be eligible for an incentive payment in an amount set by the general appropriations act. If an employee is eligible for TRICARE, the state also will offer a supplemental health coverage program. The state can reduce its contribution for employees who waive health coverage or those who waive and choose an incentive payment or supplemental coverage.

***Petroleum storage tank remediation.*** The bill extends the reimbursement deadline to August 31, 2007, for eligible petroleum storage tank owners or operators who take corrective action, which increases the number of sites that can participate in the state-lead remediation program. Operators of storage tanks in sites that are admitted into the remediation program may not be held liable for releases of regulated substances or for costs related to corrective action. The bill also removes limitations on the amount of funds within the petroleum storage tank remediation account that can be spent on administration of the account and the groundwater protection cleanup program.

Collection of fees for the petroleum storage tank remediation account will be maintained at fiscal 2003 levels, rather than reduced annually. This account cannot be used after March 1, 2008, and the reimbursement program will expire September 1, 2008.

***Collection of court costs, fees, and fines.*** Counties with at least 50,000 inhabitants and cities with at least 100,000 inhabitants, unless granted a waiver, are required to develop a program to improve collection of court costs, fees, and fines. The comptroller will assist counties and cities with developing and implementing the program.

***Interest on tax refunds.*** The bill sets the interest rate paid by the state on tax refunds at the lesser of the annual rate of interest earned on deposits in the state treasury during December of the previous year or the prime rate plus 1 percent, which was the rate paid before the enactment of SB 1863.

***Existing Debt Allotment (EDA).*** The bill rolls forward the eligibility cutoff date for the EDA for school facilities by two years so that bonds for which school districts made payments during the 2004-05 school year are eligible for state debt assistance.

***State employee benefits and pay.*** The bill changes the accrual rate for longevity pay from increments of three years' service to two-year increments. It also makes changes affecting the following employee groups:

- *Annuitant state employees.* A retired state employee who returns to work is not eligible for longevity pay or benefit replacement pay, an additional amount covering Social Security costs for senior employees. The employee's vacation time is calculated based on the length of employment after the employee retires and returns to work.
- *Benefit replacement pay.* The bill shortens from 12 consecutive months to 30 days the amount of time an employee or state-paid judge can leave state employment before becoming ineligible for benefit replacement pay. Unpaid leave-of-absence or periods when an employee usually does not work do not count toward the 30 days.

***Teacher Retirement System (TRS).*** The bill incorporates the following provisions of SB 1691 by Duncan:

- increasing active employees' required contribution to TRS-Care, the retired teacher health insurance program, from 0.5 percent to 0.65 percent of salary;
- requiring school districts to contribute to the TRS pension fund the state contribution rate during a new employee's first 90 days of employment; and
- transferring the administration of supplemental salary, such as the health insurance passthrough, from TRS to the Texas Education Agency.

SB 1863 also amends the Government Code to specify that the state contribution to the TRS pension fund must be between 6 percent and 10 percent.

## Supporters say

***TIF.*** The 74th Legislature in 1995 created the TIF to finance access to telecommunications services for public schools, nonprofit hospitals, public libraries, and higher education institutions across the state. The fund was created and maintained through an assessment of 1.25 percent of the telecommunications providers' taxable receipts and was authorized to collect up to $1.5 billion over 10 years. Eliminating the revenue cap for TIF would result in $200 million per year that could be used for property tax relief and essential government services, including education. Given that the telecommunications utilities have met their obligations up to the original revenue cap of $1.5 billion, it would be reasonable to allow those incumbent local exchange carriers (ILECs) that have not been passing on the 1.25 percent assessment to consumers to now do so.

## Opponents say

***TIF.*** Allowing ILECs to pass on their 1.25 percent assessment to customers would amount to a new tax that millions of consumers would have to pay each month. Eliminating the revenue cap on TIF and using these additional receipts for programs other than technology grants would violate the spirit of the original TIF agreement and amount to a discriminatory sales tax on telecommunications services. The state has fulfilled the goal of the original legislation by disbursing more than $1 billion for technology grants since 1995, and TIF now should be retired.

## Notes

The **HRO analysis** appeared in the May 22 *Daily Floor Report.*



Health & Human Services

|  | HB 1135 | Delisi | Creating a Medicaid buy-in program | 90 |
| * | HB 1771 | Delisi | Establishing a Medicaid integrated care management pilot project | 91 |
|  | HB 1929 | Woolley/ | Stem cell research and ban on human cloning | 93 |
|  | HB 864 | P. King |  |  |
|  | HB 2572 | Truitt | Local MH/MR authorities serving as providers | 95 |
| * | SB 410 | Whitmire | Standards for Canadian pharmacies shipping prescription drugs to Texas | 96 |

# Creating a Medicaid buy-in program

**HB 1135 by Delisi**
*Died in the House*

**HB 1135** would have directed HHSC to develop and implement a Medicaid buy-in program for people with disabilities as authorized under the federal Ticket to Work and Work Incentives Program Act of 1999 and the Balanced Budget Act of 1997. A Medicaid buy-in program is a way for people with disabilities to obtain employment without exceeding the Medicaid income threshold and thus losing their benefits.

The program would have been based on a model developed through a stakeholder workgroup that included:

- eligibility for disabled individuals with incomes below 250 percent of the federal poverty level ($23,275 per year);
- an asset limit of $2,000 to $3,000, including disregards for certain work expenses;
- a focus on work with required employment and income of about $300 per month; and
- a sliding-scale monthly premium that could range from $25 to $400.

## Supporters said

A Medicaid buy-in program would remove a significant barrier faced by people with disabilities when they contemplate employment. Although many such people are unable to earn enough to pay their significant medical costs, some can earn enough to contribute to them. Instead of not working and paying nothing for Medicaid, this program would get such people into the workforce and allow them to participate in the cost of their medical care as if it were a private health plan. Employment benefits people in intangible ways through community involvement, skills development, and social interaction. It also may reduce medical costs as people who are shut out of the working world often show symptoms of neglect or depression that could be remedied by purposeful, regular work.

Many people who are hampered by the regulations of Medicaid and Medicare – including the waiting period for Medicare for people with disabilities and the de facto employment prohibition in Medicaid – would benefit from this program. Often people with disabilities face changes in their situation, such as a new diagnosis or loss of a spouse's health insurance, that can result in a period without insurance. Untreated and without resources, these individuals often are ruined financially and physically by the gap in coverage. A Medicaid buy-in program would give them a way to obtain health insurance when their income and health were on the brink and possibly prevent them from needing more public services.

This program would not be a significant expansion of Medicaid. Concerns about the rising future cost of Medicaid and calls for holding the line on eligibility would not apply directly to this program. Because the program would have eligibility standards and cost-sharing requirements, the number of people who participated could be calibrated to the state's finances. Also, not all of the participants would be new to Medicaid because a portion of them already receive Medicaid services without any cost-sharing.

## Opponents said

Medicaid is one of the largest and fastest growing state expenses each biennium, and Texas should not expand the program in any way. Although the numbers of those who could participate in a Medicaid buy-in program may look small today, creation of such a program would add another entitlement group. The state would be required under federal law to pay for any and all eligible recipients.

Instead of loosening the eligibility requirements for Medicaid, the state should ensure that all people who receive state assistance really deserve it. Medicaid benefits should be reserved only for individuals whose income truly makes them eligible, and people with disabilities who can work should do so.

## Notes

The **HRO analysis** appeared in Part One of the April 25 *Daily Floor Report*.

# Establishing a Medicaid integrated care management pilot project

**HB 1771 by Delisi**
*Effective June 18, 2005*

**HB 1771** establishes an integrated care management (ICM) model for Medicaid recipients. The model is a non-capitated primary care case management program with no per participant charge that assigns recipients to a medical home – a medical professional who oversees all care; uses utilization management techniques; and performs health and functional needs assessments, case management, health education, and initiatives to prevent institutionalization. The ICM model is considered a managed care plan under the Medicaid program and could be implemented by a third party under contract. The bill permits the commissioner of the Health and Human Services Commission (HHSC) to create a statewide ICM advisory committee.

## Supporters said

ICM would achieve savings for the state without hospitals losing federal funds. In 2003, HHSC was charged with expanding Medicaid managed care because it is a better and less expensive model of delivering health care. As HHSC prepared to carry out that charge, the nine transferring hospitals made it clear that they would lose a significant source of federal funds – the Upper Payment Limit (UPL) – if the STAR+PLUS capitated model were implemented. Because those hospitals financially would be unable to continue sending intergovernmental transfers for federal disproportionate share funds if they lost UPL, many hospitals would face reduced federal funds. The implementation of ICM, however, would preserve the transferring hospitals' ability to bill for services and receive UPL matching funds because ICM is not a capitated model, meaning that the fees associated with the model are not on a per-patient basis, but are associated with the service rendered.

ICM would offer recipients every benefit that STAR+PLUS could. The program would create a medical home for patients and would monitor best practices and reward providers that improved the system. The client-focused approach to the program also would improve services for recipients, particularly the elderly and disabled who have a wide range of needs and for whom proper care can mean the difference between staying in the community and living in a nursing home.

Texas should ensure that its safety-net hospitals do not lose federal funding. Already these hospitals, which serve the entire spectrum of patients and conditions from trauma to indigent primary care, deliver millions of dollars in uncompensated care every year. The state does not have sufficient funds to pay for all the public benefit these hospitals deliver and should not jeopardize other sources of funding in any way. Other proposals to compensate the transferring hospitals for a loss of federal UPL funds would not be equivalent to what would be lost under STAR+PLUS.

## Opponents said

ICM is an unproven theory, and its implementation could result in a provider rate cut of $110 million and a loss of $168 million in federal funds in the coming biennium. The budget includes a cost savings of $278 million in all funds for fiscal 2006-07, which is assumed to be generated by the implementation of a non-capitated managed care program. If ICM does not deliver, HHSC will have to find a way to cut up to $278 million from existing services, and provider rates would be the most likely source of cuts. Doctor, hospital, and other health care provider rates already suffered a round of cuts in 2003, and further cuts would be unsustainable. Instead of implementing an unproven model, Texas should strongly consider other options, including proposals from HHSC. While many of these proposals are short-term funding solutions, HHSC reports that they would generate $104 million, an amount that would soften the transition from UPL to other sources. The long-term options could draw down more than $215 million each biennium, more than replacing UPL.

STAR+PLUS is a proven model of health care delivery. The debate about which method of managed care is best for the state and for patients was derailed by the UPL discussion, and the proven value of STAR+PLUS was overshadowed. Patients are happy and well cared for under STAR+PLUS, and it has been operating for more than six years. One of the many benefits of a capitated model is that the risk for achieving savings is transferred to the HMO, and such a model would assure the state of $110 million in savings in fiscal 2006-07. The state's primary responsibility is to taxpayers and patients. Only STAR+PLUS can address the needs of both.

The financial hurdles for ICM may be insurmountable. Not only would it be required to achieve the same cost and utilization savings as STAR+PLUS, but it would cost about $125 million in administrative expenses and cost the state $21 million in premium taxes collected from HMOs. Because ICM would be starting out in a hole, it is unlikely that it could achieve the savings needed by the state.

## Notes

The **HRO analysis** appeared in Part Two of the April 26 *Daily Floor Report.*

# Stem cell research and ban on human cloning

**HB 1929 by Woolley/HB 864 by P. King**
*Died in House committee*

**HB 1929** would have prohibited reproductive human cloning and established penalties, including a civil penalty of up to $10 million for each violation and a criminal offense punishable as a first-degree felony (life in prison or a sentence of five to 99 years and an optional fine of up to $10,000). The bill explicitly would not have restricted stem cell research but would have directed the Health and Human Services Commission to establish an advisory committee to develop guidelines for such research. Stem cell research only could have been conducted using female reproductive material that was voluntarily and knowingly donated; such material could not have been purchased or sold.

## Supporters said

Stem cell research is one of the most promising – and poorly understood – potential advances in medicine. Often confused with human cloning, stem cell research employs therapeutic cloning, which simply involves using a donor egg to reproduce the patient's own genetic material. This technique potentially can offer the benefit of undifferentiated stem cell transfer to treat a wide range of diseases and a lower risk of rejection by the patient. Texas should ensure that its scientists can participate in this new frontier of medicine.

By ensuring that Texas scientists could conduct stem cell research, HB 1292 would help the state attract economic development and investment. The state's institutes of higher education as well as its biotechnology industry would benefit, possibly bringing some of the nation's leaders in science and medicine to Texas.

Other states already have staked their claim on investment in stem cell research. In California, voters approved a bond initiative that will commit $3 billion to stem cell research over the next 10 years. Illinois, Maryland, New Jersey, New York, Wisconsin, and other states have plans at various stages to commit state funding toward stem cell research. If Texas prohibits stem cell research, the state quickly will be eclipsed by other states that are making a commitment to the future of scientific research and investment.

**HB 864** would have prohibited reproductive human cloning and established penalties. It also would have prohibited somatic cell nuclear transfer, a cloning process by which the nucleus of an unfertilized egg is removed or destroyed and the nucleus of a somatic cell – a cell other than a sperm or egg cell – is then placed in the emptied egg.

## Supporters said

Texas should not condone ethically abhorrent research based on dubious claims of future benefit. While stem cell research in general may produce medical advances, there is no way to predict the outcome of research using cloning techniques.

A ban on certain forms of stem cell research in Texas would not impede the state's economic development because other areas of research are active here, with strong public-private partnerships, higher education research departments, and world-renowned medical centers. Texas can grow into a center of excellence for other types of research and leave somatic cell nuclear transfer work to other states or even other countries.

## Notes

Other bills that would have prohibited reproductive cloning and protected stem cell research included SB 128 by Shapleigh and SB 1164 by Zaffirini, both of which were left pending in the Senate Health and Human Services Committee.

SB 943 by Armbrister, which was left pending in the Senate Health and Human Services Committee, also would have prohibited somatic cell nuclear transfer but would not have prohibited research using genetic material created by fertility treatments that otherwise would be discarded.

In addition to bills concerning stem cell research, legislation was filed and left pending in committee regarding the funding of such research, including:

- HB 2269 by Woolley and SB 1041 by Janek, which would have authorized the issuance of bonds to fund stem cell research;
- HB 3076 and HJR 96 by Naishtat, which would have established a grant program for stem cell research;
- HB 2469 and HJR 71 by Thompson, which would have established a statewide funding program for stem cell research; and
- HB 2081 by Paxton, which would have prohibited the use of state funds for any stem cell research.

# Local MH/MR authorities serving as providers

**HB 2572 by Truitt**
*Vetoed by the governor*

**HB 2572** would have directed the Health and Human Services Commission (HHSC) to establish roles and responsibilities for local mental retardation authorities and permitted them to offer intermediate care facilities for the mentally retarded (ICF-MRs) services and waiver services if needed to ensure access or under certain capacity limitations. Local mental health authorities also would have been permitted to serve as qualified service providers.

The bill would have restricted HHSC from decreasing the number of local mental health or mental retardation (MH/MR) authorities in a community until September 1, 2007, unless two or more local authorities requested the reduction or HHSC determined that the local authority had failed to meet contract terms.

The bill also would have required HHSC to include in its rate setting a review of different payment methods and the effect of payment changes before implementing any rate change, although the requirement would not have applied to payment rates for ICF-MRs, some waiver services, and mental retardation service coordination.

## Supporters said

Local mental health and mental retardation authorities should not be the providers of last resort as established by HB 2292 by Wohlgemuth, the omnibus health and human services reorganization bill enacted by the 78th Legislature. Not enough private provider resources are available to fill the need that would be created if the local authorities could not also serve as providers in some areas of the state. Individuals need access to services, and repealing the provider of last resort and privatization amendments would ensure access.

The approach taken in HB 2572, which would build on local networks, is more appropriate than the one in HB 470 by J. Davis, which would centralize contracts, taking management of the contracts from the local authorities and placing them at the agency. Managing local contracts from

afar is difficult and can mean working less closely with providers or with fewer providers. It also distances local donors and supporters from the local networks, which can lead to less funding, fewer volunteers, and a reduced sense of community for the people these programs serve.

## Opponents said

Local mental health and mental retardation authorities should not serve as both state contractors and providers. Already the contractor has significant influence over a client's access to services, but if it also were the provider, the client would have no other entity to which that client could turn. This inherent conflict of interest should be avoided wherever possible.

## Other opponents said

A better approach, contained in HB 470, would mandate a split in responsibilities between authority and provider and would move the state toward a more efficient and consumer-driven system by proposing a needs-based, rather than diagnosis-based, system and allowing for innovation at the local level.

## Notes

The **HRO analysis** of HB 2572 appeared in Part Two of the May 9 *Daily Floor Report*.

HB 470 died in the House. The HRO analysis of HB 470 appeared in Part Two of the May 12 *Daily Floor Report*.

For more information on HB 1572, see HRO Focus Report Number 79-9, *Vetoes of Legislation, 79th Legislature*, July 29, 2005, pp. 15-18.

# Standards for Canadian pharmacies shipping prescription drugs to Texas

**SB 410 by Whitmire, amendment by Hochberg**
*Effective generally September 1, 2005*

**SB 410**, the State Board of Pharmacy Sunset bill, in addition to other provisions, establishes a designation for Canadian pharmacies to lawfully ship prescription drugs to Texas residents.

To obtain designation, a pharmacy must meet Texas licensing standards and submit certain information, such as the name and address of the pharmacy's owner and pharmacist-in-charge. In addition, the Canadian pharmacy must have a Canadian license in good standing and be able to produce a record of a prescription drug order within 72 hours of a request by the board, an affidavit that the pharmacist has read and understands applicable Texas law and rules, and evidence that the pharmacy meets the board's safety, dispensing, and other standards.

In addition to meeting Texas pharmacy requirements, a designated Canadian pharmacy must meet other standards, including dispensing only drugs prescribed for long-term use, only drugs that are approved by Canada's Therapeutic Products Directorate for sale to residents of Canada, and only drugs in the original, unopened manufacturer's packaging whenever possible. A Canadian pharmacy may dispense only refilled prescriptions. It may not fill an initial prescription, dispense an amount that exceeds a three-month supply, dispense a drug for which there is not an equivalent drug in the United States, or dispense certain other classes of drugs, such as controlled substances, biological products, or infused drugs.

The board will conduct random, annual inspections of designated pharmacies to ensure compliance. Other than the initial inspection, the board can contract with another state to perform the inspection. Designated Canadian pharmacies must send complaint reports by Texas residents to the board and compile and maintain a 30-day effective price list for prescription drugs provided to Texas residents.

The bill directs the board to designate between one and 10 Canadian pharmacies and authorizes necessary fees to cover inspections. The board will create a web site containing information needed for Texans to order prescriptions from designated Canadian pharmacies.

## Supporters said

Inspecting and designating certain Canadian pharmacies would better protect Texas consumers. Because prescription drugs are significantly cheaper in Canada, many Texas residents already order their drugs from Canadian pharmacies or over the Internet. The cheaper prices spare some Texans from having to choose between purchasing needed drugs and paying rent or buying food and can prevent people with inadequate or no prescription drug coverage from rationing their medications. Unfortunately, some purchasers of medications from foreign pharmacies currently fall victim to online scams and receive fraudulent drugs as a result. Official state designation of Canadian pharmacies and the accompanying web site would help ensure that Texas residents obtained their prescriptions from legitimate foreign businesses that comply with standards similar to those required of a Texas pharmacy.

Other states have similar programs, including Minnesota, Nevada, Rhode Island, and Wisconsin. For example, Minnesota's state-administered web site (www. minnesotarxconnect.com) lists prescriptions that can be obtained from Canadian and British pharmacies along with their prices. The Canadian pharmacies featured on the site are licensed by Canada and inspected by Minnesota state officials. Consumers can compare prices and obtain the information necessary to purchase drugs through reliable foreign pharmacies.

Although the national debate about prescription drug importation ultimately will be decided by Congress, offering information to Texas residents in the meantime could protect them from scams and dangerous drugs. Already, many Texans buy their drugs from other countries, either in Mexico or online from foreign pharmacies. Access to a list of certified pharmacies simply would allow consumers who already buy foreign prescriptions to make safer purchases.

Federal law does not prohibit states from creating web sites containing information about Canadian pharmacies. Other states have done the same thing, and the Food and Drug Administration (FDA) has not taken enforcement action against them. In a May 2005 letter to

Gov. Kenny Guinn of Nevada, the FDA stated: "To date, FDA has focused its enforcement resources on those who commercialize the practice of importing drugs into the United States from abroad. ... As a matter of enforcement discretion, FDA generally has not seized drugs from those who have taken buses across the border and then brought foreign drugs back into the United States for their own personal use." It is unlikely that the FDA would take enforcement action against the state of Texas for establishing an informational web site or against any citizen who used it to make purchasing decisions.

## Opponents said

This bill would give consumers a false – and potentially harmful – sense of security. Even if Texas inspected Canadian facilities and ensured that the pharmacies were licensed, the board still could not determine where the drugs were manufactured, if a specific lot had been recalled, or if re-dispensing had occurred. Canada allows the sale of drugs manufactured in third-world countries and under conditions not permitted in the United States for safety reasons. By endorsing foreign pharmacies, Texas could mislead residents into thinking the drugs they purchased from abroad were safe, which could not be assured. Also, because Texas has no jurisdiction over Canadian pharmacies, any complaint resolution or recourse performed by the board would have no effect.

This bill would violate federal law, which the FDA has affirmed in more than 10 letters sent to governors and local government officials in charge of similar plans. Importing drugs by individuals from abroad is illegal, and those who can be found civilly and criminally liable include any who cause a prohibited act under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 331). The fact that the FDA has not yet taken enforcement action does not mean the agency would not choose to go after Texas.

Not only might consumers be exposed to fraudulent drugs through importation, they unwittingly could be supporting terrorist networks in the process. In a recent report by the Pharmaceutical Research and Manufacturers of America, the industry calls on the Department of Homeland Security to conduct a threat and vulnerability assessment for imported drugs because of a possible link between counterfeit goods, including pharmaceuticals, and terrorist groups.

Other, safer, options exist for consumers seeking lower-cost prescription drugs. Some manufacturers have programs through which low-income or uninsured people can obtain their prescriptions free or at a reduced cost. A web site with information on how to enroll in such programs would be more helpful to Texans than one directing them to Canadian pharmacies. Nationally, the federal government has launched initiatives to bring down the cost of medications, including accelerated approval of new medical procedures and drugs and fewer delays in bringing generic drugs to market. The Medicare prescription drug discount card also will offer seniors discounts and expanded coverage for prescriptions.

## Notes

The **HRO analysis** of SB 410 appeared in the May 22 *Daily Floor Report*. The portion dealing with Canadian pharmacies was added by amendment on the House floor and did not appear in the original bill analysis. A similar provision was proposed in HB 173 by Hochberg, which died in the House Public Health Committee.



**Higher Education**

| | | | |
|---|---|---|---|
| HB 6 (2) | Morrison | Authorizing tuition revenue bonds for higher education institutions | 99 |
| HB 2330 | Morrison | Limiting Top 10 Percent automatic admissions of undergraduate students | 101 |
| * SB 1227 | Shapiro | Student financial aid revisions and nonvoting student regent | 104 |
| SB 1228 | Shapiro | Statewide accountability system and tuition regulation review | 106 |

# Authorizing tuition revenue bonds for higher education institutions

**HB 6 by Morrison, Second Called Session**
*Died in the Senate*

**HB 6** would have authorized the issuance of a total of $2.75 billion in tuition revenue bonds (TRBs) for institutions of higher education to finance construction and improvement of infrastructure and related facilities. It also would have appropriated $108 million to pay debt service on the bonds authorized by the bill. The bonds would have been payable from pledged revenue and tuition and, if a board of regents did not have sufficient funds to meet its obligations, funds could have been transferred among institutions, branches, and entities within each system or university.

HB 6 also would have added junior college districts with a total headcount enrollment of 40,000 or more to the statutory list of entities eligible to issue debt obligations.

## Supporters said

HB 6 would authorize financing for a wide range of critical facilities projects at higher education institutions throughout the state that play an important role in closing the gaps in higher education. Renovations, repairs, upkeep, and new facilities are essential to the state's ability to provide high quality education to Texas students. Higher education institutions depend on state support for maintenance and expansion to keep pace with the exploding growth in student enrollment and to maintain and enhance the quality of education these students receive. Economists and higher education experts say that economic prosperity and better jobs depend on having a highly skilled and well educated workforce.

TRBs are the most cost-effective way to finance higher-cost construction or improvement of long-lasting infrastructure, which can be used while the debt is being paid off. With interest rates near all-time lows, now is the ideal time to finance the construction of new classrooms, laboratories, and student housing. The state should make an investment in higher education that would pay for itself many times over by supporting each institution's bond program. The bonds would be pledged against university revenues and thus would pose little financial risk for the state.

While the cost of supporting these bonds is significant, it is in the state's best interest to continue to support higher education by paying a significant portion of debt service on

TRBs. In its 2004 report, the Joint Interim Committee on Higher Education recognized the importance of supporting TRBs in its recommendation that the Legislature require that general revenue funding be used to reimburse higher education institutions for the cost related to debt service of all legislatively approved TRBs. HB 6 would continue the Legislature's recent practice of funding part, but not all, of the debt service on the TRBs authorized.

An increase in cost-sharing between the state and higher education institutions would be a significant policy shift, and the state should not retreat from the long-held practice of assisting with the funding of debt service with general revenue. The ability to support cost-sharing would vary widely among universities. It would be difficult for smaller institutions that are less able to raise tuition to make debt-service payments and would create a burden for students attending institutions that did raise tuition in response to cost-sharing pressures. According to credit rating agencies, any change to the state's long-standing commitment to fund TRBs could lower the bond ratings of public universities, thereby increasing the cost of debt for needed projects.

## Opponents said

TRBs have become popular because they allow lawmakers to support more projects by paying only a small portion of the cost and leaving the remaining financial commitments for future legislatures and taxpayers. Because of limited state resources, there should be greater cost-sharing between the state and the institutions that issue the bonds. The Legislature and higher education institutions need to move in the direction of less reliance on state funding for debt service on TRBs, requiring institutions to include bond debt as part of their overall operating budgets. Cost-sharing would allow institutions to issue larger amounts in TRBs, thereby funding more capital projects. Institutions have other sources to fund the cost of buildings, including bonds backed by the Permanent University Fund and the Higher Education Fund, indirect research cost reimbursements earned on externally funded research programs, tuition revenues, and private funds. With tuition deregulation, these institutions have more flexibility to raise the revenue they need to finance capital improvements.

## Other opponents said

HB 6 would be a step in the right direction but is significantly underfunded. While the bill would authorize $2.75 billion in bonds requiring $476 million in debt service for fiscal 2006-07, the related appropriation for debt service would be only $108 million through the next biennium. It is assumed that the institutions would be responsible for the remaining debt service, which most institutions – smaller universities in particular – would have difficulty supporting. This could force university systems to choose among critically needed projects and could result in projects being postponed.

## Notes

The **HRO analysis** appeared in the July 25 *Daily Floor Report*.

During the first called session, the House passed HB 6 by Morrison, which would have authorized $2.7 billion in TRBs for higher education institutions. The bill died in the Senate.

During the regular session, the House and the Senate passed HB 2329 by Morrison, which would have authorized a total of $2.2 billion in TRBs for higher education institutions. The bill died when neither the House nor the Senate considered the conference committee report for the bill. Sec. 14.61 of Article 9 of SB 1 by Ogden, the general appropriations act for fiscal 2006-07, included $108 million for TRB debt service, contingent on passage of HB 2329 or similar legislation. Gov. Perry line-item vetoed this provision because HB 2329, or similar legislation, was not enacted.

A related bill introduced in the first called session, SB 80 by Ogden, would have authorized the issuance of TRBs at higher education institutions, but would have limited state reimbursement for debt service beginning September 1, 2007. The state reimbursement could not have exceeded 60 percent of the amount of the debt service for as long as the bonds were outstanding, unless the limit imposed a hardship for an affected university. SB 80 was left pending in the Senate Finance Committee.

# Limiting Top 10 Percent automatic admissions of undergraduate students

**HB 2330 by Morrison**
*Died in Senate committee*

**HB 2330** would have required each state university to reserve at least 50 percent of its enrollment capacity for first-time undergraduate students for admission of students who graduated in the top 10 percent of their high school classes and, under existing law, gained automatic college admission. If the number of top 10 percent applicants exceeded 50 percent, priority would have been given to students who completed the advanced high school program or the equivalent.

The commissioner of higher education could have developed a standard method of computing a high school student's grade point average to be used in determining eligibility for automatic admission. The computation method would have given extra weight to honors courses and other advanced courses, would have applied to students who entered 9th grade during or after the 2007-08 school year, and would have expired September 1, 2010.

Automatic admission would have been granted to a transfer student who completed the core curriculum at another university and who otherwise qualified for automatic admission.

## Supporters said

HB 2330 would maintain the benefits of the Top 10 Percent Law while giving universities the flexibility they need to carry out their duty to all the people of Texas. The admissions process of any university is an exercise in both selecting qualified students with a high probability of success and crafting an entering class that meets the university's mission. By requiring universities to admit all applicants who graduated in the top 10 percent of their high school classes, the Top 10 Percent Law has had some negative consequences that HB 2330 would address.

Current law requires state universities to admit certain students based on a single criteria – graduation rank – that limits an institution's flexibility and creates an unhealthy academic environment. Texas' flagship institutions are losing control of enrollment through the number of slots they must dedicate to top 10 percent graduates. The share of students admitted automatically at Texas A&M-College Station already is approximately 50 percent, and the situation at the University of Texas (UT)-Austin is fast approaching the point where Texas residents will be admitted exclusively on the basis of high school class rank. Students are not one-dimensional, and a university needs room in its admissions decisions to consider criteria other than high school rank.

Capping the number of automatic admissions would allow institutions more discretionary admissions, and a holistic approach could be used so that other factors, such as test scores, special talents, leadership ability, personal achievements, or other relevant aspects of a student's application were considered. The bill would allow institutions the flexibility to admit a greater number of other students, including minority students and those highly qualified students who did not graduate in the top 10 percent of their classes.

Another negative consequence of the current law is that it is unfair to bright students who attend competitive high schools but do not graduate in the top 10 percent of their classes. This has caused a "brain drain" – forcing top students to attend universities outside Texas because they were denied admission to the flagship universities. Conversely, some students who graduate in the top of their classes at less demanding high schools may not be qualified to attend the state's best public universities. HB 2330 would establish balance in this area by allowing for the admission of more second-decile graduates to state universities and encouraging high school students to take rigorous courses by giving preference to students who took the advanced high school curriculum.

HB 2330 is based on data published in recent studies and presented to the Senate Subcommittee on Higher Education during the interim. A study published in 2004 by Princeton University called for allowing no more than half of top 10 percent Texas freshmen to be admitted automatically. Additionally, a report issued last year by the Commission of 125, an advisory group of prominent citizens from within and beyond Texas, contains recommendations that UT-Austin exercise primary control over admissions and efforts to ensure diversity and that no single factor should be used for admissions.

## Opponents said

The number of students allowed to be automatically admitted should not be capped because the Top 10 Percent Law is doing what is was designed to do – provide a race-neutral method of admitting a diverse class of highly qualified students. It is fair because basing admissions on class rank levels the playing field for students across the state and compares students to their peers based on how well they have taken advantage of available resources. Capping the number of students admitted automatically would undermine the college aspirations of students from all racial, ethnic, geographic, and economic backgrounds and would diminish the duty and accountability of flagship institutions to all Texans.

The existing Top 10 Percent Law has helped Texas' flagship universities fulfill their mission to serve students across the state by granting broader opportunities to the very best students from every high school. Not only has it helped create more diverse freshmen classes at UT-Austin and Texas A&M, but it has done so in a way that benefits all regions of the state, especially poorer rural and urban areas. According to an analysis performed by UT-Austin, the freshman class of 2003 was the most diverse in the university's history, and minority students made up a slightly greater percentage of the incoming classes of 2004 and 2005.

In response to concerns about the academic qualifications of many students who gain automatic admission under current law, data from UT-Austin's admissions office indicate that since 1996, among all racial and ethnic groups, top 10 percent students have outperformed students who scored significantly higher on standardized college entrance exams. In addition, class rank appears to be a good predictor of student performance. The study published by Princeton University revealed that top-ranked students from resource-poor schools are enrolling out of state in some of the most competitive public and private institutions. If these students truly were unprepared for the rigors of higher education, they would not be getting into these schools.

The Princeton study also showed that, contrary to anecdotal claims, top-ranked students from so-called competitive high schools who did not graduate in the top 10 percent of their classes still have a substantial advantage in their access to the flagship institutions. Virtually all who graduated in the top 20 percent from these schools who identified UT-Austin or Texas A&M as their top college choice succeeded in enrolling there. Lastly, the study revealed that most students who attend out-of-state universities do so by choice, not because they were denied admission to a Texas flagship.

The Top 10 Percent Law should be maintained in its current form because it has proven the most effective method of promoting diversity in higher education in Texas. Minority representation in the state's universities is greater now than it was during the days when Texas universities practiced race-conscious affirmative action policies, so it is unlikely that a "holistic" admissions policy that gave more weight to factors other than class rank would be any more successful in ensuring diversity in higher education.

## Other opponents said

The debate about changing the Top 10 Percent Law misses the point. The problem is not that the state has too many students entering higher education under automatic admission but that there are not enough flagship institutions to accommodate the number of qualified students who want to attend. Texas should have about seven more flagship universities based on its current population.

Universities need the ability to regain control of their admissions policies, but the answer should not be the capping of automatic admissions. Instead, a top 10 student should be guaranteed admission to a university system, rather than a particular school, which would allow the system administrators to make the institutional assignment in a way that was responsive to the carrying capacity of the higher education system.

Although some aspects of the law are beneficial, the Top 10 Percent Law has not done enough to meet the state's need to build minority representation in higher education. Adopting a holistic admissions approach would be a step in the right direction, but a return to a statewide policy of race-conscious university admissions, as permitted under recent U.S. Supreme Court decisions, would be the surest way to ensure true diversity in freshman admissions.

## Notes

The **HRO analysis** appeared in Part One of the May 11 *Daily Floor Report*.

A related bill, SB 111 by Shapleigh, effective September 1, 2005, authorizes the higher education commissioner to develop a standard method for computing a student's

high school grade point average that gives additional weight for each honor's course, advanced placement course, international baccalaureate course, or dual-credit course completed by a student for purposes of determining automatic undergraduate admission under the Top 10 Percent Law, beginning with students starting the 9th grade during the 2007-08 school year. It also requires higher education institutions to grant undergraduate credit to entering freshmen for completing the international baccalaureate program, achieving a required score on advanced placement or college-level examinations, or successfully completing courses while concurrently enrolled in high school and a college or university.

SB 333 by West, which would have required the commissioner to develop a weighted computation method for determining the top 10 percent and also would have limited application of the law to students who completed the recommended or advanced curriculum, passed the Senate but died in House committee.

# Student financial aid revisions and nonvoting student regent

**SB 1227 by Shapiro**
*Effective September 1, 2005*

**SB 1227** revises student financial aid programs. It requires the Texas Higher Education Coordinating Board (THECB) to develop a comprehensive financial aid training program for public school counselors, employees of student financial aid offices, and members of community-based organizations.

The bill authorizes use of funds paid to the THECB by the federal Lender's Special Allowance Program to pay for the administration of loan and grant programs, including the awarding of grants through the Towards Excellence, Access and Success Grant Program (TEXAS Grants).

TEXAS Grant awards for students attending private higher education institutions are phased out beginning with the fall 2005 semester. However, students who received TEXAS Grant awards for that semester or an earlier academic period are "grandfathered" and continue to receive them.

SB 1227 changes the name of the TEXAS Grants II program, for students attending community and technical colleges, to the Texas Educational Opportunity Grant and establishes the same hardship provisions and satisfactory academic progress requirements as for TEXAS Grants.

The bill allows students to pay tuition and fees on an installment basis, except when a student has financial aid available to cover the total amount, in which case the university must apply the financial aid toward the total amount of tuition and fees and release the balance to the student. Payment options for students with delayed awards of financial aid are authorized. An institution may allow a student waiting for disbursement of financial aid to register on an accounts-receivable basis and postpone the due date of unpaid tuition and fees. A student whose financial aid award later was cancelled or reduced would have up to 30 days to pay any unpaid tuition or fees.

SB 1227 establishes the Higher Education Enrollment Assistance Program through which the THECB provides enrollment and financial aid information to students in three areas of the state that have low rates of students enrolling in higher education.

The bill requires the governor to appoint a nonvoting student regent to the board of each general academic teaching institution, medical unit, and dental unit in each university system. The student regent has the same powers and duties as other board members except that the student regent may not vote on matters before the board, make or second any motion, or be counted in determining a quorum.

## Supporters say

SB 1227 would implement a number of changes recommended by the Joint Interim Committee on Higher Education that would enable the state, higher education institutions, and students to make better use of financial aid.

Prior law allowed the state to use the federal Lender's Special Allowance to pay for the administration of loan and grant programs. SB 1227 would allow these federal funds to be used directly as financial aid, including for TEXAS Grants, instead of merely to pay administrative costs, which could be covered by other appropriated funds.

Adjusting the installment plan and allowing students to enroll on an accounts-receivable basis would provide more payment options for students and their families. Currently, students who qualify for financial aid but have not received the award by the time they register must obtain alternate funding to pay their initial charges for tuition, fees, books, and supplies, which can create a severe financial hardship. If a student's award was delayed, SB 1227 would authorize universities to allow the student to register at the beginning of the semester and pay tuition and fees when the financial aid became available. The fact that such students already would have been processed and approved for aid would serve as collateral on a university's postponement of the payment due date.

The name of the TEXAS Grant II program should be changed to eliminate the confusion with the TEXAS Grant program. Conforming the hardship provisions and satisfactory academic progress requirements for the Texas Educational Opportunity Grant with those for the TEXAS Grant also would streamline the two programs.

While university boards of regents have done a good job of reaching out to students, these bodies should contain student representation in some form. In the years since the Legislature began allowing boards of regents to set designated tuition, many students have expressed concern that their voices have not been heard. Texas has many students capable of serving in this capacity who could handle sensitive, confidential issues that can come before boards of regents. Student regents are present on the board of the Texas Guaranteed Student Loan Corporation and on university boards in 39 other states, where they have proved to be valuable assets.

## Opponents said

The bill should prohibit a student regent from being present during executive sessions. It would be awkward to air certain proceedings in the presence of a student, including sensitive matters such as the termination of a president that best would be left to the voting regents of the board.

## Notes

The **HRO analysis** appeared in Part One of the May 24 *Daily Floor Report*.

SB 34 by Zaffirini, which requires students to complete undergraduate degrees in four or five years to qualify for the tuition rebate program, also provides for a nonvoting student regent.

# Statewide accountability system and tuition deregulation review

**SB 1228 by Shapiro**
*Died in the House*

**SB 1228** would have required the Texas Higher Education Coordinating Board (THECB) to develop and implement a statewide assessment and accountability system to measure the performance of each Texas higher education institution and public junior college and the effectiveness of each institution in managing and using available funds. The bill would have created a legislative oversight committee that would have reviewed affordability and accessibility of higher education, including the impact of tuition deregulation. It would have set forth reporting requirements for the oversight committee and THECB.

The bill would have outlined performance goals used in measuring an institution's progress in certain areas, including the number of students served, the number of degrees or certificates awarded, retention and graduation rates, institutional research, and each institution's overall excellence determined in part by its number of nationally recognized programs. Each year, using composite measures for all the goals, THECB would have rated and assessed each institution against its peers in Texas and in other states. If an institution received an unacceptable performance rating, it would have been prohibited from increasing designated tuition, except for cost-of-living increases, until it received an acceptable performance rating.

The committee would have reviewed tuition deregulation and made recommendations to the 80th Legislature for its continuation or repeal. Tuition deregulation would have been repealed as of September 1, 2008, if not continued by the Legislature.

## Supporters said

SB 1228 would improve the performance of all institutions of higher education in Texas and help control huge increases in designated tuition. *Closing the Gaps by 2015*, the state's higher education plan adopted in 2000, outlines the goals of increasing enrollment and success in higher education among students statewide but does not contain any benchmarks or mandates to ensure that institutions meet these objectives. Taxpayers deserve to know how Texas institutions compare to their peers statewide and nationally, and leaders in higher education

need data with which to measure and monitor the progress of institutions. Moreover, institutions must be held accountable in meeting the standards of excellence set by THECB.

In addition to setting goals and measuring performance, SB 1228 appropriately would prevent low-performing institutions from increasing designated tuition. This would help control escalating increases in tuition that, by some accounts, have priced many Texans out of higher education. In response to an historic budget shortfall, the 78th Legislature in 2003 deregulated designated tuition by giving universities authority to set that portion of the tuition rate. According to the comptroller, tuition rate increases in the first year of deregulation averaged 17.5 percent statewide, and tuition at some of the larger universities, including the University of Texas at Austin, increased nearly 40 percent. While institutions need the flexibility to increase designated tuition in order to meet their needs and make long-range plans, SB 1228 would demand accountability from institutions of higher education to the Legislature and the public.

## Opponents said

SB 1228 would reverse a recent policy decision that has not had enough time to work and could cause universities to increase fees. Even with tuition deregulation, higher education in Texas is still a bargain compared to tuition at public institutions in other large states. Texas does not have the resources to fully fund higher education in light of the other competing demands for state funds, and Texas institutions, through the freedom to set designated tuition, now are playing "catch-up" with other states that previously have made significant investments in higher education. In order for Texas universities to remain competitive, there must be cost-sharing in tuition between the state and the public. Current policy is a market-based model that allows tuition to fluctuate with demand and allocates students to various state institutions according to affordability.

Allowing the Legislature to regain control of setting tuition rates would create uncertainty about future funding among state universities. Higher education officials have

used their authority to set tuition responsibly, incorporating student input and committing new revenue toward hiring faculty and creating scholarships. As long as higher education institutions do not have adequate state support, they must be able to raise enough funds to keep pace with growing enrollment and the costs of instruction and faculty. Far from helping to close the gaps, a return to state-regulated tuition would cause Texas institutions to fall behind.

# J

## udiciary

| | | | |
|---|---|---|---|
| * HB 11 (2) | Hartnett | Increasing compensation for state judges and adding court fees | 109 |
| * SB 1189 | Wentworth | Creating new judicial districts in certain counties | 111 |
| * SB 1704 | Ellis | Raising the pay for jury service | 113 |

# Increasing compensation for state judges and adding court fees

**HB 11 by Hartnett, Second Called Session**
*Effective December 1, 2005*

**HB 11** raises judicial salaries, institutes a new fee on criminal court convictions and civil court filings, and requires the collection of data about judicial turnover.

*Judicial salaries.* HB 11 increases judges' salaries and bases them on the salary of district judges, instead of Supreme Court justices. District court judges' minimum annual state salaries will rise from $101,700 to $125,000. Appellate court justices, other than chief justices, will have minimum annual state salaries of 110 percent of district judges, meaning that their minimum salaries increase from $107,350 to $137,500. Supreme Court justices will have minimum annual state salaries of 120 percent of district judges, meaning that their minimum state salaries increase from $113,000 to $150,000. District judges and courts of appeal justices can receive county supplements up to the caps in HB 11.

*Fees on criminal and civil cases.* HB 11 increases fees in civil and criminal cases. A person convicted of any offense, other than a pedestrian or parking offense, will pay an additional $4 in court costs. Sixty cents of this fee will go to the general fund of the municipality or county to promote the efficient operation of municipal courts and the investigation, prosecution, and enforcement of municipal and state offenses. The other $3.40 will be deposited in the state judicial fund. The bill also adds a $37 civil case filing fee in district courts, statutory county courts, and county courts, to be deposited in the judicial fund.

## Supporters said

*Judicial salaries.* In order to attract and maintain the highest quality judges, Texas must raise its judicial salaries. State judges make important decisions that affect the entire state, and their pay should be commensurate with their responsibilities, duties, and skills. Currently, Texas ranks 39th among states in judicial salaries. HB 11 would address this by giving needed, modest raises to the state's judges, who have not had a salary increase since 1997. To attract and maintain quality judges, judicial salaries must be raised to compete with private sector and other public service salaries. The low judicial salaries paid in Texas discourage experienced judges from remaining on the bench, which inevitably affects the quality of justice and leads to inefficiency and uncertainty.

HB 11 is not the vehicle to undertake a change to sever the link between the pensions of the elected class of state officials and judicial salaries. Any change in this arrangement should be considered independently of this bill. Legislators receive low pay for their hard work, making many sacrifices during the course of their public service, and their pensions are a fair part of the compensation received by those who serve long enough to qualify.

*Fees on criminal and civil cases.* Monies from the state judicial fund traditionally are appropriated – along with general revenue – to pay judicial salaries. Depositing the fees generated by HB 11 in the judicial fund in no way would tie judicial pay directly to decisions made by judges. This mechanism simply is a method of finance that would not create a judicial conflict of interest. An increase in court fees would be the most logical way to afford a judicial pay raise at this time, which would help ensure that those in the court system received the highest quality justice. Anyone who could not afford the fees could file an affidavit asking the court to waive the costs.

HB 11 is not the appropriate vehicle for a new fee to fund indigent criminal defense, and the topic may not even be germane to the bill. The debate over increased funding for indigent criminal defense should take place independently of HB 11.

## Opponents said

*Judicial salaries.* Judges are adequately compensated. They earn significantly more than most Texans and most other public servants. Salaries in the private sector are not the appropriate benchmark by which to evaluate a judge's salary. Pay in a private law firm is vastly higher than most other occupations, even other areas of the legal profession. Individuals are attracted to the bench not for the salary but for the desire, prestige, and the privilege of public service. It is unreasonable to expect that a judge's salary could compete with earnings in the private sector.

HB 11 should sever the link between judicial salaries and legislative pensions so that an increase in judicial salaries did not result in an increase in retirement benefits for legislators and others in the elected class. Lawmakers should not enact legislation that automatically and indirectly would

boost their own pensions, especially when the Legislature has restricted future teacher retirement benefits and has failed to fully fund the Employees Retirement System and the Teacher Retirement System so that regular retired state employees and retired educators might receive long-delayed pension increases. If legislators and other elected officials deserve higher pensions, that issue should be debated separately.

***Fees on criminal and civil cases.*** A judge's salary historically has been and should continue to be funded through general revenue, not through fees on criminal and civil cases. Coupling an increase in judicial salaries with a fee on criminal convictions would raise questions about the appearance of judicial conflict of interest and the impartiality of judges' decisions about guilt or innocence.

The new fee that HB 11 would impose on criminal convictions should be increased and the money dedicated to supporting local governments' efforts to provide attorneys for indigent criminal defendants. State funding for indigent defense is inadequate, and the fee created by HB 11 would be an appropriate way to raise such revenue.

## Notes

The **HRO analysis** appeared in the July 25 *Daily Floor Report*.

An earlier version of HB 11 died in the Senate during the first called session, and its companion bill, SB 11 by Duncan died in the House Calendars Committee. A similar bill, SB 368 by Duncan, died during the regular session after the House did not consider the conference committee report on the bill.

# Creating new judicial districts in certain counties

**SB 1189 by Wentworth**
*Generally effective September 1, 2005*

**SB 1189** creates the following judicial districts:

- 6th and 7th criminal judicial districts, composed of Dallas County;
- 412th Judicial District, composed of Brazoria County;
- 424th Judicial District, composed of Blanco, Burnet, Llano, and San Saba counties;
- 425th Judicial District, composed of Williamson County;
- 426th Judicial District, composed of Bell County;
- 427th Judicial District, composed of Travis County, which will give preference to criminal matters;
- 428th Judicial District, composed of Hays County;
- 430th Judicial District, composed of Hidalgo County, which will give preference to family violence and criminal matters;
- 433rd Judicial District, composed of Comal County; and
- 434th Judicial District, composed of Fort Bend County.

The new district courts in Dallas, Brazoria, and Hays counties and the 425th multi-county court are created September 1, 2005. The rest will take effect January 1, 2007.

SB 1189 establishes when the terms of the 6th, 7th, 207th, 406th, 424th, and 426th district courts begin.

The bill also makes the following changes in jurisdiction:

- the 264th and 426th judicial districts are added to the list of districts that have concurrent jurisdiction in Bell County;
- the 424th District Court now has concurrent jurisdiction with the 33rd District Court;
- Willacy County is removed from the jurisdiction of the 103rd, 107th, 138th, 357th, and 404th district courts, which now are composed solely of Cameron County;
- the 406th District Court now has concurrent jurisdiction with the other district courts in Webb County; and

- the family violence and criminal matters preference for the 398th district court and the criminal matters preference for the 389th district court, both in Hidalgo County, are eliminated.

All civil cases in the 92nd, 93rd, 139th, 206th, 275th, 332nd, 370th, 389th, 398th, and 430th district courts must be assigned and docketed at random by the district clerk using an automated system.

SB 1189 changes the composition of the juvenile boards in Blanco, Burnet, Comal, Leon, Llano, San Saba, and Webb counties.

The bill immunizes judges of Tarrant County criminal courts from suits arising from the performance of the judges' duties, except for acts committed intentionally, willfully, wantonly, with gross negligence, or with conscious difference or reckless disregard for the safety of others. It also allows judges in the 33rd and 424th district courts to hear certain non-jury cases.

## Supporters said

SB 1189 would promote judicial efficiency by creating new district courts in Texas counties where overloaded dockets currently are denying parties the right to obtain timely justice. Texas has experienced massive population growth in the last five years, which has had a significant impact on the district courts. The workload in district courts has increased significantly, causing long docket delays and forcing judges to work exceedingly long hours. Adding district courts would be a cost-effective way to relieve existing district courts of overcrowded dockets while speeding up the administration of justice.

Adding new courts would decrease the necessity of using visiting judges. The visiting judge fund was cut substantially in 2003, and because the general appropriations act does not increase funding of the program in fiscal 2006-07 to its former level, it is unlikely that counties could rely on the use of visiting judges in the future.

Reducing the number of district courts in Willacy County to one would be sufficient to  meet the county's docket needs and save the county much needed money.

## Opponents said

This bill would cost the state $1.3 million by fiscal 2007 and $1.1 million per year thereafter, money that should be directed toward more pressing state budget needs. If counties need help to reduce their dockets, they should rely on visiting judges already paid for by money appropriated to the visiting judge fund.

## Other opponents said

By cutting the number of district courts with jurisdiction over Willacy County from six to one, this bill would create long docket delays for county residents. In addition, Willacy County residents might be unable to vote an unpopular judge out of office because the county would share the judge with Cameron County.

## Notes

The **HRO analysis** appeared in Part One of the May 23 *Daily Floor Report*.

# Raising the pay for jury service

**SB 1704 by Ellis**
*Effective September 1, 2005*

**SB 1704** requires that jurors be paid a minimum of $6 for the first day of jury service and a minimum of $40 for each additional day. The state will reimburse a county $34 per day after the first day for juror pay. A county will file a claim for reimbursement through the comptroller, and the comptroller will reimburse counties quarterly. These changes will take effect January 1, 2006.

The bill requires anyone convicted of any offense, other than one related to a pedestrian or a parking offense, to pay a $4 fee in addition to all other court costs. The fee is to be used to reimburse counties for juror pay. This court cost applies to a defendant convicted of an offense committed on or after September 1, 2005.

The bill also penalizes the act of knowingly providing false information in a request to be exempted or excused from jury service. Such an act is subject to a contempt action punishable by a fine between $100 and $1,000 in addition to any other criminal penalties authorized by law. The bill allows a person to postpone jury service for up to six months if the person has not been granted a postponement in that county during the previous year. This applies to a person summoned for jury service who is required to appear on or after September 1, 2005.

## Supporters said

SB 1704 would fund a much needed pay increase for Texas jurors, who are the lowest paid in the nation. The current $6 per day minimum pay often does not cover even the cost of parking near a courthouse. Juror pay in Texas has not been increased in more than 50 years, and the minimum is woefully insufficient to encourage people to fulfill their civic duty of performing jury service. People with lower incomes are disproportionately burdened by this low pay as they simply cannot afford to perform jury duty, which often results in the inadequate representation of minorities on Texas juries. For example, Latinos make up 30 percent of the population of Dallas and Harris counties but make up only 10 percent of juries.

The minimum pay of $6 for the first day of jury duty would not dissuade low-income citizens from appearing for jury duty. El Paso County has increased the pay of its jurors but continues to pay only $6 for the first day of service. Even so, the county has seen a dramatic increase in the percent of people, including low-income people and minorities, who appear for jury duty.

The $4 court cost fee that would be required of people convicted of most offenses would fully fund the increased juror pay, resulting in no loss to the state or to counties. It correctly would place the responsibility of financing juror pay raises on the responsible party — the offenders. Because the fee would be only $4, offenders would not be overly burdened in funding the system.

## Opponents said

This bill still would set minimum pay at only $6 for the first day of jury service. This low pay may continue to dissuade people with low incomes from appearing for jury duty.

Court costs for people convicted of criminal offenses already are very high, and many people cannot afford to pay the costs. Felons in particular experience great difficulties in readjusting to society and should not be burdened by additional costs. Additional court costs disproportionately would affect persons with low incomes and minorities, who are convicted of crimes at much higher rates. Taxpayers should pay for the costs of increasing juror pay because society as a whole benefits from having fully representative juries.

## Notes

The **HRO analysis** appeared in Part One of the May 23 *Daily Floor Report*.



**Public Education**

HB 2 (2)   Grusendorf   School finance and public education revisions                              115
HB 4       Grusendorf   Funding instructional materials and technology for public schools          120
* HB 283   Hope         Prevention of bullying in public schools                                   123
* HB 603   Eissler      Consideration of intent or disciplinary history in student discipline
                        policies                                                                    124
HB 1445    Madden       Establishing a state virtual school network                                125
HB 1476    Edwards      Prohibiting sexually suggestive performances at school events              127
SB 422     Jackson      Creating a publicly funded school voucher pilot program                    128

# School finance and public education revisions

**HB 2 by Grusendorf, Second Called Session**
*Died in the House*

**HB 2,** as reported by the House Select Committee on Public Education Reform during the second called session, would have restructured the state's method of funding public education and established new requirements for school districts, including salary increases for teachers and other professionals, mandatory school start and end dates, end-of-course assessments for high school students, and restrictions on the amount of funding that could be used for purposes other than direct instruction. The bill would have required school districts to reduce local school property taxes and obtain local voter approval for any subsequent tax increase. HB 2 would have taken effect only with the enactment of HB 3 by J. Keffer (see p. 135).

*Salaries and benefits.* The bill would have revised the minimum salary schedule for teachers and other professional staff and would have required school districts to provide an increase of $150 per month, or $1,500 per year, over 2004-05 salaries, including supplements. Districts also would have had to provide an average increase in compensation, defined as salaries, incentives, or other compensation, of $500 in 2005-06 and another $500 in 2006-07. The state would have been required to pay 50 percent of contributions for districts that currently pay into Social Security.

*Incentives.* Districts would have been required to use 1 percent of professional staff payroll to fund teacher incentive programs. HB 2 would have established a separate incentive program of up to $100 million in state funds for the 2006-07 school year for educationally disadvantaged schools. At least 75 percent of these funds would have been used to provide rewards of at least $3,000 for each teacher at a campus receiving a grant award. Teachers who continued to work but were eligible to retire with full retirement benefits would have received additional salary supplements of between $1,000 and $4,000 per year, based on their years of retirement eligibility.

*Textbooks and technology funding.* HB 2 would have established new procedures for the review, adoption, and purchase of "instructional materials," including textbooks, workbooks, and computer-adaptive materials. The current system of funding textbooks would have been eliminated, and textbook funds would have been combined with the current $30 technology allotment for an "instructional materials and technology" allotment of $100 per ADA (an unweighted count of students in average daily attendance)

in the 2006-07 school year and $150 per ADA in 2007-08 and beyond. Beginning in the 2006-07 school year, districts would have been required to use a portion of this allotment for targeted technology programs.

*Local property taxes.* School district taxes would have been capped at $1.20 per $100 of valuation or a lower rate for any school year provided by appropriation. School districts could have imposed local enrichment taxes of up to 15 cents per $100 of valuation with no recapture of these funds. These rates would have been limited to 5 cents in 2007, 10 cents in 2008 and 2009, and 15 cents thereafter and would have to have been approved by district voters by majority vote. Districts could have exceeded these limits and taxed up to the maximum maintenance and operations (M&O) tax rate – $1.50 per $100 of valuation – with at least two-thirds approval of district voters.

*State funding.* The bill would have distributed funding to school districts through two tiers. The first tier would have provided a basic "accreditation allotment" and a series of special program allotments based on dollar amounts rather than weights. All districts taxing at the minimum rate would have been guaranteed a particular sum of money adjusted based on student and community characteristics. This entitlement would have been divided into a state and local share depending on local district property wealth.

State funding in the enrichment tier would have been distributed through a guaranteed yield. Initially, the guaranteed level would have been based on a target percentile equivalent to these amounts per penny of tax effort for the following school years: $39.20 for 2006-07, $40 for 2007-08, and $40.70 for 2008-09. In 2009-10, the guaranteed yield would have been determined based on a target percentile of the 94th percentile in wealth per student, which would have been increased to the 96th percentile in 2010-11.

*Funding formulas and special allotments.* State funds distributed through formulas would have been based on dollar amounts instead of weights. Districts would have received a basic accreditation allotment of $4,600 per student and special allotments for special education, compensatory and bilingual education, career and technology education, gifted-and-talented education, and public education grants. School districts would have had

flexibility in the use of special allotments, except that they could not have spent less per student than they did in 2005-06.

Each school district or county that operated a transportation system would have received a transportation allotment of $1.50 per mile for each approved route mile. Fast-growing districts would have received $375 per student in ADA for the first year in which students attended a new instructional facility and, for the second and third years, $375 for each new student. For other districts, this allotment would have been $250 per student in ADA for the first year and $250 for each new student in the second and third years. The bill would have applied a cost of education index (CEI) to adjust for differences among districts for such costs as inflation and teacher salaries.

*Recapture.* Local revenue would have been limited to the amount of each district's entitlement under funding formulas and adjustments. Any local property tax revenue exceeding that amount would have been subject to recapture, which would have been capped at an amount equal to 38 percent of the M&O tax revenue used in determining the district's local share, provided the district was taxing at a level of at least 75 percent of the maximum tax rate. The cap would have been tied to the level of equity in the guaranteed yield for the enrichment tier.

*Hold harmless and limitations on increased funding.* School districts would have been guaranteed an increase of at least 3 percent in state funding over levels in current law. Increases in state aid would have been limited to 108 percent in the 2006-07 school year, 116 percent in 2007-08, and 124 percent in 2008-09.

*Expenditures on classroom instruction.* By the 2009-10 school year, each district would have had to allocate at least 65 percent of its total available revenues to fund direct instructional activities. This requirement would have been phased in, with an initial requirement that at least 50 percent of revenue be allocated to direct instructional activities, with a 5 percent increase each following year.

*Sanctions for low-performing schools.* The bill would have established additional procedures for the Texas Education Agency (TEA) to intervene in the operation of low-performing campuses and authorize takeover by an outside entity if a low-performing school failed to show improvement.

*School start and end dates.* In most cases, schools would have had to start the Tuesday after Labor Day and could have ended no later than June 7.

*School board elections and term lengths.* School board elections would have been held on the uniform election date in November of even-numbered years. School board members would have served staggered four-year terms.

*End-of course-examinations.* TEA would have been required to develop end-of-course assessments in secondary-level courses in mathematics, science, English, and social studies and could have required the administration of these tests to students. A joint legislative oversight committee would have been established to monitor the development of end-of-course assessments.

*Charter schools.* The bill would have repealed current statutes governing open enrollment charter schools and established new procedures for licensing charter schools and revoking the licenses of low-performing charter schools. High-performing charter schools would have received state facilities funding of $1,000 per student.

*Facilities.* The Legislative Budget Board (LBB) would have been directed to conduct a study of instructional facilities funding and needs, including age of facilities, capacity issues, and bond indebtedness.

*Continuation of TEA.* The bill would have continued TEA until September 1, 2017.

## Supporters said

HB 2 would provide $2.4 billion in new money for public education, increase significantly the state's overall share of education funding, improve the equity of the system, and establish new standards to ensure that Texans get more for their education dollars. The bill would provide tax relief by reducing local school property taxes and limiting the ability of school districts subsequently to increase taxes without local voter approval. New funding formulas in HB 2 would offer more flexibility in using state funds to meet each district's priorities, while also taking account of variations in cost due to student need, regional price variations, and district size.

*Salaries and benefits.* HB 2 would ensure that every teacher and professional staff member received a salary increase. Teachers would be assured of receiving $1,500 for each of the next two years in place of the $500 health insurance passthrough through an increase in the minimum salary schedule. The bill would allow school districts flexibility in determining the actual range of an additional pay increase of $500 in each of the next two years. Districts have discretion in developing compensation plans for all of

their employees, and they could continue to cover the cost of a health insurance passthrough for all employees if they so chose.

**Incentives.** The bill would require districts to design incentive plans that promote cooperation while also encouraging teachers to compete for incentives. A separate $100 million state incentive program would provide a $3,000 award for teachers who had helped failing campuses show improvement in student academic achievement.

**Textbooks and technology funding.** HB 2 would move public education in Texas into the 21st century by giving school districts the resources and tools needed to harness the promise of technology. For continued economic growth and improved employment opportunities, Texas cannot afford to fall behind in providing a modern learning environment. Public education should follow the example of business in embracing technology as an integral part of its operations.

The bill would break the near monopoly of a handful of publishing giants in providing textbooks and related materials for Texas students and allow state funding for instructional materials to be used for technology as well. For too long, textbook publishers – with the encouragement and support of the elected SBOE – have benefited from a system that sets prices and locks out competitors years before the final product is purchased. The bill would end a process in which textbooks are updated every six years while information and technology evolve far more rapidly.

HB 2 also would set up a process to ensure that instructional materials were reviewed in a timely manner, were free of factual errors, and contained appropriate instructional content. School districts would have more flexibility in determining their own funding levels for instructional materials and technology, depending on their existing resources. Rather than having to select from conforming and nonconforming lists of approved materials, districts could select from the wide array of products on the market and choose instructional materials that support their curricula.

**Recapture.** While every district would be guaranteed an increase in overall funding of 3 percent, no district would receive a significant and immediate windfall because funding increases would be capped at 8 percent, 16 percent, and 24 percent over the next three years. By imposing a cap on recaptured funds, the bill would provide relief to a small number of wealthy districts that currently are sending up to 70 percent of local property tax revenue back to the state. This cap would be tied to the percentage of equity in the

enrichment tier. As long as the state met its commitment to guarantee equity in the enrichment tier, recapture would be limited.

**Equity.** Under HB 2, equity among Texas schools would reach record levels. For the enrichment tier, school districts would be guaranteed a higher yield per penny of tax effort than is available under the current system. HB 2 would allow school districts to seek additional funding for enrichment but would require a vote of the people each time a school district sought a tax increase. By requiring these elections, the bill would give taxpayers more say in how their money is spent.

**Instructional costs.** The bill would simplify funding formulas by converting from weights to dollar amounts and ensure by 2009 that at least 65 percent of tax dollars were being spent in the classroom on direct instruction. Districts still would be able to use a significant portion of their budgets to fund other costs, such as cafeterias, school security, and school nurses, but the bill would require that a reasonable percentage of funds were being used to provide classroom instruction.

**Low-performing schools.** HB 2 would put more muscle into the state accountability system by allowing outside entities to bid for contracts to take over failing schools if other efforts to turn the school around were unsuccessful. Too many of the state's lowest-performing schools are allowed to fail year after year with minimal consequences for the district or the state. No child should have to wait years for a public school district to produce better results.

**Facilities.** While facilities funding is an important issue, policymakers need more information before they can address the problem. The study authorized by HB 2 would assist the Legislature in developing programs to provide assistance for facilities funding where it is needed most.

**School board elections.** Elections for school board trustees should be held in November when the voter turnout is about four times higher than in May elections. Because fewer voters go to the polls in May elections, most trustees are elected by a small minority of voters. Holding school board elections in the fall, along with other elections, would result in more citizens expressing their preferences about who should manage their schools. The bill would encourage joint elections, which would save money because the expenses would be shared by the political subdivisions holding the joint election. Currently, school districts that have trustees who serve three-year terms must hold an election every year. By mandating that trustees serve staggered four-year terms, a two-year election cycle would

result, substantially reducing the number of elections. Even if some joint elections have increased costs, holding fewer elections overall still would save money.

**Charter schools.** HB 2 would give TEA the tools it needs to weed out and shut down low-performing charter schools while establishing a framework to nourish successful charter programs so that they could fulfill the original purpose that the state envisioned when it began offering charters in 1995. There are many high-performing charter programs in the state that need additional support in order to succeed. These programs should have access to funding, including facilities funding, comparable to regular public schools.

**School start dates.** Postponing the school start date would extend the summer for students, families, and teachers, providing more options for vacations, summer camps, and professional education for teachers and generating significant economic benefits to the state as well as to school districts. The later start date would benefit migrant students who now must start school later than their peers, putting them at a significant academic disadvantage.

## Opponents said

HB 2 would not provide enough money to meet the state's current or future educational needs and would create a variety of unfunded mandates that quickly would consume any increases in funding for districts. Even though all school districts would be guaranteed increases of 3 percent, this barely would be enough to keep up with inflation. The bill would not begin to replace education cuts suffered during the 2003 session, and some of the "new funds," such as the increase in the minimum salary schedule and the increased technology allotment, simply would be a different way of spending funds already allocated for education.

**Salaries and benefits.** HB 2 would provide a minimal across-the-board raise for teachers, counselors, librarians, and nurses because the $1,500 increase would include $1,000 per year these professionals already were promised to restore the health insurance passthrough that was reduced to $500 per year in 2003. The additional $500 would amount to only $41.66 per month over a 12-month period. The bill would take away an important benefit from 300,000 other public school employees who would lose the passthrough and receive no offsetting benefit.

**Incentives.** Before approving any incentives, the state should provide funding for a more significant across-the-board pay raise for all teachers. The state will continue

to lose teachers and face ongoing shortfalls without a meaningful increase in overall salaries. Past experience has shown that performance incentive measures run out of steam when it comes time to pay for them. The career ladder experiment failed in Texas when funds ran out to pay deserving teachers, and today's incentive proposals likely would meet the same fate.

**Textbooks and technology funding.** School districts are not prepared to make the transition to technology-based instruction, and HB 2 would not provide sufficient resources to cover the full array of technology expenses it would take to support and maintain this level of instruction. Investments in technology would be wasted if a school district could not commit enough resources to cover maintenance, upkeep, replacement, training, and other elements that make up the "total cost of ownership" in a technology program. While a textbook is durable, and paper workbooks can be replaced from year to year, a laptop computer would require regular maintenance and oversight to ensure that it was being used appropriately. In many subjects, such as the study of literature, printed books are superior to technology-based materials. HB 2 should include requirements for categorical funding to ensure that school districts did not spend too much on hardware and too little on instructional content.

HB 2 would diminish Texas' influence on the instructional materials development process at many publishing companies. Protections in current law designed specifically to ensure that small, rural districts receive the same priority from publishers as larger districts would be eroded. Changing the State Board of Education's review process to an ongoing review and approval process would diminish the authority of the board and the content quality of the instructional materials. All materials – print or electronic – should meet the same review and approval requirements. Removing the requirement that districts select instructional material approved by the state board would eliminate the incentive for publishers to go through the approval process.

**Recapture.** HB 2 eventually would generate such inequities between wealthy and poor districts that the public school finance system again could be subject to constitutional challenge over funding equity issues. The 38 percent cap on recapture would lead to wide inequities between a handful of "super wealthy" districts and the rest of the school districts in the state. While some districts would see increases of slightly more than 3 percent, others would experience double-digit increases over the next several years.

**Equity.** Any gains in equity as a result of increased equalization in the enrichment tier would be more than offset by the significant inequities in the basic accreditation

allotment. The "hold harmless" provisions would carry over existing disparities in funding between property-wealthy and property-poor districts.

***Instructional costs.*** The current system of distributing state funds through student weights does a good job of accounting for the different student needs in a diverse state and should not be changed. A directive specifying the proportion of funds that should be spent on direct instruction unfairly would affect schools and districts with higher non-instructional expenses, even if these expenses contribute directly to student performance.

***Low-performing schools.*** Current law already establishes procedures for school districts and TEA to work together to address the problems of failing schools. Even the federal No Child Left Behind Act gives a low-performing school four or five years before it is subject to outside takeover. These solutions take time, and school districts should have the chance to correct the situation before a problem is turned over to outside entities.

***Facilities.*** Any revision of school funding formulas should include a component for facilities funding. This is one of the areas that the district court recently deemed to be unconstitutional, and it is important to the fast-growing districts in the state that continually must build new classrooms to accommodate rapidly growing student populations. This issue should not be put off until next session while another study is conducted. Sufficient evidence was presented in the school finance trial to document the urgency of the problem.

***School board elections.*** School districts should be allowed to retain local flexibility in choosing whether to hold school board elections in May or November. School board members are not elected by party, and November elections in even-numbered years are very partisan. School-related issues easily could be lost in the midst of partisan elections for federal, state, and county offices. Straight-party voters could become confused about why they were unable to vote for their party's nominee for school-board trustee or might skip the nonpartisan school trustee election. Nonpartisan school board candidates would have to vie for support, such as inclusion on a slate card or other advertisement, from organizations with partisan agendas and be evaluated on their positions on issues that may not be school-related.

***Charter schools.*** The bill does not go far enough in ensuring that TEA would hold all charter schools to the same academic and financial accountability standards as

public schools. Although HB 2 would allow TEA to deny charters to the lowest-performing schools, many others that at best have produced mediocre results likely would have their charters approved. The state should not commit to providing facilities funding for charter schools until it addresses the disparities and lack of facilities funding for its regular public schools.

***School start dates.*** School start dates should be based on local needs and preferences rather than economic interests such as tourism. If a district has a large number of migrant students or a major tourist attraction, there is nothing to prevent that district from starting school in early September. For many districts, savings in utilities and other costs would be offset by similar expenses in late May and early June. Many school districts and families would prefer to start school earlier in order to finish the first semester before the winter holidays. High school students in particular benefit from completing final exams before the holidays. These students should not have to compromise their academic achievement so that the state's tourism industry can profit.

## Notes

The **HRO analysis** of HB 2, second called session, appeared in the July 26 *Daily Floor Report*. The HRO analysis of HB 2, regular session, appeared in the March 8 *Daily Floor Report*. The HRO analysis of HB 2, first called session, appeared in the June 28 *Daily Floor Report*.

SB 8 by Shapiro, second called session, was approved by the Senate on August 9. While substantially similar to HB 2, SB 8 did not include the caps on recapture and non-instructional costs or requirements for fall school board elections and end-of-course assessments. SB 8 would have:

- required school districts to increase salaries for all employees for the 2005-06 school year in an amount equal to the product of $500 per professional employee and provided state aid in an amount equaling $2,000 per professional employee for the 2005-06 school year;
- allowed districts to impose an initial enrichment tax of 2 cents per $100 of valuation without voter approval;
- delayed adoption of the technology allotment until 2007; and
- specified that various provisions of the bill, including increases in the guaranteed yield in the enrichment tier, would be subject to specific appropriation.

# Funding instructional materials and technology for public schools

**HB 4 by Grusendorf**
*Died in the Senate*

**HB 4** would have abolished the current system for reviewing, adopting, and purchasing textbooks and established a process for the review, adoption and purchase of "instructional materials," including books, supplementary materials, computer software, interactive videodiscs, magnetic media, CD-ROMs, computer courseware, online services, electronic media, or other means of conveying information to a student. School districts and charter schools would have received an instructional materials and technology allotment per student in average daily attendance of $70 beginning September 1, 2005, and $150 beginning September 1, 2006. Districts would have had to use $40 of the $70 allotment and $60 of the $150 allotment to fund targeted technology programs, provide teacher training, and acquire other infrastructure, components, and technologies necessary to enhance student performance.

The bill would have established a review process by which publishers could at any time submit instructional material to the State Board of Education (SBOE) with a statement identifying the essential knowledge and skills for a subject and grade level that the material covered. The SBOE would have had to meet quarterly to review and approve instructional materials and would have had to approve or reject them no later than two board review meetings after submission. For each subject and grade level, the SBOE would have listed approved instructional materials, periodically reviewing it and, by majority vote, removing materials that the board determined no longer adequately covered essential knowledge and skills. School districts and charter schools would not have had to select instructional materials approved by the SBOE but would have had to certify to TEA annually that each student was being provided with instructional materials aligned with essential knowledge and skills adopted by SBOE for that subject and grade level.

The bill would have eliminated distribution of textbooks through the textbook depository system and allowed school districts and charter schools to purchase instructional materials directly from the publisher or through the Department of Information Resources (DIR). Prices would have been determined through negotiation between the publisher and DIR, which could have executed a contract to purchase or license each approved instructional material.

To the extent practicable and appropriate, TEA would have had to require school districts to administer the TAKS test by computer by May 1, 2007. TEA would have had to develop or acquire ongoing, computer-adaptive, interactive assessment tools for each subject and grade level TAKS test and, from funds appropriated for this purpose, make them available to public schools at no cost. TEA could have adopted rules governing computer-adaptive assessments and delayed the release of TAKS test questions and answer keys as necessary to implement computer-adaptive testing.

TEA would have been required to review all state- and federally funded grant programs and incentives designed to improve student academic performance and would have determined the extent to which funds awarded under these programs could be used to enhance technology use in public schools. The TEA commissioner would have had to appoint an advisory committee of business, education, and public members to help the agency monitor changing technology in business, industry, and education.

## Supporters said

HB 4 would move public education in Texas into the 21st century by giving school districts the resources and tools needed to harness the promise of technology. Other states and school districts already are successfully implementing this vision with positive results. For continued economic growth and improved employment opportunities, Texas cannot afford to fall behind in providing a modern learning environment. Public education should follow the example of business in embracing technology as an integral part of its operations.

Investing in technology is expensive, and HB 4 likely would not fund all of a district's technology needs. But most school districts have used the current $30 technology allotment to develop technology programs, and the additional funding that HB 4 would authorize would allow them to expand on that basic programming. Districts also could use their own resources to provide enough funding to cover the "total cost of ownership."

The bill would break the near monopoly of a handful of publishing giants in providing textbooks and related materials for Texas students and allow state funding for instructional materials to be used for technology as well. For too long, textbook publishers – with the encouragement and support of the elected SBOE – have benefited from a system that locks in prices and locks out competitors years before the final product is purchased. The bill would end a process in which textbooks are updated every six years while information and technology move at a far more rapid pace. Under the current system, students effectively are restricted from learning of spectacular advances in human achievement until years after they occur. Technology offers the promise of delivering a wide array of information to students in a variety of formats suited to particular subjects.

HB 4 would set up a process to ensure that instructional materials were reviewed in a timely manner, free of factual errors, and with appropriate instructional content. Instructional materials would be reviewed on an ongoing basis, rather than every six years, to ensure that they met state requirements for curriculum content. The bill would give school districts flexibility to determine their own funding levels for instructional materials and technology, depending on their existing resources, while providing safeguards to ensure that districts met the state's constitutional responsibility to provide instructional materials for all children. Rather than having to select from conforming and nonconforming lists of approved materials, school districts could select from the wide array of products on the market and choose which instructional materials would support their curriculum.

The bill would provide a strong incentive for school districts to convert to online testing by imposing a deadline of May 1, 2007, for TEA to provide online assessment materials and for school districts to administer the TAKS test online if practicable and appropriate. Interactive online testing could give teachers immediate feedback, which would improve students' learning and reduce the criticism of "teaching to the test" by enabling educators to fine-tune their assessment of each child's progress and needs.

The bill would help embed technology into the state's educational structure by requiring TEA to review all state- and federally funded grant programs to determine the extent to which grant funds could be used to enhance or expand the use of technology in schools. This proactive approach would help ensure that more districts made technology use a priority in developing and carrying out grant-funded programs.

## Opponents said

Schools do not need to embrace technology for its own sake but should make informed decisions about the use of technology in a broader context. It would be a mistake to assume that the state's already inadequate education budget should be spent on laptop computers rather than decreasing class sizes, hiring qualified teachers, funding pre-kindergarten, and other priorities. Businesses have harnessed technology mainly to enhance efficiency to boost profits, but schools are not businesses.

HB 4 would not provide enough resources for school districts to cover the full array of technology expenses and most are not prepared to make the full-scale transition to technology-based instruction envisioned by the bill. Investments in technology would be wasted if a school district could not commit enough resources to cover maintenance, upkeep, replacement, training, and other elements that make up the "total cost of ownership" in a technology program. While a textbook is durable and paper workbooks can be replaced from year to year, a laptop computer would require regular maintenance and oversight to ensure that it was being used appropriately. In many cases, such as the study of literature, textbooks and hard copy are superior to technology-based materials.

HB 4 would diminish Texas' influence on the instructional materials development process at many publishing companies. Without the advance commitment of funds and timelines for adoption, companies would not create project timelines to coincide with Texas. The more than 800 school districts with enrollments of fewer than 2,000 students would get little attention in marketing and sales efforts if the state adoption cycle disappeared. Once each district could determine what it wanted, when it wanted, the larger school districts would receive the sales, marketing, and implementation attention, but the smaller districts would have difficulty selecting and securing instructional materials in a timely manner. Protections in current law designed specifically to ensure that small, rural districts receive the same priority from publishers as larger districts would be eroded.

Changing the SBOE's review process to an ongoing review and approval process would diminish the authority of the SBOE, which is accountable to the voters, and the content quality of the instructional materials. Allowing the SBOE, by majority vote, to remove approved materials that the board determined no longer adequately covered essential knowledge and skills would open the door to board rejection

of materials based on subjective criteria. The bill should require the SBOE to provide publishers with notice if their materials were removed from the approved list.

If state funds were allocated for instructional materials, schools should be required to spend those funds on SBOE-reviewed and approved materials, regardless of the materials' format. All materials – print or electronic – should meet the same review and approval requirements. Removing the requirement that districts select instructional material approved by the SBOE would eliminate the incentive for publishers to go through the approval process.

HB 4 should include requirements for categorical funding to ensure that school districts did not spend too much on hardware and too little on instructional content. Texas has invested in and is a national leader in tying accountability standards to assessments and instructional materials. Without adequate controls, the quality of this system could be compromised.

The bill would encourage districts to move quickly to online testing when this may not be the best method for the state's current high-stakes accountability system. These summative assessments are designed to measure specific knowledge and to control for other variables, such as environment, test time, and other factors. These factors would be easier to control with the current paper-and-pencil system than with the online system envisioned by the bill. Online testing would be costly, and the benefits would not justify the expense. The Legislative Budget Board estimates that online testing would cost school districts an additional $11 million per year, which could be spent in other, more beneficial ways.

## Notes

The **HRO analysis** appeared in Part One of the April 20 *Daily Floor Report.*

Similar provisions appeared in HB 2 by Grusendorf, first and second called sessions, and HB 62 by Grusendorf, second called session, none of which were enacted.

# Prevention of bullying in public schools

**HB 283 by Hope**
*Effective June 18, 2005*

**HB 283** requires school districts to prohibit students from bullying, harassment, and making "hit lists." School districts must ensure that district employees enforce these provisions and must provide staff with appropriate methods for managing students in the classroom and on school grounds, disciplining students, and preventing and intervening in student discipline problems. Districts also must adopt and implement a discipline management program that provides for prevention and education concerning unwanted physical or verbal aggression, sexual harassment, and other forms of bullying in school, on school grounds, and in school vehicles.

The school board or its designee must grant a victim of bullying a transfer to another classroom or campus at the request of the parent or other person authorized to act on behalf of the victim. The board or its designee must verify that the student was a victim of bullying before granting the transfer and may consider past student behavior when identifying a bully. The decision of the board or its designee is final and may not be appealed. The board does not have to provide transportation for a student who is transferred to another campus.

Bullying for the purpose of student transfers is defined as engaging in written or verbal expression or physical conduct that a school board determines would have the effect of physically harming a student, damaging a student's property, or placing a student in reasonable fear of harm to the student or the student's property, or that is sufficiently severe, persistent, or pervasive that the action or threat creates an intimidating, threatening, or abusive educational environment for a student.

## Supporters said

HB 283 would help reduce or eliminate bullying and related behavior in public schools, provide teachers and other school staff with tools to address the problem, and provide alternatives for students who have been victims of bullying. Research shows that almost one-third of school-age children are victimized by their peers. Students who are bullied are five times more likely to be depressed and have low self esteem than are other children, conditions that can last well into adulthood. A 2002 report by the U.S. Department of Education and the U.S. Secret Service, which studied 10 students who committed school shootings, found that bullying played a role in a majority of those incidents.

School districts cannot afford to provide transportation for every student who wishes to transfer to another school to avoid a bully. If the problem is serious enough to require a transfer, the parents or other responsible party should be willing to provide transportation.

## Opponents said

HB 283 defines bullying broadly to include behavior that, while wrong, may not by itself justify transferring a student to another class or school. School districts or their designees should have the flexibility to respond to individual incidents in other ways that may be more effective than simply removing the victim from the classroom or school. Rather than punishing the bully, prevention should focus on teaching the victim to respond appropriately to bullying. Most serious school violence associated with bullying has been conducted by the victims of bullying and not the bullies themselves. Victims should be provided with anger management and other behavioral tools to shield themselves from the negative effects of bullying.

## Other opponents said

HB 283 should require school districts to provide transportation for victims of bullying who wish to transfer to another school. If a school or district has been unsuccessful in controlling the bullying, it should bear the cost of removing the victim from the situation. Many students who need to transfer to another school to avoid a bully would be unable to do so due to lack of transportation.

## Notes

The **HRO analysis** appeared in Part One of the May 2 *Daily Floor Report*.

HB 308 by Hope, effective June 18, 2005, requires school districts to authorize a transfer for a student who has been sexually assaulted by a student attending the same campus.

# Consideration of intent or disciplinary history in student discipline policies

**HB 603 by Eissler**
*Effective June 17, 2005*

**HB 603** directs school boards, in adopting a required student code of conduct, to specify whether consideration is given, as a factor in a decision to order suspension, removal to a disciplinary alternative education program, or expulsion, to:

- self-defense;
- intent or lack of intent at the time the student engaged in the conduct;
- a student's disciplinary history; or
- a disability that substantially impairs the student's capacity to appreciate the wrongfulness of the student's conduct.

The bill specifies that, except in cases involving firearms, the student code of conduct need not specify a minimum term of removal for students suspended or expelled from school.

If a student is removed from class for assaulting a teacher, the student cannot be returned to that class without the teacher's consent, and the teacher cannot be coerced to consent. Each educator who has responsibility for the instruction of a student must be notified if the student has been placed in an alternative education program or expelled. This information must be kept confidential from anyone not entitled to it.

## Supporters said

HB 603 would provide more flexibility in enforcing the state's zero-tolerance laws by requiring school districts to specify whether consideration is given to certain factors in determining whether a student who violates the code of conduct should be suspended, placed in an alternative education program, or expelled. This would allow school districts to give principals and other school authorities more discretion in determining the appropriate consequences for violations of the code of conduct.

Since these zero-tolerance laws were enacted in 1997, there have been reports of students being expelled for such actions as accidentally bringing a paring knife to school even though the student had no intention of using the knife.

Under current law, principals have no discretion to respond to individual situations in which suspending or expelling a student or placing the student in an alternative education program may not be warranted. As a result, many students end up in alternative education programs that often do not offer the same quality of education as a regular classroom, and even excellent students have difficulty maintaining their grades. The bill would not limit a principal's authority to expel students who intentionally bring weapons to school.

HB 603 would protect teachers who have been assaulted from further violence by allowing that teacher to refuse the student readmission into the class. During the 2003-04 school year, the Texas Education Agency reported that 1,221 students committed assaults against school employees. By allowing teachers to refuse to accept a student who has assaulted that teacher, the bill would affirm to teachers that they are safe and supported in their jobs. One of the main reasons teachers leave the teaching profession is because of student discipline problems. Teachers need the peace of mind of knowing that they do not need to continue to teach students who have assaulted them.

## Opponents said

The bill would give principals too much discretion in deciding whether a student should be suspended, placed in an alternative education program, or expelled for violating the student code of conduct. This should be handled by courts rather than by a principal, who may know the offender and be too inclined towards leniency or stringency depending on the particular student.

## Notes

The **HRO analysis** appeared in Part One of the April 26 *Daily Floor Report.*

# Establishing a state virtual school network

**HB 1445 by Madden**
*Died in the House*

**HB 1445** would have established a state virtual school network to provide electronic courses or programs for Texas students. The network would have been governed by the State Board of Education (SBOE), which would have established criteria for course and program content, evaluated and approved electronic courses or programs, placed courses or programs on an approved list, provided public access to the list of approved courses or programs, and solicited new courses or programs in which there was a demonstrated interest. The commissioner of education could have overruled the board's refusal to approve an electronic course or program.

The virtual school network would have been prohibited from developing its own curriculum, courses, or programs or providing educational services directly to a student. Electronic courses or programs could have been submitted to SBOE for approval by school districts rated academically acceptable or higher or by charter schools rated recognized or higher. Charter schools could serve as provider schools only to students in the school district in which the charter school was located or within its service area, whichever was smaller, or to any other student in the state through an agreement with the enrolling school.

The SBOE would have set the cost of each course or program, which could not exceed $400 per student per course or $4,800 per full-time student. An electronic course offered through the state virtual school network would have had to provide for at least the same number of instructional hours as required for a course offered in a program that met the state's required minimum number of instructional days and required length of school days. School districts or charter schools in which a student was enrolled in an electronic course would have been entitled to state funding equal to the cost of providing the course, as established by the SBOE, plus 20 percent. The number of courses available to students not enrolled in a public or charter school would have been capped at 6,000 courses in the 2006-07 school year and 15,000 courses in the 2007-08 school year.

The board would have had to adopt rules for verifying the attendance of students enrolled in electronic courses or programs. School districts or charter schools would have had to report results of assessment tests to TEA through the Public Education Information Management System (PEIMS). Teachers of electronic courses and programs

would have had to be certified by the state to teach that subject and grade level. The virtual charter school network would have begun operations beginning with the 2006-07 school year.

## Supporters said

HB 1445 would move education into the 21st century by expanding opportunities for students to use technology as an alternative method of gaining access to a high-quality education through a statewide virtual school network. The network would be firmly established in the state's existing educational framework and would build on recent pilot projects that have tested the use of electronic courses and programs at individual school districts. The bill is significantly different from a 2003 virtual charter school bill that would have provided equipment directly to participating students because the virtual school network would be operated through participating public school districts.

The bill would include safeguards to ensure that students enrolled in electronic courses or programs received an education that was equal to or better than traditional courses. The programs would be developed by school districts and charter schools and based on state content standards. Students would be subject to testing and attendance requirements, and courses would be taught by certified teachers.

While a limited number of home-school students would be eligible to participate in the virtual school network, these programs would benefit many other kinds of students, including students in rural areas who may not have access to advanced courses, children with disabilities, gifted-and-talented students, and students from families who must travel a great deal. Home-school families actually might not wish to participate because of the assessment and attendance requirements.

## Opponents said

HB 1445 would divert money from public school classrooms at a time when the state is having trouble meeting basic educational needs for public school students. According to the bill's fiscal note, the cost of the program

would increase from $20.6 million in 2007 to $52.6 million in 2010. In addition to paying for the creation of these courses, the state would have to cover the cost of reviewing and approving electronic courses and publicizing their content.

The program outlined in the bill would support home schools that are private schools and ought to be funded privately. This is a form of "virtual voucher" that would provide public funding for private schooling.

It would be premature to adopt HB 1445 before the state has had time to evaluate the results of studies of virtual school pilot programs. The initial findings about the benefits of these programs are inconclusive. While online education may offer promising opportunities, the state should not authorize resources to fund these programs until more information is available about their costs and benefits.

## Notes

The **HRO analysis** appeared in Part Three of the May 11 *Daily Floor Report.*

# Prohibiting sexually suggestive performances at school events

**HB 1476 by Edwards**
*Died in Senate Committee*

**HB 1476** would have prohibited a school dance, drill, or cheerleading team or any other performance group from performing in a manner that was overtly sexually suggestive at an athletic or other extracurricular event or competition sponsored or approved by a school district or campus. The Texas Education Agency (TEA) could have submitted a written request that a district review performances to determine whether they were overtly sexually suggestive and, if so, require the district to take appropriate action, as determined by the district, against the performance group and the group's sponsor.

## Supporters said

HB 1476 would make it clear to school districts and students that sexually suggestive performances are not acceptable in Texas public schools. Many people have expressed concern about the sexual nature of half-time shows at football games and other school-sponsored events. While overtly sexually suggestive performances may be difficult to define, they are easy to recognize, and every school administrator should be required to ensure that they do not take place.

While existing statutes include sanctions for lewdness and indecent exposure at school and school-sponsored activities, they do not speak directly to performances by cheerleaders, drill teams, and other groups at school-sponsored athletic events. School administrators are unlikely to place cheerleaders or school band members in an alternative education program because of their performance in a half-time show. This bill would not impose penalties because it is not intended to be punitive, but rather to serve as a directive to school districts that sexually explicit performances are prohibited.

The fact that cheerleading organizations voluntarily have adopted standards prohibiting sexually explicit performances illustrates that there is a problem. Cheerleading squads may perform different routines at football games than they perform in competitions because they know the behavior is prohibited. Those squads that voluntarily prohibit these movements would not be affected by the bill.

TEA and school boards are responsible for cooperating to ensure that school-related activities promote a positive self-image for young women. The bill would establish the appropriate level of state involvement by directing TEA to serve as a referral agency but giving school districts the responsibility for taking appropriate action.

## Opponents said

HB 1476 is unnecessary because existing statutes and policies already address public lewdness and indecent exposure. The bill would be difficult to implement because it does not define what would be considered "overtly sexually suggestive" and would impose no penalties for this behavior. One person's sexually suggestive behavior may be another's idea of artistic expression. A high school musical production, for example, might contain elements that some consider suggestive and others find perfectly acceptable, even charming. School districts already have sufficient authority to respond to inappropriate and suggestive performances by placing students in alternative education programs. Most cheerleading teams have adopted voluntary standards for content that prohibit sexually explicit performances, and the National Cheerleading Association penalizes squads that have vulgar or suggestive elements in their competition routines.

The state should not be involved in legislating morality. Dress codes and other guidelines should be adopted locally and should reflect local tastes and morals. TEA is in no position to decide the appropriateness of a half-time performance at a particular high school football game. If parents believe that extracurricular activities at their children's school are in violation of good taste, they have ample opportunity to seek corrective action by appealing to campus and district administrators and school board trustees.

## Notes

The **HRO analysis** appeared in the May 3 Daily Floor Report.

# Creating a publicly funded school voucher pilot program

**SB 422 by Jackson**
*Died in the House*

**SB 422**, the Texas Education Agency (TEA) Sunset bill, as substituted in the House Public Education Committee included a provision that would have established an urban school choice pilot scholarship program for eligible students in the San Antonio, Dallas, Houston, Fort Worth, Austin, Edgewood, and North Forest school districts. Eligible districts would have been the largest school districts in counties with populations of more than 750,000 in which a majority of students were economically disadvantaged or at least 90 percent of students were economically disadvantaged during the preceding year. The program would have expired June 1, 2014.

For three consecutive school years, beginning with the 2005-06 school year, the number of students eligible for the program would have been capped at 5 percent of the number of students in the district. The cap would have expired September 1, 2008, and would not have applied to students who had dropped out, were starting school for the first time, or who had been the victims of assault by a student on the same campus.

To be eligible for the program, a child would have had to meet criteria established in the bill, such as being at risk of dropping out of school, having been assaulted by another student, or being of limited English proficiency or low-income. A child who established eligibility would have remained eligible until graduating from high school or reaching the age of 21, whether or not the student had continued to live in an eligible district. The child would have been entitled to receive an annual scholarship of the lesser of 90 percent of the statewide average annual cost per student for the preceding school year or the qualifying school's average actual cost per student. If a child were eligible for special education or bilingual education, the scholarship would have had to include the amount that the school district received for these special programs for the child.

Applications for participation in the program would have been handled by schools-of-choice resource centers – independent and privately funded nonprofit organizations selected by TEA – that would have issued scholarship certificates to parents of eligible students. The parent would have had to endorse the certificate and present it to the qualifying school chosen by the parent. The qualifying

school would have had to present the certificate, along with documentation verifying attendance, to TEA, which would have issued payments in monthly installments. A qualifying school would have to have been accredited or be applying for accreditation by a recognized accreditation association and not advocate or foster unlawful behavior or teach hatred of any person or group on the basis of race, ethnicity, or national origin. The school could not have denied admission by discriminating on the basis of the child's race, national origin, or ethnicity and would have had to comply with federal anti-discrimination laws. A school with more scholarship applicants than available positions would have had to fill the available scholarship positions by a random selection process. A school could have given preference to a previously enrolled student, siblings of current students, victims of school violence, and students from low-performing schools.

Each qualifying school that enrolled a child under the program would have had to administer annually the TAKS or other state-administered assessment test or a nationally norm-referenced test approved by TEA. A qualifying school that accepted a scholarship under the program would not have been considered an agent or an arm of the state or federal government and would not have been subject to state regulation. The bill specified that the purpose of the program was to allow the private sector maximum freedom to respond to and provide for the educational needs of the children of Texas without governmental control and that the regulations authorized by the bill would be construed liberally to achieve that purpose. TEA would have had to contract with one or more researchers experienced in evaluating school choice programs to study the program.

## Supporters said

SB 422 would provide students with the opportunity to reach their full potential, regardless of their economic circumstances or where they lived, by providing individual students with the resources they need to pursue educational alternatives. The bill would offer hope and choice to students trapped in failing public schools who did not have the economic means to leave the system and attend private schools.

The state cannot afford to wait any longer to offer an alternative to students being failed by the current system. SB 422 would extend a lifeline to these students by establishing a school choice program that initially would serve only 5 percent of students but eventually could offer educational options to all students in the state's five largest urban districts and other eligible low-income districts. These are the students that would gain the most from a school choice program and who are in the most immediate need. If the program were successful, it could be expanded to other parts of the state.

The bill would improve public schools by creating competition for students and student dollars, just as the private marketplace depends on competition to improve products and services. In every community that has adopted a school choice program, the nearby public schools have improved as a result. There is no reason why education should not be subject to the same competitive forces as other elements of the economy.

Education is personal, and no one is better qualified to determine what is best for a child than the child's parent. The bill would give parents the opportunity to make informed choices about the best educational program for their children. Even if some of the beneficiaries of the program would have attended private schools anyway, these families are taxpayers and should be able to benefit from taxpayer-supported education programs.

Schools that accepted vouchers would be subject to state testing requirements, and TEA would have the authority to investigate complaints or disputes and withhold funds from districts or schools that violated TEA rules governing the program.

## Opponents said

SB 422 would drain taxpayer dollars from public education when schools already face a budget crisis. Dollars siphoned for vouchers would be taken from funding that could pay for smaller classes, education for at-risk students, and higher teacher salaries. The state should not consider funding a voucher pilot program until it has committed to providing sufficient funding for public school students.

Texas school children are not trapped in failed neighborhood public schools. Only a handful of neighborhood schools have been rated low-performing for even two years. The consistently failing schools are charter schools, which are privately run using taxpayer dollars and already have cost the state more than $1 billion. The state's

experience with charter schools should prove that vouchers and alternatives to public education should be approached with caution.

SB 422 would make Texas the first state to devote significant public funding to private and parochial schools through a voucher program. Communities in other states that have experimented with voucher programs have had mixed results. Texas should not take the lead in using public funds on this educational experiment at a statewide level.

The program is likely primarily to benefit students who would have attended private schools anyway. In Washington, DC, only 433 students from public schools labeled as needing improvement applied for and received voucher funds through the nation's first federally funded voucher program. Nearly half of the students who applied for and received vouchers already were attending private schools. The bill offers opportunities for students to attend public school briefly to qualify for state funding that could then be used to finance private school education for the rest of the student's school years. This would result in a higher cost to the state than the bill's fiscal note estimates.

The bill would allow public money to go to private schools with very few of the controls governing public schools. While these schools would have to administer the TAKS test, the bill would include limited sanctions if the students did not perform well on the test and no real accountability for the expenditures of taxpayer dollars.

## Other opponents said

Vouchers should be considered only if the state adopts a constitutional amendment prohibiting the imposition of state regulations on private and parochial schools. Although the bill specifies that private schools would not be subject to state regulation, it would include testing requirements and authorize TEA enforcement actions against private schools in certain situations. Private and parochial schools should not participate in a program that would open the door to regulation by the state. The bill would open the door to court challenges on whether the teaching of religious topics in private and parochial schools violated constitutional prohibitions against state subsidies of religion.

The program unfairly would concentrate on five major urban districts, which would lose millions of dollars in state funding if a large number of students chose to participate. If vouchers are such a good idea, every district in the state should be required to offer this option and face the loss of state funds.

## Notes

The **HRO analysis** appeared in Part One of the May 23 *Daily Floor Report*.

SB 422 would have continued the TEA until September 1, 2017, repealed statutes requiring Sunset reviews for regional education service centers, and given TEA rulemaking authority for teacher certification. The bill would have authorized TEA to close low-performing charter schools, expanded the state's accreditation system, adopted safety requirements for athletic activities, and authorized administrative changes. HB 1116 by Solomons continues TEA until September 1, 2007, and authorizes a limited Sunset review of the agency.

SB 422 was amended in the House Public Education Committee to add a provision substantially similar to HB 1263 by Harper-Brown concerning a school voucher pilot program.



**Public Employees**

| HB 1795 | Crownover | Authorizing health savings accounts for state employees | 132 |
| * SB 1691 | Duncan | Revising TRS retirement and benefit plans | 134 |

# Authorizing health savings accounts for state employees

**HB 1795 by Crownover**
*Died in Senate committee*

**HB 1795** would have required the state Employees Retirement System (ERS) to offer health savings accounts (HSAs) for eligible individuals and their dependents, to fund or purchase at least one high-deductible health plan, and to provide information to eligible individuals about the option to participate in HSAs and high-deductible health plans. Each state agency would have had to offer employees the option of participating in the program.

To participate in the program, individuals eligible for group health insurance through ERS would have had to waive basic plan coverage and purchase a high-deductible health plan. For each participant and dependent, the state would have contributed annually the same percentage to a high-deductible health plan that it contributed for an employee or dependent covered by the basic coverage plan and, to the person's health savings account, an amount determined by ERS. Each participant would have had to contribute any amount required to cover the cost of participation in a high-deductible health plan that exceeded the state contribution amount.

ERS would have had to develop and implement the program in a manner that was as revenue-neutral as possible and would have had to develop enrollment requirements during 2005-06, with coverage beginning September 1, 2006.

## Supporters said

HB 1795 would let state employees take control of their own health care expenses and could help the state control the increasing cost of employee health insurance coverage. Texas could be a model for other states and private employers by offering employees this new health benefit option.

The bill could save the state money because employees who chose HSAs would enroll in high-deductible health insurance plans, which typically cost hundreds of dollars less in monthly premiums. While a portion of this cost savings would be passed on to the employee through funds deposited in the employee's HSA, the state's overall contribution for that employee's health insurance coverage still would be lower. There is no evidence to suggest that sicker people would not select HSAs over traditional health plans. While individuals with chronic conditions may not be able to build substantial savings, HSAs give everyone more choice and control over their health care decisions. Sicker employees still would have high-deductible insurance to cover health care costs after the deductible had been met. These employees could save money with HSAs because they would be able to use pre-tax dollars to pay ongoing health care costs.

State employees who chose HSAs likely would be more careful consumers of health care. Traditional health insurance plans tend to insulate patients from the cost of care because out-of-pocket costs such as deductibles usually are a small portion of the actual cost of care. A patient who is responsible for the full cost of health treatment would be more likely to question the cost of treatment and the necessity of particular procedures, which would help control overall health costs.

HSAs are a more attractive employee benefit than the TexFlex accounts the state now offers. TexFlex accounts allow employees to pay deductibles and other health care expenses with before-tax dollars but must be used up entirely from one year to the next. An employee who leaves state employment is not entitled to any remaining funds in a flexible health spending account. HB 1795 would offer the potential for the state to control health insurance costs so that it would have money to provide state employee salary increases in the future rather than the benefit cuts of recent years.

## Opponents said

HB 1795 could lead to higher costs for the state as a result of "adverse selection" that results when healthy employees leave a group insurance pool while sicker employees, who cost more to insure, remain. While healthy state employees would be likely to opt out of traditional health insurance in favor of HSAs, those with more illnesses probably would continue to choose traditional health insurance, raising the cost of this coverage for the state and for these employees. Even though the bill directs ERS to adopt a plan that is revenue neutral, the ERS actuary estimates that the cost to the state of this adverse selection would be $13.4 million between fiscal 2007 and fiscal 2010.

Any long-term savings to the state from HSAs likely would be the result of cost-shifting rather than lower health care costs. Employees could choose not to seek preventive care because they did not wish to drain money from their HSAs, which could lead to higher costs for more serious illnesses later. The HSA plan design would put the greatest burden on those employees who require ongoing care for chronic illness, such as diabetes or asthma. The state already offers employees a way to save money on deductibles and other health insurance costs through TexFlex accounts. Any money in these accounts that is not spent remains with the state, rather than being withdrawn when an employee leaves a job.

## Other opponents said

Offering HSAs to Texas state employees would be premature. The Legislature should postpone consideration of HSAs until at least next session, when more information will be available about the experience of public employers, particularly the federal government, in offering the option of HSAs to their employees.

## Notes

The House adopted an amendment to SB 1176 by Armbrister, generally effective September 1, 2005, making various ERS revisions, that would have required ERS to offer HSAs, but it was removed in conference committee.

The **HRO analysis** of HB 1795 appeared in the May 11 *Daily Floor Report*.

# Revising TRS retirement and benefit plans

**SB 1691 by Duncan**
*Effective September 1, 2005*

**SB 1691** includes changes concerning retirement eligibility, employee contributions and administration of the Teacher Retirement System (TRS).

Retirement annuities are based on the member's highest five years of salary rather than the highest three years. To be eligible for a partial lump-sum payment at retirement, the sum of the member's age and amount of service credit must equal the number 90. These provisions do not apply to a TRS member who, as of August 31, 2005, was at least 50 years old, whose age plus amount of service credit equaled 70, or had 25 years of service credit.

To be eligible for full retirement benefits, TRS members hired on or after September 1, 2007, will have to be 65 years old with five years of service or at least 60 years old and qualify under the "rule of 80" (age plus amount of service credit equals 80.) Otherwise, their annuities will be reduced in 5 percent increments for each year of age that they retire under age 60. The bill also repealed the option of purchasing additional service credit, known as "air time," for retirement eligibility.

SB 1691 also increases the amount that active employees must contribute to TRS-Care, the retiree health insurance program, from 0.5 percent of the employee's salary to 0.65 percent. School districts that hire retired TRS members must pay the difference between the amount the retiree is required to pay for TRS-Care and the full cost of that retiree's participation, as determined by TRS. This applies only to employees who were not on the payroll in January 2005.

For new members as of September 1, 2005, employers must pay the state's share of contributions to the TRS pension fund for the first 90 days of employment. A school district that hires a retired TRS member must pay TRS an amount currently equal to both the state's and employee's share of retirement contributions as if that person were an active employee.

The bill also amends statutes governing TRS administration and transfers responsibility for the health insurance passthrough for public school employees from TRS to the Texas Education Agency.

## Supporters said

SB 1691 would help improve the financial soundness of TRS and reduce escalating pressures on TRS that threaten the solvency of the fund. The bill also would improve the system's administrative efficiency and clarify the TRS board's authority to manage and protect pension assets.

Although TRS has experienced solid investment gains in recent years, the fund has about $11 billion less than the amount needed to pay current and future benefits to retirees. Under state law, TRS cannot increase pension payments to retirees unless the fund is deemed "actuarially sound," meaning that it is sufficiently funded to pay current and future benefits over the next 31 years. TRS needs to limit its costs in order to become actuarially sound so that it can provide annuity increases for current and future retirees. The bill would reduce future benefits for all current members by $1.5 billion, which in turn would reduce the state contribution rate that would be needed to make the fund actuarially sound from 8.11 percent to 7.01 percent. The cost of making the fund actuarially sound would be reduced by $250 million in fiscal 2006.

Current teachers, school employees, and retirees would not be affected by changes in retirement eligibility related to the rule of 80. These changes would be phased in over future years and would affect only new hires.

The bill would help reverse a trend toward early retirement that is beginning to have a significant impact on TRS. The average age of TRS retirees has dropped from 61.7 years in fiscal 1998 to 59.4 years in fiscal 2004, in part as the result of early retirement incentives such as the purchase of air time and retire/rehire. As the retirement age decreases, TRS faces significantly higher health insurance costs for retirees who are not yet eligible for Medicare, as well as the loss of employee contributions to the pension fund. Retirees should not be able to take advantage of these early retirement options while also expecting the state to shore up the pension fund. Changes should be made to discourage early retirement before the state commits to an increase in its contribution rates.

The bill would clarify the TRS board's authority as a trust to manage and protect pension assets by exercising authority over risk management, contract disputes, purchasing, contracting, administrative appeals, salaries and travel, and data management. These clarifications of board authority should raise awareness that TRS is distinguishable from state agencies. Provisions in the Texas Constitution and various statutes require that pension assets be held for the exclusive benefit of the members and cannot be diverted to other uses.

## Opponents said

SB 1691 would take benefits away from current and especially future retirees without making the pension fund solvent enough to provide annuity increases for current retirees. The real cause of the TRS solvency problem is that the Legislature over the past several budget periods has reduced its contribution rate from 8.5 percent to the constitutional minimum of 6 percent of payroll. The retirement restrictions in this bill would reduce the state contribution rate required to make the fund solvent but still would not commit the state resources necessary to make TRS fully funded and thereby allow a long overdue increase in retiree benefits. Instead of reducing retirement benefits, the Legislature should address the TRS solvency problem by increasing its share of payments to the pension fund.

The bill could increase costs for school districts by eliminating early retirement incentives, which were adopted to allow school districts to save money in salary costs for experienced teachers, and by requiring districts to pay pension benefits during the 90-day waiting period. The waiting period was supposed to be temporary to address the state's 2003 budget shortfall and should not be established as an ongoing expense for districts.

If the purpose of reducing benefits this session is to ensure fund solvency and provide future benefit increases, this should be clearly stated in the bill. Current and future TRS members should be guaranteed annuity increases if the fund is deemed actuarially sound.  Also, the bill would not address the problems of TRS-Care, the retiree health care plan, which is still underfunded and structurally unsound.

## Notes

The **HRO analysis** appeared in the May 22 *Daily Floor Report*.

A related bill, HB 1579 by Kolkhorst, et. al., was amended in the Senate to establish a minimum retirement age of 60 for certain TRS members. This provision would not have applied to members who, as of August 31, 2005, were 50 years old, met the rule of 70, or had 25 years of service credit. The bill died on the Senate floor after failing to receive a two-thirds majority needed to consider the bill.



# Taxation & Revenue

HB 3 (2)   J. Keffer   Restructuring the Texas tax system   137
HB 5   Krusee   Indexing gasoline taxes to inflation   141
HB 9   Flores   Authorizing video lottery terminals and casino gambling   142
HB 879   Madden/   Authorizing sale of local governments' tax receivables   144
  SB 447   Janek
HB 1006   Isett   Lowering the rollback tax rate and setting notification requirements for
taxing units   145
HJR 35   Bohac   Authorizing a 5 percent cap on real property appraised value increases   147

# Restructuring the Texas tax system

**HB 3 by J. Keffer, Second Called Session**
*Died in the House*

**HB 3**, as reported by the House Select Committee on Property Tax Relief, would have reduced school property taxes through offsetting increases in state taxes and fees.

*Property tax rate reduction.* HB 3 would have set the maximum ad valorem tax rate for school districts at $1.25 per $100 of taxable property in the 2005 tax year and $1.21 beginning with the 2006-07 school year. It also would have permitted an additional tax of up to 15 cents for enrichment, if authorized by an election.

*Ongoing property tax rate buy-down.* The bill would have dedicated to reducing school tax rates each biennium 15 percent of any increase in the comptroller's biennial revenue estimate plus the amount distributed for property tax reduction in the previous biennium, ultimately reducing school property taxes to a floor of 75 cents per $100 of taxable value. It also would have dedicated any funds in excess of the anticipated amount raised by HB 3 to the school property tax relief fund.

*Increasing the homestead exemption.* HB 3 would have increased the homestead exemption for public school taxation purposes for residential property from the current $15,000 to $22,500, if voters had approved HJR 12 by J. Keffer, an accompanying constitutional amendment. The tax freeze amount for elderly or disabled homeowners would have been adjusted to reflect the additional homestead exemption in 2006 and any proportionate change in school property tax rates.

*Franchise tax.* The franchise tax would have been applied to a corporation holding an interest in a partnership doing business in Texas. A partner in an upper-tier partnership would have been considered a partner in each lower-tier partnership of the organization for the purposes of the franchise tax. Taxable earned surplus under the tax would have included a corporation's share of the gross receipts of each partnership or joint venture in which the corporation directly or indirectly owned an interest.

*Sales tax.* The state sales and use tax rate would have increased from 6.25 percent to 7 percent, and the rate on motor vehicle and boat sales would have increased from 6.25 percent to 7 percent. The tax base would have been broadened to include computer program repairs and motor vehicle repairs. The timely filer deduction would have been repealed.

*Standard presumptive value.* A system would have been established to use the standard presumptive value of a vehicle to assess the state sales and use tax on the purchase of a vehicle.

*Tobacco taxes.* The bill would have raised taxes on all tobacco products, including an increase of the cigarette tax from 41 cents to $1.41 per pack.

*Radioactive substances fee.* A fee of 10 percent would have been levied on the gross receipts of a permit holder from the storage and disposal of radioactive substances. Of this fee, 8 percent could have gone to the general revenue fund and 2 percent would have gone to the county in which the facility was located.

*Collection of state delinquent obligations.* Third-party collection of delinquent state debt could have been contracted by the attorney general under certain conditions.

## Supporters said

HB 3 would provide meaningful property tax relief to Texas citizens while ensuring that more Texans paid their fair share for the public services they enjoy. Any net revenue increases in the bill would be offset entirely by a reduction in the maximum school district maintenance and operations ad valorem tax rate. This rate reduction would lessen the burden of an onerous tax that increasingly has consumed household incomes and business profits.

*Property tax rate reduction.* Property taxes have increased dramatically in recent years, and a reduction in the school property tax rate to $1.21 or less would provide meaningful relief to all Texans. A higher sales tax would partially be offset by the property tax reduction because consumers would see lower prices for goods and services made possible as businesses realized the property tax savings under this bill.

Under HB 3, the state share of public education funding is projected to reach about 55 percent, compared to less than 40 percent in the current system. New state taxes would replace school property taxes, and a lower cap on school property taxes would prevent school districts and the state from becoming overly dependent on increases in local property values for school funding. This change would bring more equity to the state's school finance system because districts would be less dependent on local property bases of widely varying value, and a larger share of education dollars would flow through the state funding formulas.

***Ongoing property tax rate buy-down.*** Texas should develop a mechanism to continue lowering school tax rates and increasing the state share of education costs, thereby promoting greater equity. HB 3 would ensure that if the state's finances improved or new state tax efforts raised more money than expected, continued school tax rate reduction would be the top priority. A wide range of interests compete when the state has additional money. Requiring that a portion of any revenue increase go toward reducing the school tax rate would put property tax reduction at the top of the priority list, while preserving most of any state revenue increase for other priorities, including increases in education spending.

***Increasing the homestead exemption.*** By increasing the homestead exemption, HB 3 would provide property tax relief that particularly would benefit low- and middle-income homeowners. The proposed amendment would result in a proportionately larger tax cut for people who own less valuable homes and who would be less likely to receive significant savings from any school-tax rate reductions. In this way, an increase in the homestead exemption would help offset increases in sales and other consumer taxes.

***Franchise tax.*** By closing the current "Delaware sub" and "Geoffrey" loopholes, HB 3 would address a serious shortcoming with Texas' largest business tax. The franchise tax has proven to be a stable source of revenue and has weathered well, even during economic downturns. The primary problem with the current tax is that many businesses have been able to reorganize as partnerships in order to avoid the tax. Many large, profitable businesses such as Dell and SBC do not pay the tax. These and other companies rightly would be drawn into the franchise tax under HB 3, reinforcing this revenue stream.

Retaining the current franchise tax and closing its loopholes would be a better option than other business tax proposals. The franchise tax is a well established source of revenue that the state has relied upon for decades. A new business tax on payrolls or gross receipts that applied to all income-producing entities could cause a serious disruption in the state's economy, potentially harming investment or exacerbating unemployment. Further, given the constitutional prohibition against the taxation of personal income, any payroll-based tax or tax on sole proprietors almost certainly would be challenged in court and could be ruled unconstitutional. Given these uncertainties, it would be imprudent for the state to rely upon an unproven and potentially unconstitutional system of business taxation to fund vital government services.

***Sales tax.*** Sales taxes remain one of the most stable and reliable revenue sources, tracking a wide variety of economic activities in the state conducted by both individuals and businesses. The general sales tax rate has not increased in 15 years, and the vehicle sales tax rate has not increased in 14 years. A 0.75-cent sales tax rate increase still would give Texas a maximum combined sales tax rate lower than eight other states, including neighboring Louisiana, Arkansas, and Oklahoma. Texas' average combined rate likely would not be significantly higher than those three bordering states.

Sales taxes mostly are discretionary. They derive revenue from purchasing decisions that businesses and individuals can choose not to make. The regressiveness of sales taxes compared to other taxes is exaggerated. It is mitigated in Texas by numerous exemptions or exclusions on necessities (e.g., groceries, medicine) or goods and services with great social or economic benefits (e.g., child care, advertising).

The state is facing a property tax crisis that could be mitigated by this modest sales tax rate increase and base expansion. Any new taxes levied in the bill are necessary to provide meaningful property tax relief to Texas citizens. Texas families and businesses are burdened with some of the highest property tax bills in the nation, and this relatively modest shift in state sales tax policy would generate revenue that could be refunded to taxpayers, benefiting the state and its economy.

***Standard presumptive value.*** HB 3 would give state and local authorities the tools to collect vehicle sales taxes that already should be paid. Currently, no mechanism exists to ensure that people who transfer titles on used vehicles accurately state the sales price. This bill would allow the state to gain significant additional revenue from improved collection of the sales tax on automobiles.

***Tobacco taxes.*** Increasing taxes on cigarettes and other tobacco products would provide government with a reliable revenue stream while reducing tobacco use, saving lives, and lowering health care costs. While tobacco is an addictive product that many customers will continue buying

regardless of price hikes, tobacco taxes still are a self-assessing user fee on discretionary consumption. No one is forced to start smoking, and ample resources are available to smokers who wish to quit for health or economic reasons. Avoiding the tax is a matter of individual choice.

Higher tobacco taxes would help the state recoup some of its tobacco-related health care costs by discouraging smoking among Texans, particularly among price-sensitive young people. For example, the American Cancer Society estimates that Texas eventually could save up to $1 billion a year in Medicaid expenses and up to $10 billion overall by raising the rate $1 per pack. Tobacco tax revenue need not be dedicated to health care programs because under the Texas tobacco settlement, the tobacco industry already provides funding for this purpose.

## Opponents said

HB 3 is an unfair bill that would benefit only the state's wealthiest citizens while hiking taxes for the vast majority of Texans without generating any net increase in revenues to fund the state's many unmet needs. With the bill's heavy reliance on sales and consumption taxes, only families with incomes greater than $100,000 would benefit from the bill, with the wealthiest 10 percent benefiting by far the most, according to the Legislative Budget Board's tax equity note.

*Property tax rate reduction.* While HB 3 would lower school property tax rates, this would amount to a "tax shift" rather than a true tax cut. The property tax cuts in HB 3 would be achieved not by fiscal restraint and improved efficiency but by creating new taxes and raising existing rates. Merely reshuffling the tax burden in the state would make little economic sense.

HB 3 would raise taxes for the majority of Texans in order to reduce school property taxes primarily for the benefit of the wealthiest. This property tax cut largely would be funded through an increase in the state sales tax to 7 percent, a rate that would make Texas' rate among the highest in the nation. The Legislature should try to reverse what already is a regressive tax system rather than move the state even further in the wrong direction.

*Ongoing property tax rate buy-down.* This proposal would create a budget structure at odds with the state's economy by dedicating 15 percent of any state revenue growth to replacing school property taxes before the Legislature even had the opportunity to review state spending needs and priorities for the next biennium. The primary drivers in the state budget are not new programs but population growth and inflation.

This provision would deplete growth in state finances and become a fiscal albatross in periods of static or declining revenues. It would require the comptroller to distribute 15 percent of the increase in state revenue plus the amount distributed in the preceding biennium. This would be an ever-increasing portion of new state revenue going toward property tax reductions rather than other state needs. Without an overall cap on the percentage or amount of new revenue tied up by this buy-down provision, legislative budget writers could be forced into a fiscal strait jacket even as population demands rose and costs increased.

*Increasing the homestead exemption.* Increasing the homestead exemption would benefit only a limited group of property tax payers. Businesses, which shoulder more than 40 percent of property tax payments in Texas, would receive no benefit from the higher exemption because it would apply only to homestead residences.

HB 3 would result in only a short-term gain for homeowners who in a few years could see any reduction eclipsed by rising appraisals. When the homestead exemption was increased in 1997, homeowners barely noticed the change because any benefits from the increased exemption quickly were offset by rising appraised values and increased taxes. As appraised values continue to increase, most homeowners would be unlikely to experience any long-term tax savings from this homestead exemption increase.

*Franchise tax.* By retaining the inequitable and problematic franchise tax, HB 3 would squander an important opportunity to truly revamp the state's outmoded system of business taxation. Even with the closure of current loopholes, the base of the franchise tax would be very narrow, and the tax would continue disproportionately to burden capital-intensive industrial and mercantile enterprises. The state's rapidly growing service and information economy largely would continue to escape taxation.

Art. 8, sec. 24(a) of the Texas Constitution requires a binding statewide referendum on any law that imposes a tax on net income, "including a person's share of partnership and unincorporated association income." This provision could lead a court to declare the provisions of HB 3 unconstitutional in the likely event that they were challenged. For this reason, the franchise tax expansion in the bill should be put to a public vote in accordance with the Constitution. Such a vote would clarify the will of the electorate with regard to taxation of businesses and individuals in the state.

*Sales tax.* Sales taxes are notoriously regressive. They have a greater proportional impact on low- and moderate-income taxpayers than on the affluent, who better can absorb increases in the costs of goods and services caused by higher sales taxes. In the current school finance context, it would be poor public policy to use such hikes to relieve the tax burden on a smaller segment of the overall tax base – i.e., property owners – by shifting more of the tax burden to the more numerous and already overburdened sales tax payers.

Consumers in Texas' still shaky economy would have to pay state sales tax at a rate of 7 percent and absorb a sales tax rate increase of 12 percent. Texas would be tied with Tennessee, Mississippi, and Rhode Island for the highest state sales tax rate in the nation, and all four states that border Texas would have lower state rates. Texas' average combined state and local sales-tax rate likely would be near 8.7 percent, second only to Tennessee and higher than all bordering states, with the rate in most urban areas as high as 9 percent.

Service industries constitute a high-growth sector of the state's economy that is not paying its fair share. It would be unfair to increase the burden on a few consumers but not on those of a huge segment of the economy.

*Standard presumptive value.* This bill would put tax assessor-collectors in the position of policing a tax collection program for which they might not be qualified, a change that would create greater inconvenience for sellers and buyers. A clerk would have to spend 15 minutes or more to research values not included in the system before processing the transfer application. Tax-assessor offices typically are the busiest during the first and last five days of a month, and the delays caused by this bill could push lines out the doors.

*Tobacco taxes.* Raising tobacco taxes to enhance revenue is not sound fiscal policy. Tobacco use, particularly smoking, already is declining, which has led to an average annual revenue decrease of 2 percent (inclusive of population growth), according to the Comptroller's Office. Funding for crucial governmental functions should not be dependent on a shrinking revenue source.

Raising tobacco taxes would force a narrow class of taxpayers to subsidize a public good to a greater degree than other taxpayers. Smokers already are taxed at the state and federal levels and indirectly through the tobacco settlement. In addition, cigarette taxes are regressive because they charge all smokers the same rate, regardless of ability to pay. A tax increase would disadvantage lower-income smokers, particularly young smokers, to a greater degree than higher-income smokers.

A $1-per-pack rate hike on cigarettes would be a 244 percent increase that would put Texas at a competitive disadvantage with regard to its neighboring states, all four of which would have substantially lower rates. It would increase black-market trade and encourage out-of-state shopping, especially on Indian reservations, in duty-free shops in Mexico, and over the Internet.

## Notes

The **HRO analysis** of HB 3, second called session, appeared in the July 26 *Daily Floor Report*. Similar revenue bills considered by the 79th Legislature also were designated as HB 3. The HRO analysis of HB 3, regular session, appeared in the March 9 *Daily Floor Report*. The HRO analysis of HB 3, first called session, appeared in the July 6 *Daily Floor Report*.

# Indexing gasoline taxes to inflation

**HB 5 by Krusee**
*Died in House committee*

**HB 5** would have adjusted the gasoline tax rate and diesel fuel tax rate of 20 cents per gallon by the percent increase or decrease in the Consumer Price Index of the preceding state fiscal year. The adjustment in the tax would have been made by the Legislative Budget Board (LBB) by September 1 of each year.

## Supporters said

HB 5 would address the fact that inflation has eroded the state tax on gasoline and diesel fuel. Currently, the tax on gasoline is defined in statute at a rate of 20 cents per gallon, which has not changed since 1991. A fixed tax on the amount of fuel sold does not take into account inflation that has occurred since 1991. Consequently, in real dollars, the gasoline tax does not provide as much revenue as it did when it was set originally. Indexing the tax to inflation would prevent further erosion of this important revenue source, which helps fund the transportation infrastructure and public school system of Texas.

Because the Consumer Price Index is a general measure of prices paid by consumers, it would be an appropriate measure with which to account for rising costs in addition to rising incomes. While gas prices are volatile, the Consumer Price Index is comparatively stable, fluctuating gradually over time. While inflation may be imperceptible on a day-to-day basis, the cumulative effect of the value of money over several years can be significant. A gasoline tax that was indexed to inflation would not lead to a drastic increase in the cost of gasoline in Texas, but it would ensure over the long term that the integrity of this important revenue source was maintained.

It is misleading to characterize an indexed gasoline tax as a tax hike, as the tax actually would decrease when the Consumer Price Index declines.

## Opponents said

HB 5 would authorize an ongoing gasoline tax increase at a time of painfully high fuel prices. With gasoline prices in Texas approaching $3 per gallon, now is not the time for legislation that would require the LBB to calculate an increase in gasoline prices every year based on the Consumer Price Index.

The Consumer Price Index would not be an appropriate measure by which to index gasoline prices. The index bears limited relation to transportation and education costs on which gas tax revenue must be spent. Further, in a deflationary economic context, revenue from the indexed tax would decrease even as transportation and education expenses might remain constant or increase.

## Other opponents said

While the relative value of the gasoline tax has eroded since 1991, indexing the tax to the Consumer Price Index would be an inappropriate means of dealing with the problem. The proper, accountable way to adjust the tax would be for the Legislature to vote for a direct increase in the amount of the tax. Given the fluctuations that consumers are subject to at the pump and the variations in state government revenue and expenditures, the best way for the Legislature to deal with the gasoline tax is on a regular, biennial basis.

# Authorizing video lottery terminals and casino gambling

**HB 9 by Flores (and numerous other bills)**
*Died in House Committee*

**HB 9** would have authorized the operation of video lottery terminals (VLTs) at racetracks and on the lands of the state's three federally recognized Native American tribes. It also would have authorized casino gambling at these locations and up to 12 other locations throughout the state. The bill would have created the Texas Gaming and Boxing Commission to oversee and manage the state lottery, VLTs, casino gambling, bingo, pari-mutuel racing, and boxing. These provisions would not have taken effect without approval of a constitutional amendment authorizing VLTs and casino gambling.

VLTs could have been operated, under licenses issued by the commission, at Class 1 or Class 2 horse racetracks and greyhound tracks with a license or an application for a license in effect on June 1, 2005. VLTs could have been operated by the Ysleta del Sur Pueblo (Tiguas) tribe, the Alabama-Coushatta tribe, and the Kickapoo Traditional Tribe of Texas. VLTs would have been controlled through a central system linked to the individual terminals.

The bill would have authorized the commission to award up to 12 licenses for casinos at which gaming could have been conducted. Voters in a county would have to have approved the constitutional amendment authorizing casino gaming before one of these 12 licenses could have been issued. In addition, authority to operate casinos could have been given to persons with Class 1 and 2 horse track or greyhound track licenses or applications in effect on June 1, 2005, and to the state's federally recognized Indian tribes.

The state would have received 30 percent of net terminal income from all VLTs not on Indian lands, and the location would have received the remaining 70 percent. Income from VLTs operated on Indian lands under a gaming agreement would have been distributed as authorized by that gaming agreement. Racetracks would have been required to allocate a percentage of their share of net terminal income to a purse fund for race winners.

Casinos would have had to pay a tax of 15 percent of their gross gaming revenue. Five-sixths of the tax would have gone to the state. The remaining one-sixth would have been split between the city and county where the casino was located. One-tenth of 1 percent of the state revenue would have been allocated for a compulsive gambling program.

## Supporters said

Authorizing VLTs and limited casino gambling could raise significant revenue that could be dedicated to public education, other state programs or property tax relief without raising taxes. The bill would allow VLTs at established racetracks already engaging in gaming and allow 12 highly regulated and tightly controlled tourist-destination casinos.

VLTs as authorized by HB 9 would generate about $1.5 billion per year in state revenue and about 26,000 additional permanent jobs. These estimates already account for possible revenue losses from other gaming activities and the sales tax, and studies have shown that social costs do not exceed the economic benefits of gaming. Since playing VLTs is purely voluntary, the money collected for the state should not be considered a tax.

Any social costs related to gambling already exist because Texas currently allows numerous other forms of gaming, and Texans routinely travel out of state to gamble. Authorizing VLTs in Texas would not significantly increase pathological or problem gambling, which appears to be fairly rare, potentially afflicting only about 1 percent to 5 percent of the population by some estimates. It is unfair to penalize the large majority of Texans who are not compulsive gamblers for the problems experienced by a few. Playing VLTs would be a strictly voluntary form of entertainment and would victimize no one. Some studies have shown that social costs, including crime, can actually decrease after gaming is introduced.

In addition to directly adding dollars to the state coffers, VLTs and casinos would help stimulate the Texas economy and increase tourism. While shifts in the economy and jobs may occur as some entertainment or discretionary money is spent on VLTs, there still would be a net gain to the Texas economy. It is estimated that Texans lose about $1 billion annually gambling on electronic gaming machines in other states, and some of these funds could be spent in Texas if VLTs are approved.

Gambling is an increasingly popular form of entertainment, and it would be appropriate to let voters decide whether to amend the Constitution to allow VLTs and casinos in the state. As in any business, growth in the gaming industry is driven by consumer demand.

It is a myth that Texans oppose gambling. In an autumn 2004 Texas Poll, 72 percent of those surveyed favored legalizing state-taxed video lottery terminals at Texas' horse and dog tracks to help fund public schools. Voters already have approved numerous other gaming opportunities, including the lottery, bingo, and pari-mutuel wagering.

Authorizing VLTs actually could help combat the expansion of unregulated, illegal gambling that occurs throughout the state using "eight-liners." With the clearly legal option of playing state-regulated VLTs that return a high percentage of wagers, bettors likely would forego eight-liners for VLTs.

## Opponents said

Authorizing VLTs and casino gambling would not generate significant revenue for the state, would damage the economy, and would expand gambling to the detriment of Texas. Estimates of the potential tax revenue gain from VLTs are overblown and the costs, which often prove to be higher than the revenue generated, are underestimated. Every dollar gained for the state is offset by costs due to regulation, lost state revenue, and social costs.

Gambling will not solve Texas' fiscal problems, as the lottery and pari-mutuel racing have shown. While state gambling revenue can fluctuate greatly, at best it would raise only a fraction of the revenue needed to meet the state's public education needs.

Unlike most other forms of entertainment, gambling imposes high social costs. It can undermine the work ethic and be highly addictive, with studies indicating that as many as 5 percent of adults may be problem or compulsive gamblers. VLT machines can be especially seductive and damaging because they offer bettors speed, convenience, and repetition, leading some to refer to these machines as the "crack cocaine" of gambling.

State and local economies could suffer if VLTs were authorized in Texas and Texans spent their money at VLTs instead of at local restaurants, theaters, or retail stores or on other taxable gambling activities. Some Texans spend money gambling out of state while traveling for other reasons, and the authorization of VLTs would not necessarily keep these dollars in Texas. The state should not use VLTs as a way to support the agricultural industry or to prop up foundering horse and dog tracks that have never produced the rosy revenue estimates touted by their supporters.

Allowing casinos in Texas and introducing tens of thousands of VLTs at Texas racetracks – or anywhere else in the state – would be a significant expansion of gambling. It is unsavory and immoral to finance essential state services such as public education through expanded gambling.

Texans do not overwhelmingly support gambling. Those surveyed in a February 2003 Texas Poll were divided evenly on the question of whether video slot machines that take bets and pay prizes should be legal in Texas. Only 45 percent of those surveyed said they should be legal, while 46 percent said they should be banned. While some respondents said they supported the legalization of casinos, 43 percent opposed it with 4 percent undecided, statistically very close to an even split of opinion in a poll with a margin of error of plus or minus 3 percent.

## Notes

Numerous bills and constitutional amendments to authorize VLTs and casino gambling were introduced during the 79th Legislature. They would have taken a variety of approaches, including approving VLTs at racetracks and other locations, authorizing casino gambling, and authorizing electronic gambling on cruise ships. The bills and resolutions also varied in the amount of money that would go to the state or local governments, with some dedicating the money to specific purposes, and in their designation of whom would oversee the gaming. None of the bills or resolutions were reported from committee.

# Authorizing sale of local governments' tax receivables

**HB 879 by Madden/SB 447 by Janek**
*Died in the House/Died in the House*

**HB 879** would have authorized local governmental entities – municipalities, counties, school districts, special-purpose districts and authorities, or other political subdivisions – to sell their tax receivables under their own terms and conditions, including the price at which the tax receivable was offered. The holder of a tax receivable certificate would have been entitled to proceeds from the sale or resale of property sold in a lien foreclosure lawsuit.

Sale proceeds of tax receivables could not have been included in calculations of local governmental entities' effective tax rates or rollback rates. Tax receivables sold by a school district would have been required to meet a minimum price of 95 percent of the outstanding principal for receivables delinquent less than one year, 90 percent for receivables delinquent between one year and two years, and 75 percent for receivables delinquent more than two years.

Amounts to be sold could have included the original amounts of delinquent property taxes plus any unpaid penalties and interest through the date of sale and the original amounts of delinquent assessments or other charges plus any unpaid interest through the date of sale. Interest and penalties would have continued to accrue on the unpaid original tax amount after the sale of delinquent property tax receivables. Sales could have been negotiated or made through competitive bidding or negotiated sale and would not have affected existing relationships with private tax collectors. A local government could not have sold a tax receivable to a private individual under contract to collect the tax or enter into such a contract with the purchaser of a tax receivable.

If a property owner paid in full prior to the date of the sale, the sale could not have proceeded. The local government entity could have postponed or canceled a sale and would not have been liable for any resulting damages. A purchase and sale agreement would have had to include the purchase price and any contingency amounts, as well as a waiver of liability for the local government against damages from failure to collect delinquent taxes. The agreement could not have required local governments to prohibit paying delinquent taxes in installment, nor could it have interfered with contracts for performance of services in lieu of taxes or with individuals' rights to defer or abate a delinquent tax lawsuit. The agreement could not have demanded different collection standards than are customary.

## Supporters said

HB 879 would make the budgets of local governmental entities, especially school districts, more certain. Allowing local governments to sell their delinquent tax rolls would help improve their fiscal stability as they would realize the value of the sale immediately, rather than projecting the collection of delinquent taxes that might never be paid. Approximately 30 states already allow this type of financing.

When the receivables are sold, the local government realizes the income, and the receivables move off the local government's books. This reduces risk for the local government because it no longer matters to the local government if the tax is ever paid. All risk is borne by the purchasers.

## Opponents said

The authority to sell tax receivables could encourage local government entities to undersell their tax rolls for ready cash in a pinch. Across the state, local governments have experienced budget problems, and this new tool could seem like a windfall. Instead of conducting a thorough financial analysis of the potential lost tax revenues in relation to the cash generated by a sale, local governments could be tempted to rush forth with a sale of all outstanding tax receivables.

Local tax delinquency rates rarely exceed 3 percent, and most of that amount is collected the next year. So local governments would have relatively small and difficult accounts to sell, many of which would be bankruptcies or businesses that had closed. School districts would benefit only if they could anticipate that their collection rates were going to decline.

## Notes

The **HRO analysis** of HB 879 appeared in Part One of the May 12 *Daily Floor Report*, and the analysis of SB 447 appeared in the May 17 *Daily Floor Report*.

# Lowering the rollback tax rate and setting notification requirements for taxing units

**HB 1006 by Isett**
*Died in conference committee*

**HB 1006**, as passed by the House, would have lowered the maintenance and operations (M&O) rollback rate for taxing units from 8 percent to 5 percent above the effective tax rate. It would have required that a rollback election petition be signed by at least 10 percent of registered voters who voted in the last gubernatorial election rather than 10 percent of all registered voters.

The bill would have required all taxing units to publish notice of any increase above the effective tax rate. In addition to notifying the public, taxing units that levy property taxes in excess of $5 million would have been required to call a public hearing on any proposed increase beyond the effective rate. If a taxing unit failed to hold a required hearing, the tax rate would have reverted to the effective tax rate. After the hearing, the taxing unit would have been required to issue another public notice on the time and date of the taxing unit's subsequent vote on the tax rate. If the taxing unit did not adopt a tax rate greater than the effective tax rate by the 14th day after the public hearing, it would have been required to issue another notice announcing when and where it would vote on the tax rate increase.

The bill also would have allowed, via petition of 10 percent of registered voters, a taxing unit to increase its rollback rate up to a maximum of 1.08 times its effective rate when it needed the revenue to comply with unfunded state mandates.

## Supporters said

HB 1006 would hold local governments more accountable for proposed tax increases. By lowering the rollback rate, the bill would help ratchet down tax increases due to skyrocketing appraisal values. While the bill could raise city and county costs by increasing the frequency of rollback elections, it is more important to provide long-term taxpayer relief by keeping property taxes under control. The cost of such elections is far less than the exponential growth of property taxes.

The bill also would strengthen the truth-in-taxation provisions by requiring a local taxing unit to notify the public of any proposed increase beyond the effective rate. Taxpayers would benefit from this more transparent approach because local officials would have to expose any proposed increase beyond the effective rate to a process that ensured public participation. Local governments would have to justify any increase in revenue they sought without simply relying on increases in appraised value to automatically boost revenue.

Cities and counties would not fiscally be constrained by HB 1006. A 5 percent rollback rate would allow taxing units to collect adequate revenue while accounting for inflation, which averages between 2 percent and 3 percent nationally. Local taxing units already are familiar with rollback procedures and work to ensure financial efficiency, and if a rollback election were called, voters still could approve rate increases when local governments justified higher spending or when voters authorized the increase to cover the costs of a state mandate.

## Opponents said

Basing rollback petition requirements on a percent of registered voters who voted in the last gubernatorial election would destabilize city and county governments. Voter participation fluctuates greatly between elections and across the state. In areas of low voter participation in the gubernatorial election, very few signatures would be needed for a rollback petition. The bill would allow a small minority of voters to override local policy decisions, which would force many local governments to implement tax rates that did not represent the will or needs of the majority. With minimal petition requirements, more rollback elections would take place, costing local governments time, effort, and money.

Lowering the rollback rate to 5 percent would decrease property tax revenues at a level below the annual rate of municipal inflation. Municipal costs rise at an average rate of nearly 6 percent, which is double the overall rate of inflation. To compensate, cites and counties would be forced to increase sales taxes and impact fees and rely more on debt financing to avoid rollback elections.

Cities and counties are entrusted by voters to provide growing populations with quality, essential services. At the same time, they must be responsive to unfunded state mandates, public safety, and emergencies. When the public demands expanded or improved services, local governments cannot always avoid increased taxes. Current law provides a sensible compromise between the needs of local governments and taxpayers. The built-in buffer of a 3 percent increase beyond the effective rate allows local taxing entities to handle routine adjustments for higher property values while keeping local governments accountable to citizens for larger increases, with an 8 percent increase triggering a possible rollback election if only 10 percent of registered voters petition to hold one.

## Other opponents said

Proposed tax rates that exceed the rollback rate should trigger automatic elections rather than require voters to petition for a rollback election. Automatic elections would require taxing units to justify directly to the voters any significant revenue increase purely derived from higher property values.

While HB 1006 would strengthen "truth in taxation," and soften rollback petition requirements, it would not protect taxpayers from sharply increasing appraisal values. The current 10 percent cap on appraised value increases should be lowered. This method would be a more effective constraint on local taxing units benefiting from a revenue windfall from rising property values than merely requiring them to follow a few extra procedures before they adopt tax rates above the effective rate.

## Notes

The **HRO analysis** appeared in Part One of the April 21 *Daily Floor Report*.

Under HB 1006 as introduced, an increase of 3 percent or greater in the effective tax rate automatically would have triggered a rollback election without a voter petition.

The committee substitute of HB 1006 would have set the rollback rate at 3 percent and established a "super-rollback rate" for an increase of 5 percent or greater in the effective tax rate. If a taxing unit adopted a rate above the rollback rate, a petition calling for a rollback election would have required the signatures of at least 10 percent of registered voters who voted in the last gubernatorial election. If a taxing unit adopted a rate above the super-rollback tax rate, a petition calling for a rollback election would have required the signatures of at least 5 percent of such voters.

While HB 1006 died in conference committee, two related bills were enacted by the 79th Legislature.

SB 567 by Deuell, effective June 17, 2005, requires a governing body of a taxing unit or a school district to add budget and appraisal value information to the notification of a public hearing on a tax increase above the effective tax rate. The notice must include the annual difference, expressed as a percent increase or decrease, in the amount budgeted for M&O, debt service, and total expenditures. It also must include the total appraised value and taxable value of all property and all new property within the taxing unit, as well as the total amount of unpaid bond debt.

SB 18 by Williams, effective June 18, 2005, requires a taxing unit to notify the public and hold two public hearings in different weeks on any increase beyond its effective rate. The difference between the proposed rate and the effective rate, among other information, must be included with the notification and must be posted on the taxing unit's web site, if one exists. The bill also changes the petition requirement for a rollback election following the adoption of a tax rate that would impose M&O taxes in excess of $5 million. Signatures of 7 percent of registered voters, rather than 10 percent, are required to trigger a rollback election.

# Authorizing a 5 percent cap on real property appraised value increases

**HJR 35 by Bohac**
*Died in the House*

**HJR 35** would have amended the Texas Constitution to authorize the Legislature to set the maximum increase on annual taxable appraised value as low as 5 percent and apply it to all real property. The Constitution currently allows the Legislature to cap the annual appraised value increase at 10 percent or more for residential homesteads only.

## Supporters said

Homeowners no longer can sustain annual increases in their property tax bills due to rising values, despite the 10 percent cap on annual growth in taxable appraised value. In 1997, the Legislature approved significant property tax relief by increasing the value of the mandatory homestead exemption. Few homeowners realized any benefit, however, because the savings were consumed by rapid growth in appraised values that primarily drove up school property tax bills. The appraisal cap should be lowered to curtail the ability of local government to passively raise and spend more money merely because appraised values increased. Lowering the cap would continue helping homeowners living in areas with rapidly appreciating property values level out their property tax payments to make it more affordable to remain in their homes. Higher values still would be taxed, but increases would be spread out more reasonably to avoid the sharp increases seen under the current cap.

Extending the cap to business property would encourage economic growth. Failure by local governments to rein in property tax growth exceeding inflation or income growth has hurt the state's economy. Managing appraisal growth would attract business investments as well as help keep home ownership affordable as the housing market continued to thrive. Caps are wisely used in 14 other states, and lowering the permissible appraisal cap to 5 percent would give Texas a competitive advantage over neighboring states.

Appraisal caps do not interfere with local government spending or revenue streams. They merely balance local jurisdictions' need for additional resources with taxpayers' need for protection against surging tax bills. Taxing entities would be able annually to increase the appraised value of property by up to 5 percent and would continue raising substantially more money each year without changing their tax rates.

## Opponents said

Appraisal caps interfere with real estate market forces and create artificial levels of taxable property value that distort the market value appraisal standard. Caps inhibit government's ability to provide public goods and services and respond to external factors such as population growth, recession, and emergencies. The existing 10 percent cap took nearly $11 billion in residential property value off the tax rolls in 2003, according to the comptroller – $2.4 billion in Houston alone. Lowering the cap and extending it to all real property would make matters considerably worse.

Any tax limitation disproportionately benefits owners of more expensive property. Because high-end property value growth tends to exceed cap levels more than lower-end property, appraisal caps, even at 10 percent, shelter a greater amount of expensive property's taxable value, which benefits its owners to the detriment of all others. Lowering the cap to 5 percent only would exacerbate the inequity.

Because the cap is removed when property sells, property taxes on newly purchased real estate may be much higher than identical real estate nearby, depending on the sales price and the age and value trends of the area. Consequently, inequities arise among various segments of property owners – lowering the cap only would exacerbate this inequity.

## Other opponents said

The limitation on appraisal increases should be reduced lower than 5 percent to ensure meaningful property tax relief and protect against "appraisal creep." Also, while appraisal caps should be lowered, they should continue to apply only to residential property. Business's share of property taxes has been declining steadily since 1982, and they do not need further relief in the form of an appraisal cap.

## Notes

The **HRO analysis** of HJR 35 appeared in the April 12 *Daily Floor Report*. HB 784 by Bohac, the enabling legislation for HJR 35, was recommitted to committee on April 14.

**T**

**Transportation**

| | | | |
|---|---|---|---|
| HB 1347 | Isett | Repealing authority to use red-light cameras and to civilly enforce traffic offenses | 149 |
| * HB 1546 | McClendon/ | Creating the Texas Rail Relocation and Improvement Fund | 151 |
| * HJR 54 | McClendon | | |
| * HB 2337 | Corte | Image verification system for issuance of driver's licenses | 152 |
| * HB 2702 | Krusee | Trans-Texas Corridor revisions and toll road conversion restrictions | 154 |
| * SB 1257 | Lindsay | Prohibitions against cell phone use while driving | 157 |
| * SB 1670 | Staples | Creating a motor vehicle liability insurance verification program | 158 |

# Repealing authority to use red-light cameras and to civilly enforce traffic offenses

**HB 1347 by Isett**
*Died in Senate committee*

**HB 1347** would have prohibited local authorities from using photographic traffic signal enforcement systems. The bill also would have repealed Transportation Code, sec. 542.202(b)(3), which was added by the 78th Legislature in 2003 and permits local authorities to regulate traffic and certain traffic-related issues within their jurisdictions provided such regulation does not conflict with state law.

## Supporters said

HB 1347 would prohibit red-light cameras and close a loophole that has allowed cities to use these cameras contrary to the expressed will of the Legislature. In 2003, the 78th Legislature permitted local authorities to regulate traffic and certain traffic-related issues, including criminal and civil enforcement of state laws and municipal ordinances, provided that that regulation does not conflict with state law. Before 2003, cities could issue only criminal citations for running red lights, which must be served personally to offenders. Since then, several cities have made running a red light a civil offense and enforced violations with photographic traffic signal enforcement systems, also known as "red-light cameras." Because civil citations do not have to be served personally to offenders, creating a civil violation for running a red light facilitates the use of automated traffic enforcement systems that photograph offenders' license plates and send citations to vehicle owners through the mail. HB 1347 would prevent the use of red-light cameras as an instrument of law enforcement while also repealing the authority of local municipalities to civilly enforce traffic offenses.

Red-light cameras do not increase public safety. Recent studies have found that these cameras increase accidents, particularly rear-end collisions caused by motorists slamming on the brakes after seeing a red-light camera. These cameras also may be used to justify reducing the number of police officers or shifting officers to non-traffic divisions, further decreasing safety because, unlike officers, red-light cameras cannot remove drunk or reckless drivers from the road.

Cities with red-light cameras also have a perverse incentive to maintain or even increase the number of violations in order to maximize revenue. Several cities

with these cameras in other states have been suspected of reducing the length of time their traffic lights stay yellow in order to increase the number of offenses, which suggests that some cities are more interested in generating revenue than in increasing public safety.

Red-light cameras remove discretion in issuing citations and violate constitutionally assured rights, such as equal protection and the right to privacy. Human discretion is needed to evaluate extenuating traffic circumstances and to guard against issuing a ticket to an owner who was not driving the vehicle when the red light was run. The penalties associated with red-light cameras also violate equal protection by assigning a civil penalty to the offense when caught by camera, although the offense is punishable as a criminal misdemeanor when caught by an officer. Red-light cameras violate the Fourth Amendment right to privacy against unreasonable search and seizure because with no probable cause to believe that any particular person will run a red light, there is no individual reason for mounting a camera.

By unintentionally giving local authorities power to enforce violations civilly and administratively, the Legislature unwittingly may have opened the door to inconsistent city regulation. Such inconsistency can confuse drivers and reduce safety. The broad enforcement powers in current law also could allow individual cities to penalize other violations not authorized by the Legislature, such as driving while talking on a cell phone. Traffic regulation should be consistent statewide to ensure the highest level of safety.

## Opponents said

Red-light cameras should not be prohibited because Texas has one of the highest rates of vehicular accidents and fatalities due to red-light running in the nation, and red-light cameras are effective in reducing crashes and saving lives. Cities should be allowed to continue using this proven public safety tool. About 100 Texans die annually and thousands more are injured in accidents when drivers run red lights. Even excluding property damage, these accidents cost between $1 billion and $3 billion each year in medical, insurance, and related expenses.

Automatic traffic signal enforcement systems can reduce red-light violations more effectively than traditional enforcement because motorists know that the lights are being monitored. This consistent enforcement against violators has led to a drop in violations of up to 60 percent in cities that have used these cameras, which corresponds to a decline in accident rates of up to 40 percent over time. Cameras also have permitted more efficient and safer use of law enforcement resources as officers can be freed from red-light monitoring to fight other types of crimes and are not required to chase cars running red lights, which can create a dangerous traffic situation.

Cameras do not reduce enforcement discretion because cities require their police departments to evaluate the photographs to determine whether a citation should be issued. Those receiving citations also may request a hearing to explain extenuating circumstances and request dismissal of the citation. Fines also are not a financial boon to local law enforcement because they are used for traffic and public safety. The accusation that cities manipulate the length of yellow lights is unfounded because the length of lights is set by the Texas Department of Transportation and local traffic departments and is sequenced according to federal and state regulations.

Cities have shared information and implemented the same or similar ordinances. To ensure conformity with state regulation, they have copied sections of the Transportation Code on civil enforcement of parking violations and procedures for enforcing them. Thus, there is little danger of conflicting or confusing local regulations. Moreover, the fee for a civil penalty is equivalent to that paid by those receiving criminal citations who take defensive driving or deferred adjudication.

The use of cameras does not invade privacy any more than does traditional enforcement of red-light violations. Taking a photograph of a vehicle's license plate is less invasive than requiring a motorist to produce a license when stopped by an officer. The probable cause is the same as when an officer pulls someone over – the red light was run, which in the case of automatic enforcement is detected by sensors. Use of surveillance cameras already is widespread in office buildings and public areas and on roadways. Texas already has approved photographic enforcement of the payment of tolls on toll roads.

## Notes

The **HRO analysis** appeared in Part Two of the April 18 *Daily Floor Report.*

HB 259 by Elkins, which would have repealed Transportation Code, sec. 542.202(b)(3) that permits civil enforcement of traffic offenses by local authorities, passed the House on February 28, but died in the Senate. The analysis of HB 259 appeared in the February 24 *Daily Floor Report.*

# Creating the Texas Rail Relocation and Improvement Fund

**HB 1546 by McClendon/HJR 54 by McClendon**
*Approved by voters at November 8, 2005, election*

**HB 1546** creates the statutory framework for the establishment of the Texas Rail Relocation and Improvement Fund. The fund would be administered by the Texas Transportation Commission (TTC) as a revolving fund used to finance the relocation, construction, reconstruction, acquisition, improvement, and expansion of certain rail facilities. The fund would be subject to the same investment rules as are applied to the State Highway Fund.

The bill would allow TTC to issue bonds against the fund with a maturity period not to exceed 30 years. Bond proceeds would have to be used to improve mobility and protect public safety around the state. Bond money could be used to finance projects for state-owned rail facilities or to partially fund projects for privately owned rail facilities. Before issuing bonds, TTC would be required to develop a strategic plan outlining the proposed use of funds and potential benefits to the state. In order to relocate rail lines, TTC is required to obtain approval from the local governing body in the area where the lines are to be located.

**HJR 54** amended the Texas Constitution to authorize the Legislature to create the fund and allow the TTC to issue the bonds.

## Supporters said

HB 1546 would help alleviate traffic congestion and improve safety by financing the relocation and construction of rail lines in Texas. It would authorize the Texas Department of Transportation (TxDOT) to negotiate with railroads to move freight rail lines, especially those carrying hazardous materials, outside of densely populated urban centers and help pay for separated grade crossings that can produce fatal accidents.  Right-of-way obtained by relocating railroads out of urban areas could be used for the placement of commuter rail lines or new highways, both of which would decrease traffic congestion. The current congestion crisis on Texas highways stems in part from the inability of railroads to keep up with increasing demands for the transport of freight by rail. Allowing for the shipment of more goods by train would decrease the number of trucks traveling on highways, which would decrease congestion and potentially dangerous truck traffic.

Relocating rail lines would help boost the state's economy by encouraging investment, improving efficiency, and preventing existing businesses from moving out of the state. With a revamped rail system, investors would look to Texas as a prime location through which to ship their goods. Also, freight would be delivered much faster if freight rail lines did not pass through congested cities, making multiple stops at railroad crossings.

## Opponents said

Railroad relocation should be left entirely to the private sector. It is not the responsibility of the state to finance construction of additional freight rail lines. The proposed rail relocation fund could be used to finance an unlimited amount of bonds that could obligate the state for years to come.

TTC should use TxDOT resources to carry out its primary functions that relate to the planning, construction, and maintenance of the state's highways. The railroad industry is no longer a state-regulated industry, and the state government should not involve itself in that industry's investment decisions.

## Notes

The **HRO analyses** of HB 1546 and HJR 54 appeared in the April 25 *Daily Floor Report*.

# Image verification system for issuance of driver's licenses

**HB 2337 by Corte**
*Effective September 1, 2005*

**HB 2337** requires the Department of Public Safety (DPS) to establish an image verification system for driver's license applicants using biometric identification. DPS will authenticate the applicant's facial image and thumbprint or fingerprint using image comparison technology before issuing an identification certificate, driver's license, or commercial driver's license or permit. The technology will ensure that an applicant is issued only one original license, permit, or certificate; does not fraudulently obtain a duplicate of any of these documents; and does not commit other fraud in connection with an application for any of these documents. DPS will have authority to use the image verification system to aid other law enforcement agencies in investigating criminal conduct or establishing the identity of a victim of a disaster or crime if a local law enforcement agency is unable to do so.

An application for a license must include, in addition to a thumbprint and a brief description of the applicant, a photograph and signature. DPS may use the image of an applicant's thumb or finger to verify the identity of the individual as needed by law enforcement agencies. The bill also extends indefinitely the $1 fee required at the time of application or renewal of registration of a motor vehicle to finance the state highway fund. DPS will have to provide a statistical report annually to the Legislature describing the rate of error presented in the image verification system, including the rate of incorrect matching of facial images, categorized by race. The report requirement expires September 1, 2010.

## Supporters said

Image verification technology would enable DPS to compare photographs on licenses and identification cards in its system to verify that each person held a license or identification card in only one name. This would combat identity theft and driver's license fraud. The technology would alert DPS when a person tried to establish a false identity and would ensure that DPS did not issue licenses or identification cards to those persons. The information would be stored on DPS's secure computer system and be available to other agencies only with DPS approval and supervision. The bill would combat fraudulent driver's licenses, bolster homeland security, and provide DPS the funds to update its aging driver's license computer system while still protecting the privacy of licensees and safeguarding Texans' private information.

Using biometric identification in the license process would increase confidence in the accuracy of the cards and make them more difficult to forge. Current law requires license applicants to state their full names, addresses, and dates of birth, and to verify that information by presenting proof of identity to DPS. DPS has no way to verify many documents, such as birth certificates, used as proof of identity, which can allow people to obtain licenses under false names or multiple licenses by presenting fraudulent documents. Capturing a biometric identifier when a person applied for a license or ID card would allow DPS to use that identifier to ensure that the person did not obtain licenses under false names. This would help prevent identity theft and ensure the accurate identification of drivers by DPS and others, such as merchants who use the cards to verify identity.

The benefits of having a reliable, accurate database that law enforcement could use to authenticate identity in combating terrorism outweigh unfounded concerns about privacy. HB 2337 would not expand current law broadly. DPS already collects applicants' thumbprints, which are biometric identifiers. The bill simply would direct DPS to set up its identification system based on biometrics, provide funding to do so, and allow DPS to use other biometric identifiers, such as facial recognition. Thumbprints would be used only to authenticate identity. Other safeguards would prevent abuse or sharing of biometric information. Transportation Code, sec. 730.007, limits the disclosure of personal information collected for motor vehicle records to disclosure for use by government agencies carrying out government functions. Accordingly, biometrics could be disclosed only when the thumbprints and photographs already collected could be disclosed – for example, for legitimate law enforcement purposes.

## Opponents said

The technology provided by HB 2337 effectively would allow the government to create a colossal database of its citizens' faces, facilitating the intrusion of the government into the lives of average citizens while doing little to target

or thwart criminals. Using biometric identifiers for the driver's license program would erode Texans' individual privacy and unwisely would expand the government's reach and power. This would be another step in government's efforts to gather more and more information on private citizens.

The image verification system greatly would expand DPS's ability to use personal information. The law now restricts use of thumbprints to, for example, license issuance, child support collection, and the U.S. Selective Service. However, DPS intends to share image information with other government agencies, and computer hackers or other criminals also could gain access to this information. Biometric identifiers can contain more personal information than the photographs used on current licenses. Analysis of biometric information can go beyond identifying a person and reveal sensitive information, such as a person's genetic makeup or medical history, which could be shared with government or private entities.

HB 2337 would allow DPS to collect facial images and fingerprints, vastly expanding the agency's current authority to collect thumbprints. The thumbprints now collected are not in a searchable database like the one this bill would establish. Also, using biometrics on driver's licenses would not make the licenses fraud proof. A different person's biometric identifier could be placed on a license, just as a photograph of one person can be placed on a license with another person's name and address. This technology is untested for large populations and often fails properly to identify people. Law enforcement use of the DPS biometric database could lead to increasing harassment of innocent people.

## Notes

The **HRO analysis** appeared in Part Two of the May 4 *Daily Floor Report*.

SB 89 by Averitt, which died in conference committee, would have permitted election officers to access electronically readable information from driver's licenses to determine a voter's identity. As amended on the House floor, the bill would have allowed a business to access the electronic information to verify the identification of an individual or the validity of a check at the point of sale.

# Trans-Texas Corridor revisions and toll road conversion restrictions

**HB 2702 by Krusee**
*Effective September 1, 2005*

**HB 2702** makes a number of changes to the Transportation Code related to the construction and financing of the Trans-Texas Corridor, the conversion of non-toll to toll roads, and other associated issues.

***Toll conversion.*** In order to convert a non-toll highway or lane to tolled highway or lane, the Texas Department of Transportation (TxDOT) must hold a public hearing and gain approval from the Texas Transportation Commission (TTC) and local voters. However, non-tolled roads and lanes may be converted without voter notice and approval if:

- the road was designated by TTC as a toll road before the construction contract was awarded;
- the road, prior to September 1, 2005, had been operating as a toll road or was designated by a Metropolitan Planning Organization as a toll road;
- the number of non-tolled lanes on the road would not be reduced by the conversion;
- a facility is built adjacent to the converted road to provide the same number of non-tolled lanes that existed previously; or
- a high-occupancy vehicle lane in operation prior to May 1, 2005, that is converted to a toll lane continues to allow vehicles containing a certain number of passengers to use the lane without paying a toll.

***Comprehensive Development Agreements (CDAs).***
The bill authorizes TxDOT to enter into CDAs with private entities for toll and non-toll transportation projects, including Trans-Texas Corridor facilities. In a CDA, a private entity can design, develop, finance, construct, maintain, repair, operate, extend, or expand a project.

CDAs are subject to the following regulations:

- funds appropriated by the Legislature expressly for engineering, design, management, or planning purposes cannot be used to finance CDAs with private entities;
- TxDOT is required to use a best value approach when selecting between competing private proposals for CDAs;
- a private entity must present TxDOT with evidence of financial security to provide assurance that the entity can afford to carry out the project;

- highways and facilities built through CDAs are public property;
- highways built and maintained through CDAs must be returned to TxDOT at the end of the agreement; and
- the terms of CDAs are to expire within 50 years unless the contract contains provisions for the state to buy a developer's interest the project, in which case CDAs can last up to 70 years.

***Rail.*** HB 2702 allows TxDOT to enter into CDAs to include both rail and highway components in the development of the Trans-Texas Corridor. Contracts for CDAs for rail must be selected based on the best value method rather than the lowest bidder method. The bill authorizes TxDOT to enter passthrough toll agreements with public or private entities for freight or passenger rail projects in the process of developing the Trans-Texas Corridor. Pass-through toll agreements for rail projects can be funded through the State Infrastructure Bank.

The bill eliminates the $12.5 million cap on TxDOT annual rail expenditures. It also transfers to TxDOT all railroad-related functions formerly under the Texas Railroad Commission.

***Ancillary facilities.*** HB 2702 restricts to gas stations and convenience stores the types of commercial establishments along the Trans-Texas Corridor that directly benefit motorists. Gas stations and stores must be located at least 10 miles away from intersections with interstate highways and other legs of the corridor. The bill prohibits TxDOT from condemning land adjacent to the corridor or limiting public access to the corridor for the benefit of commercial establishments. TxDOT cannot enter into agreements that give private entities the ability to lease or license property to commercial facilities.

Private developers and business along any toll road are subject to local taxation. The bill allows for the condemnation of property on segments of toll roads that are not located along the Trans-Texas Corridor for commercial establishments, including garages, stores, hotels, and restaurants.

***Pass-through tolling.*** The bill authorizes the use of reverse pass-through tolling, in which a local government or private entity repays TxDOT the cost of road construction

through a per-vehicle fee based on the expected volume of traffic on the completed road. The bill authorizes local authorities – including municipalities, counties, Regional Mobility Authorities (RMAs), and Regional Tollway Authorities (RTAs) – to enter into pass-through toll agreements with private entities to carry out transportation projects.

***Advance acquisition agreements.*** Advance acquisition or "quick-take" agreements between TxDOT and willing property owners expire in five years. Quick-take agreements can be renewed for additional five-year periods following the initial expiration.

***Bonds.*** The bill authorizes TxDOT to borrow twice the average monthly revenue deposited in the State Highway Fund. HB 2702 increases TxDOT's toll equity cap from $800 million each year to $2 billion. The bill authorizes local governments to issue bonds secured with pass-through toll revenue.

Pending congressional action, the bill directs TxDOT to administer a private activity bond program authorizing the issuance of tax-exempt bonds to finance highway and surface freight transfer projects.

***Mitigation of environmental impact.*** TxDOT can opt to pay a fee or transfer property in exchange for the mitigation of adverse environmental impacts caused by highway projects. Before buying or condemning land for mitigation purposes, TxDOT is required to offer to purchase a conservation easement from the owner. TxDOT must produce and display on its web site a detailed statement on the environmental impacts of the Trans-Texas Corridor.

***Privately operated tolls.*** TxDOT must approve a private operator's methodology for setting and increasing toll rates. The department also is required to approve methods used by a private operator to collect tolls, including any penalties charged for late or delinquent toll payments. The bill authorizes the private or public operator of a toll road to contract with peace officers to enforce payment of tolls and to regulate traffic flow.

***Compensation for acquisition of private property.*** HB 2702 requires TxDOT to pay damages caused by the division of property along the route of a controlled access highway, including costs associated with the lack of reasonable access to property on both sides of the highway. The bill enables owners to choose to be compensated for the remainder of a severed tract with free use of a section of the toll road or the rights to a percentage of revenue gained from

a section of the toll road. If an environmental study found evidence of hazardous materials on the property in question, TxDOT would not be required to offer compensation.

***Water.*** TxDOT is required to provide notice to local water authorities before agreeing to extract groundwater for transport along Trans-Texas Corridor utility lines. The bill does not allow ground water to be extracted along the Trans-Texas Corridor's right-of-way for the purpose of providing water to a public utility. Wells along the corridor are subject to the rules of the applicable groundwater district.

***Access.*** The bill gives former owners the opportunity to build and operate commercial facilities along the Trans-Texas Corridor in a manner that fulfills TxDOT objectives for the property. An owner whose property was divided by the corridor also could build alternative access routes.

***Transfer.*** The bill allows a county to transfer a transportation project and associated debt to TxDOT under certain circumstances. HB 2702 allows counties to request authorization from the TTC to create RMAs and/or transfer county transportation projects to RMAs, provided the transfer is not prohibited by bond proceedings. The bill also allows for the dissolution of RTAs and the transfer of an RTA's financial obligations, toll projects, and toll roads to an RMA or other transportation authority.

***RMA mass transit authority.*** The bill authorizes RMAs to build, own, operate, and maintain mass transit systems, including the property and facilities of existing mass transit providers. An RMA is required to hold a public hearing before setting fares or service charges and to provide criminal penalties for failing to pay fares for transit services. The RMA must assume all financial obligations of a transit authority. RMAs also obtain any sales tax authority previously held by the former transit provider.

## Supporters said

***Toll financing.*** HB 2702 would establish procedures for conversion of existing non-toll roads into toll facilities by requiring county commissioners court approval of any proposed conversion by a local entity and local voter approval if TxDOT proposed such a conversion. Toll roads are a superior method of financing projects to address the state's congestion problems rather than steep increases in the motor fuel tax or other proposed alternatives. TxDOT estimates that the motor fuel tax, currently 20 cents per gallon, would need to be increased by $1 per gallon in order to meet the state's transportation needs. While increased

use of mass transit, high-occupancy vehicle lanes, and other such measures could be a part of the solution, no method other than toll-related financing could fund the number of transportation projects the state must complete quickly.

*Economy.* The Trans-Texas Corridor would boost the state's economy by providing jobs and improving transportation infrastructure. There is a direct relationship between transportation and the economy. Williamson County alone has lost an estimated 10,000 potential jobs in the technology industry as result of the inadequacy of the state's infrastructure to accommodate the increase in truck traffic necessary to carry out the industry's shipping and receiving activities.

*Property rights.* The bill would allow the state to acquire only land that was necessary for the Trans-Texas Corridor and its operation. The condemnation of property along the route of the Trans-Texas Corridor in the interest of private entities would be prohibited. HB 2702 would prevent the state from taking land and holding it indefinitely without putting it to its assigned use. If property acquired through the "quick take" process was not used for the corridor within five years, it automatically would revert to the landowner from whom the property was taken, who then could decide whether to renew the old agreement. Also, landowners would be able to lease condemned land for agricultural and recreational purposes until needed for construction by TxDOT.

*CDAs.* HB 2702 would allow for the use of CDAs, rather than the design-build method, in the construction of the Trans-Texas Corridor. A CDA is an innovative tool that helps contractors minimize delay in completing transportation projects by allowing them to exercise flexibility in design. CDA contracts also save money by including a provision through which the contractor agrees to provide road maintenance for a negotiated amount.

*State resources.* The Trans-Texas Corridor would solve many of Texas' transportation problems without burdening the state financially. The contract for the Trans-Texas Corridor ensures that the state would not be held responsible if the developer went bankrupt. The participation of private investment in the development of the corridor in return for future tolls would free up state money to relieve congestion in Texas' urban areas.

## Opponents said

*Economy.* HB 2702 would facilitate plans for the Trans-Texas Corridor, which, as proposed, would create a 4,000-mile network of multimodal corridors for transporting commodities and people by car, truck, rail, and utility line. Each corridor would have six lanes for cars, four additional lanes for 18-wheeler trucks, half a dozen rail lines, and a utility zone for moving oil, water, gas, and electricity – even broadband data. This gigantic superhighway spanning more than half a million acres dramatically could reduce output in Texas' agricultural industry as a result of the amount of land taken out of production.

*Public input.* The citizens of Texas should be more involved in the planning process for the Trans-Texas Corridor. The TTC entered into 50-year exclusive contract with a foreign company without legislative approval that allowed for the condemnation of right-of-way for the exclusive use of the developer. More public oversight is needed to ensure that future such deals are not struck.

*Environmental impact.* The Trans-Texas Corridor is not an environmentally sensitive solution for the state's congestion crisis. Its construction negatively would impact wildlife and hunting in many areas of the state in which hunting has become a major part of farm and ranch income. In addition, the corridor would increase air pollution by encouraging motor vehicles as the state's principal method of transportation.

## Notes

The **HRO analysis** appeared in Part One of the May 11 *Daily Floor Report*.

# Prohibitions against cell phone use while driving

**SB 1257 by Lindsay**
*Effective September 1, 2005*

**SB 1257** prohibits a person under age 18 from operating a motor vehicle while using a cell phone during the first six months after receiving a driver's license. The bill places the same restriction on the first six months that a person under the age of 17 holds a restricted motorcycle or moped license. It also prohibits the operator of a bus containing minor passengers from using a cell phone except in an emergency or while the bus is not in motion. The bill also makes other changes dealing with commercial driver's licenses.

## Supporters said

SB 1257 would make Texas roads safer by prohibiting young, inexperienced drivers from talking on cell phones while operating a motor vehicle. Research demonstrates that talking on the phone while driving increases the probability of accidents, and young drivers especially could be easily distracted by a cell phone conversation. A specific law is necessary because of the prevalence of cell phone use and to ensure that drivers know what is required of them. Special restrictions on new, young drivers are appropriate and not discriminatory or unusual. The prohibition against using a cell phone would be one more restriction contained in the graduated driver's license program for young drivers, which already prevents them initially from driving between midnight and 5 a.m. and from driving with certain other passengers under the age of 21.

## Opponents said

SB 1257 would discriminate against young drivers by restricting their cell phone use on the road based not on their abilities or driving records but on their age. It would be unfair to enact a blanket prohibition on all young drivers, some of whom may have good judgment and driving skills. This bill should not single out cell phone use because data shows that cell phones do not contribute to a significant number of crashes, and there are countless distractions related to unsafe driving that the bill would not cover, including eating or applying makeup while driving. In any case, SB 1257 is unnecessary because reckless drivers who are distracted by phone conversations can be charged with driving offenses.

## Notes

The **HRO analysis** appeared in the May 18 *Daily Floor Report*. SB 1257 was amended on the House floor to include the provisions prohibiting the use of cell phones by minors and bus drivers.

# Creating a motor vehicle liability insurance verification program

**SB 1670 by Staples**
*Effective September 1, 2005*

**SB 1670** requires the Texas Department of Insurance (TDI), in consultation with the Texas Department of Transportation (TxDOT) and the Department of Information Resources (DIR), to establish a program for verifying whether owners of motor vehicles have established financial responsibility. TDI, through a competitive bidding process, must select an agent to develop, implement, operate, and maintain the program for up to five years.

The three agencies must convene a working group to facilitate implementation, help develop rules, and coordinate a testing phase and necessary changes identified in the testing phase. The working group must include representatives of implementing agencies and the insurance industry, as well as technical experts with skills and knowledge, including knowledge of privacy laws, required to create and maintain the program. The program established must be the one most likely to reduce the number of uninsured drivers in the state, operate reliably, be cost-effective, protect privacy, ensure the security and integrity of information provided by insurers, identify and employ a compliance method that improves public convenience, and provide accurate and current information. The program must be capable of being audited by an independent auditor.

An insurance company providing motor vehicle liability insurance policies in Texas must provide information to allow the chosen agent to implement the program, subject to the agent's contract with the implementing agencies and rules governing the program. The agent is entitled only to information that is at that time available from the insurance company. Information is confidential and may not be used for commercial or other purposes. Using the information for an unauthorized purpose is a class B misdemeanor (up to 180 days in jail and/or a maximum fine of $2,000).

The implementing agencies and the Texas Department of Public Safety (DPS) must jointly adopt rules to administer the program. TDI must select an agent before December 31, 2005, and the program must be implemented for personal automobile policies by December 31, 2006. The agencies must adopt rules seven months before the full implementation. A program for commercial vehicles must be implemented when the agencies determine it to be feasible.

## Supporters said

SB 1670 would allow Texas to address its uninsured motorist problem by authorizing TDI, in consultation with TxDOT and DIR, to come up with a program for identifying uninsured motorists and to contract with a qualified private vendor to carry out such a program by the end of 2006. The bill would help lower insurers' costs for uninsured motorist claims and would bring Texas alongside more than 20 other states with similar programs that have reduced the number of uninsured motorists by double-digit percentages. A verification system would provide easier access to information and help fight the growing problem of counterfeit insurance cards.

As part of a feasibility study authorized by the Legislature in 2003, DPS and TDI recommended that Texas consider alternatives to a database software interface system that would provide the maximum reduction in the uninsured motorist rate in Texas. The bill would authorize TDI to request proposals that could include either a database interface system or other possibilities that the agencies charged with overseeing the program determined to be a better approach.

While some people might be identified mistakenly as uninsured in start-up stages of a verification program, motorists could correct these mistakes by sending in proof of insurance or by correcting errors in registration information. Many of these errors would be due to motor vehicles that were not registered or titled to the current owners, despite existing laws requiring owners to hold title and registration.

Financial responsibility laws are not to blame for the lack of affordable insurance. Insurers' discriminatory practices are more to blame than proof-of-insurance requirements.

## Opponents said

SB 1670 would require TDI to award a huge state contract to a private entity for a system with questionable value. According to the Legislative Budget Board, this

system would cost $6 million to implement in the first year and some $2 million to maintain in each following year. While the bill would authorize TDI to seek bids for alternative methods of verification, the agency would have to adopt a program and choose a contractor by December 31, 2005. Because of this short timeline, TDI may feel pressured to adopt a database reporting system, which the state's own feasibility study advised against because of problems revealed by the use of similar systems in other states.

The DPS/TDI feasibility study pointed out that for a database reporting system, the primary concern is with the error match rates associated with combining insurance company databases and motor vehicle registration information. The bill would add reporting costs for insurers, which could be passed on to policyholders in the form of higher rates. Smaller insurers, in particular, could have trouble keeping up with the regular reporting requirements needed for a verification system.

The state should not increase enforcement of the proof-of-liability law until access to affordable insurance improves. Less intrusive methods are available to increase the number of insured motorists — for example, a "pay-at-the-pump" system of insurance, under which a tax on gasoline would fund an insurance pool for all motorists.

## Notes

The **HRO analysis** of the companion bill, HB 2573 by Callegari, appeared in the May 4 *Daily Floor Report*.



**U**tilities

| * HB 412 | Turner | Prohibiting use of credit scoring by electric and telecommunications providers | 161 |
| * SB 5 (2) | Fraser | Restructuring telecommunications and cable regulation | 162 |
| * SB 20 (1) | Fraser | Expanding the state's renewable energy portfolio standard program | 166 |
| * SB 408 | Nelson | Continuing the Public Utility Commission and revising ERCOT | 168 |

# Prohibiting use of credit scoring by electric and telecommunications providers

**HB 412 by Turner**
*Effective September 1, 2005*

**HB 412** prohibits a retail electric provider from denying, on the basis of an applicant's credit history or credit score, an applicant's request to become a residential customer. A provider may use an applicant's utility payment data until either January 1, 2007, or the date on which "price to beat" is no longer in effect in the region where the customer is located. However, a provider may not use utility payment data to deny service in an area in which the provider is required to provide service. After January 1, 2007, a retail electric provider may not deny service based on an applicant's credit history, credit score, or utility payment data but may deny service based on the applicant's electric bill payment history. Credit history or a credit score may not be used to determine the price of electric service if the agreement is for 12 months or less.

The bill also prohibits a provider of basic local telecommunications service and nonbasic services from denying, on the basis of the applicant's credit history or credit score, an applicant's request to become a residential customer.

## Supporters said

HB 412 would protect Texas electric and telecommunications consumers from a discriminatory and unfair practice. Credit scoring disproportionately harms minorities and low-income Texans because individuals in those groups are more likely to have unfavorable credit scores, often through no fault of their own. Credit scoring is an inaccurate practice that relies upon data with little relation to customers' ability to or likelihood of paying their electric or telephone bills. An individual with no outstanding debt or with a history of large insurance claims or health care costs could have a very high credit score. These factors have little bearing on an individual's risk of nonpayment to an electric or telecommunications provider.

## Opponents said

Credit scoring should not be prohibited because it is an effective strategy for electric service providers in mitigating their risk. Credit agencies are developing newer, more targeted models to isolate high-risk customers, and these innovations likely will address most current concerns regarding credit scoring.

## Other opponents said

HB 412 would not go far enough to protect electric customers. Providers would be able to deny electric service based on utility or electric bill payment data, and no standards would govern the manner in which a provider could use that data. As little as one late bill payment could result in denial of electric service.

## Notes

The **HRO analysis** appeared in Part One of the April 21 *Daily Floor Report*.

# Restructuring telecommunications and cable regulation

**SB 5 by Fraser, Second Called Session**
*Effective September 7, 2005*

**SB 5** makes numerous changes to the regulation of cable and telecommunications in Texas.

***Deregulation of certain ILEC markets.*** SB 5 deregulates the markets of all incumbent local exchange carriers (ILECs) on January 1, 2006, unless the Public Utility Commission (PUC) determines that a market should remain regulated. The PUC cannot prevent deregulation in any market in which the population was at least 100,000. The commission also cannot prevent deregulation in a market with a population between 30,000 and 100,000 that contains competitors to the ILEC that meet specific criteria.

The bill establishes new categories to govern companies that are partially deregulated and transitioning to full deregulation. A company transitioning to deregulation can exercise pricing flexibility and introduce a new service after providing informational notice.

In a deregulated market, a company cannot engage in discriminatory or predatory pricing or subsidize the rate for services in a deregulated market with services provided in a regulated market. A company cannot increase the rate for stand-alone basic service until the PUC has revised its monthly per-line support under the Texas High Cost Universal Service Plan. The company must make available the same price, terms, and conditions to all customers uniformly throughout its market.

***Reduction of switched access rates.*** Under the bill, a deregulated ILEC must reduce its intrastate switched access rates to parity with the company's federal switched access rates. Schedules are established to reduce the rates of transitioning companies to parity with federal rates within three to four years. No company can increase its rates above the level prescribed in the bill after they have been reduced. If federal switched-access rates are reduced, a company must reduce its intrastate rates as well.

***Legislative oversight committee.*** The bill establishes a nine-member legislative oversight committee on telecommunications competitiveness consisting of the chair of the Senate Business and Commerce Committee, the chair of the House Regulated Industries Committee, three senators, three representatives, and the chief executive of the Office of Public Utility Counsel. The committee will

submit a biannual report to the governor, the lieutenant governor, and the speaker of the House that includes an analysis of problems caused by deregulation and legislative recommendations to address those problems.

***Statewide cable franchise.*** SB 5 creates a method for an entity seeking to provide cable or video service in the state to receive a statewide franchise from the PUC. The franchise certificate authorizes the entity to provide cable or video service and to use public rights-of-way to deliver that service.

A cable or video service provider that currently holds a cable franchise cannot seek a statewide franchise until the expiration date of the current franchise. However, as of September 1, 2005, a cable provider that serves less than 40 percent of all cable customers in the municipal franchise area can terminate its franchise and apply for a state-issued franchise, as long as that the provider remits to the affected municipality any unpaid franchise fees.

The holder of a state-issued franchise must pay each municipality a fee equal to 5 percent of the provider's gross revenues from cable services derived in the municipality. This revenue is in lieu of compensation for a provider's right to provide service or use a public right-of-way.

Until the expiration of an incumbent cable provider's agreement, the holder of a state-issued franchise must pay a municipality in which it offers cable service the same cash payments as required by the provider's franchise agreement. Upon the expiration of the agreement, the holder of a state-issued franchise must pay a municipality 1 percent of the provider's gross revenues or the per-subscriber fee that was paid under the expired agreement, in lieu of in-kind compensation and grants, whichever the municipality elects. Until the later of the date when a franchise was to expire or January 1, 2008, a provider must continue offering network capacity for noncommercial use by the municipality and cable services to community buildings.

A cable or video provider cannot deny access to service by a group of potential residential subscribers in an area because of the income of residents. A provider can satisfy this requirement by using an alternative technology, even if that alternative differs in terms of content or functionality.

Neither the state nor a political subdivision can require a provider to build out a network, except as specifically required under federal law.

The bill requires a cable or video service provider to provide a municipality with capacity in its network to allow up to three public, educational, and governmental access channels (PEGs).

A municipality can exercise police power-based regulations toward a franchise holder in a non-discriminatory manner in order to protect the health, safety, and welfare of the public. A municipality can require a cost-free construction permit for a franchisee that locates facilities in a public right-of-way. Otherwise, municipal authority over a franchisee is limited to requiring a franchisee to maintain a point of contact, establishing guidelines governing PEG channels, and submitting service complaints to the PUC.

A municipality or cable, voice, or video service provider can seek clarification of its obligations under federal law.

***Broadband over power lines (BPL).*** SB 5 authorizes an affiliate of an electric utility to operate a BPL system, defined as the provision of broadband services over electric power lines, and provide BPL services on an electric utility's electric delivery system.

An electric utility can allow an affiliate or an unaffiliated entity to own or operate a BPL system on the utility's electric delivery system or to provide Internet service over a BPL system. A utility must ensure that operation of a BPL system on its electric delivery system does not interfere with the reliability of its delivery system. The governing body of a municipality does not have jurisdiction over a BPL system, rates, or services. The operator of a radio frequency device must cease operating the device upon notification by the Federal Communications Commission (FCC) or the PUC that the device caused harmful interference.

An electric utility's investment in a BPL system that directly supports services used by the utility can be included in the utility's invested capital and be included under a rate proceeding. Such expenses must be directly allocated to customers receiving those services.

***Texas Universal Service Fund (TUSF).*** A telecommunications provider can meet its provider-of-last-resort obligations using any available technology, and the TUSF can be used to fund the use of technologies other than traditional wireline technologies to meet these obligations. A certificate holder must meet 911 and other service standards that are comparable to those for wireline technologies.

The PUC must conduct a study to assess whether the TUSF's purposes have been achieved, whether it should be phased out, and the manner in which money was collected and disbursed. The report must include recommendations such as how TUSF money should be collected, how money should be disbursed, the purposes for which it should be used, and how to ensure accountability for its use.

The bill establishes a program to provide financial assistance from the TUSF for a free audio newspaper assistance service that offers the text of newspapers over the telephone to visually impaired individuals.

***Basic service revisions.*** After July 1, 2006, residential call waiting service no longer will be part of basic service under Utilities Code ch. 58. For customers age 65 or older, however, basic service will include caller identification service. The bill requires local exchange providers to ensure that customers are informed of the Lifeline program upon the initiation of service.

## Supporters said

By making telecommunications law compatible with the latest technological and competitive innovations, SB 5 would update Texas' outmoded regulatory framework for telecommunications and cable technologies. The bill would open the Texas marketplace to true and extensive competition, providing a legal structure that would encourage technological innovation and improve service for customers.

***Deregulation.*** Texas should eliminate the artificial subsidy of basic telephone service because it does not take into account the options customers have for telecommunications service. With the advent of intermodal competition among telecommunications technologies, consumers can abandon basic telephone service in favor of other technologies, such as wireless or voice over Internet protocol (VOIP), that provide technological and economic advantages. However, current law enforces a policy preference toward outmoded landline services through an artificial subsidy of that service in the basic service rate cap. By eliminating that cap, the Legislature would align regulation with the important technological innovations of recent years.

By lowering intrastate access rates to parity with interstate rates, Texas long-distance consumers would see significantly reduced prices for in-state long-distance. Because of the current inflated intrastate access rates, it can cost more to call from Dallas to Houston than it does to call from Dallas to Albuquerque. Reducing intrastate rates

to parity with interstate rates would allow access charges to resemble more closely the actual cost of switching calls, facilitating more efficient competition in the long-distance market.

SB 5 would foster competition and benefit consumers through free-market policies. Since Texas started down the road toward deregulation in the mid-1990s, competition for telecommunications services has flourished throughout the state. The Texas market is sufficiently dynamic to absorb the reforms laid out under this bill.

**Cable franchise.** By establishing a level playing field for competition and choice in cable and video services, SB 5 would put Texas at the forefront of regulatory modernization in this rapidly innovating industry. This bill is necessary to allow deployment of integrated technologies and to encourage private investment that would benefit Texas consumers.

SB 5 would streamline state and municipal regulation of cable service providers. Currently, before a cable provider enters a market, that provider must negotiate a franchise agreement with a municipality, an expensive and inefficient process. The result is a maze of regulations that presents a barrier to entry for cable competitors. By establishing a statewide franchise, the bill would eliminate the need to negotiate individual agreements while establishing a system of stable, predictable franchise fees that have become a vital component of city budgets.

SB 5 would allow Texas customers to enjoy the benefits of competition in cable service that they have enjoyed in telecommunications service since the mid-1990s. Currently, incumbent cable companies generally operate as monopolies under local franchise agreements, limiting the amount of competition and consumer choice in most communities. The bill would tear down barriers to market entry and competition by ensuring that all video service providers operated under a single set of clear, equitable rules.

The bill would affirm current safeguards that benefit cities, schools, and consumers. It would provide for a base number of public access channels that many cities use for educational and civic purposes. Also, SB 5 would incorporate federal requirements prohibiting discriminatory treatment of low-income citizens, allowing companies to meet this obligation through new technologies.

**Broadband over power lines.** SB 5 would establish a framework for deployment of BPL technology across Texas. Because electric service is ubiquitous, the potential exists for equally expansive broadband service, provided the state establishes a framework for deploying BPL technology.

Recognizing that the FCC has exclusive jurisdiction over radio frequencies, SB 5 would establish appropriate measures to prevent interference of BPL services with amateur radio services. The bill would require BPL providers to comply with all applicable federal laws and would require a BPL service to be halted if the FCC found evidence of interference.

**Texas Universal Service Fund.** Companies with provider-of-last-resort obligations should be allowed to use any available technology to satisfy those obligations. It can be extremely expensive to run a basic landline to a remote rural location that otherwise could be served effectively by a mobile phone or other technology. There is no practical reason to discriminate against new technologies, as occurs under current law. It would be wise to study how the TUSF is managed to ensure that grants from the fund adequately serve the purpose of providing ubiquitous access to telephone service in the state.

## Opponents said

**Deregulation.** SB 5 would allow major local telephone companies, such as SBC and Verizon, to raise the price of basic local service virtually without restriction in most markets. In doing so, this bill would run counter to historic state policy ensuring that all Texans have affordable access to basic local service. By deregulating basic telephone service, this bill would result in Texas consumers facing higher prices for local phone service.

The minimal level of competition that now exists in the state would not be an effective bulwark against higher prices for telephone service. The market test established for smaller markets would not sufficiently protect competitors or ensure low phone rates. When the Legislature has deregulated nonbasic services, the cost of these services has gone up, often dramatically. Consumers could expect similar increases in local phone service under this bill.

The bill should not tie higher local telephone prices to lower intrastate long-distance prices. In effect, this provision would force consumers of basic local service to subsidize lower rates for high-volume long-distance customers. Companies could be expected to more than make up for the cost of reduced access charges with higher rates, and local phone service consumers would bear this burden.

SB 5 would mark a major step backward for telecommunications competition in Texas, the only check on prices that would exist under this new framework. Under this bill, large ILECs would be able to raise rates on consumers who have no access to competing service

providers while they lowered rates in areas of competition. This would make it very difficult for competitive local exchange companies (CLECs) to compete with SBC and other large companies and could drive many out of business.

With its overemphasis on "intermodal competition," SB 5 would ignore the significant competitive differences between basic phone service and newer telecommunications technologies. The cost of a basic line is very affordable – currently around $10 to $15 per month. On the other hand, the most basic monthly wireless plan can cost more than $40, and VOIP is even more expensive. The Legislature should not count these other services as providing sufficient competitive pressure to maintain affordable rates for basic service.

Basic service is robust and reliable, while technologies such as wireless and VOIP are less so. While basic phone service runs on an independent network isolated from problems caused by electricity blackouts, other platforms, such as wireless, could be affected by disruptions in electrical distribution. Basic service also ensures that individuals have access to E-911, which is vital in case of emergency because it allows emergency responders quickly and accurately to locate the caller.

*Cable franchise.* SB 5 would discriminate against existing cable providers that are subject to extensive federal, state, and local regulations governing network build-out, quality of service, and public access channels, among other requirements. Cable companies that have built networks throughout entire cities would be at a disadvantage compared to new entrants that could build only in neighborhoods with the most profit potential. SBC and other major telecommunications providers that receive public TUSF subsidies would be able to corner the most lucrative sections of the market, harming consumers and providing only the illusion of true competition.

Under the guise of "intermodal competition," SB 5 would open the door to abusive redlining practices by new entrants in the cable market. The bill would purport to allow "alternative technologies" to satisfy nondiscrimination mandates. However, the availability of ubiquitous yet expensive direct-to-home satellite technology likely would satisfy nondiscrimination requirements while remaining an unrealistic option for low- or middle-income consumers. New providers would be free to build video networks in higher income areas while denying the cost and service benefits of new technologies to low-income Texans.

SB 5 would undermine local control for cities that currently can negotiate cable franchise agreements that are appropriate to the diverse needs of cities across the state. The bill would allow cable providers to opt out of negotiated agreements that often provide cities with the ability to enforce customer service standards and ensure universal service.

*Broadband over power lines.* BPL is an unproven technology that has been shown to cause substantial interference with radio services, particularly amateur radio services. Because power lines are not designed to prevent radiation of radio frequency energy, interference with certain licensed broadcasters is likely. Studies by the U.S. National Telecommunications and Information Administration have demonstrated interference from BPL systems and have suggested that the recently adopted FCC regulations are insufficient.

*Texas Universal Service Fund.* Companies that reap the benefits of deregulation should not be able to keep millions of dollars in public subsidies from the TUSF. It would be unfair for taxpayers to continue subsidizing companies that receive a huge profit windfall from price deregulation under the bill, particularly as the Legislature is making it easier for those companies to enter the cable market at the same time. If the Legislature is going to require an expansive study on the TUSF but withhold substantial changes to the fund until the study is complete, the same approach should be taken to competition and price deregulation.

## Notes

SB 5 was considered in lieu of its identical companion, HB 13 by P. King, and passed by the House on August 10. The **HRO analysis** of HB 13 appeared in the August 9 *Daily Floor Report*.

# Expanding the state's renewable energy portfolio standard program

**SB 20 by Fraser, First Called Session**
*Effective September 1, 2005*

**SB 20** establishes new requirements for generating capacity from renewable energy in Texas. The bill requires a total of 5,880 megawatts (MW) of renewable capacity by January 1, 2015. It also establishes the target of 10,000 MW of additional installed renewable energy capacity by January 1, 2025. All renewable energy capacity installed in the state and all renewable energy credits in the state count toward the goal. The PUC can cap the price of renewable energy credits and suspend the renewable energy goal if necessary to protect the reliability of the grid.

The PUC will designate "competitive renewable energy zones" in which resources and land areas are sufficient to develop renewable energy generating capacity and develop a plan to construct the transmission capacity required to deliver the output from renewable energy technologies to customers.

The PUC also will consider the level of financial commitment by generators for each zone in determining whether to designate an area as a competitive renewable energy zone and whether to grant a certificate of convenience and necessity.

## Supporters said

SB 20 would continue and expand the state's successful Renewable Portfolio Standard (RPS) program. The benefits of renewable energy are significant. Unlike depleting and polluting fossil fuels, renewable energy represents a real, unlimited, clean source of energy. The current RPS has been successful because it has required electricity providers to get a specific amount of energy from renewable sources. By expanding this program, SB 20 would require this amount to increase every two years so that at least 5,880 MW of electricity would come from renewable sources by 2015.

Beyond its environmental benefits, renewable energy offers many ancillary economic benefits for landowners and local governments in areas of the state where wind energy facilities are located. For example, some have estimated that wind energy production in the state generated close to $15 million in local school property taxes in tax year 2004, and

an expansion of generating capacity to attain the 5,880 MW requirement could mean more than $60 million in annual school property tax revenue.

SB 20 would balance support for renewable technologies with concerns for system reliability. Like the current standard, the target established in SB 20 would represent a floor above which supplies of renewable energy sources could expand in order to meet growing demand. The bill incorporates important safeguards to ensure that necessary investments in the transmission grid would be made and that the electric grid's integrity would be maintained.

## Opponents said

All electricity generation should be determined by the market. Wind and solar plants cannot produce the same amount of energy as more traditional types of generating plants. Renewable energy is more expensive and therefore is not a cost-effective way to produce energy. Requiring utilities to use this more expensive energy increases electric rates for customers.

Building wind farms or solar energy generating facilities requires a source of backup energy from a traditional source, duplicating generation and increasing costs. In addition, because most zones for renewable energy production exist in areas isolated from urban markets, expansion of wind energy requires substantial investment in transmission capacity. Further, because the generation of wind energy depends on unpredictable weather patterns, renewable energy is not a reliable or consistent source of energy. All of these factors contribute to the economic inefficiency of renewable energy.

## Other opponents said

The RPS requirement set by the SB 20 should be increased in order to more effectively develop renewable energy resources in the state. Some estimates are that the likely output of renewable energy by 2015 will be 8,000

MW under the current rate of development, a level well above the one envisioned under SB 20. A better proposal would be to increase the renewable energy standard to 10,880 MW by 2015, a level that truly would set Texas on the way toward meaningful expansion of important renewable technologies.

## Notes

The **HRO analysis** appeared in the July 14 *Daily Floor Report*.

# Continuing the Public Utility Commission and revising ERCOT

**SB 408 by Nelson**
*Effective September 1, 2005*

**SB 408** continues the Public Utility Commission (PUC) until 2011 and institutes new oversight measures for the Electric Reliability Council of Texas (ERCOT). ERCOT is an independent organization responsible for facilitating wholesale electricity transactions among power generators and retailers, ensuring customer information is provided to retailers, maintaining the reliability of the transmission network, and ensuring open access to the network.

SB 408 makes ERCOT directly accountable to the PUC and authorizes the PUC to oversee and audit ERCOT finances and operations. The bill also alters ERCOT's governing structure, replacing the current 14-member board with a 16-member governing body that includes:

- the PUC chairman as an ex officio non-voting member;
- the Office of Public Utility Counsel (OPUC) counselor as an ex officio voting member representing residential and small commercial consumer interests;
- the chief executive officer of ERCOT as an ex officio voting member;
- six market participants elected by their market segments to serve one-year terms, with one member each representing independent generators, investor-owned utilities, power marketers, retail electric providers, municipally owned utilities, and electric cooperatives;
- a representative of industrial consumer interests, elected by this market segment to serve a one-year term;
- a representative of large commercial consumer interests, selected by the outgoing large commercial consumer representative to serve a one-year term; and
- five representatives unaffiliated with any market segment, selected by the other members of the governing body to serve three-year terms.

Meetings of the ERCOT board of directors are open to the public. A member of ERCOT's governing body who has a direct interest in a matter that comes before the board must disclose the interest and recuse himself or herself from deliberations on the matter.

SB 408 also establishes a wholesale electric market monitor within ERCOT to prevent manipulation of the electric market under the jurisdiction of ERCOT. The bill also increases the penalty for a violation of a PUC statute, rule, or order from $5,000 to $25,000 for each day a violation occurs.

## Supporters said

SB 408 would institute much needed oversight and accountability reforms for ERCOT and its board of directors. ERCOT has been the target of serious allegations of mismanagement and wasteful spending, and several former employees and contractors have been indicted for felony charges related to contracting fraud. Due to ambiguity surrounding the applicability of state open meetings and public records laws, members of the public have been stymied in their attempts to learn more about ERCOT's business practices and participate in its decision-making process. ERCOT performs vital functions in its management of the state's electric market, and it is imperative that this powerful organization be accountable to the public it serves.

Increasing the administrative penalty for an administrative violation by a utility would strengthen the commission's enforcement authority. If a utility or provider perpetrated a single type of violation that lasted several days, that entity could be punished for each day a violation occurred, providing an effective deterrent against a utility that might otherwise choose to pay the nominal current fine and continue its abusive practices.

## Opponents said

A $25,000 fine per day, per violation would be excessive. Doubling the fine from $5,000 to $10,000 would be more appropriate. However, if the Legislature chooses to increase the maximum administrative penalty five-fold, it also should adopt a two-year statute of limitations on violations to provide utilities and providers with a measure of regulatory certainty in their dealings with the commission and consumers.

## Other opponents said

Although the bill would increase the number of independent members on ERCOT, consumer representation on the board would remain weak. Consumers pay the fees through which ERCOT is funded, and they deserve a strong voice to ensure that these funds are spent prudently. Market participants would continue to outnumber residential, industrial, and commercial consumers. The Sunset Commission found that industry representatives on the ERCOT board have little incentive to act in the best interest of consumers, and increasing public representation could address this imbalance.

While SB 408 would strengthen protections against wholesale generation market manipulation, additional reforms are needed. Market manipulation can be difficult to identify after an abuse has occurred. A more effective method of preventing abusive practices by wholesale generators would be to require that no company control more than 20 percent of the generation capacity in a single congestion area, rather than the current, more general limitation of 20 percent across the entire ERCOT region.

## Notes

The **HRO analysis** appeared in the May 22 *Daily Floor Report*.

SB 408 as passed by the House included provisions that would have established a statewide franchise for offering cable services and provided a framework for municipal compensation for use of public rights-of-way. While these provisions were removed from the bill in conference committee, similar provisions were included in SB 5 by Fraser (see p. 160), enacted during the second called session.

# Index by Bill Number

| Bill | Page |
|------|------|
| HB 2 (2) | 115 |
| HB 3 (2) | 137 |
| HB 4 | 120 |
| HB 5 | 141 |
| HB 6 (2) | 99 |
| HB 7 | 8 |
| HB 9 | 142 |
| HB 11 (2) | 109 |
| HB 51 | 22 |
| HB 57 | 47 |
| HB 86 | 56 |
| HB 107 | 18 |
| HB 151 | 23 |
| HB 164 | 24 |
| HB 268 | 26 |
| HB 283 | 123 |
| HB 412 | 161 |
| HB 603 | 124 |
| HB 846 | 11 |
| HB 864 | 93 |
| HB 879 | 144 |
| HB 955 | 44 |
| HB 1006 | 145 |
| HB 1068 | 28 |
| HB 1135 | 90 |
| HB 1347 | 149 |
| HB 1348 | 48 |
| HB 1357 | 68 |

| Bill | Page |
|------|------|
| HB 1434 | 79 |
| HB 1445 | 125 |
| HB 1476 | 127 |
| HB 1546 | 151 |
| HB 1706 | 50 |
| HB 1765 | 40 |
| HB 1771 | 91 |
| HB 1795 | 132 |
| HB 1929 | 93 |
| HB 1938 | 42 |
| HB 2026 | 13 |
| HB 2030 | 52 |
| HB 2193 | 30 |
| HB 2330 | 101 |
| HB 2337 | 152 |
| HB 2405 | 54 |
| HB 2481 | 57 |
| HB 2544 | 81 |
| HB 2572 | 95 |
| HB 2702 | 154 |
| HB 2833 | 59 |
| HB 2868 | 68 |
| HB 2915 | 61 |
| HJR 6 | 70 |
| HJR 35 | 147 |
| HJR 54 | 151 |
| SB 3 | 62 |
| SB 5 (2) | 162 |

| Bill | Page |
|------|------|
| SB 6 | 72 |
| SB 7 (2) | 82 |
| SB 9 | 84 |
| SB 14 | 14 |
| SB 15 | 19 |
| SB 20 (1) | 166 |
| SB 60 | 33 |
| SB 122 | 35 |
| SB 327 | 15 |
| SB 408 | 168 |
| SB 410 | 96 |
| SB 419 | 76 |
| SB 422 | 128 |
| SB 447 | 144 |
| SB 877 | 43 |
| SB 1140 | 86 |
| SB 1189 | 111 |
| SB 1195 | 38 |
| SB 1227 | 104 |
| SB 1228 | 106 |
| SB 1257 | 157 |
| SB 1667 | 65 |
| SB 1670 | 158 |
| SB 1691 | 134 |
| SB 1704 | 113 |
| SB 1863 | 87 |
| SJR 21 | 44 |

(#) Introduced or enacted during first or second called session

## HOUSE RESEARCH ORGANIZATION



**Steering Committee:**

Bob Hunter, *Chairman*
David Farabee, *Vice Chairman*
Bill Callegari
Dianne White Delisi
Harold Dutton
Carl Isett
Mike Krusee
Jim McReynolds
Geanie Morrison
Elliott Naishtat
Joe Pickett
Robert Puente
Elvira Reyna
Jim Solis
G.E. "Buddy" West

John H. Reagan
Building
Room 420
P.O. Box 2910
Austin, Texas 78768-2910

(512) 463-0752

*www.capitol.state.tx.us/hrofr/hrofr.htm*

**Staff:**

Tom Whatley, *Director*
Ben Davis, *Editor*
Laura Hendrickson, *Associate Editor*
Rita Barr, *Office Manager/Analyst*
Betsy Blair, Kellie Dworaczyk, Tedd Holladay,
Kelli Soika, *Senior Analysts*
Pamela J. Bolton, Elizabeth Brenner,
Annette Coussan, Susannah Erler, Alysson Ford,
Jimmie Luthuli, Carisa Magee, Virginia L. Nailling,
Carissa J. Suarez, *Analysts*
Kalan Giniger, *Administrative Aide*

# HOUSE
# RESEARCH
# ORGANIZATION
*Texas House of Representatives*



*focus* REPORT

*July 17, 2007*

**7**    Business Regulation & Economic Development

**17**    Criminal Justice

**41**    Elections

**51**    Environment

**67**    Families & Children

**79**    Government Affairs

**107**    Health & Human Services

**123**    Higher Education

**133**    Judiciary

**139**    Public Education

**169**    Public Employees

**173**    Taxation & Revenue

**189**    Transportation

**205**    Utilities

# Major Issues
## of the 80th Legislature, Regular Session

In 2007, the 80th Texas Legislature enacted 1,481 bills and adopted 17 joint resolutions after considering more than 6,341 measures filed. This report is an overview covering many of the highlights of the regular session. It summarizes some proposals that were approved and some that were not. Also included is a brief review of the arguments offered for and against each measure as it was debated. The legislation featured in this report is a sampling and not intended to be comprehensive.

Other House Research Organization reports covering the 2007 session include those examining the bills vetoed by the governor and the constitutional amendments on the November 6, 2007, ballot and an upcoming report summarizing the appropriations for fiscal 2008-09, including HB 1, HB 2, and HB 15 by Chisum.

# Contents

Page:

## Synopsis of Legislation, 80th Legislature, Regular Session — 5

## Business Regulation and Economic Development — 7

| | | | |
|---|---|---|---|
| * HB 1038 | Ritter | Revising operation of Texas Residential Construction Commission | 8 |
| * HB 1634 | Dukes | Incentives for film, television, and related industries | 10 |
| HB 2960 | Smithee | Restructuring the Texas Windstorm Insurance Association | 12 |
| * HB 3358 | Smithee | Prohibiting insurance rate increases during judicial review | 14 |
| SB 987 | Lucio | Mortgage counseling for complex loans | 15 |

## Criminal Justice — 17

| | | | |
|---|---|---|---|
| * HB 8 | Riddle | Death penalty, other punishments for repeat sex crimes committed against children | 18 |
| * HB 1355 | Gattis | Felony for owners of dogs causing serious bodily injury or death | 21 |
| * HB 2328 | Woolley | Cruelty to animals penalties | 23 |
| HB 3200 | Madden | State basic supervision funding for local probation departments | 25 |
| * SB 103 | Hinojosa | Revising Texas Youth Commission authority and operations | 27 |
| SB 263 | Ellis | Creating a Texas Innocence Commission | 32 |
| * SB 378 | Wentworth | Use of force or deadly force in self-defense | 34 |
| * SB 909 | Whitmire | Continuing of the Texas Department of Criminal Justice | 35 |
| SB 1655 | Ellis | Creating office of capital writs for death penalty habeas corpus petitions | 38 |

## Elections — 41

| | | | |
|---|---|---|---|
| HB 218 | B. Brown | Requiring voters to present proof of identification | 42 |
| * HB 556 | Hilderbran | Exemption for disabled voter accessibility in certain elections | 44 |
| HB 626 | P. King | Proving U.S. citizenship to register to vote | 46 |
| HB 2017 | Giddings | Moving the primary election date to the first Tuesday in February | 48 |

## Environment — 51

| | | | |
|---|---|---|---|
| * HB 12 | Hilderbran | Funding and jurisdiction of TPWD and Historical Commission | 52 |
| * HB 3732 | Hardcastle | | |
| HJR 93 | Chisum | Implementation of advanced clean energy projects | 54 |
| * SB 3 | Averitt | Water resources development and management | 56 |
| * SB 12 | Averitt | Air quality enhancement programs, including energy efficiency standards | 61 |

* Finally approved or on November 6, 2007, ballot

SB 124    Ellis       Requiring low-emission vehicle standards                            64
SB 1317   Jackson     Restricting a city's ability to regulate air pollution outside its limits   65
SB 1687   Watson      Studying strategies for combating greenhouse gas emissions          66

## Families and Children                                                            67

 * HB 2685   Chisum/     Marriage license fee waiver for premarital education/
  * HB 2683  Chisum      Marriage promotion grants                                      68
   SB 221    Lucio       Obtaining noncertified copies of adoption-related birth certificates   71
   SB 439    Deuell      Advance directives and health care and treatment decisions      73
 * SB 758    Nelson      Child Protective Services revisions                             75
   SB 785    Shapiro/    Abortion reporting/
   SB 920    Patrick     Review of ultrasound image                                      77

## Government Affairs                                                                79

   HB 10     Chavez      Prosecution defense for certain gambling for Native American tribes   80
   HB 13     Swinford    Homeland security, border security, TDEx database,
                         immigration enforcement                                        82
   HB 28     Berman      Illegal immigration restrictions: Prohibiting children of illegal
                         immigrants from receiving state benefits                       86
   HB 461    Miller      Prohibiting mandatory participation in an animal ID system      87
 * HB 991    Rose        Limiting disclosure of concealed handgun licensees              89
   HB 2006   Woolley     Revised standards for authority to use eminent domain power     90
 * HJR 19    Branch      Requiring legislators to cast record votes                      93
   HJR 59    Elkins      Allowing the Legislature to override a veto after *sine die* adjournment   95
 * SB 11     Carona      Emergency management, mutual aid system, wiretaps,
                         vehicle tags, Border Security Council                           97
 * SB 129    West        Reporting the value of gifts of cash or cash equivalent to
                         public officials                                              100
   SB 903    Brimer      Continuing the Office of State-Federal Relations               101
 * SB 1908   Ellis       Modifying provisions for statewide and local housing programs  103
 * SB 2031   Ogden       Requiring legislative approval of certain claims against the state   106

## Health and Human Services                                                        107

   HB 9      Crownover   Banning smoking in all workplaces and public places            108
 * HB 14     Keffer/
  * HJR 90   Keffer      Cancer research funding                                        110
 * HB 109    Turner      Children's Health Insurance Program eligibility revisions       112
 * HB 1098   Bonnen      Preventing HPV vaccine from being required for admission to school   114
 * HB 3575   Rose        Monitoring and update of HHS eligibility systems               116
   HB 3778   Rose        Nursing home quality assurance fee                             118
 * SB 10     Nelson      Revisions to the Medicaid program and access to health care     120

## Higher Education                                                                    **123**

|   | HB 159 | Zedler | Determination of resident status of students by public universities | 124 |
| * | HB 3826 | Morrison | High school curriculum requirements for higher education admission | 126 |
|   | HB 3828 | Morrison | Performance incentive funding for higher education institutions | 127 |
| * | HB 3900 | Morrison | Establishing the Texas Tomorrow Fund II prepaid tuition program | 128 |
|   | SB 85 SB 96/SB 100/SB 578/SB 589 | Hinojosa/ | Limiting increases in tuition and required fees at higher education institutions | 130 |
|   | SB 101 | Shapiro | Limiting top 10 percent automatic undergraduate admissions | 131 |

## Judiciary                                                                            **133**

| * | HB 1602 | Van Arsdale | Amending venue rules for lawsuits involving maritime workers | 134 |
|   | SB 966 | Ellis | Establishing a qualified privilege of a journalist not to testify or disclose | 135 |
|   | SB 1204 | Duncan | Court system reorganization and administration | 137 |

## Public Education                                                                     **139**

| * | HB 1287 | Chisum | Adding study of the Bible as public school elective course | 140 |
|   | HB 1387 | P. King | Requiring school districts to conduct feasibility studies before taking land | 142 |
| * | HB 2237 | Eissler | Programs and grants for dropout prevention, high school success, and college readiness | 144 |
| * | HB 2532 | Patrick | Alternative school placement of students expelled for felonies and registered sex offenders | 146 |
| * | HB 2814 | Eissler | Requiring TEA to establish a dual language education pilot program | 148 |
| * | HB 3678 | C. Howard | Voluntary expression of religious viewpoints in public schools | 149 |
|   | SB 4 | Shapiro | Establishing a new system of public charter schools | 151 |
| * | SB 8 | Janek | Random steroid testing in public high schools | 153 |
| * | SB 9 | Shapiro | Requiring criminal background checks for public school employees | 155 |
| * | SB 530 | Nelson | Increased physical education requirements for public school students | 157 |
|   | SB 1000 | Shapiro | School vouchers for students with autism | 159 |
| * | SB 1031 | Shapiro | Replacing TAKS with end-of-course exams for graduation | 161 |
|   | SB 1643 | Shapiro | Tying educator evaluations to test scores | 164 |
| * | SB 1788 | Shapiro | Creating a state virtual school network | 166 |

## Public Employees                                                                     **169**

| * | SB 247 | Ellis | Restricting ERS and TRS pension fund investments in Sudan | 170 |
| * | SB 1846 | Duncan | Increasing TRS contribution rates and issuing a "13th check" for retirees | 172 |

## Taxation and Revenue                                                                 173

| | | | |
|---|---|---|---|
| HB 216 | Otto | Increasing school district margin of error in comptroller's property value study | 174 |
| * HB 1751 | Cohen | Entry fee for sexually oriented businesses to fund sexual assault prevention | 176 |
| HB 2785 | Paxton | Further compression of school district property tax rates | 177 |
| * HB 2994 | Bonnen | Allowing limitations on appraised value for nuclear and coal gasification plants | 178 |
| HB 3821 | Villareal | Mandatory property sales price disclosure | 180 |
| * HB 3928 | Keffer | Correcting and modifying the revised franchise tax | 182 |
| HJR 16 | Leibowitz/ | Changing limitations on taxable appraised values of properties | 184 |
| HJR 21/HJR 27/HJR 41/HJR 47/HJR 52/SJR 10/SJR 14/SJR 15/SJR 23 | | | |
| SB 1886 | Williams | Revising motor fuels taxes, including 90-day gasoline tax holiday | 186 |
| * SJR 13 | Averitt/ | Proportionate reduction in elderly and disabled school tax freeze | 187 |
| * HB 5 | Berman | amount | |

## Transportation                                                                       189

| | | | |
|---|---|---|---|
| * HB 323 | Hamilton | Three-point seat belts for school buses | 190 |
| HB 1439 | Chisum | Driver record monitoring pilot program | 192 |
| * SB 792 | Williams | Two-year moratorium and local priority for certain toll road projects, revised standards for CDAs, higher highway bonding capacity | 194 |
| * SB 1119 | Carona | Statewide standards for use of red-light cameras | 200 |
| * SJR 64 | Carona | Authorizing $5 billion in general obligation bonds for highway projects | 203 |

## Utilities                                                                             205

| | | | |
|---|---|---|---|
| * HB 735 | Straus | Repealing the Telecommunications Infrastructure Fund assessment | 206 |
| * HB 1090 | Swinford | Grants to encourage electric energy generation with biomass materials | 207 |
| * HB 3693 | Straus | Electricity efficiency and conservation incentives | 209 |
| SB 482 | Fraser | Competition incentives for retail electric customers | 211 |

## Index by Bill Number                                                                  215

# SYNOPSIS OF LEGISLATION
## 80th Legislature, Regular Session

|  | Introduced | Enacted* | Percent enacted |
|---|---|---|---|
| **House bills** | 4,140 | 955 | 23.1% |
| **Senate bills** | 2,050 | 526 | 25.7% |
| **TOTAL bills** | 6,190 | 1,481 | 23.9% |
| **HJRs** | 108 | 10 | 9.3% |
| **SJRs** | 43 | 7 | 16.3% |
| **TOTAL joint resolutions** | 151 | 17 | 11.3% |

*Includes 51 vetoed bills — 43 House bills and 8 Senate bills

|  | 2005 | 2007 | Percent change |
|---|---|---|---|
| **Bills filed** | 5,484 | 6,190 | 12.9% |
| **Bills enacted** | 1,389 | 1,481 | 6.6% |
| **Bills vetoed** | 19 | 51 | 168.4% |
| **Joint resolutions filed** | 145 | 151 | 4.1% |
| **Joint resolutions adopted** | 9 | 17 | 88.9% |
| **Legislation sent or transferred to Calendars Committee** | 1,492 | 1,692 | 13.4% |
| **Legislation sent to Local and Consent Calendars Committee** | 921 | 1,056 | 14.7% |

*Source: Texas Legislative Information System*



# Business Regulation
## and Economic Development

| | | | |
|---|---|---|---|
| * HB 1038 | Ritter | Revising operation of Texas Residential Construction Commission | 8 |
| * HB 1634 | Dukes | Incentives for film, television, and related industries | 10 |
| HB 2960 | Smithee | Restructuring the Texas Windstorm Insurance Association | 12 |
| * HB 3358 | Smithee | Prohibiting insurance rate increases during judicial review | 14 |
| SB 987 | Lucio | Mortgage counseling for complex loans | 15 |

# Revising operation of Texas Residential Construction Commission

**HB 1038 by Ritter**
*Effective September 1, 2007*

**HB 1038** revises disciplinary actions and the inspections process under the Texas Residential Construction Commission (TRCC) Act. The bill also changes requirements for registered builders and the composition of the TRCC.

***Contract requirements.*** A construction contract must include the builder's name, registration number, builder information available through TRCC, how to file a complaint, and a disclosure regarding binding arbitration if arbitration is required by the contract. HB 1038 lowers the value of interior home improvements subject to the TRCC Act from $20,000 to $10,000.

***TRCC composition.*** In appointing the three public members of the TRCC, the governor must consider individuals who can represent the interests of homeowners. A person who is an officer, employee, manager, or paid consultant of a consumer association or Texas trade association in the field of residential construction may not be a member or employee of the TRCC. A lobbyist also may not be a member or the general counsel of the TRCC.

***Disciplinary action.*** HB 1038 adds numerous violations for which a builder may be subject to disciplinary action. TRCC or the attorney general may obtain injunctions and issue cease and desist orders for violations of TRCC rules. TRCC may revoke or suspend a builder's license only if the builder engages in repeated violations resulting in disciplinary action. TRCC may assess an administrative penalty of up to $10,000 for most violations and up to $100,000 for fraud or misappropriation of funds. A builder and a person who controls a majority ownership interest in the builder are jointly and severally liable for any amount due the commission from administrative actions. The commission must make available to the public information about each complaint resulting in disciplinary action.

***Inspections.*** HB 1038 adds requirements for builders to have a fee inspector inspect residential construction conducted in areas not subject to municipal inspections. A homeowner is not bound by the state-sponsored inspection and dispute-resolution process (SIRP) if the homebuilder was not registered when the contract was made or the homebuilder's license has been revoked. If an alleged defect that would violate the statutory warranty of habitability is not reasonably discoverable within the warranty period, SIRP may be requested up to the second anniversary of

the discovery of the alleged defect. The recommendation of a third-party inspector or a panel of state inspectors is considered admissible as evidence as a business record.

***Registration requirements.*** A builder must meet continuing education requirements in order to maintain registration, including five hours of continuing education every five years. A municipality must verify that a builder is registered with TRCC or exempt from registration before issuing a building permit. The bill requires registration of colonias, and a homeowner of a colonia who claims a post-construction defect must go through the SIRP.

## Supporters said

HB 1038 is a balanced bill that would make TRCC a stronger, more effective agency with increased power to protect homeowners and punish the bad actors in the residential construction industry. The bill would make the commission more impartial by making it unlawful for the officers of a builders' trade association or consumer advocacy groups to be members or employees of the TRCC. Conflict of interest provisions for the commission would be consistent with those for other Texas regulatory bodies.

The bill would include significant increases in TRCC power to authorize disciplinary action for a variety of new offenses. Remedies for these violations would be enforceable because TRCC and the attorney general could issue cease and desist orders for violations and could obtain court-ordered injunctive relief if builders did not comply. These powers, combined with increased administrative penalties, would encourage homebuilders to perform work properly the first time and to address quickly any issues that were identified after construction.

The rights and remedies of homeowners in actions against builders would be expanded. If a builder contracted for work while not registered, a homeowner could disregard the SIRP and go directly to court. With respect to the warranty of habitability, the time period to request the SIRP if a defect was not discoverable would be extended to two years after the date of discovery. The homeowner's presumption of a defect in subsequent civil actions would be strengthened because an inspector's recommendation would be self-authenticating. HB 1038 would expand the parties against whom a homeowner could take action to include

those who had a majority interest in the builder, so these individuals could not evade their shared responsibility to homeowners.

The bill simultaneously would maintain appropriate protections for builders. It would ensure that a revocation or suspension of registration could not occur unless repeated prior violations had occurred. This would recognize that some builders conduct more business than others, and large builders should not have their registration revoked for isolated incidents.

The TRCC Act already contains appropriate flexibility for TRCC to define warranty standards. Minimum standards for warranties have been established, and TRCC has rulemaking authority to create more stringent warranty standards if research on residential construction practices indicates changes to warranties would be appropriate.

## Opponents said

Although many of the provisions in the bill would be beneficial, HB 1038 would not go far enough to help homeowners and would decrease consumer protections in some areas. Builders are afforded four places on the commission, yet a person who had certain affiliations with a consumer association could not be a member or employee of TRCC. This provision is at odds with the provision requiring that consideration be given to individuals who represent the interests of homeowners in filling the three public member slots on the commission. Many of those most well-informed regarding homeowner interests likely would have some prohibitive affiliation with a consumer association.

Certain violations perpetrated by builders are so egregious that they merit immediate revocation or suspension of registration with the first incident. HB 1038 would prevent such immediate disciplinary actions from occurring because it would not allow TRCC to revoke or suspend a builder's license unless the builder engaged in repeated violations resulting in disciplinary action.

In addition, the bill specifies that a builder who failed to pay a court judgment would be subject to disciplinary action. The current statute is more appropriate because it is general enough to apply to failure to pay an arbitration judgment. The vast majority of contracts between builders and homeowners include binding arbitration agreements, so disputes between homeowners and builders rarely are settled in court. The added specificity in HB 1038 would render this cause for disciplinary action largely useless to the majority of consumers who must address their grievances with builders in arbitration.

Ideally, the bill would remove stipulations regarding the length of warranties from the Property Code so that the commission could use its judgment to set appropriate warranty periods. Short of removing such stipulations, the bill at a minimum should extend the warranty periods from one year to two years for workmanship and from two years to three years on electrical and appliances.

## Notes

The **HRO analysis** of HB 1038 appeared in Part Two of the April 24 *Daily Floor Report*.

# Incentives for film, television, and related industries

**HB 1634 by Dukes**
*Effective June 8, 2007*

**HB 1634** renames the Film Industry Incentive Program the Moving Image Industry Incentive program and provides incentives for digital interactive media productions in addition to incentives already provided for films, television programs, and commercials. Program qualification and grant awards will be determined based on the amount of a production company's in-state spending rather than the amount of wages paid to Texas residents.

To be eligible for moving image industry incentive grants, a project must generate $1 million in in-state spending for film or television programs or $100,000 in in-state spending for commercials. At least 70 percent of the production crew, actors, and extras must be Texas residents, and at least 80 percent of the project must be filmed in Texas. A grant application may be denied because of content that is inappropriate or that portrays Texas or Texans in a negative fashion.

Qualifying applicants may receive a grant not to exceed the lesser of 5 percent of the total amount of a production company's in-state spending or $2 million for a film; $2.5 million for a television program; $200,000 for a commercial or series of commercials; or $250,000 for a digital interactive media production. The bill adds Houston and Fort Worth to the areas designated as under-used that may receive an additional 1.25 percent grant of total in-state production costs. The bill also would create a moving image industry personnel training program and a film archive program.

## Supporters said

HB 1634 would help support the state's moving image production industry, which now employs more than 18,000 Texans, and would entice producers to locate more projects in Texas. The Texas Film Commission estimates that since 2003, Texas has lost more than $700 million in production budgets and 4,500 jobs to other states that have implemented the types of incentives that the bill would allow.

Thirty-seven states and all Canadian provinces already have similar programs, and these incentive programs are dramatically altering film production location decisions. For example, the New Mexico State Film Commission saw production revenues soar from $8 million in 2002, before incentives were enacted, to $428 million in 2006. At the same time, Texas lost its market share in the moving image industry, commanding nearly 85 percent of the regional market in 2002 and only 18 percent of the market in 2006. Without an active incentive program, Texas risks losing its once promising moving image production industry.

HB 1634 would improve the state's existing grant program by increasing some project grant caps, tailoring the grant caps to encourage specific types of projects, and ensuring that productions increase employment for Texas production crews. The current grant program ignores the impact of the gaming and animation industries, which currently employ 1,835 people in Texas and have significant overlaps with the film industry in the development of post-production and special effects editing talent. The bill would add incentives to encourage digital interactive media production and would place more emphasis on television production, because it creates a more stable source of in-state spending and local jobs than do feature films.

The bill also would require that 70 percent of the production crew, actors, and extras be from Texas and more than 80 percent of the filming be done in the state. This change to the program is vital, because it would ensure that productions receiving funding would do the bulk of their work in Texas and would keep Texans from leaving the state for seasonal work. It is of primary importance that productions not depend on the relocation of crews from other states when Texas has its own base of expert production crews.

HB 1634 would ensure the Moving Image Industry Incentive Program was fiscally responsible. Because Texas is home to highly skilled production crews, it could provide a fraction of the incentives other states offer and still make an impact. In addition, the funding appropriated for this program by HB 1 for fiscal 2008-09 would be contingent on the comptroller's certifying that the moving image industry generated sufficient revenue to offset the cost of the appropriation. To further ensure financial accountability, any funding requests above the current appropriation would undergo an extensive approval process. The bill would not create a dedicated account, so if the grant program was found not to be self-sufficient, the funding would remain in general revenue to fund other state priorities.

## Opponents said

While increasing film production is important, the state cannot afford to support corporate welfare. The current budget for Film and Music Marketing in the state is $1.8 million, and the Moving Image Industry Production Incentive Program aims to dole out more than ten times that amount over the biennium. In 2003, Illinois initiated a film incentives program and by 2006 had to double its tax incentive in order to remain competitive. Like any spending program, this budget is not a fixed cost, but likely would grow over time. While it is contended that the incentive program would be self-supporting, it is unclear if the comptroller's calculations also would examine the benefits the state could derive by simply returning the $22 million to Texas taxpayers.

The state of Texas is not in the business of moving image production. The industry is made up of private businesses and is region-specific. Because most of the moving image production happens in the Dallas and Austin areas, these municipalities should develop more robust incentive packages to attract projects to their areas. It would be unfair to tax every person and business in the state in order to provide incentives that ultimately would benefit only one or two metropolitan areas. Moreover, filmmakers already are eligible for several incentives, including exemption from sales tax on many of the items and services used in the manufacture of the film, exemption from the state hotel occupancy tax if they stay for more than 30 days, and fuel sales tax refunds for fuel used off-road, such as for generators and boats.

## Other opponents said

HB 1634 would not do enough to support Texas talent. Texas residents should make up more than 70 percent of a production crew, actors, and extras. Also, the bill should designate a portion of the incentive funding to support the projects of Texas production companies rather than base eligibility solely on in-state spending and provide all benefits to out-of-state production companies.

This bill should include a minimum diversity standard. Texas production crews should reflect the makeup of our state. Historically, crews in the moving image production industry have been predominantly Anglo, but the state includes a diverse population of skilled workers.

## Notes

The **HRO analysis** of HB 1634 appeared in the April 10 *Daily Floor Report*.

HB 1 by Chisum, the general appropriations bill for fiscal 2008-09, appropriates $22 million over the biennium to fund the moving image incentive program. Appropriations may exceed this amount with approval from the Legislative Budget Board and the Office of the Governor. Any appropriation for the program is contingent on the comptroller certifying that there is sufficient revenue generated by the film industry and related activity in Texas to offset the cost of the appropriation. Not more than $2 million may be used for the personnel training and film archive programs.

# Restructuring the Texas Windstorm Insurance Association

**HB 2960 by Smithee**
***Died when no action taken on conference committee report***

**HB 2960** would have amended Insurance Code provisions for operating and funding the Texas Windstorm Insurance Association (TWIA), which provides homeowners' insurance for coastal residents and businesses that are denied coverage by private carriers.

***Funding structure.*** TWIA's current funding structure, which includes several stages for covering catastrophic losses that exceed the association's premium income, would have been revised. The first stage for covering these losses, a $100 million assessment on member insurers, would have been eliminated. The funding mechanism to cover excess losses and operating costs would have included the following, in this order:

- up to 75 percent of the amount in the catastrophe reserve trust fund could have been used to cover each catastrophic event. If the trust fund had been reduced by more than 75 percent in one year, TWIA could have required member companies to collect a premium surcharge for one year from their policyholders who lived or had insured property in the catastrophe area;
- an assessment on member insurers of up to 1.25 percent of direct premiums;
- income from Class 1 bonds issued before a catastrophic event;
- an assessment on member insurers of up to 4 percent of direct premiums; and
- up to $3.5 billion in Class 2 bonds issued on or after a catastrophic event.

Unlimited assessments on insurers for major catastrophic events and related premium tax credits for five or more successive years after paying these assessments would have been eliminated.

***Revenue bond program.*** HB 2960 would have established procedures for the issuance of Class 1 and Class 2 revenue bonds. For Class 1 bonds, debt service and bond-related expenses would have been covered by a premium surcharge on policyholders in the catastrophe area. For Class 2 bonds, debt service and bond-related expenses would have been covered by a statewide premium surcharge of up to 4.5 percent of annual premium over a 12-month period. The bill would have specified that neither the state nor a state agency, political corporation, or political subdivision of the

state was obligated to pay the principal or interest on Class 1 bonds except as provided by the bill.

***Notice to policyholders and applicants for insurance.*** TWIA would have had to issue a notice to policyholders and applicants for insurance that read substantially as follows:

"Insurance policies issued by the Texas Windstorm Insurance Association are not guaranteed by the state or federal government. In the event of a major catastrophe, the association may not have sufficient funding resources to pay all losses to all policyholders suffering damage. In such an event, you may be paid less than the full amount of damages that you suffer. You may obtain additional information as to the association's potential exposure and its available funding resources at www.tdi.state.tx.us."

***Rates.*** The TWIA board could have filed and used rates without prior approval by the insurance commissioner if the filed rates were made 60 days before being used, did not exceed 105 percent of current rates, did not reflect a rate change of more that 5 percent for any individual rating class, and were not disapproved in writing by the insurance commissioner.

The bill would have allowed recognized catastrophe models to be used as a factor in determining TWIA rates. TWIA would have been authorized to establish rating territories and vary rates among territories.

***Mandatory compliance with building codes.*** To be eligible for insurance coverage through TWIA, all construction, alteration, remodeling, enlargement, and repair of any structure in the catastrophe area begun on or after January 1, 2008, would have had to be constructed in compliance with applicable building codes. The bill would have authorized TWIA to make exceptions and charge a premium surcharge for certain structures that were altered before January 1, 2008, and had been insured in the private market for the 12-month period immediately preceding the date of the application.

***Inspections.*** The bill would have transferred authority for conducting building inspections from the Texas Department of Insurance (TDI) to TWIA and would have allowed the association to charge a reasonable fee for each inspection. The bill would have authorized TWIA to fund

inspections after a catastrophe as necessary to facilitate recovery, rebuilding, and repair in the affected catastrophe area. TWIA would have adopted procedures for the appointment and oversight of qualified inspectors.

**Incentive plan.** TDI would have had to maintain a list of all property and casualty insurers that sold insurance in the voluntary market in the seacoast territory and developed incentive programs for insurers to write insurance on a voluntary basis and to minimize the use of TWIA as a means of obtaining insurance.

**Composition of the board of directors.** The nine-member TWIA board of directors would have been appointed by the commissioner of insurance and would have included:

- four insurer representatives who were members of TWIA, who could reside anywhere in the state;
- three public members, one of whom would have had to own property or have resided in one of first-tier coastal counties and be a TWIA policyholder; and
- two licensed insurance agents, one of whom have had to maintain a principal office in a first-tier coastal county.

The commissioner also would have had to appoint a non-voting member to advise the board regarding issues related to the inspection process. All board members would have had to demonstrate experience in insurance, general business, or actuarial principles sufficient to make the success of TWIA probable.

## Supporters said

HB 2960 would give TWIA the tools it needs to cover losses in the event of one or a series of catastrophic storms along the Texas coast. TWIA's current funding level and mechanism for covering losses is insufficient to cover losses should one or more catastrophic events like hurricanes Katrina or Rita occur in the coming years. Without a new funding structure, the state would have to use general revenue to cover most losses in such a catastrophic event.

In the wake of hurricanes Katrina and Rita, many private insurers have withdrawn from the coastal market, leaving TWIA as the insurer of last resort for an increasing number of coastal residents. Over the past five years, policies in force at TWIA have increased dramatically. Between 2001 and 2006, the number of TWIA policies has nearly doubled, from 68,758 to 135,000, in the 14 coastal counties and a portion of Harris County that make up the

TWIA coverage area. As of November 30, 2006, TWIA's exposure for windstorm losses from all costs reached more than $40 billion. As of January, 2007, the association had about $180 million of premiums in force, of which about $100 million could be used to cover the cost of windstorm-related losses.

HB 2960 would give TWIA more flexibility in setting rates to meet projected demands and in issuing bonds to cover losses in the event of one or more catastrophic storms. By authorizing the use of catastrophe models, the bill would allow TWIA to predict more accurately the likelihood of catastrophic events and related funding needs.

This improved structure would better prepare TWIA to cover losses in the event of one or more catastrophic storms and would stimulate economic growth along the coast by providing sufficient windstorm coverage. This economic growth would benefit the whole state by generating increased tax revenue. While windstorm insurance may be an issue of special importance to coastal residents, it is in the entire state's interest to establish a solid system to protect against windstorm losses.

## Opponents said

HB 2960 would give TWIA too much latitude by allowing the use of recognized catastrophe models in setting rates. These models easily can be manipulated to justify rates that otherwise might be considered unnecessarily high. The bill could lead to higher TWIA rates in coastal areas, which could inhibit economic activity and growth.

Requiring TWIA to issue a notice to every policyholder and applicant that suggests that coverage might not be provided in a major catastrophe would be confusing to consumers and could have other, more serious effects on the coastal economy. For example, mortgage companies might be hesitant to provide funding if insurance coverage were provided with the sort of caveat implied by such a notice. Rather than requiring the notice, the bill should add an additional layer of assessments on insurers for the most catastrophic events so that adequate coverage was available. If a notice is required, it should include clearer and more specific parameters indicating when coverage might be curtailed.

## Notes

The **HRO analysis** of HB 2960 appeared in Part One of the May 7 *Daily Floor Report*.

# Prohibiting insurance rate increases during judicial review

**HB 3358 by Smithee**
*Effective September 1, 2007*

**HB 3358** prohibits an insurer that files in district court a petition for judicial review of a disapproved rate from raising rates for the same line of insurance before the matter under judicial review is finally resolved, unless the new rate is filed with the Texas Department of Insurance (TDI) and approved by the insurance commissioner.

If an insurer is required to file its rates, the commissioner must issue an order specifying the reasons for the required rate filings. The affected insurer is entitled to a hearing if a written request is filed with the commissioner no later than 30 days after the date of the order.

## Supporters said

HB 3358 would discourage insurers from using the court system to their advantage while challenging the disapproval of a rate increase by the insurance commissioner. This would prevent another situation like the one that occurred following the enactment of SB 14 by Jackson in 2003, when the insurance commissioner did not approve a rate increase proposed by State Farm. The company appealed the commissioner's decision but has been able to charge the higher rate while the matter is under judicial review. Experts estimate that State Farm has made more than $600 million in premium and interest charges during its court challenge to TDI's initial rate adjustment.

The bill would provide an incentive for insurers to resolve court cases as quickly as possible rather than dragging them out over several years. If insurers were prohibited from raising rates until a court case was resolved, they would be more likely to seek a more timely resolution.

## Opponents said

The Legislature enacted the file-and-use system in 2003 to allow insurers to adjust rates in response to changing market conditions. Any litigation involving past rate decisions should not have an effect on future rate filings, which affect current and future rates.

## Notes

The **HRO analysis** of HB 3358 appeared in the Part Three of the May 3 *Daily Floor Report*.

# Mortgage counseling for complex loans

**SB 987 by Lucio**
*Died in the House*

**SB 987** would have prohibited a lender from making a complex loan to a borrower with a credit score of 650 or less unless the loan applicant presented a certificate of completion of counseling from an approved housing counseling agency regarding complex loans and financial alternatives. A complex loan would have been a loan:

- that had a principal amount of less than $125,000;
- that was secured by a first lien on the principal residence of the borrower;
- for which the aggregate of the principal balance of all loans secured by the property to the value of the property was at least 90 percent; and
- that contained a variable interest rate with an initial interest rate that was significantly lower than the fully indexed rate at the time the loan was closed or a provision that permitted periodic payments that were less than the amount of accrued interest on the scheduled payment date.

The counseling agency could have charged the loan applicant a reasonable fee for the counseling. The counseling requirement would not have applied to an interim construction loan with a maturity of less than 18 months. An attorney who provided the counseling could not have represented or advised another party to the loan.

Before the applicant received counseling, the lender or broker would have had to provide the applicant and counselor written notice explaining the proposed terms of the loan, that the loan was a complex loan, and available financial alternatives.

## Supporters said

SB 987 would educate consumers regarding their loan alternatives and the risks associated with the loan product they choose. Texas ranks sixth among states in the rate of mortgage foreclosures, largely due to the number of consumers obtaining complex loans that they did not realize they could not afford. While foreclosures obviously are negative for consumers, they also adversely impact legitimate lenders and the building industry. The high level of foreclosures has contributed to many sub-prime lenders recently going out of business, and the demand for new home building decreases with a decreased pool of lenders.

A home is the largest purchase most people will make in their lives, and loan products change constantly – to the degree that often the lender does not understand fully the way a product works. If a consumer did opt for a complex loan, counseling would prepare the consumer for any changes in payment level as the loan term progressed, and the consumer could make financial arrangements accordingly. Counseling could take place in person or on the phone, and flexible options would allow counseling to occur quickly without interfering with the consumer's obtaining the desired property.

SB 987 would be focused narrowly to address the riskiest loans obtained by higher-risk consumers. It would address only negative amortizations and variable rate arrangements that had up-front teaser rates to make initial payments significantly lower. The borrower population would be limited to people with credit scores no higher than 650 who were borrowing less than $125,000. The bill would draw the line at $125,000 because consumers who could qualify for higher loan amounts would have a greater ability to recover from a loss.

More elaborate disclosures would not confer the benefits of counseling, because disclosures would be provided with the rush of other documents a borrower received on the closing date after the borrower already had made arrangements and was determined to sign on the dotted line. Even if a borrower carefully reviewed disclosures on the closing date, the borrower would not have the same opportunity to ask clarifying questions that would be afforded through counseling. While the borrower could ask the loan officer questions, the loan officer might be biased to answer in a way that ensured the borrower completed the loan transaction. Predatory lenders also could deceive the borrower, and because the Deceptive Trade Practices Act does not cover lending, the borrower would have little recourse.

## Opponents said

SB 987 would place the state government in an inappropriate role mandating mortgage loan counseling for borrowers who should be responsible for their own decision-making. A consumer intending to make such a large investment should be responsible for independently seeking

education about the loan products available and choosing the most appropriate product. In certain instances, a complex loan is the only loan for which a consumer can qualify. If a consumer found a complex loan was the only borrowing option and felt such a loan would pose too great a risk, it would be the responsibility of the consumer to delay the decision to borrow or to pursue a more affordable property.

SB 987 could be detrimental to consumers who were well educated about the type of loan they sought. Non-traditional loan types were created to suit borrowers with unique needs. A person should not be dissuaded from pursing a certain type of loan if he or she had researched the loan independently and deemed it the most appropriate financing option. In a competitive market, the delay associated with having to obtain counseling could cause a consumer to lose a desired property to another buyer who could obtain immediate financing. Rather than require counseling that could interfere with a consumer's closing a loan, complex loans could be accompanied by more detailed disclosures that made it clear what the borrower should anticipate and would ensure that the lender could not deceive the consumer.



# Criminal Justice

| * HB 8 | Riddle | Death penalty, other punishments for repeat sex crimes committed against children | 18 |
| * HB 1355 | Gattis | Felony for owners of dogs causing serious bodily injury or death | 21 |
| * HB 2328 | Woolley | Cruelty to animals penalties | 23 |
| HB 3200 | Madden | State basic supervision funding for local probation departments | 25 |
| * SB 103 | Hinojosa | Revising Texas Youth Commission authority and operations | 27 |
| SB 263 | Ellis | Creating a Texas Innocence Commission | 32 |
| * SB 378 | Wentworth | Use of force or deadly force in self-defense | 34 |
| * SB 909 | Whitmire | Continuing of the Texas Department of Criminal Justice | 35 |
| SB 1655 | Ellis | Creating office of capital writs for death penalty habeas corpus petitions | 38 |

# Death penalty, other punishments for repeat sex crimes committed against children

**HB 8 by Riddle**
*Effective September 1, 2007*

**HB 8** increases penalties for sex crimes committed against children by authorizing the death penalty for certain repeat offenders and creating a new offense for continuous sexual abuse. The bill is to be known as "the Jessica Lunsford Act."

***Super-aggravated sexual assault and death penalty.*** HB 8 authorizes the death penalty or life-without-parole for second convictions of "super aggravated sexual assault" against children. First offenses are punished with 25 years to life and are ineligible for parole.

The term "super aggravated sexual assault" describes an enhancement created by HB 8 to the existing aggravated sexual assault statute. It applies to convictions for aggravated sexual assault if the victim was:

- younger than six years old; or
- younger than 14 years old and the offense included certain aggravating factors involving bodily injury, threats to kill or hurt, deadly weapons, acting with multiple people to commit the offense, or giving certain drugs to the victim.

***New offense of continuous sexual abuse.*** HB 8 creates a new offense of "continuous sexual abuse." The offense is committed if a person who was at least 17 years old committed two or more "acts of sexual abuse," regardless of the number of victims, against a child younger than 14, over a period of 30 or more days. The offense is a first-degree felony punishable by a term of 25 years to life, and offenders are not eligible for parole. Second convictions are punished with life without parole.

"Acts of sexual abuse" are defined as sexual assault; aggravated sexual assault; indecency with a child involving contact with the sex organ or anus; aggravated kidnapping with the intent to violate or abuse the victim sexually; burglary with intent to commit one of these offenses; and sexual performance by a child.

If a jury tries the case, it does not have to agree unanimously on which specific acts of sexual abuse were committed or the exact date on which they were committed.

The jury must agree unanimously that during the 30-day-plus period, the person committed at least two acts of sexual abuse.

It is an affirmative defense to prosecution that the person was not more than five years older than the victim, did not use force, and did not have previous convictions for certain sex crimes.

***Statute of limitations.*** HB 8 removes the statute of limitations for sexual assault of a child, aggravated sexual assault of a child, and indecency with a child and establishes no statute of limitations for the new offense of continuous sexual abuse of a child.

The bill creates a new statute of limitations of 20 years from the 18th birthday of a victim for crimes against victims who were younger than 17 at the time of the offense and applies it to sexual performance by a child, aggravated kidnapping with intent to violate or abuse the victim sexually, and first-degree burglary with intent to commit certain serious sex crimes.

***Miscellaneous.*** HB 8 makes several other changes to the laws governing sex offenses committed against children. It adds sexual performance by a child to the list of serious and violent crimes in Code of Criminal Procedure Art. 42.12, sec. 3(g), which restricts probation and requires offenders to serve one-half of their sentences or 30 years, whichever is less, before being eligible for parole. The bill also adds 3(g) sex offenses committed against children to the list of offenses that are not eligible for jury-recommended probation.

It increases penalties for sexual performance by a child if the victim is younger than 14 years old and makes all indecency with a child offenses, all sexual assault offenses, sexual performance by a child, and continuous sexual abuse ineligible for release on mandatory supervision, under which certain inmates automatically are released on a certain date under supervision similar to parole.

The bill also authorizes the attorney general to offer to assist local prosecutors in prosecuting certain sexually violent offenses, and it requires the attorney general to assist local prosecutors with those cases upon their request.

# Supporters said

HB 8 is necessary to provide the best protection possible for Texas children from sex offenders who commit horrific crimes and to punish appropriately those who victimize children. HB 8 would be Texas' version of Jessica's Laws, the name given to a set of proposed laws targeting sex criminals who commit offenses against child victims.

***Super-aggravated sexual assault and death penalty.*** Sex offenses against children are so horrific that the death penalty for repeat offenders would be appropriate and just punishment. HB 8 would apply the death penalty only to the most dangerous offenders – those who repeatedly sexually assault very young children or assault children with aggravating factors. Other punishments, such as long prison sentences, are not adequate to address the harm these repeat offenders have caused and the danger to the community they represent.

Concerns that making serious sex crimes against children eligible for the death penalty would prompt offenders to kill victims are unfounded. Other states with similar laws have seen no rash of child killings. Authorizing the death penalty for repeat child rapists would be a powerful deterrent to offenders who have been convicted once of raping a child. A potential death sentence should not deter family members from protecting children from heinous crimes by reporting those crimes.

Long, mandatory prison terms are appropriate punishment for first offenses of super-aggravated sexual assault. In addition to protecting victims, witnesses, and other children by keeping sex criminals behind bars, long sentences would help deter other potential offenders. Long mandatory sentences would not make crimes more difficult to prosecute, but instead would ensure that offenders were punished appropriately. Instead of accepting plea bargains that reflect less serious offenses, prosecutors should be required in some cases to devote the resources necessary to obtain convictions for the actual crimes that were committed.

Texas should join the growing number of states instituting such laws. At least five states – Florida, Louisiana, Montana, Oklahoma, and South Carolina – have authorized the death penalty for people who commit repeat serious sex crimes against children, and other states are considering it.

Texas should do whatever is necessary to protect its children without waiting for the U.S. Supreme Court to rule specifically about the death penalty for child rapists. When the court ruled in 1977 in *Coker v. Georgia*, 433 U.S. 584,

that the death penalty was disproportionate punishment for the crime of raping an adult woman and therefore forbidden by the Eighth Amendment as cruel and unusual punishment, it did not rule on the constitutionality of sentencing child rapists to death. The issues involved in cases of repeat child rapists are different than those in the Coker case, and the language in Coker was limited specifically to the rape of an adult and did not touch on the rape of children.

***New offense of continuous sexual abuse.*** By creating the new offense of continuous sexual abuse, HB 8 would address the problem of sexual predators who abuse children repeatedly. By requiring that the sex crimes be committed over a 30-day period, the bill would capture serial offenders who were a threat to public safety. Allowing a series of crimes to be prosecuted as one offense would give prosecutors more flexibility to allege crimes under continuous sexual abuse or under existing law. It would allow prosecutors to present a more accurate picture of a predator to a jury and would allow more appropriate punishments than considering each incident individually. Courts in at least five other states have held that using a continuing-course-of-conduct approach upon which jurors must unanimously agree on certain factors satisfies constitutional requirements.

A mandatory minimum of 25 years, with no parole, would be appropriate punishment for these serious crimes and would protect children from these predators. Life without parole for second offenses is necessary to ensure that repeat offenders never again victimize a child. Although a long mandatory minimum sentence and parole restrictions would be important to ensure these offenders would not ever be released, they would not be a significant departure from current law because certain repeat offenders already must serve at least 35 years without parole consideration and are rarely, if ever, paroled.

The bill would include a "Romeo and Juliet" clause so activities by teenagers engaging in consensual sexual activity would not be considered continuous sexual abuse.

***Extending the statute of limitations for the prosecution of some sex crimes.*** Lengthening the time limit for filing charges in certain cases of sex crimes against children would be warranted because of the special circumstances surrounding child sex abuse cases and the seriousness of these crimes. Extending the statute of limitations would allow these child victims to mature and gain the financial and emotional stability necessary to speak out. Extending Texas' statute of limitations would bring the state in line with about 30 other states in which the statute of limitations is more favorable to child victims of sex crimes.

## Opponents said

Texas' current law works adequately to punish and supervise sex offenders, and while HB 8 is well intended, it actually could make it more difficult to protect children from harm. Resources should be used to enforce current law allowing long prison sentences and restricted parole for dangerous offenders and to invest in the treatment of sex offenders and the prevention of child abuse. With its many deficiencies, the death penalty in Texas should not be expanded.

***Super-aggravated sexual assault and death penalty.*** The death penalty would be a disproportionate punishment for admittedly heinous sex crimes against children. The death penalty should be reserved for especially vicious murders, and although raping a child is a hideous offense that warrants severe punishment, it should not be equated with murder by punishing offenders with death. Long prison terms, such as those imposed by current law, or life without parole could be used to punish repeat child rapists and protect the public.

Texas law already allows for a range of appropriately harsh punishments to deal with sex offenders. Requiring mandatory sentences of 25 years for first offenses and the death penalty or life without parole for second offenses could backfire by making defendants less inclined to plead guilty. In cases in which evidence was not airtight or the victim was reluctant to testify, this could lead prosecutors not to file charges or to accept plea bargains to lesser crimes. Fewer guilty pleas also might lead to more trials that could further traumatize child victims.

There is no evidence that the death penalty would deter child rapists, many of whom are sexually violent predators who habitually prey on children. The prospect of receiving a death sentence actually might be counterproductive by giving offenders a perverse incentive to kill their victims so those victims could not serve as witnesses to a crime potentially punishable by death. In addition, children and their families might be less likely to report sexual assault by a relative for fear that the family member might be executed.

Since the reinstatement of the death penalty in 1976, most states have limited the punishment to murder cases. Texas should not enact a law of questionable constitutionality simply because it is politically popular, especially given clues by the U.S. Supreme Court that death penalty laws that would be rarely imposed or that are not supported by a broad national consensus would be ruled unconstitutional.

***New offense of continuous sexual abuse.*** It is unnecessary to create a new offense of continuous sexual abuse. All of the crimes that constitute the new offense already are serious offenses that carry tough penalties that should be enforced. HB 8 would set an arbitrary time frame of committing two offenses within 30 days, which unfairly would exclude from the offense those whose crimes occur within 29 days. HB 8 could violate constitutional requirements of juror unanimity by requiring juries only to agree unanimously that during the 30-day-plus period the person committed at least two acts of sexual abuse but not requiring that the jurors be unanimous as to the dates or the acts committed.

Setting a 25-year mandatory minimum sentence for continuous sexual abuse would reduce prosecutors' flexibility to handle these cases and have the same problems as the mandatory minimum sentence for first offenses of super-aggravated sexual assault. Current law requires these inmates to serve long terms before being eligible for parole, and the Board of Pardons and Paroles has been extremely cautious about releasing sex offenders on parole. Although very few are approved for parole now, it would be better to continue allowing these offenders to be eligible for parole, for both prison management reasons and to recognize that some offenders could be rehabilitated and society best served if they were released on parole under close supervision.

***Extending the statute of limitations for the prosecution of some sex crimes.*** Current law already has carved out a unique, exceptionally long time limit for filing charges in serious child sex crimes, which is both appropriate and adequate. Extending the statute of limitations even further could render defendants unable to defend themselves adequately and infringe upon their right to due process.

## Notes

The **HRO analysis** of HB 8 appeared in the March 5 *Daily Floor Report.*

# Felony for owners of dogs causing serious bodily injury or death

**HB 1355 by Gattis**
*Effective September 1, 2007*

**HB 1355** creates "Lillian's Law" in memory of Mrs. Lillian Stiles and in dedication to various others who have been victims of unprovoked dog attacks. It creates an offense punishable as a third-degree felony (two to 10 years in prison and an optional fine of up to $10,000) if the owner of a dog is criminally negligent by failing to secure a dog that causes serious bodily injury to someone off the owner's property. The same penalty applies to a dog owner who already knows the dog is dangerous and whose dog causes serious bodily injury to another person through an attack outside of a secure enclosure.

If a dog attack under the circumstances described above results in a person's death, the penalty for the owner is increased to a second-degree felony (two to 20 years in prison and an optional fine of up to $10,000). In these cases, HB 1355 allows the court to order the destruction of the dog and to prosecute the owner under another section of the law that may apply.

In addition, the bill establishes various defenses to prosecution, including provisions for people who work with animals, people sanctioned by the government to handle dangerous dogs, and disabled people who rely on dogs for assistance. The bill also creates a defense for the owner of a dog that attacks someone who is committing a crime against a person or property, including murder, sexual assault, arson, robbery, or burglary.

HB 1355 would apply only to an unprovoked attack that caused serious bodily injury. This would limit the offense to serious attacks in which people were seriously hurt, and the bill would not apply to a dog who harmed someone only in a minor way. In addition, actions by the dog owner would have to be taken with criminal negligence or while knowing the dog was "dangerous" as defined in current law. Leash and enclosure laws are not enough. Dogs have been known to cause serious bodily harm while tied to fences or trees, which has allowed owners to avoid taking responsibility for the actions of their dogs. In addition, enclosure laws unfairly burden owners who do not keep dangerous dogs.

HB 1355 is not intended to apply to an attack that occurred while someone was trespassing in an enclosure. The bill is designed to protect people from dangerous dogs by deterring negligent behavior by dog owners. To that end, penalties would apply only if a dog owner did not take reasonable steps to keep the dog in a secured enclosure or if a dog attack happened somewhere off a dog owner's property, as in the case of Lillian Stiles. The bill is designed to protect innocent people from suddenly being attacked by a dangerous dog and would provide liability protections for a dog owner if a dog caused serious bodily harm or death to a person engaged in certain criminal acts, including burglary and criminal trespass. In addition, the bill would not refer to any specific breed nor impose any breed-specific regulations.

## Supporters said

HB 1355 would establish Lillian's Law to ensure that dog owners were held responsible for the vicious acts of their dogs and would help to prevent future attacks. In late 2005, 76-year old Lillian Stiles was brutally killed by a pack of six pit bull-rottweiler mixed breeds that escaped from a neighbor's yard. Holding a dog owner responsible for such an event is difficult under existing law because the dog previously must have been designated as dangerous. While a dog will be destroyed if it seriously attacks a person, the dog owner is not penalized until the dog has been deemed dangerous. This allows negligent dog owners to duck responsibility when they get new dogs because an owner's previous poor stewardship is not taken into account.

## Opponents said

HB 1355 would be unnecessarily severe. Under current law, a person cannot be prosecuted for an attack by a dog unless the dog already has been labeled dangerous, meaning that the person must have been aware of the possibility of an attack. Under this bill, a person could be prosecuted for a felony without any previous indication that the person's dog might hurt someone. The bill would make no distinction in penalizing a first-time offender versus the owner of a dog that already had been deemed dangerous – both owners, regardless of past history, could be prosecuted for a second- or third-degree felony.

HB 1355 would not ensure protection for people from dangerous dogs because the law would be solely punitive and not preventive. The bill would provide penalties only

after a dog had attacked. To protect innocent victims, the bill instead should require dog owners to accept responsibility for their dogs before any attack occurred by creating statewide leash and enclosure laws. While the bill aims to penalize irresponsible dog owners, such a person would have little incentive to claim ownership should the dog be involved in an attack and might be shielded from prosecution altogether.

## Notes

The **HRO analysis** of HB 1355 appeared in Part One of the April 23 *Daily Floor Report*.

# Cruelty to animals penalties

**HB 2328 by Woolley**
*Effective September 1, 2007*

**HB 2328** establishes the separate offenses of cruelty to livestock animals and cruelty to non-livestock animals.

*Non-livestock animals.* Under the offense of cruelty to non-livestock animals, animals are defined as domesticated living creatures, including stray or feral cats or dogs, and wild living creatures previously captured. Acting recklessly, in addition to knowingly and intentionally, against a non-livestock animal constitutes an offense if the person:

- tortures an animal;
- in a cruel manner kills or causes serious bodily injury to an animal;
- without the owner's effective consent, kills, poisons, or causes bodily injury an animal;
- fails unreasonably to provide necessary food, water, care, or shelter to an animal in the person's custody;
- transports or confines an animal in a cruel manner;
- causes one animal to fight another;
- uses an animal as a lure in a dog race; or
- seriously overworks an animal.

It is a defense to prosecution if the person killed or caused bodily injury to a non-livestock animal without the owner's effective consent if the person was acting within the scope of the person's employment as a public servant or during activities involving electricity transmission, distribution, or generation or natural gas delivery.

*Livestock animals.* Under the offense of cruelty to livestock animals, livestock animals are defined as cattle, sheep, swine, goats, ratites, poultry commonly raised for human consumption, horses, ponies, mules, donkeys, hinnies, and hoofstock and fowl raised under agricultural practices. The bill establishes an offense for intentionally failing unreasonably to provide necessary water to a livestock animal in one's custody. The offense is a class A misdemeanor (up to one year in jail and/or a maximum fine of $4,000).

*Definition.* Torture is defined, for purposes of both offenses, as an act that causes unjustifiable pain or suffering.

*Exception.* The bill establishes an exception to either offense for someone engaging in conduct that is a generally accepted and otherwise lawful form of conduct for wildlife management, depredation control, shooting preserve practices, or agricultural practice involving livestock animals.

*Penalties.* For purposes of enhanced penalties on a third occurrence of either offense, a person may have committed the first two offenses against livestock animals, non-livestock animals, or both.

The bill stipulates that it does not create a civil cause of action for damages or enforcement related to either offense.

## Supporters said

In a balanced way, HB 2328 would establish separate laws on animal cruelty for livestock animals and non-livestock animals. The bill would expand protections for non-livestock animals while largely retaining the status quo for treatment of livestock animals to avoid interfering with agricultural practices. The strengthened protections for non-livestock animals would help close loopholes in existing law and prevent future acts of cruelty.

*Non-livestock animals.* HB 2328 would strengthen protections for non-livestock animals by establishing that acting in a cruel manner to kill or injure an animal, short of torture, was an offense. Also, allowing "reckless" conduct, in addition to "knowing" and "intentional" conduct, to constitute an offense would enhance prosecution of abusive animal owners. This culpable mental state would apply to those who were aware their conduct was dangerous, thereby adding to the incidents that could be considered offenses.

Current laws on animal cruelty contain vague, inconsistent wording, leaving room for heinous crimes against animals to go unpunished. Texas' animal cruelty laws have not kept up with national standards, but this bill would address loopholes in current law to provide prosecutors with more legal tools to protect non-livestock animals. Under current law, pet owners sometimes escape punishment for certain acts of cruelty because causing serious bodily injury to an animal is an offense only if it is committed against an animal owned by another individual and because the definition of torture can be narrowly interpreted. In one example, a pet owner ran over his puppy

with a lawn mower and escaped prosecution because causing serious bodily injury would apply only to animals owned by someone else and defining the act as torture was precluded by the puppy's instant death. The definition of non-livestock animal also would help protect stray cats and dogs. Whether an owner of an animal can be identified should not determine whether an offense has been committed against that animal.

Evidence suggests a link between animal cruelty and family violence. Violence toward animals can be an indicator of other abuse being perpetrated within families, and perpetrators of animal cruelty are at risk of becoming violent offenders. The bill would improve prosecution of animal abuse and potentially prevent future acts of violence.

*Livestock animals.* While expanding protection for non-livestock animals, the bill would not interfere with certain currently permissible practices. It would retain exceptions to the offense for agriculture, hunting, fishing, trapping, and lawful wildlife control, while adding an exception for lawful depredation control. As a result, it actually would expand protections for certain activities. It would retain horses under the definition of livestock animals so that they could continue to be used in certain ranch activities.

## Opponents said

Amending current animal cruelty laws, as HB 2328 would do, is not an appropriate way to prevent animal cruelty. Social ills cannot be ameliorated by establishing more offenses and strengthening the state's ability to prosecute. This would not adequately deter some individuals from committing heinous acts against animals. The state instead should provide public education to prevent future incidents of animal cruelty. Also, funding is needed to shelter animals treated inhumanely.

## Other opponents said

Aside from a few minor changes, the bill would not do enough to address animal cruelty or to close the loopholes in current law. It would not establish clear standards on what acts constitute cruelty to animals and what acts do not. Broad exceptions to prosecution remain in the bill, creating the potential for some people to avoid prosecution on technicalities. The penalties for acts of cruelty against animals would not be increased, so Texas would do little to remedy its negligence concerning animal cruelty compared to other states.

Horses should be defined as non-livestock animals in order to be placed under the stricter protections provided by the bill. Most horses are used for pleasure activities rather than agricultural practices and are exposed to the same general public as non-livestock animals. Because horses are not consumed as food in the United States, they should not be placed in the same category as livestock animals, many of which are consumed as food. Also, although cockfighting is legally permissible only in New Mexico and Louisiana, the Texas law is weak and replete with loopholes, which the bill would not address. The bill specifically should prohibit cockfighting as well as the training and conditioning of animals to be used in fights.

## Notes

The **HRO analysis** of HB 2328 appeared in the April 18 *Daily Floor Report*.

# State basic supervision funding for local probation departments

**HB 3200 by Madden**
*Vetoed by the governor*

**HB 3200** would have altered the computations for determining state basic supervision funding for local probation departments for felony defendants placed on probation. Instead of having the per capita funding for felons based on those directly supervised by local probation departments, it would have been based on each felony defendant placed on probation and on each felony defendant participating in pretrial programs.

The Criminal Justice Assistance Division of the Texas Department of Criminal Justice (TDCJ) would have annually established a per capita funding formula that included:

- higher per capita rates for felony probationers who were serving the early years of their probation terms than for those who were serving the end of their terms;
- penalties in per capita funding for each felony probationer whose probation was revoked due to a technical violation of probation; and
- awards in per capita funding for each felony defendant who was discharged due to an early termination of probation.

The TDCJ board would have been authorized to adopt a policy limiting the percentage of benefit or loss that a department could have realized under the new formula.

The formula would have to have been established by January 1, 2008, and been used for the state fiscal year that begins on September 1, 2008.

## Supporters said

HB 3200 would adjust the computation used to send money to local probation departments to encourage more intensive supervision in the early years of probation terms, to discourage probation departments from keeping offenders on probation longer than necessary, and to discourage revocations of probation for technical violations of probation terms.

Front-loading probation funding by requiring higher rates for offenders in the early years of their terms would give local probation departments the resources to intensely supervise probationers during this critical period when most re-offending occurs.

The current formula used to determine state funding can create an incentive to keep felony offenders on probation longer than necessary because funding continues as long as they are on supervision. Also, sometimes the fees paid by those who continue to meet their obligations to pay them are used to make up funding from offenders who do not pay their fees. HB 3200 would address this by requiring awards for early terminations of probation. Decisions about early terminations still would be made solely by judges who are accountable to voters and would not be influenced by the funding formula to make decisions that jeopardized public safety.

HB 3200 also would discourage probation departments from revoking offenders' probation and sending them to prison for technical violations, which are violations of supervision that do not include new offenses. In some cases, these technical violations do not warrant using a prison bed for a probationer, especially given that the state prison system is operating at capacity and beds should be reserved for violent and serious offenders. The change in the funding formula would give the local probation departments incentives to work with offenders to improve their success on probation, but decisions about revocations would continue to be made by judges who do not receive the funding.

By requiring the funding formula to contain awards for early termination and for TDCJ to adopt a policy limiting benefits or loss to departments, the bill would mitigate its effects on probation departments.

## Opponents said

HB 3200 could upset the sentencing dynamics in Texas by providing incentives for probation departments to terminate probation early and disincentives to revoking probation.

If prosecutors and courts felt that early termination of probation had become the norm as a result of the awards required in HB 3200, they might support longer probation terms or more incarceration. Current law allows judges to

review offenders at their own discretion and to reduce or terminate a probation term after the lesser of one-third of the original term or two years had been served. Probation departments should not receive incentives to push for early termination in inappropriate cases.

In the same way, providing a financial disincentive to revoke probation for technical violations could result in some probationers remaining free on probation when they should have had been sent to prison. Some technical violations of probation are serious and warrant revocation. For example, absconding from probation or coming in contact with a victim both could be technical parole violations. Under HB 3200, a probation department would have a financial incentive to keep offenders who committed these violations on probation instead of sending them to prison, which might be warranted.

## Notes

The **HRO analysis** of the HB 3200 appeared in Part Two of the *Daily Floor Report*.

For more information on HB 3200, see HRO Focus Report Number 80-6, *Vetoes of Legislation, 80th Legislature*, July 9, 2007, pp. 63-64.

# Revising Texas Youth Commission authority and operations

**SB 103 by Hinojosa**
*Effective June 8, 2007*

**SB 103** makes a number of changes to the oversight and internal operations of the Texas Youth Commission (TYC).

*Governing structure.* SB 103 temporarily changes the governing structure of TYC from a seven-member board appointed by the governor. Instead, it will be governed until September 1, 2009, by an executive commissioner appointed for a two-year term by the governor, with the consent of the Senate.

The bill establishes a nine-member advisory board to advise and assist the executive commissioner. Three members are to be appointed by the governor, three by the lieutenant governor, and three by the speaker of the House. The governor designates the board's chair. At least one member must be a physician, one an experienced member of a victims advocacy organization, one a mental health professional, and one a current or former prosecutor or judge. A majority of the board members must be qualified, by experience or education, in programs for the rehabilitation and reestablishment in society of children in the custody of agencies similar to TYC.

The sections of SB 103 establishing the executive commissioner and the advisory board will expire September 1, 2009, and as of that date, TYC will be governed by seven-member board appointed by the governor with the advice and consent of the Senate.

The Sunset Advisory Commission will study the merits of moving TYC toward a regionalized structure of smaller facilities and more diversified treatment and placement options. The commission also will study the merits of an executive commissioner governing the TYC as compared to a citizen board. The Sunset commission must include its recommendations on these issues in its Sunset review report on the TYC, which will be abolished September 1, 2009, unless continued by the Legislature.

*Misdemeanor offenses.* SB 103 prohibits youths from being sent to TYC for misdemeanor offenses.

*Age limit and determinate sentences.* SB 103 lowers the maximum age limit for youths in TYC from age 21 to age 19.

*Youth placement restrictions.* TYC is prohibited from placing youths younger than age 15 in dormitories with youths age 17 and older unless it is to ensure the safety of TYC youths or for short-term assessment and orientation. The commission must adopt scheduling, housing, and placement procedures to protect vulnerable children in TYC. When deciding where to house a child, TYC must consider the proximity of the child's family.

*Lengths of stay and review panel.* TYC must establish a minimum length of stay for offenses. After youths have completed the minimum length of stay, TYC must discharge the child, release the child on parole, or extend the child's stay.

TYC must appoint a panel to review and determine which action will be taken. The panel may extend the length of a stay only on a majority vote and only on the basis of clear and convincing evidence that the youth needs additional rehabilitation and that TYC would provide the most suitable environment for that rehabilitation. Panel members must be commission employees who work at the commission's central office and cannot be involved in any supervisory decisions concerning TYC youth. TYC must establish a process for youths, parents and guardians, employees, and volunteers to request the reconsideration of an extension order.

*Training, staffing.* TYC is required to give each juvenile correction officer (JCO) at least 300 hours of training before that person begins work.

TYC must maintain a ratio of at least one JCO for every 12 youths in correctional facilities with dormitories. TYC must consider the age of a JCO so that, to the extent practicable, JCOs are at least three years older than the youths they supervise.

The TYC executive director is required to perform state and national criminal background checks of employees, contractors, volunteers, ombudsmen, and advocates working for the commission and those who provide direct delivery of services to the youths or have access to TYC records.

*Office of Inspector General (OIG).* SB 103 establishes an office of inspector general to investigate crimes committed at TYC facilities and fraud committed by TYC

employees. The executive commissioner must select a commissioned peace officer as chief inspector general, and the OIG is authorized to employ and commission peace officers to carry out the duties of the office.

The OIG is required to report the results of its investigations to the TYC commissioner and advisory board, the governor, legislative leaders and committees, and other entities. The report is public information. The chief inspector general also must prepare a quarterly report on the operations of the office. The OIG must immediately report to agency and state officials any particularly serious or flagrant problem concerning the administration of a TYC program or operation or any interference by the executive commissioner or a TYC employee with an investigation by the office. The OIG is required to immediately provide the Special Prosecution Unit with a report about an alleged offense if the offense is believed to be particularly serious and egregious.

The TYC commissioner is required to file a complaint immediately with a law enforcement agency if the director has reasonable cause to believe that a youth was the victim of a crime committed at a TYC facility.

***Special prosecution unit.*** SB 130 recognizes in statute the Special Prosecution Unit (SPU) and extends its authority to offenses relating to TYC. The SPU is an independent unit that cooperates with and supports prosecuting attorneys handling criminal offenses and delinquent conduct on TDCJ or TYC property or committed by or against anyone in their custody or while a person was performing a duty away from department or commission property. Prosecutors are authorized to request that the SPU handle any criminal offense or delinquent conduct that fits these criteria.

The SPU's executive board must elect a "counsellor," who will coordinate prosecution issues and monitor cases dealing with TYC and may conduct certain types of investigations of alleged illegal or improper conduct by commission officers, employees, or contractors.

The attorney general is authorized to offer assistance to prosecutors handling criminal offenses concerning TYC.

***Office of the ombudsman.*** SB 103 establishes the Office of Independent Ombudsman of the Texas Youth Commission as a state agency to investigate, evaluate, and secure the rights of youths committed to TYC. The ombudsman is independent of TYC.

Duties of the office include reviewing TYC procedures and services to ensure youths' rights are observed, reviewing complaints, conducting investigations of non-criminal complaints, reviewing facilities and procedures, and providing assistance to youths and their families, including advocating for the best interests of the child.

The first ombudsman is appointed by the executive commissioner for a term that ends February 1, 2009, and the governor appoints subsequent ombudsmen with the advice and consent of the Senate for two-year terms.

***Increased penalty for improper sexual activity.*** SB 103 increases the penalty for certain crimes that violate the civil rights of someone in custody and for improper sexual activity with a person in custody. The penalty increases from a state jail felony (180 days to two years in a state jail and an optional fine of up to $10,000) to a second-degree felony (two to 20 years in prison and an optional fine of up to $10,000) if the offender employs, authorizes, or induces a youth in TYC to engage in sexual conduct or a sexual performance.

***Other provisions.*** SB 103 makes numerous other changes to the laws governing TYC, including:

- requiring TYC to offer appropriate rehabilitation programs for its youths and, if not able to do so, to report to the Legislature about which programs were not offered or available and why;
- establishing a permanent, toll-free number for information about abuse, neglect, or exploitation of youths that is prominently displayed in each facility and accessible to the youths; and
- requiring TYC to create a parents' bill of rights that includes a description of the agency's grievance procedures and requiring TYC to give parents or guardians a quarterly report on their child's progress in language that is clear and easy to understand.

## Supporters said

SB 103 is necessary to address the problems that played significant roles in the recent scandal involving allegations of sexual abuse and other crimes in TYC facilities. The bill would address these problems by significantly reforming the internal operations of the agency and increasing oversight of it. The bill would enhance accountability at the agency, require transparency in its operations, establish checks and balances on agency staff and operations, establish oversight and reporting of agency operations and alleged crimes, and institute training and safeguards to protect the children committed to the agency and to help the agency staff.

The agency will undergo Sunset review this interim, and the 81st Legislature will have the opportunity to make additional changes in 2009.

**Governing structure.** Given the large number of changes being implemented at the agency, it is necessary temporarily to give the reins of the agency to an executive commissioner. This would be the best way to focus responsibility for the agency and make it clear who is in charge and whom to hold accountable as the agency reorganizes.

To ensure that this model is scrutinized in 2009, SB 103 would sunset the commissioner's position and reinstate a governor-appointed board. The 81st Legislature could impose whatever structure it deemed appropriate because the agency would be undergoing Sunset review and would be abolished in 2009 unless continued by the Legislature.

**Misdemeanor offenses.** It is important to prohibit the placement in TYC of youths who commit misdemeanor offenses so that space and resources can be devoted to those who commit more serious offenses. To properly refocus its efforts and implement some of the provisions of SB 103, including lower staff-to-youth ratios, the agency must downsize. The Legislature would be able to revise the ban on misdemeanants in two years if it felt the agency had the resources to handle them.

Prohibiting misdemeanor placements would not mean that youths who committed misdemeanors would go untreated or go without sanctions. Local juvenile probation departments are well equipped to handle these youths, and the Legislature is increasing their resources through the appropriations process.

It is unclear how often youths are influenced by the technical aspects of sentencing. Any effect on plea agreements would be minimal and would influence only a small number of cases. Only about 6 percent of the misdemeanants in TYC have committed a felony that was pled down to a misdemeanor offense.

**Age limit and determinate sentences.** Lowering the age limit of youths at TYC from 21 to 19 would allow the agency to focus on its core mission of rehabilitating youths. This would reserve TYC for younger offenders who should not be mixed with older offenders who are really adults.

TDCJ is equipped to handle these older youths. Currently, if youths are 17 years old when they commit an offense, they are handled in the adult system, and many are sent to TDCJ. Housing 19-year-olds in prisons would be more appropriate than housing them with 13-year-olds in TYC facilities.

**Youth placement restrictions.** To address the problem of very young offenders being housed and sometimes victimized by older offenders, SB 103 would place restrictions on the ages that could be housed together.

**Length of stay and review panel.** To help create transparency and fairness, SB 103 would establish a review panel to make formal decisions about whether youths should remain at TYC longer than their minimum lengths of stay. In the past, some of these decisions seem to have been made arbitrarily. The bill would ensure these decisions were made fairly and that youths and their families understood and could appeal them. The bill's statistical reporting requirements and requirements that decisions be transparent, consistent, and objective would allow oversight.

**Training and staffing.** SB 103 would address problems caused by untrained and unsupported staff by significantly increasing the training required of juvenile corrections officers from 80 hours to 300 hours. SB 103 would implement a ratio of one JCO to 12 youths, which would be within the range of national ratios and a reduction from the current rate of one-to-24 at night and one-to-15 or one-to-24 during the day.

**Office of Inspector General (OIG).** Creating the OIG would address the problem of alleged crimes committed at TYC not being prosecuted because the allegations were not properly investigated or forwarded to law enforcement officers and prosecutors. Under TYC's current system, in numerous cases the initial and only investigations of criminal allegations were done by civilian TYC staff who were untrained and unqualified to perform criminal investigations and whose focus was on whether the agency should take administrative actions. Staffing the OIG with peace officers who would have a duty to investigate and report crimes would ensure that investigations into all crimes were handled properly. The system established by SB 103 would be modeled on the one that works well in the adult criminal justice system.

Several provisions in SB 103 would ensure the independence of the office and proper oversight of its investigations and operations. For example, the OIG would report on its operations and investigations directly to several independent entities, including the Legislature, and the reports would be public information.

**Special prosecution unit.** SB 103 would address the problem of alleged crimes at TYC not being prosecuted due to a lack of local prosecutorial resources. The bill would allow the state resources of the Special Prosecution Unit (SPU) to be used to prosecute criminal offenses that occur in TYC facilities, just as they are used to prosecute offenses in adult correctional facilities. SB 103 would help prevent TYC cases from falling through the cracks by requiring the appointment of a counsellor to have the direct responsibility for alleged crimes in TYC.

The bill would create another check and balance by authorizing the attorney general to offer assistance to prosecutors handling criminal offenses concerning TYC.

**Office of the ombudsman.** SB 103 would establish an ombudsman to create an independent entity focused on the needs of the youths. Currently, no one is charged explicitly with advocating for the youths, and the youths and their families often feel that they have nowhere to turn with their concerns. SB 103 would keep the lines of authority clear by limiting the investigatory powers of the office to non-criminal cases that under SB 103 would be handled by the office of inspector general.

## Opponents said

**Governing board.** SB 103 should keep the current structure of a governor-appointed board overseeing agency operations. The problems plaguing the agency resulted from the structure of agency operations and the personnel appointed and hired to run the agency, not from the governance structure itself. The board and much of the staff who were in charge when the problems occurred have resigned or been terminated. SB 103 should keep the board structure, but set requirements for the qualifications of those appointed and allow a new board to implement the numerous improvements in the bill.

Even temporarily changing the structure to a single governor-appointed commissioner would not ensure more oversight for TYC, but actually might diminish oversight because instead of a diverse board with six members, only one person would be in charge. The answer to the problems with the agency lies in more oversight rather than less.

**Misdemeanor offenses.** Prohibiting the placement of misdemeanants at TYC would reduce the flexibility of judges to handle youths and would upset the sentencing dynamics in the state's juvenile justice system. In many cases, although a youth may be adjudicated for a misdemeanor, factors such as their past crimes, the danger

the child represents to the community, the child's success in local programs, and their home and school situations can result in judges deciding that the TYC is the best place for them.

Plea agreements could be reduced because prosecutors who want to keep the option of sending a youth to TYC would not be willing to agree to reduce a charge to a misdemeanor. This could translate into more felony charges and convictions. Crime could increase if youths realized that they could commit misdemeanors and not be sent to TYC.

SB 103 could shift problems to the local level. Although new funding may be available this session for local probation departments to handle more youths, increased funding and shifts to local communities historically have not translated into permanently increased resources.

**Age limit.** Requiring all 19-year-olds to be released or transferred to the adult system could have a negative impact on those youths who are best served at TYC where rehabilitation programs are more accessible than at TDCJ. Some youths still are immature at age 19 and face a better chance at rehabilitation if they can stay in the juvenile system.

Reducing the age cap on youths would result in some youths having shorter stays at TYC even though they received long determinate sentences. This could influence judges to order the transfer of more of these youths to the adult system when they reached age 19 so that they would stay incarcerated. It also could increase the number of youths being certified to stand trial as adults if prosecutors wanted to ensure that older youths – 16-year-olds, for example – were locked up for a number of years.

**Office of Inspector General.** The OIG that would be established by SB 103 would not be far enough removed from TYC to ensure its independent and objective investigation of alleged crimes. This could result in a conflict of interest in which the office felt pressure not to raise issues that might place the board or agency in a bad light. To ensure the true independence of the office, the OIG should be appointed by an outside entity, and the appointment should be for a set term with removal only for specified reasons.

## Other opponents said

**Governing structure.** The important job of running TYC warrants a permanent,  independent, full-time professional, rather than a short-term commissioner who

gives up power to a volunteer board of lay persons in 2009. This system could result in a caretaker commissioner whose long-term authority was unclear. The current problems demonstrate the lack of accountability and oversight when no one has clear, continuing oversight of the agency.

A permanent, professional commissioner would be the best way to focus responsibility for the agency and would make it clear whom to hold accountable. The public holds the governor responsible for the agency, and the governing structure should allow the governor to meet that responsibility by appointing the commissioner. This commissioner model is being implemented more often and has been successful in the state's insurance and health and human service agencies.

## Notes

The **HRO analysis** of the companion bill, HB 2807 by Madden, appeared in Part One of the May 7 *Daily Floor Report*.

# Creating a Texas Innocence Commission

**SB 263 by Ellis**
*Died in House committee*

**SB 263** would have created the Texas Innocence Commission to investigate thoroughly each post-conviction exoneration to:

- discover errors and defects in the criminal procedures used in the case;
- identify errors and defects in the criminal justice process;
- develop solutions and methods to correct the errors and defects; and
- identify procedures and programs to prevent future wrongful convictions.

The commission would have had nine members serving two-year terms, as follows:

- two appointed by the governor, including the dean of a law school and a law enforcement officer;
- one appointed by the lieutenant governor;
- one appointed by the speaker of the House;
- one judge appointed by the presiding judge of the Court of Criminal Appeals;
- one professional in the forensic science field, appointed by the presiding officer of the Texas Forensic Science Commission;
- one prosecutor, appointed by the Texas District and County Attorneys Association;
- one criminal defense lawyer, appointed by the Texas Criminal Defense Lawyers Association; and
- one attorney representing an innocence project appointed, on a rotating basis, by the University of Texas School of Law, the University of Houston Law Center, and the Texas Tech University School of Law.

The commission would have been required to report its findings and recommendations to the governor, the lieutenant governor, and the speaker. The report would have been made available to the public on request, and the findings and recommendations could not have been used as binding evidence in a subsequent civil or criminal proceeding.

## Supporters said

SB 263 is necessary for Texas to address the problem of wrongful criminal convictions. In Texas, DNA testing has been used to help exonerate almost 30 people who were wrongfully convicted, and these and other cases of wrongful convictions should be studied to help prevent additional miscarriages of justice. The bill would establish a process to investigate cases in which innocent persons had been wrongfully convicted, identify what went wrong and why in those cases, and recommend changes to prevent wrongful convictions in the future. In addition to the burden placed on people convicted in error, a wrongful conviction may mean that a guilty person remains free, which is also a miscarriage of justice.

It is necessary to create a commission dedicated to investigating these cases because currently there is no institutional mechanism to do so. An innocence commission investigating cases would be similar to the way that transportation accidents are investigated by a national safety board. The Legislature would have the power to eliminate or revise the commission.

SB 263 would not lead to finger pointing or eliminating the death penalty. It is designed to identify causes of wrongful convictions and to prevent additional miscarriages of justice. Cases of wrongful conviction that do not involve DNA evidence or the death penalty deserve scrutiny just as much as the higher-profile cases. The bill would not be punitive and could not be used to establish criminal or civil liability for a person who was part of a wrongful conviction. The commission would not have subpoena power or any other authority that could be used against anyone involved in such a case.

## Opponents said

SB 263 would be a back-door way to erode the death penalty in Texas. If the goal of the bill is to study post-conviction exonerations and the criminal justice process in Texas, that could be accomplished in numerous ways under current law.

The bill would create a new bureaucracy biased toward eliminating the death penalty, focused only on negative aspects of criminal cases, and lacking the traditional adversarial process central to the criminal justice system. This could institutionalize opposition to the death penalty and allow public funds and the weight of the state to be used to further the political goal of eliminating the death penalty, an objective not shared by all Texans. Such a commission might be hard ever to abolish because governmental entities traditionally are difficult to eliminate and tend to grow in scope to justify their continued existence.

# Use of force or deadly force in self-defense

**SB 378 by Wentworth**
*Effective September 1, 2007*

**SB 378** creates a presumption of reasonableness for a person's belief that the use of force or deadly force to protect the person is immediately necessary and therefore justified. The belief is presumed to be reasonable if:

- the actor knows or has reason to believe that the person against whom force or deadly force is used has unlawfully and with force entered or is trying to enter the person's occupied home, vehicle, or work place; unlawfully and with force removes or is trying to remove the person from the person's home, vehicle, or work place; or is trying to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery;
- the actor did not provoke the person against whom force is used; and
- the actor is not engaged in criminal activity at the time force is used, other than a minor traffic violation.

An actor is not required to retreat from a person against whom force or deadly force is used if the actor has a right to be present at the location, has not provoked the person against whom the force is used, and is not engaging in criminal activity at the time. The failure to retreat may not be considered in determining whether an actor reasonably believed the use of force or deadly force was necessary. A defendant who uses force or deadly force that is justified by the bill is immune from civil liability for personal injury or death resulting from that defendant's use of force or deadly force.

## Supporters said

SB 378 would provide Texans with broader power to protect themselves. It would shift the burden from victims to aggressors by creating a presumption that a victim's belief was reasonable that the use of force or deadly force was immediately necessary under certain circumstances and therefore justified. The expanded "castle doctrine" would protect people not only in their homes, but also in their vehicles and work places. In modern life, people spend more time in these places and should enjoy the same justifications for self-defense there that they enjoy at home.

The bill also would return the law to what it was before 1973, when Texas did not impose a duty to retreat in the face of an attack. In addition, protecting victims from civil liability would allow them to focus on defending themselves and their families instead of being concerned about potential lawsuits.

The bill would address organized crime and gang activity by explicitly stating that the right to stand your ground did not extend to those engaged in criminal activity, those who had provoked their attackers, or those who did not have a right to be present at the location where force was used.

## Opponents said

SB 378 would be a solution in search of a problem because current law provides a good balance between a person's right to self-defense and the value of human life. Under existing law, if a reasonable person is able to retreat, that person should do so, but people may resist deadly force with deadly force if they are unable to retreat. This rule avoids violence and conserves human life.

The bill would prevent a jury from considering reasonableness or proportionality, which could cause a miscarriage of justice as some thieves are intent only on committing property crimes, not on physically harming anyone. Texas juries historically have done a good job siding with property owners against home invaders, so no change in the law is necessary. Eliminating the duty to retreat also could increase the number of people who used deadly force and claimed it was justified by the provisions of the bill.

## Notes

The **HRO analysis** of the House companion bill, HB 284 by Driver, appeared in the March 19 *Daily Floor Report*.

# Continuing of the Texas Department of Criminal Justice

**SB 909 by Whitmire**
*Effective June 15, 2007*

**SB 909** continues the Texas Department of Criminal Justice (TDCJ) until September 1, 2011, and makes several changes to the laws governing the agency. It removes the Sunset date for the Correctional Managed Health Care Committee (CMHCC) but continues the committee and requires that it be reviewed during any review of TDCJ. The bill amends laws governing the Board of Pardons and Paroles, requiring it to review, update, and report on parole guidelines and to institute a process formally to identify and make recommendations about releasing some offenders early from parole supervision.

***Criminal Justice Legislative Oversight Committee.*** SB 909 establishes the Criminal Justice Legislative Oversight Committee to provide objective research, analysis, and recommendations to guide state criminal justice policies. The committee has six members: the chairs of the Senate Criminal Justice Committee and the House Corrections Committee; two members of the Senate appointed by the lieutenant governor; and two members of the House appointed by the speaker of the House. The presiding officer is designated alternately by the lieutenant governor and the speaker, with the speaker appointing the first chair by January 15, 2008. The committee will examine the criminal justice system, including its cost-effectiveness, critical problems, and long-range needs. It will advise the Legislature and recommend policy priorities and problem-solving strategies.

***MRIS for state jail felons.*** SB 909 authorizes judges to release from state jails certain state jail felons under the Medically Recommended Intensive Supervision (MRIS) program to a medically suitable placement. This is allowed if the judge finds the offender does not constitute a threat to public safety and is identified as elderly, physically disabled, mentally ill, terminally ill, or mentally retarded or as having a condition requiring long-term care. If released, the offender must be supervised and remain under a physician's care in a medically suitable placement.

***Payment for overtime.*** TDCJ must pay employees for overtime worked at the same time they are paid for work at the regular rate for that month.

***Miscellaneous.*** The bill makes many other changes in the laws governing TDCJ, including requiring a feasibility study on relocating the Central Prison Unit from Sugar Land to a location that more appropriately addresses the needs of the correctional system and requiring the agency to study the possibility of a prisoner exchange with foreign countries

***Correctional managed health care.*** SB 909 continues the CMHCC, which manages a statewide managed health care network for inmates, removes its individual Sunset date, and requires that its responsibilities be reviewed under the Sunset Act during any review of TDCJ.

The bill revises TDCJ's role in monitoring health care by removing limits on the department's monitoring activities and requiring it to monitor certain aspects of the quality of care delivered by providers. TDCJ must ensure that certain types of information about health care and the process for filing inmate grievances about health care are available to all inmates.

***Parole guidelines, early release from parole supervision.*** SB 909 requires the Board of Pardons and Paroles (BPP) to meet annually to review and discuss parole guidelines. Based on the review, the BPP may update the guidelines. The BPP annually must report to the newly created Criminal Justice Legislative Oversight Committee and legislative leaders on its application of the parole guidelines. SB 909 requires that when a parole board member or a parole commissioner deviates from parole guidelines, instead of making a brief written statement, they produce a written statement describing in detail the circumstances of the departure. The bill imposes a new requirement that the statement be provided to the inmate.

SB 909 requires TDCJ to establish a system for recommending persons on parole and mandatory supervision for early release from supervision. Annually, parole officers must identify releasees who meet certain criteria and determine whether early release from parole would be appropriate. Parole officers must forward their recommendations to the regional parole supervisor, and if the regional parole supervisor approves the recommendation, the parole division must allow the releasee to serve the remainder of the sentence without supervision.

## Supporters said

TDCJ should be continued, but the agency should be reviewed again in 2011 because of growth in the offender population, the significant changes being instituted in the

criminal justice system, and an increase of $200 million for offender diversion and treatment programs appropriated by the 80th Legislature. In 2011 the Legislature should be able to evaluate the criminal justice system and decide if statutory changes are necessary, using studies done by the oversight committee created in the bill.

**Criminal Justice Legislative Oversight Committee.** SB 909 would fill a gap in the information available to legislators by creating a legislative oversight committee to provide independent, objective information and analysis. Since the abolishment of the Criminal Justice Policy Council in 2003, no entity has filled its role in providing comprehensive and ongoing analysis of the criminal justice system for the Legislature. Creating the committee is warranted, given the size of the criminal justice system and the significant challenges it faces with prisons and many jails operating at capacity. Information provided by the Legislative Budget Board (LBB) and other entities does not provide objective, independent analysis of the system as a whole or include recommendations.

**MRIS for state jail felons.** Because current law does not specifically allow state jail offenders to be released on medically recommended intensive supervision, judges often are reluctant to release them early for medical reasons. There is no reason to deny this option for state jail offenders when in some cases medical release would be warranted and release would save the state the costs of extraordinary medical care.

**Payment for overtime.** Requiring TDCJ to pay employees soon after their overtime is earned would codify current agency policy. In January 2007, when the agency had 3,250 vacant correctional officer positions, it modified its overtime policies and began paying officers for their overtime in the next pay period instead of requiring them to bank 240 hours of overtime before receiving any payments. This policy could help retain correctional officers and is so important to employee retention and morale that it should be established in law so that it could not easily be changed.

**Correctional managed health care.** SB 909 would update the CMHCC's duties to better reflect its purpose in making decisions about health care delivery and would improve monitoring of inmate health care by removing a current restriction on TDCJ's monitoring efforts. TDCJ needs more authority to monitor the health care system provided by the universities so that it can identify and address individual and systemic problems.

**Parole guidelines, early release from parole supervision.** SB 909 would require the BPP to explain its efforts to meet parole guidelines so the Legislature could have more information about the board's deviation from the guidelines. Focusing more attention on the guidelines could help the Legislature, the board, and the public determine if the parole process was adequately objective, consistent, flexible, and accountable. Requiring the updating of the guidelines annually would ensure that the guidelines best served the needs of the parole process.

Requiring parole decision makers to provide reasons for their departures from the guidelines would increase transparency and confidence in the process. This would not infringe on a parole panel's discretion to make appropriate decisions because it would not be required to adhere to the guidelines and there would not be a penalty for failing to follow the guidelines.

SB 909 would institute a formal system for parolees to be identified and assessed for early release from parole, because TDCJ does not use its current authority in this area. By facilitating the early release of some offenders, SB 909 would provide incentives for parolees to meet parole conditions, reduce parole supervision caseloads, and enhance public safety by allowing parole officers to focus on high-risk and newly released offenders who needed more intensive supervision. Under the system outlined in SB 909, offenders would be released early only from supervision, but they would not be formally discharged from parole, so their parole still could be revoked if warranted.

## Opponents said

TDCJ's next date for Sunset review should be 2019, which would allow for the standard 12 years between agency reviews. The agency was reviewed by the Sunset Commission in 1987, 1999, and 2007. Having another review in 2011 would mean that it has been reviewed three times in 12 years. The Sunset Commission staff should focus their limited resources on other areas of state government in the next 12 years. Other entities, including the new oversight committee, are capable of evaluating trends in the criminal justice system.

**Criminal Justice Legislative Oversight Committee.** It is unnecessary to create a new entity to provide information about criminal justice matters because several entities now fill this need. These include the LBB, the criminal justice agencies, the state auditor, the newly created Criminal

Justice Statistical Analysis Center in the Governor's Office, and the House and Senate committees with jurisdictional oversight of criminal justice agencies.

**MRIS.** Before releasing a state jail felon on MRIS, judges should have to hold a hearing to allow prosecutors and the offender a chance to present evidence concerning the release.

**Payment for overtime.** Statutorily requiring TDCJ to pay overtime would reduce the Legislature's and agency's flexibility to allocate its budget. Although TDCJ's current overtime policies are in compliance with SB 909, in 2003 the agency had to change its policy and restrict overtime payments due to budget constraints.

**Parole guidelines, early release from parole supervision**. Many of the requirements in SB 909 are unnecessary. The BPP already meets regularly to discuss its parole guidelines and reports on them in an annual report.

The requirement in SB 909 that the parole board describe in detail the specific circumstances of a departure from the parole guidelines would be difficult to meet. When votes are cast, parole board members do not know if they have exceeded the parole guideline percentages for that month, and this knowledge could lead to charges

that the board members were voting to meet quotas for release. Parole decisions are made based on a number of factors, such as the type of crime, a person's criminal history, the impact on victims, and public safety, and parole guidelines are just one tool. Decisions should continue to be made based on these factors without overly elevating the importance of the parole guidelines.

SB 909 would institute a system in which TDCJ parole division staff, and not the parole board, could make decisions about releasing offenders early from parole supervision. Decisions to release offenders from supervision would better be made by the BPP, whose members are appointed by the governor.

## Notes

The **HRO analysis** of SB 909 appeared in the May 18 *Daily Floor Report*.

HB 431 by Madden, effective September 1, 2007, contains similar language authorizing the release of state jail offenders on medically recommended intensive supervision for state jail felons.

# Creating office of capital writs for death penalty habeas corpus petitions

**SB 1655 by Ellis, Duncan**
*Died in the House*

SB 1655 would have created a statewide office of capital writs. The office would have provided legal representation for indigent capital murder defendants who were sentenced to death and appointed counsel for a writ of habeas corpus, which is a type of legal challenge sought from a judgment that typically centers on constitutional rights, such as effectiveness of counsel or satisfactory disclosure of evidence by prosecutors, and may be filed in both state and federal court.

If an indigent defendant who had been sentenced to death desired the appointment of counsel for a writ of habeas corpus, the court would have been required to appoint the office of capital writs to represent the defendant, unless specific conditions in the bill were met. The office would have been prohibited from accepting an appointment if there were a conflict of interest, if the office had insufficient resources to provide adequate representation, if the office were incapable of providing representation in accordance with the rules of professional conduct, or if there were other good cause.

If the office had not accepted the appointment or had been prohibited from accepting the appointment under the restrictions in the bill, the convicting court would have been required to appoint an attorney from a list of competent counsel that would have been maintained by the presiding judges of the judicial administrative regions, instead of being maintained by the Court of Criminal Appeals as under current law.

The bill would have established a procedure for selecting the director of the office of capital writs. A five-member committee appointed by the president of the State Bar of Texas with ratification by the executive committee of the State Bar would have been established. This committee would have had to submit to the Court of Criminal Appeals the names of persons whom it would recommend to be director of the office, and the court would have had to appoint the director from those on the list for a four-year term. The Court of Criminal Appeals could have removed the director only for good cause.

## Supporters said

SB 1655 would help ensure that competent attorneys were appointed to help indigent defendants with writs of habeas corpus for death sentences. Because of the finality of a death sentence, the state needs to do all it can to make the appeals process fair and just and to provide consistent representation throughout the state.

The office of capital writs that would be created by SB 1655 would be fundamentally different from the federally funded Texas resource center, which aided death row inmates with appeals and was closed in the mid-1990s. The resource center was funded almost entirely with federal money and was not a state agency. The office of capital writs would be a state agency subject to standard oversight and monitoring mechanisms, and any problems with the agency could be addressed at the state level.

The office of capital writs would have a pool of talented professionals who could handle these highly technical, specialized cases. Current law requiring district courts to appoint attorneys from a list maintained by the Court of Criminal Appeals has resulted in the appointment of some lawyers who clearly are unqualified and inexperienced and some who have done substandard work. The current list of attorneys who may be appointed includes some serving probated suspensions of their licenses, some with no capital experience and no habeas corpus experience, some with mental illness, and some who have filed no cognizable claims. In addition, the work of the lawyers is not monitored or evaluated, so incompetent lawyers can continue to be appointed. This especially creates problems in habeas appeals because, in most situations, only one state habeas appeal is allowed, and a federal appeal can hinge on the quality and content of a state appeal.

Giving presiding judges in the administrative judicial regions the responsibility for the list of attorneys who could be appointed if there were a conflict of interest would improve the current system, in which the Court of Criminal Appeals maintains a list.

Having qualified and experienced lawyers working these writs would result in a more efficient and effective system for handling death penalty appeals. It would address the problem of incompetent attorneys wasting the resources of the criminal justice system by raising issues that were improper or by making other errors. It would be appropriate for SB 1655 to be limited to writs of habeas corpus because it is difficult to find competent attorneys to perform this challenging, technical, and specialized part of the death penalty appeals process.

SB 1655 also would go far in addressing the problem of compensation for attorneys currently appointed for these cases. In many cases, judges cap the compensation for these appointed attorneys at the state-funded level of $25,000, which is inadequate in almost every case. Also, courts sometimes deny claims for reimbursement for investigatory expenses. An office of professionals dedicated to this work could be compensated adequately through their salaries, and the office would have resources for investigations. According to the fiscal note, SB 1655 would cost the state in fiscal 2008-09 about $58,000 in addition to the $500,000 currently spent for court-appointed habeas attorneys for capital writs. If necessary, the Legislature could revisit the issue of compensation after the office of capital writs had been in operation.

The bill would enact recommendations by the State Bar Task Force on Habeas Counsel Training and would put Texas in line with the vast majority of other death penalty states with publicly funded offices of specialized lawyers to handle these cases. It also would mirror the structure in many prosecutors' offices that have divisions specializing in habeas corpus work.

## Opponents said

SB 1655 would establish a flawed system for providing representation of capital defendants for writs of habeas corpus. The statewide office of capital writs could turn into a publicly funded anti-death penalty office, similar to the federal death penalty resource centers that were abolished in the mid-1990s. This could institutionalize opposition to the death penalty and allow public funds and the weight of the state to be used to further the political goal of eliminating the death penalty, a goal not shared by all Texans. The current system, having courts appoint attorneys from a list maintained by the Court of Criminal Appeals, helps ensure that this does not occur.

## Other opponents said

SB 1655 would not go far enough to address the problems with appointed attorneys in capital cases. While the bill would help with writs of habeas corpus, which come at the very end of the process, it would be better to institute a statewide defender's office or other reforms earlier in the process for trial and direct appeals.

SB 1655 also would not do enough to address the need for higher compensation for attorneys working on death penalty cases. Attorneys outside of the office of capital writs who were appointed to a case due to a conflict of interest still would be under the cap for cases and still could have requests for expenses denied.

## Notes

The **HRO analysis** of SB 1655 appeared in Part Two of the May 17 *Daily Floor Report*.

SB 528 by Seliger, which died in the House, would have revised requirements for attorneys appointed to defend indigent criminal defendants in death penalty cases for both the trial and direct appeals. The bill would have established separate sets of requirements for trial attorneys and direct appeals attorneys in these cases.

For appellate attorneys, instead of the requirement of having tried to verdict as lead defense counsel a significant number of felony cases, including homicide trials and other trials for offenses punishable as second- or first-degree felonies or capital felonies, SB 528 would have required the attorneys to have authored a significant number of appellate briefs, including appellate briefs for homicide cases and other cases involving capital felonies, first-degree felonies, or certain other serious and violent offenses.

SB 528 would have required that trial attorneys and appellate attorneys in death penalty cases not have been found by a federal or state court to have rendered ineffective assistance of counsel during the trial or appeal of any capital case unless the conduct underlying the finding failed to reflect accurately the attorney's current ability to provide effective representation. The bill also would have removed the requirement for an appointed attorney to have at least five years of criminal litigation experience and replaced it with a requirement of at least five years of criminal law experience.



<div style="text-align: right">

**E**

**lections**

</div>

HB 218     B. Brown      Requiring voters to present proof of identification     43

* HB 556    Hilderbran    Exemption for disabled voter accessibility in certain elections    45

HB 626     P. King      Proving U.S. citizenship to register to vote     47

HB 2017    Giddings     Moving the primary election date to the first Tuesday in February    49

# Requiring voters to present proof of identification

**HB 218 by B. Brown**
*Died in the Senate*

**HB 218** would have required a voter to present to an election officer at the polling place a valid voter registration certificate and either one form of photo identification or two different forms of non-photo identification. The bill would have modified the list of acceptable proof of identification, specifying eight acceptable forms of photo ID and 11 acceptable forms of non-photo ID.

If the voter's identity could have been verified from the documentation presented and the voter's name was on the precinct list of registered voters, the voter could have proceeded to vote. A voter whose identity had been verified by the documentation presented could have proceeded to vote if the voter:

- had not presented a voter registration certificate but the voter's name had appeared on the precinct list of registered voters;
- had presented a correct voter registration certificate but the voter's name had not appeared on the precinct list; or
- had presented a voter registration certificate showing registration in a different precinct and the voter's name had not appeared on the precinct list, if the voter had sworn that the voter was a resident of the precinct and would vote only once in the election.

A voter with or without a voter registration certificate who had not presented proof sufficient to meet the identification requirements would have been allowed to cast a provisional ballot.

HB 218 would have prohibited the Department of Public Safety (DPS) from collecting a fee for a personal identification certificate issued to a person who stated that it was being obtained for the sole purpose of proof of identity for voting – as long as the person either was a registered voter in Texas who presented a valid voter registration certificate or was eligible to register and submitted a registration application to DPS.

The presiding election judge would have posted in a prominent location outside of each polling place a list of the acceptable forms of photographic and non-photographic identification. The bill would have required election judges and clerks to receive training on the acceptance and handling of identification presented by voters.

## Supporters said

HB 218 would protect and strengthen the electoral system by requiring voters to present identification at the polls. The bill would establish a uniform standard for voting at the polls, reduce voter fraud, bring voting in line with other transactions that require proper identification, and raise the bar in restoring confidence in elections.

Stricter identification requirements would not impose an unreasonable burden on voters. The bill would allow many ways to fulfill the identification requirements and would not force anyone to bear great cost. Some people even would be eligible for a free identification card.

HB 218 would protect the rights of citizens and serve as a reasonable precaution to prevent ineligible people from voting. Proper identification is necessary to ensure that voters are who they say they are, that voters cast only one ballot each, and that ineligible voters – including undocumented persons, felons, and people using the names of deceased voters – are not allowed to vote.

Cheating at the polls makes a mockery of the electoral process and dilutes the votes of honest citizens. Even a small amount of fraud could tip a close or disputed election, and the perception of possible fraud contributes to low confidence in the system. Many activities in everyday life require the presentation of photo ID, including air travel and cashing checks. Society has adapted to these requirements and benefited from the safeguards they provide.

## Opponents said

The voter identification requirements in HB 218 would create substantial obstacles to voting for otherwise eligible voters that would inhibit voter participation and likely would disproportionately affect certain groups, including the elderly, minorities, and low-income voters. By placing an extra burden on voters and creating confusion among election officials and the public, the bill effectively would lead to the needless disenfranchisement of many voters.

Claims that voter fraud makes it necessary to demand ID at the polls are not supported by evidence. In fact, the effect of stricter ID requirements would not be reduction of

voter fraud but the suppression of legitimate votes. While almost all voter fraud involves absentee and mail-in ballots, the bill would do nothing to make mail-in balloting more secure. Instead, it would attempt to address the nonexistent problem of voter impersonation at the polls. Evidence of such fraud is anecdotal at best, and the penalty for voter impersonation is a third-degree felony, a strong deterrent to anyone who might consider casting a dishonest vote.

Voter identification requirements should be limited to the minimum needed to prevent duplicate registration and ensure eligibility. Texas already has taken steps to diminish the threat of fraud, including the implementation of requirements under the federal Help America Vote Act (HAVA). Current registration requirements are sufficient because registrants must swear they are U.S. citizens under penalty of perjury. Falsely claiming citizenship and voting

fraud are federal offenses. Texas should attempt to curb voter fraud by vigorously prosecuting election fraud cases rather than hassle legitimate voters with unnecessary new requirements aimed at solving a nonexistent problem.

## Other opponents said

The provisions in the bill would be a major departure from current law, so a grace period of at least one election would be needed to educate election workers and voters.

## Notes

The **HRO analysis** of HB 218 appeared in Part One of the April 23 *Daily Floor Report*.

# Exemption for disabled voter accessibility in certain elections

**HB 556 by Hilderbran**
*Effective June 15, 2007*

**HB 556** exempts certain small counties and the political subdivisions within those counties from having to provide at least one voting station at each polling place that complies with federal Help America Vote Act (HAVA) requirements on accommodations for people with disabilities, unless the election is held jointly with another election in which a federal office is on the ballot. The exception is based on population criteria or on proof that the accommodation will create an undue burden. A county or political subdivision must file an application with the secretary of state no later than 90 days before an election to seek an exception from the requirements.

A county with a population of less than 2,000 is exempt, but if a disabled voter requests reasonable accommodation by the 21st day before the election, the county must make reasonable accommodations for the person to vote. A county with a population of less than 5,000 must provide at least one voting station that meets the HAVA accessibility requirements on election day. A county with a population of less than 10,000 must provide at least one accessible voting station on election day and during early voting by personal appearance. A county with a population of less than 20,000 that makes a showing that compliance constitutes an undue burden must provide an accessible voting station on election day and early voting by personal appearance and must provide a mobile voting station during early voting by personal appearance that meets the accessibility requirements.

Also, the secretary of state is authorized to reimburse political subdivisions for expenses incurred in conducting a special election that is held statewide.

## Supporters said

HB 556 would provide a balanced compromise between the disabled community and small political subdivisions that have experienced financial hardships in complying with voting accessibility requirements. It would reduce the burden on small counties and political subdivisions while maintaining the ability of disabled Texans to cast a secret ballot.

Some small communities face significant financial hardships in complying with the HAVA requirement. At this point, the only voting system that complies with accessibility standards under federal law is the DRE, or direct recording electronic voting machine. These machines are extremely expensive and often unaffordable for small entities.

While all counties in Texas are required to have electronic machines and received federal funding to make the initial purchase, continued funding for maintenance and operations is not available. The machines are expensive to program – a process also referred to as coding – which must be done for each election. Some counties do the coding themselves, while others do not have the resources to perform these duties and must pay a vendor to do it. Smaller political subdivisions, like cities, school districts, and MUDs, did not receive funding for the machines, and although some counties do hold joint elections, the expense often is passed on to the cities and school districts. Some small cities bought the voting machines, which increased the cost of their elections by thousands of dollars, only to find out that they have been under-used or not used at all. Others did not buy the machines but instead lease them from the counties. If there are not enough machines to go around, some are forced to spend money to buy them or risk being noncompliant.

The bill would follow current ADA requirements by allowing exceptions for small entities that could prove a financial burden, yet still would require them to provide reasonable accommodations. Also, disabled voters always have the option of voting early by mail.

## Opponents said

The bill could undo many years of hard-fought efforts to secure voting rights for the disabled to have a chance to cast a private ballot. It would send a message that polling places no longer had to comply with the Americans with Disabilities Act (ADA) and could open the door for more local entities to become exempt because they did not want to pay for electronic voting systems. Some disabled voters would not be able to cast a private ballot, resulting in a city or county being vulnerable to ADA lawsuits. If someone arrived to vote and no accommodation were available, that person would have a legitimate ADA complaint.

A large number of disabled voters are visually impaired, and this voting technology has benefited them the most by allowing them, for the first time in their lives, to vote a private ballot without having someone read it aloud to them. This includes the elderly who are losing their eyesight and voters who are unable to read.

Also, the 20,000 population trigger is arbitrary and should be raised. There are still many small communities with slightly larger populations that would not be able to apply for an exemption to the HAVA voting accessibility requirement.

## Notes

Other bills to exempt small communities from accessible voting station requirements for certain elections were introduced during the 80th Legislature. HB 1031 by Chisum, which would have exempted political subdivisions with a population of less than 5,000, except for elections held jointly with another election in which a federal office was on the ballot, died in Senate committee. SB 1776 by Duncan, which contained many of the same provisions as HB 556 but would have provided specific requirements for political subdivisions located in more than one county, died in the House.

# Proving U.S. citizenship to register to vote

**HB 626 by P. King**
*Died in Senate Committee*

**HB 626**, as passed by the House, would have required that, when registering to vote, a U.S. citizen by birth provide the city, county, state, and country of that applicant's birth and a naturalized citizen provide the city, state, and year of taking the naturalization oath or the applicant's alien registration number.

Using the applicant's information regarding citizenship by birth or naturalization, the voter registrar would have had to verify with the secretary of state that the applicant was a U.S. citizen. The secretary of state would have adopted rules and entered into any necessary agreements to verify an applicant's citizenship. An applicant whose citizenship could not be verified would have been able to execute an affidavit stating that the applicant was a U.S. citizen. The affidavit would have created a rebuttable presumption that the applicant was a U.S. citizen. HB 626 would have prohibited a notary public from charging a fee for notarizing the affidavit required to verify citizenship for a voter registration application.

## Supporters said

HB 626 would ensure that voting was a right reserved only for U.S. citizens as established by the U.S. and Texas Constitutions. It simply would require that those registering to vote include the city, county, state, and country of their birth, if the applicants were citizens by birth, or the city, state, and year of taking a naturalization oath or their alien registration number, if they were naturalized citizens. HB 626 would safeguard the foremost democratic right, the right to vote, from gaps in Texas election laws and procedures.

Throughout Texas, applicants who check "yes" to the question of citizenship on voter registration applications simply are taken at their word. The Office of the Secretary of State, which oversees the administration of elections, conducts no formal verification of a voter registration applicant's citizenship status. In a letter dated June 15, 2006, the Secretary of State's Office wrote that Texas relies on the applicant to provide accurate, truthful information on a voter registration application and that, to the extent that an applicant must sign the application verifying qualifications to register, including U.S. citizenship, the application is processed on those merits. Such an admission is sufficient basis for legislative action to assure that only those eligible are allowed to register to vote.

Under the Help America Vote Act of 2002 (HAVA), the secretary of state, as of January 1, 2006, checks voter registration applications against driver's license numbers, DPS-issued personal identification numbers, and Social Security numbers. While this procedure can serve to authenticate the name and address of an applicant, it does not prevent foreign nationals from registering to vote because both Texas driver's licenses and Social Security numbers are available to non-citizens. A DPS driver's license application provides a place to check citizenship status, but the agency does not verify the information.

In June 2006, the Harris County tax assessor-collector and voter registrar testified before the U.S. House Administration Committee that he identified at least 35 non-citizens who either applied for or received voter registration cards. Since 1992, the Harris County registrar has cancelled 3,742 registered voters for non-citizenship. Officials in Harris County discovered non-citizens on the voter rolls when the district clerk received returned jury summons from people who were on the voter rolls but claimed not to be citizens and ineligible for jury service. Incidents such as these provide compelling reasons to address the problem of non-citizens successfully registering to vote.

HB 626 would be consistent with efforts in other states to secure the registration and voting process. Even a few fraudulent votes can make a difference, and elections can be won and lost by a handful of votes. In November 2004, voters in Arizona approved a statewide ballot initiative, Proposition 200, requiring all applicants who register to vote to prove their citizenship and present identification at polling places. The National Commission on Federal Election Reform, chaired by former President Jimmy Carter and former Secretary of State James Baker, recommended requiring a national voter ID card with a photograph and confirmation of U.S. citizenship.

## Opponents said

HB 626 would create an additional impediment to voting, impose an onerous burden in trying to solve a problem that does not exist, and end up creating new problems. The 2000 Census information for Texas recorded 1,985,316 non-citizens out of 20,851,820 people, or 9.5 percent. HB 626 would impose greater difficulties on

the 90.5 percent of people in the state who are citizens, particularly naturalized citizens and citizens born in states other than Texas or overseas of U.S. parents.

The bill's requirement that the secretary of state verify citizenship would be costly – an estimated $21.2 million in fiscal 2008-09 – and impractical. No federal or state agency maintains a comprehensive database of U.S. citizens. Verification of citizenship as directed by HB 626 would result in expensive cross-checks with the Texas Bureau of Vital Statistics, the U.S. Citizen and Immigration Services SAVE (Systematic Alien Verification for Entitlements) program, and vital records bureaus of the 49 other states.

There is no reliable evidence of non-citizens intentionally voting illegally in Texas. In election contests, parties must prove by clear and convincing evidence that specific voters were ineligible and voted fraudulently. While there is evidence of ineligible felons voting illegally before the 75th Legislature in 1997 last changed those requirements, in the last 30 years no incontrovertible evidence has emerged in Texas for a non-citizen voting, except one. In 2005, in the Heflin v. Vo election contest, a non-citizen, a Norwegian living in Katy, voted in the November 2004 election even though he was not a U.S. citizen. He said he did not recall registering, but an application on file in the Harris County registrar's office appeared to bear his signature with a check that he was not a citizen. The Harris County registrar acknowledged that his office erred in giving the non-citizen a voter card and the vote was not counted. In the report and findings of the master in that case, the summary said that the contestant had produced no evidence of intentional voter fraud affecting the final vote tally to his detriment. No amount of required documentation would eliminate clerical error, and HB 626 would not fix such a problem.

Under current law, voter registration applicants must mark their citizenship status under penalty of perjury and must sign a statement that they understand that giving false information to procure voter registration is perjury and could result in jail time of up to 180 days, a fine up to $2,000, or both. The applicant also could be subject to imprisonment of up to three years or a fine of $250,000, or both, under federal law. These penalties, plus having to make an oath as to citizenship, would seem sufficient to keep non-citizens from registering and voting illegally in Texas. The current provision to affirm citizenship on a voter registration application is the legal equivalent of executing an affidavit, which HB 626 would mandate, but more practical for both the applicant and election officials.

Evidence of an occasional non-citizen registering has surfaced, but usually due to an over-zealous volunteer registrar and an unaware applicant. The non-citizen ultimately is stopped short of voting illegally. Non-citizens generally are the least likely to vote because they want to remain "under the radar" if they are in the country illegally. A violation could lead to more charges and deportation.

The Carter-Baker Commission's recommendations include requiring that a federal voter ID card (with the voter's photograph) be issued free of charge. The recommendations also would mandate every state to have an active recruitment program to locate people who were not registered and give them a voter identification card. The report stated that voter registration and address changes should be made easier, and this bill would directly contradict that goal.

## Notes

The **HRO analysis** of HB 626 appeared in Part One of the April 23 *Daily Floor Report*.

# Moving the primary election date to the first Tuesday in February

**HB 2017 by Giddings**
*Died in the Senate*

**HB 2017** would have changed the presidential primary and general primary date to the first Tuesday in February and the runoff primary election date to the second Tuesday in March. The filing deadline for placement on the general primary election ballot would have been not later than 6 p.m. on November 15 in the odd-numbered year preceding the general primary election day, and the application for filing would have begun after 8 a.m. on October 15 in that odd-numbered year.

The bill would have added a provision to the current requirements for a candidate's application for a place on the ballot to include a statement that the candidate was aware of the provisions of Texas Constitution, Art. 16, sec. 65, which relate to automatic resignation from certain county and district offices upon announcement of candidacy for another office.

The bill would have specified that an application for a place on the ballot for the general primary election had to be challenged for compliance not later than the 15th day after the filing deadline. A candidate in the general primary election could have been declared ineligible not later than 15 days after the date of the regular filing deadline.

A candidate would not have been able to withdraw from the general primary election after the second day following the regular filing deadline. The bill would have created other deadlines relating to a deceased applicant and an applicant who sought the office of a withdrawn, deceased, or ineligible candidate.

HB 2017 would have required the county and senatorial district conventions to be held on the fourth Saturday in March after general primary election day, unless that date fell during Passover or the day after Good Friday, in which case the conventions would have been held the following Saturday.

## Supporters said

HB 2017 would move up the presidential primary election and the general primary election from the first Tuesday in March to the first Tuesday in February to allow Texans to have meaningful input in choosing the presidential

nominees for both major political parties. The bill represents a bipartisan effort among House members, the Texas Democratic Party, and the Republican Party of Texas.

Texas should play a significant role in the presidential nominating process because of the size of its delegate pool. The state has the second-highest delegate total to the Republican National Convention and the third-highest total of delegates to the Democratic National Convention. We should not place our delegates in a mostly symbolic role by keeping the presidential primary in March, when the presidential nomination likely already will have been decided.

The demographic composition of this state is what the country will look like in 20 years, but primary states resembling the past determine the future of our nation. We should not continue to yield the interests of Texas to unrepresentative states like New Hampshire, Iowa, and South Carolina.

Advancing the primary date by only a month would not inconvenience candidates or give incumbents an advantage. Challengers usually are prepared to run long before the filing date, whenever it may be. Separating the presidential and general primary dates as some states do would be prohibitively expensive, and it also could mean that those who voted in the presidential primary for one party would be barred from voting for state and local candidates in the other party's primary in a subsequent election. Shifting the primary dates back and forth between presidential and non-presidential years also would cause voter confusion.

## Opponents said

Because as many as 23 states representing more than a majority of convention delegates could choose their party's presidential nominee on February 5, 2008, HB 2017 could cause that primary date to become a national referendum and give too much of an advantage to the front-running candidates who are better known and better financed. With so many large states, including California and New York, conducting presidential primaries on one day, candidates could not campaign in the "retail" fashion associated with early presidential primaries, making personal appearances

and engaging in single-state debates. Instead, the proposed February 5 primary would be more like a de facto general election, with candidates having to rely more heavily on television advertising and direct mail to reach voters. The candidate with the most campaign money would have the biggest advantage – even more than is customary in a presidential primary.

Several nationally recognized presidential campaign experts and pundits for both political parties concur that the concentration of such a large number of states conducting presidential primaries on February 5 could have the opposite effect of the one intended. A February 5 "super duper" Tuesday could make the outcome of earlier primaries in states like Iowa and New Hampshire even more significant because voters would not have adequate time to assess candidates and could be influenced more easily by the national media and voter sway in these earlier state primaries and caucuses. Another scenario would be that no single candidate could emerge on the first Tuesday in February. Quite possibly, two well-funded front runners could be deadlocked after February 5, giving Texas a crucial role in determining the nominee in March.

An early February primary would make the period before the general election of unprecedented length – nine full months, in which candidates would have a hard time avoiding voter apathy. Such a long campaign could give the advantage to better-funded incumbents, especially as challengers would have to compete for attention with holiday distractions during much of the primary campaign. Candidates seeking office would have to file almost a year before the general election. During the long period before the general election, new issues could emerge, yet voters could choose only from candidates chosen in primaries nine months earlier.

Residency for candidates for the Legislature is determined as of one year before the general election. Under current law, a candidate has to establish residency before filing because the filing period begins in early December, less than a year before the general election. By allowing candidates to file beginning October 15 of an odd-numbered year, a candidate could file to run in any district simply by declaring residency intent as of the date of the filing deadline. As long as the candidate maintained residency from a year before the general election, a residency challenge could be difficult to sustain.

## Other opponents said

A sound alternative to moving both the presidential primary and the party primaries to the first Tuesday in February would be to have split primary election dates. Most of the states that have enacted or are considering a presidential primary election on the first Tuesday in February have dual primaries and choose their party nominees for Congress and state and local offices at a later date closer to the general election. If the Legislature wanted the presidential primary moved up, nothing would prevent setting the general primary election at a later date. The overall benefit to the voting public and the state would outweigh any cost considerations.

## Notes

The **HRO analysis** of HB 2017 appeared in the April 12 *Daily Floor Report*.



# Environment

| * HB 12 | Hilderbran | Funding and jurisdiction of TPWD and Historical Commission | 52 |
| * HB 3732 | Hardcastle/ | | |
| HJR 93 | Chisum | Implementation of advanced clean energy projects | 54 |
| * SB 3 | Averitt | Water resources development and management | 56 |
| * SB 12 | Averitt | Air quality enhancement programs, including energy efficiency standards | 61 |
| SB 124 | Ellis | Requiring low-emission vehicle standards | 64 |
| SB 1317 | Jackson | Restricting a city's ability to regulate air pollution outside its limits | 65 |
| SB 1687 | Watson | Studying strategies for combating greenhouse gas emissions | 66 |

# Funding and jurisdiction of TPWD and Historical Commission

**HB 12 by Hilderbran**
*Generally effective June 15*

**HB 12** amends the Texas Historical Commission's Sunset statute to continue the commission until September 1, 2019, and requires the Texas Parks and Wildlife Department (TPWD) to transfer 18 historic sites to the commission by January 1, 2008. The bill requires 6 percent of sporting goods sales tax collections each biennium to be credited to the Historical Commission in the newly established Historic Site Account, which can be used to administer, operate, preserve, repair, expand, or maintain those historic sites. To aid in the transition, the bill requires the commission to prepare a base operating plan for each historic site before initiating a transfer and a management plan filed each legislative session about upcoming maintenance and funding priorities. This bill also includes protections for existing employees after the transfer.

The bill allows the Historical Commission to establish fees at all historic sites under its jurisdiction; accept grants and donations; and enter into agreements with non-profit entities for the expansion, renovation, management, operation, or financial support of any site.

The bill revises the dedication of revenue from the sporting goods sales tax to TPWD. The bill requires that 74 percent of the $32 million from the sporting goods sales tax annually credited to TPWD go to the State Parks Account. Ten percent of the tax will go to the newly established Large County and Municipal Recreation and Parks Account, 15 percent to the Texas Recreation and Parks Account that benefits smaller counties and municipalities, and 1 percent to the Texas Parks and Wildlife Conservation and Capital Account. The bill also creates a joint legislative task force to review funding of TPWD from the sporting goods sales tax and to provide recommendations to more evenly match revenue from the tax with the needs of the agency.

TPWD must comply with recommendations made by the State Auditor's Office, including certain park management-related provisions, annual equipment reviews, evaluation of its facility reservation system, and an assessment of whether maintenance tasks can be done more cost effectively by a third-party contractor. TPWD may use inmate labor, sell livestock, establish variable facility and lodging fees, establish on-site speed limits, and work to enhance revenues based on suggestions made by the Legislative Budget Board (LBB).

The bill establishes a legislative task force to review the use and appropriation of the sporting goods sales tax. In addition, it includes various parks and wildlife-related measures, including:

- physical fitness standards for law enforcement officers (also in SB 1722 by Ogden, effective September 1, 2007);
- the nuisance or noxious aquatic vegetation program (HB 2001 by Creighton);
- the regulation of party boats (SB 997 by Watson);
- regulating the power to take or unload fish (HB 3765 by O'Day, effective September 1, 2007);
- giving preferential consideration to parks programs with matching funds (SB 1848 by Duncan);
- permits for the possession or transport of non-indigenous snakes (HB 1309 by Hilderbran, generally effective September 1, 2007); and
- hunting of raptors from public rights-of-way (HB 2414 by Isett).

## Supporters said

HB 12 would protect and honor the state's most valuable historic sites. TPWD handles many different tasks, including the management of statewide recreation, hunting, fishing, coastal preservation, natural resource preservation, and historic site maintenance. TPWD has done an admirable job with historic sites in the past, but the Texas Historical Commission is the logical agency to manage the state's historic sites because its mission is to protect the state's architectural, archeological, and cultural landmarks.

The bill further would develop Texas historic sites as optimum cultural and tourist attractions. Heritage tourism currently is the third-largest segment of the travel industry, and in recent years, the marketing of historic sites has changed from a focus on single sites to a decentralized historic program that provides a more complete picture of an entire region. By transferring historic sites to the Historical Commission, HB 12 would enable the agency to develop a distinct franchise for Texas Heritage Tourism. One example of the commission's success includes the Texas Main Street Program, which helps revitalize historic downtown and neighborhood commercial districts by using preservation and economic development strategies. To date, the Main

Street Program has resulted in the private reinvestment of more than $860 million in Texas downtowns and commercial districts, created more than 18,200 jobs, and established more than 4,600 new businesses.

The Historical Commission has a proven track record for assuring better visibility and user experiences that have created financial benefits, especially in rural Texas, where park fees, lodging, food, and related travel expenses contribute greatly to the local tax base. The bill would ensure that the commission could provide improved historic site services by creating the Historic Sites Fund, requiring the commission to develop a base operating plan before transferring a site, and dedicating additional revenue to benefit historic sites.

Along with the substantial increase in TPWD funding under HB 1 by Chisum, the general appropriations act, HB 12 would provide much-needed support to TPWD. Further, the bill would establish a legislative task to study the issue of TPWD funding via the sporting goods sales tax to ensure that these funds are collected fairly and that the tax adequately supports the needs of the state's parks system. The bill would take into consideration several of the issues concerning TPWD operations raised in the state auditor's report and the LBB report. By instituting these best practices, HB 12 would ensure greater efficiency and improve the profit potential at TPWD sites.

## Opponents said

This bill would mandate unnecessarily the transfer of historic sites from TPWD to the Texas Historical Commission. TPWD already can transfer sites by interagency agreements that would ensure both agencies developed a public plan of action. At this time, there has been no public input, study, or evaluation to suggest a cost savings or operational benefit would result from transferring 18 historic sites to the Historical Commission. A recent Sunset Advisory Commission review did not make such a recommendation, nor has there been a feasibility study on transferring these 1,604 acres, which

include 100 archaeological sites. This transfer would result in a significant duplication of efforts, with both TPWD and the commission engaging in recreational activities, archeological programs, and natural resource management. The LBB found that it costs the TPWD $5 million to operate these 18 sites annually, while the Historical Commission is estimating an annual cost of $7 million and a one-time repair and restoration budget of $34 million.

HB 12 would transfer historic sites to an agency with no experience in facility operations and management. While the commission points to the success of the Courthouse Restoration program, the Main Street program, and the Heritage Trail program, none of these programs included site operation and management. Rather, all of these programs were marketing and grant-making projects of the Historical Commission that depended on the operation and management of sites by local jurisdictions. In addition, many of the historic sites being proposed for transfer do not have robust non-profit organizations that could provide ample operation and management support.

HB 12 would miss an important opportunity to ensure that the entire balance of the State Parks Account accruing from the sporting goods sales tax went to its intended purpose of supporting Texas' system of public parks. In recent years, TPWD has been denied the full amount of the $32 million from the sporting goods sales that goes into this account, leading to well-publicized problems with the upkeep and maintenance of Texas' parks system. Diversion of sporting goods sales tax revenue violates the principle of truth-in-taxation, because tax dollars ostensibly collected for the benefit of the state parks system have not been supporting that function. HB 12 at least should require that the full balance of the State Parks Account go to the agency, if not lift the $32 million cap entirely to ensure that TPWD received adequate funding from the sporting goods sales tax.

## Notes

The **HRO analysis** of HB 12 appeared in Part One of the May 2 *Daily Floor Report*.

# Implementation of advanced clean energy projects

**HB 3732 by Hardcastle/HJR 93 by Chisum**
*HB 3732 Effective September 1, 2007/HJR 93 Died in Senate Committee*

**HB 3732** establishes the advanced clean energy project grant and loan program, to be administered by the State Energy Conservation Office (SECO). A dedicated account is to be created in the general fund, and each biennium it will receive roughly $30 million in general revenue funds and any future general obligation bond revenues that may be issued to the fund by the Texas Public Finance Authority. SECO can provide up to $20 million per biennium in private sector matching grants and no more than $10 million for loans.

The bill defines an "advanced clean energy project" as one that:

- uses coal, biomass, petroleum coke, or solid waste in generating electricity, process steam, or industrial projects, including gasification, and creating liquid fuels, hydrogen for fuel cells, and other co-products;
- reduces sulfur dioxide emissions by 99 percent;
- reduces mercury emissions by 95 percent;
- maintains a nitrogen oxide (NOx) emission rate of no more than 0.05 pounds per million British Thermal Units (lbs/MMBTU); and
- captures, sequesters, or abates carbon emissions.

The Texas Commission on Environmental Quality (TCEQ) will have 18 months from the date of accepting an application to issue or deny the applicant a permit, with a three-month extension allowed. Applicants will not have to prove that the technology proposed for use in the project is commercially feasible, and emission rate requirements cannot be set based on existing facilities that are operating with the help of advanced clean energy project incentives. TCEQ will establish a non-exclusive list of pollution-control facilities, devices, or methods that will have to be updated at least once every three years. If the U.S. Environmental Protection Agency (EPA) adopts a final rule or regulation considering carbon dioxide a pollutant, the program will cover capture and sequestration technology. In addition, TCEQ and SECO must publish a joint report every four years evaluating the implementation, effectiveness, and continuation of the advanced clean energy program.

The bill also includes additional tax benefits for:

- operators of facilities, devices, or other methods of controlling pollution;

- enhanced oil recovery projects that make use of sequestered carbon dioxide; and
- sellers of electricity generated by an advanced clean energy project.

**HJR 93** proposed two constitutional amendments that would have authorized issuance of up to $250 million in general obligation bonds for incentives to use carbon-free hydrogen technologies and up to $250 million in general obligation bonds and credit enhancement agreements for incentives to use advanced clean energy technologies.

## Supporters said

HB 3732 would promote and support the development of advanced clean energy projects and technology. As the demand for electric power grows and the drawbacks associated with carbon-based fuels become more apparent, Texans have increasingly called for more environmentally clean technologies. Many of the technologies associated with advanced clean energy still are in the experimental stage and require grant support for the initial start-up costs associated with research, development, and large-scale implementation. To that end, HB 3732 would provide a mix of financial, tax, and regulatory incentives to encourage businesses to develop advanced clean energy projects in the state.

The bill would streamline the permitting process for advanced clean energy projects. One of the chief stumbling blocks to getting innovative technologies on line is the administrative uncertainty associated with obtaining an energy project permit. While energy plants should be subjected to public scrutiny, the state has a vested interest in providing a more predictable turn-around time for those plants that ultimately will reduce emissions.

The bill would uphold the highest clean-energy standards currently recommended. In the Energy Policy Act of 2005, the federal government set clean coal power emissions goals for 2020. HB 3732 would create incentives for projects that met or exceeded those goals up to 12 years early. While other clean-energy technologies exist, the bill would aim to improve the efficiency of coal, biomass, and solid waste technologies because they are cheap and abundant sources of energy that will be a part of the power grid for the foreseeable future.

Rather than creating a financial hardship for the state, HB 3732 would spawn more economic development. In much the same way that solar and wind projects receive subsidies to be competitive and develop cleaner sources of energy, clean coal technology is expensive and will require some public subsidy to be sold on the market and developed on a large scale. The bill would motivate private businesses to locate advanced clean energy projects in the state, which would create jobs and generate additional tax revenue. While the initial plants would be experimental and therefore would produce energy at a higher rate per kilowatt-hour, these technologies eventually will no longer require subsidies as they become commercially viable and costs decrease.

## Opponents said

This bill proposes an emission standard for NOx that would be too low. While HB 3732 would use the minimum 2020 standards recommended by the federal Energy Policy Act of 2005, current coal plants across the state already are meeting these standards. In fact, this bill would set the NOx emission standard for advanced clean energy at 0.05 lbs/MMBTU, which is no cleaner than the average coal plant operating in Texas today. In contrast, research by the EPA and projects currently being proposed in the state suggest that advanced clean energy projects could achieve a NOx emission standard of 0.02 lbs/MMBTU. Also, this bill would allow businesses to secure tax exemptions before actually proving that their projects would have a positive environmental impact. By setting such a low emissions standard, this bill could have the unintended consequence of subsidizing business as usual rather than stimulating technological innovation.

The bill would sacrifice accountability by fast-tracking the permitting process. The proposed 18-month application schedule would be too compressed and would leave little time for public input. The governor recently tried to fast-track coal plants on an 18-month schedule, which encountered public resistance. To meet such an aggressive permitting timeline, TCEQ would have to focus staff resources on these applications rather than on other environmental issues affecting the state. HB 3732 would represent an unfunded mandate for TCEQ and instead should provide the agency with enough time thoroughly to examine each permit request to ensure the plants were the best value for taxpayers.

There is no clear reason to provide the incentives proposed by this bill. Texans have made it clear that they want more environmentally clean technologies. To meet that need, the private market will respond to consumer demand and the stricter federal regulations on air pollution that are sure to follow. Two coal gasification plants currently are being proposed in Texas, without the benefit of the incentives proposed by this bill. In addition, TCEQ currently may offer tax incentives for pollution-control projects. Due to the experimental nature of advanced clean energy technology, the state should not put taxpayers at risk by investing $30.2 million per fiscal biennium in projects that are not yet commercially viable. Further, like any spending program, this budget would not be a fixed cost but likely would grow over time.

## Notes

The **HRO analysis** of HB 3732 appeared in Part Two of the April 25 *Daily Floor Report*. The HRO analysis of HJR 93 appeared in Part Two of the May 7 *Daily Floor Report*.

Three bills would have funded the proposals authorized by HJR 93. In addition to HB 3732 by Hardcastle, HB 2972 and HB 2970 by Chisum would have provided incentives for a hydrogen energy loan program and hydrogen-powered vehicles, but both died in the House.

# Water resources development and management

**SB 3 by Averitt**
*Effective September 1, 2007*

**SB 3** makes numerous changes to the management of Texas' water resources.

***Environmental flows.*** SB 3 creates an administrative process to determine the environmental flow needs in Texas' rivers, bays, and estuaries. The bill requires (Texas Commission on Environmental Quality (TCEQ) to:

- determine the environmental flow standards that are necessary to support the ecological environment of each river basin and bay system in the state;
- establish an amount of unappropriated water to be set aside to satisfy the environmental flow standards; and
- create a process for reducing the amount of water available under a water rights permit in order to protect environmental flows. This provision applies only to a permit approved after the bill's effective date.

After determining environmental set-asides in basins with unappropriated water rights, TCEQ may not grant an appropriation of water that interferes with those set-asides. After an environmental flow set-aside has been determined, any new water permit or new amendment to an existing water right increasing the size of that water right must include conditions for the protection of the environmental flow set-asides.

TCEQ will take these actions in response to recommendations from advisory groups operating in an administrative process created under the bill. Four new types of entities will contribute to the administrative process established under SB 3:

- an environmental flows advisory group;
- an environmental flows science advisory committee;
- environmental flows stakeholders committees for each river basin and bay system in the state; and
- expert science teams for each river basin and bay system in the state.

In adopting environmental flow standards for a river basin and bay system, TCEQ will consider multiple criteria, including recommendations and information provided by these entities.

The bill prohibits TCEQ from issuing a new permit for instream flows dedicated to environmental needs or bay and estuary inflows. TCEQ may approve an application to amend a permit or certificate of adjudication to change a use to environmental needs or bay and estuary inflows.

The bill creates a nine-member environmental flows advisory group made up senators, representatives, and state environmental agency board members. Through studies and public hearings, the advisory group will examine the balance between the water needs of Texas' population and the protection of environmental flows of the state's river, bay, and estuary systems. By December 1, 2008, and every two years thereafter, the advisory group must issue a report summarizing its activities, including proposed legislative changes and documenting progress in developing environmental flow regime recommendations initiated under the bill.

The bill also establishes the environmental flows science advisory committee to aid the environmental flows advisory group's evaluation of environmental flows. For each river basin and bay system in the state, the environmental flows advisory committee will appoint a river basin and bay area stakeholders committee that reflects a balance of interest groups concerned with environmental flows in the basin. Each river basin and bay system stakeholders committee will develop recommendations regarding environmental flow standards and strategies. Those recommendations will be submitted to TCEQ and to the environmental flows advisory group.

A new permit or amendment to an existing water right that would increase the amount of water that could be taken will have to provide for the protection of environmental flows. After an expedited public comment process, an adjustment may be made by TCEQ if such an adjustment was required to comply with environmental flow standards.

Taken with any other adjustments by TCEQ, an adjustment to a permit for compliance with environmental flow standards may not increase the amount of water taken for protection of environmental flows by more than 12.5 percent of the annualized amount of that requirement contained in the permit. For an amended water right, no more than 12.5 percent of the annualized total of the amount of the increase in the water authorized under the amended right may be taken for protection of environmental flows.

A water-right holder will receive credit for contributing water for the benefit of environmental flows against an adjustment considered by TCEQ. Water that had been set aside by TCEQ to meet environmental flow needs may used temporarily for other essential needs in the event of an emergency.

**Reservoir designation.** SB 3 designates the 19 sites recommended in the 2007 state water plan as having unique value for the construction of a dam and reservoir, determining that the sites are necessary to meet water supply needs. This designation will last until September 1, 2015, unless there is an affirmative vote for a reservoir project by a project sponsor.

The bill also designates 15 river and stream segments of unique ecological value that were recommended in the 2007 state water plan.

The bill establishes a study commission on water supply in the Region C Regional Water Planning Group (which includes Dallas/Fort Worth). The commission will review water supply alternatives available to Region C, including existing and proposed reservoirs.

No later than December 1, 2010, the study commission will report its findings and recommendations, including a recommendation as to whether Marvin Nichols should remain designated as a reservoir site.

The former owner of real property used for agricultural purposes that was acquired for a reservoir will be able to lease the property from the person who acquired the property in order to continue using the property for agricultural purposes until the lease is terminated for the construction of the reservoir.

**Water conservation.** SB 3 makes several changes in policy related to water conservation. It creates a 23-member water conservation advisory council to provide state leaders with expertise on the issue of water conservation. The Texas Water Development Board (TWDB) executive administrator is directed to develop and implement a statewide public awareness program to educate Texas residents about water conservation.

A retail public utility providing potable water service to 3,300 or more connections must submit to the TWDB chief administrator a water conservation plan based on specific goals generated in accordance with best management practices developed by TCEQ and TWDB. The entity is subject to enforcement actions by TCEQ if it commits a violation.

The bill directs TWDB to give priority to applications for funds for water supply projects in the state water plan that demonstrate water conservation savings or would achieve water conservation savings.

The bill adds a procedure by which a regional water planning group may adopt a minor amendment to its regional water plan.

The bill states that it is the policy of the state to encourage voluntary land stewardship to benefit the water of the state and to encourage public participation in the groundwater management process in areas within a groundwater management area not represented by a groundwater conservation district.

**Edwards Aquifer.** SB 3 makes several changes to the regulation of the Edwards Aquifer by the Edwards Aquifer Authority (EAA).

On January 1, 2008, the cap on permitted withdrawals from the Edwards Aquifer will be raised from 450,000 acre-feet to 572,000 acre-feet.

The EAA cannot allow withdrawals from wells drilled after June 1, 1993, except for:

- replacement, test, or exempt wells; or
- an amendment to an initial regular permit authorizing a change in the point of withdrawal under that permit.

If the level of the aquifer is equal to or greater than 660 feet, rather than 650 feet, above mean sea level as measured at well J-17, the authority can authorize withdrawals from the San Antonio pool, on an uninterruptible basis, of permitted amounts.

By January 1, 2008, the EAA must adopt a critical period management plan with withdrawal reduction percentages in specified amounts when well levels or spring flows fall below certain thresholds. Greater withdrawal reductions will be triggered if the 10-day average of springflows drops below the lowest trigger levels.

Beginning on September 1, 2007, the EAA cannot require withdrawals to be less than an annualized rate of 340,000 acre-feet, under Stage IV critical period.

Without respect to the critical period adopted by the authority, a person authorized to withdraw groundwater for irrigation can finish one already planted crop in that calendar.

The EAA must develop a recovery implementation program for threatened or endangered species with input from the U.S. Fish and Wildlife Service, other federal agencies, interested stakeholders, and environmental interests

A steering committee, with input from an expert science committee and other stakeholders, must submit recommendations to the EAA, which must review those recommendations and adopt a critical period management plan.

The EAA may operate facilities as long as those facilities are not used to recirculate water at the Comal or San Marcos springs.

*Other provisions.* SB 3 establishes a legislative joint interim committee on state water funding made up of senators and representatives.

The bill also includes other provisions creating and modifying various local water districts.

## Supporters said

*Environmental flows.* SB 3 would mark an historic step toward protecting the environment by dedicating instream flows for rivers and freshwater inflows for bays and estuaries. Currently, no state law provides designated protection to ensure a minimum of flow in rivers and into bays and estuaries. Instead, priority is given to agricultural, commercial, residential, and other uses. Water rights in several river basins have been over-permitted, and other basins likely will follow suit. SB 3 would provide a means to balance agricultural, commercial, and residential needs with important environmental considerations.

While important for the environment, instream flows do more than support fish, aquatic organisms, and wildlife. River flows provide recreation, dilute and disperse treated wastewater, and support commercial activity. Aquatic species need sufficient flows of water to facilitate their life cycles. Coastal wetlands rely upon freshwater flows from rivers to sustain their unique habitats. These bays and estuaries support the economy of the Texas Gulf Coast through the tourism industry and commercial fishing and shrimping. For these reasons and many more, environmental flows are crucial to Texas' economy and quality of life.

In order to determine standards and set-asides for environmental flows, SB 3 would establish a consensus-based process relying upon the best available science to determine the amount of flows needed for environmental

considerations. The bill would allow input from stakeholders from every group with a substantial interest in water rights and flows, while expert science teams would report the environmental needs of river basins and bays directly to TCEQ. Under this process, TCEQ could balance the best available science with the other water needs of Texas' growing population. In this manner, the process would resemble the successful regional water planning process established under SB 1, enacted by the 75th Legislature in 1997. Because water is a vital resource for so many diverse interests, it is important that the environmental flow planning process be as inclusive as practicable.

*Reservoir designation.* SB 3 would follow the recommendations in the 2007 state water plan by designating 19 reservoir sites that could be needed to meet the state's water needs in the next half century. The bill would provide state and local water supply interests with the certainty needed to plan for and meet future water needs. Texas' population is expected to more than double by 2060, and water demand will increase while water supplies decline. While conservation, reuse, desalination, and other strategies will be important to meet Texas' water needs, those strategies are unlikely to be sufficient. Reservoir construction will be an essential and unavoidable component of the state's water planning future.

The bill would not seize any private property or put any undue restrictions on landowners. Landowners would remain free to engage in virtually any action or make any improvement to property in a designated reservoir site. The bill would incorporate compromise provisions to balance the interests of affected landowners with entities that wish to construct reservoirs.

SB 3 would not require the construction of any reservoir, nor would the designation of a reservoir site guarantee that a reservoir would be constructed on the site. The bill simply would provide legislative action in order to keep these sites available for future reservoir construction if it was determined that their construction was necessary. Without designation, the few remaining reservoir sites could be preemptively foreclosed as an option due to the actions of the federal government such as a wildlife refuge designation.

*Water conservation.* SB 3 would establish and expand several important programs to encourage conservation of water resources in the state. It would incorporate state-of-the-art industry standards and techniques to realize efficient use of water resources. The bill would recognize the importance of such strategies as private land stewardship and residential conservation measures, while moving cities toward more efficient use of the state's limited water resources.

*Edwards Aquifer.* SB 3 appropriately would balance environmental, residential, and other concerns with respect to the EAA. By allowing a reasonable increase in withdrawals from the aquifer, the bill would prevent ratepayers from having to support a costly buy-down of water rights above the current withdrawal level. To protect environmental considerations, the bill would establish reduction requirements during critical periods of drought when springs were impacted most severely.

The bill would create a thorough Recovery Implementation Program developed in accordance with U.S. Fish and Wildlife Service practices that would involve an extensive group of stakeholders engaged in the sustainability of the Edwards Aquifer. The Recovery Implementation Program would provide recommendations to the EAA in order to determine the appropriate withdrawal level going forward. This consensus-based process would balance the interests of communities and entities relying on the aquifer for residential, commercial, recreational, and agricultural uses while protecting the delicate environmental balance that sustains threatened species associated with the aquifer.

The bill would raise the withdrawal limit to 572,000 acre-feet, an amount that would be subject to adjustment through the Recovery Implementation Program. Further, the critical period management procedure would hold down withdrawals when well levels and spring flows were reduced by drought. This would protect the San Marcos and Comal springs and protected species. Further, history has shown that permitting in itself is an effective method for managing demand, as permit holders become more aware of their allotted amounts. Removing the conflict in current law would provide certainty to permit holders and allow more effective management of demand from the aquifer.

## Opponents said

*Environmental flows.* SB 3 would establish an unnecessarily complicated tangle of bureaucracy. The bill would create two new statewide committees as well as stakeholder and science boards in every river basin and bay system in the state. Recommendations made by these four groups would have to work their way up to TCEQ, which would make the final determination on environmental flow standards and set-asides. Aside from the elected officials on the environmental flows advisory board, the majority of members on these policymaking bodies would not be accountable to the voters. These bodies would be granted excessive influence, a serious concern since the bill would contemplate seizing water rights for what could be

marginally important purposes. Such important and binding determinations should not be delegated by the Legislature to TCEQ.

*Reservoir designation.* SB 3 needlessly would cloud the title of landowners within the designated reservoir sites, because the threat of a future reservoir negatively would affect their property value. While supporters of reservoir designation point out that many of these reservoirs may never be built, a cloud would remain on the title to property in a designated site from the moment the bill was enacted. It would be unfair to make this designation without providing immediate funds to offset the loss in value that landowners would see.

Reservoir construction is an arcane, environmentally destructive, and wasteful strategy that should not be used to address the state's water supply needs. Reservoirs do not "create" water, but actually contribute to water loss due to evaporation. Given the looming threat of global warming, it is likely that evaporation of water stored in reservoirs will become an even greater problem. Reservoir creation can harm severely both downstream and upstream wildlife and ecosystems, in addition to the area flooded to create the reservoir. Lawmakers should not ratify this outmoded water development strategy and instead should focus on other strategies to meet Texas' water needs, including conservation, reuse, desalination, improved marketing of existing water resources, and aquifer storage and recovery.

*Edwards Aquifer.* By allowing pumping of the Edwards Aquifer up to the currently permitted amount, SB 1341 effectively would eliminate the pumping cap for all practical purposes. This level of pumping on a regular basis likely would be unsustainable over the long term. Although the bill would incorporate reductions in pumpage during drought periods, it would be better for the aquifer ecologically and hydrologically if a lower level of regular pumping were allowed.

Under current law, the EAA is empowered to raise the 400,000 acre-feet cap if the authority can demonstrate scientifically that doing so would not be environmentally harmful. SB 3 would undermine this consideration, allowing the cap to be raised due to permit considerations rather than scientific considerations. The substantial increase in the withdrawal limit under the bill could put the aquifer on a collision course with the Endangered Species Act, representing a step back in protection of the ecosystem of the Edwards Aquifer and the communities that rely on Edwards Aquifer spring flow.

The current system has been effective as an inducement to entities to repair infrastructure, implement conservation policies, develop efficient agricultural water practices, and diversify water sources. Withdrawals have gone down from a peak of more than 542,000 acre-feet in 1989 to 366,000 acre-feet in 2005. If the withdrawal limit were raised, it is likely that pumping would float up to the limit.

## Other opponents said

*Environmental flows.* SB 3 would not go far enough in protecting environmental flows. The bill would provide no remedy for the many basins in which all available water has been permitted. In addition, the provision enabling diversion of environmental flows during an emergency is problematic. When a drought strikes – precisely the time that instream flows are so crucial to river and bay ecosystems – environmental flow set-asides would be available for diversion to other uses. The only reasonable method for reliably protecting environmental flows would be to buy back more senior water rights from private interests and keep those flows in the river. If the Legislature fails to appropriate funds for this purpose, it is unlikely that SB 3 substantially would benefit those river basins that are most desperately in need of a base level of flows.

## Notes

The **HRO analysis** of SB 3 appeared in Part Two of the May 21 *Daily Floor Report*.

The provisions of HB 3 by Puente, dealing with environmental flows and the Edwards Aquifer Authority, and HB 4 by Puente, dealing with water conservation, were incorporated into SB 3, but also were enacted separately. HB 3 takes effect September 1, 2007, except the Edwards Aquifer provisions were effective June 15, 2007. HB 4 was effective June 15, 2007, except a requirement that on-site water reclamation technologies be incorporated into state buildings will be effective September 1, 2009.

# Air quality enhancement programs, including energy efficiency standards

**SB 12 by Averitt**
**Effective June 8, 2007**

**SB 12** amends various state programs with the objective of enhancing the state's air quality. It modifies guidelines set by Texas Commission on Environmental Quality (TCEQ) for the Low-Income Vehicle Replacement Program (LIRAP) at the county level. The bill adjusts eligibility criteria for participation in LIRAP to include a vehicle owner with an income up to 300 percent of the federal poverty level. The maximum amount of funding distributed under LIRAP may not exceed $3,000 for a replacement car of the current model year or the three previous model years, $3,000 for a replacement truck of the current model year or the two previous model years, or $3,500 for a replacement hybrid vehicle of the current or previous model year. Subject to the availability of funds, replacement vehicles must have a gross weight rating of less than 10,000 pounds and may not cost more than $25,000.

The bill includes requirements for the dismantling of replaced vehicles. TCEQ must work in conjunction with the steel industry and automobile dismantlers to ensure that replaced vehicles are scrapped. An automobile dealer who takes possession of a replaced vehicle must prove that the vehicle has been retired. The vehicle dismantler must scrap the emissions control equipment and engine and may be subject to a civil penalty for not doing so. Mercury switches must be removed from the vehicle in accordance with the law.

TCEQ may require certain documentation procedures for the purchase of a replacement vehicle. An automobile dealer participating in LIRAP must be located in Texas. TCEQ must work with dealers to publicize information about LIRAP using funding allocated for this purpose. A participating county is required to provide an electronic means of distributing LIRAP funds to automobile dealers.

No more than $5 million per fiscal year may be distributed through LIRAP to fund local initiative projects. Examples of local initiative projects include:

- expanding the AirCheck Texas Repair and Replacement Program;
- remotely determining vehicle emissions;
- implementing TCEQ's smoking vehicle program;
- combating the use of counterfeit state inspection stickers;

- enhancing transportation system improvements; and
- adopting new air control strategies.

SB 12 expands the scope of eligibility for Texas Emissions Reduction Plan (TERP) funding to include projects with a maximum cost effective amount of up to $15,000 per ton of nitrogen oxide (NOx) emissions reduced. Miles traveled by a qualifying vehicle outside of a nonattainment area or affected county are allowed to count toward meeting TERP's percentage-of-use standard for the operation of vehicles in nonattainment areas. For eligible infrastructure projects, TERP funding can be used for auxiliary power units designed to dispense electricity to marine vessels. Also, funding can be distributed for the lease, purchase, or installation of idle reduction technologies and facilities at rest areas and other public facilities in areas eligible for funding.

The bill extends TERP to August 31, 2013. TCEQ can hire staff and consultants to carry out duties established under the program. The commission will investigate various Internet procedures for submitting applications for rebate grants through TERP. An Internet-based application process will be implemented by June 1, 2008. The TERP fund is administered by TCEQ instead of the comptroller.

SB 12 sets certain priorities for grant distribution under the New Research and Technology Development (NRTD) program, with grants awarded reflecting a balanced mix of:

- advanced technologies to reduce emissions from the existing stock of engines;
- advanced technologies for new engines and vehicles; and
- testing facilities to evaluate these advanced technologies.

NRTD funding may be distributed to a nonprofit organization or a higher education institution to implement and administer the NRTD program. TCEQ will supervise the nonprofit organization that currently receives NRTD funding.

If the State Energy Conservation Office (SECO) determines that the latest provisions on energy efficiency in the International Residential Code and the International

Energy Conservation Code result in improved commercial energy efficiency and air quality, the office will adopt the more stringent provisions. Parties with an interest in the adoption of energy efficiency codes – including builders, architects, engineers, government authorities, and environmental groups – will have the opportunity to comment on the codes under consideration.

Energy efficiency programs for certain political subdivisions are extended to include higher education institutions and state agencies. In consequence, these entities and school districts will implement measures to reduce electricity consumption by 5 percent each year for six years, beginning September 1, 2007. Contingent upon availability and cost-effectiveness, TCEQ or another state agency will purchase equipment and appliances for state use that meet or exceed federal Energy Star standards.

SB 12 also establishes a grant program for the installation of solar electric systems in certain residences and businesses. To qualify for such a grant, the solar electric system must generate electricity using solar resources, have a generating capacity of no more than 1,000 kilowatts, and include a manufacturer's warranty.

The bill also modifies the extent to which TCEQ may prohibit or limit motor vehicle idling. It stipulates that such idling is not necessary to power a heater or air conditioner if the vehicle is within two miles of a facility offering external heating and air conditioning connections. Drivers using a vehicle's sleeper berth are prohibited from idling in a residential neighborhood or within 1,000 feet of a hospital. Motor vehicle idling requirements are extended by two years, to expire on September 1, 2009.

SB 12 amends various actions followed by TCEQ. If the commission determines there are multiple violations of the federal Clean Air Act, only the violations that require the initiation of formal enforcement will be included in any proposed enforcement action. The commission will not include violations in enforcement action that are new or have been corrected within a certain time frame. SB 12 also modifies TCEQ's notification requirements to provide that an application for certain permits must be sent to the county judge and the presiding officer of the municipality's governing body where the facility is located.

## Supporters said

SB 12 would enhance the various state programs designed to improve air quality in key areas of Texas. The state's deadline to comply with federal air quality standards is set for 2010. Currently, several areas in Texas remain in noncompliance. In order to not jeopardize federal funding, the state must implement more aggressive measures to reduce NOx emissions. By maximizing the potential of air quality programs approved by past legislatures, the bill more rapidly would improve the state's air quality, thereby advancing the removal of non-attainment areas from noncompliance status.

Through the reduction of NOx emissions, LIRAP and TERP are meaningful programs to protect the environment and health of Texas residents. Other than smog creation, NOx emissions can contribute to acid rain, oxygen depletion in bodies of water, and global warming. Also, NOx emissions result in health problems, such as asthma and emphysema, while also aggravating heart disease and damaging lung tissue. By bolstering LIRAP and TERP, the bill would help reduce future costs to the state in public health and environmental remediation.

In order to meet federal air quality improvement requirements, Texas must accelerate the turnover of the automobiles that operate in the state and replace older vehicles with newer, cleaner cars. Monetary incentives are needed to achieve the objective of removing old vehicles from the state's roadways. Since the inception of LIRAP, program demand generally has been less than the supply of program funding. The bill would increase LIRAP participation by requiring TCEQ to partner with participating automobile dealers to publicize program information. Other modifications to LIRAP would entice more vehicle owners to participate in the program by increasing grant amounts for the purchase of replacement vehicles and expanding eligibility requirements.

SB 12 would expand the reach of the TERP program by broadening project eligibility requirements and extend its expiration date to 2013, giving the program more time to achieve emission reductions to comply with federally mandated targets. Like LIRAP, much of the funding generated for TERP-related programs remains underappropriated and underutilized. The bill would give TCEQ greater authority to distribute TERP funds by transferring control of the fund from the comptroller to the agency.

The bill would make important strides toward increasing energy efficiency in Texas. New energy efficiency standards for buildings and appliances serve as an important means of reducing NOx emissions, enabling the state to meet its reserve margin for energy production and achieving cost savings for consumers. SB 12's inclusion of equipment and appliances that meet federal Energy Star

standards would spur the use of more efficient products. The inclusion of higher education and state agencies in current energy efficiency programs would set an important example for reducing electric consumption. Grants for solar electricity systems would be helpful in spurring renewable energy production.

## Opponents said

SB 12 promises many important benefits, but should not be considered the state's main strategy for meeting compliance with federal air quality standards in non-attainment areas and affected counties. Incentive-based programs would not go far enough to achieve the necessary NOx emission reductions. Moreover, power generation plants represent an estimated 27 percent of NOx emissions and should be addressed in this omnibus air quality legislation.

More than just NOx emissions must be considered in the state's efforts to improve air quality. Currently, El Paso fails to meet federal air quality standards for carbon monoxide and particulate matter. Outside of El Paso, several areas exhibit near-nonattainment status in particulate matter levels. The incentive -based programs included under LIRAP and TERP should include carbon monoxide and particulate matter in their scope.

An alternate version of SB 12 would have permitted SECO to establish minimum energy efficiency standards for certain appliances and prohibit the sale of such appliances until energy efficiency standards were met. It also would have included product certification and labeling standards for certain appliances. These energy efficiency standards would have led to a significant reduction in electricity consumption, resulting in cost savings for consumers. The establishment of such standards would not pose a fiscal hardship for the state. In fact, energy efficiency standards for certain appliances would help the state meet its reserve margin for energy production, thus reducing the need to build coal plants that negatively impact the state's air quality and public health.

## Notes

The **HRO analysis** of SB 12 appeared in Part One of the May 14 *Daily Floor Report*.

---

# Requiring low-emission vehicle standards

**SB 124 by Ellis**
*Died in Senate committee*

**SB 124** would have allowed the Texas Commission on Environmental Quality (TCEQ) to establish a low-emission vehicle program in Texas. The program would have to have been consistent with Phase II of the California low-emission vehicle program and would have applied to vehicles beginning in model year 2009.

## Supporters said

SB 124 would allow TCEQ to adopt California's stricter low-emission vehicle standards, which would improve air quality in Texas by targeting a major source of pollution. California first adopted low-emission vehicle standards in 1990 and is now implementing Phase II of its program to further reduce nitrogen oxide (NOx) emissions and greenhouse gases. Ten other states have adopted California's low-emission vehicle standards, and air quality studies show a reduction of up to 15 percent in nitrogen oxide (NOx) and volatile organic compounds under the California standards compared to federal standards.

More than two-thirds of Texans live in areas where the air is unhealthy to breathe. This poor air quality creates health problems, resulting in missed work days and health care costs to the state. In addition, Texas is required to meet air quality standards set by the U.S. Environmental Protection Agency and will lose federal funding if these standards are not met. Current incentive-based programs are an insufficient means of achieving required improvement in air quality because such gains are offset by a greater number of cars on the road and a corresponding increase in vehicle miles.

The adoption of Phase II of California's low-emissions vehicle standards would be an effective way of addressing mobile source pollution, moving Texas forward in its objective to reduce ozone precursors from vehicular emissions. SB 124 would demonstrate the state's keen desire to reduce health problems associated with air pollution. Moreover, by mandating improved vehicular emissions standards, the bill would enhance fuel economy and ultimately reduce gasoline costs for consumers.

## Opponents said

SB 124 would accomplish little in helping Texas comply with federal air quality standards. There is insufficient evidence to support the claim that stricter vehicle emissions standards significantly improve air quality. Furthermore, imposing tougher standards would hurt consumers, particularly the state's low-income population, by increasing the cost of new vehicles. Instead, the state should work to improve air quality by focusing on the Low Income Vehicle Assistance, Retrofit and Accelerated Vehicle Replacement Program (LIRAP) and the incentive-based Texas Emissions Reduction Plan (TERP), because these programs improve air quality without placing additional cost burdens on Texans.

# Restricting a city's ability to regulate air pollution outside its city limits

**SB 1317 by Jackson**
*Died in the House*

**SB 1317** would have restricted a city's ability to regulate as a nuisance air pollution that occurred outside the city's boundaries.

A city would have been authorized to define and prohibit a nuisance within 5,000 feet of its city limits only if the definition of the nuisance did not address levels of emissions authorized in a Texas Commission on Environmental Quality (TCEQ) air permit. The bill also would have specified that an ordinance for the control and abatement of air pollution would have to be consistent with TCEQ permits and could not apply outside the city's limits.

## Supporters said

SB 1317 would prevent cities in Texas from overreaching beyond their boundaries to impose onerous air quality regulations and restrictions on surrounding cities and counties. For example, the city of Houston has proposed fining industrial plants outside its city limits to require stricter enforcement of air quality standards. Such a proposal would allow Houston to impose restrictions on businesses in other cities and political jurisdictions, improperly encroaching upon the sovereignty of other political subdivisions.

Pollution is a regional and statewide issue that should be addressed in a comprehensive manner. Without SB 1317, Texas cities would be free to adopt a patchwork of confusing and conflicting local air pollution regulations. TCEQ is the state agency charged with monitoring, permitting, and enforcing the state's air pollution laws, and SB 1317 would prevent conflicts between local regulations and official state environmental policy.

Problems with urban air quality in cities like Houston primarily are a consequence of automobile exhaust. Regulating industries outside a city's boundaries provides a politically expedient scapegoat, allowing local officials to avoid making tough decisions about the most significant causes of poor air quality, such as traffic, sprawl, and a lack of public transportation options.

## Opponents said

SB 1317 would remove an important tool that Texas cities have to control air quality and ensure the health and well-being of their residents. Many Texas cities, including the city of Houston, have to contend with industrial facilities located just outside their boundaries. The businesses emit harmful pollutants into the air that harm air quality throughout the region. Pollution knows no political boundary, and it is appropriate to allow a city to mitigate pollution occurring outside its limits when that pollution substantially harms the residents of the city.

Houston is one of the nation's most polluted cities, due in large part to refineries and other regional industries that the state of Texas has failed to properly regulate. In the absence of effective regulation of these industries, the city of Houston has been forced to take the lead by addressing pollution occurring outside its boundaries.

Texas cities need the ability to protect their citizens from air pollution. TCEQ has shown an unwillingness to adequately protect Texas citizens against air pollution, most recently by overruling the recommendation of an administrative law judges by permitting the Oak Grove coal-fired power plant despite serious concerns about pollution from the plant.

# Studying strategies for combating greenhouse gas emissions

**SB 1687 by Watson**
*Died in the House*

**SB 1687** would have required the Texas Commission on Environmental Quality (TCEQ) to prepare a report by December 1, 2008, listing strategies for reducing greenhouse gas emissions in Texas. TCEQ would have been directed to consider strategies for reducing emissions from other states and countries. The study would have taken into account strategies that could be achieved without financial cost or strategies that could result in savings for consumers or businesses over the life of the strategy.

## Supporters said

SB 1687 would direct TCEQ to evaluate and identify economically beneficial policies to minimize the production of greenhouse gas, a leading cause of global climate change. Such a study would help transform Texas from a leading contributor of carbon dioxide to a true global leader in the fight against global warming. Greenhouse gas emissions such as carbon dioxide and nitrous oxide have been established as primary causes of global warming, a phenomenon with potentially severe consequences for our way of life. Without innovative, technology-driven solutions to dramatically curtail pollution caused by human activity, the pattern of rising temperatures likely will worsen.

SB 1687 would initiate a study to identify economically neutral or beneficial strategies to address the problem of global warming. Such solutions are key to safeguarding the health of Texas citizens and preserving the environment while minimizing negative economic consequences. The longer Texas, the United States, and industrialized nations wait to mitigate carbon dioxide and other greenhouse gas emissions, the more costly such policy changes will become.

## Opponents said

SB 1687 would open the door to extensive and potentially economically disruptive environmental regulation. With a growing population and expanding economy, Texas has distinct energy needs that will be challenging to accommodate even without the burden of untested restrictions on greenhouse gases. The vague strictures in the study required under SB 1687 could unfairly place the burden of compliance with recommended strategies on private business, with potentially negative consequences for employment and economic performance in the state.

Regulation of air pollution typically has been addressed through federal guidelines such as the Clean Air Act, and Texas environmental policy appropriately has been focused on attaining federal standards. SB 1687 could launch Texas down an uncharted road of regulation that could put Texas at a comparative disadvantage with neighboring states or put Texas in conflict with federal greenhouse gas legislation that Congress is likely to consider in the future.



# Families and Children

| | | | |
|---|---|---|---|
| * HB 2685 | Chisum/ | Marriage license fee waiver for premarital education/ | |
| * HB 2683 | Chisum | Marriage promotion grants | 68 |
| SB 221 | Lucio | Obtaining noncertified copies of adoption-related birth certificates | 71 |
| SB 439 | Deuell | Advance directives and health care and treatment decisions | 73 |
| *SB 758 | Nelson | Child Protective Services revisions | 75 |
| SB 785 | Shapiro/ | Abortion reporting/ | |
| SB 920 | Patrick | Review of ultrasound image | 77 |

# Marriage license fee waiver for premarital education and marriage promotion grants

**HB 2685 by Chisum/HB 2683 by Chisum**
*Effective September 1, 2007*

**HB 2685** revises the premarital education course and increases the marriage license fee from $30 to $60. Those who complete a specified premarital education course will be exempt from both the fee and a three-day waiting period between the receipt of a marriage license and the performance of a wedding ceremony.

The minimum suggested hours for a premarital education course are increased from four to eight. Each course must teach conflict management, communication skills, and the key components of a successful marriage. The bill specifies the training requirements, eligible instructors, and curriculum requirements for a premarital education course.

To receive a waiver from the marriage license fee and the three-day waiting period, a person must present to the county clerk a certificate signed and dated by the course provider during the year preceding the filing of a marriage license application with the clerk. A county clerk who collects a fee for issuing a marriage license must send $20 of that fee, or $12.50 of each $25 fee collected for a declaration of informal marriage, to the comptroller for deposit in the child abuse and neglect prevention trust fund account. The clerk also must send $10 of each marriage license fee to the comptroller for deposit in the family trust fund account.

## Supporters said

HB 2685 would improve premarital education programs and benefit the people who completed them and decided to get married. Couples planning to marry sometimes focus on the wedding at the expense of thinking seriously about issues of children, finances, and family dynamics.

By creating an incentive for marriage license applicants to complete a premarital course, the bill would encourage more couples to educate themselves about how to prevent some of the possible conflicts associated with marriage.

Studies show that the completion of premarital education often is associated with higher levels of marital satisfaction. Helping couples think carefully about the commitments associated with marriage can lower the risk of marital problems and divorce. According to recent data, as much as eight hours of premarital education can contribute to lower rates of divorce.

Premarital education under the bill would not be counseling but would focus on skills-based and research-based education. Education programs would teach couples many of the necessary skills for a good marriage, including effective communication, teamwork, problem solving, conflict management, and the importance of preserving love, commitment, and friendship.

HB 2685 would not require premarital education. It simply would offer incentives to couples already seeking to marry.

## Opponents said

Marriage without financial security is not a solution to poverty and is likely to lead to the divorce of low-income couples, if not spousal abuse or other negative outcomes. What low-income Texans really need is access to education and training, leading to jobs that provide stable employment, living wages, and access to health benefits. For those who cannot afford the higher fee, the premarital education course would be all-but-mandatory, which would be too much state interference into private, personal matters.

**HB 2683** requires the Health and Human Services Commission (HHSC) to spend a minimum of 1 percent of money from the federal Temporary Assistance to Needy Families (TANF) block grant on programs that provide services that support the development of healthy marriages or strong families. Funds will benefit the Healthy Marriage Development Program and the new Healthy Marriages and Strong Families Grant Program established by the bill.

Grants made through the Healthy Marriages and Strong Families Grant Program may provide up to $50,000 to a program supporting the development of healthy marriages or strong families. Grant recipients may use funds to provide direct services to participants, develop a program, enlarge program capacity, or pay other related expenses. Programs using grant funds may not charge for services provided to program participants.

In selecting grant recipients, HHSC must give preference to applicants whose programs will contribute to the geographic diversity of program locations or who operate small programs and seek to maximize service delivery and build capacity.

## Supporters said

HB 2683 would benefit adults, children, and society as a whole by funding programs to promote healthy marriages and strong families. Happily married couples provide a stable and healthy environment for raising children. Married people live up to eight years longer than their divorced or never-married counterparts, and marriage tends to provide increased financial security. Children of married parents also fare better. They are less likely to engage in criminal behavior, abuse drugs or alcohol, become pregnant out of wedlock, or experience emotional and psychological troubles. The initiatives funded by this bill would give low-income Texans the skills and knowledge to form and sustain healthy marriages and strong families.

By promoting strong marriages and families, the state would not withdraw support and services for single-parent families. There are many legitimate and federally approved uses for TANF block grant funds, including the strengthening of families and encouragement of two-parent households. Promoting marriage and supporting single-parent families are not mutually exclusive.

Healthy marriage initiatives do not encourage people to remain in abusive relationships. They are designed to do the opposite – strengthen families by giving couples the necessary skills to deal with conflict and anger within a relationship. Grant applicants seeking TANF funds for marriage promotion initiatives would have to demonstrate how their proposed programs addressed domestic violence and would be required to consult with domestic violence experts in the administration of the programs. Abusive marriages are good for no one, and programs funded with the grants authorized by HB 2683 would not provide comfort to abusers.

Choosing to marry is a private decision, and the state of Texas has no intention of interfering with anyone's private life. Marriage is directly related to a child's well-being. The purpose of this bill would be to fund programs that give families the tools they need to succeed in marriage and in life.

## Opponents said

By promoting marriage to low-income people, the state would send a message that the way out of poverty is dependence on a spouse rather than economic self-sufficiency. The purpose of TANF is to provide assistance to needy families to end dependence on government benefits. Rather than diverting these funds toward marriage promotion, Texas instead should invest TANF funds in strategies to support the transition from welfare to work or in giving working-poor families tools to escape poverty, such as training in job skills, child care, and adult literacy.

Marriage does not eliminate poverty. Studies show that most low-income unmarried women still would be poor or near-poor if they were married and working. Educational attainment and the job market have more influence on poverty than marital status. What low-income people really need is access to education and training opportunities, leading to jobs that provide stable employment, living wages, and access to health benefits.

An unintended consequence of marriage promotion programs could be to encourage victims of domestic violence to marry or stay married to their abusers. Promoting marriage to women who were not in safe or healthy relationships could harm them and cost the state in increased medical expenses and loss of economic productivity.

While the promotion of marriage by the state might spring from noble motives, it intrudes into fundamentally private matters. The decision to marry is one of the most personal and important decisions that people make in their lifetimes. When reaching this decision, people turn to their family and friends, not the government.

**Notes**

A related bill, HB 2684 by Chisum, would have extended the waiting period for grant of a divorce on grounds of insupportability from 60 days to two years from the date of filing suit unless the couple completed a marriage education course that included instruction in conflict management, communication skills, and forgiveness skills. HB 2684 was considered on the House floor, then died in committee after being recommitted on a point of order.

The **HRO analyses** of HB 2683 and HB 2685 appeared in Part One of the April 11 *Daily Floor Report*.

# Obtaining noncertified copies of adoption-related birth certificates

**SB 221 by Lucio**
*Died in the House*

**SB 221** would have allowed an adopted person age 18 or older who was adopted after January 1, 2008, or a spouse or relative if the adopted person was deceased, to obtain a noncertified copy of the person's original birth certificate. The bill would have created a contact preference form on which birth parents could have indicated whether they wished to be contacted by the adopted person, possibly through an intermediary, and whether they consented to the release of a noncertified copy of the adopted person's original birth certificate. If a parent had indicated that the birth certificate not be released, the state registrar could not have released a copy without a court order. If resources allowed, the Department of State Health Services (DSHS) could have released a noncertified copy of a birth certificate to a person who was adopted before January 1, 2008, if the birth parents had indicated approval for release on a contact preference form.

The bill would have allowed a birth parent to file an updated medical history form with DSHS. It would have required the Department of Family and Protective Services (DFPS), a licensed child-placing agency, or a person other than a close relative placing a child for adoption to inform the birth parents about the rights of an adopted child to obtain a noncertified copy of the birth certificate. These entities also would have been required to provide the contact preference form to the birth parents, and the petition for adoption would not have been granted until the parents had filed a completed form.

## Supporters said

SB 221 would establish a system in Texas to allow release of adoption-related information while accounting for the needs of all parties involved, including people who were adopted, their birth parents, and DSHS. The bill would help many adopted people who currently rely on private investigators, the Internet, and their own financial resources to track down information on their birth parents. Use of the contact preference form would streamline the process of enabling adopted people to communicate with their biological parents, if both parties agreed.

It is very important for adopted children to know about any genetic diseases that run in their biological families. The bill would provide a way for birth parents to update their medical records and forward this information to their biological children. In addition, it would require the agency or other entity that placed a child for adoption to notify the birth parents about the requirement to complete and file contact preference forms, which would alleviate concerns about birth parents not being aware of these reporting requirements.

Because the bill would apply prospectively, SB 221 would not place a burden on DSHS to provide records from adoptions that took place decades ago. Nevertheless, resources permitting, it would allow DSHS to comply with requests for noncertified copies of birth certificates from people who were adopted before January 1, 2008.

## Opponents said

The bill assumes that a biological parent who did not indicate otherwise on a contact preference form would not object to his or her biological child's receiving a noncertified copy of the person's birth certificate. In many cases, parents who gave up their children for adoption did so with the understanding that this information would remain confidential for life. Additionally, many parents might not know about the existence of contact preference forms or the consequences of failing to file one with the state, especially those who gave their children up for adoption many years before. The bill should err on the side of non-release to protect the birth parents' confidentiality if the state did not have affirmative evidence that such parents wished to be contacted by their biological children.

## Other opponents said

SB 221 would be much more beneficial to adopted people seeking information if the bill applied retrospectively, rather than prospectively. Even though the department could issue a noncertified copy to someone adopted before January 1, 2008, it is not certain that DSHS would have the resources to comply with all the requests from adopted people seeking to find out the identities of their birth parents.

## Notes

The **HRO analysis** of SB 221 appeared in Part Two of the May 17 *Daily Floor Report*.

The House companion bill, HB 525 by Goolsby, passed the House on May 11, but died in Senate committee. HB 525 would have required DSHS to provide a noncertified copy of a birth certificate on request to an adopted person regardless of when the adoption took place.

# Advance directives and health care and treatment decisions

**SB 439 by Deuell**
*Died in the House*

**SB 439** would have amended Health and Safety Code, ch. 166 to expand directives regarding health care and treatment for incompetent patients diagnosed with terminal conditions. It would have defined "surrogate" to mean a legal guardian, an agent under medical power of attorney, or a person authorized to make a health care decision or treatment decision for an incompetent patient.

The bill would have specified that if an attending physician disagreed with a health care or treatment decision of a surrogate made on behalf of an incompetent patient who had been diagnosed with a terminal condition that had been certified in writing by the attending physician, life-sustaining treatment would be provided to the patient, but only until a reasonable opportunity presented itself for the transfer of the patient to another physician or health care facility willing to comply with the decision.

If artificial nutrition and hydration were the only life-sustaining treatment provided to a patient with a terminal condition, the process for handling treatment disagreements could not have been invoked unless reasonable medical evidence indicated that artificial nutrition and hydration could hasten the patient's death or seriously exacerbate other major medical problems.

If an attending physician requested a consultation with an ethics or medical committee, the committee would have:

- appointed a patient liaison familiar with end-of-life issues and hospice care options to assist the patient's surrogate throughout the process; and
- appointed one or more representatives of the ethics or medical committee to conduct an advisory ethics consultation with the surrogate, which would have been documented in the patient's medical record.

If a disagreement over a health care or treatment decision persisted following an advisory ethics consultation, the attending physician could have requested a meeting with the ethics or medical committee and would have advised the surrogate that the attending physician would initiate the review process and present medical facts at the meeting. The attending physician could not have participated as a member of the committee in the case being evaluated.

On receipt of a request for a meeting of the ethics or medical committee, the surrogate would have been offered a written description of the ethics or medical committee review process and any other possible policies and procedures adopted by the health care facility, as well as other information that the surrogate was entitled to receive, including statements about the surrogate's right to seek a second opinion and a patient's right to transfer.

If the attending physician or the surrogate had not agreed with the decision reached during the review process, the physician would have had to make a reasonable effort to transfer the patient to a physician who was willing to comply with the surrogate's health care or treatment decision. The facility personnel would have assisted the physician in arranging the patient's transfer to another physician, an alternative care setting within the facility, or another facility.

If the surrogate had requested life-sustaining treatment that the attending physician had decided – and the ethics or medical committee had affirmed – was medically inappropriate treatment, the patient would have received available life-sustaining treatment pending transfer. The bill would have established that the patient receive treatment to enhance pain relief and minimize suffering, which would have included the provision of artificial nutrition and hydration. The patient would have been responsible for any costs incurred in transferring to another facility. The attending physician, any other physician responsible for the care of the patient, and the health care facility would not have been obligated to provide life-sustaining treatment, except for the provision of artificial nutrition and hydration, after the 21st calendar day after the required written decision had been provided to the surrogate.

Under the bill, a patient's surrogate could have submitted a motion for extension of time for a patient transfer in any county court at law, court with probate jurisdiction, or district court, including a family district court, and served a copy on the health care facility.

Any party could have appealed the lower court's decision to the court of appeals with appropriate jurisdiction for expedited review. Any party could have filed a petition for review of the court of appeals decision no later than three business days after the appeals decision had been issued.

Other parties could have filed responses within three days after filing of the petition for review. The Supreme Court would have had to rule on the petition for review within three business days after the day on which the response had been due. If the Supreme Court had granted review, it would have exercised its sound discretion in determining how expeditiously to hear and decide the case. The bill would have prohibited the assessment of a fee for any proceeding in a trial or appellate court.

On submission of a health care facility's application to renew its license, a facility in which one or more meetings of an ethics or medical committee had been held would have filed a report with the Department of State Health Services that contained aggregate information regarding the number of cases considered by the committee relating to a physician's disagreement with health care and the disposition of those cases by the facility. The report could not have contained any data specific to an individual patient.

In the case of a person who was incompetent but previously had executed or issued a directive to physicians requesting that all treatment, other than treatment necessary for keeping the person comfortable, be discontinued or withheld, the physician could have relied on the directive as the person's instructions to issue an out-of-hospital do-not-resuscitate order and would have placed a copy of the directive in the person's medical record.

## Supporters said

SB 439 would revise the current Texas Advance Directives Act to give additional direction for dealing with patients who are in such a condition that their physician, hospital, or family no longer believe that they should be treated. Since 1999, Texas law has held that a hospital wishing to withhold treatment must notify a family that a committee meeting to consider cutting off support be held within as little as 48 hours. Following that meeting, treatment may be stopped after 10 days unless another hospital or medical facility can be found to take the patient. This system is not working. Families often are not ready to make such a decision – often the hardest of their lives – in such a short amount of time. Finding a place to transfer a patient in this time period frequently is difficult as well.

SB 439 would give families more time to make these painful decisions by increasing from 10 days to 21 days the length of time that a family had to transfer a dying loved one. In addition, the minimum notification time that a family would receive before the hospital ethics or medical committee met would be extended from two days to seven days to allow the family to prepare themselves. Hospitals would be required to provide relevant medical records within 72 hours of a family member's request, and the hospital would appoint a liaison to further assist the family. The procedures that a hospital would follow in cases involving life-sustaining treatment and transfer decisions and the new judicial processes in the bill would help families in times of great difficulty.

## Opponents said

SB 439 would thwart the promise made by doctors to take care of their patients to the best of their abilities. The bill's provision to extend life-sustaining treatment considered medically inappropriate from 10 days to 21 days unnecessarily would prolong suffering for the irreversibly ill. With added delays from court procedures, a person could be made to experience pain and suffering for an indefinite period. It is important to acknowledge that medical treatment has limits and not to stretch out a loving family member's efforts to maintain expensive care that serves no medical purpose.

## Notes

The **HRO analysis** of SB 439 appeared in Part One of the May 22 *Daily Floor Report*.

# Child Protective Services revisions

**SB 758 by Nelson**
*Effective September 1, 2007*

**SB 758** requires the Department of Family and Protective Services (DFPS) to implement a Child Protective Services (CPS) improvement plan with the primary goals of keeping families together while ensuring child safety in the home, reducing the time children remain in state care, and improving the quality and accountability of foster care.

***Case management and substitute care.*** DFPS no longer must privatize all case management and substitute care services, as the Legislature had required be done by 2011 in SB 6 by Nelson, enacted in 2005, and the independent administrator role is eliminated. By September 1, 2008, DFPS must contract for case management services in one or more geographic areas with a goal of contracting in 5 percent of cases. Case management includes developing and revising the child and family case plan, coordinating and monitoring permanency services, and assisting DFPS in the child's custody suit. DFPS must provide conservatorship services, including approval of child placements and case plans. DFPS must assess the need for substitute care services and contract with providers if it will improve services to children and families. In an emergency, DFPS employees may provide temporary care for a child in a place other than the employee's residence, or a residential child-care facility may exceed its capacity for up to 48 hours.

***Child-care facility regulation.*** A team of at least two residential child-care monitoring staff must conduct annual, unannounced inspections of licensed residential child-care facilities. DFPS must investigate reports of incidents or alleged violations at agency foster homes pertaining to a child under the age of six. Child-placing agencies (CPAs) must report to DFPS required information about closed foster homes. Foster homes must report their violation histories when transferring to a new CPA. The child-care facility regulation division must employ an investigation safety specialist and a risk analyst who work to reduce the risk of harm to children in child-care facilities. The division must include a performance management unit that recommends improvements based on quality assurance reviews of randomly selected monitoring and investigative reports. A committee on licensing standards will recommend policy changes on licensing and facility inspections. The owner or operator of a day-care facility commits a class B misdemeanor (up to 180 days in jail and/or a maximum fine of $2,000) if that person operates a day-care facility without a qualified director or does not comply with criminal history and background check requirements for caregivers.

***Improving child and family services.*** DFPS will provide enhanced in-home support for families in which poverty could be a significant cause of child neglect. Family service plans must be adapted to meet the special needs of children under the age of two. The bill expands the drug-endangered child initiative. Children who have been in the conservatorship of DFPS are eligible for enrollment in a pre-kindergarten class. Pediatric centers of excellence will be identified that assist DFPS in evaluating medical findings for children who are suspected victims of abuse and neglect. DFPS must provide children discharged from foster care with relevant personal records and those about to be discharged with information regarding Preparation for Adult Living (PAL) program benefits. DFPS must cooperate with other entities to expand recruitment of foster parents and increase adoption assistance payments based on the level of care a child needs. DFPS will study the effect of providing reimbursements for education expenses on the ability to retain qualified CPS caseworkers and target caseworker recruitment toward those with specific degrees.

## Supporters said

SB 758 would improve the quality and accountability of child-care licensing, strengthen families, and enhance outcomes for children in substitute care. The bill also would rebalance the level of outsourcing enacted through SB 6 by Nelson in 2005 to ensure that outsourcing efforts were implemented in a measured way that enhanced the well-being of children.

Given that outsourcing represents a major change to the traditional service delivery system, SB 758 judiciously would implement case management outsourcing among 5 percent of providers across the state. This approach would reveal how the outsourced modeled worked in diverse areas. Independent review of outsourcing efforts would help uncover issues to consider in the development of best practices before expanding the program. Case management outsourcing would decrease duplication of efforts between CPS and private case managers and increase efficiency. Those best equipped to determine each child's needs – the people who work with the child on a daily basis – would make case management decisions. As the managing conservator ultimately responsible for a child's well-being, the state would retain oversight to approve case plans and

represent the child in court. Contracts could be structured to enhance outcomes for the child by rewarding private providers for meeting performance measures or sanctioning providers that keep children in substitute care longer than appropriate for the case.

SB 758 would recognize that there are circumstances under which the state is the best provider of substitute care. Often, private providers shy away from providing care to high-needs children. The bill would allow Texas to maintain its public substitute care provider infrastructure to ensure that the children most in need had adequate care. DFPS' child-care regulation division is independent of the division providing substitute care services. The regulation division sanctions for non-compliance the substitute care facilities run by the state as it would sanction a private provider.

The bill appropriately would retain a child-care facility's right to refuse certain child placements. Some homes are not equipped for special needs children, and it could be unsafe for all the children in residence if a facility took on a child it could not handle properly. With a shortage of providers, well-run facilities should not have to jeopardize their licenses by risking incidents with children that a facility was forced to accept in an emergency.

## Opponents said

The state has not given the CPS outsourcing model enacted by SB 6 in 2005 an opportunity to work. SB 758 should not delay plans to fully privatize case management in Texas by 2011. The plan to outsource only 5 percent of case management throughout the state would cause confusion in the courts and among CPS and providers because different regions could have both outsourced and traditional provider relationships. By requiring that the state approve case plans developed by outsourced case managers but not allowing private case managers to assume court-related duties, SB 758 would hold contracted service providers accountable for performance outcomes that the contractor would not have control over meeting. The case plan approval process also could harm children if a state caseworker who was less informed about the case denied plan recommendations made by a private caseworker.

Efforts to achieve full outsourcing of substitute care services should not be eliminated. DFPS faces a conflict of interest because it is responsible for both the operation and regulation of agency child-care facilities. Given that private providers already provide about 80 percent of substitute care services, it would not be disruptive to outsource the remaining 20 percent of care provided through state

facilities. Lack of substitute care providers in serving certain child populations is due to inadequate reimbursement rates for children with higher service needs. Certain private providers already provide all the types of care the state provides, including basic care, emergency shelters, therapeutic foster care, group homes, and residential treatment centers. This array of services assures that the remaining children in public foster care could be absorbed into the private system if higher reimbursement rates were provided.

The bill should require child-care facilities to take children on an emergency basis if a facility has an empty bed and the child has no alternative placement. Too many children are placed temporarily in ill-equipped CPS offices despite a child-care facility having an empty bed. In addition, SB 758 should require yearly inspections of foster homes, which are inspected by DFPS staff only once every three years. The current frequency of inspections is not enough to ensure the safety of children, as evidenced by tragic deaths that could have been prevented if more frequent inspections had uncovered risk factors in foster homes.

## Other opponents said

SB 758 would provide better protection for Texas children if it eliminated all CPS privatization efforts. Private organizations should never play a role in case decision-making for people under the state's care. Conflicts of interest arise in privatized case management models because the case managers have an incentive to make decisions that benefit their facilities. In addition, privatizing case management responsibilities held by CPS caseworkers would impose increased liability on the state because state caseworkers would be approving case plans and placement recommendations despite more limited exposure to other aspects of the child's case. Even if privatization were an option that should be explored, the aggressive timeline for implementation of the case management pilot program would not allow for appropriate planning. Rather than spending more money to privatize case management, the state should redirect funds intended for privatization to hiring more conservatorship caseworkers to reduce caseloads, providing state caseworkers more time to interact with children and families.

## Notes

The **HRO analysis** of SB 758 appeared in Part One of the May 21 *Daily Floor Report*.

# Abortion reporting and review of ultrasound image

**SB 785 by Shapiro/SB 920 by Patrick**
*Died in the House*

**SB 785** would have added reporting requirements for physicians performing abortions, including specific information about the physician, the abortion facility, the patient, the fetus, the father, and the abortion procedure. If the patient had been a minor, reporting requirements would have included whether a parent or guardian had given written consent required by law or whether a judicial authorization was received and other information.

The Department of State Health Services (DSHS) would have had to require abortion providers to maintain a list of domestic violence shelters and assistance programs and to provide referrals if a woman had communicated she was being abused or forced to have an abortion. The bill also would have required a physician who treated an illness or injury related to an abortion complication to complete an abortion complication reporting form and submit it to DSHS.

DSHS would have had to issue a public report each year summarizing the information submitted on individual reports of abortion providers and ensure that none of the information in the report could reasonably have led to the identification of a physician who performed an abortion or a woman who had an abortion. The information would have been confidential and not subject to disclosure under the Public Information Act.

Physicians would have been subject to late fees or sanctions for civil contempt for failing to submit reports. Failing to submit a report, disclosing confidential information, or intentionally submitting false information would have subjected a person to a class A misdemeanor (up to one year in jail and/or a maximum fine of $4,000). Citizens of the state could have petitioned a court for an injunction against the executive commissioner of the Health and Human Services Commission for failure to produce the report or failure to enforce reporting requirements.

The Texas Supreme Court would have had to adopt rules governing the collection of statistical information on applications and appeals by judges authorizing minors to undergo abortions without parental notification. Information collected on judicial bypasses would have had to be made available to the public in aggregate form by county and produced in a manner that could not reasonably have led to the identification of the minor.

## Supporters said

SB 785 would produce better information about abortions in order to craft better public policy. DSHS already requires reporting of general information, but that reporting does not provide the broad range of accurate, reliable data needed. Strengthening reporting requirements would provide insight into the circumstances leading women to seek abortions and would assist maternal health groups in directing their outreach efforts. The U.S. Supreme Court has said that reporting requirements that are reasonably directed to preserving maternal health and that properly respect privacy are permissible. The bill would not require collection of information not already required by some other states. In addition, collecting information on judicial bypasses granted to minors would help the Legislature assess the efficacy and frequency of the parental notification provision.

## Opponents said

SB 785 would burden patients, target elected judges, and make public an experience that should be respected as private and confidential, while doing nothing to improve public health. The reporting proposed by the bill would be more detailed and burdensome to both the patient and the physician than what is currently required. Physicians estimate that compliance would require at least 20 minutes per patient, time that is lost to treating patients and that is uncompensated. As a result, some physicians could be discouraged from offering abortion services and follow-up care because of the administrative burden and legal liabilities involved. There is no compelling justification with respect to maternal health for collecting statistics on judicial bypass cases, and it could jeopardize the confidentiality and safety of judges. Reporting by county effectively would identify the judge hearing the case because many counties have only one or two district judges.

**SB 920** would have required a physician who performed an abortion to take an obstetric ultrasound image of the unborn child and review the image with the woman. A woman would have been required to certify that she had been provided with and had the opportunity to review the image. The physician would have been responsible for informing the woman that she was not required to view the image, and neither the physician nor the woman would have been penalized if the woman refused to look at the image. A physician found intentionally in violation of this and other informed consent requirements would commit a misdemeanor offense punishable by a fine of up to $1,000.

## Supporters said

SB 920 would help to ensure that a woman making a decision about abortion had access to all medical information pertaining to the decision, including an ultrasound. A recent study indicated a pregnant woman develops a powerful bond with her unborn child once she actually sees the fetus in the womb. Clinics often conduct only perfunctory counseling sessions before abortions and rush women through the process without ensuring that they understand the information and have considered their options. Some women say they would not have had an abortion if they had known more about the procedure and the development of the unborn child. Informing a woman fully of her unborn child's gestational development through ultrasound images could reduce the number of abortions by demonstrating more graphically the humanity of the child in the womb. Requiring a physician to take an obstetric ultrasound image and review it with a woman considering abortion merely would provide an additional measure of informed consent. A woman who chose not to view the image would not be required to do so.

## Opponents said

The bill would infringe needlessly on the relationship between a woman and her doctor. The doctor, in consultation with the patient, should determine whether a woman should undergo an ultrasound before an abortion. In addition, informed consent is required for all surgical procedures, including abortion, and most women already have an ultrasound and the opportunity to view the images before an abortion. Requiring a woman to review an ultrasound image with her doctor also would emotionalize her decision inappropriately. Choosing to end a pregnancy is a difficult choice. A woman who had wanted to become pregnant but chose to terminate the pregnancy when she discovered that the fetus had a severe and life-threatening abnormality should not be faced with reviewing an image that would have no bearing on her decision and only would make a tragic situation more painful. The real intent of this legislation would not be to help a woman make an informed choice but to shame her for a choice to terminate her pregnancy. Finally, the bill would place physicians in the difficult and contradictory position of having to provide a woman with an image and review that image with her, while informing her that she was not required to view the image.

## Notes

The **HRO analysis** of SB 785 appeared in Part One of the May 22 *Daily Floor Report*.

The **HRO analysis** of SB 920 appeared in Part Two of the May 21 *Daily Floor Report*.

# G

## Government Affairs

| | | | |
|---|---|---|---|
| HB 10 | Chavez | Prosecution defense for certain gambling for Native American tribes | 80 |
| HB 13 | Swinford | Homeland security, border security, TDEx database, immigration enforcement | 82 |
| HB 28 | Berman | Illegal immigration restrictions: Prohibiting children of illegal immigrants from receiving state benefits | 86 |
| HB 461 | Miller | Prohibiting mandatory participation in an animal ID system | 87 |
| * HB 991 | Rose | Limiting disclosure of concealed handgun licensees | 89 |
| HB 2006 | Woolley | Revised standards for authority to use eminent domain power | 90 |
| * HJR 19 | Branch | Requiring legislators to cast record votes | 93 |
| HJR 59 | Elkins | Allowing the Legislature to override a veto after *sine die* adjournment | 95 |
| * SB 11 | Carona | Emergency management, mutual aid system, wiretaps, vehicle tags, Border Security Council | 97 |
| * SB 129 | West | Reporting the value of gifts of cash or cash equivalent to public officials | 100 |
| SB 903 | Brimer | Continuing the Office of State-Federal Relations | 101 |
| * SB 1908 | Ellis | Modifying provisions for statewide and local housing programs | 103 |
| * SB 2031 | Ogden | Requiring legislative approval of certain claims against the state | 106 |

# Providing prosecution defense to certain gambling for Native American tribes

**HB 10 by Chavez**
**Died in the House**

**HB 10** would have provided a defense to prosecution for gambling or other gaming activity that is or may be permitted under the federal Indian Gaming Regulatory Act (IGRA) for certain Native American tribes on certain lands. The defense would have applied to gambling or gaming if it were conducted by a tribe recognized by the federal government on January 1, 1998, and on tribal land recognized by the federal government on January 1, 1998, and designated by the tribe for gaming. The defense would have applied whether or not the gambling or gaming was conducted by a tribe governed by the IGRA.

The tribes would have had to pay to the comptroller 5 percent of the revenue from the gambling or gaming, which could be used only to fund the TEXAS grant program for higher education students.

## Supporters said

HB 10 would allow only the three federally recognized Native American tribes in Texas – the Tiguas, Kickapoos, and Alabama-Coushattas – to have a narrow defense to prosecution for limited gaming on tribal property recognized as part of their reservations on January 1, 1998. It would not legalize casino gambling throughout the state, which is barred by the Texas Constitution. HB 10 would extend to Native American tribes in Texas the same authorization as the state to operate only games that already are legal in Texas. The bill would not require a constitutional amendment because it would not authorize anything that is prohibited by the Texas Constitution. Slot machines and video lottery machines are illegal in Texas now and would remain so with HB 10. The defense would be limited to a type of gaming called class 2 gaming, which is bingo, pull-tab bingo, and non-banking card games.

Indian gaming is highly regulated by the federal government, the tribes, and the states. Under IGRA, the federal Indian Gaming Commission has broad authority to oversee tribal gaming, and the tribes, which have adopted stringent regulatory schemes, have historically proved capable and successful in their regulations.

Concerns that HB 10 would be used to authorize gaming by tribes not currently recognized in Texas or on lands other than the sites of the Alabama-Coushatta, Tigua, or Kickapoo tribes outside of Livingston, in El Paso, and near Eagle Pass, are unfounded. HB 10 would allow gaming only by tribes with federal recognition on January 1, 1998, and on land they held on that date.

The bill would legitimize an income source that has helped Native Americans in Texas and allowed them, for a short time, to become self-sufficient. The Tiguas operated a casino for about eight years and the Alabama-Coushattas for about nine months before they were closed in late 2002 by federal court rulings in lawsuits brought by the state against the tribes. The Kickapoos opened the Lucky Eagle Casino on their land near Eagle Pass in August 1996 and now conduct bingo-based games and card games in which players compete against each other but not against the house with no banking by the house or another player. HB 10 would provide the seeds for a long-term, self-sustaining economic model and help prevent gambling dollars, jobs, and other economic benefits from going to other states.

Gambling opponents predicted increased crime in the areas around the tribes' gaming centers, but in fact, crime dropped significantly in the area around the Tiguas' casino. Gambling addictions are like other unfortunate compulsions, such as alcohol addiction and compulsive shopping, that the state does not try to stop by prohibiting the activities. Most Texans support the rights of the tribes to conduct gambling on their lands. In a 2007 poll, 71 percent of Texans surveyed said they favored Indian gaming because it would keep hundreds of millions of gaming dollars in Texas, and 69 percent said they supported Indian gaming to help tribes in Texas.

HB 10 also would benefit higher education in Texas by requiring that some of the gaming revenue be allocated to the state for the TEXAS Grants program, a needs-based financial aid program for qualified Texas high school students.

## Opponents said

Gambling in Texas should not be expanded with HB 10. The broad language in the bill would allow any type of Indian gaming authorized under the federal IGRA, which authorizes a range of gaming, including casinos, and could make Indian casinos legal in Texas. If HB 10 is meant to

allow only bingo and other class 2 gaming, it should clearly state this. Also, the broad type of gaming addressed by HB 10 should not be authorized without amending the Texas Constitution. HB 10 would provide a defense to a type of gambling that is unconstitutional.

The bill would reward the tribes' earlier illegal behavior, which was stopped by federal court rulings that shut down two casinos operated by Texas tribes. They should remain closed. When the Tiguas and Alabama-Coushattas were restored to federal jurisdiction, they agreed to an identical provision in the federal law that says: "All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe."

HB 10 would provide no mechanism for regulating the gaming authorized by the bill and no requirement for a state-tribal compact that could do so. In the absence of a state-tribal compact, it is unclear what, if any, authority the state would have to oversee tribal gaming and how the bill's requirement that tribes remit to the comptroller 5 percent of the gaming revenue would be enforced.

HB 10 would provide an incentive for other tribes to press for recognition in Texas and for the three currently recognized tribes to seek to expand both land holdings and gaming.

The bill would have a far-reaching statewide impact, and any economic benefit to tribe members and others should not outweigh concerns about expanded gambling in Texas. Gambling carries with it social and other costs, such as increases in crime, unemployment, and bankruptcy, as well as the costs of regulation and potential corruption, that offset economic or other gains. The Legislature must consider the concerns not only of the Native Americans who would benefit from this bill but also of the 22 million Texans whom it could affect. Texans should have the right to express their opinions on legalizing Indian gaming by voting on this issue.

## Notes

The **HRO analysis** of HB 10 appeared in Part One of the May 2 *Daily Floor Report*.

The House adopted three amendments to HB 10 before it failed to pass to engrossment. One of the amendments would have stated that the defense to prosecution applied to conduct that consisted of activities "permitted as class II gaming." Another amendment would have limited the defense to gambling conducted by a tribe "with a reservation in this state" on January 1, 1998, and the third would have increased the percentage of revenue paid to the state from 5 percent to 10 percent.

Another bill related to gaming by Native American tribes, HB 2535 by Chavez, was placed on the May 9 General State Calendar but was not considered. HB 2535 would have expanded the definitions in the Bingo Act so that the Tigua tribe, under certain conditions, could have conducted bingo under the state's Bingo Act. Under the bill, the bingo would have to be conducted by a Tigua fraternal organization that performed charitable, benevolent, patriotic, employment-related, or educational functions. The tribe would have had to adopt rules that conformed to the substantive provisions of the Bingo Act and Texas Constitution, Art. 3, sections 47(b) and (c), and would have been able to conduct bingo under the tribe's rules without submitting to Texas' regulatory jurisdiction, including licensing requirements. The tribe would have had to remit to the state 5 percent of its gross receipts from bingo.

# Homeland security, border security, TDEx database, immigration enforcement

**HB 13 by Swinford**
***Died in the House (see Notes)***

**HB 13**, as considered by the House, would have:

- required the Department of Public Safety (DPS) to oversee the Texas Data Exchange;
- established the Office of Homeland Security in the Governor's Office;
- created the Border Security Council;
- prohibited the state and cities from adopting policies under which they would not enforce or would violate certain immigration and drug laws;
- required peace officers and their agencies to report the commission of federal crimes;
- authorized local agreements with federal immigration authorities; and
- created a legislative oversight committee on homeland and border security issues.

***Texas Data Exchange (TDEx).*** HB 13 would have required DPS to oversee the TDEx database of law enforcement information. The governor's Division of Emergency Management would have been required to provide DPS with the necessary project management resources for TDEx, including operational support and personnel.

***State Office of Homeland Security.*** HB 13 would have established the State Office of Homeland Security in the Governor's Office, which would have performed the tasks of coordinating homeland security activities among local, state, and federal agencies and the private sector. The governor would have continued to direct the state's homeland security efforts through the office. The Office of Homeland Security would have continued the current funding activities carried out by the Governor's Office but would have done so with the advice of the newly created Border Security Council.

***Border Security Council.*** HB 13 would have created the Border Security Council to advise the Office of Homeland Security about the allocation of funds for border security. The council also would have developed and recommended performance standards, reporting requirements, audit methods, and other procedures to ensure that money allocated by the Office of Homeland Security for security efforts along the Mexico border was used properly and that recipients were accountable for its use. The governor would have appointed the members of the council.

***Prohibitions against certain policies.*** State government entities and political subdivisions would have been prohibited from adopting rules, policies, or ordinances under which they would:

- refuse to take an action authorized under 8 U.S.C., sec. 1252c, which gives state and local law enforcement officials authority, as permitted by state and local laws, to arrest and detain persons who were present unlawfully in the United States and previously had been deported or left the country following a felony conviction;
- violate federal laws under 8 U.S.C., sec. 1324, which creates criminal penalties for several offenses related to bringing certain aliens into the country or harboring them; or
- not fully enforce state or federal laws relating to drugs, including the Texas Controlled Substance Act and Dangerous Drugs Act.

These same prohibitions would have been placed in the Local Government Code and would have applied to cities, county commissioners courts, sheriffs, city police departments, city attorneys, county attorneys, district attorneys, and criminal district attorneys.

If the Attorney General's Office had determined that a state governmental entity or a political subdivision had violated these prohibitions, the entity would have forfeited and had to repay funds they received for homeland or border security purposes. State governmental entities and political subdivisions would have been able to appeal a determination that they had violated this prohibition.

State governmental entities and cities would have been prohibited from adopting rules, policies, or ordinances – and from following or establishing commonly accepted practices – that required peace officers to violate state or federal criminal law. Peace officers would have been required to disregard any such rule or policy that required them to violate a state or federal criminal law.

It would have been the duty of peace officers to report to their agencies the commission of federal crimes or conspiracies to commit federal crimes if the officer had knowledge of the offense. It would have been the duty of

the officer's law enforcement agency, if it received such a report, to pass it on to the State Office of Homeland Security.

**Performance of immigration officer functions.** HB 13 would have authorized political subdivisions of the state to enter into agreements under the federal Immigration and Nationality Act to perform functions of immigration officers.

## Supporters said

HB 13 would strengthen the state's homeland and border security efforts. The bill would not encroach on the federal responsibilities relating to immigration law and is not an attempt to require local governments to enforce immigration law. The bill would focus efforts on border security, which plays a large role in homeland security.

**Texas Data Exchange.** HB 13 would place TDEx under DPS' authority because DPS is the state's premier law enforcement entity and has experience managing and protecting databases. The TDEx database was developed with authority given to the Governor's Office in 2005, in SB 9 by Staples, and should be continued and properly supported. By allowing law enforcement agencies to share information, TDEx is helping prevent terrorism and crime. The TDEx database contains only law enforcement information and is accessible only by law enforcement authorities.

It is necessary to give the Governor's Division of Emergency Management authority to support TDEx to meet federal requirements that federal funds used to support it go through a homeland security agency. HB 13 would clearly give DPS, not the Governor's Office, authority over the database and limit the division to project management.

**State Office of Homeland Security.** HB 13 would formalize the State Office of Homeland Security by giving it an official name and establishing it within the Governor's Office. In 2003 and 2005, the Legislature gave the governor authority to direct the state's homeland security efforts, and HB 13 would continue this policy decision. Because homeland security efforts are spread across several state agencies and the majority of law enforcement resources exist at the local level, it would make sense to have the state's executive coordinate efforts.

It is necessary to keep the Office of Homeland Security outside of an agency like DPS and to name the office as the entity to allocate state and federal homeland security grants

to ensure that the state meets federal requirements that grant funds go through a homeland security agency. Giving this responsibility to another state entity could jeopardize these federal funds, which may be as much as $100 million.

**Border Security Council.** By establishing the Border Security Council, HB 13 would create a structure to allow formal input into the allocation of border security funds and the evaluation of how they are spent. The bill would give the governor flexibility to appoint the members of the council so that the council could include people possessing the necessary range of expertise. The Legislature has given the governor responsibility for homeland security, so he should receive the authority to appoint the council in the same way other state advisory boards are appointed. The council would be charged only with providing advice, not with making any decisions, and its meetings and plans would be subject to the state's public meetings and information laws so that there would be checks and balances on its activities.

Requiring the council to develop performance standards and audit methods to track border security funds would help ensure the proper use of the money. The state has seen tangible, positive results from money directed to the area, and HB 13 would provide a way to monitor the success of future funds spent in this manner.

**Prohibitions against certain policies.** HB 13 would ensure that state and local governmental entities were not actively working against immigration and drug laws, but would not force any entity to take over the federal responsibility of immigration law enforcement. Federal law takes precedence over state laws and local policies, and state and local entities should not be able to pick and choose which laws they follow. The bill deals with criminal laws, not civil laws, and would not be the appropriate place to address concerns about civil violations that may affect immigrants, such as municipal housing ordinances.

HB 13 would require only that entities not adopt policies requiring peace officers to violate state or federal criminal laws. Peace officers would not be required to act as immigration agents, to investigate anyone's immigration status, or to detain or deport illegal immigrants. Following the requirements in HB 13 simply would mean that when an officer knew that a person had committed a federal crime, the officer would report it.

These provisions would help address the problem of so-called "sanctuary cities." Some of these cities have official policies under which law enforcement officers are not required to ask or to report on the immigration status of people they encounter.

*Performance of immigration officer functions.* HB 13 would establish the necessary authority for local law enforcement entities to enter into agreements with the federal government to take on some immigration functions, if they desired. The performance of immigration officer duties must be done under a formal memorandum of understanding and with required training and education. While only a handful of entities nationwide have received this designation, it should be available to Texas entities.

## Opponents said

*Texas Data Exchange.* While HB 13 would place TDEx under the control of DPS, it also would charge the governor's Division of Emergency Management with supporting the database. Authorizing the Division of Emergency Management to provide operational support and personnel to the database would mean that the Governor's Office would continue to have some control over the administration of TDEx, which would be inappropriate given the civilian, political nature of the Governor's Office

*State Office of Homeland Security.* A formalized Office of Homeland Security should be placed within a law enforcement agency such as DPS, not within the Governor's Office, as HB 13 would do. Many of the duties of the Office of Homeland Security – especially duties related to intelligence gathering – traditionally have been handled by law enforcement agencies, not civilian, political offices. Just because the Legislature chose to give the governor some oversight on homeland security issues does not mean that the responsibility should not be moved now that the duties have evolved.

Authority given to the governor in HB 13 to allocate funds to assist  law enforcement agencies in homeland security efforts, including border security and law enforcement emergencies, would be too broad and not provide enough accountability. Grants of this nature should be made through a fiscally accountable state agency, include objective requirements that account for factors such as population and crime rates, and stipulate how the money should be used and how success would be measured. Questions have been raised about the success of current border operations, and HB 13 would continue the process that has produced these questionable results.

*Border Security Council.* HB 13 is not specific enough about the composition of the Border Security Council to ensure that it would have balanced, fair representation. The bill would give the Governor's Office the sole authority to name the council without placing any requirements on the members. The bill should specify geographic and law enforcement agency diversity so the Office of Homeland Security would receive balanced advice. Without this diversity on the council, it could continue sending homeland and border security funds to a small number of law enforcement entities. Several entities, such as municipal police departments, should be included in the decision making and receipt of funds. Having the council both develop performance methods and give advice about awarding funds could be a conflict of interest.

*Prohibitions on certain policies.* HB 13 would take discretion away from local entities to set their own policies governing immigrants and public safety. HB 13 would go too far in requiring local law enforcement officers to enforce complex federal immigration laws and participate in immigration efforts, something they have neither the training nor the manpower to do. The role of local law enforcement officers is to solve and prevent local crimes, and even requiring officers to inquire or report about someone's immigration status could harm the trust and good relationships necessary for an officer to operate successfully in the community.

The reporting functions required by HB 13 would add to the burden of local law enforcement entities, which already are spread thin. In some cases, such as drug crimes that are both state and federal offenses, the federal government might not want to know that an officer had knowledge of a federal crime if the crime was being handled at the state level. Police often investigate actions that may violate federal law, but have no homeland security implications.

HB 13 would go too far in penalizing local entities for any rule, policy, or ordinance they enact. Decisions about policies can be made by numerous people in a department who may have no intention of affecting immigration actions.

## Notes

The **HRO analysis** of HB 13 appeared in Part One of the May 7 *Daily Floor Report*.

The House adopted numerous amendments to HB 13 before passing it to engrossment, including ones designating the Department of Public Safety as the only state agency or governmental entity authorized to develop, maintain, operate, and control access to the TDEx and allowing the governor's Division of Emergency Management to provide only funding to support the database. An amendment

would have required the governor to appoint a director of homeland security, with the advice and consent of the Senate.

The bill also was amended on the floor to require at least one-third of the members of the Border Security Council to be residents of the border region. The provisions creating a Border Security Council were enacted as part of SB 11 by Carona, effective September 1, 2007, except as otherwise provided.

HB 13 was approved by the House and the Senate, but died in the House on a point of order during consideration of Senate amendments.

# Illegal immigration restrictions: Prohibiting children of illegal immigrants from receiving state benefits

**HB 28 by Berman**
*Died in House Committee*

**HB 28** would have prohibited a person born in Texas whose parents were illegal immigrants from receiving any benefit provided by the state or a political subdivision of the state. These benefits would have included employment, retirement, public assistance such as welfare and food stamps, health care, disability, public housing, unemployment compensation, professional and commercial licenses, and primary, secondary, or higher education.

## Supporters said

HB 28 is necessary because the federal government is not addressing the issue of illegal immigration. Allowing children of illegal immigrants to receive state and local government benefits in Texas encourages more illegal immigration, which is imposing an enormous cost on state and local governments.

HB 28 could become a needed test case for the U.S. Supreme Court to interpret the 14th Amendment, which grants birthright citizenship. Such a test could help determine the extent of the constitutional rights of children of illegal immigrants and would be a good use of the state's resources, which are currently being used to provide these benefits. It simply is not fair or proper for the state to give benefits to children of parents who break the law by their very presence in the United States.

## Opponents said

HB 28 would be unconstitutional. It is clear that under the 14th Amendment to the U.S. Constitution anyone born in the United States is a citizen and is entitled to all the benefits of citizenship. HB 28 would unfairly punish children – who under the U.S. Constitution are citizens – for the actions of their parents. If HB 28 were enacted, it would be challenged in court, and Texas would have to spend resources defending a clearly unconstitutional law. Immigration is a federal issue, and the Texas Legislature should not act until Congress does.

## Notes

Several other bills introduced in the 80th Legislature related to illegal immigrants. HB 127 by Delisi, which died in the House State Affairs Committee, would have required state agencies to report on the cost of services and benefits provided to illegal immigrants.

HB 29 by Berman, which died in the House State Affairs Committee, would have assessed a transmission fee on money sent from Texas to Mexico and to Central and South America. A similar bill, SB 268 by Patrick, which died in the Senate Finance Committee, would have assessed a fee on money sent to any destination outside of the United States. Under both bills, U.S. citizens or others lawfully present in the United States would have been eligible for a refund of the fee.

Several bills, all of which died in committee, would have prohibited local governments from adopting policies under which they would not fully enforce state or federal immigration laws. A similar provision was included in HB 13 by Swinford, an omnibus homeland security bill, which died in the House. Other bills, which also died in committee, would have authorized or required peace officers to inquire into the immigration status of people they arrested or detained under certain circumstances and in some cases to report or arrest those who violated civil or criminal federal immigration laws. HB 3507 by Hernandez, which died in the House Law Enforcement Committee, would have prohibited peace officers from being directed or required to enforce federal immigration law. Other bills would have required certain state agencies to enter into agreements with the federal government so that state or local peace officers could be trained to enforce federal immigration law.

HB 1196 by Kolkhorst, effective September 1, 2007, bars any public subsidy designed to promote economic development to a business that does not certify that it does not and will not employ an undocumented worker, and any business convicted under federal law of hiring an undocumented worker must repay to the state the amount of any public subsidy, with interest.

# Prohibiting mandatory participation in an animal identification system

**HB 461 by Miller**
*Died in the Senate*

**HB 461** would have made an animal identification program developed by the Texas Animal Health Commission (TAHC) voluntary unless otherwise required by the U.S. Department of Agriculture (USDA). The commission could have adopted rules and required program participation only if USDA had set a timeline for the creation and implementation of a mandatory national program.

The bill would have eliminated TAHC's authority to require the use of animal identification numbers as identification for commission programs. Also, TAHC's existing authority to establish a date by which all premises must be registered would have been repealed.

HB 461 would have required the inclusion of certain information on application forms for participation in the animal identification program. This information would have included a notice of the program's voluntary status unless mandated by USDA and an explanation regarding the disclosure of information collected under the program and persons to whom this information can be disclosed. Also, a person enrolled in the animal identification program could have withdrawn, in which case their personal information would have been deleted.

TAHC could not have used information collected under the program for anything other than disease control. The executive director of the commission could not have released information collected for the program to certain persons. For other entities permitted to receive information under current law, the commission would have been able to release information only if adequate protection for the confidentiality of information had been guaranteed.

The commission would have been required to provide notice of the changes under the bill to each individual registered under the program by November 1, 2007.

## Supporters said

TAHC's ability to impose a mandatory animal identification system should be revoked. This would be consistent with a decision made by the commission in 2006, when TAHC postponed action on proposed mandatory registration rules authorized by the 79th Legislature's enactment of HB 1361 by Hardcastle in the previous year. A large, centralized system is not the most effective method for preventing and tracing animal diseases. The current process employed by TAHC to identify and track animals functions effectively, with regional or statewide quarantines imposed on animal movement during a disease outbreak.

A mandatory animal identification system consistent with the USDA's National Animal Identification System (NAIS) would be costly to implement statewide. The fee for premise registration would create a financial burden for animal owners, especially small producers who are subject to the same fees as large commercial operators. Animal owners should not be required to pay for a system designed to benefit the general public. By making participation in the animal identification system voluntary, HB 461 would permit animal owners to determine whether participation in the program would be beneficial. Letting the market drive the use of the animal identification system would be fairer and more efficient.

Being forced to register with the government constitutes an invasion of privacy, and TAHC should not have this authority unless USDA requires the commission to move forward with NAIS compliance. Although the initial phase of compliance with NAIS involves only premise registration, the next two components of the system – tagging and tracing animals – would constitute an especially intrusive form of government oversight. Owners should not be forced to provide the government with information to be stored and possibly shared with others, with no assurances that the information would remain confidential. The information generated through the program could be used against the agricultural industry, and market prices easily could be manipulated with new information available on animals in Texas.

## Opponents said

As part of its mission to ensure animal health, TAHC needs proper tools to respond to animal disease emergencies. Current law allows the commission to administer valuable programs to identify disease and infestation problems, register premises, and move quickly in case of an emergency, such as an outbreak of avian flu. These provisions are justified due to the devastating potential of an infectious animal disease or a terrorist using animal pests or diseases to destroy the state's food supply. Under HB

461, TAHC would not be able to achieve the level of animal identification necessary for effective disease control, and its ability to adequately to protect the state's livestock and public health would be weakened.

Certain identification processes are required when transporting animals across state and international borders. Several TAHC programs use identification components to administer these processes, such as the agency's efforts to stamp out cattle tuberculosis, cattle brucellosis, scrapie in sheep and goats, and equine infectious anemia. With oversight by TAHC, the state's livestock industry complies with standards imposed by other states, the federal government, and other countries. HB 461 could impede TAHC's ability to ensure compliance with these standards. The agency no longer would be able to use certain identification processes to administer important programs. In this case, the state's livestock industry could become quarantined, and HB 461 could negatively impact the Texas economy.

Although TAHC does not have plans to require premise registration, current law allows the agency to do so in the future as needed. HB 461 would weaken this important standby authority. At the same time, current authority

given to TAHC to register premises is permissive and not mandatory. The agency lacks the resources and authority to suddenly implement a mandatory program. To implement such a system, the commission would have to follow standard rule-making procedures for state agencies. Other components of the animal identification system, such as tagging and tracking, are even further from implementation.

## Other opponents said

HB 461 would not offer necessary protection against NAIS, which requires Texas to cede jurisdiction over its sovereign land and people to the federal government. The program is a violation of states' rights and could lead to the federal seizure of animals and land. Texas should adopt legislation stating that it will never implement NAIS, even if required to do so by USDA.

## Notes

The **HRO analysis** of HB 461 appeared in Part One of the April 23 *Daily Floor Report*.

# Limiting disclosure of concealed handgun licensees

**HB 991 by Rose**
*Effective May 23, 2007*

**HB 991** amends Government Code, sec. 411.192 to remove the requirement that the Department of Public Safety (DPS) furnish to anyone information on whether a person holds a concealed handgun, leaving exceptions for a criminal justice agency or the applicant or license holder. Under prior law, any individual could file a written request to discover if a particular person had a concealed handgun license, in which case DPS was required to release the licensee's name, date of birth, gender, race, and zip code to the requestor. HB 991 continues the requirement for DPS to notify a concealed handgun licensee when it releases such information to an authorized agency.

## Supporters said

HB 991 would safeguard the privacy of Texans, including more than 42,000 female license holders, who choose to protect themselves or their families by carrying a concealed handgun. Allowing the release of this personal information to the public puts license holders at risk. Access to someone's name, date of birth, gender, race, and zip code is sufficient for a stalker or burglar to locate that person, especially with the search capabilities available on the Internet. The safety and privacy of individual license holders outweigh abstract concerns about open government, and the state should err on the side of caution in protecting the identities of those who legally carry concealed weapons.

HB 991 would not prevent the public from finding out about a concealed handgun license holder who committed a weapons crime. Records concerning concealed weapons licenses already are tied to other criminal justice databases. Licensees accused of crimes have their licenses suspended, and the privilege is revoked upon conviction. The names of those with suspended or revoked licenses currently are open records under other statutes.

Current law allows the release of statistical data on concealed handgun licensees, and HB 991 would not affect the availability of that information. The media and academic researchers can reach conclusions about licensees and their behaviors without knowing the names of individuals.

Inquiring whether specific individuals – such as elected officials or celebrities – are exercising their constitutional right to protect themselves is intrusive and unnecessary for public safety. The bill would strike a fair balance between the public's need for information and the safety and privacy concerns of licensees.

## Opponents said

The government should not collect records that no one has the right to see. Names of those who hold driver's licenses or professional licenses are public record, and those licensed to carry deadly weapons should be subject to the same degree of scrutiny by the media and other citizens. If a person commits a crime involving a handgun, the public has a right to know if the state licensed that person to carry a gun. This free flow of information helps keep the government responsible and responsive to the people.

There is no reason to believe that public knowledge about a person holding a concealed handgun permit makes that license holder less safe. In fact, one could argue that a person who is known to carry a concealed weapon would be less likely to become a target for crime. Besides, burglars and stalkers are unlikely to make a public record search to target their victims. Most criminals commit their crimes impulsively, and even those planning a crime probably would be unwilling to request information about a potential victim when their name would be recorded and reported to that potential victim.

## Notes

The **HRO analysis** of HB 991 appeared in Part One of the April 18 *Daily Floor Report*.

During the 2005 regular session of the 79th Legislature, the House passed a similar bill, HB 318 by Hupp, which died in Senate committee. In 2003, another similar bill, HB 220 by Hupp, passed the House, but also died in Senate committee.

# Revised standards for authority to use eminent domain power

**HB 2006 by Woolley**
*Vetoed by the governor*

**HB 2006** would have modified processes governing eminent domain proceedings, standards of evidence that could be considered by a court in the course of making decisions regarding damages, obligations placed upon condemning entities, and the rights of previous owners to repurchase taken property.

As a basis for assessing actual damages to a property owner from a condemnation, HB 2006 would have allowed special commissioners to take into account evidence relating to the change in value of the property, including any injury or benefit to the property owner. If property was condemned for purposes related to the state highway system or a county toll project eligible for designation as part of the state highway system, special commissioners also would have had to consider diminished access to highways for any remaining property to the extent that it affected the present value of the property, including factors considered when determining market value for property tax purposes.

The bill would have defined "public use" as a use of property that allowed the state, one of its political subdivisions, or the general public to possess, occupy and enjoy the property. Governmental and private entities could not have taken property except for a public use and would have had to provide relocation services for displaced persons.

The bill would have modified the price at which previous owners condemned property on which a public use was cancelled within 10 years of the acquisition. The repurchase price would have been the price paid to the owner by the governmental entity at the time the property originally was acquired, rather than the fair market value of the property at the time the public use was canceled. The repurchase provision would not have applied to a port that was acquiring property for deep water navigation. (The constitutional authorization for this provision, HJR 30 by Jackson, is on the November 6, 2007, ballot.)

HB 2006 would have added the "Truth in Condemnation Procedures Act" to require a governmental entity, for each property or group of jointly owned contiguous properties to be condemned, to formally authorize by motion the initiation of condemnation proceedings at a public hearing by a record vote. The bill would have required entities that intended to acquire property for a public use to make a bona fide offer to acquire the property by voluntary purpose or lease. Such an offer would have to have been based on a reasonably thorough investigation and honest assessment of just compensation for the taking. A court, upon finding that a condemning entity did not make a bona fide offer, could have ordered the condemning entity to pay all costs and any reasonable attorney's fees incurred by the subject owner.

In response to a request by the property owner under the Public Information Act, condemning entities would have had to furnish only documents relating to the condemnation of the specific property. Any condemning authority not subject to public information requirements intending to exercise the power of eminent domain would have had to serve property owners with notice prior to initiating proceedings.

## Supporters said

HB 2006 would make critical amendments to existing statutes regulating eminent domain to ensure that individual property rights were balanced appropriately against legitimate public needs for property acquisition. The bill would make the use of eminent domain a public process by subjecting it to authorization by a governing body and ensure accountability by requiring disclosure of documents related to a condemnation beyond the appraisal records required in current statutes.

Property owners rightfully deserve to be compensated for diminished access to their property due to certain road projects. These costs should be borne by entities that use eminent domain for road construction and are necessary to fairly compensate property owners for their losses due to these takings. The costs of paying for diminished access would be substantially less than what has been estimated by critics of the provision, and any cost increase would mean that property owners have not been fairly compensated in the past.

HB 2006 would provide a definition of public use that both holds condemning authorities accountable and has sufficient flexibility to avoid discounting legitimate public interests. Public use would be defined generally to include specific uses added by previous legislation or uses that allow public interests to access and otherwise enjoy the property. This definition would preclude conspicuous examples of

condemnations that result in private commercial uses but that are justified as being publicly accessible, incidental to the primary use, and having economic benefits.

The bill would leave sufficient room for fair consideration of evidence in eminent domain transactions. Expanding evidence standards would provide recognition of the special status of condemnation proceedings caused by the fact that the property owner would not have sold under normal circumstances. Current standards of evidence do not provide for unique conditions associated with each property. Property owner rights would be protected by the bona fide offer requirement expressly placed on condemning authorities. Recourse would be available, along with compensable court fees, for an owner who was unable to partake in fair negotiations with the condemning authority. Entities using the power of eminent domain would have a strong incentive to negotiate in good faith and try to secure a settlement up front.

HB 2006 would provide for the repurchase of condemned property at the price the entity paid at the time of acquisition. Permitting the repurchase price to be set at the original sale value, and not the current fair market value as currently required in the Property Code, would enable subject property owners to reclaim equity for appreciating property to which they were entitled. The bill would not confer any special advantage upon an individual because it would permit only the redress of a taking that was not justly executed. The bill under no conditions would guarantee the transfer of positive value to an individual. The bill would create a strong disincentive against the speculative exercise of eminent domain authority by condemning authorities, including school districts, municipal and county governments, state agencies, pipelines, and utilities. Condemning authorities would be discouraged strongly from acquiring land through eminent domain for which there were no immediate plans.

## Opponents said

HB 2006 would introduce more liabilities into eminent domain proceedings than it would resolve. The bill unnecessarily would change statutory provisions that have not given rise to any substantial issues since they were enacted in 2005 through SB 7 by Janek, 79th Legislature, second called session.

Provisions requiring compensation to land owners for diminished access to their remaining property as a result of an eminent domain taking for certain road construction would go too far. This requirement would cost taxpayers extraordinary sums – with one estimate putting it at easily

over $1 billion annually – and stop or seriously delay needed road projects by making their costs prohibitively high. This requirement could lead to excessive compensation for those whose access was reasonably preserved and only would enrich condemnation lawyers who bring suits for these damages.

HB 2006 would add an overly broad standard to the criteria of admitting evidence for the determination of damages in a condemnation hearing. Allowing the consideration of the impact of highways built as part of toll plans would open up a dangerous and indefinite realm. This standard could include evidence of items that did not necessarily have any bearing on value of the property, the purpose for which the land was being taken, or the material damage to the owner. Allowing an expanded variety of evidence could create greater inconsistencies in the hearing process and reduce the overall equity of damage claims across the state.

The bill also would introduce vague provisions regarding the definition of public use and bona fide negotiations. While the bill appropriately would count the permitted uses specifically listed in statute as public, it would not define clearly the relationship between primary and incidental uses. HB 2006 would require future clarification about the permissibility of public uses that had an incidental private benefit. In addition, the determination of a good faith effort would be left to a court. This could place many condemning authorities in the difficult position of being unaware of what steps to take to ensure a finding of a bona fide offer. The provision could encourage litigation to clarify what constituted a good faith effort in the context of eminent domain.

HB 2006 would allow "double recovery" for property owners who had undergone eminent domain proceedings and were eligible to repurchase their property. The bill would confer a windfall upon property owners who were compensated justly for the original taking. An owner who was eligible to repurchase at the price originally paid could accrue all the equity from appreciation without having to pay property taxes, maintenance expenses, and other costs normally incurred as part of property ownership. The bill would allow any appreciation that accrued in the property while it was in the custody of a government organization to be transferred to an individual in the form of equity. Allowing an individual to repurchase at the original price effectively could result in the state being used as an instrument of financial gain for that individual. There is a good reason for the longstanding and rarely amended constitutional prohibition against transferring things of public value to individuals.

## Notes

The **HRO analysis** of HB 2006 appeared in Part One of the May 7 *Daily Floor Report*.

For more information on HB 2006, see HRO Focus Report Number 80-6, *Vetoes of Legislation, 80th Legislature*, July 9, 2007, pp. 46-49.

# Requiring legislators to cast record votes

**HJR 19 by Branch**
*Effective if approved by voters at the November 6, 2007, election*

**HJR 19** would amend Texas Constitution, Art. 3, sec. 12 to require a vote taken in either house of the Legislature be by record vote if it was on final passage of:

- a bill;
- a joint resolution proposing or ratifying a constitutional amendment; or
- any other resolution except one of a purely ceremonial or honorary nature.

A vote on final passage would mean a vote on:

- third reading;
- second reading, if the applicable house suspended or otherwise dispensed with the requirement for three readings;
- whether to concur in the amendments of the other house; or
- whether to adopt a conference committee report.

Either house could pass a rule to provide for exceptions for a bill that applied only to one district or political subdivision of the state. Each member's vote would be recorded in the appropriate journal and made available for at least two years on the Internet or future electronic communications technology in a form accessible to the public by referencing the number or subject of the bill or resolution.

## Supporters said

HJR 19 would require legislators to be accountable for their votes and help the public assess how each member stood on each significant issue before the Legislature. A key tenet of democracy is open government and the ability of voters to hold their elected officials accountable. Texas is one of only nine states that does not require record votes on final passage of legislation. Although the House Rules require final votes to be recorded, the requirement should be written in the Constitution because the rules can be changed every session. Any member can request a record vote at any time, but that does not occur on many of the votes cast, meaning that less than half of the votes taken are helpful to the public in deciding if their elected officials are voting in their best interests.

Too many votes have been hidden under the "voice vote" provision, which is a common method of passing or defeating legislation in both chambers. House members have their votes recorded as "aye" unless they state their preference for a "no" vote, so an "aye" vote is merely presumed. Members should be required to affirmatively vote one way or the other as a matter of public record.

HJR 19 appropriately would require record votes on third reading or final passage because final passage is the key vote on any bill. On other matters, any House member or any three senators may ask for a record vote and frequently do, so the most important votes already can be recorded. However, if the Constitution required record votes on second reading or on every vote on every amendment, it significantly would slow the lawmaking process.

## Opponents said

The House rules already require record votes on third reading and final passage, and any member can ask for a record vote on any measure at any time. Under House Rules, passage of a bill or joint resolution without objection is equivalent to a recorded vote because the House Journal reflects the fact that all members voted for the measure and are allowed to register opposition if they choose. The Senate has recorded all votes on final passage since the 79th Legislature in 2005, so it is not necessary to amend the Constitution to require this. Placing the requirement in the Constitution could create a time-consuming, logistical burden for future legislatures. Legislators should maintain the flexibility to determine how many of the hundreds of hours members and staff spend in session should be devoted to counting and recording votes. Current procedures adopted by rule in both chambers offer a practical way of informing the public while allowing the Legislature to carry out its business in an efficient manner during the brief biennial sessions.

## Other opponents said

HJR 19 also should require record votes on second reading, which is the most important stage in the process of considering legislation. Votes cast during the second reading of a bill carry significant importance because

amendments can be adopted at this stage with a simple majority, rather than the two-thirds vote required to amend a bill on third reading. As a result, bills rarely are amended on third reading, and most of the substantive debate takes place on second reading. The ability to view record votes on second reading would provide true transparency and allow the public to express their opinions on a bill prior to final passage. As a practical matter, votes on second reading already are posted on the Internet, and the proposed amendment should reflect this practice.

Allowing legislators to adopt rules to except local bills from the third-reading record vote requirement could allow controversial local bills to be overlooked. Although neither house would be required to adopt such a rule and any House member or any three Senators may request a record vote at any time under current rules, the proposed amendment might have the perverse effect of requiring record votes on routine measures without shedding light on how members voted on important bills that applied to only one district or political subdivision.

## Notes

The **HRO analysis** of HJR 19 appeared in the April 17 *Daily Floor Report*.

HB 83 by Branch, which would have required by statute that each house of the Legislature record on final passage votes on all bills, resolutions, and other resolutions that were not purely ceremonial or honorary in nature, died in the House.

# Allowing the Legislature to override a veto after *sine die* adjournment

**HJR 59 by Elkins**
*Died in Senate Committee*

**HJR 59** would have amended the Constitution to require the Legislature to convene after the 20-day post-session deadline for filing veto proclamations to reconsider vetoes by the governor. The period for reconsidering vetoes would have begun at 10 a.m. on the day after the veto deadline and could not have exceeded five consecutive days. Unless the Legislature had been called into special session by the governor, it could not have considered any subject except vetoes of bills or appropriation line items that the governor had returned within three days before or any time after sine die adjournment of a session.

## Supporters said

HJR 59 would give the Legislature an opportunity to exercise its authority under the Constitution to reconsider legislation vetoed by the governor following sine die adjournment. The Texas Constitution requires the governor to sign or to forward a veto with objections to the house that originated the bill within 10 days while the Legislature is in session. For bills sent to the governor during the final 10 days, not counting Sundays, of a session or after sine die adjournment, the governor has 20 days after adjournment to veto a bill or a line item in the appropriations bill, leaving the Legislature with no opportunity to attempt to override the veto.

Texas is one of 17 states where only the governor may call a special session, while the remaining 33 states permit either the governor or legislature to call a special or extraordinary session, which may include review of vetoed items. As such, the governor can kill measures approved by both chambers secure in the knowledge that the Legislature is powerless to challenge a veto decision. Providing the option to override a governor's veto would enhance the authority to enact laws by the people's representatives, where it belongs, and reinforce constitutional checks and balances. It makes little sense for the Legislature to have the authority to override vetoes if it rarely has the opportunity to exercise that authority.

Rather than addressing specific debates between the governor and the Legislature, the proposed constitutional amendment would deal with general issues of accountability

and balance of power. Under the bill, existing constitutional requirements would remain unchanged, and overriding a veto still would be extremely difficult. The governor would retain the power to veto legislation, and the vote necessary to override the veto would remain a two-thirds majority in both chambers. The call for the session would be limited to overriding vetoes, unless the governor also had called a special session.

The Legislature often must consider complex legislation for which it may be difficult to reach agreement until the very end of the session. No matter the length of a session, some legislation always will be passed within the final 10 days before sine die adjournment. HJR 59 effectively would give lawmakers additional time to complete that challenging task. Just as legislators could reach compromises and build alliances to override vetoes, the governor would have the opportunity to reach agreement to prevent a veto from being overridden. Bills that survive the winnowing of the legislative process, only to be vetoed, should not have to wait until the next regular session to be considered. The same members who passed the original legislation should have the opportunity to address the veto.

## Opponents said

The governor of Texas constitutionally has limited authority, and the ability to veto legislation after sine die adjournment and call special sessions are among the few strong powers of the office. HJR 59 would weaken further the office of the governor. Quarrels between legislators and the governor can be resolved without amending the Constitution.

The Legislature could recapture its ability to respond to vetoes if it did not send an overwhelming majority of bills to the governor during the final 10 days of the session. During the 2007 regular session, the Legislature sent to the governor 1,226 of the 1,481 bills passed, or 83 percent of the total, during the last 10 days, allowing the governor to wait until 20 days after the session adjourned to act on those bills. If the Legislature believes a bill may be vetoed, then it should enact the bill early in the session to allow an override vote to be taken.

## Other opponents said

HJR 59 would be too inflexible and would require the Legislature to convene for up to five days whether or not there was a need or desire to do so. The amendment would include no mechanism to determine whether there was a necessary majority to override a veto. For example, Gov. Perry vetoed two bills during the 2007 regular session before the final 10 days, and the Legislature made no effort to override either veto when it had the chance.

## Notes

The **HRO analysis** of HJR 59 appeared in the March 21 *Daily Floor Report*.

# Emergency management, mutual aid system, wiretaps, vehicle tags, Border Security Council

**SB 11 by Carona**
*Generally effective September 1, 2007*

**SB 11** changes the structure of the state's emergency management system, exempts certain discussions about school security audits from open meetings requirements, expands wiretap authority, allows the use of toll road technologies for criminal investigations, creates a Border Security Council to advise the governor on the distribution of border security funds, and creates a state database for temporary vehicle tags, among other provisions.

*Emergency management.* SB 11 designates certain local officials as emergency management directors to serve as the governor's designated agents for duties under the Texas Disaster Act. The bill requires public officers whose duties involve emergency management responsibilities to complete a training course developed by the governor's division of emergency management

SB 11 divides the state into disaster districts for homeland security preparedness and response activities. The districts follow the boundaries of state planning regions under Local Government Code provisions dealing with regional planning commissions.

*Mutual aid systems.* SB 11 establishes the Texas Statewide Mutual Aid System to provide for statewide mutual aid responses between local governments that do not have written mutual aid agreements. A request for mutual aid assistance between local governmental entities is considered to be made under the system in SB 11 unless the entities requesting aid and responding have a written mutual aid agreement.

*School security audits.* SB 11 exempts school boards and charter schools from open meetings requirements when deliberating about a district security audit. The bill requires school districts to report the results of the security audit to the Texas School Safety Center and allows institutions of higher education to use any appropriate model for a multi-hazard emergency operations plan developed by the center.

*Wiretap authority.* SB 11 expands the current authority to use wiretaps from investigations of capital murder, child pornography, and certain drug crimes to include investigations of kidnapping, aggravated kidnapping, trafficking of persons, and money laundering if the money laundering involved an offense against a person.

*Toll road technology and emergency vehicles.* SB 11 repeals the current prohibition against evidence from automated toll road enforcement technologies, such as photographs, being used in the prosecution of any offenses except for capital murder and certain offenses relating to paying tolls. The bill also prohibits toll project entities from requiring tolls from certain emergency vehicles used by a nonprofit disaster relief organization exclusively for emergencies and allows certain vehicles to be authorized to operate as emergency vehicles during a disaster.

*Border Security Council.* SB 11 creates the Border Security Council to advise the governor about the allocation of border security funds and to develop and recommend to the governor performance standards, reporting requirements, audit methods, and other procedures to ensure funds allocated by the governor for border security are used properly and that fund recipients are held accountable for the funds. The council is composed of members appointed by the governor, at least one-third of whom must be residents of the Texas-Mexico border region.

*Temporary vehicle tag database.* SB 11 establishes a system for generating and tracking temporary cardboard tags placed on new vehicles. The Texas Department of Transportation is required to develop and maintain a secure, real-time database of information on vehicles on which dealers and converters had affixed temporary cardboard tags and with information on persons to whom temporary tags were issued. The database must allow law enforcement agencies to use vehicle-specific numbers to obtain information about the dealer or buyer of a car. Dealers will charge $5 for each temporary cardboard buyer's tag, and the money will be deposited in the state highway fund. The bill also creates criminal penalties for illegal actions involving the tags.

*Public Safety Commission.* SB 11 increases the size of the Public Safety Commission, which oversees the Department of Public Safety (DPS), from three to five members and requires that all members reflect the diverse geographic regions and population groups of Texas.

*Immunization records of first responders and disease management.* SB 11 establishes a state registry of information about persons who receive immunization or

other medications to prepare for a potential disaster, attack, military action, or other emergency.

SB 11 revises the powers of a regional health authority and the Department of State Health Services in attempting to limit the spread of a contagious disease. If they believe that five or more people had been exposed or infected with a communicable disease, they can order those exposed to take control measures to prevent the spread of the disease. The bill establishes procedures for the isolation and quarantine of a group of five or more individuals by court order.

*Enhanced driver's licenses.* SB 11 authorizes DPS to issue an enhanced driver's license or identification card for crossing the Texas-Mexico border. These may be issued only to applicants who prove their U.S. citizenship, identity, and Texas residency. DPS must implement a biometric matching system for the enhanced license.

*Human trafficking.* SB 11 expands the kinds of activities that may be considered part of the criminal offense of human trafficking, requires certain hotels and other public lodgings that have tolerated human trafficking and are part of a common nuisance civil suit to post a toll-free number concerning human trafficking, and directs the attorney general and the Health and Human Services Commission to conduct studies on human trafficking.

## Supporters said

SB 11 is necessary to improve the state's disaster and emergency readiness and to give law enforcement necessary tools to ensure homeland security.

*Emergency management.* SB 11 would codify parts of the state's emergency management structure and response currently found in executive orders. Placing this information in statute would help ensure consistency and make it easier to find the guidelines.

*Mutual aid agreements.* SB 11 would establish a single statewide mutual aid system to cover situations in which a local entity needed aid but had not already entered into an agreement. Outlining a default system in statute would allow aid to flow more quickly and efficiently, streamline the delivery of aid in an emergency, and cut red tape. Allowing local entities to enter into any type of agreement they wanted, with the model agreement in the bill available as a back-up, would allow these agreements to be tailored to specific local needs.

*School security audits.* SB 11 would protect school districts from having to reveal security information that should be kept private, such as a planned meeting point for children in a terrorist attack, by exempting school boards from open meetings requirements when discussing these plans. School board members, who are elected to represent the public, would have access to this information, but it would not have to be revealed in a public meeting. Allowing public access to information in security audits could give terrorists or others with bad intentions information that they could exploit and could compromise the ability of the school to keep students safe.

*Wiretap authority.* SB 11 would expand the wiretap statutes to address kidnapping, trafficking in persons, and money laundering, all crimes that have an impact on homeland security. The state should allow wiretaps in these cases because these are serious crimes for which law enforcement may need to gather information and act quickly. It would be appropriate to include money laundering in the wiretap authority because this offense has a clear connection to homeland security and often involves narcotics, something for which wiretaps already are authorized.

*Toll road technology and use by certain vehicles.* Repealing restrictions dealing with toll road enforcement technology would give law enforcement another tool that would be used only in limited, but important circumstances, such as a kidnapping or terrorism case. Concerns about this provision leading to harassment and false arrest are unrealistic. SB 11 would allow evidence of toll road violations to be used in any criminal prosecution just as a parking ticket can be used in any criminal prosecution. There is no reason to continue to arbitrarily limit the type of evidence that may be used by prosecutors.

*Border Security Council*. By establishing the Border Security Council, SB 11 would create a structure to allow formal input into the allocation of border security funds and the evaluation of how they are spent. The bill would give the governor flexibility to appoint the members of the council so that it could include people possessing the necessary range of expertise. It makes sense that the governor, who has the responsibility for homeland security, should have the authority to appoint the council in the same way other state advisory boards are appointed. The council would be charged only with providing advice, not making any legally binding decisions, and its meetings and plans would be subject to the state's open meetings and public information laws so that there would be checks and balances on their activities.

**Temporary vehicle tag database.** SB 11 would create a temporary tag database with unique numbers to track sales of new vehicles, because currently law enforcement authorities cannot readily identify owners and drivers of vehicles with temporary tags. The current system raises concerns related to homeland security because the tags are counterfeited easily and can be used by criminals to move anonymously across the state roadways and to transfer stolen vehicles across the border.

## Opponents said

**Emergency management.** Placing in statute the language governing emergency management that currently is found in executive orders could reduce the state's flexibility to respond to emergencies. Under SB 11, any changes to these directives would have to wait until the law could be amended when the Legislature was in session, whereas now they can be changed through an executive order to meet the needs of a particular emergency.

**Mutual aid agreements.** SB 11 would add to the confusion concerning mutual aid agreements by establishing yet another kind of agreement to go with the three that already exist. It would be better to develop a single statewide mutual aid system.

**School security audits.** Texas needs to publicly vet its school security audits so that predictable errors can be identified and plans improved before a problem occurs. School security audits should be developed with maximum public input and accountability, and shielding them from open meetings requirements could be counterproductive.

**Wiretap authority.** The expansion of wiretap authority to money laundering would go too far. Current law limiting wiretap authority to murder, possession or promotion of child pornography, and drug crimes rightfully limits this tool to the most serious crimes in which immediate information can be crucial. While kidnapping and trafficking of persons may fit these circumstances, money laundering would not.

Even worse would be an expansion of the state's wiretap statutes, which some have proposed, to authorize roving wiretaps, which allow tapping of any phone used by a person, because this would go too far in allowing potential violations of Texans' privacy rights, especially for a person not under investigation. For example, if a person frequently used a phone at a neighbor's house or at a business, that phone could fall under the wiretap, which could violate the privacy of the neighbor or business.

**Toll road technology and use by certain vehicles.** By repealing the current restriction on using toll road photos for law enforcement purposes, SB 11 would go too far and could result in an unwarranted expansion of surveillance information. This could lead to misuse and misidentification, resulting in harassment and false arrest of innocent people who look similar to people suspected of crimes.

**Border Security Council.** SB 11 is not specific enough about the composition of the Border Security Council to ensure that it would have balanced, fair representation. The bill would authorize the governor to name the council without placing any requirements on the members, such as geographic and law enforcement agency diversity. Without this diversity, the council could continue sending homeland and border security funds to a small number of law enforcement entities. Numerous entities, such as municipal police departments, should be included in the decision making and receipt of funds.

## Other opponents said

**Wiretap authority.** SB 11 would not go far enough in revising the state's wiretap statutes. It also should authorize roving wiretaps in narrow circumstances. Roving wiretaps, which are tied to a person, not a particular instrument, are increasingly necessary because criminals have become more sophisticated in their knowledge of the law and are using cell phones for a short time – sometimes only one day – before discarding them. Tapping the person and not the instrument in limited circumstances would modernize the state wiretap statute to recognize this use of cell phone technology, which was not in existence when the original statute was enacted.

Roving wiretaps would continue to have to meet the numerous restrictions and regulations on wiretaps, including receiving authorization from a limited number of high-level judges who monitor the authority and having DPS operate the equipment. Requirements that wiretaps be minimized and turned off if conversations did not pertain to an investigation would apply.

## Notes

The **HRO analysis** of SB 11 originally appeared in the May 17 *Daily Floor Report*.

Several of the provisions in SB 11 appeared in other bills considered by the 80th Legislature. The provisions creating the Border Security Council were in HB 13 by Swinford, which died in the House.

# Reporting the value of gifts of cash or cash equivalent to public officials

**SB 129 by West**
*Effective September 1, 2007*

**SB 129** specifies that a gift of cash or cash equivalent such as a negotiable instrument or gift certificate reported on a personal financial statement disclosure filed with the Texas Ethics Commission (TEC) on or after January 1, 2008, must include in the description of the gift a statement of the gift's value.

## Supporters said

SB 129 would close a loophole in current law that allows a state official to receive cash or the equivalent without disclosing the amount of the gift. While a state officer annually must disclose any gift worth more than $250, including a description of the gift and the person who gave it, current law does not specifically require the description to include a value. In 1999, TEC issued Ethics Advisory Opinion No. 415, which held a state official need not report the specific value of a gift. The commission reaffirmed this position in 2006, stating that the description of a gift of cash or cash equivalent is not required to include its value because the term "description" is not defined in the relevant statutes. As a result, a person subject to personal financial disclosure requirements need only report a gift as a "check" or "money order" without having to disclose the face value, even if a check is for $100,000. By specifically requiring the description to include a statement of the gift's value, SB 129 would strengthen public trust in financial disclosure laws.

Current law requires that most financial activity on personal financial statements include a specific amount or range, or a dollar category. SB 129 would follow a recent recommendation for statutory change from TEC by including a statement of actual cash value for gifts reported in financial disclosure statements. This common sense requirement would set clear guidelines for state officers and generate more confidence in state government accountability and the state agency responsible for personal financial statements and their disclosure.

## Opponents said

SB 129 is not needed because Texas has had strict prohibitions involving gifts to public servants and elected officials and their employees in all three branches of government since 1973. Current law does not require officials to declare the value of gifts because the exceptions for gift-giving are so narrow, and TEC has issued an opinion upholding this principle as recently as 2006.

## Other opponents said

A better approach for the Legislature to enhance financial disclosure would be to clarify that TEC has the authority to interpret statutes that are consistent with its mission, including being able to define certain terms and adopt applicable rules.

## Notes

The **HRO analysis** of SB 129 appeared in Part One of the May 15 *Daily Floor Report*.

# Continuing the Office of State-Federal Relations

**SB 903 by Brimer**
*Died in conference committee*

**SB 903** would have continued the Office of State-Federal Relations (OSFR) until September 1, 2013. OSFR, the state's advocate with the federal government in Washington, D.C., seeks federal funding for the state, prioritizes the state's agenda at the federal level, and acts as a conduit between state and federal entities regarding Texas issues. An advisory committee of the governor, the lieutenant governor, and the speaker of the House annually reviews the state's federal priorities and strategies.

The bill would have required that any political subdivision or state agency report to the OSFR any contract it had entered or ended with a federal-level lobbyist within 30 days of a change of status. It would have added duties for the agency, including notifying certain state and congressional officials of important state and federal actions and conducting conference calls with the lieutenant governor and the speaker, or their representatives.

The House-passed version would have funded the agency through the Governor's Office, which would have provided human resources and administrative support for the OSFR. The agency could not have contracted with federal-level lobbyists. The advisory board would have been required to approve the hiring of any employees, except for the executive director, who would have been appointed by the governor, subject to the advice and consent of the Senate.

The Senate-passed version would have abolished the OSFR as an independent agency and transferred all its duties and functions to the Governor's Office. It also would have abolished the advisory committee, allowing the executive director to approve all employee hiring. The governor still would have appointed the executive director but would not have needed the advice and consent of the Senate to do so. The agency would have been permitted to contract with federal-level lobbyists, provided the governor had signed a contract that would have included performance measures, termination clauses, and oversight provisions. The OSFR would have been required to adopt written procedures for any contract with a federal-level lobbyist that provided for a competitive procurement process, a method to assign value to a bidder's ability and experience level in providing the needed services, and a way to assure that a consultant or a consultant's clients did not have interests that conflicted with those of the state.

## Supporters said

SB 903 appropriately would continue the OSFR, which the Sunset Advisory Commission found plays a vital role not only in securing federal dollars for Texas but also in serving as a resource to Texas legislators and federal officials in Washington. The bill would establish the agency as the central resource for all governmental lobbying efforts originating from Texas.

The OSFR still is a vital resource, especially on occasions when the state's congressional delegation may be unable to put aside differences for political reasons or parochial interests. It is essential the state have an advocate in Washington that reflects the view of the entire state, and Texas is not alone in this endeavor. Thirty-seven states have established a Washington office staffed by government employees, and two others use consultants to represent their interests at the federal level. The bill would make the OSFR a clearinghouse through which all state and local entities would report any federal lobbying contracts. This procedure would ensure the state and its federal legislators were on the same page with all government entities. It also would allow the OSFR to craft a consistent message from all levels of state and local government.

## Supporters of the House-passed version said

SB 903 would ensure the agency could not become entangled with partisan politics by administratively attaching it to the Governor's Office and adding new restrictions, such as a prohibition on contracts with federal-level lobbyists.

During the 2003 budget shortfall, the Legislature cut the OSFR's staff from 17 to seven, prompting the agency to subcontract some of its lobbying work, which will end up costing the state $1.2 million. In early 2006, two of those contracts made headlines when it was revealed that the state had hired two lobbyists with ties to former U.S. House Majority Leader Tom DeLay and convicted lobbyist Jack Abramoff. Critics were concerned about the potential partisanship of contracted state government workers, whose records showed they met mostly with Republican members of Congress.

The House-passed version of SB 903 would prevent this from happening again by prohibiting future contracts with lobbyists. The state has a wealth of resources in Washington, along with the sitting president and several high-ranking officials in the executive branch, that include the OSFR, other lobbyists working for state or local entities, and Texas' 34-member congressional delegation. The main role of these officials, especially those who work directly for the government, is to advocate for the needs of Texans. On any number of issues, from hurricane relief to the exemption of state sales taxes on federal returns, these government employees have put aside partisan politics to focus on the needs of Texas.

The bill would follow the spirit of the Sunset commission's recommendation to remove costly and inefficient administrative functions from the OSFR's domain, but it would depart from the letter of the recommendation to place the agency under the direction of the governor. In a state in which the executive branch is decentralized, the lieutenant governor and speaker of the House also should have a significant voice in determining federal priorities.

## Supporters of the Senate-passed version said

This version of SB 903 would recognize certain realities about the federal process and allow for the state to enter into contracts with lobbyists under strict requirements. The bill more closely would follow the recommendations of the Sunset commission, which carefully researched the agency and crafted solutions that would allow it to advocate more effectively for the state while reducing the potential risk of contracting with outside consultants. Placing the agency under the governor's direct authority would create a more efficient and responsive chain of command.

Of the 37 states with Washington offices, 13 hire additional consultants. Although the Sunset commission did not make a value judgment on whether the state should pursue this option, it did find the role of outside help to be beneficial for the states that used the assistance properly. Certain lobbyists have expertise and networks that are unmatched by OSFR employees. The OSFR attributes $1.1 billion in federal money for the state to the work of the outside lobbyists, whom it credits with successfully pressing for increases in federal highway money and authorization of maintenance dredging in the Matagorda Ship Channel. By subcontracting out the work, the Governor's Office estimates the state saved about 15 percent of the amount it would have paid to perform the same functions itself.

The Senate version would give the state the option of hiring lobbyists if doing so gave Texas an advantage in receiving more funding or achieving a specific policy goal. By setting clear guidelines for hiring and evaluation, and ensuring lobbyists had the ability to work with all members of Congress without conflicting interests, the bill would provide ample safeguards to prevent a repeat of recent controversies. Also, given recent staff cuts, the agency should have some leeway in hiring additional staff to handle a particularly taxing or overwhelming problem.

The Sunset commission found that Texas is the only state whose federal advocacy office is an independent agency. The Senate version of the bill would move the agency under the governor's authority, providing a clear chain of command that would allow the agency to act quickly in a fast-paced Washington environment. Maintaining the advisory committee of the governor, the lieutenant governor, and the speaker of the House would leave the OSFR with too many masters. If any of the three members were from different political parties, for example, the agency's ability to set clear priorities and serve as a central voice for Texas in Washington would be undermined.

## Opponents said

The state should not continue to spend money to lobby the federal government when that money could be used for more urgent local needs. Thirty-four elected officials represent the interests of Texas in Washington, and although they may take parochial views on certain issues, they have shown the ability to unite across party lines on issues of statewide significance. It is not the role of government to create an office of lobbyists or – even worse – to fund additional lobbyists to champion state interests in Washington. Using state tax dollars to chase federal tax dollars is an inherently wasteful process, especially when significant amounts of federal money are dedicated through guaranteed funding formulas.

## Notes

The **HRO analysis** of SB 903 appeared in Part One of the May 14 *Daily Floor Report*.

HB 3249 by Truitt extended OSFR's Sunset date by two years, to September 1, 2009. The governor signed the bill on June 15.

# Modifying provisions for statewide and local housing programs

**SB 1908 by Ellis**
*Effective September 1, 2007*

**SB 1908** amends provisions governing the allocation formula by the Texas Department of Housing and Community Affairs (TDHCA) for distributing housing tax credits, modifies criteria for evaluating tax credit applications, makes administrative revisions to agency operations, and creates statutory authorization for a first-time homebuyers program administered by TDHCA. The bill also establishes a statewide land bank program and revises an existing land bank program in Houston.

***Modifying the Regional Allocation Formula (RAF).***
SB 1908 requires TDHCA to allocate 15 percent of available housing tax credits for at-risk developments prior to distributing funding through the regional allocation formula (RAF). TDHCA also must allocate 20 percent or more of the housing tax credits in an application cycle to developments in rural areas. Of this allocation, at least $500,000 must be reserved for rural developments in each service region designated in the RAF. Any funds that remain following an initial allocation for rural developments will be available for allocation in urban areas in each service area.

The bill calls for TDHCA to allocate 5 percent of housing tax credits in each application cycle to developments that receive federal financial assistance through the Texas Rural Development Office. Tax credits allocated to these developments for rehabilitation must come from funds set aside for at-risk developments. Housing Trust Fund (HTF) revenue in an amount less than $3 million and funds designated primarily to serve disabled persons will be exempt from distribution through the RAF. The bill also recodifies requirements relating to regional allocation developed by TDHCA that account for the need for housing assistance and the availability of housing resources in urban or rural areas.

***Revising low-income tax credit allocation.*** SB 1908 amends provisions governing the points allocated for housing tax credit applications. Statutes providing for the administration of points on the basis of written statements from elected officials are modified to specify that such statements must come from the state representative or the senator representing the district containing the proposed development site. The bill repeals provisions requiring each written statement received to be equally weighted. An applicant will be awarded full points for demonstrating a good faith effort to obtain community participation in the event there is no neighborhood association corresponding

to the proposed development. The absence of an association must be verified by an officer of a municipality or county clerk, as applicable. Additional points may be awarded for an application located in a disaster area declared by the governor, and applicants are encouraged to provide free notary public service to the residents of proposed developments.

***Modifications to TDHCA.*** SB 1908 establishes the Texas First-Time Homebuyer Program to facilitate the origination of single-family mortgage loans for eligible first-time homebuyers and to provide loans for down payment and closing cost assistance. The bill allows the TDHCA board to adopt rules governing the administration of the program, the provision of loans to eligible applicants, and terms of contracts made with mortgage lenders. To be eligible for a mortgage loan through the program, an individual must qualify as a first-time homebuyer and meet income eligibility and other departmental requirements.

The bill makes other administrative and operational changes to TDHCA, including requiring transcripts of public meetings, exempting personal information from disclosure, allowing for the imposition of administrative penalties of up to $1,000, and providing for alternative dispute resolution procedures. The annual low-income housing report will be treated as an administrative rule, and TDHCA must follow standard statutory rulemaking procedures to adopt it as such.

***Modifying receivership programs.*** SB 1908 modifies provisions authorizing the receivership and rehabilitation of property. The bill strikes references restricting the scope of applicability of the receivership statute – which allows a municipality to bring action against a property in court and arrange for temporary custody to be granted to a nonprofit organization or developer – to residential property. Receivers may collect a receivership fee of 10 percent of total costs and expenses, which are added to the amount an owner has to pay to recover a property. Receivers are allowed to impose a lien on the property in the amount of the receivership fee and all unrecovered costs and expenses.

The bill eliminates procedural distinctions between properties whose owners had been notified and those with no identified owner. After providing sufficient public notice, receivers may petition for termination of their custody of the property, and a court may order the sale of a property if an owner fails to pay rehabilitation expenses and the

receivership fee within one year of the property being received. A receiver may bid on the property at a court-ordered sale and apply any existing liens as credit toward the purchase of the property.

***Expanding and revising land bank programs.*** SB 1908 creates the Urban Land Bank Program Act to allow a city to adopt a land bank program in which certain eligible property acquired through foreclosure proceedings for delinquent taxes may be resold by private sale for purposes of affordable housing development. The governing body of a municipality adopting such a program must establish or approve the land bank for the purposes of acquiring, holding, and transferring real property in accord with statutory provisions. A municipality adopting a land bank program must operate the program in accordance with a land bank plan to be adopted annually. A land bank plan must account for other existing municipal housing plans, including federal plans, and must list community housing development organizations eligible to participate in the program. A plan also must contain a list of parcels that could become eligible for sale to the land bank during the next year, the municipality's plan for affordable housing development on those parcels, and the account of revenue estimated to be available for the development of affordable housing. A land bank plan is subject to a public hearing. SB 1908 also revises existing statutory provisions regulating the Houston land bank program.

***Additional provisions.*** A person who is awarded state or federal funds through TDHCA to construct affordable, single family housing must ensure that each circuit breaker box is located no higher than 48 inches above the floor inside the building on the first floor. Any lease agreement signed with a tenant in a housing development that received tax credits through TDHCA must comply with applicable laws and state standards identified by departmental rules and establish an e-mail system for notifications associated with tax credit applications. SB 1908 also provides for a tax increment financing tool for the renovation of historic structures in a reinvestment zone designated by a municipality with fewer than 18,000 residents.

## Supporters said

SB 1908 would make important changes in the housing funding allocation process at the point when funds are reserved for low-income housing located in rural areas or in support of the development of housing for disabled persons. The bill would take positive measures to resolve shortcomings in the current application of the RAF that result in an insufficient availability of funds in some areas and an oversaturation in others.

The bill's set-aside provisions would resolve deficiencies and other problems that result from the allocation of rural funds based on the application of the RAF in each of TDHCA's 13 service areas. The bill would assure a $500,000 minimum for rural developments in each service area, which would provide a necessary baseline of funding while allowing for variations in the number and extent of development proposals by service area over time. The bill would recodify statutory standards to be used in the adoption of the RAF annually and highlight TDHCA's ability to modify the RAF to accommodate changing patterns of low-income housing development and need statewide.

SB 1908 would make necessary revisions to the receivership statute to increase its utility for municipalities and nonprofit housing rehabilitation organizations. Existing statutory provisions make receivership processes prohibitively difficult to exercise and discourage interest among nonprofit organizations. Current law requires a receiver to wait two or three years, depending on whether a property owner has been located, before petitioning to terminate the receivership and thereby authorizing a court-ordered sale of the property. This lengthy timeframe impairs a nonprofit's ability to apply tied-up capital to other projects and limits interest in participating in a receivership program. Decreasing the minimum receivership period to one year and allowing receivers to collect a 10 percent fee would make receivership a viable option for nonprofit housing rehabilitation organizations and other qualified individuals. Broadening the scope of receivership to include nonresidential properties would allow for rare but critical restorations of historical, commercial, and agricultural properties that have been abandoned or fallen into severe disrepair.

## Opponents said

SB 1908 would limit the effectiveness of TDHCA's RAF, which is designed to ensure an equitable distribution of resources for low-income housing around the state. Establishing a mandatory allocation for rural areas by statute would not allow the RAF to adjust for changing demands and market conditions annually. Tax credit allocations must respond to both a societal need for affordable housing and sufficient development activity to produce tax credit proposals. Setting aside a fixed percentage for rural proposals statewide could result in underserving metropolitan areas with significant needs for low-income housing. The RAF represents an objective, quantifiable instrument that can be modified incrementally and on the basis of public input. Any statutory provisions that limited the funds subject to the RAF could compromise the objectivity of the allocation process.

HB 2063 could have unintended consequences for the geographic distribution of low-income housing tax credits. By removing set-aside funding for at-risk development proposals from the RAF, the bill could make available roughly $6 million in fiscal 2008 for development proposals involving the rehabilitation of low-income housing. This may give such proposals an advantage in high-demand areas and leave a small remainder for other applicants around the state. There is much annual variation in low-income tax credit development proposals, and setting aside 15 percent of funding prior to allocation could jeopardize funding in underrepresented areas of the state. Legislation providing for an initial set-aside should include provisions to ensure the equitable distribution of funding.

## Notes

The **HRO digest** of SB 1908 appeared in Part One of the May 22 *Daily Floor Report*.

# Requiring legislative approval of certain claims against the state

**SB 2031 by Ogden**
*Effective June 15, 2007*

**SB 2031** provides a means for the Legislature to determine the extent to which the state waives its sovereign immunity with regard to a settlement of a claim or action against the state that requires an expenditure of state funds.

The attorney general or other attorney representing Texas may not enter into a settlement or a claim or action against the state without the consent or approval of the Legislature if the settlement:

- requires the state to pay total monetary damages in an amount greater than $25 million in a state fiscal biennium; or
- commits the state to a course of action that would in reasonable probability entail a continuing increased expenditure of state funds over subsequent state fiscal bienniums.

Such a settlement entered into without the prior consent or approval of the Legislature will be void unless it expressly is conditioned on obtaining subsequent approval through a resolution adopted by both houses of the Legislature. The resolution can grant permission to sue the state and limit the relief to which a claimant is entitled or provide additional conditions on the permission to sue. An appropriation of state funds to pay or comply with a settlement does not constitute consent to or approval of the settlement. A resolution consenting to or approving a settlement does not and cannot require the Legislature to appropriate a particular amount for a particular purpose.

By September 1 of each even-numbered year, the attorney general must send to the lieutenant governor, the speaker of the House, and each member of the Senate Finance Committee and the House Appropriations Committee a report describing each pending claim or action that has been or could be settled in a manner that would require prior consent or subsequent approval by the Legislature.

## Supporters said

SB 2031 would limit the types of settlements that the attorney general or another attorney representing the state could enter into without the approval of the Legislature. There is no current means of limiting the extent to which the state waives its sovereign immunity with regard to a settlement of a claim that requires a significant expenditure of state funds. Requiring the Legislature to consent would provide checks and balances on the authority of the attorney general to negotiate settlements paid out of state funds.

The bill also would prevent a situation in which the attorney general committed the state to a settlement for which the Legislature was unwilling to appropriate funds. The Legislature is the client in these situations, and as such, the attorney general should consult and negotiate with the Legislature before agreeing to a large settlement on its behalf. The Legislature must pay the bill, so its consent is crucial for the settlement actually being honored by the state. Having the Legislature's agreement before the settlement was finalized would avoid recent appropriations-related problems and makes the entire process more efficient.

## Opponents said

This bill would tie the hands of the attorney general or other attorneys representing the state. SB 2031 essentially would require a plaintiff to try his or her lawsuit in front of the Legislature when it was session. Meanwhile, during the interim, a settlement agreement would incur additional attorney's fees and interest due to the inability to obtain timely legislative consent. A better approach would be to require the Legislative Budget Board and the governor to consent to the attorney general's paying the settlement. This would avoid the complications with the timing of sessions and the difficulty of essentially trying cases in front of the Legislature.

## Notes

The **HRO analysis** of SB 2031 appeared in Part One of the May 22 *Daily Floor Report*.



Health & Human Services

| | | | |
|---|---|---|---|
| HB 9 | Crownover | Banning smoking in all workplaces and public places | 108 |
| * HB 14 | Keffer/ | | |
| * HJR 90 | Keffer | Cancer research funding | 110 |
| * HB 109 | Turner | Children's Health Insurance Program eligibility revisions | 112 |
| * HB 1098 | Bonnen | Preventing HPV vaccine from being required for admission to school | 114 |
| * HB 3575 | Rose | Monitoring and update of HHS eligibility systems | 116 |
| HB 3778 | Rose | Nursing home quality assurance fee | 118 |
| * SB 10 | Nelson | Revisions to the Medicaid program and access to health care | 120 |

# Banning smoking in all workplaces and public places

**HB 9 by Crownover**
*Died in the Senate*

**HB 9** would have prohibited a person from smoking:

- in a public place or place of employment;
- within 15 feet of an entrance, operable window, or ventilation system of a public place or place of employment;
- in the seating area of an outdoor arena, stadium, or amphitheater; or
- in bleachers or grandstands for spectators at sporting or other public events.

As passed by the House, the bill would not have applied to:

- a private residence, except when used as a child-care, adult day-care, or health care facility;
- a hotel or motel room rented to a guest and designated exclusively as a smoking room;
- a private or semiprivate room in a nursing home or long-term care facility occupied exclusively by consenting smokers;
- a fraternal or veterans organization;
- a private club not open to the general public;
- a bingo hall or a premises that conducted charitable bingo;
- property owned or leased by a church, synagogue, religious society, nonprofit veterans organization, or fraternal organization;
- a tobacco shop;
- a private club that was not established for the sole purpose of avoiding compliance with the bill and did not employ anyone, unless the club was being used for a public function;
- a bar, if the operator of the bar provided health benefits coverage for each of its employees; or
- privately owned property designated as exempt.

Under the bill, a person who owned real property could have designated the property as exempt by posting conspicuously on the property a statement that smoking was permitted.

The bill would have defined "public place" as an enclosed indoor area the public is invited or permitted to enter. Examples would have included a bar, restaurant, theater, bus, polling place, hospital, public restroom, hotel lobby, and shopping mall.

A person in control of a public place or place of employment would have had specific requirements, including posting a conspicuous "NO SMOKING" sign, removing all ashtrays, and making a reasonable effort to request that any person known to be smoking in a prohibited area extinguish the tobacco product.

An employer subject to the bill could have offered to employees a smoking cessation program. An employer that offered such a program would have been entitled to credit against the state franchise tax for the cost of the program. To qualify for the credit, the program would have had to offer assistance to an employee through at least two attempts to quit smoking and could have been offered directly by the employer or through a provider.

The Department of State Health Services (DSHS) or a public health official could have enforced the provisions of the bill and inspected a public place. Under HB 9, a person could have filed a complaint concerning a violation with DSHS or a political subdivision of the state. In addition to other provided remedies, the attorney general, or a district, county, or city attorney, could have brought an action for injunctive relief to enforce these requirements.

A violation of the bill, including smoking in a prohibited place or failure by a person with authority to create an environment to prevent smoking in public or at work, would have committed a misdemeanor punishable by a fine of no more than $100. If it were shown at trial that the defendant had a previous conviction for the same offense within one year, upon conviction the defendant would have been punished by a fine of $500 or less, and a third offense would have been punished by a maximum fine of $1,000.

HB 9 would have repealed Penal Code, sec. 48.01, which penalizes smoking in certain public places. It could not have been construed to permit smoking where it was restricted by other law. The bill would not have preempted or superseded a local ordinance, rule, or regulation adopted before September 1, 2007, by a political subdivision with a population of fewer than 50,000 people that prohibited or restricted smoking to a lesser degree. It would not have prohibited a political subdivision adopting a local ordinance, rule, or regulation after September 1, 2007, from prohibiting or restricting smoking to a greater degree than the bill.

The voters in a municipality could have voted, in the same manner as for a charter amendment, to allow its governing body to adopt a local ordinance that restricted or prohibited smoking to a lesser degree than the bill would have provided. The bill would have directed such an election be held on May 10, 2008.

## Supporters said

HB 9 would protect the health of employees by eliminating smoking in all indoor public and private workplaces, including restaurants and bars, unless the bar operator provided all employees health benefits. A recent statewide poll shows that 66 percent of Texans favor a statewide comprehensive law to eliminate smoking in all indoor workplaces and public facilities, including public buildings, offices, restaurants, and bars. HB 9 would ban smoking in all of those places as well as seating areas of outdoor arenas and stadiums and grandstands at sporting or other public events.

A June 2006 report issued by the U.S. Surgeon General states that there is no risk-free level of exposure to secondhand smoke and that the only way to protect the population from this health hazard is to eliminate exposure completely. According to the National Cancer Institute, secondhand smoke kills 53,000 non-smoking Americans each year and is the third leading cause of preventable death. HB 9 would protect employees and the public at large from the dangers posed by second-hand smoke. Seventeen states have enacted smoke-free laws, and 14 other states, including Texas, are considering such legislation.

## Opponents said

HB 9 would violate the rights of individuals and business property owners. Smoking tobacco is a choice made by millions of Americans, and this bill represents an assault on a legal product that has been part of Western culture for 500 years.

Small business owners, particularly restaurant and bar owners, in Texas cities that have adopted various smoking ordinances claim that their revenues have dropped as much as 30 percent due to smoking bans. This economic factor has affected not only owners but also employees, including waitresses and other restaurant and bar staff.

## Notes

The **HRO analysis** of HB 9 appeared in the May 4 *Daily Floor Report.*

# Cancer research funding

**HB 14 by Keffer/HJR 90 by Keffer**
*Effective pending voter approval on November 6, 2007*

**HB 14**, which would take effect if voters approve the constitutional amendment proposed by HJR 90, would dissolve the Texas Cancer Council and transfer all rights, duties, and obligations of the council to a new Cancer Prevention and Research Institute of Texas. The purpose of the institute would be to:

- create and expedite innovation in the area of cancer research enhancing the potential for a scientific breakthrough in the prevention of and cure for cancer;
- attract, create, or expand research capabilities of higher education institutions and other public or private entities that would promote a substantial increase in cancer research and in the creation of high-quality new jobs in Texas; and
- develop and implement the Texas Cancer Plan.

The institute could provide grants to public and private entities, medical research facilities, educational institutions, and collaborations to fund research into the causes, cures, and treatments for cancer. To receive a grant, the recipient would be required to have an amount of funds equal to at least one-half of the grant dedicated to the research for which the grant was received. Not more than 5 percent of total money awards could be used for facility construction and not more than 10 percent could be used for cancer prevention and control programs in any year.

The Cancer Prevention and Research Institute of Texas Oversight Committee would be the governing body of the institute. The Research and Prevention Programs Committee would perform grant application review and make recommendations to the oversight committee regarding the award of research, therapy, development, and clinical trial grants. Standards would be established requiring grant recipients to use Texas suppliers and historically underutilized businesses to the extent reasonably possible.

The Cancer Prevention and Research Institute would be funded by the issuance of up to $300 million in general obligation bonds per year beginning January 1, 2008. Proceeds of the bonds could be used for the purposes of the institute and to pay the cost of issuing the bonds. The state could collect appropriate royalties from projects undertaken with grant funds. The Cancer Prevention and Research general revenue-dedicated account could contain patent, royalty, and license fees received under contract. The institute could solicit and accept gifts and grants from any source.

The lung cancer advisory council would create a summary of the advantages, disadvantages, risks, and descriptions of all medically efficacious and viable alternatives for the treatment of lung cancer. The Department of State Health Services would make these summaries available to physicians for distribution to patients.

**HJR 90** would amend the Texas Constitution to establish the Cancer Prevention and Research Institute of Texas and enable the Texas Public Finance Authority to issue general obligation bonds on behalf of the Cancer Prevention and Research Institute in an amount not to exceed $3 billion, with no more than $300 million in bonds authorized to be issued in a year, for grants for cancer research and operation of the institute.

## Supporters said

HB 14 and HJR 90 would make Texas a global leader in cancer research and prevention. The Texas Cancer Council indicates that cancer is the number two killer of Texans, killing more than 35,000 Texans each year. Approximately 85,000 Texans are diagnosed with cancer annually. The estimated direct economic cost of cancer to Texas in 1998 was $4.9 billion and estimated indirect costs the same year were $9.1 billion.

Texas already has the infrastructure in place to support cancer research, but needs more funding and direction to encourage collaboration to better leverage its existing infrastructure. HB 14 and HJR 90 would accelerate landmark discoveries in cancer research and allow scientists and practitioners to translate these discoveries into practical tools and techniques to treat and prevent cancer.

Grants through the Cancer Prevention and Research Institute would infuse the cancer research and treatment community with up to $300 million each year. Total research spending would far exceed this level, because grant recipients would be required to dedicate funding equal to at least half the grant reward. This contribution also would

legitimize the research since grant recipients would share the risk of the undertaking. The total investment from both the state and grant recipients not only would enhance cancer research, but also would attract private businesses to emerging Texas technology clusters. This would create more jobs in Texas as companies capitalized on local intellectual resources.

Recommendations for the awarding of grants would be directed by the professional expertise of the oversight and research and prevention committees. The oversight committee would create standards that would balance Texas' economic interest in contracting for intellectual property rights and royalties with the need to provide incentives to grantees to conduct worthwhile research. Bond proceeds would be subject to the appropriations process so that the Legislature could maintain its role as the steward of this large sum of taxpayer dollars.

HB 14 and HJR 90 would not require that bonds be utilized, but this legislation would provide the option to issue bonds to pay for the Institute in years during which the Legislature found it most prudent to do so. If the general obligations bonds were utilized, the debt service on the bonds for the Cancer Prevention and Research Institute would be a small price to pay for the ground-breaking advances in cancer research that could occur. Much of the financing cost also would be offset by new jobs generated in Texas, incoming royalties, and the decreased direct and indirect costs of cancer that resulted from the discovery of breakthrough medical advances.

HB 14 and HJR 90 would lead to such breakthroughs not because the state government singularly was performing cancer research but rather because Texas would provide a sustained source of funding fostering a collaborative environment for both public and private entities to advance the field. Given that the availability of federal cancer funding is declining, making Texas the epicenter of a collaborative cancer research environment would optimize the use of cancer research funds to make unprecedented advances in cancer research. This focused investment has greater potential to facilitate advances than an environment in which diverse bodies vie for independent funding.

## Opponents said

While cancer research doubtless is a worthwhile undertaking, medical research should be left in the hands of private organizations. Creative research is neither the

role nor the talent of government. There are countless other pressing needs in this state that represent more appropriate uses of state general revenue and pose less of a gamble with taxpayer dollars, such as insuring Texas children and reducing the waitlist for community services for the disabled. Expenditures in these and other areas will have a more predictable and measurable influence on the welfare of Texans.

## Other opponents said

The state should demonstrate that cancer research is a priority by funding the Institute with general revenue in the state budget process rather than by issuing bonds. Long-term financing costs could approach $1.6 billion. Legislatures over the next 30 years could be obligated to repay financing costs in lieu of funding other state priorities such as education, transportation, or health and human services issues. If general revenue was used instead, the state would pay fully its commitment to cancer research in only ten years. In addition, royalties and other funding generated by the Institute could assist in paying for the research on a cash basis. While the constitutional authorization would not require that bonds be issued to finance cancer research, the state has demonstrated over the years that if the opportunity exists to issue bonds to finance a project rather than use general revenue, bonds most likely will be issued.

The amendment would assure a stronger impact on cancer research if bond proceeds could be used by the Institute without appropriation. The amendment already would establish the permissible use of Institute funds. Having the Legislature micromanage cancer research funding allocations would not be beneficial and could risk that legislators may attempt to influence appropriations for the Institute to fund their pet projects.

## Notes

The **HRO analysis** of HB 14 appeared in Part Five of the May 7 *Daily Floor Report*, and the analysis of HJR 90 appeared in the May 9 *Daily Floor Report*.

# Children's Health Insurance Program eligibility revisions

**HB 109 by Turner**
*Effective June 15, 2007*

**HB 109** establishes Children's Health Insurance Program (CHIP) income eligibility levels using net family income rather than gross family income. The definition of net family income allows a reduction for child-care expenses for determining income eligibility.

The period that a child remains eligible for CHIP benefits increases from six months to a period not to exceed 12 months. By September 1, 2008, the eligibility for children in families whose initial eligibility was established with a net family income in excess of 185 percent of the federal poverty level still will be verified at six months. An electronic verification method may be used if one is available and appropriate. If the net family income exceeds eligibility limits at the six-month verification, the child can be disenrolled from CHIP after the Health and Human Services Commission (HHSC) provides the family with proper notice and the opportunity to establish eligibility.

HB 109 limits the 90-day waiting period that previously applied to all children to only those children who had health insurance during the 90 days prior to applying for CHIP coverage. The family allowable asset limit for CHIP eligibility increases from $5,000 to $10,000. The value of vehicles that may be exempted from the asset calculation increases as well.

HHSC will contract with community-based organizations to conduct community outreach promoting knowledge of and enrollment in child health programs. The outreach campaign will include school-based clinics and a toll-free number. Outreach materials must be written in Spanish and English.

## Supporters said

HB 109 would restore many of the eligibility standards that were in place when CHIP began in Texas in 1999, making health coverage available to more of Texas' uninsured children. It would reverse some of the negative impact of CHIP policy changes enacted in 2003, which resulted in an enrollment decline of an estimated 152,000 children, according to HHSC. Lack of insurance leaves families no choice but to seek care at local emergency rooms, which is more costly and provided at taxpayer expense. Uninsured children often go without vital preventive care.

*Period of eligibility.* Extending the CHIP eligibility period from six to 12 months would ensure that children in need received continuous health care coverage. The state has experienced poor performance from the CHIP eligibility system, and processing errors at re-enrollment have led to eligible children being disenrolled. Increasing eligibility to 12 months would decrease the CHIP application-processing workload by half, eventually leading to decreased error rates.

It is more cost effective to serve a child on CHIP than on Children's Medicaid because the federal match rate is more favorable for CHIP. Verifying eligibility at six months causes the state to move those identified as qualifying for Children's Medicaid more quickly to that program than if eligibility were determined at 12 months. In addition, administrative costs are higher when verifying eligibility twice a year. Finally, the majority of children who leave CHIP become uninsured, which ultimately increases the population of children with poorer health outcomes and greater needs for emergency care. HB 109 appropriately would limit initial six-month eligibility verification only to those at the higher end of the income eligibility range.

*Assets test.* HB 109 would align the asset limits on the assets test for determining CHIP eligibility with values that are more reasonable for a fiscally responsible family at 150 percent to 200 percent of the federal poverty level. The current assets test limits were based on the food stamp standards created for populations at 100 percent or less of the poverty level. A higher-income family making prudent decisions to have a financial safety net or maintain reliable vehicles can risk losing CHIP coverage due to the low assets test limits.

*Income calculation.* HB 109 appropriately would add an income disregard for child-care expenses similar to one that already exists in the Medicaid program. Child care is a large expense that effectively can reduce a family's disposable income to the income levels of other families who qualify for CHIP. In 2007, a family of four at 200 percent of the federal poverty level has an income of $41,300, which is insufficient to support the cost of private insurance. Many families do not qualify for CHIP because they have incomes slightly above this level yet need child care in order to hold jobs and support their families.

*Ninety-day wait period.* HB 109 would give families much needed health care coverage during the first 90 days following the establishment of eligibility. The original policy was intended to avoid "crowd out" of private health care benefits to prevent people from opting to use CHIP rather than private or employer health insurance. The 2003 change made Texas the only state that has required all children to wait 90 days for coverage. This wait period prevents coverage for children who have never been insured as well as for newborns in need of infant care.

## Opponents said

The CHIP reforms implemented in 2003 were sound public policy. While Texas has yet to use fully its federal CHIP funding, caseloads will continue to increase under the current eligibility requirements and eventually reach the funding ceiling. The time will come when CHIP funding is limited, and it would be prudent now to retain policies ensuring that CHIP benefits are used only as a safety net for those most in need.

*Period of eligibility.* The eligibility period should not be extended to 12 months. Maintaining the six-month eligibility period would provide the best stewardship of state funds because a family's financial circumstances can change drastically over the course of a year. The state is working to resolve CHIP application-processing issues, and timeliness rates for application processing have improved. The state should not determine the eligibility period based upon the assumption that processing errors will continue to occur. Recertifying eligibility at six months would ensure the state's limited resources were used only for those truly eligible for benefits.

*Assets test.* As a safety-net program, CHIP should not be open for abuse by families trying to protect their assets while relying on the government for assistance with health care. In addition, a family that experiences a short-term loss of income should not receive CHIP funds if they have large amounts of assets that could pay for necessary health-care costs. These sorts of situations unfairly burden all taxpayers, including people receiving CHIP benefits. The family allowable asset limit should not be increased to permit such abuse. In addition, there are a variety of programs that promote savings and are exempted from the assets test, including certain retirement accounts, prepaid burial funds, and certain savings funds for higher education.

*Income calculation.* In 2007, a family of four making $41,300 annually would be eligible for CHIP. A variety of private health-care options would be affordable for a family above this income level if a consumer were willing to do the research for a plan best-suited to that family's needs. The continuation of the use of gross family income would be the fairest means of determining eligibility.

*Ninety-day wait period.* The current 90-day wait for all CHIP applicants to receive benefits should be maintained to avoid "crowd out" of other available insurance. The 90-day wait period provides a family an opportunity to obtain a reasonable private insurance option. In addition, many public and private sector employers also have 30- to 90-day wait periods for health insurance coverage. If CHIP eliminated the 90-day wait, such individuals might opt to obtain CHIP to receive immediate benefits rather than wait for their employer insurance to take effect. The 90-day waiting period discourages people with other available coverage from taking public slots.

## Other opponents said

*Assets test.* More children in need of health care could be served through the elimination of the assets test. Texas and Oregon are the only states that have implemented assets tests. While it does prevent some abuse, the assets test, regardless of how high limits are set, causes children in need to lose CHIP coverage. The mere threat of losing coverage is a disincentive for families to make the responsible decision to save. A child should not lose CHIP benefits because his or her family was saving for college or for a better home.

*Income calculation.* All income disregards in alignment with those allowable in Medicaid should be restored. This would allow families to deduct child support payments and work-related expenses up to $120 per month in the income calculation. These are reasonable deductions, without which a family's disposable income could appear inflated.

## Notes

The **HRO analysis** of HB 109 appeared in the April 3 *Daily Floor Report.*

# Preventing HPV vaccine from being required for admission to school

**HB 1098 by Bonnen**
*Effective May 8, 2007*

**HB 1098** establishes that immunization against human papilloma virus is not required as a condition for admission to any elementary or secondary school. It preempts any contrary executive order issued by the governor and prevents the executive commissioner of the Health and Human Services Commission (HHSC) from adding HPV vaccination to the list of vaccinations required for school admission. The bill also requires HHSC to provide educational materials about the HPV vaccine to schools to distribute to parents or guardians during the immunization schedule. These provisions expire January 11, 2011.

## Supporters said

HB 1098 is necessary to address an executive order from the governor that prematurely mandated that young girls receive an HPV vaccine. On February 2, 2007, Gov. Perry issued Executive Order No. RP-65, which ordered the health and human services executive commissioner to mandate vaccination against human papilloma virus (HPV) for all female children before their admission to the sixth grade. However, too many questions remain about this vaccine for its use to be made mandatory for young girls. The vaccine has been tested for only five years. It typically takes 10-15 years for HPV to develop into cervical cancer, so five years is not long enough to determine whether the vaccine will be effective. Also, there still are unanswered questions about whether this vaccine would provide lifelong immunity, what side effects the vaccine might produce, and the effect of the vaccine on pregnant women. Until those questions have been answered, it would be appropriate for the Legislature to exercise its judgment and decide not to mandate the vaccine.

Mandating HPV vaccination is unnecessary because other measures would be as effective in preventing cervical cancer – such as education and early diagnosis, along with voluntary immunization as the vaccine is proven. While most women will be exposed to HPV, most HPV infections are spontaneously cleared from a woman's immune system. The rates of cervical cancer have decreased over the last 50 years, in part because of the increasing use of pap smears to diagnose pre-cancerous cells and improvements in medical technology. The focus should continue to be on education and prevention with regular pap smears, rather than on mandatory vaccination with a yet-to-be-proven vaccine.

The Legislature in 2005 promoted these goals by enacting HB 1485 by Delisi, establishing the Texas Cervical Cancer Strategic Plan to diagnose and prevent HPV infection and eliminate mortality from cervical cancer by 2015, and HB 1485 by Thompson, requiring health benefit plans to cover screening tests to detect HPV infection and cervical cancer.

Mandatory immunization against HPV would be inappropriate because mandatory vaccination typically is used for diseases spread by casual contact, not for sexually transmitted diseases. While hepatitis is spread both sexually and more casually, the vaccine against that disease was not mandated in Texas until 15 years after it was licensed.

HB 1098 would not prohibit anyone from receiving vaccination against HPV voluntarily. It simply would block mandatory HPV vaccination for all young girls as a prerequisite for attending school.

The bill would protect the right of parents to control the upbringing of their children. Executive order RP-65 would have undermined parents' control of their children's health care. HB 1098 would allow parents to educate themselves and their children about HPV and the vaccine at their discretion and to make private decisions about whether to vaccinate their children.

## Opponents said

HB 1098 would undermine efforts to provide effective health care to Texas women for a preventable cancer. The currently available HPV vaccine, Gardasil, is effective on the strains of HPV that cause 70 percent of cervical cancers. Although most HPV infections are spontaneously cleared from a woman's immune system, the infections that do not spontaneously clear could be the strains of HPV that cause cervical cancer. Pap smears can be misinterpreted by physicians, and they have a false negative rate that may be as high as 30 percent. Although the HPV vaccine is new, it has undergone rigorous testing with peer review from the federal Food and Drug Administration. Even if the immunity is not for a lifetime, the need for booster shots to update immunity to the virus would be much like what is required for some other vaccinations. There is no evidence that the vaccine has a negative effect on pregnancy or future fertility.

If the vaccine is not required, girls from low-income families or whose families are unaware of the vaccine could be less likely to be vaccinated. In Texas, cervical cancer rates are highest among Hispanic women, and mortality rates are highest among African-American women and in rural counties, according to a report from the Department of State Health Services.

In addition, the executive order provides for parents to opt out of the HPV vaccine requirement. The opt-out provision would be no more onerous than existing opt-out provisions for other vaccines and would allow parents or guardians to file the forms over the Internet.

Mandatory vaccination has been used in the past for diseases that can be spread sexually. For example, Hepatitis A vaccination and Hepatitis B vaccination are mandatory. Hepatitis B can be transmitted through blood or infected bodily fluids. Mandating vaccination is one of the best ways to control disease. Incomplete vaccination of a person or population can cause vaccine- and drug-resistant strains of viruses to develop.

HB 1098 would foreclose the option of further discussion on the merits of mandating the HPV vaccine. Rather than just preempting Gov. Perry's executive order and the agency rulemaking process, the bill would, unlike for any other disease, prohibit state health officials from mandating HPV vaccination, regardless of the demonstrable health benefits, until 2011. Whether mandated by executive order or legislative directive, the HPV vaccination would save thousands of lives, and state officials should be allowed to require it like other vaccinations against infectious disease.

HB 1098 also would impose upon HHSC an unfunded mandate by requiring it to disseminate educational information but not providing additional funding to accomplish this goal. HHSC's budget already is stretched by other priorities and does not have available resources to produce brochures and documents effectively. Also, educational materials are most effective at outreach when they are targeted to specific groups along with clear mechanisms for informing the public. Brochures simply distributed to parents on a complex medical issue would not be effective in educating parents. The materials would be more effective if coupled with a mechanism to direct questions to medical professionals.

## Other opponents said

This bill would not go far enough to prevent government intrusion into the health care decisions of its citizens. Government should not be able to mandate vaccinations. Through education efforts, most parents would choose to have their children vaccinated when the vaccine has been proven safe and effective, but they should be able to weigh the risks and make that choice themselves.

## Notes

The **HRO analysis** of HB 1098 appeared in the March 13 *Daily Floor Report*.

HB 1379 by Deshotel, which requires development of educational materials and programs on HPV, is effective on September 1, 2007.

# Monitoring and update of health and human services eligibility systems

**HB 3575 by Rose**
*Effective June 15, 2007*

**HB 3575** prescribes goals for the enhanced health and human services eligibility system, a system that consists of the Texas Integrated Eligibility Redesign System (TIERS); the System of Application, Verification, Eligibility, Referral, and Reporting (SAVERR); and integration and delivery processes and practices used for health and human services benefit programs. Goals for the enhanced eligibility system include:

- increasing the quality of and client access to services provided through the programs;
- implementing more efficient business processes to reduce application processing times and staff workloads;
- implementing simplified application and enrollment processes;
- enhancing the integrity of and reducing fraud in benefit programs; and
- ensuring compliance with applicable federal law and rules.

HB 3575 requires the Health and Human Services Commission (HHSC) to develop a transition plan to meet the goals of the enhanced eligibility system by January 1, 2009. The State Auditor's Office (SAO) will establish or contract for an independent validation and verification (IVV) program for the eligibility system during the development of the transition plan. The IVV program will allow for the determination of whether the goals for the transition plan and enhanced eligibility systems are being met, what actions are necessary to achieve these goals, and whether the eligibility system is progressing toward becoming fully functional relative to the needs of benefit-eligible Texans.

HB 3575 establishes an HHSC eligibility system legislative oversight committee to support the commission's implementation of the enhanced eligibility system. The committee consists of seven members, including the chairs of the Senate Health and Human Services and House Human Services committees, two members of the Senate appointed by the lieutenant governor, two members of the House appointed by the speaker, and one member appointed by the governor. The committee will review information and recommendations from the public, HHSC, SAO, and the Department of Information Resources quality assurance team to make recommendations to the Legislature. The

oversight committee also will monitor and regularly report to the Legislature on the effectiveness and efficiency of the implemented enhanced eligibility system.

Each contract with the commission or a health and human services agency that requires providing call center services or written communications related to call center services must include performance standards that measure the effectiveness, promptness, and accuracy of the contractor's oral and written communications with people of limited English proficiency.

## Supporters said

HB 3575 would provide the planning and oversight necessary to ensure that performance problems in the state eligibility system were resolved without further harm to Texas benefit recipients. During the Accenture TIERS development contract, a variety of issues arose, including the contractor's failing to deliver certain technology capabilities, which led to a processing backlog of applications and renewals. These delays affected the issuance of benefits to eligible Texans and caused Texas to fall below federal timeliness standards. In addition, many eligible people mistakenly were denied benefits. The integrated eligibility system had only internal testing and quality control processes.

HB 3575 would institute three major mechanisms of enhanced quality control and oversight. HHSC would identify the enhanced eligibility system as a major information resources project in HHSC's biennial operating plan to qualify the project for review by the state quality assurance team. The legislative oversight committee would monitor the process and recommend further statutory change before the next session. Finally, the project would be reviewed by an IVV program, which would ensure an independent verifications process. This would add general state, legislative, and independent oversight to the enhanced eligibility system.

The bill would not address outsourcing requirements because in focusing on general oversight functions, many levels of authority would have oversight concerning whether HHSC contracted for the appropriate balance of state and outsourced responsibilities. The bill does not need to address

staffing issues because the fiscal 2008-09 budget would authorize HHSC to augment HHSC staff in response to any decision to use fewer contractor staff.

## Opponents said

While HB 3575 would take many positive steps toward resolving issues with the Texas eligibility system, it would fall short of incorporating all the unanimous recommendations of the House Human Services Subcommittee on Integrated Eligibility and TIERS Implementation. For example, subcommittee recommendations that included performance measures of "full functionality" were not included in the bill.

The bill does not include subcommittee recommendations to establish clear limitations for outsourcing processes that involve decision making. While outsourcing is appropriate in creating technology, it should be limited to standardized, measurable tasks when an outsourced employee communicates with benefit recipients.

Problems with dividing responsibilities between state and outsourced staff were a main driver of many of the issues that emerged during the first TIERS pilot rollout.

Finally, HB 3575 would not address the need for a staffing analysis to ensure that staffing levels were appropriate to maintain program integrity. The bill should require a staffing analysis and should require HHSC to demonstrate that the commission still could reach performance measures with any proposed reduction in staff. These measures would be a safeguard against the staff shortage and subsequent scarcity of policy knowledge that occurred after HHSC informed too many state staff that they would lose their jobs following the signing of the Accenture contract.

## Notes

The **HRO analysis** of HB 3575 appeared in Part Two of the May 8 *Daily Floor Report*.

# Nursing home quality assurance fee

**HB 3778 by Rose**
**Died in Senate Committee**

**HB 3778** would have collected a quality assurance fee (QAF) from nursing homes, convalescent homes, and related institutions. Exemptions from imposition of the nursing facility QAF would have included:

- state-owned veterans' nursing facilities;
- entities that provided multiple services on a single campus and operated under a continuing care retirement community certificate of authority; and
- entities at which the combined patient days of service provided to independent and assisted living residents exceeded the patient days of service provided to nursing facility residents.

The Health and Human Services Commission (HHSC) would have assessed the QAF on a per patient, per day basis in an amount that would not have produced annual revenues equaling more than 5.5 percent of the facility's total annual gross receipts. A nursing facility could not have listed the QAF as a separate charge on a patient's billing statement or indirectly charged the QAF to a patient.

HHSC could have used the money from the dedicated general revenue QAF account together with federal matching funds to offset an institution's allowable Medicaid expenses and to increase reimbursement rates paid under Medicaid to institutions. If for any reason it was determined that QAF funds could not draw down federal matching dollars, HHSC immediately would have ceased collection of the QAF and would have returned any collected QAFs to the appropriate institutions.

## Supporters said

HB 3778 would allow Texas nursing facilities and other state health care providers to capitalize upon a QAF collected from nursing facilities similar to legislation enacted in at least 30 other states. Texas already has successfully implemented a QAF on intermediate care facilities for the mentally retarded, and the bill would confer the same benefits on nursing facilities and the health care industry at large.

The state would use the QAF to draw down matching federal funds, first apportioning funds back to nursing facilities and then providing these facilities and other Medicaid providers with rate increases. Provider rate increases desperately are needed to expand the number of providers taking new Medicaid patients before the state reaches a critical provider shortage. The QAF would provide an alternative funding source for rate increases that would not require the use of existing general revenue.

Assuming Texas received the appropriate federal waivers, HB 3778 would prohibit the collection of QAFs from continuing care retirement communities and other facilities that predominately provided services to independent and assisted living patients. This would minimize the number of facilities that would pay the QAF without being fully reimbursed for their contribution.

The imposition of QAFs is an all-or-nothing venture, because federal regulation governing permissible health care-related taxes would not allow a tax to be imposed only on Medicaid beds. While this federally imposed limitation inevitably would create some cost to private pay facilities, this fee would serve the greater good of the nursing home community and the Medicaid health care community at large. The bill would prohibit passing the QAF on to nursing facility residents, so no private payor would be adversely affected.

## Opponents said

Imposition of the nursing facility QAF proposed in HB 3778 would represent yet another example of the state's unwillingness to support important services through the use of existing general revenue. The QAF would place a monthly fee on all eligible nursing-home beds, with the exception of certain facilities exempted through federal waiver. This QAF assessment would include nursing homes that did not take Medicaid patients.

Forty-nine out of Texas' 1,100 nursing homes contain a significant number of private-pay beds, and 22 contain purely private-pay beds. These homes are not connected with any health care system that could benefit from QAF reimbursements. A QAF on these nursing homes would be a "granny tax" passed on by the nursing home to elderly, private payors. Even though facilities could not pass on the QAF to a private payor directly on a billing statement, the private facility's increased costs inevitably would cause a private payor's bills to increase. Such increases could be masked as cost increases related to other facility overhead.

## Notes

The **HRO analysis** of HB 3778 appeared in Part One of the May 7 *Daily Floor Report*.

# Revisions to the Medicaid program and access to health care

**SB 10 by Nelson**
*Effective September 1, 2007*

**SB 10** revises certain Medicaid programs and requires the initiation of Medicaid-related studies and pilot programs. An eight-member Medicaid Reform Legislative Oversight Committee will facilitate Medicaid reform efforts, the process of addressing uncompensated hospital care, and the establishment of programs addressing the uninsured.

*Access to health care.* The Health and Human Services Commission (HHSC) will promote access to federally qualified health centers or rural health clinics. In contracts with health maintenance organizations, HHSC will establish outcome-based performance measures and incentives designed to increase recipients' access to appropriate health services. HHSC directly will supervise and administer the medical transportation program providing non-emergency transportation services to those who are eligible for HHS programs and have no other means of transportation. Former foster care youth enrolled in an institution of higher education may receive Medicaid benefits up to the age of 23. Individuals preferring to enroll in a group health benefit plan may opt-out of Medicaid coverage, and HHSC will pay the individual's share of required premiums up to the estimated total Medicaid cost. The individual must pay all deductibles, co-payments, or other cost-sharing obligations.

With federal approval, Texas will create a health opportunity pool trust fund to offset hospital uncompensated care costs, reduce the number of persons in Texas who do not have health benefits, and maintain and enhance the community public health infrastructure provided by hospitals. The fund will contain federal money from supplemental hospital payment programs, state appropriated funds, gifts, grants, and donations.

One or a group of counties may establish regional or local health care programs to provide health care benefits to the employees of small businesses. In addition to contributions from the employers and employees, state or other funds collected by the program's governing body may be used to pay program costs.

*Client-centered revisions.* If cost-effective and feasible, HHSC will implement a health savings account pilot program to encourage health care cost awareness and promote appropriate utilization of Medicaid services among volunteer participants. The HHSC may seek a federal waiver to implement tailored benefit packages customized to meet the health care needs of recipients within defined categories of the Medicaid population. If cost-effective and feasible, certain Medicaid recipients may designate a primary care provider to provide the recipients' initial and primary care and initiate referrals to other health care providers. Exceptions will be made to limitations on benefits provided under certain home and community-based waiver programs if further benefits are necessary to protect patient health and safety. HHSC will undertake initiatives to encourage managed care organizations to provide more services to improve the health status of plan enrollees. The bill establishes a means of provider selection and access for Medicaid recipients to receive eligible eye health care services.

*Prevention.* HHSC will develop and implement a pilot program in one region under which Medicaid recipients receive incentives to lead healthy lifestyles. HHSC may provide guidance to Bexar County in establishing a pilot program to prevent the spread of infectious and communicable diseases, which may include an anonymous needle exchange program. Women eligible for Medicaid coverage to treat breast or cervical cancer will be eligible for coverage for screenings for these cancers.

*Technology.* HHSC will contract for an acute care Medicaid billing coordination system and implement fraud detection and deterrence measures proven effective by a study. HHSC may permit, facilitate, and implement the use of health information technology to allow for electronic communication among HHSC, operating agencies, and participating providers. A pilot program will provide health information technology for use by primary care physicians providing services to Medicaid recipients. HHSC may expand systems such as health passport technology.

*Hospital care.* The executive commissioner will establish a work group on uncompensated hospital care to assist in implementing an uncompensated hospital care reporting and analysis system and studying the impact of standardizing the definition of uncompensated care and the computation of its cost. HHSC may require a Medicaid recipient who chooses certain high-cost medical services provided through an emergency room to pay a share of the cost of the service if the recipient does not require the treatment. The hospital may provide the recipient with a referral to a non-emergency provider who can provide the service without co-payment.

***Demonstrations and studies.*** HHSC may implement a demonstration project to determine whether paying an enhanced Medicaid reimbursement rate to a physician-centered nursing facility specializing in geriatric medicine improves resident health and results in cost savings. Studies will be conducted on reducing reliance on Medicaid through offering tax and other incentives to employers to provide health and long-term care insurance; the cost-effectiveness of implementing an integrated Medicaid managed care model for the aged, blind, disabled, or chronically ill; providing child health passports to children receiving Medicaid or enrolled in the Children's Health Insurance Program (CHIP); increasing the availability of small employer health plans; and increasing the number of medical residency programs, medical residents, and physicians practicing medical specialties in Texas.

## Supporters said

SB 10 would optimize funding available for health coverage while maintaining consumer choice and protections. According to the U.S. Census Bureau, Texas had the highest rate of uninsured in 2005 at more than 24 percent. This high level of uninsureds not only leads to poor health outcomes for individuals, but also contributes to the high cost of uncompensated care in hospital emergency rooms.

The bill would allow for experimentation with different health care program models without undermining fundamental principles of the Medicaid program or putting vulnerable clients at risk. The bill would implement consumer protections for enrollees in experimental approaches to delivering health care services, including voluntary participation on the part of enrollees, consumer counseling, and the ability to return to more traditional means of service delivery if the consumer was not happy with a particular health care alternative.

SB 10 would implement measures to reduce overall state health care spending. By focusing on attaining preventive care and encouraging healthy behaviors, the overall demand for health care services would decrease. More individuals could access health care through increased availability of premium assistance funds and encouraging participation in employer-based health plans. Such initiatives also would reduce the burden on hospitals, which are the safety net used to defray the costs of uncompensated care. The bill would promote wise consumer decision-making in health care spending through health savings accounts and tailored benefit packages. SB 10 would modernize service provision through enhanced technologies that would

protect patient confidentiality, reduce fraud, and create a more efficient and cost-effective health care system. The legislative oversight committee would provide continuity and direction for the implementation of Medicaid revisions by making recommendations that programs with greater potential be revised and successful programs be expanded.

The local and regional health care programs permitted in SB 10 would allow for a significant reduction in the number of uninsured working for small businesses. Many small businesses and their employees cannot afford the high cost of health plans without assistance. This lack of subsidy is why small business health care cooperatives alone are not as effective as supplementing employer and employee contributions with public, private, or non-profit funds. Encouraging participation in such programs would reduce reliance on Medicaid and uncompensated care.

It would be appropriate that HHSC provide guidance to Bexar County in its disease management pilot program, including a needle exchange program. Studies have demonstrated that such programs do not increase drug use, yet they reduce the spread of diseases such as hepatitis and HIV/AIDS. Needle exchange programs also provide an access point for health care professionals to connect drug abusers with treatment programs. Texas is the only state that has yet to support a needle exchange program.

## Opponents said

The bill would implement many different types of reforms at once on both a state and local level without a template for how these various options should fit together. This could lead to different levels of funding, eligibility standards, and levels of benefits being provided in different areas of the state. Such variance in levels of coverage could lead to inequities in poorer areas of the state. These disparities would be counter to the objectives of the Medicaid program, and Texas should implement the reforms in a more coordinated fashion.

The local and regional health care programs that SB 10 would permit could allow too much of the financial burden of these programs to fall on state government if individuals and employers refused to proportionally increase their level of program contribution to align with the rising cost of health care. The state should allow more time to demonstrate if small business health care cooperatives enabled by 2003 legislation provide a viable option to promote affordable, group-rate health care before the state permits multi-share programs that discourage self-reliance among small businesses and their employees.

The bill should not permit HHSC to assist Bexar County in the creation of a needle exchange program. In effect, such programs condone and facilitate drug abuse. Any funds directed towards the drug addicted should focus on treatment and encouraging abstinence from illegal drug use.

The language in the bill should be tightened to ensure that any reforms implemented would protect state funds. For example, the bill would direct HHSC to implement any methods determined effective to strengthen fraud detection and deterrence. This provision should require that HHSC first determine that projected savings from Medicaid fraud detection would be greater than the cost to implement the technology.

## Notes

The **HRO analysis** of SB 10 appeared in Part One of the May 21 *Daily Floor Report*.



# Higher Education

| HB 159 | Zedler | Determination of resident status of students by public universities | 124 |
| * HB 3826 | Morrison | High school curriculum requirements for higher education admission | 126 |
| HB 3828 | Morrison | Performance incentive funding for higher education institutions | 127 |
| * HB 3900 | Morrison | Establishing the Texas Tomorrow Fund II prepaid tuition program | 128 |
| SB 85 | Hinojosa/ | Limiting increases in tuition and required fees at higher education | |
| SB 96/SB 100/SB 578/SB 589 | | institutions | 130 |
| SB 101 | Shapiro | Limiting top 10 percent automatic undergraduate admissions | 131 |

# Determination of resident status of students by public universities

**HB 159 by Zedler**
*Died in the House*

**HB 159** would have repealed current law allowing a person to be classified as a resident for purposes of college tuition on the basis of having graduated from a public or private high school and having maintained a residence in Texas continuously for the three years preceding graduation. Only those who had lived in Texas for one year prior to the academic term in which they were enrolled in a higher education institution and whose parents had lived in Texas for one year prior to the academic term in which the dependent was enrolled would have been classified as a resident for tuition purposes.

The bill would have eliminated the option for persons who were not citizens or permanent U.S. residents to submit as information required to establish resident status an affidavit stating that the person would apply to become a permanent resident of the United States upon becoming eligible to apply. HB 159 also would have permitted universities to reclassify resident students as nonresident students if they had qualified for residency status under the provisions that would have been eliminated by the bill, if the student otherwise would not have been eligible to be classified as a resident.

## Supporters said

HB 159 would help right a wrong allowed under current law. Granting resident tuition to illegal immigrants provides an incentive for illegal behavior. There is no other circumstance in the United States where people are rewarded for breaking the law. It is unfair to allocate limited state resources to illegal immigrants who are breaking the law – especially at a time when many American citizens cannot afford to attend college.

The current law is in violation of sec. 1623 of the federal Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C.) and needs to be repealed. Offering in-state tuition to illegal immigrants violates federal law because it discriminates against U.S. citizens and legal immigrants. The federal law says that a state is not permitted to treat non-residents who are U.S. citizens worse, with respect to college benefits, than it treats illegal immigrants who are physically present in the state. As a result, many illegal immigrants are paying in-state tuition rates to attend Texas colleges and universities, while

U.S. citizens who do not reside in Texas are required to pay higher, out-of-state tuition rates. Such laws circumvent federal requirements by simply not asking students whether they are in the United States legally. Students should have to prove they are citizens or legal residents before receiving in-state tuition eligibility.

## Opponents said

In 2001, the Texas Legislature, with the support of the governor, recognized that it was good public policy to further the education of immigrants who already were integrated into local communities and wanted to fully participate and contribute to the Texas economy. While recognizing that immigration is an emotional issue, it still is good policy to support the education of Texas resident students regardless of their citizenship status. Most children of undocumented immigrants are in the United States to stay, so society benefits by providing them access to higher education that results in increased earnings and taxes and in lower crime and poverty rates. Denying in-state tuition to undocumented students would not curtail the population of illegal immigrants. The law encourages them to change their status from illegal to legal, which is a step in the right direction.

Claims that the law violates federal immigration laws because it does not offer the same tuition rates to U.S. citizens and nationals who live outside Texas are unfounded. Under Texas law, undocumented students must graduate from a Texas high school and live in Texas for at least three years before applying to college. Other residents establish Texas residency in only one year, so the requirements imposed on undocumented students are more stringent. A suit brought against a similar law in Kansas was dismissed after a judge ruled that the plaintiffs could show no potential harm or injury to themselves because their own non-resident status would not change whether or not resident tuition applied to undocumented immigrants.

The 1982 U.S. Supreme Court decision in *Plyler v. Doe*, 457 U.S. 202, 228-30 (1982), requires states to provide a free K-12 education to children regardless of immigration status, paving the way for undocumented children to reap the benefits of public education. According to the Texas Education Agency, it costs about $100,000 to educate

one student from kindergarten through 12th grade. This substantial investment made by Texas taxpayers is lost if students cannot go on to college once they graduate from high school.

Without the opportunity to qualify for in-state tuition, many undocumented students could not obtain an affordable college education and an entire class of law-abiding students would graduate high school without being able to plan for the future. Undocumented students who have grown up in the United States and graduate from American high schools should not be punished for the actions of parents who brought them illegally to this country. Until Congress addresses the complex issues surrounding immigration, the young people caught in the crossfire should continue to have access to higher education through affordable tuition rates.

## Other opponents said

The bill negatively could affect permanent residents of Texas and U.S. citizens because students who were living legally in Texas with family members other than legal guardians, such as grandparents, would lose their claim to residency. Likewise, if a student's family moved out of state and the student wanted to stay in Texas to attend college, the student would lose a claim to residency because minors are dependent on their parents and cannot establish residency on their own. Even students who had lived in Texas their entire lives could be faced with having to pay out-of-state tuition.

## Notes

The **HRO analysis** of HB 159 appeared in the May 9 *Daily Floor Report.*

# High school curriculum requirements for higher education admission

**HB 3826 by Morrison**
*Effective June 15, 2007*

To qualify for admission to a general academic institution of higher education in Texas, **HB 3826** will require, beginning with admissions for the 2008-09 academic school year, all high school students who graduate from a public or an accredited private high school in Texas to:

- graduate under the recommended or advanced high school curriculum or its equivalent;
- satisfy ACT's college readiness benchmarks; or
- score at least 1,500 on the SAT exam.

HB 3826 will require students graduating with a grade point average in the top 10 percent of their high school class to complete the recommended or advanced high school curriculum, or its equivalent, to qualify for automatic admission to a Texas university. In addition, the bill requires students who graduate in the top 25 percent of their high school class and apply to a university with an optional automatic admissions policy to satisfy the same requirements. The children of certain public servants killed in the line of duty also qualify for automatic university admission if they meet certain minimum academic requirements.

## Supporters said

HB 3826 would allow Texas to take the next step toward fully implementing the curriculum recommendations in "Closing the Gaps," the state's higher education plan, by requiring all students to graduate from high school under the recommended or advanced high school program in order to be eligible for admission to Texas universities. Texas has experienced roughly 3 percent growth each year in the number of students graduating under the recommended high school program (RHSP), and more than 80 percent of all Texas high school students graduate under these requirements. In fact, a survey of Texas public and private general academic institutions shows that 97 percent of freshman entering public institutions in the fall of 2006 graduated under the RHSP, as well as 95.5 percent of the freshman entering private or independent colleges and universities during the same time period. Now that Texas is reaching a critical mass of students who already are graduating under these requirements, it is time to make them mandatory for admission to universities.

These higher standards would improve the college readiness of new students by significantly reducing the number who are academically unprepared to continue their studies after high school and require remedial education at the college level. Currently, the remediation rate for students who graduate under the tougher graduation plan is half that for students who graduate under the minimum requirements. In addition, the bill would provide a safety net for students who did not take the recommended or advanced curriculum by allowing those who score at least 1,500 on the SAT – which is the college-readiness standard – or satisfy the ACT's college-readiness benchmarks to qualify for admission.

## Opponents said

It is critical for Texas that more students go to college, yet the bill unfairly would penalize and eliminate an entire pool of highly qualified students. For example, students who have career interests that do not require advanced mathematics and science education – such as music, dance, performing arts, or athletics – might be better served by following the minimum high school curriculum. Students who graduated under such a plan and did not perform sufficiently well on the SAT or ACT would find the doors of higher education in Texas closed to them.

## Notes

The **HRO analysis** of HB 3826 appeared in Part Two of the May 7 *Daily Floor Report*.

# Performance incentive funding for higher education institutions

**HB 3828 by Morrison**
*Died in the Senate*

**HB 3828** would have established a performance incentive funding system to encourage public universities and colleges to meet the statewide goal of increasing the number of students completing high-quality degrees and certificates. The Texas Higher Education Coordinating Board (THECB) would have distributed appropriated incentive funds to higher education institutions based on a point system. The bill would have established funding mechanisms using a matrix of weights by type of institution, including general academic teaching institutions, two-year institutions, and health-related institutions, including Baylor College of Medicine.

Universities would have been rewarded for bachelor's and advanced degrees granted, with additional weight for bachelor's degrees awarded in critical fields and to at-risk students. Community, technical, and public state colleges would have been rewarded for certificates and associate degrees granted, with additional weight for certificates and degrees awarded in critical fields and to at-risk students. Additional weight would have been awarded for certain students transferring to a university from a two-year institution. Health-related institutions would have been rewarded under the point system for degrees and residencies completed. The THECB would have been charged with establishing a method to assess the quality of degrees and certificates awarded, including minimum standards that a degree or certificate would have to satisfy in order to qualify for points under the system.

## Supporters said

HB 3828 would implement Gov. Perry's proposal for incentive funding for Texas public universities and colleges. The current funding formula is based on the number of semester credit hours students take but does nothing to address quality, and there are few incentives to improve performance. Incentive funding would benefit universities because if students graduated and earned degrees or certificates, the institutions would receive formula funding plus the incentive funding. If a student did not graduate,

the institutions still would receive formula funding. The state would benefit in several ways because incentive funding would encourage schools to graduate students, not merely enroll them, and would increase the number of graduates in critical fields, such as nursing, physical science, mathematics, and engineering. The funding system would be simple and understandable and link directly to the goals of Closing the Gaps, the state's master plan for higher education.

## Opponents said

Community colleges have a broad mission to respond to the needs of the state by offering economic and workforce training and development as well as customized training for industry. Degrees or certificates usually are not awarded for this training, and community colleges would be penalized for this by not receiving incentive funding. There should be some latitude for including certificates of completion for continuing education or workforce training as a factor to generate the incentive funding.

## Notes

The **HRO analysis** of HB 3828 appeared in Part Four of the May 4 *Daily Floor Report*.

# Establishing the Texas Tomorrow Fund II prepaid tuition program

**HB 3900 by Morrison**
*Effective June 15, 2007*

**HB 3900** establishes the Texas Tomorrow Fund II pre-paid tuition unit undergraduate education program, to be administered by the Prepaid Higher Education Tuition Board in the Comptroller's Office. The fund will receive money from the purchase of prepaid tuition contracts, plus income earned from investment of fund assets.

Purchasers may pre-pay the costs of all or a portion of a student's undergraduate tuition at four-year and two-year institutions, both private and public, or at accredited out-of-state institutions. The beneficiary must be a state resident or the child of a state resident at the time the purchaser enters the pre-paid tuition contract. Purchasers may transfer money between Texas Tomorrow Fund II accounts and similar prepaid plans established in Texas or other states.

The program offers three types of pre-paid tuition units to Texas residents. Type I units are based on the cost of undergraduate resident tuition and required fees charged by the universities with the highest tuition and fee costs. Type II units are based on the cost of the weighted average undergraduate resident tuition and fees at universities. Type III are based on the cost of the weighted average resident tuition and fees of two-year institutions. Each unit costs 1 percent of a year's tuition and fees at current rates. The board must adjust the purchase price of the tuition units annually based on the actual cost of tuition.

Purchasers may buy one type of unit or a combination of unit types. The value of a tuition unit is equal to 1 percent of the amount necessary to cover undergraduate tuition and fees for the academic year in which the unit is redeemed. One hundred Type 1 units are worth one year's tuition and fees at the highest-priced public university, 100 Type II units are worth one year's tuition and fees at a university at the weighted average, and 100 Type III units are worth one year's tuition and fees at a community college at the weighted average. The beneficiaries, or students, must be enrolled in the plan at least three years before the funds can be used, and when the student redeems units, universities must honor the unit's value.

The bill also establishes the Texas Save and Match program under which money paid by purchasers for pre-paid tuition contracts may be matched with contributions made by anyone on behalf of certain student beneficiaries selected as provided by board rule. It also may be matched with funds appropriated by the Legislature to be used for the purchase of additional tuition units for certain student beneficiaries whose annual household income is below the state median family income; whose enrollment would promote target goals of "Closing the Gaps," the state's master plan for higher education; or who meet other criteria as established by board rule.

## Supporters said

HB 3900 would establish a new Texas Tomorrow Fund II, structured in a sound manner, that would help many Texas families, particularly those in middle-income categories who do not qualify for financial assistance, to manage the costs of higher education. Families would have some predictability in planning for their children's future higher education needs by being able to lock in tuition at today's rates.

The Higher Education Prepaid Tuition Program, originally called the Texas Tomorrow Fund, was established in 1995 and helps Texans save for college through two programs – a prepaid plan and a savings plan. Both plans are authorized under sec. 529 of the federal Internal Revenue Code, so investments grow tax-deferred, and distributions to pay for college are federally tax-free. Because new enrollment in the pre-paid plan has been suspended, the savings plan currently is the only state-sponsored tool to help families save for college. The Prepaid Higher Education Tuition Board suspended enrollment in the prepaid plan in June 2003 because it could not accurately predict future college costs once the Legislature deregulated tuition. The state constitutionally guarantees that contributions to the prepaid plan will cover the costs of attending college at some point in the future, so the state is obligated to pay the actual cost of tuition, whatever that might be. The board could have jeopardized the plan's assets by selling new tuition contracts at inadequate prices. Likewise, any university with tuition and fees above the weighted average tuition must waive the difference in cost between their tuition and the weighted average amount. According to the Sunset Advisory Commission, the six largest universities waived more than $7 million in tuition for pre-paid plan beneficiaries in 2005.

Under the proposed unit redemption system, the state would be obligated only to pay contract contributions and earned interest, and the purchase price of the units could

change each year to reflect changing tuition. Institutions would receive the unit price plus interest, so in years when the value of a student's education units exceeded the cost of the weighted average of tuition and required fees, schools would earn additional income. If universities raised tuition and fees at a slower rate, they could make money from the program. If they raised tuition and fees at a faster rate, they would have to make up the difference. Universities would have an incentive to be judicious in raising tuition and required fees. Moreover, the bill has a built-in safety net to keep the fund actuarially sound. The board could impose a $25 fee to be used only to maintain the actuarial soundness of the fund. Also, to protect institutions from a shortfall, the bill would permit institutions to receive a minimum 5-percent return on investments, if the money is available.

The Save and Match program would encourage low- to moderate-income families to prepare for their children's higher-education expenses by pre-paying for all or part of their tuition in advance. Increasing the program's participants ultimately would enhance the actuarial soundness of the program. Eight other states have similar state match pre-paid plans to ensure that pre-paid tuition programs are available to a wide variety of individuals, not just higher-income families that can afford to set aside money to invest in their children's higher education.

## Opponents said

The bill would shift the cost burden of pre-paid tuition from the state to higher-education institutions. If investments of fund assets did not perform well in a given year, the investment return fell short of tuition increases, and there were not enough dollars to cover the pre-paid contracts, the institutions would be responsible for the remaining amount. If the Legislature pulled back on appropriations because of lean budgetary years, this could pose a real problem. If institutions raised tuition to make up the difference, the burden could fall on the students who had not prepaid their tuition.

The original Texas Tomorrow Fund's average rate of return over a five-year period ending in 2005 was 4.93 percent. If the Texas Tomorrow Fund II performed similarly, the new fund would be under-funded, just like the original one, and the state would not be obligated to appropriate money to keep the fund actuarially sound.

## Notes

The **HRO analysis** of HB 3900 appeared in Part Two of the April 30 *Daily Floor Report*.

# Limiting increases in tuition and required fees at higher education institutions

**SB 85 by Hinojosa/SB 96 by Ellis/SB 100 by Shapiro/SB 578 by Ellis/SB 589 by Ellis**
*Died in Senate committee*

Several bills were introduced to limit increases in designated tuition and required fees charged at public institutions of higher education and would have taken a variety of approaches. **SB 85** by Hinojosa would have placed a moratorium on any increases until 2010, at which time tuition increases would have been capped at 5 percent annually. **SB 96** by Ellis would have repealed the authority of institutions to set designated tuition in 2010 unless the Legislature voted to continue it. **SB 100** by Shapiro would have frozen tuition amounts for incoming freshmen for four or five years. **SB 578** by Ellis would have capped at 5 percent annually any tuition increases, and **SB 579** Ellis would have capped increases at 10 percent of a certain amount calculated using median income.

## Supporters said

Increases in tuition and fees at public universities are out of control and need to be reigned in. The Legislature formerly limited how much public universities could charge but relinquished that authority in 2003 because of a budget shortfall. It was a huge mistake because increases now can be imposed at any time for any amount. The amounts should be set by state lawmakers instead of unelected university regents. Tuition and fees at four-year public institutions have climbed an average of 40 percent from 2002-03 to 2006-07, adjusted for inflation. The big increases have taken students and their families by surprise, making it difficult to budget for higher education expenses. Even though part of the increase is used for financial aid, the best financial aid would be not to raise tuition.

As of October 2006, Texas surpassed the U.S. average in the cost of a four-year public education. The rising costs of going to college impacts lower income students the most and Texas has a high percentage of low income families. Increases also hurt middle-income families because those students often do not qualify for financial aid. Texas is number 41 in the national rankings on the number of people who graduate with a four-year degree, and affordability plays a role in that. Freezing tuition amounts would eliminate financial surprises that impede graduation. Limiting the increases in tuition and fees would ensure that those who can least afford it are not priced out of higher education. Institutions need to do their share in holding

down costs, including reviewing faculty productivity, scheduling more classes, better utilizing their space, and reducing the costs of instruction.

## Opponents said

Higher education is still a bargain in Texas because the cost of going to college in Texas before tuition and fees were deregulated was extremely low. However, the cost of higher education has increased even more than the cost of health care, and the state needs to find a reasonable medium between what the state subsidizes and what students and their families pay for higher education. If institutions were limited in how much tuition can be raised, Texas would not have the kind of world-class universities it needs and deserves and long-term planning would be greatly inhibited.

Even though state support for higher education has increased by about 1.8 percent a year over the last four or five biennia, the state's share has gone down compared to other sources of funding, while the cost to provide educational services has increased even more. All aspects of educating students have increased, including faculty and staff salaries, utility costs, information technology, construction, and compliance with federal research requirements. In addition to state support, constitutional funding, federal research dollars, and philanthropic support, universities have to be able to count on tuition as a source of funding. Universities need to retain the flexibility to set tuition, especially in lean budgetary times when the Legislature pulls back on state support because of competing state needs.

Deregulation has allowed universities to be innovative in addressing pricing at different colleges and for different degrees. Universities have been able to experiment with flat-rate tuition, rebates, and guaranteed tuition while providing additional financial aid, because 20 percent of any increase over a certain amount has to be set aside for financial aid. Students at the median income have not seen any increase because of the offset in additional financial aid, and students at double the median income have had half of increases offset by financial aid.

# Limiting top 10 percent automatic undergraduate admissions

**SB 101 by Shapiro**
*Conference committee report died in the House*

**SB 101** would have capped at 60 percent the proportion of first-time resident undergraduate students each general academic teaching institution would be required to admit automatically in an academic year under the top 10 percent law. To be eligible for automatic admission, applicants would have been required to have completed the recommended or advanced high school program or its equivalent. The cap on the number of automatic admissions would have expired on August 31, 2015.

If the number of applicants who qualified for automatic admission had exceeded 60 percent of an institution's enrollment capacity for those slots, institutions could have offered automatic admission to those applicants and filled the remaining slots using other admissions criteria, or they could have capped at 60 percent the number of automatic admissions. If an institution had capped automatic admissions at 60 percent, applicants qualified under the top ten percent law would have been admitted based on percentile rank according to class standing based on GPA, beginning with the top percentile rank, until a sufficient number of admission offers were made to fill 50 percent of the freshman slots. An institution would have had to offer admission to all applicants with the same percentile rank. Among remaining applicants qualifying for automatic admission, an additional 10 percent would have been considered in the same manner as generally admitted first-time freshman students until the number of automatic admissions reached 60 percent. Once 60 percent of the slots had been filled with those qualifying for automatic admission, remaining students qualifying for automatic admission would have been admitted in the same manner as generally admitted first-time freshman students.

Qualified applicants who had not been admitted because there were not enough slots remaining for automatic admissions would have been admitted to their second choice institution within the university system.

Institutions would have had to adopt a written policy on recruiting and retention of underrepresented groups with the input of community leaders. Institutions also would have had to demonstrate a commitment to providing opportunities for postsecondary education for members of all racial or ethnic minority groups, ensuring racial and ethnic diversity in the institution's faculty and administrative staff.

Automatic admission would have been granted to a transfer undergraduate student who completed core curriculum requirements at another institution if that student had qualified for automatic admission under the top 10 percent law at the time of graduation and had maintained a 3.25 GPA at the institution where core curriculum requirements were completed.

## Supporters said

SB 101 would maintain the benefits of the top 10 percent law while giving universities the flexibility they need to carry out their duty to all the people of Texas, not just a certain population. The admissions process of any university is an exercise both in selecting qualified students with a high probability of achieving success and in admitting an entering class that serves the university's mission. By requiring universities to admit all applicants who graduated in the top 10 percent of their high school class, the law has had some negative consequences that the bill would address. Many top-notch students who are not in the top 10 percent are being overlooked.

The current automatic admissions law is based on one factor, graduation rank, which limits an institution's flexibility. One of the state's flagship schools, the University of Texas at Austin, is particularly burdened by the current law and is losing control of enrollment through the number of slots it must dedicate to top 10 percent graduates. According to the university, about 71 percent were admitted under the plan in the fall of 2006, compared to 69 percent in the fall of 2005. As a result, only 28 percent of an entering freshman class is made up of students admitted under a holistic review process. Such a rigid admissions policy is hampering the university's ability to admit an ethnically diverse student body and is choking the flow of other talented students into fields such as music and the arts.

Only one in four top 10 students at UT-Austin is African-American or Hispanic, so the law has not had a dramatic effect on minority enrollment. Capping the number of automatic admissions would allow for more discretionary admissions, and a holistic approach would allow institutions to recruit a broad array of students, including minority students. Without a cap, it would be difficult to increase the number of minority students because the percentage of students being admitted under other criteria is so small that

those slots have become very competitive. If other factors could be used, such as test scores, special talents, leadership ability, and personal achievements, along with the continued use of targeted scholarships and outreach, institutions could admit a more well rounded class of students that could include more minorities, student leaders, and individual virtuosos.

## Opponents said

The number of automatically admitted students should not be capped because the law is doing exactly what it was designed to do – provide a race-neutral method of admitting a diverse class of highly qualified students. It is fair because basing admissions on class rank levels the playing field for students across the state and compares them to their peers, no matter what school they attended. It is simple to understand and sends a "play-by-the-rules" message to students across Texas.

The law has helped Texas' flagship universities fulfill their mission to serve students from across the state by granting broader opportunities to the very best students from every high school. Not only has it helped create a more diverse freshman class – racially, economically, and geographically – at UT-Austin and at Texas A&M, it has done so in a way that benefits all regions of the state, especially rural and large urban area schools. Historically, increasing ethnic diversity has been more successful, especially for Hispanic students, under the top 10 percent plan than under holistic review admissions that included race-conscious affirmative action policies in place before 1996. It would not make sense to restrict the only program that is working. Schools with a high percentage of low-income students, especially border area schools, would lose if the bill is enacted.

Data from UT-Austin indicate that the top 10 percent students are performing well, so the law has enabled Texas universities to enroll highly qualified, superior, and motivated students. Furthermore, class rank appears to be a good predictor of student performance. Because of the nature of selective universities, someone is going to be left out, and the only question is who that is going to be. Under the current law, a student population that better reflects the population of Texas is being admitted to the state's top universities.

## Other opponents said

If other state universities would aggressively recruit students, it would relieve some of the burden on UT-Austin. The Legislature also should create more attractive flagship institutions. Rather than amending the existing admissions policy, adopting a return to a statewide policy of race-conscious university admissions would be the surest way to ensure true diversity. U.S. Supreme Court decisions permit the use of race-sensitive admissions criteria, and UT-Austin has been using race and ethnicity as criteria in discretionary admissions since 2005. Such policies should be adopted by all public universities in Texas.

## Notes

The **HRO analysis** of SB 101 appeared in Part One of the May 22 *Daily Floor Report*.

# J

## udiciary

| | | | |
|---|---|---|---|
| * HB 1602 | Van Arsdale | Amending venue rules for lawsuits involving maritime workers | 134 |
| SB 966 | Ellis | Establishing a qualified privilege of a journalist not to testify or disclose | 135 |
| SB 1204 | Duncan | Court system reorganization and administration | 137 |

# Amending venue rules for lawsuits involving maritime workers

**HB 1602 by Van Arsdale**
*Effective May 24, 2007*

**HB 1602** establishes new venue rules for civil actions under the federal Jones Act, which provides a cause of action for the injury or death of maritime workers in the course of their employment. If all or a substantial part of the events or omissions giving rise to a Jones Act claim occurred in Texas or on the state's inland waters, the suit may be brought in the county in which a substantial part of the events occurred or where the defendant's principal Texas office is located.

If a substantial part of the events or omissions occurred ashore in a Gulf Coast state other than Texas or on inland waters outside Texas, the venue may be in the county:

- where the defendant's principal office in Texas is located, if the office is located in a coastal county;
- in the county where the plaintiff resided at the time the cause of action accrued, if the defendant does not have a principal office in a coastal county; or
- in Harris or Galveston counties, depending on the plaintiff's residence.

All other suits brought under the Jones Act may be filed in the county where the defendant's principal Texas office is located, where the plaintiff resided at the time the cause of action accrued, or in which a substantial part of the events or omissions giving rise to the claim occurred.

## Supporters said

HB 1602 would help protect the maritime industry in Texas, which contributes $178 billion to the Texas economy each year, by creating venue rules for Jones Act suits more consistent with other civil actions. Current law, which allows suits to be brought in the plaintiff's county of residence, differs sharply from the laws of other states. The current Jones Act venue rules were intended to be temporary, and HB 1602 finally would set appropriate venue rules for Jones Act suits.

The bill would provide a particular benefit to the dredging industry, which has been crippled in recent years by a dramatic increase in lawsuits. The current Jones Act venue statute has allowed plaintiffs to forum-shop and find sympathetic juries that provide disproportionately high damage awards. In a single year, more than 50 percent of Jones Act lawsuits filed against dredgers nationwide

were filed in four counties in the Rio Grande Valley. One company experienced 13 lawsuits in six years, causing its insurance costs to increase by 288 percent. Texas' venue exception for workers covered by the Jones Act has made the state a high-risk area for employers and directly discourages companies from hiring Texas employees. Restricting the ability for plaintiffs to file certain Jones Act claims in their counties of residence would allow generations of families to continue to work for a thriving maritime industry in South Texas.

## Opponents said

HB 1602's venue rules for injured maritime workers in Texas would be unfair. In most cases, plaintiffs injured ashore or on the inland waters of any Gulf Coast state, including Texas, would have to file in a county other than their residence. This harsh requirement would represent a significant departure from current law, which recognizes the need to create a venue exception for injured maritime workers. The Jones Act affects about 25,000 Texas employees, and the occupational hazards facing these workers are much more severe than those experienced by average land-based workers. Most of the injuries suffered by workers covered by the Jones Act prohibit travel to other parts of the state for trials or health care. As a result, the plaintiff's residence should be allowed as a choice of venue no matter where the worker was injured.

The spike in Jones Act lawsuits and awards is due to the maritime industry's safety problems and shoddy business practices, not special venue rules. The argument that the maritime industry is being crippled by Jones Act lawsuits is directly refuted by evidence of dredging companies' record profits over the last several years. The four counties that have seen the so-called lawsuit spike are the counties where the dredging companies do most of their hiring. The plaintiffs are not "forum-shopping" – they simply are filing in the counties where they live. It is insulting to suggest that judges and juries in this part of the state somehow are not trustworthy.

## Notes

The **HRO analysis** of HB 1602 appeared in Part One of the April 25 *Daily Floor Report*.

## Establishing a qualified privilege of a journalist not to testify or disclose

**SB 966 by Ellis**
*Died in the House*

**SB 966** would have established a "shield law" for journalists. With certain exceptions, a journalist could not have been compelled to testify, produce, or disclose in an official proceeding any information, document, or item, or the source of information, obtained while that person was acting as a journalist.

*Limited disclosure provisions.* A court could have compelled disclosure if the person seeking information had made a clear and specific showing that:

- reasonable efforts had been exhausted to obtain the information from alternative sources;
- the subpoena was not overbroad, unreasonable, or oppressive, and the request was limited in scope;
- reasonable and timely notice was given;
- the interest of the party seeking the information outweighed the public's interest in news gathering and dissemination in that case; and
- the information sought was not peripheral or speculative.

To have compelled disclosure, the information requested also must have been:

- relevant and material to the proper administration of the official proceeding for which the disclosure was sought and essential to the maintenance of a claim or defense of the person seeking the disclosure; or
- central to the investigation or prosecution of a criminal case regarding the establishment of guilt or innocence and, based on something other than the assertion of the person requesting the subpoena, stemming from reasonable grounds to believe that a crime had occurred.

If a court had found that the person seeking information had exhausted all reasonable efforts to obtain the information from alternative sources, disclosure also could have been compelled with a clear and specific showing that the information was obtained from the journalist's eyewitness observation of criminal conduct or that the journalist had obtained the information from someone:

- who had confessed to committing certain violent offenses or a crime against a child victim; or
- for whom there was probable cause to believe had participated in committing such an offense.

Disclosure could not have been compelled if the alleged crime to which the journalist was an eyewitness was the communicating, receiving, or possessing of the information. However, disclosure could have been compelled if the information had been disclosed in violation of a grand jury oath administered to either a juror or a witness under Code of Criminal Procedure, art. 19.34 or 20.16, or if it had related to certain violent offenses or a crime against a child victim.

A journalist also could have been compelled to disclose information if it were reasonably necessary to prevent reasonably certain death or substantial bodily harm.

*Definition of journalist.* A "journalist" would have been someone who for a substantial portion of the person's livelihood or for substantial financial gain, gathered, compiled, prepared, collected, photographed, recorded, wrote, edited, reported, investigated, processed, or published news or information that was disseminated by a news medium or communication service provider, or the parent, subsidiary, division, or affiliate of such a person.

## Supporters said

SB 966 would support the free flow of information to the public by protecting journalists from being compelled to disclose information they obtained while gathering the news, including the names of confidential sources. Under current law, a journalist who declines to reveal this information can be jailed for contempt of court. More than 30 states already have some form of "shield law" providing a journalist's privilege, and it is time for Texas to do the same.

Prosecutors should not be permitted to rely too heavily on information gathered by journalists or to use journalists as an investigative arm. This creates a time-consuming burden for journalists and threatens the freedom and independence of the press. The press plays a vital role in a democracy by helping to protect the public from powerful interests, both private and governmental, and the press often is the first entity to expose wrongdoing within these institutions. The bill would provide an incentive for whistleblowers to come forward to the press by preventing journalists from having to reveal whistleblowers' names in response to a subpoena in most cases. If sources think they

will be exposed when a journalist is compelled to disclose information, sources will be reluctant to confide in the press, and the information they have may never reach the public.

SB 966 would provide not an absolute but a qualified privilege. Journalists could be compelled to disclose information under certain circumstances, but the party seeking information would have to establish reasons the information was needed from the journalist. The bill would provide a good balance between protecting the free flow of information and allowing prosecutors to discover important evidence to prosecute crimes.

## Opponents said

SB 966 is unnecessary. Texas has enjoyed a functioning democracy and press throughout its history. Current law provides adequate protection for journalists faced with orders to compel disclosure of information. Prosecutors do not, as a rule, rely excessively on journalists for information, and those who inappropriately subpoena journalists would be unable to defend those subpoenas to a judge. In addition, the press enjoys substantial protections under the First Amendment.

SB 966 could hinder the capacity of prosecutors to gather information they need to prosecute crimes. One purported goal of the bill would be to make government and corporate institutions accountable to the public, but prosecutors need to speak with whistleblowers to investigate effectively their accusations. SB 966 inappropriately would shift the burden to prosecutors to show they had exhausted other sources of information and had a specific need to obtain it from the news media. This standard too easily could be capriciously interpreted by judges and result in wasted prosecutorial time and resources. Shifting the burden to prosecutors to prove that a journalist was an appropriate source for information could delay or prevent the administration of justice.

## Other opponents said

SB 966 would not go far enough to protect the free flow of information because it would provide too many exceptions to the journalist's privilege not to testify or to disclose information. In addition, the bill would provide legal protections to some journalists but not to others, setting up a kind of licensing system for journalists to qualify for statutory protection. The bill would apply only to journalists who practiced the craft for substantial financial gain, leaving out many amateur bloggers and student journalists.

## Notes

The **HRO analysis** of SB 966 appeared in Part One of the May 21 *Daily Floor Report*.

# Court system reorganization and administration

**SB 1204 by Duncan**
*Died in the House*

**SB 1204** would have reorganized the Texas court system by:

- increasing Supreme Court oversight of presiding judges in administrative judicial regions;
- standardizing trial courts and their jurisdictions;
- authorizing the promulgation of rules for small claims courts;
- providing additional resources to courts handling certain cases; and
- establishing a grant program for court system enhancements.

*Administrative judicial regions.* SB 1204 would have allowed the chief justice of the Supreme Court, rather than the governor, to appoint one judge in each administrative judicial region as presiding judge. The Supreme Court could have removed the presiding judge for good cause by a majority vote of the court after notice and a hearing.

*Trial courts.* The bill would have allowed a district court, statutory county court, county court, or justice court to transfer a case to any other of those courts in the county, whether or not the receiving court had jurisdiction of the matter, provided that all parties and the receiving court agreed to the transfer.

*District courts.* The bill would have codified options for exchanging cases and benches among district courts in counties with more than one district court, including:

- transferring a case to another district court in the county;
- hearing a pending case without transferring it;
- sitting for another district court in a pending case;
- temporarily exchanging benches with a judge of another district court;
- trying different cases in the same court at the same time; and
- allowing a judge temporarily to sit in a case for another district judge who was sick or absent.

When the sitting judge in a district court had determined on the judge's own motion that the judge was disqualified or should be recused, the presiding judge of the administrative judicial region could have assigned a new judge to the case or transferred a case to another district court in the county, depending on the number of district courts in the county.

The local board of district judges in a county with more than one district court could have designated a court to give preference to certain types of cases, such as family law matters. Giving preference to certain types of cases would not have limited the jurisdiction of that court or any other district court in the county.

A district court would have been required to sit in the county seat for a jury trial in a civil case. The commissioners court of the county could have authorized a district court to sit in any municipality in the county to hear non-jury trials in civil cases and to hear motions, arguments, and other matters not heard before a jury in a civil case. The district clerk temporarily could have transferred necessary books, minutes, records, and papers while the court was in session.

SB 1204 would have standardized district court terms to begin on the first Mondays in January and July. The bill would have made equal the county-provided supplemental compensation to all district judges in a county and would have required the same amount of supplemental compensation to be paid to a district judge serving on a county juvenile board as was provided to other judges serving on the juvenile board.

*County courts at law.* SB 1204 would have converted into district courts 45 county courts at law with civil jurisdiction, generally beginning January 1, 2011. The bill would have made statutory changes to ensure continuity, including providing for existing juries and pending cases. The initial vacancy in a newly created district court would have been filled by election, and subsequent vacancies would have been filled as provided by law. A judge in a converted county court who was elected to fill the initial vacancy in the district court could have chosen to continue participating in the county retirement system or become a member of the retirement system for state judges.

County criminal courts at law in Harris County would have been granted concurrent jurisdiction with county civil courts to hear appeals of driver's license suspensions, original proceedings on occupational driver's licenses, and existing appellate jurisdiction in criminal cases from justice of the peace (JP) courts and municipal courts in the county.

*JP courts.* The maximum amount in controversy for general civil jurisdiction in JP courts would have increased from $5,000 to $10,000. SB 1204 would have eliminated

the current designation of some JP courts as "small claims courts" and directed all JP courts to adjudicate small claims. The Supreme Court would have defined "small claims" and established rules for resolution of small claims cases with the advice of a committee of JPs and public members.

***Resources for certain complex cases.*** SB 1204 would have established a committee – including the chief justice of the Supreme Court as presiding officer and the nine presiding judges of the administrative judicial regions – to allocate additional resources to courts in certain complex cases. Resources would not have been provided for more than 10 cases a year and would have been awarded based on criteria adopted by the Supreme Court, including whether a case was likely to involve:

- a large number of separately represented parties;
- coordination with related actions pending in other courts;
- several pretrial motions or novel legal issues;
- many witnesses or a large amount of documentary evidence;
- substantial post-judgment judicial supervision;
- a trial lasting more than four weeks; or
- a substantial burden on the trial court's docket and available resources.

***Development grants.*** The Task Force on Indigent Defense would have developed and administered a grant program for counties to improve the courts. Applicants would have had to match the amount of a grant with local funds. The Supreme Court would have determined whether to award a grant to a county that met eligibility requirements, and the task force would have monitored use of the grant money. The Supreme Court also would have administered a program of grants to counties to alleviate a backlog of child protection cases.

## Supporters said

SB 1204 would bring simplicity and rationality to the legal process by reforming the organization and administration of the court system. Since the court system was established, it has been restructured on a piecemeal basis, resulting in an outdated system of inconsistencies and overlapping jurisdictions.

The bill would improve efficiency. The Supreme Court already has extensive powers to set administrative rules for the state's courts, so it would be appropriate to grant the court more authority to oversee who executes these rules. County courts at law were intended to provide quick

resolution of simple cases, but overlapping subject matter jurisdictions have prevented many from doing so. The bill would restore their original functions by converting 45 county courts at law into district courts. In addition, increasing the amounts in controversy adjudicated by JP courts would allow district courts and county courts at law to give more attention to higher value and more complex cases. Designating a preference for certain kinds of cases in certain courts would allow judges to build specializations and improve efficiency of district courts countywide. Authorizing district court judges to exchange cases and benches also would speed up dockets.

As the population and economy of Texas grow, so will its needs for an efficient and rational system of courts. The bill's reforms and investments would be geared toward creating more efficient and uniform justice across the state.

## Opponents said

SB 1204 would try to fix what is not broken. The court systems in each county reflect careful compromises among the local judiciary, the commissioners court, and the Legislature to address local needs, including the number, types, and jurisdiction of courts. Streamlining for the sake of streamlining would disrupt this balance. Texas is too diverse to demand statewide uniformity of the court system. Problems should continue to be addressed locally in keeping with longstanding Texas tradition.

The bill could result in some cases being heard in inappropriate courts. Increasing the amount in controversy in JP courts would bring to those courts more complex cases requiring additional legal and factual analysis, but most justices of the peace are not attorneys. JP courts traditionally have had relatively limited jurisdictions to ensure that they disposed only of relatively simple cases. In addition, allowing trial courts in a county to transfer cases between each other on agreement of the parties and the courts, which could result in a JP court hearing serious and complex cases, would be too broad a grant of authority. The bill also could change significantly the jobs of some county court-at-law judges, who specifically sought to preside in these courts with their limited jurisdiction, because the new courts would have expanded jurisdiction and hear substantially different kinds of cases.

## Notes

The **HRO analysis** of SB 1204 appeared in Part One of the May 21 *Daily Floor Report*.



## Public Education

| | | | |
|---|---|---|---|
| * HB 1287 | Chisum | Adding study of the Bible as public school elective course | 140 |
| HB 1387 | P. King | Requiring school districts to conduct feasibility studies before taking land | 142 |
| * HB 2237 | Eissler | Programs and grants for dropout prevention, high school success, and college readiness | 144 |
| * HB 2532 | Patrick | Alternative school placement of students expelled for felonies and registered sex offenders | 146 |
| * HB 2814 | Eissler | Requiring TEA to establish a dual language education pilot program | 148 |
| * HB 3678 | C. Howard | Voluntary expression of religious viewpoints in public schools | 149 |
| SB 4 | Shapiro | Establishing a new system of public charter schools | 151 |
| * SB 8 | Janek | Random steroid testing in public high schools | 153 |
| * SB 9 | Shapiro | Requiring criminal background checks for public school employees | 155 |
| * SB 530 | Nelson | Increased physical education requirements for public school students | 157 |
| SB 1000 | Shapiro | School vouchers for students with autism | 159 |
| * SB 1031 | Shapiro | Replacing TAKS with end-of-course exams for graduation | 161 |
| SB 1643 | Shapiro | Tying educator evaluations to test scores | 164 |
| * SB 1788 | Shapiro | Creating a state virtual school network | 166 |

# Adding study of the Bible as public school elective course

**HB 1287 by Chisum**
*Effective June 15, 2007*

**HB 1287** allows school districts, beginning with the 2009-2010 school year, to offer an elective course for students in grades nine or above on the Bible's Hebrew scriptures (Old Testament) and its impact, the New Testament and its impact, or a course combining the two.

The bill also adds religious literature, including the Hebrew Scriptures (Old Testament) and the New Testament, and their impact on history and literature to the required enrichment curriculum in public schools.

The purpose of the course is to teach students biblical content, characters, poetry, and narratives that are prerequisites to understanding contemporary society and culture, including literature, art, music, mores, oratory, and public policy. The course will familiarize students with the contents, history, and literary style of the Hebrew scriptures (Old Testament) or New Testament of the Bible, as well as their influence on law, history, government, literature, art, music, customs, morals, values, and culture. A course authorized by the bill must abide by all applicable laws, including any state and federal guidelines in maintaining religious neutrality.

A course teacher must hold a minimum of a high school composite certification in language arts, social studies, or history with, where practical, a minor in religion or biblical studies. A teacher selected to teach the course must complete training designed by the Texas Education Agency (TEA), which will provide:

- expertise in the appropriate Bible course curriculum;
- understanding of applicable U.S. Supreme Court rulings and current constitutional law regarding how Bible courses are to be taught with objectivity as part of a secular program;
- understanding of how to present the Bible in an objective and academic manner that neither promotes nor disparages religion;
- proficiency in instructional approaches that present course material in a manner that respects all faiths and religious traditions, while favoring none; and
- expertise in how to avoid devotional content or proselytizing in the teaching of the course.

Before adopting rules identifying the essential knowledge and skills of the course, the State Board of Education must submit them for approval to the attorney general to ensure that the course complies with the First Amendment. The bill does not prohibit a school board from offering an elective course based on books of a religion other than Christianity, according to student and parent demand.

## Supporters said

HB 1287 would provide students with biblical knowledge necessary for a full appreciation of other academic subjects. Educators widely agree that the study of the Bible is an important part of a complete education. Knowledge of biblical stories and concepts is necessary to understand fully courses in literature, history, law, and art, which contain allusions to the Bible. According to one estimate, Shakespeare alone has more than 1,300 biblical references. Schools that fail to teach about the Bible put students at a disadvantage educationally and deprive them of knowledge essential to being a well rounded citizen.

An academic and objective study of the Bible would not violate the First Amendment. As a federal district court has stated, "The First Amendment was never intended to insulate our public institutions from any mention of God, the Bible or religion. When such insulation occurs, another religion, such as secular humanism, is effectively established," *Crockett v. Sorenson*, 568 F. Supp. 1422, 1425 (W.D. Va. 1983). The case emphasizes that, "[bible study] when presented objectively as part of a part of a secular program of education, may…be effected consistently with the First Amendment." The court in the Crockett case acknowledged that without some basic understanding of the Bible, one cannot truly appreciate such great works as da Vinci's Last Supper, Handel's Messiah, or Melville's *Moby-Dick*.

The teacher training required under the bill would ensure an objective study of the Bible and not the teaching of religion. All teachers of the course would receive specialized training on instructional approaches to presenting the course material in an objective manner that would respect all faiths and meet constitutional guidelines. TEA also would provide training materials and resources

to help teachers manage an objective classroom and avoid the inclusion of devotional content. With religious literature offered as an elective in public schools, students would receive the benefit of learning about a text foundational to society and culture without any imposition of religious traditions or perspectives.

## Opponents said

The constitutionality of a religious literature course does not ensure its academic quality. Texas lacks what is needed to provide academic quality in Bible courses in public high schools. Only serious university study prepares someone to teach English, history, or chemistry, and it should not be different for the Bible and other religious texts. The bill would not require that, absent certain course work, a teacher pass a comprehensive test in the subject, while coursework and testing are required for other subject areas, such as English and biology.

Texas should not authorize high school instruction in a subject for which it does not have adequate resources. Texas public universities have opposed adopting religion departments, unlike some other states. At the university level, biblical studies include several ancient languages, archaeology, and the histories and literatures of ancient Near Eastern cultures. True academic study accounts for methods of historical inference, dating of artifacts, and linguistic analysis.

Even with the inclusion of safeguards, the teaching of religious texts in public schools could subject some students to religious views contrary to their own. The Bible is the source of many people's religious faiths. Teachers and students could have a difficult time remaining objective in their focus and interject their religious views in classroom discussion. For this reason, study of the Bible should be kept in church or parochial schools.

## Notes

The **HRO analysis** of HB 1287 appeared in Part Two of the May 7 *Daily Floor Report*.

# Requiring school districts to conduct feasibility studies before taking land

**HB 1387 by P. King**
*Died in the Senate*

**HB 1387**, as passed by the House, would have required a school district to conduct a feasibility study before acquiring title to certain property through eminent domain. A study would not have been required for property that was less than one acre or that was adjacent to property already owned by the district.

The study would have had to include an analysis of 14 specific items outlined in the bill and be approved by a licensed engineer or architect. If the study determined that the property would not be needed within 10 years of the study's completion, the study also would have been required to include justification for immediate acquisition of the property.

long-term success, such as flood hazards, infrastructure, and comprehensive municipal land use plans. HB 1387 also would force schools to look at broader city planning goals, the comparative development potential of different sites, and the costs and benefits of proposed acquisition plans.

The feasibility study would include a determination of whether property acquisition was necessary within 10 years of the end of the study. This would allow schools to acquire property when it was justifiable even if it were for a long-range project. This would give schools enough flexibility to exercise eminent domain when it was warranted while preventing them from acquiring property when it was gratuitous or speculative.

## Supporters said

HB 1387 would help ensure that school district land acquisitions remained fair for all parties involved. The initial costs and administrative burden of the feasibility study would be outweighed in the long run by the value of informed decisions. Existing law offers few protections against imprudent land takings by school districts and does not define standards for determining which properties to acquire. By requiring a school district to conduct a feasibility study before acquiring property, HB 1387 would establish safeguards against common grievances associated with poorly planned and executed takings decisions.

The misuse of eminent domain has resulted in some bad outcomes in public schools. In the El Paso area, for instance, poorly planned eminent domain decisions have led to schools that are sited in dangerous locations that municipal entities have zoned for higher-intensity land uses. In the Dallas area, school takings have needlessly derailed development plans and deprived owners of irretrievable development-related expenses.

Careful site selection also benefits school districts. School expansions undertaken based on a careful cost-benefit analysis result in new schools that are well timed and placed in a good location. Feasibility studies would require school districts to attend to major factors affecting a school's

## Opponents said

HB 1387 would place an inordinate burden on school districts trying to exercise their right to acquire land through eminent domain. The requirements would add excessive costs ultimately borne by taxpayers. Rapidly expanding districts would be disproportionately affected, and the bill would provide no offsetting compensation for the mandates it would impose.

Expanding districts often do informal feasibility studies in less time with fewer resources, conditioned by local circumstances. HB 1387 would establish a rigid, bureaucratic prerequisite that could make future property acquisitions difficult. Any value of the mandatory study would be outweighed by the administrative burdens of doing the study.

Placing administrative hurdles at the beginning of the process could lead to higher land values and diminished availability of developable land, especially in areas where development is rapid. HB 1387 would present an obstacle to school districts' ability to engage in long-range planning. More obstacles to school districts translate into valuable revenue diverted from much-needed educational resources.

## Other opponents said

A feasibility study would be a good means of ensuring the decision to take property was made only when necessary. HB 1387 should be broadened to apply to other entities with the power of eminent domain, such as universities, utility districts, and economic development corporations.

## Notes

The **HRO analysis** of HB 1387 appeared in the March 26 *Daily Floor Report*.

# Programs and grants for dropout prevention, high school success, and college readiness

**HB 2237 by Eissler**
*Effective June 15, 2007*

**HB 2237** establishes a variety of pilot projects and grant programs for dropout prevention, high school success, and college readiness.

Dropout prevention pilot programs include up to $4 million per biennium for a program to fund student club activities for students at risk of dropping out of school and up to $4 million per year for school districts and charter schools to collaborate with local businesses, non-profit and faith-based organizations, or other interested parties to reduce dropouts and increase employment opportunities for students who might otherwise drop out. Another pilot program will offer intensive academic instruction during the summer for students at risk of dropping out.

The bill also directs TEA to contract with one or more centers for education research to conduct a study of best practices for dropout prevention and requires school districts and charter schools with high dropout rates to submit to TEA a plan for using the compensatory education and high school allotments for developing and implementing research-based strategies for dropout prevention. A high school innovation grant program will provide grants to support the implementation of innovative high school improvement programs for high school reform, dropout prevention, and preparation of students for postsecondary coursework or employment.

The bill establishes a High School Completion and Success Initiative Council to identify strategic priorities for and make recommendations to improve the effectiveness, coordination, and alignment of high school completion and college and workforce readiness. Beginning with the 2008-09 school year, the State Board of Education must incorporate college readiness standards and expectations into the foundation curriculum for high school students.

Teacher training programs include a grant program to train teachers and administrators to align curriculum requirements with college readiness standards; a pilot grant program to provide content and instructional training for middle and high school mathematics teachers; teacher reading academies to provide training for teachers who provide reading instruction to students in sixth, seventh or eighth grade; and academies at higher education institutions

for teachers certified to teach in science, technology, and mathematics (STEM) programs.

The bill directs TEA to establish a competitive grant program for school districts to construct or renovate high school science laboratories. Construction costs must be limited to $200 per square foot for new construction projects or $100 per square foot for renovation projects. To be eligible for a grant, school districts must demonstrate that existing science laboratories are insufficient to comply with the recommended and advanced high school curriculum requirements. Grants will be awarded based on a ranking of school districts by wealth per student, with low-wealth districts receiving priority.

An intensive technology-based academic instruction pilot program will provide up to $3 million in grant funding to school districts with a high percentage of dropouts to provide intensive technology-based supplementary instruction in English, mathematics, science, or social studies to high school students at risk of dropping out. Another pilot program will provide grants to rural school districts to finance supplemental technology-based instruction, such as distance learning, teacher training, and academic tutoring, for students in sixth through twelfth grades.

The bill requires school districts and charter schools that teach middle and high school students to participate in "Education: Go Get It" week by providing students with comprehensive grade-appropriate information regarding the pursuit of higher education.

## Supporters said

HB 2237 would help students complete high school ready for postsecondary success and help teachers at all school levels to strengthen their content knowledge and instructional expertise.

The bill would address the state's high dropout rates with a variety of approaches, including research into best practices in dropout prevention and small grants to schools to support academic or co-curricular clubs that should strengthen connections between students and educators.

A collaborative dropout reduction pilot program between school districts and community-based organizations would provide at-risk students with job skills and continuing education opportunities.

## Opponents said

HB 2237 would create a number of relatively small dropout prevention and high school completion programs that would not be effective in confronting the state's dropout program. Rather than establishing a variety of pilot programs, the state should provide funding for a more limited number of programs that have demonstrated success in preventing dropouts.

## Notes

The **HRO analysis** of HB 2237 appeared in Part One of the May 4 *Daily Floor Report*.

# Alternative school placement of students expelled for felonies and registered sex offenders

**HB 2532 by Patrick**
*Effective June 15, 2007*

***Alternative education program placement revisions.*** **HB 2532** revises the laws governing when students may be sent to alternative educational placements called Juvenile Justice Alternative Education Programs (JJAEPs) and disciplinary alternative education programs (DAEPs).

HB 2532 allows school boards to expel students and place them in either a JJAEP or a DAEP for engaging in any felony offense under Title 5 of the Penal Code, which involves offenses against persons, regardless of where the offense occurred. Under the previous law, DAEPs were used for students who committed serious off-campus offenses that were not school-related, those who committed violations of the student code of conduct, and those who committed certain other misdemeanor offenses on campus. JJAEPs were used for certain students who were expelled from school for serious on-campus or school-related offenses listed in Education Code, sec. 37.007, some of which are Title 5 offenses. This applies in the 26 Texas counties with populations greater than 125,000, which are required to work with school districts to establish JJAEPs.

Under HB 2532, a student may be expelled and, under a memorandum of understanding between the school board and the local juvenile board, sent to a JJAEP if the student:

- is charged with engaging in conduct defined as a felony in Title 5, Penal Code, which involves offenses against persons;
- has been referred to a juvenile court for an adjudication hearing after an allegation of committing a Title 5 felony;
- has received probation or deferred adjudication for a Title 5 felony;
- has been convicted of a Title 5 felony; or
- has been arrested for or charged with a Title 5 felony.

In addition, the student's presence in the regular classroom would have to threaten the safety of other students, be detrimental to the educational process, or not be in the best interest of the district's students.

A student expelled and placed in an alternative setting is subject to that placement until graduating from high school, completing the term of placement or being assigned to another high school, or having the charges dismissed

or reduced to a misdemeanor offense. The bill allows for review of the placement of students in alternative settings. School boards are required to reimburse a JJAEP for the actual cost per day for the student.

School districts are required to assess the academic growth of students placed in DAEPs for 90 school days or longer.

***Placement of sex offenders in public schools.*** HB 2532 requires school districts, on receiving notice from a law enforcement agency that a student is required to register as a sex offender, to remove the student from the classroom and determine the appropriate placement using criteria outlined in the bill.

A school superintendent, within 24 hours of receiving notice from a prosecutor that a student is required to register as a sex offender, must notify all instructional and support personnel who have regular contact with the student. The superintendent also must notify these personnel within 24 hours of being notified of a student's conviction, deferred prosecution, or deferred adjudication for felony offenses and certain misdemeanor offenses. The bill also establishes procedures to follow when students who are sex offenders transfer among schools.

A registered sex offender under any form of court supervision must be placed in an appropriate alternative education program for one semester. Districts have the option of placing registered sex offenders who are not under court supervision in an alternative education program for one semester. The bill establishes criteria for returning these students to a regular classroom.

At the end of the first semester of a student's placement in an alternative education program, the school board must convene a committee to review the student's placement and to make a recommendation about whether the student should be returned to the classroom or remain in the alternative education program. If a student has to remain in the alternative education program, the committee will conduct additional reviews before the beginning of each school year. The bill allows a student or the student's parent or guardian to appeal a school board's decision to place the student in an alternative education program.

The placement of students with disabilities must comply with the federal Individuals with Disabilities Education Act and the review may be made only by an admission, review, and dismissal committee, which may request the assistance of the kind of committee established in the bill for other students.

## Supporters said

HB 2532 would give more flexibility to schools and juvenile boards to determine the best placement for students involved in certain serious crimes. Under current law, students who commit certain serious off-campus offenses must be sent only to a DAEP, and this placement may not be appropriate. In some cases, students involved with serious crimes should not be in the same learning environment as other students who have not committed serious crimes. HB 2532 would ensure that, when appropriate, other students were able to learn in a safe environment without fear of intimidation or disruptions from students who had been involved in Title 5 felony offenses. HB 2532 also could benefit students sent to alternative placements who may need a more specialized learning environment. JJAEPs should be able to adapt to long-term placements.

HB 2532 also would clarify and strengthen notification laws so that students who were registered sex offenders were not placed in regular classrooms without review. It would require that teachers and other personnel be notified promptly when a registered sex offender enrolled in their school.

Registered sex offenders should not attend school alongside other students. Placing these students in an alternative education program for at least one semester would help protect students and teachers while still giving the offender access to an education.

## Opponents said

HB 2532 would allow students to be expelled and placed in JJAEPs even if they had only been accused of a felony offense. Placing these students in a JJAEP before they had been convicted of a crime could violate these students' rights. HB 2532 could result in a student being left in a JJAEP for several years because it would allow placement until high school graduation. JJAEPs were not designed for and may not be equipped for such long-term placement.

The highly charged atmosphere surrounding sex offenders could lead some review committees to assign students who were registered sex offenders to alternative education programs indefinitely, without a serious review of the student's situation. Typically, the quality of education provided by alternative education programs is not comparable to that of regular public schools. Students who are registered sex offenders should be given more avenues to appeal long-term placement in alternative education programs.

## Notes

The **HRO analysis** of HB 2532 appeared in Part Four of the May 4 *Daily Floor Report*.

Numerous other bills considered by the 80th Legislature dealt with alternative educational placements. HB 2532 contains provisions similar to those found in of HB 494 by Madden that require school districts to give an assessment test to students placed in a DAEP for 90 days or longer. HB 494 died in the Senate.

Many of the provisions of HB 2532 dealing with the placement of sex offenders in public schools were in SB 1067 by Shapiro, which passed the Senate but died in the House.

HB 425 by Madden, which is effective September 1, 2007, requires the commissioner of education to determine instructional requirements for education services provided by school districts or open-enrollment charter schools in pre-adjudication secure detention facilities and post-adjudication secure correctional facilities. The requirements would address the length of the school day, the numbers of days of instruction, and the curriculum.

HB 426 by Madden, which is effective June 15, 2007, requires the Texas Education Agency to adopt minimum standards for disciplinary alternative education programs and requires DAEPs to offer at least the minimum amount of instructional time per day required by the Education Code, currently seven hours a day.

HB 1324 by Madden, which died in the Senate, would have established procedures to review the placement of certain students with disabilities into JJAEPs.

# Requiring TEA to establish a dual language education pilot program

**HB 2814 by Eissler**
*Effective June 15, 2007*

**HB 2814** requires the Texas Education Agency (TEA) to establish a dual language education pilot program to examine dual language education programs and their effect on a student's ability to graduate from high school. TEA will administer the project, selecting participating school districts that commit to a operating a dual language program for at least three years and giving preference to districts that:

- implement the program at the kindergarten level and demonstrate the potential to expand the program through middle and high school;
- offer at least one language other than English used in the pilot program; and
- demonstrate parent, teacher, and community support for a language immersion program.

TEA will select no more than 10 districts and 30 campuses to participate in the pilot program. The first year of the program must be devoted to planning activities, including hiring and training teachers, establishing parental and community support, and acquiring adequate learning materials in both program languages.

Each participating school district or campus must establish a community education pipeline team, made up of educators, district-level administrators, community leaders, and parents, to create an academic improvement plan and suggest how the immersion program should be implemented. The team will consider the educational challenges and the necessary resources specific to the district or campus and recommend how grant funds should be used to implement the improvement plan, with the approval of TEA. The pilot program will expire August 1, 2013.

To expand language learning opportunities for all public school students, including those not participating in the pilot program, TEA will contract for up to $4 million annually to license language-learning software using language immersion methods. The contract must meet the needs of up to one million public school students and employees for three years. The software must be made available online to public school students and employees no later than January 1, 2008. Districts may not use the software to supplant a bilingual education, English as a second language, or dual language education program. By January 1, 2013, TEA must report to the Legislature on the utilization and effectiveness of the software.

## Supporters said

HB 2814 would give TEA an opportunity to test a language learning program to better prepare students to succeed in college and to compete in an era of globalization. Bilingualism and multilingualism are considered marketable skills in Texas and abroad.

Language immersion products offer interactive technology that allow students to master a language at their own pace. One program, for example, presents a carefully chosen selection of four images and asks the student to select the image that matches the written text and the voices of native speakers. A student can learn a language without the traditional need for translation or memorization. Schools now experimenting with this type of instruction already are showing significant gains.

The bill also could benefit bilingual education initiatives. Language software would provide online support to non-English speakers by supplementing bilingual education curricula with English immersion software.

## Opponents said

Rather than investing in solutions offered by for-profit vendors, TEA should invest in other opportunities for students to acquire new language skills, such as dual language education or Texas' Two-Way language immersion program. These programs not only promote biliteracy and bilingualism, but also place English-speaking and non-English speaking students in the same classrooms, which allows them to help each other in learning another language.

With Texas schools already experimenting with language immersion programs, there is a marginal value to implementing a pilot program in this area. HB 2814 would require TEA to use budgeted funds to implement the language immersion pilot program. TEA instead could spend significantly less researching existing programs and not have to redirect funds from established programs.

## Notes

The **HRO analysis** of HB 2814 appeared in Part One of the April 23 *Daily Floor Report*.

# Voluntary expression of religious viewpoints in public schools

**HB 3678 by C. Howard**
*Effective June 8, 2007*

**HB 3678** requires a school district to treat a student's voluntary expression of a religious viewpoint in the same manner that the district treats a student's expression of a secular or other viewpoint on a permissible subject. The bill may be cited as the Religious Viewpoints Antidiscrimination Act or the Schoolchildren's Religious Liberties Act.

School districts must adopt a policy to establish a limited public forum for student speakers at school events in order to:

- provide a forum that does not discriminate against a student's voluntary expression of a religious viewpoint on a permissible subject;
- provide a neutral method for selecting students to speak at school events and graduation ceremonies;
- ensure a student speaker does not engage in obscene, vulgar, offensively lewd, or indecent speech; and
- provide a disclaimer, in writing or orally, that the students' remarks do not reflect the endorsement, sponsorship, position, or expression of the school district.

The bill stipulates that adopting and following a model policy contained within the bill would put school districts in compliance.

Students may express their religious beliefs in homework, art work, and other assignments. Assignments must be judged by ordinary academic standards of substance and relevance, and students may not be penalized or rewarded because of the religious content of their work.

Students may organize prayer groups, religious clubs, "see you at the pole" gatherings, and similar activities before, during, and after school to the same extent as students participating in other non-curricular groups. Religious groups must have the same access to school facilities as other non-curricular groups. Schools may disclaim sponsorship of student groups and events in a way that neither favors or disfavors students meeting to engage in prayer or practice religious speech.

## Supporters said

HB 3678 is an anti-discrimination bill that would protect students' voluntary expression of religious viewpoints. The bill would not require or suggest that students express religious viewpoints at any time but would protect them if they decided voluntarily to express their views, religious or otherwise. Under the bill, school children wishing to express religious views would have the same privileges as students expressing secular views.

The bill is drafted to align with recent Supreme Court opinions. The case of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), while considered by some to be the leading case on this issue, has not been widely referenced in recent cases. Arguably, the new standard is neutrality. *Good News Club v. Milford Central School*, 533 U.S. 98 (2001), for example, pronounced that "speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." The Supreme Court never has declared that the expression of religious views in a school setting is unconstitutional. While a school district may not provide, write, or require a prayer, nor endorse prayer as a preferable practice, these restrictions do not prohibit a student from voluntarily initiating a prayer at school events. The bill would support neutrality and prevent speech from being excluded based on its content.

HB 3678 would be aligned with the U.S. Department of Education's Guidance on Constitutionally Protected Prayer in Public Elementary and Secondary Schools. The department's guidance states that students may pray or study religious materials during non-instructional times, such as student recess or the lunch hour. The guidelines also state that students may express religious beliefs in homework, art work, or other assignments, which should be evaluated according to ordinary academic standards. While not established law, these guidelines establish permissible activities referenced in the bill.

The bill would prevent religious expression from being treated as second-class speech. Schools are not faith-free zones, and teachers should not be asked to be prayer police. Current policies have been ineffective in both protecting a

student's free speech rights and making clear the freedom that teachers have to allow these student liberties. The bill would clarify the law to dispel many misconceptions about that have led to the unconstitutional suppression of individual speech in Texas schools.

## Opponents said

HB 3678 would interfere with the management of school campuses by adding new state mandates. Principals and teachers must provide students an environment suitable for learning, and schools need order and the discretion to discipline to maintain such an environment. The bill could prevent schools from disciplining students for comments and behavior. What is offensive to some may not be to others, and schools must have discretion to determine what is appropriate for their classrooms and local communities.

The bill's constitutionality is questionable. *Lemon v. Kurtzman*, 403 U.S. 602 (1971) established the Lemon test, used by courts for more than 30 years to maintain the separation of church and state. It is one of the fundamental principles of the First Amendment's Establishment Clause that the Constitution forbids not only one religion over another, but also practices that endorse or prefer religion over non-religion. Under the test, the government's action must have a secular legislative purpose, must not have the primary effect of either advancing or inhibiting religion, and must not result in an "excessive entanglement" with religion. HB 3678, without a secular purpose, could serve to advance the presence of religion in schools. The Lemon test still embodies the dominant line of reasoning on the separation of church and state. If litigation ensued under the bill, the Lemon test still could be used to review a related constitutional challenge.

The bill could serve as a tool to proselytize the majority religious view, Christianity, in Texas schools. The United States is made up of people of many faiths. Children are required to attend school and should be allowed to do so without someone else's religion being imposed on them. An example in Texas schools of majority religious insensitivity was the scheduling of the TAKS exam for the 2006-2007 school year, when the exam was scheduled on the first day of Passover, a Jewish holiday. Families who practice the Jewish faith were forced to choose between having their child miss an important exam or honoring their faith. Promotion of religion should be reserved for homes, places of worship, and individual hearts, not the public school system.

## Other opponents said

The bill would cause further confusion on the issue of religion in schools. For fear of litigation, many schools improperly have made efforts to silence religious viewpoints in the classroom and at school events. The bill should require training on constitutionally supported free religious speech in order to eliminate uncertainties about what are legal and appropriate expressions of religious views in schools.

## Notes

The **HRO analysis** of HB 3678 appeared in Part One of the April 30 *Daily Floor Report*.

# Establishing a new system of public charter schools

**SB 4 by Shapiro**
**Died in the House**

**SB 4** would have repealed current statutes governing open-enrollment charter schools and created a new system of public charter schools. The State Board of Education would have been authorized to grant up to 215 charters for public charter districts to eligible applicants, including public, private, or independent higher education institutions, nonprofit organizations, or governmental entities.

All existing charter holders would have had to apply for a new license following procedures outlined in the bill. The State Board of Education could have approved or denied applications based on criteria it adopted and on financial, governing, and operational standards adopted by the Texas Education Agency (TEA). A public charter district could not have begun operations until TEA certified that the district had implemented acceptable administrative and accounting systems.

TEA would have had to grant a charter immediately to governmental entities holding an existing charter, charter holders that served primarily students in residential facilities, and those in which at least 25 percent of students passed assessment tests for mathematics and for language arts in the 2006-07 school year and the entity's assets equaled or exceeded liabilities in fiscal 2006 or its total liabilities exceeded its assets by not more than 20 percent of total expenditures. Schools that met the financial requirements but did not meet the academic performance requirements, including those affected by Hurricane Rita, could have had test scores averaged for the 2005-06 and 2006-07 school year.

TEA would have been able to modify, place on probation, or revoke a charter without a hearing if the commissioner determined that the charter holder committed a material violation of the charter, failed to satisfy generally accepted accounting standards of fiscal management, failed to protect the health, safety, welfare, or best interests of the students, or failed to comply with regulations governing charter schools. Charter holders would have been able to appeal a revocation only by following procedures outlined in the bill and otherwise could not have appealed to the commissioner or to a district court. If a charter were revoked or if a district surrendered its charter, the district could not have continued to operate or receive state funds.

Charter holders would have been eligible for a facilities allotment of up to $1,000 per student in average daily attendance (ADA) if any campus had for two consecutive years been rated exemplary or recognized under state accountability standards and had satisfied fiscal management standards. These charter holders would continue to be eligible for facilities funding unless they received an accountability rating of unacceptable.

The bill would have established new regulations for charter school management companies, which would have been liable for damages incurred by the state or a school district for failure to comply with its contractual or other legal obligations. The attorney general could have sued board members for breach of fiduciary responsibility or management companies for damages incurred by the state.

TEA would have had the authority to audit the records of a public charter district or campus, a charter holder, and a management company, but would have had to limit the audit to matters directly related to management or operations and would have had to limit audits to no more than one on-site audit per fiscal year without specific cause. TEA could have issued a subpoena to compel the attendance and testimony of a witness or the production of materials relevant to an audit or investigation. The bill would have established procedures for receivership and disposition of assets of a charter school that previously held a charter, but was not authorized to operate as a public charter district or elected not to do so.

TEA could have authorized up to three charter holders to grant a charter to an eligible entity to operate a "blue ribbon" charter campus if the new charter replicated a distinctive education program, the charter holder had demonstrated the ability to replicate its program, and the program to be replicated had been in operation for at least seven years and had been rated recognized or exemplary for at least five years. These charters would not have been subject to the limit on the number of charters issued in the state.

SB 4 would have allowed college or university charters to operate as advanced technical academies, which would have focused on advanced career and technology education, allowed students to combine high school and college courses

in grades 9-12, and allowed participating students to receive an associate's degree or trade or occupation certificate within five years of starting high school. The program would have had to provide flexible class scheduling and academic mentoring and would have had to be designed based on input from employers. Paid student internships, arranged through local chambers of commerce, local employers, and the Texas Workforce Commission, also would have been incorporated into the program.

## Supporters said

SB 4 would give TEA the tools it needs to weed out and shut down low-performing charter schools while establishing a new framework to nourish successful charter programs so that they could fulfill the original purpose that the state envisioned when it began offering charters in 1995. There are many high-performing charter programs in the state that need additional support in order to succeed. These programs should have access to comparable funding, including facilities funding, as regular public schools.

The bill would reward the highest performing charter schools by providing them with facilities funding of $1,000 per student in ADA. The lack of state facilities funding is the single biggest problem facing most charter schools, and SB 4 would begin to address this problem.

Many charter schools that serve the most difficult-to-educate students have met or exceeded state accountability standards. Those charter schools that cannot meet these accountability standards should not be allowed to continue to operate year after year.

## Opponents said

Many of the charter schools that would be closed under SB 4 are offering opportunities for the most difficult-to-educate students, including those who otherwise would drop out of school altogether. These schools should not be judged solely on test scores and compared to other public schools that serve a much different student population. Instead, other criteria should be used to measure their success.

Charter schools that receive an accountability rating of adequate also should have access to facilities funding. State support for facilities funding is the greatest need facing charter programs, and programs that are meeting basic standards should not be denied this support.

## Other opponents said

The state should not commit to providing facilities funding for charter schools until it addresses the disparities and lack of facilities funding for its regular public schools.

Although SB 4 would allow TEA to deny charters to the lowest-performing schools, many others that have produced mediocre results likely would have their charters approved. Even though many charter schools perform more poorly than their public school counterparts, they are not subject to the same scrutiny regarding the use of public funds. The bill would not go far enough in ensuring that TEA would hold all charter schools to the same academic and financial accountability standards as public schools, such as class-size limits and minimum teacher qualifications.

## Notes

The **HRO analysis** of SB 4 appeared in Part Two of the May 22 *Daily Floor Report*.

The Senate in a floor amendment by Sen. Shapiro added the provisions of SB 4 to HB 2237 by Eissler, but the amendment was removed from the enrolled version of the bill.

# Random steroid testing in public high schools

**SB 8 by Janek**
**Effective June 15, 2007**

**SB 8** requires high school students participating in athletic activities sponsored or sanctioned by the University Interscholastic League (UIL) to submit to random testing for steroids.

The UIL must adopt rules to administer the steroid testing program. The rules must:

- require the random testing of a statistically significant number of students to be tested;
- provide for the selection of students through a process that randomly selects from a single pool of students participating in any UIL athletic activity;
- administer the program at about 30 percent of participating high schools;
- provide for a process for confirming any initial positive results through a subsequent test;
- require the testing to be conducted at an approved and certified laboratory; and
- provide for a period of ineligibility for students with confirmed positive results.

Results of steroid tests will be confidential and, except by court order, may be disclosed only to the student, the student's parent, activity directors, and the principal and assistant principals of the student's school.

A student prescribed steroids by a medical practitioner for a valid medical purpose is not subject to a period of ineligibility from UIL events. Licensed practitioners with prescriptive authority are included in the parents' statement of acknowledgment of who may prescribe steroids.

Each employee who serves as an athletic coach at or above the seventh grade level for a UIL-sponsored athletic activity must complete an educational program regarding the health effects of steroid use.

The steroid testing program will be financed through funds budgeted to the Texas Education Agency. The UIL must conduct a study on potential mechanisms for future funding of the program and report findings and recommendations to the Legislature no later than December 1, 2008.

## Supporters said

The random testing program required by SB 8 would help discourage steroid use in public schools. The number of Texas schools testing athletes for steroids has nearly doubled since 2002, and a recent study by Texas A&M University found that steroid use among Texas students in grades 7-12 decreased from 2 percent in 2004 to 1.5 percent in 2006. The downward trend indicates that increased testing could be the deterrent schools need to maintain clean competition.

Young athletes often feel the need to become stronger and faster to remain competitive and may turn to steroid use. However, steroids can produce lasting, harmful health effects. Major side effects from steroid abuse include cancer, liver and kidney tumors, jaundice, fluid retention, high blood pressure, and stunted growth in adolescents. Psychiatric side effects can include aggression, extreme mood swings, irritability, delusions, and impaired judgment from feelings of invincibility. Research also indicates that users may turn to other drugs to alleviate some of the negative effects of steroids, compounding the problem.

In 2004, the National Institute on Drug Abuse and the University of Michigan found that more than 40 percent of 12th graders described steroids as "fairly easy" or "very easy" to get, and the perception among high school students that steroids are harmful dropped from 71 percent in 1992 to 56 percent in 2004. With students losing perspective on the dangers posed by steroids, schools should facilitate programs that discourage their use.

Under the bill, students who used steroids improperly would face a period of ineligibility from participation in athletic events. Random testing could be the necessary stimulus to keep students clean. Students aspiring to play at the college level understand that playing time is essential to advancement, and SB 8 would send a strong message to young athletes that Texas schools insist on clean competition.

## Opponents said

Random drug testing does not effectively reduce drug use among young people, including athletes. A study in the Journal of School Health (April 2003) reported that the strongest predictor of drug use by students is their attitude toward drug use and their perceptions of peer use. Random testing does not bring constructive changes to students' attitudes about drugs or their beliefs in the dangers associated with them.

With 733,000 public school athletes in Texas, more than any other state, SB 8 would create administrative and financial burdens on school districts, and some of the testing logistics for the districts remain unclear.

Drug testing programs can result in false positives, and innocent students could be unfairly stigmatized. Eliminating false positives would require schools to ask students to identify their prescription medications before taking a test. This could compromise the student's privacy rights and create an additional administrative burden for schools to ensure that private information was safeguarded.

SB 8 could undermine students' relationships with teachers and coaches because drug testing can erode trust. Students often confide in their teachers and coaches about their fears and concerns, and this trust could be jeopardized if teachers and coaches acted as confidantes in some instances and as "police" in others.

## Notes

The **HRO analysis** of SB 8 appeared in Part One of the May 21 *Daily Floor Report*.

# Requiring criminal background checks for public school employees

**SB 9 by Shapiro**
*Effective June 15, 2007*

**SB 9** requires criminal background checks for public school employees and establishes a criminal history clearinghouse within the Department of Public Safety (DPS). A national criminal history record information (CHRI) review will have to be conducted for:

- applicants for or holders of teaching certificates who currently are employed by a school district, charter school, or shared service agreement;
- teachers, librarians, educational aides, administrators, and counselors at charter schools (TEA must approve these applicants for employment);
- non-certified and contract employees for school districts who are hired after January 1, 2008, if the contract employee has or will have continuing duties related to the contract service as well as direct contact with students; and
- substitute teachers.

Student teachers and volunteers who are not a student's parents or guardians will be subject to name-based criminal background checks. This does not apply to volunteers accompanied by district personnel or volunteering for only one occasion. By September 1, 2011, the State Board of Educator Certification (SBEC) must complete a CHRI review for all current certified educators, and the Texas Education Agency (TEA) must complete a CHRI review for all substitute teachers.

School districts, charter schools and other employers affected by the background-check requirements may be required by TEA to collect a fee to cover the cost from those who must to submit to a CHRI review. School districts may use third-party vendors other than the FBI or DPS to run background checks.

SBEC may suspend or revoke a person's certificate, impose other sanctions, or refuse to issue a certificate or permit to a person who has been convicted of a felony or misdemeanor offense relating to the duties and responsibilities of the education profession, including an offense involving:

- moral turpitude;
- a form of sexual or physical abuse of a minor or student or other illegal conduct in which the victim was a minor or student;

- the possession, transfer, sale, or distribution of a controlled substance, or conspiracy to possess, transfer, sell, or distribute a controlled substance;
- the illegal transfer, appropriation, or use of school district funds or other school district property; or
- an attempt by fraudulent or unauthorized means to obtain or alter a teaching certificate or license.

SBEC must adopt a procedure for placing a notice of alleged misconduct on an educator's public certification records. The notice must be placed immediately if the alleged misconduct presents a risk to the health, safety, or welfare of a student or minor, as determined by the board. SBEC must notify the educator in writing when placing such a notice on the educator's certification records and provide an opportunity for the educator to appeal. If the board determines that the educator did not engage in this conduct, the notice must be removed immediately. This provision takes effect September 1, 2007, and applies regardless of whether the conduct occurred or was committed before, on, or after that date.

SBEC may put an educator's certificate on inactive status for failure to comply with background check requirements.

School districts, charter schools, or other potential employers must discharge or refuse to hire an employee or applicant for employment or a contract employee, if the criminal background check shows that the employee or applicant has been convicted of one of the following offenses and the victim was under 18 years old or was enrolled in a public school at the time of the offense:

- a felony offense under Title 5, Penal Code, which includes offenses against the person, including homicide, kidnapping, and sexual assault;
- an offense on conviction of which the person is required to register as a sex offender; or
- an equivalent offense under the laws of another state or federal law.

These provisions do not apply to an offense committed more than 30 years before the effective date of the bill or more than 30 years before the date the person's employment began and the employee or applicant satisfied all terms of the court order entered on conviction.

SBEC may sanction an educator who does not discharge an employee or who does not refuse to hire an applicant if the educator knew or should have known, through a criminal background review, that the employee has been convicted of an offense cited in the bill.

**Campus visitors.** School districts may require a person who enters a district campus to show a driver's license or another form of photo ID issued by a governmental entity. School districts may create electronic databases to store information about visitors and may verify whether a person is a convicted sex offender registered with DPS. Information collected for a school database may be used only for school security and may not be sold or otherwise disseminated to a third party.

**Criminal history clearinghouse.** DPS must establish an electronic clearinghouse for criminal history record information and a subscription service to provide updated information. The clearinghouse will provide either an individual's state and national criminal history information or a statement that the individual does not have a criminal history, as well as the date any information was received from the FBI. This information will be confidential and may be provided only to persons authorized to receive it.

Updated information about a person's criminal record must be provided through the subscription service within 48 hours after DPS becomes aware that a person's criminal history has changed. Subscribers who no longer are entitled to receive this information must notify DPS and cancel their subscription. The subject of the criminal history record information must consent to the release of the information. DPS must notify SBEC of the arrest of any educator who has fingerprints on file with the department.

## Supporters said

SB 9 would help protect children by expanding criminal background checks to include a broader range of individuals who come into contact with children at school, including non-certified staff, substitute and student teachers, and contract employees. It also would include certified staff who were hired before 2003, when criminal background checks were required of all new certified employees.

The bill would improve communication among school districts, SBEC, DPS, and local law enforcement, so that these organizations could share information that could prevent acts by educators against children that can happen in communities anywhere in the state.

Since Texas began requiring national criminal background checks for candidates for educator certification in October of 2003, almost 300 candidates for certification have been found to have serious offenses on their records, including sexual misconduct and crimes against children. As recently as 2004-05, SBEC found that 35 certified educators were registered sex offenders.

The cost of these background checks would be covered by modest fees of about $50 per employee. This is about the same fee that new applicants for teacher certification pay to cover the cost of criminal background checks. While name-based background checks may be less expensive than fingerprinting, they are less reliable and more subject to identity theft and other fraud.

## Opponents said

SB 9 would cast too wide a net in an effort to ensure children's safety. Educators who have served in the profession for 10 or 20 years should not be subjected to criminal background checks by the FBI.

The cost of conducting national criminal background checks would be passed on to those who could least afford it, particularly substitute teachers. The state should cover the cost of adopting a policy of conducting criminal background checks for all educators, rather than passing it on to educators.

## Other opponents said

Rather than establishing a criminal background check clearinghouse within DPS, the state could save money and get more complete information by contracting with private vendors to conduct criminal background checks. Name-based criminal background checks would be less expensive than fingerprinting and national criminal background checks. DPS criminal background checks are likely to miss a significant number of criminal convictions because counties are not required to forward criminal records to the state.

## Notes

The **HRO analysis** of SB 9 appeared in Part One of the May 22 *Daily Floor Report*.

# Increased physical education requirements for public school students

**SB 530 by Nelson**
*Effective June 15, 2007*

**SB 530** transfers authority for establishing physical education requirements for public school students from the State Board of Education to school districts and sets minimum standards for student physical activity. Beginning with the 2007-08 school year, students below sixth grade will have to participate in moderate or vigorous daily physical activity for at least 30 minutes throughout the school year. Beginning with the 2008-09 school year, students in grades six through eight must participate in daily physical activity for at least 30 minutes for at least four semesters during those grade levels.

If a school district determines, for any particular grade level below sixth grade, that this requirement is impractical due to scheduling concerns or other factors, students in that grade level may participate in moderate or vigorous physical activity for at least 135 minutes during each school week. For districts that use block scheduling, students must participate in moderate or vigorous physical activity for at least 225 minutes during each two-week school period.

Students who participate in an extracurricular activity with a moderate or vigorous physical activity component will be exempted from this requirement, as will students with illnesses or disabilities that prevent them from participating.

The local school health advisory committee will have to consider and make policy recommendations on the importance of daily recess for elementary school students, taking into account research on unstructured and undirected play, academic and social development, and the health benefits of daily recess. Any policy recommendation by the council to the district must reflect local community values.

School districts will have to annually assess the physical fitness of students in grades three through 12, unless a disability or other condition would make the assessment inappropriate. For the 2007-08 school year, the Texas Education Agency (TEA) will have to adopt an assessment instrument to be used by school districts that is based on factors related to student health, including aerobic capacity, body composition, and muscular strength, endurance, and flexibility. The assessment must include criterion-referenced standards specific to a student's age and gender and based on the physical fitness level required for good health.

Districts must compile the results of the fitness assessments and provide TEA with summary results, aggregated by grade level and any other appropriate category. These summary results may not contain the names of individual students or teachers. Individual student performance on the assessments will be confidential and may be released only in accordance with state and federal law.

TEA will have to analyze the assessment results and identify any correlation with the following:

- student academic achievement levels;
- student attendance levels;
- student obesity;
- student disciplinary problems; and
- school meal programs.

By September 1 of each year, TEA will report these findings to the School Health Advisory Committee for use in assessing the effectiveness of coordinated health programs and developing recommendations for modifications to coordinated health programs.

By September 1, 2008, TEA must submit a report to the Legislature that details options and recommendations for providing moderate or vigorous daily physical activity for students for at least 30 minutes outside the seven-hour instructional day.

## Supporters said

SB 530 would address the need for physical activity by students while also giving schools enough flexibility to meet other, equally important state requirements. The bill would help the state address a growing crisis of childhood obesity and related health problems by giving a better understanding of the relationship between student fitness and other factors, such as academic performance, dropout rates, and absenteeism. Good health is as fundamental as reading, writing, and arithmetic, a lesson students must learn.

More than one third of Texas students are overweight, putting them at higher risk for numerous chronic diseases, including heart disease. Adolescents are developing the type of diabetes that used to show up only in middle-aged adults.

Most shocking of all, our youth are at risk of becoming the first generation of Texans to live shorter lives than their parents. Action now would reverse this trend.

A lack of physical education requirements in Texas is fueling this crisis. National guidelines recommend that middle and high school students should receive 225 minutes of exercise per week. SB 530 offers a flexible approach that would take into account outside physical activities while still ensuring that students got at least a minimal amount of physical activity.

## Opponents said

An increase in physical education requirements could limit the time available for other electives, particularly art and music for elementary students. While physical activity is important, it should not be emphasized at the expense of these other important pursuits.

## Other opponents said

Increasing physical education requirements would not have a significant impact on student obesity. Nutrition education and attention to the types of food served in cafeterias also should be emphasized to have a greater impact on student health.

## Notes

The **HRO analysis** of SB 530 appeared in Part One of the May 21 *Daily Floor Report*.

# School vouchers for students with autism

**SB 1000 by Shapiro**
**Died in the Senate**

**SB 1000** would have established an Autism Services Accessibility Program and directed the Texas Education Agency (TEA) to spend up to $125,000 each fiscal year to fund the provisions of the bill. The bill would have allowed students diagnosed with autism or an autism spectrum disorder to attend public school in the district in which they resided, another public school district, or a private "qualifying school."

To participate in the program, a qualifying school would have been required to be accredited or have applied for accreditation by an accrediting organization recognized by TEA; not advocate or foster unlawful behavior or teach hatred of any person on the basis of race, ethnicity, national origin, or religion; comply with health and safety laws, including laws on criminal background checks; and hold a valid occupancy permit if required by the municipality in which the school was located. Admissions standards would have had to comply with federal laws and nondiscrimination provisions established in the bill. A private school with more qualified applicants than available positions would have had to fill the available positions by a random selection process.

If a student had attended school in a district in which the student did not reside, the district in which the student attended school would have been entitled to include the student in its average daily attendance for state aid purposes. If a student had attended a private qualifying school, TEA would have distributed directly to the school the amount that the student's home district would have received and deducted this amount from the home district's state funding. The student's program funding would have been the entitlement of the student under the supervision of the parent, and not that of any school, but the qualifying school could not have shared a student's program funding with or have refunded or rebated any share of the money to the student or student's family.

For each eligible student, qualifying schools would have had to establish academic goals similar to an individualized education program and provided a report to the student's parents every six weeks. They also would have to have administered each spring either the TAKS test or another nationally norm-referenced assessment instrument approved by TEA. Individual test results would have been provided to the student's parents, and aggregated results would have been made available to the public. Qualifying schools would not have been required to implement individualized education programs for eligible students.

It would have been the responsibility of the parent and student to locate and select a qualifying school, apply for admission to the school, and submit required information to TEA in order to qualify for funding. Funding then would have been distributed to the school following procedures established in the bill.

TEA would have designated an impartial organization to evaluate the program without the use of state funds and report to members of the Legislature by December 1, 2010. An evaluation would have compared differences between qualifying and public schools, including such factors as student and parent satisfaction, behavioral problems, class size, the fiscal impact to the state and school districts, student academic performance, and practices of a qualifying school that contributed to any change in student behavior or academic performance. The program would have been subject to sunset review and, unless continued as part of the sunset process, would have expired September 1, 2017.

TEA also would have been required to contract with a regional education service center to coordinate statewide services and training for educators serving students with autism. As part of this initiative, the regional education service center would have studied available training options, developed new ones as appropriate, coordinated statewide training, and developed procedures for school districts to use in determining the training needs of educators. The service center would have developed a guidebook for educators and parents on appropriate practices for students with autism and maintained a web site with information about available services. The web site also would have included information about the diagnosis of and current research on autism, recommended instructional practices for students with autism, and state and national autism organizations. The service center would have collaborated with the Texas Council on Autism and Pervasive Developmental Disorders to administer the initiative.

## Supporters said

SB 1000 would give parents of students with autism flexibility to determine the kind of education that best meets their children's needs by allowing students to transfer within or between districts or to a private, accredited school. Funding would follow the child and be limited to the amount the student's public school would have received to provide educational services. If tuition at a private school exceeded this amount, parents would be responsible for paying the difference.

To be eligible for participation, students would have to qualify for special education services, have an individualized educational program (IEP), and be diagnosed with autism or a related disorder. The bill would not open the door to a statewide voucher program but instead would provide a narrowly defined benefit for students needing services that a public school district may not be willing or able to provide.

One in every 150 children is diagnosed with autism each year, and the number of students in Texas public schools with autism has increased by 600 percent over the last 20 years. Research shows that with early, intensive intervention, almost 50 percent of children with autism can become indistinguishable from their peers. While some school districts provide excellent services, others do not have programs to meet the needs of these unique students. Children with autism can learn and progress if placed in an appropriate educational setting to meet their individual needs, but effective teaching strategies are crucial to their positive development and could be the difference between a generation of healthy, taxpaying citizens and institutionalized adults.

## Opponents said

SB 1000 would open the door to other voucher programs in which state funds would be used to fund private school educations for certain students. Instead of diverting money from public schools, the state should invest in improving public school services for children with autism. There are many excellent programs in public school districts throughout the state that could serve as models for other school districts.

Allowing students to transfer to other school districts without allowing the districts to limit enrollment could undermine the quality of education in school districts doing a good job of providing services for students with autism. School districts without the capacity to meet the additional demand for services could be overwhelmed if a large number of new students transferred into the district.

The state share per student is estimated to be about $14,000 per student per year, which probably would not be enough to cover the annual cost of private school tuition. Parents with the means to make up the difference would benefit from the bill, while those who could not cover the additional tuition would not be able to participate in the program. Families who lived in small towns likely would not have access to such programs at all.

# Replacing TAKS with end-of-course exams for graduation

**SB 1031 by Shapiro**
*Effective September 1, 2007*

**SB 1031** replaces the exit-level and other high school TAKS tests with end-of-course exams, which students will be required to pass in order to graduate from high school. The bill also establishes test security procedures and penalties for those who violate these procedures.

***End-of-course exams.*** To receive a high school diploma, students taking the recommended or advanced high school program will have to perform satisfactorily on end-of-course exams in each of the following subjects:

- English I, II, and III;
- Algebra I and II and geometry;
- biology, chemistry, and physics; and
- world geography, world history, and U.S. history.

Students taking the minimum high school program will have to perform satisfactorily on end-of-course exams only for the courses listed above that are required to complete the program.

Students who do not perform satisfactorily on an end-of-course exam must have multiple opportunities to retake it and be provided with accelerated instruction. If a district determines that a student, on completion of grade 11, is unlikely to achieve the cumulative scores required to pass these exams, the district must require the student to enroll in a corresponding content-area college preparatory course. The student may use the score on the end-of-course exam in the college preparatory course toward the cumulative score requirements.

Performance on any of these exams will account for 15 percent of a student's final grade in the course. Students must have an average cumulative grade of 70 on all exams and receive a score of 60 in order for a test score to count toward the cumulative score. If a student retakes an exam, the school district does not have to use the grade on the repeat exam in determining the student's final grade for the course. A student's performance on the end-of-course exams must be included in the student's academic achievement records.

End-of-course assessments may be adopted for other courses, but grade and performance requirements will not apply to those tests. Spring test administration may be no earlier than the first week of May, with the exception of tests

in English I, II and III. Tests may not be administered to any student on more than 10 percent of instructional days in any school year. The Algebra I and II and geometry tests must be administered with the aid of technology.

The Texas Education Agency (TEA) will adopt rules for the transition to end-of-course exams, so that the last students to take the exit-level TAKS test will be those entering 10th grade in the 2011-12 school year, and students entering ninth grade in that year will be subject to the new requirements for end-of-course exams. By the time they are in seventh grade, students subject to the new requirements will receive written notice of the change to end-of-course assessments.

Tests must be developed to allow for the measurement of annual student achievement. Existing test instruments may be used, provided that they are aligned with the essential knowledge and skills of the subject being assessed and allow for the measurement of annual improvement. Special-purpose questions will be included in the test to measure college readiness and to identify students likely to succeed in advanced high school courses. These students and their parents must be notified by the district of their potential to succeed in advanced courses. The tests may not be used to screen students for eligibility for those courses.

A student's satisfactory performance on an advanced placement test, international baccalaureate examination, an SAT subject test, or another assessment considered by TEA to be equally rigorous may be used as a factor in determining whether the student has satisfied requirements for an end-of-course examination.

Assessment instruments must be designed so that they could be administered by computer. By September 1, 2008, school districts must notify TEA of their ability to administer assessments by computer. TEA must compile this data and submit a report to the Legislature by December 1, 2008.

The bill will limit field testing of questions for any end-of-course exams to every other year. TEA will have to conduct a study of the sample size and procedures used in field testing questions for assessment instruments and report the results to the Legislature by December 1, 2008.

By June 1, 2008, TEA must develop a vertical scale for evaluating and comparing student test performance from one grade to the next. This scale will be implemented

beginning with the 2008-09 school year.

***Test security.*** TEA must establish procedures for administering tests to ensure security and may establish record retention requirements for school districts for test security. TEA also may develop and implement statistical methods and standards for identifying potential security violations beginning with the 2008-09 school year. These standards may include indicators of potential violations that are monitored annually and patterns of inappropriate testing practices that occur over time. TEA may establish one or more advisory committees to advise the agency on these issues and require training for those responsible for administering tests.

TEA may investigate school districts for potential violations of test security. Each school year, the agency must identify the districts that were investigated and the statistical methods and standards used to select the district. Beginning with the 2007-08 school year, TEA may conduct random audits of school districts to determine compliance with security requirements.

The bill authorizes TEA to issue subpoenas as part of an investigation or audit of test security violations, including an investigation of an educator, or for an agency accreditation investigation.

Intentional disclosure of the contents of any portion of a test, including answers, is a class C misdemeanor (maximum fine of $500).

***College preparation assessments.*** Each school year and at state cost, if funding is appropriated, school districts must administer the following tests:

- for eighth graders, a nationally norm-referenced preliminary college preparation assessment instrument to diagnose student strengths and deficiencies before entering high school;
- for 10th graders, a nationally norm-referenced preliminary college preparation assessment test to measure a student's progress toward readiness for college and the workplace; and
- for 11th and 12th graders, at state cost, a nationally norm-referenced assessment instrument selected by the student that is used by colleges and universities as part of their undergraduate admissions process.

TEA will select and approve vendors of the specific assessment instruments, pay all fees from funds allotted from the Foundation School Program, and reduce allotments to school districts accordingly. Vendors may not be paid for a test that was not administered. TEA must develop a refund system in which vendors return any payment for a student

who registered for but did not take a test.

Test results must be included in TEA's electronic student records system, and the student's parents must receive a copy of test results.

***Review of accountability system.*** The bill establishes a 15-member committee to study the state's public school accountability system. The committee will examine the mission, organizational structure, design, processes, and practices of similar accountability systems in other states, as well as federal requirements, and will conduct a thorough review of several aspects of the state accountability system. The committee will hold public hearings throughout the state and solicit testimony from public school parents and other interested parties. By December 1, 2008, the committee will report on its findings and recommend statutory changes.

## Supporters said

SB 1031 would phase out the exit-level TAKS exam, which has outlived its usefulness, and replace it with an assessment method that better reflects high school achievement and college readiness. The bill would maintain accountability for schools while providing multiple pathways to graduation by allowing a student to satisfy graduation requirements in different ways instead of depending on a single pass/fail test.

End-of-course exams would allow a more in-depth study of a particular subject and provide a more timely assessment of a student's grasp of that subject. These exams would be more relevant to the content of the course than is the broad-based TAKS test. Students would be tested at the end of the course, when the material was fresh in their minds, instead of having to pass a test covering information about subjects they may have studied years ago.

The bill would move the state away from a system in which one test is used to measure the quality of teaching as well as student performance. A random survey by one teachers' organization found that more than three out of four teachers believe the TAKS does not accurately measure a student's academic level and is turning students into test-takers rather than critical thinkers. More than 60 percent of teachers and parents surveyed said that TAKS had reduced learning to how well a student can take a test.

The bill would promote college readiness by encouraging all students to take nationally normed tests such as the SAT, ACT, and PSAT. All eighth graders would take a

diagnostic test such as EXPLORE, an assessment designed by ACT to measure a student's strengths and weaknesses in preparation for high school. Students would not be required to take the SAT or ACT, and the state would be reimbursed if a student signed up for a test but did not take it.

## Opponents said

Overemphasis on the TAKS test could be replaced with overemphasis on end-of-course exams, which could lead teachers to design entire courses around one final exam. Currently, teachers develop their own final exams based on the elements they have emphasized during the year. Standardized end-of-course exams could lead to more conformity in teaching.

By requiring students to pass at least four end-of-course exams rather than one exit-level TAKS test, the bill could lead to an increase in dropout rates. Students who failed one or several of these exams may choose to drop out of high school instead of retaking these exams.

Administering all tests by computer could create problems for districts not set up to administer exams in this way. In some courses, such as mathematics, paper exams are preferable to computer-administered assessments because of the need to show a student's work in solving a problem. School districts should have the option of administering paper tests in some cases.

More than half of the cost of the bill in fiscal 2009 and 2010, about $13 million, would cover the state cost of such nationally normed tests as the ACT, SAT, PSAT and, in eighth grade, an assessment instrument produced by ACT. Most of these tests traditionally have been paid for by students as part of the college admissions process. If students have some financial investment in test results, they are likely to take such tests more seriously.

The EXPLORE assessment, in particular, would add another layer of testing at a time the state is trying to scale back on assessments. In addition to the EXPLORE assessment, eighth-grade students still would have to take the TAKS test, which would provide a similar measurement of the student's strengths and weaknesses. School districts still should be able to decide whether they want to participate in this diagnostic program.

## Notes

The **HRO analysis** of SB 1031 appeared in Part One of the May 14 *Daily Floor Report*.

# Tying educator evaluations to test scores

**SB 1643 by Shapiro**
**Died in the Senate**

**SB 1643** would have required that the appraisal process for teachers include student achievement, including improvement in test scores, and a teacher's relevant subject area expertise. A majority of the teacher's appraisal would have been based on consideration of annual student achievement on the TAKS test and other locally adopted measures, including benchmarking systems, portfolio assessments, and nationally norm-referenced assessments. These criteria would not have applied to teachers in subjects for which objective and quantifiable measures did not exist. Teachers employed under probationary contracts would have been appraised more frequently than those employed under a term or continuing contract.

If a teacher received an unsatisfactory appraisal or one that identified important instructional deficiencies related to student achievement, the teacher's supervisor, in consultation with the appraiser and teacher, would have had to develop a performance improvement plan. The improvement plan would have identified all areas in which the teacher was in need of improvement, professional development and instructional effectiveness requirements, and a timeline for completion of the performance improvement plan.

Teachers who had received an overall unsatisfactory rating for three consecutive years either would have been discharged or not had their contracts renewed, as applicable.

The bill would have required that appraisals of principals and assistant principals be based on student test scores on that campus, as well as staff and parent evaluations and other observable measures, when appropriate. At least 25 percent of the principal's or assistant principal's evaluation would have had to be based on objective and quantifiable measures of student achievement on that campus.

The State Board for Educator Certification (SBEC) would have had to include in its accountability standards for educator preparation programs the achievement on standardized tests of students of teachers who were in the first three years following certification, as well as perseverance of beginning teachers in the profession. Perseverance would have been measured by the number of beginning teachers who had remained on active status in the Teacher Retirement System for at least three years compared to similar programs.

SBEC would have had to adopt rules allowing the Texas Education Agency (TEA) to impose sanctions on educator preparation programs that did not meet accountability standards. These sanctions could have included requiring technical assistance from SBEC or TEA or contracting for professional services, appointing a monitor to participate in and report on the activities of the program, or appointing a conservator to direct the program.

Programs rated unacceptable under the educator preparation program accountability system could have been taken over by a board of managers. Those rated unacceptable for two consecutive rating periods could have been closed, and a program rated unacceptable for three years would have been closed. These actions could also have been applied to educator preparation programs in a certain field. A program could have sought recertification after two years.

The bill would have required SBEC and the Texas Higher Education Coordinating Board to review and assess educator certification programs every two years.

## Supporters said

SB 1643 would ensure that evaluations of teachers, principals, and assistant principals were based on the academic performance and improvement of students by taking student test scores into account as a significant part of the evaluation process. Evaluations also would consider other factors, such as relevant subject area expertise.

A fair, accurate, and sound method of evaluating teacher and administrator performance is essential to strengthening the overall quality of education in the state. In Texas, teacher evaluation relies too much on inputs and efforts rather than on results and effectiveness. As a result, effective teachers are not properly rewarded, teachers in need of improvement do not receive help, and persistently ineffective teachers are not properly removed.

The bill would improve the quality of teacher preparation programs by establishing stricter accountability programs and giving SBEC clear authority to close programs or to provide assistance to programs that consistently did not meet standards for student and teacher performance.

**Opponents said**

SB 1643 would lead to even more emphasis on TAKS scores by tying teacher salaries to student test scores. The bill could create an incentive for the best teachers to gravitate to schools with the highest TAKS scores and avoid more challenging teaching assignments in schools where test scores needed improvement.

Under the current system, schools and school districts have wide latitude in evaluating teachers and deciding not to renew the contracts of teachers who do not meet performance standards, particularly during a teacher's first three years on the job. Teachers are evaluated based on a wide variety of factors, such as classroom management techniques and other observable behaviors, which are not reflected in student test scores. Any effort to tie teacher performance to student test scores should be part of an overall review and revamping of the state accountability system.

# Creating a state virtual school network

**SB 1788 by Shapiro**
**Effective September 1, 2007**

**SB 1788** establishes a state virtual school network to provide electronic courses or programs for Texas students, as well as equitable access to the courses. TEA will administer the network, employing a limited administrative staff and contracting with a regional education service center to operate the program. The State Board of Education (SBOE) will establish criteria for course and program content based on Texas essential knowledge and skills (TEKS) requirements. The courses must be in specific subjects that are part of the required state curriculum and must be equivalent in instructional rigor and scope to a course provided in a traditional classroom setting.

Electronic courses are those in which instruction and content are delivered primarily over the Internet, a student and teacher are in different locations for most of the student's instructional period, most instructional activities take place in an online environment, online instructional activities are integral to the academic program, extensive communication between a teacher and students is emphasized, and the student is not required to be on the physical premises of the school.

TEA will evaluate and approve electronic courses or programs and provide public access to a list of those that are approved, including advanced placement courses and those required for high school graduation. The agency will establish a schedule for the annual submission and approval of electronic courses to be approved by August 1 of each year.

TEA will establish the cost of providing an electronic course, which may not exceed $400 per student per course or $4,800 per full-time student. School districts or charter schools that submit courses for approval must pay a fee to cover the cost of evaluating the electronic courses and programs.

**Funding.** The state must pay for operating the state virtual school network. The costs may not be charged to a school district or charter school. School districts or charter schools in which a student is enrolled in an electronic course are entitled to state and local funding equal to the cost of providing the course, as established by TEA, plus 20 percent. Payments may be based on contact hours or on the student's successful completion of a course.

Home-schooled students must pay a fee that may not exceed the lesser of the cost of providing the course or $400.

**Teacher qualifications.** Teachers of on-line courses must be certified under state certification requirements to teach that course and grade level and must complete the appropriate professional development courses, provided through the virtual school network. The network also may provide other teacher development courses.

**Student eligibility.** Electronic courses may be offered to state residents younger than 21 and eligible to enroll in a public high school. Students may enroll full time in the virtual school network only if they were enrolled in a public school the previous year or if they were a dependent of a member of the military, were previously enrolled in high school in Texas, and did not reside in Texas because of a military deployment or transfer.

Full-time public or charter school students may enroll in one or more classes through the state virtual school network. The district or school must notify students and parents about the option of enrolling in on-line courses at the time and in the manner that the district informs students and parents about traditional courses. School districts may not require students to enroll in an on-line course, but also may not unreasonably deny the request of a student or parent for a student to enroll in one.

To deny this option, the district or school must demonstrate that the course does not meet state or district standards, the course load is inconsistent with the student's graduation plan or could negatively affect the student's performance on the TAKS test, or the student requested permission to enroll in an on-line course at a time that was not consistent with district or school enrollment periods. Districts or schools must make all reasonable efforts to accommodate a student's enrollment under special circumstances.

Home-schooled students may take up to two on-line classes per semester, but will not be considered public school students and must gain access to the courses through the district or charter school attendance zone in which the student resides.

***Attendance and accountability.*** TEA must adopt rules to verify attendance of students in electronic courses or programs. Students enrolled in on-line courses must take the same assessment tests required of students in traditional classrooms. School districts or charter schools must report results of assessment tests to TEA through the Public Education Information Management System (PEIMS).

The virtual charter school network must begin operations with the 2008-09 school year by providing electronic courses for grades nine, 10, 11, and 12 only, with grades six, seven, and eight added in the 2009-10 school year, and all grades covered starting in the 2010-11 school year.

## Supporters said

SB 1788 would move education in Texas into the 21st century by expanding  opportunities for students to use technology as an alternative way to gain access to a high-quality education through a statewide virtual school network. The network would increase equity in the educational system by providing access to courses for all students.

The network would be established within the state's existing educational framework and would build on recent pilot projects that tested the use of electronic courses and programs at individual school districts. SB 1788 would be different from virtual charter school bills the Legislature has considered in the past two sessions, particularly one that would have been offered by a private company that provided equipment directly to participating students. The virtual school network would be administered by TEA and operated through participating public school districts, charter schools, and higher education institutions.

Safeguards would be included to ensure that students enrolled in electronic courses or programs received an education equal to or better than traditional courses. The programs would be developed by school districts and charter schools and based on state content standards. Students would be subject to testing and attendance requirements, and certified teachers would teach the courses.

While the bill would not prevent private companies from contracting with districts or charter schools, the cap of no more than $400 per student per course would limit the amount of money a company could make. The company would have to meet the same standards for content as the school district or charter school.

While home-schooled students would be eligible to participate in a limited number of courses, the programs would benefit many kinds of students, including students in rural areas who may not have access to advanced courses, children with disabilities such as autism, gifted and talented students, and students from families who must travel a great deal. Home-schooled families might choose not to participate because of the assessment and attendance requirements.

SB 1788 simply would offer another educational option for Texas students and families in the same way that charter schools offer such alternatives. The bill would not divert significant funding from traditional programs, but rather would provide public schools with an important supplement to existing programs.

## Opponents said

SB 1788 would divert money from traditional public schools at a time when the state is having trouble meeting basic educational needs for public school students. According to the bill's fiscal note, the cost of the program would increase from $13.4 million in fiscal 2008-09 to $38 million in fiscal 2010-11. While electronic courses could benefit many students, the cost should be borne by individual students, families, and, in many cases, individual school districts.

The bill would not prohibit a private company from contracting with a district or charter school to develop on-line courses. This could be a windfall for some on-line vendors.

## Notes

The **HRO analysis** of SB 1788 appeared in Part One of the May 21 *Daily Floor Report*.



Public Employees

| * SB 247 | Ellis | Restricting ERS and TRS pension fund investments in Sudan | 170 |
| * SB 1846 | Duncan | Increasing TRS contribution rates and issuing a "13th check" for retirees | 172 |

# Restricting ERS and TRS pension fund investments in Sudan

**SB 247 by Ellis**
**Effective January 1, 2008**

**SB 247** establishes a "targeted divestment" process by which the Employees Retirement System (ERS) and the Teacher Retirement System (TRS) – following a series of notifications outlined in the bill – must sell, redeem, divest, or withdraw, beginning in January 1, 2008, all publicly traded securities of certain "scrutinized businesses" with operations in Sudan.

A company is considered to have engaged in "scrutinized business operations" if it has business operations that involve contracts with or provides supplies or services to the Government of Sudan, if that government has any direct or indirect equity share in the company, or if the company is a consortium or project commissioned by the Government of Sudan – or is involved in such a consortium or project – and its revenues or assets linked to Sudan exceed certain thresholds established in the bill.

The Comptroller's Office and ERS and TRS will have to follow timelines for identifying and notifying "scrutinized companies" – companies that engaged in scrutinized business operations or were "complicit" in the Darfur genocide during any preceding 20-month period. Before initiating divestment, the agencies must notify the companies of their "listed" status and give them the opportunity to cease these investments under timelines established in the bill.

ERS or TRS may stop divesting from or reinvest in a listed company only if the agencies determine in good faith that divestment would result in a loss such that the value of all assets in the fund equaled 99.7 percent of what the value would have been if the agency had not divested from those companies. The agencies may maintain investments in these companies only to the extent necessary to ensure that the overall value of the fund does not fall below 99.7 percent of what it would be without divestment.

The provisions of the bill expire on the earliest of:

- the date the U.S. Congress or the President of the United States declare that the Darfur genocide has been halted for at least 12 months;
- the date the U.S. government revokes its sanctions against the Government of Sudan; or
- the date the U.S. government declares that mandatory divestment interferes with the conduct of U.S. foreign policy.

By December 31 of each year, ERS and TRS must file a publicly available report identifying all investments sold, redeemed, divested, or withdrawn and all prohibited investments, and summarize any changes made by investment funds regarding listed companies.

## Supporters said

SB 247 would send a powerful message about corporate responsibility in the face of mass murder and human rights atrocities by requiring the state's two largest pension funds to divest in companies that actively do business in the Darfur region of Sudan. On September 26, 2006, the U.S. House of Representatives stated that "an estimated 300,000 to 400,000 people have been killed by the Government of Sudan and its Janjaweed allies since the Darfur crisis began in 2003, more than two million people have been displaced from their homes, and more than 250,000 people from Darfur remain in refugee camps in Chad." The Darfur crisis represents the first time the United States government has labeled ongoing atrocities a genocide.

The bill would put further pressure on the Government of Sudan, which has been subject to sanctions by the U.S. government since 1997, by requiring ERS and TRS to divest in companies actively doing business with the Sudanese government. This is necessary because current political and diplomatic pressure has imposed virtually no cost to the Sudanese government for continuing its genocide in Darfur. Divestment, however, would force the Sudanese government to pay a price for its refusal to restore peace and security to Darfur.

The bill would establish a "targeted divestment strategy" designed to have the greatest impact by affecting those companies, all of them foreign and mostly in the energy sector, that conduct a significant amount of business with the Government of Sudan while doing little for the country's underprivileged population.

Under a series of notice requirements specified in the bill, companies would have up to 15 months to cease active business operations that made them subject to divestment. A small fraction of companies in the ERS and TRS portfolios would be affected, and any losses to either pension fund

likely would be minimal. The bill would set limits to ensure that neither fund faced significant losses as a result of divestment.

SB 247 would allow Texas to join the growing number of states taking action to stop the genocide through targeted investments. These actions are having an effect. Unlike isolated countries that tend to shrug off sanctions, Sudan is desperately trying to attract foreign investment. Threats to these efforts are taken very seriously by the government in Khartoum.

Texas Constitution, Art. 16, sec. 67(a)(3) specifies that the Legislature by law may further restrict the investment discretion of the board of a statewide benefit system. The Legislature has clear constitutional authority to direct or restrict ERS and TRS investments in companies doing business in Sudan.

## Opponents said

Although the human rights abuses occurring in Sudan are reprehensible, it is unlikely that requiring Texas state employee and teacher pension funds to divest would affect the targeted companies or the Government of Sudan. However, such action could violate fiduciary and trust standards and cause these pension funds, neither of which currently is actuarially sound, to lose money, which ultimately would harm the retirees these funds are intended to benefit.

SB 247 could violate Art. 16, sec. 67(a)(1) of the Texas Constitution, which states that "the assets of a system are held in trust for the benefit of members and may not be diverted." The Constitution is very clear that after state money or member contributions are deposited into a pension system, the Legislature has no authority over that money. Any divestiture bill causing losses to a fund would cause a trustee to violate the fiduciary duties established in the state Constitution.

Any sale of investments would clash with Texas Constitution, Art. 16, sec. 67(a)(3), which requires that pension funds be managed in a manner that "persons of ordinary prudence, discretion, and intelligence exercise in the management of their own affairs." While the same section authorizes the Legislature to restrict the investment discretion of the board, this refers to whether trustees are exercising prudent risk in carrying out their responsibilities. For example, the Legislature could direct the board to switch to relatively safe investment-grade debt from riskier junk bonds The provision does not authorize the Legislature to direct trustees to violate their fiduciary duty by divesting certain stocks or other securities altogether for reasons unrelated to prudent investing.

SB 247 could cause the pension funds to lose money. According to the fiscal note, ERS estimates that its potential loss from divestment in fiscal 2008 could be as high as $69 million. TRS, meanwhile, would stand to lose $51 million in fiscal 2008, with ongoing losses in future years. The bill also could raise tax issues because the assets of a pension fund must be exclusively held for the benefit of members in order to be qualified under the federal tax code, which also prohibits diversion of member funds.

Divestment also would be ineffective. While Texas' retirement funds might divest themselves of Darfur-related investments, other investors would be quick to purchase these assets. The Illinois attorney general's office, arguing in defense of a similar Illinois statute, admitted that its law "does not impose any substantive economic pressure on Sudan … the act is merely moral investment style … codified into law."

## Notes

The **HRO analysis** of SB 247 appeared in Part One of the May 15 *Daily Floor Report*.

# Increasing TRS contribution rates and issuing a "13th check" for retirees

**SB 1846 by Duncan**
*Effective September 1, 2007*

**SB 1846** allows the Teacher Retirement System (TRS) board of trustees to make a one-time supplemental payment, or "13th check," to eligible TRS annuitants if the pension fund is determined to be "actuarially sound," meaning that unfunded liabilities can be amortized over a period of 30 years. If issuing such a payment would cause the fund to become actuarially unsound, the TRS board may increase the TRS member contribution rate from 6.4 to no more than 6.58 percent of salary. The bill increases the state contribution rate to 6.58 percent of payroll.

The "13th check" will be the lesser of $2,400 or the amount of the annuitant's August 2007 gross annuity payment and subject to all applicable tax withholding and other required deductions.

## Supporters said

SB 1846 would divide responsibility for the long-term health of the TRS pension fund between the state and active teachers by allowing TRS to raise the contribution rate for active teachers if necessary so that the pension fund was determined to be "actuarially sound," even if TRS issues a "13th check" to eligible retirees in September 2007.

The long-term financial strength of the pension fund should not be only the state's responsibility. Active members, for whom the fund provides retirement security, also should have to increase their contributions if the fund's soundness is in question. It would be irresponsible to issue a "13th check" to eligible retirees without taking significant steps to address the overall financial health of the pension fund.

TRS retirees have not had a benefit increase since 2001 and should not have to wait another two years or more until market gains are sufficient for the pension fund to be determined actuarially sound. Since the last benefit increase, retirees living on fixed incomes have struggled with higher costs for health care, food, and other necessities.

## Opponents said

In view of other budget needs, the state contribution rate should not be raised to match the contribution level of active teachers. Improving market conditions, changes in TRS investment strategies, and new TRS eligibility requirements adopted in 2005 eventually should lead the fund to become actuarially sound and allow TRS to grant benefit increases by 2010.

## Other opponents said

A February 2007 valuation of the TRS pension fund determined that an increase in the state contribution rate to 6.6 percent of payroll would be sufficient to make the fund actuarially sound. The state then could issue a "13th check" without taking about $50 million per year out of the pockets of working teachers and other education employees.

A "13th check" should not be held hostage by a requirement that active teachers contribute more to the pension fund. Over the past two decades, the state has decreased its TRS contribution rate to the constitutional minimum, which negatively has impacted the long-term financial health of the fund. Rather than asking active TRS employees to contribute more, the state should make a long-term commitment to funding levels that would ensure solvency.

## Notes

A related bill, HB 1105 by McLendon, would have increased the TRS state contribution rate to 6.7 percent of payroll but would not have increased contribution rates for active employees. The bill also would have required TRS to issue a "13th check" to retirees in September 2007. These provisions were adopted by the House as a complete floor substitute to SB 1846 but were not included in the conference committee report.

The **HRO analysis** of SB 1846 appeared in Part One of the May 22 *Daily Floor Report*.



# Taxation & Revenue

| | | | |
|---|---|---|---|
| HB 216 | Otto | Increasing school district margin of error in comptroller's property value study | 174 |
| * HB 1751 | Cohen | Entry fee for sexually oriented businesses to fund sexual assault prevention | 176 |
| HB 2785 | Paxton | Further compression of school district property tax rates | 177 |
| * HB 2994 | Bonnen | Allowing limitations on appraised value for nuclear and coal gasification plants | 178 |
| HB 3821 | Villareal | Mandatory property sales price disclosure | 180 |
| * HB 3928 | Keffer | Correcting and modifying the revised franchise tax | 182 |
| HJR 16 | Leibowitz/ HJR 21/HJR 27/HJR 41/HJR 47/HJR 52/SJR 10/SJR 14/SJR 15/SJR 23 | Changing limitations on taxable appraised values of properties | 184 |
| SB 1886 | Williams | Revising motor fuels taxes, including 90-day gasoline tax holiday | 186 |
| * SJR 13 | Averitt/ | Proportionate reduction in elderly and disabled school tax freeze | |
| * HB 5 | Berman | amount | 187 |

# Increasing school district margin of error in comptroller's property value study

**HB 216 by Otto**
*Died in Senate Committee*

**HB 216** would have required the comptroller to use a margin of error of 10 percent, rather than the current 5 percent, in determining whether the taxable value of property for a school district was valid.

The property value study is an annual study conducted by the comptroller's Property Tax Division to determine the taxable value of property in each school district in the state to help ensure that state funds for public schools are distributed equitably. A secondary purpose of the study is to measure county appraisal district performance.

For a specific school district, the property value study compares the district's appraised value with the district's market value. A school district's "appraised value" is determined by the school district's central appraisal district. A school district's "market value" is the fair price at which a property would sell under normal conditions. If a school district's reported value falls within a 5 percent margin of error above or below the district's taxable value as estimated by the Property Tax Division, the value is considered valid.

## Supporters said

By increasing the margin of error used in the comptroller's property value study from 5 percent to 10 percent, HB 216 would help slow the burdensome "appraisal creep" that has afflicted property owners across the state. Currently, the state forces local appraised value to fall within a stringent and unrealistic 5 percent margin around an estimate of market value by the comptroller's Property Tax Division. If a school district's appraised value falls outside that range, the school district must choose between raising property appraisals or losing state education funding – generally, the higher a district's property value, the less state aid it receives. HB 216 would correct this problem by authorizing a more appropriate margin of error, lessening the upward pressure on appraisals that have burdened property owners across the state with increasing tax bills.

Tax appraisal is more of an art than a precise science, and the 5 percent margin of error in the property value study is unreasonable. Market value is an inexact number, and two independent appraisals rarely will be within 5 percent of each other, as required under current law. The 5 percent margin is too stringent to account for the variation in appraisals that local appraisal districts and the state often report.

Without a method of holding down appraised value, increases in property value will undermine the progress made under the package of school finance legislation enacted by the 79th Legislature in 2006 during its third called session. Those bills bought down local property taxes while expanding the state's share of public education funding. However, if property appraisals are allowed to rise, citizens and businesses will see their taxes increase while the state's share of education funding erodes.

## Opponents said

According to the Legislative Budget Board, HB 216 would cost $1.9 billion in general revenue from the Foundation School Fund from fiscal 2008 through fiscal 2012, a substantial diversion of state funds that should be used for other priorities in the state budget. State budget writers struggle every session to provide adequate funding for health care, public and higher education, criminal justice, and other important programs, and it would be imprudent to dedicate such a large amount of money simply to allow below-market property appraisals.

HB 216 would undermine the accuracy of property appraisals by authorizing a wider range of property valuation. Current law indirectly encourages appraisal districts to keep values appraised at a level that is at least 95 percent of market value by tying state education funding to appraised value. The state's school finance system is predicated on accurate local appraisals, and undermining the accuracy of those appraisals would upset the balanced school finance partnership shared by the state and local school districts.

The way to address the problem of rising appraisals is not through undermining the accuracy of property appraisals by allowing greater deviation from market value. Several other potential fixes exist, such as lowering the current 10 percent annual appraisal cap on residence homestead property taxable value increases or increasing the residential homestead exemption. Ultimately, the problem with

appraisal creep lies in a state school finance system that relies too heavily on local property taxes rather than funding from other, more diverse state sources.

## Notes

The **HRO analysis** of HB 216 appeared in the April 16 *Daily Floor Report*.

# Entry fee for sexually oriented businesses to fund sexual assault prevention

**HB 1751 by Cohen**
*Effective January 1, 2008*

**HB 1751** imposes a fee of $5 on each entry by each customer to a sexually oriented business that provides live nude entertainment and allows on-premises consumption of alcoholic beverages. The money generated by the fee, up to $25 million per fiscal biennium, will go into the sexual assault program fund. Money from the sexual assault program fund may be appropriated for state programs and grants to outside organizations to combat sexual violence and provide sexual assault victim assistance.

The amount of money received from the fee that exceeds $25 million will go to the Texas health opportunity pool established under SB 10 by Nelson, 80th Legislature, for health benefits coverage premium payment assistance to low-income persons.

A sexually oriented business must record each day the number of customers admitted to the business and make those records available for inspection by the comptroller. A business may determine the manner in which it derives the money to pay the fee and is not required to pass the $5 fee on to customers.

The bill also establishes the sexual assault advisory council to coordinate state and local sexual assault programs. It also authorizes the Legislature to appropriate funds for a third-party assessment of the sexually oriented business industry that could provide recommendations on how to regulate the growth of the sexually oriented businesses in Texas.

## Supporters said

HB 1751 would provide a dedicated source of revenue to support essential sexual abuse prevention and survivor support programs. By dedicating $25 million to a range of programs, the bill would allow the state to devote resources to aid the survivors of sexual assault and support training and prevention programs to reduce future incidents of sexual assault.

HB 1751 claims no defined link between sexual assault and strip clubs. The bill simply would use a fee generated from inessential and entirely discretionary behavior to fund important services for victims of sexual assault. Sexually oriented businesses employ women, and HB 1751 would benefit survivors of sexual assault, a group that disproportionately includes women.

Contrary to arguments that a fee on customers of sexually oriented businesses would be unconstitutional, HB 1751 would not suppress or make illegal the activities at any sexually oriented business. Texas uses narrowly applied fees to fund many areas of state government, so there is ample precedent for the program contemplated under the bill.

## Opponents said

While the $5 fee in HB 1751 would support a worthy cause, the fee to be paid by patrons of strip clubs is unrelated to this goal. No link exists between strip clubs and sexual assault, meaning that the bill would institute unfair tax profiling on individuals who legally visit these establishments.

The fee imposed under HB 1751 could prove difficult to implement for the Comptroller's Office, which would have to audit sexually oriented businesses and ensure that the amount of money collected was accurate. Some businesses do not collect door charges. Other businesses that collect door charges might keep an artificially low count of customers to inappropriately divert the money to their own coffers.

The state should not use behavior that many Texans find objectionable and offensive to fund important state priorities. To do so would be hypocritical and could send a message that this type of behavior somehow is encouraged or condoned.

## Notes

The **HRO analysis** of HB 1751 appeared in Part One of the May 3 *Daily Floor Report*.

# Further compression of school district property tax rates

**HB 2785 by Paxton**
**Died in Senate committee**

**HB 2785** would have reduced the school district maintenance and operations (M&O) tax compression rate from 66.67 to 60.67 percent of the district's 2005 tax rate. It also would have repealed the current expiration date of September 1, 2009, for the new tax rate.

## Supporters said

HB 2785 would make use of the record state surplus by providing additional property tax relief. Both the House and the Senate have approved budgets that leave at least $3 billion in general revenue unspent, plus another $4 billion in the rainy day fund. This money should be returned to taxpayers in the form of additional property tax relief instead of being left on the table.

The property tax cut authorized in HB 1, 79th Legislature, third called session, is barely sufficient to keep up with increases in local property tax appraisals. HB 2785 would ensure genuine tax relief for Texans.

## Opponents said

Further tax cuts would cripple our state's ability to pay for essential services such as education and health care. The state should not spend every bit of extra money to further reduce property taxes when so many other pressing needs have not been met. The additional school tax compression in HB 2785 would cost $2.5 billion in fiscal 2008-09 alone and continue to drain the state budget in future years, with none of this money benefiting public education, only replacing local funding with state money.

The new taxes enacted in 2006 cover less than half of the cost of tax cuts from the special session. HB 2 by Chisum, which provided $14.1 billion in state aid to school districts to replace local property tax revenue, used general revenue to cover much of the cost of the tax cut. The state already is diverting funds from its historically inadequate general revenue stream to fund the current tax cut, and to cut property taxes even further would be fiscally irresponsible.

## Notes

The **HRO analysis** of HB 2785 appeared in the May 10 *Daily Floor Report*.

HB 2785 was amended on the House floor to prohibit the state from appropriating funds to reduce the compression percentage below 66.67 percent unless each school district and charter school in the state received the product of $6,000 times the number of teachers, librarians, nurses and counselors. According to the fiscal note for the House engrossed version of HB 2785, this provision would have cost $4 billion in fiscal 2008-09, in addition to the $2.5 billion cost of the further compression of school property tax rates.

# Allowing limitations on appraised value for nuclear and coal gasification plants

**HB 2994 by Bonnen**
**Effective June 15, 2007**

**HB 2994** adds nuclear power generation and electric power generation using integrated gasification combined cycle (IGCC) technology to the list of projects eligible for limitations on the appraised value of property for school district maintenance and operations (M&O) property taxation under the Texas Economic Development Act, effective January 1, 2008. Districts negotiating their appraised values through such agreements will be held harmless by the state for purposes of state education aid.

The bill allows the owner of a nuclear electric power generation facility by agreement with a taxing unit to defer the effective date of an abatement up to seven years after the agreement is made. An agreement including such a deferral may have a term no longer than 10 years following the effective date of the agreement.

The bill also requires the comptroller to file a report with the lieutenant governor, the speaker of the House, and the governor assessing the progress of every agreement for appraised value limitation under the Texas Economic Development Act. The report must include information on the number and quality of jobs created by a project, the amount of investment made under an agreement, the impact of a limitation on taxable value, and other information.

## Supporters said

By adding nuclear electric power generation and IGCC facilities to the Texas Economic Development Act, HB 2994 would put Texas at the cutting edge of developing clean, reliable, and efficient power solutions. Allowing school property tax abatements for nuclear and IGCC plants would benefit the local economy in communities in which plants were located and would increase Texas energy production with a low-emissions alternative to pulverized coal plants.

Nuclear energy is a safe, reliable energy option. Only two accidents have occurred in 12,000 cumulative reactor-years of commercial operation in 32 countries, and only Chernobyl released harmful radiation. Critics of nuclear power provide no guidance about what else can viably be done to address the growing demand for energy. Coal is too dirty, natural gas is limited in supply and expensive, and wind and solar power are unreliable and unrealistic

as a large scale solution. Nuclear power is an essential component of a multi-part strategy to address Texas' growing need for energy.

While nuclear power is an affordable source of energy once a facility is online, the permitting and construction process is very expensive. For this reason, tax incentives are required to make new nuclear plants economically viable. The process to obtain a license from the Nuclear Regulatory Commission takes years and can cost up to $100 million. The total cost of a nuclear project is estimated between $2.5 billion and $3 billion. Without abatements such as those that would be authorized under HB 2994, it is unlikely that any additional nuclear capacity will be brought online in Texas.

A new nuclear or IGCC plant would provide a significant economic benefit to any community in which it was located. For this reason, these projects clearly fall under the intent of the Economic Development Act. In particular, the proposed addition of two new units to the South Texas Nuclear Project in Matagorda County would create an estimated 3,000 jobs at peak construction of the $5.2 billion unit. It is estimated that the project would result in as many as 1,000 high paying, highly skilled permanent jobs.

## Opponents said

HB 2994 would allow public subsidies for the construction of costly and dangerous nuclear power plants in Texas. Nuclear plants take years to construct and are economically unfeasible without millions of dollars in public subsidies, making nuclear power an unrealistic way of addressing pollution and climate change. Texas instead should focus public subsidies to support IGCC plants like the ones included under HB 2994, in addition to renewable energy such as wind and solar power. Further, Texas should focus on reducing demand through energy efficiency and conservation.

The nuclear power industry has not settled the issue of disposal of radioactive waste produced in the generation process. High- and low-level radioactive waste remains dangerous for several hundred thousand years. Transportation and storage of high level radioactive waste is an unsettled issue, with the Yucca Mountain waste disposal

project in Nevada mired in controversy and unlikely to open any time soon. On-site waste storage remains the most likely option at existing and future nuclear power plants, a non-permanent solution that poses its own risks.

Security and safety at nuclear plants is a serious concern. A terrorist attack at a nuclear facility similar to the 9/11 attacks would be catastrophic. The South Texas Project nuclear plant, site of two proposed new nuclear facilities, was the subject of a report by the Union of Concerned Scientists that highlighted deficient security protocols at the existing plant. In addition, the possibility of a leak or failure at a plant could contaminate ground or surface water or the land close to a plant. The public safety concerns associated with nuclear power simply are too great to encourage the construction of additional nuclear plants.

HB 2994 could represent a very large cost to the state for planned nuclear power projects that likely will be built even without this bill. If the value of a $2.5 billion nuclear electric generation facility was limited at $10 million, the state could be required to contribute approximately $25 million per year to hold the local school district harmless for the loss in property tax revenue. The cost to the state of a more expensive plant would be even greater. Because local school districts would be held harmless by the state under HB 2994, they would have no reason not to enter into such agreements, which ultimately could cost state taxpayers hundreds of millions of dollars.

## Notes

The **HRO analysis** of HB 2994 appeared in Part Two of the April 24 *Daily Floor Report*.

# Mandatory property sales price disclosure

**HB 3821 by Villareal**
**Died in House committee**

**HB 3821** would have required any person filing with the county clerk documents conveying certain types of property to include in those records a form disclosing the property's sales price. Certain types of sales or transfers, such as those involving government sales or purchases, court orders, bankruptcy, foreclosures, or specified family members, would have been exempt from this requirement. The comptroller would have been required to create a form for the purchaser to submit. A purchaser would have been allowed to disclose under the form the financing method of the purchase, additional property included in the sale, or other unusual terms of the sale that affected the sales price.

A chief appraiser could not have used the report as the sole basis for increasing the property's market value. A county clerk could have accepted documents of sale or transfer without the disclosure report. A chief appraiser would have been authorized to send a purchaser notice of the absence of a report, and if the report was not filed within 30 days of this notice, the purchaser could have been liable for a civil penalty equaling 5 percent of the property's sales price.

## Supporters said

HB 3821 would give appraisal districts another tool with which they could more equitably assess property value. It especially would benefit middle- and low-income homeowners, who currently bear a large share of the tax burden because of appraisal districts' inability to accurately assess the value of commercial and high-end residential property. By enabling appraisal districts to accurately assess property value, the bill would allow school districts to collect more local property tax revenue, saving the state millions of dollars in payments from the Foundation School Fund. This bill would not result in higher property taxes for all property owners. Instead, it would create a more equitable assessment structure that would require all property owners to pay their constitutionally mandated fair share.

At least 35 states require a property's sales price to be disclosed, and this bill would allow appraisal districts access to vital information that currently is limited. It was one of the recommendations in the 2007 report of the Texas Task Force on Appraisal Reform. Although appraisal districts generally can ascertain the fair market value of residential property by collecting data from listings, realtors, and the Multiple Listing Service (MLS), that information is not as readily available for high-end residential homes and commercial properties. In some cases, homes are removed from MLS before a deal closes because a buyer does not want the appraisal district to learn the sales price.

The enactment of this bill would create a more uniform system of valuation and would not necessarily lead to increases in all property taxes. Taxing units are limited to annual increases in taxes collected, and property owners also are protected from large tax increases through appraisal caps. The bill further would protect property owners by specifying that the sales price could not be used as the sole factor in appraising a property's value. It also would allow property owners to disclose other factors that may have led to a sale at a particular price. Taxpayers should not be allowed to benefit from all the government services funded through taxes if they are not paying their full tax burden, and HB 3821 simply would ensure that all property owners paid their fair share.

## Opponents said

HB 3821 would encourage "sales chasing" – building up appraised values beyond a property's market value – which would lead to a larger tax burden for all property owners. Once one home in a neighborhood sold for a certain amount, owners of similar properties could expect an increase in the assessed value of their properties. Sales price disclosure would erode the confidentiality of a property owner's financial dealings. It also could enable appraisers to use sales price as the primary factor in assessing value without properly accounting for a variety of other factors that led to a property being sold for a certain amount. For commercial properties, giving this tool to appraisers without a thorough understanding of the complexity of transactions likely would lead to more overvaluations, unfairly shifting the burden of proof from the appraisal district to the property owner.

Sales price data should not be used to assess the value of commercial property and high-end homes because those properties are inherently unique. Differences in designs, floor plans, and amenities – not to mention location – play significant roles in the sales prices of high-end homes. Sales prices of commercial properties take into account the

business conducted, client lists, the value of potential future rental income, and other factors that have little to do with the actual property itself. Additionally, the financing of a sale plays a large role in a property's sales price. A buyer paying in cash likely could purchase a property for less than a buyer financing the purchase with loans. Commercial sales can be extremely complex – stock purchases, tax exchanges, and portfolio exchanges can influence a sales price. Some investors also overpay for real estate to avoid capital gains on a different property they have sold.

## Other opponents said

This bill should be coupled with a reduction in appraisal caps or the rollback rate in order to ensure sales price disclosure did not become another method for local governments to raise revenue. The governor's task force recommended that any enactment of sales price disclosure legislation be tied to a reduction from 10 percent to 5 percent on the average annual tax increase for property owners on their residence homesteads.

## Notes

HB 3820 by Villareal, which died in House committee, is identical to HB 3821 except that it would have allowed a county commissioners court to call an election to trigger the sales price disclosure requirements.

SB 270 by Wentworth, which died in the Senate, contained the same basic disclosure requirements as HB 3821 but would not have provided for inclusion of additional information aside from the sales price, nor would it have included a role for the chief appraiser. A substitute version of the bill would have limited the requirements to commercial property, vacant land, and multifamily residential property.

# Correcting and modifying the revised franchise tax

**HB 3928 by Keffer**
*Effective January 1, 2008*

**HB 3928** makes numerous changes to the revised franchise tax created under HB 3 by Keffer (79th Legislature, third called session), which will take effect January 1, 2008.

*Small business tax discount.* The bill creates a discount on tax liability for small businesses:

- a taxable entity with annual total revenue that is at least $300,000 but less than $400,000 will be eligible for a discount of 80 percent on its tax liability;
- a taxable entity with annual total revenue that is at least $400,000 but less than $500,000 will be eligible for a discount of 60 percent on its tax liability;
- a taxable entity with annual total revenue that is at least $500,000 but less than $700,000 will be eligible for a discount of 40 percent on its tax liability;
- a taxable entity with annual total revenue that is at least $700,000 but less than $900,000 will be eligible for a discount of 20 percent on its tax liability.

Beginning in tax year 2010, these thresholds will be indexed biennially for inflation.

*E-Z tax computation.* The bill will allow a taxable entity with no more than $10 million in total revenue to compute its tax liability by apportioning the entity's total revenue to Texas and multiplying this amount by a rate of .575 percent. An entity choosing this method of computation may not take another credit or deduction, including a compensation or cost-of-goods-sold deduction.

*Treatment of rental income for partnerships.* In determining total revenue, the bill will require partnerships to include gross rental income instead of net rental income.

*Apportionment of securities income.* The bill revises the manner in which a taxable entity's revenue from the sale of securities will be apportioned to Texas. If a loan or security is treated as a seller's "inventory" for federal income tax purposes, the gross proceeds from the sale of a loan or security will be considered gross receipts for apportionment purposes.

*Business loss carryforwards.* The bill establishes a method by which a taxable entity may claim a credit on its taxable margin for business loss carryforwards that existed under the previous franchise tax.

*Business tax advisory committee.* The bill creates the Business Tax Advisory Committee to study the effects of the revised franchise tax on businesses in Texas. The committee will consist of:

- two members of the House of Representatives, appointed by the speaker of the House;
- two members of the Senate, appointed by the lieutenant governor;
- at least five residents of the state, appointed by the comptroller, who are engaged in a private business subject to the tax; and
- at least two residents of the state, appointed by the comptroller, who have expertise in state business taxation.

The comptroller will serve as the presiding officer of the committee. The committee will submit a report to the Legislature before each regular session.

*Elimination of reporting requirements on certain entities.* The bill repeals a requirement that an entity with more than 100,000 employees in the state file an annual report on the number of its employees that receive assistance under Medicaid or the Children's Health Insurance Program (CHIP).

*Controlling interest.* The bill changes the definition of a "controlling interest" to include a 50 percent interest in an organization, rather than 80 percent under previous law.

## Supporters said

HB 3928 would retain the essential characteristics of the revised franchise tax that the 79th Legislature enacted overwhelmingly in its third called session in 2006. HB 3928 is a revenue-neutral clean-up bill that would make numerous corrections to clarify the existing tax and improve its administration. The bill would make several changes to ensure that all taxable entities were treated similarly and fairly, leading to a modest increase in revenue that the tax would generate. This revenue increase would be offset by

a technical correction in the apportionment of securities income and by creating a small business tax discount to provide tax relief to all entities with annual total revenue of up to $900,000.

By establishing an optional alternative calculation method for businesses with annual total revenue of less than $10 million, HB 3928 would allow an option to enable easier calculation of the tax for small businesses. Many small businesses face paying more in accounting fees to determine their tax liability than they actually might owe under the revised franchise tax. The E-Z tax computation option in HB 3928 would give a business owner the option of simply applying a rate of .575 percent to the business's total revenue and remitting that tax, saving the time and cost of complying with the revised franchise tax's more complicated calculations.

It is important that HB 3928 retain the essential characteristics of the revised franchise tax that was enacted under HB 3. The bill cannot eliminate the possibility that an unprofitable business might be taxed under the revised franchise tax, because to do so would establish a de facto unconstitutional state income tax. Courts have considered the potential of a business to owe taxes in a year in which it lost money as an essential test in determining whether a tax is a personal income tax. Further, a reduction in the rate of the tax would shrink the amount of funds flowing into the property tax relief fund, to which all revenues from the revised franchise tax are dedicated. This fund is essential to ensuring the constitutionality of the state's school finance system and to provide businesses and homeowners with an ongoing source of relief from excessively high property taxes.

## Opponents said

HB 3928 would miss an opportunity to improve a deeply flawed business tax that will have a disproportionately negative effect on small and marginally profitable businesses. This bill would not alter the revised franchise tax's characteristics as a modified gross receipts tax. The central problem remains that a business could be required to owe taxes in a year in which it lost money. The bill should incorporate an exemption so that a business's tax liability would be removed if it had negative or only slightly positive net income in a particular tax year. It is unfair to require a business owner to render state taxes when the owner's business operated at a loss in a tax year, a scenario that very likely could occur under the revised franchise tax with this bill.

HB 3928 also would fail to take advantage of a record state surplus to reduce the rate that businesses would have to pay under the revised franchise tax. A 50 percent reduction in the twin tax rates of the revised franchise tax easily could be absorbed in the state budget by either a modest increase in the sales-and-use-tax or by dedicating a portion of Texas' current budget surplus. Further, the Legislature should amend the tax to ensure that no business would be subject to any greater than a 100 percent increase in its tax liability under the revised tax. This would ensure that a business was not severely affected with a tripling of its tax liability or worse.

Small business should play a more prominent role on the business tax advisory committee proposed under HB 3928. As it stands, there is no safeguard to prevent larger firms from dominating this committee because it contains no guaranteed positions for small business owners. Many small businesses are likely to be swept up under the revised franchise tax, so it is important that the business tax advisory council be acutely responsive to the concerns of small business owners.

## Notes

The **HRO analysis** of HB 3928 appeared in Part One of the May 1 *Daily Floor Report*.

# Changing limitations on taxable appraised values of properties

**HJR 16 by Leibowitz (and nine others)**
*Died in House and Senate committee*

Ten proposals were introduced to amend the Texas Constitution to authorize the Legislature to change the limitations placed on the average annual increase in taxable appraised value of a residence homestead, which is currently set at 10 percent.

Four measures would have authorized the Legislature to reduce the appraisal cap to either 5 percent (**HJR 16** by Leibowitz and **HJR 27** by Callegari) or 3 percent (**SJR 14** by Patrick and **HJR 52** by C. Howard). Two others would have provided for a local option to reduce the appraisal cap below 10 percent to no less than 3 percent: **SJR 10** by Janek would have authorized a governing body of a taxing unit to set the new cap, while **HJR 21** by Riddle would have allowed county voters to set the lower cap.

Two proposals would have combined the statewide mandate with a local option. **HJR 47** by Bohac would have allowed the Legislature to reduce the cap to 5 percent for all school districts and authorized all other taxing units the option to set a 5 percent limit in lieu of a 10 percent limit. **SJR 23** by Nichols would have allowed the Legislature to set a cap at 5 percent or less but would have provided for a local election to raise the cap for any taxing unit to no more than 10 percent.

Two other proposals would have changed the types of properties eligible for the cap but would not have reduced the limit below 10 percent. **HJR 41** by Vo would have applied the cap to all real property, and **SJR 15** by Patrick would have applied the cap to all property used for residential purposes, not just residence homesteads.

## Supporters said

Homeowners no longer can sustain annual increases in their property tax bills due to rising values, despite the 10 percent cap on average annual growth in taxable appraised value. Although the Legislature recently reduced school property taxes by one-third over a three year period, much of that relief was not realized by homeowners because of "stealth taxes" imposed by local governments that passively raise and spend more money without raising tax rates merely because appraised values increased.

The persistent escalation of residential property values, in effect, penalizes Texans for home ownership. It unfairly increases their taxes regardless of their ability to pay. Lowering the cap would continue helping homeowners living in areas with rapidly appreciating property values level out their property tax payments to make it more affordable to remain in their homes. Higher values still would be taxed, but increases would be spread out more reasonably to avoid the sharp increases seen under the current cap. In the vast majority of cases, owners of lower-valued homes have benefited the most from the cap because their appraised values have been more likely to increase significantly. Regardless of capped values for tax appraisal purposes, property owners still would be able to sell their homes at true market value.

Appraisal caps do not interfere with local government spending or revenue streams. If anything, they require local jurisdictions to be more honest with their constituents by requiring them to raise tax rates in order to increase revenue. Caps merely restrict the rate of growth in taxable property values, protecting property owners from shouldering a disproportionate share of the tax burden. Elected officials still could raise rates for property or sales taxes or for fees if more revenue were required or if priorities and needs dictated greater expenditures for public goods and services.

## Opponents said

Appraisal caps interfere with real estate market forces and create artificial levels of taxable property value that distort the market value appraisal standard. Reducing the cap beyond the current 10 percent level would exacerbate the inequities of the current system, making it more regressive by requiring lower- and middle-class homeowners to absorb a larger share of the tax burden at the benefit of higher-income homeowners whose rapidly appreciating property values more frequently benefit from the cap.

Reducing the cap would further limit the ability of local governments to raise the revenue they need to provide essential goods and services. It would adversely impact bond ratings, constrain local financial flexibility, and limit the ability of local governments to meet vital infrastructure needs. As outstanding debt mounted due to

decreased property tax revenues, local governments would be saddled with higher interest payments, resulting in lower bond ratings and deteriorating ability to finance needed infrastructure improvements. Caps inhibit government's ability to respond to external factors such as population growth, recession, and emergencies.

The Texas Task Force on Appraisal Reform, which the governor created to respond to escalating property taxes, recommended several options the state should explore in lieu of reducing the appraisal cap. Proposed fixes include requiring voter approval for any taxing unit imposing taxes in excess of 5 percent of its previous budget's tax revenue, improving the fairness of the appraisal process, and reducing the number of unfunded state mandates. The task force did not endorse a reduction in the cap on its own and supported the measure only in conjunction with the disclosure of a property's sales price.

## Notes

Of the ten proposals introduced, four (SJRs 10, 14, 15, and 23) were heard in the Senate Finance Committee, but none was reported from committee.

HJR 40 by Hochberg, which would amend Texas Constitution, Art. 8, sec. 1-i to authorize the Legislature to limit the increase in appraised taxable value of a residence homestead to 10 percent since the property's most recent appraisal, rather than the current maximum of 30 percent if the last appraisal had occurred three years previously, was approved by the Legislature and will be presented to voters at the Tuesday, November 6, 2007, election.

# Revising motor fuels taxes, including 90-day gasoline tax holiday

**SB 1886 by Williams**
*Died in conference committee*

**SB 1886** would have amended various sections of the Tax Code, Water Code, and Code of Criminal Procedure to make administrative and technical changes to the implementation of state motor fuel taxes. The bill would have conformed laws governing motor fuel taxes with statutory revisions made in previous sessions.

As passed by the House, the bill included an amendment by Rep. Martinez Fischer that  would have instituted a temporary reduction in the state gasoline tax from 20 cents to zero cents on each gallon of gasoline. The temporary reduction would have been in effect for 90 days following the effective date of the bill, and would have expired on the 91st day.

The bill would have taken immediate effect if it had been approved by two-thirds of both houses of the Legislature on final passage. Otherwise it would have taken effect September 1, 2007.

## Supporters said

SB 1886 would provide all Texans with substantial immediate relief from high gasoline prices. In May 2007, the price of a gallon of unleaded gasoline approached the inflation-adjusted all-time high, set in 1981. Working Texans need a break from these historically high gasoline prices, and a gas tax holiday would mean tax relief for Texas families that are struggling to make ends meet. The estimated $500 - $700 million cost of the three month gas tax holiday easily could be covered with the state's multi-billion dollar budget surplus or rainy-day fund balance.

Because the gas tax is regressive, a three-month tax holiday particularly would benefit low-income and working Texans. According to the comptroller's 2007 Tax Exemptions and Tax Incidence report, Texas households in the lowest income quintile pay the greatest percentage of their income in gasoline taxes. Instead of dedicating the state's fiscal surplus to additional school property tax rate reductions, this money should be used to temporarily reduce the gasoline tax. Property tax rate reduction mostly benefits owners of highly-valued residential and commercial properties, and the Legislature has dedicated billions of dollars to reduce these tax rates in recent years. SB 1886 would provide an opportunity to extend tax relief to low-income citizens and other taxpayers such as renters who

have not sufficiently benefited from recent school property-tax cuts approved by the Legislature.

## Opponents said

The gas tax holiday included in SB 1886 would seriously undermine state finances by denying the State Highway Fund hundreds of millions of dollars of revenue that goes toward public road construction and maintenance. The gas tax is a vital revenue source for the state transportation finances that already are stretched too thin. Providing a temporary holiday from the tax would provide no long-term solution to the problem of high fuel costs and could increase demand for gasoline, ultimately leading to even higher fuel costs. In addition, consumers would experience an overnight 20 cent jump in the price of a gallon of gas upon expiration of the 90-day holiday, which could cause chaotic supply disruptions as motorists rushed to fill their tanks before the tax holiday expired.

## Other opponents said

In order to appropriately address fiscal issues related to transportation policy, the Legislature should raise the motor fuel tax or at least index the tax to account for inflation. The gasoline tax has not been raised since 1991, while inflation has eroded its ability to pay for the state's substantial unmet transportation infrastructure needs. The insufficiency of the gasoline tax as a means to support highway construction is a major reason behind the shift in transportation policy toward toll road construction and reliance on public debt to finance road construction. Without improving the fiscal stability of the motor fuel tax, Texans will face traffic congestion, highway disrepair, and increased use of toll roads.

## Notes

The **HRO digest** of HB 3320 by Keffer, the House companion bill to SB 1886, appeared in Part One of the May 7 *Daily Floor Report*.

During floor consideration of SB 1886, the House tabled an amendment by Rep. Krusee that would have adjusted annually the motor fuels tax rate based on the increase in the Consumer Price Index.

# Proportionate reduction in elderly and disabled school tax freeze amount

**SJR 13 by Averitt/HB 5 by Berman**
*Approved by voters at the May 12, 2007, election*

**SJR 13** adds Art. 8, sec. 1-b(d-1) to the Texas Constitution, to specify, for homeowners who are age 65 or older or disabled and receiving a limitation on school property taxes in the 2007 tax year, that the Legislature can reduce the limitation amount to reflect a reduction in the tax rate from tax year 2006. The Legislature also can reduce the limitation amount to reflect a rate reduction that occurred between tax year 2005 and tax year 2006.

Texas Constitution, Art. 8, sec. 1-b(d) freezes the amount of taxes imposed by a school district on the residence homestead of a person who is age 65 or older or disabled. The tax amount may not be increased while the property remains the residence homestead of the person or the person's spouse. In accordance with that section, the Legislature can provide for the continuation of the limitation amount until the limitation expires.

**HB 5**, which took effect with the voter approval of Proposition 1/SJR 13 at the May 12 election, amends the Tax Code to make the necessary statutory changes to apply the proportionate reduction in a school district's property tax rate from tax year 2006 to tax year 2007 in calculating the maximum amount of school property taxes owed by individuals whose tax bills are frozen because they are disabled or at least 65 years old. If the new calculations result in a school property tax bill lower than the amount at which it was frozen, the lower amount is established as the new cap. A homeowner eligible for the limitation prior to tax year 2006 also receives a proportional tax reduction for tax year 2007 based on a reduction in the school district tax rate that occurred between tax year 2005 and tax year 2006. The adjusted amount also takes into account improvements that increased the value of the homestead. To the extent that adjustments authorized by HB 5 reduce the revenues districts can collect from taxable property, school districts are entitled to additional state aid. HB 5 ensures the reductions made under this section will not be applied in calculating the amount of money distributed to school districts under state funding formulas.

## Supporters said

SJR 13/HB 5 would provide tax relief to senior citizens and to those who receive federal disability payments by ensuring that school tax amounts frozen for these citizens were reduced proportionally to reflect recent school tax reductions granted by the Legislature for all other property owners. For example, if a school district reduced its tax rate by one third, a tax bill that previously was frozen at $1,000 would drop in the following tax year to $667, where it would remain frozen. Without this amendment, many elderly or disabled homeowners who have had their school district taxes frozen for a number of years would be unlikely to benefit from property tax relief measures recently enacted by the Legislature.

HB 1 by Chisum, enacted in 2006 during the third called session of the 79th Legislature, provided for state aid to school districts to reduce school property taxes for maintenance and operations by 11.3 percent in tax year 2006 and one third (33.3 percent) in tax year 2007 and beyond. Many elderly and disabled homeowners live on fixed incomes and should be granted the benefit that other homeowners received last year and will receive starting this year from the reduction in school property taxes. The Legislature made a similar adjustment in the tax freeze amount in 1997 when it increased the homestead exemption amount so that every home owner would receive tax relief from the change.

The primary purpose of offering a school property tax freeze to senior citizens and the disabled is to give budget certainty to people who live on fixed incomes, and the adjusted freeze should operate in the same way. Proposals that would adjust the limitation amount upward if school tax rates subsequently were increased could cause elderly and disabled homeowners to face a substantial increase in their expenses, which might make it financially difficult for some to continue living in their homes.

## Opponents said

The property tax reduction enacted recently by the Legislature was intended to provide tax relief to those Texans whose tax bills have soared in recent years as a result of rising property values and increases in local school property tax rates. Senior citizens and disabled homeowners generally have been shielded from these increases by having their property tax bills frozen, regardless of their income or ability to pay local school district taxes. These individuals already have received significant tax relief, especially those

whose residence homesteads have increased substantially in value since their tax bills were frozen. There is no need to provide a special additional benefit to these individuals by reducing their taxes even more.

The property tax freeze already benefits individuals owning higher value homes more than those with modest residences. Any future reduction should be targeted only to the elderly and disabled under a certain income level.

## Other opponents said

It would be fairer to all property owners if the tax freeze amount were allowed to float. While elderly and disabled homeowners deserve to receive the extra tax relief, they also should have to assume the proportionate tax burden when rates inevitably rise – at least until the amount reached the level at which their taxes originally were frozen. Elderly and disabled homeowners still would receive additional tax relief under such a system because, unlike other property owners, their tax bills would never rise above the amount they paid in school taxes for 2006. Moreover, elderly and disabled

residents who participate in school tax rollback elections would have no incentive to vote against higher taxes if their tax burden remained unchanged regardless of the outcome.

While school property tax rates may continue to drop after 2007, these measures would not allow for any corresponding reductions in the tax freeze amount. As a result, the Legislature would have to repeatedly change the law and seek voter approval to amend the Constitution to allow seniors and disabled citizens to benefit from future tax cuts. The Legislature should amend the law and the Constitution one time to allow for automatic tax freeze reductions in the future.

## Notes

The **HRO analysis** of HB 5 appeared in Part One of the February 28 *Daily Floor Report*. The analysis of HJR 1, the companion to SJR 13, appeared in Part One of the February 19 *Daily Floor Report*. Also, see HRO Focus Report Number 80-5, *Constitutional Amendment Proposed for May 2007 Ballot*, April 19, 2007.



# Transportation

| * HB 323 | Hamilton | Three-point seat belts for school buses | 190 |
| HB 1439 | Chisum | Driver record monitoring pilot program | 192 |
| * SB 792 | Williams | Two-year moratorium and local priority for certain toll road projects, revised standards for CDAs, higher highway bonding capacity | 194 |
| * SB 1119 | Carona | Statewide standards for use of red-light cameras | 200 |
| * SJR 64 | Carona | Authorizing $5 billion in general obligation bonds for highway projects | 203 |

# Three-point seat belts for school buses

**HB 323 by Hamilton**
*Effective September 1, 2007*

**HB 323** requires that each bus transporting school children be equipped with three-point – lap/shoulder – seat belts for the driver and each passenger. Each school district must require students riding buses equipped with lap/shoulder belts to wear the belts and can create disciplinary procedures to enforce compliance. The requirements apply to all buses purchased by the school district on or after September 1, 2010, and to all school-chartered buses used by a school district on or after September 1, 2011. If the Legislature fails to appropriate money necessary to reimburse school districts for costs incurred in meeting these requirements, they will not take effect. A school district can use its own money or a private donation to finance the addition of lap/shoulder belts to its existing bus fleet.

School districts will be required annually to submit to the Texas Education Agency information regarding school bus accidents, which will be published on its web site. The State Board of Education must develop and distribute to school districts training materials and best practices related to proper usage of lap/shoulder belts.

## Supporters said

HB 323 would require that all buses used by a school district contain seat belts – an important safety feature required in automobiles. The bill would give school districts and the companies with which they charter buses a reasonable amount of time – three and four years, respectively – to comply in a cost-effective manner with these required vehicle upgrades. This mandate would not apply if it were not funded by the state. Studies have shown the lap/shoulder belt to be the best safety option for school buses, and any concerns about cost should not be placed ahead of the protection of our children.

The bill is designed to protect the lives of school children, particularly in view of a recent, tragic bus accident. On March 29, 2006, a chartered bus carrying 23 soccer players from West Brook High School overturned and killed two of the players. The bus did not come equipped with seat belts, causing some players to be thrown about inside and outside of the vehicle. In July, the Beaumont Independent School District became the first in Texas to require that all new buses come equipped with lap/shoulder seat belts.

Although the Beaumont students were in a chartered bus, most children in Texas still are traveling to and from school in buses employing a technology developed in the 1970s called "compartmentalization." Federal law has required that any new school bus made on or after April 1, 1977, use this method, which requires the installation of closely spaced seats with energy-absorbing seat backs, although smaller buses weighing less than 10,000 pounds are required to have seat belts. Compartmentalization has serious flaws – especially for a child sitting in the front row – and is designed to adequately protect children only in low-speed frontal crashes. Compartmentalization is especially unsafe in side-impact crashes, and its safety level varies from bus to bus depending on the height and padding of each seat back.

The National Highway Traffic Safety Administration (NHTSA), in its most recent study on school safety belts in 2002, found that lap/shoulder seat belts are the safest option for school buses, ahead of compartmentalization and lap belts, which cause problems because of the amount of pressure they place on the abdominal area of still-developing children. Lap/shoulder seat belts do not cause these problems and can be adjusted to properly fit a child of any age. According to NHTSA, usage of lap/shoulder seat belts could reduce frontal crash fatalities in school buses by an annual average of 50 percent and significantly reduce head and neck injuries. The data show they are particularly effective in reducing ejection in rollover crashes.

Seat belts also would help improve discipline problems on buses because children would not be able to stand up or roam the aisles while the bus was moving. Wearing a seat belt on a bus also would teach children good safety habits. For many children, the school bus is the only place where they do not wear a seat belt, and it is difficult to impart a consistent message about the importance of wearing seat belts if children are unable to use them in the vehicle they ride in every weekday.

Concerns about cost and bus capacity are overblown. Although three elementary school students can fit in a row of seats on an average school bus, buses carrying older – and generally larger – students typically fit two to a seat, so the capacity of these buses would be unchanged with lap/shoulder seat belts. Additionally, NHTSA reports that the average bus operates at 72 percent of its passenger capacity,

so a 20 percent reduction might have no effect on a single bus route or at least could be absorbed by reconfiguring certain routes without requiring additional vehicles. By removing requirements for full compliance before a set date, the bill simply would require that any new buses purchased by a school district come equipped with lap/shoulder belts. Such a requirement would save money by allowing buses recently purchased by school districts to run their average life span of around 10 years.

## Opponents said

School buses are the safest form of ground transportation in America today, and this bill would impose significant costs on the state without any real safety benefit. Installing lap/shoulder seat belts reduces the capacity of a bus by 20 percent, which would lead to more districts buying more buses. The costs would add up quickly after that – more fuel, more bus drivers, more salary and benefits, and more space needed to park the buses. This bill assumes a school district could find enough drivers, which would be difficult in some areas, given strict state requirements.

The Legislative Budget Board projects the state would cover all these additional costs to the tune of  $231.7 million in the first two years in fiscal 2011-12, which assumes that school districts would be replacing only one-fifth of their bus fleets during those years. The costs would continue to escalate for at least another eight years under this scenario, and the total cost could exceed $1 billion. If the state were to more narrowly interpret the reimbursement of ''expenses incurred'' in complying with this bill, local school districts would bear significant costs to purchase these buses.

These costs would not pose a great concern if the new buses significantly increased the safety of our children, but that is not necessarily true. Riding in a school bus today is eight times safer than traveling in a car, with a fatality rate of 0.2 percent for each 100 million vehicle miles traveled. Although NHTSA has shown lap/shoulder seat belts to

be the safest option, that is predicated on the idea that they are worn properly by 100 percent of the passengers. Given the demographic involved, such a scenario is not very likely. Improperly wearing a seat belt could do more damage to a child than not wearing one at all. If this were such a definitive safety solution, it would be required by the federal government and employed in more than five states. Other tangential safety benefits, such as reducing driver distraction, are questionable. In fact, this bill can lead to different distractions for drivers, such as trying to ensure that all the children properly fasten their safety belts.

## Other opponents said

The bill should be funded to ensure safety enhancements for all children were guaranteed, not just promised. This bill would be nothing more than an empty gesture without state funding because school districts would not be obligated to comply with the safety belt requirements without state funding.

The bill also should restore requirements, included in the version reported out of the House Transportation Committee, that would mandate full compliance by 2014. Given the average 10-year life span of a school bus, those school districts that have recently purchased buses – or worse, those that decide to buy additional belt-less buses in the next two years to maintain current capacity levels – would not be providing the enhanced safety protections to all its students for at least a decade.

## Notes

The **HRO analysis** of HB 323 appeared in Part One of the April 30 *Daily Floor Report*.

# Driver record monitoring pilot program

**HB 1439 by Chisum**
*Died in the House*

**HB 1439** would have authorized the Department of Public Safety (DPS) to create a one-year driver monitoring pilot program, allowing the agency to enter into contracts with certain entities with which it would have shared specific information from its driver's license records. Upon completion of certain requirements and at the recommendation of the agency, the Public Safety Commission could have authorized DPS to implement a permanent program.

An entity eligible to receive driver's license record information under the Motor Vehicle Records Disclosure Act (Transportation Code, ch. 730) would have been allowed to participate in the program, provided it also was:

- an insurance support organization or employer support organization;
- an employer or insurer; or
- an entity that self-insured motor vehicles.

In order to obtain the status of a driver's license and information regarding each moving violation during the preceding three years, such an entity would have submitted specific information and a $6 fee per record to the agency, as required under current law.

DPS would have been required, under a contract entered into through this program, to monitor the driving record of each driver requested by the contractor, identify any changes in the status of the driver's license or any time the driver was convicted for a traffic offense, and periodically provide the contractor with reports of those changes. In exchange, the contractor would have been required to purchase a copy of the driving record of any person identified as having an updated record. The contractor also would have been prohibited from sharing the information with unauthorized parties.

The Attorney General's Office could have filed suit against a contractor to seek injunctive relief to prevent or restrain the violation of contract terms governing illegal disclosure of information. If the contract was violated, the attorney general could have sought a civil penalty of up to $2,000 for each day the violation continued or occurred. An employee of the contractor who violated information disclosure requirements under the contract could have been charged with a class B misdemeanor (up to 180 days in jail and/or a maximum fine of $2,000). If the action was considered an offense under other statutes, the violator could have been prosecuted under HB 1439, another statute, or both.

A House floor amendment would have required the attorney general to allocate the civil penalty fines equally to anyone whose personal information was illegally released. Another amendment would have required DPS to charge a fee equal to one-third of the contractor's net profits under the contract and use that revenue for trauma care.

## Supporters said

HB 1439 would authorize DPS to establish a driver record monitoring pilot program to enable insurance companies and employers of large vehicle fleets, among others, to obtain up-to-date information on their clients or employees. Such a system would create a way to more quickly identify dangerous drivers and allow companies to take action leading to safer driving conditions. This program would change little about the existing system regarding those eligible to obtain information, but it would create a more efficient and expedient process. Thirty-six states already use a program like this.

Texas long has allowed access to driving records for purposes of employment verification, law enforcement, insurance coverage, legal cases, antifraud cases, and other public safety purposes. Insurance companies can use this information to check driving behaviors of new and existing customers. Companies employing drivers can do the same to avoid additional liabilities associated with unsafe motorists, and school districts can check drivers' records to ensure the safety of students who ride their buses.

Today, an average insurance company purchases only about 20 percent of its clients' driving records each year because it too expensive to buy every record on an annual basis. Most motorists' driving histories, therefore, are reviewed only once every five years or so, limiting the ability of an insurance company to determine which of its insured drivers are high-risk and which never or rarely run afoul of the law. Because of this limitation, insurance companies must spread the cost of potential risks across the entire pool of insured motorists. While insurers could not promise rate reductions, it is safe to say that good drivers'

insurance rates would be stabilized while dangerous drivers would pay higher rates and bear the majority of costs incurred through contracting with a third-party vendor.

The bill would protect the security of private information by penalizing those who illegally released information and authorizing the attorney general to file suit against these parties. The bill contains other safeguards, such as making the program temporary, to ensure that Texas did not enter into a permanent contract without first protecting its citizens.

## Opponents said

HB 1439 would create a program that not only would have little benefit for drivers but actually could cause them harm. It would add yet another avenue for the release of motorists' personal information and driving records and could create additional problems for those trying to secure their private data in an age of identity theft. This bill is unnecessary because insurance companies already have several mechanisms through which they can monitor a driver's record.

Giving another entity access to drivers' personal information and driving history would create another source from which hackers and identity thieves could obtain private data. One of the three companies that has indicated an interest and an ability to bid on this program recently has acknowledged security lapses that led to the release of private information to the public. Restoring a credit record and financial standing after identity theft is an arduous process that eats up time, money, and patience of those whose personal information had been stolen. This bill would not create any way for the state to monitor or oversee the third party.

Drivers are more likely to see an increase in rates than a decrease or stabilization of rates because this program would add another layer to the process – the third-party vendor – whose cost would be borne by all ratepayers. The correlation between moving violations and the likelihood of a driver getting involved in an accident is tenuous. In most cases, insurance companies currently receive accident notifications, and this information is the most crucial and telling as to the risk an insurance company must absorb for a particular driver. By raising a driver's rates after a moving violation, an insurance company is doubly penalizing a driver who already has been required to pay a substantial fine associated with the citation.

## Notes

The **HRO analysis** of HB 1439 appeared in Part One of the April 23 *Daily Floor Report*.

SB 876 by Seliger, the identical companion to HB 1439 as passed by the House Transportation Committee, was approved by the Senate, but died in the House.

# Two-year moratorium and local priority for certain toll road projects, revised standards for CDAs, higher highway bonding capacity

**SB 792 by Williams**
*Mostly effective June 11, 2007*

**SB 792** establishes a two-year moratorium, with certain exceptions, on all statewide toll projects that involve a private entity operating or collecting revenue on a toll road. The bill creates requirements for comprehensive development agreements (CDAs), including shortening their maximum duration, and new standards for interaction between the Texas Department of Transportation (TxDOT) and entities authorized to build toll roads. It authorizes, for all toll projects, TxDOT and the Texas Transportation Commission (TTC) to take any action necessary in their reasonable judgment to comply with federal requirements enabling the state to receive funding. SB 792 also adds reporting requirements and oversight for TxDOT.

TTC is authorized to issue bonds secured by the State Highway Fund (Fund 6) up to $6 billion instead of $3 billion and can only issue bonds or other securities in an aggregate principal amount of up to $1.5 billion annually, $500 million higher than the previous limitation. The aggregate principal amount required to be spent on projects that reduce accidents or improve hazardous situations is doubled from its former requirement to $1.2 billion.

**Moratorium.** TxDOT and local toll project entities are prohibited from selling or entering into a contract to sell a toll project to a private entity for two years. If those entities entered into a CDA with a private party after May 1, 2007, any agreement reached prior to September 1, 2009, must not contain a provision allowing the party to operate or collect revenue from a toll project.

The moratorium specifically includes any toll project or managed lane facility project on any portion of U.S. Highway 281 in Bexar County, but exempts CDAs in connection with projects:

- in Cameron, El Paso, and Hidalgo counties, unless a toll project adopted by the El Paso Metropolitan Planning Organization (MPO) prior to May 1, 2007, meets specific criteria;
- associated with the Trinity Parkway in Dallas;
- including one or more managed-lane facilities added to an existing controlled-access highway, primarily located in a nonattainment or near-nonattainment air quality area for which TxDOT issued a request for qualifications prior to May 1, 2007;

- on any portion of the Loop 9 project in a nonattainment air quality area in Tarrant and Dallas counties;
- on any portion of the State Highway 99 project;
- on certain portions of the proposed Interstate 69 project south of Refugio County;
- on the State Highway 161 project in Dallas County; and
- outside the scope of the Trans Texas Corridor located in the jurisdictions of regional mobility authorities (RMAs) meeting specific criteria.

A legislative study committee will explore the public policy implications of allowing a private party to operate and collect revenue from a toll project and must submit its findings to the governor and legislative leaders by December 1, 2008.

**Comprehensive development agreements.** A CDA may run for multiples of 10 years, but no more than 52 years in total, taking all factors into consideration. The contract must contain an explicit mechanism for setting the price at which TxDOT would purchase the interest of a private entity. TxDOT and an RMA may pay an unsuccessful bidder for work done in submitting the proposal, but no longer are required to do so.

TxDOT and TTC must use any revenue received under a CDA to finance construction, maintenance, or operation of a regional transportation or air quality project. Funds must be proportionally allocated based on TxDOT districts covering the CDA project area. Payments received by TxDOT under a CDA, surplus revenue from a toll project or system, and other specified income must be placed in a separate account in Fund 6, which will be broken down into subaccounts for each project, system, or region. A subaccount also will receive any interest it accrues.

A toll project entity must develop a formula for making termination payments to end a CDA under which a private party operated and collected revenue from a toll project. The formula must estimate the amount of loss a private party would incur as a result of the termination but cannot be based on any new estimate of future revenues. An entity that terminates a CDA that allowed a private party to operate and collect revenue from a toll project could issue bonds, if

authorized, to make termination payments or purchase the private party's interest.

A CDA may not contain any provisions limiting or prohibiting work on transportation projects by any governmental entity or contracted private entity. A CDA may allow a toll entity to compensate a private party in the event of a loss of toll revenues due to the construction of certain nearby highway projects, excluding safety or maintenance improvements, work required by an environmental regulatory agency, or a project providing a mode of transportation not included in the CDA.

***County toll road authorities (CTRAs).*** A CTRA may exercise the powers of an RMA, allowing it to enter into a CDA with a private entity. In case of a conflict, CTRAs supersede RMAs. If a CTRA requests or is requested to participate in the development of a project that is part of the Trans-Texas Corridor, the county will be granted all the powers of TxDOT in developing that part of the project.

A county commissioners court or a local government corporation, without state approval, supervision, or regulation, may authorize and use surplus toll project revenues for road work or planning in its jurisdiction. A third party may not pay off the bonds and bond interest of a CTRA toll project, causing it to become part of the state highway system, without the consent of the entity that initially issues the bonds. A commissioners court of a CTRA may pool other existing projects into its tolling authority.

***Transportation authorities.*** Regional tollway authorities (RTAs) may enter into CDAs in the same fashion as other local toll authorities. Under certain situations and after an agreement with a prescribed government entity, an RTA may use surplus revenue for a turnpike project or certain other transportation projects. A member of the RTA board of directors is subject to prohibitions on solicitation or acceptance of certain gifts and benefits. A violation of these provisions is a class A misdemeanor (up to one year in jail and/or a maximum fine of $4,000) under this section or under Penal Code, sec. 36.08, which governs gifts given to a public servant. Each MPO policy board must adopt in its bylaws provisions aimed at preventing conflicts of interest.

***Uniform toll project contract standards.*** All toll projects are subject to uniform standards governing financing, construction, operation, and maintenance. Local entities have the primary responsibility for financing, construction, and operation of a toll project, but that does not limit the authority of TxDOT or TTC to participate in those endeavors. Local entities have the right of first refusal to develop toll projects in their jurisdictions. If they exercise their option to move forward with a project but fail to take certain steps within the prescribed time frame, TxDOT and TTC have the opportunity to develop the project if they take the same steps in the same time frame. TxDOT must assist the local entities in financing, construction, and operation of a toll project by allowing them to use state highway right of way (ROW) and access to the state highway system. Any entity operating a toll road has the same powers as TxDOT for toll collection and enforcement. Fines for failing to pay a toll may not exceed $250. Revenue may be used by the entity for any work on a toll road or lane.

***Market valuation study.*** A local toll project entity – a county, RTA, or RMA – must reach an agreement with TxDOT to build a toll project. The agreement must contain provisions governing the initial toll rate and escalation methodology and requiring that the project undergo a market valuation study. TxDOT and the local entity must select an independent party, which cannot have a financial stake in the actual project, to appraise the value and corresponding upfront concession fees a project would realize on the private market. The local entity has first option to build the project, except for an RMA, for which its respective MPO makes the decision. If the local authority cannot raise the up-front payments or follow certain procedures within six months, TxDOT may proceed with the project with the private sector. If the local authority develops the project, it must commit to using the surplus revenue from the toll project to build additional road projects or deposit that money into a TxDOT account to be used for regional road projects. Both TxDOT and a local authority may issue bonds to pay any costs associated with a toll project. If TxDOT and the local entity cannot agree on the terms and conditions of an agreement, neither the entity nor the agency may develop the toll project.

***Oversight.*** TxDOT must seek transparency in its role related to the Trans-Texas Corridor by providing, to the greatest extent possible under the Texas Public Information Act and other open-records statutes, any information the agency collects, assembles, or maintains on the project. A toll project entity may not enter into a CDA until:

- the attorney general vets the agreement and determines it to be legally sufficient;
- it provides the Legislative Budget Board (LBB) with copies of the proposed agreement, proposal, and a financial forecast detailing revenue the entity expects to derive from the project, estimated construction costs and operating expenses, and the amount of income the entity expects a private party to realize under the agreement;
- it allows the state auditor to review and comment on a traffic and revenue report; and

- it publishes prescribed information in an area newspaper and conducts a public hearing on the proposed project.

## Supporters said

SB 792 would recognize the will of the people by placing a two-year moratorium on most toll projects that involve private entities running or building state roads. The bill would ensure that the state moved cautiously before leasing what could be valuable property to private industry for several decades, while providing local tolling authorities additional tools needed to build and finance toll and non-toll projects to meet growing demands for new roads. The bill also would create protections and more financial options for state transportation authorities by allowing them to ensure that procedures used by local entities did not risk the state's federal funding and by increasing the state's bonding authority limits.

*Moratorium.* The bill would allow the state to take a step back before leasing more land for highway projects to private entities. The moratorium would not stop all projects underway because most that are far enough along in the planning stages would be exempted under the bill. It also would not prevent construction of toll roads – state and local tolling authorities still could build them independently. Planning on toll roads also could continue. SB 792 would, however, have a significant effect on up to 25 projects on which TxDOT could put out a bidding request in the near future. These projects are not as far along as those that have been exempted. It would be more than appropriate to take a two-year pause to explore the types of contracts created under CDAs and the type of legacy they would leave for taxpayers in 50 years. Although TxDOT still could explore a loophole through which it could pursue private participation in toll projects, passage of the bill would convey the Legislature's disapproval of such a financial arrangement. Most projects still would be subject to a lengthy environmental review period, which would give legislators time to close any loopholes TxDOT tried to pursue during the next legislative session.

SB 792 would respond to the legitimate reservations many Texans have about allowing private enterprise to run a vital piece of infrastructure and perform a role that should be a government function. Government is more beholden to the will of the people and would be less likely to raise toll rates to the degree a private company would. It also is more accountable than a private entity, which, due to demands for higher profits, could take shortcuts in materials used to build these roads that might not be apparent until after the contract had expired. The fact that private companies are

itching to bid on these projects demonstrates their value, and instead of allowing private industry to make money off the state, Texas instead should be exploring ways to finance these projects itself. Toll revenue should not be used to enrich a few private investors but instead should be used to benefit the people who pay the tolls. The bill would require a legislative study of outsourcing toll roads, allowing serious contemplation about the ramifications of such an endeavor.

By doubling the limit on bond financing backed by the State Highway Fund, the bill would add financing options for transportation projects over the next biennium, which would help fill the void created by instituting a moratorium. TTC has been issuing bonds and allocating money to MPOs since it was first granted this authority in 2003, and this has proven to be an important source of funding for essential transportation projects.

*Comprehensive development agreements.* SB 792 would grant locally elected officials more control over toll projects in their jurisdictions. If a state agency wanted to build a toll project in a county, the bill would give local authorities the right of refusal and would give areas with local tolling authorities the ability to prevent the project altogether. Local decision makers know what is best for their areas.

The bill would keep money generated by toll roads in one region from being spent in another region. The bill would allow surplus toll revenues to be spent on free non-tolled projects in the same district, such as roads, highways, transit systems, and bicycle and pedestrian projects. It would not shift policy but instead would require what was a permissive procedure, preventing TxDOT from using toll money – essentially local tax dollars – for projects in other parts of the state. It would provide local tolling authorities access to state rights-of-way for a reasonable fee instead of the excessive terms TxDOT had been seeking in at least one proposed contract. These rights-of-way belong to state taxpayers, not any specific state agency, so charging local governments above the cost of land acquisition would be akin to double taxation.

It also would mitigate industry-friendly contract terms dealing with buy-back provisions and non-compete clauses. By prohibiting the use of future project revenue in calculating how much money a private company would receive if the state bought the road from a private industry, the bill would act as a safeguard against prohibitively high buyout costs. Non-compete clauses can lead the state to shortchange maintenance and improvements to existing free roads, tying the hands of local governments seeking solutions to transportation problems to the benefit of a private company. Non-compete clauses also force the state

to compensate private interests if certain transportation projects reduced traffic along a toll road, and by prohibiting them, this bill would reduce yet another cost borne by Texas motorists that would benefit a private company.

A pilot project, which would affect only State Highways 161 and 99 in Dallas and the Harris County area, respectively, would allow a tolling authority and TxDOT to enter into a market valuation study under which the local entity would pay costs equal to the estimated project value into Fund 6 or build additional road projects. This market valuation study would allow those critical of the current concession model to see if more revenue would be generated under that format or the traditional model of collecting tolls over the life of the project.

*Oversight.* SB 792 would continue the Legislature's efforts to press TxDOT into being more forthcoming with the public about toll projects. Audits over the past few years have shown the agency has not been as transparent as it could have been in its planning process and has not been fairly representing expected costs and revenues related to the Trans-Texas Corridor.

## Opponents said

SB 792 would be an overreaction to the unpopularity of toll roads in certain segments of the state that only would serve to exacerbate Texas' already backlogged highway construction process. If the objective of the bill is to slow down or scale back programs the Legislature created without fully vetting them four years ago, passage of a "fix" bill that has had very little public examination while being rushed through both chambers would show the state has not learned its lesson. Many of these provisions would serve to scare off potential investors both by showing that any long-term agreements could be subject to significant change and by reducing other incentives aimed at encouraging investment.

*Moratorium.* The Legislature saw fit four years ago to create an expansive, long-range solution to the state's transportation needs and revised those plans just last session. Suspending that program now, without fully seeing exactly what the program would do, would be short-sighted. Coupled with a lack of any real alternative to build new roads for a rapidly growing population, this decision would have severe repercussions for Texas roads. While TxDOT's lack of transparency and other actions have not necessarily instilled confidence in members of the Legislature and the public, any such attempt to punish the agency ultimately would hurt Texas motorists. Instead of

studying the ramifications of a program that already is in place, the Legislature should allow the program to continue and modify it or explore other changes as necessary.

The political incentives for placing a moratorium on this program are the exact reasons why the private sector is best equipped to manage toll roads. Governments concerned about a backlash against raising rates, even at the risk of losing revenue, would not necessarily operate the roads in the same manner a business would. Although a private entity could raise rates, it has to answer to the people in its own way. Drivers who found the costs excessive would speak with their cars and stop using toll roads, and if such an action were widespread, the market eventually would force the entity to respond by lowering rates. Private firms also can experiment with ideas, such as peak pricing, because they have more flexibility to try a market-based approach to solve congestion problems. Governments and taxpayers also benefit under such a scenario because the up-front payments required in most CDAs allow local entities and the state not only to use that money on other roads and urgent needs but also any money that would have come out of their own coffers for the road project.

Increasing the bond limit would require appropriations the state cannot afford to spend on interest. At a time when skyrocketing gasoline prices could cause people to reduce how much they drive, it would be unwise to use bonding authority backed by Fund 6, which is heavily dependent on revenue from state and federal motor-fuel taxes.

*Comprehensive development agreements.* This bill would prevent TxDOT from overseeing tolling authorities and would essentially be granting local tolling authorities the same powers it is trying to strip from TxDOT, creating a number of smaller versions of the agency. Granting a local entity right of first refusal on any project would increase inefficiencies and expense for any toll projects by eliminating any competition. The advantage of the current system is the role of the market in driving costs down, which compounds the advantages of issuing bonds to pay back these lower costs over time. Large, up-front concession payments from private entities have been used for other transportation projects, and by removing these companies from the initial phase and potentially from more toll projects in the state, other construction projects likely would not be built.

Amending non-compete clauses could result in lower, fewer – or, in some cases – no bids from private entities that might not find a toll project as enticing if another highway could be built to serve the same market of drivers at which the toll road was aimed. Existing non-compete clauses have

been designed to ensure the state does not use proceeds from the agreement to build a free roadway that reduces traffic on that private partner's tolled road. These agreements do not prevent a toll authority from building roadways that might compete with those toll roads in the district. Further, it does not prevent the state from repairing or improving existing thoroughfares.

Adding a buy-back provision also would have serious implications for the types and levels of bids for toll projects and could eliminate up-front payments altogether. The state essentially would be allowing private entities to finance and build a project based on the long-term revenue potential, but before the companies could actually recoup those costs, it could take the project back at a price that would not allow the companies that took the risk to realize the full reward.

*Oversight.* TxDOT contends that it has publicized as much information as it could as quickly as it could with regard to CDAs, and some of the bill's provisions would have the effect of scaring off businesses from investing in the state. The agency backed Cintra-Zachry in its legal fight against the publication of certain sensitive contract language in the master development plan of the first stage of the Trans-Texas Corridor to ensure the integrity of the competitive process by not releasing proprietary information before the contract was finalized. Once a final agreement was reached, the agency put the document on its Web site. Protecting the public interest is important, but if the state is to entice businesses to invest in its road projects, it must ensure that competitors cannot access key strategic information.

## Other opponents said

A two-year moratorium on toll road agreements with private companies that would exempt almost every project in the advanced planning stages would not be much of a moratorium. However, halting private involvement – and its associated up-front concession fees – for the next two years would reduce potential funding sources for new road construction. Texas' road construction needs are immense, as is its project backlog, and other existing resources for road construction are not enough to reduce traffic congestion and improve air quality in the most heavily trafficked areas. Any moratorium should be coupled with imposition of new state fuel taxes that would provide a funding source for the most urgent problems over at least the next fiscal biennium.

*Moratorium.* This bill should be amended to ensure TxDOT could not find loopholes through which it could still pursue privately financed or operated toll roads, such

as facilities agreements or other accounting tricks. Banning the overarching toll-road contract would not necessarily prevent a facilities agreement, under which individual segments of the Trans-Texas Corridor are expected to be built. Private companies also could finance and build toll roads by collecting annual fees from the state based on traffic, as opposed to collecting profits, and circumvent the moratorium imposed by the bill.

This bill should be amended to remove the exemptions granted to several toll projects. If the premise of SB 792 is to say that toll roads, especially those financed or built by private enterprise, are not the responsible option, the act of exempting so many projects seriously would undermine that rationale. If this is bad public policy for some, it should be bad public policy for all. Some of the proposed projects, such as the proposed Interstate 69 corridor, would be exempted from the moratorium even though there is virtually no chance a CDA could be reached during the next two years.

The moratorium should be extended to all toll road projects because tolls are an unfair double tax on drivers who already have paid for road projects through fuel taxes. They are regressive taxes that impose the same fee on all classes yet represent a greater hardship on low-income and middle-class drivers.

*Comprehensive Development Agreements.* The market-valuation study would undercut one of the critical benefits that could be attained by a moratorium. Because a government entity would not be as prone to squeezing as much money out of the driving public as would a private company, a moratorium should be expected to reduce motorists' toll burden. Unfortunately, requiring an assessment of the market value of a road would force a local government to compete with private industry in trying to achieve the greatest amount of profit for a road project. Government's job is to serve the public, not to make a profit. This provision would change little about today's current problems with privately run toll roads. Instead of facing escalating toll rates from a company, drivers would be charged excessive rates by a local government.

TxDOT should be required to gain approval of local governments before starting any toll project, whether or not there was a local toll authority. Also, the local involvement should be expanded to include voters, who should be allowed to vote on a new project in the same way they can for bond issues.

## Notes

The **HRO analysis** of SB 792 appeared in Part One of the May 17 *Daily Floor Report*.

HB 1892 by W. Smith, which contained much of the same language as SB 792, was approved by the Legislature but vetoed by the governor. Notable differences between SB 792 and HB 1892 are that SB 792 increases the maximum length of CDAs, adds exemptions to the moratorium, and allows TxDOT and TTC to take any reasonable action to ensure eligibility for federal funds is not compromised. The HRO analysis of HB 1892 appeared in Part One of the April 10 Daily Floor Report. For more information on HB 1892, see HRO Focus Report Number 80-6, *Vetoes of Legislation, 80th Legislature*, July 9, 2007, pp. 43-45.

# Statewide standards for use of red-light cameras

**SB 1119 by Carona**
*Effective September 1, 2007*

**SB 1119** establishes procedures for local entities opting to use cameras to cite owners of vehicles illegally running red lights. It caps civil penalties at $75 and late fees at $25 and requires net proceeds be split between the state and local entity for health and safety programs.

***Establishing a program.*** The governing body of an entity authorized to enact traffic laws may, by ordinance, implement a red-light camera (RLC) system to issue a civil penalty to the owner if a vehicle runs a red light. Before implementing a program, a local entity must compile accident report statistics for any eligible intersection for the 18 months before installation of a camera and send subsequent accident information annually to the Texas Department of Transportation (TxDOT).

***Installing a system.*** A governmental entity may install and operate a system itself or contract with a vendor to do so. Intersections for the program must be determined by traffic volume, accident history, and frequency of red-light violations without regard to ethnic or socioeconomic characteristics of an area. The local entity must perform a traffic engineering study of an intersection approach proposed for the program to determine whether a design change could be used in lieu of, or in addition to, an RLC to reduce violations at the intersection. A citizen committee must advise the local government on installing RLCs.

A local government must erect a sign at least 100 feet from an intersection with a RLC to notify drivers that cameras may document violations, resulting in a citation and fine. A traffic signal under the program must maintain a steady yellow light for the minimum time specified in the Texas Manual on Uniform Traffic Control Devices.

***Revenue.*** An entity may authorize a vendor to administer the system, but cannot enter into a contract granting a company a specified percentage or dollar amount for each civil penalty collected. At the end of the fiscal year, a local entity may deduct from the revenue generated through civil penalties and late fees money necessary to run the program. Of the remaining money, 50 percent must go to the state and 50 percent to a local account used only to fund traffic safety programs. The executive commissioner of the Health and Human Services Commission (HHSC) will use the state share to fund uncompensated care of designated trauma facilities and certain emergency medical services in

the same regional advisory council jurisdiction as the entity that remitted the revenue.

***Enforcement.*** A civil penalty is initiated by mailing a notice of violation to the owner of a vehicle caught running a red light by the camera. The notice, including penalty amounts and adjudication procedures, must be sent within 30 days after the violation to the owner at the address provided through registration records.

A civil penalty is not considered a conviction. A local entity may not forward information on a civil penalty to a credit bureau. Failure to pay the penalty may not result in an arrest warrant nor may it be noted on the owner's driving record. It may result in TxDOT or a county assessor-collector refusing to register the vehicle.

Implementing a RLC program does not preclude an officer from citing a person for running a red light. Any person using the cameras for other than documenting red-light running is subject to a class A misdemeanor (up to one year in jail and/or a maximum fine of $4,000).

***Presumptions.*** A RLC program presumes the owner of a vehicle shown in a photo depicting a violation committed the infraction. If, at the time of the violation, the vehicle was owned by a different person or a person in the business of selling, renting, or leasing vehicles, a civil penalty may not be imposed on that owner upon presentation of evidence within a certain time frame. If a vehicle owner proves another person was driving the vehicle, that person will be assumed to have committed the violation and be subject to a civil penalty.

***Adjudication.*** A person receiving a violation notice may contest the civil penalty by requesting an administrative adjudication hearing. An owner contesting the finding may appeal, and the court will hear the appeal through a new trial without regard to the finding made at the administrative hearing.

## Supporters said

SB 1119 would create a uniform statewide standard for red light camera programs, which have been used successfully for the last several years by cities across Texas. Codifying uniform standards would remove lingering

uncertainty about the legality of the programs and establish a procedure for all entities to follow to ensure that safety was the paramount concern. The bill would ensure that cameras were used to benefit public safety and not as a revenue stream for local governments.

Accidents caused by Texas drivers who run red lights are costly in human and economic terms. A recent Federal Highway Administration study identified Texas as one of the worst states for red-light running. Red-light accidents often are among the worst because they can involve vehicles crashing directly into the driver or passenger side of another car at high speeds. More than 110 cities and at least 12 states and the District of Columbia employ RLCs. Several studies have shown their benefit in reducing violations and accidents. Although most studies have shown some increase in rear-end crashes, due partly to drivers slamming on their brakes to avoid running a light, those accidents are not as dangerous as a "T-bone," or sideswipe, accident.

*Uniformity.* SB 1119 would create a statewide standard clear to drivers, who otherwise could face different rules in different jurisdictions. No uniform state statute specifically addresses this program, and because this statute would be more recent and more specific than any other provisions under which RLC programs have been implemented, this statute should govern all RLC programs in Texas.

SB 1119 would prevent an entity from using a RLC program as a cash cow by standardizing penalties and requiring revenue be used for certain purposes. At least one Texas city already has exceeded the $75 fine by $50, and another is using the revenue for its general budget. This bill would prevent that. Municipalities also would be prohibited from entering contracts based on the number of citations issued, reducing incentives to issue large numbers of citations. Municipalities would be able to cover expenses and net proceeds would have to be spent on local safety efforts and uncompensated trauma care.

*Effect on enforcement.* Under most RLC programs in Texas, municipalities have little ability to compel payment from offenders, and SB 1119 would increase the motivation to pay. It would allow a county or TxDOT to deny registration to the owner of a vehicle with unpaid fines. However, a county or TxDOT could decide, with proper evidence, not to use that authority under certain circumstances. The bill also would prevent credit bureaus and insurance companies from accessing RLC violations.

*Effect on motorists.* The standards for RLC programs in SB 1119 would allow a person who felt wrongly accused several opportunities to be heard. The hearing and appeals

process would give motorists ample opportunity to explain what happened and give administrative officials the same discretion an officer at the scene would have had. It also would alert drivers of an intersection using a RLC with a sign along the road.

Privacy claims brought by drivers on public roads have been rejected by courts around the country. The fact that cameras already are used widely in Texas, including at toll booths, with little public complaint proves they not only are effective but relatively noninvasive. The cameras are triggered to take photos only after a motorist has run a red light. Under SB 119, RLCs could photograph the vehicle and license plate but not the driver. The bill would protect privacy by sending an offender a copy of the license plate but not the vehicle.

## Opponents said

This bill would create statewide standards for a system with questionable safety benefits. The state should do the opposite – ban RLCs and explore other options that could have beneficial safety effects, such as lengthening yellow-light time, making lights more visible, and exploring engineering solutions to problems that may have caused drivers to run the light.

While some studies have touted the success of RLCs, several states and municipalities have reached different conclusions. Two states have canceled their programs, and at least four others have banned the cameras altogether. Studies have found installing the cameras increased rear-end crashes and crashes resulting in severe injuries and fatalities.

*Effect on enforcement.* Cameras cannot use discretion the way an officer on the scene can by choosing not to cite a motorist because of bad weather or participation in a funeral procession, for example. Cameras also cannot remove reckless or drunken drivers from the road and could evolve into a replacement for uniformed traffic officers.

*Effect on motorists.* RLCs deny a driver's ability to confront the accuser as guaranteed under the Sixth Amendment. A camera cannot testify about what happened, and an accused motorist cannot defend against a machine that may have malfunctioned and snapped a picture when the light was not red.

Use of RLCs is akin to "big brother" spying on Texas drivers. Surveillance cameras are popping up everywhere, with public and private cameras installed on streets and buildings to monitor traffic and guard against break-ins.

RLC programs violate the Fourth Amendment's protection against unreasonable search and seizure. City governments unreasonably deploy cameras on public roads without probable cause to believe that a particular motorist will violate the law.

## Other opponents said

Although this bill wisely would create statewide standards for RLC programs, several provisions would undercut this effort, including the lack of a requirement that an entity follow this model. Also, limitations on penalty amounts and revenue expenditures could hamstring local governments.

*Uniformity.* Repealing provisions that local governments now use to employ RLC programs would ensure all entities followed the procedures in the bill and would reduce the opportunity for municipalities to use penalties against motorists for violating other laws or ordinances. While municipalities so far have used this provision only to operate RLC programs, it could be construed to govern other actions not explicitly covered by state law, such as prohibiting the use of a cell phone while driving.

Limiting fines is a good idea, but the bill should provide more flexibility. Smaller cities with less net revenue should be exempted from these limitations because their budgets for public safety programs are limited. The bill could turn RLC programs into a liability, making it difficult for entities to use them if they did not have enough money to cover the costs. This bill should provide for a penalty range to allow for increases in program costs and other inflationary factors.

To ensure safety was the paramount concern, the bill should enhance requirements for an engineering study at an intersection selected for the program. Simply mandating a study and creating an advisory committee without any

power to veto use of an RLC would not be enough. The bill should require an entity to implement engineering changes that would reduce accidents and violations and determine if it would eliminate the need for an RLC. Otherwise, it could appear a city was more interested in generating revenue than preventing accidents.

*Effect on enforcement.* Denying registration to a vehicle owner would be excessive. Although the bill would prohibit an entity from issuing a civil penalty if a criminal citation already had been issued for the violation, it would not provide for what happened if a person inadvertently were issued a civil and a criminal penalty, allowing an enterprising motorist to pay the civil penalty and contest the criminal violation on the basis that the driver already had been punished for the offense. It also would not fully provide for interactions with uniformed officers. If an officer used discretion not to cite a driver at a monitored intersection, a civil penalty still could be issued under this program.

## Notes

The **HRO analysis** of SB 1119 appeared in Part One of the May 15 *Daily Floor Report*.

SB 1119 incorporates SB 125 by Carona, which was analyzed in Part Three of the May 22 Daily Floor Report.

A related bill, HB 922 by Truitt, which took effect on June 15, 2007, prohibits a municipality from using an automated traffic control system on a highway or street under its jurisdiction to enforce compliance with posted speed limits.

# Authorizing $5 billion in general obligation bonds for highway projects

**SJR 64 by Carona**
*Effective if approved by voters at the November 6, 2007, election*

**SJR 64** would add Texas Constitution, Art. 3, sec. 49-p to allow the Legislature to authorize the Texas Transportation Commission (TTC) or its successor to issue state general obligation bonds in a total amount no greater than $5 billion for highway improvement projects. TTC would prescribe terms, denominations, and installments of the execution of the bonds. A portion of the proceeds from the sale of the bonds and a portion of interest earned on the bonds could be used to pay the costs of administering authorized projects, the cost or expense of issuing the bonds, and all or part of a payment owed under a credit agreement.

The bonds authorized under this section would constitute a general obligation of the state, which would be required to pay the principal of and interest on the bonds that matured or became due during the fiscal year, including an amount necessary to make payments under a related credit agreement.

## Supporters said

SJR 64 would help the state finance badly needed highway infrastructure to meet its transportation and economic development needs. The state has a funding gap between transportation needs and available funding of at least $77 billion. While toll roads have increasingly been used as an alternative to finance highway construction, the two-year moratorium enacted this session (SB 792) that prevents the state from entering into an agreement with a private firm to build a toll road and receive up-front payments that could be used for other transportation projects shows the limitations of this funding source.

The Texas Department of Transportation (TxDOT) has been moving in a new direction since the approval of Proposition 15 in 2001, when the state's longstanding "pay-as-you-go" policy for transportation funding was modified to allow transportation officials to borrow money to construct new roads instead of waiting to build until funding was appropriated. The Constitution prohibits state-supported debt from exceeding 5 percent of uncommitted general revenue, and the state debt currently is below 2 percent, leaving roughly $21 billion available for general obligation bonds. The bonds authorized by SJR 64 would not have a significant impact on the state's fiscal standing because Texas has a low debt burden compared with other states.

Although the state has dedicated transportation funding sources, bonds supported by general revenue likely would have a lower interest rate because the revenue stream is more consistent than the revenue stream from the State Highway Fund (Fund 6). Additionally, transportation projects affect many other sectors and have a statewide benefit to the economy and the improvement of statewide infrastructure. Other states, as well as local governments, use bonding authority backed by general funds for transportation projects under this same rationale.

## Opponents said

Short-term borrowing would require general revenue appropriations the state cannot afford to spend on debt service. Borrowing would increase the state's costs in terms of forgone interest earned on cash balances and interest charges for new borrowing. Texas has a longstanding policy of funding transportation projects solely through dedicated funds and minimizing obligations of general revenue. Trusting an agency such as TxDOT that has not been forthright with the Legislature or the public regarding its expenditures and budgeting with even more money outside of the traditional appropriations process would be irresponsible.

Borrowing money for construction increases costs and passes them along to future taxpayers and legislatures. Texas should continue to pay for the amount of highway construction it can afford, rather than encumber scant resources and drive up the cost of already expensive projects. Adding even more debt would increase the amount of money needed for debt financing, which could limit the state's ability to meet unforeseen needs.

Transportation projects should be funded through Fund 6 and not general revenue. It would not be in the state's best interest to tie up money that could be used to certify the budget or for other urgent state needs such as public education and children's health care on debt service for bonds to build highways.

## Other opponents said

Rather than using strained resources to incur more debt, the state should put more money into Fund 6 by raising gas tax rates, vehicle registration fees, or both, or by dedicating other revenue streams to Fund 6, such as motor-vehicle sales taxes or vehicle inspection fees.

## Notes

The **HRO analysis** of SJR 64 appeared in Part Two of the May 22 *Daily Floor Report*.



**U**tilities

| | | | |
|---|---|---|---|
| * HB 735 | Straus | Repealing the Telecommunications Infrastructure Fund assessment | 206 |
| * HB 1090 | Swinford | Grants to encourage electric energy generation with biomass materials | 207 |
| * HB 3693 | Straus | Electricity efficiency and conservation incentives | 209 |
| SB 482 | Fraser | Competition incentives for retail electric customers | 211 |

# Repealing the Telecommunications Infrastructure Fund assessment

**HB 735 by Straus**
**Effective September 1, 2008**

**HB 735** will repeal the Telecommunications Infrastructure Fund assessment, a 1.25 percent tax on the taxable receipts of telecommunications providers. Collection of the assessment will continue until September 30, 2008, but not after that date. The bill repeals Utilities Code ch. 57, subch. C and other sections of code governing the TIF board and policies.

## Supporters said

HB 735 would eliminate an assessment paid by telecommunications consumers that raises revenue to fund a government program that has accomplished its original purpose and needs to be ended. TIF was created in 1995 to finance access to telecommunications services for public schools, nonprofit hospitals, public libraries, and higher education institutions across the state. The fund was maintained through an assessment of 1.25 percent on telecommunications providers' taxable receipts and was authorized to collect up to $1.5 billion over 10 years. The program has helped purchase computers and install networks in schools, libraries, and hospitals throughout Texas. However, more recently proceeds from the TIF assessment have been diverted into the general revenue fund rather than being earmarked for their original intended purpose to combat the "digital divide." Now that it has achieved its purpose, there is no reason to continue collecting TIF money.

The TIF assessment is a burdensome tax paid by telecommunications consumers. According to the Tax Foundation, as of 2004, Texas had an effective tax rate on telecommunications services of more than 14 percent, a rate of state telecommunications taxation surpassed only by Rhode Island. Having a vibrant telecommunications sector is crucial to continued future growth, and this sector should not be subject to excessively high taxation. Texas can afford to abolish TIF in the current fiscal environment, and policymakers should not wait any longer to eliminate a tax that was due to expire years ago.

## Opponents said

By eliminating the TIF assessment, the bill would result in an estimated loss to the state of $176 million in fiscal 2009 and an additional $424 million in fiscal 2010-11. TIF funds have been used to support essential government services in recent years and may be necessary to contribute to property tax relief or other important programs in the future. It would be imprudent for the state to eliminate this important source of revenue without accommodating the change by augmenting other taxes or reducing state spending.

While the TIF's success is commendable, its original mission has not completely been accomplished. Schools, libraries, and hospitals continue to need new computers, and Texas still has a need to upgrade local telecommunication networks. All these projects require a secure and dedicated source of funding. The state should continue collecting the TIF assessment, but the money should be dedicated to its original purpose instead of diverted to general revenue.

## Other opponents said

Collection of the TIF assessment should end as quickly as possible rather than waiting until September 2008. Delaying that provision of HB 735 only would compound the unfairness of this tax. The Legislature should reconsider the decision made last session to divert the TIF assessment revenue to pay for other general revenue expenditures. This biennium is projected to end with a substantial surplus, so any revenue loss from ending the TIF assessment as soon as possible would not affect current spending priorities.

## Notes

The **HRO analysis** of HB 735 appeared in the March 19 *Daily Floor Report*.

# Grants to encourage electric energy generation with biomass materials

**HB 1090 by Swinford**
*Effective September 1, 2007*

**HB 1090** establishes an agriculture biomass and landfill diversion incentive program at the Department of Agriculture. The program will distribute grants to encourage electric energy generation with certain types of biomass materials. Grants will be distributed with the intent of moving the state forward in its goal to generate more renewable energy.

A farmer, logger, or diverter can receive a monetary grant for delivering qualifying biomass to an eligible facility. Qualifying biomass includes agricultural biomass, storm-generated biomass debris, forest wood waste, urban wood waste, and agricultural livestock waste nutrients. Grants amount to $20 for each ton of qualifying biomass. The agriculture commissioner may compensate a farmer, logger or diverter for an amount greater than $20 per ton in order to encourage the submission of qualifying biomass.

To qualify for program participation, a facility must generate electric energy through biomass materials. Among other criteria, the facility is required to use the best available emissions control technology and be operational after August 31, 2009. Facilities must verify and document the amount of qualifying biomass received for electric energy production. The facility will disburse the grant to the farmer, logger or diverter on behalf of the Department of Agriculture. Each quarter, the department will reimburse facility operators for grant distribution. Grant provisions for farmers, loggers, and diverters also apply to facility operators, including grant amounts.

The Texas Commission on Environmental Quality and the Public Utility Commission (PUC) will assist the Department of Agriculture in implementing the bill's provisions. The total amount awarded by the department for qualifying biomass material may not exceed $30 million per fiscal year, and no single facility may receive more than $6 million per fiscal year. The agriculture biomass and landfill diversion incentive program will expire on August 31, 2019.

HB 1090 also amends the Utilities Code to make certain modifications to the renewable energy program. PUC will establish an alternative compliance payment that entities can pay in order to meet renewable energy purchase requirements. Also, if a customer notifies PUC that it chooses not to support the state's renewable energy generation goals, the commission will reduce the renewable energy purchase requirements for the appropriate retail electric provider, municipally owned utility, or electric cooperative.

The bill requires the completion of two studies by January 1, 2009. The commissioner of agriculture will conduct a study of the volume of wood waste in the East Texas and Central Texas forest regions. The PUC will examine the effect of the renewable energy credits trading program on the state's market power and residential electricity rates.

## Supporters said

As the nation's second-largest agricultural producing state, Texas represents an ideal location to promote the conversion of biomass into energy. By establishing such a program, HB 1090 would open new markets for Texas' agricultural industry and create job growth through the operation of biomass facilities. The bill's potential positive economic and environmental impact would more than outweigh its cost, offering lawmakers a rare "win-win-win" opportunity as producers, consumers, and the environment all stand to benefit from the program's implementation.

Emissions from fossil fuel plants generate harmful air contaminants, posing serious health risks for Texans. By contrast, biomass constitutes a renewable and reliable energy source, capable of generating clean electricity 24 hours a day. The bill also would benefit the environment by diverting waste from landfills and reducing the amount of refuse openly burned. Typically, biomass materials are considered a burden to farmers, loggers, landowners, and communities. Wood waste often is the primary substance in landfills, and the decay of timber leads to methane emissions that contribute to global warming. Under HB 1090, these materials would be used to produce energy instead of damaging the environment.

HB 1090 would promote biomass production in Texas, increasing the diversity of energy sources and leading to a drop in energy prices for consumers. Facilities specializing in biomass energy production are expensive to build and require a sustainable source of biomass for use as fuel. By ensuring a ready supply of biomass, the distribution of grants for qualifying biomass would make this form of

energy production more economically feasible. Moreover, the use of biomass for energy contributes to national and regional energy security.

Modifications to the Utilities Code would give customers and energy providers greater flexibility in the renewable energy credits program. Additionally, a study of the program would generate important information on program outcomes.

## Opponents said

Prior to program implementation, the life cycle of biomass should be evaluated to determine its true environmental impact in energy production. Although biomass is renewable, making it ready for use as an energy source still could contribute to global warming. For instance, the process of transporting biomass to production facilities could lead to increased emissions of air contaminants and carbon dioxide.

According to the Legislative Budget Board, the bill would cost the state over $15 million per year, staring in fiscal 2010. Currently, a market for certain forms of energy production exists. A government program should not distribute economic incentives to alter this market. Instead, market forces should determine the production and use of certain fuel sources. When biomass becomes a viable economic option for energy production, the market will demand it.

## Notes

The **HRO analysis** of HB 1090 appeared in the April 30 *Daily Floor Report.*

# Electricity efficiency and conservation incentives

**HB 3693 by Straus**
**Effective September 1, 2007**

**HB 3693** requires local governments, state agencies, and universities to adopt various policies to save energy; revises building codes to encourage energy savings; and provides incentives to electric utilities and consumers to reduce the growth in demand for electricity.

School boards must establish a goal for the reduction of energy consumption by 5 percent each fiscal year during the six years after September 1, 2007, and school districts and higher-education institutions are required to buy energy-efficient light bulbs. State agencies also will be required to buy energy-efficient products, including light bulbs. Energy-saving devices are required for vending machines in state agency buildings.

Governmental entities responsible for utility payments must post information on their electricity, water, and natural gas utility bills on an Internet site accessible to the public. Single or multi-family dwellings built with state or federal loan funds must include energy conservation and efficiency measures. The State Energy Conservation Office is authorized to adopt energy efficiency standards based on standards in the most current International Residential Code or the International Energy Conservation Code.

HB 3693 requires electric utilities to give school districts credit for any surplus energy produced by solar panels on the roofs of schools. It also allows for the interconnection of distributed renewable generation into the bulk electric grid.

Other provisions of the bill establish goals for reduction of growth in demand, beginning with a target of a 15 percent reduction of demand by December 31, 2008, and for retail electric providers in the Electric Reliability Council of Texas (ERCOT) region and electric utilities outside the ERCOT region to provide customers with energy efficiency educational materials. Municipally owned utilities and electric cooperatives with retail sales of more than 500,000 megawatt hours in 2005 must report to the State Energy Conservation Office by September 1, 2009, on the combined effects of their energy efficiency activities.

The bill exempts certain energy-efficient products – including light bulbs and some appliances – from sales and use taxes during the Memorial Day weekend.

The Public Utility Commission will be required to review a merger or consolidation, sale of 50 percent of stock, or transfer of controlling interest in a transmission and distribution utility, if the transaction took place after May 1, 2007.

## Supporters said

HB 3693 would provide a comprehensive approach to energy efficiency, with the state setting an example on how those programs work and by aligning these programs with the restructured electricity market. These measures should result in reductions in electricity consumption to avoid peak demand problems and avoid new costs for power plants and power lines. Texas must have electricity capacity to continue to grow, but the state cannot solve the projected shortfall in reserve capacity by building generation facilities or by conservation measures alone. The state must do both and needs to be a better steward of our energy resources.

Government should not mandate any program for businesses and consumers that it would not apply to its own operations. State and local governments have the obligation to set an example. HB 3693 also would provide for transparency and accountability in energy efficiency programs by requiring entities to set goals and post the results where the public could see them.

HB 3693 would be designed so that energy efficiency programs matched the Texas marketing structure. Under the old regulatory regime, the PUC could mandate energy savings as part of the rate hearing and adjust rates to account for energy savings. Policymakers must be flexible and innovative to design these new programs under restructuring. HB 3693 would provide a schedule of goals and incentives rather than mandates so that electric utilities and retail service providers could be compensated fairly for energy efficiency programs. Also, consumer concerns about global warming and energy efficiency have changed electric utilities' expectations and marketing strategies. An increasing number of consumers want to "go green," so utilities must be able to provide electricity from renewable sources and encourage conservation and efficiency programs.

Lost time cannot be made up or past decisions reversed. Texas has a completely different political culture and history than does California, and the Lone Star State has continued restructuring and competition in electric utilities. Differences in the climate and topography within the state prevent a one-size-fits-all solution from being feasible. However, Texas would join Colorado and North Carolina, which approved comprehensive energy conservation programs this spring.

School systems and other small generators who produce power through solar and alternative methods should have access to the electric grid. Texas needs to encourage alternatives to large generating stations. The technology required to meter this off-grid transmission is simple and proven, and the flows of electricity would pose no overall problems to the transmission grid.

Creating a tax holiday for certain energy-efficient products would encourage consumers to replace inefficient appliances and use energy-efficient technologies in their homes. Tax policy is an important tool for influencing consumer behavior, and this provision would help reduce energy consumption and associated air pollution. High energy demand can lead to inflated costs for consumers and shortages during peak use periods, as well as to a need for costly construction of additional generation capacity. A sales tax holiday also would provide an opportunity to educate the public about the benefits of energy conservation.

## Opponents said

HB 3693 is more of a Christmas tree of tangentially connected concepts than a coherent energy savings program. It is uncertain how the incentives would mesh with the existing restructuring of the electricity industry to provide for retail electric competition. The experience Texas had with the "price to beat" is not an encouraging sign for the incentives under HB 3693. The "price to beat" deliberately was set to be artificially high. The goal was to persuade customers to switch to other retail providers or even select another plan with their existing provider. Despite all the publicity and consumer education programs, almost one-third of ratepayers stubbornly refuse to choose another, and potentially lower, rate plan. Consumers might know how efficiency programs could affect their electricity bill and ignore that information.

The bill would impose an unfunded mandate on school districts and local governments to pay for energy programs with an uncertain return on the investment. Other provisions, such as the energy savings requirement for vending machines, would impose unnecessary burdens and costs for the individuals and private companies who contract with the state, while the cost-savings would be kept by the agency or university.

Allowing school districts with solar panels or small generators to interconnect to the bulk electric transmission system could compromise safety and reliability of electric service. These sources tend to provide insignificant and unpredictable amounts of power that do not justify the risk to the grid.

A sales tax holiday for certain energy-efficient products unfairly would affect local jurisdictions that levy sales taxes. It would deny local governments this revenue without allowing them to decide whether or not to participate. Also, instituting a tax holiday for energy-efficient products would run counter to the goal of tax simplification. The proposal could complicate Texas' participation in the Streamlined Sales Tax Project, a project under which a consortium of states are attempting to simplify their sales tax structures in order to gain federal approval for the taxation of online commerce.

## Notes

The **HRO analysis** of HB 3693 appeared in the May 4 *Daily Floor Report*.

HB 1000 by Burnam, which would have established a sales tax holiday for certain energy-efficient products during two weekends each year, died in the Senate and was analyzed in the April 10 Daily Floor Report.

# Competition incentives for retail electric customers

**SB 482 by Fraser**
*Died in the House*

**SB 482** would have established incentives and sanctions for electric utilities to persuade retail customers still paying the regulated price-to-beat rate to choose an alternative plan and would have provided for Public Utility Commission (PUC) review of future sales of electric utilities in the state. The bill also would have codified PUC rules on disconnection for non-payment of electric bills during weather emergencies, prohibited the collection of deposits from low-income customers or those who had not made late payments in 12 months, and required that utility bill surcharges collected for the System Benefit Fund be used to provide consumer education about electric retail choice and a discount for low-income ratepayers ranging from 10 percent to 20 percent.

All versions of SB 482 would have required large electric utilities to persuade customers still served at the price-to-beat rate to switch to alternative service plans or to new retail electric providers. Failure to do so would have resulted in financial penalties for utilities. The conference report for SB 482 would have required a utility serving one million customers as of December 31, 2006, to gain 120,000 residential customers outside its traditional service area and for a utility serving fewer than one million customers to gain 45,000 residential customers outside its traditional area. Penalties would have been assessed based on the difference between the goals and the actual number of customers switched, starting with $100 per customer as of December 31, 2007, rising to $200 per customer as of December 31, 2008, and increasing to $300 per customer as of December 31, 2009.

The House version and conference report for SB 482 included provisions that would have mandated a reduction of rates based on the price to beat and would have reinstituted a limited ability for PUC to regulate retail electricity rates. Customers who remained on the old price-to-beat rate would have been granted a 10 percent rate reduction on July 1, 2007, and an additional 5 percent reduction on September 1, 2007. However, the requirement would not have applied to any price-to-beat customer who had received a 10-percent reduction before June 30, 2007, from the price charged on June 30, 2006. The House version and conference report of SB 482 also would have required PUC to conduct a market review of electric rates for a transmission and distribution utility where 25 percent of the customers remained on a plan comparable to the price to beat at the end of 2007 or more than 20 percent remained at the end of 2008. If the price charged by the equivalent rate to the price to beat were more than two cents per kilowatt hour greater than the average of other available plans, the PUC could have ordered a rate reduction of not less than one cent per kilowatt hour.

SB 482 would have required a transmission and distribution utility and its affiliated power generation and retail electric providers and holding companies to have separate names and logos, independent boards of directors, and separate headquarters. The conference report added provisions that would have required a transmission and distribution company that served more than 850,000 customers on December 31, 2006, along with its affiliated power generation and retail electric provider companies and associated holding company, to implement safeguards and a code of conduct and to prevent the non-regulated portions from pledging the regulated transmission and distribution company's assets to obtain credit or assume debt.

The House version and conference report for SB 482 would have required PUC review and approval for mergers or consolidations, sales of at least 50 percent of stock, or transfer of a transmission and distribution utility, but those provisions would not have applied to any transaction agreed to before April 1, 2007, or for which an application had been filed for PUC review before May 1, 2007. The conference report also included provisions in SB 483 by Fraser that would have revised penalties and required refunds or disgorgement for market power abuses in the wholesale power generation sector. The conference report also would have included provisions from HB 2818 by Ritter that would have delayed the beginning of retail electric competition in the Southwest Power Pool region in southeast Texas without specific legislative approval before January 1, 2017.

## Supporters said

SB 482 would provide meaningful rate reductions and safeguards for consumers in Texas while allowing lawmakers to fulfill their promises to protect all ratepayers during the transition to retail competition in electricity. The bill would grant a 15-percent reduction for those paying the price-to-beat rate and allow the PUC to exercise continuing oversight on that rate. It would prohibit electric companies from charging deposits for low-income or elderly customers or those who had paid their bills on time for the past year

to establish service. In addition, the elderly and consumers with critical medical conditions would be protected from having their electricity disconnected during the extremely cold or hot days that occur frequently in Texas.

Texas should be proud of its success and achievements in restructuring the electric industry through the enactment of SB 7 by Sibley in 1999, and SB 482 would adjust market rules without resorting to re-regulation of electric utilities in the state. The price to beat, the partially regulated price for residential electricity customers, was a uniquely successful transition tool. In retrospect, Texas probably maintained the regulated rate for too long, and that program distorted prices and market behavior throughout 2006. While the PUC's 2007 Scope of Competition in Electric Markets in Texas concedes that too many Texans remain at the price-to-beat rates, there are plenty of opportunities to lower their rates. The bill would create the right mix of incentives and penalties to encourage the incumbent utilities to look beyond their traditional service areas and persuade more consumers to choose electric plans that are right for their needs.

Texas must assure existing utilities and potential investors that its markets are fair and efficient even as it provides safeguards for ratepayers. SB 482 would strike the right balance between enhancing the state's business friendly climate and ensuring that private-equity investors would not burden the regulated TXU "wires" company with debt from its other operations. In February, Kohlberg Kravis Roberts and Texas Pacific Group, a private-equity consortium, announced plans to purchase TXU, the investor-owned electric utility serving most of North Texas, for $45 billion. Transactions for the "wires" portion of TXU were subject to review by the PUC, but the purchase of the wholesale generation and retail electric sales divisions were not. SB 482 would require prior PUC approval for large sales, including any future transactions involving TXU, without interfering with existing contracts or creating additional tax burdens for the utility's potential purchasers. The bill also would address continuing concerns about abuse of market power and unfair practices by TXU and other utilities.

The Legislature cannot afford to reverse its decision on electric utility restructuring and introduction of market competition. Re-regulating electric rates for residential customers would not be sound public policy. Competition already is flourishing among large industrial users and smaller businesses, and the marketplace has increased choices and lowered prices for these ratepayers. Mixing regulation and competition would increase the burden of managing the system for government, business and industry, and residential customers. Setting arbitrary price caps and

mandatory rate reductions would not stop imposition of higher electricity costs, as shown by the experiences in California and Maryland, among other states.

Admittedly, transition to a new market structure has been painful at times. However, recent higher electric rates cannot be attributed to competition. Disruptions caused by hurricanes Katrina and Rita in 2005 caused spikes in natural gas prices. Gas-fired units produce 73 percent of power in ERCOT, including 86 of the capacity in the Houston region. While natural gas prices tripled, however, electric rates did not increase by that proportion. Notwithstanding those unprecedented increases, competitive prices for electricity are near the former regulated rates.

SB 482 would establish meaningful, but attainable, goals for larger utilities to compete outside their traditional service areas. The requirements would apply mainly to TXU and Reliant. Requiring each of these large companies to compete directly in the other's service area would draw more attention to the advantages of competition. Even if customers did not switch to the large competitor, there could be beneficial spillover effects as consumers selected alternative plans with their current provider or signed up with other retailers.

Even though SB 482 failed to pass, the debate raised awareness about the future of electric competition in the state. One positive effect was the announcement that TXU decided on a further reduction of rates from 10 percent to 15 percent shortly after the end of the legislative session.

## Opponents said

The conference report on SB 482 was a mere shell of the strong version passed by the House. Most of the claimed consumer protections already exist in statute or PUC rules. The conference committee stripped out meaningful environmental protection provisions and the requirement that the PUC report on how to re-regulate the industry. Also removed was a requirement that utility companies consider a bill paid when it was postmarked. The proposed 15 percent reduction largely would have been an empty gesture, as most TXU ratepayers still on the price to beat would not have qualified because they already had received a 10-percent reduction. The System Benefit Fund was not protected, and even a provision allowing discounts for nursing homes did not survive the conference committee deliberations.

SB 482 fundamentally would change the rules of the game and put the future of competitive markets in Texas at risk. The bill would attempt to address past problems without necessarily improving prospects for the future. Two of the major problems have been high electricity rates caused by spikes in natural gas prices after hurricanes Katrina and Rita and alleged market abuses by TXU. By definition, future natural disasters are unpredictable. It is uncertain whether the bill would provide adequate oversight or sanctions to prevent future market abuses.

The benefits of electric utility competition for residential customers were oversold initially, and the experience with increasing electricity bills during the past eight years only has increased the skepticism and anger most ratepayers feel. Freedom to choose among competing electric providers turns into an empty abstraction when the customer receives a monthly electric bill of $700 or more during a hot Texas summer. The Legislature should reconsider its decision on SB 7 and begin the process of re-regulating residential electric rates again.

## Notes

The **HRO analysis** of SB 482 appeared in the April 12 *Daily Floor Report*.

HB 624 by P. King, which took effect June 15, allows for securitization for costs related to the transition to competition that are not defined as "stranded costs." It also includes a provision that was in SB 482 authorizing PUC to review and approve future mergers, sales, and transfers of transmission and distribution utilities. HB 3693 by Straus, effective September 1, contains a similar provision (see page 209).

SB 483 by Fraser and HB 2818 by Ritter, contained provisions that also appeared in the conference committee report for SB 482. SB 483 died in conference committee, and HB 2818 died in Senate committee.

# Index by Bill Number

| Bill | Page |
|------|------|
| HB 5 | 187 |
| HB 8 | 18 |
| HB 9 | 108 |
| HB 10 | 80 |
| HB 12 | 52 |
| HB 13 | 82 |
| HB 14 | 110 |
| HB 28 | 86 |
| HB 109 | 112 |
| HB 159 | 124 |
| HB 216 | 174 |
| HB 218 | 43 |
| HB 323 | 190 |
| HB 461 | 87 |
| HB 556 | 45 |
| HB 626 | 47 |
| HB 735 | 206 |
| HB 991 | 89 |
| HB 1038 | 8 |
| HB 1090 | 207 |
| HB 1098 | 114 |
| HB 1287 | 140 |
| HB 1355 | 21 |
| HB 1387 | 142 |
| HB 1439 | 192 |
| HB 1602 | 134 |
| HB 1634 | 10 |
| HB 1751 | 176 |
| HB 2006 | 90 |
| HB 2017 | 49 |
| HB 2237 | 144 |
| HB 2328 | 23 |
| HB 2532 | 146 |
| HB 2683 | 68 |
| HB 2685 | 68 |
| HB 2785 | 177 |
| HB 2814 | 148 |

| Bill | Page |
|------|------|
| HB 2960 | 12 |
| HB 2994 | 178 |
| HB 3200 | 25 |
| HB 3358 | 14 |
| HB 3575 | 116 |
| HB 3678 | 149 |
| HB 3693 | 209 |
| HB 3732 | 54 |
| HB 3778 | 118 |
| HB 3821 | 180 |
| HB 3826 | 126 |
| HB 3828 | 127 |
| HB 3900 | 128 |
| HB 3928 | 182 |
| HJR 16 | 184 |
| HJR 19 | 93 |
| HJR 21 | 184 |
| HJR 27 | 184 |
| HJR 41 | 184 |
| HJR 47 | 184 |
| HJR 52 | 184 |
| HJR 59 | 96 |
| HJR 90 | 110 |
| SB 3 | 56 |
| SB 4 | 151 |
| SB 8 | 153 |
| SB 9 | 155 |
| SB 10 | 120 |
| SB 11 | 97 |
| SB 12 | 61 |
| SB 85 | 130 |
| SB 96 | 130 |
| SB 100 | 130 |
| SB 101 | 131 |
| SB 103 | 27 |
| SB 124 | 64 |
| SB 129 | 100 |

| Bill | Page |
|------|------|
| SB 221 | 71 |
| SB 247 | 170 |
| SB 263 | 32 |
| SB 378 | 34 |
| SB 439 | 73 |
| SB 482 | 211 |
| SB 530 | 157 |
| SB 578 | 130 |
| SB 589 | 130 |
| SB 758 | 75 |
| SB 785 | 77 |
| SB 792 | 194 |
| SB 903 | 101 |
| SB 909 | 35 |
| SB 920 | 77 |
| SB 966 | 135 |
| SB 987 | 15 |
| SB 1000 | 159 |
| SB 1031 | 161 |
| SB 1119 | 200 |
| SB 1204 | 137 |
| SB 1317 | 65 |
| SB 1643 | 164 |
| SB 1655 | 38 |
| SB 1687 | 66 |
| SB 1788 | 166 |
| SB 1846 | 172 |
| SB 1886 | 186 |
| SB 1908 | 103 |
| SB 2031 | 106 |
| SJR 10 | 184 |
| SJR 13 | 187 |
| SJR 14 | 184 |
| SJR 15 | 184 |
| SJR 23 | 184 |
| SJR 64 | 203 |

## HOUSE RESEARCH ORGANIZATION



**Steering Committee:**

David Farabee, *Chairman*
Bill Callegari, *Vice Chairman*
Dianne White Delisi
Harold Dutton
Yvonne Gonzalez Toureilles
Carl Isett
Mike Krusee
Jim McReynolds
Geanie Morrison
Elliott Naishtat
Rob Orr
Joe Pickett
Robert Puente
Todd Smith
G.E. "Buddy" West

John H. Reagan
Building
Room 420
P.O. Box 2910
Austin, Texas 78768-2910

(512) 463-0752

*www.hro.house.state.tx.us*

## Staff:

Tom Whatley, *Director*
Ben Davis, *Editor*
Laura Hendrickson, *Associate Editor*
Rita Barr, *Office Manager/Analyst*
Betsy Blair, Kellie Dworaczyk, Joel Eskovitz,
Tedd Holladay, Carisa Magee, *Senior Analysts*
Courtney Carter, Nnenna Ezekoye, Tom Howe,
Andrei Lubomudrov, Virginia L. Nailling,
Philip H. Parker, Gena've Ramirez,
Johanna Sevier, Lonny Stern, *Analysts*
Anne Clary, *Administrative Aide*