PL1126
9/2/2014
2:13-cv-000193

**HOUSE
RESEARCH
ORGANIZATION**
*Texas House of Representatives*



*focus* REPORT

*September 30, 2009*

**7**   **Business Regulation & Economic Development**

**29**   **Criminal Justice**

**53**   **Elections**

**61**   **Environment & Energy**

**89**   **Gaming**

**95**   **Government Affairs**

**119**   **Health**

**157**   **Higher Education**

**171**   **Human Services**

**183**   **Judiciary**

**195**   **Public Education**

**221**   **Public Safety**

**237**   **Taxation & Revenue**

**257**   **Transportation**

# *Major Issues*
## *of the 81st Legislature, Regular Session and First Called Session*

During its 2009 regular session, the 81st Texas Legislature enacted 1,459 bills and adopted nine joint resolutions after considering 7,609 measures filed. This report is an overview of many of the highlights of the regular session and of the first called session, held July 1-2, 2009, during which two bills were enacted. It summarizes some proposals that were approved and some that were not. Also included are arguments offered for and against each measure as it was debated. The legislation featured in this report is a sampling and not intended to be comprehensive.

Other House Research Organization reports covering the 2009 sessions include: State Finance Report Number 81-4, *Texas Budget Highlights, Fiscal 2010-11*, which summarizes SB 1 by Ogden, the general appropriations act, and HB 4586 by Pitts, the supplemental appropriations act; Focus Report Number 81-7, *Vetoes of Legislation, 81st Legislature*, which includes the governor's veto messages and responses from the authors and the sponsors of the 35 vetoed bills and three vetoed concurrent resolutions; and Focus Report Number 81-8, *Constitutional Amendments Proposed for the November 2009 Ballot*, which analyzes the 11 propositions to be submitted to the voters at the November 3, 2009, election.

# Contents

**Page:**

**Legislative Statistics, 81st Legislature, Regular Session**                **6**

**Business Regulation and Economic Development**                **7**

\* HB 873      Dukes        State incentives for media productions..............................8
  HB 2295    McClendon    Continuing the Texas Residential Construction Commission .........10
\* HB 4409    Taylor/      Restructuring the Texas Windstorm Insurance Association (TWIA) ..............13
  SB 14      Fraser
\* HB 3676    Heflin       Extending school district property-value limitation agreements...................17
\* HB 3896    Oliveira     Revising and extending local tax abatement agreement authority .................20
  HB 4525    Parker       Establishing qualified manufacturing project zones.......................21
  SB 1007    Hegar        Continuation and operation of the Texas Department of Insurance .............23
  SB 1569    Eltife       Revising eligibility for unemployment compensation.......................27


**Criminal Justice**                **29**

  HB 498     McClendon    State study on wrongful convictions.......................30
\* HB 1711    S. Turner    Comprehensive offender reentry plan after prison release ..............32
\* HB 1736    Anchia       Revising compensation for the wrongfully convicted (Tim Cole Act)..............34
\* HB 2003    McCall       Making cyber-harassment a crime..........................35
\* HB 2066    Gallego      Second- and third-degree felony for domestic violence strangulation ..............36
\* HB 2086    Moody        Prosecution and punishment for gang activities ....................37
  HB 2267    Hodge        No death penalty for certain accomplices, separate trials for capital murder .....41
\* HB 3228    Madden       Detecting contraband and monitoring cell phones in correctional facilities......43
\* HB 3689    McClendon    Continuing Texas Youth Commission, Texas Juvenile Probation Commission  45
  SB 117     Ellis        Photograph and live lineup identification procedures in criminal cases............48
\* SB 839     Hinojosa     Life in prison for juveniles convicted of capital murder.....................50
  SB 1529    Whitmire     Use, reporting, auditing of assets seized and forfeited to law enforcement.......51


**Elections**                **53**

  HB 2511    T. Smith     Revising political contribution and expenditure restrictions ...........54
  SB 315     Wentworth    Creating the Texas Congressional Redistricting Commission.........56
  SB 362     Fraser       Revising voter identification requirements .......................58


**Environment and Energy**                **61**

  HB 395     Hartnett     Repealing the state's goal for generating capacity from natural gas .............62
\* HB 469     P. King/     Carbon dioxide capture and storage................................63
  \* HB1796   Chisum/
  \* SB 1387  Seliger
  HB 836     S. Miller    Hunting feral hogs by helicopter....................................67

\* Finally approved or on November 3, 2009, ballot

HB 1243   Gallego/   Sales of distributed renewable energy generation..............................................68
  HB 1866   Solomons
HB 1182   S. Turner   Moving oversight of System Benefit Fund from Legislature to PUC ..............70
* HB 1796   Chisum/   Revising state air pollution emissions-reduction programs ............................72
  SB 16   Averitt
* HB 2259   Crownover   Extending deadlines to plug inactive oil or gas wells........................................76
HB 3245   Solomons   Providing consumer protections in the restructured electric market ................77
* HB 1937   Villarreal   Property assessments to finance energy-efficient improvements....................78
* SB 184   Watson   Studying strategies for reducing greenhouse gas emissions ..........................79
SB 541   Watson   Expanding the renewable portfolio standard for non-wind resources ............80
SB 545   Fraser   Goals and incentives for solar energy generation ............................................82
SB 546   Fraser   Increasing energy efficiency goals and demand reduction targets...................84
* SB 769   Williams   Recovering weather-related electric system restoration costs ........................85
SB 921   Fraser   Allowing access to electric cooperative meetings and certain records ............87

## Gaming

89

HB 2081   Isett/   Continuing the Texas Racing Commission .....................................................90
  SB 1013   Hinojosa
HJR 137   Kuempel   Authorizing local-option casino gambling........................................................92

## Government Affairs

95

* HB 1831   Corte   Emergency management, disaster preparedness, and school safety.................96
HB 1976   Solomons   Procedures for operating property owners' associations ..................................99
* HB 2559   Truitt   Employees Retirement System benefit and retirement eligibility .................103
* HJR 14   Corte   Revising purposes for which property may be taken .....................................105
HJR 29   Elkins   Allowing Legislature to override veto after sine die adjournment.................107
* SB 2 (1st)   Hegar   Extending and revising state agency Sunset dates.........................................109
SB 18   Estes   Standards for use of eminent domain authority.............................................111
SB 1002   Deuell   Abolishing the Texas State Affordable Housing Corporation .......................114
* SB 1003   Deuell   Continuing state-federal office and attaching it to Governor's Office ...........115
SB 2567   Duncan   Establishing a state investment review board.................................................117

## Health

119

HB 5   Crownover/   Banning smoking in certain public and work places.......................................120
  SB 544   Ellis
* HB 1310   Solomons   Restricting use of indoor tanning facility devices by minors.........................122
* HB 1358   Keffer   Revisions to Cancer Prevention and Research Institute   ...............................124
HB 1541   S. Turner   Extending Medicaid continuous eligibility ....................................................126
* HB 1672   Crownover/   Newborn screening, retention of newborns' genetic material........................128
  * HB 1795   Pierson
HB 2962   Coleman/   CHIP eligibility revisions; CHIP buy-in program...........................................131
  SB 841   Averitt
SB 7   Nelson/   Pay-for-performance, other health care payment initiatives ..........................134
  SB 8   Nelson/
  SB 10   Duncan/
  * HB 1218   D. Howard/
  * HB 4586   Pitts

| * SB 78 | Nelson/ | Healthy Texas Program; health care coverage awareness | 138 |
| SB 6 | Duncan | | |
| SB 182 | Patrick | Informed consent for abortion, mandatory ultrasound | 141 |
| * SB 187 | Deuell | Medicaid buy-in for children with developmental disabilities | 143 |
| SB 188 | Deuell | Disease control outreach, including syringe exchange | 145 |
| * SB 203 | Shapleigh | Denying certain Medicaid payments to hospitals | 147 |
| SB 204 | Shapleigh/ | Ban on foods with trans fats in certain establishments | 149 |
| HB 1523 | Alvarado | | |
| SB 586 | Carona | Managed care plans and out-of-network health care providers | 151 |
| SB 972 | Averitt | Revising employer health group cooperatives | 153 |
| SB 1500 | Duncan/ | Employment of physicians by certain hospitals | 155 |
| HB 3485 | Coleman | | |

## Higher Education 157

| * HB 51 | Branch/ | Funding incentives to promote more tier-one research universities | 158 |
| * HJR14 | Corte | | |
| HB 2083 | Solomons | Junior college employee group health insurance benefits | 161 |
| HB 3276 | D. Howard | Determining student priority in awarding TEXAS grants | 162 |
| * SB 175 | Shapiro | Revising Top Ten Percent automatic admissions | 163 |
| * SB 956 | West | Establishing a public law school in Dallas | 166 |
| SB 1443 | Zaffirini | Limits on increases in tuition and fees | 168 |

## Human Services 171

| * SB 643 | Nelson | Revising state system for individuals with mental retardation | 172 |
| SB 69 | Nelson | Child protective services revisions and foster children's bill of rights | 178 |

## Judiciary 183

| * HB 670 | Martinez Fischer | Qualified privilege for journalists not to testify | 184 |
| HB 1657 | Giddings | Defining general contractor for workers' compensation | 187 |
| SB 992 | Duncan | Reorganizing the Texas court system | 189 |
| SB 1123 | Duncan | Standard of causation in mesothelioma lawsuits | 191 |
| SJR 44/ | Duncan/ | Revising selection of state judges | 193 |
| SB 2226 | Duncan | | |

## Public Education 195

| * HB 3 | Eissler | School accountability and public school curriculum revisions | 196 |
| HB 130 | Patrick | Full-day prekindergarten for certain children | 203 |
| * HB 171 | Olivo | Mitigating factors in disciplining students | 206 |
| HB 710 | Rose | Sunset review of the State Board of Education | 207 |
| HB 2823 | Patrick | Excluding private schools from eligibility for certain TEA grants | 208 |
| * HB 3646 | Hochberg | Formula funding for public school finance, teacher pay raises | 209 |
| * HB 4294 | Branch | Buying electronic textbooks, materials, and technology | 214 |
| HJR 77 | D. Howard/ | Replacing SBOE as managers of the Permanent School Fund | 217 |
| HB 2037 | D. Howard | | |
| * SB 891 | Nelson | Standards for public school physical education curriculum | 219 |

## Public Safety                                                                          **221**

| | | | |
|---|---|---|---|
| * HB 55 | Branch | Prohibiting wireless device use while driving in a school zone | 222 |
| * HB 339 | Phillips | Driver's education and licensing requirements for minors | 223 |
| * HB 537 | Berman | Requiring safety belts for minors in passenger vehicles | 226 |
| SB 1164 | Wentworth/ | Allowing certain licensees to carry weapons on college campuses | 227 |
| HB 1893 | Driver | | |
| * HB 2730 | Kolkhorst | Continuing Department of Public Safety, Private Security Board | 229 |
| * SB 61 | Zaffirini | Increasing minimum age and height for child safety seats | 233 |
| SB 298 | Carona | Allowing sobriety checkpoints in larger Texas cities and counties | 234 |

## Taxation and Revenue                                                          **237**

| | | | |
|---|---|---|---|
| * HB 8 | Otto | Comptroller property value study and appraisal district review | 238 |
| * HB 770 | D. Howard | Homestead exemption for damaged homes; Open Beaches Act exception; property-tax exemption for chambers of commerce | 240 |
| HB 982 | Thompson/ | Raising revenue from sexually oriented businesses | 243 |
| HB 2070 | Cohen | | |
| * HB 1038 | Paxton | Including foreclosed homes in homestead property appraisals | 246 |
| * HB 1801 | Bohac | Adding certain backpacks and school supplies to sales-tax holiday | 247 |
| * HB 2154 | Edwards | Physician education loan repayment program; tobacco products tax | 248 |
| * HB 3611 | Otto/ | Property appraisal revisions | 250 |
| * HB 3612 | Otto/ | | |
| * HB 3613 | Otto/ | | |
| * HJR 36 | Otto | | |
| * HB 3613 | Otto | Disabled veterans' exemption from property taxation | 253 |
| * HB 4765 | Oliveira | Revising small business exemption from business margins tax | 254 |

## Transportation                                                                      **257**

| | | | |
|---|---|---|---|
| * HB 1 (1st) | Pitts | Issuing general obligation bonds for highway improvements | 258 |
| HB 300 | Isett | Continuing and revising the Texas Department of Transportation | 260 |
| * HB 3097 | McClendon | Creating Dept. of Motor Vehicles; regulating auto parts recyclers | 266 |
| SB 404 | Carona/ | Extending CDA authority and revising toll development process | 269 |
| SB 17 | Nichols | | |
| SB 855 | Carona | Authorizing elections for local option motor fuels taxes | 272 |
| SJR 9 | Carona | Dedication of state highway funds to construction, maintenance | 276 |
| SJR 25 | Harris | Restricting revenue from public toll roads to transportation | 278 |

## Index by Bill Number                                                          **279**

# LEGISLATIVE STATISTICS
## 81st Legislature, Regular Session

Table
of Contents

|  | Introduced | Enacted* | Percent enacted |
|---|---|---|---|
| House bills | 4,836 | 867 | 17.9% |
| Senate bills | 2,583 | 592 | 22.9% |
| TOTAL bills | 7,419 | 1,459 | 19.7% |
| HJRs | 140 | 9 | 6.4% |
| SJRs | 50 | 0 | 0.0% |
| TOTAL joint resolutions | 190 | 9 | 4.7% |

*Includes 35 vetoed bills — 20 House bills and 15 Senate bills

|  | 2007 | 2009 | Percent change |
|---|---|---|---|
| Bills filed | 6,190 | 7,419 | 19.9% |
| Bills enacted | 1,481 | 1,459 | -1.5% |
| Bills vetoed | 51 | 35 | -31.4% |
| Joint resolutions filed | 151 | 190 | 25.8% |
| Joint resolutions adopted | 17 | 9 | -47.1% |
| Legislation sent or transferred to Calendars Committee | 1,692 | 1,726 | 2.0% |
| Legislation sent to Local and Consent Calendars Committee | 1,056 | 1,398 | 32.4% |

*Source: Texas Legislative Information System*

# Business Regulation and Economic Development

Table of Contents

| | | | |
|---|---|---|---|
| * HB 873 | Dukes | State incentives for media productions | 8 |
| HB 2295 | McClendon | Continuing the Texas Residential Construction Commission | 10 |
| * HB 4409 | Taylor/ | Restructuring the Texas Windstorm Insurance Association (TWIA) | 13 |
| SB 14 | Fraser | | |
| * HB 3676 | Heflin | Extending school district property-value limitation agreements | 17 |
| * HB 3896 | Oliveira | Revising and extending local tax abatement agreement authority | 20 |
| HB 4525 | Parker | Establishing qualified manufacturing project zones | 21 |
| SB 1007 | Hegar | Continuation and operation of the Texas Department of Insurance | 23 |
| SB 1569 | Eltife | Revising eligibility for unemployment compensation | 27 |

# State incentives for media productions

**HB 873 by Dukes**
*Effective April 23, 2009*

Table
of Contents

**HB 873** changes the requirements to qualify for a moving image project incentive grant, increases the incentive for filming in certain geographic areas, expands the geographic areas that qualify a project for additional incentives, and includes educational or instructional videos in the incentive program by amending the definition of "moving image project."

HB 873 makes the following changes in the requirements to qualify for a moving image project incentive grant:

- lowers the minimum amount of in-state spending required for a film or television program from $1 million to $250,000;
- adds educational and instructional videos and digital interactive media productions to the list of qualifying productions with a $100,000 in-state spending minimum;
- allows the Music, Film, Television, and Multimedia Office to make an exception to the requirement that 70 percent of the workforce on a project be Texas residents if they determine that there is not a sufficient number of Texas residents to fill the necessary positions; and
- lowers the percentage of the project that must be filmed in Texas from 80 percent to 60 percent.

The bill also removes the cap on grant amounts and requires the Music, Film, Television, and Multimedia Office to establish, by rule, how grant amounts will be calculated. The rules will have to consider the impact of a project on employment, tourism, and economic activity and the amount of a production company's in-state spending for a project.

HB 873 changed the term "underused area" to "underutilized and economically distressed area," increased the incentive for filming in these areas to 2.25 percent, and expanded the definition of those areas to include any area that the Music, Film, Television and Multimedia Office determines received less than 15 percent of the total film and television production in this state during a fiscal year or had a median household income that was not more than 75 percent of the median state income.

## Supporters said

Texas is losing millions of dollars in film, television, commercials, and video game projects to other states, primarily Louisiana, New Mexico, Georgia, and Michigan. As a result, the state is losing high-paying jobs, economic activity, and tax dollars. The Texas Film Commission estimates the state has lost more than $500 million in direct spending and more than 7,000 jobs to other states since 2003. Although Texas has created a film incentive program and made some adjustments, the program has proven too modest for investors and production companies to find competitive.

HB 873 would provide a more flexible program by decreasing some previous requirements and allowing the Music, Film, Television, and Multimedia Office discretion when awarding grants, rather than strict guidelines that have kept some worthwhile projects from qualifying and resulted in projects going to other states to film. Decreasing spending requirements for film/television projects from $1 million to $250,000 would entice producers to keep work in-state and would qualify independent filmmakers and those in the straight-to-video market. By eliminating the cap on grants, Texas better would be able to attract high-budget productions and would eliminate the disadvantage Texas has in competing with states without caps. The requirement that 70 percent of the crew, actors, and extras on a project be Texas residents is too rigid and sometimes impossible to meet with current workforce levels, so the bill would allow flexibility if a sufficient percentage of Texas residents were not available when filming began. Also, decreasing the percentage of a project that must be filmed in Texas from 80 percent to 60 percent would entice more projects to do partial production in Texas, which would boost employment and spending in the state.

There would be no risk to the state because payments would be made only after a project was completed in Texas. The enhancements provided by HB 873 are needed because although the incentive program has been used heavily by producers of television commercials and video games, it has not been effective in stopping the flow of feature films and television programs to states offering more generous incentives.

## Opponents said

While increasing media production in Texas is important, the state cannot afford to increase support for what amounts to using taxpayer dollars for a corporate subsidy. The state of Texas is not in the business of moving image production. The industry is made up of private businesses and is mainly concentrated in the Dallas and Austin areas. Rather than offer still more grant money to attract the industry to other parts of the state, municipalities could develop more robust local incentive packages to attract projects to their areas.

## Notes

The **HRO analysis** of the bill appeared in the March 25 *Daily Floor Report*.

# Continuing the Texas Residential Construction Commission

**HB 2295 by McClendon**
*Died in Senate committee*

Table
of Contents

**HB 2295**, as passed by the House, would have continued the Texas Residential Construction Commission (TRCC) until September 1, 2015, and would have made several changes in the structure of the agency, including provisions that would have:

- required licensing of homebuilders and provided penalties for operating without a license;
- established mediation as an alternative to using the state inspection program to address alleged construction defects;
- required TRCC to adopt standard home construction contract forms;
- created a homeowners recovery fund;
- adopted additional disclosure requirements; and
- made other administrative changes, such as allowing TRCC to issue emergency orders, creating an ombudsman's office, and adding two members to the governing board.

Since HB 2295 was not enacted and the Sunset date for TRCC was not extended, the agency was abolished as of September 1, 2009, under the Sunset Act, and after a one-year wind-down period will cease to exist as of September 1, 2010.

**Licensing.** HB 2295 would have required a homebuilder to have a TRCC license to conduct business in Texas. A new license applicant would have been required to meet the current requirements for TRCC registration, pay a licensing fee, provide a $25,000 bond, complete an eight-hour course that would have included one hour of ethics and two hours covering various building codes, standards, regulations, and laws, and pass a qualifying examination. The bill would have increased continuing education requirements from five hours every five years to 16 hours every two years.

Conducting business as a builder without TRCC licensure would have been a class B misdemeanor (up to 180 days in jail and/or a maximum fine of $2,000). The bill also would have allowed TRCC to take disciplinary action against a builder for not meeting reporting requirements established for builders involved in the state inspection process or mediation; for failure to complete obligations of a construction contract; for not complying with TRCC rules related to third-party

inspectors; or for not using TRCC-adopted or TRCC-approved building contract forms.

**Opt-out provisions.** The bill would have allowed homeowners to elect mediation as an alternative to the state inspection program. If the homeowner had requested mediation, the builder would have been required to participate in good faith. If an agreement had not been reached by the end of the 90-day mediation period, the homeowner would have been allowed to initiate an action to recover damages for a construction defect.

HB 2295 would have required TRCC to assign a third-party inspector within 10 days, rather than the current 30 days, of the date it received a homeowner's complaint about construction defects, but would have permitted the TRCC executive director to assign a TRCC inspector or other state employee to conduct an emergency inspection. Recommendations by a third-party inspector would have had to be issued within 45 days, rather than the current 60 days, of the inspector's assignment. A homeowner would have been allowed to initiate an action to recover damages on or after the 76th day after initiating the state inspection process for issues related to workmanship or materials and on or after the 91st day for structural issues.

HB 2295 would have prohibited TRCC from charging homeowners certain fees, including fees to cover the cost of a third-party inspection.

**Standardized construction contract.** HB 2295 would have required TRCC to adopt standardized contract forms for the sale or construction of a new home. However, a builder would not have been precluded from using the builder's own contract form, if approved by TRCC, or a contract prepared by the purchaser or the purchaser's attorney.

**Disclosures.** A binding arbitration agreement related to a home construction contract would have been required to include a statement, initialed by each party, that the homeowner was waiving voluntarily and knowingly the right to a jury trial to settle any future disputes. The bill would have required homebuilders to disclose whether a home had been repurchased from another purchaser by the builder because of a dispute

over construction defects and the nature and remediation of the defects. Other provisions would have required that TRCC post on its website the number of complaints against individual builders, final reports on inspections, and whether the builder had resolved disputes with homeowners.

**Homeowner recovery fund.** HB 2295 would have established a homeowner recovery fund to serve as a last resort for homeowners who were unable to recover damages from a builder related to a violation of the Texas Residential Construction Act or to get a confirmed construction defect repaired. The fund would have received 10 percent of all administrative penalties collected by TRCC and could have provided up to $175,000 in compensation for a homeowner unable to collect from a bankrupt or otherwise judgment-proof homebuilder.

**Other provisions.** The bill would have established the office of ombudsman, which would have submitted comments to TRCC about rule and policy changes and would have helped builders and homeowners in locating mediation services or with the post-inspection process. The bill also would have added two members to the nine-member TRCC board, including an additional public member; established in statute the TRCC mission and purpose; and required publication of a homeowner information pamphlet.

## Supporters said

HB 2295 would strike a good balance between the economics of the homebuilding industry, which contributes more than $35 billion and 500,000 jobs to the state economy, and the concerns of millions of homeowners. TRCC survived the acid test of a very closely watched and sometimes contentious Sunset review, including a favorable vote to continue the agency by the legislators most involved in the process. This legislation would provide the agency the tools it needed to conduct its work more quickly and efficiently to help builders and homeowners resolve their disputes. Many amendments added during the House debate would make the bill even more consumer-friendly.

TRCC has made great strides since the Legislature gave it additional resources and enforcement powers in 2007. Its staff has increased significantly the resolution of complaints about construction defects. In addition, TRCC has taken major enforcement actions, including

a lifetime ban for one builder and a fine of $260,000 against another.

**Licensing.** HB 2295 would have Texas join 28 other states that license those operating in residential construction. Requiring licensing, rather than registration, would increase the level of professionalism among homebuilders. Exempting from new licensing requirements those who already hold one credential is a common practice when a regulatory agency changes regulatory standards. Requiring all existing registered builders to take a qualifying examination would be costly and burdensome for the industry and the state.

HB 2295 would provide real teeth behind TRCC enforcement efforts, including criminal penalties for unlicensed persons claiming to be builders and the ability to take disciplinary action against a builder that failed to complete all contract obligations.

**Opt-out provisions.** HB 2295 would allow homeowners to elect mediation, rather than the state inspection program, to resolve disputes in a fair and expedient manner. TRCC could take disciplinary action if a builder failed to make repairs agreed to in mediation.

For homeowners who chose the state inspection program, the process would be streamlined, and homeowners would not pay a fee to receive an inspection. Stricter deadlines would ensure that homeowners more quickly could pursue further action to recover damages if they were not satisfied with the outcome of mediation or the inspection process.

**Standardized contracts and disclosure.** Adopting standardized contract forms would help homeowners learn more about their rights. One provision would raise awareness by new homebuyers about the consequences associated with arbitration, including waiving the right to a trial by jury. Informed and prepared homebuyers would provide stability and integrity to neighborhoods and communities. Also, the TRCC website would provide additional information about complaints against builders and resolution of those disputes, which would help homebuyers make better choices.

**Homeowner recovery fund and other provisions.** HB 2295 would provide a mechanism for compensation of up to $175,000 for homeowners who were unable to recover from a builder not able to pay a full court judgment or who was bankrupt. Other provisions, such as the ombudsman office and expanded membership on

the board, would help make TRCC more responsive to consumers and the building industry.

## Opponents said

TRCC should be abolished. This bill would not make the policy or statutory changes necessary to create a regulatory agency with a clear mission to protect the public. Having a poor regulatory program, especially one that functions as a creature of the industry it is designed to oversee, is worse than having no regulatory program at all. TRCC has had the dubious distinction of having two different state reports, the Strayhorn report in 2006 and the Sunset staff report, recommend its elimination. This would be the third time this decade that the Legislature has reviewed this agency, and after three strikes, TRCC should be gone.

**Licensing.** Texas regulates doctors, attorneys, accountants, psychologists, and land surveyors, but those regulatory agencies do not deny access to justice at the courthouse for those harmed by the wrongdoing of their members. TRCC procedures effectively shield home builders from the consequences of their actions, and HB 2295 would do little to redress that imbalance.

HB 2295 would provide for licensing in name only and would do nothing to ensure the competence and financial responsibility of builders in the state, nor would it prevent unqualified individuals from entering the field. Of more than 28,000 applications, only 385 have been rejected. A vast majority of those registered builders would be grandfathered under the new license requirements. This bill would not weed out bad builders.

The bill's proposed continuing education requirements would not improve the quality of builders. They would have to complete, but not necessarily pass, an eight-hour course. One hour devoted to ethics and 30 more minutes assigned on four complex topics would not be useful either for the builders or homeowners.

**Opt-out provisions.** TRCC believes that its mission is to "reconcile differences" between builders and homeowners. A leaking roof or cracked foundation should not be a "difference." Texans do not need a state agency to make homeowners wait to begin a process that finally could force builders to repair problems with their homes.

Homebuyers would be asked to waive some rights without adding any meaningful protections. While the

bill seems to offer voluntary mediation, the wording could be construed such that mediation could be requested by a homeowner only in the unlikely event that the builder asked for the state inspection.

**Homeowner recovery fund and other provisions.** Providing up to $175,000 in compensation would be an improvement to the homeowner recovery fund, but it still could be significantly less than the amount needed to compensate a homeowner for a construction defect. The other provisions, such as an ombudsman, additional board members, changes in the mission statement, and a homeowner informational pamphlet, would be window dressing rather than substantial improvements.

## Other opponents said

The Legislature should have adopted the approach offered by HB 2243 by Leibowitz that would have required stricter licensing of builders through the Texas Department of Licensing and Regulation (TDLR) rather than TRCC. This approach would have given Texas homeowners oversight of the homebuilding industry through an agency with more than a century of experience in regulation and provided direct access to administrative and legal remedies.

## Notes

HB 1959 by Isett, the bill extending Sunset dates for agencies whose Sunset bills failed to pass, would have eliminated TRCC's authority to regulate or take enforcement action against builders, third-party warranty companies, or arbitrators as of September 1, 2009, which, in effect, would have accelerated the one-year wind-down period before the agency ceases to exist September 1, 2010. HB 1959 died when the House did not vote on the conference committee report on the bill.

SB 1 by Ogden, the general appropriations act for fiscal 2010-11, includes a Sunset contingency rider that eliminates TRCC funding for fiscal 2011 and allows only sufficient funds to close the agency during fiscal 2010.

HB 2243 by Leibowitz, which would have licensed builders through TDLR, died in the House Business and Industry Committee.

The **HRO analysis** of HB 2295 appeared in Part One of the May 6 *Daily Floor Report*.

# Restructuring the Texas Windstorm Insurance Association (TWIA)

**HB 4409 by Taylor/ SB 14 by Fraser**
*TWIA provisions effective June 19, 2009/ Died in the House*

Table
of Contents

**HB 4409** revises operation, oversight, and funding provisions of the Texas Windstorm Insurance Association (TWIA) Act, including funding coverage for catastrophic events, in part, through issuance of public securities. It revises the purpose of TWIA, stating that it is intended to provide an adequate market for windstorm and hail insurance in the seacoast territory. For these coverages, TWIA is the residual insurer of last resort.

**Payment of losses.** HB 4409 revises the method by which TWIA will pay losses, including establishing three classes of public securities that may be used to pay TWIA losses. These securities must be repaid within 10 years of issuance and generally must be issued after the catastrophic event has occurred for which additional revenue is needed. The public securities are exempt from taxation, payable through various mechanisms within TWIA, and will not be debt of the state.

If insured losses and operating expenses exceed premium and other revenue of TWIA, the losses will be paid from available association reserves and available amounts in the Catastrophe Reserve Trust Fund. If losses remain unpaid after these resources are exhausted, payments will be made from the following funding mechanisms in the order listed, subject to the noted maximum per occurrence amounts:

- $1 billion from class 1 public securities, payable from premium and other revenue, including revenue the association obtains through financing arrangements with any market source;
- $1 billion from class 2 public securities, payable from a combination of member assessments (30 percent) and nonrefundable premium surcharges on property and casualty policies issued for property located in a catastrophe area (70 percent); and
- $500 million from class 3 public securities, payable from members' assessments for which a member may pay directly or use reinsurance coverage the member elected to obtain.

Member assessments made for Class 2 and 3 public securities will be made in proportion to the member's share of premiums collected during the preceding

calendar year. These assessments may not be recouped through a premium surcharge or tax credit. TWIA may purchase reinsurance that operates in addition to or in concert with the other mechanisms authorized for payment of TWIA losses.

**Eligibility.** TWIA will provide initial or renewal coverage to applicants in the catastrophe area whose property is insurable but who were unable to obtain property insurance through the voluntary market, as evidenced by one declination from an insurer that writes windstorm and hail coverage in the first-tier coastal counties.

All construction, alteration, remodeling, enlargement, and repair of structures in catastrophe areas that was begun on or after June 19, 2009, must comply with building code standards in the plan of operation to be eligible for TWIA coverage.

Structures constructed, altered, remodeled, or enlarged on or after September 1, 2009, that are located in a zone with an additional hazard associated with storm waves may not receive initial or renewal TWIA coverage unless evidence of flood insurance is submitted with the application, if National Flood Insurance Program flood insurance is available for that property.

**Inspections.** The Texas Department of Insurance (TDI) must charge reasonable fees for inspection. Structures may not be certified for insurability unless inspection fees are paid and documentation of compliance with the plan of operation is provided within six months of application.

The bill specifies the inspection requirements for structures that have been altered, remodeled, or enlarged. Structures modified on or after January 1, 1988, are subject to inspection by TDI to be considered insurable.

Residential structures insured by TWIA as of September 1, 2009, that have been inspected for compliance with the plan of operation and found noncompliant may continue coverage through TWIA, but the policy will be subject to a separate, non-

refundable annual premium surcharge of 15 percent. The surcharge will be deposited in the Catastrophe Reserve Trust Fund.

**Rate regulation.** Recognized catastrophe models may be considered in adopting TWIA rates. TWIA may use a rate filed without prior commissioner approval, if the filing is made at least 30 days before use, does not exceed 105 percent of the rate in effect on the filing date, and does not increase rates by more than 10 percent for an individual rating class. TWIA may establish rating territories, but rates within a county may not vary more than 5 percent in 2009, with the allowable variance increasing by 1 percent annually so that rates may not vary more than 8 percent in 2012.

**Board of directors.** HB 4409 revises the composition and duties of the TWIA board of directors. All members must have demonstrated experience in insurance, general business, or actuarial principles. The members of the board, all appointed by the commissioner, must include:

- four members representing the insurance industry, selected from a slate of people nominated by the industry;
- four members who reside in the first-tier coastal counties, including at least one person who is a property and casualty agent;
- one member who represents an area of the state not located in the seacoast territory; and
- one non-voting member who is a licensed engineer residing in a first-tier coastal county.

The primary objectives of the board are to ensure that the association operates in accordance with applicable law and commissioner rules, complies with sound insurance principles, and meets all standards imposed by the TWIA Act. The TWIA board must issue biennial reports about operations of the association.

**Additional oversight and review.** HB 4409 establishes a Windstorm Insurance Legislative Oversight Board to monitor Texas windstorm insurance and review recommendations for legislation proposed by TDI and TWIA. TWIA must undergo Sunset review, paid for by the association, during the period in which state agencies abolished in 2015 are reviewed, but TWIA will not be subject to abolishment.

**SB 14** would have established many revisions to the TWIA Act that were substantially similar to those of HB 4409, such as those regarding the TWIA purpose,

board composition and duties, eligibility requirements, and rate regulation. SB 14 would have differed most substantially from HB 4409 in the method by which losses would have been paid. SB 14 also would have transferred direct responsibilities related to building inspections and appointment of inspectors from TDI to TWIA and would have repealed provisions regarding the authority of TDI to discipline inspectors and collect fines.

**Payment of losses.** SB 14 would have established two classes of public securities that could have been used to pay TWIA losses. Class 1 public securities would have been authorized for issuance before the occurrence of a catastrophic event, if the board determined premiums and other revenue might not be sufficient to pay insured losses. These securities could not have been used to pay for catastrophic events occurring before their issuance. Class 2 public securities could have been authorized to be issued on or after the occurrence.

Public security obligations that TWIA could not have paid with available revenue would have been paid with nonrefundable surcharges collected on property insurance policies that applied to property in a catastrophe area, first-tier coastal county, and the part of the second-tier coastal counties included in TWIA. These surcharges would not have been subject to premium taxes or commissions.

If insured losses and operating expenses had exceeded premium and other revenue of TWIA, the losses would have been paid from available association reserves and available amounts in the Catastrophe Reserve Trust Fund. If losses had remained unpaid after these resources had been exhausted, SB 14 would have authorized payments from the following funding mechanisms in the order listed, subject to the noted maximum per occurrence amounts:

- $300 million from class 1 public securities;
- $300 million from class 2 public securities;
- $300 million from member assessments that could not have been recouped from a premium surcharge or tax credit and would have been made in proportion to the member's share of premiums collected during the preceding calendar year;
- $100 million from member assessments that would have been repaid by nonrefundable premium surcharges charged to policyholders in a catastrophe area;

- up to $1 billion from reinsurance that had been purchased by TWIA from premiums and other revenue; and
- $750 million from member assessments that could have been credited against the insurer's premium tax at a rate of up to 20 percent per year for five or more successive years.

If the board of directors had determined that the sale of public securities or the purchase of reinsurance were not possible or that other financing mechanisms were more fiscally appropriate or economically beneficial to Texas, the board, with the approval of the commissioner, could have used any combination of financing arrangements allowed by the TWIA Act to pay the excess losses.

## Supporters said

HB 4409 would establish a fair funding and governance approach for the Texas Windstorm Insurance Association (TWIA), giving TWIA the tools it needs to cover losses in the event of another catastrophic storm along the Texas coast. The bill would represent the healthiest balance between interests. Premiums would remain affordable for coastal consumers, which would protect the coastal economy, and costs would not be shifted to insurers.

Losses associated with hurricanes Dolly and Ike in 2008 exposed the weaknesses in the current TWIA funding mechanism. In 2008, hurricanes Dolly and Ike required TWIA to use all existing premiums, reinsurance, and the full balance of the Catastrophe Reserve Trust Fund, which was about $470 million. In addition, $530 million in assessments were made to Texas property insurers, of which $230 million will be subject to premium tax credits. Large assessments such as these not only drive up Texas property insurance rates statewide because the costs are spread to all Texas property insurers, but the $230 million subject to tax credits represents a long-term revenue loss to the state in premium taxes that will not be able to be collected.

Through the use of public securities, HB 4409 would spread the cost of a major storm over as long as ten years. Coastal residents would not face any surcharges, nor would TWIA members face any assessments, until losses exceeded $1 billion. Because the bill caps the exposure of member insurers to at most

$800 million, insurers could better calculate their risks of participating in the Texas market. When insurers face an unlimited assessment for excess storm losses, such as they can under the current funding structure, they are more likely to either exit the market or raise rates more aggressively because they cannot adequately predict their future costs.

Coastal residents would bear 70 percent of the costs between $1 billion and $2 billion, but given the opportunity to spread premium surcharges over 10 years, a property owner would not have to pay more than an approximately 3-percent increase for any major storm. This approach would acknowledge the fairness of TWIA policy holders paying more for their losses than the rest of the state, yet would prevent coastal property owners from being overburdened by insurance costs to the point they could not maintain their homes or businesses or subjected to total loss because they chose to risk dropping coverage.

All Texans benefit by ensuring that reasonably priced insurance is available along the coast. The coastal area is host to a substantial portion of the oil and gas industry, and coastal ports are the gateway for a vast number of imports and exports that distribute Texas-produced goods abroad or that supply Texas manufacturers with the goods they need for production. By maintaining the affordability of TWIA coverage, HB 4409 would avoid disruptions to coastal business that would impact every aspect of the state economy.

Texas faced an extraordinary year in 2008 with the largest losses by far in TWIA's 37 years of existence, yet the claims for hurricanes Ike and Dolly still fell below the $2.5 billion of losses that HB 4409 could fund. Even still, the bill would authorize TWIA to purchase reinsurance for use in addition to the other funding mechanisms. For every year that TWIA premiums generated excess revenue, these funds would be building the balance of the Catastrophe Reserve Trust Fund, which would be tapped before any of the other funding mechanisms in this bill.

The bill also would establish more stringent building code requirements that would encourage construction of buildings that could better tolerate storm conditions. Changes to the composition of the board would give property owners more voice in a governing body that currently is dominated by insurance industry representatives.

## Opponents said

HB 4409 would leave unfinished the critical task of revising TWIA's funding structure to reflect realistically the risk the Texas coast faces from damaging and costly storms. TWIA's total exposure exceeds $60 billion, and estimates of TWIA losses if a category 4 or 5 hurricane directly hit Galveston are as high as $10 billion. Even though such a storm would be rare, Texas should be prepared for a worst-case scenario to avoid the chance that a major storm could leave state budget-writers grappling with billions of dollars in unexpected storm costs. Weather is unpredictable, and Texas cannot afford to gamble that $2.5 billion will be sufficient to cover storm losses in future storm seasons.

Instead of the HB 4409 proposal, the state should address the fundamental issue with TWIA coverage — the artificially low rates charged to coastal property owners. Current TWIA rates fall far short of addressing the risk associated with coastal properties, and the rest of the state should not continue to subsidize coastal premiums. If TWIA premiums were increased to be more reflective of actual risk, these revenues could build a larger balance in the Catastrophe Reserve Trust Fund so fewer additional funding mechanisms would be needed to address significant TWIA losses.

## Notes

The **HRO analysis** of SB 14 by Fraser appeared in the May 24 *Daily Floor Report*.

The **HRO analysis** of HB 4409 by Taylor appeared in Part Two of the May 4 *Daily Floor Report*. HB 4409 was amended in the Senate to include revisions to TWIA. Other provisions of HB 4409 allow certain agencies to enter into pre-event contracts to receive various services in the event of a weather-related disaster, extend protection from liability to certain persons assisting with disaster-related issues, and allow critical governmental facilities to be equipped with a combined heating and power system if it would result in savings over a 20-year period.

# Extending school district property-value limitation agreements

**HB 3676 by Heflin**
*Generally effective June 19, 2009*

Table
of Contents

**HB 3676** extends to 2014 the expiration date for value-limitation agreements under Tax Code, ch. 313, which authorizes school districts to agree to limit the appraised value of certain property in the district for economic development purposes.

**Sunset date.** HB 3676 extends the sunset date of ch. 313 value-limitation agreements from December 31, 2011, to December 31, 2014.

**Leaseholder's eligibility for value-limitation agreements.** HB 3676 allows the owner or lessee of, or the holder of another possessory interest in, qualified property to apply to the governing body of a school district for a value-limitation agreement.

**Comptroller's evaluation of the application for an agreement.** HB 3676 requires the comptroller's economic impact evaluation of an application for a value-limitation agreement to include, among other existing requirements:

- the number of qualifying jobs to be created by the applicant;
- the impact the project would have on the state and individual local units of government, including tax and other revenue gains, and the economic effects of the project on local communities;
- the proposed limitation on appraised value for the qualified property of the applicant;
- the projected dollar amount of the taxes that would be imposed on the qualified property for each year of the agreement, if the property does or does not receive a limitation on the appraised value;
- the projected effect on the Foundation School Program of payments to the district for each year of the agreement;
- the projected future tax credits if the applicant also applies for school tax credits; and
- the total amount of taxes projected to be lost or gained by the district over the life of the agreement.

After receiving a copy of the application and other pertinent information, the comptroller must determine whether the property meets the eligibility requirements for a limitation on appraised value. The applicant will have an opportunity for a hearing before a final determination.

A school district may approve an application the comptroller does not recommend only if the governing body holds a public hearing to consider the application and the comptroller's decision, and at a subsequent meeting at least two-thirds of the members of the governing body vote to approve the application.

A school district is not required to consider an application for a limitation on appraised value.

**Disclosure of public information.** HB 3676 requires disclosure of appraised value limitations. The comptroller must post on the Comptroller's Office website each document or item of information the comptroller designates as substantive. Each document or item of information must be posted until the appraised value limitation expires. HB 3676 makes certain business information confidential by segregating confidential information from other information in the application.

**Agreement provisions.** HB 3676 allows a value-limitation agreement to provide that the property owner will protect the school district in the event the district incurs extraordinary education-related expenses related to the project that are not directly funded in state aid formulas, including expenses for the purchase of portable classrooms and the hiring of additional personnel to accommodate a temporary increase in student enrollment attributable to the project.

**Limits on PILOTs.** A school district may not enter into agreements under which the person agrees to provide payments in lieu of taxes (PILOTs) to a school district in an amount that exceeds $100 per student per year in average daily attendance or for certain periods of time.

**Recapture provisions.** HB 3676 allows for the recapture of lost property-tax revenue. A person with whom a school district enters into an agreement is required to make the minimum amount of qualified

investment during the qualifying time period and is required to create the minimum number of qualifying jobs during each year of the agreement.

If in any tax year a property owner fails to comply with the minimum investment and job creation requirements, the property owner is liable to the state for a penalty equal to the amount computed by subtracting from the market value of the property for that tax year the value of the property as limited by the agreement and multiplying the difference by the maintenance and operations tax rate of the school district for that tax year. Such a penalty would become delinquent if not paid on or before February 1 of the following tax year.

**Eligibility of school districts.** An eligible school district has territory in an area that qualified as a strategic investment area. The requirement that the school district not have territory in a metropolitan statistical area has been removed.

# Supporters said

HB 3676 would make several changes to Tax Code, ch. 313 to increase the effectiveness and transparency of value-limitation agreements between school districts and new businesses to promote economic development and local job creation. Ch. 313 agreements are one of the single most effective economic development tools in Texas. Ch. 313 agreements allow school districts to provide a temporary limitation on the taxable value of new property investments that are subject to the property tax. No existing facility's value may be abated under ch. 313, and they must meet stringent guidelines to be eligible. These limitations generally expire after eight years, after which time the property is taxed at its full value. These agreements ultimately add substantial value to local tax rolls.

The program has been very successful in bringing new investments and jobs to Texas, many of which would not have located here if not for these tax abatements. Through the beginning of 2009, 90 projects involving over $40 billion of new investment and an estimated 5,600 high-wage jobs, have qualified for ch. 313 agreements. These new facilities include semi-conductor manufacturing, chemical plants, auto manufacturing, research and development facilities, renewable energy, and nuclear energy.

HB 3676 would extend the sunset date from 2011 to 2014 to reassure projects with a long planning horizon

that the state is committed to the ch. 313 program, while permitting the Legislature to review the effectiveness of the program and the changes made by HB 3676 again after a reasonable period.

The bill would:

- provide greater transparency by requiring school districts and the comptroller to have published all relevant information associated with the agreements, which would ensure that all the information associated with an application for value-limitation agreement was made public;
- provide greater oversight by requiring the comptroller to determine whether or not a project met all statutory requirements before allowing the agreement; and
- provide a more thorough and balanced economic evaluation of applications by requiring the comptroller to conduct an economic study to evaluate both the value of the limitation agreement and the associated economic and financial benefits to the state and local communities.

The bill would make important changes to the way ch. 313 affects school finance. HB 3676 would limit the amount of revenue a school district could receive from payments in lieu of taxes, or PILOTs, to $100 per student per year. Had this provision existed previously, it could have limited average PILOTs in existing projects to 20 percent of their current levels. While these payments currently are legal, HB 3676 would cap them to ensure that no district received excessive payments outside of the school-finance system.

HB 3676 would create important protections for state funds by creating recapture provisions. If, in any year, a person in a value-limitation agreement with a school district failed to meet minimum investment or job creation obligations, that property owner's investment would be taxed at full value for that year. This would ensure that the investment and job-creation goals would be met, or that the state would receive its investment back if the developer failed to honor the developer's minimum obligations.

The bill would expand the kinds of industries that would be eligible for ch. 313 agreements, create jobs and investment in Texas, and bring projects to the state that would not be otherwise economically feasible.

## Opponents said

Texas cannot afford four more years of ch. 313 agreements. The main problem with these agreements is that local school boards grant these subsidies, but the state absorbs the cost of foregone property-tax revenue through the school finance system. While the comptroller could recommend whether an application for a ch. 313 agreement should be granted, that recommendation would not be binding on the school district. Several districts have signed agreements for these tax breaks even with a lack of recommendation by the comptroller. The state should have more control over how its funds are spent.

Extending the expiration date would cost the state billions of dollars in business subsidies. Under ch. 313, the state must make payments to local school districts through the school finance system to reimburse them for the funds they would have received had the value-limitation agreement not been made. According to the comptroller, the cost to the state over the lifetime of projects already in existence and those likely to be signed by the current expiration date of December 31, 2011, is $5.7 billion. This would be $900 million out of the total fiscal 2014-2015 budget alone.

Some companies make side-payments to school districts for signing these agreements. These companies give school districts a share of their tax savings as a reward for signing an agreement. These payments in lieu of taxes, or PILOTs, can come to many thousands of dollars per student for each year of the ten-year life of an agreement. One Texas school district receives almost $9,700 per student per year through PILOTs. These payments are not included in school-finance calculations and can enrich select districts with per-student revenue that is two or three times the target revenues most districts receive. These payments, no matter how small, should be included in school-finance calculations.

HB 3676 would not offer meaningful protections for state investments. While the bill would create claw-back provisions that would apply when a developer failed to make the required investments or create the required number of jobs, the required minimums would be so low, especially in rural areas, that the provisions rarely would apply.

HB 3676 would be a move away from the original intent of ch. 313, which was to attract manufacturing jobs to Texas. Wind energy developments, which have especially benefited from these agreements, do not produce nearly as many long-term jobs. Besides, wind developers would come to Texas regardless of tax subsidies because some of the world's most constant wind is located in Texas.

## Notes

The **HRO analysis** of HB 3676 appeared in the May 14 *Daily Floor Report*.

# Revising and extending local tax abatement agreement authority

**HB 3896 by Oliveira**
*Effective June 19, 2009*

Table
of Contents

**HB 3896** allows a county to enter into an abatement agreement with an owner of personal property located on real property, or an individual with a leasehold interest in or owner of personal property located on tax-exempt real property, even if that individual did not own the real property. HB 3896 also allows a city or county to defer an abatement period. HB 3896 also extends the expiration date of the Property Redevelopment and Tax Abatement Act to September 1, 2019.

## Supporters said

HB 3896 would allow cities and counties to defer the start date of a tax abatement period for any project with a long start-up time. This would enable cities and counties to give advance abatement approval on those projects, reducing uncertainty regarding the future profitability of projects that may have a later start date. The 80th Legislature enacted a similar provision in 2007 in HB 2994 by Bonnen, which allowed the start of the abatement period on nuclear plants to be deferred because of long regulatory approval and construction processes.

HB 3896 also would resolve a technical issue that was raised by an attorney general's opinion by clarifying that a county could enter into a tax abatement agreement with an owner of property even if the owner of the abated property did not own the underlying land.

## Opponents said

Allowing projects with long start-up times to defer the abatement period could create more property tax abatement agreements, resulting in a loss of revenue to cities and counties. It would encourage greater use of business tax subsidies, which require other taxpayers to make up the revenue lost during the abatement period.

## Notes

The **HRO analysis** of HB 3896 appeared in Part One of the May 11 *Daily Floor Report*.

# Establishing qualified manufacturing project zones

**HB 4525 by Parker**
*Died in the Senate*

Table
of Contents

**HB 4525**, as passed by the House, would have created standards for the establishment of qualified manufacturing project zones.

**State project zone benefits.** The owner of a qualified manufacturing zone project would have been eligible for a refund of state sales taxes of 50 percent of the total amount of sales taxes collected on all taxable items purchased within a designated project zone minus the sales tax base for the preceding fiscal year. The total refund amount that a project could have received as a designated project zone would have been either $50 million or five percent of the project's investments in the zone, whichever was less. The refund could have been used to pay for or to refund eligible expenses incurred before or after the project had received its designation as a project zone. These expenses would have included recruiting or training present, prospective, or potential employees for available jobs or those expected to be available for the planning, designing, construction, fabrication, or operation of a project. Expenditures also would have included salaries, wages, and benefits of employees through the first two years that the project was commercially operating.

**Qualified manufacturing project.** To be eligible, manufacturing projects would have had to have:

- invested at least $200 million or at least $100 million if the facility was related to renewable energy, energy storage technology, or waste recycling;
- been forecast to create at least 300 FTEs;
- been in competition with at least one alternative site for the facility that was not located in Texas or competing against similar projects located outside Texas for federal funds or financial support, including loan guarantees, that would benefit the project;
- not produced carbon-dioxide emissions, within certain parameters; and
- not been part of a Tax Code, ch. 312 or 313 tax limitation agreement.

**Initial and annual certification.** The owner of a qualified manufacturing project would have been required to conduct an economic impact study of the county in which the project would be located and to submit the study to the comptroller. The comptroller would have had to certify the study if it had estimated accurately certain required economic information. The projects would have to have been reauthorized yearly to ensure compliance with investment and job creation goals. A zone could not have existed for more than ten years.

**Clawback provisions.** The owner of a project who failed to submit proper certification of investment and job creation goals would forfeit the right to receive future state benefits under this program and repayment of the entire amount of all refunds previously received under the program.

## Supporters said

HB 4525 is necessary to shore up a declining manufacturing sector. These investments in the manufacturing sector are necessary if Texas is to continue to enjoy the strong economic development benefits that manufacturing jobs bring to the state. The incentives provided by HB 4525 would help tip the scales in favor of Texas when manufacturers are making business decisions on relocation or expansion and would not benefit needlessly projects already in planning or construction stages. The bill would help bring manufacturing jobs to the state that otherwise would not locate here and would encourage retention of existing businesses.

The bill would help underemployed and unemployed workers to make the transition into new manufacturing jobs by providing workforce development money for manufacturers that create at least 300 full-time jobs. This is crucial, as over 80 percent of manufacturers have difficulty finding qualified employees because entry-level jobs in manufacturing increasingly require additional skills and education as a result of technological advances.

The bill would provide several safeguards to ensure that only projects that would provide a significant positive impact to the state's economy would be awarded. As the criteria for eligible manufacturing projects would be purposely restrictive, granting designations would be selectively used for projects that

would have a large "bang for the buck." Additionally, the bill would contain "clawback" provisions that would apply if the designated project failed to reach the required job or investment thresholds. Any agreement between a local government body and a designated project would be strictly optional. Also, the comptroller would have clear authority to reject an economic impact study if it did not accurately estimate projected job creation or investments.

The fiscal note ignores that the related sales and local taxes would not have been otherwise realized by the state and local governments had an eligible manufacturer not expanded or relocated. As such, returning a portion of these sales and local taxes would be fiscally reasonable, especially given the related benefits of manufacturing investment.

## Opponents said

HB 4525 would be a costly and unnecessary business subsidy that would divert precious tax revenue from the public sector and direct it to businesses that likely would locate in Texas or expand here even without these subsidies. While Texas is known as a business-friendly state, it should not forgo roughly $135 million in general revenue over the next five years, especially to promote a declining industrial sector.

According to the methodology for the fiscal note, several nuclear power projects that are well into the planning stages of development, and one close to the construction phase, would meet the eligibility requirements for a qualified manufacturing project zone. These include the two additional units for the South Texas Nuclear Project in Matagorda County, expected to begin construction after the bill's effective date, and could possibly include two other nuclear projects, one in Somervell County and one in Victoria County. As these projects are either in motion or planned, they need not be incentivized by state funds.

The bill would require the comptroller to accept automatically an economic impact study from a project owner requesting designation as a project zone if the study was conducted by an independent third party using generally accepted economic impact forecasting methods. Unlike the field of accounting, which has generally accepted accounting practices, economic forecasts often are based on a number of assumptions about a given project. Should those assumptions not be reasonable, the entire forecast could be called into

question. At the very least, the comptroller should have the authority either to reject or question the forecasting methods used by an applicant, especially given the amount of taxpayer money involved.

The bill would allow tax rebates to be used for workforce development for manufacturing jobs and also to cover the salaries, wages, and benefits of employees over the first two years of operation. While job creation is a laudable goal, the state and its local governments should not give up tax revenue that otherwise would go to public services to cover an expense that firms would rightfully incur as part of normal operations.

HB 4525 would provide up to $50 million in sales tax rebates in addition to local tax incentives to a designated project in a qualified manufacturing zone. This incentive could be accessed for up to three years before the project had even begun to operate, based solely on forecasting the required number of jobs to be created. A more reasonable provision would be to deny benefits to the firm until it created actual positions. Additionally, while the bill includes a $50 million cap on state sales tax rebates, there would be no such limit on local taxes that could be rebated or refunded.

## Notes

HB 4525 passed the House and was reported favorably, as substituted, by the Senate Economic Development Committee, but was not considered by the Senate.

The **HRO analysis** of HB 4525 appeared in Part One of the May 6 *Daily Floor Report*.

# Continuation and operation of Texas Department of Insurance

**SB 1007 by Hegar**
*Died in the House*

Table
of Contents

SB 2 by Hegar, enacted during the first called session, continued the Texas Department of Insurance (TDI) until September 1, 2011.

**SB 1007**, as reported by the House Insurance Committee, would have continued TDI until September 1, 2021. The bill would have added standard Sunset provisions governing conflicts of interest of the commissioner of insurance and agency staff, maintaining information about complaints, use of technology to increase public access, and alternative rulemaking and dispute resolution procedures.

SB 1007 would have made it a duty of TDI to protect and ensure the fair treatment of consumers and ensure fair competition in the insurance industry in order to foster a competitive market.

**Rate regulation for property and casualty insurance.** SB 1007 would have revised rate regulation for property and casualty insurance lines, except those provided by certain exempted insurers or insurer's affiliates. The bill would have allowed an insurer to use a rate on or after the date the rate was filed. TDI could have requested additional information related to rate filings, including those made by an insurer subject to prior approval.

The commissioner would have had to disapprove rates that did not comply with statutory requirements before they took effect or within 30 days of the day the rate was filed. With certain exceptions, if the commissioner had not disapproved a rate prior to these deadlines, the commissioner could have disapproved the rate only after a hearing.

TDI would have had to make available to the public information concerning the department's process and methodology for rate review, including disapproval of rates. TDI would have tracked, compiled, and analyzed the factors that contributed to the disapproval of rates and the volume and content of requests for additional information.

The bill would have required the commissioner to establish the financial conditions and rating practices that could subject an insurer to prior approval and to provide insurers under prior approval with an

explanation of steps the insurer would have to take to be excused from the order. TDI would have tracked precedents related to disapprovals of rates filed by insurers subject to prior approval.

**Regulation of independent preferred provider organizations.** The bill would have established requirements for certain preferred provider organizations (PPOs) to hold a certificate of authority to organize or operate as a PPO in Texas. The bill would have established the application process to receive a certificate of authority, including payment of a filing fee up to $1,000, and the circumstances under which the commissioner of insurance would have approved an application. The denial, suspension, or revocation of authority to act as a PPO would have been subject to laws regarding professional conduct, disciplinary actions, and sanctions for license holders subject to the jurisdiction of TDI. The department would have tracked and analyzed complaints about PPOs.

**Examination of title insurance agents.** The bill would have established requirements for TDI to examine each title insurance agent and direct operation licensed in Texas. The Texas Title Insurance Guaranty Association would have paid fees and reasonable expenses that TDI incurred in conducting the examinations. A title agent or direct operation could have been subject to disciplinary action for failure to comply with an examination request. At least every five years, the commissioner would have evaluated if TDI needed additional information examined to promulgate title insurance rates.

**Engineers for windstorm inspections.** TDI would have been required to contract with, rather than appoint, engineers who conducted windstorm inspections. The bill would have required TDI to compile a list of qualified, contracted inspectors and report possible licensing violations by an inspector to the Board of Professional Engineers.

**Advisory committees.** The bill would have abolished all advisory committees established by the Insurance Code that did not have an expiration date and would have transferred all their powers, duties, obligations, rights, contracts, funds, records, and property to TDI. The department could have retained or

developed committees as appropriate to meet changing needs. The commissioner of insurance would have adopted rules regarding the purpose, structure, and use of advisory committees by the commissioner, the state fire marshal, or TDI staff.

**State Fire Marshal's Office.** The bill would have required the commissioner by rule to delegate to the state fire marshal the authority to take disciplinary and enforcement action, including the imposition of administrative penalties, against pyrotechnic operators and certain people licensed to provide fire-protection-related services. The bill would have specified the manner in which administrative penalties could be imposed and how a person could dispute the imposition of an administrative penalty.

The state fire marshal would have been required to inspect more state-owned and state-leased buildings. The inspection schedule would have been based on guidelines developed for assigning fire safety risk and would have required inspection of each of these buildings, regardless of a building's fire safety risk.

**Data collection for personal auto or residential property insurance.** Personal automobile and residential property insurers would have been required to file certain aggregate claims information for a filing period. TDI would have posted aggregate data on its website in a manner that did not reveal proprietary or trade secret information.

**Electronic transactions.** The bill would have authorized entities regulated by TDI to conduct business electronically if each party to the business agreed to do so.

## Supporters said

SB 1007 would implement revisions, including a number of recommendations of the Sunset Advisory Commission, that would improve the operations of the Texas Department of Insurance. The bill would clarify the regulation of property and casualty rates under the file-and-use system, providing insurers more certainty about the acceptance of rate filings and the conditions under which rates could be denied. Unnecessary advisory committees would be abolished, and the commissioner of insurance would be granted the flexibility to establish advisory committees as needed by rule.

By requiring PPOs to obtain a certificate of authority to operate in Texas, TDI would have more information about the operation of these entities and could take enforcement action against them as necessary. About 4.5 million Texans are insured through PPO plans, and TDI needs a mechanism to protect these consumers against financial and medical harm.

The bill would provide the commissioner of insurance with more data with which to promulgate title insurance rates, and examinations of title agents would assess their financial solvency.

**Regulation of property and casualty rates.** The bill would bring clarity to the file-and-use system, in which insurers rarely file and use rates immediately for fear of the legal and administrative costs they could incur if rates later were disapproved. Contested case hearings are costly, and insurers must justify their rates against the findings of actuaries from both TDI and the Office of Public Insurance Counsel. Costs increase further if an insurer must appeal a rate ruling to a district court. In 2008, only 12.6 percent of homeowners insurers actually filed and began to use new rates on the same day.

The bill would strengthen the existing prior approval processes by giving TDI rulemaking authority to establish the processes and standards by which an insurer could be placed under prior approval. In 2007, about 45 percent of homeowners insurers were subject to prior approval. SB 1007 would require the commissioner to establish the financial conditions and rating practices that could subject an insurer to prior approval and to disclose to insurers how they could be freed from prior approval.

The file-and-use system proposed in SB 1007 would be better for consumers than a full prior approval regulatory system because it would enhance market competition. A healthy, competitive insurance market with many participating insurers is the best way to ensure that companies will strive for efficiencies to keep costs down and to keep rates low enough to attract a large consumer base. File-and-use allows insurers to assess risks and immediately begin use of an actuarially justified rate. Prior approval systems allow the state regulatory agency to interfere in an insurer's implementation of rates that an insurer has deemed will keep the insurer solvent with a reasonable buffer to guard against annual fluctuations in claims filings.

The insurance industry is based on assessment of risk, and insurers must assess a variety of consumer, environmental, and regulatory standards, as well as the performance of the financial markets when setting rates. A prior approval system would introduce yet another risk to an insurer because the insurer would not know if insurance regulators would approve the rates it filed. Worse outcomes could result for consumers because insurers would set higher rates to account for the higher risk and also could decide to exit the market or reduce the number of policies they wrote to avoid losses. The regulatory history of the Texas insurance market demonstrates the trend of significant declines in insurer participation when regulation is increased. Reduced competition leads to higher rates for consumers. While efforts to increase regulation may be well intended, they lead to worse consumer outcomes.

Consumers face the biggest risk when excessive rate regulation prevents insurers from establishing an adequate reserve and fully paying consumer claims following a catastrophe. Although insurer profits were high in 2006 and 2007, the reserves generated from business during those years allowed many insurers to stay in business despite the extreme natural-disaster-related claims they had to pay in 2008.

Commissioner of insurance. The insurance commissioner should be an impartial regulator, not an elected official. The best way for an insurance commissioner candidate to appeal to citizens would be to run on the premise of lowering insurance rates, yet the market does not always safely allow this goal. An insurance commissioner elected with the mandate to lower rates could implement policies that jeopardized insurer solvency.

**Regulation of forms.** SB 1007 appropriately would not require standardized forms for homeowners policies. By allowing insurers to file different forms, market competition is enhanced not only through pricing differences but also through product offerings. Uniformity in forms can lead to property owners paying for coverage they did not need, rather than selecting a plan at the price and coverage level they desired.

**Credit-scoring.** Those who seek to abolish the use of credit rating in establishing premiums make the incorrect assumption that the industry is indicating that a low credit score increases the likelihood of poor driving. However, credit scoring has proved an accurate way to measure risk because studies consistently have demonstrated that people with low credit ratings have

a greater likelihood of making a claim when other consumers may have chosen not to. Whatever the factor that drives the risk association between credit and claim rates, insurers should be able to measure this indicator of risk.

## Opponents said

SB 1007 would not take advantage of the opportunity to revise processes at TDI in the interest of consumer protection.

**Regulation of property and casualty rates.** This bill would continue the file-and-use system that allows insurers to file notice of a rate change with TDI and begin to use that rate immediately. TDI could not disapprove a rate-in-effect, even if deemed unfair or excessive, without an administrative hearing and possible appeal to a district court. Insurers should not be allowed to determine whether their own rates were fair. The file-and-use system was supposed to decrease Texas' insurance rates, which are the highest in the nation, yet this system has not lived up to this expectation.

Implementing a prior approval system would allow TDI to review and approve all rates before they were passed along to policyholders. Insurers could not enact steep rate increases and engage in price gouging to recoup losses too rapidly. Prior approval would place the burden of proof on the insurer to justify that rate filings were necessary and justified.

The insurance market is not a standard competitive marketplace because consumers in some instances are mandated to obtain coverage or may greatly need the benefits of coverage. This environment necessitates rate review so that insurers do not take advantage of consumer vulnerability.

Regulatory interventions do not influence the amount of market participation to the extent that some file-and-use proponents claim. Before 2003, when there were benchmark rates, insurers were not allowed to have different rating tiers. Because of this, insurers spun off affiliates so that each affiliate could act as a surrogate for a rating tier. These affiliates no longer were needed when regulatory changes were made in 2003, and many affiliate operations ceased. The actual decline in insurer group participation was negligible, even if the total number of companies seemed to decrease significantly.

**Commissioner of insurance.** While the commissioner directs policy that influences homeowners, patients, and other consumers, the commissioner is accountable only to the governor. Many more Texans are affected by the actions of the insurance commissioner than by the actions of the elected agriculture and railroad commissioners, yet Texas voters do not have a say in choosing their insurance commissioner. Eleven other states allow their citizens to have a say in who would best govern a fair insurance market through election of their insurance commissioners, and Texans should have this ability also.

Regulation of forms. This bill should have required homeowners policies to offer standard coverage. When consumers are offered the same policies by different insurers, they easily may shop the market by comparing the prices offered by different insurers. Today, it is difficult if not impossible for consumers to interpret and compare complex and differentiated policies to determine appropriate, cost-effective coverage. Today's homeowners policies provide much less coverage than they provided under standard forms, but rates have not dropped correspondingly to reflect the decreased coverage.

**Credit-scoring.** Texas should not allow the use of credit scores in setting insurance rates. Credit scores are determined based on a person's payment history, amounts owed, length of credit history, new credit, and types of credit. None of these criteria reflects the measure of risk associated with a consumer's driving behavior. Many consumers unfairly have faced rate increases solely based on their credit score when they never have filed a claim.

## Notes

SB 1007 passed the Senate, but died on the May 23 Major State Calendar in the House when no further action was taken. The **HRO analysis** of SB 1007 appeared in Part One of the May 23 *Daily Floor Report*.

During the 81st Legislature, first called session, the House considered SB 2 by Hegar, the Senate companion bill, in lieu of HB 2 by Isett, the House version of the bill, which had been set on the July 2 Major State Calendar. SB 2 extended the Sunset date for TDI and other agencies to September 1, 2011. The **HRO analysis** of HB 2 appeared in the July 2 *Daily Floor Report*, with additional background on SB 1007 in the July 1 *Daily Floor Report*.

# Revising eligibility for unemployment compensation

**SB 1569 by Eltife**
*Died in the House*

Table
of Contents

**SB 1569** would have revised the way eligibility for benefits is determined under the Texas Unemployment Compensation Act and would have established a task force on unemployment compensation reform.

**Federal Recovery Act modifications.** SB 1569 would have amended the Texas Unemployment Compensation Act to make the state eligible to receive federal funds appropriated in the federal Recovery and Reinvestment Act of 2009. The bill would have created an "alternate base period" for determining benefit eligibility. An alternate base period would have been defined as the four most recently completed calendar quarters before an individual applied for benefits. It would have applied to those claimants who otherwise would not qualify under the standard base period.

The bill would have eliminated requirements for a lag in benefits of six to 25 weeks for a person who lost a job due to the relocation of a spouse. A spouse could not have been disqualified from receiving benefits if a move made it impractical for the spouse to commute.

Under the bill, an individual would have qualified for benefits even if the individual was seeking and available only for part-time work, defined as employment of at least 20 hours per week.

The bill would have revised eligibility for a person who left work due to the illness of a child or a terminally ill spouse or for reasons of family violence. Existing documentary requirements establishing a person's eligibility for reasons of family violence would have been replaced by "reasonable documentation," which could have included a statement from a qualified professional. Exceptions for illness of a child or a terminally ill spouse would have been extended to an illness of an immediate family member.

**Redefining "last work."** SB 1569 would have revised the definition of "last work" used to determine the eligibility of an initial claim. Under the bill, the "last work" of a person applying for benefits would have been the last person for whom the claimant worked at least 30 hours a week or the last person for whom the claimant worked who met the definition of an employer in the Texas Unemployment Compensation Act.

**Task Force on Unemployment Compensation Reform.** On January 1, 2010, or later, the governor would have had to appoint a task force to study the administration, financing, and benefit eligibility of unemployment compensation in the state. The task force would have been composed of nine members meeting specific descriptions contained in the bill.

The members of the task force would have been advised by employees of certain agencies and chambers. The task force would have been charged with specific duties relating to unemployment compensation and would have had to make recommendations to the Texas Workforce Commission (TWC) by January 1, 2012. At that time, the TWC would have determined whether any of the unemployment compensation revisions required under the federal Recovery Act warranted continuation.

## Supporters said

SB 1569 would secure eligibility for the state of $555 million in federal funds for unemployment compensation available under the federal Recovery Act while providing necessary modifications to the state's outdated unemployment compensation system. The state's current unemployment insurance (UI) system is in need of additional funding and reform. Texas ranks at the bottom nationally in the percentage of unemployed workers receiving jobless benefits. According to TWC, state unemployment insurance claims have grown about 140 percent over the past year, and initial claims are up more than 100 percent during this time. A recent TWC estimate projected the unemployment compensation fund balance to fall to $18.8 million by October 1, 2009, which would be $839 million below the statutory floor of 1 percent of all taxable wages. When the amount of money in the fund falls below the floor, a "deficit tax" is imposed on businesses that pay unemployment taxes to bring the fund balance above the statutory floor.

Making the changes required to be eligible for federal stimulus funds could forestall some of the inevitable business tax increases triggered by the fund's diminished balance. Making changes now could reduce employer deficit taxes by as much as 70 percent in the short term. SB 1569 is necessary to establish eligibility and to offset costs for borrowing funds to

resolve imminent deficits. The additional revenue made available through the fund would be sufficient to cover any additional costs for expanded eligibility in the short term. The Legislative Budget Board (LBB) has estimated that costs associated with the unemployment modernization could total about $369 million over the course of five years, well below the funds that would be made available through the Recovery Act. Further, every $1 of the federal UI money accepted for the additional benefits could generate $2.15 of economic activity, stimulating the state's economy during a deepening statewide and national recession.

The bill would save an estimated additional $82.6 million for the unemployment insurance trust fund by ending a deceptive practice some claimants use to avoid disqualification under existing state laws. Under current law, an employee who is fired can maintain eligibility by assuming an informal, temporary job for a short time and then applying for benefits upon the natural termination of that employment. SB 1569 would add a provision defining "last work" as employment in excess of 30 hours per week or through an employer that is part of the unemployment insurance system in the state. This measure effectively would end this deceptive practice by removing this eligibility loophole.

A recent policy statement from the U.S. Department of Labor indicated that states would have the option of subsequently repealing legislation enacted to establish eligibility for the UI funds under the Recovery Act. The state could accept the funds now, when they are needed to address economic woes, while reserving the right to minimize its long-term obligations. The task force established in the bill would provide an opportunity to study the changes made after the funds have been fully received and distributed. After reviewing the findings, the TWC could determine if the provisions should be retained or rolled back.

## Opponents said

SB 1569 would constitute an unfunded federal mandate by requiring a permanent increase in state costs in exchange for temporary federal assistance. Current estimates of the probable cost of accepting the funds, about $369 million over the next five years, are misleading. Such projections assume that the state's economy would not be affected by accepting the Recovery Act funds. In fact, accepting the Recovery Act funds is likely to result in a negative impact on the state's economy that would increase the burden on unemployment compensation resources, cancelling any positive five-year gain to the trust fund. The costs of accepting unemployment compensation funds would amount to a long-term drain on the private sector that could reduce growth in real net business output and ultimately result in significant job losses in the state.

Expanding the eligibility for unemployment insurance ultimately would force businesses to pay higher taxes into the unemployment trust fund. This would amount to a tax increase on businesses, with negative long-term implications for those businesses and the state economy. Texas thus far has fared better than many states in the recession, largely due to regulatory and tax and spending policies favorable to a healthy business climate. Increasing taxes on businesses could erode the state's reputation as an attractive place to conduct business and result in a loss of business.

While the state theoretically could repeal the expanded eligibility requirements in the future, there is no guarantee this would happen. The unemployment compensation task force established in the bill would have no authority to make any official changes in the expanded eligibility provisions and therefore would have little added value other than as an interim committee assigned to study the topic. In addition, the findings of the task force would come too late. The state is in a serious recession and can scarcely afford to threaten private businesses at this volatile time. The task force findings, which would be reported to the TWC as late as 2012, would be largely an afterthought.

There are much more productive solutions to address funding shortfalls in the unemployment insurance trust fund. One way to increase the amount of money available in the trust fund would be to be more vigilant about fraud and overpayments. A federal Department of Labor study from 2000 found that 13.8 percent of Texas unemployment trust fund payouts came from fraud and overpayments. The state should pursue policies to reduce these illegitimate payments from the trust fund before it considers measures that could result in additional obligations on employers.

## Notes

SB 1569 passed the Senate, but died in the House when a point of order was sustained against further consideration of the bill beyond the deadline for consideration of Senate bills on second reading.

The **HRO analysis** of SB 1569 appeared in the May 20 *Daily Floor Report*.

# Criminal Justice

| | | | |
|---|---|---|---|
| * HB 498 | McClendon | State study on wrongful convictions | 30 |
| * HB 1711 | S. Turner | Comprehensive offender reentry plan after prison release | 32 |
| * HB 1736 | Anchia | Revising compensation for the wrongfully convicted (Tim Cole Act) | 34 |
| * HB 2003 | McCall | Making cyber-harassment a crime | 35 |
| * HB 2066 | Gallego | Second- and third-degree felony for domestic violence strangulation | 36 |
| * HB 2086 | Moody | Prosecution and punishment for gang activities | 37 |
| HB 2267 | Hodge | No death penalty for certain accomplices, separate trials for capital murder | 41 |
| * HB 3228 | Madden | Detecting contraband and monitoring cell phones in correctional facilities | 43 |
| * HB 3689 | McClendon | Continuing Texas Youth Commission, Texas Juvenile Probation Commission | 45 |
| SB 117 | Ellis | Photograph and live lineup identification procedures in criminal cases | 48 |
| * SB 839 | Hinojosa | Life in prison for juveniles convicted of capital murder | 50 |
| SB 1529 | Whitmire | Use, reporting, auditing of assets seized and forfeited to law enforcement | 51 |

# State study on wrongful convictions

**HB 498 by McClendon**
*Effective September 1, 2009*

Table
of Contents

**HB 498** requires the state's Task Force on Indigent Defense (TFID) to study the causes and means of prevention of wrongful criminal convictions and creates an advisory panel to assist the task force in the study. The panel is named the Timothy Cole Advisory Panel on Wrongful Convictions. The task force and panel are required to study the causes of wrongful convictions, procedures and programs to prevent wrongful convictions, the effect of state law on wrongful convictions, and whether creating an innocence commission to investigate wrongful convictions would be appropriate. By January 1, 2011, the TFID must report on its study to the governor and the Legislature.

The advisory panel is composed of 10 members: the director of the TFID, the four legislators who chair the Senate Criminal Justice and Jurisprudence committees and the House Criminal Jurisprudence and Corrections committees, and representatives of defense lawyers, prosecutors, judges, public law schools, and the governor.

## Supporters said

HB 498 would help address the state's problem of wrongful criminal convictions. The wrongful conviction and imprisonment of any innocent person is a miscarriage of justice that carries with it a moral obligation to prevent additional mistakes. According to The Innocence Project, at least 38 men in Texas have been exonerated after wrongful convictions. HB 498 would help the state address this problem by initiating a formal, state-sponsored study of the issue. The advisory panel would be named in honor of Timothy Cole, a Texas Tech student who was wrongfully convicted of rape and died in prison after serving 13 years of a 25-year sentence.

The study required by HB 498 would help identify what went wrong in cases of wrongful convictions as well as why, examine the criminal justice system, and recommend changes to prevent wrongful convictions in the future. The Legislature needs a formal, state-sponsored study of wrongful convictions and recommendations for systemic changes because currently no adequate mechanism exists for doing so. Even though some individuals are exonerated

through the judicial or clemency systems, this does not necessarily result in a comprehensive study of the causes of wrongful convictions, a close examination of statewide issues, or recommendations on how to prevent wrongful convictions.

Fears that HB 498 would erode support for the death penalty are unfounded. The bill would require only a study, and the advisory panel that would help with the study would include representatives from all parts of the criminal justice system.

## Opponents said

It is unnecessary and a waste of state resources to charge a state entity with a formal study of wrongful convictions. The criminal justice and legislative systems in the state have checks and balances that work to achieve justice and to identify and address problems. In the past two-and-a-half decades, the state's criminal justice system has had many substantial improvements, resulting in a just and fair system that protects the public. The state should continue to let the judicial and clemency systems handle individual cases of alleged innocence.

In many cases, the causes of wrongful convictions already have been identified, and the state should address them rather than study them further. The state should focus on preventing errors at the front end of the criminal justice system, such as with eyewitness identification or recording interrogations.

If the state must study wrongful convictions in Texas, it would be more appropriately done by an existing entity, such as the Criminal Justice Legislative Oversight Committee, the Texas Criminal Justice Integrity Unit, which was established in June 2008 by Judge Barbara Hervey of the Court of Criminal Appeals, innocence projects at one of the state's law schools, or local entities such as the Conviction Integrity Unit established by the Dallas County district attorney. Requiring the Task Force on Indigent Defense to study wrongful convictions would move the task force too far from its mission of aiding and monitoring the counties' delivery of indigent defense services into an inappropriate role in developing state policy.

A study on wrongful convictions could be used as a back-door way to erode support for the death penalty in Texas.

## Other opponents said

HB 498 should create a state innocence commission charged with investigating thoroughly all post-conviction exonerations rather than a body to study whether the state needs an innocence commission.

## Notes

The House-passed version of the bill would have created the Timothy Cole Innocence Commission to investigate thoroughly and report on post-conviction exonerations to:

- ascertain errors and defects in the criminal procedure used to prosecute a case;
- identify errors and defects in the criminal justice process in Texas;
- develop solutions and methods to correct the identified errors and defects; and
- identify procedures and programs to prevent future wrongful convictions.

The commission would have been composed of nine members, including appointees by the governor, the attorney general, legislative leaders, the chief justice of the Texas Supreme Court, the chancellor of the Texas Tech University System, and the Texas Criminal Defense Lawyers Association.

The **HRO analysis** of HB 498 appeared in the May 14 *Daily Floor Report*.

# Comprehensive offender re-entry plan after prison release

**HB 1711 by S. Turner**
*Effective June 19, 2009*

Table
of Contents

**HB 1711** requires the Texas Department of Criminal Justice (TDCJ) to develop a comprehensive plan to reduce recidivism and ensure the successful reentry and reintegration of offenders into the community after release from a correctional facility. The plan must be implemented by January 1, 2010.

The reentry and reintegration plan must include the following:

- an assessment of offenders to determine which skills they need to be successful upon release;
- programs that address offenders' needs;
- a comprehensive network of transition programs to address the needs of released offenders;
- identification of providers of local programs and transitional services with whom TDCJ could contract to implement the reentry and reintegration plan; and
- the sharing of information between local coordinators, contractors, and other service providers to assess and address each offender's needs.

Programs for offenders and the transition programs must be implemented by highly skilled, experienced staff and must provide offenders individualized case management and a full continuum of care, life skills and employment training, education, treatment programs, and parenting and relationship building classes.

TDCJ may contract and coordinate with private vendors, local governments, and other entities to implement the comprehensive reentry and reintegration plan.

TDCJ must coordinate the work of a reentry task force that includes several state agencies and others. The task force may identify gaps in services for released offenders and coordinate with providers of existing local reentry and reintegration programs on recommendations for those services.

TDCJ must implement policies encouraging family unity while an offender is confined and family participation in offenders' transition to the community.

It is required to study whether HB 1711 has reduced recidivism rates. TDCJ must report the results of the recidivism study to the Legislature by September of each even-numbered year.

## Supporters said

HB 1711 would ensure that the approximately 70,000 prison inmates who are released each year receive the assistance they need to reintegrate successfully into Texas communities. Currently, released offenders are faced with a lack of services and programs to assist their reintegration and often have a lack of knowledge of programs and services in the community. Successful reintegration is vital to reducing the recidivism of offenders, which would help safeguard the public, rebuild families and communities, and in the long run, save Texas money.

While TDCJ assesses inmates upon their entry into the state's prisons, the assessments focus on determining the medical, educational, or other situation of the offender but do not look long-range at what the offender may need when released. While in prison offenders may receive education services, substance abuse treatment, or life skills or job skills training, these services are not necessarily offered with an eye to community reentry. When offenders are released, they do not receive the type of comprehensive, individualized plan that would be required by HB 1711.

HB 1711 would address these problems by requiring TDCJ to develop a comprehensive plan to reduce recidivism and ensure the successful reentry and reintegration of released offenders. The specific, clear mandate in the bill would focus state resources, including existing programs and services within prisons, on this important task and would ensure they were tailored to offenders' needs.

Focusing existing resources on reentry, and committing funds for these efforts, would save the state money in the long run while increasing public safety and rebuilding the lives of offenders and their families.

## Opponents said

Meeting all the requirements in HB 1711 would lead to an increased demand on state resources. The Legislature should be cautious about committing to new programs during a time of economic uncertainty.

## Notes

The **HRO analysis** of HB 1711 appeared in Part Two of the April 24 *Daily Floor Report*.

HB 1711 takes effect only if there is a specific appropriation for its implementation in a general appropriations act of the 81st Legislature. SB 1, the general appropriations act for fiscal 2010-11, appropriates to TDCJ $5.2 million to fund 64 new positions called reentry transitional coordinators to assist offenders in their transition to the community after leaving prison.

# Revising compensation for the wrongfully convicted (Tim Cole Act)

**HB 1736 by Anchia**
*Effective September 1, 2009*

Table of Contents

**HB 1736**, the Tim Cole Act, revises the law that entitles certain persons who have been wrongfully imprisoned to compensation from the state. It applies to persons who have been wrongfully imprisoned and have received a full pardon based on innocence or have been granted relief on the basis of actual innocence.

Under HB 1736, those persons are entitled to lump-sum payments of $80,000 per year spent in prison, regardless of whether a person was on death row, rather than $100,000 per year spent in prison if on death row and $50,000 per year spent in prison for others. The bill also entitles persons who qualify for compensation and were on parole or required to register as a sex offender to $25,000 per year on parole or on the registry.

HB 1736 authorizes annuity payments for the wrongfully imprisoned. The payments are based on the amount to which a person was entitled for the time imprisoned and time spent on parole or on the sex offender registry. Annuity payments are payable in equal monthly installments for life and based on a 5 percent annual interest rate. Persons no longer have the option of filing a lawsuit against the state to receive compensation.

Upon request within seven years of receiving a pardon or other relief, the state must pay up to 120 hours of tuition and fees at an institution of higher education or a career center for a person who had been wrongfully imprisoned.

The bill requires the Texas Department of Criminal Justice (TDCJ) to develop a comprehensive plan to ensure the successful reentry and reintegration into the community of wrongfully imprisoned persons after being released from prison. The plan must include life skills and job skills, the provision of necessary documents such as a state identification card, and up to $10,000 in financial assistance to cover living expenses. The financial assistance will be deducted from any lump-sum payment.

The Texas Correctional Office on Offenders with Medical or Mental Impairments (TCOOMMI) must assist wrongfully imprisoned persons released from TDCJ with accessing medical care, obtaining mental health treatment, and obtaining support services.

## Supporters said

HB 1736 would recognize that wrongfully convicted persons deserve more compensation than the state currently provides. Exonerated persons need clothing, housing, transportation, and medical care, and unlike parolees, exonerated persons receive little to no help from the state. When the state's judicial system has failed and effectively taken years of a person's life, the state should bear the responsibility of compensating them. The bill would address these issues by adjusting the level of compensation wrongfully imprisoned persons can receive so that all persons, whether on death row or not, would be entitled to $80,000 per year of wrongful incarceration.

The bill would authorize annuity payments so that the wrongfully imprisoned would be ensured a lifetime income, in addition to a lump sum that could be spent quickly. Exonerated persons with little or no money-management experience might be unable to make a lump sum last. By allowing the heirs of posthumously exonerated persons to receive lump sum payments, HB 1736 would recognize, and compensate for, the impact wrongful convictions have on families.

HB 1736 would provide additional help to exonerees by requiring TDCJ to develop reentry and reintegration services to help ease their transition from prison. The TCOOMMI office would be charged with assisting exonerees with medical care and mental health care, which otherwise can be difficult for them to obtain. The bill also would require the state to pay tuition and fees so exonerees could pursue a higher education.

## Opponents said

Increasing compensation would cost the state more money than is fiscally responsible. Texas already offers a high level of compensation to those wrongfully imprisoned. The state should be cautious about increasing expenditures in the current economic climate.

## Notes

The **HRO analysis** of HB 1736 appeared in Part One of the April 24 *Daily Floor Report*.

# Making cyber-harrassment a crime

**HB 2003 by McCall**
*Effective September 1, 2009*

Table
of Contents

**HB 2003** creates criminal offenses for harassment online of another person. The bill makes it a third-degree felony (two to 10 years in prison and an optional fine of up to $10,000) to create a webpage or post a message on a social networking site in someone else's name, without their consent, and with the intent to harm, defraud, intimidate, or threaten someone. It is a class A misdemeanor (up to one year in jail and/or a maximum fine of $4,000) to send an e-mail, instant or text message, or similar communication using another person's identity, without consent, with the intent that the recipient of the communication believe that the other person sent the message and with intent to harm or defraud someone. The offense is a third-degree felony if done with intent to solicit a response from emergency personnel. The bill gives a defense to prosecution to employees of social networking sites, Internet service providers, interactive computer services, telecommunication providers, and video and cable service providers.

## Supporters said

HB 2003 would establish appropriate punishments for a new wave of serious crimes that have come about with the advent of social networking sites and text messaging. Current law does not address instances of malicious social networking impersonation or text messaging harassment or bullying. The state should take these actions seriously.

HB 2003 is narrowly focused to regulate unlawful conduct, not infringe on free speech rights. Harming others is not protected under the free speech rights in the U.S. Constitution. The bill would fill a gap in current law by making impersonation that is done to harm, defraud, intimidate, or threaten a crime. To be prosecuted for an offense, an individual would have to assume someone else's identity and use it maliciously. Law enforcement officials and prosecutors would be able to exercise discretion in determining which circumstances warranted harsher penalties.

## Opponents said

HB 2003 could compromise the First Amendment right to freedom of speech. The term "harm" in the bill could be interpreted broadly, including something as simple as harming a person's reputation. HB 2003 could criminalize a juvenile prank that could be considered "harmful" to someone. The bill could make behavior that may have been just annoying into a felony. The bill should limit severe punishment to actions that threaten bodily injury.

The bill could overlap with the current offense of harassment. Instances of cyber-harassment and impersonation are being prosecuted effectively under current law. Stealing someone's identity online is prosecuted as identity theft, and there already are laws against stalking.

## Notes

The **HRO analysis** of HB 2003 appeared in Part Three of the May 8 *Daily Floor Report*.

# Second- and third-degree felony for domestic violence strangulation

**HB 2066 by Gallego**
*Effective September 1, 2009*

Table
of Contents

**HB 2066** makes assault a third-degree felony if committed by strangulation or suffocation against a person with whom the defendant has a dating relationship or who is in the defendant's family or household. Specifically, the offense must be committed by intentionally, knowingly, or recklessly impeding the normal breathing or blood circulation of a person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth.

The same offense is a second-degree felony if the defendant previously was convicted of certain offenses against a family or household member or a person with whom the defendant had been in a dating relationship.

## Supporters said

HB 2066 is necessary because cases of strangulation and suffocation in domestic violence situations are not taken seriously enough nor punished harshly enough. Strangulation in these cases often is an indicator of serious, life-threatening violence, the result of escalating domestic violence, and a sign of prolonged abuse. By defining clearly the offense and making increased penalties available, HB 2066 would give prosecutors more tools to combat domestic violence, better protect victims, and punish offenders more appropriately.

Despite the seriousness of strangulation, in domestic violence cases it often is charged as a class A misdemeanor form of assault, which does not require any minimum jail time. While it is possible under current law that some cases could be prosecuted and punished more harshly, this rarely is done, for several reasons. It can be difficult to prove bodily injury or serious bodily injury because strangulation may leave no marks and victims may appear to have no injuries. In some cases, obtaining higher penalties can be done only if there was a previous offense. Some prosecutors may be hesitant to try to prove that a defendant's hands were used as a deadly weapon.

HB 2066 would solve these problems by stating clearly that strangulation and suffocation in domestic violence situations constituted assault and by applying appropriate penalties to first and subsequent offenses. The definitions in HB 2066 would allow prosecutors,

judges, and juries to identify the offense, and the increased penalties would reflect more accurately the physical harm that can be caused by strangulation. The increased penalty could keep offenders incarcerated longer, giving victims more time to take steps to protect themselves.

Charges of strangulation would have to be proved beyond a reasonable doubt, so that law enforcement could ensure that charges were not based on false or frivolous accusations. Requiring signs of physical abuse or the testimony of another witness could make victims reluctant to come forward in strangulation cases, which could place them in danger of escalating violence.

## Opponents said

Current law is adequate to prosecute and to punish cases of strangulation in domestic violence situations. Prosecutors, judges, and juries increasingly take domestic violence seriously and respond with appropriate charges and penalties.

If strangulation in domestic violence causes bodily injury or serious bodily injury, it can be punished severely under the assault or aggravated assault statutes. Many strangulation and suffocation cases have been tried successfully as aggravated assault, a second-degree felony. Those causing bodily injury in a domestic violence situation who have previous convictions for other violent offenses already can be punished for a third-degree felony. If serious bodily injury is caused and a deadly weapon used, the offense can be a first-degree felony. Texas courts have recognized hands as a deadly weapon, including in strangulation.

The penalties for assault should not be enhanced unless a victim shows some sign of physical abuse or injury or there is corroborating testimony from another witness to the crime. HB 2066 could result in only the word of an alleged victim being used to prosecute a person for a crime that carries an enhanced penalty.

## Notes

The **HRO analysis** of HB 2066 appeared in the April 23 *Daily Floor Report*.

# Prosecution and punishment for gang activities

**HB 2086 by Moody**
*Effective September 1, 2009*

Table
of Contents

**HB 2086** creates new criminal offenses related to gang activity, increases penalties for certain offenses if they involve gang activity, increases the restrictions that can be imposed on probationers and parolees involved in certain gang or organized crime offenses, expands the criteria for inclusion in gang databases, allows certain nuisance laws to be applied to actions by street gangs or their members, authorizes cities and counties to require graffiti removal, changes the requirements for what must be in some applications to intercept communications, and establishes a DPS Public Corruption Unit.

A related bill, **SB 379** by Carona, effective June 19, 2009, requires the gang section of the Texas Fusion Center annually to submit to the governor and the Legislature a report assessing the statewide threat posed by criminal street gangs.

**Criminal offenses relating to gangs.** HB 2086 creates a new criminal offense for directing the activities of certain types of street gangs. It is a first-degree felony (life in prison or a sentence of five to 99 years and an optional fine of up to $10,000) to knowingly initiate, organize, finance, direct, manage, or supervise a criminal street gang or its members with the intent to benefit or to promote the interests of the gang or to increase the person's standing in the gang.

HB 2086 makes the punishment for criminal solicitation of a minor the same category as the solicited offense if the defendant is at least 17 years old at the time of the offense and a member of a criminal street gang and commits the offense with the intent to further the criminal activities of the gang or to avoid detection as a member of a gang.

HB 2086 adds the following four offenses to the list of those subject to an enhanced penalty when undertaken as part of organized criminal activity:

- escape from custody;
- permitting or facilitating escape;
- providing implements for an escape from custody; and
- providing prohibited substances or items in adult and juvenile correctional or detention facilities.

HB 2086 increases the punishment for certain offenses that can constitute organized criminal activity to the next highest category, unless the offense was a first-degree felony, if the defendant was at least 17 years old and the location of the offense was:

- in, on, or within 1,000 feet of school or higher education institution property, any premises of a youth center, or a playground; or
- in, on, or within 300 feet of the premises of a shopping mall, movie theater, public swimming pool, or video arcade; or
- on a school bus.

HB 2086 adds crimes committed by adults as part of criminal street gang activities to the list of offenses for which certain multiple sentences arising out of the same criminal episode can run concurrently or consecutively.

Juveniles who are adjudicated for committing crimes that are gang-related conduct, as defined by the bill, must be ordered to participate in a criminal street gang intervention program.

**Probation, parole restrictions for gang activity.** HB 2086 authorizes courts to require certain members of criminal street gangs who are repeat offenders and are convicted of felonies and placed on probation to submit to electronic monitoring. The bill also expands the authority of judges to require probationers to avoid persons or places of disreputable or harmful character to include avoiding any persons, other than family members, who are active members of criminal street gangs.

Parole panels can require electronic monitoring of parolees who are identified as criminal street gang members and are repeat offenders. Courts are authorized to place restrictions on operating a motor vehicle by persons who are placed on probation after a conviction for an organized crime offense.

**Contraband.** HB 2086 adds property used in the commission of organized crime offenses to the list of what is considered contraband and can be subject to seizure and forfeiture.

**Criminal street gang intelligence databases.**
HB 2086 adds two criteria to the list of items that can make a person's information eligible for inclusion in a criminal justice intelligence database:

- evidence that the person had visited a known gang member, other than a member of the person's family, while the gang member was in prison; and
- evidence of the person's use of technology to recruit new gang members.

The bill makes evidence that a person visited a gang member in a penal institution or frequented a documented area of a street gang and associated with known gang members insufficient to include a person's information in an intelligence database, unless it is combined with other information.

HB 2086 increases from three years to five years the amount of time that information about criminal street gangs can remain in databases before it must be removed.

**Civil suits against gangs for public nuisances.**
HB 2086 makes criminal street gangs or their members liable to the state or other governmental entity for violations of injunctive orders issued under the civil statutes governing public nuisances.

The state or a governmental entity may recover actual damages, a civil penalty of up to $20,000 for each violation, and court costs and attorney's fees. The gang or a gang member's property may be seized for a judgment, with exceptions for property owned by persons who were not members of the gang and did not violate the injunctive order and those whose property was stolen or used without consent. Damages and civil penalties may be used only for the benefit of the community or neighborhood harmed by the violation of the injunctive order.

**Graffiti.** Counties and cities, under some circumstances, may require property owners to remove graffiti from the owner's property on receipt of notice from the county or municipality. Counties and cities may take this action only if they had offered to remove the graffiti free of charge and the property owner refused.

The order from the city or county must require property owners to remove the graffiti within 15 days of the notice. If the owner does not meet this deadline, the city or county may remove the graffiti and charge the property owner for the removal expenses. The expenses could be assessed against the property on which the removal work was performed.

A political subdivision or a state agency may enact an ordinance or rule requiring aerosol paint be made accessible only with the assistance of personnel of a business.

**Applications to intercept communications.** HB 2086 establishes exceptions to the requirement that applications for authorization to intercept oral, wire, or electronic communications include a particular type of description of the location from which or the place where the communication will be intercepted.

**DPS Public Corruption Unit.** The Department of Public Safety (DPS) is required to create a Public Corruption Unit by December 1, 2010. The unit will investigate allegations of participation in organized criminal activity by peace officers and federal law enforcement officers working in Texas. It will have authority to assist local prosecutors, law enforcement agencies, and federal entities in these investigations and, under certain conditions, to initiate allegations of participation in organized criminal activity by law enforcement officers.

**Governor's grant program.** The governor's Criminal Justice Division is required to administer a grant program for regional, multidisciplinary approaches to combating gang violence. The grant program must be directed toward regions with high levels of gang violence.

## Supporters said

HB 2086 would provide a comprehensive approach to the problem of gang involvement and gang violence. By increasing the penalties and costs associated with criminal gang activity, HB 2086 would help deter involvement in gangs and stem the growing threats posed by gang activity and membership. The presence of gangs in Texas has increased in recent years, and transnational gangs have established a foothold in the border area. These gangs are the primary channel for human and drug trafficking into the United States, weapons trafficking into Mexico and Central America, and the violence associated with these activities.

The multi-faceted approach of HB 2086 would include tougher penalties for certain gang-related crimes, additional tools for law enforcement authorities to go after gang members, and more options for courts to punish those involved in gang activity. Other provisions would allow better monitoring of these offenders when they are on probation or parole. HB 2086 also would aid law enforcement authorities in their gathering intelligence essential to investigating and prosecuting criminal gang activity through provisions such as expanding the criteria that allow inclusion in a gang database and creating some exceptions for certain applications to intercept communications.

By requiring juveniles involved with gangs to participate in a gang intervention program, the bill would help prevent children from engaging in further gang activity.

The bill would address gang activity on additional fronts by allowing nuisance laws to be used to target the financial assets of gangs and gang members and by authorizing cities and counties to issue orders to remove graffiti, which often is gang-related.

## Opponents said

HB 2086 would give law enforcement authorities invasive new tools that would not necessarily improve public safety. New criminal offenses and enhanced punishments should not be imposed when existing offenses can cover these activities and existing punishments are adequate.

Enhanced penalties for gang activities would not be an effective deterrent. A comprehensive approach to gang activity, with a focus on intervention, would have a greater chance of preventing gang violence than increased punishments. The most effective time for intervention occurs prior to a juvenile's gang involvement or after the juvenile's first brush with the law. Over-criminalization of minor gang activity would minimize this window of opportunity.

Resources in the criminal justice system already are strained, and enhanced punishments for gang activities would lead to incarcerating more offenders for longer periods rather than working to divert offenders from incarceration. This could stress the system further and could divert resources from other important efforts. For example, the expanded use of electronic monitoring

for certain probationers without a finding that the offender presented a unique danger to the community would not be a cost-effective law enforcement tool. Electronic monitoring already is allowed for certain high-risk offenders. Expanding the list of criteria allowing inclusion in gang databases would increase the likelihood that non-gang members would be included in them. This could diminish their effectiveness as an investigative tool and waste law enforcement resources by encouraging the investigation of innocent people without make the public safer.

## Notes

The **HRO analysis** of HB 2086 appeared in the April 23 *Daily Floor Report*. The House-passed version of HB 2086 included only the provision adding offenses to the list of those subject to an enhanced penalty when undertaken as part of organized criminal activity. Many of the provisions in the enrolled version of HB 2086 were originally in SB 11 by Carona, which passed the Senate, but died on the May 22 General State Calendar in the House when no further action was taken. The **HRO analysis** of SB 11 appeared in Part Two of the May 22 *Daily Floor Report*.

SB 371 by Carona included the provision in HB 2086 that adds property used in organized crime offenses to the list of what is contraband and can be subject to seizure and forfeiture. SB 371 passed the Senate, but died on the May 22 General State Calendar in the House when no further action was taken. The **HRO digest** of SB 371 appeared in Part Two of the May 22 *Daily Floor Report*.

SB 369 by Carona included the provisions in HB 2086 dealing with criminal street gang intelligence databases. SB 369 passed the Senate, but died on the May 22 General State Calendar in the House when no further action was taken. The **HRO analysis** of SB 369 appeared in Part Two of the May 22 *Daily Floor Report*.

SB 423 by Carona included the provision in HB 2086 that expands the authority of judges to place conditions on probationers to include a requirement that probationers avoid persons, other than family members, who are active members of criminal street gangs. SB 423 passed the Senate, but died on the May 22 General State Calendar in the House when no further action was taken. The **HRO digest** of SB 423 appeared in Part Two of the May 22 *Daily Floor Report*.

HB 2086 includes a provision, which also was in SB 366 by Carona, adding crimes committed as part of criminal street gang activities to the list of offenses for which certain multiple sentences arising out of the same criminal episode can run concurrently or consecutively. SB 366 passed the Senate, but died on the May 23 General State Calendar in the House when no further action was taken. The **HRO analysis** of SB 366 appeared in Part Two of the May 23 *Daily Floor Report*.

# No death penalty for certain accomplices, separate trials for capital murder

**HB 2267 by Hodge**
*Died in the Senate*

Table of Contents

**HB 2267** would have prohibited a death sentence for defendants found guilty in capital felony cases only as a party under the conspirator liability section of the state's law of parties found in Penal Code sec. 7.02(b). Under this section, if persons conspire to commit a serious crime and, in the process of committing the crime, one of them commits another crime that should have been anticipated, all parties can be guilty of the crime actually committed, even though they did not intend to commit it. Prosecutors would have been prohibited from seeking the death penalty in cases in which a defendant's liability was based solely on that section.

HB 2267 also would have prohibited courts from trying defendants jointly if either defendant was to be tried for a capital felony. Courts would have had to order a severance for any two or more defendants jointly charged with a capital felony.

## Supporters said

HB 2267 would address the most troubling aspects of the state's law of parties by prohibiting a death sentence for an accomplice who was a party to a murder under the conspirator liability part of the law. Current law allows accomplices to be found guilty of capital murder and to be eligible for a death sentence if they should have anticipated the murder. This standard should not be used to make a person eligible for a death sentence. HB 2267 would leave other parts of the law of parties intact.

The cases of Kenneth Foster and Jeffery Wood have called attention to deficiencies in Texas' law of parties. The conspirator liability provisions of the law of parties have been used to obtain death sentences in these and other cases in which accomplices, such as lookouts or getaway drivers, were not directly involved in the capital murder and did not kill or intend to kill, but a prosecutor argued that they should have anticipated the murder. It is too difficult for a jury to determine what a person should have anticipated, and such conjecture about what went on in a defendant's mind should not be used to make someone eligible for a death sentence. Even though juries use the standard of whether the accomplice actually anticipated the murder when imposing punishment, it still is too difficult to determine and inappropriate for life-and-death decisions.

The conspirator portion of the law of parties violates the concept that punishment for a crime should be in proportion to a person's actions and culpability. The death penalty should be reserved for the worst of the worst, and allowing accomplices, who did not themselves kill, to be put to death violates this principle. Under HB 2267, accomplices who fell under the conspirator liability portion of the law still would be punished harshly with life in prison without parole.

All capital murder defendants would get fairer trials if they were tried separately, as HB 2267 would require. Under current law, courts do not always sever trials when they should. This creates a problem, because joint trials too easily allow one defendant to be tainted by evidence or information about another defendant, which can prejudice jurors, especially against accomplices. Severing capital murder trials would not be a financial burden on courts trying these cases because the state has a program to help reimburse counties for the investigation and prosecution of capital murders.

## Opponents said

Texas has decided that the death penalty is an appropriate penalty for those who intimately are involved in committing capital murder, and the law should not be changed to eliminate this punishment option for one type of accomplice to such crimes. Death sentences are used for punishment, deterrence, and retribution, all of which are appropriate reasons to retain the death penalty option for accomplices to capital felonies who fall under the conspirator liability portion of the law. Current law holds accomplices to capital murder responsible for their own actions, not the actions of others.

Current law sets appropriate standards for imposing a death sentence when an accomplice is convicted under the conspirator liability portion of the law of parties. The law requires that to be found guilty, an accomplice should have anticipated the victim's death,

but the standard for receiving a death sentence — found in the questions asked of jurors deciding punishment — is whether the person actually anticipated the victim's death. Jurors must decide unanimously, beyond a reasonable doubt, that an accomplice actually anticipated the death, before the jury may impose a death sentence. In addition, all other requirements for imposing a death sentence must be met, including findings about future dangerousness and any mitigating evidence.

The law of parties should remain intact, as it has been used to obtain death sentences for accomplices to some horrific crimes, including the killers of James Byrd, Jr., who in 1998 was dragged to death in Jasper, Texas, and some of the inmates who escaped from a Texas prison in 2000 and went on a crime spree that included killing a police officer.

Checks and balances and safeguards help ensure that a death penalty is appropriate and legally justified. As with all death penalty cases, prosecutors decide carefully when to seek the death penalty and reserve it for only the worst crimes in which the role of an accomplice meets the constitutional requirements for a death sentence. Juries consider the circumstances of each case, and before imposing a death sentence, must unanimously answer questions about a defendant's future dangerousness, the accomplice's role in the capital murder, and mitigating circumstances that would warrant a sentence of life without parole rather than death. If even one juror does not agree to impose a death sentence, the accused accomplice cannot be sentenced to death. The appeals process for death sentences through the state and federal courts is extensive and thorough. Texas' sentencing laws for accomplices are constitutional based on decisions made by the U.S. Supreme Court.

Requiring the severing of capital murder trials is unnecessary because current law sets appropriate standards for severing trials, and judges act in good faith, severing trials when appropriate. Joint trials can be a cost-effective use of court resources.

## Other opponents said

It is unclear how HB 2267 would be implemented because accomplices are charged with the crime committed, not with a violation of a specific part of the law of parties. The charge given to the jury during the guilt-or-innocence phase of the trial includes

instructions about the law of parties. However, jurors are not required under the law to agree on or record whether they considered a defendant guilty as the primary murderer or as an accomplice under the law of parties, or which, if any, section of the law of parties the jury applies to an offender. Developing a new procedure to identify accomplices found guilty under one section of the law could hold up capital trials and possibly shut down the death penalty in Texas while any changes to Texas' well established capital punishment system were litigated.

## Notes

The **HRO analysis** of HB 2267 appeared in the May 9 *Daily Floor Report*.

The Senate Criminal Justice Committee amended HB 2267 by removing provisions dealing with the law of parties and leaving only provisions that would have prohibited courts from jointly trying defendants if either defendant was to be tried for a capital felony for which the state was seeking a death penalty. Courts would have had to order a severance for any two or more defendants jointly charged with a capital felony if the state was seeking the death penalty for any defendant. The full Senate did not consider HB 2267.

HB 111 by Peña, which also would have prohibited joint capital felony trials if the state was seeking the death penalty, died on the May 13 General State Calendar in the House when no further action was taken.

For more information on the law of parties, see House Research Organization Interim News Number 80-7, October 9, 2008, *Should Accomplices to Capital Murder be Eligible for the Death Penalty*.

# Detecting contraband, monitoring cell phones in correctional facilities

**HB 3228 by Madden**
*Effective September 1, 2009*

Table
of Contents

**HB 3228** expands the law dealing with contraband in correctional facilities so that it covers specific actions dealing with cell phones and wireless devices, expands some offenses concerning contraband in correctional facilities so they apply to local jails, reorganizes the current statute dealing with contraband, and gives the Texas Department of Criminal Justice (TDCJ) and the Texas Youth Commission (TYC) expanded authority for dealing with nonconsensual interception devices for wire, oral, or electronic communications.

HB 3228 expands the current criminal offense involving providing and possessing prohibited substances and items in correctional facilities to include taking certain actions that would facilitate the use of a prohibited cell phone or wireless device by a person confined in a correctional facility. The following actions, if committed with intent to provide or make available a cell phone, wireless communications device, or a component to a person in a correctional facility, would be a criminal offense:

- acquiring a cell phone, wireless device, or component to be delivered to an inmate or person in custody;
- providing a cell phone, wireless device, or component to another person for delivery to an inmate or person in custody; or
- making a payment to a communications common carrier or to any communication service that provided wire or electronic communications.

HB 3228 expands the offense for providing certain prohibited substances and items to persons in correctional facilities to include possessing the substances or items with the intent to provide them to someone in a correctional facility.

HB 3228 expands the offense of possessing a cell phone in state prisons and secure juvenile facilities to include possessing a cell phone in a municipal or county jail. It also applies to local jails the offense of taking controlled substances or dangerous drugs onto the property of certain facilities.

TDCJ and TYC are authorized to own certain nonconsensual interception devices for wire, oral, or

electronic communications for authorized uses. The inspectors general of the two agencies may possess, install, operate, and monitor the devices. The bill details the circumstances, all centering on detecting the use of cell phones in correctional facilities, under which the inspector general of TDCJ may use the devices without a warrant and the procedure that must be followed after using an interception device. The bill allows the prevention of transmissions, if authorized by federal law. The bill also adds the offense of providing certain prohibited substances and items to persons in correctional facilities to the list of specified felony crimes for which judges are authorized to order the interception of communications upon showing of probable cause.

## Supporters say

HB 3228 would give the state additional tools to combat cell phones and other contraband in correctional facilities. There has been heightened concern about the problem of contraband cell phones in prisons since October 2008, when a death row inmate was caught with a cell phone. Cell phones in prison are a serious threat to public safety and prison security and have been used to plan crimes and threaten witnesses and others.

The bill would ensure that certain actions that enable an inmate to get and use a cell phone were illegal and would expand the current offense for providing certain kinds of contraband to inmates to include intending to provide the items. This change would give authorities another tool to stop contraband before it got into prisons. These changes would make it easier to prosecute someone possessing the contraband and intending to provide it to an offender even if the person had not yet actually given it to the offender.

HB 3228 would close a loophole in state law by extending the current offense of possessing a cell phone so that it applied to persons in local jails and would reorganize, without making substantive changes, statutes dealing with providing and possessing certain items in correctional facilities to make them easier to understand and to use.

HB 3228 would give TDCJ and TYC necessary tools to combat cell phone use in correctional facilities by expanding their authority concerning nonconsensual interception devices for wire, oral, or electronic communications. The current process for using interception devices involves going through the Department of Public Safety, following detailed procedures, and, for certain actions, obtaining court approval. This process can be cumbersome and time consuming and may not always permit the inspectors general to move quickly enough. Many prison investigations into cell phones are time sensitive and must happen rapidly upon learning about the contraband because the phones can be easily concealed, passed around, and thrown away.

With the authority to possess, under strict guidelines, detection equipment for investigations of offenses involving contraband, TDCJ and TYC would be ready to move quickly to combat contraband when necessary. TDCJ's inspector general would be able to use the equipment to detect the presence or use of cell phones and wireless devices and to monitor, detect, or prevent transmission of communications through these devices so evidence could be gathered. This authority would be strictly limited to communications in correctional facilities. Although frequency jamming of cell phone signals is illegal under federal law, there are discussions about changing that law, and HB 3228 would authorize the inspector general to prevent these transmissions if federal law changed.

Safeguards in the bill would ensure that the equipment was used only under strict guidelines and that the authority was not abused. The unlawful interception of wire, oral, or electronic communications would remain a crime.

## Opponents say

HB 3228 could give too much power to the inspectors general of TDCJ and TYC. Allowing the inspector general of TDCJ to use detection and interception equipment without a warrant could stray too far from current requirements for these devices, which generally regulate their use so that there is a statewide policy with uniform standards. TDCJ should be able to address contraband problems using current procedures for interception devices.

Applying certain contraband laws to local jails would result in the punishment for those crimes being enhanced to a higher level. Any penalty enhancement has the potential to lead to increased incarceration, something the state should be cautious about, given the strain it puts on state resources.

## Notes

The **HRO analysis** of HB 3228 appeared in Part Two of the May 2 *Daily Floor Report*.

Many of the provisions in the final version of HB 3228 also were in HB 1481 by Madden, which was analyzed in Part Six of the May 8 *Daily Floor Report*. HB 1481 was placed on the May 8 General State Calendar, but no further action was taken.

# Continuing Texas Youth Commission and Texas Juvenile Probation Commission

**HB 3689 by McClendon**
*Effective June 19, 2009*

Table
of Contents

**HB 3689** continues the Texas Youth Commission (TYC) and the Texas Juvenile Probation Commission (TJPC) as separate agencies. They are continued until 2011, and the Sunset Advisory Commission's review of the agencies for the 82nd Legislature will be limited to:

- the agencies' compliance with SB 103 by Hinojosa, enacted in 2007, that made numerous revisions to the juvenile justice system;
- requirements enacted by the 80th Legislature in 2007, including programs to divert youths from TYC; and
- the agencies' initiatives to improve integration of TYC, TJPC, and county juvenile justice functions.

The bill also continues TYC's Office of the Independent Ombudsman and requires that it undergo Sunset review whenever TYC is reviewed.

HB 3689 creates a strategic planning committee to develop the joint strategic plan that has been required of the agencies since 1995. TYC's director and TJPC's executive director are co-presiding officers of the strategic planning committee, and they must appoint its members following guidelines in the bill. HB 3689 requires that new components be included in the coordinated plan, including procedures for communication between the agencies and for determining ways to coordinate practices.

The bill also requires TYC, TJPC, other state agencies, and local juvenile probation departments to adopt a memorandum of understanding establishing their responsibilities for providing a continuity of care for juveniles with mental impairments in the juvenile justice system. The Texas Office on Offenders with Medical and Mental Impairments will coordinate and monitor the memorandum.

## Texas Youth Commission

**Governance.** HB 3689 allows a scheduled change in the agency's governance to occur on September 1, 2009, when it will shift from an executive commissioner appointed by the governor to a seven-member board

appointed by the governor with the advice and consent of the Senate.

**Reentry and reintegration plan.** TYC must develop a plan to reduce recidivism and ensure successful reentry and reintegration into the community of juveniles released from the agency. Each child's plan must have certain components, including an assessment of the skills the child needs to develop to be successful in the community and a network of transition programs to address the child's needs. TYC must report to the Legislature on whether the plan reduced recidivism rates.

If requested, TYC must provide courts with periodic updates on a child's progress while committed to the agency.

**Reading and behavior plans.** TYC must implement a comprehensive plan to improve the reading skills and behavior of juveniles committed to the agency. The bill also requires the agency to adopt a system-wide classroom and individual positive behavior support system. The bill makes youths' release on parole contingent on participation in the programs, if required, and requires TYC to report to the Legislature by December 1, 2010, on the effectiveness and implementation of these plans.

**Office of the Independent Ombudsman (OIO).** HB 3689 also continues TYC's Office of the Independent Ombudsman. It removes the separate Sunset review date for the OIO and requires that it be reviewed when TYC is reviewed. The bill requires the OIO to accept comments from TYC on certain reports and requires the two entities to adopt a memorandum of understanding concerning the sharing of information and procedures for handling overlapping responsibilities.

## Texas Juvenile Probation Commission

**Governing board.** HB 3689 changes the composition of TJPC's governing board by reducing the number of public members from five to one and adding as members a chief juvenile probation officer,

a mental health professional, an educator, and a person representing an organization that advocates for juvenile offenders or victims of crime.

**Distributing state funding.** TJPC is required by September 1, 2010, to establish by rule funding formulas for money sent to local juvenile boards for basic probation services and community corrections. TJPC is required to consider past performance of a juvenile board when contracting for services other than basic probation services, and contracts must include performance targets.

**Nonsecure correctional facilities.** Governments and private entities operating nonsecure correctional facilities for juveniles on probation must register the facilities with TJPC and adhere to certain minimum standards. Juvenile court judges and juvenile boards must inspect annually all nonsecure juvenile correctional facilities in their jurisdiction and certify to local authorities and TJPC whether they are suitable to confine children. TJPC is required to inspect annually and report on these public and private nonsecure facilities and to adopt certification standards for persons who work in them.

**Other provisions.** HB 3689's other provisions include:

- requiring TJPC to collect data concerning the outcomes of local probation programs throughout the state;
- requiring TJPC to report quarterly on abuse, neglect, and exploitation in juvenile justice programs and facilities;
- authorizing TJPC to contract with a local mental health and mental retardation authority for a residential treatment facility for juveniles with mental illness or emotional injury; and
- allowing TJPC to place suspended officers on probation and allowing TJPC to revoke or suspend probation or detention officers' certification if it determines that the continued certification threatens juveniles in the juvenile justice system.

## Supporters said

TYC and TJPC should be continued as separate agencies because they have distinct mandates and responsibilities that can best be accomplished as

independent entities. While TJPC focuses on the front end of the juvenile justice system by ensuring core probation services are available throughout the state and providing alternatives to state commitment, TYC focuses on youths in correctional facilities and on parole. These distinct points in the juvenile justice system deserve the undivided attention of individual agencies without the competition for resources and attention that would come with consolidation.

Consolidating the two agencies would not solve current problems, especially those identified by the Sunset Advisory Commission at TYC. TYC should be allowed to continue to implement the reforms enacted by the Legislature in 2007 before any wholesale changes are made in the agency's structure.

HB 3689 would address the Sunset Advisory Commission's concerns about coordination between the agencies by establishing a strategic planning committee to develop the coordinated strategic plan required of the two agencies. TYC and TJPC have been working together and increasingly collaborating in a productive manner, and this would continue under HB 3689.

### Texas Youth Commission

**Reentry and reintegration plan.** Requiring TYC to develop a reentry plan for youths leaving the agency would help ensure that they received the assistance and support they needed to reintegrate successfully into the community and to reduce recidivism.

**Office of the Independent Ombudsman.** The OIO would continue its role as an independent entity focused on and advocating for the youth in TYC. HB 3689 would improve communication between the OIO and TYC by establishing formal procedures for the agency to review and comment on the OIO's report. The current process in which TYC informally comments on the OIO's reports does not ensure timely, predictable input by TYC.

### Texas Juvenile Probation Commission

**Governing board.** HB 3689 would give TJPC the formal input that it currently lacks from a chief juvenile probation officer, a mental health professional, an educator, and a representative of an organization that advocates for juvenile offenders or victims of crime. One public member would remain on the board, enough to provide adequate representation.

**Distributing state funding.** HB 3689 would more effectively target state funding for juvenile probation services and make them more accountable. Problems with the current funding system include poor accountability measures for state grants, too many restrictions on the grants, and insufficient formal input on funding formulas. HB 3689 would address these problems by requiring TJPC to consider past performance and performance targets when awarding certain grants. Requiring TJPC to establish basic funding formulas by rule would allow for public comment to be made on the formulas while giving the agency the flexibility to make changes when necessary.

**Nonsecure facilities.** HB 3689 would bring state and local oversight to the small number of nonsecure facilities that are used exclusively for youths on probation. These facilities and their employees should be subject to the same oversight given to other juvenile facilities.

## Opponents said

TYC and TJPC should be merged into one agency, as recommended by the Sunset Advisory Commission, to address the lack of an effective continuum of treatment and rehabilitation for juvenile offenders in Texas. Even after repeated attempts to force better collaboration, the agencies continue to operate with almost no coordinated strategic planning for the integration of state and local services, ineffective sharing of critical information, and limited means of evaluating outcomes or targeting resources. Merging the two agencies would result in increased cooperation and collaboration between state and local services and a more consistent approach to handling juvenile offenders.

## Other opponents said

TYC and TJPC should be maintained as separate agencies, but placed under a single governing board. This would allow the agencies to continue to perform their distinct roles in the juvenile justice system while ensuring collaboration through unified governance.

Another option would be to establish a new entity, such as a coordinating council, to provide continuing coordination and evaluation of the two agencies' activities. The entity could develop and adopt a five-year juvenile justice improvement plan and make recommendations about improving services and programs for juveniles on probation and in TYC. Such a plan could be updated annually and would be a benchmark that could be used to evaluate the progress of the agencies.

The TJPC governing board should include representation from chief juvenile probation officers from small, medium, and large juvenile departments, not just the one chief probation officer required by HB 3689. Different sized departments have unique perspectives that should be represented on the board.

## Notes

The **HRO analysis** of HB 3689 appeared in Part One of the May 21 *Daily Floor Report*.

The House-passed version of HB 3689 would have required TJPC, in coordination with TYC, to establish guidelines for community corrections pilot programs for juvenile courts to use to divert certain youths from TYC. This provision was not included in the final version, but SB 1 by Pitts, the general appropriations act for fiscal 2010-11, appropriates $45.7 million to TJPC for local programs to divert youths from TYC. The programs can include residential, community-based, family, and aftercare programs. If admissions to TYC exceed 1,783 in fiscal 2010, $51,100 will be transferred from TJPC to TYC for each commitment over that cap for fiscal 2011, upon LBB approval.

# Photograph, live lineup identification procedures in criminal cases

**SB 117 by Ellis**
*Died in the House*

Table
of Contents

**SB 117** would have required law enforcement agencies in Texas to adopt and implement a detailed written policy for the administration of photograph and live lineup identification procedures.

Law enforcement agencies could have adopted a model policy that would have been developed by the Bill Blackwood Law Enforcement Management Institute of Texas at Sam Houston State University or their own policy that conformed to the requirements of the Institute's model policy. The model policy would have had to be based on scientific research on eyewitness memory and on relevant policies and guidelines developed by the federal government, other states, other law enforcement organizations, and other relevant information and would have had to address the following:

- the selection of photo and live lineup filler photos or participants;
- instructions given to a witness before a photo or live lineup was conducted;
- the documentation and preservation of results of a photo or live lineup, including the documentation of witness statements, regardless of the outcome;
- procedures for administering a photo or live lineup to an illiterate person or person with limited English proficiency;
- procedures for assigning an administrator who was unaware of which member of the live lineup was the suspect in the case and was capable of administering a photo array in a blind manner, or alternative procedures to prevent opportunities to influence the witness; and
- any other procedures or best practices supported by credible research or commonly accepted as a means to reduce erroneous identifications and enhance the objectivity and reliability of eyewitness identifications.

Evidence of compliance or noncompliance with the model policy would have been relevant and admissible in a criminal case, but would not have been necessary for an out-of-court eyewitness identification to be admissible. A failure to comply substantially with the model policy would not have barred the admission of eyewitness identification testimony in court.

## Supporters said

SB 117 would be a significant step toward addressing the role of misidentification in wrongful convictions in Texas. About 80 percent of DNA exonerations in Texas have involved faulty eyewitness identifications, according to the Innocence Project of Texas. These cases include that of Timothy Cole, a Texas Tech student who was wrongfully convicted of rape and died in prison after serving 13 years of a 25-year sentence.

The photo or live lineup is a critical step in building a criminal case and should be governed by best practices. Poor procedures can taint the evidence, undermine its validity, and in the worst cases, lead to misidentified persons being wrongfully convicted. A wrongful conviction is detrimental to public safety because it allows the real perpetrator of a crime to remain free to commit more crimes.

Currently, only a small percentage of Texas law enforcement agencies have written procedures for photo or live lineups, and many of those are vague or incomplete or do not use best practices. The bill would address these problems by requiring law enforcement agencies to adopt written polices for identification procedures and setting minimum requirements for those procedures. By requiring the implementation of identification procedures based on best practices, SB 117 would produce more reliable evidence and help prevent innocent people from being wrongfully convicted.

The requirement to develop a policy according to the guidelines in SB 117 would not burden law enforcement agencies nor infringe on their authority. SB 117 would require only that the agencies develop a policy based on the guidelines in the bill, but would not require a specific policy or procedures.

Best practices would not be difficult to implement nor would they impede prosecution. Identifications resulting from noncompliant lineups still would be allowed into evidence at trial. An officer could be cross-examined regarding a noncompliant procedure and would have the chance to explain the reason for using a different procedure.

## Opponents said

The Legislature should not mandate law enforcement's use of a specific type of identification procedure. It is unfair to use cases that may be decades old to argue for placing such a mandate on law enforcement agencies. In the past two-and-a-half decades, the state's criminal justice system has undergone numerous and substantial improvements, resulting in a just and fair system that protects the public. Placing requirements for eyewitness procedures in statute could make change difficult if the policies proved ineffective.

Allowing an identification to be attacked based on noncompliance with statutory standards could hurt the prosecution of cases or result in the loss of the use of evidence because of honest mistakes or technical violations. It would be better to establish training or education for law enforcement officers on identification issues and let individual agencies develop policies as they see fit.

## Other opponents said

SB 117 would have no significant enforcement mechanism to ensure compliance with policies adopted under the bill. Because identifications made from noncompliant lineups still would be admissible in court, law enforcement agencies would have inadequate incentive to comply with the model policy.

## Notes

SB 117 passed the Senate on the Local and Uncontested Calendar and was placed on the May 21 General State Calendar in the House, but no further action was taken.

The **HRO analysis** appeared in Part Two of the May 21 *Daily Floor Report*.

# Life in prison for juveniles convicted of capital murder

**SB 839 by Hinojosa**
*Effective September 1, 2009*

Table
of Contents

**SB 839** requires that juveniles certified to stand trial as adults and found guilty of capital murder be given life sentences. These defendants are not eligible for release on parole until their actual calendar time served, without the consideration of good conduct time, equals 40 years. Jurors in these capital felony trials must be informed that a life sentence is mandatory upon conviction.

## Supporters said

SB 839 would allow juveniles who had been certified to stand trial as adults and convicted of capital murder to be treated more justly. Currently, these juveniles can be sentenced only to life without parole, a punishment that does not take into account the unique characteristics of juvenile offenders or their diminished culpability. The bill would address this flaw in the state's capital murder punishment scheme by requiring that juveniles convicted of capital murder be given life sentences, which would require that they serve at least 40 calendar years in prison.

SB 839 would be a rational approach for the very small set of juvenile offenders who are tried as adults. Holding out the possibility of parole would give these youthful offenders more incentive to behave in prison and would recognize the fact that juvenile offenders show the most potential for rehabilitation. The bill would return the punishment for juvenile capital murders to what it was before the state instituted life without parole in 2005.

SB 839 would not mean that juveniles convicted of capital murder would be released after 40 years. The bill only would establish eligibility for parole, which could occur only after 40 calendar years in prison, with no consideration of good conduct time. The Board of Pardons and Paroles would evaluate each case after 40 years and decide whether parole was appropriate. Even if released on parole, these offenders would be under the supervision of the parole division for the remainder of their life sentences.

The criminal justice system is designed to treat juveniles differently than adults, and so it would be appropriate to punish juveniles who commit capital murder differently than adults. The U.S. Supreme Court decision banning the death penalty for those who were juveniles when a crime was committed details the reasons juveniles cannot reliably be classified as among the worst offenders, including their immaturity, vulnerability, and lack of irretrievable depravity.

## Opponents said

Texas should retain life without parole as a punishment for juveniles who commit capital murder as a deterrent to others. Life without parole remains an appropriate punishment if a juvenile commits a capital murder — designated as the worst of the worst crimes. In these cases, a juvenile has been identified by a prosecutor and trial court as committing capital murder, and the case has been upheld on appeal. The punishment of life without parole can be applied only to those juveniles whom courts have evaluated and have determined should be tried as adults, so it is appropriate that they receive the same punishment as adults.

## Notes

The **HRO analysis** of SB 839 appeared in the May 19 *Daily Floor Report*.

# Use, auditing of assets seized and forfeited to law enforcement

**SB 1529 by Whitmire**
*Died in the House*

Table
of Contents

**SB 1529** would have imposed new restrictions on the use of contraband proceeds and property seized by law enforcement authorities, authorized the state auditor to conduct audits and investigations relating to seized assets, and authorized the attorney general to take certain actions to enforce the law.

**Prohibiting waivers.** Peace officers would have been prohibited from requesting, requiring, or inducing persons to sign a document waiving their interest in seized property. Prosecutors could not, at any time before they filed a notice of a forfeiture proceeding for seized property, have requested, required, or induced someone to sign a document waiving their rights to seized property.

**Restrictions on the use of contraband proceeds and property.** Law enforcement agencies and prosecutors would have been prohibited from using contraband proceeds or property to:

- contribute to a political campaign;
- make a donation to any entity, except those specified in the bill;
- pay expenses for judicial training or education;
- pay travel expenses for training or education seminars, if the expenses violated generally applicable restrictions established by a county or city;
- purchase alcoholic beverages; or
- make any expenditure not approved by the governing body of a county or city, if the head of a law enforcement agency or prosecutor held elective office and was not running for reelection or if these elected officials were finishing a term in office for which they had not won reelection.

**Audits, investigations and enforcement.** The currently required annual audit of contraband funds would have had to include a detailed report and explanation of all expenditures. At any time, the state auditor would have been authorized to perform an audit or conduct an investigation related to the seizure, forfeiture, receipt, and specific expenditure of contraband proceeds and property. If an audit or investigation indicated that a law enforcement agency or

a prosecutor had knowingly violated the law, the auditor would have had to notify promptly the attorney general so that enforcement proceedings could begin.

The attorney general would have been authorized to file lawsuits for injunctive relief and to recover civil penalties if audit results indicated that a law enforcement agency or prosecutor had violated or knowingly was violating a statute relating to the disposition of contraband proceeds or property. Civil penalties collected by the state would have had to be used to fund drug court programs.

## Supporters said

SB 1529 would bring more oversight, transparency, and accountability to the state's asset forfeiture laws. State law places only broad restrictions on the use of these seized funds by local law enforcement agencies and prosecutors, requires only minimal reporting, and has no mechanism to enforce the law. This has led to problems, including the use of the assets for purposes unrelated to law enforcement and law enforcement authorities abusing the law by coercing motorists into giving up their rights to their property in exchange for freedom or a promise that no criminal charges will be filed.

Current law has been stretched and sometimes ignored by law enforcement agencies that have used seized asset funds for parties, liquor, campaign contributions, and extravagant trips. The bill would address such misuses by prohibiting specifically certain expenditures. The bill would result in more transparency in the use of asset forfeiture funds by requiring agencies to report in detail how they were used. The bill would not infringe on local control, but would clarify the current restrictions and list some unacceptable expenditures.

In other cases of abuses, the law has been used to seize the property of persons who were never charged with, much less convicted of, a crime. In some situations, peace officers have claimed they were not violating current law, which prohibits waivers at the time of a seizure, because they obtained waivers a few

hours after seizing the property. SB 1529 would address these abuses by prohibiting peace officers from using asset waivers. To ensure that persons were given due process before any assets were forfeited, prosecutors would be restricted from using waivers until after they had begun forfeiture proceedings in court.

## Opponents said

If specific agencies are abusing the asset forfeiture law, those abuses should be addressed without making changes that could make asset seizures and forfeitures more difficult for those who are abiding by the law. For example, restricting the use of waivers could impose unnecessary hurdles for law enforcement agencies in some cases. The practices of some law enforcement agencies described in media accounts could violate not just the seizure and forfeiture statutes but perhaps other existing laws or the standards of the State Bar or a law enforcement oversight entity. The forfeiture of assets is an essential law enforcement tool that takes some of the profit out of crime, and it should not be made more difficult to use.

Some provisions of SB 1529, such as statutory restrictions on the use of the asset proceeds, could remove local control over the funds from counties and cities, where it should remain.

## Other opponents said

SB 1529 would not go far enough. Allowing peace officers to see a direct financial benefit from their work distorts criminal justice. The Legislature should eliminate any direct financial incentive in asset forfeitures to ensure that law enforcement agencies focus on crimes, not assets.

## Notes

SB 1529 passed the Senate on April 23 but died on the May 21 Major State Calendar in the House when no further action was taken.

The **HRO analysis** of SB 1529 appeared in Part One of the May 21 *Daily Floor Report*.



Table
of Contents

**E**lections

| HB 2511 | T. Smith | Revising political contribution and expenditure restrictions ............................ 54 |
| SB 315 | Wentworth | Creating the Texas Congressional Redistricting Commission .......................... 56 |
| SB 362 | Fraser | Revising voter identification requirements ....................................................... 58 |

# Revising political contribution and expenditure restrictions

**HB 2511 by T. Smith**
*Died in Senate committee*

Table
of Contents

**HB 2511** would have amended existing campaign finance provisions, including those relating to administrative expenses and electioneering practices. The bill would have defined routine administrative expenses, electioneering communication, express advocacy, separate segregated funds, and in-kind contributions. Direct campaign expenditure would have been redefined to include expenditures for communications that were express advocacy or electioneering communication.

Electioneering communication would have been communication that if taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as an appeal to vote for or against one or more clearly identified candidates or ballot measures. Express advocacy would have been defined as a communication that was not susceptible to any reasonable interpretation other than as an appeal to vote for or against a candidate. Voter guides would not have been considered electioneering communication.

The bill would not have restricted corporations, unions, and membership organizations from spending money to communicate with their shareholders, members, or families, including communications containing express advocacy or electioneering communications. It would have authorized a political party to accept a corporate or union contribution, but the money could have been used only for its own administrative expenses or to help pay for a party primary or convention. It would have raised the threshold for reporting campaign contributions made by individuals from $100 to $500. The bill would not have applied to any ongoing civil or criminal case.

The bill would have amended provisions on electing the speaker of the Texas House of Representatives and would have required the Texas Ethics Commission to post certain reports on the agency website. The bill would have increased disclosure and reporting requirements and provided penalties for violations in a speaker election. It would have required the election of the speaker to be governed by the rules of the House of Representatives. It also would have authorized candidates or officeholders to loan funds to their campaigns and the reimbursement of those personal funds from political contributions.

## Supporters said

HB 2511 would clarify Texas campaign finance laws to ensure the state maintained its long-standing tradition of full disclosure and a prohibition against corporate and union funding for direct campaign expenditures or electioneering. Texas law has been unclear and has been abused by those who have produced sham issue ads. The bill would incorporate a U.S. Supreme Court decision prohibiting the use of corporate or union funds to support or campaign against a political candidate through campaign advertising. Current law prohibits corporate and union funds from being used for political contributions or expenditures unless expressly authorized, but the practice nonetheless is not uncommon.

Current law is not clear on what constitutes administrative expenses. Defining administrative expenses, electioneering communication, and direct expenditures would spell out the practices in which corporations and unions would and would not be allowed to participate. It would permit a political party to accept a corporate or union contribution, but the money could be used only for its own administrative expenses or to help pay for a party primary or convention. The bill would close a loophole that some use to fund sham issue ads against their rivals that stop short of urging a "vote for" or "vote against" the candidate. It would ensure that Texas kept corporate and union money out of election campaigns and that the public knew the individual donors who were funding campaign ads.

The definition of electioneering communications in the bill would adopt the current constitutional standard for electioneering set by the opinion of U.S. Supreme Court Chief Justice John Roberts in the 2007 case *Wisconsin Right to Life v. FEC*, 551 U.S. 409. According to Chief Justice Roberts, the communication had to be the functional equivalent of express advocacy. Roberts said that an equivalent electioneering communication was one for which there was no

reasonable interpretation other than that it advocates the election or defeat of a specific candidate.

## Opponents said

HB 2511 would create an entirely new definition for the term electioneering communication, an issue that remains the subject of litigation before the U.S. Supreme Court, so it is not clear exactly what definition the state would be adopting. The bill likely would subject issue-advocacy organizations to lawsuits based on materials they may send out in the course of their regular activities, such as newsletters, email updates, legislative vote score cards, and candidate questionnaires. First Amendment free speech rights would be restricted because advocacy groups, charitable non-profit organizations, and churches could run afoul of the law for electioneering. Almost any communication material that featured an incumbent member of the legislative or executive branch would be subject to question.

## Other opponents said

The electioneering standard set forth in HB 2511 already is the law today in Texas, so the bill is unnecessary. Chief Justice Roberts in *Wisconsin Right to Life v. FEC* in 2007 defined the constitutional test for electioneering. Roberts' standard has applied for the past two years, pursuant to the Texas Ethics Commission's opinions and Texas case law.

## Notes

HB 2511 passed the House, but died in the Senate State Affairs Committee when no action was taken on the bill.

The **HRO analysis** of HB 2511 appeared in the May 14 *Daily Floor Report*.

# Creating the Texas Congressional Redistricting Commission

**SB 315 by Wentworth**
*Died in the Senate*

Table
of Contents

**SB 315** would have established a nine-member commission that would have been responsible for drafting decennial plans for reapportionment of U.S. congressional districts in Texas.

**Composition of the commission.** Members would have included:

- two members elected by members of the largest party in the Senate;
- two members elected by members of the next largest party in the Senate;
- two members elected by members of the largest party in the House;
- two members elected by members of the next largest party in the House; and
- one non-voting presiding officer elected by the above eight commission members.

At least one member appointed by senators and at least one member appointed by House members would have had to be residents of rural areas of the state outside of a metropolitan statistical area. All members would have been required to be Texas citizens. Elected officials, candidates for office, political party officials, and registered lobbyists would not have been eligible to serve as commission members.

The members would have served two-year appointments beginning on February 1 of a year ending in one and expiring on January 31 of the next year ending in three.

**Adoption of a redistricting plan.** The commission would have convened on the first business day after January 31 of each year ending in one and would have had until June 15 of that year to adopt a redistricting plan. If the commission did not adopt a plan within that time, the chief justice of the Texas Supreme Court would have appointed an additional voting member of the commission. The commission then would have had an additional 45 days after the initial deadline to adopt a plan. Failing that, the commission's authority to adopt a plan would have been suspended, and the Texas Supreme Court would have adopted a plan not later than 45 days after the lapse of the prior deadline. If the Supreme Court failed to adopt a plan, the commission would have been allowed to reconvene. The commission

also would have been allowed to reconvene to modify a plan that had been challenged in a court proceeding or that had become unenforceable by order of a court or other appropriate authority.

**Plan requirements.** In a redistricting plan or a modification of a plan:

- each district would have been composed of contiguous territory;
- each district would have contained a population as nearly equal as practicable to the population of any other district in the plan; and
- to the extent reasonable, each district would have been compact and convenient and separated from adjoining districts by natural geographic barriers, artificial barriers, or political subdivision boundaries .

The commission would have had to produce a report for submission to the governor, the secretary of state, and the Legislature regarding each plan or modification that detailed:

- the total population of each district and the percentage deviation from the average district population;
- an explanation of the criteria used in developing the plan, with a justification of any population deviation in a district from the average district population;
- a map or maps of all the districts; and
- the estimated cost to be incurred by the counties for changes in county election precinct boundaries required to conform to the districts adopted by the commission.

The Texas Supreme Court would have had original jurisdiction to hear challenges to any plan or modification.

## Supporters said

SB 315 would result in less acrimony and more representative redistricting maps because it would make the redistricting process less toxically partisan. Historically, the process of redistricting after a census

has resulted in the dominant party steamrolling the minority party through attempts to maximize its own seats, disregarding all other considerations. This results in acrimony, destroys bipartisanship, and fuels needless and costly litigation.

SB 315 would create a bipartisan congressional redistricting commission similar to those in a dozen other states. These states report a faster redistricting process, less litigation, and strong voter satisfaction. These commissions prevent deadlock because the two parties are forced to work together and negotiate reasonable compromises and have a proven record of doing so. SB 315 would help these negotiations by providing clear guidelines for the formation of districts. By requiring that the districts be compact and convenient and separated from adjoining districts by natural geographic barriers, artificial barriers, or political subdivision boundaries, SB 315 would provide superseding rules that would replace the pure partisanship that produces "salamander," "barbell," and other oddly shaped districts that do not represent actual communities and break up others.

## Opponents said

SB 315 would decrease accountability. Currently, the Legislature is the body with primary responsibility for redistricting. Legislators are directly responsible to voters for their votes, and this can act as a check on partisan overreaching. However, SB 315 would not result in a decrease of partisanship because redistricting is, by its very nature, a partisan exercise. Because SB 315 would create a commission split evenly between Republicans and Democrats, deadlock would be inevitable, as neither party would find the other's plans or suggestions palatable.

While SB 315 does contain a provision requiring rural representation on the redistricting commission, it would not ensure representation on the commission by other minority groups. This could lead to the law being held unenforceable under the federal Voting Rights Act.

## Notes

SB 315 was reported favorably by the Senate State Affairs Committee, but the Senate failed to suspend its regular order to consider the bill.

# Revising voter identification requirements

**SB 362 by Fraser**
*Died in the House*

Table
of Contents

**SB 362**, as passed by the Senate, would have required a voter to present to an election officer at a polling place one form of photo identification or two different forms of non-photo identification in order to vote. The bill would have modified the list of acceptable proof of identification, specifying six acceptable forms of photo ID and 11 acceptable forms of non-photo ID. A voter registration certificate would have been an acceptable form of non-photo ID.

A voter whose identity was verified by presenting the required documentation would have been accepted for voting if the voter's name was on the precinct list of registered voters. A voter whose identity was verified by presenting the documentation could have proceeded to vote if the voter:

- had presented a correct voter registration certificate but the voter's name had not appeared on the precinct list; or
- had presented the required documentation showing registration in a different precinct and the voter's name had not appeared on the precinct list, if the voter had sworn that the voter was a resident of the precinct, was not deliberately providing false information, and would vote only once in the election.

A voter who had not presented proof sufficient to meet the identification requirements would have been allowed to cast a provisional ballot.

The bill would have required notice of the identification requirements in voter registration certificates and renewal certificates, statewide voter education on identification requirements, and enhanced training for election judges and clerks. The presiding election judge would have had to post in a prominent location outside of each polling place a list of the acceptable forms of photographic and non-photographic identification. The bill would have authorized free-of-charge Department of Public Safety personal ID certificates for eligible voters who stated that it was being obtained for the sole purpose of proof of identity for voting.

## Supporters said

SB 362 would protect and strengthen the electoral system by requiring voters to present identification at the polls. The bill would reduce fraud by establishing a uniform standard for voting, bring voting in line with other transactions that require proper identification, and raise the bar in restoring confidence in elections. The U.S. Supreme Court recently upheld the constitutionality of Indiana's law requiring unexpired government-issued photo identification for voters at the polls, and SB 362 would more than meet the standards outlined in that decision.

Stricter identification requirements would not impose an unreasonable burden on voters. The bill would allow many ways to fulfill the identification requirements, while not forcing anyone to bear great cost, because DPS identification cards for voting would be free of charge and other readily available forms of identification could be used.

SB 362 would protect the rights of citizens and serve as a reasonable precaution to prevent ineligible people from voting. Proper identification is necessary to ensure that voters are who they say they are, that voters cast only one ballot each, and that ineligible voters — including undocumented persons, felons, and people using the names of deceased voters — are not allowed to vote. Strict ID requirements for voters do not suppress voter turnout but instead bolster the public's faith in the integrity of elections and lead to better turnout.

Voter fraud drives honest citizens out of the democratic process and breeds distrust of government. Many circumstances in everyday life require a photo ID, including air travel and cashing checks. Society has adapted to these requirements and benefited from the safeguards they provide. When non-citizens or otherwise unqualified individuals are on the voter rolls, illegal votes could be cast, which dilutes legitimate votes. Even a small amount of voting fraud could tip a close or disputed election, and the perception of possible fraud contributes to low confidence in the system. Guaranteeing the integrity of elections

requires implementing security measures, and requiring identification from voters at the polls would be more than justified as a security measure.

## Opponents said

The voter identification requirements in SB 362 would create substantial obstacles to voting for otherwise eligible voters, inhibit voter participation, and affect certain groups disproportionately, including the elderly, minorities, low-income voters, women whose name has changed, and disabled persons. The bill would place an extra burden on voters and lead to needless disenfranchisement of many voters.

Claims that voter fraud makes it necessary to demand ID at the polls are not supported by evidence. In fact, the effect of stricter ID requirements would not be a reduction of voter fraud but the suppression of legitimate votes. While almost all voter fraud involves mail-in ballots, the bill would do nothing to make mail-in balloting more secure. Instead, it would attempt to address the nonexistent problem of voter impersonation at the polls. The type of polling-place fraud that the bill seeks to remedy rarely occurs. It would be difficult to perpetrate the kind of fraud to the extent necessary to tip an election. There is no evidence of organized, widespread voter fraud at the polls, and cases of voter impersonation are anecdotal at best. Evidence does show, however, that voter error and administrative and clerical errors often explain allegations of fraud.

Texas already has taken steps to lessen the threat of fraud, including implementing requirements of the federal Help America Vote Act. Current registration requirements are sufficient because prospective Texas voters must establish their identity either during the registration process or when they show up at the polls to vote. Registrants also must swear that they are U.S. citizens under penalty of perjury. Falsely claiming citizenship and voting fraud are federal offenses.

The bill would not offer any solution for those who simply do not have the required identification. Better alternatives that impose less of a burden on eligible Texas voters exist to address allegations targeted by voter ID requirements. In those instances, signature comparison could be used. Voters must offer a signature when registering to vote, and this signature is copied for use at the polls. When the voter appears to cast a ballot, he or she must sign the poll book. If the signatures matched, the voter could vote with a regular ballot. Signature comparison has been used to determine legitimate mail-in ballots, and there is no reason why it would be any less reliable at the polls.

Similar legislation approved in several other states has been invalidated by the courts or is being challenged as an unjustified or illegal obstacle to voting. Texas should attempt to curb real voter fraud, investigate vigorously allegations of election fraud, and utilize the law to the fullest extent to prosecute violations, rather than enacting a law, aimed at solving a nonexistent problem, that would do more harm than good and is designed to give one party an unfair advantage over the other.

## Other opponents said

The bill should require unexpired, government-issued photo identification from voters at the polls modeled after Indiana's polling requirements. The U.S. Supreme Court has affirmed the constitutionality of Indiana's photo identification requirements. Allowing two forms of non-photo identification to suffice would be inadequate to prevent or deter voter fraud.

## Notes

SB 362 passed the Senate by 19-12 on March 18. It was reported favorably, without amendment, by the House Elections Committee on May 11 and was placed on the May 23 Major State Calendar in the House, but no further action was taken.

The **HRO analysis** of SB 362 appeared in Part One of the May 23 *Daily Floor Report*.



**E**nvironment and Energy

Table of Contents

| | | | |
|---|---|---|---|
| HB 395 | Hartnett | Repealing the state's goal for generating capacity from natural gas | 62 |
| * HB 469 | P. King/ | Carbon dioxide capture and storage | 63 |
| * HB1796 | Chisum/ | | |
| * SB 1387 | Seliger | | |
| HB 836 | S. Miller | Hunting feral hogs by helicopter | 67 |
| HB 1243 | Gallego/ | Sales of distributed renewable energy generation | 68 |
| HB 1866 | Solomons | | |
| HB 1182 | S. Turner | Moving oversight of System Benefit Fund from Legislature to PUC | 70 |
| * HB 1796 | Chisum/ | Revising state air pollution emissions-reduction programs | 72 |
| SB 16 | Averitt | | |
| * HB 2259 | Crownover | Extending deadlines to plug inactive oil or gas wells | 76 |
| HB 3245 | Solomons | Providing consumer protections in the restructured electric market | 77 |
| * HB 1937 | Villarreal | Property assessments to finance energy-efficient improvements | 78 |
| * SB 184 | Watson | Studying strategies for reducing greenhouse gas emissions | 79 |
| SB 541 | Watson | Expanding the renewable portfolio standard for non-wind resources | 80 |
| SB 545 | Fraser | Goals and incentives for solar energy generation | 82 |
| SB 546 | Fraser | Increasing energy efficiency goals and demand reduction targets | 84 |
| * SB 769 | Williams | Recovering weather-related electric system restoration costs | 85 |
| SB 921 | Fraser | Allowing access to electric cooperative meetings and certain records | 87 |

# Repealing the state's goal for generating capacity from natural gas

**HB 395 by Hartnett**
*Died in the House*

Table
of Contents

**HB 395** would have repealed Utilities Code, sec. 39.9044, which establishes a state goal that 50 percent of the megawatts of generating capacity installed in this state after January 1, 2000, use natural gas.

## Supporters said

HB 395 would have repealed a provision in the Utilities Code that encourages natural gas to be the preferential fuel source. The Governor's Competitiveness Council in its 2008 Texas State Energy Plan recommended that the Legislature repeal this provision in order to ensure that a diverse mix of energy resources is developed in Texas. An influx of natural gas capacity has led to a fuel mix in Texas that, when measured on the basis of both installed generation capacity and energy produced from that capacity, illustrates an excessive reliance on natural gas. Because of this heavy reliance on natural gas, the price of electricity in the wholesale market within the Electric Reliability Council of Texas has become closely correlated with natural gas prices. Last year, the price of natural gas sky-rocketed and with it the price of electricity, and that trend is likely to repeat itself. The state should not dictate which fuel is used to generate electricity. It should be up to the generators and the market to choose the most economical source for fuel.

Texas is trying to diversify its energy sources, not only to minimize the effects of price volatility, but to decrease the vulnerability created by too much dependence on one fuel source. The provision outlined in PURA is an arbitrary goal that no longer is necessary to have in statute. Natural gas may be an abundant, clean source of energy that creates jobs in this state, but there are other fuel sources, such as solar and other renewables, that offer the same benefits.

## Opponents said

Natural gas is a good, clean fuel that is produced abundantly in Texas. This was recognized by the Legislature in 1999, and goals were placed in statute to encourage the use of Texas natural gas as the preferential fuel. That was a good policy then and it is a good policy now. The provision in PURA is simply a goal, not a mandate. There is no reason to repeal this provision.

Because natural gas is an abundant, home-grown fuel source, there are many benefits to its use beyond the positive environmental impacts. For example, natural gas production in Texas means jobs and revenue in the state. About 189,000 Texans currently work in the oil and gas industry, and for every job created, an additional nine satellite jobs are created. Also, natural gas production is a huge tax base for school districts. Natural gas is an important component of the state's fuel mix, and promoting its use is good for the whole state.

## Notes

HB 395 was reported favorably, without amendment, by the House State Affairs Committee on May 6 and was placed on the May 11 General State Calendar, but no further action was taken.

The **HRO analysis** of HB 395 appeared in the May 11 *Daily Floor Report*.

# Carbon dioxide capture and storage

**HB 469 by P. King/ HB 1796 by Chisum/ SB 1387 by Seliger**
*Effective September 1, 2009*

Table
of Contents

**HB 469** authorizes the Railroad Commission (RRC) to certify three carbon-fueled electric generation projects as clean energy projects. These projects will be issued franchise tax credits by the comptroller.

HB 469 makes the RRC responsible for certifying whether a project meets the requirements to be a clean energy project. A clean energy project will be a project to construct a coal-fueled or petroleum coke-fueled electric generating facility in which the fuel is gasified before combustion that will:

- have a capacity of at least 200 megawatts;
- meet the emissions profile for an advanced clean energy project under the Health and Safety Code;
- capture at least 70 percent of the carbon dioxide ($CO_2$) resulting from or associated with the generation of electricity by the facility;
- be capable of permanently sequestering $CO_2$ in a geologic formation; and
- be capable of supplying the capture of $CO_2$ for an enhanced oil recovery (EOR) project.

On verification that a project meets the requirements, the RRC must issue a certificate of compliance and provide a copy of the certificate to the comptroller for issuance of a franchise tax credit. The comptroller, by rule, will issue a franchise tax credit to a clean energy project after the RRC has provided certification, construction has been completed, the facility is fully operational, the Bureau of Economic Geology (BEG) at the University of Texas at Austin verifies that the facility is sequestering at least 70 percent of its $CO_2$ emissions, and the owner or operator of the project has entered into an interconnection agreement with the Electric Reliability Council of Texas. The total amount of the franchise tax credit will be equal to 10 percent of the capital cost of the project, excluding financing costs, or $100 million, whichever is less. The BEG will design and supervise the monitoring, measurement, and verification protocols for sequestering $CO_2$ and provide an evaluation to the RRC.

HB 469 also amends Tax Code, subch. H, ch. 151, by providing that components of tangible personal property used in connection with sequestration of $CO_2$ will be exempt from sales tax if the components are used to capture, transport, or inject man-made $CO_2$ and if the $CO_2$ is sequestered in Texas as part of an enhanced oil recovery project that qualifies for a severance tax rate reduction or is sequestered in a manner that creates an expectation that at least 99 percent of the $CO_2$ will remain sequestered for at least 1,000 years.

## Supporters of HB 469 said

HB 469 would provide incentives in the form of tax credits of up to $100 million for the first three coal-fired power plants that could produce at least 200 megawatts of power and sequester at least 70 percent of $CO_2$ emissions. Providing these incentives would help overcome the "prototype penalty" of being the first to invest money in this type of project.

This bill, dubbed by some as "NowGen," would give Texas an opportunity to become the first state in the United States with fully operational, large-scale clean-coal power plants. Each of the three plants incentivized would bring 2,000 construction jobs for the building of the plant, and 120 to 150 well-paying permanent jobs to Texas.

Texas is well-suited to become a major repository for $CO_2$ capture. The captured $CO_2$ could be used for valuable enhanced oil recovery (EOR) projects, which would create an additional economic benefit to the state. For the past 30 years, Texas oil producers in the Permian Basin have been piping in $CO_2$ from naturally occurring underground domes in New Mexico and Colorado. When the $CO_2$ is injected into depleted wells, it causes an additional 15 percent or more of an oilfield's original crude oil volume to rise to the surface. The state of Texas, led by efforts of the Bureau of Economic Geology, has estimated that as much as 4 to 5 billion barrels of additional Texas oil is available across the state to be recovered using $CO_2$ for EOR. The bill would help incentivize the use of $CO_2$ produced in Texas rather than piping it in from other states.

The capture of 70 percent of the $CO_2$ would meet the California and Washington emission standard of

1,100 pounds of $CO_2$ per megawatt hour of net power produced. This is roughly the amount of $CO_2$ produced by the newest, state-of-the-art natural gas plant.

A project could not receive a franchise tax credit until both the BEG and RRC had verified that $CO_2$ actually was being sequestered. Enforcement would be non-payment of the tax credit.

Concerns that this bill is not technology neutral are unfounded. Of all of the technologies available, integrated gasification combined cycle is seen as the cleanest, most acceptable way of using carbon-based fuel for electricity.

## Opponents of HB 469 said

HB 469 would set the percentage of $CO_2$ to be sequestered too low. Some companies are boasting that they could design plants that would capture as much as 90 percent of their $CO_2$ emissions. If this is possible, then making 70 percent the standard might be a disincentive for innovation. Incentives should be given for going beyond the standards. Also, this bill would not provide any enforcement provisions to ensure that $CO_2$ actually would be sequestered.

It is not good state policy to subsidize the coal industry when there are cheaper and cleaner energy sources available, such as renewables and energy efficiency.

It is important to look at the full life-cycle of a coal plant before determining whether these coal plants actually would be clean. Mining for coal has significant negative environmental effects, and transporting coal requires a lot of energy. Also, coal plants require a large amount of water, a resource not plentiful in West Texas, where these projects would be located.

This bill would be directed specifically at integrated gasification combined cycle or other pre-combustion technology. By not being technology-neutral, the state would run the risk of picking winners and losers rather than letting the market decide.

**HB 1796** permits the General Land Office (GLO), in conjunction with the Bureau of Economic Geology (BEG) at the University of Texas at Austin, to build and operate a carbon dioxide ($CO_2$) repository on state-owned offshore submerged land. The bill requires that Texas rules be updated to comply with federal standards if the federal Environmental Protection Agency (EPA) were to issue standards on offshore geologic storage of $CO_2$.

The land commissioner must contract with the BEG to conduct a study to determine the best location for the repository. The School Land Board ultimately will decide where the repository will be located. The School Land Board will lease land from the Permanent School Fund for construction of the offshore repository.

After building the repository, the board will begin accepting $CO_2$ for storage in exchange for a fee. If Texas were to participate in a carbon credit program, the fee could be assessed in units of carbon credits.

The board would be the owner of any $CO_2$ stored in the repository upon determination that that permanent storage has been verified by the BEG and that the storage location has met all state and federal requirements. The stored $CO_2$ will be considered property of the Permanent School Fund. $CO_2$ producers will not be liable for $CO_2$ after it is transferred to the Permanent School Fund.

The bill also requires the land commissioner to post annually a report to GLO's website that includes the volume of $CO_2$ stored, the total volume of $CO_2$ received for storage, and the volume of $CO_2$ received from each $CO_2$ producer.

## Supporters of HB 1796 said

HB 1796 would place Texas on the path to become the world's leader in long-term storage of $CO_2$. Texas is fortunate to have vast deep brine aquifers offshore with the capacity to store tremendous amounts of $CO_2$. This land currently is the property of the Permanent School Fund, but could be leased for the purpose of storing $CO_2$. HB 1796 would lay the groundwork for Texas to construct an offshore $CO_2$ storage repository.

HB 1796 would prepare Texas to compete in the market for carbon credits if the federal government were to institute a compulsorily cap-and-trade system. Recently, the EPA ruled that $CO_2$ and other greenhouse gases are a danger to public health. This ruling was the first step along the path to regulation of $CO_2$ emissions. The offshore $CO_2$ repository created by the bill could

allow Texas to gain valuable carbon credits by accepting greenhouse gases from all over nation. The Bureau of Economic Geology at the University of Texas at Austin is a world-class research institution, with the scientific expertise to advise policymakers on decisions about offshore carbon storage. Scientists at the school of economic geology are international leaders in the field of carbon capture and storage (CCS) technology. HB 1796 would allow policy makers to work with experts to develop CCS technology.

## Opponents of HB 1796 said

CCS technologies have not been proven and do not represent the most environmentally friendly option for combating global warming. CCS still is in its technological infancy and needs much more research to advance to viability. Texas should focus on proven renewable energy sources, like solar and wind, rather than search for ways to continue to burn coal. Fossil fuels should be phased out entirely over time because their net impact on the environment always will be negative.

Implementing HB 1796 could be prohibitively costly. The fiscal note estimates an annual cost to general revenue of more than $1.3 million, which accounts only for two FTEs and the study commissioned in the bill. Infrastructure, including pipelines and a repository, likely would cost the state many millions more. Researchers project that CCS will need $15-$30 billion dollars more in investments for it to begin to affect climate change.

**SB 1387** grants jurisdiction to the Railroad Commission (RRC) over injection of $CO_2$ into a reservoir that was initially or could be productive of oil, gas, or geothermal resources or for storage into a saline formation directly above or below that reservoir. The RRC also has jurisdiction over the extraction of $CO_2$ stored in a geologic storage facility and will develop rules to govern the extraction. The RRC must adopt rules and procedures for collection and administration of fees and penalties, enforcement, and requirements pertaining to the injection and geologic storage of $CO_2$, including geologic site characterization, area of review and corrective action, well construction, operation, mechanical integrity testing, monitoring, well plugging, post-injection site care, site closure, and long-term stewardship. These rules must be consistent with any federal rules or regulations. The state is authorized to seek primary enforcement authority.

A permit will be required from the RRC before drilling or operation of a $CO_2$ injection well for geologic storage or before construction or operation of a geologic storage facility can begin. The RRC may impose fees to cover the cost of permitting, monitoring, and inspecting the injection wells and facilities and for enforcing and implementing the rules adopted by the RRC. These fees will be deposited in an anthropogenic $CO_2$ storage trust fund to be used for training, technology transfer, inspection, investigation, remediation, and enforcement. A permit application must include a letter from the executive director of the Texas Commission on Environmental Quality (TCEQ) stating that drilling and operating a $CO_2$ injection well or operating a geologic storage facility will not injure any freshwater strata in the area or that the stratum to be used for the geologic storage facility is not freshwater sand. The RRC may issue a permit if there is a finding of non-endangerment of oil, gas, or other mineral formations, as well as of human health and safety and both groundwater and fresh water. It also will have to find that the reservoir into which the $CO_2$ would be injected was suitable to protect against escape and that the applicant meets all other statutory and regulatory requirements.

A permittee will be required to demonstrate evidence of financial responsibility annually to ensure that the injection well is properly plugged and that funds are available for plugging, post-injection care, and closure.

$CO_2$ stored in a geologic storage facility will be considered property of the storage operator unless willfully abandoned, administratively transferred, or transferred or conveyed by operation of some other law or legal document. The owner will have the authority to recover the stored $CO_2$ at some point in the future.

## Supporters of SB 1387 said

SB 1387 would provide a regulatory framework for the storage and sequestration of $CO_2$ in Texas so that entities wanting to capture and sequester $CO_2$ for long-term storage would have clear legal guidelines by which to operate. Texas is approaching a crossroads of a growing demand for energy and the need for sound environmental policy. The adoption of federal mandates to regulate greenhouse gases is more likely today than ever before. Carbon capture and storage (CCS) technology is one of the most promising new developments to address these issues. Under

the guidance of the RRC, the enhanced oil recovery industry has been injecting $CO_2$ underground safely since 1972. Texas leads the world in the use of CCS technology with more than 480 million tons of $CO_2$ captured, transported, injected, and stored in connection with enhanced oil recovery in Texas. SB 1387 also would have a positive environmental impact on global warming. The provisions of this bill are agreed to not only by the industry, but also environmental groups.

## Opponents of SB 1387 said

No apparent opposition.

## Notes

The **HRO analyses** of HB 469 and HB 1796 appeared in the May 4 *Daily Floor Report*. The **HRO analysis** of HB 2669, the companion to SB 1387, appeared in the May 8 *Daily Floor Report*.

HB 1796 also contains air quality provisions from SB 16 by Averitt, which died in the House and is discussed starting on page 72.

# Hunting feral hogs by helicopter

**HB 836 by S. Miller**
*Died in Senate Committee*

Table
of Contents

**HB 836** would have barred the Texas Parks and Wildlife Commission from prohibiting a person or a person's agent or lessee who holds a landowner's authorization and permit from using a helicopter to take depredating feral hogs.

## Supporters said

The estimated two million feral hogs in Texas devastate agriculture by trampling crops, tearing down fences, spreading diseases to livestock, and eating seeds and livestock feed. Direct damage from feral hogs is estimated conservatively at $400 million annually. For each dollar spent on feral hog control, over $7.50 is saved in agricultural products. Feral hogs are also significant predators of lambs, kid goats, newborn fawns, ground nesting birds, and sea turtles.

Feral hogs are a prolific species that may have two litters per year, with four to eight, and possibly as many as 13, piglets in a litter. The problem of feral hogs is no longer just a rural issue because they now are affecting suburban areas and highways.

The Texas Parks and Wildlife Department already issues permits for aerial hunting of feral hogs and has several existing rules in place that address concerns such as staying within property boundaries and limiting proximity to neighborhoods as well as other safety issues. Any additional concerns could be addressed in further rulemaking.

## Opponents said

Shooting guns from helicopters during aerial hunting of feral hogs could pose serious safety risks. Along with being dangerous, hunting feral hogs from a helicopter would be a nuisance to nearby residential areas due to noise from helicopters and gunfire.

Hunting feral hogs from helicopters also could raise issues with carcass removal. Some of the hogs weigh hundreds of pounds, making it difficult to dispose properly of the carcass. Also, there is not much incentive to retrieve the carcass because the meat cannot be used. If the carcasses are not handled properly, health and safety issues could arise, particularly if a carcass was left to decompose near a water source, causing contamination. Because the hunting typically is done on private property, there are not clear regulations.

Feral hogs do present a large problem, but hunting from helicopters is an inhumane solution.

## Other opponents said

Aerial hunting of feral hogs is a necessary tool for controlling the population of this nuisance animal. However, the language of this bill is unclear and may not accomplish the goal of helping landowners recoup their costs for the permit. It also may have the unintended consequence of preventing the Texas Parks and Wildlife Commission from prohibiting a person with a previous conviction from participating in a flight related to the management of wildlife from an aircraft.

## Notes

The **HRO analysis** of HB 836 appeared in the May 8 *Daily Floor Report*.

# Sales of distributed renewable energy generation

**HB 1243 by Gallego/ HB 1866 by Solomons**
*Died in the House/ Died in Senate Committee*

Table
of Contents

**HB 1243** would have required electric utilities, electric cooperatives, or retail electric providers (REPs) to contract with owners of distributed renewable generation (DRG) so that surplus electricity produced by DRG would be available for sale to the transmission and distribution system at fair market value, credited to the DRG owner. The bill would have:

- provided pricing guidelines for surplus electricity;
- directed the Public Utility Commission (PUC) to provide a methodology for determining fair market value;
- provided qualifications to receive compensation;
- provided instructions for municipally owned utilities (MOUs) for handling DRG;
- required certain information be provided on the Internet; and
- revised the definition of a DRG owner and provided that DRGs are not to be defined as electric utilities.

A DRG owner would not have been considered a power generation company if, at the time DRG was installed on a retail electric customer's side of the meter, the estimated annual amount of energy produced was less than or equal to the estimated annual amount of energy consumed.

## Supporters of HB 1243 said

Consumer-owned alternative energy sources such as solar panels or wind energy generators, known as distributed renewable generation (DRG), reduces the need for new conventional generation, transmission, and distribution systems and reduces reliance on existing generation that is damaging to the environment. There is a great deal of interest in DRG, but there are barriers that are inhibiting its growth. For example, a DRG owner currently is subject to the same registration requirements as a big generation company. Also, not all electric providers are allowing interconnection access or offering to buy surplus electricity generated from DRG. HB 1243 would remove some of these barriers by guaranteeing that a DRG owner would receive compensation for surplus electricity at a fair payment

rate. Also, the bill would relieve the DRG owner of the requirements of a larger electricity generation company.

Requiring electric providers to buy back surplus electricity ultimately could be a net benefit to them by reducing their own peak demand. It would offset any initial burden that may be placed on them in order to comply with the requirements of this bill.

## Opponents of HB 1243 said

HB 1243 could place a burden on electric providers by requiring them to put systems in place to buy back surplus electricity produced from DRG.

## Other opponents of HB 1243 said

The goals of HB 1243 are good, but the bill would not go far enough. DRG systems could allow for reduced need for transmission and distribution systems and could have a positive environmental impact. The price for surplus electricity should be adjusted to account for these benefits.

Under the bill, only the DRG systems that have generating capacities of 10 kilowatts or less would be able to qualify for the fair market value price. The threshold of 10 kilowatts may be a good average for a residential solar system, but would not be large enough to handle a school or church. Also, other renewables such as biogas or wind could need much greater generating capacity than 10 kilowatts. By limiting the generation capacity to 10 kilowatts, HB 1243 effectively would be a solar-only bill.

**HB 1866** would have amended the customer protection chapter of the Utilities Code to entitle all buyers of retail electric service the opportunity to interconnect distributed renewable generation according to Public Utility Commission (PUC) rule. The PUC, by rule, would have been required to establish safety, technical, and performance standards for DRG that could be interconnected.

The bill also would have placed electric cooperatives under the PUC rules for standards governing the interconnection of distributed renewable generation (DRG). The PUC would have had jurisdiction to establish conditions for co-op customers to interconnect DRG. The PUC, rather than the co-op board of directors, would have had exclusive jurisdiction to set all terms of access, conditions, and rates concerning interconnection of DRG, and a co-op would have been deemed a service provider for the purposes of enforcement of the DRG interconnection requirements.

HB 1866 would have provided a definition of an electric utility that would have excluded a DRG owner or a person with whom a retail electric customer contracted to install or maintain DRG on the customer's side of the meter.

## Supporters of HB 1866 said

Technology is now available to allow consumers to generate their own electric power for personal use with distributed renewable generation, such as solar panels and small wind energy generation systems. If a consumer generates more power than needed, the consumer can sell the excess power to the electric company. However, some providers do not allow consumers to sell the power back to the grid without a penalty.

HB 1866 would entitle all buyers of retail electric service, including electric co-op customers, to interconnect their distributed renewable generation systems. HB 1866 would apply interconnection standards for distributed renewable generation on a system-wide basis by allowing the PUC to adopt rules and have oversight over the process. This would eliminate some longstanding barriers that have prevented small generators from interconnecting to the grid. The PUC would have the discretion to establish regulations and technical standards to ensure the safety and integrity of the electric grid.

## Opponents of HB 1866 said

While interconnection of distributed renewable generation of electric power by electric customers should be encouraged, the bill should specify the standards for interconnection in order to ensure the technical integrity of the electric grid.

## Notes

HB 1243 passed both houses, but died in the House when a point of order was sustained that the deadline for considering Senate amendments to the bill had expired. HB 1866 passed the House, but died in the Senate Business and Commerce Committee.

The **HRO analysis** of HB 1243 appeared in the May 8 *Daily Floor Report*. The **HRO analysis** of HB 1866 appeared in the April 23 *Daily Floor Report*.

# Moving oversight of System Benefit Fund from Legislature to PUC

**HB 1182 by S. Turner**
*Died in the Senate*

Table
of Contents

**HB 1182** would have made the System Benefit Fund (SBF), which uses assessments on electric ratepayers to provide a 10 percent discount to eligible ratepayers in areas affected by electric retail competition, a trust fund held outside the state treasury. It would have allowed the Public Utility Commission (PUC) to spend the funds on eligible activities without further legislative approval or appropriation.

The bill would have required the PUC to adopt rules by January 1, 2012, to ensure that low-income utility programs provided a 10-to-20 percent discount to eligible ratepayers and would have eliminated the one-time limit on assistance to seriously ill or disabled low-income electric customers facing disconnection due to nonpayment. Also, the PUC would have been required to give priority first to weatherization programs, next to customer education programs on selecting retail electric providers, and finally, to administrative expenses.

Funds collected for the SBF before September 1, 2011, the date the bill would have become effective, would have remained on deposit in the General Revenue Fund, and collections of the electric bill assessments made after that date would have been held in the PUC-managed trust fund.

## Supporters said

HB 1182 would ensure that all of the SBF would be used as it was intended — to help low-income Texans to pay their utility bills — and would remove the possibility of using the money for budget certification. A separate trust fund under control of the PUC and outside of the appropriations process would help the state live up to commitments made when electric restructuring was authorized in 1999. The bill would allow the Legislature to manage an estimated $688.6 million SBF balance remaining at the end of fiscal 2011 and would ensure that the fund be used for its intended purposes from fiscal 2012 forward.

HB 1182 would address the ongoing need to help low-income Texas electricity customers. Currently, the caseload for SBF assistance grows at 1.5 percent each month, and more Texas utility customers would qualify for the discount should food stamp or Medicaid

programs expand through federal stimulus funding. The PUC projects that 548,000 will qualify for SBF assistance in 2010 and 655,000 in 2011.

The PUC would make allocations for SBF programs based on the priorities that would be established in HB 1182. The PUC already has well-established procedures for public review and comments in its decision-making process. During several summers, the PUC considered and adopted emergency rules on disconnection policies for nonpayment of bills, so commissioners already are familiar with crafting policies that affect directly low-income electric customers.

## Opponents said

Moving the System Benefit Fund outside the appropriations process — which was tried in 2001 — would not necessarily mean that all funds would be used. The appointed Public Utility Commission could be less responsive to needs of low-income electricity customers than the elected members of the Legislature have been in the past. In its recommendations for this budget cycle, the PUC requested a level of assistance that still would leave significant unallocated balances remaining in the SBF. Moving the SBF off of the budget still could mean that the funds would not help fully low-income Texas electric customers and could accumulate without being used.

The PUC, an unelected regulatory agency, would not be the appropriate entity to set spending priorities among programs providing assistance for low-income discounts, disconnection policies, and weatherization.

## Other opponents said

The Legislature should end the System Benefit Fund program — much like it did last session with the Telecommunications Infrastructure Fund — and allocate the remaining SBF balances. Assessing a fee on electric bills to run essentially a social service that redistributes wealth among utility customers is questionable public policy. Besides, utility bills should not be used as tax collection vehicles. Monthly electric statements list line after line of special taxes and fees, and while this money

may go to worthwhile goals, these extra charges become burdensome to consumers.

## Notes

HB 1182 passed the House on May 12 and was reported favorably, as substituted, by the Senate Business and Commerce Committee on May 23, but died when no further action was taken.

The **HRO analysis** of HB 1182 appeared in the May 11 *Daily Floor Report*.

# Revising state air pollution emissions-reduction programs

**HB 1796 by Chisum/ SB 16 by Averitt**
*Effective September 1, 2009/ Died in the House*

Table
of Contents

The following provisions from SB 16 were added as amendments to HB 1796 and became effective September 1, 2009.

## Texas Emissions Reductions Program (TERP)

**HB 1796** expands TERP objectives to include advancing new technologies that reduce nitrogen oxide (NOx) emissions from stationary sources. The bill extends TERP until August 31, 2019. HB 1796 also extends the clean school bus program and the following TERP surcharges until August 31, 2019:

- heavy-duty diesel equipment;
- on-road diesel vehicles weighing more than 14,000 lbs;
- vehicle title fees;
- truck-tractors; and
- commercial motor vehicles.

**New Technology Implementation Grant Program.** HB 1796 establishes the New Technology Implementation Grant Program as a new TERP program. The program provides grants aimed at reducing emissions from point sources by offsetting the incremental costs of emissions reductions.

*Projects.* The projects eligible for new technology grants include:

- advanced clean energy projects;
- new technologies costing more than $500 million that reduce pollution from point sources; and
- renewable energy electricity storage projects.

*Applications.* The Texas Commission on Environmental Quality (TCEQ) is required to evaluate each new grant application for emissions-reduction potential, cost-effectiveness, contributions to air-quality goals, and the strength of the implementation plan. TCEQ is required to calculate projected emissions reductions and project their cost-effectiveness. TCEQ also is required to ensure that the projects funded result in emissions reductions not otherwise required by state or federal law. Preference will be given to cost-effective projects that use Texas' natural resources, contain

an energy efficacy component, or include use of a renewable energy source such as solar or wind.

*Grants.* Grant amounts may not exceed the incremental cost of a proposed project. Financial incentives, like tax breaks, that reduce the cost of a project, are subtracted from the project cost to determine the incremental cost. Applicants are required to pay 50 percent of the costs associated with project implementation. The comptroller reviews the use of grant money. Grant money is restricted to incremental costs and cannot be used to pay costs of operating and maintaining emissions-reducing equipment.

*New Technology Research and Development Program.* HB 1796 allows TCEQ to contract with nonprofits and institutions of higher education in administering the New Technology Research and Development Program.

*Air quality research.* The bill adds an air quality research component to the program. TCEQ may contract with a nonprofit or institution of higher education to carry out an air quality research program. The program has a board of directors consisting of two individuals with relevant scientific expertise, not more than four county judges from the Houston-Galveston-Brazoria and Dallas-Fort Worth non-attainment areas, and not more than 11 members total. The board oversees the allocation of new technology research and development grants. The air quality research program must receive at least 20 percent of the 9 percent of the TERP fund dedicated to the New Technology Research and Development Program.

The renewable energy development contract between TCEQ and the Energy Systems Laboratory at the Texas Engineering Experiment Station will focus on statewide emissions reduction goals, rather than only on the Houston-Galveston-Brazoria and Dallas-Fort Worth non-attainment areas.

**Other TERP revisions.** The amount of the TERP fund dedicated to the New Technology Research and Development Program will be reduced from 9.5 percent to 9 percent, and the amount for TCEQ administrative costs will be increased from 1.5 percent to 2 percent.

The bill requires natural gas recovery projects to operate in non-attainment areas or affected counties in order to qualify for the diesel emissions reduction program.

## Advanced clean energy projects

**Projects and baseline requirements.** HB 1796 specifies that projects using coal, biomass, solid waste, or other such fuels qualify as advanced clean energy projects, whether implemented in connection with a new facility or with upgrades to an existing facility, and that such projects could involve a portion of a facility's emissions. TCEQ is required to adopt baseline emissions reduction requirements, and projects must document compliance with these requirements.

**Carbon capture and storage.** Advanced clean energy projects include carbon capture and sequestration projects that capture and store at least 50 percent of a facility's emissions. Geologically stored carbon dioxide can be used for enhanced oil recovery. Carbon capture and storage pilot studies are not required to capture at least 50 percent of a facility's emissions as long as the following conditions are met:

- the study's purpose is to test the technology's effectiveness;
- the study is conducted for no more than two years;
- the applicant submitted documentation proving how the technology is expected to reduce overall harmful emissions; and
- a report is produced at the end of the study and made available to the public.

## Other clean air provisions

**LIRAP.** The bill increases from five to 10 days the amount of time counties have to provide a dealer with vehicle repair or replacement funds. Counties receiving Low Income Vehicle Repair Assistance Program (LIRAP) funding for local clean air projects receive an incentive for implementing new technologies to combat the use of counterfeit state inspection stickers.

**Federal greenhouse gas reporting rule.** HB 1796 directs TCEQ to partner with the RRC, the Texas Department of Agriculture (TDA), and the PUC to work with the federal government in the process of developing greenhouse gas reporting and registry requirements.

## SB 16 provisions not enacted

**Idling of motor vehicles.** SB 16 would have allowed vehicles weighing more than 8,500 pounds to idle at any time provided the vehicle was equipped with a 2008 or later heavy-duty diesel engine certified by the EPA or another agency to emit no more than 30 grams of NOx per hour. This idling provision would have expired on November 1, 2010.

The bill also would have increased the maximum vehicle weight limit by an amount necessary to compensate for the additional weight of an idle reduction system not to exceed 400 pounds. It also would have required a driver to provide proof to a law enforcement officer or agency official that the idle reduction technology was fully functional and that the weight increase was used only for the idle reduction system.

**Building energy codes.** SB 16 would have adopted the May 1, 2009, energy efficiency provisions of the International Residential Code for single family home construction in Texas beginning on January 1, 2012. Also, beginning on January 1, 2012, International Energy Conservation Code energy efficiency standards from May 1, 2009, would have applied to all other residential, commercial and industrial buildings.

**Housing partnership rebates.** The bill would have required the State Energy Conservation Office to use rebates to promote energy efficiency in residential housing. The bill also would have also allowed SECO to contract with other state agencies.

**Point sources.** The bill would have established a searchable online database of emissions from TCEQ-permitted point sources. The bill would have added a federally required fee on stationary sources in severe non-attainment areas to the list of Clean Air Act fees.

**Mercury monitoring.** If the federal government imposed regulations on mercury emissions from coal-fired plants, power plant operators would have had 18 months to install a monitor to track mercury emissions. In this instance, the operator would have had to report quarterly to TCEQ mercury emissions and to make the information available publicly.

## Supporters said

**TERP.** The bill would expand TERP to include incentives for reducing emissions from point sources. TERP long has been criticized for offering incentives for emissions reductions only from mobile sources, such as cars and trucks, and overlooking point sources such as power plants. Coal-fired power plants are notorious for emitting massive amounts of nitrogen oxides (NOx), which pollute the air and endanger public health. The new technology implementation grant program set up by the bill would give matching grants to eligible power plants that took steps to reduce NOx emissions.

The bill would enhance TERP and other state programs designed to improve air quality in areas of Texas that do not meet federal standards. Three metropolitan areas in Texas have air pollution levels that exceed the EPA eight-hour ozone standard: Houston-Galveston-Brazoria; Dallas-Fort Worth; and Beaumont-Port Arthur. Several other areas have rising pollution levels that are nearing non-attainment status. In order not to jeopardize federal highway funding, the state must implement more aggressive measures to reduce NOx emissions.

Through the reduction of NOx emissions, TERP protects the environment and health of Texas residents. Besides smog creation, NOx emissions can contribute to acid rain and oxygen depletion in bodies of water. Also, NOx emissions result in health problems, such as asthma and emphysema, while also aggravating heart disease and damaging lung tissue. By bolstering TERP, the bill would help reduce future costs to the state in public health and environmental remediation.

**Advanced clean energy projects.** The bill would expand eligibility requirements for qualifying a project as an advanced clean energy project. TCEQ has yet to receive an application for the program since it was established in 2007. Relaxing the program criteria to allow for projects that involve a reduction in a portion of the emission from an existing facility would open the program to more applicants.

As the demand for electric power grows and the externalities of carbon-based fuels become more apparent, Texans increasingly have called for more environmentally clean technologies. The bill would allow more clean coal plants to qualify as advanced clean energy projects and receive the streamlined permitting and tax breaks associated with the program.

Encouraging advanced clean energy projects would ensure that Texas would be positioned to attract the cleanest carbon-fueled power plants in the nation. Advanced clean energy has the potential to lessen the impact of federal carbon regulation by advancing technology to enable Texas to use the lowest cost and most reliable fuel available.

**Federal greenhouse gas rule.** The bill would bring Texas to the table in federal discussions on the regulation of carbon dioxide and other greenhouse gases. The recent EPA designation of carbon dioxide as a threat to public health represents the first step in the federal emissions regulating process. The bill would direct TCEQ to work with other state agencies in deliberations with the EPA to ensure that Texas receives credit for actions that already have been taken to reduce greenhouse gas emissions.

**Vehicle idling.** SB 16 would allow trucks with new clean diesel engine technology to idle beginning on November 1, 2010. Trucks equipped with an EPA-certified "clean idle" engine contribute no more than 30 grams of dangerous nitrogen oxide emissions per hour when idling. Even California, a state known for strict air quality standards, allows these clean engine trucks to idle at any time. SB 16 would give the trucking industry more than a year to upgrade trucks to cleaner engine technology.

SB 16 would promote the use of Auxiliary Power Units in the trucking industry, which present a viable and eco-friendly alternative to idling. Auxiliary Power Units are small generators that allow trucks to operate heat and air conditioning systems without running the primary engine. These units use much less fuel and therefore emit much less pollution than standard truck engines. SB 16 would prevent the weight of Auxiliary Power Units from being applied to the maximum vehicle weight allowable for trucks.

## Opponents said

The bill would set too low the percentage of carbon dioxide to be sequestered. Some companies are boasting that they could design plants that would capture as much as 90 percent of their carbon dioxide emissions. If this is possible, then making 50 percent the standard might be a disincentive for innovation. Incentives should be given for going beyond what already can be achieved. Standards should be strengthened every few years in

order to continue to improve emission standards as new technology became available.

**Vehicle idling.** SB 16 would apply to too broad of a range of trucks, including farm trucks, recreational vehicles, and ranch trucks, all of which can weigh more than 8,500 pounds. The goal of idling legislation should be to target large commercial trucks that emit the largest amount of harmful particulate matter.

## Notes

The **HRO analysis** of SB 16 appeared in Part One of the May 23 *Daily Floor Report*, and the **HRO analysis** of HB 1796 appeared in Part Three of the May 4 *Daily Floor Report*.

SB 16 contained a number of air quality improvement provisions that were deleted in the House committee substitute version of the bill, including:

- the plug-in hybrid motor vehicle purchase credit program;
- the energy-efficient appliance purchase incentive program;
- appliance efficiency standards; and
- consideration of cumulative effects of a facility's emissions in TCEQ's power plant permitting process.

SB 16 passed the Senate on April 14, but died on the May 23 Major State Calendar in the House when no further action was taken. Significant provisions of SB 16 concerning air quality were added to HB 1796.

# Extending deadlines to plug inactive oil or gas wells

**HB 2259 by Crownover**
*Effective September 1, 2009*

Table
of Contents

**HB 2259** requires the Railroad Commission (RRC) to implement requirements for extending the deadline for plugging inactive oil and gas wells and adds requirements for surface cleanup.

For every year an operator applies for an extension of a deadline for plugging an inactive well, the operator must provide one of the seven financial assurance requirements outlined in the bill as well as affirmation by the operator that electric service has been terminated. If the well has been inactive for five to less than 10 years, the equipment must be purged of production fluid. If the well has been inactive for at least 10 years, the surface equipment must be removed according to RRC rule. The operator of an inactive well must leave a clearly visible marker at the wellhead.

An operator is eligible for a temporary extension of the deadline for plugging an inactive well or a temporary exemption from the surface cleanup requirements if there are safety concerns or required maintenance of the well.

An operator is eligible for an extension of the deadline for plugging an inactive well without removing the surface equipment if the well and the equipment are part of an enhanced oil recovery project. The RRC may revoke an extension if it determines, after notice and opportunity for hearing, that the applicant was ineligible under RRC rules.

Electrical power lines serving a well site or other surface facility must be constructed, operated, and maintained in accordance with the National Electrical Code.

## Supporters said

Under current law, it is too easy to maintain a well as inactive. The oil field cleanup fund has been successful, but there still is a problem. The intent of HB 2259 is to bring in bad actors who are not plugging their wells. It would force operators to make business decisions on the future viability of their wells. HB 2259 is an industry-driven solution that would place more requirements on operators who leave their wells inactive year after year. Today's inactive wells become tomorrow's abandoned wells.

The bill also would require the eventual cleanup of unusable surface equipment. This program would be supplemental to the existing requirements for financial assurance and effectively would supplant the RRC's existing program requirements for inactive wells, which have been in place for years and no longer are effective in handling the problem as it exists today. The bill initially may require some administrative changes by the RRC, but any added cost to the agency would be offset by potential fees to be deposited in the oil field cleanup account.

## Opponents said

The bill would create an administrative burden at the RRC due to the need to amend rules and forms, perform fairly substantial computer programming, and add personnel to handle the review of the documentation for all of the options, to verify compliance, and to handle hearings resulting from denial of extensions.

## Notes

The **HRO analysis** of HB 2259 appeared in the April 28 *Daily Floor Report*.

# Providing consumer protections in restructured electric market

**HB 3245 by Solomons**
*Died in the House*

Table
of Contents

**HB 3245** would have amended the Utilities Code to add various consumer protection provisions, including guidelines for electric service disconnection in the summer months, deferred payment options to prevent disconnection, a retail market monitor to detect and prevent market manipulations, mitigation options for market abuse, and provisions regarding the cost for nodal implementation and the publication of natural gas and electric prices.

## Supporters said

Since the deregulation of the electric market in Texas, concerns have been raised about the benefits to consumers and whether there are adequate market and consumer protections in place. This legislation would provide necessary guardrails so that consumers could benefit from the current market structure. Many poor and elderly Texans face disconnection of electric service over the summer, when extreme temperatures result in sky-high electric bills. This poses an unnecessary and extreme health hazard to children and the elderly. HB 3245 would provide regulatory certainty that these customers would be able to avoid disconnection of electricity when they needed it the most.

The bill was the product of an extensive stakeholder process with input from consumer advocacy groups, the environmental community, and the electric industry.

## Opponents said

HB 3245 would place a moratorium on electric disconnections for a large class of consumers during the summer months. Historically, moratoria have resulted in retail electric providers (REPs) being left with millions of dollars of bad debt. The bill would expand the pool of people who would be able to defer payments and would expand the amount of time the payments could be deferred. REPs would be forced to deliver a product without payment for several months. By the time the deferral period was over, the amount of money the consumer owed would be so large that many consumers likely would never catch up and ultimately would be disconnected, leaving the REP with a bad

debt that would raise the rates of all of their electric consumers. REPs should not be forced to float a large class of customers for several months when there are other avenues of bill pay assistance available through the System Benefit Fund and the Texas Department of Housing and Community Affairs.

HB 3245 would provide less protection for customers with prepaid service and would create two classes of residential customers — those who have options available for keeping their electricity service on during the summer and those who do not. The Legislature should ensure that consumers who could lose essential service because of an inability to pay and lack of credit are prohibited from taking prepaid service.

## Other opponents said

HB 3245 would make good progress in addressing consumer and market protections, but the language in the bill regarding the retail market monitor is broad enough to include the wholesale market. This could blur the distinction between the existing independent wholesale market monitor and a retail market monitor. The language should be tailored to fit the specific needs of the retail market.

## Notes

HB 3245 was considered by the House on May 14, but died when a point of order was sustained against its further consideration.

The **HRO analysis** of HB 3245 appeared in the May 13 *Daily Floor Report*.

# Property assessments by cities for energy-efficient improvements

**HB 1937 by Villarreal**
*Effective September 1, 2009*

Table
of Contents

**HB 1937** allows the governing body of a municipality to designate an area in which municipal officials and property owners may enter into contracts to assess properties for energy-efficient public improvements and to finance the installation of distributed generation renewable energy resources or energy-efficient improvements that would be permanently affixed to real property. Any assessment imposed would be considered a lien against a lot on which it was imposed until the assessment and any related interest or penalty was paid.

To designate an area for assessment, the governing body of a municipality must adopt a resolution of intent including a description of the boundaries of the area in which contracts for assessments may be entered into and the proposed arrangements for financing the program, information regarding the types of energy-efficient improvements or public improvements or distributed generation renewable energy resources that may be financed, and the time and place for a public hearing at which interested persons could object to or inquire about the proposal. The resolution of intent also must direct an appropriate municipal official to consult with the appropriate appraisal district or districts regarding collecting the assessments, and to prepare a report regarding the assessment.

Property owners who wish to enter into an assessment contract may purchase directly installation equipment and materials or contract for the installation of the improvements and renewable energy sources by obtaining the written consent of an authorized municipal official.

## Supporters said

HB 1937 would give cities the option of setting up a municipal finance system to help homeowners make their homes more energy efficient or install renewable energy devices, such as solar panels. This legislation has been modeled after municipal financing programs that have been successful in other cities around the country.

Municipal financing could eliminate the largest disincentive to installing solar panels — the often prohibitive initial cost. Solar panel systems could be financed like gas lines or water lines, covered by a loan from the city, and secured by property taxes. The advantage of this system over private borrowing is that any local homeowner would be eligible and the obligation to pay the loan would attach to the house and pass to any future buyer, eliminating the concern that the homeowner may not stay in the house long enough to recoup the investment. The bill also would aim to give the option to finance other renewable energy devices, or upgrades aimed at improving energy efficiency.

## Opponents said

HB 1937 inappropriately would expand the scope of municipal authority by allowing city governments to create financial districts to lend money to private individuals for energy-efficiency and renewable energy projects. Allowing cities to use public funds to make loans to private individuals would give them a competitive advantage over private lenders in financing such loans.

## Notes

The **HRO analysis** of HB 1937 appeared in the May 8 *Daily Floor Report*.

# Studying strategies for reducing greenhouse gas emissions

**SB 184 by Watson**
*Effective September 1, 2009*

Table
of Contents

**SB 184** requires the comptroller of public accounts to prepare a report by December 1, 2010, listing strategies for reducing greenhouse gas emissions in Texas. The comptroller is directed to consider strategies for reducing emissions from other states and countries. The study must take into account strategies that can be achieved without financial cost or that will result in savings for consumers or businesses over the life of the strategy, as well as help Texas businesses maintain global competitiveness. The report also must include the initial and short-term capital costs and lifetime costs and savings for each identified strategy.

The comptroller must appoint advisory committees, consisting of representatives from certain state agencies, to assist in identifying and evaluating greenhouse gas emission reduction strategies. The comptroller may enter into an interagency agreement with the Texas Commission on Environmental Quality or other state agency for technical advice or assistance.

## Supporters said

SB 184 would direct the comptroller to evaluate and identify economically beneficial policies to minimize the production of greenhouse gases, a leading cause of global climate change. Such a study would help transform Texas from a leading contributor of carbon dioxide to a true global leader in the fight against global warming. Greenhouse gas emissions, such as carbon dioxide and nitrous oxide, have been established as primary causes of global warming, a phenomenon with potentially severe consequences for our way of life. Without innovative, technology-driven solutions to curtail dramatically pollution caused by human activity, the pattern of rising temperatures likely will worsen.

SB 184 would initiate a study to identify economically neutral or beneficial strategies to address the problem of global warming. Such solutions are key to safeguarding the health of Texas citizens and preserving the environment while minimizing negative economic consequences. The longer that Texas, the United States, and other industrialized nations wait to mitigate carbon dioxide and other greenhouse gas emissions, the more costly such policy changes will become.

## Opponents said

SB 184 would open the door to extensive and potentially economically disruptive environmental regulation. With a growing population and an expanding economy, Texas has distinct energy needs that will be challenging to accommodate even without the burden of untested restrictions on greenhouse gases. The vague strictures in the study required under SB 184 unfairly could place on private business the burden of compliance with recommended strategies, with potentially negative consequences for employment and economic performance in the state.

Regulation of air pollution typically has been addressed through federal guidelines such as the Clean Air Act, and Texas environmental policy appropriately has been focused on attaining federal standards. SB 184 could send Texas down a road of regulation that could put the state at a competitive disadvantage with neighboring states or in conflict with federal greenhouse gas legislation that Congress is likely to consider in the future.

## Notes

SB 184 passed the House on the Local, Consent, and Resolutions Calendar and was not analyzed in a *Daily Floor Report*.

# Expanding renewable portfolio standard (RPS) for non-wind resources

**SB 541 by Watson**
*Died in the House*

Table
of Contents

**SB 541** would have amended the Utilities Code by establishing definitions of tier 1 and tier 2 renewable energy, creating new goals for renewable energy generation capacity, and providing for a credit-trading program. Tier 1 renewable energy would have been solar, wind, geothermal, hydroelectric, tidal energy (wave), and biomass, including landfill gas. Tier 2 would have been tier 1 renewable energy technology, excluding energy derived from wind, with a capacity of more than 150 kilowatts.

SB 541 would have removed the existing target of 500 megawatts of non-wind renewable capacity and replaced it with a goal of 1,500 megawatts of tier 2 renewable energy to be installed by January 1, 2020. In certain instances, the PUC would have been allowed to suspend requirements to meet the goals.

The PUC would have been required to set up a tier 1 and tier 2 renewable energy credit (REC) program as well as alternative compliance payments so that entities with a renewable energy purchase requirement could have elected to pay the alternative compliance payment instead of applying RECs toward the satisfaction of the entity's obligation. The PUC also would have been required to adopt rules necessary to provide a "Made in Texas" incentive for tier 1 and tier 2 RECs generated by equipment that had been wholly produced or substantially transformed by a Texas workforce.

## Supporters said

SB 541 would provide a 1,500 megawatt non-wind renewable portfolio standard (RPS) goal, to be achieved by 2020. This would continue Texas' leadership in installing clean, renewable energy in a market-based manner that would drive creation of manufacturing jobs and provide price protections for businesses and consumers.

The RPS model has been proven to work well and effectively in Texas and is the most market-driven of incentive programs. The bill would be the right mix for the state's economy and its environment. While Texas has installed more renewable energy than any other state thanks to large-scale wind energy development in West Texas, the state has fallen behind in the development

of emerging renewable energy technologies such as solar, geothermal, and biomass power. A second-tier renewable portfolio standard would help jumpstart these industries in Texas and prepare the state for the expected federal Renewable Electricity Standard and carbon cap and trade legislation currently being debated in Congress. The bill also would help create Texas jobs by providing an incentive for renewable energy equipment manufacturing to locate in Texas.

Concerns that an RPS leads to higher electricity rates are unfounded, because renewable energy has been proven to lower the wholesale market price of electricity and would drive those prices even lower due infrastructure investment where wind and solar resources are most abundant. The RPS allows Texas to hedge against the risk of future skyrocketing electric rates and insulates ratepayers from the volatility of natural gas prices. By expanding the RPS for non-wind sources, SB 541 would lead to lower electricity prices and provide for more energy diversity.

SB 541 also would provide important protections for ratepayers by keeping the cost of the program and REC prices low through a gradual, staged increase of megawatt targets. In the initial years, the requirements would be relatively small, which would keep the cost of the program low. The bill also would provide price certainty for ratepayers by providing price caps for tier 2 renewable energy, and the program could be suspended if an undue burden was placed on ratepayers.

## Opponents said

All electricity generation should be based on the market. Renewable energy is more expensive and therefore is not currently a cost-effective way to produce energy. Although this program would not be financed by surcharges or non-bypassable fees, generators that did not meet the standards would have to buy RECs to meet their obligations. This essentially would be a cap-and-trade system, for which the costs ultimately would be passed on to customers. Requiring utilities to use more expensive energy sources would increase electric rates for customers. Manufacturers, schools, and other large customers anticipate paying millions more per year on electricity.

Solar plants and other renewable sources cannot produce the same amount of energy as more traditional generating plants. Many of the renewable energy generating facilities, such as solar, require a source of backup energy from a traditional source. This duplicates generation and further increases costs.

## Notes

SB 541 passed the Senate, but died on the May 26 Major State Calendar in the House when no further action was taken.

The **HRO analysis** of SB 541 appeared in the May 26 *Daily Floor Report*.

# Goals and incentives for solar energy generation

**SB 545 by Fraser**
*Died in the House*

Table
of Contents

**SB 545** would have required the PUC, by rule, to establish and oversee implementation of a solar generation incentive program to be implemented by electric utilities for residential and commercial customers. The PUC also would have had to establish procedures to achieve the goal of installing at least 3,000 megawatts of solar generation capacity in Texas by 2020, at least 1,000 megawatts of which would have been distributed renewable generation. Electric utilities would have recovered their costs through a non-bypassable fee of $0.000650 per kilowatt hour for each residential or commercial customer meter, and $40 per month for each industrial customer meter.

The PUC would have set rebate amounts for the installation of solar generation, with up to a 20 percent higher rebate amount for solar generation manufactured in Texas. For the first two years of the program, 25 percent of the rebates would have been reserved for use by public school districts. The State Energy Conservation Office (SECO) in the Comptroller's Office would have been required to establish a revolving loan program to provide loans to pay the costs of installing photovoltaic solar panels on public school buildings and buildings owned by religious organizations. The revolving loan program would have been patterned after the Texas LoanSTAR (Loans to Save Taxes And Resources) revolving loan program, which is a building energy-efficiency loan program administered by SECO.

SB 545 also would have prohibited a property owners' association from restricting a property owner from installing a solar energy device, except in certain instances. Also, a builder who entered into a contract for construction of a new home in a subdivision that contained more than 50 lots would have been required to offer a homebuyer at least one plan in the subdivision on which the homebuyer could purchase an option to install a solar energy device on the home for heating or cooling or for the production of power.

## Supporters said

SB 545 would establish a solar generation incentive program that would make it easier and cheaper for Texans to bring solar energy into homes and businesses. It also would allow Texas to become more energy independent and meet renewable energy goals. The bill would move Texas to the forefront of solar energy generation in the United States. Texas already has led the nation in wind power generation, and the bill would allow Texas to lead the way in solar power generation as well.

The incentive program would be funded by a nominal flat fee on customers' electricity bills, making administering this program more predictable. Everyone would benefit from a cleaner environment from solar energy generation. The loan program allowing schools to switch to solar power would reduce their electric bills and generate income in the summer months.

Concerns that it could be risky for Texas to be an early leader in the solar industry should not delay these efforts. If everyone hesitated to promote use of solar energy and other renewables, the industry would never develop. The early leaders have the opportunity to become the manufacturing clusters that create jobs. SB 545 would send a signal that Texas was the place to do business, especially with the "Made in Texas" provision to encourage the installation of solar generation manufactured in Texas.

Also, the bill contains a five-year check point that would help avoid unintended consequences and would provide an opportunity to make adjustments as the industry evolves.

## Opponents said

Electricity customers would pay for this program through a surcharge on electricity bills. The money from the surcharge could be as much as $100 million a year for five years. Adding a cost to the consumer, particularly business consumers, would mean less money for them to spend to do the things they need to do to grow their businesses. Everyone would have to pay the surcharge, but only the customers that participated in the program would receive any benefit.

Solar energy is only now becoming a viable option for energy generation. It could be risky for Texas to be the early leader in an industry that is not fully developed. This bill would encourage school

districts and Texas citizens to be the early adopters of a technology that still is in its infancy, which could result in unknown and intended consequences. Texas jumped in head first with ethanol subsidies, which caused a number of problems for the state.

Creating a solar energy incentive program would jump-start that industry, and it is questionable public policy for the government to make decisions that would affect a market in that manner, essentially picking winners and losers.

## Notes

SB 545 passed the Senate, but died on the Major State Calendar in the House when no further action was taken. The provisions of SB 545 were added as a Senate amendment to HB 1243 by Gallego, but HB 1243 died in the House when the end-of-session deadline passed for consideration of Senate amendments.

The **HRO analysis** of SB 545 appeared in the May 25 *Daily Floor Report*.

# Increasing energy efficiency goals and demand reduction targets

**SB 546 by Fraser**
*Died in Conference Committee*

Table
of Contents

**SB 546** would have increased the state's energy efficiency goals and changed the standard to a percentage of peak demand rather than a percentage of load growth. SB 546 would have established annual efficiency goals of:

- 30 percent of annual growth in demand by January 1, 2012, rather than 10 percent by December 31, 2007;
- 0.5 percent of peak demand by January 1, 2013, rather than 15 percent of annual growth in demand by December 31, 2008;
- 1 percent of peak demand by January 1, 2016, rather than 20 percent of annual growth in demand by December 31, 2009.

SB 546 would have required each electric utility to administer an energy efficiency program designed to meet an energy savings goal calculated from its demand savings goal, using a capacity factor of 25 percent.

The PUC could have established, and each utility could have implemented, market-transformation incentive programs that encouraged the use of new building technologies and construction practices. A market transformation program that was launched as a pilot program would have been allowed to be extended for more than three years if the PUC determined that the pilot program was an appropriate means of addressing special market barriers that prevented or inhibited the behavior addressed by the pilot program.

SB 546 would have created an Office of Energy Efficiency Deployment in the State Energy Conservation Office (SECO) to design and implement a statewide campaign to educate customers, utilities, and public entities about energy efficiency.

SB 546 also would have required various studies addressing certain energy efficiency issues.

## Supporters said

SB 546 would build on the foundation created by HB 3693 by Straus, enacted by the 80th Legislature in 2007, by setting far-reaching goals for energy efficiency programs that would reduce peak electricity demand by 1 percent by 2016 and would implement recommendations set out by the PUC's 2009 energy efficiency report.

In a report that studied the feasibility of further increasing the energy efficiency goals, the PUC estimated that the implementation of its recommendations would result in a minimum of $4.3 billion in net savings to Texas electric customers through the next decade. Also, the report found that a dramatic ramp-up in Texas' energy efficiency goals is achievable — up to one percent of peak demand by 2015. For every dollar spent on energy efficiency, the customer potentially saves $2.70. Energy efficiency is one of the few tools available that both saves money and reduces air pollution. SB 546 simply would be about being smart about the way energy is used in Texas. Now is a critical time to act because Texas needs to be prepared to receive federal stimulus dollars and put them to maximum good use. These types of innovative energy efficiency measures are exactly the kind of one-time stimulus expenditures that lead to long-term savings, create jobs, and position Texas to be the nation's leader in creating the new, green economy.

## Opponents said

SB 546 would place an enormous administrative burden on the PUC with increased oversight and rulemaking responsibilities. An estimated 2,500 PUC staff hours would be needed to conduct a major rulemaking to change the energy-efficiency rules and the demand-response programs operated by ERCOT. The PUC also would be involved in increased oversight activities to assess whether goals were met and to oversee program implementation.

## Notes

The **HRO analysis** of the companion bill, HB 280 by Anchia, appeared in the May 8 *Daily Floor Report*.

# Recovering weather-related electric system restoration costs

**SB 769 by Williams**
*Effective April 16, 2009*

Table
of Contents

**SB 769** enables an electric utility to recover system restoration costs of $100 million or more without a base rate proceeding with the Public Utilities Commission (PUC) and to use securitization financing to recover those costs, if approved by the PUC. System restoration costs are defined as the reasonable and necessary costs incurred by an electric utility for the restoration of service and infrastructure resulting from electric power outages due to weather-related events or natural disasters that took place in 2008, as well as for future events. System restoration costs include reasonable estimates of costs subject to true-up and reconciliation after the actual costs were known.

The PUC was granted authority over the amount of system restoration costs that a utility is eligible to recover through securitization and the issuance of a financing order authorizing the request, including timelines, safeguards to ensure the most cost-effective method of recovery, and restrictions on bypassability.

SB 769 also provides standards and definitions relating to system restoration costs, instructions on appeal procedures for PUC decisions, and instructions on how system restoration costs are to be allocated to customers with consideration to rate freezes and federal tax offsets.

## Supporters said

SB 769 would expedite the recovery of costs and provide a more cost-effective means of recovery for utilities hit with system restoration costs due to natural disasters. The conventional method of recovering storm costs is for a utility to go through a base-rate proceeding at the PUC, which takes 185 days to complete and often is costly due to litigation. Base rate proceedings cause significant delays in the recovery of storm costs and place additional costs — including both the cost of the proceeding and high interest and finance charges — on the affected utilities, which pass them on to customers.

Utilities previously have had to receive approval from the Legislature through specific legislation in order to recover system restoration costs through securitization. For example, HB 163 by P. King, enacted

by 79th Legislature during its 2006 third called session, allowed Entergy to use securitization to recover costs resulting from Hurricane Rita in 2005. This bill would authorize the PUC to approve the use of securitization without the utilities having to wait for a legislative session to do so. Securitization allows for very low interest rates on bonds that are issued to cover system restoration costs. It is a form of low-cost refinancing similar to refinancing a home mortgage. A utility issues bonds and pays off existing debt or reinvests the proceeds in its infrastructure. The securitized bonds that are issued are then paid off by the provider's retail customers. Securitization financing costs customers less money because the financing order provides terms and conditions that result in highly rated bonds with relatively low interest rates.

Securitization is a proven financial technique that has minimized the rate impact on Texas consumers by saving million of dollars in financing costs. Entergy used securitization to recover costs from the devastation caused by Hurricane Rita in 2005, resulting in an estimated savings of $300 million to consumers. With respect to recovering costs from the 2008 hurricane season, securitization is anticipated to reduce the monthly system restoration charges to a typical residential customer by approximately 20 percent as compared to conventional rate-setting methods.

SB 769 would put into place protections to ensure that securitization would provide a better benefit to the utility and consumers than the conventional method of recovery. The PUC would have to find tangible and verifiable benefits before securitization was approved, and a trigger mechanism would set a threshold amount of recovery costs before securitization could become an option.

## Opponents said

SB 769 would speed up the cost-recovery process for electric utilities hit by natural disasters and could put the PUC under pressure to move more quickly than would be prudent. Time and consideration should remain a high priority when decisions are made to pass costs onto consumers.

This bill would put a cost-recovery mechanism into place for storms that have yet to occur and for recovery of damages that currently are unknown. Securitization always has been an extraordinary means to recover extraordinary costs. This bill would open up the use of securitization to any storm or natural disaster before it could be known how best to proceed.

Securitization could be a disincentive for utilities and industry to engage in mitigation efforts, such as grid hardening, if they know they will recover all of their costs.

Also, this bill would allow a utility to base securitization on only estimated costs. Estimates are unreliable and should not be the basis of securitization or surcharges. There at least should be mandatory rate cases every three years to capture any over-recovery.

If the PUC determined that a utility did not qualify for securitization, the utility would not have to go back to a standard base rate proceeding. This would allow a utility to bypass the traditional ratemaking process.

SB 769 would allow a utility essentially to earn a double return on investment — for building and maintaining the electric system and for recovering costs to repair damages. Without a base rate proceeding, there would not be an opportunity to reconcile those amounts.

## Notes

The **HRO analysis** of the House companion bill, HB 1378 by Thompson, appeared in the April 6 *Daily Floor Report*.

# Allowing access to electric cooperative meetings and certain records

**SB 921 by Fraser**
*Died in the House*

Table
of Contents

**SB 921** would have outlined guidelines to be followed by electric cooperatives, including requirements that director elections be conducted in a manner that was fair and open to all members of the electric cooperative. Rules would have differed for electric cooperatives with more than 170,000 members (currently, only the Pedernales Electric Cooperative) and electric cooperatives with 170,000 members or less. Also, SB 921 would have required that members be given notice of and access to electric cooperative board meetings, as well as access to nonproprietary books and records of the cooperative. SB 921 would have provided a procedure for a member to file a complaint against a board and would have required electric cooperatives to adopt certain policies, have an independent financial audit performed annually, and provide notice to members of certain investments. Electric cooperatives with more than 170,000 members would have been prohibited from acquiring equipment capable of generating electricity for sale, other than equipment that used an alternative energy resource, unless approved by the Public Utility Commission.

## Supporters said

Issues have been raised related specifically to the Pedernales Electric Cooperative (PEC), including lack of access to board meetings and public information, misappropriation of funds, and irregularities in director elections. SB 921 would bring more transparency and accountability not only to PEC, but also to all 63 electric cooperatives around the state. The laws governing electric cooperatives now establish only a rough framework for organization and operation. The bylaws adopted by a board have the biggest impact on the election of board members and on how an electric cooperative functions. SB 921 would provide statutory guidelines to ensure open meetings, records, and director elections while maintaining local control.

SB 921 would address issues that were an isolated problem at the PEC without over-regulating other electric cooperatives. The bill is the product of a stakeholder process with input from electric cooperatives. The provisions of the bill mirror the best management practices currently utilized at other electric cooperatives.

## Opponents said

SB 921 would impose requirements that already are the best management practices at electric cooperatives, including at the PEC under its current board. The problems with electric cooperatives were isolated to the PEC under a board that no longer is in control. Also, SB 921 contains provisions that are bracketed specifically to apply only to the PEC, and it is questionable public policy for legislation to target only one entity.

## Notes

SB 921 passed the Senate and was placed on the May 21 Major State Calendar in the House, but no further action was taken. The Senate added provisions of SB 921 as an amendment to HB 1243 by Gallego, which died in the House on a point of order when the deadline expired for House consideration of Senate amendments.

The **HRO analysis** of SB 921 appeared in the May 21 *Daily Floor Report*.



Table
of Contents

Gaming

HB 2081     Isett/          Continuing the Texas Racing Commission ........................................................ 90
  SB 1013   Hinojosa
HJR 137     Kuempel         Authorizing local-option casino gambling ...................................................... 92

# Continuing the Texas Racing Commission

**HB 2081 by Isett/ SB 1013 by Hinojosa**
*Died in the House*

Table
of Contents

SB 2 by Hegar, enacted during the first special session, extended the Texas Racing Commission until September 1, 2011. The agency's sunset bills, HB 2081 by Isett and SB 1013 by Hinojosa, were not enacted during the regular session.

The House committee version of **HB 2081** would have continued the Texas Racing Commission (TRC) until September 1, 2015. The bill would have repealed the current provision that racetrack licenses are perpetual and would have required the commission to develop a process for reviewing and renewing the licenses. It also would have reduced the types of workers that the commission was required to license, revised the method of financing the commission, revised the law on unlawful betting, and abolished the Equine Research Advisory Committee and transferred authority to spend the funds in the equine research account to the executive director of Texas AgriLife Research at Texas A&M University.

As passed by the Senate, **SB 1013** contained many of the same or similar provisions as HB 2081, including continuing the commission until September 1, 2015, and repealing the provision making track licenses perpetual. SB 1013 also contained a provision not in HB 2081 that would have required license fees for inactive tracks to be greater than for active tracks and to be increased based on the time a license had been inactive. While both bills would have revised the method of financing for the commission by eliminating uncashed winning tickets as a source of funding for the agency, SB 1013 would have made additional changes to the way the commission receives and repays general revenue funds when necessary.

## Supporters said

The Texas Racing Commission should be continued because there is a need for oversight of the pari-mutuel racing industry, and the commission is the only agency with the infrastructure and expertise to do so. Because the racing industry has been in decline, HB 2081/SB 1013 would require review of the commission after six years, instead of the standard 12 years.

HB 2081/SB1013 would clarify TRC's authority so that it could provide adequate, ongoing oversight of racetrack licensees. The Racing Act currently states that licenses are perpetual, and questions have been raised about whether that provision, combined with unclear statutory language on the commission's revocation authority, give the commission statutory authority to revoke a track license. These questions have resulted in the commission taking no action against the two inactive track licensees that have held licenses since 1989 but have yet to build a track. To address this problem, HB 2081 would repeal the provision that grants track licenses in perpetuity and would require the commission to establish a process for racetrack license review and renewal.

Licenses that were renewed periodically would not harm tracks' ability to gain financing. The lending industry is familiar with licensed industries that commonly carry a license renewal period, and nothing in the bill would be inconsistent with other lending situations involving licensed industries.

HB 2081/SB 1013 would change the current requirement that the commission license all people involved in racing because it results in the licensing of too many people with little or no chance to affect pari-mutuel racing, which serves no clear public interest. The bill would address this problem by requiring licensing only of those who can affect pari-mutuel racing. The commission still would have authority over those who were not licensed through their employers, and the racetracks still would be responsible for their employees' compliance with the Racing Act and commission rules.

The bill would update and clarify Texas' policy that prohibits betting on pari-mutuel wagering outside of Texas tracks by stating that persons without a pari-mutuel track license were prohibited from taking bets from Texas residents no matter how the bet was placed — including by telephone or over the Internet. Even though enforcement could be difficult, the language in HB 2081 should bring some bettors and on-line sites into compliance.

HB 2081 would eliminate the Equine Research Account Advisory Committee because its benefits are not clear and its duties could be more efficiently performed directly by Texas AgriLife Research. The state does not need a separate committee to review and recommend equine research grants. There are other ways for Texas AgriLife to obtain input and opinions from the racing industry without a statutory advisory committee.

## Opponents said

Removing the current provision making track licenses perpetual and instituting a review and renewal process is unnecessary and would be burdensome for the tracks. It also could make obtaining financing to build a track or to make additional investment in a licensed track more difficult and costly. The commission has adequate power to address any problems with licensees, including inactive tracks. It would be better to use this power to target specifically inactive tracks that do not build facilities or ask for race dates than to place a new regulatory burden on active tracks.

The commission should continue to license all those involved with racing. No matter what a worker's job, it would be best to license them due to their presence at the track.

Rather than further an unenforceable policy that tries to prohibit Internet wagering, the state should move in a different direction and authorize advance deposit wagering, which allows bettors to use the Internet to place wagers on races using funds already placed in their accounts. In other states this type of wagering is done with an agreement that allows a portion of betting revenue to go to the tracks, horse owners, and the state.

Abolishing the Equine Research Account Advisory Committee would be detrimental to equine research in the state because it would eliminate from the grant awarding process the formal input of broad and diverse groups in both industry and academia.

## Notes

During the regular session, HB 2081 by Isett and its companion bill, SB 1013 by Hinojosa, would have continued the Racing Commission, but both bills died in the House. HB 2081 was set on the May 12 Major State Calendar, but was postponed and never taken up. SB 1013 passed the Senate, but died in the House Licensing and Administrative Procedures Committee.

The **HRO analysis** of HB 2081 appeared in Part One of the May 13 *Daily Floor Report*.

SB 2 by Hegar, enacted during the first called session, extended the Sunset date for the Texas Racing Commission and certain other agencies to September 1, 2011, and limits Sunset Advisory Commission review of these agencies to the appropriateness of the recommendations made to the 81st Legislature. SB 2 was considered by the House in lieu of its companion bill, HB 2 by Isett. The **HRO analysis** of HB 2 appeared in the July 2 *Daily Floor Report*.

The governor called a special session to enact SB 2 because HB 1959 by Isett, a Sunset revision bill that would have extended to September 1, 2011, the Sunset date for TRC and certain other agencies due to be abolished on September 1, 2009, died when the House did not act on the conference committee report on the bill. The House on June 1 adopted HCR 291 by Pitts, a corrective resolution for HB 4583, that also included an extension of the TRC Sunset date to September 1, 2011, but the Senate did not act on the concurrent resolution.

# Authorizing local-option casino gambling

**HJR 137 by Kuempel**
*Died in the House*

Table
of Contents

**HJR 137** would have amended the Texas Constitution to authorize the Legislature to enact laws allowing and regulating gaming that involved wagering. The Legislature could have made the laws contingent on voter approval in a statewide referendum. Before gaming could have occurred in a county, it would have had to be approved by local voters in a county-option election.

The Legislature could have limited the locations of casinos to:

- coastal barrier islands at least 25 miles long that are accessible by bridges;
- dredge spoil islands at least 18 miles long located in coastal counties; and
- populous metropolitan areas.

The Legislature would have been authorized to dedicate a portion of gaming revenue to higher education, transportation, or the children's health insurance program.

Texas' three federally recognized Native American tribes would have been authorized to conduct casino gaming, but with some restrictions. Gaming by the tribes would have been regulated by the tribe and the secretary of state. The Tigua tribe, with lands near El Paso, and the Alabama-Coushatta tribe, with lands in Polk County in East Texas, would have been authorized to conduct gaming on their tribal lands. The Kickapoo tribe would have been authorized to conduct gaming, subject to certain location restrictions, if any gaming was permitted within 200 miles of any part of their reservation near Eagle Pass.

## Supporters said

Casinos would diversify and expand the Texas economy by creating jobs, increasing tourism, boosting the entertainment industry, and producing much needed tax revenue. Casinos could increase state and local tax revenue $3 billion to $4.5 billion annually, with a total annual economic impact of $51 billion. HJR 137 would allow the Legislature, through enabling legislation, the flexibility to decide where casino gambling could take place, including at pari-mutuel racetracks, and would allow the state's Native American tribes to participate in gaming. The amendment's requirement for local-voter approval would ensure that any casino had community support.

Casinos would draw tourists to Texas and keep many Texans, and their entertainment dollars, from traveling to other states to gamble. New Mexico, Oklahoma, Louisiana, and Mexico offer easy access for Texans to gamble, and HJR 137 would keep some of this economic activity at home. This would result in the development of hotels, restaurants, and retail stores, and existing businesses would be helped through new tourism, jobs, and increased consumer spending.

Gambling is an increasingly popular form of entertainment. It would not compete with the lottery, pari-mutuel wagering, or charity gaming, because those games attract a different clientele.

Because playing casino games is a purely voluntary form of entertainment, the money collected by the state should not be compared to a mandatory tax. Casino gambling offers a taxable, regulated, aboveboard alternative to illegal gambling and could help combat illegal gaming machines in Texas.

Casino gambling would be strictly voluntary and victimize no one. Social problems in communities with casinos are no different than those in other communities, and communities with casinos are as safe as those without casinos. Strict government regulation of casinos ensures that they operate honestly and that there are no ties to organized crime. Problem gambling is rare, and the prevalence rate of pathological gambling has been relatively unchanged even as legal gambling has expanded.

HJR 137 could help address some of the state's long-term needs by authorizing the Legislature to dedicate a portion of gaming revenue to higher education, transportation, or the children's health insurance program.

The Legislature should allow voters to decide whether Texas should permit casino gambling. Polls show support for casinos, and Texans should be given a chance to vote on the issue.

## Opponents said

The social, moral, and economic costs of casino gambling would far outweigh any purported public benefits. Estimates of the economic benefits of casinos are inflated and misleading and ignore the negative economic impact of casinos. Instead of creating new economic demand, casinos merely redistribute money and can hurt local businesses, reduce government sales tax revenue, and divert money from the lottery and pari-mutuel wagering. Casinos can bring new dollars into a local economy only if they attract tourists who otherwise would not come. With numerous casinos being proposed for Texas and competition from casinos in other states, Texas casinos would have a hard time attracting new tourists.

Gambling will not solve Texas' fiscal problems, as the lottery and pari-mutuel racing have shown. The state should not finance essential state services with gambling revenues and should not encourage gambling. Gambling revenues fluctuate, and casino taxes get failing marks when examined using standard tax analysis, especially in regard to equity.

Unlike most other forms of entertainment, casinos impose high social costs, such as increased street and white collar crime and compulsive gambling.

Voters elect state legislators to evaluate proposals and reject those with superficial appeal and potentially dangerous consequences. The Legislature should exercise responsible judgment by not legalizing casino gambling and not should pass the buck to voters.

## Notes

HJR 137 was reported favorably by the House Licensing and Administrative Procedure Committee, but died in the House Calendars Committee.

HB 222 by Menendez, which would have legalized and regulated poker gaming in Texas, was placed on the May 8 General State Calendar in the House, but was postponed and not subsequently considered. The **HRO analysis** of HB 222 appeared in Part Four of the May 8 *Daily Floor Report*.



Table
of Contents

# Government Affairs

| | | | |
|---|---|---|---|
| * | HB 1831 | Corte | Emergency management, disaster preparedness, and school safety ................. 96 |
| | HB 1976 | Solomons | Procedures for operating property owners' associations ................................... 99 |
| * | HB 2559 | Truitt | Employees Retirement System benefit and retirement eligibility .................. 103 |
| * | HJR 14 | Corte | Revising purposes for which property may be taken ..................................... 105 |
| | HJR 29 | Elkins | Allowing Legislature to override veto after sine die adjournment ................. 107 |
| * | SB 2 (1st) | Hegar | Extending and revising state agency Sunset dates .......................................... 109 |
| | SB 18 | Estes | Standards for use of eminent domain authority ................................................ 111 |
| | SB 1002 | Deuell | Abolishing the Texas State Affordable Housing Corporation ........................ 114 |
| * | SB 1003 | Deuell | Continuing state-federal office and attaching it to Governor's Office ........... 115 |
| | SB 2567 | Duncan | Establishing a state investment review board .................................................. 117 |

---

# Emergency management, disaster preparedness, and school safety

**HB 1831 by Corte**
*Generally effective September 1, 2009*

Table
of Contents

**HB 1831** modifies provisions related to emergency management and disaster mitigation and response.

**Mandatory evacuation and liability.** A county judge or mayor who orders the evacuation of an area stricken or threatened by a disaster also may order the compelled removal of people who remain in the evacuated area. Government officials or employees who order an evacuation or carry out an evacuation order are immune from civil liability. Persons who remain in an area ordered evacuated are civilly liable to a governmental entity or nonprofit agency acting on its behalf for the costs of rescuing such persons if they knowingly ignored an evacuation order and acted or failed to act unreasonably and placed another person in danger. The Governor's Division of Emergency Management (GDEM) must develop a phased reentry plan to govern who can enter previously evacuated areas and a reentry credentialing process.

**Emergency management plan.** GDEM, the Department of State Health Services (DSHS), and the Texas Department of Agriculture (TDA) each must develop an annex to the state emergency management plan. GDEM's annex must address planning for providing services and supplies during the first five days immediately after a disaster. The DSHS annex must include the requirements of individuals in various medical special needs categories and the establishment of minimum health-related standards for the operations of state-funded shelters. TDA's annex must include recovery and relief information, training and assistance requirements, and other information related to agriculture emergency response.

**Emergency Management Council.** Representatives of state agencies, boards, commissions, and organized volunteer groups may serve on the governor's Emergency Management Council, not just the heads of those groups. The council is responsible for identifying, mobilizing, and deploying state resources in response to disasters and other emergencies.

**Emergency management training and education.** Elected law enforcement officers and county judges who supervise or manage others and whose job duties include emergency management or who play a role in emergency preparedness, response, or recovery

must receive emergency management training. DSHS must establish an education program on disaster and emergency preparedness, response, and recovery.

**Reservists and volunteers.** The GDEM may organize and train disaster reservists to augment its staff temporarily and must encourage public participation in volunteer emergency response teams, integrate volunteer and faith-based groups into emergency management plans, and establish a volunteer liability awareness program. Councils of government and regional planning agencies must develop plans for handling disaster-related personnel increases and lodging and meals for relief workers and volunteers.

**Disaster funding.** The disaster emergency funding board is abolished. State agencies may request disaster contingency fund money to buy property damage insurance.

**Communications coordination.** The GDEM must create a communications coordination group to facilitate interagency coordination and provide communications support during a disaster. It must include representatives from local, state, and federal government, the state military, utility companies, and emergency services groups.

**Authority granted to state officials.** An emergency management director exercising a power granted to the governor by declaration of a state of disaster is prohibited from seizing or otherwise using state or federal resources without authorization from the governor or the state or federal agency responsible for the resources.

**Definition of a first responder.** HB 1831 revises the state's definition of a first responder to include public health, public safety, and emergency medical personnel, commissioned law enforcement personnel, paid and volunteer firefighters, members of the Texas State and National Guards, and related personnel that support disaster prevention, response, or recovery.

**Personnel compensation and reimbursement.** A state employee who is a firefighter, police officer, emergency medical technician, emergency management personnel, or other emergency services personnel, and

who is not an employee of the Legislature or subject to federal overtime compensation laws, is allowed to take compensatory time off within 18 months of when it was accrued. The employee may be paid overtime compensation at the regular hourly salary rate for all or part of the time accrued, with the compensatory time balance reduced proportionally.

**Disaster unemployment compensation.** The governor may waive the unemployment benefit waiting period for individuals who are unemployed as a direct result of a federally declared disaster but otherwise eligible for unemployment compensation and who are not receiving disaster unemployment benefits during that period.

**Judicial preparedness.** The Texas Supreme Court is allowed to temporarily modify or suspend procedures for the conduct of a court proceeding affected by a disaster. HB 1831 establishes a process by which other courts or individuals may act if the disaster prevents the Supreme Court from doing so.

**Electric utilities.** Each electric utility must submit an annual report to the Public Utility Commission (PUC) regarding the identification of areas susceptible to severe weather damage, vegetation management, the inspection of distribution poles, and a summary of the utility's emergency preparedness activities.

The PUC may require one electricity provider to sell electricity to another in order to meet customer demand in a disaster. If the PUC does not require a provider to sell electricity during a declared disaster, it must submit a report to the Legislature on why it did not. The PUC must complete a study by June 1, 2010, to determine areas of the state most likely to experience a natural disaster or other emergency, the ability of electricity providers in those areas to provide electricity during an emergency, and any steps needed to strengthen the reliability of electric service during a disaster or emergency.

**School safety and emergency operations planning.** Public junior college districts and general academic teaching institutions must join school districts in implementing multihazard emergency operations plans. Both school and public junior college districts must conduct a facility safety and security audit every three years. Each school district is required to establish a safety and security committee to develop and implement emergency plans and provide information for a safety and security audit.

The Texas School Safety Center must develop a model safety and security audit procedure for public junior college districts, establish a registry of individuals who provide school safety or security consulting services in the state, encourage school districts to enter mutual aid agreements for safety and security issues, and research best practices for public junior college emergency preparedness. The center must issue a biennial school safety and security report.

**University of Houston Hurricane Center for Innovative Technology.** HB 1831 establishes a Hurricane Center for Innovative Technology at the University of Houston to promote interdisciplinary research, education, and training on wind and structural damage mitigation and disaster recovery.

**Temporary insurance signage.** Licensed insurance agents may display temporary claims service signage that is not more than five feet tall and 40 square feet in total size in a county within or adjacent to a declared disaster area, regardless of a municipality's on-premise outdoor signage regulations. The signage may not be displayed in the right of way and must be removed after the earlier of 30 days or the end of the disaster declaration.

**2-1-1.** State-licensed nursing, convalescent, and assisted-living facilities must register with the 2-1-1 Texas Information and Referral Network, help the state identify people who would need assistance during an evacuation, and notify each resident's next of kin or guardian about how to register for evacuation assistance with the 2-1-1 service.

**Post-disaster evaluation.** The GDEM may request that an agency or political subdivision evaluate its response to a disaster and, within 90 days, submit a report identifying areas for improvement.

**Other issues.** HB 1831 includes circumstances of extreme heat in the definition of a disaster for the purposes of emergency management. The GDEM must create and publicize uniform guidelines for acceptable home repairs following disasters and report on the implementation of medical special needs plans during Hurricane Ike.

A person who holds a license, certificate, permit, or other documented evidence of qualification and who acts at the request of a state agency during an emergency is considered to be licensed, certified, permitted, or otherwise qualified to act in the city or county in which the service is provided.

Hospitals providing outpatient dialysis services due to a federal- or state-declared disaster are exempt from state end-stage renal disease facility licensing requirements.

Law enforcement vehicles leased by a federal government entity are considered authorized emergency vehicles. Private vehicles owned or leased by police officers and approved for law enforcement uses and vehicles used by peace officers that are owned or leased by certain other entities are considered police vehicles. A police officer's vehicle must bear a law enforcement agency's insignia regardless of whether the vehicle displays an emergency light.

When building or renovating certain government facilities, the state or local government entity owning the facility must evaluate whether a combined heating and power system would result in energy savings that exceed the cost of the system over a 20-year period and, if so, may equip the facility with such a system.

HB 1831 establishes a two-year public health extension service pilot program in a group of South Texas counties to support local health and medical infrastructure and promote disease control and medical preparedness.

Prepaid wireless telecommunications retailers must charge a 2 percent prepaid wireless 9-1-1 emergency services fee and remit the collected fees to the state comptroller.

## Supporters said

HB 1831 would help ensure that the state was better prepared for future disasters by updating poorly worded or outdated provisions of the state's emergency management statutes and providing a comprehensive approach to state emergency management. The bill would address many subjects where improvement was needed following Hurricane Ike and would help ensure a more effective distribution of resources among areas in critical need.

## Opponents said

This bill would duplicate current efforts in many areas. The GDEM already does a good job of coordinating among hospitals and housing entities, and the PUC already requires reporting by the utilities it oversees. There also are national guidelines for vegetation management by utilities, assessment of the susceptibility of utility infrastructure, and infrastructure improvement processes.

## Notes

The **HRO analysis** of HB 1831 appeared in the April 23 *Daily Floor Report.*

SB 12 by Carona, with many of the same provisions as HB 1831, passed the Senate, but died in the House.

HB 1861 by Eiland, continuing the operation of the judiciary during a disaster, was enacted and took effect June 19, 2009.

HB 4068 by Gonzales, continuing the operation of the judiciary during a declared disaster, was enacted, but vetoed by the governor.

*The following bills contained provisions that are included in HB 1831:*

HB 1695 by S. Turner, requiring electric utilities to create hurricane damage mitigation plans, passed the House, but died in the Senate.

SB 936 by Carona, establishing a communications coordination group for emergencies, passed the Senate, but died in the House.

SB 111 by Carona, allowing the governor to suspend the unemployment compensation waiting period during a federally declared disaster, passed the Senate, but died in the House.

HB 1948 by Rios Ybarra, establishing a public health extension service pilot program, died in the House.

SB 1587 by Van de Putte and HB 3359 by McClendon, requiring collection of a prepaid wireless 9-1-1 emergency services fee, each died in the House.

SB 2323 by Carona, requiring the establishment of school safety and security committees and requiring institutions of higher education to develop multihazard emergency operations plans, passed the Senate, but died in the House.

HB 708 by Rose, establishing the University of Houston Hurricane Center for Innovative Technology, passed the House, but died in the Senate.

# Procedures for operating property owners' associations

**HB 1976 by Solomons**
*Died in Senate*

Table
of Contents

**HB 1976**, as passed by the House, would have amended several sections of the Property Code, particularly Property Code, ch. 209 (Texas Residential Property Owners Protection Act) to:

- allow property owners to bring suit against a property owners' association (POA) for violation of any of its rules;
- change procedures on assessing fines and allow alternative payment schedules;
- require a hearing before a judge before any POA foreclosure of a property owner's homestead;
- require public notice of POA board meetings and require that the sessions be open to all property owners;
- grant a right of all property owners to have access to POA records, including restrictions, bylaws, rules, and regulations, and to obtain a resale certificate;
- change voting procedures and requirements;
- impose deadlines on POAs to respond to record inspection requests by property owners;
- require a detailed list for closings of fees associated with transfer of ownership of the property, including a requirement that a fee for a resale certificate could not be required until the certificate was available for delivery;
- limit a POA's ability to enter onto a homeowner's property to inspect or remedy an alleged violation of deed restrictions; and
- void various restrictions on parking personal vehicles, solar energy devices, and ownership of multiple properties within the association.

**Legal action against property owners' associations.** HB 1976 would have allowed a property owner to bring a lawsuit alleging that a POA had violated, was violating, or was threatening to violate Property Code provisions on operations of POAs. The property owner in the association would have been allowed to seek:

- injunctive relief;
- the greater amount of either actual damages or $1,500; or
- both injunctive relief and damages.

HB 1976 would have set limits on legal action by prohibiting any lawsuit against a POA officer or board member individually and would have allowed a court to award damages to a POA of the greater of three times actual damages or $4,500 for actions the court had determined to be frivolous or groundless.

**Assessing fines and alternative payment schedules.** HB 1976 would have required changes in the process for notification of alleged violations and would have required a reasonable period of at least 30 days to cure any violation. A POA could have filed a lawsuit in a justice of the peace or small claims court if the POA and a property owner failed to resolve a dispute. If the POA had not filed suit by a 180-day deadline, its claim to collect the fine would have been considered to be waived.

Other provisions would have required that a fine be reasonable in relation to the nature and frequency of a violation and that the POA establish a reasonable maximum fine for a continuing violation. A POA could have assessed a fine against a non-owner occupant of a property, but it could not have assessed a fine against both the owner and non-owner occupant. The bill also would have allowed mixed-use master associations that existed before January 1, 1974, that lacked authority to assess fines to seek civil damages in courts for up to $200 per day of a violation.

HB 1976 also would have:

- allowed for a payment plan to pay special assessments or other charges;
- created a priority for payments received by a POA that would have prevented diversion of assessment payments to satisfy outstanding fines and penalties; and
- established a 10-year statute of limitations for a POA to file suit or otherwise begin collection actions authorized by the dedicatory instrument or other law.

HB 1976 also would have allowed a court to order payment of attorneys' fees to the prevailing party in a lawsuit alleging a breach of a restrictive covenant or a statute pertaining to those restrictive covenants.

**Judicial review.** A POA would have had to obtain a court order under an expedited foreclosure process before foreclosing on a lien against a property owner, unless the property owner waived the expedited foreclosure process. The Texas Supreme Court would have been required to adopt the rules of civil procedure for the expedited foreclosure procedure by January 1, 2010.

**Open meetings and open records requirements.** HB 1976 would have defined what constituted "board meetings," provided requirements on notice and the ability of property owners to attend the sessions, and provided exemptions to open meetings requirements. The bill also would have required access to a POA's books and records, including financial records and invoices. The bill would have required a POA to respond to open record requests within 10 days and would have allowed civil penalties of up to $1,500 and court costs and attorneys' fees for denial of access to POA records.

**Voting requirements.** HB 1976 would have required a POA to provide notice of at least 30 days of any election or vote held by it. A POA would have had to contract with a third party such as a county judge, county elections administrator, justice of the peace, or county voter registrar to count votes, if a petition signed by 10 percent of the voting interests in a POA was submitted at least 15 days before the date voting began. Other provisions would have governed recount requests and procedures.

The bill would have required that any vote cast would have had to be in writing and signed. Other provisions would have prohibited any dedicatory instruments that disqualified a property owner from voting and would have prohibited proxy voting. The bill would have added provisions for the removal of a board member upon conviction of certain crimes and would have allowed an owner to cast a vote at a meeting in person, by absentee ballot, or by electronic ballot.

The bill would have allowed for removal of a provision in a dedicatory document granting the right to foreclose on a lien by a vote of 51 percent of the votes allocated to property owners. A positive vote of 67 percent would have been required to make capital improvements.

**Resale certificates.** HB 1976 would have required a seller of a property in a POA to deliver promptly a current resale certificate to a purchaser upon demand.

The POA could not have processed payment for a resale certificate until it was available for delivery.

## Supporters said

HB 1976 represents a balanced compromise that would provide transparency and accountability for the operations of POAs without affecting unduly their ability to perform the managerial functions needed to protect the property values of their members. Increasing numbers of Texans live in POA neighborhoods. Many of these entities are larger than small- and medium-sized municipalities and have the power to foreclose on residential homestead property. However, the state lacks the level of oversight for POAs that it has over general law cities. The bill would culminate debate that has lasted for eight legislative sessions and would provide comprehensive reform.

**Legal actions against property owners associations.** HB 1976 would provide another level of accountability for POAs by allowing lawsuits by property owners should an association violate the deed restrictions or ignore the provisions of state law, including the other consumer protection provisions that would be added by the bill. The property owner would be able to seek legal redress in a justice of the peace court, which would not necessarily require hiring an attorney, and could collect monetary penalties from the association.

**Assessing fines and alternative payment schedules.** HB 1976 would provide a fair compromise and resolution of the concerns that POAs might act too quickly to foreclose to collect on liens for relatively small amounts. The extension of the statute of limitations to 10 years would allow POAs, particularly those with healthy cash flows, to be patient in collecting delinquent assessments and fines and to wait to receive the money if the house in question was sold.

HB 1976 would provide protection for homeowners by defining a priority of payment to ensure that money paid for dues would be credited properly. Current law prohibits POAs from foreclosing on a home for failure to pay fines or attorneys' fees, but many associations will redirect a homeowner's association dues to pay other outstanding fees and fines, leaving their dues in arrears. The use of this kind of bookkeeping trick allows POAs to foreclose on homeowners who have made good-faith efforts to stay current with their obligations.

**Judicial review of foreclosures.** HB 1976 would address a major complaint — that POAs possess the ability to foreclose without a judicial process. The bill would require all such actions to be decided through the court system, where due process protections are afforded to both the property owner and the POA.

**Open meetings, open records, and voting requirements.** HB 1976 would help end the situation where the unique design of property owners' associations have made some associations, but not others, subject to provisions in Texas law that allow property owner access to open records, open meetings, and association election voting. Operational transparency is a necessary part of federal, state, and local government, and no POA should be exempted from it. While some POAs currently are structured in such a way as to make their records and meetings available to all members, other associations structure themselves in a way that intentionally avoids this transparency. These differences should be eliminated.

**Resale certificates.** HB 1976 would help ensure prompt delivery of a resale certificate, as a POA only could collect payment on delivery.

## Opponents said

HB 1976 would not address the fundamental flaw of POAs — the concept of a private government. Without the checks and balances of a true government and without a separation of powers, POAs enable unregulated third party vendors, such as management companies and attorneys, to profit by asserting violations and collecting fines in a private judicial system.

**Legal actions against property owners associations.** Requiring a 30-day notice prior to filing suit potentially could raise the legal fees charged by a POA to review and respond to a possible legal action. A POA should not be allowed to impose its attorneys' fees upon the homeowner, but should bear the cost of its own attorneys' fees, as do the homeowners. Also, in the event that the property management company complied with the request without the lawsuit, there should be some provision for payment of the homeowner for the cost of providing notice and other incidental expenses.

The bill should allow for recovery against the members of the POA's board or officers of the management company if they failed to perform

their fiduciary duties. These entities should be held accountable and not exempted from all culpability if they failed to perform their duties.

**Assessing fines and alternative payment schedules.** Enactment of HB 1976 explicitly would delegate fining authority to private organizations and would legitimize a source of much abuse by POAs. Texas should follow the example of Rhode Island and Virginia, which have declared fines by POAs unconstitutional.

Not only would HB 1976 make the statute of limitations for purported POA debt longer than the statute of limitations for any other type of debt, but it also would make it the equivalent of some criminal offenses as well. Additionally, this provision would require homeowners to maintain payment records for at least 10 years, which is longer than what is required by the IRS and longer than the period HB 1976 would require a POA to keep its financial records.

**Judicial review of foreclosures.** HB 1976 would provide some safeguards, but it would not address the basic flaw of allowing a private entity to foreclose on residential homesteads. If the objective is to mandate payment of assessments, there are alternatives that would be less expensive and would not require a homeowner to forfeit an asset worth hundreds of thousands of dollars for an original debt of only a few hundred dollars.

**Open meetings, open records, and voting requirements.** Compliance with open meetings and open records standards could be costly and burdensome for POAs, especially those run by volunteers rather than by management companies. Even a smaller association holds dozens of committee meetings each month, and it would be unwieldy to provide notice and keep records for all these meetings. Complying with the requirements on open meetings and open records could expose board members to possible criminal and civil penalties. All associations would be forced to retain attorneys at meetings to help comply with the standards, and those costs would have to be absorbed by property owners through assessments.

**Resale certificates.** The Legislature should mandate a strict deadline on producing resale certificates. Delays in providing these documents could cause problems in closing real estate sales. Most of the information would be readily available. The Legislature should establish a clearer dollar limit for providing these documents

other than just a "reasonable fee." The bill also should expressly prohibit POAs from charging "transfer fees" based on percentage of the sales price.

## Notes

HB 1976 passed the House on May 15 and was reported favorably, as substituted, by the Senate Intergovernmental Relations Committee on May 23, but no further action was taken.

The **HRO analysis** of HB 1976 appeared in Part Five of the May 9 *Daily Floor Report*. The **HRO analysis** of HJR 76 by Solomons, a constitutional amendment that would have allowed POAs to assess liens, and HB 1977 by Solomons, the enabling legislation, appeared in Part One and Part Four, respectively, of the May 11 *Daily Floor Report*.

# Employees Retirement System benefit and retirement eligibility

**HB 2559 by Truitt**
*Effective September 1, 2009*

Table
of Contents

**HB 2559** makes various revisions to the Employees Retirement System (ERS), including increasing the contribution rate for state employees, establishing different retirement procedures and benefit calculations for non-members of ERS hired on or after September 1, 2009, and restricting those employees who retire and subsequently return to state employment.

**Higher employee contribution.** The bill increases the member contribution rate to a maximum of 6.5 percent of compensation if the member is not a member of the Legislature, an increase from 6 percent. If the state contribution rate is less than 6.5 percent, the member contribution rate will match that of the state's, but the state's rate may not be less than 6 percent. An additional 0.5 percent will be deducted from a law enforcement or custodial officer's payroll for deposit in a supplemental retirement fund, with a lower percentage deducted if the state's contribution rate is lower.

**New employee retirement and benefit limitations.** HB 2559 establishes different retirement procedures and benefit calculations for persons who are not ERS members when they are hired by the state on or after September 1, 2009. These new employees may use sick and annual leave credits only for the calculation of the member's or beneficiary's annuity, not to satisfy service requirements for retirement, which is restricted to individuals who were ERS members on or before August 31, 2009. The same restriction will be applied to death benefit beneficiaries, who may use the deceased member's sick leave credit to qualify for making a death benefit plan selection.

New employees also will have different retirement eligibility criteria than those who were members before September 1, 2009. Those employees will be eligible to retire when the member is at least 65 years old (instead of 60) and has at least 10 years (instead of five) of service credit in the employee class or meets the current rule of 80 (service credit plus age equals 80 or more).

New employees will have a different computation for their standard service retirement annuity than current employees. Those employees' annuities will be calculated using the member's average monthly compensation for service in that class for the 48 highest months of compensation (rather than the highest 36

months). The annuity will be reduced by 5 percent for each year the member retires before reaching age 60, with a maximum possible reduction of 25 percent.

A law enforcement or custodial officer hired on or after September 1, 2009, who has at least 20 years of service credit will be eligible to retire and receive a retirement annuity in an amount computed using the member's average monthly compensation for the 48 highest months of compensation. The annuity will be based on retirement at either the age of 55 or the rule of 80. The annuity of a law enforcement or custodial officer who retires before reaching age 55 will be reduced by 5 percent for each year the member retires before the member reaches age 55, with a maximum possible reduction of 25 percent. The annuity payable for at least 20 years of service credit as a law enforcement or custodial officer may not exceed 100 percent of the average compensation. Law enforcement and custodial officers retiring before the age of 60 will no longer have their retirement annuity recalculated when they reach the age 60.

**Return to work after retirement limitations.** An ERS member who retires on or after May 31, 2009, may not return to work for the state before a 90-day waiting period. For an ERS retiree who retires on or after September 1, 2009, and is rehired by the state, the hiring entity must pay into ERS the state contribution that the entity would pay for an ERS active member.

**Other provisions.** After four years, unclaimed death beneficiary benefits will be deposited in the state accumulation account for ERS. Unclaimed contributions made by former members of ERS will be deposited into the system fund if the retirement system has not received a request for a refund before the seventh anniversary of the member's last day of service and if the member or the member's heirs cannot be found.

The bill adds the option that after a retiree's death, three-fourths of the reduced annuity is payable throughout the lifetime of the beneficiary. At the time a service or death benefit becomes payable, the retirement system will refund any contributions, interest, or membership fees used to establish service credit that is not used in the computation of the annuity.

A member otherwise eligible to receive a disability retirement annuity may not receive the annuity if the member is still earning a salary or wage from the employment for which the member is claiming disability or is on leave from that employment. A member is incapacitated for the further performance of duty if the member has demonstrably sought and been denied workplace accommodation of the disability and is physically or mentally unable to hold the position occupied or another position offering comparable pay.

In awarding contracts to private professional investment managers or otherwise acquiring private financial services, the ERS board of trustees must make a good faith effort to award contracts to or acquire services from qualified emerging fund managers. Emerging fund manager means a private professional investment manager that manages assets of not more than $2 billion. ERS will report the methods and results of the system's efforts to hire emerging fund managers, including data disaggregated by race, ethnicity, gender, and fund size.

For members of the Judicial Retirement System Plan II, the bill repeals the cap on maximum retirement benefits of 80 percent of salary, allowing a maximum benefit of 90 percent.

HB 2559 also allows surviving spouses and dependents to enroll in group health plans upon the death of a member, clarifies ERS subpoena power, mandates all court proceedings involving ERS to take place in Travis County, and places a two-year statute of limitations on any claims against ERS or a trustee, officer, or employee of the system. The bill exempts ERS records from public disclosure, except to a survivor or survivor designee, and indemnifies ERS against any unauthorized access to information after its release to the a survivor or survivor designee. Counterclaims cannot be filed against ERS related to any interpleader action taken by the system.

## Supporters said

HB 2559 would help put the ERS retirement fund back on track toward actuarial soundness. The change in the contribution rate along with some benefit adjustments for new hires would address a persistent gap between the combined contributions and the annual cost of the benefits being paid. Similar changes were made in 2005 to the Teacher Retirement System of Texas that improved the fiscal condition of the fund, enabling it to pay a 13th check to retirees last year.

While the bill would change the benefits for future employees, these changes would protect the benefits of current members and retirees. Without such changes, the actuarial condition of the ERS fund would continue to deteriorate, and there would be little chance that current or future retirees ever would be able to receive any type of post-retirement benefit enhancement.

The employee contribution rate for ERS would be tied to the state contribution rate. Employees currently contribute 6 percent, and the state has been contributing 6.45 percent since 2005. Employees would contribute more than 6 percent only if the state contributed at a higher rate, up to 6.5 percent.

The bill also would address a number of ERS issues within the Government and Insurance codes to promote delivery of high-quality benefits at the lowest practical cost and would clean up redundant or outdated law.

## Opponents said

HB 2559 would amount to a pay cut for employees since employee contributions would increase and most employees do not receive pay raises in the fiscal 2010-11 budget. The state has long contributed too little to ERS while asking more of employees. Reduced state ERS contributions in the 1990s largely are responsible for the fund's current state. The burden of taking steps to improve the fund's actuarial soundness has been borne disproportionately by state employees and retirees.

It is not good policy to make ERS a two-tiered retirement system, with newer employees receiving lower benefits and being penalized for retiring before age 60. State government jobs do not pay private sector wages, but the pension system and health care benefits provide offsetting incentives to work for the state. Reducing the quality and changing eligibility standards for benefits would compromise the incentive, which could reduce the number and quality of people seeking state employment.

## Notes

The **HRO analysis** of HB 2559 appeared in Part One of the May 8 *Daily Floor Report*. The provisions concerning employee contributions, return to work restrictions, and differing retirement procedures and benefit calculations for newer employees were added when the House concurred with Senate amendments.

# Revising purposes for which property may be taken

**HJR 14 by Corte**
*On November 3, 2009, ballot*

Table
of Contents

**HJR 14**, if approved by the voters, would amend Texas Constitution, Art. 1, sec. 17 to restrict the taking of property to instances in which the taking, damage, or destruction was primarily for ownership, use, and enjoyment by the state or the public at large or by an entity given the authority of eminent domain under the law. Authorized uses of eminent domain would include the elimination of urban blight on a particular parcel. Public use would not include the taking of property for transfer to a private entity for the primary purpose of economic development or enhancement of tax revenues.

On or after January 1, 2010, the Legislature could enact a general, local, or special law granting the power of eminent domain to an entity only by a two-thirds vote of all the members elected to each house.

## Supporters said

HJR 14 would add key protections against abuses of the power of eminent domain by defining in the Constitution the legitimate purposes for which property may be taken. Current language in the Constitution governing eminent domain is very broad, stating that no person's property should be taken for a public use without adequate compensation. The existing language does not specify what constitutes a legitimate "public use."

In enacting SB 7 in 2005, the Legislature took an important step in reforming eminent domain law and practices in the state by prohibiting the taking of private property primarily for economic development purposes or to confer a private benefit on a private entity. SB 7 was enacted in response to the U.S. Supreme Court's 2005 decision in *Kelo v. City of New London*, 545 U.S. 469, which broadly allowed use of eminent domain for economic development purposes, but also permitted states to restrict that authority. However, SB 7 left open a number of issues, including establishing a new constitutional framework to restrict the use of eminent domain to clearly public purposes.

A constitutional amendment would have both practical and symbolic value in protecting private property — practical value in placing clear restrictions on the use of eminent domain and symbolic value in

sending a strong message from the Legislature and voters that eminent domain must be used for very limited purposes only when absolutely necessary. A further restriction would require the Legislature to approve any new grant of eminent domain authority by a two-thirds vote of the membership of each chamber.

The requirement that any taking of private property be solely for "ownership, use, and enjoyment" of the state or local government or the public as a whole would convey a common concept found in federal and other laws. The language would require a condemning authority to keep the property in its ownership, occupy the property, and use the property for some productive purpose. It would prohibit a public entity from taking property and then, in effect, transferring the rights to that property to a private entity by allowing it to own, occupy, and profit from the property. Further, it would prohibit acquiring property through eminent domain with no clear plans to put the property to a pressing use.

No private property should be taken without a compelling reason and plan for its use. HJR 14 would place this intent in the Constitution in general terms that would prevent many abuses, but would not affect legitimate takings. According to the Legislative Budget Board, this constitutional change would not have a significant fiscal impact on the state or on local governments. HJR 14 also would apply to the wide range of parties authorized by law to exercise eminent domain authority and subject them to the same requirements as public entities. Secondary uses of taken property, such as leasing space in an airport or hospital, would be allowed.

HJR 14 would protect property owners from such misuses of eminent domain authority as taking a property on the ground that it is blighted, then transferring the property to another private interest in the name of economic redevelopment. The amendment would resolve a problem with eminent domain power not addressed by existing law, which allows municipalities to condemn and clear whole neighborhoods at a time as long as 50 percent of the affected properties are determined to be blighted. This allows municipalities to take the properties of honest, hardworking residents and business people merely due

to hazards that may exist in part of their neighborhood, which subverts individual property rights for an ill-defined notion of a common good.

Under HJR 14, property owners no longer would be subjected to condemnation due to overall neighborhood conditions because each parcel would have to be reviewed independently and determined to be blighted. Protecting property rights of established owners who have been able to maintain their properties in distressed areas would allow those owners actively to partake in the revitalization of their own communities.

## Opponents said

HJR 14 could have unintended consequences by introducing language into the Constitution that courts ruling on eminent domain cases could interpret in varying ways. The proposed constitutional amendment could create a grey area around the legitimate uses of eminent domain and be an invitation for future litigation that would be costly for the state and local governments. If a court found that the new language prohibited certain uses of eminent domain that previously had been considered legitimate, the new interpretation would be difficult to change. For instance, the amendment would not apply to "incidental uses" nor allow the "transfer" of property to a private entity for the "primary purpose of economic development." The lack of definition for these key terms would allow courts to assume a significant role in determining how the amendment would apply in practice.

The Constitution is not the proper forum for testing new legal terms and provisions concerning eminent domain that may have uncertain implications. If the courts interpret these constitutional changes in an unforeseen manner, they would be very difficult to change or clarify. It would be more appropriate to test these new laws in statutory form first before locking them into the Constitution.

HJR 14 would erode a municipality's ability to designate a blighted area and use its eminent domain authority to promote urban renewal, which is important for long-term urban vitality. Municipal governments use their power of eminent domain to clear blighted areas for urban renewal as an absolute last resort. Such actions require expensive and long-term relocations, court proceedings, demolitions, and planning efforts. Municipalities seldom try to use their eminent domain authority under the blight provisions unless they are left with no other options to correct rampant health and safety concerns that affect the quality of life of everyone living in the neighborhood.

Under HJR 14, municipalities would have to make a blight determination on each property individually. Blighted areas often are poorly platted and un-surveyed and contain unconventionally shaped lots that lack proper documentation. Property owners in blighted areas can be difficult to locate, and no allowance would be made for owners who had vacated, abandoned, or otherwise neglected property for long periods. This would limit a municipality's ability to address structural safety hazards, inadequate infrastructure, and limited commercial opportunities. Removing an important and longstanding tool available to cities would diminish their ability to improve the quality of life of residents who need the most assistance.

## Other opponents said

HJR 14 could increase the number of entities that could be granted authority to use eminent domain, contrary to the general intent of the amendment to limit use of this authority. A provision that would allow the Legislature to enact a law granting the power of eminent domain to an "entity" by a two-thirds vote of each house could provide the necessary legal basis for expanding the types of entities given this power. The amendment does not specify the types of "entities" that could be granted eminent domain authority, which could range from local governments to private corporations or utilities. This broad language could allow a wide range of entities to seek the power of eminent domain from the Legislature. The two-thirds vote requirement is not sufficient to prevent future misuse of any expanded eminent domain power.

## Notes

HJR 14 was amended late in the regular session to add another proposed constitutional amendment that would convert the corpus of the permanent Higher Education Fund into a new National Research University Fund. That provision is discussed under HB 51 by Branch starting on page 158.

The **HRO analysis** of HJR 14 appeared in Part One of the May 11 *Daily Floor Report*.

# Allowing the Legislature to override a veto after sine die adjournment

**HJR 29 by Elkins**
*Died in Senate*

Table
of Contents

**HJR 29** would have amended the Texas Constitution to require the lieutenant governor and the speaker of the House to convene the Legislature after the 20-day post-session deadline for the governor to file veto proclamations if a majority of either house requested a session to reconsider vetoed bills. The requests would have had to have been filed by House members with the chief clerk or by senators with the secretary of the Senate within five days of the governor's deadline for vetoes. The period for reconsidering vetoed bills would have begun at 10 a.m. on the second Tuesday after the veto deadline and could not have lasted more than three days. Unless the Legislature had been called into special session by the governor, it could not have considered any subject except vetoes of bills or appropriations line items that the governor had returned within three days before or any time after sine die adjournment of a session.

## Supporters said

HJR 29 would give the Legislature an opportunity to decide whether it should exercise its authority under the Constitution to reconsider legislation vetoed by the governor following *sine die* adjournment of the session in which the legislation was enacted. It would provide a usable trigger mechanism for deciding whether members want to return to Austin to try to override a veto. Rather than require a meeting of the Legislature on the Tuesday after the veto deadline, the proposal would allow a majority of members of either chamber to request the session. Currently, the Texas Constitution requires the governor to sign or forward a veto with objections to the house that originated the bill within 10 days while the Legislature is in session. For bills sent to the governor during the final 10 days, not counting Sundays, the governor has 20 days after adjournment to veto a bill or a line appropriation in the appropriations bill, leaving the Legislature with no opportunity to override the veto.

Texas is one of 17 states that allow only the governor to call a special session, while the remaining 33 states permit either the governor or the legislature to call a special or extraordinary session, which may include review of vetoed items. As such, the governor

can kill measures approved by both chambers secure in the knowledge that the Legislature is powerless to challenge this decision. Providing this option to the Legislature would restore the authority to enact laws to the people's representatives, where it belongs, and would reinforce constitutional checks and balances. It makes little sense for the Legislature to have the authority to override vetoes if it rarely has the opportunity to exercise that authority.

Rather than addressing contemporary debates between the governor and the Legislature, the proposed constitutional amendment would deal with general issues of accountability and balance of power. Existing constitutional requirements would remain unchanged, and overriding a veto still would be extremely difficult. The governor would retain the power to veto legislation, and the vote necessary to override a veto would remain a two-thirds majority in both chambers. The call for the brief session would be limited to overriding vetoes, unless the governor also had called a special session.

The Legislature must consider a large volume of complex legislation each session, and it often is difficult to reach agreement until the very end of the session. As a result, much of the legislation is enacted so late in the session that the governor can wait nearly three weeks after the session ends before deciding to veto legislation, too late for the Legislature to attempt to override the veto. HJR 29 effectively would give lawmakers additional time to complete that challenging task. Just as legislators could reach compromises and build alliances to override vetoes, the governor also would have the opportunity to convince legislators not to override a veto. Bills that survive the winnowing of the legislative process — only to be vetoed — should not have to wait until the next regular session for consideration. The same members who passed the original legislation should have the opportunity to address the veto.

## Opponents said

HJR 29 would weaken further the Office of the Governor of Texas, who constitutionally has limited authority. The ability to veto legislation after *sine die* adjournment and call special sessions are among the few

strong powers of the office. Quarrels between legislators and governors can be resolved without amending the Constitution.

The Legislature could recapture its ability to respond to vetoes if it did not send almost all bills to the governor in the final 10 days of the session. The 81st Legislature sent 1,176 of 1,457 bills (80.7 percent) to the governor in the final 10 days (excluding Sundays) of the 2009 regular session. It sent 335 bills on June 3 alone, two days after *sine die*, compared with 281 forwarded to the governor during the session before May 20. If the Legislature believes that a bill may be vetoed and a sufficient majority wants the opportunity to override, then it should enact the bill early enough in the session to allow that vote to be taken.

## Notes

HJR 29 was approved by the House by 131-16 on April 1 and was reported favorably, as substituted, by the Senate State Affairs Committee on May 14, but the Senate took no further action.

The **HRO analysis** of HJR 29 appeared in the April 1 *Daily Floor Report*.

# Extending and revising state agency Sunset dates

**SB 2 by Hegar, First Called Session**
*Effective July 10, 2009*

Table
of Contents

**SB 2** extends until 2011 the following five agencies, which were set to be abolished in 2009: the Texas Department of Transportation (TxDOT); the Texas Department of Insurance (TDI); the Office of Public Insurance Counsel (OPIC); the Texas State Affordable Housing Corporation (TSAHC); and the Texas Racing Commission (TRC). The bill also extends from 2009 to 2011 the Equine Research Account Advisory Committee, which was reviewed as part of the Racing Commission. SB 2 limits the Sunset review of these agencies to the appropriateness of recommendations made by the Sunset Advisory Commission to the 81st Legislature.

SB 2 also revises the Sunset review schedule by changing the abolition date for several agencies.

**Agencies and reviews moved to 2011.** SB 2 moves forward from 2013 to 2011 the Sunset dates for following agencies:

- Texas Commission on Environmental Quality;
- Texas Water Development Board;
- State Soil and Water Conservation Board;
- Railroad Commission;
- Coastal Coordination Council;
- On-site Wastewater Treatment Research Council;
- State Board of Examiners for Speech-Language Pathology and Audiology; and
- State Committee of Examiners in the Fitting and Dispensing of Hearing Instruments.

The Texas Forest Service was placed under the Sunset Act and given a Sunset date of September 1, 2011.

SB 2 requires the Sunset Advisory Commission to conduct a special purpose review of the Electric Reliability Council of Texas (ERCOT) as part of its review of the Public Utility Commission (PUC) for the 82nd Legislature.

**Agencies and reviews moved to 2013.** SB 2 extends the Sunset date for the Texas Education Agency from 2012 to 2013.

The bill moves the Sunset dates for the following agencies from 2011 to 2013:

- Health and Human Services Commission;
- Texas Health Services Authority;
- Department of State Health Services;
- Department of Family and Protective Services;
- Texas Council for Developmental Disabilities;
- Governor's Committee on People with Disabilities;
- Department of Assistive and Rehabilitative Services;
- Department of Aging and Disability Services;
- Texas Board of Criminal Justice and Texas Department of Criminal Justice;
- Texas Lottery Commission;
- Office of Firefighters' Pension Commissioner; and
- Texas Emancipation Juneteenth Cultural and Historical Commission.

The bill moves the review date for the Texas Council on Purchasing from People with Disabilities from 2015 to 2013.

The Sunset Advisory Commission's scheduled evaluation of the tax division of the State Office of Administrative Hearings and of the transfer of state purchasing powers and duties to the comptroller was changed so that the commission will report on the two entities to the 83rd Legislature instead of the 82nd Legislature. A scheduled transfer of the purchasing powers and duties from the comptroller to the Texas Facilities Commission was moved from 2011 to 2013.

## Supporters said

SB 2 would continue the five state agencies and one advisory committee that otherwise would have to begin winding down their operations on September 1, 2009. During the regular session, the bills reauthorizing these agencies were not enacted, and other attempts to extend the life of these agencies in other pieces of legislation also were unsuccessful, even though there was no intention to kill the agencies.

SB 2 would address this problem by continuing these vital agencies, but only for two years. SB 2 would ensure, by requiring only a limited-scope review of these agencies, that resources were not wasted nor efforts duplicated. It would be best for the Legislature to wait until 2011 to vet fully the agencies, rather than to try to consider full-fledged Sunset bills in a special session in which the call was limited to extending the agencies' existence and did not include consideration of Sunset bills themselves.

A two-year extension for the Texas State Affordable Housing Corporation would be in line with the Sunset Advisory Commission's recommendation that it be continued for a two-year probationary period and then re-evaluated in conjunction with the Sunset review of the Texas Department of Housing and Community Affairs in 2011.

Each session, the Legislature traditionally alters the Sunset review schedule to bring similar agencies under review at the same time, to address special problems or concerns, or to adjust the Sunset Advisory Commission's workload. SB 2 also would make these kinds of adjustments.

## Opponents said

Rather than just extending the current statutes for TxDOT, TDI, OPIC, TSAHC, and TRC for two years, the Legislature should consider individual Sunset bills for these agencies. Putting off revisions to these agencies would mean they will operate for another two years without the meaningful reform that some of them need.

For example, during the regular session, at least one agency that would be extended by SB 2, the Texas State Affordable Housing Corporation, was being considered seriously for elimination. SB 2 would give TSAHC another two years to operate when it might be best to reform or abolish it now.

## Notes

SB 2 was considered by the House in lieu of its companion bill, HB 2 by Isett. The **HRO analysis** of HB 2 appeared in the July 2 *Daily Floor Report*.

During the regular session, the 81st Legislature considered, but did not adopt, a bill similar to HB 2. The conference committee report on HB 1959 by Isett would have extended the 2009 Sunset date for TxDOT to 2013, and the 2009 Sunset dates for TDI, OPIC, TSAHC, and TRC to 2011. HB 1959 died when the House did not vote on the conference committee report, which had been approved by the Senate. The conference committee report on HB 1959 also would have revised the Sunset review schedule by changing the abolition date for several agencies.

HCR 291 by Pitts, a concurrent resolution making corrections to HB 4583 by Pitts, which eliminated certain dedicated funds, would have extended from 2009 to 2011 the Sunset dates for TxDOT, TDI, OPIC, TSAHC, and TRC. HCR 291 was adopted by the House on June 1, the final day of the regular session, but died when the Senate did not act on the concurrent resolution.

# Standards for use of eminent domain authority

**SB 18 by Estes**
*Died in the House*

Table
of Contents

**SB 18** would have modified processes and requirements governing eminent domain, standards of evidence considered by special commissioners in making decisions on damages, obligations of condemning entities, and the rights of previous owners to repurchase taken property.

The bill would have prohibited a government or private entity from taking land that was not for a public use. It would have prohibited a taking for economic development, unless it resulted in community development activities to eliminate blighted areas. A governmental entity would have had to authorize the initiation of condemnation proceedings at a public meeting by a record vote. The bill also would have established procedures for voting on specific properties and groups of properties.

**Bona fide offer.** An entity with eminent domain authority that wished to acquire real property for a public use would have had to make a bona fide offer to acquire the property from the owner voluntarily. An entity with eminent domain authority would have made a bona fide offer if it conformed with specific requirements in the bill. If a court had determined that a condemning authority had not made a bona fide offer, the court would have had to order the condemning entity to pay costs authorized in law and reasonable attorney's fees incurred by the property owner directly related to the failure to make a bona fide offer.

**Right of repurchase.** An owner of property acquired through eminent domain could have repurchased the property if the public use for which the property had been acquired was canceled before the property was used for that purpose, if no "actual progress" had been made toward the public use by 10 years after the taking, or if the property had become unnecessary for the public use for which it had been acquired. "Actual progress" would have been defined as meeting two or more of several conditions specified in the bill. Suits over the right of repurchase could have been settled in a district court. The repurchase price would have been the lower of the price paid to the owner by the entity at the time the entity acquired the property or the fair market value of the property at the time the public use was canceled.

**Assessments and damages.** In assessing damages to a property owner from condemnation, special commissioners would have had to admit evidence on whether the condemnation required relocation of a homestead or farm to another property that allowed the property owner, without incurring debt higher than the owner was subject to before the condemnation, to have a comparable standard of living or, if the land included a farm, to operate a comparable farm.

Special commissioners, in assessing actual damages to a property owner from a condemnation, would have had to take into account a material impairment of direct access on or off the remaining property that affected its market value but could not have considered the directness of travel or diversion of traffic in common with the general community. Determinations of fair value of the state's interest in access to a highway right-of-way would have been the same as standards used by the Texas Transportation Commission in acquiring access rights under provisions on the acquisition of property and in payment of damages for impairment of access. Special commissioners hearing an eminent domain case could not have set a hearing to assess damages until 20 days after they had been appointed.

**Slum and blight revisions.** SB 18 would have stricken references to "slums" from Local Government Code, chs. 373 and 374. For an area to be considered blighted, properties would have had to meet four of the conditions listed in the bill for at least one year after the date on which a municipality provided initial notice to the owner.

A municipality could not have exercised powers granted under the Texas Urban Renewal Law unless its governing body had determined that each unit of property in an area met the definition of blight and the municipality provided a statement to this end as necessary. Before designating a blighted area, a municipality would have had to give written notice to the property owner at the property owner's last known address, as well as the property's address, and would have had to post notice on the property if the owner's address were unavailable. A property could have been designated as blighted only if the owner had taken no reasonable measures to remedy the conditions and if the determination had not been solely for aesthetic reasons.

A blight designation would have been valid for two years and would have had to be re-designated at the end of that period. Contiguous properties owned by the same person could have been jointly designated. The bill also would have repealed sections authorizing a municipality to acquire and clear all buildings, structures, and other improvements for redevelopment and reuse in accordance with its urban renewal plan.

## Supporters said

SB 18 would make critical revisions to existing statutes regulating eminent domain to ensure that individual property rights were appropriately balanced against legitimate public needs. The bill would add fairness to state statutes governing the right of repurchase, restrict use of eminent domain on the basis of slum and blight conditions, and expand the range of damages that could be considered in eminent domain proceedings to ensure just compensation to property owners subject to condemnation.

**Right of repurchase.** SB 18 would provide for the repurchase of condemned property for the price paid by the acquiring entity. Permitting the repurchase price to be set at the original sale value, and not the current fair market value as now required in the Property Code, would enable property owners to reclaim equity for appreciating property to which they were entitled. The bill would not confer any special advantage on an individual because it would permit only the redress of a taking that was not justly executed.

The bill would create a strong disincentive against the speculative exercise of eminent domain authority, including by schools, municipal and county governments, state agencies, pipelines, and utilities. Condemning authorities would be strongly discouraged from acquiring land through eminent domain for which there were no immediate plans.

**Slum and blight provisions.** SB 18 would address a vulnerability created by eminent domain power that was left unaddressed by SB 7, the eminent domain reform bill enacted in 2005 — exceptions for areas designated as blighted or as slums. Existing statutory definitions of slum and blight are vague at best, leaving it to the judgment of municipal officials to decipher what constitutes hazardous conditions, greater welfare, and social and economic liabilities. The current statutory definition of blight would allow a taking in cases where a property's defect was minor, such as deteriorating

improvements, or was not caused by the property owner, such as inadequate infrastructure. A lack of safeguards for property owners in potentially blighted areas has given rise to a number of abusive and reckless eminent domain practices.

SB 18 would balance legitimate municipal interests in using eminent domain to mitigate public safety hazards with the rights of property owners who live in areas with characteristics of blight. The bill would not prohibit a municipality from declaring a blighted area, exercising the power of eminent domain on properties within it, or taking other steps to adopt and support an urban renewal plan. Protecting property rights of established owners who have been able to maintain their properties in distressed areas would allow those owners to actively partake in the revitalization of their own communities.

**Damages and assessments.** The bill would include relocation costs sufficient to return a property owner to a standard of living or operation comparable to what the owner had before condemnation and would allow for consideration of a material impairment of direct access to a property. Expanding the range of plausible damages is critical to ensuring just compensation for property owners subject to condemnation.

Expanding the range of damages would help restore current imbalances in favor of condemning entities by both leading to more reasonable judgments in court and sending a message to condemning entities to consider the expanded range of damages in crafting their initial offers. Expanding legitimate damages would encourage condemning authorities to make fair offers upfront to avoid the possibility of paying a higher sum on appeal of the initial offer.

## Opponents said

SB 18 would introduce more problems into eminent domain proceedings than it would resolve. The bill would significantly curtail municipalities' ability to operate under the Texas Urban Renewal Law, introduce standards of admission for evidence that could be costly and indefinite, and create unfair methods for calculating the resale of land to condemned property owners.

**Right of repurchase.** SB 18 would allow "double-recovery" for property owners who had undergone eminent domain proceedings and were eligible to repurchase their property. It would confer a

windfall upon property owners who already had been compensated justly for the original taking. An owner who was eligible to repurchase at the price originally paid could accrue all the equity from appreciation without having to pay property taxes, maintenance expenses, and other costs normally incurred as part of property ownership.

The U.S. Constitution's "takings clause" requires property owners to be justly compensated for any property transferred through eminent domain. Once this compensation is granted, the owner relinquishes any right to equity and other investments associated with the property. Allowing an individual to repurchase at the original price effectively could result in putting the state in a position of being used as an instrument of financial gain for that individual.

**Slum and blight provisions.** Urban renewal is a long-accepted government function and critical to the long-term health of municipalities. Municipal governments use their powers of eminent domain to clear blighted areas for urban renewal as an absolute last resort.

SB 18 effectively would eliminate a municipality's ability to designate a blighted area and use its eminent domain authority to promote urban renewal. The bill would increase the time and resources required to achieve designation as a blighted area to such an extent as to render such a task near impossible. The bill would curtail a municipality's ability to address structural safety hazards, inadequate infrastructure, and limited commercial opportunities.

**Damages and assessments.** SB 18 could impose unreasonable relocation costs on condemning authorities exercising eminent domain. The bill includes vague language about considering evidence on restoring a property owner to a standard of living comparable to that before the condemnation took place. It would be extremely difficult to determine what constitutes a comparable standard of living. A condemning entity would have limited means of bringing evidence to prove or disprove a claim regarding a comparable standard of living. Allowing an undefined variety of evidence could create greater inconsistencies in the hearing process and reduce the overall equitability of damage claims across the state.

## Other opponents said

SB 18 contains provisions on bona fide offers that would not provide adequate protections to property owners. Language in HB 2006, enacted by the 80th Legislature in 2007 and vetoed by the governor, would have broadly required a condemning authority to make a good faith offer. Language from that bill was permissive to allow the matter to be defined through court proceedings. SB 18 would provide specific conditions that, if met, would constitute a bona fide offer. The conditions in the bill are focused on small procedural matters and in large measure reflect current practices, which have proven decidedly to favor condemning entities over property owners. Bona fide offer provisions in the bill likely would compel condemning entities to minimally satisfy the provisions on paper but would not guarantee a more fair process for property owners. This bill also would provide meager penalties for condemning authorities found to have violated bona fide offer requirements.

## Notes

SB 18 passed the Senate, but died on the May 22 Major State Calendar in the House when no further action was taken.

The **HRO analysis** of SB 18 appeared in Part One of the May 22 *Daily Floor Report*.

# Abolishing the Texas State Affordable Housing Corporation

**SB 1002 by Deuell**
*Died in the House*

Table
of Contents

SB 2 by Hegar, enacted during the first called session, continued the Texas State Affordable Housing Corporation (TSAHC) until September 1, 2011.

**SB 1002** would have abolished TSAHC on January 1, 2010, and transferred its powers, duties, and assets to the Texas Department of Housing and Community Affairs (TDHCA). All TSAHC policies and procedures would have been continued as policies and procedures of TDHCA. TDHCA would have been able to adopt any rules it felt would improve the efficiency or effectiveness of any program. All TSAHC-owned property, bond revenue, loan records, and pending applications also would have been transferred to TDHCA. Any contract or acquisition made, proceeding begun, grant or loan awarded, or obligation incurred by TSAHC would have remained in effect.

## Supporters said

SB 1002 would help improve the administration of the state's low-income single- and multi-family housing programs and increase state government efficiency. The Texas State Affordable Housing Corporation has not fulfilled its unique role as a non-profit housing entity in a meaningful way. The corporation's tax-exempt status allows it to raise private funds and market its programs, but the corporation did not begin active fundraising efforts until 2006 and has raised just $45,000 in private donations. Since 2002, TSAHC has issued only eight loans to housing developers leveraged from funds awarded by financial institutions. Many of TSAHC's programs are duplicated by the Texas Department of Housing and Community Affairs, such as issuing low-income housing bonds and performing compliance site visits, and SB 1002 would consolidate the administration of those programs.

SB 1002 also would provide for a reasonable transition period, requiring TDHCA to adopt a plan by October 1, 2009, that would include a timetable with specific steps to fully complete the transfer by January 1, 2010. Because TSAHC has been under Sunset Commission review, failure to pass the bill would result in the corporation and its programs being abolished on September 1, 2010, after a one-year phase-out period. While TSAHC has not been the best steward of these programs, the programs should be allowed to continue under the auspices of TDHCA.

## Opponents said

TSAHC has a unique role to play in making low-income housing more available to state residents and should be continued on a limited trial basis. Both the Professional Educators program, which targets low- and moderate-income teachers and school staff, and the Homes for Texas Heroes program, which targets low- and moderate-income peace and corrections officers, paid firefighters, and other emergency and security personnel, have had successful track records. The corporation also has done a good job seeking and receiving bond financing. TSAHC has recently implemented a new fundraising strategy and created a new local grant program, and both of those efforts should be given more time to succeed.

## Notes

The **HRO analysis** of SB 1002 appeared in the May 26 *Daily Floor Report*.

SB 2 by Hegar, enacted during the first called session, extended the Sunset date for TSAHC and certain other agencies to September 1, 2011, and limits Sunset Advisory Commission review of TSAHC to the appropriateness of the recommendations made to the 81st Legislature. SB 2 was considered by the House in lieu of its companion bill, HB 2 by Isett. The **HRO analysis** of HB 2 appeared in the July 2 *Daily Floor Report*.

The governor called a special session to enact SB 2 because HB 1959 by Isett, a Sunset revision bill that would have extended to September 1, 2011, the Sunset date for TSAHC and certain other agencies due to be abolished on September 1, 2009, died when the House did not act on the conference committee report on the bill. The House on June 1 adopted HCR 291 by Pitts, a corrective resolution for HB 4583, that also included an extension of the TSAHC Sunset date to September 1, 2011, but the Senate did not act on the concurrent resolution.

# Continuing state-federal office and attaching it to Governor's Office

**SB 1003 by Deuell**
*Effective September 1, 2009*

Table
of Contents

**SB 1003** continues Office of State-Federal Relations (OSFR) through September 1, 2015, and administratively attaches it to the Office of the Governor. The Governor's Office will provide human resources, administrative support, and funding to OSFR.

The bill requires OSFR to consult with the legislative leadership in Austin through frequent conference calls and responses to inquiries from the Legislature. OSFR must report to House and Senate committees with jurisdiction over intergovernmental affairs and coordinate with the Legislative Budget Board on the effects of federal funding on the state budget. OSFR must include a performance evaluation in its annual report.

The bill also requires OSFR to establish written procedures for contracts with federal lobbyists. The procedures must include contract management guidelines, a competitive selection process, a way to determine the value of lobbyist services, a way to determine how effective a lobbyist is at influencing Congress on behalf of Texas, and a conflict of interest provision. Contracts between OSFR and federal lobbyists must be signed by all three members of the advisory policy board — the governor, the lieutenant governor, and the speaker of the House — and include an agreement on the goals of service, targeted performance measures, a termination clause, and a provision allowing the contractor's performance to be audited by OSFR or the State Auditor's Office.

SB 1003 requires state agencies and political subdivisions to report all contracting and subcontracting with federal-level lobbyists to OSFR. Agencies must submit a report within 30 days of both the start and the termination of a contract with a federal lobbyist. If lobbyists report contracts with political subdivisions under another law, they do not have to submit an additional report to OSFR. The bill repeals provisions on the administrative functioning of the agency, including staffing, complaint procedures, interagency contracts, handicapped accessibility, and state agency funding guidelines.

## Supporters said

SB 1003 appropriately would continue OSFR by administratively attaching it to the Office of the Governor. The Sunset Advisory Commission found that the agency plays a vital role in securing federal dollars for Texas and in serving as an information resource to Texas lawmakers and to federal officials in Washington. The bill would place new restrictions on the OSFR to prevent it from becoming entangled in partisan politics.

Allowing OSFR to contract with federal lobbyists under strict conditions would help the state secure federal funding and achieve policy goals. Some lobbyists have knowledge or networks unmatched by OSFR employees. OSFR credits lobbyists with securing more highway funding and with gaining federal approval for maintenance dredging in the Matagorda Ship Channel. The Governor's Office estimates subcontracting work to lobbyists saved the state about 15 percent of what it would have paid to perform the same functions itself.

During the 2003 budget shortfall, the Legislature cut OSFR's staff from 17 to seven, prompting the agency to subcontract some of its lobbying work, which ended up costing the state $1.2 million. In early 2006, two of the contracts made headlines when it was revealed that the state had hired two lobbyists with ties to former U.S. Majority Leader Tom Delay and convicted lobbyist Jack Abramoff. Critics were concerned about potential partisanship of contracted state government workers, whose records showed they met mostly with Republican members of Congress. SB 1003 would remedy this problem by requiring the office to develop strict procedures for contracting with federal lobbyists.

SB 1003 would make OSFR a clearinghouse through which all state and local entities reported federal lobbying contracts. This would ensure that the state and its federal legislators were on the same page with all government entities. It also would allow the OSFR to craft a consistent message from all levels of state and local government. Compiling information on

all state agency relationships with lobbyists in a central location would provide a clearer picture of the nature of federal lobbying in Texas.

## Opponents said

The duties of OSFR are redundant and the office should be abolished entirely. Texas sends a congressional delegation of 34 members to represent the state's interests at the federal level. The responsibilities of OSFR are handled by the Texas congressional delegation, which can unite across party lines on issues of statewide significance.

The state should not continue to spend money to lobby the federal government when that money could be used on more urgent local needs. Continuing the office for another six years would cost Texas a minimum of $675,000 each year in FTE salaries alone, not to mention the costs of hiring outside lobbyists. It is not the role of the government to create an office of lobbyists, or even worse, to fund additional lobbyists to champion state interests in Washington. It is difficult to defend using state tax dollars to chase federal tax dollars and to explain why this is not an inherently wasteful process, especially when significant amounts of federal money are dedicated through guaranteed funding formulas.

## Other opponents said

The Legislature should follow the recommendations of the Sunset Advisory Commission to abolish the advisory policy board and place OSFR under the exclusive authority of the governor. Instead, this bill would require the governor to agree with the lieutenant governor and the speaker of the House on the policy priorities of OSFR. In the past, this has led to delays in the production of major policy documents. This complex system of checks and balances is more burdensome than necessary, especially considering that elections already hold the governor accountable to the people of Texas every four years.

## Notes

The **HRO analysis** of SB 1003 appeared in the May 18 *Daily Floor Report*.

# Establishing a state investment review board

**SB 2567 by Duncan**
*Died in the House*

Table
of Contents

**SB 2567** would have addressed state fiscal matters, including expanding the oversight authority of the Pension Review Board to include investment strategies of public retirement systems, the Permanent University Fund (PUF), and the Permanent School Fund (PSF). It also would have authorized the University of Texas System Board of Regents to issue tuition revenue bonds for the University of Texas Medical Branch at Galveston and established a fund for federal stimulus money, provisions that were enacted in other bills.

**Oversight by the Pension Review Board.** SB 2567 would have renamed the Pension Review Board as the Pension and Investment Review Board (PIRB) and expanded its oversight authority. It would have added the following duties to the PIRB regarding public retirement systems, public funds of the comptroller, and the nonprofit corporations managing the PUF and PSF:

- conducting a continuing review of their investment practices;
- conducting studies of potential or existing problems that threatened or inhibited their financial condition or actuarial soundness; and
- reviewing and documenting whether the PIRB believed that the entities were investing funds in compliance with the entity's investment strategy and applicable law.

The PIRB would have had oversight of the investment strategies of the PUF, the PSF, the public funds of the comptroller, the Employees Retirement System of Texas, the Teacher Retirement System of Texas, the Texas Municipal Retirement System, the Texas County and District Retirement System, and the Texas Emergency Services Retirement System.

The PIRB could have required larger retirement systems to conduct an actuarial experience study every five years. A contract with an investment manager or other person to provide services to an entity relating to the management and investment of public funds for or on behalf of the entity would have been subject to review by the PIRB for fees and the services rendered.

**Reporting requirements.** An entity subject to these provisions would have had to file a report with the PIRB and post required information on its website, unless the information was confidential under law. An entity subject to these provisions would have had to develop and adopt a written investment strategy, and file a copy of the strategy or change in the strategy with PIRB within 90 days of adopting the strategy or change.

A presiding officer consistently not submitting a required report in timely manner would have been subject to removal from office by the appointing officer.

A person covered by these provisions would have been required to disclose immediately in writing to the entity a relationship that a reasonable person would consider a conflict of interest. Intentionally not doing so would have been grounds for removal. Those with a potential conflict of interest would have had to file a statement with the entity each year stating that they were aware that they were required to disclose material conflicts of interest.

**Revising the PIRB board of directors.** The bill would have reduced the current number of Pension Review Board members from nine to seven and revised the board's composition. The bill would have reduced the number of governor appointees to the PIRB from seven to five and revised the appointees of the speaker of the House and the lieutenant governor.

**Prohibitions and penalties for PIRB-related entities.** Members of boards of covered entities or high-level employees could not have accepted items totaling more than $250 in a year, including food, entertainment, and gifts, from another person seeking to do business with the entities. Former members of covered entities' governing bodies could not have been hired for investment or management work for the entities for two years after leaving the entities.

A person who committed fraud, theft, embezzlement, fraudulent conversion, unlawful appropriation, or misapplication of property in relation to service provided to a covered entity would have been liable for a civil penalty of up to $250,000 for each offense. The PIRB or the attorney general could have investigated suspected wrongdoing and conflicts of interest and could have referred the case to the appropriate law enforcement agency for prosecution.

**UTIMCO board of directors.** SB 2567 would have changed the composition of the Board Of Directors of the nonprofit University of Texas Investment Management Company (UTIMCO), which has delegated authority to invest funds under the control and management of the University of Texas System Board of Regents, including the Permanent University Fund.

It would have required that three UT board members — rather than at least three plus the chancellor, as under current law — be appointed to the UTIMCO board. This would have been in addition to four other directors not employed or contracted by UTIMCO, the University of Texas System or the Texas A&M University System, or a component institution in the UT or A&M systems. The UT board would have appointed two members to the UTIMCO board from a list submitted by the board of regents of the Texas A&M University System, rather than the UT board selecting one or more from the list of candidates submitted by the Texas A&M System.

UTIMCO would have had to provide to the Legislative Budget Board (LBB) and the governor written notice of the terms of any payment to or agreement to pay a director, officer, or employee of UTIMCO a bonus, reward, or other incentive payment based on performance, including the performance of an investment made or recommended by the director, officer, or employee.

## Supporters said

The attorney general since June 2007 has called for greater oversight of state and local pension funds. According to the attorney general, 80 of the largest funds had $20 billion in unfunded liabilities. There is currently no coherent state strategy and little effective state oversight of Texas public pension and endowment funds. These funds belong to the people of Texas to provide needed financial support to public educational institutions and to secure the financial futures of individuals who dedicate their careers to public service. They demand a more disciplined approach to oversight.

SB 2567 would provide that rigorous oversight by requiring the PIRB to provide guidance on actuarial standards, monitor investment strategies of public pension funds and endowments, and review contracts providing fees charged by investment managers. In addition, the bill would increase transparency of the management of these investments by providing measures that would reduce conflicts of interest and reduce the influence of persons seeking to do business

with an entity who managed public funds. Especially in light of the recent diminished value of public pension funds and endowments, the oversight measures included in SB 2567 would enhance the state's ability to manage and protect these critical financial assets.

## Opponents said

The methods that SB 2567 would employ to achieve greater accountability over investment and management of state endowments and pensions funds are unnecessary and, with respect to the Permanent University Fund, potentially unconstitutional.

Texas Constitution, Art. 7, sec. 11(b) grants the University of Texas Board of Regents exclusive authority to manage the Permanent University Fund (PUF). The Legislature has no authority to infringe of the board's sole and exclusive right to manage the PUF and, as such, the PUF should not be included in the bill. Under constitutional provisions for the state retirement system outlined in Texas Constitution, Art. 16, sec. 67, ERS and TRS cannot claim this exclusive right.

While heightened standards in the bill would be helpful, individual pension funds could easily make these changes on their own. The Pension Review Board was established to monitor state pensions, not investments. It has no expertise in this area and, even in hiring additional new staff at a cost of $1.6 million in the next biennium, it is questionable whether they would do a better job of overseeing investment and management of state endowments than those that have fiduciary responsibility to do so. It is not clear why the Texas County and District Retirement System and Texas Municipal Retirement System should be included under state oversight, as they receive no state funding.

## Notes

SB 2567 passed the Senate, but died on the May 24 Major State Calendar in the House when no further action was taken. A provision in SB 2567 authorizing tuition revenue bonds for UTMB was enacted in HB 51 by Branch and a provision establishing a separate fund and oversight for federal stimulus funds was enacted in HB 4583 by Pitts. The **HRO analysis** of SB 2567 appeared in Part One of the May 24 *Daily Floor Report*.



# Health

| HB 5 SB 544 | Crownover/ Ellis | Banning smoking in certain public and work places ........................... 120 |
| * HB 1310 | Solomons | Restricting use of indoor tanning facility devices by minors................ 122 |
| * HB 1358 | Keffer | Revisions to Cancer Prevention and Research Institute    .................. 124 |
| HB 1541 | S. Turner | Medicaid continuous eligibility extension ............................................. 126 |
| * HB 1672   * HB 1795 | Crownover/ Pierson | Newborn screening, retention of newborns' genetic material.............. 128 |
| HB 2962 SB 841 | Coleman/ Averitt | CHIP eligibility revisions; CHIP buy-in program................................ 131 |
| SB 7 SB 8 SB 10   * HB 1218   * HB 4586 | Nelson/ Nelson/ Duncan/ D. Howard/ Pitts | Pay-for-performance, other health care payment initiatives................ 134 |
| * SB 78 SB 6 | Nelson/ Duncan | Healthy Texas Program; health care coverage awareness.................... 138 |
| SB 182 | Patrick | Informed consent for abortion, mandatory ultrasound......................... 141 |
| * SB 187 | Deuell | Medicaid buy-in for children with developmental disabilities ............ 143 |
| SB 188 | Deuell | Disease control outreach, including syringe exchange ........................ 145 |
| * SB 203 | Shapleigh | Denying certain Medicaid payments to hospitals ................................ 147 |
| SB 204 HB 1523 | Shapleigh/ Alvarado | Ban on foods with trans fats in certain establishments ....................... 149 |
| SB 586 | Carona | Managed care plans and out-of-network health care providers ........... 151 |
| SB 972 | Averitt | Revising employer health group cooperatives..................................... 153 |
| SB 1500 HB 3485 | Duncan/ Coleman | Employment of physicians by certain hospitals................................... 155 |

# Banning smoking in certain public and work places

**HB 5 by Crownover/ SB 544 by Ellis**
*Died in the House/ Died in the Senate*

Table
of Contents

**HB 5**, as reported by the House State Affairs Committee, and **SB 544**, as reported by the Senate Health and Human Services Committee, would have prohibited a person from smoking:

- in a public place or place of employment;
- in restaurants and certain bars;
- within 10 feet of the entrance of an enclosed area in which smoking was prohibited;
- in the seating area at an outdoor arena, stadium, or amphitheater; or
- in bleachers or grandstands for spectators at a sporting or other public event.

HB 5/SB 544 would not have applied to:

- a private residence, except when used as a child-care, adult-care, or health care facility;
- a nursing home or long-term care facility;
- a hotel or motel room designated as a smoking room rented to a guest, if a maximum of 20 percent of the rooms rented to guests were designated as smoking rooms, all smoking rooms in the hotel or motel on the same floor were contiguous, smoke did not enter a no smoking area, and the non-smoking rooms were not converted to smoking rooms;
- a tobacco shop whose business primarily was devoted to the sale of tobacco products and that did not hold an alcoholic beverage permit or license;
- a cigar bar whose business made at least 15 percent of gross sales in tobacco products and held an alcoholic beverage permit or license;
- a private club that was not established for the sole purpose of avoiding compliance with this bill and did not employ anyone, unless the club was being used for a public function; or
- the outdoor porch or patio of a bar or restaurant that was for employee use only.

HB 5/SB 544 would have defined "public place" as an enclosed indoor area that the public was invited or permitted to enter. Examples would have included restaurants, theaters, shopping malls, convention facilities, buses, restrooms, specific bars, and facilities of a state or local government, regardless of whether the public was invited or permitted to enter, and other common-use areas the public was invited or permitted to enter.

HB 5/SB 544 would have set specific requirements for a person in control of a public place or a place of employment, including clearly and conspicuously posting a "No Smoking" sign at each entrance and removing all ashtrays from any area where smoking was prohibited.

The Department of State Health Services (DSHS) would have enforced the provisions of the bills. A person could have filed a complaint with DSHS concerning a violation. The bills would have allowed DSHS, another state agency, or political subdivision to inspect a public place or a place of employment. In addition to other provided remedies, the attorney general could have brought an action for injunctive relief to enforce these requirements. DSHS would have been required to engage in a continuing program to explain, guide, and clarify the purpose and requirements of the smoking restrictions to employers, owners, operators, and managers.

A person smoking in a prohibited place would have committed a Class C misdemeanor punishable by a fine of no more than $50. A person with authority failing to post appropriate signs and remove ashtrays from places where smoking was prohibited in a public place or a place of employment would have been guilty of a Class C misdemeanor punishable by a maximum fine of $100. If it was shown at trial that the person in control of the public place or the place of employment had a previous conviction for the same offense within one year, the fine would have been $200 or less, and for a third offense, the maximum fine would have been $500.

HB 5/SB 544 would have repealed Penal Code, sec. 48.01, which penalizes smoking in certain public places. HB 5/SB 544 could not have been construed to permit smoking where it was restricted by other laws.

HB 5/SB 544 would have preempted or superseded a local ordinance, rule, or regulation that prohibited or restricted smoking to a lesser degree than the bill. HB 5 would have preempted or superseded a local ordinance,

rule, or regulation relating to smoking adopted after May 15, 2009, by a political subdivision of this state that prohibited or restricted smoking to a greater degree than the bill, while SB 544 specifically would not have.

HB 5, unlike SB 544, would have excluded from the bill counties with populations of fewer than 115,000 people, which would have excluded 226 of 254 Texas counties.

HB 5, unlike SB 544, would have exempted fraternal or veterans organizations and bars located in areas not subject to local ordinances, rules, or regulations restricting or prohibiting smoking and whose gross sales were at least 75 percent from the sale of alcoholic beverages. A person who owned a bar meeting these requirements could have designated the property as exempt from the smoking restrictions by posting conspicuously on the property a statement that smoking was permitted.

## Supporters said

HB 5/SB 544 would help ensure that people had access to clean air in public places and places of work, including restaurants and certain bars. Smoke-free policies are the most economical and effective way to protect individuals from the unnecessary health risk of second-hand smoke. Second-hand smoke kills 53,000 nonsmoking Americans every year and is a known cause of lung cancer, heart disease, low birth weight, and chronic lung ailments. Employees should not be forced to choose between their health and their paycheck. Twenty-five states have enacted similar anti-smoking laws, and Texas should follow suit.

## Opponents said

HB 5/SB 544 would infringe on the rights of individuals and business property owners. It is a constitutional and personal property issue, and taxpaying citizens should not be told what to do with their personal property. A person who wants to smoke a legal product should have the right to do so as long as the owner of the property allows it.

Imposing a statewide smoking ban would harm businesses. Individual businesses or local governments should set and control their own smoking restrictions because they know what best benefits the local economy.

## Other opponents said

HB 5 provides a too-lenient level of smoking restrictions that would do little to streamline the state's patchwork of smoking laws into one clear smoking ban. If one business is required to abide by a smoking ban, then all business should be required to do so.

HB 5 should not exclude more sparsely populated counties because the people in these rural areas have fewer employment options and are less able to leave a place of work where they are exposed to second-hand smoke.

## Notes

HB 5 was reported favorably as substituted by the House State Affairs Committee on May 8. SB 544 was reported favorably as substituted by the Senate Health and Human Services Committee on May 13 and placed on the Intent Calendar. No further action was taken on either bill.

# Restricting use of indoor tanning facility devices by minors

**HB 1310 by Solomons**
*Generally effective January 1, 2010*

Table
of Contents

**HB 1310** prohibits a child under 16-and-one-half years old from using a tanning device that emits ultraviolet radiation.

Persons under 18 years old but not younger than 16-and-one-half years old may use a tanning device only if the person's parent or legal guardian provides written consent for the child to use the tanning device. The parent or guardian must provide the written consent in person at the facility and may revoke consent at any time.

The minor also must provide the tanning facility operator a written informed consent statement signed by both the minor and a parent or legal guardian that they have read and understood an advisory statement, developed by the Texas Medical Board, warning of the dangers of indoor and outdoor tanning and its association with various health risks and agree that the minor will wear protective eyewear at all times.

The date on which the new age requirements take effect as well as when the new rules and statements must be established is January 1, 2010, although the bill technically is effective September 1, 2009.

## Supporters said

HB 1310 would prohibit children under 16-and-one-half years of age from using indoor tanning devices. There is no adequate medical justification for full-body indoor tanning, and younger children are at the highest risk of developing skin cancer. By 16-and-one-half years of age, the state deems teens responsible enough to have their driver's license, so they also are old enough to understand the dangers of tanning and responsible enough to tan with parental consent.

The bill would provide adequate information for parents and teens to understand the health consequences of indoor and outdoor tanning and would provide parents with final discretion over protecting the health and well-being of their minor child. The U.S. Department of Health and Human Services considers UV radiation to be a carcinogen. Long-term exposure can increase the risk of melanoma — the form of skin

cancer with the highest mortality rate. UV radiation also can cause eye damage, age skin, and suppress the immune system. It is considered addictive because it causes the body to release endorphins. Minors cannot buy cigarettes, another well-known carcinogen, and Texas should limit minors' indoor tanning as well.

Any skin condition for which a doctor recommends light treatment should be addressed in a controlled and localized way through medical instruments in a doctor's office. HB 1310 would not adversely impact the business of small tanning salon owners, because minors still could use alternative tanning products offered by tanning facilities, such as spray tans.

HB 1310 would acknowledge that a parent and a minor over 16-and-one-half years old would have the knowledge, given the advisory statement that must be signed, of the risks of indoor tanning without the need for a doctor's participation in this decision. The consent form would have to be signed in person at the facility to ensure that the parent truly had signed the consent form and that the minor had not forged this consent.

## Opponents said

HB 1310 should not impose further restrictions on tanning by minors, because the tanning industry already has adequate oversight by the state and federal governments and the bill would not improve public health. It is rare that very young children use tanning facilities, and those under 13 cannot tan without a doctor's prescription. Children 13 and over who tan already are required to have parental consent, and children ages 13 to 15 must have a parent at the facility at all times while the child tans.

There are some skin conditions, including psoriasis or eczema, for which a doctor would prescribe light treatment. While such a procedure often would be performed in a dermatologist's office, HB 1310 should not prevent children in rural areas that may not have convenient access to treatment in a doctor's office from tanning for medical conditions under the supervision of their parents.

Ultimately, well-informed parents should have the final say on whether their children tan, and HB 1310 would take away parents' rights to decide what is an acceptable health risk for a child who is 13 to 15 years old. This bill would take away business unnecessarily from the many small-business owners who operate tanning facilities.

## Other opponents said

HB 1310 would be beneficial in disallowing younger children from tanning, but it would cause unnecessary confusion by setting the age at which a child could tan at 16-and-one-half years old. Teens could make informed decisions about tanning at exactly 16. Using this age rather than 16-and-one-half years old would avoid business owners and tanning clients needing to calculate the date on which a person had achieved the legal age to tan.

The bill also should require persons under age 18 but age 16 or older to obtain a doctor's prescription to tan. As a medical professional, a doctor is the best resource to explain the health risks of tanning and would be able to answer questions posed by the minor or parent about tanning. Feedback on specific medical questions would not be afforded by a simple medical advisory statement.

## Notes

The **HRO analysis** of HB 1310 appeared in the April 21 *Daily Floor Report*.

# Cancer Prevention and Research Institute of Texas

**HB 1358 by Keffer**
*Effective June 19, 2009*

Table
of Contents

**HB 1358** revises the composition and duties of certain Cancer Prevention and Research Institute committees, the grant-making process, and the powers granted to the institute's executive director.

The Oversight Committee will adopt the rules governing the institute and its duties, including the procedures for awarding grants. The Oversight Committee will create an ad hoc committee on childhood cancers and other ad hoc advisory committees as necessary. A University Advisory Committee, composed of at least nine members appointed by certain university presidents and university system chancellors, will advise the Oversight Committee about the role of higher education institutions in cancer research. Committee members, except for the Oversight Committee, must disclose to the executive director any interest they hold in a matter before their committee and must recuse themselves from decisions on any such matter.

The bill establishes a new grant-making process in which Scientific Research and Prevention Programs committees, composed of cancer prevention and research experts appointed by the executive director with majority approval of the Oversight Committee, review grant applications and make recommendations about the order in which the applications should be funded. The executive director will submit to the Oversight Committee a list, substantially based on the recommendation of the Scientific Research and Prevention Programs Committee, of grant applications to fund. The Oversight Committee will fund the grant applications in the order recommended by the executive director, unless the committee overrides the recommendations by a two-thirds vote.

Grant recipients must undergo regular inspection and progress reviews. The executive director may terminate grants that do not meet contractual obligations. Not more than 5 percent of money awarded during any year may be used for facility purchase, construction, remodel, or renovation. Any money awarded for these purposes must benefit cancer prevention and research.

## Supporters said

HB 1358 would revise the structure of the Cancer Prevention and Research Institute of Texas by providing greater flexibility for input from diverse expert resources and minimizing the potential for conflicts of interest. The Oversight Committee, which would cast the final vote on what grants would be awarded, would be able to form expert ad hoc committees to advise them on whatever matter they deemed necessary. The executive director also could appoint Scientific Research and Prevention Programs committees with diverse expertise to make recommendations about what grants should be funded. The revised structure the bill would create would be similar to the flexible committee structure of the National Cancer Institute.

The bill would eliminate the role that representatives of institutions of higher education could play in influencing the decisions made concerning grant awards because these representatives unavoidably have conflicts of interest when their institutions could be the recipients of a grant. Conflicts of interest further would be prevented by the requirement that committee members disclose the interests they held in matters before their committee and recuse themselves from decisions regarding matters in which they held an interest.

HB 1358 would not vest too much authority in the institute's executive director. The executive director would be chosen by the Oversight Committee through an elaborate vetting process that ensured only the most highly qualified and professional candidate was chosen. The executive director's funding recommendations would be based on the recommendations of a committee of experts. The Oversight Committee could vote to disregard the executive director's recommendations if they were not in the best interest of the institute and the state. The executive director only could terminate a grant if it was determined that a recipient was not meeting contractual obligations, and the rule-making authority of the Oversight Board would ensure procedures could be established, if necessary, to review the grounds on which the executive director decided to terminate a grant.

## Opponents said

HB 1358 would vest too much authority in the institute's executive director. Under this bill, the executive director would make the final recommendations for grant funding to the Oversight Committee, rather than a diverse, expert Scientific Research and Prevention Programs committee. Further, these recommendations would be based on the suggestions of a Scientific Research and Prevention Programs committee that the executive director had appointed, rather than the current structure under which the committee would be appointed by various officials to represent the geographic and cultural diversity of the state. Finally, the bill would not provide any check on the authority that it would grant to the executive director to terminate any grant that did not meet contractual obligations. Under these provisions, the executive director singularly would wield too much decision-making power in the use of up to $300 million per year of funding that voters had approved with the expectation that these funds would be governed in a different way.

## Notes

The **HRO analysis** of HB 1358 appeared in Part One of the May 6 *Daily Floor Report*.

# Extending Medicaid continuous eligibility

**HB 1541 by S. Turner**
***Died in House Calendars Committee***

Table
of Contents

**HB 1541** would have required that, subject to certain conditions, a child under age 19 who qualified for Children's Medicaid remain eligible until the earlier of the first anniversary of the date the child was determined eligible or the child's 19th birthday. The extension from the current six months of continuous eligibility to 12 months of continuous eligibility for the Children's Medicaid Program would have occurred only during the fiscal 2010-11 biennium and only if:

- Texas had qualified, based on the state's unemployment rate, for a certain increase to the Federal Medical Assistance Percentage (FMAP) authorized in the American Recovery and Reinvestment Act of 2009; and
- federal funds received from the FMAP increase made available general revenue funds otherwise appropriated to the Health and Human Services Commission (HHSC) that could be used for the eligibility extension.

## Supporters said

By extending the period of continuous eligibility for Children's Medicaid from six months to 12 months, HB 1541 would ensure more children in need received higher-quality, uninterrupted health care. Twelve-month continuous eligibility already exists in Texas' Children's Health Insurance Program and Medicaid newborn and maternity coverage. Eighteen other states have 12-month continuous eligibility for their full Children's Medicaid programs.

Many children disenrolled from Children's Medicaid at six months have been dropped due to application processing errors or have experienced brief periods of ineligibility and re-enroll a short time later. If these children instead remained eligible for Medicaid for 12 months, they likely would have better health outcomes. Studies indicate that children with continuous health coverage are more likely to receive preventative care and less likely to experience delays in receiving necessary health care. Shorter eligibility periods not only may reduce child health outcomes but also may increase health care costs because children's conditions may worsen, leading to avoidable hospitalizations or other more costly treatments.

Extending Children's Medicaid eligibility to 12 months would cut the application processing workload in half for the state's eligibility determination system, which has been particularly troubled due to staffing shortages and issues with the new eligibility determination system. According to federal law, 95 percent of all applications for the Medicaid program should be processed within 45 days of application. However, in July 2009, only 78 percent of Medicaid applications were processed on time. Many children also are denied eligibility improperly. With a decreased workload, eligibility staff could process more applications on time and more accurately.

Implementation of 12 months of continuous eligibility would reduce significantly the number of uninsured children in Texas, estimated to be 1.5 million in 2007. Estimates of the increase to the number of children who would be enrolled in Children's Medicaid in 2011 range from about 260,000 to 380,000. This dramatic increase in the number of insured children would be well worth the costs.

Direct estimates of the cost of implementing continuous eligibility fail to account for the many ways this change would save the state money. HHSC has reported that only a quarter of children leaving Medicaid had other insurance coverage. The charity healthcare that children disenrolled from Medicaid might seek in their communities would not be paid for with the significant federal Medicaid match. Some who required care for which they could not pay would create uncompensated care costs that had to be absorbed by local taxpayers. The state Medicaid program pays more for many children who are dropped from Medicaid coverage after six months and later re-enroll because they often must be treated for costly conditions that could have been avoided with uninterrupted, preventative care.

Also, state application processing and other costs would be reduced significantly when verifying eligibility only once a year. Costs for the administration of Medicaid managed care health plans would decline due to reduced disenrollment and reenrollment of eligible children.

Finally, billions of dollars of general revenue funds would be made available specifically by the FMAP enhancement in the federal Recovery Act. HB 1541 would allow these funds to be "reinvested" in the Medicaid program during fiscal 2010-11 when most of the "freed" general revenue funds would be appropriated to unrelated programs and services.

## Opponents said

HB 1541 would cost nearly $300 million in general revenue funds during fiscal 2010-11, according to the Legislative Budget Board. Texas should not be making this investment when it could mean taxpayers with their own unsubsidized health care expenses would pay for the health coverage of many children who no longer were eligible for Medicaid.

A family's financial circumstances can change drastically over the course of a year. Every state dollar spent by a government assistance program on a person who is not eligible forfeits the opportunity to spend that money on someone more in need. The current six-month eligibility period ensures the best stewardship of taxpayer funds because it provides a reasonable eligibility period that minimizes administrative costs yet ensures that only those who remain eligible after six months continue receiving coverage.

Given the value of Children's Medicaid benefits, it is not asking too much to require that families reapply for coverage every six months. To the extent that problems with the eligibility determination system cause some inappropriate denials of Medicaid coverage, resources should be spent on fixing the system, not changing public policy to accommodate the troubled program.

## Notes

The House Human Services Committee heard seven bills that would have extended the eligibility period for Children's Medicaid to 12 months. It reported HB 1541 favorably, as substituted, but the bill died in the House Calendars Committee when no further action was taken.

# Newborn screening and retention of newborns' genetic material

**HB 1672 by Crownover/ HB 1795 by Pierson**
*Effective May 27, 2009/ Effective September 1, 2009*

Table
of Contents

**HB 1672** revises statutes governing retention by the Department of State Health Services (DSHS) of genetic material from newborn screening tests and requires the department to add sickle-cell trait to the list of diseases for which the newborn screening program provides detection and treatment.

DSHS must develop a disclosure statement, which will be included with the form DSHS develops to explain newborn screening to parents, that informs them that the genetic material obtained for their child's screening may be retained for use by DSHS or an approved lab and how the material is managed and used. DSHS must establish procedures for a physician attending a newborn or the person attending the newborn's delivery to verify that the disclosure has been provided to the parent or guardian of the newborn. The disclosure statement must be provided in one of two permissible formats that gives parents the option to sign a form and indicate to DSHS that their child's genetic material must be destroyed on completion of the newborn screening tests.

A parent or guardian may submit a signed, written statement to DSHS prohibiting the retention and use of a child's genetic material for purposes other than the authorized newborn screening. Adults also may file with DSHS a written statement instructing the department or an approved lab to destroy their genetic material that was obtained for newborn screening. Within 60 days of receipt of these statements, the genetic material must be destroyed.

Reports, records, and information related to genetic material collected for a newborn screening are not subject to subpoena or disclosure under public records provisions. Such documents may not otherwise be released unless the release meets criteria established by HB 1672, such as obtaining consent as required. Officers or employees of the state or a DSHS contractor or subcontractor may not be examined in judicial or administrative proceedings about the existence or contents of records, reports, or other information made confidential by HB 1672 unless otherwise authorized by the bill.

The speaker of the House must charge a committee to conduct and report on the results of an interim study on newborn screening in Texas. The study will address disclosure of the retention of genetic material and possible procedures to notify parents and guardians of the destruction of a retained specimen.

## Supporters of HB 1672 said

HB 1672 would require disclosure to parents that genetic material collected for health-critical newborn screenings will be retained by DSHS following testing. It also would provide a straightforward method by which parents could direct DSHS to destroy their children's genetic material so it could not be used for future research. The bill would put in statute the stringent confidentiality standards that DSHS already applies to the use of retained genetic material.

Research on the "de-identified" genetic material retained following newborn screenings can lead to breakthroughs in the treatment and prevention of conditions such as autism and premature birth and can assist in other disease research, such as cancer. The material retained by DSHS is uniquely critical for such research because DSHS maintains the largest sample of de-identified newborn genetic material in the nation.

While research using this genetic material, which DSHS already retains, may serve an invaluable public health purpose, HB 1672 would acknowledge that some parents have personal concerns about the retention of their children's genetic material and would make the retention and use of this material more transparent. Even if parents did not have immediate concerns prompting them to request destruction of their children's genetic material, HB 1672 would allow a parent to submit such a request if concerns arose at a future date.

The disclosure process required in HB 1672 would not cost the state anything and would be the most efficient way to disclose the genetic material retention policy. The disclosure could be developed this summer in conjunction with DSHS's planned development of other forms, and it would be distributed with the other materials already provided to newborns' parents.

Proposals requiring an informed consent process — disclosing information to parents directly, requiring

parents to sign a consent form, and then sending signed consent forms to DSHS — would be unnecessarily burdensome and costly to the state and health providers. DSHS would have to carry out an extensive process to develop the consent form, a system for consent form submission, and a system to store the forms and track whether a parent had granted consent. The associated costs would be particularly unnecessary in light of current privacy safeguards and those added by HB 1672. Not only is all personally identifiable information removed from the specimens, but only DSHS staff have access to the personal information database, and the research request process is structured to protect confidentiality.

In addition, the elaborate nature of a consent process could cause needless alarm among parents who previously would not have been concerned about retention of the genetic material. Such alarm could cause a disproportionate number of parents to decline consent, which could negatively affect the amount of data collected.

The genetic material legally obtained through the newborn screening program meets the definition of a state record as machine-readable information received on behalf of a state agency. As such, this material may be retained for an appropriate amount of time as dictated by state records retention statutes. Despite this fact, some have expressed concerns that the retention constitutes an unlawful search and seizure in violation of the Fourth Amendment of the U.S. Constitution. Such concerns are unfounded because passive consent to retention of the materials would be implicit when parents knew that they could request that the genetic material be destroyed, but did not.

## Opponents of HB 1672 said

Although HB 1672 would improve existing law by requiring DSHS to inform parents about retention of newborn genetic material, the approach used in the bill would not eliminate the possibility that new parents could leave the hospital unaware that their child's genetic material will be retained. The bill better would safeguard a parent's right to protect their child's confidentiality by establishing an "opt-in" process for retention of genetic material, in which a child's genetic material could not be retained without the signed, informed consent of a parent.

Instead, HB 1672 would allow DSHS to establish the procedures by which physicians or other people responsible for attending a newborn's delivery verified that they had provided parents with the required disclosure. Without extremely explicit procedures, confusion could occur about who was responsible for providing the disclosure statement if multiple people attended a newborn's delivery. This confusion could lead to the medical team's failure to provide the disclosure to some parents.

Given the potential that some parents might not receive the disclosure statement due to this bill's "opt-out" disclosure policy, parents may later discover that their child's genetic material was subject to uses of which they may not approve. Although a parent may feel comfortable with the permitted uses of retained genetic material in HB 1672, the permissible uses of this material could be expanded in future years in ways to which many people would object. Should genetic information ever become available to employers, they could discriminate in their choice of job applicants based on the applicants' genetic predispositions. If law enforcement were provided access to this retained genetic material, they might attempt to use this information in investigations, which could infringe on a person's right against self-incrimination.

Further, a lawsuit was filed in March against DSHS in U.S. district court in San Antonio, *Beleno v. Texas Department of State Health Services*, in which the plaintiffs — five parents of newborns whose genetic material was collected and retained — alleged that DSHS's retention of newborn genetic material violated the Fourth Amendment's prohibition against unlawful search and seizure when their children's confidential genetic information was taken and stored without their consent.

**HB 1795** requires the Department of State Health Services (DSHS) to increase the number of screening tests conducted on newborns to include the screenings for all core and secondary target conditions recommended in "Newborn Screening: Toward a Uniform Screening Panel and System" or to establish a more stringent set of newborn screening guidelines, if determined necessary. DSHS may exclude from the required testing screening for galactose epimerase and galactokinase. DSHS also may require additional newborn screening tests based on the recommendations of the Newborn Screening Advisory Committee established by the bill.

DSHS must establish the Newborn Screening Advisory Committee to advise the department about strategic planning, policy, rules, and services related to newborn screening and additional newborn screening tests. The advisory committee must include health care providers, a hospital representative, people with family members affected by conditions for which newborn screening could be conducted, and people involved in the delivery of newborn screening services, follow-up, or treatment.

Unless she objects, a woman must be tested for HIV infection at an exam conducted during her third trimester of pregnancy or prior to delivery if there is no record of test results from an HIV test conducted during the woman's third trimester. Unless a newborn's parent or guardian objects, a newborn must receive expedited testing for HIV infection if the mother's medical record does not contain HIV infection test results from a test performed in the third trimester of pregnancy or immediately prior to delivery.

## Supporters of HB 1795 said

HB 1795 could enhance the treatment potential and quality of life for newborns who had one of the additional 24 disorders for which DSHS would screen. The conditions for which newborns are screened may have no immediate visible effects, but if not detected and treated early, could cause physical debilitation, cognitive disabilities, or death. Many of the treatments for these disorders can be as simple and inexpensive as dietary changes.

One in 750 children is born with a genetic disorder detectable by newborn screening. However, Texas is among the bottom five states in the number of genetic conditions screened for in newborns. The American College of Medical Genetics, under commission by the U.S. Department of Health and Human Services, recommended that states screen newborns for 54 genetic diseases. HB 1795 would bring Texas screening in line with these expert recommendations.

The core screening panel includes screening for the most severe form of galactosemia, a disorder that can lead to serious developmental problems and death. HB 1795 would allow DSHS to exclude screenings for two less-severe forms of galactosemia — galactose epimerase and galactokinase — which are more costly to test for and do not cause death.

While some say additional screenings are too costly, this argument fails to weigh the value of saving a child's life and fails to account for the costs saved for families, insurers, and the Texas Medicaid program when early diagnosis and intervention lead to less costly long-term treatments.

HB 1795 also would add additional HIV testing requirements for pregnant mothers who did not object so that preventative treatment could occur to decrease the chances of a mother transmitting HIV to her baby. The transmission rate for HIV infection from mother to infant is about 25 percent when HIV-infected mothers do not undergo treatment and is less than 2 percent for mothers who begin treatment while pregnant. The HIV testing that would be required for newborns whose mothers were not tested could identify infants who were exposed to HIV but had not been infected. Early treatment of these infants could prevent them from being infected with HIV.

## Opponents of HB 1795 said

HB 1795 would be too costly during difficult fiscal times. The state already screens for most of the disorders on the core panel recommended by the American College of Medical Genetics. Screening for the core panel is more critical than the secondary targets that would be added by this bill because the core panel represents the disorders that are more severe, more prevalent, or more responsive to existing early interventions.

## Notes

The **HRO analysis** of HB 1672 appeared in the April 7 *Daily Floor Report*.

The **HRO analysis** of HB 1795 appeared in the May 13 *Daily Floor Report*. HB 1795 was amended on the Senate floor on May 27 to include the provisions about HIV infection testing included in SB 1886 by Ellis, which passed the Senate, but died in the House Public Health Committee.

The **HRO analysis** of SB 1720 by Uresti, the Senate companion to HB 1795, appeared in the May 26 *Daily Floor Report*. SB 1720 passed the Senate, but died on the May 26 Major State Calendar in the House when no further action was taken. SB 1720 did not include the HIV infection-testing provisions from SB 1886.

# CHIP eligibility and buy-in program

**HB 2962 by Coleman/ SB 841 by Averitt**
*Died in Senate committee/ Died in the House*

Table of Contents

**SB 841/HB 2962** would have increased the income eligibility level for the Children's Health Insurance Program (CHIP) to 300 percent of the federal poverty level and would have established a CHIP buy-in program for certain children whose net family incomes were greater than 300 percent but did not exceed 400 percent of the federal poverty level.

**Increased CHIP eligibility.** CHIP enrollees whose net family incomes were greater than 200 percent, but did not exceed 300 percent, of the federal poverty level would have paid a share of CHIP plan costs not to exceed 5 percent of an enrollee's net family income. The premium would have been about 2.5 percent of the enrollee's net family income.

The measure of net family income on which eligibility would have been based would have allowed a deduction for both child-care expenses and child support payments. The assets test would have applied to children whose net family income was 250 percent or greater of the federal poverty level. The calculation of allowable assets would have been modified, and the allowable asset limit would have been increased to $20,000.

Applicants for coverage who met the extended eligibility criteria and who had health coverage within 180 days of application would not have received coverage until 180 days after the last date on which the applicant had health coverage.

**CHIP buy-in.** The HHSC executive commissioner would have adopted eligibility and payment requirements for a CHIP buy-in program that would have allowed certain children whose net family incomes were greater than 300 percent, but did not exceed 400 percent, of the federal poverty level to buy CHIP coverage for at least the full cost HHSC would pay for coverage. Children would have been eligible for the CHIP buy-in program only if they had been enrolled in CHIP or Children's Medicaid but no longer were eligible based on an increase in net family income and lack of access to adequate health coverage through an employer-sponsored health plan.

HHSC could have adopted rules, benefits coverage, and procedures for CHIP buy-in enrollees that were different than those adopted for CHIP enrollees at 300

percent or less of the federal poverty level. Provisions for the CHIP buy-in program would have been required to discourage employers from discontinuing health coverage for employees' children and individuals from opting to enroll their children in the CHIP buy-in program when they had other health coverage options. A child whose CHIP buy-in program coverage was terminated due to nonpayment could not have been re-enrolled in the program for the duration of a lock-out period.

**Community outreach.** The bill would have established methods by which HHSC would have been required to improve the effectiveness of community outreach efforts for CHIP. The methods would have included enhancing existing public education, assistance with applications, and issue resolution in eligibility determination processes.

**Eligibility determination process.** The executive commissioner would have adopted a corrective action plan if for three consecutive months less than 90 percent of CHIP applications or recertifications were processed accurately through either of the state's eligibility processing systems. The executive commissioner would have adopted processes to reduce eligibility denials due to applications with missing information and would have established requirements for HHSC to attempt to contact applicants with missing information before an application was denied.

**Miscellaneous provisions.** Telephone call resolution standards and processes would have been developed to ensure that calls regarding questions, issues, and complaints successfully were resolved by call center or agency staff. The bill would have required HHSC to implement a federally required prospective payment system for CHIP services provided in federally qualified health centers and rural health clinics.

## Supporters said

SB 841/HB 2962 would enhance access to affordable health coverage for Texas children by increasing eligibility for CHIP to 300 percent of the federal poverty level. It also would establish a program by which the families of children whose net incomes

were greater than 300 percent but did not exceed 400 percent of the federal poverty level could buy CHIP coverage at full cost.

Children with health insurance are more likely to be vaccinated against major illnesses. Lack of insurance can lead to more illness, which causes poorer educational performance because children miss more days of school. Through the relatively low cost of providing health coverage, the state can achieve high returns on child well-being.

The CHIP eligibility levels established in this bill would be appropriate to fill the gap in available coverage for the many lower-income children who do not have access to affordable health coverage. Only 49 percent of employers offer health coverage to families. Without an employer's contribution to premiums, most uninsured families must turn to coverage in the private, individual market, which often is prohibitively costly for even the most basic plans.

Middle-income families with incomes just above 200 percent of the federal poverty level are the fastest-growing uninsured population, largely because of the increasing cost of health coverage. Between 2000 and 2006 in Texas, family health insurance premiums rose 5.1 times faster than median family income. SB 841/HB 2962 would raise CHIP eligibility to 300 percent of the federal poverty level to capture the growing population of families in the income range that lacks other insurance options. The buy-in program would provide reasonably priced coverage to children with family incomes up to 400 percent of the federal poverty level.

SB 841/HB 2962 would provide appropriate protections to prevent families from enrolling children in CHIP when they otherwise had private coverage options. Studies have shown that crowd-out of private insurance coverage by public programs is negligible when a 180-day waiting period is implemented, as would be the case for the new CHIP income eligibility levels established by this bill. In addition, studies indicate that when offered employer-based health coverage, only 8 percent reject it. The bill also would increase cost-sharing requirements for families with higher incomes to reflect their greater ability to pay.

The costs of this bill would be very reasonable considering the benefits to the health of Texas children and when balancing the cost savings that would be achieved by reducing the uncompensated care costs paid for uninsured children. With no other alternative,

parents often take their sick, uninsured children to hospital emergency rooms, which provide the most costly care. The burden of uncompensated care costs ultimately falls to taxpayers and other health consumers through increased local taxes or increased insurance premiums.

In addition, Texas loses the opportunity to leverage federal matching funds when the state does not cover all populations that could be eligible for CHIP. The federal government pays for 72 cents of every dollar spent in Texas on CHIP. Texas taxpayer dollars also are redistributed to other states when Texas does not use its full CHIP allotment.

The bill would enhance outreach and education efforts to enroll more eligible children in CHIP. In 2007, more than 1.4 million Texas children were uninsured. HHSC projects the number of children eligible for, but not enrolled in, CHIP and Children's Medicaid in 2009 to be 850,000. If all of these children were enrolled in the appropriate benefit program, the uninsured rate among Texas children would be cut in half.

By providing more assistance to people applying for CHIP and implementing processes to streamline eligibility determination, fewer "procedural denials" would result due to issues like missing paperwork. Also, problems with the current eligibility determination system have caused application processing times to exceed federal standards, and applicants have had issues with application processing errors. SB 841/HB 2962 would require HHSC to enhance assistance to applicants in resolving problems encountered during the eligibility determination process. Corrective action plans could be implemented to address ongoing issues with the eligibility determination system.

## Opponents said

SB 841/HB 2962 would expand CHIP eligibility to cover children whose family incomes exceeded the levels for which the program was created. CHIP was designed to provide health coverage to the children of low-income, working families who had no private coverage alternative.

The increase in CHIP eligibility to 300 percent of the federal poverty level would cause Texas taxpayers to subsidize the health coverage provided to children in families of four with incomes up to $66,540. A variety of private healthcare options would be affordable for

families below this income level if a consumer was willing to do the research to find a plan best-suited to that family's needs. Even with the current 200 percent eligibility level for CHIP, more than 170,000 eligible children still are not yet enrolled. It does not make sense to spend more resources on expanding eligibility for CHIP when many children already in need have not been served.

Given projected budget shortfalls for the next biennium, Texas needs to be wiser in its use of limited funds. The resources devoted to this bill would be spent more effectively on enhancing private insurance alternatives. The primary issue with the health insurance market is cost. Decreasing the cost of health coverage would allow more businesses to resume offering health coverage and would make more private, individual market options affordable. Texas could make a major advance toward the goal of reducing health insurance costs by reducing the number of insurance coverage mandates. Instead of taking this approach, SB 841/ HB 2962 would expand a taxpayer-funded program to members of the middle class.

## Notes

SB 841 passed the Senate, but died on the May 25 Major State Calendar in the House when no further action was taken. The **HRO analysis** of SB 841 appeared in the May 25 *Daily Floor Report*.

HB 2962 passed the House, but died in the Senate Finance Committee when no further action was taken. The **HRO analysis** of HB 2962 appeared in the May 14 *Daily Floor Report*.

The conference committee report for SB 2080 by Uresti, which concerns child abuse and neglect and assistance for adoptive parents and foster care providers, would have expanded CHIP eligibility to 300 percent of the federal poverty level, among other revisions to the program. These CHIP revisions were stripped from the version of SB 2080 that ultimately was enacted.

# Pay-for-performance and other health care payment initiatives

**SB 7 by Nelson/ SB 8 by Nelson/ HB 1218 by D. Howard/ SB 10 by Duncan/ HB 4586 by Pitts**
*Died in the House/ Died in the House/ Effective September 1, 2009/ Died in the House/*
*Effective June 19, 2009*

Table
of Contents

**SB 7** would have implemented a number of initiatives intended to improve the quality of care and efficiency of services provided in the Medicaid program and Children's Health Insurance Program (CHIP), including pay-for-performance initiatives.

**Pay-for-performance pilot programs.** Pay-for-performance payment systems would have been defined as systems for compensating health care providers or facilities for health care services based on their meeting or exceeding defined performance measures. Cost savings under a pay-for-performance system could have been shared with participating providers and facilities.

SB 7 would have required the Health and Human Services Commission (HHSC) to establish one or more pilot programs to test pay-for-performance payment systems to reimburse health care providers or facilities participating in CHIP or Medicaid, if feasible and cost-effective to the state. The pilots would have been selected from proposals made by health care providers and facilities or by disease or care management organizations, or adapted from payment methodologies that were used in the Medicare program.

Quality-of-care standards, evidence-based protocols, and measureable goals for the pilot programs would have been established in consultation with an advisory committee that included certain health care practitioners and representatives of health care consumers, certain hospitals, a care management organization, and a member of the Advisory Panel on Health Care-Associated Infections and Preventable Adverse Events. Efficiency performance standards also could have been established, as long as the standards did not encourage limits on medically necessary services.

**Pay-for-performance incentives for nursing facilities.** SB 7 would have required the HHSC executive commissioner to establish, if feasible, an incentive payment program for nursing facilities that was designed to improve the quality of care and service provided to Medicaid recipients. The pilot program would have provided additional payments to nursing facilities that met or exceeded certain standards. Measures could have included quality of life, level of person-centered care, recipient and employee satisfaction, staff retention and turnover, regulatory

compliance, and other factors. To be eligible for an incentive payment, a nursing facility would have had to meet or exceed performance thresholds for at least two of the performance measures, at least one of which was an indicator of quality of care.

**Quality-based hospital reimbursement system.** HHSC would have established a quality-based hospital reimbursement system intended to align Medicaid provider payment incentives with improved quality of care, to promote coordination of health care, and to reduce potentially preventable complications and readmissions.

In phase one, the HHSC executive commissioner would have adopted rules to identify potentially preventable readmissions of Medicaid recipients to hospitals, collected data on present-on-admission indicators of potentially preventable readmissions, and provided a confidential report to each Texas hospital on the hospital's performance. Hospitals would have had two years during which they adjusted their practices to prevent potentially preventable readmissions. Existing payment methods for hospitals would have been modified to allow HHSC to classify more accurately specific patient populations and account for severity of patient illness and mortality risk.

In phase two, HHSC would have adjusted Medicaid reimbursements to hospitals based on performance in reducing potentially preventable readmissions. Adjustments would have been focused on addressing potentially preventable readmissions that were continuing, significant problems. During phase three, HHSC would have studied and reported on the feasibility of collecting data about potentially preventable complications that resulted from care or treatment provided during a hospital stay, adjusting Medicaid reimbursements based on reductions in those complications, and developing reconsideration review processes that provided basic due process in challenging a reimbursement adjustment.

**SB 8** would have expanded the purpose of the Texas Health Services Authority to include researching, developing, supporting, and promoting recommended strategies to improve the quality of health care funded by both public and private payors

and to increase accountability and transparency. To accomplish these goals, the authority would have been required to examine standards, strategies, and payment methodologies used by the federal Medicare program or created by certain nationally recognized organizations that address health care quality and efficiency. The authority's recommendations would have been reviewed for safety, effectiveness, timeliness, efficiency, equity, and patient-centeredness.

The recommendations would have included evidence-based best practice standards for health care facilities and practitioners, performance measures for health care practitioners, and improved payment methods. The authority would have developed and promoted:

- strategies to require or encourage health care practitioners and facilities to adhere to the evidence-based best practice standards developed;
- performance measures to evaluate the quality of care that a patient population received from health care practitioners or facilities and to compare and report on the relative performance of similar practitioners and facilities;
- standards for technology to collect information that measured medical outcomes, quality of care, and adherence to evidence-based best practices; and
- alternative payment methods for health care payors that recognized the investments needed to deliver primary care in a patient-centered medical home and provided rewards for improving efficiency, promoting high-quality patient care, and using evidence-based best practices.

The authority would have conducted or contracted for studies to:

- develop payment incentives to increase access to primary care; and
- develop payment methods based on risk-adjusted episodes of care that created incentives for higher-quality services and a reduction in unnecessary services.

**HB 1218**, which was enacted and took effect September 1, 2009, implements several health information technology initiatives, including requiring the HHSC executive commissioner to establish, if

feasible, a quality-of-care health information exchange in which the commission exchanges information with participating nursing facilities about performance measures to improve the quality of care and services provided to Medicaid recipients. Nursing facilities may receive incentive payments to encourage their participation if money has been appropriated for that purpose. The executive commissioner may determine the amount of incentive payment and may enter into a contract for data collection, data analysis, and technical support services.

The performance measures must be recognized by the executive commissioner as valid indicators of the overall quality of care received by Medicaid recipients and designed to encourage and reward evidence-based practices in nursing facilities. Measures may assess quality of life, level of person-centered care, recipient and employee satisfaction, staff retention and turnover, regulatory compliance, and other factors. The executive commissioner must maximize the use of information technology and limit the number of performance measures to achieve administrative cost efficiency and to avoid an unreasonable administrative burden on participating nursing facilities.

**SB 10** would have authorized the board of trustees of the Employees Retirement System (ERS) to establish one or more pilot programs to compensate health care providers under an alternative system to the traditional fee-for-service payments made under the ERS group benefits program. An alternative payment system would have included any type of payment system other than fee-for-service, including:

- a global payment system, which makes a predetermined payment per enrollee for a specified period, without regard to the quantity of services provided;
- an episode-based bundled system, which makes a flat payment for all services provided in connection with a single episode of medical care;
- a pay-for-performance system, which pays a provider for meeting or exceeding certain defined performance measures, including potentially paying bonuses or a share of realized savings; and
- a blended payment system that includes one or more features of a global payment, pay-for-performance, and episode-based bundled system.

The ERS board would have ensured that a coverage plan in the pilot program was at least equivalent to the basic coverage plan provided to state employees. Pilot programs would have been required to include policies and practices designed to ensure high-quality, effective health care, including policies to promote clinical integration — networks of health care providers who actively evaluate and modify practice patterns by the network's participants. To the extent practicable, the pilot program would have been based on nationally recognized quality-of-care standards and evidence-based best practices.

The ERS board would have had authority to extend a pilot program and make it permanent. The program could have been limited to one or more geographical regions or health care networks. The bill would have established a pilot program evaluation process and required that programs ensure the availability of providers for plan enrollees and appropriate compensation of health care providers.

**HB 4586**, the supplemental appropriations act, which took effect June 19, 2009, authorizes ERS to establish a pilot program under which physicians and health care providers who provide services to employees and retirees in the ERS group benefits program are compensated under a system designed to test alternatives to traditional fee-for-service payments. The program must be based on nationally recognized quality-of-care standards and evidence-based best practices, to the extent practicable, and must include policies designed to promote provider collaboration and other policies as necessary to ensure high-quality and effective health care services.

## Supporters said

Pay-for-performance and other alternative payment initiatives would improve the quality, safety, and efficiency of health care delivery in Texas.

**Alternative payment initiatives.** With alternative payment systems, Texas health care providers would be rewarded for the quality of health care services provided, not the quantity. The currently dominant fee-for-service payment model encourages providers to perform unnecessary procedures to obtain higher reimbursements. At a minimum, fee-for-service does not discourage doctors from taking an inefficient, thoughtless approach to diagnoses when they may be reimbursed for unnecessary tests run in lieu of spending adequate time with a patient to narrow the diagnostic focus.

Fee-for-service not only is needlessly costly but discourages the delivery of the highest quality of care because the most effective doctor who quickly addresses a patient's health problem at a lower overall cost does not receive as much payment as a colleague treating the same condition who struggled more to establish a diagnosis and provided unnecessary services.

The various pilot programs and other payment initiatives that have been proposed would allow Texas to explore payment systems that provide health care services on a global basis (per person), on an episode basis (per disease or health care need), or on a performance basis. Texas could determine the payment methods that would produce the best outcomes along a spectrum of measures, both for patient health and savings to taxpayers.

In a pay-for-performance system, providers would be rewarded for following evidence-based best practices that could incorporate the wealth of knowledge available from nationally recognized organizations with the resources to aggregate health care data and establish what provided the best, most efficient care. Such payment initiatives also would reduce health spending long term if doctors were reimbursed adequately for preventative care that kept more of their patients out of the hospital or emergency room.

Global and episodic payment systems would pay providers a flat amount for patient care over a fixed period of time or for a specific episode of treatments. Such systems could lead to highly efficient care because the doctors who would benefit most in such systems would be those who skillfully could identify and address their patients' exact needs. These doctors also would benefit by providing their patients with quality, preventative care. Given that payments were flat, doctors would benefit less financially from patients they had to treat for costly illnesses that could have been avoided with proper prevention.

**Potentially preventable readmissions in hospitals.** The current structure of the Texas Medicaid program causes Texas taxpayers to pay hospitals for preventable mistakes. By allowing Medicaid to adjust reimbursements to hospitals based on their reductions in potentially preventable readmissions, hospitals would have a greater incentive to make sure Medicaid patients were treated effectively on their first hospital visit, and the state would waste fewer Medicaid dollars on subsequent, unnecessary treatments. Proposals to adjust reimbursements to hospitals based on their reduction in

potentially preventable readmissions would specify that a hospital admission could be deemed preventable only if linked to deficiencies identified in a patient's care or treatment during a previous hospital stay.

## Opponents said

Most of Texas' quality of care issues stem from inadequate reimbursement rates for Medicaid providers. Texas first should focus on providing adequate reimbursement to all Medicaid providers before diverting limited resources to experiments with alternative payment systems that may not produce the outcomes that policy-makers hope.

**Alternative payment initiatives.** Each of the alternative payment systems would have risks if not implemented properly. Alternative payment systems can be abused or could have unintentional, punitive consequences for health care providers. For example, without proper safeguards, episode-based payment systems that reimbursed doctors a fixed amount to address a single condition could lead some doctors to cut corners in care because they would benefit more financially from using low-cost treatments, even if they were not as effective.

Also, a patient's needs can be very nuanced, and it is impossible for doctors to provide the best individualized care to all of their patients if they follow cookie-cutter best practice guidelines established for a pay-for-performance system. However, doctors who deviate from these guidelines could receive less reimbursement even if they made a reasoned decision acknowledging their patients' unique needs.

**Potentially preventable readmissions in hospitals.** Proposals to adjust Medicaid payments to hospitals based on the finding of a potentially preventable readmission should not advance unless hospitals are ensured the opportunity to weigh in on the definition of this term. Current proposals would define "potentially preventable readmission" broadly, to include readmissions for a condition or procedure that "indicates that a surgical intervention performed during a previous admission was unsuccessful in achieving the anticipated outcome." Even the most skilled surgeons may not have a perfect success rate given the challenging procedures they undertake. This proposal, when interpreted too broadly, could discourage surgeons from performing procedures initially for fear they would have to perform reasonable follow-up procedures in the future for which they may not receive adequate reimbursement.

## Notes

The **HRO analysis** of SB 7 appeared in the May 24 *Daily Floor Report*. Although SB 7 died in the House, many SB 7 provisions were enacted substantially or in part by other legislation.

HB 1218 by D. Howard was amended in the Senate to include substantially the health information exchange provisions of SB 7. The SB 7 provision about pay-for-performance incentives for nursing facilities was revised to become the HB 1218 quality of care health information exchange for nursing facilities. The quality-based hospital reimbursement system in SB 7 was revised in HB 1218 so that hospitals must provide information about preventable readmissions to HHSC, but HHSC will not adjust hospital payments for preventable readmissions. The **HRO analysis** of HB 1218 appeared in Part Two of the May 8 *Daily Floor Report*.

A pilot program included in SB 7 to reduce obesity, increase physical activity, and improve nutrition among Medicaid and CHIP recipients was added as an amendment to **SB 870** by Lucio, which became effective September 1, 2009. SB 870 passed the House on the Local, Consent, and Resolutions Calendar and was not analyzed in a *Daily Floor Report*.

Requirements from SB 7 for third-party health insurers to provide timely information to HHSC about their benefits coverage for Medicaid beneficiaries were added as amendments to **SB 531** by Patrick, which became effective September 1, 2009. SB 531 passed the House on the Local, Consent, and Resolutions Calendar and was not analyzed in a *Daily Floor Report*.

Requirements from SB 7 for reporting on and denial of payment for preventable adverse events were added as amendments to SB 203 by Shapleigh, which became effective September 1, 2009. **SB 203** passed the House on the Local, Consent, and Resolutions Calendar and was not analyzed in a *Daily Floor Report*. Other provisions of SB 203 are discussed starting on page 147 of this report.

The **HRO analysis** of SB 8 appeared in the May 25 *Daily Floor Report*. The **HRO analysis** of SB 10 appeared in the May 26 *Daily Floor Report*. The **HRO analysis** of HB 4586 appeared in the April 16 *Daily Floor Report*.

# Healthy Texas Program and promoting health coverage awareness

**SB 78 by Nelson/ SB 6 by Duncan**
*Effective September 1, 2009/ Died in the House*

Table
of Contents

**SB 78** establishes the Healthy Texas Program, which provides an additional option for certain small employers to obtain health coverage but is not intended to diminish the availability of traditional small employer health plan coverage. SB 78 also renames the Health Coverage Awareness and Education Program the TexLink to Health Coverage Program and revises the program's duties in informing and educating the public about health coverage.

**SB 6** would have established the Healthy Texas Program in the same form as the program was enacted in SB 78 (see Notes).

**Healthy Texas Program.** A small employer — an employer with two to 50 employees — may obtain a health benefit plan for its employees through the Healthy Texas Program, if the employer meets the following eligibility criteria:

- during the 12-month period before the date of application, the small employer does not offer employees group health benefits;
- the employer pays at least 30 percent of its full-time employees annual wages that are less than or equal to 300 percent of the federal poverty level; and
- 60 percent or more of the employer's eligible employees elect to participate in the plan.

The commissioner of insurance is granted rulemaking authority to alter certain eligibility criteria, if necessary to prevent inappropriate substitution of other health benefits plans for a Healthy Texas plan or otherwise to fulfill the purposes of the program.

A small employer that purchases a qualifying Healthy Texas health benefit plan must pay 50 percent or more of the premium for each employee covered and may elect to pay all or any portion of the premium for dependent coverage.

**Coverage.** A Healthy Texas plan must include a preexisting condition provision that meets the criteria established for large and small employer health benefit plans. Healthy Texas plans are not subject to a health care service or benefit requirement unless a law specifically applies the requirement to these plans.

A qualifying health benefit plan may provide coverage only for in-plan services and benefits, except for emergency care or other services not available through a plan provider. In-plan services and benefits must include inpatient and outpatient hospital services, physician services, and prescription drug benefits. The commissioner is granted rulemaking authority to develop various coverage plans, approve additional in-plan benefits, establish certain administrative and operational procedures, and establish certain monitoring, oversight, and strategic planning processes.

**Plan rating.** A health benefit plan issuer may use only age and gender as case characteristics in setting premium rates for a qualifying health benefit plan. In setting premiums for Healthy Texas plans, a health benefit plan issuer must apply rating factors consistently with respect to all small employers in a class of business and charge premium rates that are reasonable and reflect objective differences in plan design. A health benefit plan issuer must file premium rates with the Texas Department of Insurance (TDI) for review and approval.

**Healthy Texas Small Employer Premium Stabilization Fund.** SB 78 establishes the Healthy Texas Small Employer Premium Stabilization Fund from which health benefit plan issuers may receive reimbursement for 80 percent per enrollee per year of claims paid between $5,000 and $75,000. If the total reimbursement amount requested by health benefit plan issuers for a calendar year exceeds the amount of funds available for distribution, the commissioner must provide for the distribution of any available funds in an amount proportional to a health plan issuer's share of total eligible claims paid. Enrollment will be suspended if the total reported enrollment exceeds the total eligible enrollment and likely will result in anticipated expenditures in excess of the funds available for distribution. Stop-loss insurance or reinsurance may be purchased for the fund.

Up to 8 percent of the annual amount of the fund may be used for public education, outreach, and enrollment strategies targeted to small employers that do not provide health insurance. The commissioner must make any excess funds available for distribution in the next calendar year. SB 78 establishes annual reporting requirements for the fund. The commissioner

may obtain the services of an independent organization to administer the fund and submit required reports to evaluate the operation of the fund.

***Participation by health benefit plan issuers.*** Any health benefit plan issuer may participate in Healthy Texas, unless the commissioner establishes a rule limiting participation. If participation is limited, the commissioner will conduct a competitive procurement process to select one or more health benefit plan issuers with which to contract. The commissioner will establish participation requirements applicable to regional and local health care programs that consider the unique plan designs, benefit levels, and participation criteria of each program.

**TexLink to Health Coverage Program.** The duties of the TexLink to Health Coverage Program include educating the public about the availability and value of health coverage, providing information on health coverage options, promoting and developing new health coverage options, and assisting small employers and individuals seeking to purchase health coverage.

SB 78 requires TexLink to develop printed materials designed to educate small employers, individuals, and others about health coverage. TexLink also may produce a newsletter about health coverage. Materials for the program may include information about health plan issuers but may not favor or endorse particular issuers.

The bill allows TexLink to undertake other health coverage awareness and education efforts, including establishing toll-free telephone options through which callers can receive information about health insurance coverage, establishing materials and a curriculum for educating high school students, supporting colleges, universities, and those seeking to develop community-based health coverage for the uninsured, and conducting health coverage fairs at which TexLink and health plan issuers and agents may provide information to attendees. TexLink will seek gifts and grants to fund health coverage fairs.

TDI may undertake measures to educate small employers and single-employee businesses about health coverage options, how to establish health coverage for their employees, and how to qualify for favorable federal tax treatment on the coverage they obtain.

## Supporters said

**Healthy Texas Program.** By establishing the Healthy Texas Program, SB 78 would provide affordable health coverage for small employers with low-wage employees through an innovative public-private partnership. Texas has the highest uninsured rate of any state in the nation, with 6 million people, or 25.2 percent of the population, uninsured. This not only leads to poor health outcomes for those who cannot afford health care, which costs employers in lost productivity, but also places the burden of uncompensated care costs on the taxpayers of Texas through higher local taxes and higher insurance premiums.

The Healthy Texas Program would lead to a reduction in the number of uninsured and a corresponding reduction in uncompensated care costs and worker productivity losses. Although most Texans obtain their health coverage through their employer, the uninsured rate among employees of businesses with 24 or fewer workers is more than 44 percent. Only 32.2 percent of small employers with two to 50 employees offered insurance in Texas in 2006, and employers indicated in TDI focus groups that cost was the number one reason they did not offer coverage.

The Healthy Texas Program significantly could reduce small-employer premiums, which would allow many more people to be insured. The program would be modeled on the Healthy New York program, which offers insurance premiums that are 30 percent lower than premiums paid by those not insured through Healthy New York. Insurers charge higher premiums to smaller groups because they include fewer plan participants over which to spread risk. The Healthy Texas Program could reduce insurer risk by providing participating insurers reinsurance, a type of insurance obtained by insurers to protect against extraordinary losses by policyholders. The state would pay for 80 percent of claims between $5,000 and $75,000.

Other elements of the program would reduce costs or otherwise enable more small employers to offer health coverage. Unlike in Texas' broader small-employer market, insurers could not use health status when determining small-employer premiums, and TDI would have to review and approve rates. Removing health status from rate-setting would prevent a single or handful of employees with higher health risks from making the group's premiums unaffordable. In the

current small-employer market, some small employers pay as much as $2,400 per employee per month; rejected quotes for some employers have been even higher than that. Also, small employer insurers require 75 percent of a business' employees to participate in a plan in order to offer coverage. Many small employers cannot reach this threshold of participation, yet SB 78 would allow employers to join the Healthy Texas Program if only 60 percent of employees participated.

The Healthy Texas Program would not be an entitlement program and would cost only what the Legislature chose to appropriate. Healthy Texas would not compete with the small-employer insurance market because eligibility would be limited to employers who had not offered insurance during the prior year and who had a workforce composed at least 30 percent of low-wage earners making less than 300 percent of the federal poverty level. Eligible employers that chose to participate would be those that had wanted to provide health coverage but had been prevented from doing so because of costs or participation requirements.

**TexLink to Health Coverage Program.** The revisions made to the TexLink to Health Coverage Program would increase public awareness of the benefits of health coverage and the available options so that more uninsured people could identify insurance plans that met their needs. TexLink also directly could assist people or small employers with their technical questions about coverage or educate small employers on how to obtain plans for which they could receive the most favorable federal tax treatment.

Continuing to allow TexLink to solicit gifts and grants, including those from insurers, to fund outreach efforts would be crucial. Given the difficult economic times, the state is short on funding for non-essential programs, yet consumers now more than ever need help finding affordable insurance. Existing safeguards, such as a required review by the Texas Ethics Commission of TDI's rules related to accepting donations, would prevent inappropriate outcomes from occurring in relation to gifts accepted from an insurer. Informational materials distributed by TexLink cold not endorse one health benefit issuer over another.

## Opponents said

**Healthy Texas Program.** The Healthy Texas Program would be yet another costly government intervention in an insurance market that would be

served best by efforts to reduce health costs rather than increasing subsidies. If the private, individual market was subject to fewer mandates, for example, plan costs would decline and fewer people would need to rely on employers to subsidize their premium payments.

Depending on program enrollment, Healthy Texas eventually could spend hundreds of millions of dollars per fiscal year, much of which would be spent on people who could afford private coverage. For an employer to be eligible, the bill would require only that 30 percent of an employer's full-time employees receive annual wages that are less than or equal to 300 percent of the federal poverty level, which is $32,490 for a single person in 2009. A variety of private health-care options would be affordable for people above this income level if they were willing to research plans best suited to their needs. Limited state funds should be reserved for those most in need, and the Healthy Texas funding would be spent more appropriately on efforts to enroll those eligible but not enrolled in programs such as CHIP.

**TexLink to Health Coverage Program.** SB 78 would make valuable improvements in public outreach efforts about health coverage, but these efforts should not have the potential to be funded by a health plan issuer. For example, this bill would allow TexLink to seek funding from a health insurer to hold a health coverage fair. If such funding arrangements produced the public perception of a special relationship between TexLink and an insurer, consumers would have a difficult time trusting that TDI was playing a neutral role in regulating the insurance market. Such funding arrangements would defeat the purpose of other provisions that prohibit TexLink from favoring or endorsing certain insurers in their publications.

## Notes

SB 6 by Duncan, which passed the Senate, but died on the May 24 Major State Calendar in the House when no further action was taken, also would have established the Healthy Texas Program. The **HRO analysis** of SB 6 appeared in the May 24 *Daily Floor Report*.

SB 78 by Nelson, which originally included only the health coverage awareness and education promotion program, was amended in conference committee to include the Healthy Texas Program. The **HRO analysis** of SB 78 appeared in the May 18 *Daily Floor Report*.

# Informed consent for abortion, including mandatory ultrasound

**SB 182 by Patrick**
*Died in the House*

Table
of Contents

**SB 182**, as reported by the House State Affairs Committee, would have amended the Health and Safety Code to add that consent to an abortion would have been considered voluntary and informed only if a physician or a physician's agent:

- provided the pregnant woman with the printed material she currently has a right to view;
- informed her that she was not required to review those materials; and
- provided her with a form entitled "Ultrasound Election" that stated "Texas law requires you to undergo an ultrasound prior to receiving an abortion," with space for a woman to elect whether or not to see and hear the ultrasound, with the statement, "I am making this election of my own free will and without coercion."

The consent would have been voluntary and informed only if the woman underwent an ultrasound prior to the abortion, had been allowed to view and hear it, and heard an explanation of the sounds and images, including a medical description of the dimensions of the embryo or fetus, the presence of cardiac activity, and the presence of external members and internal organs. Viewing and hearing the ultrasound would not have been required if the women elected on the Ultrasound Election form not to view the image or hear the heartbeat or explanations.

The woman would have had to certify in a signed, written statement that she was provided with the required information and printed materials and that they were explained to her. The required information would have had to have been provided to the woman 24 hours prior to the abortion, and it could not have been provided by audio or video recording. The physician who would have performed the abortion would have to have received a copy of the signed, written certification.

A physician could have performed an abortion without obtaining informed consent in a medical emergency and would have been required to include in the patient's medical records a statement signed by the physician that certified the nature of the emergency. The physician would have had to certify to the Department of State Health Services the specific medical condition

that constituted the emergency no later than the seventh day after the date the abortion was performed.

The bill would have defined "medical emergency" to mean a condition that, in a physician's good faith clinical judgment, complicated the medical condition of the pregnant woman and necessitated the immediate abortion of her pregnancy to avert her death or to avoid a serious risk of substantial impairment of a major bodily function.

## Supporters said

SB 182 would protect women's health and help ensure that a woman making a decision about an abortion had access to all medical information pertaining to the decision, including an ultrasound, which gives a woman a clearer view of what she is choosing and whom is affected by her decision. If a woman elected not to view the image or hear the ultrasound or explanation, she would not be required to do so.

Clinics often conduct only perfunctory counseling sessions before abortions and rush women through the process without ensuring that they understand the information and have considered their options. Informing a woman fully of her unborn child's gestational development through ultrasound images could reduce the number of abortions because it would demonstrate more graphically the humanity of the child in the womb.

Performing an ultrasound prior to an abortion procedure already is the standard of care. It would pose no additional cost to the woman seeking an abortion, as most, if not all, clinics already include an ultrasound in the price of the abortion.

## Opponents said

Requiring a woman to have an ultrasound and elect whether or not to see or hear it would inappropriately emotionalize a woman's decision. This bill would be especially traumatic for victims of sexual assault and

incest or women seeking an abortion due to a severe fetal abnormality, as it would not exempt women in these already painful situations.

The bill would needlessly infringe on a woman's relationship with her doctor. The doctor, in consultation with the patient, should determine whether a woman should undergo an ultrasound before an abortion. Although a woman could choose not to view or hear the ultrasound, it still would have to be performed, regardless of whether it was medically necessary, adding a needless cost to the procedure.

## Notes

SB 182 passed the Senate by 20-10 on May 1, but died on the May 26 Major State Calendar in the House when no further action was taken.

The **HRO analysis** of SB 182 appeared in the May 26 *Daily Floor Report*.

# Medicaid buy-in program for children with developmental disabilities

**SB 187 by Deuell**
*Effective September 1, 2009*

Table
of Contents

**SB 187** requires the executive commissioner of the Health and Human Services Commission to develop and implement a Medicaid buy-in program for disabled children whose family incomes do not exceed 300 percent of the federal poverty level. The commissioner must adopt rules for this program, in accordance with federal law, that establish eligibility and cost-sharing requirements. Participants will pay monthly premiums according to a sliding scale based on family income.

## Supporters said

SB 187 would establish a Medicaid buy-in program that would provide medical care and therapy for children with significant physical or intellectual disabilities. This program would assist families with incomes of 300 percent or less of the federal poverty level in paying the high cost of special needs care and increase the quality of life for those children.

Children eligible for the buy-in program could receive all the services they needed to remain healthy and achieve a better quality of life. The cost of even basic care for children with disabilities can be significant. Many require durable medical equipment, such as wheelchairs, and ongoing, costly drug therapies. In addition, they may require speech, occupational, and physical therapy at a young age in order to integrate into the community and learn communication and self-care skills. Children who need certain therapies but do not receive them in the first six years of life may never reach their full developmental potential.

A family of four making only $66,150 per year, which is 300 percent of the federal poverty level, cannot afford the out-of-pocket costs of medical care and critical therapies for a child with disabilities. Nor can most families afford private health coverage that provides an adequate array of services. Without proper health coverage or care, a child's condition often worsens or families may seek more costly care in emergency rooms. Some families that grapple with health costs would prefer to raise their children with disabilities at home but find they must institutionalize their children for them to receive care. Parents in

families that qualify for Medicaid coverage have taken extreme measures such as divorcing or declining job promotions in order to continue qualifying for government-sponsored health coverage. A Medicaid buy-in program would give families a positive option in the midst of these detrimental alternatives.

The Medicaid buy-in program would include safeguards, established in federal law, that would prevent people from dropping private health coverage in favor of more extensive Medicaid coverage. Eligible children covered by employer-sponsored plans could receive wrap-around Medicaid coverage for the Medicaid-eligible services that their existing health plans did not provide.

The Medicaid buy-in program would be a more comprehensive and cost-effective program than a child with disabilities could receive through other state programs. The Medicaid program provides significantly more services than Early Childhood Intervention, public school-based programs, or even the Children's Health Insurance Program (CHIP).

Coverage under the state health insurance risk pool, designed for the medically uninsurable, would be unaffordable for most families under 300 percent of the federal poverty level. Risk pool premiums are twice the average premium that would be paid on the private market, and plans may have high deductibles and are subject to pre-existing condition exclusions.

The Medicaid buy-in program would achieve long-term cost savings that could counterbalance much of the program's short-term Medicaid costs. Many children with disabilities who are not eligible currently for Medicaid services will be eligible for Medicaid services when they turn 19 and the state no longer determines their eligibility based on parental income. Without having been able to capitalize on a Medicaid buy-in program's medical and therapeutic services at a young age, which can dramatically increase developmental capacity, many people with disabilities would be more costly to the Medicaid program throughout the rest of their lives.

## Opponents said

The state should not expand the Medicaid program. A Medicaid buy-in program, even limited to coverage of children with disabilities, annually would cost an additional $59.3 million in general revenue funds by fiscal 2014, according to the bill's fiscal note. All states are facing a fiscally challenging time. While other states are cutting their Medicaid services, Texas is serving its citizens well by maintaining existing Medicaid programs.

The state already has established public-assistance programs that provide health services for low-income Texans most in need. The Medicaid program covers children 18 and younger whose family incomes are at or below 100 percent of the federal poverty level. CHIP covers children whose family incomes are at or below 200 percent of the federal poverty level. In 2009, a child in a family of four making up to $44,100 annually would be eligible for CHIP.

The state health insurance risk pool was designed for people with high-cost medical conditions who can afford the cost of premiums. People with children with special health care needs in families with incomes above 200 percent of the federal poverty level should be able to afford these premiums.

## Notes

The **HRO analysis** of HB 67 by Lucio, the House companion to SB 187, appeared in Part One of the May 1 *Daily Floor Report*.

# Disease control outreach programs, including syringe exchange

**SB 188 by Deuell**
*Died in the House*

Table
of Contents

**SB 188** would have authorized local health authorities or certain other local government entities in counties with populations of 300,000 or more to establish disease control outreach programs that could have:

- provided for the anonymous exchange of used syringes for an equal number of new syringes;
- assisted participants in obtaining health care and other physical and mental health-related services, including substance abuse treatment and blood-borne disease testing; and
- offered education on the transmission and prevention of communicable diseases, including hepatitis C, hepatitis B, and HIV.

A disease control outreach program could have charged a fee for each new syringe used in the program. Program employees and volunteers would have been required to follow procedures for the secure storage and disposal of syringes.

A wholesale drug or device distributor could have distributed syringes to a disease control outreach program. It would have been a defense to prosecution to offenses related to possession or delivery of drug paraphernalia if a person manufactured syringes used by a disease control program or used, possessed, or delivered syringes for use by a program and presented evidence showing that the person was an employee, volunteer, or participant of the program.

An organization operating a disease control outreach program annually would have had to provide the Department of State Health Services with information on program effectiveness, the program's impact on reducing the spread of communicable diseases, and the program's effect on injected drug use.

## Supporters said

SB 188 would provide to certain communities the option to establish disease control outreach programs, including those that established anonymous syringe exchanges, to enhance the health and safety of community members. The programs would provide public education to reduce the spread of communicable diseases and assistance obtaining health services, including substance abuse treatment referrals. Syringe exchanges would make neighborhoods safer, because drug addicts would be less likely to leave used syringes in public or to hide them in places where law enforcement or health care providers could be pricked because the addict feared prosecution for syringe possession.

Injection drug users not only infect themselves with contaminated syringes but can spread blood-borne diseases to their innocent children and sexual partners. More than two decades of research shows that syringe exchanges protect the health of injection drug users and those they could infect. For example, a 1997 National Institutes of Health consensus panel on HIV and a 2002 panel on hepatitis C recommended syringe exchange to reduce transmission of these diseases. Based on an array of studies, the HIV panel said the programs could lead to a 30 percent or greater reduction in HIV.

By reducing transmission of blood-borne diseases, syringe exchanges also reduce health care costs to individuals and the state. If a user is on public assistance or must shift to public assistance as illness prevents earning wages, the costs of treating HIV and hepatitis shift to the Texas taxpayer. The combined Medicaid cost to Texas for HIV/AIDS and hepatitis C in 2005 was more than $110 million. Further costs are borne by local taxpayers, who fund unreimbursed care provided to the indigent at public hospitals.

Syringe exchanges are an effective way to connect drug abusers with treatment programs and to provide medical assistance to a population often lacking basic, preventative health care. The National Institutes of Health has stated that people in areas with syringe exchange programs are more likely to enter drug treatment. The syringe exchanges that would be authorized by SB 188 would provide to volunteers a chance to build trust with drug users who are inaccessible through other forms of outreach and to encourage them to seek treatment.

Reports from the U.S. General Accountability Office, National Academy of Sciences, and the U.S. Centers for Disease Control (CDC) have said there is no evidence that syringe exchange programs

increase illegal drug use. Another CDC study showed no evidence that U.S. programs increase the total number of discarded syringes in cities where they are located. A study published in the *American Journal of Public Health* concluded that Baltimore arrest rates in program and non-program areas show syringe exchange programs do not appear to be associated with increased crime rates.

The author of a Vancouver study that often is cited by opponents as demonstrating issues with syringe exchanges has made public a statement that her research was misused and the results of her study were influenced by the higher risk nature of the study participants and the coinciding emergence of use of a specific drug that required more frequent injection. The author of a Montreal study often cited by opponents has indicated that the results of her study demonstrate the need for more syringe exchanges because they typically drive down HIV rates.

## Opponents said

Any health benefits provided by syringe exchange programs are overshadowed by the harmful message they send that illegal drug use is condoned. Texas could not send a clear message to adolescents that they should not use illegal drugs if the state authorized community programs that provided to an addict an instrument for drug use.

The premise that drug abusers will risk an overdose for a short-term high, yet consistently use clean syringes to protect their long-term health, is questionable. Syringe-sharing often persists among participants in syringe exchange programs. The best way to squelch the spread of disease from injection drug use is for people to abstain from using illegal drugs. By authorizing syringe exchanges for known drug users, SB 188 would facilitate an illegal drug user's addiction.

Many studies touted by advocates of syringe exchange involve questionable experimental design, including small sample sizes, problems with the accuracy of self-reporting, and questionably drawn causal relationships. For example, findings of decreased disease transmission rates could be independently attributable to the outreach and education efforts associated with the syringe exchange programs, rather than with the exchange efforts themselves. In addition, not all studies show syringe exchange programs in a positive light. A 1995 Montreal study showed

that injection drug users who used the local syringe exchange program were more than twice as likely to become infected with HIV as those who did not use the syringe exchange. A Vancouver study showed AIDS prevalence rose significantly in the first ten years the program was in operation.

SB 188 would attract drug users to the areas in which syringe exchanges operated. Areas with high concentrations of drug users are linked with higher crime rates, and drug dealers could be attracted to areas that established syringe exchange programs because they could provide a ready supply of clientele from the surrounding neighborhoods. More local dealers also could increase the exposure of local youth to drugs, potentially starting them down the path to drug use when they otherwise might not have been exposed to this activity. Many neighborhood residents living near syringe exchange programs have reported witnessing increases in the number of discarded syringes in their neighborhoods after a program began operating. It is not fair to ask that certain neighborhoods suffer safety risks and restrict their daily routines so that a syringe exchange program can operate in a particular area.

## Notes

SB 188 passed the Senate, but died on the May 21 General State Calendar in the House when no further action was taken.

The **HRO analysis** of SB 188 by Deuell appeared in Part Two of the May 21 *Daily Floor Report*.

# Denying Medicaid payments to hospitals for preventable conditions

**SB 203 by Shapleigh**
*Effective September 1, 2009*

Table
of Contents

**SB 203** expands the current reporting system for health care-associated infections to include reporting on preventable adverse events and requires the denial or reduction of reimbursement under the Medicaid program for preventable adverse events that occur in a hospital setting.

Health care facilities must report to the Department of State Health Services (DSHS) preventable adverse events for which the Medicare program will not reimburse health care facilities or that are included in the list of adverse events identified by the National Quality Forum. Certain adverse events included in the National Quality Forum may be excluded if it is determined that the adverse event was not preventable. SB 203 provides for DSHS to compile and make available to the public a summary of information, by health care facility, on health care-associated preventable adverse events.

The executive commissioner of the Health and Human Services Commission (HHSC) must adopt rules on the denial or reduction of Medicaid reimbursement for preventable adverse events that occur in a hospital. At a minimum, reimbursement denials and reductions will be imposed for the same types of health care-associated adverse conditions and the same types of health care providers and facilities for which denials and reductions occur in the Medicare program. HHSC may impose reimbursement denials or reductions for other preventable adverse events that cause patient death or serious disability in health care settings, including events on the list of adverse events identified by the National Quality Forum.

## Supporters said

SB 203 would save Texas money and encourage better patient care by denying or reducing reimbursement by the state Medicaid program for preventable adverse events that occurred in a hospital. In October 2008, the federal government began limiting reimbursement to hospitals for Medicare claims regarding preventable medical errors that can result in serious health consequences for the patient. SB 203 would include all the conditions for which Medicare limits or denies reimbursement, and more preventable

events could be added to Texas' list in consultation with an expert health care quality advisory committee.

A 1999 Institute of Medicine survey estimated that nearly 100,000 deaths per year were due to preventable errors, and direct and indirect costs related to such errors could be as much as $29 billion annually. SB 203 would enhance patient safety because hospitals would have a greater incentive to provide better care to patients if the hospitals absorbed the cost of care for avoidable conditions. Consumers also could make more well-informed decisions about the facilities at which they sought care based on the information made publicly available about preventable conditions that occurred at various health care facilities.

Texas would not be alone in pursuing the goals of this bill. Almost 20 states already have or are considering methods to eliminate payment for some preventable medical conditions. Twenty-seven states already collect data on medical errors.

SB 203 would not prohibit Medicaid reimbursement for any infections except those that could have been prevented by the hospital. The included infections only would be those that the patient did not have upon admission to the hospital and that occurred at a site on which the hospital performed a procedure.

## Opponents said

SB 203 would establish overly broad classifications of infections as preventable, adverse conditions for which a hospital would be subject to nonpayment by Medicaid. Due to certain immune-compromising conditions or the limited ability of some patients to heal, some infections that develop during a patient's hospitalization are unavoidable even when the hospital strictly adheres to appropriate protocols. Hospitals, which already bear a large burden of the state's uncompensated care costs for the uninsured, should not have to absorb the cost of treatment for unavoidable infections acquired by Medicaid patients. SB 203 further would harm hospitals that were not paid for treatment of unavoidable infections by requiring HHSC to post on its website the facilities and conditions for which Medicaid payment was denied.

# Notes

SB 203 by Shapleigh passed the House on the Local, Consent, and Resolutions Calendar and was not analyzed in a *Daily Floor Report*.

SB 203 was amended to include the provisions on reporting of and denial of reimbursement for preventable conditions that had been included in SB 7, which passed the Senate, but died on the May 24 Major State Calendar in the House when no further action was taken. The **HRO analysis** of SB 7 appeared in the May 24 *Daily Floor Report*. The provisions of SB 7 are discussed starting on page 134.

HB 852 by T. Smith would have enumerated a list of preventable adverse conditions for which HHSC was to deny payment for additional associated treatments. Additional preventable adverse conditions could have been added to the list for which Medicaid could deny hospitals payment if these conditions were the same type of conditions for which the federal Medicare program limits reimbursement. HB 852 died on the May 11 General State Calendar in the House when no further action was taken. The **HRO analysis** of HB 852 appeared in Part Three of the May 11 *Daily Floor Report*.

# Ban on foods with trans fats in certain food service establishments

**SB 204 by Shapleigh/ HB 1523 by Alvarado**
*Died in the House*

Table
of Contents

**SB 204** would have established a ban on serving, in certain food service establishments, foods containing trans fats. Trans fats would have been defined as foods or food additives artificially created by partial hydrogenation. The ban would not have applied to nonprofits, volunteer fire departments, shelters, private home kitchens, private catering, gasoline retailers, or grocery stores.

The implementation of the ban would have been staggered, first applying to certain foods served by chains and franchises of food service establishments that operated at 15 or more Texas locations. The ban would have applied to all food service establishments that were not exempted beginning September 1, 2011. On or after this date, food service establishments could not have prepared, packaged, stored, or served a food that contained trans fat except for a food served in its original package that contained less than 0.5 grams of trans fat per serving.

Food service establishments would have had to maintain the original federally required food label for any food or food additive that contained fat. The establishment would have had to make food labels available to any person conducting an inspection of the establishment for the Department of State Health Services.

Similar to SB 204, **HB 1523** also would have established a ban on serving, in certain food service establishments, foods containing trans fats. However, HB 1523 would not have exempted grocery stores from the ban on trans fats. HB 1523 also would have exempted from the ban only nonprofits that served food to the public four days or less each week rather than all nonprofits.

## Supporters said

SB 204/HB 1523 would enhance the health of Texans by prohibiting food service establishments from selling most foods with artificial trans fats. Trans fats lower "good" cholesterol and raise "bad" cholesterol, leading to clogged arteries, insulin resistance, and serious health conditions such as heart disease, stroke, and type 2 diabetes. These conditions often are debilitating or deadly. Trans fats also contribute to the obesity epidemic in Texas. Almost 28 percent of Texas adults are obese, and that figure could climb to more than 42 percent by 2040, according to the state demographer.

The bill not only would increase quality of life by reducing the incidence of serious health problems associated with trans fats, but it also could save Texans money. Both consumers and the state pay for health services that could have been avoided by diets that did not include artificial trans fats. Obesity-related issues could cost Texans as much as $39 billion by 2040. In enacting SB 204/HB 1523, Texas would join California, as well as major cities such as New York, Philadelphia, and Boston, in providing citizens with healthier food options. Restaurant chains and major food manufacturers already are shifting to trans fat-free foods because they are responding to what consumers want.

Because of the phased-in approach to this bill, it would not harm local businesses. They would have ample opportunity to make changes to their ingredients before the ban took effect. In light of the movement toward trans fat-free foods, fewer businesses would have to change food suppliers to meet the requirements of the bill because food manufacturers are switching to trans fat-free foods as well.

## Opponents said

SB 204/HB1523 would be a government intrusion into Texans' right to choose what they eat and Texas businesses' right to choose the foods they serve. It is a matter of personal choice and responsibility for informed consumers to determine what they will eat, including what health risks they are willing to assume. If it was the will of consumers to stop eating trans fats, then the market would stop producing them. In fact, current market trends demonstrate declines in the amount of artificial trans fats being produced. This trend should be allowed to run its course until a natural equilibrium is established between consumer demand for trans fats and market supply.

SB 204/HB 1523 would harm many businesses that served food that was wholly or partly produced by a manufacturer that used trans fats. Even though this bill would provide an exemption from the trans fat prohibition for businesses with existing contracts for foods that included trans fats, businesses would be required to change their food suppliers as soon as existing contracts expired if their suppliers did not eliminate trans fats from the foods they produced. This could lead to losses for food businesses that relied on a customer-base that expected continuity in the taste of the foods they purchased. It also could increase contracting costs for businesses that had to switch to food distributors with which they lacked an established relationship from which to negotiate lower prices.

## Notes

SB 204 passed the Senate, but died on the May 23 General State Calendar in the House when no further action was taken. The **HRO analysis** of SB 204 appeared in Part Two of the May 23 *Daily Floor Report*.

HB 1523 was reported favorably, as substituted, by the House Public Health Committee, but died on the May 11 General State Calendar when no further action was taken. The **HRO analysis** of HB 1523 appeared in Part Three of the May 11 *Daily Floor Report*.

# Managed care plans and out-of-network health care providers

**SB 586 by Carona**
*Died in the House*

Table
of Contents

**SB 586** would have established requirements for the conduct of HMOs and insurers offering preferred provider benefit plans with respect to providers who share information with patients about in-network and out-of-network health care.

An HMO would not have been allowed to terminate participation of a physician or provider solely because the physician or provider informed an enrollee of the full range of physicians and providers available to the enrollee, including in-network and out-of-network providers, and the enrollee chose an out-of-network provider. An HMO could not have prohibited or discouraged a provider, as a condition of a contract with that provider, from sharing with patients the availability of facilities, both in-network and out-of-network, for the treatment of their medical conditions.

An insurer could not have terminated an insured's participation in a preferred provider benefit plan solely because the insured used an out-of-network provider nor terminated the contract of a preferred provider solely because the provider's patients used out-of-network providers. An insurer could not have penalized a preferred provider for communicating with an insured about the availability of out-of-network providers.

An insurer's contract with a preferred provider could have required that before the provider could make an out-of-network referral for an insured, the preferred provider would have to inform the insured of the option to choose a preferred or out-of-network provider and that the out-of-network provider could require more out-of-pocket expenses. The preferred provider also would have had to inform patients about any financial interest the provider held in the out-of-network provider.

## Supporters said

SB 586 would safeguard health care providers and patients against insurer retribution for referral to or use of out-of-network health care providers. Despite terms in most contracts between insurers and health care providers prohibiting the insurer's influence on a physician's medical care decisions, many physicians inappropriately have been penalized or even have had

their contract terminated for making out-of-network referrals. Similarly, some insurers have ceased coverage for consumers seeking out-of-network care.

When physicians feel threatened by insurers for making out-of-network referrals, it can pose a dilemma for physicians, who are obligated to make medical decisions in the best interest of their patients yet are financially dependent on the business that contracts with insurers afford. While most contracts require a physician to refer patients to an in-network provider when possible, there are situations in which an out-of-network provider or facility is better equipped to meet a patient's needs or is the only reasonably available provider or facility. Particularly with respect to preferred provider organizations, the insured pays extra for the flexibility of using an out-of-network provider when appropriate, even if the cost is higher. SB 586 would prevent insurers from influencing a physician's medical judgment and would allow the insured to exercise the right to seek medical services where and from whom they prefer.

The bill would not interfere with an insurer's ability to take action against a provider who truly was abusing the system for personal gain. The protections for physicians only would apply when they had informed enrollees of the full range of medical providers available to them. The bill would allow an insurer to require a preferred provider to inform the insured of the available medical providers and the potential to incur higher out-of-pocket costs for out-of-network care.

## Opponents said

SB 586 would hinder an HMO or insurer's ability to regulate its provider network in the best interest of patients. As more physician-owned health facilities have been established, physicians increasingly have been encouraging their patients to use services at a facility in which the physician held a financial interest, even if there was a more convenient and less costly in-network facility at which the patient could receive services. Such referrals financially benefit the physician yet can lead to much higher medical bills for patients. For example, an in-network surgeon could see his patients at a private office but encourage the patient to undergo the surgery

at his physician-owned surgical center, where the patient would have to pay more because the anesthesiologist was an out-of-network provider.

Although the majority of physicians have their patients' best interests in mind, the bill would equip self-interested physicians with grounds to challenge actions taken by their contracting insurer to curb behaviors that lead to needless out-of-pocket expenses for the insured. It is not clear what information would be sufficient for physicians to argue they had informed an enrollee of the "full range" of in-network and out-of-network providers available to them. Bad actors could provide minimal information regarding in-network providers while advocating for their out-of-network facility services. Consumers with limited knowledge of their rights in navigating the health care market would be inclined to trust these doctors. The bill would minimize insurer recourse in such situations.

## Notes

SB 586 passed the Senate, but died on the May 22 General State Calendar in the House when no further action was taken.

The **HRO analysis** of SB 586 appeared in Part Two of the May 22 *Daily Floor Report*.

# Revising small and large employer health group cooperatives

**SB 972 by Averitt**
*Died in the House*

Table
of Contents

**SB 972** would have allowed health group cooperatives to elect to treat participating employers within the cooperative as separate employers for the purpose of rating health benefit plans. The bill also would have allowed, under specified circumstances, eligible single-employee businesses to participate in a health group cooperative.

**Health group cooperative elections for rating.** A health group cooperative could have filed an election to treat participating employers within the cooperative as separate employers for purposes of rating health benefit plans. The bill would have established notice requirements for the health group cooperative to inform participating employers and employers considering joining the cooperative of this election. All plans offered by the cooperative would have been required to be made available to all employers covered by the cooperative rather than to all employees participating in the cooperative.

**Single-employee businesses in health group cooperatives.** Eligible single-employee businesses could have participated in a health group cooperative if the cooperative elected to permit participation by these employers and the cooperative also included small employers, large employers, or both small and large employers. The health group cooperative first would have had to obtain a written agreement from a health plan issuer to issue coverage to the cooperative if its membership included single-employee businesses. Single-employee businesses could not have joined a sub(p) cooperative, which is a type of health group cooperative that is limited to 50 or fewer employee participants and is treated as a single small employer for rate setting and for issuance and renewal of coverage.

Guaranteed issuance, rating requirements, and mandated benefits applicable to small employers would have applied to single-employee businesses that were members of a health group cooperative.

A health group cooperative could have rescinded its election to permit eligible single-employee businesses to join the cooperative if the election to allow coverage of these businesses had been in effect at least two years and the cooperative met certain notice requirements. A health group cooperative that had

made such a rescission could not have filed an election to allow single-employee businesses to receive health coverage through the cooperative for five years after the rescission.

## Supporters said

SB 972 would allow health group cooperatives to determine if their members would benefit more if they were treated separately or as a single employer for rating purposes and would expand the opportunities cooperatives afford people to obtain health coverage.

The flexibility that would be granted by the bill to determine how a cooperative's member employers would be treated for rating purposes would encourage more communities to establish health group cooperatives and increase the local rate of insurance coverage. All members of a health group cooperative currently are treated as a single employer for the purpose of setting premiums. This structure increases premium costs for businesses with employees with lower health risks to balance the higher coverage costs for cooperative participants with greater health risks. A health group cooperative does not serve its purpose to insure more people if the businesses that have employees with lower health risks drop health coverage because they do not feel the benefits they receive through the cooperative's health plan are worth the costs.

In addition, no employers benefit if the costs for an insurer to offer health plans to a cooperative become so great that the insurer ceases to offer the coverage. SB 972 would allow health group cooperatives to elect to treat members separately for the purpose of rating if this measure would prevent an insurer from ceasing to offer coverage. A low percentage of small firms in Texas, only 33.6 percent in 2005, offer health insurance, and it is critical to Texas' efforts to expand small employer health coverage that cooperatives are maintained as a viable coverage option.

Those who argue that employers that would like to join a cooperative yet be treated separately for rate-setting purposes should join a private purchasing cooperative fail to acknowledge that private purchasing

cooperatives do not afford all the benefits that a health group cooperative does. Unlike standard private purchasing cooperatives, health group cooperatives are not required to offer all state-mandated health benefits. They confer more stability by requiring members to join for two years. Health group cooperatives also allow the members to limit membership to employers from a specific industry or to maintain the issuance and pricing restriction benefits of a small employer health plan.

By allowing sole proprietors to join health group cooperatives, SB 972 would expand the opportunities for small business owners to obtain health coverage. Some sole proprietors go without insurance because premiums in the private, individual market are too high. In this market, insurers also may refuse to cover a sole proprietor.

A health group cooperative could elect whether or not to allow single-employee businesses to participate and could rescind this election at a later date. With the option afforded by SB 972 to treat participating employers separately for rating purposes, a cooperative would be able to choose if the health risks of participating sole proprietors were spread over the cooperative at large or borne only through the premiums paid by the sole proprietor. Single-employee businesses would not be allowed to join sub(p) cooperatives, because insurers are not allowed to decline coverage to a sub(p) cooperative and it would be inappropriate to compel them to assume the risk of coverage for sole proprietors in a small group.

## Opponents said

By allowing health group cooperatives to elect to treat employers separately rather than as a single employer for the purpose of rate setting, SB 972 could deny some employers one of the cost-saving characteristics of health group cooperatives that prompted them to join. In addition to reduced administrative costs, health group cooperatives make insurance affordable for small employers because the treatment of all participating employers as a single employer spreads risk, which reduces their premiums.

If a health group cooperative elected to treat employers separately for rating purposes, many participating small employers could drop health coverage for their employees because they no longer could afford the premiums. Those small employers that recently had joined a cooperative could experience major increases to their premiums in their second year of coverage due to such an election, yet they would be required to fulfill their two-year commitment to participate in the cooperative unless they could demonstrate financial hardship. The original form of private purchasing cooperative already treats participating employers separately for rating purposes, so employers desiring this option should form a private purchasing cooperative instead.

## Notes

SB 972 passed the Senate, but died on the May 22 General State Calendar in the House when no further action was taken. The **HRO analysis** of SB 972 by Averitt appeared in Part Three of the May 22 *Daily Floor Report*.

The companion bill, HB 2586 by Smithee, was placed on the May 8 General State Calendar in the House, but died when no further action was taken. The **HRO analysis** of HB 2586 appeared in Part Six of the May 8 *Daily Floor Report*.

# Employment of physicians by certain hospitals

**SB 1500 by Duncan/ HB 3485 by Coleman**
*Died in the House/ Vetoed by the governor*

Table
of Contents

**SB 1500** would have allowed the Dallas County Hospital District — which performs business as the Parkland Health and Hospital System — and certain small, rural hospitals to employ physicians.

The Dallas County Hospital District could have appointed, contracted for, or employed physicians, dentists, and other health care providers. Employment of physicians could have occurred only to fulfill the district's mandate to provide medical care for the indigent and needy residents of the district. For all matters relating to the practice of medicine, each employed physician ultimately would have reported to the chief medical officer of the district.

The district would have established a committee of five physicians who would have ensured that district policies allowed employed physicians to exercise independent medical judgment in providing care to patients. Committee members would have had to disclose financial conflicts of interest and report to the Texas Medical Board any event that the member believed in good faith constituted a compromise of the independent medical judgment of a physician in caring for a patient.

Critical access or sole community hospitals that had a medical staff of 15 or fewer physicians could have employed a physician if the hospital was a certified non-profit health corporation that met applicable statutory and Texas Medical Board requirements. The bill would have established guidelines for the policies a hospital would have been required to adopt and enforce to ensure that an employed physician exercised independent medical judgment in the care of patients.

The bill would have established requirements for the equal treatment by hospitals of employed and non-employed physicians, including equal consideration for physician credentials and privileges, and requirements that hospital by-laws prevent discrimination against or in favor of a physician based on the physician's employment status.

Hospitals could not have penalized a physician or other person who reported a violation of corporate practice of medicine statutes, laws regulating nonprofit health corporations, or Medical Board rules, nor could a physician making such a report in good faith have been held civilly liable or disciplined by the Texas Medical Board for the report.

The Texas Medical Board could have charged a reasonable fee to certify a nonprofit health corporation that employed physicians and to investigate the organization's compliance with applicable laws. Fines and administrative remedies could have been applied for violations.

## Supporters said

SB 1500 would allow the Parkland Hospital System and certain small, rural hospitals to employ physicians to ensure adequate staffing to meet the needs of the populations they serve. The bill would establish mechanisms to ensure physicians could exert their independent medical judgment without influence from the hospital employing them.

The bill would confine the smaller hospitals that were granted the right to employ physicians to those with 15 or fewer physicians that were critical access or sole community hospitals. These designations indicate the particular need of these hospitals to have flexibility in hiring practices because they provide health services to populations with limited access to health care. Since contract physicians earn a living according to the volume of patients they see and the number of procedures they perform, contracting with rural hospitals may not provide adequate patient volume for physicians to pay administrative costs for their practice. The bill would allow the rural hospitals most in need to recruit physicians with an employment package that would afford a stable salary and defined benefits.

The Parkland Health System has a mandate to provide medical care for the indigent and needy residents of the district. Because these residents often are unable to pay for their health services, it is difficult to maintain adequate staffing to serve their needs. The bill would acknowledge Parkland's unique circumstances in needing to provide a salary to doctors who served patients whose payments would not be sufficient to compensate a contracted doctor.

The bill would have many safeguards for physicians to protect their independent medical judgment. Employed Parkland physicians ultimately would report to the chief medical officer, and their policies would be governed by a committee of physicians. Safeguards for the rural hospitals would include whistleblower protections and policies designed to provide equal privileges to and demand equal work requirements of employed and contracted physicians. Employment would be optional and not mandatory for physicians if they were concerned about retaining independence in their medical practice.

Texas already allows physicians to own hospitals and doctors to be employees of state medical schools, community health centers, and almost a dozen rural hospitals. Many states have no prohibitions on hospital employment of physicians.

## Opponents said

SB 1500 would allow more hospitals to employ physicians, a practice that never should occur because it interferes with the physician's ability to exercise independent medical judgment. Even public and nonprofit hospitals are motivated to keep costs low and meet other business needs. These needs may cause a hospital's priorities to conflict with providing the best course of treatment that most would enhance a patient's care and safety. It is impossible for an employed physician to act independently of their employing hospital's influence. Even if the physician reported to a medical professional, that physician's salary and benefits would be administered by employees, often laypeople, of a corporate entity with incentives to minimize the hospital's operating budget.

## Notes

The **HRO analysis** of SB 1500 appeared in Part Two of the May 21 *Daily Floor Report*.

**HB 3485** by Coleman was amended to enable the Parkland Health System and certain small, rural hospitals to employ physicians, but the bill was vetoed by the governor. For more information on HB 3485, see HRO Focus Report Number 81-7, *Vetoes of Legislation, 81st Legislature*, July 22, 2009, pp. 43-46.



Table
of Contents

* HB 51      Branch/      Funding incentives to promote more tier-one research universities ...............158
   * HJR14      Corte
     HB 2083      Solomons      Junior college employee group health insurance benefits ...............................161
     HB 3276      D. Howard      Determining student priority in awarding TEXAS grants ............................162
* SB 175      Shapiro      Revising the Top Ten Percent automatic admissions policy...........................163
* SB 956      West      Establishing a public law school in Dallas ...................................................166
     SB 1443      Zaffirini      Limits on increases in tuition and fees.........................................................168

# Funding incentives to promote more tier-one research universities

**HB 51 by Branch/ HJR 14 by Corte**
*HB 51 generally effective September 1, 2009/*
*HJR 14 effective pending voter approval on November 3, 2009*

Table
of Contents

**HB 51** creates new funding mechanisms and incentives to promote the development of national research universities. It rededicates the corpus of the Permanent Higher Education Fund (PHEF) endowment; requires a long-term strategic plan for each research and emerging research university on how the institution plans to achieve or enhance research recognition; authorizes $150 million in tuition revenue bonds for the University of Texas Medical Branch (UTMB) at Galveston to assist in the recovery from Hurricane Ike; allocates to eligible institutions the annual $262.5 million appropriation made through the Higher Education Fund (HEF); authorizes excellence funding and incentive grants for certain universities; establishes performance incentive funding based on at-risk student enrollments and graduation rates of students in high-need fields; and requires a feasibility study on creating a searchable database to track specialized technology research projects conducted at public universities and other state institutions.

The National Research University Fund (NRUF) would be created, contingent on voter approval of a proposed constitutional amendment in HJR 14. It would provide a source of funding to enable emerging research universities to achieve national prominence as major research universities using money that has been invested in the PHEF endowment. The corpus of the PHEF endowment would be rededicated as the corpus of the NRUF. Annual NRUF allocations to eligible institutions would be based on the future earnings of the NRUF corpus. In order to receive distributions from the NRUF, eligible institutions must reach certain steps toward designation as tier-one research institutions, including expending at least $45 million in restricted research in two consecutive years; have a total endowment of at least $400 million; award 200 doctoral degrees per year; and satisfy other academic standards.

HB 51 establishes three funding streams for research and emerging research universities. The Research University Development Fund (RUDF) will provide funding to eligible research and emerging research universities for recruitment and retention of faculty and to promote increased research capacity. Funding will be allocated to public universities based

on the total amount research funds expended over a specified time. The Texas Research Incentive Program (TRIP) will provide matching grants to emerging research universities based on the amount of donations from private sources or endowments to enhance research productivity and faculty recruitment. Performance incentive funding is for all general academic teaching institutions. Using a system of weights and points, allocations will be based on combinations of noncritical and critical fields and at-risk and not at-risk students. Institutions will qualify for incentive funds in proportion to the increase in the average number of degrees awarded each year.

The bill also authorizes an Excellence Awards program for excellence in specific programs and fields for general academic teaching institutions that are not research universities or emerging research universities. Excellence award funding is to encourage the development of designated degree programs to the highest national standards.

**HJR 14** would amend the Texas Constitution to establish the NRUF for the stated purpose of providing a dedicated, independent, and equitable source of funding to enable emerging research universities in Texas to achieve national prominence. Funding would be derived from investment earnings of the PHEF endowment, which would be rededicated to become the corpus for the NRUF. The University of Texas at Austin and Texas A&M University would not be eligible to receive money from the fund. An eligible state university could use distributions from the fund only for the support and maintenance of educational and general activities that promote increased research capacity at the university.

## Supporters said

Creating additional national research universities would help Texas achieve the vision of being globally competitive. Tier-one universities are one of the best ways to develop a highly skilled workforce, especially in the sciences, engineering, and professional fields critical to economic success, but the state trails other leading states in the number of tier-one research

universities. California has nine tier-one schools for about 36 million residents. With more than 24 million Texans and only three tier-one institutions — the University of Texas at Austin and Texas A&M University, the public institutions, and Rice University, which is private — it is no surprise that the state's top-flight public institutions have more applicants than they can admit. Texas is losing more than 10,000 high school graduates a year to doctoral-granting universities in other states. At the same time, the state is recruiting only 4,000 students per year from other states, resulting in a net loss of 6,000 students a year. The presence of additional tier-one institutions would expand the educational opportunities available to Texas students and keep more of them in the state.

Texas is at a disadvantage in attracting and retaining top talent and drawing research and venture capital investment to the state. The bill would encourage the state's seven emerging research institutions — UT-Arlington, UT-Dallas, UT-El Paso, UT-San Antonio, the University of Houston, the University of North Texas, and Texas Tech University — to strive for national excellence. University officials say that the new initiative would help the state add two or three more tier-one universities within a decade.

Limited state dollars should not be targeted to those institutions that are the closest to attaining top tier status. All institutions that compete for the funding to build up their research programs and endowments would be encouraged to challenge themselves for excellence. Also, the eligibility criteria for receiving distributions from the NRUF should be stringent because Texas universities striving for tier-one status would be competing not only with each other, but nationally.

HB 51 and HJR 14 are necessary to repurpose the inactive corpus of the PHEF into the National University Research Fund to create an endowment for emerging research universities in Texas to achieve nationally recognized research status. The PHEF endowment was established starting in 1995 with annual appropriations of $50 million for the benefit of the non-Permanent University Fund institutions. The goal was for the PHEF to reach $2 billion, at which time the interest generated would replace general revenue appropriations currently allocated to eligible institutions. However, no state appropriations have been made to the endowment since fiscal 2003, and it currently is worth around $500 million.

Using the money in the moribund PHEF endowment to promote tier-one universities would be a worthy use that would in no way reduce state funding for infrastructure and other needs already allocated to all non-PUF state universities, regardless of whether they are emerging research institutions. In fact, HB 51 would authorize general revenue allocations to non-PUF institutions based on updated formulas, as required by the Texas Constitution.

HB 51 also would provide crucial help to meet the recovery needs of UTMB, which was devastated by Hurricane Ike last fall. Damages suffered by UTMB in Galveston were significant, estimated to be around $1 billion. The tuition revenue bonds (TRBs) authorized by HB 51 would fund a hospital tower on Galveston Island to enable UTMB to restore its trauma and indigent care capacity. The $150 million from TRBs authorized by the bill would be used to match $200 million from the Sealy Smith Foundation to build the building. Although a consulting firm had recommended moving all the patient beds from Galveston to the mainland, the community and the University of Texas System board of regents unanimously support a plan to repair and improve the island-based facilities. The consultant's report did not take into account that some of the FEMA money might not be available if UTMB medical operations moved inland. Rebuilding on Galveston would maintain the proximity and economies of scale with the rest of the campus.

## Opponents said

While the goals of the bill are laudable, Texas should focus more of its limited state resources on those institutions that are the closest to attaining tier-one status. Especially because of the urgency of developing more nationally competitive research universities, it would make more sense to target fewer institutions that were further along the path to tier-one status.

An independent outside consulting firm hired by the UT Board of Regents found that an inland location would be the best hope for securing the financial future of UTMB and recommended moving patient-care enterprises from Galveston to the mainland. The recommendation said an inland location made more sense because of the closer proximity to the more heavily populated outskirts of Houston, which has a greater proportion of patients with commercial and governmental insurance, and would help support operational costs of UTMB's health care system.

## Other Opponents said

The funding criteria in the bill would be too difficult for many institutions to reach and result in their taking many years to qualify for funding. The number of doctoral degrees that would be required should be lowered and take into account the underserved regions and populations served by the institutions, such as those in South Texas.

## Notes

The **HRO analysis** of HB 51 appeared in Part One of the April 24 *Daily Floor Report*.

HJR 14, originally related solely to eminent domain, was amended to include provisions relating to establishing a National Research University Fund. SJR 35 by Duncan, which would have established the National Research University Fund, was approved by the Senate, but died on the Constitutional Amendments Calendar in the House when no further action was taken. The **HRO analysis** of SJR 35 appeared in the May 24 *Daily Floor Report*.

# Junior college employee group health insurance benefits

**HB 2083 by Solomons**
*Died in Senate committee*

Table
of Contents

**HB 2083** would have required the Employees Retirement System (ERS) board of trustees to include eligible public junior college employees when determining the state contribution amount necessary to pay for coverage under the group benefits program. The bill would have defined as eligible those instructional or administrative employees of a public junior college that otherwise were eligible to participate in the group benefits program and whose salary could be paid from funds appropriated under the general appropriations act, regardless of whether the salary actually was paid from appropriated funds.

The bill would have required the number of employees eligible for state health insurance contributions to be adjusted in proportion to the change in enrollment at each college during the reporting period. Colleges that experienced a decline in enrollment would have been allowed to petition to maintain the number of eligible employees at the same level as the prior biennium.

## Supporters said

HB 2083 would recognize and codify the historic commitment by the state to fund community college group healthcare insurance for faculty and staff. If the issue of responsibility for group health insurance benefits for all community college employees involved with educational programs is not settled, there could be negative statewide implications that would be felt in every community, as community colleges would be forced to shoulder a significantly higher local expense.

If the state did not pay for eligible employee health insurance benefits, then community colleges would be forced to push those costs onto the community in the form of increased local taxes, increased tuition and fees, reduced programs and services, or deferred maintenance to pay for the benefits. Most districts simply cannot raise local taxes or tuition and have already been deferring maintenance for some time. The last resort would be to cut services by educating only the number of students for which the state provides funding.

Forty years ago, the state agreed to fund the cost of instruction at community colleges if local residents agreed to tax themselves to build and maintain the necessary physical facilities. Community colleges are in compliance with proportionality requirements — which are included as a rider in the appropriations bill — by paying for the salaries and benefits of physical plant and auxiliary services employees and those who work on projects funded by externally funded grants.

## Opponents said

All state agencies and public higher education institutions determine the proportional cost-sharing split for employee benefits costs, and community colleges should not be treated differently. State funds should not be used to pay for health insurance benefits for non-state paid employees. Community colleges should pay their fair share of health insurance for their employees. In 2005 and 2007, the Legislative Budget Board recommended that the state apply proportionality cost-sharing to state contributions for public community college employees in order to reduce the state's financial obligation.

Even though the state leadership agreed to restore to community colleges the funding for employee health insurance that the governor line-item vetoed, the agreement was contingent on the community colleges making the transition to proportionality in the future. Since the governor's veto in 2007, the community colleges have had time to prepare for the transition and assume their fair share of these costs.

## Notes

HB 2083 passed the House, but died in the Senate Finance Committee.

The **HRO analysis** of HB 2083 appeared in Part Two of the May 1 *Daily Floor Report*.

# Determining student priority in awarding TEXAS grants

**HB 3276 by D. Howard**
*Died in the Senate*

Table
of Contents

**HB 3276**, as passed by the House, would have required the Legislative Budget Board (LBB), in consultation with the Texas Higher Education Coordinating Board (THECB), to conduct a study to identify and recommend methods of prioritizing TEXAS grants for eligible students to ensure the most effective use of program funds. The LBB would have been required to study the effects of prioritizing awards based on financial need and in a manner that was designed to provide incentives for students to meet college readiness standards. This would have included successful performance on assessments of college readiness standards of the Texas Success Initiative (TSI) program.

The LBB would have been required to report by December 1, 2010, the results of the study to the governor, the lieutenant governor, the House speaker, and each legislative higher education committee.

## Supporters said

While not aiming to reduce the number of students eligible for a TEXAS grant, HB 3276 would determine if prioritizing the award of grants based on student financial need and college preparedness was an effective method to ensure the best use of the program's funds. TEXAS grants already help many students, but the grants could be more effective if the awards were given to financially needy students who are prepared academically. Institutions currently allocate existing funds to the neediest eligible students on a first-come, first-served basis without regard to academic preparation. The study required by the bill would assist in determining the best use of limited state dollars and who would be affected by a more targeted approach.

Since its creation, the TEXAS grants program has proven to be an effective tool for improving college readiness in Texas high school students. In 1999, only 15 percent of high school graduates were completing at least the recommended high school program (RHSP), compared to 80 percent today. This very likely is due, in part, to the fact that a student must complete the RHSP in order to qualify for a TEXAS grant.

## Opponents said

Any change to a merit-based component when awarding TEXAS grants would shift a disproportionate amount of funds to students at four-year institutions and away from community college students. Community colleges, by their mission, are open enrollment institutions. They provide services to students who are trying to bridge a gap in order to be successful, learn marketable skills, or strengthen their academic abilities so they can continue on to four-year universities.

If a decision was made to add a merit component to awarding the grants, many community college students no longer would meet the eligibility criteria and would be bumped to the end of the line for TEXAS grants. By their nature, four-year institutions set academic standards for admission at higher levels. If grants were awarded to needy students who met the TSI standards, a significantly larger portion of grant recipients would be at four-year institutions.

## Other opponents said

A better approach would be to convert TEXAS grants to strictly a university program and move the community college share to the Texas Educational Opportunity Grant (TEOG) program for community colleges. If the TEXAS grants program were converted to a university-only financial aid program, attention would have to be paid to students who graduated under the RHSP and were TSI prepared, but for other reasons started their higher education at a community college. Once they earn an associate's degree and are ready to transfer to a four-year university, they should be eligible for a TEXAS grant renewal at the time of transfer, as long as they met the other eligibility criteria.

## Notes

HB 3276 passed the House on May 7 and was reported favorably, as substituted, by the Senate Higher Education Committee, but no further action was taken.

The **HRO analysis** of HB 3276 appeared in Part One of the May 6 *Daily Floor Report*.

# Revising Top Ten Percent automatic admissions

**SB 175 by Shapiro**
*Effective June 19, 2009*

Table
of Contents

**SB 175** authorizes the University of Texas at Austin (UT-Austin) to limit automatic admissions of those graduating with a grade point average (GPA) in the top 10 percent of their high school graduating class to 75 percent of its first-time resident undergraduate student enrollment capacity in an academic year, beginning with admissions for the 2011-12 academic year. SB 175 requires UT-Austin to report to the state leadership, in every year that it limits automatic admissions, on progress made in the areas of diversity, counseling and outreach, and recruiting efforts. The authorization to limit automatic admissions expires after the 2015-16 academic year.

The bill allows automatic admission for transfer undergraduate students who would have qualified for automatic admission at the time of their high school graduation. The bill limits to 10 percent the admission offers to students who are not Texas residents. It establishes a scholarship program for certain students who graduate in the top ten percent of their high school graduating class. The bill also requires the Texas Higher Education Coordinating Board (THECB) to implement a program for universities to increase and enhance outreach efforts to academically high-performing high school seniors. The bill establishes the Higher Education Assistant Plan to provide to prospective students at certain high schools information about college enrollment, admissions, and financial aid.

If the number of applicants who qualify for automatic admission at UT-Austin exceeds 75 percent of the university's slots for first-time resident undergraduates, the university may elect to limit automatic admissions to no more than 75 percent of the enrollment capacity for first-time resident undergraduates. If the university limits automatic admissions, it must offer admission to those top ten percent applicants according to their percentile ranking in their graduating class based on grade point average, beginning with the top percentile rank, until a sufficient number of applicants have been offered admission to fill 75 percent of enrollment capacity. The university must offer admission to all applicants with the same percentile rank. After offering admission to those applicants, the university must offer admission to any remaining top 10 percent applicants in the same manner

as generally admitted first-time freshman students. If the university elects to limit automatic admissions, it may not use an applicant's legacy status in deciding on admissions. Students admitted under the cap must complete at least six semester credit hours during evening hours or other low-demand hours to ensure efficient use of available classrooms.

To be eligible for a top 10 percent scholarship, students who are Texas residents must satisfy certain requirements, including graduating from a Texas public or private high school ranked in the top 10 percent of their graduating class under the recommended or advanced high school curriculum. Students must apply to a university that has elected to cap the number of automatic admissions but have been denied admission, have been awarded a TEXAS grant, and have met other eligibility requirements. To continue to receive the scholarship, a student must make satisfactory academic progress, as defined in the bill.

## Supporters said

SB 175 would maintain the benefits of the Top Ten Percent Law while giving universities the flexibility they need to carry out their duty to all students in Texas. Since the enactment of the Top Ten Percent Law, universities have been required to admit all applicants who graduated in the top ten percent of their high school class. This has had significant negative consequences, especially at the University of Texas at Austin, which the bill would address. Texas universities should address the needs of all Texans, including the other 90 percent. Many top-notch students whose GPA does not rank them in the top 10 percent are being overlooked, even though they are extremely well-prepared and successful students. This is especially true for those in large urban high schools where academic competition is fierce.

The law was enacted in response to the *Hopwood* decision that said race could not be used as a factor in college admissions. It requires state universities to admit certain students based on a single criterion — class rank — that limits an institution's flexibility and creates a one-dimensional, unhealthy academic environment. Basing admissions on this single criterion deprives a

campus of a well-rounded freshman class that reflects the diversity and excellence of the state. Texas' flagship campuses are losing control of enrollment through the number of slots they must dedicate to top 10 percent admissions.

According to officials at UT-Austin, among incoming freshman students from Texas high schools, 81 percent were automatically admitted in the fall of 2008. By 2009, that number is expected to be 86 percent. If the law was not amended, by 2013, UT-Austin would be forced to reject all high school applicants who were not top 10 percent graduates.

Now that the U.S. Supreme Court has decided that race can be an element of admissions criteria, universities no longer need such a rigid policy to help promote diversity. Texas universities should admit and retain more minority students, and SB 175 would give them the flexibility to ensure greater campus diversity. Capping the number of automatic admissions would allow for more discretionary admissions. A more holistic review would allow for the recruitment of a rich array of students, including minority students. If allowed more discretion, institutions could use ethnicity as a factor in admissions in a robust way. If institutions could use other factors, such as test scores, special talents, leadership ability, personal achievements, or other relevant aspects of a student's application, while continuing the use of targeted scholarships and outreach, they could admit a well-rounded class of students that would include more minorities, student leaders, scientists, and virtuosos.

Without a cap, it would be difficult to increase the number of minority students because the number of students being admitted under a holistic review is so small that the slots are very competitive. Even though the minority enrollment percentage at UT-Austin has increased since the enactment of the law, the actual numbers are not that significant. Besides, the increased minority enrollment in higher education simply reflects the high school population trends because, since 1996, African-American, Hispanic, and Asian populations have increased in Texas. Further, there is no evidence that rural representation overall has increased since the law was enacted.

The bill would authorize limiting the number of those automatically admitted only through 2015-16, which would allow UT-Austin time to develop a more

diverse, well-rounded student body. It also gives the Legislature an opportunity to reevaluate the program in the future. If minority enrollment declined, the Legislature would be able to address it at that time.

## Opponents said

The number of students allowed to be automatically admitted should not be limited because the Top Ten Percent system is doing exactly what is was designed to do — provide a race-neutral, merit-based method of admitting a diverse class of highly qualified, motivated students with the necessary skills to succeed. The system is fair because basing admissions on class rank levels the playing field for students across the state and compares them to their peers based on how well they have taken advantage of available resources. It was designed for students, not for institutions. Capping the number of automatically admitted students would undermine the college aspirations of students from all racial, ethnic, geographic, and economic backgrounds and would diminish the duty and accountability of flagship institutions to all Texans.

The existing law has helped Texas' flagship universities fulfill their mission to serve students across the state by granting broader opportunities to the very best students from every high school. Not only has it helped create more diverse freshman classes — racially, economically, and geographically — at UT-Austin and Texas A&M, but it has done so in a way that benefits all regions of the state, especially rural areas. Increasing ethnic diversity has been more successful, especially for Hispanic students, under the Top Ten Percent Law than under holistic review admissions that included pre-1996 race-conscious affirmative action policies. Diversity has increased over the years since the law was enacted, both in numbers and percentages, and there is a better reflection of the population of Texas in the classes of students being admitted to the state's universities. That same diversity is missing in the numbers of non-top 10 percent students. It does not make sense to cap the only program that is working.

With a more limited top 10 percent plan, Hispanic and African-American students in rural and urban areas would find it more difficult to be admitted to the state's flagship schools. Schools with a high percentage of low-income students, especially border area schools, would lose out if the plan were changed.

Claims that automatically admitting students based on high school GPA is one-dimensional are misguided. Rather, a high school GPA is a collective indicator of a student's hard work and achievement. Data from UT-Austin's admissions office indicate that since 1996, among all racial and ethnic groups, top 10 percent students have outperformed students who scored significantly higher on standardized college entrance exams. In addition, class rank appears to be a good predictor of student performance.

## Other opponents said

Rather than amending the existing admissions policy, adopting a return to a statewide policy of race-conscious university admissions would be the surest way to ensure true diversity in freshman admissions.

## Notes

The **HRO analysis** of SB 175 appeared in the May 20 *Daily Floor Report*.

# Establishing a public law school in Dallas

**SB 956 by West**
*Effective June 19, 2009*

Table
of Contents

**SB 956** authorizes the University of North Texas System board of regents to establish a law school in Dallas. The Texas Higher Education Coordinating Board (THECB) is required to conduct a feasibility study to determine the actions the University of North Texas System must take to obtain accreditation for the law school. THECB also is required to conduct a study on the feasibility of establishing a public law school in areas of the state, including the Texas-Mexico border region, where a law school is not located, using the same criteria used for the determination of the need for the University of North Texas at Dallas College of Law.

## Supporters said

Texas has four public law schools, but none in the state's most populous metropolitan area. In fact, Dallas-Fort Worth is the largest metropolitan region in the nation without a public law school. The Dallas-Fort Worth area is home to about 6 million people, and that number is expected to increase by 300 percent by 2040. Dallas needs to be ready for this population surge. The money invested for a new public law school would be well spent and provide advantages both for the Dallas area and the state.

The last public law school in Texas to receive American Bar Association approval was Texas Tech in 1969. Since 1980, the population of Texas has grown from 14 million to around 24 million, but no additional public legal education institution has been created at existing schools during this time. Only 525 new law school seats have been created at existing schools in the last 25 years.

North Texans do not have an affordable option to continue legal studies on a graduate level. Having a public law school in Dallas would serve a broad range of the population by providing opportunities for traditional and non-traditional students, many of whom are of modest means. Currently, anyone in the Dallas area desiring to attend law school must either leave for other areas of the state, leave the state entirely, or attend a private law school, which is much more expensive. On average, private law schools are three times as expensive as public ones.

Dallas has a significant minority population that needs and wants a public law school. The population in Dallas is 60 percent minority, but only 9 percent of lawyers are members of minority groups. Minority representation has declined in the legal profession, and part of the reason is affordability. Having a more affordable public law school in Dallas would feed the pipeline to increase the number of lawyers in an underserved area.

The bill has broad-based support from the city of Dallas and the University of North Texas. The city of Dallas has donated the old municipal building and an adjacent annex to house the law school as well as parking and some renovation funding. A new law school is so important to downtown revitalization that the city already has pledged $14 million in bond funds and $2 million in public/private partnership funds to renovate the facilities to get the law school operational. The city also has awarded a $1 million contract and started the design for the exterior renovations.

## Opponents said

There is no immediate need for a new public law school in the state, now or in the near future. The state is producing or importing enough lawyers to meet current employment demands, and over the next seven years, the number of lawyers is projected to grow faster than the increase in population. Costs for a new law school would be substantial. Increasing opportunities for Texas students, particularly students from under-represented groups, may be better achieved by increasing class size at existing institutions. Starting evening and part-time programs at existing institutions and providing financial support for grants and preparatory undergraduate programs would serve the needs of under-represented populations and increase the likelihood that they would remain to practice near the area.

The state's fastest-growing economy is in the Rio Grande Valley, and if there is a sharp increase over the next 10 years in the demand for new lawyers, as some have suggested, it would likely be in and around that area. Dallas already has two law schools in the area — both private — whereas the only law school in the

South, West, or Upper Rio Grande regions is St. Mary's in San Antonio, which is also a private institution.

In THECB's recent report, "Projecting the Need: Legal Education," four criteria were considered to evaluate the location for a new public law school: area of the greatest student demand, greatest student need, greatest shortage of lawyers, and most developed resources already in place. Of the 10 regions, the Metroplex and the South Texas regions rank highest in existing resources, but the area with the greatest student demand is the Gulf Coast region and the greatest student need is shared by the West Texas, Upper Rio Grande, Northwest, and Upper East Texas regions, none of which are home to a law school. The region with the fewest lawyers is the Upper Rio Grande.

Other recommendations include allocating more resources and incentives to existing public institutions to expand their class sizes before a new school is established. New loan repayment programs or admissions partnerships also could help address shortages in the workforce without the greater expense of building a new school.

## Notes

The House considered SB 956 in lieu of HB 59 by Branch, the House version of the bill. The **HRO analysis** of HB 59 appeared in Part Three of the May 8 *Daily Floor Report*.

# Limits on increases in tuition and fees at higher education institutions

**SB 1443 by Zaffirini**
*Died in House Calendars Committee*

Table of Contents

**SB 1443** would have limited increases in total academic costs, including designated tuition and mandatory academic fees, charged to resident undergraduate students by public higher education institutions. The limit on increases would have applied to the 2010-11, 2011-12, and 2012-13 academic years. The bill also would have required certain reports regarding core operational costs be submitted to the Legislature.

The charges for total academic costs could not have exceeded the total amount charged to a similarly situated student in the preceding academic year by more than the greater of 3.95 percent or $280. Mandatory academic fees would have included fees for labs, field trips, Internet access or multimedia service, equipment replacement, and instructional technology. Optional fees or fees approved by the students in a referendum would have been excluded from the limit. The bill would not have guaranteed that the total academic costs to a student would not have increased more than the bill prescribed if there was a change in the student's circumstances.

By September 1 of each even-numbered year, the Legislative Budget Board (LBB) would have been required to submit to the legislative leadership an estimate of the core operational costs for the next state fiscal biennium for each general academic teaching institution. The information would have been used in determining the amount of general revenue appropriations to the institutions as well as tuition rates. The LBB would have used a methodology that projected for each year of the next biennium changes in student enrollment for each institution and a rate of inflation, as well as other data relating to costs of instruction, institutional support, and operations and maintenance of physical plants. Beginning in 2013, the LBB would have been required to submit a comparison of each institution's actual core operational costs for the biennium with the LBB's estimate of those costs for the same period.

## Supporters said

Increases in tuition and fees at public universities have made a college education unaffordable for many Texans and need to be reigned in. From fall 2003 through fall 2007, the statewide average total academic charges increased by 53 percent. SB 1443 would provide predictability for families to plan for higher education costs. It would provide financial relief to students and their families while recognizing the connection between tuition, state support, and operational costs. The bill would provide flexibility for institutions by allowing either a reasonable percentage increase annually or a fixed dollar amount, whichever was greater.

The Legislature formerly limited the amount that public universities could charge, but relinquished that authority to individual institutions and university systems in 2003 because a budget shortfall required increased revenues to cover costs. Before 2003, access to higher education was greater because tuition was low. The change was a mistake because tuition increases now can be imposed at any time for any amount, regardless of whether Texas students and families can afford it. It was short-sighted to allow appointed boards of regents, rather than legislators, who are accountable to voters, to set college tuition. The large increases have outstripped other increases, including family income, and have blindsided students and their families. If the Legislature does not reassert some control, rising tuition could add a financial burden on Texas families that is not sustainable.

The rising costs of higher education affect all students but low-income students particularly since Texas has a high percentage of low-income families. Tuition increases also hurt middle-income families because students from those families often do not qualify for financial aid. Capping the yearly increases in tuition and required fees would help eliminate financial surprises that impede graduation and would ensure that those who least can afford it are not priced out of higher education. Even though part of increased tuition is used for financial aid, the best financial aid would be not to raise tuition.

Several Texas university systems and individual campuses already are utilizing similar approaches to limiting the increase in tuition, and it is working well. A cap on tuition and mandatory fee increases would not hamper an institution's chances to strive for national,

tier-one excellence as long as the institution budgeted carefully and maintained cost-containment efforts.

## Opponents said

The cost of a higher education in Texas remains a good value because average tuition remains below the national average. Universities take education costs very seriously and realize that while tuition is linked to access and excellence, they must strive to set tuition rates that are affordable. Tuition has not gone up uniformly across the state because universities are sensitive to the markets in which they are located and take into account regional family income.

Tuition deregulation has allowed universities to innovate in addressing the pricing at different campuses in different geographic regions of the state as well as the different missions of each institution. They have experimented with flat-rate tuition, rebates, and guaranteed tuition, all while providing additional student financial aid, because 20 percent of any tuition increase over a base amount must be set aside for financial aid. Around 25 institutions offer free tuition to families with a certain income level, which is possible because of the tuition deregulation and tuition set-asides. Many students at the median income level have not seen any increase because of offsetting additional financial aid. For example, students at double the median income have had half of increases offset by financial aid.

As a result of tuition deregulation allowing a more stable source of funding for public institutions of higher education in Texas, applications and college graduate numbers are up. Research dollars have increased, and faculty salaries are more competitive. Many campuses have been able to lower their faculty-to-student ratios, which benefits everyone.

There has been a shift in the share of costs for higher education over the last four or five biennia. Even though state support for higher education has increased about 1.9 percent a year, the state's share has declined compared to other sources of funding, while the cost to provide educational services has increased even more. The state funded 48 percent of operating costs prior to 2003, when tuition was deregulated; it is now at about 36 percent. All costs of education have increased, including faculty and staff salaries and benefits, utility costs, information technology, and construction. As the state's share of the costs-per-student has gone down,

the share that families and students pay has gone up. Universities must be able to count on tuition revenue as a source of funding and need to retain the flexibility to set tuition rates.

According to the Texas Higher Education Coordinating Board (THECB), tuition and fee increases have had very little impact on the numbers of applications and enrollment. This likely is due to the fact that a portion of any tuition increase must be used for student financial aid, which has helped students that otherwise might be hurt by increases.

A better alternative would be to require price stabilization with a multi-year agreement but not mandate the terms, and to allow institutions to plan according to the needs of their students and the institutions.

## Other opponents said

The ability for boards of regents to set tuition should be repealed altogether. Tuition should be frozen for a period of time to allow students the opportunity to know what their total education cost will be.

## Notes

SB 1443 passed the Senate and was reported favorably, as substituted, by the House Higher Education Committee, but died in the House Calendars Committee when no further action was taken.

House Research Organization



**Human Services**

Table
of Contents

* SB 643   Nelson   Revising state system for individuals with mental retardation ......................172
  SB 69    Nelson   Child protective services and foster children's bill of rights..........................178

# Revising state system for care of individuals with mental retardation

**SB 643 by Nelson**
*Effective June 11, 2009*

Table
of Contents

**SB 643** establishes measures for oversight, safety, and prevention of abuse, neglect, and exploitation of individuals with mental retardation residing in state schools, in community and private ICFs-MR (intermediate care facilities for the mentally retarded), and in certain group homes, and for those receiving home and community-based services (HCS) in lieu of institutional care. A focus of the bill is state schools, which now are referred to as state-supported living centers (SSLCs), and the ICF-MR component of the Rio Grande State Center.

**State-supported living centers and center directors.** Under SB 643, state school superintendents now are referred to as "center directors." Their powers and duties are expanded to include ensuring the health, safety, and general welfare of center residents and clients and ensuring their civil rights are protected, as well as monitoring arrivals and departures to ensure residents' safety.

**Video surveillance.** The Department of Aging and Disability Services (DADS) must install and operate video surveillance equipment in state centers. Video cameras may not be operated in "private spaces," including bedrooms, bathrooms, or places where individuals receive medical services, privately meet with visitors, or make phone calls.

**Criminal background checks and fingerprinting.** DADS and the Department of State Health Services (DSHS) must perform background checks on all agency employees, volunteers, or applicants for employee or volunteer positions who would be placed in direct contact with residents or clients. Submission of Texas Department of Public Safety (DPS) quality fingerprints is mandatory. Employees will be dismissed if a criminal history check reveals a conviction that would bar employment.

**Drug testing.** SB 643 requires random drug testing of all SSLC employees and allows drug testing of a center employee upon reasonable suspicion of the use of illegal drugs by the employee. Any employee who knows or reasonably suspects that another center employee is illegally using or is under the influence of a controlled substance must report this knowledge or reasonable suspicion to the center director.

**Center employee training.** Before a center employee performs duties without direct supervision, the department must provide training and instruction related to the employee's job, including the uniqueness of the individuals the center serves, the health and safety of individuals with mental retardation, and conduct expected of employees. The bill also allows a SSLC to provide training to employees of private ICFs-MR or HCS waiver program group homes or other professionals involved in the care of individuals with mental retardation.

**Forensic state-supported living center.** SB 643 creates a forensic SSLC for the care of high-risk alleged offender residents at the Mexia State Center. DADS must hire more employees and provide training to direct care staff in the care of high-risk alleged offender residents. An interdisciplinary team (IDT) will determine whether an alleged offender residing in a state center on the effective date of the bill is "high risk," or at risk of inflicting substantial harm to another. A current alleged offender resident classified as high risk is entitled, before being transferred to the forensic SSLC, to an administrative appeals process. DADS must place all new alleged offender residents charged with or convicted of a felony offense, or who have been found to have engaged in delinquent conduct defined as a felony offense, in the forensic SSLC until a risk determination is completed. Alleged offender residents criminally committed for misdemeanor behavior may be placed in other SSLCs until a risk determination is made. Within 30 days of an alleged offender resident's being committed to a SSLC, and annually thereafter, an IDT must determine whether the alleged offender is high risk. An individual deemed to be a high-risk alleged offender is entitled to an administrative hearing to contest the determination and may file an appeal in a Travis County district court within 30 days of the administrative hearing determination.

**Educational services for forensic SSLC residents.** A school district must provide educational services to eligible alleged offender residents. The educational placement of an alleged offender resident and the services provided must be determined by the admission, review, and dismissal committee (ARD), consistent with federal law for placement of students with disabilities in the least restrictive environment.

A school district in which high-risk alleged offender residents are enrolled must employ one or more behavior support specialists to serve the residents while at school. A behavioral support specialist must have a baccalaureate degree and training in providing positive behavioral support and intervention. A behavioral support specialist must conduct a functional behavioral assessment for each alleged offender resident enrolled in the district, including development of an individualized school behavioral intervention plan for the resident. The behavioral support specialist must coordinate with the resident's IDT to ensure that behavioral intervention actions of the district and of the forensic SSLC do not conflict and participate in implementing the plan and determining the placement for each resident.

A school district and the forensic SSLC must enter into a memorandum of understanding (MOU) to ensure the provision of appropriate facilities and equipment if a resident's ARD determines that the resident must receive educational services at the state center. The district is entitled to an annual allotment of $5,100 for each resident in average daily attendance or a different amount for any year provided by appropriation. The school district must submit a report to the governor and legislative leaders each year accounting for the expenditure of funds.

**Office of Independent Ombudsman.** SB 643 creates an Office of Independent Ombudsman to investigate, evaluate, and secure the rights of residents and clients of SSLCs. The governor must appoint as ombudsman an individual with at least five years of experience managing and ensuring the quality of care and services provided to individuals with mental retardation. Although administratively attached to DADS, the office will act independently of the department. The ombudsman will evaluate how centers investigate, review, and report unusual incidents and injuries and will evaluate center services to ensure the rights of residents and clients are protected and that sufficient unannounced patrols are conducted. The ombudsman will hire assistant ombudsmen with the same degree of experience to be stationed at each SSLC. The ombudsman will investigate complaints of a possible systemic issue in a state center's services and may apprise interested parties of a resident's or client's rights, as well as advocate with an agency, provider, or other person on behalf of the individual.

The ombudsman will prepare a biannual report on reviews or investigations and recommendations for systemic improvements. SB 643 requires the ombudsman immediately to report to the governor, the

lieutenant governor, and the speaker of the House any particularly serious or flagrant case of abuse or injury of a resident or client or other serious issues.

**Toll-free number.** The ombudsman office must establish a permanent, toll-free number to report a violation of a resident's or client's rights. The toll-free number must be displayed in common areas, and employees, residents, clients, and legally authorized representatives of a resident or client must have confidential access to a telephone to call the number.

**New agency roles and procedures; private facilities.** SB 643 requires DADS to notify each resident, parent, or adult family member of a resident in a state center of any incident in the center involving the abuse, neglect, or exploitation of a resident. The bill adds private ICFs-MR to the list of facilities the Department of Family and Protective Services (DFPS) must investigate regarding allegations of abuse, neglect, or exploitation. DFPS must immediately notify the Health and Human Services Commission (HHSC) Office of Inspector General when it has cause to believe an individual with mental retardation has been abused, neglected, or exploited in a manner that constitutes a criminal offense.

**Office of Inspector General (OIG).** SB 643 establishes additional duties for the HHSC Office of Inspector General for criminal investigations of abuse, neglect, or exploitation in state centers and for filing reports relating to investigations. OIG must assist local law enforcement with the investigation of abuse, neglect, or exploitation of a criminal nature and may employ and commission peace officers for the sole purpose of assisting law enforcement. The OIG must prepare an annual status report, including non-identifying information aggregated and disaggregated by individual center, including the number and types of alleged offenses investigated by the office, alleged offenses involving center employees, and investigations involving suicides, deaths, or hospitalization of center residents or clients.

**Mortality review.** SB 643 creates an independent mortality review system to review deaths of individuals with developmental disabilities who at the time of death were residents in or received services from a state center, a private ICF-MR or community center, or certain 1915(c) waiver program group homes. The review will be in addition to, and upon the completion of, any investigation conducted by the facility. The executive commissioner must contract with an independent, federally certified, patient safety

organization (PSO) to conduct mortality reviews, and PSO findings must be submitted to DADS, DFPS, the independent ombudsman, and the OIG. The PSO must submit a report semi-annually to the governor and legislative leaders with aggregated data on deaths, trends in the causes of death, and recommendations for system-wide improvements. Information acquired by the PSO in the course of the investigation is confidential and exempt from disclosure under open records law.

**Increased penalties and expansion of hearsay provisions.** SB 643 increases the penalty for failure to report the abuse of a child and enhances the penalty for failure to report abuse of a child or individual with mental retardation residing in a state center when the actor knew the individual suffered serious bodily injury. It also increases the penalty for intentionally and knowingly committing an injury to a disabled individual if the individual resided in a state center and the actor was a direct-care employee for the victim. Texas law provides exceptions allowing for the admissibility of hearsay statements made by children who are victims of sexual or assaultive offenses, and SB 643 adds hearsay statements made by individuals with disabilities to those currently admissible.

## Supporters said

SB 643 would address problems that have played a significant role in ongoing allegations of abuse, neglect, and exploitation of one of the state's most vulnerable populations — individuals with intellectual and developmental disabilities in state schools, private ICFs-MR, and HCS group homes. The bill would reform the internal operations of state facilities and increase oversight. It would enhance investigation and reporting, institute training, establish safeguards for residents and clients, assist staff, and ultimately initiate change in the culture of state schools.

**State-supported living centers and center directors.** SB 643 would change the name "state schools" to a more accurate and illustrative term. "State school" is a misnomer that leads to confusion because, while state schools do provide some educational services, they are residential settings offering a wide array of services, treatments, and habilitation, primarily to adults. The associated title of "state school superintendent" reinforces the confusion. The bill would require transitioning to the more appropriate terms "state-supported living center" and "center director."

**Video surveillance.** The use of video surveillance systems would deter inappropriate behavior and provide evidence in cases of alleged abuse, neglect, or exploitation. The privacy of residents would be maintained by limitations on camera use, but cameras in hallways and other common areas would protect residents as employees would know their movements into and out of residents' rooms were recorded and time stamped and could be evidence should any abuse occur in private.

**Criminal background checks and fingerprinting.** Studies have shown that fingerprint background checks are the most accurate type of background check. An individual can fake a name but not a fingerprint. Both the state auditor and a Senate interim report recommended this measure.

**Drug testing.** A House interim report recommended that current DADS policy allowing employee drug testing only upon reasonable suspicion of drug use be changed to allow random drug testing of all state center employees. This would help protect residents by ensuring that employees were not under the influence of drugs.

**Center employee training.** U.S. Department of Justice (DOJ) findings noted the need for increased training of staff, including training on implementing the unique interdisciplinary treatment program of each resident for whom the employee would provide direct care. Training required by the bill would ensure that staff were adequately prepared to care for the specialized needs of people with intellectual and developmental disabilities. The value-based training recommended by the interim committee would begin a philosophical shift and change in state school culture by focusing on valuing each resident as an individual, respecting the needs and abilities of each resident, and recognizing the uniqueness of individuals, while offering them the highest quality of life.

**Forensic state-supported living center.** Establishing a separate forensic state center would provide more appropriate care for high-risk alleged offender residents and a safer environment for residents of other SSLCs. Currently, alleged offenders, including those deemed to be "high risk," are found throughout the state school system, housed with non-offender populations and cared for by regular direct care staff. Assigning all high-risk alleged offenders to the designated forensic center would allow them to be cared for by staff specially trained to meet the needs of this unique population.

The bill would ensure that current alleged offender residents were not transferred to the newly designated forensic center until they had been determined to be "high-risk" and all administrative appeals had been exhausted. Therefore, no undue transfer or disruption would be imposed on current alleged offender residents until a final determination had been made. Only individuals entering from the court system on an initial criminal commitment involving behavior constituting a felony would be placed in the forensic SSLC. Other alleged offenders would be committed by the court to DADS, and the agency would determine an appropriate state center placement for the individual until a risk determination could be completed. The bill would protect these individuals by requiring a determination within 30 days of an individual arriving at a state center.

SB 643 would provide for annual reviews of all alleged offenders determined to be high-risk so that if someone was determined to no longer be at risk of inflicting substantial physical harm to another, the individual could be transferred out of the forensic center to another SSLC.

**Educational services for forensic SSLC residents.** SB 643 would address the safety and well being of the forensic SSLC residents as well as the students, staff, and community of the Mexia Independent School District (ISD). The bill would provide much-needed guidance to the district and DADS, thereby resolving many issues that have been topics of dispute between the two.

**Office of Independent Ombudsman.** An ombudsman would be established as an independent entity focused on the needs of residents and clients. The ombudsman would strengthen oversight and be a confidential intermediary among parents, residents, guardians, and DADS. Assistant ombudsmen would be located at each center to ensure that the rights of residents were upheld. The office also would serve as a check and balance for DADS because it would be authorized to review procedures and services. Requiring the office to report annually to the Legislature and immediately to report certain serious or flagrant situations would be another check. Allowing the ombudsman to make investigation reports public would provide greater transparency and public oversight.

**Toll-free number.** Although other toll-free numbers currently are posted in facilities, adding one more would help residents and might encourage them to call when necessary.

**New agency roles and procedures; private facilities.** SB 643 would improve the current system of private group home inspection by requiring unannounced on-site surveys of all HCS group homes, other than foster homes. The bill also would improve oversight of private ICFs-MR. Currently, when an allegation of abuse, neglect, or exploitation is received about a private ICF-MR, the institution investigates itself, and DADS follows up to confirm that the investigation was conducted properly and to check for compliance with state and federal licensure and certification standards. The bill would remove the conflict of interest inherent in the current process by providing that reports of abuse in private institutions be investigated by DFPS, rather than the facility investigating itself. The bill also would provide more transparency, as DADS would be required to notify residents and family members when an incident of abuse, neglect, or exploitation of a state center resident occurred.

**Mortality review.** These reviews would help determine whether deaths were preventable or caused by abuse or neglect, lack of adequate care, or natural causes. The reviews would increase independence and transparency. Currently, when a death occurs in a state school, DADS handles the incident and reports it only to DFPS or HHSC if DADS believes there is an indication that the death was not due to natural causes. Under the bill, more trust would be instilled in the system because one agency, DADS, would administer the SSLC program; a second, DFPS, would investigate the circumstances of incidents to determine if they were due to abuse, neglect, or exploitation; and a third agency, HHSC, would be responsible for mortality reviews to identify trends and address quality of care. Mortality reports would provide regulators, providers, and legislators with trend data and strategies to improve care.

**Increased penalties.** Abuse and neglect of this population is deplorable, and the increased penalties provided by the bill would reflect the seriousness of these crimes.

## Opponents said

SB 643 would not address major systemic issues in state schools cited by DOJ in its report, such as staff-to-client ratios and the lack of mid-level supervision. Security cameras, name changes, and ombudsmen would not change the culture of state schools, which is the prime cause of the abuse and neglect.

**State-supported living centers and center directors.** SB 643 simply would waste the state's fiscal resources by changing the name of state schools to "state-supported living centers." The cost of the name change would be $650,000, yet residents and clients would not be better served nor better protected as a result of the change. People would continue to call them "state schools," as they always have.

The bill would not go far enough to specify the authority of a center director to fire employees "at will." A December 2008 recommendation by the House Select Committee on Services for Individuals Eligible for Intermediate Care Facility Services specifically addressed the need for a center director to have authority to dismiss employees at will because many abuse and neglect reports are found to be "inconclusive" because it often is the resident's word against the employee's.

**Video surveillance.** The bill's requirement of video surveillance would be costly while failing to achieve a safer environment for residents. The presence of cameras in common areas likely would not reduce the incidence of abuse and neglect because most of it occurs in private. The fiscal resources for cameras would be better spent on items that truly would produce change, such as staffing, mid-level supervision, and increased pay to attract higher-quality employees.

**Drug testing.** While the bill would require random drug testing of center employees, individuals with developmental disabilities living in private ICFs-MR and HCS group homes also deserve the same protection from possible mistreatment by employees under the influence of drugs. The bill would not provide this protection to these groups.

**Center employee training.** Increased training is good, but the bill would not address improving the quality of staff hired to care for residents by establishing higher education requirements or better pay.

**Forensic state-supported living center.** The bill would not provide a means by which alleged offenders could return to their communities. SB 643 would provide for periodic reviews to determine whether the individual continued to be "high risk" for inflicting substantial harm to another, but would provide no review of the state center placement. Under the bill, individuals would be presumed guilty based on their intellectual disability, and, instead of a time-certain sentence in the criminal justice system, would receive an indefinite sentence to a state center.

**Educational services for forensic SSLC residents.** While the bill would make major improvements, some question would remain about providing services in the least restrictive environment. The least restrictive environment would be on Mexia ISD school campuses, but because under the bill all alleged offender residents receiving educational services from Mexia ISD would have been criminally committed to the state school system and would have been deemed to be "high risk," or at risk of inflicting substantial harm to another, the forensic state center would be the safest and most appropriate environment for all parties.

**Toll-free number.** The required toll-free number for the independent ombudsman would do nothing to change the reporting of abuse and neglect. Three toll-free numbers already are posted in state schools for reporting allegations of abuse, neglect, or exploitation.

**New agency roles and procedures; private facilities.** Investigation reports should be provided to residents and family members, as well as made available to the public with identifying information redacted. It is doubtful the current state school reform would have occurred if not for public records.

**Mortality review.** The bill's mortality review is good, but the system would be better served if the bill required mortality reports to be released to the public, as long as resident or client names were redacted.

**Increased penalties.** The bill would raise the criminal penalties for abuse by a direct care giver and for failure to report abuse or neglect of individuals living in state centers or private ICFs-MR, but not for those living in HCS group homes. The bill should address the entire developmentally disabled population living in group settings and not protect individuals residing in certain facilities over others.

## Other opponents said

SB 643 would address needed change in state schools, but should establish a moratorium on admissions. The moratorium should remain in effect until the facilities are free of abuse and neglect, or for at least one year, to give DADS time to address problems and improve facilities. This was done recently to address issues at the Corpus Christi State School and should apply systemwide.

**Center employee training.** The bill would not go far enough with the training made available to private providers. Making the training available would not mean that the providers would take advantage of it, due to logistical inconveniences and cost. The bill would be stronger and fulfill its intent by requiring the training as part of licensure or certification requirements for private providers.

**Over-reaching legislation.** The bill is over-reaching legislation. Much of what it would implement would simply be recreating and renaming existing positions. DADS and HHSC currently are initiating changes to address the DOJ report. The state increased funding for state schools significantly in fiscal 2008-09 and fiscal 2010-11 and should continue putting money toward increasing the number, quality, and training of available staff rather than creating more government oversight under SB 643 in an attempt to create a false sense of security.

## Notes

The **HRO analysis** of SB 643 appeared in the May 18 *Daily Floor Report*.

# Child Protective Services revisions and foster children's bill of rights

**SB 69 by Nelson**
*Died in the House*

Table
of Contents

**SB 69** would have required the Department of Family and Protective Services (DFPS) to study the feasibility of implementing a financial incentive program to encourage foster children to achieve and maintain the progress goals set under the child's individualized treatment or service plan. The Health and Human Services Commission (HHSC) would have coordinated with DFPS to study the feasibility of making changes to foster care assessment, placement, and reimbursement methodologies to improve outcomes for foster children.

**Preparation for Adult Living (PAL) Program.**
DFPS would have been required to ensure that each individual enrolled in the PAL program received information about available community resources in the county in which the individual intended to reside to assist in obtaining employment, job training, educational services, housing, food, and health care. If no community resources were available, the department would have ensured that the individual received information about any community resources available in surrounding counties.

**Exit survey.** DFPS would have adopted a policy to conduct an exit survey of each foster parent who decided to leave the foster care system, encouraging foster parents to state in their own words their reasons for leaving.

**Foster children's bill of rights.** SB 69 would have required that each child in foster care be informed of the child's rights under state or federal law or policy relating to:

- abuse, neglect, exploitation, discrimination, and harassment;
- food, clothing, shelter, and education;
- medical, dental, vision, and mental health services;
- emergency behavior intervention;
- placement with siblings and contacts with family members;
- privacy, including storage space, searches, mail, and telephone conversations;
- participation in school-related extracurricular or community activities;

- interactions with individuals outside of the foster care system, including teachers, church members, mentors, and friends;
- contact and communication with a caseworker, attorney ad litem, guardian ad litem, and court-appointed special advocate (CASA);
- religious services and activities;
- participation in court hearings involving the child; and
- participation in the development of service and treatment plans.

DFPS would have had to provide a written copy of the foster children's bill of rights to each foster child in the child's primary language, if possible, and would have informed the child orally in simple, nontechnical terms, in the child's primary language. The foster child could have signed a document acknowledging the child's understanding of the foster children's bill of rights, and if the child signed the document, DFPS would have placed it in the child's case file. The department would have to have promoted the participation of foster children and former foster children in educating other foster children about the foster children's bill of rights. DFPS would have had to develop and implement a policy for receiving and handling reports that a foster child's rights had been denied. The section of the bill establishing the foster children's bill of rights would not have created a cause of action.

**Caseload standards.** DFPS would have had to spend up to $12 million to increase the number of available caseworkers with the goal of ensuring that 95 percent of foster children or children whose parent, managing conservator, possessory conservator, guardian, caretaker, or custodian was receiving family-based services from the department were visited by a caseworker at least one time each month, subject to a specific appropriation in the general appropriations act for fiscal 2010-11.

**Other provisions.** DFPS would have had to establish a pilot program under which the foster parents of a child could have provided mentoring services to the child's parents to assist the child's parents in complying with the terms of the service plan. When assessing the

needs of a child in a service level review, DFPS would have to have considered whether, during the 90 days preceding the date of the review, the child had engaged in behavior that had caused life-threatening injury to the child or another individual or had undergone a psychiatric hospitalization. SB 69 would have allowed DFPS to contract with child-placing agencies throughout the state to provide office space for DFPS employees providing conservatorship services and performing licensing functions.

## Supporters said

SB 69 would build on the past efforts of SB 6 by Nelson, enacted in 2005, and SB 758 by Nelson, enacted in 2007, to strengthen the foster system and improve care for abused, neglected, and abandoned children in Texas. A 2005 Harvard study indicated that foster children were more likely to suffer from post-traumatic stress disorder than combat veterans. Other studies have found that foster children are at greater risk of homelessness, teen pregnancy, and entering the criminal justice system. The state has a responsibility to care for these children and equip them with the tools they will need to be successful in life.

Provisions of the bill, such as informing PAL program participants of available community services, would help foster youth aging out of the system to transition successfully into living independently as adults. In addition, the studies required by SB 69 would seek new and innovative ways of improving the system and providing incentives for foster children to achieve their goals, similar to those used by parents with their children in intact families.

The bill also would seek to improve conditions for foster parents by conducting exit surveys of foster parents leaving the system in an effort to identify systemic issues that lead to frustration among caregivers. This would be done in order to make recommendations and initiate required changes to support foster families better.

**Foster children's bill of rights.** By codifying in statute a comprehensive bill of rights for foster children, SB 69 would ensure that young people who were a part of the foster care system in Texas were aware of their protections under the law. This would enable these children to advocate effectively on their own behalf and provide guidance for court-appointed special advocates and other foster care professionals. The rights included

in SB 69 are taken from various existing sections of the Texas Administrative Code, the Texas Family Code, federal law, and other sources. The bill would compile these rights and protections in one place in the Family Code and make them available and understandable so that foster children could know the legal rights they were afforded.

All of the rights afforded to foster children under SB 69 would be reasonable and appropriate for any child, and foster children deserve these protections. Children in the foster care system have experienced trying and often traumatic experiences. The foster children's bill of rights would let these children know that they could benefit from reasonable protections, such as the right to privacy, freedom from abuse and harassment, the ability to access medical care, the right to file a confidential complaint regarding treatment, and the ability to engage with foster care professionals and the legal system.

The bill specifically would state that the rights conferred in the bill were based upon children's rights under state or federal law or policy, ensuring that the rights reflected different policies under state and federal law to allow for different levels of care based on a child's needs, and that the foster children's bill of rights would not create a cause of action.

**Caseload standards.** SB 69 would require, subject to funding, that DFPS hire more caseworkers to improve the frequency of visits to foster children. Regular visits are crucial to ensure the safety and well-being of a child and to increase the chance of finding a "forever home" for the child, whether through adoption, living with a relative, or reunification with birth parents. Foster children who do not receive regular visits from caseworkers frequently get "lost" in the system for years, ultimately "aging out" of foster care, where outcomes are grim.

Because of these facts, federal standards require that 95 percent of foster children be visited at least once each month by their caseworker. In 2008, only 74 percent of Texas foster children received visits once a month, resulting in $4 million in federal fines being imposed upon the state. The state got the money back this time due to a technicality, but next time likely would not. The state instead could spend the money on hiring caseworkers, thereby improving outcomes for foster children, or could continue to fail in its obligations to these abused, neglected, and abandoned children and waste money by paying fines to the federal government.

## Opponents said

**Foster children's bill of rights.** Some of the foster children's rights included under SB 69 would be too broad and could add to the difficulty that foster care providers face when caring for children in their custody. If a child could justify inappropriate behavior by pointing to a right included in the Foster Children's Bill of Rights, the bill could have the unintended consequence of undermining the authority of a foster care provider.

SB 805 by Uresti, which died on the General State Calendar during the 80th Legislature, would have provided for a foster children's bill of rights, but sought to prevent inappropriate use of a right conferred by stating that no right conferred under the bill would require a foster parent or foster care provider to take an action that would impair the health or safety of a child. In this manner, a foster parent could restrict reasonably a right at least to the extent necessary to prevent harm to a child's health or safety.

## Other opponents said

**Foster children's bill of rights.** This bill is unnecessary, as all of the foster children's rights included in SB 69 already exist in other areas of current law. Foster care providers in the vast majority of cases already present a foster child with a list of the child's rights and ask the child to sign documentation verifying that the child understands those rights.

## Notes

SB 69 passed the Senate, but died on the May 23 General State Calendar when no further action was taken. The **HRO analysis** of SB 69 appeared in Part Two of the May 23 *Daily Floor Report*.

Several other bills dealing with foster care were enacted by the 81st Legislature, including:

**HB 3137** by Gallego, *effective June 19, 2009*, requires DFPS to develop a statement listing the rights and responsibilities of a foster parent in a foster home or an agency foster home and of the department or a child-placing agency. DFPS must provide a written copy of the statement to each foster parent in a foster home and to each child-placing agency licensed by the department. A child-placing agency must provide a written copy of the statement to each foster parent in an agency foster home.

**HB 1151** by Thompson, *effective September 1, 2009*, clarifies procedures by which a child may express a preference in designating the primary residence of the child in custody litigation. HB 1151 also establishes a new type of monthly payment, called a permanency care assistance benefit, that will be provided to eligible kinship care providers of foster children. Currently, kinship care providers, who are extended family members who care for children or sibling groups who have been removed from their homes, receive a one-time $1,000 payment per sibling group, and some may be reimbursed for approved expenses up to $500 per year for three years. Eligible adoptive parents receive adoption subsidies of $400 to $545 per month that help pay for an adoptive child's long-term care.

HB 1151 provides for permanency care assistance benefits, including monthly payments to kinship providers, and may include reimbursement of up to $2,000 for nonrecurring expenses a kinship provider incurs to obtain permanent managing conservatorship of a foster child, including attorney's fees and court costs. The bill also specifies educational and employment criteria for adoption assistance, permanency care assistance, or foster care benefits to continue until the month during which a child turned 21 or 22, as applicable. DFPS only is required to provide these extended adoption assistance, permanency care assistance, or foster care benefits if DFPS receives a specific appropriation for these purposes.

**HB 2225** by Parker, *effective June 19, 2009*, creates an adoption review committee to evaluate the process for finding permanent placements for foster children. The bill requires DFPS, in conjunction with the adoption review committee, to conduct an extensive review of the foster care system to identify obstacles that impede DFPS' ability to find permanent placements for foster children, including adoption, and to develop ways to improve the foster care system by reducing the time a child is in the conservatorship of the state before being permanently placed, reducing the number of children in the conservatorship of the state who are placed outside of their home county, and enhancing the procedures for adopting foster children.

**SB 939** by Watson, *effective June 19, 2009*, which incorporated SB 493 by Nelson, requires the Texas Education Agency (TEA) and DFPS to enter into a memorandum of understanding regarding the tracking

of educational information about foster children, as TEA currently codes and tracks homeless and at-risk children to ensure they achieve academic success. SB 939 exempts from payment of college tuition and fees students who were in the conservatorship of DFPS on the day preceding the date the student was adopted or the date permanent managing conservatorship of the student was awarded to a person other than the student's parent. SB 939 also makes exemption eligibility applicable to those who enroll in an institution of higher education as an undergraduate not later than their 25th birthday, rather than their 21st.

In addition, the bill requires that DFPS include in a child's permanency plan concurrent permanency goals, consisting of a primary permanency goal and at least one alternative permanency goal. Goals may include the reunification of the child with a parent or other individual from whom the child was removed, the termination of parental rights and adoption of the child by a relative or other suitable individual, the award of permanent managing conservatorship of the child to a relative or other suitable individual, or another planned, permanent living arrangement for the child. If the department's goal in the permanency plan is to find another planned, permanent living arrangement for the child, SB 939 requires DFPS to document a compelling reason why the other permanency goals are not in the child's best interest. The bill also requires that when DFPS is named as a child's managing conservator in a final order terminating a parent's parental rights, the court must conduct a placement review hearing within 90 days of the final order, followed by additional placement review hearings at least once every six months until the date the child is adopted or becomes an adult.

**HB 1043** by Orr, *effective September 1, 2009*, requires an employment preference by state agencies or higher education institutions for former foster care children, age 25 years or younger, who were under permanent managing conservatorship of DFPS on the day before their 18th birthday or aged out of foster care, if other applicants for the same position were not better qualified. This preference would not extend to a position of private secretary or deputy of an official or department or to a person holding a strictly confidential relation to an employer. HB 1043 also adds foster care alumni to the list of economically disadvantaged individuals for purposes of the enterprise zone program.

**SB 983** by Davis, *effective September 1, 2009*, requires DFPS to provide to foster children aging

out of the system certain documents within 30 days before the date of discharge, including a DPS personal identification certificate or driver's license, a social security card, and proof of enrollment in Medicaid, if appropriate. These documents are in addition to those already required, such as the foster youth's birth certificate and immunization records. In addition, the bill requires DFPS, in cooperation with TEA and DPS, to develop a plan to ensure that each foster child in permanent managing conservatorship is provided the opportunity to complete a driver's education course and to obtain a driver's license before the child leaves conservatorship.

**HB 1912** by Rodriguez, *effective September 1, 2009*, creates the Transitional Living Service Program, to include and expand upon the existing Preparation for Adult Living program, which eases the transition from foster care to independent living by providing instruction in money management, job skills, housing, and transportation for foster children aging out of the system who are at least 16 years of age. The Transitional Living Service Program will assist foster youth or alumni between the ages of 14 and 21 in obtaining experiential life-skills training to improve their transition to independent living. The training will be individually tailored to a youth's skills and abilities and may include practical skills such as grocery shopping, meal preparation and cooking, using public transportation, performing basic household tasks, and balancing a checkbook.

**HB 704** by Rose, *effective June 19, 2009*, establishes extended jurisdiction over a foster child after the child's 18th birthday. The bill allows a young adult to request a court that has continuing, exclusive jurisdiction over the young adult on the day before that person's 18th birthday to render an order extending jurisdiction over the young adult. A "young adult" is an individual between 18 and 21 years of age who is in the conservatorship of DFPS on the day before the individual's 18th birthday, and after the individual's 18th birthday, resides in foster care or receives transitional living services from DFPS.

A young adult who consents to the continued jurisdiction of the court has the same rights as any other adult of the same age. If the court finds the young adult to be incapacitated, the court may extend its own jurisdiction without the person's consent in order to allow DFPS to refer the young adult to the Department of Aging and Disability Services (DADS) for guardianship services. The bill prohibits a court

from appointing DADS as the managing conservator or guardian of a young adult.

**HB 1629** by Naishtat, *effective May 23, 2009*, requires that DFPS and the Texas Youth Commission (TYC) coordinate efforts and consistently provide each other with relevant health and education information regarding foster youth committed to TYC. DFPS must visit a child at least once a month while committed to TYC, and TYC must permit communication between a foster child and the child's attorney ad litem, guardian ad litem, CASA advocate, or DFPS. The bill requires that provision of and consent for medical, dental, or psychological treatment for a foster child committed to TYC be governed by the provisions relating to the medical care of a foster child in the Family Code. A court may not dismiss a suit affecting the parent-child relationship filed by DFPS if the child is committed to TYC.

**J**

**udiciary**

Table
of Contents

| | | | |
|---|---|---|---|
| * HB 670 | Martinez Fischer | Qualified privilege for journalists not to testify | 184 |
| HB 1657 | Giddings | Defining general contractor for workers' compensation | 187 |
| SB 992 | Duncan | Reorganizing the Texas court system | 189 |
| SB 1123 | Duncan | Standard of causation in mesothelioma lawsuits | 191 |
| SJR 44 | Duncan/ | Revising selection of state judges | 193 |
| SB 2226 | Duncan | | |

# Qualified privilege for journalists not to testify

**HB 670 by Martinez Fischer**
*Effective May 13, 2009*

Table
of Contents

**HB 670** creates a qualified privilege for journalists not to testify on information or sources. The privilege applies in civil actions and to confidential sources and unpublished information in criminal matters.

Under the bill, a journalist is defined as a person who engages in the practice of journalism for a substantial portion of the person's livelihood or for substantial financial gain. It would include someone employed by an institution of higher education at the time information was gathered for publication for a news medium or an agent of the news medium.

## Criminal Proceedings

**Privilege generally.** An authority with subpoena power may not compel a journalist to testify regarding, or to produce or disclose in an official proceeding, any confidential or nonconfidential unpublished information, document, or item obtained or prepared while acting as a journalist nor the source of any such information.

A subpoena or other compulsory process may not compel the parent, subsidiary, division, or affiliate of a communication service provider or news medium to disclose the unpublished information, documents, or items or the source of any information, documents, or items that are privileged from disclosure.

HB 670 creates two exceptions to the privilege in criminal proceedings that concern unpublished information and confidential sources:

**Unpublished information in criminal proceedings.** A court may compel testimony on or publication of any unpublished information or its source obtained while acting as a journalist if the party seeking the information shows that all reasonable efforts have been exhausted to obtain the information from another source and:

- the information is relevant and material; or
- the information is central to the investigation or prosecution of a criminal case and the request is not based solely on the assertion of the person requesting the subpoena, but on reasonable grounds that support a belief that a crime has occurred.

In considering whether to compel disclosure, a court must consider, among other factors, whether:

- the subpoena is overbroad, unreasonable, or oppressive;
- reasonable and timely notice was given;
- in the particular instance, the interest of the party seeking the information outweighs the public interest in gathering and disseminating news, including the concerns of the journalist; and
- the subpoena or compulsory process is being used to obtain peripheral, nonessential, or speculative information.

**Confidential sources in criminal proceedings.** HB 670 allows a court to compel a journalist to testify about or to disclose the source of any information if the party seeking the testimony made a clear and specific showing that the source of any information was observed by the journalist committing a felony criminal offense; was a person who confessed or admitted to the journalist committing a felony criminal offense; or was a person for whom probable cause existed that the person participated in a felony criminal offense or the disclosure of the confidential source was reasonably necessary to stop or prevent reasonably certain death or substantial bodily harm.

Requests for information regarding other crimes in which the transmission of information was in and of itself a criminal act would be subject to a clear and specific showing that, among other things, all reasonable efforts had been exhausted to obtain the information from an alternative source.

**Published or broadcast information.** These protections would not apply to any information, document, or item that had at any time been published or broadcast by the journalist. Publication by a news medium or communication service provider of privileged information, documents, or items would not be a waiver of the journalist's privilege regarding sources and unpublished information, documents, or items.

**Civil Proceedings**

**Privilege in civil proceedings.** HB 670 creates a journalist's qualified privilege not to testify in civil proceedings. The bill prevents an authority with subpoena power from compelling a journalist to testify on or to produce or disclose any confidential or non-confidential information, document, or item obtained or prepared while acting as a journalist or the source of any such information, document, or item. A subpoena or other compulsory process could not compel the parent, subsidiary, division, or affiliate of a communication service provider or news medium to disclose such information.

A court may compel a journalist, a journalist's employer, or a person with an independent contract with a journalist to testify on or produce any information or its source if the party seeking the information made a clear and specific showing that:

- all reasonable efforts to obtain the information from an alternative source had been exhausted;
- the subpoena seeking the information was not overbroad, unreasonable, or oppressive, and when appropriate, was limited to verifying published information and the surrounding circumstances relating to the accuracy of the published information;
- reasonable and timely notice was given of the demand for the information;
- in the particular case, the interest of the party subpoenaing the information outweighed the public interest in the gathering and dissemination of news, including the concerns of the journalist;
- the subpoena or compulsory process was not being used to obtain peripheral, nonessential, or speculative information; and
- the information was relevant and material to the official proceeding for which testimony or production was sought and was essential to a claim or defense of the party seeking the testimony or production.

Publication by a news medium or communication service provider of privileged information would not constitute a waiver of the journalist's privilege.

## Supporters said

HB 670 would increase the free flow of information to the public and preserve a free and active press, while also protecting the right of the public to effective law enforcement and the fair administration of justice. The bill represents a compromise between media representatives and Texas prosecutors and would place Texas with the majority of states that have some form of shield law for journalists. It would provide valuable guidance to Texas courts as they tried to balance the freedom of the press with the interests of law enforcement. Currently, 36 states and the District of Columbia have some kind of testimonial privilege for journalists.

The press plays a vital role in a democracy by helping to protect the public from abuses by powerful governmental and private interests. The press serves as an entity through which anyone can report and bring important issues to the public's attention. If sources believe they will be exposed when a journalist is compelled to disclose information, those sources will be fearful of confiding in the press, and that information may never reach the public. It is imperative for an open society to protect this vital function of the press by shielding it from forced disclosure of sources.

Under current law, a journalist who protects the confidentiality of a source against a judicial order can be jailed for contempt of court. In addition, responding to orders to produce notes and tapes can be a time-consuming burden for the news media. To fight a subpoena can easily exceed $10,000 because of briefing costs and the hearings involved. Journalists and news media in Texas face a real burden. Large-market Texas newspapers typically receive 10-20 subpoenas a year, and the average Dallas-Fort Worth newsroom received about 38 subpoenas a year from 2005 to 2008. A Mineola radio station's one-man news department effectively was shut down for almost two days to comply with a subpoena.

HB 670 would help protect the free flow of information by forcing prosecutors to satisfy certain criteria to prove a need for the information they seek from the press and would require that prosecutors show that all reasonable efforts had been exhausted to obtain the information from other sources. Critically, HB 670 would provide not an absolute privilege but a qualified privilege. A court could compel testimony if a journalist

was an eyewitness to or obtained information from a person who confessed to committing a felony, or if there was probable cause to believe that the person was involved with the commission of a felony. A journalist also could be compelled to testify if disclosure was reasonably necessary to stop or prevent reasonably certain death or substantial bodily harm. The party seeking the information would have to establish strong reasons why the information was needed before a judge would breach a journalist's privilege against testimony. The simple requirement that the party seeking the information satisfy certain criteria would help deter abuse and over-reliance by law enforcement on the news media for information. In addition, the procedural requirements that HB 670 would establish would give the media specific grounds on which to oppose subpoenas and would give judges greater guidance when making their rulings.

HB 670's limited disclosure rules would provide a carefully negotiated balance between protecting the free flow of information and allowing prosecutors to discover important evidence to prosecute serious crimes.

## Opponents said

HB 670 is not needed. Texas has enjoyed a functioning democracy and a functioning press since its earliest history. Current law provides adequate protections for journalists faced with orders to compel disclosure of information. Journalists already can, and routinely do, make successful motions to quash subpoenas forcing them to testify.

Prosecutors do not, as a rule, rely excessively on journalists for information, and those who inappropriately subpoena journalists find their subpoenas tossed out of court by the judiciary. In addition, the press already enjoys substantial protections under the First Amendment to the U.S. Constitution.

HB 670 potentially could hinder the ability of prosecutors to gather information. One of the goals of HB 670 is to make large government and corporate institutions more accountable, but prosecutors still need to speak with whistleblowers in order to investigate effectively any accusations of wrongdoing. HB 670 would shift the burden to prosecutors to show they have exhausted all reasonable efforts to obtain the information from other sources, among other burdens, which could too easily be capriciously interpreted by judges and result in wasted prosecutorial time and resources. Shifting the burden to prosecutors to prove that the journalist was an appropriate source of information could delay or even prevent the administration of justice.

## Notes

The **HRO analysis** of HB 670 appeared in the April 1 *Daily Floor Report*.

# Defining general contractor for workers' compensation

**HB 1657 by Giddings**
*Died in the Senate*

Table
of Contents

**HB 1657** would have amended the Labor Code to define a general contractor as a person who undertook to procure the performance of work or services for the benefit of another, either separately or through the use of subcontractors.

A subcontractor would have been defined as a person who contracted with a general contractor to perform all or any part of the work or services that the general contractor had contracted with another party to perform.

The bill as substituted by the Senate State Affairs Committee would have allowed a premises owner who was a homeowner, a general small business, or a small business engaged in agriculture to be considered a general contractor in procuring the performance of work or service on the premises owner's property.

## Supporters said

By defining a general contractor as a person who procured the performance of work or services for the benefit of another, HB 1657 would establish that a premises owner was not a general contractor entitled to the exclusive remedy defense provided under workers' compensation in claims brought by injured workers. It would counter the 2007 Texas Supreme Court ruling in *Entergy Gulf States v. Summers*, in which the court found that the law did not forbid a premises owner from being considered a general contractor entitled to the exclusive remedy defense. The bill would reassert that the Legislature, not the Texas Supreme Court, should make this determination.

Premises owners should not have a blanket workers' compensation exemption from liability as general contractors. In practice, premises owners do not have an ongoing relationship with the employees of contractors on construction and repair projects on their property, nor do they actively supervise the work. Owners of oil refineries or chemical plants focus on producing their products, not on incidental construction or repair projects. In addition, the Senate committee version of HB 1657 would provide reasonable exemptions for homeowners and small businesses, which would be more likely to supervise work, to operate as general contractors.

Premises owners already enjoy significant protections from liability suits through Civil Practices and Remedies Code, ch. 95. Essentially, an injured employee has to prove that a premises owner had control over the manner in which work was performed and had actual knowledge of the unsafe conditions and failed to adequately warn of the danger. The tort reform group's own study on the low number of workers who prevail in such cases proves this is a high barrier. Allowing the *Entergy* standard to stand would make recovery from a negligent premises owner even more unlikely.

HB 1657 would provide incentives for a premises owner to maintain a safe workplace and prevent accidents, rather than skimp on safety or implement measures to save money on insurance premiums. The bill would restore the possibility of a premises owner being sued for a catastrophic event, such as the BP Refinery explosion in Texas City in 2005 that killed 15 contract workers and injured hundreds of others. In the BP plant case, the premises owner had control of the work site and extensive knowledge of defects and safety issues, yet ignored warnings from its own employees and consultants.

Entergy Gulf States does business in both Texas and Louisiana, and its contracts include provisions asserting that premises owners have protections as general contractors — something allowed in Louisiana's statutes based on the Napoleonic code. The Texas Supreme Court should not have applied the Louisiana standard, and HB 1657 simply would restore what had been longstanding Texas law.

If, as the Texas Supreme Court claims, premises owners already had an established right in law to be considered "statutory employers" when contracting with subcontractors to provide workers' compensation insurance, lawmakers would not have made several attempts to pass bills allowing a premises owner to qualify for the exclusive remedy defense. HB 1657 simply would restore the long-standing interpretation of Texas law.

## Opponents said

Lawmakers should reject HB 1657 and instead bar all third-party lawsuits for on-the-job injuries if the injured worker was covered by workers' compensation insurance. The *Entergy* decision provides an opportunity for the Legislature to reevaluate the public policy on third-party immunity in the workers' compensation system.

By preventing premises owners from being considered general contractors for purposes of workers' compensation, HB 1657 could raise the cost of doing business in Texas and discourage economic development in the state. A study by the Stradian Group commissioned by Texans for Lawsuit Reform shows associated costs of third-party litigation in workers' compensation cases exceed $300 million annually. Those expenses would not be paid just by the chemical plant, but would be passed along by the tire store and the beauty shop that sell products to consumers. Few workers benefit from third-party litigation in workers' compensation cases. The Stradian Group report found that 187,000 compensable injuries occurred in Texas between 2000 and 2003, but only 397 plaintiffs, or fewer than 100 a year, collected more benefits than provided by workers' compensation insurance.

No employers — whether they participate in workers' compensation or opt out as nonsubscribers as allowed by Texas law — would deliberately put their own employees or those of a contractor or subcontractor at risk. They provide safety programs both to contain the high costs of insurance coverage and to meet their own moral obligations.

HB 1657 could discourage premises owners from providing workers' compensation insurance to jobsite workers. Allowing premises owners to be considered general contractors, and thus to qualify for the exclusive remedy defense when they provide workers' compensation, is good for workers, business, and consumers. Premises owners could provide both protections for workers and safety programs through owner-controlled insurance programs (OCIP), which typically include workers' compensation. With an OPIC, the owner of a project designates an insurance broker to secure insurance policies for an entire project. According to the Comptroller's 2003 Good Government recommendations, OCIPs could result in savings of between 0.5 and 4 percent of construction costs for state projects alone.

HB 1657 would be contrary to what has become common employment practice in Texas. When Texas enacted workers' compensation in 1913, workplace relationships usually were direct between employers and employees. In the past century, job sites have grown more complex, with multiple tiers of contractors and subcontractors. Texas law accommodates this reality by conferring immunity against tort lawsuits to a general contractor when the general contractor has agreed in writing with subcontractors to provide workers' compensation insurance. The *Entergy* decision merely clarified that premises owners qualified for this immunity when they contracted with subcontractors to provide workers' compensation insurance.

## Other opponents said

The Legislature should address the lack of sufficient compensation under workers' compensation for those workers with catastrophic injuries, a significant contributor to third-party litigation in workers' compensation cases. If these severely injured workers received fair and adequate compensation, they would have less incentive to sue premises owners.

## Notes

After handing down its ruling in *Entergy Gulf States v. Summers* on August 31, 2007, the Texas Supreme Court held a rare rehearing on the case in October. The court reaffirmed the decision on April 3, 2009.

HB 1657 passed the House by 73 to 71 on May 14 and was reported favorably, without amendment, by the Senate State Affairs Committee on May 25, but no further action was taken.

The **HRO analysis** of HB 1657 appeared in the May 13 *Daily Floor Report*.

# Reorganizing the Texas court system

**SB 992 by Duncan**
*Died in House committee*

Table
of Contents

**SB 992** would have reorganized the Texas trial court system by making the jurisdictions of certain trial courts uniform by redesignating district courts that grant preference to certain types of law, such as family or criminal, as regular district courts. District courts would have had a common jurisdictional amount of $10,000 and up. They would have retained overall civil jurisdiction, family law jurisdiction, and the responsibility for complex and felony law matters. SB 992 would have removed statutory preferences that currently require certain district courts to grant priority to certain types of cases. The bill would have allowed the district court judges in a county to assign preferences for certain matters to certain courts by agreement.

SB 992 would have converted certain county courts at law into district courts. Under the bill, the Office of Court Administration (OCA) would have conducted a study to recommend which courts would be suitable for conversion, and the presiding judge in that court would have undertaken the decision either to transform the court into a district court or revert to a uniform county court at law. OCA would have examined the efficiency, feasibility, and estimated cost of converting certain county courts at law. The conversion would have been phased in over several years. OCA would have been required to complete by September 1, 2010, its study of each county that had a county court at law with jurisdiction over $250,000. By January 1, 2011, those county courts at law recommended for conversion would have been required to elect either conversion to a district court or adoption of standard streamlined characteristics for a county court at law.

SB 992 would have increased the maximum jurisdiction for a county court at law from $100,000 to $200,000, effective September 1, 2012.

SB 992 would have merged small claims and justice courts and required the Texas Supreme Court to promulgate rules of evidence for justice courts. The bill also would have increased the annual training requirements for justices of the peace and included a new 15-hour course on the substantive, procedural, and evidentiary matters in civil law.

The bill would have created rules for the transfer of cases between district courts. This provision would have allowed for the transfer of cases from one district court in a county to another.

The bill would have authorized the nine presiding administrative judges to employ up to three additional staff attorneys. These additional staff attorneys could have been assigned to various courts in the presiding administrative judge's region to assist courts with complex matters or to address backlog or other matters.

SB 992 would have created several new grants for court system enhancements. The funds would have been distributed by OCA and would have been used by counties to develop programs to manage more efficiently cases that required special judicial attention. The bill also would have directed the Permanent Judicial Commission for Children, Youth, and Families to develop a grant program for initiatives that would improve safety and permanency outcomes, enhance due process, or increase the timeliness of resolutions in child protection cases.

## Supporters said

SB 992 would bring simplicity and rationality to the legal process by reforming the organization and administration of the court system. Ever since the current court system was established in 1891, it has been amended and restructured on a piecemeal and ad hoc basis, resulting in an outdated system of irregularities, inconsistencies, and overlapping jurisdictions. To understand a particular court's jurisdiction, six sources must be consulted: the Texas Constitution; general statutory provisions for all courts on a particular level; the specific statutory provision that authorizes the individual court; statutes creating other courts in the county that may affect the jurisdiction of the court in question; statutes dealing with specific subject matter; and local rules that may specify a subject matter preference for particular courts. The process is frustrating for licensed attorneys, let alone the average Texan.

SB 992 is the result of an exhaustive study of the judicial system by the Court Administration Task Force of the State Bar of Texas. Experts laid out specific recommendations to improve efficiency, increase simplicity, adopt more flexibility, and encourage excellence.

County courts at law were intended to provide quick resolution to simple cases. Overlapping subject matter jurisdictions have prevented many county courts at law from carrying out this function. The bill would restore the original functions to county courts at law by redesignating their jurisdiction to cover cases in which the matter in controversy was between $500 and $250,000. These courts would retain their civil jurisdiction and criminal jurisdiction over misdemeanors.

The bill would create mechanisms to strengthen local control of courts. These would include allowing the judges in a county to designate preference for specific kinds of jurisdiction to certain courts. This reform would allow judges to build specializations that also would improve the efficiency of the other district courts in the county. In addition, district court judges would receive new powers to exchange cases and benches. These new efficiencies would speed up dockets. SB 992 would create grants to direct additional resources to courts considering certain types of cases.

## Opponents said

SB 992 would attempt to fix what is not broken. The court system in each county is a reflection of carefully crafted compromises between the local judiciary, the county commissioners court, and the Legislature to address local needs for civil and criminal courts. The number and kinds of courts and the jurisdiction of each reflects the individual needs of each locality. Streamlining these courts for the sake of streamlining would disrupt this local balance. Texas is too diverse to demand uniformity of the court system when local needs vary so widely. Any problems should be addressed on a local basis, as Texas historically has done.

The bill further would interfere with local interests by changing the jobs of county court at law judges. These judges specifically sought to preside in county courts at law. Becoming district court judges would mean different jobs for many of them because their courts would have expanded jurisdictions and thus would hear new kinds of cases. Some judges might face a pay cut if they were forced to transform the nature of their courts. Their pay scales are set as a result of careful balancing by local and state officials.

## Notes

SB 992 passed the Senate, but died in the House Judiciary and Civil Jurisprudence Committee when it was referred to subcommittee and no further action was taken.

# Standard of causation in asbestos-related mesothelioma lawsuits

**SB 1123 by Duncan**
*Died in House Committee*

Table
of Contents

**SB 1123** would have modified the standard of causation for legal claims that sought to recover damages for malignant mesothelioma allegedly caused by exposure to asbestos fibers. The bill would have required a claimant to establish that a defendant's product or conduct was a substantial factor in causing the claimant's mesothelioma by presenting qualitative proof of substantial asbestos exposure, as determined by the frequency, regularity, and proximity of the claimant's exposure over a period of time. The same causation standard would have applied to a defendant who sought to prove that another person was responsible in full or in part for a claimant's asbestos-related mesothelioma. The bill would not have required a plaintiff or a defendant to prove the approximate or exact numerical dose of exposure to asbestos fibers.

## Supporters said

SB 1123 would establish a fairer standard of proof for a small but deserving class of victims who contracted mesothelioma, an invariably fatal cancerous disease, from exposure to asbestos fibers. The Texas Supreme Court recently imposed one of the most stringent causation standards in the nation for asbestos-related mesothelioma cases in *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765 (Tex. 2007), which required asbestos victims to quantify numerically their "dose" of exposure to each individual defendant's product. Unfortunately, it often is impossible to prove a particular quantity of asbestos exposure from any one product because most asbestos victims were exposed to multiple asbestos products and their injuries remained latent for several years, even decades, after the exposure. As a result of the 2007 decision, mesothelioma victims who file claims in Texas courts face greater difficulties in pursuing their claims and receiving fair compensation than victims who file in jurisdictions that take a more balanced approach to mesothelioma cases. The same difficulties apply to defendants who seek to defer or share liability with other responsible parties by demonstrating that a victim's disease resulted from a product different than the defendant's own.

Because the occurrence of mesothelioma generally requires a lower level of asbestos exposure over a shorter period of time than asbestosis, SB 1123 would

apply a different causation standard to mesothelioma cases. The current standard is unnecessarily strict when applied to mesothelioma cases, since it assumes incorrectly that mesothelioma victims must have endured frequent and regular exposure to asbestos.

SB 1123 is a middle ground compromise between the unduly burdensome standard established by Borg-Warner and the more permissive standard, which only requires a victim to show that a defendant caused any exposure of asbestos, used in some jurisdictions. The bill's proposed "substantial factor" causation standard would comport with the standard used in a majority of state jurisdictions. It would balance the needs of mesothelioma victims by recognizing the difficulties in quantifying asbestos exposure with the right of defendants to be free from liability unless their products were a substantial cause of a claimant's illness.

## Opponents said

SB 1123 would take asbestos-related litigation in the wrong direction by lowering the standard of causation for mesothelioma claims. Because scientific research has confirmed that the level of exposure, or "dose," to asbestos fibers is the most important factor in determining the onset of mesothelioma, an increasing number of state and federal jurisdictions have adopted the Borg-Warner causation standard by requiring plaintiffs to quantify their exposure to asbestos. The required showing of an approximate dose amount is common to other toxic tort cases and does not impose an undue evidentiary burden upon mesothelioma plaintiffs. SB 1123 would expose small business owners and other entities to spurious and costly litigation by allowing a plaintiff to proceed on a mesothelioma claim without first having to show quantitative, scientifically grounded evidence of exposure to asbestos.

The current causation standard establishes a uniform, consistent framework for evaluating all asbestos-related claims. By reducing the causation standard for mesothelioma cases, SB 1123 would create a multi-tiered legal regime for toxic tort cases by distinguishing mesothelioma claims from asbestosis claims. Because the onsets of mesothelioma and asbestosis are determined by dose, it makes sense

that a plaintiff should have to present evidence of the approximate amount of dose in both types of cases.

## Notes

SB 1123 passed the Senate by 19-11 on April 20, but died in the House Judiciary and Civil Jurisprudence Committee. A similar bill, HB 1811 by Eiland, also died in the Judiciary and Civil Jurisprudence Committee.

# Revising selection of state judges

**SJR 44/ SB 2226 by Duncan**
*Died in the Senate*

Table
of Contents

**SJR 44** would have proposed a constitutional amendment to require a justice or judge elected to the Texas Supreme Court, Court of Criminal Appeals, courts of appeals, or district court to stand for a retention election on a nonpartisan ballot at the end of the judge or justice's initial term of office. **SB 2226**, the enabling bill, would have established election procedures for these judges and would have required a justice or judge appointed to a vacant judicial office by the governor to stand for an election on a partisan ballot at the end of the appointed term, followed by a nonpartisan retention election at the end of each successive term.

After an initial term, a judge would have been subject to a retention election on a November general election ballot. A judge retained by a majority of voters would have served an additional term. If voters elected not to retain a judge, the office would have become vacant and subject to being filled by the governor with the advice and consent of the Senate. The retention system would have taken effect January 1, 2010.

## Supporters said

SJR 44/SB 2226 would reform the state's judicial system to help ensure that incumbent judges were evaluated based on their individual merits and experience rather than their party affiliation. Shifting political winds, not judicial performance, have resulted in the defeat of significant numbers of qualified, experienced judges. Because judges currently are barred from stating their positions on specific issues, factors such as party affiliation and campaign advertising and contributions have played an inappropriate and undeserved role in determining the outcome of judicial elections. As a result, many Texas voters regard the state judicial system as intrinsically biased toward litigants who contribute to a judge's campaign.

Requiring nonpartisan retention elections for judges who first were elected on a partisan ballot would establish an ideal balance between allowing input by politically motivated interest groups and encouraging voters to select judges primarily based on qualifications and performance. It would reduce the influence of campaign contributions, help ensure a roster of

qualified candidates, guarantee voters a voice in judicial selection, and encourage assessment of candidates on the basis of their records, rather than party affiliations or campaign advertising.

## Opponents said

The election system proposed by SJR 44/SB 2226 would not make judicial elections any less political than they are under the current partisan ballot system. The appointment of a judge by the governor is an inherently political act, and judges likely would be selected because of political connections rather than individual merit. Retention elections would not necessarily improve the public's perception of judicial candidates or make voters' decisions any more related to the qualifications and experience of the candidates. Litigants and special interest groups still could exert influence through campaign contributions and advertising. The most likely effect of SJR 44/SB 2226 would be to make it more difficult for voters to oust incumbent judges. Experiences in other states with retention systems show that, in retention elections without a single opposing candidate, incumbents face low rejection rates from voters and become ensconced in their positions. The current partisan election system has served the state well by allowing judicial candidates from outside the legal establishment to bring a diversity of experiences and viewpoints to bench.

## Other opponents said

Without any limiting conditions on the governor's power to appoint judges, SJR44/SB 2226 would give the governor too much political influence on judicial selection. A better approach would be to require the governor to select from a list of judges approved by the State Bar or other independent group based on specific criteria pertaining to a judge's qualifications and experience. This would help ensure that judicial appointments were made on the basis of merit, not politics.

Another alternative would be to finance judicial elections publicly. Public financing would diminish the negative influence of campaign contributions while still

allowing voters to consider party affiliation as one factor among many in selecting judges.

## Notes

SJR 44 and SB 2226 both were reported favorably, without amendment, by the Senate State Affairs Committee on April 17, but no further action was taken. A proposed constitutional amendment, SJR 23, and the enabling bill, SB 782, both by Duncan, would have provided for nonpartisan retention elections for appellate judges, but not district judges, following a gubernatorial appointment of a judge to a vacant office, but would not have required that an appointed judge first stand for an election on a partisan ballot. SJR 23 and SB 782 both died in the Senate Jurisprudence Committee.

HB 3995 by Hunter, which also would have provided for nonpartisan retention elections for appellate judges appointed by the governor to a vacant office, died in the House Judiciary and Civil Jurisprudence committee.



Table
of Contents

**Public Education**

* HB 3        Eissler      School accountability and public school curriculum revisions ...................... 196
  HB 130      Patrick      Full-day prekindergarten for certain children ................................................ 203
* HB 171      Olivo        Mitigating factors in disciplining students ................................................... 206
  HB 710      Rose         Sunset review of the State Board of Education ............................................. 207
  HB 2823     Patrick      Excluding private schools from eligibility for certain TEA grants ................ 208
* HB 3646     Hochberg     Formula funding for public school finance, teacher pay raises ..................... 209
* HB 4294     Branch       Buying electronic textbooks, materials, and technology ............................... 214
  HJR 77      D. Howard/   Replacing SBOE as managers of the Permanent School Fund .................... 217
  HB 2037     D. Howard
* SB 891      Nelson       Standards for public school physical education curriculum .......................... 219

# School accountability and public school curriculum

**HB 3 by Eissler**
*Effective June 19, 2009*

Table
of Contents

**HB 3** revises requirements for high school graduation and promotion to the next grade level, academic and financial accountability standards for the public schools, and the dissemination of assessment data.

**High school graduation programs.** The State Board of Education (SBOE) must designate specific foundation courses required for the minimum, recommended, and advanced high school graduation programs, but may not designate specific enrichment courses or a specific number of enrichment credits required for each program. All students must complete one physical education credit.

To enroll in the minimum high school plan, a student must be at least 16 years old; have completed two credits required for graduation in English, mathematics, science, and social studies; or have failed to be promoted to the 10th grade one or more times. The student's parent or guardian and a school administrator must provide written approval. A parent or guardian may not consent until the school district provides written notice in both English and Spanish of the benefits of the recommended high school program. A student in the minimum high school graduation program may choose at any time to resume the recommended program.

Under the recommended and advanced programs, all students still must complete four years of mathematics, science, English language arts, and social studies. The social studies requirement must include at least one-half credit of government and at least one-half credit of economics. The social studies requirement includes two credits of a language other than English to graduate under the recommended program and three under the advanced program. Students will need six elective credits to graduate under the recommended program and five under the advanced program. A student must achieve at least the minimum score determined by the commissioner of education for English III and Algebra II end-of-course exams to graduate under the recommended or advanced programs.

Students who meet college readiness standards on both the Algebra II and English III end-of-course exams

and complete either the recommended or advanced program are not required to take assessments given by an institution of higher education to assess ability to perform in a freshman-level course in those subject areas.

A school district must use the GPA calculation method adopted by the commissioner of higher education, if the commissioner adopts a uniform method.

**Fine arts.** All middle and high school students must complete at least one fine arts course. TEA will administer a pilot program allowing high school students in certain counties to satisfy the fine arts credit by participating in a program on or off campus and outside the regular school day. TEA will report to the Legislature the feasibility of expanding it statewide.

**Early diploma pilot program.** The bill establishes a pilot program under which a school district may issue a high school diploma to a student if, using standards developed by participating universities, the student demonstrates early readiness for college and mastery of subject areas for which readiness standards have been adopted and a language other than English, notwithstanding other local or state requirements. A student receiving a diploma through this program is considered to have completed the recommended high school program.

**Dual credit.** The SBOE, with the Texas Higher Education Coordinating Board (THECB), must adopt rules to ensure that a student who completes a course at an institution of higher education to earn high school credit has met the curriculum requirements of the student's graduation program.

**Grade promotion.** The commissioner of education must provide guidelines to districts to use in determining grade promotion requirements. School districts must determine by the first day of the school year the requirements for students to be promoted to the next grade. School districts must consider a student's performance on assessments, teacher recommendations, grades in each subject area, and any other information a school district deems important. For each subject in which the student fails to perform satisfactorily on the

assessment, a student promoted to the next grade by the grade placement committee must be assigned to a teacher who meets all state and federal qualifications to teach in that subject area and grade.

A student who failed to pass the 3rd grade reading assessment no longer will be automatically retained in the 3rd grade. A school district must provide accelerated instruction for students in grades 3 through 8 in the subject area in which the student failed to perform satisfactorily on the state assessment. A student in grades 3 through 8 who does not perform satisfactorily may not be promoted to the next grade level unless the student completes accelerated instruction before the beginning of the new school year. The commissioner will develop guidelines for district accelerated instruction programs.

**Career and technical education.** The bill requires that the state plan for career and technical education provide a rigorous course of study consistent with the required curriculum through which a student may receive specific education in a career and technical program that:

- incorporates competencies leading to academic and technical skill attainment;
- leads to an industry-recognized license, credential, certificate, or an associate or baccalaureate degree;
- includes opportunities for students to earn college credit for coursework; and
- includes, as an integral part of the program, participation by students and teachers in activities of career and technical student organizations.

Each time the THECB revises the official statewide inventory of workforce education courses, the SBOE must revise the essential knowledge and skills of any corresponding career and technical curriculum.

The commissioners of education and higher education, with the comptroller and the Texas Workforce Commission, may award grants of up to $1 million to an institution of higher education to work with at least one school district and a business entity to develop advanced math and science courses to prepare students for a high-demand occupation. Total grant awards in a biennium may not exceed $10 million. An institution awarded a grant must obtain from one or more business entities in the relevant industry — in a total amount equal to the amount of the state grant — gifts, grants, or donations of funds or property to be used for the course.

**School district accreditation.** Each school district will be assigned an accreditation status of accredited, accredited-warned, or accredited-probation, based on criteria determined by the commissioner of education. In assigning accreditation, the commissioner must consider a school district's performance on student achievement indicators and under the financial accountability system. The commissioner may continue to consider statutory compliance, data reporting, and the effectiveness of district programs. A district's accreditation status may be raised or lowered based on the district's performance or lowered based on the performance of one or more campuses in the district that do not meet performance standards.

The commissioner may change the accreditation status of a district, change the accountability rating of a district or campus, or withdraw a distinction designation as a result of a special on-site investigation of a district into questions about a program, including special education, required by federal law or for which the district receives federal funds.

The bill expands the situations in which the commissioner must conduct a special accreditation investigation. After the investigation, the commissioner may change the accreditation status of a district or the accountability rating of a district or campus, or may impose interventions or sanctions as deemed necessary.

The bill amends the current calculation of dropout and completion rates by excluding students ordered to GED programs by a court, those previously reported to the state as dropouts, students not counted in average daily attendance, students who enrolled initially as unschooled refugees or asylees, and students detained at a county, state, or federal facility within the criminal justice system.

**Performance ratings.** By August 8 of each year, the commissioner will assign each school district, campus, and open-enrollment charter school a performance rating of either acceptable or unacceptable based on the state minimum standard set for each student achievement indicator and for required improvement. Required improvement is the progress necessary for the campus or district to meet state standards.

The commissioner must raise the state standards for the student achievement indicators for accreditation as

necessary to reach the goals of achieving, by the 2019-20 school year:

- student performance in this state, disaggregated by race, ethnicity, and socioeconomic status, that ranks nationally in the top 10 states in terms of college readiness; and
- student performance, including the percentage of students graduating under the recommended or advanced high school program, with no significant achievement gaps by race, ethnicity, and socioeconomic status.

TEA will determine the annual improvement for a student to be prepared to perform satisfactorily on the 5th and 8th grade assessment instruments and the end-of-course exams required to earn a high school diploma.

The commissioner must define acceptable performance as meeting the state standard for the current school year based on student performance in the current school year or as averaged over the current school year and the preceding two school years. The commissioner may assign an acceptable performance rating if the campus or district:

- performs satisfactorily on 85 percent of the measures the commissioner determines appropriate with respect to the student achievement indicators; and
- does not fail to perform satisfactorily on the same student achievement indicator for two consecutive school years.

An exception may be granted only if the performance of the district or campus is within a certain percentage, as determined by the commissioner, of the minimum performance standard, or in special circumstances, based on alternative criteria established by the commissioner.

If a district or campus received an unacceptable rating for the preceding year, the commissioner will notify the district or campus of a subsequent unacceptable rating by June 15.

**Distinction designations.** The commissioner must adopt criteria for a campus or district to earn recognized or exemplary academic distinction, including the percentage of students performing satisfactorily on college readiness indicators, aggregated across grade levels by subject area, or the percentage meeting annual improvement standards, aggregated across grade levels by subject area.

The commissioner will award a campus a distinction designation if a campus:

- is ranked in the top 25 percent of all state campuses in annual student improvement;
- demonstrates an ability to significantly close the achievement gap between student subpopulations and is in the top 25 percent of all state campuses under the student performance criteria; or
- demonstrates significant academic achievement in English language arts, mathematics, science, social studies, fine arts, physical education, 21st century workforce development programs, or second language acquisition.

**Intervention and sanctions.** Campus interventions and sanctions will begin the first year that a campus, including an open-enrollment charter school, does not meet performance standards on all student achievement and financial indicators. If the campus implements intervention measures substantially similar to federal accountability requirements, the commissioner may accept those measures as sufficient for the purposes of the state accountability system.

The commissioner may order a hearing at which the president of the school district board of trustees, the superintendent, and the campus principal appear to explain the school's low performance, lack of improvement, and plans for improvement.

The commissioner may order the establishment of a school community partnership team composed of members of the campus-level planning and decision-making committee and additional community representatives as determined appropriate by the commissioner.

The campus-level planning committee of a campus or charter school must develop a campus improvement plan to address the areas in which the school was not projected to meet performance standards the following year.

A campus intervention team must be assigned to a campus that does not meet performance standards on any indicator and work with the school community partnership team. The team must assess factors such

as teacher retention, certification, and professional development and the quality of educational programs. The team must provide targeted help in areas in which the school did not meet performance standards and help develop a targeted improvement plan. The team must remain with the school until all academic performance standards are met, updating the targeted improvement plan as necessary.

If a campus is rated unacceptable for two consecutive years, the commissioner must order the campus reconstituted. A reconstitution plan must be submitted to the commissioner after a public hearing and approval from the school district board of trustees. Each year the campus has an unacceptable rating, the campus intervention team must help update the target improvement plan and submit it to the board of trustees, parents, and the commissioner for approval.

A school principal who was assigned to the campus during the time the campus did not meet performance standards may not be retained unless the campus intervention team determines it is appropriate to do so. The bill retains the requirement that all math, reading, science, writing, English/language arts, and social studies teachers be removed from the campus unless the campus intervention team determines that students taught by the teacher exhibited a pattern of significant academic improvement.

The commissioner still may appoint a conservator, monitor, management team, or board of managers to oversee district-level support to low-performing campuses and the implementation of the updated targeted improvement plan.

If the commissioner determines that a campus did not fully implement the targeted improvement plan or students failed to demonstrate substantial improvement in the targeted areas, the commissioner may pursue alternative management, repurpose the campus, or order the closure of the campus.

**Repurpose or closure of a campus.** Should a campus maintain an unacceptable rating for five consecutive years, then repurposing the campus, alternative management, or closure is required. The commissioner may waive this requirement for one year if the commissioner determines that significant improvement in student performance over the preceding two years indicated that the campus is likely to be rated acceptable the following year.

If the commissioner orders repurposing, the school district must submit a comprehensive plan to the board of trustees and to the commissioner for approval. All students assigned to the campus in the school year immediately preceding the repurposing of the campus will have the opportunity to enroll at another campus. The principal may not be retained at the campus unless the commissioner determines that the students have achieved significant academic improvement. Teachers may not be retained unless the commissioner grants a waiver for those who did not teach a subject for which an assessment was administered or whose students had demonstrated improved academic growth.

The commissioner may not require a campus to change its name as a result of reconstitution or when the campus is re-purposed.

A qualified for-profit entity may apply for alternative management of a public school if a qualified non-profit entity is unavailable.

**Transitional intervention and sanctions.** During the transition to the accreditation system established under HB 3, to be implemented in August 2013, the commissioner may suspend assignment of accreditation status and performance ratings for the 2011-12 school year.

As soon as practicable following the 2011-12 school year, the commissioner must report and evaluate district and campus performance on the college readiness student achievement indicators. For the 2012-13 school year, the commissioner must assign district accreditation status and district and campus performance ratings based on that evaluation.

Beginning with the 2013-14 school year, the commissioner must evaluate district and campus performance based on student performance on assessment instruments and assign district accreditation status and district and campus performance ratings based on that evaluation.

During the 2011-12 and 2012-13 school years, the commissioner must implement interventions and sanctions for districts and campuses identified as having unacceptable performance in the 2010-11 school year based on the performance standards applicable during that school year. The commissioner may increase or decrease interventions and sanctions based on district or campus performance. For determining multiple years of unacceptable performance and required interventions

and sanctions, performance ratings and accreditation statuses issued in the 2010-11 and 2012-13 school years will be considered consecutive.

**State and local testing.** TEA must develop state assessments that allow a student's score to provide reliable information on each performance standard and an appropriate range of performance to serve as a valid indication of growth in student achievement. A separate section for testing college readiness no longer is permitted; these questions will be integrated into the assessment. The commissioner may not require any school district or open-enrollment charter school to administer a statewide assessment by computer.

On required end-of-course exams in mathematics, science, English, and social studies, a student's cumulative score must average out to a satisfactory scale score, as determined by the commissioner. A student must achieve a minimum score determined by the commissioner for an end-of-course exam score to count toward a cumulative score.

A student who does not perform satisfactorily on an end-of-course exam must retake the exam. If the student's performance does not meet college readiness performance standards on the Algebra II or English III end-of-course exam, the student may take the exam again.

For students under the recommended or advanced graduation plans, the commissioner may by rule determine a way by which a student's score on the PSAT or the ACT can help determine whether the student satisfies the requirement to perform satisfactorily in mathematics, science, English, or social studies to obtain a high school diploma.

The exemption from taking an assessment instrument provided for certain students with limited English proficiency will be extended to six years.

The determination of which students in a special education program qualify for an alternative assessment is left solely to the students' admission, review, and dismissal committees.

The bill limits the time that may be spent on locally required testing to prepare students for state-administered exams to no more than 10 percent of instructional days in a school year. A campus-level planning and decision-making committee may set this limit at 10 percent or lower.

**Performance standards.** The commissioner must establish college readiness standards and overall performance standards for end-of-course exams and assessments in grades 3-8. The bill defines college readiness as the level of preparation necessary for a student to enroll and succeed without remediation in an entry-level English language arts or math course for credit toward a baccalaureate or associate degree program.

Before the beginning of the 2011-12 school year, TEA, with THECB, will conduct research to substantiate the correlation between college readiness and a certain level of performance by students on the Algebra II and English III end-of-course exams. Algebra II and English III end-of-course exams will be developed to measure college readiness beginning with the 2011-12 school year.

TEA, with THECB, must research science and social studies end-of-course exams. If the education commissioner determines that the research substantiates a correlation between student performance on end-of-course exams and college readiness, the commissioner may establish college readiness performance standards for the science and social studies end-of-course exams.

By December 1, 2012, TEA must report to legislative leaders the feasibility of implementing college readiness performance standards for the science and social studies end-of-course exams and a summary of implementation procedures for each standard.

The commissioner must collect data every three years to assess the correlation between student performance on end-of-course exams and college readiness and, if necessary, adjust the rigor of the state's college readiness performance standards. TEA must compare the college readiness standards in Texas to other states and countries to ensure academic rigor and competitiveness and report its findings to legislative leaders.

**Financial accountability.** The bill requires each school district to post a copy of its budget to the district's website and allow public access to that budget for three years. The bill repeals the rule that at least 65 percent of a district's budget be spent for instructional purposes and prohibits any proscription of funds appropriated to school districts and open-enrollment charter schools. Open-enrollment charter schools must meet financial accountability expectations.

The comptroller must identify school districts and campuses that allocate resources in a way that contributes to high academic achievement and cost-effective operations, based on existing academic and financial data, and rank school districts based on the evaluation and identify areas for improvement.

The commissioner, in consultation with school district and open-enrollment charter school financial officers, must develop a process to review annually the financial solvency of all school districts and open-enrollment charter schools. An electronic system developed by the commissioner must alert TEA when a student-to-staff ratio is significantly outside the norm, when there is a rapid depletion of the district or charter school's general fund balance, and when a significant discrepancy between actual budget figures and projected revenues and expenditures occurs. TEA will immediately notify the school district of such an alert.

If a deficit within three years is projected for a district, the district must submit to TEA a new budget that will resolve the deficit. A district will be rated accredited-warned if it does not submit a plan, fails to have its plan approved, or fails to comply with the approved plan, or if in a subsequent year TEA finds that the plan will not avoid the projected deficit.

**Data collection and reporting.** TEA must establish a student assessment data portal to allow school districts, teachers, parents, students, and public institutions of higher education access to individual or general student assessment data, including tracking of student progress. The information must be available by the first day of the school year and include data over multiple years, beginning with the 2007-08 school year. The portal must permit comparisons of student performance at the classroom, campus, district, and state levels.

## Supporters said

HB 3 would facilitate a true educational continuum for public school students in Texas from pre-school through higher education. State assessments would be properly aligned with grade-level curriculum and with college readiness. The new system would provide assurance that graduates were college- or workforce-ready upon graduation.

Students would have more flexibility in coursework to pursue their individual interests, while still receiving

a quality education. Having multiple pathways with equal rigor would allow each student to reach his or her full potential. The bill would make interventions and sanctions more effective by allowing schools adequate time to implement changes and demonstrate improvement.

The financial accountability system would provide early indications to school districts and charter schools if their financial plans required adjustment to prevent problems in future years.

**Student improvement.** The current accountability system does not account for the diversity of the student population or student progress because it holds all schools to the same standard, despite diverse student populations. By contrast, a growth measure system would credit districts for individual student performance improvement, while also accounting for individual student and district characteristics. A growth model would acknowledge that a child who has fallen behind typically requires more than one academic year to catch up to that child's peers.

**Data collection.** The current system collects copious data but does not disseminate the information in a coherent or useful manner. The bill would implement a system that would be diagnostic, transparent, and easier to use.

**High-stakes testing.** Claims that the bill would maintain high-stakes testing are unfounded. It actually would lower significantly the number of tests students are required to take because the bill would reduce the number of instructional days during which it was permissible to administer practice tests.

**Alternative management standards.** In order to ensure that alternative management was a viable option, it is necessary to allow for-profit companies the opportunity to apply to manage schools. When the state previously requested applications from non-profit organizations to manage schools that were required to be under new management, repurposed, or closed, no such organizations applied. This meant that the commissioner was forced to choose between closure and repurposing the building. The bill would allow a for-profit entity to apply to manage schools only if a qualified non-profit entity were unavailable.

**Accreditation ratings and performance standards.** While some argue that TEA needs explicit guidance on accreditation and performance standards in

order to make the criteria known, this is not necessary. The agency would be required to publish the criteria on its website so that all stakeholders would be informed. When developing rules and standards, the agency gathers data about best practices and current research and seeks the input of stakeholders. This ensures that rules and standards are in line with parent, business, and industry expectations.

## Opponents said

This bill represents a missed opportunity to address mistakes made in the past. It would not ensure that students acquired the knowledge and skills in each core subject area to succeed in college or the workforce, which in turn would ensure that students had the basic knowledge and skills to become "trainable" in a variety of fields. While Algebra II and English III can be a proxy for college and career readiness in their respective subject areas, meeting college readiness on those two exams alone would not demonstrate the ability to succeed in all areas after high school.

**High-stakes testing.** Student performance on tests still would drive the accountability system under HB 3. This bill would retain the emphasis on one test throughout elementary and middle school, as well as required performance standards on end-of-course exams. The system would continue to promote "teaching to the test" at the expense of other necessary curriculum, such as critical thinking, analytical skills, and reading comprehension.

**Accreditation ratings and performance standards.** TEA would need guidance on accreditation and performance standards, with explicit language, so that all stakeholders know the criteria. The bill should provide explicit standards for the career and technical courses that would qualify to meet the four years of math and science graduation requirement. The bill should stipulate that teachers would have to be highly qualified in the same way a math and science teacher will be.

**Alternative management standards.** The state experienced significant problems the last time for-profit entities were allowed to participate in the competitive bidding process to run public schools. Costs assumed by for-profit entities were significantly higher, but student performance decreased. Their curriculum did not adhere to curriculum standards set by the state. These entities may fail to adequately manage schools by inaction, such as failing to order textbooks on time. As a result of past experience, the state revoked permission for for-profit entities to participate in the bidding process. Reinstating them would not benefit public schools, as for-profit entities still present these same problems, as evidenced in other states.

## Notes

The **HRO analysis** of HB 3 appeared in Part One of the April 29 *Daily Floor Report*.

# Full-day prekindergarten for certain children

**HB 130 by Patrick**
*Vetoed by the governor*

Table of Contents

**HB 130** would have directed the commissioner of education to establish a grant program for school districts and open-enrollment charter schools, with funds appropriated in the general appropriations act, to implement a full-day prekindergarten program for a child at least three years old who:

- was unable to speak and comprehend the English language;
- was educationally disadvantaged;
- was a homeless child;
- was the child of an active duty member of the armed forces;
- was the child of a member of the armed forces who was injured or killed while serving on active duty; or
- was or ever had been in the conservatorship of the Department of Family and Protective Services.

**Grants awarded to school districts.** A school district or open-enrollment charter school would have applied to the commissioner, who would have awarded grants in the following priority:

- school districts that received grant funding for early childhood education in a lesser amount than the amount provided during the 2008-09 school year and demonstrated above-average student performance for the preceding three school years on the state assessment instruments to students in the 3rd grade; and
- school districts that provided services to eligible prekindergarten students and demonstrated above-average student performance for the preceding three school years on the state assessment instruments to students in the 3rd grade.

The commissioner would have determined the amount of each grant awarded to school districts, and no grant could have exceed $4 million annually. Grant funding would have been paid directly to a school district or open-enrollment charter school and could not have been used in any way that would resemble a voucher program.

A school district participating in the grant program would have included in the district's Public Education Information Management System (PEIMS) report student-level results of reading instruments administered at the kindergarten, first, and second grade levels.

TEA would have collected and maintained information reported by school districts regarding state assessments to students in the third grade, produced longitudinal student performance reports, and made the reports available and accessible to the general public.

**Enhanced quality.** A district could not have enrolled more than 22 students in a prekindergarten class and would have had to maintain an average ratio in the program of not less than one certified teacher or teacher's aide for each 11 students. Each class would have had to have at least one certified teacher — an individual with a minimum of nine semester credit hours of college education courses emphasizing early childhood education. If a certified teacher was unavailable, a community provider contracting with a school district could have employed a teacher who had a minimum of three years experience in early childhood education, was certified as a Child Development Associate by the Council for Professional Recognition, and was taking one or more college education courses that emphasized early childhood education. The bill would have required the community provider to employ a certified teacher by the third anniversary of the date the provider contracted with the district.

A school district would have selected and implemented a curriculum for the program that included the prekindergarten guidelines established by TEA and would have been subject to all statutes governing prekindergarten programs.

Students enrolled in full-day prekindergarten programs would have been required to participate in moderate or vigorous daily physical activity for at least 30 minutes throughout the school year.

**Community providers partnerships.** The bill would have required a school district to use at least 20 percent of grant funds provided to contract with one

or more eligible community providers. The amount of reimbursement provided by a school district to a community provider would have been negotiable between the district and the community provider based on the services provided. This reimbursement would not have affected a community provider's eligibility to receive any other local, state, or federal funds to provide before-school, after-school, and summer child care.

*Waivers.* The commissioner could have waived the requirement to contract with a community provider if a school district demonstrated documentation that the area served by the district did not have a sufficient number of eligible community providers or the district could not reach an agreement with eligible community providers or did not receive any applications.

*Eligibility.* A community provider would have had to be center-based and licensed by and in good standing with the Department of Family and Protective Services. An eligible community provider also would have had to be:

- certified through the school readiness certification system;
- a Texas Early Education Model Participant;
- a Texas Rising Star Provider with a three-star certification or higher; or
- accredited by a research-based, nationally recognized, and universally accessible accreditation system approved by TEA that required a developmentally appropriate curriculum that included math, science, social studies, literacy, and social and emotional components.

**Program evaluation.** The commissioner would have had to contract for an evaluation of the effectiveness of the enhanced program in promoting student achievement and school readiness and deliver an interim report to the Legislature.

**Duties of the commissioner of education.** The commissioner would have had to require regional service centers to assist school districts in informing parents of prekindergarten options, identifying eligible community providers, and maintaining an updated list of eligible community providers. The commissioner would have had to require regional service centers to assist community providers in establishing contracts with school districts and provide eligibility information to community providers not currently eligible. The commissioner would have had to encourage regional

education service centers and school districts to use locally available child care resources and referral services. The commissioner could not have required a district or recipient of a grant to participate in the school readiness certification system.

## Supporters said

HB 130 would include high-quality, research-based components in prekindergarten programs while maintaining district control and oversight. A Texas A&M study demonstrated that for every dollar Texas spends on prekindergarten, the state earns a return on investment of $3.50. Claims that there is a "fade out" of the positive benefits of quality prekindergarten programs are unfounded because such results are from weak programs or weak research designs.

Students who attend prekindergarten need less remediation and are less likely to enter the criminal justice system, more likely to graduate from high school, more likely to go to college, and more likely to become productive members of society with higher-paying jobs. The higher the quality of the program, the higher the return. Other states find they get back as much as $8.00 or more.

The bill would increase the quality of prekindergarten programs by promoting collaboration between private providers and school districts to share best practices and resources. Partnerships would decrease the number of new classrooms needed to be built to accommodate students.

The bill would help reduce overly large class sizes and student-to-adult ratios for prekindergarten programs and increase more programs to full day. Full-day programs are a significant factor in closing the achievement gap between students, and children with early childhood intervention outperform other students.

The bill would allow Texas to reach its most at-risk students as early as possible in order to have the greatest effect. Children who attend prekindergarten are more likely to be ready to begin learning in kindergarten and 44 percent less likely to drop out of school.

More students would participate in full-day prekindergarten programs because it would alleviate the need for midday transportation for working families. A shift from half-day to full-day programs would draw in the remaining eligible students. Many families do not

participate in half-day programs because they cannot work out the logistics of picking up the child midday and transporting the child to daycare.

HB 130 would ensure that prekindergarten programs had a steady and reliable source of funding. Currently, Texas funds half-day programs for participating districts, but those districts must rely on grants or local funding to pay for the remainder of the day.

## Opponents said

This bill would represent an unnecessary increase in the role of government and would cost the state too much money. It would authorize a massive state spending increase of $390.4 million in fiscal 2010-11, which would be too extravagant during a severe recession, and $584.7 million in fiscal 2012-13, when the state's fiscal situation is expected to be even worse.

The bill would move the state closer to a universal prekindergarten system, which is not the direction in which the state should be moving. Prekindergarten benefits only the profoundly disadvantaged, and the positive effects have faded by middle school.

With limited state resources dedicated to prekindergarten, state grant money should be directed to districts with the greatest academic need. State funding also should be directed to programs demonstrating the most efficiency, thereby benefiting the largest number of Texas students. Under the funding formula for the existing prekindergarten grant program, $25 million would serve more than 27,000 students over the next biennium, which is 21,000 students more than the estimated 6,800 students that would have been served under the bill's proposed program — or a 305-percent increase. Expanding the current grant program, rather than creating an additional mandatory full-day prekindergarten program, would serve more students with greater needs.

Prekindergarten funding should be used to expand the number of students served by the existing half-day prekindergarten grant program rather than dilute the effectiveness of the existing program by funding full-day programs. The priority should be to provide assistance to half-day prekindergarten programs in districts whose third graders have scored below the state average on the reading portion of TAKS for the past three years.

## Notes

The **HRO analysis** of HB 130 appeared in Part Three of the May 4 *Daily Floor Report*.

For additional information on the governor's veto of HB 130 and the response by the author and the sponsor, see HRO Focus report Number 81-7, *Vetoes of Legislation, 81st Legislature*, July 22, 2009, pp. 9-15.

# Mitigating factors in disciplining students

**HB 171 by Olivo**
*Effective on June 19, 2009*

Table
of Contents

**HB 171** requires school districts to consider mitigating factors such as self-defense, intent, a student's disciplinary history, or any disability a student may have, before suspending, expelling, or assigning a student to a disciplinary alternative education program (DAEP) or juvenile justice alternative education program (JJAEP). A district must consider the mitigating factors regardless of whether the disciplinary action is mandatory under the district's code of conduct. The bill will apply beginning in the 2009-10 school year.

## Supporters said

HB 171 would decrease the number of students disciplined unreasonably because a school district did not consider mitigating factors when evaluating a student's actions. Seventy-eight percent of the students suspended, expelled, or assigned to DAEP or JJAEP are placed there by mandatory disciplinary actions under a school district's code of conduct, indicating that the student probably had not misbehaved previously or had committed a minor offense. Students in a school district with a zero tolerance policy who defend themselves against another student physically harming them receive the same punishment as the students' attackers because school administrators do not consider self defense. Districts sometimes punish students for accidents or overreact if a student who has never been in trouble before violates the code of conduct.

Punishments that do not fit the misbehavior have long-term negative emotional effects on students, and unjustified assignments to alternative education programs isolate students and often result in the students falling behind academically. School administrators are allowed to consider mitigating factors but sometimes choose not to exercise common sense. This bill would help ensure that students were not unnecessarily removed from the traditional learning environment.

## Opponents said

HB 171 would restrict the amount of local control afforded to school administrators. Education Code, ch. 37 already permits a district to consider mitigating factors.

## Notes

The **HRO analysis** of HB 171 appeared in Part Three of the May 1 *Daily Floor Report*.

# Sunset review of State Board of Education

**HB 710 by Rose**
*Died in the House*

Table
of Contents

**HB 710** would have placed the State Board of Education (SBOE) under Sunset review during the same time periods as the Texas Education Agency (TEA), but would not have allowed the board to be abolished.

## Supporters said

HB 710 would provide necessary oversight of the State Board of Education. The board should be reviewed periodically by the Sunset Advisory Commission with the intent of improving the effectiveness of state government and to ensure that the board does not circumvent legislative intent and statutory limitations on its authority. The bill would not allow the SBOE to be abolished, but would ensure that it carried out its duties in the most efficient and effective manner.

While the SBOE is established in the Constitution, much of its policy-making authority comes from the Legislature through statute. It would be appropriate for the Legislature to review the role and operation of the SBOE in relation to TEA, which implements policies set by the board, at the same time that TEA comes under Sunset review. Other elected bodies or agencies with elected heads, including the Department of Agriculture, the Railroad Commission, and the Veterans' Land Board, have been subject to periodic full sunset review. The SBOE textbook adoption process also was reviewed by the Sunset Advisory Commission in 1995, which led to statutory changes narrowing the board's ability to approve textbooks.

## Opponents said

HB 710 would undermine the public's role as a check on elected officials. The State Board of Education is an elected body, and it is up to the voters to decide if the members of the board are doing a good job. If the voters do not agree with the decisions of SBOE members, they will demonstrate this dissatisfaction at the polls. It would not be an appropriate use of the Sunset process to institute review of the SBOE just because lawmakers do not agree philosophically with members of the board. The SBOE has exercised its authority within the parameters laid out in the Constitution and in the Education Code.

## Notes

HB 710 failed to pass the House on third reading by 71-73 on May 6.

The **HRO analysis** appeared in Part Three of the May 2 *Daily Floor Report*.

# Excluding private schools from eligibility for certain TEA grants

**HB 2823 by Patrick**
*Died in the House*

Table
of Contents

**HB 2823** would have amended the eligibility requirements for grants awarded to organizations that provide volunteers to teach classroom or after-school programs. The bill would have included only those organizations that provided volunteers to teach classroom or after-school programs to students enrolled in a public school district or open-enrollment charter school. These grants would have been awarded to organizations for programs to provide technical assistance, professional development, case-managed student services, and programs for the benefit of students enrolled in school districts or open-enrollment charter schools.

The commissioner of education could not have awarded a grant to an organization that served as a substitute for a regular educational program provided by a school district or open-enrollment charter school. The commissioner could not have awarded a grant to a nonprofit organization for services provided as a private school or to a private school.

The bill would have expressed the intent of the Legislature that grants could not be awarded to an organization or nonprofit organization, including dropout recovery grants, such as the grants awarded in 2008 in response to the Texas Education Agency's Request for Applications (RFA) 701-08-116.

## Supporters said

The Legislature did not intend for the dropout recovery program to become a medium for grants of public money to private schools. The commissioner misinterpreted the statute and should not have awarded the grants to private schools. The bill would state clearly the Legislature's intent that taxpayer money should be spent on public school education programs and should not finance private or alternative education programs. Private schools still could receive grant money if they contracted with a public school district.

## Opponents said

This bill would limit the flexibility of the commissioner of education. Texas has one of the highest dropout rates in the nation, so the state should not limit available solutions. The nonprofit organizations are administering successful dropout recovery programs and reaching students that otherwise would not complete their education. The state should not act in a way to inhibit any successful dropout recovery program regardless of the provider.

## Notes

HB 2833 was reported favorably, without amendment, by the House Public Education Committee on April 14 and was placed on the May 11 General State Calendar, but no further action was taken.

The language in HB 2823 was adopted by the House as an amendment to HB 3 by Eissler. The language was removed by the conference committee on HB 3 and was not included in the enacted version of that bill.

The **HRO analysis** of HB 2823 appeared in Part Three of the May 11 *Daily Floor Report*.

# Formula funding for public school finance, teacher pay raises

**HB 3646 by Hochberg**
*Effective September 1, 2009*

Table
of Contents

**HB 3646** revises the school finance system by changing the calculations of the basic allotment, guaranteed yield allotment, and equalized wealth level for school districts and funneling an additional $1.87 billion to the public schools. All midsize school districts, regardless of property wealth, will be eligible for the small school district adjustment within the formula. The bill also commissions a comprehensive review of public school finance by establishing a 15-member Select Committee on Public School Finance Weights, Allotments, and Adjustments. The committee must prepare and deliver its report by December 1, 2010.

**Formula funding.** Under HB 3646, the basic allotment, which is the base level of funding for each student in average daily attendance, is increased to $4,765 or, for the next four years, 1.65 percent of average statewide property value per weighted student, whichever is greater.

In addition, every school district and open-enrollment charter school is guaranteed an increase of at least $120 per weighted student in average daily attendance (WADA), a measure that accounts for the extra costs of educating certain students, and a maximum increase of $350 per WADA per school year. Districts receiving "target revenue" will receive the increase in addition to their total revenue.

The bill ties the amount of the basic allotment to the calculation of the first of three equalized wealth levels, above which a district becomes subject to "recapture" of a portion of local property taxes to equalize statewide funding.

Target revenue is maintained, based on 2009-10 funding levels, except that districts no longer are subject to the "drag back" provision and instead will retain all funding to which they are entitled through formula funding.

**Indirect costs allocation.** For the 2009-10 school year, the indirect cost allotments will increase as necessary to reflect the increased percentage of total maintenance and operations funding provided by the amended basic allotment.

**Formula revisions.** The bill amends the method of finance for certain Foundation School Program set-asides, such as: study guides for assessments; the cost of preparing, administering, and grading assessments; teacher training materials and resources for teachers of students with limited English proficiency; life skills classes for teen parents; optional extended year programs; and salaries for certified counselors. These programs will be funded through appropriations.

The bill increases from 15 percent to 45 percent the portion of funds that may be used for the indirect costs of providing compensatory, intensive, or accelerated instruction programs to supplement the regular school program at a campus at which at least 40 percent of the students are educationally disadvantaged.

Each school district receives an additional $650 for every student with a parent or guardian serving in the U.S. military in a combat zone or with a parent or guardian whose service in the U.S. military has resulted in a transfer to the district as a result of an action under the Defense Base Closure and Realignment Act of 1990. This allotment will be funded by a specific appropriation or from excess funds from the Foundation School Program and may be used only to provide for these students supplemental educational programs or life skills programs for student who are parents.

The existing high school allotment was made a separate allotment under the school finance system, rather than only a part of the calculation of target revenue.

**Salary increase.** Public school districts and open-enrollment charter schools must increase the salary for each classroom teacher, full-time speech pathologist, full-time librarian, full-time counselor, and full-time school nurse by the greater of either $80 per month ($800 per year, based on a 10-month school year) or the maximum uniform amount they can provide with $60 per student in weighted average daily attendance. This salary increase is in addition to any increase to which the employee is entitled through the district's salary schedule, including local supplement, and any money representing a career ladder supplement.

The bill guarantees each individual employed as a teacher, full-time speech pathologist, full-time librarian, full-time counselor, or full-time school nurse during the 2010-11 school year at least that salary for the duration of the individual's employment with the school district.

**Incentive grants.** The bill abolishes the Texas Educator Excellence Grant. The funding amount for District Awards for Teacher Excellence (DATE) will be determined by the general appropriations act rather than by a statutory formula. Districts must notify teachers and principals of the criteria and formulas to be used to receive awards before the beginning of the performance period on which the awards will be based.

**Special education grant.** The bill establishes a special education grant to help districts that did not receive sufficient state and federal funds to pay for special education services to students with disabilities. The grants will be funded with appropriations, federal funds, or other funds available. Districts must report to the commissioner of education a comparison of state and federal funds received and the expenses incurred by the district, including the cost of training teachers.

**Career and technology certification subsidy.** The bill makes career and technology certification subsidies available only for current or emerging high-demand, high-wage, high-skill occupations or for a student enrolled in the special education program. It removes the stipulation that a student demonstrate financial need in order to be eligible for a subsidy. Funding will flow to the district and then the student. It adds an allotment of $50 per student enrolled in two or more advanced career and technology courses or an advanced course as part of a tech-prep program.

**Virtual School Network.** For each student who completes an electronic course through the state virtual school network as a part of a normal course load, the school district or open-enrollment charter school that provides the course will receive a $400 allotment. The district in which the student is enrolled will receive $80 for administrative costs. Other entities authorized to participate in the network will receive comparable reimbursement.

A school district or charter school may charge a fee for enrollment in a course provided through the network during the summer. The commissioner of education will determine the maximum allowable fee and adopt rules to prohibit artificially high fees.

Students under supervision of the juvenile probation department, Texas Youth Commission, or the Texas Department of Criminal Justice may participate in the network. A student who transferred from one educational setting to another after beginning enrollment in an electronic course may continue enrollment in the course. High school students who are military dependents and no longer reside in the state due to military deployment or transfer may enroll in one or more courses provided by the network.

TEA will pay the cost of evaluating and approving courses. If funds appropriated for that purpose fall short of the demand, a school district or open-enrollment charter school may pay the fee necessary for the commissioner to evaluate and approve a course.

**Facilities.** The bill makes bonds for facilities funding on which the district had made payments during the preceding state fiscal biennium eligible automatically under the existing debt allotment program, no longer requiring each legislature to "roll forward" eligibility.

**Bonds guaranteed by the Permanent School Fund.** On approval by the commissioner of education, school district bonds guaranteed by the corpus and income of the Permanent School Fund (PSF) are guaranteed until the date those bonds mature or are defeased in accordance with state law.

The State Board of Education (SBOE) may establish a percentage of the cost value of the PSF to be reserved from use in guaranteeing bonds.

The commissioner of education may order a school district to set an ad valorem tax rate capable of producing revenue sufficient to enable the district to provide reimbursement and pay the principal of and interest on district bonds. If a school district fails to comply, the commissioner may impose a sanction authorized under the state accountability system.

**Intercept Credit Enhancement Program.** A school district whose application for the PSF bond guarantee program is rejected may apply for credit enhancement of bonds by money appropriated for the Foundation School Program (FSP), other than money appropriated to school districts as required by the Texas Constitution or for assistance in paying debt service. The same school district bonds may not be eligible for

both the PSF bond guarantee program and FSP backing. The credit enhancement provided for bonds will remain in effect until the bonds mature or are defeased in accordance with state law.

Money appropriated for the FSP may be used to provide credit enhancement for eligible bonds as provided by state law, the general appropriations act, and SBOE rule if using the PSF to guarantee particular bonds will result in:

- the total amount of outstanding bonds guaranteed by the Permanent School Fund exceeding the authorized amount; or
- the use of a portion of the cost value of the Permanent School Fund reserved in accordance with the bill, as determined by the SBOE.

In each month of each fiscal year, TEA will determine the amount available for the intercept credit enhancement program from the FSP and the amounts due to public schools from the FSP through the end of the fiscal year.

The commissioner of education may not endorse particular bonds for credit enhancement until the commissioner has determined that funds are available for this purpose and that the endorsement will not cause the projected debt service coming due during the remainder of the fiscal year for bonds provided credit enhancement to exceed the lesser of:

- one-half of the amount of funds due to public schools from the FSP for the remainder of the fiscal year; or
- one-half of the amount of funds anticipated to be on hand in the FSP to make payments for the remainder of the fiscal year.

**Higher education and school district facility construction partnerships.** An independent school district and an institution of higher education in the same county may contract for the district to contribute district resources to pay part of the costs of the design or construction of an instructional or athletic facility under the control of the institution of higher education. A district may contribute district resources only if the district and the institution of higher education enter into a written agreement authorizing the district to use that facility.

**Other provisions.** The bill also:

- requires school districts to equip school buses with seatbelts only if the state pays for it;
- allows certain school districts to schedule a tax-rate approval election before the new school year starts;
- expands permissible uses of the optional flexible school day to more grade levels and allows it to be offered during the school year or the summer; and
- establishes a financial literacy pilot program.

## Supporters said

HB 3646 would simplify the public school finance system and increase funding for most school districts by flowing an additional $1.87 billion through the system. It would increase aid to districts that have had their funding frozen under low "revenue targets" established in 2006. It also would improve equity in funding among school districts by increasing the basic allotment, which is the base level of funding for each student in average daily attendance, to at least $4,765.

Districts would reap the benefit of increased property tax values and not be constrained by growing costs and shrinking budgets. The new system would fund more districts under formula calculations, which account for the differing costs of educating students with differing needs. It also would increase allocations to districts whose funding is calculated through the formula because the basic allotment, and thus the equalized wealth level that determines when a district is subject to "recapture," would increase if property values increase over the next four years.

Districts that had their target revenue reduced to an amount below what the formula would have provided them would have access under HB 3646 to the full amount available through the formula. The bill would guarantee that no district received less funding as a result of being funded through the formula. A district that would receive more revenue through the target revenue provision would remain at target revenue until the formula provided more revenue.

HB 3646 also would increase the allowed wealth per student before recapture by tying it to the amount of the basic allotment, recognizing that all districts need additional funds. It would raise the first equalized wealth level, which covers most of the revenue raised

by school districts, from $374,200 per WADA in 2008-2009 to $476,500 per WADA in 2009-2010. As a result, recapture would be eliminated for some 26 of the more than 100 districts affected. Also, Foundation School Program set-asides no longer would cut into the total revenue provided to school districts.

**Salary increase.** The bill would provide teachers and certain other school employees with a well deserved pay raise and would address teacher compensation within a framework that maintained equity.

**Incentive programs.** The incentive pay provisions would be significantly improved over current law. The bill would repeal the Texas Educator Excellence Program, which has serious structural problems. It also would increase local control by school districts over the design of local incentive programs.

**Optional flexible school day.** Some school districts use the optional flexible school day to allow students to make up absences in classes for which they may otherwise not receive credit. These programs help students to reach their grade level and finish high school. The bill would provide another way school districts could reach out to at-risk students and help reduce the number of dropouts. Unconventional school hours often are needed for certain students' unique circumstances, and the bill will allow districts more flexibility to tailor their programs to meet these needs. The bill would fund these programs with no additional cost to the state and ultimately would result in savings. It is more expensive for the state to fund a student retaking a course than to fund a student making up the days the student missed.

**Facilities funding.** School districts need additional and renovated instructional facilities because of rapid population growth and the increased need for specialty classrooms, such as science laboratories. The permanent roll-forward for eligibility for the existing debt allotment would provide equity among school districts by helping property-poor school districts that otherwise would be priced out of building new classrooms.

**Virtual School Network.** The bill would simplify the funding mechanism for the virtual school network and bring equity to its students by providing access to quality teachers and courses that might not be available in a traditional setting. The network was underused in the past biennium because the state failed to fund the initiative adequately, which made districts hesitant to use it.

The bill would allow all public school students to enroll in the virtual school network, while current law only permits high school students to enroll. It also would increase access for students with parents in the military by allowing them to enroll both part time and full time in the network.

The bill would not divert significant funding from traditional programs but would provide public schools with an important supplement to their existing programs. Virtual schools provide students the opportunity to enroll in courses that the students' home districts do not offer, including for rural students who otherwise may not have the opportunity to take four years of a foreign language or students from families who must travel frequently.

**Intercept Credit Enhancement Program.** The bill would create a bond backing guarantee using the Foundation School Program (FSP) to guarantee bond issuances of school districts and would serve as a backstop to the Permanent School Fund (PSF) bond guarantee program. The program established by the bill would be known as a "state intercept" because, in the case of a default, the state would intercept the normal FSP payment to the school district and pay the bondholders. Thirteen other states have established similar programs. This would be a separate guarantee program and would be used while the PSF guarantee was unavailable. Due to market conditions, funds have not been sufficient in the PSF to guarantee local school district bonds since November 2008, which has forced school districts to turn to an increasingly small private bond insurance market to issue bonds at higher costs.

School district bonds are backed by the taxing capacity of districts, and no defaults on PSF-guaranteed bonds have ever occurred. Also, the FSP has ample reserve for backing local school district bonds. For the last 10 years, it has run a surplus of between $400 million and $800 million. The bill also would provide important safeguards to ensure that FSP appropriations were not used unless strict conditions were met.

## Opponents said

**Salary increase.** The state should not specify the amount by which a teacher's salary should be increased. The decision to increase teachers' salaries should be made at the local level to award effective teachers. This would acknowledge teachers as professionals by approaching their raises the same the way a corporation

would its employees' raises. Some teachers do not deserve pay raises.

**Incentive programs.** The changes to incentive programs under HB 3646 would damage current programs. The bill would change the rules concerning how the money could be spent. Some districts choose not to participate in incentive programs, believing that they are unstable and not sustainable, and the changes made by this bill would be an example of that problem.

**Facilities funding.** This bill would decrease the number of fast-growth districts eligible for state facilities funding assistance. It would calculate eligibility using the taxable property value of the current tax year, and if the district had experienced significant property growth over the year, this would reduce the state aid for which the district was eligible, as the need for facilities increased.

**High school allotment.** The bill would continue the high school allotment based on ADA rather than WADA. As a result, the funding would flow to districts whether or not they had a significant drop-out problem. Shifting the basis of funding from ADA to WADA would help ensure the districts with the greatest drop-out problem received the most funding to address that problem.

**Virtual School Network.** By increasing use of the virtual school network, this bill could divert money from public schools at a time when the state is not meeting basic educational needs for public school students. While electronic courses may benefit some students, the cost of these courses should be borne by individual students and families.

**Intercept Credit Enhancement Program.** The bill would offer a low-risk way for school districts to issue bonds at lower rates using the state's Foundation School Program (FSP). However, because the FSP provides most of the state's funding for school districts, the state should be cautious about using it to back school district bonds.

## Notes

The **HRO analysis** of HB 3646 appeared in Part One of the May 11 *Daily Floor Report.*

The provisions of SB 955 by Shapiro expanding the Virtual School Network were added to HB 3646, as were those of SB 1255 by Shapiro allowing the Foundation School Program to guarantee school district bonds in lieu of the Permanent School Fund.

SB 955 passed the Senate, but died on the May 22 General State Calendar in the House when no further action was taken. The **HRO analysis** of SB 955 appeared in Part Two of the May 22 *Daily Floor Report.*

SB 1255 passed the Senate, but died on the May 21 General State Calendar in the House when no further action was taken. The **HRO analysis** of SB 1255 appeared in Part Three of the May 21 *Daily Floor Report.*

# Buying electronic textbooks, materials, and technology

**HB 4294 by Branch**
*Effective on June 19, 2009*

Table of Contents

**HB 4294** requires the commissioner of education to adopt a list of electronic textbooks and instructional materials that convey information to a student or otherwise contribute to the learning process. School districts and open-enrollment charter schools could select electronic textbooks or instructional materials to purchase from the list.

Electronic textbooks or instructional materials on the list must:

- be reviewed and recommended by a panel of experts in the subject area of the textbook or materials;
- be aligned with the current research in the subject area of the textbook or materials;
- meet the National Instructional Materials Accessibility Standard;
- cover each part of the Texas essential knowledge and skills and indicate the percentage of each essential knowledge and skill covered; and
- include appropriate training for teachers.

The commissioner must give the State Board of Education (SBOE) an opportunity to comment on proposed electronic textbooks and instructional materials before placing such materials on the approved list. A panel of experts will make a recommendation before an approved electronic textbook or instructional material can be removed from the approved list. Changes to materials on the approved list are subject to review and approval of the commissioner.

Funds from the state textbook fund may be used to purchase technological equipment necessary to support electronic textbooks or instructional materials, according to rules adopted by the commissioner.

If a school district or open-enrollment charter school purchases from the approved list, the state will pay, for each textbook or instructional material purchased, 100 percent of the maximum amount approved by the SBOE for a printed textbook for the subject area and grade level, plus a textbook credit equal to 50 percent of the difference between that cost and the maximum amount, multiplied by the number of electronic textbooks or instructional materials the

district or school needed for that subject and grade level. School districts and open-enrollment charter schools can purchase additional textbooks, supplemental material, electronic textbooks, instructional materials, and technological equipment with the district or charter school portion of the textbook credit.

School districts and open-enrollment charter schools will be required to obtain a classroom set of textbooks for each subject and grade level in the foundation and enrichment curriculum and must certify annually to the SBOE and the commissioner that printed textbooks, electronic textbooks, or instructional materials that cover all elements of the essential knowledge and skills in that subject area and grade level are provided to each student.

A school district or open-enrollment charter school may cancel a subscription and subscribe to a new electronic textbook or instructional material on the conforming list before the end of the state contract period if the electronic textbook or instructional material has been used for at least one school year and the Texas Education Agency (TEA) approves the change.

HB 4294 also requires the commissioner by rule to establish a computer lending pilot program to provide computers to public schools in which 50 percent or more of the students enrolled are educationally disadvantaged and to make computers available for use by students and their parents. Computers will be provided from surplus or salvage equipment from state agencies, higher education institutions, and donations. The commissioner will submit an annual report to the Legislature. The pilot program expires September 1, 2014.

Eligible public school computer lending programs must:

- allow students and parents to borrow a computer;
- include an option for students and parents to work toward owning a computer initially borrowed under the school's lending program;
- provide computer training for students and parents; and
- operate outside regular school hours.

## Supporters said

HB 4294 would provide more local control and flexibility to school districts and would save the state money. School districts and charter schools would be able to decide whether printed or electronic textbooks better serve the needs of its student population. The bill acknowledges that not all districts may be ready for the transition to technology, while others could serve their students best with electronic materials. For districts that chose to do so, the bill would allow information to be downloaded to student laptops, Kindles, or technologies deemed appropriate.

The bill would authorize school districts to purchase electronic books or other instructional materials that have been vetted and are less expensive. Around the state, warehouses are filled with unused printed textbooks due to reluctance to issue textbooks to each student for fear they might lose or damage them. When each textbook costs on average between $50 and $75, it becomes clear that the state must be smarter about the use of state dollars. The claim that textbooks in a warehouse do not go to waste because of a computerized inventory system that allows districts to ship textbooks to another district that needs them fails to account for the fact that other districts do not, in fact, need them.

The bill would bring textbooks into the 21st century. The learning styles of students have changed dramatically. Students have been raised in front of computer screens, and they are more comfortable consuming information in this manner. Students often do not find traditional textbooks engaging, and it is cumbersome for them to carry around several big, heavy textbooks when they prefer an electronic version. The state's current approach is short-sighted and undermines the ability of teachers to do their jobs in the most effective and engaging manner.

A study in Great Britain found that young students using electronic textbooks scored higher in both group and individual tests than those using print books. A pilot program in Texas that provided laptops to every student in class has shown a positive impact on student learning, and school administrators emphasize that technology has improved student learning and increased standardized test scores.

The process the state uses to approve textbooks is long and laborious, and sometimes the information is out of date by the time the textbook reaches the classroom. The bill would allow local school districts to utilize modern technology and to save money. Traditional textbooks in areas such as social studies become out-of-date very quickly, becoming irrelevant and useless to school districts and to teachers, who must find supplemental material to ensure students are learning accurate and relevant information. With electronic textbooks, publishers can update their books and correct errors every year instead of every several years as with printed textbooks.

The State Board of Education's power to approve textbooks derives from the Legislature, not the Texas Constitution. The Legislature can increase and decrease that power to meet the changing needs of the state. The input of the SBOE would be considered in the review process as would the recommendations of experts. The bill would grant the commissioner ample oversight ability.

## Opponents said

The bill would impede the power granted to the State Board of Education to approve the content of textbooks. The system could become fraught with opportunities to misdirect and harm students because of the lack of oversight by elected officials and parents. The review process for electronic textbooks would not provide for parental input because it would not include public hearings or comment. Parents would not have control over the content of their children's textbooks. Parents can pick up and read a hard-bound copy of a textbook, whereas they may not take the time to access an electronic textbook to review what their child is learning.

There is no evidence that electronic textbooks or an increase in the use of technology in the classroom improves student learning. Some justify the transition to electronic textbooks by saying that it is what students want, but it is not the role of adults to indulge children. If educators do not trust a student with a textbook, it is not clear why they would trust the student with a laptop. Some families also cannot afford to purchase at-home technology that enables the student to access an electronic textbook at home.

The state textbook fund should be used only to purchase traditional printed textbooks. Textbooks in warehouses do not go to waste. The state operates a computerized inventory that allows districts to ship books to another district that needs them. Claims that

the state would save money are not valid because transitioning to technology and the upkeep required is expensive. Software glitches would require school districts to employ individuals with expertise in these areas.

## Notes

The **HRO analysis** of HB 4294 appeared in Part One of the May 2 *Daily Floor Report*.

On June 19, 2009, Gov. Rick Perry issued an executive order mandating cooperation among the commissioner of education, TEA, and the SBOE to ensure digital content meets the essential knowledge and skills and is factually error-free. The review process must include the SBOE, and the panel of experts required in HB 4294 must include SBOE members or their designees who qualify as an expert as determined by the provisions of the bill. If the SBOE has previously rejected an electronic textbook based upon its content, it cannot be placed on the approved list.

# Replacing SBOE as managers of the Permanent School Fund

**HJR 77 and HB 2037 by D. Howard**
*Died in Senate Committee*

Table
of Contents

**HJR 77**, a proposed constitutional amendment, and its enabling legislation, **HB 2037**, would have required the Legislature to provide by law for a Permanent School Fund Management Council to manage the Permanent School Fund (PSF) rather than the State Board of Education (SBOE). Individuals would have been appointed to the council only if they had substantial institutional investment expertise or institutional financial management experience. Council members would have served staggered four-year terms. The council would have assumed oversight of the PSF bond guarantee program, replaced the SBOE in contracts pertaining to the fund, and entered into a memorandum of understanding with the School Land Board under which the council would not invest in real estate without the consent of the School Land Board. References to management of the fund by the SBOE would have been replaced with references to the new council.

Under HB 2037, the council would have included:

- two members appointed by the governor;
- one member appointed by the governor from a list prepared by the speaker of the House;
- one member appointed by the governor from a list prepared by the State Board of Education;
- one member appointed by the lieutenant governor;
- one member appointed by the land commissioner; and
- one member appointed by the comptroller.

By majority vote, the council would have appointed a chief investment officer for the PSF.

HJR 77 also would have expanded the role of the School Land Board during a fiscal year in which constitutional restrictions prevented a distribution from the PSF to Available School Fund (ASF) by allowing the School Land Board to distribute funds to the ASF for that fiscal year in an amount not to exceed the five-year annual average of funds released by the board for use by the PSF.

HJR 77 also would have required that the distribution rate for the amount distributed from the PSF to the ASF in each year of a state fiscal biennium

be adopted by a two-thirds vote of the total membership of the PSF Management Council, with approval by a majority vote of the total membership of the State Board of Education (SBOE). The Legislature would have adopted a rate if the council did not adopt one or if the SBOE did not approve one.

## Supporters said

HJR 77 and its enabling legislation, HB 2037, would allow for management of the Permanent School Fund (PSF) by one entity composed of individuals with expertise in financial matters. The original intent the framers of the Texas Constitution was that the SBOE be a body of prudent and careful people who would make safe investments in stocks and bonds. HJR 77 would restore that original intent through creation of the Permanent School Fund Management Council, whose sole responsibility would be the prudent investment of the PSF.

The SBOE in its current form has not managed the fund successfully. In a report to the 77th Legislature in 2000, the Texas House General Investigating Committee recommended that the Constitution be amended to create an appointed Permanent School Fund Investment Board, separate from the SBOE, with the jurisdiction of the SBOE limited to education policy. In 2003, an independent report contracted through the State Auditor's Office and requested by the SBOE said that "by constitutional amendment a governing board for a state-sponsored, quasi-independent investment management organization [should be] created to administer the PSF."

The Permanent School Fund Management Council would improve the effectiveness of fund management. The SBOE does not provide adequate management for the fund because it lacks expertise. While most members are qualified for education policy-making, they are not qualified in investment fund management. Their lack of knowledge has resulted in each member appointing a personal advisor, none of whom is a professional money manager. The change to a separate investment council would enable a comprehensive investment strategy and adequate management, which would increase the money available to the public school finance system.

The SBOE has duplicated work and employed an ineffective and non-comprehensive investment strategy. For example, the SBOE is able to invest in real estate without consulting the General Land Office, resulting in chaotic and ill-informed investments. The SBOE's duplication of GLO actions has resulted in doubled expenses to the fund.

## Opponents said

HJR 77 and its enabling legislation, HB 2037, would undermine the intent of the framers of the Constitution, who did not intend to place the PSF in the hands of financial experts but to have it overseen by those accountable to the people. The SBOE successfully has managed the fund for more than 125 years. The SBOE has survived all the ups and downs in the state's history and provides checks and balances to ensure that the fund produces as much money as possible. Any dysfunction of the SBOE is a result of piecemeal changes made by Legislature to the duties of the SBOE. The Legislature demanded increased returns, so SBOE investments became riskier, which necessitated personal advisors for members of the board.

The SBOE plays an important role in maintaining the permanency of the fund and preserving intergenerational equity, both of which require conservative investment and fund distribution policies. The SBOE is charged with maintaining equity between generations of children, taking into account inflation and the cost of education, so SBOE membership has resisted efforts to overspend the fund. The SBOE, as a separately elected independent body accountable to the voters of the state, is not required to guarantee a fixed disbursement each biennium, but to protect the long-term financial soundness of the PSF.

The state does not need to create an entire new governmental entity because the SBOE can correct itself within the existing structure. The SBOE is diverse in beliefs and ideas, which is a strength, not a weakness.

## Other opponents said

The Constitution should not be amended to change the management of the Permanent School Fund until the state examines the policies and procedures of successfully managed funds such as the University of Texas Investment Management Company (UTIMCO),

the Teacher Retirement System (TRS), and the Employees Retirement System (ERS). From this research, the state would determine what best practices suit the Permanent School Fund.

The SBOE should not have final approval authority over the distribution rate adopted by the council. This responsibility should be transferred wholly to the new council. To ensure intergenerational equity, spending and investment policy decisions should be consistent with one another.

## Notes

The House approved HJR 77 by 104-40 on April 27 and HB 2037 by 104-42 on April 28. Both measures died in the Senate Education Committee.

The **HRO analysis** of HJR 77 and HB 2037 appeared in Part One of the April 27 *Daily Floor Report*.

# Standards for public school physical education curriculum

**SB 891 by Nelson**
*Effective June 1, 2009*

**Table
of Contents**

**SB 891** requires a school's physical education curriculum to be structured along certain guidelines. A physical education curriculum must be sequential, developmentally appropriate, and designed, implemented, and evaluated to enable students to develop the motor, self-management, and other skills, knowledge, attitudes, and confidence necessary to participate in physical activity throughout life. Each school district must establish specific objectives and goals for a program. The State Board of Education must develop essential knowledge and skills for physical education ensuring that the curriculum:

- emphasizes a lifetime of regular physical activity; and
- is consistent with national physical education standards for the information that students should learn about physical activity and the physical activities that students should be able to perform.

On a weekly basis, at least 50 percent of a physical education class must be used for actual student physical activity at a moderate or vigorous level and must:

- offer students an opportunity to choose among many types of physical activity in which to participate;
- offer students both cooperative and competitive games;
- cover all physical ability levels;
- take into account gender and cultural differences;
- teach self-management and movement skills;
- teach cooperation, fair play, and responsible participation in physical activity;
- promote student participation in physical activity; and
- allow physical education classes to be an enjoyable experience for students.

All prekindergarten students must meet the same physical activity requirements as students in kindergarten through sixth grades. The bill requires school districts with a student-to-teacher ratio greater than 45 to 1 in physical education classes to identify specifically the manner in which the safety of the students is maintained.

## Supporters said

SB 891 would provide a more structured set of guidelines for physical education classes in public schools. Only half of adolescents participate regularly in vigorous physical education, and one-fourth report no physical education whatsoever. Regular physical education is important for maintaining a healthy body, enhancing physiological well-being, and preventing premature death. Of children aged 5 to 10 who are overweight, 61 percent have one or more cardiovascular disease factors, and 27 percent have two or more. Forty-two percent of fourth graders in Texas are either obese, overweight, or at risk of becoming overweight, and 70 percent of overweight children will become overweight adults. This bill would help to combat obesity by requiring schools to implement rigorous physical education curricula.

## Opponents said

SB 891 would infringe on the local control afforded to school districts. A district is capable of determining the physical education needs of its students. Because of the high demands that high-stakes testing imposes, school districts already have difficulty finding time in the school day to implement proper physical education or recess.

## Notes

The **HRO analysis** appeared in the May 19 *Daily Floor Report*.



**Public Safety**

Table
of Contents

| | | | |
|---|---|---|---|
| * HB 55 | Branch | Prohibiting wireless device use while driving in a school zone | 222 |
| * HB 339 | Phillips | Driver's education and licensing requirements for minors | 223 |
| * HB 537 | Berman | Requiring safety belts for minors in passenger vehicles | 226 |
| SB 1164 | Wentworth/ | Allowing certain licensees to carry weapons on college campuses | 227 |
| HB 1893 | Driver | | |
| * HB 2730 | Kolkhorst | Continuing Department of Public Safety, Private Security Board | 229 |
| * SB 61 | Zaffirini | Increasing minimum age and height for child safety seats | 233 |
| SB 298 | Carona | Allowing sobriety checkpoints in larger Texas cities and counties | 234 |

# Prohibiting wireless device use while driving in a school zone

**HB 55 by Branch**
*Effective September 1, 2009*

Table
of Contents

**HB 55** prohibits the operator of a vehicle from using a wireless communication device in a school crossing zone unless the vehicle is stopped or a hands-free device is used. The bill establishes a misdemeanor offense with a fine of no more than $200 and an affirmative defense to prosecution if the device was used to make an emergency call to an emergency response service; a hospital, health clinic, or a medical doctor's office; a fire or police department; or an individual to administer first aid treatment.

The prohibition does not apply to operators of authorized emergency vehicles using a device while acting in an official capacity or operators who are licensed by the Federal Communications Commission to operate a wireless communication device or a radio frequency device. The bill defines a "wireless communication device" as a device that uses a commercial mobile service, as defined in federal codes regulating telegraphs, telephones, and radiotelegraphs.

A local government enforcing the ban must post a sign informing drivers that the use of a wireless communication device is prohibited in the school zone and that a driver in violation will be subject to a fine. TxDOT must adopt standards for a required sign to be attached to an existing sign and for the content of the sign. The bill creates an affirmative defense to prosecution for a driver in violation in a school zone that does not have the required sign. The bill preempts all inconsistent local ordinances, rules, or regulations.

## Supporters said

HB 55 would create consistency and promote safety by requiring drivers statewide from using cell phones in school zones. A growing body of research has concluded that cell phones distract drivers and increase response times to sudden traffic incidents. Nowhere is this added distraction more dangerous than in school zones, which are characterized by numerous sudden traffic incidents, such as students crossing a street to reach a sidewalk or make their way to a waiting vehicle.

In response to these obvious hazards, many municipalities have adopted ordinances to prohibit the use of cell phones to varying extents in school zones.

Differing local approaches to this problem may create confusion in areas with multiple adjacent municipalities. Local ordinances may not be well publicized and may have specific rules that vary between neighboring localities.

Creating a uniform statewide prohibition would promote consistent, well-publicized standards barring cell phone use without a hands-free device by drivers in school zones. The bill would create a primary offense — allowing an officer to pull over an offending party — that would be critical to the enforcement of the cell phone ban. An officer would have to be vested with the authority to pull over an individual in visible violation of the prohibition for it to be effective.

## Opponents said

HB 55 would single out one of an innumerable number of distractions that can result in dangerous driving. Drivers commonly are distracted by radios, various auto controls, passengers, and a host of other potential distractions that decrease awareness and reduce judgment time. Banning the use of cell phones without hands-free devices, even in limited areas, would not address the core issue of distracted driving.

## Other opponents said

HB 55 would create a primary offense for using a cell phone in a school zone, an infraction that would be left to the discretion of an officer and would be very difficult to discern. Because it would be difficult to prove either affirmatively or negatively that an individual was using a cell phone without a hands-free device while driving, this provision would give license to an officer to stop people on a pretense that could not be verified readily. The bill should be revised to include cell phone use in a school zone as a secondary offense that could be enforced only in the course of pursuing a driver for a primary offense, such as speeding.

## Notes

The **HRO analysis** of HB 55 appeared in Part Four of the May 8 *Daily Floor Report*.

# Driver's education and licensing requirements for minors

**HB 339 by Phillips**
*Effective on September 1, 2009*

Table
of Contents

**HB 339** requires school districts to consider offering a driver's education and traffic safety course during each school year. A school district may charge a fee for the course in an amount determined by the Texas Education Agency (TEA) comparable to the fee charged by a licensed driver's education school. A school district also may contract with a licensed driver's education school. The education commissioner may charge a fee to each driver's education school to cover the expense incurred to regulate driver's education courses. TEA must establish or approve all curricula for driver's education courses, including those conducted by school districts, driver's education schools, parent-taught programs, or those exclusively for adults. This provision will apply beginning in the 2009-2010 school year.

**Driver's education courses for adults.** The commissioner may not approve a driving safety course or a drug and alcohol driving awareness program as a driver's education course. An adult driver's education course must be a six-hour course, which can be offered both online and in the classroom. The curriculum must include instruction:

- in alcohol and drug awareness;
- about the traffic laws of this state, highway signs, signals, and markings that regulate, warn, or direct traffic; and
- about the issues commonly associated with motor vehicle accidents.

Those who complete the highway sign and traffic law parts of the adult course need not take those parts of the license exam.

**Driver's education courses for minors.** A driver's license may not be issued to a person younger than 21 years of age unless the person submits a driver's education certificate that states that the person has completed and passed an approved driver's education course. A driver's education course for both adults and minors must require a student to complete:

- seven hours of behind-the-wheel instruction with a licensed driver's education instructor;
- seven hours observing a licensed driver's education instructor; and

- 20 hours of behind-the-wheel instruction, of which at least 10 must take place at night in the presence of an adult over the age of 21 with a valid driver's license and at least one year of driving experience.

**Driving test for minors.** A driving test is required for any applicant who applies for a driver's license on or after September 1, 2009, who is under the age of 18. The commissioner must adopt rules governing this section of the bill by January 1, 2010, and each driver's education and training program approved by the commissioner must comply with the curriculum requirements outlined in this bill by May 1, 2010.

**Driver's education instructors.** The commissioner of education may not issue or renew a driver's education instructor license, including a temporary license, to a person who has six or more points assigned to the person's driver's license. An individual may not teach a parent-taught course if the individual has six or more points assigned to his or her driver's license. A foster parent can qualify to teach a parent-taught driver's education course.

**Revoking provisional license or instruction permit for dropouts.** A person under the age of 18 cannot be issued a driver's license unless the applicant's parent or legal guardian has submitted written permission authorizing DPS to access the applicant's student enrollment records. TEA must inform DPS if a person with a provisional license or instruction permit drops out of school. On the date DPS receives notification, DPS will revoke the person's provisional license or instruction permit and notify the person in writing of the revocation. This change applies only to licenses issued on or after September 1, 2009.

A provisional license or instruction permit expires on the individual's 18th birthday for any license issued on or after September 1, 2009. The fee for the issuance of a provisional license or instruction permit will increase from $5 to $15.

**Driver's license restrictions for minors.** A person under the age of 18 is restricted from operating a motor vehicle during the twelve-month, rather than six-month,

period following the issuance of an original Class A, B, or C driver's license:

- after midnight and before 5 a.m. except for work, school or school-related activity, or medical emergency;
- with more than one passenger under the age of twenty-one who was not a family member; and
- while using a wireless communications device, except in case of emergency.

The bill extends current motorcycle and moped restrictions for riders under the age of 17 from six months to twelve months following license issuance.

**DPS annual report.** DPS must collect data regarding collisions by students taught by public schools, licensed driver's education schools, parent-taught courses, and other entities that offer driver's education courses for which a uniform certificate of completion was issued. The rate must be computed by dividing the number of an entity's students who completed a course during that fiscal year by the number of collisions that involved students who completed a course with that entity that occurred in the twelve-month period following licensure. The department must issue a publication listing these collision rates by October 1 of each year, noting the severity of the collisions involving students of each entity and each type of course. The first report must be issued no later than October 1, 2011.

DPS must include in the report the number of minor students taught by each driver's education entity and the total number of minor students taught by parent-taught courses who become licensed during fiscal 2009-10.

**DPS task force.** DPS must appoint a task force to review and make recommendations regarding the effectiveness of the materials provided for use in driver's education courses taught by a parent or guardian. The task force will consist of:

- a DPS representative;
- a TEA representative;
- a commercial provider of driver's education courses;
- a member of an interested group or association as determined by DPS; and
- other appropriate members as determined by DPS.

## Supporters said

HB 339 would create the "Less Tears More Years Act" to help ensure that teenage drivers receive proper practice and instruction to be safe drivers. Texas law is weaker than at least 30 states, receiving a rating of only "fair" from the Insurance Institute for Highway Safety. Motor vehicles are the number-one killer of teenagers, accounting for one in three deaths. Last year, children aged 15 to 17 caused more than 70,000 crashes, 300,000 injuries, and over 300 fatalities. A teenager is four times more likely to die than older adults in a crash.

The bill would increase the quality of driver's education in Texas by requiring each applicant under the age of 18 to pass a driving test. Under current law, DPS waives the driving skills test for those aged 15 to 18 who complete a driver education course. A driving test identifies those drivers not ready for a license and is a credible check on the system. Also, the data-collection section of the bill would help legislators evaluate the different ways by which drivers are licensed, and parents would be able to identify programs whose students have lower collision rates.

School districts would do a better job of teaching driver's education and provide a safe atmosphere, and schools and teachers would be more accountable. Claims that school districts would expose themselves to more lawsuits are unfounded; prior to 1995, nearly all school districts had driver's education programs and did not have significant liability issues.

The bill would not require any school district establish a driver's education program, but would allow school districts who chose to offer driver's education courses to assess a fee to cover the cost to the district or contract with a private provider. Small or rural school districts could consolidate programs to share costs.

## Opponents said

The state should subsidize costs to provide an incentive for school districts to establish driver's education programs. Otherwise, school districts may not be able to afford them. This bill would be expensive for school districts, especially for small and rural districts with few eligible students. A school district that decided to establish a driver's education program would have

to purchase a vehicle, modify the vehicle with a brake pedal on the passenger side, and pay a teacher's salary as well as a stipend to attract the teacher to the district, totaling an estimated $81,000 in start-up costs.

This bill could add an additional layer of bureaucracy to school districts and potentially subject districts to increased liability and expose them to lawsuits. The state should establish a way to indemnify school districts. Data requirements imposed on school districts who establish a driver's education program may violate federal confidentiality laws.

## Notes

The **HRO analysis** for HB 339 appeared in Part Two of the May 4 *Daily Floor Report*.

# Requiring safety belts for minors in passenger vehicles

**HB 537 by Berman**
*Effective September 1, 2009*

Table
of Contents

**HB 537** expands current safety belt requirements to create an offense for a person 15 years or older to not wear a safety belt while riding in a rear seat of a moving passenger vehicle. The bill also creates an offense for a person to allow a child younger than 17, who was not required to ride in a child safety seat, to ride in a passenger van designed to transport 15 or fewer passengers, including the driver, without securing the child individually by a safety belt. The bill applies only to those occupying seats equipped with a safety belt. The bill retains misdemeanor offenses and fines for similar offenses in current law.

The bill also prohibits the operator of a motorcycle from carrying another passenger under 5 years old, unless the passenger is seated in a sidecar attached to the motorcycle. Riding with a passenger under 5 years old is a misdemeanor punishable by a fine between $100 and $200.

## Supporters said

Expanding requirements for safety belts in passenger vehicles, including vans, would reduce the chances of sustaining devastating injuries in the event of an accident. From 2003 to 2007, 78 percent of passengers killed in 15-passenger vans were not wearing safety belts, and motor vehicle deaths are the leading cause of death for children ages 4 to 14. The risk of rollover in 15-passenger vans is similar to trucks and sports utility vehicles, but increases significantly when the van has 10 or more occupants. Wearing a safety belt dramatically reduces the risk of death or serious injury during a rollover crash.

The state already has a mandatory safety belt law for persons in the front seat of a car, and there is no reason this law should not extend to persons in the back seat of a car. The state has determined that it has an interest in motorists wearing safety belts and that such laws do not violate personal liberty. Hundreds of motorists are injured or killed each year because they failed to use available safety belts. Only 17 percent of crash victims wearing safety belts are hospitalized, compared with 32 percent of crash victims not wearing safety belts. Seventy-five percent of crash victims who are ejected from a car are injured fatally.

HB 537 would help reduce the financial impact of costly auto crash injuries. Traffic accidents create a burden for the individuals involved, law enforcement officers who investigate accidents, and entities that pay for short-term or long-term healthcare for injured individuals. The severity of crash injuries also can affect auto insurance rates. Wearing a safety belt is not just a matter of personal responsibility. Safety belt use is important to traffic safety and should be regulated just as any other traffic law. The best way to increase safety belt use is by expanding use requirements. Rear safety belt use is higher in states that require it by law, with 88 percent usage, than in those that do not, with 69 percent usage. While educating about safety belt use is important, it is not enough on its own.

## Opponents said

The state should not further intrude into the personal choices and liberties of Texans by mandating the use of safety belts in passenger vans and other vehicles. The existence of laws mandating front-seat safety belts for passengers under 15 and other safety belt requirements do not justify expansion of the current restrictions. Motorists and passengers have abundant information about safety belt safety, and they should be free to make this decision for themselves. It is not the government's job to protect Texans from every potentially bad choice, including whether or not to wear a safety belt in the back seat of a car or in a passenger van. Increasing the use of safety belts is best done through education. A more restrictive law is not the most effective way to convince those resistant to wearing safety belts to adopt the practice.

## Notes

The **HRO analysis** of HB 537 appeared in Part Two of the May 6 *Daily Floor Report*.

# Allowing concealed handgun licensees to carry weapons on college campuses

**SB 1164 by Wentworth/ HB 1893 by Driver**
*Died in the House*

Table
of Contents

**SB 1164** and **HB 1893** would have created an exception to the prohibition against carrying a weapon at a public or private university or college if a person held a concealed handgun license issued under Government Code, ch. 411.

Both bills also would have prohibited a college or university from adopting rules against concealed handgun license holders carrying weapons, with two exceptions:

- public and private colleges and universities would have been able to establish rules on the storage of handguns in dormitories or other residential buildings owned or operated by the institutions and located on their campuses; and
- a private college or university would have been allowed to prohibit carrying of weapons by concealed handgun license holders after consulting with students, staff, and faculty.

Under both bills, a prohibition against concealed weapons at a collegiate sporting event would not have applied unless the stadium posted warning signs in conspicuous places.

SB 1164 differed from HB 1893 in that it would have prohibited a concealed handgun license holder from carrying a weapon on the premises of a hospital maintained or operated by an institution of higher education and would have made the changes effective on September 1, 2010, rather than September 1, 2009.

## Supporters said

SB 1164/HB 1893 would eliminate an arbitrary and imaginary line around college campuses where law-abiding Texas concealed handgun license holders cannot carry their weapons for their own personal safety. College campuses should not be treated any differently than other public places where concealed handguns can be carried legally. Violent criminals are not deterred by those restrictions. Simply removing a geographic barrier would not cause concealed handgun license holders to act less responsibly or become less law-abiding.

The bill would affect only adult students, faculty, staff, and parent visitors and would not arm large numbers of undergraduates. Concealed handgun license holders must be at least 21, pass background checks, and complete 10 to 15 hours of training. According to DPS records, only 4,175 — about 5.7 percent — of the 73,090 concealed handgun licenses issued in fiscal 2008 were granted to those 25 years of age or younger. Generally, less than 5 percent of about 400,000 concealed handgun holders are in this age group.

Enactment of either bill would not be precedent-setting. Twenty-three states with concealed carry laws do not prohibit their license holders from possessing their weapons on college campuses. Twelve U.S. colleges and universities currently allow concealed carry on campus and have not seen an increase in gun violence, gun accidents, or gun thefts during a period of hundreds of semesters. Also, the federal Gun-Free School Zones Act, which prohibits possession of firearms within 1,000 feet of a school, exempts those with state concealed-handgun licenses from the ban.

Enacting this proposal would not suggest that concealed handgun license holders be responsible for protecting campuses. Despite some concerns from law enforcement officers, there would be little danger from a concealed weapon holder or a first responder engaging in "friendly fire." Most real-world shootouts are typically localized and over very quickly. It is not realistic to expect police to encounter an ongoing shootout between assailants and armed civilians.

Prevention of violence and preparedness are not mutually exclusive. In a perfect system, the two approaches to safety complement each other. Preventive measures could include teaching students and faculty to watch for the warning signs of mental illness and providing counseling to disturbed students. Those efforts could complement preparative measures, such as developing campus alert systems, providing additional training to campus police, and allowing trained, licensed adults who legally carry concealed handguns to possess them on campus. SB 1164/HB 1893 could reduce the vulnerability of students and faculty should an unthinkable and low-probability tragic event occur.

## Opponents said

SB 1164/HB 1893 would not make college campuses any safer and could increase the risk of more violence. The bill would solve a phantom problem. Statistically, campuses are much safer than their surrounding cities. According to a U.S. Department of Justice study, 93 percent of crimes committed against college students from 1995 to 2002 occurred off campus. In fact, there may be a counterintuitive relationship between personal safety and carrying a weapon. A Harvard School of Public Health study on guns and gun threats at college concludes that "predictors for being threatened with a gun while at college include personally having a gun for protection."

Concealed handgun advocates overstate the law-abiding nature of those with concealed handgun license holders. While DPS records show concealed handgun license holders commit a statistically insignificant portion of all crimes in the state, some are convicted of serious offenses. The DPS reports are delayed to include final convictions, but the report for 2007 showed that four concealed handgun license holders were convicted of murder, including two for capital murder.

Campus shootings remain extremely rare, albeit extremely tragic, events. The chance of their occurring at any given college or university is almost infinitesimal. Even advocates concede that the proposed bills would apply to an extremely limited subset of Texas residents and college students. It would be almost impossible to calculate the chances of a concealed handgun license holder being in the position to stop a campus gunman. While the massacres at Luby's Cafeteria in Killeen and at Virginia Tech raise the question of whether someone with a handgun could have stopped the killings or at least minimized the number of victims, enacting legislation based on such questions would be bad public policy.

After the Columbine massacre, first responders have been trained to act aggressively against any gunmen in a crowded and confined space. Police could be as likely to shoot any would-be concealed handgun hero as the assailant. A crossfire among the concealed handgun holder and assailant could be dangerous to others in the room as well. Recent experiences in Oakland and in Pennsylvania demonstrated that a determined, if not suicidal, gunman easily could kill and wound well-armed and highly trained law enforcement officers wearing bulletproof vests. It would be better to leave law enforcement to trained professionals.

Statistically, handguns are more likely to be used for suicides, rather than homicides. Suicide rates already are high among teenagers and young adults, and the college years can be stressful. Having more guns available on campus could exacerbate this problem.

## Notes

SB 1164 passed the Senate by 20-11 on May 20, and was reported favorably, without amendment, by the House Public Safety Committee on May 22, but died in the House Calendars Committee. The companion bill, HB 1893, was placed on the May 11 General State Calendar in the House, but no further action was taken.

The **HRO analysis** of HB 1893 appeared in Part Four of the May 11 *Daily Floor Report*.

# Continuing Department of Public Safety and Private Security Board

**HB 2730 by Kolkhorst**
*Generally effective September 1, 2009*

Table
of Contents

**HB 2730** continues the Department of Public Safety (DPS) until September 1, 2015. It requires the adoption of a civilian management model for driver's license operations, revisions to the structure of the Texas Division of Emergency Management, and creation of an Office of Inspector General. The Sunset Advisory Commission will review and prepare an initial report on the adoption of the Sunset recommendations and the October 2008 Deloitte Consulting management review report by December 1, 2010, with a final report required before February 15, 2011.

HB 2730 continues the Private Security Board as a division of DPS and will require its evaluation as part of the DPS Sunset review rather than separately. The bill makes administrative changes to the licensing procedures for private investigators, including requiring all licensees to undergo criminal background checks using FBI records and pass an exam on knowledge of jurisprudence. Other provisions allow the Private Security Board to assess administrative penalties of up to $5,000, rather than $500, exempt computer repair technicians from private security licenses, and make unlicensed persons offering private security services subject to penalties for deceptive trade practices. These changes take effect on September 1, 2009.

**Driver's license operations.** The further Sunset Advisory review due in February 2011 will focus on developing a civilian business model for DPS driver's license operations, including improvements in customer service by use of best practices in call center technology, expansion of operating hours, and a decrease in the time to send a replacement driver's license. HB 2730 also requires training programs in customer service, cultural diversity, and review of proof of citizenship documents for all employees in the DPS driver's license offices.

The bill creates the offense of conspiring to manufacture counterfeit driver's licenses or state identification cards and makes it a state-jail felony (180 days to two years in a state jail and an optional fine of up to $10,000). If committed by a public servant, the offense is a third-degree felony (two to 10 years in prison and an optional fine of up to $10,000). Other provisions require a program to verify addresses given by driver's license applicants and disallow the use of a post office box as an address.

HB 2730 changes the notice requirements on assessment of surcharges for points and other offenses under the Drivers Responsibility Program. DPS must provide up to 45 days to pay a surcharge or set up a payment plan for first notice, and up to 60 days after a second notice, before suspending a driver's license. In addition, the bill provides for drivers to establish indigent status to reduce the surcharge and for procedures for deducting points from a license. These provisions take effect September 1, 2011.

Other provisions require schools to offer driver training programs, restrict drivers under the age of 18 from using wireless devices, and increase the charge for provisional licenses from $5 to $15.

**Emergency management.** HB 2730 transfers the Texas Division of Emergency Management (TDEM) from the Governor's Office to DPS and requires that its chief be appointed by the DPS director with approval of the governor. TDEM will administer the state's disaster contingency fund and be required to report annually on expenditures and rules changes to the lieutenant governor and the House speaker. In addition, DPS will be the sole state government agency to select recipients for state and federal grants for homeland security or border security programs. TDEM will develop a pilot program for reentry credentialing of those evacuated because of a disaster or threat of a disaster.

**Inspector general.** HB 2730 replaces the DPS internal affairs division with an inspector general appointed and supervised by the Public Safety Commission. The Inspector General's Office will investigate criminal activity within DPS, allegations of wrongdoing by DPS employees, crimes on department property, and serious breaches of department policy.

**Concealed handgun licenses.** HB 2730 makes several changes in the administration of the concealed handgun license program. The bill ends the prohibition against concealed handgun licenses for applicants convicted of offenses that subsequently have become felonies, allows qualified handgun instructors to list that designation on their licenses, and imposes a $25 fee on any returned checks for concealed handgun applications. The bill also removes the requirement that a concealed

handgun license holder must display that permit upon demand by a law enforcement officer.

**Pilot programs and studies.** HB 2730 allows for the creation of a one-year driver monitoring pilot program, in which DPS can enter into a contract with certain entities with which it would share specific information from its driver's license records.

HB 2730 requires DPS to develop a pilot identification verification program with the Texas Department of Criminal Justice to provide driver's licenses and state identification cards to inmates. The two agencies must report on the results of the program before December 1, 2010.

The bill also requires counties whose disposition completeness percentage on crimes reported to DPS falls under 90 percent to establish a local data advisory board to make recommendations on improving that disposition completeness percentage. The board must make its report by June 1, 2010.

Each October 1, TxDOT will be required to compile and report on the percentage of accidents involving students from public school driver training programs, driver training schools, and other entities offering driver instruction.

**Other provisions.** HB 2730 requires the confidentiality of personal information and fingerprint records collected from DPS as part of criminal background checks for public school employees. DPS must keep those records confidential regardless of whether the information had been stored in a format other than that of the original records.

The bill also:

- changes the name of the Unsolved Crimes Investigation Team to the Unsolved Crimes Investigation Unit and allows it to be located outside of Austin;
- allows DPS and other state law enforcement agencies to provide incentives, including up to four days of administrative leave a year, to meet physical fitness standards; and
- increases the administrative fine for parking violations at the Capitol complex from $10 to $25 and the late fee from $2 to $5.

## Supporters said

HB 2730 would help institutionalize and continue ongoing efforts to transform the culture of the DPS and modernize its operations. The department's new board members and management team have made great strides since fall 2008, and the bill would provide a statutory framework to implement the recommendations from the Sunset Commission and the Deloitte report.

**Driver's license operations.** HB 2730 would continue efforts to establish a civilian management model of driver's license operations and would lead to a more customer-friendly approach. Adoption of best practices and other changes could remedy complaints about long lines, unclear directions to services, limited hours, and waits to receive driver's licenses and identification cards.

HB 2730 would provide the necessary training for civilian driver's license employees as they interact with the public and examine documents proving citizenship. Without further guidance from the federal government, there remains no urgency in adopting REAL ID standards for Texas driver's licenses and identification cards.

Increased penalties for fraudulent applications and increased scrutiny of applications would be appropriate because driver's license operations retain an important law enforcement role, even under civilian management.

HB 2730 would implement needed reforms in the Drivers Responsibility Program approved last session and recommended in the Legislative Budget Board's January 2009 *Texas State Government Effectiveness and Efficiency* report. The study showed that only 38.5 percent of drivers assessed surcharges comply with the program, and many low-income Texans continue to drive without licenses. With little of the $1.3 billion in surcharges collected, legislators should be skeptical about any claims about potential revenue losses from changing the surcharge program.

**Emergency management.** HB 2730 would clarify the role of TDEM, DPS, and the Governor's Division of Homeland Security concerning the state's preparedness and emergency management functions. The bill would provide a clear line of authority and accountability for the grant of emergency management and homeland security resources.

**Inspector General's Office.** HB 2370 would reform and strengthen current efforts to root out criminal activity and other violations of DPS policies. The Inspector General's Office would be modeled on similar positions in other state and federal agencies and would answer to the Public Safety Commission rather than the DPS chain of command. DPS has enjoyed a well-deserved reputation for integrity and service to the citizens of Texas in the past, and the bill would help maintain and enhance that tradition.

**Pilot programs and studies.** The bill would help encourage further innovation and development of best practices by short-term pilot projects to monitor driver records and help inmates transition back into society. Also, studies about county crime disposition completeness and collision data on young drivers would guide both policymakers and the public to make better decisions about important issues.

Establishment of a driving record monitoring pilot program would enable insurance companies and employers of large vehicle fleets, among others, to obtain up-to-date information on their clients or employees. Such a system would create a way to identify more quickly dangerous drivers and allow companies to take actions leading to safer driving conditions. This program would change little regarding eligibility to obtain information, but it would create a more efficient and expedient process.

**Other provisions.** Changes to school employee criminal history background checks would address what is believed to be a loophole in provisions to keep information confidential and not subject to the Public Information (Open Records) Act. The bill would provide protection to any school district that may have converted its records to another format.

## Opponents said

**Driver's licenses operations.** While making some needed management changes, HB 2730 would not address larger policy questions about the DPS rules, issued fall 2008, requiring proof of citizenship and residency. The training procedures do not address the fundamental flaw in requiring clerks to practice immigration law, a complex and arcane specialty. Also, the Legislature should make a firm decision on whether to implement or reject the stringent requirements of the federal REAL ID program.

Provisions of the bill would create an unnecessary new crime of conspiring to manufacture counterfeit licenses and certificates, which duplicates existing statutes. Also, the bill could compromise the personal information of millions of Texans by allowing private companies to assist in verifying addresses of driver's license and identification card applicants.

Adoption of the reductions in surcharges for indigent drivers would cost the state $5.5 million per fiscal year in needed funding for trauma care. The intention of the program adopted in 2003 was to ensure that those who caused the most injuries because of their negligence as drivers, including driving while intoxicated, bear the brunt of the responsibility for the costs.

**Emergency management.** Direction of emergency management efforts, including the ability to name the director of TDEM, should remain in the Governor's Office.

**Pilot programs and studies.** Requiring local data advisory boards would be yet another unfunded state mandate on county governments. The provisions of the bill would have a significant fiscal impact on counties that have not attained the 90 percent disposition completeness rate. According to the *DPS Report Examining Reporting Compliance to the Texas Computerized Criminal History System* for 2009, only 38 counties meet the standard of 90 percent completion rates. Therefore, 216 counties fall below that average, and would have to hire additional staff and spend considerable time in meetings to study the issue and prepare the plan required by the bill.

**Other provisions.** Provisions in HB 2730 would continue legislative efforts to weaken the right of the public and the media to receive information collected at taxpayer expense and reduce the transparency and accountability of school districts. Parents and others should have access to information obtained through criminal background checks on teachers and other school employees and should receive a campus-by-campus report summary of convictions. The attorney general has ruled that some of these records still remain public, and access should be allowed.

## Notes

The **HRO analysis** of HB 2730 appeared in Part One of the May 13 *Daily Floor Report*.

The **HRO analysis** of HB 2286 by Driver, which would have made various changes to the Private Security Act but died on the House calendar, appeared in Part Two of the May 11 *Daily Floor Calendar*. The **HRO analysis** of SB 1244 by Carona, which would have exempted computer repairers from private security licensing but died on the calendar, appeared in Part Three of the May 22 *Daily Floor Report*.

Provisions similar to HB 2730's definition of conspiracy to manufacture counterfeit driver's licenses and identification and to provide for verification of addresses are included in SB 1785 by Carona, which was withdrawn from the May 27 House Local and Consent Calendar.

The **HRO analysis** of HB 2411 by Fletcher, which would have made knowingly swearing to or affirming falsely any information required by the Department of Public Safety in an application for an original, renewed, or duplicate driver's license or ID a third-degree felony, failed to pass the House by 39-90 on May 14 and appeared in Part Five of the May 8 *Daily Floor Report*.

The **HRO analysis** of SB 1061 by Shapiro, which would have required counties whose disposition completeness percentage on crimes reported to DPS falls under 90 percent to establish a local data advisory board, appeared in Part Two of the May 22 *Daily Floor Report*.

The **HRO analysis** of SB 1858 by West, which included similar provisions on the confidentiality of school employee criminal background check records, appeared in Part Four of the May 22 *Daily Floor Report*.

The **HRO analysis** of SB 1775 by Whitmire, which included similar provisions to change the name of the DPS Unsolved Crimes Investigation Team, appeared in Part Two of the May 21 *Daily Floor Report*.

# Increasing minimum age and height for child safety seats

**SB 61 by Zaffirini**
*Effective September 1, 2009*

Table
of Contents

**SB 61** increases from five years to eight years and from three feet to four feet, nine inches the minimum age and height that a person must be to ride in a vehicle without being secured in a child safety seat. A fine for a person who does not secure the child properly is no more than $25 for the first offense and no more than $250 for subsequent offenses. In addition, a person must pay 15 cents as a court cost upon conviction of such an offense. Revenue from the additional fee will be deposited in a separate account in the General Revenue Fund and may be appropriated only to the Texas Department of Transportation to purchase child safety seats for distribution to low-income families.

The bill applies to offenses on or after June 1, 2010, before which a law enforcement officer may only issue a warning to an offending individual.

## Supporters said

By requiring safety seats for children from five to eight years of age, SB 61 would reduce the risk of serious injury and save lives. Current law allows children to be restrained by a standard safety belt once they are over 36 inches in height. However, safety belts were not designed for children and do not fit appropriately until a child reaches four feet, nine inches tall. In car crashes, children under this height are likely to suffer severe head, spinal cord, and internal organ injuries. Safety seats reduce the risk of these injuries by 59 percent.

SB 61 would educate parents and help them protect their children. It is intended to inform parents of the best way to keep children safe in vehicles. The fine would be used to fund safety seats for low-income families, rather than as mere punishment.

The bill would help families and the state save money on personal injury and public medical costs, as well as work losses. Treating one child with injuries sustained without a safety seat is very costly. In comparison, safety seats can be purchased for as little as $15.

## Opponents said

SB 61 would set in place a misdirected incentive system to achieve the important goal of enhancing child safety in motor vehicles. The bill would extend penalties to drivers who did not use an approved safety seat for children aged six and seven or shorter than 4 feet 9 inches. The penalties would be less effective than other measures in encouraging families to use the restraint systems. Motivating parents to secure older children in safety seats would be better accomplished through education, rather than by punishing families that may not even be aware of the safety risks of standard seat belts.

## Notes

The **HRO analysis** of the House companion bill, HB 528 by Vaught, appeared in Part One of the May 8 *Daily Floor Report*.

# Allowing sobriety checkpoints in larger Texas cities and counties

**SB 298 by Carona**
*Died in House committee*

Table
of Contents

**SB 298** would have allowed the Department of Public Safety (DPS) or a sheriff's department in a county with a population of more than 250,000, as well as a police department in a city larger than 500,000, to operate a temporary checkpoint to determine whether drivers were intoxicated. The bill would have set standards for selecting locations and for operating sobriety checkpoints.

Selection criteria for checkpoints would have been based on the number of alcohol-related accidents and intoxication arrests in the vicinity within the preceding 12 months and could not have been based on the ethnic or socioeconomic characteristics of the area. Individual stops would have been required to be reasonably predictable and non-arbitrary. A DPS captain, sheriff, or mayor would have had to approve the operation of the checkpoint based on written selection criteria. The criteria would have been required to be posted on the law enforcement agency's website. Locations would have been selected to allow for the safety of the public and law enforcement officers conducting the checks and for diversion of drivers believed to be intoxicated. In addition, the checkpoint would have had to be marked with signs and safety devices, such as flares, flags, or traffic cones, and the officers making initial contact would have been required to wear uniforms.

SB 298 would have required that:

- drivers not be questioned longer than three minutes or made to wait more than 10 minutes to pass through the checkpoint;
- video and audio recordings be made of all encounters between law enforcement officers and drivers;
- no requests be made to show driver's licenses, concealed handgun licenses, or proof of insurance;
- the date and time of the checkpoint, but not necessarily the location, be publicized in the media and on the Internet; and
- checkpoints not operate for more than four hours and no more than once every 12 months in the same location or within a mile of that location.

The bill also would have required that law enforcement agencies maintain records on the operations for five years and video and audio recordings for two years. In addition, the law enforcement agencies would have been required to report on checkpoint operations by January 15 each year to the Texas Department of Transportation (TxDOT), which in turn would have been required to make a report on sobriety checkpoint effectiveness to the governor, the lieutenant governor, and the House speaker by February 1, 2015.

## Supporters said

Sobriety checkpoints would provide an effective law enforcement tool to prevent driving while intoxicated by deterring Texans from driving drunk in the first place. It is impossible to arrest more than a relatively small proportion of alcohol-impaired drivers, so general deterrence is critical to reducing the deaths and injuries caused by drinking drivers. In 2007, 1,292 people were killed and almost 30,000 injured in alcohol-related crashes on Texas roads and highways, according to the National Highway Traffic Safety Administration. Sobriety checkpoints would increase public awareness of the problem of alcohol-impaired driving, the possibility of arrest, and the presence of an aggressive law enforcement effort.

SB 298 would limit the intrusion on motorists passing through sobriety checkpoints and would preserve Texans' protections against unreasonable searches and seizures. In *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990), the U.S. Supreme Court upheld the constitutionality of sobriety checkpoints. However, the Texas Court of Criminal Appeals ruled in June 1994 that sobriety checkpoints were unconstitutional in Texas only because no statewide guidelines existed for properly conducting such stops. SB 298 would provide steps to prevent racial and socioeconomic profiling, require all stops to be non-arbitrary and recorded, and prevent law enforcement officers from asking for driver's licenses and insurance. Overall, SB 298 would require law enforcement agencies to operate sobriety checkpoints transparently and without improperly expanding into other enforcement activities.

The bill would be bracketed narrowly to apply only to large cities and counties with resources to conduct sobriety checkpoints in a way that protected drivers' rights while deterring drunk driving. It would prevent smaller jurisdictions from running sobriety checkpoints as revenue-producing traps. Law enforcement agencies would have to coordinate so that, for example, the Arlington Police Department could not operate a checkpoint at a location soon after the Tarrant County Sheriff's Department had conducted similar stops.

Data from other states, including 23 studies reviewed by the Centers for Disease Control, demonstrate that sobriety checkpoints significantly reduce alcohol-related crashes and associated fatal and nonfatal injuries.

Sobriety checkpoints could complement other widely publicized enforcement efforts against drunk driving, such as "no refusal" weekends, when suspected drunk drivers must submit to a breath or blood test. "No refusal" policies already have been adopted successfully in Houston and Austin and have proven effective in deterring drinking drivers and convicting those with multiple driving while intoxicated (DWI) offenses.

## Opponents said

SB 298 would be a violation of Texans' rights under both the U.S. and state constitutions to be free from unreasonable searches and seizures. Randomly selecting drivers for sobriety screenings, rather than basing investigations on behavior, is inefficient, wastes taxpayer resources, and interferes with everyday Texans' rights to be left alone. Even in *Michigan Dept. of State Police v. Sitz*, the U.S. Supreme Court held that checkpoints constitute a Fourth Amendment seizure. However, the court reasoned that the seizure was not unreasonable because the "subjective intrusion" to motorists would be minor in light of the alleged effectiveness of checkpoints in reducing drunk driving. Traditionally, Texans reject such loose interpretations of constitutional rights, and state courts have upheld higher protections against unreasonable searches and seizures.

Sobriety checkpoints are not effective in identifying drunk drivers on the road when compared to "saturation patrols," which focus patrol resources on areas known for drunk driving problems or "emphasis patrols," where drunk drivers are identified after stops for minor violations. Both tactics are more efficient and less intrusive. Media studies and an FBI bulletin indicate that sobriety checkpoints have lower arrest rates per car stopped and officer hour than do saturation patrols.

Other data suggest that between 2003 and 2004, most of the reduction in alcohol-related fatalities occurred in states without sobriety checkpoints.

Bracketing the bill to larger Texas cities and counties could be seen as a tacit admission that the legislation would be questionable public policy. Once sobriety checkpoints were in statute, it would be easy to change the brackets and allow smaller jurisdictions without the same level of resources or monitoring to conduct the stops. There already has been too much experience with small cities running "speed traps" or abusing drug asset forfeiture laws to run treasure hunts against passing motorists to raise revenue.

Public awareness about the dangers of drunk driving could be raised without adopting intrusive measures such as sobriety checkpoints or "no refusal" weekends and holidays. Larger Texas cities could decrease alcohol-related accidents through public service announcements and increased access to safe transportation. Encouraging designated drivers, as well as increasing access to public transportation and subsidized and accessible taxi services would make Texas cities safer without sacrificing civil liberties.

## Other opponents said

Increasingly intrusive investigations and draconian punishments apparently have not deterred repeat DWI offenders, who pose the most danger to other drivers. TxDOT reports that more than 124,662 Texans have three or more DWI convictions, including 18,271 with five or more. One person has 22 convictions. Texas may have reached the point of diminishing returns on strategies such as sobriety checkpoints and may need to reconsider its approach to drunk driving.

## Notes

SB 298 passed the Senate by 20-11 on March 31, but died in the House Criminal Jurisprudence Committee. The companion bill, HB 169 by T. Smith, died in the House Public Safety Committee.



Table
of Contents

## Taxation & Revenue

| | | | |
|---|---|---|---|
| * | HB 8 | Otto | Comptroller property value study and appraisal district review .................... 238 |
| * | HB 770 | D. Howard | Homestead exemption for damaged homes; Open Beaches Act exception; property-tax exemption for chambers of commerce..................... 240 |
| | HB 982 | Thompson/ | Raising revenue from sexually oriented businesses....................................... 243 |
| | HB 2070 | Cohen | |
| * | HB 1038 | Paxton | Including foreclosed homes in homestead property appraisals...................... 246 |
| * | HB 1801 | Bohac | Adding certain backpacks and school supplies to sales-tax holiday.............. 247 |
| * | HB 2154 | Edwards | Physician education loan repayment program; tobacco products tax ............ 248 |
| * | HB 3611 | Otto/ | Property appraisal revisions .................................................................. 250 |
| * | HB 3612 | Otto/ | |
| * | HB 3613 | Otto/ | |
| * | HJR 36 | Otto | |
| * | HB 3613 | Otto | Disabled veterans' exemption from property taxation .................................. 253 |
| * | HB 4765 | Oliveira | Revising small business exemption from business margins tax ................... 254 |

# Comptroller property value study and appraisal district review

**HB 8 by Otto**
*Effective January 1, 2010*

Table
of Contents

**HB 8** changes the frequency of the comptroller's property value study from annual to biennial. About half of the state's school districts' property values will be studied each year. The other half will undergo a review of their standards, procedures, and methodology. HB 8 also establishes a Property Value Study Advisory Committee to help the comptroller draft rules governing the conduct of the standards and procedures study.

**Timing of study.** Under Government Code, sec. 403.302, the comptroller will conduct a study:

- at least every two years in each school district for which the most recent study resulted in a determination by the comptroller that the school district's value was valid; and
- each year in a school district for which the most recent study resulted in a determination by the comptroller that the school district's local value was not valid.

In any year in which the comptroller does not conduct a study of a school district, its local value for that year will be considered valid.

**Study results.** The property value study will use the results of a study of property values produced by an appraisal district to determine the school district's taxable value in a year when the comptroller had studied the property values produced by the appraisal district. The study will follow the same procedures and apply the same margin of error that the comptroller currently uses.

The property value study will use the market value provided by an appraisal district, minus certain tax exemptions, to determine the taxable value of property in a school district in a year when a study of a school district's taxable value has not been done by the property tax division.

**Review of appraisal district procedures.** HB 8 establishes guidelines for the review of appraisal districts' standards, procedures, and methodology, which will take place at least once every two years. The comptroller will review the governance of each appraisal district, taxpayer assistance provided, and the operating and appraisal standards, procedures, and methodology used by each appraisal district. The

review will determine compliance with generally accepted standards, procedures, and methodology. The comptroller by rule may establish procedures and standards for conducting and scoring the review.

**Failing to take remedial action.** HB 8 changes the mechanism for conservatorship of appraisal districts that fail to comply with the comptroller's recommendations for improvement. If the appraisal district fails to comply with the recommendations in the report and if the comptroller finds that the board of directors of the appraisal district fails to take remedial action reasonably designed to ensure substantial compliance with each recommendation in the report within a year, the comptroller will notify the Board of Tax Professional Examiners, or a successor agency, which will be required to take action necessary to ensure that the recommendations are implemented as soon as practicable. Before February 1 of the year following the year in which the Board of Tax Professional Examiners, or a successor agency, takes action to ensure substantial compliance with each recommendation in the report, the board will determine, with the assistance of the comptroller, whether the recommendations in the most recent report substantially have been implemented. The presiding officer of the board will notify the chief appraiser and the board of directors of the appraisal district of the board's determination.

# Supporters said

HB 8 would increase accuracy and improve standards and practices of property appraisals in Texas. Under current law, there is no state oversight beyond the property value study, and the current system does not exert enough pressure on appraisal districts to produce accurate and professional valuations.

Changing the frequency of the property value study from annual to biannual would allow the comptroller to do more focused analyses of school districts' taxable property because the number of appraisal districts' valuations studied in a year would be halved. It also would allow the comptroller to examine more closely local appraisal standards and procedures. The comptroller's property tax division staff would be able to check more closely for highly technical processes

that can be used to manipulate values, which often are overlooked in a more general analysis.

Reviews of standards and practices would be especially helpful to appraisal districts in smaller counties that can have difficulty recruiting qualified employees and whose tight budgets make training relatively expensive. These reviews also would help promote professionalism and uniformity in appraisal districts across Texas. One of the categories that an appraisal district would be graded on would be taxpayer assistance. The comptroller would look at office practices, the appraisal review process, and other aspects of the office to ensure that appraisal districts were in compliance with best practices. These reviews would help restore confidence in the property tax system.

HB 8 would not encourage appraisal districts to lower their property values. The review of standards and practices would discourage them from undervaluing property in the off years. Further, they would not be able to keep appraisals flat for one year and then catch up on the next because the existing 5-percent allowable variation in local appraisals above and below the comptroller's value determination may not provide enough leeway in the catch-up year. In addition, only the appraisal districts that produced valid local values would be eligible to be studied every other year. Those appraisal districts that did a poor job would continue to face annual studies. Finally, those appraisal districts that lowered their values in an off year would open themselves up to additional and costly litigation.

## Opponents said

HB 8 would be an excuse for appraisal districts to lower their property values, potentially costing the state more under the school finance formulas that send more state aid to districts with lower property values per student. Because their values would be studied only every other year, districts would be tempted to keep the values flat in the off year.

Many Texans already lack confidence in property appraisals. HB 8 would erode that confidence further if they perceived a pattern of no appraisal growth, followed by large jumps in anticipation of the property value study.

HB 8 would be too much of a change. The bill would be improved by including a Sunset provision so that the Legislature could examine several years of data and make changes and improvements or even discontinue the program if necessary.

## Notes

The **HRO analysis** of HB 8 appeared in the April 23 *Daily Floor Report*.

# Homestead exemption for damaged homes; Open Beaches Act exception; property-tax exemption for chambers of commerce

**HB 770 by D. Howard**
*Effective January 1, 2010*

Table
of Contents

**HB 770** allows a homestead exemption to continue on property with a damaged home while a replacement home is being built; allows certain property owners on the Bolivar peninsula to retain property and rebuild homes on land that otherwise would have been claimed as public beach beyond the vegetation line by the Texas Open Beaches Act; and allows chambers of commerce to receive an exemption from property taxes.

**Continuing the homestead exemption while rebuilding damaged homes.** If a home under a homestead exemption is rendered uninhabitable or unusable by casualty or by wind or water damage, the owner may continue to receive the homestead exemption for the structure and the land while the owner constructs a replacement residence on the land, if the owner has not established a different principle residence or homestead exemption and the property owner returns and occupies the rebuilt residence as a principle residence. HB 770 requires that reconstruction occur within a certain period of time and that the replacement structure meet certain construction standards for square footage and exterior in order to qualify as a replacement and not as a new structure. If an owner continues a homestead exemption and sells the property before the construction of the replacement home is completed, the property owner will owe the tax that would have been due absent the continuation.

**Bolivar Peninsula property owners.** HB 770 prevents a court order or an injunction to remove a house from a public beach if:

- the line of vegetation establishing the boundary of the public beach moved as a result of a storm that occurred before January 1, 2009;
- the house was located landward of the natural line of vegetation before the storm;
- a portion of the house continues to be located landward of the line of vegetation; and
- the house is located on the Bolivar Peninsula.

The owner of the house may repair or rebuild the house if it was damaged or destroyed by the storm. The house still may be ordered removed if the owner does not repair or rebuild before September 1, 2013.

**Granting chambers of commerce a property-tax exemption.** HB 770 adds a property-tax exemption for nonprofit community business organizations that provide economic development services to a local community. To qualify, a "nonprofit community business organization" must:

- have been in existence for at least the five preceding years;
- be organized as a nonprofit corporation under state law (under the Texas Non-Profit Corporation Act or Texas Non-Profit Corporation Law) and federal law (under U.S. I.R.C. sec. 501(c)(6));
- be a local, not a statewide, organization;
- have maintained a dues-paying membership of at least 50 for the preceding three years;
- have a board of directors elected by its members who are not compensated for their service on the board; and
- be supported by membership dues and income related to its primary functions.

In addition, the organization in its local community must be engaged primarily in:

- promoting the common economic interests of businesses;
- improving business conditions; or
- providing economic development services.

HB 770 includes definitions of the types of buildings and personal property owned by nonprofit community business organizations that will be exempt from taxation under the bill.

## Supporters said

**Continuing the homestead exemption while rebuilding damaged homes.** HB 770 would address a gap in current law regarding the property-tax protections provided by the homestead exemption. In order for a property owner to qualify for the homestead exemption, the law requires both real property and a residence upon it. Those who lose their homestead to a natural

disaster such as a hurricane or flood are at risk of losing their homestead exemption, even if their intent is to rebuild and keep the property as their primary residence. Reapplying for the homestead at a later date is not an adequate solution because the owner would lose valuable homestead protections such as the ten-percent appraisal cap. HB 770 would allow taxpayers to keep homestead exemptions while rebuilding and working to piece their lives back together.

HB 770 would help property owners rebuild homesteads. Even though a homeowner whose property is annually reappraised would receive a lower tax bill because the value of the residence was reduced, that person still might lose the homestead protections of an appraisal cap and a freeze on school taxes if disabled or 65 years of age or older. Loss of these valuable protections could result in dramatically higher taxes. Even if a county only reappraises every other year, appraisal districts quickly detect new construction and appraise accordingly. New construction of a replacement structure could result in a finding that the property no longer was a principal residence and a resulting loss of the homestead exemption.

**Bolivar Peninsula property owners.** The Texas Open Beaches Act can unfairly restrict the use of the property of homeowners by declaring that a change in the vegetation line causes the property to become of the public beach, which is akin to forced taking. HB 770 would allow homeowners on the Bolivar Peninsula a chance to rebuild. They should not be punished for storm actions wholly outside of their control.

**Granting chambers of commerce a property-tax exemption.** HB 770 would provide a narrow exemption from property taxation for chambers of commerce, defined in the bill as "nonprofit community business organizations." This exemption would allow a local chamber of commerce to direct money that the organization otherwise would have to spend on property taxes to its primary goal of improving the business climate and recruiting companies to the community.

Because the role of a chamber of commerce or similar organization is to support the activities of local businesses and to increase property values and tax revenue in local communities, it would be appropriate to grant these organizations this tax exemption. Further, because businesses that fund chambers of commerce already pay state and local taxes, including property taxes, taxing chambers of commerce amounts to a form of double taxation. Chambers of commerce already are exempted from other federal and state taxes, and HB 770 simply would extend this policy to local property taxes.

## Opponents said

**Continuing the homestead exemption while rebuilding damaged homes.** HB 770 is unnecessary. Homeowners already are protected by existing law that allows appraisers to reappraise properties in a disaster area, which results in proper tax reductions for those who have suffered catastrophic loss.

The point of the homestead exemption is to protect property that is a primary residence. While it is tragic that a person may have lost a house due to a natural disaster, if the person moves off the property, it no longer is a primary residence. In addition, the person already should have been compensated by insurance and direct governmental aid, such as FEMA funds. Further, a person always can reapply for a homestead exemption once the home is rebuilt.

**Bolivar Peninsula property owners.** HB 770 would unacceptably undermine the Texas Open Beaches Act, which protects the rights of Texans to access the beach and also prevents unsafe construction on constantly moving beaches. HB 770 would allow a dozen specific property owners to rebuild houses destroyed by recent hurricanes below the vegetation line. Not only would this exemption from the Open Beaches Act be granted to a small group no more deserving than others who suffered property damage, but it also would be questionable public policy to allow for the construction of buildings on unsecured and even dangerous sand. Further, these property owners purchased their land with full knowledge that it someday could become public land if the vegetation line changed. While the loss of the use of property is regrettable, an act of nature shifted this property into public beach, and it should be treated as such.

**Granting chambers of commerce a property-tax exemption.** Full property-tax exemptions generally should be reserved for churches, shelters, and other nonprofit charitable organizations that serve the community. A chamber of commerce is a voluntary organization supported by its members that engages in advocacy for their benefit. As such, it would be inappropriate for the state to grant tax exemptions to these organizations without extending the exemption to other voluntary organizations. For

example, labor unions provide support for members and work to improve the lives of working people in local communities. However, under HB 770 unions still would have to pay ad valorem taxes. If a chamber of commerce was exempted from property taxes under this bill, it only would be fair to provide a similar exemption to unions and other voluntary organizations that also benefitted the community.

Providing a property tax exemption for real and personal property of chambers of commerce would reduce taxable property values, shifting the tax burden to other taxpayers and requiring the state to make up the difference for school-tax purposes. This would effectively result in an inappropriate government subsidy for these business organizations.

## Notes

The **HRO analysis** of HB 770 appeared in Part Three of the May 4 *Daily Floor Report*. HB 770 originally included only the retention of the homestead exemption during the reconstruction of damaged property, and the other provisions were added subsequently as floor amendments.

The property-tax exemption for chambers of commerce originally was included in HB 831 by Taylor, which passed the House, but died in the Senate Finance Committee. The **HRO analysis** of HB 831 appeared in Part Five of the May 8 *Daily Floor Report*.

# Raising revenue from sexually oriented businesses

**HB 982 by Thompson/ HB 2070 by Cohen**
*Died in the Senate/ Died in the House*

Table
of Contents

**HB 982** would have imposed a 10 percent tax on admissions charged by sexually oriented businesses and repealed the $5 per entry fee established by HB 1751 by Cohen, enacted by the 80th Legislature in 2007. One-fourth of the revenue collected from the tax would have been allocated to the Foundation School Fund and three-fourths to the General Revenue Fund, which the comptroller would then have transferred to the Sexual Assault Program Fund.

A sexually oriented business that had paid the entry fee under HB 1751 prior to its repeal would have received a credit against the new admissions tax equal to the amount of fees paid. The penalty for failure to pay the tax or file the report would have been a forfeiture of 5 to 10 percent of the amount owed.

## Supporters of HB 982 said

HB 982 would quell the constitutional concerns raised by the $5 entry fee added by HB 1751 enacted by the 80th Legislature. The occupation tax established by HB 982 would be applied to all sexually oriented businesses, using a definition already established in statute, and would not target those with nude entertainment or performances, an expression protected by the First Amendment. The structure of HB 982 is the same as statutes enacted in 10 different states, all found constitutional. One-fourth of the collected revenue from this occupation tax would be allocated to the Foundation School Fund, as required by the Texas Constitution, Art. 7, sec. 3(a).

Enactment of HB 982 would end the litigation against HB 1751, allow the state to distribute the money collected under HB 1751, and give the businesses that paid the fee a credit against the tax equal to the amount of any fees previously paid.

Taxing an activity neither endorses nor penalizes that activity. Texas imposes taxes on a variety of activities, from buying cigarettes to purchasing food, without attempting to encourage or discourage the activity.

## Opponents of HB 982 said

By instituting this tax and collecting revenue to fund state programs, HB 982 would legitimize and encourage objectionable behavior.

This bill selectively would penalize individuals who patronize or own sexually oriented businesses.

## Other opponents of HB 982 said

By repealing HB 1751 and imposing an occupation tax rather than a fee, HB 982 would split the revenue allocation between the Foundation School Fund and the General Revenue Fund. This would shift funds away from the original purpose of supporting sexual assault programs. Also, the existing fee applies to each customer admitted, regardless of the admission price or whether an admission price is charged at all, while a tax would be levied only on the admission price, likely generating much less revenue for sexual assault programs.

**HB 2070** would have reduced the sexually oriented business entry fee from $5 to $3 and would have required the comptroller to deposit all revenue received from the fee to the Sexual Assault Program Fund. The bill would have repealed the provision of HB 1751 that allocates fees collected over $25 million to the Texas Health Opportunity Pool.

The bill also would have added representatives from the Texas Alcoholic Beverage Commission (TABC) to the Sexual Assault Advisory Council and would have expanded the council's reporting duties. The bill would have required the attorney general to conduct a study on violence against women.

## Supporters of HB 2070 said

HB 2070 would eliminate the constitutional concerns currently facing HB 1751. In a challenge to HB 1751, a state district court in Austin found that persuasive evidence exists linking nude performance and the secondary effects addressed by the Sexual

Assault Program Fund, but that an insufficient nexus exists between nude performance and inadequate healthcare. By allocating all collected fees to the Sexual Assault Program Fund and removing the allocation to the Texas Health Opportunity Pool, HB 2070 would eliminate this concern.

The bill would not apply a discriminatory tax on protected expression. The bill imposes a fee, rather than a tax, and would be applied only to sexually oriented businesses that also authorize the consumption of alcohol on the premises. The U.S. Supreme Court has held that states have the right to ban this combination of nude performance and consumption of alcohol. Therefore, the state can discourage the combination by imposing a fee. The bill is content neutral, as it seeks to regulate negative, secondary effects associated with sexually oriented businesses that combine live nude entertainment and serving alcohol.

By providing a dedicated source of revenue, HB 2070 would support essential sexual abuse prevention and survivor support programs. The bill would allow the state to devote approximately $16.5 million annually to aid the survivors of sexual assault and support training and prevention programs to reduce future incidents of sexual assault.

Enforcement of the fee should not be problematic, as the vast majority of these entities sell alcohol and already are licensed, regulated, and audited by TABC. The Comptroller's Office could partner with TABC to ensure enforcement of this program and easily could handle the auditing duties of the few entities that do not sell alcohol.

Imposing a fee on an activity does not mean condoning it. Texas assesses a variety of "sin taxes" on tobacco, alcohol, and other activities that many Texans may not condone, in addition to sales and property taxes that business may have to pay. Because a certain segment of the population will visit strip clubs regardless of cost, the state is justified in imposing a fee on that activity and funding other state programs with the proceeds.

## Opponents of HB 2070 said

Lowering the fee and allocating all the funds to the Sexual Assault Program Fund would not cure the constitutional challenges currently facing HB 1751. HB 2070 still would impose a tax on constitutionally

protected speech. The U.S. Supreme Court has ruled that erotic expression is protected speech under the First Amendment and that taxation of protected speech is unconstitutional. The state of Texas already has incurred significant legal expenses due to court challenges to HB 1751, and enactment of HB 2070 would not quell these legal challenges.

The fee imposed under HB 2070 could prove difficult to implement for the Comptroller's Office, which would have to audit and ensure that the amount of money collected was accurate. Some businesses do not collect door charges. Other businesses may collect door charges but keep the count of customers low in order to inappropriately divert the money to their own coffers.

The state should not use behavior that many Texans find objectionable and offensive to fund important state priorities. To do so would be hypocritical and could send a message that this type of behavior somehow is encouraged.

## Other opponents of HB 2070 said

While the $3 fee in HB 2070 would support a worthy cause, the fee instituted on patrons of strip clubs is unrelated to this goal. No link exists between strip clubs and sexual assault, so the bill would institute unfair tax profiling on individuals who visit these establishments legally. Sexual assault prevention and treatment certainly deserve financial support from the state of Texas, but they should not be paid for by a discriminatory tax unrelated to the problem that those programs are trying to address.

## Notes

HB 982 passed the House and initially passed the Senate, but the Senate reconsidered its vote on final passage, and the bill died when no further action was taken. The **HRO analysis** of HB 982 appeared in the April 2 *Daily Floor Report*.

HB 2070 died on the May 9 General State Calendar in the House when no further action was taken. The **HRO analysis** of HB 2070 appeared in Part Three of the May 9 *Daily Floor Report*.

HB 1751 by Cohen, enacted by the 80th Legislature during the 2007 regular session (Business and Commerce Code, ch. 47, subch. B), requires that a fee

of $5 be charged per customer admitted to a sexually oriented business providing live nude entertainment or performances and authorizing consumption of alcohol on the premises. The first $25 million collected is allocated to the Sexual Assault Program Fund and the remaining revenue is allocated to the Texas Health Opportunity Pool.

In March 2008, a state district court in Austin held that this provision of HB 1751 violates the First Amendment of the U.S. Constitution and therefore is invalid. The fee was found to be a tax aimed at restricting speech protected by the First Amendment. The Third Court of Appeals in Austin upheld the lower court decision on June 5, 2009, and the state has appealed to the Texas Supreme Court. The fee is still being collected, but the funds are being held by the Comptroller's Office while the appeal is pending.

# Including foreclosed homes in homestead property appraisals

**HB 1038 by Paxton**
*Effective January 1, 2010*

Table
of Contents

**HB 1038** requires an appraisal district to include comparable foreclosed and distressed homes when valuing a residential homestead.

HB 1038 directs appraisers, when valuing a homestead, to consider the value of properties that were foreclosed upon during the prior three years and were comparable to the homestead at the time of the foreclosure sale. Appraisers also must include those distressed homes whose value has decreased due to a declining economy. To be comparable, these foreclosed and distressed properties must be in the same neighborhood and have similar relevant characteristics.

## Supporters said

By requiring that foreclosure sales of homes in the same neighborhood be taken into account in determining their value for property taxation purposes, HB 1038 would help ensure more accurate property appraisals. When selecting properties to compare for valuation purposes, appraisers routinely exclude properties that have been foreclosed or sold at auction, even if those homes were comparable at that time. This practice is widespread because appraisers interpret sec. 1.04(7)(C) of the Tax Code as directing them to do so, because the properties were not sold willfully through an arm's-length transaction.

Directing appraisers to take into account foreclosed properties would create a more representative pool of comparable properties for valuation. Foreclosed properties and those sold at auction tend to sell for significantly less than those sold through a normal agreement. Including these properties should result in property-tax relief as individual appraisal values would more accurately reflect neighborhood sales prices.

The current system takes too long to account for the effects of foreclosed properties on home values in a neighborhood. It can take two, three, or even four years to account for the effect that a foreclosed property can have on neighborhood property values. HB 1038 would require that the effect of foreclosure sales be taken into account much sooner, creating more accurate appraisals.

HB 1038 would direct appraisers to include foreclosed properties that sold within the past three years because not all neighborhoods or communities have enough turnover in homeowners to find comparable foreclosed homes within the past year or two. Some rural areas or smaller neighborhoods may even have trouble finding comparable sales within the previous three years. Most appraisers agree that a three-year period is an appropriate time frame.

## Opponents said

HB 1038 would look back too far in time by including foreclosed properties that sold at auction within the past three years. A year-long window would be more appropriate because there is enough property turnover in Texas, especially in urban areas, that a year would provide more than enough comparable sales data and limit comparisons to only the most recent, and therefore the most relevant, sales.

## Notes

The **HRO analysis** of HB 1038 appeared in the March 30 *Daily Floor Report*.

# Adding certain backpacks and school supplies to sales-tax holiday

**HB 1801 by Bohac**
*Effective July 1, 2009*

Table
of Contents

**HB 1801** adds certain backpacks and school supplies to the back-to-school sales-tax holiday. Eligible purchases are exempted from sales taxes if they are purchased:

- for use by a student in a public or private elementary or secondary school;
- during the sales tax holiday beginning on the third Friday in August and ending on the following Sunday; and
- for less than $100.

HB 1801 defines "backpack" as a messenger bag, book bag, or pack with straps that a person wears on the back, including a backpack with wheels if the backpack also can be worn on the back. Luggage, a briefcase, an athletic bag, a duffle bag, a gym bag, a computer bag, a purse, and a framed backpack are not eligible.

Eligible school supplies are defined in the interstate Streamlined Sales and Use Tax Agreement and include: binders; book bags; calculators; cellophane tape; blackboard chalk; compasses; composition books; crayons; erasers; folders, including expandable, pocket, plastic, and manila; glue, paste, and paste stickers; highlighters; index cards; legal pads; lunch boxes; markers; notebooks; certain kinds of paper, poster board and construction paper; pencil boxes and other school supply boxes; pencil sharpeners; pencils; pens; protractors; rulers; scissors; and writing tablets.

## Supporters said

HB 1801 would help Texas families with the yearly costs of preparing to send children to school and would help students be better prepared with tools for success. Under current law, school clothes are exempted from state and local sales taxes during the state's back-to-school sales tax holiday. While the tax holiday has been a huge success, it does not cover school supplies, which are essential to a child's success. HB 1801 would add school supplies to the sales tax holiday to assist parents with the costs of equipping their children for school.

HB 1801 only would add a list of 27 school supplies that have been agreed upon by education and tax experts and recommended by the multi-state Streamlined

Sales and Use Tax Agreement. If the list included items that some schools require that generally also are not education-specific, like tissue and plastic bags, consumers could take advantage of the back-to-school sales-tax holiday and purchase large quantities of these goods without ever intending to use them as school supplies. HB 1801 would include a narrow list of goods that generally were education-specific. Sticking to this list would ensure the smallest possible fiscal impact while still achieving substantial savings for families as they prepare for the start of the school year.

Other states have found that sales-tax holidays improve revenue collection because people increase purchases and taxes from increased sales offset losses from exemptions.

## Opponents said

HB 1801 could reduce general revenue by up to $40.25 million over 2009-2014. Local governments could lose $10.7 million over five years. Texas' infrastructure, law enforcement, education, and healthcare systems, and other public programs require adequate funding. This sales tax break would require the tax burden needed to fund these programs be shifted to other taxpayers or that the programs supported by these funds be scaled back.

## Other opponents said

HB 1801 would not exempt enough items necessary for school. Many school districts require items that are not covered by HB 1801, such as tissues, plastic bags, and other supplies. In addition, many families buy computers and reference material for the sole purpose of their children's education. If the goal of a sales-tax exemption weekend is to enable families to prepare for the start of school, the list of exempted items should reflect what Texas school districts and other education professionals require, not what an agreement between states deems acceptable for exemption.

## Notes

The **HRO analysis** of HB 1801 appeared in Part One of the May 12 *Daily Floor Report*.

# Physician education loan repayment program and tobacco tax

**HB 2154 by Edwards**
*Effective September 1, 2009*

Table
of Contents

**HB 2154** expands the physician education loan repayment program, which assists physicians in repaying student loan debt in exchange for practicing for a certain period in medically underserved areas. It also creates a dedicated revenue source for the program by changing the tax on tobacco products such as snuff, chewing tobacco, and pipe tobacco from a price-based to a weight-based tax.

HB 2154 allows eligible physicians who have one, two, three, or four consecutive years of practice in areas designated by the Department of State Health Services as experiencing a health professional shortage to receive up to $160,000 in repayment assistance. The bill establishes a ladder that increases assistance with each year of service:

- $25,000 for the first year;
- $35,000 for the second year;
- $45,000 for the third year; and
- $55,000 for the fourth year.

The bill also changes the way that Texas taxes certain tobacco products other than cigars and cigarettes. Instead of a tax rate of 40 percent of the manufacturer's list price, the tax rate will be:

- $1.10 per ounce in fiscal 2010;
- $1.13 per ounce in fiscal 2011;
- $1.16 per ounce in fiscal 2012;
- $1.19 per ounce from September 1, 2012 to December 1, 2013; and
- $1.22 per ounce after December 1, 2013.

The amount of revenue attributed to the General Revenue Fund and the Property Tax Relief Fund from the tobacco products tax based on the former tax rate would remain the same, but any additional revenue would be deposited in the physician education loan repayment program account.

## Supporters said

HB 2154 would implement a recommendation in the Legislative Budget Board's 2009 Government Effectiveness and Efficiency Report. More than 5.6 million Texans, or 23 percent, currently live in health

professional shortage areas, including under-privileged or rural areas, or areas served primarily by community health clinics. The shortage of health professionals negatively affects the health and economic development of those areas.

The bill would allow the Texas Higher Education Coordinating Board to fund loan repayments to additional physicians and would create a ladder that would reward physicians an increasing amount of loan repayment the longer they stayed in the program. This change would make the program more competitive with similar programs in other states and have a positive impact by recruiting and retaining more physicians in under-served areas.

At $9,000 per year, the program's current benefits are not competitive with programs in other states. As a result, Texas is losing interested physicians to other states with more lucrative benefits. The ladder established by HB 2154 would increase repayment assistance with each year of service. This would encourage physicians to establish long-term practices and roots in the communities they serve, making them more likely to remain after the repayment assistance has ended.

Changing the tax formula for tobacco products such as snuff, chewing tobacco, and pipe tobacco from a price-based to a weight-based formula would result in a significant increase, of $44 million, in available revenue for the program. This increase is warranted as the tax on a tobacco product would be used to fund health care in underserved areas.

## Opponents said

The Higher Education Coordinating Board does not routinely track the length of time physicians remain in underserved areas beyond their practice obligation. Without information on retention rates, it cannot be determined if this program has had any long-term impact.

Changing the tobacco products tax from a price-based to a weight-based formula would benefit large tobacco companies at the expense of their smaller

competitors. Large companies would be able to raise prices on their products to match the popularity of their brands, something smaller companies could not do. This increased competitive advantage could allow larger tobacco companies further to marginalize smaller manufacturers.

The bill would target lower-income Texans who previously could avoid some tax by buying lower-priced tobacco products such as snuff. If the tax was shifted to a weight-based formula, many lower-income Texans would not be able to avoid the tax.

## Notes

The **HRO analysis** of HB 2154 appeared in Part One of the May 11 *Daily Floor Report*.

# Property appraisal revisions

**HB 3611, HB 3612, HB 3613, and HJR 36 by Otto**
*Generally effective January 1, 2010*

Table
of Contents

**HB 3611,** *effective January 1, 2010, pending voter approval of HJR 36 on November 3, 2009,* allows the boards of directors of two or more adjoining central appraisal districts to form a consolidated appraisal review board by interlocal contract.

## Supporters of HB 3611 said

HB 3611 would allow rural counties to form consolidated appraisal review boards, allowing them to take advantage of certain efficiencies. Many rural counties encounter difficulty finding enough qualified and willing candidates to sit on their appraisal review boards. HB 3611 would allow counties to join together and pool their talent. Having fully staffed and qualified appraisal review boards would help to ensure a more professional, equitable, and timely appraisal review process.

## Opponents of HB 3611 said

Only residents of an appraisal district should decide appeals of appraisals of property located in that district. Local appraisal review boards know their county markets and local economic realities. Bringing in outsiders from another county could result in a loss of local control of a local issue

**HB 3612,** *effective January 1, 2010,* directs the State Office of Administrative Hearings (SOAH) to develop a pilot program for a property owner to appeal to SOAH an Appraisal Review Board (ARB) decision regarding a protest of appraised or market value if the appraised or market value is more than $1 million. SOAH must develop this program by January 1, 2010. The pilot program will cover Bexar, Cameron, Dallas, El Paso, Harris, Tarrant, and Travis counties for a three-year period beginning January 1, 2010. The program will cover real or personal property, not including industrial property or minerals. The program expires in 2013.

## Supporters of HB 3612 said

HB 3612 would create a pilot program that would provide an interim step between an ARB decision and

an appeal to district court. Many taxpayers are unhappy with the ARB process but cannot afford to appeal their cases to district court, as the cost of doing so often exceeds the tax savings they hoped to obtain. Under current law, property owners whose property is valued at less than $1 million have the option of going to binding arbitration. Doing so can save tens of thousands of dollars from the cost of appealing to district court. However, property owners whose property is valued at more than $1 million do not have this option. HB 3612 would allow these property owners, if the property in question was located in one of the seven most populous Texas counties, to take their appeals to SOAH. SOAH expects the average cost of these hearings to be between $1,500 and $2,000. This would result in significant cost savings compared to an appeal in district court and would open up an avenue for a meaningful and professional appeal to those who otherwise might not find it economical to pursue one.

HB 3612 would promote confidence and professionalism in the appraisal system. Taxpayers would have an avenue for an appeal that would be independent of the appraisal district, increasing confidence in the system. Further, as administrative law judges (ALJ) heard these tax appeals, they would become more expert, and a body of opinions would form that would better direct future tax appraisal practices. These would be deterrents for everything from poor appraisal practices to frivolous appeals.

HB 3612 also would help speed up the appeals process, as ALJs would resolve cases in about 30 days. Under the current system, some appeals have taken longer than two years to be resolved by district courts. Further, HB 3612 would not promote a proliferation of frivolous appeals because those who lost would be required to pay for the cost of the appeal to SOAH. The chief appraiser would be able to appeal to SOAH if the appraisal district's board of directors voted to allow it. This also would provide an important check on possible misuse of this appeals process.

HB 3612 would require that appeals from SOAH to district court be by a trial de novo, starting afresh without being bound by any prior ruling, in order to protect the interests of property owners. One of the goals of HB 3612 would be to open up the

appeals process to those who otherwise would find it uneconomical to appeal. If the standard of appeal were a review of whether substantial evidence justified the previous decision, then a taxpayer would have to be represented by an attorney in order to follow rules of evidence and procedure and to ensure that issues would be preserved for appeal. HB 3612 would allow a taxpayer to be represented by anyone who currently can represent a taxpayer before an ARB.

Even though a trial de novo standard would allow parties two chances at appeal, HB 3612 would require that the findings of the ALJ be admissible in district court and the party that lost the SOAH hearing be required to pay for that hearing. This would help to deter automatic appeals and should result in district courts having to hear fewer property tax appeals.

Creating an appeals system for certain property-tax appraisals through SOAH would be a better approach than allowing non-binding arbitration. SOAH hearings would prevent more litigation than non-binding arbitration would because non-binding arbitration would not prevent a party from simply appealing a case to district court. Further, because SOAH is independent of any taxing entity, taxpayers would feel that they had received a fair and impartial hearing, something many taxpayers feel they do not currently receive at ARB hearings.

The SOAH appeals system that HB 3612 would establish would be a pilot program. It would expire after three years unless the Legislature renewed it, and it would apply only to the seven largest urban counties. This program would be limited enough to allow the Legislature to evaluate it and improve it as needed or scrap it in favor of a better solution.

## Opponents of HB 3612 said

HB 3612 would not reduce the amount of litigation surrounding property-tax appraisal because it would require that an appeal from a SOAH decision to district court be by trial de novo. Because litigants would not be bound by the decisions of an ALJ, they would not be deterred from trying a second appeal before a district court.

A better approach would be to allow property owners whose properties were valued at more than $1 million to go to non-binding arbitration as an option before they appealed to district court. This option would reduce the number of cases that ended up before district court, would use the already well-established arbitration system, and would not require an expansion of SOAH's duties.

**HB 3613,** *effective on January 1, 2010, pending voter approval of HJR 36 on November 3, 2009,* requires that the land of a residence homestead be appraised as a residence and not based on the highest and best use of the property.

The bill also entitles a veteran classified as having a 100 percent disability rating as a result of military service to a tax exemption for the total appraised value of the veteran's residential homestead. HB 3613 also revises the disability ratings to determine disabled veterans' property tax exemption as less than 30, 50, and 70 percent rather than not more than those percentages. These provisions of HB 3613 took effect June 19, 2009, and are discussed starting on page 253.

## Supporters of HB 3613 said

The constitutional requirement that property be taxed in proportion to its value has all too often meant that county tax appraisers have valued property on its "highest and best use" rather than on its current use. For example, a residential property in or near a commercial district may be valued based on its commercial potential even though it currently is being used as a residence. HB 3613 would require that the market value of a residence homestead be determined by its value as a residence homestead, regardless of whether it is the highest and best use of the property.

Some Texas homeowners have seen their property appraisals double or even quadruple in a short period, not because the value of their homes increased, but because the highest and best use of the land dramatically changed. While the 10-percent cap on annual increases in taxable value of residence homesteads mitigates the impact of large increases in appraised market value, it still means that every year the taxes on the property will rise substantially. Where property use is restricted by zoning regulations, residential homesteads are somewhat protected from dramatic changes in highest and best use — for example, from residential to commercial. But those areas of the state not covered by zoning regulations are susceptible to dramatic appraisal increases based solely on the changes of land use in the area where the homestead happens to be located.

Texas already protects certain types of property from large appraisal increases due to changes in highest and best use. For example, the taxable value of agricultural or timber land is appraised based on the land's capacity to produce agricultural or timber products, not on its market value, which usually is much higher. Residential homesteads do not have such protection.

HB 3613 would protect Texas homesteads from increases due to changes in highest and best use by ensuring that the properties were appraised only on the basis of the property's value as a residence homestead. These protections are especially necessary to protect homeowners whose neighborhoods are in transition from residential to commercial use. This limitation on the appraisal process would apply only to residence homesteads, not to other residential property such as apartments or vacation homes.

## Opponents of HB 3613 said

HB 3613 would arbitrarily move the property appraisal process further away from a true valuation of property according to its worth. According to the LBB, allowing residential homestead property to be valued based solely on its residential use and exempted from a highest and best use valuation would reduce taxable property values, thereby reducing local tax revenue and potentially requiring a local tax increase or spending cuts to offset the revenue loss. The owners of residence homesteads already receive a substantial benefit from the 10-percent annual limitation on the increase in the taxable value of their property plus other value exemptions and tax freezes, which owners of other types of property do not receive.

When school districts' property values per student are lower, the state must provide additional funding to these districts under the Foundation School Program's equalization formulas. The state cannot afford to increase its obligations in this manner, especially when state finances are expected to be spread thin over the next few years.

**HJR 36** proposes three separate constitutional amendments. One would authorize the consolidated appraisal review boards implemented by HB 3611, and one would authorize the requirement that residence homesteads be appraised based solely on their value as homesteads rather than the highest and best use, as implemented by HB 3613.

HJR 36 also includes a third proposed constitutional amendment that would eliminate the current requirement that administrative and judicial enforcement of uniform standards and procedures for property appraisal originate in the county where the tax is imposed. The three proposed amendments will be submitted to the voters at the November 3, 2009, election.

## Supporters of HJR 36 said

While appraisers are trained and certified, the only check on appraisals are appraisal review boards and expensive litigation in district courts. HJR 36 would help to improve appraisals when they were initially conducted through state enforcement of uniform statewide standards that would ensure more accurate and equitable appraisals.

## Opponents of HJR 36 said

HJR 36 could lead to a loss of local control. Central Appraisal Districts know their local markets and economic realties better than state officials do. Enforcing standards at the state level could impose a one-size-fits-all solution that might not produce the most accurate appraisals for each locale.

## Notes

The **HRO analyses** of HB 3611, HB 3612, HB 3613, and HJR 36 appeared in Part One of the April 27 *Daily Floor Report*.

# Implementing disabled veterans' exemption from property taxation

**HB 3613 by Otto**
*Effective June 19, 2009*

Table
of Contents

**HB 3613** entitles a veteran classified as having a 100 percent disability rating as a result of military service to a tax exemption for the total appraised value of the veteran's residence homestead. The bill also removes as taxable property under the comptroller's property value study any property subject to the totally disabled veterans-homestead exemption. The exemption applies starting with the tax year beginning January 1, 2009.

HB 3613 also revises the disability ratings to determine disabled veterans' property tax exemption as less than 30, 50, and 70 percent, rather than not more than those percentages.

## Supporters said

HB 3613 would allow those veterans classified as fully disabled an exemption from property taxes, implementing Proposition 9 (SJR 29 by Carona), a constitutional amendment that the voters of Texas approved overwhelmingly in 2007. A classification of total disability means these veterans are completely unemployable, and HB 3613 would remove a significant burden for those whose ability to earn an income is severely hindered. This exemption would apply to those whose disabilities are service-connected, meaning these veterans have given their health and safety in defense of our freedoms and values.

Under current law, a totally disabled veteran only can receive an exemption of up to $12,000 from the homestead's value. Although this helps defray costs, it does not reduce significantly the ever-increasing property tax burden caused by appraisal creep that veterans and all Texans are facing. For disabled veterans who are completely unemployable and with limited means to earn an income, a full exemption from property taxes would allow them to keep their homes.

The bill also would implement another 2007 constitutional change included in Proposition 9 that would allow more disabled veterans to claim a higher exemption from their homestead value and thus lower their taxes. Under the current disability rating system, a disability rating is rounded to the nearest multiple of

10. If a veteran's disability rating is rounded down to a rating of 10, 30, 50, or 70 percent, that person falls into a lower tier of exemption. For example, the $7,500 exemption currently is for disability ratings of more than 30 percent but not more than 50 percent. Under the change that would be implemented by SB 469, the $7,500 exemption tier would be at least 30 percent but less than 50 percent, which would allow a 30 percent disabled veteran to get the $7,500 exemption and a 50 percent disabled veteran to get the next highest exemption, which is $10,000.

## Opponents said

No one disagrees with granting benefits to veterans for their service to the nation, but this measure would reduce revenue available to local governments. This effect would be exacerbated by the influx of new disabled veterans returning from Iraq and Afghanistan. Technological advancements and new medical techniques, coupled with more dangerous enemy weaponry, have led to different and sometimes more debilitating injuries than in previous conflicts, even while fatality rates in these conflicts are much lower than in previous wars. Additionally, totally disabled veterans do not face an increased tax burden because they are eligible for a school property tax freeze the same as other homeowners receive when they reach age 65.

## Notes

The **HRO analysis** of HB 3613 appeared in Part One of the April 27 *Daily Floor Report*. As originally considered by the House, HB 3613 also provided that the land of a residence homestead must be appraised as a homestead and not on the highest and best use of the property. This provision of HB 3613 is discussed on page 251.

SB 469 by Carona, which also would have implemented the disabled veterans tax exemptions, passed the Senate, but died on the May 21 Major State Calendar in the House when no further action was taken. The **HRO analysis** of SB 469 appeared in Part One of the May 21 *Daily Floor Report*.

# Revising small business exemption from business margins tax

**HB 4765 by Oliveira**
*Effective January 1, 2010*

Table
of Contents

**HB 4765** increases the revenue ceiling for a business to qualify for a total exemption from the business margins franchise tax from $300,000 to $1 million, for two years. The $1 million ceiling to qualify for the tax exemption will decrease to $600,000 on January 1, 2012.

These provisions will take effect if HB 2154 by Edwards, which changes the way certain tobacco products are taxed, also takes effect and increases state revenue during fiscal 2010-11 to offset part of the revenue lost by the increased exemption. HB 2154 was enacted and took effect September 1, 2009 (see pp. 248-249). If HB 2154 had not taken effect, HB 4765 only would have increased the business margins franchise tax exemption to $600,000, as of January 1, 2010.

## Supporters said

HB 4765 would deliver needed tax relief to the small businesses that constitute the backbone of the Texas economy and create most new jobs. According to comptroller estimates, 40,000 small businesses would benefit from raising the revenue ceiling to $1 million for businesses to qualify for the margins tax exemption. The average tax relief would be a reduction of $2,200. Qualifying businesses also would save accounting and tax preparation expenses.

HB 4765 would provide instant tax relief. Under the margins tax, payments on a particular year are due in May of the following year. Taxes on revenues earned in 2009 are not due until May of 2010. Small business owners and their accountants would be able to predict these savings and invest or spend those saved tax dollars immediately.

Under HB 4765, future legislatures would not be obligated to expenditures or reductions in revenues that did not have an ongoing funding source. This would be targeted tax relief designed to help small businesses make it through the recession. Once the economy improved, the margins tax would revert to the broad-based tax it was designed to be. Making the cuts permanent would undermine this critical goal.

HB 4765 would not endanger future federal stimulus funds. Fears that it would are speculative. This tax cut would be paid for with state general revenue funds and increases in the state tax on certain tobacco products, including snuff, chewing tobacco, and pipe tobacco, and not with stimulus dollars. Further, HB 4765 would not directly violate any of the guidance from the federal government on how to spend the stimulus funds. Most of the concern about a tax cut is that it would mean fewer state dollars going to education through the Property Tax Relief Fund. The point of the fiscal stabilization funds given to the states by the federal government is to prevent cuts in certain social services. Under SB 1, the general appropriations act, overall funding to education would be increased, achieving the goals of the federal fiscal stabilization and stimulus programs.

HB 4765 would deliver targeted tax relief to small businesses, the group affected by the margins tax that most needs relief. Lowering the EZ calculation rate for the margins tax from 0.575 to 0.4 would not target small businesses as effectively and would more than double the revenue loss, to $402 million.

## Opponents said

HB 4765 would result in millions of dollars in lost general revenue for the next biennium. According the LBB, HB 4765 would cost the state $172 million in all funds for the fiscal 2011-12 biennium. A cut in general revenue of this size would reduce the state's ability to fund critical public services. Moreover, during an economic downturn, public spending on critical needs would better stimulate the economy than would tax cuts for business.

The margins tax was designed to be a broad-based tax. HB 4765 would move drastically away from that premise. Sound tax policy dictates that taxes should be broad-based to allow tax rates to be as low as possible at all points and for all payers. HB 4765 would remove margins tax liability from 40,000 businesses, which would remove 80 percent of payers from the tax base and drastically violate the "broad-based" principle.

If HB 4765 were enacted, fewer businesses would be paying the margins tax than were paying the old franchise tax, defeating one of the primary reasons for enacting the margins tax — to broaden the tax base and require all businesses of all types to pay their fair share.

HB 4765 could threaten Texas' eligibility to receive future stimulus funds from the federal government. HB 4765 would reduce the revenue going into the Property Tax Relief Fund, which supports the Foundation School Program. In order to ensure the state's public school finance obligations were fulfilled, this revenue loss would have to be replaced by another funding source. The state budget for fiscal 2010-11 would use $1.77 billion in federal stabilization dollars to shore up the Foundation School Program. The U.S. Department of Education could find that HB 4765 reduces revenue to the Foundation School Program and that the state paid for this tax cut with federal funds that may be used only to restore lost education funding resulting from declining tax revenue, not from voluntary tax cuts. In order to ensure compliance with the federal American Recovery and Reinvestment Act, fiscal stabilization dollars are being disbursed in two phases. Texas could be putting a significant share of future stimulus payments at risk by enacting a margins tax cut.

## Other opponents said

HB 4765 would not provide enough relief to small businesses. A better approach would be to lower the EZ calculation rate. This would preserve the broad base of the margins tax and have the potential to deliver relief to a broader swath of taxpayers, not just small businesses.

## Notes

The **HRO analysis** of HB 4765 appeared in Part One of the May 4 *Daily Floor Report*.

A related bill, SB 19 by Patrick, would have raised the margins tax exemption to $1 million and reduced the EZ calculation rate from .575 to .4. According to the LBB, SB 19 would have cost the state $402 million over the next fiscal biennium. SB 19 was left pending in the Senate Finance Committee.



Table
of Contents

# Transportation

\* HB 1 (1st)  Pitts       Issuing general obligation bonds for highway improvements ....................... 258

  HB 300     Isett       Continuing and revising the Texas Department of Transportation ................ 260

\* HB 3097   McClendon   Creating Department of Motor Vehicles; regulating auto parts recyclers ....... 266

  SB 404     Carona/     Extending CDA authority and revising toll development process ................ 269

  SB 17      Nichols

  SB 855     Carona      Authorizing elections for local option motor fuels taxes ............................... 272

  SJR 9      Carona      Dedication of state highway funds to construction, maintenance ................. 276

  SJR 25     Harris      Restricting revenue from public toll roads to transportation .......................... 278

# Issuing general obligation bonds for highway improvements

**HB 1 by Pitts, First Called Session**
*Effective July 10, 2009*

Table
of Contents

**HB 1** allows the issuance of general-obligation bonds for highway improvements authorized by Proposition 12, a constitutional amendment approved by the voters in 2007. The bill allows the Texas Transportation Commission to issue bonds to:

- pay for costs of a highway improvement project, defined as the acquisition, construction, reconstruction, and major maintenance of a highway or right-of-way; and
- cover administrative costs for authorized projects, pay costs of issuing the bonds, or make a payment due under a credit agreement.

Proceeds from the sale of general obligation bonds must be appropriated by the Legislature. The Texas Transportation Commission may enter into credit agreements relating to the bonds. Bond issuances may not exceed the total authorized in the Texas Constitution and must mature no later than 30 years after issuance. Bonds and related records must be submitted to the attorney general for approval.

HB 1 amends provisions in Texas Department of Transportation (TxDOT) Rider 60 in SB 1, the general appropriations act for fiscal 2010-11, to appropriate $2 billion in Proposition 12 general-obligation bond proceeds for highway projects and $100 million for debt service on the bonds. It also amends provisions in SB 1 directing $1 billion in general obligation bond proceeds to be used to capitalize the State Infrastructure Bank by specifying that money in the bank for loans to public entities may not be used for the purpose of converting a non-tolled road or highway to a tolled road or highway.

The bill also revises current law allowing a local toll project entity and TxDOT to issue bonds and enter into credit agreements to pay any costs associated with certain toll road projects. The bill extends the maximum duration of bonds issued for these purposes from 30 years to 40 years.

## Supporters said

HB 1 would authorize the Texas Transportation Commission to issue the Proposition 12 general

obligation bonds that were approved overwhelmingly by Texas voters in November 2007, in conjunction with appropriations made in SB 1, the general appropriations act for fiscal 2010-11, to generate revenue for desperately needed highway improvements. The bill would implement the appropriation of $2 billion from bond proceeds for fiscal 2010-11 made by SB 1, which received near-unanimous approval by both houses of the Legislature during the regular session.

General obligation bonds are another funding mechanism needed to finance the state's vital transportation infrastructure. The state motor fuels tax has been declining in relative value since 1991, and the original 20-cent per gallon tax is now equal to only about 13 cents in inflation-adjusted dollars. Demands on the state's transportation infrastructure have been steadily increasing while political support for a statewide increase in the motor fuels tax, including an increase limited to annual inflation, has flagged. Despite multiple attempts since 2001, no legislation supporting an increase in the statewide motor fuels tax has mustered the votes to pass a house of the Legislature.

The state needs alternative approaches to generating funding for transportation projects. While the Texas Constitution prohibits state-supported debt from exceeding 5 percent of uncommitted general revenue, state debt currently remains well below that maximum at about 4.1 percent, leaving room for additional general obligation bonds backed by state general revenue. Issuing the bonds would not have a significant impact on the state's fiscal standing, and Texas still would have a low debt burden compared to other states.

Borrowing against future general revenue would speed up highway projects, thus alleviating traffic congestion, enhancing productivity, improving safety, and reducing negative economic and social impacts that stem from inadequate highway infrastructure. Improving mobility sooner rather than later would aid economic development and job creation in the midst of a national economic recession. Issuing the general obligation bonds soon would be critical in light of diminishing availability of Fund 6 revenue bonds and Texas Mobility Fund bonds and in view of recent highway funding shortfalls.

## Opponents said

HB 1 would provide the legislative authorization to obligate future general revenue appropriations the state cannot afford to spend on debt service to finance highway construction and maintenance. Texas has a longstanding policy of funding transportation projects solely through dedicated funds. Borrowing money for construction increases costs because interest must be paid on the bond proceeds, and these costs are passed along to future taxpayers and legislatures. If all the authorized general-obligation bonds were issued over the next five years, debt service payments from general revenue would reach about $359 million in fiscal 2015 to continue to 2044. This is a significant sum of money with serious long-term implications for the taxpayers of the state. Texas should continue to pay for the highway construction it can afford, rather than obligate scarce general revenue and drive up the cost of already expensive projects by adding interest payments.

Adding even more debt would increase the general revenue needed for debt financing and could limit the state's ability to meet other needs. Highway projects should be paid for through Fund 6 and with bonds borrowed through transportation-related funds that are secured with revenue from motor fuels taxes and vehicle registration fees, and thus from those who use state roads. It would not be in the state's best interest to commit general revenue that could be used for other urgent state needs, such as education and human services, to pay for debt service for bonds to build highways.

HB 1 would continue the state's piecemeal approach of providing transportation funding without addressing the core issue facing the state — a motor fuels tax that has been declining in relative value since 1991. Expanding the practice of issuing bonds for highway improvements would not address long-term, structural highway funding shortfalls, which represent the most significant obstacle to adequate highway construction and maintenance. The state needs to address the core issue facing highway funding and increase or index to inflation the motor fuels tax, preferably both. Continuing the flawed policy of paying for highways with borrowed money would postpone and worsen transportation funding shortfalls in the future.

## Notes

The **HRO analysis** of HB 1 appeared in the July 2 *Daily Floor Report*. The enrolled version of HB 1 contains elements similar to SB 263 by Carona, considered during the regular session of the 81st Legislature. SB 263, which would have provided the statutory authorization for the Texas Transportation Commission to authorize general obligation bonds and also would have required 10 percent of the proceeds to go to fund local pass-through financing agreements, passed the Senate, but died on the May 23 Major State Calendar in the House when no further action was taken. The **HRO analysis** of SB 263 appeared in Part One of the May 23 *Daily Floor Report*.

The version of HB 1 reported by the House Appropriations Committee would have created a Texas Transportation Revolving Fund and charged the Texas Transportation Commission with administering and providing financial assistance from the fund. The commission could have used money in the fund to provide loans and other forms of financial assistance to a public entity, including TxDOT, for the costs of a highway improvement. Money in the fund also could have been used to pay debt service on revenue bonds secured through the revolving fund. Language in the bill regarding the revolving fund was stricken by an amendment on the House floor, and the $1 billion funding to capitalize the proposed revolving fund was shifted to the existing State Infrastructure Bank.

# Continuing and revising the Texas Department of Transportation

**HB 300 by Isett**
*Died in conference committee*

Table
of Contents

SB 2 by Hegar, enacted during the first called session, extended the Texas Department of Transportation (TxDOT) until September 1, 2011. The agency's sunset bill, HB 300 by Isett, was not enacted during the regular session.

**HB 300** would have revised policy and oversight bodies, statewide and local transportation planning, funding for transportation projects, toll road authority, and TxDOT powers, duties, and regulatory oversight. The bill also would have continued TxDOT for four years, until September 1, 2013.

**Revisions to policy and oversight.** The conference committee report version of HB 300 would have retained the existing structure and appointments of the Texas Transportation Commission. The House-passed version of the bill would have replaced the current structure with a 15-member commission with a chair elected at large and the other 14 members elected for two-year terms by districts. The conference committee report version of the bill also would have established a legislative oversight committee to make recommendations on the state transportation system. It would have transferred to the oversight committee funds for employees and duties currently in TxDOT's government and public affairs research section. The committee would have met quarterly and would have included eight appointed members from specific committees of the House and the Senate.

The committee would have been responsible for monitoring the implementation of Sunset recommendations, transfer of certain duties from TxDOT to the new Department of Motor Vehicles (DMV), state and federal transportation policy initiatives, financial issues facing transportation in the state, major TxDOT projects, and other subjects as the committee deemed relevant. The committee would have had other powers and duties of special committees but could not have recommended funding for developing a specific project.

**Revisions to transportation planning.** HB 300 would have revised provisions governing statewide surface transportation planning and funding. It would have eliminated a requirement that there be no more than 25 regional districts in the state established to

perform TxDOT's duties in those areas. The commission would have been able to align district boundaries in congruity with regional planning commissions, such as a council of government.

The bill would have required a statewide transportation plan covering at least 25 years that contained specific, long-term transportation goals and measurable targets for each goal, identified priority projects, and included a plan for input on goals and priorities identified by the general public and governmental organizations. The bill would have codified in statute federal requirements for metropolitan planning organizations (MPOs) to prepare and update long-range plans for their service areas and would have required that interested parties have a reasonable opportunity to comment on the plan before its adoption. The bill also would have codified in statute specific duties and performance standards for MPOs on project selection and planning.

The bill would have placed in statute certain existing practices, requiring TxDOT to develop a 10-year unified program to guide the development of transportation projects and to estimate project timelines and funding levels for each year in the program. The commission would have specified criteria for selecting and defining phases of major transportation projects and program funding categories, such as safety, bridges, maintenance, and mobility. Local planning organizations would have developed 10-year transportation plans consistent with the criteria and definitions adopted by the commission. TxDOT would have prioritized a list of projects with input from local officials for areas not located in the boundaries of a planning organization.

The commission would have established criteria for TxDOT to use in collaboration with local planning organizations in selecting projects for the statewide transportation plan. TxDOT would have used project lists adopted by local planning organizations to create the statewide program and budget, which would have included the agency's official cash flow forecast and each region's estimated allocation of funds.

The commission would have adopted rules to create funding formulas for transportation projects and would have allocated funds for metropolitan area corridor

projects, mobility and rehabilitation projects, congestion mitigation and air quality improvement projects in non-attainment areas, and a percentage of transportation enhancement project funding to MPOs with urban areas with populations over 200,000. For MPOs with smaller urban areas, the commission would have allocated funds for urban area corridor projects and a percent of transportation enhancement project funding.

TxDOT would have been required to work with planning organizations to develop a statewide connectivity plan. The agency would have adopted rules to establish criteria for designating a project as a statewide connectivity project and would have developed benchmarks to evaluate progress. The plan would have been adopted formally by the Texas Transportation Commission.

**Funding for transportation projects.** HB 300 would have authorized TxDOT to issue $2 billion in general obligation bonds appropriated in the general appropriations act for fiscal 2010-11 (SB 1 by Ogden). (These provisions were included in HB 1 by Pitts, enacted by the 81st Legislature in its first called session.) HB 300 would have allowed the bonds to be issued to pay costs of highway improvement projects, the cost or expense of issuing the bonds, or payments owed under a credit agreement or to provide money for deposit in the Texas Transportation Revolving Fund (TTRF).

The bill would have created the TTRF and would have charged the commission with administering and providing financial assistance from the fund. The commission could have used money in the fund, subject to existing restrictions, to provide loans and other forms of financial assistance to a public entity, including TxDOT, for highway improvement. Money in the fund also could have been used to pay debt service on revenue bonds secured through the revolving fund. A public entity authorized to construct, maintain, or finance a transportation project could have borrowed money from the revolving fund, subject to terms set by the commission.

To provide for repayment, a public entity could have pledged any combination of revenue, income, and taxes. The commission could have required revenue from a toll road to be shared between a tolling entity and TxDOT in lieu of repayment. The commission could have sold loans from revenue in the fund and would have had to deposit proceeds of the sale in the fund. Any loans sold

would have had to use a competitive bidding process and be sold at a price and under terms the commission deemed reasonable. A public entity receiving financial assistance from the fund could have agreed to waive sovereign immunity from a suit regarding its obligations under the terms of the assistance agreement.

HB 300 would have allowed a municipality or county to establish a transportation reinvestment zone for any transportation project. If any part of the project were subject to TxDOT oversight, the municipality or county could have requested that the agency delegate to it full responsibility for developing the project. If the project were on the state highway system, it would have had to comply with state design criteria unless TxDOT made a specific exception. TxDOT could have taken any reasonable action necessary to comply with a federal requirement and enable the state to receive federal-aid highway funds.

A law establishing a transportation reinvestment zone would have had to designate the base year used to establish a tax increment in the municipality or county. The bill would have required the portion of the money deposited into the tax increment account, as specified by the municipality, to be used to fund the project associated with the zone and for aesthetic improvements within the zone. Remaining funds from the increment could have been used for other purposes.

A municipality or county could not have been penalized with a reduction in traditional transportation funds due to establishing a transportation reinvestment zone. Funds that TxDOT designated for a project before a reinvestment zone was established could not have been reduced solely because of the designation of the zone. Funds for TxDOT districts similarly could not have been reduced due to the establishment of a reinvestment zone by a county or municipality in the district.

The bill also would have allowed funds from the highway beautification account to be used for regulating outdoor signs on rural roads. Certain civil penalties for violations of outdoor advertising provisions would have been redirected from the State Highway Fund (Fund 6) to the beautification account. The bill would have provided for administrative penalties in lieu of a suit to collect a civil penalty. The TTC would have adopted procedures for suspending or revoking a license for outdoor advertising and could have denied license renewals for failing to conform to permit requirements.

The bill would have required that notice be provided to a party whose permit to display an outdoor advertisement was revoked or denied.

**Revisions to comprehensive development agreements.** The bill would have required a comprehensive development agreement (CDA) to include a repurchase provision allowing TxDOT to buy a private entity's interest in a toll project. The provision would have had to include a schedule stating a specific price for the purchase of the toll project at certain intervals. A local tolling authority could have repurchased a private entity's interest for no more than the lower of the price stated for the interval or the governing fair market value or outstanding debt at the time, whichever was greater. A contract would have had to include the calculation used to determine the repurchase value based on these conditions.

A CDA allowing a private entity to operate or receive revenue from a toll project would have been required to be reviewed for legal sufficiency by the attorney general and reviewed for financial viability by the comptroller and signed by the commission. "Non-compete" provisions in CDAs limiting roads that could be constructed near a toll road could not have been effective for more than 30 years and could not have applied to an interstate highway. Local tolling authorities, with certain exceptions, would have been prohibited from accepting concession payments for CDAs but could have entered into a toll revenue sharing agreement with a private entity.

The bill would have included provisions found in SB 17 and SB 404, both of which died in the House, extending the authority to enter into CDAs and revising the process by which toll roads were developed.

**Revisions to TxDOT powers and duties.** The bill would have included standard Sunset recommendations on filing and acting on complaints, developing a policy for public involvement, negotiated rulemaking and alternative dispute resolution, and technological solutions.

The commission would have been responsible for reviewing TxDOT's performance against specific criteria and making the review available to the public. TxDOT would have been required to establish a transportation project and reporting system on its website to allow for tracking project development and expenses. The reporting system would have contained specific information about transportation projects and

funding in the 10-year project development program, including reports on the effectiveness of project funding. TxDOT would have been charged with conducting a performance review of each project in the program, including the status of the project and whether the project met projected timelines. The website would have included information on the condition of the state's bridges and traffic congestion and delays.

The bill would have allowed TxDOT to enter into design-build contracts for non-tolled highway projects. A "design-build" contract would have been defined as an agreement with a private entity for the design and construction, expansion, or improvement of a highway project, not including the financing or operation of the highway.

The commission would have been charged with organizing a rail transportation division within TxDOT to assume related functions and duties. The division would have had to:

- assure that rail transportation was an integral part of the department's transportation planning process;
- coordinate and oversee rail projects financed with TxDOT funds, including money from the Texas Rail Relocation and Improvement Fund;
- develop and plan for improved passenger and freight rail facilities and services; and
- coordinate the efforts of TxDOT, the federal government, local governments, and private entities to continue the development of rail transportation facilities and services.

TxDOT would have coordinated activities for the planning, construction, operation, and maintenance of a statewide passenger rail system. The agency also would have prepared and updated a long-term plan for a statewide passenger rail system.

**General provisions.** HB 300 would have required TxDOT to manage a system of changeable message signs on highways in its jurisdiction with information about traffic incidents, weather conditions, road construction, and alternative routes.

The bill would have revised municipal authority to impose a civil penalty for a red light traffic violation to allow the owner of a motor vehicle that received a civil fine for running a red light to successfully complete an intersection safety course. The course could have included a fee set by the governing body and could

have been provided by a third party. The conference committee report version of the bill did not include an amendment adopted in the House that would have prohibited new red light cameras and phased out contract renewals for existing red-light cameras after June 2009.

HB 300 would have authorized "Choose Life" specialty license plates. Fees for issuing the license plates would have gone to the Choose Life account, which the bill would have created in the General Revenue Fund. The Choose Life account could have received gifts, grants, donations, and legislative appropriations that the attorney general could have spent to make grants to eligible organizations and to defray the cost of administering the account. Money received from the account could have been spent only for specific purposes related to pregnancy and prenatal care.

The bill would have repealed statutory references to the Trans-Texas Corridor.

## Supporters said

HB 300, the TxDOT Sunset bill, would promote transparency, accountability, and efficiency and improve planning. The bill would make structural changes to oversight of the agency, revise its powers and duties, and establish new procedures for planning and funding.

**Texas Transportation Commission.** HB 300 would focus on key aspects of TxDOT that need reform, rather than reorganizing a commission that is not primarily responsible for the agency's shortcomings. Retaining the existing commission structure would allow many key revisions to be implemented with the expertise and geographic balance of the current commissioners.

While proposals to overhaul or eliminate the existing commission may have merit, most also have weaknesses that eclipse their promise. A single appointed official or single elected commissioner could leave large areas of the state with no representation on the commission. Adding elected officials also could politicize the selection of transportation projects and result in decisions made for political expediency rather than the state's best interests.

In other respects, a single commissioner actually could reduce accountability and transparency by eliminating the discussion of transportation projects at commission meetings. One commissioner could act

unilaterally without the need to justify decisions or reasoning to fellow commissioners.

Major structural modifications to the commission would not address core issues with transportation management in the state — the need to make organizational, leadership, and cultural changes within TxDOT.

**Changes to planning and funding.** The bill would strike an important balance by clarifying expectations and increasing accountability of transportation planning and funding in the state without going too far to localize statewide transportation priorities. Under current practices, the commission determines the funds available to districts and MPOs through a formula developed internally that is subject to change and has been the source of much confusion in recent years. Requiring TxDOT to establish the formula in rule and to allocate certain funds for each region would reduce confusion about the allocations. Local entities would know the exact sum available to them for transportation projects and would have access to the formula that yielded the funds.

Texas is a center of commerce and a hub for international and domestic trade. A strong statewide road system is critical to maintaining the state's competitive business advantage. A statewide transportation program must be coordinated by the state, not local entities. Subordinating the state's role in planning to local planning organizations would threaten the long-term viability of the state's transportation system.

HB 300 would be a logical progression in the use of transportation reinvestment zones to fund road development and improvements. Under current law, transportation reinvestment zones — which allow a local entity to dedicate additional tax revenue generated by increased property values around a transportation project to the costs of developing the project — are confined to projects funded in a pass-through tolling agreement with TxDOT. A pass-through tolling agreement allows a local entity to pay the development costs of a road project, then seek reimbursement from TxDOT based on the estimated number of vehicles that travel on the road.

HB 300 would broaden local governments' ability to establish transportation reinvestment zones. It also would clarify and update existing laws on reinvestment zones and make assurances that a government could not

rescind certain agreements attached to a zone or modify a zone if the proposed change had an impact on pre-committed revenue. These changes would help ensure the viability of transportation zones and reassure parties seeking to develop highway projects in such zones.

The bill would help to secure another transportation financing option for local governments in an era of increasing congestion and limited resources. While raising the motor fuels tax may be another reasonable approach, this recently has proved a political impossibility. With fixed state and federal funds for transportation projects, it is critical to maximize options for developing transportation projects.

**Legislative oversight committee.** Current legislative oversight of TxDOT, while valuable, is insufficient for the guidance and review necessary to restore trust and confidence in the agency and to ensure the intent of the Legislature is carried out after a legislative session. Current legislative committees must review a wide range of functions with limited staff resources. A formal oversight committee tasked with specific duties in how transportation projects are implemented and funded in the state could go a long way in providing direct guidance for the agency's operations. Further, providing the committee with additional funding would provide the resources needed for thorough review and oversight of the agency.

## Opponents said

HB 300 would miss an important opportunity to restructure TxDOT in ways that promote the state's long-term interests.

**Texas Transportation Commission.** The Sunset Advisory Commission found a pervasive atmosphere of distrust surrounding TxDOT and recommended decisive action. Sunset argued that a single commissioner would help restore accountability, trust, and responsiveness to the agency. Retaining the five-member commission would not adequately reflect current discontent with TxDOT operations. The state needs significant change in how transportation projects are planned and implemented that would not be realized by the bill.

The TTC should be significantly restructured to include a single appointed or elected representative or multiple, elected representatives. A change of this magnitude would send a strong message to TxDOT and fundamentally alter the commission to make its policymaking functions responsive to the public and its representatives.

**Changes to planning and funding.** HB 300 would not go far enough in changing the emphasis of planning functions in the state. Much of the bill simply would codify existing practices without significant changes. The House-passed version of the bill would have made some major changes to the emphasis in transportation planning. That version of the bill would have created rural planning organizations and would have required the commission to align district and planning organization boundaries and to allocate a larger share of transportation funds to local planning organizations. This would have changed decisively the emphasis on current transportation planning in the state by relocating more authority and resources to local entities, which have the greatest local accountability. The conference committee version of HB 300 did not retain many of the strong planning and funding reform measures contained in the House-passed version of the bill.

Transportation reinvestment zones likely would be limited to select areas and would not address statewide highway funding shortfalls. The state needs to address the core issue of lack of adequate funding for transportation needs and increase or index to inflation the motor fuels tax — preferably both. Reinvestment zones also would be a diversion from this necessity and would expand the troubling practice of using property taxes to fund transportation improvements. This questionable use of property taxes could create an incentive to increase appraisals of property in the zone. Further, the increment dedicated to the costs of transportation projects would be diverted from other needs of local governments.

**Legislative oversight committee.** The legislative oversight committee would not substantially change any authority or review process that currently applies to TxDOT. A number of legislative committees and subcommittees already oversee TxDOT and can review implementation and funding of transportation projects. More legislative oversight likely would result in more time and resources devoted to reviewing TxDOT, with no guarantee the reviews would result in real change at the agency.

**Bids and contracts.** The bill would apply a very specific method of delivery for transportation contracts, design-build contracts, to standard contracts that should be procured with standard processes. Allowing TxDOT to use design-build contracting for any non-tolled

highway project would not make sense because only a fraction of highway projects are suited for procurement through specialized means. Allowing an expanded use of design-build contracts would have few benefits and could present a number of risks, based on how these contracts were structured.

## Notes

The **HRO analysis** of HB 300 appeared in the May 7 *Daily Floor Report.*

SB 2 by Hegar, enacted during the first called session, extended the Sunset date for TxDOT and certain other agencies to September 1, 2011, and limits Sunset Advisory Commission review of TxDOT to the appropriateness of the recommendations made to the 81st Legislature. SB 2 was considered by the House in lieu of its companion bill, HB 2 by Isett. The **HRO analysis** of HB 2 appeared in the July 2 *Daily Floor Report.*

The governor called a special session to enact SB 2 because HB 1959 by Isett, a Sunset revision bill that would have extended the Sunset date for TxDOT and certain other agencies due to be abolished on September 1, 2009, died when the House did not act on the conference committee report on the bill. The House on June 1 adopted HCR 291 by Pitts, a corrective resolution for HB 4583, that included an extension of TxDOT's Sunset date to September 1, 2011, but the Senate did not act on the concurrent resolution.

# Creating Texas Department of Motor Vehicles; regulating auto parts recyclers

**HB 3097 by McClendon**
*Effective September 1, 2009*

Table
of Contents

**HB 3097** transfers various functions related to the management of motor vehicles currently under the Texas Department of Transportation (TxDOT) to a new Department of Motor Vehicles (DMV), moves the Automobile Burglary and Theft Prevention Authority (ABTPA) from TxDOT to the DMV, and establishes a new regulatory framework for used automotive parts recyclers in the state.

**Department Of Motor Vehicles.** HB 3097 creates the Texas Department of Motor Vehicles (DMV) as a separate state agency. The bill charges the department with administering and enforcing laws governing:

- certificates of title and motor vehicle registration;
- motor carrier registration, including federal motor carrier registration;
- the sale and lease of motor vehicles;
- salvage vehicle dealers;
- markings on commercial motor vehicles;
- motor transportation brokers; and
- foreign commercial motor transportation.

The DMV is organized into divisions to accomplish assigned functions and duties, including divisions for administration, motor carriers, motor vehicles, and vehicle titles and registration. Over-size and over-weight permitting functions will remain at TxDOT.

The bill makes conforming changes to statutes governing TxDOT to reflect the transferred responsibilities and associated appropriations. Powers and duties consolidated in the DMV will be transferred to the agency on November 1, 2009. The DMV will be abolished on September 1, 2015, unless continued by the Legislature.

***DMV board.*** The DMV has an executive director appointed by a board that will meet quarterly and consists of nine members serving staggered, six-year terms, appointed by the governor no later than October 1, 2009, with the advice and consent of the Senate. The governor designates a presiding member of the board to preside over meetings, create subcommittees, and appoint a member to act in his or her absence. Appointments to the board must include:

- three members to represent motor vehicle dealers, two of whom must be franchised dealers and one of whom must be an independent dealer;
- one member to represent a licensed manufacturer or distributor;
- one member who is a county tax assessor-collector;
- one member who is a law enforcement officer for a local government;
- one member who represents the motor carrier industry; and
- two members to represent the general public.

**Automobile Burglary And Theft Prevention Authority.** The bill revises statutes governing the Automobile Burglary and Theft Prevention Authority (ABTPA) to transfer its authority from TxDOT to the DMV. Conforming changes are made to reflect the transfer.

**Regulation of used automotive parts recyclers.** HB 3097 adds Occupations Code, ch. 2309, the Texas Used Automotive Parts Recycling Act, governing the dismantling and reuse or resale of used automotive parts and the safe disposal or resale of salvaged or non-repairable motor vehicles. The bill does not apply to a salvage yard that does not deal in used automotive parts as more than an incidental part of its primary business. The bill also does not apply to metal recyclers unless a metal recycler is involved in a transaction in which a motor vehicle was delivered or used as a source of used automotive parts.

***Advisory board.*** The bill establishes an advisory board that meets twice annually to provide advice and recommendations to the Texas Department on Licensing and Regulation (TDLR) on technical matters relating to licensing standards and other matters related to used automotive parts recyclers. The advisory board consists of five members appointed for staggered, six-year terms by the Texas Commission on Licensing and Regulation to represent the used automotive parts industry. Board members are entitled to receive reimbursement only for expenses incurred as part of exercising official duties.

*Licensing and inspection.* The Texas Commission on Licensing and Regulation is charged with adopting rules for licensing used automotive parts recyclers and taking necessary enforcement action accordingly. The commission also will establish and collect reasonable fees necessary to cover administration costs.

The bill requires a person that owns or operates a used automotive parts recycling business to be licensed by TDLR and establishes requirements for a license applicant. TDLR is charged with entering and inspecting a business regulated by the bill every two years and may conduct additional regular inspections based on criteria established by the bill. A peace officer may inspect any record that a recycler is required to maintain or the recycler's premises at any reasonable time.

*Requirements and procedures.* A used automotive parts recycler who acquires a salvaged vehicle must obtain a properly assigned title from the previous owner and maintain a record of each vehicle purchased. A dealer that acquires a vehicle for the purpose of dismantling or destroying the vehicle must submit to TxDOT documentation of ownership information by the 31st day after acquiring the vehicle. TxDOT must issue a receipt to the dealer upon receiving the certificate. Parts recyclers also must comply with existing statutes governing salvaged and non-repairable vehicles, including processes for titling such vehicles. A recycler may not dismantle or dispose of a motor vehicle without first obtaining a certificate of authority to dispose of the vehicle, a similar document, or a certificate or title showing that all liens have been satisfied.

A used automotive parts recycler must keep an inventory of each major auto component acquired, such as an engine, transmission, fender, or frame. Each inventory record must include specific information listed in the bill. A dealer alternatively could keep an inventory of the name of the person who participated in the sale, including the person's certificate or inventory number or federal taxpayer identification number. A dealer does not have to keep an inventory of interior components or special accessories from a vehicle older than 10 years or of a part delivered by a commercial freight line or other commercial carrier.

A recycler must keep each component in its original condition for at least three calendar days after obtaining the part unless the part is an inoperable engine, transmission, or rear axle from another recycler or automotive-related business. A recycler must surrender any documents it is required to retain under law to TxDOT upon request and will receive a receipt for any surrendered certificate of title.

*Additional provisions.* The bill provides administrative penalties for anyone who violated a provision it established or an associated rule. The director of TDLR may issue a cease-and-desist order as necessary to uphold applicable laws. A person who violates licensing requirements, deals used parts without a license, or employs an unlicensed individual is subject to a class C misdemeanor (maximum fine of $500). Regulations in the bill supplement local ordinances or other regulations of used automotive parts dealers and do not restrict any similar municipal licensing or permit requirement.

## Supporters said

HB 3097 would consolidate key customer service functions currently housed in TxDOT into a new state agency, the Texas Department of Motor Vehicles. Moving functions carried out by the motor vehicle titles and registration division, the motor vehicle division, and the motor carrier division to the DMV would allow TxDOT to focus on expanding and managing the state's transportation system. TxDOT currently is saddled with too many exacting responsibilities related to the state's transportation network to devote adequate attention to managing the divisions serving Texas drivers. An agency of the size of TxDOT is prohibitively difficult to restructure internally without causing disruptions to other divisions and activities. Separating the functions to an independent agency would provide the best opportunity for any further restructuring or other revisions that may be necessary in the long-term.

Creating a separate agency with an emphasis on customer service for Texas drivers would improve registration processing times and reduce administrative lags that inconvenience many residents and businesses in the state. A stand-alone agency also would improve transparency and accountability by creating clear responsibility for overseeing the transferred functions and subjecting the agency to direct scrutiny from a number of sources, including the Legislature and the State Auditor's Office.

HB 3097 also would impose long-overdue regulations on used auto parts recyclers, which have to date been free of direct regulation in state statutes. Some used auto parts recyclers have engaged in criminal activities associated with stolen and damaged auto

parts as well as other offenses. The bill would create a separate chapter in the statutes for used auto parts recyclers and would establish a regulatory framework that would provide licensing and oversight of the industry by the Texas Department of Licensing and Regulation (TDLR). TDLR, with abundant experience overseeing many different professions, is well-equipped to extend its purview to include auto recyclers. Clear regulations would not impair an honest broker's ability to operate, but would empower the state to stop those engaged in criminal activity.

## Opponents said

HB 3097 would create a new agency to address problems that could be addressed through restructuring or by making other changes to the management of the divisions that would be moved out of TxDOT. The state did in fact have a separate department to administer motor vehicle registrations until the early 1990s, when it was merged to form TxDOT. Reversing that decision would not necessarily resolve problems with turnaround times and understaffing. Moving the functions to a new agency possibly could relocate the sources of current problems without addressing underlying issues, specifically concerning lack of resources.

The bill would constitute another example of diversions of State Highway Fund (Fund 6) revenue from TxDOT to a different agency. A new agency could create additional demands on resources over time and effectively divert a larger portion of dedicated highway funds away from desperately needed highway projects.

HB 3097 could have unintended consequences on used parts recyclers that operate in good faith in Texas. The bill would apply overbearing standards to all recyclers, requiring them to collect and record personal information from a person that delivered parts. This could place both the recycler and the seller in a difficult position, since the former may not want to record and store personal information and the latter may not want to surrender this information. Further, provisions requiring that a recycler retain a component part for three days after purchase would serve no clear purpose and would place a significant inconvenience on a recycler that received an order for the part. The requirement to hold a part for three days could be a decisive factor that could lose a particular sale.

## Notes

The **HRO analysis** of HB 3097 appeared in Part Two of the May 4 *Daily Floor Report*. The House and Senate versions of HB 300 by Isett, the TxDOT Sunset bill, contained similar provisions creating a DMV.

# Extending CDA authority and revising toll development process

**SB 404 by Carona/ SB 17 by Nichols**
*Both died in the House*

Table
of Contents

**SB 404** would have changed, from August 31, 2009 to August 31, 2013, the termination date of the authority of the Texas Department of Transportation (TxDOT) and Regional Mobility Authorities (RMAs) to enter into comprehensive development agreements (CDAs). The bill also would have changed, from August 31, 2011, to August 31, 2015, the termination date of the authority to enter into other CDAs that did not grant a private entity a right to finance a toll project or those in connection with a project located in an air quality nonattainment zone or for which a request for qualifications previously had been issued.

**SB 17** would have repealed provisions requiring a market valuation process for toll projects developed by a local tolling authority and established a development review process for toll projects. The bill also would have modified other provisions governing CDAs.

**Toll road development review process.** SB 17 would have established a development review process for toll projects located in the territory of a local toll authority — defined as a public entity, not including TxDOT, authorized by law to acquire, design, construct, finance, operate, and maintain a toll project, including certain counties, a Regional Tollway Authority (RTA), or an RMA. The bill would not have applied to certain toll roads listed in the bill nor to specific exceptions listed in statute. A toll project obtained by TxDOT or a local tolling authority would have been owned in perpetuity, unless it was sold or otherwise transferred.

The bill would have established a process to determine which entity, either a local tolling authority or TxDOT, would develop, finance, construct, and operate a toll project. After a Metropolitan Planning Organization (MPO) approved the inclusion of a toll project in its metropolitan transportation plan, a local tolling authority could have notified TxDOT of its interest to initiate the tolling project review process. TxDOT also could have notified a local toll project entity of the department's intent to initiate the tolling project review process after approving the final environmental impact statement for the project.

SB 17 would have established a process for determining which entity would have the right to develop a toll project and whether a toll project would be developed as a publicly owned or privately owned facility. Each entity that received notification of a possible toll project would have had a specific timeframe in which to exercise the option to develop the project and enter into a contract for constructing the project. The option to develop a toll project would have been offered for development in the following order, moving to the next choice if an entity failed or declined to exercise its option to develop a toll project:

- a local tolling authority could develop the project as a publicly owned and operated facility, with 180 days to exercise the option after receiving notice; and if not, then
- TxDOT could develop the project as a publicly owned and operated facility, with 60 days to exercise the option after receiving notice; and if not, then
- a local tolling authority could develop the project as a privately owned and operated facility, with 60 days to exercise the option after receiving notice; and if not, then
- TxDOT could develop the project as a privately owned and operated facility, with 60 days to exercise the option after receiving notice.

If the process had concluded without a contract for development, either a local tolling authority or TxDOT could have re-initiated the process. TxDOT or a local tolling authority could have, at any time during the process, declined to exercise an option to develop a toll project. If TxDOT declined to exercise its option to develop a project as a publicly funded toll project, then the local tolling authority would have had to determine simultaneously whether to develop the project as a publicly or privately funded toll project within 180 days of receiving notice.

**Comprehensive development agreements.** SB 17 would have revised provisions governing the right to repurchase a private interest in a toll project. Under the bill, a CDA would have had to contain a provision authorizing a local tolling authority to purchase the interest of a private participant in a toll project and related property under agreed terms. The provision would have had to include a schedule over the term of

the agreement stating a specific price for the purchase of the toll project at certain intervals up to five years from the date the project opened.

The local tolling authority could have repurchased a private entity's interest for no more than the lower of the price stated for the interval or the governing fair market value or outstanding debt at the time, whichever was greater. A contract would have had to include the calculation used to determine the repurchase value based on these conditions. The repurchase provision in the bill would not have applied to certain highway developments, including portions of the IH-69 corridor.

The bill would have placed a 30-year maximum on a clause in CDAs that authorized compensation to a private party for loss of toll revenue attributable to a competing highway facility. An agreement for compensation for lost toll revenues could not have applied to an interstate highway.

## Supporters said

Together, SB 404 and SB 17 would extend the state's authority to enter into CDAs while making important changes to how toll projects are developed. SB 404 would extend the state's ability to enter into CDAs with private entities that can, in key instances, bring abundant resources to toll projects that may be unavailable to the public sector. Many private toll road developers have international asset and capital bases that they may leverage to finance the initial acquisition and construction of toll facilities. Private toll road development agreements bring the state initial income in the form of concession agreements, provide the state a portion of ongoing revenue collections, and relieve the state from the responsibility of building or maintaining the road.

By leasing the rights to develop and operate toll projects to private entities, the state shields itself from unavoidable risks associated with these projects. These risks are inherent in every aspect of toll development. Estimates of initial construction costs, maintenance and operation costs, the number of drivers willing to pay tolls, and the price drivers would pay to use toll roads are all unknown values that determine the ultimate profitability of the project.

Private entities also have a vested interest in maintaining toll roads because deteriorating road quality affects the number of drivers using the road

and the amount of revenue collected by the tolling authority. Private participation is necessary to the long-term efficiency of the state's highway network, and it is imperative to maintain the option to enlist private resources in toll road development.

SB 17 would ensure that extended CDA authority would be properly executed in a larger, balanced toll road development framework. The bill would retain primacy for local tolling authorities over private entities while still allowing private entities to develop toll projects in the event that local tolling authorities were not interested in or able to develop eligible projects. The bill also would split the authority to develop toll roads between local tolling authorities and TxDOT, subject to the established development system. Specific timelines restricting option periods would prevent the process from slowing project development inordinately.

SB 17 would provide an alternative to the much-maligned market valuation process established in 2007 by SB 792. Flexible language establishing the process has been interpreted as authorizing what amounts to a "concession fee" on local tolling authorities for the right to develop and manage a toll road. Imposing this fee on public local tolling authorities merely substitutes one pot of public funding for another, as local entities must recover the cost of upfront bond issuances through increased toll fares.

Primacy should be preserved for local public entities that retain equity in toll road projects over time and reinvest proceeds into the transportation infrastructure in communities that pay for the facilities. Local, public tolling entities and private interests share pressures to maintain toll roads as time passes, and they have more flexibility and self-determination in decision-making than does the state. Local, public tolling authorities also provide for the recirculation of revenue from toll roads into maintaining local transportation infrastructure — successful public toll roads become future engines of transportation funding.

## Opponents said

SB 404 and SB 17 would continue the flawed practice of turning over valued public assets to the private sector. The value of the transportation assets the state loses by leasing out development rights for toll roads most often exceeds any benefits it might enjoy as a result of ceding such rights. The capacity of private financing to minimize the risks inherent in developing

a toll road is overstated. Private developers are not likely to gamble with toll roads that they do not expect to yield significant net profits over their lifetime, and it is unlikely that the state credibly could deny financial or contractual assistance to a private interest operating a failing tollway. Toll projects that do not expect to yield generous returns on investment are not sought as aggressively by private interests.

Because roads are built only at great public expense and are built on rights-of-way often acquired through eminent domain, and because roads act as critical public assets by giving motorists access to important destinations, the state is deeply invested in their continued, viable operation. As a result, the notion that the state simply could deny requests for intervention or assistance that, if withheld, could lead to the failure and closure of a privately financed tollway is highly questionable. If a private company leased a toll project that failed to be profitable, the state would be compelled to take on the expense of buying out the private entity and assume maintenance of the road or to amend the contract to include terms more favorable to the private interest.

The best course for toll road development is to restrict the option of development only to local tolling authorities. Local, public tolling authorities share pressures to maintain toll roads as time passes, and they have more flexibility and self-determination in decision-making than does the state. Local, public tolling authorities also provide for the recirculation of revenue from toll roads into the maintenance of local transportation infrastructure. Successful public toll roads become future engines of transportation funding, while privately funded toll roads export revenue to shareholders.

SB 17 would leave vulnerabilities that TxDOT likely would use to continue its policy of pushing privately funded and operated toll roads. Under the bill, TxDOT automatically could decline the option to develop a project as a public toll project, which would force a local tolling authority to review at once the possibility of developing the road publicly and privately. The bill would leave open the possibility for TxDOT to "wait out," or even obstruct actively, a local authority's ability to develop the project until the statutory period expired, at which point the agency could turn over the rights to develop toll roads to a private entity.

## Other opponents said

SB 17 would place private financiers and developers of toll road projects at a distinct disadvantage and would reduce competition for toll projects. The bill would create a structural bias against private entities in favor of public tolling authorities, irrespective of the nature of a particular toll project. This bias could hinder the optimal development of toll roads in the state and thereby result in worsened congestion over time in major metropolitan areas. The state cannot afford to restrict available tools to promote the accelerated development of critical highway infrastructure.

## Notes

The **HRO analysis** of SB 404 and SB 17 appeared in Part Two of the May 22 *Daily Floor Report*. The bills were set on the General State Calendar in the House, but no further action was taken.

The 81st Legislature, in its first called special session, considered legislation that would have extended the authority to enter into CDAs and revised the toll road development framework. HB 3 by Pickett, which died in the House Transportation Committee, and SB 3 by Nichols, which died in the Senate Finance Committee, contained provisions similar to SB 404 and SB 17 from the regular session. In addition to revising the toll road development process in similar terms as SB 17 would have, the bills would have exempted from expiration on August 31, 2009, CDAs that TxDOT entered into before August 31, 2013, for:

- IH-35E managed lanes in Dallas and Denton Counties from IH-635 to U.S. 380;
- SH-183 managed lanes in Dallas County from State Highway 161 to State Highway 114 in Irving and from State Highway 114 to IH-35E in the city of Dallas;
- IH-30 managed lanes from the Trinity River to Baird Farm Road in Tarrant County; and
- a project for which a local toll project entity had declined to exercise its option to develop, construct, and operate and requested TxDOT to develop as a CDA.

# Authorizing elections for local option motor fuels taxes

**SB 855 by Carona**
*Died in the House*

Table
of Contents

**SB 855**, as reported from committee in the House, would have allowed a county to impose and collect a tax of 10 cents per gallon on the sale of gasoline and diesel fuel if such a measure was approved by a majority of voters in the county. The tax would have been added to the sales price of the fuel and would have been part of the total fuel price. The tax would have been in addition to current state motor fuels taxes and would have been collected when the fuel was removed from a terminal to be delivered in a county with the local option fuel tax. A county would have had to discontinue collecting the local option tax if all mobility projects were accepted by the entity contracting for the projects, all issued bonds were paid in full, and additional revenue was not necessary for ongoing maintenance and operation of mobility improvement projects.

**Election.** County commissioners' courts that were in total or in part covered by a single metropolitan planning organization (MPO) could have ordered an election for a local option fuel tax on a uniform election date in November if:

- the commissioners courts of the counties representing two-thirds of the total population of a MPO adopted a resolution calling for an election; or
- at least 10 percent of registered voters in the counties submitted a petition requesting an election.

Elections in multiple counties covered by one MPO would have been held on the same date. A commissioners court could have called another election two years after the first election.

The election ballot would have contained prescribed language and would have listed and described the nature and scope of mobility projects to be constructed, along with estimated cost and completion dates. A transit authority proposing to use funds for a rail-related project would have had to include an estimate of any increased cost of service resulting from the improvement. Proposed projects could have included improvements to an existing or proposed mobility project or the retirement of existing debt of a transit agency related to a mobility project. A commissioners court would have determined which

projects to submit for election in a public hearing based on information provided by the MPO.

**County mobility improvement fund.** The commissioners court of each county that imposed a local option fuel tax would have established a county mobility improvement fund separate from the county's general revenue account. A county could have used money in the mobility improvement fund for specific purposes listed in the bill related to mobility improvement projects. The county could have used mobility improvement funds to pay bonds or other obligations, but could not have used money in the fund to finance a mobility project not approved by voters or to transfer funds approved for one mobility project to another.

The county would have deposited tax revenue into the fund, which would have been separated into accounts for each approved mobility improvement project and for certain transit authorities. All funds used would have had to be consistent with transportation plans adopted by the governing MPO.

**Administration.** The comptroller would have administered, collected, and enforced the local option fuel tax. Provisions governing the collection of the state motor fuels tax codified in current law would have applied equally to the local option fuel tax. A tax approved by voters would have taken effect on the first new quarter following an election that authorized the local option tax. The comptroller could have delayed the effective date of the tax if necessary to prepare for collecting the tax and could have deducted any costs incurred for administering the tax. The comptroller would have deposited the collected taxes into a trust account and would have distributed to counties their share monthly. Earned interest would have remained in the account.

The comptroller's administrative duties with respect to the local option fuel tax would have been contingent on the receipt of sufficient funding in advance adequate to cover any necessary implementation costs. If the Texas Constitution required that one-fourth of the local option fuel taxes collected be dedicated to the Available School Fund, then the county would have deposited the funds into a separate account

for allocation to the comptroller for the purposes required.

**General provisions.** A county could not have used revenue from a local option fuel tax to:

- acquire, construct, maintain, or otherwise directly fund a toll project;
- fund an approved mobility improvement if the revenue was used to reallocate other revenue for a toll project;
- directly or indirectly hold, promote, or oppose an election for a local option fuel tax; or
- pay a registered lobbyist.

A county could not have operated or provided directly passenger rail or other services reserved by a transit authority. A local option fuel tax could not have been used to establish or fund a transit authority created after January 1, 2009. A county or other entity that received transportation funds could not have been penalized with a reduction in state or federal transportation funding due to the imposition of a local option fuel tax.

Provisions governing the assessment of a local option fuel tax would have expired January 1, 2019. No additional elections could have been held after that date, but the expiration would not have affected the collection of a tax authorized before that date or other functions related to the tax.

## Supporters said

SB 855 would give counties that were covered by or intersected a metropolitan planning organization (MPO) the opportunity to pursue measures to generate revenue for desperately needed highway and rail improvements in urban areas. The state motor fuels tax has been declining in relative value since 1991, and the original 20-cent tax per gallon is now equal to only about 13 cents in inflation-adjusted dollars. Demands on the state's transportation infrastructure have been steadily increasing while political support for a statewide increase in the motor fuels tax, including an increase limited to annual inflation, has flagged. Despite multiple attempts since 2001, no legislation supporting an increase in the statewide motor fuels tax has mustered the votes to pass a house of the Legislature. Some of the opposition to a statewide increase is derived from concerns that additional motor fuels tax revenue would not be distributed evenly

around the state, but instead would be concentrated on transportation improvements in and around urban areas.

SB 855 culminates from many years of discussion about the dire state of transportation funding and the limited funding options available to finance critical transportation infrastructure. If enacted, the bill would avoid a statewide increase in the motor fuels tax while allowing congested urban areas to propose an increase in local taxes for voter approval. The bill would not allow any increase in local motor fuels taxes without an election and would require a ballot initiative to include specific projects as well as associated cost estimates. Funds derived from the local option tax would be dedicated to paying for the listed projects.

The bill would represent a critically timed measure that would allow the most severely congested municipalities and counties to take decisive actions to provide critical infrastructure. Counties that were not experiencing severe congestion would not be able to marshal the necessary votes to pass the local option fuel tax and therefore would not be affected by the bill. However, the bill would be sufficiently broad to allow many urban areas to vote for an increase in the near future should local support for infrastructure projects grow. The bill is a direct response to a continued lack of decisive action on transportation funding on the state level.

Urban transportation systems in some metropolitan areas in the state, such as the Dallas-Fort Worth region, have become sufficiently congested as to have a demonstrable effect on residents' quality of life, health, and ability to conduct business. Texas is a major domestic and international trade hub and a national center of commerce. Maintaining safe and reliable transportation is critical to the long-term economic vitality of the state. Sustained and improved mobility would ensure that Texas remained a business leader into the future.

## Opponents said

SB 855 could result in an increase of taxes on vital sectors of the economy when those sectors are least able to absorb additional hardships imposed by the government. The midst of a recession is not time for new government tax-and-spend policies — in fact, just the opposite. When businesses are reducing operations and laying off employees, and when people are reducing consumption, the government should be following suit

by cutting non-essential programs and reducing tax burdens. Money retained by businesses and consumers would be reinvested in the economy and would promote a quicker economic recovery. Allowing for an increase in the motor fuels tax in major metropolitan areas could have a significant impact on the price of goods and could worsen the recession in consumption and production and slow the pace of recovery.

Allowing selective tax increases only in certain areas would be a patchwork approach to transportation funding that could have serious long-term implications on statewide connectivity. Authorizing metropolitan areas to establish local sources of revenue for transportation projects could essentially localize funding for transportation improvements. Without pressure to secure statewide sources of funding, transportation infrastructure outside of metropolitan areas could deteriorate.

The long-term implications of the local-option approach for statewide connectivity are troubling, since Texas is a major source and destination of freight that depends on quality highways throughout the state. The responsibility for expanding and maintaining state highways rests with the state and should not devolve to local entities which, by nature, are not focused on statewide concerns. SB 855 would set a precedent for local transportation funding that could, if continued, effectively undermine the state's role in funding transportation projects.

Other avenues for transportation funding currently are available to the state. The recent federal Recovery Act included about $2.7 billion in appropriations for a variety of transportation projects in the state. This funding, which included funds for public transportation, has offset the need for any immediate increase in motor fuels tax. Many options also are available to pursue private-public partnerships for the development of toll projects. Toll roads are an ideal solution to transportation financing shortfalls, since they impose a direct user fee only on those that use them and are able to secure financing and initiate construction much faster than conventional transportation projects.

## Other opponents said

SB 855 would continue the state's piecemeal approach to providing transportation funding without addressing the core issue facing the state — a motor fuels tax that has been declining in relative value since

1991. The local option tax authorized in the bill would not address statewide highway funding shortfalls, which represent the most significant obstacle to adequate highway construction and maintenance. The state needs to address the core issue facing highway funding and increase or index to inflation the motor fuels tax, preferably both. Creating additional transportation funding options for local projects without a dedicated source of revenue would represent another diversion from this necessary step.

## Notes

The Senate-passed version of SB 855 would have allowed local entities the option of holding an election to decide on various fees for transportation projects, including:

- a tax on the retail sale of gasoline or diesel fuel in the county;
- a mobility improvement fee, imposed on a person registering a motor vehicle in the county at the time of registration;
- a parking management fee;
- an annual motor vehicle emissions fee on vehicles registered in the county;
- a fee for the renewal of a driver's license issued to a county resident; and
- a Texas new resident roadway impact fee, imposed on each person registering a motor vehicle previously registered in another state or country.

The Senate-passed version of the bill would have applied to specific regions identified in the bill and contained specific provisions applying to each of those regions.

SB 855 passed the Senate, but died on the May 21 General State Calendar in the House when no further action was taken.

The Senate-passed version of HB 300, the TxDOT Sunset bill, contained a provision authorizing a local option motor fuels tax similar to SB 855. The language was stripped from the conference committee report version of HB 300, which never received a final vote in either house.

The **HRO analysis** of SB 855 appeared in Part Two of the May 21 *Daily Floor Report*.

SJR 52 by Davis would have amended the Texas Constitution to authorize counties to assess and collect an additional local motor fuels tax in the county and an additional motor vehicle registration fee on vehicles registered in the county. It would have included passenger, transit, and freight rail systems, in addition to highway uses, to the purposes for which revenue from the county tax or fee could be used and would have exempted such taxes or fees from the requirement that one-fourth of the revenue be transferred to the Available School Fund. SJR 52 was approved by the Senate, but died on the May 22 Constitutional Amendments Calendar in the House when no further action was taken. The **HRO analysis** of SJR 52 appeared in Part One of the May 22 *Daily Floor Report*.

# Constitutional dedication of state highway funds to construction and maintenance

**SJR 9 by Carona**
*Died in the House*

Table
of Contents

**SJR 9** would have amended the Texas Constitution to strike existing provisions that allow revenue from state motor fuels taxes and vehicle registration fees to be used for policing public roads and for supervision of traffic and safety by a state agency that was not also responsible for the construction and maintenance of state highways. Similar requirements would have applied to federal reimbursements for qualified state expenditures.

The bill would have included a temporary provision that no motor fuels tax or vehicle registration funds could be appropriated or otherwise allocated for an unauthorized purpose after September 1, 2018. After September 1, 2011, the Legislature would have had to decrease proportionally the revenue dedicated to purposes not specifically named. The agency responsible for construction and maintenance of state highways would have had to ensure that revenue appropriated to it would reflect the required proportional decrease.

## Supporters said

SJR 9 would provide a gradual but decisive long-term approach to ending diversions of motor fuels and registration fee revenue from highway construction and maintenance. Ending the practice of diverting motor fuels and vehicle registration revenue to purposes not directly related to building roads is essential in light of existing and projected transportation funding shortfalls. The state motor fuels tax has been declining in relative value since 1991, and the 20-cent tax per gallon is now equal to only about 13 cents in inflation-adjusted dollars. Moreover, demands on the state's transportation infrastructure have been steadily increasing. The 2030 Committee, charged by the Texas Transportation Commission with reviewing funding needs for highway maintenance, including bridges, and for urban mobility and rural mobility and safety, as well as other transportation needs, reported that the state's highway network would require $313 billion in improvements between 2009 and 2030 — or about $14.2 billion a year.

Despite multiple attempts since 2001, no legislation supporting an increase in the statewide motor fuels

tax has mustered the votes to pass a house of the Legislature. In the absence of a plausible route for raising the statewide motor fuels tax, it is necessary to locate other means of securing funding for highways, including ensuring that funds that should be dedicated to those purposes are appropriated accordingly. The current diversion of state highway funds (Fund 6) to the Department of Public Safety (DPS) originated when there was much more correspondence between the highway and safety functions in the state. The original justification for highway funds for DPS has grown less relevant as the separation between these functions has become more defined.

SJR 9 would phase out appropriations of revenue collected for purposes not related to highway construction and maintenance. DPS should be funded out of general revenue, which would be appropriate for an agency that serves a statewide need and contributes funds to general revenue but does not have dedicated revenue sources sufficient to pay its costs. The amendment would not prescribe immediate suspension of the transfers, which could have a major cost to general revenue and could create instability in funding critical services if done suddenly, but would instead create a transition period for legislators gradually to fund an increasing share of DPS operations from sources besides the state motor fuels tax and vehicle registration fees.

Adopting a constitutional amendment rather than a change in statute or change in appropriations practice is necessary in light of the Legislature's inability to exercise restraint in diverting funds from state highways. Definitively restricting state motor fuel and vehicle registration tax revenue to highways could assist in building support for tax increases in the future by addressing concerns that an increase in the motor fuels tax may not be destined to fund its stated purpose.

## Opponents said

SJR 9 would create instabilities in funding for safe transportation on the state's roads. Constitutional and statutory provisions authorizing the use of the motor

fuel tax and vehicle registration fees for policing and ensuring safety on the roads are long-standing features of state law, the constitutional provision having been added in 1946. Similarly, appropriations practices have followed the legal authority to allocate transportation-related taxes to police public roads in recent history. The practice of appropriating state highway funds for public safety stems from a long-standing precedent that funding for public safety on state highways is in keeping with the intended purposes of motor fuels and vehicle registration taxes. Ensuring the safety of travelers on state highways is an equally valid use of motor fuels tax revenue as is maintaining and improving the quality of those roads.

Making DPS ineligible to receive revenue from motor fuels taxes would not resolve ongoing transportation shortfalls and would place the agency in competition with other state needs for limited resources. Ending transfers to DPS from Fund 6, which amounted to about $1 billion in fiscal 2008-09, would not solve rapidly growing statewide transportation shortfalls. Also, the general revenue necessary to fund DPS would have to be shifted not only from other state priorities but also from TxDOT, which increasingly will rely on general revenue for debt service on general obligation bonds.

SJR 9 would continue the state's piecemeal approach to providing transportation funding without addressing the core issue facing the state — a motor fuels tax that has been declining in relative value since 1991. Prohibiting appropriations of motor fuels tax and vehicle registration fees to DPS would not address long-term statewide highway funding shortfalls, which represent the most significant obstacle to adequate highway construction and maintenance. The state needs to address the core issue facing highway funding and increase or index to inflation the motor fuels tax, preferably both. Creating a prohibition on transferring relatively small appropriations to DPS would represent another distraction from this necessary step.

SJR 9 would make use of a constitutional amendment to accomplish something that is best left to a statutory change. DPS provides essential services that must be fully funded. The amendment would allow no Fund 6 appropriations for DPS whatever the circumstances, which would place the agency in competition with other essential public services for scarce general revenue. Eliminating from the Constitution the option of using state highway funds for public safety purposes would be too rigid and could

have unintended consequences in the future — for instance, in the event of a recession causing a shortfall in general revenue.

## Other opponents said

SJR 9 would create a far too distant time horizon for prohibiting diversions of state highway funds to DPS. The state is experiencing a crisis in transportation funding now, and waiting up to nine years to definitively end diversions of highway funds would be too long a transition.

## Notes

SJR 9 was approved by the Senate, but died on the May 22 Constitutional Amendments Calendar in the House when no further action was taken.

The **HRO analysis** of SJR 9 appeared in Part One of the May 22 *Daily Floor Report*.

A related bill, HB 1047 by Deshotel, which would have stripped statutory provisions allowing revenue from the State Highway Fund (Fund 6) to be used by DPS to police the state highway system and to administer state laws relating to traffic and safety on public roads, died in the House Calendars Committee.

# Restricting revenue from public toll roads to transportation

**SJR 25 by Harris**
*Died in the House*

Table
of Contents

**SJR 25** would have amended the Texas Constitution to add Art. 8, sec. 7-c to limit the use of revenue a public entity collected from a tolled highway project to acquiring, constructing, operating, maintaining, or improving transportation projects. The restriction would not have applied to an international bridge or revenue that was dedicated to repaying debt for the tolled highway project.

## Supporters said

SJR 25 would restrict revenue collected by a local tolling authority for a toll project to being spent for transportation projects. This constitutional restriction is needed in light of the growing number of toll projects completed by local tolling authorities in the wake of SB 792 by Williams, which granted local authorities primacy over private entities for toll road development. A constitutional prohibition has important advantages over a statutory revision — it is decisive, enduring, and reflects the will of voters in the state. Toll projects completed by local tolling authorities are given primacy in part with the justification that these projects provide a long-term source of revenue for transportation projects. However, projected increases in revenue generated by these projects could give rise to political attempts to reallocate the surplus funds in the future to purposes other than transportation.

The proposed constitutional amendment would ensure in the long term that revenue from public toll roads was spent on purposes that adhered to the original justification for these projects — enhancing mobility by maintaining and expanding transportation infrastructure. The proposal would achieve a balance by granting some flexibility concerning which types of transportation projects could receive surplus toll funds so that future legislatures could modify the range of eligible transportation projects, if necessary.

## Opponents said

SJR 25 would take the unnecessary step of adding a constitutional amendment restricting revenue from public toll roads to transportation projects. Transportation Code, sec. 228.0055 and sec. 228.006 currently restrict the use of toll revenue from comprehensive development agreements and other surplus toll revenue to being spent on highways, air quality projects, and transportation projects. There is no compelling reason that the current statutory restrictions are insufficient to dedicate properly surplus toll revenue to transportation projects.

## Other opponents said

SJR 25 would add language that is overly broad and would not restrict the use of revenue from publicly owned toll roads specifically to funding highway and bridge projects. Current constitutional provisions restrict the uses of motor fuels taxes and vehicle registration fees to improving and policing public roadways. This is an important restriction that ties the spending of the revenue to the purposes for which it is collected. Surplus toll road revenue should not be used for other transportation-related initiatives, such as passenger or freight rail or airport development, that have no direct relation to the source of the revenue.

## Notes

SJR 25 was approved by the Senate, but died on the May 26 Constitutional Amendments Calendar in the House when no further action was taken.

The **HRO analysis** of SJR 25 appeared in the May 26 *Daily Floor Report*.

# Index by Bill Number

| Bill | Page |
|------|------|
| HB 1 | 258 |
| HB 3 | 196 |
| HB 5 | 120 |
| HB 8 | 238 |
| HB 51 | 158 |
| HB 55 | 222 |
| HB 130 | 203 |
| HB 171 | 206 |
| HB 300 | 260 |
| HB 339 | 223 |
| HB 395 | 62 |
| HB 469 | 63 |
| HB 498 | 30 |
| HB 537 | 226 |
| HB 670 | 184 |
| HB 710 | 207 |
| HB 770 | 240 |
| HB 836 | 67 |
| HB 873 | 8 |
| HB 982 | 243 |
| HB 1038 | 246 |
| HB 1182 | 70 |
| HB 1218 | 134 |
| HB 1243 | 68 |
| HB 1310 | 122 |
| HB 1358 | 124 |
| HB 1523 | 149 |
| HB 1541 | 126 |
| HB 1657 | 187 |
| HB 1672 | 128 |
| HB 1711 | 32 |
| HB 1736 | 34 |
| HB 1795 | 128 |
| HB 1796 | 63, 72 |
| HB 1801 | 247 |
| HB 1831 | 96 |
| HB 1866 | 68 |
| HB 1893 | 227 |
| HB 1937 | 78 |
| HB 1976 | 99 |
| HB 2003 | 35 |
| HB 2037 | 217 |
| HB 2066 | 36 |
| HB 2070 | 237 |
| HB 2081 | 90 |
| HB 2083 | 161 |

| Bill | Page |
|------|------|
| HB 2086 | 37 |
| HB 2154 | 248 |
| HB 2259 | 76 |
| HB 2267 | 41 |
| HB 2295 | 10 |
| HB 2511 | 54 |
| HB 2559 | 103 |
| HB 2730 | 229 |
| HB 2823 | 208 |
| HB 2962 | 131 |
| HB 3097 | 266 |
| HB 3276 | 162 |
| HB 3228 | 43 |
| HB 3245 | 77 |
| HB 3485 | 155 |
| HB 3611 | 250 |
| HB 3612 | 250 |
| HB 3613 | 250, 253 |
| HB 3646 | 209 |
| HB 3676 | 17 |
| HB 3689 | 45 |
| HB 3896 | 20 |
| HB 4294 | 214 |
| HB 4409 | 13 |
| HB 4525 | 21 |
| HB 4586 | 134 |
| HB 4765 | 254 |
| HJR 14 | 105, 158 |
| HJR 29 | 107 |
| HJR 36 | 250 |
| HJR 77 | 217 |
| HJR 137 | 92 |
| SB 2 (1st) | 109 |
| SB 6 | 138 |
| SB 7 | 134 |
| SB 8 | 134 |
| SB 10 | 134 |
| SB 14 | 13 |
| SB 16 | 72 |
| SB 17 | 269 |
| SB 18 | 111 |
| SB 61 | 233 |
| SB 69 | 178 |
| SB 78 | 138 |

| Bill | Page |
|------|------|
| SB 117 | 48 |
| SB 175 | 163 |
| SB 182 | 141 |
| SB 184 | 79 |
| SB 187 | 143 |
| SB 188 | 145 |
| SB 203 | 147 |
| SB 204 | 149 |
| SB 298 | 234 |
| SB 315 | 56 |
| SB 362 | 58 |
| SB 404 | 269 |
| SB 541 | 80 |
| SB 544 | 120 |
| SB 545 | 82 |
| SB 546 | 84 |
| SB 586 | 151 |
| SB 643 | 172 |
| SB 769 | 85 |
| SB 839 | 50 |
| SB 841 | 131 |
| SB 855 | 272 |
| SB 891 | 219 |
| SB 921 | 87 |
| SB 956 | 166 |
| SB 972 | 153 |
| SB 992 | 189 |
| SB 1002 | 114 |
| SB 1003 | 115 |
| SB 1007 | 23 |
| SB 1013 | 90 |
| SB 1123 | 191 |
| SB 1164 | 227 |
| SB 1387 | 63 |
| SB 1443 | 168 |
| SB 1500 | 155 |
| SB 1529 | 51 |
| SB 1569 | 27 |
| SB 2226 | 193 |
| SB 2567 | 117 |
| SJR 9 | 276 |
| SJR 25 | 278 |
| SJR 44 | 193 |

PL1127
9/2/2014
2:13-cv-000193



HOUSE
RESEARCH
ORGANIZATION

*Texas House of Representatives*

Focus Report No. 81-6

March 23, 2009

# Legislative Staff

## 81st Legislature

# Table of Contents

House of Representatives ................... 3

House Committees ............................ 15

Senate ................................................. 18

Senate Committees ........................... 22

Other State Numbers.......................... 24

# House of Representatives

**ALLEN, Alma A.**                                               E2.722
   **Phone: 463-0744**
   Fax: 463-0761
   Chief of staff ................................Anneliese Vogel
   Legislative aides...........................Teresa LeNoir
                                   Seth Mazow
                                   Joy Thomas
   Interns ..........................................Alex Jackson
                                   Jessica Kemp
                                   Tiffany Williams

**ALONZO, Roberto R.**                                          4N.6
   **Phone: 463-0408**
   Fax: 463-1817
   Chief of staff ................................Jesse R. Bernal
   Legislative aides...........................Clarissa Ramon
                                     Daniela Santoni
   Legislative interns.......................Madeline "Maddie" Dunn
                                   Brad Isbon

**ALVARADO, Carol**                                             E2.820
   **Phone: 463-0732**
   Fax: 463-4781
   Chief of staff ................................Jerry Greenspan
   Legislative director .....................Kaitlyn Murphy
   Legislative aides...........................Alex Martinez
                                     Joanna Schenke

**ANCHIA, Rafael**                                              E2.822
   **Phone: 463-0746**
   Fax: 463-5896
   Chief of staff ................................Elizabeth Zornes
   Legislative director .....................Damien Brockmann
   Communications director.............Timothy Dickey
   Constituent services director.......Ana Reyes
   Legislative aides...........................Alondra Johnson
     Will Ikard           Juan Saenz
     Tristan Sierra        Farrah Pasha

**ANDERSON, Charles "Doc"**                                     E1.510
   **Phone: 463-0135**
   Fax: 463-0642
   Chief of staff ................................Matt Welch
   Administrative assistant...............Laura Bowman
   Legislative assistant ....................Cristina Whittaker
   Interns ..........................................Austin Epps
                                     Hanna Hammak

**AYCOCK, Jimmie Don**                                          E2.506
   **Phone: 463-0684**
   Fax: 463-8987
   Chief of staff ................................Allison Billodeau
   Legislative aide............................Mitzi Stoute

**BERMAN, Leo**                                                 E2.908
   **Phone: 463-0584**
   Fax: 463-3217
   Chief of staff ................................Gloria Rogers
   Legislative director .....................Andy Kuchera

**BOHAC, Dwayne**                                               E2.904
   **Phone: 463-0727**
   Fax: 463-0681
   Chief of staff ................................Manny Salazar
   Director of constituent services ....Kay Clinton
   Legislative aide............................Chris Sanchez
   Administrative aide......................Shana Gooch

**BOLTON, Valinda**                                             E2.716
   **Phone: 463-0652**
   Fax: 463-0565
   Chief of staff ................................Elizabeth Hartman
   Legislative director .....................Andrew Dupuy
   Director of constituent services ....Heather Welles
   Legislative aides...........................Kelley Brault
                                     Melanie Harrison

**BONNEN, Dennis**                                              4N.5
   **Phone: 463-0564**
   Fax: 463-8414
   Chief of staff ................................Shera Eichler
   Legislative director .....................Carson Hooks
   Legislative aide............................Mollie Schall

**BRANCH, Dan**                                                 E2.322
   **Phone: 463-0367**
   Fax: 322-9935
   Chief of staff ................................Candice Woodruff
   Legislative aides...........................Jordan Hill
                                     Hunter Hughes
   Interns ..........................................Chase Weber
                                     Lindsay Nichols

**BROWN, Betty**                                                E1.404
   **Phone: 463-0458**
   Fax: 463-2040
   Chief of staff ................................Jackie King
   Deputy chief of staff.....................Ellen Gale
   Legislative intern ........................Melissa Jones
   Interns ..........................................Matthew Pulliam
                                     Eric Endres

**BROWN, Fred**                                              **GS.6**
   **Phone:  463-0698**
   Fax:  463-5109
   Chief of staff ................................Melissa Nicholas
   Legislative director ......................Thomas Holloway

**BURNAM, Lon**                                              **GW.8**
   **Phone:  463-0740**
   Fax:  463-1075
   Legislative director ......................Craig Adair
   Legislative aides...........................Alice Van Zant
                               Jillian Cordero
                               Kimberly Freeman
                               Daniel Williams

**BUTTON, Angie Chen**                                       **E1.416**
   **Phone:  463-0486**
   Fax:  463-0793
   Chief of staff ................................Amanda Jeffers
   Legislative aides...........................Craig Blum
                                 Elizabeth Block

**CALLEGARI, William "Bill"**                               **E2.806**
   **Phone:  463-0528**
   Fax:  463-7820
   Chief of staff ................................Jeremy Mazur
   Legislative aides...........................Amy DeWeese
                                 Cole Presnell

**CASTRO, Joaquin**                                          **E1.302**
   **Phone:  463-0669**
   Fax:  463-5074
   Director of administration ............Cynthia Ann Carrizales
   Legislative director ......................Matthew Jones
   Legislative assistant ...................Giovanna Colson-Basurto
   Legislative interns........................Carolina Hernandez
                                 Sarah Linares

**CHÁVEZ, Norma**                                            **GN.8**
   **Phone:  463-0622**
   Fax:  478-6755
   Chief of staff ................................Ali Razavi
   General counsel ...........................John Kearney
   Administrative assistant ..............Cassandra Mata-Brigante
   Legislative interns........................Melinda Griffith
                                 Mike Hutson
                               Carlos Mejia

**CHISUM, Warren**                                           **GW.15**
   **Phone:  463-0736**
   Fax:  463-5896
   Legislative director ......................Cristen Wohlgemuth
   Administrative director................Judith Wynn
   Administrative aide ......................Reshma Charles
   Legislative interns........................Spencer Harris
                                 Eamon Briggs

**CHRISTIAN, Wayne**                                         **GN.12**
   **Phone:  463-0556**
   Fax:  463-5896
   Chief of staff ................................David White
   Legislative director ......................Jon McClellan
   Administrative assistant...............Sarah Hensley
   Legislative aide...........................Luke Bullock
   Legislative intern ........................Tyler Norris

**COHEN, Ellen**                                             **E2.320**
   **Phone:  463-0389**
   Fax:  463-1374
   Chief of staff ................................Bill Kelly
   Legislative director ......................Ashley Brooks
   Administrative director................Lindsay Pearson
   Legislative aides...........................Jon Harris Maurer
                                 Eronn Putman

**COLEMAN, Garnet F.**                                       **GW.17**
   **Phone:  463-0524**
   Fax:  463-1260
   Comm. director/ policy analyst .....Rebecca Acuña
   Policy analyst ..............................Joshua Bekerman
   Leg. director/ general counsel ......Elizabeth Choate
   Policy analyst/ general counsel ....Erin Gilmer
   Policy analysts.............................Juliana Kerker
                                 Rebecca Reyes

**COOK, Byron**                                              **E2.508**
   **Phone:  463-0730**
   Fax:  463-2506
   Chief of staff ................................Toni Barcellona
   Legislative aide...........................Gabriel Sepulveda

**CORTE, Frank, Jr.**                                        **E2.314**
   **Phone: 463-0646**
   Fax:  463-0893
   Policy advisor ..............................Kathi Seay
   Administrative assistant...............Amy L'Etoile
   Legislative assistant ....................Loretta Class

**CRABB, Joe**                                               **1W.5**
   **Phone: 463-0520**
   Fax:  463-5986
   Legislative aide...........................Adrian Rocha

**CRADDICK, Tom**                                  **1N.10**
  Phone:  463-0500
  Fax:  463-7722
  Chief of staff ................................ Kate Huddleston
  Legislative assistant .................... Kimberly Crews
  Legislative aide............................ Amy Wilkinson

**CREIGHTON, Brandon**                             **E1.424**
  Phone:  463-0726
  Fax:  463-8428
  Chief of staff ................................ Becky Dean
  Legislative aide............................ Sandy Garcia
  Administrative assistants.............. Kindal Wetuski
                                              Vanessa Leyton
  Interns ......................................... Tyler Spears
                                              Tanner Gentry

**CROWNOVER, Myra**                                **GN.9**
  Phone: 463-0582
  Fax:  463-0471
  Chief of staff ................................ Kevin Cruser
  Legislative advisor ....................... Lauren Francis
  Administrative aide ....................... Logan Vender
  Legislative interns........................ Justin May
                                              Ryan Wimmer

**DARBY, Drew**                                    **E2.712**
  Phone: 463-0331
  Fax:  499-3978
  Chief of staff ................................ Trent Thomas
  Legislative director ...................... Brigitt Hartin
  Intern ............................................ Matthew Mazur

**DAVIS, John**                                    **4S.4**
  Phone:  463-0734
  Fax:  479-6955
  Chief of staff ................................ Meghan Weller
  Legislative aide............................ John Robert Ball
  Legislative assistant .................... Rachel Deason
  Interns ......................................... Lindsay Janoe
                                              Hayley Hewett

**DAVIS, Yvonne**                                  **GW.7**
  Phone:  463-0598
  Fax:  463-2297
  Legislative director ...................... Lemuel Price
  Legislative aide/ office manager... Alma Allen-Johnson
  Legislative intern ......................... Natasha Egharevba

**DESHOTEL, Joseph D.**                            **E2.408**
  Phone:  463-0662
  Fax:  463-8381
  Chief of staff ................................ Jim Navarro
  Scheduler ..................................... Christian Manuel
  Legislative director ...................... Melissa Quevedo
  Legislative assistant .................... W. Joe Deshotel

**DRIVER, Joe**                                    **4S.6**
  Phone:  463-0574
  Fax:  463-1481
  Chief of staff ................................ Rachael Schreiber
  Legislative aides.......................... Jaclyn Kerbow
                                              Brady Vaughn

**DUKES, Dawnna**                                  **E1.504**
  Phone:  463-0506
  Fax:  463-7864
  Chief of staff ................................ Pamela McPeters
  Legislative director ...................... Melissa Rosser
  Outreach coordinator................... Evan Avery
  Legislative aides.......................... Kimberly Graves
                                              Kierah Weber

**DUNNAM, Jim**                                    **4S.2**
  Phone:  463-0508
  Fax:  463-5934
  Chief of staff ................................ Jenny Casey
  Legislative director ...................... Clinton Knorpp
  District director ............................ Russell Devorsky
  Legislative assistants .................. Tommy Micah
                                              Austin Lytle

**DUTTON, Harold V., Jr.**                         **3N.5**
  Phone:  463-0510
  Fax:  463-8333
  Legislative aides.......................... Linda Brooks
                                              Ashley Gause

**EDWARDS, Al**                                    **1W.9**
  Phone:  463-0518
  Fax:  463-0941
  Legislative director ...................... Murry Matthews
  Intern ............................................ Michael Stoll

**EILAND, Craig**                                  **GW.5**
  Phone:  463-0502
  Fax:  936-4260
  Chief of staff ................................ Lynette Kilgore
  Legislative aide............................ Amanda Hudgens
  Administrative aide ...................... Malika Te
  Legislative interns........................ Robert Edrozo
                                              Jennifer Taylor

**House Research Organization**                                                    **Page 6**

**EISSLER, Rob**                                    E1.414
   **Phone: 463-0797**
   Fax:  463-0898
   Chief of staff ...............................Carole Bleakney
   Admin./ legislative assistants .......Lainey Behrend
                                        Marianna Gose
   Legislative intern .........................Alexis Wright

**ELKINS, Gary**                                    E1.408
   **Phone: 463-0722**
   Fax:  472-5610
   Chief of staff ...............................Debra Clonts
   Legislative aide............................Chelsey Robles

**ENGLAND, Kirk**                                   E2.910
   **Phone: 463-0694**
   Fax:  463-1130
   Chief of staff ...............................Theresa Huchingson
   Legislative aides..........................Anthony Burton
                                        Noah Beaudette

**FARABEE, David**                                  E2.422
   **Phone: 463-0534**
   Fax:  463-8161
   Chief of staff ...............................Thure Cannon
   Administrative director.................Brenda Crook
   Legislative aide............................Ben Trotter
   Legal intern..................................Miles Stiles

**FARIAS, Joe**                                     E1.314
   **Phone: 463-0714**
   Fax:  463-1458
   Chief of staff ...............................Clifton Walker
   Legislative director ......................Alexis Reza
   Legislative aide............................Julianna Gonzaba
   Legislative interns.......................Nicole Munoz
                                        Melissa Huron

**FARRAR, Jessica**                                 4N.7
   **Phone: 463-0620**
   Fax:  463-0894
   Chief of staff ...............................Lillian Aguirre Ortiz
   Legislative director ......................Veronica L. Garcia
   Legislative aides..........................Sandra D. Harris
                                        Salil Deshpande
   Legislative assistant ....................Joey Oliva

**FLETCHER, Allen**                                 E2.804
   **Phone: 463-0661**
   Fax:  463-4130
   Chief of staff ...............................Beau Rothschild
   Legislative director ......................Robert Papierz

**FLORES, Ismael "Kino"**                           1N.9
   **Phone: 463-0704**
   Fax:  463-5364
   Chief of staff ...............................Lee R. Loya
   Policy/ communications director...Marcos A. Lopez
   Legislative assistant ....................Roxanne M. Garza

**FLYNN, Dan**                                      GW.4
   **Phone: 463-0880**
   Fax:  463-2188
   Legislative director ......................Jenni Franks
   Legislative aide............................Karah Carr

**FROST, Stephen**                                  E2.710
   **Phone: 463-0692**
   Fax:  463-0902
   Chief of staff ...............................Patsy Clapper
   Legislative director ......................Collin Ronan
   Intern ...........................................Amber Dudley

**GALLEGO, Pete P.**                                4N.9
   **Phone: 463-0566**
   Fax:  236-9408
   Chief of staff ...............................Patrick Tarlton
   Legislative director ......................Liliana Mireles
   Policy analyst ..............................Oscar Padilla
   Legislative assistants ...................Raul Ojeda
                                        Karen Wood
                                        America Gonzalez

**GATTIS, Dan**                                     E2.212
   **Phone: 463-0309**
   Fax:  499-8354
   Chief of staff/ general counsel......Hal Talton
   Legislative assistant ....................Darryl Pool
   Scheduler/ press secretary...........Amy Ellsworth
   Legislative aide............................Patrick Steck
   Administrative assistant...............Leah Alexander
   Interns .........................................Staci Rives
                                        Rebecca Lester

**GEREN, Charlie**                                  E2.308
   **Phone: 463-0610**
   Fax:  463-8310
   Chief of staff ...............................Laura Grable
   Legislative director ......................Robert Armstrong
   Legislative aide............................Walker Meadows
   Aide .............................................Vernon Effenberger

**GIDDINGS, Helen**        **1N.5**
Phone: **463-0953**
Fax: 463-5887
Chief of staff ................................Tamara Hobbs
General counsel ..........................Nina Wiggins
Legislative aide.............................Anne Mazuca
Interns ..........................................Tanya Gripton
Kirsten Brew
Caitlin Richter

**GONZALES, Veronica**        **E1.324**
Phone: **463-0578**
Fax: 463-1482
Chief of staff ................................Ricardo Lopez-Guerra
Legislative aides..........................Brittney Booth
Diana Cruz
Rodolfo D. Delgado
Regina Campos

**GONZALEZ TOUREILLES, Yvonne**        **E2.720**
Phone: **463-0645**
Chief of staff ................................Nelson Salinas
Legislative director ......................Sabrina Sullivan
Legislative aides..........................Maria Molina
Christopher Kirkpatrick

**GUILLEN, Ryan**        **E2.902**
Phone: **463-0416**
Chief of staff ................................Robert McVey
Legislative director ......................Sandra Frizzell
Assistant legislative director.........Natasha Levinsohn
Communications director..............Keith Cook
Asst. to the chief of staff ..............Brian Hogue

**GUTIERREZ, Roland**        **E1.316**
Phone: **463-0452**
Fax: 463-1447
Chief of staff ................................Thelma De Leon
Legislative director ......................Margaret Frain Wallace
Legislative aide.............................Jamie Nodarse
Legislative interns........................Ayed Ahbabi
Albert Castro
Jenna Hollerbach
Cassie Wright

**HAMILTON, Mike**        **E2.310**
Phone: **463-0412**
Chief of staff ................................Nikki Gonzales
Legislative aides..........................Jeff Madden
Chrissy Williford

**HANCOCK, Kelly**        **E1.406**
Phone: **463-0599**
Fax: 463-0751
Chief of staff ................................Mia Garza
Legislative director ......................Kyle Jackson
Communications director.............Camille Carter

**HARDCASTLE, Rick**        **E2.706**
Phone: **463-0526**
Fax: 463-6003
Chief of staff ................................Missy Warren
Legislative assistant ....................Paul Hanna
Administrative assistant...............Carol Castlebury
Interns ..........................................Michael Adan
Jordan Ballard

**HARLESS, Patricia**        **E2.714**
Phone: **463-0496**
Fax: 463-1507
Chief of staff ................................Julie Scott
Legislative aide...........................Rachel Saucier
Interns ..........................................Brady Franks
Kathryn Cantlon

**HARPER-BROWN, Linda**        **E2.608**
Phone: **463-0641**
Fax: 463-0044
Chief of staff ................................Ashley Hodgini
Exec. administrative director ........Deanna Zimmerman
Scheduler/ admin. assistant .........Dawn Balli

**HARTNETT, Will**        **1N.8**
Phone: **463-0576**
Fax: 463-7827
Chief of staff ................................Alyssa Eacono
Legislative director ......................Rowland Greenwade
Administrative aide ......................Chase Carter
Intern ............................................Brendan Hyde

**HEFLIN, Joe**        **E1.310**
Phone: **463-0604**
Fax: 236-0704
Chief of staff ................................Trish Conradt
Legislative director ......................Erica Grigg
Legislative aide...........................Reina Cisneros

**HERNANDEZ, Ana E.**        **E1.220**
Phone: **463-0614**
Fax: 463-0612
Chief of staff/ general counsel......David A. Parnell
Communications director..............Sonia C. López
Policy analysts.............................Gloria E. López
Alejandro Diaz

**HERRERO, Abel**        E1.212
   **Phone:  463-0462**
   Fax:  463-1705
   Chief of staff ................................Jaclyn J. Uresti
   Legislative director ......................Laura Hernandez
   Legislative assistant ....................Juliana Ibarra
   Legislative intern .........................Rahsaan J. Coefield

**HILDERBRAN, Harvey**      GW.12
   **Phone:  463-0536**
   Fax:  463-1449
   Chief of staff ................................Debra Van Bibber
   Legislative director ......................Isaac Albarado
   Interns .........................................Brad Poronsky
     Juan Salem              Erika Fernandez
     Chase Fulbright         Kris Hicks

**HOCHBERG, Scott**        4N.8
   **Phone:  463-0492**
   Fax:  479-8976
   Legislative director ......................Rachel McClure
   Senior legislative aide .................Shawn Leventhal
   Legislative aides..........................Rahul Sreenivasan
                                 Becky Cohen

**HODGE, Terri**        E2.818
   **Phone:  463-0586**
   Fax:  463-8147
   Chief of staff ................................Clint Magee
   Legislative aide...........................Sandy Pickell
   Legislative interns.......................Brant Bennett
                               Travis Whetsell

**HOMER, Mark**        4S.3
   **Phone:  463-0650**
   Fax:  463-0575
   Legislative director ......................Jim Boynton
   Policy analyst ..............................Dimetrius Holland
   Communications director..............Lindsay Taylor

**HOPSON, Chuck L.**       E2.708
   **Phone:  463-0592**
   Fax:  463-8792
   Chief of staff ................................Cheryl L. Lively
   Administrative assistant...............Denyce E. Deadrick
   Legislative aide...........................Jake Hale

**HOWARD, Charlie**       4S.5
   **Phone:  463-0710**
   Fax:  463-0711
   Legislative assistant ....................Carrie Nelson
   Administrative assistant...............Deidra D. Voigt

**HOWARD, Donna**       E2.810
   **Phone:  463-0631**
   Fax:  463-0901
   Chief of staff ................................Eleanor D'Ambrosio
   Legislative director ......................Scheleen Walker
   Director of constituent services ....Scott Daigle
   Legislative interns........................Laura Bloomer
                                 Kim Blum

**HUGHES, Bryan**       E1.508
   **Phone:  463-0271**
   Fax:  463-1515
   Chief of staff/ legislative director ..Daniel Deslatte
   Legislative coordinator ................S. Cody Terry
   Attorney/ policy advisor ...............Timothy Head
   Legislative assistant/ scheduler....Ben Garner
   Intern ...........................................Megan Cowart

**HUNTER, Todd**       E2.808
   **Phone:  463-0672**
   Chief of staff ................................Bech Bruun
   Legislative aide............................Justin Hudman
   Intern ...........................................Caleb McGee

**ISETT, Carl**       E1.506
   **Phone:  463-0676**
   Fax:  708-8427
   Chief of staff ................................Robin MacEwan
   Legislative director ......................Dan Paschal
   Office manager............................Kimberly Lile

**JACKSON, Jim**       E1.402
   **Phone:  463-0468**
   Fax:  463-1044
   Chief of staff ................................Pauline Mikus
   Legislative director ......................Ryan Fisher
   Interns .........................................Kimberly Dodds
                                 Kevin Sullivan
                                 Michelle Sereno

**JONES, Delwin**       3S.2
   **Phone:  463-0542**
   Fax:  463-0671
   Chief of staff ................................Barbara Crawford
   Office assistant............................Christa Quinn

**KEFFER, Jim**       E2.418
   **Phone:  463-0656**
   Fax:  478-8805
   Chief of staff ................................Ky Ash
   Office manager............................Gayle Gilmore
   General counsel ...........................Tori Regas
   Legislative assistant ....................Bernice Espinosa

**House Research Organization**                                                         **Page 9**

**KENT, Carol**                                       E2.814
   **Phone: 463-0454**
   Fax: 463-1121
   Chief of staff ................................Will Stovall
   Legislative director .....................Phil Lovegren
   Legislative aide............................Matt Weinstein
   Legislative assistant/ scheduler....Stephen Rispoli

**KING, Phil**                                        1N.7
   **Phone: 463-0738**
   Fax: 463-1957
   Chief of staff ................................Mattie Parker
   Director of operations .................Caleb Troxclair
   Legislative aide............................Liz Young

**KING, Susan**                                       E2.416
   **Phone: 463-0718**
   Fax: 463-0994
   Chief of staff ................................Tammy Pirtle
   Legislative aide/ administrator......Kate Raetz

**KING, Tracy O.**                                    E1.304
   **Phone: 463-0194**
   Fax: 463-1220
   Chief of staff ................................Celina Overbo
   Legislative director .....................LaTronda Darnell
   Legislative assistant ...................Jay Hodge

**KLEINSCHMIDT, Tim**                                 E2.702
   **Phone: 463-0682**
   Fax: 463-9955
   Chief of staff ................................John Higgins, Jr.
   Legislative director .....................Anna Hynes
   Legislative aide............................Ashley Heath

**KOLKHORST, Lois W.**                                E2.318
   **Phone: 463-0600**
   Fax: 463-5240
   Chief of staff ................................ Chris Steinbach
   Legislative aides........................ Taurie Randermann
                                   Allen Match
   Scheduler ................................... Kelli Stoffels

**KUEMPEL, Edmund**                                   3N.6
   **Phone: 463-0602**
   Fax: 463-0391
   Chief of staff ................................Brittney Thomas
   Legislative director .....................Mandeep Chatha
   Legislative aide............................Jennifer Dykstra

**LAUBENBERG, Jodie**                                 E2.504
   **Phone: 463-0186**
   Fax: 463-5896
   Chief of staff ................................Suzanne Bowers
   Legislative director .....................Rachael Hendrickson
   Legislative aides..........................Katie Qualls
                                    Cassidy Daniel

**LEGLER, Ken**                                       E2.304
   **Phone: 463-0460**
   Fax: 463-0763
   Chief of staff ................................Brad Tegeler
   Legislative aide............................Matt Barr
   Administrative aide/ scheduler .....Natalie Shafir

**LEIBOWITZ, David**                                  E2.410
   **Phone: 463-0269**
   Fax: 320-0555
   Chief of staff ................................Rob Borja
   Legislative director .....................Kristina Garza
   Legislative aide............................Eloy LaQue
   Legislative intern .........................Andrea Chavez

**LEWIS, Tryon**                                      E2.812
   **Phone: 463-0546**
   Fax: 463-8067
   Chief of staff ................................Scott Sims
   Legislative director .....................Jack Ladd
   Administrative assistant...............Julie Black
   Legislative aide............................Alex San Martin

**LUCIO, Eddie III**                                  E1.318
   **Phone: 463-0606**
   Fax: 463-0660
   Chief of staff ................................Ruben O'Bell
   Legislative director .....................Charlie Leal
   Communications director.............Arnold Flores

**MADDEN, Jerry**                                     GW.11
   **Phone: 463-0544**
   Fax: 463-9974
   Legislative aide............................Mark Hey
   Administrative aide/ scheduler .....Jillian Arizpe
   Admin. aide/ policy analyst..........Samantha McLane
   Interns .........................................Chelsea Belote
     Deirdre Dawson         Rebecca Hopkins
     Diane Huynh            Ashley Nwonuma
     Nick Raymond         Sean Stumpf

**MALDONADO, Diana**                          E2.802
  **Phone:  463-0670**
  Fax:  463-1469
  Chief of staff ................................Tommy Tynes
  Legislative director ......................Amy Bruno
  Communications director..............Jon Niven
  Legislative aide.............................Jasser Awad

**MALLORY CARAWAY, Barbara**            E2.420
  **Phone:  463-0664**
  Fax:  463-0476
  Chief of staff ................................Jennifer L. Pence
  Legislative interns.......................Tressie A. Bates
                           Lisa Coleman

**MARQUEZ, Marisa**                          E2.704
  **Phone:  463-0638**
  Fax:  463-8908
  Chief of staff ................................Michael Garemko
  Legislative director ......................Karen Gilbert
  Communications director..............Dyana Mercado
  Policy analyst ...............................Ben Kruger-Robbins

**MARTINEZ, Armando**                        E2.312
  **Phone:  463-0530**
  Fax:  463-0849
  Legislative director ......................Scott Jenkines
  Legislative aide.............................Kacie González
  Interns ........................................Ana Blanco
    Karla Randolph       Avery Sheppard
    Kassandra Sanchez   Alexandra Medack

**MARTINEZ FISCHER, Trey**                   E1.320
  **Phone:  463-0616**
  Fax:  463-4873
  Chief of staff ................................Martin Golando
  Communications director..............Christina Gomez
  Legislative assistants .................Leslie Granado
                           Carrie Blanda
                           Daniel Greenfield
  Legislative interns.......................Rudy Loza
                           Philip Prazan
                           Robin Rosales

**MCCALL, Brian**                            1W.11
  **Phone:  463-0594**
  Fax:  463-5896
  Chief of staff ................................Sean Cunningham
  Administrative aide ......................Lila Tompkins
  Aide .............................................Libby Goss

**MCCLENDON, Ruth Jones**                    4N.4
  **Phone:  463-0708**
  Fax:  463-7071
  Chief of staff ................................Janis Reinken
  Legislative aide............................Casandra Anderson
  Legislative intern ........................Caryn Malone

**MCREYNOLDS, Jim**                          1W.3
  **Phone:  463-0490**
  Fax:  463-9059
  Legislative director ......................Heather Fleming
  Legislative aides..........................Resha Thomas
                           Scott Glenn
                           Nicole Robbins

**MENÉNDEZ, José**                           E2.204
  **Phone:  463-0634**
  Fax:  463-7668
  Chief of staff ................................Don Jones
  Legislative director ......................Margaret Richardson
  Legislative assistant ....................Jessica Castilleja

**MERRITT, Tommy**                           1N.12
  **Phone:  463-0750**
  Fax:  463-9085
  Chief of staff ................................Jennifer Foster
  Legislative director ......................Lisa Mayes
  Legislative aides..........................Michael Lozano
                           Kip Smith
  Interns ..........................................Matthew Ashley
                           Katie Love

**MIKLOS, Robert**                           E2.816
  **Phone:  463-0464**
  Fax:  463-9295
  Chief of staff ................................Brian Hodgdon
  Legislative director ......................Analiese Kornely
  Legislative aides..........................Tammy Tijerina
                           Chelsea Thurman
  Legal intern..................................Joshua Houston

**MILLER, Doug**                             E1.216
  **Phone:  463-0325**
  Fax:  463-6161
  Chief of staff ................................Fritz Reinig
  Legislative aide............................Lauren Murray
  Scheduler .....................................Amanda Miller
  Intern ...........................................Robby Beach

**MILLER, Sid**                              GN.10
  **Phone:  463-0628**
  Fax:  463-3644
  Chief of staff ................................Karen Kolb
  Legislative aide............................Amy Bertrand

**MOODY, Joseph**                                      E1.208
    **Phone: 463-0728**
    Fax: 463-0397
    Chief of staff ................................Daniel Mahoney
    Legislative director .....................Chaille Jolink
    Legislative intern .........................J.J. Lietzke

**MORRISON, Geanie W.**                                GN.11
    **Phone: 463-0456**
    Fax: 476-3933
    Chief of staff ................................Justin Unruh
    Administrative director.................Lisa Peterson
    Aide ..............................................Lauren Simcik
    Intern ............................................Kristen Hampton

**NAISHTAT, Elliott**                                  GW.16
    **Phone: 463-0668**
    Fax: 463-8022
    Chief of staff ................................Dorothy Browne
    Legislative director .....................Nancy Walker
    Legislative aides...........................Judith Dale
      Leslie Weston      Sarah Wilkinson
      Meghan Kempf      Katie Carmichael
      Jennifer Fein      Jackie Mintz
      Daniel Goldstein      Carol Barger

**OLIVEIRA, René**                                     4N.10
    **Phone: 463-0640**
    Fax: 463-8186
    Chief of staff ................................J.J. Garza
    Legislative director .....................Anthony Gray
    Office manager............................Andrea Oliveira
    Policy analyst ..............................Elvia Rios

**OLIVO, Dora**                                        GN.7
    **Phone: 463-0494**
    Fax: 463-1403
    Administrative assistant...............Tiffany Norman
    Legislative director .....................Stephen Vigorito
    Legislative aides...........................Stefani Williams
                                Laura Bellows
                                  Keleen Miller

**ORR, Rob**                                           E1.410
    **Phone: 463-0538**
    Fax: 463-0897
    Legislative director .....................Matthew Miller
    Legislative aide/ admin. aide ........Christianne Kellett

**ORTIZ, Solomon, Jr.**                               E1.322
    **Phone: 463-0848**
    Fax: 463-7834
    General counsel ...........................Jose "Chito" Vela
    Legislative director .....................Will Krueger
    Legislative aides..........................Monica "Desiree" Castro
                                    Curtis Smith

**OTTO, John**                                         E2.906
    **Phone: 463-0570**
    Fax: 463-0315
    Chief of staff ................................Nikki Dawson
    Legislative interns.......................Alex Butts
      Carly Castetter      Taylor Darby
      Jacob Fowler      Chelsea Marshall

**PARKER, Tan**                                        E2.606
    **Phone: 463-0688**
    Fax: 480-0694
    Chief of staff ................................Rick Dennis
    Legislative aides..........................Jessica Lutrell
                                    Jack Daly

**PATRICK, Diane**                                     E2.412
    **Phone: 463-0624**
    Fax: 463-8363
    Chief of staff ................................Julie Freeman

**PAXTON, Ken**                                        E2.502
    **Phone: 463-0356**
    Fax: 463-0701
    Senior legislative director ............Randy Samuelson
    Legislative director .....................Ben Williams
    Scheduler/ intern ........................Molly Banas

**PEÑA, Aaron**                                        E1.512
    **Phone: 463-0426**
    Fax: 463-0043
    Chief of staff ................................James Lampley
    General counsel ..........................Anne Creixell
    Legislative aides..........................Stuart Chaney
                                    Maricela DeLeon
    Intern ...........................................Pete Diaz

**PHILLIPS, Larry**                                    E2.604
    **Phone: 463-0297**
    Fax: 463-1561
    Chief of staff ................................Sara Haenes
    Legislative assistant ....................Devra Feld

**PICKETT, Joe C.**                                  E1.308
  **Phone:  463-0596**
  Fax:  463-6504
  Chief of staff ................................Katharine Chambers
  Legislative aide............................Markey Culver

**PIERSON, Paula**                                   E2.210
  **Phone:  463-0562**
  Fax:  463-2053
  Chief of staff ................................Maureen Perro
  Legislative director ......................Andrew Billingsley
  Legislative assistant ...................Baylor Johnson
  Legislative intern .........................Amber Goodwin

**PITTS, Jim**                                       1W.2
  **Phone: 463-0516**
  Fax: 463-1051
  Legislative director ......................Jason Nelson
  Executive assistant......................Candice Wigand
  Legislative assistants .................Dianne Shrum
                                           Rachel Burkhart
                                           Austin Talbert

**QUINTANILLA, Chente**                              E1.218
  **Phone:  463-0613**
  Fax:  463-1237
  Chief of staff ................................Robert Grijalva
  Capitol office director...................Samantha Dominguez
  District director ...........................Nina Serna
  Legislative aides...........................Lacy Baron
    Lee Baron                              Danielle Faulkner
    Olivia Provencio-Johnson               Moctezuma Zuniga

**RAYMOND, Richard Peña**                            1W.4
  **Phone:  463-0558**
  Fax:  463-6296
  Chief of staff ................................Jesus "Chuy" Gonzalez
  Legislative director ......................Fabiola Flores
  Legislative aide............................David Leo
  Law clerks ...................................Carlos Galvan
                                           Catherine Moran
  Interns .........................................Alejandra Salinas
                                           Ben Holland
                                           Jeremy Holland
                                           Kimberly Scheifer

**RIDDLE, Debbie**                                   E2.306
  **Phone:  463-0572**
  Fax:  463-1908
  Chief of staff ................................Jon English
  Office manager............................Gail Gallien
  Interns .........................................Katherine Butler
    Juan Garcia-Lascurain                  Adam Kowis
    Meredith Meyer                         Natalie Myers
    Katie-Rose Newton                      Fiona Prendergast
    Rianna Richardson

**RIOS YBARRA, Tara**                                E2.302
  **Phone:  463-0463**
  Fax:  463-1765
  Chief of staff ................................Edward Gonzales
  Legislative director ......................Rogelio Chanes
  Legislative aide............................Cesar De Leon

**RITTER, Allan**                                    E2.406
  **Phone:  463-0706**
  Fax:  463-1861
  Chief of staff ................................Sean Haynes
  Legislative aides...........................Peter Salatich
                                           Graham Bass
                                           Candace Carver

**RODRIGUEZ, Eddie**                                 E2.718
  **Phone:  463-0674**
  Fax:  463-0314
  Chief of staff ................................Nate Walker
  Legislative director ......................Robin Chandler
  Legislative aides...........................Carlos Calle
                                           Gustavo Garza
                                           Erika Martinez

**ROSE, Patrick**                                    E2.602
  **Phone:  463-0647**
  Fax:  473-9946
  Chief of staff ................................Mireya Zapata
  Legislative director ......................Melissa Henderson
  Office manager............................Cheryl Tarochione
  Constituent liaison ......................Lacie Ritchie
  Legislative aide ...........................Joe Stephens
  Interns .........................................Spencer Cron
    Becca Durr                             Cicely Kay
    Katie Kinder                           Katelyn Blackburn
  Office assistant............................Andrea Laws

**SHEFFIELD, Ralph**                                 E1.422
  **Phone:  463-0630**
  Fax:  322-9054
  Chief of staff ................................Molly Quirk
  Legislative aide............................Maggie Irwin
  Scheduler/ admin. assistant .........Martha Bell
  Research assistant......................Chad Bludau

**SHELTON, Mark**                                    E1.418
  **Phone:  463-0608**
  Fax:  463-8342
  Chief of staff ................................Clayton Stewart
  Legislative director ......................Ashley McAndrew
  Legislative aides...........................Caitlin Styrsky
                                           Richard  Shelton
                                           Rebecca Rogers

**House Research Organization**                                                        **Page 13**

**SMITH, Todd**                                    **GW.6**
   **Phone:  463-0522**
   Fax:  463-9529
   Chief of staff ................................Judy Coppolo
   Administrative aide ....................Nina Sidoryanskaya
   Legislative assistant ...................Chris McGhee


**SMITH, Wayne**                                   **E2.214**
   **Phone:  463-0733**
   Fax:  463-1323
   Chief of staff ................................Colin Parrish
   Legislative aide.............................Amanda Peters
   Aide/ scheduler.............................Lauren Smith


**SMITHEE, John**                                  **1W.10**
   **Phone:  463-0702**
   Fax:  476-7016
   Chief of staff ................................Andrea Stingley
   Policy intern.................................Isaiah Logan


**SOLOMONS, Burt**                                 **E1.420**
   **Phone:  463-0478**
   Fax:  463-2089
   Legislative director ......................Bonnie Bruce
   Legislative aide.............................Beth Morrison


**STRAMA, Mark**                                   **E2.510**
   **Phone:  463-0821**
   Fax:  463-1199
   Chief of staff ................................Mary Throop
   Legislative director ......................James Paver
   Legislative aides..........................Beth Olson
                                                   David Smeltzer
   Executive aide ..............................Jessica Gonzales


**STRAUS, Joe (Speaker)**                          **2W.13**
   **Phone:  463-1000**
   Fax:  463-0675
   Chief of staff ................................Clyde Alexander
   Executive assistant.......................Amy Chamberlain
   Director of administration .............Laurie Loiselle
   Director of policy and budget/
   special counsel............................Lisa Kaufman
   Gen. counsel/ senior tax advisor ..Jesse Ancira
   Director of communication............Angela Hale


**SWINFORD, David**                                **4N.3**
   **Phone:  463-0470**
   Fax:  463-8003
   Chief of staff ................................Allison Scott
   Legislative aide.............................Aaron Gibson
   Legislative intern .........................Rusty Smith


**TAYLOR, Larry**                                  **E2.610**
   **Phone:  463-0729**
   Fax:  474-2398
   Chief of staff ................................Cari Christman-Ott
   Administrative assistant...............Wesley Starnes
   Correspondence aide .................Ryan Little
   Legislative aide............................Lauren Connett
   Capitol intern ...............................Natalie East


**THIBAUT, Kristi**                                **E2.404**
   **Phone:  463-0514**
   Fax:  463-8715
   Chief of staff ................................Jennifer Brader
   Legislative aide.............................Alex Hammond
   Legislative interns........................Nicanor Valdez
                                                   Ali Al-Bassam


**THOMPSON, Senfronia**                            **3S.6**
   **Phone:  463-0720**
   Fax:  463-6306
   Administrative director.................Milda Mora
   Comm. director/ policy analyst .....Colleen Tran
   Legislative director ......................Brete Anderson
   Legislative aide.............................Chani Seals
   Legislative intern .........................James Clanton


**TRUITT, Vicki**                                  **GW.18**
   **Phone:  463-0690**
   Fax:  477-5770
   Chief of staff ................................Terra Taylor
   Legislative director ......................Dan Sutherland
   Legislative aide.............................Sophia Lecky
   Interns ..........................................Cameron Eckel
                                                   John Hefley


**TURNER, Chris**                                  **E2.402**
   **Phone:  463-0374**
   Fax:  463-0364
   Chief of staff ................................Emily Amps
   Legislative director ......................Erica Prosser
   Legislative aide.............................Brittany Rosales
   Legislative intern .........................Joseph Cullar


**TURNER, Sylvester**                              **1W.6**
   **Phone:  463-0554**
   Fax:  463-8380
   Chief of staff ................................Alison Brock
   Legislative administrator...............Pam Watson
   Legislative aides..........................Cory Henrickson
                                                   Ashley Thomas
   Legislative interns........................Morris Williams
                                                   Eric Taylor

**House Research Organization**                                                                **Page 14**

**VAUGHT, Allen**                                  E2.414
   **Phone: 463-0244**
   Fax: 463-9967
   Chief of staff ................................Lauren Mish
   Legislative directors.....................Jo Cassandra Cuevas
                                    Frederick Lopez


**VEASEY, Marc**                                   E1.306
   **Phone: 463-0716**
   Fax: 463-1516
   Chief of staff ................................R. Kirk McPike
   Legislative director ......................Anne Hagan
   Legislative aide............................Alexis Dugger


**VILLARREAL, Mike**                               E1.204
   **Phone: 463-0532**
   Fax: 463-7675
   Chief of staff ................................Gina Amatangelo
   Legislative director ......................Peter Clark
   Senior policy analysts..................Stephanie Chiarello
                                    April Shapley
   Policy analysts.............................Andrea Troncoso
                                    Merrick Garb


**VO, Hubert**                                     E2.208
   **Phone: 463-0568**
   Fax: 463-0548
   Chief of staff ................................Debi Sheeran
   Sr. legislative aide ......................Carlos Mejias
   Legislative aide............................Brooke Boutwell
   Administrative aide......................Julie Pham


**WALLE, Armando L.**                              E1.312
   **Phone: 463-0924**
   Fax: 463-1510
   Chief of staff ................................Neesha I. Davé
   Legislative director ......................Natalie Rovira
   Legislative aide............................Jorge Lopez
   Intern ...........................................Taylor Ellison


**WEBER, Randy**                                   E1.412
   **Phone: 463-0707**
   Fax: 463-8717
   Chief of staff ................................Chara McMichael
   Legislative aide............................Weston Woodward
   Interns .........................................Sarah Majzoub
                                    Charissa Mureen
                                    Katie Grosskopf
                                    Colin Wood


**WOOLLEY, Beverly**                               GS.2
   **Phone: 463-0696**
   Fax: 463-9333
   Chief of staff/ general counsel......Tessa Zavala
   Legislative assistant ....................Amy Rister
   Legislative intern .........................Heather Crosby


**ZERWAS, John**                                   E2.316
   **Phone: 463-0657**
   Fax: 236-0713
   Chief of staff ................................Brad Westmoreland
   Legislative director ......................Bryan Law
   Legislative aide/ scheduler ...........Robert Lundell
   Health policy fellow......................Kirsten Niederhofer

# House Committees

**AGRICULTURE AND LIVESTOCK**                    E2.114
   **Phone: 463-0762**
   CHAIR .......................................... Yvonne Gonzalez Toureilles
   Committee clerk ........................... Jim Terrell
   Assistant committee clerks........... Austin McCarty
                                  Henry Uribe

**APPROPRIATIONS**                                E1.032
   **Phone: 463-1091**
   Fax: 463-0270
   CHAIR.......................................... Jim Pitts
   Committee director...................... Amy Peterson
   General counsel.......................... Paul Bollinger
   Committee clerk .......................... Courtney Reid
   Assistant committee clerk ........... Jonathon Storms
   Analysts ...................................... Hunter Thompson
     Kathy Panaszek            Joaquin Guadarrama
     Julie Haeber                 Casey Fannin

**BORDER AND
INTERGOVERNMENTAL AFFAIRS**                      E2.158
   **Phone: 463-1211**
   Fax: 463-1221
   CHAIR .......................................... Veronica Gonzales
   Committee clerk .......................... David Wilkie
   Assistant committee clerk............. Brenda Tso

**BUSINESS AND INDUSTRY**                         E2.128
   **Phone: 463-0766**
   Fax: 463-6698
   CHAIR .......................................... Joseph Deshotel
   Committee clerk .......................... Benjamin Fitzgibbons
   Assistant committee clerk............. Heather J. Filippone

**CALENDARS**                                     E2.148
   **Phone: 463-0758**
   Fax: 463-5896
   CHAIR .......................................... Brian McCall
   Committee clerk .......................... Juan V. Garcia

**CORRECTIONS**                                   E2.110
   **Phone: 463-0796**
   Fax: 463-0295
   CHAIR .......................................... Jim McReynolds
   Committee clerk .......................... Travis Sampley
   Assistant committee clerk............. Jamie Durham

**COUNTY AFFAIRS**                                E2.130
   **Phone: 463-0760**
   CHAIR .......................................... Garnet F. Coleman
   Committee director...................... Revlynn Lawson
   Assistant committee clerks........... Meredith McKinney
                                 Jon Ryan Parker

**CRIMINAL JURISPRUDENCE**                        E2.112
   **Phone: 463-0768**
   CHAIR .......................................... Pete P. Gallego
   General counsel .......................... Adrianna Bernal
   Cmte. clerk/ assist. gen. counsel.. Andrew Cates
   Assistant committee clerks........... Michael Pacheco
                                 Caroline Solis

**CULTURE, RECREATION, AND TOURISM**              E2.134
   **Phone: 463-1974**
   Fax: 463-0237
   CHAIR .......................................... Mark Homer
   Committee director...................... Gabe Valenzuela
   Committee clerk .......................... Leia Deyhle
   Legislative/committee aide........... Sarah Lacy
   Policy analysts............................. Cody Schneider
                                 Samantha Shaw
                                 Jaime Wheeler

**DEFENSE AND VETERANS' AFFAIRS**                 E2.160
   **Phone: 463-1393**
   CHAIR .......................................... Frank Corte, Jr.
   Committee clerk .......................... Teri Avery
   Assistant committee clerk............. Loretta Class

**ELECTIONS**                                     E2.144
   **Phone: 463-0772**
   CHAIR .......................................... Todd Smith
   Committee clerk .......................... Steven Schar
   Assistant committee clerk............. Travis Richmond

**ENERGY RESOURCES**                              E2.162
   **Phone: 463-0774**
   Fax: 478-8805
   CHAIR .......................................... Jim Keffer
   Committee clerk .......................... Ky Ash
   Assistant committee clerk............. Bernice Espinosa-Torres

**ENVIRONMENTAL REGULATION**                    E2.154
   **Phone:  463-0776**
   Fax:  463-9503
   CHAIR ......................................... Byron Cook
   Chief committee clerk.................. Sherri Walker
   Assistant committee clerk............ Amanda Brant
   Policy analyst .............................. Justin Stryker

**FEDERAL ECONOMIC
STABILIZATION FUNDING, SELECT**          E2.202
   **Phone:  463-0240**
   Fax:  463-0769
   CHAIR ......................................... Jim Dunnam
   Executive director........................ Leslie Lemon
   Deputy director ............................ Zac Evans
   Committee clerks......................... Chelsea Reilly
                         Valerie Pizana

**GENERAL INVESTIGATING AND ETHICS**       E2.170
   **Phone:  463-0592**
   Fax:  463-8792
   CHAIR...........................................Chuck Hopson
   Committee clerk ..........................Cheryl Lively
   Committee counsel ......................Jake Hale

**HIGHER EDUCATION**                        E2.106
   **Phone:  463-0782**
   Fax:  692-2971
   CHAIR.......................................... Dan Branch
   Chief committee clerk ................. Jonathan Mathers
   Assistant committee clerk ........... Dustin Meador
   Policy analyst .............................. Caroline Hammond
   Legislative aide ........................... Kathryn Bonesteel

**HOUSE ADMINISTRATION**                    E2.140
   **Phone:  463-0784**
   Fax:  463-8310
   CHAIR ..........................................Charlie Geren
   Committee clerk ..........................Laura Grable

**HUMAN SERVICES**                          E2.152
   **Phone:  463-0786**
   Fax:  463-8981
   CHAIR ......................................... Patrick M. Rose
   Committee clerk ......................... Michael Ruggieri
   Committee director ...................... Kristie Zamrazil

**INSURANCE**                               E2.150
   **Phone:  463-0788**
   CHAIR ......................................... John Smithee
   Chief committee clerk.................. LyAnna Johnson
   Assistant committee clerk............ John McCord

**JUDICIARY AND CIVIL JURISPRUDENCE**       E2.120
   **Phone:  463-0790**
   Fax:  463-0174
   CHAIR ...........................................Todd Hunter
   Chief committee clerk...................Jennifer Welch
   Staff counsel..................................Marshall Coover
   General counsel ...........................Bech Bruun

**LAND AND RESOURCE MANAGEMENT**            E2.136
   **Phone:  463-1623**
   CHAIR ......................................... Dennis Bonnen
   Committee clerk ........................... Trey Burke
   Assistant committee clerk.............. Jennifer Pierson

**LICENSING AND ADMINISTRATIVE
PROCEDURES**                               E2.156
   **Phone:  463-0798**
   CHAIR.............................................Edmund Kuempel
   Committee clerk .............................Brittney Thomas
   General counsel...............................Adam Sibley

**LOCAL AND CONSENT CALENDARS**             3S.6
   **Phone:  463-0800**
   Fax:  463-6306
   CHAIR ......................................... Senfronia Thompson
   Chief committee clerk..................... Milda Mora
   Assistant committee clerk............... Colleen Tran

**NATURAL RESOURCES**                       E2.104
   **Phone:  463-0802**
   Fax:  463-9810
   CHAIR .............................................Allan Ritter
   Chief committee clerk....................Elizabeth Fazio
   Assistant committee clerk...............Nicole Sunstrum
   General counsel ............................Paul Townsend
   Committee intern ...........................Jenelle Hill

**PENSIONS, INVESTMENTS,
AND FINANCIAL SERVICES**                   E2.164
   **Phone:  463-2054**
   CHAIR ......................................... Vicki Truitt
   Committee clerk ............................ Merita Zoga
   Assistant committee clerk............... Adam Shapiro

**PUBLIC EDUCATION**                        E2.124
   **Phone:  463-0804**
   Fax:  463-6910
   CHAIR .............................................Rob Eissler
   Committee clerk .............................Rita Ashley
   Assistant committee clerk...............Rob Hill
   Policy analyst .................................Jenna Watts
   Intern .............................................Janie Causey

**PUBLIC HEALTH**                                    E2.172
   **Phone:  463-0806**
   Fax:  463-0900
   CHAIR .............................................Lois W. Kolkhorst
   Cmte. director/ policy analyst ..........Ann-Marie Price
   Chief clerk/ general counsel ............Douglas Brown
   Assistant clerk/ legal counsel ..........Whet Smith

**PUBLIC SAFETY**                                    E2.146
   **Phone:  463-0133**
   Fax:  463-0011
   CHAIR ........................................... Tommy Merritt
   Chief committee clerk................... Paul Kamprath
   Asst. committee clerks ................. Kirby Portley
                                            Michael Lozano

**REDISTRICTING**                                    E2.142
   **Phone:  463-9948**
   Fax:  463-0296
   CHAIR ...........................................Delwin Jones
   Chief committee clerk..................Barbara Crawford
   Asst. committee clerk ..................Gregory Watson

**RULES AND RESOLUTIONS**                            E2.138
   **Phone:  463-0812**
   CHAIR ...........................................Ruth Jones McClendon
   Chief committee clerk...................Nicole Gilmore

**STATE AFFAIRS**                                    E2.108
   **Phone:  463-0814**
   CHAIR ...........................................Burt Solomons
   Committee clerk/ gen. counsel .....Lesley French
   Committee counsel.......................Michelle Furmanski
   Policy analyst ...............................Robert Orr
   Legal intern..................................Scott Brown

**TECHNOLOGY, ECONOMIC DEVELOPMENT,
AND WORKFORCE**                                      E2.118
   **Phone:  463-0794**
   Fax:  463-0474
   CHAIR ...........................................Mark Strama
   Committee director ......................Laurie McAnally
   Assistant committee clerk.............Beth Olson
   General counsel ...........................Ryan Downton

**TRANSPORTATION**                                   E2.122
   **Phone:  463-0818**
   CHAIR ...........................................Joe Pickett
   Committee clerk ...........................Brian O'Reilly
   Assistant committee clerk.............Leigh Anne Lauderdale

**URBAN AFFAIRS**                                    E2.126
   **Phone:  463-9904**
   Fax:  463-1049
   CHAIR ...........................................Yvonne Davis
   Committee clerks..........................Michael Gibson
                                            Tatiana Oria
                                            Lemuel Price
                                            Kent Willis

**WAYS AND MEANS**                                   E2.116
   **Phone:  463-0822**
   Fax:  463-1529
   CHAIR ...........................................René O. Oliveira
   Cmte. clerk/ general counsel.......Carolyn Merchan Saegert
   Assistant committee clerks..........Jesse Sifuentez
                                            Celeste Montellano

**OFFICE OF THE COMMITTEE COORDINATOR**              E2.174
   **Phone:463-0850**
   Fax:  463-7547
   Committee coordinator ................Stacey Nicchio
   Asst. committee coordinator.........Damian Duarte
   Clerks ..........................................Ethan Harlow
                                            Byron Bradshaw
                                            Katy Reagan

**HOUSE RESEARCH ORGANIZATION**                      JHR 420
   **Phone:463-0752**
   Fax:  463-1962
   Director.........................................Tom Whatley
   Editor ...........................................Laura Hendrickson
   Office manager/ senior analyst.....Rita Barr
   Associate editor............................Ken Basart
   Administrative clerk .....................Julie Nieto
   Senior analysts............................Catherine Dilger
      Kellie Dworaczyk                      Tom Howe
      Andrei Lubomudrov                     Carisa Magee
                                            Blaire Parker
   Analysts........................................Bettie Anne Buerk
      Jennifer Burnett                      Jonathan Lewallen
      Jimmie Luthuli                        Phil Parker
      Stephen Sibley                        Charles Wilson

# Senate

**AVERITT, Kip**                                    **E1.606**
  **Phone:  463-0122**
  Fax:  475-3729
  Chief of staff ..................................Heather Harward
  Leg. director/ comm. director........Josh Meeks
  Office manager/ scheduler ...........Natalie Colley
  General counsel ...........................Elizabeth Hadley
  Policy analyst ...............................Johanna Sheffield
  Interns .........................................Melissa Yeakley
                                   Collin Huber

**CARONA, John**                                    **4E.2**
  **Phone:  463-0116**
  Fax:  463-3135
  Chief of staff .................................Margie McCloskey
  Administrative director.................Detta Haffelder
  Scheduler/ admin. assistant .........Stephanie Schotz
  Gen. counsel/ legislative director .Barbara K. Salyers
  Legislative aides..........................Preston Streufert
                                   Jamie Billman

**DAVIS, Wendy**                                    **E1.608**
  **Phone:  463-0110**
  Fax:  475-3745
  Chief of staff .................................Hector Nieto
  Legislative director ......................Stephanie Leavitt
  Office manager ............................Jean Dendy

**DEUELL, Bob**                                    **E1.706**
  **Phone:  463-0102**
  Fax:  463-7202
  Chief of staff .................................Don Forse
  Legislative director ......................Scot Kibbe
  Legislative aide............................Janiece Crenwelge

**DUNCAN, Robert**                                    **3E.10**
  **Phone:  463-0128**
  Fax:  463-2424
  Chief of staff .................................Porter Wilson
  Legislative director ......................Jennifer Chambers
  General counsel ...........................Cory Pomeroy
  Communications director..............Deon Daugherty Allen
  Scheduler/ legislative aide...........Kyler  Arnold
  Senior policy analyst ...................Sarah Clifton
  Legislative interns.......................Meagan Scott
                                   Laramie Adams

**ELLIS, Rodney**                                    **3E.6**
  **Phone:  463-0113**
  Fax:  463-0006
  Chief of staff/ general counsel......Brandon Dudley
  Legislative director ......................Doug Lewin
  Scheduler ....................................Orianna Diaz
  Press secretary ...........................Jeremy Warren
  Administrative assistant...............Linda Christofilis

**ELTIFE, Kevin**                                    **3E.16**
  **Phone:  463-010**1
  Fax:  475-3751
  Chief of staff .................................Cheryl Vanek
  Executive assistant......................Connie Hernandez
  Legislative aides..........................Chuck Mains
                                   Ryan Weiseman
                                   Mary Elen Williams
                                   Zak Triplett
  Intern ...........................................Jared Staples

**ESTES, Craig**                                    **3E.8**
  **Phone:  463-0130**
  Fax:  463-8874
  Chief of staff .................................Lewis Simmons
  Legislative director ......................Noe Barrios
  Communications director..............Jody Withers
  Administrative assistant...............Sam Carlson
  Legislative aide............................Dianne Helms

**FRASER, Troy**                                    **1E.15**
  **Phone:  463-0124**
  Fax:  465-3732
  Chief of staff .................................Janice McCoy
  Policy analyst ...............................Will McAdams
  Scheduler ....................................Terri Mathis
  Administrative assistant...............Sarah Thigpen
  Legislative intern .........................Billy Hall
  Policy analyst ...............................Tara Rejino

**GALLEGOS, Mario, Jr.**                                    **E1.804**
  **Phone:  463-0106**
  Fax:  463-0346
  Chief of staff .................................Mary Ann Carrion
  Legislative director ......................Debra Gonzales
  Legislative assistants ..................Lesley Nelson
    Santiago Diaz                    Rodolfo Morales
    Ashley Bernal                   Mirel Herrera

**HARRIS, Chris**                                    3S.5
   **Phone: 463-0109**
   Fax:  463-7003
   Chief of staff ................................Jeff Jeter
   Senior policy analyst ..................Tricia Hermes
   Administrative aide .....................Kristen Webb
   Legislative aides.........................Chad Craycraft
                                                            Ryan Brooke
   Intern ...........................................Bryan Wilganoski

**HEGAR, Glenn**                                    E1.808
   **Phone: 463-0118**
   Fax:  475-3736
   Chief of staff ................................Lisa Craven
   Administrative director................Barbara Erickson
   Legislative aides.........................Deidra Garcia
      Melissa Hamilton                     Marti Johnson
      Lauren Wied                             Peter Winckler

**HINOJOSA, Juan "Chuy"**                   3E.12
   **Phone: 463-0120**
   Fax:  463-0229
   Chief of staff ................................Rene Ramirez
   General counsel ..........................Jerry Haddican
   Scheduler/ legislative assistant ....Luis Moreno
   Media relations/ policy analyst .....Arturo Ballesteros
   Policy analyst ..............................Athena Ponce
   Legislative assistants .................Oscar Garza
                                                            Carlos Gutierrez
   Interns ..........................................Josh Reyna
                                                            Vanessa Padula
                                                            Andrea Gutierrez

**HUFFMAN, Joan**                                 GE.5
   **Phone: 463-0117**
   Fax:  463-0639
   Chief of staff ................................Jim Sheer
   Legislative director ......................Jonathan Stinson
   Legislative aides.........................Ryan Hutchison
                                                            Kyle Kamrath
                                                            Drew Lawson

**JACKSON, Mike**                                 3E.2
   **Phone: 463-0111**
   Fax:  475-3727
   Chief of staff ................................Holly Deshields
   Legislative director ......................Jason Damen
   Communications director.............Beth Shields
   Scheduler/ legislative aide............Riley Stinnett
   Office manager............................Judy Brooks

**LUCIO, Eddie, Jr.**                              3E.18
   **Phone: 463-0127**
   Fax:  463-0061
   Chief of staff ................................Paul Cowen
   Legislative director ......................Ian Randolph
   Senior policy analyst ..................Kate Volti
   Policy analyst ..............................Emily Wheeler
   Cap. offc. coordinator/ scheduler .Monica Counts
   Communications director.............Doris Sanchez
   Legislative aides.........................Louie Sanchez
                                                            Jason Driver
                                                            Thomas Garza

**NELSON, Jane**                                   1E.5
   **Phone: 463-0112**
   Fax:  463-0923
   Chief of staff ................................Steve Roddy
   General counsel ..........................Charlotte Shivers Johnson
   Correspondence director..............Addie Smith
   Fiscal policy analyst ....................Joe Dyer
   Dir. of schedule/ const. services...Nicole Matous
   Policy analyst ..............................Travis Broussard
   Communications director.............Dave Nelson
   Communications aide...................Adam Arellano

**NICHOLS, Robert**                            E1.708
   **Phone: 463-0103**
   Fax:  463-1526
   Chief of staff ................................Steven Albright
   Senior policy analyst ...................Angus Lupton
   Press secretary ...........................Alicia Pierce
   Legislative aides.........................Adrianne Emr
                                                            Matt Dowling
   Administrative assistant...............Mandy Morton

**OGDEN, Steve**                                   GE.4
   **Phone: 463-0105**
   Fax:  463-5713
   Chief of staff ................................Constance Allison
   Administrative director................Betty Cotte
   Legislative aides.........................Patty Guerra
                                                            Stephanie Leavell

**PATRICK, Dan**                                   3S.3
   **Phone: 463-0107**
   Fax:  463-8810
   Legislative director ......................Logan Spence
   Operations director......................Court Koenning
   Executive assistant......................Tina Poston
   Legal counsel ..............................Kate Pigg
   Legislative aides.........................John Gibbs
                                                            Suzanne Tomlin
                                                            Marian Wallace

**SELIGER, Kel**                                                    E1.806
   **Phone:  463-0131**
   Fax:  475-3733
   Chief of staff ................................Bryan McMath
   Legislative director ......................Ginger Murray
   Correspondence mgr./ leg. aide ...Kirsten Knuth
   Office manager/ legislative aide ...Rose Guajardo Walker
   Administrative aide ......................Lauren Freriks
   Legislative interns........................Jonathan Dumire
                                         Edward "Trey" Owens
                                         Kristi Rehmann
                                       Zachary Page

**SHAPIRO, Florence**                                              1E.3
   **Phone:  463-0108**
   Fax:  463-7579
   Chief of staff ................................ Jennifer Ransom Rice
   Offc. mgr./ session scheduler .......Tara Korstad
   Communications.........................Bryan Hadley
   Legislative director ......................Sarah Bagwell
   Staff attorney/ policy analyst ........Lindsay Mullins
   Policy analyst ..............................Mike Kamerlander
   Legislative interns........................Sasha Kakabadse
                                          Paige Cory
                                        Andres Guajardo

**SHAPLEIGH, Eliot**                                               E1.610
   **Phone:  463-0129**
   Fax:  463-0218
   Chief of staff ................................Eduardo Hagert
   Administrative assistant...............Rosa Alfaro
   Communications director..............Daniel Collins
   General counsel ...........................David S. Edmonson
   Legislative analyst ......................Sushma Jasti
   Legislative interns........................Bren Gorman
                                          Claudia Ordaz
                                        Andre Rodriguez

**URESTI, Carlos**                                                 E1.810
   **Phone:  463-0119**
   Fax:  463-1017
   Chief of staff ................................Tomas Larralde
   Chief director ...............................Liz Campos
   General counsel ...........................Jason Hassay
   Director of communications..........Mark Langford
   Senior policy analyst ...................Rachel Johnston
   Policy analyst ..............................Jerry Needham
   Legislative assistant ...................Micah Rodriguez
   Scheduler/ legislative assistant ....Mark Reyna
   Staff attorney ..............................David Brooks
   Communications aide..................Arthur Reyna III
   Luna fellow .................................Ana Villalobos
   Legal intern.................................Carla Sanchez
   Interns ........................................Lauren Matthews
                                          Eric Weeks
                                        Melessa Rodriguez

**VAN DE PUTTE, Leticia**                                          E1.704
   **Phone:  463-0126**
   Fax:  463-2114
   Chief of staff ................................Gilbert Loredo
   Legislative director ......................Ida Garcia
   Deputy legislative director ...........Sara González
   Media specialist...........................Kathryn Freeman
   Scheduler ....................................JD Pedraza
   Administrative assistant...............Adriana Alanis
   Admin./ legislative assistant ........Heidi Kluber
   Legislative assistants ..................Linda Townsend
      Amber Hausenfluck           Adrian Reyna
      Jamila Marie Patten         Sherita Simmons

**WATSON, Kirk**                                                   E1.712
   **Phone:  463-0114**
   Fax:  463-5949
   Chief of staff ................................Trent Townsend
   Deputy chief of staff....................Sarah Chanslor
   Offc. mgr./ legislative assistant .....Yvonne Reynolds
   Legislative director ......................Stacy Pearson
   Policy director..............................Steve Scheibal
   Counsel/ district director..............Susan Turner Nold
   Gen. couns./ sr. policy advisor .....Edna Butts
   Legislative analyst ......................Sandy Hentges
   Legislative assistant ....................Joe Hamill

**WENTWORTH, Jeff**                                                1E.9
   **Phone:  463-0125**
   Fax:  463-7794
   Chief of staff ................................Joe Morris
   Deputy chief of staff....................Pat Kelly
   General counsel ...........................Katie Henry
   Scheduler ....................................Chelsy Hutchison
   Legislative aide............................Katie Coggins
   Administrative assistant...............Nicole Albers

**WEST, Royce**                                                    1E.12
   **Phone:  463-0123**
   Fax:  463-0299
   Chief of staff ................................LaJuana Barton
   Executive assistant/ scheduler .....Susie Ramirez
   Legislative director ......................Graham Keever
   General counsel ...........................Colin Coe
   Legislative aides..........................Kelvin Bass
      Ahmad Goree                 Tim Thetford
      Eric Dominguez             Clifford Sparks

**WHITMIRE, John**                          **1E.13**
   **Phone:  463-0115**
   Fax:  475-3737
   Chief of staff ................................Lara Wendler
   Scheduler/ legislative assistant ....Deborah Levy
   Legislative assistant ....................Susan Fontenette
   Legislative aides...........................Jenny Marquez
                                        Holly Tippit

**WILLIAMS, Tommy**                          **GE.7**
   **Phone:  463-0104**
   Fax:  463-6373
   Executive assistant.......................Reta Cooke
   Administrative assistant...............Tara Boothe
   Legislative director .......................Jason Baxter
   Legislative aides...........................Jason Smith
                                         Amanda Montagne
   Legislative interns........................Mark Arnold
                                         Ross Clark
                                         Ross Mizell

**ZAFFIRINI, Judith**                          **1E.14**
   **Phone:  463-0121**
   Fax:  475-3738
   Office manager............................Sarah Acosta
   Director of budget policy..............Brent Whitaker
   Chief of staff ................................Warren von Eschenbach
   Gen. couns./ pub. info. aide .........Celeste Villarreal
   Policy analyst ...............................Vincent Cho
   Legislative coordinator ................Claudia Tijerina
   Legislative aides...........................Lauren Cook
                                         Michael Dole
                                         Sean Griffin
                                         Jessica Ramos
   Legislative aide/ admin. aide ........Gonzalo Serrano
   Scheduler ....................................Molly Donovan

# Senate Committees

**ADMINISTRATION**       E1.714
   **Phone: 463-0350**
   Fax: 463-0499
   CHAIR ..........................................Tommy Williams
   Committee director ......................Candace Hargenrader
   Senior policy analyst ...................Ryan LaRue

**AGRICULTURE AND RURAL AFFAIRS**       SHB 455
   **Phone: 463-0340**
   Fax: 463-2293
   CHAIR ..........................................Craig Estes
   Committee director ......................Raenetta Nance
   Committee clerk ..........................Catherine Hearn

**BUSINESS AND COMMERCE**       SHB 370
   **Phone: 463-0365**
   Fax: 463-1613
   CHAIR ..........................................Troy Fraser
   Committee director ......................Dan Madru
   Committee clerk .........................Tatum Reagan
   Assistant committee clerk ............Ellen Scholl
   Policy analyst/ staff counsel .........Melanie Durst
   Policy analyst .............................Mark Harmon

**CRIMINAL JUSTICE**       SHB 470
   **Phone: 463-0345**
   Fax: 475-2015
   CHAIR ..........................................John Whitmire
   Policy director.............................Larance Coleman
   Committee clerk .........................Vanessa Valdez
   Policy analyst .............................Terra James

**ECONOMIC DEVELOPMENT**       SHB 340
   **Phone: 463-1171**
   Fax: 463-2599
   CHAIR ..........................................Chris Harris
   Committee director ......................Tricia Hermes
   Committee clerk .........................Kelli Cleveland

**EDUCATION**       SHB 440
   **Phone: 463-0355**
   Fax: 463-7467
   CHAIR ..........................................Florence Shapiro
   Committee director ......................Von Byer
   Committee clerk ..........................Holly Mabry
   Assistant committee clerk............Katie Brueckman
   Committee counsel.....................Susan Strzelec
   Senior policy analyst ...................Ryan Franklin
   Committee intern .........................Kelsi Wade

**FINANCE**       E1.038
   **Phone: 463-0370**
   Fax: 463-5752
   CHAIR ..........................................Steve Ogden
   Committee director ......................Sarah Hicks
   Deputy committee director ..........Daniel Harper
   Committee clerk ..........................Amy Jeter
   Assistant committee clerk ...........Elizabeth McClung
   General counsel ..........................Annette Graves
   Budget analysts ..........................Laura Kolstad
                             Michael Meyer
                              Brittani Bilse

**GOVERNMENT ORGANIZATION**       SHB 630
   **Phone: 463-1818**
   Fax: 463-1700
   CHAIR ..........................................Rodney Ellis
   Cmte. director/ legal counsel........E. Joyce Iyamu
   Committee clerk ..........................Mattie Murray
   Assistant clerk/ policy advisor ......Ryan Mosler
   Policy advisors ............................Johanna Thomas
                             Rudy Becerra

**HEALTH AND HUMAN SERVICES**       SHB 420
   **Phone: 463-0360**
   Fax: 463-9889
   CHAIR ..........................................Jane Nelson
   Committee director ......................Shannon Ghangurde
   Committee clerk ..........................Kyle Baum
   Policy analysts.............................Jordan Head
                             Nnenna Ezekoye
                             Phil Fountain
   Legislative fellow ........................Tara Swayzee
   Legislative intern ........................Sharen Ludher

**HIGHER EDUCATION**       SHB 320
   **Phone: 463-4788**
   Fax: 463-0695
   CHAIR ..........................................Judith Zaffirini
   Committee director ......................Warren von Eschenbach
   Committee clerk ..........................Lauren Cook
   Assistant committee clerk............Gonzalo Serrano
   Policy analyst .............................Vincent Cho
   Legislative aide/ staff attorney......Ashley Storm

**INTERGOVERNMENTAL RELATIONS**       SHB 475
   **Phone: 463-2527**
   Fax: 463-2858
   CHAIR ..........................................Royce West
   Committee director ......................Julie Frank
   Committee clerk ..........................Tiffany White

**SUBCOMMITTEE ON FLOODING**
**AND EVACUATIONS**                          **E1.804**
>    Phone:  463-0106
>    Fax:  463-0346
>    CHAIR ............................................Mario Gallegos Jr.
>    Director.........................................Lindsey Reed

**INTERNATIONAL RELATIONS AND TRADE**        **SHB 335**
>    Phone:  463-0385
>    Fax:  463-6004
>    CHAIR ...........................................Eddie Lucio
>    Committee director ......................Daniel Esparza
>    Director of communications ..........Doris Sanchez
>    Committee clerk/ policy analyst....Nicanor Pesina
>    Policy analyst  .............................Natalie Fontenot

**JURISPRUDENCE**                            **SHB 350**
>    Phone:  463-0395
>    Fax:  463-8336
>    CHAIR ...........................................Jeff Wentworth
>    Committee dir./general counsel ...Janelle A. Collier
>    Committee clerk  .........................Stephanie Hoover
>    Assistant committee clerk ............Brandon Chase
>    Senior policy analyst ...................Katie Ogden
>    Policy analyst  .............................Kara Crawford

**NATURAL RESOURCES**                        **SHB 325**
>    Phone:  463-0390
>    Fax:  463-6769
>    CHAIR ...........................................Kip Averitt
>    Committee director/ clerk .............Teddy Carter
>    Assistant committee clerk.............Tulsi Reddy
>    Senior policy analyst ...................Samm Osborn
>    Legislative aide............................Servando Esparza
>    Intern ............................................Martha Perez

**NOMINATIONS**                              **E1.716**
>    Phone:  463-2084
>    Fax:  463-8123
>    CHAIR ...........................................Mike Jackson
>    Committee director ......................Robert Haley
>    Committee clerk ..........................Brian Carey

**STATE AFFAIRS**                            **SHB 380**
>    Phone:  463-0380
>    Fax:  463-0342
>    CHAIR ...........................................Robert Duncan
>    Committee director ......................Jennifer Fagan
>    Committee clerk .........................Erin Fry
>    Senior policy analyst ...................Ellen Goodwin
>    Legislative interns........................Charles Goff
>                                            Tyler Hargrave
>                                            Connor Nix
>                                            Sergio Villarreal

**TRANSPORTATION**
**AND HOMELAND SECURITY**                    **SHB 445**
>    Phone:  463-0067
>    Fax:  463-0097
>    CHAIR ...........................................John Carona
>    Committee director ......................Steven Polunsky
>    Committee clerk ..........................Kelsey Erickson
>    Assistant committee clerk ...........Matthew Reyna
>    Policy analysts ............................Erika Akpan
>                                            Adam Burklund
>                                            Angie Cervantes
>                                            Christy Gonzalez
>    Policy advisor ..............................David Erinakes
>    Interns ..........................................Pablo "Sonny" Garza
>       Joel Griebel                         Will Hailey
>       Dawn Steinhoff                       Jere Thompson

**VETERAN AFFAIRS**
**AND MILITARY INSTALLATIONS**               **SHB 345**
>    Phone:  463-2211
>    Fax:  463-7683
>    CHAIR ...........................................Leticia Van de Putte
>    Committee director ......................Jenee Margo Gonzales
>    Cmte. clerk/legislative assistant ...Estella French
>    Legislative assistant ....................Brent Turner
>    Administrative intern ...................Savanna Trevino

**SUBCOMMITTEE ON BASE**
**REALIGNMENT AND CLOSURE**                  **SHB 460**
>    Phone:  463-4779
>    Fax:  463-0218
>    CHAIR ...........................................Eliot Shapleigh
>    Committee director ......................David Edmonson

**CRIMINAL JUSTICE**
**LEGISLATIVE OVERSIGHT COMMITTEE**          **JHR 310**
>    Phone:  463-1703
>    Fax: 463-4776
>    CHAIR.........................................John Whitmire
>    Committee director......................Marsha McLane
>    Assistant researcher ...................Amanda Deason
>    Interns.........................................Erica Gibbs
>       Maria Velez                          Christine Love
>       Tracy Randecker                      Alyson Bechtol
>       Matthew Bierschenk                   David Skawin
>       Julie Paik                           Jonathan Fessenden

# Other State Numbers

| | |
|---|---|
| Governor's Office | 463-2000 |
| Lieutenant Governor's Office | 463-0001 |
| Attorney General's Office | 463-2100 |
| Comptroller's Office | 463-4000 |
| Secretary of State | 463-5770 |
| Department of Public Safety (Capitol) | 463-3333 |
| Legislative Budget Board | 463-1200 |
| Legislative Reference Library | 463-1252 |
| State Archives | 463-5455 |
| State Auditor's Office | 936-9500 |
| Sunset Advisory Commission | 463-1300 |
| Texas Legislative Council | 463-1151 |
| Capitol nurse practitioner, E1.214 | 463-0313 |

**House of Representatives**

| | |
|---|---|
| Audio/video | 463-0920 |
| Bill distribution | 463-1144 |
| Chief clerk | 463-0845 |
| Journal | 463-0855 |
| Parliamentarian | 463-2003 |
| Sergeants | 463-0910 |

**Senate**

| | |
|---|---|
| Bill distribution | 463-0252 |
| Committee coordinator | 463-0070 |
| Journal | 463-0050 |
| Media services | 463-0300 |
| Messengers | 463-0205 |
| Parliamentarian | 463-0248 |
| Secretary of the Senate | 463-0100 |
| Senate Research Center | 463-0087 |

PL1128
9/2/2014
2:13-cv-000193

# HOUSE
# RESEARCH
# ORGANIZATION

*Texas House of Representatives*

Focus Report No. 82-4

March 8, 2011

# Legislative
# Staff

## 82nd Legislature



# Table of Contents

House of Representatives ................... 3

House Committees ............................ 16

Senate ................................................. 20

Senate Committees ........................... 24

Other State Numbers .......................... 26

# House of Representatives

**ALISEDA, Jose**                                    E2.812
>   **Phone: 463-0645**
>   Fax: 463-0559
>   Chief of staff ....................................Aaron Gibson
>   Legislative director ...........................Matt Lamon
>   Legislative intern ..............................Tina M. Garza
>   Administrative intern.........................Cassie Maneen

**ALLEN, Alma A.**                                    E2.722
>   **Phone: 463-0744**
>   Fax: 463-0761
>   Chief of staff ....................................Anneliese Vogel
>   Legislative aide  ...............................Teresa Lenoir
>   Legislative intern ..............................Brian Waldrup
>   Legislative intern ..............................Durrel Douglas

**ALONZO, Roberto R.**                                    4N.6
>   **Phone: 463-0408**
>   Fax: 463-1817
>   Chief of staff ....................................Jesse R. Bernal
>   Legislative aide ...............................Deborah Seriki
>   Legislative aide ...............................Cole Howard
>   Legislative intern ..............................Tonya Snyder

**ALVARADO, Carol**                                    E2.810
>   **Phone: 463-0732**
>   Fax: 463-4781
>   Chief of staff ....................................Kaitlyn Murphy
>   Legislative director ...........................Jerry Greenspan
>   Legislative aide/scheduler ...............Sara Montelongo
>   Legislative aide ...............................Luis Salguero
>   Legislative aide ...............................Abigail Aiken

**ANCHIA, Rafael**                                    E2.818
>   **Phone: 463-0746**
>   Fax: 473-0738
>   Chief of staff ....................................Elizabeth Zornes
>   Legislative director ...........................Damien Brockmann
>   Communications director ................Timothy Dickey
>   Legislative aide ...............................Angie Von Pageler
>   Legislative intern ..............................Edgar Morales
>   Constituent svcs director.................Ana Reyes

**ANDERSON, Charles "Doc"**                                    E2.502
>   **Phone: 463-0135**
>   Fax: 463-0642
>   Chief of staff ....................................Matt Welch
>   Administrative assistant .................Cristina Whittaker
>   Legislative intern ..............................Alexandrea Drees
>   Legislative intern ..............................Joel Diharce

**ANDERSON, Rodney**                                    E1.424
>   **Phone: 463-0694**
>   Fax: 463-1130
>   Chief of staff ....................................Mark Dalton
>   Legislative director ...........................Jennifer Harris
>   Administrative director....................Ashley Hughes
>   Legislative intern ..............................Charnae Salter

**AYCOCK, Jimmie Don**                                    E2.710
>   **Phone: 463-0684**
>   Fax: 463-8987
>   Chief of staff ....................................Mitzi Stoute
>   Legislative aide ...............................Morgan Hendon
>   Public education staffer...................Belinda Pustka
>   Lead intern ......................................Sam Nancarrow

**BECK, Marva**                                    E1.310
>   **Phone: 463-0508**
>   Fax: 463-5896
>   Chief of staff ....................................Brigitt Hartin
>   Legislative aide ...............................Melissa Wagner

**BERMAN, Leo**                                    E2.908
>   **Phone: 463-0584**
>   Fax: 463-3217
>   Chief of staff ....................................Gloria Rogers
>   Legislative director ...........................Sharon Guthrie
>   Legislative intern ..............................Sarah Branagen
>   Legislative intern ..............................Randi Schultz

**BOHAC, Dwayne**                                    E2.904
>   **Phone: 463-0727**
>   Fax: 463-0681
>   Chief of staff ....................................Manny Salazar
>   Legislative director ...........................Bradley Pepper
>   Administrative aide..........................Adrianne Fore

**BONNEN, Dennis**                                4N.5
   **Phone: 463-0564**
   Fax: 463-8414
   Chief of staff ....................................Shera Eichler
   Legislative director/gen counsel.....Lauren Sutterfield


**BRANCH, Dan**                                   E1.308
   **Phone: 463-0367**
   Fax: 322-9935
   Chief of staff ................................... Candice Woodruff
   Capitol office director ................... Jordan Hill
   Legislative aide ............................. Justin Stein


**BROWN, Fred**                                   1N.9
   **Phone: 463-0698**
   Fax: 463-5109
   Chief of staff ...................................Melissa Nicolas
   Legislative director ..........................Austin McCarty
   Legislative aide .............................. Ashlyn Webb
   Administrative aide.........................Christie Clark


**BURKETT, Cindy**                                E2.804
   **Phone: 463-0464**
   Fax: 463-9295
   Chief of staff ...................................Matthew Brownfield
   Legislative director ..........................Lauren Hamner
   Constituent services.........................Michelle Atnip
   Policy analyst/general counsel.........John Buxie
   Intern ..............................................Susan Davis
   Intern ..............................................Alex Judd


**BURNAM, Lon**                                   GW.8
   **Phone: 463-0740**
   Fax: 463-1075
   Chief of staff ...................................Craig Adair
   Legislative director ..........................Rachel McClure
   Legislative aide ..............................Matthew Johnston
   Legislative aide ..............................Jaime Rivera
   Legislative aide  .............................Mayra Mendez


**BUTTON, Angie Chen**                            E2.504
   **Phone: 463-0486**
   Fax: 463-0793
   Chief of staff ...................................Amanda Jeffers
   Legislative aide ..............................Craig Blum
   Legislative aide ..............................Tori Smith


**CAIN, Erwin**                                   E1.402
   **Phone: 463-0650**
   Fax: 463-0575
   Chief of staff ....................................Jay Wiley
   Legislative director ..........................Cassie Daniel
   Administrative director.....................Amanda Robertson


**CALLEGARI, Bill**                               GN.12
   **Phone: 463-0528**
   Fax: 463-7820
   Chief of staff ...................................Jeremy Mazur
   Legislative aide ..........................Rebecca Grothaus
   Legislative aide .............................Steven Will


**CARTER, Stefani**                               E2.702
   **Phone: 463-0454**
   Fax: 463-1121
   Chief of staff ...................................Taurie Randermann
   Legislative director ..........................Chase Weber
   Administrative aide.........................Michael Walter


**CASTRO, Joaquin**                               E2.204
   **Phone: 463-0669**
   Fax: 463-5074
   Chief of staff ...................................Matthew Jones
   Communications director ..............Jorge Urby
   Legislative aide ..............................Bianca J. Briseño
   Scheduler/legislative aide .............Sarah Linares
   TLIP legislative intern....................Ryan Phipps
   Legislative intern ...........................Floyd Contreras
   Legislative intern ...........................Amalia Beckner
   Legislative intern ...........................Marlys McKinney


**CHISUM, Warren**                                GW.15
   **Phone: 463-0736**
   Fax: 463-0211
   Chief of staff ...................................Cristen Wohlgemuth
   Office manager...............................Reshma Charles
   Legislative aide .............................Trevor Spears
   Legislative aide .............................Jennifer Bremer
   Administrative aide.........................David Puentes, Jr.
   Intern ..............................................Megan Wagner
   Intern ..............................................Hannah Glenn


**CHRISTIAN, Wayne**                              GN.7
   **Phone: 463-0556**
   Fax: 476-1068
   Chief of staff ...................................Jon McClellan
   Legislative director ..........................Luke Bullock
   Administrative aide.........................Gabriele Nestande

**COLEMAN, Garnet F.** GW.17
Phone: 463-0524
Fax: 463-1260
Chief of staff ..................................Joseph Carlos Madden
Legislative director ....................Juliana Cruz Kerker
Communications director ............Rebecca Acuña
Policy analyst ...............................Christopher Walker
Policy analyst ...............................Chloe Walker
Policy analyst ...............................Jay Johnson

**COOK, Byron** E2.214
Phone: 463-0730
Fax: 463-2506
Chief of staff ..................................Toni Barcellona
Legislative assistant ....................Amanda Flores
Director, special projects .............Allie VanDeventer
Legislative assistant ....................Weston Drake

**CRADDICK, Tom** 1W.9
Phone: 463-0500
Fax: 463-7722
Chief of staff ..................................Kate Huddleston
Legislative aide ...........................Alice Puccio
Legislative assistant ....................Stephanie Waters

**CREIGHTON, Brandon** E2.210
Phone: 463-0726
Fax: 463-8428
Chief of staff ..................................Jenni Sellers
Legislative aide ...........................Tara Garcia
Administrative aide......................Allyn Izzard

**CROWNOVER, Myra** 4S.2
Phone: 463-0582
Fax: 463-0471
Chief of staff/general counsel......Kevin Cruser
Legislative advisor.......................Miranda Goodsheller
Administrative assistant ..............Ben Rowe

**DARBY, Drew** E1.508
Phone: 463-0331
Fax: 499-3978
Chief of staff ..................................Trent W. Thomas
Legislative aide ...........................Matthew Mazur
Legislative aide ...........................Justin Till
Legislative intern ........................Sydney Summers
Legislative intern ........................Hayden Lawson

**DAVIS, John** 4S.3
Phone: 463-0734
Fax: 479-6955
Chief of staff ..................................Rachel Deason
Legislative aide ...........................Rob Ries
Legislative assistant .......................Katy Aldredge

**DAVIS, Sarah** E1.312
Phone: 463-0389
Fax: 463-1374
Chief of staff ..................................Vince Sudela
Admin assistant/scheduler .............Elise LeGros
Intern ................................................Cody Crews
Intern ................................................Rob Davis
Intern ................................................Mike Hestand

**DAVIS, Yvonne** 1N.8
Phone: 463-0598
Fax: 463-2297
Legislative director ........................Lemuel Price
Legislative intern .............................Shalette Mitchell

**DESHOTEL, Joseph "Joe"** GN.8
Phone: 463-0662
Fax: 463-8381
Chief of staff ..................................Jacquelyn Savoy
Legislative director .......................Melissa Quevedo
Legislative aide  ...........................Christian Manuel

**DRIVER, Joe** 1N.10
Phone: 463-0574
Fax: 463-1481
Chief of staff ..................................Rachael Schreiber
Legislative aide ...........................John Robert Ball
Admin assistant/scheduler ..............Liz Worley

**DUKES, Dawnna** E1.504
Phone: 463-0506
Fax: 463-7864
Chief of staff ..................................Pamela McPeters
Legislative director ........................Jessica Kemp
Special projects coordinator...........Pam Parker
Legislative aide ............................Juan Garcia
Legislative aide ............................Stephanie LeBleu
Legislative aide ............................Thais Macedo
Legislative aide ............................Edward Pollard
Legislative aide ............................Czara Venegas
Legislative intern ...........................Jennifer Berberich
Legislative intern ...........................Esteban Desantiago

**DUTTON, Harold V., Jr.**                             **3N.5**
    Phone: **463-0510**
    Fax: 463-8333
    Legislative aide ..............................Linda Brooks
    Legislative aide ..............................Stephanie Russell
    Legislative assistant .....................Brandi Alexander

**EILAND, Craig**                                     **GW.5**
    Phone: **463-0502**
    Fax: 936-4260
    Chief of staff ..................................Lynette Kilgore
    Legislative aide ..............................Malika Te
    Scheduler ......................................Charlie Anderson
    Intern ...............................................Meaghan Nowell
    Intern ...............................................Brian Buescher

**EISSLER, Rob**                                      **E1.408**
    Phone: **463-0797**
    Fax: 463-0898
    Chief of staff ..................................Carole Bleakney
    Administrative assistant ................Sydney Klatt
    Legislative assistant......................Geoffrey Urbach

**ELKINS, Gary**                                      **4N.3**
    Phone: **463-0722**
    Fax: 472-5610
    Chief of staff ..................................Debra Clonts
    Office manager...............................Jessica Lynch

**FARIAS, Joe**                                       **E1.204**
    Phone: **463-0714**
    Fax: 463-1458
    Chief of staff ..................................Julianna Gonzaba
    Legislative director .........................Jaime Solis
    Legislative correspondent .............Niniane Tozzi
    Legislative intern ...........................Alberto A. Altamirano
    Legislative intern ...........................Alicia Lopez

**FARRAR, Jessica**                                   **4N.7**
    Phone: **463-0620**
    Fax: 463-0894
    Legislative director .........................Nicholas Reed
    Communications director ...............Liliana Mireles
    Administrative assistant ................Ariana Campos
    Environmental director/counsel......Adrian Shelley
    Environmental analyst/counsel ...Ji Min Park
    Policy analyst .................................Isabel Longoria
    Policy analyst (TLIP) .....................Christian Taylor
    Legislative intern ...........................Nishi Kothari
    Legislative intern ...........................Ross Weingarten

**FLETCHER, Allen**                                   **E2.906**
    Phone: **463-0661**
    Fax: 463-4130
    Chief of staff ..................................Robert Papierz
    Legislative director .........................Diane Parlapiano

**FLYNN, Dan**                                        **GN.10**
    Phone: **463-0880**
    Fax: 463-2188
    Chief of staff ..................................David Erinakes
    Office manager...............................Karah Carr
    Intern ...............................................Shelby Plasek

**FRULLO, John M.**                                   **E1.406**
    Phone: **463-0676**
    Fax: 463-0072
    Chief of staff ..................................Robin MacEwan
    Scheduler .......................................Kimberly Lile

**GALLEGO, Pete P.**                                  **4N.9**
    Phone: **463-0566**
    Fax: 236-9408
    Chief of staff ..................................Martin Lujan
    Deputy chief of staff .......................Jaclyn Uresti
    Policy analyst .................................Oscar Padilla
    Legislative aide ..............................Evita Zavaleta

**GARZA, John**                                       **E1.512**
    Phone: **463-0269**
    Fax: 463-1096
    Chief of staff ..................................Art Martinez De Vara
    General counsel .............................Michael Berlanga
    Capitol office director ....................Amy Lane

**GEREN, Charlie**                                    **E2.308**
    Phone: **463-0610**
    Fax: 463-8310
    Chief of staff ..................................Laura Grable
    Legislative director .........................Robert Armstrong
    Legislative aide ..............................Jordan Walker
    Legislative aide ..............................Kyle Smoke

**GIDDINGS, Helen**                                   **1N.5**
    Phone: **463-0953**
    Fax: 463-5887
    Chief of staff ..................................Sherri Gilbert

**GONZALES, Larry**                          E2.412
    Phone: **463-0670**
    Fax: 463-1469
    Chief of staff ...............................Chris Sanchez
    Legislative aide ..........................Courtney Forsell
    Administrative aide....................Betty Horton
    Intern ..........................................Sarah Holman
    Intern ..........................................Rebekah Gomez
    Intern ..........................................Kathleen Wong

**GONZALES, Veronica**                       E2.406
    Phone: **463-0578**
    Fax: 463-1482
    Chief of staff ...............................Ricardo Lopez-Guerra
    General counsel ..........................Jennifer Saenz
    Legislative aide ..........................Rudy Delgado
    Legislative aide ..........................Bernie Aldape
    Legislative aide ..........................Katherine Mendiola
    Law clerk ....................................Brenda Tso

**GONZALEZ, Naomi**                          E2.416
    Phone: **463-0622**
    Fax: 463-0931
    Chief of staff ...............................Claudia Tijerina
    Legislative director .....................Kate Mason
    Legislative aide/intern ................Brittney Quezada
    Legislative aide/intern ................Ryan McHutchion

**GOODEN, Lance**                            E1.324
    Phone: **463-0458**
    Fax: 463-2040
    Chief of staff ...............................Lindsey Johnson
    Legislative director .....................Jeff Stokes
    Administrative assistant .............Hillary Heisel
    Director, communications...........Austin Talbert

**GUILLEN, Ryan**                            E1.320
    Phone: **463-0416**
    Fax: 463-1012
    Chief of staff ...............................Robert McVey
    Legislative director .....................Katheryn Johnson
    Communications director ...........Daniel Barrera
    Policy director.............................Corey Howell
    Office manager............................Amanda Roark
    Intern ..........................................Eddie Escobar
    Intern ..........................................Emily Sellers
    Intern ..........................................Merrit Martin
    Intern ..........................................Paul Diaz
    Intern ..........................................Jerrico Perez
    Intern ..........................................Amolee Chavda
    Intern ..........................................Jung-Hyun Han

**GUTIERREZ, Roland**                        E1.510
    Phone: **463-0452**
    Fax: 463-1447
    Chief of staff ...............................Margaret Frain Wallace
    Legislative director .....................Michael Lozano
    Legislative aide ..........................Jorge Reyes
    Admin aide/scheduler.................Amanda Domaschk

**HAMILTON, Mike**                           E2.318
    Phone: **463-0412**
    Fax: 463-1915
    Chief of staff ...............................Nikki Gonzales
    Intern ..........................................Meredith Cooke
    Intern ..........................................Shelby Galvin

**HANCOCK, Kelly**                           E2.910
    Phone: **463-0599**
    Fax: 463-0751
    Chief of staff ...............................Mia Garza
    Communications director ...........Camille Carter
    Legislative director .....................Zena Wommack
    Legislative aide ..........................Matthew Cope

**HARDCASTLE, Rick**                         4N.4
    Phone: **463-0526**
    Fax: 463-6003
    Chief of staff ...............................Missy Warren
    Senior policy analyst ..................Allison Billodeau
    Legislative aide ..........................John-Cade Griffin
    Intern ..........................................Eugenia Wagner

**HARLESS, Patricia**                        E2.410
    Phone: **463-0496**
    Fax: 463-1507
    Chief of staff ...............................Colby Beuck
    Director of operations.................Julie Scott
    Intern ..........................................Austin Beck
    Intern ..........................................Blake Earle
    Intern ..........................................Ashlee Jahn
    Intern ..........................................Kayla Williams

**HARPER-BROWN, Linda**                      E2.212
    Phone: **463-0641**
    Fax: 463-0044
    Chief of staff ...............................Amy Ellsworth
    Legislative director .....................James Carter
    Administrative assistant .............Katie Bennett

**HARTNETT, Will**                         4N.10
   Phone: 463-0576
   Fax: 463-7827
   Chief of staff................................Stephen Raines
   Legislative director ....................Rowland Greenwade
   Administrative aide.....................Annie Nabers

**HERNANDEZ LUNA, Ana**                    E1.212
   Phone: 463-0614
   Fax: 463-0612
   Chief of staff................................Sonia Lopez
   Legislative director ....................Jo Cassandra Cuevas
   Policy analyst .............................Robin Raasch

**HILDERBRAN, Harvey**                     GW.12
   Phone: 463-0536
   Fax: 463-1449
   Chief of staff................................Debra Van Bibber
   Legislative director ....................Isaac Albarado
   Legislative aide ..........................Raul Espinoza
   Legislative aide ..........................Dustin Cox
   Legislative intern .......................Matthew Church
   Legislative intern .......................Jacey Svendsen
   Legislative intern .......................Worth Farabee
   Legislative intern .......................Stephen Small

**HOCHBERG, Scott**                        4N.8
   Phone: 463-0492
   Fax: 463-5896
   Chief of staff................................Theresa Woodward
   Legislative aide ..........................Becky Cohen
   Legislative aide ..........................Rachel Hamra
   Legislative aide ..........................Rahul Sreenivasan
   Legislative intern  ......................Sara Lang

**HOPSON, Chuck**                          GW.6
   Phone: 463-0592
   Fax: 463-8792
   Chief of staff................................Cheryl Lively
   Legislative director ....................Paul Hanna
   Administrative assistant .............Kathryn Cantlon
   Legislative intern ........................Adam Taylor

**HOWARD, Charlie**                        4S.5
   Phone: 463-0710
   Fax: 463-0711
   Legislative director ....................Andy Kuchera
   Administrative aide.....................Rebekah Balciunas

**HOWARD, Donna**                          E2.418
   Phone: 463-0631
   Fax: 463-0901
   Chief of staff................................Eleanor D'Ambrosio
   Legislative director ....................Scheleen Walker
   Director, constituent svcs ............Scott M. Daigle

**HUBERTY, Dan**                           E2.712
   Phone: 463-0520
   Fax: 463-1606
   Chief of staff................................Casey Christman
   Legislative director ....................Maggie Irwin
   Executive assistant ....................Autumn Jodzio
   Legislative aide ..........................Chase Barker

**HUGHES, Bryan**                          E1.404
   Phone: 463-0271
   Fax: 463-1515
   Chief of staff................................Daniel Deslatte
   Legislative coordinator ..............S. Cody Terry
   Legislative asst/scheduler..........Desiree Smith
   Legislative assistant...................Wesley Traylor
   Intern ...........................................Bradley Rogers
   Intern ...........................................Katie Wilson
   Intern ...........................................Lamar DeLong

**HUNTER, Todd**                           E2.808
   Phone: 463-0672
   Fax: 463-2101
   Legislative coordinator ..............Justin Hudman
   Scheduler.....................................Mandi Villarreal
   Legislative assistant...................Caleb McGee
   Legislative assistant...................John Michael Wilshusen
   Communications director ...........Angie Flores

**ISAAC, Jason**                           E1.410
   Phone: 463-0647
   Fax: 463-3573
   Chief of staff................................Ellen Troxclair
   Policy director............................Ryan Paylor
   Director, constituent services .... Carrie Nelson

**JACKSON, Jim**                           E2.718
   Phone: 463-0468
   Fax: 463-1044
   Chief of staff................................Ryan Fisher
   Legislative aide ..........................Alexa Calligas

**JOHNSON, Eric**                          **E1.306**
    **Phone: 463-0586**
    Fax: 463-8147
    Chief of staff ................................Juan Ayala
    Legislative director ....................Brent Rubin
    Legislative intern ......................Ayomide Shittu
    Legislative intern ........................Claire Stieg
    Legislative intern ......................Clyde Jiles
    Legislative intern ......................Kayla McDermott
    Legislative intern ......................Robiel Abraha

**KEFFER, Jim**                            **1N.12**
    **Phone: 463-0656**
    Fax: 478-8805
    Chief of staff ...............................Ky Ash
    Administrative assistant ...........Brenda Crook
    Legislative assistant.................Bernice Espinosa-Torres

**KING, Phil**                             **1N.7**
    **Phone: 463-0738**
    Fax: 463-1957
    Chief of staff .............................Caleb Troxclair
    Legislative director ...................Ashley Westenhover

**KING, Susan**                            **E2.422**
    **Phone: 463-0718**
    Fax: 463-0994
    Chief of staff .............................Tammy Pirtle
    Legislative assistant.................Kate Raetz
    Office manager.........................Sherrie Parks

**KING, Tracy O.**                         **GW.7**
    **Phone: 463-0194**
    Fax: 463-1220
    Chief of staff .............................Celina Overbo
    Legislative assistant.................Chelsea Wallace
    Legislative assistant.................Regina Campos

**KLEINSCHMIDT, Tim**                      **E2.814**
    **Phone: 463-0682**
    Fax: 463-5896
    Chief of staff .............................John Higgins, Jr.
    Legislative director ...................Anna Hynes

**KOLKHORST, Lois**                        **GN.9**
    **Phone: 463-0600**
    Fax: 463-5240
    Chief of staff/leg director ..........Chris Steinbach
    Legislative aide ........................Donald Barber
    Scheduler..................................Rebecca Pride
    Legislative assistant.................Benjamin Barkley

**KUEMPEL, John**                          **E1.208**
    **Phone: 463-0602**
    Fax: 463-0391
    Chief of staff .............................Brittney Grigg
    Administrative assistant ...........Whitney Moses
    Legislative aide ........................Brittany Ingram

**LANDTROOP, Jim**                         **E1.422**
    **Phone: 463-0604**
    Fax: 463-5244
    Chief of staff .............................Katherine Munal
    Legislative aide ........................Jason Briggs
    Admin/legislative intern .............Katie Weissman
    Legislative intern ......................Ryan McCarty

**LARSON, Lyle**                           **E2.816**
    **Phone: 463-0646**
    Fax: 463-0893
    Chief of staff .............................Lynlie Wallace
    Legislative director ...................Emily Eppright

**LAUBENBERG, Jodie**                      **E2.902**
    **Phone: 463-0186**
    Fax: 463-5896
    Chief of staff .............................Suzanne Bowers
    Legislative director ...................Rachael Hendrickson
    Legislative assistant...................Alexandra Glendenning

**LAVENDER, George**                       **E2.716**
    **Phone: 463-0692**
    Fax: 463-0902
    Chief of staff ............................. Andrea Williams-McCoy
    Legislative director ................... Benjamin Pollock
    Legislative aide ........................ Matthew Ashley

**LEGLER, Ken**                            **E2.316**
    **Phone: 463-0460**
    Fax: 463-0763
    Chief of staff .............................Brad Tegeler
    Legislative aide ........................Chris Noonan
    Administrative aide/scheduler .....Emily Lord

**LEWIS, Tryon**                           **E2.508**
    **Phone: 463-0546**
    Fax: 463-8067
    Chief of staff .............................Gregory D. Watson
    Legislative aide ........................Pam Johnson
    Legislative director ...................Bobby Janecka

**LOZANO, J.M.**                                    **E1.318**
    **Phone: 463-0463**
    Fax: 463-1765
    Chief of staff ................................Patsy Clapper
    Legislative director ....................Josh Reyna
    Legislative aide ..........................Rey Milan
    Legislative aide ..........................Jose A. Ramirez

**LUCIO, Eddie III**                                **E2.510**
    **Phone: 463-0606**
    Fax: 463-0660
    Chief of staff ...................................Rubén O'Bell
    Legislative director ..........................Charlie Leal

**LYNE, Lanham**                                    **E2.820**
    **Phone: 463-0534**
    Fax: 463-8161
    Chief of staff ...................................Allison Scott
    Legislative intern ..............................Lance Umlang

**MADDEN, Jerry**                                   **GW.11**
    **Phone: 463-0544**
    Fax: 463-9974
    Legislative aide ..............................Mark Hey
    Policy director...................................Marsha McLane
    Intern ................................................Chelsea Belote
    Intern ................................................Adrienne Bowyer
    Intern ................................................Kayla Bramble
    Intern ................................................Angie Burford
    Intern ................................................Jolie Delcambre
    Intern ................................................Steven Denman
    Intern ................................................Lauren Glass
    Intern ................................................Kate Goodrick
    Intern ................................................Lena Proft
    Intern ................................................Ayla Williams

**MALLORY CARAWAY, Barbara**                        **E2.420**
    **Phone: 463-0664**
    Fax: 463-0476
    Chief of staff ...................................Samantha Davis
    Intern ................................................Davilin Hamel

**MARGO, Dee**                                      **E1.316**
    **Phone: 463-0728**
    Fax: 463-0397
    Chief of staff ...................................Olivia Zepeda
    Legislative director ..........................Justin Dudley

**MÁRQUEZ, Marisa**                                 **E2.414**
    **Phone: 463-0638**
    Fax: 463-8908
    Chief of staff ..........................Haley D. Greer
    Legislative director ...............Philip Lovegren
    Policy analyst ........................Michael Garemko
    Legislative aide .....................Chasity Tillis

**MARTINEZ, Armando "Mando"**                       **E2.312**
    **Phone: 463-0530**
    Fax: 463-0849
    Chief of staff ..........................Scott Jenkines
    Director, constituent svcs .......Jesse Ozuna
    Legislative assistant...............Sandra Morales
    Intern ......................................Caitlin Shea
    Intern ......................................Kylie LeBlanc
    Intern ......................................Mariana DeCarvalho
    Intern ......................................Santiago "James" Casiano
    Intern ......................................Steven Garza

**MARTINEZ FISCHER, Trey**                          **4S.4**
    **Phone: 463-0616**
    Fax: 463-4873
    Chief of staff ..........................Martin Golando
    Legislative assistant...............Daniel Greenfield
    Legislative asst/scheduler ......Melessa C. Rodriguez
    Legislative assistant...............Michael Moran
    Legislative assistant...............Tyler Ingraham
    Communications director .......Christina Gomez

**MCCLENDON, Ruth Jones**                           **3S.2**
    **Phone: 463-0708**
    Fax: 463-7071
    Chief of staff ..........................Janis Reinken
    Legislative aide .....................Curtis Smith
    Legislative scholar.................Michael Johnson
    Legislative scholar.................Murtuza Hussain
    Legislative intern ..................Kori Hattemer
    Legislative intern ..................Josh Levine

**MENÉNDEZ, José**                                  **E1.420**
    **Phone: 463-0634**
    Fax: 463-7668
    Chief of staff ..........................Don Jones
    Legislative director ...............Hector Morales
    Legislative assistant...............Victoria Flores
    Legislative assistant...............Allison Hughes

**MILES, Borris**                                    **E2.506**
    Phone: **463-0518**
    Fax: 463-0941
    Chief of staff ....................................Rob Borja
    Legislative director .........................Camille Foster
    General counsel .............................Simeon Popoff
    Legislative intern ............................Alex Green
    Legislative intern ............................Brad Cunningham

**MILLER, Doug**                                     **E1.314**
    Phone: **463-0325**
    Fax: 463-6161
    Chief of staff ....................................Fritz Reinig
    Legislative aide ...............................Lara Meyer
    Intern .............................................Emi Anderson
    Intern .............................................Cole Ruiz

**MILLER, Sid**                                      **GN.11**
    Phone: **463-0628**
    Fax: 463-3644
    Chief of staff....................................Karen Kolb Steakley
    Legislative aide ...............................Brooks Allen

**MORRISON, Geanie W.**                              **GS.6**
    Phone: **463-0456**
    Fax: 463-0158
    Chief of staff....................................Justin Unruh
    Administrative assistant ..................Lauren Simcik

**MUÑOZ, Sergio, Jr.**                               **E1.322**
    Phone: **463-0704**
    Fax: 463-5364
    Chief of staff....................................Richard Sanchez
    Legislative aide ...............................Christopher Madrid
    Legislative intern ............................Jessica Enriquez
    Legislative intern ............................Dylan Matthews
    Legislative intern ............................Isaac Sulemana
    Legislative intern ............................Ricco Garcia
    Legislative intern ............................Alex Ramirez
    Legislative intern ............................Conny Sanchez
    Legislative intern ............................Ashley Lopez

**MURPHY, Jim**                                      **E2.606**
    Phone: **463-0514**
    Fax: 463-8715
    Chief of staff....................................Molly Quirk
    Executive assistant .........................Laura Sorrell
    Legislative aide ...............................Scott Stewart
    Legislative assistant ........................Blair Bradford
    Legislative assistant ........................Jessica Wurzel
    Legislative assistant ........................Sean Danielson

**NAISHTAT, Elliott**                                **GW.16**
    Phone: **463-0668**
    Fax: 463-8022
    Chief of staff ...................................Dorothy Browne
    Legislative director .......................Nancy Walker
    Legislative aide ............................Judith Dale
    Legislative aide ............................Jessica Hoy
    Legislative aide ............................Melanie Wilmoth
    Legislative aide ............................Eric Leventhal
    Legislative aide ............................Susan Watson
    Legislative aide ............................Clay Scallan
    Legislative aide ............................Robert Nunez

**NASH, Barbara**                                    **E2.404**
    Phone: **463-0562**
    Fax: 463-2053
    Chief of staff ..................................Marc Alcedo
    Legislative director .......................Courtney Hanson
    Legislative assistant .....................David Paschall
    Intern ...........................................Rana Robinson

**OLIVEIRA, René O.**                                **3N.6**
    Phone: **463-0640**
    Fax: 463-8186
    Chief of staff ..................................J.J. Garza
    Legislative director .......................Michael T. Gray
    Legal clerk.....................................Jamie Durham
    Full-time intern ..............................Margie Alfaro
    Full-time intern ..............................Brittane Hamilton
    Part-time intern..............................Alyssa Flores
    Part-time intern..............................Angie Lopez

**ORR, Rob**                                         **E1.414**
    Phone: **463-0538**
    Fax: 463-0897
    Legislative director  ......................Matthew Miller
    Legislative aide ............................Landon Young
    Intern ...........................................Ryan Avera
    Intern ...........................................James Owen
    Intern ...........................................Estanislao Rodriguez

**OTTO, John**                                       **E2.706**
    Phone: **463-0570**
    Fax: 463-0315
    Chief of staff ..................................Nikki Cobb
    Legislative aide ............................Carly Castetter
    Legislative intern ..........................Leah Buenik

**PARKER, Tan**                                          **E2.608**
   Phone: 463-0688
   Fax: 480-0694
   Chief of staff .................................... Rick Dennis
   Legislative aide ............................. Jessica Lutrell
   Policy analyst ................................. John Furlow

**PATRICK, Diane**                                      **E2.610**
   Phone: 463-0624
   Fax: 463-8386
   Chief of staff .................................... Jenny Goerdel
   Legislative aide ............................. Ben Maddox
   Outreach coordinator .................... Mary Anthes
   Administrative assistant ................ Emily Hemphill
   Legislative intern ........................... Rachel Whiteley

**PAXTON, Ken**                                          **GW.4**
   Phone: 463-0356
   Fax: 463-0701
   Chief of staff .................................... Randy Samuelson
   Legislative director .......................... Ben Williams
   Legislative aide ............................... Michele Samuelson
   Legislative intern ............................ Ashley Kim
   Legislative intern ............................ James Lamey

**PEÑA, Aaron**                                          **E1.304**
   Phone: 463-0426
   Fax: 463-0043
   Chief of staff .................................... Maricela De Leon
   Legislative director .......................... Michael Garcia
   Legislative aide ............................... Felicia Peña
   Legislative aide ............................... Abby Felts
   Legislative intern ............................ Melinda Reyes
   Legislative intern ............................ Medardo Perez
   Legislative intern ............................ Daniel Ramirez

**PERRY, Charles**                                      **E1.418**
   Phone: 463-0542
   Fax: 463-0671
   Chief of staff .................................... Jackie King
   Legislative aide/scheduler ............... Catherine Rodman

**PHILLIPS, Larry**                                     **E2.602**
   Phone: 463-0297
   Fax: 463-1561
   Chief of staff .................................... Sara Haenes
   Legislative director .......................... Courtney Reid
   Intern ............................................... Meredith Reid
   Intern ............................................... Chris Hester

**PICKETT, Joe C.**                                      **1W.5**
   Phone: 463-0596
   Fax: 463-6504
   Chief of staff ................................ Eduardo Miranda, Jr.
   Legislative director ..................... Amy Morales

**PITTS, Jim**                                           **1W.2**
   Phone: 463-0516
   Fax: 463-1051
   Chief of staff .................................... Aaron Gregg
   Office manager ........................... DeeDee Shrum
   Legislative aide .......................... Jason Steele
   Legislative aide .......................... Josh Devin
   Legislative aide .......................... Blaire Booker
   Legislative aide .......................... Chris Kirby

**PRICE, Four**                                          **E2.704**
   Phone: 463-0470
   Fax: 236-1908
   Chief of staff/general counsel ...... Hal Talton
   Legislative director ..................... Katharine McAden
   Communications director ........... Dana Parish

**QUINTANILLA, Chente**                                  **E1.218**
   Phone: 463-0613
   Fax: 463-1237
   Chief of staff ............................... Robert Grijalva
   Legislative intern ....................... Roberto Nino-Vasquez

**RAYMOND, Richard Peña**                                **1W.4**
   Phone: 463-0558
   Fax: 463-6296
   Chief of staff .............................. David Leo
   Gen counsel/legislative director .. Catherine Moran
   Legislative aide .......................... Julia Rubio
   Legal intern ................................ Meagan Armstrong
   Legal intern ................................ Mateo Fisher
   Legal intern ................................ Seth Sanders
   Legislative intern ....................... Margaret Rubio

**REYNOLDS, Ron**                                        **E2.402**
   Phone: 463-0494
   Fax: 463-1403
   Chief of staff ............................... Jennifer Brader
   Legislative aide .......................... Laolu Yemitan
   Legislative intern ....................... Naomi Showers

**RIDDLE, Debbie**      E2.306
    **Phone: 463-0572**
    Fax: 463-1908
    Chief of staff ....................................Jon English
    Legislative director ..........................Scott Riling
    Intern ...............................................Alexandria Newman
    Intern ...............................................Charles Nwaogu
    Intern ...............................................Joshua Santo
    Intern ...............................................Samantha Kline

**RITTER, Allan**      1W.3
    **Phone: 463-0706**
    Fax: 463-1861
    Chief of staff ....................................Sean Haynes
    Legislative aide ...............................Peter Salatich

**RODRIGUEZ, Eddie**      E2.408
    **Phone: 463-0674**
    Fax: 463-0314
    Chief of staff ....................................Nate Walker
    Legislative director ..........................Carlos Calle
    Senior legislative assistant...............Alda M. Santana
    Legislative intern .............................Brittney Rodriguez
    Legislative intern .............................Valerie Vera

**SCHWERTNER, Charles**      E2.304
    **Phone: 463-0309**
    Fax: 463-0049
    Chief of staff ...................................Thomas Holloway
    Legislative aide ...............................Rachel Nicholson
    Legislative intern .............................Cai Benavides
    Director of constituent services .......Leah Alexander

**SCOTT, Connie**      E2.302
    **Phone: 463-0462**
    Fax: 463-1705
    Chief of staff ....................................Anne Billingsley
    Legislative aide ...............................Jeff Marks
    Scheduler/intern ..............................McCall Cunningham

**SHEETS, Kenneth**      E1.412
    **Phone: 463-0244**
    Fax: 463-9967
    Chief of staff ....................................Amy DeWeese
    Legislative aide ...............................Hunter Thomas
    Legislative assistant.........................Taylor Davis

**SHEFFIELD, Ralph**      E2.314
    **Phone: 463-0630**
    Fax: 463-0937
    Chief of staff ....................................Travis Sampley
    Scheduler ........................................Jessica Fajans
    Legislative aide ...............................Sally Bage
    Administrative aide..........................Blane Langston

**SHELTON, Mark**      E2.604
    **Phone: 463-0608**
    Fax: 463-8342
    Chief of staff ....................................Clayton Stewart
    Policy analyst ..................................Sierra Stephens
    Research assistant...........................Richard Shelton
    Legislative aide ...............................Katy Odom
    Legislative aide ...............................Sarah Classen
    Legislative assistant........................Carolyn Webb
    Legislative assistant........................Christopher Semper

**SIMPSON, David**      E1.416
    **Phone: 463-0750**
    Fax: 463-9085
    Chief of staff ....................................Kathi Seay
    Legislative aide ...............................Michael Levens
    Administrative assistant/scheduler...Michael Bullock

**SMITH, Todd**      4S.6
    **Phone: 463-0522**
    Fax: 463-9529
    Chief of staff ....................................Trish Conradt
    General counsel ...............................Erica Grigg
    Legislative aide ...............................Patrick McMahon

**SMITH, Wayne**      E2.708
    **Phone: 463-0733**
    Fax: 463-1323
    Chief of staff ....................................Amanda Peters
    Legislative aide ...............................Lauren Smith
    Legislative aide ...............................Stephanie Kunz

**SMITHEE, John**      1W.10
    **Phone: 463-0702**
    Fax: 476-7016
    Chief of staff ....................................Andrea Stingley
    Legislative aide ...............................Lauren Murray

**SOLOMONS, Burt**                          1W.11
   **Phone: 463-0478**
   Fax: 463-2089
   Chief of staff ....................................Bonnie Bruce
   General counsel ..............................Carsi Mitzner
   Legislative aide ..............................Staci Rives
   Legislative intern ............................Jennifer Stanley
   Legal intern ....................................Valeria Mirolevich

**STRAMA, Mark**                           E2.822
   **Phone: 463-0821**
   Fax: 463-1199
   Chief of staff ....................................Mary Throop
   Legislative director ..........................David Smeltzer
   Legislative aide ..............................Beth Olson Drew

**STRAUS, Joe (Speaker)**                  2W.13
   **Phone: 463-1000**
   Fax: 463-0675
   Chief of staff ....................................Denise Davis
   Director of policy & budget...............Lisa Kaufman
   General counsel/sr tax advisor........Jesse Ancira
   Executive assistant ..........................Channing Burke
   Scheduler.........................................Gretchen Steen
   Director of administration ................Laurie Loiselle
   Director of communications.............Tracy Young
   Director of special programs ...........Kari Torres

**TAYLOR, Larry**                          E2.322
   **Phone: 463-0729**
   Fax: 474-2398
   Chief of staff ....................................Cari Christman
   Administrative assistant ..................Wesley Starnes
   Legislative aide ..............................Kyle Funderburk

**TAYLOR, Van**                            E2.714
   **Phone: 463-0594**
   Fax: 463-1021
   Chief of staff ....................................Brittany Eck
   Legislative director ..........................Matt Creel
   Legislative assistant.........................Madeleine Bell
   Legislative assistant.........................Jordan Williford
   Legislative intern ............................Rachel Pace
   Legislative intern ............................Thomas Fulton
   Legislative intern ............................James Zhu

**THOMPSON, Senfronia**                    3S.6
   **Phone: 463-0720**
   Fax: 463-6306
   Chief of staff ....................................Milda Mora
   Legislative director ..........................Brete Anderson
   Communications dir/policy analyst...Colleen Tran
   Director of public relations...............Lee Loya
   Legislative intern ............................Megan Atchley
   Legislative intern ............................Melissa Jones

**TORRES, Raul**                           E2.802
   **Phone: 463-0484**
   Fax: 463-7834
   Chief of staff ....................................Martha Bell
   Legislative director ..........................Gene Seaman
   Legislative assistant ........................Chris Duke
   Legislative intern ............................Chase Skjolsvik
   Legislative intern ............................Katie Gleghorn
   Legislative intern ............................Tristan Summers
   Legislative intern ............................Evan Stewart
   Legislative intern ............................Daryl Sedillo

**TRUITT, Vicki**                          GW.18
   **Phone: 463-0690**
   Fax: 477-5770
   Chief of staff ....................................Terra Taylor
   Legislative director ..........................Dan Sutherland
   Legislative aide ..............................Joseph Halbert
   Legislative intern ............................Jonathan Connors
   Legislative intern ............................Jessica Myles

**TURNER, Sylvester**                      1W.6
   **Phone: 463-0554**
   Fax: 463-8380
   Chief of staff ....................................Alison Brock
   Scheduler.........................................Pam Watson
   Policy director, Appropriations
   and State Affairs...............................Cory Henrickson
   Legislative aide ..............................Murry Mathews
   Legislative intern ............................Lisa Sherrod
   Legislative intern ............................Krystal Braden
   Law intern.........................................Nicholas Giles

**VEASEY, Marc**                           E2.806
   **Phone: 463-0716**
   Fax: 463-1516
   Chief of staff/general counsel.........Anne Hagan
   Legislative director ........................Tanya Gripton
   Legislative aide ............................Alexander Hammond
   Legislative intern ..........................Anastasia Thomas

**VILLARREAL, Mike**  E1.506
**Phone: 463-0532**
Fax: 463-7675
Legislative director ........................ Peter Clark
Senior policy analyst .................... Stephanie Chiarello
Policy analyst ............................... Adelina Bryant
Legislative aide ............................ Diane Nguyen
Legislative aide ............................ Ellis Ware
Legislative aide ............................ Patrick Steck

**VO, Hubert**  E2.208
**Phone: 463-0568**
Fax: 463-0548
Chief of staff ................................. Elizabeth Tschudi
Legislative director ........................ Carlos Mejias
Legislative aide ............................ Benjamin Griggs
Legislative aide ............................ Brooke Boutwell
Intern ............................................ Tiffany Dinh

**WALLE, Armando**  E1.220
**Phone: 463-0924**
Fax: 463-1510
Chief of staff ................................. Neesha Davé
Legislative director ........................ Laura Martin
Legislative aide ............................ Maxie Gallardo
Legislative intern .......................... Jesus Moreno
Legislative intern .......................... Ted Seeger

**WEBER, Randy**  E2.320
**Phone: 463-0707**
Fax: 463-8717
Chief of staff ................................. Chara McMichael
Legislative assistant ...................... Sarah Majzoub
Intern ............................................ Shelby Clawson
Intern ............................................ Katie Grosskopf
Intern ............................................ Hannah Lee
Intern ............................................ Julie Timte

**WHITE, James**  E2.720
**Phone: 463-0490**
Fax: 463-9059
Chief of staff ................................. Timothy Head
Legislative aide ............................ Jillian Henderson
Intern ............................................ Akilah Craig

**WOOLLEY, Beverly (Speaker Pro Tem)**  GS.2
**Phone: 463-0696**
Fax: 463-9333
Legislative assistant ...................... Amy Rister
General counsel ............................ Tessa Zavala
Intern ............................................ Benjamin McPhaul
Intern ............................................ Clark Miller

**WORKMAN, Paul**  E1.216
**Phone: 463-0652**
Fax: 463-0565
Chief of staff ................................. Araminta Everton
Legislative director ........................ Stuart Moss
Legislative aide ............................ Truett Jones
Intern ............................................ Stephen Nevlud
Intern ............................................ Jason Haydon

**ZEDLER, Bill**  E1.302
**Phone: 463-0374**
Fax: 463-0364
Chief of staff ................................. Phil Fountain
Administrative aide ........................ Bryan Shufelt
Director .......................................... Deanna Zimmerman

**ZERWAS, John**  E2.310
**Phone: 463-0657**
Fax: 236-0713
Chief of staff ................................. Brad Westmoreland
Legislative aide ............................ Hunter Hughes
Legislative aide ............................ Brandon Zerwas
Administrative/legislative aide ......... Caroline Dickerson

# House Committees

**AGRICULTURE AND LIVESTOCK**                 E2.114
**Phone: 463-0762**
Fax: 463-6003
CHAIR .............................................Rick Hardcastle
Committee clerk .............................Allison Billodeau


**APPROPRIATIONS**                                        E1.032
**Phone: 463-1091**
Fax: 463-0270
CHAIR .............................................Jim Pitts
Committee director ........................Amy Peterson
Clerk...............................................Jonathon Storms
Assistant clerk ...............................Blake Calvert
Analyst - Article 2 ..........................Nelda Hunter
Analyst - Article 3 ..........................Hunter Thompson
Analyst - Articles 6,7,8...................Joaquin Guadarrama
Analyst - Articles 1,4,5...................Heather Fleming


**BORDER AND INTERGOVERNMENTAL AFFAIRS**   E2.158
**Phone: 463-1211**
Fax: 463-1221
CHAIR .............................................Veronica Gonzales
Committee clerk .............................Elizabeth Barrett
Assistant clerk ...............................Will Stovall


**BUSINESS AND INDUSTRY**                         E2.128
**Phone: 463-0766**
Fax: 463-6698
CHAIR .............................................Joseph Deshotel
Chief clerk .....................................Benjamin Fitzgibbons
Assistant clerk ...............................Melissa Lindsey


**CALENDARS**                                                 E2.148
**Phone: 463-0758**
Fax: 463-5896
CHAIR .............................................Todd Hunter
Committee clerk .............................Jennifer Welch
Assistant clerk ...............................James Allen


**CORRECTIONS**                                              E2.110
**Phone: 463-0796**
CHAIR .............................................Jerry Madden
Committee clerk .............................Teri Avery
Assistant committee clerk .............Marsha McLane


**COUNTY AFFAIRS**                                         E2.130
**Phone: 463-0760**
Fax: 463-5227
CHAIR .............................................Garnet F. Coleman
Committee director....................Revlynn Lawson
Assistant clerk .............................Katy Reagan


**CRIMINAL JURISPRUDENCE**                     E2.112
**Phone: 463-0768**
Fax: 463-0270
CHAIR .............................................Pete P. Gallego
Committee clerk ..........................Michael Pacheco
Assistant clerk .............................Moises Morales
Assistant clerk .............................Ashley Malone


**CULTURE, RECREATION, AND TOURISM**       E2.134
**Phone: 463-1974**
Fax: 463-0237
CHAIR .............................................Ryan Guillen
Committee clerk ..........................Sandy Frizzell
Assistant clerk .............................Steve A. Martinez
Assistant clerk .............................Kathleen Hill


**DEFENSE AND VETERANS' AFFAIRS**          E2.160
**Phone: 463-1393**
Fax: 463-1023
CHAIR .............................................Joe C. Pickett
Committee clerk ..........................Leigh Anne Lauderdale
General counsel ...........................Kendra Davitt
Policy analyst ...............................Pierce Mitchell


**ECONOMIC AND SMALL BUSINESS
DEVELOPMENT**                                             E2.118
**Phone: 463-0069**
Fax: 463-3624
CHAIR .............................................John Davis
Committee clerk ..........................Laurie McAnally
Assistant clerk .............................Rob Ries


**ELECTIONS**                                                  E2.144
**Phone: 463-0772**
Fax: 463-0270
CHAIR .......................................Larry Taylor
Chief clerk .................................Nicole Sunstrum
Assistant clerk ..........................Margot Anne Cromack

**ENERGY RESOURCES**      E2.162
    **Phone: 463-0774**
    Fax: 478-8805
    CHAIR ........................................ Jim Keffer
    Committee clerk ...................... Bernice Espinosa-Torres

**ENVIRONMENTAL REGULATION**      E2.154
    **Phone: 463-0776**
    Fax: 463-9503
    CHAIR ........................................ Wayne Smith
    Committee director ................... Gabe Valenzuela
    General counsel ...................... Elizabeth Hundt
    Committee clerk ....................... Lindsay Pearson

**GENERAL INVESTIGATING AND ETHICS**      GW.6
    **Phone: 463-0592**
    Fax: 463-8792
    CHAIR ........................................ Chuck Hopson
    Committee clerk ....................... Paul Hanna
    Assistant clerk ........................... Cheryl Lively
    Assistant clerk ........................... Kathryn Cantlon

**GOVERNMENT EFFICIENCY AND REFORM**      E2.202
    **Phone: 463-0903**
    Fax: 463-0861
    CHAIR ........................................ Bill Callegari
    Committee clerk ....................... Jonathan Mathers

**HIGHER EDUCATION**      E2.106
    **Phone: 463-0782**
    CHAIR ........................................ Dan Branch
    Committee clerk ....................... Dustin Meador
    Deputy clerk ............................. Nick Wat
    Policy analyst ............................ Sarah Daniel

**HOMELAND SECURITY AND PUBLIC SAFETY**      E2.146
    **Phone: 463-0133**
    CHAIR ........................................ Sid Miller
    Chief clerk ................................ Steven Schar
    Assistant clerk ........................... Matthew Posey

**HOUSE ADMINISTRATION**      E2.308
    **Phone: 463-0784**
    CHAIR ........................................ Charlie Geren
    Clerk ......................................... Laura Grable

**HUMAN SERVICES**      E2.152
    **Phone: 463-0786**
    Fax: 463-8981
    CHAIR ........................................ Richard Peña Raymond
    Committee clerk ....................... Jim Terrell
    Assistant committee clerk ......... Lucky Urias
    Committee intern ...................... Miguel Flores

**INSURANCE**      E2.150
    **Phone: 463-0788**
    Fax: 476-7016
    CHAIR ........................................ John Smithee
    Chief committee clerk ................ Jon Ryan Parker
    Assistant clerk ........................... Bridget Levien
    Committee intern ...................... Sally Polk

**JUDICIARY AND CIVIL JURISPRUDENCE**      E2.120
    **Phone: 463-0790**
    Fax: 463-0174
    CHAIR ........................................ Jim Jackson
    General counsel/clerk ............... Kari King
    Assistant clerk ........................... Brett Newnam
    Intern ....................................... Laurie Walker

**LAND AND RESOURCE MANAGEMENT**      E2.136
    **Phone: 463-1623**
    Fax: 463-8186
    CHAIR ........................................ Rene Oliveira
    Committee clerk ....................... Jamie Durham
    Assistant committee clerk ......... Brittane Hamilton

**LICENSING AND ADMINISTRATIVE PROCEDURES**      E2.156
    **Phone: 463-0798**
    CHAIR ........................................ Mike Hamilton
    Clerk ......................................... Jeff Madden
    Assistant clerk ........................... Michael Gibson

**LOCAL AND CONSENT CALENDARS**      3S.6
    **Phone: 463-0800**
    Fax: 463-6306
    CHAIR ........................................ Senfronia Thompson
    Chief clerk ................................ Milda Mora
    Assistant clerk ........................... Colleen Tran

**NATURAL RESOURCES**                    E2.104
  Phone: 463-0802
  Fax: 463-9810
  CHAIR ........................................ Allan Ritter
  Committee director/chief clerk ..... Elizabeth Fazio
  Assistant clerk ............................. Hailey Wolf
  General counsel ......................... Evan Hochschild
  Committee intern ........................ Jose Bonilla
  Committee intern ........................ Hannah Hartman
  Committee intern ........................ Krista Heiden


**PENSIONS, INVESTMENTS,**
**AND FINANCIAL SERVICES**               E2.164
  Phone: 463-2051
  CHAIR ........................................ Vicki Truitt
  Chief clerk ................................. Merita Zoga
  Assistant clerk ........................... Emily Landon


**PUBLIC EDUCATION**                      E2.124
  Phone: 463-0804
  Fax: 463-6910
  CHAIR ........................................ Rob Eissler
  Policy director ............................. Jenna Watts
  Committee clerk ......................... Rita Ashley
  Assistant clerk ........................... Ryan Marquess


**PUBLIC HEALTH**                         E2.172
  Phone: 463-0806
  Fax: 463-0900
  CHAIR ........................................ Lois Kolkhorst
  Committee director ..................... Bryan W. Law
  Committee clerk ......................... Crystal Ford
  Assistant committee clerk .......... Brian Gehr
  Assistant committee clerk .......... John Ruff
  Health policy analyst ................. Nicholas Reale


**REDISTRICTING**                         E2.1006
  Phone: 463-9948
  Fax: 463-0296
  CHAIR ........................................ Burt Solomons
  Committee clerk ......................... Bonnie Bruce
  General counsel ......................... Ryan Downton
  Assistant committee clerk .......... Addie Crimmins
  Legislative intern ....................... Kate Hayden


**RULES AND RESOLUTIONS**                 E2.138
  Phone: 463-0812
  CHAIR ........................................ Ruth Jones McClendon
  Committee clerk ......................... Nicole Gilmore


**STATE AFFAIRS**                         E2.108
  Phone: 463-0814
  CHAIR ................................... Byron Cook
  Chief committee clerk ........... Toni Barcellona
  Assistant committee clerk ..... Amanda Flores
  Assistant committee clerk ..... Weston Drake


**STATE SOVEREIGNTY, SELECT**             E2.142
  Phone: 463-0379
  CHAIR ................................... Brandon Creighton
  Committee clerk ................... Laura Collins


**TECHNOLOGY**                            E2.206
  Phone: 463-0794
  Fax: 463-0474
  CHAIR ................................... Aaron Peña
  Committee clerk ................... Paul Kamprath
  Assistant committee clerk ..... Felicia Peña
  Assistant committee clerk ..... Abby Felts
  Assistant committee clerk ..... Jacob Welch


**TRANSPORTATION**                        E2.122
  Phone: 463-1561
  CHAIR ................................... Larry Phillips
  Committee clerk ................... Courtney Reid
  Policy/assistant clerk ........... Brady Franks
  Assistant clerk ...................... Ryan Hall
  Assistant clerk ...................... Clayton Snodgrass


**URBAN AFFAIRS**                         E2.126
  Phone: 463-9904
  CHAIR ................................... Harold V. Dutton, Jr.
  Committee clerk ................... Nicole Bates
  Assistant clerk ...................... Ty Davis


**VOTER IDENTIFICATION AND VOTER**
**FRAUD, SELECT**                         4N.5
  Phone: 463-0564
  CHAIR ................................... Dennis Bonnen


**WAYS AND MEANS**                        E2.116
  Phone: 463-0822
  Fax: 463-1529
  CHAIR ................................... Harvey Hilderbran
  Committee clerk ................... Carolyn Merchan Saegert
  Assistant committee clerk ..... Tanya C. Vazquez
  Legislative aide .................... Raul Espinoza
  Legislative intern ................. Stephen Small

**OFFICE OF THE COMMITTEE COORDINATOR          E2.174**
    **Phone: 463-0850**
    Fax: 463-7547
    Committee coordinator.....................Stacey Nicchio
    Assistant committee coordinator ......Damian Duarte
    Clerk.................................................Ethan Harlow
    Clerk.................................................Nausheen Habib
    Clerk.................................................Kelsey Kappel

**HOUSE RESEARCH ORGANIZATION          JHR 420**
    **Phone: 463-0752**
    Fax: 463-1962
    Director.............................................Tom Whatley
    Editor................................................Laura Hendrickson
    Office manager/senior analyst .........Rita Barr
    Associate editor................................Elizabeth Paukstis
    Administrative clerk ..........................Julie Nieto
    Senior analysts.................................Catherine Dilger
                                     Kellie Dworaczyk
                                     Tom Howe
                                     Andrei Lubomudrov
                                     Blaire Parker
    Analysts...........................................Kat Closmann
                                       Lauren Dooley
                                     Julia Montgomery
                                     Philip Parker
                                     Melissa Shannon
                                     Ari Witkin
                                     Tanikqua Young
                                     Kristie Zamrazil
                                     Elissa Zlatkovich

# Senate

**BIRDWELL, Brian**                          E1.708
    **Phone: 463-0122**
    Fax: 475-3729
    Chief of staff ....................................Casey H. Kelley
    Legislative director ..........................Liz Young
    Director of constituent svcs ............Barbara Erickson
    Policy analyst ...................................Anna Paulson
    Policy analyst ...................................Scott Hutchinson
    Policy/communications...................Ben Stratmann

**CARONA, John**                          4E.2
    **Phone: 463-0116**
    Fax: 463-3135
    Chief of staff ....................................Margie McCloskey
    Administrative director....................Detta Haffelder
    Scheduler/admin assistant...............Stephanie Schotz
    Gen counsel/legislative director ......Barbara K. Salyers
    Legislative aide ................................Jamie McCormick
    Legislative aide ................................Amy Bresnen

**DAVIS, Wendy**                          E1.608
    **Phone: 463-0110**
    Fax: 475-3745
    Chief of staff ....................................Dan Buda
    Gen counsel/senior policy analyst....Bradley Domangue
    Communications director ................Anthony Spangler
    Office administrator..........................Kristi Wiseman
    Senior policy analyst .......................Sonya Grogg
    Policy analyst ...................................Ashley Brooks
    Policy analyst ...................................Graham Stadler

**DEUELL, Bob**                          E1.704
    **Phone: 463-0102**
    Fax: 463-7202
    Chief of staff ....................................Don Forse
    Legislative director ..........................Scot Kibbe
    Legislative aide ................................Janiece Crenwelge
    Scheduler.........................................Bogan Durr
    Communications aide.......................Thomas Flanders
    Administrative assistant ..................Shelly Reynolds

**DUNCAN, Robert**                          3E.10
    **Phone: 463-0128**
    Fax: 463-2424
    Chief of staff ...............................Porter Wilson
    Legislative director ....................Jennifer Chambers
    General counsel ..........................Cory Pomeroy
    Senior policy analyst ..................Sarah Clifton
    Scheduling czar/
    legislative assistant ....................Meagan Scott
    Communications director/
    legislative assistant ....................Megan LaVoie
    Legislative intern .......................Jade Keith
    Legislative intern .......................Victoria Messer

**ELLIS, Rodney**                          3E.6
    **Phone: 463-0113**
    Fax: 463-0006
    Chief of staff ...............................Brandon Dudley
    Deputy chief of staff ...................Andrea Usanga
    Scheduler....................................Loi Taylor
    Legislative director ....................Tina Tran
    Communications director ...........Jeremy Warren
    Senior policy adviser ..................Scott Ehlers
    Senior policy adviser ..................David Edmonson
    Policy adviser .............................Arielle Edwards
    Policy adviser .............................Chuck Franklin

**ELTIFE, Kevin**                          3E.16
    **Phone: 463-010**1
    Fax: 475-3751
    Chief of staff ...............................Cheryl Vanek
    Administrative assistant .............Connie Hernandez
    Legislative assistant ...................Chuck Mains
    Legislative assistant ...................Ryan Weiseman
    General counsel ..........................Stacey Kounelias
    Legislative assistant ...................Andrew Solomon

**ESTES, Craig**                          3E.8
    **Phone: 463-0130**
    Fax: 463-8874
    Chief of staff ...............................Noe Barrios
    Administrative/legislative aide .....Sam Carlson
    General counsel ..........................John Bennett
    Policy analyst .............................Samantha Gilley
    Legislative aide ..........................Ryan Alter
    Legislative aide/legal rsch asst ...Amy Tellegen

**FRASER, Troy**      1E.15
    Phone: **463-0124**
    Fax: 465-3732
    Chief of staff ...............................Janice McCoy
    Scheduling director ..................Terri Mathis
    Policy analyst ............................Will McAdams
    Policy analyst ............................David Whitley
    Legislative aide .........................Johnie Jones
    Admin assistant .........................Whitney Smith-Nelson

**GALLEGOS, Mario, Jr.**      E1.804
    Phone: **463-0106**
    Fax: 463-0346
    Chief of staff ...............................Mary Ann Garza Carrion
    Legislative director ..................Debra Gonzales
    Senior policy analyst ................Lesley Nelson
    Legislative assistant .................Mirel Herrera
    Legislative assistant .................Santiago Diaz
    Legislative assistant .................Diana Cruz
    Legislative intern ......................Robert Lopez

**HARRIS, Chris**      3S.5
    Phone: **463-0109**
    Fax: 463-7003
    Chief of staff ...............................Jeff Jeter
    Communications director/
    policy analyst.............................Kristen Webb
    Administrative aide...................Jennifer Coffee
    Policy analyst ............................Adam Leggett

**HEGAR, Glenn**      E1.806
    Phone: **463-0118**
    Fax: 475-3736
    Chief of staff ..............................Lisa Craven
    Dir of constituent svcs...............Karen Reaves
    Staff counsel ..............................Melissa Hamilton
    Legislative aide .........................Lauren Wied
    Legislative aide .........................Pete Winckler
    Legislative aide .........................Renee Gertson

**HINOJOSA, Juan "Chuy"**      3E.12
    Phone: **463-0120**
    Fax: 463-0229
    Chief of staff ...............................Rene Ramirez
    Legislative director ..................Sofia Hernandez
    Policy analyst ............................Roxanne De la Garza
    Media relations..........................Daniela Santoni
    Legislative analyst.....................Oscar Garza
    Scheduler/legislative analyst......Luis Moreno
    Legislative assistant .................Andrea Gutierrez
    Legislative assistant .................Carlos Gutierrez
    Policy analyst ............................Arturo Ballesteros

**HUFFMAN, Joan**      GE.5
    Phone: **463-0117**
    Fax: 463-0639
    Legislative director .......................Jonathan Stinson
    Senior policy analyst ....................Kyle Kamrath
    Senior policy analyst ....................Johanna Sheffield
    Legislative aide ............................Wroe Jackson
    Legislative aide ............................Zachary Stephenson
    Admin/communications director .....Mollie Schall

**JACKSON, Mike**      3E.2
    Phone: **463-0111**
    Fax: 475-3727
    Chief of staff ....................................Holly Deshields
    Communications director ...............Beth Shields
    Legislative director ..........................Jason Damen
    Legislative aide ...............................Riley Stinnett
    Office manager................................Judy Brooks
    Scheduler .........................................Jenna Dailey

**LUCIO, Eddie, Jr.**      3E.18
    Phone: **463-0127**
    Fax: 463-0061
    Chief of staff ....................................Ian Randolph
    Deputy chief of staff .......................Louie Sanchez
    Legislative director ..........................Sara Gonzalez
    Policy analyst ...................................Emily Wheeler
    Capitol office coordinator ...............Monica Counts
    Communications director ...............Ben Wright
    Legislative aide ...............................Katelin Dietz

**NELSON, Jane**      1E.5
    Phone: **463-0112**
    Fax: 463-0923
    Chief of staff ....................................Dave Nelson
    Scheduling coordinator ...................Elizabeth Rice
    Policy analyst ...................................Travis Broussard
    Communications director ...............Janet Elliott

**NICHOLS, Robert**      E1.808
    Phone: **463-0103**
    Fax: 463-1526
    Chief of staff ....................................Steven Albright
    Legislative director ..........................Angus Lupton
    Policy analyst ...................................Adrianne Emr
    Press secretary ................................Alicia Pierce
    Admin aide/scheduler......................Lindsey Skinner
    Legislative aide ...............................J.D. Hale

**OGDEN, Steve**        GE.4
    **Phone: 463-0105**
    Fax: 463-5713
    Chief of staff/general counsel...........Constance Allison
    Administrative director/scheduler.....Betty Cotte
    Legislative aide ...............................Patty Guerra
    Legislative aide ...............................Stephanie Leavell
    Legislative aide ...............................Valerie Brak

**PATRICK, Dan**        3S.3
    **Phone: 463-0107**
    Fax: 463-8810
    Chief of staff ...................................Logan Spence
    Legislative director ..........................John Gibbs
    Legal counsel ..................................Kate Pigg
    Legislative aide ...............................Suzanne Tomlin
    Legislative aide ...............................Marian Wallace
    Communications director ................Donna Bahorich
    Executive assistant .........................Tina Poston

**RODRÍGUEZ, José**        E1.712
    **Phone: 463-0129**
    Fax: 463-7100
    Chief of staff ...................................Richard Sookiasian
    Legislative director/gen counsel.......Sushma Jasti Smith
    Scheduler/office manager ................Rosa Alfaro
    Communications director/
    legislative analyst............................Emily Amps Mora
    Legislative analyst...........................Andrew Dupuy
    Luna fellow ......................................Ryan Delgado
    TLIP intern.......................................Bryce Romero
    Legislative intern ............................Daniel Collins
    Legislative intern ............................Richard Griffin
    Legislative intern ............................Jonathan Noble
    Legislative intern ............................Courtney Osborn
    Legislative intern ............................Cristian Sanchez
    Legislative intern ............................Jacqueline Sanchez
    Legislative intern ............................Lamine Zarrad

**SELIGER, Kel**        E1.606
    **Phone: 463-0131**
    Fax: 475-3733
    Chief of staff ...................................Ginger Murray
    Correspondence manager/
    policy analyst...................................Kirsten Knuth
    Office manager/policy analyst.........Lauren Freriks
    Policy analyst ..................................Betsy Bird
    Administrative aide..........................Tien Do
    Legislative intern ............................David Sneed
    Legislative intern ............................Omar Gomez
    Legislative intern ............................Aimee Fisher
    Legislative intern ............................Ashley Myers

**SHAPIRO, Florence**        1E.3
    **Phone: 463-0108**
    Fax: 463-7579
    Office manager/session scheduler...Tara Korstad
    Legislative director ..........................Lindsay Mullins
    General counsel ...............................Susie Strzelec
    Communications director ................Frank Ward
    Policy analyst ..................................Sylvia Stastny

**URESTI, Carlos**        E1.706
    **Phone: 463-0119**
    Fax: 463-1017
    Chief of staff/general counsel..........Jason Hassay
    Communications director ................Mark Langford
    Senior policy analyst .......................Micah Rodriguez
    Senior policy analyst .......................Jerry Needham
    Legislative director ..........................Michael Ruggieri
    Scheduler .........................................Allison Brooks
    Legislative aide ...............................Mark Reyna
    Luna scholar/legislative aide ...........Roy Attwood
    Luna scholar/legislative aide ...........Elisabeth Crawford

**VAN DE PUTTE, Leticia**        E1.610
    **Phone: 463-0126**
    Fax: 463-2114
    Chief of staff ...................................Gilbert Loredo
    Gen counsel/legislative director .......Ida Garcia
    Deputy legislative director ...............Amber Hausenfluck
    Communications director ................Sarah Gomez
    Scheduler .........................................J.D. Pedraza
    Admin assistant/receptionist ...........Adriana Alanis
    Luna scholar/legislative intern..........Maria Garcia
    Luna scholar/legislative intern..........Daniel Vasquez

**WATSON, Kirk**        E1.810
    **Phone: 463-0114**
    Fax: 463-5949
    Chief of staff ...................................Sarah Howard
    Legislative director ..........................Sandy Guzman
    Policy director..................................Steve Scheibal
    General counsel ...............................Edna Butts
    Counsel/legislative analyst...............Susan Nold
    Counsel/legislative analyst...............Ana DeFrates
    Legislative aide ...............................Katie O'Brien
    Constituent services.........................Lora Ann Gerson
    Constituent services.........................Yolanda Velasquez
    Office mgr/legislative aide ...............Yvonne Reynolds

**WENTWORTH, Jeff**                                    **1E.9**
> **Phone: 463-0125**
> Fax: 463-7794
> Chief of staff.....................................Katie King Ogden
> Deputy chief of staff .........................Pat Kelly
> General counsel ...............................Ashley Storm
> Legislative assistant .........................David Clark
> Scheduler/administrative assistant...Sarah Willcox
> Administrative assistant ..................Nicole Albers

**WEST, Royce**                                      **1E.12**
> **Phone: 463-0123**
> Fax: 463-0299
> Chief of staff.....................................La Juana Barton
> Legislative director ...........................Graham Keever
> General counsel ...............................Colin Coe
> Executive assistant/scheduler..........Susie Ramirez
> Sr policy analyst/press secretary .....Kelvin Bass
> Legislative aide ................................Eric Dominguez
> Legislative aide ................................Quinn Ryan
> Intern ................................................Asha Daniel
> Intern ................................................Jennifer Dykstra
> Intern ................................................Wendilyn Diaz

**WHITMIRE, John**                                   **1E.13**
> **Phone: 463-0115**
> Fax: 475-3737
> Chief of staff.....................................Lara Wendler
> Legislative aide ................................Susan Fontenette
> Legislative aide ................................Veronica Juarez
> Legislative aide ................................Jenny Marquez
> Legislative assistant.........................Cathryn Ibarra
> Legislative assistant ........................Epernay Kyles

**WILLIAMS, Tommy**                                  **GE.7**
> **Phone: 463-010**4
> Fax: 463-6373
> Executive assistant .......................... Reta Cooke
> Legislative director ........................... Jason Baxter
> General counsel ............................... Amanda Montagne
> Admin assistant/legislative aide ....... Chelsie Sanders
> Legislative aide ................................ Rob Orr
> Legislative aide  .............................. Brady Vaughn
> Intern ................................................ Brock Niezgoda
> Intern ............................................... Rachel Kalina

**ZAFFIRINI, Judith**                                **1E.14**
> **Phone: 463-0121**
> Fax: 475-3738
> Chief of staff/general counsel........... Ray Martinez
> Assistant chief of staff ..................... Sean Griffin
> Scheduler ......................................... Molly Donovan
> Office manager.................................. Sarah Acosta
> Legislative aide ................................ Sara Hull
> Legislative aide ................................ Jaclyn Simon
> Legislative aide ................................ Michael J. Dole
> Public information aide..................... Will Krueger

# Senate Committees

### ADMINISTRATION                                          E1.714
**Phone: 463-0350**
Fax: 463-0499
CHAIR ..............................................Kevin Eltife
Committee clerk/policy analyst.......Kara Crawford
Senior policy analyst .....................Lori Mannion
Legislative assistant......................Catie Arnold

### AGRICULTURE AND RURAL AFFAIRS          SHB 455
**Phone: 463-0340**
Fax: 463-2293
CHAIR ..............................................Craig Estes
Committee director........................Raenetta Nance
Committee clerk ............................Ashley Patton

### BUSINESS AND COMMERCE                    SHB 370
**Phone: 463-0365**
Fax: 463-1613
CHAIR ..............................................John Carona
Committee director........................Steven Polunsky
Committee clerk ............................Kimmi Selinger
General counsel ............................Adam Burklund
Policy analyst - energy/telecom .....Erika Akpan
Policy analyst - gen regulatory.......Angie Cervantes
Policy analyst - insurance .............Matthew Nihiser
Intern .............................................Rustin Khavari

### CRIMINAL JUSTICE                             SHB 470
**Phone: 463-0345**
Fax: 475-2015
CHAIR ..............................................John Whitmire
Policy director................................Larance Coleman
Committee clerk ............................Michaela Bernacchio
Policy analyst ................................Terra James
Policy analyst ................................Doug Clements

### ECONOMIC DEVELOPMENT                     SHB 340
**Phone: 463-1171**
Fax: 463-2599
CHAIR ..............................................Mike Jackson
Committee clerk ............................Colby Karhan
Assistant committee clerk .............Lea Anne Erwin

### EDUCATION                                      SHB 440
**Phone: 463-0355**
Fax: 463-7467
CHAIR ..............................................Florence Shapiro
Committee director........................Von Byer
Committee clerk ............................Holly Mabry
Assistant committee clerk .............Adam Nelson
Policy analyst ................................Courtney Boswell
Policy analyst ................................Candice DePrang

### FINANCE                                         E1.038
**Phone: 463-0370**
Fax: 463-5752
CHAIR ..............................................Steve Ogden
Committee director........................Sarah Hicks
Deputy director/budget analyst .....Daniel Harper
Committee clerk ............................Stephanie Hoover
Assistant clerk ...............................Elisabeth Spring
General counsel ............................Annette Graves
Budget analyst ..............................Brittani Bilse
Budget analyst ..............................Laura Kolstad
Budget analyst ..............................Michael Meyer

### GOVERNMENT ORGANIZATION              SHB 630
**Phone: 463-1818**
Fax: 463-1700
CHAIR ..............................................Rodney Ellis
Committee director........................Andrea Usanga
Committee clerk/policy analyst.......Jessica Schleifer
Assistant clerk/policy analyst ........Janice Tolbert
Legal counsel ................................Tina Tran
Policy analyst ................................Chelsea Frazier
Policy analyst ................................Elizabeth Tagle
Policy analyst ................................Conor Kenny
Policy analyst ................................Tumi Wallace

### HEALTH AND HUMAN SERVICES            SHB 420
**Phone: 463-0360**
Fax: 463-9889
CHAIR ..............................................Jane Nelson
Committee director........................Shannon Ghangurde
Clerk ..............................................Mason Moses
Policy analyst - public health..........Jordan Head
Policy analyst - human services.....Tara Swayzee
Policy analyst - CHIP/Medicaid ......Sharen Ludher
Policy analyst - Article 2 budget ....Christina Tippit

**HIGHER EDUCATION**                              **SHB 320**
    **Phone: 463-4788**
    Fax: 463-0695
    CHAIR ............................................ Judith Zaffirini
    Committee director ......................... Ray Martinez
    Committee clerk ............................. Gonzalo Serrano
    Policy analyst ................................ Mark Kavanaugh

**INTERGOVERNMENTAL RELATIONS**        **SHB 475**
    **Phone: 463-2527**
    Fax: 463-2858
    CHAIR ............................................ Royce West
    Committee director ......................... Julie Frank
    Committee clerk ............................. Tiffany Holmes White
    Intern ............................................ Courtney Lewis
    Intern ............................................ William McDonald
    Intern ............................................ Phillip Nevels
    Intern ............................................ Wesley Nute
    Intern ............................................ Kevin Osemene

    **SUBCOMMITTEE ON FLOODING**
    **AND EVACUATIONS**                     **E1.804**
        **Phone: 463-0106**
        Fax: 463-0346
        CHAIR .............................. Mario Gallegos, Jr.
        Committee director .......... Sean Abbott

**INTERNATIONAL RELATIONS AND TRADE**      **SHB 335**
    **Phone: 463-0385**
    Fax: 463-6004
    CHAIR ............................................ Eddie Lucio, Jr.
    Committee director ......................... Daniel Esparza
    Committee clerk/ policy analyst ...... Natalie Fontenot

**JURISPRUDENCE**                              **SHB 350**
    **Phone: 463-0395**
    Fax: 463-8336
    CHAIR ............................................ Chris Harris
    Committee director ......................... Tricia Stinson
    Committee clerk ............................. Katie Qualls
    General counsel ............................. Kenneth Hines
    Legislative intern ........................... Ryan Pope
    Assistant clerk ............................... Matt Pulliam

**NATURAL RESOURCES**                          **SHB 325**
    **Phone: 463-0390**
    Fax: 463-6769
    CHAIR ............................................ Troy Fraser
    Committee director ......................... Dan Madru
    Committee clerk ............................. Tatum Reagan
    Policy analyst ................................ Mark Harmon
    Policy analyst ................................ Tara Cowen Rejino
    Policy analyst ................................ Ellen Scholl

**NOMINATIONS**                                **E1.716**
    **Phone: 463-2084**
    Fax: 463-8123
    CHAIR ........................................ Bob Deuell
    Committee director .................... Robert Haley

**OPEN GOVERNMENT, SELECT**                    **SHB 815**
    **Phone: 463-0125**
    CHAIR ........................................ Jeff Wentworth
    Chief of staff .............................. Katie King Ogden
    General counsel ......................... Ashley Storm

**REDISTRICTING, SELECT**                      **SHB 460**
    **Phone: 463-8802**
    Fax: 463-8805
    CHAIR ........................................ Kel Seliger
    Committee director .................... Doug Davis
    Committee clerk ........................ Stephanie Hoover
    Assistant clerk ........................... Mattie Murray
    Legislative intern ...................... Jared Staples
    Legislative intern ...................... Amer Abdullat

**STATE AFFAIRS**                              **SHB 380**
    **Phone: 463-0380**
    Fax: 463-0342
    CHAIR ........................................ Robert Duncan
    Committee director .................... Jennifer Fagan
    Committee clerk ........................ Erin Fry
    Senior staff attorney ................. Jill Reeder
    Staff attorney ........................... Sean Opperman
    Policy analyst/Luna scholar ........ Matthew Hall
    Policy analyst/Bullock scholar ..... Amanda Gonzalez

**TRANSPORTATION AND HOMELAND SECURITY**   **SHB 450**
    **Phone: 463-0067**
    Fax: 463-0097
    CHAIR ........................................ Tommy Williams
    Committee director .................... Ryan LaRue
    Committee clerk ........................ Tulsi Reddy
    Assistant committee clerk .......... J.W. Galloway
    Policy analyst ........................... Libby Nezda
    Policy analyst ........................... Jonathan Sierra-Ortega

**VETERAN AFFAIRS AND**
**MILITARY INSTALLATIONS**                     **SHB 345**
    **Phone: 463-2211**
    Fax: 463-7683
    CHAIR ........................................ Leticia Van de Putte
    Committee director .................... Brent Turner
    Committee clerk ........................ Felicia Wright
    Committee policy analyst ........... Servando Esparza

# Other State Numbers

| | |
|---|---|
| Governor's Office | 463-2000 |
| Lieutenant Governor's Office | 463-0001 |
| Attorney General's Office | 463-2100 |
| Capitol Nurse Practitioner, E1.214 | 463-0313 |
| Comptroller's Office | 463-4000 |
| Department of Public Safety (Capitol) | 463-3333 |
| Legislative Budget Board | 463-1200 |
| Legislative Reference Library | 463-1252 |
| Secretary of State | 463-5770 |
| State Archives | 463-5455 |
| State Auditor's Office | 936-9500 |
| Sunset Advisory Commission | 463-1300 |
| Texas Legislative Council | 463-1155 |

**House of Representatives**

| | |
|---|---|
| Audio/video | 463-0920 |
| Bill distribution | 463-1144 |
| Chief Clerk | 463-0845 |
| Journal Clerk | 463-0855 |
| Parliamentarian | 463-2003 |
| Sergeants | 463-0910 |

**Senate**

| | |
|---|---|
| Bill distribution | 463-0252 |
| Committee Coordinator | 463-0070 |
| Journal Clerk | 463-0050 |
| Media services | 463-0300 |
| Messengers | 463-0205 |
| Parliamentarian | 463-0248 |
| Secretary of the Senate | 463-0100 |
| Senate Research Center | 463-0087 |
| Sergeant-at-Arms | 463-0200 |

PL1129
9/2/2014
2:13-cv-000193

# HOUSE
# RESEARCH
# ORGANIZATION

*Texas House of Representatives*

# Legislative
# Staff

## 83rd Legislature

2013

## Focus Report No. 83-4

# Table of Contents

House of Representatives .....................................3

House Committees .............................................16

Senate.............................................................19

Senate Committees ...........................................23

Other State Numbers.........................................25

# House of Representatives

**ALLEN, Alma A.**                                              E1.506
    **Phone: 463-0744**
    Fax: 463-0761
    Chief of staff ............................................Anneliese Vogel
    Legislative aide ..........................................Teresa Lenoir
    Interns .......................................................Tomas Leon
                                  Blake Medley

**ALONZO, Roberto R.**                                          1N.12
    **Phone: 463-0408**
    Fax: 463-1817
    Chief of staff ...............................................Jesse Bernal
    Legislative aides..........................................Jose Alonzo
        Glen Austin                      Octivia Marcel
        Brette Minton                    Kira Retana
               John Paul Thompson

**ALVARADO, Carol**                                             E2.810
    **Phone: 463-0732**
    Fax: 463-4781
    Chief of staff ..............................................Crystal Ford
    Legislative director ....................Richard "Rich" Ramirez
    Executive assistant...............................Sara Montelongo
    Legislative aides.............................Michelle Seebachan
                       Hazel Thakkar

**ANCHIA, Rafael**                                              E1.408
    **Phone: 463-0746**
    Fax: 463-5896
    Chief of staff .........................................Elizabeth Zornes
    General counsel/leg. director ...................Tricia Horatio
    Legislative counsel...................................Scott Flukinger
    Legislative interns...................................Manny Gonzalez
                  Jacqueline Osborn
                  Jamie Pesantes

**ANDERSON, Charles "Doc"**                                     GN.12
    **Phone: 463-0135**
    Fax: 463-0642
    Chief of staff ...................................................Matt Welch
    Administrative assistant.........................Tracy Morehead
    Interns .......................................................David Pevear
                    Patrick Sweeney

**ASHBY, Trent**                                                E2.414
    **Phone: 463-0508**
    Fax: 463-5934
    Chief of staff ...................................................Scott Riling
    Legislative director ..........................................Nick Wade

**AYCOCK, Jimmie Don**                                          E2.708
    **Phone: 463-0684**
    Fax: 463-8987
    Chief of staff ..............................................Mitzi C. Stoute
    Legislative aide.....................................Madison Stewart
    Public education staffer ..........................Belinda Pustka
    Legislative interns.....................................Jessica Eaton
                  Amanda Goodson
                  Will Holleman

**BELL, Cecil, Jr.**                                            E2.720
    **Phone: 463-0650**
    Fax: 463-0575
    Chief of staff ..............................................Jessica Lynch
    Legislative aide............................................Julie Cowan
    Policy analyst - appropriations .............Jillian Henderson

**BOHAC, Dwayne**                                               GS.6
    **Phone: 463-0727**
    Fax: 463-0681
    Chief of staff ...........................................Bradley Pepper
    Administrative aide...................................Xanthe Shirley

**BONNEN, Dennis**                                              1W.6
    **Phone: 463-0564**
    Fax: 463-8414
    Chief of staff ...............................................Shera Eichler
    Legislative director .............................................Ty Petty
    Senior policy analyst .................................Steven Schar
    Interns .....................................................Camille Eslick
                  Shannon Kahlden
                  Ben Proler

**BONNEN, Greg**                                                E.2.714
    **Phone: 463-0729**
    Chief of staff ...............................................Brigitt Hartin
    Legislative aide................................................Justin Till
    Interns .....................................................Paul DeAyala
        Trigg Edwards                    Thom Fain
        Cristian Perez                   Hailey Senske

**BRANCH, Dan**                                                 E1.308
    **Phone: 463-0367**
    Fax: 463-9935
    Chief of staff .........................................Candice Woodruff
    Legislative aides...............................Miranda Landsman
                  Pierce Mitchell
                  Andrew Townsell

**BURKETT, Cindy**     E2.504
  **Phone: 463-0464**
  Fax: 463-9295
  Chief of staff ........................................ Allison Billodeau
  Legislative aide.............................. Luis Acuna
  Scheduler/constituent services....................... Leah Brite
  Legislative interns......................................Elizabeth Bell
                                      Mark Thomas

**BURNAM, Lon**     4S.5
  **Phone: 463-0740**
  Fax: 463-1075
  Chief of staff ...............................................Conor Kenny
  Legislative director .............................Laura Hernandez
  Scheduler/policy analyst.................. Samantha Gongora
  Policy analysts.......................................Michael Gaudini
    Imad Khan                   David Lopez
    Cavan O'Raghallaigh         DeAndrea Petty
                                    Ana Rodriguez

**BUTTON, Angie Chen**     E2.910
  **Phone: 463-0486**
  Fax: 463-0793
  Chief of staff ...........................................Amanda Jeffers
  Legislative aides............................................ Austin Hood
                                     Victoria Smith

**CALLEGARI, William "Bill"**     GS.2
  **Phone: 463-0528**
  Fax: 463-7820
  Chief of staff ........................................Jonathan Mathers
  Legislative director ............................................Steve Will
  Policy analyst ........................................Gregory Watson
  Scheduler ................................................... Leigh Collins
  Hobby fellow......................................... Matthew Conner

**CANALES, Terry** ...................................................... E2.816
  **Phone: 463-0426**
  Fax: 463-0043
  Chief of staff ................................................ Curtis Smith
  Legislative director ................ Jonathan Gonzalez-Smith
  Scheduler .................................................Emily Campbell

**CAPRIGLIONE, Giovanni**     E1.412
  **Phone: 463-0690**
  Chief of staff .............................................. Mark Dalton
  Legislative director ........................................... Nick Wat
  Legislative aide......................................Adriane Purdom
  Interns .......................................................... Caity Cline
                                     Alyse Ullery

**CARTER, Stefani**     E2.904
  **Phone: 463-0454**
  Fax: 463-1121
  Executive assistant........................................ Nikki Tyson
  Legislative aide.............................................. Kat Watson
  Intern ..............................................................Peter Ueng

**CLARDY, Travis**     E2.316
  **Phone: 463-0592**
  Fax: 463-8792
  Chief of staff ................................................Kelly Barnes
  Legislative director ....................................Adrianne Fore
  Legislative aide.............................................. Joey Parr
  Legislative intern ....................................Karina Erickson

**COLEMAN, Garnet F.**     4N.10
  **Phone: 463-0524**
  Fax: 463-1260
  Chief of staff/general counsel............ Christopher Walker
  Health care policy analyst ................................Mike Eber
  Policy analysts...........................................Yvonne Green
                                     Jose Guzman
                                     Jordan Rux

**COLLIER, Nicole**     E1.324
  **Phone: 463-0716**
  Fax: 463-1516
  Chief of staff ............................................... Jacob Limon
  Legislative director ......................................Jim Boynton
  Legislative assistants ...........................Genevieve Cato
                                     Irma Reyes

**COOK, Byron**     GN.11
  **Phone: 463-0730**
  Fax: 463-2506
  Chief of staff ......................................... Toni Barcellona
  Legislative assistant ...........................Rebecca Brereton

**CORTEZ, Philip**     E2.812
  **Phone: 463-0269**
  Fax: 463-1096
  Chief of staff ......................................... Thelma De Leon
  Deputy chief of staff............Veronica Gonzalez-Vasquez
  Legislative director ..............................Joaquin Gonzalez
  Community outreach director ..................Andres Ramos

**CRADDICK, Tom**     1W.9
  **Phone: 463-0500**
  Fax: 463-7722
  Chief of staff ......................................... Kate Huddleston
  Legislative aide.......................................Sydney Prosise
  Legislative intern ........................................Laura Parton

**CREIGHTON, Brandon**                              E2.214
  **Phone: 463-0726**
  Fax: 463-8428
  Chief of staff ................................................. Tara Garcia
  Legislative director ........................Zachary Stephenson
  General counsel .............................................. Amy Miller
  Administrative director.............................Kathleen Yount
  Legislative intern ........................ JohnPaul Wiechkoske
  UT Law intern ......................................... Shannon Smith

**CROWNOVER, Myra**                                   4S.3
  **Phone: 463-0582**
  Fax: 463-0471
  Chief of staff ................................................Kevin Cruser
  Legislative aide.............................Benjamin "Ben" Rowe
  Legislative assistant .....................................Macy Cotton
  Policy analyst ............................................John Maxwell

**DALE, Tony**                                        E1.410
  **Phone: 463-0696**
  Fax: 463-9333
  Chief of staff .................................................. Amy Rister
  Legislative director ....................................Raul Espinoza
  Legislative assistant ..................................... Ross Oliver
  District director ...............................................Greg Bentch
  Constituent liaison ...................................... Mike Cooper

**DARBY, Drew**                                       E2.406
  **Phone: 463-0331**
  Chief of staff ...............................................Jason Modglin
  Legislative director ........................................ Kate Raetz
  Legislative aide....................................... Victoria Messer
  Energy intern .............................................Margaret Cook
  Legal intern................................................... Dave Player
  Legislative intern .............................................Brady Kent

**DAVIS, John E.**                                    1N.10
  **Phone: 463-0734**
  Fax: 463-0401
  Chief of staff ............................................ Rachel Deason
  Legislative aide...........................................Chris Mendez
  Legislative assistant .................................Worth Farabee

**DAVIS, Sarah**                                      E2.310
  **Phone: 463-0389**
  Fax: 463-1374
  Chief of staff ...........................................Hunter Hughes
  Legislative aides......................................... Lucia Mueller
                                     Charles Prothro

**DAVIS, Yvonne**                                     4N.9
  **Phone: 463-0598**
  Fax: 463-2297
  Legislative director .......................... Lemuel Henry Price
  Administrative assistant/scheduler ..........Pitria McKinney
  General counsel ................................... Shalette Mitchell
  Legislative aide............................................Gaven Norris

**DESHOTEL, Joseph D.**                               GN.8
  **Phone: 463-0662**
  Fax: 463-8381
  Chief of staff ................................................Jackie Savoy
  Legislative director .............................. Melissa Quevedo
  Deputy legislative director ....................Christian Manuel
  Legislative aide .................................... Elizabeth Milam

**DUKES, Dawnna**                                     E1.504
  **Phone: 463-0506**
  Fax: 463-7864
  Chief of staff ........................................ Pamela McPeters
  Legislative director ...........................................John Julitz
  Dir. community & media relations........ KiYa Moghaddam
  Legislative aides.........................................Eliana Briceno
                           Tiajuana "TJ" Robinson
                                   Morgan Scott

**DUTTON, Harold V., Jr.**                            3N.5
  **Phone: 463-0510**
  Fax: 463-8333
  Chief of staff ................................................Nicole Bates
  Legislative aides.........................................Linda Brooks
                                   Tamoria Jones

**EILAND, Craig**                                     GW.5
  **Phone: 463-0502**
  Fax: 936-4260
  Chief of staff/legislative director ...............Lynette Kilgore
  Legislative aide.........................................Anne Drescher
  Outreach director......................................Payton Spreen
  Interns ...................................................... Joseph Vogas
                                   Faith Webber

**ELKINS, Gary**                                      4N.3
  **Phone: 463-0722**
  Fax: 463-2331
  Chief of staff ................................................Debra Clonts
  Executive assistant......................................Kate Watson
  Interns ................................................... Gilbert Medina
                                   Matthew Porter

**House Research Organization**                                                           **Page 6**

**FALLON, Pat**                                          E1.312
   **Phone: 463-0694**
   Fax: 463-1130
   Chief of staff ..........................................Martha Bell Liner
   Legislative director ................................. Sean Danielson
   Administrative assistant............................Megan Titford
   Interns ............................................... Denise Forsthuber
                              George Walden

**FARIAS, Joe**                                          E2.204
   **Phone: 463-0714**
   Fax: 463-1458
   Chief of staff .......................................Julianna Gonzaba
   Legislative director ........................................Ana Ramon
   Legislative aide............................................ Rachel Perry
   Legislative intern .............................Juan Carlos Estrada

**FARNEY, Marsha**                                       E1.310
   **Phone: 463-0309**
   Fax: 463-0049
   Chief of staff ..........................................Aaron Gibson
   District director ................................................Chris Duke
   Legislative aide.......................................... Taylour Shaw
   Legislative interns..........................................Andrea Bruti
                               Katy Donahue
                             Travis Greenfield

**FARRAR, Jessica**                                      1N.8
   **Phone: 463-0620**
   Fax: 463-0894
   Legislative director .................................. Allison Schmitz
   Exec. dir. Women's Health Caucus ............. Nishi Kothari
   Legislative aide/communications..........Krystafer Redden
   Legislative aide/scheduler ......................Ariana Campos
   Legislative aides......................................Lauren Berryhill
                              Ilsinelida Bazaldua
                              Charles Wilkison

**FLETCHER, Allen**                                      E2.902
   **Phone: 463-0661**
   Fax: 463-4130
   Chief of staff ...............................................Robert Papierz
   Legislative director .....................................Cynthia Meyer

**FLYNN, Dan**                                           GN.7
   **Phone: 463-0880**
   Fax: 463-2188
   Chief of staff .............................................David Erinakes
   Legislative director ...........................Amanda Robertson

**FRANK, James**                                         E2.304
   **Phone: 463-0534**
   Fax: 463-8161
   Chief of staff ............................................ Andy Kuchera
   Legislative director ...............................Rachel Nicholson

**FRULLO, John M.**                                      E2.608
   **Phone: 463-0676**
   Fax: 463-0072
   Chief of staff ..........................................Robin MacEwan
   District director ............................................ Kimberly Lile

**GEREN, Charlie**                                       GW.17
   **Phone: 463-0610**
   Fax: 463-8310
   Chief of staff ................................................Laura Grable
   Legislative director/gen. counsel..........Robert Armstrong
   Legislative aide........................................Jordan Walker
   Legislative intern ....................................Nancy Farabee

**GIDDINGS, Helen**                                      GW.11
   **Phone: 463-0953**
   Fax: 463-5887
   Chief of staff ............................................ Tamara Hobbs
   Legislative aide..................................Brandalyn Rodgers
   Scheduler .............................................. Carnell Emanuel
   Interns ....................................................Lauren Beckett
                            Jessica Faith Carter

**GOLDMAN, Craig**                                       E2.416
   **Phone: 463-0608**
   Fax: 463-8342
   Chief of staff ..................................... Cristen Wohlgemuth
   Legislative director ................................. Jennifer Bremer
   Communications director.......................Rachel Jonkers
   Legislative aides.......................John David Montgomery
                               Emily Voight

**GONZALES, Larry**                                      E2.906
   **Phone: 463-0670**
   Fax: 463-1469
   Chief of staff ............................................ Chris Sanchez
   Administrative director..................................Betty Horton
   Legislative aides........................................ Caleb McNew
                               Sarah Norman

**GONZÁLEZ, Mary**                                       E1.218
   **Phone: 463-0613**
   Fax: 463-1237
   Chief of staff ...............................................Roger Garza
   Legislative director ····································· Victor Reyes
   Communications assistant ..................Shelby Alexander
   Legislative aides......................................Jessica Oswald
                                Joel Zapata
   Legislative interns...................................Miranda Herrera
                                Justin Perez
                               Richie Pineda
                            Catherine Rodarte

**GONZALEZ, Naomi**                                          **E2.814**
  **Phone: 463-0622**
  Fax: 463-0931
  Chief of staff ................................................ Ariane Marion
  Legislative director .............................. Ryan McHutchion

**GOODEN, Lance**                                             **E2.212**
  **Phone: 463-0458**
  Fax: 463-2040
  Chief of staff ....................................................Jeff Stokes
  Legislative aide........................................John Stavinoha
  Executive assistant....................................Tatiana Claros

**GUERRA, R.D. "Bobby"**                                      **E1.306**
  **Phone: 463-0578**
  Fax: 463-1482
  Chief of staff ......................................Bernardo Aldape III
  General counsel ...................................Courtney Hanson
  Legislative aides......................................Shantal Ortega
                                                          Kellean Travillion

**GUILLEN, Ryan**                                              **4N.4**
  **Phone: 463-0416**
  Fax: 463-1012
  Chief of staff ................................................ Robert McVey
  Deputy chief of staff.........................................David Klein
  Communications director....................Rebecca Erickson
  Lead communications deputy........... Jasmine Alexander
  Lead comm. consultant ......................Jeremy S. Choate
  Sr. deputy communications ........................Paige Schell
  Communications deputy............................. Rachel Kang
  Grants liaison deputy............................Rachel Osterloh
  Administrative director ................................. Reid Koenig
  Deputy administrative director.................Brady Mayfield
  Legislative director ..........................................Katy Johnson
  Deputy legislative director .............................. Jess Heck
  Senior policy analyst ................................... Crystal Zhao
  Policy analysts...............................................Ben Alonzo
                                                              Magen Elenz
                                                                Jeff Stice
  Project manager ......................................Sophie Rosales
  Executive assistant.................................Andrew Ehrhardt
  Staff researcher.............................................Sivmey Hok

**GUTIERREZ, Roland**                                          **GN.9**
  **Phone: 463-0452**
  Fax: 463-1447
  Chief of staff ................................ Margaret Frain Wallace
  Legislative director ........................................Jorge Reyes
  Legislative aide..........................................Gabriel Garcia

**HARLESS, Patricia**                                         **E2.408**
  **Phone: 463-0496**
  Fax: 463-1507
  Chief of staff ....................................................Julie Scott
  Legislative director ........................................Staci Rives
  Interns .......................................................Alexa Broyles
                                                             Alec Gregoire
                                                             Jenna Shorter
                                                             Taylor Turner

**HARPER-BROWN, Linda**                                        **4N.6**
  **Phone: 463-0641**
  Fax: 463-0044
  Chief of staff .................................... Taurie Randermann
  Legislative director .................................... Katy Aldredge
  Legislative aide........................................... Philip Collins

**HERNANDEZ LUNA, Ana**                                       **E1.212**
  **Phone: 463-0614**
  Fax: 463-0612
  Chief of staff .............................................. Lesley Nelson
  District director .......................................... Maria Delgado
  Legislative aides.................................... Estefani Jimenez
                                                             TaLisa Jones

**HERRERO, Abel**                                             **E2.818**
  **Phone: 463-0462**
  Fax: 463-1705
  Chief of staff ..........................................Analiese Kornely
  Legislative director ....................................Jesus Moreno
  Legislative aide/scheduler ......................Jedidah Guerra
  Legislative aide....................................Angeline Lasanta
  Intern ...........................................................Miquel Liscano

**HILDERBRAN, Harvey**                                        **GW.12**
  **Phone: 463-0536**
  Fax: 463-1449
  Chief of staff .......................................Debra Van Bibber
  Legislative director ....................................Isaac Albarado
  Legislative interns.............................. Garrett DiPasquale
      Lakin Kennedy                          Caroline Kirby
      Jacques Mercier des Rochettes        Logan Skinner

**HOWARD, Donna**                                             **E2.418**
  **Phone: 463-0631**
  Fax: 463-0901
  Chief of staff ...........................................Scott M. Daigle
  Legislative director ..............................Jacob Cottingham
  Director of constituent services ..............Brooke Bennett
  Director of special projects.............................. Mary Fero

**HUBERTY, Dan**                              E2.722
   Phone: 463-0520
   Fax: 463-1606
   Chief of staff ......................................... Casey Christman
   Legislative director ...................................... Maggie Irwin
   Legislative aides........................................Chase Barker
                                                                             Ben Melson
   Legislative intern ..........................................Molly Spratt
   Administrative intern.................................. Victoria Haas


**HUGHES, Bryan**                            E1.404
   Phone: 463-0271
   Fax: 463-1515
   Chief of staff ............................................... Cody Terry
   Legislative coordinator ............................. Désirée Smith
   Legislative aide....................................... Maselyn Walker


**HUNTER, Todd**                             GW.18
   Phone: 463-0672
   Fax: 463-2101
   Legislative coordinator .............................Justin Hudman
   Senior advisor/comm. director....................Angie Flores
   Legislative aide.........................................Caleb McGee
   Legislative assistant ............................Dan Leyendecker
   Scheduler .......................................................Alex Scott


**ISAAC, Jason**                             E1.414
   Phone: 463-0647
   Chief of staff ............................................ Ellen Troxclair
   District director ...........................................Carrie Nelson
   Legislative director ......................................Trey Thigpin
   Legislative aide........................................Chelsea McGee
   Legislative intern .........................................Mayra Diaz


**JOHNSON, Eric**                            E1.204
   Phone: 463-0586
   Fax: 463-8147
   Chief of staff ............................................... Juan Ayala
   Legislative director ...................................Richard Griffin
   Legislative aide...................................Matthew McDougal
   Legislative interns........................................ Ryan Biggs
                                                                           Harry Hadland
                                                                           Kanittá Hamilton


**KACAL, Kyle**                              E2.704
   Phone: 463-0412
   Chief of staff ................................................Terra Willett
   Legislative director .............................Ryan Skrobarczyk
   Legislative aide.......................................Jarrod Azopardi


**KEFFER, Jim**                              1W.11
   Phone: 463-0656
   Fax: 463-0211
   Chief of staff ..........................................................Ky Ash
   District director/general counsel .....................Tori Regas
   Legislative assistants ..................................... Evan Autry
                                                            Bernice Espinosa-Torres


**KING, Ken**                                E2.402
   Phone: 463-0736
   Fax: 463-0211
   Chief of staff ............................................... Cheryl Lively
   Legislative director ..........................................Kyle Bush
   Administrative aide .....................................Megan Klegin


**KING, Phil**                               1N.5
   Phone: 463-0738
   Fax: 463-1957
   Chief of staff ...........................................Caleb Troxclair
   Legislative director ..........................Ashley Westenhover


**KING, Susan**                              E1.304
   Phone: 463-0718
   Fax: 463-0994
   Chief of staff ...............................................Bryan W. Law
   Legislative director ...........................Shana Berenzweig
   Administrative aide ............................ M. Reid Alexander


**KING, Tracy**                              GW.07
   Phone: 463-0194
   Fax: 463-1220
   Chief of staff ...............................................Celina Overbo
   Legislative director .................................Sam Bacarisse
   Legislative assistant ...................... Max Allen Thompson


**KLEINSCHMIDT, Tim**                        E2.510
   Phone: 463-0682
   Fax: 463-9955
   Chief of staff ...............................................John Higgins
   Legislative director ............................MeLissa Nemecek
   Education specialist....................................Alonzo Wood
   Legislative aides....................................Caitlin Ahlemeyer
                                                                        Amanda Biedegar
                                                                        Brett Finley
                                                                        Brendan Hyde


**KLICK, Stephanie**                         E2.716
   Phone: 463-0599
   Fax: 463-0751
   Chief of staff ......................................... Matthew Dowling
   District director/scheduler...............................Amber Ray
   Administrative assistant......................................Lori Lutz
   Intern .................................................... Matthew Russell

**KOLKHORST, Lois W.**                                     **4N.8**
  **Phone: 463-0600**
  Fax: 463-5240
  Chief of staff ........................................... Chris Steinbach
  Legislative director .................................Preston Streufert
  Legislative aide.......................................... Corbin Marak
  Scheduler ..............................................Madison Gessner

**KRAUSE, Matt**                                          **E1.424**
  **Phone: 463-0562**
  Fax: 463-2053
  Chief of staff ................................................. Elliott Griffin
  Legislative director .......................................... Scott Stier
  Legislative aide........................................ Clayton Knippa

**KUEMPEL, John**                                         **E2.422**
  **Phone: 463-0602**
  Chief of staff ...........................................Brittney Grigg
  Legislative aides...................................Thomas Flanders
                                                    Mariel Kanene

**LARSON, Lyle**                                          **E2.604**
  **Phone: 463-0646**
  Fax: 463-0893
  Chief of staff ..............................................Lynlie Wallace
  Legislative aide/scheduler .................Shannon Houston
  Legislative assistant ...........................Haley Klausmeyer
  Legislative aide.......................................... Sarah DeCuir
  Natural resources intern ................................. Andy Uhler
  Legislative interns.............................................Kevin Beaty
                                              Alfonso Pacheco

**LAUBENBERG, Jodie**                                     **1N.7**
  **Phone: 463-0186**
  Fax: 463-5896
  Chief of staff .........................................Suzanne Bowers
  Legislative director ..............................Christopher Covo
  Legislative aides....................................... Bonnie Brewer
                                                 Helen Hansen

**LAVENDER, George**                                      **E2.606**
  **Phone: 463-0692**
  Fax: 463-0902
  Chief of staff ............................... Andrea Williams-McCoy
  Legislative director ..................................... Noah Gilliam
  Legislative assistant ..................................... Bryan Smith
  Legislative aide..................................Thomas Renfroe III

**LEACH, Jeff**                                           **E1.322**
  **Phone: 463-0544**
  Fax: 463-9974
  Chief of staff ............................................ Mary McClure
  Legislative director ........................................ Chris Kirby
  Legislative aide.....................................Murphy Simpson
  Legislative interns............................................Alex Buck
                                             Alyssa Kimmet
                                                  Hayley Orr
                                                  Nick Virden

**LEWIS, Tryon**                                          **E2.318**
  **Phone: 463-0546**
  Fax: 463-8067
  Chief of staff .........................................Aaron Whitehead
  Legislative director .................................Michael Lozano
  Scheduler ..................................................Pam Johnson
  Legislative assistants ............................Armen Hazarian
                                                     Ryan Lutz

**LONGORIA, Oscar**                                       **E1.510**
  **Phone: 463-0645**
  Fax: 463-0559
  Chief of staff .......................................................Lee Loya
  Legislative director .............................Michelle Villarreal
  Legislative assistants ....................................Tony Flores
                                                   Ricco Garcia

**LOZANO, J.M.**                                          **E2.908**
  **Phone: 463-0463**
  Fax: 463-1765
  Chief of staff ...............................................Matt Lamon
  Legislative aides......................................Andrew Burton
                                               Brenda Montoya
                                   Fernando Trevino, Jr
  Administrative aide ......................................Abigail Ryan

**LUCIO, Eddie III**                                      **E2.808**
  **Phone: 463-0606**
  Fax: 463-0660
  Chief of staff ...................................................Rubén O'Bell
  Legislative director ..................................Houston Tower
  Legislative aide........................................Rolando Garcia

**MÁRQUEZ, Marisa**                                       **E2.822**
  **Phone: 463-0638**
  Fax: 463-8908
  Chief of staff ....................................................Colin Coe
  Legislative director ......................................Chasity Tillis

**House Research Organization**                                    **Page 10**

---

**MARTINEZ, Armando "Mando"**                E2.306
   **Phone: 463-0530**
      Fax: 463-0849
      Chief of staff .............................................. Scott Jenkines
      Legislative director .................................... Paco Sanchez
      Legislative aide .................................. James Casiano, IV
      Scheduler/intern ........................................... Bianca Kyle
      Interns .......................................................... Ali Cortinas
                                                                    Art Montelongo
                                                                    Normandie Scanlon

**MARTINEZ FISCHER, Trey**                       4S.4
   **Phone: 463-0616**
      Fax: 463-4873
      Chief of staff ............................................. Martin Golando
      Legislative asst./scheduler ........................ Chris Madrid
      Legislative assistants ......................... Huey Rey Fischer
                                                                    Josefina Ibarra
                                                                    Michael Moran

**McCLENDON, Ruth Jones**                         3S.2
   **Phone: 463-0708**
      Fax: 463-7071
      Chief of staff ............................................... Janis Reinken
      Legislative aides ......................................... Josiah Biggs
                                                                    Meagan Harding
      McClendon legislative scholar ................. Amarro Nelson
      Legislative intern ................................. Michael Simpson

**MENÉNDEZ, José**                                E1.420
   **Phone: 463-0634**
      Chief of staff ................................................ Don Jones
      Legislative director .................................... Victoria Flores
      Legislative assistants .................................. Dwight Clark
                                                                    Travis Miller

**MILES, Borris L.**                              E2.718
   **Phone: 463-0518**
      Fax: 463-0941
      Chief of staff .................................................. Rob Borja
      Legislative director ................................... Camille Foster
      Legislative interns ............................. Jeremiah Bailey
                                                                    Arthur Huggins
                                                                    Alexandra Rosales

**MILLER, Doug**                                  GW.4
   **Phone: 463-0325**
      Fax: 463-6161
      Chief of staff .................................................. Fritz Reinig
      Legislative aides ....................................... Sarah Bennett
                                                                    Diane Durbin

**MILLER, Rick**                                  E2.312
   **Phone: 463-0710**
      Fax: 463-0711
      Chief of staff ........................... Courtney Moore Hjältman
      Scheduler/assistant .................................... Keith Erikson
      Legislative aides ........................................ Blake Landon
                                                                    Cliff Rusek

**MOODY, Joe**                                    E1.216
   **Phone: 463-0728**
      Fax: 463-0397
      Chief of staff/general counsel .................... Ellic Sahualla
      Legislative director ...................................... Jen Shugert
      Legislative aides ......................................... Daisy Pavia
                                                                    Matt Steward
      Legislative intern ............................... Chelsea Rountree

**MORRISON, Geanie W.**                           1N.9
   **Phone: 463-0456**
      Fax: 463-0158
      Chief of staff ................................................ Justin Unruh
      Administrative assistants ........................ Lauren Simcik
                                                                    Katherine Speer

**MUÑOZ, Sergio, Jr.**                            E1.508
   **Phone: 463-0704**
      Fax: 463-5364
      Chief of staff .................................... Richard P. Sanchez
      Legislative aides ..................................... Garrett Brawley
                                                                    Dylan Matthews
      Legal legislative intern ...................... Deanna Markowitz
      Legislative interns ................................... Arturo Garcia
                                                                    Abdul Muhialdin

**MURPHY, Jim**                                   E2.710
   **Phone: 463-0514**
      Fax: 463-8715
      Chief of staff ................................................ Molly Quirk
      Legislative aides ......................................... Jason Briggs
                                                                    Kait Roth
      Legislative assistants ................................ Sarah Aimad
                                                                    Ethan Caudillo

**NAISHTAT, Elliott**                             GW.16
   **Phone: 463-0668**
      Chief of staff ............................................ Dorothy Browne
      Legal aide ..................................................... Abril Davila
      Legislative aide - HHS .......................... Jessica Boston
      Legislative aides ........................................... Judith Dale
         Jayme Johnson                       Jessica Kolmer
         Linda Rangel                          John Wooding

**NEVÁREZ, Poncho**                    E2.802
  **Phone: 463-0566**
  Fax: 463-0220
  Chief of staff ................................ Oberlyn "Obie" Salinas
  Legislative director ........................................ Leo Aguirre
  General counsel ................................. Lauren Cacheaux
  Legislative aides............................................. Ali Carlson
                                                                  Jarrett Jackson

**OLIVEIRA, René**                      3N.6
  **Phone: 463-0640**
  Fax: 463-8186
  Chief of staff .................................................... J.J. Garza
  Legislative director .......................................... Tony Gray
  Office manager.........................................Veronica Crum
  Committee clerk ..................... Jamie Durham Burchfield
  Interns ................................................Patricio Gutierrez
                                                                  Jorge Longoria
                                                                  Marcela Siller

**ORR, Rob**                            GN.10
  **Phone: 463-0538**
  Fax: 463-0897
  Legislative director  ...................................Matthew Miller
  Legislative aide..........................................Samantha Link
  Legislative intern ...................................Douglas Sechrist

**OTTO, John**                          E2.706
  **Phone: 463-0570**
  Fax: 463-0315
  Chief of staff .................................................. Nikki Cobb
  Legislative aide.........................................Justin Coleman
  Legislative intern ........................................Melva Gomez

**PADDIE, Chris**                       E2.314
  **Phone: 463-0556**
  Fax: 463-0611
  Chief of staff .............................................John Buxie
  Legislative director .......................................... Amy Goins
  Legislative aide..........................................Mia Hutchens

**PARKER, Tan**                         E2.602
  **Phone: 463-0688**
  Fax: 480-0694
  Chief of staff ........................................... Richard Dennis
  Legislative assistant ..................................Meagan Smith

**PATRICK, Diane**                      E2.806
  **Phone: 463-0624**
  Fax: 463-8386
  Chief of staff .......................................... Jenny Goerdel
  Legislative aide......................................Sam Nancarrow
  Outreach coordinator.................................... Abby Bryant
  Administrative assistant............................... Michael Blair

**PEREZ, Mary Ann**                     E1.208
  **Phone: 463-0460**
  Fax: 463-0763
  Chief of staff ..................................... Theresa Woodward
  Director of communications.................. Danielle Cordova
  Policy analyst ........................................Emily McCann
  Legislative assistant ................................. Veronica Forge

**PERRY, Charles**                      E2.502
  **Phone: 463-0542**
  Fax: 463-0671
  Chief of staff .........................................Scott Hutchinson
  Communications director...................Catherine Rodman
  Legislative aide..........................................Ryan Wallace

**PHILLIPS, Larry**                     4N.5
  **Phone: 463-0297**
  Fax: 463-1561
  Chief of staff ................................................Sara Haenes
  Legislative director ........................................ Matt Ashley
  Interns ...................................................... Nicholas Chan
                                                                  Aryana Esfahani
                                                                  Meghan Kahlig

**PICKETT, Joe C.**                     1W.5
  **Phone: 463-0596**
  Fax: 463-6504
  Chief of staff ........................................Michael Breitinger

**PITTS, Jim**                          1W.2
  **Phone: 463-0516**
  Fax: 463-1051
  Chief of staff ................................................ Aaron Gregg
  Scheduler .............................................. DeeDee Dunlap
  Legislative director .................................. Victoria Weber
  Legal analyst .......................................... Tiffany Terndrup

**PRICE, Four**                         E2.610
  **Phone: 463-0470**
  Fax: 463-8003
  Chief of staff/general counsel..........................Hal Talton
  Policy analyst ..............................Jacquelyn Greenwood
  Scheduler/legislative assistant ............Meredith Earwood

**RANEY, John**                         E2.712
  **Phone: 463-0698**
  Fax: 463-5109
  Chief of staff ................................................ Anna Hynes
  Legislative director ........................ Miranda Goodsheller
  Legislative assistant ................................Brendin James
  Legislative interns........................................ Torey Musha
                                                                  Hanna Paper
                                                                  Adam Phillips

**RATLIFF, Bennett**                                                    E2.404
   **Phone: 463-0468**
   Fax: 463-1044
   Chief of staff .......................................... Amanda McCune
   Legislative director ................................... Matthew Burgin
   Interns .....................................................Richard Arowlo
                                                                          Kelley Mathis
   District coordinator ................................. Beverly Wagner

**RAYMOND, Richard Peña**                                              1W.04
   **Phone: 463-0558**
   Fax: 463-6296
   Chief of staff ....................................................David Leo
   Gen. counsel/legislative director..............Kimmi Selinger
   Legislative aide............................................. Miguel Flores
   Legal interns...............................................Matthew Kinskey
                                                                          Logan Robinson
   Press secretary ........................................... Kayla Oliver
   Legislative interns......................................... Trevor Gitlin
                                                                          Julia Kowalsky
                                                                          Bianca Lopez
                                                                          Mara Montalvo
   Administrative assistant................................Lucky Urias

**REYNOLDS, Ron**                                                      E1.314
   **Phone: 463-0494**
   Fax: 463-1403
   Chief of staff ........................................... Jennifer Brader
   Legislative director ................................ Broderick Butler
   Legislative aide......................................... Sonji A. Moore
   Legislative intern ....................................... Kathryn Kluge

**RIDDLE, Debbie**                                                     4N.7
   **Phone: 463-0572**
   Fax: 463-1908
   Chief of staff ...............................................Shelton Green
   District director ........................................... Gail Gallien
   Legislative interns....................................Suruchi Avasthi
     Alyssa Dunbar              Jessica Edmundson
     Edwin Hurtado                  Rebecca James
                                                                          Suchi Sundaram

**RITTER, Allan**                                                      1W.3
   **Phone: 463-0706**
   Fax: 463-1861
   Chief of staff .............................................. Sean Haynes
   District director ........................................Candace Carver
   Legislative aide..................................Nicholas Raymond

**RODRIGUEZ, Eddie**                                                   4S.2
   **Phone: 463-0674**
   Fax: 463-0314
   Chief of staff ................................................ Nate Walker
   Legislative director ................................... Selena Booth
   Legislative aides..................................Bonnie Bacarisse
                                                                          Deisy Jaimes

**RODRIGUEZ, Justin**                                                  E2.804
   **Phone: 463-0669**
   Fax: 463-5074
   Chief of staff ............................................Brian Hodgdon
   Scheduler ............................................ Cynthia Carrizales
   Legislative assistants ...............................Janneth Clark
                                                                          Christopher Cox
   Communications assistant ...............Jordan Mandelberg
   Legislative interns...............................David Loewenberg
                                                                          Kevin Matula

**ROSE, Toni**                                                         E2.302
   **Phone: 463-0664**
   Fax: 463-0476
   Chief of staff ....................................Alma Allen-Johnson
   Legislative aide............................................Larry Thomas
   District director .....................................Vernesha Cathey

**SANFORD, Scott**                                                     E1.422
   **Phone: 463-0356**
   Fax: 463-0701
   Chief of staff ..........................................Katherine Munal
   Legislative director ...........................Christopher Paxton

**SCHAEFER, Matt**                                                     E1.406
   **Phone: 463-0584**
   Fax: 463-3217
   Chief of staff ............................................. Judd Quarles
   Legislative director ...................................Sarah Hughes
   Legislative assistant ........................... Audrey Ritcheson

**SHEETS, Kenneth**                                                    E1.402
   **Phone: 463-0244**
   Fax: 463-9967
   Chief of staff ............................................. Amy DeWeese
   Legislative director ......................................JP Haskins
   Legislative aide..................................Danielle Lobsinger

**SHEFFIELD, J.D.**                                                    E2.320
   **Phone: 463-0628**
   Fax: 463-3644
   Chief of staff ........................................ Andrew Johnson
   Legislative director ..............................Amanda Kit Tollett
   Scheduler/communications aide .......... Brynnan Whaley
   Legislative aides........................................Tina Gonzales
                                                                          Fernando Mancilla
                                                                          Christopher Orr

**SHEFFIELD, Ralph**                                                   E2.322
   **Phone: 463-0630**
   Fax: 463-0937
   Chief of staff ............................................ Brad Tegeler
   Legislative director ................................... Alexa Calligas
   Legislative aide......................................... Trevor Spears
   Administrative assistant................................ Anna Wood

**SIMMONS, Ron**                                    E2.420
   **Phone: 463-0478**
   Fax: 463-2089
   Chief of staff ................................................. Eric Stratton
   Legislative director ..................................... Ben Lancaster
   Legislative aide ........................................... Nicole DeCair
   Interns ................................................ Caroline Chadwick
                                    Aiman Tinwala

**SIMPSON, David**                                  E1.416
   **Phone: 463-0750**
   Fax: 463-9085
   Chief of staff .................................................. Kathi Seay
   Legislative director ................................ Michael Bullock
   Legislative aides............................................ Holden Fox
                                     Carly Rose Jackson
   Administrative assistant.............................. Tanisha Bush

**SMITH, Wayne**                                     GW.8
   **Phone: 463-0733**
   Fax: 463-1323
   Chief of staff ............................................. Amanda Peters
   Legislative aide/scheduler .................... Mackenna Head
   Legislative aide ....................................... Aisha Ainsworth

**SMITHEE, John**                                   1W.10
   **Phone: 463-0702**
   Fax: 476-7016
   Chief of staff ......................................... Andrea Stingley
   Legislative aide............................................ Beth Klunder

**SPRINGER, Drew, Jr.**                             E2.412
   **Phone: 463-0526**
   Fax: 463-6003
   Chief of staff ....................................... Travis McCormick
   Legislative assistant ..................................... Jacey Jetton
   Senior intern ............................... Mark Thorne-Thomsen
   Interns ........................................................ Britt Brandon
                                      Jim Dwyer
                                     Macy Nix

**STEPHENSON, Phil**                                E1.316
   **Phone: 463-0604**
   Fax: 463-5244
   Chief of staff .................................................... Matt Minor
   Office administrator/scheduler.................... Hope Rymarz
   Staff ....................................................... Jesus Rodriguez

**STICKLAND, Jonathan**                             E1.418
   **Phone: 463-0522**
   Fax: 463-9529
   Chief of staff ........................................... Tony McDonald
   Communications director.................... Micah Cavanaugh
   Legislative aides ....................................... Colin Huffines
                                      Anthony Reed
   Legislative correspondent ....................... Jake Robinson

**STRAMA, Mark**                                    E1.320
   **Phone: 463-0821**
   Fax: 463-1199
   Chief of staff ............................................... Mary Throop
   Legislative director ................................ David Smeltzer
   Legislative aides ......................................... Tim Regal
                                      Claire Wiley

**STRAUS, Joe (Speaker)**                           2W.13
   **Phone: 463-1000**
   Fax: 463-0675

   Chief of staff ............................................... Jesse Ancira
   Strategic legislative advisor.................... Patricia Shipton
   Budget director ....................................... Andrew Blifford
   House ethics advisor .................................... Frank Battle
   Exec. asst. to speaker........................... Channing Burke
   Exec. asst. to chief of staff ....................... Carolyn Scott
   Exec. asst. to strategic leg. advisor............ Josie Gamez
   Advance/travel aide.................................. John Romano
   Scheduler .................................................. Tara Korstad
   Dir. of admin. & special programs ................. Kari Torres
   Constituent services coordinator .............. Seth Juergens
   Press secretaries (463-0223) ........................... Erin Daly
                                      Jason Embry

**TAYLOR, Van**                                     E1.302
   **Phone: 463-0594**
   Fax: 463-1021
   Policy director................................................ Ryan Paylor
   Legislative director ................................. Jordan Williford
   Legislative aide/scheduler .......................... Rachel Pace

**THOMPSON, Ed**                                    E2.506
   **Phone: 463-0707**
   Fax: 463-8717
   Chief of staff ............................................. Emily Kirchner
   Legislative interns....................................... Luke Orlando
                                      Grace Richardson

**THOMPSON, Senfronia**     **3S.6**
   **Phone: 463-0720**
    Fax: 463-6306
    Chief of staff ....................................... Milda Mora
    Comm dir./senior policy analyst.................. Colleen Tran
    Legislative director .................................. Brete Anderson
    Legislative interns........................ Ana Cabrera-Marquez
                Paul Hanchett
                Joanna Joseph

**TOTH, Steve**     **E1.512**
   **Phone: 463-0797**
    Fax: 463-0898
    Chief of staff ........................................... Amy Lane
    Legislative director ................................... Michael Houck
    Communications director.......................... Brittany Houck

**TURNER, Chris**     **E2.210**
   **Phone: 463-0574**
    Fax: 477-1481
    Chief of staff ....................................... Emily Amps
    Deputy chief of staff........................... Kate Fox
    Legislative aides.................................. Dania Al-Rasheed
               Jacqueline Hernandez
               Shane Stodghill
    Legislative interns........................... Reid Watler
               Grant Wiles

**TURNER, Scott**     **E1.318**
   **Phone: 463-0484**
    Fax: 463-7834
    Chief of staff ..................................... Deanna Kuykendall
    Legislative director ..................................... Nick Cantrell
    Staff assistant.................................... Jon David Bruegel
    Interns ........................................... Robert Lane
               Katie Peisen

**TURNER, Sylvester**     **GW.15**
   **Phone: 463-0554**
    Fax: 463-8380
    Chief of staff ..................................... Alison Brock
    Scheduler .................................... Pam Watson
    Student legislative counsel.................... Ashley Thomas
    Legislative aide.................................... Murry Matthews
    Policy analyst (TLIP) ............................ Carmela Walker
    Budget analyst (TLIP)........................... Matthew Cherry

**VILLALBA, Jason**     **E2.702**
   **Phone: 463-0576**
    Fax: 463-7827
    Chief of staff ..................................... Brittany Eck
    Legislative director ...................................... Chase Fruge
    Policy advisor ........................................ Ashley Juergens
    Legislative assistant .............................. Mike Stinebaugh

**VILLARREAL, Mike**     **4S.6**
   **Phone: 463-0532**
    Chief of staff ................................... Peter Clark
    Policy analysts.................................... Amanda Gonzalez
               Dale Mantey
               Meghan Regis
               Andrew Serrano

**VO, Hubert**     **E2.208**
   **Phone: 463-0568**
    Fax: 463-0548
    Chief of staff/district director....................... Karen Loper
    Legislative director ...................................... Jenny Casey
    Legislative aides................................ Lindsay Kubatzky
               Rashad Roberson

**WALLE, Armando**     **E1.220**
   **Phone: 463-0924**
    Fax: 463-1510
    Chief of staff ........................................... Neesha Davé
    Legislative director ........................... Rahul Sreenivasan
    Legislative assistants ............................... Dara Johnson
               Isabel Soto

**WHITE, James**     **E2.508**
   **Phone: 463-0490**
    Fax: 463-9059
    Chief of staff .................................... Tyler Norris
    Legislative aides........................................ Saul Mendoza
               Morgan Williamson

**WORKMAN, Paul**     **E2.410**
   **Phone: 463-0652**
    Fax: 463-0565
    Chief of staff ................................... Allison Smith
    Communications director.......................... Brian Mitchell
    Legislative aide........................................ Blake Rogers
    Legislative intern .......................... Kaysi Dean

**WU, Gene**     **E2.820**
   **Phone: 463-0492**
    Fax: 463-1182
    Chief of staff ..................................... Amy Bruno
    Deputy chief of staff...................................... Beth Martin
    Legislative director ....................................... Greg Wythe
    Legislative aides...................................... Daniel Boettger
               Stephen Holloway
               Michael Soliz

**ZEDLER, William "Bill"**                                     **GW.6**
   **Phone: 463-0374**
   Fax: 463-0364
   Chief of staff ....................................Deanna Zimmerman
   Legislative director ................................. Matthew Posey
   Legislative assistant .................................. Bryan Shufelt
   Administrative assistant........................MaryKate Parker


**ZERWAS, John**                                              **E2.308**
   **Phone: 463-0657**
   Fax: 236-0713
   Chief of staff ............................................Meghan Weller
   Legislative aides....................................Cameron Cocke
                                                       Caroline Dickerson
                                                       Joel Garcia

# House Committees

**AGRICULTURE AND LIVESTOCK**            E2.114
    Phone: 463-0762
    CHAIR ............................................................Tracy King
    Chief committee clerk.............................Angelina Lopez

**APPROPRIATIONS**            E1.032
    Phone: 463-1091
    Fax: 463-0270
    CHAIR .................................................................Jim Pitts
    Committee director..........................................Keith Yawn
    Committee clerk ...................................Jonathon Storms
    Assistant clerk ............................................Douglas Ray
    Analysts..................................................Heather Fleming
                               Brady Franks
                               Hunter Thompson
                               Brady Vaughn

**BUSINESS AND INDUSTRY**            E2.128
    Phone: 463-0766
    Fax: 463-6698
    CHAIR .......................................................Rene Oliveira
    Committee clerk ...........................Benjamin Fitzgibbons
    Assistant clerk .........................................Terry Gutierrez

**CALENDARS**            E2.148
    Phone: 463-0758
    CHAIR ...........................................................Todd Hunter
    Committee clerk .......................................Jennifer Welch
    Assistant clerk ...........................................Caleb McGee

**CORRECTIONS**            E2.110
    Phone: 463-0796
    CHAIR ..........................................................Tan Parker
    Committee clerk .......................................Lesley French
    Assistant clerk .........................................Joseph Halbert

**COUNTY AFFAIRS**            E2.130
    Phone: 463-0760
    Fax: 463-5227
    CHAIR ................................................Garnet F. Coleman
    Committee clerk .........................................Katy Reagan
    Assistant clerk ..........................................Amir Tavakkoli

**CRIMINAL JURISPRUDENCE**            E2.112
    Phone: 463-0768
    CHAIR .........................................................Abel Herrero
    Committee clerk/gen. counsel...............Amelia Harnagel
    Deputy committee clerk........................Vanessa Fuentes

**CULTURE, RECREATION, AND TOURISM**            E2.134
    Phone: 463-1974
    Fax: 463-0237
    CHAIR ...................................................... Ryan Guillen
    Committee director ..................................... Corey Howell
    Assistant clerk .......................................... Lucia Mendez

**DEFENSE AND VETERANS' AFFAIRS**            E2.160
    Phone: 463-1393
    CHAIR ................................................. José Menéndez
    Committee clerk .................. Jessica Balladares-Bennett
    Committee assistant...............................Jacqueline Mintz

**ECONOMIC AND SMALL BUSINESS
DEVELOPMENT**            E2.118
    Phone: 463-0069
    CHAIR .......................................................John E. Davis
    Committee clerk ....................................Laurie McAnally
    Aide ..........................................................Chris Mendez

**ELECTIONS**            E2.144
    Phone: 463-0772
    CHAIR ................................................. Geanie Morrison
    Committee clerk ...........................................Justin Unruh
    Assistant clerk ...............................................Will Shindler

**ENERGY RESOURCES**            E2.162
    Phone: 463-0774
    CHAIR ...............................................................Jim Keffer
    Committee clerk .......................Bernice Espinosa-Torres

**ENVIRONMENTAL REGULATION**            E2.154
    Phone: 463-0776
    CHAIR ....................................................Patricia Harless
    Committee clerk ....................................Jamie Burchfield
    Assistant clerk .......................................Caroline Hendrix

**GENERAL INVESTIGATING AND ETHICS**            E2.170
    Phone: 463-0780
    CHAIR .........................................................John Zerwas
    Committee clerk .........................................Laura Strunk

**GOVERNMENT EFFICIENCY AND REFORM**            E2.202
    Phone: 463-0903
    CHAIR ............................................Linda Harper-Brown
    Committee clerk ........................................Krista Heiden
    Policy analyst ...............................................Jon Palmer

**HIGHER EDUCATION** E2.106
Phone: 463-0782
CHAIR ......................................................Dan Branch
Committee clerk ........................................ Dustin Meador
Policy analyst ...........................................Robert Thetford

**HOMELAND SECURITY AND PUBLIC SAFETY** E2.146
Phone: 463-0133
Fax: 463-0011
CHAIR ......................................................Joe C. Pickett
Committee clerk ............................Mariann H. Morelock
Assistant clerk ..............................................JW Galloway

**HOUSE ADMINISTRATION** E2.140
Phone: 463-0784
Fax: 463-8310
CHAIR ...................................................... Charlie Geren
Committee clerk .........................................Laura Grable

**HUMAN SERVICES** E2.152
Phone: 463-0786
Fax: 463-8981
CHAIR ........................................Richard Peña Raymond
Committee clerk .............................................. Jim Terrell
Assistant committee clerk......................Shiloh Gonzalez

**INSURANCE** E2.150
Phone: 463-0788
Fax: 476-7016
CHAIR ......................................................John Smithee
Chief committee clerk...............................Cristal Retana
Assistant clerk ..............................................Carol Namé

**INTERNATIONAL TRADE AND**
**INTERGOVERNMENTAL AFFAIRS** E2.158
Phone: 463-1211
CHAIR ......................................................Rafael Anchia
Committee director ......................................Jeff Madden
Deputy director ..........................................Scott Flukinger

**INVESTMENTS AND FINANCIAL SERVICES** E2.172
Phone: 463-0871
CHAIR .................................................. Mike Villarreal
Clerk ........................................................ Rudy England
Assistant clerk (intern)............................ Rachel Bookout

**JUDICIARY AND CIVIL JURISPRUDENCE** E2.120
Phone: 463-0790
Fax: 463-0174
CHAIR .......................................................... Tryon Lewis
Chief clerk/general counsel................................ Kari King
Assistant clerk ............................................. Jeffrey Miller

**LAND AND RESOURCE MANAGEMENT** E2.126
Phone: 463-1263
CHAIR ......................................................Joe Deshotel
Committee clerk ..................................Melissa Quevedo
Clerk assistance ...............................Christian V. Manuel

**LICENSING AND ADMINISTRATIVE**
**PROCEDURES** E2.156
Phone: 463-0798
CHAIR ...................................................... Wayne Smith
Committee director ............................... Gabe Valenzuela
Policy analyst .................................................Sally Bage

**LOCAL AND CONSENT CALENDARS** 3S.6
Phone: 463-0800
Fax: 463-6306
CHAIR ......................................... Senfronia Thompson
Chief committee clerk....................................Milda Mora
Assistant clerk ............................................ Colleen Tran

**NATURAL RESOURCES** E2.104
Phone: 463-0802
Fax: 463-9810
CHAIR .......................................................... Allan Ritter
Committee director/chief clerk................ Elizabeth Fazio
Assistant clerk ...................................... Timothy Gregg
Legal analyst .......................................Martha Landwehr
Committee intern .........................Geetika "Vinnie" Rawat

**PENSIONS** E2.164
Phone: 463-2054
CHAIR ..........................................................Bill Callegari
Committee clerk .....................................Emily R. Brandt
Assistant clerk ...................................Carly A. Reedholm

**PUBLIC EDUCATION** E2.124
Phone: 463-0804
CHAIR ............................................ Jimmie Don Aycock
Committee director ........................................Jenna Watts

**PUBLIC HEALTH** E2.1010
Phone: 463-0806
Fax: 463-0900
CHAIR ..................................................Lois W. Kolkhorst
Committee director .......................................Han Nguyen
Committee clerk ..................................Donald Barber
Assistant clerk ............................................ Pader Moua
Policy analysts.............................................Diana Hamil
Steven Kummins

**REDISTRICTING** E2.142
Phone: 463-9948
CHAIR ..........................................................Drew Darby
Committee clerk ....................Natalie Foerster-Gonzalez

**RULES AND RESOLUTIONS**                                              **E2.138**
    **Phone: 463-0812**
    CHAIR ........................................ Ruth Jones McClendon
    Chief clerk ............................................. Linda Christofilis
    Assistant clerk ........................................... Janis Reinken


**SELECT COMMITTEE ON CRIMINAL**
**PROCEDURE REFORM**                                                  **JHR 310**
    **Phone: 463-8159**
    CHAIR ......................................................... Debbie Riddle
    Committee clerk ................Graden "Grady" W. Dahlberg


**SELECT COMMITTEE ON FEDERALISM**
**AND FISCAL RESPONSIBILITY**                                         **E2.1006**
    **Phone: 463-7861**
    CHAIR ................................................Brandon Creighton
    Committee clerk ............................................ Tara Garcia
    General counsel .............................................. Amy Miller


**SELECT COMMITTEE ON TRANSPARENCY**
**IN STATE AGENCY OPERATIONS**                                        **JHR 310**
    **Phone: 463-8160**
    CO-CHAIRS ............................................. Carol Alvarado
                                                                             Dan Flynn
    Committee clerk ......................................... Kent Sholars
    Assistant clerk ...............................................Matt Abel


**SPECIAL PURPOSE DISTRICTS**                                         **E2.1016**
    **Phone: 463-0277**
    Fax: 463-0977
    CHAIR…………………………….......... Dennis Bonnen
    Committee clerk ........................................ Steven Schar
    Assistant clerk ......................................... Donald Carter


**STATE AFFAIRS**                                                     **E2.108**
    **Phone: 463-0814**
    Fax: 463-6783
    CHAIR ........................................................Byron Cook
    Chief committee clerk............................. Toni Barcellona
    Assistant committee clerk....................... Amanda Flores


**TECHNOLOGY**                                                        **E2.206**
    **Phone: 463-0794**
    Fax: 463-0474
    CHAIR .......................................................... Gary Elkins
    Committee director ........................................... Teri Avery


**TRANSPORTATION**                                                    **E2.122**
    **Phone: 463-0818**
    CHAIR ....................................................... Larry Phillips
    Committee clerk ........................................Courtney Reid
    Assistant clerk ..............................................David Glenn


**URBAN AFFAIRS**                                                     **E2.126**
    **Phone: 463-9904**
    Fax: 463-1049
    CHAIR ..............................................Harold V. Dutton, Jr.
    Committee clerk ..................................... Nicole R. Bates
    Assistant clerk ......................................... Tamoria Jones


**WAYS AND MEANS**                                                    **E2.116**
    **Phone: 463-0822**
    Fax: 463-1529
    CHAIR ...............................................Harvey Hilderbran
    Chief committee clerk.............Carolyn Merchan Saegart
    Assistant clerk ....................................... Chance Ryndak
    Intern ..........................................................Carl Hansen


**OFFICE OF THE COMMITTEE COORDINATOR**                              **E2.174**
    **Phone: 463-0850**
    Fax: 463-7547
    Committee coordinator ...........................Stacey Nicchio
    Assistant committee coordinator .............Damian Duarte
    Committee coordinator clerks.......................Jack Lenske
                                                                        Robert Morgan
                                                                         Missy Warren
                                                                        Ana Zabalgoitia


**HOUSE RESEARCH ORGANIZATION**                                      **JHR 420**
    **Phone: 463-0752**
    Fax: 463-1962
    Director................................................Laura Hendrickson
    Senior editor ................................................... Ben Davis
    Session editor......................................Charles Boisseau
    Office manager/analyst ................................. Tom Howe
    Admin clerk/session analyst...............Mark Neuman-Lee
    Senior analyst ....................................... Kellie Dworaczyk
    Analysts......................................................Janet Elliott
                                                                  Andrei Lubomudrov
                                                                        Blaire Parker
    Session analysts .........................................Lauren Ames

| Marcus Denton | Frank Fuller |
| Ben Haguewood | Michael D. Hernandez |
| Annie Jones | Gresham Kay |
| Danielle Nasr | Jessica Wilson |

# Senate

**BIRDWELL, Brian**                                                     E1.708
    **Phone: 463-0122**
    Fax: 463-3729
    Chief of staff ...............................................Ben Stratmann
    Legislative director ................................... Anna Paulson
    Director of constituent services ........... Barbara Erickson
    Senior policy analyst ...............................Spencer Harris
    Policy analysts.................................................. Matt Cope
                                      Jason Steele
    Scheduler/administrative aide ..................... Liz Sanchez
    Legislative aide/Bullock scholar .............Stephen Leland

**CAMPBELL, Donna**                                                     3E.8
    **Phone: 463-0125**
    Fax: 463-7794
    Chief of staff ................................................ Bonnie Bruce
    Senior legislative aides....................................Matt Creel
                                       Tanya Vazquez
    Legislative aide......................................... Amanda Shell
    Communications director..................................Jon Oliver
    Administrative director............................Lauren Schmidt
    Legislative intern ..........................................Kristen Cade

**CARONA, John**                                                       4E.2
    **Phone: 463-0116**
    Fax: 463-3135
    Chief of staff ...........................................Barbara Salyers
    Legislative director ........................................Erika Akpan
    General counsel ......................................... Adam Burklund
    Communications dir./policy analyst ..... Jamie McCormick
    Administrative director.............................Detta Haffelder
    Office mgr./session scheduler .............Stephanie Schotz

**DAVIS, Wendy**                                                       3E.12
    **Phone: 463-0110**
    Fax: 475-3745
    Chief of staff .....................................................Dan Buda
    Legislative director .....................................Sonya Grogg
    Communications director............................ Rick Svatora
    Office manager........................................ Graham Stadler
    Senior policy analyst ................................ Ashley Brooks
    Policy analysts.........................................Carmen Gaddis
                                      Michael Ramsey
    Legislative interns................................ Lissette Villarruel
                                      Leah Wise

**DEUELL, Bob**                                                        E1.704
    **Phone: 463-0102**
    Chief of staff ................................................... Don Forse
    Legislative director ........................................ Scot Kibbe
    Legislative aide............................................ Bogan Durr
    Scheduler ...............................................Sallie Armstrong
    Interns ...............................................Crystal Gonzales
                                       Shradah Thakur

**DUNCAN, Robert**                                                     3E.18
    **Phone: 463-0128**
    Fax: 463-2424
    Chief of staff ............................................... Porter Wilson
    Legislative director ........................... Jennifer Chambers
    Staff ................................................................ Evan Dixon
       Erin Hornaday                      Megan LaVoie
       Joel Riedel                           John Stokes

**ELLIS, Rodney**                                                      3E.6
    **Phone: 463-0113**
    Fax: 463-0006
    Chief of staff/general counsel................Brandon Dudley
    Legislative director ...........................................Tina Tran
    Scheduler ...............................................Sylvia Camarillo
    Communications director........................ Jeremy Warren
    Policy advisors ..................................... David Edmonson
                                       Todd Hendricks
    District director/policy advisor....................Jeremy Brown
    Casework mgr./policy advisor.............Ashley San Miguel
    District aide/policy advisor.......................Chuck Franklin

**ELTIFE, Kevin**                                                      3E.16
    **Phone: 463-0101**
    Fax: 463-3751
    Chief of staff .............................................. Cheryl Vanek
    Executive assistant............................Connie Hernandez
    General counsel ......................................Margo Cardwell
    Legislative aides.........................................Chuck Mains
                                       Ryan Weiseman
    Policy analyst .............................................Regan Ellmer
    Intern ....................................................Lamar DeLong

**ESTES, Craig**                                   **1E.9**
  Phone: 463-0130
  Fax: 463-8874
  Chief of staff ...................................Noe Barrios
  Legislative director ...........................Liz White
  General counsel ...........................John Bennett
  Legislative counsel .......................Jeremy Hagen
  Legislative aide/scheduler .....Jennifer Coffee
  Legislative aides..........................Sarah Farley
                                                        Morgan Stewart
  Luna scholar..................................Karla Hoyos

**FRASER, Troy**                                  **1E.12**
  Phone: 463-0124
  Chief of staff ................................Janice McCoy
  Scheduling director........................Terri Mathis
  Senior policy analyst ....................Riley Stinnett
  Legislative assistants ..................Mark Burgin
                                                        Taylor Horne
  Admin. assistant.........................Whitney Smith-Nelson

**HANCOCK, Kelly**                                 **GE.7**
  Phone: 463-0109
  Fax: 463-7003
  Chief of staff ...............................Mia McCord
  Legislative director ....................Tricia Stinson
  Senior policy analyst ...............Adam Leggett
  Communications director.....................Camille Carter
  Administrative assistant.....................Liz Doerr
  Policy intern......................Meena Manivannan

**HEGAR, Glenn**                                  **E1.806**
  Phone: 463-0118
  Fax: 475-3736
  Chief of staff ...............................Lisa Craven
  Scheduler ...............................Elisabeth Spring
  Legislative aides..........................Jessica Hale
                                                        Jake Johnson
                                                        Daniela Silva
                                                        Pete Winckler

**HINOJOSA, Juan "Chuy"**                         **3E.10**
  Phone: 463-0120
  Fax: 463-0229
  Chief of staff ..............................Luis Moreno
  Legislative director .....................Oscar Garza
  General counsel .......................Jennifer Saenz
  Policy analysts...........................Desiree Castro
                                                        Josh Reyna
  Legislative assistant ...................Patrick Smith
  Legislative aide.......................Carlos Gutierrez
  Scheduler ...............................Jennifer Salazar

**HUFFMAN, Joan**                                  **3E.2**
  Phone: 463-0117
  Fax: 463-0639
  Leg. director/general counsel .................Lindsay Mullins
  Senior policy analyst ...................Patty Guerra
  Policy analysts....................Austin Arceneaux
                                                        Sam Carlson
  Communications director.................Jeff Hillery
  District director/scheduler....................Amanda Jenson

**LUCIO, Eddie, Jr.**                              **3S.5**
  Phone: 463-0127
  Fax: 463-0061
  Chief of staff .............................Louie Sanchez
  Legislative director ...................Sara Gonzalez
  Senior advisor ...........................Dan Esparza
  General counsel .......................Daniel Collins
  Policy analyst ...............................Darrell Farr
  Correspondent...................Haydee Escalante
  Legislative aides ........................Ivan Medina
                                                        Wilson Macha
  Ombudsmen ..........................Brenda Watson
                                                        Blanca Villalpando

**NELSON, Jane**                                   **E1.5**
  Phone: 463-0112
  Fax: 463-0923
  Chief of staff ..............................Dave Nelson
  Scheduler ...............................Elizabeth Rice
  Correspondence aide ....................Julie Black
  Communications director....................Megan Hanson
  Legislative assistant ..................Kevin Fletcher
  Senior policy analyst ..........................Travis Broussard
  Policy analyst ..............................Austin Holder
  General counsel ......................Christina Tippit

**NICHOLS, Robert**                                **E1.706**
  Phone: 463-0103
  Fax: 463-1726
  Chief of staff ...........................Steven Albright
  Legislative director ...................Angus Lupton
  Senior policy analyst ................................Adrianne Emr
  Policy analyst ..................................J.D. Hale
  Press secretary .........................Mandy Morton
  Administrative assistant...........................Sydni Mitchell

**PATRICK, Dan**                                   **3S.3**
  Phone: 463-0107
  Fax: 463-8810
  Chief of staff ..............................Logan Spence
  Legislative director .........................John Gibbs
  Executive assistant........................Tina Poston
  Legal counsel .....................Lauren Sutterfield
  Legislative aide......................Suzanne Tomlin

**House Research Organization**                                      **Page 21**

**PAXTON, Ken**                                    E1.810
  **Phone: 463-0108**
  Fax: 463-7579
  Chief of staff ................................................. Steve Roddy
  Legislative director ............................. Randy Samuelson
  Senior policy analyst ................................... Ben Williams
  Communications director......................Kate Zaykowski
  Policy analyst/counsel ....................................Tom Smith
  Legislative aide....................................... Danny Stockton

**RODRIGUEZ, José**                                E1.808
  **Phone: 463-0129**
  Fax: 463-7100
  Chief of staff/legislative director .......Sushma Jasti Smith
  Office manager/scheduler ...................... Avina Gutierrez
  General counsel .......................................Ross Peavey
  Communications director....................Luis "Sito" Negron
  Binational affairs/media relations ................. David Stout
  Interns ................................................Arturo de Santiago
                                                  Thea Ulrich-Lewis
  Part-time interns ...................................Louis Armendariz
      Danielle Briggs              Destinnie Bujanda
      Lynn Hua                     Nicole Kruijs
      Alexia Rey                   Bryce Romero

**SCHWERTNER, Charles**                            E1.608
  **Phone: 463-0105**
  Fax: 463-5113
  Chief of staff ........................................ Thomas Holloway
  District director/scheduler......................Leah Alexander
  Legislative director ......................................Terry Franks
  General counsel/policy analyst...................Nelson Jarrin
  Policy analyst ..........................................Caitlin Styrsky
  Administrative aide................................ Chelsea Brown
  Interns .................................................... Annel Gonzales
                                                          Taylor Lee

**SELIGER, Kel**                                    GE.4
  **Phone: 463-0131**
  Fax: 475-3733
  Chief of staff ................................................Ginger Averitt
  Legislative director ........................................Betsy Madru
  Office manager....................................................Tien Do
  Policy analyst ...........................................Chris Munson
  Media relations/policy analyst ..................Becky Walker
  Legislative interns...................................... Sidd Dadhich
                                                          Jamie Feldt
                                                          Taylor Ward
                                                          Lauren Young

**TAYLOR, Larry**                                   GE.5
  **Phone: 463-0111**
  Fax: 475-3727
  Chief of staff ...........................................Cari Christman
  Office manager ......................................Wesley Starnes
  Communications dir./policy analyst .............Beth Shields
  General counsel/policy analyst...................Colby Beuck
  Policy analyst ........................................ Nicole Sunstrum
  Legislative intern ...................................... Theresa Golde

**URESTI, Carlos**                                  E1.804
  **Phone: 463-0119**
  Fax: 463-1017
  Chief of staff ........................................... Jason Hassay
  Communications director........................Mark Langford
  Legislative director ............................... Michael Ruggieri
  Senior policy analysts............................. Jerry Needham
                                                        Micah Rodriguez
  Policy analyst/scheduler........................ Lorena Robledo
  Policy analyst .........................................Benjamin Factor
  Legal intern.......................................La Vonda Russell
  Intern ................................................... Katie Hammons
  Luna scholars ................................. Alejandro Barrientos
                                                        Daniela Huerta

**VAN de PUTTE, Leticia**                           E1.610
  **Phone: 463-0126**
  Fax: 463-2114
  Chief of staff ..............................................Gilbert Loredo
  Legislative director/gen. counsel...............Ida Musgrove
  Deputy legislative director ................ Amber Hausenfluck
  Policy analyst ..................................... Servando Esparza
  Legislative assistant ............................... Sarah Clemons
  Communications director............................. Lee Nichols
  Scheduler .............................................. Adriana Cabrera
  Legislative interns..........................................Andrew Hill
                                                            Patrick Lopez
  Luna scholar...........................................Brianna Roberts

**WATSON, Kirk**                                    E1.606
  **Phone: 463-0114**
  Chief of staff ............................................Sarah Howard
  Legislative director ................................. Sandy Guzman
  General counsel/leg. director ...................... Susan Nold
  Asst. gen. counsel/leg. director ..................Ana Defrates
  Legislative analyst.......................................Katie O'Brien
  Policy & communications director ...........Steve Scheibal
  Office manager/legislative aide ...........Yvonne Reynolds
  Constituent services managers ............Lora Ann Gerson
                                                        Yolanda Velasquez

**WEST, Royce**                 **1E.3**
  **Phone: 463-0123**
  Fax: 463-0299
  Chief of staff .......................................... La Juana Barton
  Legislative director ................................ Graham Keever
  Legislative aide/press secretary ................... Kelvin Bass
  Legislative aide...................................... Eric Dominquez
  Legal counsel ......................................... Susie Strezelec
  Executive secretary/scheduler ................ Susie Ramirez
  Interns ......................................................... Dylan Luper
                                                        Swapna Reddy
                                                        Nathan Salazar

**WHITMIRE, John**           **1E.13**
  **Phone: 463-0115**
  Fax: 475-3737
  Chief of staff ............................................. Lara Wendler
  Legislative aides..................................... Doug Clements
                                                        Susan Fontenette
                                                        Trey Owens
  Legislative interns............................................ Justin Diaz
                                                        Tanisa Imoto
                                                        Maria Ivanez
                                                        J.D. Sorrentino

**WILLIAMS, Tommy**          **1E.15**
  **Phone: 463-0104**
  Chief of staff ................................................ Janet Stieben
  Legislative director/gen. counsel ............ Amanda Martin
  Communications director.......................... Gary Scharrer
  Administrative assistant........................ Morgan Sanders
  Senior legislative aide ................................. Libby Nezda
  Legislative aides............................................. Jeff Nelson
                                                        Chelsie Sanders

**ZAFFIRINI, Judith**         **1E.14**
  **Phone: 463-0121**
  Fax: 475-3738
  Chief of staff ................................................. Sean Griffin
  Scheduler .................................................. Nathan Lerma
  Policy analyst - HHS......................................... Sara Hull
  Policy analyst - higher education........... Tracy Ballysingh
  Legislative aides.......................................... Isabel Casas
                                                        Michael Dole
  Office manager........................................... Sarah Acosta
  Public information aide................................ Will Krueger

# Senate Committees

**ADMINISTRATION**                                      E1.714
   **Phone: 463-0350**
   Fax: 463-0499
   CHAIR ..........................................................Kevin Eltife
   Committee clerk/policy analyst...................Mattie Murray
   General counsel ............................... Stacey Chamberlin

**AGRICULTURE,  RURAL AFFAIRS,
AND HOMELAND SECURITY**                     **SHB 455**
   **Phone: 463-0340**
   Fax: 463-2293
   CHAIR ............................................................ Craig Estes
   Committee director ........................................ Ren Newey
   Policy analyst & committee clerk........... Gretchen Essell

**BUSINESS AND COMMERCE**                     **SHB 370**
   **Phone: 463-0365**
   Fax: 463-1613
   CHAIR ..........................................................John Carona
   Committee director ................................ Steven Polunsky
   Deputy committee director ................... Angie Cervantes
   Committee clerk ...................................... Troupe Brewer
   Assistant committee clerk.......................... Kristin Smart
   Policy analysts.......................................... Lauren Emery
                                Kelsey Erickson
                               Natalia Rivera Mack

**CRIMINAL JUSTICE**                                  **SHB 470**
   **Phone: 463-0345**
   Fax: 475-2015
   CHAIR ......................................................John Whitmire
   Policy director...................................... Larance Coleman
   Policy analysts........................................ Doug Clements
                                  Terra Tucker
   Legislative aide/clerks ................................ Brooke Alger
                                Kathryn Hendrix

**ECONOMIC DEVELOPMENT**                     **SHB 340**
   **Phone: 463-1171**
   CHAIR ........................................................... Bob Deuell
   Committee director ................................Hillery Stephens
   Committee clerk .......................................... Alex Karam
   Intern ...................................................... Joseph Keeney

**EDUCATION**                                            **SHB 440**
   **Phone: 463-0355**
   CHAIR ......................................................... Dan Patrick
   Committee director ................................. Marian Wallace
   Committee clerk ...............................Holly Mabry McCoy
   Policy analysts................................................ Ben Bhatti
                                  Ryan Fisher
   Assistant clerk ........................................Ryan Davenport

**FINANCE**                                                 E1.038
   **Phone: 463-0370**
   CHAIR .................................................Tommy Williams
   Committee director ....................................... Sarah Hicks
   Deputy director .............................................Jason Baxter
   Committee clerk ................................. Stephanie Hoover
   Assistant clerk ....................................... Grace Huffman
   Budget analysts........................................Kara Crawford
                                  Janiece Crenwelge
                                Tulsi Oberbeck
                                Rob Orr
   Interns ...................................................Daniel Bernhard
                                  Elizabeth Desselle

**GOVERNMENT ORGANIZATION**               **SHB 630**
   **Phone: 463-1818**
   Fax: 463-1700
   CHAIR ..................................................... Judith Zaffirini
   Committee director ................................. Rachel McClure
   Policy analyst ..................................... Sarah Brownstein
   Committee clerk ...................................Gonzalo Serrano

**HEALTH AND HUMAN SERVICES**           **SHB 420**
   **Phone: 463-0360**
   Fax: 463-9889
   CHAIR ...........................................................Jane Nelson
   Committee director ......................... Shannon Ghangurde
   Committee clerk ........................................ Michael Baca
   Senior policy analyst ...................................Jordan Dixon
   Policy analysts.................................... Heather Bradford
                                  Sharen Ludher

**HIGHER EDUCATION**                             **SHB 320**
   **Phone: 463-4788**
   Fax: 463-0695
   CHAIR ........................................................... Kel Seliger
   Committee director ................................Mark Kavanaugh
   Committee clerk ........................................Sarah Willcox
   Policy analysts........................................ Trevin Franklin
                                  Sean Opperman
   Legislative intern ..................................... Anthony Leclair

**House Research Organization**                                                  **Page 24**

**INTERGOVERNMENTAL RELATIONS**          **SHB 475**
  **Phone: 463-2527**
  Fax: 463-2858
  CHAIR ..........................................Juan "Chuy" Hinojosa
  Committee director ......................Roxanne De La Garza
  Committee clerk ..........................................J.D. Pedraza
  Assistant clerk ..........................................Rudy Delgado
  UT law Intern ...................................................Lisa Kinzer
  Luna scholars .................................................Omar Araiza
                                   Dariel Ramirez
  Interns ................................... Daniel Gonzalez
                                   Sam Saldivar

**JURISPRUDENCE**                        **SHB 350**
  **Phone: 463-0395**
  Fax: 463-8336
  CHAIR .......................................................... Royce West
  Committee director ..........................................Julie Frank
  Committee clerk ..........................................Tiffany White
  General counsel ..............................................Ryan Lee

**NATURAL RESOURCES**                    **SHB 325**
  **Phone: 463-0390**
  Fax: 463-6769
  CHAIR .......................................................... Troy Fraser
  Committee director .........................................Tara Rejino
  Committee clerk ......................................... Tatum Regan
  Policy analyst for oil, gas, energy..............Will McAdams
  Policy analyst for air and waste..................Rick Sumner
  Policy analysts...................................Cameron Barnette
                                   Hannah Wilchar

**NOMINATIONS**                          **E1.716**
  **Phone: 463-2084**
  Fax: 463-8123
  CHAIR ......................................................... Glenn Hegar
  Committee director .......................................Robert Haley
  Committee clerk ..........................................Jake Johnson

**OPEN GOVERNMENT**                      **SHB 335**
  **Phone: 463-7733**
  CHAIR ..........................................................Rodney Ellis
  Committee director ...............................Jessica Schleifer
  Committee clerk ..........................................Amber Weed

**STATE AFFAIRS**                        **SHB 380**
  **Phone: 463-0380**
  Fax: 463-0342
  CHAIR ......................................................Robert Duncan
  Committee director ....................................Jennifer Fagan
  Committee clerk ..........................................Gabe Hughes
  Staff ............................................................. Chana Elgin
                                  Lana Freeman
                                  Drew Graham
                                  Chase Roe

**TRANSPORTATION**                       **SHB 450**
  **Phone: 463-0067**
  CHAIR ....................................................Robert Nichols
  Committee director ...........................................Amy Jeter
  Policy director ...........................................Steven Albright
  Policy analysts...........................Jonathan Sierra-Ortega
                                   Paul Townsend
  Assistant clerk ..........................................Rachel Wetsel

**VETERAN AFFAIRS AND**
**MILITARY INSTALLATIONS**               **SHB 345**
  **Phone: 463-2211**
  Fax: 463-7683
  CHAIR ..............................................Letica Van de Putte
  Committee director ......................................... Bill Wilson
  Committee clerk ......................................Cinda Johnson

# Other State Numbers

| | |
|---|---|
| Governor's Office | 463-2000 |
| Lieutenant Governor's Office | 463-0001 |
| Attorney General's Office | 463-2100 |
| Capitol Nurse Practitioner, E1.214 | 463-0313 |
| Comptroller's Office | 463-4000 |
| Department of Public Safety (Capitol) | 463-3333 |
| Legislative Budget Board | 463-1200 |
| Legislative Reference Library | 463-1252 |
| Secretary of State | 463-5770 |
| State Library and Archives Commission | 463-5455 |
| State Auditor's Office | 936-9500 |
| Sunset Advisory Commission | 463-1300 |
| Texas Legislative Council | 463-1155 |

**House of Representatives**

| | |
|---|---|
| Audio/video | 463-0920 |
| Bill distribution | 463-1144 |
| Chief Clerk | 463-0845 |
| Journal Clerk | 463-0855 |
| Parliamentarian | 463-2003 |
| Sergeants | 463-0910 |

**Senate**

| | |
|---|---|
| Bill distribution | 463-0252 |
| Committee Coordinator | 463-0070 |
| Journal Clerk | 463-0050 |
| Media services | 463-0300 |
| Messengers | 463-0205 |
| Parliamentarian | 463-0248 |
| Secretary of the Senate | 463-0100 |
| Senate Research Center | 463-0087 |
| Sergeant-at-Arms | 463-0200 |

## HOUSE RESEARCH ORGANIZATION

***Steering Committee:***

Bill Callegari, *Chairman*
Alma Allen, *Vice Chairman*
Rafael Anchia
Drew Darby
Joe Deshotel
Joe Farias
Harvey Hilderbran
Donna Howard
Susan King
George Lavender
Tryon Lewis
J.M. Lozano
Eddie Lucio III
Diane Patrick
Joe Pickett

John H. Reagan Building
Room 420
P.O. Box 2910
Austin, Texas 78768-2910

(512) 463-0752

*www.hro.house.state.tx.us*



### Staff:

Laura Hendrickson, *Director*;
Ben Davis, *Senior Editor*;
Charles Boisseau, *Session Editor*;
Tom Howe, *Analyst/Office Manager*;
Mark Neuman-Lee, *Admin. Clerk/Session Analyst*;
Kellie Dworaczyk, *Senior Analyst*;
Janet Elliott, Andrei Lubomudrov,
Blaire Parker, *Analysts*