**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

FEB 0 7 2012

Joseph M. Nixon, Esq.
Dalton L. Oldham, Esq.
James E. Trainor, III, Esq.
Beirne Maynard & Parsons
401 West 15th Street, Suite 845
Austin, Texas 78701

Dear Messrs. Nixon, Oldham, and Trainor:

This refers to the 2011 redistricting plans for the commissioners court, justice of the peace, and constable, for Nueces County, Texas submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c. We received your response to our November 28, 2011 request for additional information on December 9, 2011.

With respect to the justice of the peace and constable redistricting plan, the Attorney General does not interpose an objection to the specified change. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the change. *Procedures for the Administration of Section 5 of the Voting Rights Act of 1965*, 28 C.F.R. 51.41.

With respect to the commissioners court redistricting plan, we have carefully considered the information you have provided, as well as census data, comments and information from other interested parties, and other information, including the county's previous submissions. Under Section 5, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color or membership in a language minority group. *Georgia* v. *United States,* 411 U.S. 526 (1973); 28 C.F.R. 51.52(c). For the reasons discussed below, I cannot conclude that the county's burden under Section 5 has been sustained in this instance. Therefore, on behalf of the Attorney General, I object to the 2011 redistricting plan for commissioners court.

The commissioners court is made up of four commissioners elected from single-member precincts, and a county judge, who is elected at large. According to the 2010 Census, the county has a total population of 340,223 persons, of whom 206,293 (60.6%) are Hispanic, and a voting-

age population of 251,968 persons, of whom 142,995 (56.8%) are Hispanic. Based on the 2010 and 2000 Census data, the Hispanic population in Nueces County increased by 17.9 percent, and the Hispanic voting-age population in the county increased by 21.9 percent, over the past decade. The Anglo population in Nueces County decreased by 5.3 percent, and the Anglo voting-age population decreased by 0.5 percent, during that same period.

With respect to the county's ability to demonstrate that the plan was adopted without a prohibited purpose, the starting point of our analysis is the framework established in *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). There, the Court provided a non-exhaustive list of factors that bear on the determination of discriminatory purpose, including the impact of the action on minority groups; the historical background of the action; the sequence of events leading up to the action or decision; the legislative or administrative history regarding the action; departures from normal procedures; and evidence that the decision-maker ignored factors it has otherwise considered important or controlling in similar decisions. *Id.* at 266-68.

Based on our analysis of the evidence, we have concluded that the county has not met its burden of showing that the proposed plan was adopted with no discriminatory purpose. The county's redistricting history reveals a distinct pattern with regard to Precinct 1. In 1991, the county increased the Hispanic population percentage in Precinct 1 by removing Voting District ("VTD") 63, in which Anglos were a significant majority of the registered voters; the Anglo incumbent in Precinct 1 at that time correctly predicted that the resulting increase in Hispanic population percentage would result in his inability to get re-elected. Ten years later, the county also removed VTD 42, which had similar population and registered voter characteristics to VTD 63, from Precinct 1. In each instance, the majority-Anglo VTD was placed in Precinct 3, where, because of the higher Hispanic population percentage, the potential effect on Hispanic voters would be minimized. The consequence of these changes was that Hispanic-preferred candidates were successfully elected to the commissioners court from Precinct 1 in each election from 1992 until 2008. In 2008, the Hispanic incumbent, despite strong support from Precinct 1's Hispanic voters, narrowly lost to an Anglo challenger, by a margin of 50.4 to 49.6 percent. As a result of that election, the commissioners court was transformed from one in which Hispanic-preferred candidates held three of the five seats to one in which Anglo-preferred candidates held three of the five seats.

During the 2011 redistricting cycle, the county departed from its normal procedure with regard to its treatment of Hispanic voters in Precinct 1, and moved the predominantly Anglo and high-turnout VTDs 42 and 63 from Precinct 3 back to Precinct 1. The county then exacerbated the effect of those moves by cutting VTD 61, where Hispanics constitute a majority of the registered voters, out of Precinct 1 and adding it to Precinct 3. The net result of these VTD swaps was to reduce Hispanic electoral ability in Precinct 1. These changes were particularly noteworthy because, according to the 2010 Census, Precinct 1 already complied with the Federal Constitution's "one-person, one-vote" rule, so there was no need to add population to, or remove population from, that precinct.

These changes were opposed by Hispanic commissioners and other Nueces County citizens on the ground that they would diminish Hispanic electoral ability. Precinct 3

- 3 -

Commissioner Oscar Ortiz specifically requested that VTDs 42 and 63 be left in his district, and Precinct 2 Commissioner Joe Gonzalez, as well as other minority residents, repeatedly voiced their concerns about these moves. The record is devoid of any response to these requests or concerns.

Despite the vocal opposition from these commissioners and other citizens to the Precinct 1 changes, and despite the effect of those changes on the ability of Hispanic citizens in Precinct 1 to elect their preferred candidates, the county has offered no plausible nondiscriminatory justification for the changes. Instead, the county has offered shifting explanations for the changes. When the proposed redistricting plan was announced for public comment on May 25, 2011, county officials first explained that the changes in the proposed plan – including the decision to add VTDs 42 and 63 and remove VTD 61 from Precinct 1 – resulted from earlier discussions that the plan's designers held individually with each commissioner. But none of the commissioners or the county judge has acknowledged requesting these changes to Precinct 1; instead, each has denied requesting or suggesting the Precinct 1 changes. The county subsequently informed us that the changes to Precinct 1, in fact, did not originate with the commissioners, but rather came from the plan's designers.

The county later argued that the Precinct 1 changes were necessary to prevent any reduction in the Hispanic population percentage in Precinct 3. This statement cannot withstand scrutiny. Commissioner Ortiz presented an alternative plan at the June 15, 2011 public hearing that would have kept VTDs 42 and 63 in his district, Precinct 3, without diminishing Hispanic citizens' ability to elect in either Precinct 3 or Precinct 1. The plan's designers contended that the Ortiz alternative plan would face more scrutiny under the Voting Rights Act than the proposed plan because it had a larger population deviation (although within the constitutionally permissible range). This advice was incorrect: The Department of Justice Guidance Concerning Redistricting makes clear that "[t]he Attorney General may not interpose an objection to a redistricting plan on the grounds that it violates the one-person one-vote principle," 76 Fed. Reg. 7470, 7470 (Feb. 9, 2011), and therefore the Attorney General does not review plans for compliance with this requirement, and certainly does not demand population equality in excess of what the Constitution requires. The erroneous advice from the plan's designers appears to have prevented any prolonged discussion by the commissioners court of the Ortiz alternative plan, and the request from Commissioners Ortiz and Gonzalez to delay a vote to provide for further public comment and discussion was denied.

The redistricting process departed both procedurally and substantively from past redistricting cycles in other ways. In its 2011 redistricting, the county considered only one plan, and that plan was revised only once. This is in stark contrast to the redistricting process in both 2001 and 1991, when numerous alternative plans were presented by the county's demographers and consultants for the commissioners court to consider. Previous redistricting procedures also included consultation and cooperation with local Hispanic residents and groups in drawing plans. This time, several of the commissioners and the plan's designers engaged in a closed, secretive process, such that Hispanic residents and groups that had traditionally participated in redistricting were excluded from the development of the 2011 plan. Concerns raised by such individuals and groups at public hearings went unaddressed.

Many of the county's actions taken with regard to Precinct 1 during the redistricting process appear to have been undertaken to have an adverse impact on Hispanic voters. Given the history of Hispanic electoral success in Precinct 1, the county-wide growth in the Hispanic voting-age population and simultaneous drop in the Anglo voting-age population over the past decade, the county's shifting justifications for the changes to Precinct 1, the absence of a credible explanation for those changes, and the drop in Hispanic electoral ability that results from the Precinct 1 changes, there is sufficient evidence that prevents the county from meeting its burden of demonstrating that the proposed plan was not motivated by a discriminatory purpose prohibited by Section 5. *Garza* v. *County of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part), *cert. denied*, 498 U.S. 1028 (1991); *cf. LULAC* v. *Perry*, 548 U.S. 399, 428-29 (2006).

The county's failure to establish the absence of a discriminatory purpose is sufficient to warrant an objection to the commissioners court redistricting plan. We would note, however, that based on the facts as identified above, the county has also failed to carry its burden of showing that its proposed plan does not have a retrogressive effect on the ability of Hispanic voters to elect their candidate of choice.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the submitted change continues to be legally unenforceable. *Clark* v. *Roemer*, 500 U.S. 646 (1991); 28 C.F.R. 51.10. To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Nueces County plans to take concerning this matter. If you have any questions, please contact Robert S. Berman (202/514-8690), a Deputy Chief in the Voting Section. Because the Section 5 status of the redistricting plan is before the court in *Nueces County* v. *United States*, No. 11-1784 (D.D.C.), we are providing a copy of this letter to the court and counsel of record in that case.

Sincerely,

Thomas E. Perez
Assistant Attorney General



**U.S. Department ° Justice**

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

NOV 16 2001

The Honorable Geoffrey Connor
Acting Secretary of State
P.O. Box 12060
Austin, Texas  78711-2060

Dear Secretary Connor:

This refers to the 2001 redistricting plan for the Texas
House of Representatives, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.
We received your submission on August 17, 2001; supplemental
information was received through October 12, 2001.

We have considered carefully the information you have
provided, as well as census data, comments and information from
other interested parties, and other information.  As discussed
further below, I cannot conclude that the State's burden under
Section 5 has been sustained in this instance.  Therefore, on
behalf of the Attorney General, I must object to the 2001
redistricting plan for the Texas House of Representatives.

The 2000 Census indicates that the State has a total
population of 20,851,820, of whom 11.5 percent are African
American and 31.9 percent are Hispanic.  The State's voting age
population (VAP) is 14,965,061, of whom 10.9 percent are African
American and 28.6 percent are Hispanic.  One of the most
significant changes to the State's demography has been the
increase in the Hispanic population.  Between 1990 and 2000, the
Hispanic share of the State's population increased from 26 to
31.9 percent.  Statewide, African American population remained
stable.

Under the Voting Rights Act, a jurisdiction seeking to
implement a proposed change affecting voting, such as a
redistricting plan, must establish that, in comparison with the
status quo, the change does not "lead to a retrogression" in the
position of minority voters with respect to the "effective
exercise of the electoral franchise."  See <u>Beer</u> v. <u>United
States</u>, 425 U.S. 130, 141 (1976).  In addition, the jurisdiction
must establish that the change was not adopted with an intent to
retrogress.  <u>Reno</u> v. <u>Bossier Parish</u> <u>School Board</u>, 528 U.S. 320,
340 (2000).  Finally, the submitting authority has the burden of
demonstrating that the proposed change has neither the prohibited

-2-

purpose nor effect.  Id. at 328; see also Procedures for the Administration of Section 5 (28 C.F.R. 51.52).

The constitutional requirement of one-person, one-vote mandated that the State reapportion the house districts in light of the population growth since the last decennial census.  We note that the redistricting plan submitted by the State was passed by the Legislative Redistricting Board (LRB), which had assumed reapportionment responsibility under Article III of the Texas Constitution after the State legislature was unable to enact a redistricting plan.

The LRB held a series of meetings and hearings, culminating with a meeting on July 24, 2001, at which it considered new plans submitted by LRB members.  The LRB adopted three amendments making substantive changes to the plan then under consideration. These amendments consisted of approximately 14 discrete changes.

The Texas House of Representatives consists of 150 members elected from single-member districts to two-year terms.  Under the existing plan, there are 57 districts that are combined majority minority in total population, and 53 are combined majority minority in voting age population.  With regard to those with a majority minority voting age population, 31 districts have a majority Hispanic voting age population, seven have a majority black voting age population, and the remaining 15 districts have a combined minority majority voting age population.  There are 27 districts where a majority of the registered voters have a Spanish surname.

An initial issue arises as to the appropriate standard for determining whether a district is one in which Hispanic voters can elect a candidate of choice.  The State of Texas has provided, and accepted as a relevant consideration, Spanish-surnamed registered voter data as well as election return information and voting age population data from the census.  We agree with the State's assessment, although we also consider comments from local individuals familiar with the area, historical election analysis, analysis of local housing trends, and other information intended to create an accurate picture of citizenship concerns.  Campos v. Houston, 113 F.3d 544, 548 (5th Cir. 1997).

Our examination of the State's plan indicates that it will lead to a prohibited retrogression in the position of minorities with respect to their effective exercise of the electoral franchise by causing a net loss of three districts in which the minority community would have had the opportunity to elect its

-3-

candidate of choice.  Although there is an increase in the number
of districts in which Hispanics are a majority of the voting age
population, the number of districts in which the level of Spanish
surnamed registration (SSRV) is more than 50 percent decreases by
two as compared to the benchmark plan.  Moreover, we note that in
two additional districts SSRV has been reduced to the extent that
the minority population in those districts can no longer elect a
candidate of choice.  In the State's plan these four reductions
are only offset by the addition of a single new majority minority
district – District 80 – leaving a net loss of three.

     As described more fully below, when coupled with an analysis
of election returns and other factors, we conclude that minority
voting strength has been unnecessarily reduced in Bexar County,
South Texas, and West Texas.  Because retrogression is assessed
on a state-wide basis, the State may remedy this impermissible
retrogression either by restoring three districts from among
these problem areas, by creating three viable new majority
minority districts elsewhere in the State, or by some combination
of these methods.

     With regard to the problem areas we have identified, in
Bexar County the 2000 Census data indicated that the county
population constituted 10.4 ideal districts.  As a result of the
State's constitutional requirement of assigning a whole number of
districts to the more populous counties, known as the "county
line rule," the State reduced the number of districts in the
county from 11 in the existing plan to 10.  Although the State
has admitted that the reduction to 10 would not have precluded it
from maintaining the number of majority Hispanic districts at
seven, it in fact chose to reduce that number to six.  Initially,
the State asserted that it had created an additional majority
Hispanic district in Harris County so as to offset the loss of
the Bexar County district and identified District 137 as a
compensating district.  Because the State's obligation under
Section 5 is to ensure that the redistricting plan, as a whole,
is not retrogressive, such a course of action is not
impermissible.  However, in the supplemental materials that were
provided on October 10, 2001, the State notified us that if any
district should be considered as the replacement, District 80 in
South Texas – not District 137 – should be the one which offsets
the loss of the majority Hispanic district in Bexar County.

     When the State is considered as a whole, however, this
argument is ultimately unpersuasive.  While District 80 indeed
adds an additional district in which Hispanic voters in South
Texas will have the opportunity to elect a candidate of their
choice, in two other districts, as discussed below, they lose

−4−

this opportunity, resulting in the net loss for Hispanic voters of one district in South Texas.

In South Texas Hispanic voters will lose the opportunity to elect their candidate of choice in District 35.  The new district is created from existing Districts 31 and 44 and pairs an nonminority and a Hispanic incumbent.  The Hispanic incumbent currently represents a district which has a Spanish surname registration level of 55.6 percent; that level drops to 50.2 percent in the proposed plan while the Hispanic voting age population decreases from 57.8 to 52.1 percent.  Over half (58%) of the new district's configuration is from the nonminority incumbent's former district.  Our analysis indicates that District 35 as drawn will preclude Hispanic voters from electing their candidates of choice.

In addition, in Cameron County District 38 reverts to a configuration that previously precluded Hispanic residents from electing a candidate of their choice.  The Spanish surnamed registration level is reduced from 70.8 to 60.7 percent, and the Hispanic voting age population decreases from 78.7 percent to 69.6 percent.  The State removed over 40 percent of the core of existing District 38, 90 percent of whom are Hispanic persons, and replaced it with population that is 45 percent nonminority. While the Hispanic voters in District 38 still remain a majority of voters in the district, because the area is subject to polarized voting along racial lines and under the particular circumstances present in this district, it is doubtful that Hispanics will be able to elect their candidate of choice.

