*552.111 - entire document*

# VOTER ID BILL SUMMARY
## SB14 (82R engrossed)

## SUMMARY

SB14 would give Texas arguably the strictest photo ID law in the country. A review of the US Supreme Court's approval of Indiana's photo ID law and the DOJ's approval of Georgia's photo ID law indicate that SB14 is likely to be upheld under both constitutional review and Section 5 Voting Rights Act review.

SB14 requires a voter to provide one of six acceptable photo IDs on election day (TX DL, DPS ID card, military ID, passport, citizenship certificate, or CHL), except that there is an opportunity to opt out of the photo ID requirement for people who are over age 70 when the law takes effect or who provide a signature affirming that they are disabled, indigent, or have a religious objection to being photographed and therefore cannot get a photo ID.

If a person does not have acceptable ID on election day, they may cast a provisional ballot and return to the voter registrar within six days with acceptable ID and have their ballot counted.

The criminal penalties for attempting to vote fraudulently are increased.

There are several provisions requiring training of poll workers and notice and education for the public in multiple languages and formats. The education and training efforts begin now, but the new ID requirements will not apply until the 2012 primary election. The Secretary of State has federal HAVA funds available to pay for the education and training efforts.

## SUBSTANTIVE PROVISIONS

- A voter must present an acceptable photo ID on election day:
  - (1) TX DL (current or expired no more than 60 days)
  - (2) ID card issued by DPS (current or expired no more than 60 days) - *provided free if requested by a voter*
  - (3) military ID (current or expired no more than 60 days)
  - (4) US passport (current or expired no more than 60 days)
  - (5) US citizenship certificate
  - (6) CHL (current or expired no more than 60 days)

- *Exception #1*: a voter who is 70 or older on 01/01/12 need only present a voter registration card on election day
- *Exception #2*: a voter who is disabled and has provided a physician certification of the disability to the registrar and received a registration card marked "Photo ID not required" need only present the registration card on election day
- *Exception #3*: indigent people and people with religious objection to being photographed may cast a provisional ballot on election day and return to the registrar within 6 days to sign an affidavit confirming their exempt status

HIGHLY CONFIDENTIAL

- The name on the ID must be "substantially similar" to the name on the voter list. If a person does not have acceptable ID on election day, they may cast a provisional ballot and return to the voter registrar within six days with acceptable ID and have their ballot counted.

- All election workers must be trained in the new ID requirements. The SOS and counties must provide education and notice in multiple languages to voters, including signs at polling places, written notice included with registration cards, written notice to voters attempting to use unacceptable ID, educational materials on the SOS website, and a statewide education campaign organized by the SOS.

- The criminal penalty for voting fraudulently is increased from a third degree felony to a second degree felony, and the penalty for attempting to fraudulently vote is increased from a Class A misdemeanor to a state jail felony.

HIGHLY CONFIDENTIAL

PL 1135
9/2/2014
2:13-cv-000193



**TALKING POINTS FOR DHD CALL TO MEMBERS
VOTER ID TIMELINE & PROCEDURES**

DRAFT

Today Governor Perry designated voter i.d. legislation as an emergency within the Constitutional Order of Business.

It is my intent to name Senator Duncan as chair of the Committee of the Whole and to work with Senator Duncan so the Committee can take up SB 14 starting on Monday.

Senator Duncan did a great job presiding last time, and I think he has earned the members' trust on this issue.  I have asked him and Senator Fraser to move the bill as expeditiously as possible.

I intend for the Senate to meet as long as it takes next week to get this done.  We have a lot of other very important work ahead of us, and I think it is in the Senate's best interests to complete our work on voter i.d. so we can concentrate on the budget, eminent domain, border security, and other pressing issues.

Senator Duncan will be in touch with you about specific procedures for the Committee.

I'm calling because I wanted you to hear it first from me.

PL1136
9/2/2014
2:13-cv-000193

**From:** Bryan Hebert
**Sent:** Monday, January 24, 2011 10:04 AM
**To:** Jason Baxter; Amanda Montagne; Ryan LaRue_SC
**Subject:** RE: Voter ID Talking Points & Analysis

Some of that is fine, but avoid talking about illegals and registration. We are not doing this to crack down on illegals, but to generally strengthen the security and integrity of the voting process. This is a bill about voting, not registering (though some mention of registration fraud is useful to show that fraud exists generally in the system).

**Bryan Hebert**
Deputy General Counsel
Office of the Lieutenant Governor
512-463-0001

**From:** Jason Baxter
**Sent:** Monday, January 24, 2011 10:00 AM
**To:** Amanda Montagne; Ryan LaRue_SC
**Cc:** Bryan Hebert
**Subject:** FW: Voter ID Talking Points & Analysis

FYI

**From:** Brent Connett [mailto:brent@txcc.org]
**Sent:** Monday, January 24, 2011 9:57 AM
**To:** brent@txcc.org
**Cc:** tom@txcc.org
**Subject:** Voter ID Talking Points & Analysis

Senators,

In advance of your Committee of the Whole Senate meeting today, please see the attached Talking Points & Analysis document on election integrity.  The piece recommends:

> The Legislature must secure the integrity of elections by verifying the citizenship of those registering to vote, requiring a photo ID to vote, removing non-qualified voters from voter registration lists, and improving absentee ballot security.

In addition to providing recommendations and talking points, this paper provides background on successful voter identification laws in Georgia and Indiana.

Sincerely,

Brent Connett
Texas Conservative Coalition
512-474-1798 (office)
512-799-8360 (cell)
txcc.org
facebook.com/txconservativecoalition

TX_00081510

HIGHLY CONFIDENTIAL

PL1137
9/2/2014
2:13-cv-000193

| | |
|---|---|
| **From:** | Bryan Hebert |
| **Sent:** | Wednesday, March 04, 2009 1:32 PM |
| **To:** | Janice McCoy |
| **Subject:** | ID docs |
| **Attachments:** | VOTE - REASONS TO SUPPORT SB362.doc; VOTE - TALKING POINTS.doc; VOTE-PROVISIONAL BALLOT PROCESS.doc; VOTE - state law comparison.doc; VOTE - Pre-clearance by DOJ.doc; VOTE - GETTING BC OR ID.doc |

for your use, as needed

**Bryan Hebert**
Deputy General Counsel
Office of the Lieutenant Governor
*The Capitol*
*P.O. Box 12068*
*Austin, TX 78711-2068*
*ph: (512) 463-0001*
*fax: (512) 936-8144*

1

HIGHLY CONFIDENTIAL

TX_00087007

PL 1138
9/2/2014
2:13-cv-000193

## REASONS TO SUPPORT SB362 AS FILED

(1)   This bill improves security in election process but is not as restrictive as Indiana and Georgia. There is less chance of disenfranchising elderly, poor, or minority voters.

(2)   This is a compromise bill that is basically the same bill that passed the House and the Senate State Affairs Committee last session.

(3)   Senators Fraser, Williams, and Duncan support this version of the bill, and are explaining it to members of Senate and House.

(4)   Potentially gets support from conservative House Democrats (Ritter, Hopson, and Homer) and undecided House Republicans (Merritt and Jones).

(5)   Increases chances of federal pre-clearance (because many forms of ID are acceptable, and provisional ballot procedure is less burdensome).

TX_00087008

PL1139
9/2/2014
2:13-cv-000193

## TALKING POINTS

I.   **THE THREAT OF FRAUD IS REAL**
   - Deceased voters, felons, duplicate registrations, and non-residents remain on
      voter rolls (*2007 State Auditor report found over 49,000 of these possible*
        *ineligible voters*)
   - Fraudulent registration applications are rampant (*over 6,000 applications by*
      *non-citizens rejected in Harris County from 2004-2007, and 2008 ACORN*
      *registration scandal made national news*)
   - Texas Election Administration Management (TEAM) system is improving, but
      continues to have accuracy problems
   - Current election system is inadequate to catch in-person voting fraud

II.  **THIS BILL PROTECTS TEXAS VOTERS**
   - Deters and detects fraud
   - Improves and modernizes election procedures
   - Protects against fraud enabled by inaccurate registration rolls
   - Counts only eligible voters' votes
   - Protects public confidence in elections

   *(These points are taken directly from Supreme Court opinion describing*
      *Indiana's "legitimate state interests")*

III. **THIS BILL REPRESENTS COMPROMISE AND AN ATTEMPT TO**
    **ENSURE THAT EVERY ELIGIBLE VOTER CAN VOTE AND THAT ONLY**
    **LEGITIMATE VOTES ARE COUNTED**

   -   Allows both photo and non-photo forms of ID
   -   Not as restrictive as Indiana and Georgia laws (which were both upheld by the
      federal courts)
   -   Requires months of statewide voter education efforts before law takes effect

**TX_00087009**

HIGHLY CONFIDENTIAL

PL1140
9/2/2014
2:13-cv-000193

## TEXAS PROVISIONAL BALLOT PROCESS

(1) If a voter is unable to produce ID or is not listed on precinct list, the voter may cast a provisional ballot.

(2) Provisional ballot is a paper ballot that is placed in a sealed envelope, which the voter signs and on which the voter lists any information which may help determine the voter's eligibility (address, social security number, driver's license number, etc)

(3) All provisional ballots are placed in a secure ballot box and transferred to the county ballot board when polls close.

(4) If the election is decided by fewer votes than the number of provisional ballots cast, the provisional ballots are counted.

(5) The county ballot board and voter registrar examine each provisional ballot and, using county records and other public information, attempt to verify whether the voter is eligible. If deemed eligible, the vote is counted.

(6) The county ballot board and voter registrar must complete verification within 7 days of the election. The county must notify a voter within 10 days of canvassing the votes whether the voter's provisional ballot was accepted.

HIGHLY CONFIDENTIAL

PL1141
9/2/2014
2:13-cv-000193

| | INDIANA LAW | GEORGIA LAW | TEXAS - SB 362 | TEXAS - CURRENT LAW |
|---|---|---|---|---|
| **REQUIRED I.D.** | **One photo ID:**<br>• state or federal ID that includes name, photo, and expiration date (specific forms of ID not provided) | **One photo ID:**<br>• driver's license (even if expired)<br>• state or federal photo ID<br>• local, state, or federal govt employee photo ID<br>• U.S. passport<br>• military photo ID<br>• tribal photo ID | **One photo ID:**<br>• DPS-issued ID that has not expired in last two years<br>• military photo ID<br>• citizenship certificate with photo<br>• U.S. passport<br>• concealed handgun ID<br>• state or federal photo ID<br><br>- OR -<br><br>**Two non-photo ID:**<br>Govt-issued mail or document; Birth certificate; Citizenship papers; Marriage license or divorce decree; Adoption, name change, or sex change court records; Public benefits card; Temporary driving permit; Pilot's license; Library card, Hunting or fishing license | voter registration card<br><br>- OR -<br><br>sign affidavit at polls<br>**AND**<br>• DPS-issued ID (even if expired)<br>• any photo ID with name<br>• birth certificate<br>• citizenship papers<br>• U.S. passport<br>• govt-issued mail or document<br>• other ID prescribed by Sec of State |
| **EXCEPTIONS TO PHOTO REQUIREMENT** | • indigent<br>• religious objection<br>• voters in state-licensed care facility | none | non-photo documents are acceptable | (photo ID not required) |
| **PROVISIONAL BALLOT** | If no ID, voter may cast provisional ballot and must return within 10 days with ID for ballot to be counted. | If no ID, voter may cast provisional ballot and must return within 2 days with ID for ballot to be counted. | If no ID, voter may cast provisional ballot, and registrar must confirm eligibility within 7 days | If no ID, voter may cast provisional ballot, and registrar must confirm eligibility within 7 days |

HIGHLY CONFIDENTIAL

TX_00087011

| **REQUIRED VOTER EDUCATION** | secretary of state conducts statewide education campaign for voters and poll workers | none | secretary of state conducts statewide education campaign for voters and poll workers | N/A |
| --- | --- | --- | --- | --- |

HIGHLY CONFIDENTIAL

TX_00087012

PL1142
9/2/2014
2:13-cv-000193

# FEDERAL PRECLEARANCE OF TEXAS VOTER ID LAW REQUIRED

## WHAT IS PRECLEARANCE?

Section 5 of the Voting Rights Act states that a covered jurisdiction (such as Texas) may not implement a change in its election laws or practices unless the jurisdiction demonstrates the change will be free of any racially discriminatory purpose or effect. The burden is on the state to prove that the change in law will not have a discriminatory impact. Redistricting plans are the most common source of preclearance opinions, but any change in voting is subject to preclearance.

## WHO PROVIDES PRECLEARANCE?

A covered jurisdiction must submit a proposed election law to either the United States Department of Justice - Civil Rights Division for formal approval or to the United States District Court for the District of Columbia for a declaratory judgment that the proposed law is acceptable. Both venues use the same standard of review.

## WHAT IS THE PRECLEARANCE PROCESS?

After passage by the Texas legislature, and before the effective date of the Act, the Texas Secretary of State will submit the appropriate paperwork for preclearance to the DOJ or the Attorney General will file a preclearance action in the DC District Court. The DOJ or Court will conduct a statistical and legal analysis to determine if the proposed law has any racially discriminatory purpose or effect.

## WHAT HAPPENED WITH GEORGIA?

In 2005, Georgia passed a voter ID law that allows only photo ID and requires voter to return within 2 days to confirm identity for provisional ballot. Career attorneys and analysts at DOJ wrote a 50-page memo explaining why the Georgia law was retrogressive and should be denied preclearance. Bush political appointees at the DOJ overruled that determination and granted preclearance. (The 11th Circuit Court later upheld the plan under the standards enumerated by the Supreme Court.)

## THE BOTTOM LINE

Even if the Texas legislature passes a voter ID bill that is signed by the governor, it will not take effect until the attorneys at the DOJ or the judges at the DC District Court determine that minority voters will not be adversely affected by the ID requirements.

The Bush political appointees at the DOJ have been replaced by Obama political appointees, and the career attorneys and analysts that wrote the 2005 memo remain.

If the DOJ or DC Circuit Court grants preclearance, the law is still likely to be challenged in federal court under the more relaxed guidelines established in the Indiana case.

TX_00087013

HIGHLY CONFIDENTIAL

## PROCESS FOR GETTING COPY OF TEXAS BIRTH CERTIFICATE

(1) In Austin (Office of Vital Statistics):
- Bring photo ID, OR two documents with your name, one of which has your
signature, OR a copy of immediate family member's photo ID
- Pay $22
- Birth certificate usually ready in less than 2 hours

(2) Online order:
- Enter driver license number
- Pay $22 by credit card
- Birth certificate delivered in 10-15 days

(3) By expedited mail:
- Submit application with ID documents by overnight mail or fax
- Pay $43 by credit card
- Birth certificate delivered in 10-15 days

(4) By regular mail:
- Submit application with ID documents by regular U.S. mail
- Pay $38 by credit card, check, or money order
- Birth certificate delivered in 3-4 weeks if credit card payment, or ready in 6-8
weeks if check or money order payment

*[Louisiana, New Mexico, and New York have similar systems. Delivery by mail from
these states takes 4-8 weeks and costs $10-30]*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## PROCESS FOR GETTING DPS-ISSUED ID CARD

(1) Submit application with government-issued photo ID or birth certificate and two
supporting documents. Non-citizens must provide proof of lawful status in U.S.
(2) Pay $15 for ID card, or $24 for driver license if 18-85 years old (both IDs require
renewal every 6 years)
(3) ID card is processed in Austin (no matter where in Texas it is requested)
(4) ID card is mailed from Austin 2-6 weeks after request.

*[DPS offices in Harris, Dallas, Tarrant, El Paso, Maverick, and Liberty counties confirm
that all driver's license and ID requests in Texas are sent to Austin for processing and
take 2-6 weeks.]*

**TX_00087014**

HIGHLY CONFIDENTIAL

PL 1144
9/2/2014
2:13-cv-000193

| | |
|---|---|
| **From:** | Tommy Williams [tommy_williams@usa.net] |
| **Sent:** | Tuesday, October 20, 2009 8:53 PM |
| **To:** | Janet Stieben; Jason Baxter |
| **Cc:** | tommy_williams@usa.net |
| **Subject:** | 81st post session remarks |
| **Attachments:** | TW_new&improved_81st_NL-Taking_Points[1].doc |

Please keep this where you can access it in case I need you to send it to me.

