Exhibit 16
Date 8/26/14
Melody Campbell, CSR



# CALTECH/MIT VOTING TECHNOLOGY PROJECT

A multi-disciplinary, collaborative project of
the California Institute of Technology – Pasadena, California 91125 and
the Massachusetts Institute of Technology – Cambridge, Massachusetts 02139

# THE EFFECT OF VOTER IDENTIFICATION LAWS ON TURNOUT

R MICHAEL ALVAREZ
CALTECH
DELIA BAILEY
WASHINGTON UNIVERSITY IN ST. LOUIS
JONATHAN KATZ
CALTECH

Key words: *voter identification, HAVA, voter identification requirements, voter turnout*

VTP WORKING PAPER #57
Version 2
Oct 2007

# The Effect of Voter Identification Laws on Turnout*

R. Michael Alvarez    Delia Bailey    Jonathan N. Katz

### Abstract

Since the passage of the "Help America Vote Act" in 2002, nearly half of the states have adopted a variety of new identification requirements for voter registration and participation by the 2006 general election. There has been little analysis of whether these requirements reduce voter participation, especially among certain classes of voters. In this paper we document the effect of voter identification requirements on registered voters as they were imposed in states in the 2000 and 2004 presidential elections, and in the 2002 and 2006 midterm elections. Looking first at trends in the aggregate data, we find no evidence that voter identification requirements reduce participation. Using individual-level data from the Current Population Survey across these elections, however, we find that the strictest forms of voter identification requirements — combination requirements of presenting an identification card and positively matching one's signature with a signature either on file or on the identification card, as well as requirements to show picture identification — have a negative impact on the participation of registered voters relative to the weakest requirement, stating one's name. We also find evidence that the stricter voter identification requirements depress turnout to a greater extent for less educated and lower income populations, but no racial differences.

*Previous versions of this paper were presented at the 2007 Summer Methods Meeting, The Society for Political Methodology, Pennsylvania State University, and at the 2007 Annual Meeting of the American Political Science Association, Chicago, Illinois. We thank Shigeo Hirano and Thad Hall, who provided comments at each conference respectively, as well as conference participants. We also thank Andrew Gelman for helpful conversations and Clark Bensen for help with proofreading. We thank the Carnegie Corporation of New York and the John S. and James L. Knight Foundation for their support of our research through grants to the Caltech/MIT Voting Technology Project. The analysis presented here, and the interpretations of our analysis, are those of the authors and not of the Caltech/MIT Voting Technology Project, nor the foundations supporting this research. Please note that Katz has served as an expert witness in two lawsuits involving voter identification requirements, however the research presented here was neither funded by any interested party to those lawsuits nor discussed in court testimony.

# 1. INTRODUCTION

That election rules and procedures have been used historically to deny the right to vote to potential participants in democracies is no surprise to any student of elections. There has been a great deal of research showing how election rules and procedures have systematically denied suffrage to women, racial and ethnic minorities, and other groups, especially in the United States (see Kousser 1974; Keyssar 2001 for summaries and analysis). Another line of research on voter participation in the United States has looked at the modern period, and focused on possibly less pernicious, but still potentially problematic, procedures and laws that are argued to make voter registration and turnout more onerous: voter registration deadlines, inaccessible registration and voting processes, and the availability of polling places. This line of research was sparked by the seminal work of Wolfinger and Rosenstone (1978) and their research has been followed by a vast array of studies that mainly focus on the effects of registration laws on voter participation (see Highton 2004 for summaries), though recent research has begun to look directly at how aspects of the voting experience, like the availability of voting machines, might affect participation (e.g., Highton 2006, Mebane 2005).

In recent years, especially in the wake of the disputed 2000 presidential election, there has been much debate about imposing what some see as important safeguards of electoral integrity, but what others see as additional barriers to participation — new requirements for voter identification. The debates about voter identification became central during the legislative maneuvering prior to the passage of the Help America Vote Act (2002), and since passage of HAVA, these arguments have been front and center in the public discussion of election reform. HAVA addressed one aspect of the voter identification debate, as HAVA's Section 303 required that all new registrants must show an identification or provide proof of identification, either with their by-mail application or the first time they show up to vote.

