Robert Duncan                                                                                     June 7, 2012

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS                    )
                                  )
                                  )
VS.                               )   NO. 12-CV-128
                                  )   (DST, RMC, RLW)
                                  )
ERIC H. HOLDER, JR.,              )
In his official                   )
Capacity as Attorney              )
General of the United             )
States, ET AL                     )

*******************************************
ORAL DEPOSITION OF ROBERT DUNCAN
*******************************************

ANSWERS AND DEPOSITION OF ROBERT DUNCAN, a witness
called by the United States taken before Janalyn Reeves,
Certified Shorthand Reporter for the State of Texas, on
the 7th day of June, 2012, between the hours of 9:30 a.m
and 4:29 p.m., in the offices the US Attorney, 816
Congress Avenue, Suite 1000, Austin, Texas, pursuant to
the agreement of counsel for the respective parties as
hereinafter set forth.

**Page 3**

INDEX

                                                       PAGE
Appearances............................   2

ROBERT DUNCAN
  Examination by Ms. Maranzano ........   6
  Examination by Mr. Brazil. .........  242

Signature and Changes...................  254
Reporter's Certificate..................  256

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
  OFFICE OF THE ATTORNEY GENERAL:
  By:  MR. PATRICK SWEETEN
  - and -
  MR. JAY DYER
  209 West 14th Street
  Austin, Texas  78701
  PH: (512) 936-6432

FOR THE DEFENDANT:
  DEPARTMENT OF JUSTICE
  By:  MS. JENNIFER MARANZANO
  - and -
  MR. VICTOR WILLIAMSON
  950 Pennsylvania Avenue, NW
  Room 7161 NWB
  Washington, DC  20530
  PH: (202) 305-0185

FOR THE INTEVENORS:
  BRAZIL & DUNN, LLP
  By:  MR. SCOTT BRAZIL
  4201 Cypress Creek Parkway
  Suite 530
  Houston, Texas  77068
  Ph: (281) 580-6310

**Page 4**

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 520 | Notice of Deposition | 35 |
| 521 | House Bill | 48 |
| 522 | Interim Report | 58 |
| 523 | Online History | 82 |
| 524 | HB 218 Record | 126 |
| 525 | Senate Rules | 137 |
| 526 | Letter | 149 |
| 527 | Letter | 149 |
| 528 | Senate Journal | 163 |
| 529 | Email | 170 |
| 530 | Senate Bill 14 | 172 |
| 531 | Letter | 215 |
| 532 | Letter | 215 |
| 533 | Senate Rules | 219 |
| 534 | Indiana Voter ID Law | 221 |
| 535 | SB 14 Hearing Transcript | 223 |
| 536 | Senate Journal | 228 |

PREVIOUSLY MARKED EXHIBITS

|    |          |     |
|----|----------|-----|
| 3  | Letter   | 98  |
| 28 | HB 218   | 79  |
| 29 | SB 362   | 105 |





EXHIBIT
RD-1

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                                June 7, 2012

---

**Page 5**

1  MS. MARANZANO: Good afternoon, Senator
2  Duncan. My name is Jennifer Maranzano. I'm
3  representing the defendant, Attorney General Eric
4  Holder, in this matter. Can you please --
5  MR. SWEETEN: I'm sorry. Can we do
6  introductions? I would like to make sure the record is
7  clear on who is here for whom.
8  MS. MARANZANO: Yes. Why don't we go around
9  the room and everybody state their name and who they are
10  representing.
11  MR. WILLIAMSON: Victor Williamson,
12  Department of Justice.
13  MR. BRAZIL: Scott Brazil for the Kennie
14  Intervenor's.
15  MS. MARANZANO: Jennifer Maranzano with
16  defendant, Attorney General Eric Holder.
17  MR. SWEETEN: I'm Patrick Sweeten with the
18  State of Texas and on behalf of the State and on behalf
19  of the witness, Senator Robert Duncan. And attorney Jay
20  Dire who will be joining us very shortly.
21  MS. MARANZANO: Thank you.
22  SENATOR ROBERT DUNCAN,
23  having being first duly sworn, testified as follows:
24
25

---

**Page 6**

1  EXAMINATION
2  BY MS. MARANZANO:
3  Q. Senator, can you please state your name for the
4  record?
5  A. Robert Duncan.
6  Q. Have you been deposed before?
7  A. Yes.
8  Q. And what was the -- what case was that?
9  A. I'm an attorney, so I appeared as an expert on
10  things before. I was also deposed in the redistricting
11  case by Senator Davis's attorney that was -- occurred
12  here in 2011 I believe, or '12.
13  Q. How many times have you been deposed?
14  A. I don't know. I've had depositions on
15  legislative intent back when I was in the House. So I
16  would say four or five times, but I can't remember
17  specifically.
18  Q. And one was the redistricting case in 2011?
19  A. Correct.
20  Q. And one was a case where you were an expert, did
21  you say?
22  A. Well, more or less, yes, on workers'
23  compensation. It's an area that I had some expertise a
24  long time ago. Not anymore.
25  Q. And when was that?

---

**Page 7**

1  A. 90s, 1995, '94.
2  Q. And the cases on legislative intent, can you tell
3  me about those?
4  A. That was a case on a workers' comp bill I
5  believe, back in 1994. And I was deposed on what was
6  the -- I can't remember the specific issue, but it had
7  something to do with workers' comp.
8  Q. Were you deposed in your capacity as a senator?
9  A. No, I wasn't a senator at this time.
10  Q. Were you deposed as a member of the House of
11  Representatives?
12  A. Correct.
13  Q. And the other cases you were deposed in?
14  A. They were private cases, as I was deposed as a
15  person with knowledge, specialized knowledge in a
16  certain area or field.
17  Q. Okay. And what field or area?
18  A. That was workers' compensation.
19  Q. Okay. And the case in which you testified -- in
20  which you were deposed that dealt with legislative
21  intent, can you tell me what you mean by that
22  legislative intent?
23  A. Well, they were -- the lawyers on one side
24  were -- there had been an amendment to a bill that I had
25  handled. And they were trying to -- and I don't even

---

**Page 8**

1  remember the bill. And it was workers' comp -- may have
2  been something else. I can't remember. But it was --
3  they were trying to understand what the nature of the
4  legislation and what was in it. That's all I really
5  remember about it.
6  Q. Do you remember the nature of that case?
7  A. No.
8  Q. And the other cases, the other cases for which
9  you were deposed, other than this case that we're
10  talking about right now where you testified about the
11  legislative intent of the workers' compensation bill and
12  the redistricting case, you said you were deposed in
13  your capacity as an individual, not as a legislator; is
14  that correct?
15  A. In the -- I don't understand the question. I'm
16  sorry.
17  Q. So there were two times, I think, that we've
18  talked about where you were deposed in your capacity as
19  a legislator; is that correct?
20  A. Twice, yes.
21  Q. And the other times you were deposed, was that in
22  your capacity as an individual?
23  A. Correct.
24  Q. Okay. Well, I'm going to tell you a little bit
25  about how this is going to go today. It sounds like you

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

9

1  are very familiar with depositions. You've been placed
2  under oath so it's important to testify truthfully,
3  accurately and completely. The court reporter is taking
4  a transcript of everything we say, so it's important
5  that you wait until I finish asking a question before
6  you answer and I will wait for you to finish your answer
7  before I ask the next question. Please respond verbal
8  to my questions instead of nodding or shaking your head.
9  I'll try to ask you clear questions. If you don't
10 understand anything I say, please let me know. If you
11 wish to take a break, just let me know and we'll go
12 ahead and take a break. If there's a question pending,
13 I would ask you to just finish that question before we
14 take a break. Do you understand these instructions?
15     A. Yes.
16     Q. Are you on any medication today that would affect
17 your ability to testify truthfully, accurately and
18 completely?
19     A. No.
20     Q. Is there any other reason why you can't testify
21 truthfully, accurately and completely today?
22     A. No.
23     Q. Today I may use the terms voter ID and photo ID
24 interchangeably. I want you to interpret these terms
25 broadly to mean a requirement that a voter present a

10

1  form of identification, whether it has photo on it or
2  not, when voting in person before being permitted to
3  cast a regular ballot. Do you understand that?
4      A. Yes.
5      Q. When I refer to minority voters today, I mean
6  voters who are non-white, non-Anglo. Do you understand
7  that term?
8      A. As you laid it out, yes.
9      Q. Thank you. Are you represented by counsel today?
10     A. Yes.
11     Q. And who is that?
12     A. The Attorney General of the State of Texas.
13     Q. And when did that representation begin?
14     A. Well, I would assume it began at any point in
15 time where I guess when this litigation -- for the
16 purpose of this litigation, when this litigation
17 occurred, was filed. I think at any time I confer with
18 the Attorney General on any issue. I think that there's
19 the attorney/client relationship exists.
20     Q. We've talked a little bit about the times in
21 which you've been deposed. Have you ever testified in
22 court?
23     A. Yes.
24     Q. And how many times have you testified?
25     A. Twice.

11

1      Q. What were the nature of those proceedings?
2      A. The -- one was in connection with this time that
3  I was an expert on workers' compensation issue in a
4  civil case in district court in Texas, the State
5  district court. The other time was an issue that arose
6  from a lawsuit against Farmers Insurance. And I was
7  subpoenaed to testify in that case with regard to
8  negotiations and mediation that I conducted as a member
9  of the legislature trying to resolve that dispute. It
10 was over homeowner's insurance. And I testified briefly
11 in Travis County district court on that case.
12     Q. And the first case you said was in State district
13 court?
14     A. Right.
15     Q. And the second one was in Travis County district
16 court --
17     A. State court, yes.
18     Q. Oh, the State court. Have you ever been a party
19 to a lawsuit?
20     A. No.
21     Q. Other than the redistricting case which we talked
22 about, have you ever been involved in a case in which
23 the State of Texas was either a plaintiff or defendant?
24     A. No.
25     Q. What did you do to prepare for today's

12

1  deposition?
2      A. Well, I had a brief visit with Mr. Sweeten over
3  the phone and then briefly this morning before we came
4  in here. And I reviewed parts of the transcript of the
5  hearings in 2009-2011.
6      Q. Which parts of the transcript did you review?
7      A. Mainly the parts were in the beginning where I
8  was mainly involved in those issues.
9      Q. The beginning of the legislative debate?
10     A. Right.
11     Q. Are you referring to the Committee of the Whole
12 debate?
13     A. Right.
14     Q. And your meetings with Mr. Sweeten, how long did
15 you talk to him on the phone?
16     A. 20 minutes.
17     Q. Was anybody else on the phone?
18     A. No, not that I know of. There may have been
19 somebody else from his office, but I can't remember who
20 it was. I just remember Mr. Sweeten.
21     Q. Other than your attorneys, have you spoken to
22 anybody about your deposition today?
23     A. Other than scheduling it, no.
24     Q. Have you spoken to anyone who has been deposed in
25 this case?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

13

1    A. Not about this -- about the case or the
2  deposition.
3    Q. Have you reviewed any transcripts from anybody
4  who's been deposed in this case?
5    A. No.
6    Q. Did you bring any notes or documents with you
7  today?
8    A. No.
9    Q. Is it your understanding that you, as a state
10  legislator, may invoke legislative privilege?
11    A. Yes.
12    Q. Will you be invoking the legislative privilege
13  over your deposition testimony today?
14    A. Yes.
15       MS. MARANZANO: I would like to note, for
16  the record, that we've received a court order on June
17  5th about what topics are covered by the legislative
18  privilege and what topics are not covered by the
19  legislative privilege. I'm going to ask questions in
20  compliance with that court order. Obviously your
21  attorney can object to questions that he believes invade
22  the legislative privilege and give you instructions
23  accordingly. But I want to say, for the record, that
24  we're reserving our right to appeal that decision at the
25  appropriate juncture.

14

1  BY MS. MARANZANO:
2    Q. Can you describe your educational background for
3  me?
4    A. Yes. I completed a BS degree in 1976 in
5  agricultural economics, a JD degree from the Texas Tech
6  University School of Law in 1981. And that's generally
7  it.
8    Q. Are you currently licensed to practice law?
9    A. Yes.
10    Q. And in what states are you admitted to the bar?
11    A. Texas.
12    Q. Any others?
13    A. Just federal courts and Supreme Courts, 5th
14  Circuit.
15    Q. And your bar license is currently active?
16    A. Yes.
17    Q. Can you tell me every legal job you've had since
18  graduating from law school?
19    A. Yes. I served as an associate in the law firm of
20  Crenshaw, Dupree & Milam until 1984. And then I was a
21  partner in that firm and have been a partner in that
22  firm since then and continue today to be a partner in
23  that firm.
24    Q. And do you have a special area you work on in
25  that firm?

15

1    A. I don't have a legal specialization. I primarily
2  am involved in litigation, personal injury and
3  commercial.
4    Q. How long have you served in the Senate?
5    A. I was elected in the special election and sworn
6  in in December of 1996.
7    Q. And you've served continuously since then?
8    A. Yes, ma'am.
9    Q. Have you held other elected offices?
10    A. Yes, ma'am.
11    Q. And what are those?
12    A. I was a member of the Texas House of
13  Representatives from 1993 until 1996 when I resigned to
14  run for the Senate.
15    Q. What made you decide to seek public office?
16    A. In essence, public service.
17    Q. Can you tell me about the population of the
18  district that you currently serve pre-redistricting?
19    A. Well, be more specific.
20    Q. Do you have any sense of the population
21  demographics?
22    A. I would be speculating on them. I know that the
23  region of the state I represent has Anglo and Hispanic
24  influence and Hispanic influence is growing.
25    Q. Any sense of what percentage, approximately?

16

1    A. Well, I would be guessing so I don't want to
2  speculate on that. I've seen the numbers and know the
3  numbers. But from a general list, but I don't want to
4  lay a number out without being specific. Those
5  demographics exist and change periodically. But
6  generally we have -- in rural West Texas we're Hispanic
7  and Anglo primarily, with African-American as well.
8    Q. Do you do any outreach in your district that's
9  geared particularly at minority communities?
10    A. I try to be available and outreach to all
11  communities. And yes, I do. I work very well with
12  Hispanic leaders and members of the Hispanic community,
13  as well as the African-American community.
14    Q. What do you mean by that, "you work well with
15  leaders of the Hispanic community"?
16    A. Well, I support their events and meet with them
17  on a regular basis. They support me. I recently had a
18  fundraiser. It was supported by and sponsored by
19  Hispanic leaders in the Lubbock community. And so, you
20  know, I try to -- my district is very broad and verse
21  and I try to do the best I can to meet the needs of the
22  members of my constituents I represent.
23    Q. Would you say that Hispanics are an important
24  constituency in your district?
25    A. They are.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                                 June 7, 2012

17

1    Q. Would you say African-Americans are an important
2    constituency in your district?
3    A. They are.
4    Q. What committees do you serve on in the Texas
5    Senate?
6    A. I chair the State Affairs Committee. I serve on
7    the Finance Committee, Higher Education Committee, on
8    Jurisprudence -- Committee on Jurisprudence and, you
9    know, various select committees that are appointed
10   during the interim. I don't think I left anything out.
11   Q. You what?
12   A. I think I covered everything.
13   Q. Okay. How long have you served on the State
14   Affairs Committee?
15   A. I was initially appointed to that committee in
16   2003. And in 2000 -- excuse me, 2001 -- no, 2003. I'm
17   sorry, 2003. And then I became chair in 2004 or '05,
18   2004, I believe.
19   Q. How did you become chair?
20   A. The Lieutenant Governor appoints the chairman of
21   various committees.
22   Q. And who was the Lieutenant Governor at that time?
23   A. Lieutenant Governor Dewhurst, David Dewhurst.
24   Q. What were the -- did you say you were on a couple
25   select committees?

18

1    A. Right.
2    Q. What were those?
3    A. Well, I've been on several. But mostly involving
4    school finance, public school finance.
5    Q. Anything else?
6    A. That's all. I think that's really, mainly it.
7    Q. And what's the purpose of a select committee?
8    A. Well, generally a select committee has members of
9    both the House and the Senate to study an issue in the
10   interim and often times they'll also have members of the
11   general public, as school finance did.
12   Q. Are they always held during interim sessions?
13   A. Normally. I can't recall of one not. There's no
14   requirement of that, but it would be unusual to have a
15   select committee operating during a 140-day general
16   session.
17   Q. Other than the Committee of the Whole, is the
18   State Affairs Committee the only Senate committee that
19   considered voter ID bills?
20   A. To my recollection, I believe that to be the
21   case, as far as I remember.
22   Q. If a Senator wishes to introduce a bill that's
23   going to be heard by the State Affairs Committee, do
24   they usually confer with you about that bill?
25   A. No.

19

1    Q. Putting aside voter ID bills, how many election
2    related bills have you sponsored?
3    A. That's a good question. I don't know the answer
4    I have, because as chairman of the committee we
5    interface with the Secretary of State quite a bit and
6    during the terms that I have served as chairman we've
7    implemented HAVA, we've implemented -- last session we
8    did the MOVE Act. So we've worked with the Secretary of
9    State's office. And typically I will sponsor those
10   bills, or a lot of times Leticia Van de Putte will do
11   that. She handles a lot of legislation and she and I
12   have worked together on those issues with regard to
13   election bills.
14   Q. Is Senator Van de Putte also on the State Affairs
15   Committee?
16   A. Yes.
17   Q. And so am I understanding you correctly, it's a
18   number of legislation bills you've sponsored?
19   MR. SWEETEN: You can refer to matters of
20   the public record when answering this.
21   BY MS. MARANZANO:
22   Q. We're just talking about ones that you've
23   publicly sponsored?
24   A. I can't give you an amount. That would be in the
25   record. You can look that up.

20

1    Q. Right. But are you saying you can't give me an
2    amount because it's more than a few?
3    A. Well, that and I've carried a lot of bills over a
4    lot of things in the 14 or 15 years. So I just can't
5    tell you specifically what they are. I can tell you
6    like I did, the general -- the bills that basically are
7    mandated to be -- by Congress to be a part of the State
8    systems, typically I'll handle those. But not always.
9    It depends if there's another member who wants to do
10   that, that's fine with me.
11   Q. And how does that work, if a federal law passes
12   that the State needs to implement, does the Secretary of
13   State usually reach out to you? How do you end up
14   proposing a law to implement HAVA or the MOVE Act, as
15   you referenced?
16   MR. SWEETEN: I'm going to object to the
17   question to the extent it calls for him to reveal his
18   mental impressions, his thoughts, his motivation about
19   legislation or the furtherance of the legislative
20   process. I'm going to instruct you not to answer to the
21   extent that your answer would implement those things.
22   You're free to refer to matters of the public record.
23   Also I'm going object to the question as vague and
24   compound.
25   A. I'll follow his instruction.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                              June 7, 2012

21

1    Q. (By Ms. Maranzano)  Okay.  There's nothing on the
2    public record that you could tell me about how the State
3    goes about implementing a federal election law that
4    passes?
5    A. Well, the public -- yeah, there is.  If you look
6    at the record of our committee.  When a bill is passed,
7    or introduced and then it goes to the hearing process.
8    And so there's a recorded testimony, there is evidence
9    that's put in the record and all of that is a part of
10   the legislative record and that's where it is.  It's
11   pretty clear on how it goes about what the testimony is,
12   Secretary of State will testify.  Typically the expert
13   in their office will testify as to the need for the
14   bill.  And that's how that works.
15   Q. Okay.  Are there primary areas of focus, of
16   legislative focus that you work on?
17   A. Not really.  I've had pretty -- well, work in a
18   lot of different areas.
19   Q. Other than being the chair of the State Affairs
20   Committee, do you have any leadership roles in the
21   Senate?
22   A. Today, that's it.
23   Q. In the past have you had other leadership roles?
24   A. I was chairman of the Jurisprudence and was
25   president pro tem.

22

1    Q. And when were you chair of the Jurisprudence
2    Committee?
3    A. 2003 and 2000 -- 2001, 2003, I think.
4    Q. 2001 to 2003?
5    A. I think it was two sessions.
6    Q. Approximately.  Okay.  When were you president
7    and pro tem?
8    A. 2011.  No, 2009.  Sorry.  Sorry.
9    Q. What are the responsibilities of being president
10   pro tem?
11   A. Well, I think the main responsibility is the
12   constitutional position.  And should the Lieutenant
13   Governor not be in the state or not be able to act,
14   well, then, the pro tem immediately succeeds that
15   position.  If the Lieutenant Governor leaves office, the
16   president pro tem then must call a special session to
17   elect a presiding officer.  That's primarily -- when the
18   Lieutenant Governor and the governor are out of the
19   state temporarily, then the president pro tem moves into
20   the head of the government.  So it's primarily what it's
21   responsibilities include.
22   Q. Do you have any experience related to election
23   law?
24   A. Other than serving on the State Affairs Committee
25   no.

23

1    Q. Do you have any experience related to election
2    administration?
3    A. No.
4    Q. Have you ever served as a poll worker?
5    A. No.
6    Q. While you -- well, let me ask you this.  Do you
7    vote in person?
8    A. Yes, ma'am.
9    Q. Have you ever witnessed any problems while you've
10   been voting?
11   A. No.
12   Q. Have you ever seen anybody try to impersonate
13   another voter, that you're aware of, while you've been
14   voting?
15   A. No.
16   Q. Have you ever seen a non-citizen trying to vote
17   while you've been voting, that you're aware of?
18   A. I wouldn't be aware.
19   Q. Have you ever challenged a voter's eligibility?
20   A. No.
21   Q. Are you familiar with a group called the American
22   Legislative Exchange Council, or ALEC?
23   A. I've heard of them.
24   Q. Have you ever had any affiliation with them?
25   A. No.

24

1    Q. Have you ever gone to any of their meetings?
2    A. No.
3    Q. Have you ever received any documents or
4    communications from them?
5    A. Not that I know of.  You know, I'm not a member
6    so I don't get their documents.  If they send something
7    generally to everybody in the legislature, maybe so.  I
8    don't know.  I don't recall seeing anything.  It might
9    not get to me.
10   Q. Are you familiar with a group called the National
11   Conference of State Legislators?
12   A. Yes, ma'am.
13   Q. Do you have any affiliation with that group?
14   A. With who?
15   Q. National Conference of State Legislators.
16   A. I think, like all legislators, we're probably
17   members, the legislature is.  But I don't have any
18   particular, individual affiliation or office or anything
19   like that.  I don't go to the meetings other than, I
20   think I've given a speech at one.  And I think I got an
21   award when I was in the House and I went to one as a
22   result of that award.
23   Q. Can you tell me when you gave the speech?
24   A. I think it was in 2009, something like that 2008
25   or '09.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                                June 7, 2012

25

1    Q. Do you -- what was that about?
2    A. Retirement benefits.
3    Q. And what did you get an award for?
4    A. The National Republican Legislators Award,
5    something like that, when I was in the House.
6    Q. When was that?
7    A. '94 or '95, 95.
8    Q. And was it for anything in particular?
9    A. No.
10   Q. Just being a good legislator?
11   A. Not sure why I got it.
12   Q. Okay. Have you received materials from the
13   National Council of State Legislators?
14   A. I'm sure we have over the -- overtime.
15   Q. Do you know if any of them involved voter ID?
16   A. I don't know.
17   Q. Do you have any familiarity with a group called
18   Safe Texas?
19   A. No.
20   Q. Do you know who they are?
21   A. No.
22   Q. Do you have any familiarity with a group called
23   Secure and Fair Elections in Texas?
24   A. No.
25   Q. Are you familiar with someone with the name of

27

1    A. Yes.
2    Q. Who is Mr. Mecler?
3    A. He's a member of the SREC.
4    Q. And what is the SREC?
5    A. State Republican Executor's Committee.
6    Q. Have you had any --
7    A. And I think he's also a member of the -- he's on
8    the Texas Department of Criminal Justice Board as well,
9    I believe.
10   Q. I'm sorry. I didn't catch that?
11   A. The Texas Department of Criminal Justice Board, I
12   think he's on that, too.
13   Q. Have you had any communications with Mr. Mecler
14   about voter ID?
15   A. No. Not that I recall.
16   Q. Are you familiar where someone by the name of
17   Bill Nobel?
18   A. Bill who?
19   Q. Nobel.
20   A. No.
21   Q. Do you know someone by the name Eric Opiela?
22   A. No.
23   Q. Linda Rogers?
24   A. No.
25   Q. Are you familiar with someone by the name of

26

1    Melinda Frederick?
2    A. No.
3    Q. Are you familiar with someone by the name of Tony
4    Ann Dashiell, D-A-S-H-I-E-L-L?
5    A. No, ma'am.
6    Q. Do you know someone by the name of Russ Durstine?
7    A. Durstine, yes, I know Russ.
8    Q. Can you tell me who he is?
9    A. Russ is, I think the -- isn't he from San Angelo.
10   I think Russ is from San Angelo, which is in my
11   district. Or he's either that or he's active in the
12   Republican Party Chairman's Association. One of those
13   two. I think Russ is a constituent from San Angelo.
14   Q. Have you had any communications with Mr. -- say
15   his last name for me again?
16   A. Durstine.
17   Q. Durstine. About voter ID?
18   A. No. Probably not.
19   Q. Probably not?
20   A. Probably not.
21   Q. Are you familiar with someone by the name of
22   Barbara Larson?
23   A. No.
24   Q. How about -- are you familiar with someone by the
25   name Tom Mecler?

28

1    Skipper Wallace?
2    A. Yes.
3    Q. And who is Skipper Wallace?
4    A. Skipper Wallace is the person who is affiliated
5    or associated with the Republican County Chair's
6    Association, I believe.
7    Q. Do you have any communications with Mr. Wallace
8    about voter ID?
9    A. Not other than -- you know, I believe Mr. Wallace
10   probably testified in front of the committee. I would
11   assume that he did because he did on a number of
12   different issues. He would be the person who would
13   testify in front of the State Affairs Committee on
14   election issues and things like that.
15   Q. Did you have any communications, apart from his
16   testimony, from Mr. Wallace about voter ID issues?
17   A. Not that I recall.
18   Q. Are you familiar with someone by the name of
19   Maria Martinez?
20   A. No.
21   Q. Are you familiar with someone named Catherine
22   Englebreth?
23   A. Catherine who?
24   Q. Englebreth.
25   A. No.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                                                                June 7, 2012

29

1    Q. Have you heard of an organization called True to
2   Vote?
3    A. No.
4    Q. Have you heard of an organization called the King
5   Street Patriots?
6    A. Yes.
7    Q. Do you have any affiliation with them?
8    A. No.
9    Q. Did you have any communications with the King
10   Street Patriots about voter ID?
11    A. If I did it would have been as an entity or a
12   person who represented that entity testifying before the
13   committee.
14    Q. I think I understand you. But just to be clear,
15   you're saying any communications you would have had with
16   them would have been them testifying at the State
17   Affairs Committee?
18    A. Right. I don't recall ever having -- and I had
19   very few meetings like that on issues like that in my
20   office. It would be something that would -- typically I
21   would just say come to the committee and talk to the
22   committee.
23    Q. Okay. So --
24    A. So that would be my interface with those folks.
25    Q. And just to be clear, when you say "you have very

30

1   few meetings like that," what do you mean by that?
2    A. Well, I mean typically serving in the
3   legislature, serving on the finance committee, other
4   capacities. I'm very seldom in my office. And so -- in
5   fact, I'm never in the office. So I'll be in a
6   committee room or in hearing or, you know, typically on
7   the floor all day long. And so I typically don't
8   entertain a lot of in office meetings with people about
9   legislation pending before my committee. My standard
10   thing is come to the committee and testify.
11    Q. Got it. Can anybody come to the committee and
12   testify?
13    A. Yes.
14    Q. During the times of the year when you are not in
15   the legislative session, do you have meetings with
16   people about potential legislative issues?
17    A. From time to time. But, you know, not that many,
18   quite frankly. I mean, there may be comments in
19   Lubbock or there may be something on workers'
20   compensation or, you know, from time to time people will
21   come to you with ideas. But that's probably like every
22   member, you know, has some meetings and dealings with
23   different trade organizations or work constituents.
24    Q. When you say "not that many," is it -- can you
25   just give me and approximate number?

31

1    A. No.
2    Q. Like a couple a months?
3    A. I'm not going to guess. But, you know, I will
4   say this. Typically in Austin, you know, I will come
5   during the interim once, maybe, a month for one day,
6   maybe two. Usually it's before -- because of a hearing.
7    Typically, if I have a meeting with someone it
8   will be, 90 percent of the time, an agency head over an
9   issue, whether it's a budget issue or an issue that I
10   have jurisdiction over in State Affairs or in some
11   committee or if I passed a bill. And if it's an
12   insurance bill I want to meet with the commissioner and
13   say, "What are you doing with regard to that?" Those
14   are the kinds of meetings I have in Austin.
15    In Lubbock I will have meetings from time to
16   time. I try to never turn down a constituent who wants
17   to come meet with me there. Or in San Angelo. I go to
18   Childress. I have 51 counties now. I had 46. So
19   it's -- you try to meet with your constituents, but at
20   the same time, logistics also cause us some issues
21   there.
22    Q. And you said your district was in Western Texas;
23   is that right?
24    A. Yes, ma'am.
25    Q. Can you describe, just very generally, the

32

1   geographic area?
2    A. Sure. It's -- before redistricting, it was 46
3   counties that spanned from the Panhandle all the way
4   down to Eldorado, Texas. And the major -- the larger
5   cities would be Lubbock and San Angelo. Came near
6   Abilene and Amarillo and near Wichita Falls as well.
7    Q. Can you tell me your staff members who work for
8   you in your legislative capacity?
9    A. Yes. My chief of staff is Porter Wilson. At
10   that time my general council was Cory Pomeroy. The
11   director for State Affairs and also general council is
12   Jennifer Fagan. My staff person in charge of Article 2
13   and health and human service issues is Jennifer
14   Chambers. Sara Clifton is the staff person in charge
15   of -- at that time -- she was with me at this time, in
16   2011. And then numerous staff members that are -- that
17   I can't remember the names of that are interim hires or
18   rather, staff session hires, with regard to legal issues
19   and things like that that, you know, younger lawyers
20   that help us with the committee and briefing bills and
21   working through problems with bills in the committee.
22    Q. And for a couple of these people you said "at
23   that time," and you were referring to during the 2011
24   legislative session?
25    A. Right. That's legislation.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

33

1    Q. Which of these staff worked on the voter ID
2    issue?
3    A. Jennifer Fagan.
4    Q. Anybody else?
5    A. Probably not.
6    Q. Do you know someone by the name of Megan LaVoie?
7    A. Uh-huh.
8    Q. Who is Megan LaVoie?
9    A. I'm sorry. Megan is -- handles the media for us
10   primarily. She's a law student who has just graduated
11   and studying for the bar now.
12   Q. Is she a staff of yours?
13   A. Yes, she still is. I just -- don't tell her I
14   forgot.
15   Q. All right. How often do you communicate with
16   your staff during the legislative session?
17   A. Daily.
18   Q. And how do you usually communicate with them?
19   A. Directly.
20   Q. In terms of verbally?
21   A. Right.
22   Q. Do you ever e-mail with them?
23   A. You know, other than "can you come to the
24   office," yes. "Would you send me -- send down a granola
25   bar," or "would you order me lunch." Just logistical

34

1    things. I don't -- it's hard to communicate like that
2    when you're trying to listen to a hearing or something
3    like that. So at the end of the day, we meet before we
4    go home and we debrief about what's happened.
5    Q. So when you do communicate with them, do you have
6    a blackberry or a phone?
7    A. At that time I had a blackberry, but I didn't --
8    we didn't communicate other than for the purpose of,
9    "can you bring me a granola bar" or, "somebody's here"
10   or whatever. And that's it.
11   Q. Okay. Non-substantive communication?
12   A. Yeah. I'm not very good at that thumb typing
13   stuff, plus I don't -- I think if a member is at the
14   committee dios, you ought to be listening and not
15   communicating with folks. I feel strongly about that.
16   Q. Do you ever use -- when you said you have -- I
17   think I didn't get an answer. Did you say you used a
18   blackberry when you do that?
19   A. Right.
20   Q. And is that a personal blackberry or work
21   blackberry?
22   A. It was a personal blackberry or law firm
23   blackberry.
24   Q. And do you save the messages on that?
25   A. No.

35

1    Q. Do you delete them or do they automatically get
2    deleted?
3    A. I don't know what happens to them, quite frankly.
4    The blackberry quit working so I had to replace it. And
5    because that technology is, more or less, going
6    obsolete, I replaced it with an iPhone. And I
7    definitely can't work that.
8    Q. Me either, actually. Is there someone in your
9    office who maintains legislative records?
10   A. You know, I guess everybody does. We don't
11   have -- we follow whatever the secretary of the Senate
12   tells us to do. I assume my chief of staff probably
13   handles most of that for the committee. It would have
14   been Jennifer Fagan.
15   Q. So the secretary of the Senate issues a retention
16   policy about files?
17   A. Yes.
18   Q. Okay.
19   A. We follow that.
20        MS. MARANZANO: Can we have this marked?
21        (Exhibit No. 520 was marked.)
22   BY MS. MARANZANO:
23   Q. Senator, I'm showing you what we're marking, for
24   the record, as deposition Exhibit 520. Can you just
25   take a look at this and let me know if it looks familiar

36

1    to you?
2    A. Yes, ma'am.
3    Q. And what is this?
4    A. It is a notice of deposition for today.
5    Q. And when you received this notice, can -- well,
6    did you receive this notice?
7    A. Well, we did. And I instructed staff to assemble
8    the documents I think that are necessary to comply.
9    Q. And did the staff turn those documents over to
10   your attorney?
11   A. Yes, they did.
12   Q. Can I direct your attention to request No. 5,
13   which is on the second to last page. Do you know how
14   many documents you turned over that were responsive to
15   that request?
16   A. No, ma'am.
17   Q. Who in your staff conducted the search for these
18   documents?
19   A. I think that Ms. Fagan did.
20   Q. Do you know if she searched electronic documents
21   as well as hard copies of documents?
22   A. I assume that she did and followed the
23   instructions in the subpoena.
24   Q. Did you have any communications with her about
25   her search for documents?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                              June 7, 2012

37

1    A. Other than when the subpoena came in, she called
2  and said we were notified by subpoena. Of course, we
3  get those kind of requests all the time. Typically, she
4  will do those. And I said, "Well, go ahead and comply
5  with it and turn it over to the Attorney General's
6  office." It was more or less routine in our office to
7  do that sort of thing.
8    Q. It's routine because of public information
9  request?
10    A. Sure. Yeah.
11    Q. Did you have any files compiled already that you
12  had done for public request on this issue?
13    A. No, I don't think so.
14    Q. Are you familiar with Section 5 of the Voting
15  Rights Act?
16    A. Not -- I know it exists. I'm not an expert on
17  it.
18    Q. What's your understanding of the requirements
19  under Section 5?
20    A. Well, you know, I'm not -- I don't really want to
21  go into what my understanding of it is. I think that
22  is, Section 5 of the Voting Rights Act, I believe is the
23  requirement for preclearance; is that correct? Is this
24  a test?
25    Q. No. I'm not trying to test you, sir. I'm really

38

1  not.
2    MR. BRAZIL: You'll be graded later.
3    A. Thank you. What I'm trying to figure out is what
4  are you asking, I guess. It's not clear to me.
5    Q. (By Ms. Maranzano) Right. Well, let me ask you
6  a different question. Are you familiar with a
7  requirement under the Voting Rights Act by which Texas
8  has to submit election related changes to either the
9  Department of Justice or federal court to get
10  preclearance?
11    A. I am familiar that we are required to do that.
12    Q. Okay. Could you describe as a general matter any
13  steps of the legislature takes to increase the chances
14  that a law is going to be precleared by the Department
15  of Justice or a federal court?
16    MR. SWEETEN: I'm going to instruct you not
17  to answer on the basis of legislative privilege. The
18  question would require you to reveal your thoughts,
19  mental impression and motivation about legislation in
20  furtherance of the legislative process. So I'm going to
21  instruct you not to answer on that basis.
22  BY MS. MARANZANO:
23    Q. All right. Let me ask you this, Senator. Is
24  there anything based on the public record that you could
25  tell me about the steps the legislature takes in regards

39

1  to Section 5?
2    MR. SWEETEN: Again, if you will confine
3  your answers to matters of the public record. Do not
4  reveal your thoughts, mental impressions or motivations
5  about this.
6    A. The committees in the Texas Senate hold hearings.
7  Those hearings are recorded and the documents that are
8  presented to be included in the record are included in
9  the record. And that would be the public record. The
10  Senate debates are the same way, as far as I don't use
11  exhibits on the Senate floor. But the debates and the
12  amendments to bills are in the public record.
13    Q. And again, based on the public record, does the
14  legislature usually do some sort of factual analysis to
15  determine if a law is going to have a retrogressive
16  effect on minorities?
17    MR. SWEETEN: Objection, compound.
18  Objection. Don't answer if it requires you to reveal
19  your mental impressions, opinions, motivation about
20  legislation. You can refer to matters of the public
21  record. But if in referring to the public record you
22  would be revealing your mental impressions do not do so.
23  It's subject to privilege.
24  BY MS. MARANZANO:
25    Q. And just to be clear, this isn't really -- I'm

40

1  not asking about what you personally do. I'm asking
2  about steps the legislature takes, available in the
3  public record, in terms of a factual analysis about
4  election related changes and whether or not they have a
5  retrogressive effect?
6    MR. SWEETEN: Same instruction.
7    A. I think the public record reflects what we do
8  very clearly and we follow, you know, the -- in the
9  committees we have hearings, we have public hearings.
10  And the testimony that we receive, pros and cons,
11  analytical, not so analytical, is in the public record.
12    Q. And just in terms of a "yes" or "no" answer for
13  this one. Do you do anything beyond that testimony. Do
14  you do any analysis beyond that testimony?
15    MR. SWEETEN: Don't answer that question.
16  That would require you --
17    MS. MARANZANO: Not even to say "yes" or
18  "no"?
19    MR. SWEETEN: No, not even a "yes" or "no."
20  You're asking him about his mental impression.
21  motivation. Whether he does something beyond the public
22  record would go into that and he's not going to provide
23  it based upon the legislative privilege objection.
24    MS. MARANZANO: Okay. This isn't about him.
25  This is about steps the legislature takes. So it's not



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                    June 7, 2012

41

1   his mental impressions. And I'm not trying to probe
2   what it is, I'm just asking for a "yes" or "no."
3           MR. SWEETEN: And, you know, respectfully,
4   my response is that if you're asking him things beyond
5   the public record, if things are done, then you would
6   potentially be asking him to reveal communications he's
7   had with other senators, with legislative staff,
8   State agencies, Texas legislative council constituents,
9   you would be asking for his mental impressions and
10  thought process. So with respect to that, I'm going to
11  instruct him not to answer that question as posed.
12  BY MS. MARANZANO:
13      Q.  You're following your counsel's instructions,
14  just for the record?
15      A.  Yes, ma'am.
16      Q.  Thank you. Based on the public record, are there
17  any steps that the legislature takes to build a record
18  that supports an assertion that there's no
19  discriminatory purpose behind the bill? Based on the
20  public record.
21          MR. SWEETEN: First of all, I think he's
22  answered based on the public record. I think he's
23  answered this question. Secondly, you're now asking him
24  about his process as reflected in the public record.
25  And in that regard, you're seeking to find out his

42

1   mental impressions, opinions and his motivations about
2   legislation. So he's referred to the public record. He
3   can do that, but he's not going to get into what his
4   thinking is about how something complies with the Voting
5   Rights Act. That is absolutely subject to the
6   privilege.
7   BY MS. MARANZANO:
8       Q.  Okay. Well, let me try it this way. We spoke
9   about the public record in regard to the retrogressive
10  effect. And you said people testify at hearings and
11  they're all transcribed or recorded, I think you said.
12  And now I'm just asking about, is there anything
13  additional that happens on the public record that goes
14  to building a record to support an assertion that
15  there's no discriminatory purpose?
16      A.  First, I don't recall you ever asking me about
17  specifically the retrogressive effect. So I'm not sure
18  I understand your question. So if you could -- the
19  foundation was fairly lengthy. If you could just --
20      Q.  Yes. I'm sorry. I thought my last question had
21  been about the effect. That was when you said to me
22  that there were hearings, the hearings were recorded
23  people testified.
24      A.  Well, I just didn't hear the word retrogression
25  effect.

43

1       Q.  Yes. So this time I'm asking you about, based on
2   the public record, does the legislature take steps to
3   build a record that would support an assertion that
4   there's no discriminatory purpose behind an act?
5           MR. SWEETEN: Okay. You're asking him, does
6   the legislature build a record to support facts and
7   based upon the public record. In doing that, you're
8   asking for more than what's on the public record.
9   You're asking for, are they taking steps to build a
10  record.
11          MS. MARANZANO: On the record.
12          MR. SWEETEN: He's not going to talk about
13  his process on what steps they take, the purpose of
14  those steps. He's not going to answer that question.
15  You can ask him, you know, as to what's on the public
16  record. But you're not going to get into his thoughts
17  and mental impressions. There's a line there and these
18  last few questions you're getting into his mental
19  impressions and I'm not going to let him do that. That
20  is subject to privilege.
21          MS. MARANZANO: Okay. I am actually -- I am
22  really not trying to get into his mental impressions.
23  I'm trying to ask him about the steps taken on the
24  record. And we went through the effect and now I'm
25  asking about steps taken on the record that go to the

44

1   purpose of the legislature. What sort of steps does the
2   legislature take on the public record that support an
3   assertion that there's no discriminatory purpose behind
4   the bill.
5           MR. SWEETEN: Again, you're asking for his
6   motivations in that question. He can testify about what
7   is on the record. He's not going to testify about steps
8   taken to build a record. And to answer that question.
9   So you're treading into what is subject to the
10  legislative privilege and I'm going to instruct him not
11  to answer.
12  BY MS. MARANZANO:
13      Q.  When you talked about the committee proceedings,
14  are there any procedures, public procedures established
15  by the committee that relate to Section 5 of the Voting
16  Rights Act?
17          MR. SWEETEN: You can testify about matter
18  on the public record.
19      A.  I don't know if there are any specific rules or
20  requirements with regard to any specific law of how we
21  would handle anything.
22      Q.  (By Ms. Maranzano) Senator, What is Texas'
23  current system for verifying a voter's identity?
24          MR. SWEETEN: You can answer.
25      A.  Well, in the statute  I think you have -- there



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                    June 7, 2012

45
1  is -- I think you present a voter registration card as
2  one. If you don't have the card, you can present other
3  forms of ID. I think generally that's it. I mean, if
4  you can show me the statute I can tell you specifically.
5      Q. If a voter doesn't have a voter registration
6  card, are you familiar with the forms of ID that the
7  voter would need to show?
8      A. I believe it's a driver's license or -- there are
9  other alternative forms of ID as well.
10     Q. Are there some non-photo IDs that a voter can
11 show?
12     A. I believe that's correct. Under the current law
13 before Senate Bill 14.
14     Q. Exactly, yes. Do you know if a utility bill is
15 one of those forms of identification?
16     A. Whatever the statute says is what it says.
17     Q. And if the voter doesn't have any of those forms
18 of identification, can a voter cast a provisional
19 ballot?
20     A. I think that's correct.
21     Q. And do you know the standards by which that
22 provisional ballot may or may not be counted?
23         MR. SWEETEN: Hold on a second. You're
24 asking about existing law. I'm going to let him answer
25 that to the extent he knows.

46
1         MS. MARANZANO: Thank you.
2      A. I will be -- you know, I'm like most lawyers I
3  would have to go to the statute and look. I'm not going
4  to guess on what it says specifically.
5      Q. (By Ms. Maranzano) Okay. Is it your
6  understanding that a voter does not need to take an
7  additional trip anywhere to in -- and show the registrar
8  one of the -- this is current law, one of the forms of
9  ID under current law in order for that provisional
10 ballot be counted?
11     A. I would have to look at the statute. And I
12 didn't look at the statute to prepare.
13     Q. Okay. Is the current system for verifying a
14 voter's identity inadequate?
15         MR. SWEETEN: Objection. It calls for
16 matters of legislative privilege. Don't answer the
17 question.
18 BY MS. MARANZANO:
19     Q. Let me ask you this. Did anything come up on the
20 public record that reflects problems with the current
21 system for verifying a voter's identity?
22         MR. SWEETEN: You can answer the question as
23 phrased.
24     A. You would have to look at the public record. I
25 think -- you know, I don't recall specific anecdotal

47
1  testimony. I recall whatever is in the record, is in
2  the record is all I can say. I didn't look at the whole
3  record. It's a long record. And so I would be going
4  solely off of memory. And I'm not comfortable doing
5  that.
6      Q. So right now as you sit here, you're not aware of
7  problems that were testified to on the public record
8  with the current system of verifying a voter's identity?
9      A. That's not what I said. I just said I'm not
10 prepared to go into specific instances. It is in the
11 record. Whatever is in the record, is in the record.
12     Q. Okay. But right now -- but I'm just asking you
13 what you know right now, sitting here today, and you're
14 not prepared to testify about any?
15     A. Right now I know there was. But I can't recall
16 the specific instances to the degree of certainty that I
17 would be comfortable testifying under oath about.
18     Q. Okay. You recall there were problems that were
19 testified to?
20     A. Yes. I think there were. But you would have to
21 go to the record to see what they were.
22     Q. Well, what do you remember about the record?
23     A. I don't.
24     Q. You don't? So you can't tell me anything about
25 those problems?

48
1      A. I can tell you this -- and, you know, there were
2  issues. But I'm not prepared to go into specific anecdotal
3  situations. The record reflects that. And the record
4  will have to speak for that.
5      Q. Can you tell me when you first heard support for
6  enacting a photo identification law in Texas?
7         MR. SWEETEN: You can answer to the extent
8  it doesn't reveal matters of legislative privilege.
9      A. I can't remember specifically.
10     Q. (By Ms. Maranzano) Can you tell me
11 approximately?
12     A. No.
13     Q. Do you remember what the first voter
14 identification law that you worked on was?
15     A. I don't remember the specific bill. I know --
16 and I didn't work on them. I was never a sponsor of any
17 of these bills. They would either, when I took over as
18 State Affairs chairman that's the jurisdiction, voter
19 election laws are in that jurisdiction with a lot of
20 other things. And so I think there was an interim study
21 on that. I think there was -- there were bills that
22 were passed went through the committee after that.
23     Q. Okay.
24         MS. MARANZANO: Can we mark this?
25         (Exhibit No. 521 was marked.)



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                                June 7, 2012

---

**49**

1 BY MS. MARANZANO:

2    Q.  Senator, I'm showing you what we're marking as

3 deposition Exhibit 521.  If you can take a look at it

4 and tell me if it looks familiar to you?

5    A.  No.

6    Q.  No?  Have you ever seen this bill before?

7    A.  I don't -- it's a House Bill.  If it passed the

8 House and came to the committee, I would assume I would.

9 I don't know if it did pass the House.

10    Q.  Well, I'll represent to you that this bill did

11 pass the House.

12    A.  Okay.

13    Q.  And it was referred to the State Affairs

14 Committee.

15    A.  Okay.

16    Q.  Perhaps that refreshes your recollection

17 slightly.

18    A.  Well, yes.  If that's the case, then we would

19 have heard this bill in the committee.

20    Q.  Do you recall if you did hear the bill?

21    A.  If you can tell me what year.

22    Q.  I'm sorry.  This is from 2005.

23    A.  Okay.  I assume we did hear the bill, but I don't

24 know.  You will have to look at the record.

25    Q.  Well, I will represent to you that this bill was

---

**50**

1 referred to and there was not a hearing on the bill.  Do

2 you have any recollection -- you can take a couple of

3 minutes and maybe look it over and see if you have any

4 recollection.  You can see at the top it was introduced

5 by -- it's House Bill -- for the record, it's House Bill

6 1706.

7    A.  Okay.  I do not know why the bill didn't get a

8 hearing.  That was seven years ago.  There are a number

9 of reasons why bills don't get hearings.  So I couldn't

10 tell you, nor do I know if the public record reflects

11 why it didn't get a hearing.  I don't know.

12    Q.  What are some of the reasons that a bill doesn't

13 get hearing?

14        MR. SWEETEN:  Yeah.  Don't reveal your

15 thoughts, mental impressions about legislation in

16 answering the question.  That's subject to the

17 legislative privilege.

18 BY MS. MARANZANO:

19    Q.  Are you able to provide an answer?

20    A.  Well, I'm not sure I understand the question.

21    Q.  You said there are several reasons a bill might

22 not get a hearing, so I was asking you what are those

23 reasons?

24        MR. SWEETEN:  Again, don't reveal your

25 thoughts or mental impressions.  I'm also going to

---

**51**

1 object based on compound and vague.  If you can answer

2 it without revealing your thoughts and mental

3 impressions or communications that you've had, then do

4 so.  But the you can't --

5    A.  The only thing I can do without -- without going

6 into the legislative privilege is just generally in all

7 committees.  Number one, there's not support for the

8 bill.  Number two, it's not ready.  It has flaws or

9 technical flaws in it and you can't get any agreement to

10 fix it.  Number three, and sometimes this is number one,

11 is that there's just not time.  A bill doesn't get over

12 to the Senate from the House until late in the session

13 and there's just not time to take up the bill and hear

14 it, especially if it is a bill that requires a lot of

15 testimony.  And there are just a lot of discretionary

16 issues that are involved in generally -- in doing that.

17 So that's basically -- that's a few of them.  Sometimes

18 they get tagged.  They're procedural rules that members

19 follow to prevent bills from getting heard that they

20 don't want to have heard.  So it's -- you know, a lot of

21 different ways to -- and reasons why bills don't get

22 hearings or why they don't -- they don't pass.

23    Q.  But what does it mean to have a bill tagged?

24    A.  In the rules require -- there's a 48 -- when the

25 bill is in a committee, in a standing committee, it

---

**52**

1 requires -- a member can ask for a 48-hour hearing.  And

2 a 48-hour notice, which is typically twice the notice.

3 So if it's -- you don't ever see that until the end of

4 the session.  And it -- you know, somebody will tag a

5 bill and you'll run out of time to hear it.

6    Q.  I think the issue that you said before we talked

7 about tagging was that there may just not be enough

8 time.  About how much time does a committee need to have

9 a hearing and refer the bill to the floor?

10    A.  Depends on the bill.

11    Q.  Do you know about how much time a bill like

12 HB 1706 would need?

13        MR. SWEETEN:  Objection.  I think the

14 question is vague.  Also you -- don't reveal matters of

15 legislative privilege about a specific bill.  You can

16 answer about general procedures as long as they're

17 matters in public record, but don't reveal your mental

18 impressions in answer.

19    A.  Would you repeat the question?

20    Q.  (By Ms. Maranzano)  About how much time would a

21 bill, such as HB 1706 or another voter ID bill, need to

22 get heard in committee and then referred out?

23        MR. SWEETEN:  Same objection.  Instruction.

24    A.  I can't answer that specifically.  There is no

25 formula for how much time it takes.  It just depends on

---

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                    June 7, 2012

53

1   the bill.
2        Q.  (By Ms. Maranzano)  Okay.  And can you just give
3   me a sense of -- just a sense of what you mean by that?
4   What about the bill informs how much time you need?
5            MR. SWEETEN:  Let's -- I'm going to object
6   based upon compound, vague.  Also don't reveal any
7   thoughts, mental impressions or communications about any
8   specific bill, legislative act in answering the
9   question.
10       A.  Logistically, depends on how many witnesses you
11  have, depends on the availability of members to be
12  there.  It depends on the length of the bill.  A number
13  of logistical objective things like that.
14       Q.  (By Ms. Maranzano)  Okay.  And one of the other
15  issues you mentioned that sometimes prevents a bill from
16  getting a hearing in committee is there might not be
17  support for the bill.  Were you referring to support in
18  the committee or support in the Senate?
19           MR. SWEETEN:  And this is as a general
20  matter.
21  BY MS. MARANZANO:
22       Q.  As a general matter.
23       A.  A general matter, either way.
24       Q.  How do you usually know if a bill has support?
25           MR. SWEETEN:  You can answer as a general

54

1   matter.
2        A.  You don't, unless -- you may hear or know what
3   you may have a sense as a chairman in your judgment.
4        Q.  (By Ms. Maranzano)  Do you make the determination
5   of whether a bill has a hearing or not?
6            MR. SWEETEN:  Objection to the question as
7   compound.  And don't reveal matters subject to the
8   legislative privilege including your mental impressions,
9   thoughts and opinions.  You can answer as a general
10  matter of procedure, if you can.  But don't reveal
11  privilege.
12       A.  As a general matter, chairmen determine what
13  bills are heard and when they're heard.
14       Q.  (By Ms. Maranzano)  Can you direct your attention
15  to Section 7 of HB 1706, and just take a quick look at
16  that.
17       A.  What page is that on?
18       Q.  I'm sorry.  Page 4 and I goes on to Page 5.  And
19  it looks like it also goes on to Page 6  And actually
20  the top of 7?
21       A.  Okay.
22       Q.  Do you see that -- well, do you see that this
23  legislation provides for a number of different forms of
24  identification to be used?
25       A.  It appears to have a number of different options.

55

1        Q.  And is there both photo ID and non-photo ID
2   listed there?
3        A.  It looks like they all require that, but I may be
4   wrong.
5        Q.  I'm sorry.  It looks like they all require what?
6        A.  A photo identification.
7        Q.  Well, do you see that on Page 5 towards the
8   bottom it says there's a Section B?
9        A.  Oh, there's an alternative, yeah.  Utility bill,
10  which is current law, official mail address.
11       Q.  So would you agree that it allows for both photo
12  an non-photo ID?
13           MR. SWEETEN:  You can answer based on the
14  text of the bill.
15       A.  I think that's what it says.
16       Q.  (By Ms. Maranzano)  Did you have any
17  communications about HB 1706, that you can recall?
18       A.  No, I don't recall any.  I'm not saying I didn't.
19  I just -- it's been a long time ago.
20       Q.  Right.  I understand.  Are you aware of the
21  source of the legislative language for HB 1706?
22       A.  No, ma'am.
23       Q.  Do you know if your staff had any involvement in
24  the development of HB 1706?
25       A.  I'm going to say probably not.  It's a House

56

1   Bill.  And so we wouldn't have been involved with that.
2   And I don't know who the Senate sponsor was.
3        Q.  Is it pretty unusual for Senate staff to be
4   involved in developing a House Bill?
5            MR. SWEETEN:  You can answer there was a general
6   matter.
7        A.  As a general matter, yes.  But there were times
8   when we worked with House members to build an early
9   consensus, if that's ever possible.
10       Q.  (By Ms. Maranzano)  Did you take a public
11  position on HB 1706?
12       A.  I don't recall.
13       Q.  Do you know if there was any analysis done on
14  HB 1706?
15           MR. SWEETEN:  Don't reveal matters of
16  privilege.  Objection; vague.  Go ahead.
17       A.  The House may have done a bill analysis as they
18  normally do and if it passed the House floor then --
19           MR. SWEETEN:  Yeah.  I'm also going -- go
20  ahead and finish.
21       A.  Oh, I'm sorry.  I'm not aware that the Senate did
22  anything.
23           MR. SWEETEN:  I'm going to object on the
24  foundation as it calls for speculation.
25  BY MS. MARANZANO:



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                              June 7, 2012

57

1    Q. You're not aware that the Senate did any analysis
2  on House Bill 1706?
3    A. I don't recall any.
4    Q. What was the purpose of 1706, if you know?
5        MR. SWEETEN: You can answer as to the
6  general purpose. Don't provide the subjective intent of
7  anyone if you know.
8    A. I'm going to start by saying this is a House
9  Bill. And it was generated by the House members. It's
10 not a Senate Bill. So I'm not going to speculate on
11 what their purpose was. The general purpose of the
12 voter ID bill was to assure voter integrity or voting
13 integrity. And that's the primary general purpose of
14 all these types of bills. It's the general purpose of
15 what we do with a lot of the election bills. HAVA, even
16 MOVE was designed to help military voters. So that's
17 the general purpose.
18    Q. (By Ms. Maranzano) And based on the public
19 record, do you think that this would have accomplished
20 that goal?
21        MR. SWEETEN: No. Don't answer the
22 question. She's asking for your mental impressions and
23 thoughts about whether this bill accomplishes a certain
24 goal. So don't answer the question as phrased. It's
25 legislative privilege.

58

1  BY MS. MARANZANO:
2    Q. I assume you're not going to answer. Just for
3  the record, you're going to follow your counsel's
4  instruction not to answer that question?
5    A. Yes, ma'am.
6    Q. Do you recall a photo identification bill being
7  introduced in 2007?
8    A. No.
9    Q. Do you recall, in 2006, an interim report that
10 the State Affairs Committee did?
11    A. Yes, ma'am.
12        MS. MARANZANO: Can we have this marked?
13        (Exhibit No. 522 was marked.)
14 BY MS. MARANZANO:
15    Q. Can you take a look at that and let me know if
16 you recognize it.
17    A. I do.
18    Q. Is this a copy of the interim report that was
19 done in December of 2006?
20    A. Yes. It is.
21    Q. By the State Affairs Committee?
22    A. Yes, ma'am.
23    Q. What prompted this interim report? I mean, how
24 did it come about that the State Affairs Committee
25 issued this report?

59

1        MR. SWEETEN: Yeah. Don't answer the
2  question to the extent it would reveal thoughts, mental
3  impressions, opinions, motivation about legislation or
4  any communication you've had with legislators, staff,
5  State agencies, Texas ledge council.
6    A. If you'll refer to the record, the report was a
7  part of the interim charges that the Senate State
8  Affairs Committee was to take up.
9    Q. And do the interim charges come from the
10 governor?
11    A. No.
12    Q. Who do they come from?
13    A. Generally they come from the Lieutenant Governor
14 with, I think, input from other members of the Senate.
15        MR. SWEETEN: Are we at a point where we can
16 take a break in just a few minutes.
17        MS. MARANZANO: Yeah.
18        MR. SWEETEN: When you get to a logical
19 stopping point.
20        MS. MARANZANO: Yeah. Why don't we do it
21 now before we get into this too much. Thanks.
22        (Brief recess.)
23 BY MS. MARANZANO:
24    Q. So before the break we were taking a look at
25 interim report that the State Affairs Committee did.

60

1  Can you take a look for me -- at the first page is a
2  letter that's written to you. And the signatures are on
3  the next page. It's from Senator Lucio and Senator
4  Ellis. Do you see that letter?
5    A. Yes, ma'am.
6    Q. You tell me, were there any members of the
7  committee other than Senator Lucio and Senator Ellis who
8  were minority members?
9    A. Who?
10    Q. Who were on the committee when this report was
11 issued.
12    A. The names of the committee members are on the
13 first page on the letterhead. And then I think all
14 members signed the report.
15    Q. And were any, other than Senator Ellis and
16 Senator Lucio, racial or ethnic minorities?
17    A. Not according to this list. Well, Frank Madla
18 was a member, but I think he -- I'm not sure why he
19 wasn't on the list. Maybe he had stopped serving or
20 maybe that was an old letterhead that shouldn't have
21 been used. But I can't -- it shows that he is on the
22 committee. And I recall that he was on the committee
23 for a while.
24    Q. His name was?
25    A. Frank Madla.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                                    June 7, 2012

---

61

1   Q. And what race or ethnicity is he?
2   A. Hispanic. He may have gone off and -- he may
3   have been -- I think that he lost his reelection and
4   that may have been why he didn't -- the report was done
5   after January 1st so that may have been why he wasn't on
6   it.
7   Q. I see. Okay. What was the purpose of this
8   report?
9   A. General purpose was to as stated in the charge.
10       MR. SWEETEN: You can refer to matters of
11  public record. I don't want you to give -- you don't
12  have to give the general -- you've answered the
13  question.
14  A. The general purpose as stated in the charge.
15  Q. (By Ms. Maranzano) Can you tell me what that is?
16  A. Well, the record reflects that -- I don't think
17  you provided the whole report.
18  Q. I'm sorry. I didn't.
19  A. The entire report the charge in it.
20  Q. Okay. And I should have said that earlier. This
21  is actually an excerpt from the report. Well, what's
22  your understanding, as you sit here today, as to what
23  the purpose was?
24       MR. SWEETEN: Again, you can refer to
25  matters of public record.

---

62

1   A. Purpose of what?
2   Q. (By Ms. Maranzano) Of this report.
3   A. The -- that you have before me?
4   Q. Let me narrow it, because what I'm interested in
5   is the section of the report that says here, which looks
6   like there were several different issues you looked at.
7   And this was related to charge No. 3. And I think that
8   this might be the charge that you're referring to under
9   charge No. 3 on Page 13?
10       MR. SWEETEN: Again, you can refer to
11  matters in the public record in answering the question.
12  Don't reveal matters that are subject to the privilege.
13  A. The charge No. 3 is -- is the purpose for
14  writing -- general purpose for writing a report. And
15  the record here reflects the instructions provided in
16  the charge.
17  Q. (By Ms. Maranzano) Do you see that first
18  sentence under charge No. 3 says, "Study and make
19  recommendations on how election of firms could verify
20  the identity of a voter without hindering a person's
21  right to vote?"
22  A. I do.
23  Q. Did the committee come up with a recommendation
24  on that?
25       MR. SWEETEN: Again, you can refer to

---

63

1   matters of the public record. Don't reveal matters of
2   privilege including conversations you've had with anyone
3   or your own thoughts or mental impressions.
4   A. The report, which was prepared in 2006, reflects
5   the committee's carrying out the charge. Number,
6   whatever it is, 13, I believe. Whatever the charge
7   is -- it's charge No. 3.
8   Q. (By Ms. Maranzano) Can you just turn back to the
9   letter for a second. It says -- there's a sentence in
10  the second paragraph that says, "The committee makes no
11  recommendations regarding policy issues in favor or in
12  opposition to voter identification or ballot
13  authenticity."
14  A. Where is this? I'm sorry.
15  Q. It's in that letter that we were looking at.
16  It's in the second -- yeah, that one.
17  A. The one from Senator Ellis.
18  Q. From Senator Ellis and Lucio. And it's in that
19  second paragraph and it's a phrase of the second
20  sentence.
21       MR. SWEETEN: It's right there.
22  A. Okay.
23  Q. (By Ms. Maranzano) Does that refresh your
24  recollection as to whether a recommendation was made
25  about voter identification and ballot authenticity?

---

64

1       MR. SWEETEN: You can reveal matters of the
2   public record.
3   A. It reflects what Senator Ellis said and Senator
4   Lucio.
5   Q. (By Ms. Maranzano) Do you have a different
6   recollection?
7   A. No.
8       MR. SWEETEN: Wait a minute. Can you
9   rephrase the question? Do you have a different
10  recollection of what?
11       MS. MARANZANO: Well, he said --
12       MR. SWEETEN: That it says this?
13       MS. MARANZANO: He said this reflects what
14  Senator Ellis and Senator Lucio said. I'm sorry.
15  BY MS. MARANZANO:
16  Q. Do you have a different recollection of what
17  occurred?
18       MR. SWEETEN: You can refer to matters of
19  the public record. Don't reveal matters of privilege.
20       MS. MARANZANO: I believe this should all be
21  a public record question.
22       MR. SWEETEN: Are you asking him -- I don't
23  understand what you're asking him. Are you asking him
24  does it say what it says. Are you asking him did he
25  write the letter.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

65

1          MS. MARANZANO:  No.  I'm asking did the
2    committee make a recommendation regarding voter
3    identification.
4          MR. SWEETEN:  You can refer to matters of
5    public record.
6    A.  I think you just have to read the report and
7    determine that.  And the report speaks for itself.
8    Q.  (By Ms. Maranzano)  All right.  But I'm just
9    asking you, specifically I'm just wanting to find out
10   your knowledge.  And so as you sit here today, do you
11   have a recollection as to whether there was a
12   recommendation made?
13         MR. SWEETEN:  You can answer.
14   A.  The report reflects.
15         MR. SWEETEN:  Go ahead.  Sorry.
16   A.  The report reflects what we did seven years ago.
17   Q.  (By Ms. Maranzano)  Okay.  And did you -- did the
18   committee thoroughly study this issue prior to making
19   the report based on the public record?
20         MR. SWEETEN:  Yeah.  Don't answer the
21   question as asked.  The question directly asks your
22   thought processes.  I mean, the term "thoroughly" asks
23   for your mental impressions, opinions, motivation about
24   legislation.  Could implicate discussions.  Don't answer
25   as phrased.

66

1    BY MS. MARANZANO:
2    Q.  Okay.  Let me ask it this way.
3          MR. SWEETEN:  Legislative privilege.
4    BY MS. MARANZANO:
5    Q.  What did the committee do in order to issue this
6    report?
7          MR. SWEETEN:  You can refer to matters of
8    the public record.  Don't reveal your processes, mental
9    impressions, opinions, motivations about legislation.
10   A.  I believe the report is fairly clear and specific
11   what we did.
12   Q.  (By Ms. Maranzano)  And as you sit here today,
13   can you add any testimony to that?
14         MR. SWEETEN:  Don't reveal matters of
15   privilege.  You can refer to matter of the public
16   record.  But your thoughts and mental impressions are
17   your own and are subject to the legislative privilege.
18   A.  I wouldn't be able to elaborate further than
19   what's in the report.
20   Q.  (By Ms. Maranzano)  Okay.  Can you, in that same
21   paragraph that we were talking about in the letter, do
22   you see there's a sentence that says, "However,
23   Georgia"?
24   A.  Let's -- when you say "letter," you're referring
25   to Senator Ellis's letter.

67

1    Q.  Yes.  Exactly.  Same paragraph -- second
2    paragraph.  But this one is towards the bottom.  The
3    sentence starts with, "However, Georgia Secretary of
4    State, Cathy Cox, recently completed a demographic
5    analysis revealing that between a quarter and a third of
6    senior and African-American voters lacked State photo
7    identification, thus disenfranchising them from the
8    election process."  Do you know if that was a study that
9    was looked at by the State Affairs Committee in the
10   public record prior to issuing this report?
11   A.  No, I do not know.
12   Q.  And can you look at the last paragraph on that
13   page?  There's a sentence that says, "It is our shared
14   belief that anti-fraud measures adopted by the federal
15   Help America Vote Act sufficiently deter voter fraud and
16   that additional photo identification measures are
17   unnecessary."  Did the committee, based on the public
18   record, analyze whether the identification under the
19   Help America Vote Act would sufficiently deter voter
20   fraud?
21         MR. SWEETEN:  Yeah.  Don't answer the
22   question to the extent it requires you to reveal your
23   mental thoughts, impressions, analysis, motivation about
24   legislation.  You can refer to matters of the public
25   record in answering it, but other than that don't answer

68

1    it.
2    A.  I don't recall other than what's in the report.
3    Q.  (By Ms. Maranzano)  Can you look at Page 25 and
4    26 in the report for me?  On Page 25, do you see a chart
5    that talks about voter fraud investigation from 2006?
6    A.  Yes.
7    Q.  And the fourth one down says, "unspecified
8    allegations."  Can you tell me what that means?
9          MR. SWEETEN:  You can refer to matters of
10   the public record.  Don't reveal your thoughts or mental
11   impressions in answering the question.
12   A.  I don't recall.
13   Q.  (By Ms. Maranzano)  A few down below that there's
14   one that says, "unlawfully accepting a voter and
15   illegally voting."  Can you tell me what that means?
16         MR. SWEETEN:  Same instruction.
17   A.  No.  I would have to -- I don't recall what that
18   is.
19   Q.  (By Ms. Maranzano)  And a few below that,
20   "illegal ballot handling," do you recall what that
21   means?
22         MR. SWEETEN:  Same thing.  You can refer to
23   matters of the public record.  Don't reveal your mental
24   thoughts and impressions about that, other than what's
25   on the public record.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                    June 7, 2012

69

1    A. I don't recall specifically what that refers to.
2    Q. (By Ms. Maranzano) Do you see on -- that
3    chart -- am I correct, that chart is labeled "voter
4    fraud investigations"?
5    A. Yes.
6    Q. And on the next page there's a chart that's
7    listed "voter fraud convictions"?
8    A. Yes.
9    Q. And do you see in that paragraph below it says,
10   "Although there have been three instances of alleged
11   illegal voting which may include circumstances prevented
12   by voter photo ID, only one of these has been fully
13   investigated and referred for criminal prosecution." Do
14   you know if that case that's referred to there, that was
15   referred for prosecution, resulted in a conviction?
16        MR. SWEETEN: Yeah. Don't answer the
17   question except for to the extent it's a matter of
18   public record.
19   A. I don't know.
20   Q. (By Ms. Maranzano) Do you remember any details
21   about that case, based on the public record?
22   A. No.
23   Q. Do you remember any details about the other cases
24   that may have been prevented by a voter photo ID based
25   on the public record?

70

1        MR. SWEETEN: Same objection; legislative
2    privilege, but you can answer to the extent you can
3    refer to public record.
4    A. I don't know.
5    Q. (By Ms. Maranzano) After this report was issued,
6    were there any bills introduced to prevent voter fraud
7    in the vote by mail process, based on the public record
8    that was introduced?
9        MR. SWEETEN: Well, you're asking -- no.
10   You're asking were there bills --
11       MS. MARANZANO: After the report. Not
12   related to the report.
13       MR. SWEETEN: If you want to ask him if
14   there were bills related to photo identification, I'll
15   let him answer the question. You're asking him to
16   address a problem, is what you've put in -- and I think
17   this that's intruding into legislative purpose. In
18   other words, you're asking as result of this, what is
19   the effect to introduce X. He's not going to answer it
20   as phrased. I will let him answer if chronologically an
21   additional photo ID bill was introduced, matters of the
22   public record, he can refer to. But he's not going to
23   reveal his thoughts and mental impressions, as subtle as
24   you want to be, he's not going to do that.
25   BY MS. MARANZANO:

71

1    Q. Okay. No, I've got you. How about I ask it like
2    this. In the 2007 legislative session, were there bills
3    introduced related to the vote by mail process?
4    A. Number one, I didn't introduce any bills.
5    Q. Okay.
6    A. Number two, there may be bills -- the members
7    introduce about 5,000 bills a session. So there may
8    have been bills. I'm not familiar with them,
9    specifically.
10   Q. Do you recall having any hearings on any bills
11   about the vote by mail process in the State Affairs
12   Committee?
13       MR. SWEETEN: You can answer.
14   BY MS. MARANZANO:
15   Q. In the 2007 legislative session?
16   A. As we sit here today, no. If you show me a
17   record, I might refresh my recollection. But if we had,
18   in that committee, several hundred bills and I'm not
19   sure -- when you start talking dates I just can't -- a
20   lot of water has been under the bridge since 2007 so I
21   can't give you a specific answer.
22   Q. How about do you remember any bills related to
23   vote by mail on which the State Affairs Committee heard
24   testimony in either the 2009 or 2011 legislative
25   sessions?

72

1        MR. SWEETEN: You can answer as phrased.
2    A. All of these years run together and so I can't
3    give you a specific time frame of when we heard bills,
4    unless you show me the bill.
5    Q. (By Ms. Maranzano) Okay. But sitting here
6    today, and I'm not trying to ask you which session it
7    was introduced, but do you have a recollection of
8    hearings in the State Affairs Committee on vote by mail
9    bills?
10   A. I think we did. But, you know, again, we hear a
11   lot of bills. And so I believe we did have some
12   legislation in regard to vote by mail. I'm not sure if
13   I sponsored it, it was part of an omnibus bill or what.
14   But I can't recall, specifically, the details around
15   that.
16   Q. Okay. Fair enough. Can you look at the page
17   that says Page 28 at the bottom. And there's a
18   subheading that says "conclusion." Under the second
19   paragraph in that section, there's a sentence that
20   starts with 200. It says, "244 of Texas' 254 counties,
21   96 percent have at last one office." If you look at the
22   sentence before, I think it's referring to driver's
23   license offices. Would you agree with that?
24   A. I'm not finding it.
25   Q. I'm sorry?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                           June 7, 2012

73

1    A. Let me find it. Oh, it's in the second
2  paragraph. Yeah, I see.
3    Q. Do you see the sentence now, 200?
4    A. Yes, ma'am.
5    Q. And that's referring to driver's license offices?
6    A. That's what it says.
7    Q. Do you know how many counties currently have
8  driver's license offices in Texas?
9    A. I couldn't tell you.
10    Q. Based on the public record of what occurred in
11  the committee, did the committee determine that the
12  number of driver's license offices in the state was a
13  component that needed to be looked at when analyzing
14  voter ID legislation?
15    MR. SWEETEN: Don't answer it. It requests
16  information that would be subject to the legislative
17  privilege. You can refer to the record for factual
18  matters, but don't reveal your processes or analysis.
19    A. The report speaks for itself on that issue.
20    Q. (By Ms. Maranzano) And can you look at the
21  paragraph below that. And the sentence that says,
22  "Opponents of voter ID legislation requiring a photo ID
23  for foreign and elderly voters. However, as the lack of
24  reports on voter fraud, there are no studies to believe
25  status to support this claim." Based on the public

74

1  record, did the committee make any effort to look into
2  whether -- how many minority voters, minority registered
3  voters possessed forms of photo identification?
4    MR. SWEETEN: Don't answer the question as
5  phrased. It calls for matters of legislative privilege.
6    MS. MARANZANO: Mr. Sweeten, can he testify
7  at least as to whether this issue was discussed on the
8  public record?
9    MR. SWEETEN: I will allow him to answer
10  that question, was the issue discussed on the public
11  record, yes. Were any steps taken -- your previous
12  question was, were any steps taken to do an analysis is
13  not appropriate. But, yeah, he can answer that
14  question.
15  BY MS. MARANZANO:
16    Q. Okay. Let me ask you, were any discussions of
17  that taken -- held on the public record?
18    A. You'll have to look at the public record. I
19  don't -- that's seven years ago and, you know, I can't
20  remember anything specifically -- or can't remember what
21  specific debates or conversations. Again you've got --
22  we do a lot of legislation. And it's not -- that's a
23  long time ago. The report, in the record of the report,
24  would be the best evidence of what we considered and
25  what the committee conclusions were.

75

1    Q. When you're having an interim -- when you're
2  creating an interim report like this one, do you have
3  public testimony in front of the State Affairs Committee
4  as with -- as you testified happened on other matters in
5  front of the State Affairs Committee?
6    A. On most issues, yes.
7    Q. Do you recall if that occurred with this report?
8    A. No. You know, it may -- the public record would
9  have to reveal that.
10    Q. Can you look at the last sentence in that
11  paragraph that we were just talking about which says,
12  "It is unknown whether the current level of voter fraud
13  will decrease, but a voter photo ID law will certainly
14  prevent some fraud. At the very least it would increase
15  voter confidence." Can you tell me if there were
16  discussions on the public record that would allow you
17  to -- were there discussions on the public record about
18  those statements?
19    A. You would have to look at the public record.
20    Q. You have no independent recollection?
21    A. I don't.
22    Q. Can you look at the next page for me. There's a
23  subheading that says "recommendations." Under 3 A, do
24  you see that second bullet?
25    A. I do.

76

1    Q. It says, "Issuance of qualifying photo IDs free
2  of charge to any voter requesting, regardless of
3  personal income." Can you tell me what was the purpose
4  of including that language?
5    MR. SWEETEN: Don't answer the question if
6  she's asking for your mental thoughts, processes,
7  analyses.
8    MS. MARANZANO: What about the purpose of
9  the committee, this legislative purpose?
10    MR. SWEETEN: If you're asking him what is
11  the purpose of the committee.
12    MS. MARANZANO: For making this
13  recommendation.
14    MR. SWEETEN: No, he's not going to answer
15  as to the specific recommendation set forth throughout
16  whatever these recommendations are. That would require
17  him to reveal matters of legislative privilege. He can
18  refer to the record itself. But he's not going to
19  answer based on his mental impressions, thoughts,
20  opinions, analysis. Don't answer except to the extent
21  it's a matter of public record.
22    MS. MARANZANO: For the record, I disagree.
23  I think that's a question as to the general legislative
24  purpose, which I believe the order allows us to ask.
25    MR. SWEETEN: Let's pull the order out.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                      June 7, 2012

77

1     MS. MARANZANO: I'm referring to Page 11.
2     MR. SWEETEN: I'm going to go to the order
3  on general purpose. Let's do that first. The order
4  that I'm reading is dated 5/17/12. And it says, "It is
5  ordered that to the extent such a privilege exists, that
6  privilege does not protect testimony with respect to the
7  general purpose or the purpose of the legislature as a
8  whole in enacting Senate Bill 14 as opposed to the
9  subjective intent of the legislator." So he can answer
10 as to the general purpose of legislation. You're now
11 asking him about, not legislation, but instead you're
12 asking him about something called the Senate Committee
13 on State Affairs interim report to the 80th Legislature.
14 In particular you're asking him about paragraph 3A.2 of
15 Page 29 of that report and what it's purpose was. That
16 is --
17    MS. MARANZANO: No, no, no.
18    MR. SWEETEN: That is not the same thing.
19 He can talk about general purpose of a statute. He's
20 not going to talk about general purpose of different
21 bullet points within that recommendation. That is not
22 contemplated by the order that we just read. Go ahead.
23    MS. MARANZANO: Mr. Sweeten, I wasn't
24 asking -- the way I interpret what you just read is that
25 I'm not allowed to ask about his subjective motivations.

78

1  I'm not asking that. I'm asking the committee's purpose
2  for putting this bullet in. And I'm reading from the
3  order that we got on June 5th, Page 11. It says, "With
4  respect to deposition testimony this court has already
5  ordered that foundational privilege questions are
6  proper, as are questions regarding overall legislative
7  purpose, as opposed to an individual legislator's motive
8  with respect to the bill." I'm not asking for his
9  motive. I'm asking for the committee's purpose.
10    MR. SWEETEN: Show me where you just read
11 because there's an important word in there.
12    MS. MARANZANO: F.
13    MR. SWEETEN: F what?
14    MS. MARANZANO: The first sentence under F
15 on Page 11.
16    MR. SWEETEN: "With respect to the
17 deposition testimony this court has already ordered that
18 foundational privilege questions are proper," which
19 we're allowing. You'll agree we're completely allowing.
20    MS. MARANZANO: Yes.
21    MR. SWEETEN: "As are questions regarding
22 overall legislative purpose as opposed to an individual
23 legislator's motive with respect to the bill." This
24 isn't a bill. This is an interim report. It is a
25 sub-subparagraph of an interim report. And you're

79

1  asking him what he means within that bullet point. And
2  that is not what the court has said. We will give
3  general purpose. We're not going to give bullet by
4  bullet interpretation of what you meant at this date on
5  this report. That is beyond what the court has ordered.
6  I think that is beyond the scope of the legislative
7  privilege that I am now asserting.
8     MS. MARANZANO: All right. Well, we've got
9  to move on.
10 BY MS. MARANZANO:
11    Q. And I think we are done with this document. So
12 you can put that aside. And I believe before -- when we
13 started looking at this deposition I asked you if you
14 recall the photo ID bill being introduced in 2007 and I
15 think you said no; is that correct?
16    A. That's right. I don't recall a Senate Bill or
17 House Bill or -- in 2007, whether we considered the
18 bill. It seems like we did, but I can't recall
19 specifically that.
20    MS. MARANZANO: Okay. This we can mark as
21 Exhibit 28 because we've previously marked it.
22        (Exhibit No. 28 was previously marked.)
23 BY MS. MARANZANO:
24    Q. I'm showing you what we're marking as deposition
25 Exhibit 28. If you can take a look at that and let me

80

1  know if you recognize this, this bill.
2     A. I recognize it as House Bill 218. And it shows
3  on there that it was apparently filed before the end of
4  2007 legislative session, if it was filed. And it
5  appears it was because it was assigned a number, 218.
6     Q. Are you familiar with the provisions of House
7  Bill 218?
8     A. As we sit here today, no.
9     Q. Can you take a look at Section 11 of the bill
10 which is on page -- Section 11, looks like it starts on
11 Page 9.
12    A. Okay.
13    Q. Does it appear that, for the most part, House
14 Bill 218 follows House Bill 1706?
15    MR. SWEETEN: You can refer to the text of
16 the bill, matters of the public record.
17    A. Well, it would take a while to do a side by side
18 analysis.
19    Q. For the most part, just generally.
20    A. They are both bills relating to requiring a voter
21 to present proof of identification.
22    Q. And do you see that House Bill 218 allows for
23 both photo and non-photo identification to be presented?
24    A. If you would point me to where you reach that
25 conclusion.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                    June 7, 2012

81

1    Q. Sure. So on Page 10 there's a subsection B.
2    A. Yes, I see that.
3    Q. Okay. And would you agree that allows for some
4    forms of non-photo identification?
5    A. It states that the following documentation is
6    acceptable of proof of identification under this chapter
7    and then it lists a number of things. And it appears
8    that some of those things do not have a photo ID
9    Q. Did you or did anybody in your office my a role
10   in the development of House Bill 218?
11   A. Because it's a House Bill, no.
12   Q. I'm sorry. You said no?
13   A. We did not.
14   Q. Did you have communications about House Bill 218?
15   A. With whom?
16   Q. Anybody. First let me just ask if you did?
17   A. Not that I recall -- well, when?
18   Q. At any point.
19   A. Today?
20   Q. Other than at this deposition, have you had
21   communications about House Bill 218, that you recall, as
22   you're sitting here?
23   A. I don't recall any.
24   Q. Are you aware of whether your staff had any
25   communications about House Bill 218?

82

1    A. I do not know.
2    Q. If they did, do you think you would know?
3    A. Not necessarily.
4    Q. Did you monitor the consideration of House Bill
5    218 in the House?
6    A. No.
7    Q. Do you recall if House Bill 218 was referred to
8    the State Affairs Committee?
9    A. I don't know if it passed the House. If it did
10   pass the House, you know, whatever the record shows, the
11   record shows. That was in 2007. So that was five years
12   ago.
13       (Exhibit No. 523 was marked.)
14   BY MS. MARANZANO:
15   Q. So I only have one copy of this. I'm showing you
16   what we're marking as deposition Exhibit 523 which is --
17   well, can you tell me what that is?
18   A. The title is Texas Legislature Online History.
19   Q. Can you take a look at that and just let me know
20   if that refreshes your recollection at all as to the
21   procedural history of House Bill 218?
22   A. Well, it's a record of the history. I'm not sure
23   it refreshes my recollection of anything.
24   Q. Fair enough.
25   A. But it appears that, yes, it doesn't refresh my

83

1    memory, but it would reflect what happened to the bill
2    Q. And does it look like the bill passed the House?
3    A. According to this document, it passed to
4    engrossment on 4/23/07.
5    Q. Did you have any communications with anybody
6    about carrying House Bill 218 in the Senate?
7        MR. SWEETEN: You can answer the question as
8    phrased, but don't reveal the substance of any
9    communications
10   A. I really don't remember. Some people may tell
11   you they're going to carry a bill or whatever. But I
12   don't recall in this particular instance how that came
13   about.
14   Q. (By Ms. Maranzano) As a general matter, how is
15   it usually determined what senator will carry a bill
16   that passes the House?
17   A. There is no -- chairmen are different about how
18   they do that. Some chairmen are very particular and
19   some aren't. And so it just depends on what committee
20   in the House or the Senate the bill goes to.
21   Q. Can you tell me how you do it just as general
22   matter?
23       MR. SWEETEN: I think you're asking for him
24   to reveal his mental impressions and thought process.
25   How would determine -- carries a bill if he did. So

84

1    objection; legislative privilege. Instruct not to
2    answer.
3    BY MS. MARANZANO:
4    Q. Did you and Senator Fraser communicate about
5    House Bill 218?
6        MR. SWEETEN: You can answer the question as
7    phrased.
8    A. I'm sure we did.
9    Q. (By Ms. Maranzano) Do you have any recollection
10   of communicating with him?
11   A. No. No.
12   Q. Are you aware of any communications about House
13   Bill 218 that reflect concerns that this bill would have
14   a disproportionate impact on minority voters?
15       MR. SWEETEN: Don't answer the question as
16   phrased. This is more than a general subject matter
17   description. If you want to rephrase it and put less of
18   a -- you know, lead up to the question, then he can
19   answer if you rephrase it. Right now I'm going to
20   instruct him not to answer that question.
21   BY MS. MARANZANO:
22   Q. Let me try it this way. Did you have any
23   communications about House Bill 218 with groups
24   representing minority voters?
25       MR. SWEETEN: You can answer.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                          June 7, 2012

85

1     A. Communications with groups, what do you mean by
2  groups?
3     Q. (By Ms. Maranzano) Groups who are representing
4  the interest of minority voters?
5     A. The record of the committee will reflect those
6  communications.
7     Q. So apart from the committee, you didn't -- you
8  aren't aware of any other communications?
9     A. I'm not aware or recall any of those.
10    Q. Do you recall any communications, apart from
11 testimony in front of the committee, with local elected
12 officials about House Bill 218?
13    A. Do I recall, I really don't. When you say "local
14 elected officials," what are you talking about, who are
15 you talking about?
16    Q. County officials, voter registrars.
17    A. I don't recall any. If there are, typically with
18 regard to procedural issues and things like that are
19 necessary in implementing a new voting process, we hear
20 from the committees, the election officials of
21 committees; this causes this issue, this causes this,
22 this causes that. You need to take into account that.
23 And that would be typically done through the hearing
24 process. We may have information about that. But with
25 regard to the general policy consideration, I don't

86

1  recall any.
2     Q. What was the purpose of House Bill 218?
3     A. To preserve voter integrity or ballot integrity.
4     Q. Based on the public record, was there any
5  evidence that a problem existed with ballot integrity?
6        MR. SWEETEN: Objection to the extent that
7  it asks for your mental impressions about any problem
8  that any legislation was attempting to address. You can
9  refer to the public record as to anything you've heard
10 regarding a problem. But don't reveal your mental
11 impressions or thoughts about why you worked on a bill,
12 what a bill was meant to address. You can just discuss
13 what's in the public record.
14    A. The public record reflects what information the
15 committee heard on House Bill 218 and. I wouldn't
16 have any independent recollection of any of that.
17    Q. (By Ms. Maranzano) Was House Bill 218 -- was
18 part of the purpose of House Bill 218 to prevent
19 non-citizens from voting?
20    A. No.
21    Q. Are you familiar with any statements that
22 Representative Betty Brown made on the floor about House
23 Bill 218?
24    A. No.
25    Q. Do you recall the Senate's consideration of House

87

1  Bill 218?
2     A. At what point?
3     Q. Overall. Let me ask you. Do you have a
4  recollection of it, first?
5     A. I have a recollection, generally, of the fact
6  that we had a voter ID bill go through the committee and
7  considered by the Senate.
8     Q. Was the bill amended in the committee?
9     A. I don't recall. The record would have to reflect
10 that.
11    Q. Can you tell me how the witnesses who testified
12 on House Bill 218 were selected?
13       MR. SWEETEN: Don't answer the question. It
14 would call for your mental impressions, thoughts,
15 opinions about legislation.
16 BY MS. MARANZANO:
17    Q. And you're following your counsel's instruction?
18    A. Yes.
19    Q. Was House Bill 218 voted out of committee, to the
20 best of your recollection?
21    A. Yes.
22    Q. Do you recall if it was voted out of committee on
23 party line?
24    A. The record would have to reflect the record vote
25 of the members of the Senate and the committee.

88

1     Q. And as you sit here today, do you have any
2  recollection?
3     A. I would not speculate.
4     Q. So in 2006, is it fair to say that based on that
5  interim report, the committee made no recollection --
6  made no recommendation on photo ID laws?
7     A. You're going to have to repeat that. I'm sorry.
8  I didn't follow it.
9     Q. In December 2006, we looked at the interim
10 committee report, and is it fair to say the committee
11 made no recommendation as to photo ID?
12       MR. SWEETEN: You can refer to matters of
13 the public record.
14    A. I think the committee report is clear as to what
15 it did and didn't do.
16    Q. (By Ms. Maranzano) Well, let me ask you this.
17 Is there anything in the public record that you can
18 testify about today that would reflect a change between
19 when you issued the report in December of 2006 and when
20 you voted HB 218 out of committee?
21    A. I can't answer that because I don't know and
22 haven't looked at it.
23       MR. SWEETEN: And I'll instruct you as to
24 legislative privilege. Don't reveal your mental
25 impressions.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                          June 7, 2012

89

1    A. I do not want to run afoul or ignore the
2    legislative privilege that I am asserted in this case.
3    Q. (By Ms. Maranzano) Did each -- did HB 218
4    require a two-thirds majority vote of senators to bring
5    that bill to the floor of the Senate?
6    A. The bill didn't require it.
7    Q. Did the Senate rules require it?
8    A. The Senate rules require bills to be brought up
9    in the regular order of business.
10   Q. And was House Bill 218 brought up in the regular
11   order of business?
12   A. No.
13   Q. So in order to bring it up out of order, did it
14   require a two-thirds vote?
15   A. In 2007, to suspend the rules you had to have a
16   two-thirds vote.
17   Q. What's the purpose of that requirement, that you
18   needed two-thirds vote to suspend the regular order of
19   business?
20        MR. SWEETEN: Are you saying in the 2007
21   session, the two-thirds
22        MS. MARANZANO: I was asking more generally,
23   actually.
24        MR. SWEETEN: You can give the general
25   purpose. Objection, vague. Because I don't think we're

91

1    blend of a rule and a tradition. And so to that end,
2    there's not really a good answer that I can give
3    speaking on behalf of the whole Senate as a general
4    purpose.
5    Q. Well, to be clear, I'm not interested in your
6    subjective opinion about it. I'm just interested in
7    your characterization of the legislative purpose.
8        ATTORNEY2: Objection; asked and answered.
9    BY MS. MARANZANO:
10   Q. Do you have anything else to add?
11   A. I probably don't.
12   Q. Okay. Are most bills brought to the floor with a
13   two-thirds vote?
14        MR. SWEETEN: Answer as a general matter.
15   A. In my experience, yes. But not all.
16   Q. (By Ms. Maranzano) Can you tell me about the
17   ones that went to the floor without a two-thirds vote?
18   A. Well, over what period of time? I mean I've been
19   in there 14 years.
20   Q. Well, how many times -- I'm sorry. I didn't mean
21   to interrupt your answer.
22   A. A number of times.
23   Q. Can you tell me how in the 14 years?
24   A. No.
25   Q. More than five?

90

1    talking about a specific rule. But you can give a
2    general purpose to -- if you can understand what she's
3    asking you about.
4    BY MS. MARANZANO:
5    Q. My question is about the requirement or the
6    tradition in the Senate that when bills go out of order
7    that it requires a two-thirds majority vote.
8    A. There are 31 members of the Texas Senate. And
9    there are 31 different general purposes of what that
10   rule is all about. So I couldn't give you -- I couldn't
11   speak for anybody else. And so the general purpose is
12   obviously to require two-thirds vote to bring up a bill.
13   But I can't tell you what the -- I don't know of any law
14   reviews that discuss that or -- it has different
15   meanings to different members of the Senate, if you're a
16   rule member or what. It has different meetings.
17   Q. Would it be fair to say that it's an effort to
18   get the senators to reach some sort of consensus?
19        MR. SWEETEN: You can provide and answer as
20   to the general purpose of the bill. Don't discuss
21   anything further than that or whatever rule she's
22   referring to.
23   A. Again, I would think that it's -- it has -- to
24   different members it has different general -- there's
25   different interpretations because it is a kind of a

92

1    A. Sure.
2    Q. More than ten?
3    A. Yeah.
4    Q. More than 15?
5    A. Yes.
6    Q. More than 20?
7    A. Your question is how many times have bills come
8    to the Senate floor with a lack of -- with only 16 votes
9    or without 21 votes.
10   Q. Uh-huh.
11   A. Multiple times. More than you've asked. I
12   believe more than you have stated.
13   Q. Okay. And I think I left off at 20. Would you
14   say it's around -- can you just give me and approximate
15   number?
16   A. No, I really can't. Because I know -- generally
17   I can't. The 21 vote rule is often debated. But again,
18   you go back to Bullock, Hobby and other Lieutenant
19   Governors. Either the rule has been -- there have been
20   special orders or other measures to not apply the rule
21   or that threat has been used. So it's an interesting
22   part of Texas history. But it is -- again, there's no
23   specific thing. It has been done a number of times,
24   though.
25   Q. Do you know what the partisan makeup of the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

**93**

1  Senate was when the two-thirds rule was suspended under
2  Lieutenant Governor Bullock?
3      A.  It was probably -- I believe -- the Republicans
4  did not have a majority until December of '96.  So I
5  believe -- I don't believe that it was done in '97.  So
6  it would have been -- before that it probably would have
7  been Democrat majority.
8      Q.  Do you know by how much?
9      A.  No.
10     Q.  How about under Lieutenant Governor Hobby?
11     A.  I don't believe the Republicans had a majority
12 under Hobby.
13     Q.  Do you have any idea by what percentage or by
14 what numbers they were in the minority?
15     A.  No.  You would have to look -- it would be easy
16 to determine.
17     Q.  Can you provide the circumstances under which
18 House Bill 218 was voted on by the Senate?
19     A.  No.  Is that the 2007 bill?
20     Q.  Yeah.
21     What was your question?
22     Q.  The circumstances on which it was voted on in the
23 Senate, do you recall anything about that vote?
24     A.  I don't understand the question.  So, no, I
25 can't.

**94**

1      Q.  Okay.  Well, let me ask you this.  Do you recall
2  it being voted on by the Senate?
3      A.  I recall there was a vote.
4      Q.  Who made the decision, if this is part of the
5  public record, to bring this bill to the floor, to a
6  vote of the Senate?
7      MR. SWEETEN:  When you're saying "bill," are
8  we talking about --
9      MS. MARANZANO:  We're talking about House
10 Bill 218.
11     MR. SWEETEN:  To the extent you're not
12 revealing legislative privilege, you can answer it.  But
13 don't reveal matters of privilege, including
14 communications you've had with others or mental
15 impressions.
16     A.  I do not know who made the decision to bring the
17 House Bill in 2007 to a vote.
18     Q.  (By Ms. Maranzano)  Is that usually the
19 Lieutenant Governor's decision?
20     A.  Generally the rules allow the Lieutenant Governor
21 to set the calendar.
22     Q.  Do you know if any members of the Senate were not
23 present when the vote was taken?
24     A.  I don't recall if there were members, you know,
25 either present or on the floor or what.  Members are

**95**

1  often on and off the floor or absent from time to time.
2  There's an excused absence.  There's just people not
3  there.  And so I don't know exactly what the record
4  shows for that day.
5      Q.  And if somebody has an excused absence, votes are
6  still taken; is that correct?
7      A.  Yes, as long as there's a quorum.
8      Q.  Are you aware of any conversations that Senator
9  Uresti had with any members of the Senate about House
10 Bill 218?
11     A.  No.
12     Q.  Were you aware in May of 2007, based on the
13 public record, that there were concerns that House Bill
14 218 would disproportionately impact minority voters?
15     MR. SWEETEN:  You can testify to matters on
16 the public record.  Don't testify as to communications
17 you've had with others or to matter subject to
18 privilege.
19     A.  To the extent those comments were made on either
20 a debate on the Senate floor, which is what I understand
21 the time frame you're talking about now, we're out of
22 committee we're on the floor, is that the public record
23 would reflect those concerns if they were raised.
24     Q.  But in May of 2007, were you aware of those
25 concerns?

**96**

1      A.  If I was on the Senate floor and I heard them on
2  the -- as part of the public record, the public record
3  is the public record.
4      Q.  Based on the public record, were any concerns
5  expressed about taking a vote on House Bill 218 when
6  some members weren't present?
7      A.  The record will reveal that.
8      Q.  Do you have any recollection about this
9  occurring?
10     A.  If I do, it would be subject to the legislative
11 privilege.
12     Q.  I'm just asking you about the public record?
13     A.  The public record is the public record.  And that
14 is -- if those statements were made on the public
15 record, those statements were made on the public record
16 and they speak for themselves.  I'm sure Senator Ellis
17 made a comment or somebody else.  This is what the
18 public record is.
19     Q.  Why are you sure Senator Ellis made a comment?
20     A.  Because he was active in this issue.
21     Q.  And what -- I guess I'm losing you.  You're sure
22 he made a comment because some members weren't present
23 on the floor?
24     A.  No.  On the public record, on the public issue of
25 the debate on the bill.  The issue -- the record will



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

97

1   reflect who and what was said.
2       Q.  Do you recall that in was a request made to
3   verify the vote on House Bill 218?
4       A.  No.  But there may have been.
5       Q.  Are you aware that Senator Uresti had called in
6   sick that day?
7           MR. SWEETEN:  Don't reveal matters subject
8   to legislative privilege in answering that question.
9   You can refer to matter of public record.
10      A.  I'll refer to the record.
11      Q.  (By Ms. Maranzano)  What's Senator Uresti's race?
12      A.  Well, I think Senator Uresti is Hispanic.
13      Q.  What part of Texas does he represent?
14      A.  He has a large district.  It is similar to mine
15   in that it -- it abuts the mine.  It's in West Texas,
16   far West Texas, but he also has some urban areas.  And
17   he, at that time, was representing part of El Paso as
18   well.
19      Q.  Had he expressed concerns on the public record
20   about the impact of House Bill 218 on his constituents?
21      A.  Public record will reflect what concerns, if any,
22   he expressed.
23      Q.  Do you recall that House Bill 218 failed to
24   obtain a two-thirds majority vote?
25      A.  It apparently did not pass that session.

98

1       Q.  Do you know if there were any additional actions
2   taken on House Bill 218 after it failed to obtain the
3   two-thirds majority vote?
4           MR. SWEETEN:  You can answer based on the
5   public record.
6       A.  I don't understand the question.  It's not clear
7   enough to me to respond accurately.
8       Q.  (By Ms. Maranzano)  Was there any additional
9   action taken on House Bill 218 after it failed to obtain
10   a two-thirds majority vote?
11          MR. SWEETEN:  Again, you can refer to
12   matters of the public record in answering the question.
13      A.  I don't recall based on the question.
14          MS. MARANZANO:  This has been previously
15   marked as Exhibit 3.
16          (Exhibit No. 3 was previously marked.)
17   BY MS. MARANZANO:
18      Q.  Senator, I'm showing you what we're marking for
19   the record as deposition Exhibit 3.  And I would like to
20   direct your attention to -- there's a letter that's
21   issued from Lieutenant Governor David Dewhurst.  Do you
22   recall this letter?  Let me state for the record, what
23   I'm showing you is an article from the Texas Weekly.
24      A.  Let me have just a few minutes to read this.
25      Q.  Sure.

99

1       A.  Okay.
2       Q.  Okay.  Do you see that this includes a letter
3   from the Lieutenant Governor related to House Bill 218?
4       A.  As reported in this media outlet.
5       Q.  And the letter that's printed in this media
6   outlet asserts that the photo identification
7   requirements will prevent voting by persons who are not
8   US citizens, right?
9       A.  Where does it say that?
10          MR. SWEETEN:  Can you reread the question
11   for me, please?
12          (Requested question was read.)
13   BY MS. MARANZANO:
14      Q.  And Senator, below the -- in the second letter,
15   below that topic, "This is a letter from Lieutenant
16   Governor David Dewhurst on voter ID."  In the second
17   paragraph, I just want to read you a sentence that says,
18   "I want people to consider that with 8 to 12 million
19   illegal aliens currently living in the US, the basic
20   American principal of "one person, one vote" is in
21   danger," correct?
22      A.  Well, that's what -- that's what that says.
23      Q.  Right.  Do you believe that the Lieutenant
24   Governor's letter is not asserting that photo ID
25   requirements will prevent persons voting who are not US

100

1   citizens?
2           MR. SWEETEN:  Don't answer the question.
3   Legislative privilege.
4           MS. MARANZANO:  I'm asking him about the
5   letter.
6           MR. SWEETEN:  You can ask him about what
7   this says.  You can't ask him about his beliefs about
8   legislation or about what he thinks about specific
9   legislation.  Those are his thoughts and mental
10   impressions.  If you're asking him if that's what it
11   says, he's free to answer that.
12   BY MS. MARANZANO:
13      Q.  I'm asking if the Lieutenant Governor made that
14   assertion in this letter.
15      A.  I can't speak for the Lieutenant Governor on what
16   he meant or intended or whether or not this is accurate.
17   So I don't really have an opinion on that.
18      Q.  Let me ask you this.  Is there anything in the
19   public record that would support a contention that photo
20   identification requirements prevent persons from voting
21   who are not US citizens?
22          MR. SWEETEN:  Calls for matters of
23   legislative privilege.  You can refer to matters in the
24   public record, but don't reveal your thoughts and mental
25   impressions about any specific legislation.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

101

1    A. You would have to refer to the legislative record
2    to —
3    Q. Anything you can add today?
4    A. No, ma'am.
5    Q. Do you see that in this letter — I'm sorry. In
6    this article there was a — there are two letters from
7    the Lieutenant Governor that are printed? There's a
8    letter and then there's a corrected letter.
9    A. This document which's a media report indicates
10   that. I don't know about the authenticity of it?
11   Q. You have no recollection of the?
12   A. No, I don't subscribe to the Texas Weekly and did
13   not review this. So this is the first time I've seen
14   this document.
15   Q. And apart from the letter -- apart from the
16   article, do you recall ever seeing either of these
17   letters from the Lieutenant Governor?
18        MR. SWEETEN: You can answer.
19   A. No, I don't. Let me correct, my staff may read
20   this Texas Weekly, but I don't. I don't recall seeing
21   this letter or -- I'm not even sure I recall hearing
22   about it. It's been five years ago.
23   Q. (By Ms. Maranzano) Is a voter registration
24   applicant's citizenship status -- well, does a voter
25   registration applicant affirm their citizenship status

102

1    on a voter registration application?
2        MR. SWEETEN: Under present law?
3        MS. MARANZANO: Under present law.
4        MR. SWEETEN: You can answer the question if
5    you know.
6    A. I don't know. I would have to look at the law.
7    Q. (By Ms. Maranzano) What ethnic group makes up
8    the largest percentage of the immigrant population in
9    Texas?
10   A. I don't know for a fact. I think, generally, I
11   believe that the Hispanic growth in Texas is well-known
12   to be flourishing.
13   Q. Based on public record, is there any connection
14   between photo ID bills and the growth of non-citizen
15   population in Texas?
16        MR. SWEETEN: Don't answer her question. It
17   calls for matters of legislative privilege. Instruct
18   not to answer.
19   BY MS. MARANZANO:
20   Q. Have you heard an assertion that photo ID bills
21   are connected to the growth of non-citizen population in
22   Texas?
23        MR. SWEETEN: You can answer based on
24   matters of the public record. Don't make a legislative
25   privilege.

103

1    A. I don't recall or have any knowledge of that
2    other than if -- I don't even know if there's anything
3    on the public record on that.
4    Q. (By Ms. Maranzano) Have you heard anyone in the
5    legislature say there's a connection between photo ID
6    bills and the growth of population? I'm not talking
7    about private communications you may have had.
8        MR. SWEETEN: You the can discuss matters of
9    the public record.
10   A. You would have to refer to the public record.
11   Q. (By Ms. Maranzano) How about anyone in the
12   governor's office, made such an assertion?
13        MR. SWEETEN: Same instruction. Legislative
14   privilege. But you can reveal matters of the public
15   record.
16   A. You would have to look -- refer to public record
17   on that issue.
18   Q. (By Ms. Maranzano) Are you familiar with a
19   decision by the name of Crawford versus Marion County?
20        MR. SWEETEN: Don't reveal your thoughts or
21   mental impressions about legislation, your analysis or
22   motivation in answering the question. You can reveal
23   matters of the public record.
24   A. When you say "familiar," I'm not sure what you
25   mean by that. If that is the Georgia case, I think it

104

1    may be referred to in the public record. If that
2    involves the Georgia voter ID.
3    Q. The Crawford opinion, I believe was referred to
4    in the public record. It's a Supreme Court decision
5    about a law in Indiana. Does that refresh your
6    recollection at all?
7    A. Right. Right. It does.
8    Q. Have you read that opinion?
9    A. I have not analyzed it.
10   Q. Have you read it?
11        MR. SWEETEN: You don't have to say if
12   you've read the decision or not. That would reveal your
13   thoughts, mental impressions or processes and
14   legislative privilege. Objective; legislative
15   privilege. You can refer to matters in the public
16   record.
17   BY MS. MARANZANO:
18   Q. I assume you can't answer the question?
19   A. I think the public record would answer the
20   question.
21   Q. Did you or your staff have any communications
22   with officials in Indiana regarding photo ID laws?
23        MR. SWEETEN: You can answer the question.
24   A. I did not. I do not know if my staff did or not.
25   Q. (By Ms. Maranzano) Are you familiar with a photo



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                      June 7, 2012

105

1  identification bill that was introduced in the 2009
2  legislative session?
3      A. You're going to have to be more specific. There
4  are many bills.
5      Q. There were many photo identification bills?
6      A. I believe -- I assume there was. I do not know.
7  I just know that members file bills.
8      Q. All right.
9      A. There's nothing to prevent a member from filing a
10  bill.
11      Q. I was asking, just to be clear, I was asking
12  specifically about the photo identification bills?
13      A. Well, I'm familiar with one bill.
14      Q. Okay. Which bill is that?
15      A. It's the bill that was considered by the Senate
16  in 2009.
17          MS. MARANZANO: Can we mark this as 29?
18          (Exhibit No. 29 was previously marked.)
19  BY MS. MARANZANO:
20      Q. Are you referring to Senate Bill 362, Senator?
21      A. Yes, ma'am.
22      Q. I'm showing you what we're marking as deposition
23  Exhibit 29, previously marked exhibit. And can you look
24  at it and tell me if you recognize this document?
25      A. I assume this is the introduced version of Senate

106

1  Bill 362, but I don't know. You have given me -- this
2  doesn't necessarily reflect what -- what this is, other
3  than Senate Bill 362. Was it the original filed
4  version, were there changes. I don't recall what
5  version this is that you're referring to here.
6      Q. Okay. Is there a way, from looking at this bill,
7  that you could determine that?
8      A. No.
9      Q. I can represent to you that it is the engrossed
10  version. And if you will look at Section 10 of the
11  bill, which is on Page 5, do you see that list "forms of
12  identification"?
13      A. Yes.
14      Q. Do you see that Subsection B provides for some
15  forms of identification that don't have photographs on
16  them?
17      A. I believe it does.
18      Q. Do you believe that Senate Bill 362 follows House
19  Bill 218, for the most part?
20      A. I don't know. I haven't analyzed it.
21      Q. Well, just generally?
22          MR. SWEETEN: You can refer to the text of
23  the bill. Don't reveal your impressions.
24      A. I don't know, generally. It appears to me that
25  they're both bills that require -- relate to requiring a

107

1  voter to present proof of identification. And it seems
2  like both bills have photo ID or alternatives.
3      Q. Can you look at Section 10, for me? And, in
4  particular, Section 6 -- Subsection 6 of that, it says,
5  "A valid identification card that contains the person's
6  photograph and is issued by an agency or institution of
7  the federal government or an agency institution or
8  political subdivision of this State." Do you believe
9  that would include a State University?
10      A. I'm not sure what you're referring to, quite
11  frankly. So I'm a little slow on reading.
12      Q. Oh, yeah. I'm sorry.
13      A. Six is struck -- Subsection 6 is struck on my
14  bill.
15      Q. Well, I'm looking at the section that --
16      A. So it would be now, 7. I'm sorry, 6. I see.
17  Yeah. It would be U-6. And it refers to a "valid
18  identification card that contains the person's
19  photograph and is issued by an agency of the federal
20  government or an agencies institution or political
21  subdivision of the State." Is that what you're
22  referring?
23      Q. Uh-huh. Would that include identifications
24  issued by a State University?
25          MR. SWEETEN: You can testify based on the

108

1  text of the bill.
2      A. An institution of the State would -- may be a
3  little bit vague and ambiguous. But it's not -- one
4  could argue that it means a higher Ed institution.
5      Q. Were you involved in the development of Senate
6  Bill 362?
7          MR. SWEETEN: Objection; vague.
8      A. What do you mean by "development"?
9      Q. (By Ms. Maranzano) Were you involved in the
10  concept of creating this bill?
11      A. No.
12      Q. Were you involved in the drafting of this bill?
13      A. No.
14      Q. Was anybody in your staff?
15      A. I don't think so.
16      Q. Would you know if your staff had been involved in
17  the drafting of this bill?
18      A. Not necessarily. I usually would. From time to
19  time members would ask members of my staff issues on
20  questions about things. So I don't know. But that was
21  not our bill and we weren't sponsoring it. So it's
22  unlikely we were involved to any large degree in
23  developing the bill. Now, there may have been questions
24  that may have been answered. But I don't know what
25  those were.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

109

1    Q. If questions had been asked would they likely
2    have been directed to Jennifer Fagan?
3          MR. SWEETEN: Objection; calls for
4    speculation. You can answer. Objection; vague, too.
5    A. Or the Committee staff, generally. Jennifer
6    would direct the question or answer it.
7    Q. (By Ms. Maranzano) How many staff work for the
8    committee?
9    A. I don't recall. It depends, five or six
10   during -- during a session.
11   Q. Did you have communications with Senator Fraser
12   about Senate Bill 362?
13         MR. SWEETEN: You can answer if you had
14   communications.
15   A. We did.
16   Q. (By Ms. Maranzano) You did. How many?
17   A. I can't tell you.
18   Q. Can you give me an approximate number?
19   A. No.
20   Q. Can you tell me when those communications
21   occurred?
22   A. Between the time the bill was filed and between
23   the time it was passed out of the Committee of the
24   Whole.
25   Q. Any communications before it was filed with

110

1    Senator Fraser?
2    A. Probably.
3    Q. And would those have been verbal communications
4    or written?
5    A. Yes, verbal.
6    Q. Are you aware of the source of the legislative
7    language in Senate Bill 362?
8          MR. SWEETEN: Don't reveal matters of
9    privilege.
10   A. I'm not.
11   Q. (By Ms. Maranzano) Are you aware of how this
12   list of acceptable forms of identification was arrived
13   at?
14         MR. SWEETEN: Don't answer. Objection;
15   legislative privilege
16   BY MS. MARANZANO:
17   Q. Was there any discussion on the public record
18   about these forms of identification and whether or not
19   any additional forms of identification should be added
20   to this bill?
21         MR. SWEETEN: You can answer as phrased.
22   A. I recall there was an a lot of discussion on the
23   public record about a lot of things. And I would assume
24   that some of these issues were discussed, but you would
25   have to refer to the record, generally.

111

1    Q. (By Ms. Maranzano) You can't recall any?
2    A. Not specifically.
3    Q. Do you recall whether the legislature considered,
4    based on the public record, adding additional forms of
5    identification based on Senate Bill 362?
6          MR. SWEETEN: Don't answer. It calls for
7    mental impression, thoughts about legislation. It also
8    would implicate other communications with other
9    legislators so don't answer the question as phrased. If
10   you interpret the word "consider" to mean was it
11   discussed on the public record, that's fair game. But
12   consideration gets into the privilege. Instruct not to
13   answer on that basis. But with my instruction.
14   BY MS. MARANZANO:
15   Q. Let me ask you this. Were proposals made on the
16   public record, such as amendments or other proposals to
17   add additional forms of identification to Senate Bill
18   362?
19         MR. SWEETEN: You can answer as phrased.
20   A. By "proposed," do you mean amendments.
21   Q. (By Ms. Maranzano) Amendments or any other kind
22   of proposals. I'm not of aware of anything other than
23   amendments, but you may be.
24   A. The record would reflect that if there were.
25   Q. And what's your recollection?

112

1    A. You know, I vaguely remember that nobody offered
2    amendments in 2009. But I may be wrong on that. The
3    record would have to reflect that in the committee. Now
4    I don't know about on the floor. If you're talking
5    about the committee. But for some reason I recall there
6    were no amendments offered. But I may be incorrect.
7    The record would reflect that.
8    Q. And how about on the floor?
9    A. I don't recall that.
10   Q. Were there discussions on the public record about
11   how many registered voters did not possess one of the
12   forms of identification listed in Senate Bill 362?
13         MR. SWEETEN: You can answer.
14   A. The record will reflect that clearly if there
15   was. I'm not going to speculate on that.
16   Q. (By Ms. Maranzano) What's your recollection, as
17   you sit here today?
18   A. I don't recall.
19   Q. You don't recall that happening?
20   A. Recall what happening?
21   Q. Discussions about how many registered voters
22   would not possess one of the forms of identification
23   listed in Senate Bill 362?
24   A. There were a lot of discussions over a period of
25   time that I, you know, can't remember specifically if



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

113

1   there were discussions framed exactly as you have framed
2   it or generally as you have framed it. I believe there
3   were a number of discussions as the record will reflect
4   regarding issues similar to that, generally.
5       Q. Were there discussions on the public record about
6   doing an analysis to determine how many voters would
7   possess one of those forms of ID.
8       A. I don't recall whether there was or not. The
9   record would have to reflect that.
10      Q. If Senate Bill 362 had passed, would it have been
11  subject to the requirements of Section 5?
12          MR. SWEETEN: Don't reveal matters of
13  legislative privilege. You can answer if you would not
14  be doing that.
15      A. I believe as we discussed earlier, Texas is a
16  state that is subject to Section 5.
17      Q. (By Ms. Maranzano) Is that a "yes" or "no"?
18      A. Well, if you or subject to Section 5 and it
19  changes the vote procedure, I would assume it would
20  require preclearance.
21      Q. Did the legislature take the position that after
22  Crawford was covered by Section 5 of the Voting Rights
23  Act, did not meet the analysis of the impact of photo --
24  photo identification laws on minority voters?
25          MR. SWEETEN: In answering the question,

114

1   don't reveal matters of legislative privilege. Also
2   objection to the question as vague.
3       A. I can't speak for the legislature.
4       Q. (By Ms. Maranzano) Was there any position, such
5   as that taken on the public record?
6       A. I don't know.
7       Q. What was the purpose of Senate Bill 362?
8           MR. SWEETEN: You can answer the general
9   purpose.
10      A. The general purpose is to preserve ballot
11  integrity.
12      Q. (By Ms. Maranzano) Was this law designed to
13  correct any specific problem?
14          MR. SWEETEN: Don't answer the question. It
15  calls for matters of legislative privilege. Instruct
16  not to answer.
17  BY MS. MARANZANO:
18      Q. Was there anything on the public record that
19  would suggest that that law was designed to address any
20  specific problem with regard to the ballot integrity?
21          MR. SWEETEN: Don't reveal your thoughts and
22  mental impressions. You can refer to factual matters on
23  the public record in answering the question. Don't
24  reveal your analysis.
25      A. You would just have to look at the record to

115

1   determine that.
2       Q. (By Ms. Maranzano) So you have no independent
3   recollection of whether there was discussion of any
4   particular problem that Senate Bill 362 was designed to
5   correct within the realm of voter integrity as you
6   described the purpose?
7       A. I believe the public record is clear on what was
8   discussed along those lines and that would be the best
9   source, what the public record contains.
10      Q. But your -- I mean, I'm just trying to
11  understand --
12      A. Other than my recollection, which would be
13  analysis and mental process. So what I'm trying to say
14  is simply, that was three years ago. And the record is
15  created to preserve what was said. And that would be
16  the best evidence of what was said regarding those
17  things, not my recollection, which is basically a mental
18  impression.
19      Q. Well, your recollection of the public record is
20  what I'm asking you about?
21      A. Public record?
22      Q. Not your impressions of the public record?
23      A. Well, the public record is the public record,
24  period. It is the record.
25      Q. Yes. But you're being deposed today so I can get

116

1   your knowledge. So that's what I'm asking you to
2   explain to me. Things that happened on the public
3   record. So let me ask you this.
4           MR. SWEETEN: I just want to -- he can --
5   and I just want to be clear. He can say whether he
6   recalls it being addressed in the public record. So I
7   will let him do that. Obviously, to the extent you're
8   asking for mental impressions or thought processes about
9   the bill, that's legislative privilege. But he can say
10  if he recalls. And I think, for the most part, he says
11  he doesn't recall. So I just want to make sure my
12  instruction is clear on that point.
13  BY MS. MARANZANO:
14      Q. Was there -- was any part of the purpose of
15  Senate Bill 362 to prevent non-citizens from voting?
16      A. No.
17      Q. Based on the public record, was there any
18  evidence that Senate Bill 362 would be more effective at
19  preventing in person voter impersonation than the
20  current system?
21          MR. SWEETEN: You're now asking him for his
22  qualitative analysis of what was on the record, which
23  would require him to reveal his mental impression,
24  thoughts that would be subject to the legislative
25  privilege so I'm instructing you not to answer on that


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

117

1  basis.
2  BY MS. MARANZANO:
3      Q.  Was there any factual analysis on the public
4  record that compared Senate Bill 362 to the current
5  system, in terms of the purported goals of the bill?
6          MR. SWEETEN:  You can answer based on the
7  public record if there was factual analysis.
8      A.  I don't -- I don't -- I don't understand the
9  question.  Could you repeat it again?
10     Q.  (By Ms. Maranzano)  Sure.  Was there factual
11 analysis in the public record about Senate Bill 362, the
12 regime that Senate Bill 362 had set up and the current
13 system and each of their -- and the goal of
14 Senate Bill 362 to prevent in person voter
15 impersonation?
16         MR. SWEETEN:  Objection; compound.  Same
17 instruction on legislative privilege.  You can refer to
18 matters of the public record.
19     A.  I think you can refer to the public record.  It
20 would reflect that my memory is a little vague, what
21 you're asking.  But if I understand you correctly, the
22 record would reflect those sorts of things, what was
23 discussed and what was put in the record as far as
24 written testimony, oral testimony, debate between the
25 members and those sorts of things would be covered, I

118

1  think, in a very extensive record on this issue.
2      Q.  (By Ms. Maranzano)  And you have no independent
3  recollection, as you sit here today?
4      A.  It would be -- if I have independent recollection
5  it would be recollection that would be subject to my
6  mental processes and judgment as a legislator.  And I
7  would not be accurate -- it would be somewhat
8  speculative on my part to try to go back three years and
9  remember what people said without putting my judgment in
10 there as to what it meant.  The record is very clear
11 about what people said and what the debates were.  And
12 that's why the record was created.  And so that's the
13 best evidence, in my view, of what the legislature did
14 in 2009.
15     Q.  Did you have any communications with legislators
16 who opposed Senate Bill 362?
17         MR. SWEETEN:  You can answer.
18     A.  Yes.
19     Q.  (By Ms. Maranzano)  With whom?
20     A.  Well, Senator Ellis, Senator Lucio, Senator
21 Whitmire, Senator Van de Putte, and probably others.
22     Q.  How many conversations?
23     A.  Senator Gallegos.
24     Q.  Sorry.  Anybody else?
25     A.  You know, probably, but I remember those folks

119

1  typically, I communicated with quite a bit.
2      Q.  How many conversations did you have with Senator
3  Ellis about Senate Bill 362?
4      A.  There's no way to tell you how many.
5      Q.  Do you know when they occurred?
6      A.  No.
7      Q.  Can you tell me --
8      A.  During the process.
9      Q.  Can you tell me, generally, what the subject
10 matter of those conversations were?
11     A.  No, I really don't recall, generally.  I mean,
12 Senator Ellis was opposed to the bill and Senator Ellis
13 expressed that opinion several times.
14     Q.  Can you tell me how in conversations you had with
15 Senator Lucio about Senate Bill 362?
16     A.  No.
17     Q.  Can you tell me when they occurred?
18     A.  No.
19     Q.  The general nature of those conversations?
20         MR. SWEETEN:  Well, you've already asked him
21 was it about this bill so I think that is the general
22 subject matter.
23         MS. MARANZANO:  You're not going to let him
24 testify to anything more specifically?
25         MR. SWEETEN:  Well, I'm not going to let him

120

1  reveal the substance of the communication.  I think he
2  said opponents about the bill.  That would be a
3  privileged log description.
4          MS. MARANZANO:  That seems extremely general
5  to me.
6          MR. SWEETEN:  Well, what do you
7  specifically -- I mean, if you can find a middle ground
8  I will work with you Jennifer.
9          MS. MARANZANO:  It's hard for me to find a
10 middle ground when I don't know what the subject matter
11 is.
12         MR. SWEETEN:  Well, if you can recall the
13 specific communication she's referring to, I will allow
14 you to give a general subject matter description with
15 the opponents.  Does that satisfy you?
16         MS. MARANZANO:  It does, thank you.
17     A.  ID not recall a specific conversation other than
18 what -- there are thousands of bills.  And as chairman
19 of committee, I communicate with members on all of those
20 bills.  And for me to come and try to reconstruct a
21 specific conversation that occurred three years ago
22 would be impossible, to accurately construct it.  And so
23 I can't give you an accurate answer to your question
24 without violating the privilege and without going into
25 mental processes and opinion.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                      June 7, 2012

121

1    Q. (By Ms. Maranzano) And would that hold true for
2  each of these members that you've identified?
3    A. I believe it would.
4    Q. Did these members explain to you why they were
5  opposing the bill?
6        MR. SWEETEN: Objection; compound.
7    A. Common sense would tell you that some more than
8  others, yes.
9        MR. SWEETEN: Don't reveal anymore than the
10  general subject matter description why they opposed the
11  bill. You can just answer it.
12  BY MS. MARANZANO:
13    Q. Why do you say some more than others?
14    A. Some were more vocal about their opposition than
15  others. Some sit closer to me on the floor than others
16  too. And some members I'm closer to than others. Just
17  depends on who it is and what's happening on the day.
18    Q. Do you remember if any of them specifically told
19  you why they opposed the bill?
20        MR. SWEETEN: You can answer "yes" or "no"
21  on that question. Don't reveal the communication
22  itself.
23    A. Yes.
24    Q. (By Ms. Maranzano) Which ones?
25    A. I'm sure it would have been Senator Ellis.

122

1  Senator Whitmire, Senator Van de Putte, perhaps Senator
2  Lucio.
3    Q. I'm sorry, did you say perhaps?
4    A. Well, not Lucio. It would be those three.
5  Probably those three. Because of the committee and
6  other issues.
7    Q. Did you have communications with outside groups
8  about Senate Bill 362?
9    A. Again, to the extent that they appeared before
10  the committee. But not to any other extent.
11    Q. Did you have communications with the executive
12  branch about Senate Bill 362?
13    A. You know, I don't really recall doing that. If
14  it was, it might have been some staff member on
15  logistics of when. But not on any substantive matter.
16    Q. Did you have conversations with other
17  communications with locally elected officials on Senate
18  Bill 362?
19    A. To the extent they appeared before the committee
20  and gave public testimony or submitted record --
21  testimony or evidence in the record, yes.
22    Q. Anything -- any conversations apart from their
23  testimony?
24    A. Not that I recall.
25    Q. Were concerns raised on the public record about

123

1  the impact of Senate Bill 362 on minority voters?
2    A. You would have to refer to the public record.
3    Q. Did the legislature take any steps on the public
4  record to address those concerns?
5    A. The record would reflect that.
6    Q. And you have no independent recollection?
7    A. Not as you have framed the question, no.
8    Q. Well, do you have a different recollection?
9        MR. SWEETEN: Don't provide thought, mental
10  impressions about the bill or discussions that you've
11  had with other legislators in answering the question.
12    A. The only way I can answer the question accurately
13  is to say that there was discussion on the public record
14  about all of these issues. And there was testimony
15  given by experts on all of these issues. And there was
16  testimony given by lay witnesses on all of these issues.
17  And all that is reflected in the record. And my
18  independent recollection of any of that would be
19  inaccurate. But if you refer to the record, the record
20  would be an accurate depiction of what was considered by
21  the committee, debated by the committee and what was
22  before the Committee of the Whole when it made the
23  decision to vote, based on the record.
24    Q. (By Ms. Maranzano) So my question is, do you
25  have a recollection, based on what happened on the

124

1  public record, about whether the legislature took any
2  steps to address the concerns raised about the impact of
3  Senate Bill 362 on minority voters?
4        MR. SWEETEN: Objection, legislative
5  privilege. You're asking about what steps they took and
6  that's asking for his mental impressions and thoughts
7  and opinions about the legislation that would be subject
8  to the legislative privilege, as phrased.
9        MS. MARANZANO: But steps that they took --
10  let me clarify.
11        MR. SWEETEN: You're asking him to
12  characterize steps they took in the context of
13  information which is clearly an analysis and process
14  question.
15        MS. MARANZANO: All right. I got you.
16  BY MS. MARANZANO:
17    Q. Let me ask you this. Was there anything stated
18  on the public record that a step was being taken where
19  it was publicly stated that this step was being taken to
20  address concerns about the potential impact of Senate
21  Bill 362 on minority voters?
22        MR. SWEETEN: As narrowed, in referencing
23  the public record, to the extent you can recall, you can
24  answer the question.
25    A. The public record is several thousand page.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                              June 7, 2012

125

1    Q. (By Ms. Maranzano) Well, what's your
2  recollection?
3    A. I don't -- I don't have a specific recollection
4  of what was done. I would have to refer to the record.
5    Q. Did you have a role in attempting to secure
6  passage of Senate Bill 362?
7        MR. SWEETEN: Hold on a minute. Object on
8  the basis of legislative privilege. Any role he had to
9  implicate his analysis and thoughts about the bill or
10  communications that he had. To the extent you can refer
11  to matters of the public record, you can answer that
12  question.
13    A. My role was as chairman of the Committee of the
14  Whole, with regard to the process of hearing the bill
15  and presenting it to the members.
16        MR. SWEETEN: Okay. I think we're getting
17  close to a break. That bowl of Captain Crunch I had at
18  5 a.m. is not lasting. So can we get to a point and
19  take a break pretty soon?
20        MS. MARANZANO: Yes. Why don't we just go
21  ahead and do that.
22        MR. SWEETEN: I would like a time check now.
23  Please.
24        MS. MARANZANO: Let's go back on the record.
25  And can we mark this?

126

1        (Exhibit No. 524 was marked.)
2  BY MS. MARANZANO:
3    Q. Before the break we were talking about Senate
4  Bill 362. I'm actually going to go back for a moment to
5  House Bill 218. I'm giving you what we're marking as
6  deposition Exhibit 524. If you could take a look at
7  that and tell me if you recognize it.
8    A. It appears to be a record of the Senate Committee
9  on State Affairs, dated April 30, 2007. House Bill 218
10  is the title.
11    Q. Can you look at the page that's Bates labeled at
12  the bottom -- actually it's Page No. 54 in the
13  record.
14    A. 54 of the transcript.
15    Q. Of the transcript. And the Bates label is Texas
16  00213319. There's a statement made by you on that page.
17  Do you see that?
18    A. Does that appear at line 14.
19    Q. Line 14, exactly. And if you can look down a few
20  lines from that there's a sentence that says, "One thing
21  I think, Senator Fraser laid out a good argument in the
22  beginning and he says that, 'Well, if one voter votes
23  illegally or fraudulently, cancels out the vote of a
24  person who voted legally.'" Does that seem like an
25  accurate representation of something you said, to the

127

1  extent you remember?
2    A. Well, again as we discussed earlier I don't
3  remember specific things that were said or what I said.
4  But if that's what the record says I said then I'm sure
5  that's what I said.
6    Q. Has anyone ever told you that they're not going
7  to vote because they're worried about somebody voting
8  illegally and cancelling out their vote?
9        MR. SWEETEN: Don't reveal matters of
10  privilege in answering the question.
11    A. Not specifically.
12    Q. (By Ms. Maranzano) Not -- not specifically. Has
13  anybody ever told you generally?
14    A. Well, generally no. I mean, as far as you hear
15  people discussing, the general public about voter ID and
16  what's wrong with voter ID, people may make statements
17  generally about voter confidence. But I can't recall a
18  specific statement anybody said.
19    Q. And what kinds of statements about voter
20  confidence do you recall?
21        MR. SWEETEN: Don't reveal matters that
22  would be subject to the legislative privilege.
23  Communications with the legislative staff, State
24  agencies, Texas Legislative Council. And don't reveal
25  your thoughts or mental impression.

128

1    A. Just generally, what you would read in the
2  newspaper or what you would hear on the radio talk show
3  or what you would hear on a general discussion of the
4  people at meetings and things like that about,
5  generally, voter confidence, voter ID and that sort of
6  thing.
7    Q. Okay. And I'm just trying to understand, what do
8  you mean by "voter confidence and voter ID." What have
9  you heard in those forums that you just listed about the
10  connection between voter confidence and voter ID?
11    A. Generally, what I would recall is that there is a
12  frustration while somebody should not be allowed --
13  should not be required to show and ID to vote when
14  they're shown an ID to do a lot of other things that we
15  all do in this society in this day an age.
16    Q. Have you also heard that, in those same forums,
17  that some of those things we have to show ID for are not
18  legal rights?
19        MR. SWEETEN: You can answer. Don't reveal
20  your mental thoughts and impressions and don't reveal
21  the communications that would be subject to the
22  legislative privilege. You can refer to matters in the
23  public record, which I think you have.
24    A. I don't recall anything specific as to what you
25  described.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

129

1   Q. (By Ms. Maranzano) Is there any reason based on
2   the various public records that you're familiar with
3   from sitting through COMMITTEE hearings and Senate floor
4   hearings and debates on various voter identification
5   bills and other election bills, based on all of that, is
6   there any reason to believe that voters do not have
7   confidence in the system?
8           MR. SWEETEN: That asks him to reveal his
9   mental impressions or thoughts, so don't answer the
10  question as posed. It's subject to the legislative
11  privilege.
12  BY MS. MARANZANO:
13      Q. Can you look at the -- in that same statement
14  there's -- the first sentence says, "number one target
15  of priority on my agenda." Would you say that that was
16  a consistent position you had throughout the additional
17  debates on voter identification that took place in 2009
18  and 2011?
19          MR. SWEETEN: As phrased, the question asks
20  for you to reveal matters of legislative privilege,
21  whether it was a consistent position of you. You can
22  refer to matters in the public record, but don't answer
23  to the extent it requests information that's subject to
24  the legislative privilege.
25      A. I would just simply refer to the statements made

130

1   in the public record.
2       Q. (By Ms. Maranzano) Did it become a priority on
3   your agenda in 2009 or 2011, if that is something that
4   would have been public?
5           MR. SWEETEN: You can answer if it has to do
6   with something you said on the public record. However,
7   do not answer if it became a priority for you or a
8   matter that would be subject to the legislative
9   privilege, including your mental thoughts and
10  impressions.
11      A. I don't know if I've made a statement to -- I
12  don't recall whether I made a statement one way or the
13  other with regard to that being a priority of my office
14  or my -- or me, as a policy issue in -- in subsequent
15  days or periods after April 30, 2007, which is the date
16  of this statement.
17      Q. (By Ms. Maranzano) Can you look at the next
18  page. It's a continuation of that same statement from
19  you in the two paragraphs below the paragraph that we
20  were looking at there's a statement that says, "And I'm
21  not sure how I understand that -- how that is so
22  oppressive as opposed to the part -- as opposed to the
23  scenario of when someone votes fraudulently a legal vote
24  is cancelled and that seems to me to be an overriding
25  policy principal in this whole issue." Is there any

131

1   reason to believe, based on the public record, that
2   criminal penalties are not sufficient to deter
3   fraudulent votes?
4           MR. SWEETEN: Don't answer that. She's
5   asking for your qualitative judgment about whether or
6   not criminal penalties are sufficient. That would
7   require you to reveal your mental impressions, thoughts
8   and motivations regarding legislation. My instruction
9   is do not answer the question.
10  BY MS. MARANZANO:
11      Q. Was there any public testimony or discussion
12  about whether criminal penalties would be sufficient to
13  deter fraudulent votes?
14          MR. SWEETEN: You can answer to the extent
15  that it appears on the public record.
16      A. You would have to refer to the public record. I
17  don't are specific recollection.
18      Q. (By Ms. Maranzano) You don't have specific
19  recollection, independently?
20      A. Well, not independently. It may or may not have.
21  I would just to refer you to the record.
22      Q. Do you see that first part that says, "I'm not
23  sure how I understand that is so oppressive."
24  Presumably you can look at the paragraph above to give
25  some context. Is that talking about the voter ID

132

1   requirement?
2           MR. SWEETEN: You can refer to the public
3   record itself when answering the question.
4       A. Well, I'm not sure I really understand the
5   question.
6       Q. (By Ms. Maranzano) I wanted to ask you a
7   question about this phrase, but since it's sort of taken
8   out of context as it is, I was just saying you could
9   look at the statements ahead of it and the paragraph
10  preceding. And is it your understanding that when you
11  say, "I'm not sure how that is so oppressive," what is
12  that in that sentence, just so that we have a clear
13  record. Is that talking about the voter identification
14  requirement?
15          MR. SWEETEN: You're asking him to interpret
16  what that meant, which is in the public record. And in
17  providing an interpretation of that you're asking him to
18  reveal his thoughts, mental impressions. You can refer
19  to matters in public record.
20  BY MS. MARANZANO:
21      Q. Can you look at the full statement which
22  starts on Page 54 and continues on to Page 55? I'm just
23  asking for the context of that statement.
24      A. It's a legislative debate that's on the public
25  record. So I will invoke the legislative privilege on



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                                June 7, 2012

133

1    that. This statement is what it is. It is a statement
2    that basically is a form of public debate on the issue.
3    So that's what I recall. And that is how I can answer
4    that.
5        Q. Okay. You're not able to provide any additional
6    answer as to what you meant -- what the word that refers
7    to? I mean I was just actually just asking for the
8    context?
9        A. You know, I don't remember making -- this is the
10   record -- I don't recall this specific conversation.
11   I'm not denying that it occurred. I'm just saying I
12   don't recall the conversation. So I actually
13   don't understand -- can't -- or don't recall -- I cannot
14   accurately answer what context that's in.
15       Q. So would it be oppressive if a person was unable
16   to afford an identification and couldn't vote, would
17   that system be oppressive?
18           MR. SWEETEN: Objection. Don't answer.
19   Calls for matters subject to the legislative privilege.
20   BY MS. MARANZANO:
21       Q. Can you look at the next page for me, on Page 57
22   of the public record, the public hearing. And at the
23   bottom of that page do you see there's a quote by you?
24       A. Well, I have testimony beginning on line 14.
25       Q. Yes. Can you look at where that -- can you look

134

1    at the testimony that's at line 24 and 25 and the top of
2    the one on the next page. Do you see that it says, "So
3    what this is, this is the least restrictive more to be
4    able to verify voters. It seems to me." Based on the
5    public record, do you think House Bill 218 is the least
6    restrictive means to verify voters?
7            MR. SWEETEN: Objection. Don't answer the
8    question. It calls for matters of legislative
9    privilege, including your mental impressions, thoughts,
10   motivations about bills.
11   BY MS. MARANZANO:
12       Q. Was there discussion on the public record about
13   whether House Bill 218 was the least restrictive means
14   to verify voters?
15           MR. SWEETEN: You can answer the question.
16       A. It appears that there was discussion and debate
17   about that and the record will speak for that.
18       Q. (By Ms. Maranzano) Was there any discussion on
19   the public record about whether House Bill 218 would
20   continue to be the least restrictive means to verify
21   voters if some of the forms of identification in the
22   bill were removed from it?
23       A. If there was such a discussion of that it would
24   be in the record.
25       Q. Do you have any recollection of that, as you sit

135

1    here today?
2        A. Not in the record. Are you talking just about
3    this Senate Committee public hearing or are you talking
4    about 218, generally?
5        Q. I'm talking about the public record, generally?
6        A. Okay.
7        Q. Does that change your answer at all?
8        A. No.
9        Q. Okay. Can you look at Page 99 of the transcript,
10   the Bates label is Texas 00213364. And there's an
11   exchange -- I'm sorry. Do you see there's an exchange
12   at the bottom of the page between Senator Van de Putte
13   and Ms. McGeehan. Can you identify for the record who
14   Ms. McGeehan is?
15       A. I believe that would be referring to Ann McGeehan
16   who was an employee of the Secretary of State's office.
17   I'm think in the election division.
18       Q. Was she the director of elections?
19       A. I think that was generally her title. It I'm not
20   sure specifically what her title was.
21       Q. Do you see on line 22, Senator Van de Putte
22   asked, "About how many complaints have you about had
23   voter impersonation?" And Ms. McGahan responds on line
24   24, "We have not had any."
25       A. I see that.

136

1        Q. Do you recall that exchange?
2        A. Not specifically. But I recall it from reviewing
3    the record here
4        Q. Do you recall at any point publicly getting an
5    update on that information sometime between when this
6    happened and the 2011 legislative session?
7            MR. SWEETEN: You can refer to matters in
8    the public record.
9        A. I don't recall if we did or not. If we did it's
10   reflected either in -- or it should be reflected in the
11   committee records post April 30, 2007.
12       Q. Would that information, if it was publicly made
13   available, have gone to the State Affairs Committee?
14           MR. SWEETEN: Objection. Calls for
15   speculation. Also don't reveal your mental processes or
16   communications.
17       A. It could have gone to the State Affairs
18   Committee. It could have gone to members generally.
19   Sometimes post-hearing or once a bill is out of the
20   COMMITTEE people will disseminate things. I don't know.
21   But I can't tell you outside the record whether the
22   committee followed up or did anymore in that session on
23   that question.
24       Q. (By Ms. Maranzano) Okay. We can put this aside.
25   Before the break we had started talking about Senate



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                          June 7, 2012

137

1    Bill 362. Do you recall that?
2            MS. MARANZANO: Can we have this marked.
3            (Exhibit No. 525 was marked.)
4    BY MS. MARANZANO:
5        Q. Senator, I'm showing you what we're marking for
6    the record as deposition Exhibit 525. It does not have
7    a cover page on this, but do you recognize that this
8    looks to be an excerpt from the Senate rules?
9            MR. SWEETEN: Is this '09 or '11, did you
10   say.
11           MS. MARANZANO: This is '09.
12           MR. SWEETEN: '09, okay.
13       A. Is your question does this appear to be?
14       Q. (By Ms. Maranzano) An excerpt from the Senate
15   rules?
16       A. I assume that it is.
17       Q. Do you recall -- do you recall having a debate on
18   the rules resolution in 2009 in the Senate?
19       A. I do recall there was a debate on this.
20       Q. And can you direct your attention to Section D of
21   Rule 5.11?
22       A. Yes, ma'am.
23       Q. Do you see that there's a provision explicitly
24   for voter identification requirements in Section D of
25   Rule 5.11?

138

1        A. Uh-huh. Yes, ma'am.
2        Q. Can you tell me what the circumstances were for
3    adopting that rule, that section of the rules?
4            MR. SWEETEN: Done reveal -- don't answer
5    the question as phrased. It will require you to reveal
6    matters subject to legislative privilege. You can
7    answer as to the general purpose of Rule 5.11. I will
8    let him do that.
9    BY MS. MARANZANO:
10       Q. Why don't you tell me about the general purpose
11   of Rule 5.11?
12       A. Well, as I understand the general purpose of Rule
13   5.11 was to be able to take up consider -- a bill of
14   resolution relating to voter identification
15   requirements, within the confines of this rule. And it
16   sets up the process and procedure of doing that.
17       Q. And what was the purpose for making this special
18   carve-out for voter identification requirements?
19           MR. SWEETEN: You can testify to the purpose
20   of rule 5.11 generally.
21       A. Well, generally, the purpose is to allow a bill
22   to be brought up as a special order as opposed to the
23   regular order of business.
24       Q. (By Ms. Maranzano) So what I'm directing your
25   attention to is the Subsection D of that rule. What was

139

1    the purpose of subsection D?
2        A. The purpose of that subsection is to provide for
3    consideration of voter identification or a bill of
4    resolution relating to voter identification requirements
5    by a Committee of the Whole in setting the time limit.
6        Q. And so -- I'm sorry. Were you done?
7        A. I think so.
8        Q. Do you see that that also allows for a vote by
9    the majority of the members of the Senate?
10       A. That's correct.
11       Q. And so that -- was this in the 2007 Senate rules?
12       A. I think this rule was either added or amended in
13   2009.
14       Q. So you believe it was or was not in the 2007
15   rules?
16       A. Not as 5.11. I don't know what was -- if there
17   was a version of special order bill that was amended by
18   the Senate on -- in January of 2009.
19       Q. Okay. But I'm asking specifically about
20   Subsection D?
21           MR. SWEETEN: You're asking was D in the
22   2007 Senate rules.
23           MS. MARANZANO: Yeah.
24           MR. SWEETEN: You can answer.
25       A. I don't think so.

140

1        Q. (By Ms. Maranzano) Okay. How about the 2005
2    Senate rules?
3        A. I don't believe it was.
4        Q. Are you aware of any other times when there has
5    been a carve-out for any particular type of legislation
6    written into the Senate rules?
7            MR. SWEETEN: You're talking about in -- in
8    the context of the 5.11. Because I think the question
9    could be very broad. I just want to make sure I
10   understand.
11   BY MS. MARANZANO:
12       Q. Okay. Why don't we focus on 5.11. Was there any
13   other time that you're aware of when there has been an
14   exception written into the rules for Rule 5.11 about one
15   particular type of legislation?
16       A. Not that I recall. Not that I know of.
17       Q. Did Senate Bill 362 pass by more than two-thirds
18   a majority vote?
19       A. I think the record would reflect it passed by a
20   majority, but not a two-thirds majority.
21       Q. Did you have any communication -- well, let me
22   ask you this. Did Senator Williams introduce the
23   resolution to the Senate rules resolution in 2009?
24       A. I believe Senator Williams was the primary author
25   of the rule, of the proposed rule, yes.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                                          June 7, 2012

141

1     Q.  Did you have communications with Senator
2  Williams?
3     A.  Yes.
4     Q.  About the proposed rules?
5     A.  Yes.
6     Q.  How many?
7     A.  I don't know.  Not many.
8     Q.  Prior to his introduction of the resolution?
9     A.  Yes, prior.
10    Q.  Can you give me an approximate number?
11    A.  Not really.  I mean it was -- I really can't.  It
12  would be an approximate guess, so I hate to guess.  We
13  had more than one.
14    Q.  More than five?
15    A.  Probably.
16    Q.  And they were all prior to the introduction of
17  the resolution?
18    A.  No.  Well, I don't know.  Prior to passage.  I'll
19  qualify it that way.
20    Q.  When did you learn that Senator Williams was
21  going to introduce the rules resolution that included
22  this Subsection D for Rule 5.11?
23    A.  Sometime in January of 2009.
24    Q.  Did any other Senate rules get changed from the
25  consideration of voter identification requirements in

142

1  2009?
2         MR. SWEETEN:  Could you read the question
3  back, please, madam court reporter.
4         (Requested question was read.)
5         MS. MARANZANO:  And I think what I intended
6  to say was for the identification of voter
7  identification requirements.
8     A.  Would you just rephrase it?
9     Q.  (By Ms. Maranzano)  Were any other Senate rules
10  changed in 2009 solely for -- as is written in 5.11-D,
11  solely for a bill or resolution related to voter
12  identification requirements?
13    A.  I don't know if there were any conforming rules
14  or anything that were changed as a result of this.  I do
15  not know the answer to this question.
16    Q.  Other than conforming rules, did anything change?
17    A.  I don't think so.  But again, I don't know for
18  sure.  I don't recall that there were.  I don't think
19  there were.
20    Q.  Did you take a public position on the rules
21  resolution that Senator Williams introduced?
22    A.  What do you mean?
23    Q.  Presumably, you voted on it, right?
24    A.  I voted for it.
25    Q.  You voted for it?

143

1     A.  Yes.  Yes.
2     Q.  Did you have any communications with anybody
3  about changing other rules in 2009 for the consideration
4  of voter identification requirements, other rules other
5  than the 5.11?
6     A.  I don't think so.
7     Q.  And other than Senator Williams, did you have any
8  communications about Subsection D of 5.11 with anybody
9  in 2009?
10    A.  I had conversations with several members of the
11  Senate over that.  During the debate on the floor,
12  during the few days before when it was proposed and
13  voted on.  Just part of what we do in the Senate is
14  there are discussions formal and informal.  Formal would
15  be on the record, informal would be discussions that
16  would be had on the Senate floor.
17    Q.  Who did you have informal communications with?
18    A.  I would assume members of the -- different
19  members.
20    Q.  Can you give me their names?
21    A.  Well, Senator Lucio, Senator Ellis, Senator Van
22  de Putte, Senator Whitmire, probably Senator Fraser,
23  probably Senator Williams, probably Senator Ogden.
24  Probably Carona, Senator Eltife perhaps.  Those are just
25  specific people that are coming to my mind that I would

144

1  have had a discussion on the Senate floor about this
2  particular rule.
3     Q.  Do you remember conversations with them or you're
4  just saying if you --
5     A.  I don't remember the context of generally what
6  members of the legislative body do in discussing an
7  issue.
8     Q.  And am I correct that some of the members you
9  listed voted against the rules resolution?
10    A.  That's correct.
11    Q.  Were you conversations -- did your conversations
12  with them include -- include discussing the reasons why
13  they were voting against the rules resolution?
14        MR. SWEETEN:  Don't discuss the specific
15  conversations.  But if you want to -- I think as phrased
16  I'm going to let you answer it.
17    A.  Members discuss their mental processes and
18  thoughts about bills on the Senate floor all the time
19  that may not be on the record.  In other words, it's --
20  as opposed to a formal debate where somebody is holding
21  a mic and debating formally or whether somebody is
22  working on a bill and debating the bill on the Senate
23  floor informally without a debate.  It is part of the
24  mental process sharing of legislators that occurs.  And
25  that would be the type of communication that we were



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                June 7, 2012

145
1  having.
2  Q. (By Ms. Maranzano) So my question was about
3  whether they expressed why they were opposed to the
4  bill's resolution.
5  A. I'm sure those that did expressed or gave reasons
6  as to why they were opposed.
7  Q. Do you recall if Senator Carona gave you reasons
8  about why he was opposed to the rules resolution?
9  A. Yes.
10  Q. How many conversations did you have with him?
11  A. Two or three.
12  Q. Were all of these conversations that you've
13  referred to, and for the purposes of this question I'm
14  including more than just Senator Carona, were they all
15  verbal?
16  A. Yes.
17  Q. Did you have any written communications?
18  A. No.
19  Q. Did Senate Bill 362 go to any Senate committees?
20  THE REPORTER: Go what?
21  MS. MARANZANO: Was it referred to any
22  Senate committees?
23  A. I don't believe it was, other than the Committee
24  of the Whole. I don't believe it went to a specific
25  standing committee.

146
1  Q. (By Ms. Maranzano) Is that the -- is that
2  unusual?
3  MR. SWEETEN: You can answer as the general
4  Senate procedure.
5  A. That was the procedure that was established by
6  Rule 5.11.
7  Q. (By Ms. Maranzano) Rule 5.11 established that it
8  would go straight to the Committee of the Whole?
9  A. I believe that's what it says. I'll look at it.
10  I believe that the Senate Rule 5.11 contemplates the
11  bill being referred to by the Senate of the whole.
12  Q. Would this bill, had it not been referred to the
13  Committee of the Whole, been referred to the State
14  Affairs Committee? The bill I'm referring to is Senate
15  Bill 362.
16  MR. SWEETEN: Hold on a minute. Calls for
17  speculation and calls for him to reveal his thoughts,
18  mental impressions about legislation. So I'm going to
19  instruct you not to answer based on that.
20  BY MS. MARANZANO:
21  Q. Did you have any communications with the
22  Lieutenant Governor about the referral of Senate Bill
23  362 straight to the Committee of the Whole?
24  A. Yes.
25  Q. How many?

147
1  A. I can't tell you. Five or more.
2  Q. And when were those?
3  A. From the point of -- it would after the rule was
4  adopted and from the time we had the hearing.
5  Q. I'm sorry. The time that the Committee of the
6  Whole held the hearing?
7  A. Right. Right.
8  Q. It was after the rule was adopted you said?
9  A. Yes. I may have had some conversations before,
10  generally. I just don't recall.
11  Q. What was the purpose of referring the bill
12  directly to the Committee of the Whole?
13  MR. SWEETEN: Yeah. Don't answer that
14  question. That calls for matters that are your mental
15  impressions, thoughts, opinions about legislation,
16  motivations, so don't answer the question.
17  BY MS. MARANZANO:
18  Q. Were there any conversations on the public record
19  about the referral of this bill straight to the
20  Committee of the Whole?
21  MR. SWEETEN: You can answer the question as
22  phrased.
23  A. If they there were they're on the record. I
24  assume there may have been discussions about that during
25  the debate on Rule 5.11.

148
1  Q. (By Ms. Maranzano) Do you recall any members
2  expressing concern that this bill was trying to be moved
3  along extremely quickly?
4  MR. SWEETEN: You can refer to matters of
5  the public record. Don't reveal matters of legislative
6  privilege.
7  A. I don't know for sure. I don't recall -- have
8  independent recall. That would be reflected in the
9  record. It's not unusual for that to occur.
10  Q. (By Ms. Maranzano) I'm sorry. For what to --
11  what's not unusual?
12  A. For someone to complain that the bill is moving
13  too quickly.
14  Q. I see. Based on the public record would you say
15  Senate Bill 362 moved fairly quickly through the
16  legislature compared to other bills?
17  A. No.
18  Q. Did you have less of an ability to shape Senate
19  Bill 362 since it went straight to the Committee of the
20  Whole and not to State affairs?
21  MR. SWEETEN: Objection; calls for
22  legislative privilege. Your qualitative judgment about
23  one committee process as opposed to another. That's a
24  matter of legislative privilege. Instruct you not to
25  answer.



ESQUIRE

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

149

1        MS. MARANZANO:  Can we get these two
2    exhibits mark?
3        (Exhibit No. 526-527 was marked.)
4    BY MS. MARANZANO:
5        Q.  Do you recognize these?
6        A.  I believe so.
7        Q.  What are these?
8        A.  Well, Exhibit 526 is a letter from Senator Van de
9    Putte to me dated March 3, 2009.  Opening a written
10   dialogue concerning the Committee of the Whole hearing
11   and ground rules.  And the -- and 527 is a letter that I
12   wrote responding to her concerns dated March 5, 2009.
13       Q.  And can you look at -- do you recall having this
14   exchange with Senator Van de Putte?
15       A.  I recall that we wrote letters back and forth and
16   also had conversations seeking conversations about these
17   issues.
18       Q.  Can you look at your response for me?
19       A.  Yes, ma'am.
20       Q.  And can you look at No. 1, the first sentence
21   says, "I am not inclined to support further delay in
22   consideration of voter identification legislation."  Can
23   you tell me, based on the public record, had there been
24   a delay in the consideration of voter identification
25   legislation?

150

1        MR. SWEETEN:  Yeah.  Don't answer the
2    question.  It calls for you to interpret what you said
3    there.  Legislative privilege.  You can answer as to
4    whether you said that.
5        A.  That's a statement I wrote.  But that's as much
6    as I can testify to.
7        Q.  (By Ms. Maranzano)  Okay.  Can you -- can you
8    look down in that same paragraph where there's a
9    sentence that says, "More than a week's notice of a
10   hearing is much more than the Senate usually provides,"
11   what amount of notice does the Senate usually provide?
12       MR. SWEETEN:  You can answer as a general
13   matter, but I don't want you to interpret statements on
14   this.
15       A.  The rules of the Senate provide posting notices
16   and I believe, you can go with the rules, but I think
17   it's 24 hours or 48 hours to the tag and there's certain
18   periods of times it changes depending on the time of the
19   session.  So the rules of the Senate would be the time
20   limits that committees are required to provide for
21   hearings.  And I would just refer you to those rules
22   that were in effect.
23       Q.  (By Ms. Maranzano)  And is it -- is it your
24   testimony that more than a week's notice would be much
25   more than what the Senate would usually provide?

151

1        MR. SWEETEN:  Again, don't refer to the
2    document itself or interpret the words on the page.  If
3    you -- you can answer as a general matter about Senate
4    procedure matters of the public record.
5        A.  Generally a week would be longer than normal
6    bills would -- notice on most bills.
7        Q.  (By Ms. Maranzano)  Are there some bills that you
8    give a longer amount of notice time for?
9        MR. SWEETEN:  You can refer to matters of
10   the public record.
11       A.  Generally, no.  We generally -- we generally set
12   a hearing docket and post it within the required time
13   limits.  Just depends on when it gets down to the
14   Senate.
15       Q.  (By Ms. Maranzano)  Is there any consideration of
16   whether there's significant public interest on a bill?
17       MR. SWEETEN:  Yeah.  Don't reveal that.
18   That would require you to reveal matters that are
19   privileged and instruct you not to answer.
20   BY MS. MARANZANO:
21       Q.  Can you look at that paragraph below the one we
22   were just looking at?  There's a sentence that says,
23   "Additionally, that committee heard extensive testimony
24   last session on a substantially similar voter election
25   bill.  Texas Senate almost spent nearly an entire day on

152

1    the Senate floor discussing the importance of this
2    issue."  Does that sentence refer to the debate that
3    occurred on the rules resolution?
4        MR. SWEETEN:  Don't interpret the sentence
5    on the page.  You can answer -- I mean, I don't know
6    that you can answer that.  I think that's legislative
7    privilege.
8        MS. MARANZANO:  So what he meant in this
9    letter --
10       MR. SWEETEN:  He's not going to interpret
11   what he meant when he said it.  That's legislatively
12   privileged.  He can answer questions about the public
13   record, but he's not going interpret the letter.  That
14   would reveal his thoughts, mental impressions about a
15   bill in legislation.
16       MS. MARANZANO:  I'm not sure I see that as
17   interpretation, but more just as what event he was
18   referring to.  But in the interest of --
19       MR. SWEETEN:  Well, I mean, as the court has
20   said, you can ask him about a public statement, he made
21   it, he didn't make it.  The court has not said that you
22   can -- that you can go behind that and ask for reasons,
23   support or information or thought processes behind that
24   statement.  In fact, they've said the contrary.  And so
25   I'm drawing that line.  I think that is an absolutely



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

correct interpretation of the court's decision on this matter. That's why I'm not going to allow him to give additional information about this statement or what he's expressed.
BY MS. MARANZANO:
Q. Well, let me ask you this, Senator. That sentence refers to there being discussion about the importance of this issue. Was the substance of legislation discussed during that discussion, which appears to me is a discussion that happened on the public record?
A. Well, let me answer it this way. I don't know of any other hearing we had on the public record on the Senate for a day other than the hearing on the rule.
Q. And was the substance of Senate Bill --
A. There may have been, but I don't recall.
Q. There may have been what?
A. There may have been other -- I don't recall any other hearing before the Senate that lasted more than a day, other than the one on Rule 5.11.
Q. And was the substance of Senate Bill 362 discussed in that debate?
A. The record will clearly reflect what issues were discussed.
Q. And what's your recollection, as you sit here

today?
A. My recollection is, we talked about the issues of voter identification and the issues of the special order rule. But the record -- you would have to check the record to get a better recollection or better reflection of what was discussed. There were a lot of things discussed that day.
Q. So your recollection is you talked about voter identification and you don't recall whether or not --
A. I don't recall specifics independently. The record will reflect that. That was a long day for me. I had a personal tragedy.
Q. I'm sorry. Can you look at the next page for me? By the --
A. The next -- my letter of March --
Q. Exactly. By paragraph 5. Can you read that?
A. Read it?
Q. Just take a look at it.
A. Yes.
Q. Is that about whether the office of the Attorney General would be available to testify in a legislative proceeding?
A. That's correct.
Q. Are you aware of whether this position -- am I correct that what 5 -- what that paragraph is asserting

is that the office of Attorney General would not testify because should there be litigation that would present a conflict of sorts?
A. Well, I think you just have to read it.
Q. Well, how would you describe it for me?
A. As I wrote it.
Q. Which says, "Given fact that the office of the Attorney General will represent the State of Texas in litigation if any arising out of this legislation, it would be inappropriate to present the Attorney General as a witness in the legislative debate." Did that position change in any of the legislative debates. And that's -- that's a public record. Did the office of Attorney General testify in the 2011 legislative session on voter identification vote?
MR. SWEETEN: That second question, if the AG testified, I'm fine with. The first one, whether his position changed, I think we --
BY MS. MARANZANO:
Q. Okay. Let's go with the second one.
MR. SWEETEN: Because you amended the question.
A. So to make sure I'm clear, would you restate it?
Q. (By Ms. Maranzano) Yeah. Did the office of the Attorney General testify during the debate on SB 14?

A. There were staff persons from the office of the Attorney General who testified on -- in the public hearing on Senate Bill 362.
Q. On 362?
A. Or whatever it was.
Q. Senate Bill 14?
A. Yeah, I think on 14 as well.
Q. Okay. And you think they testified in 2009?
A. I think so.
Q. As well?
A. Yeah.
Q. Okay.
A. I'm sorry. I thought we were on --
Q. We were, but --
A. You've got to be clear with me on what you were talking about.
Q. I'm sorry.
A. It will help me a lot.
MR. SWEETEN: Jennifer, I need to take a 2-minute break.
(Brief recess.)
MS. MARANZANO: Before we actually go back into the substantive discussion we were having, I wanted to raise an issue with Mr. Sweeten, on the record, about documents that we believe should have been produced

Robert Duncan                                                    June 7, 2012

157

1    yesterday pursuant to the court's order related to --
2    this is from Page 15 of the June 5th order.  The court
3    ordered that y'all produce a constituent lobbyist and
4    interest groups communication on legislative responses.
5    And we believe that the privilege log asserts that there
6    were some constituent communications with Senator
7    Duncan's office that have not been produced.  So I can
8    give you the specific Bates ranges.
9         MR. SWEETEN:  Do you want to -- looks like
10   you've got them all written down.
11        MS. MARANZANO:  I do.
12        MR. SWEETEN:  Do you want to --
13        MS. MARANZANO:  Why don't I read it into the
14   record and then I can send you an e-mail follow-up.
15        MR. SWEETEN:  Yeah.  That would be helpful.
16        MS. MARANZANO:  Okay.
17        MR. SWEETEN:  Let me just say that, in
18   response, that I know that we've obviously -- were in
19   receipt of the court order.  We obviously responded.
20   And I would think you would agree that we sent,
21   certainly over 1,000 constituent -- or documents fitting
22   that description yesterday.  You've been advised --
23        MS. MARANZANO:  I can't represent the
24   number.  I understand that constituent communications
25   were produced.

158

1         MR. SWEETEN:  So you were given -- let's say
2    this.  You were given a substantial number of
3    constituent communications.  If you're suggesting that
4    you don't think you got some of Senator Duncan's, then
5    all I can do in response to that is to look.  And we
6    believe that we've been in full compliance with the
7    court's order.  But I will certainly look at your list
8    and we'll double-check.
9         MS. MARANZANO:  Right.  And, I mean, that's
10   what I'm asking.  And I think -- because our
11   understanding is we don't have these documents, I am
12   going to need to hold the deposition open.  But, you
13   know, we will --
14        MR. SWEETEN:  If at the next break I can
15   potentially make a phone call and check to see.
16        MS. MARANZANO:  So let me just read for the
17   record that the Bates numbers are Texas 00203510, Texas
18   0020354 -- 3524 through 3527, Texas 00203528 through
19   3529, Texas 00203532, Texas 00203533 through 3539,
20   Texas 00203540 through 3541.  Texas 00203542 through
21   00203544.  Texas 00204706.  Texas 00204707 through 4710.
22   So those are the ones we're missing.  And I can send you
23   e-mail communication following up.
24        MR. SWEETEN:  That actually would be helpful
25   so we can have them all written down and we'll -- I'll

159

1    look into your suggestion.  But again, I think we fully
2    complied yesterday.  But we'll check that.  We'll check
3    what you're suggesting.
4         MS. MARANZANO:  To be clear, we're looking
5    at the privilege log from May 21st and I believe these
6    documents are explicitly listed as constituent
7    communications.
8    BY MS. MARANZANO:
9         Q   Okay.  Senator, we were talking about Senate Bill
10   362 before the break.  Can you tell me what your role
11   was during the consideration of Senate Bill 362 when it
12   went before the Committee of the Whole?
13        MR. SWEETEN:  You can refer to your
14   public -- matters of public record.
15        A.  I was appointed to be the chairman of the
16   Committee of the Whole.
17        Q   (By Ms. Maranzano)  And what are your
18   responsibility when you're chair of the Committee of the
19   Whole?
20        A.  To conduct the hearing.
21        Q   And can you describe to me what that means?
22        A.  Well, it means setting the parameters for the
23   ground -- the parameters and the ground rules for
24   hearing witnesses and organizing the committee so that
25   it moves in an orderly fashion.  So that -- to work with

160

1    the members of the committee to determine how we will
2    move through the witnesses expeditiously.  To get
3    consensus on order of witnesses and generally to ensure
4    that there's proper de quorum during the hearing as it's
5    taking place so that there can be the best quality of
6    deliberations possible.
7         Q   When you say, "work with committee members," when
8    this is a Committee of the Whole, does that mean work
9    with everybody?
10        A.  Right.
11        Q   Who just thought -- who appointed you to this
12   position?
13        A.  Lieutenant Governor appoints that committee
14   chairman.
15        Q   Were witnesses invited to testify on the
16   Committee of the Whole for Senate Bill 362?
17        A.  The record reflects proponents and opponents that
18   were invited.
19        Q   Do you recall what the break down of witnesses
20   was between opponents and proponents?
21        A.  No, the record will reflect that.
22        Q   What's the -- what's the usual break down between
23   witnesses on either side of the bill?
24        MR. SWEETEN:  Do you mean on the Committee
25   of the Whole?

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                    June 7, 2012

161

1   BY MS. MARANZANO:
2   Q.  Well, why don't we talk about Committee of the
3   Whole first?
4         MR. SWEETEN:  You can talk about general
5   procedure based on the public record.
6   A.  There is no usual.
7   Q.  (By Ms. Maranzano)  What about in the State
8   Affairs Committee while you've been chair, what's the
9   usual break down of witnesses between supporters and
10  opponents of the bill?
11        MR. SWEETEN:  Same instruction.
12  A.  There is no usual.  Just depends on the bill
13  and -- basically.
14  Q.  (By Ms. Maranzano)  what -- during the Committee
15  of the Whole, who invites the witnesses to testify?
16  A.  The proponents and opponents of the bill.  So any
17  member of the Senate can propose a witness and bring
18  them.  It's not -- there's not any rule about that.  So
19  that's the best way I can answer that.
20  Q.  There's no rule.  Is there a limited time for
21  which people can testify?
22  A.  That's a consensus that we normally try to
23  develop a hearing and our standing committee hearing we
24  have witness limits sometimes.  Sometimes we don't.  And
25  on most public testimony we do have time limits in the

162

1   Senate on public testimony.
2   Q.  Do you recall if any groups representing minority
3   voters testified during the 2009 consideration of Senate
4   Bill 362?
5   A.  I recall they did.
6   Q.  Do you recall if concerns were raised about
7   Senate Bill 362's impact on minority voters, either by
8   these groups or by others?
9         MR. SWEETEN:  You can testify to matters on
10  the public record.
11  A.  I think the record will reflect they did.  I
12  don't recall specifically what the objections were, as
13  we sit here today, independently.
14  Q.  (By Ms. Maranzano)  Do you recall who raised
15  those concerns?
16        MR. SWEETEN:  Same instruction.
17  A.  No.  It would be on the record.
18  Q.  (By Ms. Maranzano)  Do you recall if legislators
19  raised those concerns?
20        MR. SWEETEN:  Same instruction.
21  A.  It would be on the record.
22  Q.  (By Ms. Maranzano)  And you have nothing to add
23  to the record in that regard?
24  A.  No.  The record -- I don't have independent --
25  enough independent recollection to give you an accurate

163

1   answer.  You would have to rely on the record for that.
2   Q.  Were there any public -- well, let me ask.  Were
3   there any amendments to Senate Bill 362 when it was
4   being considered on the floor that were publicly stated
5   as amendments to respond to the concerns that SB 362
6   would disproportionately impact minority voters?
7   A.  We had talked about this earlier.  The record
8   would have to reflect it.  Independently, I don't recall
9   and for some reason I think we -- there was a consensus
10  not to add amendments, but -- from everybody.  But I
11  can't -- the record would reflect that.
12        (Exhibit No. 528 was marked.)
13  BY MS. MARANZANO:
14  Q.  I'm showing what we're marking deposition
15  Exhibit 528.  Can you take a look and tell me if you
16  recognize this and I will tell you that it's an excerpt
17  not the full record?
18  A.  Appears to be an excerpt from the Senate journal
19  for the week -- or from the day of March 18, 2009.
20  Q.  And can you look at the second page.  Do you see
21  there's something that says, "statement regarding votes
22  cast on Senate Bill 362."  If you would quickly take a
23  look at that.  Is this something you've seen before?
24  A.  This would be on the third page.
25  Q.  It starts on the second and it goes on to the

164

1   third?
2   A.  Okay.  Paragraph 3.
3         MR. SWEETEN:  Are you talking about the
4   statement on the bottom?
5   BY MS. MARANZANO:
6   Q.  The statement regarding both House and Senate
7   Bill 362.  And it starts and it says, "Senator West
8   submitted the following statement," do you have that?
9   A.  No.  Sorry.  I'm a slow reader I guess.  What
10  page is it on?  Third page?
11  Q.  It starts right here.  But actually I'm going to
12  direct your attention to No. 8?
13        MR. SWEETEN:  Starting here, she wants you
14  to read that.
15  A.  Senator West, yeah.  I see that.
16  Q.  (By Ms. Maranzano)  Yeah.  Do you recall this
17  happening?
18  A.  No, I really don't.  It's -- it may have been
19  submitted and not read to the Senate.  It may have just
20  been submitted post-vote.  Sometimes those get done.
21  Q.  Okay.  Can I direct your attention to No. 8 in
22  that -- in that statement.  Do you see that it says, "Of
23  all the opportunities members of the Senate have had to
24  vote on voter identification legislation or Senate
25  process regarding voter identification legislation, no



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                      June 7, 2012

165

1   senator who is an ethnic minority has voted in favor of
2   such legislation or the process related to such
3   legislation"?
4       A. I see that.
5       Q. Based on the public record -- let me ask you
6   this. Did you have any public response to the unified
7   opposition of the minority members of the Senate?
8       A. Are you talking about as reflected or a response
9   to Senator West's statement that he placed in the
10  record.
11      Q. I'm asking actually, more generally. Just this
12  statement talked about a unified opposition of minority
13  members of the Senate. And I'm asking if you had any
14  public response to that opposition.
15      A. Did I, as Senator Duncan have any public
16  response? I don't recall that I did.
17      Q. Do you recall the reasons why senators gave for
18  opposing voter ID?
19          MR. SWEETEN: Objection; call for matters
20  subject to legislative privilege. Instruct not the
21  answer.
22  BY MS. MARANZANO:
23      Q. How about if we base it on the public record?
24          MR. SWEETEN: You can testify as to matters
25  of public record.

166

1       A. Public record reflects their opposition to it.
2       Q. (By Ms. Maranzano) Do you recall if one of the
3   issues that they discussed on the public record was the
4   impact that Senate Bill 362 would have on minority
5   voters?
6       A. The record will reflect that if it was brought
7   up.
8       Q. So do you have no recollection of whether that
9   occurred?
10      A. My independent recollection is not accurate as to
11  exactly what was raised. Those issues generally were
12  discussed during our fairly lengthy debate on several
13  occasions on the issue. But specifically what issues --
14  how those issues were framed and what evidence was
15  brought forward I would have to rely on the record.
16      Q. Okay. So you have a recollection that it came up
17  generally, related to voter identification legislation?
18      A. Correct.
19      Q. And based on the public record, do you have any
20  reason to believe that these senators were not being
21  genuine about their concerns on the impact of the bill?
22          MR. SWEETEN: I'm going to object. Because
23  of the subjective interpretation and the sincerity of
24  these senators would be a matter of legislative
25  privilege. And I'm going to instruct him not to answer

167

1   on that basis.
2   BY MS. MARANZANO:
3       Q. Are you following your counsel's instruction?
4       A. Yes.
5       Q. Did any supporters of Senate Bill 362 publicly
6   state that if the Senate -- the legislature did not
7   respond to the concerns of minority legislators it might
8   threaten the preclearance of Senate Bill 362?
9       A. "Supporters," meaning?
10      Q. People who voted for it.
11      A. Members of the Senate?
12          MR. SWEETEN: Your question is about public
13  statements.
14          MS. MARANZANO: Uh-huh.
15      A. I don't know if they did or not.
16      Q. (By Ms. Maranzano) You don't recall that?
17      A. Right.
18      Q. Was it true that some legislators and members of
19  the public stayed up all night to testify about Senate
20  Bill 362?
21      A. The hearing lasted throughout the evening hours
22  and concluded in the late morning hours of the following
23  day.
24      Q. Was there any public discussion of what prompted
25  this level of interest in Senate Bill 362?

168

1       A. You know, I don't recall anything specifically
2   other than what would be on the record.
3       Q. And as you sit here today, you can't --
4       A. Well, I remember there were statements that were
5   made by some people who testified as experts and as
6   laypersons. But I don't -- I can't recall specifically
7   what they said to give you an accurate depiction of it,
8   but the record will reflect that.
9       Q. Well, what do you recall generally, even if you
10  don't recall specifically?
11      A. What I just said.
12      Q. That's it?
13      A. Right.
14      Q. Okay.
15      A. I mean, I recall some loud voices. I recall some
16  passionate testimony. I recall some very
17  straightforward testimony. And, you know, the
18  testimony, I thought, and the debate throughout the day
19  was generally -- we kept things moving. And the debate
20  was on both sides of the issue. And I can't remember
21  generally or specifically -- or specifically what was
22  said by any member of the Senate that day. But it is
23  reflected in the record. That's why we kept the record.
24      Q. Did you have any role when Senate Bill 362 was
25  referred to the House?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

169

1    A. No.
2    Q. Did you have any communications with any members
3    of the House about Senate Bill 362?
4    A. Yes.
5    Q. With whom?
6    A. Delwin Jones.
7    Q. Delwin Jones? Is that what you said?
8    A. Right.
9    Q. Can you tell me in a general way what that
10   communication was about?
11   A. He's a member of the Lubbock delegation. Yeah, I
12   can remember generally. But it was just about the bill.
13   Q. Do you -- was it one communication or more than
14   one?
15   A. Just one or two.
16   Q. Was it after the bill had been referred to the
17   House or before?
18   A. It was after.
19   Q. Do you remember what happened to the bill in the
20   House?
21   A. Yes.
22   Q. What happened?
23   A. It didn't pass.
24   Q. Was that because essentially the time ran out?
25        MR. SWEETEN: Don't reveal matters of

170

1    legislative privilege in answering the question.
2    A. Well, the record is fairly clear about what
3    happened on that bill as it went to the House.
4    Q. (By Ms. Maranzano) And you don't want to add
5    anything to the record?
6    A. I don't think you could add much to that record.
7    Q. Fair enough. Have you heard of ID verification?
8        MR. SWEETEN: You can answer as a general
9    matter. Don't reveal any legislative -- your mental
10   impressions. That would be subject to the legislative
11   privilege.
12   A. No. I'll have to say I don't know what you're
13   talking about.
14       MS. MARANZANO: Can we mark this?
15       (Exhibit No. 529 was marked.)
16   BY MS. MARANZANO:
17   Q. I'm showing you what we're marking as deposition
18   Exhibit 527? No, 529. Do you recognize this?
19   A. No, but it's from Jennifer.
20   Q. You testified earlier that Jennifer Fagan is a
21   member of your staff?
22   A. That's correct.
23   Q. Do you know who John Sepehri is?
24   A. John Sepehri? You'll have to refresh my memory.
25   Q. My recollection is John Sepehri is the general

171

1    council for the Secretary of State, or at least was?
2    A. Okay.
3    Q. Does that refresh your recollection as to what
4    this e-mail exchange is about?
5    A. Yes. I guess -- well, I'm not familiar with this
6    e-mail. So -- but if he works for the Secretary of
7    State we often, through the State Affairs Committee,
8    communicated with the Secretary of State's office about
9    issues that we had questions about technically.
10   Q. So what is the ID verification process bill that
11   Jennifer refers to in her e-mail?
12   A. I'll have --
13       MR. SWEETEN: Don't discuss matters of
14   legislative privilege including communications you had
15   with State agencies.
16   BY MS. MARANZANO:
17   Q. But just generally, can you just tell me what --
18   I mean, I'm not -- I'm not interested in what this
19   exchange is about. I'm just asking you what is the
20   topic on which this says we're not going to file voter
21   identification -- ID verification process bill?
22   A. I don't know.
23   Q. Okay.
24   A. I seriously do not know.
25   Q. Okay.

172

1    A. It may have been discussed and I may have said no
2    or we may not have. I don't know. I just have no
3    idea what -- this is not ringing a bell with me today.
4    Other than we didn't file it.
5        MS. MARANZANO: Can we label that?
6        (Exhibit No. 530 was marked.)
7    BY MS. MARANZANO:
8    Q. Senator, I'm showing you what we're labeling as
9    Exhibit 530, for the record. Can you take a look at
10   this and tell me if you recognize it?
11   A. I would recognize this to be legislation titled
12   Senate Bill 14.
13   Q. If you look at the last page it has signatures on
14   it.
15   A. This appears to be signatures reflecting that it
16   is the enrolled version of the bill signed by the
17   governor.
18   Q. Do you have any knowledge, based on public
19   record, of when Senator Fraser started working on this
20   bill?
21   A. No, I do not.
22   Q. Did you or anyone in your office have
23   conversations with Senator Fraser about the development
24   of what would become Senate Bill 14?
25   A. Probably, at some point in time we did.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                                June 7, 2012

173

1    Q. And when was that?
2    A. I cannot tell you a specific time. I do not
3    know.
4    Q. Would that have been you or would that have been
5    your staff who had that communication?
6    A. If Senator Fraser and I had a conversation it
7    would have been more or less informal. It would not be
8    unusual for Senator Fraser's office to contact my staff
9    for information or records from the last committee or
10   from hearing or to discuss the issue. It would not be
11   unusual.
12   Q. Who on your staff would Senator Fraser have
13   contacted?
14   A. It would be Jennifer.
15   Q. When you said "record," -- what is the first
16   thing you said?
17   A. Well, I mean, this is speculation a little bit.
18   So I'm just saying if somebody wanted a document or
19   something they might call our office and request it.
20   Q. Do you have any knowledge as to whether Senator
21   Fraser's staff and Ms. Fagan did have any communications
22   about Senate Bill 14?
23   A. Define what you're talking about communications.
24   Q. I'm referring very broadly to conversations,
25   e-mails?

174

1    A. Yes.
2    Q. Yes you do have knowledge?
3    A. Yes.
4    Q. And did they?
5    A. The only -- the only communications that I would
6    be aware of would be communications about logistics.
7    They're going to file a bill. We're going to --
8        MR. SWEETEN: Don't reveal the substance on
9    it though.
10   BY MS. MARANZANO:
11   Q. Are you aware of whether there were any
12   substantive communications between your staff and
13   Senator Fraser's staff about Senate Bill 14?
14   A. I'm not -- I'm not aware of any.
15   Q. And I believe you said you may have had
16   conversations with Senator Fraser, but you don't recall
17   specifically whether you did or not?
18   A. Right.
19   Q. And would your conversations with Senator Fraser
20   have been about the substance of the bill or about the
21   logistics of the bill?
22   A. Probably both.
23   Q. And I assume since you said you have no specific
24   recollection you couldn't tell me how many substantive
25   conversations you had with Senator Fraser?

175

1    A. No, I couldn't.
2    Q. Could you give me an approximation?
3    A. It would be a guess.
4    Q. Did you have conversations with other legislators
5    about Senate Bill 14?
6    A. When?
7    Q. At any time?
8    A. I assume when you say "Senate Bill 14," it would
9    have to have been from the time we filed it because it
10   didn't have a name then. I'm just trying to understand
11   the time frames here.
12   Q. I appreciate that. Why don't we start and say
13   did you have any conversations with any legislators
14   about what would become Senate Bill 14?
15   A. No.
16   Q. Did you have any conversations with legislators
17   about Senate Bill 14?
18   A. Yes.
19   Q. With whom?
20   A. Well, from the time it was introduced until the
21   time it was passed, probably most members of the Texas
22   Senate.
23   Q. Okay. And would those have been verbal
24   communications?
25   A. Yes.

176

1    Q. Did you have any --
2    A. Unless there was -- unless there was some writing
3    between Senator Van de Putte and myself, she was acting
4    as chairman of the caucus. And as in 2009, I seem to
5    recall she may have sent a similar letter in 2011. But
6    I don't -- I'm sure you've got that if it's part of the
7    record.
8    Q. Did you have any conversations with any
9    legislators other than Senator Fraser who we've already
10   talked about, about the development or drafting of
11   Senate Bill 14?
12       MR. SWEETEN: Objection; vague. Go ahead
13   and answer it.
14   A. As far as drafting the original version, no.
15   Q. (By Ms. Maranzano) How about drafting later
16   versions?
17   A. Only to understand what was in the bill, which
18   would be generally what a legislator --
19       MR. SWEETEN: Don't talk about the
20   conversation.
21   BY MS. MARANZANO:
22   Q. Who were those conversations with?
23   A. I don't recall all who would have been involved
24   in that.
25   Q. Well, can you give me some names of who was



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

177

1  involved in that?
2      A. Well, it probably would have been Senator Fraser,
3  might have involved Senator Williams, Senator -- I don't
4  know if it involved Carona or not. It would have
5  involved Senator Van de Putte, Senator Ellis and others
6  who, as we generally discuss legislative matters coming
7  before the body.
8      Q. Are the members that you've just named on the
9  State Affairs Committee?
10     A. Some of them are.
11     Q. Which ones are not?
12     A. Well, I think Carona used to be. I think most of
13  them are. Maybe I talked to Senator West. He's not on
14  the committee.
15     Q. And you said, "to understand what was in the
16  bill." Is that what you testified to? Those were your
17  communications?
18     A. Well, just a listing of the bill and what's in
19  the bill.
20     Q. That's how you're describing your communications
21  with all of these members?
22     A. Right. Right.
23     Q. And when would those -- when would those
24  communications have occurred?
25     A. Throughout the period of deliberations on the

178

1  bill.
2      Q. Did you have any communications with the
3  Lieutenant Governor about Senate Bill 14?
4      A. Yes.
5      Q. And when was that -- or when were those?
6      A. Generally, as I've stated, randomly throughout
7  the process of deliberations on the bill.
8      Q. And what was the general nature of that
9  communication?
10         MR. SWEETEN: You can give a general subject
11  matter description of the communication. Do not reveal
12  the subject for communication.
13     A. Progress on setting the hearing, the process that
14  the senators have discussed with regard to the process
15  for procedures for the hearing, generally that was the
16  primary -- main reason for discussions.
17     Q. (By Ms. Maranzano) Did you set the hearing date
18  for the -- for Senate Bill 14?
19     A. I'll answer this in a way that nobody will
20  object. I don't remember.
21     Q. Did you have any conversations with the
22  governor's office about Senate Bill 14?
23         MR. SWEETEN: You can answer.
24     A. I don't know if I did or not.
25     Q. (By Ms. Maranzano) Does that mean you don't

179

1  recall any?
2      A. I don't remember any. Not saying I didn't. I
3  just don't remember any.
4      Q. Let me ask you this. Is it common to talk to the
5  governor's office about ongoing legislation?
6      A. For me --
7          MR. SWEETEN: Objection; vague and not
8  limited in time and scope, foundation. But you can go
9  ahead and answer it if you can. That's fine.
10     A. The answer is no. It's not common.
11     Q. (By Ms. Maranzano) Can you take a look at Senate
12  Bill 14? In particular, I would like to direct your
13  attention to Section 14 of the bill.
14     A. On what page?
15     Q. It's on Page 9. Do you see that it lists in that
16  section the forms of identification that are permissible
17  under Senate Bill 14?
18     A. The section is entitled documentation of proof of
19  identification.
20     Q. Yep. Do you see that?
21     A. Yes.
22     Q. Can you tell me what the major difference between
23  Senate Bill 14 and Senate Bill 362 are?
24         MR. SWEETEN: You can answer based on the
25  text of the bill. Don't give your mental impressions

180

1  and thoughts about it. We'll take a little while so
2  Jennifer can get a bite in.
3      A. There are numerous differences textually for one
4  reason or another and I can't tell you why.
5          MR. SWEETEN: Don't provide the reasons why.
6  She's just asking if there is a difference from this to
7  this.
8      A. There are differences.
9      Q. (By Ms. Maranzano) Does Senate Bill 14 allow for
10  any forms of non-photo identification?
11     A. The provisions that are in Section 14 of the bill
12  do not appear to provide a form of identification other
13  than one that includes a photo ID and I'm assuming a
14  license to carry a concealed hand gun license does.
15  That's in section 14.
16     Q. If you look at the very beginning of the
17  provision under Section 14, it says Section 63.0101. Do
18  you see that it actually specifies that the forms of
19  identification listed need to have a photo
20  identification?
21     A. Line 17 inserts the word photo.
22     Q. Can you tell me what the purpose was of removing
23  non-photo identification as allowable for voter
24  identification?
25         MR. SWEETEN: Don't answer the question. He



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                         June 7, 2012

181
1   can testify about the general purpose of the bill. He's
2   not going to testify about the specifics of one
3   insertion, deletion, we're not going to parse it that
4   way. That was issuing the purpose of the court's order.
5   I'm going to instruct him not to answer that question.
6   BY MS. MARANZANO:
7       Q. Was there anything in the public record that you
8   can refer to related to the purpose of removing
9   non-photo IDs from Senate Bill 14?
10          MR. SWEETEN: You can testify based upon
11  matters of the public record. Don't reveal your
12  thoughts, mental impressions in answering the question.
13      A. The public record has a discussion between
14  members of the Senate and debate on the floor concerning
15  the purpose for the exclusion of non-photo ID methods of
16  identification.
17      Q. (By Ms. Maranzano) And what was the purpose of
18  that as stated in the public record?
19      A. The public record would reflect that.
20      Q. Well, what's your testimony about it, as you sit
21  here today?
22      A. The general purpose of the bill is to basically
23  ensure voter ballot integrity.
24      Q. And removing non-photo identification from the
25  bill is related to ensuring valid integrity?

182
1           MR. SWEETEN: He's not going to answer that
2   question. He's not going to answer the reasons for the
3   insertion or deletions of any bill. He's answered the
4   general purpose of the bill. We're not going to have
5   him give his thoughts and general impressions on
6   various -- the reasons and thoughts behind -- or his
7   impressions about the deletion or insertion of a given
8   paragraph. Legislative privilege.
9   BY MS. MARANZANO:
10      Q. I'm going to ask you about the public record
11  related to the removal of non-photo ID. You mentioned
12  ensuring voter integrity, the integrity of the ballot.
13  So based on the public record, what was said about how
14  non-photo IDs are connected to ensuring the integrity of
15  the ballot?
16          MR. SWEETEN: Misstates the testimony.
17  Objection. You can answer as to what was said in the
18  public record to the extent you recall. Do not give
19  reasons behind any changes made. That's subject to the
20  legislative privilege. You can answer based on that
21  instruction.
22      A. I can't -- I do not have independent recollection
23  of exactly what was said. I would not want to
24  mischaracterize what was said. And the public record
25  accurately reflects that and I would refer you to the

183
1   public record.
2       Q. (By Ms. Maranzano) You have no independent
3   recollection?
4       A. Not that would be accurate that I could testify
5   to.
6       Q. And what about your recollection of the public
7   record as related to the purpose of allowing forms of
8   identification that had expired 60 days before
9   presentation?
10          MR. SWEETEN: Once again, you can refer to
11  matters in the public record in answering this question.
12  Don't reveal matters of legislative privilege.
13      A. I couldn't answer that. I don't have a
14  recollection of the details concerning those
15  discussions.
16      Q. (By Ms. Maranzano) Are you aware of the source
17  of the language for Senate Bill 14 or sources of the
18  language?
19          MR. SWEETEN: You can answer that question
20  "yes" or "no".
21      A. Yes.
22      Q. (By Ms. Maranzano) Was there anything on the
23  public record about the source or sources of the
24  language in Senate Bill 14?
25      A. I think there may be. I don't recall

184
1   specifically. But I think there were discussions about
2   that on the Senate floor --
3       Q. Can you tell -- I'm sorry.
4       A. Or in the debate.
5       Q. Can you tell me what those discussions were?
6       A. Not without seeing the record.
7       Q. You can't testify to anything, as you sit here
8   today?
9       A. Again, I don't want to be inaccurate. And what I
10  recall about what was said as opposed to what was said
11  is not relevant. The record is the relevant testimony
12  with regard to the issues that you're asking about.
13      Q. Who was involved in the drafting of Senate Bill
14  14?
15      A. Senator Fraser.
16      Q. Anybody else?
17      A. I have no recollection of who else might have
18  been involved. It came out of his office. And to what
19  extent other members or other staff members were
20  involved, I don't know.
21      Q. Did you have any communications with current or
22  former legislators about Senate Bill 14 -- I'm sorry.
23  Do you have any communications about Senate Bill 14 with
24  current or former legislators who had offered other
25  voter identification bills?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

185

1    A. I don't know.
2    Q. You don't know?
3    A. I don't know.
4    Q. Because you don't know --
5    A. Yeah. I don't know what other people have
6    offered. If you could be -- I don't know.
7    Q. Did you have any conversations with
8    Representative Denny about Senate Bill 14?
9    A. No. Well, if I did it would have been in 2005
10   whenever, I think she had -- she had a bill -- or wasn't
11   she on one of those bills that we looked at earlier.
12   Q. I'm sorry. Did you have any communications with
13   her about Senate Bill 14?
14   A. Oh, no, I don't believe so.
15   Q. Did you have any communications with
16   Representative Betty Brown about Senate Bill 14?
17   A. No, I don't know Betty Brown very well.
18   Q. Did you have any communications with
19   representative Leo Berman about Senate Bill 14?
20   A. I don't recall having any with Leo.
21   Q. And did you have any conversations with the staff
22   people of any of those members?
23   A. I don't believe so.
24   Q. Did you have any communications with officials or
25   legislators in the State of Georgia about Senate Bill

186

1    14?
2    A. No
3    Q. Did you have communications with any officials or
4    legislators in the State of Indiana about Senate Bill
5    14?
6    A. I did not.
7    Q. Did anybody in your office?
8    A. I do not know. Jennifer may have, but I don't
9    know.
10   Q. And how about with Georgia, do you know if
11   anybody in your office had communications?
12   A. I don't know.
13   Q. Did the legislature publicly considered adding
14   additional forms of identification to Senate Bill 14?
15         MR. SWEETEN: Don't answer to the extent it
16   calls for you do you reveal legislative privilege. You can
17   testify as to matters on the public record.
18   A. I can't -- the reason I'm having trouble with
19   this is because I can't remember if we offered
20   amendments on Senate Bill 14 on the floor during the
21   Committee of the Whole or during the debate. The record
22   will reveal that. And it may be that someone did, but
23   it would depend on whether or not there were amendment
24   proposals that were offered to Senate Bill 14, either
25   during the Committee of the Whole or during the general

187

1    Senate debate.
2    Q. (By Ms. Maranzano) Okay. We can get to that in
3    a few minutes.
4    A. Okay.
5    Q. But other than that, do you recall any
6    conversations, publicly, about the -- about adding
7    additional forms of identification to Senate Bill 14?
8         MR. SWEETEN: You can testify about matters
9    in the public record.
10   A. The public record probably reflects some
11   discussion about that.
12   Q. (By Ms. Maranzano) Okay. And you have no
13   independent recollection?
14   A. I don't have independent recollection of what was
15   said other than the fact that I believe there was some
16   discussion about that on the public record.
17   Q. Based on the public record, are you aware of any
18   analysis as to how many registered voters possess the
19   required forms of identification in Senate Bill 14?
20         MR. SWEETEN: You can testify about matters
21   on the public record.
22   A. I believe the public record may reflect some
23   estimates of that. But I don't recall exactly what they
24   reflect, the record would show that more accurately.
25   Q. (By Ms. Maranzano) Have you heard of a Spanish

188

1    surname voter registration analysis?
2    A. I believe I have.
3    Q. Are you aware, based on the public record,
4    whether the Secretary of State conducted such an
5    analysis while the legislature was considering Senate
6    Bill 14?
7    A. You would have to go to the record to be accurate
8    about that. I seem to recall some discussion about
9    that, but I don't recall what the conclusion was.
10   Q. Do you recall Senator Williams asking the
11   Secretary of State's office?
12   A. No.
13   Q. Did Legislature -- let me start again. Are you
14   aware, based on the public record, of whether the
15   legislature conducted any analysis to determine whether
16   minority voters would be disproportionately impacted by
17   Senate Bill 14?
18         MR. SWEETEN: You're asking him about
19   legislator's analysis. It calls for speculation. It
20   also calls for him to reveal legislative privilege
21   including your mental impressions, thoughts,
22   motivations, discussions with other members, staff
23   members. And I'm going to instruct him not to answer on
24   that basis. To the extent there is a discussion in
25   the public record regarding that issue I'll let you



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                        June 7, 2012

**189**

1 refer to the record, but other than do not answer the
2 question.
3 BY MS. MARANZANO:
4    Q. Are there any specific conversations on the
5 public record about that?
6    A. You'll have to look at the record.
7       THE REPORTER: I'm sorry. I didn't
8 understand.
9       THE WITNESS: She'll -- you'll have to look
10 at the record.
11 BY MS. MARANZANO:
12    Q. Are you aware of any legislators publicly
13 requesting that analysis?
14    A. As I sit here today, no. The record may reflect
15 that they did.
16    Q. If I told you that Senator Fraser's chief of
17 staff testified that there was no analysis of who had
18 some ID for purposes of Senate Bill 14, would you
19 dispute that?
20       MR. SWEETEN: Objection; assumes facts not
21 in evidence, misstates testimony and also calls for
22 matters subject to the legislative privilege. Don't
23 answer if it would reveal any matters subject to the
24 privilege.
25    A. I can't respond to that.

**190**

1    Q. (By Ms. Maranzano) Because it's privileged?
2    A. Because I don't know.
3    Q. Do you know what a military identification card
4 is?
5    A. Generally.
6    Q. What is it?
7    A. Well, I assume that it's an identification issued
8 to persons who are enlisted in the military.
9    Q. Do you know how many different forms of
10 identification fall into that category?
11    A. I don't recall.
12    Q. Is that something -- when you say "you don't
13 recall," is that something you think you knew when you
14 considered Senate Bill 14?
15       MR. SWEETEN: And don't answer that. You're
16 not going to reveal your mental impressions or analysis
17 or thought process. That's a legislative privilege.
18 Instruct not to answer.
19 BY MS. MARANZANO:
20    Q. Do you know what a citizenship certificate is?
21    A. Only generally.
22    Q. Do you know what steps a person needs to take to
23 obtain a citizenship certificate?
24    A. Not off the top of my head.
25    Q. Do you know how much it costs to obtain a

**191**

1 citizenship certificate?
2    A. Not off the top of my head.
3    Q. Do you know -- do you know how much it costs to
4 obtain a US passport?
5    A. Yes.
6    Q. How much?
7    A. I think it's $37, but I just bought one so that's
8 why I know. But I think it's -- by the time you get the
9 picture made and everything like that, it's like $35 to
10 $37.
11    Q. And do you know what documents you need to
12 provide in order to get one, a US passport?
13    A. Yes.
14    Q. Which documents?
15    A. A birth certificate.
16    Q. Do you know how long it takes to obtain a US
17 passport?
18    A. Not generally.
19    Q. How long did it take you to get yours?
20    A. I'm speculating. A month, three weeks to a
21 month.
22    Q. Is there anything in public record about a change
23 in circumstances between 2009 and 2011 that would have
24 made non-photo identification acceptable in 2009, but
25 not in 2011?

**192**

1       MR. SWEETEN: Objection, calls for matters
2 subject to the legislative privilege. You can testify
3 if there was such an explicit statement made in the
4 public record. But otherwise don't reveal your thought
5 processes.
6    A. I don't know if there was a statement like that
7 might made or not.
8    Q. (By Ms. Maranzano) You have no recollection of
9 that?
10    A. No.
11    Q. Was there any statement in the public record
12 about removing from Senate Bill 14 the option to show a
13 state or federal issued identification as is allowed in
14 Senate Bill 362?
15       MR. SWEETEN: You can testify about matters
16 on the public record.
17    A. I don't completely understand the question
18    Q. (By Ms. Maranzano) Do you recall when we talked
19 about Senate Bill 362 we read that section --
20    A. Right.
21    Q. That allowed for a State or federally issued
22 photo ID. Was there anything stated on the public
23 record about the purpose of removing those forms of
24 identification from Senate Bill 14, although they had
25 been allowed in Senate Bill 362?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

193

1          MR. SWEETEN:  Same objection and
2    instruction.
3          A.  That issue may have been discussed on the Senate
4    floor and would be a part of the Senate record.
5          Q.  (By Ms. Maranzano)  You have no independent
6    recollection?
7          A.  Not really.
8          Q.  Any at all?
9          A.  Well, generally a change in the bill, and I
10   assume that a change in the bill was discussed.  I'm
11   going off of memory, but I would assume that in 14 there
12   was a change from 362 and those discussions took place
13   on the Senate floor.  And I remember the -- that Senator
14   Fraser probably laid out those changes on the public
15   record.  That's what I recall.  But I couldn't tell do
16   you specifically what he said.  You would have to go to
17   the record.
18         Q.  Was it Senator Fraser's decision to make those
19   changes?
20         MR. SWEETEN:  Objection.  Requires him to
21   speculate.  Requires him to reveal communications
22   between -- if any, between he and Senator Fraser or any
23   other legislator.  So to the extent it's even passed by
24   legislative privilege don't answer the question.
25   BY MS. MARANZANO:

194

1          Q.  I assume you're following your counsel's
2    instruction?
3          A.  Yes, ma'am.
4          Q.  Do you recall the circumstances by which the
5    license to carry a concealed hand gun were included
6    in -- came to be included in Senate Bill 14?
7          MR. SWEETEN:  Don't reveal matters of
8    privilege.
9          A.  No.
10         Q.  (By Ms. Maranzano)  Do you know the racial
11   composition of individuals who possess a license to
12   carry a concealed handgun?
13         A.  No.  No.  I should say it louder.
14         MR. SWEETEN:  An objection to the extent it
15   calls for legislative privilege.
16   BY MS. MARANZANO:
17         Q.  Is it disproportionately white relative to Texas
18   registered voters?
19         MR. SWEETEN:  Objections; asked and
20   answered.  Objection to the extent it calls for your
21   mental impressions about a bill, but you can answer
22   otherwise.
23         A.  I don't know.  If it's on the record, it's on the
24   record.
25         Q.  (By Ms. Maranzano)  Well, are you aware of any

195

1    legislator who made a statement on the public record
2    about the racial composition of the license to carry
3    holders?
4          THE REPORTER:  Wait.
5          MS. MARANZANO:  About the racial composition
6    of the license to carry holders.
7          A.  I recall there was a conversation about the -- on
8    the public record about the use of the license to carry
9    as a form of identification.  I do not remember -- I
10   cannot recall independently with accuracy the content of
11   those statements.  That would be reflected in the
12   record.
13         Q.  (By Ms. Maranzano)  And how did the exceptions
14   with individuals with disability come to be included in
15   Senate Bill 14, based on the public record?
16         MR. SWEETEN:  Don't answer to the extent it
17   would require to you to reveal matters of legislative
18   privilege.  To the extent you can refer to matters in
19   the public record, you can do so.
20         A.  There may have been some testimony.  I can't
21   recall specifically.  I think there was concerning that.
22         Q.  (By Ms. Maranzano)  From certain advocates, did
23   you say?
24         A.  Correct.  On the record.  Or some reference to
25   that on the record.

196

1          Q.  And was this added?  Was this provisions added to
2    the bill after the testimony from advocates?
3          A.  I don't --
4          MR. SWEETEN:  Hold on a minute.  Hold on a
5    minute.  Can you read the question back, please?
6          (Requested question was read.)
7          MR. SWEETEN:  So you're asking about an
8    amendment, whether it was -- which is a public record,
9    whether it was added after a public record statement.
10   Is that the question?
11         MS. MARANZANO:  Uh-huh.
12         MR. SWEETEN:  Then you can answer as
13   phrased.
14         A.  I don't know.
15         Q.  (By Ms. Maranzano)  Is your recollection that the
16   amendment was a response to the testimony from advocates
17   from the disability community?
18         MR. SWEETEN:  Don't answer the question.  It
19   calls for matters of legislative privilege as to what
20   the response was, if any.
21   BY MS. MARANZANO:
22         Q.  How did the exception for individuals with
23   religious objections to being photographed come to be
24   included in Senate Bill 14?
25         MR. SWEETEN:  Don't answer the question.  It



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                      June 7, 2012

197

1  calls for matters of legislative privilege. You can
2  testify about the public record, such as an amendment.
3  BY MS. MARANZANO:
4      Q. Was that part of an amendment?
5      A. You would have to look at the record.
6      Q. You have no independent recollection?
7      A. No.
8      Q. Is it fair to say that the legislators --
9  legislators modify Senate Bill 14 to respond to concerns
10  raised by disability groups?
11         MR. SWEETEN: Don't answer the question.
12  Calls for matters of legislative privilege.
13  BY MS. MARANZANO:
14      Q. Were there any public discussions about the
15  provisions in Senate Bill 14 pertaining to the
16  administration of identification requirement -- that the
17  identification requirement at the polling place?
18         MR. SWEETEN: You can answer if there's a
19  public statement.
20      A. I'm not sure that I follow the question enough to
21  give you and answer. I don't -- so I can't answer the
22  question.
23      Q. (By Ms. Maranzano) Were there any public
24  discussions about how at a polling place that Senate
25  Bill 14 would be administered? In other words, how the

198

1  requirements laid out in Senate Bill 14 would come to be
2  administered at a polling place.
3      A. You would have to refer to the public record.
4      Q. You have no independent recollection of those
5  discussions?
6         THE REPORTER: No recollection of what?
7         MS. MARANZANO: Of those discussions on the
8  public record.
9      A. I do not have an independent recollection of what
10  was said. I am only -- you have to refer to the record
11  on that.
12      Q. (By Ms. Maranzano) Were there any public
13  discussions about including more specific language in
14  Senate Bill 14 related to what a poll worker would need
15  to do to verify somebody's identity?
16      A. I don't remember that. There may have been, but
17  I don't remember it.
18      Q. Are you familiar with the provision in Senate
19  Bill 14 that allows a person to show a form of
20  identification called an election identification
21  certificate?
22      A. I think if that's referring to the provision that
23  allows a person to go to the DPS to get an ID for free,
24  if that's the title of that, yes, I've heard of that.
25      Q. Do you recall anything publicly about how this

199

1  form of identification was added to Senate Bill 14?
2         MR. SWEETEN: Don't reveal matters of
3  legislative privilege. In fact, court reporter, would
4  you please read that question back.
5         (Requested question was read.)
6         MR. SWEETEN: Okay. You can -- because it's
7  got matters of the public record. Don't reveal
8  legislative privilege, but you can answer as to the
9  public record. Go ahead.
10      A. No, I do not know when or how it was added. I'm
11  about ready for a break. I don't know about y'all.
12         MR. SWEETEN: Okay. Let's take a break.
13         MS. MARANZANO: Let's take a break.
14         (Brief recess.)
15  BY MS. MARANZANO:
16      Q. Senator, before the break we were talking about
17  the election identification certificate. Are you aware,
18  based on the public record, of concerns about potential
19  difficulties in obtaining an election certificate?
20      A. I'm aware that the issue of the ease or
21  difficulty of retaining a certificate was discussed on
22  the public record.
23      Q. Do you recall there being concerns voiced on the
24  public record about the distance to drive to those
25  offices?

200

1      A. I would refer to you to public record with regard
2  to the specific discussions concerning specific concerns
3  about that.
4      Q. You don't have any independent recollection of
5  the various concerns that were raised?
6      A. Not sufficient to give you and accurate depiction
7  of that or accurate account of it.
8      Q. During the drafting of Senate Bill 14 or the
9  consideration of Senate Bill 14, was there any publicly
10  spoken about or discussed analysis of the cost for
11  obtaining an election identification certificate?
12         MR. SWEETEN: Don't reveal matters of
13  privilege. You can reveal matters of public record.
14      A. I think anything having to do with drafting would
15  be privileged. On the public record there was some
16  discussions about the cost and whether or not
17  appropriations would occur to cover those costs.
18      Q. (By Ms. Maranzano) And was there discussion on
19  the public record about the steps a voter might have to
20  take to obtain an election identification certificate?
21      A. There may have been. I would refer you to the
22  record for an accurate account of that.
23      Q. And was there any discussion on the public record
24  about the cost that those steps might -- costs that a
25  voter might incur in obtaining an election



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                    June 7, 2012

201

1  identification certificate?
2      A. I believe there was some discussion of that.
3      Q. What discussion was that?
4      A. You'll have to refer to the record for an
5  accurate account of that.
6      Q. Do you know what documents are needed to obtain
7  an election certificate?
8          MR. SWEETEN: As he is sitting here.
9          MS. MARANZANO: Yes.
10     A. You would have to refer -- I don't have an
11 independent recollection of that.
12     Q. (By Ms. Maranzano) You don't know, as you sit
13 here?
14     A. No, I don't. I would have to look it up.
15     Q. Do you know if there was any discussion on the
16 public record about an analysis conducted regarding
17 individuals who would or would not possess those
18 underlying forms of documentation.
19     A. I don't know what you mean by "analysis." I know
20 there was discussion at length about that issue or
21 whether or not -- about the issue of obtaining an
22 alternative ID. The specifics of that, though, I can't
23 give you accurately from independent recollection and
24 would refer you to the record.
25     Q. Did the legislature conduct any sort of analysis

202

1  in a public way about -- in terms of documents that are
2  needed to obtain election identification certificate in
3  terms of who would have those documents?
4          MR. SWEETEN: You can testify about matters
5  in the record. Don't reveal matters of privilege.
6      A. To the extent there was -- I don't know if it's
7  the word "analysis," but there was a discussion on that
8  in the -- on the Senate -- during the debate on the bill
9  either at the committee level or on the Senate floor or
10 both.
11     Q. (By Ms. Maranzano) If the documents needed to
12 obtain an election identification certificate have a
13 cost to them, then would you agree that that is actually
14 charging a voter to vote?
15         MR. SWEETEN: Objection, don't reveal your
16 thought process, mental impressions, opinions,
17 motivations about the legislation in answering this
18 question. So unless you can avoid doing that, I'm going
19 to instruct you not to answer the question.
20     A. An answer to that would require me to invoke my
21 mental impressions and analysis so I would prefer to
22 invoke the legislative privilege.
23     Q. (By Ms. Maranzano) Do you know where a person
24 can obtain an election identification certificate?
25     A. Under the statute, I believe that it is the

203

1  Department of Public Safety.
2      Q. And when -- is it the driver's license offices?
3      A. I believe it is.
4      Q. When are those offices usually -- what are the
5  hours of those offices generally?
6      A. I would have to call and find out. I would
7  assume from 9:00 to 5:00 during the weekdays. But there
8  may be -- some offices may have local rules or local
9  opening times that are different.
10     Q. Does Senate Bill 14 require employees to provide
11 paid leave for somebody to obtain an identification?
12     A. You'd have to refer to the legislation for that.
13     Q. Do you have any independent recollection of
14 whether that's included?
15     A. Not at this time.
16     Q. Are you aware of any analysis, public analysis
17 conducted to determine if any Hispanic or blacks or any
18 other group are more likely not to have the necessary
19 identification under Senate Bill 14?
20         MR. SWEETEN: I'm going to instruct you not
21 to answer on the basis of legislative privilege.
22         MS. MARANZANO: I asked about public
23 analysis.
24         MR. SWEETEN: If you're talking about public
25 testimony about analysis, boy, I think that's been asked

204

1  and answered a number of times, but you can go ahead and
2  you can answer.
3      A. I would refer you to the record on that.
4      Q. (By Ms. Maranzano) No independent recollection?
5      A. My independent recollection is not enough
6  information to be accurate to give you testimony with
7  regard to such analysis. If it occurs on the record I
8  would refer you to the record for an accurate account on
9  that.
10     Q. Are you familiar with the provisional ballot
11 provisions in Senate Bill 14?
12     A. If you'll point me to that provision. Refresh my
13 memory.
14     Q. Section 17 talks about provisional ballots.
15     A. Section 17. I'm sorry.
16     Q. Starts on Page 11 and goes on to Page 12.
17     A. Okay. Section 17.
18     Q. Uh-huh.
19     A. I'm generally familiar with Section 17, Senate
20 Bill 14.
21     Q. Do you think that individuals who vote a
22 provisional ballot, except for some narrow exceptions,
23 need to show the same forms of ID as is required under
24 the bill for voters who cast a regular ballot, in order
25 for their ballot to be counted?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                              June 7, 2012

205

1           MR. SWEETEN:  You can talk about the text of
2      the bill.  Don't reveal your thoughts and mental
3      impressions about legislation.
4      BY MS. MARANZANO:
5          Q.  Do you recall my question?
6          A.  Vaguely.  If you'll remember -- If you'll
7      rephrase it.
8          Q.  I'm wondering whether -- with, except for some
9      narrow exceptions, it's essentially the same
10     identification requirements for those who cast a
11     provisional ballots, correct?
12         A.  No.
13         Q.  What's the difference?
14         A.  Well, I think B -- Subsection B and C provides
15     affidavits -- an opportunity to present an affidavit --
16         Q.  So you're --
17         THE REPORTER:  I'm sorry.
18         THE WITNESS:  For the reasons stated
19     therein.
20     BY MS. MARANZANO:
21         Q.  So Section B you're referring to is individuals
22     who have a religious objection to being photographed?
23         A.  Right.
24         Q.  And Section C is individuals who do not have
25     identification meeting the requirements because of a

206

1      natural disaster that was declared by the President of
2      the United States or the governor which occur no earlier
3      than 45 days before the date the ballot was cast and
4      lead to the destruction of the identification; is that
5      correct?
6          A.  Yes.
7          Q.  And so other than those exceptions individuals
8      who cast a provisional ballot need to show one of the
9      forms required of identification?
10         MR. SWEETEN:  I'm sorry.  Can you read the
11     question back, please?
12         (Requested question was read.)
13         MR. SWEETEN:  You can testify based upon the
14     text of the bill don't reveal your thoughts, mental
15     impression that would be a matter of legislative
16     privilege.  Go ahead and answer it.
17         A.  The provision for that -- for provisional ballots
18     is contained in Section 17 and also discussed in Section
19     18 of the bill.  And those provisions would appear to
20     provide the process for provisional ballot.  What's
21     required in the event a provisional ballot is cast with
22     regard to identification.
23         Q.  (By Ms. Maranzano)  And other than the exceptions
24     that we've discussed, does a voter who casts a
25     provisional ballot need to show one of the required

207

1      forms of identification as listed in Senate Bill 14?
2          A.  The Section 65.0541, Subdivision 1, provides that
3      the photo ID would be required or the affidavits
4      required as discussed earlier.
5          Q.  The affidavits for -- that we just discussed with
6      an individual?
7          A.  Correct.
8          Q.  Okay.  Does the voter have to show their
9      identification to a voter registrar, voter who cast a
10     provisional ballot has to show one of the forms of
11     required identification to a voter registrar, correct?
12         A.  I believe there's the provision in the statute.
13         Q.  Is this a voter registrar office in every county?
14         A.  I believe there is.
15         Q.  Are they usually in the county seat?  Are they
16     usually located --
17         A.  That would be normally where they would be.
18         Q.  What's the purpose of Senate Bill 14?
19         MR. SWEETEN:  You can give the general
20     purpose.
21         A.  The general purpose is to in sure ballot
22     integrity.
23         Q.  (By Ms. Maranzano)  Based on the public record,
24     can you tell me the basis of that statement?  Your
25     saying that's the purpose.

208

1          MR. SWEETEN:  That calls for matters of
2      legislative privilege.  He can testify to purpose, which
3      he did.  You're asking him now to go to the public
4      record and do an analysis and give you the reasons that
5      are in the public record in support of what he has
6      stated as general purpose.  And to do so would discover
7      his mental impressions and be subject to the mental
8      impressions.  I instruct you not to answer.
9      BY MS. MARANZANO:
10         Q.  Any other purposes of Senate Bill 14?
11         A.  That's the general purpose.
12         Q.  Can you tell me each and every purpose of Senate
13     Bill 14?
14         MR. SWEETEN:  Asked and answered.
15         A.  I've told you the general purpose which is my
16     response to your question.
17         Q.  (By Ms. Maranzano)  So are there any other
18     purposes?
19         A.  There are -- there is a general purpose to the
20     statute, as I stated.  And it's broad enough to include
21     the general purpose, as I stated.
22         Q.  I would like to know each and every purpose of
23     Senate Bill 14?
24         MR. SWEETEN:  He's answered the question.
25     Asked and answered.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                    June 7, 2012

209

1    MS. MARANZANO: He hasn't answered that
2 question.
3        MR. SWEETEN: He's given you the purpose of
4 the bill. Objection; asked and answered.
5    A. The purpose of the bill is generally to prevent
6 and preserve -- prevent fraud and observe -- preserve
7 the integrity of the ballot.
8    Q. (By Ms. Maranzano) And the reason why I was
9 following up is because you say "generally." So I'm
10 just trying to make sure I have every purpose of Senate
11 Bill 14?
12    A. Well, when I say "generally," means the general
13 purpose of the bill.
14    Q. But are there any other specific purposes of the
15 bill?
16    A. My testimony involves the general purpose of the
17 bill. And I stated the general purpose of the bill.
18    Q. But I am allowed to ask you about the legislative
19 purpose so I think that would include any legislative
20 purpose of Senate Bill 14?
21    A. Well, just general purpose and legislative
22 purpose are synonymous in this view and that's to
23 prevent voter fraud and protect the integrity of the
24 ballot.
25    Q. Okay. That's good. Can you tell me, based on

210

1 the public record, how Senate Bill 14 prevents fraud?
2        MR. SWEETEN: Hold on a minute. How it
3 prevents fraud. No, he's not going to answer that.
4 That's subject to the legislative privilege.
5 BY MS. MARANZANO:
6    Q. Was there testimony on the public record about --
7        MR. SWEETEN: Counsel, let's go to the order
8 here.
9        MS. MARANZANO: Yeah.
10        MR. SWEETEN: Specifically, we are on
11 Page 16 of 16 of the court's order. And that provision
12 order says, "Further ordered that questions of
13 depositions shall comply with the terms and restrictions
14 set forth in this order.
15        MS. MARANZANO: Yes.
16        MR. SWEETEN: Yesterday, in two depositions
17 held at this building, we had a sitting representative
18 sit and answer these same types of questions until 7:00
19 p.m. in violation of that provision of the court order.
20 We had another witness, Representative Aliseda, who was
21 here until 6:15 p.m. -- no, it was 7:00 because I was
22 waiting for the attorney to come back so we could visit
23 about other matters.
24        Now, we've got an order from the court that
25 explicitly prohibits and requires that deposition

211

1 questions will comply with the terms and restrictions of
2 the order. The court has a succession of four orders
3 carved-out and explicitly told us what the areas of
4 legislative privilege are. You continue, and I'm not --
5 I'm using you in the broadest sense because you have
6 been polite. But your office is continuing to ask
7 questions in violation of this order. And at some point
8 this -- in violation of this order, if this conduct
9 continues we are going to have no other choice but to go
10 to the court and seek relief from them. Because they
11 have been clear.
12        And this type of questioning, where you
13 continue to ask him matters that are subject to the
14 privilege, is inappropriate. And is in violation of the
15 court's order. And I'm going to ask you -- I'm going to
16 ask you here at 3:00 p.m. on the late afternoon after
17 Senator Duncan has sat here since 9:30, I'm going to ask
18 you to rein that in. Because we are now getting to a
19 point where we have our sitting representatives and
20 senators being -- basically sitting here answering
21 questions that have been prohibited by the court. And
22 at some point this has to end.
23        MS. MARANZANO: Well, Mr. Sweeten our
24 position is, absolutely, that we are complying with the
25 court's order, and, you know, I have made every effort to

212

1 be very clear with the Senator today that I'm asking him
2 questions about the public record. We've had exchanges
3 and there have been times when I have withdrawn
4 questions. There's been times when you have withdrawn
5 objections. So, you know, I think we're both making
6 good faith efforts to comply with the order.
7        And the -- you know, all the attorneys
8 representing the defendant in this matter are doing the
9 same. And it's absolutely our position that we are
10 complying with this court order.
11        And, you know, my understanding, and
12 obviously I wasn't involved in those depositions
13 yesterday. My understanding is that part of the reason
14 people were here late was because there were problems
15 with documents that had nothing to do with questions at
16 a deposition.
17        MR. SWEETEN: Well, I would submit a very
18 different view of things and I have. I've stated it.
19 I'm simply -- I'm letting you know. And I'm making this
20 clear on the record, that this has got -- you've got to
21 tamper this down based upon this order, or we're going
22 to seek relief from the court.
23        This is -- yesterday's exercise was in
24 violation of the court order. And we are starting to
25 get there here. And I want you to take this very



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                      June 7, 2012

213

1    seriously that we are doing our best.
2           We have put these people through seven hours
3    of depositions. You have taken the limit of time with
4    these individuals. And this -- at some point this has
5    to stop, or this has to be reined in, because we're
6    going to seek redress from the court. With that, I'll
7    let you continue with your examination of Senator
8    Duncan. We'll continue -- continue with this exercise.
9    But please respect the court's order with respect to the
10   legislative privilege. It is very clear.
11          MS. MARANZANO: I am going to continue. But
12   I just want to say, I do not appreciate the suggestion
13   that I am doing anything other than respecting the
14   Court's order.
15   BY MS. MARANZANO:
16       Q. Senator Duncan, was Senate Bill 14 given an
17   emergency designation by the governor?
18       A. I believe that the Governor Perry issued an
19   emergency declaration for legislation related to voter
20   identification.
21       Q. Did you or did anyone in your office have
22   communications about Senate Bill 14's emergency
23   designation?
24       A. With whom?
25       Q. With anybody.

214

1        A. Not that I'm aware of.
2        Q. What are the consequences of a bill having this
3    designation, this emergency designation?
4        A. I don't know of any consequences.
5        Q. What does it mean for a bill to be designated as
6    emergency?
7        A. The only thing it means is that the constitution
8    requires that you cannot take up a bill or a resolution
9    of substance prior to the 60th day of a legislative
10   session. Declaring an issue an emergency allows the
11   measure to be taken up and considered before the 60th
12   day.
13       Q. Were there any public statements about why Senate
14   Bill 14 was given this emergency designation?
15       A. The only public statement that I would be aware
16   of would be the proclamation by the governor declaring
17   it an emergency. There may be others by others, but I'm
18   not aware of them.
19       Q. And in the governor's proclamation, did he give
20   any explanation as to why he was declaring it an
21   emergency?
22       A. You know, I don't recall that he really did. I
23   think -- it's in the journal and I don't remember
24   exactly what it said. But I don't believe there was any
25   statement with regard to considerations in the journal.

215

1    Whether he made other statements I don't know.
2           (Exhibit No. 531-532 was marked.)
3    BY MS. MARANZANO:
4        Q. Senator, I am showing you what we're marking for
5    the record as deposition Exhibit 531 and 532. Can you
6    take a look at these and tell me if you recognize them?
7        A. I recognize -- I don't know if I've seen 531
8    before. I assume that I've seen 532 because it's
9    addressed to me by Senator Van de Putte.
10       Q. And deposition Exhibit 532, is that a letter from
11   Lieutenant Governor Dewhurst?
12       A. It's a letter from Governor Dewhurst to --
13   Lieutenant Governor Dewhurst to Senator Birdwell.
14       Q. And dated January 20, 2011?
15       A. Correct.
16       Q. Do you recall getting a letter similar to this
17   yourself?
18       A. No. But I may have.
19       Q. Do you see that in -- do you see that it says
20   that, "This Lieutenant Governor's intent to recognize
21   Senator Robert Duncan for a motion to resolve the Senate
22   into a Committee of the Whole to consider Senate Bill
23   14"?
24       A. Yes.
25       Q. And do you see it says that's going to happen on

216

1    Monday January 24, 2011?
2        A. Yes.
3        Q. Can you take a look at Exhibit -- deposition
4    Exhibit 532?
5        A. Yes, ma'am.
6        Q. And can you look at the second paragraph for a
7    minute? Do you see that that's referring to a letter
8    from the Lieutenant Governor?
9        A. Okay.
10       Q. Do you see that it states that the Lieutenant
11   Governor circulated a letter on Thursday after most
12   senators had left for the weekend? And it stated that
13   the Senate was going to convene as Committee of the
14   Whole four days later to consider voter ID legislation.
15   Do you see that?
16       A. I see her description.
17       Q. Is that your, based on your recollection, do you
18   believe that that occurred?
19       A. I don't know.
20       Q. You don't have any recollection?
21       A. No. It -- I don't know one way or the other. I
22   don't recall an issue about this. Although, she did
23   raise it in a letter to me.
24       Q. Do you recall receiving this letter?
25       A. Let me read it. I believe -- yeah, I remember



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                                    June 7, 2012

217

1  this. I do.
2    Q. You do remember it?
3    A. Yes, ma'am.
4    Q. Did you respond to it?
5    A. I assume I did. I always respond to Senator Van
6  de Putte when I can. So I don't know if I did it in
7  writing or gave her a phone call.
8    Q. Do you -- do you recall if you disputed the way
9  she describes the notice that was given in that
10  paragraph that we were just looking at?
11    A. I don't recall if I did or not.
12    Q. As you sit here today, you don't recall if this
13  is how the notice was provided to members?
14    A. No, I don't. I remember this letter now. But I
15  don't know how that happened or why it happened or what
16  happened, quite frankly.
17    Q. Did any opponents of Senate Bill 14 make
18  allegations that minority members of the Senate were
19  being excluded from participation in the debate because
20  they weren't given enough notice?
21        MR. SWEETEN: You can answer as to matters
22  of the public record.
23    A. I simply don't remember that specifically. I
24  know if there's some correspondence to that effect, you
25  know, there's typically -- I think there was. I think

218

1  this letter right here, basically is some protest of the
2  speed in which the bill was moving. But other than
3  that, I don't recall anything.
4    Q. And you don't recall whether you had a public
5  response to that?
6    A. I don't know. I may have. I mean, I typically
7  would respond to Senator Van de Putte by phone call or
8  formal letter. Not only this issue, but other issues as
9  well.
10    Q. Do you recall that in 2011 there was a similar
11  rule, that's what we discussed in the 2009 session, that
12  allowed for voter identification legislation to be
13  brought to the floor without a two-thirds majority vote?
14    A. I recall it. I think Senate Rule 5.11 remained
15  in place.
16    Q. So Section D of Rule 5.11 would have been the
17  same in 2011 as it was in 2009?
18    A. I don't believe there were any conceptual changes
19  in it.
20    Q. Would it refresh your recollection to look at the
21  rule?
22    A. It would be helpful to look at both the rules.
23  I've got one here. Well, I've got the original exhibit
24  you previously provided.
25    Q. I'm going to give you.

219

1        (Exhibit No. 533 was marked.)
2  BY MS. MARANZANO:
3    Q. I'm going to give you what we're marking as
4  deposition Exhibit 533, which I'll represent to you is
5  from the 2011 Senate rules. And do you see rule 5.11 D
6  on Page 24?
7    A. Okay.
8    Q. Do they appear to be the same to you?
9    A. They appear to be substantially the same, if not
10  identical.
11    Q. Senator, based on the public record, can you tell
12  me why you were the person who introduced the resolution
13  to bring Senate Bill 14 to the Committee of the Whole?
14        MR. SWEETEN: Don't answer the question. It
15  would call for you to reveal matters of legislative
16  privilege, of why it would relate to mental processes
17  about the legislative process. If there's something
18  expressed specifically on the public record you can
19  refer to.
20  BY MS. MARANZANO:
21    Q. Let me actually ask you this. Is there a
22  procedure by which there's a process for who would bring
23  a bill to the floor -- or who would bring a bill to the
24  Committee of the Whole, is that a set procedure in the
25  Senate?

220

1    A. No.
2    Q. Okay. Is that a decision that the Lieutenant
3  Governor makes?
4    A. Yes.
5    Q. And did you preside over the Committee of the
6  Whole's consideration of Senate Bill 14?
7    A. Yes.
8    Q. And that was the same rule, and it contained the
9  same responsibilities as what you testified to in 2009?
10    A. Yes.
11    Q. During the debate and the consideration by the
12  Committee of the Whole, did anybody raise public
13  concerns about the impact Senate Bill 14 would have on
14  minority voters?
15    A. Generally those issues were discussed. An
16  accurate account would be contained in the record.
17    Q. And do you recall -- actually we'll get to that
18  in a second. Never mind. Have you had occasion to
19  review the Georgia and Indiana voter identification
20  laws?
21        MR. SWEETEN: Objection, asked and answered.
22  And don't reveal your mental processes when you're
23  evaluating legislation, your motivations that would be
24  subject to legislative privilege. Instruct not to
25  answer if your answer would reveal that.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

221

1    A. The answer is, I have reviewed materials that
2    relate to the Indiana an Georgia laws and those cases.
3    I can't recall if I've actually read the cases verbatim
4    or -- and I know I have not done an analysis of those
5    cases verbatim.
6    Q. (By Ms. Maranzano) Is out your belief, as you
7    sit here today, that the Georgia identification law is
8    similar to Senate Bill 14?
9    A. I can't answer that.
10          MR. SWEETEN: Okay. I was going to say if
11   this is going to reveal your legislative processes about
12   Senate Bill 14 don't answer it. But if you don't -- if
13   it's not.
14   A. I can't answer it for two reasons. One, it would
15   require analysis. And number two is I haven't -- I'm
16   not prepared give you and accurate answer on that. It
17   would have to be contained -- it would have to be
18   something contained in the record.
19   Q. (By Ms. Maranzano) Are you familiar with the
20   Indiana identification law?
21   A. Generally.
22          MS. MARANZANO: Can you mark this? Thank
23   you.
24          (Exhibit No. 534 was marked.)
25   BY MS. MARANZANO:

222

1    Q. Senator, I'm showing you what we're marking as
2    deposition Exhibit 534. Can you take a look at this?
3    Does this appear to be the Indiana voter identification
4    law?
5    A. The title of this document is Public Law
6    109-2005. And it appears to be an excerpt from the
7    Indiana code. I don't know the authenticity of this. I
8    assume you're representing it to be an authentic version
9    of the law and I have no reason to doubt that.
10   Q. Can you take a look at Page 2015 for me, please?
11   And I want to direct your attention to the Subsection C,
12   but if you need to look at the preceding page it might
13   give you the context for that.
14   A. Okay.
15   Q. Do you see that a voter who cast a provisional
16   ballot is able to execute an affidavit saying they're
17   indigent and their provisional ballot would be counted?
18   A. Yes.
19   Q. And they would not have to show the required
20   identification?
21   A. Yes.
22   Q. Do you recall public discussions or discussions
23   on public record about this portion of the Indiana code
24   during the debate of Senate Bill 14?
25   A. I believe there was.

223

1    Q. Do you recall what those discussions entailed?
2    A. No. You would have to refer to the record for an
3    accurate description.
4    Q. Do you recall introducing any amendments to
5    Senate Bill 14?
6    A. Do I recall?
7    Q. Uh-huh.
8    A. Introducing amendments, I did not introduce
9    amendments that I recall.
10          MS. MARANZANO: Could we have this marked?
11          (Exhibit No. 535 was marked.)
12   BY MS. MARANZANO:
13   Q. I'm showing you what we're marking as deposition
14   Exhibit 535. Can you take a look and tell me if you
15   recognize this?
16   A. Well, this is apparently a transcription of the
17   hearing on Senate Bill 14, January 26, 2011.
18   Q. And can you look on that first page by Duncan and
19   take a look at what -- at that paragraph?
20   A. Yes. That indicates that I apparently introduced
21   amendment 40.
22   Q. Does that refresh your recollection?
23   A. Well, yeah. Because apparently Senator Davis had
24   an amendment. And now that I'm looking at this it
25   appears that, according to the record, I was amending

224

1    her amendment.
2    Q. I'm sorry. You were amending her amendment?
3    A. I believe that's what this is.
4    Q. And can you tell me, based on public discussions,
5    why you thought that was a provision that you wanted to
6    add to Senate Bill 14?
7          MR. SWEETEN: Don't answer the question. It
8    calls for matters of legislative privilege. You're
9    asking why in his thought process.
10   BY MS. MARANZANO:
11   Q. Did you have any discussions on the public record
12   about this amendment?
13          MR. SWEETEN: You can answer.
14   A. Yes.
15   Q. (By Ms. Maranzano) Do you recall the substance
16   of those discussions?
17   A. Those discussions were stated in the record.
18   Q. And is that the record that's right here in front
19   of us?
20   A. It is.
21   Q. And do you see that, in that paragraph that we
22   were looking at, you point out that this amendment is
23   very similar to, if not identical to, the provisions of
24   Indiana law? Do you see that? And then it says, "and
25   it would be a fail safe privilege for those persons,"



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                              June 7, 2012

225

1  which I assume you're referring to indigent persons?
2      A. That's what -- well, I will refer you to the
3  record, if that accurately states what I said, I assume.
4      Q. Can you tell me what the purpose of this
5  amendment was?
6          MR. SWEETEN: Don't answer the question.
7  You can give general purpose of legislation. Don't go
8  into the purpose of the amendment, legislative
9  privilege.
10 BY MS. MARANZANO:
11     Q. Can you tell me if this provision was included in
12 the final version of Senate Bill 14?
13     A. According to the record it was adopted, but I
14 don't know -- and I assume that it was in the engrossed
15 version, but I don't know. You would have to go to the
16 record.
17     Q. Well, do you want the take a look at Senate Bill
18 14 and tell me if you see it in the bill?
19     A. In the enrolled and signed version?
20     Q. Uh-huh.
21     A. The bill will speak for itself I'm sure, but --
22 and that would have been -- I'm trying to see where that
23 was amended. But I don't recall that it made it through
24 the House. But let me look and see.
25     Q. Let me direct your attention to that paragraph

226

1  that we were just looking at. It points out that this
2  is for individuals who cast a provisional ballot.
3      A. Right.
4      Q. So that might help direct your attention to the
5  portion of Senate Bill 14 about provisional ballots.
6      A. You might remind me of what provision that is.
7      Q. And you said you don't recall that it did make it
8  through. Is that what you said?
9      A. Well, it appears if you're looking at Section
10 60 -- or Section 14 of Senate Bill 14, that -- for
11 amendment No. 40, which was a Senate amendment to Senate
12 Bill did not get in the enrolled version of the bill
13 signed by the governor.
14     Q. Do you know when this provision was removed from
15 the bill?
16     A. No, I do not. You know, you can narrow it down
17 to either in the House or in a conference committee. I
18 don't think this bill went to a conference committee.
19     Q. Do you -- did you have any communications with
20 any other legislators about this amendment -- well, this
21 amendment first of all, at all?
22     A. Not that I recall.
23     Q. So I take it then, you didn't have any
24 conversations about this amendment getting removed from
25 the bill?

227

1      A. I don't remember any. But that doesn't -- I
2  could have. I just don't remember any specific
3  amendments. When this bill came back over we were in a
4  lot of other different issues. But I don't remember
5  being told specifically that it came out. And I just
6  now remembered that we put the amendment on. So I don't
7  recall being involved at that stage of any decision to
8  remove the amendment.
9      Q. Did you have any communication with anybody about
10 whether a provision like this, the exemption of for
11 indigency, would increase the chances that Senate Bill
12 14 would be precleared?
13         MR. SWEETEN: Don't reveal matters of
14 privilege. I think this asks for more than a general
15 subject matter discussion. If you -- so I would
16 instruct you not to answer as phrased. If you want to
17 change the preface of the question, I think we can
18 probably get you and answer that would give you the
19 foundational information you seek.
20 BY MS. MARANZANO:
21     Q. I think you stated previously you don't recall
22 having conversations about this amendment generally?
23     A. Well, apparently I did because I put an amendment
24 on the bill. And as chairman of the committee, I
25 typically work to improve a bill and listen to people.

228

1  And so obviously there was some reason to put that on
2  the bill. The reasons that are there are stated here.
3  What conversations I had with folks, with other members
4  on this particular amendment were probably based upon
5  Indiana law, as stated in the public record. But my
6  specific conversations with Senator Fraser or others,
7  Senator Davis, I do not recall specifically what they
8  were. To provide you, especially, to provide you with
9  an accurate account of those conversations. The
10 statement contained in the record is my conversation
11 with regard to Amendment 40.
12     Q. Do you recall any of the other amendments that
13 were proposed for Senate Bill 14?
14     A. If I don't recall my own, I probably don't recall
15 the others. But I do recall -- at least I don't think
16 there were amendments in 2009, but I do recall, I
17 thought we did some amendments in 2011 and obviously we
18 did.
19         MS. MARANZANO: Okay. Let's mark this. I'm
20 sorry. Wrong one. Can you mark this?
21         (Exhibit No. 536 was marked.)
22 BY MS. MARANZANO:
23     Q. Senator, I'm showing you what we're marking as
24 deposition Exhibit 536. Do you recognize this?
25     A. Well, I recognize the title, as apparently it's



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                            June 7, 2012

229

1     an excerpt from the Senate journal for January 26, 2011.
2         Q.  And can you take a look at Page 118, and I'm
3     going to direct your attention to floor Amendment 12.
4     Do you see that that amendment would have prohibited
5     state agencies from charging fees for issuance of any
6     acceptable form of photo identification under Senate
7     Bill 14, or for underlying documentation that would be
8     required to obtain such an ID?
9         A.  I believe the provision -- or the amendment poses
10    a similar concept to what you described.
11        Q.  And do you see below that amendment there's a
12    recorded motion to table and a vote on that motion to
13    table?
14        A.  That's correct.
15        Q.  And you voted, according to the public record, in
16    favor of the motion to table?
17        A.  According to the record, that's how I voted.
18        Q.  Did you take any public position as to how this
19    amendment would have impeded the goals of Senate Bill
20    14?
21        A.  I don't recall if I did or not.
22        Q.  You have no recollection?
23        A.  No.
24        Q.  Can you turn to Page 134, Amendment No. 30?
25        A.  Page what?

230

1         Q.  130.  Do you see floor Amendment No. 30?
2         A.  I see that.
3         Q.  Amendment by Senator Ellis as well as Senator
4     Rodriguez and Senator Uresti.  Can you take a look at
5     that amendment?  Do you see that this amendment would
6     have required the secretary of State to conduct a study
7     that would have included information about the number of
8     eligible voters who were prevented from voting because
9     of a lack of possessing an identification?
10        A.  I'll only agree to what it says.  I'm not --
11    you're paraphrasing it.  And I'm not familiar enough
12    after two years, after a year, whatever it is, of the
13    language to agree with your paraphrasing.  But I will
14    agree it is an amendment that requires the Secretary of
15    State to produce an annual report.  And it has specific
16    requirements with seven subsections of requirements for
17    the Secretary of State to either collect data or do
18    analysis and report back to the legislature.
19        Q.  And can you look at Subsection 7, and that
20    actually requires that "the report include an analysis
21    by subgroup of whether the enhanced identification
22    requirements were being accepted to vote, produce a
23    disparate impact on women, the elderly, persons with
24    disabilities, students or persons of racial or ethnic
25    minorities."  Is that correct?

231

1         A.  That's what Subparagraph 7 states, yes.
2         Q.  And can you look below, I think it goes on to the
3     next page, that there was a motion the table that
4     amendment?
5         A.  Correct.
6         Q.  And you publicly voted in favor of this motion to
7     table; is that correct?
8         A.  That's correct.
9         Q.  Did you take -- did you make any public
10    statements or take a public position about your
11    opposition of this amendment?
12        A.  I don't recall doing so.
13        Q.  Were there any public statements made about
14    concerns that a study, such as the one proposed by this
15    amendment, would actually show there was a disparate
16    impact on minority voters?
17        A.  I'm confident that whenever floor Amendment 30
18    was laid out on the Senate floor that the author and the
19    sponsors of the amendment made certain public statements
20    regarding -- or in support of the amendment.
21        Q.  And my question was about whether public
22    statements were made expressing a concern that to do
23    such a study would show there was a disparate impact?
24        A.  You would have to look at the record to determine
25    whether or not there were public statement on that.  I

232

1     don't recall independently.
2         Q.  Can you look at Page 129 for me?  And
3     specifically at floor Amendment No. 29.  Do you see that
4     amendment it requires driver's license offices to be
5     open until 7:00 p.m. on a weekday during each week and
6     at least four or more hours on two Saturdays of each
7     month?
8         A.  I see that.
9         Q.  Do you see below that there's a motion to table
10    that amendment?
11        A.  Yes.
12        Q.  And you voted in favor of that motion to table?
13        A.  Correct.
14        Q.  And did you take any public position as to how
15    this amendment would have impeded the goals that you
16    described earlier of Senate Bill 14?
17        A.  I don't remember if -- whether I did or not.
18    Probably not.
19        Q.  Did you make any public statements about that?
20        A.  No, I don't think I did.
21        Q.  Do you recall when the Senate passed Senate Bill
22    14?
23        A.  It was probably in January of 2011 as this
24    particular -- well, somewhere near the January 26, 2011
25    proceeding that's reflected in the Senate journal.  But



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                         June 7, 2012

233

1    I don't recall the exact date.
2         Q   Can you tell me as a general matter, is it
3    unusual for legislation to be introduced, considered and
4    passed within two weeks?
5         A   Not necessarily.
6         Q   Has that happened -- how many times has that
7    happened during your time in the Senate?
8         A   No.  My freshman year I introduced the Boll
9    Weevil.  Actually I introduced it, but I didn't even
10   take it up until the Supreme Court had overruled or had
11   held an existing law unconstitutional until April 30th.
12   And I think we headed out of Senate to the House in two
13   and a half weeks.  So it can be done, if it's necessary,
14   on emergency orders.  On orders that are emergency, they
15   can move fairly quickly depending on the consensus in
16   the bill.  Just depends on all those things.  So
17   generally it's not -- it's -- it's not -- it's -- it
18   happens -- it can and does happen that legislation moves
19   fairly quickly.
20        Q   I'm sorry.  I missed the piece of legislation you
21   worked on?
22        A   Boll Weevil.
23             MR. SWEETEN:  Boll Weevil.
24   BY MS. MARANZANO:
25        Q   Okay.

234

1         A   Actually that's a pretty interesting case.
2         Q   We'll talk about that off the record.  And you
3    said it depends on the consensus; is that right?
4         A   Correct.
5         Q   Is it unusual for a bill that is highly
6    contentious to pass -- to be introduced, considered and
7    passed within two weeks?
8         A   Depends.
9         Q   And other than this legislation that yourself
10   mentioned that you worked on, are there other
11   examples -- during the time you've been in the Senate,
12   about how many times have you seen this happen?
13        A   Couldn't tell you.  Special orders.  Other issues
14   that come up late in the session that need to be
15   addressed.  So, you know, I couldn't.  Just too much to
16   me.  Too long and too much.
17        Q   Are you familiar with the Conference Committee's
18   consideration as to Senate Bill 14?
19        A   Remind me who was on the Conference Committee,
20   please?
21        Q   I would have to look it up.  I'm not sure I had
22   that document in front of me.  It would refresh your
23   recollection if you knew if members of the Conference
24   Committee?
25        A   Yeah.

235

1         Q   All right.  We'll come back to that.  Did you
2    ever have any discussions -- strike that.  To the best
3    of your knowledge, based on public record, did the
4    legislature take steps to determine whether SB 14 might
5    disproportionately impact minority voters?
6             MR. SWEETEN:  Don't reveal matters of
7    legislative privilege.  If you can answer the question
8    without doing so, you can.  If you cannot, then instruct
9    you not to answer.
10        A   I can't accurately respond to the question based
11   on independent recollection.  I would refer you to the
12   record.
13        Q   (By Ms. Maranzano)  Okay.  Was any part of the
14   purpose of Senate Bill 14 to decrease the number of
15   Hispanic voters?
16        A   No.
17        Q   Was any part of the purpose of Senate Bill 14 to
18   decrease the number of any other group of minority
19   voters?
20        A   No.  The purpose is as I've stated.
21        Q   Was any part of the purpose of Senate Bill 14
22   partisan?
23        A   No.  The purpose is as I stated.
24        Q   Did the purpose of photo ID in Texas evolve
25   overtime?

236

1         A   I'm not sure I understand that.  What do you
2    mean?
3         Q   Did the purpose of the photo ID bills that we
4    talked about in different legislative sessions change?
5         A   Not that I'm aware of.
6             MR. SWEETEN:  Hold on a second.  I think
7    that you're asking to compare and contrast different
8    bills from different sessions.  I think that the
9    question is vague.  I think it's compound.  I also think
10   that it calls upon him to give you an analysis of how
11   one bill compares with another which would require him
12   to write his mental impressions and would be subject to
13   the legislative privilege.  He will testify -- I think
14   you've asked him all day about the different bills and
15   what he thought the general purpose was.  He has
16   testified to all of that.
17   BY MS. MARANZANO:
18        Q   Are you aware of any legislators making any
19   statements about illegal aliens voting?
20        A   No.
21        Q   Have you ever heard a Texas State legislator who
22   voted in favor of Senate Bill 14 say it would prevent
23   racial or ethnic minorities from voting in Texas?
24        A   No.
25             MR. SWEETEN:  Don't reveal any



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                June 7, 2012

237

1   communications you've had with any Senate or staff in
2   answering these questions.
3       A.  I've had no such communications is what I'm
4   trying to say.  I want to be clear on that.
5       Q.  (By Ms. Maranzano)  I didn't hear the very last
6   thing you said.  You said you've had no such --
7       A.  I have not been a party to any such
8   communications or overheard or heard any such
9   communications.
10      Q.  Does Senate Bill 14 do anything to address
11  allegations of fraud in the vote by mail system?
12          MR. SWEETEN:  Don't answer the question.
13  Requires you to reveal your mental thought processes and
14  motivations by the voter process.
15          MS. MARANZANO:  I'm just asking him about
16  the text of the bill.
17          MR. SWEETEN:  You're asking if the text of
18  the bill --
19          MS. MARANZANO:  Addresses voter fraud and
20  vote by mail.
21          MR. SWEETEN:  You can answer it based upon
22  the text.
23      A.  The text of the bill is to achieve the general
24  purpose of the bill, which is to enhance voter -- their
25  ballot box integrity and prevent fraud.

238

1       Q.  (By Ms. Maranzano)  So I'm just asking if
2   anything in the bill, based on the face of the bill,
3   addresses vote by mail voter fraud?
4       A.  I've answered the question to the best of my
5   ability.
6       Q.  Okay.
7       A.  Given -- go ahead.  Re-ask the question.
8       Q.  I know we talked about that the purpose of Senate
9   Bill 14 is about integrity of the electoral system and
10  voter fraud.  And I'm just wondering if the specific
11  area of vote by mail fraud is addressed by Senate Bill
12  14, based on the face of the bill?
13          MR. SWEETEN:  But I think your question is
14  asking for him to give you the potential effect of
15  Senate Bill 14 and would therefore, to some extent could
16  reveal his mental processes, opinions and thoughts about
17  the legislation.  So to some -- if to that extent I
18  would instruct you not to reveal it if it implements
19  matters of legislative privilege.
20      A.  I don't know, sitting here today.  I believe that
21  voter -- that mail in ballots is covered under other
22  legislation and not necessarily Senate Bill 14, if my
23  recollection is correct.
24      Q.  (By Ms. Maranzano)  Do you believe that -- well,
25  strike that.  Based on the face of Senate Bill 14, does

239

1   it do anything in terms of the goals that you've stated
2   that is not already covered by federal or State law?
3           MR. SWEETEN:  Don't answer that.  Calls for
4   matters of legislative privilege.  Instruct not to
5   answer.
6   BY MS. MARANZANO:
7       Q.  Do you know how somebody -- do you know what
8   forms of identification a voter registration applicant
9   in Texas needs to show under the current system to
10  register to vote?
11      A.  I know there are -- there are a -- there's a
12  laundry list of items that a voter needs to show.  I
13  couldn't recite them specifically for you right now.
14  You would have to show me the statute.
15      Q.  Is there anything in the public record about the
16  insufficiency of that current system, in terms of the
17  identification of voter registration an applicant needs
18  to show?
19      A.  If there is it would have certainly been stated
20  in the debate of Senate Bill 362 or Senate Bill 14.
21      Q.  Can you give me just a minute?  I think I'm just
22  about done.  I just want to go through my notes real
23  fast.
24      A.  Sure.
25          (Brief recess.)

240

1   BY MS. MARANZANO:
2       Q.  Back on the record.  Senator, do you know how
3   many investigated incidents of in person voter fraud
4   have occurred in the state of Texas in the last
5   20 years?
6       A.  I don't have a statistic available to me at this
7   time to give you an accurate answer on that.
8       Q.  Do you know how many convictions for in person
9   voter fraud have been obtained in the last 20 years in
10  the State of Texas?
11      A.  I don't have that information available to me at
12  this time.
13      Q.  Do you know if those statistics were part of the
14  public debate on Senate Bill 14?
15      A.  If they were, they would be in the record.
16      Q.  At any time since the passage of Senate Bill 14,
17  have you come to believe that it was passed with a
18  discriminatory purpose?
19      A.  No.
20      Q.  Have you come to believe it was passed with a --
21  at any time since the passage of Senate Bill 14, have
22  you come to believe that it would have a discriminatory
23  impact on minority voters?
24      A.  No.
25      Q.  If called to testify at trial, will you testify



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                              June 7, 2012

241

1  that Senate Bill 14 has no discriminatory purpose?
2      A. Yes.
3      Q. And will you testify that it has no
4  discriminatory effect?
5      A. Yes.
6      Q. Are there any answers that you gave today that
7  now you would like to change?
8      A. Other than the fact that I forgot that I had
9  offered an amendment. That's the only one I think. But
10  I just simply again, don't typically offer those kind of
11  amendments. But that was corrected and I remember --
12  once you showed it to me I remembered it. It did
13  refresh my memory.
14      Q. Is there anything about earlier today you
15  couldn't recall that you are now able to recall?
16      A. No. That was the main thing.
17      Q. Okay. I'm now going to turn the questioning over
18  to Mr. Brazil. As I mentioned earlier, we are going to
19  leave this deposition open because we believe there may
20  be some documents that the court has ordered to be
21  produced that have not yet been produced. So for the
22  moment we're leaving the deposition open?
23      A. Thank you.
24          MS. MARANZANO: Thank you.
25

242

1              EXAMINATION
2  BY MR. BRAZIL:
3      Q. Senator, I just have a few questions and I'll do
4  it from here. So if I don't speak loud enough just ask
5  me to speak up. Okay?
6      A. Yes, sir.
7      Q. I only have about four areas to briefly cover so
8  I'll jump around and if I lose you, just say so. Fair
9  enough?
10      A. Yes, sir.
11      Q. I believe you said earlier this morning that your
12  Senatorial district is 36 counties?
13      A. 46.
14      Q. I'm sorry?
15      A. 46.
16      Q. 46. Do all 46 of your counties have DPS offices?
17      A. I do not know the -- I couldn't accurately give
18  you and answer right now. I don't know that they all
19  do. I'm not sure. I can't tell you today.
20      Q. I think you saw in the public record that 77 of
21  the 254 counties do not have DPS offices. Do you recall
22  that?
23      A. I don't recall those specific numbers.
24      Q. And you are not sure how many of your counties do
25  or do not have offices?

243

1      A. I haven't -- I haven't looked at that.
2      Q. Did your office do any independent polling of
3  your constituents on the issue of voter ID?
4      A. I don't believe.
5          MR. SWEETEN: Hold on a minute. Don't
6  answer questions that are subject to the legislative
7  privilege. So that would -- potentially reveal thought
8  process, mental impressions about legislation. So don't
9  answer if it would to that.
10  BY MR. BRAZIL:
11      Q. Well, let me make my question more specific. Did
12  your office send out any mailers, request any e-mails
13  from your constituents, anything of that sort, in the
14  public domain about voter ID?
15          MR. SWEETEN: That sounds like a public
16  statement so that would be -- you can go ahead and
17  testify.
18      A. I don't remember doing that. We don't typically
19  do those sorts of mailers to our constituent.
20      Q. (By Mr. Brazil) Did your staff ever keep records
21  of the telephone calls from your constituents, pro or
22  con, against the voter ID bill?
23      A. I don't know if they did on that bill. We've
24  done it before on other bills, but I couldn't tell you
25  whether or not we had a log on that.

244

1      Q. Did you attend any, what we call town meetings,
2  anything of that sort where you specifically discussed
3  the voter ID bill?
4      A. I'm sure I did.
5      Q. Do you recall anything specific, any group that
6  you addressed or invited to address?
7      A. No. Generally, we have a fairly by-partisan
8  group of people that come to our town hall meetings in
9  these rural counties, even in Lubbock and other areas.
10  So I typically and generally speak about a number of
11  issues that were considered during the legislative
12  session and/or that we are considering or thinking about
13  considering. And -- but I never have -- I don't recall
14  ever having a specific town hall meeting just dealing
15  with voter ID. There's a lot of other issues that we
16  generally cover in those types of meetings.
17      Q. Did you ever -- were you ever invited to speak
18  publicly to a group just on the issue of voter ID?
19      A. I don't remember if I did. If I did I didn't do
20  it.
21      Q. Have you seen any independent studies regarding
22  alleged voter fraud in Texas?
23          MR. SWEETEN: Don't reveal your thoughts and
24  mental processes regarding legislation. That would be
25  legislative -- that would be subject to the legislative



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

245

1  privilege.
2         MR. BRAZIL:  How would that be privileged?
3  Are you contending that somehow he got some secret
4  information or something that's not public?  Some
5  independent study that he received that the public
6  didn't receive?
7         MR. SWEETEN:  What I'm saying is that the
8  Senator's thought process, his motivation, his analysis
9  related to any legislation, would be subject to the
10 legislative privilege.  And I think your question asks
11 him to reveal his analysis about legislation,
12 potentially to divulge conversations that he's had that
13 would be subject to the privilege and therefore, that
14 would be a matter of legislative privilege.  That's what
15 I'm saying.
16 BY MS. MARANZANO:
17        Q.  Well, my question was very specific.  Have you
18 seen any independent studies of alleged voter fraud in
19 Texas?
20        MR. SWEETEN:  You can reveal matters of
21 public record.  Don't reveal matters of privilege.
22        A.  The investigations related to voter fraud or that
23 I have seen are those that are contained in the public
24 record of the Senate on this issue.
25        Q.  (By Mr. Brazil)  Okay.  Do you recall whether or

246

1  not the public record contains any study by an
2  independent agency, such as a university or some entity,
3  that's been hired independent of the legislature on
4  alleged voter fraud?
5         A.  If there is such study that it was included in
6  the record either on Senate Bill 362 or the interim
7  study that we did, or on Senate Bill 14.
8         Q.  I think you've already said you're not aware of
9  the number of prosecutions for illegal voting or voter
10 fraud in Texas over the last ten years.  Is that fair?
11        A.  I couldn't give you the numbers.
12        Q.  Did I here you say that Amendment No. 40, floor
13 Amendment No. 40, did not make it into the final bill
14 that was signed into law?
15        A.  Yes.
16        Q.  Okay.  And did you say that the Senate Bill did
17 or did not go to Conference Committee?
18        A.  It apparently did.  And counsel's asked me about
19 that.  But I'm not -- I don't recall any deliberations
20 in regard to the Conference Committee, other than we had
21 a Conference Committee.  I don't believe I was on the
22 Conference Committee.
23        Q.  Okay.  But somewhere in conference, floor
24 Amendment No. 40 was removed?
25        A.  I don't know that to be a fact.  I know it was

247

1  removed, but I don't know where it was removed.
2         Q.  And you don't know, I assume, who removed it?
3         A.  Correct.
4         Q.  Did you serve on any committees or have you ever
5  served on any committee that specifically investigated
6  alleged voter fraud in Texas?
7         A.  The only -- the interim study that we did in 2006
8  had a charge that reflected that we were to look into
9  and study the voter fraud.  You can look at how it's
10 specifically worded.  That's the only committee that
11 I've worked on or served on where that issue that was
12 taken up, I believe.  I don't think any other committee
13 I've served on has taken that issue.
14        Q.  Have you served on any committee that
15 specifically investigated the effect the voter ID bill
16 would have on any group of the voting population.  For
17 example, the elderly, minorities.  Have you served on
18 any committee that specifically investigated what effect
19 this bill may have on their voting?
20        MR. SWEETEN:  Don't reveal any analysis
21 regarding legislation, nor factual information that you
22 did or did not consider in supporting or opposing a
23 bill.  That would be subject to a legislative privilege.
24        A.  The studies or -- that would relate to your
25 question would be the interim study that was a part of

248

1  the charge for the State Affairs Committee in 2006.
2  Other than that, I don't recall anything.
3         Q.  I think you said earlier that Senate Bill 14 was
4  to -- I'm trying to quote you, "ensure voter and ballot
5  integrity."  Is that correct?
6         A.  I think ballot integrity is more accurate.
7         Q.  Okay.  I have reviewed, I think on the record and
8  many of the depositions that have been taken in this
9  case, Senator.  Can you point to any area of the record
10 going back, you know, five or six years where there's
11 any real substantial evidence statewide voter fraud in
12 Texas?
13        MR. SWEETEN:  Don't reveal -- don't answer
14 the question.  It would require you to reveal matters of
15 legislative privilege.  Straight out of the order that
16 would include what factual information a legislator did
17 or did not consider in supporting or opposing a bill.
18 That's legislatively privileged.
19        A.  I'll follow counsel's advice on this.
20        Q.  (By Mr. Brazil)  Well, I think my question
21 basically was what was in the public domain, the
22 hearings, the record, if we stay in that vein, if we
23 stay in that train of thought, can you -- what in your
24 opinion is the most outstanding evidence that you
25 believe supports this allegation of voter fraud in

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                June 7, 2012

249

1   Texas?
2          MR. SWEETEN: Don't answer the question.
3   That calls for matters of legislative privilege. You're
4   asking him to weigh the evidence which is part of his
5   analysis in considering legislation. You're asking for
6   him to say what's the most -- what's the most relevant
7   evidence. And that is very clearly asking for his
8   mental impressions and thoughts about a bill. And
9   instruct you not to answer on that basis.
10  BY MS. MARANZANO:
11     Q. Can you point to anything in the public record
12  that indicates substantial voter fraud in Texas?
13         MR. SWEETEN: Same instruction.
14         MR. BRAZIL: I'm sorry?
15         MR. SWEETEN: Same instruction.
16         MR. BRAZIL: So you're contending that the
17  privilege covers what's in the public record. Is that
18  what you're stating?
19         MR. SWEETEN: I didn't state that. I
20  said --
21         MR. BRAZIL: Let me ask him again.
22         MR. SWEETEN: No, let me finish my
23  statement. You're asking him what was substantial
24  evidence, which goes to his mental processes. Now,
25  remember the court said that what factual information a

250

1   legislator did or did not consider in supporting or
2   opposing a bill is part of the legislative privilege.
3   So I'm instructing him that the court order and the
4   legislative privilege covers the question that you're
5   asking. And I'm instructing him not to answer the
6   question as posed.
7          BY MR. BRAZIL: Okay. Well --
8          MR. SWEETEN: You can -- if you want to ask
9   him was there evidence or an issue came up in the public
10  record, I don't have a problem with it. When you start
11  asking him what was substantial, how did he weigh it,
12  that goes to his mental processes. He's not answering
13  that question.
14  BY MR. BRAZIL:
15     Q. Was there any evidence in the public record, in
16  your opinion, to support the allegation of voter fraud
17  in Texas?
18         MR. SWEETEN: I think that's -- it's the
19  same for the same reason that question is inferred. He
20  can refer to evidence in the public record that existed.
21  He's not going to talk about what was more or less
22  important to him. He can talk about what occurred in
23  the public record. That is legislatively privileged.
24  Instruction not the answer.
25  BY MR. BRAZIL:

251

1      Q. What occurred in the public record that supported
2   the allegation of voter fraud?
3          MR. SWEETEN: It's the same instruction.
4   It's the same question.
5   BY MR. BRAZIL:
6      Q. Would you agree with me that there's nothing in
7   the public record to support the allegation of voter
8   fraud in Texas?
9          MR. SWEETEN: Don't answer the question.
10  The question ask for what was your support for a certain
11  issue that calls for matters of the legislative
12  privilege.
13  BY MR. BRAZIL:
14     Q. Who put on -- or presented evidence in the public
15  record of voter fraud in Texas?
16     A. The record I think reflects that in 2006 there
17  was evidence in the interim committee. I do not recall
18  specifically who put on evidence. I do believe the
19  Attorney General's office did testify in 2009 and also
20  2011 with regard to those issues. I would refer you to
21  the record for an accurate account of their testimony.
22     Q. Do you remember how many specific instances of
23  voter fraud they presented?
24     A. I would refer you to the record for an accurate
25  recollection of that.

252

1      Q. Did you serve on any committee that specifically
2   investigated what segment of the population would be
3   most affected by this bill?
4          MR. SWEETEN: Objection. Calls for matters
5   of legislative privilege.
6   BY MR. BRAZIL:
7      Q. Did any committee you serve on investigate that
8   publicly?
9      A. The Senate Committee on State Affairs in 2006
10  carried out its assignment under its charge as stated in
11  the public record. And I will refer you to that record.
12  The Senate Committee of the Whole in 2009, 2011 I
13  believe, the public record reflects a discussion of
14  those issues. I'll refer you to the record for those --
15  for the...
16     Q. There was a lot of discussion and a lot of
17  questions about how this bill progressed and the rules
18  and what rules were changed, et cetera. If we just look
19  at this legislative session, how many bills were handled
20  in a similar manner to Senate Bill 14?
21         MR. SWEETEN: Objection: compound. You can
22  answer based on matters of public record.
23     A. I don't recall that there were any other
24  committee -- or any other bills that were considered by
25  a Committee of the Whole to that extent it would have



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

253

1   been different.
2      Q. (By Mr. Brazil) What was the urgency of this
3   bill? What was the emergency? What precipitated the
4   need for this type of bill and the way was handled?
5          MR. SWEETEN: Objection; calls for matters
6   of legislative privilege. Don't answer the question.
7   BY MR. BRAZIL:
8      Q. Is there anything in the public record that you
9   can point to that would support the urgency or the
10  emergency or the special treatment of this bill?
11         MR. SWEETEN: Objection. He's asking you to
12  find evidence that supports something that calls for
13  your mental impressions or thoughts about legislation.
14  Don't answer the question as posed.
15         MR. BRAZIL: I'll pass the witness.
16         MR. SWEETEN: I have no questions for the
17  witness. We'll reserve questions to the time of trial.
18         (Deposition concluded.)
19
20
21
22
23
24
25

254

1              CHANGES AND SIGNATURE
2           RE: STATE OF TEXAS VS. HOLDER
3
4   PAGE  LINE   CHANGE        REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

255

1         I, ROBERT DUNCAN, have read the foregoing
    deposition and hereby affix my signature that same is
2   true and correct, except as noted above.
3
            ROBERT DUNCAN
4   THE STATE OF TEXAS  )
                        )
5   COUNTY OF _____  )
        Before me, _____, on this day
6   personally appeared ROBERT DUNCAN, known to me (or
    proved to me under oath or through
7   (description of identity card or other document) to be
    the person whose name is subscribed to the foregoing
8   instrument and acknowledged to me that they executed the
    same for the purposes and consideration therein
9   expressed.
10      Given under my hand and seal of office this ____
    day of _____.
11
12          NOTARY PUBLIC IN AND FOR
            THE STATE OF
13
14
15
16
17
18
19
20
21
22
23
24
25

256

1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
2
    STATE OF TEXAS      )
3                       )
                        )
4   VS.                 )  NO. 12-CV-128
                        )  (DST, RMC, RLW)
5                       )
    ERIC H. HOLDER, JR., )
6   In his official     )
    Capacity as Attorney )
7   General of the United )
    States, ET AL       )
8
    **************************************
9       CERTIFICATE FROM THE
            ORAL DEPOSITION OF
10          ROBERT DUNCAN
            JUNE 7, 2012
11
    **************************************
12      I, Janalyn Reeves, a Certified Shorthand Reporter
13  in and for the State of Texas, do hereby certify that
14  the foregoing deposition is a full, true and correct
15  transcript;
16      That the foregoing deposition of ROBERT DUNCAN, the
17  Witness, hereinbefore named was at the time named, taken
18  by me in stenograph on June 7, 2012, the said Witness
19  having been by me first duly cautioned and sworn to tell
20  the truth, the whole truth, and nothing but the truth,
21  and the same were thereafter reduced to typewriting by
22  me or under my direction. The charge for the completed
23  deposition is $_____ due from Defendant.
24  () That pursuant to the Federal Rules of Civil
25  Procedure, the Witness shall have 30 days after being



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                        June 7, 2012

257

1  notified by certified mail, return receipt requested, by
2  the deposition officer that the original deposition
3  transcript is available in her office for review and
4  signature by the Witness and if any corrections made are
5  attached hereto;
6      () That by agreement of counsel, a reading condensed
7  copy of the deposition transcript along with the
8  full-size original changes and Signature Sheet has been
9  sent to_____ on_____ for review and
10  signature within 30 days and if any corrections returned
11  are attached hereto;
12      () That by agreement of counsel, the deposition
13  officer is instructed to release the original deposition
14  transcript to_____ on_____, for review and
15  signature, and the deposition officer is thereafter
16  released of any further responsibility with regard to
17  the original.
18      () That the Witness shall have thirty (30) days for
19  review and signature of the original transcript and if
20  any corrections returned are attached hereto.
21      () That the signed transcript () was () was not
22  received from the Witness within 30 days.
23      () That the examination and signature of the Witness
24  is waived by the Witness and the parties;
25      That the amount of time used by each party at the

258

1  deposition is as follows:
2          Ms. Maranzano - 5 hours 34 minutes
3          Mr. Brazil - 16 minutes
4          Mr. Sweeten - no time
5      I further certify that I am neither counsel for,
6  related to, nor employed by any of the parties in the
7  action in which this proceeding was taken, and further
8  that I am not financially or otherwise interested in the
9  outcome of the action.
10          WITNESS MY HAND, this the_____ day
11  of_____, A.D., 2012.
12          _____
           JANALYN REEVES
13          Cert. No. 3631
           Expires Dec. 12
14          100 Congress
           Suite 220
15          Austin, Texas  78701
           (512)634-1980
16          Firm Registration No. 283
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

259

| A | | | | |
|---|---|---|---|---|
| **A.D**<br>258:11 | 100:16 118:7<br>120:23 123:20<br>126:25 162:25<br>166:10 168:7 | **added**<br>110:19 139:12<br>196:1,9<br>199:1,10 | 248:19<br>**advised**<br>157:22 | 89:1<br>**A f r i c a n -**<br>**A m e r i c a n**<br>16:7,13 67:6 |
| **Abilene**<br>32:6 | 183:4 188:7<br>200:6,7,22 | **adding**<br>111:4 186:13 | **advocates**<br>195:22 196:2,<br>16 | **A f r i c a n -**<br>**A m e r i c a n s**<br>17:1 |
| **ability**<br>9:17 148:18<br>238:5 | 201:5 204:6,8<br>220:16 221:16<br>223:3 228:9<br>240:7 248:6 | 187:6<br>**additional**<br>42:13 46:7<br>67:16 70:21 | **af**<br>101:25<br>**Affairs** | **afternoon**<br>5:1 211:16 |
| **able**<br>22:13 50:19<br>66:18 133:5 | 251:21,24<br>**accurately**<br>9:3,17,21 | 98:1,8 110:19<br>111:4,17<br>129:16 133:5 | 17:6,14<br>18:18,23<br>19:14 21:19 | **AG**<br>155:17 |
| 134:4 138:13<br>222:16 241:15 | 98:7 120:22<br>123:12 133:14<br>182:25 187:24 | 153:3 186:14<br>187:7 | 22:24 28:13<br>29:17 31:10<br>32:11 48:18 | **age**<br>128:15 |
| **absence**<br>95:2,5 | 201:23 225:3<br>235:10 242:17 | **Additionally**<br>151:23 | 49:13 58:10,<br>21,24 59:8,25<br>67:9 71:11,23 | **agencies**<br>41:8 59:5<br>107:20 127:24 |
| **absent**<br>95:1 | **achieve**<br>237:23 | **address**<br>55:10 70:16<br>86:8,12 | 72:8 75:3,5<br>77:13 82:8 | 171:15 229:5 |
| **absolutely**<br>42:5 152:25<br>211:24 212:9 | **acknowledged**<br>255:8 | 114:19 123:4<br>124:2,20<br>237:10 244:6 | 126:9 136:13,<br>17 146:14<br>148:20 161:8 | **agency**<br>31:8 107:6,7,<br>19 246:2 |
| **abuts**<br>97:15 | **Act**<br>19:8 20:14<br>22:13 37:15, | **addressed**<br>116:6 215:9 | 171:7 177:9<br>248:1 252:9 | **agenda**<br>129:15 130:3 |
| **acceptable**<br>81:6 110:12<br>191:24 229:6 | 22 38:7 42:5<br>43:4 44:16<br>53:8 67:15,19 | 234:15 238:11<br>244:6 | **affect**<br>9:16 | **ago**<br>6:24 50:8<br>55:19 65:16 |
| **accepted**<br>230:22 | 113:23<br>**acting** | **Addresses**<br>237:19 238:3 | **affidavit**<br>205:15 222:16 | 74:19,23<br>82:12 101:22 |
| **accepting**<br>68:14 | 176:3<br>**action** | **administered**<br>197:25 198:2 | **affidavits**<br>205:15 207:3,<br>5 | 115:14 120:21<br>**agree** |
| **accomplished**<br>57:19 | 98:9 258:7,9<br>**actions** | **administratio**<br>**n**<br>23:2 197:16 | **affiliated**<br>28:4 | 55:11 72:23<br>78:19 81:3<br>157:20 202:13 |
| **accomplishes**<br>57:23 | 98:1<br>**active** | **admitted**<br>14:10 | **affiliation**<br>23:24 24:13, | 230:10,13,14<br>251:6 |
| **account**<br>85:22 200:7,<br>22 201:5 | 14:15 26:11<br>96:20 | **adopted**<br>67:14 147:4,8 | 18 29:7<br>**affix** | **agreement**<br>1:17 51:9<br>257:6,12 |
| 204:8 220:16<br>228:9 251:21 | **add**<br>66:13 91:10<br>101:3 111:17 | 225:13<br>**adopting** | 255:1<br>**afford** | **agricultural**<br>14:5 |
| **accuracy**<br>195:10 | 162:22 163:10<br>170:4,6 224:6 | 138:3<br>**advice** | 133:16<br>**afoul** | **ahead**<br>9:12 37:4<br>56:16,20 |
| **accurate** | | | | |



65:15 77:22
125:21 132:9
176:12 179:9
199:9 204:1
206:16 238:7
243:16

**AL**
1:7 256:7

**ALEC**
23:22

**aliens**
99:19 236:19

**Aliseda**
210:20

**allegation**
248:25 250:16
251:2,7

**allegations**
68:8 217:18
237:11

**alleged**
69:10 244:22
245:18 246:4
247:6

**allow**
74:9 75:16
94:20 120:13
138:21 153:2
180:9

**allowable**
180:23

**allowed**
77:25 128:12
192:13,21,25
209:18 218:12

**allowing**
78:19 183:7

**allows**
55:11 76:24
80:22 81:3
139:8 198:19,
23 214:10

**along**
115:8 148:3
257:7

**already**
37:11 78:4,17
119:20 176:9
239:2 246:8

**also**
6:10 18:10
19:14 20:23
27:7 31:20
32:11 50:25
52:14 53:6
54:19 56:19
97:16 111:7
114:1 128:16
136:15 139:8
149:16 188:20
189:21 206:18
236:9 251:19

**alternative**
45:9 55:9
201:22

**alternatives**
107:2

**Although**
69:10 192:24
216:22

**always**
18:12 20:8
217:5

**Amarillo**
32:6

**ambiguous**
108:3

**amended**
87:8 139:12,
17 155:21
225:23

**amending**
223:25 224:2

**amendment**

7:24 186:23
196:8,16
197:2,4
223:21,24
224:1,2,12,22
225:5,8
226:11,20,21,
24 227:6,8,
22,23 228:4,
11 229:3,4,9,
11,19,24
230:1,3,5,14
231:4,11,15,
17,19,20
232:3,4,10,15
241:9 246:12,
13,24

**amendments**
39:12 111:16,
20,21,23
112:2,6
163:3,5,10
186:20 223:4,
8,9 227:3
228:12,16,17
241:11

**America**
67:15,19

**American**
23:21 99:20

**amount**
19:24 20:2
150:11 151:8
257:25

**analyses**
76:7

**analysis**
39:14 40:3,14
56:13,17 57:1
67:5,23 73:18
74:12 76:20
80:18 103:21
113:6,23
114:24 115:13

116:22 117:3,
7,11 124:13
125:9 187:18
188:1,5,15,
19 189:13,17
190:16 200:10
201:16,19,25
202:7,21
203:16,23,25
204:7 208:4
221:4,15
230:18,20
236:10 245:8,
11 247:20
249:5

**analytical**
40:11

**analyze**
67:18

**analyzed**
104:9 106:20

**analyzing**
73:13

**and/or**
244:12

**anecdotal**
46:25 48:2

**Angelo**
26:9,10,13
31:17 32:5

**Anglo**
15:23 16:7

**Ann**
26:4 135:15

**annual**
230:15

**another**
20:9 23:13
52:21 148:23
180:4 210:20
236:11

**answer**

9:6 19:3
20:20,21
34:17 38:17,
21 39:18
40:12,15
41:11 43:14
44:8,11,24
45:24 46:16,
22 48:7 50:19
51:1 52:16,
18,24 53:25
54:9 55:13
56:5 57:5,21,
24 58:2,4
59:1 65:13,
20,24 67:21,
25 69:16
70:2,15,19,
20 71:13,21
72:1 73:15
74:4,9,13
76:5,14,19,
20 77:9 83:7
84:2,6,15,
19,20,25
87:13 88:21
90:19 91:2,
14,21 94:12
98:4 100:2,11
101:18 102:4,
16,18,23
104:18,19,23
109:4,6,13
110:14,21
111:6,9,13,
19 112:13
113:13 114:8,
14,16 116:25
117:6 118:17
120:23
121:11,20
123:12 124:24
125:11 128:19
129:9,22
130:5,7
131:4,9,14



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

133:3,6,14,18
134:7,15
135:7 138:4,7
139:24 142:15
144:16 146:3,
19 147:13,16,
21 148:25
150:1,3,12
151:3,19
152:5,6,12
153:12 161:19
163:1 165:21
166:25 170:8
176:13
178:19,23
179:9,10,24
180:25 181:5
182:1,2,17,20
183:13,19
186:15 188:23
189:1,23
190:15,18
193:24 194:21
195:16
196:12,18,25
197:11,18,21
199:8 202:19,
20 203:21
204:2 206:16
208:8 210:3,
18 217:21
219:14 220:25
221:1,9,12,
14,16 224:7,
13 225:6
227:16,18
235:7,9
237:12,21
239:3,5 240:7
242:18 243:6,
9 248:13
249:2,9
250:5,24
251:9 252:22
253:6,14

answered
41:22,23
61:12 91:8
108:24 182:3
194:20 204:1
208:14,24,25
209:1,4
220:21 238:4
answering
19:20 50:16
53:8 62:11
67:25 68:11
97:8 98:12
103:22 113:25
114:23 123:11
127:10 132:3
170:1 181:12
183:11 202:17
211:20 237:2
250:12
ANSWERS
1:11 39:3
241:6
anti-fraud
67:14
anybody
12:17,22 13:3
23:12 30:11
33:4 81:9,16
83:5 90:11
108:14 118:24
127:13,18
143:2,8
184:16 186:7,
11 213:25
220:12 227:9
anymore
6:24 121:9
136:22
anywhere
46:7
apart
28:15 85:7,10

101:15 122:22
apparently
80:3 97:25
223:16,20,23
227:23 228:25
246:18
appeal
13:24
appear
80:13 126:18
137:13 180:12
206:19 219:8,
9 222:3
Appearances..
. . . . . . . . . . . .
. . . . . . . . . . . .
..
3:3
appeared
6:9 122:9,19
255:6
appears
54:25 80:5
81:7 82:25
106:24 126:8
131:15 134:16
153:10 163:18
172:15 222:6
223:25 226:9
applicant
101:25 239:8,
17
applicant's
101:24
application
102:1
apply
92:20
appointed
17:9,15
159:15 160:11
appoints

17:20 160:13
appreciate
175:12 213:12
appropriate
13:25 74:13
appropriatio
ns
200:17
approximate
30:25 92:14
109:18
141:10,12
approximatel
y
15:25 22:6
48:11
approximatio
n
175:2
April
126:9 130:15
136:11 233:11
area
6:23 7:16,17
14:24 32:1
238:11 248:9
areas
21:15,18
97:16 211:3
242:7 244:9
argue
108:4
argument
126:21
arising
155:9
arose
11:5
around
5:8 72:14
92:14 242:8

arrived
110:12
Article
32:12 98:23
101:6,16
aside
19:1 79:12
136:24
asked
65:21 79:13
91:8 92:11
109:1 119:20
135:22 194:19
203:22,25
208:14,25
209:4 220:21
236:14 246:18
asking
9:5 38:4
40:1,20 41:2,
4,6,9,23
42:12,16
43:1,5,8,9,
25 44:5 45:24
47:12 50:22
57:22 64:22,
23,24 65:1,9
70:9,10,15,
18 76:6,10
77:11,12,14,
24 78:1,8,9
79:1 83:23
89:22 90:3
96:12 100:4,
10,13 105:11
115:20 116:1,
8,21 117:21
124:5,6,11
131:5 132:15,
17,23 133:7
139:19,21
158:10
165:11,13
171:19 180:6



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

262

184:12
188:10,18
196:7 208:3
212:1 224:9
236:7 237:15,
17 238:1,14
249:4,5,7,23
250:5,11
253:11

**asks**
65:21,22 86:7
129:8,19
227:14 245:10

**assemble**
36:7

**asserted**
89:2

**asserting**
79:7 99:24
154:25

**assertion**
41:18 42:14
43:3 44:3
100:14 102:20
103:12

**asserts**
99:6 157:5

**assigned**
80:5

**assignment**
252:10

**associate**
14:19

**associated**
28:5

**Association**
26:12 28:6

**assume**
10:14 28:11
35:12 36:22
49:8,23 58:2
104:18 105:6,

25 110:23
113:19 137:16
143:18 147:24
174:23 175:8
190:7 193:10,
11 194:1
203:7 215:8
217:5 222:8
225:1,3,14
247:2

**assumes**
189:20

**assuming**
180:13

**assure**
57:12

**attached**
257:5,11,20

**attempting**
86:8 125:5

**attend**
244:1

**attention**
36:12 54:14
98:20 137:20
138:25
164:12,21
179:13 222:11
225:25 226:4
229:3

**Attorney**
1:6,15 2:3
5:3,16,19
6:9,11 10:12,
18 13:21
36:10 37:5
154:20 155:1,
8,10,14,25
156:2 210:22
251:19 256:6

**attorney/clie
nt**
10:19

**ATTORNEY2**
91:8

**attorneys**
12:21 212:7

**Austin**
1:16 2:6
31:4,14
258:15

**authentic**
222:8

**authenticity**
63:13,25
101:10 222:7

**author**
140:24 231:18

**automatically**
35:1

**availability**
53:11

**available**
16:10 40:2
136:13 154:21
240:6,11
257:3

**Avenue**
1:16 2:10

**avoid**
202:18

**award**
24:21,22
25:3,4

**aware**
23:13,17,18
47:6 55:20
56:21 57:1
81:24 84:12
85:8,9 95:8,
12,24 97:5
110:6,11
111:22 140:4,
13 154:24
174:6,11,14

183:16 187:17
188:3,14
189:12 194:25
199:17,20
203:16 214:1,
15,18 236:5,
18 246:8

─────── B ───────

**B**
55:8 81:1
106:14
205:14,21

**back**
6:15 7:5 63:8
92:18 118:8
125:24 126:4
142:3 149:15
156:22 196:5
199:4 206:11
210:22 227:3
230:18 235:1
240:2 248:10

**background**
14:2

**ballot**
10:3 45:19,22
46:10 63:12,
25 68:20
86:3,5
114:10,20
181:23
182:12,15
204:10,22,
24,25 206:3,
8,20,21,25
207:10,21
209:7,24
222:16,17
226:2 237:25
248:4,6

**ballots**
204:14 205:11
206:17 226:5
238:21

**bar**
14:10,15
33:11,25 34:9

**Barbara**
26:22

**base**
165:23

**based**
38:24 39:13
40:23 41:16,
19,22 43:1,7
51:1 53:6
55:13 57:18
65:19 67:17
69:21,24 70:7
73:10,25
76:19 86:4
88:4 95:12
96:4 98:4,13
102:13,23
107:25 111:4,
5 116:17
117:6 123:23,
25 129:1,5
131:1 134:4
146:19 148:14
149:23 161:5
165:5 166:19
172:18 179:24
181:10
182:13,20
187:17 188:3,
14 195:15
199:18 206:13
207:23 209:25
212:21 216:17
219:11 224:4
228:4 235:3,
10 237:21
238:2,12,25
252:22

**basic**
99:19

**basically**



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012
263

20:6 51:17
115:17 133:2
161:13 181:22
211:20 218:1
248:21
**basis**
16:17 38:17,
21 111:13
117:1 125:8
167:1 188:24
203:21 207:24
249:9
**Bates**
126:11,15
135:10 157:8
158:17
**began**
10:14
**beginning**
12:7,9 126:22
133:24 180:16
**behalf**
5:18 91:3
**being**
5:23 10:2
16:4 21:19
22:9 25:10
58:6 79:14
94:2 115:25
116:6 124:18,
19 130:13
146:11 153:7
163:4 166:20
196:23 199:23
205:22 211:20
217:19 227:5,
7 230:22
256:25
**belief**
67:14 221:6
**beliefs**
100:7
**believe**

6:12 7:5
17:18 18:20
27:9 28:6,9
37:22 45:8,12
63:6 64:20
66:10 72:11
73:24 76:24
79:12 92:12
93:3,5,11
99:23 102:11
104:3 105:6
106:17,18
107:8 113:2,
15 115:7
121:3 129:6
131:1 135:15
139:14 140:3,
24 145:23,24
146:9,10
149:6 150:16
156:25 157:5
158:6 159:5
166:20 174:15
185:14,23
187:15,22
188:2 201:2
202:25 203:3
207:12,14
213:18 214:24
216:18,25
218:18 222:25
224:3 229:9
238:20,24
240:17,20,22
241:19 242:11
243:4 246:21
247:12 248:25
251:18 252:13
**believes**
13:21
**bell**
172:3
**benefits**
25:2

**Berman**
185:19
**best**
16:21 74:24
87:20 115:8,
16 118:13
160:5 161:19
213:1 235:2
238:4
**better**
154:5
**Betty**
86:22 185:16,
17
**between**
1:14 67:5
88:18 102:14
103:5 109:22
117:24 128:10
135:12 136:5
160:20,22
161:9 174:12
176:3 179:22
181:13 191:23
193:22
**beyond**
40:13,14,21
41:4 79:5,6
**Bill**
4:3,7 7:4,24
8:1,11 18:22,
24 21:6,14
27:17,18
31:11,12
41:19 44:4
45:13,14
48:15 49:6,7,
10,19,20,23,
25 50:1,5,7,
12,21 51:8,
11,13,14,23,
25 52:5,9,10,
11,15,21
53:1,4,8,12,

15,17,24 54:5
55:9,14 56:1,
4,17 57:2,9,
10,12,23 58:6
70:21 72:4,13
77:8 78:8,23,
24 79:14,16,
17,18 80:1,2,
7,9,14,16,22
81:10,11,14,
21,25 82:4,7,
21 83:1,2,6,
11,15,20,25
84:5,13,23
85:12 86:2,
11,12,15,17,
18,23 87:1,6,
8,12,19 89:5,
6,10 90:12,20
93:18,19
94:5,7,10,17
95:10,13
96:5,25 97:3,
20,23 98:2,9
99:3 105:1,
10,13,14,15,
20 106:1,3,6,
11,18,19,23
107:14 108:1,
6,10,12,17,
21,23 109:12,
22 110:7,20
111:5,17
112:12,23
113:10 114:7
115:4 116:9,
15,18 117:4,
5,11,12,14
118:16 119:3,
12,15,21
120:2 121:5,
11,19 122:8,
12,18 123:1,
10 124:3,21
125:6,9,14
126:4,5,9

134:5,13,19,
22 136:19
137:1 138:13,
21 139:3,17
140:17 142:11
144:22 145:19
146:11,12,
14,15,22
147:11,19
148:2,12,15,
19 151:16,25
152:15
153:15,21
156:3,6
159:9,11
160:16,23
161:10,12,16
162:4,7
163:3,22
164:7 166:4,
21 167:5,8,
20,25 168:24
169:3,12,16,
19 170:3
171:10,21
172:12,16,
20,24 173:22
174:7,13,20,
21 175:5,8,
14,17 176:11,
17 177:16,18,
19 178:1,3,7,
18,22 179:12,
13,17,23,25
180:9,11
181:1,9,22,
25 182:3,4
183:17,24
184:13,22,23
185:8,10,13,
16,19,25
186:4,14,20,
24 187:7,19
188:6,17
189:18 190:14
192:12,14,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

264

| | | | | |
|---|---|---|---|---|
| 19,24,25 | 253:3,4,10 | 203:17 | **break** | 14:4 |
| 193:9,10 | **bills** | **blend** | 9:11,12,14 | **budget** |
| 194:6,21 | 18:19 19:1,2, | 91:1 | 59:16,24 | 31:9 |
| 195:15 196:2, | 10,13,18 | **Board** | 125:17,19 | **build** |
| 24 197:9,15, | 20:3,6 32:20, | 27:8,11 | 126:3 136:25 | 41:17 43:3,6, |
| 25 198:1,14, | 21 39:12 | **body** | 156:20 158:14 | 9 44:8 56:8 |
| 19 199:1 | 48:17,21 50:9 | 144:6 177:7 | 159:10 | **building** |
| 200:8,9 202:8 | 51:19,21 | **Boll** | 160:19,22 | 42:14 210:17 |
| 203:10,19 | 54:13 57:14, | 233:8,22,23 | 161:9 199:11, | **bullet** |
| 204:11,20,24 | 15 70:6,10,14 | **both** | 12,13,16 | 75:24 77:21 |
| 205:2 206:14, | 71:2,4,6,7,8, | 18:9 55:1,11 | **bridge** | 78:2 79:1,3,4 |
| 19 207:1,18 | 10,18,22 | 80:20,23 | 71:20 | **Bullock** |
| 208:10,13,23 | 72:3,9,11 | 106:25 107:2 | **brief** | 92:18 93:2 |
| 209:4,5,11, | 80:20 89:8 | 164:6 168:20 | 12:2 59:22 | **business** |
| 13,15,17,20 | 90:6 91:12 | 174:22 202:10 | 156:21 199:14 | 89:9,11,19 |
| 210:1 213:16, | 92:7 102:14, | 212:5 218:22 | 239:25 | 138:23 |
| 22 214:2,5,8, | 20 103:6 | **bottom** | **briefing** | **by-partisan** |
| 14 215:22 | 105:4,5,7,12 | 55:8 67:2 | 32:20 | 244:7 |
| 217:17 218:2 | 106:25 107:2 | 72:17 126:12 | **briefly** | _____C_____ |
| 219:13,23 | 120:18,20 | 133:23 135:12 | 11:10 12:3 | |
| 220:6,13 | 129:5 134:10 | 164:4 | 242:7 | **C** |
| 221:8,12 | 144:18 148:16 | **bought** | **bring** | 2:1 205:14,24 |
| 222:24 223:5, | 151:6,7 | 191:7 | 13:6 34:9 | 222:11 |
| 17 224:6 | 184:25 185:11 | **bowl** | 89:4,13 90:12 | **calendar** |
| 225:12,17,18, | 236:3,8,14 | 125:17 | 94:5,16 | 94:21 |
| 21 226:5,10, | 243:24 | **box** | 161:17 | **call** |
| 12,15,18,25 | 252:19,24 | 237:25 | 219:13,22,23 | 22:16 87:14 |
| 227:3,11,24, | **bill's** | **boy** | **broad** | 158:15 165:19 |
| 25 228:2,13 | 145:4 | 203:25 | 16:20 140:9 | 173:19 203:6 |
| 229:7,19 | **Birdwell** | **branch** | 208:20 | 217:7 218:7 |
| 232:16,21 | 215:13 | 122:12 | **broadest** | 219:15 244:1 |
| 233:16 234:5, | **birth** | **BRAZIL** | 211:5 | **called** |
| 18 235:14,17, | 191:15 | 2:13 3:5 5:13 | **broadly** | 1:12 23:21 |
| 21 236:11,22 | **bit** | 38:2 241:18 | 9:25 173:24 | 24:10 25:17, |
| 237:10,16,18, | 8:24 10:20 | 242:2 243:10, | **brought** | 22 29:1,4 |
| 23,24 238:2, | 19:5 108:3 | 20 245:2,25 | 89:8,10 91:12 | 37:1 77:12 |
| 9,11,12,15, | 119:1 173:17 | 248:20 | 138:22 166:6, | 97:5 198:20 |
| 22,25 239:20 | **bite** | 249:14,16,21 | 15 218:13 | 240:25 |
| 240:14,16,21 | 180:2 | 250:7,14,25 | **Brown** | **calls** |
| 241:1 243:22, | **blackberry** | 251:5,13 | 86:22 185:16, | 20:17 46:15 |
| 23 244:3 | 34:6,7,18,20, | 252:6 253:2, | 17 | 56:24 74:5 |
| 246:6,7,13,16 | 21,22,23 35:4 | 7,15 258:3 | **BS** | 100:22 102:17 |
| 247:15,19,23 | **blacks** | | | 109:3 111:6 |
| 248:3,17 | | | | |
| 249:8 250:2 | | | | |
| 252:3,17,20 | | | | |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

114:15 133:19
134:8 136:14
146:16,17
147:14 148:21
150:2 186:16
188:19,20
189:21 192:1
194:15,20
196:19 197:1,
12 208:1
224:8 236:10
239:3 243:21
249:3 251:11
252:4 253:5,
12

**came**
12:3 32:5
37:1 49:8
83:12 166:16
184:18 194:6
227:3,5 250:9

**cancelled**
130:24

**cancelling**
127:8

**cancels**
126:23

**cannot**
133:13 173:2
195:10 214:8
235:8

**capacities**
30:4

**Capacity**
1:6 7:8 8:13,
18,22 32:8
256:6

**Captain**
125:17

**card**
45:1,2,6
107:5,18
190:3 255:7

**Carona**
143:24 145:7,
14 177:4,12

**carried**
20:3 252:10

**carries**
83:25

**carry**
83:11,15
180:14 194:5,
12 195:2,6,8

**carrying**
63:5 83:6

**carved-out**
211:3

**carve-out**
138:18 140:5

**case**
6:8,11,18,20
7:4,19 8:6,9,
12 11:4,7,11,
12,21,22
12:25 13:1,4
18:21 49:18
69:14,21 89:2
103:25 234:1
248:9

**cases**
7:2,13,14 8:8
69:23 221:2,
3,5

**cast**
10:3 45:18
163:22 204:24
205:10 206:3,
8,21 207:9
222:15 226:2

**casts**
206:24

**catch**
27:10

**category**

190:10

**Catherine**
28:21,23

**Cathy**
67:4

**caucus**
176:4

**cause**
31:20

**causes**
85:21,22

**cautioned**
256:19

**Cert**
258:13

**certain**
7:16 57:23
150:17 195:22
231:19 251:10

**certainly**
75:13 157:21
158:7 239:19

**certainty**
47:16

**certificate**
190:20,23
191:1,15
198:21
199:17,19,21
200:11,20
201:1,7
202:2,12,24
256:9

**Certificate..**
.............
...
3:8

**Certified**
1:13 256:12
257:1

**certify**

256:13 258:5

**cetera**
252:18

**chair**
17:6,17,19
21:19 22:1
159:18 161:8

**chairman**
17:20 19:4,6
21:24 48:18
54:3 120:18
125:13 159:15
160:14 176:4
227:24

**Chairman's**
26:12

**chairmen**
54:12 83:17,
18

**Chair's**
28:5

**challenged**
23:19

**Chambers**
32:14

**chances**
38:13 227:11

**change**
16:5 88:18
135:7 142:16
155:12 191:22
193:9,10,12
227:17 236:4
241:7 254:4

**changed**
141:24
142:10,14
155:18 252:18

**changes**
38:8 40:4
106:4 113:19
150:18 182:19

193:14,19
218:18 254:1
257:8

**Changes.....**
............
..
3:7

**changing**
143:3

**chapter**
81:6

**characteriza
tion**
91:7

**characterize**
124:12

**charge**
32:12,14
61:9,14,19
62:7,8,9,13,
16,18 63:5,6,
7 76:2 247:8
248:1 252:10
256:22

**charges**
59:7,9

**charging**
202:14 229:5

**chart**
68:4 69:3,6

**check**
125:22 154:4
158:15 159:2

**chief**
32:9 35:12
189:16

**Childress**
31:18

**choice**
211:9

**chronologica**



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                    June 7, 2012
                                                      266

lly
70:20
Circuit
14:14
circulated
216:11
circumstances
69:11 93:17,
22 138:2
191:23 194:4
cities
32:5
citizens
99:8 100:1,21
citizenship
101:24,25
190:20,23
191:1
civil
11:4 256:24
claim
73:25
clarify
124:10
clear
5:7 9:9 21:11
29:14,25 38:4
39:25 66:10
88:14 91:5
98:6 105:11
115:7 116:5,
12 118:10
132:12 155:23
156:15 159:4
170:2 211:11
212:1,20
213:10 237:4
clearly
40:8 112:14
124:13 153:23
249:7
Clifton

32:14
close
125:17
closer
121:15,16
code
222:7,23
collect
230:17
COLUMBIA
1:1 256:1
come
29:21 30:10,
11,21 31:4,17
33:23 46:19
58:24 59:9,
12,13 62:23
92:7 120:20
195:14 196:23
198:1 210:22
234:14 235:1
240:17,20,22
244:8
comfortable
47:4,17
coming
143:25 177:6
comment
96:17,19,22
comments
95:19
commercial
15:3
commissioner
31:12
Committee
12:11 17:6,7,
8,14,15 18:7,
8,15,17,18,23
19:4,15 21:6,
20 22:2,24
27:5 28:10,13

29:13,17,21,
22 30:3,6,9,
10,11 31:11
32:20,21
34:14 35:13
44:13,15
48:22 49:8,
14,19 51:25
52:8,22
53:16,18
58:10,21,24
59:8,25 60:7,
10,12,22
62:23 63:10
65:2,18 66:5
67:9,17
71:12,18,23
72:8 73:11
74:1,25 75:3,
5 76:9,11
77:12 82:8
83:19 85:5,7,
11 86:15
87:6,8,19,22,
25 88:5,10,
14,20 95:22
109:5,8,23
112:3,5
120:19 122:5,
10,19 123:21,
22 125:13
126:8 129:3
135:3 136:11,
13,18,20,22
139:5 145:23,
25 146:8,13,
14,23 147:5,
12,20 148:19,
23 149:10
151:23
159:12,16,18,
24 160:1,7,8,
13,16,24
161:2,8,14,23
171:7 173:9
177:9,14

186:21,25
202:9 215:22
216:13
219:13,24
220:5,12
226:17,18
227:24
234:19,24
246:17,20,
21,22 247:5,
10,12,14,18
248:1 251:17
252:1,7,9,
12,24,25
committees
17:4,9,21,25
39:6 40:9
51:7 85:20,21
145:19,22
150:20 247:4
committee's
63:5 78:1,9
234:17
Common
121:7 179:4,
10
communicate
33:15,18
34:1,5,8 84:4
120:19
communicated
119:1 171:8
communicating
34:15 84:10
communication
34:11 59:4
120:1,13
121:21 140:21
144:25 157:4
158:23
169:10,13

173:5 178:9,
11,12 227:9
communications
24:4 26:14
27:13 28:7,15
29:9,15 36:24
41:6 51:3
53:7 55:17
81:14,21,25
83:5,9 84:12,
23 85:1,6,8,
10 94:14
95:16 103:7
104:21
109:11,14,
20,25 110:3
111:8 118:15
122:7,11,17
125:10 127:23
128:21 136:16
141:1 143:2,
8,17 145:17
146:21 157:6,
24 158:3
159:7 169:2
171:14
173:21,23
174:5,6,12
175:24
177:17,20,24
178:2 184:21,
23 185:12,15,
18,24 186:3,
11 193:21
213:22 226:19
237:1,3,8,9
communities
16:9,11
community
16:12,13,15,
19 196:17
comp
7:4,7 8:1



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

compare
236:7

compared
117:4 148:16

compares
236:11

compensation
6:23 7:18
8:11 11:3
30:20

compiled
37:11

complain
148:12

complaints
135:22

completed
14:4 67:4
256:22

completely
9:3,18,21
78:19 192:17

compliance
13:20 158:6

complied
159:2

complies
42:4

comply
36:8 37:4
210:13 211:1
212:6

complying
211:24 212:10

component
73:13

composition
194:11 195:2,
5

compound
20:24 39:17

51:1 53:6
54:7 117:16
121:6 236:9
252:21

con
243:22

concealed
180:14 194:5,
12

concept
108:10 229:10

conceptual
218:18

concern
148:2 231:22

concerning
149:10 181:14
183:14 195:21
200:2

concerns
84:13 95:13,
23,25 96:4
97:19,21
122:25 123:4
124:2,20
149:12 162:6,
15,19 163:5
166:21 167:7
197:9 199:18,
23 200:2,5
220:13 231:14

concluded
167:22 253:18

conclusion
72:18 80:25
188:9

conclusions
74:25

condensed
257:6

conduct
159:20 201:25

211:8 230:6

conducted
11:8 36:17
188:4,15
201:16 203:17

confer
10:17 18:24

Conference
24:11,15
226:17,18
234:17,19,23
246:17,20,21,
22,23

confidence
75:15 127:17,
20 128:5,8,10
129:7

confident
231:17

confine
39:2

confines
138:15

conflict
155:3

conforming
142:13,16

Congress
1:16 20:7
258:14

connected
102:21 182:14

connection
11:2 102:13
103:5 128:10

cons
40:10

consensus
56:9 90:18
160:3 161:22
163:9 233:15
234:3

consequences
214:2,4

consider
99:18 111:10
138:13 215:22
216:14 247:22
248:17 250:1

consideratio
n
82:4 85:25
86:25 111:12
139:3 141:25
143:3 149:22,
24 151:15
159:11 162:3
200:9 220:6,
11 234:18
255:8

consideratio
ns
214:25

considered
18:19 74:24
79:17 87:7
105:15 111:3
123:20 163:4
186:13 190:14
214:11 233:3
234:6 244:11
252:24

considering
188:5 244:12,
13 249:5

consistent
129:16,21

constituency
16:24 17:2

constituent
26:13 31:16
157:3,6,21,
24 158:3
159:6 243:19

constituents
16:22 30:18,
23 31:19 41:8
97:20 243:3,
13,21

constitution
214:7

constitution
al
22:12

construct
120:22

contact
173:8

contacted
173:13

contained
206:18 220:8,
16 221:17,18
228:10 245:23

contains
107:5,18
115:9 246:1

contemplated
77:22

contemplates
146:10

contending
245:3 249:16

content
195:10

contention
100:19

contentious
234:6

context
124:12 131:25
132:8,23
133:8,14
140:8 144:5
222:13



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

268

continuation
130:18

continue
14:22 134:20
211:4,13
213:7,8,11

continues
132:22 211:9

continuing
211:6

continuously
15:7

contrary
152:24

contrast
236:7

convene
216:13

conversation
120:17,21
133:10,12
173:6 176:20
195:7 228:10

conversations
63:2 74:21
95:8 118:22
119:2,10,14,
19 122:16,22
143:10 144:3,
11,15 145:10,
12 147:9,18
149:16 172:23
173:24
174:16,19,25
175:4,13,16
176:8,22
178:21 185:7,
21 187:6
189:4 226:24
227:22 228:3,
6,9 245:12

conviction
69:15

convictions
69:7 240:8

copies
36:21

copy
58:18 82:15
257:7

Correct
6:19 7:12
8:14,19,23
37:23 45:12,
20 69:3 79:15
95:6 99:21
101:19 114:13
115:5 139:10
144:8,10
153:1 154:23,
25 166:18
170:22 195:24
205:11 206:5
207:7,11
215:15 229:14
230:25 231:5,
7,8 232:13
234:4 238:23
247:3 248:5
255:2 256:14

corrected
101:8 241:11

corrections
257:4,10,20

correctly
19:17 117:21

correspondenc
e
217:24

Cory
32:10

cost
200:10,16,24
202:13

costs

190:25 191:3
200:17,24

couldn't
50:9 73:9
90:10 133:16
174:24 175:1
183:13 193:15
234:13,15
239:13 241:15
242:17 243:24
246:11

Council
23:22 25:13
32:10,11 41:8
59:5 127:24
171:1

counsel
1:17 10:9
210:7 257:6,
12 258:5

counsel's
41:13 58:3
87:17 167:3
194:1 246:18
248:19

counted
45:22 46:10
204:25 222:17

counties
31:18 32:3
72:20 73:7
242:12,16,21,
24 244:9

County
11:11,15 28:5
85:16 103:19
207:13,15
255:5

couple
17:24 31:2
32:22 50:2

course
37:2

COURT
1:1 9:3 10:22
11:4,5,11,
13,16,17,18
13:16,20
38:9,15 78:4,
17 79:2,5
104:4 142:3
152:19,21
157:2,19
199:3 210:19,
24 211:2,10,
21 212:10,22,
24 213:6
233:10 241:20
249:25 250:3
256:1

courts
14:13

court's
153:1 157:1
158:7 181:4
210:11
211:15,25
213:9,14

cover
137:7 200:17
242:7 244:16

covered
13:17,18
17:12 113:22
117:25 238:21
239:2

covers
249:17 250:4

Cox
67:4

Crawford
103:19 104:3
113:22

created
115:15 118:12

creating

75:2 108:10

Creek
2:14

Crenshaw
14:20

Criminal
27:8,11 69:13
131:2,6,12

Crunch
125:17

current
44:23 45:12
46:8,9,13,20
47:8 55:10
75:12 116:20
117:4,12
184:21,24
239:9,16

currently
14:8,15 15:18
73:7 99:19

Cypress
2:14

_____

D

D
137:20,24
138:25 139:1,
20,21 141:22
143:8 218:16
219:5

Daily
33:17

danger
99:21

Dashiell
26:4

D-A-S-H-I-E-
L-L
26:4

data
230:17

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



Robert Duncan

June 7, 2012
269

date
79:4 130:15
178:17 206:3
233:1

dated
77:4 126:9
149:9,12
215:14

dates
71:19

David
17:23 98:21
99:16

Davis
223:23 228:7

Davis's
6:11

day
1:14 30:7
31:5 34:3
95:4 97:6
121:17 128:15
151:25
153:14,20
154:7,11
163:19 167:23
168:18,22
214:9,12
236:14 255:5,
10 258:10

days
130:15 143:12
183:8 206:3
216:14 256:25
257:10,18,22

DC
2:11

de
19:10,14
118:21 122:1
135:12,21
143:22 149:8,
14 160:4

176:3 177:5
215:9 217:6
218:7

dealing
244:14

dealings
30:22

dealt
7:20

debate
12:9,12 95:20
96:25 117:24
132:24 133:2
134:16
137:17,19
143:11
144:20,23
147:25 152:2
153:22
155:11,25
166:12
168:18,19
181:14 184:4
186:21 187:1
202:8 217:19
220:11 222:24
239:20 240:14

debated
92:17 123:21

debates
39:10,11
74:21 118:11
129:4,17
155:12

debating
144:21,22

debrief
34:4

Dec
258:13

December
15:6 58:19
88:9,19 93:4

decide
15:15

decision
13:24 94:4,
16,19 103:19
104:4,12
123:23 153:1
193:18 220:2
227:7

declaration
213:19

declared
206:1

Declaring
214:10,16,20

decrease
75:13 235:14,
18

DEFENDANT
2:7 5:3,16
11:23 212:8
256:23

Define
173:23

definitely
35:7

degree
14:4,5 47:16
108:22

delay
149:21,24

delegation
169:11

delete
35:1

deleted
35:2

deletion
181:3 182:7

deletions
182:3

deliberation
s
160:6 177:25
178:7 246:19

Delwin
169:6,7

Democrat
93:7

demographic
67:4

demographics
15:21 16:5

Denny
185:8

denying
133:11

DEPARTMENT
2:8 5:12
27:8,11 38:9,
14 203:1

depend
186:23

depending
150:18 233:15

depends
20:9 52:10,25
53:10,11,12
83:19 109:9
121:17 151:13
161:12 233:16
234:3,8

depiction
123:20 168:7
200:6

deposed
6:6,10,13
7:5,8,10,13,
14,20 8:9,12,
18,21 10:21
12:24 13:4
115:25

DEPOSITION

1:9,11 4:2
12:1,22 13:2,
13 35:24 36:4
49:3 78:4,17
79:13,24
81:20 82:16
98:19 105:22
126:6 137:6
158:12 163:14
170:17 210:25
212:16 215:5,
10 216:3
219:4 222:2
223:13 228:24
241:19,22
253:18 255:1
256:9,14,16,
23 257:2,7,
12,13,15
258:1

depositions
6:14 9:1
210:13,16
212:12 213:3
248:8

describe
14:2 31:25
38:12 155:5
159:21

described
115:6 128:25
229:10 232:16

describes
217:9

describing
177:20

DESCRIPTION
4:2 84:17
120:3,14
121:10 157:22
178:11 216:16
223:3 255:7

designated
214:5



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

270

designation
213:17,23
214:3,14
designed
57:16 114:12,
19 115:4
destruction
206:4
details
69:20,23
72:14 183:14
deter
67:15,19
131:2,13
determination
54:4
determine
39:15 54:12
65:7 73:11
83:25 93:16
106:7 113:6
115:1 160:1
188:15 203:17
231:24 235:4
determined
83:15
develop
161:23
developing
56:4 108:23
development
55:24 81:10
108:5,8
172:23 176:10
Dewhurst
17:23 98:21
99:16 215:11,
12,13
dialogue
149:10
didn't
27:10 34:7,8,

17 42:24
46:12 47:2
48:16 50:7,11
55:18 61:4,18
71:4 85:7
88:8,15 89:6
91:20 152:21
169:23 172:4
175:10 179:2
189:7 226:23
233:9 237:5
244:19 245:6
249:19
difference
179:22 180:6
205:13
differences
180:3,8
different
21:18 28:12
30:23 38:6
51:21 54:23,
25 62:6 64:5,
9,16 77:20
83:17 90:9,
14,15,16,24,
25 123:8
143:18 190:9
203:9 212:18
227:4 236:4,
7,8,14 253:1
difficulties
199:19
difficulty
199:21
dios
34:14
Dire
5:20
direct
36:12 54:14
98:20 109:6
137:20

164:12,21
179:12 222:11
225:25 226:4
229:3
directed
109:2
directing
138:24
direction
256:22
Directly
33:19 65:21
147:12
director
32:11 135:18
disabilities
230:24
disability
195:14 196:17
197:10
disagree
76:22
disaster
206:1
discover
208:6
discretionary
51:15
discriminator
y
41:19 42:15
43:4 44:3
240:18,22
241:1,4
discuss
86:12 90:14,
20 103:8
144:14,17
171:13 173:10
177:6
discussed
74:7,10

110:24 111:11
113:15 115:8
117:23 127:2
153:9,22,24
154:6,7
166:3,12
172:1 178:14
193:3,10
199:21 200:10
206:18,24
207:4,5
218:11 220:15
244:2
discussing
127:15 144:6,
12 152:1
discussion
110:17,22
115:3 123:13
128:3 131:11
134:12,16,
18,23 144:1
153:7,9,10
156:23 167:24
181:13
187:11,16
188:8,24
200:18,23
201:2,3,15,
20 202:7
227:15
252:13,16
discussions
65:24 74:16
75:16,17
112:10,21,24
113:1,3,5
123:10
143:14,15
147:24 178:16
183:15 184:1,
5 188:22
193:12
197:14,24
198:5,7,13

200:2,16
222:22 223:1
224:4,11,16,
17 235:2
disenfranchi
sing
67:7
disparate
230:23
231:15,23
disproportio
nate
84:14
disproportio
nately
95:14 163:6
188:16 194:17
235:5
dispute
11:9 189:19
disputed
217:8
disseminate
136:20
distance
199:24
DISTRICT
1:1 11:4,5,
11,12,15
15:18 16:8,
20,24 17:2
26:11 31:22
97:14 242:12
256:1
division
135:17
divulge
245:12
docket
151:12
document



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

79:11 83:3
101:9,14
105:24 151:2
173:18 222:5
234:22 255:7

**documentation**
81:5 179:18
201:18 229:7

**documents**
13:6 24:3,6
36:8,9,14,18,
20,21,25 39:7
156:25 157:21
158:11 159:6
191:11,14
201:6 202:1,
3,11 212:15
241:20

**doesn't**
45:5,17 48:8
50:12 51:11
82:25 106:2
116:11 227:1

**doing**
31:13 43:7
47:4 51:16
113:6,14
122:13 138:16
202:18 212:8
213:1,13
231:12 235:8
243:18

**domain**
243:14 248:21

**double-check**
158:8

**doubt**
222:9

**down**
31:16 32:4
33:24 68:7,13
126:19 150:8
151:13 157:10

158:25
160:19,22
161:9 212:21
226:16

**DPS**
198:23
242:16,21

**drafting**
108:12,17
176:10,14,15
184:13 200:8,
14

**drawing**
152:25

**drive**
199:24

**driver's**
45:8 72:22
73:5,8,12
203:2 232:4

**DST**
1:4 256:4

**due**
256:23

**duly**
5:23 256:19

**DUNCAN**
1:9,11 3:4
5:2,19,22 6:5
165:15 211:17
213:8,16
215:21 223:18
255:1,3,6
256:10,16

**Duncan's**
157:7 158:4

**DUNN**
2:13

**Dupree**
14:20

**during**
17:10 18:12,

15 19:6 30:14
31:5 32:23
33:16 109:10
119:8 143:11,
12 147:24
153:9 155:25
159:11 160:4
161:14 162:3
166:12
186:20,21,25
200:8 202:8
203:7 220:11
222:24 232:5
233:7 234:11
244:11

**Durstine**
26:6,7,16,17

**DYER**
2:5

---
**E**
---

**E**
2:1

**each**
89:3 117:13
121:2 208:12,
22 232:5,6
257:25

**earlier**
61:20 113:15
127:2 163:7
170:20 185:11
206:2 207:4
232:16
241:14,18
242:11 248:3

**early**
56:8

**ease**
199:20

**easy**
93:15

**economics**
14:5

**Ed**
108:4

**Education**
17:7

**educational**
14:2

**effect**
39:16 40:5
42:10,17,21,
25 43:24
70:19 150:22
217:24 238:14
241:4 247:15,
18

**effective**
116:18

**effort**
74:1 90:17
211:25

**efforts**
212:6

**either**
11:23 26:11
35:8 38:8
48:17 53:23
71:24 92:19
94:25 95:19
101:16 136:10
139:12 160:23
162:7 186:24
202:9 226:17
230:17 246:6

**El**
97:17

**elaborate**
66:18

**elderly**
73:23 230:23
247:17

**Eldorado**
32:4

**elect**

22:17

**elected**
15:5,9 85:11,
14 122:17

**election**
15:5 19:1,13
21:3 22:22
23:1 28:14
38:8 40:4
48:19 57:15
62:19 67:8
85:20 129:5
135:17 151:24
198:20
199:17,19
200:11,20,25
201:7 202:2,
12,24

**Elections**
25:23 135:18

**electoral**
238:9

**electronic**
36:20

**eligibility**
23:19

**eligible**
230:8

**Ellis**
60:4,7,15
63:17,18
64:3,14
96:16,19
118:20 119:3,
12 121:25
143:21 177:5
230:3

**Ellis's**
66:25

**Eltife**
143:24

**Email**
4:7



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                      June 7, 2012
272

e-mail
33:22 157:14
158:23 171:4,
6,11
e-mails
173:25 243:12
emergency
213:17,19,22
214:3,6,10,
14,17,21
233:14 253:3,
10
employed
258:6
employee
135:16
employees
203:10
enacting
48:6 77:8
end
20:13 34:3
52:3 80:3
91:1 211:22
Englebreth
28:22,24
engrossed
106:9 225:14
engrossment
83:4
enhance
237:24
enhanced
230:21
enlisted
190:8
enough
52:7 72:16
82:24 98:7
162:25 170:7
197:20 204:5
208:20 217:20

230:11 242:4,
9
enrolled
172:16 225:19
226:12
ensure
160:3 181:23
248:4
ensuring
181:25
182:12,14
entailed
223:1
entertain
30:8
entire
61:19 151:25
entitled
179:18
entity
29:11,12
246:2
ERIC
1:5 5:3,16
27:21 256:5
especially
51:14 228:8
essence
15:16
essentially
169:24 205:9
established
44:14 146:5,7
estimates
187:23
ET
1:7 252:18
256:7
ethnic
60:16 102:7
165:1 230:24

236:23
ethnicity
61:1
evaluating
220:23
evening
167:21
event
152:17 206:21
events
16:16
everybody
5:9 24:7
35:10 160:9
163:10
evidence
21:8 74:24
86:5 115:16
116:18 118:13
122:21 166:14
189:21
248:11,24
249:4,7,24
250:9,15,20
251:14,17,18
253:12
evolve
235:24
exact
233:1
Exactly
45:14 67:1
95:3 113:1
126:19 154:16
166:11 182:23
187:23 214:24
Examination
3:5 6:1 213:7
242:1 257:23
example
247:17
examples

234:11
exception
140:14 196:22
exceptions
195:13 204:22
205:9 206:7,
23
excerpt
61:21 137:8,
14 163:16,18
222:6 229:1
Exchange
23:22 135:11
136:1 149:14
171:4,19
exchanges
212:2
excluded
217:19
exclusion
181:15
excuse
17:16
excused
95:2,5
execute
222:16
executed
255:8
executive
122:11
Executor's
27:5
exemption
227:10
exercise
212:23 213:8
Exhibit
35:21,24
48:25 49:3
58:13 79:21,

22,25 82:13,
16 98:15,16,
19 105:18,23
126:1,6
137:3,6
149:3,8
163:12,15
170:15,18
172:6,9
215:2,5,10
216:3,4
218:23 219:1,
4 221:24
222:2 223:11,
14 228:21,24
EXHIBITS
4:1,11 39:11
149:2
exist
16:5
existed
86:5 250:20
existing
45:24 233:11
exists
10:19 37:16
77:5
expeditiousl
y
160:2
experience
22:22 23:1
91:15
expert
6:9,20 11:3
21:12 37:16
expertise
6:23
experts
123:15 168:5
expired
183:8



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

273

| | | | | |
|---|---|---|---|---|
| **Expires** 258:13 | 78:12,13,14 **face** 238:2,12,25 | 32:6 **familiar** 9:1 23:21 | 34:15 **fees** 229:5 | **firms** 62:19 |
| **explain** 116:2 121:4 | **fact** 30:5 87:5 | 24:10 25:25 26:3,21,24 | **field** 7:16,17 | **first** 5:23 11:12 41:21 42:16 |
| **explanation** 214:20 | 102:10 152:24 155:7 187:15 | 27:16,25 28:18,21 | **figure** 38:3 | 48:5,13 60:1, 13 62:17 77:3 |
| **explicit** 192:3 | 199:3 241:8 246:25 | 35:25 37:14 38:6,11 45:6 | **file** 105:7 171:20 | 78:14 81:16 87:4 101:13 |
| **explicitly** 137:23 159:6 | **facts** 43:6 189:20 | 49:4 71:8 80:6 86:21 | 172:4 174:7 | 129:14 131:22 149:20 155:17 |
| 210:25 211:3 | **factual** 39:14 40:3 | 103:18,24 104:25 105:13 | **filed** 10:17 80:3,4 | 161:3 173:15 223:18 226:21 |
| **expressed** 96:5 97:19,22 | 73:17 114:22 | 129:2 171:5 198:18 | 106:3 109:22, 25 175:9 | 256:19 |
| 119:13 145:3, 5 153:4 | 117:3,7,10 247:21 248:16 | 204:10,19 221:19 230:11 | **files** 35:16 37:11 | **fitting** 157:21 |
| 219:18 255:9 | 249:25 | 234:17 | **filing** 105:9 | **five** 6:16 82:11 |
| **expressing** 148:2 231:22 | **Fagan** 32:12 33:3 | **familiarity** 25:17,22 | **final** 225:12 246:13 | 91:25 101:22 109:9 141:14 |
| **extensive** 118:1 151:23 | 35:14 36:19 109:2 170:20 | **far** 18:21 39:10 | **Finance** 17:7 18:4,11 | 147:1 248:10 |
| **extent** 20:17,21 | 173:21 | 97:16 117:23 127:14 176:14 | 30:3 | **fix** 51:10 |
| 45:25 48:7 59:2 67:22 | **fail** 224:25 | **Farmers** 11:6 | **financially** 258:8 | **flaws** 51:8,9 |
| 69:17 70:2 76:20 77:5 | **failed** 97:23 98:2,9 | **fashion** 159:25 | **find** 41:25 65:9 | **floor** 30:7 39:11 |
| 86:6 94:11 95:19 116:7 | **Fair** 25:23 72:16 | **fast** 239:23 | 73:1 120:7,9 203:6 253:12 | 52:9 56:18 86:22 89:5 |
| 122:9,10,19 124:23 125:10 | 82:24 88:4,10 90:17 111:11 | **favor** 63:11 165:1 | **finding** 72:24 | 91:12,17 92:8 94:5,25 95:1, |
| 127:1 129:23 131:14 182:18 | 170:7 197:8 242:8 246:10 | 229:16 231:6 232:12 236:22 | **fine** 20:10 155:17 | 20,22 96:1,23 112:4,8 |
| 184:19 186:15 188:24 193:23 | **fairly** 42:19 66:10 | **federal** 14:13 20:11 | 179:9 | 121:15 129:3 143:11,16 |
| 194:14,20 195:16,18 | 148:15 166:12 170:2 233:15, | 21:3 38:9,15 67:14 107:7, | **finish** 9:5,6,13 | 144:1,18,23 152:1 163:4 |
| 202:6 238:15, 17 252:25 | 19 244:7 | 19 192:13 239:2 256:24 | 56:20 249:22 | 181:14 184:2 186:20 193:4, |
| **extremely** 120:4 148:3 | **faith** 212:6 | **federally** 192:21 | **firm** 14:19,21,22, 23,25 34:22 | 13 202:9 218:13 219:23 |
| | **fall** 190:10 | | 101:25 258:16 | 229:3 230:1 |
| **F** | **Falls** | **feel** | | 231:17,18 |
| **F** | | | | 232:3 246:12, |


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan
June 7, 2012
274

23

**flourishing**
102:12

**focus**
21:15,16
140:12

**folks**
29:24 34:15
118:25 228:3

**follow**
20:25 35:11,
19 40:8 51:19
58:3 88:8
197:20 248:19

**followed**
36:22 136:22

**following**
41:13 81:5
87:17 158:23
164:8 167:3,
22 194:1
209:9

**follows**
5:23 80:14
106:18 258:1

**follow-up**
157:14

**foregoing**
255:1,7
256:14,16

**foreign**
73:23

**forgot**
33:14 241:8

**form**
10:1 133:2
180:12 195:9
198:19 199:1
229:6

**formal**
143:14 144:20
218:8

**formally**
144:21

**former**
184:22,24

**forms**
45:3,6,9,15,
17 46:8 54:23
74:3 81:4
106:11,15
110:12,18,19
111:4,17
112:12,22
113:7 134:21
179:16
180:10,18
183:7 186:14
187:7,19
190:9 192:23
201:18 204:23
206:9 207:1,
10 239:8

**formula**
52:25

**forth**
1:18 76:15
149:15 210:14

**forums**
128:9,16

**forward**
166:15

**foundation**
42:19 56:24
179:8

**foundational**
78:5,18
227:19

**four**
6:16 211:2
216:14 232:6
242:7

**fourth**
68:7

**frame**
72:3 95:21

**framed**
113:1,2 123:7
166:14

**frames**
175:11

**Frank**
60:17,25

**frankly**
30:18 35:3
107:11 217:16

**Fraser**
84:4 109:11
110:1 126:21
143:22
172:19,23
173:6,12
174:16,19,25
176:9 177:2
184:15
193:14,22
228:6

**Fraser's**
173:8,21
174:13 189:16
193:18

**fraud**
67:15,20 68:5
69:4,7 70:6
73:24 75:12,
14 209:6,23
210:1,3
237:11,19,25
238:3,10,11
240:3,9
244:22
245:18,22
246:4,10
247:6,9
248:11,25
249:12 250:16
251:2,8,15,23

**fraudulent**
131:3,13

**fraudulently**
126:23 130:23

**Frederick**
26:1

**free**
20:22 76:1
100:11 198:23

**freshman**
233:8

**front**
28:10,13
75:3,5 85:11
224:18 234:22

**frustration**
128:12

**full**
132:21 158:6
163:17 256:14

**full-size**
257:8

**fully**
69:12 159:1

**fundraiser**
16:18

**further**
66:18 90:21
149:21 210:12
257:16 258:5,
7

**furtherance**
20:19 38:20

─── **G** ───

**Gallegos**
118:23

**game**
111:11

**gave**
24:23 122:20
145:5,7

165:17 217:7
241:6

**geared**
16:9

**General**
1:7 2:3 5:3,
16 10:12,18
16:3 18:11,15
20:6 32:10,11
38:12 52:16
53:19,22,23,
25 54:9,12
56:5,7 57:6,
11,13,14,17
61:9,12,14
62:14 76:23
77:3,7,10,
19,20 79:3
83:14,21
84:16 85:25
89:24 90:2,9,
11,20,24
91:3,14
114:8,10
119:19,21
120:4,14
121:10 127:15
128:3 138:7,
10,12 146:3
150:12 151:3
154:21 155:1,
8,10,14,25
156:2 161:4
169:9 170:8,
25 178:8,10
181:1,22
182:4,5
186:25
207:19,21
208:6,11,15,
19,21 209:12,
16,17,21
225:7 227:14
233:2 236:15
237:23 256:7



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

275

| | | | | |
|---|---|---|---|---|
| **generally**<br>14:6 16:6<br>18:8 24:7<br>31:25 45:3<br>51:6,16 59:13<br>80:19 87:5<br>89:22 92:16<br>94:20 102:10<br>106:21,24<br>109:5 110:25<br>113:2,4<br>119:9,11<br>127:13,14,17<br>128:1,5,11<br>135:4,5,19<br>136:18<br>138:20,21<br>144:5 147:10<br>151:5,11<br>160:3 165:11<br>166:11,17<br>168:9,19,21<br>169:12 171:17<br>176:18 177:6<br>178:6,15<br>190:5,21<br>191:18 193:9<br>203:5 204:19<br>209:5,9,12<br>220:15 221:21<br>227:22 233:17<br>244:7,10,16<br><br>**General's**<br>37:5 251:19<br><br>**generated**<br>57:9<br><br>**genuine**<br>166:21<br><br>**geographic**<br>32:1<br><br>**Georgia**<br>66:23 67:3<br>103:25 104:2<br>185:25 186:10 | 220:19 221:2,<br>7<br><br>**getting**<br>43:18 51:19<br>53:16 125:16<br>136:4 211:18<br>215:16 226:24<br><br>**give**<br>13:22 19:24<br>20:1 30:25<br>53:2 61:11,12<br>71:21 72:3<br>79:2,3 89:24<br>90:1,10 91:2<br>92:14 109:18<br>120:14,23<br>131:24 141:10<br>143:20 151:8<br>153:2 157:8<br>162:25 168:7<br>175:2 176:25<br>178:10 179:25<br>182:5,18<br>197:21 200:6<br>201:23 204:6<br>207:19 208:4<br>214:19 218:25<br>219:3 221:16<br>222:13 225:7<br>227:18 236:10<br>238:14 239:21<br>240:7 242:17<br>246:11<br><br>**given**<br>24:20 106:1<br>123:15,16<br>155:7 158:1,2<br>182:7 209:3<br>213:16 214:14<br>217:9,20<br>238:7 255:10<br><br>**giving**<br>126:5<br><br>**go** | 5:8 8:25 9:11<br>24:19 31:17<br>34:4 37:4,21<br>40:22 43:25<br>46:3 47:10,21<br>48:2 56:16,19<br>65:15 77:2,22<br>87:6 90:6<br>92:18 118:8<br>125:20,24<br>126:4 145:19,<br>20 146:8<br>150:16 152:22<br>155:20 156:22<br>176:12 179:8<br>188:7 193:16<br>198:23 199:9<br>204:1 206:16<br>208:3 210:7<br>211:9 225:7,<br>15 238:7<br>239:22 243:16<br>246:17<br><br>**goal**<br>57:20,24<br>117:13<br><br>**goals**<br>117:5 229:19<br>232:15 239:1<br><br>**goes**<br>21:3,7,11<br>42:13 54:18,<br>19 83:20<br>163:25 204:16<br>231:2 249:24<br>250:12<br><br>**going**<br>8:24,25 13:19<br>18:23 20:16,<br>20,23 31:3<br>35:5 38:14,<br>16,20 39:15<br>40:22 41:10<br>42:3 43:12, | 14,16,19<br>44:7,10 45:24<br>46:3 47:3<br>50:25 51:5<br>53:5 55:25<br>56:19,23<br>57:8,10 58:2,<br>3 70:19,22,24<br>76:14,18<br>77:2,20 79:3<br>83:11 84:19<br>88:7 105:3<br>112:15<br>119:23,25<br>120:24 126:4<br>127:6 141:21<br>144:16 146:18<br>152:10,13<br>153:2 158:12<br>164:11<br>166:22,25<br>171:20 174:7<br>181:2,3,5<br>182:1,2,4,10<br>188:23 190:16<br>193:11 202:18<br>203:20 210:3<br>211:9,15,17<br>212:21 213:6,<br>11 215:25<br>216:13 218:25<br>219:3 221:10,<br>11 229:3<br>241:17,18<br>248:10 250:21<br><br>**gone**<br>24:1 61:2<br>136:13,17,18<br><br>**Good**<br>5:1 19:3<br>25:10 34:12<br>91:2 126:21<br>209:25 212:6<br><br>**government**<br>22:20 107:7, | 20<br><br>**Governor**<br>17:20,22,23<br>22:13,15,18<br>59:10,13<br>93:2,10 94:20<br>98:21 99:3,16<br>100:13,15<br>101:7,17<br>146:22 160:13<br>172:17 178:3<br>206:2 213:17,<br>18 214:16<br>215:11,12,13<br>216:8,11<br>220:3 226:13<br><br>**Governors**<br>92:19<br><br>**Governor's**<br>94:19 99:24<br>103:12 178:22<br>179:5 214:19<br>215:20<br><br>**graded**<br>38:2<br><br>**graduated**<br>33:10<br><br>**graduating**<br>14:18<br><br>**granola**<br>33:24 34:9<br><br>**ground**<br>120:7,10<br>149:11 159:23<br><br>**group**<br>23:21 24:10,<br>13 25:17,22<br>102:7 203:18<br>235:18 244:5,<br>8,18 247:16<br><br>**groups**<br>84:23 85:1,2,<br>3 122:7 157:4 |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

276

162:2,8
197:10

growing
15:24

growth
102:11,14,21
103:6

guess
10:15 31:3
35:10 38:4
46:4 96:21
141:12 164:9
171:5 175:3

guessing
16:1

gun
180:14 194:5

**H**

H
1:5 256:5

half
233:13

hall
244:8,14

hand
180:14 194:5
255:10 258:10

handgun
194:12

handle
20:8 44:21

handled
7:25 252:19
253:4

handles
19:11 33:9
35:13

handling
68:20

happen
215:25 233:18

234:12

happened
34:4 75:4
83:1 116:2
123:25 136:6
153:10
169:19,22
170:3 217:15,
16 233:6,7

happening
112:19,20
121:17 164:17

happens
35:3 42:13
233:18

hard
34:1 36:21
120:9

hasn't
209:1

hate
141:12

HAVA
19:7 20:14
57:15

haven't
88:22 106:20
221:15 243:1

HB
4:4,12 52:12,
21 54:15
55:17,21,24
56:11,14
88:20 89:3

head
9:8 22:20
31:8 190:24
191:2

headed
233:12

health
32:13

hear
42:24 49:20,
23 51:13 52:5
54:2 72:10
85:19 127:14
128:2,3 237:5

heard
18:23 23:23
29:1,4 48:5
49:19 51:19,
20 52:22
54:13 71:23
72:3 86:9,15
96:1 102:20
103:4 128:9,
16 151:23
170:7 187:25
198:24 236:21
237:8

**Hearing**
4:10 21:7
30:6 31:6
34:2 50:1,8,
11,13,22
52:1,9 53:16
54:5 85:23
101:21 125:14
133:22 135:3
147:4,6
149:10 150:10
151:12
153:13,14,19
156:3 159:20,
24 160:4
161:23 167:21
173:10
178:13,15,17
223:17

hearings
12:5 39:6,7
40:9 42:10,22
50:9 51:22
71:10 72:8
129:3,4

150:21 248:22

held
15:9 18:12
74:17 147:6
210:17 233:11

help
32:20 57:16
67:15,19
156:18 226:4

helpful
157:15 158:24
218:22

her
33:13 36:24,
25 102:16
135:19,20
149:12 171:11
185:13 216:16
217:7 224:1,2
257:3

hereby
255:1 256:13

hereinafter
1:18

hereinbefore
256:17

hereto
257:5,11,20

Higher
17:7 108:4

highly
234:5

hindering
62:20

hired
246:3

hires
32:17,18

Hispanic
15:23,24
16:6,12,15,
19 61:2 97:12

102:11 203:17
235:15

Hispanics
16:23

History
4:4 82:18,21,
22 92:22

Hobby
92:18 93:10,
12

hold
39:6 45:23
121:1 125:7
146:16 158:12
196:4 210:2
236:6 243:5

HOLDER
1:5 5:4,16
254:2 256:5

holders
195:3,6

holding
144:20

home
34:4

homeowner's
11:10

hours
1:14 150:17
167:21,22
203:5 213:2
232:6 258:2

House
4:3 6:15 7:10
15:12 18:9
24:21 25:5
49:7,8,9,11
50:5 51:12
55:25 56:4,8,
17,18 57:2,8,
9 79:17 80:2,
6,13,14,22
81:10,11,14,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012
277

| | | | | |
|---|---|---|---|---|
| 21,25 82:4,5, 7,9,10,21 83:2,6,16,20 84:5,12,23 85:12 86:2, 15,17,18,22, 25 87:12,19 89:10 93:18 94:9,17 95:9, 13 96:5 97:3, 20,23 98:2,9 99:3 106:18 126:5,9 134:5,13,19 164:6 168:25 169:3,17,20 170:3 225:24 226:17 233:12 **Houston** 2:15 **human** 32:13 **hundred** 71:18 | 127:15,16 128:5,8,10, 13,14,17 131:25 165:18 170:7 171:10, 21 180:13 181:15 182:11 189:18 192:22 198:23 201:22 204:23 207:3 216:14 229:8 235:24 236:3 243:3,14,22 244:3,15,18 247:15 **idea** 93:13 172:3 **ideas** 30:21 **identical** 219:10 224:23 **identificatio n** 10:1 45:15,18 48:6,14 54:24 55:6 58:6 63:12,25 65:3 67:7,16,18 70:14 74:3 80:21,23 81:4,6 99:6 100:20 105:1, 5,12 106:12, 15 107:1,5,18 110:12,18,19 111:5,17 112:12,22 113:24 129:4, 17 132:13 133:16 134:21 137:24 138:14,18 139:3,4 141:25 142:6, | 7,12 143:4 149:22,24 154:3,9 155:15 164:24,25 166:17 171:21 179:16,19 180:10,12,19, 20,23,24 181:16,24 183:8 184:25 186:14 187:7, 19 190:3,7,10 191:24 192:13,24 195:9 197:16, 17 198:20 199:1,17 200:11,20 201:1 202:2, 12,24 203:11, 19 205:10,25 206:4,9,22 207:1,9,11 213:20 218:12 220:19 221:7, 20 222:3,20 229:6 230:9, 21 239:8,17 **identificatio ns** 107:23 **identified** 121:2 **identify** 135:13 **identity** 44:23 46:14, 21 47:8 62:20 198:15 255:7 **IDs** 45:10 76:1 181:9 182:14 **ignore** | 89:1 **illegal** 68:20 69:11 99:19 236:19 246:9 **illegally** 68:15 126:23 127:8 **immediately** 22:14 **immigrant** 102:8 **impact** 84:14 95:14 97:20 113:23 123:1 124:2, 20 162:7 163:6 166:4, 21 220:13 230:23 231:16,23 235:5 240:23 **impacted** 188:16 **impeded** 229:19 232:15 **impersonate** 23:12 **impersonatio n** 116:19 117:15 135:23 **implement** 20:12,14,21 **implemented** 19:7 **implementing** 21:3 85:19 **implements** 238:18 **implicate** 65:24 111:8 | 125:9 **importance** 152:1 153:8 **important** 9:2,4 16:23 17:1 78:11 250:22 **impossible** 120:22 **impression** 38:19 40:20 111:7 115:18 116:23 127:25 206:15 **impressions** 20:18 39:4, 19,22 41:1,9 42:1 43:17, 19,22 50:15, 25 51:3 52:18 53:7 54:8 57:22 59:3 63:3 65:23 66:9,16 67:23 68:11,24 70:23 76:19 83:24 86:7,11 87:14 88:25 94:15 100:10, 25 103:21 104:13 106:23 114:22 115:22 116:8 123:10 124:6 128:20 129:9 130:10 131:7 132:18 134:9 146:18 147:15 152:14 170:10 179:25 181:12 182:5, 7 188:21 190:16 194:21 202:16,21 205:3 208:7,8 |

I

ID
4:9 9:23 18:19 19:1 25:15 26:17 27:14 28:8,16 29:10 33:1 45:3,6,9 46:9 52:21 55:1,12 57:12 69:12, 24 70:21 73:14,22 75:13 79:14 81:8 87:6 88:6,11 99:16,24 102:14,20 103:5 104:2, 22 107:2 113:7 120:17



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012
278

236:12 243:8
249:8 253:13
**improve**
227:25
**inaccurate**
123:19 184:9
**inadequate**
46:14
**inappropriate**
155:10 211:14
**incidents**
240:3
**inclined**
149:21
**include**
22:21 69:11
107:9,23
144:12 204:5
208:20 209:19
230:20 248:16
**included**
39:8 141:21
194:5,6
195:14 196:24
203:14 225:11
230:7 246:5
**includes**
99:2 180:13
**including**
54:8 63:2
76:4 94:13
130:9 134:9
145:14 171:14
188:21 198:13
**income**
76:3
**incorrect**
112:6
**increase**
38:13 75:14
227:11
**incur**

200:25
**independent**
75:20 86:16
115:2 118:2,4
123:6,18
148:8 162:24,
25 166:10
182:22 183:2
187:13,14
193:5 197:6
198:4,9 200:4
201:11,23
203:13 204:4,
5 235:11
243:2 244:21
245:5,18
246:2,3
**independently**
131:19,20
154:10 162:13
163:8 195:10
232:1
**INDEX**
3:1
**Indiana**
4:9 104:5,22
186:4 220:19
221:2,20
222:3,7,23
224:24 228:5
**indicates**
101:9 223:20
249:12
**indigency**
227:11
**indigent**
222:17 225:1
**individual**
8:13,22 24:18
78:7,22 207:6
**individuals**
194:11 195:14
196:22 201:17

204:21
205:21,24
206:7 213:4
226:2
**inferred**
250:19
**influence**
15:24
**informal**
143:14,15,17
173:7
**informally**
144:23
**information**
37:8 73:16
85:24 86:14
124:13 129:23
136:5,12
152:23 153:3
173:9 204:6
227:19 230:7
240:11 245:4
247:21 248:16
249:25
**informs**
53:4
**initially**
17:15
**injury**
15:2
**input**
59:14
**insertion**
181:3 182:3,7
**inserts**
180:21
**instance**
83:12
**instances**
47:10,16
69:10 251:22
**instead**

9:8 77:11
**institution**
107:6,7,20
108:2,4
**instruct**
20:20 38:16,
21 41:11
44:10 84:1,20
88:23 102:17
111:12 114:15
146:19 148:24
151:19 165:20
166:25 181:5
188:23 190:18
202:19 203:20
208:8 220:24
227:16 235:8
238:18 239:4
249:9
**instructed**
36:7 257:13
**instructing**
116:25 250:3,
5
**instruction**
20:25 40:6
52:23 58:4
68:16 87:17
103:13 111:13
116:12 117:17
131:8 161:11
162:16,20
167:3 182:21
193:2 194:2
249:13,15
250:24 251:3
**instructions**
9:14 13:22
36:23 41:13
62:15
**instrument**
255:8
**insufficienc**

y
239:16
**Insurance**
11:6,10 31:12
**integrity**
57:12,13
86:3,5
114:11,20
115:5 181:23,
25 182:12,14
207:22 209:7,
23 237:25
238:9 248:5,6
**intended**
100:16 142:5
**intent**
6:15 7:2,21,
22 8:11 57:6
77:9 215:20
**interchangea
bly**
9:24
**interest**
85:4 151:16
152:18 157:4
167:25
**interested**
62:4 91:5,6
171:18 258:8
**interesting**
92:21 234:1
**interface**
19:5 29:24
**Interim**
4:3 17:10
18:10,12 31:5
32:17 48:20
58:9,18,23
59:7,9,25
75:1,2 77:13
78:24,25
88:5,9 246:6



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012
                                                                         279

247:7,25
251:17
interpret
9:24 77:24
111:10 132:15
150:2,13
151:2 152:4,
10,13
interpretatio
n
79:4 132:17
152:17 153:1
166:23
interpretatio
ns
90:25
interrupt
91:21
Intervenor's
5:14
INTEVENORS
2:12
introduce
18:22 70:19
71:4,7 140:22
141:21 223:8
introduced
21:7 50:4
58:7 70:6,8,
21 71:3 72:7
79:14 105:1,
25 142:21
175:20 219:12
223:20 233:3,
8,9 234:6
introducing
223:4,8
introduction
141:8,16
introductions
5:6
intruding

70:17
invade
13:21
investigate
252:7
investigated
69:13 240:3
247:5,15,18
252:2
investigation
68:5
investigation
s
69:4 245:22
invited
160:15,18
244:6,17
invites
161:15
invoke
13:10 132:25
202:20,22
invoking
13:12
involved
11:22 12:8
15:2 25:15
51:16 56:1,4
108:5,9,12,
16,22 176:23
177:1,3,4,5
184:13,18,20
212:12 227:7
involvement
55:23
involves
104:2 209:16
involving
18:3
iPhone
35:6

Issuance
76:1 229:5
issue
7:6 10:18
11:3,5 18:9
31:9 33:2
37:12 52:6
65:18 66:5
73:19 74:7,10
85:21 96:20,
24,25 103:17
118:1 130:14,
25 133:2
144:7 152:2
153:8 156:24
166:13 168:20
173:10 188:25
193:3 199:20
201:20,21
214:10 216:22
218:8 243:3
244:18 245:24
247:11,13
250:9 251:11
issued
58:25 60:11
70:5 88:19
98:21 107:6,
19,24 190:7
192:13,21
213:18
issues
12:8 19:12
28:12,14,16
29:19 30:16
31:20 32:13,
18 35:15 48:2
51:16 53:15
62:6 63:11
75:6 85:18
108:19 110:24
113:4 122:6
123:14,15,16
149:17 153:23

154:2,3
166:3,11,13,
14 171:9
184:12 218:8
220:15 227:4
234:13
244:11,15
251:20 252:14
issuing
67:10 181:4
items
239:12

**J**

Janalyn
1:12 256:12
258:12
January
61:5 139:18
141:23 215:14
216:1 223:17
229:1 232:23,
24
JAY
2:5 5:19
JD
14:5
JENNIFER
2:8 5:2,15
32:12,13 33:3
35:14 109:2,5
120:8 156:19
170:19,20
171:11 173:14
180:2 186:8
job
14:17
John
170:23,24,25
joining
5:20
Jones
169:6,7

Journal
4:6,10 163:18
214:23,25
229:1 232:25
JR
1:5 256:5
judgment
54:3 118:6,9
131:5 148:22
jump
242:8
juncture
13:25
June
1:14 13:16
78:3 157:2
256:10,18
jurisdiction
31:10 48:18,
19
Jurisprudenc
e
17:8 21:24
22:1
just
9:11,13 12:20
14:13 19:22
20:4 25:10
29:14,21,25
30:25 31:25
33:10,13,25
35:24 39:25
40:12 41:2,14
42:12,19,24
47:9,12 51:6,
11,13,15
52:7,25 53:2,
3 54:15 55:19
58:2 59:16
63:8 65:6,8,9
71:19 75:11
77:22,24
78:10 80:19



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

81:16 82:19
83:19,21
86:12 91:6
92:14 95:2
96:12 98:24
99:17 105:7,
11 106:21
114:25 115:10
116:4,5,11
121:11,16
125:20 128:1,
7,9 129:25
131:21 132:8,
12,21,22
133:7,11
135:2 140:9
142:8 143:13,
24 144:4
145:14 147:10
150:21
151:13,22
152:17 154:18
155:4 157:17
158:16 160:11
161:12 164:19
165:11 168:11
169:12,15
171:17,19
172:2 173:18
175:10 177:8,
18 179:3
180:6 191:7
207:5 209:10,
21 213:12
217:10 226:1
227:2,5
233:16 234:15
237:15 238:1,
10 239:21,22
241:10 242:3,
4,8 244:14,18
252:18

**JUSTICE**
2:8 5:12
27:8,11 38:9,

15

---

**K**

**keep**
243:20
**Kennie**
5:13
**kept**
168:19,23
**kind**
37:3 90:25
111:21 241:10
**kinds**
31:14 127:19
**King**
29:4,9
**knew**
190:13 234:23
**know**
6:14 9:10,11
12:18 15:22
16:2,20 17:9
19:3 24:5,8
25:15,16,20
26:6,7 27:21
28:9 30:6,17,
20,22 31:3,4
32:19 33:6,23
35:3,10,25
36:13,20
37:16,20 40:8
41:3 43:15
44:19 45:14,
21 46:2,25
47:13,15
48:1,15 49:9,
24 50:7,10,11
51:20 52:4,11
53:24 54:2
55:23 56:2,13
57:4,7 58:15
67:8,11
69:14,19 70:4
72:10 73:7

74:19 75:8
80:1 82:1,2,
9,10,19 84:18
88:21 90:13
92:16,25 93:8
94:16,22,24
95:3 98:1
101:10 102:5,
6,10 103:2
104:24 105:6,
7 106:1,20,24
108:16,20,24
112:1,4,25
114:6 118:25
119:5 120:10
122:13 130:11
133:9 136:20
139:16 140:16
141:7,18
142:13,15,17
148:7 152:5
153:12 157:18
158:13 167:15
168:1,17
170:12,23
171:22,24
172:2 173:3
177:4 178:24
184:20 185:1,
2,3,4,5,6,17
186:8,9,10,12
190:2,3,9,20,
22,25 191:3,
8,11,16 192:6
194:10,23
196:14
199:10,11
201:6,12,15,
19 202:6,23
208:22 211:25
212:5,7,11,19
214:4,22
215:1,7
216:19,21
217:6,15,24,
25 218:6

221:4 222:7
225:14,15
226:14,16
234:15 238:8,
20 239:7,11
240:2,8,13
242:17,18
243:23 246:25
247:1,2
248:10

**knowledge**
7:15 65:10
103:1 116:1
172:18 173:20
174:2 235:3

**known**
255:6

**knows**
45:25

---

**L**

**label**
126:15 135:10
172:5
**labeled**
69:3 126:11
**labeling**
172:8
**lack**
73:23 92:8
230:9
**lacked**
67:6
**laid**
10:8 126:21
193:14 198:1
231:18
**language**
55:21 76:4
110:7 183:17,
18,24 198:13
230:13
**large**

97:14 108:22
**larger**
32:4
**largest**
102:8
**Larson**
26:22
**last**
19:7 26:15
36:13 42:20
43:18 67:12
72:21 75:10
151:24 172:13
173:9 237:5
240:4,9
246:10
**lasted**
153:19 167:21
**lasting**
125:18
**late**
51:12 167:22
211:16 212:14
234:14
**later**
38:2 176:15
216:14
**laundry**
239:12
**LaVoie**
33:6,8
**Law**
4:9 14:6,8,
18,19 20:11,
14 21:3 22:23
33:10 34:22
38:14 39:15
44:20 45:12,
24 46:8,9
48:6,14 55:10
75:13 90:13
102:2,3,6
104:5 114:12,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

281

19 221:7,20
222:4,5,9
224:24 228:5
233:11 239:2
246:14
laws
48:19 88:6
104:22 113:24
220:20 221:2
lawsuit
11:6,19
lawyers
7:23 32:19
46:2
lay
16:4 123:16
laypersons
168:6
lead
84:18 206:4
leaders
16:12,15,19
leadership
21:20,23
learn
141:20
least
74:7 75:14
134:3,5,13,20
171:1 228:15
232:6
leave
203:11 241:19
leaves
22:15
leaving
241:22
ledge
59:5
left
17:10 92:13
216:12

legal
14:17 15:1
32:18 128:18
130:23
legally.'
126:24
legislation
8:4 19:11,18
20:19 30:9
32:25 38:19
39:20 42:2
50:15 54:23
59:3 65:24
66:9 67:24
72:12 73:14,
22 74:22
77:10,11 86:8
87:15 100:8,
9,25 103:21
111:7 124:7
131:8 140:5,
15 146:18
147:15
149:22,25
152:15 153:9
155:9 164:24,
25 165:2,3
166:17 172:11
179:5 202:17
203:12 205:3
213:19 216:14
218:12 220:23
225:7 233:3,
18,20 234:9
238:17,22
243:8 244:24
245:9,11
247:21 249:5
253:13
legislative
6:15 7:2,20,
22 8:11 12:9
13:10,12,17,
19,22 20:19

21:10,16
23:22 30:15,
16 32:8,24
33:16 35:9
38:17,20
40:23 41:7,8
44:10 46:16
48:8 50:17
51:6 52:15
53:8 54:8
55:21 57:25
66:3,17 70:1,
17 71:2,15,24
73:16 74:5
76:9,17,23
78:6,22 79:6
80:4 84:1
88:24 89:2
91:7 94:12
96:10 97:8
100:3,23
101:1 102:17,
24 103:13
104:14 105:2
110:6,15
113:13 114:1,
15 116:9,24
117:17 124:4,
8 125:8
127:22,23,24
128:22
129:10,20,24
130:8 132:24,
25 133:19
134:8 136:6
138:6 144:6
148:5,22,24
150:3 152:6
154:21
155:11,12,14
157:4 165:20
166:24 170:1,
9,10 171:14
177:6 182:8,
20 183:12
186:16 188:20

189:22 190:17
192:2 193:24
194:15 195:17
196:19 197:1,
12 199:3,8
202:22 203:21
206:15 208:2
209:18,19,21
210:4 211:4
213:10 214:9
219:15,17
220:24 221:11
224:8 225:8
235:7 236:4,
13 238:19
239:4 243:6
244:11,25
245:10,14
247:23 248:15
249:3 250:2,4
251:11 252:5,
19 253:6
legislativel
y
152:11 248:18
250:23
legislator
8:13,19 13:10
25:10 77:9
118:6 176:18
193:23 195:1
236:21 248:16
250:1
Legislators
24:11,15,16
25:4,13 59:4
111:9 118:15
123:11 144:24
162:18 167:7,
18 175:4,13,
16 176:9
184:22,24
185:25 186:4
189:12 197:8,

9 226:20
236:18
legislator's
78:7,23
188:19
legislature
11:9 24:7,17
30:3 38:13,25
39:14 40:2,25
41:17 43:2,6
44:1,2 77:7,
13 82:18
103:5 111:3
113:21 114:3
118:13 123:3
124:1 148:16
167:6 186:13
188:5,13,15
201:25 230:18
235:4 246:3
length
53:12 201:20
lengthy
42:19 166:12
Leo
185:19,20
less
6:22 35:5
37:6 84:17
148:18 173:7
250:21
Leticia
19:10
Let's
53:5 66:24
76:25 77:3
125:24 155:20
158:1 199:12,
13 210:7
228:19
Letter
4:5,6,8,12
60:2,4 63:9,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012
282

15 64:25
66:21,24,25
98:20,22
99:2,5,14,15,
24 100:5,14
101:5,8,15,21
149:8,11
152:9,13
154:15 176:5
215:10,12,16
216:7,11,23,
24 217:14
218:1,8

**letterhead**
60:13,20

**letters**
101:6,17
149:15

**letting**
212:19

**level**
75:12 167:25
202:9

**license**
14:15 45:8
72:23 73:5,8,
12 180:14
194:5,11
195:2,6,8
203:2 232:4

**licensed**
14:8

**Lieutenant**
17:20,22,23
22:12,15,18
59:13 92:18
93:2,10
94:19,20
98:21 99:3,
15,23 100:13,
15 101:7,17
146:22 160:13
178:3 215:11,
13,20 216:8,

10 220:2

**likely**
109:1 203:18

**limit**
139:5 213:3

**limited**
161:20 179:8

**limits**
150:20 151:13
161:24,25

**Linda**
27:23

**line**
43:17 87:23
126:18,19
133:24 134:1
135:21,23
152:25 180:21
254:4

**lines**
115:8 126:20

**list**
16:3 60:17,19
106:11 110:12
158:7 239:12

**listed**
55:2 69:7
112:12,23
128:9 144:9
159:6 180:19
207:1

**listen**
34:2 227:25

**listening**
34:14

**listing**
177:18

**lists**
81:7 179:15

**litigation**
10:15,16 15:2
155:2,9

**little**
8:24 10:20
107:11 108:3
117:20 173:17
180:1

**living**
99:19

**LLP**
2:13

**lobbyist**
157:3

**local**
85:11,13
203:8

**locally**
122:17

**located**
207:16

**log**
120:3 157:5
159:5 243:25

**logical**
59:18

**logistical**
33:25 53:13

**Logistically**
53:10

**logistics**
31:20 122:15
174:6,21

**long**
6:24 12:14
15:4 17:13
30:7 47:3
52:16 55:19
74:23 95:7
154:11
191:16,19
234:16

**longer**
151:5,8

**look**

19:25 21:5
35:25 46:3,
11,12,24 47:2
49:3,24 50:3
54:15 58:15
59:24 60:1
67:12 68:3
72:16,21
73:20 74:1,18
75:10,19,22
79:25 80:9
82:19 83:2
93:15 102:6
103:16 105:23
106:10 107:3
114:25 126:6,
11,19 129:13
130:17 131:24
132:9,21
133:21,25
135:9 146:9
149:13,18,20
150:8 151:21
154:13,18
158:5,7 159:1
163:15,20,23
172:9,13
179:11 180:16
189:6,9 197:5
201:14 215:6
216:3,6
218:20,22
222:2,10,12
223:14,18,19
225:17,24
229:2 230:4,
19 231:2,24
232:2 234:21
247:8,9
252:18

**looked**
62:6 67:9
73:13 88:9,22
185:11 243:1

**looking**

63:15 79:13
106:6 107:15
130:20 151:22
159:4 217:10
223:24 224:22
226:1,9

**looks**
35:25 49:4
54:19 55:3,5
62:5 80:10
137:8 157:9

**lose**
242:8

**losing**
96:21

**lost**
61:3

**lot**
19:10,11
20:3,4 21:18
30:8 48:19
51:14,15,20
57:15 71:20
72:11 74:22
110:22,23
112:24 128:14
154:6 156:18
227:4 244:15
252:16

**loud**
168:15 242:4

**louder**
194:13

**Lubbock**
16:19 30:19
31:15 32:5
169:11 244:9

**Lucio**
60:3,7,16
63:18 64:4,14
118:20 119:15
122:2,4
143:21



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012
283

| | | | | |
|---|---|---|---|---|
| **lunch**<br>33:25 | **makeup**<br>92:25 | 10,20,23<br>82:14 83:14 | 152:8,16<br>153:5 155:19, | 228:19,22<br>233:24 235:13 |
| _____ | **making** | 84:3,9,21 | 24 156:22 | 236:17 237:5, |
| **M** | 65:18 76:12 | 85:3 86:17 | 157:11,13, | 15,19 238:1, |
| **ma'am** | 133:9 138:17 | 87:16 88:16 | 16,23 158:9, | 24 239:6 |
| 15:8,10 23:8 | 212:5,19 | 89:3,22 90:4 | 16 159:4,8,17 | 240:1 241:24 |
| 24:12 26:5 | 236:18 | 91:9,16 94:9, | 161:1,7,14 | 245:16 249:10 |
| 31:24 36:2,16 | **mandated** | 18 97:11 | 162:14,18,22 | 258:2 |
| 41:15 55:22 | 20:7 | 98:8,14,17 | 163:13 164:5, | **March** |
| 58:5,11,22 | **manner** | 99:13 100:4, | 16 165:22 | 149:9,12 |
| 60:5 73:4 | 252:20 | 12 101:23 | 166:2 167:2, | 154:15 163:19 |
| 101:4 105:21 | **MARANZANO** | 102:3,7,19 | 14,16 170:4, | **Maria** |
| 137:22 138:1 | 2:8 3:5 5:1, | 103:4,11,18 | 14,16 171:16 | 28:19 |
| 149:19 194:3 | 2,8,15,21 6:2 | 104:17,25 | 172:5,7 | **Marion** |
| 216:5 217:3 | 13:15 14:1 | 105:17,19 | 174:10 | 103:19 |
| **madam** | 19:21 21:1 | 108:9 109:7, | 176:15,21 | **mark** |
| 142:3 | 35:20,22 | 16 110:11,16 | 178:17,25 | 48:24 79:20 |
| **Madla** | 38:5,22 39:24 | 111:1,14,21 | 179:11 180:9 | 105:17 125:25 |
| 60:17,25 | 40:17,24 | 112:16 113:17 | 181:6,17 | 149:2 170:14 |
| **mail** | 41:12 42:7 | 114:4,12,17 | 182:9 183:2, | 221:22 |
| 55:10 70:7 | 43:11,21 | 115:2 116:13 | 16,22 187:2, | 228:19,20 |
| 71:3,11,23 | 44:12,22 | 117:2,10 | 12,25 189:3, | **MARKED** |
| 72:8,12 | 46:1,5,18 | 118:2,19 | 11 190:1,19 | 4:11 35:20,21 |
| 237:11,20 | 48:10,24 49:1 | 119:23 120:4, | 192:8,18 | 48:25 58:12, |
| 238:3,11,21 | 50:18 52:20 | 9,16 121:1, | 193:5,25 | 13 79:21,22 |
| 257:1 | 53:2,14,21 | 12,24 123:24 | 194:10,16,25 | 82:13 98:15, |
| **mailers** | 54:4,14 55:16 | 124:9,15,16 | 195:5,13,22 | 16 105:18,23 |
| 243:12,19 | 56:10,25 | 125:1,20,24 | 196:11,15,21 | 126:1 137:2,3 |
| **main** | 57:18 58:1, | 126:2 127:12 | 197:3,13,23 | 149:3 163:12 |
| 22:11 178:16 | 12,14 59:17, | 129:1,12 | 198:7,12 | 170:15 172:6 |
| 241:16 | 20,23 61:15 | 130:2,17 | 199:13,15 | 215:2 219:1 |
| **Mainly** | 62:2,17 63:8, | 131:10,18 | 200:18 201:9, | 221:24 |
| 12:7,8 18:6 | 23 64:5,11, | 132:6,20 | 12 202:11,23 | 223:10,11 |
| **maintains** | 13,15,20 | 133:20 | 203:22 204:4 | 228:21 |
| 35:9 | 65:1,8,17 | 134:11,18 | 205:4,20 | **marking** |
| **major** | 66:1,4,12,20 | 136:24 137:2, | 206:23 207:23 | 35:23 49:2 |
| 32:4 179:22 | 68:3,13,19 | 4,11,14 | 208:9,17 | 79:24 82:16 |
| **majority** | 69:2,20 70:5, | 138:9,24 | 209:1,8 | 98:18 105:22 |
| 89:4 90:7 | 11,25 71:14 | 139:23 140:1, | 210:5,9,15 | 126:5 137:5 |
| 93:4,7,11 | 72:5 73:20 | 11 142:5,9 | 211:23 | 163:14 170:17 |
| 97:24 98:3,10 | 74:6,15 76:8, | 145:2,21 | 213:11,15 | 215:4 219:3 |
| 139:9 140:18, | 12,22 77:1, | 146:1,7,20 | 215:3 219:2, | 222:1 223:13 |
| 20 218:13 | 17,23 78:12, | 147:17 148:1, | 20 221:6,19, | 228:23 |
| | 14,20 79:8, | 10 149:1,4 | 22,25 223:10, | **Martinez** |
| | | 150:7,23 | 12 224:10,15 | |
| | | 151:7,15,20 | 225:10 227:20 | |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                    June 7, 2012
                                                          284

28:19
materials
25:12 221:1
matter
5:4 38:12
44:17 53:20,
22,23 54:1,
10,12 56:6,7
66:15 69:17
76:21 83:14,
22 84:16
91:14 95:17
97:9 119:10,
22 120:10,14
121:10 122:15
130:8 148:24
150:13 151:3
153:2 166:24
170:9 178:11
206:15 212:8
227:15 233:2
245:14
matters
19:19 20:22
39:3,20 46:16
48:8 52:14,17
54:7 56:15
61:10,25
62:11,12 63:1
64:1,18,19
65:4 66:7,14
67:24 68:9,23
70:21 73:18
74:5 75:4
76:17 80:16
88:12 94:13
95:15 97:7
98:12 100:22,
23 102:17,24
103:8,14,23
104:15 110:8
113:12 114:1,
15,22 117:18
125:11 127:9,
21 128:22

129:20,22
132:19 133:19
134:8 136:7
138:6 147:14
148:4,5
151:4,9,18
159:14 162:9
165:19,24
169:25 171:13
177:6 181:11
183:11,12
186:17 187:8,
20 189:22,23
192:1,15
194:7 195:17,
18 196:19
197:1,12
199:2,7
200:12,13
202:4,5 208:1
210:23 211:13
217:21 219:15
224:8 227:13
235:6 238:19
239:4 245:20,
21 248:14
249:3 251:11
252:4,22
253:5
McGahan
135:23
McGeehan
135:13,14,15
mean
7:21 9:25
10:5 16:14
30:1,2,18
45:3 51:23
53:3 58:23
65:22 85:1
91:18,20
103:25 108:8
111:10,20
115:10 119:11
120:7 127:14

128:8 133:7
141:11 142:22
152:5,19
158:9 160:8,
24 168:15
171:18 173:17
178:25 201:19
214:5 218:6
236:2
meaning
167:9
meanings
90:15
means
68:8,15,21
79:1 108:4
134:6,13,20
159:21,22
209:12 214:7
meant
79:4 86:12
100:16 118:10
132:16 133:6
152:8,11
measure
214:11
measures
67:14,16
92:20
Mecler
26:25 27:2,13
media
33:9 99:4,5
101:9
mediation
11:8
medication
9:16
meet
16:16,21
31:12,17,19
34:3 113:23

meeting
31:7 205:25
244:14
meetings
12:14 24:1,19
29:19 30:1,8,
15,22 31:14,
15 90:16
128:4 244:1,
8,16
Megan
33:6,8,9
Melinda
26:1
member
7:10 11:8
15:12 20:9
24:5 27:3,7
30:22 34:13
52:1 60:18
90:16 105:9
122:14 161:17
168:22 169:11
170:21
members
16:12,22
18:8,10 24:17
32:7,16 51:18
53:11 56:8
57:9 59:14
60:6,8,12,14
71:6 87:25
90:8,15,24
94:22,24,25
95:9 96:6,22
105:7 108:19
117:25 120:19
121:2,4,16
125:15 136:18
139:9 143:10,
18,19 144:6,
8,17 148:1
160:1,7
164:23 165:7,

13 167:11,18
169:2 175:21
177:8,21
181:14 184:19
185:22
188:22,23
217:13,18
228:3 234:23
memory
47:4 83:1
117:20 170:24
193:11 204:13
241:13
mental
20:18 38:19
39:4,19,22
40:20 41:1,9
42:1 43:17,
18,22 50:15,
25 51:2 52:17
53:7 54:8
57:22 59:2
63:3 65:23
66:8,16 67:23
68:10,23
70:23 76:6,19
83:24 86:7,10
87:14 88:24
94:14 100:9,
24 103:21
104:13 111:7
114:22
115:13,17
116:8,23
118:6 120:25
123:9 124:6
127:25 128:20
129:9 130:9
131:7 132:18
134:9 136:15
144:17,24
146:18 147:14
152:14 170:9
179:25 181:12
188:21 190:16



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

285

194:21
202:16,21
205:2 206:14
208:7 219:16
220:22 236:12
237:13 238:16
243:8 244:24
249:8,24
250:12 253:13
**mentioned**
53:15 182:11
234:10 241:18
**messages**
34:24
**methods**
181:15
**mic**
144:21
**middle**
120:7,10
Milam
14:20
**military**
57:16 190:3,8
**million**
99:18
**mind**
143:25 220:18
**mine**
97:14,15
**minorities**
39:16 60:16
230:25 236:23
247:17
**minority**
10:5 16:9
60:8 74:2
84:14,24 85:4
93:14 95:14
113:24 123:1
124:3,21
162:2,7 163:6

165:1,7,12
166:4 167:7
188:16 217:18
220:14 231:16
235:5,18
240:23
**minute**
64:8 125:7
146:16 196:4,
5 210:2 216:7
239:21 243:5
**minutes**
12:16 50:3
59:16 98:24
187:3 258:2,3
**mischaracteri**
**ze**
182:24
**missed**
233:20
**missing**
158:22
**Misstates**
182:16 189:21
**modify**
197:9
**moment**
126:4 241:22
**Monday**
216:1
**monitor**
82:4
**month**
31:5 191:20,
21 232:7
**months**
31:2
**morning**
12:3 167:22
242:11
**most**
35:13 46:2

75:6 80:13,19
91:12 106:19
116:10 151:6
161:25 175:21
177:12 216:11
248:24 249:6
252:3
**mostly**
18:3
**motion**
215:21
229:12,16
231:3,6
232:9,12
**motivation**
20:18 38:19
39:19 40:21
59:3 65:23
67:23 103:22
245:8
**motivations**
39:4 42:1
44:6 66:9
77:25 131:8
134:10 147:16
188:22 202:17
220:23 237:14
**motive**
78:7,9,23
**MOVE**
19:8 20:14
57:16 79:9
160:2 233:15
**moved**
148:2,15
**moves**
22:19 159:25
233:18
**moving**
148:12 168:19
218:2
**Multiple**
92:11

**must**
22:16
**myself**
176:3

_____ N _____

N
2:1
**name**
5:2,9 6:3
25:25 26:3,6,
15,21,25
27:16,21,25
28:18 33:6
60:24 103:19
175:10 255:7
**named**
28:21 177:8
256:17
**names**
32:17 60:12
143:20 176:25
**narrow**
62:4 204:22
205:9 226:16
**narrowed**
124:22
National
24:10,15
25:4,13
**natural**
206:1
**nature**
8:3,6 11:1
119:19 178:8
**near**
32:5,6 232:24
**nearly**
151:25
**necessarily**
82:3 106:2
108:18 233:5

238:22
**necessary**
36:8 85:19
203:18 233:13
**need**
21:13 45:7
46:6 52:8,12,
21 53:4 85:22
156:19 158:12
180:19 191:11
198:14 204:23
206:8,25
222:12 234:14
253:4
**needed**
73:13 89:18
201:6 202:2,
11
**needs**
16:21 20:12
190:22 239:9,
12,17
**negotiations**
11:8
**neither**
258:5
**never**
30:5 31:16
48:16 220:18
244:13
**new**
85:19
**newspaper**
128:2
**night**
167:19
Nobel
27:17,19
**nobody**
112:1 178:19
**nodding**
9:8



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

286

non-Anglo
10:6
non-citizen
23:16 102:14,
21
non-citizens
86:19 116:15
non-photo
45:10 55:1,12
80:23 81:4
180:10,23
181:9,15,24
182:11,14
191:24
N o n -
substantive
34:11
non-white
10:6
normal
151:5
Normally
18:13 56:18
161:22 207:17
NOTARY
255:12
note
13:15
noted
255:2
notes
13:6 239:22
nothing
21:1 105:9
162:22 212:15
251:6 256:20
Notice
4:2 36:4,5,6
52:2 150:9,
11,24 151:6,8
217:9,13,20

notices
150:15
notified
37:2 257:1
number
16:4 19:18
28:11 30:25
50:8 51:7,8,
10 53:12
54:23,25 63:5
71:4,6 73:12
80:5 81:7
91:22 92:15,
23 109:18
113:3 129:14
141:10 157:24
158:2 204:1
221:15 230:7
235:14,18
244:10 246:9
numbers
16:2,3 93:14
158:17 242:23
246:11
numerous
32:16 180:3
NW
2:10
NWB
2:10

O

oath
9:2 47:17
255:6
object
13:21 20:16,
23 51:1 53:5
56:23 125:7
166:22 178:20
Objection
39:17,18
40:23 46:15

52:13,23 54:6
56:16 70:1
84:1 86:6
89:25 91:8
108:7 109:3,4
110:14 114:2
117:16 121:6
124:4 133:18
134:7 136:14
148:21 165:19
176:12 179:7
182:17 189:20
192:1 193:1,
20 194:14,20
202:15 205:22
209:4 220:21
252:4,21
253:5,11
objections
162:12 194:19
196:23 212:5
objective
53:13 104:14
observe
209:6
obsolete
35:6
obtain
97:24 98:2,9
190:23,25
191:4,16
200:20 201:6
202:2,12,24
203:11 229:8
obtained
240:9
obtaining
199:19
200:11,25
201:21
Obviously
13:20 90:12
116:7 157:18,

19 212:12
228:1,17
occasion
220:18
occasions
166:13
occur
148:9 200:17
206:2
occurred
6:11 10:17
64:17 73:10
75:7 109:21
119:5,17
120:21 133:11
152:3 166:9
177:24 216:18
240:4 250:22
251:1
occurring
96:9
occurs
144:24 204:7
offer
241:10
offered
112:1,6
184:24 185:6
186:19,24
241:9
OFFICE
2:3 12:19
15:15 19:9
21:13 22:15
24:18 29:20
30:4,5,8
33:24 35:9
37:6 72:21
81:9 103:12
130:13 135:16
154:20 155:1,
7,13,24 156:1
157:7 171:8

172:22 173:8,
19 178:22
179:5 184:18
186:7,11
188:11 207:13
211:6 213:21
243:2,12
251:19 255:10
257:3
officer
22:17 257:2,
13,15
offices
1:15 15:9
72:23 73:5,8,
12 199:25
203:2,4,5,8
232:4 242:16,
21,25
official
1:6 55:10
256:6
officials
85:12,14,16,
20 104:22
122:17 185:24
186:3
Ogden
143:23
Oh
11:18 55:9
56:21 73:1
107:12 185:14
Okay
7:17,19 8:24
17:13 21:1,15
22:6 25:12
29:23 34:11
35:18 38:12
40:24 42:8
43:5,21 46:5,
13 47:12,18
48:23 49:12,
15,23 50:7



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012
287

53:2,14 54:21
61:7,20 63:22
65:17 66:2,20
71:1,5 72:5,
16 74:16
79:20 80:12
81:3 91:12
92:13 94:1
99:1,2 105:14
106:6 125:16
128:7 133:5
135:6,9
136:24 137:12
139:19 140:1,
12 150:7
155:20 156:8,
12 157:16
159:9 164:2,
21 166:16
168:14 171:2,
23,25 175:23
187:2,4,12
199:6,12
204:17 207:8
209:25 216:9
219:7 220:2
221:10 222:14
228:19 233:25
235:13 238:6
241:17 242:5
245:25
246:16,23
248:7 250:7
**old**
60:20
**omnibus**
72:13
**once**
31:5 136:19
183:10 241:12
**ones**
19:22 91:17
121:24 158:22
177:11

**ongoing**
179:5
**Online**
4:4 82:18
**open**
158:12 232:5
241:19,22
**Opening**
149:9 203:9
**operating**
18:15
**Opiela**
27:21
**opinion**
91:6 100:17
104:3,8
119:13 120:25
248:24 250:16
**opinions**
39:19 42:1
54:9 59:3
65:23 66:9
76:20 87:15
124:7 147:15
202:16 238:16
**Opponents**
73:22 120:2,
15 160:17,20
161:10,16
217:17
**opportunities**
164:23
**opportunity**
205:15
**opposed**
77:8 78:7,22
118:16 119:12
121:10,19
130:22 138:22
144:20 145:3,
6,8 148:23
184:10

**opposing**
121:5 165:18
247:22 248:17
250:2
**opposition**
63:12 121:14
165:7,12,14
166:1 231:11
**oppressive**
130:22 131:23
132:11
133:15,17
**option**
192:12
**options**
54:25
**ORAL**
1:9 117:24
256:9
**order**
13:16,20
33:25 46:9
66:5 76:24,25
77:2,3,22
78:3 89:9,11,
13,18 90:6
138:22,23
139:17 154:3
157:1,2,19
158:7 160:3
181:4 191:12
204:24 210:7,
11,12,14,19,
24 211:2,7,8,
15,25 212:6,
10,21,24
213:9,14
248:15 250:3
**ordered**
77:5 78:5,17
79:5 157:3
210:12 241:20
**orderly**

159:25
**orders**
92:20 211:2
233:14 234:13
**organization**
29:1,4
**organizations**
30:23
**organizing**
159:24
**original**
106:3 176:14
218:23 257:2,
8,13,17,19
**ought**
34:14
**outcome**
258:9
**outlet**
99:4,6
**outreach**
16:8,10
**outside**
122:7 136:21
**outstanding**
248:24
**over**
11:10 12:2
13:13 20:3
25:14 31:8,10
36:9,14 37:5
48:17 50:3
51:11 91:18
112:24 143:11
157:21 220:5
227:3 241:17
246:10
**overall**
78:6,22 87:3
**overheard**
237:8

**overriding**
130:24
**overruled**
233:10
**overtime**
25:14 235:25

**P**

**P**
2:1
**p.m**
1:15
**PAGE**
3:2 4:2 36:13
54:17,18,19
55:7 60:1,3,
13 62:9 67:13
68:3,4 69:6
72:16,17
75:22 77:1,15
78:3,15
80:10,11 81:1
106:11 124:25
126:11,12,16
130:18 132:22
133:21,23
134:2 135:9,
12 137:7
151:2 152:5
154:13 157:2
163:20,24
164:10 172:13
179:14,15
204:16 210:11
219:6 222:10,
12 223:18
229:2,24,25
231:3 232:2
254:4
**paid**
203:11
**Panhandle**
32:3
**paragraph**



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

288

63:10,19
66:21 67:1,2,
12 69:9 72:19
73:2,21 75:11
77:14 99:17
130:19 131:24
132:9 150:8
151:21
154:16,25
164:2 182:8
216:6 217:10
223:19 224:21
225:25

**paragraphs**
130:19

**parameters**
159:22,23

**paraphrasing**
230:11,13

**Parkway**
2:14

**parse**
181:3

**part**
20:7 21:9
59:7 72:13
80:13,19
86:18 92:22
94:4 96:2
97:13,17
106:19
116:10,14
118:8 130:22
131:22 143:13
144:23 176:6
193:4 197:4
212:13
235:13,17,21
240:13 247:25
249:4 250:2

**participation**
217:19

**particular**

24:18 25:8
77:14 83:12,
18 107:4
115:4 140:5,
15 144:2
179:12 228:4
232:24

**particularly**
16:9

**parties**
1:17 257:24
258:6

**partisan**
92:25 235:22

**partner**
14:21,22

**parts**
12:4,6,7

**party**
11:18 26:12
87:23 237:7
257:25

**Paso**
97:17

**pass**
49:9,11 51:22
82:10 97:25
140:17 169:23
234:6 253:15

**passage**
125:6 141:18
240:16,21

**passed**
21:6 31:11
48:22 49:7
56:18 82:9
83:2,3 109:23
113:10 140:19
175:21 193:23
232:21 233:4
234:7 240:17,
20

**passes**

20:11 21:4
83:16

**passionate**
168:16

**passport**
191:4,12,17

**PATRICK**
2:4 5:17

**Patriots**
29:5,10

**penalties**
131:2,6,12

**pending**
9:12 30:9

**Pennsylvania**
2:10

**people**
30:8,16,20
32:22 42:10,
23 83:10 95:2
99:18 118:9,
11 127:15,16
128:4 136:20
143:25 161:21
167:10 168:5
185:5,22
212:14 213:2
227:25 244:8

**percent**
31:8 72:21

**percentage**
15:25 93:13
102:8

**period**
91:18 112:24
115:24 177:25

**periodically**
16:5

**periods**
130:15 150:18

**permissible**
179:16

**permitted**
10:2

**Perry**
213:18

**person**
7:15 10:2
23:7 28:4,12
29:12 32:12,
14 99:20
116:19 117:14
126:24 133:15
190:22
198:19,23
202:23 219:12
240:3,8 255:7

**personal**
15:2 34:20,22
76:3 154:12

**personally**
40:1 255:6

**persons**
99:7,25
100:20 156:1
190:8 224:25
225:1 230:23,
24

**person's**
62:20 107:5,
18

**pertaining**
197:15

**PH**
2:6,11,15

**phone**
12:3,15,17
34:6 158:15
217:7 218:7

**photo**
9:23 10:1
48:6 55:1,6,
11 58:6 67:6,
16 69:12,24
70:14,21

73:22 74:3
75:13 76:1
79:14 80:23
81:8 88:6,11
99:6,24
100:19
102:14,20
103:5 104:22,
25 105:5,12
107:2 113:23,
24 180:13,19,
21 192:22
207:3 229:6
235:24 236:3

**photograph**
107:6,19

**photographed**
196:23 205:22

**photographs**
106:15

**phrase**
63:19 132:7

**phrased**
46:23 57:24
65:25 70:20
72:1 74:5
83:8 84:7,16
110:21 111:9,
19 124:8
129:19 138:5
144:15 147:22
196:13 227:16

**picture**
191:9

**piece**
233:20

**place**
129:17 160:5
193:12
197:17,24
198:2 218:15

**placed**
9:1 165:9



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

289

| | | | | |
|---|---|---|---|---|
| **PLAINTIFF** 2:3 11:23 | 103:6 247:16 252:2 | **potentially** 41:6 158:15 243:7 245:12 | 86:3 114:10 115:15 209:6 | 140:24 178:16 |
| **please** 5:4 6:3 9:7, 10 99:11 125:23 142:3 196:5 199:4 206:11 213:9 222:10 234:20 | **Porter** 32:9 **portion** 222:23 226:5 **posed** 41:11 129:10 250:6 253:14 | **practice** 14:8 **preceding** 132:10 222:12 **precipitated** 253:3 | **preside** 220:5 **president** 21:25 22:6,9, 16,19 206:1 **presiding** 22:17 | **principal** 99:20 130:25 **printed** 99:5 101:7 **prior** 65:18 67:10 141:8,9,16, 18 214:9 |
| **plus** 34:13 | **poses** 229:9 | **preclearance** 37:23 38:10 | **Presumably** 131:24 142:23 | **priority** 129:15 130:2, 7,13 |
| **point** 10:14 59:15, 19 79:1 80:24 81:18 87:2 116:12 125:18 136:4 147:3 172:25 204:12 211:7,19,22 213:4 224:22 248:9 249:11 253:9 | **position** 22:12,15 56:11 113:21 114:4 129:16, 21 142:20 154:24 155:12,18 160:12 211:24 212:9 229:18 231:10 232:14 | 113:20 167:8 **precleared** 38:14 227:12 **preface** 227:17 **prefer** 202:21 **prepare** 11:25 46:12 | **pretty** 21:11,17 56:3 125:19 234:1 **prevent** 51:19 70:6 75:14 86:18 99:7,25 100:20 105:9 116:15 117:14 209:5,6,23 236:22 237:25 | **private** 7:14 103:7 **privilege** 13:10,12,18, 19,22 38:17 39:23 40:23 42:6 43:20 44:10 46:16 48:8 50:17 51:6 52:15 |
| **points** 77:21 226:1 | **possess** 112:11,22 | **prepared** 47:10,14 48:2 63:4 221:16 | **prevented** 69:11,24 230:8 | 54:8,11 56:16 57:25 62:12 63:2 64:19 |
| **policy** 35:16 63:11 85:25 130:14, 25 | 113:7 187:18 194:11 201:17 **possessed** 74:3 | p r e - **redistricting** 15:18 | **preventing** 116:19 **prevents** | 66:3,15,17 70:2 73:17 74:5 76:17 77:5,6 78:5, |
| **polite** 211:6 | **possessing** 230:9 | **present** 9:25 45:1,2 | 53:15 210:1,3 **previous** 74:11 | 18 79:7 84:1 88:24 89:2 94:12,13 |
| **political** 107:8,20 | **possible** 56:9 160:6 | 80:21 94:23, 25 96:6,22 102:2,3 107:1 | **PREVIOUSLY** 4:11 79:21,22 98:14,16 | 95:18 96:11 97:8 100:3,23 102:17,25 |
| **poll** 23:4 198:14 | **post** 136:11 151:12 | 155:2,10 205:15 | 105:18,23 218:24 227:21 | 103:14 104:14,15 |
| **polling** 197:17,24 198:2 243:2 | **post-hearing** 136:19 | **presentation** 183:9 | **primarily** 15:1 16:7 | 110:9,15 111:12 113:13 |
| **Pomeroy** 32:10 | **posting** 150:15 | **presented** 39:8 80:23 251:14,23 | 22:17,20 33:10 | 114:1,15 116:9,25 |
| **population** 15:17,20 102:8,15,21 | **post-vote** 164:20 **potential** 30:16 124:20 199:18 238:14 | **presenting** 125:15 **preserve** | **primary** 21:15 57:13 | 117:17 120:24 124:5,8 125:8 127:10,22 |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

128:22
129:11,20,24
130:9 132:25
133:19 134:9
138:6 148:6,
22,24 150:3
152:7 157:5
159:5 165:20
166:25 170:1,
11 171:14
182:8,20
183:12 186:16
188:20
189:22,24
190:17 192:2
193:24 194:8,
15 195:18
196:19 197:1,
12 199:3,8
200:13 202:5,
22 203:21
206:16 208:2
210:4 211:4,
14 213:10
219:16 220:24
224:8,25
225:9 227:14
235:7 236:13
238:19 239:4
243:7 245:1,
10,13,14,21
247:23 248:15
249:3,17
250:2,4
251:12 252:5
253:6

**privileged**
120:3 151:19
152:12 190:1
200:15 245:2
248:18 250:23

**pro**
21:25 22:7,
10,14,16,19
243:21

**probably**
24:16 26:18,
19,20 28:10
30:21 33:5
35:12 55:25
91:11 93:3,6
110:2 118:21,
25 122:5
141:15
143:22,23,24
172:25 174:22
175:21 177:2
187:10 193:14
227:18 228:4,
14 232:18,23

**probe**
41:1

**problem**
70:16 86:5,7,
10 114:13,20
250:10

**problems**
23:9 32:21
46:20 47:7,
18,25 115:4
212:14

**procedural**
51:18 82:21
85:18

**procedure**
54:10 113:19
138:16 146:4,
5 151:4 161:5
219:22,24
256:25

**procedures**
44:14 52:16
178:15

**proceeding**
154:22 232:25
258:7

**proceedings**
11:1 44:13

**process**
20:20 21:7
38:20 41:10,
24 43:13 67:8
70:7 71:3,11
83:24 85:19,
24 115:13
119:8 124:13
125:14 138:16
144:24 148:23
164:25 165:2
171:10,21
178:7,13,14
190:17 202:16
206:20
219:17,22
224:9 237:14
243:8 245:8

**processes**
65:22 66:8
73:18 76:6
104:13 116:8
118:6 120:25
136:15 144:17
152:23 192:5
219:16 220:22
221:11 237:13
238:16 244:24
249:24 250:12

**proclamation**
214:16,19

**produce**
157:3 230:15,
22

**produced**
156:25 157:7,
25 241:21

**Progress**
178:13

**progressed**
252:17

**prohibited**
211:21 229:4

**prohibits**
210:25

**prompted**
58:23 167:24

**proof**
80:21 81:6
107:1 179:18

**proper**
78:6,18 160:4

**proponents**
160:17,20
161:16

**proposals**
111:15,16,22
186:24

**propose**
161:17

**proposed**
111:20 140:25
141:4 143:12
228:13 231:14

**proposing**
20:14

**pros**
40:10

**prosecution**
69:13,15

**prosecutions**
246:9

**protect**
77:6 209:23

**protest**
218:1

**proved**
255:6

**provide**
40:22 50:19
57:6 90:19
93:17 123:9
133:5 139:2
150:11,15,

20,25 180:5,
12 191:12
203:10 206:20
228:8

**provided**
61:17 62:15
217:13 218:24

**provides**
54:23 106:14
150:10 205:14
207:2

**providing**
132:17

**provision**
137:23 180:17
198:18,22
204:12 206:17
207:12
210:11,19
224:5 225:11
226:6,14
227:10 229:9

**provisional**
45:18,22 46:9
204:10,14,22
205:11 206:8,
17,20,21,25
207:10
222:15,17
226:2,5

**provisions**
80:6 180:11
196:1 197:15
204:11 206:19
224:23

**public**
15:15,16
18:4,11 19:20
20:22 21:2,5
37:8,12 38:24
39:3,9,12,
13,20,21
40:3,7,9,11,
21 41:5,16,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

291

| | | | | |
|---|---|---|---|---|
| 20,22,24 | 130:1,4,6 | 22,23 224:4, | 9,10 115:6 | 217:6 218:7 |
| 42:2,9,13 | 131:1,11,15, | 11 228:5 | 116:14 138:7, | **Putting** |
| 43:2,7,8,15 | 16 132:2,16, | 229:15,18 | 10,12,17,19, | 19:1 78:2 |
| 44:2,14,18 | 19,24 133:2, | 231:9,10,13, | 21 139:1,2 | 118:9 |
| 46:20,24 47:7 | 22 134:5,12, | 19,21,25 | 147:11 180:22 | |
| 50:10 52:17 | 19 135:3,5 | 232:14,19 | 181:1,4,8, | _____ Q _____ |
| 56:10 57:18 | 136:8 142:20 | 235:3 239:15 | 15,17,22 | |
| 61:11,25 | 147:18 148:5, | 240:14 242:20 | 182:4 183:7 | **qualify** |
| 62:11 63:1 | 14 149:23 | 243:14,15 | 192:23 | 141:19 |
| 64:2,19,21 | 151:4,10,16 | 245:4,5,21,23 | 207:18,20, | **qualifying** |
| 65:5,19 66:8, | 152:12,20 | 246:1 248:21 | 21,25 208:2, | 76:1 |
| 15 67:10,17, | 153:11,13 | 249:11,17 | 6,11,12,15, | **qualitative** |
| 24 68:10,23, | 155:13 156:2 | 250:9,15,20, | 19,21,22 | 116:22 131:5 |
| 25 69:18,21, | 159:14 161:5, | 23 251:1,7,14 | 209:3,5,10, | 148:22 |
| 25 70:3,7,22 | 25 162:1,10 | 252:11,13,22 | 13,16,17,19, | **quality** |
| 73:10,25 | 163:2 165:5, | 253:8 255:12 | 20,21,22 | 160:5 |
| 74:8,10,17,18 | 6,14,15,23,25 | **publicly** | 225:4,7,8 | **quarter** |
| 75:3,8,16,17, | 166:1,3,19 | 19:23 124:19 | 235:14,17, | 67:5 |
| 19 76:21 | 167:12,19,24 | 136:4,12 | 20,21,23,24 | **question** |
| 80:16 86:4,9, | 172:18 181:7, | 163:4 167:5 | 236:3,15 | 8:15 9:5,7, |
| 13,14 88:13, | 11,13,18,19 | 186:13 187:6 | 237:24 238:8 | 12,13 19:3 |
| 17 94:5 | 182:10,13,18, | 189:12 198:25 | 240:18 241:1 | 20:17,23 |
| 95:13,16,22 | 24 183:1,6, | 200:9 231:6 | **purposes** | 38:6,18 40:15 |
| 96:2,3,4,12, | 11,23 186:17 | 244:18 252:8 | 90:9 145:13 | 41:11,23 |
| 13,14,15,18, | 187:9,10,16, | **pull** | 189:18 | 42:18,20 |
| 24 97:9,19,21 | 17,21,22 | 76:25 | 208:10,18 | 43:14 44:6,8 |
| 98:5,12 | 188:3,14,25 | **purported** | 209:14 255:8 | 46:17,22 |
| 100:19,24 | 189:5 191:22 | 117:5 | **pursuant** | 50:16,20 |
| 102:13,24 | 192:4,11,16, | **purpose** | 1:16 157:1 | 52:14,19 53:9 |
| 103:3,9,10, | 22 193:14 | 10:16 18:7 | 256:24 | 54:6 57:22,24 |
| 14,16,23 | 195:1,8,15,19 | 34:8 41:19 | **put** | 58:4 59:2 |
| 104:1,4,15,19 | 196:8,9 | 42:15 43:4,13 | 21:9 70:16 | 61:13 62:11 |
| 110:17,23 | 197:2,14,19, | 44:1,3 57:4, | 79:12 84:17 | 64:9,21 65:21 |
| 111:4,11,16 | 23 198:3,8,12 | 6,11,13,14,17 | 117:23 136:24 | 67:22 68:11 |
| 112:10 113:5 | 199:7,9,18, | 61:7,9,14,23 | 213:2 227:6, | 69:17 70:15 |
| 114:5,18,23 | 22,24 200:1, | 62:1,13,14 | 23 228:1 | 74:4,10,12, |
| 115:7,9,19, | 13,15,19,23 | 70:17 76:3,8, | 251:14,18 | 14 76:5,23 |
| 21,22,23 | 201:16 202:1 | 9,11,24 77:3, | **Putte** | 83:7 84:6,15, |
| 116:2,6,17 | 203:1,16,22, | 7,10,15,19,20 | 19:10,14 | 18,20 87:13 |
| 117:3,7,11, | 24 207:23 | 78:1,7,9,22 | 118:21 122:1 | 90:5 92:7 |
| 18,19 122:20, | 208:3,5 | 79:3 86:2,18 | 135:12,21 | 93:21,24 97:8 |
| 25 123:2,3,13 | 210:1,6 212:2 | 89:17,25 | 143:22 149:9, | 98:6,12,13 |
| 124:1,18,23, | 214:13,15 | 90:2,11,20 | 14 176:3 | 99:10,12 |
| 25 125:11 | 217:22 218:4 | 91:4,7 114:7, | 177:5 215:9 | 100:2 102:4, |
| 127:15 128:23 | 219:11,18 | | | 16 103:22 |
| 129:2,22 | 220:12 222:5, | | | |



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                    June 7, 2012
                                                        292

| | | | | |
|---|---|---|---|---|
| 104:18,20,23 109:6 111:9 113:25 114:2, 14,23 117:9 120:23 121:21 123:7,11,12, 24 124:14,24 125:12 127:10 129:10,19 131:9 132:3, 5,7 134:8,15 136:23 137:13 138:5 140:8 142:2,4,15 145:2,13 147:14,16,21 150:2 155:16, 22 167:12 170:1 180:25 181:5,12 182:2 183:11, 19 189:2 192:17 193:24 196:5,6,10, 18,25 197:11, 20,22 199:4,5 202:18,19 205:5 206:11, 12 208:16,24 209:2 219:14 224:7 225:6 227:17 231:21 235:7,10 236:9 237:12 238:4,7,13 243:11 245:10,17 247:25 248:14,20 249:2 250:4, 6,13,19 251:4,9,10 253:6,14 **questioning** 211:12 241:17 | **questions** 9:8,9 13:19, 21 43:18 78:5,6,18,21 108:20,23 109:1 152:12 171:9 210:12, 18 211:1,7,21 212:2,4,15 237:2 242:3 243:6 252:17 253:16,17 **quick** 54:15 **quickly** 148:3,13,15 163:22 233:15,19 **quit** 35:4 **quite** 19:5 30:18 35:3 107:10 119:1 217:16 **quorum** 95:7 160:4 **quote** 133:23 248:4 <hr> **R** <br> **R** 2:1 **race** 61:1 97:11 **racial** 60:16 194:10 195:2,5 230:24 236:23 **radio** 128:2 **raise** 156:24 216:23 220:12 | **raised** 95:23 122:25 124:2 162:6, 14,19 166:11 197:10 200:5 **ran** 169:24 **randomly** 178:6 **ranges** 157:8 **reach** 20:13 80:24 90:18 **read** 65:6 77:22,24 78:10 98:24 99:12,17 101:19 104:8, 10,12 128:1 142:2,4 154:16,17 155:4 157:13 158:16 164:14,19 192:19 196:5, 6 199:4,5 206:10,12 216:25 221:3 255:1 **reader** 164:9 **reading** 77:4 78:2 107:11 257:6 **ready** 51:8 199:11 **real** 239:22 248:11 **really** 8:4 18:6 21:17 37:20, 25 39:25 | 43:22 83:10 85:13 91:2 92:16 100:17 119:11 122:13 132:4 141:11 164:18 193:7 214:22 **realm** 115:5 **Re-ask** 238:7 **reason** 9:20 112:5 129:1,6 131:1 163:9 166:20 178:16 180:4 186:18 209:8 212:13 222:9 228:1 250:19 254:4 **reasons** 50:9,12,21, 23 51:21 144:12 145:5, 7 152:22 165:17 180:5 182:2,6,19 205:18 208:4 221:14 228:2 **recall** 18:13 24:8 27:15 28:17 29:18 42:16 46:25 47:1, 15,18 49:20 55:17,18 56:12 57:3 58:6,9 60:22 68:2,12,17, 20 69:1 71:10 72:14 75:7 79:14,16,18 81:17,21,23 82:7 83:12 | 85:9,10,13, 17 86:1,25 87:9,22 93:23 94:1,3,24 97:2,23 98:13,22 101:16,20,21 103:1 106:4 109:9 110:22 111:1,3 112:5,9,18, 19,20 113:8 116:11 119:11 120:12,17 122:13,24 124:23 127:17,20 128:11,24 130:12 133:3, 10,12,13 136:1,2,4,9 137:1,17,19 140:16 142:18 145:7 147:10 148:1,7,8 149:13,15 153:16,18 154:9,10 160:19 162:2, 5,6,12,14,18 163:8 164:16 165:16,17 166:2 167:16 168:1,6,9, 10,15,16 174:16 176:5, 23 179:1 182:18 183:25 184:10 185:20 187:5,23 188:8,9,10 190:11,13 192:18 193:15 194:4 195:7, 10,21 198:25 199:23 205:5 |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

214:22 215:16 216:22,24 217:8,11,12 218:3,4,10,14 220:17 221:3 222:22 223:1, 4,6,9 224:15 225:23 226:7, 22 227:7,21 228:7,12,14, 15,16 229:21 231:12 232:1, 21 233:1 241:15 242:21,23 244:5,13 245:25 246:19 248:2 251:17 252:23

**recalls**
116:6,10

**receipt**
157:19 257:1

**receive**
36:6 40:10 245:6

**received**
13:16 24:3 25:12 36:5 245:5 257:22

**receiving**
216:24

**recess**
59:22 156:21 199:14 239:25

**recite**
239:13

**recognize**
58:16 80:1,2 105:24 126:7 137:7 149:5 163:16 170:18 172:10,11

215:6,7,20 223:15 228:24,25

**recollection**
18:20 49:16 50:2,4 63:24 64:6,10,16 65:11 71:17 72:7 75:20 82:20,23 84:9 86:16 87:4,5, 20 88:2,5 96:8 101:11 104:6 111:25 112:16 115:3, 12,17,19 118:3,4,5 123:6,8,18,25 125:2,3 131:17,19 134:25 153:25 154:2,5,8 162:25 166:8, 10,16 170:25 171:3 174:24 182:22 183:3, 6,14 184:17 187:13,14 192:8 193:6 196:15 197:6 198:4,6,9 200:4 201:11, 23 203:13 204:4,5 216:17,20 218:20 223:22 229:22 234:23 235:11 238:23 251:25

**recommendatio**
**n**
62:23 63:24 65:2,12 76:13,15 77:21 88:6,11

**recommendatio**
**ns**
62:19 63:11 75:23 76:16

**reconstruct**
120:20

**Record**
4:4 5:6 6:4 13:16,23 19:20,25 20:22 21:2,6, 9,10 35:24 38:24 39:3,8, 9,12,13,21 40:3,7,11,22 41:5,14,16, 17,20,22,24 42:2,9,13,14 43:2,3,6,7,8, 10,11,16,24, 25 44:2,7,8, 18 46:20,24 47:1,2,3,7, 11,21,22 48:3 49:24 50:5,10 52:17 57:19 58:3 59:6 61:11,16,25 62:11,15 63:1 64:2,19,21 65:5,19 66:8, 16 67:10,18, 25 68:10,23, 25 69:18,21, 25 70:3,7,22 71:17 73:10, 17 74:1,8,11, 17,18,23 75:8,16,17,19 76:18,21,22 80:16 82:10, 11,22 85:5 86:4,9,13,14 87:9,24

88:13,17 94:5 95:3,13,16, 22 96:2,3,4, 7,12,13,15, 18,24,25 97:9,10,19, 21 98:5,12, 19,22 100:19, 24 101:1 102:13,24 103:3,9,10, 15,16,23 104:1,4,16, 19 110:17,23, 25 111:4,11, 16,24 112:3, 7,10,14 113:3,5,9 114:5,18,23, 25 115:7,9, 14,19,21,22, 23,24 116:3, 6,17,22 117:4,7,11, 18,19,22,23 118:1,10,12 122:20,21,25 123:2,4,5, 13,17,19,23 124:1,18,23, 25 125:4,11, 24 126:8,13 127:4 128:23 129:22 130:1, 6 131:1,15, 16,21 132:3, 13,16,19,25 133:10,22 134:5,12,17, 19,24 135:2, 5,13 136:3,8, 21 137:6 140:19 143:15 144:19 147:18,23 148:5,9,14

149:23 151:4, 10 152:13 153:11,13,23 154:4,5,11 155:13 156:24 157:14 158:17 159:14 160:17,21 161:5 162:10, 11,17,21,23, 24 163:1,7, 11,17 165:5, 10,23,25 166:1,3,6, 15,19 168:2, 8,23 170:2,5, 6 172:9,19 173:15 176:7 181:7,11,13, 18,19 182:10, 13,18,24 183:1,7,11, 23 184:6,11 186:17,21 187:9,10,16, 17,21,22,24 188:3,7,14, 25 189:1,5,6, 10,14 191:22 192:4,11,16, 23 193:4,15, 17 194:23,24 195:1,8,12, 15,19,24,25 196:8,9 197:2,5 198:3,8,10 199:7,9,18, 22,24 200:1, 13,15,19,22, 23 201:4,16, 24 202:5 204:3,7,8 207:23 208:4, 5 210:1,6 212:2,20


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

215:5 217:22
219:11,18
220:16 221:18
222:23 223:2,
25 224:11,17,
18 225:3,13,
16 228:5,10
229:15,17
231:24 234:2
235:3,12
239:15 240:2,
15 242:20
245:21,24
246:1,6
248:7,9,22
249:11,17
250:10,15,20,
23 251:1,7,
15,16,21,24
252:11,13,14,
22 253:8

**recorded**
21:8 39:7
42:11,22
229:12

**records**
35:9 129:2
136:11 173:9
243:20

**redistricting**
6:10,18 8:12
11:21 32:2

**redress**
213:6

**reduced**
256:21

**reelection**
61:3

**Reeves**
1:12 256:12
258:12

**refer**
10:5 19:19

20:22 39:20
52:9 59:6
61:10,24
62:10,25
64:18 65:4
66:7,15 67:24
68:9,22 70:3,
22 73:17
76:18 80:15
86:9 88:12
97:9,10 98:11
100:23 101:1
103:10,16
104:15 106:22
110:25 114:22
117:17,19
123:2,19
125:4,10
128:22
129:22,25
131:16,21
132:2,18
136:7 148:4
150:21 151:1,
9 152:2
159:13 181:8
182:25 183:10
189:1 195:18
198:3,10
200:1,21
201:4,10,24
203:12 204:3,
8 219:19
223:2 225:2
235:11 250:20
251:20,24
252:11,14

**reference**
195:24

**referenced**
20:15

**referencing**
124:22

**referral**

146:22 147:19
**referred**
42:2 49:13
50:1 52:22
69:13,14,15
82:7 104:1,3
145:13,21
146:11,12,13
168:25 169:16
**referring**
12:11 32:23
39:21 53:17
62:8 66:24
72:22 73:5
77:1 90:22
105:20 106:5
107:10,22
120:13 135:15
146:14 147:11
152:18 173:24
198:22 205:21
216:7 225:1
**refers**
69:1 107:17
133:6 153:7
171:11
**reflect**
83:1 84:13
85:5 87:9,24
88:18 95:23
97:1,21 106:2
111:24 112:3,
7,14 113:3,9
117:20,22
123:5 140:19
153:23 154:11
160:21 162:11
163:8,11
166:6 168:8
181:19
187:22,24
189:14
**reflected**
41:24 123:17

136:10 148:8
165:8 168:23
195:11 232:25
247:8
**reflecting**
172:15
**reflection**
154:5
**reflects**
40:7 46:20
48:3 50:10
61:16 62:15
63:4 64:3,13
65:14,16
86:14 160:17
166:1 182:25
187:10 251:16
252:13
**refresh**
63:23 71:17
82:25 104:5
170:24 171:3
204:12 218:20
223:22 234:22
241:13
**refreshes**
49:16 82:20,
23
**regard**
11:7 19:12
31:13 32:18
41:25 42:9
44:20 72:12
85:18,25
114:20 125:14
130:13 162:23
178:14 184:12
200:1 204:7
206:22 214:25
228:11 246:20
251:20 257:16
**regarding**
63:11 65:2
78:6,21 86:10

104:22 113:4
115:16 131:8
163:21 164:6,
25 188:25
201:16 231:20
244:21,24
247:21
**regardless**
76:2
**regards**
38:25
**regime**
117:12
**region**
15:23
**register**
239:10
**registered**
74:2 112:11,
21 187:18
194:18
**registrar**
46:7 207:9,
11,13
**registrars**
85:16
**registration**
45:1,5
101:23,25
102:1 188:1
239:8,17
258:16
**regular**
10:3 16:17
89:9,10,18
138:23 204:24
**rein**
211:18
**reined**
213:5
**relate**
44:15 106:25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012
295

| | | | | |
|---|---|---|---|---|
| 219:16 221:2 247:24 | 69:20,23 71:22 74:20 83:10 112:1, 25 118:9,25 121:18 127:1, 3 133:9 144:3,5 168:4,20 169:12,19 178:20 179:2, 3 186:19 193:13 195:9 198:16,17 205:6 214:23 216:25 217:2, 14,23 227:1, 2,4 232:17 241:11 243:18 244:19 249:25 251:22 | 35:4 **replaced** 35:6 **Report** 4:3 58:9,18, 23,25 59:6,25 60:10,14 61:4,8,17,19, 21 62:2,5,14 63:4 65:6,7, 14,16,19 66:6,10,19 67:10 68:2,4 70:5,11,12 73:19 74:23 75:2,7 77:13, 15 78:24,25 79:5 88:5,10, 14,19 101:9 230:15,18,20 | 86:22 185:8, 16,19 210:17, 20 **Representatives** 7:11 15:13 211:19 **represented** 10:9 29:12 **representing** 5:3,10 84:24 85:3 97:17 162:2 212:8 222:8 **Republican** 25:4 26:12 27:5 28:5 **Republicans** 93:3,11 | **required** 38:11 128:13 150:20 151:12 187:19 204:23 206:9,21,25 207:3,4,11 222:19 229:8 230:6 **requirement** 9:25 18:14 37:23 38:7 89:17 90:5 132:1,14 197:16,17 **requirements** 37:18 44:20 99:7,25 100:20 113:11 137:24 138:15,18 |
| **related** 19:2 22:22 23:1 38:8 40:4 62:7 70:12,14 71:3,22 99:3 142:11 157:1 165:2 166:17 181:8,25 182:11 183:7 198:14 213:19 245:9,22 258:6 | | | | |
| **relating** 80:20 138:14 139:4 | | | | 139:4 141:25 142:7,12 143:4 198:1 205:10,25 230:16,22 |
| **relationship** 10:19 | **remembered** 227:6 241:12 | **reported** 99:4 | **request** 36:12,15 37:9,12 97:2 173:19 243:12 | **requires** 39:18 51:14 52:1 67:22 90:7 193:20, 21 210:25 214:8 230:14, 20 232:4 237:13 |
| **relative** 194:17 | **remind** 226:6 234:19 | **Reporter** 1:13 9:3 142:3 145:20 189:7 195:4 198:6 199:3 205:17 256:12 | | |
| **release** 257:13 | **removal** 182:11 | | **Requested** 99:12 142:4 196:6 199:5 206:12 257:1 | |
| **released** 257:16 | **remove** 227:8 | | | |
| **relevant** 184:11 249:6 | **removed** 134:22 226:14,24 246:24 247:1, 2 | **Reporter's** 3:8 | **requesting** 76:2 189:13 | **requiring** 73:22 80:20 106:25 |
| **relief** 211:10 212:22 | | **reports** 73:24 | **requests** 37:3 73:15 129:23 | |
| **religious** 196:23 205:22 | | **represent** 15:23 16:22 49:10,25 97:13 106:9 155:8 157:23 219:4 | | **reread** 99:10 |
| **rely** 163:1 166:15 | **removing** 180:22 181:8, 24 192:12,23 | | **require** 38:18 40:16 51:24 55:3,5 76:16 89:4,6, 7,8,14 90:12 106:25 113:20 116:23 131:7 138:5 151:18 195:17 202:20 203:10 221:15 236:11 248:14 | **reserve** 253:17 |
| **remained** 218:14 | **repeat** 52:19 88:7 117:9 | | | **reserving** 13:24 |
| **remember** 6:16 7:6 8:1, 2,5,6 12:19, 20 18:21 32:17 47:22 48:9,13,15 | **rephrase** 64:9 84:17,19 142:8 205:7 **replace** | **representation** 10:13 126:25 **Representative** | | **resigned** |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

15:13
resolution
137:18 138:14
139:4 140:23
141:8,17,21
142:11,21
144:9,13
145:4,8 152:3
214:8 219:12
resolve
11:9 215:21
respect
41:10 77:6
78:4,8,16,23
213:9
respectfully
41:3
respecting
213:13
respective
1:17
respond
9:7 98:7
163:5 167:7
189:25 197:9
217:4,5 218:7
235:10
responded
157:19
responding
149:12
responds
135:23
response
41:4 149:18
157:18 158:5
165:6,8,14,16
196:16,20
208:16 218:5
responses
157:4
responsibilit

ies
22:9,21 220:9
responsibilit
y
22:11 159:18
257:16
responsive
36:14
restate
155:23
restrictions
210:13 211:1
restrictive
134:3,6,13,20
result
24:22 70:18
142:14
resulted
69:15
retaining
199:21
retention
35:15
Retirement
25:2
retrogression
42:24
retrogressive
39:15 40:5
42:9,17
return
257:1
returned
257:10,20
reveal
20:17 38:18
39:4,18 41:6
48:8 50:14,24
52:14,17 53:6
54:7,10 56:15
59:2 62:12

63:1 64:1,19
66:8,14 67:22
68:10,23
70:23 73:18
75:9 76:17
83:8,24 86:10
88:24 94:13
96:7 97:7
100:24
103:14,20,22
104:12 106:23
110:8 113:12
114:1,21,24
116:23 120:1
121:9,21
127:9,21,24
128:19,20
129:8,20
131:7 132:18
136:15 138:4,
5 146:17
148:5 151:17,
18 152:14
169:25 170:9
174:8 178:11
181:11 183:12
186:16,22
188:20 189:23
190:16 192:4
193:21 194:7
195:17 199:2,
7 200:12,13
202:5,15
205:2 206:14
219:15
220:22,25
221:11 227:13
235:6 236:25
237:13
238:16,18
243:7 244:23
245:11,20,21
247:20
248:13,14
revealing

39:22 51:2
67:5 94:12
review
12:6 101:13
220:19 257:3,
9,14,19
reviewed
12:4 13:3
221:1 248:7
reviewing
136:2
reviews
90:14
right
8:10 11:14
12:10,13
13:24 18:1
20:1 29:18
31:23 32:25
33:15,21
34:19 38:5,23
47:6,12,13,
15 55:20
62:21 63:21
65:8 79:8,16
84:19 99:8,23
104:7 105:8
124:15 142:23
147:7 158:9
160:10 164:11
167:17 168:13
169:8 174:18
177:22 192:20
205:23 218:1
224:18 226:3
234:3 235:1
239:13 242:18
Rights
37:15,22 38:7
42:5 44:16
113:22 128:18
ringing
172:3

RLW
1:4 256:4
RMC
1:4 256:4
ROBERT
1:9,11 3:4
5:19,22 6:5
215:21 255:1,
3,6 256:10,16
Rodriguez
230:4
Rogers
27:23
role
81:9 125:5,8,
13 159:10
168:24
roles
21:20,23
Room
2:10 5:9 30:6
routine
37:6,8
rule
90:1,10,16,
21 91:1
92:17,19,20
93:1 137:21,
25 138:3,7,
11,12,15,20,
25 139:12
140:14,25
141:22 144:2
146:6,7,10
147:3,8,25
153:14,20
154:4 161:18,
20 218:11,14,
16,21 219:5
220:8
Rules
4:5,9 44:19
51:18,24



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

89:7,8,15
94:20 137:8,
15,18 138:3
139:11,15,22
140:2,6,14,23
141:4,21,24
142:9,13,16,
20 143:3,4
144:9,13
145:8 149:11
150:15,16,19,
21 152:3
159:23 203:8
218:22 219:5
252:17,18
256:24
**run**
15:14 52:5
72:2 89:1
**rural**
16:6 244:9
**Russ**
26:6,7,9,10,
13

**S**

**S**
2:1
**Safe**
25:18 224:25
**Safety**
203:1
**San**
26:9,10,13
31:17 32:5
**Sara**
32:14
**sat**
211:17
**satisfy**
120:15
**Saturdays**
232:6

**save**
34:24
**saw**
242:20
**saying**
20:1 29:15
55:18 57:8
89:20 94:7
132:8 133:11
144:4 173:18
179:2 207:25
222:16 245:7,
15
**says**
45:16 46:4
55:8,15 62:5,
18 63:9,10
64:12,24
66:22 67:13
68:7,14 69:9
72:17,18,20
73:6,21
75:11,23 76:1
77:4 78:3
99:17,22
100:7,11
107:4 116:10
126:20,22
127:4 129:14
130:20 131:22
134:2 146:9
149:21 150:9
151:22 155:7
163:21 164:7,
22 171:20
180:17 210:12
215:19,25
224:24 230:10
**SB**
4:10,13
155:25 163:5
235:4
**scenario**
130:23

**scheduling**
12:23
**School**
14:6,18 18:4,
11
**scope**
79:6 179:8
**SCOTT**
2:13 5:13
**seal**
255:10
**search**
36:17,25
**searched**
36:20
**seat**
207:15
**second**
11:15 36:13
45:23 63:9,
10,16,19 67:1
72:18 73:1
75:24 99:14,
16 155:16,20
163:20,25
216:6 220:18
236:6
**Secondly**
41:23
**secret**
245:3
**Secretary**
19:5,8 20:12
21:12 35:11,
15 67:3
135:16 171:1,
6,8 188:4,11
230:6,14,17
**Section**
37:14,19,22
39:1 44:15
54:15 55:8

62:5 72:19
80:9,10
106:10 107:3,
4,15 113:11,
16,18,22
137:20,24
138:3 179:13,
16,18 180:11,
15,17 192:19
204:14,15,
17,19 205:21,
24 206:18
207:2 218:16
226:9,10
**Secure**
25:23 125:5
**see**
47:21 50:3,4
52:3 54:22
55:7 60:4
61:7 62:17
66:22 68:4
69:2,9 73:2,3
75:24 80:22
81:2 99:2
101:5 106:11,
14 107:16
126:17 131:22
133:23 134:2
135:11,21,25
137:23 139:8
148:14 152:16
158:15 163:20
164:15,22
165:4 179:15,
20 180:18
215:19,25
216:7,10,15,
16 219:5
222:15
224:21,24
225:18,22,24
229:4,11
230:1,2,5
232:3,8,9

**seeing**
24:8 101:16,
20 184:6
**seek**
15:15 211:10
212:22 213:6
227:19
**seeking**
41:25 149:16
**seen**
16:2 23:12,16
49:6 101:13
163:23 215:7,
8 234:12
244:21
245:18,23
**segment**
252:2
**seldom**
30:4
**select**
17:9,25 18:7,
8,15
**selected**
87:12
**Senate**
4:5,6,7,9,10
15:4,14 17:5
18:9,18 21:21
35:11,15
39:6,10,11
45:13 51:12
53:18 56:2,3,
21 57:1,10
59:7,14 77:8,
12 79:16
83:6,20 87:7,
25 89:5,7,8
90:6,8,15
91:3 92:8
93:1,18,23
94:2,6,22
95:9,20 96:1



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

298

105:15,20,25
106:3,18
108:5 109:12
110:7 111:5,
17 112:12,23
113:10 114:7
115:4 116:15,
18 117:4,11,
12,14 118:16
119:3,15
122:8,12,17
123:1 124:3,
20 125:6
126:3,8 129:3
135:3 136:25
137:8,14,18
139:9,11,18,
22 140:2,6,
17,23 141:24
142:9 143:11,
13,16 144:1,
18,22 145:19,
22 146:4,10,
11,14,22
148:15,18
150:10,11,15,
19,25 151:3,
14,25 152:1
153:14,15,19,
21 156:3,6
159:9,11
160:16 161:17
162:1,3,7
163:3,18,22
164:6,19,23,
24 165:7,13
166:4 167:5,
6,8,11,19,25
168:22,24
169:3 172:12,
24 173:22
174:13 175:5,
8,14,17,22
176:11 178:3,
18,22 179:11,
17,23 180:9

181:9,14
183:17,24
184:2,13,22,
23 185:8,13,
16,19,25
186:4,14,20,
24 187:1,7,19
188:5,17
189:18 190:14
192:12,14,19,
24,25 193:3,
4,13 194:6
195:15 196:24
197:9,15,24
198:1,14,18
199:1 200:8,9
202:8,9
203:10,19
204:11,19
207:1,18
208:10,12,23
209:10,20
210:1 213:16,
22 214:13
215:21,22
216:13
217:17,18
218:14 219:5,
13,25 220:6,
13 221:8,12
222:24 223:5,
17 224:6
225:12,17
226:5,10,11
227:11 228:13
229:1,6,19
231:18
232:16,21,25
233:7,12
234:11,18
235:14,17,21
236:22 237:1,
10 238:8,11,
15,22,25
239:20
240:14,16,21

241:1 245:24
246:6,7,16
248:3 252:9,
12,20
**Senate's**
86:25
**Senator**
5:1,19,22
6:3,11 7:8,9
18:22 19:14
35:23 38:23
44:22 49:2
60:3,7,15,16
63:17,18
64:3,14 66:25
83:15 84:4
95:8 96:16,19
97:5,11,12
98:18 99:14
105:20 109:11
110:1 118:20,
21,23 119:2,
12,15 121:25
122:1 126:21
135:12,21
137:5 140:22,
24 141:1,20
142:21 143:7,
21,22,23,24
145:7,14
149:8,14
153:6 157:6
158:4 159:9
164:7,15
165:1,9,15
172:8,19,23
173:6,8,12,20
174:13,16,19,
25 176:3,9
177:2,3,5,13
184:15 188:10
189:16
193:13,18,22
199:16 211:17
212:1 213:7,

16 215:4,9,
13,21 217:5
218:7 219:11
222:1 223:23
228:6,7,23
230:3,4 240:2
242:3 248:9
**Senatorial**
242:12
**senators**
41:7 89:4
90:18 165:17
166:20,24
178:14 211:20
216:12
**Senator's**
245:8
**send**
24:6 33:24
157:14 158:22
243:12
**senior**
67:6
**sense**
15:20,25 53:3
54:3 121:7
211:5
**sent**
157:20 176:5
257:9
**sentence**
62:18 63:9,20
66:22 67:3,13
72:19,22
73:3,21 75:10
78:14 99:17
126:20 129:14
132:12 149:20
150:9 151:22
152:2,4 153:7
**Sepehri**
170:23,24,25
**seriously**

171:24 213:1
**serve**
15:18 17:4,6
247:4 252:1,7
**served**
14:19 15:4,7
17:13 19:6
23:4 247:5,
11,13,14,17
**service**
15:16 32:13
**serving**
22:24 30:2,3
60:19
**session**
18:16 19:7
22:16 30:15
32:18,24
33:16 51:12
52:4 71:2,7,
15 72:6 80:4
89:21 97:25
105:2 109:10
136:6,22
150:19 151:24
155:14 214:10
218:11 234:14
244:12 252:19
**sessions**
18:12 22:5
71:25 236:4,8
**set**
1:18 76:15
94:21 117:12
151:11 178:17
210:14 219:24
**sets**
138:16
**setting**
139:5 159:22
178:13
**seven**
50:8 65:16



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

74:19 213:2
230:16

**shaking**
9:8

**shall**
210:13 256:25
257:18

**shape**
148:18

**shared**
67:13

**sharing**
144:24

**Sheet**
257:8

**She'll**
189:9

**Shorthand**
1:13 256:12

**shortly**
5:20

**show**
45:4,7,11
46:7 71:16
72:4 78:10
128:2,13,17
187:24 192:12
198:19 204:23
206:8,25
207:8,10
222:19
231:15,23
239:9,12,14,
18

**showed**
241:12

**showing**
35:23 49:2
79:24 82:15
98:18,23
105:22 137:5
163:14 170:17

172:8 215:4
222:1 223:13
228:23

**shown**
128:14

**shows**
60:21 80:2
82:10,11 95:4

**sick**
97:6

**side**
7:23 80:17
160:23

**sides**
168:20

**Signature**
3:7 254:1
255:1 257:4,
8,10,15,19,23

**signatures**
60:2 172:13,
15

**signed**
60:14 172:16
225:19 226:13
246:14 257:21

**significant**
151:16

**similar**
97:14 113:4
151:24 176:5
215:16 218:10
221:8 224:23
229:10 252:20

**simply**
115:14 129:25
212:19 217:23
241:10

**sincerity**
166:23

**sir**
37:25 242:6,

10

**sit**
47:6 61:22
65:10 66:12
71:16 80:8
88:1 112:17
118:3 121:15
134:25 153:25
162:13 168:3
181:20 184:7
189:14 201:12
210:18 217:12
221:7

**sitting**
47:13 72:5
81:22 129:3
201:8 210:17
211:19,20
238:20

**situations**
48:3

**Six**
107:13 109:9
248:10

**Skipper**
28:1,3,4

**slightly**
49:17

**slow**
107:11 164:9

**society**
128:15

**solely**
47:4 142:10,
11

**somebody**
12:19 34:9
52:4 95:5
96:17 127:7
128:12
144:20,21
173:18 203:11
239:7

**somebody's**
198:15

**somewhat**
118:7

**somewhere**
232:24 246:23

**soon**
125:19

**sorry**
5:5 8:16
17:17 22:8
27:10 33:9
42:20 49:22
54:18 55:5
56:21 61:18
63:14 64:14
65:15 72:25
81:12 88:7
91:20 101:5
107:12,16
118:24 122:3
135:11 139:6
147:5 148:10
154:13
156:13,17
164:9 184:3,
22 185:12
189:7 204:15
205:17 206:10
224:2 228:20
233:20 242:14
249:14

**sort**
37:7 39:14
44:1 90:18
128:5 132:7
201:25 243:13
244:2

**sorts**
117:22,25
155:3 243:19

**sounds**
8:25 243:15

**source**
55:21 110:6
115:9 183:16,
23

**sources**
183:17,23

**Spanish**
187:25

**spanned**
32:3

**speak**
48:4 90:11
96:16 100:15
114:3 134:17
225:21 242:4,
5 244:10,17

**speaking**
91:3

**speaks**
65:7 73:19

**special**
14:24 15:5
22:16 92:20
138:17,22
139:17 154:3
234:13 253:10

**specializati**
**on**
15:1

**specialized**
7:15

**specific**
7:6 15:19
16:4 44:19,20
46:25 47:10,
16 48:2,15
52:15 53:8
66:10 71:21
72:3 74:21
76:15 90:1
92:23 100:8,
25 105:3



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

300

114:13,20
120:13,17,21
125:3 127:3,
18 128:24
131:17,18
133:10 143:25
144:14 145:24
157:8 173:2
174:23 189:4
198:13 200:2
209:14 227:2
228:6 230:15
238:10 242:23
243:11 244:5,
14 245:17
251:22

**specifically**
6:17 20:5
42:17 45:4
46:4 48:9
52:24 65:9
69:1 71:9
72:14 74:20
79:19 105:12
111:2 112:25
119:24 120:7
121:18
127:11,12
135:20 136:2
139:19 162:12
166:13 168:1,
6,10,21
174:17 184:1
193:16 195:21
210:10 217:23
219:18 227:5
228:7 232:3
239:13 244:2
247:5,10,15,
18 251:10
252:1

**specifics**
154:10 181:2
201:22

**specifies**

180:18

**speculate**
16:2 57:10
88:3 112:15
193:21

**speculating**
15:22 191:20

**speculation**
56:24 109:4
136:15 146:17
173:17 188:19

**speculative**
118:8

**speech**
24:20,23

**speed**
218:2

**spent**
151:25

**spoke**
42:8

**spoken**
12:21,24
200:10

**sponsor**
19:9 48:16
56:2

**sponsored**
16:18 19:2,
18,23 72:13

**sponsoring**
108:21

**sponsors**
231:19

**SREC**
27:3,4

**staff**
32:7,9,12,14,
16,18 33:1,
12,16 35:12
36:7,9,17
41:7 55:23

56:3 59:4
81:24 101:19
104:21,24
108:14,16,19
109:5,7
122:14 127:23
156:1 170:21
173:5,8,12,21
174:12,13
184:19 185:21
188:22 189:17
237:1 243:20

**stage**
227:7

**standard**
30:9

**standards**
45:21

**standing**
51:25 145:25
161:23

**start**
57:8 71:19
175:12 188:13
250:10

**started**
79:13 136:25
172:19

**Starting**
164:13 212:24

**starts**
67:3 72:20
80:10 132:22
163:25 164:7,
11 204:16

**STATE**
1:2,13 2:3
5:9,18 6:3
10:12 11:4,
12,17,18,23
13:9 15:23
17:6,13
18:18,23

19:5,14 20:7,
12,13 21:2,
12,19 22:13,
19,24 24:11,
15 25:13 27:5
28:13 29:16
31:10 32:11
41:8 48:18
49:13 58:10,
21,24 59:5,7,
25 67:4,6,9
71:11,23 72:8
73:12 75:3,5
77:13 82:8
98:22 107:8,
9,21,24 108:2
113:16 126:9
127:23
136:13,17
146:13 148:20
155:8 161:7
167:6 171:1,
7,15 177:9
185:25 186:4
188:4 192:13,
21 229:5
230:6,15,17
236:21 239:2
240:4,10
248:1 249:19
252:9 254:2
255:4,12
256:2,13

**stated**
61:9,14 92:12
124:17,19
163:4 178:6
181:18 192:22
205:18 208:6,
20,21 209:17
212:18 216:12
224:17 227:21
228:2,5
235:20,23
239:1,19

252:10

**statement**
126:16 127:18
129:13
130:11,12,
16,18,20
132:21,23
133:1 150:5
152:20,24
153:3 163:21
164:4,6,8,22
165:9,12
192:3,6,11
195:1 196:9
197:19 207:24
214:15,25
228:10 231:25
243:16 249:23

**statements**
75:18 86:21
96:14,15
127:16,19
129:25 132:9
150:13 167:13
168:4 195:11
214:13 215:1
231:10,13,
19,22 232:19
236:19

**STATES**
1:1,7,12
14:10 81:5
206:2 216:10
225:3 231:1
256:1,7

**State's**
19:9 135:16
171:8 188:11

**statewide**
248:11

**stating**
249:18

**statistic**
240:6



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

301

statistics
240:13

status
73:25 101:24,
25

statute
44:25 45:4,16
46:3,11,12
77:19 202:25
207:12 208:20
239:14

stay
248:22,23

stayed
167:19

stenograph
256:18

step
124:18,19

steps
38:13,25
40:2,25 41:17
43:2,9,13,14,
23,25 44:1,7
74:11,12
123:3 124:2,
5,9,12 190:22
200:19,24
235:4

stop
213:5

stopped
60:19

stopping
59:19

straight
146:8,23
147:19 148:19
248:15

straightforwa
rd
168:17

Street
2:5 29:5,10

strike
235:2 238:25

strongly
34:15

struck
107:13

student
33:10

students
230:24

studies
73:24 244:21
245:18 247:24

study
18:9 48:20
62:18 65:18
67:8 230:6
231:14,23
245:5 246:1,
5,7 247:7,9,
25

studying
33:11

stuff
34:13

subdivision
107:8,21
207:2

subgroup
230:21

subheading
72:18 75:23

subject
39:23 42:5
43:20 44:9
50:16 54:7
62:12 66:17
73:16 84:16
95:17 96:10
97:7 113:11,

16,18 116:24
118:5 119:9,
22 120:10,14
121:10 124:7
127:22 128:21
129:10,23
130:8 133:19
138:6 165:20
170:10
178:10,12
182:19
189:22,23
192:2 208:7
210:4 211:13
220:24 227:15
236:12 243:6
244:25 245:9,
13 247:23

subjective
57:6 77:9,25
91:6 166:23

submit
38:8 212:17

submitted
122:20 164:8,
19,20

Subparagraph
231:1

subpoena
36:23 37:1,2

subpoenaed
11:7

subscribe
101:12

subscribed
255:7

subsection
81:1 106:14
107:4,13
138:25 139:1,
2,20 141:22
143:8 205:14
222:11 230:19

subsections
230:16

subsequent
130:14

substance
83:8 120:1
153:8,15,21
174:8,20
214:9 224:15

substantial
158:2 248:11
249:12,23
250:11

substantiall
y
151:24 219:9

substantive
122:15 156:23
174:12,24

s u b -
subparagraph
78:25

subtle
70:23

succeeds
22:14

succession
211:2

sufficient
131:2,6,12
200:6

sufficiently
67:15,19

suggest
114:19

suggesting
158:3 159:3

suggestion
159:1 213:12

Suite
1:16 2:14

258:14

support
16:16,17
42:14 43:3,6
44:2 48:5
51:7 53:17,
18,24 73:25
100:19 149:21
152:23 208:5
231:20 250:16
251:7,10
253:9

supported
16:18 251:1

supporters
161:9 167:5,9

supporting
247:22 248:17
250:1

supports
41:18 248:25
253:12

Supreme
14:13 104:4
233:10

sure
5:6 25:11,14
32:2 37:10
42:17 50:20
60:18 71:19
72:12 81:1
82:22 84:8
92:1 96:16,
19,21 98:25
101:21 103:24
107:10 116:11
117:10 121:25
127:4 130:21
131:23 132:4,
11 135:20
140:9 142:18
145:5 148:7
152:16 155:23
176:6 197:20



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

302

| | | | | |
|---|---|---|---|---|
| 207:21 209:10 | 87:13 88:12, | 24 159:13 | 250:8,18 | 138:13 142:20 |
| 225:21 234:21 | 23 89:20,24 | 160:24 161:4, | 251:3,9 | 154:18 156:19 |
| 236:1 239:24 | 90:19 91:14 | 11 162:9,16, | 252:4,21 | 163:15,22 |
| 242:19,24 | 94:7,11 95:15 | 20 164:3,13 | 253:5,11,16 | 172:9 179:11 |
| 244:4 | 97:7 98:4,11 | 165:19,24 | 258:4 | 180:1 190:22 |
| **surname** | 99:10 100:2, | 166:22 167:12 | **sworn** | 191:19 |
| 188:1 | 6,22 101:18 | 169:25 170:8 | 5:23 15:5 | 199:12,13 |
| **suspend** | 102:2,4,16,23 | 171:13 174:8 | 256:19 | 200:20 212:25 |
| 89:15,18 | 103:8,13,20 | 176:12,19 | **synonymous** | 214:8 215:6 |
| **suspended** | 104:11,23 | 178:10,23 | 209:22 | 216:3 222:2, |
| 93:1 | 106:22 107:25 | 179:7,24 | **system** | 10 223:14,19 |
| **SWEETEN** | 108:7 109:3, | 180:5,25 | 44:23 46:13, | 225:17 226:23 |
| 2:4 5:5,17 | 13 110:8,14, | 181:10 182:1, | 21 47:8 | 229:2,18 |
| 12:2,14,20 | 21 111:6,19 | 16 183:10,19 | 116:20 117:5, | 230:4 231:9, |
| 19:19 20:16 | 112:13 | 186:15 187:8, | 13 129:7 | 10 232:14 |
| 38:16 39:2,17 | 113:12,25 | 20 188:18 | 133:17 237:11 | 233:10 235:4 |
| 40:6,15,19 | 114:8,14,21 | 189:20 190:15 | 238:9 239:9, | **taken** |
| 41:3,21 43:5, | 116:4,21 | 192:1,15 | 16 | 1:12 43:23,25 |
| 12 44:5,17,24 | 117:6,16 | 193:1,20 | **systems** | 44:8 74:11, |
| 45:23 46:15, | 118:17 | 194:7,14,19 | 20:8 | 12,17 94:23 |
| 22 48:7 | 119:20,25 | 195:16 196:4, | | 95:6 98:2,9 |
| 50:14,24 | 120:6,12 | 7,12,18,25 | **T** | 114:5 124:18, |
| 52:13,23 | 121:6,9,20 | 197:11,18 | | 19 132:7 |
| 53:5,19,25 | 123:9 124:4, | 199:2,6,12 | **table** | 213:3 214:11 |
| 54:6 55:13 | 11,22 125:7, | 200:12 201:8 | 229:12,13,16 | 247:12,13 |
| 56:5,15,19,23 | 16,22 127:9, | 202:4,15 | 231:3,7 | 248:8 256:17 |
| 57:5,21 59:1, | 21 128:19 | 203:20,24 | 232:9,12 | 258:7 |
| 15,18 61:10, | 129:8,19 | 205:1 206:10, | **tag** | **takes** |
| 24 62:10,25 | 130:5 131:4, | 13 207:19 | 52:4 150:17 | 38:13,25 |
| 63:21 64:1,8, | 14 132:2,15 | 208:1,14,24 | **tagged** | 40:2,25 41:17 |
| 12,18,22 | 133:18 134:7, | 209:3 210:2, | 51:18,23 | 52:25 191:16 |
| 65:4,13,15,20 | 15 136:7,14 | 7,10,16 | **tagging** | **taking** |
| 66:3,7,14 | 137:9,12 | 211:23 212:17 | 52:7 | 9:3 43:9 |
| 67:21 68:9, | 138:4,19 | 217:21 219:14 | **take** | 59:24 96:5 |
| 16,22 69:16 | 139:21,24 | 220:21 221:10 | 9:11,12,14 | 160:5 |
| 70:1,9,13 | 140:7 142:2 | 224:7,13 | 35:25 43:2,13 | **talk** |
| 71:13 72:1 | 144:14 146:3, | 225:6 227:13 | 44:2 46:6 | 12:15 29:21 |
| 73:15 74:4,6, | 16 147:13,21 | 233:23 235:6 | 49:3 50:2 | 43:12 77:19, |
| 9 76:5,10,14, | 148:4,21 | 236:6,25 | 51:13 54:15 | 20 128:2 |
| 25 77:2,18,23 | 150:1,12 | 237:12,17,21 | 56:10 58:15 | 161:2,4 |
| 78:10,13,16, | 151:1,9,17 | 238:13 239:3 | 59:8,16 60:1 | 176:19 179:4 |
| 21 80:15 | 152:4,10,19 | 243:5,15 | 79:25 80:9,17 | 205:1 234:2 |
| 83:7,23 84:6, | 155:16,21 | 244:23 245:7, | 82:19 85:22 | 250:21,22 |
| 15,25 86:6 | 156:19,24 | 20 247:20 | 113:21 123:3 | **talked** |
| | 157:9,12,15, | 248:13 249:2, | 125:19 126:6 | |
| | 17 158:1,14, | 13,15,19,22 | | |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

303

| | | | | |
|---|---|---|---|---|
| 8:18 10:20 11:21 44:13 52:6 154:2,8 163:7 165:12 176:10 177:13 192:18 236:4 238:8 | 38:25 45:4 47:24 48:1,5, 10 49:4,21 50:10 60:6 61:15 68:8,15 73:9 75:15 76:3 82:17 83:10,21 | 9:23,24 19:6 33:20 40:3,12 117:5 202:1,3 210:13 211:1 239:1,16 **test** 37:24,25 **testified** | 29:12,16 47:17 **testimony** 13:13 21:8,11 28:16 40:10, 13,14 47:1 51:15 66:13 71:24 75:3 | 235:24 236:21,23 239:9 240:4, 10 244:22 245:19 246:10 247:6 248:12 249:1,12 250:17 251:8, |

**talking**
8:10 19:22
66:21 71:19
75:11 85:14,
15 90:1 94:8,
9 95:21 103:6
112:4 126:3
131:25 132:13
135:2,3,5
136:25 140:7
156:16 159:9
164:3 165:8
170:13 173:23
199:16 203:24

**talks**
68:5 204:14

**tamper**
212:21

**target**
129:14

**Tech**
14:5

**technical**
51:9

**technically**
171:9

**technology**
35:5

**telephone**
243:21

**tell**
7:2,21 8:24
14:17 15:17
20:5 21:2
24:23 26:8
32:7 33:13

87:11 90:13
91:16,23
105:24
109:17,20
119:4,7,9,14,
17 121:7
126:7 136:21
138:2,10
147:1 149:23
159:10
163:15,16
169:9 171:17
172:10 173:2
174:24 179:22
180:4,22
184:3,5
193:15 207:24
208:12 209:25
215:6 219:11
223:14 224:4
225:4,11,18
233:2 234:13
242:19 243:24
256:19

**tells**
35:12

**tem**
21:25 22:7,
10,14,16,19

**temporarily**
22:19

**ten**
92:2 246:10

**term**
10:7 65:22

**terms**

5:23 7:19
8:10 10:21,24
11:10 28:10
42:23 47:7,19
75:4 87:11
155:17 156:2,
8 162:3 168:5
170:20 177:8
189:17 220:9
236:16

**testify**
9:2,17,20
11:7 21:12,13
28:13 30:10,
12 42:10
44:6,7,17
47:14 74:6
88:18 95:15,
16 107:25
119:24 138:19
150:6 154:21
155:1,14,25
160:15
161:15,21
162:9 165:24
167:19 181:1,
2,10 183:4
184:7 186:17
187:8,20
192:2,15
197:2 202:4
206:13 208:2
236:13 240:25
241:3 243:17
251:19

**testifying**

77:6 78:4,17
85:11 117:24
122:20,21,23
123:14,16
131:11 133:24
134:1 150:24
151:23 161:25
162:1 168:16,
17,18 181:20
182:16 184:11
189:21 195:20
196:2,16
203:25 204:6
209:16 210:6
251:21

**TEXAS**
1:2,13,16
2:3,6,15 5:18
10:12 11:4,23
14:5,11 15:12
16:6 17:4
25:18,23
27:8,11 31:22
32:4 38:7
39:6 41:8
48:6 59:5
73:8 82:18
90:8 92:22
97:13,15,16
98:23 101:12,
20 102:9,11,
15,22 113:15
126:15 127:24
135:10 151:25
155:8 158:17,
18,19,20,21
175:21 194:17

15 254:2
255:4 256:2,
13 258:15

**Texas'**
44:22 72:20

**text**
55:14 80:15
106:22 108:1
179:25 205:1
206:14
237:16,17,
22,23

**textually**
180:3

**Thank**
5:21 10:9
38:3 41:16
46:1 120:16
221:22
241:23,24

**Thanks**
59:21

**the..**
252:15

**themselves**
96:16

**thereafter**
256:21 257:15

**therefore**
238:15 245:13

**thing**
30:10 37:7
51:5 68:22
77:18 92:23
126:20 128:6



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

304

| | | | | |
|---|---|---|---|---|
| 173:16 214:7<br>237:6 241:16<br>**things**<br>6:10 20:4,21<br>28:14 32:19<br>34:1 41:4,5<br>48:20 53:13<br>81:7,8 85:18<br>108:20 110:23<br>115:17 116:2<br>117:22,25<br>127:3 128:4,<br>14,17 136:20<br>154:6 168:19<br>212:18 233:16<br>**think**<br>8:17 10:17,18<br>17:10,12 18:6<br>22:3,5,11<br>24:16,20,24<br>26:9,10,13<br>27:7,12 29:14<br>34:13,17<br>36:8,19<br>37:13,21 40:7<br>41:21,22<br>42:11 44:25<br>45:1,3,20<br>46:25 47:20<br>48:20,21<br>52:6,13 55:15<br>57:19 59:14<br>60:13,18<br>61:3,16 62:7<br>65:6 70:16<br>72:10,22<br>76:23 79:6,<br>11,15 82:2<br>83:23 88:14<br>89:25 90:23<br>92:13 97:12<br>102:10 103:25<br>104:19 108:15<br>116:10 117:19<br>118:1 119:21 | 120:1 125:16<br>126:21 128:23<br>134:5 135:17,<br>19 139:7,12,<br>25 140:8,19<br>142:5,17,18<br>143:6 144:15<br>150:16 152:6,<br>25 155:4,18<br>156:7,8,9<br>157:20 158:4,<br>10 159:1<br>162:11 163:9<br>170:6 177:12<br>183:25 184:1<br>185:10 190:13<br>191:7,8<br>195:21 198:22<br>200:14 203:25<br>204:21 205:14<br>209:19 212:5<br>214:23 217:25<br>218:14 226:18<br>227:14,17,21<br>228:15 231:2<br>232:20 233:12<br>236:6,8,9,13<br>238:13 239:21<br>241:9 242:20<br>245:10 246:8<br>247:12 248:3,<br>6,7,20 250:18<br>251:16<br>**thinking**<br>42:4 244:12<br>**thinks**<br>100:8<br>**third**<br>67:5 163:24<br>164:1,10<br>**thirty**<br>257:18<br>**thoroughly**<br>65:18,22 | **thought**<br>41:10 42:20<br>65:22 83:24<br>116:8 123:9<br>152:23 156:13<br>160:11 168:18<br>190:17 192:4<br>202:16 224:5,<br>9 228:17<br>236:15 237:13<br>243:7 245:8<br>248:23<br>**thoughts**<br>20:18 38:18<br>39:4 43:16<br>50:15,25 51:2<br>53:7 54:9<br>57:23 59:2<br>63:3 66:16<br>67:23 68:10,<br>24 70:23<br>76:6,19 86:11<br>87:14 100:9,<br>24 103:20<br>104:13 111:7<br>114:21 116:24<br>124:6 125:9<br>127:25 128:20<br>129:9 130:9<br>131:7 132:18<br>134:9 144:18<br>146:17 147:15<br>152:14 180:1<br>181:12 182:5,<br>6 188:21<br>205:2 206:14<br>238:16 244:23<br>249:8 253:13<br>**thousand**<br>124:25<br>**thousands**<br>120:18<br>**threat**<br>92:21 | **threaten**<br>167:8<br>**three**<br>51:10 69:10<br>115:14 118:8<br>120:21 122:4,<br>5 145:11<br>191:20<br>**throughout**<br>76:15 129:16<br>167:21 168:18<br>177:25 178:6<br>**thumb**<br>34:12<br>**Thursday**<br>216:11<br>**time**<br>6:24 7:9<br>10:15,17<br>11:2,5 17:22<br>30:17,20<br>31:8,15,16,<br>20 32:10,15,<br>23 34:7 37:3<br>43:1 51:11,13<br>52:5,8,11,<br>20,25 53:4<br>55:19 72:3<br>74:23 91:18<br>95:1,21 97:17<br>101:13<br>108:18,19<br>109:22,23<br>112:25 125:22<br>139:5 140:13<br>144:18 147:4,<br>5 150:18,19<br>151:8,12<br>161:20,25<br>169:24 172:25<br>173:2 175:7,<br>9,11,20,21<br>179:8 191:8<br>203:15 213:3 | 233:7 234:11<br>240:7,12,16,<br>21 253:17<br>256:17 257:25<br>258:4<br>**times**<br>6:13,16 8:17,<br>21 10:20,24<br>18:10 19:10<br>30:14 56:7<br>91:20,22<br>92:7,11,23<br>119:13 140:4<br>150:18 203:9<br>204:1 212:3,4<br>233:6 234:12<br>**title**<br>82:18 126:10<br>135:19,20<br>198:24 222:5<br>228:25<br>**titled**<br>172:11<br>**today**<br>8:25 9:16,21,<br>23 10:5,9<br>12:22 13:7,13<br>14:22 21:22<br>36:4 47:13<br>61:22 65:10<br>66:12 71:16<br>72:6 80:8<br>81:19 88:1,18<br>101:3 112:17<br>115:25 118:3<br>135:1 154:1<br>162:13 168:3<br>172:3 181:21<br>184:8 189:14<br>212:1 217:12<br>221:7 238:20<br>241:6,14<br>242:19<br>**today's** |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

305

11:25
together
19:12 72:2
told
121:18 127:6,
13 189:16
208:15 211:3
227:5
Tom
26:25
Tony
26:3
top
50:4 54:20
134:1 190:24
191:2
topic
99:15 171:20
topics
13:17,18
towards
55:7 67:2
town
244:1,8,14
trade
30:23
tradition
90:6 91:1
tragedy
154:12
train
248:23
transcribed
42:11
Transcript
4:10 9:4
12:4,6
126:14,15
135:9 256:15
257:3,7,14,
19,21

transcription
223:16
transcripts
13:3
Travis
11:11,15
treading
44:9
treatment
253:10
trial
240:25 253:17
trip
46:7
trouble
186:18
True
29:1 121:1
167:18 255:2
256:14
truth
256:20
truthfully
9:2,17,21
try
9:9 16:10,20,
21 23:12
31:16,19 42:8
84:22 118:8
120:20 161:22
trying
7:25 8:3 11:9
23:16 34:2
37:25 38:3
41:1 43:22,23
72:6 115:10,
13 128:7
148:2 175:10
209:10 225:22
237:4 248:4
turn
31:16 36:9

37:5 63:8
229:24 241:17
turned
36:14
Twice
8:20 10:25
52:2
two
8:17 22:5
26:13 31:6
51:8 71:6
101:6 130:19
145:11 149:1
169:15 210:16
221:14,15
230:12 232:6
233:4,12
234:7
two-thirds
89:4,14,16,
18,21 90:7,12
91:13,17 93:1
97:24 98:3,10
140:17,20
218:13
type
140:5,15
144:25 211:12
253:4
types
57:14 210:18
244:16
typewriting
256:21
typically
19:9 20:8
21:12 29:20
30:2,6,7
31:4,7 37:3
52:2 85:17,23
119:1 217:25
218:6 227:25
241:10 243:18

244:10
typing
34:12

_____U_____

U-6
107:17
Uh-huh
33:7 92:10
107:23 138:1
167:14 196:11
204:18 223:7
225:20
unable
133:15
unconstituti
onal
233:11
under
9:2 37:19
38:7 45:12
46:9 47:17
62:8,18 67:18
71:20 72:18
75:23 78:14
81:6 93:1,10,
12,17 102:2,3
179:17 180:17
202:25 203:19
204:23 229:6
238:21 239:9
252:10 255:6,
10 256:22
underlying
201:18 229:7
understand
8:3,15 9:10,
14 10:3,6
29:14 42:18
50:20 55:20
64:23 90:2
93:24 95:20
98:6 115:11
117:8,21

128:7 130:21
131:23 132:4
133:13 138:12
140:10 157:24
175:10 176:17
177:15 189:8
192:17 236:1
understandin
g
13:9 19:17
37:18,21 46:6
61:22 132:10
158:11
212:11,13
unified
165:6,12
UNITED
1:1,7,12
206:2 256:1,7
University
14:6 107:9,24
246:2
unknown
75:12
unlawfully
68:14
unless
54:2 72:4
176:2 202:18
unlikely
108:22
unnecessary
67:17
unspecified
68:7
unusual
18:14 56:3
146:2 148:9,
11 173:8,11
233:3 234:5
update
136:5



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

306

**urban**
97:16

**Uresti**
95:9 97:5,12
230:4

**Uresti's**
97:11

**urgency**
253:2,9

**use**
9:23 34:16
39:10 195:8

**usual**
160:22 161:6,
9,12

**usually**
18:24 20:13
31:6 33:18
39:14 53:24
83:15 94:18
108:18
150:10,11,25
203:4 207:15,
16

**utility**
45:14 55:9

— **V** —

**vague**
20:23 51:1
52:14 53:6
56:16 89:25
108:3,7 109:4
114:2 117:20
176:12 179:7
236:9

**vaguely**
112:1 205:6

**valid**
107:5,17
181:25

**Van**
19:10,14

118:21 122:1
135:12,21
143:21 149:8,
14 176:3
177:5 215:9
217:5 218:7

**various**
17:9,21
129:2,4 182:6
200:5

**vein**
248:22

**verbal**
9:7 110:3,5
145:15 175:23

**verbally**
33:20

**verbatim**
221:3,5

**verification**
170:7 171:10,
21

**verify**
62:19 97:3
134:4,6,14,20
198:15

**verifying**
44:23 46:13,
21 47:8

**verse**
16:20

**version**
105:25 106:4,
5,10 139:17
172:16 176:14
222:8 225:12,
15,19 226:12

**versions**
176:16

**versus**
103:19

**VICTOR**

2:9 5:11

**view**
118:13 209:22
212:18

**violating**
120:24

**violation**
210:19 211:7,
8,14 212:24

**visit**
12:2 210:22

**vocal**
121:14

**voiced**
199:23

**voices**
168:15

**vote**
23:7,16 29:2
62:21 67:15,
19 70:7 71:3,
11,23 72:8,12
87:24 89:4,
14,16,18
90:7,12
91:13,17
92:17 93:23
94:3,6,17,23
96:5 97:3,24
98:3,10 99:20
113:19 123:23
126:23 127:7,
8 128:13
130:23 133:16
139:8 140:18
155:15 164:24
202:14 204:21
218:13 229:12
230:22
237:11,20
238:3,11
239:10

**voted**

87:19,22
88:20 93:18,
22 94:2
126:24
142:23,24,25
143:13 144:9
165:1 167:10
229:15,17
231:6 232:12
236:22

**Voter**
4:9 9:23,25
18:19 19:1
23:13 25:15
26:17 27:14
28:8,16 29:10
33:1 45:1,5,
7,10,17,18
46:6 48:13,18
52:21 57:12
62:20 63:12,
25 65:2
67:15,19
68:5,14 69:3,
7,12,24 70:6
73:14,22,24
75:12,13,15
76:2 80:20
85:16 86:3
87:6 99:16
101:23,24
102:1 104:2
107:1 115:5
116:19 117:14
126:22
127:15,16,
17,19 128:5,
8,10 129:4,17
131:25 132:13
135:23 137:24
138:14,18
139:3,4
141:25 142:6,
11 143:4
149:22,24

151:24 154:3,
8 155:15
164:24,25
165:18 166:17
171:20 180:23
181:23 182:12
184:25 188:1
200:19,25
202:14 206:24
207:8,9,11,
13 209:23
213:19 216:14
218:12 220:19
222:3,15
237:14,19,24
238:3,10,21
239:8,12,17
240:3,9
243:3,14,22
244:3,15,18,
22 245:18,22
246:4,9
247:6,9,15
248:4,11,25
249:12 250:16
251:2,7,15,
23

**voters**
10:5,6 57:16
67:6 73:23
74:2,3 84:14,
24 85:4 95:14
112:11,21
113:6,24
123:1 124:3,
21 129:6
134:4,6,14,
21 162:3,7
163:6 166:5
187:18 188:16
194:18 204:24
220:14 230:8
231:16 235:5,
15,19 240:23

**voter's**



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012
307

| | | | | |
|---|---|---|---|---|
| 23:19 44:23 | 140:9 144:15 | **weekdays** | 172:8 174:7 | 100:16 110:18 |
| 46:14,21 47:8 | 150:13 157:9, | 203:7 | 181:3 182:4 | 111:3 113:8 |
| **votes** | 12 170:4 | **weekend** | 212:5,21 | 115:3 116:5 |
| 92:8,9 95:5 | 182:23 184:9 | 216:12 | 213:5 215:4 | 124:1 129:21 |
| 126:22 130:23 | 212:25 213:12 | **Weekly** | 219:3 222:1 | 130:12 131:5, |
| 131:3,13 | 222:11 225:17 | 98:23 101:12, | 223:13 228:23 | 12 134:13,19 |
| 163:21 | 227:16 237:4 | 20 | 241:22 | 136:21 144:21 |
| **voting** | 239:22 250:8 | **weeks** | **weren't** | 145:3 150:4 |
| 10:2 23:10, | **wanted** | 191:20 233:4, | 96:6,22 | 151:16 154:9, |
| 14,17 37:14, | 132:6 156:23 | 13 234:7 | 108:21 217:20 | 20,24 155:17 |
| 22 38:7 42:4 | 173:18 224:5 | **week's** | **West** | 166:8 173:20 |
| 44:15 57:12 | **wanting** | 150:9,24 | 2:5 16:6 | 174:11,17 |
| 68:15 69:11 | 65:9 | **Weevil** | 97:15,16 | 186:23 188:4, |
| 85:19 86:19 | **wants** | 233:9,22,23 | 164:7,15 | 14,15 196:8,9 |
| 99:7,25 | 20:9 31:16 | **weigh** | 177:13 | 200:16 201:21 |
| 100:20 113:22 | 164:13 | 249:4 250:11 | **Western** | 203:14 205:8 |
| 116:15 127:7 | **Washington** | **we'll** | 31:22 | 215:1 218:4 |
| 144:13 230:8 | 2:11 | 9:11 158:8,25 | **West's** | 227:10 230:21 |
| 236:19,23 | **wasn't** | 159:2 180:1 | 165:9 | 231:21,25 |
| 246:9 247:16, | 7:9 60:19 | 213:8 220:17 | **we've** | 232:17 235:4 |
| 19 | 61:5 77:23 | 234:2 235:1 | 8:17 10:20 | 243:25 245:25 |
| **VS** | 185:10 212:12 | 253:17 | 13:16 19:6,7, | **which's** |
| 1:4 254:2 | **water** | **well-known** | 8 79:8,21 | 101:9 |
| 256:4 | 71:20 | 102:11 | 157:18 158:6 | **white** |
| ——— W ——— | **way** | **went** | 176:9 206:24 | 194:17 |
| **wait** | 32:3 39:10 | 24:21 43:24 | 210:24 212:2 | **Whitmire** |
| 9:5,6 64:8 | 42:8 53:23 | 48:22 91:17 | 243:23 | 118:21 122:1 |
| 195:4 | 66:2 77:24 | 145:24 148:19 | **whatever** | 143:22 |
| **waiting** | 84:22 106:6 | 159:12 170:3 | 34:10 35:11 | **Whole** |
| 210:22 | 119:4 123:12 | 226:18 | 45:16 47:1,11 | 12:11 18:17 |
| **waived** | 130:12 141:19 | **we're** | 63:6 76:16 | 47:2 61:17 |
| 257:24 | 153:12 161:19 | 8:9 13:24 | 82:10 83:11 | 77:8 91:3 |
| **Wallace** | 169:9 178:19 | 16:6 19:22 | 90:21 156:5 | 109:24 123:22 |
| 28:1,3,4,7,9, | 181:4 202:1 | 24:16 35:23 | 230:12 | 125:14 130:25 |
| 16 | 216:21 217:8 | 49:2 78:19 | **whenever** | 139:5 145:24 |
| **want** | 253:4 | 79:3,24 82:16 | 185:10 231:17 | 146:8,11,13, |
| 9:24 13:23 | **ways** | 89:25 94:9 | **whether** | 23 147:6,12, |
| 16:1,3 31:12 | 51:21 | 95:21,22 | 10:1 31:9 | 20 148:20 |
| 37:20 51:20 | **week** | 98:18 105:22 | 40:4,21 54:5 | 149:10 |
| 61:11 70:13, | 151:5 163:19 | 125:16 126:5 | 57:23 63:24 | 159:12,16,19 |
| 24 84:17 89:1 | 232:5 | 137:5 158:22 | 65:11 67:18 | 160:8,16,25 |
| 99:17,18 | **weekday** | 159:4 163:14 | 74:2,7 75:12 | 161:3,15 |
| 116:4,5,11 | 232:5 | 170:17 171:20 | 79:17 81:24 | 186:21,25 |
| | | | | 215:22 216:14 |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012
308

219:13,24
220:12
252:12,25
256:20
**Whole's**
220:6
**Wichita**
32:6
**Williams**
140:22,24
141:2,20
142:21 143:7,
23 177:3
188:10
**WILLIAMSON**
2:9 5:11
**Wilson**
32:9
**wish**
9:11
**wishes**
18:22
**withdrawn**
212:3,4
**within**
77:21 79:1
115:5 138:15
151:12 233:4
234:7 257:10,
22
**witness**
1:11 5:19
155:11
161:17,24
189:9 205:18
210:20
253:15,17
256:17,18,25
257:4,18,22,
23,24 258:10
**witnessed**
23:9

**witnesses**
53:10 87:11
123:16 159:24
160:2,3,15,
19,23 161:9,
15
**women**
230:23
**wondering**
205:8 238:10
**word**
42:24 78:11
111:10 133:6
180:21 202:7
**worded**
247:10
**words**
70:18 144:19
151:2 197:25
**work**
14:24 16:11,
14 20:11
21:16,17
30:23 32:7
34:20 35:7
48:16 109:7
120:8 159:25
160:7,8
227:25
**worked**
19:8,12 33:1
48:14 56:8
86:11 233:21
234:10 247:11
**worker**
23:4 198:14
**workers'**
6:22 7:4,7,18
8:1,11 11:3
30:19
**working**
32:21 35:4
144:22 172:19

**works**
21:14 171:6
**worried**
127:7
**wouldn't**
23:18 56:1
66:18 86:15
**write**
64:25 236:12
**writing**
62:14 176:2
217:7
**written**
60:2 110:4
117:24 140:6,
14 142:10
145:17 149:9
157:10 158:25
**wrong**
55:4 112:2
127:16 228:20
**wrote**
149:12,15
150:5 155:6

---
**X**

**X**
70:19

---
**Y**

**y'all**
157:3 199:11
**yeah**
21:5 34:12
37:10 50:14
55:9 56:19
59:1,17,20
63:16 65:20
67:21 69:16
73:2 74:13
92:3 93:20
107:12,17
139:23 147:13
150:1 151:17

155:24 156:7,
11 157:15
164:15,16
169:11 185:5
210:9 216:25
223:23 234:25
**year**
30:14 49:21
230:12 233:8
**years**
20:4 50:8
65:16 72:2
74:19 82:11
91:19,23
101:22 115:14
118:8 120:21
230:12 240:5,
9 246:10
248:10
**Yep**
179:20
**yesterday**
157:1,22
159:2 210:16
212:13
**yesterday's**
212:23
**younger**
32:19
**yourself**
215:17 234:9

---
**0**

00203510
158:17
00203528
158:18
00203532
158:19
00203533
158:19
0020354
158:18

00203540
158:20
00203542
158:20
00203544
158:21
00204706
158:21
00204707
158:21
00213319
126:16
00213364
135:10

---
'

**'05**
17:17
**'09**
24:25 137:9,
11,12

---
**1**

**1**
149:20 207:2
**10**
81:1 106:10
107:3
**100**
258:14
**1000**
1:16 157:21
**105**
4:13
**109-2005**
222:6
**11**
77:1 78:3,15
80:9,10
204:16

---
'

**'11**



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

309

137:9

**1**

118
229:2
12
99:18 204:16
229:3 258:13

'12
6:12

**1**

126
4:4
129
232:2
12-CV-128
1:4 256:4
13
62:9 63:6
130
230:1
134
229:24
137
4:5
14
4:7,10 20:4
45:13 77:8
91:19,23
126:18,19
133:24 155:25
156:6,7
172:12,24
173:22 174:13
175:5,8,14,17
176:11 178:3,
18,22 179:12,
13,17,23
180:9,11,15,
17 181:9
183:17,24

184:14,22,23
185:8,13,16,
19 186:1,5,
14,20,24
187:7,19
188:6,17
189:18 190:14
192:12,24
193:11 194:6
195:15 196:24
197:9,15,25
198:1,14,19
199:1 200:8,9
203:10,19
204:11,20
207:1,18
208:10,13,23
209:11,20
210:1 213:16
214:14 215:23
217:17 219:13
220:6,13
221:8,12
222:24 223:5,
17 224:6
225:12,18
226:5,10
227:12 228:13
229:7,20
232:16,22
234:18 235:4,
14,17,21
236:22 237:10
238:9,12,15,
22,25 239:20
240:14,16,21
241:1 246:7
248:3 252:20
140-day
18:15
149
4:5,6
14's
213:22

14th
2:5
15
20:4 92:4
157:2
16
92:8 210:11
258:3
163
4:6
17
180:21
204:14,15,17,
19 206:18
170
4:7
1706
50:6 52:12,21
54:15 55:17,
21,24 56:11,
14 57:2,4
80:14
172
4:7
18
163:19 206:19
1976
14:4
1981
14:6
1984
14:20
1993
15:13
1994
7:5
1995
7:1
1996
15:6,13
1st

61:5

**2**

2
3:3 32:12
20
12:16 92:6,13
215:14 240:5,
9
200
72:20 73:3
2000
17:16 22:3
2001
17:16 22:3,4
2003
17:16,17
22:3,4
2004
17:17,18
2005
49:22 140:1
185:9
2006
58:9,19 63:4
68:5 88:4,9,
19 247:7
248:1 251:16
252:9
2007
58:7 71:2,15,
20 79:14,17
80:4 82:11
86:15 89:15,
20 93:19
94:17 95:12,
24 126:9
130:15 136:11
139:11,14,22
2008
24:24
2009
22:8 24:24

71:24 105:1,
16 112:2
118:14 129:17
130:3 137:18
139:13,18
140:23 141:23
142:1,10
143:3,9
149:9,12
156:8 162:3
163:19 176:4
191:23,24
218:11,17
220:9 228:16
251:19 252:12
2009-2011
12:5
2011
6:12,18 22:8
32:16,23
71:24 129:18
130:3 136:6
155:14 176:5
191:23,25
215:14 216:1
218:10,17
219:5 223:17
228:17 229:1
232:23,24
251:20 252:12
2012
1:14 256:10,
18 258:11
2015
222:10
202
2:11
20530
2:11
209
2:5
21
92:9,17



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

310

215
4:8

218
4:4,12 80:2,
5,7,14,22
81:10,14,21,
25 82:5,7,21
83:6 84:5,13,
23 85:12
86:2,15,17,
18,23 87:1,
12,19 88:20
89:3,10 93:18
94:10 95:10,
14 96:5 97:3,
20,23 98:2,9
99:3 106:19
126:5,9
134:5,13,19
135:4

219
4:9

21st
159:5

22
135:21

220
258:14

221
4:9

223
4:10

228
4:10

24
134:1 135:24
150:17 216:1
219:6

242
3:5

244
72:20

25
68:3,4 134:1

254
3:7 72:20
242:21

256
3:8

26
68:4 223:17
229:1 232:24

28
4:12 72:17
79:21,22,25

281
2:15

283
258:16

29
4:13 77:15
105:17,18,23
232:3

2-minute
156:20

_____
3
_____

3
4:12 62:7,9,
13,18 63:7
75:23 98:15,
16,19 149:9
164:2

30
126:9 130:15
136:11 229:24
230:1 231:17
256:25
257:10,18,22

300
211:16

305-0185
2:11

30th

233:11

31
90:8,9

34
258:2

35
4:2 191:9

3524
158:18

3527
158:18

3529
158:19

3539
158:19

3541
158:20

36
242:12

362
4:13 105:20
106:1,3,18
108:6 109:12
110:7 111:5,
18 112:12,23
113:10 114:7
115:4 116:15,
18 117:4,11,
12,14 118:16
119:3,15
122:8,12,18
123:1 124:3,
21 125:6
126:4 137:1
140:17 145:19
146:15,23
148:15,19
153:21 156:3,
4 159:10,11
160:16 162:4
163:3,5,22
164:7 166:4
167:5,8,20,25

168:24 169:3
179:23
192:14,19,25
193:12 239:20
246:6

362's
162:7

3631
258:13

37
191:7,10

3A.2
77:14

_____
4
_____

4
54:18

4/23/07
83:4

40
223:21 226:11
228:11
246:12,13,24

4201
2:14

425
1:15

45
206:3

46
31:18 32:2
242:13,15,16

4710
158:21

48
4:3 51:24
150:17

48-hour
52:1,2

_____
5
_____

5
36:12 37:14,

19,22 39:1
44:15 54:18
55:7 106:11
113:11,16,
18,22 125:18
149:12
154:16,25
258:2

5.11
137:21,25
138:7,11,13,
20 139:16
140:8,12,14
141:22 143:5,
8 146:6,7,10
147:25 153:20
218:14,16
219:5

5.11-D
142:10

5/17/12
77:4

500
203:7

5000
71:7

51
31:18

512
2:6

512634-1980
258:15

520
4:2 35:21,24

521
4:3 48:25
49:3

522
4:3 58:13

523
4:4 82:13,16

524



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012
311

| | | | |
|---|---|---|---|
| 4:4 126:1,6 | 133:21 | 4:12 | 96 |
| 525 | 58 | 7th | 72:21 |
| 4:5 137:3,6 | 4:3 | 1:14 | ' |
| 526 | 580-6310 | 8 | '96 |
| 4:5 149:8 | 2:15 | 8 | 93:4 |
| 526-527 | 5th | 99:18 164:12, | '97 |
| 149:3 | 13:17 14:13 | 21 | 93:5 |
| 527 | 78:3 157:2 | 80th | 9 |
| 4:6 149:11 | 6 | 77:13 | 98 |
| 170:18 | 6 | 816 | 4:12 |
| 528 | 3:5 54:19 | 1:15 | 99 |
| 4:6 163:12,15 | 107:4,13,16 | 82 | 135:9 |
| 529 | 60 | 4:4 | ' |
| 4:7 170:15,18 | 183:8 226:10 | 9 | 'Well |
| 530 | 60th | 9 | 126:22 |
| 2:14 4:7 | 214:9,11 | 80:11 179:15 | |
| 172:6,9 | 615 | 90 | |
| 531 | 210:21 | 31:8 | |
| 4:8 215:5,7 | 63.0101 | 900 | |
| 531-532 | 180:17 | 203:7 | |
| 215:2 | 65.0541 | 90s | |
| 532 | 207:2 | 7:1 | |
| 4:8 215:5,8, | 7 | 930 | |
| 10 216:4 | 7 | 1:14 211:17 | |
| 533 | 54:15,20 | 936-6432 | |
| 4:9 219:1,4 | 107:16 230:19 | 2:6 | |
| 534 | 231:1 256:10, | ' | |
| 4:9 221:24 | 18 | '94 | |
| 222:2 | 700 | 7:1 25:7 | |
| 535 | 210:18,21 | 9 | |
| 4:10 223:11, | 232:5 | 95 | |
| 14 | 7161 | 25:7 | |
| 536 | 2:10 | ' | |
| 4:10 228:21, | 77 | '95 | |
| 24 | 242:20 | 25:7 | |
| 54 | 77068 | 9 | |
| 126:12,14 | 2:15 | 950 | |
| 132:22 | 78701 | 2:10 | |
| 55 | 2:6 258:15 | | |
| 132:22 | 79 | | |
| 57 | | | |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

PL1164
9/2/2014
2:13-cv-000193

1

TEXAS HOUSE OF REPRESENTATIVES

COMMITTEE ON ELECTIONS

FEBRUARY 28, 2007


(EXCERPT OF HEARING REGARDING

HB 1290, HB 266, HB101, HB 218 AND HB 626)



EXHIBIT
RD-4


Transcribed by Jean Thomas Fraunhofer, CSR


April 30, 2012



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JA_007340

TX_00205011

USA_00022222

Case 2:13-cv-00193 Document 677-7 Filed on 11/11/14 in TXSD Page 120 of 133
Case 1:12-cv-00128-RMC-DST-RLW Document 215-1 Filed 06/20/12 Page 34 of 231
House Elections Committee Hearing                                    February 28, 2007

56

1    covered by this.

2              REPRESENTATIVE BURNAM:  So there could

3    be --

4              REPRESENTATIVE ANCHIA:  A third.  There

5    could be a third.

6              REPRESENTATIVE BURNAM:  -- three in the

7    two year cycle.

8              REPRESENTATIVE ANCHIA:  That's correct,

9    sir.

10             REPRESENTATIVE BURNAM:  Thank you.

11             CHAIRMAN BERMAN:  We're going to change

12   the procedure just a little bit.  I'm going to call up

13   each of the authors of the bills on identification and

14   let them lay out their bills and then we'll hear

15   witnesses testifying on all three bills.  So, at first,

16   I will call -- call up House Bill 218 and call Chairman

17   Betty brown to lay out House Bill 218, and I'll call

18   Chairman Phil King to lay out House Bill 626 and then

19   Representative Riddle to lay out House Bill 101.  Betty,

20   it's good to have you.

21             REPRESENTATIVE BROWN:  Thank you,

22   Mr. Chairman.  Appreciate your giving me this

23   opportunity.  There's been so much said about voter

24   registration, and so I'll try to make this very brief

25   and not repeat anything else.  There are presently --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_007395

TX_00205066

USA_00022277

Case 2:13-cv-00193  Document 677-7  Filed on 11/11/14 in TXSD  Page 121 of 133
Case 1:12-cv-00128-RMC-DST-RLW  Document 215-1  Filed 06/20/12  Page 35 of 231
House Elections Committee Hearing                    February 28, 2007

57

1     there are -- There are no statutory standards to verify

2     the identity of individuals at the polling place when

3     they present a voter registration certificate.  HB218

4     modifies provisions requiring a voter to present proof

5     of identification when offering to vote.  The bill

6     requires that in offering to vote, a voter must present

7     either one form of photo identification or two different

8     forms of non-photo identification.  If the person fails

9     to meet these standards, they may still vote upon

10    completion of a provisional ballot affidavit.

11          HB218 adds proof of identification to the

12    existing qualifications required for our provisional

13    ballot to being accepted by the early voting ballot

14    board.  Voting is the most important right in America.

15    And as I have said before, I consider this a very

16    personal thing because I think when someone votes who's

17    not qualified and shouldn't be voting, it diminishes the

18    rights that the rest of us have and this great privilege

19    that we have to vote.

20          The government requires voters to register

21    before receiving a ballot, therefore, verifying the

22    information they provide on their registration

23    application is not a measure designed to prevent any

24    citizen from voting.  It is instead a measure designed

25    to keep illegal aliens, noncitizens and people otherwise



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8310

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_007396

TX_00205067

USA_00022278

House Elections Committee Hearing                    February 28, 2007

58

1    not qualified from voting and diluting the legitimate

2    votes cast by citizens.  So that pretty well covers what

3    my bill addresses.  I could go into a lot of instances

4    that I've seen happen at the polls because I've worked a

5    lot of elections myself, but I will save that for

6    another day.

7                    CHAIRMAN BERMAN:  I will allow members to

8    question.  Do you have a question?

9                    UNIDENTIFIED SPEAKER:  Yes.

10                    CHAIRMAN BERMAN:  Lon?

11                    REPRESENTATIVE BURNAM:  Thank you,

12    Chairman Brown, in your closing comments just then, you

13    mentioned a concern about illegal aliens and noncitizens

14    voting.  They can't register to vote at this, time can

15    they?

16                    REPRESENTATIVE BROWN:  All it takes to

17    register to vote if you are a noncitizen is to check a

18    box.  It presently is not -- there's no one verifying

19    that that person is a citizen.  There's a little box

20    that says check here if you're a citizen, and so that's

21    all it takes.  We know that this is happening, that

22    people are registering to vote because they're showing

23    up in the jury pools.  As people are called in, you

24    know, those people who are called in to serve on a jury

25    are taken from the registered voter list, right?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_007397

TX_00205068

USA_00022279

PL1165
9/2/2014
2:13-cv-000193

# SENATE JOURNAL

## EIGHTIETH LEGISLATURE — REGULAR SESSION

### AUSTIN, TEXAS

### PROCEEDINGS

### SIXTY-SECOND DAY
(Tuesday, May 15, 2007)

The Senate met at 11:25 a.m. pursuant to adjournment and was called to order by the President.

The roll was called and the following Senators were present: Averitt, Brimer, Carona, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hegar, Hinojosa, Jackson, Janek, Lucio, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Williams, Zaffirini.

The President announced that a quorum of the Senate was present.

The Reverend Neal Terwilliger, First Baptist Church, Taylor, offered the invocation as follows:

"Enter into His gates with thanksgiving and into His courts with praise: be thankful unto Him, and bless His name. For the Lord is good; His mercy is everlasting; and His truth endureth to all generations." (Psalms 100:4-5) Eternal God, we come before You today with praise and with thankful hearts. We ask Your hand of blessing to be upon this Senate today. May You give wisdom and guidance to all in attendance today, that they may continue to lead this great state to be a place of love, peace, and prosperity. Allow us to dwell together in unity and like-mindedness that Your favor may continue to shine upon us. May we bless You and not forget all Your benefits to us, Your children. Eternal Father, hear our prayers, we pray. Amen.

Senator Whitmire moved that the reading of the Journal of the proceedings of yesterday be dispensed with and the Journal be approved as printed.

The motion prevailed without objection.

### CO-AUTHOR OF SENATE BILL 961

On motion of Senator Shapleigh, Senator Zaffirini will be shown as Co-author of **SB 961**.

### CO-AUTHORS OF SENATE BILL 1292

On motion of Senator Nelson, Senators Carona, Estes, Harris, and Lucio will be shown as Co-authors of **SB 1292**.

JA_008318

EXHIBIT
RD-5

USA_00023200

Case 2:13-cv-00193 Document 677-7 Filed on 11/11/14 in TXSD Page 124 of 133
e 1:12-cv-00128-RMC-DSD-RLW Document 215-4 Filed 06/20/12 Page 37 of
2002 80th Legislature — Regular Session 62nd Day

### CO-AUTHOR OF SENATE BILL 1764

On motion of Senator Uresti, Senator Hinojosa will be shown as Co-author of **SB 1764**.

### CO-AUTHOR OF SENATE JOINT RESOLUTION 43

On motion of Senator Nelson, Senator Lucio will be shown as Co-author of **SJR 43**.

### CO-SPONSORS OF HOUSE BILL 14

On motion of Senator Nelson, Senators Ellis, Gallegos, Hinojosa, Shapleigh, Uresti, Van de Putte, Watson, West, Whitmire, and Zaffirini will be shown as Co-sponsors of **HB 14**.

### CO-SPONSOR OF HOUSE BILL 125

On motion of Senator Van de Putte, Senator Uresti will be shown as Co-sponsor of **HB 125**.

### CO-SPONSOR OF HOUSE BILL 1887

On motion of Senator Whitmire, Senator Patrick will be shown as Co-sponsor of **HB 1887**.

### CO-SPONSOR OF HOUSE BILL 3900

On motion of Senator Shapiro, Senator Van de Putte will be shown as Co-sponsor of **HB 3900**.

### CO-SPONSOR OF HOUSE BILL 3446

On motion of Senator Eltife, Senator Nelson will be shown as Co-sponsor of **HB 3446**.

### PHYSICIAN OF THE DAY

Senator Wentworth was recognized and presented Dr. Tamara Dominguez of San Antonio as the Physician of the Day.

The Senate welcomed Dr. Dominguez and thanked her for her participation in the Physician of the Day program sponsored by the Texas Academy of Family Physicians.

### MESSAGE FROM THE HOUSE

HOUSE CHAMBER
Austin, Texas
May 15, 2007

The Honorable President of the Senate
Senate Chamber
Austin, Texas

Mr. President:

I am directed by the House to inform the Senate that the House has taken the following action:

JA_008319

USA_00023201

Case 2:13-cv-00193 Document 677-7 Filed on 11/11/14 in TXSD Page 125 of 133
e 1:12-cv-00128-RMG-DST-RLW Document 215-4 Filed 06/20/12 Page 38 of
Tuesday, May 13, 2007      SENATE JOURNAL                    2003

THE HOUSE HAS PASSED THE FOLLOWING MEASURES:

**SCR 73,** Congratulating Eric R. Bittner for his selection as a 2007 Fellow by the John Simon Guggenheim Memorial Foundation.

**SJR 20,** Proposing a constitutional amendment providing for the issuance of additional general obligation bonds by the Texas Water Development Board to provide assistance to economically distressed areas.

THE HOUSE HAS CONCURRED IN SENATE AMENDMENTS TO THE FOLLOWING MEASURES:

**HB 421** (137 Yeas, 0 Nays, 2 Present, not voting)

**HB 716** (139 Yeas, 0 Nays, 2 Present, not voting)

**HB 2683** (130 Yeas, 11 Nays, 2 Present, not voting)

THE HOUSE HAS REFUSED TO CONCUR IN SENATE AMENDMENTS TO THE FOLLOWING MEASURES AND REQUESTS THE APPOINTMENT OF A CONFERENCE COMMITTEE TO ADJUST THE DIFFERENCES BETWEEN THE TWO HOUSES:

**HB 2261** (non-record vote)
House Conferees: Callegari - Chair/Aycock/Miles/O'Day/Taylor

Respectfully,

/s/Robert Haney, Chief Clerk
House of Representatives

### CONCLUSION OF MORNING CALL

The President at 11:30 a.m. announced the conclusion of morning call.

### COMMITTEE SUBSTITUTE
### HOUSE BILL 218 ON SECOND READING

Senator Fraser moved to suspend the regular order of business to take up for consideration **CSHB 218** at this time on its second reading:

**CSHB 218,** Relating to requiring a voter to present proof of identification.

The motion prevailed by the following vote: Yeas 19, Nays 9.

Yeas: Averitt, Brimer, Carona, Deuell, Duncan, Eltife, Estes, Fraser, Harris, Jackson, Janek, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Wentworth, Williams.

Nays: Ellis, Gallegos, Hinojosa, Lucio, Shapleigh, Van de Putte, Watson, West, Zaffirini.

Absent: Hegar, Uresti, Whitmire.

The bill was read second time.

### VERIFICATION OF VOTE

Senator Shapleigh called for a verification of the vote by which the regular order of business was suspended for **CSHB 218**.

JA_008320

PL1166
9/2/2014
2:13-cv-000193



# SENATE RULES

adopted by
## 81st LEGISLATURE
January 14, 2009

Senate Resolution No. 14



EXHIBIT
RD-7

USA_00025467

Rule 5.10

not required to permit consideration to continue when a Senate bill day arrives (73 S.J. Reg. 1082 (1993)).

## SPECIAL ORDERS

**Rule 5.11.**  (a)  Any bill, resolution, or other measure may on any day be made a special order for a future time of the session by an affirmative vote of two-thirds of the members present.

(b)  A special order shall be considered at the time for which it is set and considered from day to day until disposed of, unless at the time so fixed there is pending business under a special order, but such pending business may be suspended by a two-thirds vote of all the members present.  If a special order is not reached or considered at the time fixed, it shall not lose its place as a special order.  All special orders shall be subject to any Joint Rules and Rule 5.10.

(c)  Upon the affirmative vote of four-fifths of the members present, a special order may be reset to an earlier time than previously scheduled.

(d)  Notwithstanding Subsection (a) of this rule, a bill or resolution relating to voter identification requirements reported favorably from the Committee of the Whole Senate may be set as a special order for a time at least 24 hours after the motion is adopted by a majority of the members of the Senate.

### Editorial Notes

A bill once set as a special order does not lose its place on the calendar of special orders if not taken up at the hour for which it is set.

A special order, the hour for the consideration of which has arrived, takes precedence of the unfinished business unless the unfinished business is itself a special order.

### Notes of Rulings

A bill being considered as a special order that is laid on the table subject to call is no longer a special order (43 S.J. Reg. 980 (1933)).

Refusal of Senate to set bill as special order for a certain hour does not prevent a motion being made and adopted

24

PL1167
9/2/2014
2:13-cv-000193



EXHIBIT
PENGAD 800-631-6989
16 8

# SENATE JOURNAL

### EIGHTY-FIRST LEGISLATURE — REGULAR SESSION

#### AUSTIN, TEXAS

##### PROCEEDINGS

##### SECOND DAY
(Wednesday, January 14, 2009)

The Senate met at 11:00 a.m. pursuant to adjournment and was called to order by the President.

The roll was called and the following Senators were present: Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hegar, Hinojosa, Huffman, Jackson, Lucio, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Williams, Zaffirini.

The President announced that a quorum of the Senate was present.

Rabbi Alan Freedman, Temple Beth Shalom, Austin, offered the invocation as follows:

Almighty God, prosper the work of our hands. Although this session has just begun, we recognize the immense importance and complexity of the work that lies before this body in the few short weeks that lie ahead. There is so much work to be done for the people of Texas and so little time to accomplish it. Therefore, help us to take into our hearts the prayer contained in Psalm 90 in which we ask You, Holy One, to teach us to number our days that we might obtain a heart of wisdom. May the Members of this body, indeed, be inspired by You to govern with wise hearts and thereby make each day count in the service of the people of this great state. For when we do so, our work in this Chamber shall surely be worthy of Your blessing. Thus, will the final words of Psalm 90 be fulfilled: May the favor of the Lord, our God, be upon us; let the work of our hands prosper, O prosper the work of our hands. And let us say: Amen.

Senator Whitmire moved that the reading of the Journal of the proceedings of yesterday be dispensed with and the Journal be approved as printed.

The motion prevailed without objection.

##### MESSAGE FROM THE HOUSE

HOUSE CHAMBER
Austin, Texas
January 14, 2009

The Honorable President of the Senate
Senate Chamber
Austin, Texas



EXHIBIT
tabbies
RD-8

USA_00027618

RESOLVED, That a copy of this Resolution be prepared for the citizens of Andrews as an expression of esteem from the Texas Senate.

SR 8 was read and was adopted without objection.

## GUESTS PRESENTED

Senator Seliger was recognized and introduced to the Senate a delegation of citizens from the City of Andrews.

The Senate welcomed its guests.

## RECESS

On motion of Senator Whitmire, the Senate at 11:07 a.m. recessed until 12:00 noon today.

## AFTER RECESS

The Senate met at 12:33 p.m. and was called to order by the President.

## SENATE RESOLUTION 14

Senator Williams offered the following resolution:

BE IT RESOLVED by the Senate of the State of Texas, That the Rules of the Senate of the 80th Legislature are adopted as the Permanent Rules of the Senate of the 81st Legislature with the following modifications:

1. Amend Rule 5.11 to read as follows:

## SPECIAL ORDERS

Rule 5.11. (a) Any bill, resolution, or other measure may on any day be made a special order for a future time of the session by an affirmative vote of two-thirds of the members present.

(b) A special order shall be considered at the time for which it is set and considered from day to day until disposed of, unless at the time so fixed there is pending business under a special order, but such pending business may be suspended by a two-thirds vote of all the members present. If a special order is not reached or considered at the time fixed, it shall not lose its place as a special order. All special orders shall be subject to any Joint Rules and Rule 5.10.

(c) Upon the affirmative vote of four-fifths of the members present, a special order may be reset to an earlier time than previously scheduled.

(d) Notwithstanding subsection (a), a bill or resolution relating to voter identification requirements reported favorably from the Committee of the Whole Senate may be set as a special order for a time at least 24 hours after the motion is adopted by a majority of the members of the Senate.

2. Amend Rule 6.15 to read as follows:

## WHEN RECORD VOTE REQUIRED; CALLS FOR YEAS AND NAYS [REQUIRED]

Rule 6.15. (a)(1) A vote on [Upon the] final passage of a bill, a resolution proposing or ratifying a constitutional amendment, or a resolution other than a resolution of a purely ceremonial or honorary nature shall be by record vote, with the vote of each member entered in the journal.

TX_0000890

(2) A vote on [all amendments proposed to the Constitution, all bills appropriating money or lands for any purpose, all bills containing an immediate effect clause,] all motions to suspend the constitutional three-day rule, [and] all questions requiring a vote of two-thirds of the members elected, all motions on whether to concur in House amendments to Senate bills, and all motions on whether to adopt a conference committee report shall be by record vote, with the vote of each member [the presiding officer shall call for the yeas and nays, and they shall be] entered in the journal.

(3) Upon all other questions requiring a vote of two-thirds of the members present, including a motion to suspend the rules, the presiding officer shall determine if there is objection and, if so, call for the yeas and nays, but they shall not be entered into the journal unless required under Subsection (b) of this rule. If no objection is made, the journal entry shall reflect a unanimous consent vote of the members present without necessity of a roll call of yeas and nays.

(b) On any other question, at [At] the desire of any three members present, the yeas and nays shall be entered on the journal, and the names of the members present and not voting shall be recorded immediately after those voting in the affirmative and negative, and such members shall be counted in determining the presence of a quorum. (Constitution, Article III, Section 12)

(c)(1) Any nonprocedural motion adopted by voice vote, without objection, or with unanimous consent shall be reflected in the journal by showing members present as "yea", unless a member registers otherwise with the Secretary of the Senate.

(2) The following statement shall be entered in the journal after each vote taken as provided in Subdivision (1) of this subsection:

"All members are deemed to have voted 'Yea' except as follows:

Nays:

PNV:

Absent-Excused:

Absent:"

(d) A member must be on the floor of the Senate or in an adjacent room or hallway on the same level as the Senate floor or gallery in order to vote; but a member who is out of the Senate when a record vote is taken and who wishes to be recorded shall be permitted to do so provided:

(1) the member was out of the Senate temporarily, having been recorded earlier as present;

(2) the vote is submitted to the Secretary of the Senate prior to adjournment or recess to another calendar day; and

(3) the recording of the member's vote does not change the result as announced by the chair.

(e) Once begun, a roll call may not be interrupted for any reason.

3. Amend Rule 16.07 as follows:

MATTERS REQUIRING VOTE OF MAJORITY
OF MEMBERS OF SENATE

Rule 16.07. A vote of the majority of the members of the Senate is required to:

(1) pass a resolution initially adopting temporary or permanent rules of the Senate; Rule 21.01

TX_0000890

USA_00027621

(2) adopt, amend, or rescind any Joint Rules of the two Houses; Rules 21.02 and 22.02

(3) adopt resolution to suspend conference committee rules; Rule 12.08

(4) commit or recommit bill, resolution, or petition to a committee; Rule 6.08

(5) hold an executive session; Rule 15.02

(6) pass a resolution amending the Rules of the Senate.

(7) set voter identification requirement bills for special order; Rule 5.11(d)

SR 14 was read.

### POINT OF ORDER

Senator Shapleigh raised a point of order against further consideration of SR 14 in that the resolution should be referred to committee.

### POINT OF ORDER RULING

The President stated that the point of order was respectfully overruled.

### PERSONAL PRIVILEGE STATEMENT

Senator Van de Putte was recognized to speak on a matter of personal privilege.

#### (Senator Duncan in Chair)

#### (President in Chair)

Senator Ellis offered the following amendment to the resolution:

**Floor Amendment No. 1**

Amend SR 14 as follows:

(1) On page 2, line 1, strike "voter identification requirements", and add the following: "protecting families through insurance rate regulation and foreclosure prevention"

(2) On page 5, line 1, strike "voter identification requirements", and add the following: "protecting families through insurance rate regulation and foreclosure prevention"

The amendment to SR 14 was read.

On motion of Senator Williams, Floor Amendment No. 1 was tabled by the following vote: Yeas 19, Nays 12.

Yeas: Averitt, Carona, Deuell, Duncan, Eltife, Estes, Fraser, Harris, Hegar, Huffman, Jackson, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Wentworth, Williams.

Nays: Davis, Ellis, Gallegos, Hinojosa, Lucio, Shapleigh, Uresti, Van de Putte, Watson, West, Whitmire, Zaffirini.

Senator Uresti offered the following amendment to the resolution:

**Floor Amendment No. 2**

Amend SR 14 as follows:

(1) On page 2, amend modification 1, after "voter identification requirements", by inserting the following: "or increasing veterans' benefits"

TX_0000891

USA_00027622

PL1168
9/2/2014
2:13-cv-000193



△ π EXHIBIT 24
Deponent D
6-7-12
Date_____ Rptr_____
WWW.DEPOBOOK.COM

EXHIBIT
RD-9

# The Senate of The State of Texas

## Senator Leticia Van de Putte, R. Ph.
### District 26

Date:        March 3, 2009
To:          Chairman Duncan
From:        Leticia Van de Putte
Subject:     Ground Rules, Committee-of-the-Whole Public Hearing

Thank you for being open to discussing our serious concerns regarding this legislation, and the process by which it will be considered. The Senate Democrats have remaining concerns regarding the process moving forward:

1. We would request more time to prepare for the Committee-of-the-Whole hearing. In fact, we have at least one expert witness who because of a scheduling conflict will not be able to attend on March 10. Further, we renew our protest that the Texas Senate has no business taking voter identification legislation prior to addressing issues of broad importance to Texans.

2. We would request additional slots for invited testimony. What has been discussed is "3 or 4" from each side. We would request at least 8 from each side. Before asking Texas voters to go to considerable additional bureaucratic burden to exercise a fundamental right, the Texas Senate should be absolutely clear that there is an identifiable and measurable problem in need of a legislative solution, the perils involved with the legislative reactions currently proposed, and detailed analysis on the effects on minority voters protected under the Voting Rights Act. These crucial issues could be more completely addressed with expanded panels of expert witnesses.

3. We request that the Senate provide qualified legal representation to the Democrats, much as might happen during a debate over redistricting legislation in which myriad Constitutional issues are present.

4. We request that a stenographer be provided to record all proceedings of the Committee-of-the-Whole testimony and deliberations, and the subsequent deliberations of the Texas Senate on this legislation. The necessary pre-clearance requirements with the U.S. Department of Justice, and the likelihood of litigation resulting from this legislation makes this request prudent.

5. We request that the Texas Attorney General make himself available as a resource witness during the deliberations of the Committee-of-the-Whole. Many claims of "voter fraud" have been made in the course of the public debate in this and previous legislative

700 N. St. Mary's St., Suite 1725
San Antonio, Texas 78205
210-733-6604
210-733-6605 Fax

P.O. Box 12068
Austin, Texas 78711
512-463-0126
Fax 512-463-2114
1-888-279-0648
Dial 711 For Relay Calls

E-MAIL: leticia.vandeputte@senate.state.tx.us
TX_00001678

Committees: Veteran Affairs and Military Installations, Chair
Business & Commerce • Education • State Affairs

Ex 1 A

USA_00033763

sessions.  Since the Attorney General's office has spent considerable tax dollars investigating the extent of this problem, his testimony is relevant to deliberations on this legislation.

Thank you in advance for addressing these concerns. As always, please feel free to call me at any time to discuss these or any other concerns.

USA_00033764