Finally, the districts adjacent to Districts 35 and 38 have levels of Spanish surnamed registered voters exceeding 80 percent, and Hispanic voting age population exceeding 90 percent, both of which are far beyond what is necessary for compliance with the Voting Rights Act.  Thus the reductions in Districts 35 and 38 were avoidable had the State avoided packing Hispanic voters into the districts adjacent to them.  Moreover, overall the State fragments the core of majority Hispanic districts in this area, thus affecting member-constituent relations and existing communities of interest in these districts at a disproportionately higher rate than it does other districts in this part of the State.  This fragmentation is unnecessary and disadvantages Hispanic voters by requiring them to establish new relations with their elected representatives.  It also deviates from the State's traditional redistricting principles in a manner that exacerbates the retrogression in South Texas.

-5-

As for West Texas, Hispanic voters lose the opportunity to elect their candidate of choice in proposed District 74. The Spanish surname registration level decreases from 64.5 to 48.7 percent, and the Hispanic voting age population decreases from 73.4 to 57.3 percent. Significantly, the State did not need to reconfigure existing District 74 because the existing configuration under the 2000 Census was underpopulated by only 894 persons, a deviation of 0.64 percent. Such unnecessary population movement supplements our finding in our election analysis that Hispanic voters in District 74 will suffer a retrogression in the effective exercise of the electoral franchise. See Guidance Concerning Redistricting and Retrogression under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, 66 Fed. Reg. 5411, 5413 (Jan. 18, 2001).

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); see also Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude that your burden has been sustained in this instance. On behalf of the Attorney General, I must object to the 2001 redistricting plan for the Texas House of Representatives. Beyond the specific discussion above, however, in all other respects we find that the State has satisfied the burden of proof required by Section 5.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the redistricting plan continues to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

-6-

To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the State of
Texas plans to take concerning this matter.  If you have any
questions, you should call Mr. Robert Berman (202-307-3718),
Deputy Chief of the Voting Section.

Sincerely,

Ralph F. Boyd, Jr.
Assistant Attorney General
Civil Rights Division



**U. S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

June 21, 2002

Denise Nance Pierce, Esq.
Bickerstaff, Heath, Smiley,
   Pollan, Kever & McDaniel
816 Congress Avenue, Suite 1700
Austin, Texas  78701-2443

Dear Ms. Pierce:

     This letter is in reference to the 2001 redistricting plans
for the commissioners court, justice of the peace, and constable
districts; the renumbering and realignment of voting precincts;
two polling place changes; the elimination and renaming of
polling places; and the temporary additional early voting
locations and their hours for Waller County, Texas, submitted to
the Attorney General pursuant to Section 5 of the Voting Rights
Act, 42 U.S.C. 1973c.  We received your responses to our
February 6, 2002, request for additional information through
June 10, 2002.

     We have considered carefully the information you have
provided, as well as census data, comments from interested
parties, and other information, including the county's previous
submissions.  As discussed further below, I cannot conclude that
the county's burden under Section 5 has been sustained in this
instance.  Therefore, on behalf of the Attorney General, I must
object to the 2001 redistricting plans for the commissioners
court, justice of the peace, and constable districts.

     The 2000 Census indicates that Waller County has a total
population of 32,663 persons, of whom 9,565 (29.3%) are black and
of whom 6,344 (19.4%) are Hispanic.  The county's voting age
population is 24,277, of whom 7,601 (31.3%) are black and 3,871
(15.9%) are Hispanic.

- 2 -

The county is governed by a five-member commissioners court. Voters elect four commissioners to four-year, staggered terms from single-member districts, called precincts. The justice of the peace and constable districts are coterminous with the commissioners court districts. Under the census data above, there are two districts under the benchmark plan, Precinct 1 and Precinct 3, in which minority persons are a majority of the voting age population:  Precinct 1 has a total minority voting age population of 52.5 percent, while Precinct 3 has a total minority voting age population of 71.9 percent.

In contrast, the proposed 2001 redistricting plans contain only one district in which minority persons are a majority of the voting age population. According to the information that you provided, the black percentage of the voting age population in proposed Precinct 1 voting age population drops to 29.7 percent. Within the context of electoral behavior in Waller County, the county has not established that implementation of this plan will not result in a retrogression in the ability of minority voters to effectively exercise their electoral franchise. Moreover, the viability of alternative plans demonstrates that the potential retrogression of the proposed plan is avoidable.

Our analysis of county elections shows that minority voters in Precinct 1 have been electing candidates of choice since 1996, and that those candidates are elected on the basis of strong, cohesive black and Hispanic support. Our statistical analysis also shows that white voters do not provide significant support to candidates sponsored by the minority community, and that interracial elections are closely contested. For example, the black candidate for commissioner in Precinct 1 prevailed in the last election by two votes. As a result, the proposed reduction in the minority voting age percentage in Precinct 1 casts substantial doubt on whether minority voters would retain the reasonable opportunity to elect their candidate of choice under the proposed plan, particularly if the current incumbent in Precinct 1 declines to run for office again.

Our review of the county's benchmark and proposed plans as well as the alternative plans presented to the county, suggests that the significant reduction in minority voting age population percentage in Precinct 1 in the proposed plan, and the likely resulting retrogressive effect on the ability of minority voters to elect candidates of choice, was neither inevitable nor required by any constitutional or legal imperative. Illustrative plans demonstrate that it is possible to avoid any retrogression in Precinct 1, maintain the minority voting strength in Precinct 3, and meet the county's redistricting criteria. Accordingly, we

- 3 -

are not persuaded by the county's contention that a reduction in minority voting strength in Precinct 1 was necessary to preserve the minority voting strength in Precinct 3 if one is to honor the redistricting criteria used by the county.

Under the Voting Rights Act, a jurisdiction seeking to implement a proposed change affecting voting, such as a redistricting plan, must establish that, in comparison with the status quo, the change does not "lead to a retrogression" in the position of minority voters with respect to the "effective exercise of the electoral franchise."  See Beer v. United States, 425 U.S. 130, 141 (1976).  If the proposed plan materially reduces the ability of minority voters to elect candidates of their choice to a level less than what they enjoyed under the benchmark plan, preclearance must be denied.  State of Georgia v. Ashcroft, C.A. No. 2001-2111 (D.D.C. Apr. 5, 2002), slip op. at 117-18.  In addition, the jurisdiction must establish that the change was not adopted with an intent to retrogress.  Reno v. Bossier Parish School Board, 528 U.S. 320, 340 (2000).  Finally, the submitting authority has the burden of demonstrating that the proposed change has neither the prohibited purpose nor effect.  Id. at 328; see also Procedures for the Administration of Section 5 (28 C.F.R. 51.52).

In light of the consideration discussed above, I cannot conclude that your burden of showing that a submitted change does not have a discriminatory effect has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the submitted redistricting plans.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  See 28 C.F.R. 51.44.  In addition, you may request that the Attorney General reconsider the objection.  See 28 C.F.R. 51.45.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the changes continue to be legally unenforceable.  Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

Please note that the Attorney General will make no determination regarding the submitted realignment and renumbering of voting precincts, the polling place changes, the elimination and renaming of polling places, and the temporary additional early voting locations and their hours because those changes are dependent upon the redistricting plan.

- 4 -

Further, in our letter of February 2, 2002, we informed you that, under the Voting Rights Act, changes, such as the county's proposed redistricting plans, are not legally enforceable until the jurisdiction has obtained Section 5 preclearance for those changes.  Clark v. Roemer, 500 U.S. 646 (1991).  However, it is our understanding that on March 12, 2002, Waller County conducted an election, which implemented the proposed plan, without such preclearance.  Please inform us of the action Waller County plans to take  regarding both the objection interposed by this letter as well as the conduct of the March 12 primary election without the requisite preclearance.

If you have any questions on either of these matters, you should call Mr. Timothy Mellett (202-307-6262), an attorney in the Voting Section.  Refer to File Nos. 2001-3951 and 2002-2142 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

J. Michael Wiggins
Acting Assistant Attorney
General



**U. S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

Wallace Shaw, Esquire
P.O. Box 3073                              AUG 1 9 2002
Freeport, Texas  77542-1273

Dear Mr. Shaw:

    This refers to the procedures for conducting the May 4,
2002, special city charter amendment election and the change in
the method of electing city council members from districts to at
large for the City of Freeport in Brazoria County, Texas,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act, 42 U.S.C. 1973c.  We received your responses
to our May 14, 2002, request for additional information through
July 31, 2002.

    With regard to the special election, the Attorney General
does not interpose any objection to the specified change.
However, we note that Section 5 expressly provides that the
failure of the Attorney General to object does not bar subsequent
litigation to enjoin the enforcement of the change.  See the
Procedures for the Administration of Section 5 (28 C.F.R. 51.41).

    As to the change to at-large elections with numbered
positions, we have carefully considered the information you have
provided, as well as census data, comments and information from
other interested parties, and other information, including the
city's previous submission of the adoption of the current
districting system for the election of council members.  Based on
our analysis of the information you have provided, on behalf of
the Attorney General, I am compelled to object to the submitted
change in the method of election.

    According to the 2000 Census, the city has a total
population of 12,708, of whom 6,614 (52.0 percent) are Hispanic
and 1,696 (13.3 percent) are black persons.  Hispanic residents
comprise 47.3 percent, and black residents 12.3 percent, of the
city's voting age population.  Approximately 29 percent of the
city's registered voters are Spanish-surnamed individuals.

- 2 -

    Until 1992, the city elected its four-member council on an
at-large basis.  In that year it began to use the single-member
district system, which it had adopted as part of a settlement of
voting rights litigation challenging the at-large system.  Under
the subsequent single-member district method of election,
minority voters have demonstrated the ability to elect candidates
of choice in at least two districts, Wards A and D.  The city now
proposes to reinstitute the at-large method of election.  Our
analysis shows that the change will have a retrogressive effect
on the ability of minority voters to elect a candidate of their
choice.

    Elections in the city are marked by a pattern of racially
polarized voting.  Under the city's previous use of at-large
elections, no Hispanic-preferred candidates were successful until
1990.  In that election, one such candidate narrowly won office
when several Anglo-supported candidates split the vote.  In
contrast, a Hispanic-preferred candidate won over significant
Anglo opposition in 1992 in the first election held under the
single-member district system.  Since then, three other minority-
preferred candidates have been successful in their wards.
However, minority voters remain unable to elect their candidates
of choice in municipal at-large elections.  Thus, a return to an
electoral system where all council offices are elected on an at-
large basis will result in a retrogression in their ability to
exercise the electoral franchise that they enjoy currently.  A
voting change has a discriminatory effect if it will lead to a
retrogression in the position of members of a racial or language
minority group (i.e., will make members of such a group worse off
than they had been before the change) with respect to their
opportunity to exercise the electoral franchise effectively.
Reno v. Bossier Parish School Board, 528 U.S. 320, 328 (2000);
Beer v. United States, 425 U.S. 130, 140-42 (1976).

    Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot conclude
that your burden has been sustained in this instance.  Therefore,
on behalf of the Attorney General, I must object to the change in
the method of election.

    We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed change neither has the
purpose nor will have the effect of denying or abridging the

- 3 -

right to vote on account of race, color, or membership in a language minority group.  See 28 C.F.R. 51.44.  In addition, you may request that the Attorney General reconsider the objection.  See 28 C.F.R. 51.45.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the submitted change continues to be legally unenforceable.  Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Freeport plans to take concerning this matter.  If you have any questions, you should call Mr. Robert Lowell (202-514-3539), an attorney in the Voting Section.

Sincerely,

J. Michael Wiggins
Acting Assistant Attorney
General



**U. S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

May 5, 2006

Ms. Renee Smith Byas
Vice Chancellor and General Counsel
North Harris Montgomery Community College District
5000 Research Forest Drive
The Woodlands, Texas  77381

Dear Ms. Byas:

This refers to the change from the past practice of conducting joint elections with 11 Independent School Districts (ISD), to the sole conduct of the May 13, 2006, regular and special bond and tax election, including the reduction in the number of polling places and early voting locations, for the North Harris Montgomery Community College District (District) in Harris and Montgomery Counties, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.  We received your submission on March 10, 2006.

We have carefully considered the information you have provided, as well as information and comments from other interested parties.  We note that currently, elections of the District are consolidated with other elections, including those of 11 of the 12 ISDs that comprise the District. Voters currently may go to a single polling place and vote in elections of the District, as well as the elections of their respective ISDs.  In the last election, 84 polling places served the voters of the District.

Under the proposed change, District elections will be held separately from ISD elections, so that voters will have to travel to two separate polling places in order to cast their ballots. Moreover, instead of 84 polling places, there will be 12 polling places.  These 12 polling places will serve a geographic area of well over 1,000 square miles with over 540,000 registered voters. The assignment of voters to these 12 sites is remarkably uneven: the site with the smallest proportion of minority voters will serve 6,500 voters, while the most heavily minority site (79.2% black and Hispanic) will serve over 67,000 voters.

-2-

Section 5 provides that the submitting authority has the burden of establishing that the proposed changes will not have a retrogressive effect on minority voters to participate in the political process and elect candidates their choice, and that the proposed changes were not adopted with such a discriminatory purpose. We cannot conclude that the statutory burden has been met in this instance. Accordingly, I must, on behalf of the Attorney General, interpose an objection to the proposed changes.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District Court for the District of Columbia is obtained, the proposed changes continue to be legally unenforceable. *Clark v. Roemer*, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the District plans to take concerning this matter. If you have any questions, you should call Ms. Yvette Rivera (202-305-4953), Special Litigation Counsel in the Voting Section.

Sincerely,

Wan J. Kim
Assistant Attorney General



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

August 21, 2008

The Honorable Phil Wilson
Secretary of State
P.O. Box 12060
Austin, Texas  78711-2060

Dear Mr. Wilson:

This refers to Chapter 912 (H.B. 2984) (2007), which changes the candidate qualification requirements for the position of supervisor of a fresh water supply district (except for those districts located in Denton County), for the State of Texas submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.  We received your response to our May 2, 2008, follow-up request for additional information on June 26, 2008.

We have considered carefully the limited information you have provided, as well as census data, comments and information from other interested parties, and other information, including the state's prior submissions. Under Section 5 of the Voting Rights Act, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed changes do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.  42 U.S.C. 1973c; Georgia v. Ashcroft, 123 U.S. 2498 (2003); Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R. 51.52 (c). As discussed further below, I cannot conclude that the state's burden of proving that Chapter 912 (H.B. 2984) (2007) will not have a retrogressive effect under Section 5 has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to Chapter 912.

Your initial submission of September 28, 2007, did not contain the information required to enable us to determine that the proposed change does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.52 through 51.57.  As a result, we made a timely written request for additional information with regard to this submission on November 26, 2007. See 28 C.F.R. 51.37.

-2-

Your responses to our request for additional information, received on January 29 and 31, and March 20, 2008, failed to provide the necessary information that was requested, including the name and location of each fresh water supply district affected by the change, and total population for each broken down by race, color, or language minority group percentages, or the name, race, color or minority language group, and telephone number of each incumbent supervisor, and whether such supervisor is or is not an owner of taxable property in the district. Furthermore, the state declined to take a position on concerns that precluding non-landowning registered voters of a fresh water supply district from qualifying as a candidate for supervisor may have a discriminatory purpose or effect.

We sent a follow-up letter requesting additional information on May 2, 2008. In your June 26, 2008, response to our letter, you respectfully reported that you could not provide any additional information. You also requested that we make no determination if the information provided is insufficient to warrant preclearance.