1

HIGHLY CONFIDENTIAL

TX_00202988

Exhibit _____ 18
Milip
Date 8/26/14
Melody Campbell, CSR

SYMPOSIUM

# The Empirical Effects of Voter-ID Laws: Present or Absent?

Jason D. Mycoff, *University of Delaware*
Michael W. Wagner, *University of Nebraska*
David C. Wilson, *University of Delaware*

The effect of voter-identification (voter-ID) laws on turnout is a hot-button issue in contemporary American politics. In April of 2008, the U.S. Supreme Court affirmed Indiana's voter-ID law, the nation's most rigorous, which requires voters to arrive at the polls with a state-issued photo ID containing an expiration date (*Crawford v. Marion County* 2008). In a famous incident highlighting how Hoosiers were dealing with their state's voter-ID law, representative Julia Carson (D-IN) was initially blocked from voting during Indiana's 2006 primary election for failing to comply with Indiana's voter-identification standard. Carson identified herself with her congressional ID card; since that card did not include an expiration date and therefore did not meet Indiana's voter-identification law, she was turned away at the polls before later being allowed to vote (Goldstein 2006). The rising wave of public, political, and legal debate crested two years later in the wake of the Supreme Court ruling and during the Indiana primaries, with reports of a dozen nuns being denied ballots at the polls due to their lack of appropriate identification (Urbina 2008).

While political science research regarding the impact of voter-ID on turnout is scarce, a growing community of scholars is examining whether voter-ID requirements affect behavior. Though reservations regarding the fairness of these laws persist, we address the question of whether strict voter-identification requirements have (already) systematically affected voter turnout at the aggregate or individual levels. The early evidence paints an incomplete picture, consisting of some qualified claims that states with stricter voter-identification laws negatively, albeit marginally, affect turnout (Alvarez, Bailey, and Katz 2007; Eagleton Institute of Politics and Moritz College of Law 2006; Vercellotti and Anderson 2006), while other reports find that these effects are too small to be of practical concern (Ansolabehere 2007; Muhlhausen and Sikich 2007). Variations in the populations under investigation, the time periods examined, the statistical methods employed, and the specifications of the various models perhaps explain these inconsistencies. But, research is also limited by theoretical shortcomings about why voter-ID laws should impact turnout.

In this article, we argue that voter-ID laws should have little to no effect on aggregate or individual-level turnout, particularly after considering political motivations for voting. This is not to claim that voter-ID laws will not have an impact on future voting nor are we arguing no one is impacted by voter-ID laws, rather we suggest that these laws have *not* had a significant impact on voting thus far. Moreover, given the get-out-the-vote initiatives and grassroots programs designed to increase civic engagement and inform voters, we expect that members of the electorate who are interested in voting are more likely to do so regardless of the state laws requiring various forms of identification.

While there are many examples of anecdotal evidence in the debate over disenfranchisement and voter-identification laws, like the one with which we open this article,[1] we chose to put the question of the impact of voter-ID laws to an empirical test.[2] Using multiple data sources, we explored whether strict voter-identification laws affect voter turnout at both the aggregate (state) and individual level. We find that voter-identification laws do not affect voter turnout, and as a result we fail to reject the null hypothesis of no effects. In the sections below we review our reasoning, data, and findings, and provide discussion and conclusions regarding the impact of voter-ID laws on turnout.

## VOTER IDENTIFICATION AND TURNOUT

We argue that socio-demographic and political motivational factors are far more determinative of voting than the imposition of identification laws.[3] On the one hand, education remains a crucial factor that drives turnout (Wolfinger and Rosenstone 1980)[4] and perhaps more importantly, political interest (Brady, Verba, and Schlozman 1995) is a strong and consistent force behind the decision to vote. Indeed, this supports earlier claims from *The American Voter*, where Campbell et al. wrote that "the stronger the individual's psychological involvement [in political matters] the more likely he is to participate in politics by voting" (1960, 102). On the other hand, the personal cost of voting is a potentially important part of the decision calculus as well (Downs 1957). Recent voter-ID laws potentially increase this cost in at least two ways. First, voters who fail to supply the necessary identification may be turned away without voting. Second, there are sometimes monetary and preparation costs associated with voter-ID laws that voters must incur. These costs may be relatively low or high depending on a voter's level of sophistication, work flexibility, or income.

Yet, voters who are interested in politics should be able to overcome the potential institutional barrier of strict voter-identification requirements while citizens who are

uninterested in politics should be less likely to vote regardless of the nature of a state's voter-identification law. Moreover, many individuals who plan to participate in elections have already overcome any potential costs by having obtained government-issued identification, as well as other less stringent forms of ID. Thus, we hypothesize that voters with higher levels of interest in politics are more likely to vote, and are less affected by voter-identification laws.

From a theoretical standpoint, the voters most likely to be negatively affected by voter-identification laws are those who are interested in voting, but do not know and or have the proper identification. This population may include groups such as first-time voters, those not wanting to interact with government, or those whose IDs have recently expired. For now, we are less concerned about the average member of the electorate not having a single form of government-issued identification. The data on voting-age citizens by demographic characteristics with or without photo identification is quite limited; however, recent data collected on six states (see Barreto, Nuño, and Sanchez 2009 for an estimate of Indiana) show that while 15% of the voting-age population lacks the necessary identification to vote, 20% of minorities are lacking. However, not all the states examined (e.g., Wisconsin, California, Washington, or New Mexico) require government-issued photo ID, and these data cannot sufficiently say whether such an estimate has any relation to voting behavior, although there is the implication.

States requiring a photo ID to vote, including Indiana, have made special efforts to publicize the need for proper ID and encourage citizens to secure identification. For example, the State of Indiana spent $1.25 million on an outreach program to inform voters of the change in identification requirements, and its secretary of state's office estimates that it increased its outreach efforts by 50% during the 2008 primary election season (Indiana Secretary of State 2008). In addition to outreach efforts, Indiana's identification law was written to make acquiring a state-issued identification relatively painless. First, Public Law 109-2005 requires that the Indiana Bureau of Motor Vehicles (BMV) issue any voting eligible citizen a free voter-ID card, which is valid for six years, upon request. Aside from monetary costs, time costs—in Indiana at least—also appear to be relatively low. The BMV estimates that the average visit time to one of the 146 statewide BMV offices is eight minutes, with the longest average visit time in the state at 14 minutes (Indiana BMV 2008a). Between January 1, 2007, and May 6, 2008, the BMV issued 257,100 free identification cards (Indiana BMV 2008b).[5] Therefore, the biggest impediment to acquiring identification is a trip to the BMV; a trip that is likely to be a bit further than the distance travelled to a polling place, but made only once every six years.[6]

The lead Supreme Court opinion in *Crawford* concurred with Indiana's position that requiring photo identification was minimally burdensome (*Crawford* v. *Marion County* 2008). In two dissenting opinions, Justices Souter and Breyer were less sanguine about the ease of availability of appropriate ID for the poor, the disabled, and the elderly. So while average visit times to the Indiana BMV are quite low, certain voters (first time voters, minorities, seniors, etc.) may face more individ-

ual scrutiny than others and face longer visit times. This may account for the disparity between the systematic state data on average visit time and anecdotal evidence of individual voters who faced difficulty in securing a free voter-identification card. Presently, there is extremely limited data regarding this claim.

In fact, efforts at making registration and voting easier have increased registration and turnout *only among those groups most likely to register and vote before the new measures were implemented* (Berinsky 2005) while occasionally providing a modest increase in the number of voters casting a ballot (Gronke, Galanes-Rosenbaum, and Miller 2007). According to Berinsky, "Individuals who utilize easy voting procedures tend to be more politically engaged and interested than those who do not take advantage of the opportunity" (2005, 482). Thus, we argue that voters who are interested enough to register and turn out to vote would also understand and secure the necessary form of identification needed to cast a ballot. We expect the individual motivation to participate in politics to not only minimize the empirical effects of voter-ID laws, but also to trump them when considered together.

### DATA AND METHODS

We tested our hypothesis using both aggregate and individual-level data. We collected aggregate data across four federal elections from 2000 to 2006. At the individual level, we examined data from the 2006 Cooperative Congressional Election Study (CCES).[7] Our main theoretical variables of interest are voter turnout and strictness of voter-identification laws. Aggregate turnout is the percentage of the voting-age population that actually voted in the 2000 through 2006 elections, and individual turnout is a self-reported measure (1 = voted, 0 = did not vote) captured during the 2006 CCES interviews. Strictness of voter-identification laws is measured using a six-point Guttman scale called ID Requirement, and we also consider a dummy variable indicating whether a state requires a photo ID or not (1 = photo ID required, 0 = not).[8]

Our analysis proceeds in two stages. First, we examined the bivariate relationships among turnout and state-ID law using analysis of variance (ANOVA) techniques. Second, we provided hierarchical regression model results for the turnout—state-ID-law relationship, controlling for other factors. In our aggregate data multivariate analysis, we examined a baseline model using only demographics and time (Model 1), then added the voter-identification law variables to the model (Model 2), before finally adding political variables to the model (Model 3). This allows us to reveal the effects of each variable of interest after controlling for other factors; thus, variables entered later are only allowed to account for variance unexplained by factors entered earlier. We used this same approach for our individual-level analysis using the 2006 CCES.

### VOTER-ID LAW AND TURNOUT

#### Bivariate Results

Table 1 reports the distribution of states' identification requirements along with turnout at both the aggregate and individual level. The distribution of voting-ID requirements reveals

*Table 1*
## Mean Turnout by Identification Requirement, 2000–2006

| | IDENTIFICATION REQUIREMENT | 2000 | | 2002 | | 2004 | | 2006 | |
|---|---|---|---|---|---|---|---|---|---|
| | | M | N | M | N | M | N | M | N |
| Aggregate Turnout | State Name | 68.9% | 10 | 48.6% | 11 | 70.5% | 10 | 45.5% | 10 |
| | Sign Name | 66.1% | 19 | 47.2% | 19 | 70.3% | 16 | 42.8% | 13 |
| | Match Signature | 66.1% | 8 | 40.6% | 8 | 71.7% | 7 | 40.0% | 6 |
| | ID with Name | 66.0% | 10 | 46.8% | 10 | 70.9% | 15 | 44.2% | 17 |
| | Photo ID | 57.7% | 1 | 44.2% | 1 | 70.1% | 2 | 37.7% | 3 |
| | Photo ID + | — | 0 | — | 0 | — | 0 | 36.6% | 1 |
| | Total* | 66.5% | 48 | 46.3% | 49 | 70.7% | 50 | 43.1% | 50 |
| Individual Turnout (CCES) | State Name | — | — | — | — | — | — | 63% | 3905 |
| | Sign Name | — | — | — | — | — | — | 66% | 9521 |
| | Match Signature | — | — | — | — | — | — | 71% | 5623 |
| | ID with Name | — | — | — | — | — | — | 67% | 12780 |
| | Photo ID | — | — | — | — | — | — | 63% | 3598 |
| | Photo ID + | — | — | — | — | — | — | 57% | 975 |
| | Total | — | — | — | — | — | — | 66% | 36402 |

*Note:* ANOVA F-tests comparing aggregate mean turnout across identification requirement categories reveal no significant mean differences within years; however turnout in 2000 and 2004 were significantly higher than turnout in 2002 and 2006 (see ANOVA results in the text). *Source:* Aggregate data gathered by the authors and 2006 Cooperative Congressional Election Survey (CCES).

* North Dakota and Wisconsin are omitted in 2000 and Wisconsin is omitted in 2002 because the turnout data was not available for the states. In each of the three cases, however, state law required the standard of stating one's name to cast a regular ballot.

considerable variation across the states. In the 2000, 2002, and 2004 elections the majority of states required less demanding standards of stating or signing one's name in order to cast a regular ballot; yet, by 2006, we found the slight majority of states at the top end of the scale requiring items such as a photo identification and a signature.

A two-way random effects analysis of variance (ANOVA) comparing mean turnout across election year, voter identification laws, and the interaction between the two reveals only the year variable reaching statistical significance ($F[3,5.545] = 140.1$, $p < 0.01$). Post-hoc Bonferroni adjusted $t$-tests indicate lower turnout in the midterm election years (2002 and 2006), and higher turnout in presidential election years (2000 and 2004). Both the voter-identification requirement variable ($F[5,29] = 2.35$, *n.s.*), and the interaction of year and voter-identification requirement ($F[12,161] = 0.46$, *n.s.*) were non-significant predictors of state-level turnout. Using the same random effects model, we also found no statistically significant relationship when treating our Guttman scale measure of identification stringency as an ordinal covariate ($\beta = -0.81$, $SE = 0.46$, *n.s.*). Thus, controlling for the election year, state voter-identification laws produced no statistically significant effects on aggregate state-level turnout. This simple analysis suggests that from 2000 to 2006, state-level aggregate turnout and voter-ID requirements *were* unrelated.

Examining CCES data in Table 1, self-reported turnout appears to be lowest at the most stringent ID requirement; however, we examined the pattern across all stringency levels.

We estimated the relationship between voter-ID laws and turnout using multi-level logistic regression (1 = voted, 0 = did not vote) with state as the cluster variable (i.e., the random factor), and voter-ID law as the predictor. When the voter-ID law variable is treated as ordinal ($\beta = 0.01$, $SE = 0.04$, *n.s.*) the results show a non-significant positive relationship, and when it is treated as photo ID required or not ($\beta = -0.33$, $SE = 0.18$, *n.s.*) the result is a negative coefficient, but it is not statistically significant. In both cases, states with strict voter-ID requirements did not significantly reduce the probability of individual-level turnout.

**Multivariate Results**

Having shown state voting-requirement laws have no significant effect on state-level turnout, we turn to more rigorous analyses to illustrate the factors that should matter. To save space in the symposium, we do not report the large table containing the results of a random effects general linear model with maximum likelihood estimation clustering on state explaining turnout in four elections, 2000 through 2006.[9] Our analysis begins by accounting for demographic variables and time. These variables have been shown to be consistent predictors of turnout in the voting behavior literature. *Population* measures the size of each state's voting age population as measured by the Census.[10] *Percent black* and *percent Hispanic* measure the percentage of each state's citizens who are black and Hispanic, respectively. We also control for states in the *South* and interact *South* and *percent Black* to control for differences

in southern states percentages of black voters. *Percent college* is a variable indicating the percentage of college graduates in each state and *percent urban* indicates the percentage of citizens living in urban areas. This basic model does a good job of explaining aggregate turnout with statewide turnout as the dependent variable. The results of the base model are consistent with the expectations established in the turnout literature with the variables accounting for race, education, and the South reaching statistical significance. The dummy variables for election year indicate that as expected, turnout was statistically higher in presidential election years (2000 and 2004). In our second and third models we added two different measures of identification requirements, the Guttman scale variable *ID Requirement* and a dummy variable *Photo ID* respectively.[11] Neither *ID Requirement* nor *Photo ID* reached statistical significance.

In the final two iterations of the aggregate model we included legal and political control variables. First we controlled for three legal factors: voter-ID requirements (*ID requirement*), the number of days between each state's voter-registration deadline and Election Day (*days*), and a dichotomous variable indicating whether a state's election laws changed with respect to voter ID since the previous election (*requirement change*).[12] If voter-ID laws depress turnout, they would be most likely to do so during the first election following a change in the requirements. We controlled for election-specific characteristics that could affect turnout. *Senate race* and *gubernatorial race* are dichotomous variables indicating whether there was a Senate or gubernatorial race in a state during an election year. *Spending* measures the total amount of spending in 2004 dollars by federal candidates in each year as reported by candidates to the Federal Election Commission.[13] We also controlled for *social issues* through a variable that indicates the number of social issues (abortion, same sex marriage, or stem cell research) that were on the ballot in a state during each election.[14] Among these variables only the number of social issues on the ballot (in both models) and federal campaign spending (in the photo-ID model) were statistically significant. The aggregate turnout results reveal no significant relationship between aggregate turnout and voter-ID laws, but many statistically significant relationships among political and demographic factors.

At the individual level there is a similar story. Our self-reported turnout analyses contain socio-demographics (e.g., sex, race, age, region, and socioeconomic status), political affiliation (i.e., party identification), and a 3-point ordinal measure of political interest (1 = not interested to 3 = very much interested). By controlling for political interest we tested an alternative hypothesis to the theoretical effects of voter-ID laws proffered by Alvarez, Bailey, and Katz (2007) and Vercellotti and Anderson (2006). Even if voter-ID laws do have pronounced empirical effects, once political interest is taken into account, the laws should not matter at all because once the motivation to participate is held constant there is little theoretical reason to believe voter-ID laws would dampen one's desire to vote. Similar to our aggregate analysis, we estimated five models; the first examining demographic factors, the next two examining the effects of voter-ID law, and the fourth and

fifth examining the effects of voter-ID law and a photo-ID requirement controlling for political interest.

Table 2 reports the results of mixed-model logistic regression analyses using states as a random factor variable, and shows that voter-identification laws—stringency and photo-ID required or not—have no statistically significant effects on self-reported turnout. However, political interest has both strong and significant effects. All five models essentially show statistically significant effects of basic demographic variables, but they also show how factors such as race and age can play an important role in voting behavior. Neither voter-ID-law stringency (Model 2) nor photo-ID requirement (Model 3) produced statistically significant effects at the threshold 95% confidence level, nor did they contribute to the explanatory power of the regression model (as indicated by the change in −2LL model fit values), especially when political-interest levels are considered. Of the 10 variables in each of the last two models, political interest has the strongest and most stable effects suggesting that political motivations trump ID requirements.