But since the passage of HAVA, many states have pushed for additional identification requirements, in particular, requiring that all voters show identification before they are allowed to obtain and cast a ballot in any election. The justification for the expansion of these identification requirements is to prevent election fraud and to thus improve the integrity of the electoral process, despite some who argue that there is scant evidence that without identification requirements there are significant levels of double voting or voting by non-eligible individuals (Fund 2004; Overton 2006a). As of just prior to the 2006 general election, roughly half of the states required some form of voter identification from all voters (Electionline 2006).

There is little research on the effect that voter identification requirements, of any form, have on the participation of registered voters. Thus, while both HAVA and nearly half of the states have implemented a variety of new identification requirements for voter registration and participation by the 2006 general election, there is little understanding about whether these requirements reduce voter participation, and whether they reduce

the participation rates of certain classes of voters. This is the central task of our paper: documenting the effect of voter identification requirements on registered voters as they were imposed in states in the 2000 and 2004 presidential elections, and in the 2002 and 2006 midterm elections. Using four election cycles and individual responses to the Current Population Surveys allows us to isolate the effect of voter identification requirements on voter turnout. The state-level panel data allows us to control for changes in the electoral environment both across states and across time — which we could not do with only one year of data — and the individual-level data allows us to answer questions about whether certain subpopulations are disproportionately effected by these regulations — which is not possible using aggregate data.[1]

Looking first at trends in the aggregate data, there is no evidence that voter identification requirements reduce participation. Once we turn to the individual-level data, however, we find that the strictest forms of voter identification requirements — combination requirements of presenting an identification card and positively matching one's signature with a signature either on file or on the identification card, as well as requirements to show picture identification — have a negative impact on the participation of registered voters relative to the weakest requirement, stating one's name. In general, there does not seem to be a discriminatory impact of the requirements on some subpopulations of registered voters, in particular minority registered voters; however we do find evidence that the stricter voter identification requirements do depress turnout to a greater extent for less educated and lower income populations. In the next section we discuss the substantive problem of voter identification requirements in more detail, and the relevant research. We then turn to a discussion of our methodology, the data we use (the 2000-2006 Current Population Survey Voter Supplements, from the U.S. Census Bureau), and our results. Our paper concludes with a discussion of the implications of our work, and with our suggestions for future research.

## 2. IDENTIFICATION REQUIREMENTS AND VOTER PARTICIPATION

Despite much attention in the popular literature, the impact of voter identification requirements on participation in the United States has, to-date, received little academic attention.[2] For example, in 2005 the Commission on Federal Election Reform, after months of hearings and deliberations, released a report recommending that all voters present photographic identification before they could cast their ballot. But, writing in the *Michigan Law Review*, Spencer Overton (a member of the Commission, though a member who dissented from the voter photographic identification requirement recom-

---

[1] For methodological specifics and details about the analysis, please see Alvarez, Bailey and Katz (2007).

[2] Recently there has been some controversy regarding a study that the U.S. Election Assistance Commission sponsored regarding voter identification laws, including a study of the effects of voter identification laws on voter participation. We discuss the specifics of the latter study below, and later we compare our results to theirs. Additional information regarding the EAC's voter identification study can be found at http://www.eac.gov/eac_voter_id_fraud.htm.

mendation) noted that there was little research on either the basic rationale for voter photo identification requirements (reducing election fraud) or on the effect of these requirements on voter participation: "Rather than continuing to rely on unsubstantiated factual assumptions, election law scholars and policy-makers should look to empirical data to weigh the costs and benefits of various types of election regulations" (Overton 2006b, 681).

Unfortunately, few scholars have so far answered Overton's call for research in this area. We are aware of only a handful of recent studies on this subject. One group of scholars has looked recently at the implementation of voter identification laws, using New Mexico in 2006 as their laboratory (Atkeson et al. 2007; Alvarez, Atkeson and Hall 2007). Despite much debate in New Mexico, in 2006 the voter identification law there allowed a broad range of methods of identifying voters, including a simple written or verbal statement of the voter's basic identifying information (Atkeson et al. 2007). But as these studies have shown, how this was implemented in polling places throughout the state in the 2006 general election varied considerably, and these studies provide evidence that Hispanics were more likely asked to provide some form of identification than non-Hispanics (Atkeson et al. 2007).