The Attorney General does not have the option of issuing a no determination on this particular submission. See 28 C.F.R. 51.35. The Department is also aware of at least four newly created districts that are operating under the proposed candidate qualifications of Chapter 912.

The submitted data confirms that there are Hispanic supervisors who are known to be non-landowning residents of their district. If the proposed candidate qualifications were implemented, these individuals would be unable to run for reelection. Concerns that the proposed change may have a future retrogressive effect also are raised by statistics that reveal a significant disparity in home and agricultural land ownership rates between Caucasians and minorities in Texas. Without additional data, the Attorney General is unable to assess whether the law would have a discriminatory effect.

Under Section 5 of the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Public Law 109-246, 120 Stat. 577 (2006) ("Voting Rights Act"), the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. In failing to provide the information necessary to complete our review of your submission, you have failed to sustain your burden of proof. See Georgia v. United States, 411 U.S. 526 (1971); see also 28 C.F.R. 51.40 and 51.52.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44.

-3-

        In addition, you may request that the Attorney General reconsider the objection.  See 28
C.F.R. 51.45.  However, until the objection is withdrawn or a judgment from the District Court
for the District of Columbia is obtained, Chapter 912 (H.B. 2984) (2007)  will continue to be
legally unenforceable.  Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

        To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us
of the action the State of Texas plans to take concerning this matter.  If you have any questions,
you should call Robert Lowell (202-514-3539), an attorney in the Voting Section.

                                        Sincerely,

                                        Grace Chung Becker
                                        Acting Assistant Attorney General



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

MAR  2 4  2009

Robert T. Bass, Esq.
Allison, Bass & Associates
402 West 12th Street
Austin, Texas  78701

The Honorable David Bird
County Judge
414 St. Joseph Street, Suite 200
Gonzales, Texas  78629

Ms. Lee Riedel
County Clerk
P.O. Box 77
Gonzales, Texas  78629

Dear Mr. Bass, Judge Bird, and Ms. Riedel:

This refers to the Spanish language election procedures for the November 2, 2004, November 7, 2006, and November 4, 2008, general elections in Gonzales County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.  We received your response to our November 26, 2008, follow-up request for additional information on January 23, 2009.

According to the 2000 Census, the county had a population of 18,628 persons, of whom 7,381 (39.6%) were Hispanic, a voting age population of 13,421, of whom 4,705 (35.1%) were Hispanic, and a citizen voting age population of 12,555, of whom 3,585 (29.3%) were Hispanic. The census also indicated that 30.3 percent of Hispanic voting age citizens are limited English proficient, and over three-quarters of the county's Hispanic population speak Spanish at home. Significantly, 1,411 Hispanics live in households in which no one over the age of 14 speaks English "without difficulty."  The Texas Secretary of State's February 11, 2009, report indicates that the county has 11,983 registered voters, of whom 3,552 (29.6%) are Spanish surnamed.

-2-

On December 7, 1978, the Attorney General informed county officials that no objection would be interposed to the county's proposed bilingual procedures. In describing those procedures, the county represented that "all notices concerning elections are both posted in the courthouse and published in all the county newspapers. All these notices are in Spanish and English." Our review of those notices indicated the translations to be accurate. With regard to the assignment of bilingual poll workers, the county characterized it as based on where they were most needed. It noted that precincts not staffed with "interpreters," as the county then called bilingual assistors, had "either no Spanish speaking people * * * or only 1 to 2." This process resulted in the assignment of at least one individual in 10 (55.6%) of the 18 voting precincts for the November 1976 general election to provide the required oral assistance.

Since December 7, 1978, the county has neither made a submission to the Attorney General of any changes to those procedures to which no objection has been interposed, nor has it obtained a declaratory judgement from the United States District Court for the District of Columbia that any such changes had neither a discriminatory purpose nor would have a discriminatory effect. Accordingly, the 1978 procedures remain the legally enforceable bilingual procedures within the county. Indeed, the county asserts that the benchmark procedures remain in effect.

Our review of the information that you have submitted, however, reveals that, at least since 2004, the county has implemented bilingual procedures, including the process for translating Spanish language documents, provision of Spanish language election notices and publicity, and assignment of bilingual poll workers, which are different from the benchmark procedures. Because of the county's position that the benchmark remains in force or effect, we examine the bilingual practices employed in each election as a one-time departure from the benchmark, and, therefore, as a discrete change. Changes to bilingual election procedures constitute a voting change that are not effective as a matter of law unless and until the county establishes that they do not violate Section 5. *Apache County High School District No. 90* v. *United States,* Case No. 77-1518 (D.D.C. June 12, 1980); 28 C.F.R. § 51.13.

We have carefully considered the information you have provided, as well as information from other interested parties. Under Section 5, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed change "neither has the purpose nor will have the effect" of denying or abridging the right to vote on account of race, color or membership in a language minority group. As discussed further below, I cannot conclude that the county has sustained its burden of showing that the proposed change does not have a retrogressive effect or a discriminatory purpose. Therefore, based on the information available to us, I object to the voting changes on behalf of the Attorney General.

We first examine the county's provision of election-related materials to voters. In contrast to the benchmark procedures, where the county represented that all notices were in English and Spanish, a significant number of the county's election notices and other documents

-3-

containing election-related information were made available only in English over the course of the last three general elections.  The county often distributes lists of precincts and polling places only in the English language; notices in the *Cow Country Courier* have not always appeared in a bilingual format.  During this time period, the county has published its county-created notice in a bilingual format only once, and that was for the November 4, 2008, election, which was during the pendency of our review of this submission.

We next turn to the adequacy of the county's translation of written material.  We recently re-examined the bilingual information submitted with the 1978 submission.  That analysis confirms that the translation is understandable.  The same cannot be said for the more recent translations.  The Spanish language translations of two notices, a document including detailed election-related information for the November 4, 2008, election, and a list of declared write-in candidates for the November 7, 2006, election contain numerous errors that adversely affect their comprehensibility, including portions that are not translated, missing polling place names and addresses, incorrect word choice with confusing or misleading results, misspelled words, and wrong conjugations.

For example, the English version of the November 4, 2008, notice refers to updating information for voter registration purposes:

> The Tax Office as Voter's Registrar is still needing 911 addresses.  If you are still using the Route and Box information, your voter's registration card has probably been returned to this office.  You can obtain your 911 address by calling Golden Crescent at 1-877-917-3911 and then advise the Tax Office at 672-2841.

In the Spanish version of the notice, "The Tax Office as Voter's Registrar is still needing 911 addresses," is completely omitted, as is the phrase "your voter's registration card has probably been returned to this office," in the second sentence.  Without this information, the reader would not know that he or she might not have received his or her voter registration card because they did not provide the County Tax Office with the correct 911 address.  Therefore, the significance of providing an updated 911 address for voting in the November election would be lost.

We now examine the assignment of bilingual poll workers.  Under the benchmark procedures, the county assigned bilingual poll workers to over half of the precincts in 1976.  Despite an almost one-third increase in the county's Hispanic population percentage since that time, our examination of the 2004, 2006, and 2008 general elections show that the county has fallen short of that standard in each instance.  Both census data and anecdotal evidence indicate that there continues to be a significant need for such assistance.  Moreover, the current level of assignment is below the Texas Secretary of States's  recommended guidelines that bilingual poll workers be assigned to 14 of the county's 15 voting precincts.

The county contends that its failure to meet the requirements of federal law stems from the failure of the political parties to recommend adequate staffing, and is not the result of any action on the county's part.  Although the political parties, not the county, recruit poll

-4-

workers, the county must ensure that the election it conducts meets the requirements of federal law, which includes providing adequate oral assistance. See Texas Elec. Code § 272.009. In that regard, the county informs us that it has encountered difficulties in finding bilingual poll workers and has provided a newspaper article quoting county officials expressing that view. Our information, however, is that prior to the November 2008 election several minority individuals and organizations contacted county officials volunteering to help the county meet federal language minority requirements.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the deviations from the county's 1978 bilingual election procedures described above will continue to be legally unenforceable. *Clark v. Roemer*, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Gonzales County plans to take concerning this matter. If you have any questions, you should call J. Eric Rich (202-305-0107), an attorney in the Division's Voting Section.

Sincerely,

*Loretta King*

Loretta King
Acting Assistant Attorney General
Civil Rights Division

**U. S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                     *Washington, D.C. 20530*

**MAR 1 2 2010**

Robert T. Bass, Esq.
Allison, Bass & Associates
402 West 12ᵗʰ Street
Austin, Texas 78701

Dear Mr. Bass:

This refers to the Spanish language election procedures, including the use of Texas Secretary of State forms and notices, the procedures for translating county-produced election materials, and the oral assistance procedures, for Gonzales County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c. We received your response to our November 2, 2009, request for additional information on January 11, 2010.

According to the 2000 Census, the county had a total population of 18,628 persons, of whom 7,381 (39.6%) were Hispanic, and had a total voting age of population of 13,421, of whom 4,705 (35.1%) were Hispanic. The census also indicated that 14.3 percent of Hispanic residents over the age of five speak English less than very well, 30.3 percent of Hispanic voting age citizens were limited English proficient, over three-quarters of the county's Hispanic population speak Spanish at home, and over 76 percent of Hispanics of voting age in the county are United States citizens. Significantly, 1,411 Hispanics live in households in which no one over the age of 14 speaks English "without difficulty." The Texas Secretary of State's January 27, 2010, report indicates that the county has 12,259 registered voters, of whom 3,694 (30.1%) are Spanish surnamed.

On December 7, 1978, the Attorney General informed county officials that no objection would be interposed to the county's proposed bilingual procedures. In describing those procedures, the county represented that "all notices concerning elections are both posted in the courthouse and published in all the county newspapers. All these notices are in Spanish and English." Our review of those notices found the translations to be accurate. With regard to the assignment of bilingual poll workers, the county characterized it as based on where they were most needed. It noted that precincts not staffed with "interpreters," as the county then called bilingual assistors, had "either no Spanish speaking people * * * or only 1 to 2." This process resulted in the assignment of at least one bilingual individual to 10 (55.6%) of the 18 voting precincts for the November 1976 general election to provide the required oral assistance.

-2-

Since that time, the county has neither made a submission to the Attorney General of any changes to those procedures to which no objection has been interposed, nor has it obtained a declaratory judgment from the United States District Court for the District of Columbia that any such changes did not have a discriminatory purpose and would not have a discriminatory effect. As the county has noted previously, the 1978 procedures remain in effect and, accordingly, constitute the benchmark bilingual procedures against which the submitted bilingual procedures are measured.

Changes to bilingual election procedures constitute a voting change under Section 5. *Apache County High School District No. 90* v. *United States,* Case No. 77-1518, p. 15 (D.D.C. 1980); Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, 28 C.F.R. § 51.13. As such, the submitting authority has the burden of establishing that a proposed change is not motivated by a discriminatory purpose and will not have a retrogressive effect on the ability of minority voters to participate in the political process and elect candidates of choice. *Georgia v. United States,* 411 U.S. 526 (1973); 28 C.F.R § 51.52. Changes related to voting may not be implemented unless and until the submitting authority establishes that, when compared to that jurisdiction's benchmark standard, practice or procedure, the proposed change does not diminish the ability of minority voters to participate in the political process. *Beer v. United States,* 425 U.S. 130 (1976).

The applicable legal standard for determining whether discriminatory purpose exists is *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U.S. 252 (1977). This approach requires an inquiry into 1) the impact of the decision; 2) the historical background of the decision, particularly if it reveals a series of decisions undertaken with discriminatory intent; 3) the sequence of events leading up to the decision; 4) whether the challenged decision departs, either procedurally or substantively, from the normal practice; and 5) contemporaneous statements and viewpoints held by the decision-makers. *Id.* at 266-68.

With regards to the county's use of Texas Secretary of State forms and notices, the Attorney General does not interpose any objection to the specified change. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the change. 28 C.F.R. 51.41.

With regards to the remaining elements of the county's proposed bilingual procedures, we have carefully considered the information you have provided, as well as information from other interested parties. Under Section 5, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed change "neither has the purpose nor will have the effect" of denying or abridging the right to vote on account of race, color or membership in a language minority group. As discussed further below, I cannot conclude that the county has sustained its burden of showing that the proposed changes do not have a retrogressive effect or a discriminatory purpose. Therefore, based on the information available to us, I object on behalf of the Attorney General to the procedures for translating county-produced election materials and the oral assistance procedures.

-3-

The county proposes to use an internet machine translator, such as Google Translator, for the initial translation of county-produced election materials. The county indicates that the resulting translations will then be sent to the Office of the Texas Secretary of State and to the local LULAC chapter to confirm its accuracy. However, the county has not established that it has an arrangement with the Secretary of State to review these county-generated translations. That state office has also informed us that it has had no communication with the county on this matter. In fact, our information is that the Secretary of State does not offer this service to counties with respect to county-generated notices and the state must itself hire a third-party vendor to translate documents into Spanish.

Because there is no evidence that the county has an agreement with the state to review the translation, the sole quality control rests with the local LULAC chapter's review of the initial translation. The county has not provided sufficient information to establish this measure will, by itself, ensure adequate review of county-produced election materials. For instance, the procedures do not establish a deadline for the county to provide the initial translations to LULAC for its review, which would ensure adequate time to conduct the review, or for that organization to return its edits and/corrections to the county, which would ensure adequate time before an election to incorporate those changes. Although the involvement of county residents and organizations, such as a local LULAC chapter, would be a positive element in any program, such entities are under no obligation to assist the county, whereas a third-party translator, such as a high-school Spanish teacher retained by the county, would be contractually bound to perform.

The county has conducted no research or study into the effectiveness of the proposed process, and has provided no evidence, in the form of a sample or otherwise, supporting the conclusion that the process will produce adequate translations. In comparison to the benchmark procedure, in which a third-party translator produced understandable translations of county-generated notices, the proposed procedure lacks an effective quality control mechanism to ensure the accuracy of the translations.

Hence, the county has not established that its proposed procedure for translating using an internet translator with the review process described in its submission will not have a retrogressive effect when compared to the benchmark of engaging a third-party translator.

We now examine the assignment of bilingual poll workers. Both census data and anecdotal evidence indicate that there continues to be a significant need for Spanish language oral assistance in the county. Under the benchmark procedures, which were devised at a time when the county's Hispanic population percentage was significantly smaller than it is today, the county assigned bilingual poll workers to over half of its voting precincts in 1976. Under the proposed procedure, the county provides that it will make "best efforts" to provide bilingual poll workers to seven of the county's 15 voting precincts. The county's "best efforts" are not equivalent to an unqualified commitment to provide any number of bilingual poll workers, be it the number provided previously under the benchmark procedures, the number recommended by

-4-

the Secretary of State's office, or any number in between those two standards. In contrast, the benchmark procedures result in measurable commitments, assuring that only precincts with a handful of Spanish-surnamed voters will be without bilingual poll workers.

The county contends that its failure to meet the requirements of federal law stems from difficulties in finding bilingual poll workers willing to work in several voting precincts. Our information, however, is that prior to the November 2008 and 2009 elections, minority individuals and organizations contacted county officials volunteering to help the county meet federal language minority requirements. The county failed to employ those bilingual citizens who volunteered as poll workers for those elections.

The county's refusal to adopt a standard for staffing polling places with bilingual poll workers increases the concern that these elements of the program will diminish the ability of Hispanic voters to participate in the electoral process. As with its proposed translation procedures, the county has failed to show that its proposed procedures to assign bilingual poll workers will not have a retrogressive effect.