DISCUSSION AND CONCLUSION

We are highly sensitive to those who are improperly and unjustifiably denied their right to vote; however, there is limited available data on the incidence of actual exclusion from voting due to the lack of proper identification. This is not to say that actually requiring a more strict form of identification is not on its face discriminatory; it is, and the laws deserve to be scrutinized. But, our question is whether these laws have significantly reduced turnout. Based on our analysis, they have not.

In the CCES, respondents answered questions about whether they were asked to show identification and if they were prevented from voting because of a problem with identification. Ansolabehere (2007) used this data to demonstrate that exclusions from voting are exceptionally rare. Twenty-two respondents out of the 36,421 person sample said voter-ID requirements prevented them from voting. Ansolabehere reports no more than 0.2% of potential voters claimed to have been excluded from voting due to ID requirements, and with no clear demographic pattern among them, there is very little empirical basis to raise the alarm over the implementation of identification requirements.[15] As Ansolabehere explains, "one would need a survey more than 10 times as large as this one to begin to gauge who was excluded and why. It is just that rare of a phenomenon" (2007, 8). Indeed, when non-voters in the Current Population Surveys (CPS) from 2000 to 2006 were asked why they did not vote, a lack of interest in politics was given as a reason twice as often as registration problems (which include a variety of issues, many of which are unrelated to having a photo ID at the polls on Election Day). Indeed, according to the CPS, even in states where photo IDs are required, 11.7% of non-voters claim that a lack of interest kept them home in 2006 while 6.3% cited general registration problems. General registration problems could include voters turned away due to a lack of identification but also includes voters who had moved without reregistering, felons, and a litany of other special cases. More telling was that one-third of 2006

Table 2
## Multi-level Model for Binary Outcomes Regression Coefficients Predicting Individual-Level Turnout

| | MODEL 1 B (SE) | MODEL 2 B (SE) | MODEL 3 B (SE) | MODEL 4 B (SE) | MODEL 5 B (SE) |
|---|---|---|---|---|---|
| Intercept | −1.4 (.08)** | −1.4 (.14)** | −1.4 (.08)** | −2.9 (.17)** | −2.8 (.11)** |
| Age (years) | .02 (.00)** | .02 (.00)** | .02 (.00)** | .02 (.00)** | .02 (.00)** |
| Sex (Male = 1) | .21 (.03)** | .21 (.03)** | .21 (.03)** | .08 (.03)* | .08 (.03)** |
| Other Race | −.72 (.04)** | −.72 (.04)** | −.72 (.04)** | −.65 (.05)** | −.65 (.05)** |
| Black | −.82 (.05)** | −.83 (.05)** | −.82 (.05)** | −.69 (.06)** | −.69 (.06)** |
| Education | .30 (.01)** | .30 (.02)** | .30 (.01)** | .25 (.01)** | .25 (.01)** |
| Household Income | .04 (.00)** | .03 (.00)** | .04 (.00)** | .02 (.00)** | .02 (.00)** |
| Democrat | .13 (.03)** | .13 (.03)** | .13 (.03)** | .15 (.04)** | .15 (.04)** |
| Republican | .10 (.03)** | .10 (.03)** | .10 (.03)** | .15 (.04)** | .15 (.04)** |
| State ID Law Scale (Stringency) | | .02 (.04) | | .02 (.05) | |
| State ID Law—Photo ID required | | | −.29 (.18) | | −.27 (.23) |
| Political Interest | | | | .76 (.03)** | .76 (.03)** |
| Initial −2LL | −17239.4 | −17230.4 | −17230.4 | −11526.7 | −11526.6 |
| Final −2LL | −17207.7 | −1/192.1 | −17190.9 | −11496.5 | −11495.9 |
| Wald $\chi^2$ | 1992.4** | 1994.2** | 1996.4** | 2315.6** | 2316.4** |

Note: Analyses are based on unweighted sample CCES data: 2006 Analytic N level 1 = 22.006.

Analytic N level 2 = 49.

* $p \leq .05$, ** $p \leq .01$.

Source: 2006 Cooperative Congressional Election Survey (CCES).

CPS respondents from Indiana said they did not vote because they were "too busy," which can arguably be interpreted to mean they were less interested in midterm voting; after all they did respond to the CPS.

At every level of analysis, and with multiple forms of data, we have consistently demonstrated that voter-identification laws appear to be a much smaller piece to the voting behavior puzzle than are factors such as the kinds of issues on a state ballot, the competitiveness of campaigns, the institutional structures of a particular election, socioeconomic factors, and individual-level motivational factors such as interest in politics. This is not to say that the rules of voting are unimportant or that there is no potential for disenfranchisement; rather our findings suggest that voter-ID laws have had no systematic effect on turnout thus far, and that some rules (voter-ID laws) do not affect turnout as much as others (same-day registration in Minnesota, a state with historically high turnout).

While voter-ID laws appear to have little to no main effects on turnout (see Alvarez, Bailey, and Katz 2007), our central argument is that other individual-level motivations such as interest in politics (Berinsky 2005), types of elections (Gronke, Galenas-Rosenbaum, and Miller 2007), and social issues (Tolbert, Grummel, and Smith 2001) would mediate any impacts related to ID rules. While strict ID requirements have the potential to burden some members of the electorate, our analyses suggest that these numbers are small. What's more, actions taken by state governments, interest groups, and political par-

ties are likely strong enough to induce those who are interested in voting, but have no more strict form of ID, to take action to ensure their voice is heard. This form of political resilience is the type we expect, and have seen from racial minorities, women, and other oppressed groups in America's history.

Until there is systematic, empirical evidence of discrimination in the *administration* or *availability* of required forms of identification, there is little reason to suspect voter-identification laws will significantly affect turnout. Thus, we fail to reject the null hypothesis that voter-ID laws do not significantly affect turnout. While all state-level voting laws should be heavily scrutinized as efforts to stop voter disenfranchisement are paramount, it is time we give some credit to the electorate and as Berinsky (2005) suggests, spend more time searching for ways to increase citizens' interest in politics. ∎

## NOTES

1. Barreto, Nuño, and Sanchez (2009) report that educated, upper-income whites in Indiana are more likely to have a valid ID, suggesting that Indiana's voter-ID law disenfranchises legal voters; however, their analysis does not attempt to explain voter turnout in Indiana and therefore does not ask respondents about interest in voting or about voting. One can however reasonably conclude that those without identification will be less likely to vote.

2. Reconciling anecdotal evidence of voter disenfranchisement with more systematic analysis is a difficult task. To do so we would need reliable,

Symposium: *Voter-ID Issues in Politics and Political Science*

large-scale exit polling data with a special emphasis on including those who were turned away at the polls.

3. Little work has been done with respect to voter-*identification* laws, but scholars have debated the significance of voter-*registration* laws on turnout for decades. Turnout varies significantly across different socio-demographic groups (Wolfinger and Rosenstone 1980; Rosenstone and Hansen 1993). Wolfinger and Rosenstone (1980) suggest that in states with restrictive registration laws those with lower levels of education vote less than those who have higher education levels. Nagler (1991) finds that restrictive voter-registration laws have no effect on turnout.

4. Brady, Verba, and Schlozman (1995) argue that education's effect on voting is "funneled through political interest" (283).

5. There is no available data with respect to whether the 257,000 (5.4% of the voting-age population in Indiana) people who secured a free photo ID were registered voters who voted in previous elections (when a photo ID was not required) but would have been prevented from voting under the new law. Without a public-opinion survey oversampling those who have acquired a free photo ID, we cannot know the impact of the secretary of state's efforts to help interested voters acquire the appropriate ID to be able to cast a ballot.

6. In addition, the voter-identification law had exceptions for senior citizens born outside of a hospital with no birth certificate issued, the indigent, those with religious objections to being photographed, and those living in state-licensed facilities that also serve as a polling place.

7. The CCES was conducted by Polimetrix in the week after the 2006 election. We used the CCES because of its large sample size ($n = 36,421$), and the inclusion of political variables that we believe will help explain turnout.

8. We coded state voter-identification laws based on our reading of state election law and in consultation with state secretaries of state. At the low end of the scale, a 1 represents the least strict standard of a voter stating his or her name to establish identity. A 2 increases in strictness to signing one's name. A 3 is coded as matching one's signature to a signature on file at the polling location. A 4 represents a requirement that a voter present a form of identification that does not include a picture. A 5 is coded as a standard that requires a photo identification. The final level, a 6 includes the strictest requirement of presenting a valid, state-issued photo identification with an expiration date—a standard met only in Indiana. We add the sixth category because the requirements in Indiana are more burdensome than other state's photo-identification requirements. For further elaboration see Mycoff, Wagner, and Wilson (2007).

9. For those interested in examining the table, containing the results of the five models described in these pages, contact the authors at mycoff@udel.edu. The analysis includes 197 observations as turnout data was not available for North Dakota in 2000 or for Wisconsin in 2000 and 2002.

10. We also estimated the model with registered voters instead of population size; the results were equivalent.

11. The *Photo ID* variable adds levels five and six on our scale together yielding all states that required a photo id.

12. We collected the number of days between the registration deadline and Election Day from state laws. The *change in election law* variable is a dichotomous indicator based on our *identification requirement* variable.

13. We collected financial data from www.fec.gov.

14. We collected ballot initiative data using information from the National Conference of State Legislatures (http://www.ncsl.org/index.htm#).

15. If, for example, photo identification was the standard nationwide, and we extrapolated from the survey data, then 0.2% of the 125 million who voted in 2004 would equate to approximately 250,000 voters nationwide, or about 5,000 voters per state.

## REFERENCES

Alvarez, R. Michael, Delia Bailey, and Jonathan N. Katz. 2007. "The Effect of Voter Identification Laws on Turnout." Paper presented at the annual meeting of the American Political Science Association, Chicago, IL.

Ansolabehere, Stephen. 2007. "Access versus Integrity in Voter Identification Requirements." Paper presented at the New York University Law School's Election Law Symposium for the Annual Survey of American Law.

Barreto, Matt, Stephen Nuño, and Gabriel Sanchez. 2009. "The Disproportionate Impact of Voter-ID Requirements on the Electorate—New Evidence from Indiana." *PS: Political Science and Politics* 42 (January): 111–16.

Berinsky, Adam J. 2005. "The Perverse Consequences of Electoral Reform in the United States." *American Politics Research* 33 (4): 471–91.

Brady, Henry E., Sidney Verba, and Kay Lehman Schlozman. 1995. "Beyond SES: A Resource Model of Political Participation." *American Political Science Review* 89: 271–94.

Campbell, Angus, Philip E. Converse, Warren E. Miller, and Donald E. Stokes. 1960. *The American Voter.* Chicago: University of Chicago Press.

*Crawford v. Marion County Board of Elections.* 2008. 553 U.S.

Downs, Anthony. 1957. *An Economic Theory of Democracy.* New York: Harper Collins.

Eagleton Institute of Politics and The Moritz College of Law. 2006. "Report to the U.S. Election Assistance Commission on Best Practices to Improve Voter Identification Requirements Pursuant to the HELP AMERICA VOTE ACT OF 2002 Public Law107-252." Rutgers University and The Ohio State University.

Goldstein, Amy. 2006. "Democrats Predict Voter ID Problems; Laws May Create Election Day Turmoil." *Washington Post,* November 3, A01.

Gronke, Paul, Eva Galanes-Rosenbaum, and Peter Miller. 2007. "Early Voting and Turnout." *PS: Political Science and Politics* 40 (October): 639–45.

Indiana Bureau of Motor Vehicles. 2008a. "Check Average Visit Times." www.in.gov/bmv/3319.htm

———. 2008b. "Voter Services." www.in.gov/bmv/3210.htm.

Indiana Secretary of State. 2008. "U.S. Supreme Court Upholds Indiana's Voter ID Law." New release, April 28. www.in.gov/sos/press/2008/042808.html.

Muhlhausen, David B., and Keri Weber Sikich. 2007. "New Analysis Shows Voter Identification Laws do not Reduce Turnout." *The Heritage Center for Data Analysis.* www.heritage.org/Research/LegalIssues/upload/cda_07-04.pdf.

Mycoff, Jason D., Michael W. Wagner, and David C. Wilson. 2007. "The Effect of Voter Identification Laws on Turnout." Paper presented at the annual meeting of the American Political Science Association, Chicago, IL.

Nagler, Jonathan. 1991. "The Effect of Registration Laws and Education on U.S. Voter Turnout." *American Political Science Review* 85: 393–405.

Rosenstone, Steven J., and J.M. Hansen. 1993. *Mobilization, Participation, and Democracy in America.* New York: MacMillian.

Tolbert, Caroline J., John A. Grummel, and Daniel A. Smith. 2001. "The Effects of Ballot Initiatives on Voter Turnout in the American States." *American Politics Research* 29: 625–48.

Urbina, Ian. 2008. "Voter ID Battle Shifts to Proof of Citizenship." *The New York Times,* May 12, A01.

Vercellotti, Timothy, and David Anderson. 2006. "Protecting the Franchise, or Restricting it? The Effects of Voter Identification Requirements on Turnout." Paper presented at the annual meeting of the American Political Science Association, Philadelphia, PA.

Wolfinger, Raymond E., and Steven J. Rosenstone. 1980. *Who Votes?* New Haven, CT: Yale University Press.

# The Effects of Photographic Indentification on Voter Turnout in Indiana: A County-Level Analysis

Jeffrey Milyo

Report 10–2007
November 2007

*A publication from:*
*Institute of Public Policy*
*University of Missouri*
*137 Middlebush Hall*
*Columbia, MO 65211*



INSTITUTE *of* PUBLIC POLICY

*Harry S. Truman School of Public Affairs*

xhibit   11
ate   8/26/14
Melody Campbell, CSR

Report 10–2007

## Abstract:

I examine the change in voter turnout across Indiana counties before and after the implementation of photo ID requirements. Overall, statewide turnout increased by about two percentage points after photo ID; further, there is no consistent evidence that counties that have higher percentages of minority, poor, elderly or less-educated population suffer any reduction in voter turnout relative to other counties. In fact, the estimated effect of photo ID on turnout is positive for counties with a greater percentage of minorities or families in poverty. The only consistent and frequently statistically significant impact of photo ID in Indiana is to increase voter turnout in counties with a greater percentage of Democrats relative to other counties. These findings run counter to some recent and prominent concerns that have been raised about voter identification reforms; however, these results are consistent with both existing theory on voter behavior and the most recent and reliable empirical evidence on the effects of voter identification requirements on turnout.



Institute of Public Policy

# The Effects of Photographic Indentification on Voter Turnout in Indiana: A County-Level Analysis

## Jeffrey Milyo

### 1. Introduction

This study evaluates the effects of photographic voter identification requirements implemented in Indiana prior to the 2006 general election. Previous studies have examined the effects of voter identification laws more generally, but none of these separately analyzes the effects of so-called "mandatory photo ID" (hereafter simply, "photo ID") on turnout in Indiana.[1] Nevertheless, the existing scholarly literature on voter identification does strongly suggests that photo ID requirements are likely to have only a negligible impact on overall voter turnout; further, previous studies indicate that photo ID is unlikely to reduce the relative participation of minorities (e.g., Alvarez et al. 2007 and Mycoff et al. 2007). Given that these lessons from social science research run counter to the conventional wisdom, at least that espoused in some quarters,[2] I first review the most recent and relevant literature on the effects of voter identification on turnout, then present the findings from my empirical analysis of turnout in Indiana.

The change in voter turnout from the 2002 to 2006 general elections provides a nearly ideal natural experiment for estimating the effects of photo ID on voter turnout across the 92 counties in Indiana. Both years were midterm election years and in neither year was there a major contested statewide race (i.e., for governor or U.S. Senate); however, 2006 was the first general election year in which Indiana's photo ID law was actually implemented. I exploit this natural experiment to identify the effects of photo ID on turnout in counties with a greater percentage of minority, poor, elderly, or less educated populations.

I examine a variety of models of voter turnout and control for a the influence of several other factors and that may influence turnout. Overall, voter turnout in Indiana increased about two percentage points from 2002 to 2006; however, in counties with greater percentages of minority or poor voters, turnout increased by even more, although this increase is not statistically significant. For countries with greater percentages of elderly or less educated voters, results are more mixed, but not consistently significant or negative. The only consistent and frequently significant effect of voter ID that I find is a positive effect on turnout in counties with a greater percentage of Democrat-leaning voters.

### 2. Voter ID and Turnout: Lessons from the Social Science Literature

The public debate over photo identification requirements for voters has been marked by oft-repeated concerns about the possible dramatic and detrimental effects of state voter identification requirements on voter turnout. The political rhetoric has become so super-heated that recent attempts to reform voter identification laws have been met with explicit accusations of racism on the part of reformers, dire warnings of a coming "disenfranchisement," and assertions that such reforms, though popular across party lines, are a "thinly veiled" attempt to prevent Democrats from voting.