Other scholars have asked whether minority voters are less likely to possess potential forms of identification, than non-minority voters. Barreto, Nuño, and Sanchez (2007) utilize exit polls from the 2006 elections in California, New Mexico, and Washington — all states with signature requirements — to ask voters whether they would be able to provide several different forms of identification, such as a birth certificate or recent bank statement, if required. The study finds that "controlling for age, income, and education, ... immigrant and minority voters are significantly less likely to be able to provide multiple forms of identification" (Barreto, Nuño, and Sanchez 2007, 1).

Another recent study is Lott's analysis of county-level data, for general and primary elections, from 1996 through 2004. His analysis of the aggregated data does not find that voter photo identification requirements in place during this period decreased voter participation rates, noting that "it is still too early to evaluate any possible impact of mandatory photo IDs on U.S. elections" (Lott 2006, 11).

In a different analysis — more like the one we develop and focus on below — Vercellotti and Anderson (2006) analyze the 2004 Current Population Survey's (CPS) Voter Supplement to study the effect of voter identification requirements in the 2004 presidential election. Vercellotti and Anderson study both aggregate and individual-level data, and reach a number of conclusions that differ significantly from Lott's analysis. Vercellotti and Anderson find in their aggregate-level analysis that some forms of identification requirements (signature matches and non-photo identification provision) did reduce voter participation, and that in their individual-level analysis of the CPS survey data they found that the deleterious effects of identification requirements were more substantial for non-whites than for whites. Their study, however, is methodologically flawed.

Our study is similar to Vercellotti and Anderson's in two ways: first, we employ

the same basic data source as they did (the Census CPS Voter Supplement data), and second, we employ a similar theoretical framework. We use the CPS Voter Supplement data for the same reasons as Vercellotti and Anderson: these survey data provide a relatively large sample of the American voting population, sufficiently large so that we can attempt to estimate the effects of voter identification requirements for subpopulations of the electorate (racial and ethnic minorities), and so that we can get variation in the requirements themselves across states. Furthermore, the CPS Voter Supplement data are about as close to a canonical dataset as political scientists have; most of the important studies of political participation, going back to Wolfinger and Rosenstone's seminal contribution (1978) have used the CPS data.[3] But unlike Vercellotti and Anderson's study, we use a much broader array of CPS Voter Supplement data, from four federal elections, 2000, 2002, 2004, and 2006. By employing four federal elections instead of the single election that Vercellotti and Anderson used we are able to correctly estimate the causal effect of voter identification requirements by utilizing the differences between states that changed their requirements and those that did not. Also with much larger sample sizes we can obtain a much more precise estimate of the effects of voter identification requirements on participation.

In another recent analysis, Mycoff, Wagner, and Wilson (2007) utilize the 2000, 2002, 2004, and 2006 American National Election Studies (NES) to measure the effect of voter identification requirements on turnout in federal elections. Mycoff, Wagner, and Wilson examine both aggregate and individual-level data, and suggest, like Lott, that voter identification requirements have no effect on turnout. Although the authors utilize data from the same four recent federal elections as we do, they analyze each year separately, and in doing so, fail to isolate the causal effect of the institutional change in requirements. Furthermore, as has been noted by others, the CPS data are seen as superior for studying voter turnout, because the NES has much smaller samples and hence much less sample coverage, because the NES has a much lower response rate than the CPS, and the NES post-election interviewing can often run well into December following an election while the CPS is typically completed in November (Highton 2005). Additionally, the overreporting of turnout in the NES is commonly seen as higher than what the CPS routinely reports.[4]

---

[3] There are, of course, exceptions. Like Lott's study cited in the text, there are other aggregate-level studies of voter participation rates, for example, Knack's (2001) study of the effect of the implementation of election-day voter registration on turnout rates across states. Another prominent exception is the study by Verba, Schlozman and Brady (1995), as they collected their own survey data to study civic engagement and participation. But the CPS Voter Supplement data are provide extensive cross-sectional data, comparable over time, and thus are well-suited to our analysis. The CPS Voter Supplement data to pose some problems for the study of voter turnout, especially misreporting of voter turnout; this is an issue we return to in out conclusion.