Our analysis under the standard identified in *Arlington Heights* also precludes a determination that the county has met its burden of showing that the proposed plan was not adopted, at least in part, with the a discriminatory purpose. We look first to the clear retrogressive impact of the county's failure to translate all election-related information into Spanish adequately as well as the lack of a commitment to provide adequate oral assistance in Spanish to those who require it to cast an informed ballot. More importantly, the county has determined that it does not plan to generate its own election notices in the future, including one similar to one posted at the Gonzales City Hall for the November 2008 general election; the notice had information not contained in the notice of election translated by the state, including the date of the close of registration prior to the election, a request by the county clerk for 911 addresses from voters maintaining post office boxes, and notice of the voter identification requirement, as well as appropriate county contacts. As our March 24, 2009, letter noted, that translation had numerous errors and omissions. Now, it appears that rather than translate this important information correctly, the county has chosen simply not to post it.

Equally significant is the historical context in which these activities have occurred. As noted earlier, on March 24, 2009, we interposed an objection to an earlier attempt by the county to change its benchmark bilingual election procedures. That objection letter detailed shortcomings of the proposed change. The county's actions following the receipt of the March 2009 objection raises additional hurdles to the county establishing the absence of a discriminatory purpose. If anything, the current proposal is retrogressive even when measured against the 2008 bilingual program to which an objection was interposed. Moreover, even after the objection, the county continues to post English-only election notices on its website, raising concerns about its stated commitment to provide translations of all election materials.

-5-

County officials have openly expressed hostility toward complying with the language minority provisions of the Voting Rights Act. In local news articles, the county official who has direct control over the election process has expressed frustration with this Department's efforts to increase the availability of bilingual poll workers, suggesting that language minority voters are not citizens if they do not speak English. The county has proposed the use of either state officials or local residents, two options that would not incur any additional cost (assuming these options even exist), as a quality control mechanism for the machine translation because the county asserts that it is likely unable to pay for a third party, even a local Spanish-language high-school teacher, to translate materials. On the whole, it seems reasonable that the county could afford to pay a qualified translator on the rare occasion that it generates its own election materials, as it did under the benchmark practice.

In sum, the available information precludes the county from establishing that its implementation of the procedures for the translation of election materials into Spanish and assignment of bilingual poll officials was not motivated, at least, in part, by discriminatory purpose. *Arlington Heights*, 429 U.S. at 266-68.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the specified elements of the proposed bilingual procedures will continue to be legally unenforceable. *Clark* v. *Roemer*, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

We further note that the county remains obligated to comply with the language minority requirements of Sections 4(f)(4) and 203 of the Voting Rights Act, 42 U.S.C. 1973b(f)(4) and 1973aa-1a.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Gonzales County plans to take concerning this matter. If you have any questions, you should call Robert S. Berman (202-514-8690), a Deputy Chief in the Voting Section.

Sincerely,

Thomas E. Perez
Assistant Attorney General

**U. S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

June 28, 2010

Ms. Elesa Ocker
County Clerk
P.O. Box 189
Ballinger, Texas 76821

Dear Ms. Ocker:

This refers to the Spanish language election procedures for the November 4, 2008, general and the November 3, 2009, statewide constitutional amendment elections, including use of Texas Secretary of State forms and notices and the oral assistance procedures, for Runnels County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c. We received your response to our April 12, 2010, follow-up request for additional information on April 30, 2010; supplemental information was received on May 12, 2010.

According to the 2000 Census, the county had 11,495 persons, of whom 3,372 (29.3%) were Hispanic, and a total voting age of population of 8,398, of whom 2,047 (24.4%) were Hispanic. Between 1980 and 2000, the county's Hispanic population percentage grew from 19.4 to 29.3 percent of the total population. The Texas Secretary of State's January 27, 2010, report indicates that the county has 6,791 registered voters, of whom 1,534 (22.6%) are Spanish surnamed. The census also indicated that 38.2 percent of Hispanic voting age citizens speak English less than very well, more than 90 percent of the county's Hispanic voting age population speaks Spanish at home, more than 86 percent of Hispanics in the county are United States citizens, and 1,037 Hispanic residents over the age of five speak Spanish but are limited English proficient. Significantly, 619 Hispanics live in households in which no one over the age of 14 speaks English "without difficulty."

The Attorney General interposed no objection to the county's procedures for providing bilingual election materials on December 29, 1978. The county described the procedures as including the use of the "Spanish language in all of the electoral process," and indicated that "all ballots, polling places notices, and any other notices concerning elections" were provided in both English and Spanish. With regards to Spanish language oral assistance, on October 29, 1984, the Attorney General informed county officials that no objection would be interposed to the county's proposed bilingual oral assistance election procedures, which were set forth in the

-2-

Runnels County Commissioners' Court order of March 13, 1984, which requires "each voting precinct election judge to hire as an election clerk for each election a bilingual person, able to speak and read both Spanish and English."

Since that time, the county has neither made a submission to the Attorney General of any changes to those procedures to which no objection has been interposed, nor has it obtained a declaratory judgement from the United States District Court for the District of Columbia that any such changes did not have a discriminatory purpose and would not have a discriminatory effect. The 1978 procedures for providing bilingual election materials and the 1984 procedures for providing Spanish language oral assistance remain in effect and, accordingly, constitute the benchmark bilingual procedures against which the submitted bilingual procedures are measured.

Changes to bilingual election procedures constitute a voting change under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c. *Apache County High School District No. 90* v. *United States,* Case No. 77-1518, p. 15 (D.D.C. 1980); Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, 28 C.F.R. § 51.13. As such, the submitting authority has the burden of establishing that a proposed change is not motivated by a discriminatory purpose and will not have a retrogressive effect on the ability of minority voters to participate in the political process and elect candidates of choice. *Georgia v. United States,* 411 U.S. 526 (1973); 28 C.F.R § 51.52. Changes related to voting may not be implemented unless and until the submitting authority establishes that, when compared to that jurisdiction's benchmark standard, practice or procedure, the proposed change does not diminish the ability of minority voters to participate in the political process. *Beer* v. *United States*, 425 U.S. 130 (1976).

The applicable legal standard for determining whether discriminatory purpose exists is *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). This approach requires an inquiry into 1) the impact of the decision; 2) the historical background of the decision, particularly if it reveals a series of decisions undertaken with discriminatory intent; 3) the sequence of events leading up to the decision; 4) whether the challenged decision departs, either procedurally or substantively, from the normal practice; and 5) contemporaneous statements and viewpoints held by the decision-makers. *Id.* at 266-68.

With regards to the use of Texas Secretary of State forms and notices, the Attorney General does not interpose any objection to the specified change. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the change. 28 C.F.R. 51.41.

With regards to the remaining elements of the proposed bilingual procedures, we have carefully considered the information you have provided, as well as information from other interested parties. Under Section 5, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed change "neither has the purpose nor will have the effect" of denying or abridging the right to vote on account of race, color or

-3-

membership in a language minority group. As discussed further below, I cannot conclude that the county has sustained its burden of showing that the proposed changes do not have a retrogressive effect or a discriminatory purpose. Therefore, based on the information available to us, I object to the oral assistance procedures used for the November 4, 2008, general and November 3, 2009, constitutional amendment elections on behalf of the Attorney General.

Under the benchmark procedures enumerated in the 1984 order, the county was required to assign one bilingual poll worker to each of its five consolidated polling places. Despite an almost fifty percent increase in the county's Hispanic population percentage since 1984, our examination of the November 2008 general and November 2009 constitutional amendment elections show that at least half of county voting precincts did not have a bilingual poll worker for the November 4, 2008, general election, and no voting precincts had a bilingual poll worker for the November 3, 2009, constitutional amendment election. Both census data and anecdotal evidence from members of the minority community indicate, however, that there continues to be a significant need for such assistance. The proposed level of assignment, moreover, is below the Texas Secretary of States's recommended guidelines that bilingual poll workers be stationed in election precincts where five percent or more of the inhabitants are persons of Spanish origin.

Instead of applying the benchmark standard for the elections in question, the county implemented a practice in the 2008 and 2009 elections of having only having an on-call bilingual assistor available by phone in the event that Spanish language oral assistance was required on election day. We note that procedure has not been reviewed under Section 5. The evidence available to us, however, demonstrates that this procedure does not provide effective Spanish language oral assistance. In fact, it appears that the on-call bilingual assistor has not received a single call for assistance in the approximately seven years that she has served in that capacity. We also note that the county does not test the Spanish language proficiency of its bilingual poll workers, or provide training for bilingual assistance. Our information suggests that one of the individuals asserted by the county to be a bilingual poll worker is not proficient in Spanish.

The county contends that departure from the benchmark procedure stems from difficulties in finding bilingual poll workers willing to work in several voting precincts. Our information, however, is that after a recent election a county official told a bilingual poll worker that her services were no longer required. Additionally, employing the on-call bilingual assistor as a poll worker would provide for more effective oral assistance than employing her on-call, since she has never received a call for assistance. Further, despite written and telephonic requests to do so, the county has produced no information documenting its good-faith efforts to recruit, find, or hire bilingual poll workers. The county has failed to show that its proposed procedures to assign bilingual poll workers will not have a retrogressive effect.

Our analysis under the standard identified in *Arlington Heights*, *supra*, looks first to the clear retrogressive impact of the county's failure to provide oral assistance in Spanish to those who require it to cast an informed ballot. The county decided to reduce the level of bilingual assistance for the 2008 election and to eliminate it totally for the 2009 election. The county

-4-

committed itself to a procedure that it knew would not maintain the level of Spanish language oral assistance envisioned under the benchmark. This county has not only failed to provide any data indicating this reduction did not have a retrogressive effect, but has offered no explanation as to why its failure to either recruit new bilingual individuals or to retain other individuals who previously served as bilingual poll workers for the 2008 and 2009 elections is not the result of an intent not to provide less bilingual assistance than under the benchmark. In sum, the evidence precludes the county from establishing that the procedures for assigning bilingual poll officials for the November 4, 2008, general and November 3, 2009, constitutional amendment elections was not motivated, at least, in part, by discriminatory purpose. *Arlington Heights*, 429 U.S. at 266-68.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the deviations from the county's benchmark bilingual election procedures described above will continue to be legally unenforceable. *Clark* v. *Roemer*, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Runnels County plans to take concerning this matter. If you have any questions, you should call Maureen Riordan (202-353-2087), an attorney in the Division's Voting Section.

Sincerely,

*Thomas E. Perez*

Thomas E. Perez
Assistant Attorney General

U. S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

October 3, 2011

C. Robert Heath, Esq.
Bickerstaff Heath Delgado Acosta
3711 South MoPac Expressway, Suite 300
Austin, Texas 78746

Dear Mr. Heath:

This refers to your request that the Attorney General reconsider and withdraw the December 14, 1998, objection interposed under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, to a charter amendment that changes the method of election for the city council from six single-member districts to four single-member districts, with two members elected at large to numbered posts. We received your request on August 3, 2011; additional information was received through September 12, 2011.

A jurisdiction may request reconsideration of an objection and, in that request, demonstrate that "there appears to have been a substantial change in the operative facts or relevant law" that would warrant a change in the Attorney General's previous determination. Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, 28 C.F.R. § 51.49. The submitting authority has the burden of establishing the existence of such a change in circumstances that would warrant a different determination.

We have carefully considered our earlier determination in this matter and reviewed the information and arguments you have advanced in support of your request, as well as census data, information in our files, and comments received from other interested persons. According to the 2010 Census, the city's total population is 19 percent black and 31.3 percent Hispanic. Under the existing system, six councilmembers are elected from single-member districts, and the mayor is elected at-large.

We start with a review of the procedural history of the city's attempts to implement a method of election that consisted of four councilmembers elected from single-member districts, two members elected on an at-large basis using numbered posts, and a mayor elected at large to replace its existing at-large system.

Prior to 1992, the city was governed by a mayor and six councilmembers, all of whom were elected at large by majority vote for staggered terms. In August 1990, minority plaintiffs filed an action alleging that the city's at-large system violated Section 2 of the Voting Rights

Act. *Arceneaux* v. *City of Galveston*, No. G-90-221 (S.D. Tex.). During the course of the litigation, the city appointed a charter review committee to review and make recommendations for amendments to the city charter. The committee proposed a method of election consisting of four councilmembers elected from single-member districts, two councilmembers elected at large from numbered positions, and the mayor elected at large ("4-2-1 method of election"). The proposed changes were approved by the voters in a November 5, 1991, referendum election. The city submitted the 4-2-1 method of election for Section 5 review. In 1992, the court granted preliminary relief, enjoining the city's May 1992 municipal election pending the Department of Justice decision regarding the city's 4-2-1 method of election.

On December 14, 1992, the Attorney General interposed an objection to the 4-2-1 method of election because the city had not met its burden under Section 5 of demonstrating the absence of a discriminatory purpose and retrogressive effect.

After the 1992 objection, the parties in the *Arceneaux* suit reached a settlement agreement. On February 16, 1993, the court entered a consent decree which established a method of election and districting plan in which six councilmembers are elected from single-member districts and the mayor is elected at large. This method of election and districting plan received preclearance under Section 5 for use on an interim basis on April 29, 1993, and for use on a permanent basis on January 27, 1994.

On June 16, 1998, the city submitted numerous amendments to the city charter for Section 5 review. The amendments had been approved by voters in a referendum election. One of the amendments, Proposition 10, provided for a virtually identical change in the method of election for the city council from six single-member districts to four single-member districts with two additional members elected at large to numbered posts. On December 14, 1998, the Attorney General again interposed an objection under Section 5 to those proposed changes because the city had not met its burden under Section 5 of demonstrating the absence of a discriminatory purpose and retrogressive effect. In 2001, the city requested that the Attorney General reconsider and withdraw the December 14, 1998, objection. In support of that request, the city pointed to the 2001 Census that indicated Hispanics supplanted African-Americans as the predominant minority group in the city. The city also noted that a Hispanic mayor was elected in 2000, but there was no indication that racial bloc voting was no longer an operative factor in city elections. After a review of this additional information, the Attorney General remained unable to conclude that the city carried its burden of showing that the submitted changes have neither a discriminatory purpose nor a discriminatory effect and declined to withdraw the objection.

In light of the Attorney General's prior objections to virtually identical voting changes, and the requirement that the submitting authority carries the burden of demonstrating that proposed voting changes are free of discriminatory purpose and retrogressive effect, we have examined the information provided to determine whether new factual or legal circumstances exist which would lead to the conclusion that voting changes that did not satisfy the

nondiscrimination requirement of Section 5 in 1992, 1998, and 2002 will satisfy that requirement under Section 5 today.

Under Section 5 of the Voting Rights Act, the submitting authority bears the burden of showing that a submitted change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. 51.52; *South Carolina* v. *Katzenbach*, 383 U.S. 301, 328, 335 (1966). A voting change that has the purpose or will have the effect of diminishing the ability of minorities to elect their preferred candidates of choice denies or abridges the right to vote within the meaning of Section 5. 42 U.S.C 1973c(b).

A voting change has a discriminatory effect if it will lead to a retrogression in the ability of language or racial minorities "with respect to their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U.S. 130, 141 (1976). The voting change at issue must be measured against the benchmark practice to determine whether the ability of minority voters to participate in the political process and elect candidates of their choice will be "augmented, diminished, or not affected by the change affecting voting." *Ibid.*

With respect to the city's ability to demonstrate that the plan was adopted without a prohibited purpose, the starting point of our analysis is *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). In *Arlington Heights*, the court provided a non-exhaustive list of factors that bear on the determination of discriminatory purpose, including, but not limited to, the disparate impact of the action on minority groups; the historical background of the action; the sequence of events leading up to the action or decision; the legislative or administrative history regarding the action; departures from normal procedures; and evidence that the decision-maker ignored factors it has otherwise considered important or controlling in similar decisions. *Id.* at 266-68.