In contrast, political theory suggests that the effects of voter identification laws on voter turnout are ambiguous. Such reforms increase the effort required to vote for some persons without proper identification (at least one time, anyway). Of course, some of these persons may be eligible voters and others will be ineligible voters. However, voter identification reforms may also instill greater confidence in the electoral process among eligible voters, making them more willing to participate in elections. Consequently, the actual impact of voter identification on turnout is an empirical question; and even if turnout decreases with



voter identification laws, it is by no means apparent that it is eligible voters that are being affected.

Until very recently, there were no systematic statistical studies of the effects of photo ID requirements for voting, although it is has long been understood that many other countries both require such identification and experience higher rates of turnout than in the U.S. Studies of voter turnout across countries have instead focused on voter registration, the frequency of elections, non-compulsory voting, and single-member districts (as opposed to proportional representation) as reasons that turnout in the U.S. is low relative to other developed democracies (Powell 1986 and Blaise 2006). The fact that such cross country studies do not even entertain the possibility that photo ID requirements reduce turnout is itself informative about the long-standing opinion of the political science profession regarding the relative unimportance of such laws for turnout.

In contrast, numerous studies analyze the effects of voting institutions other than voter identification on turnout. In general, these studies find at best very modest effects of post-registration laws such as time off work for voting, opening polls early or keeping polls open late, mailing sample ballots, etc. (Primo, et al. 2007). This is because voter registration is a relatively high hurdle compared to these post-registration requirements; adding or removing some marginal costs of voting beyond registration has virtually no observable effect on turnout. Applying these lessons to voter identification, it is highly unlikely that anyone sufficiently motivated to register to vote, inform themselves about the current election issues, and transport themselves to a polling place will then be deterred by the incremental requirement of presenting proper identification at the polls.

In fact, there is an even more fundamental reason to expect that the impact voter identification requirements on turnout are likely to be negligible. This is because very few eligible voters lack official identification and presumably even fewer (if any) lack the capacity to produce sufficient identification should they have a need and inclination to do so.[3] Finally, the ability to cast a provisional ballot reduces further the potential for a legitimate voter to be disenfranchised, even when that person is lacks proper identification.

On this point, Ansolabehere (2007) notes that in a recent national survey with 36,500 respondents, only 23 persons self-reported that they were not permitted to cast a regular ballot at the polls in 2006 because of identification problems. Further, it is not clear how many of these 23 persons cast a provisional ballot, although it appears that most did;[4] nor is it ascertainable from the survey whether any of these persons were actually eligible to vote, or whether they were honestly reporting problems at the polls.[5]   It is nonetheless apparent that recent claims of a coming "disenfranchisement" are nothing more than irresponsible and ignorant exaggerations (e.g., Schulz 2007).

On the other hand, the widespread popularity of voter identification requirements suggests that the general public is indeed concerned about vote dilution from ineligible votes.[6]   Lott (2006) has argued that confidence in the fairness of elections translates directly into higher voter turnout; such an effect, if it existed, might also reasonably be expected to be most pronounced for groups that tend to have less trust in the efficacy American democracy (e.g., racial and ethnic minorities, the poor and the less educated).

In fact, scholars of American politics generally agree that voter turnout is determined largely by idiosyncratic factors, such as an individual's intrinsic value of voting (i.e., does the individual feel a duty to vote) as opposed to political institutions (Matsusaka and Palda 1999).[7] For this reason, factors that influence trust and confidence in the integrity of the electoral process are generally thought to be important determinants of an individual's decision to vote (Putnam 2000).[8] For all these reasons, it is theoretically plausible that photo identification requirements actually increase voter turnout. Consequently, there exists a long-standing political science literature that does not support recent assertions that photo ID requirements have dramatic and detrimental effects on turnout.

### Recent empirical studies of state voter identification laws

In the wake of recent legislation implementing voter identification reforms in the states, a flurry of new empirical studies have appeared that more directly address the question of how state voter identification laws impact voter turnout. Unfortunately, the two studies that have received the most coverage in the



press (Eagleton 2006 and Vercellotti and Anderson 2006; hereafter, the "Rutgers studies") are fatally flawed on several counts.[9] For example, several authors note that these studies examine only a single cross-section of turnout data from 2004, so cannot properly estimate the treatment effect of state voter identification laws; nor can these studies properly estimate the effects of mandatory photo ID requirements (Alvarez, et al 2007, Mycoff, et al 2007 and Muhlhausen and Sikich 2007). Further, the Rutgers studies miscode several state identification laws (Mycoff, et al. 2007 and Muhlhausen and Sikich 2007). Finally, the findings reported in the Rutgers studies are not robust to reasonable changes in their statistical model (Alvarez, et al. 2007 and Muhlhausen and Sikich 2007).

The flawed Rutgers studies are also the only systematic studies of voter identification for which the authors conclude that ID laws have strong or consistently negative consequences for voter turnout overall, and especially for minorities. However, even ignoring the methodological problems with the Rutgers studies, the authors do an additional disservice to the public debate by mischaracterizing their own findings. For example, taken at face value, the results presented in the Rutgers studies imply that the most strict forms of voter identification laws examined in their data (voluntary photo ID) are associated with higher voter turnout among Black, Hispanic and Asian minorities than are the next most strict category of identification laws that they examine (non-photo ID). Further, the Rutgers studies also find that voluntary photo ID requirements yield no difference in overall turnout compared to non-photo ID requirements. The authors of the Rutgers studies fail to note any of these findings; this is a serious error that leads them to make conclusions that are not supported by their own evidence.

In contrast to the Rutgers studies, more recent studies stand out for both their methodological rigor and the fact that they examine voter turnout through the 2006 general elections (Alvarez, et al. 2007 and Mycoff, et al 2007). However, both of these studies are work in progress, so results must be interpreted with care.

Mycoff et al. (2007) examine the effects of voter identification laws on state level voter turnout, as well as individual-level self-reported voter turnout from the National Election Studies (a large

national survey that is conducted each election year). The authors examine turnout from 2000 to 2006 using a random-effects model; they find that voter ID laws are not significantly related to turnout in either the aggregate state data or the individual level data. The individual-level analysis in Mycoff et al. is a particularly valuable innovation, since it allows the researchers to more confidently discuss the impacts of voter identification on minorities, the poor, the elderly, etc. However, the original analysis in Mycoff et al. does not examine these differential effects, nor do the authors separately investigate the effects of photo ID apart from other voter identification requirements.

More recently, however, Mycoff et al. have analyzed the effects of mandatory photo ID on individual level turnout after controlling for state fixed effects. In this most recent analysis, Mycoff et al. cannot reject the null hypothesis that the within state effects of photo ID on overall turnout are zero; likewise, the null of zero effect cannot be rejected for turnout across race, ethnicity, income or age categories.[10] Overall, Mycoff et al. (2007) find that idiosyncratic factors, such as an individual's interest in politics, are far more important determinants of turnout than are institutional factors like voter identification.

The most recently available study of the effects of voter identification on voter turnout is by Alvarez, et al. (2007); these authors also examine the effects of voter identification on both state-level turnout and individual level turnout (from the Current Population Survey). Alvarez et al. control for state fixed effects in their analysis, but they fail to control for the presence and competitiveness of statewide races in the different states and years in their study. This unfortunate oversight should be corrected in future iterations of the study, but for now this shortcoming undermines the usefulness of the authors' findings. Ignoring this methodological problem, Alvarez et al. (2007) report that voter ID laws are associated with higher (albeit not significant) voter turnout in the analysis of state-level turnout from 2000-2006. The individual-level analysis suggests that voter identification requirements have a modest negative impact on overall turnout, no differential impacts by race or ethnicity and a slightly more negative impact on elderly or poor voters.

The results reported in Alvarez et al. (2007)



also suggest that there is no significant change in voter turnout for any population subgroup when comparing the effects of mandatory photo ID laws to voluntary photo ID, although the authors do not conduct a formal test of this hypothesis. However, it is unclear at this point how sensitive the estimates reported by Alvarez et al. will be to the inclusion of controls for the presence and competitiveness of statewide races. Consequently, the recent and on-going study by Mycoff et al. (2007) remains the most reliable and thorough systematic evaluation of the effects of photo ID laws on voter turnout to date.

In this review, I have demonstrated that both theory and the best evidence to date strongly suggest that the effects of photo ID on overall turnout are likely to be very modest (and may even be positive). Further, the best analyses of the differential impact of photo ID indicate no deleterious effects on minorities, the poor, or the elderly. In the next section, I demonstrate that these conclusions are borne out in the county-level election returns for Indiana.

### 3. Data and Methods

The subsequent empirical analysis examines the effects of photographic identification requirements on county-level turnout in Indiana. I analyze the change in voter turnout in the general midterm elections of 2002 and 2006; these elections offer a nearly ideal natural experiment for identifying the effects of photo ID on turnout. This is because there were no other major changes in Indiana election laws during this time period, so the impact of photo ID will not be confounded with other changes in state election administration. Further, because some demographic groups tend to have higher turnout in presidential election years, it is appropriate to compare turnout in the two most recent midterm elections. Finally, these two midterm elections are also relatively comparable since there were no major contested statewide races in either year.[11] Even so, I also check whether the resulting estimates are sensitive to the inclusion of additional midterm and\ or presidential election years; to preview: they are not.

I measure voter turnout as the percent of voting age population (VAP) in each election year; VAP is estimated by the U.S. Census as of July 1st of the election year.[12] This measure is commonly employed in studies of voter turnout in aggregate data, since voter registration data is not of a consistent quality across time or jurisdiction. However, voting age population estimates including non-citizens and other persons that are not eligible to vote. While this is more problematic for studies of turnout in states with larger populations of ineligible voters, it is less likely to be a concern in a state like Indiana. Further, to the extent that the number of non-citizens is growing over time, and is disproportionately of Hispanic ethnicity, this has the effect of understating overall turnout in 2006, especially in areas with higher Hispanic populations.

For this reason, I also measure voter turnout as the percentage of the estimated number of citizens of voting age (CVAP) in each year. However, reliable estimates of CVAP at the county-level are not readily available, so I generated my own estimate based upon U.S. Census counts of non-citizens in 2000. In order to estimate CVAP by county in each year, I first calculate the ratio of citizens of voting age population to all the total voting age population for each county in 2000 from Census data. I then multiply the estimated VAP for each county and year by this ratio. However, the question of whether voter turnout should be measured as a percentage of VAP or CVAP is not surprisingly a non-issue in the present context; the correlation between the two measures is better than 98% for the time periods examined in this study.

In order to measure the overall effect of photo ID on voter turnout across the 92 Indiana counties, I estimate an ordinary least squares regression controlling for county-fixed effects and year effects. The county fixed-effects account for factors such as demographic differences across counties, while the year effects account for the different composition of state races in each election year. However, there has only been one general election in Indiana post-photo ID, so it is not possible to separately identify the overall effects of photo-ID on voter turnout absent additional assumptions. For this reason, the present analysis focuses on the effects of photo ID on different groups of eligible voters.

I evaluate claims about the relative effects of voter ID on racial and ethnic minorities, the poor, the elderly, persons without a high school diploma and Democrats by estimating the effects of photo ID on turnout in counties with greater percentages of those

groups as a percent county population. However, these demographic variables do not vary over time, since they are taken from the 2000 U.S. Census. This means that it is not possible to control for county-fixed effects when estimating the effects of photo ID on these particular demographic groups. For this reason, I account for differences in the demographic composition of counties by including control variables for per capita income and the percent of county population by several categories, including: age, education, ethnicity, female labor force participation, military status, non-citizens, party, poverty, race, and rural status (see Appendix). I also check the sensitivity of results when this list of control variables is pared down to just age, education, ethnicity, income and race.

Despite the plethora of county-level control variables described above, it is possible that there remain some unobserved county-level phenomena that may bias the estimated effects of photo ID on turnout in some unknown way. For this reason, I also examine the effects of photo ID on the within-county change in voter turnout since the most recent general election (i.e., the change in voter turnout from 2004 to 2006 compared to the change from 2000 to 2002). This alternative model effectively purges voter turnout of the county-specific factors mentioned above and so provides an important check on the estimates obtained form the basic model. Finally, because repeated observations at the county-level over time are not necessarily independent observations, I also control for clustering of standard errors by county in every regression model.

While most authors examine the effects of voter identification on voter turnout, some (e.g., Alvarez et al. 2007) look at the effects on the natural logarithm of voter turnout (i.e. "log turnout"); for this reason, I use both of these measures in my analysis. Therefore, in the next section I present estimates for four basic statistical models, where the dependent variable is i) turnout, ii) log turnout, iii) change in turnout, and iv) change in log turnout. I also discuss the sensitivity of these results to different measures of turnout, time periods or sets of control variables; for the most part, the key findings are quite robust to these alternative specifications.

## 4. Results
Voter turnout as a percentage of VAP in

Indiana was about 2 percentage points higher in 2006 compared to 2002. This increase in turnout was fairly uniform across all counties; the mean within-in county change in turnout was +1.76% (p<.001). However, it is not possible to discern how much of this increase in turnout is attributable solely to the effects of photo ID; this is because there was also an uncompetitive Senate race in 2006. For example, the presence of a U.S. Senate election in 2006 might have led to an increase in turnout above what it would have been otherwise. On the other hand, the fact that there was no Democrat candidate in the 2006 Senate race might have led to lower turnout than otherwise. In fact, my examination of historical Senate election data does indeed suggest that state voter turnout tends to be lower when there is an uncompetitive Senate election at the top of the state ticket, all else constant. Assuming that this phenomenon occurred in 2006 in Indiana, then the photo ID likely led to an even greater increase in voter turnout than the 2% observed in the raw data.

Even so, I prefer to err on the side of caution in this report, so I focus only on the differential impact of photo ID across Indiana counties. In contrast to the situation for overall turnout in 2006, there is no a priori reason to believe that the uncompetitive 2006 Senate election influenced voter turnout in some counties more than others. Consequently, the effects of photo ID on turnout across counties with differing populations of minority, poor, low education, elderly voters, or Democrat voters can be identified and estimated in the available election data.

In Table 1A, I report the estimated effects of photo ID on both turnout and the change in turnout for counties with higher proportions of minority population. The table is divided into two panels; one for each model. For example, the results in the top panel of the table under column one indicate that photo ID increased voter turnout in counties with higher percentage of black population, albeit this estimate is not statistically significant (t=1.23). However, the estimated magnitude of this effect is quite large; for each percentage point increase in black population in a county, voter turnout increases by 0.1 percentage points. Looking to the bottom panel of Table 1A under the same column, the estimated effect of photo ID on the change in turnout for counties



with a higher percentage of Black population is also positive, nearly identical in magnitude, although again not statistically distinguishable from zero (t=0.59).

Moving to column two of Table 1A, the estimated effect of photo ID on voter turnout (top panel) for counties with larger Hispanic populations is negative, but much smaller in magnitude than that for Black population and also statistically insignificant. However, the impact of voter ID on the change in voter turnout for counties with greater Hispanic population is positive (even more so than for Black population), but once again not significantly different from zero (bottom panel).

In column three, I report the estimated effects of photo ID for both the Black and Hispanic variables; this model exhibits a similar pattern as when the variables are estimated separately. In all but one case the estimated effect of photo ID on turnout is positive for counties with more Black or Hispanic population. However, in no case are these variables individually or jointly significant.

The final column of Table 1A reports the effects of photo ID on turnout in counties with higher total minority population (non-white and\or Hispanic). The estimates are identical for both turnout and the change in turnout models. For each one percentage point increase in minority population, county turnout increases by 0.7 percentage points after the implementation of photo ID. Again, these effects are imprecisely estimated, so the null hypothesis of a zero differential effect of voter ID on turnout in counties with higher minority populations cannot be rejected.

My analysis of the effects of photo ID on turnout by race and ethnicity continues with an examination of the impact on both the log of turnout and the change in the log of turnout. The results of this estimation are reported in Table 1B; however, because this is a non-linear model, the coefficients do not have a similarly straightforward interpretation as before. For example, the point of estimate of .003 for %Black in the top panel under column one of Table 1B has the following interpretation: for each percentage point increase in Black population in a county, voter turnout increases by .003 times voter turnout in 2002. For example, given a county-wide voter turnout rate of 30% in 2002, the implementation of photo ID is associated with a .09 percentage point increase in 2006 turnout for each percentage point of black population

(or a nearly identical effect as was observed in Table 1A).

Given the complexity of interpreting the estimates in Table 1B, and the fact that none of these estimates are significantly different from zero (either individually, or in the case of column three, jointly), I will only note that the pattern of qualitative results obtained in the log models of turnout is very similar to that seen in Table 1A. In fact, the only substantive difference is that the effect of photo ID on Hispanic population is uniformly more positive.