[4] The U.S. Census Bureau's official report on the 2000 voter supplement data stated: "Significant discrepancies occur each election between the CPS estimates and the official numbers. In the November 2000 CPS, 111 million of the 203 million people of voting age in the civilian noninstitutional population reported that they voted in the 2000 election. Official counts showed 105.6 million votes cast, a difference of about five million votes (5 percent) between the two sources" (U.S. Census Bureau, 2000, page 11). McDonald estimates the NES voter turnout rate in the 2000 presidential election as 72.7%, with his "Reconciled-VAP" turnout rate of 55.2%, that is an overreporting rate of 17.5% (McDonald 2003; see original data at http://elections.gmu.edu/NES_Bias.htm).

We use the same theoretical premise as the Vercellotti and Anderson study, and the Mycoff, Wagner, and Wilson study, which is the theoretical basis for most work on voter participation: the cost-benefit calculus of voter turnout articulated in early work on rational choice (Downs 1957; Riker and Ordeshook 1968). The key assumptions of this calculus of voter turnout are that voters are rational, that they are aware of the costs and benefits of participating in an election, and they behave according to the relative comparison of the costs and benefits. Thus, if it is too costly for them to participate — if for example the barriers to participation are high relative to the returns, with the barriers being such things as registration requirements, long lines at polling places, inaccessible voting locations, and other similar factors — they will not cast a ballot on election day. Like these previous two studies, we assume that the more restrictive a state's voter identification requirements, the more likely they are to constitute a hurdle for registered voters, and thus that more restrictive voter identification requirements are likely to be associated with a reduction in the likelihood that an individual registered voter turns out to vote.

It is also instructive to think about how this basic calculus of voting works for different categories of voters, as well. For example, the basic question about whether or not eligible citizens with lower levels of educational attainment are less likely to vote because the barriers to participation, even at the margin, are greater for them than for highly educated voters, has received attention in the research literature (see Wolfinger and Rosenstone 1978; Nagler 1991). But instead of focusing only on the interaction between education and potential barriers to the exercise of the franchise, we are interested below in the interaction between race or ethnicity and barriers to the franchise, especially voter identification requirements. We see this latter interaction as important to study because of the potential legal ramifications of finding that the effects of voter identification requirements and differential across racial or ethnic groups (Overton 2006a), not to mention the normative implications if we find racial or ethnic differences in the effects of voter identification requirements on participation.

Thus, our critical hypotheses, which we test below, flow clearly from the theoretical literature on participation, and are closely linked to decades of applied research on the effects of barriers to voting on participation. First, we hypothesize that where states have imposed more restrictive identification requirements for registered voters, their participation rates should be lower, ceteris paribus, than in states which have less restrictive identification requirements for voting. Second, we also hypothesize that these effects of more restrictive voter identification requirements should be stronger for black and Hispanic registered voters than for white eligible voters, ceteris paribus, following arguments that minority voters may be less likely to have appropriate government-issued identification, or that they may be less willing to provide that identification in order to vote (Overton 2006a) Similarly, we hypothesize that the effects of identification requirements on voters with lower levels of education and income will be disproportionately negative.

In the end, while the hypotheses we will test below are similar to those tested by previous scholars, our methodology is much more appropriate for this substantive prob-

lem. Our multilevel model combines the approaches of both these previous studies of the 2004 presidential election, but by incorporating data going back to 2000, we are able to better identify and estimate critical parameters in our model, especially the direct effect of voter identification requirements on voter participation, as well as the indirect effects of these requirements on racial minorities, and those on the lower rungs of the socioeconomic scale. Thus, we argue that our framework presents an important contribution over earlier work in this area methodologically, and more importantly, allows us to more confidently answer questions about the potential of voter identification requirements to disenfranchise. In subsequent sections we present our methodological argument in more detail.

## 3. VOTER IDENTIFICATION LAWS IN THE STATES

As a starting point for our analysis, we develop a classification scheme for the different voter identification regimes that exist in the United States. Since the enactment of HAVA, there are eight basic types of requirements to vote *at the polls*. They are in listed in order of increasing stringency:

1. Voter must state his/her name.
2. Voter must sign his/her name in a poll-book.
3. Voter must sign his/her name in a poll-book and it must match a signature on file.
4. Voter is requested to present proof of identification or voter registration card[5]
5. Voter must present proof of identification or voter registration card.[6]
6. Voter must present proof of identification and his/her signature must match the signature on the identification provided.
7. Voter is requested to present photo identification.[7]
8. Voter is required to present photo identification.