As it did in 2001, the city notes that a Hispanic candidate was elected mayor in 1998 and 2000. The city's current request notes this occurred again in 2002, and that a Hispanic candidate was elected as councilmember from a district with a Hispanic population percentage of less than 50 percent. As it in 2001, the city's submission asserts that it is not longer possible to draw two districts with a predominately black population. In addition to the information previously provided in 2001, which noted that Hispanics had become the predominate minority group, the city's most recent information points to the results of the 2010 Census that the black population has decreased significantly in the past decade.

Our review of the demographics of the current districts and the results for elections conducted since 2001 as well as the information provided by the city does not alter our earlier determination that city has not established the absence of a retrogressive effect. Racial bloc voting continues to play a significant role in city elections. Under the existing method of election, minority voters currently have the ability to elect a candidate of choice in three of the six single-member districts. In contrast, this ability would exist only in two of the four districts and in neither of the two at-large positions under the proposed system. Indeed, in the course of our investigation, the city acknowledged that the proposed method of election will decrease the

number of minority ability-to-elect districts. As a result, the city has failed to establish that the proposed 4-2-1 method of election with numbered posts would not lead to a retrogression in minority voting strength prohibited by Section 5.

The city's most recent request provides virtually no discussion of the motivation for seeking the 4-2-1 method of election, other than the results of the 1998 referendum election. Given the Attorney General's previous determinations in 1992, 1998, and 2002 that the city had failed to meet its burden of demonstrating that the 4-2-1 method of election was not motivated by a discriminatory purpose, and in light of the absence of any additional information from the city to indicate it can now meet that standard in the context of a proposed change that is admittedly retrogressive, we find no basis to alter our earlier determination.

In light of these considerations, I remain unable to conclude that the city has carried its burden of showing that the submitted changes have neither a discriminatory purpose nor will have a discriminatory effect. *Georgia* v. *United States*, 411 U.S. 526 (1973); 28 C.F.R. 51.52. Therefore, on behalf of the Attorney General, I must decline to withdraw the objection to the charter amendments that provide for a change in the method of election for the city council from six single-member districts to four single-member districts, with two additional members elected at large to numbered posts.

As we previously advised, you may seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. Unless and until such a judgment is rendered by that court, the objection by the Attorney General remains in effect and the proposed changes continue to be legally unenforceable. *Clark* v. *Roemer*, 500 U.S. 646 (1991); 28 C.F.R. 51.10. To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Galveston plans to take concerning this matter. If you have any questions, you should contact Robert S. Berman, (202/515-8690), a deputy chief in the Voting Section.

Sincerely,

Thomas E. Perez
Assistant Attorney General



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

FEB 0 7 2012

Joseph M. Nixon, Esq.
Dalton L. Oldham, Esq.
James E. Trainor, III, Esq.
Beirne Maynard & Parsons
401 West 15th Street, Suite 845
Austin, Texas 78701

Dear Messrs. Nixon, Oldham, and Trainor:

This refers to the 2011 redistricting plans for the commissioners court, justice of the peace, and constable, for Nueces County, Texas submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c. We received your response to our November 28, 2011 request for additional information on December 9, 2011.

With respect to the justice of the peace and constable redistricting plan, the Attorney General does not interpose an objection to the specified change. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the change. *Procedures for the Administration of Section 5 of the Voting Rights Act of 1965*, 28 C.F.R. 51.41.

With respect to the commissioners court redistricting plan, we have carefully considered the information you have provided, as well as census data, comments and information from other interested parties, and other information, including the county's previous submissions. Under Section 5, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color or membership in a language minority group. *Georgia v. United States*, 411 U.S. 526 (1973); 28 C.F.R. 51.52(c). For the reasons discussed below, I cannot conclude that the county's burden under Section 5 has been sustained in this instance. Therefore, on behalf of the Attorney General, I object to the 2011 redistricting plan for commissioners court.

The commissioners court is made up of four commissioners elected from single-member precincts, and a county judge, who is elected at large. According to the 2010 Census, the county has a total population of 340,223 persons, of whom 206,293 (60.6%) are Hispanic, and a voting-

- 2 -

age population of 251,968 persons, of whom 142,995 (56.8%) are Hispanic.  Based on the 2010 and 2000 Census data, the Hispanic population in Nueces County increased by 17.9 percent, and the Hispanic voting-age population in the county increased by 21.9 percent, over the past decade.  The Anglo population in Nueces County decreased by 5.3 percent, and the Anglo voting-age population decreased by 0.5 percent, during that same period.

With respect to the county's ability to demonstrate that the plan was adopted without a prohibited purpose, the starting point of our analysis is the framework established in *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  There, the Court provided a non-exhaustive list of factors that bear on the determination of discriminatory purpose, including the impact of the action on minority groups; the historical background of the action; the sequence of events leading up to the action or decision; the legislative or administrative history regarding the action; departures from normal procedures; and evidence that the decision-maker ignored factors it has otherwise considered important or controlling in similar decisions.  *Id*. at 266-68.

Based on our analysis of the evidence, we have concluded that the county has not met its burden of showing that the proposed plan was adopted with no discriminatory purpose.  The county's redistricting history reveals a distinct pattern with regard to Precinct 1.  In 1991, the county increased the Hispanic population percentage in Precinct 1 by removing Voting District ("VTD") 63, in which Anglos were a significant majority of the registered voters; the Anglo incumbent in Precinct 1 at that time correctly predicted that the resulting increase in Hispanic population percentage would result in his inability to get re-elected.  Ten years later, the county also removed VTD 42, which had similar population and registered voter characteristics to VTD 63, from Precinct 1.  In each instance, the majority-Anglo VTD was placed in Precinct 3, where, because of the higher Hispanic population percentage, the potential effect on Hispanic voters would be minimized.  The consequence of these changes was that Hispanic-preferred candidates were successfully elected to the commissioners court from Precinct 1 in each election from 1992 until 2008.  In 2008, the Hispanic incumbent, despite strong support from Precinct 1's Hispanic voters, narrowly lost to an Anglo challenger, by a margin of 50.4 to 49.6 percent.  As a result of that election, the commissioners court was transformed from one in which Hispanic-preferred candidates held three of the five seats to one in which Anglo-preferred candidates held three of the five seats.

During the 2011 redistricting cycle, the county departed from its normal procedure with regard to its treatment of Hispanic voters in Precinct 1, and moved the predominantly Anglo and high-turnout VTDs 42 and 63 from Precinct 3 back to Precinct 1.  The county then exacerbated the effect of those moves by cutting VTD 61, where Hispanics constitute a majority of the registered voters, out of Precinct 1 and adding it to Precinct 3.  The net result of these VTD swaps was to reduce Hispanic electoral ability in Precinct 1.  These changes were particularly noteworthy because, according to the 2010 Census, Precinct 1 already complied with the Federal Constitution's "one-person, one-vote" rule, so there was no need to add population to, or remove population from, that precinct.

These changes were opposed by Hispanic commissioners and other Nueces County citizens on the ground that they would diminish Hispanic electoral ability.  Precinct 3

- 3 -

Commissioner Oscar Ortiz specifically requested that VTDs 42 and 63 be left in his district, and Precinct 2 Commissioner Joe Gonzalez, as well as other minority residents, repeatedly voiced their concerns about these moves. The record is devoid of any response to these requests or concerns.

Despite the vocal opposition from these commissioners and other citizens to the Precinct 1 changes, and despite the effect of those changes on the ability of Hispanic citizens in Precinct 1 to elect their preferred candidates, the county has offered no plausible nondiscriminatory justification for the changes. Instead, the county has offered shifting explanations for the changes. When the proposed redistricting plan was announced for public comment on May 25, 2011, county officials first explained that the changes in the proposed plan – including the decision to add VTDs 42 and 63 and remove VTD 61 from Precinct 1 – resulted from earlier discussions that the plan's designers held individually with each commissioner. But none of the commissioners or the county judge has acknowledged requesting these changes to Precinct 1; instead, each has denied requesting or suggesting the Precinct 1 changes. The county subsequently informed us that the changes to Precinct 1, in fact, did not originate with the commissioners, but rather came from the plan's designers.

The county later argued that the Precinct 1 changes were necessary to prevent any reduction in the Hispanic population percentage in Precinct 3. This statement cannot withstand scrutiny. Commissioner Ortiz presented an alternative plan at the June 15, 2011 public hearing that would have kept VTDs 42 and 63 in his district, Precinct 3, without diminishing Hispanic citizens' ability to elect in either Precinct 3 or Precinct 1. The plan's designers contended that the Ortiz alternative plan would face more scrutiny under the Voting Rights Act than the proposed plan because it had a larger population deviation (although within the constitutionally permissible range). This advice was incorrect: The Department of Justice Guidance Concerning Redistricting makes clear that "[t]he Attorney General may not interpose an objection to a redistricting plan on the grounds that it violates the one-person one-vote principle," 76 Fed. Reg. 7470, 7470 (Feb. 9, 2011), and therefore the Attorney General does not review plans for compliance with this requirement, and certainly does not demand population equality in excess of what the Constitution requires. The erroneous advice from the plan's designers appears to have prevented any prolonged discussion by the commissioners court of the Ortiz alternative plan, and the request from Commissioners Ortiz and Gonzalez to delay a vote to provide for further public comment and discussion was denied.

The redistricting process departed both procedurally and substantively from past redistricting cycles in other ways. In its 2011 redistricting, the county considered only one plan, and that plan was revised only once. This is in stark contrast to the redistricting process in both 2001 and 1991, when numerous alternative plans were presented by the county's demographers and consultants for the commissioners court to consider. Previous redistricting procedures also included consultation and cooperation with local Hispanic residents and groups in drawing plans. This time, several of the commissioners and the plan's designers engaged in a closed, secretive process, such that Hispanic residents and groups that had traditionally participated in redistricting were excluded from the development of the 2011 plan. Concerns raised by such individuals and groups at public hearings went unaddressed.

- 4 -

Many of the county's actions taken with regard to Precinct 1 during the redistricting process appear to have been undertaken to have an adverse impact on Hispanic voters. Given the history of Hispanic electoral success in Precinct 1, the county-wide growth in the Hispanic voting-age population and simultaneous drop in the Anglo voting-age population over the past decade, the county's shifting justifications for the changes to Precinct 1, the absence of a credible explanation for those changes, and the drop in Hispanic electoral ability that results from the Precinct 1 changes, there is sufficient evidence that prevents the county from meeting its burden of demonstrating that the proposed plan was not motivated by a discriminatory purpose prohibited by Section 5. *Garza* v. *County of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part), *cert. denied*, 498 U.S. 1028 (1991); *cf. LULAC* v. *Perry*, 548 U.S. 399, 428-29 (2006).

The county's failure to establish the absence of a discriminatory purpose is sufficient to warrant an objection to the commissioners court redistricting plan. We would note, however, that based on the facts as identified above, the county has also failed to carry its burden of showing that its proposed plan does not have a retrogressive effect on the ability of Hispanic voters to elect their candidate of choice.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the submitted change continues to be legally unenforceable. *Clark* v. *Roemer*, 500 U.S. 646 (1991); 28 C.F.R. 51.10. To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Nueces County plans to take concerning this matter. If you have any questions, please contact Robert S. Berman (202/514-8690), a Deputy Chief in the Voting Section. Because the Section 5 status of the redistricting plan is before the court in *Nueces County* v. *United States*, No. 11-1784 (D.D.C.), we are providing a copy of this letter to the court and counsel of record in that case.

Sincerely,

Thomas E. Perez
Assistant Attorney General



**U.S. Department of Justice**

Civil Rights Division

_____

_Office of the Assistant Attorney General_          _Washington, D.C. 20530_

MAR 0 5 2012

James E. Trainor III, Esq.
Beirne, Maynard & Parsons
401 West 15th Street, Suite 845
Austin, Texas 78701

Dear Mr. Trainor:

      This refers to the 2011 redistricting plan for the commissioners court, the reduction in the number of justices of the peace from nine to five and the number of constables from eight to five, and the 2011 redistricting plan for the justices of the peace/constable precincts for Galveston County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c. We received your response to our December 19, 2011, request for additional information on January 4, 2012; additional information was received on February 6, 2012.

      We have carefully considered the information you have provided, as well as census data, comments and information from other interested parties, and other information, including the county's previous submissions. Under Section 5, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed changes have neither the purpose nor the effect of denying or abridging the right to vote on account of race or color or membership in a language minority group. _Georgia_ v. _United States_, 411 U.S. 526 (1973); _Procedures for the Administration of Section 5 of the Voting Rights Act of 1965_, 28 C.F.R. 51.52(c). For the reasons discussed below, I cannot conclude that the county's burden under Section 5 has been sustained as to the submitted changes. Therefore, on behalf of the Attorney General, I must object to the changes currently pending before the Department.

      According to the 2010 Census, Galveston County has a total population of 291,309 persons, of whom 40,332 (13.8%) are African American and 65,270 (22.4%) are Hispanic. Of the 217,142 persons who are of voting age, 28,716 (13.2%) are black persons and 42,649 (19.6%) are Hispanic. The five-year American Community Survey (2006-2010) estimates that African Americans are 14.3 percent of the citizen voting age population and Hispanic persons comprise 14.8 percent. The commissioners court is elected from four single-member districts with a county judge elected at large. With regard to the election for justices of the peace and constables, there are eight election precincts under the benchmark method. Each elects one

person to each position, except for Precinct 8, which elects two justices of the peace. The county has proposed to reduce the number of election precincts to five, with a justice of the peace and a constable elected from each.

We turn first to the commissioners court redistricting plan. With respect to the county's ability to demonstrate that the commissioners court plan was adopted without a prohibited purpose, the starting point of our analysis is the framework established in *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). There, the Court provided a non-exhaustive list of factors that bear on the determination of discriminatory purpose, including the impact of the action on minority groups; the historical background of the action; the sequence of events leading up to the action or decision; the legislative or administrative history regarding the action; departures from normal procedures; and evidence that the decision-maker ignored factors it has otherwise considered important or controlling in similar decisions. *Id.* at 266-68.

Based on our analysis of the evidence, we have concluded that the county has not met its burden of showing that the proposed plan was adopted with no discriminatory purpose. We start with the county's failure to adopt, as it had in previous redistricting cycles, a set of criteria by which the county would be guided in the redistricting process. The evidence establishes that this was a deliberate decision by the county to avoid being held to a procedural or substantive standard of conduct with regard to the manner in which it complied with the constitutional and statutory requirements of redistricting.

The evidence also indicates that the process may have been characterized by the deliberate exclusion from meaningful involvement in key deliberations of the only member of the commissioners court elected from a minority ability-to-elect precinct. For example, the county judge and several – but not all – of the commissioners had prior knowledge that a significant revision to the pending proposed map was made on August 29, 2011, and would be presented at the following day's meeting at which the final vote on the redistricting plans would be taken. This is particularly noteworthy because the commissioner for Precinct 3, one of two precincts affected by this particular revision, was one of the commissioners not informed about this significant change. Precinct 3 is the only precinct in the county in which minority voters have the ability to elect a candidate of choice, and is the only precinct currently represented by a minority commissioner.