To this point, there is no evidence that photo ID requirements in Indiana reduced voter turnout, either overall, or in counties with relatively larger racial or ethnic minority populations. Re-estimating these models for the three most recent midterm elections (1998, 2002 and 2006) yields a similar pattern of results, with one exception: the effect of photo ID on counties with more Hispanic population is consistently positive. Similarly, including presidential election years, along with additional controls for the differing turnout tendencies in midterm versus presidential election years, likewise produces nearly identical results. Finally, substituting citizen voting age population (CVAP) for VAP in any of the models discussed above has the effect of making the estimated effects of photo ID on Hispanic population positive, but otherwise yields only no appreciable difference.

The analysis above is repeated for other demographic groups in Tables 2A and 2B. Specifically, I examine the effects of photo ID on turnout in counties with higher percentages of families below the poverty line (%Poverty), persons with less than a high school degree (%No High School) education, and persons over 65 years of age (%Elderly). These demographic variables are never statistically significant in the turnout models shown in panel one of Table 2A, although both the percent of county population in poverty or elderly approach statistical significance (p<.15). The effect of photo ID on turnout in counties with more poor families is positive, while the effect on turnout in counties with more elderly population is negative. However, these effects are largely attenuated for the change in turnout, and especially so for the percentage elderly (bottom panel of Table 2B). The effect of photo ID on turnout in counties with relatively fewer high school graduates exhibits a similar

pattern; it is negative and insignificant in panel one, but closer to zero and less precisely estimated in panel two. Further, these three demographic variables are jointly insignificant in both models. Finally, all of the race, ethnicity and demographic variables examined to this point are also not jointly significant when they are all simultaneously included in these turnout models.

As was the case for the race and ethnicity variables, the same general pattern of qualitative effects are observed in the log turnout and change in log turnout models (Table 2B); in addition, the demographic variables (poverty, no high school and elderly) are not jointly significant, nor is the combination of these demographic variables with the race and ethnicity variables examined in Table 1A and 1B. Re-estimating these four models for additional years, and\or substituting CVAP for VAP likewise yields no major changes, although the estimated effects of photo ID on counties with more elderly or low-education population become more positive and less precisely estimated.

The final variable examined is the extent of Democrat voting preferences in a county; this is measured using a common proxy in the political science literature, the county vote percentage for the Democrat presidential candidate in 2004 (John Kerry). The results for this variable are found in column four of Tables 2A and 2B. In all but one case, the effect of voter ID on turnout in highly Democrat-leaning counties is statistically significant or marginally so (p>.10 or better). In every case examined in Tables 2A and 2B, the photo ID is associated with higher turnout in counties with a greater share of Democrat leaning voters. The magnitude of this estimated effect is about 0.1 percentage points higher voter turnout in 2006 per percentage point increase in John Kerry's 2004 vote percentage in the county. Not only is this result stronger and more robust in Tables 2A and 2B, the same is true when the model is estimated using additional election years or citizen voting age population, as above.

I have also estimated all of the models described above with a more sparse set of control variables, only including controls for age, education, ethnicity, income, and race. However, the choice of these control variables does not yield any notable changes in the pattern of results discussed here.

As a final sensitivity check, all of the models above have been estimated without the adjustment for clustering of observations at the county level. This does not affect the estimated coefficients in these models but in general will affect the standard errors of the estimates. The effect of the cluster-adjustment to standard errors is to make some of the key estimates described above more precise; without the cluster-adjustment, none of the coefficients on percent elderly or percent poor remain even marginally statistically significant (i.e., p<.10 in every case). The only coefficient estimates that remain statistically significant without the cluster-adjustment are those for the percent Democrat in the county.

## 5. Discussion

Given the context of the existing research on voter turnout, my findings for Indiana are completely unsurprising. Despite the attention-grabbing and often strident claims that voter identification is the modern version of the poll tax and the like, nothing could be further from the truth. Existing theory and evidence from decades of social science research do not support the contention that photo ID requirements are likely to have a large and detrimental impact on turnout; nor does the previous empirical evidence find any significant impact of photo identification on racial or ethnic minorities. Further, the best previous evidence to date also finds no significant impact of photo ID on the poor or the elderly.

In this study, I exploit the existence of a natural experiment in the impact of photo ID: the change in turnout between the 2002 and 2006 midterm elections in Indiana. My analysis is novel not only for its focus on the effects of photo ID in Indiana, but because I subject my findings to a battery of sensitivity checks. This is also the first study to analyze the differential impact of photo ID requirements on turnout among more Democrat-leaning voters.

The findings that emerge from my analysis are that photo ID is associated with: i) an overall county-level turnout increase of almost two percentage points, ii) an insignificant increase in relative turnout for counties with a greater percentage of minority and poor population, iii) no consistent or significant impact on relative turnout in counties with a greater percentage of less educated or elderly voters, and iv) a significant relative increase in turnout for counties with a higher percentage of Democrat voters.

1 The term "mandatory" is a misnomer, since voters without proper photo ID are still allowed to cast a provisional ballot at the polls.

2 For example, see the recent brief for certiorari submitted to the U.S. Supreme Court by the Indiana Democratic Party and Marion County Democratic Central Committee (Indian Democratic Party, et al. v. Todd Rokita, et. al.).

3 Hood and Bullock (2007) argue that about 5% of registered voter names in Georgia do not have a valid driver's license or state identification card; however, the authors make no attempt to investigate how many of the registered voter names are actually attached to eligible voters. This is a rather egregious error, since it is well known that voter registration lists overstate, sometimes quite dramatically, the number of valid eligible voters due to duplicate, erroneous, out-dated and even fraudulent registrations. For example, in Indiana, the number of registered voters exceeds the number of voters that report being registered by more than 40% (Schulz 2007).

4 Ansolabehere (2007) does not explicitly report how many of the 23 persons with voter identification issues cast provisional ballots, although it would appear to be nearly all of them, since elsewhere he writes: "an almost immeasurably small number of people who tried to vote were excluded because of identification requirements or questions with their qualifications;" also, Ansolabehere notes that only three persons did not vote because of any problems with their voter registration.

5 Given the bitter partisan debate over voter identification, it would not be surprising if a handful of respondents chose to exaggerate their experience at the polls; in light of this, it is quite amazing that so few respondents self-report problems voting.

6 Ansolabehere (2007) reports that large majorities support voter identification reforms, including 70% of Blacks, 78% of Hispanics and 67% of all Democrats; in fact, persons who were asked to show identification when voting in 2006 were even more supportive of voter identification requirements than other respondents.

7 Also, see Primo and Milyo 2006a,b on the effects of political institutions on citizen trust and voter turnout.

8 For example, influential evidence on the importance of the intrinsic value of voting comes from field experiments in which those individuals that receive reminders about their civic duty to vote are more likely to do so (Gerber and Green 2000). Further evidence comes from Ansolabehere, et al (1999); they argue that negative campaign advertising reduces voter turnout primarily because of its detrimental effect on public trust in the political process.

9 In fact, the two studies are nearly identical, as Vercellotti and Anderson were part of the research team that produced the Eagleton (2006) report.

10 Personal communication with Jason Mycoff (November 9, 2007).

11 There was not a gubernatorial or U.S. Senate election in Indiana in 2002. In 2006, there was a U.S. Senate race in which Richard Luger, a Republican, was not opposed by a Democrat; Lugar defeated his closest opponent, a Libertarian candidate, by 87.3% to 12.6% of the total vote.

12 All data employed in this study were provided by Polidata (www.Polidata.com).

## REFERENCES

Alvarez, Michael, Delia Bailey, Jonathan Katz 2007. "The Effect of Voter Identification Laws on Turnout," Working Paper #57 in the Caltech/MIT Voting technology Project (California Institute of Technology: Pasadena, CA).

Ansolabehere, Stephen 2007. "Access Versus Integrity in Voter Identification Requirements," Working Paper #58 in the Caltech/MIT Voting Technology Project (California Institute of Technology: Pasadena, CA).

Ansolabehere, Stephen D., Shanto Iyengar, and Adam Simon 1999. "Replicating Experiments Using Aggregate and Survey Data: The Case of Negative Advertising and Turnout" American Political Science Review, 93: 901-909.

Blais, Andre (2006). "What Affects Voter Turnout?" Annual Review of Political Science, 9: 111-125.



Eagleton Institute 2006. "Report to the U. S. Election Assistance Commission:   Best Practices to Improve Voter Identification Requirements," Eagleton Institute of Politics (Rutgers University: New Brunswick, NJ).

Gerber, Alan and Donald Green 2000. "The Effect of a Non-Partisan Get-Out-the-Vote Drive: An Experimental Study of Leafletting," Journal of Politics, 62(3): 846-857. Hood, M.V. and Charles Bullock 2007. "Worth a thousand Words?: An Analysis of Georgia's Voter Identification Statute," working paper (University of Georgia: Athens, GA).

Lott, John R. 2006. "Evidence of Voter Fraud and the Impact that Regulations to Reduce Fraud have on Voter Participation Rates" working paper (University of Maryland: College Park, MD).

Matsusaka, John and Filip Palda 1999. "Voter Turnout: How Much Can We Explain?" Public Choice 98: 431-446

Muhlhausen, David B. and Keri Weber Sikich 2007. "New Analysis Shows Voter Identification Laws Do Not Reduce Turnout." (Heritage Foundation: Washington, D.C.).

Mycoff, Jason, Michael W. Wagner and David C. Wilson 2007. "Do Voter Identification Laws Affect Voter Turnout?" working paper (University of Delaware: Newark, DE).

Powell, G. Bingham, Jr. (1986). "American Voter Turnout in Comparative Perspective." American Political Science Review 80: 17-44.

Primo, David, Matthew L. Jacobsmeier and Jeffrey Milyo 2007. "Estimating the Effects of State Policies and Institutions with Mixed Level Data," State Politics and Policy Quarterly, 7(4): 447-461.

Primo, David and Jeffrey Milyo 2006a. "Campaign Finance Laws and Political Efficacy: Evidence from the States," Election Law Journal, 5(1): 23-39.

Primo, David and Jeffrey Milyo 2006b. "The Effects of State Campaign Finance Laws on Voter Turnout," working paper (University of Missouri: Columbia, MO).

Putnam, Robert 2000. Bowling Alone: The Collapse and Revival of American Community. (Simon and Schuster: New York).

Schulz, David 2007. "Less than Fundamental: The Myth of Voter Fraud and the Coming of the Second Great Disenfranchisement," working paper (Hamline University: St Paul, MN).

Vercelli, Timothy and David Anderson 2006. "Protecting the Franchise, or Restricting It?  The Effects of Voter Identification Requirements on Turnout," working paper (Rutgers university: New Brunswick, NJ).



## Table 1A: Effects of Photo ID by Race and Ethnicity
### (County Turnout in 2002 and 2006)

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| *Panel One: % Voting Age Pop. (%VAP)* | | | | |
| %Black*PhotoID | 0.10 | | 0.12 | |
|  | (1.23) | | (1.44) | |
| %Hispanic*PhotoID | | -0.03 | -0.15 | |
|  | | (0.21) | (0.97) | |
| %Minority*PhotoID | | | | 0.07 |
|  | | | | (1.27) |
|  | | | | |
| *Panel Two: Change in % Voting Age Pop.* | | | | |
| %Black*PhotoID | 0.09 | | 0.08 | |
|  | (0.59) | | (0.45) | |
| %Hispanic*PhotoID | | 0.13 | 0.06 | |
|  | | (0.83) | (0.28) | |
| %Minority*PhotoID | | | | 0.07 |
|  | | | | (0.72) |

NOTES: Absolute values of t-statistics in parentheses (adjusted for clustering by counties). The estimated effects of photo ID interacted with percent Black and Hispanic are also not jointly significant in either panel above. All models include controls for year and characteristics of county population, including: age, education, ethnicity, female labor force participation, income per capita, military status, non-citizens, party, poverty, race, and rural status.



*The Effects of Photographic Identification on Voter Turnout in Indiana: A County-Level Analysis*    Report 10-2007

### Table 1B: Effects of Photo ID by Race and Ethnicity
### (Natural Logarithm of County Turnout in 2002 and 2006)

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| *Panel One: Log of % Voting Age Pop. (%VAP)* | | | | |
| %Black*PhotoID | .003 | | .004 | |
|  | (1.42) | | (1.50) | |
| %Hispanic*PhotoID | | .000 | -.003 | |
|  | | (0.08) | (0.82) | |
| %Minority*PhotoID | | | | .002 |
|  | | | | (1.55) |
|  | | | | |
| *Panel Two: Change in Log of % Voting Age Pop.* | | | | |
| %Black*PhotoID | .002 | | .002 | |
|  | (0.67) | | (0.58) | |
| %Hispanic*PhotoID | | .002 | -.000 | |
|  | | (0.55) | (0.00) | |
| %Minority*PhotoID | | | | .002 |
|  | | | | (0.82) |

NOTES: Absolute values of t-statistics in parentheses (adjusted for clustering by counties). The estimated effects of photo ID interacted with percent Black and Hispanic are also not jointly significant in either panel above. All models include controls for year and characteristics of county population, including: age, education, ethnicity, female labor force participation, income per capita, military status, non-citizens, party, poverty, race, and rural status.



## Table 2A: Effects of Photo ID by Poverty, Education, Age, and Party
### (County Turnout in 2002 and 2006)

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| *Panel One: % Voting Age Pop. (%VAP)* |  |  |  |  |
| %Poverty*PhotoID | 0.29 |  |  |  |
|  | (1.67) |  |  |  |
| %NoHighSchool*PhotoID |  | -0.08 |  |  |
|  |  | (1.25) |  |  |
| %Elderly*PhotoID |  |  | -0.36 |  |
|  |  |  | (1.89) |  |
| %Democrat*PhotoID |  |  |  | 0.10 |
|  |  |  |  | (2.22) |
| *Panel Two: Change in % Voting Age Pop.* |  |  |  |  |
| %Poverty*PhotoID | 0.17 |  |  |  |
|  | (0.98) |  |  |  |
| %NoHighSchool*PhotoID |  | -0.01 |  |  |
|  |  | (0.11) |  |  |
| %Elderly*PhotoID |  |  | -0.08 |  |
|  |  |  | (0.41) |  |
| %Democrat*PhotoID |  |  |  | 0.11 |
|  |  |  |  | (1.59) |

NOTES: Absolute values of t-statistics in parentheses (adjusted for clustering by counties). The estimated effects of photo ID interacted with percent poverty, no high school degree and elderly are also not jointly significant in either panel above. All models include controls for year and characteristics of county population, including: age, education, ethnicity, female labor force participation, income per capita, military status, noncitizens, party, poverty, race, and rural status.



Institute of Public Policy

## Table 2B: Effects of Photo ID by Poverty, Education, Age, and Party
### (Naural Logarithm of County Turnout in 2002 and 2006)

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| *Panel One: Log of % Voting Age Pop. (%VAP)* | | | | |
| %Poverty*PhotoID | .007 | | | |
|  | (1.56) | | | |
| %NoHighSchool*PhotoID | | -.003 | | |
|  | | (1.60) | | |
| %Elderly*PhotoID | | | -.011 | |
|  | | | (2.08) | |
| %Democrat*PhotoID | | | | .003 |
|  | | | | (2.28) |
| *Panel Two: Change in Log of % Voting Age Pop.* | | | | |
| %Poverty*PhotoID | .004 | | | |
|  | (0.88) | | | |
| %NoHighSchool*PhotoID | | -.001 | | |
|  | | (1.05) | | |
| %Elderly*PhotoID | | | -.005 | |
|  | | | (0.99) | |
| %Democrat*PhotoID | | | | .003 |
|  | | | | (1.87) |

NOTES: Absolute values of t-statistics in parentheses (adjusted for clustering by counties). The estimated effects of photo ID interacted with percent poverty, no high school degree and elderly are also not jointly significant in either panel above. All models include controls for year and characteristics of county population, including: age, education, ethnicity, female labor force participation, income per capita, military status, non-citizens, party, poverty, race, and rural status.



## APPENDIX :

The following county-level census variables are
included as controls in all statistical models:

Percent non-Hispanic Black
Percent Hispanic
Percent non-white and\or Hispanic

Natural logarithm of per-capita income
Percent of families in poverty

Percent without a high school degree
Percent with at most a high school degree
Percent with some college education
Percent with college degree
Percent with post-graduate education

Percent age less than 5 years
Percent age between 5 and 17 years
Percent age between 19 and 24 years
Percent age between 25 and 44 years
Percent age between 45 and 64 years
Percent age 65 or more

Percent voting for John Kerry in 2004 (of those
casting votes in 2004)

Percent active military
Percent female labor force participation
Percent non-citizens
Percent retired military
Percent rural

Jeffrey Milyo is a professor in the Truman School of
Public Affairs and the department of economics at the
University of Missouri; he is also the Hanna Family
Scholar in the Center for Applied Economics at the
University of Kansas School of Business and a Senior
Fellow at the Cato Institute in Washington, D.C.
Comments are welcome; please contact the author at:
milyoj@missouri.edu.