Combinations of the above requirements are often in place, such as requiring a voter to both state *and* sign his/her name. In our analysis, cases are coded at the level of requirement that is more stringent. In this example, the case would be coded as a signature requirement. Most states in 2004 required that first-time voters who registered by mail to present identification (per HAVA requirements), but here we are interested in the effect of requirements on all registered voters.

Thus, we want to measure the extent to which voter identification requirements affected voter participation at the polls, but this is a difficult methodological problem for

---

[5] An affidavit may be signed in lieu of presenting identification and a regular (non-provisional) ballot may still be cast.

[6] The range of acceptable proof of identification ranges across the states, but in addition to a form of government-issued photo identification, other acceptable pieces of identification include utility bills, social security cards, student identification cards, paychecks, and bank statements, as well as hunting and fishing licenses and gun permits.

[7] An affidavit may be signed in lieu of presenting photo identification and a regular (non-provisional) ballot may still be cast.

7

several reasons. First, the requirements are not binary. As is apparent from the listing of the types of regimes, it is not the case that a state either requires identification to vote, or does not. States require many different levels of identification from simply stating one's name to showing a picture identification. This further complicates the question, as we must determine not just one effect but several potentially incremental effects. Second, states may differ in their implementation of similar requirements. While one state may consider a student identification card or discount club membership card to be valid photo identification, another state may only recognize government-issued photo identification cards. Third, the data we have to answer this question is relatively sparse. That is, since the changes in voter identification requirements have really only started since the passage of HAVA in 2002 and the law we are most interested in — photo identification requirements — was only implemented in 2006, we have only a small amount of information in the available data about how each type of voter identification requirement might affect participation. Finally, identification requirements are not randomly assigned across states. This is a problem if states with historically lower turnout also tend to adopt stricter identification requirements, we will have trouble isolating whether the low level of turnout is due to the identification requirement or to other factors that lead a given state to have lower turnout rates.

Figure 1 presents the geographical distribution of voter identification requirements across states over the period 2000 to 2006.[8] The lightest shade represents the "state name" requirement, while the darkest shade represents the requirement for a photo identification card. In 2000, nine states had the weakest identification requirement, 18 states required a signature to vote, nine states required a matching signature, four states requested an identification card, eight states required an identification card and three states required that the voter's signature match that on the identification card. In 2006, seven states only required voters to state their name at the polls, ten states required a signature, seven states required a matching signature, two optionally required identification, 20 required some form of identification card, three requested a photo identification card and two required that the identification be photo. In Florida, the photo identification allowed ranged from government-issued cards to discount club cards with photos. In Indiana, only government-issued photo identification and student identification from Indiana state universities were accepted. In addition to the differences between states in any particular year, many states strengthened their identification requirements between 2000 and 2006 and only one state weakened their requirements as can be seen by the darkening of the figure.[9]

The change in requirements over time and across states will allow us to identify and estimate the causal impact of the voter identification requirements. That is, we can com-

---

[8] In order to save space only the Continental states are included. Alaska required government-issued identification cards in all elections covered here. Hawaii requested identification in 2000 and 2002, required identification in 2004 and requested photo identification in 2006.

[9] South Carolina is the only state to have reduced its requirements during this time frame. It required both an identification card and a matching signature in 2000 and 2002. In 2004, South Carolina requested photo identification, but in 2006 returned to only requiring some form of identification or a voter registration card.



Figure 1: *Voter Identification Laws, 2000-2006. Darker shades correspond to more stringent authentication requirements. In general, identification requirements became stricter between 2000 and 2006.*

pare changes in turnout rates in states that altered their requirements to those that did not, and we can attribute any changes to the change in requirements. Figure 1 also brings to light a critical methodological problem of non-random treatment assignment that we believe plagues some of the earlier work that uses single elections. Close examination of the figure shows that states in the Southern and Western regions are more likely than states in the Northeast to have strengthened their voter identification requirements over our study period. As can be seen in Figure 2 turnout in both the South and West is historically lower than that of states in the Northeastern and Midwestern regions. The combination of these two factors in these regions of the United States raises the problem of non-random assignment, an issue that complicates the analysis of the effect of identification requirements on voters.

9