Another factor that bears on a determination of discriminatory purpose is the impact of the decision on minority groups. In this regard, we note that during the current redistricting process, the county relocated the Bolivar Peninsula – a largely white area – from Precinct 1 into Precinct 3. This reduced the overall minority share of the electorate in Precinct 3 by reducing the African American population while increasing both the Hispanic and Anglo populations. In addition, we understand that the Bolivar Peninsula region was one of the areas in the county that was most severely damaged by Hurricane Ike in 2008, and lost several thousand homes. The county received a $93 million grant in 2009 to provide housing repair and replacement options for those residents affected by the hurricane, and has announced its intention to spend most of the grant funds restoring the housing stock on Bolivar Peninsula. Because the peninsula's population has historically been overwhelmingly Anglo, and in light of the Census Bureau's

- 3 -

estimated occupancy rate for housing units in the Bolivar Census County Division of 2.2 persons per household, there is a factual basis to conclude that as the housing stock on the peninsula is replenished and the population increases, the result will be a significant increase in the Anglo population percentage. In the context of racially polarized elections in the county, this will lead to the concomitant loss of the ability of minority voters to elect a candidate of choice to office in Precinct 3. *Reno* v. *Bossier Parish School Board*, 528 U.S. 320, 340 (2000) ("Section 5 looks not only to the present effects of changes but to their future effects as well.") (citing *City of Pleasant Grove* v. *United States*, 479 U.S. 462, 471 (1987)).

That this retrogression in minority voting strength in Precinct 3 is neither required nor inevitable heightens our concern that the county has not met its burden of showing that the change was not motivated by any discriminatory purpose. Both Precincts 1 and 3 were underpopulated, and it would have been far more logical to shift population from a precinct that was overpopulated than to move population between two precincts that were underpopulated. In that regard, benchmark Precinct 4 was overpopulated by 23.5 percent over the ideal, and its excess population could have been used to address underpopulation in the other precincts. Moreover, according to the information that the county supplied, its redistricting consultant made the change based on something he read in the newspaper about the public wanting Bolivar Peninsula and Galveston Island to be joined into a commissioner precinct; but a review of all the audio and video recordings of the public meetings shows that only one person made such a comment.

Based on these factors, we have concluded that the county has not met its burden of demonstrating that the proposed commissioners court redistricting plan was adopted with no discriminatory purpose. We note as well, however, that based on the facts as identified above, the county has also failed to carry its burden of showing that the proposed commissioners court plan does not have a retrogressive effect.

The voting change at issue must be measured against the benchmark practice to determine whether it would "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U.S. 130, 141 (1976). Our statistical analysis indicates that minority voters possess the ability to elect a candidate of choice in benchmark Precinct 3, and that ability has existed for at least the past decade.

As noted, the county's decision to relocate the Bolivar Peninsula from Precinct 1 into Precinct 3 had the effect of reducing the African American share of the electorate in Precinct 3, while increasing both the Hispanic and Anglo populations. In specific terms, the county decreased the black voting age population percentage from 35.2 to 30.8 percent and increased the Hispanic voting age population 25.7 to 27.8 percent, resulting in an overall decrease of 2.3 percentage points in the precinct's minority voting age population. There is sufficient credible evidence to prevent the county from establishing the absence of a retrogressive effect as to this change, especially in light of the anticipated and significant population return of Anglo residents to the Bolivar Peninsula, as discussed further above.

- 4 -

We turn next to the proposed reduction in the number of election precincts for the justice of the peace and constable, and the 2011 redistricting plan for the justices of the peace/constable precincts. With regard to the election for justices of the peace and constables, there are eight election precincts under the benchmark method. Each elects one person to each position, except for Precinct 8, which elects two justices of the peace. The county has proposed to reduce the number of election precincts to five, with a justice of the peace and a constable elected from each.

Our analysis of the benchmark justice of the peace and constable districts indicates that minority voters possess the ability to elect candidates of choice in Precincts 2, 3 and 5. With respect to Precincts 2 and 3, this ability is the continuing result of the court's order in *Hoskins* v. *Hannah*, Civil Action No. G-92-12 (S.D. Tex. Aug. 19, 1992), which created these two districts. Following the proposed consolidation and reduction in the number of precincts, only Precinct 3 would provide that requisite ability to elect. In the simplest terms, under the benchmark plan, minority voters in three districts could elect candidates of choice; but under the proposed plan, that ability is reduced to one.

In addition, we understand that the county's position is that the court's order in *Hoskins* v. *Hannah*, which required the county to maintain two minority ability to elect districts for the election of justices of the peace and constables, has expired. If it has, then it is significant that in the first redistricting following the expiration of that order, the county chose to reduce the number of minority ability to elect districts to one. A stated justification for the proposed consolidation was to save money, yet, according to the county judge's statements, the county conducted no analysis of the financial impact of this decision. The record also indicates that county residents expressed a concern during the redistricting process that the three precincts electing minority officials were consolidated and the precincts with white representatives were left alone. The record is devoid of any response by the county.

In sum, there is sufficient credible evidence that precludes the county from establishing, as it must under Section 5, that the reduction of the number of justice of the peace/constable districts as well as the redistricting plan to elect those officials will not have a retrogressive effect, and were not motivated by a discriminatory intent.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. *Georgia* v. *United States*, 411 U.S. 526 (1973); 28 C.F.R. 51.52. In light of the considerations discussed above, I cannot conclude that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the county's 2011 redistricting plan for the commissioners court and the reduction in the number of justice of the peace and constable districts as well as the redistricting plan for those offices.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. 28 C.F.R. 51.45. However, until the

- 5 -

objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the submitted changes continue to be legally unenforceable. *Clark* v. *Roemer*, 500 U.S. 646 (1991); 28 C.F.R. 51.10. To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action that Galveston County plans to take concerning this matter. If you have any questions, you should contact Robert S. Berman (202/514-8690), a deputy chief in the Voting Section.

Because the Section 5 status of the redistricting plan for the commissioners court is presently before the United States District Court for the District of Columbia in *Galveston County* v. *United States,* No. 1:11-cv-1837 (D.D.C.), we are providing the Court and counsel of record with a copy of this letter. Similarly, the status of both the commissioners court and the justice of the peace and constable plans under Section 5 is a relevant fact in *Petteway* v. *Galveston County*, No. 3:11-cv-00511 (S.D. Tex). Accordingly, we are also providing that Court and counsel of record with a copy of this letter.

Sincerely,

Thomas E. Perez
Assistant Attorney General



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

MAR 1 2 2012

Mr. Keith Ingram
Director of Elections
Elections Division
Office of the Texas Secretary of State
P.O. Box 12060
Austin, Texas 78711-2060

Dear Mr. Ingram:

 This refers to Chapter 123 (S.B. 14) (2011), which amends the Texas Transportation
Code relating to the issuance of election identification certificates, and which amends the Texas
Election Code relating to the procedures for implementing the photographic identification
requirements, including registration procedures, provisional-ballot procedures, notice
requirements, and education and training requirements, for the State of Texas, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c.  We
received your response to our January 9, 2012 follow-up to our September 23, 2011 request for
additional information on January 12, 2012; additional information was received through
February 17, 2012.

 According to the 2010 Census, the State of Texas had a total population of 25,145,561, of
whom 9,460,921 (37.6%) were Hispanic, 2,975,739 (11.8%) were black, 1,027,956 (4.1%) were
Asian, and 11,397,345 (45.3%) were Anglo.  Texas's total voting-age population was
18,279,737, of whom 6,143,144 (33.6%) were Hispanic, 2,102,474 (11.5%) were black, 758,636
(4.2%) were Asian, and 9,074,684 (49.6%) were Anglo.  The five-year aggregate American
Community Survey (2006-2010) estimates that Texas had a Hispanic citizen voting-age
population of 25.5 percent.

 We have carefully considered the information you have provided, as well as census data,
comments and information from other interested parties, and other information, including the
state's previous submissions.  Under Section 5, the Attorney General must determine whether the
submitting authority has met its burden of showing that the proposed changes have neither the
purpose nor the effect of denying or abridging the right to vote on account of race or color or
membership in a language minority group.  *Georgia* v. *United States*, 411 U.S. 526 (1973);
*Procedures for the Administration of Section 5 of the Voting Rights Act of 1965*, 28 C.F.R.
51.52(c).  With regard to Sections 9 and 14 of S.B. 14, concerning photographic identification

51.52(c).  With regard to Sections 9 and 14 of S.B. 14, concerning photographic identification requirements for in-person voting and acceptable forms of photographic identification, I cannot conclude that the state has sustained its burden under Section 5 of the Voting Rights Act. Therefore, on behalf of the Attorney General, I must object to Sections 9 and 14 of S.B. 14.

We start our analysis recognizing the state's legitimate interest in preventing voter fraud and safeguarding voter confidence.  *Crawford* v. *Marion County Election Bd.*, 553 U.S. 181 (2008).  In that vein, the state's sole justifications for changing the current practice to require photographic identification to vote in person that appear in the legislative proceedings and are presented in its submission are to ensure electoral integrity and deter ineligible voters from voting.  At the same time, we note that the state's submission did not include evidence of significant in-person voter impersonation not already addressed by the state's existing laws.

The voting changes at issue must be measured against the benchmark practice to determine whether they would "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."  *Beer* v. *United States*, 425 U.S. 130, 141 (1976).  In support of its position that this proposed requirement will not have such a prohibited effect, the state provided two sets of registered-voter data, which were matched with two different data sources maintained by the state's Department of Public Safety (DPS).  One set was current as of September 16, 2011, and the other as of early January 2012.  The September data reported that there were 12,780,841 registered voters, of whom 2,785,227 (21.8%) were Hispanic.  The January data reported that there were 12,892,280 registered voters, of whom 2,810,869 (21.8%) were Hispanic.

There is, however, a significant difference between the two data sets with regard to the number and characteristics of those registered voters without a driver's license or personal identification card issued by DPS.  The September data indicate that 603,892 (4.7%) of the state's registered voters do not have such identification; this population consists of 174,866 voters (29.0% of the 603,892 voters) who are Hispanic and 429,026 voters (71.0%) who are non-Hispanic.  The January data indicate that 795,955 (6.2%) of the state's registered voters do not have such identification; this population consists of 304,389 voters (38.2%) who are Hispanic and 491,566 voters (61.8%) who are non-Hispanic.  The state has not provided an explanation for the disparate results.  More significantly, it declined to offer an opinion on which of the two data sets is more accurate.  Accordingly, we have considered both in reviewing your submission.

Starting our analysis with the September data set, 6.3 percent of Hispanic registered voters do not have the forms of identification described above, but only 4.3 percent of non-Hispanic registered voters are similarly situated.  Therefore, a Hispanic voter is 46.5 percent more likely than a non-Hispanic voter to lack these forms of identification.  In addition, although Hispanic voters represent only 21.8 percent of the registered voters in the state, Hispanic voters represent fully 29.0 percent of the registered voters without such identification.

Our analysis of the January data indicates that 10.8 percent of Hispanic registered voters do not have a driver's license or personal identification card issued by DPS, but only 4.9 percent of non-Hispanic registered voters do not have such identification.  So, Hispanic registered voters are more than twice as likely as non-Hispanic registered voters to lack such identification.  Under

are more than twice as likely as non-Hispanic registered voters to lack such identification. Under the data provided in January, Hispanics make up only 21.8 percent of all registered voters, but fully 38.2 percent of the registered voters who lack these forms of identification.

Thus, we conclude that the total number of registered voters who lack a driver's license or personal identification card issued by DPS could range from 603,892 to 795,955. The disparity between the percentages of Hispanics and non-Hispanics who lack these forms of identification ranges from 46.5 to 120.0 percent. That is, according to the state's own data, a Hispanic registered voter is at least 46.5 percent, and potentially 120.0 percent, more likely than a non-Hispanic registered voter to lack this identification. Even using the data most favorable to the state, Hispanics disproportionately lack either a driver's license or a personal identification card issued by DPS, and that disparity is statistically significant.

The state has provided no data on whether African American or Asian registered voters are also disproportionately affected by S.B. 14.

Sections 9 and 14 of S.B. 14 would also permit a voter to vote in person using military photographic identification, a United States citizenship certificate that contains the person's photograph, a United States passport, or a license to carry a concealed handgun. The state has produced no data showing what percent of registered voters lack a driver's license or personal identification card issued by DPS, but do possess another allowable form of photographic identification. Nor has the state provided any data on the demographic makeup of such voters. In addition, when the Texas Legislature was considering S.B. 14, there were a number of legislative proposals to expand the forms of identification that could be used by voters to meet this new requirement – including proposals to allow any state-issued or tribal identification with a photograph to be used for regular voting – but those proposals were rejected.

In view of the statistical evidence illustrating the impact of S.B. 14 on Hispanic registered voters, we turn to those steps that the state has identified it will take to mitigate that effect.

You have informed us that the DPS-issued "free" election identification certificate, which is proposed to be implemented by Section 20 of S.B. 14, would protect voters who do not already have another acceptable form of identification. The application process for these certificates will mirror the manner in which a person obtains a driver's license. First-time applicants will be required to furnish various supplemental documents and undergo an application process that includes fingerprinting and traveling to a driver's license office.

An applicant for an election identification certificate will be required to provide two pieces of secondary identification, or one piece of secondary identification and two supporting documents. If a voter does not possess any of these documents, the least expensive option will be to spend $22 on a copy of the voter's birth certificate. There is a statistically significant correlation between the Hispanic population percentage of a county and the percentage of a county's population that lives below the poverty line. The legislature tabled amendments that would have prohibited state agencies from charging for any underlying documents needed to obtain an acceptable form of photographic identification.

As noted above, an applicant for an election identification certificate will have to travel to a driver's license office. This raises three discrete issues. First, according to the most recent American Community Survey three-year estimates, 7.3 percent of Hispanic or Latino households do not have an available vehicle, as compared with only 3.8 percent of non-Hispanic white households that lack an available vehicle. Statistically significant correlations exist between the Hispanic voting-age population percentage of a county, and the percentage of occupied housing units without a vehicle.

Second, in 81 of the state's 254 counties, there are no operational driver's license offices. The disparity in the rates between Hispanics and non-Hispanics with regard to the possession of either a driver's license or personal identification card issued by DPS is particularly stark in counties without driver's license offices. According to the September 2011 data, 10.0 percent of Hispanics in counties without driver's license offices do not have either form of identification, compared to 5.5 percent of non-Hispanics. According to the January 2012 data, that comparison is 14.6 percent of Hispanics in counties without driver's license offices, as compared to 8.8 percent of non-Hispanics. During the legislative hearings, one senator stated that some voters in his district could have to travel up to 176 miles roundtrip in order to reach a driver's license office. The legislature tabled amendments that would have, for example, provided reimbursement to voters who live below the poverty line for travel expenses incurred in applying for the requisite identification.

The third and final point is the limited hours that such offices are open. Only 49 of the 221 currently open driver's license offices across the state have extended hours. Even Senator Troy Fraser, the primary author of this legislation in the Senate, acknowledged during the legislative hearing that, "You gotta work to make sure that [DPS offices] are open." Despite the apparent recognition of the situation, the legislature tabled an amendment that would have required driver's license offices to be open until 7:00 p.m. or later on at least one weekday and during four or more hours on at least two Saturdays each month.

The legislation mandates a statewide voter-education effort concerning the new identification requirement, but does not provide specific standards for the program. The state, however, has yet to approve a final version of the materials designed to accomplish that goal, either for voters or for election officials. The state has indicated that it will implement a new educational program; but as of this date, our information indicates that the currently proposed plan will incorporate the new identification requirement into a general voter-education program.

The legislation requires that poll-worker training materials reflect the new identification requirements. This is particularly vital because a poll-worker can permit a voter to cast a ballot if the name as listed on the documentation is "substantially similar to but does not match exactly" the name on the voter registration list, and if the voter also submits an affidavit stating that he or she is the person on the list of registered voters. Though the Secretary of State's office has adopted an administrative rule to guide poll-workers in determining when names are substantially similar, the rule gives poll-workers a great deal of discretion. The state has provided no enforcement guidelines to prevent the vagueness of this standard from leading to inconsistency or bias in its application.