Suggested Citation

Milyo, Jeffrey. (2007). "The Effects of Photographic Indentification
on Voter Turnout in Indiana: A County-Level Analysis." Report
10-2007.   Retrieved [Month Day, Year], from University of
Missouri Columbia, Institute of Public Policy Web site: http://
www.truman.missouri.edu/ipp/products

Institute of Public Policy
137 Middlebush
University of Missouri
Columbia, MO 65211
http://www.truman.missouri.edu/ipp



# State Politics & Policy Quarterly
http://spa.sagepub.com/

## Much Ado About Nothing? An Empirical Assessment of the Georgia Voter Identification Statute

M. V. Hood III and Charles S. Bullock III
State Politics & Policy Quarterly 2012 12: 394 originally published online 15 October
2012
DOI: 10.1177/1532440012452279

The online version of this article can be found at:
http://spa.sagepub.com/content/12/4/394

Published by:
⑤SAGE

http://www.sagepublications.com

On behalf of:
American Political Science Association

# STATE POLITICS
## AND POLICY

An Organized Section of the
American Political Science Association

Additional services and information for **State Politics & Policy Quarterly** can be found at:

**Email Alerts:** http://spa.sagepub.com/cgi/alerts

**Reprints:** http://www.sagepub.com/journalsReprints.nav

**Permissions:** http://www.sagepub.com/journalsPermissions.nav

**Citations:** http://spa.sagepub.com/content/12/4/394.refs.html

>> Version of Record - Nov 13, 2012

OnlineFirst Version of Record - Oct 15, 2012

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

What is This?

Exhibit   12
m/Cgo
Date  8/26/14
Melody Campbell, CSR

# Much Ado About Nothing? An Empirical Assessment of the Georgia Voter Identification Statute

State Politics & Policy Quarterly
12(4) 394–414
© The Author(s) 2012
Reprints and permission:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/1532440012452279
http://sppq.sagepub.com
⑤SAGE

## M. V. Hood III[1] and Charles S. Bullock III[1]

### Abstract

Voter identification (ID) policies, especially those of the photo ID variety, have been hotly contested over the last few years. The primary concern surrounding these statutes amounts to lower turnout, especially among certain groups in the electorate, such as racial/ethnic minorities. In 2007, the way was cleared for Georgia to implement a new statute requiring registrants to present a government-issued photo ID to vote. Using population data on registrants from two election cycles coupled with information on a subgroup of registrants known to lack photo ID, we conduct a policy impact analysis of the Georgia voter ID law. We find that the new law did produce a suppression effect among those registrants lacking proper ID. Substantively, the law lowered turnout by about four-tenths of a percentage point in 2008. However, we find no empirical evidence to suggest that there is a racial or ethnic component to this suppression effect.

### Keywords

voter identification, election administration, Georgia

The framers of the U.S. Constitution intentionally left the question of voter qualifications to the states, and within the framework of constitutional amendments and federal statutes this matter still resides at the same level today. This situation has produced an ongoing tension between the goal of expansion of suffrage rights usually represented

[1]University of Georgia, Athens, USA

**Corresponding Author:**
M. V. Hood III, Department of Political Science, University of Georgia, 104 Baldwin Hall, Athens, GA 30602, USA
Email: th@uga.edu

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

by the federal government and protection of the voting franchise more typically associated with the states. The contemporary debate over voter identification (ID) requirements finds itself squarely within this same context of access versus ballot security and, like most changes dealing with election administration, matters quickly devolve into partisan politics as one side typically sees an advantage while the other side cries foul.

More stringent voter ID statutes have typically been favored by Republican state legislators who view such safeguards as a necessary hedge against the possibility of voter fraud. Requiring voters to provide evidence of their identity, however, has generated far more controversy in the public arena than scholarly research on the topic. Critics of more demanding standards for ID point to research showing that *any* additional requirement reduces participation. On the other side of the debate, opponents claim that demands for more extensive documentation before giving a ballot to a prospective voter tend to depress participation by minorities and the less affluent (Sobel and Smith 2009). Evidence of selective enforcement of ID requirements, with minorities more frequently asked to provide documentation than whites (Atkeson et al. 2010), has bolstered claims of discrimination.

In 2008, the Supreme Court upheld the constitutionality of what was characterized as the most stringent ID requirement, Indiana's photo ID statute, in *Crawford v. Marion County Election Board*. The trial court and Supreme Court pointed to everyday situations that require a photo ID. A challenge to Georgia's photo ID requirement, which is similar to the Indiana law litigated in *Crawford*, failed when the plaintiffs could not identify a single prospective voter who either did not have an acceptable ID or testified that it would be impossible to acquire the needed document which the state provides at no cost (*Common Cause v. Billups*, 2007).[1] In addition to approval by state and federal courts, pursuant to Section 5 of the Voting Rights Act, the U.S. Department of Justice reviewed Georgia's requirement for a government-issued photo ID and found it not to be racially discriminatory.[2]

In this article, we make use of a unique natural experiment that occurred in Georgia between the 2004 and 2008 election cycles, which involved implementation of the state's new photo ID statute. We attempt to answer three primary research questions: (a) What is the extent to which the new law may have suppressed voter turnout? (b) Is there a disparate impact of the new law in reference to racial minorities? and (c) Are there any age-specific effects produced by the photo ID statute?

## Literature Review

Political scientists have explored whether the type of documentation required from a prospective voter affects turnout and, if it does, what kind of voters are most likely to feel the impact. The guiding theoretical perspective for this research comes from Anthony Downs' (1957) proposition that prospective voters will participate if the benefits they derive from the activity exceed the costs. Requiring the presentation— and perhaps the acquisition—of some form of ID to vote constitutes a cost as an

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

additional burden and, in some instances, may also involve the expenditure of time and money if it necessitates the acquisition of documentary evidence.

In a similar vein, Rosenstone and Hansen (1993) indicate that states can produce institutional barriers to political participation by mandating regulations, such as those governing the voter registration process. On this matter, they state that

> the legal restrictions on the exercise of the franchise adopted in the early part of the [20th] century and maintained to the present day place significant burdens on American citizens and lower the probability they will participate in political life. (Rosenstone and Hansen 1993, 209)

Such legal restrictions, in turn, are more likely to affect those in society with fewer resources as posited by the socioeconomic status (SES) model of participation (see, for example, Wolfinger and Rosenstone 1980, or for a general overview, Leighley 1995). Again, opponents of photo ID laws contend that possession of the proper ID will be inversely related to one's level of resources, thus leading to voter suppression.

Although litigation has focused on government-issued photo IDs, all states require some method of ID. At a minimum, voters must state their names. Currently, 30 states require voters to present some form of ID to accompany stating or writing one's name, with 14 of these specifically requiring photo ID.[3] Alvarez, Bailey, and Katz (2007) identify seven different types of requirements including a signature match, presentation of a registration card or other form of ID, and the need for a photo ID.[4] Most states accept a Social Security card, a birth certificate, or a utility bill for purposes of ID.

One line of scholarly research has examined the distribution of acceptable means of ID across the population. Using exit poll data from three western states, Baretto, Nuno, and Sanchez (2007) examine the correlates of having six different types of ID. They report positive relationships between having the kinds of documents that states require to establish identity and socioeconomic measures, such as higher income and education levels. They also observe racial and ethnic differences with blacks and Latinos less likely to have five of the items, with a significant exception being a driver's license. Asians were significantly less likely to have a driver's license and other types of documentation with the exception of a passport.

Other research using individual-level data of registrants who specifically lacked a driver's license or state-issued ID card found that a larger percentage of blacks and Hispanics compared with Anglos did not possess these types of ID. Age was also inversely related to possession of a driver's license; however, no income-related effect was found (Hood and Bullock 2008). A study in Indiana found that 83.2% of whites, but only 71.7% of blacks, met that state's photo ID criteria (Baretto, Nuno, and Sanchez 2009). In addition, Baretto et al. (2009) find that younger Indianans, those with less education, the less affluent, and Democrats are less likely to possess an acceptable photo ID. A growing body of scholarly research indicates that those more likely to be adversely affected by the adoption of photo ID requirements include minorities, the elderly, the poor, and Democrats.

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

A second body of research has sought to determine whether turnout declines as the type of ID required becomes more restrictive, with government-issued photo IDs considered the most demanding ID level. Researchers probing this question have used two types of data. One approach has analyzed data aggregated to the state (Alvarez et al. 2007) or county level (Vercellotti and Anderson 2006). An alternative approach uses individual data from the Census Bureau's Current Population Survey (CPS; Alvarez et al. 2007; Erikson and Minnite 2009; Vercellotti and Anderson 2006), public opinion polls (Mycoff et al. 2009), or exit polls (Baretto et al. 2007).

The results of these analyses have been quite mixed in terms of whether the overall turnout rate is affected and which set of specific registrants is affected. One analysis of CPS data from 2000 through 2006 found no relationship between ID requirements and turnout at the aggregate level. Using individual-level data, the authors find an inverse relationship between stricter ID and turnout in general. This effect is magnified for those of lower SES (income and education). The observed SES effect, however, was in no way amplified by race or ethnicity (Alvarez, Bailey, et al. 2008).

Vercellotti and Anderson (2009) study the impact of heightened ID requirements on 2004 turnout using CPS data. Although they found no relationship between ID requirements and turnout for the entire electorate, they uncovered effects for certain groups. Specifically, they find that states that adopted new standards had lower turnout among Hispanics, but not among African American or Asians. They also reported lower turnout among voters younger than 25 years of age in states with new requirements.

Similarly, other researchers also fail to find evidence that heightened ID requirements depress turnout levels in general. Using 2004 CPS data, Muhlhausen and Sikich (2007) do not find any effect for voter ID requirements related to turnout in general or racial/ethnic minorities in particular. Erikson and Minnite (2009, 97) use CPS data from the 2002 and 2006 elections to examine change over time as related to alterations in state ID requirements. They report that moving from lenient to strict ID requirements appears to dampen turnout by a few percentage points; however, they also point out that this relationship is *statistically inconclusive*. They strongly urge caution in the use of CPS data to make inferences about the effects of voter ID requirements and voter turnout.

Using the Cooperative Congressional Election Study (CCES) from 2006 to 2008, Ansolabehere (2009) finds virtually no respondents who went to the polls, but were prohibited from casting a ballot because they lacked required ID. Furthermore, this research also attempts to examine whether ID requirements deter some from even attempting to vote by probing registrants who did not vote in 2008 as to why they chose not to turn out. Altogether, the findings from these surveys indicate that only 0.18% of respondents were in part deterred from voting due to voter ID requirements.

Mycoff, Wagner, and Wilson (2009) report similar results using the 2006 CCES where they estimate a series of models using a Guttman scale designed to measure the stringency of state ID requirements and a measure to denote the presence of a photo ID law in particular. Using two sets of models, an individual-level CCES analysis and an aggregate state-level analysis (2000–06), these researchers find no statistically significant relationship between voter ID statutes and turnout.

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

To determine what effect adoption of a photo ID law may have on voter turnout and which groups may be affected, we need relevant data coupled with an appropriate research design. With the exception of exit polls, issues related to turnout inflation argue against the use of survey data like the CPS. However, aggregate-level data do not provide the degree of leverage necessary to make appropriate causal inferences concerning the individual-level act of voting. Not only is validated data at the individual level necessary to answer questions of turnout, but it is also necessary to be able to categorize registrants based on whether they need a government-issued photo ID and, thus, may face an additional hurdle to voting. Finally, as Erikson and Minnite (2009) point out, we need to assess any effect related to turnout based on a *difference-in-differences* analysis where we can compare the effect of the changes in voter ID laws before and after implementation.

Fortunately, Georgia provides us with just such a case to test the effects of changing to a more stringent photo ID requirement. We also have the proper data from which to draw such inferences: population-level data on individual registrants across two presidential election cycles, which contain validated turnout and segmentation based on possession of a photo ID. Georgia, unlike Indiana, also contains a large minority population, which allows for a more stringent test of hypotheses related to the effect of photo ID requirements and minority voters. In 2008, 30.0% of registrants in Georgia were African American (Georgia Secretary of State). In addition, like other Southern states, Georgia has a past history of disenfranchising minority voters and also a colorful record of fraud related to the electoral process as well (see Key 1949 for examples of voter fraud and disenfranchisement).

Although our analysis is of a single state, we are dealing with over-time individual-level population data, a fact that should give us some degree of confidence about drawing inferences concerning the effects of photo ID in Georgia. Furthermore, we would argue that the circumstances in Georgia offer one of the best possible opportunities to study the *before and after* effects of implementation of an Indiana-style voter ID statute in a context with a sizable presence of minority registrants. Our test of the Georgia statute should also be generalizable to other states moving from an ID statute requiring the presentation of some form of ID to vote in-person to a highly restrictive law allowing only for the presentation of a government-issued photo ID.

## The Georgia Context

In 2008, Georgia voters confronted changes, which included one modification that arguably facilitated voting but another that added a new cost to casting a ballot. In addition, Georgians like other Americans acted in an environment that provided a unique stimulus, the candidacy of the charismatic Barack Obama. Obama's candidacy had an especially great impact on African Americans, a group usually classified among those less inclined to participate. In November 2008, African Americans cast a slightly larger share of the votes in Georgia (30.06%) than their share of registrants (30.01%). This was unprecedented as the gap between the percentage of black registrants

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

Case 2:13-cv-00193   Document 676-23   Filed on 11/11/14 in TXSD   Page 42 of 57

and the percentage of black voters is usually about five percentage points. From 1998 through 2006, blacks cast between 23% and 25% of Georgia's ballots.

Georgia made casting a ballot more convenient by extending the period prior to election day for in-person voting from 5 to 45 days. However, after a protracted legal battle, federal and state courts approved a reduction in the number and types of ID required of prospective voters. Previously, a voter could present any of 17 types of documentation including a bank statement, utility bill, or Social Security card.

The voter ID statute requiring a photo ID to vote in-person was first passed by the General Assembly in 2005. Almost immediately opponents filed suit in federal and state courts to block its implementation. Judge Harold Murphy, U.S. District Court for the Northern District of Georgia, issued a temporary injunction on the grounds that the law was tantamount to a poll tax for those who did not already possess a government-issued photo ID.

The legislature modified the statute in 2006 to provide no-cost photo ID cards for the purpose of voting at all 159 county voter registrars offices. In addition, no-excuse absentee voting by mail, which does not require photo ID, was also allowed for the first time. Again, Judge Murphy issued a temporary injunction on the basis of the 1st and 14th Amendments. In 2007, the injunction was lifted when Judge Murphy ruled in a trial on the merits that the amended law did pass constitutional muster. Efforts to block the law in state courts and subsequent appeals to the 11th Circuit Court of Appeals failed, thus clearing the law for full implementation for the 2008 election cycle.

Beginning in 2008, voters must present a government-issued photo ID to vote in-person, with a driver's license the most prevalent form of ID for most voters.[5] Other acceptable forms of ID include a passport, a student ID from a public institution, a state-issued ID card from the Department of Motor Vehicles (DMV), or a military ID. In addition, following an earlier injunction issued by a federal court in the *Common Cause v. Billups* case, registrants could receive an ID card valid for voting at no cost from their county registrar. The Georgia statute is very similar to the Indiana law in terms of the requirement and acceptable types of photo ID. Voters who do not present a government-issued photo ID card, like in Indiana, can cast a provisional ballot. This ballot is only counted if the voter presents proper ID prior to the official vote canvass.[6]

## Data and Method

The data for this project come from two primary sources: the voter registration and history databases maintained by the Georgia Secretary of State and a report produced by the State of Georgia in the course of defending the voter ID statute. This report was designed to determine the number of registrants who lacked a valid Georgia driver's license or state ID card. The work was carried out by the Georgia DMV in August of 2007 and cross-referenced its database with the voter registration database maintained by the Secretary of State.[7] This report indicated that 289,622 Georgia registrants had neither a valid driver's license nor state ID card. At the time the report was released,

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

Case 2:13-cv-00193   Document 676-23   Filed on 11/11/14 in TXSD   Page 43 of 57

this represented 5.66% of the total registrants in the state or 6.65% of the total active registrants.

Using archived copies of the voter registration files for the state gives some degree of leverage over other types of data. These files provide snapshots of the electorate as it existed around the time of the 2004 and 2008 general elections and include individual-level information on the population of registrants. In fact, without historical copies of the voter registration database, comparisons such as ours would be impossible as states constantly update their registration rolls to ensure accuracy. There is no incentive, therefore, for the states themselves to maintain historical records of their voter registration databases, and few do. First, although never providing complete coverage, using population-level data does make generating inferences about specific groups all the more straightforward. Second, we do not have to worry about questions related to the inflation of self-reported turnout, which have made using survey data to gauge turnout very problematic.