Even after submitting data that show over 600,000 registered voters do not have either a driver's license or personal identification card issued by DPS – and that a disproportionate share of those registered voters are Hispanic – the state has failed to propose, much less adopt, any program for individuals who have to travel a significant distance to a DPS office, who have limited access to transportation, or who are unable to get to a DPS office during their hours of operation. This failure is particularly noteworthy given Texas's geography and demographics, which arguably make the necessity for mitigating measures greater than in other states. The state also has not developed any specific proposals to educate either voters about how to comply with the new identification requirement or poll officials about how to enforce the proposed change.

In conclusion, the state has not met its burden of proving that, when compared to the benchmark, the proposed requirement will not have a retrogressive effect, or that any specific features of the proposed law will prevent or mitigate that retrogression. Additionally, the state has failed to demonstrate why it could not meet its stated goals of ensuring electoral integrity and deterring ineligible voters from voting in a manner that would have avoided this retrogressive effect. Because we conclude that the state has failed to meet its burden of demonstrating that the proposed law will not have a retrogressive effect, we do not make any determination as to whether the state has established that the proposed changes were adopted with no discriminatory purpose.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. *Georgia* v. *United States*, 411 U.S. 526 (1973); 28 C.F.R. 51.52. In light of the considerations discussed above, I cannot conclude that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the changes affecting voting that are occasioned by Sections 9 and 14 of Chapter 123 (S.B. 14) (2011). Sections 1 through 8, 10 through 13, 15, and 17 through 22 of S.B. 14 are directly related to the procedures for implementing the photographic identification requirements, including registration procedures, provisional-ballot procedures, notice requirements, and education and training requirements. Accordingly, no determination by the Attorney General is required or appropriate under Section 5. 28 C.F.R. 51.22 and 51.35.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the submitted changes continue to be legally unenforceable. *Clark* v. *Roemer*, 500 U.S. 646 (1991); 28 C.F.R. 51.10. To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action that the State of Texas plans to take concerning this matter. If you have any questions, you should contact Robert S. Berman (202/514-8690), a deputy chief in the Voting Section.

6

Because the Section 5 status of this legislation is presently before the United States District Court for the District of Columbia in *State of Texas* v. *Holder,* No. 1:12-cv-00128 (D.D.C.), we are providing the Court and counsel of record with a copy of this letter.

Sincerely,

Thomas E. Perez
Assistant Attorney General



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

December 21, 2012

Ms. Melody Thomas Chappell, Esq.
Wells, Peyton, Greenberg & Hunt
P.O. Box 3708
Beaumont, Texas  77704-3708

Dear Ms. Chappell:

     This refers to the change in the method of election from seven single-member districts to five single-member districts with two at-large positions, and the 2012 board of trustee districting plan, for Beaumont Independent School District in Jefferson County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c.  We received your response to our October 1, 2012, request for additional information on October 22, 2012, and additional information was received through December 10, 2012.

     We have carefully considered the information you have provided, as well as census data, comments, and information from other interested parties.  Under Section 5 of the Voting Rights Act, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed changes "neither [have] the purpose nor will have the effect" of denying or abridging the right to vote on account of race, color, or membership in language minority group.  _Georgia_ v. _United States_, 411 U.S. 526 (1973); _Procedures for the Administration of Section 5 of the Voting Rights Act of 1965,_ 28 C.F.R. 51.52.  The voting changes at issue must be measured against the benchmark practice to determine whether they would "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."  _Beer_ v. _United States_, 425 U.S. 130, 141 (1976).

     According to the 2010 Census, the district had a total population of 132,225 persons, of whom 60,581 (45.8%) were African American and 19,459 (14.7%) were Hispanic.  Its voting age population was 101,912, of whom 44,085 (43.3%) were black, and 13,734 (13.5%) were Hispanic.  The vast majority of the district's population resides in the City of Beaumont, which has a similar demographic profile.

     Prior to 1985, five of the seven board members were elected from single-member districts and two were elected at large.  In 1985, a federal court devised a single-member district plan for the election of all seven board members.  _United States_ v. _Texas Education Agency (Beaumont_

*Independent School District)*, Cause No. 6819-CA (E.D. Tex. Apr. 22, 1985). That method of election has been used continuously since then and is the benchmark for our analysis here. It provides African American voters with the ability to elect four members to the district's board.

The district proposes to elect two of its members at large and five members from single-member districts. Our analysis shows that a fairly-drawn districting plan with five districts will provide African American voters with the ability to elect candidates of choice in three of the districts. Accordingly, to meet its burden that the change does not result in impermissible retrogression, the district must establish that the at-large method for the two remaining seats does not preclude African American voters from electing a candidate of choice to office. For the reasons discussed below, the district has failed to do so.

Aside from various tax elections, the May 2011 referendum is the only recent school district election in which the electorate would be identical to that of an at-large position on the school board. There is overwhelming evidence that both the campaign leading to the election as well as the issue itself carried racial overtones with the genesis of the change and virtually all of its support coming from white residents. A statistical analysis of the election confirms the extreme racial polarization that the issue created. Black voters cohesively voted to maintain the current method of election and white voters voted cohesively for the proposed change. We estimate over 90 percent of white voters, but less than 10 percent of black voters, supported the change.

An examination of at-large elections for the Beaumont City Council also proved informative because of the overlap in population and the similarity in demographics. There, we found racial cohesion among black voters at levels similar to those identified in the school district election. More significantly, we found significant racial polarization and the same unwillingness of white voters to support a black-preferred candidate, with little evidence of crossover voting by white voters in the city's at-large council races.

In the past ten years, numerous black-preferred candidates have sought municipal office in the city. With the sole exception of one candidate, African Americans have been unable to elect candidates of choice to the city's at-large council positions. Our analyses showed that this candidate only received about eight percent of the non-black vote in both the 2007 and 2011 elections, placing second to last among non-black voters in 2011. And anecdotal evidence suggests that even this minimal level of crossover voting was the result of an out-of-the-ordinary public endorsement and television appearance by white voters on behalf of this candidate; other black-preferred candidates have failed to achieve more than three percent of the non-black vote in at-large city council elections. In addition, our analyses demonstrate that this candidate's election was dependent on single-shot voting, in which black voters withheld their votes for the second at-large city council seat in both 2007 and 2011, voting only for this candidate. The statistical and anecdotal evidence therefore confirm that this one candidate's experience is not indicative of black-preferred candidates' prospects for success in at-large elections. *See Texas* v. *United States*, 2012 WL 3671924, at *22-23 (D.D.C. Aug. 28, 2012) (three-judge court) (isolated electoral success by one candidate is insufficient to demonstrate that minority voters have the consistent ability to elect their preferred candidates of choice).

The school district has failed to establish that implementing the proposed method of election will offer the same ability to African American voters to exercise the electoral franchise that they enjoy currently. Black voters now have the ability to elect four of the seven board members; the proposed plan provides that ability for only three positions. In order for black voters to maintain their current level of voting strength under the new configuration, they must be able to elect a candidate of choice from one at-large position. The evidence, however, offers little, if any, support for that conclusion.

We note as well that this is not the first occasion on which the school district has proposed the use of at-large elections in a manner that would cause a retrogression in black voting strength; on October 20, 1983, the Attorney General objected to the proposed consolidation of the Beaumont and South Park school districts on the ground that the change would "have a significant adverse impact on the ability of blacks to elect representatives of their choice to the surviving school board under an at-large election system."

As detailed above, it is not likely that a black-preferred candidate would successfully be elected in an at-large contest. Based upon that analysis I cannot conclude, as I must under Section 5, that the district has met its burden of establishing the absence of a retrogressive effect. Accordingly, I must interpose an objection to the proposed change in method of election for the Beaumont Independent School District from seven single-member districts to five single-member districts with two at-large positions. Because the district has failed to meet its burden of demonstrating that this proposed change will not have a retrogressive effect, we do not make any determination as to whether the district has established that the proposed change was adopted with no discriminatory purpose.

Because the adoption of the districting plan is dependent upon the objected-to proposed change in method of election, it would be inappropriate for the Attorney General to make a determination on this related change. 28 C.F.R. 51.22.

Under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. 28 C.F.R. 51.45. However, unless and until the objection is withdrawn or a judgment from the federal district court is obtained, the changes continue to be legally unenforceable. *Clark* v. *Roemer*, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

- 4 -

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the district plans to take concerning this matter.  If you have any questions, please call Mr. Robert S. Berman (202-514-8690), a deputy chief in the Voting Section.

Sincerely,

Thomas E. Perez
Assistant Attorney General



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                                        _Washington, D.C. 20530_

April 8, 2013

Melody Thomas Chappell, Esq.
Wells, Peyton, Greenberg & Hunt
P.O. Box 3708
Beaumont, Texas  77704-3708

Dear Ms. Chappell:

This refers to two submissions of changes affecting voting for the board of trustees for the Beaumont Independent School District (BISD) in Jefferson County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. First, on March 1, 2013, we received your submission of the BISD's adoption of the February 21, 2013, redistricting plan and accompanying notices and orders necessary for the election of three of the seven members of the board of trustees.  Second, on March 19, 2013, we received your submission of the changes effectuated as the result of the March 18, 2013, ruling in _In re Rodriguez_, __ S.W. 3d __, 2012 WL 1189005 (Tex. App. Beaumont), as well as those changes adopted by the BISD to implement the state court's orders.  We have received additional information concerning both submissions through April 4, 2013, including the denial of the stay request in _Rodriguez_, No. 09-13-00115 (Tex. App. Beaumont Mar. 27, 2013), and the court's ruling on the same day in _In re Neil_, No. 9-13-00144 (Tex. App. Beaumont).

Collectively, these changes would shorten the terms of four incumbents from four years to two years, such that all seven trustee positions would be up for election this year.  These changes also would treat the candidate qualification period as having closed before the date of the court order, with the effect that in three districts that provide black voters with the ability to elect candidates of choice, the black-preferred incumbent trustees would be removed from their offices and replaced with the candidates they defeated in the last election (and who received virtually no support from black voters), without the incumbent trustees in those three districts having had notice that an election would be held in their districts or the opportunity to qualify for re-election.  In particular, the information contained in the two submissions indicates that the state court ordered (1) the school district election be conducted on May 11, 2013, (2) using the redistricting plan that the BISD adopted on February 21, 2013, (3) with all seven trustee positions to be contested, (4) resulting in the terms of four incumbents, three of whom are elected from districts which provide minority voters with the ability to elect candidates of choice, being shortened from four to two years.  In addition, (5) the BISD must deem all persons who filed and qualified for any district on or before March 1, 2013, to be placed on the ballot with (6) no additional time allowed for persons to qualify for those districts not identified in the February 21,

2013, election order and notice.  Finally, the BISD must (7) designate those persons who qualified for Districts 1, 2, 3 and 5 as unopposed candidates.  The BISD has adopted provisions for (8) the county to conduct the election, (9) the use of separate ballots, (10) three polling place changes, and (11) the use of county early voting locations and hours.  Because these changes are directly related, the Attorney General must review them simultaneously.  *Procedures for the Administration of Section 5 of the Voting Rights Act of 1965*, 28 C.F.R. §§ 51.22(b) and 51.35.

According to the 2010 Census, the BISD has a total population of 132,225 persons, of whom 46,691 (35.3%) are white, 60,581(45.8%) are black, and 19,459 (14.7%) are Hispanic.  The BISD's voting age population is 39.2 percent white, 43.3 percent black, and 13.5 percent Hispanic.  Although citizenship rates are not available for the BISD, they are available for the City of Beaumont, which is wholly contained within the BISD and shares similar demographics.  The American Community Survey for 2007 to 2011 estimates that of the city's voting age population who are citizens, 43.5 percent are white, 47.9 percent are black, and 5.4 are Hispanic.

At the outset, it is imperative to note the historical context in which the present submissions arise and which informs our analysis.  On April 22, 1985, the United States District Court for the Eastern District of Texas in *United States* v. *Texas Education Agency (Beaumont Independent School District)*, No. 6819-CA (E.D. Tex.), ordered the use of single-member districts for the election of the seven school district trustees for the BISD.  The court, in addition to ordering the BISD's method of election, also required that the trustees' terms would be staggered, with a subset of trustees chosen at each election.  The BISD has continued the practice of using single-member districts with staggered terms for the past 26 years, through two redistricting cycles.  Most recently, on April 2, 2008, the Attorney General informed BISD officials that no objection would be interposed under Section 5 to the change in the staggering of terms for the board of trustees to account for the change from three-year to four-year terms.

In 2011, the BISD conducted a referendum election on the question of whether to change from the federal court-ordered method of election to one with five single-member districts and two at-large positions.  Both the public activities prior to the referendum election as well as the election results showed extreme racial polarization.  As required by the referendum results, the BISD submitted the 5-2 method of election and a five single-member district redistricting plan for administrative review under Section 5 of the Voting Rights Act.  On December 21, 2012, the Attorney General informed BISD officials that implementing the proposed 5-2 method of election would not offer the same ability to African American voters to exercise the franchise as the benchmark method of election, and was therefore retrogressive in violation of Section 5.  As a result of that determination, federal law required the continued use of the method of election ordered into effect by the federal court in 1985.

Following the December 2012 objection to the proposed change in the method of election, the BISD proceeded to adjust the existing districts to reflect the population changes reflected in the 2010 Census results, resulting in the adoption of a seven single-member district redistricting plan on February 21, 2013, along with the requisite notices and orders, providing for staggered terms according to the district's previously established schedule of staggered terms.  Accordingly, the BISD's notice of election announced that elections would be held only in Districts 4, 6 and 7 in May 2013, and BISD only accepted candidate qualifying papers from

persons in those districts.  The incumbents in Districts 1, 2 and 3, which provide minority voters with the ability to elect candidates of choice, did not seek to qualify for election, as the BISD had not announced that those seats would be up for election in May 2013.  At the end of the last day for the candidate qualifying period, several of the referendum supporters, who had previously run and lost in the districts that provide minority voters with the ability to elect, appeared and sought to qualify in Districts 1, 2 and 3.  The BISD did not accept their candidate filings, as it had not scheduled or announced an election in those districts in May 2013.  Following the close of candidate qualification, litigation in both state court and federal court ensued.

As noted above, we continue to receive additional information on the BISD's submissions.  At the same time, we are aware of the tight deadlines, both legal and practical, and have worked to expedite our review to the maximum extent possible.  For that reason, rather than waiting until we have completed our review of all the changes currently before us, we believe that it would be helpful to both the BISD and the various courts in which litigation concerning the election is pending to inform you of those matters on which we have already made a determination.

The BISD has made two submissions.  The first submission concerns the BISD's own February 21, 2013 adoption of a redistricting plan and related election procedures.  The second submission includes two categories of changes: (1) those effectuated by the state court's order, and (2) those the BISD adopted to implement that order.

We first assess whether the procedures included in these submissions are changes within the meaning of Section 5 and therefore subject to our review.  There is little question that all the changes adopted by the BISD itself, which include the changes contained in its initial March 1 submission and those submitted subsequently, such as the conduct of the election by the county, the resulting use of separate ballots, the three polling places changes, and the use of county early voting locations and hours, are subject to review under Section 5.

The remaining changes are those that were ordered by the state court.  These changes are not insulated from review merely because they were ordered by the state court; rather, a "change in election procedures ordered by [state] courts is subject to preclearance under § 5."  *Hathorn* v. *Lovorn*, 457 U.S. 255, 266 (1982).  In language particularly applicable to the factual circumstances presented here, the Supreme Court has explained that a "state court decree directing compliance with a state election statute [may result in a covered change] within the meaning of §5," and noting that "if § 5 did not encompass this situation, covered jurisdictions easily could evade the statute by declining to implement new state statutes until ordered to do so by state courts."  *Id.* at 266 n.16.  The measure by which we identify those actions subject to scrutiny under Section 5 is whether the action results in a change to existing standards, practices, or procedures with respect to voting.  42 U.S.C. § 1973c.  "It is immaterial that the change sought" by a covered jurisdiction "derives from a statute" that need not be precleared.  *Hathorn*, 457 U.S. at 266 n.16.  The state court order at issue here contains numerous directives, all based on the court's application of state law, designed to result in a single set of procedures for the conduct of an election.  Accordingly, we examine the state court ruling to identify those instances where the application of state law did, in fact, produce changes requiring Section 5 review.