We have a unique opportunity to study the effect of the Georgia photo ID statute from the vantage point of a traditional policy impact model. Contrary to much of the previous research examining the effects of voter ID laws, we do not have to rely on contextual data (e.g., presence of a specific requirement) or on self-reports on the part of survey respondents (e.g., type of ID possessed). This list allows us to examine the turnout behavior for a set of registrants lacking photo ID before and after the implementation of the Georgia statute. In this manner, we can determine whether stricter ID requirements actually deterred some registrants from voting. Stated otherwise, we can empirically determine whether the law produced a suppression effect and, in addition, calculate the size of such an effect. In 2004, this group of registrants could vote in-person without photo ID. In 2008, however, these registrants could vote only after obtaining some form of government-issued photo ID.[8] If those registrants lacking photo ID prior to the law's implementation did vote in the 2008 general election, one has to conclude that in the intervening time period they obtained some form of valid photo ID (i.e., driver's license or ID card issued by county registrar) or voted absentee by mail (see endnote 8).

To our knowledge, this is the first study that tracks a group of registrants who lack photo ID and studies their voting behavior prior to, and following, implementation of a photo ID statute. In addition, we also have a ready comparison group, all other Georgia registrants, who it is assumed possess some form of photo ID. Using these two groups, we can study turnout across subsequent presidential election cycles to gauge the extent to which the voter ID statute may have suppressed turnout. We can determine not only if turnout rose or fell among registrants lacking photo ID but we can also compare the shift in turnout that may have occurred with the change in turnout for registrants with proper ID.

More specifically, with the data at hand, we can estimate what is known as a random-comparison-group model of comparative change, as we have an experimental group (those registrants lacking ID) and a control group (all other registrants), which are simultaneously exposed to the same treatment—the implementation of the Georgia

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

Case 2:13-cv-00193   Document 676-23   Filed on 11/11/14 in TXSD   Page 44 of 57

photo ID statute (Mohr 1995). Using this design, we have a baseline for voter turnout prior to implementation of the photo ID statute for each of these groups. Therefore, noted shifts in voter turnout, if any, between the control and experimental groups should be related to the implementation of the law.

Although we cannot randomize assignment to the treatment group, we can manipulate assignment to the control group, helping to minimize what is known as selection-Q bias (defined as a difference in outcome between the experimental and control groups caused by some causal factor or factors but falsely associated with the treatment effect; Mohr 1995). In our case, instead of choosing a random sample to act as a control group, we used the entire population minus the treatment group as our comparison group. In using the remaining population of registrants as our comparison group, the only group that could be said to be potentially unrepresentative is, therefore, the treatment group whose membership cannot be controlled.

This design also helps to mitigate the threat to internal validity from external events or history. Thus, this type of research design helps control for a number of external factors, such as changes related to the context of an election. For example, should the Obama candidacy in 2008 have an impact on black turnout as compared with the 2004 presidential election? The answer is yes, but with this model we have a set of black registrants with and without photo ID who are being exposed to the same set of electoral circumstances. Any divergence in behavior should again be due to the introduction of the treatment and not to external events (see Mohr 1995 for a discussion of impact analysis models for policy implementation).

Using copies of the state's voter registration database to represent the pool of registrants following the 2004 and 2008 general elections, we added a field to represent those registrants lacking photo ID from the report generated for the state by the DMV. As each Georgia registrant has a unique eight-digit voter registration number and this information was also included in the report produced by DMV, it was a straightforward process to match registrants using this field. For the database used to represent registrants from the 2004 election, we achieved a match rate of 78.5% (227,455 of the 289,622 registrants detailed on the report above), and for 2008, our match rate was 98.2% (274,356 of 289,622). In 2004, this represented 4.99% of total registrants and in 2008, 4.74%.[9] Almost four out of five from this identified group then were in the electorate and eligible to vote in the 2004 general election.

To study the effects of Georgia's photo ID law, we specify three models where the dependent variable is turnout (1 = *voted*, 0 = *did not vote*). All three models pool the population of registrants in Georgia from 2004 to 2008 providing just under 10.2 million cases for analysis. Our primary variable of interest, *no driver's license*, is a binary measure where those registrants who do not possess a valid driver's license or state-issued ID card are coded 1 while all other registrants are coded 0.

Georgia is one of five states that officially collect racial and ethnic data on registrants and we use this information from the registration database to create a series of dummy variables designed to measure a registrant's race or ethnicity.[10] These variables include *black, Hispanic, Asian*, and a residual category labeled *other race/ethnicity*.[11]

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

Case 2:13-cv-00193 Document 676-23 Filed on 11/11/14 in TXSD Page 45 of 57

**Table 1.** Voter Turnout in the 2004 and 2008 Georgia General Elections by ID Status

|  | 2004 Election | | 2008 Election | |
|---|---|---|---|---|
|  | No ID | ID | No ID | ID |
| Voted | 47.6% (170,547) | 72.9% (3,138,397) | 39.6% (108,376) | 70.0% (3,819,971) |
| Did not vote | 52.4% (118,492) | 27.1% (1,166,816) | 60.4% (165,171) | 30.4% (1,640,138) |

*Notes:* ID = identification. Entries are column percentages, and frequency counts are given in parentheses.

In both models, white (Anglo) registrants are used as the excluded racial category. In addition, we also include variables for sex (1 = *female*, 0 = *male*) and registrant age in years. A contextual variable, *per capita income*, measuring the 2004 or 2008 per capita income by residential zip code is incorporated in the model as well.[12] To differentiate the effects of the two election cycles, we created a dummy variable where the registrant pool from the 2004 election is coded 1. Finally, to distinguish the effects of not having ID across the two elections, an interactive term was computed by multiplying the ID status indicator by the 2004 election cycle indicator.

We also specified a second model designed to parse the effects of ID status by race/ethnicity and a third model designed to test age-related effects. It includes all the variables described in the first model along with a full set of interactive terms where ID status is multiplied by all included racial categories, the election cycle indicator is multiplied by all included racial categories, and ID status is multiplied by all racial categories and the election cycle dummy. A third model includes the requisite set of interactive terms to test for age-related effects. All models are estimated using logistic regression with robust standard errors clustered by zip code due to the inclusion of the contextual income variable previously described.[13]

## Findings

Before delving into the results of our multivariate models, we present some simple descriptive statistics on turnout by election cycle and ID status in Table 1. In 2004, those registrants lacking photo ID had a turnout rate of 47.6% compared with other registrants with a 72.9% rate of turnout. In 2008, the turnout rate for those registrants lacking ID drops to 39.6%, whereas for those with photo ID the rate falls to 70.0%. Although turnout falls in general from 2004 to 2008, one can note that the gap for those lacking ID is much wider, at 8 points, than that for our comparison group at 2.9 points. This cursory evidence indicates that those registrants without ID may have been more adversely affected by implementation of the new law compared with other registrants. To provide a greater degree of substantiation, however, we need to test this hypothesis within the context of a multivariate model where adequate control measures can be employed.

The results of our logistic regression model designed to study the impact of Georgia's voter ID law are found in the first column of Table 2. The *no driver's license*

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

**Table 2.** Models Predicting Voter Turnout in the 2004 and 2008 General Elections in Georgia

| Variable | Model 1 | Model 2 | Model 3 |
|---|---|---|---|
| No driver's license | −1.2158*** (.0120) | −1.3128*** (.0119) | −0.7360*** (.0175) |
| Black | −0.0167 (.0267) | 0.1574*** (.0249) | −0.0156 (.0267) |
| Hispanic | −0.5278*** (.0203) | −0.4932*** (.0183) | −0.5265*** (.0203) |
| Asian | −0.6268*** (.0353) | −0.7147*** (.0391) | −0.6252*** (.0354) |
| Other race/ethnicity | −0.6363*** (.0164) | −0.5528*** (.0172) | −0.6350*** (.0164) |
| Female | 0.2079*** (.0065) | 0.2101*** (.0065) | 0.2099*** (.0065) |
| Age | 0.0219*** (.0003) | 0.0220*** (.0003) | 0.0228*** (.0003) |
| Per capita income | 0.0000095*** (.0000019) | 0.0000095*** (.0000019) | 0.0000095*** (.0000019) |
| 2004 election | 0.1370*** (.0112) | 0.2655*** (.0088) | 0.1558*** (.0172) |
| 2004 election × No driver's license | 0.2270*** (.0208) | 0.3163*** (.0120) | |
| Black × No driver's license | | 0.0898*** (.0229) | |
| Hispanic × No driver's license | | −0.0692 (.0435) | |
| Asian × No driver's license | | 0.3900*** (.0548) | |
| Other race/ethnicity × No driver's license | | 0.3185*** (.0263) | |
| Black × 2004 election | | −0.4169*** (.0127) | |
| Hispanic × 2004 election | | −0.0407 (.0233) | |
| Asian × 2004 election | | 0.2678*** (.0225) | |
| Other race/ethnicity × 2004 election | | −0.2629*** (.0196) | |
| Black × No driver's license × 2004 election | | 0.0094 (.0409) | |
| Hispanic × No driver's license × 2004 election | | 0.0796 (.0560) | |
| Asian × No driver's license × 2004 election | | .0478 (.0739) | |
| Other race/ethnicity × No driver's license × 2004 election | | −0.0222 (.0369) | |
| Age × No driver's license | | | −0.0110*** (.0004) |
| Age × 2004 election | | | −0.0004 (.0002) |
| Age × No driver's license × 2004 election | | | 0.0046*** (.0003) |
| Constant | −0.4432*** (.0593) | −0.5022*** (.0592) | −0.4802*** (.0590) |
| Percentage correctly predicted | 70.8% | 70.8% | 70.8% |
| Null prediction | 69.9% | 69.9% | 69.9% |
| Proportional reduction in error | 3.0% | 3.0% | 3.0% |
| N | 10,189,755 | 10,189,755 | 10,189,755 |

*Notes:* Entries are logistic regression coefficients with robust standard errors in parentheses. Dependent variable: 1 = *voted*, 0 = *did not vote.*
*$p < .05$. **$p < .01$. ***$p < .001$.

coefficient is negative and statistically significant, indicating that Georgia registrants lacking photo ID were less likely to turn out in the 2008 general election. The interactive term designed to measure the probability of turnout in the 2004 election for registrants lacking ID was positive and significant. Turnout for those lacking photo ID was

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014



**Figure 1.** Georgia turnout by identification status

higher in 2004 as compared with 2008. The dummy variable for the 2004 election cycle indicates that turnout was higher for registrants possessing photo ID as well as in the 2004 general.

The other findings from the model indicate that Hispanics, Asians, and those of another race/ethnicity were significantly less likely to vote compared with white registrants. For black registrants, the coefficient is not statistically significant indicating turnout for blacks is indistinguishable from that of white registrants. Female registrants, older registrants, and those registrants residing in more affluent areas were also more likely to turn out to vote.

In Figure 1, we convert the model coefficients into probabilities by manipulating the variables for ID status and election cycle.[14] In 2004, registrants in Georgia lacking photo ID were predicted to turn out at .542 compared with other registrants at .761. The difference of .219 is statistically significant. Although there is a large gap in turnout between these two groups, what we are interested in detecting is not whether a turnout gap between these groups of registrants exists but whether the gap in 2004 has expanded or contracted relative to the gap present in the 2008 general election.

In 2008, turnout among the group without photo ID dropped to .451, whereas turnout for other registrants fell to .735. The difference in probabilities for turnout is .284, which is statistically significant. Although turnout for both groups of registrants

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

Case 2:13-cv-00193   Document 676-23   Filed on 11/11/14 in TXSD   Page 48 of 57

**Table 3.** Probability Differences by ID Status, Race, and Election Cycle

| Race/ethnicity | Election | Intraelection difference | Interelection difference |
|---|---|---|---|
| All registrants | 2004 | .219* | |
| | 2008 | .284* | |
| | | | −.065* |
| White | 2004 | .216* | |
| | 2008 | .310* | |
| | | | −.095* |
| Black | 2004 | .207* | |
| | 2008 | .280* | |
| | | | −.073* |
| Hispanic | 2004 | .239* | |
| | 2008 | .329* | |
| | | | −.089* |
| Asian | 2004 | .131* | |
| | 2008 | .224* | |
| | | | −.094* |
| Other | 2004 | .173* | |
| | 2008 | .243* | |
| | | | −.070* |

*Notes:* ID = identification. Intraelection difference = turnout probability of registrant with ID − turnout probability of registrant without ID; interelection difference = intraelection difference, 2004 − intraelection difference, 2008.
*$p < .05$.

declined over this time period, one can see that the gap between these two groups widened from 2004 to 2008. The interelection difference, calculated as the 2004 intraelection difference minus the 2008 intraelection difference, at −.065, is also statistically significant (see Table 3). This difference of the difference is one estimate of a suppression effect induced by the full implementation of the voter ID statute in Georgia, as this measure takes into account the effect of ID status on turnout comparing the 2004 election (pre implementation) with the 2008 election (post implementation).[15]

A second model further refines the effects of the voter ID statute by racial and ethnic classifications for Georgia registrants. By producing an exhaustive set of interactive terms, we are able to separate the impact of the law by race/ethnicity, ID status, and election cycle. In this manner, we can gain insight into the manner in which the photo ID law may disproportionately have affected registrants of various races/ethnicities. The full model is presented in the second column of Table 2. As an alternative to discussing the model coefficients directly, we transpose the coefficients into a set of predicted probabilities which are presented in Table 3 and Figure 2.

Figure 2 decomposes the effects on turnout by ID status and racial category across the 2004 and 2008 general elections. For those Georgians who lacked proper photo ID

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014



**Figure 2.** Georgia turnout by race and identification status

turnout across all racial categories falls from 2004 to 2008. For white registrants in this category, turnout declined from .56 in 2004 to .41 in 2008—a 15-point fall-off. The largest drop occurred among Asian registrants where turnout declined 22 points. The smallest decline was witnessed among black registrants who only fell 5 points. Those registrants with valid photo ID, with two exceptions, also witnessed a decrease in turnout over the same period. White and Hispanic turnout for these registrants fell 5 points from 2004 to 2008, whereas Asian turnout dropped from .69 to .56, or 13 points. Turnout for those in the residual *other* category stayed exactly the same from 2004 to 2008 at .60, whereas turnout among black registrants actually ticked up 2 points during this time from .73 to .75.

Probability differences by race/ethnicity, ID status, and election cycle are highlighted in Table 3. Again, these predicted probabilities are generated from the coefficients presented in the second column of Table 2. For each racial category, intraelection difference measures are calculated for the 2004 and 2008 general elections, as well as the interelection difference between the two election cycles. The combination of these calculations takes into account the known fact that those without ID are already less prone to participate compared with those who possess photo ID.

The largest effect is actually observed among white registrants. For this group, the interelection difference is .216 in 2004 and .310 in 2008. The difference of these differences or the interelection difference is −.095, indicating that the turnout gap between

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014



**Figure 3.** Georgia turnout by age and identification status

registrants with and without photo ID widened by almost 10 points between the two election cycles. Again, we would argue that the interelection difference is evidence of a possible suppression effect produced by the implementation of the Georgia voter ID statute.

It should be noted that the interelection difference for all racial/ethnic categories is negative and fairly sizable, with a .025 point range from the highest to lowest measure. In addition, as indicated in the table, difference measures across all racial/ethnic groups are statistically significant. It is interesting to note that although the interelection difference for Asians is extremely close to that for white registrants (−.094 vs. −.095), no minority group saw a bigger gap than that produced by the state's racial majority. The interelection difference for black registrants, at −.073, was just over 2 points less than that for whites. Although there appears to be credible empirical evidence that Georgia's voter ID law lowered turnout, the law does not appear to have disproportionately affected minority registrants.

We also analyze the voter ID statute and its interaction with registrant age in Model 3 of Table 2. Again, using a set of interactive terms, we can separate effects by age category, ID status, and election cycle to determine the extent to which the statute may have altered the probability of turnout. As age is measured in a continuous manner, we transpose the effects of Model 3 into a graphical format. Figure 3 plots the turnout

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

probability by age beginning at 18 years and continuing in 5-year increments through the age of 93. A total of four lines is plotted representing Georgia registrants who do, and do not, possess ID for the 2004 and 2008 election cycles.

As the political participation literature has long indicated, age should be positively related to the probability of turnout. Across the four groups plotted, this pattern is indeed evident; however, the intercepts and slopes across these four groups vary markedly. Registrants with ID are slightly less likely to turn out in 2008 compared with 2004 across the entire age spectrum. For example, registrants with photo ID who were 18 had a turnout probability of .64 in 2004 compared with .60 in 2008. At the other end of the spectrum, the intraelection difference for those 93 years of age had narrowed to 1 point (.90 vs. .89). For registrants lacking photo ID, there is a larger gap between turnout in 2004 and 2008, and this gap is positively related to age. The predicted turnout probability for 18-year-old registrants is .43 in 2004 and .37 in 2008, producing a drop of 6 points. For those 93 years of age, the gap from 2004 to 2008 has more than doubled at more than 12 points (.71 vs. .59).