The state court noted that the February 21 redistricting plan based on the 2010 Census results met constitutional one-person, one-vote requirements, and ordered that plan into effect even though it was not timely adopted under state law. *In re Rodriguez*, __ S.W. 3d __, 2013 WL 1189005, at \*3-4 (Tex. App. Beaumont). The state court administered a voting change by ordering that plan into effect. *Branch* v. *Smith*, 538 U.S 254, 262 (2003). This change permitted the court to order that the election should go forward on May 11, 2013, the regularly-scheduled election date.

With regard to the number of positions to be contested at the election and the concomitant shortening of the terms of those individuals elected in 2011, the state court ordered that the election comply with Tex. Educ. Code § 11.052(h), which requires that "[a]t the first election at which some or all of the trustees are elected [from single-member districts] and after each redistricting, all positions on the board shall be filled. The trustees then elected shall draw lots for staggered terms as provided by Section 11.059." Tex. Educ. Code § 11.052(h); *see In re Rodriguez*, 2013 WL 1189005, at \*6. Pursuant to state law, however, a school district "may provide for the trustees in office when the plan is adopted or the school district is redistricted to serve for the remainder of their terms \* \* \* \*." Tex. Educ. Code § 11.053(a). The board must make this choice after the first election under single-member districts or after each redistricting. *Id*. at § 11.053(b). In this instance, the state court found the board's adoption of a redistricting plan to be untimely and determined that the board policy on staggering of terms was not sufficient to meet the state law requirements. *In re Rodriguez*, 2013 WL 1189005, at \*3-4, 6.

Thus, after determining that the February 21 plan would be used in the May election despite its untimely adoption under state law, the state court stood in the stead of the BISD and had the option either to continue the BISD's longstanding existing staggered-term structure at the May election, the first election after a redistricting, or to eliminate the staggered terms. The state court decided not to continue the staggered terms, thus requiring an election in all seven districts in May 2013 and truncating the terms of office of those persons elected in 2011. In doing so, the court applied state law to administer an election procedure different from that in force or effect in the BISD prior to the court's action, thus rendering the new procedures subject to Section 5 review.

We are aware that the state court concluded that its order was not a change affecting voting. The Supreme Court has held otherwise. *Hathorn*, 457 U.S. at 265; *see also NAACP* v. *Hampton County Election Comm'n*, 470 U.S. 166, 180 (1985) (rejecting the assertion by a covered jurisdiction that Section 5 review was not necessary "because [the changes] were undertaken in good faith, were merely an attempt to implement a statute that had already been approved by the Attorney General, and were therefore an improvement over prior voting procedures"). And the application of Section 5 to these changes is squarely within the definition of voting changes established by the Attorney General's Procedures for the Administration of Section 5. *See* 28 C.F.R. § 51.13(i) ("[a]ny change in the term of an elective office or an elected official \* \* \* (*e.g.*, by shortening or extending the term of an office)" is subject to review); 28 C.F.R. § 51.13(g) ("[a]ny change affecting the eligibility of persons to become or remain candidates, to obtain a position on the ballot in primary or general elections, or to become or remain holders of elective offices" is subject to review).

Having identified those actions that are subject to review, we assess whether the BISD has established that the submitted changes – whether those resulting from the state court order or those that the BISD itself adopted pursuant to the state court order or otherwise – comply with federal law.  We have carefully considered the information you have provided, as well as census data, comments, and information from other interested parties.  Under Section 5 of the Voting Rights Act, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed changes "neither [have] the purpose nor will have the effect" of denying or abridging the right to vote on account of race."  *Georgia* v. *United States*, 411 U.S. 526 (1973); 28 C.F.R. § 51.52.  The voting changes at issue must be measured against the benchmark practice to determine whether they would "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U.S. 130, 141 (1976).

As noted above, the state court determined that all seven trustee positions would be contested concurrently in the upcoming May 11, 2013 election.  In addition, the state court determined that the statutorily-mandated deadline to file for office had passed and would not be reopened.  We start with the effect of these changes on the voters in Districts 4, 6 and 7.  There is little, if any, effect of these changes on voters in these districts.  BISD residents expected an election in each of these three districts in May 2013; residents were aware of the notice calling an election in these three districts, and the incumbent trustees filed for election in each of these three districts in a timely manner.  The BISD's actions – including its longstanding policy of staggering terms, its listing only these three districts in its February 21, 2013, election order, and its notice rejecting applicants for other districts – supports this conclusion.  As such, there is no retrogressive effect as to Districts 4, 6 and 7.

We reach a contrary conclusion with respect to the effect of these changes in Districts 1, 2, 3 and 5.  The change from the benchmark practice of staggered terms, in which the trustee positions to represent Districts 1, 2, 3 and 5 would not be up for election again until 2015, has the effect of shortening the terms of the incumbents in these districts from four years to two years.  Three of these districts (1, 2 and 3) are currently represented by trustees who have won election with the cohesive support of black voters in their districts.  In addition, unlike the factual circumstances in Districts 4, 6 and 7, there was no expectation that Districts 1, 2, 3 and 5 would be up for election this year.  The board's policy on the staggering of terms, the most recent version of which had been in effect since 2008, had yet to be ruled inapplicable to the post-2010 Census redistricting plan.  Residents in these districts reasonably relied on the BISD's policy on staggered terms, as well as the notice of election, to decide that it was unnecessary and probably inappropriate to file for an office for which there would be no election.  Our investigation revealed that none of incumbent trustees in the three affected districts that provide minority voters with the ability to elect (Districts 1, 2 and 3), much less the voters in those districts, were aware that the terms had been shortened and an election for their districts would be held in May.

Although these circumstances alone would support a finding that the BISD could not establish that an election in the four additional districts (1, 2, 3 and 5) in May 2013 would not be retrogressive, there are two additional factors that buttress that conclusion.  First, all the individuals who filed for the three ability-to-elect districts (1, 2 and 3), had previously been

candidates for the board of trustees.  Some ran more than once.  In no election did any of the candidates receive support from more than 10.9 percent of the black voters in their respective district when they ran as candidates in 2011.  Indeed, our statistical analysis of the 2011 election determined that although one candidate did receive 37.4 percent of the total vote in District 1 (in which black voters are a bare majority of the voting age population), she received virtually no support from the district's black residents.  Second, the state court's decision was issued after the close of the candidate filing period, thereby precluding anyone from filing who had relied on the BISD's policy and election notice as well as the common understanding that no election would be held in the four additional districts.  The effect of the state court's order in these districts is that candidate qualifying was deemed closed, without any notice to either the voters in these districts or the incumbents, that qualifying had ever opened.  Likewise, the effect of the state court's order is that candidates would run unopposed who are not the choice of the minority community – and indeed had previously been rejected by minority voters in contested elections – with no opportunity for them to be contested.  Had the state court reopened the candidate qualifying period after the decision, even for a short period of time, the incumbent trustees or other residents of those districts would likely have qualified, thereby providing the voters in these districts with the opportunity to participate in the electoral process and the ability to elect their candidates of choice.  This eventuality could have significantly mitigated, and potentially eliminated, the retrogressive effect of the changes.

In light of the considerations discussed above, I cannot conclude that the BISD has sustained its statutory burden that the use of the state court-adopted plan for elections in Districts 1, 2, 3 and 5, the truncating of the terms of the incumbents in those districts from four years to two years, and the changes to the candidate qualification procedures for those districts do not have a discriminatory effect.  Therefore, on behalf of the Attorney General, I must object to the changes described in this paragraph.  Because we conclude that the BISD has failed to meet its burden of demonstrating that these proposed changes will not have a retrogressive effect, we do not make any determination as to whether the BISD has established that these changes were adopted with no discriminatory purpose.

Under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  28 C.F.R. § 51.44.  In addition, you may request that the Attorney General reconsider the objection.  28 C.F.R. § 51.45.  However, unless and until the objection is withdrawn or the United States District Court for the District of Columbia grants the BISD the relief it has requested in *Beaumont Independent School District* v. *United States*, 1:13-cv-00401 (D.D.C.), its pending declaratory judgment action, the changes identified above to which the Attorney General has interposed an objection continue to be legally unenforceable. *Clark* v. *Roemer*, 500 U.S. 646 (1991); 28 C.F.R. § 51.10.

With regard to the February 2013 redistricting plan that the BISD adopted and the state court ordered into effect, at the present time, we are not in a position to complete our analysis of its compliance with Section 5.  The information provided to date is insufficient to enable us to determine that the proposed redistricting plan neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language

minority group, as required under Section 5.  The following information is necessary so that we may complete our review of the plan:

1.  A list of registered voters, by name and by precinct, for the May 2007 election, the May 2011 election, and the list of registered voters as it currently exists.

2.  The voter history files for each voter, by name and precinct, registered to vote in the BISD.

3.  Copies of any available reports, studies, analyses, summaries, or other documents or publications, including county planning commission reports and school planning reports, that contain an assessment of the current and future demographic growth, broken down by race and ethnicity, in the BISD.

4.  Election returns for all elections for offices in Jefferson County held from 2003 to the present in which a black candidate participated.  For each election, indicate:

    a.  The office sought;
    b.  Each candidate's name and race;
    c.  The number of votes for each candidate, by precinct;
    d.  The number of registered voters, by race and by precinct at the time of each election;
    e.  The number of persons by race and by precinct, who participated in the election.

With regard to the information requested in Items 4(d) and (e), if the exact numbers are not available, please provide your best estimate and the basis for that estimate.  Our review would be expedited if the information identified above could be provided in an electronic format (.dbf, .xls, or .txt files).

We note that concerns have been raised that the diminution in the black percentage of the voting age population in District 2 from 65.4 to 50.1 percent may diminish the ability of black voters to elect candidates of choice in that district.  Any response that the BISD may wish to provide regarding this concern will be helpful to our analysis.

The Attorney General has 60 days to consider a completed submission pursuant to Section 5.  This 60-day review period for the state court's adoption of the redistricting plan will begin when we receive the information specified above.  28 C.F.R. § 51.37.  However, if no response is received within 60 days of this request, the Attorney General may object to the proposed changes consistent with the burden of proof placed upon the submitting authority.  28 C.F.R. §§ 51.40 and 51.52(a) and (c).  Changes that affect voting are legally unenforceable unless and until the appropriate Section 5 determination has been obtained.  *Clark* v. *Roemer*, 500 U.S. 646 (1991); 28 C.F.R. § 51.10.

The BISD's procedures for the county to conduct the election, the temporary use of separate ballots, the three polling place changes, and the use of county early voting locations and hours are directly related to the redistricting plan. Accordingly, it would be inappropriate for the Attorney General to make a determination on those changes at this time. 28 C.F.R. §§ 51.22(b) and 51.35. Likewise, because the BISD's March 1 submission of its own adoption of the February 21 redistricting plan has been superseded by the state court's order adopting that same plan, no determination is required or appropriate concerning the BISD's adoption of that same plan. 28 C.F.R. § 51.35.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action that the BISD plans to take concerning this matter. If you have any questions concerning this letter, please call Robert S. Berman (202-514-8690), a deputy chief of the Voting Section.

Because the Section 5 status of the changes contained in this submission is currently before both the United States District Court for the District of Columbia in *Beaumont Independent School District* v. *United States*, No. 1:13-cv-00401 (D.D.C.) and the United States District Court for the Eastern District of Texas in *Jones* v. *Beaumont Independent School District*, No.1:13-cv-0177 (E.D. Tex), we are providing a copy of this letter to the Court and to counsel of record in those cases.

Sincerely,

Thomas E. Perez
Assistant Attorney General

PL1131
9/2/2014
2:13-cv-000193



# STATEMENT
## *From the Office of State Senator Leticia Van de Putte*

For Immediate Release
January 26, 2011
**Contact:** Sarah Gomez, 512-463-0126

## Statement from Senator Van de Putte Regarding the Suspension of the 24 Hour Layout Requirement

**Lt. Governor**

**Senators**

**Secretary**

**Committees**

**News & Media**

**Visitor Center**

**Senate Kids**

**Español**

"The Senate Democrats, including those who represent districts in which minority voters are electing candidates of their choice, and who also speak on behalf of the minority voters in the state, have made clear their unanimous opposition to voter ID legislation. That opposition remains.

No matter the specific time of passage of this bill, the outcome is inevitable, and our opposition remains firm. In the interest of continuing debate on the legislation during appropriate hours, however, and to avoid late-night debate which the public would find more difficult to observe, we will not oppose a vote to suspend the 24-hour lay-out requirement.

Debate on this legislation was in a committee-of-the-whole consisting of all 31 members of the Senate. Thus we see little compelling need for such a lay-out requirement, which typically exists to give those senators not on the relevant committee opportunity to review legislation. All 31 Senators have had ample opportunity to review the bill, which is the purpose of having a lay-out requirement."

PL132
9/2/2014
2:13-cv-000193     552·11]

**Frank Battle**

| | |
|---|---|
| **From:** | Bryan Hebert |
| **Sent:** | Wednesday, January 19, 2011 2:55 PM |
| **To:** | Bryan Hebert |
| **Subject:** | voter ID |

```
-----Original Message-----
From: Bryan Hebert
Sent: Thursday, January 13, 2011 3:05 PM
To: Noe Barrios
Subject: voter ID
```

Noe -

Blaine mentioned that your boss had some concerns about whether Fraser's voter ID bill
complied with the Voting Rights Act. As you know, all changes to Texas election law have
to be pre-cleared by the DOJ or the DC Circuit Court. The good news is that the US
Supreme Court has already upheld a similar photo ID law in Indiana. Below are some notes
I prepared last session that incorporate parts of the Court's findings in that case. Let
me know if you want to chat more.

ENSURING COMPLIANCE WITH SUPREME COURT

I.     LEGITIMATE STATE INTERESTS
       - Deterring and detecting fraud
       - Improving and modernizing election procedures
       - Protecting against fraud enabled by inaccurate registration rolls
       - Counting only eligible voters' votes
       - Protecting public confidence in elections

II.    MEASURES REQUIRED TO OFFSET BURDENS ON VOTERS
       - Access to free photo ID cards
       - Availability of provisional ballots and absentee ballots
       - Ensure that obtaining ID is no more inconvenient or burdensome than usual act of
voting

III.   MEASURES RECOMMENDED TO OFFSET BURDENS ON VOTERS
       - Phase-in over two election cycles (as prescribed by Carter-Baker Report)
       - Exception for certain elderly voters (to decrease size of class of voters adversely
impacted by law)

Bryan Hebert
Deputy General Counsel
Office of the Lieutenant Governor
512-463-0001

HIGHLY CONFIDENTIAL

TX_00034442

PLTF
9/2/2014
2:13-cv-000193   552.111

**Frank Battle**

| | |
|---|---|
| **From:** | Bryan Hebert |
| **Sent:** | Thursday, January 27, 2011 11:33 AM |
| **To:** | Jonathan Stinson; Janice McCoy; Amanda Montagne; Jennifer Fagan; Ryan LaRue_SC; Wroe Jackson |
| **Subject:** | SB14 bill summary |
| **Attachments:** | VOTE - SB14 - engrossed- summary.docx |

Attached is a summary of SB14 as passed by the senate.


**Bryan Hebert**
Deputy General Counsel
Office of the Lieutenant Governor
512-463-0001

HIGHLY CONFIDENTIAL

TX_00034469