As with the prior analyses presented, it is critical that not only the turnout differential be calculated for those without photo ID pre- and post implementation but also that any difference be compared with those registrants who do possess photo ID. The same interelection difference measure described previously is again calculated for each age category used. This measure is plotted as a series of bars across the bottom of Figure 3. Looking at Figure 3, one can see that the interelection difference for those 18 years of age is −.02. This measure increases across the age spectrum to −.11 by the age of 83 years. As the figure clearly shows, age is definitely a mediating factor related to ID status and turnout.[16]

## Discussion and Conclusion

What can we conclude from the results of the analyses presented? Using a traditional policy impact model to ascertain the effects of the Georgia voter ID statute leads to a number of generalizations. First, there is a suppression effect among those lacking this form of ID. The analysis presented yields different results than earlier cross-sectional studies, which generally concluded that more demanding ID standards do not negatively affect participation. Our study demonstrates an across-the-board drop in turnout for Georgians lacking photo ID that is 6.5 points higher than the decline witnessed for the remainder of the voting population. We should also note that this decline occurred in an election cycle that generated greater voter interest, with approximately 650,000 more votes cast in the Peach State in 2008 compared with 2004.

A related observation concerns the level of such suppression. Using some basic mathematics, we estimate the extent to which the Georgia voter ID statute may have affected turnout in the 2008 election. Assuming 274,356 registrants (again, this is the number of matches generated from the 2008 voter registration database) were still on the roll without valid photo ID in 2008, we can estimate the number of registrants in Georgia adversely affected by the law. Our model estimates that prior to the new

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

Georgia law, the turnout rate for this group was .54, whereas after implementation turnout fell to .45 (see Table 3). In the absence of the new law, we would estimate that 148,152 of these registrants would have voted in 2008. In actuality, 123,460 of this group of registrants voted producing a difference of 24,692. Total turnout in 2008 was 3,928,348, or 67.84% of all registrants. Adding the 24,692 registrants estimated to be deterred by the new law, would have increased turnout to 3,953,040, equating to a turnout rate of 68.27%. The difference, −.43, could be considered one measure of the suppressive effect of the new law. Stated succinctly, we estimate turnout in Georgia in 2008 would have been about four-tenths of a percentage point higher had the courts blocked the photo ID statute.[17]

Second, although the law does slightly depress overall turnout, this effect does not disproportionately affect racial or ethnic minority groups. Although the extent of the fall-off in participation among those lacking necessary ID varied across racial/ethnic groups, it affected all groups, including whites. In fact, white Georgians were actually the most likely to be affected by the new law. Again, our findings stand in contrast to other researchers who have concluded that voter ID laws disproportionately affect racial or ethnic minorities (Baretto et al. 2009; Vercellotti and Anderson 2009). A more likely explanation for the drop in turnout among those lacking photo ID is a linkage of the law with SES, which cuts across racial and ethnic lines in roughly the same manner. This was one of the conclusions reached by Alvarez, Bailey, et al. (2008) in research involving CPS data.

Third, registrant age was also found to be an important mediating agent in relation to ID status. Older registrants lacking photo ID were much more likely to be affected by the voter ID statute in 2008 compared with their counterparts. The interelection difference for those at the upper end of the age spectrum was 11 points compared with only a 2-point differential for the youngest registrants. The effect uncovered for age then, eclipses those related to race and ethnicity where the maximum interelection difference was calculated to be 9.5 points.

From a policy perspective, states that implement more stringent voter ID laws must view the potential drop in turnout against the stated intent of such statutes. The federal courts have, indeed, recognized the compelling interest of states to prevent fraud in the electoral process. In Georgia, the stated legislative intent among Republican lawmakers who crafted the legislation was the reduction of in-person voting fraud.[18] It is unclear, however, just how much voter fraud, much less the in-person variety, has been committed in Georgia lately.[19] In the *Common Cause* proceedings, Cathy Cox testified that during her tenure as Secretary of State (1997–2007) no cases of in-person voter fraud had been reported to her office.[20] In addition, to make the statute more legally palatable, the state implemented no-excuse absentee voting by mail in 2007. The small body of scholarly research conducted on voter fraud indicates that mail absentee balloting is more susceptible to fraud than in-person voting methods.[21] In summation, the statute strengthens controls over voting methods not as prone to contemporary fraud, while relaxing standards over an area currently more susceptible to malfeasance.[22]

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

Case 2:13-cv-00193  Document 676-23  Filed on 11/11/14 in TXSD  Page 53 of 57

Voter ID requirements have been a lightning rod topic inside and outside of academia. As with other subjects, such as gun control or abortion, many come to the debate with a preconceived opinion of the effects and merits of voter ID laws. It is the job of social scientists to use real-world observations combined with statistical techniques to produce unbiased inferences concerning various phenomena. To that end, we present an empirical assessment related to the effects rendered by the implementation of Georgia's photo ID statute. Our pre- and post-implementation research design, which uses individual-level population data on registrants in Georgia, provides a great deal of leverage in generating a number of causal statements related to the impact of the change in the state's election laws. From empirical observation, we now know that the requirement suppressed turnout and we can estimate the size of the effect. Whether one views this negative externality of the law as an unacceptable disenfranchisement of voters, as plaintiffs have argued, or as acceptable for ballot security concerns, as the courts have held, is a normative judgment. As such, we leave it to readers to make their own decisions concerning the merits of photo ID laws.

## Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

## Notes

1. 4:05-CV-00201-HLM (N.D. Ga., 2007).
2. As a jurisdiction subject to Section 5 of the Voting Rights Act, Georgia has to secure federal approval before implementing changes related to the election process. Eggen reports that Department of Justice approval came when political appointees overruled objections registered by the professional staff (Dan Eggen. "Politics Alleged in Voting Case." *Washington Post*, January 23, 2006).
3. A detailed listing of voter identification (ID) requirements by state has been compiled by the National Council of State Legislatures and is available on their website: www.ncsl.org
4. Vercellotti and Anderson (2006) describe five types of ID requirements. Baretto, Nuno, and Sanchez (2007) consider six types of ID exclusive of a photo ID.
5. Unlike other states, *every* registrant in Georgia who shows up to vote in-person, either early or on election day, is required to present proper photo ID.
6. Some have argued that examining provisional ballots might be one method of determining the impact of photo ID laws. Following this line of reasoning, we were able to collect some data from the Georgia Secretary of State relating to provisional ballots. In 2004 (pre implementation), there were a total of 12,895 provisional ballots cast in the general election of which 30.8% were eventually counted. In the 2008 general election (post implementation), there were a total of 17,365 provisional ballots cast, half (48.2%) of which were counted.

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

If we take overall turnout into account, however, the percentage of provisional ballots cast drops from .49% of the total vote in 2004 to .44% in 2008. Although studying provisional ballots is one method of trying to gauge the effect of photo ID laws, this metric does not capture voter suppression that may be associated with implementation of such a statute. In other words, provisional ballots are only a measure of those registrants who may have shown up to the polls lacking proper photo ID. Those lacking photo ID who may have been deterred from attempting to cast an in-person ballot are not captured by this measure. In addition, we should note that other issues (i.e., registration) may force a voter to cast a provisional ballot. Unfortunately, the data we received from the *Secretary of State* do not delineate provisional votes by cause, so we have no way of determining just how many of these provisional votes were specifically linked to ID issues.

7. This report was subsequent to an earlier one which was requested by the State Election Board in June of 2006 and was used to create a mailing list to inform registrants who were thought to lack proper photo ID about the new statute. See Carlos C. Campos, "Fight over Photo ID Resumes," *Atlanta Journal-Constitution*, September 2, 2006.

8. These registrants might also have voted using the state's new no-excuse absentee mail ballot which could be requested by registrants without photo ID. For our purposes, we are interested only in whether this group of registrants voted in 2008, not the voting method used.

9. Calculated as 227,455/4,560,309 and 274,356/5,790,570. Voter registration databases are constantly being updated by states to ensure accuracy. The fact that we were not able to match the entire list of 289,622 registrants lacking photo ID in 2007 to our historical copies of the registration database could stem from a variety of reasons. Most of this loss is certainly attributable to the natural addition and subtraction of registrants carried out for a variety of reasons, such as death, movement in and out of the state, and other eligibility requirements (i.e., legal age for registration, obtaining citizenship through naturalization, and criminal disenfranchisement among others).

10. The other states are Florida, Louisiana, North Carolina, and South Carolina.

11. This category includes those registrants who were classified as other, unknown, or American Indian.

12. Data Source: *Community Sourcebook of Zip Code Demographics* (18th and 22nd ed., 2004 and 2008). Vienna, VA: ESRI Press.

13. Models estimated using the logit command in Stata 10. See Primo, Jacobmeier, and Millyo (2007) for discussion of using mixed-level data.

14. The remaining variables in the model were set at their mean or modal values. Our *average* Georgia registrant is a white female of mean age residing in a zip code with average per capita income. Probability simulations are produced using *Clarify 2.0.*

15. Our interelection difference measure is one estimate of a suppression effect produced by Georgia's photo ID statute as it assumes that implementation of the new law will not alter the turnout rate for those registrants who already possess photo ID. Although we view this as a reasonable assumption, some opponents of photo ID laws argue that such laws may even deter those registrants with the proper ID credentials from voting for a variety of reasons. Unfortunately, we are unable to test any of these claims empirically.

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

16. Some opponents of photo ID statutes have argued that older blacks may be more affected by these laws than elderly white registrants. To test this claim, we subset the data set by race and estimated two additional models to isolate the effects of ID status and age for white and black registrants. Using the ages 18 and 75, we again calculated the interelection difference for white and black registrants, comparing those with and without ID across the 2004 and 2008 election cycles. For those registrants 18 years of age, the interelection difference for whites is −.037 compared with −.031 for black registrants. The interelection difference for registrants 75 years of age is −.105 for whites and −.069 for blacks. Counter to some claims that have been made then, the effect of age and ID status on turnout is more pronounced for white registrants than black registrants. The results of these analyses are available on request.

17. Again, we acknowledge the possibility that some registrants who previously possessed photo ID may have been deterred from voting in 2008. Our calculation is based solely on turnout rates pre- and post implementation for those registrants identified as lacking photo ID. Given this, four-tenths of a percentage point decline in turnout we attribute to implementation of the new law can be viewed as a conservative estimate of voter suppression.

18. The Speaker of the House in the Georgia General Assembly stated that actions to block the statute in court "clearly reveal the intent of the Georgia Democrats to secure voting rights for dead people, felons, and illegal immigrants." Carlos Campos. "Voter ID Law on Hold." *Atlanta Journal-Constitution*, July 8, 2006.

19. It should be noted that scientific studies related to the prevalence of voter fraud are very sparse. Although there continue to be numerous anecdotal examples of fraud reported in journalistic sources (many of which are not actual cases of fraud), few studies have been undertaken by social scientists to offer a systematic method(s) for discovering and measuring the extent to which voter fraud exists in contemporary elections. Some notable examples of scholarly research on this topic include Alvarez, Hall, and Hyde (2008) and Minnite (2010).

20. Sonji Jacobs and Carlos Campos. "Voter Bill Stirs Furor." *Atlanta Journal-Constitution*, March 30, 2005.

21. See, for example, U.S. Election Assistance Commission. 2006. *Status Report on the Voting Fraud-Voter Intimidation Research Project*. Washington, DC.

22. One of the more recent cases of voter fraud in Georgia involved a state court judge tampering with absentee ballots. Although certainly fraudulent in nature, this type of activity could not have been prevented by the state's voter ID statute. Todd South. "Defense Focuses on Investigators During Second Trial Day." *Chattanooga Times-Free Press*, March 30, 2009.

## References

Alvarez, R. Michael, Delia Bailey, and Jonathan Katz. 2008. *The Effect of Voter Identification Laws on Turnout*. Pasadena, CA: CalTech/MIT Voting Technology Project.

Alvarez, R., Michael, Thad E. Hall, and Susan D. Hyde, eds. 2008. *Election Fraud*. Washington, DC: Brookings Institution Press.

Ansolabehere, Stephen. 2009. "Effects of Identification Requirements on Voting: Evidence from the Experiences of Voters on Election Day." *PS: Political Science & Politics* 42(January): 127–30.

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

Atkeson, Lonna Rae, Lisa Ann Bryant, Thad E. Hall, Kyle Saunders, and Michael Alvarez. 2010. "A New Barrier to Participation: Heterogeneous Application of Voter Identification Policies." *Electoral Studies* 29(1): 66–73.

Baretto, Matt A., Stephen A. Nuno, and Gabriel R. Sanchez. 2007. "Voter ID Requirements and the Disenfranchisements of Latino, Black and Asian Voters." Prepared for the Annual Meeting of the American Political Science Association.

Baretto, Matt A., Stephen A. Nuno, and Gabriel R. Sanchez. 2009. "The Disproportionate Impact of Voter-ID Requirements on the Electorate—New Evidence from Indiana." *PS: Political Science & Politics* 42 (January): 111–6.

*Common Cause v. Billups.* 2007. United States District Court, Northern District of Georgia.

Downs, Anthony. 1957. *An Economic Theory of Democracy.* New York: Harper and Row.

Erikson, Robert S., and Lorraine C. Minnite. 2009. "Modeling Problems in the Voter Identification—Voter Turnout Debate." *Election Law Journal* 8(2): 85–101.

Hood, M. V., III, S. Charles, and Bullock, III. 2008. "Worth A Thousand Words? An Analysis of Georgia's Voter Identification Statute." *American Politics Research* 36(June): 555–79.

Key, V. O. 1949. *Southern Politics in State and Nation.* New York: Alfred A. Knopf.

Leighley, Jan E. 1995. "Attitudes, Opportunities, and Incentives: A Field Essay on Political Participation." *Political Research Quarterly* 48:191–209.

Minnite, Lorraine C. 2010. *The Myth of Voter Fraud.* Ithaca, NY: Cornell University Press.

Mohr, Lawrence B. 1995. *Impact Analysis for Program Evaluation.* Newbury Park, CA: Sage Publications, Inc.

Muhlhausen, David B., and Keri Weber Sikich. 2007. *New Analysis Shows Voter Identification Laws Do Not Reduce Turnout.* A Report of the Heritage Center for Data Analysis. www.heritage.org/Research/LegalIssues/cda07-04.cfm (Accessed June 18, 2012).

Mycoff, Jason D., Michael W. Wagner, and David C. Wilson. 2009. "The Empirical Effects of Voter-ID Laws: Present or Absent?" *PS: Political Science & Politics* 42(January): 121–6.

Primo, David M., Matthew L. Jacobmeier, and Jeffrey Millyo. 2007. "Estimating the Impact of State Policies and Institutions with Mixed-Level Data." *State Politics and Policy Quarterly* 7(4): 446–59.

Rosenstone, Steven J., and John Mark Hansen. 1993. *Mobilization, Participation, and Democracy in America.* New York: Macmillan Publishing Company.

Sobel, Richard, and Robert Ellis Smith. 2009. "Voter-ID Laws Discourage Participation, Particularly among Minorities, and Trigger a Constitutional Remedy in Lost Representation." *PS: Political Science & Politics* 42(January): 107–10.

Vercellotti, Timothy, and David Anderson. 2006. *Protecting the Franchise or Restricting It? The Effects of Voter Identification Requirements on Turnout.* Presented at the Annual Meeting of the American Political Science Association, Philadelphia, PA.

Vercellotti, Timothy, and David Anderson. 2009. "Voter-Identification Requirements and the Learning Curve." *PS: Political Science & Politics* 42(January): 117–20.

Wolfinger, Raymond E., and Steven J. Rosenstone. 1980. *Who Votes?* New Haven, CT: Yale University Press.

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014

## Bios

**Charles S. Bullock, III**, is the Richard B. Russell Chair in Political Science and Josiah Meigs Distinguished Teaching Professor at the University of Georgia. His teaching and research interests include Southern and legislative politics, redistricting and voting rights. He is the author, co-author, editor, or co-editor of 28 books and more than 150 articles. His most recent books are *Redistricting: The Most Political Activity in America, The Oxford Handbook of Southern Politics, The Triumph of Voting Rights in the South and Key States, High Stakes: Sarah Palin, the Tea Party and the 2010 Elections.*

**M.V. Hood, III**, is an associate professor of political science at the University of Georgia, where he conducts research in American politics and policy. He is coauthor of *The Rational Southerner: Black Mobilization, Republican Growth, and the Partisan Transformation of the American South* (Oxford University Press).

Downloaded from spa.sagepub.com at REED COLLEGE LIBRARY on August 24, 2014